ACCEPTED
15-25-00124-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/18/2025 2:35 PM
CHRISTOPHER A. PRINE
CLERK

Case No. 15-25-00124-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/18/2025 2:35:47 PM
CHRISTOPHER A. PRINE
Clerk

Court of Appeals of Texas
Fifteenth District

**Brian Beckcom**
*Appellant*

v.

**Texas A&M University**
*Appellee*

On Appeal from a Dismissal of a Petition for Writ of Mandamus
85th District Court; Bryan County, Texas
Cause No. 24-003177-CV-85
Hon. Kyle Hawthorne, Presiding

**Appellant's Appendix**

Matthew J. Kita
Texas Bar No. 24050883
3110 Webb Avenue, Suite 150
Dallas, Texas 75205
(214) 699-1863
matt@mattkita.com

Counsel for Appellant

- 1 -

# Table of Contents

| Document | Page |
|---|---|
| Plaintiff's Amended Petition for Writ of Mandamus (3/3/25) | 4 |
| Agreed Order Consolidating Cases (3/6/25) | 16 |
| Defendant's First Amended Plea to the Jurisdiction (2/19/25) (filed in Cause No. 24-3358-CV-28, consolidated via order above) | 19 |
| Defendant's First Supplemental Plea to the Jurisdiction (3/21/25) | 576 |
| Plaintiff's Response to Defendant's Plea to the Jurisdiction (4/15/25) | 2788 |
| Court's Letter Ruling (4/24/25) | 2796 |
| Order Denying Plea and Dismissing Petition (5/12/25) | 2797 |
| Plaintiff's Request for Findings of Fact and Conclusions of Law (6/2/25) | 2798 |
| Defendant's Objections to Plaintiff's Request (6/4/25) | 2800 |
| Plaintiff's Response to Defendant's Objections (6/6/25) | 2806 |
| Plaintiff's Proposed Findings and Conclusions (6/6/25) | 2810 |
| Plaintiff's Proposed Order Overruling Defendant's Objections (6/6/25) | 2815 |
| Plaintiff's Proposed Order Vacating May 12, 2025 Order (6/6/25) | 2816 |
| Defendant's Proposed Findings and Conclusions (6/6/25) | 2817 |
| Defendant's Objections to Plaintiff's Proposed Order (6/9/25) | 2822 |
| Plaintiff's Motion for New Trial (6/10/25) | 2826 |

Order Sustaining Defendant's Objections to Plaintiff's Request (6/16/25)     2828

Plaintiff's Notice of Past Due Findings and Conclusions (6/23/25)     2830

Plaintiff's Designation of Reporter's Record (6/30/25)     2832

Plaintiff's Notice of Appeal (6/30/25)     2834

Plaintiff's Notice of Appendix in Lieu of Clerk's Record (6/30/25)     2836

District Court's Docket Sheet     2839

**Received & Filed 3/3/2025 12:18 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Emily Velasquez
Envelope# - 97984983**

Cause No.24-003177-CV-85

| Brian Beckcom | ) | In the District Court of |
| | ) | |
| vs. | ) | Brazos County, Texas |
| | ) | |
| Texas A&M University | ) | 85th Judicial District |

**Amended Petition for Writ of Mandamus**

*"The purpose of the Texas Public Information Act is to ensure transparency in government so that the public can retain control over the government they created."[1]*

The Texas Public Information Act ("TPIA") mandates openness, emphasizing that governmental bodies exist to serve the people, not to withhold information from them. By requiring liberal construction in favor of disclosure, the Texas Legislature intended to empower citizens to fully monitor the official acts of public officials and institutions. Thus, when governmental entities withhold public records, they undermine the very foundation of public accountability that the Act was created to protect.

TAMU is withholding hundreds of pages of documents in this case, claiming a variety of inapplicable privileges and questionable exceptions. Petitioner requests that this Court require TAMU to respond to two particular requests: (1) documents related to a March 2024 investigation into Squadron 17 of the Corps of Cadets; and (2) a "compilation" of DEI documents, and any other documents that exist and have not been produced, related to former

---

[1] *City of Dallas v. Abbott*, 304 S.W.3d 380, 385 (Tex. 2010).

Commandant Patrick Michaelis' plan to completely restructure the Corps of Cadets freshman experience (or "fish brigade").[2]

## 1. Discovery Control Plan

1.1     Petitioner requests expedited relief under Level 1 of the Texas Rules of Civil Procedure. At this time, Petitioner requests non-monetary relief only, except for attorney fees and court costs, the amount of which will not exceed $100,000.

## 2. Claim for Relief

2.1     Petitioner seeks only non-monetary relief and attorney's fees and court costs necessary for the prosecution of this writ and subsequent discovery.

## 3. Parties

3.1     Petitioner Brian Beckcom is an attorney whose address is 1220 Augusta, Suite 240, Houston, Texas 77057.

3.2.     Respondent Texas A&M University is a public university that can be served through its Office of General Counsel at  Moore / Connally Building, 6th Floor, 301 Tarrow Street, College Station, Texas  77840-7896

## 4. Jurisdiction, Venue, and Conditions Precedent

4.1     This Court has jurisdiction under Texas Government Code § 552.321. Venue is mandatory in Brazos County under Texas Government Code § 552.321(b).

4.2     All conditions precedent have been performed or have occurred.

## 5. Facts

---

[2] Michaelis has since been relieved of his duties by the Texas A&M Board of Regents in August 2024, in part for his insistence on moving forward with the proposed restructure.

**5.1     Petitioner Brian Beckcom sent requests for production under the TPIA that have not been fully responded to.**

5.1.1 The TPIA expressly prohibits governmental bodies from refusing to produce documents based on the status of the requester, and yet, TAMU is doing exactly that in this case.

5.1.2.  On March 28, 2024, Petitioner Brian Beckcom sent a request for documents related to several investigations into Corps of Cadets.[3] TAMU refused to produce any documents related to one particular outfit—Squadron 17–yet produced documents related to other outfits, with appropriate private information redacted, TAMU claimed that because Mr. Beckcom is a parent of one of the students in the outfit, Mr. Beckcom was prohibited from seeing documents related to his son's outfit.

TAMU's legal position is incorrect based on black letter law. In fact, the TPIA expressly prohibits governmental entities from discriminating based on the stats of the requestor.[4]

Further, and strangely, TAMU produced documents related to a different investigation of the same outfit and has produced documents related to investigations of several other Corps units. It is only this one particular investigation, of this one particular outfit, that TAMU seeks to withhold.[5]

5.1.3 TAMU is also withholding many documents related to the former Commandant's plans to radically restructure the Corps based on DEI principles. On February 26, 2024, Petitioner

---

[3] Exhibit A, March Corps of Cadets Document Request.

[4] Tex. Gov't Code 552.223 "The officer for public information or the officer's agent shall treat all requests for information uniformly without regard to the position or occupation of the requestor, the person on whose behalf the request is made, or the status of the individual as a member of the media"

[5] Of note, all Corps members were cleared of any alleged wrongdoing.

Brian Beckcom sent a request for documents related to the Corps of Cadets freshman experience. TAMU stated that a "compilation of DEI documents" responsive to the request was withheld. It is still being withheld, along with the planning documents and other documents related to the former Commandant's plans to restructure the Corps of Cadets[6]

6.      **Violation of the Texas Public Information Act**

6.1     The TPIA requires that public information be produced "promptly."[7] The Texas Supreme Court has emphasized that the TPIA's prompt production requirement is a key part of its purpose to promote government transparency.[8]   TAMU's failure to provide the requested information and perform an adequate search is a clear violation of the TPIA's unambiguous mandate.

7.      **Request for Relief**

        Petitioner requests that the Court order TAMU to produce the requested documents and information or perform an *in-camera* review of the materials to determine the applicability of the alleged privileges. Petitioner Beckcom further requests costs and fees as allowed by law.


                                          Respectfully submitted,

                                          **VB Attorneys**

                                          /s/ Brian Beckcom
                                          _____

                                          **Brian Beckcom**
                                          SBN:  24012268
                                          1220 Augusta, Suite 240
                                          Houston, Texas 77057

---

[6] Exhibit B, Fish Brigade Request.
[7] *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 243-44 (Tex. App.—Austin 2016, no pet.).
[8] *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011).

713/224-7800 (Office)
713/224-7801 (Facsimile)
Certificate of Service

On the 3rd day of March a true and correct copy of the foregoing was forwarded to all counsel of record.

/s/Brian Beckcom

_____

Brian Beckcom

# EXHIBIT A





March 28, 2024

Texas A&M University by email to: open-records@tamu.edu
Office of Open Records
750 Agronomy Road
Mail Stop 1280
College Station, Texas 77843

To Whom It May Concern:

Pursuant to Section 552.001, *et seq.,* of the Texas Open Records Act, Public Records Information, please produce the following documents:

- All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation

- All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A&M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same

- Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.

- Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same.

I agree to pay reasonable fees for the processing of this request.

As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information.

Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.

Sincerely,

/s/ Brian Beckcom
Brian Beckom
Brian@vbattorneys.com

# EXHIBIT B



Brian Beckcom
Board Certified in Personal Injury Trial Law
Texas Board of Legal Specialization

6363 Woodway Drive
Suite 400
Houston, Texas 77057

Tel (713) 224-7800
Fax (713) 224-7801

www.VBAttorneys.com

February 26, 2024

Texas A&M University by email to: open-records@tamu.edu
Office of Open Records
750 Agronomy Road
Mail Stop 1280
College Station, Texas 77843

To Whom It May Concern:

Pursuant to Section 552.001, *et seq.,* of the Texas Open Records Act, Public Records Information, please produce the following documents:

- All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

- All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

- All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

- Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

- Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

- Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes would potentially impact Texas A&M or the Corps of Cadets from a DEI perspective.

I agree to pay reasonable fees for the processing of this request.

As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.

Sincerely,

/s/ Brian Beckcom
Brian Beckom
Brian@vbattorneys.com

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michael Granado on behalf of Brian Beckcom
Bar No. 24012268
Michael@vbattorneys.com
Envelope ID: 97984983
Filing Code Description: Amended Filing
Filing Description: Amended Petition For Writ of Mandamus
Status as of 3/3/2025 4:07 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 3/3/2025 12:18:04 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 3/3/2025 12:18:04 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 3/3/2025 12:18:04 PM | SENT |
| Michael  Granado | | michael@vbattorneys.com | 3/3/2025 12:18:04 PM | SENT |
| Hunter Shurtleff | | hunter@shurtlefflaw.com | 3/3/2025 12:18:04 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 3/3/2025 12:18:04 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 3/3/2025 12:18:04 PM | SENT |

Received & Filed 3/6/2025 11:36 AM
Gabriel Garcia, District Clerk
Brazos County, Texas
Kristin Emert
Envelope# - 98142714

CAUSE NO. 24-003358-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## AGREED ORDER GRANTING DEFENDANT'S MOTION TO CONSOLIDATE

Came to be considered Defendant Texas A&M University's Motion to Consolidate. Based on agreement of the parties, the motion is **GRANTED**.

ACCORDINGLY, it is **ORDERED** that the two following cases are **CONSOLIDATED** into one action:

1. *Brian Beckcom v. Texas A&M University*, in the 85th Judicial District of Brazos County, Texas, Case No. 2024-003177-CV-85

2. *Brian Beckcom v. Texas A&M University*, in the 85th Judicial District of Brazos County, Texas, Case No. 2024-003358-CV-85.

It is **ORDERED** that the cause number for the two consolidated cases identified above shall be No. 2024-003177-CV-85.

SIGNED this the _____ day of _____ 3/6/2025 _____ 2025.

_____
JUDGE PRESIDING

- 16 -

**AGREED:**

/s/ Brendan Fradkin  *signed w/ permission
Brendan Fradkin
Texas Bar No. 24097706
VB Attorneys
1220 Augusta, Suite 240
Houston, TX 77057
brendan@vbattorneys.com
**Counsel for Plaintiff**


/s/ Jason T. Contreras
Jason T. Contreras
Assistant Attorney General
Texas Bar No. 24032093
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
Jason.Contreras@oag.texas.gov
**Counsel for Defendant**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 98142714
Filing Code Description: Proposed Order
Filing Description: AGREED ORDER GRANTING DEFENDANT'S MOTION TO CONSOLIDATE
Status as of 3/6/2025 3:15 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 3/6/2025 11:36:00 AM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 3/6/2025 11:36:00 AM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 3/6/2025 11:36:00 AM | SENT |
| Michael  Granado | | michael@vbattorneys.com | 3/6/2025 11:36:00 AM | SENT |
| Hunter Shurtleff | | hunter@shurtlefflaw.com | 3/6/2025 11:36:00 AM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 3/6/2025 11:36:00 AM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 3/6/2025 11:36:00 AM | SENT |

| | | |
|---|---|---|
| BRIAN BECKOM[1], | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## <u>DEFENDANT'S FIRST AMENDED PLEA TO THE JURISDICTION</u>

Defendant Texas A&M University ("TAMU") files this First Amended Plea to the Jurisdiction because it met its obligations under the Texas Public Information Act ("TPIA") to produce information responsive to Plaintiff's TPIA request in issue. TAMU also properly withheld documents as expressly permitted by the TPIA and controlling law.

Plaintiff also lacks standing because there was no violation of the TPIA that can be redressed by way of this lawsuit. There is no live justiciable controversy or dispute to resolve. Even if a controversy ever existed, which TAMU disputes, it is now moot. Thus, there has been no violation of the TPIA. Plaintiff is not entitled to any relief whatsoever and all TPIA claims should be dismissed with prejudice.

In support, TAMU respectfully offers the following for consideration by the Court:

---

[1] Plaintiff is not a TAMU student.

## I.    PLAINTIFF'S LITIGATION HISTORY AGAINST TAMU

To date, Plaintiff has filed a total of four actions against TAMU complaining of the same or substantially-related TPIA matters, as follows:

**1. Beckcom 1 – Plaintiff without explanation voluntarily non-suits case two days before the hearing**

On March 28, 2024, Plaintiff filed an action styled as follows: *Brian Beckcom v. Texas A&M University*, in the 85th Judicial District of Brazos County, Texas, Case No. 24-000902-CV-85 ("Beckcom 1"). See **Exhibit 1**. This was a suit for writ of mandamus under the Texas Public Information Act ("TPIA"). TEX. GOV'T CODE § 552.321. Plaintiff claimed that TAMU failed to produce "full and complete responsive documents" and further "has refused to produce all of the requested public information" in violation of the TPIA. **Exhibit 1** at ¶¶ 3.1, 5.2. TAMU timely filed an answer denying the allegations and asserted affirmative defenses.

On May 10, 2024, Plaintiff filed an amended petition for writ of mandamus and, on June 26, 2024, a second amended petition and request for declaratory relief. **Exhibit 2**; **Exhibit 3**. Plaintiff complained of the five following TPIA requests:

1. First request – J000762 – Office of the Commandant docs;
2. Second request – J000767 – Commandant Patrick Michaelis docs;
3. Third request – J001123 – Hiring of the Commandant docs;
4. Fourth request – J0001147 – the Squadron 17 Investigation docs;
5. Fifth request – J001320 – the DEI docs;
6. Sixth request – J001365 – Audio/video of candidates Commandant selection process; and
7. Seventh request – J0001723 – Bathroom renovation docs.

**Exhibit 3** at pgs. 2-7.

He further complained that TAMU's hazing investigation of Squadron 17 of the Corps of Cadets was improper. **Exhibit 3** at pgs. 4-5.

Without conferring with defense counsel, Plaintiff unilaterally set a hearing on August 9, 2024 (i.e., a date picked by Plaintiff) on the mandamus action as well as a baseless Motion for Sanctions[2] against TAMU. Although having previously filed a Plea to the Jurisdiction, Plaintiff's repeated amended petitions added more claims which necessitated the filing of a First Amended Plea to the Jurisdiction by TAMU. Within a few hours of this filing by TAMU setting it *on the same date and time selected by Plaintiff* – August 9, 2024 – his counsel contacted the undersigned defense counsel suddenly claiming a "scheduling conflict" and requested that TAMU agree to pass on the August 9th hearing date. TAMU declined to do so. On August 7, 2024, two days before the hearing, and without any explanation whatsoever, Plaintiff voluntarily non-suited the case. **Exhibit 4**.

2. **Beckcom 2 – Plaintiff gives TAMU 10 minutes notice of a hearing filed in the wrong venue then non-suits again**

On November 1, 2024 at 2:50pm, Plaintiff's counsel through his legal assistant directly emailed Ray Bonilla, General Counsel for the Texas A&M University System, transmitting to him four filings, namely:

1. Plaintiff's Motion for a Temporary Restraining Order;
2. Affidavit of Brian Beckcom;
3. A proposed order on the motion; and
4. A notice of hearing on the TRO set for November 1, 2024, at 3pm.

---

[2] Plaintiff's Motion for Sanctions was filed for improper, bad faith purposes thus the reason why he never pursued it any further.

These were not filings in the **Beckom 1** matter but rather in a new matter *filed in Houston* styled as follows: *Brian Beckcom v. Texas A&M University*, In the 281st Judicial District of Harris County, Texas, Case No. 2024-76697 ("Beckcom 2"). **Exhibit 5**. Plaintiff's TRO Motion involved the same TPIA matters raised in **Beckcom 1** and further requested that TAMU be ordered to halt an investigation into the Corps of Cadets. **Exhibit 6**.

Opposing counsel also informed General Counsel Bonilla there was "an emergency hearing today *at 3pm*." **Exhibit 5** (emphasis added). Thus, while Plaintiff was sitting in the courthouse in Houston ready to go on TRO motion, he failed to properly serve TAMU with process of the motion and gave Bonilla *ten minutes notice of the hearing.*

Plaintiff's counsel did not copy the undersigned defense counsel on the email to Bonilla despite being well-aware that said counsel was representing TAMU in **Beckcom 1**, a substantially-related matter. When told to cease and desist from contacting TAMU directly, Plaintiff's counsel Brendan Fradkin responded as follows:

> *"What are you talking about? I'm on vacation and certainly haven't contacted anyone directly."*

**Exhibit 6**.

Finding out after the fact, the Harris County judge did not permit Plaintiff to proceed on the TRO motion on Friday, November 1, 2024 due to improper service. Defense counsel was then informed by the court that same afternoon that Plaintiff re-set the hearing the following Monday, November 4th at 10am. When defense counsel landed in Houston that morning for the hearing, he was informed that

Plaintiff's counsel emailed General Counsel Bonilla around 8am that morning telling him that Plaintiff was passing on the 10 am hearing. *Id.* Plaintiff's counsel provided no explanation for passing on their own hearing *that they set*. *Id.*

TAMU promptly filed a Motion to Transfer Venue based on a Mandatory Venue Statute and set it for hearing on December 20, 2024. Plaintiff responded by filing a Notice of Nonsuit on December 2, 2024. **Exhibit 7**. It was plainly evident **Beckcom 2** was filed solely for purposes of harassment.

### 3. Beckcom 3 – improper piecemeal litigation

On October 24, 2024, Plaintiff filed yet another action styled as follows: *Brian Beckcom v. Texas A&M University*, in the 85th Judicial District of Brazos County, Texas, Case No. 2024-003177-CV-85. **Exhibit 8**. This is another suit for writ of mandamus under the TPIA. Plaintiff alleges that TAMU failed to produce documents in response to a TPIA request and requests an order that (1) prohibits TAMU from destroying documents and (2) prohibits TAMU from proceeding with an internal investigation. *Id.* at pg. 1. The underlying TPIA request (#J3445-101024) was made on October 10, 2024 seeking additional information regarding the investigation into Squadron 17 of TAMU's Corps of Cadets "in order to analyze claims and potential litigation against the conspirators." *Id.* at pgs. 3-5. He further alleges that TAMU is violating the 4th and 14th Amendment rights of its students[3] in connection with the investigation. *Id.* at pg. 6. He further claims that information should be provided to the public to determine if the investigation is in compliance with "due process." *Id.*

---

[3] Plaintiff is not a TAMU student.

On January 13, 2024, TAMU timely filed an answer denying the allegations and asserted several affirmative defenses.

### 4. Beckcom 4 – improper piecemeal litigation – the instant lawsuit

On November 12, 2024, Plaintiff filed a new action styled as follows: *Brian Beckcom v. Texas A&M University*, in the 85th Judicial District of Brazos County, Texas, Case No. 2024-003358-CV-85 ("Beckcom 4"). **Exhibit 9**. This is yet another suit for writ of mandamus under the TPIA and *is the instant lawsuit as referenced above*. He complains that TAMU failed to produce documents in response to a TPIA request and further complains of an investigation into Squadron 17 of the Corps of Cadets. *Id.* at pgs. 1-4. The TPIA request in issue was made on March 28, 2024, which was the same request raised in **Beckcom 1**, namely J0001147 – the Squadron 17 Investigation documents.

On December 27, 2024, TAMU timely filed an answer denying the allegations and asserted several affirmative defenses. On January 17, 2025, TAMU filed a Plea to the Jurisdiction since Plaintiff's mandamus action is without merit, frivolous and brought solely for purposes of harassment. TAMU now files this First Amended Plea to the Jurisdiction. Plaintiff's claims are without merit and should be dismissed with prejudice.

## II. INCORPORATION OF EVIDENCE

In filing this plea, TAMU attaches the following affidavits, documents, statements, materials, and other evidence to establish, as evidence in support

thereto, and all such evidence is fully incorporated and adopted herein by reference

for all purposes:

**Exhibit 1:** Plaintiff's Original Petition for Writ of Mandamus
**Exhibit 2:** Plaintiff's First Amended Petition for Writ of Mandamus
**Exhibit 3:** Plaintiff's Second Amended Petition for Writ of Mandamus
**Exhibit 4:** Plaintiff's Notice of Non-suit
**Exhibit 5:** Plaintiff's email to Ray Bonilla
**Exhibit 6:** Emails from Plaintiff's counsel
**Exhibit 7:** Plaintiff's Notice of Non-suit
**Exhibit 8:** Plaintiff's Petition for Writ of Mandamus
**Exhibit 9:** Plaintiff's Petition for Writ of Mandamus
**Exhibit 10:** Business Records Affidavit, Patricia Bledsoe
**Exhibit 11:** TAMU System policy 61.01, Public Information Act Compliance[4]
**Exhibit 12:** TAMU System regulation, 61.01.02, Public Information
**Exhibit 13:** Plaintiff's TPIA request w/ history – J001147
**Exhibit 14:** J1147 production part one (292 pgs)
**Exhibit 15:** J1147 production part two (13 pgs)
**Exhibit 16:** J1147 production June 13, 2024 (108 pgs)
**Exhibit 17:** TAMU Student Code of Conduct

## III.  STATEMENT OF FACTS

### A.  TAMU's Office of Open Records

TAMU's Office of Open Records (ORO) is dedicated to the principles of open

government and strives to ensure compliance with the TPIA. **Exhibit 10** at ¶ 5.

TAMU maintains policies regarding TPIA compliance and the establishment of

baseline procedures to help members of the TAMU System comply with it. **Exhibit

11**; **Exhibit 12**.

TAMU's ORO oversees the collection process of information requested under

the TPIA. *Id.* The actual collection is done by the department maintaining the

---

[4] TAMU system policies and regulations identified as **Exhibit 24** and **Exhibit 25**
may be found online accessible to the public at https://orec.tamu.edu/open-records/.

information or, in the case of emails, IT for that group. **Exhibit 10** at ¶ 5. The ORO reviews, processes and releases information gathered by the respective department and/or IT. *Id*. The ORO confirms the applicability of exceptions to disclosure on information requested under the TPIA with the Office of General Counsel of The Texas A&M University System (TAMUS OGC). *Id*. For information determined to be excepted, TAMU's ORO works with TAMUS OGC to: request a decision from the Office of the Attorney General; confirm the applicability of a prior open records decision from the Office of the Attorney General; confirm TAMU's authority to redact or withhold excepted information without seeking a decision from the Office of the Attorney General per the TPIA; and/or confirm the applicability of the requestor's authorization to redact or withhold excepted information without seeking a decision from the Office of the Attorney General. *Id*. The ORO redacts and/or withholds information requested under TPIA only when: authorized by the Office of the Attorney General in a decision/letter ruling; the information is subject to a prior decision of the Office of the Attorney General; the TPIA authorizes the action; and/or authorized by the requestor. *Id*.

## B. Plaintiff's TPIA Request in Issue – J1147 - the Squadron 17 investigation documents

On March 28, 2024, Plaintiff made a request for the following four (4) categories of documents:

- All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or

from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation;

- All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A&M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same;
- Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere; and
- Any texts, emails or other forms of communication, digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same.

**Exhibit 13**.

The same day the request was made, the ORO responded and assigned a reference number to the request. *Id*. at p. 17. Plaintiff agreed to both the redaction of information subject to mandatory exceptions and to the redaction of information subject to discretionary exceptions. *Id*. at p. 3.

On April 1, 2024, the ORO requested clarification of the request. *Id*. at pgs. 15-16. The clarification requested was to provide a date range to better assist Plaintiff with his request. *Id*. at p. 13. Shortly thereafter, Plaintiff responded that "[t]his is

another form response" and provided the date range of 2023 and 2024. *Id*. at p. 13. On May 2, 2024, the ORO informed Plaintiff that his request was still being processed and that responsive documents will be produced by May 8, 2024. *Id*. at p. 9. TAMU produced the responsive documents on May 8, 2024, subject to redactions and/or withheld information under the TPIA. **Exhibit 13** at pgs. 5-6; **Exhibit 14** (292 pages produced); **Exhibit 15** (13 pages produced).

**C.  TAMU Produces Additional Documents regarding the Squadron 17 Investigation**

On or about June 12, 2023, while TAMU was in the process of gathering documents in support of its Plea to the Jurisdiction in **Beckcom 1**, additional documents responsive to this request were located. Accordingly, on June 13, 2024, TAMU promptly produced to Plaintiff an additional 108-pages of documents. **Exhibit 16**. They were produced in redacted form pursuant to TEX. GOV'T CODE § 552.114 because they contain personally identifiable student record information. *Id*. A 46-page document was withheld from disclosure pursuant to TEX. GOV'T CODE § 552.114 because the entire document contains personally identifiable student record information that cannot be sufficiently de-identified.

## IV.    THE PLEA TO THE JURISDICTION STANDARD

"[S]ubject-matter jurisdiction is essential to a court's power to decide a case." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). The trial court's subject matter jurisdiction may be challenged through a plea to the jurisdiction. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004); *Blue*, 34 S.W.3d at 554 ("A plea to the jurisdiction is a dilatory plea, the purpose of which

is to defeat a cause of action without regard to whether the claims asserted have merit."). Whether a court has subject matter jurisdiction is a question of law. *Miranda*, 133 S.W.3d at 228.

The plaintiff has the burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction. *Id*. at 226. We begin with the allegations in the plaintiff's live pleadings, which we construe liberally in favor of jurisdiction and, unless challenged with evidence, taken as true. See *id*. We consider any evidence introduced relevant to the jurisdictional inquiry. *See City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010); *Blue*, 34 S.W.3d at 555 ("[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.").

"Standing is implicit in the concept of subject-matter jurisdiction, and subject-matter jurisdiction is essential to the authority of a court to decide a case." *In re Abbott*, 601 S.W.3d 802, 807 (Tex. 2020) (orig. proceeding) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993)). Thus, if Plaintiff lacks standing, this Court lacks subject-matter jurisdiction to proceed with this case. Mootness is also a threshold issue that implicates a court's subject matter jurisdiction. *See State ex rel. Best v. Harper*, 562 S.W.3d 1, 6 (Tex. 2018); *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012).

A trial court must determine at its earliest opportunity whether it has the authority to decide the issues before it because if it lacks jurisdiction over the subject matter of the case, its judgment is void. See *Tex. Dep't of Parks & Wildlife v. Miranda*,

133 S.W.3d 217, 226 (Tex.2004). Texas Courts of Appeal have similarly held that jurisdiction is fundamental in nature and must not be ignored. *Harper v. Welchem, Inc.*, 799 S.W.2d 492, 494 (Tex.App.—Houston [14th Dist.] 1990, no writ); *Royal Indep. Sch. Dist. v. Ragsdale*, 273 S.W.3d 759, 763 (Tex. App.–Houston [14th Dist.] 2008, no pet.); *State v. Morse*, 903 S.W.2d 100, 101 (Tex.App.–El Paso 1995, no pet.).

## V. ARGUMENT AND AUTHORITY

### A.    The Texas Public Information Act

The TPIA "guarantees access to public information, subject to certain exceptions." See generally TEX. GOV'T CODE ch. 552; *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 114 (Tex. 2011). "Those exceptions embrace the understanding that the public's right to know is tempered by the individual and other interests at stake in disclosing that information." *Cox Tex. Newspapers, L.P.*, 343 S.W.3d at 114.

The TPIA defines "public information" in relevant part, as "information that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business: (1) by a governmental body; or (2) for a governmental body and the governmental body owns the information or has a right of access to it." TEX. GOV'T CODE § 552.002(a).

A public information request typically involves the governmental body holding the information and the citizen requesting it. Upon receiving a request for public information, a governmental body must promptly produce the information for inspection, duplication, or both, TEX. GOV'T CODE § 552.221, unless an exception

applies. *See In re City of Georgetown,* 53 S.W.3d 328, 331 (Tex. 2001). The TPIA is to be liberally construed in favor of granting requests for information. TEX. GOV'T CODE § 552.001(b).

If the governmental body believes an exception applies, it must promptly ask the Attorney General for a ruling. See *id.* § 552.301. Whether an exception under the TPIA applies to support withholding information is a question of law. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 357 (Tex. 2000). The party seeking the exception bears the burden of establishing that the exception applies. *See Texas Dep't of Pub. Safety v. Abbott,* 310 S.W.3d 670, 673–74 (Tex. App.—Austin 2010, no pet.). Because the TPIA is to be "liberally construed in favor of granting a request for information," TEX. GOV'T CODE § 552.001(b), the exceptions must be narrowly construed. *Harris Cnty. Appraisal Dist. v. Integrity Title Co.,* 483 S.W.3d 62, 69 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

**B.  TAMU Produced Documents Responsive to Plaintiff's TPIA Request regarding the Squadron 17 Investigation – J1147**

Plaintiff's assertion that TAMU has "refused to produce these documents" or that it has "refused to produce full and complete information and documents" in response to his TPIA request is simply false. *See* Plaintiff's Petition at pg. 4. In fact, in response to Plaintiff's clarification on the date range of the requested items to the years 2023 and 2024, TAMU promptly responded by advising him on May 2, 2024 that responsive documents were still being processed, and six days later on May 8, 2024, they were produced subject to redactions permitted under the TPIA. **Exhibit 13** at pgs. 5-6, 13; **Exhibit 14**; **Exhibit 15**.

TAMU is expressly permitted to request clarification pursuant to TEX. GOV'T CODE § 552.222(d), Permissible Inquiry by Governmental Body to Requestor. Per the clarification provided, TAMU's production of documents were responsive to item 2 (qualifications/training of staff participating in the Squadron 17 investigation), item 3 (any investigation of Squadron 17), and item 4 (communications related to the investigation of any Corps outfit) of that request. **Exhibit 13** at p. 2; **Exhibit 14**; **Exhibit 15**.

Information about the Squadron 17 hazing investigation was redacted under TEX. GOV'T CODE § 552.114 because the information is personally identifiable to the other students involved in the hazing case (complainant or respondent). Moreover, TAMU's withholding of the 46-page document from disclosure was appropriate pursuant to TEX. GOV'T CODE § 552.114 because the entire document contains personally identifiable student record information that cannot be sufficiently de-identified.

Indeed, Section 552.114(b) expressly provides that information is confidential and excepted from the requirements of Section 552.021 if it is information in a student record at an educational institution funded wholly or partly by state revenue. TAMU properly redacted information covered under subsection (b) without requesting a decision from the attorney general. *Id.* at § 552.114(d). The TPIA specifically adopts the term "student record" as defined by the Family Educational Rights and Privacy Act (FERPA) with respect to "information that constitutes education records." *Id.* at § 552.114(a)(1). The redactions were consistent with

TAMU's policies and established protocol in response to TPIA requests. **Exhibit 11**; **Exhibit 12**; **Exhibit 10** at ¶ 5.

Accordingly, there is no factual basis to support Plaintiff's obviously incorrect allegation that TAMU "refused to produce these documents" or that it improperly either redacted or withheld responsive documents or materials.

Moreover, his assertion that TAMU employees have been instructed to delete or destroy responsive information or materials is utterly baseless. A review of all exhibits attached hereto indicate no such instruction or direction to do so. TAMU has fully met and complied with its TPIA obligations in response to Plaintiff's request.

## C. TAMU Properly Withheld Documents Containing Personally Identifiable Student Record Information

TAMU properly withheld the above-referenced 46 pages of documents pursuant to TEX. GOV'T CODE § 552.114 because the entire document contains personally identifiable student record information that cannot be sufficiently de-identified.

In this regard, in the Squadron 17 investigation mentioned in J1147 (submitted March 28, 2024), the 46 pages of documents were withheld because TAMU reasonably believes that Plaintiff knows the identity of the students to the records relate, that is, the complainant and all students charged, including one of his own sons. In fact, Plaintiff was his son's representative in the process and knows all particulars of specific acts and the associated conduct charges, making all the information "personally identifiable" to these students as defined by 34 C.F.R. § 99.3.

Personally identifiable information includes, but is not limited to:

(a) The student's name;

(b) The name of the student's parent or other family members;

(c) The address of the student or student's family;

(d) A personal identifier, such as the student's social security number, student number, or biometric record;

(e) Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name;

(f) Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or

(g) *Information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates.*

See 34 C.F.R. § 99.3 (emphasis added); 20 U.S.C.A. § 1232g.

Moreover, Plaintiff's son has not given the university consent to release information to Plaintiff in TPIA request J0001147 or in any of his other requests. Similarly, none of the other involved students have provided such consent, either the complainant or other respondents. Even if all mention of students by name is redacted, Plaintiff knows their identities. Thus, disclosure would be a FERPA violation. See 20 U.S.C. § 1232g(b)(1). Plaintiff's son can access his individual education records from the university, but even his son cannot access information identifiable as to another student absent an exception to FERPA. Based on these circumstances, Section 552.026 grants TAMU the discretion whether to disclose information in an education record if the disclosure is authorized by FERPA. *The Univ. of Texas at Austin, et al. v. Gatehouse Media Texas Holdings II, Inc.*, No. 23-0023, 2024 WL 5249449, at *6-7 (Tex. Dec. 31, 2024) (mem. op.). Thus, TAMU properly exercised its discretion in this instance to not disclose the 46 pages of documents in compliance with the TPIA.

**D. Plaintiff Attempts to Mislead the Court by Raising a Completely Unrelated Matter – the Katherine Banks message**

In his Petition, Plaintiff cites to a message by former TAMU President, Katherine Banks, that "I assume all texts were deleted" suggesting that documents are being hidden or destroyed with respect to the TPIA request in issue. See Plaintiff's Original Petition at pgs. 1, 5. This claim is patently false.

In order to intentionally mislead the court, Plaintiff failed to provide the context in which the message was made. That message was made in or around June 2023 related to the unsuccessful hiring of Kathleen McElroy to lead TAMU's new journalism program. A fact-finding committee was created to look into the mishandling of that matter resulting in an internal report released on August 3, 2023. The report completed by the Office of General Counsel of the Texas A&M University System along with all the documents can be found at https://www.tamus.edu/internal-review/. Contrary to Plaintiff's baseless contention, no texts or any or documents were deleted in that matter and were, in fact, included in the report.

There is also no evidence to support the claim that any documents were hidden or destroyed regarding Plaintiff's TPIA request for documents and information pertaining to the Squadron 17 hazing investigation in issue.

**E. TAMU Rules Prohibit Hazing - TAMU has an Affirmative Obligation to Investigate Reports of Hazing**

Every institution of higher education has a code of conduct in some form or fashion that imposes certain obligations and standards regarding student conduct. In

this regard, TAMU may discipline students to secure compliance with these higher obligations as a teaching method or to sever the student from the academic community, such as for poor academic performance or misconduct. **Exhibit 17**; see also TEX. EDUC. CODE § 85.21(a) (TAMUS Board of Regents shall regulate the course of study and prescribe the course of discipline necessary to enforce the faithful discharge of the duties of the officers, faculty, and students).

Among these higher obligations is TAMU's policy that prohibits organization affiliation misconduct, including hazing, which expressly applies to the Corps of Cadets, Corps outfit, Corps unit, and Corps Special Activities. **Exhibit 17** at 24.4.5. TAMU's definition of "hazing" is broad and includes many types of misconduct, including physical brutality (whipping, beating, striking, branding, electric shock, etc.), sleep deprivation, activity that subjects an individual to unreasonable risk of harm, activity that causes or forces an individual to commit a violation of criminal law, or that coerces an individual to consume drugs or alcohol, among others. *Id.* at 24.4.5.1. Conduct constituting hazing is also a violation of Texas law. See TEX. EDUC. CODE §§ 37.151 and 51.936.

Under Texas law, "hazing" is defined as any intentional, knowing, or reckless act, occurring on or off the campus of an educational institution, by one person alone or acting with others, directed against a student for the purpose of pledging, being initiated into, affiliating with, holding office in, or maintaining membership in an organization if the act:

(A) is any type of physical brutality, such as whipping, beating, striking, branding, electronic shocking, placing of a harmful substance on the body, or similar activity;

(B) involves sleep deprivation, exposure to the elements, confinement in a small space, calisthenics, or other similar activity that subjects the student to an unreasonable risk of harm or that adversely affects the mental or physical health or safety of the student;

(C) involves consumption of a food, liquid, alcoholic beverage, liquor, drug, or other substance, other than as described by Paragraph (E), that subjects the student to an unreasonable risk of harm or that adversely affects the mental or physical health or safety of the student;

(D) is any activity that induces, causes, or requires the student to perform a duty or task that involves a violation of the Penal Code; or

(E) involves coercing, as defined by Section 1.07, Penal Code, the student to consume:

(i) a drug; or

(ii) an alcoholic beverage or liquor in an amount that would lead a reasonable person to believe that the student is intoxicated, as defined by Section 49.01, Penal Code.

TEX. EDUC. CODE § 37.151(6).

A TAMU organization, such as Squadron 17, commits an offense if the organization condones or encourages hazing or if an officer or any combination of members, pledges, or alumni of the organization commits or assists in the commission of hazing. TEX. EDUC. CODE § 37.153(a). A person commits an offense of hazing if that person (1) engages in hazing, (2) solicits, encourages, directs, aids, or attempts to aid another in engaging in hazing, (3) recklessly permits hazing to occur, or (4) has firsthand knowledge of the planning of a specific hazing incident involving a student in an educational institution, or has firsthand knowledge that a specific hazing incident has occurred, and knowingly fails to report that knowledge to the dean of

students or other appropriate official of the institution, a peace officer, or a law enforcement agency. *Id.* at § 37.152.[5]

An offense is a misdemeanor punishable by (1) a fine of not less than $5,000 nor more than $10,000; or (2) if the court finds that the offense caused personal injury, property damage, or other loss, a fine of not less than $5,000 nor more than double the amount lost or expenses incurred because of the injury, damage, or loss. *Id.* § 37.153(b).

State law also permits a school to expel a student for hazing. TEX. EDUC. CODE § 37.007(c)(D).

Texas law also imposes on institutions of higher education such as TAMU the requirement to report on hazing committed on or off campus to include information regarding each disciplinary action taken against an organization for hazing, each conviction for hazing under Section 37.153, including the name of the organization disciplined or convicted, the date the incident occurred, a general description of the incident and violations of the institutions code of conduct or criminal charges, the findings of the institution and any sanctions or fines imposed on the organization. TEX. EDUC. CODE § 51.936(c-1)(1). Postsecondary institutions such as TAMU are also required to provide to each student attending orientation a notice regarding the nature and availability of the report required under subsection c-1. *Id.* at c-2.

---

[5] The only section of this statute held as facially unconstitutional is Section 37.152(a)(3), providing that a person commits a personal hazing offense by recklessly permitting hazing to occur. See *State v. Zascavage*, 216 S.W.3d 495, 497 (Tex. App.— Fort Worth 2007, pet. ref'd) (high school wrestling coach charged with four counts of hazing).

Based on this robust body of law and well-established university rules that not only prohibit hazing but also for discipline and criminal liability for hazing, it is without question that TAMU has an affirmative duty to investigate reports of hazing as well as to provide a report on confirmed acts of hazing. Plaintiff can cite to no legal authority, under the TPIA or elsewhere, that this court can order TAMU to stop a hazing investigation into Squadron 17 "until the TPIA requests have been complied with." See **Beckcom 3** - Plaintiff's Petition for Writ of Mandamus at ¶ 7.3. Neither can Plaintiff, by way of this lawsuit, obtain an order that TAMU simply "look the other way" or ignore credible reports of hazing and decline to investigate. This request for relief by Plaintiff is utterly frivolous and without legal basis.

**F.     Plaintiff Raises Numerous Matters that have no Relevance or Bearing on the TPIA Request in Issue**

In Plaintiff's Petition for Writ of Mandamus, he raises numerous matters that have nothing to do with the TPIA request in issue, as follows:

- Falsely claiming that former TAMU President Katherine Banks encouraged TAMU personnel to destroy texts. Petition at pgs. 1, 5.
- An alleged "retaliatory" and "frivolous" investigation against Squadron 17. *Id.* at p. 4.
- The Commandant of the Corps of Cadets being relieved of command. *Id.*
- An alleged "DEI-inspired agenda" involving building transgender bathrooms and restructuring of the Corps of Cadets "in secret." *Id.*

None of these matters have any bearing on the TPIA request in issue and do not serve as a basis to aid or assist in the determination of TAMU's compliance in connection thereto. What is blatantly obvious is that Plaintiff has brought this TPIA mandamus action as nothing more than a conduit through which to express his disagreement with internal university business at TAMU. However, a TPIA

mandamus action is not the proper vehicle through which such complaints can or should be addressed.

## G.   Plaintiff is Not Entitled to Costs or Attorney's Fees Because he is not the Prevailing Party

Based on the controlling law and the evidence presented in support, TAMU met its TPIA obligations in response to Plaintiff's request. Accordingly, TAMU is the prevailing party. As such, Plaintiff is not entitled to costs of litigation or reasonable attorney fees pursuant to TEX. GOV'T CODE § 552.323.

## H.   Plaintiff Lacks Standing

Plaintiff lacks standing to bring this action. "Standing requires an injury-in-fact that is fairly traceable to the defendant's conduct and likely to be redressed by a decision in the plaintiff's favor." *Abbott v. Harris County*, 672 S.W.3d 1, 8 (Tex. 2023). An "injury-in-fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Perez v. Turner*, 653 S.W.3d 191, 198 (Tex. 2022).

As set forth in detail above, TAMU complied with its TPIA obligations to disclose information, and it properly withheld documents as expressly permitted therein. For these reasons, any legally protected interest afforded to Plaintiff under the TPIA was not violated. Hence, Plaintiff can show no injury-in-fact traceable to TAMU's conduct that can be redressed by a decision by this Court in his favor.

Also, Plaintiff has no legal basis upon which to bring suit on behalf of TAMU students or to attempt to interfere with an internal university investigation of Squadron 17 by requesting in this action that any such investigations be halted. This

is not only based on the fact he is not a TAMU student, but also that the impacted TAMU students, as college students over the age of eighteen (18), are of majority age and could bring legal action on their own behalf if they so choose to. Nowhere in the TPIA can there be found a provision providing an individual such as Plaintiff withstanding much less grant him the requested injunctive relief.

In the alternative, this case is moot. A case becomes moot when (1) a justiciable controversy no longer exists between the parties, (2) the parties no longer have a legally cognizable interest in the case's outcome, (3) the court can no longer grant the requested relief or otherwise affect the parties' rights or interests, or (4) any decision would constitute an impermissible advisory opinion. *Electric Reliability Council of Texas, Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634–35 (Tex. 2021).

When a case becomes moot, the court loses jurisdiction and must dismiss the case, because any decision would constitute an advisory opinion that is outside the jurisdiction conferred by Texas Constitution article II, section 1. *State ex rel. Best v. Harper*, 562 S.W.3d 1, 6 (Tex. 2018). The mootness doctrine is a constitutional limitation that prohibits courts from issuing advisory opinions. *Electric Reliability Council of Texas, Inc.*, 562 S.W.3d at 634.

Here, even if a justiciable controversy ever existed, it no longer exists. This is based on TAMU's production of additional documents and information responsive to the TPIA requests in issue. More specifically, to the extent there was ever a delay or the unintentional non-production of information, it was remedied by TAMU's

subsequent supplemental production of that information, including the Squadron 17 hazing investigation documents. **Exhibit 16**. There is no controversy or dispute between the parties. Hence, this court cannot grant him any of the relief he is requesting, and any decision would constitute an impermissible advisory opinion.

## I.     Plaintiff's Request for Injunctive Relief Should be Denied

Plaintiff requests this court issue an order that TAMU preserve all documents and information and enjoin it from deleting, discarding, or hiding any such information. See Plaintiff's Petition at ¶ 7.2. There is no evidence that TAMU has deleted, discarded, or is hiding any documents or information, as incorrectly alleged by Plaintiff. Simply stated, no factual basis exists in support of this request for injunctive relief. Thus, Plaintiff has failed to state a viable claim for injunctive relief.

As set forth above, the message by former TAMU President Katherine Banks has no bearing or relevance on the TPIA request in issue. Furthermore, nowhere in the TPIA can be found a provision that would support the injunctive relief requested by Plaintiff.

Finally, it is without dispute that TAMU is a state agency. See *Tex. A&M Univ. v. Carapia*, 494 S.W.3d 201, 205 (Tex. App.—Waco 2015, pet. denied). As an arm of the state, a state university such as TAMU is entitled to sovereign immunity. See *Sampson v. Univ. of Texas at Austin*, 500 S.W.3d 380, 384 (Tex. 2016); see also *Prairie View A&M Univ. v. Dickens*, 243 S.W.3d 732, 735 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Plaintiff's request for injunctive relief against TAMU is barred by sovereign immunity.

## VI.  PRAYER

Wherefore, premises considered, TAMU respectfully requests this First Amended Plea be set for hearing on March 5, 2025, and that this plea be granted thereby dismissing Plaintiff's claims with prejudice and denying all requested relief. TAMU further requests all other relief to which it may be justly entitled both at law and in equity.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
Jason T. Contreras
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through E-File Texas, File and Serve Texas in compliance with TRCP 21 on February 19, 2025 to:

Brendan Fradkin
VB Attorneys
1220 Augusta, Suite 240
Houston, TX 77057
brendan@vbattorneys.com
**Counsel for Plaintiff**

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General

# EXHIBIT 1

Received & Filed 3/28/2024 4:08 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Kristin Emert
Envelope# - 86169545

24-000902-CV-85

Cause No. _____

| | | |
|---|---|---|
| Brian Beckcom | ) | In the District Court of |
| | ) | |
| vs. | ) | Brazos County, Texas |
| | ) | |
| Texas A&M University | ) | ____ Judicial District |

## Petitioner's Original Petition for Writ of Mandamus

In this Petition for Writ of Mandamus under the Texas Public Information Act, Brian Beckcom ("Petitioner") seeks an order from the Court compelling Respondent Texas A&M University ("TAMU") to release public records requested by Petitioner.

1. **Discovery Control Plan**

1.1 Petitioner requests expedited relief under Level 1 of the Texas Rules of Civil Procedure. At this time, Petitioner requests non-monetary relief only, except for attorney fees and court costs, the amount of which will not exceed $100,000.

2. **Claim for Relief**

2.1 Petitioner seeks only non monetary relief and attorney's fees and court costs necessary for the prosecution of this writ and subsequent discovery.

3. **Parties**

3.1 Petitioner Brian Beckcom is an attorney whose address is 6363 Woodway Drive, Suite 400, Houston, Texas 77057.

3.2. Respondent Texas A&M University is a public university that can be served through its Office of General Counsel at Moore / Connally Building, 6th Floor, 301 Tarrow Street, College Station, Texas 77840-7896

- 45 -

## 4. Jurisdiction, Venue, and Conditions Precedent

4.1 This Court has jurisdiction under Texas Government Code § 552.321. Venue is mandatory in Brazos County under Texas Government Code § 552.321(b).

4.2 All conditions precedent have been performed or have occurred.

## 5. Facts

5.1 On February 26, 2024, Petitioner submitted two requests for public information to TAMU pursuant to the Texas Public Information Act, Texas Government Code Chapter 552 (the "TPIA"). The requests sought documents related to issues involving the Corps of Cadets, including but not limited to so-called "DE&I" and irregularities related to the hiring of the new Commandant as well as irregularities related to the new Commandant's plan to radically restructure the Corps of Cadets in secret. The requests are attached to this motion as Exhibit 1.

5.2 The TPIA mandates timely responses, and specifically responses within 10 days.[1] To date, over thirty business days later, TAMU has failed to produce full and complete responsive documents and has refused to produce all of the requested public information. Instead, TAMU initially lodged frivolous form objections, refused to comply with the requests, refused to work with the undersigned, refused to respond to certain emails seeking clarification, and has repeatedly violated Texas open records laws. The email exchanges between Mr. Beckcom and the open records department are attached as Exhibit 2.

---

[1] Tex. Gov't Code § 552.301

5.3 Given recent occurrences wherein certain individuals at TAMU encourage others to delete text messages and other communications, there is a real and present danger that information and documents may be destroyed. It is imperative that TAMU preserve and produce all relevant information and materials immediately.

5.3 TAMU's failure to "promptly produce" the requested information violates the TPIA[2].

## 6. Violation of the Texas Public Information Act

6.1 The TPIA requires that public information be produced "promptly."[3] The Texas Supreme Court has emphasized that the TPIA's prompt production requirement is a key part of its purpose to promote government transparency.[4] TAMU's failure to provide the requested information is a clear violation of the TPIA's unambiguous mandate.

## 7. Request for Relief

Petitioner requests that the Court:

7.1 Order TAMU to immediately produce all public information responsive to Petitioner's February 26, 2024 TPIA requests immediately;

7.2 Order the video deposition of any personnel at TAMU who have participated in compiling the records requests or answering same;

7.3 Award Petitioner his reasonable attorney fees and costs under TPIA § 552.323, with that amount be decided pursuant to submission of evidence and hearing by this Court;

7.4 Order TAMU to comply fully with the TPIA for any future related requests or face further potential sanctions; and

---

[2] Tex. Gov't Code § 552.221(a)

[3] *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 243-44 (Tex. App.—Austin 2016, no pet.).

[4] *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011).

7.5    Grant all other relief to which Petitioner is entitled.

Respectfully submitted,

**VB Attorneys**

/s/ Brian Beckcom

**Brian Beckcom**
*Brian@vbattorneys.com*
SBN: 24012268
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713/224-7800 (Office)
713/224-7801 (Facsimile)



**Brian Beckcom**
Board Certified in Personal Injury Trial Law
Texas Board of Legal Specialization

6363 Woodway Drive
Suite 400
Houston, Texas 77057

Tel (713) 224-7800
Fax (713) 224-7801

www.VBAttorneys.com

February 26, 2024

Texas A&M University by email to: open-records@tamu.edu
Office of Open Records
750 Agronomy Road
Mail Stop 1280
College Station, Texas 77843

To Whom It May Concern:

Pursuant to Section 552.001, *et seq.*, of the Texas Open Records Act, Public Records Information, please produce the following documents:

- All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

- All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

- All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

- Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

- Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

- Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes would potentially impact Texas A&M or the Corps of Cadets from a DEI perspective.

I agree to pay reasonable fees for the processing of this request.

As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.

Sincerely,

/s/ Brian Beckcom
Brian Beckom
Brian@vbattorneys.com



**Brian Beckcom**
Board Certified in Personal Injury Trial Law
Texas Board of Legal Specialization

6363 Woodway Drive
Suite 400
Houston, Texas 77057

Tel (713) 224-7800
Fax (713) 224-7801

www.VBAttorneys.com

February 26, 2024

Texas A&M University by email to: open-records@tamu.edu
Office of Open Records
750 Agronomy Road
Mail Stop 1280
College Station, Texas 77843

To Whom It May Concern:

Pursuant to Section 552.001, *et seq.*, of the Texas Open Records Act, Public Records Information, please produce the following documents:

1. Any contracts of employment for the Commandant of the Corps of Cadets, Patrick Michaelis, any drafts of the same, any communications in whatever form regarding the same, and any other agreements which relate to the same;

2. Any documents or materials related to the selection of Patrick Michaelis as Commandant, including but not limited to meeting notes, interview notes, memos, discussions, digital communications of any form, any discussion or notes regarding why Michaelis was selected over other candidates, and any other documents or materials concerning the same.

I agree to pay reasonable fees for the processing of this request.

As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

Please direct any future correspondence to the undersigned or Patti@vbattorneys.com We look forward to hearing from you.

Sincerely,

/s/ Brian Beckcom
Brian Beckom
Brian@vbattorneys.com

VUJASINOV EXHIBIT BECKCOM PLLC

## Message History (18)

↩ On 3/29/2024 2:42:02 PM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [open-records@tamu.edu], [patti@vbattorneys.com], [brendan@vbattorneys.com]

Ms. Brashear:
TAMU has repeatedly and intentionally violated Texas law. I will proceed accordingly.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video

On Fri, Mar 29, 2024 at 2:15 PM Texas A&M University Public Records Support wrote:

✉ On 3/29/2024 2:15:12 PM, Texas A&M University Public Records Support wrote:

CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/29/2024

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Our apologies for the delay, but we are still in the process of locating and gathering records responsive to your request.

As required by Tex. Gov't Code sec. 552.221(d), we anticipate having any remaining records found responsive to your request to you no later than the close of business on Friday, April 5th.

Sincerely,

Knesha Brashear
Open Records Office



On 3/23/2024 4:51:02 PM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Patti"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

This email confirms that the Open Records Office at TAMU promised to respond by March 21, 2024, after being given multiple extensions, and then, on March 21, 2024, did not comply with the open records request, and instead produced almost nothing responsive.

Please explain to me why you promised to produce materials on March 21st after being given multiple extensions and then did not do so. Please include the legal justification for your failure to comply with Texas Open Records laws. Please also identify the individuals you have been working with on these requests as their depositions may be necessary.

Also, for some reason you refuse to reply to Brendan and Patti as well. Please do so going forward, including with any future document requests.

Thank you.

-bb

VBAttorneysLessons from Leaders PodcastMy Bio Video


On Mon, Mar 11, 2024 at 9:19 AM Texas A&M University Public Records Support wrote:



Exhibit 2

Page 2

- 54 -

On 3/23/2024 4:03:02 PM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

By copy of this email, I hereby confirm that Texas A&M originally claimed the request was overbroad and that TAMU needed additional time to gather the documents, then, when the documents were partially produced, TAMU only produced three PowerPoint presentations that could have been produced in five minutes. Put another away, the original objections were frivolous, and the request for more time was also frivolous.
At this point, it is clear that TAMU is slow-playing the request for strategic and tactical reasons, which violates the Texas Open Records laws.
I expect the next production to be responsive, full, and complete. If not, I will pursue formal legal action, which will include potentially depositions and forensic discovery.
I remind you (yet again) to let any involved parties know about their legal obligations to keep and maintain all records, including but not limited to emails, texts, and any other digital communications.

-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Fri, Mar 22, 2024 at 12:20 PM Texas A&M University Public Records Support wrote:


Exhibit 2

Page 3

- 55 -

On 3/22/2024 12:20:14 PM, Texas A&M University Public Records Support wrote:

CC: open-records@tamu.edu
Subject: Public Information Records :: J000762-022624
Body:
03/22/2024


RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

As mentioned in our correspondence sent to you yesterday, we are still processing the remaining items of your request and expect to have a response to you on or before Friday, March 29th.

Sincerely,

Knesha Brashear
Open Records Office



Exhibit 2

Page 4

- 56 -

On 3/22/2024 11:24:02 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Brendan Fradkin"[brendan@vbattorneys.com], "Patti"[patti@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

See below page advise today.
Thanks.

-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org

On Thu, Mar 21, 2024 at 11:04 PM Brian Beckcom wrote:
I received part one of the responses. Where are the rest of the materials?
Please advise immediately as TAMU is now potentially in violation of the open records laws, which mandate timely and complete responses.
Also, please continue to ensure that all relevant materials of any nature preserved.
Thank you.
-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org

On Thu, Mar 21, 2024 at 6:05 PM Texas A&M University Public Records Support wrote:



Exhibit 2

Page 5

- 57 -

On 3/21/2024 11:06:02 PM, Brian Beckcom wrote:

TO: "Brendan Fradkin"[brendan@vbattorneys.com], "Patti"[patti@vbattorneys.com], "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "open-records@tamu.edu"[Open-records@tamu.edu]

I received part one of the responses. Where are the rest of the materials?
Please advise immediately as TAMU is now potentially in violation of the open records laws, which mandate timely and complete responses.
Also, please continue to ensure that all relevant materials of any nature preserved.
Thank you.
-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org

On Thu, Mar 21, 2024 at 6:05 PM Texas A&M University Public Records Support wrote:

On 3/21/2024 6:05:12 PM, Texas A&M University Public Records Support wrote:

CC: open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/21/2024

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Texas A&M University received a public information request from you on February 26, 2024. Your request mentioned:

*"Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*• All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.*

*• All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any*



Exhibit 2

Page 6

- 58 -

discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

● Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

● Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes"

Information found to be responsive to items 2 and 3 of your request is available and can be obtained by visiting the Public Records Online Portal and logging in from the "My Request Center" tab.

Please note that we are still processing the remaining items of your request and expect to have a response to you on or before Friday, March 29th.

Sincerely,

Knesha Brashear
Open Records Office



Exhibit 2

Page 7

- 59 -

✉ On 3/11/2024 9:19:01 AM, Texas A&M University Public Records Support wrote:

CC: Open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
Subject: Public Information Records :: J000762-022624
Body:
03/11/2024

RE: PUBLIC RECORDS REQUEST, Reference # J000762-022624

Dear Brian Beckcom,

We are in receipt of your narrowed request, received on March 7th and appreciate your willingness to work with us. We are processing your narrowed request and expect to have a response to you on or before your tenth (10ᵗʰ) business day of March 21, 2024.

Sincerely,

Tricia Bledsoe

Open Records Office

↩ On 3/11/2024 6:03:03 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
I hope you had a relaxing weekend.
I have sent a few emails with no response and no acknowledgement. I would very much appreciate your responding to my requests. My hope is you will comply with the requests as limited and produce the overdue materials immediately. Please let me know the status. I am hoping we can avoid further legal measures and can work cooperatively.
I am happy to send my own IT team to assist if needed.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 2:13 PM Brian Beckcom wrote:
Ms. Kacer:
Please respond to my questions and to the unobjected to FOIA requests today. Otherwise, we will move forward with legal action as authorized by statute and Texas law.

 Exhibit 2 Page 8

- 60 -

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 10:28 AM Brian Beckcom wrote:

Ms. Kacer:

1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory deadline;

2. Please confirm that the relevant personnel have been informed of their obligations to preserve all communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested documents and information.

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video

On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:

Ms. Kacer:

Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.

For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.

With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved. With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.

I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/

I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.

Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.

Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.



Exhibit 2

Page 9

- 61 -

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:


↩ On 3/8/2024 3:15:33 PM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan
Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
Please respond to my questions and to the unobjected to FOIA requests today. Otherwise, we will move
forward with legal action as authorized by statute and Texas law.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 10:28 AM Brian Beckcom wrote:
Ms. Kacer:
1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory
deadline;
2. Please confirm that the relevant personnel have been informed of their obligations to preserve all
communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested
documents and information.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:
Ms. Kacer:
Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my
request is obviously limited in scope and time. I also note that you have not objected to some of the requests,
which makes the responses to those requests now one day overdue. Please produce any and all materials to
which you do not object immediately, or advise why you refuse to do so.
For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We
are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of



Exhibit 2

- 62 -

Student Affairs, and Office of the President.

With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved. With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.

I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/

I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.

Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.

Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.

-bb

VBAttorneysLessons from Leaders PodcastMy Bio Video

On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:

↰ On 3/8/2024 10:30:43 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:

1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory deadline;

2. Please confirm that the relevant personnel have been informed of their obligations to preserve all communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested documents and information.

-bb

VBAttorneysLessons from Leaders PodcastMy Bio Video



Exhibit 2

Page 11

- 63 -

On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:

Ms. Kacer:

Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.

For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.

With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved. With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.

I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/

I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.

Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.

Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.

-bb

VBAttorneysLessons from Leaders PodcastMy Bio Video


On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:



Exhibit 2

Page 12

- 64 -

On 3/7/2024 9:33:02 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:

Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.

For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.

With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved. With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.

I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/

I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.

Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.

Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.

-bb

VBAttorneysLessons from Leaders PodcastMy Bio Video

On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:

On 3/6/2024 6:56:02 PM, Texas A&M University Public Records Support wrote:

CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
March 6, 2024



Exhibit 2

Page 13

- 65 -

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Texas A&M University received a public information request from you on February 26, 2024. Your request mentioned:

*"From: Patti Artavia <patti@vbattorneys.com>*
*Sent: Monday, February 26, 2024 7:03 AM*
*To: open-records@tamu.edu*
*Subject: Open Records Request*

*Please see attached letter. Thank you*

*Patti Artavia*
*Senior Paralegal/Case Manager*
*2016 AAJ Paralegal of the Year*
*VBAttorneys.com*
*Direct Dial (832) 791-3118*


*Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.*

*● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.*

*● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.*

*● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.*

*● Any and all communications from anyone at Texas A&M concerning the plan to restructure*



Exhibit 2

Page 14

- 66 -

the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

• Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes"</patti@vbattorneys.com>

Our office is unable to conduct a blind search for

"• All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

• All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

• All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

• Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

• Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

• Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes" as there are numerous employees within the the Office of the Commandant and thousands of employees within the university. A request of this magnitude is too broad. Therefore, we are requesting that you narrow your request by providing us with the name(s) of employees who would be in possession of the requested records. Additionally, if you could please provide us with a date range so that we can better assist you with your request.

As provided by section 552.222(d) of the Texas Public Information Act, your request will be considered



Exhibit 2

Page 15

- 67 -

withdrawn if we do not receive a response from you by the 61st day after the date of this request for clarification/narrowing.

Sincerely,

Leslie Kacer
Open Records Office

 On 2/26/2024 11:15:43 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu]

Yes to both questions.
Please make sure all the records requested are preserved.
Thank you.

On Feb 26, 2024, at 9:10 AM, Texas A&M University Public Records Support wrote:



Exhibit 2

Page 16

- 68 -

CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
February 26, 2024

BRIAN BECKCOM (J000762-022624): REQUEST FOR CLARIFICATION/NARROWING; REDACTION RESPONSES REQUESTED

There are now 2 statements regarding mandatory exceptions and discretionary exceptions you need to select for your open records request. These questions are derived from a form developed by the Office of the Attorney General, dated 10/01/19. Please select "yes" or "no" in regards to these 2 exception questions for your open records request. Selecting "yes" will allow the university to expedite your request by avoiding the necessity of seeking a decision from the Office of the Attorney General.

Statement #1:
Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Statement #2:
Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Note: This is a request for clarification/narrowing of your request. Section 552.222 provides that a request for information is considered withdrawn if the requestor does not respond in writing to a governmental body's written request for clarification or additional information within 61 days.

Sincerely,

Leslie Kacer
Open Records Office

 Exhibit 2 Page 17

- 69 -

✉ On 2/26/2024 8:54:25 AM, Texas A&M University Public Records Support wrote:

Dear Brian Beckcom:

We received your public information request for **Texas A&M University**. Your request was given the **reference number J000762-022624** for tracking purposes. Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.

To monitor the progress or update this request please log into the Public Records Center.

✉ On 2/26/2024 8:54:25 AM, Texas A&M University Public Records Support wrote:

Request was created by staff

 Exhibit 2

- 70 -

Page 18

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Patti Artavia on behalf of Brian Beckcom
Bar No. 24012268
patti@vbattorneys.com
Envelope ID: 86169545
Filing Code Description: Case Information Sheet
Filing Description:
Status as of 4/2/2024 8:29 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brendan Fradkin | | brendan@vbattorneys.com | 4/1/2024 6:00:54 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 4/1/2024 6:00:54 PM | SENT |
| Patti Artavia | | patti@vbattorneys.com | 4/1/2024 6:00:54 PM | SENT |

# EXHIBIT 2

Received & Filed 5/10/2024 4:14 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Kristin Emert
Envelope# - 87643776

Cause No. 24-000902-CV

| | | |
|---|---|---|
| Brian Beckcom | ) | In the District Court of |
| | ) | |
| vs. | ) | Brazos County, Texas |
| | ) | |
| Texas A&M University | ) | 85th Judicial District |

### Petitioner's First Amended Petition for Writ of Mandamus

In this Petition for Writ of Mandamus under the Texas Public Information Act, Brian Beckcom ("Petitioner") seeks an order from the Court compelling Respondent Texas A&M University ("TAMU") to appoint a third-party service to perform a search for the requested public records, fully respond to Petitioner's requests for Diversity, Equity, and Inclusion and Squadron 17 hazing documents, and produce those documents to the public.

1.     **Discovery Control Plan**

1.1     Petitioner requests expedited relief under Level 1 of the Texas Rules of Civil Procedure. At this time, Petitioner requests non-monetary relief only, except for attorney fees and court costs, the amount of which will not exceed $100,000.

2.     **Claim for Relief**

2.1     Petitioner seeks only non monetary relief and attorney's fees and court costs necessary for the prosecution of this writ and subsequent discovery.

3.     **Parties**

3.1     Petitioner Brian Beckcom is an attorney whose address is 6363 Woodway Drive, Suite 400, Houston, Texas 77057.

3.2.     Respondent Texas A&M University is a public university that can be served through

- 73 -

its Office of General Counsel at Moore / Connally Building, 6th Floor, 301 Tarrow Street, College Station, Texas 77840-7896

3.3     Respondent has answered the Original Writ of Mandamus through the Attorney General's office, Jason T. Contreras, Assistant Attorney General, PO Box 12548, Capitol Station, Austin, Texas 78711.

## 4.     Jurisdiction, Venue, and Conditions Precedent

4.1     This Court has jurisdiction under Texas Government Code § 552.321. Venue is mandatory in Brazos County under Texas Government Code § 552.321(b).

4.2     All conditions precedent have been performed or have occurred.

## 5.     Facts

**5.1     TAMU failed to search for and produce documents responsive to requests for communications regarding the Commandant's plan to restructure the Corps of Cadets.**

5.1.1   On February 26, 2024, Petitioner submitted two requests for public information to TAMU pursuant to the Texas Public Information Act, Texas Government Code Chapter 552 (the "TPIA"). The requests sought documents related to issues involving the Corps of Cadets, including but not limited to so-called "DE&I" and irregularities related to the hiring of the new Commandant as well as irregularities related to the new Commandant's plan to radically restructure the Corps of Cadets in secret.

5.1.2   The TPIA mandates timely responses, and specifically responses within 10 days.[1] To date, over thirty business days later, TAMU has failed to produce full and complete responsive documents and all of the requested public information.

---

[1] Tex. Gov't Code § 552.301

5.1.3   This failure is not mere conjecture. Petitioner propounded the following request to TAMU:

(1) All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

(2) All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of the same.

(3)  All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

(4) Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

(5)  Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President

of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

5.1.4    On April 24, 2024, TAMU produced what it alleges to be all documents responsive to the request, including those contained in Commandant Michaelis's email account.[2]

5.1.5    However, Petitioner knows of and is in possession of documents and communications responsive to this request which have not been produced by TAMU.

5.1.6    Accordingly, either: (1) the search was not conducted adequately or in good faith; or (2) documents are being unlawfully withheld.

5.1.7    Given recent occurrences wherein certain individuals at TAMU encourage others to delete text messages and other communications, there is a real and present danger that information and documents may be destroyed. It is imperative that TAMU allow a third-party search for all relevant information and materials immediately.

5.2    **TAMU failed to produce documents responsive to requests for DEI documents.**

5.2.1    As part of the February 26, 2024 TPIA request, Petitioner requested the following: "Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes would potentially impact Texas A&M or the Corps of Cadets from a DEI perspective."

---

[2] Exhibit 1, Email from TAMU Counsel stating that Commandant Michaelis's email account was searched.

5.2.2   TAMU has refused to produce these documents, claiming that the AG has ruled on this topic in the past and therefore there is no obligation to produce.[3] However, the AG's opinion was not specific to this request, and therefore TAMU had the obligation to get a new AG opinion on these documents, which they have failed to do. Accordingly, these documents must be produced.

5.3   **TAMU failed to produce documents related to the 2024 hazing investigation into Squadron 17, an incident where all accused students were fully exonerated.**

5.3.1   On March 28, 2024, Petitioner requested documents regarding the wrongful investigation into Squadron 17 for alleged hazing misconduct. Specifically, Petitioner requested the following:

(1) All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation

(2) All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A&M

_____

[3] Exhibit 2, Email between TAMU counsel and petitioner stating that a compilation of DEI documents are being withheld.

University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same

(3) Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.

(4) Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same.

5.3.2 TAMU partially responded to these requests on May 9, 2024, but this request was only partial as TAMU has withheld an unknown number of documents based on alleged FERPA issues. The failure to produce entire documents based on FERPA is erroneous, as these documents could and should be produced following redaction of student names or

other specific student information. In the absence of any other objection, these documents must be produced.

6.    **Violation of the Texas Public Information Act**

6.1    The TPIA requires that public information be produced "promptly."[4] The Texas Supreme Court has emphasized that the TPIA's prompt production requirement is a key part of its purpose to promote government transparency.[5] TAMU's failure to provide the requested information and perform an adequate search is a clear violation of the TPIA's unambiguous mandate.

7.    **Request for Relief**

Petitioner requests that the Court:

7.1    Order TAMU to allow a third party search service to perform the document searches at issue and produce the public information responsive to Petitioner's February 26, 2024 TPIA requests;

7.2    Order the video deposition of any personnel at TAMU who have participated in compiling the records requests or answering same;

7.3    Order TAMU to produce documents responsive to Petitioner's DEI requests.

7.4    Order TAMU to produce documents responsive to Petitioner's Squadron 17 requests.

7.5    Award Petitioner his reasonable attorney fees and costs under TPIA § 552.323, with that amount be decided pursuant to submission of evidence and hearing by this Court;

7.6    Order TAMU to comply fully with the TPIA for any future related requests or face further potential sanctions; and

---

[4] *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 243-44 (Tex. App.—Austin 2016, no pet.).

[5] *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011).

7.7    Grant all other relief to which Petitioner is entitled.

Respectfully submitted,

**VB Attorneys**

/s/ Brian Beckcom

_____

**Brian Beckcom**
*/s/ Brian Beckcom*
*Brian@vbattorneys.com*
SBN:  24012268
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713/224-7800 (Office)
713/224-7801 (Facsimile)

Certificate of Service

On the 10th day of May 2024, the foregoing Amended Writ of Mandamus was served on all counsel of record by electronic e-service.

/s/ Brian Beckcom

_____

Brian Beckcom

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Patti Artavia on behalf of Brian Beckcom
Bar No. 24012268
patti@vbattorneys.com
Envelope ID: 87643776
Filing Code Description: Amended Petition
Filing Description: Petitioner's First Amended Petition for Writ of Mandamus
Status as of 5/13/2024 8:42 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 5/13/2024 8:17:17 AM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 5/13/2024 8:17:17 AM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 5/13/2024 8:17:17 AM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 5/13/2024 8:17:17 AM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 5/13/2024 8:17:17 AM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 5/13/2024 8:17:17 AM | SENT |
| Jerri Low | | jlow@tamus.edu | 5/13/2024 8:17:17 AM | SENT |

# EXHIBIT 3

Received & Filed 6/26/2024 5:06 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Kristin Emert
Envelope# - 89236863

## Cause No. 24-000902-CV

| | | |
|---|---|---|
| Brian Beckcom | ) | In the District Court of |
| | ) | |
| vs. | ) | Brazos County, Texas |
| | ) | |
| Texas A&M University | ) | 85th  Judicial District |

### Petitioner's Second Amended Petition for Writ of Mandamus and Request for Declaratory Judgment

In this Petition for Writ of Mandamus under the Texas Public Information Act, Brian Beckcom ("Petitioner") seeks an order from the Court compelling Respondent Texas A&M University ("TAMU") to appoint a third-party service to perform a search for the requested public records, fully respond to Petitioner's requests for "fish Brigade," Diversity, Equity, and Inclusion, Squadron 17 hazing documents, and bathroom renovation documents, and produce those documents to the public.

## 1. Discovery Control Plan

1.1     Petitioner requests expedited relief under Level 1 of the Texas Rules of Civil Procedure. At this time, Petitioner requests non-monetary relief only, except for attorney fees and court costs, the amount of which will not exceed $100,000.

## 2. Claim for Relief

2.1     Petitioner seeks only non monetary relief and attorney's fees and court costs necessary for the prosecution of this writ and subsequent discovery.

**3. Parties**

3.1     Petitioner Brian Beckcom is an attorney whose address is 6363 Woodway Drive, Suite 400, Houston, Texas 77057.

3.2.     Respondent Texas A&M University is a public university that can be served through its Office of General Counsel at Moore / Connally Building, 6th Floor, 301 Tarrow Street, College Station, Texas 77840-7896.

3.3     Respondent has answered the Original Writ of Mandamus through the Attorney General's office, Jason T. Contreras, Assistant Attorney General, PO Box 12548, Capitol Station, Austin, Texas 78711.

**4. Jurisdiction, Venue, and Conditions Precedent**

4.1     This Court has jurisdiction under Texas Government Code § 552.321. Venue is mandatory in Brazos County under Texas Government Code § 552.321(b).

4.2     All conditions precedent have been performed or have occurred.

**5. Facts**

5.1     TAMU failed to search for and produce documents responsive to requests for communications regarding the Commandant's plan to restructure the Corps of Cadets.

5.1.1     On February 26, 2024, Petitioner submitted two requests for public information to TAMU pursuant to the Texas Public Information Act, Texas Government Code Chapter 552 (the "TPIA"). The requests sought documents related to issues involving the Corps of Cadets, including but not limited to so-called "DE&I" and irregularities related to the hiring of the new Commandant as well as irregularities related to the new Commandant's plan to radically restructure the Corps of Cadets in secret.

5.1.2   The TPIA mandates timely responses, and specifically responses within 10 days.[1] To date, over thirty business days later, TAMU has failed to produce full and complete responsive documents and all of the requested public information.

5.1.3   This failure is not mere conjecture. Petitioner propounded the following request to TAMU:

(1) All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

(2) All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of the same.

(3) All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

(4) Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

(5) Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

5.1.4   On April 24, 2024, TAMU produced what it alleges to be all documents responsive to the request, including those contained in Commandant Michaelis's email account.[2]

---

[1] Tex. Gov't Code § 552.301.
[2] Exhibit 1, Email from TAMU Counsel stating that Commandant Michaelis's email account was searched.

5.1.5 However, Petitioner knows of and is in possession of documents and communications responsive to this request which have not been produced by TAMU, and moreover, TAMU has told Petitioner that it is withholding documents.

5.1.6 Accordingly, either: (1) the search was not conducted adequately or in good faith; or (2) documents are being unlawfully withheld.

5.1.7 Given recent occurrences wherein certain individuals at TAMU encouraged others to delete text messages and other communications, there is a real and present danger that information and documents may be destroyed. It is imperative that TAMU allow a third-party search for all relevant information and materials immediately.

5.2 TAMU failed to produce documents responsive to requests for DEI documents.

5.2.1 As part of the February 26, 2024 TPIA request, Petitioner requested the following:

> "Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes would potentially impact Texas A&M or the Corps of Cadets from a DEI perspective."

5.2.2 TAMU has refused to produce these documents, claiming that the AG has ruled on this topic in the past and therefore there is no obligation to produce.[3] However, the AG's opinion was not specific to this request, and therefore TAMU had the obligation to get a new AG opinion on these documents, which they have failed to do. Accordingly, these documents must be produced.

5.3 TAMU failed to produce documents related to the frivolous and possibly retaliatory 2024 hazing investigation into Squadron 17, an incident where all accused students were fully

---

[3] Exhibit 2, Email between TAMU counsel and petitioner stating that a compilation of DEI documents are being withheld.

exonerated after the cadets and parents spent over 1700 hours and hundred of thousands of dollars defending themselves from ridiculous allegations that were brought in bad faith to retaliate against the all-male outfit.

5.3.1 On March 28, 2024, Petitioner requested documents regarding the frivolous and retaliatory investigation into Squadron 17 for alleged hazing misconduct. Specifically, Petitioner requested the following:

(1) All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind.related in any manner to any such investigation, along with any other information pertaining to any such investigation

(2) All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A&M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same

(3) Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.

(4) Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such

materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same.

5.3.2 TAMU partially responded to these requests on May 9, 2024, but this request was only partial as TAMU has withheld an unknown number of documents based on a frivolous and made-up rationale that the Petitioner -- and only the Petitioner -- is prohibited from getting certain of these documents. The failure to produce entire documents based on FERPA is erroneous, as these documents could and should be produced following redaction of student names or other specific student information. In the absence of any other objection, these documents must be produced.

5.4 TAMU also failed to produce documents related to a questionable multimillion dollar bathroom renovation project. This project is suspected to be in response to continued DEI-related policy initiatives within TAMU and was apparently done because one transvestite cadet threatened to sue TAMU.

5.4.1 On May 16, 2024, Plaintiff requested the following:

(1) Any documents pertaining to renovation plans for the bathroom/restroom facilities in the dormitories housing the Corps of Cadets. This should include contracts or agreements related to the renovation projects, estimates, analyses, architectural designs/plans, engineering designs/plans, and anticipated costs.

(2) Any communications between university employees or officials regarding the renovation plans or any of the documents pertaining to those plans.

(3) Any communications between university employees or officials and third-parties regarding the renovation plans or any of the documents pertaining to those plans.

5.4.2 On June 3, 2024, TAMU produced some documents responsive to this request, but stated that other responsive documents were subject to a requested OAG opinion letter based on the attorney-client privilege and the financial information privilege.

5.4.3 Defendant's alleged privileges are bogus, but even if they weren't, Defendant is in possession of documents which clearly aren't subject to either the attorney-client privilege or the financial information privilege. For example, Plaintiff is aware of a recorded, public Microsoft Teams call which Defendant is refusing to produce. Neither the attorney-client privilege nor the financial information privilege would be applicable to a public, recorded conference call.

## 6. Violation of the Texas Public Information Act and SB 17

6.1 The TPIA requires that public information be produced "promptly."[4] The Texas Supreme Court has emphasized that the TPIA's prompt production requirement is a key part of its purpose to promote government transparency.[5] TAMU's failure to provide the requested information and perform an adequate search is a clear violation of the TPIA's unambiguous mandate.

6.2 SB-17 is a recent bill that prevents public institutions from engaging in or promoting DEI initiatives. This unambiguous mandate effected if the public *actually has access* to DEI and related documents. TAMU's attempts to rely on discretionary privileges, whether applicable or not, would prevent the ability for SB-17 to be effective. Accordingly, even if the privileges are applicable–which they aren't–they must be discarded in favor of public knowledge based on the mandate of the TPIA and SB-17.

---

[4] *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 243-44 (Tex. App.—Austin 2016, no pet.).
[5] *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011).

**7. Request for Relief**

Petitioner requests that the Court:

7.1     Order TAMU to allow an independent third party search service to perform the document searches at issue and produce the public information responsive to Petitioner's February 26, 2024 TPIA requests;

7.2     Order the video deposition of any personnel at TAMU who have participated in compiling the records requests or answering same;

7.3     Order TAMU to produce documents responsive to Petitioner's fish Brigade, DEI requests, and bathroom requests;

7.4     Order TAMU to produce documents responsive to Petitioner's Squadron 17 requests;

7.5     Order TAMU to produce documents responsive to Petitioner's bathroom renovation requests;

7.6     Award Petitioner his reasonable attorney fees and costs under TPIA § 552.323, with that amount be decided pursuant to submission of evidence and hearing by this Court;

7.7     Order TAMU to comply fully with the TPIA for any future related requests or face further potential sanctions; and

7.8     Plaintiff seeks a Declaratory Judgment pursuant to Section 37.001 of the Texas CPRC et seq. Specifically, that Plaintiff is a person seeking a declaration of his rights under the Public Information Act pursuant to Section 37.004 CPRC. The Defendant violated the Plaintiff's rights and status under Texas Public Information Act by unilaterally deciding to withhold documents from Plaintiff that would be released to other people and unilaterally withholding information based on previous Attorney General opinions.

7.9    Grant all other relief to which Petitioner is entitled.

Respectfully submitted,
J. David Dodd III
/s/J. David Dodd III
820 S. MacArthur,
Suite 105-341
Coppell, TX 75019
(214)923-3417

VB Attorneys
Brian Beckcom
/s/ Brian Beckcom
SBN: 24012268
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713/224-7800 (Office)
713/224-7801 (Facsimile)

Certificate of Service

On the 26th day of June 2024 the foregoing Amended Writ of Mandamus was served on all counsel of record by electronic e-service.

/s/ J. David Dodd III

_____
J. David Dodd III

From: **Moore, Brooks** <RBM@tamus.edu>
Date: Fri, Apr 26, 2024 at 10:53 AM
Subject: RE: Public Information Records :: J001320-041024
To: Brendan Fradkin <brendan@vbattorneys.com>

On request J1147, the 10-business day deadline (from receipt of payment per Tex. Gov't Code sec. 552.263(e)) is May 2nd.

On request J1320, no, you are misconstruing my response. As I previously stated, the university searched all Office of the Commandant accounts, including his. We have provided what was found to my knowledge. I do not know what you mean when you say that you "clearly have responsive documents." If you have specific information that you believe the university should have found, please identify it as we are not aware of any additional information that the university actually has.

Also, please note that I will be unavailable until around 5:00 this afternoon.

Brooks

**R. Brooks Moore | Deputy General Counsel**
Office of General Counsel
THE TEXAS A&M UNIVERSITY SYSTEM

From: **Moore, Brooks** <RBM@tamus.edu>
Date: Mon, Apr 8, 2024 at 1:18 PM
Subject: RE: Beckcom TPIA Request Recap
To: Brendan Fradkin <brendan@vbattorneys.com>
Cc: Brian Beckcom <brian@vbattorneys.com>, Patti Artavia <patti@vbattorneys.com>

My responses are below.  The below is correct with a couple of minor corrections (see highlighted text).

Brooks

**R. Brooks Moore | Deputy General Counsel**
Office of General Counsel
THE TEXAS A&M UNIVERSITY SYSTEM

---

**From:** Brendan Fradkin <brendan@vbattorneys.com>
**Sent:** Monday, April 8, 2024 1:02 PM
**To:** Moore, Brooks <RBM@tamus.edu>
**Cc:** Brian Beckcom <brian@vbattorneys.com>; Patti Artavia <patti@vbattorneys.com>
**Subject:** Beckcom TPIA Request Recap

Brooks,

Thanks again for talking with me today. This email is intended to confirm what documents are being withheld, what privileges are being applied to those documents, and additional documents you may be able to produce.

**DEI/Fish Program Documents**

Under this category of requests, you are withholding the following:

(1) An email with attached proposed policymaking document regarding the fish brigade.
*withheld based on policymaking privilege*—Brooks Moore Response-Correct
(2) The attached proposed fish brigade policymaking document.

*withheld based on policymaking privilege*—Brooks Moore Response-Correct
(3) A compilation of DEI documents prepared for systemwide compliance efforts.
*withheld based on 552.101 + 51.971(e)(2)* —Brooks Moore Response-Correct

(4) Documents that contain student identification information.
*withheld subject to FERPA request*—Brooks Moore Response-Correct

You stated that on (1), you would look into getting us the email if the email itself contained no policymaking information. —Brooks Moore Response-Correct

You stated that on (2), if we withdraw our consent to withholding, you could go back to the AG for an opinion. —Brooks Moore Response-Correct

You stated that on (3), there may already be an applicable holding from the AG's office, but you would send us that holding, and that you would go back to the AG's office with these documents as well. —Brooks Moore Response-Correct, except that if we have an applicable letter ruling on the same information, we are prohibited for asking for another ruling. If the information is different from that previously submitted to the OAG, we will request a letter ruling. We will provide the citation if it is binding here.

You stated that (4) would require an additional FERPA request, but if approved, you would produce. —Brooks Moore Response-Correct, assuming that the applicable student provides prior written consent for the release of the information in accordance with FERPA.

**Commandant Hiring Documents**

(1) Michaelis personnel information.
*this was all produced, subject to some personal information redactions*—Brooks Moore Response-Correct

(2) Communications about Michaelis hiring
*these will be produced*—Brooks Moore Response-Correct, under request J001123.

(3) Personnel information for other candidates
*these will be produced*. —Brooks Moore Response-Correct, under request J001123.

If this sums up what we discussed today accurately, please confirm.

--

Brendan Fradkin

VB Attorneys

832-791-2337

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

--
Brendan Fradkin
VB Attorneys
832-791-2337

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

**- 93 -**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Patti Artavia on behalf of Brian Beckcom
Bar No. 24012268
patti@vbattorneys.com
Envelope ID: 89236863
Filing Code Description: Amended Petition
Filing Description: Petitioner's Second Amended Petition for Writ of Mandamus and Request for Declaratory Judgment
Status as of 6/27/2024 9:10 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 6/26/2024 5:06:58 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 6/26/2024 5:06:58 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 6/26/2024 5:06:58 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 6/26/2024 5:06:58 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 6/26/2024 5:06:58 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 6/26/2024 5:06:58 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 6/26/2024 5:06:58 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| J DavidDodd III | | David@Jddoddlaw.com | 6/26/2024 5:06:58 PM | SENT |

# EXHIBIT 4

Received & Filed 8/7/2024 5:09 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Emily Velasquez
Envelope# - 90654839

Cause No. 24-000902-CV

| | | |
|---|---|---|
| Brian Beckcom | ) | In the District Court of |
| | ) | |
| vs. | ) | Brazos County, Texas |
| | ) | |
| Texas A&M University | ) | 85th Judicial District |

**Plaintiff's Notice of Nonsuit Without Prejudice**

Plaintiff Brian Beckcom files this Notice of Nonsuit Without Prejudice and in support thereof would respectfully show the Court as follows:

1.     Plaintiff is not pursuing his case at this time but reserves his right to file at another time.

2.     This nonsuit is not done for the purposes of undue delay but rather to comply with state and federal civil procedure requirements and so that justice may be done.

Respectfully submitted,

/s/ J. David Dodd
J. David Dodd III
SBN:00787374
820 S. MacArthur Blvd,
Suite 105-341
Coppell, TX 75019
(214)923-3417

- 95 -

Certificate of Service

A true and correct copy of the foregoing was served on all counsel of record on this 7th day of

August 2024.

/s/J. David Dodd III

_____

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Patti Artavia on behalf of Brian Beckcom
Bar No. 24012268
patti@vbattorneys.com
Envelope ID: 90654839
Filing Code Description: Notice of Nonsuit
Filing Description: Without Prejudice
Status as of 8/8/2024 8:26 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 8/7/2024 5:09:43 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/7/2024 5:09:43 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/7/2024 5:09:43 PM | SENT |
| Michael  Granado | | michael@vbattorneys.com | 8/7/2024 5:09:43 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/7/2024 5:09:43 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/7/2024 5:09:43 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/7/2024 5:09:43 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/7/2024 5:09:43 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| J DavidDodd III | | David@Jddoddlaw.com | 8/7/2024 5:09:43 PM | SENT |

**EXHIBIT 5**

**From:** Patti Artavia <patti@vbattorneys.com>
**Date:** November 1, 2024 at 2:50:18 PM CDT
**To:** "Bonilla, Ray" <RBonilla@tamus.edu>
**Cc:** Brendan Fradkin <brendan@vbattorneys.com>, Brian Beckcom <brian@vbattorneys.com>, Michael Granado <michael@vbattorneys.com>
**Subject: TAMU - TRO Hearing**


Mr. Bonilla please see attached which is being filed today with an emergency hearing today at 3pm.

**EXHIBIT 5**

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
Tell me how I'm doing: ReviewVB.com
The best compliment you can give our team is the referral of someone who needs our help.

# EXHIBIT 6

**Jason Contreras**

---

| | |
|---|---|
| **From:** | Brendan Fradkin <brendan@vbattorneys.com> |
| **Sent:** | Monday, November 4, 2024 9:03 AM |
| **To:** | Jason Contreras |
| **Cc:** | Bonilla, Ray; Brian Beckcom; Michael Granado; Moore, Brooks; Patti Artavia; Silver, Thomas |
| **Subject:** | Re: TPIA Hearing on TRO Harris County |

What are you talking about? I'm on vacation and certainly haven't contacted anyone directly.

On Mon, Nov 4, 2024 at 10:02 AM Jason Contreras <Jason.Contreras@oag.texas.gov> wrote:

Brendan: You are very well aware that I represent TAMU in this matter. Cease and desist from contacting TAMU directly.

Jason Contreras
Asst. Attorney General

Get Outlook for iOS

---

**From:** Bonilla, Ray <RBonilla@tamus.edu>
**Sent:** Monday, November 4, 2024 8:43 AM
**To:** Patti Artavia <patti@vbattorneys.com>
**Cc:** Brendan Fradkin <brendan@vbattorneys.com>; Brian Beckcom <brian@vbattorneys.com>; Michael Granado <michael@vbattorneys.com>; Silver, Thomas <TSilver@tamus.edu>; Moore, Brooks <RBM@tamus.edu>; Jason Contreras <Jason.Contreras@oag.texas.gov>
**Subject:** RE: TPIA Hearing on TRO Harris County

At this point, we are no longer surprised by the unprofessional tactics of VB Attorneys.

**Ray Bonilla | General Counsel**
**The Texas A&M University System**

---

**From:** Patti Artavia <patti@vbattorneys.com>
**Sent:** Monday, November 4, 2024 8:00 AM
**To:** Bonilla, Ray <RBonilla@tamus.edu>
**Cc:** Brendan Fradkin <brendan@vbattorneys.com>; Brian Beckcom <brian@vbattorneys.com>; Michael Granado <michael@vbattorneys.com>
**Subject:** TPIA Hearing on TRO Harris County

Mr. Bonilla, please be advised we are passing our hearing set this morning at 10am in Harris County.

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**

Why hire VB Attorneys

Tell me how I'm doing: ReviewVB.com

The best compliment you can give our team is the referral of someone who needs our help.

--

Brendan Fradkin
VB Attorneys
832-791-2337


Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

# EXHIBIT 7

Cause No. 2024-76697

| | | |
|---|---|---|
| Brian Beckcom | ) | |
| *Plaintiff* | ) | In the District Court of |
| | ) | |
| VS. | ) | |
| | ) | Harris County, Texas |
| | ) | |
| Texas A&M University | ) | |
| *Defendant* | | 281ST Judicial District |

## NOTICE OF NONSUIT

Plaintiff, Brian Beckcom files this Notice of Nonsuit and hereby gives notice to this Court and

all parties that Plaintiff nonsuits all claims in this case without prejudice to refiling the same.

Respectfully submitted,

**VB Attorneys**

**/s/Brendan Fradkin**
Brendan Fradkin
SBN: 24097706
Brendan@vbattorneys.com
Job Tenant
Job@vbattorneys.com
1200 August, Suite 240
Houston, Texas 77057
713-224-7800 Phone
713-224-7801 Facsimile

**Certificate of Service**

The undersigned authority hereby certifies that a true and correct copy of the foregoing instrument has been served on the office of General Counsel on December 2, 2024.

*/s/Brendan Fradkin*
**Brendan Fradkin**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michael Granado on behalf of Brian Beckcom
Bar No. 24012268
Michael@vbattorneys.com
Envelope ID: 94833684
Filing Code Description: No Fee Documents
Filing Description: Notice of Nonsuit
Status as of 12/2/2024 3:14 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 12/2/2024 2:24:01 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 12/2/2024 2:24:01 PM | SENT |
| Raymond Bonilla | 2600985 | rbonilla@tamus.edu | 12/2/2024 2:24:01 PM | SENT |
| Jason Contreras | | Jason.contreras@oag.texas.gov | 12/2/2024 2:24:01 PM | SENT |
| Job Tennant | | Job@vbattorneys.com | 12/2/2024 2:24:01 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 12/2/2024 2:24:01 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 12/2/2024 2:24:01 PM | SENT |
| Michael Granado | | michael@vbattorneys.com | 12/2/2024 2:24:01 PM | SENT |

| Brian Beckcom | ) | |
|---|---|---|
| *Plaintiff* | ) | In the District Court of |
| | ) | |
| VS. | ) | |
| | ) | Harris County, Texas |
| | ) | |
| Texas A&M University | ) | |
| *Defendant* | | 281ST Judicial District |

## **ORDER**

On this day, the Court considered Plaintiff's Notice of Nonsuit. The Court finds that the notice should be GRANTED.

IT IS THEREFORE ORDERED that all claims asserted by Plaintiff in the above-referenced cause are hereby dismissed without prejudice to refiling of same.

All other relief not expressly granted herein is denied.

SIGNED this _____ day of _____, 2024.

_____
JUDGE PRESIDING

# EXHIBIT 8

Received & Filed 10/24/2024 4:31 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Jessica Martinez
Envelope# - 93578513

Cause No. _____ 24-003177-CV-85

| | | |
|---|---|---|
| Brian Beckcom | ) | In the District Court of |
| | ) | |
| vs. | ) | Brazos County, Texas |
| | ) | |
| Texas A&M University | ) | _____ Judicial District |

## Petition for Writ of Mandamus

*"I assume all texts were deleted."*
- Kathy Banks, Former A&M President

Texas A&M has a recent history of not complying with Texas law as it relates to public information requests. In this Petition for Writ of Mandamus under the Texas Public Information Act, Brian Beckcom ("Petitioner") seeks an order from the Court: (1) compelling Respondent Texas A&M University ("TAMU") produce documents it has thus far failed to produce; (2) prohibiting TAMU from destroying any documents, emails, or text, like when former TAMU President Kathy Banks, along with possibly still employed by TAMU, encouraged TAMU to destroy texts covered by Texas public information law.; and (3) also prohibiting TAMU from any further retaliatory investigation until TAMU has complied with the law.

## 1. Discovery Control Plan

1.1 Petitioner requests expedited relief under Level 1 of the Texas Rules of Civil Procedure. At this time, Petitioner requests non-monetary relief only, except for attorney fees and court costs, the amount of which will not exceed $100,000.

## 2. Claim for Relief

2.1     Petitioner seeks only non-monetary relief and attorney's fees and court costs necessary for the prosecution of this writ and subsequent discovery.

**3.      Parties**

3.1     Petitioner Brian Beckcom is an attorney whose address is 1220 Augusta, Suite 240, Houston, Texas 77057.

3.2.    Respondent Texas A&M University is a public university that can be served through its Office of General Counsel at Moore / Connally Building, 6th Floor, 301 Tarrow Street, College Station, Texas 77840-7896

**4.      Jurisdiction, Venue, and Conditions Precedent**

4.1     This Court has jurisdiction under Texas Government Code § 552.321. Venue is mandatory in Brazos County under Texas Government Code § 552.321(b).

4.2     All conditions precedent has been performed or have occurred.

**5.      Facts and Argument**

**5.1     Factual Background**

5.1.2   In August of this year, the Commandant of the Corps of Cadets was relieved of command, as was the Vice President of Student Affairs. They were removed in part because of a retaliatory and frivolous investigation into one of the Corps of Cadets most impressive and accomplished outfits and also because they were pushing a DEI-inspired agenda,[1]

---

[1] So-called "DEI" is not illegal in Texas as of January 1, 2024, pursuant to Senate Bill 17, which Governor Abbott signed into law.

including attempting to build transgender bathrooms on the quad and to radically restructure the Corps of Cadets in secret. [2]

On October 10, 2024, Ramirez and the Office of the Commandant launched yet another retaliatory investigation of the same outfit. On the following day, Petitioner sent a public information request for all information related to the frivolous and retaliatory investigation, including all texts and emails, in order to analyze claims and potential litigation against the conspirators. Petitioner also sent a preservation of evidence letter to Ray Bonilla, General Counsel of Texas A&M System, requesting that Bonilla implement litigation holds and take steps to obtain and preserve all the evidence before the conspirators deleted it.

Unsurprisingly, TAMU's Open Records Department and the Office of General Counsel have not complied with the law and have refused to produce full and complete information and documents, which is par for the course for TAMU's Open Records Department.

**5.2 TAMU failed to search for and produce documents responsive to requests for communications regarding a sham investigation into Squadron 17 of the Corps of Cadets.**

---

[2] The former Commandant was allowed to stay on the job for a short time, then "re-assigned" to a made-up job in the Office of the President of TAMU. Based on information and belief, Ramirez was allowed to remain on duty for a few months after being relieved of command for "optics" reasons. See Why the taxpayers of Texas are required to continue to pay for personnel that should have been removed immediately is an open question, and the public information request may shed some light on the subject.

5.2.1    On October 10, 2024, Petitioner requested that TAMU produce documents regarding an investigation into Squadron 17, a section of the TAMU Corps of Cadets.

5.2.2    The requests were as follows:

5.2.2.1 All documents or other materials related to any so-called investigation of Squadron 17 over the past four months, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation sent to or from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from any persons related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation for the past 4 months (from June 1, 2024 to present)

5.2.2.2 All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A&M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same

5.2.2.3 Any and all materials which show how any investigation of Squadron 17 initiated since June 2024 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.

5.2.3 As of October 24, 2024, the due date for response under the TPIA, TAMU has failed to respond.

5.2.4 Accordingly, this Court should issue a writ requiring compliance with the TPIA and that TAMU should produce the requested documents.

**5.3 TAMU has a history of hiding information subject to the TPIA, so an Order requiring preservation of documents is appropriate.**

5.3.1 At the highest levels, TAMU has a history of attempting to hide information about its own misdeeds. For example, Kathy Banks, the former president of A&M, attempted to delete texts that otherwise would have been accessible under the TPIA, and encouraged others to do so. Some of those she encouraged are still employed by TAMU. [3]

5.3.2 Here too, TAMU may be subject to public ridicule for a sham investigation in one of the Corps of Cadets' most prestigious outfits. There is a significant likelihood that TAMU personnel will attempt to hide emails, texts, and written communications about the investigation in order to avoid embarrassment and scandal.

---

[3] https://www.houstonchronicle.com/news/houston-texas/education/article/texas-am-kathleen-mcelroy-investigation-explained-18279212.php

5.3.3 Accordingly, this Court's Order should also require TAMU to preserve all evidence at issue.

**5.4 In order to ensure due process, TAMU's investigation should be postponed until compliance with the TPIA is complete.**

5.4.1 TAMU is violating the 4th and 14th amendment rights of its students by engaging in an investigation with no public accountability and to retaliate against them. Making this information publicly available is the only way to ensure that these students are receiving due process.

5.4.2 If TAMU fails to provide the public with the information necessary to determine if due process is being provided, then the investigation itself must stop in order to prevent potential violations of due process from occurring.

5.4.3 Accordingly, this Court should also enter an order stopping the investigation of Squadron 17 until the TPIA requests have been complied with.

6. **Violation of the Texas Public Information Act**

6.1 The TPIA requires that public information be produced "promptly."[4] The Texas Supreme Court has emphasized that the TPIA's prompt production requirement is a key part of its purpose to promote government transparency.[5] TAMU's failure to provide the requested information and perform an adequate search is a clear violation of the TPIA's unambiguous mandate.

7. **Request for Relief**

Petitioner requests that the Court:

---

[4] *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 243-44 (Tex. App.—Austin 2016, no pet.).
[5] *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011).

7.1     Order TAMU to produce the requested documents and information.

7.2     Order TAMU to preserve all documents and information and enjoin them from deleting, discarding, or hiding any documents or information.

7.3     Order TAMU's investigation into Squadron 17 to stop until the TPIA requests have been complied with.

Respectfully submitted,

**VB Attorneys**

/s/ Brian Beckcom

_____

**Brian Beckcom**
SBN:  24012268
brian@vbattorneys.com
1220 Augusta, Suite 240
Houston, Texas 77057
713/224-7800 (Office)
713/224-7801 (Facsimile)

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michael Granado on behalf of Brian Beckcom
Bar No. 24012268
Michael@vbattorneys.com
Envelope ID: 93578513
Filing Code Description: Petition
Filing Description: Petition for Writ of Mandamus
Status as of 10/28/2024 10:56 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brendan Fradkin | | brendan@vbattorneys.com | 10/25/2024 11:41:36 AM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 10/25/2024 11:41:36 AM | SENT |
| Patti Artavia | | patti@vbattorneys.com | 10/25/2024 11:41:36 AM | SENT |
| Michael  Granado | | michael@vbattorneys.com | 10/25/2024 11:41:36 AM | SENT |

# EXHIBIT 9

Cause No. 24-003358-CV-85 _____

| Brian Beckcom | ) | In the District Court of |
| | ) | |
| vs. | ) | Brazos County, Texas |
| | ) | |
| Texas A&M University | ) | _____ Judicial District |

## Petition for Writ of Mandamus

*"I assume all texts were deleted."*
- Kathy Banks, Former A&M President

Texas A&M has a recent history of not complying with Texas law as it relates to public information requests. In this Petition for Writ of Mandamus under the Texas Public Information Act, Brian Beckcom ("Petitioner") seeks an order from the Court: (1) compelling Respondent Texas A&M University ("TAMU") produce documents it has thus far failed to produce; and (2) prohibiting TAMU from destroying any documents, emails, or text, like when former TAMU President Kathy Banks encouraged TAMU personnel to destroy texts covered by Texas public information law.

## 1. Discovery Control Plan

1.1 Petitioner requests expedited relief under Level 1 of the Texas Rules of Civil Procedure. At this time, Petitioner requests non-monetary relief only, except for attorney fees and court costs, the amount of which will not exceed $100,000.00

## 2. Claim for Relief

2.1 Petitioner seeks only non-monetary relief and attorney's fees and court costs necessary for the prosecution of this writ and subsequent discovery.

- 114 -

### 3.  Parties

3.1  Petitioner Brian Beckcom is an attorney whose address is 1220 Augusta, Suite 240, Houston, Texas 77057.

3.2.  Respondent Texas A&M University is a public university that can be served through its Office of General Counsel at Moore / Connally Building, 6th Floor, 301 Tarrow Street, College Station, Texas 77840-7896

### 4.  Jurisdiction, Venue, and Conditions Precedent

4.1  This Court has jurisdiction under Texas Government Code § 552.321. Venue is mandatory in Brazos County under Texas Government Code § 552.321(b).

4.2  All conditions precedent have been performed or have occurred.

### 5.  Facts and Argument

### 5.1  Factual Background

5.1.1 In late February/early March, TAMU began a retaliatory and unwarranted hazing investigation against Squadron 17, a decorated outfit of the Corps of Cadets. On March 28, 2024, Petitioner Beckcom requested the following of TAMU pursuant to the TPIA:

(1) All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind

related in any manner to any such investigation, along with any other information pertaining to any such investigation.

(2) All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A&M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same.

(3) Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.

(4) Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf

of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same.

5.1.3 TAMU has refused to produce these documents, inaccurately stating that because Petitioner Beckcom knew the individuals who were being falsely investigated, the documents could not be produced. This is untrue, and TAMU knew it was untrue, as they have already produced documents related to a second, also retaliatory investigation against Squadron 17.[1]

5.1.3 In August of this year, the Commandant of the Corps of Cadets was relieved of command, as was the Vice President of Student Affairs. They were removed in part because of this retaliatory and frivolous investigation into Squadron 17 and also because they were pushing a DEI-inspired agenda,[2] including attempting to build transgender bathrooms on the quad and to radically restructure the Corps of Cadets in secret.[3]

5.1.4 TAMU's Open Records Department and the Office of General Counsel have not complied with the law and have refused to produce full and complete information and documents, which is par for the course for TAMU's Open Records Department.

5.1.5 The due date for these responses was May 5, 2024. They are overdue under the TPIA.

---

[1] Counsel for Petitioner, Brendan Fralkin sent an email to TAMU Counsel Claudene Marshall requesting an explanation for why documents were produced with respect to the October investigation but not the March investigation. Ms. Marshall merely stated that "[t]he university's position regarding [the] request : [has not changed" and no further explanation was given.

[2] So-called "DEI" is now illegal in Texas as of January 1, 2024 pursuant to Senate Bill 17, which Governor Abbott signed into law.

[3] The former Commandant was allowed to stay on the job for a short time, then "re-assigned" to a made-up job in the Office of the President of TAMU. Based on information and belief, Ramirex was allowed to remain on duty for a few months after being relieved of command for "optics" reasons. Why the taxpayers of Texas are required to continue to pay for personnel that should have been removed immediately is an open question, and the public information request may shed some light on the subject.

5.1.6    Accordingly, this Court should issue a writ requiring compliance with the TPIA and that TAMU should produce the requested documents.

**5.2 TAMU has a history of hiding information subject to the TPIA, so an Order requiring preservation of documents is appropriate.**

5.2.1 At the highest levels, TAMU has a history of attempting to hide information about its own misdeeds. For example, Kathy Banks, the former president of A&M, attempted to delete texts that otherwise would have been accessible under the TPIA, and encouraged others to do so. Some of those she encouraged are still employed by TAMU. [4]

5.2.2 Here too, TAMU may be subject to public ridicule (or worse) for a retaliatory investigation in one of the Corps of Cadets' most prestigious outfits. There is a significant likelihood that TAMU personnel will attempt to hide emails, texts, and written communications about the investigation in order to avoid embarrassment and scandal.

5.2.3 Accordingly, this Court's Order should also require TAMU to preserve all evidence at issue.

6.       **Violation of the Texas Public Information Act**

6.1      The TPIA requires that public information be produced "promptly."[5] The Texas Supreme Court has emphasized that the TPIA's prompt production requirement is a key part of its purpose to promote government transparency.[6] TAMU's failure to provide the

---

[4] https://www.houstonchronicle.com/news/houston-texas/education/article/texas-am-kathleen-mcelroy-investigation-explained-18279212.php

[5] *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 243-44 (Tex. App.—Austin 2016, no pet.).

[6] *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011).

requested information and perform an adequate search is a clear violation of the TPIA's unambiguous mandate.

## 7. Request for Relief

Petitioner requests that the Court:

7.1     Order TAMU to produce the requested documents and information.

7.2     Order TAMU to preserve all documents and information and enjoin them from deleting, discarding, or hiding any documents or information.

7.3     Order TAMU to pay cost, expenses, and attorney fees for withholding clearly responsive information and documents.

Respectfully submitted,

**VB Attorneys**

/s/ Brendan Fradkin

_____

**Brendan Fradkin**
*/s/ Brendan Fradkin*
SBN: 24097706
1220 Augusta, Suite 240
Houston, Texas 77057
        713/224-7800 (Office)
        713/224-7801 (Facsimile)

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Michael Granado on behalf of Brian Beckcom
Bar No. 24012268
Michael@vbattorneys.com
Envelope ID: 94204236
Filing Code Description: Petition
Filing Description: Writ of Mandamus | Brian Beckcom
Status as of 11/13/2024 9:37 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brendan Fradkin | | brendan@vbattorneys.com | 11/12/2024 3:23:59 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 11/12/2024 3:23:59 PM | SENT |
| Michael Granado | | michael@vbattorneys.com | 11/12/2024 3:23:59 PM | SENT |
| Patti Artavia | | patti@vbattorneys.com | 11/12/2024 3:23:59 PM | SENT |

EXHIBIT
10

CAUSE NO. 24-003358-CV-85

| BRIAN BECKOM, | § | IN THE DISTRICT COURT |
|---|---|---|
| *Plaintiff,* | § § § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| TEXAS A&M UNIVERSITY, | § § § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## BUSINESS RECORDS AFFIDAVIT

State of Texas      §
County of Brazos    §

Before me, the undersigned notary, on this day personally appeared Tricia Bledsoe, the affiant, whose identify is known to me. After I administered an oath, the affiant testified as follows:

1. My name is Tricia Bledsoe, and I am over the age of 18 years of age, of sound mind, capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am currently employed as the Director and designated Public Information Officer of Texas A&M University's (TAMU) Office of Open Records (ORO) and in this capacity am the primary custodian of the records identified herein by virtue of my duties and responsibilities.

3. The records identified in this affidavit and attached to Defendant's Plea to the Jurisdiction by exhibit number as business records are as follows:

   **Exhibit 13**: Plaintiff's TPIA request w/ history – J001147
   **Exhibit 14**: J1147 production part one (292 pgs)
   **Exhibit 15**: J1147 production part two (13 pgs)
   **Exhibit 16**: J1147 production June 13, 2024 (108 pgs)

4. These said 430 pages are kept by TAMU in the regular course of business. It was in the regular course of business for an employee or representative of TAMU or its predecessor agency, with knowledge of the act, event or condition recorded, to make the memorandum or record or to transmit information thereof to be included in such memorandum or record, and the memorandum or record was made at or near the time of the act, event or condition recorded or reasonably soon thereafter; or, in the case of documentation given to or received by TAMU, it was in the regular course of business for an employee or representative of TAMU to receive the record and place it in the appropriate files of TAMU. With the exception of the redaction of any personal, private, or confidential information, and any bates numbering or exhibit number identification of any documents by the parties of the records identified by exhibit number above, they are exact duplicates of the originals.

5. TAMU's Office of Open Records is dedicated to the principles of open government and strives to ensure compliance as set forth by the Texas Public Information Act (TPIA). TAMU's ORO oversees the collection process of information requested under the TPIA. The actual collection is done by the department maintaining the information or, in the case of emails, IT for that group. TAMU's ORO reviews, processes and releases information gathered by the respective department and/or IT. TAMU's ORO confirms the applicability of exceptions to disclosure on information requested under the TPIA with the Office of General Counsel of The Texas A&M University System (TAMUS OGC). For information determined to be excepted, TAMU's ORO works with TAMUS OGC to: request a decision from the Office of the Attorney General; confirm the applicability of a prior open records decision from the Office of the Attorney General; confirm TAMU's authority to redact or withhold excepted information without seeking a decision from the Office of the Attorney General per the TPIA; and/or confirm the applicability of the requestor's authorization to redact or withhold excepted information without seeking a decision from the Office of the Attorney General. TAMU's ORO redacts and/or withholds information requested under TPIA only when: authorized by the Office of the Attorney General in a decision/letter ruling; the information is subject to a prior decision of the Office of the Attorney General; the TPIA authorizes the action; and/or authorized by the requestor.

EXECUTED on January 15, 2025.



Patricia Bledsoe, Director
Office of Risk, Ethics, and
Compliance
Open Records
Texas A&M University

SUBSCRIBED AND SWORN BEFORE ME, on January 15, 2025 to certify which witness my hand and official seal.

CINDY PATTERSON
Notary Public, State of Texas
Comm. Expires 07-07-2026
Notary ID 12158588

Notary Public, State of Texas

Page 3

# EXHIBIT 11

**61.01**  **Public Information Act Compliance**



Revised November 10, 2022 (MO   -2022)
Next Scheduled Review:  November 10, 2027
Click to view Revision History.

## Policy Summary

The Texas A&M University System (system) and its members are committed to full compliance with the Texas Public Information Act.

## Policy

1. The system Board of Regents (board) is committed to full and complete compliance with the letter and the spirit of the Texas Public Information Act and to public policy of the state of Texas that "all persons are, unless otherwise expressly provided by law, at all times entitled to full and complete information regarding the affairs of government and the official acts of those who represent them."  It is the board's policy that the system and all members fully comply with the provisions of the Texas Public Information Act.  In the absence of any applicable exception to disclosure under the Act, requested information will be provided as soon as possible.

2. Each chief executive officer (CEO) is designated as that member's Officer for Public Information.  To assist in achieving full compliance with the Act, the chancellor must promulgate a regulation that includes procedures to be used in the receipt and referral of public information requests.  Such procedures must provide for the appointment of a specific agent of the Officer for Public Information at each member to compile and coordinate responses to all public information requests.  The System Office of General Counsel assists members in determining whether requested information is public and in seeking Attorney General decisions in accordance with the Act.  The agent of the Officer for Public Information must notify the CEO and/or other appropriate member or system contacts of requests that may have public relations significance.

3. The chancellor and each member CEO must make every effort to keep the board informed on issues which could appear in the media and about which board members may be questioned.

## Related Statutes, Policies, or Requirements

Tex. Gov't Code, Ch. 552

Regulation *61.01.02, Public Information*

## Member Rule Requirements

A rule is not required to supplement this policy.

## Contact Office

General Counsel
(979) 458-6120

# EXHIBIT 12

## 61.01.02   Public Information

Revised September 10, 2019
Next Scheduled Review:  September 10, 2024
Click to view Revision History.



## Regulation Summary

This regulation establishes baseline procedures to help members of The Texas A&M University System (system) comply with the Texas Public Information Act.

## Regulation

1.   PUBLIC INFORMATION

   1.1   The Texas Public Information Act, Chapter 552, Texas Government Code (the Act), specifies that, with certain exceptions, all information collected, assembled or maintained pursuant to law or ordinance or in connection with the transaction of official business by a governmental body or for a governmental body, if the governmental body owns or has access to the information, is public information and must be available to the public during normal business hours of the governmental body.

   1.2   As used in the Act, the term "governmental body" includes boards, committees, institutions, agencies or offices that are within or created by the executive branch of the state government, including the system Board of Regents (board), system members and System Offices, and are under the direction of one or more elected or appointed members (i.e., system board).

   1.3   The Act "will be liberally construed in favor of granting a request for information."

2.   THE OFFICER FOR PUBLIC INFORMATION AND DESIGNATED AGENT

   2.1   The Act provides that each member chief executive officer (CEO) is the officer for public information, who is responsible for the preservation and care of the member's public records.

   2.2   Each CEO must designate an agent to act as public information officer/coordinator (PIO) for that member.  The PIO will compile and coordinate responses to all public information requests the member receives.  ***However, the CEO retains ultimate responsibility for that member's full compliance with the Act.***  Also, each CEO must appoint a backup or alternate PIO to act in the PIO's absence.  Each CEO will also ensure that the identity of the PIO, the PIO's office and mailing address, the member's open records email address, and a link to the member's electronic open records portal are prominently displayed and easily accessible on the member's website.  The System Office of General Counsel (OGC)

and the PIOs for the other members must be promptly notified upon the appointment of a new PIO.

2.3 Each member PIO and backup/alternate must complete open records training as required by the Act.

2.4 The PIO will not make any inquiry of a requestor except to establish proper identification, seek clarification to determine what public information is being requested, or seek to narrow the scope of a request for a large amount of information. All requests will be treated uniformly without regard to the position or occupation of the requestor or whether the requestor is a member of the media.

2.5 The PIO must keep an accurate record of all public information requests the member receives for a given year, including the name and contact information of each requestor, the date on which a request is received, the date on which the records are made available or copies provided, the type of information requested, which departments or units were requested to provide information by the PIO, which departments or units provided the requested information, how much is charged to and paid by the requestor for copies and other costs, if any, and any other information necessary to demonstrate the member's compliance with the Act for each request. The PIO must also keep a record of when an Attorney General decision is sought and the decision of the Attorney General for a given request, if any.

2.6 Not later than the end of each month, the PIO must electronically submit to the Office of the Attorney General all necessary information on the number and nature of public information requests the member responded to during the prior month. For example, reports for September of a given year must be submitted to the Attorney General's Office by the end of October of that year.

2.7 Each member PIO must ensure that the member timely makes all other reports to the Office of the Attorney General which are required by the Act.

2.8 Each member PIO must prominently display the sign in the form approved by the Attorney General "that contains basic information about the rights of a requestor, the responsibilities of a governmental body, and the procedures for inspecting or obtaining a copy of public information under" the Act.

2.9 Each member must develop guidelines for public information requests to ensure that the PIO can promptly seek and receive responsive information from the widest reasonable group of departments/units. Members are encouraged to use email and electronic records when possible to expedite responses to public information requests.

3. PUBLIC INFORMATION REQUEST PROCEDURES

3.1 Any public information request to a member must be in writing and directed to that member's PIO. A public information request to a member may only be submitted by one of the following methods to the person designated as that member's PIO: hand delivery, US mail, email, or the member's electronic open records portal.

3.2 After receiving a public information request, the PIO must promptly:

(a) Process the request through the member's electronic open records portal.

(b) Send an acknowledgment of receipt to the requestor, including its assigned portal number.

(c) Forward a copy of the request to the member department/unit or widest group of departments/units that may reasonably possess the requested information. The member department/unit or group of departments/units will search for the requested information and notify the PIO by the next business day, if possible, what responsive information each department/unit possesses. A copy of the records containing the responsive information will be forwarded to the PIO as soon as possible.

(d) Notify the CEO and/or other appropriate member or system contacts of requests that may have public relations significance.

(e) Forward a copy of the request and responsive documents to OGC if the PIO has a question regarding the applicability of an exception to disclosure under the Act. See Section 5 for seeking a decision from the Attorney General.

3.3 If the PIO determines, through consultation with OGC, the requested information is public, the PIO must promptly produce to the requestor a copy of the information or produce the information for inspection.

3.4 If the information is unavailable within 10 business days after receiving a written request for information, the PIO must certify this fact in writing to the requestor and set a date and hour within a reasonable time when the information will be available.

4. COST OF COPIES

4.1 If assessed, copy charges will not be excessive. Maximum charges for the reproduction of public information, reflecting rates approved by the Office of the Attorney General, can be found in Texas Administrative Code.

4.2 Public information will be furnished without charge or at a reduced rate if the member determines that a waiver or reduction of the fee is in the public interest because furnishing the information can be considered as primarily benefiting the general public. Requests for reduced charges must be in writing and addressed to the PIO.

5. PUBLIC INFORMATION DECISIONS

5.1 If a member receives a public information request that it (1) considers to be within one of the Act's exceptions to disclosure; and (2) wishes to withhold responsive information from public disclosure, a request for decision must be submitted to the Attorney General within **_10 business days_** after receiving the public information request. In some limited circumstances, the Act may permit the withholding of information without seeking an Attorney General decision, e.g., FERPA.

5.2 The PIO will segregate responsive public information from the information submitted to the Attorney General and will promptly produce the public information to the requestor.

5.3 The member PIO will immediately submit information to OGC for review and for preparation of the Attorney General decision request, including the following:

(a) a copy of the written public information request and information showing when the request was first received by the member;

(b) information showing who at the member first received the request;

(c) a copy of the specific information requested or representative samples of the information if a voluminous amount of information was requested; and

(d) a list of all departments/units that were requested by the PIO to provide responsive information and which departments/units actually provided the information.

OGC will then forward the decision request and the information to the Attorney General.

6. EMPLOYEE PUBLIC INFORMATION REQUESTS

6.1 System employees are not authorized to submit public information requests to members while acting in their official capacity. Any public information request made by a member employee must be submitted in that employee's individual capacity as a private citizen.

6.2 The willful misuse of information received through the Act may subject the employee to the loss of individual indemnification by the state. This regulation does not affect employees' access to information in their official personnel files.

7. ANNUAL SYSTEM MEMBER COMPLIANCE CERTIFICATION

Not later than the last business day of September, members must annually submit a *Public Information Act Compliance Certification* to OGC for the prior fiscal year. The certification will be consistent with the form linked in this regulation.

## Related Statutes, Policies, or Requirements

1 Tex. Admin. Code Ch. 70, *Cost of Copies of Public Information*

Tex. Gov't Code Ch. 552

Attorney General's Open Government website

Attorney General's Public Information Act Handbook 2018

Attorney General's Public Information Act Sign

System Policy *33.04, Use of System Resources*

System Policy *61.01, Public Information Act Compliance*

System Regulation *61.99.01, Retention of State Records*

## Appendix

[Annual System Member Public Information Act Compliance Certification Form](#)

## Member Rule Requirements

A rule is not required to supplement this regulation.

## Contact Office

General Counsel
(979) 458-6120

# EXHIBIT 13

# Public Information Records <span>(#J001147-032824)</span>

⌄ **Public Information Records Details**

---

This request is for:              Texas A&M University

Summary of Request:              Documents, communications, other materials regarding Investigation of Squadron 17.

| | |
|---|---|
| Describe in detail the Record(s) Requested: | From: Brian Beckcom<br>Sent: Thursday, March 28, 2024 5:31 PM<br>To: Texas A&M University Public Records Support<br>Cc: Patti Artavia ; Brendan Fradkin ; open-records@tamu.edu<br>Subject: Freedom of Information Request related to Squadron 17<br><br>To whom it may concern:<br><br>Please see attached an open records request. Do not send me a form letter with frivolous objections like the last two times. Also, I agree with appropriate redactions and the answer to both of those questions is yes, so do not send me the form email that you utilize to delay the process.<br><br>Please remind Dr. Douglas Bell, Joe Ramirez, Patrick Michalis, and anyone else involved in this matter of their legal obligations to preserve any potentially responsive documents.<br><br>Texas law mandates the response be sent in 10 days. Do not ask for an extension unless you give me a rational, logical and appropriate reason for any extension. Given the failure to comply with my previous two requests, I expect this request to be answered fully and timely. If it is not, I will proceed appropriately<br><br>If you have any questions, please let me know.<br><br>-bb<br><br>● All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation<br><br>● All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A&M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same<br><br>● Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.<br><br>● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same.<br>I agree to pay reasonable fees for the processing of this request.<br><br>As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.<br><br>Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.<br><br>Sincerely,<br>/s/ Brian Beckcom<br>Brian Beckcom<br>Brian@vbattorneys.com |

Date From:

Date To:

| | |
|---|---|
| Preferred Method to Receive Records: | Electronic via Records Center |
| Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?: | YES |
| Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?: | YES |

> **Category**

⌄ **Clarification(s)**

| | | |
|---|---|---|
| Clarification(s): | Rec'd Response to Narrowing Request - 4/2<br>Sent Request to Narrow - 4/2<br>Rec. payment for CE 4/18 | STAFF: Please describe any clarifications requested and received. |

> **OAG decision requested**

> **Exceptions**

> **Charges**

⌄ **Notes**

| Note | Created | Modified |
|---|---|---|
| Per the requestor direct any future correspondence to Patti@vbattoreys.com for this request. | 4/1/2024 12:55:00 PM by Leslie Kacer | 4/1/2024 12:55:00 PM by Leslie Kacer |

⌄ **Message History**

On 5/8/2024 8:36:01 PM, Knesha Brashear wrote:

Date

CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com

**Subject:** Public Information Records :: J001147-032824

**Body:**
05/08/2024

RE: PUBLIC RECORDS REQUEST of March 29, 2024, Reference # J001147-032824

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 29, 2024.   Your request mentioned:

*"To whom it may concern:*

*Please see attached an open records request. Do not send me a form letter with frivolous objections like the last two times. Also, I agree with appropriate redactions and the answer to both of those questions is yes, so do not send me the form email that you utilize to delay the process.*

*Please remind Dr. Douglas Bell, Joe Ramirez, Patrick Michalis, and anyone else involved in this matter of their legal obligations to preserve any potentially responsive documents.*

*Texas law mandates the response be sent in 10 days. Do not ask for an extension unless you give me a rational, logical and appropriate reason for any extension. Given the failure to comply with my previous two requests, I expect this request to be answered fully and timely. If it is not, I will proceed appropriately*

*If you have any questions, please let me know.*

*-bb*

*● All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation*

*● All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A& M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in " DE& I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same*

*● Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or*

*elsewhere.*

*● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same. I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.*

*Sincerely,*
*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"*

The information found responsive to your request is available and can be obtained by visiting the Public Records Online Portal and logging in from the " My Request Center" tab. Per your affirmative response to the "Redaction Statement" giving us permission to redact information subject to mandatory and discretionary exceptions, we have redacted and/or withheld information excepted under the following sections of the Texas Government Code: 552.024, 552.107, 552.114 and 552.137.

Sincerely,

Knesha Brashear
Open Records Office

On 5/2/2024 5:37:00 PM, Knesha Brashear wrote:

Date
CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J001147-032824
**Body:**
05/02/2024


RE: PUBLIC RECORDS REQUEST of March 29, 2024, Reference # J001147-032824

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 29, 2024.   Your request mentioned:

"● *All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation*

● *All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A& M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in " DE& I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same*

● *Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.*

● *Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same. I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We*

*look forward to hearing from you.*

*Sincerely,*
*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"*

Our apologies for the delay, but we are still processing your request. We expect to have a response to you no later than the close of business on Wednesday, May 8th.

Sincerely,

Knesha Brashear
Open Records Office

Date

On 4/15/2024 5:35:41 PM, Knesha Brashear wrote:

Date

CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com

**Subject:** Public Information Records :: J001147-032824

**Body:**
04/15/2024


RE: PUBLIC RECORDS REQUEST of March 29, 2024, Reference # J001147-032824

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 29, 2024. Your request mentioned:

*"● All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation*

*● All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A& M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in " DE& I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same*

*● Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.*

*● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same. I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We*

*look forward to hearing from you.*

*Sincerely,*
*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"*

It has been determined that complying with your request will result in the imposition of a charge that exceeds $40. Therefore, a cost estimate is being provided to you as required by Section 552.2615 of the Texas Government Code. Additionally, the estimated charges exceed $100.00; therefore, as allowed by section 552.263(a) of the Government Code, TAMU requires payment of the bond before starting work on your request. As a less expensive way for you to obtain this information, the estimated cost can be reduced significantly by narrowing your request. It may be that viewing the information will be less costly. However, charges for the mandatory redactions may still apply. Your check or money order should be made payable to " Texas A& M University" and forwarded to:

*Texas A& M University*

1280 TAMU

*College Station, TX 77843-1280*

*Attn: Wendy Ramirez*

Your request will be considered automatically withdrawn if you do not either: a) provide the required bond payment within ten business days from the date of this letter; or b) notify us in writing within ten business days from the date of this letter that you:

1. wish to modify your request; OR

2. have sent to the Open Records Division of the Office of the Attorney General a complaint alleging that you are being overcharged for the information you have requested.

Please consider the options indicated above and advise this office of your decision as soon as possible.

Breakdown of responsive information:

- Estimated number of pages requiring mandatory redactions = 952
- 1 minute per page to make redactions = 952 minutes or 15.86 hours
- 15.86 X $15.00 per hour = $237.90 Labor charge
- $237.90 X 20% = $47.58 Overhead
- Total = $285.48

Please note, you can contact the Student Conduct' s Office directly to obtain your son' s student records through the University' s FERPA process.

*Douglas Bell*

douglasb@vpsa.tamu.edu

The university will redact or withhold personally identifiable information from student education records in accordance with Tex. Gov' t Code sec. 552.114 and the Family Educational Rights and Privacy Act, 20 U.S.C. sec. 1232g, and the Department of Education' s FERPA regulations (34 C.F.R. Pt. 99). Please note that the scope of what is " personally identifiable" under FERPA is more expansive and may cover entire records depending on how much a requesting party knows about a particular situation and the students involved, such as in the case of information " requested by a person who the education agency or institution reasonably believes knows the identity of the student to whom the education record relates." See 34 C.F.R. § 99.3, Definition of " Personally Identifiable Information, " (g). This will be particularly applicable to information you requested regarding Squadron 17, such as in items 1, 3, and 4.

Sincerely,

Knesha Brashear
Open Records Office

On 4/1/2024 5:33:01 PM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu]

This is another form response.
Date range is 2023 and 2024.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Mon, Apr 1, 2024 at 5:30 PM Texas A&M University Public Records Support wrote:

Date

On 4/1/2024 5:30:29 PM, Leslie Kacer wrote:

Date
CC: Open-records@tamu.edu;
**Subject:** Public Information Records :: J001147-032824
**Body:**

April 1, 2024

RE: PUBLIC RECORDS REQUEST of March 29, 2024, Reference # J001147-032824

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 29, 2024.   Your request mentioned:

*"From: Brian Beckcom< brian@vbattorneys.com>*
*Sent: Thursday, March 28, 2024 5:31 PM*
*To: Texas A& M University Public Records Support< texasam@mycusthelp.net>*
*Cc: Patti Artavia  < patti@vbattorneys.com> ; Brendan Fradkin  < brendan@vbattorneys.com> ; open-records@tamu.edu*
*Subject: Freedom of Information Request related to Squadron 17*

*To whom it may concern:*

*Please see attached an open records request. Do not send me a form letter with frivolous objections like the last two times. Also, I agree with appropriate redactions and the answer to both of those questions is yes, so do not send me the form email that you utilize to delay the process.*

*Please remind Dr. Douglas Bell, Joe Ramirez, Patrick Michalis, and anyone else involved in this matter of their legal obligations to preserve any potentially responsive documents.*

*Texas law mandates the response be sent in 10 days. Do not ask for an extension unless you give me a rational, logical and appropriate reason for any extension. Given the failure to comply with my previous two requests, I expect this request to be answered fully and timely. If it is not, I will proceed appropriately*

*If you have any questions, please let me know.*

*-bb*

*● All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation*

*● All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A& M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in " DE& I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students,*

- 145 -

*and any communications between or amongst same*

*● Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.*

*● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same. I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.*

*Sincerely,*
*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"< /brendan@vbattorneys.com> < /patti@vbattorneys.com> < /texasam@mycusthelp.net> < /brian@vbattorneys.com>*

Our office is unable to conduct a search for *"...All documents or other materials related to any so-called investigation of Squadron 17, ..., " "...All documents or materials related to the qualifications or training of the individuals..., " "...Any and all materials which show how any investigation of Squadron 17..., "* and *"...Any texts, emails or other forms of communication , digital or otherwise, ...."* Therefore, we are requesting that you narrow your request by providing us with a date range, so that we can better assist you with your request.

As provided by section 552.222(d) of the Texas Public Information Act, your request will be considered withdrawn if we do not receive a response from you by the 61st day after the date of this request for clarification/narrowing.

Sincerely,

Leslie Kacer
Open Records Office

Date

On 3/28/2024 5:44:14 PM, System Generated Message:
**Subject:** Texas A&M University Public Information Request :: J001147-032824
**Body:**
Dear Brian Beckcom:

We received your public information request for **Texas A&M University**.  Your request was given the **reference number J001147-032824** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.


To monitor the progress or update this request please log into the Public Records Center.

On 3/28/2024 5:44:13 PM, Leslie Kacer wrote:
Request was created by staff

## ⌄ Request Details

| | |
|---|---|
| Reference No: | J001147-032824 |
| Created By: | Leslie Kacer |
| Create Date: | 3/29/2024 8:00 AM |
| Update Date: | 5/8/2024 10:23 PM |
| Completed/Closed: | No |
| Required Completion Date: | 5/8/2024 |
| | |
| Status: | Activity Assigned |
| Priority: | Medium |
| Assigned Dept: | TAMU_Open Records |
| Assigned Staff: | Open Records University |
| | |
| Customer Name: | Brian Beckcom |
| Email Address: | Brian@vbattorneys.com |
| Phone: | 8327913118 |
| Group: | TAMU |
| | |
| Source: | Email |

# EXHIBIT 14

**From:** Bell Jr, Douglas
**To:** Winking, Audrey J
**Cc:** Gardner, Jeffery D; Smith, Asia
**Subject:** FW:
**Date:** Tuesday, March 5, 2024 12:08:25 PM

Howdy Audrey,

Have we spoken wit

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, March 5, 2024 11:38 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**

Sir,

has not been questioned yet you may want to reach out to him.  He is
willing to make a statement if asked.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Corps Standards and Accountability Director
Military Advisor Parsons Mounted Cavalry
979-458-9317

—

**From:** Eddy, Georgia G <spur-saddle59@exchange.tamu.edu>
**Sent:** Wednesday, January 31, 2024 1:01 PM
**To:** Alvarado, Blair <abalvarado@tamu.edu>
**Subject:** Fw

Howdy,

A student has requested witnesses to be present for their upcoming Conference. I will discuss the case with you during our 1:1 today.

Respectfully,

Georgia Eddy '22
Texas A&M University
Academic Integrity Administrator
Aggie Honor System Office
(979) 458-3378

**From**
**Sent:** Tuesday, November 28, 2023 12:15 AM
**To:** Eddy, Georgia G <spur-saddle59@exchange.tamu.edu>; Eddy, Georgia G <spur-saddle59@exchange.tamu.edu>
**Subject**

Dear Georgia Eddy,

This email is for additional information for the

*Amend to the case's file:
- The case's file claimed that ▮▮▮▮ went to the afternoon activity's training time. However, instead, ▮▮ texted and called ▮▮▮▮▮ through his (▮▮▮▮▮▮ phone number and told ▮▮ ▮▮▮ to go back to the dormitory.

*Witnesses:
▮▮▮▮▮▮▮▮ Justify whether ▮▮ has told others that he (▮▮ was a ▮▮▮▮ .

- ▮▮▮▮▮▮ is a ▮▮▮▮ in company ▮▮ in the Corps of Cadets. He is a lower ranking

Cadet than ▓▓▓▓ and a ▓▓▓ with ▓▓▓▓ ▓ is taking ▓▓▓ for ▓▓▓ During a conversation with ▓▓▓▓, ▓▓▓▓ told ▓▓▓▓ that Mr. ▓ told that he (Mr. ▓) was a ▓▓▓▓, and he (Mr. ▓) would help ▓▓▓ if ▓▓▓ struggled in that class (as ▓ did with ▓▓▓▓).

▓▓▓▓ Justify whether ▓ has told others that he (Mr. ▓) was a ▓▓▓

- ▓▓▓▓ is a ▓▓▓ in company ▓▓ in the Corps of Cadets. He is a lower ranking Cadet than ▓▓▓▓, a ▓▓ with ▓▓▓▓, and a former roommate with ▓▓▓▓ (before ▓▓▓▓ moved to a different room). ▓▓▓▓ used to take ▓▓ (he dropped it to take ▓▓. At the time he was taking ▓▓▓, He, as he told ▓▓▓▓, was told by Mr. ▓ that Mr. ▓ is a ▓▓▓ and would offer help if ▓▓ struggled in that class (as ▓ did with ▓▓▓▓).

▓▓▓▓ : Justify whether ▓ has told others that he (Mr. ▓) was a ▓▓▓

- ▓▓▓▓ is a ▓▓▓ in company ▓▓ in the Corps of Cadets. ▓▓ is a lower ranking Cadet than ▓▓▓▓ and a ▓▓ with ▓▓▓▓. Unlike other witnesses, ▓ is not taking ▓▓▓ for ▓▓ Despite that, ▓▓ was told by Mr. ▓ that he (Mr. ▓) is a ▓▓▓ after he (Mr. ▓) found out that ▓▓▓▓ was gathering witnesses for the case. After ▓▓▓▓ asked ▓▓ whether Mr. ▓ told ▓▓ that he (Mr. ▓) was a ▓▓▓ Mr. ▓ found out the situation and came to ▓▓▓▓'s room; he (Mr. ▓) started to convince ▓▓ that he (Mr. ▓) was a ▓▓▓

▓▓▓▓ Justify whether ▓▓ has told others that he (▓▓ was a ▓▓▓ .

- ▓▓▓▓ is a ▓▓▓ in company ▓▓ in the Corps of Cadets. He is a lower ranking cadet than ▓▓▓ and a ▓▓ with ▓▓▓. ▓▓ is taking ▓▓▓ for ▓▓▓ knows, as he told ▓▓▓, that ▓▓ is a ▓▓▓ through a story by ▓▓▓ (As ▓▓▓

▓▓▓▓ Justify the story on ▓▓▓▓ leaving outfit's afternoon training time to meet Mr. ▓).

▓▓▓▓ is a ▓▓▓ in company ▓▓ in the Corps of Cadet. ▓▓ is a lower ranking cadet than ▓▓▓▓ and a ▓▓ buddy with ▓▓▓▓. On ▓▓▓ as ▓▓▓ was leaving the outfit's afternoon activity from the ▓▓▓ | ▓▓▓ He (▓▓▓) met ▓▓▓ on the steep in front of the Kyle Field. They (▓▓▓▓ and ▓▓▓▓) had a talk about how sore ▓▓▓▓ leg was from having to train in the morning. Then, they (▓▓▓ and ▓▓▓▓ saw Mr. ▓, and ▓▓▓▓ started to leave with Mr. ▓.

*Edvidences:



| **From:** | Bell Jr, Douglas |
|---|---|
| **To:** | Latham, Skylar |
| **Cc:** | Smith, Asia |
| **Subject:** | Investigation Assigned |
| **Date:** | Monday, December 18, 2023 3:24:13 PM |
| **Attachments:** | |

Howdy,

Please see the attached      harassment investigation assigned to you.  Please let me know if you have any questions or concerns.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Smith, Asia |
|---|---|
| To: | Bell Jr, Douglas |
| Subject: | RE: 3 items shared with you |
| Date: | Monday, February 26, 2024 9:50:00 AM |
| Attachments: | image001.png |

I would assign myself as the SCA and ask Skylar to co adjudicate with me.

**Asia Smith M.S.Ed.**  |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Smith, Asia
**Sent:** Monday, February 26, 2024 9:45 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: 3 items shared with you

Dr. Bell,

I have reviewed this case and believe tha          should be charged with Abuse of Process for *attempting to discourage an individuals'          participation in, or use of, a student conduct, disciplinary or legal process.* Additionally, I would charge hazing for the coercive behavior and theft for stealing the intellectual property of another student. Dishonesty may also apply or making false statements in the meeting with the faculty member and submission of work that was not his.

The theft maybe addressed by the AHSO but if I were charging the student I would want to encompass all behaviors. I would not charge              ould also like to determine if other          members sent their work

**Asia Smith M.S.Ed.**  |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, February 23, 2024 2:23 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:** FW: 3 items shared with you

I'm looking through my email, and I forgot to send this your way for your review.  Please review and let me know your thoughts before you assign.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards

Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas
**Sent:** Tuesday, February 6, 2024 11:43 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: 3 items shared with you

See attached.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, February 6, 2024 11:39 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: 3 items shared with you

Hey Dr. Bell,

I tried but I'm unable to open those attachments, it says I need access.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, February 6, 2024 11:06 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: 3 items shared with you

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Blair Alvarado (via Google Drive) <drive-shares-noreply@google.com>
**Sent:** Friday, February 2, 2024 1:08 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** 3 items shared with you

**This Message Is From an External Sender**

This message came from outside your organization.

# Blair Alvarado shared 3 items



Blair Alvarado (abalvarado@tamu.edu) has shared the following items:



Howdy Dr. Bell,

We have been navigating a potential case of academic misconduct with the following information. As information continues to be provided, some indicators have begun to present themselves that may need to be reviewed by your office. ▮▮▮▮▮ sites exceeding pressures to provide assignments along with demands to delete emails, etc. to and from their ▮▮▮▮▮ in the documents I have provided. There are also some witnesses that may provide some clarity. There are other documents as well; if you would like to review more or have questions, please let me know. A conference is scheduled to address potential academic misconduct within the next week. Thank you for your time.

ABA

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because abalvarado@tamu.edu shared files or folders
located in Google Drive with you.



**From:** Smith, Asia
**To:** Gardner, Jeffery D
**Cc:** Latham, Skylar
**Subject:** RE: Corps Conduct Cases
**Date:** Wednesday, March 20, 2024 2:27:00 PM

Thanks for the statement from ▮▮▮▮. The Honor Council Probation is different from the Student Conduct Probation. He was charged for student rule violations in Student Rule 20. For our office Student Rule 24 is used and he will have different behaviors addressed that include Hazing, Abuse of process, dishonesty.

I tried calling you this morning to see where you were at with getting this statement (great minds think alike). Are you available                                          I can schedule him for that time.

**Asia Smith M.S.Ed.**  |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, March 20, 2024 11:02 AM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** RE: Corps Conduct Cases

Morning Ladies,

        I'm trying to catch up on delinquent emails.  I apologize for the delay in responding.    For the ▮▮▮▮▮▮▮▮ situation, Aggie Honor has already ruled that       is responsible.  I received a statement from ▮▮▮▮ (attached).  I do have a question.  If ▮▮ is already on Conduct Probation as a result of academic dishonesty, would it be double jeopardy to charge him again?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Corps Standards and Accountability Director
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Smith, Asia <asias@sco.tamu.edu>
**Sent:** Thursday, February 29, 2024 4:05 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** Corps Conduct Cases

Howdy,

We have three cadets that will be seen by the Conduct office. I wanted to get your schedule for March 7th and 8th.

I've asked Skylar to co-SCA with me so I have copied her on this email. In my conversations with Skylar she said that you may already be aware of the incidents but I wanted to loop you in officially prior to sending charge letters.

I assume all will get conduct unbecoming a cadet.

**Summary**

-Fighting a non student

█████- interfering with the officers who were addressing the fight with

██ - appeared before AHSO regarding turning in another        The other         stated that asked several other students for them to submit their work to him. Would it be possible to gather statements for the other students named?

 –

24.4.3. Physical abuse. Any attempt to cause injury or inflict pain; or causing injury or inflicting pain. Also causing physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. It is not a defense that the person, group, or organization against whom the physical abuse was directed consented to, or acquiesced to, the physical abuse.

24.4.6.1. Evading. Intentionally fleeing from a University official or law enforcement officer when the person knows or reasonably should have known the University official or law enforcement officer is attempting to confront, arrest, or detain.

███████

24.4.17. Disorderly conduct. Public behavior that is disruptive, lewd, or indecent; breach of peace; or aiding, or procuring another person to breach the peace on University premises or at functions sponsored by the University or participated in by members of the University community.

24.4.6. Failure to comply. Failure to comply with proper and lawful direction of any University official or law enforcement officer.

██████████

24.4.23. Abuse of process. Abuse of the student conduct, disciplinary and/or legal processes including, but not limited to, investigations, conferences, and appeals.

24.4.5. Hazing. Any act that endangers the mental or physical health or safety of a student, or that destroys or removes public or private property; and/or assisting, directing, or in any way causing others to participate in degrading behavior and/or behavior that causes ridicule, humiliation, or embarrassment for the purpose of initiation, admission into, affiliation with, or as a condition for continued membership in a group or organization; or as part of any activity of a recognized student organization, student group, Corps of Cadets, Corps outfit, Corps unit, or Corps Special Activities. Previously relied upon "traditions" (including Corps, fraternity/sorority, or any other group or organization activity, practice or tradition), intent of such acts, or coercion by current or former

members or student leaders of such groups, will not suffice as a justifiable reason for participation in such acts. It is not a defense that the person (or group) against whom the hazing was directed consented to, or acquiesced to, the behavior in question.

Examples of such behavior include but are not limited to:
- Misuse of authority by virtue of one's class rank or leadership position.

24.4.1. Dishonesty. Acts of dishonesty, including but not limited to the following:

24.4.4.1. Theft. Unauthorized removal or stealing and/or attempted removal or stealing of property of a member of the University community or other personal or public property, on or off campus. This includes knowingly possessing such stolen property. This also includes theft of services and/or misuse of another's property including, but not limited to, unauthorized use of another's property, unauthorized selling of subsidized tickets, and use of a forged parking permit.

I was hoping to get with you earlier today however time moves so quickly. I must have letters out on Monday to have meetings at the end of the week so your prompt response is appreciated.

Let me know your thoughts!

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Skylar will be the SCA for this case.

**Asia Smith M.S.Ed.**  |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Monday, January 8, 2024 2:32 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**                Investigation Report

Howdy,
Please review the attached investigation report and let me know who you would like for me to forward this report to.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas
**To:** Winking, Audrey J
**Subject:** FW: Corps Hazing/Harassment Complaint
**Date:** Thursday, September 14, 2023 12:15:29 PM
**Attachments:** FW Video and photos from corps student.msg

I am forwarding this information to initiate an investigation into this matter. Please let me know if you have any questions or concerns.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Smith, Jennifer M <jennifer.smith@exchange.tamu.edu>
**Sent:** Thursday, September 7, 2023 1:16 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Desai, Jennifer L <jdesai@tamu.edu>
**Subject:** FW: Corps Hazing/Harassment Complaint

See synopsis below.

*Jennifer Smith* | Assistant Vice President & Title IX Coordinator
University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations
Texas A&M University | YMCA, Suite 108
1268 TAMU | College Station, TX 77843-1268
ph: 979.458.8167 | Jennifer.smith@tamu.edu

**From:** Desai, Jennifer L <jdesai@tamu.edu>
**Sent:** Wednesday, September 6, 2023 1:31 PM
**To:** Smith, Jennifer M <jennifer.smith@exchange.tamu.edu>
**Subject:** Corps Hazing/Harassment Complaint

Hi Jennifer-

I had an intake this morning with ▮▮▮▮▮ a corps member in ▮▮▮ He is being harassed/hazed by ▮▮▮▮▮ another student in his unit. I recognize this is not an 08.01.01 violation, but a Rule ▮▮▮▮▮ is concerned about retaliation and ostracism from the corps if he reports up the chain and also worried that Student Conduct will identify him to the respondent and ▮▮ is already in fear for his safety and under emotional distress. When I asked him what he wanted to get from reporting to our office, he stated "I just want ▮▮▮ moved away from me. I do not want to interfere with his ▮▮▮▮▮ and future."

Synopsis of events
This past weekend, ▮▮▮ was 5 minutes late to ▮▮▮▮▮ and ▮▮ forced him to stand in front of the unit whi▮ ▮▮ yelled things at him, such as "you're a p▮▮ of shit", "I fucking hate

you", "I want you out". After the game several people told ▮ to watch his back and keep his door locked to his dorm room. ▮ reported that he is afr of ▮ causing him bodily harm. ▮ understands he needs to take responsibility for his infraction and is willing to follow corps a oved sanctions, but ▮ takes things beyond discipline to the level of harassment.

▮ has repeatedly targeted ▮ since his ▮ year. ▮ reported the following hazing incidents, all of which are not approved by the corps:
-Last year before the ▮ game, ▮ entered ▮ dorm room at 4am

-▮ forced him to do squats while holding his footlocker.

-When ▮ was sick with ▮ forced him to stand at attention in front of his window ▮ would come up behind him d yell at him. This was reported to the CO but nothing was done about it.
-▮ called ▮ a "faggott"

▮ has photos and videos of these incidents

▮ also reports ▮ had issues with his ▮ when she was a student at TAMU. ▮ was a ▮ and was drinking in the dorm and lied about it. ▮ was the ▮ and ▮ reported it up. ▮ tried to accuse her of ▮ days ▮ graduation, but was proven innocent. ▮ instantly targeted ▮ because of the issues with ▮ refers to her as a ' ' and talks about hi tred for her.



Jennifer Desai | Case Manager
Department of Civil Rights and Equity Investigations
Texas A&M University | YMCA Building, Suite 108
1268 TAMU | College Station, TX 77843
ph: 979.458.8192 | jdesai@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
TEXAS A&M UNIVERSITY

MENTAL HEALTH RESOURCES: 24/7 Professional Counseling | After-hours Mental Health Support | Local Emergency Services

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **To:** | Washington, Robert Sykes |
| **Subject:** | RE: Investigation |
| **Date:** | Friday, September 22, 2023 9:27:00 AM |

Thank you!  See you in a bit.

**From:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Sent:** Friday, September 22, 2023 9:00 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation

I can do that

LtCol Robert Washington, USMC (ret)
Cadet Training Officer, Corps of Cadets
Texas A&M University
rwashington@corps.tamu.edu

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 8:28:27 AM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE: Investigation

Would 11 work? If so, I can meet with you in                                    in one of our
panel rooms.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Sent:** Thursday, September 21, 2023 5:02 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: Investigation

Audrey,
   Yes, I am available at 10am. I am assuming you are in the SSB? What is your office number?

 Rob

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders



**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Thursday, September 21, 2023 4:15 PM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** Investigation

Howdy,

Dr. Bell informed me that you have been assigned to work on the          investigation with me.  Do you have some time tomorrow (Friday) where we could chat briefly about the plan for the investigation moving forward?  The only times I am unavailable                                                          .  We could meet via Zoom or Teams if that is more convenient for you since it should be a quick meeting!

I am hoping to do interviews next Wednesday afternoon          if that works for you!

Thanks,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:**  Winking, Audrey J
**To:**  Washington, Robert Sykes
**Subject:**  RE: █
**Date:**  Friday, September 29, 2023 10:30:00 AM

Okay great, thank you!  I do plan on condensing some of our questions as well so I will make sure he's done on time.  I can always have him come back the next day to review notes if needed.

**From:** Washington, Robert Sykes
**Sent:** Friday, September 29, 2023 10:29 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: █

That is the event that I have to leave for since I am the        advisor. He is not expected to be out there until 4:25 so I think if we are done by 3:45 then he should have time to get to his room and change. It is important for him to take part in it but I think he will have time.

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders



**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 29, 2023 10:22 AM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** █

Hi Lt. Col. Washington,

██████ emailed me saying he has the                                        at                    , so he was asking if we can reschedule his interview.  I typically only work around students' class schedules, but is this something we should work around? I wasn't sure if this was extracurricular or something that is critical he participates in so I wanted to get your perspective!

He is the one we have scheduled            with his class ending            So we in theory should be done by         but I do recognize that would be really rushed for him.

Thanks,
Audrey

| From: | Bell Jr, Douglas |
|---|---|
| **To:** | Winking, Audrey J |
| **Subject:** | FW: - |
| **Date:** | Thursday, October 12, 2023 10:55:54 AM |

FYI for Co-Investigator

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, October 12, 2023 8:48 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE:

Sir,

John Regan will be our investigator. He can be reached at jregan@corps.tamu.edu

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: ██ ██ - |
| Date: | Wednesday, October 11, 2023 2:27:04 PM |
| Attachments: | FW Filex - You have access to the folder 23-1003-0003.msg |
| | Re Filex - You have access to the folder 23-1003-0003.msg |
| | FW ██ ██ update.msg |

Please see the information below. I am recommending this information for an investigation.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Sent:** Wednesday, October 11, 2023 1:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: ██ ██ -

Howdy Dr. Bell.

Attached below is another email SCO email received from ██ ██

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station,TX 77843-1172

ph: 979.847.7272 | neldat@sco.tamu.edu | sco.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ██████████
**Sent:** Wednesday, October 11, 2023 1:11 PMHowdy
**To:** Mathes, Kathryn <kathryn_mathes@studentlife.tamu.edu>; Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Cc:** ██████████
**Subject:** ██ ██ -

-

| This Message Is From an External Sender |
|---|
| This message came from outside your organization. |

To whom this may concern,

██ ██ has become too distraught over the idea of reporting the ongoing and progressing issues of retaliation and harassment to anyone, but especially ██ due to his recent actions and the new threats that have steamed from them. ██ expressed a resistance to speaking to ██ over the weekend. And this morning she stated that she did not want to speak to ██ because he's not going to do anything, and things just keep getting worse. Which, I firmly believe was ██ intent to begin with, which was clearly demonstrated in his actions of reporting to other students and informing them of the police report, and her hiding place between classes, and other things she reported to him in confidence.

I feel it's pertinent to review the facts that have occurred over this long weekend because so much has happened over such a short period of time. ██ and immediately upon receiving the report ██ informed the students in ██ Chain of Command that ██ met with ██, who immediately turned around and informed these students ██ what ██ reported to him including the fact that ██ has been essentially ██ was then informed by ██ that she would be expected to sit in a meeting with these same ██ who have been bullying, threatening, and intimidating her for weeks.

Less than 24 hours later, after standing for a uniform inspection, with at least ██ inspecting her not a single one said anything about her hair. ██ waited until after the formation was over, and for ██ to enter her room before ordering her to wear a hair net, again. She didn't even have the common curtesy to stop and speak to her about it, she gave the order and walked away. Let's take this opportunity to point out that other students in ██ class have **not** been required to wear hair nets from day one. Including ██ and ██ who did not have hair nets on during that same inspection. And ██ has been allowed to wear her hair in a braid, every day, since day one, when all the ██ were ordered that braids were forbidden for ██ to wear (not a privilege). But nothing has been said to these other students. They went as far as deducting demerits from ██ due to her hair style, and in turn refused her the right to due process in accordance with the Standard to appeal those demerits. As a matter of fact, everything these girls have ordered ██ to do regarding her hair or attempted to enforce is in clear violation of the Standard and made up lies, but they only want to enforce these made-up policies when it comes to ██ no one else is required to follow them. No other students are singled out. No other students are required to wear hair nets or forbidden to wear braids. No other ██ in this unit are being constantly harassed over their hair. Clearly this is retaliation that has progressed into unrelenting harassment.

On Saturday, during the football game, several ██ publicly accosted ██ demanding that she put a hair net on immediately or else they were going to get "smoked" (physical training). Apparently, Cadet ██ told these ██ they needed to hold ██ accountable and if ██ refused to immediately put on a hair net the entire ██ class was going to pay and be smoked. First, I would like to point out that they are not only ordering ██ to wear a hairnet but are taking away the rights afforded to her under the standard, which clearly states all females are authorized to wear their hair in the approved styles, hair nets are optional, and that these standards apply to all cadets regardless of class year. Second, the ██ already gave permission for ██ to wear her hair in this specific style and did not require her to wear a hair net. Third, ██ also told ██ she was authorized to wear her hair in accordance with the Standard and I think he also even went as far as telling her not to buy a hair net because it is not required.

Cadets ██████ decision to threaten several ████ that ██ better put on the hair net right this minute or else, is a blatant threat of punitive physical training. According to the Standard, "Punitive PT" (used solely to punish) is not authorized. It goes on to state how Corrective Physical Training should not be the default answer and that counseling has to take place first. The one time they attempted to conduct a counseling was when they made it a formal written counseling, which ██ refused to sign, and in turn the girls' deducted demerits without informing her. And the counseling was in direct violation to the Standards policy on female hair and grooming standards. These girls were attempting to conduct a formal counseling and deduct demerits because ██ was FOLLOWING THE STANDARDS POLICY. These girls are simply making things up with the sole intent to get another student in trouble, which is what they verbally told ██ was their intent weeks ago when they threatened to re-write the unit manual to ensure she gets in trouble and threatened to have her kicked out of the program. To return to the topic of Corrective Physical Training, threatening students with Physical Corrective Training for following the Standard, is outrageous to say the least. But according to the standard "Group ██ will never be conducted because of a single cadet's actions." Which is exactly what they threatened or have planned to do, ██ the entire ██ class solely because of ██ Let's go on to state that the Standard also says "Violations of these guidelines will be investigated as potential hazing incidents."

Last night, ██ returned to her dorm at approximately ██ She was not even in her room for an hour before the problems started. Last night, the same group of girls told ██ she was not allowed to go to ██ practice in the morning. Claiming they were never given a document excusing her from morning formation. At the beginning of the ██ was told by her ██ Cadet ██, that she simply had to fill out the accountability sheet to be excused. This was the same form the other ██ in her unit on the team filled out. And what has been used up to this point to excuse these ██ from formation. But it wasn't until last night that ██ and only ██ was told she wasn't allowed to go to practice unless she produced the document from the Corps Commander excusing her from practice. ██ checked with the other ██ in her unit, and confirmed she was the only one told she wasn't allowed to go. The other ██ was never spoken to about any issues regarding ██ practice.

On top of all of that, ██ was told by another ██ this morning ██ that she overheard a conversation that sounded suspicious and concerned this student enough to tell ██ what she heard, but also requested to remain anonymous because she feared retaliation and being treated the way ██ has been. The ██ reported to ██ that she overheard Cadets talking about ██ and that they said: "... good, I hope she doesn't make it back." Why wouldn't ██ make it back from her car? What plans have they made that would prevent this from happening? They already stole her daily class schedule; a school faculty member told these bullies where she was hiding between classes, and now threats are being made about ██ not making it back from her car. How many more red flags do we need to see before someone intervenes and brings a stop to this?

Let's be very clear, at this point it is specific unrelenting pinpointed attacks designed to target, harass, and intimidate ██ These girls are doing everything in and out of their power to ensure ██ gets in trouble, makes her life miserable, fails her classes, and ruins her reputation. These attacks are being planned and implemented by Cadets ██ ████████ who have refused to stop after multiple School faculty members have insured ██ repeatedly, that their behavior would stop, and this situation would not continue. However, that could not be the furthest from the truth. After all, these

- 170 -

problems have continued to progress for over three weeks now.

Are these girls so out of control that the faculty members have no form or recourse to bring them to a stop? Are these girls blatantly refusing to follow the orders and directions given to them by faculty members? Are they so out of control that they are refusing to conform to the rules of the school and the program? How many faculty members over how many weeks, with how many repeated occurrences, does it take to get someone to intervene and to bring an end to this insanity? How little control and oversight of its students does the Corps have that this type of behavior is being condoned and allowed to continue? Or, is this the intent of the faculty members and the cadet program, to allow it to continue and bread so out of control that ▮ is forced to flee the program and the school because ▮ violated the perceived "code of silence" bread into the Corps students as "tradition." And students who follow the rules, and refuse to be bullied and intimidated, are labeled as troublemakers.

These have just been the problems that have steamed since ▮ To add to the never-ending list of problems these girls are instigating. I am completely flabbergasted that these students have been allowed to continue on this destructive path with unchecked authority at clearly retaliating, harassing, and intimidating another student. I completely understand why ▮ feels like nothing will ever get done and these girls are clearly not just being allowed to continue to behave like this but are being encouraged to create more problems for ▮ has been ostracized from her fellow classmates and ▮ because of these ongoing problems. Instead of focusing on her studies she is being required to take time out of her personal study time to address these unrelenting problems which is becoming increasingly time demanding, stressful, and degrading.

It is not just ▮ that is concerned for her health and safety, but ▮ and I as well. I fear it will just be a matter of time before there's another incident.

Regards,

▮

Dr. Bell,

Please see email below.

Best,
Lori

**Lori White** | Administrative Coordinator I
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | loriw@tamu.edu | sco.tamu.edu

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, October 9, 2023 4:18 PM
**To:** Mathes, Kathryn <kathryn_mathes@studentlife.tamu.edu>
**Cc:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Subject:** ▮▮▮▮▮ update

**This Message Is From an External Sender**

This message came from outside your organization.

Mrs. Mathes,

I wanted to keep you updated on the situation with ▮▮▮ and bring to light some concerning issues I have. And new information was brought to light regarding what I believe are red flags in the decision-making processes of a faculty member.

Are you aware ▮▮▮▮▮▮▮ considers it part of his standard policy to notify a student's chain of command when police reports are made? This means a faculty member believes it's his obligation to inform other students when police reports are being made. Without the prior knowledge or consent of the student who actually made the report. Even when the report is made about those exact same students in the chain of command.

**I honestly can not think of a greater threat and deterrent to reporting crimes and problems of any nature.**

Students, including those in the Corps of Cadets, are known to spread vicious rumors and gossip especially when faculty members themselves are the ones maliciously feeding this information to students. Faculty members that tell Cadet

- 172 -

students when another cadet has made a report to law enforcement or another faculty member. This breeds into the culture at A&M Corps of Cadets demanding that "what happens in the Corps, stays in the Corps." This is reminiscent of the military "code of silence" regarding violence within the military setting, especially geared toward females, in which some victims fail to report their victimization experiences because they believe no action will be taken, or because they fear they will experience negative career consequences, or other forms of retaliation, including being labeled a "troublemaker."

How many crimes occur between a subordinate and a higher-ranked student in the same chain of command in the Corps of Cadets? I am willing to bet this category is the highest when it comes to hazing and other serious crimes involving the Corps. However, how likely is a student in the Corps to report a crime if they fear retaliation, especially when it's a 100% guaranteed fact that the other students will be notified by faculty members if they even attempt to report anything to anyone? I fear this is the case, and a lot is going underreported in the Corps because of this fear tactic practice that demands victims stay silent.

To further perpetuate this conflict,      was informed on      by  (student) that she will be expected to sit in on a meeting with      of the girls who have been involved in the incidents      has reported.
against my one      With     , the faculty member, who has demonstrated he has no concern for      health and safety, and in turn, has been gossiping with the students and spreading information      gave to him in confidence that could prove to endanger her safety if this situation continues to spiral.

We also already know that      found it pertinent to divulge information about what      reported to him during their meeting to students. To include,      reporting to      (a student) that      has been practically out of fear of being in her own room due to these girls' actions and behaviors.      has flagrantly advertised to these girls where      has been hiding when she is not in classes. And I will remind you, they already stole her daily schedule that was required of her to publically post on her door (door card) and now they know where she hides between classes.      actions have taken away her only safe space and boldly advertised her location to not only her bullies but strangers who have already clearly demonstrated a blatant refusal to follow school rules and the Standard. Strangers that have already blatantly told her they have every intention of getting her into trouble and ensuring she is kicked out of the Corps, and not only have they said these things but have already acted upon these threats.

     can claim they are part of her chain of command and live together, regardless of his petty excuse for his poor decisions. I will remind you these students are not friends and have never been friends. They do not socialize to any degree outside of the quad, and in      case, the absolute only time they speak to her is to threaten her and/or give orders that often conflict with the Standard or orders provided to      by higher ranked Cadets, intentionally creating more problems. These same girls have created such fear in the dorm that the other students don't even speak to my daughter anymore because they fear they will be treated like      f they even socialize with her. There is total and complete segregation in the dorm and this unit because of the absolutely poor leadership and behavior displayed by a handful of power-hungry girls who have been given too much authority, not enough training, and zero accountability. Any so-called leader who controls and demands

compliance and respect through fear-based leadership has absolutely no business influencing the lives of other students or continuing this horrible cycle that gets labeled in the Corps as a "tradition."

It is absolutely no student's business where ⬛ location is at any point in time, especially not some random unhinged strangers who nave clearly and deliberately been targeting ⬛ Double fold for a student who is already being accused of threatening, intimidating, harassing, and bullying her. No police officer in the world would condone advertising the schedule and location of any person, especially to their bullies and people they already feared. This screams "red flag" with pure deliberate and malicious intent behind it.

There is zero empathy or even a basic level of understanding by ⬛ in how it feels to be in ⬛ shoes or any kid who is stuck living in this horrible situation while attempting to get an education and achieve her goals while being at this school and in this so-called "leadership program." I believe if the Corps was truly interested in problem resolution they would have handled this situation more effectively weeks ago, instead of not only allowing the problems to continue to spiral out of control but having staff members feed into the problems. Even after ⬛ repetitive complaints of continued problems the corps chose to ignore her. The school should have better oversight and ensure there are adequate policies and procedures put in place to instill more trust, professionalism, and confidence in the system and in the actions of the Crops faculty members and the students involved in this program. The school and the Corps should follow their own rules and the Standard it claims to uphold and properly educate the students on these rules. Instead, it would appear the Corps operates totally separately from the school with zero oversight.

The girls ⬛ has reported have no respect for the Standard. No respect for school policies or the law of the land. And clearly, they see themselves as above these rules and laws. As they have repetitively demonstrate their refusal to follow them. As exemplified on Saturday when they yet again gave ⬛ an order that restricts and takes away the rights afforded to her in the Standard. As the Standard clearly states: "...all cadets are permitted to wear their hair in the following fashion regardless of class year." At this point, there is no misunderstanding of their intent to continue to harass and intimidate ⬛ Clearly, these girls feel they have unlimited power to give students any order they see fit and feel these orders should be followed regardless of what the law, the school, or the Standard states. There were also reports made to ⬛ by other students that could indicate a plan made by these same girls to issue punitive physical training to the entire ⬛ class as a form of punishment if ⬛ doesn't do what they say.

I appreciate the help you are trying to prove ⬛ However, I fear the Corps is practicing unhealthy and potentially harmful practices for students who are trying to report problems or seeking assistance. In the future, we will not utilize the school police department as there's a clear conflict of interest and no respect for victims much less students trying to protect themselves, rather it's a dangerous path for any student, especially those in the Corps to utilize.

Thank you for your time on this matter.

⬛

| From: | TAMU Civil Rights |
|---|---|
| To: | Gardner, Jeffery D; Bell Jr, Douglas |
| Cc: | Simpson, Meredith M |
| Subject: | FW: Filex - You have access to the folder 23-1003-0003 |
| Date: | Thursday, October 5, 2023 9:03:30 AM |
| Attachments: | |

Good morning,

The CREI office received the attached UPD report yesterday afternoon. Since this does not rise to the CREI or TIX level to address, we are referring to the Corps and SCO to address as you see fit.

Please let me know if you have any questions or discover any sex-based misconduct or discrimination/harassment against a protected class.

Best,

Samantha Brunner  (she/her)
Assistant Deputy Title IX Coordinator
University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations
Texas A&M University | YMCA, Suite 108
1268 TAMU | College Station, TX 77843-1268
ph: 979.458.7598 |SBrunner@tamu.edu


-----Original Message-----
From: tbrooks@tamu.edu <tbrooks@tamu.edu>
Sent: Wednesday, October 4, 2023 2:56 PM
To: TAMU Civil Rights <civilrights@tamu.edu>
Subject: Filex - You have access to the folder

The folder,                 , is now available for you to use:



You can download files in this folder.

This folder currently has the following files:

                .PDF
Commander Johnson (                 )

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: ▮ Car statement |
| Date: | Monday, October 16, 2023 9:07:34 AM |

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Sent:** Monday, October 16, 2023 9:05 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: ▮ Car statement

This is the first email received this morning from ▮ ▮

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station,TX 77843-1172

ph: 979.847.7272 | neldat@sco.tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮ ▮
**Sent:** Monday, October 16, 2023 5:27 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Leible, Jason Aaron
<jleible@corps.tamu.edu>; Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Subject:** ▮ Car statement

On ▮ , at approximately 2120, I was informed by ▮ that she had
been approached by other cadets outside of the unit with questions regarding if she is
in the unit that has the ▮ I believe that this supports my claim
that ▮ jeopardize my safety by informing other cadets of information I gave
him in confidence. It also supports my claim that the unit leadership/ students(s) this
information was given to is maliciously gossiping about me and providing information
to others that do not have a need to know about any of this.

- ▮ ▮

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | [dbelljr3@tamu.edu](mailto:dbelljr3@tamu.edu) | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Sent:** Monday, October 16, 2023 9:10 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: ██████ Dorm Statement

More information from ██████ ██████

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station,TX 77843-1172

ph: 979.847.7272 | [neldat@sco.tamu.edu](mailto:neldat@sco.tamu.edu) | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ██████ ██████ ██ ██████████
**Sent:** Monday, October 16, 2023 5:27 AM
**To:** Gardner, Jeffery D <[jeff_gardner@corps.tamu.edu](mailto:jeff_gardner@corps.tamu.edu)>; Leible, Jason Aaron
<[jleible@corps.tamu.edu](mailto:jleible@corps.tamu.edu)>; Mailbox - DSL - Student Conduct Office <[sco@tamu.edu](mailto:sco@tamu.edu)>
**Subject:** ██████ Dorm Statement

On ██████████, during my meeting with the Commandant I had informed him I suspected someone was entering my room with the malicious intent of messing with things, including leaving debris behind on my desk. Ensuring I failed my room inspections. This was documented in my room inspection appeal (sent on ████████), which was sent to ████████████████████████████████████████. As well as, the other statement I will be sending up in regards to all of the incidents that have occurred since.

On Sunday, ██████████, I returned to campus, at approximately 1830, I walked through the door to my room to discover a singular french fry centered on the star on my bed sheet, perfectly parallel to the lines in the star. Obviously, this fry was intentionally placed there.

At approximately 2000, I asked ██████████ if she did it and she stated ██████ did it. It turns out she let him into our room and allowed him to place the fry on my bed yesterday morning (Saturday). And let it stay there for over 24 hours which obviously could have gotten me into trouble. Not to mention the insects or rodents this could have attracted.

██████, is one of the cadets in this unit that does not speak to me. We don't socialize and we are not on friendly terms, I do not consider this "good bull."

-██████ ██████

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: ▮▮▮ Statement |
| Date: | Monday, October 16, 2023 9:32:26 AM |
| Attachments: | Teams-Text Messages.zip |
| | Social Media Incident.zip |
| | Emails.zip |
| | Demerit pictures - Documents.zip |
| | ▮▮▮ ▮▮▮ Statement.docx |

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Sent:** Monday, October 16, 2023 9:30 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: ▮▮▮ Statement

Another email with information.

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station,TX 77843-1172

ph: 979.847.7272 | neldat@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮
**Sent:** Monday, October 16, 2023 9:22 AM
**To:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>; Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** ▮▮▮ Statement

Good morning,
Attached is my statement along with supporting documents/ pictures. My apologies, the first email did not include the attachments.

Respectfully,



FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** specialsituationsteam@tamu.edu <specialsituationsteam@tamu.edu>
**Sent:** Wednesday, October 18, 2023 9:27 PM
**To:** DSA - DL - DSA TAMU Special Situations Team <SpecialSituationsTeam@tamu.edu>
**Subject:** Tell Somebody Report

**Name of Submitter:** ███████████
**Title:** parent
**UIN:**
**Email:** ███████████
**Phone:** ██████████
**Address:** ██████████████████████

**Name of person exhibiting behavior:** ██████████████
**UIN of person exhibiting behavior:**

**Event Description:** ███████████████ is my daughter's roommate, she has been allowing people to go into the room and rummage through my daughter's drawers and wardrobe closet. Things have been stolen and damaged.█
██████ admitted to my daughter, ██████████, on Sunday ████████ that she allowed █████ to leave a french fry behind on my daughter's bed for over 24 hours, while she was out of town (trying to get her in trouble and harass her).
██████ admitted to another student that █████ and █████ have been participating in this same behavior by damaging my daughter's stuff, going through her personal stuff including undergarments, and leaving dirt and debris behind on furniture. And participating in other activities to ensure my daughter fails room inspections and gets in trouble.

Today ████████ - She went through all her drawers and damaged a dress with ink. A book and some sheet music were stolen. She suspects other clothing is missing but it's hard to identify each

**- 180 -**

individual piece of clothing.

My daughter has reason to believe this activity has been going on for at least the past 3 weeks and has been taking pictures and videos of her room before leaving every day. This situation is increasing in frequency and seriousness with more being disturbed and damaged on a daily basis.

Residence in this hall have also started cyberstalking my daughter and our family, they have been printing off pictures from my social media accounts, altering the images, and posting them in the hallways (there are pictures to document this). The Corps of Cadets faculty is aware of this and has done nothing to stop it.

**Supporting Documentation 1:**
**Supporting Documentation 2:**
**Supporting Documentation 3:**
**Supporting Documentation 4:**

FYI

Douglas Bell

Please excuse any typo, message sent from I-Phone

Begin forwarded message:

> **From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
> **Date:** October 19, 2023 at 8:23:49 AM CDT
> **To:** "Bell Jr, Douglas" <douglasb@vpsa.tamu.edu>
> **Subject: FW:** ▮▮▮ ▮▮▮ **Room Incident #2**

Good morning Dr. Bell.

Another incident.

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station,TX 77843-1172

ph: 979.847.7272 | neldat@sco.tamu.edu<mailto:neldat@sco.tamu.edu> |
sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
DIVISION OF STUDENT AFFAIRS | One Division. One Mission.

**From:** ▮▮▮ ▮▮▮▮▮▮▮▮ >
**Sent:** Wednesday, October 18, 2023 10:43 PM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>; Mailbox - DSL - Student
Conduct Office <sco@tamu.edu>
**Subject:** ▮▮▮ ▮▮▮ Room Incident #2

at approximately 1700, I returned to my dorm room and immediately knew an unknown party had rummaged through it. First, I took pictures of my room at approximately 0700 before leaving for the day. The room was perfectly squared away and inspection-ready. Upon returning at 1700, I immediately noticed my books on the shelf above the desk were tipped over. Upon further inspection clothes had been pulled off the hangers in the wardrobe closet and left laying on the bottom ground area, drawers had been opened and clothing and personal items had been rummaged through. A dress was damaged with what

- 182 -

appears to be ink. I suspect articles of clothing are missing, but I am positive a book and some sheet music have been stolen. My ▮▮▮▮▮ with as they The bins over my bed, very top shelf, had also been rummaged through.

▮▮▮▮ had heard about the incident on Monday regarding my roommate, ▮▮▮, accusing ▮▮▮ of messing around with my side of the room and leaving a french fry on my bed. ▮▮▮ told ▮▮▮ that he had nothing to do with it and that it was actually ▮▮ and ▮▮.

My expectation of reasonable privacy has been violated by people opening drawers and digging through my personal items and undergarments, not to mention the theft, and damage to private property. My roommate, ▮▮, already admitted to bringing her friends into our room and allowing other people and herself to violate my personal property is a clear and blatant violation of guests' privileges, regardless of whether those guests are family, strangers, or other students/residents. Regardless of other people/students' involvement ▮▮ already admitted to being an equal participant in violating my privacy, and my property.

I do not consider targeting me and vandalizing my personal space, property, and gear in my room funny. It is not a joke. Nor is it considered "good bull".

The continued harassment of my roommate, ▮▮▮▮▮▮▮, and other unknown residents of this hall is a clear demonstration of repeated harassment in I have been facing for the last several weeks and have repeatedly sought out faculty assistance with and it has resulted in zero resolution. I spent over four hours trying to locate my roommate, ▮▮ to confront her about the new incident and missing/damaged items in my room. However, I was unable to locate her, even after lights out.

I am unsure if the incidents that have occurred/continue to occur fall under the current investigation or if I am required to file another report elsewhere.

[cid:18b45fee9727790a4ed1]
[cid:image001.jpg@01DA0265.907DFFE0]
[cid:image002.jpg@01DA0265.907DFFE0]
[cid:image003.jpg@01DA0265.907DFFE0]

[cid:image004.jpg@01DA0265.907DFFE0]
[cid:image005.jpg@01DA0265.907DFFE0]



| From: | Gardner, Jeffery D |
|---|---|
| To: | Bell Jr, Douglas |
| Cc: | Michaelis, Patrick Ralph; Simpson, Meredith M |
| Subject: | Re: Filex - You have access to the folder |
| Date: | Monday, October 9, 2023 5:03:26 PM |

Sir,

After speaking with this student and her outfit we have actions in place that will resolve the situation. As the police report stated there is no indication of hazing and we found the same thing. I will be happy to discuss your findings and mine.

V/R

> On Oct 9, 2023, at 4:51 PM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> Howdy,
> I wanted to follow up on this issue. I received some additional information regarding this concern, and I feel that an investigation from SCO maybe warranted. Please let me know if you have any additional information.
>
> Douglas Bell, Ph.D. | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - - -
> DIVISION OF STUDENT AFFAIRS | One Division. One Mission.
> -----Original Message-----
> From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> Sent: Thursday, October 5, 2023 10:08 AM
> To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
> Cc: Simpson, Meredith M <msimpson@corps.tamu.edu>
> Subject: FW: Filex - You have access to the folder
>
> Dr. Bell,
>
>   I reviewed the report and the other complaints Ms. ▮▮▮▮ has filed against her outfit. I will be speaking with her either today or tomorrow to determine what is going on.
>
> V/R
>
> Lt. Col Jeff Gardner '82, USAF (Ret)
> Assistant Commandant for Accountability and Standards Military Advisor Parsons Mounted Cavalry
> 979-458-9317
>
> -----Original Message-----
> From: TAMU Civil Rights <civilrights@tamu.edu>
> Sent: Thursday, October 5, 2023 9:03 AM
> To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> Cc: Simpson, Meredith M <msimpson@corps.tamu.edu>
> Subject: FW: Filex - You have access to the folder
>
> Good morning,
>
> The CREI office received the attached UPD report yesterday afternoon. Since this does not rise to the CREI or TIX level to address, we are referring to the Corps and SCO to address as you see fit.

>
> Please let me know if you have any questions or discover any sex-based misconduct or discrimination/harassment against a protected class.
>
> Best,
>
> Samantha Brunner  (she/her)
> Assistant Deputy Title IX Coordinator
> University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations Texas A&M University | YMCA, Suite 108
> 1268 TAMU | College Station, TX 77843-1268
> ph: 979.458.7598 |SBrunner@tamu.edu
>
>
> -----Original Message-----
> From: tbrooks@tamu.edu <tbrooks@tamu.edu>
> Sent: Wednesday, October 4, 2023 2:56 PM
> To: TAMU Civil Rights <civilrights@tamu.edu>
> Subject: Filex - You have access to the folder 23-1003-0003
>
> The folder, 2               , is now available for you to use:
>
>
>
> You can download files in this folder.
>
> This folder currently has the following files:
>
>

: ▓▓ ▓▓▓

>

| From: | Regan III, John M |
|---|---|
| To: | Winking, Audrey J |
| Subject: | RE: investigation |
| Date: | Friday, October 13, 2023 10:50:38 AM |

Good Morning Audrey,

The only time I will not be available next week is Wednesday 1200 – 4:30.

**GySgt John M. Regan III USMC (Ret)** | 1st Regiment Military Advisor/CCMU Advisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-4279 I jregan@corps.tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 13, 2023 8:50 AM
**To:** Regan III, John M <jregan@corps.tamu.edu>
**Subject:** investigation

Good morning,

I was told that you will be working on the ▮▮▮▮▮▮▮ investigation with me.  Can you please send me your availability for next week so that we can get her interview scheduled? I would like to meet with her on Tuesday or Wednesday next week if possible                     and then once we have more information from her we can schedule the other students' interviews for the following week.

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Bell Jr, Douglas**

---

**From:** Winking, Audrey J
**Sent:** Wednesday, May 24, 2023 11:56 AM
**To:** Upshaw-Brown, Jaclyn B; Bell Jr, Douglas
**Subject:** Investigation

The　　　investigation report is complete and can be found here:　　Investigations\Active Investigations\Completed Investigations\Completed_

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Wednesday, April 19, 2023 8:34 AM
**To:** Harrell, Kristen
**Subject:** FW: [Maxient]      College Station - On-Campus Grounds
**Attachments:**

We can chat about this at our 1 on 1

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Monday, April 17, 2023 10:42 AM
To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]      College Station - On-Campus Grounds

For discussion. . .

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]      College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**

Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**

() Alleged Offender
() Alleged Offender
() Alleged Offender
() Alleged Offender

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**
**No additional documents were attached to this report.**

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Thursday, April 20, 2023 11:08 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** RE: [Maxient]      College Station - On-Campus Grounds

Hey Jaclyn,
I would like to chat about this today for first thing tomorrow morning.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Monday, April 17, 2023 10:42 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: [Maxient]     College Station - On-Campus Grounds

For discussion. . .

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Maxient System <notifications@maxient.com>
**Sent:** Sunday, April 16, 2023 6:39 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** [Maxient]     College Station - On-Campus Grounds

### This Message Is From an External Sender
This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**

Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
() Alleged Offender
() Alleged Offender
() Alleged Offender
() Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**
No additional documents were attached to this report.

**Submitted By**
Your full name

Position/title/student status

Your email address

2

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

## Bell Jr, Douglas

**From:** Gardner, Jeffery D
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas
**Cc:** Upshaw-Brown, Jaclyn B; Winking, Audrey J; Anderson, Chauncy Jovan
**Subject:** Re: [Maxient]      College Station - On-Campus Grounds


Msg t Anderson is your man. He is copied on this email.

V/R


> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]      College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences


We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]                College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

Thank you for your assessment of the information provided.  We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the
     ? Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]          College Station - On-Campus Grounds

So I've ask a few questions about this process. Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]                College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
? We'll also be checking to see if security footage from Duncan is available (although we
suspect it may not have been retained this long, since the alleged incident in Duncan occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]                College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
() Alleged Offender
[] Alleged Offender
() Alleged Offender
() Alleged Offender

4

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation

No additional documents were attached to this report.

## Submitted By

Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

# Bell Jr, Douglas

**From:**              Bell Jr, Douglas
**Sent:**             Thursday, May 11, 2023 1:17 PM
**To:**               Winking, Audrey J
**Subject:**        FW: [Maxient]          College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, May 11, 2023 1:16 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>
**Subject:** RE: [Maxient]          College Station - On-Campus Grounds

Just spoke to him.  He has received the correspondence and is tracking for next week.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, May 11, 2023 1:13 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>
**Subject:** RE: [Maxient]          College Station - On-Campus Grounds

Howdy Lt. Col. Gardner,
We have had some issues getting in touch with MSG. Anderson and we would like to move forward with our investigation. Can you please give him a gentle reminder to check his email and respond to Audrey Winking.  Thanks in advance.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>; Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Re: [Maxient]          College Station - On-Campus Grounds

Msg t Anderson is your man. He is copied on this email.

V/R

> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]          College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences

We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]                College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

These are the names I was given:

<span style="color:#a02020">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B
<jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

Thank you for your assessment of the information provided.  We would still like to do our due diligence
to ensure everything is above board and not assume any details within this incident report. So again, do
you know how we would go about figuring out who would have been in the
       Thank you for this information.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

.........................

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, April 20, 2023 2:55 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]                    College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry

4

979-458-9317

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
        We'll also be checking to see if security footage from Duncan is available (although we suspect it may not have been retained this long, since the alleged incident in Duncan occurred several months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]        College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report

**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**

        lleged Offender
        () Alleged Offender
        () Alleged Offender
() Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific

5

people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
- scrs@studentlife.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

# Bell Jr, Douglas

**From:** Winking, Audrey J
**Sent:** Wednesday, May 10, 2023 11:39 AM
**To:** Anderson, Chauncy Jovan
**Cc:** Bell Jr, Douglas
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Hi Chauncy,

I would like to schedule interviews for the following dates/times (     interviews total). Please let me know as soon as possible if these work for you so that I can send the interview notices to the students!

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Thursday, May 4, 2023 10:40 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Are there any days/times that I need to avoid scheduling interviews for next week?

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Thursday, May 4, 2023 10:39 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Ok next week will be good. Looking forward to it.

R/

**MSgt Chauncy J. Anderson USMC (Ret)**  | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 |                                | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, May 3, 2023 10:40 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

Hi Chauncy,

Just wanted to follow up on your availability. We will probably need to look at next week and depending on whether the cadets are still in town after finals or not we may need to do some via Zoom.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Friday, April 28, 2023 11:52 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

Hi there,

Looks like you will be working with me on this investigation!  What does your availability look like next week?  Once I know when you're available for interviews, I will work on getting the students scheduled. I am hoping we can get them in before finals or them leaving for the semester. If you happen to know when the cadets leave campus for summer too, that may be helpful for me to know in case we can't fit them all in before finals.

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>; Anderson,

Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Re: [Maxient]                    College Station - On-Campus Grounds

Msg t Anderson is your man. He is copied on this email.

V/R

On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:

Thank you for this information.

Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]                    College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences

We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>

Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>
Subject: FW: [Maxient]                    College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Wednesday, April 26, 2023 8:47 AM
To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]                    College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

From: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Sent: Thursday, April 20, 2023 3:12 PM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B
<jaclynu@sco.tamu.edu>
Subject: RE: [Maxient]                    College Station - On-Campus Grounds

Thank you for your assessment of the information provided. We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the

Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

4

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]          College Station - On-Campus Grounds

So I've ask a few questions about this process. Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in
        We'll also be checking to see if security footage from Duncan is available (although we
suspect it may not have been retained this long, since the alleged incident in Duncan occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]                College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**

    () Alleged Offender
    Alleged Offender
        Alleged Offender
    Alleged Offender

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective
language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific
people, words, phrases, and interactions.

6

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:

7

Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Wednesday, September 27, 2023 11:59 AM |
| **To:** | Winking, Audrey J |
| **Subject:** | Corp Incident |
| **Attachments:** | FW: Corps Searching Rooms |

Howdy Audrey,

I wanted to give you the opportunity to weigh in to see if an additional investigation is needed or if this is enough information to move forward with the conduct process. One email contain statements from the Corps Members and the next email contains information from the IRs received. Let me know your thoughts.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

**From:** Latham, Skylar
**Sent:** Friday, March 22, 2024 8:49 AM
**To:** Bell Jr, Douglas
**Cc:** Smith, Asia
**Subject:** RE:     Hazing Concerns

I will forward him the link to the report and inform him that if he wishes to, he may file a report.

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, March 22, 2024 8:45 AM
**To:** Latham, Skylar <skylarl@sco.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:** RE:     Hazing Concerns

I think this may be worth investigating if student ▮▮▮▮ would like to make a formal statement via a CCIR.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Latham, Skylar <skylarl@sco.tamu.edu>
**Sent:** Friday, March 22, 2024 8:42 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**     Hazing Concerns

Hey ya'll,

Yesterday I met with student ▮▮▮▮ ▮▮▮▮ who is a ▮▮▮▮ and was ▮▮▮▮ in the Corps of Cadets. At one point in our meeting, he mentioned having been in the Corps, and to make conversation, I asked why he punched. He then proceeded to tell me he and ▮▮▮▮ punched three days into ▮▮▮▮ and discussed how it was intense for them both. Two specific comments he made raised concerns for me:

1.  He was woken up at 2:00 AM to an ▮▮▮▮ and telling them to be ready for fallout at the usual start time.
2.  When punching, he was advised to not share much about his experience with the outfit to Corps staff, specifically by an upperclassman (or multiple), because ▮▮▮▮ could get disbanded.

I'm not sure what much may be done in this circumstance, but I do want it to be brought to your attention.

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Monday, September 25, 2023 3:31 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | FW: |
| **Attachments:** | ██████.pdf; ██ Account.pdf; ██████ Account.pdf; ██████ Account.pdf; ██ Account.pdf; ██ Account.pdf; ██ Account.pdf; ██ Account.pdf; ██ Account.pdf; ██ Account.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Sir,

Statement from ████ cadets.

V/R

<span style="color:#8b1a2b">Lt. Col Jeff Gardner '82, USAF (Ret)</span>
<span style="color:#8b1a2b">Assistant Commandant for Discipline</span>
<span style="color:#8b1a2b">Military Advisor Parsons Mounted Cavalry</span>
<span style="color:#8b1a2b">979-458-9317</span>

**From:** ████████████████████████ >
**Sent:** Friday, September 22, 2023 10:29 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject**:

Howdy!

Sir, attached are the written accounts of ████ Cadets involved in the incident with nonregs in our dorm. I am sorry for the late email, but I was just now able to gather all of the accounts. Thank you again, and let me know if there is anything I can do to help.

With Respect,

██████████

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Monday, September 25, 2023 11:20 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Michaelis, Patrick Ralph; Simpson, Meredith M |
| **Subject:** | RE: Corps Searching Rooms |

Sir,

I spoke to the       1st Sgt.  He is providing me with information today.  I'll send it to you as soon as I receive it.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Monday, September 25, 2023 10:37 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: Corps Searching Rooms

I have discovered the names of    cadets that were searching rooms:

██████████████████████████.  Please let me know if you have any additional information.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, September 21, 2023 12:31 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: Corps Searching Rooms

Sir,

I will reach out to the

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, September 21, 2023 12:15 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Subject:** Corps Searching Rooms

Howdy Lt. Gardner,
I received several incident reports from Residence Life regarding Corps Members entering non-regs student rooms in search of a                laundry bag last week.  I wanted to see if you have any additional information related to this situation.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Friday, September 29, 2023 2:39 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | RE: Incident report |
| **Attachments:** | Incident report.docx |

I made a few highlights on here where we did get         names.  There is also mention about UPD assisting with one of the incidents – can you reach out to see if we can get notes from that?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, September 29, 2023 2:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: Incident report

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 10:55 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** Incident report

Good Morning Dr. Bell,

     Attached you will find four individual incident reports from Corps       .  In each of these incidents, non-corps students attempted to take items from the cadets.  We would appreciate the Student Conduct Office looking into these events and taking appropriate action.  Please let me know if you have questions or if we can be of assistance.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards

## Bell Jr, Douglas

**From:**  Gardner, Jeffery D
**Sent:**  Tuesday, September 5, 2023 2:15 PM
**To:**  Bell Jr, Douglas; Michaelis, Patrick Ralph; Simpson, Meredith M
**Subject:**  RE: [Maxient]                College Station - On-Campus Residence Hall
**Attachments:**  Incident.pdf

Dr. Bell,

    Attached are the Commandant's thoughts on the        issue.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, September 5, 2023 11:42 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>;
Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Residence Hall

I wanted to follow up to see if there was any additional information.   SCO intends to move forward with an investigation in the coming week.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas
**Sent:** Wednesday, August 30, 2023 3:41 PM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>;
Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]                College Station - On-Campus Residence Hall

I wanted to pass this along for your consideration and review.  Please let me know your thoughts.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Thursday, October 19, 2023 10:53 AM |
| **To:** | Caldwell III, Danny Wilson |
| **Subject:** | Investigation Report |
| **Attachments:** | Investigation Report - Final.pdf; Audio Clip 1 - S.mp3; Audio Clip 2 - W.mp3; FW_ Audio Files for Hazing Investigation.pdf |

Howdy Danny,

I am assigning the        investigation to you.  Lets chat after you have reviewed this information.  I will also forward you the initial report in Maxient.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Wednesday, October 11, 2023 3:21 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | RE:     report |

I just added two audio files as well as a PDF of the email from the student from when he sent the audio files to Tia.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Wednesday, October 11, 2023 11:24 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:**     report

The     investigation report is complete and in the share drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Upshaw-Brown, Jaclyn B
**To:** Winking, Audrey J; Barrett, Jamyia C; Doughty, Jeanae
**Cc:** Bell Jr, Douglas
**Subject:** Investigations
**Date:** Friday, January 6, 2023 1:43:21 PM

Hi, all!

After looking at the two bigger investigations that have recently come in, here is what I'm thinking in terms of assignments:

- Jeanae and Jaclyn to team up as SCAs.
- : Jamyia and Audrey to team up as SCAs
    - Note: We are still uncertain whether more information relevant to this org/investigation is forthcoming from the individual who contacted OFSL shortly before the break. I've checked in with CREI to see if they've heard from her; OFSL has provided contact information so I can follow up with her if not. But I figured y'all could at least start reading, making your list of who might be charged and what type of process, drafting charges, etc. while we figure that out.

Each investigation came with some video/audio files; I've put those into the main Scans→Investigations folder for now.

Please let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**- 227 -**

**From:**      Doughty, Jeanae
**To:**          Gardner, Jeffery D
**Subject:**      Administrative Conferences
**Date:**         Thursday, February 23, 2023 10:13:00 AM

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the      cadets. Would you be available on Monday,                    and Tuesday,                  Since there are     cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Morning Ma'am,

I can be available at those times.  Quick question, I thought they were all going before a panel starting on            Has there been a change?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the      cadets. Would you be available on Monday,                                and Tuesday,                              ? Since there are      cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D
**To:** Doughty, Jeanae
**Subject:** RE:     Administrative Conferences
**Date:** Thursday, February 23, 2023 10:48:22 AM

Very well.  I knew I had not seen charge letters for this.  Makes sense now.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:43 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Administrative Conferences

Okay perfect! I'll get those letters sent out now. To clarify, the      cadets are still going before a panel starting                The administrative conferences are for the                              that had lesser alleged unrelated hazing/alcohol violations. Also, the cadet on              has              charges.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:37 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Administrative Conferences

Morning Ma'am,

        I can be available at those times.  Quick question, I thought they were all going before a panel starting on            .  Has there been a change?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the       cadets. Would you be available on Monday,                                    and Tuesday,                                    Since there are        cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|---|---|
| To: | Gardner, Jeffery D |
| Subject: | RE: Administrative Conferences |
| Date: | Thursday, February 23, 2023 1:42:00 PM |

Looks like it was just a system glitch. I have retracted the second letter.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 12:59 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Administrative Conferences

I received letters on ▮ cadets but received two letter for ██████████

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the ▮ cadets. Would you be

available on Monday, ▮ and Tuesday, ▮ Since there

are ▮ cadets, I've scheduled two separate conferences. If you are unavailable during those
days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|-------|------------------|
| To: | Gardner, Jeffery D |
| Subject: | Re:      Administrative Conferences |
| Date: | Thursday, February 23, 2023 1:47:40 PM |

Yes, and just a heads up,      of the cadets just called to request a separate administrative conference on Monday. Are you available at 8:30 am or 11:00 am?

All the Best,
**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Administrative Conferences
Very well. So there are only      ?
V/R
Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Administrative Conferences
Looks like it was just a system glitch. I have retracted the second letter.
All the Best,
**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 12:59 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Administrative Conferences
I received letters on      cadets but received two letter for ██████████

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Sent:** Thursday, February 23, 2023 10:14 AM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:**     Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the        cadets. Would you be

available on Monday,                                     and Tuesday,                              ? Since there

are        cadets, I've scheduled two separate conferences. If you are unavailable during those

days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator

Student Conduct Office | Division of Student Affairs | Texas A&M University

1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - -

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

I am available at both times.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:48 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re: Administrative Conferences

Yes, and just a heads up, ⬛ of the cadets just called to request a separate administrative conference on Monday. Are you available at 8:30 am or 11:00 am?

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Administrative Conferences

Very well. So there are only ⬛?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Administrative Conferences

Looks like it was just a system glitch. I have retracted the second letter.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 12:59 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Administrative Conferences

I received letters on          cadets but received two letter for ██████████ .

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the      cadets. Would you be available on Monday,                              and Tuesday,                              ? Since there are      cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator

Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Doughty, Jeanae
**To:** Gardner, Jeffery D
**Subject:** Options Letter
**Date:** Monday, February 27, 2023 12:02:00 PM

Howdy Col. Gardner,

I am creating the options letter for ▉▉▉▉▉ for his abuse of process charge/unbecoming a cadet (for abusing the process) and wanted to run the sanctions by you before sending. I was thinking about assigning him Conduct Review/Corps Conduct Review for the remainder of the                as well as an        that will be due at the end of April. Thoughts?

All the Best,

**Jeanae Doughty** *|she/her/hers|* Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Gardner, Jeffery D |
| --- | --- |
| To: | Doughty, Jeanae |
| Subject: | RE: Options Letter |
| Date: | Monday, February 27, 2023 12:04:13 PM |

Thank you very much.  That works for me.

V/R

<span style="color:#a00000">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Monday, February 27, 2023 12:02 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Options Letter

Howdy Col. Gardner,

I am creating the options letter for ▉▉▉▉▉ for his abuse of process charge/unbecoming a cadet (for abusing the process) and wanted to run the sanctions by you before sending. I was thinking about assigning him Conduct Review/Corps Conduct Review for the remainder of the        as well as an       that will be due at the end of April. Thoughts?

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B
**To:** Freeman Jr, Cedric L; Alvarado, Blair; Gardner, Jeffery D
**Cc:** Spangler, Rebecca; Doughty, Jeanae
**Subject:** Panel information for March 6-10
**Date:** Tuesday, February 21, 2023 9:13:10 AM

Howdy, panel members,

Thank you SO MUCH for volunteering for the large panel scheduled for March 6-10! I'll be your Panel Chair. Rebecca, I'm sharing this information with you so that you'll have it in the event we need to bring you in. If that's the case, we will let you know as soon as we find out!

I do want to note that we are planning to feed you throughout the week; if you have any special dietary needs (or just ideas of what you'd like to eat!), please let me know.

Given the length of the investigation report, I am giving you access to the file documents via Filex a little earlier than we usually would. You will need to enter the access codes below to decrypt the files.

**Some reminders about reviewing the file electronically:** Please take steps to maintain confidentiality while reviewing the files and do not save them to your devices. We also ask that you delete the files from your downloads once you are finished. Finally, please refrain from seeking out information about the individuals or incidents involved other than what is provided in the file documents.

**Filex access codes**
Combined charge letters:
Investigation report:
Recording 1:
Recording 2:

If you have any questions or concerns, please let us know.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** jbupshaw@tamu.edu
**To:** Doughty, Jeanae
**Subject:** Filex - You have access to the folder March 6-10 panel documents
**Date:** Tuesday, February 21, 2023 9:13:10 AM

The folder, March 6-10 panel documents, is now available for you to use:


You can upload and download files in this folder.

This folder currently has the following files:

Recording 2
Recording 2.m4a

Recording 1
Recording 1.mp3

Investigation report
    Investigation Report - FINAL_Redacted.pdf

Combined charge letters
Compiled charge letters.pdf

**From:** jbupshaw@tamu.edu
**To:** Doughty, Jeanae
**Subject:** Filex - A new file is available for you to download
**Date:** Thursday, March 2, 2023 10:14:07 AM

The encrypted file, Screenshots submitted by ███████ is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:


File Details:
Screenshots submitted by ██████
Screenshots submitted by ██████ .pdf 1.85MB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

**From:** jbupshaw@tamu.edu
**To:** Doughty, Jeanae
**Subject:** Filex - A new file is available for you to download
**Date:** Thursday, March 2, 2023 10:17:26 AM

The encrypted file,      log submitted by ▮▮▮▮▮▮ is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:

File Details:
EST log submitted by ▮▮▮▮▮▮
2nd Reg EST Log -                    , 9_47PM.xlsx 123.52KB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

| From: | Upshaw-Brown, Jaclyn B |
|-------|----------------------|
| **To:** | Alvarado, Blair; Freeman Jr, Cedric L; Gardner, Jeffery D |
| **Cc:** | Spangler, Rebecca; Doughty, Jeanae |
| **Subject:** | Documents added to file |
| **Date:** | Thursday, March 2, 2023 10:21:36 AM |

Morning, all,

I have received some additional documents from one of the students for next week's panel. Their submission deadline is today at 5 pm, so if anything else comes in I will get it added to the Filex tomorrow and send you the codes.

**Access codes:**
- Screenshots submitted by ▮▮▮▮▮▮▮▮ :
- log submitted by ▮▮▮▮▮▮ :

It looks like the Filex links have expired for the other files; let me know if you didn't have a chance to view them before that happened, and I'll re-add them.

Just as an FYI, we are planning to order breakfast for y'all on Monday and Tuesday, since we're asking you to join us so bright and early.  We'll provide lunch as well. Reminder to let me know if there are any dietary needs!

Thank you!

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** jbupshaw@tamu.edu
**To:** Doughty, Jeanae
**Subject:** Filex - A new file is available for you to download
**Date:** Friday, March 3, 2023 10:16:02 AM

The encrypted file, Compiled     documents submitted 3.2 is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:


File Details:
Compiled     documents submitted 3.2
Compiled     documents submitted 3.2.pdf 19.60MB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

Hi again, everyone,

I'm writing with one more access code for documents for fact-finding that were submitted by the deadline. You should have just received a Filex link, but let me know if not.

Access code:

This document includes several written statements from the charged students, a few witness statements pertaining to the alleged hazing of the ⬛⬛⬛⬛⬛⬛ and a larger set of text messages discussing the planning of the ⬛⬛⬛ incident. If you have time to take a look at it before Monday, that's great. If not, don't stress about it; you should have a bit of time at the beginning of the day to review while we get the students settled, help them complete paperwork, etc.

Thank you!!!
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Thursday, March 2, 2023 10:22 AM
**To:** Alvarado, Blair <abalvarado@tamu.edu>; Freeman Jr, Cedric L <cedric_freeman@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Spangler, Rebecca <rebeccas@studentlife.tamu.edu>; Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Documents added to file

Morning, all,

I have received some additional documents from one of the students for next week's panel. Their submission deadline is today at 5 pm, so if anything else comes in I will get it added to the Filex tomorrow and send you the codes.

**Access codes:**
- Screenshots submitted by ⬛⬛⬛⬛⬛⬛ :
- ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

It looks like the Filex links have expired for the other files; let me know if you didn't have a chance to view them before that happened, and I'll re-add them.

Just as an FYI, we are planning to order breakfast for y'all on Monday and Tuesday, since we're asking you to join us so bright and early.  We'll provide lunch as well. Reminder to let me know if there are any dietary needs!

Thank you!

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

| From: | Bell Jr, Douglas |
|---|---|
| To: | Doughty, Jeanae |
| Subject: | Res.Life/Corps Incident |
| Date: | Tuesday, October 3, 2023 10:07:07 AM |
| Attachments: | Statements.pdf |
| | 23-0918-0005 SA.pdf |
| | 2023.09.20 - Email_2.pdf |
| | 2023.09.20 - Email.pdf |
| | 2023.09.22 - Email_2.pdf |
| | 2023.09.22 - Email.pdf |
| | 2023.09.25 - Email.pdf |
| | text from ▮▮▮ 1.png |
| | text from ▮▮▮ 2.png |
| | text from ▮▮▮ 3.png |

Howdy Jeanae,

I have gathered all the emails and statements I received and there are several incident reports as well. Below are the actors who allegedly entered the rooms:

▮▮▮▮ (Instructed ▮▮▮ to check rooms)
▮▮▮▮ (checked rooms)
▮▮▮▮ (checked rooms)
▮▮▮▮ (checked rooms)

▮▮▮▮ – went upstairs
▮▮▮▮ – went upstairs
▮▮▮▮ – went upstairs
▮▮▮▮ – went upstairs

There are three other names mentioned, but based on the information, they were just present

 (appears to have calmed things down)
▮▮▮▮
▮▮▮▮

Take a look at all the information, and we can discuss it tomorrow or Thursday. I will forward the res.life IRs to you as well.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|---|---|
| To: | Gardner, Jeffery D |
| Subject: | Case |
| Date: | Tuesday, October 10, 2023 9:47:00 AM |

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Gardner, Jeffery D |
|---|---|
| To: | Doughty, Jeanae |
| Subject: | RE:    Case |
| Date: | Tuesday, October 10, 2023 9:54:43 AM |

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>
<span style="color:maroon">Assistant Commandant for Accountability and Standards</span>
<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>
<span style="color:maroon">979-458-9317</span>

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Case

Howdy Col. Gardner,

I've been assigned the     case and wanted to reach out and touch base with you regarding your availability. There are     students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From:          Doughty, Jeanae
To:            Gardner, Jeffery D
Subject:     RE:    Case
Date:        Tuesday, October 10, 2023 10:03:00 AM

This is for the administrative conferences involving   cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Jeanae,

       Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Case

Howdy Col. Gardner,

I've been assigned the      case and wanted to reach out and touch base with you regarding your availability. There are      students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D
**To:** Doughty, Jeanae
**Subject:** RE:     Case
**Date:** Tuesday, October 10, 2023 2:29:32 PM

Howdy Ma'am,

I have read through everything.  Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

This is for the administrative conferences involving    cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

**- 253 -**

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**     Case

Howdy Col. Gardner,

I've been assigned the       case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Howdy,

Ok, thank you! Also, the only rule I could charge the upper for giving the direction is "hazing", which doesn't apply in this case, so I am leaving his charges as is. In looking at our calendars, I wanted to confirm that you are available during the following days/times:

- Monday, October 16th 9:30 am-11:00 am
- Monday, October 16th 2:00 pm-3:30 pm
- Wednesday, October 18th 9:30 am-11:00 am

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:30 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Ma'am,

    I have read through everything.  Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Case

This is for the administrative conferences involving    cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:**  Gardner, Jeffery D
**To:**  Doughty, Jeanae
**Subject:**  RE:     Case
**Date:**  Tuesday, October 10, 2023 2:42:46 PM

Those times should work.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:39 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

My apologies. Wednesday, the time is 9:00 am-10:30 am.

**From:** Doughty, Jeanae
**Sent:** Tuesday, October 10, 2023 2:33 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

Howdy,

Ok, thank you! Also, the only rule I could charge the upper for giving the direction is "hazing", which doesn't apply in this case, so I am leaving his charges as is. In looking at our calendars, I wanted to confirm that you are available during the following days/times:

- Monday, October 16th 9:30 am-11:00 am
- Monday, October 16th 2:00 pm-3:30 pm
- Wednesday, October 18th 9:30 am-11:00 am

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:30 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Case

Howdy Ma'am,

I have read through everything.  Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Case

This is for the administrative conferences involving      cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.


**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**- 258 -**

**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**     Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas
**To:** Doughty, Jeanae
**Subject:** Investigation Assigned
**Date:** Friday, October 20, 2023 10:23:40 AM
**Attachments:** Investigation Report.pdf

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Doughty, Jeanae |
| **Subject:** | Investigation Assigned |
| **Date:** | Friday, October 20, 2023 10:23:40 AM |
| **Attachments:** | Investigation Report.pdf |

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|---|---|
| To: | Gardner, Jeffery D |
| Subject: | Corps Admin |
| Date: | Wednesday, October 25, 2023 2:31:00 PM |
| Attachments: | Investigation Report.pdf |

Howdy Col. Gardner,

I've been assigned the                investigation. I am attaching the investigation report for your reference. Please let me know if/when you are available to chat.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Sounds good! I can walk over at 10:15 am.

All the Best,
**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, October 26, 2023 7:17 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Corps Admin

Morning Ma'am,

I have some time tomorrow after 1000.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Wednesday, October 25, 2023 2:32 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Corps Admin

Howdy Col. Gardner,

I've been assigned the                investigation. I am attaching the investigation report for your reference. Please let me know if/when you are available to chat.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator

**- 263 -**

Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Doughty, Jeanae
**To:**           - Student Conduct Office - Student Employee
**Subject:** FW: Investigation Assigned
**Date:** Friday, October 27, 2023 9:45:00 AM
**Attachments:**         Investigation Report.pdf

Hey, can you redact this for us please?

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 10:24 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Investigation Assigned

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | - Student Conduct Office - Student Employee |
| **To:** | Doughty, Jeanae |
| **Subject:** | RE: Investigation Assigned |
| **Date:** | Friday, October 27, 2023 10:10:56 AM |
| **Attachments:** | Investigation Report_Redacted.pdf |

All done.

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Friday, October 27, 2023 9:46 AM
**To:** - Student Conduct Office - Student Employee
**Subject:** FW: Investigation Assigned

Hey, can you redact this for us please?

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 10:24 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Investigation Assigned

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
DIVISION OF STUDENT AFFAIRS | One Division. One Mission.

# Jeanae Doughty

EMAIL: ██████████

## EDUCATION

2021        **Master of Organizational Leadership** *(awarded May 7, 2021)*
            Trevecca Nazarene University – Nashville, TN

2013        **Bachelor of Liberal Studies** *(awarded May 12, 2013)*
            The University of Memphis – Memphis, TN
            Major:  Interdisciplinary Studies

## PROFESSIONAL EXPERIENCE

2021 – Present    **Associate Coordinator, Student Conduct Office**
                  **Texas A&M University – College Station, TX**
- Assist in the resolution of student conduct cases and other office initiatives, services, and projects.
- Supervise the Graduate Assistant.
- Administer the student conduct code.
- Serve as an investigator.
- Assist with office assessment.
- Assisting with and coordinating office presentations and trainings.
- Review reports for potential violations of the Student Conduct Code.
- Meet with students, witnesses, advisors, and other supporters to resolve cases.
- Engage in individual developmental and/or educational conversations with students.
- Appropriately refer to university and community resources and services.
- Assign appropriate educational sanctions.
- Serve as panel chair or student conduct administrator as needed.
- Design, implement, and evaluate presentations and workshops to students, faculty, and staff in alignment with office mission.
- Stay current on trends in student conduct and new legislation, state laws, federal requirements, and national standards relating to student conduct.
- Work with supervisor to create and maintain professional development plan, this may include utilizing campus trainings and/or attending professional conferences directly affiliated with job responsibilities.
- Assist in maintaining positive working relationships with office stakeholders, providing information when appropriate, responding promptly to appropriate requests for assistance, and maintaining a professional demeanor.

- Serve as representative on Department, Division and University committees and task forces, at events, and to department stakeholders as assigned.
- Attend and actively engage in Department and Division meetings, trainings, and functions. Other duties as assigned.

2019 – 2021    **Administrative Assistant to the Dean of Student Services & Enrollment Management**
**Mississippi Gulf Coast Community College, Harrison County Campus – Gulfport, MS**

- Assist Dean in daily planning and implementation of Student Services functions.
- Take minutes at all meetings assigned by the Dean.
- Produce letters, reports, and minutes from rough drafts utilizing word processing skills.
- Compose routine correspondence.
- Handle telephone calls in an effective manner.
- Maintain an accurate and complete filing system.
- Compile and maintain data for reports.
- Arrange for college vehicles, transportation, reservations, and lodging requirements.
- Order all departmental printing from District Printing.
- Handle the purchasing of supplies, etc. for the department.
- Complete hiring packages for personnel hired.
- Maintain employee personnel files for all Student Services personnel.
- Maintain timecards for all Student Services personnel and input leave in Banner during specific payroll dates.
- Prepare special contracts and/or contract addendums when required.
- Monitor, process, and reconcile expenditures and revenues.
- Prepare specifications for quotes and bid tabulations.
- Prepare monthly procurement card statements.
- Process check requests, purchase orders, and travel vouchers.
- Verify and maintain departmental budgets for accuracy.
- Maintain inventory for major and minor equipment for the department and stay up to date on inventory procedures.
- Schedule, coordinate, and assist Dean of Student Services with all aspects of conduct hearings.
- Supervise and/or participate in student activities as assigned by administrative staff.
- Supervise student workers and, when assigned, office personnel in lower levels.
- Schedule meetings and coordinate arrangements for refreshments, meals, audiovisual, and other requirements.
- Handle the reservations for rooms under Student Services responsibility.
- Coordinate the Awards Day Program held at the end of the spring semester.

- Coordinate nominations and selection of the Citizenship Award, Campus Hall of Fame, and Who's Who Among Mississippi Gulf Coast Community College programs.
- Participate in the planning and execution of all Student Services functions (orientation, registration, graduation, Bulldog Day, etc.).
- Maintain an effective relationship with college personnel, students and the community.
- Upgrade skill level and performance through employee development.
- Demonstrate exceptional adherence to work schedules and policies as exemplary performance for co-workers and subordinates.
- Perform other duties as assigned by the Dean of Student Services and Campus Vice President.
- Nominated and selected as 1st Quarter "In the Blue" Employee for the Harrison County Campus in March 2021.

2017– 2019 **Teller**
**BancorpSouth – Biloxi, MS**
- Provided basic cash receipt and payment services in accordance with policies and procedures.
- Offered prompt and efficient customer transactions.
- Cashed checks and processing withdrawals.
- Balanced cash drawer daily.
- Completed balanced, weekly reports.
- Maintained confidentiality of bank records and customer information.
- Processed orders for tellers from the vault.
- Prepared incoming and outgoing monetary shipments.

## PROFESSIONAL AFFILIATIONS & AWARDS
Association for Student Conduct Administrators (ASCA), 2021-Present
MGCCC "In the Blue" Staff Award, 3rd Quarter - 2021
Delta Sigma Theta Sorority, Incorporated, 2011-Present



View Submitted Application: TAMU Career
Site: Assistant Coordinator-Student Conduct
Office

10:22 AM
04/08/2024
Page 1 of 3

## Contact Information

Recruiters can reach out to you about this application using the public contact information from your worker profile below.

| | |
|---|---|
| **Email** | jeanaed@sco.tamu.edu (Work)<br>jeanaed@tamu.edu (Work) |
| **Phone Number** | |

## Experience

| | |
|---|---|
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | Mississippi Gulf Coast Community College, Harrison County Campus |
| **Title** | Administrative Assistant to the Dean of Student Services & Enrollment Management |
| **Location** | Gulfport, MS |
| **Start Date** | |
| **Currently Work Here** | Yes |
| **Responsibilities and Achievements** | ·Assist Dean in daily planning and implementation of Student Services functions.<br>· Take minutes at all meetings assigned by the Dean.<br>· Produce letters, reports, and minutes from rough drafts utilizing word processing skills.<br>· Compose routine correspondence.<br>· Handle telephone calls in an effective manner.<br>· Maintain an accurate and complete filing system.<br>· Compile and maintain data for reports.<br>· Arrange for college vehicles, transportation, reservations, and lodging requirements.<br>· Order all departmental printing from District Printing.<br>· Handle the purchasing of supplies, etc. for the department.<br>· Complete hiring packages for personnel hired.<br>· Maintain employee personnel files for all Student Services personnel.<br>· Maintain time cards for all Student Services personnel and input leave in Banner during specific payroll dates.<br>· Prepare special contracts and/or contract addendums when required.<br>· Monitor, process, and reconcile expenditures and revenues.<br>· Prepare specifications for quotes and bid tabulations.<br>· Prepare monthly procurement card statements.<br>· Process check requests, purchase orders, and travel vouchers.<br>· Verify and maintain departmental budgets for accuracy.<br>· Maintain inventory for major and minor equipment for the department and stay up to date on inventory procedures.<br>· Schedule, coordinate, and assist Dean of Student Services with all aspects of conduct hearings.<br>· Supervise and/or participate in student activities as assigned by administrative staff.<br>· Supervise student workers and, when assigned, office personnel in lower levels.<br>· Schedule meetings and coordinate arrangements for refreshments, meals, audiovisual, and other requirements.<br>· Handle the reservations for rooms under Student Services responsibility.<br>· Coordinate the Awards Day Program held at the end of the spring semester.<br>· Coordinate nominations and selection of the Citizenship Award, Campus Hall of Fame, and Who's Who Among Mississippi Gulf Coast Community College programs.<br>· Participate in the planning and execution of all Student Services functions (orientation, registration, graduation, Bulldog Day, etc.).<br>· Maintain an effective relationship with college personnel, students and the community.<br>· Upgrade skill level and performance through employee development.<br>· Demonstrate exceptional adherence to work schedules and policies as exemplary performance for co-workers and subordinates.<br>· Perform other duties as assigned by the Dean of Student Services and Campus Vice President.<br>· Nominated and selected as 1st Quarter "In the Blue" Employee for the Harrison County Campus in March 2021. |

| | |
|---|---|
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | Morton's the Steakhouse |
| **Title** | Hostess/Food Runner |

| | |
|---|---|
| **Location** | Biloxi, MS |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | · Greeted and seated all guests.<br>· Enhanced customer experiences by providing personalized service.<br>· Maintained a positive rapport with colleagues and other patrons.<br>· Retrieved and delivered guest entrees and sides.<br>· Assisted bar staff with daily operations. |
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | BancorpSouth |
| **Title** | Teller |
| **Location** | Biloxi, MS |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | · Provided basic cash receipt and payment services in accordance with policies and procedures.<br>· Offered prompt and efficient customer transactions.<br>· Cashed checks and processing withdrawals.<br>· Balanced cash drawer daily.<br>· Completed balanced, weekly reports.<br>· Maintained confidentiality of bank records and customer information.<br>· Processed orders for tellers from the vault.<br>· Prepared incoming and outgoing monetary shipments. |
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | Red Lobster, Inc. |
| **Title** | Service Professional |
| **Location** | D'Iberville, MS |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | ·Greeted and seated all VIP Guests.<br>· Enhanced customer experiences by providing personalized service<br>· Maintained a positive rapport with colleagues and other patrons.<br>· Delivered food and drinks.<br>· Managed financial transactions. |
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | Harrison County Courthouse |
| **Title** | Chancery Clerk Assistant |
| **Location** | Gulfport, MS |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | ·Input data including deed records, liens records, and IRS revenue.<br>· Filed and archived records.<br>· Organized and designed informational displays for individuals considering foreclosures. |
| **Replace the Experience information in my profile with this information** | No |

Education

| | |
|---|---|
| **Country** | United States of America |
| **School** | Trevecca Nazarene University |
| **Degree** | Masters |
| **Degree Received** | |
| **Field of Study** | |
| **First Year Attended** | 2019 |
| **Last Year Attended** | 2021 |
| **GPA** | |

| | |
|---|---|
| **Country** | |
| **School** | |
| **Degree** | Bachelors |
| **Degree Received** | |
| **Field of Study** | Interdisciplinary Studies |
| **First Year Attended** | 2007 |
| **Last Year Attended** | 2013 |
| **GPA** | |

| | |
|---|---|
| **Replace the Education information in my profile with this information** | No |

| Certifications | |
|---|---|
| | none entered |

| Language | |
|---|---|
| | none entered |

| Skills | |
|---|---|
| | My experience related to Assistant Coordinator – Student Conduct Office includes: •10 plus years of administrative duties; •Efficient organizational skills, ensuring that all data is complete and accurate upon insertion; •Ability to work effectively with diverse populations; •Experience in purchasing and budget management; •Strong planning, execution, and project management skills; •Experience in coordinating student conduct hearings; •Ability to effectively resolve conflict; •Experience in advising and supervising undergraduate peers and student workers in various organizations; •Ability to develop and maintain effective working relationships with stakeholders and vendors. |
| **Replace the Skills information in my profile with this information** | No |

Resume - JADoughty.doc

| | |
|---|---|
| **File Name** | Resume - JADoughty.doc |
| **Content Type** | application/msword |
| **Updated By** | |
| **Upload Date** | 07/29/2021 09:07:55 AM |
| **Comment** | |

Cover Letter - TA&M - JDoughty.docx

| | |
|---|---|
| **File Name** | Cover Letter - TA&M - JDoughty.docx |
| **Content Type** | application/vnd.openxmlformats-officedocument.wordprocessingml.document |
| **Updated By** | |
| **Upload Date** | 07/29/2021 09:27:46 AM |
| **Comment** | |



**MEMORANDUM**

DATE:            January 30, 2024

TO:              BG Joe E. Ramirez, Jr., USA (Ret.)
                 Vice President for Student Affairs

THROUGH:         Dr. Kristen Harrell
                 Assistant Vice President for Student Affairs

FROM:            Dr. Douglas Bell
                 Director, Student Community Standards

SUBJECT:         Case
_____

                        submitted a statement to the Corps of Cadets when she requested to transfer out of
   and into a different squadron. The statement that            submitted included information concerning multiple
incidents that have taken place within         that led to            request to transfer outfits. Some of the incidents
that occurred include:

- Requiring       to stand on the wall for an extended amount of time (three hours with only one "shake it out"
  where they got to relax). Multiple       submitted statements mentioning standing at 5 points of attention
  for "very long periods of time."
    - Five points meant their heels, butt, both shoulder blades, and head had to be on the wall.
    - It was stated during the investigation that "only the         had to stand like this."
- Requiring       to make and break their racks repeatedly for over 40 minutes. Upperclassmen repeatedly gave
  the       3-5 minutes to make their racks. Some statements mentioned that they had to remake their Rack
  for 2 hours during FOW.
- During FOW,       was required to perform Uniform Drills where they were required to change from PT gear
  to bravos, then charlies, then bravos fully wired, back to PT gear in an unreasonable amount of time.
- Making       perform PT when sick or injured.
- Calling the       pathetic/weak/ and other names such as "wags."
- The       were told there would be "hell to pay" if they did not win and capture the flag. Calling       "fucking
  retards" after they lost a game of
- Performing "       Jokes" during outfit meetings where a       gets to tell a joke to an upperclassman to
  attempt to make an upperclassman laugh. Anyone who laughs has to "wipe it off," which means sticking
  their hand out and counting to three and then smacking themselves in the forehead and wiping their smile
  off their face.

All the cadets within the outfit were charged with alleged violations of Student Rule 24 related to Hazing.
Also, all the       were charged with having knowledge and failing to report due to the bolded portions of
our Hazing rule:

Student Conduct Office
Student Services Building, 3rd Floor, Suite 309
1172 TAMU
College Station, TX 77843

Tel. 979.847.7272
Fax 979.845.6136
sco@tamu.edu
http://studentconduct.tamu.edu/

**- 273 -**



1. [24.4.5.] Hazing. Any act that endangers the mental or physical health or safety of a student, or that destroys or removes public or private property; and/or assisting, directing, or in any way causing others to participate in

degrading behavior and/or behavior that causes ridicule, humiliation, or embarrassment for the purpose of initiation, admission into, affiliation with, or as a condition for continued membership in a group or organization; or as part of any activity of a recognized student organization, student group, Corps of Cadets, Corps outfit, Corps unit, or Corps Special Activities. Previously relied upon "traditions" (including Corps, fraternity/sorority, or any other group or organization activity, practice or tradition), intent of such acts, or coercion by current or former members or student leaders of such groups, will not suffice as a justifiable reason for participation in such acts**. It is not a defense that the person (or group) against whom the hazing was directed consented to, or acquiesced to, the behavior in question.**

Examples of such behavior include but are not limited to:
- Misuse of authority by virtue of one's class rank or leadership position.
- Striking another student by hand or with any instrument.
- Any form of physical bondage of a student.
- Taking of one or more students to an outlying area and dropping them off.
- Causing a student to violate the law or a University rule such as indecent exposure, trespassing, violation of visitation, etc.
- Any form of "quadding."
- **Having firsthand knowledge of the planning of such activities or firsthand knowledge that an incident of this type has occurred and failing to report it to appropriate University officials (The Vice President for Student Affairs or designee responsible for oversight of the student conduct processes and/or the University Police Department) is also a violation under this section.**

During the investigation, it was mentioned by the Corps Staff that the information that was provided was not a part of the legitimate military training program as defined and approved by the University. Due to the information provided during the investigation, it was requested that all the        provide statements. The        were not charged with Conduct Unbecoming of a Cadet. Cadet        was transferred to        Since she initially reported this information, she was not charged with violating the student rule.  All the        were offered the low-level options process, which did not include any Corps sanctions.   If requested, we will hold administrative conferences and talk with the        to gain additional perspective regarding the case and determine if the cadets were in violation of our hazing rule.

Douglas Bell, Ph.D.
Director of Student Community Standards

Student Conduct Office
Student Services Building, 3rd Floor, Suite 309
1172 TAMU
College Station, TX 77843

Tel. 979.847.7272
Fax 979.845.6136
sco@tamu.edu
http://studentconduct.tamu.edu/

- 274 -

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Tuesday, October 24, 2023 4:26 PM |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: incidents ███████████ |

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Subject:** RE: incidents ███████████

Sir,

That would be Jason Leible, jleible@corps.tamu.edu

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:26 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: incidents ███████████

Howdy,
I think there may be enough here to at least investigate. We can initiate our investigation into this situation. Lt. Col. Gardner, can you please provide a support staff name to serve as a Co-Invesitgator.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

1

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:        incidents ███████████████

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the        in this outfit.  The first document is the one that really stands out (request to transfer).  Before I act here, I'd like your perspectives if there is any form of violation of university hazing standards here.

patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**        incidents ███████████████

Good Morning Sir,

I finally received the additional info last night regarding Cadet ███████████ Below is the original email from last month but I've also attached the additional document that I received last night as well.  She stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.

**R/**
**MSgt Chauncy J. Anderson USMC (Ret)**  | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 |                            | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** ███████████████████████
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ███████████████ . I'm a cadet in        and a recent transfer from        I was in the same outfit as ██████ ██████ when she was in the Corps of Cadets. My time in        , though brief, has been incredibly different than my time

2

spent in ▮▮▮▮. If you're available this Thursday, ▮▮▮▮ and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to ▮▮▮▮ was the best choice for me, and I'm truly grateful to ▮▮▮▮ and ▮▮▮▮ for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including ▮▮▮ would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in ▮▮▮▮.

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,

▮▮▮▮

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Friday, December 22, 2023 12:06 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | investigation reports complete |

Both the        and        Event reports have been completed and saved in the shared drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Tuesday, January 30, 2024 2:35 PM
**To:** Harrell, Kristen
**Subject:** Memo for Gen. Ramirez
**Attachments:** Case Memo -            docx


Please see the attached memo and let me know if you have any questions or feedback.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Harrell, Kristen |
| **Sent:** | Monday, January 29, 2024 11:00 AM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | Need to follow up |

We'll need to chat about

**Kristen Harrell, PhD** | She, her, hers | Assistant Vice President
Office of the Vice President | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.845.4728 | kristenh@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Monday, November 6, 2023 9:43 AM
**To:** Rydl, Chareny L
**Cc:** Reber, Thomas W; Harrell, Kristen
**Subject:** RE: Cadet Suspension

To my knowledge, this individual was      suspended from the Corps (only) by CMDT, pending the outcome of an investigation and adjudication process. We are still investigating

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

---

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Monday, November 6, 2023 9:31 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Reber, Thomas W <treber@tamu.edu>; Harrell, Kristen <kristenh@vpsa.tamu.edu>
**Subject:** FW: Cadet Suspension

Well this is a first. Not sure how if he is      suspended from the Corps how they can allow him to move back. Not my area so if there is any follow up I will leave it up to you.

Chareny

**From:** Wilson, Jeff C <jeff_wilson@tamu.edu>
**Sent:** Monday, November 6, 2023 9:23 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; McCracken, Kyle R <kyle_mccracken@reslife.tamu.edu>; Krenz, Michael D <mikek@reslife.tamu.edu>
**Subject:** FW: Cadet Suspension

Interesting...that the OOC is allowing a cadet who has been      suspended to remain (move back) to the Quad (in a Corps space) while this issue is being worked thru Student Conduct
Thank you

**Jeff Wilson '84** | Associate Director
Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-1258

ph: 979.845.4744 | toll free 888.451.3896 | email: jeff_wilson@reslife.tamu.edu

---

 **TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Friday, November 3, 2023 2:36 PM
**To:** Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Parker, Chad L <cparker@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Subject:** RE: Cadet Suspension

All,

The CMDT learned this afternoon via parent concern that ▮▮ is living in a study carrell in       . That was not his intended result of the suspension and subsequent move, and he assured the family that the OOC would take action to remedy the situation.

Rick identified a space in                              that is vacant.▮▮ will connect with Corps Housing on Monday morning to initiate the next iteration of the move. Rick is standing by with access/keys/       and the student was notified of the availability of the space/next steps.

Chad, can you please let the CO know to expect to see the student in the hallway on Monday mid-day?
Rick, once the move is complete can you cancel access to his current facility in       ?

Thanks,
mms

**Meredith Simpson**
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

**From:** Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Sent:** Friday, October 20, 2023 1:07 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>; Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Cadet Suspension

All –
We have a temporary space held for this student in                . We have notified                    that this student could move today (after 5 pm).

Sylvia & Rick –
Alexis sent you a note on this via Teams as well
Thank you

**Jeff Wilson '84 |** Associate Director
Housing Assignments Office | Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-0000

ph: 979.845.4744 | toll free 888.451.3896 |email:  jeff_wilson@reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 1:04 PM
**To:** Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Cadet Suspension

Howdy Sylvia,
      I will cc you on an email to a cadet shortly but wanted to first explain what is going on.

      SCO has initiated and investigation into potential violations of student rules in        Based on statements gathered so far a particular cadet has been identified as possibly be the main focus of the investigation.  BG Michaelis has decided to suspend that cadet from the Corps pending the results of the investigations.  This cadet will be instructed to move out of his Corps dorm living space Monday and into another      space, preferably off the quad.  This is similar to the situation involving a number of    cadets     .

      I already called Jeff Wilson and talked through this with him.  Let me know if you have any questions.

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Michaelis, Patrick Ralph |
| **Sent:** | Friday, October 20, 2023 12:25 PM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Gardner, Jeffery D; Simpson, Meredith M |
| **Subject:** | RE:      incidents ██████████████ |

Doug. I've temporarily suspended ████████ from the Corps pending the results of the investigation.  Thanks for your help here and looking forward to a quick turnaround.


patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**


**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:42 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      incidents ██████████████

I am available to chat until noon.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.


**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:39 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re:      incidents ██████████████

Doug - before you move forward, need a quick chat. Are you available for a call this morning?

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

On Oct 20, 2023, at 9:35 AM, Gardner, Jeffery D <jeff_gardner@corps.tamu.edu> wrote:

Sir,

That would be Jason Leible, jleible@corps.tamu.edu

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:26 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     incidents ███████████████

Howdy,
I think there may be enough here to at least investigate.  We can initiate our investigation into this situation.   Lt. Col. Gardner, can you please provide a support staff name to serve as a Co-Invesitgator.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:     incidents ███████████████

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the         in this outfit.  The first document is the one that really stands out (request to transfer).  Before I act here, I'd like your perspectives if there is any form of violation of university hazing standards here.

patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**        incidents ███████████████████

Good Morning Sir,

I finally received the additional info last night regarding Cadet ████████ Below is the original email from last month but I've also attached the additional document that I received last night as well.  She stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.


**R/**
**MSgt Chauncy J. Anderson USMC (Ret)**  | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 | mobile:                          | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders



**From:** ██████████████████████████████████
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ██████████████████. I'm a cadet in        and a recent        from        . I was in the same outfit as ██████████ when she was in the Corps of Cadets. My time in        ,           , has been incredibly different than my time spent in        . If you're available this Thursday, ████ and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to        was the best choice for me, and I'm truly grateful to ████████ and ████████ for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including        would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in        .

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,

██████████

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Friday, January 19, 2024 9:34 AM |
| **To:** | Latham, Skylar; Smith, Asia |
| **Subject:** | RE: |

That is my thought.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Latham, Skylar <skylarl@sco.tamu.edu>
**Sent:** Friday, January 19, 2024 9:33 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Smith, Asia <asias@sco.tamu.edu>
**Subject:** RE:

Should these be the students brought in for administrative conferences?

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:28 AM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** FW:

Below are the names of the                    who assisted during        .

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, January 19, 2024 9:26 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE:

Sir,

As requested.

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**

Howdy Lt. Col. Gardner,
We are reviewing the investigation report for                    , and I wanted to know if you had the list of the Members for                who participated/assisted in        .  Thanks in advance.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Request to Transfer Document Concerning ▮▮▮▮▮

Objective: Transfer to

Reasons for Transfer: Compatibility with outfit culture, moral alignment, leadership methods, differing priorities.

To be more specific, ▮▮▮ promotes selfless leadership and actively engages in community service. The outfit is very academic-oriented. ▮▮▮▮▮ is currently in ▮▮▮. The outfit promotes honor and hard work and heavily promotes discipline through physical training.

I was personally asked by my superiors to provide constructive criticism for the outfit. The leadership in the outfit is striving to change for the better. The following list details my personal experience and recommendations. These are my personal opinions, but I can honestly say that many are shared by my fellow cadets.

Unfortunately, we have lost ▮▮▮▮▮ so far, leaving ▮▮▮ in our buddy class; however, several would have been excellent cadets. I'm writing this because I don't want to lose any more cadets who might punch if things don't change.

My overall observation is that ▮▮▮▮▮▮▮▮▮ care very much about this outfit. There are a few issues I would like to address:

Chain of command is ineffective:
▮▮▮ are not willing or able to answer questions or address concerns. Fire teams are inefficient and squad leaders are nonexistent. ▮▮▮ are the ones primarily disciplining us throughout ▮▮▮ and even now. For example, they are the ones who dictated training in ▮▮▮. They are intimidating figures who lead with negative reinforcement and degradation. This treatment has led some ▮▮▮ to punch * Although ▮▮▮▮▮ is in a position to lead by example, she has allowed ▮▮▮ to dictate training and often harsh discipline. For example, during ▮▮▮, ▮▮▮ participated in rack drills for most days of ▮▮▮ often lasting more than two hours. We also had timed uniform drills, in which the ▮▮▮ had to change back and forth between various uniforms for inspection. It was often very intense and the pressure was excessive. The ▮▮▮ stood at attention on the wall for increasingly long periods of time past the point where the ▮▮▮ collapsed from leg cramps, or were shaking and in tears. You're considered weak if you're pushing yourself and your body doesn't comply. Examples include cadets passing out during PT, cadets participating in PT even when excused with doctor's notes, and having a "spew line" for the amount of ▮▮▮ throwing up, and cadets being called "pathetic" and "weak" before collapsing.

*I can provide specifics for why many ▮▮▮ quit and which factors were responsible, but it is not my place to type it out on this report.

Communication is lacking:

who were sick or injured were still expected to participate in PT even when excused by medical professionals. In my case, I was unable to attend classes for 3 days. I messaged my team leaders immediately, and received no specific instructions. I was told to still line up with my buddies for the first call even though I was unable to stand properly. My CO found me in the restroom and told me that in the future, I should go to my           doors rather than just text them so that I would be accounted for. The next day, I was still unable to participate in PT or training activities, but was told to still line up with my buddies. I attended formation and all attempts made to make a statement and explain that I was dizzy and ill were met with harsh instructions and demands to shut up. We went back to our dorms and had our room inspection drills until breakfast. I stumbled through helping my buddies clean their holes while fighting nausea. We lined up on the wall, and I was yelled at for looking like I was falling asleep. I made a statement that I was dizzy and concerned about passing out before running to the restroom. When I finally did return to PT, I informed my           that I was able to do calisthenics, but would likely throw up if I ran. I was still expected to run sprints until I was violently puking on the ground and hyperventilating.

Unfortunately, a fellow buddy of mine who was sick had a similar story. She was excused for several days by a doctor, but was told by the upperclassmen that she was still expected to attend PT. She is recovering from a                    injury, and still attempts to do strenuous physical activity to avoid getting yelled at.


Culture:

The culture of this outfit is competitive and intense. There is no positive feedback and expectations are never clear. There is no transparency, and the       are not treated respectfully. Our outfit has had        punch out. The       are overwhelmed and often scared. The often confuse fear for respect and lead by intimidation instead of example. The       are often told that if we get it together for once, we'll get good bull. When we do get good bull, we aren't allowed to smile or laugh, and we aren't allowed to initiate anything considered fun. They tell us that they push us to make us better and that we're lucky to have them. Our buddy class all encouraged each other to hold on until after        because things would get better. Our then told us that they had weeded out all the weak ones, and it was only going to get harder. There is no motivation or encouragement. We are belittled and called pathetic if we struggle to keep up. This outfit defines your worth in your PFT scores, and cadets are treated accordingly. You will not be respected if you aren't athletic. In fact, you will likely be the target of belittlement and degradation during PT times if you fall behind. There's no accountability with leadership, and the       do not know who to ask questions to. We were assigned our fire team leaders after three weeks and didn't meet our                    until after two weeks of classes. Personally, I felt that my        were not willing to answer my questions and often took a very long time to reply to messages if they replied at all.

Personal Experience:

In my experience, I've had little to no issues with most of the           . Many of them have been very supportive and inspiring figures to me. I have had little to no contact with most of the
.

was primarily run by                . Those who were there were often intimidating and harsh disciplinarians. My personal opinion of ▮▮▮▮▮▮▮ is that he is degrading and unapproachable. He would often say harsh things about us to other        in the hallway. He's angry most of the time and gives off the impression that he would be much happier of a person if he had never met any of us. When he does feel like joking around, he gets angry if we react positively. We often say that he loves good bull and hates other people's joy. In the case of some cadets, his degradation often seemed personal. It is my understanding that        are supposed to be inspiring and supportive figures. I felt neither of those things after being called "a bunch of f****ng retards" after losing a game of        In fact, during field day we were told that        don't lose, and if we lost a game, we would go back to standing at attention on the wall for two hours.

We are often told that the        are rooting for us and want to see us improve. I mentioned to ▮▮▮▮▮▮▮▮ that I felt that some        were rooting for me to quit, and would celebrate if I left because they wouldn't have to deal with me during PT anymore. He assured me that that wasn't the case and that some people just take PT a lot more seriously than others and that I would get better. In the case of ▮▮▮▮▮▮▮, the degradation has often felt personal to me. My buddies often say that outside of training times, he's nice; however, he's never spoken to me outside of harshly pointing out my mistakes or calling me pathetic. In fact, there was a time during        in which there were several of us in the hallway rushing back to our holes hoping we wouldn't have to greet. We were noisier than necessary, and ▮▮▮▮▮▮▮ saw us. I was the only one who got in trouble. He came to my door and told me that it was astounding how I couldn't get the simplest things right, and how shockingly incompetent and pathetic I am. There were six of us in the hallway, and I was the only one who got in trouble. I went to a paired dinner with my        mentor, a buddy of mine, and her mentor. I made a joke about how I was sure that ▮▮▮▮▮▮▮ hated me because I struggled during PT, and both ▮▮▮▮▮▮▮▮▮▮▮ confirmed that I was probably right.

I had no issues with ▮▮▮▮▮▮ until going to dinner with him, my mentor, and my buddy. That evening, I had previously told ▮▮▮▮▮ that I was considering transferring outfits. He asked me if he could tell ▮▮▮▮▮ so she could talk to me about it. I told him I would be happy to talk to her about it and that he definitely should tell her. I hadn't yet told anyone other than ▮ ▮▮▮▮▮▮ and I was planning on speaking to my        about it the following day, but for reasons regarding consolidation of rooms, I spoke up sooner than planned. That night, during the        mentor dinner, ▮▮▮▮▮ began to ask me questions. He asked me if it was true that I was planning to transfer outfits. I told him yes, and my buddy with me was very upset.        began to ask me why. I told him that I would be happy to have that conversation with him in another time and place, but I wasn't comfortable talking about it at the moment. He continued pushing me multiple times, and I continued saying that I was uncomfortable. I felt like my privacy had been breached.

I am seriously concerned about the                of one of my buddies. She's had many breakdowns and reached out to the        . She dreads PT for fear of degradation, and she is

understanding but upset that I am leaving because we had previously hoped to be _____ . Her concerns are valid, and I worry about how she will cope if things continue how they are.

It is only fair to mention the positives in this outfit.
There are several people who have made my experience in the outfit a positive one. ██ ████████████████████████ were both very kind and supportive to my buddies and I who were struggling. ████████████████ have both inspired me to work hard even when I've been upset, frustrated, or tired. ████████ especially has given me invaluable advice and motivation. During PT, the only person who was kind to me when I struggled was ████████ He fell out on runs with me, and instead of belittling me, he encouraged me to try my best and to keep pushing myself. He never made me feel bad, and I was always thankful to have him there with me. Similarly, ████████ helped me calm down when I hyperventilated, and didn't make me feel bad about myself.

In conclusion, I strongly believe that there needs to be a culture change within this outfit. There needs to be accountability because the ____ are struggling, and I would not be surprised if there were more punches. In an outfit where worth is defined by ____ scores, "weak ___" are degraded and belittled. We are never fully unlocked and the ____ are always walking on eggshells and afraid of upsetting the ____ . Ultimately, I am requesting immediate transfer to ____ because I anticipate retaliation for my transfer request.

Update as of 09/26/27

I have spent one full week in _____ and I truly believe that I have made the right decision. There is an effective chain of command, and I was immediately placed in a fire team with strict, but helpful _____. My ____ team leader is often hard on me, but in the best possible way. I can tell he cares and wants me to improve, and I only feel motivated to work harder and make him proud. Our _____ leader is very approachable, though I haven't yet needed to ask a question that far up the chain of command. Our _____ are fantastic. They inspire and motivate us to improve.

I've experienced severe _____ in the past during outfit physical training time. This morning, we had our _____ session, and those feelings came flooding back. No one was upset with me. In fact, ▮▮▮▮▮▮ pulled me aside to collect myself. He told me it was good that I understood that what I was going through was _____ and that I could work through it because if I couldn't, I wouldn't already be here. One of the _____ told me that while they wanted me to push myself, overexertion was not the goal. Even the _____ motivated me. No one called me weak or pathetic, they all just told me that they knew I had more to give, and I did. I completed an incredibly intense workout, and instead of feeling _____ or dread for the day to come, I felt a sense of accomplishment. I did something difficult and scary, and I got through it. I was never put down or left behind, I was only supported and encouraged to get back up. The training environment is so different from what I was used to, I didn't know how to react at first. Now, I'm just so thankful that I'm here.

The culture here is different too. Everyone cares about each other and lifts each other up. You never give up on yourself, and you never give up on your buddies. I'm still finding my place within this outfit, but everyone has been so kind and welcoming, I have no doubt that this is where I'm meant to be. I know that there will always be hard days, but I also know that in ____ I have people to lean on. My buddies are supporting me, my _____ are pushing me, my _____ are rooting for me, and my _____ are inspiring me. Every day will be another step towards improvement, and someday, I'll be able to inspire that growth in someone else.

# Bell Jr, Douglas

**From:**             Bell Jr, Douglas
**Sent:**             Wednesday, January 24, 2024 1:23 PM
**To:**               Smith, Asia
**Cc:**               Latham, Skylar
**Subject:**        RE:       Tentative Charges

Move forward.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Smith, Asia <asias@sco.tamu.edu>
**Sent:** Wednesday, January 24, 2024 1:16 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** RE:       Tentative Charges

Dr. Bell,

After consultation with Col. Garner and heavy reflection, I believe Skylar is ready to move forward with        charge letters.

Please let us know if you have any thoughts or concerns.

Asia

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:18 AM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** RE:       Tentative Charges

After an additional review, this makes sense. I would do an options process for the        and unnamed upperclassmen. I am attempting to get the     list from Gardner, so we know exactly who was present at    .

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Smith, Asia <asias@sco.tamu.edu>
**Sent:** Friday, January 19, 2024 9:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:**          Tentative Charges

Howdy Dr. Bell,

I wanted to streamline the tentative charges for you for review.


Failure to report
Conduct Unbecoming


Failure to report
Complicity
Conduct Unbecoming a Cadet


Hazing
Failure to report
Complicity
Conduct Unbecoming

As mentioned some of the named upperclassmen were dishonest in their interview with the investigators and, as a result, will also receive "Abuse of the Conduct Process".

**Asia Smith M.S.Ed.**   |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Latham, Skylar |
| **Sent:** | Thursday, January 25, 2024 5:48 PM |
| **To:** | White, Lori J; Trevino, Nelda L.; Gonzalez Guerra, Bernardo; Crumrine, Calleigh; Koch, Aubrey - Student Conduct Office - Student Employee; Doughty, Jeanae; Caldwell III, Danny Wilson; Masroor, Wajiha - Graduate Assistant - Student Conduct Office; Taylor, Japheth J. |
| **Cc:** | Smith, Asia; Bell Jr, Douglas |
| **Subject:** | |

Howdy,

Just finished finalizing        Letters will auto send at 8:30 AM tomorrow morning. There is about      students involved so we may want to make a tablet or two.

Sincerely,

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**Bell Jr, Douglas**

---

**From:** Smith, Asia
**Sent:** Tuesday, January 9, 2024 4:44 PM
**To:** Bell Jr, Douglas
**Subject:** RE:                Investigation Report

Skylar will be the SCA for this case.

**Asia Smith M.S.Ed.**   |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Monday, January 8, 2024 2:32 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**                Investigation Report

Howdy,
Please review the attached investigation report and let me know who you would like for me to forward this report to.

**Douglas Bell, Ph.D.**   | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

---

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Thursday, January 5, 2023 11:41 AM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Subject:** | FW:     Report |

I have put this report within your scans folder.

**Douglas Bell, Ph.D.**  | Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, December 23, 2022 11:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:**     Report

The     Investigation Report is complete. The final report and the two audio recordings can be found here:
  \Investigations\Active Investigations\In Progress _


Have a great break!

**Audrey Winking**|  Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 11:26 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** FW:    Initial Report:

Dr. Bell,

I just received another incident report.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:**
**Sent:** Friday, September 29, 2023 11:23 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>;

**Cc:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬
**Subject:**    Initial Report:

Good afternoon, Lt Col Gardner and Cadet ▬▬,

**Who:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
**What:** Stolen Property
**Where:** In between
**When:** 1300, Thurs
**Why:**  Cadet ▬▬▬ was returning from a mathematics lab class with a non-reg friend, during which

one of his          was taken.    fraternity students (male) came up from
behind him and took his spur by stepping on his heels and shoving him. Cadet ▮▮▮▮ tried to grab
one of the frat students, but he got away with the        .
The    fraternity students were
                     Both wore black tennis shoes, no glasses, one with a turquoise shirt other with a
black shirt.

The reasoning for submitting this      is to help create a trail of similar cases to hold the fraternities
accountable.


--
Very Respectfully,


▮▮▮▮▮▮▮▮
Texas A&M University
Corps of Cadets |
P: ▮▮▮▮▮▮▮
E: ▮▮▮▮▮▮▮▮▮▮▮▮

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: |
| **Date:** | Friday, September 29, 2023 9:52:11 AM |

Gardner is suppose to provide some statements. I am not sure who should be a co-investigator.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Harrell, Kristen <kristenh@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 8:14 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW:

**Kristen Harrell, PhD** | She, her, hers | Assistant Vice President
Office of the Vice President | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.845.4728 | kristenh@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:02 PM
**To:** Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ███████████████████████████████████████
███████████████████████████████████
**Subject:** RE:

**Good on all, Shante. Thanks.**

**I'd like a report on where we are on this incident next week. This is the kind of behavior that leads to physical altercations between our students – something that is never good for anyone.**

**Thanks again for the information.**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

**From:** Hearst, Shante <shearst@stuact.tamu.edu>
**Sent:** Thursday, September 28, 2023 12:07 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Cc** ███████████████████████████████████████
███████████████████████████████████████
**Subject:** RE:

General Ramirez,

███ are recognized as a registered student organization but are not a member of any council. They operate and are viewed more like a ██████ because they are not affiliated with ██ (where they would be housed if they were affiliated with a council).

I'm happy to provide additional clarification if this wasn't helpful.

**Shanté Hearst**
Fraternity & Sorority Life, Director
Department of Student Activities, Assistant Director
Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.5636 | shearst@stuact.tamu.edu | studentactivities.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 12:01 PM
**To:** Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ███████████████████████████████████████
███████████████████████████████████████
**Subject:** Re:

So the frat involved is NOT recognized by the university?? Is that what you're telling me??

BG(R) Joe E. Ramirez, Jr
Vice President for Student Affairs
Texas A&M University
Sent from my iPhone

On Sep 28, 2023, at 11:42 AM, Hearst, Shante <shearst@stuact.tamu.edu> wrote:

Hello General Ramirez,

▮▮▮▮ has been in contact with ▮▮▮▮▮ , and shared that ▮▮▮▮▮▮▮▮ (outside of our office) is an identified group. It was addressed on Tuesday at the meeting and all chapters were warned to refrain from participating in this behavior. I will continue to keep everyone posted.

**Shanté Hearst**
Fraternity & Sorority Life, Director
Department of Student Activities, Assistant Director
Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.5636 | shearst@stuact.tamu.edu | studentactivities.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 11:30 AM
**To:** Dobiyanski, Victoria E <vdobiyanski@tamu.edu>; Brown, Josh <jhbrown@stuact.tamu.edu>; Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ >
**Subject:** Fwd:

I've asked ▮▮▮▮▮▮ to send me everything he has on this incident, including any names he may have of those who did this, as well any specific fraternities who have been doing it. Once I get that information I want this investigated and dealt with immediately.

More to follow. Will forward the information once I get it.

BG(R) Joe E. Ramirez, Jr
Vice President for Student Affairs
Texas A&M University
Sent from my iPhone

Begin forwarded message:

> **From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> **Date:** September 28, 2023 at 11:22:09 AM CDT
> **To:** "Ramirez Jr, Joe E" <jramirez@vpsa.tamu.edu>
> **Cc:** "Simpson, Meredith M" <msimpson@corps.tamu.edu>
> **Subject: Fwd:**
>
> ▮▮ - I don't know of a single instance where the Corps actively targets Greek life. This is embarrassing.
>
> ▮▮▮

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

Begin forwarded message:

> **From:** "Simpson, Meredith M"
> <msimpson@corps.tamu.edu>
> **Date:** September 28, 2023 at 10:51:50 AM CDT
> **To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>,
> "Michaelis, Patrick Ralph" <pmichaelis@corps.tamu.edu>
> **Subject: RE:**
>
>
> Sir,
>
> Jeff and I talked this morning and I reached out to
> /Fraternity and Sorority Life to engage their
> leadership as well. The pledges are being 'tasked' with
> stealing spurs.
>
> V/R,
> mms
>
> **Meredith Simpson**
> Office of the Commandant | Corps of Cadets
> 1227 TAMU | College Station, TX 77843-1227
> ph: 979.458.2829 | msimpson@tamu.edu
>
> Corps Virtual Office: tx.ag/corpsacademics
> - - - - - - - - - - - - - - - - - - - - - - - -
> **TEXAS A&M UNIVERSITY**
>
> ---
>
> **From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Sent:** Thursday, September 28, 2023 10:27 AM
> **To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
> **Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>
> **Subject:**
>
> Morning Sir,
>
> Wanted to update you on the           situation.
> So far this week there have been three known instances
> where frat pledges have either attempted to steal or have

stolen      . I am obtaining statements from the and      . I'm still trying to find the female     in the wing who was surrounded by frat pledges and had her spurs stomped. We have the names of two of the frat pledges. Once I have all the information consolidated, we will move forward to Student Conduct. I am available for questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 10:55 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** Incident report

Good Morning Dr. Bell,

Attached you will find        individual incident reports from Corps            . In each of these incidents, non-corps students attempted to take items from the cadets.  We would appreciate the Student Conduct Office looking into these events and taking appropriate action.  Please let me know if you have questions or if we can be of assistance.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

Who:

What: Stolen Property

Where: Outside Southside Commons by Bike Racks

When: 1230

Why: _____ was walking with a non-reg friend of his and they were in the middle of a conversation on their way into the commons near the bike rack area. _____ got flat tired by two kids and one grabbed onto his backpack. _____ spun around and was carrying a metal water bottle in his hand so he used it and whacked one of the kids in the ribs but the other with the spurs got away and started running towards the parking lot near the greenhouses in front of the commons. A few other cadets saw what happened and ran to the parking lot. The kid who took the spurs went inside their getaway car and they surrounded the car so they couldn't move. A few minutes later he quickly ran out the side of the car and the cadets chased him around commons by _____ dorm hall. While this was happening a few cadets stayed behind to keep the car from leaving and the University Police Department arrived and surrounded their car. Then, the kid with the spurs ran inside _____. The kid then returned back to the car and a few minutes later he was forced to return the _____ with the help of UPD. UPD asked if _____ wanted to press charges but he declined.


Walking back from class by _____, frat guy on a bike drove by and grabbed bider off of Cadets head. No retaliation from _____. Was reacquired by _____ after the same guy tried to take his. in this occurrence _____ lowered his shoulder, causing the frat to drop both biders and run off.

_____ Incident report


In the early afternoon of _____ my roommate and I, _____ were eating in the commons at the tables side by side Infront of the 4 vending machines across from the mail room. I then suddenly heard face paced footsteps behind me when a person took my _____ off the table and proceeded to sprint away. Without hesitation I sprinted after him running through the doors in the back of commons. In full uniform _____ I was chasing this pledge through the commons and down the concrete steps in the back of commons. I then proceeded to subdue him from behind in the street in the back of commons. He then was getting up still refusing to give up my property. I then secured his leg with my upper body. I also felt his leg rear back to kick me. I knew _____ was not far behind. _____ then proceeded to subdue him causing him to be on the ground again. He still would not give up my property. After a few seconds of me and my roommate securing him on the ground he finally gave my property back. His get away truck then left without him. He then walked into the commons. This was an organized event enacted by the pledges who were involved. Me and _____ never used force that could have caused serious or fatal harm to this pledge even though we had the full ability to do so. We were simply reacting to someone who blatantly stole a valuable item from me with the intention of getting that item back and not hurting the pledge.

Incident Report

In the early afternoon of                    my roommate and I were eating a quick snack at the Commons at the tables in front of the vending machines across from the MailRoom when suddenly an individual while sprinting by our table reaches down and grabs something off of our table. Unsure exactly what was happening, I began to sprint after this individual alongside my roommate and after realizing exactly what was taken I turned back to grab the remainder of our property off of the table such as my phone and the rest of our             . When sprinting back out of the door I heard the other people standing outside causing ruckus and after getting to a position where I could see I witnessed this individual standing over my roommate with a deminer of aggression while my roommate was hugging tightly onto one of his legs and holding his head against his thigh which made me realize he was continuing to escalate the situation. My immediate reaction was to subdue the individual in order to deescalate the situation to insure the safety of everyone involved. Referring back to the numerous de escalation training I have participated in at the                              as a                 ” I did exactly what I was taught. After a quick scan of the surrounding terrain and analyzing the environment I realized that a takedown would be safe therefore I quickly got the individual onto the ground and stood with one leg in between his two legs bisecting the center of his body with my body turned at a 45 degree angle towards the center of the individual in the ready position for anything that this individual might try to do. I stayed in this position and did not allow him to get up until I felt the situation was completely deescalated and was comfortable with the attitude this individual had due to the fact that I knew he was much bigger than myself and I was unsure of his mission and skillset.  The individuals name is

On Monday,                      I was studying at the West Campus Dining facility on the 2nd floor. At approximately 1545, I had my             on the table next to my laptop while I was working on a math assignment. All of a sudden, some kid snatched my spurs and took off running. I was taken by surprise but quickly got up and started chasing him. I ran down the stairs and chased him outside of the building. I sprinted, slowly gaining on him until he ran through the door of the Heep Building. He then proceeded to run into a pole in the middle of a doorway where I was able to catch him. I quickly grabbed him with both arms and held him from getting away. Then, a fellow cadet came to my aid and helped me pry the spurs from his hands. Even being captured by me, he did not want to give up the spurs as we had to forcefully take them from his hands. After I got my spurs back, I let him go without much confrontation. I then ran back to get my stuff from where I was studying before going to class. After class I learned that the kid that attempted to steal my spurs was in my same class but left once he saw me enter. He also did not show up to class on Wednesday. I do not have much information on him except that his name is

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Tuesday, September 19, 2023 9:10 AM
**To:** Michaelis, Patrick Ralph
**Cc:** Gardner, Jeffery D; Simpson, Meredith M
**Subject:** FW: [Maxient]          College Station - On-Campus Residence Hall
**Attachments:** .pdf

**Follow Up Flag:** Follow up
**Flag Status:** Completed

Please see the incident report I received last week. I sent this information to CREI, and they returned it to SCO. Please conduct your 72-hour review of this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Monday, September 11, 2023 4:33 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** [Maxient]          College Station - On-Campus Residence Hall

**This Message Is From an External Sender**
This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
### Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Residence Hall**

### Involved Parties
**Corp of cadets,** ▮▮▮▮▮ _ Alleged Offender
▮▮▮▮▮▮▮▮ Witness

### Incident Description

1

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**During my time in the ▮▮▮▮ unit, I witnessed some very hurtful and unproductive "leadership" among the upperclassmen. To give some specifics:**

**A student who came from ▮▮▮▮ was talked about behind his back as if he was an outsider. One upperclassman specifically said, "When I get in trouble for hazing that ▮▮▮, I will say I was protecting my country." A group of upperclassmen then laughed as if that was something funny to say. This same student continued to be given a hard time based on ▮▮▮▮▮▮▮▮▮▮▮▮▮ in the way they wanted him to.**

**▮▮▮▮▮▮ He would be forced to stand in the hall constantly repeating the same phrase and if he did not get it right he would be sent back into his room, only to then come out 5 minutes later and deal with the same actions. Even being laughed at and shouted at while attempting to do things correctly.**

**The other ▮▮▮▮ do not have things any easier, the upperclassmen are constantly changing times around on them or calling the ▮▮▮▮ dumb and stupid. In one specific instance, the ▮▮▮▮ were told to have three jokes for their Sunday meeting and when the meeting came they were told every ▮▮▮▮ should have had three individual jokes, that the jokes they did have were horrible, that they were stupid for not coming up with anything in 8 hours. The ▮▮▮▮ are also struggling to get enough sleep because when a meeting is scheduled for just 1 hour it will end up taking 2. They do not feel they have enough time to accomplish their academic homework.**

**The final inconsistency comes with the ▮▮▮▮ being told to join groups outside of the corps, but then being told they are not allowed to miss too much formation. They then have to quit the groups they joined or pick between the few.**

**Overall the ▮▮▮ outfit is negatively impeeding the mental health and overall stability of this group of ▮▮▮▮ .**

**Supporting Documentation**
**No additional documents were attached to this report.**

**Submitted By**
Your full name
▮▮▮▮▮▮▮▮▮

Position/title/student status
▮▮▮▮▮▮▮▮▮▮▮▮

Your email address
▮▮▮▮▮▮▮▮▮▮

Your phone number
▮▮▮▮▮▮

UIN
▮▮▮▮▮▮▮

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Dr. Douglas Bell (Interim Executive Director, Student Community Standards)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Dr. Douglas Bell, Interim Executive Director, Student Community Standards.

**Upshaw-Brown, Jaclyn B**

---

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, January 31, 2023 1:40 PM
**To:** Gardner, Jeffery D
**Subject:**

Hi, Jeff,

I've shared        with you through Filex. Passcode is

I'll be the assigned SCA for this one. On first read, I'm seeing some concerns about unauthorized PT. . . there may not be a lot more than that, since the reporting party was contradicted by those whom he says were hazed on most of the incidents. I'll finish reading more thoroughly this afternoon and keep you posted.

Thanks,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**Upshaw-Brown, Jaclyn B**

**From:** Bell Jr, Douglas
**Sent:** Thursday, January 5, 2023 11:41 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** FW: Report


I have put this report within your scans folder.

**Douglas Bell, Ph.D.** | Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.


**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, December 23, 2022 11:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:**

The       Investigation Report is complete. The final report and the two audio recordings can be found here:
  \Investigations\Active Investigations\In Progress _


Have a great break!

**Audrey Winking**| Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

# Upshaw-Brown, Jaclyn B

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, February 7, 2023 9:13 AM
**To:** Pearce, Jeffrey Scott
**Subject:** FW:
**Attachments:** statements.docx; Night Incident - ██████ (1).pdf; ██████ Statement.docx; ██████ ██ written report.docx; Incident Report.pdf; ██████ - Google Docs.pdf; Statment .pdf; ██████ Statement - Google Docs.pdf; ██████ Paper.docx; CDT ██████ Personal Statement.docx; ██████ Incident 01_15_23.pdf; FDT Written Statement.docx

As discussed. Let me know if you run into questions!

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 Jjaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 2, 2023 9:08 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:**

Good morning,

Attached are the statements from the members of the ▮▮▮▮▮▮. Let me know if you have questions. Enjoy your day.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Tuesday, January 17, 2023 2:13 PM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Winking, Audrey J; Gardner, Jeffery D |
| **Subject:** | FW: FW: [Maxient]        College Station - Off Campus        8:00 PM |

Good afternoon, Dr. Bell,

Please see below for an incident report and some initial follow-up regarding alleged hazing of ⬛⬛ leaders.

I believe these allegations warrant further investigation.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** ⬛⬛⬛⬛⬛⬛
**Sent:** Tuesday, January 17, 2023 11:56 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: FW: [Maxient]        College Station - Off Campus        8:00 PM

Howdy!

I became aware of this information when I asked ⬛⬛⬛⬛ why he had the wok in his room, and he explained the details I provided about the situation.

I know it occurred on Sunday night, ⬛⬛ at around 6:30pm.

I do not know any names of those who were subjected, all he explained was that they did this to all ⬛⬛ members.

Sincerely,
⬛⬛⬛

On Tue, Jan 17, 2023 at 11:17 AM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

> Howdy ⬛⬛
>
>
> Thank you for bringing this matter to the University's attention.

So that we can determine an appropriate path forward in looking into this issue, I wondered if you could answer a few preliminary questions:

- How did you become aware of this information?
- Do you know approximately when this occurred?
- Can you provide names of any of the individuals who were subjected to this behavior?

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

From: ▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
Sent: Sunday, January 15, 2023 8:36 PM
To: Sellers, Tyler B <tsellers@stuact.tamu.edu>
Subject: [Maxient]          College Station - Off Campus          8:00 PM

**This Message Is From an External Sender**
This message came from outside your organization.

Secondary recipient (you were copied)

**Campus Community Incident Report**

2
**- 315 -**

## Background Information

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

## Involved Parties

⬛ () Organization

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

⬛ and other ⬛ leadership blind folded members and made them get into cars and drove them to a house at an unknown location. **They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.**

## Supporting Documentation

**No additional documents were attached to this report.**

## Submitted By

Your full name
⬛

Position/title/student status
**Student**
Your email address
⬛

Your phone number
⬛

UIN
⬛

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:

- Tyler Sellers
- jhbrown@stuact.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

Message sent by Maxient
Replies will be sent to the submitter

**Upshaw-Brown, Jaclyn B**

**From:**       Upshaw-Brown, Jaclyn B
**Sent:**       Tuesday, January 24, 2023 5:31 PM
**To:**         Bell Jr, Douglas; Winking, Audrey J
**Subject:**    FW: Investigations

Thoughts on this???

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:27 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations

Thank you. Is there any chance I could go ahead and get statements from the                          to help speed up the process?

V/R

> On Jan 24, 2023, at 4:01 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:
>
> Sure! I'll Filex them to you. Please use the access codes below.
>
> After reviewing      , I would agree with Jamyia that there's not enough here to support issuing charges. I do have some lingering questions about the references to conversations that the CTO had with the outfit early in the fall semester where            was left with the impression that the CTO felt hazing was happening; do you know anything more about that?
>
> Additionally, I wanted to give you an update regarding the timeline for the      investigation. Audrey will be working on it with a representative from the Corps. We would expect interviews to start no earlier than late next week, as she is currently attending the ASCA conference and will be wrapping up a different report early next week.
>
> **Access codes:**
>
> Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations

Good morning Ma'am,

Just a quick question. Will I be able to review the investigation reports before they are charged out? I believe I can provide some insight and context.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

# Upshaw-Brown, Jaclyn B

**From:** Sellers, Tyler B
**Sent:** Tuesday, January 17, 2023 9:39 AM
**To:** Upshaw-Brown, Jaclyn B
**Cc:** Bell Jr, Douglas; Dobiyanski, Victoria E; Brown, Josh; Moore, Erica
**Subject:** FW: [Maxient]        College Station - Off Campus - 01/15/2023 8:00 PM
**Attachments:**

Howdy Jaclyn,

Please see below and attached for an IR we received related to activities within                which may constitute violations of student rules. As this is a Corps unit, I'll have Erica forward you the IR in Maxient so you can determine next steps with Corps staff partners. Let us know regarding any questions or support you may need on our end. Thanks.

-Tyler

**Tyler Sellers** | Assistant Director
SOLAD & Community Expectations and Conduct
Department of Student Activities | Texas A&M University
125 John J. Koldus Building, 1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2953 | tsellers@stuact.tamu.edu | studentactivities.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Sunday, January 15, 2023 8:36 PM
**To:** Sellers, Tyler B <tsellers@stuact.tamu.edu>
**Subject:** [Maxient]        College Station - Off Campus        8:00 PM

---

**This Message Is From an External Sender**

This message came from outside your organization.

---

Secondary recipient (you were copied)

## Campus Community Incident Report
### Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

### Involved Parties

() Organization

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

███████████████████████ and other ████████████ blind folded members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.

**Supporting Documentation**
No additional documents were attached to this report.

**Submitted By**
Your full name
████████████████

Position/title/student status
**Student**
Your email address
█████████████████████████

Your phone number
██████████████

UIN
█████████████████████

**Routing Information**
Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
• Tyler Sellers
• jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

**Message sent by Maxient**
Replies will be sent to the submitter

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Wednesday, March 1, 2023 10:32 AM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Subject:** | Fwd: OCJ |
| **Attachments:** | OCJ-    .pdf |

Sorry for the delay

Douglas Bell

Please excuse any typo, message sent from I-Phone

Begin forwarded message:

> **From:** "Berry, Carrie M" <cberry@vpsa.tamu.edu>
> **Date:** February 22, 2023 at 4:27:37 PM CST
> **To:** "Bell Jr, Douglas" <douglasb@vpsa.tamu.edu>
> **Subject: RE: OCJ**
>
>
> Thanks,
> Carrie
>
> **From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> **Sent:** Wednesday, February 22, 2023 4:04 PM
> **To:** Berry, Carrie M <cberry@vpsa.tamu.edu>
> **Subject:** RE: OCJ
> Good Afternoon. Nothing is attached. You can just scan the memo.
> **Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
> **From:** Berry, Carrie M <cberry@vpsa.tamu.edu>
> **Sent:** Wednesday, February 22, 2023 3:57 PM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> **Subject:** OCJ
> Doug-
> Off campus incident for                    memo attached.
> Do you want me to just scan the memo in the future or do you need the
> attachments as well?
> Carri
> **Carrie Berry |** Sr. Administrative Coordinator
> Office of the Vice President for Student Affairs | Texas A&M University

1256 TAMU | College Station, TX 77843-1256
ph: 979.845.4728 | c-berry@tamu.edu

- - - - - - - - - - - - - - - - - - - - - - - -

**TEXAS A&M UNIVERSITY**

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Friday, January 6, 2023 1:43 PM |
| **To:** | Winking, Audrey J; Barrett, Jamyia C; Doughty, Jeanae |
| **Cc:** | Bell Jr, Douglas |
| **Subject:** | Investigations |

Hi, all!

After looking at the two bigger investigations that have recently come in, here is what I'm thinking in terms of assignments:

- : Jeanae and Jaclyn to team up as SCAs.
- Jamyia and Audrey to team up as SCAs
  - o Note: We are still uncertain whether more information relevant to this org/investigation is forthcoming from the individual who contacted OFSL shortly before the break. I've checked in with CREI to see if they've heard from      OFSL has provided contact information so I can follow up with      if not. But I figured y'all could at least start reading, making your list of who might be charged and what type of process, drafting charges, etc. while we figure that out.

Each investigation came with some video/audio files; I've put those into the main Scans→Investigations folder for now.

Please let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

*Submitted on January 15, 2023 at 8:35:47 pm CST*

Nature                                    **College Station**
Urgency                                   **Recognized Student Organization**
Incident Date and Time                            **8:00 PM**
Incident Location

Reported by
Name:
Title:
Email:                    ██████████████████████
Phone                     ████████████
Address:                  ████████████
                          **[UNAUTHENTICATED]**

Involved Parties

                                                    ████████████████        ████████████

Organization

Incident Description
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

██████████████████████ **and other**                        **blind folded team members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.**

*Pending*
*Submitted from                    and routed to Erica Moore (Administrative Coordinator, Department of Student Activities). Processed by routing rule #189.*
*Copies to: tsellers@stuact.tamu.edu,jhbrown@stuact.tamu.edu*



## Upshaw-Brown, Jaclyn B

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, February 21, 2023 11:32 AM
**To:** Bell Jr, Douglas
**Subject:** OCJ request
**Attachments:** OCJ request.pdf

Hi, Doug,

Please see the attached request for OCJ and let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jaclynu@sco.tamu.edu |sco.tamu.edu

DIVISION OF STUDENT AFFAIRS
OFFICES OF THE DEAN OF STUDENT LIFE



**MEMORANDUM**

DATE:      February 17, 2023

TO:        BG Joe E. Ramirez, Jr., USA (Ret.)
           Interim Vice President for Student Affairs

THROUGH:   Dr. Douglas Bell
           Executive Director, Student Community Standards

FROM:      Jaclyn Upshaw-Brown *Jaclyn Upshaw-Brown*
           Interim Director, Student Conduct Office

SUBJECT:   Disciplinary Action for an Off-Campus Incident

On                    the Assistant Commandant for Discipline submitted to the Student Conduct Office a series of statements from current and former                    regarding an incident on                    According to the statements,                    and                    were instructed to report to Hensel Park and bring their Corps beanies. Once at the park, they were met by                    who told them to pull their beanies down over their eyes and then drove them to a location that was undisclosed to the                    at the time (the home of a                    and                    TAMU student). At the home, the                    were informed they would each be expected to eat a 12-egg omelet, competing for the fastest time. Some                    reported hearing comments that suggested failing to finish would result in negative consequences, though it does not seem they were explicitly told what those ramifications would be. Several statements reflect that two or three of the                    felt ill and/or vomited as a result of eating the omelets. Finally, one report indicates that one of the upperclassmen consumed alcohol while                    during the event.

Given this conduct occurred off campus and in order to address the totality of the situation, I recommend that the University be granted permission to further investigate and, if necessary, issue disciplinary charges. In accordance with University Student Rules 24.3, disciplinary action for an off-campus offense will be taken only when, in the judgment of the Vice President for Student Affairs, action is warranted.

Attached to this request memo is the packet of statements.

Approved/Disapproved

_____          2/22/2023
BG Joe E. Ramirez, Jr., USA (Ret.)              Date
Vice President for Student Affairs

ENCL:   FDT statements

Student Conduct Office
Student Services Building, Suite 309
1257 TAMU
College Station, TX 77843-1257

Tel. 979.847.7272   Fax 979.845.6136
scrs@tamu.edu
http://studentlife.tamu.edu/sco

**Upshaw-Brown, Jaclyn B**

**From:** ██████████████████████████████
**Sent:** Wednesday, January 18, 2023 12:46 PM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** Re: FW: [Maxient]                    College Station - Off Campus                    8:00 PM

Thank you. I appreciate your concerns, and for letting me know quickly.

On Tue, Jan 17, 2023 at 2:52 PM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

Thank you, ████ You may be hearing from our investigations team in the coming weeks; please be on the lookout for communication from them via email.

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** ██████████████████████████████████
**Sent:** Tuesday, January 17, 2023 11:56 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: FW: [Maxient]                    College Station - Off Campus                    8:00 PM

Howdy!

I became aware of this information when I asked ████████████ why he had the wok in his room, and he explained the details I provided about the situation.

I know it occurred on Sunday night,          at around 6:30pm.

I do not know any names of those who were subjected, all he explained was that they did this to all
          members.

Sincerely,

███████████

On Tue, Jan 17, 2023 at 11:17 AM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

Howdy, ████

Thank you for bringing this matter to the University's attention.

So that we can determine an appropriate path forward in looking into this issue, I wondered if you could answer a few preliminary questions:

- How did you become aware of this information?

- Do you know approximately when this occurred?
- Can you provide names of any of the individuals who were subjected to this behavior?

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jaclynu@sco.tamu.edu | sco.tamu.edu

From: ▓▓▓▓▓▓▓ (via Maxient) <notifications@maxient.com>
Sent: Sunday, January 15, 2023 8:36 PM
To: Sellers, Tyler B <tsellers@stuact.tamu.edu>
Subject: [Maxient]                College Station - Off Campus                8:00 PM

**This Message Is From an External Sender**

This message came from outside your organization.

Secondary recipient (you were copied)

**Campus Community Incident Report**

**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

**Involved Parties**

　　　　　ı () Organization

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words,

2

**- 330 -**

phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

████████████████████████ and other ████████████ blind folded
▒▒▒▒▒▒▒▒▒▒▒ members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.

## Supporting Documentation

No additional documents were attached to this report.

## Submitted By

Your full name
████████████████

Position/title/student status
**Student**
Your email address
██████████████████████

Your phone number
████████████

UIN
████████████

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
• Tyler Sellers
• jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | Doughty, Jeanae |
| **Sent:** | Tuesday, January 17, 2023 8:20 AM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Subject:** | RE: Investigation Report |

Oops! Sorry about that. Will do! Thanks!

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, January 17, 2023 8:18 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Investigation Report

Hi, Jeanae,

There's no attachment here. Also, Dr. Bell should be the one to receive completed investigation reports!

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jaclynu@sco.tamu.edu | sco.tamu.edu

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Friday, January 13, 2023 5:40 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigation Report

Hey Jaclyn,

I am attaching the Investigation Report for       Please let me know if you have any questions. Have a great weekend 😊

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Upshaw-Brown, Jaclyn B**

**From:** Gardner, Jeffery D
**Sent:** Wednesday, January 25, 2023 12:48 PM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** Re: Investigations

Very well. Thank you.


> On Jan 25, 2023, at 12:34 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:


If it were me, I would probably try something like:
"There has been a report regarding an alleged hazing event that occurred around                involving upperclassmen requiring                          to eat a large quantity of eggs. The Student Conduct Office will be investigating this allegation. In order to expedite and streamline that process, and in accordance with the expectation to report hazing within the Student Conduct Code, anyone who has information about this incident is asked to submit a written statement detailing their knowledge of what occurred."
Of course, you are welcome to wordsmith so that it makes sense to you/them.
Jaclyn
**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172
ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, January 25, 2023 12:26 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** RE: Investigations
Very well. How would you recommend I ask?
Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Wednesday, January 25, 2023 12:23 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigations
If you want to request written statements from the students who may have additional information, that may help guide the investigation process. The framing of that request will be important, in that it truly needs to be a request and not a situation where we are seen as coercing or threatening students.
**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172
ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:27 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations
Thank you. Is there any chance I could go ahead and get statements from the                                    to help speed up the process?
V/R

> On Jan 24, 2023, at 4:01 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:
>
>
> Sure! I'll Filex them to you. Please use the access codes below.
> After reviewing      I would agree with Jamyia that there's not enough here to support issuing charges. I do have some lingering questions about the references to conversations that the CTO had with the outfit early in the      semester where              was left with the impression that the CTO felt hazing was happening; do you know anything more about that?
> Additionally, I wanted to give you an update regarding the timeline for the investigation. Audrey will be working on it with a representative from the Corps. We would expect interviews to start no earlier than late next week, as she is currently attending the ASCA conference and will be wrapping up a different report early next week.
> **Access codes:**
>
>
> Jaclyn
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations
Good morning Ma'am,
Just a quick question. Will I be able to review the investigation reports before they are charged out? I believe I can provide some insight and context.
V/R
Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Wednesday, January 25, 2023 4:50 PM |
| **To:** | Gardner, Jeffery D |
| **Cc:** | Bell Jr, Douglas |
| **Subject:** | Re: Investigations |

Okay. Bases on what we have, there's not enough information to support issuing Student Conduct charges to a specific individual at this time; the specific actions discussed in the interviews that might have been chargeable could not be attributed to a particular person. Please let me know if you learn anything else that might change that decision.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 |jaclynu@studentlife.tamu.edu| studentlife.tamu.edu/sco
– – – – – – – – – – – – – – – – – – – – – – – –
**OFFICES OF THE DEAN OF STUDENT LIFE** | Supporting [YOU]

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, January 25, 2023 4:44 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations
I do not. However,        leadership, CTO, the cadets in question and I are going to have a nice discussion.

V/R


> On Jan 25, 2023, at 4:17 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:
>
>
> Thank you! Did you have any additional context regarding the        conversations referenced below?
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu
>
> ---
>
> **From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Sent:** Wednesday, January 25, 2023 2:58 PM
> **To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
> **Subject:** RE: Investigations
> Howdy Ma'am,

I spent an enjoyable and educational afternoon reading the two reports you provided. I'm available to discuss should my input be needed.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:02 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigations

Sure! I'll Filex them to you. Please use the access codes below.

After reviewing      I would agree with Jamyia that there's not enough here to support issuing charges. I do have some lingering questions about the references to conversations that the CTO had with the outfit early in the      semester where            was left with the impression that the CTO felt hazing was happening; do you know anything more about that?

Additionally, I wanted to give you an update regarding the timeline for the      investigation. Audrey will be working on it with a representative from the Corps. We would expect interviews to start no earlier than late next week, as she is currently attending the ASCA conference and will be wrapping up a different report early next week.

**Access codes:**


Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172
ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations

Good morning Ma'am,

Just a quick question. Will I be able to review the investigation reports before they are charged out? I believe I can provide some insight and context.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

# Upshaw-Brown, Jaclyn B

**From:** Gardner, Jeffery D
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas
**Cc:** Upshaw-Brown, Jaclyn B; Winking, Audrey J; Anderson, Chauncy Jovan
**Subject:** Re: [Maxient]        College Station - On-Campus Grounds


Msg t Anderson is your man. He is copied on this email.

V/R


> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]        College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences running for


We have confirmed that surveillance footage from        is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]         College Station - On-Campus Grounds        2

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]         College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]         College Station - On-Campus Grounds

Thank you for your assessment of the information provided. We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the pool of candidates for
      Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]         College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)

3

Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]          :ollege Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the current and prospective
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
for            ' We'll also be checking to see if security footage from          is available (although we
suspect it may not have been retained this long, since the alleged incident in          occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]          College Station - On-Campus Grounds

**This Message Is From an External Sender**
This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
() Alleged Offender
() Alleged Offender
() Alleged Offender
() Alleged Offender

4
- 340 -

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

**From:** Crawford, Dr. Tia
**To:** Winking, Audrey J
**Subject:** Investigation - Final Report
**Date:** Wednesday, October 11, 2023 10:43:52 AM

Audrey,

I have completed the Investigation final report. It is labeled *Investigation – Final* and located V:\Working Groups\DSA Investigators\ Investigation\REPORT PREP\Final Report.

Please let me know if you need anything else.

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| From: | Crawford, Dr. Tia |
|---|---|
| To: | Winking, Audrey J; Brummett, Kevin L |
| Subject: | RE: Investigation |
| Date: | Friday, September 22, 2023 12:49:25 PM |

Thank you, Audrey!

Howdy Kevin! I look forward to working with you.

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 12:27 PM
**To:** Brummett, Kevin L <kbrummett@corps.tamu.edu>; Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** Investigation

Good afternoon,

I wanted to introduce you two, as you will be working together on the         investigation.  Tia has graciously agreed to help me out during this busy time by taking the lead on this investigation.  I will do my best to assist you all throughout the process if anything comes up that you need help with!

Thanks so much for your help with this investigation!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| From: | Winking, Audrey J |
|---|---|
| To: | Crawford, Dr. Tia |
| Subject: | RE: investigation |
| Date: | Friday, October 6, 2023 4:03:00 PM |

No worries at all, just wanted to check back in!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, October 6, 2023 2:28 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: investigation

Audrey,

My deepest apologies as I was tasked with a last-minute project and got swamped. I will get this completed and sent to you ASAP!!!

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 6, 2023 1:15 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: investigation

Hey Tia,

Just wanted to check in to see how things were going with the report? Is there anything I can do to help you?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

___

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:31 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: investigation

Hi Audrey,

No worries. I've been in and out of meetings all day as well. Thanks again for helping us troubleshoot the technology. I will know moving forward how to do it. But the last two interviews went well. We do not believe we need to have additional interviews. The two that we interviewed have until tomorrow to send additional information. Both indicated that they might actually send something. So, we will see.

I have blocked a couple of hours on tomorrow to knock out the report for it. The only thing I may need is to have you look at the report to make sure I have done it correctly.

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

___

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:18 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** investigation

Hey Tia,

Sorry for not checking in sooner, it's been a crazy week!  But I wanted to see how interviews went for the      investigation and if you need anything from me moving forward?

Best,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

Good deal! Thank you!

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 3:29 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

I think just you two is fine!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 1:32 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: Shared Folder Access

One more question, should I copy you on the communication? Or just Kevin & me?

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu | stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 1:26 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

Yes!  I reserved　　　　　(the other panel room, not the one we were in this morning) for all of those times!

For the students' interview notices, you'll just put "X date at X time in the Student Services Building,　　　" (not the exact room) so they just check in and then our student worker will let you know when they check in.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 1:14 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: Shared Folder Access

Audrey,

Are there rooms available for the following:

Monday, Sept. 25th, 9am – 10am – Investigator Touch Base
Tuesday, Sept. 26th, 9am-10am – Conduct Meeting
Wednesday, Sept. 27th, 9:30am-10:30am – Conduct Meeting
Wednesday, Sept. 27th, 10:30am-11:30am – Conduct meeting

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 12:46 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

I created a document called "Notes Formatting Directions" in the DSA Investigators Drive.  Hopefully it makes sense, but I tried to make a step by step for how to format the notes pages after the

interview so that the student can review and sign them.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Friday, September 22, 2023 12:28 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

Wonderful!  I am working on adding documents to the folder in that drive now.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 10:54 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Shared Folder Access

Audrey,

I found the DSA Investigators Folder and I do have access.

Thank you,
Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Monday, December 11, 2023 12:24 PM |
| **To:** | Harrell, Kristen |
| **Subject:** | Memo |
| **Attachments:** | Case Memo -        .docx |

Please let me know if you need any additional information.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.



**MEMORANDUM**

DATE:               April 12, 2024

TO:                 BG Joe E. Ramirez, Jr., USA (Ret.)
                    Vice President for Student Affairs

THROUGH:        Dr. Kristen Harrell
                    Assistant Vice President for Student Affairs

FROM:               Dr. Douglas Bell
                    Director, Student Community Standards

SUBJECT:          Case
_____

Several reports were submitted by cadets who had their                taken by alleged fraternity members. Only three of the alleged fraternity members were identified, so they were interviewed. Each of them are members of different fraternities. There was also an incident where the Student Conduct Office was unable to identify the alleged violators.

During the Student Conduct Office investigation, it was discovered that members of the Corps chased an individual in an effort to retrieve the           .  One of the alleged students who took the           has a class with one of the members from the Corps.  Through our investigation, it is alleged that the alleged thief had to skip class because there were "like 20 people waiting" for him at his class, which is why there was an additional complicity charge.

During the Student Conduct Office Investigation, it was discovered that when one of the alleged thieves ran with the           , members of the Corps gave chase and "subdued him from behind."  Another member from the Corps "secured the individual's leg with his upper body."  When the alleged thief complied and gave the spurs back, a Corp member "straddled him," and when he tried to get up after no longer being in possession of the Spur, the Corp member "pushed him back down and said, 'get up pussy'.  As the alleged thief walked away, the members of the Corps kept taunting him.  The alleged thief had his phone shattered when he was tackled to the ground and had multiple bruises and scrapes.

The decision to charge both the alleged thieves and the members of the Corp of Cadets stemmed from the information that was collected during the interview process.  The Assistant Commandant for Discipline was involved with the Corps administrative hearing and did not provide any resistance regarding the charges or sanctions.

Charge
- Theft
    - Accepted Responsibility

Sanction
- Conduct Review through
- Ethics and Decision-Making Workshop



Charge
- Theft
    - Accepted Responsibility

Sanction
- Conduct Review through
- Ethics and Decision-Making Workshop


Charge
- Theft
    - Accepted Responsibility

Sanction
- Conduct Review Through
- Ethics and Decision-Making Workshop


(Co Adjudicated with Lt. Col. Gardner)

Charges
- Physical Abuse
    - Accepted Responsibility
- Harassment
    - Not Responsible
- Complicity
    - Accepted Responsibility
- Corps – Conduct Unbecoming a Cadet
    - Accepted Responsibility

Sanctions
- Conduct Review through                    (Case Heard November 28th)
- Corps Review
- Ethics and Decision-Making Workshop


(Co Adjudicated with Lt. Col. Gardner)

Charges
- Physical Abuse
    - Found Responsible
- Damages
    - Not Responsible
- Corps-Conduct Unbecoming a Cadet
    - Found Responsible

Sanctions
- Conduct Review through
- Corps Conduct Review
- Ethics and Decision-Making Workshop


(Co Adjudicated with Lt. Col. Gardner)

Charges



- Physical Abuse
  - Found Responsible
- Damages
  - Not Responsible
- Corps-Conduct Unbecoming a Cadet
  - Found Responsible

Sanctions
- Conduct Review through
- Corps Conduct Review
- Ethics and Decision-Making Workshop


Charges
- Physical Abuse
  - Not Responsible
- Corps-Conduct Unbecoming a Cadet
  - Not Responsible


In closing, all of the respondents who were alleged to have stolen the             expressed remorse and thought that this was a standing tradition.  All of the alleged thieves demonstrated some level of reflection prior to their administrative conference.


Douglas Bell, Ph.D.
Director of Student Community Standards

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Tuesday, February 21, 2023 11:59 AM |
| **To:** | Ramirez Jr, Joe E |
| **Cc:** | Smith, Cindy M; Barrett, Sandra; Harrell, Kristen |
| **Subject:** | FW: OCJ request |
| **Attachments:** | OCJ request.pdf |

Howdy BG Ramirez,
Please see attached OCJ. Please let me know if you have any additional questions.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, February 21, 2023 11:32 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** OCJ request

Hi, Doug,

Please see the attached request for OCJ and let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu



**MEMORANDUM**

DATE:        February 17, 2023

TO:         BG Joe E. Ramirez, Jr., USA (Ret.)
                Interim Vice President for Student Affairs

THROUGH:   Dr. Douglas Bell
                Executive Director, Student Community Standards

FROM:       Jaclyn Upshaw-Brown
                Interim Director, Student Conduct Office

SUBJECT:    Disciplinary Action for an Off-Campus Incident

On February 2, 2023, the Assistant Commandant for Discipline submitted to the Student Conduct Office a series of statements from current and former                                       regarding an incident on                . According to the statements,                     and              were instructed to report to Hensel Park and bring their Corps beanies. Once at the park, they were met by          , who told them to pull their beanies down over their eyes and then drove them to a location that was undisclosed to the                 at the time (the home of a                 advisor and              TAMU student). At the home, the                were informed they would each be expected to eat a 12-egg omelet, competing for the fastest time. Some                 reported hearing comments that suggested failing to finish would result in negative consequences, though it does not seem they were explicitly told what those ramifications would be. Several statements reflect that two or three of the                felt ill and/or vomited as a result of eating the omelets. Finally, one report indicates that one of the upperclassmen consumed alcohol while                    during the event.

Given this conduct occurred off campus and in order to address the totality of the situation, I recommend that the University be granted permission to further investigate and, if necessary, issue disciplinary charges. In accordance with University Student Rules 24.3, disciplinary action for an off-campus offense will be taken only when, in the judgment of the Vice President for Student Affairs, action is warranted.

Attached to this request memo is the packet of statements.

Approved/Disapproved


_____     _____
BG Joe E. Ramirez, Jr., USA (Ret.)                                    Date
Vice President for Student Affairs

ENCL:   FDT statements

Student Conduct Office
Student Services Building, Suite 309
1257 TAMU
College Station, TX 77843-1257

- 356 -

Tel. 979.847.7272   Fax 979.845.6136
scrs@tamu.edu
http://studentlife.tamu.edu/sco

Personal Statement

On Sunday                    at 6:00PM, the                              and              arrived at a park off campus where we were instructed to park and bring beanies. A few minutes later,                    and              arrived, where we got into their cars and blindfolded ourselves with our beanies.              drove with                                        and myself, and we drove a few minutes to                              residence, where we waited for everyone to arrive. Once everyone was there, we were told that we would be cooked a plate of a dozen eggs to eat with whatever toppings we liked as fast as possible with the intent of us needing to finish to remain with the team or potentially face some unknown consequences as well as competing for the record time. We all hung out as                    with help from the other                              and              cooked each plate of eggs.              ate the first plate of eggs within a few minutes while everyone else watched, socialized, and played board games. I do not remember exactly who went after her, but I believe I was around the      person to begin eating, going after              and before                  . I ate for about 1 hour and 40 minutes and completed my                        during this time. At some point              ate her eggs within a couple of minutes, and she called                to be able to see how fast she could eat. I was quite spaced out and was otherwise focused on eating for the rest of the time, so I am not aware of too much of what else was going on, although I believe it was mostly just people catching up and socializing. The              and              took an egg shot at some point during this time frame, and people were eating ice cream and pizza while they continued to socialize. Before I finished eating, the                      made              stop eating the eggs because she was having an adverse reaction to the eggs and was throwing up, and they did not wish for her to continue eating since it was making her sick. They noted expressly that they did not care that she did not finish and wanted to prioritize health and wellbeing first. I finished eating shortly after              stopped eating and I myself was not feeling well physically and was overstimulated from the social setting, so I went outside to lay down on the front porch with              and          , and                        stayed outside with us for a while as well. We stayed outside for the remainder of the time at the house, maybe an hour, as we waited for everyone else to finish eating. Other people came outside to check on us and bring us water or ice cream if we wanted, including                              . Once                , the last person to eat, was finished eating, we went inside to regroup before leaving. We split back up into cars and drove back to the park, picked up our vehicles and drove back to campus, where we all met in the          . We were given our                        and then left, and I returned back to bed.

I would like to write a statement concerning the alleged incident concerning the                    which occurred on                    . I dropped in for approximately 5-10 minutes in order to say hello to everyone after they had finished hell week before the rest of the corps returned from Christmas. From what I saw, everyone that was there was watching the NFL playoff games that were occurring that night, playing board games and talking. After saying hello to everyone there, I left the location as I had a prior commitment later that night.

Very Respectfully,

The                    were instructed to meet at a park and stay in their cars until they were told otherwise. There were a total of three cars of                    sense we all car pulled. About 7-10 min after we were told to be there the             pulled into the parking lot and walked up to our cars. They told us to get out of the cars and put on our corps beanies over our eyes. We then were separated into groups to fit into different cars. We held onto each other's shoulders and were guided by a          . I was in the backseat of a truck making jokes with my buddies.                      was sitting next to me and we started to play a game of sticks , a finger counting game that many elementary schoolers play. When the short car ride was over we piled out of the car and were led inside. We were then sat down on a couch and waited till everyone had made it. After everyone had gotten there we were told to take off our beanies to see a combination of current and past             . Soon after music was turned on and people started playing board games, such as Secret Hittler, and picking out what they wanted in their omelets. It was explained to us that it was a competition to see who could eat it the fastest.              was the first to go and she finished fast. After her I don't really remember the order. The others such as                       took a really long time to finish. In fact          started to not feel good from the eggs and was told to stop. She didn't finish. After you finished eating the eggs you just went back to the party. They had ice cream for after you had finished as well. Some time after I had finished I ended up sitting on the front porch with                       . The music was really loud inside so it was nice to just get a breath of fresh air and talk about all the stories we had from        and the Corps in general. Periodically someone, whether it was one of our buddies or an upperclassman, would come outside and check on us. After everyone was done and the night had come to an end, we were driven back to the park where the cars were or back to campus depending on if you were the person who drove or not. All the current            and                    then met in the        room and we were given out                    . Then everyone dispersed and went back to their rooms for the night.

On                    , we parked in Hensel Park at 1800, turned the cars off and waited there until the             told us to get out of the car, put on the Corps issued beanie and put it over our eyes. They guided us to their cars and drove us for about five minutes. When we arrived, they carefully led us inside and sat us down before telling us to take the beanie off. All of the                          team was there along with the          from last year and some of the team from the                  They told us that we were all going to eat dozen egg omelets, and why that was a tradition. I told them that I had a slight sensitivity to eggs which makes my stomach a bit upset, but I refused the option of vegan eggs that they wanted me to eat and instead insisted on eating normal eggs.         was in the kitchen making the eggs however we wanted them to be made. While she was making them, more and more of the past       came in. Half of the                    had no problem eating the eggs, but                    who were before me were struggling. The three of us took about an hour and a half to finish the eggs. After I had thrown up a second time, they made me quit even though I wanted to finish.

Since it was so loud inside from everyone cheering, playing games, and having a good time, I went outside to breathe with                 and          went out with us to make sure we were doing alright and talked with us while          would poke his head out and make sure we didn't need anything and gave us ice cream to help settle our stomachs. We visited outside until the remaining              finished and we were called back inside to ask who we thought got 15 eggs. We easily reached the conclusion that              and              were the ones who ate 15 eggs. We were then told to go to the          So we got back into the           cars to go back to the Park and get our cars. We then drove back to campus and went to the                 where they gave us the                   .

On                     me and my                          buddies were told me go to a location that is close to campus and arrive hungry. After we arrived at the park our                          pretended to kidnap us and drove us to a house where we were surprised with the company of                    and from

It was explained to us that it was an old tradition for the                          back in the day to eat for time a large omelet that was served at a restaurant that is now closed. The offered us to partake in this friendly competition to eat omelets that they made for us with whatever toppings we wanted in the omelet. All of my buddies partook in this friendly competition and me and my buddies cheered each other on as each of us ate an omelet. After we finished we were drove back to get our cars and arrived back on campus.

Overall, the night was very memorable and brought me and my buddies together in a positive way while being around past                    that we love being around.

This concludes my statement,

Very respectfully,

This account is told from the perspective of

On Sunday,                          , the                          were informed that they would be meeting at Hensel Park and to bring a Corps issued beanie with us. Once arrived at around 1610 current          on the team instructed us to put the beanies on and pull them down over our face. I was guided to the          car and drove to a location that I did not know about. Once we arrived I was guided out of the car and into a room where I sat down. After everyone arrived we were told to remove our beanies so that we could see, and we realized that we were in a living room sitting down on a couch. Around us were our former          who we said hi to. The                    were all gathered onto the couch and the          explained the situation about having to eat a dozen egg omelets. They explained the rules of the competition and how we would want to eat as fast as possible.

We then got up and greeted and joked around with our                    and          and were plenty happy to see all of them. We made an order of who was going to eat the eggs, and we were all allowed to customize the omelets we were given. As the night progressed we would make jokes around those eating, play board games with each other. The night continued on with those eating the eggs able to take breaks, eat at their own pace, watch tv or Youtube, or anything they wanted. The rest of us just talked and joked around, discussed          within the team and continually checked on those eating. No events within that time really stood out.

After the last person had finished eating they gathered us onto the couch and explained to us the tradition of the egg eating and that there used to be a diner where the          would all order a 12 egg omelet. They explained that when the diner closed they started making their own and that punishment for not finishing would mean a giant smoke session with the          . Finally they let us know that before      was disbanded, the                    used to add extra eggs into their meals. They let us know that                    were the ones to receive this tradition and that it was based on someone's personality. We were free to leave after that and we all went back to the          and received our                    and we all joked around for a bit and then went back to the dorms.

This is                    , one of the                              . This email is my written statement of the event.

On                    we were told to drive to 502 College Ave (Hensel Park) at 1800 and to bring our Corps issued beanie. Once there, we waited in our cars for about 5 minutes before the arrived. When they arrived they told us to get out of our cars and to put our beanies over our eyes. We were then guided into the cars of upperclassmen.    was with two other                              . We were driven to                    house, a              student and previous              Once there we were brought in and moved to a couch in the room then were told to take our beanies off. We saw all of the current                              and some of our              from when we were       . They then told us about the dozen egg omelet and the story behind it. After Hell Week, the             would go to a diner and the                    would order the 12 egg omelet on the menu. When the diner took the omelet off the menu, the             didn't want the tradition to die so they decided to start making the omelets themselves. We were told to pick an order to eat in. I was the             one to go. When it was my turn,                    asked me what all I wanted in my omelet. I chose cheese, ham, and bacon and she made the omelet. It took me over an hour to eat and while I was eating a few more former                                             ) walked in. Once I finished I started talking to everyone again. I encouraged my buddies when it was their turn to eat.                              , started to get sick and was told to stop eating. After everyone was done eating, we stayed at the house talking for about another hour before getting rides back to the park for the cars or back to the quad.

That is my statement of the event.

Very Respectfully,

On                     after the first        mock drill meet of the semester,                                    and buddies were told to keep the following evening open around 1830 and to be hungry. The next day around 1400 we were notified through the Microsoft teams chat to arrive at Hensel Park at 1800, bringing our corps issued beanies. After we arrived at the park we saw the                          and              drive up and approach our cars. We were instructed to get out and pull our beanies down over our eyes. They led us in groups of 2-3 to their cars and helped us in. I ended up in a car with              and we sat in the back of the car trying not to laugh as                                    put music on the radio and drove us away from the park. None of the three of us spoke during the car ride. When the car stopped        led us out of the car and into a house where we were led to a couch and told to sit down. I could hear my other                buddies sitting around me on the couch as well as some familiar voices of past upperclassmen on the team. We were all laughing and talking and someone told us to "take the beanies off already". When I opened my eyes I saw several of my old advisors including              and                     . We were briefly told about the competition of eating 12 egg omelets and when asked who wanted to go first I raised my hand excitedly because I am a competitive person. We were told of the previous record of three minutes and fifty-three seconds, as well as given the opportunity to choose toppings for our omelets. While everyone else, all                                    as well as most of the                from last year, played board games and conversed,                was cooking the omelets for                to consume. The omelets took awhile to cook, but when each one was completed the next              in line would have someone begin their timer and start eating. When my omelet was done being cooked I fully intended to break the previous record and I finished eating in                          . Everyone else took varying lengths of time to finish their omelets, with              beating                          and              taking over ninety minutes. Several people threw up during or after eating their omelets including                            ,                While each              either waited their turn to eat or hung around after they were finished, we had fun talking and catching up with people we hadn't seen in nearly a year due to being in                     or due to their              . We intermittently cheered on our buddies who were still eating and sat around reminiscing about        last year. Once everyone was done eating, the                              cleaned up the dishes from cooking and eating the omelets then made sure all the              had rides back to campus or to their cars at the park. We met up in the              and received our              to commemorate the end of our                     , then we were congratulated on our hard work over the past week and released.

Very Respectfully,

I'm _____ and I am one of the _____ on the team in question. The team _____ let us know to share our side of the story and any knowledge of the event we might have to share. It is my intention to speak plainly about what happened at the event.

After our _____ meet we had our _____ and at the very end we were told to keep our schedule clear for the Evening of Sunday _____. They told us it would be fun to come with an appetite and our black corps issued beanies. On that evening we drove to a park 5 minutes away from campus and we waited for the upperclassmen to arrive. The upperclassman met us and pretended to kidnap us by pulling our beanies over our heads and we drove in their cars to, which we didn't know at the time, one of the old _____ house. It was about a 5 minute drive away from campus. Once we arrived at the location though, it was revealed that all the _____ as well as our _____ were there. The reason we went to the house was to have more space and a proper kitchen.

Once there, they shared that once hell week was over, the time where the team comes back early from winter break and prepares for Tulane, traditionally the team and past _____ would go celebrate the hard work of the _____ and recount old stories. In years past, the team would go to a restaurant that offered an omelet made from a dozen eggs and the _____ would typically order one and there would be a friendly competition to see who could eat it the fastest. The restaurant has since stopped offering a dozen egg omelets so the _____ made homemade ones for us. They asked us for toppings and made it to our desire and once it had cooled enough for eating we started chowing down while recording each other's times. We cheered each other on while we waited for ours to be made, board games were played, and we enjoyed each other's company before the school year started.

At the end of the evening, we thanked our host, said our goodbyes, and we were driven back to our cars. My _____ buddies and myself enjoyed the evening and laughed about our experience on the way back to the quad.

I hope my side of the story is able to add another piece to this puzzle and I am more than willing to answer any questions anyone has on the subject. Thank you for taking the time to hear my side.

Very Respectfully,

My name is                    and I was present at the events of                    with        This is an account of events from my perspective.

On the evening of                            , myself and the other                            of the Team arrived at Hensel Park, and were instructed to bring our black beanies. We waited for approximately 5 minutes then various                    arrived. We exited our vehicles and were instructed to put the beanies on and pull them down to cover our eyes. We were guided to our upperclassman's vehicles and guided to the door handle, where we were told to get in. We were driven to another location which took about 5-10 minutes of which I was not sure where, however it was a residential location. We were then guided inside the building, still unable to see, and sat down on a couch as we waited for the rest of our buddies to arrive.

Once all of my buddies had arrived, we were instructed to remove our beanies and were greeted by the other                    . There were a decent number of people at the house, approximately 20-25. It was at this point that the purpose of us being there was presented. We were told that each member of        would attempt to eat a 12 egg omelets against the clock. We were allowed to customize the omelets with cheese, peppers, ham, turkey, and other toppings if we desired. While it was a race against the clock, we could also take as long as we needed, however it was stressed the expectation was to finish the omelet by the end of the night. There was no penalty for a slow time vs a fast time, however, again, the expectation was that we finished the omelet. We weren't told what would happen if we did not finish the omelet, only told that we should finish them. Once                started to

volunteer for order, since each omelets took a while to cook, we began to socialize and play board games until it was our turn to eat. Some took a very short time,                            eating very quickly at a sub 5 minute time. Times were written down on a white board as we completed. We were allowed to eat as slow or as fast as we wanted using whatever strategy we wanted,          approximately an hour and a half to eat            and                            . As we finished, ice cream and other snacks were available and we continued to socialize.

Once we finished, we were driven back to our vehicles in Hensel park and arrived at our vehicles at approximately 2300.

I hope this is satisfactory and if any more information is required please let me know.

Best Regards,

To whom it concerns,

This is a personal recount of the sequence of events that occurred regarding the report to the Student Conduct Office. On                    at 1800 I was in the car waiting with                                    at Hensel Park. We waited until                    and                            arrived. All current year                pulled up in vehicles behind us around five minutes later.                        , and I got out of our respective vehicle as instructed by                                        then we were instructed to place a beanie over our eyes and led to different vehicles. I got into a car with                        and we were driven by            to an undisclosed location. Upon arriving, I was led into a house and instructed to sit down on a couch. All the                                        as well as                    were in attendance and we were collectively instructed to take off our blindfolds. I was informed by                    that it was his house. Previous year            arrived throughout the night such as                            . I talked with before sitting down to play Settler's of Catan with

                        was cooking bacon in the kitchen. All the                        were called to gather in the living room and informed by                    and                    that each                would be receiving a twelve-egg omelet to eat. We were to be timed in doing so and the slowest eater would face a punishment at a later date. We were told by various                                                                that we could take however long we wanted as long as we finished. After the instructions for what we were going to do,                    volunteered to go first.                    cooked the omelets for each one at a time. While I waited for my turn, I sat at the counter talking to

                        asked me what I wanted on my eggs and she cooked it.                        kept my time while I ate at my own pace. I sat next to                        while I ate. She could not finish her plate of eggs and started to feel sick and was told that she would not have to eat anymore and there would be no punishment. After every                        was done eating eggs, every individual (myself included) made conversation for about

an hour before departing in the separate vehicles that we had arrived in. I rode back in            car

where I was dropped off at campus, not blindfolded and knowing exactly where we were

going. Afterward the entire            team met in the campus                            and we (all

            ) were rewarded, by the                                        to commemorate our

achievement of finishing Hellweek. Afterwards I left and returned to my dorm.


Respectfully,

26 January 2023

Incident Report

On the night of _____ many current and former members of the _____ and myself took part in what had been an annual tradition for what I assume to be many years. I arrived at the house of one of the _____ from last year, _____, at around 1800. The individuals who showed up to the event were all of the _____ of the team, as well as almost all of my _____ buddies from last year, the _____ from last year, and a few other members of the

The events that transpired are the following: the _____ members of the team showed up in two groups to the house, their eyes covered by the beanies they had on their head, and they were seated on the couch in the living room until the rest of their buddies arrived. When the _____ deemed they were ready, they were told to uncover their eyes, and were told that they would be eating 12 eggs in an omelet as it had been tradition on the team from years past. Then, over the course of the night, the _____ cooked all of the eggs for the _____ feeding them their omelets one by one, while other current/former _____, (myself included), had a stopwatch going to time how fast the _____ finished. The _____ were also told in a joking manner that they didn't want to know what happened if they did not finish. Some _____ took as fast as 2 minutes and some took as long as an hour. Their were a few who struggled to eat them, and one, _____, who's body reacted poorly and she threw up. She was then told she didn't have to finish. During this time, I was leading a group in playing the board game "Secret Hitler" while the _____ ate their eggs and the rest of us ate

pizza. We all exchanged memories, inside jokes, and stories from our time with the team. Once the                had finished, the                gathered them in the living room and revealed that two of them had been given an omelet of 15 eggs instead of 12. After they were able to figure out who it was, they then reminded the                that they have to get back to work on Monday after the fun they had that night, and they gave additional words of encouragement, criticism, etc. about how their fish are doing in getting prepared for Tulane. This was the conclusion of the night and people incrementally left the house.

Written Statement of     Incident on         :

On Saturday,           , at the conclusion of the team's         meet. I told the         and       to keep their Sunday evening free and to come hungry. On the night of the    we (the

to drive to Hinsel Park (I believe) and to bring their corps-issued beanies with them. From there the             picked up the      and told them to put their beanies on so that it covered their eyes.      then drove them to       ,         was already there (both former members of the Corps and the previous year's respectively). While this was happening,          and I were preparing all of the eggs and omelet toppings. At this point     arrived.

When the      arrived at the house we sat them down on the couch and other chairs in the living room while we waited for the rest of the       to arrive. When all of the          were at the house we had them remove their blindfolds. At this point I explained how at the end of hell week each year the        would go to a restaurant in town that served dozen egg omelets and how all the      would order and eat one. Since then that restaurant stopped serving these omelets. The tradition changed to where the       would make the omelets for the      .

During this time, former         to the team,               arrived at the house.

Then  started taking orders for the omelets.      and    started making the omelets for the      . When the omelet was finished, a      would get the omelet and we would set a timer before they started eating so as to see who would finish their omelet the fastest. There was no prize for being the fastest, and no punishment for being the slowest or being unable to finish. When      was eating her omelet, another former         to the team,        was facetiming      was on a     .    continued cooking and serving the omelets. While cooking the omelets,       and           , took 1-2 egg shots (a small amount of liquor is poured into an egg that had the top cracked off, and the egg and liquor was drunk). This was the only alcohol consumed during the night. None of the       drank anything. At some point in the night, another former         to the team        arrived to say hello to everyone, was there for less than half an hour then left. While people were not eating they were all playing board games or watching football. All of the       ate and finished their omelet        , who was not able to finish and no repercussions followed. I just took the plate and told her she didn't have to worry about not being able to finish. When another      ,      finished her omelet, she was not feeling well so she, along with         , went and sat out on the front porch. After the     finished their omelet they were served ice cream if they wanted it. I went out to go check on the

three                that were outside and brought them some water and ice cream. I sat with them, while the remaining                finished their omelets.

When everyone was finished with their omelets      returned indoors. I spoke to them about how proud I was of all of them for the hard work they put in that past week and how we still had a lot of work ahead of us.

The           then left with them to take them back to their cars.        and   finished cleaning everything up and said goodbye to                  then we drove back to campus. When everyone had returned to campus, all of us went down to our          to give the                              . We meant to give the            to them at          house but they were forgotten in the          . Once everyone had their              . Everyone returned to their dorms.

Here is my statement for the student conduct officer concerning the        event that happened on


I arrived at                    house at around 8pm with                    . In the house were the current                    and a couple former            from the team. Everyone in the house were either currently or formerly an            on the team excluding the other residents of the house. The house atmosphere was laid back with music playing consistently, board games being played and food being consumed. As the night went on the                                                                    were cooking a dozen eggs for each                    to eat. The                    were allowed to pick what was in the eggs (meat, veggies, cheese, etc.) and then would proceed to eat the eggs on their own accord either as fast as they could or whatever pace they wanted. I do not remember all the                    who ate the eggs but the ones I remember were                                        , the other                        and the other                    whose names I can't remember. They each ate their eggs in whatever time they could and then would presume enjoying the evening talking and later eating ice cream that was also provided. 2-3 of the                threw up after eating the egg but continued to enjoy the night. The gathering went until about 2215 where                    and I talked with with two of our old                                until about 2230.            and I left at about 2235 and went back to the dorms where we went to        room and talked for about an a hour before going back to our own dorms.

This concludes my statement of what happened on                        . Thank you for your time.

Very Respectfully,

My name is                        and I was present at the        incident. My knowledge about the incident is as follows. The site was off campus and I arrived at the house at approximately 1830 with the remainder of the team. I believe the house was owned by                and                        (prior         ). From there, I talked to present                        and the past since this was an event to bring back                        . When the event started, the                                was asked to consume a 12-egg omelet made to their liking.                                were

in charge of making the omelets as well as preparing the fixings. We held it in a competition style where the fastest one to eat it won. The                        ate it at their own pace with no penalty for finishing last. I played a board game for the remainder of the time and talked to my peers. When the event finished, we all went our separate ways. If there needs to be any clarification do not hesitate to reach out.

Sincerely,

The following is my statement on the incident on              .

The event consisted of the current                 , myself, a few current cadets, and one graduate, who were all              at some point. The event occurred at a house off campus. My experience was mostly hanging out with the other older/prior cadets and also talking with some of the cadets who were eating the eggs, encouraging them to finish what they were eating. Alcohol was present, but only some people were drinking to my knowledge, all of whom are at                          including myself. This started around 2000-2100 and then we left around 2200. Others who had not been drinking drove us back to campus. Upon returning to campus, I went to sleep.

If I can be of any further assistance, please contact me using the information listed below.

Very Respectfully,

**Written Statement**

After hearing that everyone would meet around 1800, I left campus around 1915 to arrive at            s apartment on the night of                  around 1930 hours. I went inside and immediately caught up with the group of        guys and girls who were there, including                                                   right inside the front door. By the counter area, the                  had already begun the egg-eating tradition so I swung by to see how they were doing. Around this time, I was catching up with                                            , and others. I ate a            pizza there as well while catching up with some of the                  and said hello to                        who was cooking the eggs and                        who was helping to keep things clean. After, I walked around and talked with the group and checked on                                            to see how their omelets and stomachs were doing. Later, roughly around 2000,   had a shot of pink-lemonade vodka with                              , followed by an egg-shot with the same vodka with                        around 2030. At some point,                        came by for a short time and I said hello to him. Afterwards, I went over to the couch area and caught up with more friends and listened to music. I could tell                        and                        were struggling with their eggs a bit, so I went over to check on them before            ended up vomiting in a garbage can. After she vomited and finished her eggs,                        ended up going outside for some fresh air;            went out to check on them soon after. I saw                        quickly finish her eggs in about 2 minutes or so while FaceTiming                        , who I also said hello to over the phone. After, I talked to            and others about music and how their breaks were near the couch area, talked to                                            a bit, and then checked on            as he was eating his eggs while watching a video. After            finished his omelet, I said my goodbyes around the room to as many people as I could before heading outside to see                              sitting together on the front porch helping to calm down their stomachs;            was curled up in a ball near the corner of the porch. I said goodbye to them,                        before walking back to my car and driving away at 2205. I arrived back at campus and the                                            .

I arrived at College Station on that same evening and was there between the hours of 1930 to 2230. This was an event where            got together to boost morale after a long "hell week". It was a very comfortable environment where everyone was hanging out and getting ready to return to school. From what I know concerning the eggs, nobody was required to participate in eating them. Anyone that did not feel well after eating was well taken care of. After the event, I left and went back to the dorms.

Best,



This email is to respond as a report to what happened around                    . Each          currently on the team (who could attend) was made a 12-egg omelet and timed to see how long it would take for them to eat it. People would cheer them on and encourage them to eat it fast and some people threw up and felt quite ill due to it.                                        A speech was given at the end to build morale.

Very Respectfully,

Before my time on the team, the _____ used to go to a local restaurant and order a 12 egg omelet for each of the _____ on the team at the conclusion of Hell Week. That restaurant has since stopped serving the 12 egg omelet, so now the team buys its own eggs and toppings, and the omelets are made by the _____ on the team to the liking of each of the _____ This event now happens at an off campus house. More specifically, a house that belongs to someone who once held a _____, and this year _____. The _____ were introduced to this night by being told that there was a surprise, and that they should plan on not eating heavily during the day. They were told to meet at a certain location where the _____ were waiting to carpool them to the house.

With the event not being fully known to the                    they were blindfolded for the surprise, and then brought into the house. After everyone's arrival, the blind folds were taken off and they were able to see all of the             they had looked up to the year before when they were freshmen. It was like a big family reunion, with board games, the NFL football game on the TV, and omelets being served one by one to each of the                . In true fashion of the very competitive team, the times it takes for each person to finish the omelet was recorded on the whiteboard, and everyone wants to beat the best time from the year before, to "stick it" to their previous upperclassmen. Many times during the night the             were reminded that nothing would happen in the event that they couldn't finish the omelet. There was a story that was told about one time (a few years before I                  ) that someone didn't finish the omelet, and as a punishment, they had to do physical training until they vomited, but it was assured numerous times that in no event would there be any backlash in the case that someone didn't finish. Everyone ended up finishing their omelet, and the previous year's record was broken twice. After everyone had finished, some were feeling a little queasy as expected, but everyone seemed to be in good spirits, and most people would even wash down the eggs with a bowl of ice cream. The whole event had no ounce of mal-intent, and it was only for the reunion purpose as well as your previous upperclassmen cooking for you after you ordered what you wanted in your omelet. Everyone cleaned up where they had sat, and made sure looked as good as it did when they showed up. I was even able to get a hug and a smile, and tell everyone how proud I was about their accomplishments both on the team and in the Corps. I remember multiple times during the night where myself and the previous                          would look around at all the people we had hopefully had a positive impact on during our times in the Corps. Looking at all of the and multiple            that were once             when they were         gave me so much pride and happiness. The overall mood of the night seemed so good and heartwarming, and it saddens me very much to understand that other people may not have had the same sense of reunion and happiness.

On              around 1800,

came to Hensel Park in separate cars.

Shortly afterward,                                                        I arrived at Hensel Park and instructed the                to pull the beanies over their eyes and get into our cars. We arrived as a group at                apartment, where                    ,

                    , and several of          roommates were socializing. Blindfolds came off and someone explained that      for some time had a yearly event where            were encouraged to eat 12-egg omelets. There was no punishment for not finishing, and in fact,              did not finish her omelet and did not receive any negative repercussions from any upperclassmen.

I heard a rumor that back in the day they used to do terrible things to            that did not finish their omelet, but I had never witnessed anything like that, nor had any evidence presented to me to suggest that my fellow        and                intended on doing anything of the sort. The intention of the event was to socialize and celebrate a finished week of practice, not to initiate members.

At some point during the night of the incident,            arrived and stayed.              and his girlfriend dropped by for around 10 minutes at most

                                                                                had upset stomachs after eating, and                  and I checked in with both of them throughout the night, to offer them water and anything else they might need. Around 2230-2300 we all left back to the dorms in separate cars.

I don't recall there being any underage drinking at the event. There could have been more people at this event, but to the best of my memory, these were all the names I could gather.

                                                and I are all the current                    on     . Together, we organized and coordinated the event, and in no way are any of the participating            to blame for the incident.

Please contact me via email or at                you have any questions or concerns.

Very respectfully,

On Sunday,                        at approximately 1730, I drove to the store to buy supplies for the omelet dinners for the                   on the                   and the                   who would be participating. I then drove to                   house as he was a                   who had offered to let us use his house for the evening.                   , the                   , then spent the next hour prepping the kitchen for the                   to arrive At some point around 1830,                   and     other                   from the Corps who were all former                   arrived.

The                   arrived between 1830 and 1900 and were led blindfolded into the house by the                   on the team who had picked them up. I was in the kitchen from 1900 to 2200, where, over the course of the evening,                                             .                   was allowed to choose what ingredients they wanted included and allowed to take their time in eating the food.

  then cleaned the dishes and around the kitchen/dining area from 2200 to sometime after 2300 when the party ended and everyone left.

The egg eating event is a tradition in which             eat a cooked 12 egg omelet upon the completion of Hell Week. They choose what, if any, condiments they would like in their omelet and are timed how fast they eat it. Some choose to eat their omelets slowly, while others try to eat it quickly. The event is in no way "bad bull" and was an opportunity for past and present         to reconnect. On the evening of         , I witnessed the omelet eating event that occurred with the         ,         , as well as various other      personnel/former personnel. Everyone present was either a current or former                 The event occurred off campus at around 1830. I rode with             to the event about an hour after the planned start time, as we were both at an      practice. When we arrived, the         were already eating the eggs, had already eaten, or waiting for the omelets to be cooked. After about 2-3 hours, the omelets had been eaten and people began to depart the house. I rode back to the Quad again with         , and     h also rode in the car.

V/R

On the evening of         , I witnessed the omelet eating event that occurred with the             , as well as various other      personnel/former personnel. Everyone present was either a current or former             . The event occurred off campus at around 1830. I rode with             to the event about an hour after the planned start time, as we were both at an         . When we arrived, the         were already eating the eggs, had already eaten, or waiting for the omelets to be cooked. After about 2-3 hours, the omelets had been eaten and people began to depart the house. I rode back to the Quad again with             also rode in the car.

Please let me know if there is anything else I can provide to assist in this matter.

Very Respectfully,

Written Statement:


On                         participated in an event that took place off campus involving
          members of the                         eating eggs.   coordinated with the other
                                                 .   messaged the
                                    and to meet us at Hensel Park at 1800.
                              communicated the same with the                              . Once
at the park, we met with all the                    and had them put on their corps issued beanies as
a blindfold and led them to our cars.   was responsible for driving
                    and drove them to                    house. Once there, we led them inside with the
beanies covering their eyes and had them sit on the couch. Once everyone was present, we
had them take off the beanies. Following that,                    explained the situation, which
was that they were being cooked 12 egg omelets to eat as fast as they were able to. This has
been a tradition in past years, starting when the           went to Hullabaloo Diner and ordered
a 12 egg omelet each.                    was in charge of cooking the eggs, and the
were allowed to choose what toppings they wanted inside. They went in random order and each
ate the omelet while being timed.                    did not finish the omelet, which was
          . The times were written on a white board and after they finished the omelet,      gave
them ice cream to calm their stomachs. The rest of the night was just waiting for everyone to
finish and hanging out around the house. After everyone was done,      told them that two of
them received 15 eggs instead of 12, which were                                        , who
were randomly selected based on their size. After talking for a little bit,      all drove the
                    back to the park where their cars were. Afterwards,      all met at the           to
distribute                    and then went our separate ways.

I'm writing to detail my account of the reported          incident.

In advance, the                    were told to keep their evening open on Sunday          and to not eat much that day. All of the team's active                              ) met at a park off campus where they were picked up by the team's        . They were told to put their Corps-issue beanie on to cover their eyes. They were driven by the        to            apartment since a place was needed to cook the eggs. They were led inside and told to remove the beanies once all were inside.
explained to the              that they would each be eating dozen egg omelets.              cooked all the omelets with help from                  .

                ate in the order they volunteered. The omelets were made to-order. They were allowed to pick whatever toppings they wanted. When it came time to eat, they were timed and encouraged to attempt to be the fastest, but were ultimately allowed to eat at whatever pace they desired without threat. Times varied from 2:20 to 1:41:02. If requested, ice cream was served once a
finished to help them feel better since that soothes the stomach. I believe 2 or 3            threw up.
2                had omelets that contained 15 eggs but they were not the ones who threw up as those were given to the 2 perceived biggest eaters.

Beyond the egg eating, it was a standard social gathering. There was no PT involved the entire night. No alcohol was consumed by minors. If anyone started to feel unwell while or after eating, they were assisted as needed/requested. If a            felt unwell while eating, they were allowed to take a pause as needed. People played board games and talked. Former members arrived to cheer on the
             in their old positions and ask about Hell Week. These former members include


                              was not present as she was                          . She was on                                to eat her omelet.

Once every            was done and ready to leave, everyone said their goodbyes and the
were either taken back to their cars or directly back to campus. Nothing was required of them the following day.

Please let me know if you or the Student Conduct Office need anything clarified or have any questions.

Very respectfully,

Statement

I arrived at            house at around 1800 along with the other

While we waited for everyone else to arrive we prepped the supplies to make the omelets.       cooked the bacon and chopped up vegetables to add if the              wanted that in their meal. At around 1830 the             on the team arrived with the        driving them. The             were blind folded when they walked into the house but the blind folds were removed as soon as they had sat down in the house. The             were told how as a celebration of the end of hell week the whole team got together to compete in a food challenge. Each             would receive a 12 egg omelet to eat. There was no maximum amount of time allowed but the goal is to compete against their buddies and finish the omelet. Vegan egg substitute was also provided if the wanted to participate but was unable to eat egg. I don't remember the exact order that they went but I do know          went first. While        cooked the Omelets everyone else cheered on their buddies, hung out and talked.             started feeling sick while eating hers so she did not finish it. She went outside with                       to get some water and cool off. Those       who were of age also took a shot of raw egg but that was the only alcohol at the event that I am aware of. The rest of the           finished their Omelets. After everyone was done,            gathered everyone together to congratulate us on the end of hell week and to get ready to be in the mindset to compete at Tulane. We left around 11:00.

The following is my account of what happened the night of                    .

It started with the other                                        and myself arriving at a park to meet the
                         After all the           and                    had arrived, we told the                 to cover their
eyes with beanies they'd been told to bring. They were then escorted into the             vehicles. The
              then drove the                                        house where           and past       members where
waiting. After being escorted inside they were told to remove their blindfolds. The upperclassmen then
explained what the                    would be doing. They would be eating an omelet made up of twelve
eggs and other ingredients at the                    request. The                    then began to eat. They
decided on an order and each took a turn eating. While each                    was eating, the upperclassmen
and the                    who weren't eating socialized, played music and board games, cheered on the
                    eating, and those over 21 drank. During the night a few of the                    felt sick from
the omelet and threw up. After confirming that the                    were okay, the upperclassmen would
encourage them to finish the omelet. Old team members came and went throughout the night. After
everyone had finished, the time to eat the omelet was written on a whiteboard for each
The socializing went on for a little longer, and eventually the                    were driven back to their
parked vehicles by the           . Everyone then separated.

This has been my knowledge of the night of the event, told to the best of my ability. If there are any
questions, please email me.

Very respectfully,

**exas A&M Corps of Cadets**



Date 21 September 2023

**MEMORANDUM**

TO:        Dr. Douglas Bell

FROM:      BG Patrick Michaelis

SUBJECT:

Our initial investigation was conducted yesterday with the             in Company        During the
discussion, the            were asked general questions about the treatment they have received
from their upperclassmen and how things were going overall. As the discussion progressed more
direct questions were asked dealing with the specific allegations outlined in the complaint. When
asked about the      from        being given a hard time based on
and required to repeat answers, the            indicated all       were required to repeat answers
until they answered in the way the upperclassmen desired. The specific example given was a
campusology question that had to be memorized and repeated exactly as written. All        that
could not repeat the answer correctly were sent back to their room for five minutes to practice.
Knowing campusology answers are part of the             class earning their Corps       which is
consistent with Corps policy. The question dealing with having joke ready for the outfit meeting
was met with the answer that it was a misunderstanding between the upperclassmen and the
The upperclassmen said one thing and the      understood something different. The
were asked about being able to get enough sleep, and responded with they stay up late to do
homework, and the length of the meeting had nothing to do with their lack of sleep. The
in     are encouraged to be involved in activities outside the Corps, but the outfit does require
them to attend evening formation, a required activity, unless they are in class or have signed a
military letter to miss the event. This is consistent with Corps policy.

Based on the answers provided by the             , we believe the allegations to be unsubstantiated.


Patrick R. Michaelis

Brigadier General (Ret.), U.S. Army

Commandant, TAMU Corps of Cadets

# Bell Jr, Douglas

**From:**                  Bell Jr, Douglas
**Sent:**               Tuesday, November 7, 2023 2:26 PM
**To:**                   Winking, Audrey J
**Subject:**            FW: [Maxient]           College Station - On-Campus Residence Hall

Additional information from

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, November 7, 2023 1:42 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** Fwd: [Maxient]           College Station - On-Campus Residence Hall

Please excuse short messages and typos, as I am responding on my phone

Begin forwarded message:

> **From:** "Moore, Erica" <erica_moore@stuact.tamu.edu>
> **Date:** November 7, 2023 at 1:25:31 PM CST
> **To:** "Murray, Dylan C" <dmurray@stuact.tamu.edu>
> **Subject: FW: [Maxient]**        **College Station - On-Campus Residence Hall**
>
> Howdy Dylan,
>
> I am sending this over to you. I've already submitted a report for this and told the student an additional report from him would be helpful as well.
>
> **Erica Moore** | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000
>
> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

> **From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
> **Sent:** Tuesday, November 7, 2023 1:12 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** Re: [Maxient]           College Station - On-Campus Residence Hall
>
> Good afternoon, I experienced hazing this morning at formation. The entire class of       cadets were yelling at me, cursing at me and making fun of me in front of the rest of my unit. One particular student

named ██████████ who is a ████████ was leading the charge as they surrounded me and were mocking me for being hurt and unable to run. They are making me very uncomfortable being part of ████ as they continue to say hurtful things to me in front of the rest of the unit. They made me continuously do push ups until I was no longer able to, and they kept screaming at me to do it

On Tue, Nov 7, 2023 at 12:01 PM Moore, Erica <erica_moore@stuact.tamu.edu> wrote:

Howdy,

Thank you for reaching out to us regarding the incident below. Your report has been received by the Department of Student Activities and will be reviewed to determine any needed further action. If you have any additional information or documentation related to the incident you would like to submit, feel free to reply to this email, or if you would prefer to speak to a staff member directly you may contact me at the number below. Thank you again for your submission, and for your support of our Texas A&M student organization community.

Sincerely,

-Erica

**Erica Moore** | Administrative Coordinator II
Koldus 224G|Student Organization Leadership And Development I Department of Student Activities

1236 TAMU | College Station, TX 77843-0000

ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ████████████████████████ notifications@maxient.com>
**Sent:** Sunday, November 5, 2023 9:11 PM
**To:** Moore, Erica <erica_moore@stuact.tamu.edu>
**Subject:** [Maxient] ████████ College Station - On-Campus Residence Hall

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report

**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident

Location of incident
**On-Campus Residence Hall**

**Involved Parties**

**Company** ) Alleged Offender

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation

[doctorsnote1.pdf](doctorsnote1.pdf)
[doctorsnote2.pdf](doctorsnote2.pdf)
[doctorsnote3.pdf](doctorsnote3.pdf)
*For added security, these links will expire in 10 days. The attachments will remain accessible when viewing the report within Maxient.*

## Submitted By

Your full name



***[UNAUTHENTICATED]***

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
    • Dylan Murray
    • [jhbrown@stuact.tamu.edu](mailto:jhbrown@stuact.tamu.edu)
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1

Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of Student Activities.

Message sent by Maxient
Replies will be sent to the submitter

## Bell Jr, Douglas

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Friday, November 3, 2023 11:35 AM |
| **To:** | Winking, Audrey J |
| **Subject:** | ██████ |
| **Attachments:** | Re: ██████ DOC 231030 10_53_55.pdf; DOC 231030 15_33_52.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

FYI for the ██████ Investigation

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ██████

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the ██████ acquisitions with supporting documentation.

V/R


Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

# Bell Jr, Douglas

**From:**           Bell Jr, Douglas
**Sent:**           Monday, December 18, 2023 3:24 PM
**To:**           Latham, Skylar
**Cc:**           Smith, Asia
**Subject:**           Investigation Assigned
**Attachments:**           Investigation Report.pdf

Howdy,

Please see the attached      harassment investigation assigned to you.  Please let me know if you have any questions or concerns.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Tuesday, December 12, 2023 4:09 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | investigation complete |

The     investigation report is completed and has been saved in the shared drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

# Bell Jr, Douglas

**From:**        Bell Jr, Douglas
**Sent:**        Monday, November 6, 2023 10:17 AM
**To:**        Winking, Audrey J
**Subject:**        FW: █████████

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Monday, November 6, 2023 9:29 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re: █████████

Doug,

Desiree Ornelaz is the next coinvestigator.

I'll talk with █████ and see if a new room will alleviate some of his immediate concerns.

Thanks!

> On Nov 6, 2023, at 8:37 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Howdy,
> Thanks for the update.  If you move him to another, it will not impact the investigation. I would like to know who the co-investigator is so we can begin scheduling with the student and members of the outfit.
>
> **Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
> **Sent:** Sunday, November 5, 2023 5:28 PM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Subject:** RE: █████████

Doug,

Jeff is out of the office and will return this week. If you need an investigator sooner, I can see who is next up for assignment.

Additionally, there are some extenuating circumstances with this student that also impact his health. If we offer to move him to another room on the ▮▮▮▮▮ is that a violation of any protocols now that SCO investigation is ongoing?

Thanks,

**Meredith Simpson**
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, November 3, 2023 3:59 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: ▮▮▮▮▮

Howdy,
Can you please provide a co-investigator from the Corps regarding this case?  We will be initiating an investigation. Thank you in advance.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ▮▮▮▮▮

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the ▮▮▮▮ acquisitions with supporting documentation.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317



Date 21 September 2023

**MEMORANDUM**

**TO:**        Dr. Douglas Bell

**FROM:**    BG Patrick Michaelis

**SUBJECT:**

An initial inquiry was conducted into the allegations contained in the        reports submitted to Student Conduct.  Our findings for each complaint are:

**Retaliation from                          after missing a mandatory football game.**

For missing the football game without authorization         ██████ was given a restricted weekend.  In the explanation, the discipline was given as much for██████ lying about attending the event and providing a photoshopped phot as "proof" of attending much as missing the game. (See attached Discipline report)

**The                          members have continuously kept adding more overexaggerating and falsified discipline items on to my profile to serve in the form of demerits, marching tours, and restricted weekends.**

See attached incidental counseling forms and Discipline report.

**People have taken my several of my personal belongings and school supplies and I have been unable to find out where they went.**

When questioned about what was taken Cadet ██████ was unable to provide specific examples.

**                          has given me restricted weekends for missing                          class which we both have, even though I have excusal letters for them.**

Cadet ██████ was not able to produce the excusal letters for missing class.

**Destruction of my personal property as I had to make unnecessary repairs to my**

Cadet ██████ was not able to explain what damage was done to his

Military Sciences Building
1227 TAMU
College Station, TX 77843-1227

Tel. 979.845.2811  Fax 979.845.8066
corps.tamu.edu

- 400 -

I was also set up by members of my unit when my room mate ████████████ and passed me in the hall not telling me anything and did not take my calls or texts right after seeing me walk by, even though he did not have class. ████████████ locked me out of my room for several hours and I missed class because I could not get into my uniform and ████████████ stood in the hall watching me with a smirk on his face as I could not get into my room, and then          gave me discipline for not attending class intentionally, even though I went to the Corps Housing Office and they were not able to help me get into my room so I could go to class.

Cadet ████ does not sleep in the dorm. When Cadet ████ left for work, he locked his door. Cadet ████ was not carrying his room key.

Most recently as of thi████ s to my knowledge. I was kicked off of the Corps of Cadets      team which I have been on since          year, and my unit's leadership has continued to pressure the captain about having me on the team.

Cadet ████ was removed from the team for not attending practice. (See email from team captain)

continuously bullied by ████████ and ████████████ - who routinely drunkenly bullies ████

Cadet ████ does not sleep in the Corps Dorm and is not there in the evenings.

Cadet ████ is described by his military advisor as being nonparticipative for most outfit activities. In addition to being absent, he has also been caught being untruthful on several occasions. His military letter for missing morning activity Monday-Thursday indicated he was training with the          when in fact the team only trains Monday-Wednesday. Lt Col Gardner conducted a meeting with ████ his Commanding Officer and Executive Officer. During the discussion, Cadet ████ indicated he did not feel comfortable being in the same room as his roommate, ████████ because of his roommate's personal lifestyle choices and had been staying off campus with one of his friends. When questioned about what personal items or school supplies had been taken, ████ was unable to provide specific examples. His roommate denies taking anything from ████ or messing with any of his belongings. Cadet ████ was told by his Commander he was authorized to change rooms, but ████ has not talked to the Corps Housing Officer to initiate this process. Cadet ████ came to this outfit from      in the      and was on a      for the      semester, making this only the      full semester he has been in this outfit. With the small amount of time ████ spends with the outfit, it is difficult to determine when, or by whom he is being harassed. Although the situation is not ideal, we do not see violations of Student Rule 24.

Patrick R. Michaelis
Brigadier General (Ret.), U.S. Army
Commandant, TAMU Corps of Cadets

Building and room/suite number
#### TAMU
College Station, TX 77843-####

Tel. 979.123.4567  Cell. 979.123.4567  Fax 979.123.4567
myname@tamu.edu
www.mywebsite.tamu.edu

| From: | Ramirez Jr, Joe E |
|---|---|
| To: | Michaelis, Patrick Ralph; Bell Jr, Douglas |
| Cc: | Gardner, Jeffery D; Simpson, Meredith M |
| Subject: | RE: [Maxient]     College Station - On-Campus Residence Hall -     On |
| Date: | Tuesday, October 24, 2023 6:26:17 PM |

**Doug – we agreed to let the Commandant and his staff have 72 hours to conduct their own internal inquiry to determine if there was validity to the report before they sent to SCO. This definitely falls into that category.**

**Please hold on any further actions until the Commandant and his staff have had the chance to look into this and come back to SCO with what they have discovered.**

**Patrick – you and your staff have 72 hours to report back to Doug and SCO what you find out about this allegation.**

**Thanks.**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

---

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Tuesday, October 24, 2023 5:45 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>; Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Subject:** Re: [Maxient]     College Station - On-Campus Residence Hall     On

Okay Doug. This is not within the MOA agreement. You have every right to do what you want (which you've tipped your hand already) after the 72 hour period.

I will discuss with Joe on Thursday.

Michaelis

Sent from my iPad

> On Oct 24, 2023, at 17:39, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> The first report was received today from a Tell Somebody report from a faculty. Within this report it appears that the Corps is aware of this student issue and complaints. The second report is from the student and outlines the same information. I intend to reach out to this student, who is a      in the Corps about his concerns about continued harassment. We can discuss tomorrow if needed.
>
> Douglas Bell

- 402 -

Please excuse any typo, message sent from I-Phone

On Oct 24, 2023, at 4:46 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:

 Okay… so lay them out.  Did we do the 72 hour process on the first one?  Are they both from different or the same student?  Did we see the first on?

This is why we do this.  Thanks.

Sent from my iPad

> On Oct 24, 2023, at 14:42, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>  Yes, but being we have received two reports regarding this situation, I feel that an investigation is warranted.
>
> Douglas Bell
>
> Please excuse any typo, message sent from I-Phone
>
>> On Oct 24, 2023, at 4:38 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:
>>
>>  Okay… but isn't that how almost all reports start?
>>
>> Sent from my iPad
>>
>>> On Oct 24, 2023, at 14:34, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>>>
>>>  Being this report is coming from the student I feel an investigation is warranted.
>>>
>>> Douglas Bell
>>>
>>> Please excuse any typo, message sent from I-Phone

On Oct 24, 2023, at 4:29 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:

Doug - is this a secondary report? If not, let us come back to you within the 72 hour agreement first. As I recall this is one we've been working for a while. Jeff can elaborate.

Sent from my iPad

On Oct 24, 2023, at 14:24, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:

Howdy, I have received the attached IR and Tell Somebody Report about the

outfit. SCO will be investigating this matter. Can you provide a CTO to co-investigate.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards Student Conduct Office | Division of Student Affairs | Texas A&M University 1257 TAMU | College Station, TX 77843-1257 ph: 979.847.7272 | [dbelljr3@tamu.edu](mailto:dbelljr3@tamu.edu) | sco.tamu.edu

--------------

**- 405 -**

# Bell Jr, Douglas

**From:** Simpson, Meredith M
**Sent:** Monday, November 6, 2023 9:29 AM
**To:** Bell Jr, Douglas
**Cc:** Gardner, Jeffery D
**Subject:** Re: ▮▮▮▮▮▮

Doug,

Desiree Ornelaz is the next coinvestigator.

I'll talk with ▮▮▮ and see if a new room will alleviate some of his immediate concerns.

Thanks!

> On Nov 6, 2023, at 8:37 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> Howdy,
> Thanks for the update. If you move him to another, it will not impact the investigation. I would like to know who the co-investigator is so we can begin scheduling with the student and members of the outfit.
>
> **Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
> **Sent:** Sunday, November 5, 2023 5:28 PM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Subject:** RE: ▮▮▮▮▮▮
>
> Doug,
>
> Jeff is out of the office and will return this week. If you need an investigator sooner, I can see who is next up for assignment.
>
> Additionally, there are some extenuating circumstances with this student that also impact his health. If we offer to move him to another room on the Quad, is that a violation of any protocols now that SCO investigation is ongoing?
>
> Thanks,
>
> **Meredith Simpson**
> Office of the Commandant | Corps of Cadets

1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, November 3, 2023 3:59 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: ▬▬▬▬

Howdy,
Can you please provide a co-investigator from the Corps regarding this case?  We will be initiating an investigation. Thank you in advance.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ▬▬▬▬

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the ▬▬▬ acquisitions with supporting documentation.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Tuesday, October 31, 2023 8:50 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Michaelis, Patrick Ralph; Simpson, Meredith M |
| **Subject:** | RE: ▮▮▮▮ |

Yes Sir.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:49 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE:▮▮▮▮

Thank you for this information.  The Student Conduct Office will follow up with ▮▮▮▮▮▮ regarding his submission of an Incident report.  Depending on the information received from our routine follow-up, an investigation may still be warranted.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
<span style="color:maroon">**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.</span>

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ▮▮▮▮

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the ▮▮▮▮ acquisitions with supporting documentation.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

I have received the information and will be recommending this situation for an investigation.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, October 24, 2023 4:11 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Brown, Josh <jhbrown@stuact.tamu.edu>
**Subject:** FW: [Maxien       College Station - On-Campus Residence Hall     On

Howdy Doug,

Please see the below Incident Report received this morning to review from a SCO perspective or to pass along to Corps Staff to address through their processes.

Thank you,
Dylan

**Dylan Murray** | Assistant Director
Campus Engagement & Traditions | Organization Conduct
Department of Student Activities | Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.1973 | dmurray@stuact.tamu.edu | http://studentactivities.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Tuesday, October 24, 2023 10:03 AM
**To:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Subject:** [Maxient]      College Station - On-Campus Residence Hall     On

**This Message Is From an External Sender**

This message came from outside your organization.

**- 410 -**

Secondary recipient (you were copied)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**On**
Location of incident
**On-Campus Residence Hall**

**Involved Parties**
Company        in the Corps of Cadets () Organization

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective
language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific
people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the
body of the report. When possible, we encourage the use of direct quotes, even in incidents when the
language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a
stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."
I am currently being harassed by multiple people in my unit      in the Corps of Cadets. I have
been receiving continuous retaliation from other        cadets. It started during the week after I
missed a mandatory event the football game against the                          game
and went to my                          instead. The        cadets in my unit gave me enough
discipline to get me removed from the Corps, and go before the Cadet Performance Review
Board, however after the incident                      had to meet with the head of the Corps
Discipline office to ensure I was still able to stay in the organization without being forced out. The
problem is that even after being put in a bad position, the        cadet members have
continuously kept adding more overexaggerating and falsified discipline items on to my profile to
serve in the form of demerits, marching tours, and restricted weekends; and I have been given
heavy discipline for barely missing deadlines of online forms to submit and messing up letters.
However I was delivered the amount of discipline from the unit's leadership to kick me out of the
Corps in less              with only having been counseled a single day about missing the
game beforehand. I have experienced ongoing harassment from members in my unit including
destruction of my personal property as I had to make unnecessary repairs to my        . As
well, people have taken my several of my personal belongings and school supplies and I have
been unable to find out where they went, and my room mate ▓▓▓▓▓ did not even tell me
who did it even when someone stole            or several days. The other        cadets in my
unit continue to try give me large discipline as ▓▓▓▓ has given me restricted weekends for
missing        class which        have, even though I have excusal letters for them.

**Supporting Documentation**
**No additional documents were attached to this report.**

**Submitted By**
Your full name

██████████

Position/title/student status
**Student**
Your email address

██████████████████

Your phone number

████████████

UIN

███████

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
   • Dylan Murray
   • jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of Student Activities.

**Message sent by Maxient**
**Replies will be sent to the submitter** ██████████████████

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: [Maxient]         College Station - On-Campus Residence Hall |
| Date: | Tuesday, November 7, 2023 2:26:05 PM |

Additional information from

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, November 7, 2023 1:42 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** Fwd: [Maxient]       College Station - On-Campus Residence Hall


Please excuse short messages and typos, as I am responding on my phone

Begin forwarded message:

> **From:** "Moore, Erica" <erica_moore@stuact.tamu.edu>
> **Date:** November 7, 2023 at 1:25:31 PM CST
> **To:** "Murray, Dylan C" <dmurray@stuact.tamu.edu>
> **Subject: FW: [Maxient]       College Station - On-Campus Residence Hall**
>
>
> Howdy Dylan,
>
> I am sending this over to you. I've already submitted a report for this and told the student an additional report from him would be helpful as well.
>
> **Erica Moore** | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000
>
> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> ---
>
> **From:** ███████████████████████████
> **Sent:** Tuesday, November 7, 2023 1:12 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** Re: [Maxient]       College Station - On-Campus Residence Hall -

Good afternoon, I experienced hazing this morning at formation. The entire class of ████ cadets were yelling at me, cursing at me and making fun of me in front of the rest of my unit. One particular student named ████████ who is a ████ was leading the charge as they surrounded me and were mocking me for being hurt and unable to run. They are making me very uncomfortable being part of Company ████ as they continue to say hurtful things to me in front of the rest of the unit.

On Tue, Nov 7, 2023 at 12:01 PM Moore, Erica <erica_moore@stuact.tamu.edu> wrote:

> Howdy,
>
> Thank you for reaching out to us regarding the incident below. Your report has been received by the Department of Student Activities and will be reviewed to determine any needed further action. If you have any additional information or documentation related to the incident you would like to submit, feel free to reply to this email, or if you would prefer to speak to a staff member directly you may contact me at the number below. Thank you again for your submission, and for your support of our Texas A&M student organization community.
>
> Sincerely,
>
> -Erica
>
> **Erica Moore**  | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000
>
> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** ██████████ (via Maxient) <notifications@maxient.com>
> **Sent:** Sunday, November 5, 2023 9:11 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** [Maxient]                College Station - On-Campus Residence Hall

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
### Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident

Location of incident
**On-Campus Residence Hall**

### Involved Parties
**Company**      () Alleged Offender

### Incident Description
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**

doctorsnote1.pdf
doctorsnote2.pdf
doctorsnote3.pdf
*For added security, these links will expire in 10 days. The attachments will remain accessible when viewing the report within Maxient.*

**Submitted By**
Your full name

Position/title/student status
**Student**
Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:

- Dylan Murray
- jhbrown@stuact.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of Student Activities.

**Message sent by Maxient**
**Replies will be sent to the submitter**

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: |
| Date: | Friday, November 3, 2023 11:35:18 AM |
| Attachments: | |
| | DOC   10_53_55.pdf |
| | DOC   15_33_52.pdf |

FYI for the        Investigation

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:**

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the        acquisitions with supporting documentation.

V/R

    Lt. Col Jeff Gardner '82, USAF (Ret)
    Assistant Commandant for Accountability and Standards
    Military Advisor Parsons Mounted Cavalry
    979-458-9317

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **To:** | Ornelaz, Desiree A |
| **Subject:** | RE:      Investigation |
| **Date:** | Monday, November 20, 2023 3:37:00 PM |

No problem, I went ahead and let my new full-time investigator serve as the co-investigator since he was here already anyways to observe for his training, so we have wrapped up the interviews for today.

Best,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 20, 2023 2:31 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re:      Investigation

I'm so sorry about missing my appointments with you. I will certainly be all day tomorrow and I will cancel my leave if no problem.

Sent from my iPhone

> On Nov 20, 2023, at 12:37 PM, Ornelaz, Desiree A <dmercado@corps.tamu.edu> wrote:
>
> I appolligize, I am trying to find your office.
>
> Sent from my iPhone
>
>> On Nov 20, 2023, at 11:08 AM, Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:
>>
>>
>> Good morning,
>>
>> Just checking to see if you were still able to do the interviews we have at 11, 2, and 3 today?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student
Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Tuesday, November 14, 2023 3:10 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:      Investigation

Yes, that works. Thank you! I will clear my calendar for Monday so we can finish hopefully before the holiday.

**GySgt Desiree A. Ornelaz USMC (Ret)** | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 14, 2023 2:20 PM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:      Investigation

I just looked at their class schedules and it's going to be really tough to get them in this week in the order I wanted to interview them (complainant first).  It looks like              would work well for them though – would this work for you?


Complainan
Alleged
Alleged

Let me know if that would work for you and if so, I will send you a calendar appointment and will send them their interview notices!

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 13, 2023 8:31 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:      Investigation

Sounds great, thank you!

**GySgt Desiree A. Ornelaz USMC (Ret)**  | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 13, 2023 8:17 AM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:

Thank you! My goal is to try to fit the interviews in by the end of this week, but if needed we could finish up next Monday/Tuesday while the students still technically have class. So we should be done by the time you leave, but we can definitely Zoom if something major changes and we absolutely have to do any after Thanksgiving.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 13, 2023 8:03 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Subject:** RE:      Investigation

Thank you so much, It is awesome that you are a                    . I completely understand           always comes first.            is moving from here to           for work so starting the 22nd I will be on leave to help her move. Hopefully we will be done by then, but if not I can definitely get on zoom or whatever.

**GySgt Desiree A. Ornelaz USMC (Ret)**  | 1St Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 13, 2023 7:57 AM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:      Investigation

Sure, I have attached the reports that have been submitted as well as documentation that I received from the Corps regarding some of the allegations.

Also – I am a                 and ended up receiving a new              Friday afternoon, so I won't be in the office today but will try to be doing some work from home as I am able.  I am hoping that I can get              set up to start tomorrow.  As soon as I know when she can start           , I will schedule the interviews!  Sorry for the delay, I had fully intended to do that on Friday. I apologize for any inconvenience this delay is causing but will get these scheduled ASAP once I know when she can go to

Sincerely,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>

**Sent:** Monday, November 13, 2023 7:53 AM

**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Subject:**        Investigation

Good morning,

I was wondering if there are any notes or anything I should read concerning this case. Thank you.

**GySgt Desiree A. Ornelaz USMC (Ret)**  | 1St Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Sent:** Wednesday, November 8, 2023 12:37 PM

**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>

**Subject:**       Investigation

Hi Desiree,

I was told that you will be helping me with the       investigation.  I am planning on setting up interviews to take place next week.  Would you mind sending me your availability for next week when you have a chance?  I am hoping to send the students their notices by the end of this week.

Thanks, and looking forward to working with you!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:**        Bell Jr, Douglas
**To:**          Winking, Audrey J
**Subject:**     FW: SQ 21 incidents ICO ▮▮▮▮▮▮▮▮ (SQ 6)
**Date:**        Friday, October 20, 2023 9:27:01 AM
**Attachments:** Request to Transfer Document Concerning ▮▮▮▮▮▮.pdf
                 ▮Incident.pdf

Howdy,

I have received this information and I an recommending an investigation.  I have requested a military advisor (CTO) to co-investigate.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:        incidents        ▮▮▮▮▮▮▮

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the ▮▮▮▮ in this outfit.  The first document is the one that really stands out (request to transfer).
Before I act here, I'd like your perspectives if there is any form of violation of university hazing standards here.


patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**        incidents        ▮▮▮▮▮▮▮

Good Morning Sir,

I finally received the additional info last night regarding Cadet ▮▮▮▮▮.  Below is the original email from last month but I've also attached the additional document that I received last night as well.  She

- 424 -

stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.


R/
**MSgt Chauncy J. Anderson USMC (Ret)** | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy|            TAMU | College Station, TX 77843

ph: 979.458.9372 | mobile:                    | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** ███████████████████████████ >
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ██████████████ . I'm a cadet in         and a                    from        I was in the same outfit as ██████████ when              in the Corps of Cadets. My time in       ,              , has been incredibly different than my time spent in         . If you're available this              and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to        was the best choice for me, and I'm truly grateful to Mr. Garza and Ms. Peters for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including ██████ would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in         .

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,


██████████

| From: | Winking, Audrey J |
|---|---|
| To: | Leible, Jason Aaron |
| Subject: | RE: interviews postponed |
| Date: | Tuesday, November 7, 2023 3:32:00 PM |

Thank you!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 3:32 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Yes, I can do Monday.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 3:30 PM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

███████ just emailed me saying he will be out of town on Friday…can you do 2:00pm on Monday 11/13? If so, then I will try to move one of our Friday students so that we don't have an hour in between the two.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 10:01 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Yes, I changed the date to 10 Nov for Friday.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                         | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 9:57 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

Here's what I am thinking, let me know if this works for you and then I can send their notices and will send you calendar appointments:

Wednesday, 11/8:
2:00pm –
3:00pm –

Friday, 11/10:
9:00am –
10:00am –
11:00am –

Will that work?

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 9:37 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Thursday, I have a Veterans day speech to do for a high school. 0750-1000hrs
1430hrs I have a meeting to attend.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 8:27 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

Good morning,

I'm back in the office sooner than expected. Can you please send me your availability for tomorrow through the end of the week? I will work on rescheduling our interviews from yesterday. I did also get the names of those who punched from the        so I will add a couple interviews for them as well.

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Monday, November 6, 2023 8:05 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Ok, thanks for letting me know.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)**  | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

| mobile:                | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 6, 2023 6:35 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** interviews postponed

Good morning,

I am going to have to be out of the office today (and likely for a couple of days), so the interviews are going to have to be postponed. I will reach out about rescheduling once I know when I will be returning to work.  I apologize for any inconvenience!

Best,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| From: | Winking, Audrey J |
|---|---|
| To: | Leible, Jason Aaron |
| Subject: | Re: interviews today |
| Date: | Thursday, November 2, 2023 7:10:04 PM |

We've got ██████████ at 1:00 Friday. I'll look at those other names tomorrow morning! Thanks!

Sent from my iPhone

On Nov 2, 2023, at 4:27 PM, Leible, Jason Aaron <jleible@corps.tamu.edu> wrote:

Checking on interview times for Friday. Want to make sure I am tracking all.

Also, 2x people we may want to talk with



I spoke with , if he knew anyone we might want to talk to.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:52 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews today

Yep I can get that pulled up for you to review before we start!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs |
Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:52 AM

**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Subject:** RE: interviews today

Was getting ready to head over, saw the change. On my way at 0900. If I could review the complaint and any information about the case?

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                    | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:50 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** interviews today

Good morning,

Just wanted to make sure you saw that I had to slightly adjust the interview times for this morning! So we start at 9:30 instead of 9.

See you in a bit!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs |
Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron
**To:** Winking, Audrey J
**Subject:** RE: rescheduling today
**Date:** Tuesday, November 14, 2023 9:03:15 AM

I think we can work with it.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 14, 2023 9:02 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: rescheduling today

Okay maybe we do this…

Please describe in detail any situations/instances that you've experienced that:
- you believe may have been hazing
- were concerning to you
- caused you to question what was happening

These may include, but are not limited to: making/remaking your rack over and over, rapidly changing uniforms, standing on the wall with 5 points at attention for extended periods of time, participating in "training" or "gentleman's" chow, having to use EST for Corps-related tasks, being asked to do Corps-related tasks during the academic day, etc.

Thoughts on that? If there's anything I missed that you think should be included in that list, let me know or feel free to add it!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 14, 2023 8:56 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: rescheduling today

Howdy Audrey,

I can do this, I spoke with ███████ and his concern is if we provided no context then we would get nothing back.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 14, 2023 7:52 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: rescheduling today

I will be back in the office tomorrow, so I am going to reschedule ███████ to Wednesday at 3pm! Let me know if that doesn't work for you.

When we've had cadets write statements in the past, it's been more broad (not a set of questions like we would do in an interview). So maybe something like this:

Please describe in detail any situations/instances that you've experienced that:
- you believe may have been hazing
- were concerning to you
- caused you to question what was happening

**Audrey Winking** | Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | audrey_winking@sco.tamu.edu | sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Monday, November 13, 2023 2:33 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: rescheduling today

Howdy,

No issues. I have not been in my office all this morning. I would like to have the questions to get them started and work it.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Sent:** Monday, November 13, 2023 7:38 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** rescheduling today

Good morning,

Since I got my new _____ late on _____ hasn't gotten set up yet, so I will be out today with her.  I will check in with the caseworker later today to try and make sure it gets submitted/approved today!  I will reschedule ▮▮▮▮▮▮ interview from today once I know when I will be back in the office.  Can you send me your availability for the rest of the week?

Also, I spoke with Dr. Bell and he said that it would be great if you can ask MSgt. ▮▮▮▮▮ to have the ___ in ___ submit written statements to him about anything that's taken place that they have found concerning.

Thanks so much!  And sorry I am out again and having to reschedule another one!

Best,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| From: | Leible, Jason Aaron |
|---|---|
| **To:** | Winking, Audrey J |
| **Subject:** | RE:    Investigation |
| **Date:** | Friday, October 27, 2023 11:19:49 AM |

Howdy Audrey,

I'll put them on my calendar.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 27, 2023 8:41 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE:    Investigation

I just sent calendar appointments for what I am planning on scheduling.  I plan on sending their interview notices out later today.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Winking, Audrey J
**Sent:** Wednesday, October 25, 2023 3:48 PM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE:    Investigation

Thank you!  My Monday afternoon is already full so I will plan on scheduling interviews for Tuesday and Wednesday (I will make sure to work around the times you listed below for those days).  I will probably have us hold Friday in case we determine we need to interview additional people after the Tuesday and Wednesday interviews.

I will try to get schedules confirmed tomorrow, but if not I will for sure get calendar appointments to

you Friday!

Thanks again,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 3:39 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:            Investigation

Audrey,

Howdy, I listed when I currently have hard times that I must meet for next week.

Monday – Meeting 0845-0945; Class 1020-1130
Tuesday- OPS&TRNG MTG 1430-1530
Wednesday – Class 1240-1330
Thursday
Friday

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)**  | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: | mobile:                | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, October 25, 2023 10:47 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:**            Investigation

Good morning,

I was told that you will be my co-investigator for the _____ investigation.  Would you mind sending me your availability for next week so that I can begin scheduling interviews? I will send you calendar appointments as I get them scheduled.

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

## Bell Jr, Douglas

**From:** Smith, Asia
**Sent:** Tuesday, March 19, 2024 4:24 PM
**To:** Bell Jr, Douglas
**Subject:** RE:


Thank you. I will officially assign it to Skylar tomorrow.

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, March 19, 2024 4:12 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**

Howdy,
I have placed the         investigation report in your intake folder.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

**From:** Doughty, Jeanae
**Sent:** Tuesday, January 17, 2023 8:27 AM
**To:** Bell Jr, Douglas
**Cc:** Upshaw-Brown, Jaclyn B
**Subject:** Investigation Report Submission
**Attachments:** FINAL Sample Investigtion Report -

Howdy,

Please find the completed investigation report related to the incidents involving                  attached.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# EXHIBIT 15



**THE TEXAS A&M UNIVERSITY SYSTEM**

---

**Contact Information**

Recruiters can reach out to you about this application using the public contact information from your worker profile below.

| | |
|---|---|
| **Email** | audrey_winking@sco.tamu.edu (Work) |
| **Phone Number** | |

**Experience**

| | |
|---|---|
| **Company** | Texas A&M University |
| **Title** | Student Affairs Coordinator |
| **Location** | Student Conduct Office |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | Supervision and training of full time administrative support staff. Student conduct case administration. Facilitate training and outreach opportunities. |

| | |
|---|---|
| **Company** | Texas A&M University |
| **Title** | Associate Coordinator |
| **Location** | Student Conduct Office |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | Supervision of graduate assistant, including hiring and training. Student conduct administration. Facilitate hazing prevention trainings, hazing education workshops, and ethics and decision making workshops. |

| | |
|---|---|
| **Company** | Texas A&M University |
| **Title** | Community Director |
| **Location** | Residence Life |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | Supervise resident advisors. Manage residence halls, keys, budgets, and more. Advise community council. Serve in on-call duty rotation. Plan events and programs for the on campus residents. |

| | |
|---|---|
| **Company** | Texas A&M University |
| **Title** | Graduate Hall Director/Graduate Resident Manager |
| **Location** | Residence Life |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | |

| | |
|---|---|
| **Replace the Experience information in my profile with this information** | No |

**Education**

| | |
|---|---|
| **Country** | United States of America |
| **School** | Texas A&M University |
| **Degree** | Doctorate |
| **Degree Received** | |



THE TEXAS A&M
UNIVERSITY SYSTEM

| | |
|---|---|
| **Field of Study** | Higher Education Administration |
| **First Year Attended** | 2018 |
| **Last Year Attended** | |
| **GPA** | |

| | |
|---|---|
| **Country** | United States of America |
| **School** | Texas A&M University |
| **Degree** | Masters |
| **Degree Received** | |
| **Field of Study** | Education Administration |
| **First Year Attended** | 2014 |
| **Last Year Attended** | 2016 |
| **GPA** | |

| | |
|---|---|
| **Country** | United States of America |
| **School** | Maryville University of Saint Louis |
| **Degree** | Bachelors |
| **Degree Received** | |
| **Field of Study** | |
| **First Year Attended** | 2010 |
| **Last Year Attended** | 2013 |
| **GPA** | |

| | |
|---|---|
| **Replace the Education information in my profile with this information** | No |

**Certifications**

none entered

**Language**

none entered

**Skills**

none entered

**Resume / Cover Letter**

**Questionnaire**

1. Default Primary Questionnaire - Internal Career Site 09/22

| Question | Answer(s) |
|---|---|
| If this position is located in the United States and you are selected, would you now or in the future require sponsorship for immigration-related employment authorization (e.g. H1-B, O-1, E-3, TN)? | No |



| Question | Answer(s) |
|---|---|
| Texas Government Code, Section 657, as amended, requires that a state agency or institution of higher education must provide employment preference to individuals who qualify for a veteran's employment preference. An individual who qualifies for a veteran's employment preference is entitled to a preference in employment with or appointment to a state agency or institution of higher education over other applicants for the same position who do not have a greater qualification.<br><br>You are not obligated to respond to State Veteran's Preference demographics; however, your response is important to meet federal and state reporting requirements. Information you provide will remain confidential in accordance with applicable federal and state regulations. Your employment will not be adversely affected by information you furnish.<br><br>Do you qualify for State of Texas veteran employment preference based on the four definitions below? | None of the above |
| I am 25 years of age or younger and was under the permanent managing conservatorship of the Texas Department of Family and Protective Services on the day preceding my 18th birthday. If hired and claiming foster child status, you will be required to provide verification of such status. | No |
| To comply with The Texas A&M University System policy on nepotism, answer the following question. Are you related to any current Texas A&M University System employee, official or regent? | No |
| If yes, state his/her name, relationship and the A&M System institution or agency. | |
| Have you ever worked for the State of Texas? | Yes |
| If yes, please indicate the agency and start/end dates of employment. | Texas A&M, August 2014-current |



| Question | Answer(s) |
|---|---|
| Application Terms and Conditions<br><br>I certify the statements made by me in this application and materials supplied by me as part of my employment application are true, complete and correct to the best of my knowledge and belief and made in good faith. I understand that any falsification, misrepresentation, or omission of fact made herein or at any point in the hiring process may (a) void my application, (b) be cause for denial of employment or immediate termination of employment, regardless of when or how it was discovered. I agree to revise this application should any of the information change.<br><br>I authorize Texas A&M System members to conduct checks relating to my employment, education and any licenses. I also authorize all current and prior employers to provide full details concerning my past employment and I release them from all liability that may result from providing such truthful information. I understand that this history check may be required as specified by the appropriate System Member.<br><br>The Texas A&M System members are at-will employers and may dismiss employees with or without cause. I understand that if employed by a member of The Texas A&M System I will be an at-will employee and may be dismissed from employment with or without cause unless I have a legally different status.<br><br>I understand that if I am male, I am required to sign a Certification of Registration Status for the Selective Service as a requirement for employment. I further understand if I am a male age 18 through 25, I must show proof of registration with Selective Service at the time of hire.<br><br>I understand that any offer of employment is contingent upon my completing the U.S. Citizenship and Immigration Services Form I-9 and providing documents to verify my identity and employment eligibility as required by law. When completing the Form I-9, I will be required to attest that I am a citizen or national of the U.S., a lawful Permanent Resident or an alien authorized to work.  I understand that as conditions of employment, I will be required to comply with U.S. export control regulations, clear a background check, and provide the TAMUS member all required employment documentation.<br><br>I acknowledge that by checking the certification statement below, I am ELECTRONICALLY SIGNING the Employment Application and affirming that information contained within this application is accurate and true. | Yes, I have read and consent to the terms and conditions |
| You have responded to the Term and Conditions that you do not consent, which will cause your application to be removed from consideration. | |



| Question | Answer(s) |
|---|---|
| Application Terms and Conditions<br><br>I certify the statements made by me in this application and materials supplied by me as part of my employment application are true, complete and correct to the best of my knowledge and belief and made in good faith. I understand that any falsification, misrepresentation, or omission of fact made herein or at any point in the hiring process may (a) void my application, (b) be cause for denial of employment or immediate termination of employment, regardless of when or how it was discovered. I agree to revise this application should any of the information change.<br><br>I authorize Texas A&M System members to conduct checks relating to my employment, education and any licenses. I also authorize all current and prior employers to provide full details concerning my past employment and I release them from all liability that may result from providing such truthful information. I understand that this history check may be required as specified by the appropriate System Member.<br><br>The Texas A&M System members are at-will employers and may dismiss employees with or without cause. I understand that if employed by a member of The Texas A&M System I will be an at-will employee and may be dismissed from employment with or without cause unless I have a legally different status.<br><br>I understand that if I am male, I am required to sign a Certification of Registration Status for the Selective Service as a requirement for employment. I further understand if I am a male age 18 through 25, I must show proof of registration with Selective Service at the time of hire.<br><br>I understand that any offer of employment is contingent upon my completing the U.S. Citizenship and Immigration Services Form I-9 and providing documents to verify my identity and employment eligibility as required by law. When completing the Form I-9, I will be required to attest that I am a citizen or national of the U.S., a lawful Permanent Resident or an alien authorized to work.  I understand that as conditions of employment, I will be required to comply with U.S. export control regulations, clear a background check, and provide the TAMUS member all required employment documentation.<br><br>I acknowledge that by checking the certification statement below, I am ELECTRONICALLY SIGNING the Employment Application and affirming that information contained within this application is accurate and true. | |

Questionnaire

TAMU_U9798_Student Affairs Coordinator

| Question | Answer(s) |
|---|---|
| Select the response that best represents your years of education. | Completed a Master's degree |
| Select the response that best represents your years of experience student affairs work or related specialty area. | 8 |

# Audrey Winking

## EDUCATION:

**Texas A&M University**                                    College Station, TX
    Ph.D. in Educational Administration                    Anticipated: May 2023

**Texas A&M University**                                    College Station, TX
    Master of Education in Educational Administration                May 2016
    Student Affairs Administration in Higher Education

**Maryville University**                                        St. Louis, MO
    Bachelor of Arts in Organizational Leadership – Cum Laude          December 2013
    Concentration:  Rehabilitation Services

**Regent's College**                                        London, England
    Study Abroad                                        June 2011

## EXPERIENCE:

**Texas A&M University – Student Conduct Office**                    College Station, TX
**Associate Coordinator**                                February 2020 – present
- Review reports for potential violations of the Student Code of Conduct
- Meet with students, witnesses, advisors, and other stakeholders to resolve cases and assign appropriate educational sanctions
- Hire, train, and supervise the Graduate Assistant
- Update and facilitate Hazing Education Workshops and Hazing Prevention Trainings
- Facilitate Ethics and Decision-Making Workshops
- Serve on various working groups and committees, including a multi-office group focused on establishing accommodations in the conduct process for Aggie ACHIEVE students, the Department Unity committee, the Professional Development and Staff Training committee, and a full-time staff search committee
- Additional responsibilities during Summer 2021, including but not limited to:
  - Supervise full-time staff members
  - Supervise, evaluate, and hire student employees
  - Review all incoming reports, determine potential rule violations, assign cases to staff
  - Process incoming investigation reports
  - Prepare paperless process for resuming in-person conduct conferences and panels
  - Draft and send all letters to students
  - Run analytics and sanction reports
  - Collaborate with campus partners for various presentations and trainings

**Texas A&M University – Residence Life**                    College Station, TX
**Community Director**                                        January 2016 – February 2020
- Supervise 1-2 Graduate Hall Directors
- Supervise 11-16 undergraduate Resident Advisors
  - Includes oversight of multiple buildings, including Corps dorms, for a total of 480-740 residents
- Work through the student conduct process and hold student conduct conferences in hall
- Collaborate with the Student Conduct Office on co-adjudications and serve on conduct panels
- Participate in an on-call duty rotation for all on-campus residence halls (approximately 10,000 residents)
- Refer students to various campus and community resources
- Facilitate training presentations for the RAs and GHDs
- Advise a Community Council and manage the budget (about $1000-$1300 per semester)
- Assist in the recruitment and selection of resident advisors
- Follow through with the department's accountability model for staff members
- Manage the facilities for summer conferences, including meeting with camp and conference sponsors
- Serve on two Residence Education committees (RA Training and Summer Operations)

**Texas A&M University – Residence Life**                    College Station, TX
**Graduate Resident Manager**                                May 2015 – December 2015
- Prepared the facility for opening Fall 2015 to house over 1200 primarily freshmen
- Hired and supervised undergraduate student workers (office assistants and resident advisors)
- Developed the RAs' programming model based on the department's academic initiatives
- Planned a program (with a $1000 budget) to take place the first week of classes to build community
- Established a community council for the White Creek Apartments, including recruiting members and officers, creating a constitution, and completing the steps for student organization recognition
- Advised the White Creek Community Council and managed the budget (about $2500 per semester)
- Supervised the 21 RAs' programming efforts (including budget) for the entire White Creek Apartments
- Worked through the student conduct process and held student conduct conferences
- Participated in an on-call duty rotation for on-campus apartments (approximately 2100 residents)
- Served on a Residence Education committee (RA Training and Development)

**Texas A&M University – Athletics**                         College Station, TX
**Center for Student Athlete Services Intern**               August 2015 – December 2015
- Worked one on one with 13 student athletes that were high-risk for losing NCAA eligibility
- Created Week at a Glance (WAG) charts for each athlete to help them keep up with coursework
- Completed administrative tasks around the office as needed when not meeting with an athlete

**Association for Student Conduct Administration (ASCA)**    College Station, TX
**Practicum Intern**                                         May 2015 – July 2015
- Assisted in planning the 2015 Gehring Academy, Title IX workshops, and webinars
- Began a historical project by doing research and setting up the methodology for collecting the data, as well as conducting interviews with the organization's original members

- Attended the Gehring Academy (July 2015) to assist throughout the conference, including helping with registration and set up/clean up
- Attended the ASCA Annual Conference (February 2016 and 2017) and assisted throughout the conference, including helping with registration and collecting items for and setting up the silent auction

**Texas A&M University – Residence Life**                        College Station, TX
**Graduate Hall Director**                                       August 2014 – May 2015

- Co-supervised staff of 15 resident advisors in two separate residence halls (about 450 residents)
- Advised two student organizations (hall councils)
- Served on a Residence Education committee (First Year Experience)
- Developed and used conflict resolution, mediation, and student conduct adjudication skills
- Understood and worked within the student conduct process
- Managed Hall Council and staff programming budgets
- Performed facility management duties, including managing keys for both residence halls
- Participated in duty rotation for half of the university's residence halls

## INVOLVEMENT:

- Conflict Mediation Certificate
- Green Dot Training (Bystander Intervention)
- QPR Training (Question, Persuade, Refer – Suicide Prevention Training)
- Gehring Academy Attendee – 2015, 2019 (Foundations), 2020 (Conflict Resolution), 2021 (Equitable & Inclusive Practices)
- ASCA Annual Conference Attendee – 2016, 2017, 2021
- ASCA Member – Association for Student Conduct Administration
- SWACUHO Conference Attendee (Southwest Association of College and University Housing Officers)
- ACUHO-I Annual Conference Attendee – 2016
- Summer Operations Committee Member
- First Year Experience Committee Member
- Community Director Selection Committee Member
- Resident Manager Search Committee Member
- Graduate Hall Director Selection Committee Member
- Resident Advisor Training and Development Committee Member
- Graduate Hall Director Training and Development Committee Member
- SWACURH 2015 Advisor – Dining and Hospitality Committees (Southwest Affiliate of College and University Residence Halls)
- National Night Out (Texas A&M University Campus Safety Week) Committee Member and Volunteer
- AFSAP Member – Association of Future Student Affairs Professionals

3

# MARK TAPLETTE, ED. D.

Phone:

## PROFESSIONAL PROFILE

- Accomplished career demonstrating consistent success as an Administrator and Educator at the secondary and higher education levels. Outstanding record of accomplishment in assuring student success.

- Seasoned in conceiving and building programs from the ground up through proven competencies in grant writing and administration, project and program management, and staff development and empowerment.

- Extensive background of developing and implementing special programs for at-risk and special needs students

- Effective communicator with excellent planning, organizational, and negotiation strengths as well as the ability to lead, reach consensus, establish goals, and attain results.

## EDUCATION

**EdD** Azusa Pacific University, Azusa, CA, Educational Leadership/Administration, December 2005 Dissertation: *"Factors Affecting Retention and Graduation of Black American Football and Basketball Players at Division I-A, Revenue-Producing Institutions"*

**MS** The Criswell College, Dallas, TX Theology, May 1999

**BS** Texas A&M University-Commerce, Public Administration Minored in Sociology, December 1983

## PROFESSIONAL EXPERIENCE

**Laura Burrell GO Center/Bryan, Texas**                    2022 to 2023
**Program Director**
- Provide on-going leadership and effective direction to all aspects of area network.
- Program development and grant writing.
- Working with College Bound students on college admission requirement, testing, and financial aid.
- Working with Board of Director to accomplish local mission.
- Supervision and training of volunteers.
- Make recommendations to management on policy and procedures changes.
- Annual development and implementation of the budgetary plan.

M. Taplette - 1

**Sam Houston State University/Huntsville, Texas**                          2020-2022
**Assistant Director of Greek Life**

- Provide comprehensive advising leadership to 30+ social Greek-letter organizations, Interfraternity Council, Multicultural Greek Council, National Pan-Hellenic Council, Panhellenic Association, and the Greek honor society Order of Omega.
- Develop and maintain educational workshop series for Greek students focusing on leadership, chapter development, wellness programs, risk management and risk-reduction education, community service initiatives, and membership recruitment.
- Serve as a liaison to inter/national offices, chapter advisors, faculty advisors, housing corporations, alumni, and members of the University community.
- Advise the coordination of formal and informal fraternity and sorority recruitment efforts.
- Oversee data collection and database management for fraternities and sororities. Maintain active and current records on membership, conduct matters, retention, and scholastic achievement of all Greek-letter organizations.
- Assist the Associate Dean with the coordination and oversight of Greek traditional events, including Greek Week, the Greek Awards program, and Bearkat Bolt 5K.
- Serve as a member of the Dean of Students Office department leadership team providing support to other areas within Dean of Students Office, assisting in the planning and coordination of University traditions such as Bearkat Family Weekend and Homecoming.
- Help manage University's Greek standards.
- Be able to create PR and marketing content related to the Greek life office, i.e. booklets, pamphlets, videos, etc.
- Be one of the sole account users of all office related social media accounts.
- Act as a student advocate, providing personal advice and appropriate referrals to students seeking assistance.
- Be willing and able to travel with students or alone to various conferences.

## PUBLICATIONS

### *Journal Papers in Review*

- Taplette, M.T., "Review of *Colormute* by Mica Pollock," Submitted to Childhood Education, vol. 83, no. 3, 2007, pp. 181-186.

## PRESENTATIONS

### Paper Presentation

- "Minority Males and College Athletics," Graduate Symposium Azusa Pacific University, December 2020.
- "*Minority Athletes at Division I-A Institutions: Should they be paid?*" Texas A&M University, May 2016.

**Keynote Address**
- "Making it Work: Keys to Success for Minority Students on Predominately White Universities," Black College Professionals Conference, May 2018.

**Workshop**
- "Student Success in the 21st Century," Moorpark College Student Success Day, May 2022.
- Taplette, M. (2019), "Staff Development for Mid-Career Faculty." Presented at the Bryan ISD staff development conference, Bryan, TX.
- Taplette, M. (2017), "Youth Suicide Prevention." Presented to Brazos County Public School Special Education Teachers in In-service Day, Bryan, TX.
- Taplette, M. (2016), "Creating Effective Schools," seminar at the Association of Professional Educator of Texas, Austin, TX
- Special Education Facilities In-service Conference, Bryan, TX.

---

## PROFESSIONAL TRAINING

National Workforce Institute
NASPA/SACSA Mid-Managers Institute, Participant, Duke University
NASPA Doctoral Students Workshop, St. Louis, Missouri
Student Activities Diversity Committee, Chair, Criswell College
Upward Bound Program, Mentor, East Texas State University
Intercultural Leadership Seminar, facilitator, Howard Payne University
University Retention Initiative, Co-Chair, Howard Payne University
Department of Residence Life Diversity Committee, Texas A&M University
Department of Residence Life Resident Advisor Training Class, Facilitator, Texas A&M University

## PROFESSIONAL AFFILIATIONS

Southern Association for College Student Affairs
National Association of Student Personnel Administrators

## COMMUNITY SERVICE

**Save our Streets Ministry**
Board of Directors, Bryan, TX, February 2003 to Present

**Pop Warner Little Scholars**
Regional President, Brazos Valley, May 2007, to May 2014

**Boy Scouts of America**

Assistant Scout Leader Troop 976, Bryan, TX, 2005 to 2013

## LANGUAGES

**English**: Native Language

**Spanish**: Intermediate Listener, Novice Speaker

## COMPUTER SKILLS

- Microsoft Office
- Spreadsheets
- PowerPoint
- Microsoft Access
- QuickBooks
- Email
- Web and Social Skills
- Graphic and Writing Skills

## REFERENCES

**John Yarabeck,** Dean of Students
Campus Life & Student Relations
McMurry University
1400 Sayles Blvd.
Abilene, TX  79605
936-577-1444


**Dr. Rachael Valle,** Director
Student Activities
Sam Houston State University
1905 University Avenue
Huntsville, TX 77340
936-294-3588
**Rachael.Valle@shsu.edu**

**Dr. Jerrell Sherman,** Associate Dean
Dean of Students Office
University of Houston
4455 University Dr.
Student Center South RM 256
Houston, TX 77204-3035
713-992-0038
jsherman6@uh.edu

**Dr. Michael Thornton**, Clinical Assistant Professor
Health & Kinesiology
 Texas A&M University
332 Blocker
College Station, TX 77843
(979) 845-3109
mthornton@tamu.edu

**Dr. John Singer**, Tenured Professor
Health and Kinesiology
Texas A&M University
355-B Blocker
804 E Harrington Office Building
College Station, TX 77843
(979) 845-5497
singerjn@tamu.edu

M. Taplette - 5

# EXHIBIT 16

## FRANK WOOD

PRI Email: fcwood@corps.tamu.edu
ALT Email:

## Objective

To earn a Doctorate in Education (Curriculum & Instruction) to collaborate with the Hollingsworth Center improve the SOMs curriculum and overall delivery of the leadership pedagogy at TAMU.

## Summary

- One year as a Corps OPS Coordinator II/Military Advisor and SOMs instructor with Office of the Commandant TAMU
- Three years as a Cadet Training Officer III and SOMs instructor with Office of the Commandant TAMU
- Seven years as a US Army JROTC Army Instructor
- 30 years of experience in Leadership and Training in the US Army.
- Developed and implemented training and special programs for Combined Arms Operations.
- Evaluated and managed Personnel Specialists to ensure performance objectives were met consistently.
- Experienced in Information Technology and proficient in working with Digital Projectors and Video Camera systems, Microsoft Suite, the Army C4ISR and battle command automated systems including FBCB2, MCS, MBTR, ASIP, BFT.
- Recognized numerous times for outstanding job performance.

## Education

- Currently enrolled in Ed D Cohort XIV EDCI TAMU (4.0 gpa)
- Graduate of Basic and Advanced JROTC School of Cadet Command Instructor Certification Course, Fort Knox, KY
- Graduate, M. Ed, C&I, TAMU, College Station, TX (3.8 gpa)
- Graduate, BS degree, Liberal Arts, Excelsior College, NY (3.5 gpa)
- Graduate, AA degree, General Study, Central Texas College, TX (3.0 gpa)
- Command Sergeant Major Training, Fort Leavenworth, KS
- US Air Force Sergeants Major Course, Maxwell-Gunter Annex, AL
- First Sergeant School, Fort Bliss, TX **(Commandants' List)**
- Fast ROPE Master training, Fort Campbell, KY
- Sabaluaski Air Assault School, Fort Campbell, KY **(Distinguished Graduate)**
- Small Group Leader Instructor Trainers Course, Fort Bragg, NC
- Maneuver Senior Leaders Course, Fort Benning, GA **(Commandants' List)**
- Pathfinder School, Fort Benning, GA
- Advanced Airborne Course (Jumpmaster), Fort Bragg, NC
- Air movement Operations Course, Fort Bragg, NC
- Ranger School, Fort Benning, GA
- TRADOC Small Group Instructor Trainer school, Fort Jackson, SC
- Drill Sergeant School, Fort Jackson, SC **(Commandants' List)**

- Infantry Advanced Leaders Course, Fort Benning, GA **(Commandants' List)**

## Work Experience

Corps OPS Coordinator II/1st BDE Military Advisor, Office of the Commandant TAMU, College Station TX JUL 2020-Currently Supervisor: John Fleming Asst CMDT OPS & TRNG (979) 862-4311; jfleming@corps.tamu.edu Contact: Yes

Assists the Commandant, Deputy Commandant, and Assistant Commandants with the oversight of daily operations, facilities, services, and activities which contribute to missions of the Office of the Commandant and the Corps of Cadets, the learning environment and overall quality of cadet life. Ensures appropriate dining hall practices, customs, etiquette, and decorum are observed and maintained. Serves as an advisor to the Duncan Dining Council. Approves and supervises unit physical training programs. Conducts periodic dorm room, uniform, and individual inspections of cadets to ensure compliance with Corps Policies and The Standard. Assists cadets at the Unit, Major Unit, and Corps Level in the planning and conduct of events to include, but not limited to Corps Trips, parades, reviews, ceremonies, and march-ins. Advise, recognize and sponsored Student Organizations. Responds and coordinates action during contingencies and emergencies. Keeps the Commandant, Deputy Commandant, and Assistant Commandant for Operations and Training informed of serious incidents and problems. Represents the Assistant Commandant for Operations and Training in his/her absence and makes decisions as delegated.

- Capably schedules and advises the cadet supervision the Freshman Orientation Week event that efficiently and effectively assists over 700 incoming cadets assimilate and inculcate into the cadet and academic experience of TAMU.

- Expertly instructs two sections of SOMs and manages the curriculum, content, delivery, and scheduling of SOMs 181 sections.

- Diligently performs 24-hour duty and oversight of the Quad as the Commandants Duty Officer.

- Routinely performs march in support and sideline oversight to support the boot line and other student activities during all home and select football games.

JROTC Army Instructor, "Eagle Battalion" CE Ellison HS, Killeen TX AUG 2012-JUN 2020 Supervisor: Elise Jacko AP – (254) 336-0600; Elise.Jacko@killeenisd.org Contact: Yes

Annually educates over 200 high school students in the areas of leadership, academics, athletics, while motivating them to be better citizens. Coached and sponsored special performance and exhibition teams in synchronized drill and ceremonies and academic challenges for Military Skills Meets and competitions across the great state of Texas. Worked diligently to earn the Honor Unit award for one Annual Formal Inspection and the most recent JROTC Program Accreditation.

- Developed strategies to ensure the JROTC program surpassed accreditation standards and earned distinguished ratings.

- Implemented an interactive journal for all cadets in all grades to develop reflective thinking skills and improve academic rigor.

- Coached and mentored three cocurricular competition teams that routinely competed and won titles across the state of Texas.

Command Sergeant Major, 1-8th Calvary Regt, Fort Hood, TX Aug 2010 – Jul 2012
Supervisor: COL Sicoli, Peter – (516) 376-7386; peter.a.sicoli.mil@mail.mil;  Contact: Yes

Mentored and influenced for over 1100 men and women in Combined Armed Battalion Combat team during Garrison and combat operations.  As a top senior enlisted executive manager, provided sound advice to the Commander on all matters pertaining to enlisted personnel including assignment, training, education, professional development, morale, welfare, and performance evaluation.

- Directly responsible for this organization earning the Meritorious Unit Citation for successful transition of U.S. Forces in support of Operation New Dawn, Iraq.

- Developed and implemented the battalion Abrams Tank and Bradley IFV resulting in 100% crew qualification and 97% 1st time qualification rates.

- Commended by the 1st Cavalry Division Deputy Commanding General-Maneuver for his expert training and evaluation of six infantry platoons during combined arms live fire exercises.

- Prepared and led five leader professional development sessions on topics about the history of Iraq, ethnic diversity in the Diyala and sectarian fault lines of the Iraqi Northern provinces, and so was recognized as the most technically and tactically proficient battalion command sergeant major in the brigade.

- Managed the battalion volunteer recognition ceremonies and organization celebrations that honored the soldiers and their families for providing dedicated service to our community, greatly increasing esprit de corps, morale, and camaraderie.

G3 Operation SGM, 7th US Army JMTC, Grafenwoehr, Germany, Nov 2009 - Aug 2010
Supervisor: CSM (ret) ZaGara, Darieus – (304) 535-5394;  darieus.a.zagara.mil@mail.mil;
Contact: Yes

Responsible for all garrison operations and functions related to soldier and family fitness, soldier and family readiness, continued soldier education programs while serving in a community of over 38,000 soldiers, family members, and civilians. Advises and mentors the commanders, panel chairs, and community representatives overseeing all community and garrison functions for the commanding general. Provided oversight, synchronization, and coordination for all the command's special projects, and community relations.

- Directly responsible for the lead the effort to establish historical displays spanning the 100 years of Grafenwoehr Training Area in support of the centennial celebration.

- provided much needed experience regarding Soldiers and their struggles during Community Health Promotion Council and Risk Reduction Program meetings thereby enhancing the programs.

- established a much-needed bridge between many of the community panels/advisory committees and Soldiers and Family's resulting in

- presented invaluable input in support of Warrior University that was an absolute success in supporting post deployment soldiers training in achieving college credit.

Command Sergeant Major, 2/2 Stryker Cavalry Regt, Vilseck, Germany, APR 2006– Nov 2009
Supervisor:  MG Jones IV, Omar--(571) 358-4420; omar.jones.mil@mail.mil; Contact: Yes
Supervisor:  COL (ret) Reineke, Myron -- (913) 705-0311; myron.reineke.civ@mail.mil; Contact: Yes

Mentored and influenced for over 900 men and women in a Stryker Infantry Squadron during Garrison and combat operations. As a top senior enlisted executive manager, provided sound advice to the Commander on all matters pertaining to enlisted personnel including assignment, training, education, professional development, morale, welfare, and performance evaluation.

- Directly responsible for this organization earning the Valorous Unit Award for combat operation during the U.S. Forces surge in support of Operation Iraqi Freedom, Iraq.

- Implemented systems for administrative management that resulted a near perfect176 of 177 or 99.4% of annual enlisted evaluation reports being processed on time.

- Executed a program that efficiently deduced NCO education back log sending 473 soldiers to all levels of leader professional development school and motivated 159 of them to graduate with honors.

- Actively involved in effort to make Composite Risk Management along with the Risk Reduction Program habitual across the formation; resulting in early identification and intervention with high risk Soldiers

- Expertly evaluated 6 rifle platoons during live-fire exercises in Bulgaria in support of a USAREUR Theater Security Cooperation deployment exercise

- Consistently recognized and commended as one of the best of six senior enlisted advisors in the Regiment.

- Time and again sought innovative techniques and procedures to solve training and operational dilemmas and then codified those lessons into standard operation procedures that would be adopted as the regimental standard.

# Lt Col Jeffery D. Gardner

## Curriculum Vitae

_____

## Education

BS in Mechanized Agriculture Texas A&M University 1982

MPA in Public Administration Troy State University 1990

Squadron Officers School 1987

Air Command and Staff College 1996

Armed Forces Staff College 1996

Air War College 1999

Air Force Academic Instructor School 2003

Texas A&M Student Conduct investigator/panel member training 2007

Texas A&M SASH panel member training 2012

Gehring Academy 2023

## Teaching Experience

Squadron Officers School 1993-1995

Air Force ROTC Texas A&M University 2003-2007

School of Military Science Texas A&M University 2007-Present

## Professional Experience

Corps Accountability and Standards Director 1 October 2023-Present

Director, Sanders Corps of Cadets Center, Office of the Commandant, Texas A&M 2008-2023

First Wing Cadet Training Officer, Office of the Commandant, Texas A&M 2007-2008

Professor of Aerospace Studies, Air Force ROTC, Texas A&M 2006-2007

Assistant Professor of Aerospace Studies, Air Force ROTC, Texas A&M, 2003-2006

Command Center Operations Chief, National Airborne Operations Center, Offutt AFB 1999-2003

Chief, SIOP Training, Cheyenne Mountain Air Station, 1996-1999

Operations Officer, Squadron Officers School, Maxwell AFB, 1993-1995

Chief, Command and Control Inspections, USAF Europe, Ramstein AB, 1990-1993

Chief, Command Post, RAF Bentwaters UK, 1987-1990

Instructor ICBM Combat Crew Commander, Malmstrom AFB, 1986-1987

ACP/SCP ICBM Combat Crew Commander, Malmstrom AFB, 1985-1986

Instructor ICBM Deputy Combat Crew Commander, Malmstrom AFB, 1984-1985

| From: | Gardner, Jeffery D |
|---|---|
| To: | Fleming, John D; Schlather, Byron L |
| Subject: | Fwd: Outcome Letters |
| Date: | Wednesday, February 8, 2023 6:19:35 AM |
| Attachments: | ▮ SCO Final Outcome Letter.pdf |
| | ▮ 08 01 01 Final Outcome Letter Respondent Copy.pdf |
| | ▮ SCO Final Outcome Letter.pdf |
| | ▮ 08 01 01 Final Outcome Letter Respondent Copy.pdf |

FYI. We need to discuss if these cadets will return to their outfit.

V/R

Begin forwarded message:

> **From:** "Reilly, Michael" <mreilly@navy.tamu.edu>
> **Date:** February 7, 2023 at 5:48:00 PM CST
> **To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>, "BEATY, GARY" <gbeaty@corps.tamu.edu>
> **Cc:** "Fleming, John D" <jfleming@corps.tamu.edu>, "Marsh, Scott" <smarsh@navy.tamu.edu>, "Mullenberg, Jason" <jmullenberg@navy.tamu.edu>
> **Subject: Fwd: Outcome Letters**
>
> Gary and Jeff,
>
> Please see the attached SCO and Title IX results for ▮ and ▮ .
>
> Both of these cadets have displayed appropriate repentance and I'd like for them to resume their life in the Corps as soon as possible.
>
> I don't have any of the results for other cadets.
>
> Thanks,
> Mike
>
> Semper Fi,
> Col Michael D. Reilly
>
> Begin forwarded message:
>
>> **From:** "Quandt, Kathryn" <kquandt@navy.tamu.edu>
>> **Date:** February 7, 2023 at 17:08:23 CST
>> **To:** "Reilly, Michael" <mreilly@navy.tamu.edu>
>> **Subject: Outcome Letters**

Good Afternoon, Sir,

As requested.

Respectfully,

**Kathryn Quandt**
Captain | USMC
Marine Officer Instructor | NROTC | Texas A&M University
(979) 845-1775
(979) 458-6066

- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

From:         Fleming, John D
To:            Anderson, Chauncy Jovan
Cc:           Schlather, Byron L
Subject:    FW: Cadet ██████
Date:        Wednesday, February 8, 2023 10:50:06 AM

MSgt,

      FYI below on ██████ .

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, February 8, 2023 10:39 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Cadet ██████

Sir,

      We conducted a conduct hearing for the failed urinalysis test for Cadet ██████████ , a ██████ in ██████ He provided a list of prescribed medications he takes for back pain. I consulted a pharmacist and determined the combination of prescribed medications can result in a false positive THC test. The cadet has agreed to participate in future random or directed drug tests. I believe this is a false positive and the matter is closed.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**- 461 -**

From: Fleming, John D
To: Gardner, Jeffery D
Cc: Michaelis, Patrick Ralph; BEATY, GARY; Schlather, Byron L; Anderson, Chauncy Jovan
Subject: Urinalysis results
Date: Monday, January 30, 2023 4:32:18 PM
Attachments:

---

Jeff,

One positive result from our 23 Jan urinalysis, see attached.  Cadet ▮▮▮▮▮ is a ▮▮▮ in Pop is for THC.

There is also one cadet who was on the roster and notified Sunday night 22 Jan, but then he had to leave campus in the middle of the night for a family emergency.  He is still at home in ▮▮▮ He will provide his sample upon return.

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Michaelis, Patrick Ralph |
| **Cc:** | BEATY, GARY; Fleming, John D; Schlather, Byron L |
| **Subject:** | |
| **Date:** | Tuesday, February 21, 2023 2:27:59 PM |
| **Attachments:** | |

Good afternoon Sir,

The attachment contains the members of        that are being charged.  Student Conduct office has determined this to be low level hazing and as such, has given those charged three options:

      (1) Accept responsibility for all charges and accept the sanctions listed below

      (2) Choose not to contest the charges and accept the sanctions listed below.

      (3) Request a Student Conduct Conference to contest the charges.

The sanctions identified by Student Conduct include:

1. Conduct Review through Friday, May 12, 2023.
2. Corps Conduct Review through Friday, May 12, 2023
3. Hazing Education Workshop (HEW), due Friday, April 28, 2023.

I am standing by for your questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| From: | Gardner, Jeffery D |
|---|---|
| To: | Michaelis, Patrick Ralph |
| Cc: | BEATY, GARY; Fleming, John D; Schlather, Byron L; Regan III, John M |
| Subject: | Additional      charges |
| Date: | Thursday, February 23, 2023 1:35:00 PM |

Good afternoon Sir,

An additional      cadets from      were charged today for hazing resulting from the investigation.  These cadets are not facing dismissal from the University. The cadets are:

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

Sir,

       Yesterday we held a conduct conference for Cadet █████████,        He was found responsible for hazing with        and has been placed on Conduct Review until 12 May 2023.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

Sorry.  Probation until Dec 2023.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:33 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** RE:

Thank you Sir.

?

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:29 AM
**To:** Fleming, John D <jfleming@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** RE:

Here you go.  We need to discuss the future of the        on probation.

██ - one year suspension-withdrew from the university
███ - one year suspension
███ - one year suspension
███ - one semester suspension
███ - one semester suspension
██ - Probation

 - Probation
- Probation
- Probation

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:25 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** RE:

Jeff,

I have lost count on these.  Can you please give us a full paybook on the ⬛⬛⬛⬛ and their status.

Chief,

For all cadets whose suspension from the University has been upheld, are we cleared hot to inform them of their Corps dismissal and have them start checkout?

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:08 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Reilly, Michael <mreilly@navy.tamu.edu>
**Subject:**

Sir,

I received the following results of the ⬛⬛⬛ appeals.

 - Suspension from the University until 29 Dec 2023

- Suspension from the University until 31 May 2023

- Conduct probation- there was no end date in the letter, so I am checking with Title IX.

- Suspension form the University until 31 Dec 2024

- Suspension from the University until 29 Dec 2023

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| From: | Gardner, Jeffery D |
|---|---|
| To: | Fleming, John D; Schlather, Byron L |
| Subject: | Fwd: College Station - On-Campus Residence Hall - 04/07/2023 1:15 AM |
| Date: | Friday, April 7, 2023 11:29:30 AM |
| Attachments: | |

FYI.

Begin forwarded message:

**From:** "Upshaw-Brown, Jaclyn B" <jaclynu@sco.tamu.edu>
**Date:** April 7, 2023 at 8:56:16 AM CDT
**To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>
**Subject: FW:** **College Station - On-Campus Residence Hall - 04/07/2023 1:15 AM**

Sharing this with you; there are no names as of now. Res Life may also be following up to see if they can provide further information.

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Kaitlin Kopf (via Maxient) <notifications@maxient.com>
**Sent:** Friday, April 7, 2023 2:37 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** College Station - On-Campus Residence Hall - 04/07/2023 1:15 AM

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

**Campus Community Incident Report**
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

**- 469 -**

**2023-04-07**
Time of incident
**1:15 AM**
Location of incident
**On-Campus Residence Hall -**

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**was just arriving to the dorm around 1:15 am when she got to the stairwell, about 4 or 5 corps boys were giggling and running very quickly and loudly down the stairs. They all went into the 1st floor hallway with the rest if the boys. They moved quickly, but             got a glimpse of about 3 of them, the one who dropped the table had dark hair and a white shirt, looked to be Caucasian, the other two had shaven heads, also Caucasian, one with dark hair and one with lighter, blonder hair. None of them were wearing shoes. The residents of                              then heard a loud pop sound from the hallway.         had just gotten to the top of the stairs when the residents came out of their rooms to see what was happening.        noticed an exploded water bottle with a small bag inside and a foamy substance and water around it. She spoke with Resident                        about the first explosion, how the water bottle was smoking and smelled of chemicals.        looked around and found a second bottle, still building the pressure to pop.        called the RA on duty,                  .        turned to walk back to her room and heard the loudest sound she's ever heard.        ear drum almost burst, it hurt for at least 10 minutes after, she couldn't hear out of her right ear for about 7 minutes and had just had a lot of ear pain. Floor partner,                        came out to see.          arrived and called noticed a light fixture had been tampered with, noting the same people who threw the water bottles probably broke the light as well. The light's plastic clover was on the floor.          believes it was an attack from the below Corps floors, specifically the first floor as she saw them running down the stairs to the first floor.**

**             has noted a few times in the past where corps members have had animosity towards the**

**Supporting Documentation**
70254150642e3d19dd7609b4135a8f8b1dd4155300c.heic
img5592.heic
img5593.heic
img5594.heic
img5595.heic
img5596.heic
img5597.png
*For added security, these links will expire in 10 days. The attachments will remain accessible when viewing the report within Maxient.*

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**Replies will be sent to the submitter (katie.kopf@tamu.edu).**

Good Afternoon Sir,

As stated in my previous email, I ask that you provide me with any statements you may have that lists specific potential violations. If you have names, please include them. I understand that you have doubts and concerns about retaliation. I can assure you that if the unlikely act of retaliation does occur, it will be dealt with swiftly and appropriately.

Until I am provided with statements of potential specific violations, I have nothing to move forward with.

Respectfully,


**GySgt John M. Regan III USMC (Ret)** | 1ˢᵗ Regiment Military Advisor/CCMU Advisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-4279 I jregan@corps.tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders



**From:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Sent:** Tuesday, August 22, 2023 2:37 PM
**To:** Regan III, John M <jregan@corps.tamu.edu>
**Subject:** Re: Hazing


**This Message Is From an External Sender**
This message came from outside your organization.


GySgt Regan:

I assumed that was the response I would receive, and, with all do respect, based on what has occurred I have zero trust that this would be handled in a manner that would allow a cadet to continue in the Corps after making such a report.

It's very disappointing that the Corps doesn't have a way for a cadet to report such issues anonymously without fear of retaliation.

We were sold on the Corps for the leadership development and tradition, but I'm not sure how forcing immorality and criticizing spirituality and religious beliefs can possibly develop better leaders.

On Tue, Aug 22, 2023 at 2:01 PM Regan III, John M <jregan@corps.tamu.edu> wrote:

> Good Afternoon Sir,
>
> My name is GySgt John Regan and I currently serve as the 1st Regiment Military Advisor, and member of the Commandants Staff. As per your email, you have serious concerns about things that may be occurring in         .  If you have statements that lists specific violations, I encourage you to send them to me so that I may begin an initial inquiry.  Holding on to them will not help us in identifying and correcting potential issues/violations.
>
> I also ask that you send any further correspondence directly to me.
>
> Respectfully,
>
> **GySgt John M. Regan III USMC (Ret)**  | 1st Regiment Military Advisor/CCMU Advisor
> Office of the Commandant | Division of Student Affairs | Texas A&M University
> 1227 TAMU | College Station, TX 77843-1227
>
> ph: 979-458-4279 I jregan@corps.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - - -
> **Corps of Cadets** | We Make Leaders
>
> ---
>
> **From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
> **Sent:** Tuesday, August 22, 2023 11:35 AM
> **To:** Regan III, John M <jregan@corps.tamu.edu>
> **Subject:** Fwd: Hazing
>
> I think this one is for you
>
> Sent from my iPhone

- 473 -

Begin forwarded message:

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Date:** August 22, 2023 at 11:15:36 AM CDT
**To:** "Ornelaz, Desiree A" <dmercado@corps.tamu.edu>
**Subject: Fwd: Hazing**

**This Message Is From an External Sender**

This message came from outside your organization.

---------- Forwarded message ----------
From: ▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮
Date: Tue, Aug 22, 2023 at 11:12 AM
Subject: Hazing
To: ▮▮▮▮▮@tamu.edu ▮▮▮▮▮▮@tamu.edu>
Cc: <dmercado@corps.tamu>

Mr. ▮▮▮▮ :

You need to get your house in order. The Corps' sales pitch was great, but the execution is horrible. For a leadership organization to work, your upperclassmen should set an example of the high moral character you say you desire. You have a lot of work to do to really develop a culture rooted in excellence, character and pride.

Please speak to your Pissheads and upperclassmen as there have already been violations that could be the end of some student careers, and your legacy as the commanding officer of your unit will be tarnished.

I have statements that I will send to the leadership, if necessary, specifically outlining incidents that would result in disciplinary action. As you can imagine, I won't give specifics now, because I'm afraid of how you and your buddies may use it against people in your unit.

Remember, our students should believe that they can trust and look up to the leadership, and I really had the feeling that they could - but I am left extremely disappointed on the second day of class. Set a better example.

Sincerely,

A concerned and very motivated parent

Thanks Kevin.

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, August 29, 2023 8:54 AM
**To:** Brummett, Kevin L <kbrummett@corps.tamu.edu>; Fleming, John D
<jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>
**Cc:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: Cadet ▮▮▮ ,

I talked to the outfit and ▮▮▮ yesterday afternoon during training time.  We received a "tell
someone'  Report regarding her. I'll be interested to hear what the command team has to say.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Brummett, Kevin L <kbrummett@corps.tamu.edu>
**Sent:** Tuesday, August 29, 2023 8:42 AM
**To:** Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>;
Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Cadet ▮▮▮

Sir,

I just finished talking to the ▮▮▮ about the concerning hazing statement in this survey.  Cadet
▮▮▮ is going to present a plan of action to our team and Lt Col Gardner today.  In it, it should
detail what happened, what steps they have taken to fix the solution, a way forward for retraining to

**- 475 -**

make sure it doesn't happen again and repercussions for the Cadets who                          about the situation and posted it to the outfit.  I believe it can be dealt with at the Wing/Minor Unit Level and teach a good lesson to all, but I wanted to make sure that Lt Col Gardner was in the loop, and you had a heads-up if the Commandant or Meredith asked any questions.

Because I will be out of the office the next couple of days, I wanted to let you know it was being covered and that            should be reporting this via email to our CAT team and Lt Col Gardner before the end of today.

Lt Col Gardner, please let me know if you have any questions or guidance moving forward to assist these Cadets in taking care of this issue.

**v/r,**

**CPT Kevin L. Brummett USA (ret.)**  | 3rd Group Operations Advisor
Office of the Commandant | Operations and Training | Texas A&M University
Harrell Hall,                    | 1227 TAMU College Station | TX 77843-1227

ph: 979.458.4406 |                          | kbrummett@corps.tamu.edu
**TEXAS A&M UNIVERSITY** | We Make Leaders

| | |
|---|---|
| **From:** | Ornelaz, Desiree A |
| **To:** | Schlather, Byron L |
| **Cc:** | Fleming, John D |
| **Subject:** | FW: |
| **Date:** | Tuesday, September 19, 2023 3:33:42 PM |

Good Afternoon Sir,

This is what John and I received from LtCol Gardner.

**GySgt Desiree A. Ornelaz USMC (Ret)** | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, September 19, 2023 2:18 PM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:      allegations

I don't think so.  We can discuss tomorrow if you like.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Tuesday, September 19, 2023 11:22 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      allegations

Good Morning Sir,

I was unaware of allegations against       Do you need anything from my end as the operations advisor?

**GySgt Desiree A. Ornelaz USMC (Ret)** | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |

- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, September 19, 2023 10:56 AM
**To:** ▓▓▓▓▓▓@email.tamu.edu; ▓▓▓▓▓▓▓@email.tamu.edu; ▓▓▓▓▓▓▓
<▓▓▓▓▓▓@email.tamu.edu>
**Cc:** Regan III, John M <jregan@corps.tamu.edu>; Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:**       allegations

All,

        We have received an allegation of hazing in ▓▓▓ .  I need to meet with all your ▓▓▓▓▓ that are not in class tomorrow at 1600 in room 203 of Ash 1.  ▓▓▓▓▓ and ▓▓▓ I would like for you to attend and run the meeting.  Let me know if you have questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

- 478 -

| From: | Schlather, Byron L |
|---|---|
| To: | Gardner, Jeffery D |
| Cc: | Fleming, John D; Washington, Robert Sykes; Simpson, Meredith M |
| Subject: | FW: ███████ , UIN ███████ |
| Date: | Wednesday, October 25, 2023 10:37:00 AM |
| Attachments: | ███████ |

Jeff,

FYSA. Jeff Wilson from ResLife indicated that former cadet ███████ 's mother has "made comments about the 'horrible things' that happened to her son over the past several months while he was in the Corps..." and may be making an official complaint in the future. He didn't mention any of this in his resignation survey or resignation form (both attached). I just wanted you to be aware in case you get a call from SCO (or someone else).

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

From: Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
Sent: Wednesday, October 25, 2023 10:16 AM
To: Schlather, Byron L <bschlather@corps.tamu.edu>
Subject: RE ███████ , UIN ███████

Thank you. Just a heads up, but we have now had several conversations with the Mom (called several offices here and I spoke to her yesterday as well)...who made comments about the "horrible things" that happened to her son over the past several months while he was in the Corps (to include the ███████ that he received). Sounded like they were getting ready make an official complaint on this.

This student has been assigned to temporary space in the ███████ If you look in StarRez, you should see this "tentative" booking (which means he has not completed the move-in yet)

Thanks

**Jeff Wilson '84** | Associate Director
Housing Assignments Office | Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-0000

ph: 979.845.4744 | toll free 888.451.3896 |email: jeff_wilson@reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

From: Schlather, Byron L <bschlather@corps.tamu.edu>

**Sent:** Tuesday, October 24, 2023 10:37 AM
**To:** Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Subject:** RE: ██████████ , UIN ██████████

Jeff,

██████████ voluntarily resigned from the Corps on ██████████ to focus on his academics; he completed his check-out on ██████████ . His resignation form is attached.

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
------------------------------
**CORPS OF CADETS** | We Make Leaders

---

**From:** Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Sent:** Tuesday, October 24, 2023 10:34 AM
**To:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** ██████████ , UIN ██████████

Working on an appeal on the above student. Anything you can share on why he left the Corps?
Thanks

**Jeff Wilson '84** | Associate Director
Housing Assignments Office | Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-0000

ph: 979.845.4744 | toll free 888.451.3896 |email: jeff_wilson@reslife.tamu.edu
------------------------------
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

*Q1.* Last Name:

███

*Q2.* First Name:

██

*Q3.* UIN:

██████

*Q4.* Major:

[ ⌄ ]

*Q5.* Outfit:

[ ⌄ ]

*Q6.* Sex:

- ● Male
- ○ Female

*Q7.* Age:

[ 19 ⌄ ]

*Q8.* Please answer the following questions:

|  | Yes | No |
|---|:---:|:---:|
| Did you attend Fish Camp? | ○ | ● |
| Did you participate in the "Spend the Night with the Corps" program? | ○ | ● |
| Do you intend to continue to attend Texas A&M University? | ● | ○ |
| Did you receive a Corps of Cadets Scholarship (e.g., Sul Ross Scholarship, Corps 21 Scholarship, General Rudder Scholarship, Easterwood Scholarship, etc.) | ● | ○ |
| Did you receive an ROTC Scholarship? | ○ | ● |

Do you have any family members who graduated from Texas A&M University?     ◉     ○

Q9. Did your family influence your decision to join the Corps of Cadets?

◉ Yes
○ No

Q9A. On a scale of 1 to 5, how much influence did your family have on your decision to join the Corps of Cadets?

1 = Verbal encouragement ... 5 = Family member(s) made the decision for me

|  | 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|---|
| Family Influence |  |  |  |  |  | 2 |

Q10. Did your family support your decision to join the Corps of Cadets?

◉ Yes
○ Neutral
○ No

Q11. Does your family support your decision to leave the Corps of Cadets?

◉ Yes, my family is fully supportive of my decision to leave the Corps.
○ My family somewhat supports my decision to leave the Corps.
○ My family is neutral regarding my decision to leave the Corps.
○ My family is somewhat unsupportive of my decision to leave the Corps.
○ No, my family is not supportive of my decision to leave the Corps.

Q12. Did you want to seek a commission in one of the military services?

◉ Yes
○ No
○ Undecided

Q13. Why did you join the Corps of Cadets?

I joined the Corps of Cadets to prepare myself to become an officer in the US Navy.

Q14. How were you recruited for the Corps of Cadets? (check all that apply)

- [ ] Was not recruited
- [ ] Was contacted by a cadet
- [ ] During College Night at my high school
- [ ] Interaction with Recruiting Office staff
- [x] JROTC instructor recommended the Corps
- [ ] High School Counselor recommended the Corps
- [ ] Teacher or Coach recommended the Corps
- [ ] Heard a presentation about the Corps
- [ ] Spend the Night with the Corps program
- [ ] Spend the Day with the Corps program
- [ ] Junior Cadet Accession Program (JCAP)
- [ ] Aggie Eagle Program (AEP/Scouting)
- [ ] Aggieland Saturday
- [x] New Student Conference at Texas A&M

**Q15.** What is your MAIN reason for leaving the Corps? (check only one)

- (●) Academic reasons
- ( ) Family Influence
- ( ) Financial reasons
- ( ) Other Medical reasons
- ( ) Religious reasons
- ( ) Lifestyle is too negative
- ( ) Lifestyle is too stressful
- ( ) Lifestyle is too physical
- ( ) Lifestyle is too structured
- ( ) Other

**Q15A.** Please elaborate on your reason for leaving the Corps (including explaining any selection of "Other").

I am leaving the Corps of Cadets to focus on academics. I have had trouble placing academics first while in the Corps and it is my desire to earn a GPA of 3.75 so that I can enter into _____ I have also struggled to focus in classes because of worrying too much about what I needed to get done for the Corps.

**Q16.** What other reasons contribute to your departure? (Check all that apply)

- [ ] No additional reasons
- [ ] Academic reasons
- [ ] Family influence
- [ ] Financial reasons
- [ ] Other Medical reasons
- [ ] Religious reasons
- [ ] Lifestyle is too negative
- [ ] Lifestyle is too stressful
- [ ] Lifestyle is too physical

- 483 -

☐ Lifestyle is too structured

☐ Other

*Q16A.* You selected "Other."  Please elaborate.

*This question was not displayed to the respondent.*

*Q17.* Indicate your opinions on the following statements regarding the Corps of Cadets:

| | Strongly Agree | Agree | Neutral | Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| My outfit really cared about me. | ○ | ◉ | ○ | ○ | ○ |
| The upperclassmen were professional. | ○ | ◉ | ○ | ○ | ○ |
| Members of my outfit demonstrated good leadership. | ○ | ◉ | ○ | ○ | ○ |
| Members of my outfit respected my dignity as a person. | ○ | ◉ | ○ | ○ | ○ |
| Academic performance was really my outfit's first priority. | ○ | ○ | ◉ | ○ | ○ |
| Discipline and training were correctly balanced in the Corps. | ○ | ◉ | ○ | ○ | ○ |
| I had adequate time to study. | ○ | ○ | ○ | ◉ | ○ |
| I had enough to eat during mealtimes. | ○ | ◉ | ○ | ○ | ○ |
| I had sufficient time to sleep. | ○ | ○ | ◉ | ○ | ○ |
| My dorm room was an adequate living environment. | ○ | ○ | ◉ | ○ | ○ |
| I had sufficient free time scheduled into an average week. | ○ | ○ | ○ | ○ | ◉ |
| I was physically prepared for the Corps. | ○ | ○ | ◉ | ○ | ○ |
| I was mentally prepared for the Corps. | ○ | ◉ | ○ | ○ | ○ |
| There was more PT than I expected. | ○ | ○ | ○ | ◉ | ○ |
| There was more yelling than I expected. | ○ | ○ | ◉ | ○ | ○ |
| There was a lot of profanity used around me. | ○ | ◉ | ○ | ○ | ○ |
| There was a lot of alcohol use. | ○ | ○ | ○ | ◉ | ○ |
| I witnessed a hazing incident while in the Corps. | ○ | ○ | ○ | ◉ | ○ |
| I was a victim of hazing while in the Corps. | ○ | ○ | ○ | ○ | ◉ |

*Q17A.* Describe the hazing event(s) in detail.  Include who was present, what actions took place, when did it occur, where did it occur, and what purpose was given, if any, for the activity that took place.

*This question was not displayed to the respondent.*

*Q18.* List the three MOST POSITIVE upperclassmen in your outfit:

███████ Mr. ███ and Mr. ██████ .

*Q19.* If applicable, list any ABUSIVE upperclassmen in your outfit.  Provide a short explanation why you consider their actions or behavior negative or abusive.

# RESIGNATION FROM THE CORPS OF CADETS

*\*\*FORM TO BE PRINTED AS A TWO-SIDED DOCUMENT & ISSUED BY OPERATIONS ADVISOR\*\**

## I. PERSONAL INFORMATION *(PLEASE PRINT LEGIBLY IN BLACK OR BLUE INK)*

NAME (LAST, FIRST, MIDDLE) ███████████

UIN ███████████

| CORPS CLASS YR | CORPS UNIT | DORM NUMBER ██ | ROOM NUMBER ██ | ACADEMIC MAJOR | SEX ☒ M ☐ F |
|---|---|---|---|---|---|

ROTC BRANCH AFFILIATION *(IF APPLICABLE)*
☐ Army   ☐ Air Force   ☐ Navy/Marine

CONTRACT STATUS
☐ Basic ROTC   ☐ ROTC Contract   ☐ Marine PLC   ☒ D&C

| HOME ADDRESS ███████████ | CITY ██████ | STATE ████ | ZIP ████ |
|---|---|---|---|

CELL PHONE NUMBER ██████

EMAIL ADDRESS ███████████

| Are you a **Corps Scholarship** recipient? | | ☒ YES | ☐ NO | | |
|---|---|---|---|---|---|
| Are you a **ROTC Scholarship** recipient? | ☐ YES | ☒ NO | Term | ☐ 3Yr | ☐ 4Yr |

## II. REASON(S) FOR RESIGNATION

I decided to resign from the Corps of Cadets in order to focus more on my academics and pursue an _____ degree.

## III. PLANS AFTER LEAVING CORPS *(CHECK ALL THAT APPLY)*

☒ remain at TAMU as a civilian student   ☐ resign from TAMU   ☐ return to Corps at later date

## IV. STATEMENT ON HAZING

*(CHECK ONE)*
I ☐ was   ☒ was not   a victim of hazing in the Corps of Cadets

*(CHECK ONE)*
I ☐ am   ☐ am not   willing to provide a statement about hazing incident(s) in Corps   ☒ N/A

## V. TERMS AND CONDITIONS OF RESIGNATION *(PLEASE READ BEFORE SIGNING)*

I resign my membership in the Corps of Cadets. I understand and accept the following terms and conditions:

- I am required to complete the clearance process indicated on the reverse side of this form within 5 business days from the date of resignation
- I am required to turn in all Corps uniforms to the UDC within 5 business days from my date of resignation
- I remain bound by the terms of my housing contract
- I will forfeit any Corps scholarships that have been awarded for current and future semesters
- I must present a copy of this form to the Sbisa Dining Center to cancel my meal plan or change to a non-Corps plan
- I must contact my ROTC department to determine the status of my ROTC scholarship (if applicable)
- I must complete all steps in the clearance process prior to Corps Operations, the last stop of the checkout process.

I certify by my below signature that all information I have provided is accurate to the best of my knowledge.

CADET SIGNATURE ██████████

DATE OF RESIGNATION 9/26/2022

## VI. CLEARANCE FROM THE CORPS OF CADETS

### 1. COMMANDERS' INITIALS

| OUTFIT | MINOR UNIT | MAJOR UNIT |
|---|---|---|
| ███ | Not Avail for Signature | Not Available for signature |

| COMMENTS: Stay HARD | COMM ███ | COMMENT ███ |

### 2. OPERATIONS ADVISOR

SIGNATURE ███  DATE 9/26/23

COMMENTS: Would like to focus on Academics.

### 3. BAND DIRECTOR (Band Hall), 845-3529
For Cadets in the Aggie Band Only

SIGNATURE N/A  DATE 10/17/23

COMMENTS:

### 4. CORPS HOUSING (Plank LLC), 845-3443
Pick up room inventory card and transfer papers *(if transferring to civilian housing)*

SIGNATURE ███  DATE 10/17/23

COMMENTS:

### 5. SCHOLARSHIP OFFICE (ASH 1 LLC), 458-0469
Mr. Siegel, Director of Corps Scholarship Programs

███  DATE 10/17/23

COMMENTS:

## VII. ADDITIONAL REQUIREMENTS *(STUDENT MAY INCUR ADDITIONAL CHARGES IF THESE STEPS ARE NOT COMPLETED)*

### 1. ROTC REPRESENTATIVE (Trigon)
Army - 3rd Floor, 845-2814;   Air Force - 2nd Floor, 845-7611;
Navy/Marine - 1st Floor & Basement, 845-1775

SIGNATURE ███  DATE 10/18/23

COMMENTS: ROTC is Aware of resignation.

### 2. UNIFORM DISTRIBUTION CENTER, 845-2528
Uniforms must be turned in no later than **5 business days** from the Date of Resignation *(on front side of this form)*

SIGN ███  DATE 10/3/23

The UDC has my permission to assess dry cleaning charges to my fee statement  [ ] YES  [ ] NO

COMMENTS:

### 3. MEAL PLAN OFFICE (Sbisa Underground)
Cancel Corps meal plan or change to non-Corps plan

SI ███  DATE 10/18/23

COMMENTS:

### 4. CORPS HOUSING OFFICER (In appropriate dorm)
[ ] Room Inspected & Inventory Card Signed

SIGNATU ███  DATE 10/18/23

COMMENTS:

### 5. CORPS HOUSING (Plank LLC), 845-3443
Must complete all previous steps prior to outprocessing Corps Housing

SIGNATU ███  DATE 10/18/23

COMMENTS:

[✓] Signed and completed inventory card & room key returned    [✓] Card access canceled    [✓] Photocopy of this form given to student

### 6. CORPS OPERATIONS (ASH II LLC), 862-4311, LAST
LtCol Fleming, Operations Director
LtCol Schlather, Operations Deputy

SIG ███  DATE 18 OCT 23

COMMENTS:

[ ] Deactivated in CMS    [ ] Updated Exit Roster    [ ] Updated Fish Attrition Report, if freshman

| From: | Gardner, Jeffery D |
|---|---|
| To: | Schlather, Byron L; Anderson, Chauncy Jovan |
| Cc: | Fleming, John D; Griffing, Kenneth; Scheffler, Ricky L; Washington, Robert Sykes |
| Subject: | RE:                    Floor Damage and Guidance |
| Date: | Monday, January 29, 2024 9:40:48 AM |

If specific individuals are responsible for the damage, why are they going to pay out of outfit funds? Seems like the individuals responsible should pay. I can charge them with destruction of property under student rules if you would like.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Corps Standards and Accountability Director

Military Advisor Parsons Mounted Cavalry

979-458-9317

---

**From:** Schlather, Byron L <bschlather@corps.tamu.edu>

**Sent:** Monday, January 29, 2024 9:36 AM

**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>

**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Griffing, Kenneth <kgriffing@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Washington, Robert Sykes <rwashington@corps.tamu.edu>

**Subject:** RE:                    Floor Damage and Guidance

Chauncy,

Thanks for the info. Other than the shower door and room       , all of the other rooms belong to
              , yet those identified as being responsible for the damage are             and          . That's a curious trend.

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>

**Sent:** Monday, January 29, 2024 8:16 AM

**To:** Schlather, Byron L <bschlather@corps.tamu.edu>

**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Griffing, Kenneth <kgriffing@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Washington, Robert Sykes <rwashington@corps.tamu.edu>

**Subject:** RE:                    Floor Damage and Guidance

Good Morning Sir,

I Spoke with ██████████ on this issue. He provided me with the following info.

Room ██████ - Missing Door number. ██████████ and ██████████ responsible.
Room ██████ - Broken Peephole. ██████████ Responsible
Room ██████ - Broken Peephole. ██████████ Responsible.
Room ██████ – Broken Peephole. ██████████ Responsible
Room ██████ Peephole - ██████ Responsible.
Shower Door- ██████████ responsible.

He also stated that they we willing to pay for it with outfit funds if possible.  I told him we would let him know if that was an option. I know you said we cant ENFORCE group billing but does that mean they cant voluntarily pay for it with outfit funds? I will stop by the office to get further guidance here in a bit.

R/

**MSgt Chauncy J. Anderson USMC (Ret)** | 1st Wing Military Advisor
Office of the Commandant | Division of Student Affairs| Texas A&M University
Plank| ██████ TAMU | College Station, TX 77843

ph: 979.458.9372 | ██████████ | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Sent:** Friday, January 26, 2024 8:54 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Griffing, Kenneth <kgriffing@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** FW: ██████████ Floor Damage and Guidance

Chauncy,
Try to find out who broke the shower door.  We can no longer enforce group billing, so if we don't identify a cadet (or multiple cadets), we can't split the cost among all outfit members.

Please look into the peephole issue (pun intended).  If cadets are reversing the peepholes or removing them, that's a chargeable offense.

Also, tell the cadets that removing room numbers is vandalism, at least, and could easily be considered theft (an honor code violation).

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

---

**From:** Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>
**Sent:** Friday, January 26, 2024 8:16 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Griffing, Kenneth <kgriffing@corps.tamu.edu>; Meredith Jr, Billy <bmeredith@corps.tamu.edu>; DSA - DL - Corps Advisors <cto@corps.tamu.edu>
**Subject:** RE:                    Floor Damage and Guidance


Thanks ▮▮▮ for the follow-up and inspection report in                    . -
Just to confirm you put            in the header but
I assume this information is all about            and not    correct ?  I am
including Corps Staff on this as we have a couple of different issues to
resolve here.  Also ▮▮▮ send me your        report form with all of the
relevant information on these issues including the work order number for
that shower door.

- First as far as the broken shower door if you are able to identify the cadet or cadets who broke this door let me know as there will most likely be billing involved here as this does not look like normal wear & tear.

- As far as the missing number cards if those are the ones with a cadet's name & class information those are obtained through the Corps and not Housing

- Also on your report let me know where all of the missing peepholes are as that is a risk management issue and needs to be addressed asap .

Thanks ,

Rick


---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, January 25, 2024 4:13 PM

**To:** Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>
**Subject:**                    Floor Damage and Guidance

**This Message Is From an External Sender**

This message came from outside your organization.

Howdy Rick,

This week for inspection, there some missing room number cards and a lot of missing or broken peepholes on the _____ floor, as well as a broken shower door which I'll include a picture of. I've already submit a work order for the door and for the number cards and peepholes, I'm going to talk with _____ leadership this evening and determine what all can still be recovered before marking it all as lost.

For the number cards and peepholes that are considered lost or no longer usable, should I submit a work order or are those kept in the housing office?

Thank you,

██████



From:      Gardner, Jeffery D
To:      Michaelis, Patrick Ralph
Cc:      Fleming, John D
Subject:      FW: FW:      College Station - Off Campus - 01/15/2023 8:00 PM
Date:      Tuesday, January 17, 2023 2:58:59 PM

Sir,

I received the following from Student Conduct. I do not believe we should act until the University determines if they will start a hazing investigation.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** ▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>

**Sent:** Sunday, January 15, 2023 8:36 PM

**To:** Sellers, Tyler B <tsellers@stuact.tamu.edu>

**Subject:**      College Station - Off Campus - 01/15/2023 8:00 PM

**This Message Is From an External Sender**

This message came from outside your organization.

Secondary recipient (you were copied)

**Campus Community Incident Report**

**Background Information**

Campus Location

**College Station**

Status of the Alleged Offender

**Recognized Student Organization**

Date of incident

**2023-01-15**

Time of incident

**8:00 PM**

Location of incident

**Off Campus - Unknown House**

**Involved Parties**

() Organization

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes,

even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

██████████████ **and other** ██████████ **blind folded** ███████████████████████ **and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that** ████ **keeps in his dorm.**

## Supporting Documentation
**No additional documents were attached to this report.**

## Submitted By
Your full name
████████████

Position/title/student status
**Student**
Your email address
█████████████████████

Your phone number
██████████

UIN
███████

*[UNAUTHENTICATED]*

## Routing Information
Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
• Tyler Sellers
• jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

| From: | Gardner, Jeffery D |
| --- | --- |
| To: | Brummett, Kevin L; Nester, Aoife |
| Cc: | Simpson, Meredith M; Fleming, John D; Schlather, Byron L; BEATY, GARY; Regan III, John M |
| Subject: | RE: ▮▮▮▮▮▮▮ Incident |
| Date: | Thursday, January 26, 2023 12:29:28 PM |
| Attachments: | image001.png |

Officer Nestor,

You will need to contact Student Conduct to obtain any violations of Student Rules and resulting sanctions. As for the Corps side, he was in violation of the Corps Alcohol policy ▮▮▮▮▮▮▮ and received sanctions. If you need more specific information, please contact me directly.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Brummett, Kevin L <kbrummett@corps.tamu.edu>
**Sent:** Thursday, January 26, 2023 11:28 AM
**To:** Nester, Aoife <aoifenester@tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>; Regan III, John M <jregan@corps.tamu.edu>
**Subject:** RE: ▮▮▮▮▮▮▮ Incident

Officer Nestor,

Below are several contacts that may be able to provide information about ▮▮▮▮▮▮▮ All are copied on this email. My best guess is to talk to LtCol Gardner and COL Beaty first so they can talk to the University Discipline and Legal offices about releasing any information.

Gunnery Sergeant Regan was ▮▮▮▮▮▮ Cadet Training Officer – jregan@tamu.edu

LtCol Gardner is our Asst. Commandant of Discipline – jeff.gardner@tamu.edu

Ms. Simpson is our Asst. Commandant for Academics – msimpson@corps.tamu.edu

COL Beaty is our Chief of Staff for the Corps - gbeaty@tamu.edu

Hope this helps.

**v/r,**

**CPT Kevin L. Brummett USA (ret.)** | 3rd Wing Cadet Training Officer
Office of the Commandant | Operations and Training | Texas A&M University
Harrell Hall, ▮▮▮▮▮▮ | 1227 TAMU College Station | TX 77843-1227

ph: 979.458.4406 | ▮▮▮▮▮▮▮ | kbrummett@corps.tamu.edu
**TEXAS A&M UNIVERSITY** | We Make Leaders

RLTW

**From:** Nester, Aoife <aoifenester@tamu.edu>
**Sent:** Wednesday, January 25, 2023 8:55 PM
**To:** Brummett, Kevin L <kbrummett@corps.tamu.edu>
**Subject:** ▮▮▮▮▮▮ - Dec. 11 Incident

Capt. Brummett,

I'm Officer Nester, one of the two TAMUPD Officers you spoke with in regards to the incident involving ▮▮▮▮▮ and ▮▮▮▮▮ after the ▮▮▮▮▮ .

I've been asked by the District Attorney to obtain any complaints, sanctions, disciplinary actions or commendations for ▮▮▮▮▮ for his time during the Corps. You were my one point of contact during that ▮▮▮ so I figured I would start with you as to figuring out the best way to go about obtaining this information.

As with when we spoke last time, I am still working nights, 1800 to 0600, but I am able to access my email from my phone.

*Aoife Nester '18*
*Police Officer*
*Texas A&M University Police Department*
*979-845-2345*
*aoifenester@tamu.edu*

**From:** Gardner, Jeffery D
**To:** Michaelis, Patrick Ralph
**Cc:** BEATY, GARY; Fleming, John D
**Subject:** ▮▮▮▮▮▮▮▮
**Date:** Wednesday, February 1, 2023 10:27:11 AM

Good morning Sir,

I participated in a conduct panel yesterday for ▮▮▮▮▮▮▮▮  The panel's decision was to suspend him from the university and dismiss him from the Corps.  He can return to the university in the fall. He will appeal the decision.

V/R

| From: | Gardner, Jeffery D |
|---|---|
| To: | Michaelis, Patrick Ralph |
| Cc: | BEATY, GARY; Fleming, John D |
| Subject: | outcome |
| Date: | Wednesday, February 8, 2023 7:42:55 AM |

Sir,

I have requested the official outcome from the Title IX office. I received the following from the outfit:

█████ withdrew from the university

██████ one year suspension

███████ one year suspension

███████ one semester suspension

██████ one semester suspension

█████ Probation

████████ Probation

█████ Probation

██████ Probation

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Gardner, Jeffery D
**To:** Michaelis, Patrick Ralph
**Cc:** BEATY, GARY; Fleming, John D
**Subject:** FW: RE:  Outcome Letters
**Date:** Wednesday, February 8, 2023 2:06:23 PM
**Attachments:**



Sir,

Attached is the email request sent to Title IX. It answers your question as to why we were not notified. I reiterated the importance of letting us know the outcome of investigations before or when the student is notified with the understanding the appeals process could change the outcome.

I also contacted Jennifer Smith, who informed me the deadline to appeal is                    If any of the cases are appealed, it goes through another process and will likely not be resolved until sometime mid-March. As summary of the findings is attached in the excel document.

Sir, I believe we need to have a discussion regarding the cadets not suspended future in the Corps.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Allison, Terri L <terriallison@tamu.edu>
**Sent:** Wednesday, February 8, 2023 9:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Smith, Jennifer M <jennifer.smith@exchange.tamu.edu>
**Subject:** RE:      Outcome Letters

Good morning, Lt. Col. Gardner

Our usual practice is not to send out the final decision letters to campus entities until the appeals process has run it's course, in case any decisions are modified. However, I have attached the outcome letters for you here as a courtesy. The deadline for appeal in this case is                    .

Best,

*Terri Allison* | She |Her|Hers|Hearing Coordinator/Civil Rights Investigator
University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations
Texas A&M University | YMCA, Suite 200D

**From:** Gardner, Jeffery D
**To:** Michaelis, Patrick Ralph
**Cc:** BEATY, GARY; Thompson, Amy L; Fleming, John D
**Subject:**
**Date:** Wednesday, February 8, 2023 2:47:02 PM

Afternoon Sir,

Just got off the phone with Student Conduct. Charge letters for       should be out by next Wednesday. The          will be included in the letters. I presume       discussed the plan for ensuring      calendar is not impacted.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Gardner, Jeffery D |
|---|---|
| To: | Fleming, John D; Schlather, Byron L |
| Subject: | Fwd: Outcome Letters |
| Date: | Wednesday, February 8, 2023 6:19:34 AM |
| Attachments: | ██████████████████ █████████ |

FYI. We need to discuss if these cadets will return to their outfit.

V/R


Begin forwarded message:


**From:** "Reilly, Michael" <mreilly@navy.tamu.edu>
**Date:** February 7, 2023 at 5:48:00 PM CST
**To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>, "BEATY, GARY" <gbeaty@corps.tamu.edu>
**Cc:** "Fleming, John D" <jfleming@corps.tamu.edu>, "Marsh, Scott" <smarsh@navy.tamu.edu>, "Mullenberg, Jason" <jmullenberg@navy.tamu.edu>
**Subject: Fwd: Outcome Letters**


Gary and Jeff,

Please see the attached SCO and Title IX results for ████ and ██████

Both of these cadets have displayed appropriate repentance and I'd like for them to resume their life in the Corps as soon as possible.

I don't have any of the results for other cadets.


Thanks,
Mike

Semper Fi,
Col Michael D. Reilly


Begin forwarded message:


**From:** "Quandt, Kathryn" <kquandt@navy.tamu.edu>
**Date:** February 7, 2023 at 17:08:23 CST
**To:** "Reilly, Michael" <mreilly@navy.tamu.edu>
**Subject: Outcome Letters**

Good Afternoon, Sir,

As requested.

Respectfully,

**Kathryn Quandt**

Captain | USMC

Marine Officer Instructor | NROTC | Texas A&M University

(979) 845-1775

(979) 458-6066

- - - - - - - - - - - - - - - - - - - - - - - -

**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Norris, Dale W; Fleming, John D |
| **Subject:** | FW: CC: Texas A&M University Correspondence for Conduct Case |
| **Date:** | Thursday, February 9, 2023 10:47:40 AM |
| **Attachments:** | |

FYI

<span style="color:#8B2332">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

<span style="color:#8B2332">Assistant Commandant for Discipline</span>

<span style="color:#8B2332">Military Advisor Parsons Mounted Cavalry</span>

<span style="color:#8B2332">979-458-9317</span>

**From:** Student Conduct Office (via Maxient) <notifications@maxient.com>
**Sent:** Thursday, February 9, 2023 10:40 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** CC: Texas A&M University Correspondence for Conduct Case

**This Message Is From an External Sender**

This message came from outside your organization.

You have been copied on a letter for case ▮▮▮▮▮▮▮▮▮▮ Please review the PDF attachment and retain a copy for your files. If you encounter difficulty opening this attachment, please contact our office.

Student Conduct Office
Offices of the Dean of Student Life
Texas A&M University
Phone: 979.847.7272
scrs@tamu.edu
https://studentlife.tamu.edu/sco/

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Norris, Dale W; Fleming, John D |
| **Subject:** | FW: CC: Texas A&M University Correspondence for Conduct Case |
| **Date:** | Thursday, February 9, 2023 10:47:56 AM |
| **Attachments:** | |

FYI

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Student Conduct Office (via Maxient) <notifications@maxient.com>
**Sent:** Thursday, February 9, 2023 10:44 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** CC: Texas A&M University Correspondence for Conduct Case

**This Message Is From an External Sender**

This message came from outside your organization.

You have been copied on a letter for case ▮▮▮▮▮▮▮▮▮▮ Please review the PDF attachment and retain a copy for your files. If you encounter difficulty opening this attachment, please contact our office.

Student Conduct Office
Offices of the Dean of Student Life
Texas A&M University
Phone: 979.847.7272
scrs@tamu.edu
https://studentlife.tamu.edu/sco/

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Norris, Dale W; Fleming, John D |
| **Subject:** | FW: CC: Texas A&M University Correspondence for Conduct Case ▮▮▮▮▮ |
| **Date:** | Thursday, February 9, 2023 10:51:23 AM |
| **Attachments:** | |

FYI

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

<span style="color:maroon">Assistant Commandant for Discipline</span>

<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>

<span style="color:maroon">979-458-9317</span>

**From:** Student Conduct Office (via Maxient) <notifications@maxient.com>

**Sent:** Thursday, February 9, 2023 10:46 AM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:** CC: Texas A&M University Correspondence for Conduct Case ▮▮▮▮▮

**This Message Is From an External Sender**

This message came from outside your organization.

You have been copied on a letter for case ▮▮▮▮▮▮▮▮ Please review the PDF attachment and retain a copy for your files. If you encounter difficulty opening this attachment, please contact our office.

Student Conduct Office
Offices of the Dean of Student Life
Texas A&M University
Phone: 979.847.7272
scrs@tamu.edu
https://studentlife.tamu.edu/sco/

They kicked        back to me.

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

<span style="color:maroon">Assistant Commandant for Discipline</span>

<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>

<span style="color:maroon">979-458-9317</span>

**From:** Fleming, John D <jfleming@corps.tamu.edu>

**Sent:** Thursday, February 9, 2023 11:26 AM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:** RE: CC: Texas A&M University Correspondence for Conduct Case ⬛⬛⬛ ⬛⬛⬛

Copy all. ?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training Office of the Commandant | Division of Student Affairs | Texas A&M University Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - - -

<span style="color:maroon">**Corps of Cadets**</span> | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Thursday, February 9, 2023 10:51 AM

**To:** Norris, Dale W <dnorris@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>

**Subject:** FW: CC: Texas A&M University Correspondence for Conduct Case ⬛⬛⬛ ⬛⬛⬛

FYI

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

<span style="color:maroon">Assistant Commandant for Discipline</span>

<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>

<span style="color:maroon">979-458-9317</span>

**From:** Student Conduct Office (via Maxient) <notifications@maxient.com>

**Sent:** Thursday, February 9, 2023 10:46 AM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:** CC: Texas A&M University Correspondence for Conduct Case ⬛⬛⬛

**This Message Is From an External Sender**

This message came from outside your organization.

You have been copied on a letter for case ⬛⬛⬛ Please review the PDF attachment and retain a copy for your files. If you encounter difficulty opening this attachment, please contact our office.

| From: | Michaelis, Patrick Ralph |
| --- | --- |
| To: | Gardner, Jeffery D |
| Cc: | BEATY, GARY; Fleming, John D; Schlather, Byron L; Washington, Robert Sykes |
| Subject: | RE: |
| Date: | Tuesday, February 14, 2023 3:52:10 PM |

Got it. Thanks Jeff.

Also… got a not from Joe Ramirez,      will be charged out on Thursday.

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets | Texas A&M University**

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Tuesday, February 14, 2023 3:35 PM

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>

**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Washington, Robert Sykes <rwashington@corps.tamu.edu>

**Subject:**

Sir,

Results of the        Conduct hearing today are:

██████████ not responsible for hazing. Responsible for Conduct unbecoming a cadet- University and Corps Conduct review until 12 May 2023

██████████ not responsible for hazing. Responsible for Conduct unbecoming a cadet- University and Corps Conduct review until 12 May 2023

██████████ not responsible for hazing. Responsible for Conduct unbecoming a cadet- University and Corps Conduct review until 12 May 2023

Additionally, the outfit is required to meet with me to determine how we are going to change the outfit culture.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

These did not file an appeal. The others did file so we will not be able to move forward until mid-March.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>

**Sent:** Monday, February 20, 2023 4:01 PM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>

**Subject:** RE:

So much for the middle of March…?

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - - -

**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Monday, February 20, 2023 3:45 PM

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>

**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>;
Schlather, Byron L <bschlather@corps.tamu.edu>

**Subject:**

Good afternoon Sir,

Just received notice that the appeals window for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is closed and their sanctions and their cases are now finalized. We will need to decide on their Corps status in the next couple of days.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Gardner, Jeffery D |
| --- | --- |
| To: | Michaelis, Patrick Ralph |
| Cc: | BEATY, GARY; Fleming, John D; Schlather, Byron L |
| Subject: | |
| Date: | Tuesday, February 21, 2023 2:27:59 PM |
| Attachments: | |

Good afternoon Sir,

The attachment contains the members of　　　that are being charged. Student Conduct office has determined this to be low level hazing and as such, has given those charged three options:

　　　(1) Accept responsibility for all charges and accept the sanctions listed below

　　　(2) Choose not to contest the charges and accept the sanctions listed below.

　　　(3) Request a Student Conduct Conference to contest the charges.

The sanctions identified by Student Conduct include:

1. Conduct Review through Friday, May 12, 2023.
2. Corps Conduct Review through Friday, May 12, 2023
3. Hazing Education Workshop (HEW), due Friday, April 28, 2023.

I am standing by for your questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

The "deal" was for        This is still part of the bigger        problem not separable.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>

**Sent:** Thursday, February 23, 2023 2:20 PM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:** RE: Additional        charges

Any idea if they will be offered the same deal as the others?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Thursday, February 23, 2023 1:35 PM

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>

**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>;
Schlather, Byron L <bschlather@corps.tamu.edu>; Regan III, John M <jregan@corps.tamu.edu>

**Subject:** Additional        charges

Good afternoon Sir,

An additional        cadets from        were charged today for hazing resulting from the investigation.        The cadets are:

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

Got it. Thank you.

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

> On Feb 27, 2023, at 12:31 PM, Gardner, Jeffery D <jeff_gardner@corps.tamu.edu> wrote:
>
>
> Sir,
> They are the          class.
> V/R
> Lt. Col Jeff Gardner '82, USAF (Ret)
> Assistant Commandant for Discipline
> Military Advisor Parsons Mounted Cavalry
> 979-458-9317
>
> **From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
> **Sent:** Monday, February 27, 2023 11:30 AM
> **To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Regan III, John M <jregan@corps.tamu.edu>; Parker, Chad L <cparker@corps.tamu.edu>; Thompson, Amy L <amy.thompson@tamu.edu>
> **Subject:** Re:
> Thanks Jeff. Remind me what class they belong to?
>
> Patrick R. Michaelis
> Brigadier General, USA (ret)
> Commandant
> Texas A&M Corps of Cadets
> Sent from my iPhone
>
>
> > On Feb 27, 2023, at 12:21 PM, Gardner, Jeffery D <jeff_gardner@corps.tamu.edu> wrote:

- 510 -

Good Morning Sir,

We help the Conduct Conference for ██████ cadets from ██ this morning. ████████████████████████████████ were all found NOT RESPONSIBLE for the allegations of hazing regarding last ████████. I am available for questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Gardner, Jeffery D |
|---|---|
| To: | Fleming, John D |
| Cc: | Schlather, Byron L |
| Subject: | RE: |
| Date: | Thursday, March 2, 2023 9:34:10 AM |

Sorry. Probation until Dec 2023.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>

**Sent:** Thursday, March 2, 2023 9:33 AM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>

**Subject:**

Thank you Sir.

██████?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
Corps of Cadets | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Thursday, March 2, 2023 9:29 AM

**To:** Fleming, John D <jfleming@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>

**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>

**Subject:** RE:

Here you go. We need to discuss the future of the ████ on probation.

██████  one year suspension-withdrew from the university

██████ one year suspension

██████ one year suspension

██████ one semester suspension

██████ one semester suspension

██████ Probation

██████ Probation

██████ Probation

██████ Probation

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:25 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** RE:

Jeff,

I have lost count on these. Can you please give us a full paybook on the      cadets and their status.

Chief,

For all cadets whose suspension from the University has been upheld, are we cleared hot to inform them of their Corps dismissal and have them start checkout?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:08 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Reilly, Michael <mreilly@navy.tamu.edu>
**Subject:**

Sir,

I received the following results of the      appeals.

██████████ Suspension from the University until 29 Dec 2023

████████ Suspension from the University until 31 May 2023

█████████ Conduct probation- there was no end date in the letter, so I am checking with Title IX.

███████ Suspension form the University until 31 Dec 2024

██████████ Suspension from the University until 29 Dec 2023

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

Begin forwarded message:

**From:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>
**Date:** March 9, 2023 at 11:24:46 AM CST
**To:** "Michaelis, Patrick Ralph" <pmichaelis@corps.tamu.edu>
**Cc:** "BEATY, GARY" <gbeaty@corps.tamu.edu>
**Subject:**

Sir,
The Student Conduct panel for ▮▮▮▮ concluded today. The students will be notified of their sanctions either this afternoon or tomorrow. I do not have the sanction letters but will send them to you as soon as I receive them. The sanctions are as follows:

▮▮▮▮▮▮▮▮ -University and Corps Conduct Probation until Dec 23
▮▮▮▮▮▮▮▮ - University and Corps Conduct Probation until Dec 23
▮▮▮▮▮ - University and Corps Conduct Probation until Dec 23
▮▮▮▮▮▮▮ - University and Corps Conduct Probation until Dec 23 ( recently selected as a ▮▮▮▮▮▮▮▮▮ )
▮▮▮▮▮▮▮▮ - University and Corps Conduct Probation until Dec 23
▮▮▮▮▮▮▮ ' - University and Corps Conduct Probation until Dec 23
▮▮▮▮▮▮▮ ' - University and Corps Conduct Probation until Dec 23
▮▮▮▮▮▮▮▮ - University and Corps Conduct Probation until Dec 23
▮▮▮▮▮▮ - University and Corps Conduct Probation until May 23

Each of these students is considered not in good standing with the University or Corps and as such, cannot hold leadership positions in student organizations nor represent the Corps or University.
In addition to the Probation there are educational requirements for each cadet that include Ethical decision-making workshop, Hazing Education workshop, reflective papers and monthly meetings with me.
I am available for questions or to discuss.
V/R
Lt. Col Jeff Gardner '82, USAF (Ret)

**- 514 -**

Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

Rob is being assigned to investigate

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Wednesday, September 13, 2023 1:55 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Who's next

Washington, then Leible.  Provided they do not conflict with the subject of the investigation.

Let me know if they are going to be assigned so I can give them a heads up.

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, September 13, 2023 1:48 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Who's next

John,

Who are the next two on the joint investigation list?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Leible, Jason Aaron
**To:** Fleming, John D
**Subject:** RE: Investigation
**Date:** Friday, October 20, 2023 9:55:16 AM

Roger Sir.

v/r

Jason

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:54 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigation

Jason,

　　　　You were next on the list when the ▮▮▮▮▮▮ investigation came up, but because you were close to that I assigned John.  So you get the ▮▮▮▮ investigation.

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:36 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Investigation

Jason,

　　　　Heads up.  You will be contacted to assist in the investigation into ▮▮▮▮.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

I'll come talk to you later today.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 7:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigator

What is this one for?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 7:42 AM
**To:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** RE: Investigator

Thanks

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 6:44 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigator

Desiree is next on the list.  What is this one for?

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 24, 2023 4:27 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Investigator

John,

I need another investigator.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

Sorry, was in class.  Rob already did the      .  Chad is up next, please take him.

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Operations Director
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 22, 2024 2:27 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Investigation

John,

I'm going to take Rob.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Corps Standards and Accountability Director
Military Advisor Parsons Mounted Cavalry
979-458-9317

# ROBERT WASHINGTON

linkedin.com/in/robert-washington-63269438

## EXECUTIVE OVERVIEW

**Seasoned professional** with 25 years' experience building and leading high functioning teams and organizations. Has 7+ years training and instruction to U.S. and foreign military to include advising in austere environments. Proven performer in challenging situations. Effectively managed an under resourced staff while directing twice as many subordinate units than the normal structure and preparing 450 person unit for combat deployment. Led organizations and planning efforts in support of crisis operations. With Master's Degree in Strategic Foresight, learned how to determine and understand changes in business environments and assist companies in modifying their model for continued success. Lean Sigma Six Green Belt trained and currently pursuing Project Management Professional certification. Able to step back to see the big picture and direct appropriate action but does not hesitate to get involved in the work. Proficient in the use of Microsoft Word, Excel, SharePoint and PowerPoint. A dedicated volunteer to the community and non-profits. Foreign experience in Asia, Europe, and Middle East. Active Top Secret Clearance.

## KEY TRAITS

- Executive Leadership
- Organizational Management
- Operational Planning
- Attention to Detail

- Quality Assurance & Quality Improvement
- Resource & Requirements Planning
- Crisis Management
- Program Management

## WORK EXPERIENCE

**Cadet Training Officer (Leadership Teacher)**                    **July 2020- Present**
- Mentor, lecture, and develop cadet leaders within the Texas A&M University Corps of Cadets on the Cadet Values, the Aggie Honor Code as well as leadership traits and principles in order to prepare them to handle the global challenges of the future.

**Senior Marine Instructor (Leadership Teacher)**                    **July 2018- July 2020**
- Lectured, and mentored 80+ Junior Reserve Officer Training Corps high school cadets on techniques of leadership, citizenship, general military subjects and staff planning processes, thereby developing more responsible citizens
- Organized, and scheduled numerous public engagements for the cadets which resulted in improved community relations and opportunities for cadets to develop their leadership skills
- Developed and managed program budget and fundraising activities to enable logistical support to cadet activities and events through equipment acquisition and transportation ordering

**Active Duty Officer, United States Marine Corps**                    Dec 1995- July 2018

**Operations Officer, (Chief Operations Officer)**                    July 2016- July 2018
**2d Marine Expeditionary Brigade, Camp Lejeune, NC**
- Supervised a section of over 40 Marines in the planning and execution of a major exercise for a 4000 person force that successfully conducted training and maneuvers with 9 foreign countries and resulted in no mishaps
- Directed the readiness, equipping and training of a 100 person staff in preparation for crisis response operations for national defense and humanitarian assistance which resulted in a response force ready to execute within 24 hours while managing a $1 million annual budget for exercise, travel and training costs

**Executive Officer, (Senior Vice President)**                    July 2013- June 2016
**10th Marine Regiment, Camp Lejeune, NC**
- Organized the information management and decision making cycle for the chief executive officer that was in charge of three subordinate elements totaling over 2300, enabling on a daily basis multiple critical decisions to maintain, organize and train the force while also meeting all higher headquarters reporting and tasking requirements
- Managed a staff of 12+ intermediate managers who were responsible for a collective of 200+ personnel, organized and prepared this group for successful passing of higher headquarters readiness inspection

# ROBERT WASHINGTON

**Training Requirements Officer, (Training and Development Manager)**    July 2010- June 2013
**Joint Staff, J7 Directorate, Suffolk, VA**
- Assessed strategic initiatives as related to the joint training environment and recommended and developed changes to respond to evolving needs of the joint warfighter, while directing a 25 person staff in the absence of the branch chief and managing a $4 million budget
- Developed Department of Defense technology roadmaps from policy analysis and future technology assessments thereby anticipating future challenges for our forces and preparing their global crisis response readiness

**Executive Officer, (Staff Director)**    Jan 2009- June 2010
**1st Battalion, 10th Marines, Camp Lejeune, NC**
- Evaluated and assigned over 70+ new personnel to positions within the unit to ensure resource allocation was in line with commander's guidance and thereby maximizing efficiencies in human resource structure to meet unit mission
- Analyzed and improved staff processes in order to manage the increased number of assigned sub-units to the headquarters without an equal increase in management personnel to handle the additional requirements and material
- Organized, coordinated and prepared a unit for crisis response deployment on a humanitarian mission to Haiti following an earthquake thereby fully resourcing response options for national command authority relief operations

**Military Transition Team Advisor**, **(Senior Operations Consultant)**    July 2007- Dec 2008
**1st Iraqi Army Division Advisor Team, Camp Lejeune, NC and Iraq**
- Led an ad hoc team of 12 Marines, on short notice, in partnering with an Iraqi Army unit to provide intelligence and operational support during remote location security missions away from Coalition bases and within a 4 month period traveled 800+ miles, cleared 12+ municipalities/neighborhoods, and brought all personnel home safely
- Advised, trained and mentored my Iraqi counterpart on the headquarters staff in the execution of large scale clearing and checkpoint operations which resulted in the transfer of security responsibilities for multiple towns and sectors in the Euphrates River Valley from U.S. forces to host nation forces, thereby facilitating drawdown of U.S. presence

**Small Group Leader & Doctrine Rep, (Staff Trainer & Policy Writer)**    July 2004- June 2007
**U.S. Army Field Artillery School, Fort Sill, Ok**
- Lectured, evaluated and mentored 60+ Army, Marine and International officers in small group settings on techniques of command management and staff planning processes, thereby successfully graduating 4 separate classes
- Organized, scheduled and taught curriculum instruction as the subject matter expert for specialized coursework
- Led project execution with numerous stakeholders on the development and refinement of a publication that provided procedures for the implementation of new system across both the U.S. Army and the Marine Corps services

## EDUCATION

Regent University, Virginia Beach, Virginia
Masters, Strategic Foresight, GPA: 3.83 / 4.0

Texas A&M University, College Station, Texas
Bachelor of Science, Political Science, GPA: 3.24 / 4.0

## TRAINING

- Lean Sigma Six, Green Belt Course, 2018- Department of the Navy recognized continuous performance improvement process for developing efficiencies in administrative procedures and production efforts
- Joint Maritime Prepositioning Forces Planners Course, 2017- Training focused on the tasks necessary to plan, deploy and employ prepositioned equipment by Marine and Navy forces

2

# ROBERT WASHINGTON

- Military Justice Senior Officers Course, 2013- Familiarize one with the uniform code of military justice, administrative fact-finding bodies and policy matters relating to command legal responsibilities
- Toastmaster Curriculum, 2010 to 2013- Competent Communicator and Leader levels achieved
- Collateral Damage Assessment Course, 2011- Determine hazards for target engagement
- Joint Targeting, Staff Course, 2011- Honor Graduate, planning target engagements at operational level
- Joint, Interagency and Multinational Planners Course, 2011- Plan and coordinate operations with Federal, State and local agency for national defense and humanitarian response to natural disasters
- Joint Information Ops Orientation Course, 2011- Plan operations to influence adversary information
- Basic Effective Facilitation Course, 2011- Techniques to enable instructor led discussions and debates
- Joint & Combined Warfighting School, 2011- Operational level of joint & interagency conflict planning
- Security Manager's Course, 2009- Information safeguarding and applying personnel security measures
- Operator Advanced Casualty Response Course, 2007- Hands on first responder treatment of injuries
- Joint Operational Fires and Effects Course, 2006- Plan use of artillery and air delivered munitions
- Combat Lifesaver Course, 2004- Basic lifesaving techniques of CPR, and treating injuries
- Small Group Instructor Training Course, 2004- Techniques of small group teaching and discussion
- Total Army Instructor Training Course, 2004- Techniques of large group lecture and demonstration
- Field Artillery Captain's Career Course, 2001- Distinguished Honor Graduate, number 1 out of 47
- Basic Instructor Course, 2000- Taught the techniques of lecture and discussion methods of instruction
- Field Artillery Officer's Basic Course, 1996- Honor Graduate, number 6 out of 167 students

## VOLUNTEER AND CIVIC CONTRIBUTIONS

- Boy Scouts of America leader for 10 years, mentoring young boys to become better citizens
- Semper Fi Fund volunteer for 5 years, assisted in community events to raise money so that the non-profit could provide assistance to critically wounded service members on their road to recovery
- Local church volunteer for 4 years supporting the children's ministry and guest services
- Volunteered with multiple Parent-Teacher Associations over a 15 year period
- Youth soccer league coach for two years teaching boys and girls between ages 4-7

## AWARDS

Bronze Star Medal, Defense Meritorious Service Medal, Meritorious Service Medal (2x), Navy/Marine Corps Commendation Medal (3x), Army Commendation Medal, Combat Action Ribbon, Presidential Unit Citation, Joint Meritorious Unit Award (x2), Meritorious Unit Commendation, NATO Medal, Iraqi Campaign Medal, Inherent Resolve Campaign Medal, Letter of Appreciation (3x), Certificate of Appreciation (3x), Letter of Commendation, Certificate of Achievement, Staff Achievement Award, Distinguished Student Certificate, Distinguished Naval Student Certificate (3x), Commandant's Honor Roll Certificate (2x), Superior Physical Fitness Certificate

3

| | |
|---|---|
| **From:** | Washington, Robert Sykes |
| **Sent:** | Thursday, April 4, 2024 10:30 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: Investigation Interview Notice |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, October 4, 2023 8:14 AM
**To:** XXXXXXXXXXXXXXXX
**Cc:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE: Investigation Interview Notice

Okay, thank you for getting back to me!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Monday, October 2, 2023 8:05 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy Audrey,
I apologize for not responding over the weekend. The picture                                                                              before it
was deleted and for some reason I had saved it, I came by it when looking through old photos for supporting
documentation like you requested. I do not know who took the picture or who was present but I believe he sent the
picture of himself to the account to be posted.

Thank you,
XXXXXXXXXXXXXX

On Mon, Oct 2, 2023 at 3:53 PM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Hi XXXXXXXXXXXX

I just wanted to follow up to see if you could share with us where you got this picture? Also, if you have any additional context (who took the picture, who was present, etc.), any additional information you have would be greatly appreciated.

Please let me know by the end of the day tomorrow (Tuesday).

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Winking, Audrey J
**Sent:** Friday, September 29, 2023 9:13 AM
**To:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX>
**Subject:** RE: Investigation Interview Notice

Thank you for sending this, XXXXXXXXXXX  Can you clarify where you were able to obtain this picture from?

Thanks again,

Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257


ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** XXXXXXXXXXXXXXXXXXXXX>
**Sent:** Thursday, September 28, 2023 6:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice


Howdy Audrey,

This is the only supporting documentation I have for The investigation. I
                                        I was asked about at the beginning of my interview in regards to
        dorms. I do not know who took the picture but I hope it will be sufficient evidence that XXXXXXXXXXX was
the one who                                                        I was not aware of        when it
happened so all I have is the picture.

Thank you for your time,

XXXXXXXXXXXXX


On Tue, Sep 26, 2023, 7:59 AM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

  Good morning, XXXXXXXXXXXX,


  Thank you for confirming your plan to attend tomorrow's meeting.  I do not need anything from you at this time.  At the start of your interview tomorrow I will walk through the acknowledgment form with you, and during the interview you will gain more context for what the report entails.  Once you have more context for the situation we will be discussing during the interview, should you wish to submit any supporting documentation (statements, pictures, texts, etc.) you will have the opportunity to do so!


  We do not share the report with students unless a student is charged with a student rule violation, which is not the case at this time.  If this investigation does lead to any charges, the charged student(s) would be able to review the report at that time.

Again, I will go over all of this more in detail with you tomorrow at the start of your interview, but hopefully this provides a little clarity on our process in the meantime.

Best,

Audrey

**FromXXXXXXXXXXXXXXXXXXXXXXXX**>
**Sent:** Monday, September 25, 2023 11:57 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy,

Thank you for the communication I will be present for the interview in my designated time slot. Is there any additional information you need from me? Is there any additional information you can provide to me about the nature of the complaint or investigation? I do not know anything.

Thank you for your time,

XXXXXXXXXXXXXX

On Mon, Sep 25, 2023, 1:33 PM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Dear XXXXXX

The Student Conduct Office received a report regarding alleged hazing within        You have been identified as someone who may have been involved in the incident or have witnessed/has additional knowledge related to the incident. In order to gain additional information you are being asked to participate in the investigation process and an interview date has been scheduled for **Wednesday, September 27th at 2:30pm in the Student Services Bldg., Suite 309.** Your options for participation in this investigation will be reviewed with you prior to being asked to respond to any questions posed by the investigators. The attached Investigation Acknowledgement Form will be reviewed with you during your interview and you will be able to choose your level of participation in the interview process. A copy of the investigation flowchart, which outlines the process is also attached for your review. Information related to the student conduct code and any alleged violations specific to this investigation can be found here: http://student-rules.tamu.edu/rule24/. Click here to review additional information or FAQs regarding the investigation process.

Per student rule (*24.4.23. Abuse of Process*), you are required to meet with investigators. Should this meeting conflict with a scheduled class online or other obligation, please let us know. **Please confirm your receipt of this notice and your intended attendance on the date and time above by replying to this email.**

**Please note that pursuant to section 30.06 of the penal code and University Rule 34.06.02. MI:** while formal administrative hearings/investigations are taking place the carrying of concealed handguns is prohibited in **the Student Services Bldg., Suite 309.** Written communication will be posted outside of the room. Section 30.06 of the penal code states:

(3) Written communication means:

(A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."

If you need an accommodation for a disability, please contact our office. Requests for accommodations may be evaluated in consultation with Disability Resources.

Sincerely,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| **From:** | Washington, Robert Sykes |
| **Sent:** | Thursday, April 4, 2024 10:22 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 29, 2023 10:22 AM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:**

Hi Lt. Col. Washington,

XXXXXX emailed me saying he has the                                      at 4:00 on Monday, so he was asking if we can reschedule his interview.  I typically only work around students' class schedules, but is this something we should work around? I wasn't sure if this was extracurricular or something that is critical he participates in so I wanted to get your perspective!

He is the one we have scheduled at 2:45, with his class ending at 2:40.  So we in theory should be done by 3:45 but I do recognize that would be really rushed for him.

Thanks,
Audrey

| **From:** | Washington, Robert Sykes |
|---|---|
| **Sent:** | Thursday, April 4, 2024 10:24 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: Investigation Interview Notice |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, October 2, 2023 3:52 PM
**To:** XXXXXXXXXXXXXXXXXXXXXXXX
**Cc:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE: Investigation Interview Notice

Hi XXXXX,

Lt. Col. Washington and I would like to ask you a few follow up questions, so I have scheduled another interview for you on **Wednesday, October 4th at 1:30pm**.  This interview should be pretty brief since we only have a few things to follow up on!

We will meet in the same location and all of the same processes will apply.  Please just reply back to this email to confirm that this new date/time will work for you.

Best,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Tuesday, September 26, 2023 10:28 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

I'll be there at 1pm tomorrow.
Very Respectfully,

XXXXXXXXXXX

XXXXXXXXXXXXX

████████

On Mon, Sep 25, 2023 at 13:33 Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Dear XXXXXXX,

The Student Conduct Office received a report regarding alleged hazing within        You have been identified as someone who may have been involved in the incident or have witnessed/has additional knowledge related to the incident. In order to gain additional information you are being asked to participate in the investigation process and an interview date has been scheduled for **Wednesday, September 27th at 1:00pm in the Student Services Bldg., Suite 309.** Your options for participation in this investigation will be reviewed with you prior to being asked to respond to any questions posed by the investigators. The attached Investigation Acknowledgement Form will be reviewed with you during your interview and you will be able to choose your level of participation in the interview process. A copy of the investigation flowchart, which outlines the process is also attached for your review. Information related to the student conduct code and any alleged violations specific to this investigation can be found here: http://student-rules.tamu.edu/rule24/. Click here to review additional information or FAQs regarding the investigation process.

Per student rule (*24.4.23. Abuse of Process*), you are required to meet with investigators. Should this meeting conflict with a scheduled class online or other obligation, please let us know. **Please confirm your receipt of this notice and your intended attendance on the date and time above by <u>replying</u> to this email.**

**Please note that pursuant to section 30.06 of the penal code and University Rule 34.06.02. MI:** while formal administrative hearings/investigations are taking place the carrying of concealed handguns is prohibited in **the Student Services Bldg., Suite 309.** Written communication will be posted outside of the room. Section 30.06 of the penal code states:

> (3) Written communication means:
>
> > (A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."

If you need an accommodation for a disability, please contact our office. Requests for accommodations may be evaluated in consultation with Disability Resources.

Sincerely,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| | |
|---|---|
| **From:** | Washington, Robert Sykes |
| **Sent:** | Thursday, April 4, 2024 10:27 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: Investigation Interview Notice |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, October 2, 2023 3:54 PM
**To:** XXXXXXXXXXXXXXXXXXXXXXXX
**Cc:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE: Investigation Interview Notice

Hi XXXXXXXXXXXXXXX,

I just wanted to follow up to see if you could share with us where you got this picture? Also, if you have any additional context (who took the picture, who was present, etc.), any additional information you have would be greatly appreciated.

Please let me know by the end of the day tomorrow (Tuesday).

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Winking, Audrey J
**Sent:** Friday, September 29, 2023 9:13 AM

**To:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Subject:** RE: Investigation Interview Notice

Thank you for sending this, XXXXXXX!  Can you clarify where you were able to obtain this picture from?

Thanks again,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Thursday, September 28, 2023 6:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy Audrey,
This is the only supporting documentation I have for The investigation. I
                                              I was asked about at the beginning of my interview in regards to
    dorms. I do not know who took the picture but I hope it will be sufficient evidence that XXXXXXXX was the one
who                                                                    I was not aware of         when it
happened so all I have is the picture.
Thank you for your time,
XXXXXXXXXXXXXXX

On Tue, Sep 26, 2023, 7:59 AM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

> Good morning, XXXXXXXXXX,
>
>
> Thank you for confirming your plan to attend tomorrow's meeting.  I do not need anything from you at this time.  At the start of your interview tomorrow I will walk through the acknowledgment form with you, and during the interview you will gain more context for what the report entails.  Once you have more context for the situation we will be discussing during the interview, should you wish to submit any supporting documentation (statements, pictures, texts, etc.) you will have the opportunity to do so!
>
>
> We do not share the report with students unless a student is charged with a student rule violation, which is not the case at this time.  If this investigation does lead to any charges, the charged student(s) would be able to review the report at that time.
>
>
> Again, I will go over all of this more in detail with you tomorrow at the start of your interview, but hopefully this provides a little clarity on our process in the meantime.

Best,

Audrey


**From:** XXXXXXXXXXXXXXX>
**Sent:** Monday, September 25, 2023 11:57 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice


Howdy,

Thank you for the communication I will be present for the interview in my designated time slot. Is there any additional information you need from me? Is there any additional information you can provide to me about the nature of the complaint or investigation? I do not know anything.

Thank you for your time,

XXXXXXXXXXXX


On Mon, Sep 25, 2023, 1:33 PM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Dear XXXXXXXXXX,


The Student Conduct Office received a report regarding alleged hazing within         You have been identified as someone who may have been involved in the incident or have witnessed/has additional knowledge related to the incident. In order to gain additional information you are being asked to participate in the investigation process and an interview date has been scheduled for **Wednesday, September 27th at 2:30pm in the Student Services Bldg., Suite 309.** Your options for participation in this investigation will be reviewed with you prior to being asked to respond to any questions posed by the investigators.  The attached Investigation Acknowledgement Form will be reviewed with you during your interview and you will be able to choose your level of participation in the interview process. A copy of the investigation flowchart, which outlines the process is also attached for your review.  Information related to the student conduct code and any alleged violations specific to this investigation can be found here:  http://student-rules.tamu.edu/rule24/. Click here to review additional information or FAQs regarding the investigation process.


Per student rule (*24.4.23. Abuse of Process*), you are required to meet with investigators. Should this meeting conflict with a scheduled class online or other obligation, please let us know. **Please confirm your receipt of this notice and your intended attendance on the date and time above by replying to this email.**

**Please note that pursuant to section 30.06 of the penal code and University Rule 34.06.02. MI:** while formal administrative hearings/investigations are taking place the carrying of concealed handguns is prohibited in **the Student Services Bldg., Suite 309.** Written communication will be posted outside of the room. Section 30.06 of the penal code states:

> (3) Written communication means:
>
>> (A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."

If you need an accommodation for a disability, please contact our office. Requests for accommodations may be evaluated in consultation with Disability Resources.

Sincerely,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| | |
|---|---|
| **From:** | Washington, Robert Sykes |
| **Sent:** | Thursday, April 4, 2024 10:20 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: Investigation Interview Notice |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 29, 2023 9:34 AM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** FW: Investigation Interview Notice

Received the below email and the attached picture from XXXX last night.  I emailed him back this morning and asked for clarification in where/how he got the photo. But depending on what he says, we may need to have XXXX come back in so we can ask him about this and some of the other discrepancies in his version of that incident
.).

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Thursday, September 28, 2023 6:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy Audrey,
This is the only supporting documentation I have for The investigation. I believe this was
                                        I was asked about at the beginning of my interview in regards to

dorms. I do not know who took the picture but I hope it will be sufficient evidence that XXXXX XXXXX was the one who                                                                          . I was not aware of          when it happened so all I have is the picture.

Thank you for your time,

XXXX XXXX

On Tue, Sep 26, 2023, 7:59 AM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Good morning, XXXX,

Thank you for confirming your plan to attend tomorrow's meeting.  I do not need anything from you at this time.  At the start of your interview tomorrow I will walk through the acknowledgment form with you, and during the interview you will gain more context for what the report entails.  Once you have more context for the situation we will be discussing during the interview, should you wish to submit any supporting documentation (statements, pictures, texts, etc.) you will have the opportunity to do so!

We do not share the report with students unless a student is charged with a student rule violation, which is not the case at this time.  If this investigation does lead to any charges, the charged student(s) would be able to review the report at that time.

Again, I will go over all of this more in detail with you tomorrow at the start of your interview, but hopefully this provides a little clarity on our process in the meantime.

Best,

Audrey

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Monday, September 25, 2023 11:57 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy,

Thank you for the communication I will be present for the interview in my designated time slot. Is there any additional information you need from me? Is there any additional information you can provide to me about the nature of the complaint or investigation? I do not know anything.

Thank you for your time,

XXXX XXXX

On Mon, Sep 25, 2023, 1:33 PM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Dear XXXXX,

The Student Conduct Office received a report regarding alleged hazing within      .  You have been identified as someone who may have been involved in the incident or have witnessed/has additional knowledge related to the incident. In order to gain additional information you are being asked to participate in the investigation process and an interview date has been scheduled for **Wednesday, September 27th at 2:30pm in the Student Services Bldg., Suite 309.** Your options for participation in this investigation will be reviewed with you prior to being asked to respond to any questions posed by the investigators.  The attached Investigation Acknowledgement Form will be reviewed with you during your interview and you will be able to choose your level of participation in the interview process. A copy of the investigation flowchart, which outlines the process is also attached for your review.  Information related to the student conduct code and any alleged violations specific to this investigation can be found here:  http://student-rules.tamu.edu/rule24/. Click here to review additional information or FAQs regarding the investigation process.

Per student rule (*24.4.23. Abuse of Process*), you are required to meet with investigators. Should this meeting conflict with a scheduled class online or other obligation, please let us know. **Please confirm your receipt of this notice and your intended attendance on the date and time above by replying to this email.**

**Please note that pursuant to section 30.06 of the penal code and University Rule 34.06.02. MI:** while formal administrative hearings/investigations are taking place the carrying of concealed handguns is prohibited in **the Student Services Bldg., Suite 309.** Written communication will be posted outside of the room. Section 30.06 of the penal code states:

> (3) Written communication means:
>
> > (A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."

If you need an accommodation for a disability, please contact our office. Requests for accommodations may be evaluated in consultation with Disability Resources.

Sincerely,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257


ph: 979.847.7272 |[audrey_winking@sco.tamu.edu](mailto:audrey_winking@sco.tamu.edu)| [sco.tamu.edu](http://sco.tamu.edu)

| **From:** | Winking, Audrey J |
| **Sent:** | Thursday, September 21, 2023 4:15 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | Investigation |

| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Howdy,

Dr. Bell informed me that you have been assigned to work on the _____ investigation with me. Do you have some time tomorrow (Friday) where we could chat briefly about the plan for the investigation moving forward? The only times I am unavailable tomorrow are 10-11am and 1:30-3:15pm. We could meet via Zoom or Teams if that is more convenient for you since it should be a quick meeting!

I am hoping to do interviews next Wednesday afternoon (9/27) if that works for you!

Thanks,
Audrey

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:**
**Sent:** Thursday, September 7, 2023 11:35 AM
**To:** WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>
**Cc:** Leible, Jason Aaron <jleible@corps.tamu.edu>; ███████████████████████████
**Subject:** Re:  Hazing Investigation Statements (████████)

Good morning CSM Wood,

The ████████, has collected the statements from the ████████ involved, so I'll help make sure that gets to ████ . ████████ for the cadet in question. Him and I are both free this afternoon from 1415-1500 to link up if that works for you.

Very Respectfully,

███████████

On Thu, Sep 7, 2023 at 09:27 WOOD, FRANK Chriswell <fcwood@corps.tamu.edu> wrote:

Howdy Mr. ████


I've read your attachment. You also need individual statements from each of the ████ involved and any that later may have additional information relayed to them after the ████ returned from PT. Those are the most important ones. I would also like to link up with you ███████████████ sometime today  regarding ████████ ' statement.

**V/R…RLTW**


**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st  Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University

Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**



**From:** ██████████████████████████████
**Sent:** Thursday, September 7, 2023 8:59 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>; WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>
**Subject:** I1 Hazing Investigation Statements (CDT Kimes)

Good morning SGM Wood and MAJ Leible,


Attached below are the statements in regards to the hazing investigation involving          and ██████████


██████████

██████████████

Of my own volition, I decided to do a morning workout. I wanted to get fit and build up my physical resilience. ██████ happened to have a morning workout plan and I volunteered to join. ██████ is good at jogging and pacing so I asked to join his morning workout. We slow paced jogged until we reached bush school, then we proceeded to walk around until we were ready to leave. There were no expectations of me and I had a great time with ██████.

I volunteered to participate in the voluntary physical training lead by ████████ several times he mentioned that it was voluntary and anyone could join if they want to. I volunteered because I enjoy doing extra physical training. During the physical training we jogged for a short distance and completed short easy excersises.

The workout we did with ██████████ was as follows: We started with a jog to a parking area, where we did 100 burpees, or up to however many we could do and double the remander on saturdays. After that, we started jogging again until we reached the Bush School of Government and Public Service. We then walked to where President Bush's tombstone, along with his wife Barbara Bush and daughter Pauline Robinson Bush, are located, to which after standing and resting for a few moments began to walk back to

Throughout the workout, the tone was very nonchalatent, where we could ask ██████████ any questions freely, along with ██████████ giving explanations and stories behind buildings and landmarks. All Participants came on their own free will, and there was no shaming for those who did not.

5 6

██████ colorfully informed people of an entirely voluntary work out that he would hold the morning of ████████ The group who showed up did of their own volition with out any reminder from ██████ that morning. The workout started with stretching then a light jog to the Bush school. At the Bush school ████████ showed us the Berlin wall memorial and the Bush family cemetery with no expectation to memorize information of not a certain way. We walked back to the quad finishing our voluntary work out.

— ████████

If ██████ punished I will seriously consider quiting the Corps of Cadets. ████████ is a wealth of knowledge, who has opened my eyes to new possibilities in work out of the corps. ██████ is a model ████████ and cadet.

On Monday ██████████████, a small group of ████████, led
by ██████████, went out on a run to George Bush's grave.
We went at a ten minute mile pace and stopped
several times to allow everyone to catch up. On these steps
he did a series of burpees and squats, with rests in between.
Once we reached our destination, and on the walk back,
██████████ talked to us about history, rudders, & gave us tips
and tricks to be more successful in the corps. This event
was not, in any shape of form, a type of hazing in any way.

- 549 -

[REDACTED]

`writes:` [REDACTED] had has^3 ~~pieces of~~ incidents of which a lack of _Integrity_ was displayed. and behavior was unbecoming of the Corps values. Foremost is the most recent event, in which [REDACTED] took (see appendix) on a morning run and calisthenics workout on the date of the were told it was the , which [REDACTED] did start last year. However, [REDACTED] was the only person there other than . There was not sanctioned practice to be held by the university or Corps at this time. The workout was optional for the which is why only attended. Next, [REDACTED] wore a ' shirt to a event, around the quad, and in the dorms, representing a poor message to and military career.

what: voluntary workout with

who: myself; male no

when: Mon

where: white tables outside dorms; mvmnt
to Reed; logged 9:30 pace, burpees,
squats, walked back

why: noPT monday ⇒ told                     about it
wanked to join
team

Statement:

Bad judgement on ██████████ part,
not getting approval from  training chain.
Not pushing it to my higher before
conducting. ████████ did not think he
had to get approved because it was not
corps event.

███████████

What: ███████████, PT'd them unbeknowing to anyone else

when: ████████████████ to his knowledge
where: run to Bush + back; burpees
how: on the run made stops to do calisthenics
why: he ████ said ██████████ practice
Recommended Discipline: 4hr, 2 RW's, silenced
How found out: word of mouth, asked ███ during run throughs if it happened or not

statement

███████████ task confirmed. (suspected)
up an unauthorized run. ███████ He ran
to the bush school and back with "calisthenics spread
out. He has also been seen disrupting despite
not being un scholastic. His actions were not made
public and were told after the fact.

what:

▮ pleads the 5th, does not want a part it in it. Believes discipine evaluation should be left up to command team.

██████████████ + Sept 5 23

What: unauthorized PT for the purpose of affiliation with as a condition for continued membership (24.4.5 hazing) by ████████ + on

When:

Where: Reed Arena

Why: optional PT; "wbm" (in eyes of )

How: unformal meetup + unauthorized times, logged on app [evidence]

Statement: To put it simply, ██████████ lacks an understanding of integrity. His actions did not display a commitment to the Corps values or commitment to selfless service. ought to represent in memorium of and what he stood for. He does not have a clear understanding of following the standard operating procedures for leadership development of training. He failed to represent the Corps values through these actions.

Appendix



| From: | WOOD, FRANK Chriswell |
|---|---|
| Sent: | Friday, April 5, 2024 4:55 AM |
| To: | Simpson, Meredith M |
| Subject: | FW:    Hazing Investigation Statements (          ) |
| Attachments: | Scanned Documents.pdf |

| Categories: | ORR Clear |
|---|---|

More to follow

**V/R...RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st  Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**



**From:** WOOD, FRANK Chriswell
**Sent:** Thursday, September 7, 2023 9:31 AM
**To:**
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**          Hazing Investigation Statements ( ▮▮▮▮▮▮ )

▮▮▮▮▮ didn't oversee this (he's been advised to do so) and the ▮▮▮▮ didn't even interview the      . MTF...

**V/R...RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st  Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**



**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, September 7, 2023 8:59 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>; WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>
**Subject:**    Hazing Investigation Statements ( ▮▮▮▮▮▮

Good morning SGM Wood and MAJ Leible,

Attached below are the statements in regards to the hazing investigation involving        and ▮▮▮▮▮▮

Very Respectfully,

▮▮▮▮▮▮▮▮▮▮

| From: | WOOD, FRANK Chriswell |
|---|---|
| **Sent:** | Friday, April 5, 2024 4:55 AM |
| **To:** | Simpson, Meredith M |
| **Subject:** | FW:    Hazing Investigation Statements |

**Importance:**    High

**Categories:**    ORR Clear

More to follow

**V/R...RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st  Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**

---

**From:** WOOD, FRANK Chriswell
**Sent:** Thursday, September 7, 2023 9:27 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** Leible, Jason Aaron <jleible@corps.tamu.edu>; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE:    Hazing Investigation Statements
**Importance:** High

Howdy ▮▮▮▮▮▮

I've read your attachment. You also need individual statements from each of the ▮▮▮ involved and any that later may have additional information relayed to them after the ▮▮▮ returned from PT. Those are the most important ones. I would also like to link up with you ▮▮▮▮▮▮▮▮▮▮▮▮▮ sometime today  regarding ▮▮▮▮▮▮' statement.

**V/R...RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st  Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**

**From:** █████████████████████████████████

**Sent:** Thursday, September 7, 2023 8:59 AM

**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>; WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>

**Subject:**     Hazing Investigation Statements (█████████)

Good morning SGM Wood and MAJ Leible,

Attached below are the statements in regards to the hazing investigation involving          and █████████

Very Respectfully,

█████████████████

| From: | WOOD, FRANK Chriswell |
|---|---|
| **Sent:** | Friday, April 5, 2024 4:56 AM |
| **To:** | Simpson, Meredith M |
| **Subject:** | FW: Discipline CCIR |

**Categories:** ORR Clear

More to follow

**V/R...RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**

**From:** ███████████████████████████
**Sent:** Tuesday, September 5, 2023 9:18 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>; Leible, Jason Aaron <jleible@corps.tamu.edu>; ██████████
███████████████████████████
**Subject:** Discipline CCIR

Good evening Col. Gardner,

There was a report this morning that ████████ (               ) took a group        out for a workout on
        . I am treating this allegation as a hazing report and have asked the             of Company    to collect statements,
silence the                   in question, and ensure the       are mentally and physically well.

I will have the packet ready for your review by Thursday COB.

Very Respectfully,

████████████ ████████████████████ Corps of Cadets Intramural & Logistics Office Division of Student Affairs
TAMU | College Station, TX 77843-1227

EXHIBIT
17



## Student Rules

TEXAS A&M UNIVERSITY

# 24. Student Conduct Code

(Revised: 2024)

The General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education supports higher standards of behavior for students. Attendance at a university is not compulsory. The voluntary attendance of a student at a university is a voluntary entrance into the academic community. By such voluntary entrance, the student voluntarily assumes obligations of performance and behavior reasonably imposed by the university. These obligations are generally much higher than those imposed on all citizens by the civil and criminal law. A university may discipline students to secure compliance with these higher obligations as a teaching method or to sever the student from the academic community. The General Order further emphasizes the ability of universities to establish standards of superior ethical and moral behavior that occur either on or off campus.

24.1 Definitions. Only for purposes of this Student Conduct Code, the following terms and definitions will apply. The Vice President for Student Affairs or designee reserves the right to interpret and enforce this Code of Conduct.

24.1.1. The term "**accused student**" means any student charged with a violation of a student *rule*.

24.1.2. The term "**chairperson**" means a *Student Conduct Administrator* who is authorized by the *Vice President for Student Affairs* or designee to take the lead role in conducting *conferences* when there is more than one person serving as a *Student Conduct Panel* and/or more than one *Student Conduct Administrator* present.

24.1.3. The term "**charge**" means an allegation of a potential violation of the Student Rules. Charges are issued after a Student Conduct Administrator has determined sufficient information exists to hold a *conference* to determine whether a student (or students) has violated a *rule* (or *rules*).

24.1.4. The term "**complainant**" means any person who submits information indicating that a *student may* have violated the Student Conduct Code. Information brought forth by the *complainant may* result in an *investigation*.

24.1.5. The term **"conference"** means a process that provides an opportunity for an accused *student* to respond to a specific *charge* or *charges*. The purpose of a *conference* is to determine whether there is a preponderance of information to support the *charges* and if so, to determine the appropriate *sanction* or *sanctions*. Only information presented during the *conference* can be used to determine if there is a finding of responsibility.

24.1.6. The term "**consent**," solely for the purposes of the Sexual Misconduct rule (see *rule* 24.4.20), means clear, voluntary, and positive verbal or non-verbal communication that all participants have agreed to the activity.

- Consent must occur prior to or at the same time as the activity.
- Consent must remain clear, voluntary, and positive throughout the activity.
- Consent must be given for the current activity. The existence of a prior relationship or prior activity does not automatically ensure consent for current or future activity. There must be consent for each specific type of act throughout the activity. Consent must be given by each participant involved.
- A person must be 17 years of age or older to be able to consent to sexual activity if the other participant(s) involved are more than three (3) years of age older than that person.
- A person who is clearly or visibly incapacitated is not able to give consent to sexual activity (see definition of incapacitation below).

24.1.7. The term "**faculty member**" means any person hired by the *University* to conduct classroom, teaching, or research activities or who is otherwise considered by the *University* to be a member of its faculty.

24.1.8. The term "**incapacitation**" means the physical and/or mental inability to make informed, rational judgments. States of *incapacitation* include, but are not limited to, sleep, unconsciousness, and brownouts and blackouts (where an individual is awake but is not forming memories). Where alcohol or other drugs are involved, *incapacitation* is defined with respect to how the substance consumed impacts a person's decision-making capacity, awareness of consequences, and ability to make fully informed judgments.

24.1.9. The term "**investigation**" means the follow through on a complaint to ascertain details and circumstances associated with the complaint. *Investigations may* result in *charges*, a form of alternative dispute resolution, or dismissal of complaint. This determination is made at the sole discretion of the Vice President for Student Affairs or designee responsible for the oversight of the Student Conduct processes.

24.1.10. The term "**may**" is used in the permissive sense.

24.1.11. The term "**member of the University community**" includes any person who is a *student, faculty member, staff, University official* or any other person employed by the *University or by a company contracted to provide services for the University.*

24.1.12. The term "**organization**" means any number of people who meet any single or combination of the following criteria:

- belong to a group whose members are primarily Texas A&M University *students* including but not limited to academic, athletic, recreational, religious, performance, political, and social or similar groups, and/or
- have complied with the formal requirements for *University* recognition, and/or
- are advised by a *University official* whose position description designates them as an advisor, and/or
- are advised by a *University official* who has volunteered as an advisor, and/or
- live in close proximity to, for example, residence hall floors or wings, Corps outfit, Corps unit or Corps Special Activity, and/or
- are otherwise considered by the *University* to be an *organization*.

24.1.13. The term "**retaliation**" means any adverse action taken against a person for making a good faith report of a violation of Texas A&M System policies, university rules, student rules, and/or the law, or for participating in any proceeding related to the investigation or resolution of such report. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a decision of "unsubstantiated," "insufficient information to substantiate," "not responsible," and/or "not guilty" on the allegations. Retaliation does not include good faith actions lawfully pursued in response to a report. Violation of an interim, remedial, or protective measure will be considered retaliation.

24.1.14. The term "**sanction**" includes responses or requirements given by the *University* to a *student* during a *conference* in response to a violation of a *rule*. *University sanctions* include all items listed in Section 27 of this Student Conduct Code.

24.1.15. The term "**shall**" is used in the imperative sense.

24.1.16. The term "**staff**" means any person who is employed by the *University* that is not defined as *faculty.*

24.1.17. The term "**student**" includes all persons who have accepted their offer of admission, and/or who are taking courses at the *University*, either full-time or part-time, pursuing undergraduate, graduate, or professional studies and who are either currently enrolled or

were enrolled the previous semester and registered for a future semester. Persons who withdraw after allegedly violating the Student Conduct Code, or who are not officially enrolled for a particular term but who have a continuing relationship with the *University* are considered *students*. In addition, persons who are living in University residence halls and apartments, although not enrolled in this *institution*, are also considered "*students*", for the purpose of enforcing this code.

24.1.18. The term "**Student Conduct Administrator**" means a *University official* authorized by the *Vice President for Student Affairs* or designee to collect information, to initiate *charge* letters, articulate *charges* in conferences, present information to support *charge*s, to conduct *conferences*, and to impose *sanctions* upon any *student*(*s*) found to have violated the Student Conduct Code. The Vice President for Student Affairs or designee may authorize a *Student Conduct Administrator* to serve simultaneously as a *Student Conduct Administrator* as the sole member, or one of the members of a *Student Conduct Panel*.

24.1.19. The term "**Student Conduct Panel**" means any person or persons authorized by the *Vice President for Student Affairs* or designee to determine whether a *student* has violated the Student Conduct Code and to determine *sanctions* that *may* be imposed when a *rule* violation has been committed (or found responsible).

24.1.20. The term "**rule**" encompasses those behavior expectations contained in, but not limited to, the Student Rules, Residence Hall handbook, University Apartment Handbook, the Standard of the Corps of Cadets, and the University Computer Use and Resource Rules. These rules should be read broadly and are not designed to define prohibited conduct in exhaustive terms.

24.1.21. The term "**university**" or "**institution**" means Texas A&M University.

24.1.22. The term "**University official**" means any person employed by the *University* to perform assigned administrative or professional responsibilities or who is otherwise considered by the *University* to be a *University official*.

24.1.23. The term "**University premises**" includes all land, buildings, facilities, and other property in the possession of or owned, leased, operated, supervised, used or controlled by the *University* (including adjacent streets and sidewalks)

24.1.24. The **Vice President for Student Affairs** is that person designated by the *University* President to be responsible for the administration of the Student Conduct Code. The Vice President for Student Affairs *may* assign a designee to meet these responsibilities.

24.2 Student Conduct Authority

24.2.1. The Vice President for Student Affairs or designee *shall* develop procedures for the administration of the student conduct system and for the implementation of Student Conduct Conferences that are consistent with provisions of the Student Conduct Code.

24.2.2. The Vice President for Student Affairs or designee *shall* determine the composition of *Student Conduct Panel*(s) and determine which *Student Conduct Panel, Student Conduct Administrator* and Appeal Panel *shall* be authorized to hear each matter.

24.2.3. Decisions made by a *Student Conduct Panel* and/or *Student Conduct Administrator shall* not be final until the appeal processes have been exhausted, waived, or time has expired.

24.3. Jurisdiction of the Student Conduct Code The Student Conduct Code *shall* apply to conduct that occurs on *University premises* and/or at *University* sponsored activities or any other activity that adversely affects the *University* community and/or the pursuit of its objectives (mission). This action *may* be taken for either affiliated or non-affiliated activities. The *University may* take action in situations occurring off *university premises* involving: student misconduct demonstrating flagrant disregard for any person or persons; or when a *student*'s or student *organization*'s behavior is judged to threaten the health, safety, and/or property of any individual or group; and/or when a student's sexual harassment of a *Member of the University Community* occurring off campus creates a hostile environment on campus.. Using the Vice President for Student Affairs' discretion, the Vice President for Student Affairs or designee *shall* decide whether the Student Conduct Code *shall* be applied to conduct occurring off campus, on a case-by-case basis. This Student Conduct Code applies at all locations of the *University*, except those campuses who write their own student conduct code.

24.4 Rules and Regulations Conduct standards at the *University* are set forth in writing in order to give *students* general notice of prohibited conduct. These rules should be read broadly and are not designed to define prohibited conduct in exhaustive terms. Any *student* found to have committed or to have attempted to commit the following misconduct is subject to the disciplinary *sanctions* outlined in Section 27. It *shall* not be a defense that a *University official*, student leader or other person authorized the behavior in question:

24.4.1. **Dishonesty.** Acts of dishonesty, including but not limited to the following:

- Withholding material information from the *University*, misrepresenting the truth during a *University investigation* or student conduct conference, and/or making false statements to any *University officials or*, law enforcement officer, in the course of their duties.
- Furnishing false information to and/or withholding information from any University official, faculty member, office, or law enforcement officers in the course of their duties.
- Forgery, alteration, possession, or misuse of any *University* document, record, or instrument of identification.

- The submission of false information at the time of admission or readmission is grounds for rejection of the application, withdrawal of any offer of acceptance, cancellation of enrollment, dismissal or other appropriate disciplinary action.

24.4.2. **Harassment.** Behavior that is severe, pervasive, or persistent to a degree that a reasonable person similarly situated would be prevented from accessing an educational opportunity or benefit. This behavior includes, but is not limited to, verbal abuse, threats, intimidation, and coercion. In addition, harassment *may* be conducted by a variety of mediums, including but not limited to, physical, verbal, graphic, written, or electronic. (Please see University Rule 08.01.01.M1. for harassment based on a person's protected status).

24.4.3. **Physical abuse.** Any attempt to cause injury or inflict pain; or causing injury or inflicting pain. Also causing physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. It is not a defense that the person, group, or *organization* against whom the physical abuse was directed consented to, or acquiesced to, the physical abuse.

The physical abuse *rule* is not intended to prohibit the following conduct:

- Customary public athletic events, contests, or competitions that are sponsored by the *University* or the organized and supervised practices associated with such events; or
- Any activity or conduct that furthers the goals of a legitimate educational curriculum, a legitimate extracurricular program or a legitimate military training program as defined and approved by the *University*.

24.4.4. **Theft/Damages.**

24.4.4.1. **Theft**. Unauthorized removal or stealing and/or attempted removal or stealing of property of a *member of the University community* or other personal or public property, on or off campus. This includes knowingly possessing such stolen property. This also includes theft of services and/or misuse of another's property including, but not limited to, unauthorized use of another's property, unauthorized selling of subsidized tickets, and use of a forged parking permit.

24.4.4.2. **Damages.** Behavior that destroys, damages, or litters any property of the *University*, of a *University* community member, of another institution, or of another person, on or off campus (as permitted in section 24.3.) is prohibited under this *rule*.

24.4.5. **Organization Affiliation Misconduct** means any intentional, knowing, or reckless act, occurring on or off any campus of Texas A&M University, by one person alone or acting with others, directed against an individual for the purpose of pledging, being initiated into, affiliating with, holding office in, or maintaining membership in an organization; or as part of any activity

of a recognized student organization, student group, Corps of Cadets, Corps outfit, Corps unit, Corps Special Activities, or Athletics that meets the criteria of: 24.4.5.1. Hazing; and/or 24.4.5.2. Organization-Related Intimidation and/or Abuse.

A student is responsible for Organization Affiliation Misconduct if the student:
(a) engages in Organization Affiliation Misconduct;
(b) solicits, encourages, directs, aids, or attempts to aid another in engaging in Organization Affiliation Misconduct;
(c) recklessly permits Organization Affiliation Misconduct to occur; or
(d) has firsthand knowledge of the planning of a specific Organization Affiliation Misconduct incident involving a student or has firsthand knowledge that a specific Organization Affiliation Misconduct incident has occurred, and knowingly fails to report that knowledge to the Vice President for Student Affairs or other appropriate official of the institution, a peace officer, or a law enforcement agency.

There are two types of Organization Affiliation Misconduct, based on the conduct and potential resulting harm:

24.4.5.1 **Hazing** is Organization Affiliation Misconduct that includes:

24.4.5.1.1 any type of physical brutality, such as whipping, beating, striking, branding, electronic shocking, placing of a harmful substance on the body, or similar activity;

24.4.5.1.2 sleep deprivation, exposure to the elements, confinement in a small space, calisthenics, or other similar activity that subjects the individual to an unreasonable risk of harm or that adversely affects the mental or physical health or safety of the individual;

24.4.5.1.3 consumption of a food, liquid, alcoholic beverage, liquor, drug, or other substance, other than as described by 24.4.5.1.5., that subjects the individual to an unreasonable risk of harm or that adversely affects the mental or physical health or safety of the individual;

24.4.5.1.4 any activity that induces, causes, or requires the individual to perform a duty or task that involves a violation of a criminal law or university rule that implicates a criminal law; or

24.4.5.1.5 coercion of the individual to consume:
(a) a drug; or
(b) an alcoholic beverage or liquor in an amount that would lead a reasonable person to believe that the individual is intoxicated.

"Coercion" means a threat, however communicated, to commit a violation of a criminal law or university rule that implicates a criminal law; inflict bodily injury in the future on the person threatened or another; accuse a person of any criminal offense or violation of university rule; expose a person to hatred, contempt, or ridicule; harm the credit or professional repute of any person; or take or withhold action as a public servant, or to cause a public servant to take or withhold action.

Conduct constituting Hazing may also be a violation of Texas state law (see Tex. Educ. Code §37.151 and §51.936).

24.4.5.2. **Organization-Related Intimidation and/or Abuse** is Organization Affiliation Misconduct that does not rise to the level of Hazing and includes, but is not limited to:

24.4.5.2.1 conduct that endangers the mental or physical health or safety of the individual

24.4.5.2.2. behavior that is severe and/or persistent to a degree that a reasonable person similarly situated would be prevented from accessing an educational opportunity or benefit. This behavior includes, but is not limited to, verbal abuse, deceit, threats, intimidation, and unreasonable requirements for new and continued membership of an organization;

24.4.5.2.3. confining a person or exposing participants to uncomfortable elements such as environments that are too hot, cold, noisy, small, or intimidating;

24.4.5.2.4. parading individuals in public areas, transporting individuals in a motor vehicle while wearing a visual obstruction, or privately conducting visually obstructed activities that serve no constructive purpose;

24.4.5.2.5. encouraging or requiring a person to publicly carry objects or wear apparel that is abnormal, not normally in good taste, conspicuous, and/or indecent;

24.4.5.2.6. destroying or removing public or private property;

24.4.5.2.7. any activity that induces, causes, or requires the individual to perform a duty or task that involves a violation of a university rule that does not implicate a criminal law;

24.4.5.2.8. soliciting, encouraging, directing, aiding, or attempting to aid another in engaging in intimidation or harassment; or

24.4.5.2.9. assisting, directing, or in any way causing others to participate in degrading behavior and/or behavior that causes ridicule, humiliation, or embarrassment.

Previously practiced "traditions" (including Corps of Cadets, fraternity/sorority, or any other group or organization activity, practice or tradition) or coercion by current or former members or student leaders of the involved organization, will not suffice as a justifiable reason for participation in Organization Affiliation Misconduct. It is not a defense that the person (or group) against whom the Organization Affiliation Misconduct was directed consented or acquiesced to the behavior in question.

Students who are recipients and/or victims of Organization Affiliation Misconduct and who have not perpetrated Organization Affiliation Misconduct on others involved in the fact pattern for which they are reporting, and who report the activities to the Vice President for Student Affairs or designee responsible for oversight of the student conduct processes and/or the University Police Department, will not be charged with a violation of the Organization Affiliation Misconduct rule.

The Organization Affiliation Misconduct rule is not intended to prohibit the following conduct:

- Customary public athletic events, contests, or competitions that are sponsored by the University or the organized and supervised practices associated with such events; or
- Any activity or conduct that furthers the goals of a legitimate educational curriculum, a legitimate extracurricular program or a legitimate military training program as defined and approved by the University.

24.4.6. **Failure to comply.** Failure to comply with proper and lawful direction of any *University official* or law enforcement officer.

24.4.6.1. **Evading**. Intentionally fleeing from a *University official* or law enforcement officer when the person knows or reasonably should have known the *University official* or law enforcement officer is attempting to confront, arrest, or detain.

24.4.7. **Failure to present identification.** Failure to provide identification upon the request of a *University official*.

24.4.8. **Breaching safety or security**. This includes but is not limited to: Unauthorized access to *University* facilities; unauthorized entry into or use of *University premises*; intentionally damaging door locks; unauthorized possession of *University* keys or access cards; duplicating *University* keys or access cards; propping open of exterior residence hall or other

campus building doors; tampering with fire safety equipment such as fire extinguishers, smoke detectors, alarm pull stations, gas detectors, or emergency exits; and/or unauthorized entry into another person's or entity's residence, vehicle, or business.

24.4.9. **Violation of published University rules.** Violation of any *University* policy, *rule*, or regulation published in hard copy or available electronically on the *University* website. Such rules include, but are not limited to, Residence Life contracts and rules, Corps of Cadets rules, *University* motor vehicle rules, rules relating to the use of student identification cards, entry and use of *University* facilities and dining hall conduct.

24.4.10. **Violation of NCAA Regulations.** Violations of any NCAA regulations.

24.4.11. **Violation of law.** Violation(s) of any federal, state or local law.

24.4.12. **Drugs.** The act of using, possessing, being under the influence of, manufacturing, or distributing illegal drugs or illegally obtained/possessed controlled substances is prohibited. Abusing legally obtained drugs by failing to take the drug as directed. Except as expressly permitted by law, use, possession, manufacturing, or distribution or being a party thereto of marijuana, heroin, narcotics, or other controlled and/or prescribed substances and/or drug paraphernalia and/or dangerous drug is also prohibited. Individuals may not operate a motor vehicle or another form of transportation while under the influence of drugs or while intoxicated. (See **Appendix VII, Texas A&M University Drug Rules (https://student-rules.tamu.edu/append7)** )

24.4.13. **Alcohol.** Alcohol use, possession, manufacturing, or distribution of alcoholic beverages (except as expressly authorized by *University* regulations), is prohibited on Texas A&M *University premises* and *University* sponsored events. In addition, use, possession, or distribution of alcohol beverages while driving or riding in or on a vehicle on *University premises* is prohibited. Alcoholic beverages may not, in any circumstance, be used by, possessed by, or distributed to any person under twenty-one (21) years of age. Individuals may not be in a state of public intoxication or drunkenness. Individuals may not operate a motor vehicle or another form of transportation while intoxicated or while under the influence of alcohol (See **Appendix VIII, Texas A&M University Alcohol Rules (https://student-rules.tamu.edu/append8)**).

24.4.14. **Weapons and explosives.** Illegal or unauthorized use, possession, or storage of fireworks or explosives, other weapons, or dangerous chemicals on *University premises* or at any *University*-sponsored activity is prohibited. In addition, use of any such item, even if legally possessed, in a manner that harms, threatens or causes fear to others is prohibited. The term weapon is defined as any object or substance designed or used to inflict a wound, to cause or threaten injury , or to incapacitate. Weapons may include, but are not limited to, all firearms, pellet guns, tasers, stunguns, slingshots, martial arts devices, switchblade knives and clubs.

24.4.15. **Disruptive activity.** Disruption or obstruction of teaching, research, administration, or other *University* activities (including public-service functions on or off campus) or of other authorized non-*University* activities when conduct occurs on *University premises*. Such activities *may* include, but are not limited to:

- Leading or inciting others to disrupt scheduled and/or normal activities on *University premises*.
- Classroom behavior that seriously interferes with either (a) the *faculty member*'s ability to conduct the class or (b) the ability of other *students* to profit from the instructional program. (See Texas A&M University Rule on **Classroom Behavior, section 21 (https://student-rules.tamu.edu/rule21)** of this publication.)
- Any behavior in class or out of class, which for any reason interferes with the class work of others, involves disorder, or otherwise disrupts the regular and essential operation of the *University*.
- Activity or conduct that violates the Texas A&M University Rules on Freedom of Expression (See **Appendix XI (https://student-rules.tamu.edu/append11)**).

24.4.16. **Traffic obstruction.** Obstruction of the free flow of pedestrian or vehicular traffic on *University premises* or at *University*-sponsored or supervised activities.

24.4.17. **Disorderly conduct.** Public behavior that is disruptive, lewd, or indecent; breach of peace; or aiding, or procuring another person to breach the peace on University premises or at functions sponsored by the *University* or participated in by members of the *University* community.

24.4.18. **Unauthorized recording**. Any unauthorized use of electronic or other devices to make an audio, video, still frame or photographic record of any persons without their prior knowledge, or without their effective consent when the person or persons being recorded have a reasonable expectation of privacy and/or such recording is likely to cause injury or distress. This includes, but is not limited to, surreptitiously taking pictures of another person in a gym, locker room, or restroom or recording administrative meetings with *University officials*. If a recording is made that captures a violation of the Student Rules or law, the *Student Conduct Administrator may* elect not to enforce this section of the Student Rules against the *student* making the recording.

24.4.19. **Misuse of Computing Resources.** Failure to comply with *University* regulations and policies, license agreements, and contracts governing network, software and hardware use; abuse of communal resources; use of computing resources for unauthorized commercial purposes or personal gain; failure to protect your password or use of your account; breach of computer security, harmful access or invasion of privacy. Misuse and/or other abuse of computer facilities and resources including, but not limited to:

- Use of another individual's identification and/or password.
- Use of computing facilities and resources to send obscene or threatening messages.
- Use of computing facilities and resources in violation of copyright laws.

(see Appendix V, Individual Responsibility for Use of Computing Resources)

24.4.20. **Sexual Misconduct.**

> **24.4.20.1. Sexual contact.** Attempting or making sexual contact, including but not limited to, inappropriate touching without the person's consent (see "consent" definitions), or in circumstances where the person is physically, mentally or legally unable to give consent when the behavior is not so severe, pervasive, or persistent to create a work, educational, or campus living environment that a reasonable person would consider intimidating, abusive, or offensive or sexual exploitation as defined in Texas A&M University System Regulation 08.01.01. (For sex-based behaviors that are sever, persistent, or pervasive to create a work, education, or campus living environment that a reasonable person would consider intimidating, abusive, or offensive; sexual exploitation; sexual assault; or sexual harassment; please see System Texas A&M University System Regulation 08.01.01. and University Rule 08.01.01.M1.)

24.4.21. **Animal Cruelty.** Intentionally, knowingly, or recklessly torturing or in a cruel manner killing or causing serious bodily injury to an animal, failing to provide necessary food, water or care for an animal in the person's custody, abandoning unreasonably an animal in the person's custody, transporting or confining an animal in a cruel manner, causing bodily injury to any animal without the owner's *consent*, causing one animal to fight with another animal, or seriously overworking an animal. Intentionally, knowingly, or recklessly attacking, injuring or killing an assistance animal or inciting another to attack, injure or kill an assistance animal.

This policy is not intended to prohibit:

- Killing or injuring an animal within the scope of a person's employment or furthering the goals of legitimate educational curriculum as designed and approved by the *University*.
- Killing or injuring an animal when the actor had a reasonable fear of bodily injury to self or other person by that animal.

24.4.22. **Reckless driving**. Driving in a manner that recklessly endangers the health and/or safety of oneself or others.

24.4.23. **Abuse of process**. Abuse of the student conduct, disciplinary and/or legal processes including, but not limited to, *investigations*, *conferences*, and appeals. Prohibited behavior includes, but is not limited to:

- Failure to obey the notice from a *Student Conduct Panel*, *Student Conduct Administrator*, and/or *University official* to appear for a meeting or *conference* as part of an official *University* disciplinary process.
- Falsification, distortion, or misrepresentation of information.
- Disruption or interference with the orderly conduct of an *investigation*, *conference*, or an appeal process.
- Intentionally initiating or causing to be initiated any false report.
- Attempting to discourage an individual's proper participation in, or use of, a student conduct, disciplinary, or legal process.
- Attempting to influence the impartiality of a member of a *Student Conduct Panel* prior to, and/or during the course of, the *Student Conduct Panel*
- Verbal or physical intimidation, and/or retaliation of any party to the Student Conduct proceeding prior to, during, and/or afterwards.
- Committing a violation of *University* rules while serving a conduct probation, conduct review, or deferred suspension status or failing to meet deadlines imposed in accordance with *University*
- Failure to abide by the terms of *University* administered *sanctions*.
- Influencing or attempting to influence another person to commit an abuse of the Student Conduct Code system.

24.4.24. **Complicity.** Attempting, aiding, abetting, conspiring, hiring or being an accessory to any act prohibited by this code *shall* be considered to the same extent as completed violations.

24.5. **Bias-Related Violations**–Violations of 24.4 of this Student Conduct Code that are motivated by prejudice toward a person or group because of factors such as race, religion, ethnicity, disability, national origin, age, gender or sexual orientation *may* be assessed an enhanced *sanction* as prescribed in section 27 of this publication.

24.6. **Violations of Law and University Discipline** The focus of inquiry in student conduct proceedings *shall* be the determination of whether a violation of University rules occurred. Student conduct proceedings *shall* be informal in nature and need not comply with the formal processes associated with the criminal and civil courts, nor *shall* deviations from prescribed process necessarily invalidate a decision or proceeding unless significant prejudice to the *student* or *University may* result. Standards outlined by the *University* for *students may* be higher than those standards set for the general population. As each person is subject to multiple layers of expectations through the Federal, State, County and local governments, *students* are further expected to maintain a higher standard of behavior as members of the *University* community. *Students* failing to adhere to those standards *may* be subject to a University conduct process in addition to civil or criminal litigation should the behavior also be a potential violation of the law. The attempted analogy of student discipline to criminal proceedings

against adults and juveniles is not sound. *Students may* be charged with conduct that potentially violates both the criminal law and this Student Conduct Code (that is, if both possible violations result from the same factual situation) without regard to the pendency of civil or criminal litigation in court or criminal arrest and prosecution. Proceedings under this Student Conduct Code *may* be carried out prior to, simultaneously with, or following civil or criminal proceedings off campus at the discretion of Vice President for Student Affairs or designee. Determinations made or *sanctions* imposed under this Student Conduct Code *shall* not be subject to change because criminal *charges* were dismissed, reduced, or resolved in favor of or against the criminal law defendant. When a *student* is charged by federal, state, or local authorities with a violation of law, the *University* will not request or agree to special consideration for that individual because of that individual's status as a *student*. If the alleged offense is also being processed under the Student Conduct Code, the *University may* advise off-campus authorities of the existence of the Student Conduct Code and of how matters are typically handled within the *University* community. The *University* will attempt to cooperate with law enforcement and other agencies in the enforcement of criminal law on campus.

## 24.7 **Amnesty**

24.7.1 **Amnesty relating to sexual harassment, sexual assault, dating violence, and stalking.** Texas A&M University will "not take any disciplinary action against a student enrolled at the institution who in good faith reports to the institution being the victim of, or a witness to, an incident of sexual harassment, sexual assault, dating violence, or stalking [as defined in System Regulation 08.01.01, *Civil Rights Compliance*], for a violation by the student of the institution's code of conduct occurring at or near the time of the incident, regardless of the location at which the incident occurred or the outcome of the institution's disciplinary process regarding the incident, if any." (Texas Education Code Sec. 51.284).

This amnesty does not apply in situations where:

(a) A student "reports the student's own commission or assistance in the commission of sexual harassment, sexual assault, dating violence, or stalking" [as defined in System Regulation 08.01.01]; or
(b) A student's behavior occurring near or at the time of the incident could result in a suspension or expulsion from the university. For the purposes of this rule, suspension or expulsion may be possible outcomes when the student's behavior:

- Threatens or endangers the physical or mental health and/or safety of other individuals;
- Causes significant property damage or loss;
- Causes significant burden on the university and/or community members to repair the harm caused by the behavior;

- Would cause a reasonable person similarly situated to fear for their safety or suffer substantial emotional distress;
- Causes significant disruption that limits others' ability to access the academic, co-curricular, or work environment; or
- Has demonstrated a pattern of failure to comply with university behavioral expectations;

Staff in the Student Conduct Office "may investigate to determine whether a report of an incident of sexual harassment, sexual assault, dating violence, or stalking was made in good faith" (Texas Education Code Sec. 51.284(b)). A determination by the Vice President for Student Affairs or designee responsible for oversight of the student conduct processes that a student is entitled to amnesty is final and may not be revoked. All questions of implementation of this amnesty rule are subject to the decision of the Vice President for Student Affairs or designee responsible for oversight of the student conduct processes.

24.7.2 **Amnesty pertaining to alcohol and other drugs.** A student who calls 9-1-1 or takes an individual to receive emergency treatment for possible alcohol and/or drug overdose will not be charged under this code for possession or use of alcohol or other drugs. This amnesty only applies if:

(a) The student stays with the individual needing treatment until emergency services arrive;
(b) The student takes reasonable measures to assist the individual needing treatment; and
(c) The student is cooperative with emergency services and university processes.

**Propose a Student Rule Revision (https://student-rules.tamu.edu/propose/revision/?title=Student Conduct Code&section=)**

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## DEFENDANT'S FIRST SUPPLEMENT TO PLEA TO THE JURISDICTION

Defendant Texas A&M University ("TAMU") files this First Supplement to Plea to the Jurisdiction and respectfully shows as follows:

TAMU attaches and incorporates fully by reference herein for all purposes the filings in *Brian Beckcom v. Texas A&M University*; Cause No. 24-000902-CV-85; In the 85th Judicial District Court of Brazos County, Texas, namely:

1. Defendant's First Amended Plea to the Jurisdiction and all exhibits attached thereto;

2. Defendant's First Supplement to First Amended Plea to the Jurisdiction and all exhibits attached thereto; and

3. Defendant's Second Supplement to First Amended Plea to the Jurisdiction and all exhibits attached thereto.

## PRAYER

Wherefore, premises considered, TAMU respectfully requests this plea be granted thereby dismissing Plaintiff's claims with prejudice, and that all requested

1

relief be denied. TAMU further requests all other relief to which it may be justly entitled both at law and in equity.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
**Attorneys for Defendant**

2

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through E-File Texas, File and Serve Texas in compliance with TRCP 21 on March 21, 2025 to:

Brendan Fradkin
Brian Beckcom
VB Attorneys
1220 Augusta, Suite 240
Houston, TX 77057
713/224-7800 (Office)
713/224-7801 (fax)
brendan@vbattorneys.com
Brian@vbattorneys.com

Hunter Shurtleff
Texas Bar No. 00794629
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
Office: 409 E. 26th Street
Bryan, Texas 77803
Telephone (979) 446-4012
Fax (979) 431-0065
hunter@shurtlefflaw.com

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General

3

CAUSE NO. 24-000902-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## DEFENDANT'S FIRST AMENDED PLEA TO THE JURISDICTION

Defendant Texas A&M University ("TAMU") files this First Amended Plea to the Jurisdiction[1] because it met its obligation under the Texas Public Information Act ("TPIA") to produce information in response to Plaintiff's open records requests. TAMU also properly withheld documents as expressly permitted by the TPIA and in reasonable reliance of a prior decision by the Attorney General's Office. Thus, Plaintiff lacks standing because there was no violation of the TPIA that can be redressed by way of this lawsuit. There is no live justiciable controversy or dispute to resolve. Even if a controversy ever existed, it is now moot. As a result, Plaintiff is not entitled to any relief whatsoever, including declaratory judgment relief or attorney's fees. In support, TAMU respectfully offers the following for consideration by the Court:

---

[1] TAMU incorporates by references its initial Plea to the Jurisdiction, First Supplement and Second Supplement thereto, and all exhibits attached thereto.

- 579 -

## I. BACKGROUND

### A.  Nature of Suit and Claims

This is a suit for writ of mandamus under the Texas Public Information Act ("TPIA"). TEX. GOV'T CODE § 552.321. On March 28, 2024, Plaintiff,[2] an attorney previously *pro se* that recently obtained counsel, filed this action claiming that TAMU failed to produce "full and complete responsive documents" and further "has refused to produce all of the requested public information" in violation of the TPIA. See Plaintiff's Original Petition for Writ of Mandamus at ¶¶ 3.1, 5.2. Plaintiff requests that TAMU "immediately produce" all public information responsive to his February 26, 2024 request, a deposition of the TAMU personnel that gathered and collected the requested materials in issue, and attorney's fees and costs. *Id.* at ¶¶ 7.1-7.3.

On May 10, 2024, Plaintiff filed a First Amended Petition for Writ of Mandamus (First Amended Petition) requesting that TAMU appoint a third-party service to perform a search for the requested public records. See First Amended Petition. He also listed five of the six requests in the first TPIA request made on February 26, 2024. See First Amended Petition at ¶ 5.1.3(1)-(5). Plaintiff admits that on April 24, 2024, TAMU produced documents responsive to this request, but claims it was an incomplete production and that he "knows of" and is in possession of additional documents that were not produced. *Id.* at ¶ 5.1.4-5.1.5. He asserts that TAMU's search for documents was not conducted properly in good faith "or" that TAMU is improperly withholding documents. *Id.* at ¶¶ 5.1.6-5.1.7.

---

[2] TAMU collectively refers to "Plaintiff" to include Plaintiff and any other attorneys or assistants with whom it had contact with regarding the TPIA requests in issue, including Brendan Fradkin and Patti Artavia.

**B.**    **Plaintiff's Attempt to Improperly Prejudice TAMU by filing an Amended Petition *one day* before a Scheduled Court Hearing**

On June 26, 2024, in the late afternoon just *one day* before a previously scheduled hearing was set to take place on June 27, 2024, Plaintiff filed a Second Amended Petition for Writ of Mandamus and Request for Declaratory Judgment (Second Amended Petition). Amended pleadings and their contents take the place of prior pleadings. *FKM Prtshp. v. Board of Regents*, 255 S.W.3d 619, 633 (Tex. 2008); TEX. R. CIV. P. 65.

His fundamental allegations remain the same, but *he added three new, significant matters*, as follows:

(1) allegations regarding an additional public information request for "bathroom renovation project" documents, which was allegedly undertaken because "one transvestite cadet threatened to sue TAMU;"
(2) a purported violation of Senate Bill 17; and
(3) a claim for declaratory judgment relief.

See Second Amended Petition at 5.4, 6.2, 7.8.

Plaintiff also added a new (incorrect) allegation that TAMU is refusing to produce a "recorded, public Microsoft Teams call." *Id.* at ¶ 5.4.3.

Despite adding these new allegations and claims, Plaintiff improperly insisted to the court, and over TAMU's objection, that it should still proceed with the June 27th hearing. The hearing on June 27th was cancelled by the Court due to a scheduling conflict with another matter.

**C.**    **Documents regarding Diversity, Equity, and Inclusion (DEI)**

Plaintiff further alleges that TAMU failed to produce documents regarding DEI relating to proposed changes to the Corps of Cadets. See Second Amended Petition at ¶¶

5.2-5.2.2. Plaintiff acknowledges he was informed by TAMU that it is withholding these documents pursuant to a prior AG Letter ruling, but (incorrectly) contends it was "not specific to this request" and that TAMU is required to get a new AG opinion on these documents. *Id*. at ¶ 5.2.2.

**D.     Documents regarding the Hazing Investigation of Squadron 17**

In response to Plaintiff's March 28, 2024 TPIA request, he alleges TAMU failed to produce documents relating to the "wrongful" hazing investigation of Squadron 17. See Second Amended Petition at ¶¶ 5.3-5.3.1. While Plaintiff admits that on May 9, 2024, TAMU did in fact produce documents responsive to this request, he claims it was incomplete and that it is withholding an "*unknown number of documents …*" *Id*. at ¶ 5.3.2. (emphasis added).

For unknown reasons, Plaintiff felt the need to "chime in" with his completely subjective, irrelevant and unsubstantiated personal "opinion" that the hazing investigation was "brought in bad faith to retaliate against the all-male outfit." *Id*. at ¶ 5.3.

TAMU disputes these allegations and contends that it met its TPIA obligations by producing the responsive information to which Plaintiff is entitled. TAMU further contends that it properly withheld the DEI documents as expressly permitted by law.

**E.     Request for Hearing**

A hearing before the court is set for August 9, 2024 in this case. In the interest of judicial economy and efficiency, TAMU respectfully requests this First Amended Plea to the Jurisdiction be set for hearing along with all other matters to be addressed that day before the court.

## II. INCORPORATION OF EVIDENCE

In filing this plea, Defendant attaches the following affidavits, documents, statements, materials, and other evidence to establish, as evidence in support thereto, and all such evidence is fully incorporated and adopted herein by reference for all purposes:

**Exhibit 1:** Plaintiff's first TPIA request w/ history – J000762
**Exhibit 2:** Plaintiff's second TPIA request w/ history –J000767
**Exhibit 3:** Plaintiff's third TPIA request w/ history – J001123
**Exhibit 4:** Plaintiff's fourth TPIA request w/ history – J001147
**Exhibit 5:** Plaintiff's fifth TPIA request w/ history – J0001320
**Exhibit 6:** TAMU request for AG decision, April 19, 2024
**Exhibit 7:** AG decision OR2024-004322
**Exhibit 8:** Plaintiff's lawsuit against TAMU
**Exhibit 9:** First batch produced B-1 (11 pgs)
**Exhibit 10:** Second batch produced B-2 (111 pgs)
**Exhibit 11:** TAMU withdrawal letter re B-1 and B-2 docs
**Exhibit 12:** Plaintiff's sixth TPIA request w/ history – J0001365
**Exhibit 13:** Email w/ transmittal of documents re sixth TPIA request
**Exhibit 14:** Plaintiff's seventh TPIA request w/ history – J0001723
**Exhibit 15:** Email w/ transmittal of partial disclosure of seventh TPIA req
**Exhibit 16:** TAMU request for AG decision, May 6, 2024
**Exhibit 17:** TPIA request by JD Foster – J1330
**Exhibit 18:** Fish brigade concept docs (152 pgs)
**Exhibit 19:** Updated Plaintiff's fifth TPIA request w/ history – J-1320
**Exhibit 20:** Emails b/t Plaintiff and TAMU re TPIA req J001320
**Exhibit 21:** Rudder theatre email (2 pgs)
**Exhibit 22:** Facebook post (6 pgs)
**Exhibit 23:** Emails b/t Plaintiff and defense counsel
**Exhibit 24:** TAMU System policy 61.01, Public Information Act Compliance[3]
**Exhibit 25:** TAMU System regulation, 61.01.02, Public Information
**Exhibit 26:** J1147 production part one (292 pgs)
**Exhibit 27:** J1147 production part two (13 pgs)
**Exhibit 28:** Business records affidavit, Patricia Bledsoe
**Exhibit 29**: J1147 production June 13, 2024 (108 pgs)
**Exhibit 30**: Second business records affidavit, Patricia Bledsoe

---

[3] TAMU system policies and regulations identified as **Exhibit 24** and **Exhibit 25** may be found online accessible to the public at https://orec.tamu.edu/open-records/.

**Exhibit 31**: Plaintiff's seventh TPIA request w/ history – J1723 (6 pgs)
**Exhibit 32**: J1723 production part 1 (123 pgs), June 3, 2024
**Exhibit 33**: J1723 production part 2 (1 pg), June 3, 2024
**Exhibit 34**: J1723 production part 3 (5 pgs chart), June 3, 2024
**Exhibit 35**: J1723 production part 4 (2 pgs), June 3, 2024
**Exhibit 36**: J1723 production part 5 (2 pgs), June 3, 2024
**Exhibit 37**: J1723 production part 6 (71 pgs), June 3, 2024
**Exhibit 38**: Third business records affidavit, Patricia Bledsoe
**Exhibit 39**: J1723 Notice of Project w weblink for meeting
**Exhibit 40**: J1723 production part 1 (633 pgs), July 12, 2024
**Exhibit 41**: J1723 production part 2 (108 pgs), July 12, 2024
**Exhibit 42**: J1723 production part 3 (1 pg), July 12, 2024
**Exhibit 43**: J1723 production part 4 (3 pgs), July 12, 2024
**Exhibit 44**: Fourth business records affidavit, Patricia Bledsoe
**Exhibit 45**: Attorney General ruling, OR2024-023625

## III.    STATEMENT OF FACTS

### A.    TAMU's Office of Open Records

TAMU's Office of Open Records (ORO) is dedicated to the principles of open government and strives to ensure compliance as set forth by the TPIA. **Exhibit 28** at ¶ 5. TAMU maintains policies regarding TPIA compliance and the establishment of baseline procedures to help members of the TAMU System comply with it. **Exhibit 24**; **Exhibit 25**.

TAMU's ORO oversees the collection process of information requested under the TPIA. *Id*. The actual collection is done by the department maintaining the information or, in the case of emails, IT for that group. **Exhibit 28** at ¶ 5. The ORO reviews, processes and releases information gathered by the respective department and/or IT. *Id*. The ORO confirms the applicability of exceptions to disclosure on information requested under the TPIA with the Office of General Counsel of The Texas A&M University System (TAMUS OGC). *Id*. For information determined to be excepted, TAMU's ORO works with TAMUS OGC to: request a decision from the Office of the Attorney General; confirm the

applicability of a prior open records decision from the Office of the Attorney General; confirm TAMU's authority to redact or withhold excepted information without seeking a decision from the Office of the Attorney General per the TPIA; and/or confirm the applicability of the requestor's authorization to redact or withhold excepted information without seeking a decision from the Office of the Attorney General. *Id*. The ORO redacts and/or withholds information requested under TPIA only when: authorized by the Office of the Attorney General in a decision/letter ruling; the information is subject to a prior decision of the Office of the Attorney General; the TPIA authorizes the action; and/or authorized by the requestor. *Id*.

## B.     Plaintiff's TPIA Requests

Plaintiff made several TPIA requests to TAMU, as follows:

### 1.  *First request – J000762*

On February 26, 2024, Plaintiff made a request for the following six (6) categories of documents:

- All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same;
- All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same;

- 585 -

- All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.
- Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same;
- Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents; and
- Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes.

**Exhibit 1** at p. 2.

The same day the request was made, TAMU's ORO responded and assigned a reference number to the request. *Id.* at p. 17. The ORO and Plaintiff exchanged several emails regarding clarification of the request so that TAMU can comply with its TPIA obligations. *Id.* at pgs. 4-17. On March 7, 2024, Plaintiff provided clarification by limiting the request to the years 2023 and 2024 and limiting the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs and the Office of the President. *Id.* at pgs. 11-12. In those email exchanges, Plaintiff accused TAMU of making frivolous objections and threatened it with legal action. *Id.* at pgs. 4-6, 10-11.

Plaintiff agreed to both the redaction of information subject to mandatory exceptions and to the redaction of information subject to discretionary exceptions. *Id.* at pgs. 2, 17. TAMU produced documents responsive to this request in two separate productions, the first on March 21, 2024 and the second on April 5, 2024. *Id.* at pgs. 3, 8.

*2. Second request – J000767*

On February 26, 2024, the same day as the first request, Plaintiff made a request for the following two (2) categories of documents:

- Any contracts of employment for the Commandant of the Corps of Cadets, Patrick Michaelis, any drafts of the same, any communications in whatever form regarding the same, and any other agreements which relate to the same; and
- Any documents or materials related to the selection of Patrick Michaelis as Commandant, including but not limited to meeting notes, interview notes, memos, discussions, digital communications of any form, any discussion or notes regarding why Michaelis was selected over other candidates, and any other documents or materials concerning the same.

**Exhibit 2**.

The same day the request was made, the ORO responded and assigned a reference number to the request. *Id*. at p. 6. Plaintiff agreed to both the redaction of information subject to mandatory exceptions and to the redaction of information subject to discretionary exceptions. *Id*. at pgs. 1, 6.

The ORO and Plaintiff exchanged several emails regarding clarification of the request so that TAMU can fully comply with its TPIA obligations, including the status of the request and that it expected to provide a response no later than March 19, 2024. *Id*. at pgs. 2-6. TAMU produced the responsive documents on March 19, 2024. *Id*. at p. 3. Plaintiff once again threatened TAMU with legal action. *Id*. at p. 2.

### 3. *Third request – J001123*

On March 27, 2024, Plaintiff made a request for the following information pertaining to the hiring of the Commandant:

- The job posting and applicant resumes;

- Emails, texts, and other communications between the office of the Vice President of Student Affairs and the Office of the President (former President Banks);[4]
- Letters of recommendation;
- Notes from deliberations; and
- Emails to and from the candidates.

**Exhibit 3**.

The same day the request was made, TAMU's ORO responded and assigned a reference number to the request. *Id*. at p. 3. Plaintiff agreed to both the redaction of information subject to mandatory exceptions and to the redaction of information subject to discretionary exceptions. *Id*. at p. 2. On April 11, 2024, TAMU produced the responsive documents. *Id*. at p. 2. Plaintiff incorrectly stated that the responsive documents were overdue. *Id*. at p. 2.

### 4. *Fourth request – J0001147 – the Squadron 17 Investigation documents*

On March 28, 2024, Plaintiff made a request for the following four (4) categories of documents:

- All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation;
- All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the

---

[4] TAMU notes that M. Katherine Banks served as TAMU President from June 1, 2021 to July 20, 2023. Accordingly, at the time of Plaintiff's third TPIA request, Ms. Banks was no longer president.

Texas A&M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same;

- Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere; and

- Any texts, emails or other forms of communication, digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same.

**Exhibit 4**.

The same day the request was made, the ORO responded and assigned a reference number to the request. *Id*. at p. 17. Plaintiff agreed to both the redaction of information subject to mandatory exceptions and to the redaction of information subject to discretionary exceptions. *Id*. at p. 3.

On April 1, 2024, the ORO requested clarification of the request. *Id*. at pgs. 15-16. The clarification requested was to provide a date range to better assist Plaintiff with his request. *Id*. at p. 13. Shortly thereafter, Plaintiff responded that "[t]his is another form response" and provided the date range of 2023 and 2024. *Id*. at p. 13. On May 2, 2024, the ORO informed Plaintiff that his request is still being processed and that responsive documents will be produced by May 8, 2024. *Id*. at p. 9. TAMU produced the responsive documents on May 8, 2024, subject to redactions and/or withheld information under the

TPIA. **Exhibit 4** at pgs. 5-6; **Exhibit 26**; **Exhibit 27**. Certain documents were withheld because the entire document is personally identifiable to the students in the investigation. With respect to the student records of Plaintiff's son, he was advised to go directly to TAMU's Student Conduct Office through the FERPA access process. **Exhibit 4** at p. 12.

### 5. *Fifth request – J001320 – The DEI docs*

On April 10, 2024, Plaintiff re-filed his first request but without redaction authority. **Exhibit 5** at p. 1. Thus, it was a re-urged request for the same six categories of documents without redaction to any mandatory or discretionary exceptions. *Id.*

Plaintiff had several email communications with TAMU's Deputy General Counsel, R. Brooks Moore regarding this renewed request, including the production of DEI-related documents. *Id.* at pgs. 4-10. In those communications, TAMU indicated it was withholding the DEI-related documents pursuant to TEX. GOV'T CODE § 552.101 and TEX. EDUC. CODE § 51.971(e)(2). *Id.* at 8-9. TAMU also noted the existence of several AG letter rulings covering different DEI documents covered by ongoing compliance review, and that one letter ruling covers the specific DEI information in issue, but that verification was necessary; it was fine with seeking an AG decision if required. *Id.* at p. 5. TAMU further noted that Plaintiff's pending mandamus action required it to obtain representation from the Attorney General's Office and that this legal action complicated Plaintiff's TPIA request from moving forward. *Id.* at p. 4.

On April 19, 2024, TAMU submitted a request to the AG's Office for a decision regarding Plaintiff's fifth TPIA request. **Exhibit 6**. Noting that on April 8, 2024, Plaintiff withdrew consent to withhold excepted information which resulted in the first request to

be handled as a new request, TAMU indicated it will seek an AG decision. **Exhibit 5** at pgs. 4-5, 7. TAMU cited to a prior AG decision (**Exhibit 7**) regarding the DEI documents since it was the same information at issue in a separate prior TPIA request, namely TEX. ATT'Y GEN. OR2024-004322. **Exhibit 6** at p. 2. Hence, TAMU withheld those documents. *Id.*

TAMU also requested an AG decision on remaining responsive information excepted from disclosure, which was information withheld under the deliberative process privilege component of section 552.111 of the TPIA. **Exhibit 6** at pgs. 2-4. In this regard, the information relates to policymaking in connection with the university's adoption of formal policies applicable to the Corps of Cadets, including student cadets (i.e., the Fish Brigade) and university staff Corps administration. *Id.* at p. 4.

The exhibits attached to the request for an AG decision were as follows:

**Exhibit 5**:  Fifth TPIA request (identified in request for AG decision as Exhibit A-1)

**Exhibit 1**:  First TPIA request (identified in request for AG decision as Exhibit A-2)

**Exhibit 8**:  Plaintiff's mandamus action against TAMU (identified in request for AG decision as Exhibit A-3)

**Exhibit 9**:  First batch of remaining responsive information (identified in request for AG decision as Exhibit B-1)
**\*subsequently produced to Plaintiff**

**Exhibit 10**:  Second batch of remaining responsive information (identified in request for AG decision as Exhibit B-2)
**\*subsequently produced to Plaintiff**

**Exhibit 7**:  AG Order 2024-004322 (identified in request for AG decision as Exhibit C)

On April 23, 2024, TAMU notified the AG's office that it was withdrawing a decision on the information submitted as Exhibits B-1 and B-2. **Exhibit 11**. Accordingly,

a decision was no longer requested on those documents. On April 24, 2024, TAMU produced these documents to Plaintiff, referred to as the "fish brigade concept" documents. **Exhibit 18**[5]; **Exhibit 19** at p. 4.

On April 26, 2024, TAMU produced two additional documents to Plaintiff, namely the Rudder theatre email and a Facebook post. **Exhibit 20** at p. 1; **Exhibit 21**; **Exhibit 22**. In those email communications, TAMU also provided Plaintiff with additional helpful information regarding this production, including reference to prior productions and also informed him that it did not have documents regarding certain topics (i.e., proposed lesson plans/curricula). **Exhibit 20** at pgs. 1-3.

### 6. Sixth request – J001365

On April 15, 2024, Plaintiff made a request for the following documents:

- Any and all audio or video recordings of candidates as part of the Commandant selection process;

**Exhibit 12**.

The same day the request was made, the ORO responded and assigned a reference number to the request. *Id*. at p. 2. Plaintiff agreed to the redaction of information subject to mandatory exceptions but did not agree to the redaction of information subject to discretionary exceptions. *Id*. at pgs. 1-2. On April 29, 2024, TAMU produced the materials responsive to this request. **Exhibit 13**.

---

[5] For purposes of clarification, the documents contained in **Exhibits 9** and **10** were contained in the 152-page production contained in **Exhibit 18** as part of the J01320 production.

### 7. *Seventh request – J0001723 – the bathroom renovation documents*

On May 16, 2024, Plaintiff made a request for the following three (3) categories of documents:

- Any documents pertaining to renovation plans for the bathroom/restroom facilities in the dormitories housing the Corps of Cadets. This should include contracts or agreements related to the renovation projects, estimates, analyses, architectural designs/plans, engineering designs/plans, and anticipated costs;
- Any communications between university employees or officials regarding the renovation plans or any of the documents pertaining to those plans; and
- Any communications between university employees or officials and third-parties regarding the renovation plans or any of the documents pertaining to those plans.

**Exhibit 14** at pg. 1.

The same day the request was made, the ORO responded and assigned a reference number to the request. *Id*. at p. 5. Plaintiff agreed to the redaction of information subject to mandatory exceptions but did not agree to the redaction of information subject to discretionary exceptions. *Id*. at pg. 1. In need of clarification, TAMU requested a date range for the request, in response to which Plaintiff indicated it was limited "to the last 3 years." *Id*. at pgs. 2-4. Plaintiff incorrectly accused TAMU of "constant delay and piecemeal production." *Id*. at p. 2. He further requested a privilege log, which is not permitted under the TPIA. *Id*.

On June 3, 2024, the ORO provided Plaintiff with a partial disclosure of documents, which was information that it was not seeking to withhold. **Exhibit 15**; **Exhibit 32** through **Exhibit 37**. Plaintiff was further notified that the information sought was the subject of a

prior request and that TAMU had requested a ruling by the AG's Office thereon, namely a TPIA request from JD Foster (J001330-041124). **Exhibit 15**; **Exhibit 16**; **Exhibit 17**.

C.     **Plaintiff Threatens Defense Counsel's Employment and Raises Matters Clearly Outside the Scope of the TPIA**

In May 2024, Plaintiff and defense counsel exchanged emails regarding a conference call to discuss the case; Plaintiff inexplicably cancelled the conference call without explanation about a day or two before it was scheduled to take place. **Exhibit 23**. In the email, Plaintiff wrongfully threatened defense counsel's employment at the Attorney General's Office and raised completely irrelevant matters outside the scope of the TPIA, as follows:

- "**Does your boss know** that you are taking a **pro-DEI, anti-SB 17 position** in this litigation?? Have you sought and received approval from the higher-ups in the AGs office to take this position?" (emphasis added)
- "I think the **powers-that-be may be interested to know that you** are taking a **pro-DEI, anti-SB 17 position** in this case." (emphasis added).

*Id*.

These "questions" by Plaintiff were not legitimate inquiries but were rather solely for purposes of harassment and bullying in violation of the Texas Lawyer's Creed. They clearly served no purpose towards resolution of the case. Accordingly, the undersigned defense counsel did not respond.

D.     **Plaintiff's Fourth TPIA request – J1147 - Additional Documents Produced regarding the Squadron 17 Investigation**

On or about June 12, 2023, while TAMU was in the process of gathering documents in support of its Plea to the Jurisdiction, additional documents responsive to this request were located. Accordingly, on June 13, 2024, TAMU promptly produced to Plaintiff an

additional 108-pages of documents. **Exhibit 29**. They were produced in redacted form pursuant to TEX. GOV'T CODE § 552.114 because they contain personally identifiable student record information. *Id*. A 46-page document was withheld from disclosure pursuant to TEX. GOV'T CODE § 552.114 because the entire document contains personally identifiable student record information that cannot be sufficiently de-identified.

**E.      Plaintiff's Seventh TPIA request – J0001723 – Additional Documents Produced regarding the bathroom renovation documents**

On July 12, 2024, TAMU produced additional information responsive to Plaintiff's seventh TPIA request. **Exhibit 31**; **Exhibit 40** through **Exhibit 43**. Some records were found to be copyrighted and therefore not produced. **Exhibit 31** at p. 2. However, Plaintiff was informed that the copyrighted documents can be made available for viewing at TAMU's office. *Id*. Plaintiff never contacted TAMU to schedule a time to view those documents.

**F.      TAMU recently received an AG ruling on the TPIA request from JD Foster (J1330) – a ruling that it relied on for Plaintiff's TPIA request (J1723) - the bathroom renovation documents**

On June 3, 2024, in response to Plaintiff's seventh TPIA request, J1723, TAMU did a partial production of documents it was not seeking to withhold but requested a ruling from the Attorney General's Office on some documents responsive to that request, **Exhibit 15**; **Exhibit 32** through **Exhibit 37**. As indicated above, TAMU relied on an AG ruling for this TPIA request based on a request by JD Foster (J001330-041124). **Exhibit 15**; **Exhibit 16**; **Exhibit 17**. On July 8, 2024, the AG ruling was issued regarding the documents that were withheld pending this ruling. **Exhibit 45**. Accordingly, additional documents

responsive to Plaintiff's seventh TPIA request are expected to be produced on or about August 2, 2024.

## IV.    THE PLEA TO THE JURISDICTION STANDARD

"[S]ubject-matter jurisdiction is essential to a court's power to decide a case." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). The trial court's subject matter jurisdiction may be challenged through a plea to the jurisdiction. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004); *Blue*, 34 S.W.3d at 554 ("A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat a cause of action without regard to whether the claims asserted have merit."). Whether a court has subject matter jurisdiction is a question of law. *Miranda*, 133 S.W.3d at 228.

The plaintiff has the burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction. *Id.* at 226. We begin with the allegations in the plaintiff's live pleadings, which we construe liberally in favor of jurisdiction and, unless challenged with evidence, take as true. See *id*. We consider any evidence introduced relevant to the jurisdictional inquiry. *See City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010); *Blue*, 34 S.W.3d at 555 ("[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.").

"Standing is implicit in the concept of subject-matter jurisdiction, and subject-matter jurisdiction is essential to the authority of a court to decide a case." *In re Abbott*, 601 S.W.3d 802, 807 (Tex. 2020) (orig. proceeding) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993)). Thus, if Plaintiff lacks standing, this Court

lacks subject-matter jurisdiction to proceed with this case. Mootness is also a threshold issue that implicates a court's subject matter jurisdiction. *See State ex rel. Best v. Harper*, 562 S.W.3d 1, 6 (Tex. 2018); *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012).

A trial court must determine at its earliest opportunity whether it has the authority to decide the issues before it because if it lacks jurisdiction over the subject matter of the case, its judgment is void. See *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004). Texas Courts of Appeal have similarly held that jurisdiction is fundamental in nature and must not be ignored. *Harper v. Welchem, Inc.*, 799 S.W.2d 492, 494 (Tex.App.—Houston [14th Dist.] 1990, no writ); *Royal Indep. Sch. Dist. v. Ragsdale*, 273 S.W.3d 759, 763 (Tex. App.–Houston [14th Dist.] 2008, no pet.); *State v. Morse*, 903 S.W.2d 100, 101 (Tex.App.–El Paso 1995, no pet.).

## V. ARGUMENT AND AUTHORITY

### A.  The Texas Public Information Act

The TPIA "guarantees access to public information, subject to certain exceptions." See generally TEX. GOV'T CODE ch. 552; *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 114 (Tex. 2011). "Those exceptions embrace the understanding that the public's right to know is tempered by the individual and other interests at stake in disclosing that information." *Cox Tex. Newspapers, L.P.*, 343 S.W.3d at 114.

The TPIA defines "public information" in relevant part, as "information that is written, produced, collected, assembled, or maintained under a law or ordinance or in

connection with the transaction of official business: (1) by a governmental body; or (2) for a governmental body and the governmental body owns the information or has a right of access to it." TEX. GOV'T CODE § 552.002(a).

A public information request typically involves the governmental body holding the information and the citizen requesting it. Upon receiving a request for public information, a governmental body must promptly produce the information for inspection, duplication, or both, TEX. GOV'T CODE § 552.221, unless an exception applies. *See In re City of Georgetown*, 53 S.W.3d 328, 331 (Tex. 2001). The TPIA is to be liberally construed in favor of granting requests for information. TEX. GOV'T CODE § 552.001(b).

If the governmental body believes an exception applies, it must promptly ask the Attorney General for a ruling. See *id.* § 552.301. Whether an exception under the TPIA applies to support withholding information is a question of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex. 2000). The party seeking the exception bears the burden of establishing that the exception applies. *See Texas Dep't of Pub. Safety v. Abbott*, 310 S.W.3d 670, 673–74 (Tex. App.—Austin 2010, no pet.). Because the TPIA is to be "liberally construed in favor of granting a request for information," TEX. GOV'T CODE § 552.001(b), the exceptions must be narrowly construed. *Harris Cnty. Appraisal Dist. v. Integrity Title Co.*, 483 S.W.3d 62, 69 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

**B.    TAMU Produced Documents Responsive to Plaintiff's TPIA Request regarding the Squadron 17 Investigation – J1147**

Plaintiff's assertion that TAMU's production of the Squadron 17 documents was incomplete is incorrect and without factual basis. In response to Plaintiff's clarification on

the date range of the requested items to the years 2023 and 2024, TAMU promptly responded by advising him on May 2, 2024 that responsive documents were still being processed, and six days later on May 8, 2024, they were produced subject to redactions. **Exhibit 4** at pgs. 5-6, 13; **Exhibit 26**; **Exhibit 27**.

TAMU is expressly permitted to request clarification pursuant to TEX. GOV'T CODE § 552.222(d), Permissible Inquiry by Governmental Body to Requestor. Per the clarification provided, TAMU's production of documents were responsive to item 2 (qualifications/training of staff participating in the Squadron 17 investigation), item 3 (any investigation of Squadron 17), and item 4 (communications related to the investigation of any Corps outfit) of that request. **Exhibit 4** at p. 2; **Exhibit 26**; **Exhibit 27**.

Information about the Squadron 17 hazing investigation was redacted under TEX. GOV'T CODE § 552.114 because the information is personally identifiable to the other students involved in the hazing case (complainant or respondent). The withholding of certain entire documents for the same reason was also appropriate and in accordance with TPIA.

Section 552.114(b) expressly provides that information is confidential and excepted from the requirements of Section 552.021 if it is information in a student record at an educational institution funded wholly or partly by state revenue. TAMU properly redacted information covered under subsection (b) without requesting a decision from the attorney general. *Id.* at § 552.114(d). The TPIA specifically adopts the term "student record" as defined by the Family Educational Rights and Privacy Act (FERPA) with respect to "information that constitutes education records." *Id.* at § 552.114(a)(1). Additionally, the

redactions were consistent with TAMU's policies and established protocol in response to TPIA requests. **Exhibit 24**; **Exhibit 25**; **Exhibit 28** at ¶ 5.

Accordingly, there is no factual basis to support Plaintiff's allegation that TAMU is improperly withholding responsive documents or materials. Moreover, his assertion that TAMU employees have been instructed to delete or destroy responsive information or materials is utterly baseless. A review of all exhibits attached hereto indicate no such instruction or direction to do so. Furthermore, nowhere in the TPIA does it permit or require a governmental body to appoint a third-party to perform a search for public information. Similar to litigants engaged in the discovery process with respect to responding to a request for production of documents, TAMU cannot produce documents that do not exist. It can only produce documents in existence and in its possession. TAMU met this burden in accordance with the TPIA.

## C.  TAMU Properly Withheld DEI Documents in Accordance with a Prior AG Decision – TAMU Acted in Reasonable Reliance of the Prior AG Decision

Plaintiff's contention that TAMU improperly withheld the requested DEI documents fares no better. His fifth TPIA request (J1320) on April 10, 2024 included the following request:

- Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes.

**Exhibit 5** at p. 1.

Plaintiff had several email communications with TAMU's Deputy General Counsel, R. Brooks Moore, regarding this request, including the above request for DEI documents

and one letter ruling covers the specific DEI information in issue. *Id*. at pgs. 4-10. TAMU

indicated it was withholding the DEI-related documents pursuant to TEX. GOV'T CODE §

552.101 and TEX. EDUC. CODE § 51.971(e)(2). *Id*. at 8-9.

Section 552.101 of the Government Code excepts from public disclosure

"information considered to be confidential by law, either constitutional, statutory, or by

judicial decision." TEX. GOV'T CODE § 552.101. Hence, Section 552.101 encompasses

information protected by other statutes, including Section 51.971 of the Texas Education

Code. This section of the Education Code provides, in relevant part, the following:

> (a)     In this section:
>     (1) "Compliance program" means a process to assess and ensure compliance by the officers, employees, agents, contractors, subcontractors, or other persons acting on behalf of an institution of higher education with applicable laws, rules, regulations, and policies, including matters of:
>         a. Ethics and standards of conduct;
>         b. Financial reporting;
>         c. Internal accounting controls; or
>         d. Auditing.
>     (2) "Institution of higher education" has the meaning assigned by Section 61.003.[6]
> (e)     Information is excepted from disclosure under Chapter 552, Government Code, if it is collected or produced:
>     (2)    by a systemwide compliance office for the purpose of reviewing compliance processes at a component institution of higher education of a university system.

*Id*. at § 51.971.

If a governmental body receives a TPIA request for information that it wishes to

withhold from public disclosure and believes is excepted from disclosure, *within ten days*

---

[6] As a public university, it is without dispute that TAMU meets the definition of "institution of higher education." TEX. EDUC. CODE § 61.003(8).

*of receipt of the written request*, the governmental body must ask for a decision from the AG about whether the information may be withheld. See TEX. GOV'T CODE § 552.301(a) (emphasis added). TAMU's April 19th request for an AG decision was timely, which therein cited to an applicable prior AG letter ruling because *Plaintiff's request was for the same information at issue in a separate prior TPIA request*. **Exhibit 6** at pgs. 1-2. The prior AG decision concluded this DEI information is confidential pursuant to TEX. EDUC. CODE § 51.971(e)(2). **Exhibit 7**. Hence, TAMU "must withhold" this information under TEX. GOV'T CODE § 552.101 in conjunction with TEX. EDUC. CODE § 51.971(e)(2). *Id*. Since there had already been a prior determination about whether this information falls within one of the permitted TPIA exceptions, TAMU's reliance on it is reasonable in accordance with the TPIA. See §§ 552.301(a), 552.323(a)(3).

Plaintiff can cite to no AG letter ruling indicating that the DEI documents in issue is public information not excepted from disclosure by Subchapter C of the TPIA. The fact that Plaintiff disagrees with the Attorney General's express mandate to withhold the DEI documents in issue has no relevance or bearing on the analysis. TAMU properly withheld the DEI documents pursuant to a prior AG letter ruling.

**D.    Plaintiff's Allegation that TAMU has additional responsive documents but is not producing them is false**

In his Second Amended Petition, Plaintiff repeatedly alleges that TAMU has more responsive documents but is refusing to produce them, as follows:

- "TAMU failed to search for and produce documents responsive to requests for communications regarding the Commandant's plan to restructure the Corps of Cadets." Second Amended Petition at ¶ 5.1.

- "TAMU has failed to produce full and complete responsive documents and all of the requested public information." *Id*. at ¶ 5.1.2.
- "Petitioner knows of and is in possession of documents and communications responsive to this request which have not been produced by TAMU…" *Id*. at ¶ 5.1.5.
- "TAMU failed to produce documents related to the frivolous and possibly retaliatory 2024 hazing investigation …" *Id*. at ¶ 5.3.
- "TAMU partially responded to these requests on May 9, 2024, but this request was only partial as TAMU has withheld an *unknown number of documents …*" *Id*. at ¶ 5.3.2 (emphasis added).

In each of the above-cited allegations, Plaintiff makes a generalized assertion that TAMU did not produce all responsive documents. This clearly suggests that Plaintiff is either in possession of the "unproduced" documents or has some knowledge that they exist. But he fails to identify or specify them in any meaningful way whatsoever. And without doing so renders these allegations baseless and unsubstantiated.

In fact, even the allegation that Plaintiff makes claiming that he is "aware of a recorded, public Microsoft Teams call which Defendant is refusing to produce" is suspect, since he fails to provide any of the following identifying information:

1. When did the Teams call take place?
2. Who was on the Teams call?
3. What was the Teams call about?
4. Which of Plaintiff's numerous TPIA requests is this information responsive to?

The above questions are made to simply illustrate the vague, generalized and unsupported nature of the allegations made by Plaintiff. Moreover, after further inquiry regarding the Teams call, the document regarding the Teams call was responsive to Plaintiff's seventh TPIA request, J1723 regarding the bathroom renovation documents, which was produced to Plaintiff by TAMU's ORO on June 3, 2024. **Exhibit 15**; **Exhibit 33**. A weblink is on the document for the Teams meeting identified as a "Public Proposal

Virtual Meeting" to take place on November 15, 2023, but nowhere on the document does it indicate the meeting will be recorded. **Exhibit 33**.

Hence, contrary to Plaintiff's allegation, TAMU did, in fact, produce the documentation it had in its possession regarding the Teams call. Plaintiff claims that TAMU withheld information about the Teams call is false.

**E.  TAMU Responded to Plaintiff's TPIA Request for the "bathroom renovation" documents**

Plaintiff's assertion that TAMU failed to produce documents regarding the bathroom renovation is false and incorrect. As indicated above, TAMU first produced documents in response to his seventh TPIA request (J1723) on June 3, 2024. **Exhibit 15**; **Exhibit 32** through **Exhibit 37**. On July 12, 2024, TAMU produced additional documents responsive to this TPIA request. **Exhibit 31**; **Exhibit 39** through **Exhibit 43**.

Moreover, TAMU was within its legal right to request a ruling from the Attorney General's Office regarding the withholding of documents, which is expressly permitted under the TPIA, as follows:

> A governmental body that receives a written request for information that it wishes to withhold from public disclosure and that it considers to be within one of the exceptions under Subchapter C must ask for a decision from the attorney general about whether the information is within that exception if there has not been a previous determination about whether the information falls within one of the exceptions.

TEX. GOV'T CODE § 552.301(a).

Hence, TAMU withheld certain documents pursuant to an exception *expressly permitted under the TPIA*. **Exhibit 15**. The mere fact that Plaintiff disagrees with TAMU's right to request an AG ruling regarding information it believes is excepted from disclosure

does not overcome its right to do so. Finally, even if the AG's Office ultimately rules that the documents in issue are not excepted from required disclosure, that does not constitute a TPIA violation.

**F.      Plaintiff's Senate Bill 17 "violation" claim[7] is Baseless, Frivolous and Harassing**

Senate Bill 17 was passed into law in 2023 and made effective on January 1, 2024, which amends Texas Education Code Section 51.3525, Responsibility of Governing Boards Regarding Diversity, Equity and Inclusion Initiatives. Its purpose is to prohibit institutions of higher education from requiring or giving preferential consideration for certain ideological oaths or statements that undermine academic freedom and open inquiry and impede the discovery, preservation, and transmission of knowledge.

Section 51.3525 has no bearing or application to the TPIA. In this regard, Section 51.3525 is entirely devoid of any reference to the TPIA and does not set forth anything regarding public access to government records, which is the TPIA's stated purpose. *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 57 (Tex. 2015). Hence, it has no bearing on the TPIA analysis and creates no claim or cause of action under the TPIA as Plaintiff incorrectly claims.

The only authorized legal action under this statute is for injunctive or declaratory relief by a student or employee of an institution of higher education who is required to participate in training in violation of Subsection (b)(1)(E). TEX. EDUC. CODE § 51.3525(i). Plaintiff makes no such claim in this regard and he is clearly not a student or employee of

---

[7] TAMU notes that in his live pleading, Plaintiff failed to cite to the enabling statute of Senate Bill 17.

TAMU. Rather, based on his own live pleading, Plaintiff is a merely member of the public that made several TPIA requests. See Plaintiff's Second Amended Petition. Therefore, any assertion that TAMU has "violated" Section 51.3525 or "Senate Bill 17" is entirely without merit and, in fact, frivolous, brought in bad faith and for purposes of harassment.[8]

## G. Plaintiff is Not Entitled to Costs or Attorney's Fees

Even if Plaintiff should prevail in this action, which TAMU disputes, he is not entitled to attorney's fees. In an action brought under Section 552.321 or 552.3215, the court shall assess costs of litigation and reasonable attorney fees incurred by a plaintiff who substantially prevails, except that the court may not assess those costs and fees against a governmental body *if the court finds that the governmental body acted in reasonable reliance on a written decision of the attorney general*, including a decision issued under Subchapter G or an opinion issued under Section 402.042. TEX. GOV'T CODE § 552.323(a)(3) (emphasis added).

Plaintiff is not entitled to costs or attorney's fees because, as shown above, TAMU reasonably relied on the above-cited prior AG decision issued under Subsection G of the TPIA. Hence, it is improper to assess any costs or fees against TAMU.

## H. Plaintiff is Not Entitled to any Declaratory Relief

Plaintiff's claim for declaratory judgement relief should also be flatly rejected. The Uniform Declaratory Judgments Act is remedial in nature. Its "purpose is to settle and to

---

[8] Plaintiff's counsel David Dodd, III violated TEX. R. CIV. P. 13 by asserting a groundless "Senate Bill 17" claim in Plaintiff's Second Amended Petition. This Court should take whatever action is appropriate in response, up to and including sanctions.

afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.002(b); see *Gulshan Enters., Inc. v. Zafar, Inc.*, 530 S.W.3d 298, 305 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "A declaratory judgment, by its nature, is forward looking; it is designed to resolve a controversy and prevent future damages. It affects a party's behavior or alters the parties' legal relationship on a going-forward basis." *Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 660 (Tex. 2009). A trial court may render a declaratory judgment if it serves a useful purpose or will terminate the controversy between the parties. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 468 (Tex. 1995); *Gulshan Enters., Inc.*, 530 S.W.3d at 305.

Consistent with this, it is Plaintiff's burden to show that (1) a justiciable controversy exists between the parties and (2) the controversy would be solved by the declaration sought. See *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 685 (Tex. 2020).

Plaintiff's simplistic and conclusory one-sentence "explanation" as to why he believes he is entitled to declaratory judgment relief is based on the false premise that TAMU "unilaterally decid[ed] to withhold documents … that would be released to other people and unilaterally withholding information based on previous Attorney General opinions." See Plaintiff's Second Amended Petition at ¶ 7.8.

First, as indicated above, TAMU has produced hundreds of documents responsive to Plaintiff's numerous TPIA requests. **Exhibit 9**; **Exhibit 10**; **Exhibit 18**; **Exhibit 26**; **Exhibit 27**; **Exhibit 29**; **Exhibit 32** through **Exhibit 37**; **Exhibit 39** through **Exhibit 43**. Thus, he cannot plausibly claim those documents were "unilaterally withheld."

Second, TAMU complied with the TPIA by requesting an AG ruling on information it believed was excepted from required disclosure, which is expressly permitted by law. **Exhibit 15**; **Exhibit 16**; **Exhibit 17**; **Exhibit 45**. This demonstrates the frivolous nature of Plaintiff's request for declaratory relief.

Third, TAMU acted in reasonable reliance on a prior AG decision regarding the DEI documents since it was a request for the same information at issue in a separate prior TPIA request. **Exhibit 6** at pgs. 1-2. That prior AG decision specifically concluded the DEI information in issue is confidential therefore TAMU "must withhold" that information. **Exhibit 7**. This is a clear basis under the TPIA to deny Plaintiff any award of attorney's fees. TEX. GOV'T CODE § 552.323(a)(3).

Finally, Plaintiff's contention that TAMU is improperly withholding additional information responsive to his numerous TPIA requests is simply false. Indeed, while TAMU was preparing documents in support of the plea, additional documents regarding the Squad 17 hazing investigation were located and promptly produced to Plaintiff. **Exhibit 29**. This is analogous to a party in litigation complying with the rules of discovery by supplementing with additional information as it becomes known. That is not a rule violation but rather is required.

Based on the foregoing, it is without question that TAMU complied with its TPIA obligations in response to each and every one of Plaintiff's TPIA requests and that it exercised its permitted legal right to redact and/or withhold information in accordance with the TPIA. Hence, a justiciable controversy never existed, and even if a controversy ever did exist, it is now moot based on TAMU's continued compliance with its TPIA

obligations. Therefore, there is no controversy to resolve and no uncertainty or insecurity with respect to Plaintiff's rights under the TPIA. For this reason, declaratory judgment is improper because there is no "justiciable controversy" to resolve.

## I.      Plaintiff Lacks Standing

Plaintiff lacks standing to bring this action. "Standing requires an injury-in-fact that is fairly traceable to the defendant's conduct and likely to be redressed by a decision in the plaintiff's favor." *Abbott v. Harris County*, 672 S.W.3d 1, 8 (Tex. 2023). An "injury-in-fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Perez v. Turner*, 653 S.W.3d 191, 198 (Tex. 2022).

As set forth in detail above, TAMU complied with its TPIA obligations to disclose required information and it properly withheld documents as expressly permitted therein, including the right to withhold information pending an AG decision thereon. TAMU further acted in reasonable reliance on a prior AG decision that it "must withhold" the DEI documents in issue, which is not a violation of the TPIA. That would have only been a violation if a prior AG decision had ruled that the documents were public information subject to required disclosure. TEX. GOV'T CODE § 552.301(f)(1)-(2). Thus, he has no basis to assert grounds for a TPIA violation much less one for declaratory judgment relief. His purported Senate Bill 17 "violation" claim is also completely frivolous in violation of TEX. R. CIV. P. 13. For these reasons, any legally protected interested afforded to Plaintiff under the TPIA was not violated. Hence, Plaintiff can show no injury-in-fact traceable to TAMU's conduct that can be redressed by a decision by this Court in his favor.

In the alternative, this case is moot. A case becomes moot when (1) a justiciable controversy no longer exists between the parties, (2) the parties no longer have a legally cognizable interest in the case's outcome, (3) the court can no longer grant the requested relief or otherwise affect the parties' rights or interests, or (4) any decision would constitute an impermissible advisory opinion. *Electric Reliability Council of Texas, Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634–35 (Tex. 2021).

When a case becomes moot, the court loses jurisdiction and must dismiss the case, because any decision would constitute an advisory opinion that is outside the jurisdiction conferred by Texas Constitution article II, section 1. *State ex rel. Best v. Harper*, 562 S.W.3d 1, 6 (Tex. 2018). The mootness doctrine is a constitutional limitation that prohibits courts from issuing advisory opinions. *Electric Reliability Council of Texas, Inc.*, 562 S.W.3d at 634.

Here, even if a justiciable controversy ever existed, it no longer exists. This is based on TAMU's production of additional documents and information responsive to the TPIA requests in issue. More specifically, to the extent there was ever a delay or the unintentional non-production of information, it was remedied by TAMU's subsequent supplemental production of that information, including the Squadron 17 hazing investigation documents. **Exhibit 29**. There is no controversy or dispute between the parties. Hence, this court cannot grant him any of the relief he is requesting, and any decision would constitute an impermissible advisory opinion.

## VI.   PRAYER

Wherefore, premises considered, Defendant respectfully requests this plea be set for hearing on June 20, 2024 and that it be granted thereby dismissing Plaintiff's claims with prejudice and that all requested relief be denied. Defendant further requests all other relief to which it may be justly entitled both at law and in equity.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
Jason T. Contreras
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through the E-File Texas, File and Serve Texas in compliance with TRCP 21 on August 2, 2024 to:

J. David Dodd III
820 S. Macarthur Blvd., Ste. 105-341
Coppell, Texas 75019
214-923-3417
David@jddoddlaw.com
**Counsel for Plaintiff**

/s/ Jason T. Contreras
Jason T. Contreras
Assistant Attorney General

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90476455
Filing Code Description: Amended Filing
Filing Description: DEFENDANT'S FIRST AMENDED PLEA TO THE JURISDICTION
Status as of 8/2/2024 12:12 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 8/2/2024 11:39:21 AM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/2/2024 11:39:21 AM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/2/2024 11:39:21 AM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/2/2024 11:39:21 AM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/2/2024 11:39:21 AM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/2/2024 11:39:21 AM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/2/2024 11:39:21 AM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| J DavidDodd III | | David@Jddoddlaw.com | 8/2/2024 11:39:21 AM | SENT |

Received & Filed 8/2/2024 11:44 AM
Gabriel Garcia, District Clerk
Brazos County, Texas
Emily Velasquez
Envelope# - 90476849

EXHIBIT
31

# Public Information Records (#J001723-051624)

## ⌄ Public Information Records Details

| | |
|---|---|
| This request is for: | Texas A&M University |

Summary of Request:

1. Any documents pertaining to renovation plans for the bathroom/restroom facilities in the dormitories housing the Corps of Cadets. This should include contracts or agreements related to the renovation projects, estimates, analyses, architectural designs/plans, engineering designs/plans, and anticipated costs.

2. Any communications between university employees or officials regarding the renovation plans or any of the documents pertaining to those plans.

3. Any communications between university employees or officials and third-parties regarding the renovation plans or any of the documents pertaining to those plans.
I agree to pay reasonable fees for the processing of this request.

Describe in detail the Record(s) Requested:

From: Patti Artavia
Sent: Thursday, May 16, 2024 3:37 PM
To: open-records@tamu.edu
Cc: Brendan Fradkin ; Brian Beckcom
Subject: TPIA Request

Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:

1. Any documents pertaining to renovation plans for the bathroom/restroom facilities in the dormitories housing the Corps of Cadets. This should include contracts or agreements related to the renovation projects, estimates, analyses, architectural designs/plans, engineering designs/plans, and anticipated costs.

2. Any communications between university employees or officials regarding the renovation plans or any of the documents pertaining to those plans.

3. Any communications between university employees or officials and third-parties regarding the renovation plans or any of the documents pertaining to those plans.
I agree to pay reasonable fees for the processing of this request.

Please respond within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

You may make redactions for confidential personal information. I do not consent to redaction or withholding based on any other privilege.

Date From:

Date To:

| | |
|---|---|
| Preferred Method to Receive Records: | Electronic via Records Center |
| Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?: | YES |
| Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?: | NO |

> **Category**

∨ **Clarification(s)**

| Clarification(s): | Rec'd Response to Clarification Request - 5/17 | STAFF: Please describe any clarifications requested and received. |
| | Sent Clarification Request - 5/16 | |

> **OAG decision requested**

> **Exceptions**

> **Charges**

> **Notes**

∨ **Message History**

Date

On 7/12/2024 4:59:00 PM, Knesha Brashear wrote:
CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J001723-051624
**Body:**
07/12/2024


RE: PUBLIC RECORDS REQUEST of May 16, 2024, Reference # J001723-051624

Dear Brian Beckcom,

Additional  information found responsive to your request that we are not seeking to withhold is available and can be obtained by visiting the  Public Records Online Portal  and logging in from the " My Request Center" tab.

Per your affirmative response to the "Redaction Statement" giving us permission to redact information subject to mandatory exceptions, we have redacted and/or withheld information excepted under the following sections  of the Texas Government Code: 552.024, 552.114, 552.136 and 552.137.
Additionally, some records were found to be copyrighted. While we cannot provide a copy of the copyrighted information, it is available for viewing in our office. Please contact our office, if you would like to schedule a time to view the information.


Sincerely,

Knesha Brashear
Open Records Office

Date

On 6/3/2024 4:53:00 PM, Tricia Bledsoe wrote:
CC: Open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J001723-051624
**Body:**
06/03/2024

RE: PUBLIC RECORDS REQUEST, Reference # J001723-051624

Dear Mr. Brian Beckcom,

The information you seek was the subject of a previous request received by our office. We have requested a ruling from the Office of the Attorney General (OAG) regarding this information. Therefore, we will be relying on the pending ruling letter regarding your request.  You will be notified, once we are in receipt of the OAG's decision letter.  Please find uploaded information responsive to your request we are not seeking to withhold.  We are still reviewing the remaining responsive information and if there is any additional information that can be released pending the Attorney General' s ruling, we will provide as soon as possible.

Please note, the PO for Spence showing a $503, 055 charge for Patterson architects for design services is not accurate. The $503, 055 is the total budget for the project. As shown in the uploaded a spreadsheet, the $503, 055 total budget is broken down in the following categories:

Pre-design/pre-construction costs:                  $600

Design costs:                                                            $31, 250

Construction:                                                          $406, 950

Project Management:                                            $64, 255 (including $40, 400 contingency and $23, 955
SSC contract administration services)

Total:                                                                        $503, 055

  This information  is now available and can be obtained by visiting the  <u>Public Records Online Portal </u>and logging in from the " My Request Center" tab.

Sincerely,

Tricia Bledsoe

Open Records Office

On 5/17/2024 2:21:02 PM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Brendan@vbattorneys.com], [Open-records@tamu.edu], [Patti@vbattorneys.com]

We will limit it to the last 3 years.
Please respond timely instead of the constant delay and piecemeal production.
If you choose to assert any privileges, please produce a privilege log.

-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org

On Thu, May 16, 2024 at 4:49 PM Texas A&M University Public Records Support wrote:

On 5/16/2024 4:48:22 PM, Leslie Kacer wrote:

Date

CC: Open-records@tamu.edu; Brendan@vbattorneys.com; Patti@vbattorneys.com
**Subject:** Public Information Records :: J001723-051624
**Body:**
May 16, 2024

RE: PUBLIC RECORDS REQUEST of May 16, 2024, Reference # J001723-051624

Dear Brian Beckcom,

Texas A& M University received a public information request from you on May 16, 2024. Your request mentioned:

*"From: Patti Artavia < patti@vbattorneys.com>*
*Sent: Thursday, May 16, 2024 3:37 PM*
*To: open-records@tamu.edu*
*Cc: Brendan Fradkin < brendan@vbattorneys.com> ; Brian Beckcom < brian@vbattorneys.com>*
*Subject: TPIA Request*

*Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records*
*Information, please produce the following documents:*

*1. Any documents pertaining to renovation plans for the bathroom/restroom facilities in*
*the dormitories housing the Corps of Cadets. This should include contracts or*
*agreements related to the renovation projects, estimates, analyses, architectural*
*designs/plans, engineering designs/plans, and anticipated costs.*

*2. Any communications between university employees or officials regarding the*
*renovation plans or any of the documents pertaining to those plans.*

*3. Any communications between university employees or officials and third-parties*
*regarding the renovation plans or any of the documents pertaining to those plans.*
*I agree to pay reasonable fees for the processing of this request.*

*Please respond within 10 business days. If you choose to deny this request, please*
*provide a written explanation for the denial including a reference to the specific statutory*
*exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise*
*exempt material.*

*You may make redactions for confidential personal information. I do not consent to*
*redaction or withholding based on any other privilege."< /brian@vbattorneys.com> <*
*/brendan@vbattorneys.com> < /patti@vbattorneys.com>*

We are in need of clarification/narrowing regarding the information requested. Could you please provide us with a date range so that we can better assist you with your request?

As provided by section 552.222(d) of the Texas Public Information Act, your request will be considered withdrawn if we do not receive a response from you by the 61st day after the date of this request for clarification/narrowing.

Sincerely,

Leslie Kacer
Open Records Office

Date

On 5/16/2024 4:16:02 PM, Leslie Kacer wrote:
CC: Open-records@tamu.edu; Brendan@vbattorneys.com; Patti@vbattorneys.com
**Subject:** Public Information Records :: J001723-051624
**Body:**
Dear Brian Beckcom:

We received your public information request for  Texas A& M University.  Your request was given the **reference number J001723-051624** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed. Thank you for your interest in  Texas A& M University.

To monitor the progress or update this request please log into the  Public Records Center.

On 5/16/2024 4:05:00 PM, Leslie Kacer wrote:
Request was created by staff

## ⌄ Request Details

| | |
|---|---|
| Reference No: | J001723-051624 |
| Created By: | Leslie Kacer |
| Create Date: | 5/16/2024 8:00 AM |
| Update Date: | 7/12/2024 4:48 PM |
| Completed/Closed: | No |
| Required Completion Date: | 6/3/2024 |
| | |
| Status: | Activity Assigned |
| Priority: | Medium |
| Assigned Dept: | TAMU_Open Records |
| Assigned Staff: | Open Records University |
| | |
| Customer Name: | Brian Beckcom |
| Email Address: | Brian@vbattorneys.com |
| Phone: | 8327913118 |
| Group: | TAMU |
| | |
| Source: | Email |

**EXHIBIT**
**32**

# REQUEST FOR COMPETITIVE SEALED PROPOSALS
SECTION 00 21 00

## INSTRUCTIONS
### For SSC Services for Education

### *Texas A&M University - College Station, TX*

**Project No.: _2023-06030_**

**Project Title: _Spence Hall Corps Dorm Bathroom Renovations_**

**Date: _October 24, 2023_**

**Table of Contents**

Instructions for Proposals

Proposal Form and Pricing Schedule (Part 1)

Technical Proposal (Part 2)

Safety, Risk Assessment & Quality Control (Part 3)

HUB Subcontracting Plan (Part 4)

Sample Master Agreement Contract - Appendix A

UGSC

Special Conditions

**Contractor Submittal Checklist**
(Please use this checklist to ensure all the proper documents are provided)

Are parts 1-4 complete?
Is part 1 executed in ink?
Is submittal addressed correctly?
Is submittal on time?
Is submittal (hard copy and Flash Drive) properly labeled?
Is submittal in sealed envelopes?

**SSC SERVICES FOR EDUCATION**
**INSTRUCTIONS FOR COMPETITIVE SEALED PROPOSALS**
SECTION 00 21 00

**1.0    GENERAL:**

1.1    SSC Services for Education (SSC) as Owner Designated Representative (ODR) for Texas A&M University – College Station, TX is requesting Competitive Sealed Proposals (CSP) from general construction contractors.

1.2    All data submitted with a Proposal, except as noted herein, is deemed to be part of the Contract.

1.3    Purchases made for State of Texas use are exempt from the State Sales tax and Federal Excise tax. Do not include tax in bid.  Excise Tax Exemption Certificates are available upon request.

1.4    Payment for work performed will be in accordance with the SSC Uniform General and Supplementary Conditions ("UGSC"). The UGSC will not be changed.

1.5    Proposal documents will be available via a Web Based file sharing program in a PDF format. All printing is the responsibility of the bidder.

**2.0    RECEIPT OF PROPOSALS:**

2.1    The review and approval of the CSP process is a multi-step process which requires variable amounts of time. Responders are advised that these projected dates may change as required.

| | |
|---|---|
| Pre-Proposal Meeting – Facilities Services Bldg, Conf. Rm. 204 | 10-30-23, 2:30 PM |
| Deadline for Questions | 11-03-23, 5:00 PM |
| Deadline for Addenda (Min.10 business days prior to proposal) | 11-06-23, 5:00 PM |
| **Deadline for Receipt of Proposals** | 11- 14-23, 2:00 PM |
| **Deadline for Receipt of HSP (Part 4)** | 11- 15-23, 2:00 PM |
| **Public Proposal Opening –** Facilities Services Bldg, Conf. Rm. S118 (and Teams Meeting) | 11- 15-23, 3:00 pm |
| Evaluation of Proposals Completed | 11-30-2023 |
| Award of Contract | 11-30-2023 |

2.2    Location: Proposals are to be received at the office of the Owners Designated Representative:

*SSC Facilities Services Bldg. #1156*
*600 Agronomy Road, Suite 218*
*College Station, TX. 77843*

**3.0    INFORMATION INQUIRIES:**

3.1    Questions regarding the proposal process should be directed:
*Mike Garon, Sr. Project Manger*
*Michael.Garon@sscserv.com, 979-446- 2506*

3.2     Inquiries regarding the technical aspects of the Construction Documents shall be directed to:
*Fred Patterson, AIA*
*Patterson Architects*
*fred@patarch.com*
*979-775-6036*

3.3     Inquiries regarding the HUB documents shall be directed to:

| | |
|---|---|
| *Shawna Kennedy* | *Cindy Gillar* |
| *979.845.3425* | *979-845-9010* |
| *shawna.kennedy@tamu.edu* | *c-gillar@tamu.edu* |

**4.0     DISCREPANCIES AND INTERPRETATIONS:**

4.1     Notify the ODR and A/E, in writing, at least ten (10) business days prior to the scheduled Proposal opening date, if discrepancies, ambiguities or omissions are found in the Proposal/Construction documents, or if further information or interpretation is desired.

4.2     Answers will be provided in addenda format.  All provisions and requirements of such addenda will supersede or modify affected portions of the Proposal documents.  All addenda will be incorporated in and bound with the Contract Document.  No other explanation or interpretation will be considered binding. Notice of Addenda are posted on the Texas Smart Buy website on the original project posting. Any additional documentation needed will be uploaded to e-Builder on the same original link shown on the Notice of Project.

**5.0     SUBMITTAL CONTENT & PROCEDURE:**

5.1     Contents

- Proposal Form & Pricing Schedule (Part 1, Section 00 42 13)
    o   Base Proposal & Alternates
    o   Construction Time

- Technical Proposal (Part 2, Section 00 45 16)
    o   Company Information & History
    o   Experience & Qualifications
    o   Ability & Qualifications of Professional Personnel
    o   Project Approach & Methodology
    o   List of Subcontractors

- Safety, Risk Assessment & Quality Control (Part 3, Section 00 45 17)
    o   Safety Program
    o   Site Specific Risk Assessment
    o   Quality Control Program

- HUB Subcontracting Plan (Part 4)
    Refer to HUB Subcontracting Plan (see separate attachment) for information and requirements (refer back to 3.3 for Inquiry information).

5.2     Procedure

5.2.1 Submit Parts 1-3 as (1) hard copy in a sealed envelope clearly labeled "CSP Submission for Project Number *2023-06030* Parts 1-3" with Respondent's Company Name clearly identified on the outside.

5.2.2 Submit Part 4 (HUB Subcontracting Plan) in a separate sealed envelope clearly labeled "HUB Subcontracting Plan for Project Number *2023-06030* with respondent's Company Name clearly identified on the outside.

5.2.3 Submit (1) digital copy in .pdf format of Parts (1-4) on a flash drive, which is to be included in sealed envelope containing Part 4.

5.2.4 ALL Parts (1-4) and flash drive are to be submitted by deadline as set forth in 2.1.

**THE ODR IS NOT RESPONSIBLE FOR DOCUMENTS THAT CANNOT BE READ OR CONVERTED. UNREADABLE PROPOSALS MAY BE, AT ODR'S SOLE DISCRETION, REJECTED AS NONRESPONSIVE.**

5.3 If the Proposal and all parts are submitted by mail, the address is:

*SSC Facilities Services Bldg. #1156*
*600 Agronomy Road, Suite 218*
*College Station, TX. 77843*
*ATTN: Mike Garon*

"PROPOSAL ENCLOSED"

5.4 Delivery of all Proposal parts prior to the advertised deadline(s) is the sole responsibility of the respondent.

**6.0 PREPARATION OF COMPETITIVE SEALED PROPOSAL:**

6.1 The Proposal must be based on conditions at the project site, the bidding documents and any addenda issued.

6.2 The Proposal, Part 1 must be authoritatively executed **in ink** and submitted on the Proposal Form.

6.3 A Proposal showing omissions, alterations, conditions, or carrying riders or qualifications which modify the Proposal Form & Pricing Schedule (00 42 13) will be rejected as irregular.

6.4 Only one Part 1 Proposal shall be submitted. If two or more Part 1 Proposals are submitted, either in one envelope or in separate envelopes, such multiple Proposals may be subject to rejection.

6.5 Proposal amounts may not be amended or modified in any manner after the time set for deadline for receipt of Proposals. After all Proposals are publicly opened, but before they are read aloud, they will be examined by the presiding official to determine if they are in proper form and properly signed. Proposals which are illegible or incomplete will not be read, nor will the Proposal prices be revealed.

6.6 A respondent will receive no compensation or reimbursement of expenses incurred in the preparation of a Competitive Sealed Proposal submission.

6.7    All respondents are strongly urged to attend Pre-Proposal Conferences. Respondent attendance may be included as part of evaluation.

6.8    Proposals received after the advertised time for deadline for receipt of Proposals will be ineligible and will be returned unopened.

6.9    The ODR reserves the right to reject any or all Proposals at any time prior to award.

**7.0    PUBLIC INFORMATION AND NOTICE OF CONFIDENTIALITY:**

7.1    The ODR considers all Proposal information, documentation and supporting materials submitted in response to these instructions to be non-confidential and/or non-proprietary in nature, and therefore, shall be subject to the public disclosure under the Texas Public Information Act (*Texas Government Code*, Sec. 552.001 et seq.) after the award of the contract.  Portions of the respondent's Technical Proposal which contains trade secrets or other proprietary data which must remain confidential shall be identified as below:

  7.1.1    Mark the cover sheet of the Technical Proposal with the following phrase:  "This Proposal includes data that shall not be disclosed outside of ODR and the A/E design team and shall not be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate this Proposal."

  7.1.2    Mark each sheet and specific data on that sheet that the respondent wishes to restrict with the following phrase:  "Use or disclosure of this specifically marked data is subject to the restrictions regarding confidentiality cited on the cover sheet of this Proposal."

**8.0    RESPONDENT REQUIREMENTS:**

8.1    The ODR may make such investigations as necessary to determine the ability of the respondent to perform the Work, and the respondent shall furnish any requested information data including an audited financial statement within five (5) days of the Proposal Opening.  The ODR reserves the right to reject any Proposal if the evidence submitted by, or investigation of, such respondent fails to satisfy the ODR that this respondent is properly qualified to complete the Work.  Any false statements or omissions will automatically disqualify applicants from consideration.

8.2    Each respondent submitting a Proposal must be prepared to furnish the firm's State Comptroller Vendor Identification Number, or the date on which an application was submitted. Contract payments to the successful respondent are contingent on submittal of this identification number and on having a current Form W-9 on file with SSC.

8.3    Respondents must be in a "Taxpayer is not on Vendor Hold" status with the Texas State Comptroller's Office in order to be awarded the contract. Respondent certifies this with the submittal of a properly executed proposal. Ref: Texas Comptroller of Public Accounts Taxpayer and Vendor Information. http://mycpa.cpa.state.tx.us/coa/search.do.

8.4    As required by Chapter 231 Texas Family Code, a Proposal for a contract to be paid from state funds must include the name and social security number of the sole proprietor, each partner, shareholder or owner with an ownership interest of a least 25 percent of the business entity submitting the Proposal.

8.5     The Texas Family Code requires each Proposal to include the following statement: "Under Section, 231.006, Family Code, the vendor or applicant certifies that the individual or business entity named in this contract Proposal or application, is not ineligible to receive the specified grant, loan or payment and acknowledges that this contract may be terminated and payment may be withheld if this certification is inaccurate." Respondent agrees with this certification statement upon submittal of a properly executed Proposal.

**9.0     OWNERSHIP OF THE COMPETITIVE SEALED PROPOSAL:**

9.1     Submitted Proposals, documentation and supporting materials shall become the property of the ODR.

**10.0    SITE INVESTIGATION:**

10.1    It is the responsibility of each respondent to examine the project site, existing improvements and adjacent property and be familiar with existing conditions before submission of a Proposal.

10.2    After investigating the project site and comparing the Drawing and Specifications with the existing conditions, the respondent should immediately notify the ODR, in accordance with paragraph 4.0 of these Instructions for Competitive Sealed Proposals, of any conditions for which requirements are not clear, or about which there is any question regarding the extent of the Work involved.

10.3    Should the successful respondent fail to make the required investigation and should a question arise later as to the extent of the Work involved in any particular case, after receiving recommendations from the A/E, the ODR will make the proper interpretation of the Contract Documents.

**11.0    CSP EVALUATION SCORING GUIDELINES:**

11.1    Proposals will be opened publicly.

11.2    Proposals will be evaluated by the ODR/Owner and others as determined by SSC.  The criteria for evaluation and selection of the successful respondent for this award will be based upon the factors listed below with the corresponding percentage of weighting:

- **Base Proposal Amount & Alternates**                    **51%**

- **Construction Time**                    **10%**

- **Technical Proposal**                    **24%**
    o   Company Information & History
    o   Experience & Qualifications
    o   Ability & Qualifications of Professional Personnel
    o   Project Approach & Methodology
    o   List of Subcontractors

The following will be rated as Pass or Fail. Pass = 5%, Fail =0%
- **Litigation & Claims**                    **5%**
    o   Project incompletion, judgements/claims/lawsuits

- **Safety, Risk Assessment & Quality Control**                    **5%**
    o   Safety Program
    o   Site Specific Risk Assessment
    o   Quality Control Program

- **Quality Control**                    **5%**

**HUB Subcontracting Plan**
Missing, incomplete, or late submission of HUB Subcontracting Plan will result in disqualification of entire submission.

**12.0    CONTRACT AWARD PROCESS**

12.1    After opening the HUB submissions and determining that each submission is qualified the Proposals pricing is read publicly.  Afterwards, the ODR/Owner, A/E & others as determined by SSC will evaluate and rank each Proposal with respect to the published selection criteria described under Section 11.  After opening and ranking, an award may be made on the basis of the initially submitted Proposal, without discussion, clarification or modification, or the ODR may discuss with the selected respondent, offers for cost adjustment and other elements of the Proposal.  Other than the data read at the Proposal opening, the ODR shall not disclose any information derived from the Proposals submitted by competing firms in conducting such discussions.

12.2   If the ODR/Owner determines that it is unable to reach a satisfactory agreement with the first ranked respondent, the ODR will terminate discussions with that respondent.  The ODR will then proceed with negotiations with each successive respondent as they appear in the order of ranking until an agreement is reached, or until the ODR has rejected all Proposals.  After termination of discussions with any respondent, ODR will not resume discussions with that respondent.

12.3   Following the ODR/Owner approval of the order of ranking of respondent and the ODR contract award or Proposal rejection action, the respondents may be notified via email of which firm has been selected.

12.4   The ODR/Owner reserves the right to accept or reject any or all alternates or to accept any combination of alternates considered advantageous.

12.5   The award or rejection action regarding the Proposal is at the sole discretion of the ODR/Owner and the ODR makes no warranty regarding this Proposal that a contract will be awarded to any respondent.

12.6   The ODR agrees that if the Contract is awarded, it will be awarded to the respondent offering the best value to the Owner.  The ODR/Owner is not bound to accept the lowest priced Proposal if that Proposal is judged not to be the best value for the Owner, as determined by the ODR/Owner.

12.7   SSC Agreement
       If applicable, provide comments pertaining to SSC's Sample Master Agreement Contract (attached as Appendix A).

NOTE: SSC will not make significant changes to its Master Agreement Contract. Minor changes may be considered, SSC will not guarantee acceptance of such changes.

END OF SECTION

**SSC SERVICES FOR EDUCATION**
**COMPETITIVE SEALED PROPOSAL**
**PART 1**
**PROPOSAL FORM & PRICING SCHEDULE**
SECTION 00 42 13

SSC Services for Education
***Texas A&M University – College Station, TX***
Project No.: ***2023-06030***
Project Title: ***Spence Hall Corps Dorms Bathroom Renovations***

_____doing business as _____

               Business Name                                  (Corporation, Partnership or Individual)

hereby proposes to furnish and install all work required by the Contract Documents that includes, SSC Uniform General and Supplementary Conditions ("UGSC"), SSC Special Conditions, the Drawings, the Project Manual/Specifications and any Addenda issued prior to the Proposal.

The "Total Contract Cost" shall include the cost of delivery, insurance, bonds, taxes, labor, materials, supervision, overhead, profit, incidentals and the use of all equipment and tools required to complete the work.  The proposed Contract Cost, indicated in the Pricing Schedule included shall constitute full compensation for work required by the Contract Documents and the Addenda.

- The RESPONDENT certifies that this proposal is made in good faith, without collusion or connection with any other person or persons offering a proposal for the same work, and that it is made in pursuance of and subject to all the terms and conditions of the Construction Documents for the work to be accomplished, all of which have been examined by the RESPONDENT.

- All work required by the Contract Documents and enumerated in the Pricing Schedule included, whether specifically mentioned, included by implication or appurtenant thereto, shall be performed by the RESPONDENT, irrespective of whether it is named in the Pricing Schedule.

- The Proposal will remain subject to acceptance for 90 calendar days after submittal, or for such longer time as the RESPONDENT may agree to in writing upon request by the Owners Designated Representative (ODR).

- The RESPONDENT will submit a construction schedule and execute the contract within 10 business days after notification of contract award.

- Proposal amounts must be shown in both written words and figures.  In case of discrepancy, the amount shown in words will govern.

**- 629 -**

| DESCRIPTION | TOTAL PRICE |
|---|---|
| **Contractor must list an amount for each line item as required for the scope of this project OR bid will be disqualified for being incomplete. Blank division entries are acceptable if the division is not in the scope of work.** | |
| Division 01 - General Requirements | |
| Division 02 - Existing Conditions | |
| Division 03 - Concrete | |
| Division 04 - Masonry | |
| Division 05 - Metals | |
| Division 06 - Wood, Plastics and Composites | |
| Division 07 - Thermal and Moisture Protection | |
| Division 08 - Openings | |
| Division 09 - Finishes | |
| Division 10 - Specialties | |
| Division 11 - Equipment | |
| Division 12 - Furnishings | |
| Division 13 - Special Construction | |
| Division 14 - Conveying Equipment | |
| Division 21 - Fire Suppression | |
| Division 22 - Plumbing | |
| Division 23 - Heating, Ventilating, and Air Conditioning (HVAC) | |
| Division 25- Integrated Automation | |
| Division 26 - Electrical | |
| Division 27 - Communications | |
| Division 28 - Electronic Safety and Security | |
| Division 31 - Earthwork | |
| Division 32 - Exterior Improvements | |
| Division 33 - Utilities | |
| Division 34 - Transportation | |
| Division 44 - Pollution Control Equipment | |
| Division 45 - Industry-Specific Manufacturing Equipment | |
| **BASE PROPOSAL AMOUNT** | |

**ITEM NO. 1 - BASE PROPOSAL AMOUNT**

The amount for the complete construction of ***Spence Hall Corps Dorms Bathroom Renovations***, including all general, plumbing, mechanical, and electrical work indicated on the drawings by ***Patterson Architects*** dated ***10/20/2023***:

_____Dollars $_____

**SUBSTANTIAL COMPLETION DATE**

After Commitment Approval or Notice to Proceed is issued by SSC Services for Education, all of the work shall be substantially completed within _____ calendar days. Number of days listed **must** include materials & equipment lead times and construction duration.  Final Completion shall be achieved within 30 consecutive calendar days after the date of Substantial Completion as determined by the ODR.

**ALTERNATES:  BIDDER MUST INDICATE WHETHER EACH ALTERNATE IS AN ADD OR DEDUCT.  ALTERNATES NOT INDICATED AS AN ADD OR DEDUCT WILL BE DEEMED AN ADD.**

**ALTERNATE 1** – PSI Wall System 410 (details forthcoming via posted Addendum)

(*CONTRACTOR TO INDICATE ALTERNATE AS AN ADD OR DEDUCT ALONG WITH A DOLLAR AMOUNT AND A NUMBER OF DAYS. IF THAT NUMBER IS "0", CONTRACTOR MUST WRITE "0". ITEMS LEFT BLANK WILL BE DISQUALIFIED FOR BEING INCOMPLETE.*)

ADD/DEDUCT_____ Dollars $_____

ADD/DEDUCT_____ Calendar Days

**ADDENDA – Contractor must list number of Addenda issued.**

Respondent has received the following Addenda to the Request for Proposals, but agrees and understands that it will be responsible for performing the Work in accordance with all terms and conditions in all Addenda issued in connection with the Request for Proposals, and that it's Proposal will be construed to include all requirements of all such Addenda.

   Addenda No.(s)

_____

**NOTE**: Failure to acknowledge Addenda does not release Contractor from financial obligation to complete all Addenda.

The undersigned Respondent has carefully examined and considered the Project Site and relevant conditions and circumstances for the Work, information and requirements set out in the Request for Proposals, the Drawings and Project Manual/Specifications, and the requirements of the proposed Contract Documents, including the ODR's Agreement, the Uniform General and Supplemental Conditions, Special Conditions, and Tex. Gov. Code pertaining to Prevailing Wages Rates, in making this Proposal. Capitalized terms used but not otherwise defined in this Proposal Form shall have the same meanings as designated in the Request for Proposals.

The undersigned Proposer further agrees to the following conditions:
1.  An incomplete Proposal or one having additional information or other modifications or qualifications inscribed thereon, may be cause for rejection of the entire Proposal.
2.  That, if accepted by the Owner ODR, this Proposal becomes a part to the Contract Documents upon the signing of the Contract Agreement, and failing to comply with any part of this Bid will be taken as failure of the Proposer to comply with the Contract Documents, and will be just cause for rejection of the Work.

RESPONDENT:

_____          _____
              Company                        Employer Federal Identification Number (EIN)

By:

_____
              Signature

_____          _____
               Title                                Company Phone Number

_____          _____
               Date                             Company Email or Fax Number

_____
Company Contact and Address for Invoice

_____


_____


END OF SECTION

**SSC SERVICES FOR EDUCATION**
**COMPETITIVE SEALED PROPOSAL**
**PART 2**
**TECHNICAL PROPOSAL**
SECTION 00 45 16

SSC Services for Education
*Texas A&M University – College Station, TX*
*Project No.: 2023-06030*
*Project Title: Spence Hall Corps Dorms Bathroom Renovations*

**NOTE: Contractor must complete each item pertaining to this form or bid may be disqualified for being incomplete.**
**FALSIFICATION OF ANY INFORMATION ON THIS PROPOSAL MAY RESULT IN DISQUALIFICATION.**

General Contractor's Name: _____

Address: _____

City, State, Zip: _____

Telephone No.: _____ E-Mail: _____

State Comptroller Vendor Identification Number: _____

**1.0    GENERAL**
　　　　1.1 Qualification information submitted shall be applicable only to the Contractor's office that will perform this Work.

**2.0    COMPANY INFORMATION & HISTORY**
　　　　2.1    ☐ Corporation ☐ Partnership ☐ Sole Proprietorship ☐ Joint Venture ☐ Limited Liability Company
　　　　　　　State of Organization: _____

　　　　2.2    How many years has organization been in business as a contractor? _____

　　　　2.3    How many years has your organization been in business under its present business name?
　　　　　　　_____

　　　　2.4    Under what other or former names has your organization operated?_____
　　　　　　　_____

　　　　2.5    List other fully staffed offices or fully staffed branch offices of your organization:
　　　　　　　Name/Location　　　　　Branch Manager　　　　　Telephone Number

| Name/Location | Branch Manager | Telephone Number |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

　　　　2.6    Corporate Officers, Partners or Owners of Organization:
　　　　　　　Name　　　　　　　　　Title　　　　　　　　Construction Experience

| Name | Title | Construction Experience |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

2.7    If your organization is a corporation, answer the following:
- Date of incorporation:_____
- State of incorporation:_____
- President's name:_____
- Vice-president's name(s):_____
- Secretary's name:_____
- Treasurer's name:_____

2.8    If your organization is a partnership, answer the following:
- Date of organization:_____
- Type of partnership, if applicable:_____
- Name(s) of general partner(s):_____
_____

2.9    If your organization is individually owned, answer the following:
- Date of organization:_____
- Name of owner:_____

2.10   If the form of your organization is other than those listed above, describe it and name principals:_____
_____
_____

2.11   List jurisdictions and trade categories in which your organization is legally qualified to do business, and indicate registration or license numbers, if applicable._____
_____
_____
_____

2.12   List jurisdictions in which your organization's partnership or trade name is filed._____
_____
_____

**3.0    LITIGATION/CLAIMS**

3.1    Has your organization ever failed to complete any work awarded to it as     YES ☐ NO ☐
contracted, that resulted in termination of the contract?

3.2    Are there any judgements, claims, arbitration proceedings or suits     YES ☐ NO ☐
pending or outstanding against your organization or its officers made
by your customers?

3.3    Has your organization filed any lawsuits or requested arbitration with     YES ☐ NO ☐
regard to construction contracts within the last five years?

3.4    Within the last five years, has any officer or principal of your organization     YES ☐ NO ☐
 ever been an officer or principal of another organization when it failed
to complete a construction contract?

**4.0    EXPERIENCE & QUALIFICATONS**

4.1    List categories of work that your organization normally performs with its own forces.

_____
_____
_____

4.2    Propose to perform_____% of the work for this project with own forces.
(List Trades) _____
_____
_____

4.3    List major construction projects of similar scope and size where General Contractor acted as prime of publically funded projects. Using a similar format to that shown below list projects your organization has in-progress and/or has completed (Limit 10 projects) within the past 5 years:
(Include as attachment at end of this document titled as "Current & Past Projects")

**FOR EXAMPLE ONLY**

# PROJECT PHOTO HERE

SAMPLE

Name and Location of Project: _____
_____
_____

Contract Amount:_____
Percent Complete: _____
Contract Start Date: _____
Contractual Completion Date: _____
Actual Completion Date:_____

Owner Reference Contact:

_____          _____
Name                                                                       Telephone

_____
Physical Address
Email:_____

A/E Reference Contact:

_____          _____
Name                                                                       Telephone

_____
Physical Address
Email:_____

4.4     Total number and dollar amount of contracts currently in progress:
Number _____ $ _____

4.5     Largest single contract amount currently in-progress: $ _____
Project Name: _____
Projected Completion Date: _____

4.6     Volume of work completed over last 5 years: (Through 12/31)
2022    $_____
2021    $_____
2020    $_____
2019    $_____
2018    $_____

**5.0     REFERENCES**
5.1     Client References: _____
_____
_____
_____

5.2     Trade References:

5.3     Bank References: _____

5.4     Surety
•   Name of bonding company: _____

•   Name and address of agent: _____

**6.0     ABILITY & QUALIFICATIONS OF PROFESSIONAL PERSONNEL**
6.1     Project Organization Chart (Please attach at the end of this document)

6.2     Detailed resumes of individuals assigned to this project including project manager, superintendent, project scheduler/expediter, and quality control supervisors as applicable. (Please attach at end of this document)

6.2.1   Resumes of your key personnel shall include professional affiliations such as membership in the American Institute of Constructors and if the individual is a Level I or Level II Certified Professional Constructor.

6.2.2   In addition, a listing of other construction personnel within your organization that are members of the American Institute of Constructors shall be included and their respective level of certification.

**- 637 -**

6.3    Approximate amount of time each project team member is expected to spend on the project: _____

_____

_____

_____

_____

**7.0    PROJECT APPROACH & METHODOLOGY**

7.1    Provide methodology on meeting the parameters/expectations of the specific project. (If additional space is needed please insert additional sheets at the end of this document):

_____

_____

_____

_____

_____

**8.0    LIST OF SUBCONTRACTORS**

8.1    Please list all subcontractors proposing to use on this project. (If additional space is needed please insert additional sheets at the end of this document): _____

_____

_____

_____

_____

_____

**9.0    PROPOSED PROJECT SCHEDULE**

9.1    List procedures outlining how the contractor will update the Architect & ODR on progress of the project work schedule in order to meet the established contractual completion date:_____

_____

_____

_____

_____

9.2    Please attach proposed project schedule in Gantt format at the end of this document, including material/equipment lead times prior to construction.

END OF SECTION

**SSC SERVICES FOR EDUCATION**
**COMPETITIVE SEALED PROPOSAL**
**Part 3**
**SAFETY, RISK ASSESSMENT & QUALITY CONTROL**
SECTION 00 45 17

SSC Services for Education
***Texas A&M University – College Station, TX***
*Project No.:* ***2023-06030***
*Project Title:* ***Spence Hall Corps Dorms Bathroom Renovations***

**NOTE: Contractor must complete each item pertaining to this form or bid may be disqualified for being incomplete.**
**FALSIFICATION OF ANY INFORMATION ON THIS PROPOSAL MAY RESULT IN DISQUALIFICATION.**

General Contractor's Name: _____

Address: _____

City, State, Zip: _____

Telephone No.: _____ E-Mail: _____

State Comptroller Vendor Identification Number: _____

## 1.0    SAFETY PROGRAM

1.1    List your organization's Workers Compensation Experience Modification Rate (EMR) for the last three years, as obtained from your insurance agent. Provide proof in the form of a letter from your Insurance Agent.  If you do not have an EMR rating provide name and contact information for your Insurance Agent.

2022 _____          Average (3 years)
2021 _____          _____
2020 _____

Insurance Company Name: _____
Agent Name: _____
Agent Phone #: _____
Agent Email: _____

1.2    **OSHA Recordable Incident Rate**.  Attach your OSHA 300A log or similar documentation of company's injuries if the OSHA 300A log is not required due to the size of your company:

The OSHA Recordable Incident Rate (or Incident Rate) is calculated by multiplying the number of recordable cases by 200,000, and then dividing that number by the number of labor hours at the company.

$$IR = \frac{\text{Number of OSHA Recordable Cases X 200,000}}{\text{Number of Employee labor hours worked}}$$

IR = _____

1.3 Are regular project safety meetings held? ☐ Yes  ☐ No
   If yes, frequency:  ☐ Weekly ☐ Bi-monthly ☐ Monthly ☐ As Needed

1.4 Are project safety inspections conducted? ☐ Yes  ☐ No
   If yes, who performs inspection? _____

   _____
   How often?_____
   Who is required to attend?_____

   _____

1.5 Does organization have a written safety program? ☐ Yes  ☐ No
   If yes, provide a copy.  It will become a compliance document upon contract award.


**2.0 SITE SPECIFIC RISK ASSESSMENT**
  2.1 Submit a complete Risk Assessment Program for this specific project at the end of this section.

**3.0 QUALITY CONTROL PROGRAM**
  3.1 Submit a complete quality control program for this project which will become a compliance document upon contract award.
  3.2 This plan should address all aspects of quality control including responsibility for surveillance work, acceptance, rejection, documentation and resolution of deficiencies, trend analysis and corrective action and interface with Owner's inspectors.
  3.3 Contractor to maintain documentation log of project progress including photos from beginning to end of project.


<div align="center">END OF SECTION</div>



# HUB Subcontracting Plan (HSP)
## QUICK CHECKLIST

While this HSP Quick Checklist is being provided to merely assist you in readily identifying the sections of the HSP form that you will need to complete, it is very important that you adhere to the instructions in the HSP form and instructions provided by the contracting agency.

➤ **If you will be awarding <u>all</u> of the subcontracting work you have to offer under the contract to <u>only</u> Texas certified HUB vendors, complete:**

Section 1 - Respondent and Requisition Information

Section 2 a. - Yes, I will be subcontracting portions of the contract.

Section 2 b. - List all the portions of work you will subcontract, and indicate the percentage of the contract you expect to award to Texas certified HUB vendors.

Section 2 c. - Yes

Section 4 - Affirmation

GFE Method A (Attachment A) - Complete an Attachment A for each of the subcontracting opportunities you listed in Section 2 b.

➤ **If you will be subcontracting any portion of the contract to Texas certified HUB vendors and Non-HUB vendors, and the aggregate percentage of all the subcontracting work you will be awarding to the Texas certified HUB vendors with which you <u>do not</u> have a <u>continuous contract</u>\* in place for more than five (5) years <u>meets or exceeds</u> the HUB Goal the contracting agency identified in the "Agency Special Instructions/Additional Requirements", complete:**

Section 1 - Respondent and Requisition Information

Section 2 a. - Yes, I will be subcontracting portions of the contract.

Section 2 b. - List all the portions of work you will subcontract, and indicate the percentage of the contract you expect to award to Texas certified HUB vendors and Non-HUB vendors.

Section 2 c. - No

Section 2 d. - Yes

Section 4 - Affirmation

GFE Method A (Attachment A) - Complete an Attachment A for each of the subcontracting opportunities you listed in Section 2 b.

➤ **If you will be subcontracting any portion of the contract to Texas certified HUB vendors and Non-HUB vendors or only to Non-HUB vendors, and the aggregate percentage of all the subcontracting work you will be awarding to the Texas certified HUB vendors with which you <u>do not</u> have a <u>continuous contract</u>\* in place for more than five (5) years <u>does not meet or exceed</u> the HUB Goal the contracting agency identified in the "Agency Special Instructions/Additional Requirements", complete:**

Section 1 - Respondent and Requisition Information

Section 2 a. - Yes, I will be subcontracting portions of the contract.

Section 2 b. - List all the portions of work you will subcontract, and indicate the percentage of the contract you expect to award to Texas certified HUB vendors and Non-HUB vendors.

Section 2 c. - No

Section 2 d. - No

Section 4 - Affirmation

GFE Method B (Attachment B) - Complete an Attachment B for each of the subcontracting opportunities you listed in Section 2 b.

➤ **If you will not be subcontracting any portion of the contract and will be fulfilling the entire contract with your own resources (i.e., employees, supplies, materials and/or equipment), complete:**

Section 1 - Respondent and Requisition Information

Section 2 a. - No, I will not be subcontracting any portion of the contract, and I will be fulfilling the entire contract with my own resources.

Section 3 - Self Performing Justification

Section 4 - Affirmation

---

*<u>Continuous Contract</u>: Any existing written agreement (including any renewals that are exercised) between a prime contractor and a HUB vendor, where the HUB vendor provides the prime contractor with goods or service, to include under the same contract for a specified period of time. The frequency the HUB vendor is utilized or paid during the term of the contract is not relevant to whether the contract is considered continuous. Two or more contracts that run concurrently or overlap one another for different periods of time are considered by CPA to be individual contracts rather than renewals or extensions to the original contract. In such situations the prime contractor and HUB vendor are entering (have entered) into "new" contracts.*



# HUB Subcontracting Plan (HSP)

Rev. 2/17

In accordance with Texas Gov't Code §2161.252, the contracting agency has determined that subcontracting opportunities are probable under this contract. Therefore, all respondents, including State of Texas certified Historically Underutilized Businesses (HUBs) must complete and submit this State of Texas HUB Subcontracting Plan (HSP) with their response to the bid requisition (solicitation).

NOTE: Responses that do not include a completed HSP shall be rejected pursuant to Texas Gov't Code §2161.252(b).

The HUB Program promotes equal business opportunities for economically disadvantaged persons to contract with the State of Texas in accordance with the goals specified in the 2009 State of Texas Disparity Study. The statewide HUB goals defined in 34 Texas Administrative Code (TAC) §20.284 are:

- *11.2 percent for heavy construction other than building contracts,*
- *21.1 percent for all building construction, including general contractors and operative builders' contracts,*
- *32.9 percent for all special trade construction contracts,*
- *23.7 percent for professional services contracts,*
- *26.0 percent for all other services contracts, and*
- *21.1 percent for commodities contracts.*

## - - Agency Special Instructions/Additional Requirements - -

*In accordance with 34 TAC §20.285(d)(1)(D)(iii), a respondent (prime contractor) may demonstrate good faith effort to utilize Texas certified HUBs for its subcontracting opportunities if the total value of the respondent's subcontracts with Texas certified HUBs meets or exceeds the statewide HUB goal or the agency specific HUB goal, whichever is higher. When a respondent uses this method to demonstrate good faith effort, the respondent must identify the HUBs with which it will subcontract. If using existing contracts with Texas certified HUBs to satisfy this requirement, only the aggregate percentage of the contracts expected to be subcontracted to HUBs with which the respondent __does not__ have a __continuous contract*__ in place for __more than five (5) years__ shall qualify for meeting the HUB goal. This limitation is designed to encourage vendor rotation as recommended by the 2009 Texas Disparity Study.*

## SECTION 1: RESPONDENT AND REQUISITION INFORMATION

**a.** Respondent (Company) Name: _____     State of Texas VID #: _____

Point of Contact: _____     Phone #: _____

E-mail Address: _____     Fax #: _____

**b.** Is your company a State of Texas certified HUB? ☐ - **Yes**   ☐ - **No**

**c.** Requisition #: _____     Bid Open Date: _____
(mm/dd/yyyy)

1

Enter your company's name here: _____     Requisition #: _____

## SECTION 2: RESPONDENT's SUBCONTRACTING INTENTIONS

After dividing the contract work into reasonable lots or portions to the extent consistent with prudent industry practices, and taking into consideration the scope of work to be performed under the proposed contract, including all potential subcontracting opportunities, the respondent must determine what portions of work, **including contracted staffing, goods and services will be subcontracted**. Note: In accordance with 34 TAC §20.282, a "Subcontractor" means a person who contracts with a prime contractor to work, to supply commodities, or to contribute toward completing work for a governmental entity.

**a.** Check the appropriate box (Yes or No) that identifies your subcontracting intentions:

☐ - *Yes*, I will be subcontracting portions of the contract. (If *Yes*, complete Item b of this SECTION and continue to Item c of this SECTION.)

☐ - *No*, I will not be subcontracting <u>any</u> portion of the contract, and I will be fulfilling the entire contract with my own resources, including employees, goods and services. (If *No*, continue to SECTION 3 and SECTION 4.)

**b.** List all the portions of work (subcontracting opportunities) you will subcontract. Also, based on the total value of the contract, identify the percentages of the contract you expect to award to Texas certified HUBs, and the percentage of the contract you expect to award to vendors that are not a Texas certified HUB (i.e., Non-HUB).

| Item # | Subcontracting Opportunity Description | HUBs | | Non-HUBs |
|---|---|---|---|---|
| | | Percentage of the contract expected to be subcontracted to HUBs with which you <u>**do not**</u> have a <u>continuous contract*</u> in place for <u>more than five (5) years</u>. | Percentage of the contract expected to be subcontracted to HUBs with which you have a <u>continuous contract*</u> in place for <u>more than five (5) years</u>. | Percentage of the contract expected to be subcontracted to non-HUBs. |
| 1 | | % | % | % |
| 2 | | % | % | % |
| 3 | | % | % | % |
| 4 | | % | % | % |
| 5 | | % | % | % |
| 6 | | % | % | % |
| 7 | | % | % | % |
| 8 | | % | % | % |
| 9 | | % | % | % |
| 10 | | % | % | % |
| 11 | | % | % | % |
| 12 | | % | % | % |
| 13 | | % | % | % |
| 14 | | % | % | % |
| 15 | | % | % | % |
| | Aggregate percentages of the contract expected to be subcontracted: | **%** | **%** | **%** |

(Note: If you have more than fifteen subcontracting opportunities, a continuation sheet is available online at https://www.comptroller.texas.gov/purchasing/vendor/hub/forms.php).

**c.** Check the appropriate box (Yes or No) that indicates whether you will be using <u>**only**</u> Texas certified HUBs to perform <u>**all**</u> of the subcontracting opportunities you listed in SECTION 2, Item b.

- *Yes* (If *Yes*, continue to SECTION 4 and complete an "HSP Good Faith Effort - Method A (Attachment A)" for <u>**each**</u> of the subcontracting opportunities you listed.)
- *No* (If *No*, continue to Item d, of this SECTION.)

**d.** Check the appropriate box (Yes or No) that indicates whether the aggregate expected percentage of the contract you will subcontract <u>**with Texas certified HUBs**</u> with which you <u>**do not**</u> have a <u>continuous contract*</u> in place with for <u>**more than five (5) years**</u>, <u>**meets or exceeds**</u> the HUB goal the contracting agency identified on page 1 in the "**Agency Special Instructions/Additional Requirements**."

- *Yes* (If *Yes*, continue to SECTION 4 and complete an "HSP Good Faith Effort - Method A (Attachment A)" for <u>**each**</u> of the subcontracting opportunities you listed.)
- *No* (If *No*, continue to SECTION 4 and complete an "HSP Good Faith Effort - Method B (Attachment B)" for <u>**each**</u> of the subcontracting opportunities you listed.)

*__Continuous Contract__: Any existing written agreement (including any renewals that are exercised) between a prime contractor and a HUB vendor, where the HUB vendor provides the prime contractor with goods or service under the same contract for a specified period of time. The frequency the HUB vendor is utilized or paid during the term of the contract is not relevant to whether the contract is considered continuous. Two or more contracts that run concurrently or overlap one another for different periods of time are considered by CPA to be individual contracts rather than renewals or extensions to the original contract. In such situations the prime contractor and HUB vendor are entering (have entered) into "new" contracts.*

Rev. 2/17

Enter your company's name here: _____     Requisition #: _____

## SECTION 2: RESPONDENT's SUBCONTRACTING INTENTIONS (CONTINUATION SHEET)

This page can be used as a continuation sheet to the HSP Form's page 2, Section 2, Item b. Continue listing the portions of work (subcontracting opportunities) you will subcontract. Also, based on the total value of the contract, identify the percentages of the contract you expect to award to Texas certified HUBs, and the percentage of the contract you expect to award to vendors that are not a Texas certified HUB (i.e., Non-HUB).

| Item # | Subcontracting Opportunity Description | HUBs — Percentage of the contract expected to be subcontracted to HUBs with which you **do not** have a **continuous contract*** in place for **more than five (5) years**. | HUBs — Percentage of the contract expected to be subcontracted to HUBs with which you have a **continuous contract*** in place for **more than five (5) years**. | Non-HUBs — Percentage of the contract expected to be subcontracted to non-HUBs. |
|---|---|---|---|---|
| 16 | | % | % | % |
| 17 | | % | % | % |
| 18 | | % | % | % |
| 19 | | % | % | % |
| 20 | | % | % | % |
| 21 | | % | % | % |
| 22 | | % | % | % |
| 23 | | % | % | % |
| 24 | | % | % | % |
| 25 | | % | % | % |
| 26 | | % | % | % |
| 27 | | % | % | % |
| 28 | | % | % | % |
| 29 | | % | % | % |
| 30 | | % | % | % |
| 31 | | % | % | % |
| 32 | | % | % | % |
| 33 | | % | % | % |
| 34 | | % | % | % |
| 35 | | % | % | % |
| 36 | | % | % | % |
| 37 | | % | % | % |
| 38 | | % | % | % |
| 39 | | % | % | % |
| 40 | | % | % | % |
| 41 | | % | % | % |
| 42 | | % | % | % |
| 43 | | % | % | % |
| Aggregate percentages of the contract expected to be subcontracted: | | **%** | **%** | **%** |

*****Continuous Contract**:  *Any existing written agreement (including any renewals that are exercised) between a prime contractor and a HUB vendor, where the HUB vendor provides the prime contractor with goods or service under the same contract for a specified period of time. The frequency the HUB vendor is utilized or paid during the term of the contract is not relevant to whether the contract is considered continuous. Two or more contracts that run concurrently or overlap one another for different periods of time are considered by CPA to be individual contracts rather than renewals or extensions to the original contract. In such situations the prime contractor and HUB vendor are entering (have entered) into "new" contracts.*

HSP – SECTION 2
(Continuation Sheet)

| Enter your company's name here: _____ | Requisition #: _____ |

---

**SECTION 3:** **SELF PERFORMING JUSTIFICATION** (If you responded "No" to SECTION 2, Item a, you must complete this SECTION and continue to SECTION 4.) If you responded "No" to SECTION 2, Item a, in the space provided below **explain how** your company will perform the entire contract with its own employees, supplies, materials and/or equipment.

.

---

**SECTION 4:** **AFFIRMATION**

As evidenced by my signature below, I affirm that I am an authorized representative of the respondent listed in SECTION 1, and that the information and supporting documentation submitted with the HSP is true and correct. Respondent understands and agrees that, if awarded any portion of the requisition:

- The respondent will provide notice as soon as practical to all the subcontractors (HUBs and Non-HUBs) of their selection as a subcontractor for the awarded contract. The notice must specify at a minimum the contracting agency's name and its point of contact for the contract, the contract award number, the subcontracting opportunity they (the subcontractor) will perform, the approximate dollar value of the subcontracting opportunity and the expected percentage of the total contract that the subcontracting opportunity represents. A copy of the notice required by this section must also be provided to the contracting agency's point of contact for the contract no later than ten (10) working days after the contract is awarded.

- The respondent must submit monthly compliance reports (Prime Contractor Progress Assessment Report – PAR) to the contracting agency, verifying its compliance with the HSP, including the use of and expenditures made to its subcontractors (HUBs and Non-HUBs). (The PAR is available at https://www.comptroller.texas.gov/purchasing/docs/hub-forms/ProgressAssessmentReportForm.xls).

- The respondent must seek approval from the contracting agency prior to making any modifications to its HSP, including the hiring of additional or different subcontractors and the termination of a subcontractor the respondent identified in its HSP. If the HSP is modified without the contracting agency's prior approval, respondent may be subject to any and all enforcement remedies available under the contract or otherwise available by law, up to and including debarment from all state contracting.

- The respondent must, upon request, allow the contracting agency to perform on-site reviews of the company's headquarters and/or work-site where services are being performed and must provide documentation regarding staffing and other resources.

| _____ | _____ | _____ | _____ |
| Signature | Printed Name | Title | Date (mm/dd/yyyy) |

**Reminder:**

➤ If you responded "Yes" to SECTION 2, Items c or d, you must complete an "HSP Good Faith Effort - Method A (Attachment A)" for each of the subcontracting opportunities you listed in SECTION 2, Item b.

➤ If you responded "No" SECTION 2, Items c and d, you must complete an "HSP Good Faith Effort - Method B (Attachment B)" for each of the subcontracting opportunities you listed in SECTION 2, Item b.

3

# HSP Good Faith Effort - Method A (Attachment A)

Rev. 2/17

Enter your company's name here: _____     Requisition #: _____

**IMPORTANT**: If you responded "*Yes*" to **SECTION 2, Items c** or **d** of the completed HSP form, you must submit a completed "HSP Good Faith Effort - Method A (Attachment A)" for <u>each</u> of the subcontracting opportunities you listed in **SECTION 2, Item b** of the completed HSP form. You may photo-copy this page or download the form at https://www.comptroller.texas.gov/purchasing/docs/hub-forms/hub-sbcont-plan-gfe-achm-a.pdf

---

**SECTION A-1:  SUBCONTRACTING OPPORTUNITY**

Enter the item number and description of the subcontracting opportunity you listed in SECTION 2, Item b, of the completed HSP form for which you are completing the attachment.

Item Number: _____     Description: _____

---

**SECTION A-2:  SUBCONTRACTOR SELECTION**

List the subcontractor(s) you selected to perform the subcontracting opportunity you listed above in SECTION A-1. Also identify whether they are a Texas certified HUB and their Texas Vendor Identification (VID) Number or federal Employer Identification Number (EIN), the approximate dollar value of the work to be subcontracted, and the expected percentage of work to be subcontracted. When searching for Texas certified HUBs and verifying their HUB status, ensure that you use the State of Texas' Centralized Master Bidders List (CMBL) - Historically Underutilized Business (HUB) Directory Search located at http://mycpa.cpa.state.tx.us/tpasscmblsearch/index.jsp. HUB status code "**A**" signifies that the company is a Texas certified HUB.

| Company Name | Texas certified HUB | Texas VID or federal EIN<br>Do not enter Social Security Numbers.<br>If you do not know their VID / EIN,<br>leave their VID / EIN field blank. | Approximate<br>Dollar Amount | Expected<br>Percentage of<br>Contract |
|---|---|---|---|---|
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |
|  | - Yes    - No |  | $ | % |

**REMINDER:** As specified in SECTION 4 of the completed HSP form, <u>if you (respondent) are awarded any portion of the requisition</u>, you are required to provide notice as soon as practical to <u>all</u> the subcontractors (HUBs and Non-HUBs) of their selection as a subcontractor. The notice must specify at a minimum the contracting agency's name and its point of contact for the contract, the contract award number, the subcontracting opportunity they (the subcontractor) will perform, the approximate dollar value of the subcontracting opportunity and the expected percentage of the total contract that the subcontracting opportunity represents. A copy of the notice required by this section must also be provided to the contracting agency's point of contact for the contract <u>no later than ten (10) working days</u> after the contract is awarded.

<div align="center">

Page 1 of 1
(Attachment A)

**- 645 -**

</div>

# HSP Good Faith Effort - Method B (Attachment B)

Enter your company's name here: _____     Requisition #: _____

**IMPORTANT:** If you responded "*No*" to **SECTION 2, Items c** and **d** of the completed HSP form, you must submit a completed "HSP Good Faith Effort - Method B (Attachment B)" for **each** of the subcontracting opportunities you listed in **SECTION 2, Item b** of the completed HSP form. You may photo-copy this page or download the form at https://www.comptroller.texas.gov/purchasing/docs/hub-forms/hub-sbcont-plan-gfe-achm-b.pdf..

## SECTION B-1: SUBCONTRACTING OPPORTUNITY

Enter the item number and description of the subcontracting opportunity you listed in SECTION 2, Item b, of the completed HSP form for which you are completing the attachment.

Item Number:            Description:

## SECTION B-2: MENTOR PROTÉGÉ PROGRAM

If respondent is participating as a Mentor in a State of Texas Mentor Protégé Program, submitting its Protégé (Protégé must be a State of Texas certified HUB) as a subcontractor to perform the subcontracting opportunity listed in **SECTION B-1**, constitutes a good faith effort to subcontract with a Texas certified HUB towards that specific portion of work.

Check the appropriate box (Yes or No) that indicates whether you will be subcontracting the portion of work you listed in SECTION B-1 to your Protégé.

  - Yes (If *Yes*, continue to SECTION B-4.)

  - No / Not Applicable (If *No* or *Not Applicable*, continue to SECTION B-3 and SECTION B-4.)

## SECTION B-3: NOTIFICATION OF SUBCONTRACTING OPPORTUNITY

When completing this section you MUST comply with items a, b, c and d, thereby demonstrating your Good Faith Effort of having notified Texas certified HUBs and trade organizations or development centers about the subcontracting opportunity you listed in SECTION B-1. Your notice should include the scope of work, information regarding the location to review plans and specifications, bonding and insurance requirements, required qualifications, and identify a contact person. When sending notice of your subcontracting opportunity, you are encouraged to use the attached HUB Subcontracting Opportunity Notice form, which is also available online at https://www.comptroller.texas.gov/purchasing/docs/hub-forms/HUBSubcontractingOpportunityNotificationForm.pdf.

Retain supporting documentation (i.e., certified letter, fax, e-mail) demonstrating evidence of your good faith effort to notify the Texas certified HUBs and trade organizations or development centers. Also, be mindful that a working day is considered a normal business day of a state agency, not including weekends, federal or state holidays, or days the agency is declared closed by its executive officer. The initial day the subcontracting opportunity notice is sent/provided to the HUBs and to the trade organizations or development centers is considered to be "day zero" and does not count as one of the seven (7) working days.

**a.** Provide written notification of the subcontracting opportunity you listed in SECTION B-1, to three (3) or more Texas certified HUBs. Unless the contracting agency specified a different time period, you must allow the HUBs at least seven (7) working days to respond to the notice prior to you submitting your bid response to the contracting agency. When searching for Texas certified HUBs and verifying their HUB status, ensure that you use the State of Texas' Centralized Master Bidders List (CMBL) - Historically Underutilized Business (HUB) Directory Search located at http://mycpa.cpa.state.tx.us/tpasscmblsearch/index.jsp. HUB status code "**A**" signifies that the company is a Texas certified HUB.

**b.** List the **three (3) Texas certified HUBs** you notified regarding the subcontracting opportunity you listed in SECTION B-1. Include the company's Texas Vendor Identification (VID) Number, the date you sent notice to that company, and indicate whether it was responsive or non-responsive to your subcontracting opportunity notice.

| Company Name | Texas VID (Do not enter Social Security Numbers.) | Date Notice Sent (mm/dd/yyyy) | Did the HUB Respond? |
|---|---|---|---|
|  |  |  | - Yes    - No |
|  |  |  | - Yes    - No |
|  |  |  | - Yes    - No |

**c.** Provide written notification of the subcontracting opportunity you listed in SECTION B-1 to two (2) or more trade organizations or development centers in Texas to assist in identifying potential HUBs by disseminating the subcontracting opportunity to their members/participants. Unless the contracting agency specified a different time period, you must provide your subcontracting opportunity notice to trade organizations or development centers at least seven (7) working days prior to submitting your bid response to the contracting agency. A list of trade organizations and development centers that have expressed an interest in receiving notices of subcontracting opportunities is available on the Statewide HUB Program's webpage at https://www.comptroller.texas.gov/purchasing/vendor/hub/resources.php.

**d.** List **two (2) trade organizations or development centers** you notified regarding the subcontracting opportunity you listed in SECTION B-1. Include the date when you sent notice to it and indicate if it accepted or rejected your notice.

| Trade Organizations or Development Centers | Date Notice Sent (mm/dd/yyyy) | Was the Notice Accepted? |
|---|---|---|
|  |  | - Yes    - No |
|  |  | - Yes    - No |

Page 1 of 2
(Attachment B)
**- 646 -**

Enter your company's name here: _____ Requisition #: _____

**SECTION B-4:** **SUBCONTRACTOR SELECTION**

Enter the item number and description of the subcontracting opportunity you listed in **SECTION 2, Item b,** of the completed HSP form for which you are completing the attachment.

**a.** Enter the item number and description of the subcontracting opportunity for which you are completing this Attachment B continuation page.

Item Number:                Description:

**b.** List the subcontractor(s) you selected to perform the subcontracting opportunity you listed in **SECTION B-1**. Also identify whether they are a Texas certified HUB and their Texas Vendor Identification (VID) Number or federal Employer Identification Number (EIN), the approximate dollar value of the work to be subcontracted, and the expected percentage of work to be subcontracted. When searching for Texas certified HUBs and verifying their HUB status, ensure that you use the State of Texas' Centralized Master Bidders List (CMBL) - Historically Underutilized Business (HUB) Directory Search located at http://mycpa.cpa.state.tx.us/tpasscmblsearch/index.jsp. HUB status code "**A**" signifies that the company is a Texas certified HUB.

| Company Name | Texas certified HUB | Texas VID or federal EIN Do not enter Social Security Numbers. If you do not know their VID / EIN, leave their VID / EIN field blank. | Approximate Dollar Amount | Expected Percentage of Contract |
|---|---|---|---|---|
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |
| | - Yes    - No | | $ | % |

**c.** If any of the subcontractors you have selected to perform the subcontracting opportunity you listed in **SECTION B-1** is **not** a Texas certified HUB, provide <u>written</u> justification for your selection process (attach additional page if necessary):

**REMINDER:** As specified in SECTION 4 of the completed HSP form, <u>if you (respondent) are awarded any portion of the requisition</u>, you are required to provide notice as soon as practical to **all** the subcontractors (HUBs and Non-HUBs) of their selection as a subcontractor. The notice must specify at a minimum the contracting agency's name and its point of contact for the contract, the contract award number, the subcontracting opportunity it (the subcontractor) will perform, the approximate dollar value of the subcontracting opportunity and the expected percentage of the total contract that the subcontracting opportunity represents. A copy of the notice required by this section must also be provided to the contracting agency's point of contact for the contract <u>no later than ten (10) working days</u> after the contract is awarded.

 # HUB Subcontracting Opportunity Notification Form

Rev. 2/17

In accordance with Texas Gov't Code, Chapter 2161, each state agency that considers entering into a contract with an expected value of $100,000 or more shall, before the agency solicits bids, proposals, offers, or other applicable expressions of interest, determine whether subcontracting opportunities are probable under the contract. The state agency I have identified below in Section B has determined that subcontracting opportunities are probable under the requisition to which my company will be responding.

34 Texas Administrative Code, §20.285 requires all respondents (prime contractors) bidding on the contract to provide notice of each of their subcontracting opportunities to at least three (3) Texas certified HUBs (who work within the respective industry applicable to the subcontracting opportunity), and allow the HUBs at least seven (7) working days to respond to the notice prior to the respondent submitting its bid response to the contracting agency. In addition, at least seven (7) working days prior to submitting its bid response to the contracting agency, the respondent must provide notice of each of its subcontracting opportunities to two (2) or more trade organizations or development centers (in Texas) that serves members of groups (i.e., Asian Pacific American, Black American, Hispanic American, Native American, Woman, Service Disabled Veteran) identified in Texas Administrative Code §20.282(19)(C).

We respectfully request that vendors interested in bidding on the subcontracting opportunity scope of work identified in Section C, Item 2, reply no later than the date and time identified in Section C, Item 1. Submit your response to the point-of-contact referenced in Section A.

## SECTION A: PRIME CONTRACTOR'S INFORMATION

Company Name: _____     State of Texas VID #: _____

Point-of-Contact: _____     Phone #: _____

E-mail Address: _____     Fax #: _____

## SECTION B: CONTRACTING STATE AGENCY AND REQUISITION INFORMATION

Agency Name: _____

Point-of-Contact: _____     Phone #: _____

Requisition #: _____     Bid Open Date: _____

(mm/dd/yyyy)

## SECTION C: SUBCONTRACTING OPPORTUNITY RESPONSE DUE DATE, DESCRIPTION, REQUIREMENTS AND RELATED INFORMATION

1.  Potential Subcontractor's Bid Response Due Date:

    If you would like for our company to consider your company's bid for the subcontracting opportunity identified below in Item 2,

    we must receive your bid response no later than _____ on _____.

    Central Time    Date (mm/dd/yyyy)

> *In accordance with 34 TAC §20.285, each notice of subcontracting opportunity shall be provided to at least three (3) Texas certified HUBs, and allow the HUBs at least seven (7) working days to respond to the notice prior to submitting our bid response to the contracting agency. In addition, at least seven (7) working days prior to us submitting our bid response to the contracting agency, we must provide notice of each of our subcontracting opportunities to two (2) or more trade organizations or development centers (in Texas) that serves members of groups (i.e., Asian Pacific American, Black American, Hispanic American, Native American, Woman, Service Disabled Veteran) identified in Texas Administrative Code, §20.282(19)(C).*
>
> *(A working day is considered a normal business day of a state agency, not including weekends, federal or state holidays, or days the agency is declared closed by its executive officer. The initial day the subcontracting opportunity notice is sent/provided to the HUBs and to the trade organizations or development centers is considered to be "day zero" and does not count as one of the seven (7) working days.)*

2.  Subcontracting Opportunity Scope of Work:

3.  Required Qualifications:                                                        - Not Applicable

4.  Bonding/Insurance Requirements:                                                - Not Applicable

5.  Location to review plans/specifications:                                       - Not Applicable

# Attachment B

## HUB Subcontracting Plan

A complete HUB Subcontracting Plan must be submitted within 24 hours of the bid documents in its own envelope marked HUB Plan. The following items must be submitted to meet the full HUB Subcontracting Plan requirements.

The State of Texas HUB Subcontracting Plan forms for Texas A&M University shall be accessed on the following website:

https://hub.tamu.edu/forms.html

1. Complete Section 1, page 1 of the HSP form.

2. Complete Section 2a through d.

3. Complete Section 3 (if you are self-performing all the work)

4. Complete Section 4 (must be signed)

5. Complete either Method A or Method B (only one can be used per HSP Plan) for each opportunity listed in Section 2b. Reminder that all supporting documentation shall be provided as part of this plan. The following are additional items of note as part of the good faith effort required:

    - The respondent shall provide potential HUB subcontractors reasonable time to respond to the respondent's notice. "Reasonable time to respond" in this context is no less than seven (7) complete business days (not counting the day you send it out, the day the CSP/RFQ/CMAR is due, or postal holidays), unless circumstances require a different time period, which is determined by the agency and documented in the contract file.

    - The respondent shall use the State of Texas Centralized Master Bidders List (CMBL), HUB Directory, internet resources, and/or other directories as identified by the State of Texas or the TAMU HUB Program Office when searching for HUB subcontractors.

      **NOTE: A complete list of all certified HUBs may be electronically accessed through the Internet at**
      https://mycpa.cpa.state.tx.us/tpasscmblsearch/index.jsp

    - The respondent shall provide the notice described in this section to **three (3) or more** HUBs for **each** subcontracting opportunity as stated in Section B3a. Texas A&M encourages respondents to seek and find a "Diverse Group" of Historically Underutilized Businesses in each category in which a subcontract

of services is solicited.

- The respondent shall provide notice to at least two trade organizations or development centers that assist in identifying HUBs by disseminating opportunities to their membership/participants.

  **NOTE: A list of Trade Organizations and Development Centers may be accessed at:**

  **https://comptroller.texas.gov/purchasing/vendor/hub/resources.php**

- The respondent shall negotiate in good faith with qualified HUBs, not rejecting qualified HUBs who were also the best value responsive bidder.

- Provide written justification of the selection process if a non-HUB subcontractor is selected in Section B-4c.

6. If you will not be using any Subcontractors you will fill out Section 3a (Self-Perform).

If you have HUB Subcontracting Plan questions, contact the Texas A&M University HUB Program Office:

Cindy Gillar                                  Shawna Kennedy
979.845.9010                                 979.845.3425
c-gillar@tamu.edu                            shawna.kennedy@tamu.edu

# Appendix A

## Sample Master Agreement Contract

**SSC Agreement**

If applicable, provide comments pertaining to SSC's standard Agreement attached as Appendix A

NOTE: SSC will not make significant changes to its standard Agreement. Minor changes may be considered, SSC will not guarantee acceptance of such changes.

# MASTER AGREEMENT CONTRACT

**THIS MASTER AGREEMENT CONTRACT**, ("Master Agreement") made and entered into this ____ day of _____, 2014, by and between _____ with principal offices at:

*(address)*_____

(hereinafter called "Contractor") and Southeast Service Corporation, a Tennessee corporation d/b/a SSC Service Solutions ("ODR") with principal office at:

1500 Liberty Ridge Drive, Suite 210, Wayne, PA 19087.

## WITNESSETH:

**WHEREAS,** ODR was retained by The Texas A&M University System ("Owner"), to manage certain projects on the Owner's campus as the Owner's Designated Representative and which ODR has requested and Contractor has agreed to perform certain tasks on certain projects as more specifically set forth in a work order in the form attached hereto and marked Exhibit "A" attached hereto ("Project Work").

**WHEREAS**, This Master Agreement sets forth certain obligations and terms and conditions applicable to all the Project Work.

**WHEREAS**, In addition, the terms and conditions set for the herein, attached hereto and made are part hereof are also certain Uniform General and Supplemental Conditions ("UGSC"), the ODR Special Conditions ("SC"), if applicable, and certain statements, illustrations and drawings ("Drawings"), specific material requirements, processes, time tables, schedules and specific requirements for the manner in which the Project Work will be performed or conducted ("Specifications"), scopes of work and any addenda and other documents attached hereto as Exhibit "B" ("Scope Documents") (collectively this Master Agreement, the UGSC ,the SC, Drawings, Specifications and Scope Documents shall be the "Contract Documents")

1.	**CONTRACTOR'S INVESTIGATION AND REPRESENTATIONS**.   The Contractor hereby acknowledges and certifies that it has examined the site and has carefully read and examined the Contract Documents, which identify the Project Work to be performed and/or managed by the Contractor, and the Contractor agrees that it is and will be bound by and will fully, faithfully and punctually perform all of the provisions thereof insofar as it relates or pertains in any manner to the Project Work to be performed by the Contractor or any part thereof including, but not limited to, all labor, material, services, reports, tests, working drawings, permits, certificates, indemnities and guarantees specified, indicated, inferred or reasonably intended to be part of the Contract Documents. The Project Work to be performed by the Contractor is to be done under the direction of ODR to the satisfaction of the Owner and ODR, and the decision of ODR as to true construction and meaning of the Contract Document in respect to the Project Work to be performed by Contractor shall be final and binding upon the Contractor. The Contractor further acknowledges that it has checked the approaches

and access to the jobsite, nearby structures, telephone and power lines, and all governmental laws ordinances and regulations relating to the use of streets, highways and alleyways, which may in any manner restrict, interfere with, delay or otherwise affect the delivery, storage, handling, hoisting and rigging of any and materials and equipment and the Contractor agrees that no additional charge will be made by reason of any applicable laws, ordinances, regulations or restrictions ("Applicable Laws").

**2.** **SCOPE OF WORK.** ODR and the Contractor agree that the primary and principal materials to be furnished and the primary and principal Work to be done by the Contractor are as set forth in and contemplated in a completed Work Order in the form attached hereto and marked as Exhibit A, inclusive of all its terms and conditions being hereby incorporated herein and made a part of this Project Work.

**(a)** **Maximum Contract Sum.** The total, maximum, not-to-exceed amount of money authorized for payment to the Contractor for services provided pursuant to this Master Agreement is _____. Total billings for authorized work performed by the Contractor shall not exceed this maximum contract sum. The maximum contract sum shall not be increased except by written amendment to this Master Agreement executed by ODR and Contractor.

**(b)** **No Minimum Amount of Work.** ODR makes no minimum representations regarding the amount or type of services, if any, that the Contractor will be asked to provide Owner during the term of this Master Agreement. It is expressly understood that ODR is under no obligation to request any services from Contractor and no minimum amount of work is required or contemplated under this Master Agreement. All service requests will be made by ODR on an as-needed basis, subject to future agreement on the scope of work and the fee.

**3.** **APPLICABILITY OF THE MASTER AGREEMENT.** Contractor agrees to be bound to ODR by all the terms and conditions of the Contract Documents, above referenced, so far as the terms relate to the Project Work specified herein and to assume toward ODR all of the obligations and responsibilities that ODR has by the said Contract Documents assumed toward Owner. All terms and conditions contained in the Contract Documents are hereby incorporated herein, by operation of law, or as required to be placed in the Contract Documents, as if they were specifically written herein.

**4.** **PERFORMANCE BY CONTRACTOR.**

(a) Time is of the essence in the performance of all Project Work and the Contractor shall perform all of the requirements hereof with all possible dispatch and shall execute all Project Work in such a manner as not to delay any other contractor or ODR also performing or concurrently performing Project Work. The Contractor shall follow the progress of the project, be prepared to commence and complete the Project Work when notified, keep up with the general progress of the whole Project Work and shall be responsible for all damages caused by its delay, including liquidated damages or actual damages assessed under the terms of the Contract Documents which are attributable to work under this Master Agreement.

(b) Should the Contractor's performance of the Project Work be delayed by any acts of a subcontractors or suppliers not retained by Contractor, and provided that ODR is able to obtain an extension of time under the Contract Documents, the Contractor shall receive an equitable extension of time for the performance the Project Work (not to exceed the time received by ODR from the Owner) but shall not be entitled to any increase in contract price, damages or additional compensation as a consequence of such delays, unless the Owner pays for such delay's increases costs directly attributable to Contractor. Within five (5) days after the commencement of any delay caused by

2

the Owner, its subcontractors or suppliers, the Contractor shall notify ODR in writing of any delays for which the Owner is responsible, in sufficient time so that its claim may be timely processed against the Owner administratively per the terms of the Contract Documents.

(c)     Contractor shall furnish adequate on-site supervision for its Project Work. Contractor shall designate an on-site representative who shall have authority to legally bind Contractor to all matters, contractually or otherwise.

(d)     Contractor shall not start work until all Contract Documents have been executed and all insurance certificates have been submitted, reviewed and accepted by ODR as required by Section 10 herein, at which time a Notice to Proceed will be issued.  The Contractor shall notify the ODR prior to commencing any Project Work.

**5.       PAYMENTS TO CONTRACTOR.**

(a)     ODR agrees to pay the Contractor for the timely and proper performance of the Project Work identified in the applicable Work Order, in accordance with the provisions of the Contract Documents, and, if applicable, subject to any additions and deductions for changes as agreed upon in writing and signed by both parties.

(b)     The Contractor shall furnish ODR with a construction schedule and tabulated breakdown of the Project Work covered herein, listing items of the Project Work in sufficient detail to facilitate progress billing payment requests to be checked and verified by ODR as the Project Work progressed. ODR shall approve or disapprove the billing breakdown within ten (10) days of its receipt of completed invoice with all required supporting backup. If all required back up is not provided with the billing breakdown, only the portion of the invoice with sufficient billing breakdown will be paid.

(c)     Provided Contractor's rate of progress and general performance are satisfactory to ODR, and provided that the Contractor is in full compliance with each and every provision of the Contract Documents, ODR will make partial payments to the Contractor in an amount equal to ninety-five percent (95%) of the submitted progress billing; however, as a condition precedent to the obligation of ODR to make said payments, the following provisions must be met:

1.       Contractor shall submit its request for progress payment conforming to the tabulated breakdown and schedule of values attached therewith referenced in subparagraph (b) above and representing a true and accurate reflection of the Work completed during the immediately preceding month or such other immediately preceding period as directed by ODR. Said progress billing request shall be in duplicate copies, and on the form attached hereto and made a part hereof as Exhibit "B". The request must reach ODR's local office not later than the 20th day of each month, in order to be considered timely. Untimely billings shall be processed in the next payment.

2.       The Contractor's Affidavit and Waiver of Lien form included herein as Exhibit "C" must be properly executed by an authorized representative of Contractor.

3.       ODR shall have been paid by the Owner.

(d)     No partial payment, or certificate therefor, shall constitute acceptance or approval by ODR of any of the Project Work or material for which the progress payment is made. No progress payment shall constitute a wavier by ODR of any right to require fulfillment of all the terms of the Contract Documents. Neither the final payment nor any partial payment, nor any certificate for either, shall constitute acceptance by ODR of defective work or improper materials or if any element of Contractor's performance is determined to be at variance with the Contract Documents.

3

(e)     Final payment, inclusive of retention, shall be made within thirty (30) days of completion of the entire Project Work, acceptance of the same by the Owner, and as a condition precedent, receipt of final payment by ODR from the Owner.

(f)     Payments otherwise due to the Contractor may be withheld by ODR on account of defective work performed by the Contractor and not remedied, claims filed by third parties arising out of the Contractor's work, or upon the presentation of reasonable evidence indicating the probability of the filing of such claims, failure of the Contractor to make payments to its subcontractors or materialmen for work done or material furnished, or a reasonable doubt that the Project Work can be completed for the balance then owing the Contractor.

(g)     Without prejudice to any other rights specified herein or given to ODR by operation of law, ODR specifically reserves the right to write joint checks to Contractor and its material suppliers and/or subcontractors, if in ODR's judgment it is necessary to do so in order to insure payment to the materialmen and/or subcontractors. Additionally, it is specifically agreed that ODR possesses the right of setoff relative to any monies due and owing ODR by the Contractor, from whatever source.

**6.     CHANGES**.  ODR may at any time, by written change order and without notice to surety, make changes in the Project Work herein contracted for and Contractor shall proceed with the work as directed. If said changes cause an increase or decrease in the cost of performance or in the time required for performance by Contractor, an equitable adjustment shall be mutually agreed upon and the Contract Documents shall be amended in writing with a change order to reflect the price adjustment accordingly. Nothing herein contained shall excuse the Contractor from proceeding with the prosecution of the work as changed.

**7.     DISPUTES.**  The Contractor agrees to make any claims to ODR for damages or additional compensation alleged extra work, changed conditions or any other grounds in the same manner as provided in the Contract Documents, and in such time as will enable ODR, if it so chooses to do so, to present such claims to the Owner for payment or recognition. ODR will not be liable to the Contractor on account of any claim not timely or properly presented nor, unless and until it is allowed by the Owner, and then only to such extent as is allowed by the Owner. Notwithstanding anything to the contrary contained herein, no interruption, cessation, postponement or delay in the cause whatsoever, including disputes, shall relieve the Contractor of its duty to timely perform or give rise to any right to damages or additional compensation from ODR except to the extent that reimbursement is confirmed in writing by ODR and additional monies are received from the Owner therefor with respect to the work performed by Contractor hereunder and the Contractor hereby expressly waives and releases any other or further right to damages or additional compensation.

If ODR, in its sole discretion, determines NOT to submit the Contractor's claim to the Owner for resolution the following disputes resolution procedure shall be employed:

(a)     If the claim cannot be resolve by job-site representatives within 14 days of its submission to ODR, the claim shall be referred to each party's senior representative who shall meet and confer within 14 days of the claims referral.

(b)     If the senior representatives are unable to reach a resolution they shall jointly select mediator who is knowledgeable of construction and Texas law. The parties shall

4

share equally the cost and expense of the mediator. The dispute shall be mediated within 30 days of selection and retention of the mediator.

(c)     The party initially submitting the dispute for mediation shall notify the other party of its selection of a contactor (an "Independent Contractor"). The other party shall notify the first party of its selection of an Independent Contractor within 15 days of its receipt of the first selection. The two Independent Contractors shall select a third Independent Contractor within 30 days and the parties may submit such information as they deem appropriate to the third Independent Contractor for consideration in connection with the disputed matters. The determination by such third Independent Contractor shall be binding upon the Parties.

(d)     Nothing in the Contract Documents shall prevent or be construed as a waiver of ODR's right to seek redress on any disputed matter in a court of competent jurisdiction.

(e)     If applicable, nothing in the Contract Documents shall waive or be construed to waive the state's sovereign immunity.

**8.     TERMINATION**.   It is understood that the basic assumption underlying the mutual obligations and responsibilities entered into by the parties to the Contract Documents are the continued performance with respect to the Project Work that exists between ODR and the Owner. If, for any reason, the contract between ODR and the Owner is breached, rescinded or terminated, ODR shall have the right to immediately terminate this Master Agreement. ODR shall have the right to allocate a fair and equitable share of any monies received from the Owner, but in no event shall ODR be obligated to Contractor for any anticipatory profits or any damages incurred by Contractor as a result of the termination of this Master Agreement. Contractor agrees that ODR's decision or determination regarding the pro rata share of any monies received from the Owner as damages or compensation for said breach, rescission or termination on of the Project Work   shall be final and conclusive and that Contractor shall have no claim or cause of action against ODR for any reason or greater amount.

**9.     INDEMNITY.**  To the fullest extent permitted under state law, Contractor shall indemnify and save harmless ODR and Owner for any and all Losses (as defined below), of whatever nature and however caused, which results from or arises out of Contractor's or its officers, directors, shareholders, employees, agents, subcontractors, vendors, suppliers, representatives, affiliates, successors, assigns, or any person for whom Contractor is responsible for, (x) acts or omissions or (y) breach of Applicable Laws.  "Loss(es)" includes any claim, including third party claims, liability, loss, demand, suit, cause of action, settlement payment, cost and expense (including reasonable attorney's fees and investigation expenses), interest, award, judgment, damages (including punitive damages), diminution in value, liens, fines, fees and penalties. In the event of any such Losses arising out of the Contract Documents, ODR shall have the right to withhold from any payments due or to become due to the Contractor an amount sufficient, in its sole discretion, to protect and indemnify it from any and all such Losses.

(a)     The Contractor shall protect, indemnify, defend and save harmless ODR and Owner from and against all Losses, arising out of any infringement or claim of infringement on any trademarks, copyrights, trade secrets, patents, licenses, contractual rights or other proprietary rights of any other party in the use of any articles or equipment furnished or required to be furnished or performance of any services by the Contractor under the Contract Documents.

5

**10. INSURANCE.** The Contractor shall carry insurance in the types and amounts indicated in this Section 10 for the duration of the Master Agreement. The required insurance shall include coverage for Owner's property in the care, custody and control of Contractor prior to construction, during construction and during the warranty period. The insurance shall be evidenced by delivery to ODR of certificates of insurance executed by the insurer or its authorized agent stating coverages, limits, expiration dates and compliance with all applicable required provisions prior to the start of the Project Work. Upon request, ODR, and/or its agents, shall be entitled to receive without expense, copies of the policies and all endorsements. The Contractor shall update all expired policies prior to submission for monthly payment and during the contract warranty period. Failure to update policies shall be reason for withholding of payment until renewal is provided to ODR.

(a)     The Contractor shall provide and maintain the insurance coverage with the minimum amounts described below until the end of the warranty period unless otherwise stated herein. Failure to maintain insurance coverage, as required, is grounds for Suspension of Work for Cause pursuant to Article 14 of the UGSC. The Contractor will be notified of the date on which the Builder's Risk insurance policy may be terminated through Substantial Completion (defined in the UGSC) notices, acceptance notices and/or other means as deemed appropriate by ODR.

(b)     Coverage shall be written on an occurrence basis by companies authorized and admitted to do business in the State of Texas and rated A- or better by A.M. Best Company or otherwise acceptable to ODR, and shall include:

(i)     Worker's Compensation. Workers' Compensation Insurance with limits as required by the Texas Workers' Compensation Act, with the policy endorsed to provide a waiver of subrogation as to the Owner and ODR and Employer's Liability insurance of not less than:
$2,000,000 each accident
$2,000,000 disease each employee
$2,000,000 disease policy limit

(ii)     General Liability Coverage. Commercial General Liability Insurance, including Independent Contractor's liability, Products and Completed Operations and Contractual Liability, covering, but not limited to, the liability assumed under the indemnification provisions of the Contract Documents, fully insuring Contractor's (or subcontractors) liability for bodily injury and property damage with a combined bodily injury (including death) and property damage minimum limit of:
$1,000,000 per occurrence
$10,000,000 general aggregate
$1,000,000 products and completed operations
$1,000,000 personal and advertising injury
$1,000,000 damage to premises

Coverage shall be on an "occurrence" basis.

The policy shall include coverage extended to apply to completed operations and explosion, collapse, and underground hazards. The policy shall include

6

endorsement CG2503 Amendment-Aggregate Limits of Insurance (Per Project) or its equivalent.

(iii)     Asbestos Coverage. Asbestos Abatement Liability Insurance, including coverage for liability arising from the encapsulation, removal, handling, storage, transportation, and disposal of asbestos containing materials. *This requirement applies if the Project Work includes asbestos containing materials.

The combined single limit for bodily injury and property damage will be a minimum of $1,000,000 per occurrence or each claim if on a claims-made basis. Coverage may be evidenced through either professional liability or pollution liability.

*Specific Requirement for Claims-Made Form: Required period of coverage will be determined by the following formula: Continuous coverage for life of the JOW, plus one (1) year (to provide coverage for the warranty period), and an extended discovery period for a minimum of five (5) years which shall begin at the end of the warranty period.

If the Master Agreement is for asbestos abatement only, the All-Risk Builder's Risk or All-Risk Installation Floater (b)(iii) is not required.

(iv)     Automobile Coverage. Comprehensive Automobile Liability Insurance, covering owned, hired, and non-owned vehicles, with a combined bodily injury (including death) and property damage minimum limit of $5,000,000 each claim. No aggregate shall be permitted for this type of coverage. Such insurance is to include coverage for loading and unloading hazards.

(v)     Builder's Risk Coverage. All Risk Builder's Risk Insurance (or All Risk Installation Floater for instances in which the work involves solely the installation of equipment). Coverage shall be All-Risk, including, but not limited to, Fire, Extended Coverage, Vandalism and Malicious Mischief, Flood, Earthquake, Theft and damage resulting from faulty workmanship, design or materials. If Builder's Risk, limit shall be equal to the greater of (x) 100 percent of the Master Agreement Project Work or (y) ten million dollars ($10,000,000.00). If applicable, installation floater, limit shall be equal to 100 percent of the Project Work contract sum.  The policy shall be written jointly in the names of the Owner, ODR, the Contractor, and subcontractors shall be named as additional insured. The policy shall have endorsements as follows:

(A)     This insurance shall be primary as to coverage and not contributing insurance with any permanent insurance maintained on the property.

(B)     This insurance shall not contain an occupancy clause suspending or reducing coverage should the Owner occupy, or begin beneficial occupancy before the Owner has accepted final completion.

7

(C)     Loss, if any, shall be adjusted with and made payable to the Owner as Trustee for the insureds as their interests may appear; the right of subrogation under the Builder's Risk policy shall be waived as to the Owner and ODR. The Owner and ODR shall be named as Loss Payee. For renovation projects or projects that involve portions of work contained within an existing structure, refer elsewhere in the SC for possible additional Builder's Risk insurance requirements.

(vi)     Umbrella Coverage. "Umbrella" Liability Insurance. The Contractor shall obtain, pay for and maintain umbrella liability insurance, during the contract term, insuring the Contractor (or subcontractor) for an amount specified in the Master Agreement, but not less than $10,000,000 per occurrence aggregate, that provides coverage at least as broad as and applies in excess and follows form of the primary liability coverages required hereinabove. The policy shall provide "drop down" coverage where underlying primary insurance coverage limits are insufficient or exhausted.

(vii)     Crime Coverage. Commercial Crime Insurance with minimum limit of $500,000 per occurrence with third party coverage.

(viii)     Professional Liability to include coverage for Architects and Engineers If applicable, Architects and Engineers Professional Insurance with minimum limits of $2,000,000 in the aggregate and $1,000,000 each claim.

(c)     Policies must include the following clauses, as applicable:

(i)     This insurance shall not be canceled, materially changed, or non-renewed until after thirty (30) days prior written notice has been given to ODR.

(ii)     It is agreed that the Contractor's insurance shall be deemed primary with respect to any insurance or self-insurance carried by the Owner or ODR for liability arising out of operations under the Contract Documents with the Owner and ODR.

(iii)     The Comprehensive Automobile Liability, Commercial General Liability, professional, and pollution coverage insurance shall list The Texas A&M University System Board of Regents for and on behalf of Owner and ODR, their respective officials, directors, employees, representatives, and volunteers as additional insureds as respects operations and activities of, or on behalf of the named insured performed under contract with the Owner. The additional insured status must cover completed operations as well.

(iv)     The workers' compensation, employers' liability policy, Comprehensive Automobile Liability and Commercial General Liability insurance will provide a waiver of subrogation in favor of Owner and ODR.

8

(d)      Without limiting any of the other obligations or liabilities of the Contractor, the Contractor shall require each subcontractor performing Project Work under the Master Agreement, at the subcontractor's own expense, to maintain during the term of the Master Agreement, the same stipulated minimum insurance including the required provisions and additional policy conditions as shown above or Contractor's policies shall cover such subcontractors. The Contractor must retain the certificates of insurance for the duration of the Master Agreement plus five (5) years and shall have the responsibility of enforcing these insurance requirements among its subcontractors. The Owner shall be entitled, upon request and without expense, to receive copies of these certificates.

(e)      By requiring such minimum insurance, ODR shall not be deemed or construed to have assessed the risk that may be applicable to Contractor under this Master Agreement. Contractor shall assess its own risks and if it deems appropriate and/or prudent, maintain higher limits and/or broader coverage. Contractor is not relieved of any liability or other obligations assumed pursuant to the Contract Documents by reason of its failure to obtain or maintain insurance in sufficient amounts, duration, or types.

(f)      Workers' Compensation Insurance Coverage must meet the statutory requirements of Tex. Lab. Code, §401.011(44), and those specific to construction projects for public entities as required by Tex. Lab. Code, §406.096.

**11.      LIENS AND CLAIMS.**   The Contractor shall fully protect, indemnify, defend and save harmless ODR and the Owner from and against any and all liens, bond claims, and/or claims of laborers, mechanics, materialmen and subcontractors of the Contractor hereunder or of the laborers, mechanics, materialmen or subcontractors of any subcontractor of the Contractor hereunder. In the event that any such lien or bond claim shall be filed or asserted, the Contractor shall, whether under the Contract Documents or from any other source.

**12.      PERFORMANCE AND PAYMENT BONDS.**   Contractor agrees to promptly remove or discharge such lien or claim. If the Contractor shall fail to so remove or discharge the same within five (5) days after receipt of written notice from ODR, ODR shall have the right to remove or discharge the same by bonding, payment or otherwise. The amount of any payment, costs and/or expenses made or incurred by ODR in connection with the removal or discharge of any such lien or claim may be deducted by ODR from any payment or amounts then due or thereafter to become due to the Contractor. The premium of such bond is to be paid by the Contractor. ODR, at its option, may terminate and cancel this contract without cost to ODR upon Contractor's failure to deliver such properly executed bonds to ODR and Contractor agrees to indemnify and hold harmless ODR from any and all damages suffered by ODR as a result of Contractor's failure to provide such a bond.

**13.      CONSTRUCTION BONDS.**   The Contractor is required to tender to ODR, prior to commencing any work, performance and payment bonds, as required below:

(a) Performance Bond.  A Performance Bond is required if the payment hereunder is in excess of $100,000. The Performance Bond is solely for the protection of the Owner and ODR. The Performance Bond is to be for the total Project Work to guarantee the faithful performance of the Project Work in accordance with the Contract Documents. The form of the bond shall be approved by ODR. The Performance Bond shall be effective through the Contractor's warranty period.

(b) Payment Bond.  A Payment Bond is required if the payment hereunder is in excess of $25,000. The Payment Bond is to be for the total Project Work and is payable to the ODR solely for the

9

protection and use of payment bond beneficiaries who have a direct contractual relationship with the Contractor or its subcontractor. The form of the bond shall be approved by ODR.

(c) Bond Requirements.  Each bond shall be executed by a corporate surety or sureties authorized to do business in the State of Texas and acceptable to the ODR, on the ODR's form, and in compliance with the relevant provisions of the Texas Insurance Code.  If any bond is for more than 10 percent of the surety's capital and surplus, the ODR may require certification that the company has reinsured the excess portion with one or more reinsurers authorized to do business in the State of Texas.  A reinsurer may not reinsure for more than 10 percent of its capital and surplus.  If a surety upon a bond loses its authority to do business in the State of Texas, the Contractor shall, within thirty (30) days after such loss, furnish a replacement bond at no added cost to the ODR.

(d) Power of Attorney.  Each bond shall be accompanied by a valid power-of-attorney issued by the surety company, attached to the bond, and signed and sealed with the corporate embossed seal, authorizing the attorney in fact who signs the bond to commit the surety to the terms of the bond, and stating any limit in the amount for which the attorney can issue a single bond.

(e) Bond Indemnification.    IF FOR ANY REASON A STATUTORY PAYMENT OR PERFORMANCE BOND IS NOT HONORED BY THE SURETY, THE CONTRACTOR SHALL FULLY INDEMNIFY AND HOLD THE ODR AND OWNER HARMLESS OF AND FROM ANY COSTS, LOSSES, OBLIGATIONS OR LIABILITIES IT INCURS AS A RESULT.

(f) Furnishing Bond Information.  ODR shall furnish certified copies of the Payment Bond and the related documentation to any qualified person seeking copies who complies with Texas Gov't Code, §2253.026.

(g) Claims on Payment Bonds.  Claims on Payment Bonds must be sent directly to the Contractor and his surety in accordance with Tex.  Gov't Code § 2253.041.  All Payment Bond claimants are cautioned that no lien exists on the funds unpaid to the Contractor on any work, and that reliance on notices sent to the ODR may result in loss of their rights against the Contractor and/or his surety. The ODR is not responsible in any manner to a claimant for collection of unpaid bills, and accepts no such responsibility because of any representation by any agent or employee.

(h) Payment Claims when Payment Bond not Required.  The rights of subcontractors regarding payment are governed by Tex. Prop. Code, §§53.231 – 53.239 when the value of the work between the ODR and the Contractor is less than $25,000.00.  These provisions set out the requirements for filing a valid lien on funds unpaid to the Contractor as of the time of filing the claim, actions necessary to release the lien and satisfaction of such claim.

(i) Sureties.  Sureties shall be listed on the US Department of the Treasury's Listing of Approved Sureties stating companies holding Certificates of Authority as acceptable sureties on Federal Bonds and acceptable reinsuring companies (Department Circular 570) and have a rating of A- or better with A.M.  Best Company.

**14.**            **WORK COORDINATION.**  If in the execution or performance of the Contract Documents, manufacturers working drawings, samples, lists, acts, schedules, shop drawings, etc. are required, Contractor shall promptly, in accordance with instruction from ODR, furnish and obtain approval for the

10

use    of these drawings prior to commencing any Project Work. Any measurement necessary for fabrication or installation of Contractor's work shall be the responsibility of Contractor unless ODR assumes this responsibility in writing. If the Contractor deems that services or work to which its work is to be applied or affixed is unsatisfactory or unsuitable, written notification of said condition shall be given to ODR before proceeding to take remedial action, otherwise Contractor shall be fully and solely responsible and liable for any and all expenses, loss or damage resulting from said condition and ODR shall be relieved of all liability in connection therewith.

15.    **CLEAN UP.**  Contractor will clean up and haul away all debris occasioned by the work done by it hereunder and will leave the building and premises clean. If, after twenty-four (24) hours' notice by the ODR representative to the Contractor's representative at the site of the work, the Contractor has not diligently proceeded with the cleanup work, ODR may, at its option, perform said work and withhold from monies due the Contractor a reasonable amount for said services.

16.    **WARRANTY.**   In addition to any other warranties, general or specific, set forth in the Contract Documents, relative to the Project Work, materials or equipment covered by this Master Agreement, the Contractor warrants that all materials and equipment furnished under this Master Agreement will be new unless otherwise specified in the Contract Documents and in accordance with the requirements of the Contract Documents. The Contractor further warrants that all work will be in conformance with the requirements of the Contract Documents and shall be of good quality and free from faults and defects. The Contractor shall remove or replace and/or repair at its own expense and at the convenience of ODR and the Owner any defective or improper work, materials or equipment discovered at any time within one (1) year from the date of acceptance of the work as a whole, by the Owner or for such longer period as may be provided in the Contract Documents. Additionally, with respect to any defect that is not readily visible to inspection, the Contractor expressly agrees that this warranty shall extend for a period of one (1) year from the date that the defect becomes manifest and readily visible without dismantling. In addition, the Contractor shall pay for all damages, direct and consequential, suffered by ODR or the Owner as a result of defects in the work, failure to perform in accordance with the terms of this Contract Documents, or breach of the warranties contained herein, and all costs and expenses necessary to correct, remove, replace and/or repair the work and any other work or property which may be damaged in correcting, removing, replacing or repairing the work.

17.    **TAXES.** Contractor shall pay all social security and other taxes imposed upon it as an employer in connection with the performance of this Master Agreement, and will furnish evidence, when required by ODR, showing that all such payments required to be made have been paid. Contractor shall pay all local, state and federal taxes in connection with its work under this Master Agreement. Contractor agrees to protect, indemnify, defend and hold harmless ODR and Owner from and against all damages incurred by ODR by the failure of the Contractor to discharge the duties imposed upon Contractor by this paragraph and by law.

18.    **SAFETY.**  Contractor agrees to comply with all applicable provisions of the Occupational Safety and Health Act of 1970, any standards promulgated pursuant thereto, and any State specific requirements.  Contractor agrees to indemnify and hold harmless ODR from the expense of payment (including the proposed penalty) of any penalty or proposed assessed against ODR as the result of an unsafe conditions or standard violation created by or arising from Contractors' action, inaction or work. Additionally, Contractor agrees to immediately remedy and abate any unsafe condition or standard violation upon its discovery by any party or upon notification of such by ODR.

19.    **EQUAL OPPORTUNITY.**   During the performance of this Master Agreement, the Contractor agrees as follows:

11

**- 662 -**

(a)  The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices of the Contractor's undertakings hereunder. The Contractor shall comply with all current Executive Orders regarding Equal Opportunity requirements.

(b)  In the event of the Contractor's non-compliance with any Applicable Laws, this Master Agreement may be canceled, terminated or suspended in whole or in part.

**20.  PAYROLL REPORTING.**  At ODR's option, certified payroll records may be required. If requested by ODR, duplicate copies must be in ODR's office within five (5) calendar days after end of the payroll week.  Regardless of the reporting requirement, the Contractor is required to pay its employees, as a minimum, the prevailing legal minimum wage scale or the minimum wage scale for the surrounding area, if any, whichever is the higher scale.

**21.  SUBCONTRACTING, ASSIGNMENTS.**  Contractor shall not let, assign or transfer this MASTER AGREEMENT, any part thereof or any interest therein, without the written consent of ODR.

(a)  The Contractor and ODR agree as follows with respect to the assignment of such payments as may be due or as may become due under this Master Agreement: 1) The Contractor make no assignment of the proceeds hereof without the prior written consent of ODR; 2) In no instance shall ODR be obligated to any assignee of the Contractor on account of payments at any time made in good faith under any assignment  and/or erroneously or inadvertently made to the assignor; 3) ODR shall in no instance be liable to any assignee of the Contractor for any amount in excess of the net sums owing Contractor hereunder after first deducting any amounts for which Contractor may otherwise be obligated or indebted; 4) By making an assignment of the proceeds hereof the Contractor waives any claim against ODR resulting from ODR's continued payment to the assignees or former assignees, notwithstanding notification to ODR of termination of any said assignment; and 5) By making an assignment of the proceeds hereof the Contractor agrees to assume full liability for the conveyance to assignees of any payments mistakenly, inadvertently or otherwise made or addressed to Contractor and Contractor agrees to defend and hold harmless ODR from claims or causes of action of any assignee related to this Master Agreement.

**22.  MISCELLANEOUS PROVISIONS.**

(a)  This Master Agreement shall be binding upon and enure to the benefit of the parties respective successors, assigns, heirs, administrators, executors and legal representatives; provided, however, that nothing in this section shall be construed to authorize the Contractor to make an assignment or transfer  prohibited by Section 21 of the Master Agreement.

(b)  In the event of a conflict or inconsistency between the terms set forth in the Contract Documents, the conflict shall be resolved in favor of the interpretation which affords greater rights or benefits upon the ODR.

(c)  The paragraph titles are for convenience only in locating information and in no way alter or limit the text of the provisions of this Master Agreement.

12

(d)      No provision contained in this Master Agreement shall create or give to third parties any claim of action against ODR or the Contractor beyond such as may legally exist in the absence of such provision.

(e)      This Contract shall be construed under the laws of the State of Texas and venue in any suit involving this Contract shall be in Brazos County, Texas.



13

IN WITNESS WHEREOF the parties hereto have caused this Master Agreement to be duly executed the day and year first above written.

**Southeast Service Corporation**
**d/b/a SSC Service Solutions**                          **CONTRACTOR**

Company:_____

By:_____          By:_____

Signature:_____          Signature_____

Title:_____          Title:_____

14

**EXHIBIT "A"**

**SCOPE OF WORK**

**WORK ORDER NO.** _____

The Contractor agrees to furnish all necessary management, supervision, labor, materials, supplies, equipment, plant, services, sundries, appurtenances, engineering (if required by the contract), diligently and fully perform all those portions of the Project Work described as follows and all in accordance with the MASTER AGREEMENT CONTRACT, dated _____, between Southeast Service Corporation d/b/a SSC Service Solutions and _____("Contractor"). The work shall commence on or before _____ and be substantially complete on or before _____.

*Attach:*

*Scope/Statement of Work*

*Drawings*

*Specifications*

*Addenda*

*Other Documents As Required*

*PRICING:*

**EXHIBIT "B" APPLICATION**
**FOR PAYMENT**

TO: Southeast Service Corporation                                    DATE:

WORK ORDER/PROJECT NUMBER:

APPLICATION FOR PAYMENT NUMBER:

NAME:  (Contractor)

ADDRESS:


We hereby apply for payment of $_____on the account of contract for:

*(type of work)*

As per terms of our contract for work performed from_____ to _____ on subject project for Texas A&M as follows:

| | | DO NOT WRITE IN SPACES BELOW |
|---|---|---|
| 1.  Amount of Initial Contract | $ | |
| 2.  Approved Change Orders (Net Changes to Contract) | $ | |
| 3.  Initial Contract Plus Approved Change Orders To Date (Current Contract Amount) | $ | |
| 4.  Approved Work Completed To Date       (_____%) | $ | |
| 5.  Value of Materials Stored On Site (If Allowable By Contract) | $ | |
| 6.  TOTAL GROSS AMOUNT DUE TO DATE | $ | |
| 7.  Less _____% Retainage | $ | |
| 8.  Total Earned to Date Less Retainage | $ | |
| 9.  Amount of Previous Pay Applications/Payments | $ | |
| 10.  Less Other Deductions Per Attached | $ | |
| 11.  **CURRENT PAYMENT DUE** | **$** | |
| 12.  Balance to Finish Including Retainage | $ | |

**NOTE:**  Before this pay application can be processed, the CONTRACTOR'S AFFIDAVIT AND WAIVER OF LIEN MUST BE COMPLETED.

**CONTRACTOR**

By:_____

Signature:_____

Title:_____

**EXHIBIT "C"**

**CONTRACTOR'S AFFIDAVIT AND WAIVER OF LIEN**

STATE OF _____, COUNTY OF _____ , to wit: _____

_____ being first duly sworn, deposes and says: that he makes this Affidavit on behalf of _____ ("Contractor"), who entered into a contract to furnish labor, materials and construction services for the construction of Work Order No_____ for Southeast Service Corporation, d/b/a SSC Service Solutions, as owner's designated representative of The Texas A&M University System , said construction hereinafter referred to as "Project"; that, excluding the amount billed herewith, the said Contractor has received full payment for all labor, materials and services provided and committed for the aforementioned contract up to and including the date of this Affidavit; that all of the subcontractors, laborers and men with whom or with which said Contractor has contracted for services, labor or materials in the construction, alteration or repair of any improvements located on the above described premises have been fully paid for all labor, materials and services provided and committed for as of the date of this Affidavit, that the undersigned has no notice of any claim, demand, lien or right of lien of such subcontractors, laborers, or materialmen, against the above described premises; that all indebtedness of the Contractor to said subcontractors, and all indebtedness of said subcontractors to their subcontractors, laborers and materialmen, up to and including the date of this Affidavit have been fully discharged; and that the foregoing statements are true and correct to the best of the undersigned's knowledge, information and belief.

Furthermore, in consideration of payments previously received on said Project and other good and valuable considerations paid to the undersigned, receipt of which is hereby acknowledged, the undersigned does hereby waive, release and relinquish any and all liens, claims and right to lien which the undersigned now has against the above described premises, any improvements located thereon, or any payment bond posted by Contractor, for all labor (including general supervision) performed on, and materials furnished to, the above premises up to and including the date of this Affidavit. The undersigned acknowledges that all payments received on account of the above referenced contract have been and are accepted in full satisfaction of the liens or right to lien waived hereunder irrespective of the form or forms of such payment. Furthermore, the Contractor agrees to save, protect and hold harmless the Owner, Contractor and Contractor's surety, if any, their successors and assigns, against any liability for costs and expenses (including attorneys' fees) growing out of or arising from or suffered by any of them on account of claims made for items herein represented as being paid and discharged.

Contractor:

By:_____

Signature_____

Title:_____

STATE OF _____, COUNTY OF _____ to wit:

I HEREBY CERTIFY that on this _____ day of ____ , 20_____ before the undersigned, a Notary Public of the State of_____ in and for the County aforesaid, personally appeared _____ and, after first being duly sworn acknowledged the foregoing Affidavit and Waiver of Lien to be his act and that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public:_____

My Commission Expires:_____

Notary's Printed Name:_____

# PERFORMANCE BOND
## SECTION 00 61 13

STATE OF TEXAS

COUNTY OF _____          KNOWN ALL MEN BY THESE PRESENTS

That we, _____ , as Principal, and _____
_____ , as Surety, are hereby held and firmly bound unto SSC Service Solutions
in the penal sum of: Dollars ($ _____ ) for
the payment whereof, the said Principal and Surety bind themselves, their heirs, executors, administrators and successors, jointly and severally, firmly
by these presents.

The conditions of this obligation are such that, whereas the Principal entered into a certain contract (the "Contract"), which
Contract is incorporated into this Performance Bond by this reference, with SSC Service Solutions, as Obligee, dated _____
for the _____ ,
Project No. _____

NOW, THEREFORE, if the Principal shall faithfully perform the Contract in accordance with the Contract Documents, including any
warranties, and shall fully indemnify, and save harmless SSC Service Solutions from all costs and damage that SSC Service Solutions may suffer by reason
of the Principal's default or failure to perform and shall fully reimburse and repay SSC Service Solutions all outlay and expense that SSC Service Solutions
may incur in making good any such default or failure to perform, then this obligation shall be null and void, otherwise it shall remain in full force and
effect.

In the event the Principal is declared in default under the Contract, Surety will, within fifteen (15) days of the determination of such default,
take over and assume responsibility for completion of such Contract and become entitled to the payment of the balance of the Contract Price, or the
Surety shall make other arrangements satisfactory to the Obligee for the completion of the defaulted Work.
Conditioned upon the Surety's faithful performance of its obligations, the Surety's liability shall not exceed the penalty of this Bond.

The Surety, for value received, hereby stipulates and agrees that no change, extension of time, alteration or addition to the terms of the
Contract or to the Work to be performed under the Contract or to the Specifications accompanying the same shall in any manner affect its obligation
on this Performance Bond, and it does hereby waive notice of any such change, extension of time, alteration
or addition to the terms of the Contract or to the Work or to the Specifications.

The Surety agrees to pay to SSC Service Solutions upon demand all loss and expenses, including attorney's fees and court costs,
incurred by SSC Service Solutions by reason of or on account of any breach of this obligation by the Surety.

This Bond is issued pursuant to the requirements of Section 2253.021, Texas Government Code, as amended.

IN WITNESS WHEREOF, the Principal and Surety have executed and sealed this instrument this _____ day of
_____ , 20 ____

_____ , Principal          (PRINCIPAL'S SEAL if a corporation)

By: _____
Name: _____
Title: _____

_____ , Surety          (SURETY'S SEAL)

By: _____
Name: _____

Attorney-in-Fact

**- 669 -**

# PAYMENT BOND

## SECTION 00 61 14

STATE OF TEXAS

COUNTY OF BRAZOS          KNOW ALL MEN BY THESE PRESENTS

That we, _____, as Principal, and _____
_____, as Surety, are hereby held and firmly bound unto the State of Texas in the penal          sum          of:
Dollars ($_____) for the payment whereof, the said Principal and Surety bind themselves, their heirs, executors, administrators and successors, jointly and severally firmly by these presents.

The conditions of this obligation are such that, whereas the Principal entered into a certain contract (the "Contract"), which Contract is incorporated into this Payment Bond by this reference, with the State of Texas acting by and through the Board of Regents of The Texas A&M University System, as Obligee, dated _____ for the _____
_____ Project No. _____.

**NOW, THEREFORE**, if the Principal shall promptly make payments to all claimants, as defined in Chapter 2253, Texas Government Code, supplying labor and materials in the prosecution of the work provided for in said Contract, then this obligation shall be null and void, otherwise it shall remain in full force and effect.

This Bond is made and entered into solely for the protection of all claimants supplying labor and material in the prosecution of the Work provided for in said Contract, and all such claimants shall have a direct right of action under the Bond as provided in Chapter 2253, Texas Government Code.

The Surety, for value received, hereby stipulates and agrees that no change, extension of time, alteration or addition to the terms of the Contract or to the Work to be performed under the Contract shall in any wise affect its obligation on this Bond, and it does hereby waive notice of any such change, extension of time, alteration or addition to the terms of the Contract or to the Work to be performed under the Contract.

The Surety agrees to pay the State of Texas upon demand all loss and expense, including attorney's fees and court costs, incurred by the State of Texas by reason of or on account of any breach of this obligation by the Surety.

**IN WITNESS WHEREOF**, the Principal and Surety have duly signed and sealed this instrument this _____ day of _____, 20___.

_____, Principal          (PRINCIPAL'S SEAL)
                                               if a corporation)

By: _____
Name:_____
Title:_____


_____, Surety          (SURETY'S SEAL)


By: _____
Name:_____
     Attorney-in-Fact

Use of this form has been approved by the Office of the Attorney General of Texas

# SSC UNIFORM GENERAL AND SUPPLEMENTARY CONDITIONS

## Table of Contents

Article 1.   Definitions ..................................................................................................................2

Article 2.   Wage Rates and Other Laws Governing Construction ........................................6

Article 3.   General Responsibilities of Owner and Contractor..............................................10

Article 4.   Historically Underutilized Business (HUB) Subcontracting Plan.......................16

Article 5.   Bonds and Insurance ...........................................................................................18

Article 6.   Construction Documents, Coordination Documents, and Record Documents.................20

Article 7.   Construction Safety ..............................................................................................22

Article 8.   Quality Control......................................................................................................24

Article 9.   Construction Schedules ........................................................................................30

Article 10.  Payments ..............................................................................................................36

Article 11.  Changes .................................................................................................................40

Article 12.  Project Completion and Acceptance ....................................................................44

Article 13.  Warranty and Guarantee.......................................................................................48

Article 14.  Suspension and Termination .................................................................................51

Article 15.  Dispute Resolution ...............................................................................................55

Article 16.  Miscellaneous........................................................................................................55

1

## SSC UNIFORM GENERAL AND SUPPLEMENTARY CONDITIONS

**These General and Supplementary Conditions shall be used for contracts in support of the agreement between The Texas A&M University System ("TAMUS") ("Owner") and Southeast Service Corporations d/b/a SSC Services for Education ("SSC") ("ODR").**
**All users are advised to read and understand this entire document.**

## Article 1.  Definitions

Unless the context clearly requires another meaning, the following terms have the meaning assigned herein.

1.1     Application for Payment means Contractor's monthly partial invoice for payment that includes any portion of the Work that has been completed for which an invoice has not been submitted and performed in accordance with the requirements of the Contract Documents.  The Application for Payment accurately reflects the progress of the Work, is itemized based on the Schedule of Values, bears the notarized signature of Contractor, and shall not include subcontracted items for which Contractor does not intend to pay.

1.2     Application for Final Payment means Contractor's final invoice for payment that includes any portion of the Work that has been completed for which an invoice has not been submitted, amounts owing to adjustments to the final Contract Sum resulting from approved change orders, and release of remaining Contractor's retainage.

1.3     Architect/Engineer (A/E) means a person registered as an architect pursuant to Tex. Occ. Code Ann., Chapter 1051, as a landscape architect pursuant to Tex. Occ. Code Ann., Chapter 1052, a person licensed as a professional engineer pursuant Tex. Occ. Code Ann., Chapter 1001, and/or a firm employed by **ODR** or Design-Build Contractor  to provide professional architectural or engineering services  and  to exercise overall responsibility for the design of a Project or a significant portion thereof, and to perform the contract administration responsibilities set forth in the Contract.

1.4     Baseline Schedule means the initial time schedule prepared by Contractor for ODR's information and acceptance that conveys Contractor's and Subcontractors' activities (including coordination and review activities required in the Contract Documents to be performed by A/E and ODR), durations, and sequence of work related to the entire Project to the extent required by the Contract Documents.  The schedule clearly demonstrates the critical path of activities, durations and necessary predecessor conditions that drive the end date of the schedule.  The Baseline Schedule shall not exceed the time limit current under the Contract Documents.

1.5     Certificate of Final Completion means the certificate issued by A/E that documents, to the best of A/E's knowledge and understanding, Contractor's completion of all Contractor's Punch List items and pre-final Punch List items, final cleanup and

Contractor's provision of Record Documents, operations and maintenance manuals, and all other closeout documents required by the Contract Documents.

1.6     Change Order means a written modification of the Contract between **ODR** and Contractor, signed by **ODR**, Contractor and A/E.

1.7     Close-out Documents mean the product brochures, submittals, product/equipment maintenance and operations instructions, manuals, and other documents/warranties, record documents, affidavit of payment, release of lien and claim, and as may be further defined, identified, and required by the Contract Documents.

1.8     Competitive Sealed Proposals**,** in accordance with Tex. **Gov't Code, Chapter 2166**, a delivery procedure for construction projects by which a governmental entity (or its representative) requests proposals, ranks the offerors, negotiates as prescribed, and then contracts with a general contractor for the construction, rehabilitation, alteration, or repair of a facility.

1.9     Contract means the entire agreement between **ODR** and Contractor, including all of the Contract Documents.

1.10    Contract Date is the date when the agreement between **ODR** and Contractor becomes effective.

1.11    Contract Documents mean those documents identified as a component of the agreement (Contract) between **ODR** and Contractor. These may include, but are not limited to, Drawings; **Project Manual/**Specifications; **SSC Uniform General and Supplementary Conditions**, and Special Conditions; and all pre-bid and/or pre-proposal addenda.

1.12    Contract Sum means the total compensation payable to Contractor for completion of the Work in accordance with the terms of the Contract.

1.13    Contract Time means the period between the start date identified in the Notice to Proceed with construction and the Substantial Completion date identified in the Notice to Proceed or as subsequently amended by a Change Order.

1.14    Contractor means the individual, corporation, limited liability company, partnership, firm, or other entity contracted to perform the Work, regardless of the type of construction contract used, so that the term as used herein includes a Construction Manager-at-Risk or a Design-Build firm as well as a general or prime Contractor. The Contract Documents refer to Contractor as if singular in number.

1.15    Construction Documents mean the Drawings, **Project Manual/**Specifications, and other documents issued to build the Project. Construction Documents become part of the Contract Documents when listed in the Contract or any Change Order.

1.16    Construction Manager at Risk. In accordance with Tex. Gov't Code Chapter 2269, means a sole proprietor, partnership, corporation, or other legal entity that assumes the risk for

construction, rehabilitation, alteration, or repair of a facility at the contract price as a general contractor and provides consultation to ODR regarding construction during and after the design of the facility

1.17     Date of Commencement means the date designated in the Notice to Proceed for Contractor to commence the Work.

1.18     Day means a calendar day unless otherwise specifically stipulated.

1.19     Design-Build means a project delivery method in which the detailed design and subsequent construction is provided through a single contract with a Design-Build firm; a team, partnership, or legal entity that includes design professionals and a builder.  The Design-Build Project delivery shall be implemented in accordance with Tex. Gov't Code § 2269.301.

1.20     Drawings mean that product of A/E which graphically depicts the Work.

1.21     Final Completion means the date determined and certified by A/E and **ODR** on which the Work is fully and satisfactorily complete in accordance with the Contract.

1.22     Final Payment means the last and final monetary compensation made to Contractor for any portion of the Work that has been completed and accepted for which payment has not been made, amounts owing to adjustments to the final Contract Sum resulting from approved change orders, and release of Contractor's retainage.

1.23     Historically Underutilized Business (HUB) pursuant to Tex. Gov't Code, Chapter 2161, means a business that is at least 51% owned by an Asian Pacific American, a Black American, a Hispanic American, a Native American, a Disabled Veteran, and/or an American Woman; is an entity with its principal place of business in Texas; and has an owner residing in Texas with proportionate interest that actively participates in the control, operations, and management of the entity's affairs.

*1.24     Manufacturing Process means the application of a process to alter the form or function of materials or elements of a product in a manner that adds value and transforms the materials or elements into a new finished product that is functionally different from a finished product produced merely from assembling the materials or elements into a product.*

1.25     Notice to Proceed means written document informing Contractor of the dates beginning Work and the dates anticipated for Substantial Completion.

1.26     Open Item List means a list of work activities, Punch List items, changes or other issues that are not expected by **ODR** and Contractor to be complete prior to Substantial Completion.

1.27     Owner means the State of Texas, and any agency of the State of Texas, acting through the responsible entity of the State of Texas identified in the Contract as Owner.

4

1.27    Owner's Designated Representative (ODR) means the individual assigned by Owner to act on its behalf and to undertake certain activities as specifically outlined in the Contract. ODR is the only party authorized to direct changes to the scope, cost, or time of the Contract.

1.28    *Produced in the United States means, with respect to iron and steel products, a product for which all manufacturing processes, from initial melting through application of coatings, occur in the United States, other than metallurgical processes to refine steel additives.*

1.29    Project means all activities necessary for realization of the Work.  This includes design, contract award(s), execution of the Work itself, and fulfillment of all Contract and warranty obligations.

1.30    **Project Manual means a bound document that contains the contract documents, with the exception of the drawings, specifically organized into bid requirements, contract information, addenda, general conditions for construction, and technical specifications.**

1.31    Progress Assessment Report (PAR) means the monthly compliance report to **ODR** verifying compliance with the HUB subcontracting plan (HSP).

1.32    Proposed Change Order (PCO) means a document that informs Contractor of a proposed change in the Work and appropriately describes or otherwise documents such change including Contractor's response of pricing for the proposed change.

1.33    Punch List means a list of items of Work to be completed or corrected by Contractor after Substantial Completion.  Punch Lists indicate items to be finished, remaining Work to be performed, or Work that does not meet quality or quantity requirements as required in the Contract Documents.

1.34    Record Documents mean the drawing set, Specifications, and other materials maintained by Contractor that documents all addenda, Architect's Supplemental Instructions, Change Orders and postings and markings that record the as-constructed conditions of the Work and all changes made during construction.

1.35    Request for Information (RFI) means a written request by Contractor directed to A/E or ODR for a clarification of the information provided in the Contract Documents or for direction concerning information necessary to perform the Work that may be omitted from the Contract Documents.

1.36    Samples mean representative physical examples of materials, equipment, or workmanship used to confirm compliance with requirements and/or to establish standards for use in execution of the Work.

1.37    Schedule of Values means the detailed breakdown of the cost of the materials, labor, and equipment necessary to accomplish the Work as described in the Contract Documents, submitted by Contractor for approval by **ODR** and A/E.

5

1.38    Shop Drawings mean the drawings, diagrams, illustrations, schedules, performance charts, brochures, and other data prepared by Contractor or its agents which detail a portion of the Work.

1.39    Site means the geographical area of the location of the Work.

1.40    Special Conditions mean the documents containing terms and conditions which may be unique to the Project.  Special Conditions are a part of the Contract Documents and have precedence over the Uniform General Conditions and Supplementary General Conditions.

1.41    Specifications mean the written product of A/E that establishes the quality and/or performance of products utilized in the Work and processes to be used, including testing and verification for producing the Work.

1.42    Subcontractor means a business entity that enters into an agreement with Contractor to perform part of the Work or to provide services, materials, or equipment for use in the Work.

1.43    Submittal Register means a list provided by Contractor of all items to be furnished for review and approval by A/E and **ODR** and as identified in the Contract Documents including anticipated sequence and submittal dates.

1.44    Substantial Completion means the date determined and certified by Contractor, A/E, and **ODR** when the Work, or a designated portion thereof, is sufficiently complete, in accordance with the Contract, so as to be operational and fit for the use intended.

1.45    Unit Price Work means the Work, or a portion of the Work, paid for based on incremental units of measurement.

1.46    Unilateral Change Order (ULCO) means a Change Order issued by **ODR** without the complete agreement of Contractor, as to cost and/or time.

1.47    Work means the administration, procurement, materials, equipment, construction and all services necessary for Contractor, and/or its agents, to fulfill Contractor's obligations under the Contract.

1.48    Work Progress Schedule means the continually updated time schedule prepared and monitored by Contractor that accurately indicates all necessary appropriate revisions as required by the conditions of the Work and the Project while maintaining a concise comparison to the Baseline Schedule.

## Article 2.  Wage Rates and Other Laws Governing Construction

2.1    Environmental Regulations.  Contractor shall conduct activities in compliance with applicable laws and regulations and other requirements of the Contract relating to the environment and its protection at all times.  Unless otherwise specifically determined,

Contractor is responsible for obtaining and maintaining permits related to storm water run-off.   Contractor shall conduct operations consistent with storm water run-off permit conditions.   Contractor is responsible for all items it brings to the Site, including hazardous materials, and all such items brought to the Site by its Subcontractors and suppliers, or by other entities subject to direction of Contractor. Contractor shall not incorporate hazardous materials into the Work without prior approval of Owner, and shall provide an affidavit attesting to such in association with request for Substantial Completion inspection.

2.2     Wage Rates.  Contractor shall not pay less than the wage scale of the various classes of labor as indicated by county and "Building Type" at the following link: https://www.wdol.gov/wdol/scafiles/davisbacon/tx.html.  The specified wage rates are minimum rates only.  Owner is not bound to pay any claims for additional compensation made by any Contractor because the Contractor pays wages in excess of the applicable minimum rate contained in the Contract.  The prevailing wage schedule is not a representation that qualified labor adequate to perform the Work is available locally at the prevailing wage rates.

2.2.1   Notification to Workers.  Contractor shall post the prevailing wage schedule in a place conspicuous to all workers on the Project Site and shall notify each worker, in writing, of the following as they commence work on the Contract: the worker's job classification, the established minimum wage rate requirement for that classification, as well as the worker's actual wage.  The notice must be delivered to and signed in acknowledgement of receipt by the worker and must list both the wages and fringe benefits to be paid or furnished for each classification in which the worker is assigned duties.   When requested by Owner, Contractor shall furnish evidence of compliance with the Texas Prevailing Wage Law and the addresses of all workers.

2.2.1.1   Contractor shall submit a copy of each worker's wage-rate notification to ODR with the application for progress payment for the period during which the worker was engaged in activities on behalf of the Project *when requested by Owner*.

2.2.1.2   The prevailing wage schedule is determined by Owner in compliance with Tex. Gov't Code, Chapter 2258.  Should Contractor at any time become aware that a particular skill or trade not reflected on Owner's Prevailing Wage Schedule will be or is being employed in the Work, whether by Contractor or by Subcontractor, Contractor shall promptly inform ODR of the proposed wage to be paid for the skill along with a justification for same and ODR shall promptly concur  with or reject the proposed wage and classification. Contractor is responsible for determining the most appropriate wage for a particular skill in relation to similar skills or trades identified on the prevailing wage schedule.  In no case, shall any worker be paid less than the wage indicated for laborers.

2.2.2   Penalty for Violation.  Contractor, and any Subcontractor, will pay to the State a

7

penalty of sixty dollars ($60) for each worker employed for each day, or portion thereof, that the worker is paid less than the wage rates stipulated in the Prevailing Wage Schedule.

2.2.3    <u>Complaints of Violations</u>.

2.2.3.1    **ODR**'s Determination of Good Cause.   Upon receipt of information concerning a violation, **ODR** will conduct an investigation in accordance with Tex. Gov't Code, Chapter 2258 and make an initial determination as to whether good cause exists that a violation occurred. Upon making a good cause finding, ODR will retain the full amounts claimed by the claimant or claimants as the difference between wages paid and wages due under the Prevailing Wage Schedule and any supplements thereto, together with the applicable penalties, such amounts being subtracted from successive progress payments pending a final decision on the violation.

2.2.3.2    **If the Contractor and claimant worker reach an agreement concerning the claim, the Contractor shall promptly notify the ODR in a written document countersigned by the worker.**

2.2.3.3    **Arbitration Required. If the violation is not resolved within 14 days following initial determination by the ODR, the Contractor and the claimant worker must participate in binding arbitration in accordance with the Texas General Arbitration Act, Tex. Civ. Prac. & Rem. Code, Chapter 171. If the Contractor and the claimant worker do not agree on an arbitrator within 10 days, after the date arbitration is required, a district court may be petitioned by any of the parties to the arbitration to appoint an arbitrator whose decision will be binding on all parties. (See Tex. Gov't Code, § 2258.053)**

2.2.3.4    **Arbitration Award. If an arbitrator assesses an award against the Contractor, the Contractor shall promptly furnish a copy of said award to the ODR. The ODR may use any amounts retained under Article 2.2.3.1 to pay the worker the amount as designated in the arbitration award. If the retained funds are insufficient to pay the worker in accordance with the arbitration award, the worker has a right of action against the Contractor, and/or the surety to receive the amount owed, plus attorneys' fees and court costs. The ODR has no duty to release any funds to either the claimant or the Contractor until it has received the notices of agreement or the arbitration award.**

2.2.3.5    <u>No Extension of Time</u>.   If **ODR**'s determination proves valid that good cause existed to believe a violation had occurred, Contractor is not entitled to an extension of time for any delay arising directly or indirectly from the arbitration procedures.

2.3     Venue for Suits.  The venue for any suit arising from the Contract will be in a court of competent jurisdiction **in the county of the site location**.

2.4     Licensing of Trades.  Contractor shall comply with all applicable provisions of State law related to license requirements for skilled tradesmen, contractors, suppliers and or laborers, as necessary to accomplish the Work.  In the event Contractor, or one of its Subcontractors, loses its license during the term of performance of the Contract, Contractor shall promptly hire or contract with a licensed provider of the service at no additional cost to Owner **or ODR**.

  2.4.1     **Partial list of licenses required. Listed by Texas Statue:**

  - **Boilers--Chapter 755, Health and Safety Code.**

  - **Electrical--Title 8, Occupations Code, Chapter 1305, Administered by the Texas Department of Licensing and Regulation.**

  - **Elevators, Escalators, and related Equipment--Chapter 754, Health and Safety Codes, Subchapter B. Inspection, Certification, and Registration.**

  - **Fire Detection and Alarms--Insurance Code, Article 5.43-2**.

  - **Fire Protection--Insurance Code, Article 5.43-1 and 5.43-3.**

  - **Plumbing--Plumbing License Law, Occupations Code, Title 8. Regulation of Environmental and Industrial Trades, Chapter 1301. Plumbers.**

  - **Mechanical--Air Conditioning and Refrigeration Contractor License Law, Occupations Code, Title 8. Regulation of Environmental and Industrial Trades, Chapter 1302, Administered by the Texas Department of Licensing and Regulation.**

2.5     Royalties, Patents, and Copyrights.  Contractor shall pay all royalties and license fees, defend suits or claims for infringement of copyrights and patent rights, and shall hold Owner **and ODR** harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents, or where the copyright violations are contained in Drawings, Specifications or other documents prepared by **ODR** or A/E.  However, if Contractor has reason to believe that the required design, process, or product is an infringement of a copyright or a patent, Contractor shall be responsible for such loss unless such information is promptly furnished to A/E.

2.6     State Sales and Use Taxes.  Owner qualifies for exemption from certain State and Local Sales and use taxes pursuant to the provisions of Tex. Tax Code, Chapter 151.  Upon request from Contractor, Owner/**ODR** shall furnish evidence of tax exempt status.  Contractor may claim exemption from payment of certain applicable State taxes by complying with such procedures as prescribed by the State Comptroller of Public

9

Accounts.   Owner/**ODR** acknowledges not all items qualify for exemption. Owner/**ODR** is not obligated to reimburse Contractor for taxes paid on items that qualify for tax exemption.

2.7    *Iron and Steel Products. In accordance with Tex. Gov't. Code, Chapter 2252, Subchapter F all iron and steel products produced through a manufacturing process and used in the project shall be produced in the United States.*

*2.7.1  Exemption. Electrical components, equipment, systems, and appurtenances, including supports, covers, shielding, and other appurtenances related to an electrical system, necessary for operation or concealment are not considered to be iron or steel products and are exempt from this requirement.*

*2.7.2   Other exemptions, only if agreed to in writing by the Owner are:*

*2.7.2.1    Iron or steel products produced in the United States are not: (A) produced in sufficient quantities; (B) reasonably available; or (C) of a satisfactory quality; or if*

*2.7.2.2    Use of iron or steel products produced in the United States will increase the total cost of the project by more than 20 percent.*

2.8    *Prohibition on contracts with Companies boycotting Israel In accordance with Tex. Gov't Code, Chapter 2270 SSC will not enter into a contract with a company for goods or services unless the contract contains a written verification from the company that it*
       *(1) does not boycott Israel; and*
       *(2) will not boycott Israel during the term of the contract.*

## Article 3.  General Responsibilities of Owner and Contractor

3.1    **ODR**'s General Responsibilities.    **ODR** is the entity identified as such in the Contract and referred to throughout the Contract Documents as if singular in number.

3.1.1   Preconstruction Conference.   Prior to, or concurrent with, the issuance of Notice to Proceed with construction, a conference will be convened for attendance by Owner, Contractor, A/E and appropriate Subcontractors.  The purpose of the conference is to establish a working understanding among the parties as to the Work, the operational conditions at the Project Site, and general administration of the Project.   Topics include communications, schedules, procedures for handling Shop Drawings and other submittals, processing Applications for Payment, maintaining required records and all other matters of importance to the administration of the Project and effective communications between the project team members.

3.1.2   Owner's Designated Representative.  Prior to the start of construction, Owner will identify Owner's Designated Representative (ODR), who has the express authority to act and bind Owner to the extent and for the purposes described in the various Articles of the Contract, including responsibilities for general

administration of the Contract.

3.1.2.1    Unless otherwise specifically defined elsewhere in the Contract Documents, ODR is the single point of contact between Owner and Contractor.  Notice to ODR, unless otherwise noted, constitutes notice to Owner under the Contract.

3.1.2.2    All directives on behalf of Owner will be conveyed to Contractor and A/E by ODR in writing.

3.1.3    Owner Supplied Materials and Information.

3.1.3.1    Owner **or ODR** will furnish to Contractor those surveys describing the physical characteristics, legal description, limitations of the Site, site utility locations, and other information used in the preparation of the Contract Documents.

3.1.3.2    Owner **or ODR** will provide information, equipment, or services under Owner's control to Contractor with reasonable promptness. *The Owner or ODR makes no representation as to the accuracy or completeness of the site information furnished to the Contractor by the Owner, and is not responsible for any interpretations or conclusions reached by the Contractor with respect to the information.*

3.1.4    Availability of Lands.  Owner will furnish, as indicated in the Contract, all required rights to use the lands upon which the Work occurs.  This includes rights-of-way and easements for access and such other lands that are designated for use by Contractor.   Contractor shall comply with all Owner identified encumbrances or restrictions specifically related to use of lands so furnished.  Owner will obtain and pay for easements for permanent structures or permanent changes in existing facilities, unless otherwise required in the Contract Documents.

3.1.5    Limitation on **ODR**'s Duties.

3.1.5.1    The **ODR** will not supervise, direct, control or have authority over or be responsible for Contractor's means, methods, technologies, sequences or procedures of construction or the safety precautions and programs incident thereto.  T h e   **ODR** is not responsible for any failure of Contractor to comply with laws and regulations applicable to the Work.  The **ODR** is not responsible for the failure of Contractor to perform or furnish the Work in accordance with the Contract Documents.   Except as provided in Section 2.5, the **ODR** is not responsible for the acts or omissions of Contractor, or any of its Subcontractors, suppliers or of any other person or organization performing or furnishing any of the Work on behalf of Contractor.

3.1.5.2    ODR will not take any action in contravention of a design decision made by A/E in preparation of the Contract Documents, when such

11

actions are in conflict with statutes under which A/E is licensed for the protection of the public health and safety.

3.2      Role of Architect/Engineer. **(if applicable)** Unless specified otherwise in the Contract between Owner and Contractor, A/E shall provide general administration services for Owner during the construction phase of the Project.   Written correspondence, Requests For Information, and Shop Drawings/submittals shall be directed to A/E for action. **The A/E has no authority to change material specifications, contract cost or contract time unless approved by the ODR.**

    3.2.1    Site Visits.

        3.2.1.1   A/E will make visits to the Site at intervals as provided in the A/E's Contract with Owner, to observe the progress and the quality of the various aspects of Contractor's executed Work and report findings to **ODR**.

        3.2.1.2   A/E has the authority to interpret Contract Documents and inspect the Work for compliance and conformance with the Contract. Except as referenced in Paragraph 3.1.5.2, The **ODR** retains the sole authority to accept or reject Work and issue direction for correction, removal, or replacement of Work.

    3.2.2    Clarifications and Interpretations.  It may be determined that clarifications or interpretations of the Contract Documents are necessary.  Upon direction by ODR, such clarifications or interpretations will be provided by A/E consistent with the intent of the Contract Documents.  A/E will issue these clarifications with reasonable promptness to Contractor as A/E's Supplemental Instruction ("ASI") or similar instrument.  If Contractor believes that such clarification or interpretation justifies an adjustment in the Contract Sum or the Contract Time, Contractor shall so notify **ODR** in accordance with the provisions of Article 11.

    3.2.3    Limitations on Architect/Engineer Authority.  A/E is not responsible for:

        3.2.3.1   Contractor's means, methods, techniques, sequences, procedures, safety, or programs incident to the Project, nor will A/E supervise, direct, control or have authority over the same;

        3.2.3.2 The failure of Contractor to comply with laws and regulations applicable to the furnishing or performing the Work;

        3.2.3.3   Contractor's failure to perform or furnish the Work in accordance with the Contract Documents; or

        3.2.3.4   Acts or omissions of Contractor, or of any other person or organization performing or furnishing any of the Work.

12

3.3   Contractor's General Responsibilities.   Contractor is solely responsible for implementing the Work in full compliance with all applicable laws, codes, regulations and the Contract Documents and shall supervise and direct the Work using the best skill and attention to assure that each element of the Work conforms to the Contract requirements. Contractor is solely responsible for all construction means, methods, techniques, safety, sequences, coordination and procedures. *The Contractor is responsible for having visited the Site and having ascertained all pertinent local conditions such as existing subsurface concealed conditions, location, accessibility and general character of the Site or building, the character and extent of existing work, the character and extent of existing work within adjacent sites, and any other work being performed thereon at the time Contractor's bid or proposal is submitted.*

3.3.1   Project Administration.   Contractor shall provide project administration for all Subcontractors, vendors, suppliers, and others involved in implementing the Work and shall coordinate administration efforts with those of A/E **if applicable** and ODR in accordance with these **SSC Uniform General and Supplementary Conditions**, **Division 1 Specifications**, and other provisions of the Contract, and as outlined in the pre-construction conference.

3.3.2   Contractor's Management Personnel.   Contractor shall employ a competent person or persons who will be present at the Project Site during the progress of the Work to supervise or oversee the work.  The competent persons are subject to the approval of ODR.  Contractor shall not change approved staff during the course of the project without the written approval of ODR unless the staff member leaves the employment of Contractor.   Contractor shall provide additional quality control, safety and other staff as stated in the **SSC Uniform General and Supplementary Conditions.**

3.3.3   Labor.   Contractor shall provide competent, suitably qualified personnel to survey, lay-out, and construct the Work as required by the Contract Documents and maintain good discipline and order at the Site at all times.

3.3.4   Services, Materials, and Equipment.   Unless otherwise specified, Contractor shall provide and assume full responsibility for all services, materials, equipment, labor, transportation, construction equipment and machinery, tools, appliances, fuel, power, light, heat, telephone, water, sanitary facilities, temporary facilities, and all other facilities, incidentals, and services necessary for the construction, performance, testing, start-up, inspection and completion of the Work.

3.3.5   Contractor General Responsibility.   For Owner furnished equipment or material that will be in the care, custody, and control of Contractor, Contractor is responsible for damage or loss.

3.3.6   Non-Compliant Work. Should A/E and/or ODR identify Work as non- compliant with the Contract Documents, A/E and/or ODR shall communicate the finding to Contractor, and Contractor shall correct such Work at no additional cost to the Owner.  The approval of Work by either A/E or ODR does  not   relieve

13

Contractor from the obligation to comply with all requirements of the Contract Documents.

3.3.7   Subcontractors.  Contractor shall not employ any Subcontractor, supplier or other person or organization, whether initially or as a substitute, against whom Owner **or ODR** shall have reasonable objection. **ODR** will communicate such objections in writing within ten (10) days of receipt of Contractor's intent to use such Subcontractor, supplier, or other person or organization. Contractor is not required to employ any Subcontractor, supplier or other person or organization to furnish any of the work to whom Contractor has reasonable objection. Contractor shall not substitute Subcontractors without the acceptance of Owner.

   3.3.7.1   All Subcontracts and supply contracts shall be consistent with and bind the Subcontractors and suppliers to the terms and conditions of the Contract Documents including provisions of the Contract between Contractor and **ODR**.

   3.3.7.2   Contractor shall be solely responsible for scheduling and coordinating the Work of Subcontractors, suppliers and other persons and organizations performing or furnishing any of the Work under a direct or indirect contract with Contractor.  Require all Subcontractors, suppliers and such other persons and organizations performing or furnishing any of the Work to communicate with Owner **and ODR** only through Contractor.  Contractor shall furnish to Owner and ODR a copy, at Owner's **or ODR's** request, of each first-tier subcontract promptly after its execution. Contractor agrees that Owner **and ODR** have no obligation to review or approve the content of such contracts and that providing Owner **and ODR** such copies in no way relieves Contractor of any of the terms and conditions of the Contract, including, without limitation, any provisions of the Contract which require the Subcontractor to be bound to Contractor in the same manner in which Contractor is bound to Owner.

3.3.8   Continuing the Work.  Contractor shall carry on the Work and adhere to the progress schedule during all disputes, disagreements, or alternative resolution processes with **ODR**.  Contractor shall not delay or postpone any Work because of pending unresolved disputes, disagreements or alternative resolution processes, except as **ODR** and Contractor may agree in writing.

3.3.9   Cleaning.  Contractor shall at all times, keep the Site and the Work clean and free from accumulation of waste materials or rubbish caused by the construction activities under the Contract.  Contractor shall ensure that the entire Project is thoroughly cleaned prior to requesting Substantial Completion inspection and, again, upon completion of the Project prior to the final inspection.

3.3.10   Acts and Omissions of Contractor, its Subcontractors and Employees. Contractor shall be responsible for acts and omissions of his employees and all

14

its Subcontractors, their agents and employees.  Owner **or ODR** may, in writing, require Contractor to remove from the Project any of Contractor's or its Subcontractor's employees whom ODR finds to be careless, incompetent, unsafe, uncooperative, disruptive, or otherwise objectionable.

3.3.11   Indemnification of Owner.  **Contractor covenants and agrees to FULLY INDEMNIFY and HOLD HARMLESS, Owner and the elected and appointed officials, employees, officers, directors, volunteers, and representatives of Owner, individually or collectively, from and against any and all costs, claims, liens, damages, losses, expenses, fees, fines, penalties, proceedings, actions, demands, causes of action, liability and suits of any kind and nature, including but not limited to, personal or bodily injury, death or property damage, made upon Owner directly or indirectly arising out of, resulting from or related to Contractor's activities under this Contract, including any acts or omissions of Contractor,  or  any  agent, officer, director, representative, employee, consultant or the Subcontractor of Contractor, and their respective officers, agents, employees, directors and representatives while in the exercise of performance of the rights or duties under this Contract.  The indemnity provided for in this paragraph does not apply to any liability resulting from the negligence of the Owner, its officers or employees, separate contractors or assigned contractors, in instances where such negligence causes personal injury, death or property damage. IN THE EVENT CONTRACTOR AND OWNER ARE FOUND JOINTLY LIABLE BY A COURT OF COMPETENT JURISDICTION, LIABILITY WILL BE APPORTIONED COMPARATIVELY IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT WAIVING ANY GOVERNMENTAL IMMUNITY AVAILABLE TO THE STATE UNDER TEXAS LAW AND WITHOUT WAIVING ANY DEFENSES OF THE PARTIES UNDER TEXAS LAW.**

3.3.11.1  The provisions of this indemnification are solely for the benefit of the parties hereto and not intended to create or grant any rights, contractual or otherwise, to any other person or entity.

3.3.11.2  Contractor shall promptly advise Owner in writing of any claim or demand against Owner or against Contractor which involves Owner and known to Contractor and related to or arising out of Contractor's activities under this Contract.

3.3.12   Ancillary Areas. Operate and maintain operations and associated storage areas at the site of the Work in accordance with the following:

3.3.12.1  Confine all Contractor operations, including storage of materials and employee parking upon the Site of Work, to areas designated by Owner **or ODR**.

3.3.12.2  **With prior written approval of the Owner and ODR,** Contractor may erect, at its own expense, temporary buildings that will remain its

15

property.   Remove such buildings and associated utility service lines upon completion of the Work, unless Contractor requests and Owner provides written consent that it may abandon such buildings and utilities in place.

3.3.12.3  Use only established roadways or construct and use such temporary roadways as may be authorized by Owner.  Do not allow load limits of vehicles to exceed the limits prescribed by appropriate regulations or law.  Provide protection to road surfaces, curbs, sidewalks, trees, shrubbery, sprinkler systems, drainage structures and other like existing improvements to prevent damage and repair any damage thereto at the expense of Contractor.

3.3.12.4 ODR may restrict Contractor's entry to the Site to specifically assigned entrances and routes.

3.3.13  Separate Contracts. ODR reserves the right to award other contracts in connection with other portions of the Project under these same or substantially similar contract conditions, including those portions related to insurance and waiver of subrogation.  ODR reserves the right to perform operations related to the Project with ODR's own forces.

3.3.14  Under a system of separate contracts, the conditions described herein continue to apply except as may be amended by change order.

3.3.15  Contractor shall cooperate with other contractors or forces employed on the Project by Owner, including providing access to Site and Project information as requested.

3.3.16  ODR shall be reimbursed by Contractor for costs incurred by ODR which are payable to a separate contractor because of delays, improperly timed activities, or defective construction by Contractor.  ODR will equitably adjust the Contract by Change Order for costs incurred by Contractor because of delays, improperly timed activities, damage to the Work or defective construction by a separate contractor.

# Article 4.  Historically Underutilized Business (HUB) Subcontracting Plan

4.1     General Description. *The purpose of the HUB Program is to promote full and equal business opportunities for all businesses in State contracting.*

*In accordance with 34 TAC §20.14(d)(1)(D)(iii), a respondent (prime contractor) may demonstrate good faith effort to utilize Texas certified HUBs for its subcontracting opportunities if the total value of the respondent's subcontracts with Texas certified HUBs meets or exceeds the statewide HUB goal or the agency specific HUB goal, whichever is higher. When a respondent uses this method to demonstrate good faith effort, the respondent must identify the HUBs with which it will subcontract. If using*

16

*existing contracts with Texas certified HUBs to satisfy this requirement, only contracts that have been in place for five years or less shall qualify for meeting the HUB goal. The limitation is designed to encourage vendor rotation as recommended by the 2009 Texas Disparity Study.*

4.1.1    State agencies are required by statute to make a good faith effort to assist HUBs in participating in contract awards issued by the State.    34 T.A.C. §20.13(b) outlines the State's policy to encourage the utilization of HUBs in State contracting opportunities through race, ethnic and gender neutral means.

4.1.2    A Contractor who contracts with the State in an amount of $100,000 or greater is required to make a good faith effort to award subcontracts to HUBs in accordance with 34 T.A.C. § 20.14(a)(2)(A) by submitting a HUB subcontracting plan within twenty-four (24) hours after the bid or response is due and complying with the HUB subcontracting plan after it is accepted by Owner and during the term of the Contract.

4.2    <u>Compliance with Approved HUB Subcontracting Plan</u>.    Contractor having been awarded this Contract in part by complying with the HUB program statute and rules, hereby covenants to continue to comply with the HUB program as follows:

4.2.1    Prior to adding or substituting a Subcontractor, promptly notify Owner in the event a change is required for any reason to the accepted HUB subcontracting plan.

4.2.2    Conduct the good-faith effort activities required and provide Owner with necessary documentation to justify approval of a change to the approved HUB subcontracting plan.

4.2.3    Cooperate in the execution of a Change Order or such other approval of the change in the HUB subcontracting plans as Contractor and Owner may agree to.

4.2.4    Maintain and make available to Owner upon request business records documenting compliance with the accepted HUB subcontracting plan.

4.2.5    Upon receipt of payment for performance of Work, submit to Owner a compliance report, in the format required by Owner that demonstrates Contractor's performance of the HUB subcontracting plan.

4.2.5.1    Progress Assessment Report (PAR): monthly compliance reports to Owner (contracting agency), verifying their compliance  with  the HUB subcontracting plan, including the use/expenditures they have made to Subcontractors.    (The PAR is available at **http://www.window.state.tx.us/procurement/prog/hub/hub-forms/progressassessmentrpt.xls**).

4.2.6    Promptly and accurately explain and provide supplemental information to Owner to assist in Owner's investigation of Contractor's good-faith effort to fulfill

17

the HUB subcontracting plan and the requirements under 34 T.A.C. §20.14(a)(1).

4.3   Failure to Demonstrate Good-Faith Effort.   Upon a determination by Owner that Contractor has failed to demonstrate a good-faith effort to fulfill the HUB subcontracting plan or any Contract covenant detailed above, Owner may, in addition to all other remedies available to it, report the failure to perform to the Comptroller of Public Accounts, Texas Procurement and Support Services Division, Historically Underutilized Business Program and may bar Contractor from future contracting opportunities with Owner.

## Article 5.  Bonds and Insurance

5.1   Construction Bonds.  Contractor is required to tender to ODR, prior to commencing the Work, performance and payment bonds, as required by Tex. Gov't Code, Chapter2253.  On Construction Manager-at-Risk and Design-Build Projects the Owner shall require a security bond, as described in Subsection 5.1.2 below.

5.1.1   Bond Requirements. Each bond shall be executed by a corporate surety or sureties authorized to do business in the State of Texas and acceptable to the ODR, on the ODR's form, and in compliance with the relevant provisions of the Texas Insurance Code.  If a surety upon a bond loses its authority to do business in the State, Contractor shall, within thirty (30) days after such loss, furnish a replacement bond at no added cost to the ODR.

**Contractor agrees to promptly remove or discharge such lien or claim.  If the Contractor shall fail to so remove or discharge the same within ten (10) days after receipt of written notice from ODR, ODR shall have the right to remove or discharge the same by bonding, payment or otherwise.  The amount of any payment, costs and/or expenses made or incurred by ODR in connection with the removal or discharge of any such lien or claim may be deducted by ODR from any payment or amounts then due or thereafter to become due to the Contractor.  The premium of such bond is to be paid by the Contractor.  ODR, at its option, may terminate and cancel this contract without cost to ODR upon Contractor's failure to deliver such properly executed bonds to ODR and Contractor agrees to indemnify and hold harmless ODR from any and all damages suffered by ODR as a result of Contractor's failure to provide such a bond.**

5.1.1.1   Performance Bond.  A Performance Bond is required if the Contract Sum is in excess of $100,000.  The Performance Bond is solely for the protection of the Owner and ODR.  The Performance Bond is to be for the Contract Sum to guarantee the faithful performance of the Work in accordance with the Contract Documents.  The form of the bond shall be approved by the Office of the Attorney General of Texas.  The Performance Bond shall be effective through Contractor's warranty period.

18

5.1.1.2   Payment Bond.  A Payment bond is required if the Contract price is in excess of $25,000.  The payment bond is to be for the Contract Sum and is payable to the ODR solely for the protection and use of payment bond beneficiaries who have a direct contractual relationship with the Contractor or its subcontractor.  The form of the bond shall be approved by the Office of the Attorney General of Texas.

5.1.2   Security Bond.  The security bond provides protection to ODR if Contractor presents an acceptable guaranteed maximum price ("GMP") to ODR and 1) fails to execute the GMP; or 2) fails to deliver the required payment and performance bonds within the time period stated below.

5.1.3   When Bonds Are Due
5.1.3.1  Security bonds are due within ten (10) days of signing a Construction Manager-at-Risk or Design-Build Contract.

5.1.3.2  Payment and performance bonds are due within ten (10) days of Contractor's receipt of a fully executed GMP on a Construction Manager-at-Risk project or the Contract Sum for a Design-Build project, or within ten (10) days of Contractor's receipt of a fully executed Contract on competitively bid or competitive sealed proposal projects.

5.1.4   Power of Attorney.  Each bond shall be accompanied by a valid power- of- attorney issued by the surety company, attached to the bond, and signed and sealed with the corporate embossed seal, authorizing the attorney-in-fact who signs the bond to commit the surety to the terms of the bond, and stating any limit in the amount for which the attorney can issue a single bond.

5.1.5   Bond Indemnification.  The process of requiring and accepting bonds and making claims there under shall be conducted in compliance with Tex. Gov"t Code, Chapter 2253.  IF FOR ANY REASON A STATUTORY PAYMENT OR PERFORMANCE BOND IS NOT HONORED BY THE SURETY, CONTRACTOR SHALL FULLY INDEMNIFY AND HOLD THE ODR AND OWNER HARMLESS OF AND FROM ANY COSTS, LOSSES, OBLIGATIONS OR LIABILITIES IT INCURS AS A RESULT.

5.1.6   Furnishing Bond Information.  ODR shall furnish certified copies of the Payment Bond and the related Contract to any qualified person seeking copies who complies with Tex. Gov't Code § 2253.026.

5.1.7   Claims on Payment Bonds.  Claims on payment bonds must be sent directly to Contractor and his surety in accordance with Tex. Gov't Code § 2253.041. All payment bond claimants are cautioned that no lien exists on the funds unpaid to Contractor on such Contract, and that reliance on notices sent to ODR may result in loss of their rights against Contractor and/or his surety. The ODR is not responsible in any manner to a claimant for collection of unpaid bills, and accepts no such responsibility because of any representation by any agent or employee.

19

5.1.8   Payment Claims when Payment Bond not Required.  The rights of Subcontractors regarding payment are governed by Tex. Prop. Code §§53.2 31 – 53.239 when the value of the Contract between ODR and Contractor is less than $25,000.00. These provisions set out the requirements for filing a valid lien on funds unpaid to Contractor as of the time of filing the claim, actions necessary to release the lien and satisfaction of such claim.

5.1.9   Sureties.   Sureties shall be listed on the US Department of the Treasury's Listing of Approved Sureties maintained by the Bureau of Financial Management Service (FMS), www.fms.treas.gov/c570, stating companies holding Certificates of Authority as acceptable sureties on Federal Bonds and acceptable reinsuring companies (FMS Circular 570) **and have a rating of A- or better with A.M. Best Company.**

5.2   **Insurance Requirements.  See attached Sample Contract or Master Agreement. for insurance requirements.**

# Article 6.  Construction Documents, Coordination Documents, and Record Documents

6.1   Drawings and Specifications.

6.1.1   Copies Furnished.  *The Contractor will be furnished one (1) digital copy of Drawings and Specifications free of charge.*

6.1.2   Ownership of Drawings and Specifications. **If applicable**, all Drawings, Specifications and copies thereof furnished by A/E are to remain A/E's property. These documents are not to be used on any other project, and with the exception of the Contract record set and electronic versions needed for warranty operations, are to be returned to the A/E, upon request, following completion of the Work.

6.1.3   Interrelation of Documents.  The Contract Documents as referenced in the Contract between Owner and Contractor are complimentary, and what is required by one shall be as binding as if required by all.

6.1.4   Resolution of Conflicts in Documents.  Where conflicts may exist within the Contract Documents, the documents shall govern in the following order:  (a) Change Orders, addenda, and written amendments to the Contract; (b) the Contract; (c) Specifications; (d) Drawings; and (e) other Contract Documents. Among other categories of documents having the same order of precedence, the term or provision that includes the latest date shall control.  *Where conflicts may exist between and/or within the Contract Documents, the higher quality, greater quantity, more restrictive, and/or more expensive requirement shall be required and shall be the basis of Contractor pricing.* Contractor shall notify A/E and ODR for resolution of the issue prior to executing the Work in question.

20

6.1.5   Contractor's Duty to Review Contract Documents.   In order to facilitate its responsibilities for completion of the Work in accordance with and as reasonably inferable from the Contract Documents, prior to commencing the Work, Contractor shall examine and compare the Contract Documents, information furnished by Owner, relevant field measurements made by Contractor and any visible or reasonably anticipated conditions at the Site affecting the Work.  This duty extends throughout the construction phase prior to commencing each particular work activity and/or system installation.

6.1.6   Discrepancies and Omissions in Drawings and Specifications.

6.1.6.1   Promptly report to ODR and to A/E the discovery of any apparent error, omission or inconsistency in the Contract Documents prior to execution of the Work.

6.1.6.2   It is recognized that Contractor is not acting in the capacity of a licensed design professional, unless it is performing as a Design- Build firm.

6.1.6.3   It is further recognized that Contractor's examination of Contract Documents is to facilitate construction and does not create an affirmative responsibility to detect errors, omissions or inconsistencies or to ascertain compliance with applicable laws, building codes or regulations, unless it is performing as a Design- Build firm or a Construction Manager-at-Risk.

6.1.6.4   When performing as a Design-Build firm, Contractor has sole responsibility for discrepancies, errors, and omissions in the Drawings and Specifications.

6.1.6.5   When performing as a Construction Manager-at-Risk, Contractor has a shared responsibility with A/E for discovery and resolution of discrepancies, errors, and omissions in the Contract Documents.  In such case, Contractor's responsibility pertains to review, coordination, and recommendation of resolution strategies within budget constraints.

6.1.6.6   Contractor has no liability for errors, omissions, or inconsistencies unless Contractor knowingly failed to report a recognized problem to Owner or the Work is executed under a Design-Build or Construction Manager-at-Risk Contract as outlined above.   Should Contractor fail to perform the examination and reporting obligations of these provisions, Contractor is responsible for avoidable costs and direct and/or consequential damages.

6.1.6.7   *The* **ODR** *makes no representations, express or implied, about the adequacy or accuracy of the Drawings, Specifications or other*

21

*Construction Documents provided or their suitability for their intended use. Owner expressly disclaims any implied warranty that the Construction Documents are adequate, accurate or suitable for their intended use.*

6.2     Requirements for Record Documents.  Contractor shall:

6.2.1   Maintain at the Site one copy of all Drawings, Specifications, addenda, keep current and maintain Drawings and Specifications in good order with **as constructed** postings and markings to record actual conditions of Work and Show and reference all changes made during construction.  Provide Owner and A/E access to these documents.

6.2.2   Not Applicable.

6.2.3   Not Applicable.

6.2.4   **Prior to final payment application**, Contractor shall furnish a copy of its marked-up Record Documents and a preliminary copy of each instructional manual, maintenance and operating manual, parts catalog, wiring diagrams, spare parts, specified written warranties and like publications, or parts for all installed equipment, systems, and like items and as described in the Contract Documents.

6.2.5   Once determined acceptable by ODR with input from A/E, provide one (1) reproducible copy and one (1) electronic media copy of all Record Documents, unless otherwise required by the **SSC Uniform General & Supplementary Conditions or Special Conditions**.

6.2.6   Contractor shall be responsible for updating the Record Documents for all Contractor initiated documents and changes to the Contract Documents due to coordination and actual field conditions, including RFIs.

6.2.7   A/E shall be responsible for updating the Record Documents for any addenda, Change Orders, A/E supplemental instructions and any other alterations to the Contract Documents generated by A/E or Owner.

# Article 7.  Construction Safety

7.1     General.  It is the duty and responsibility of Contractor and all of its Subcontractors to be familiar with, enforce and comply with all requirements of Public Law No. 91-596, 29 U.S.C. § 651 et. seq., the Occupational Safety and Health Act of 1970, (OSHA) and all amendments thereto.  Contractor shall prepare a safety plan specific to the Project and submit it to ODR and A/E **(if applicable)** prior to commencing Work.  In addition, Contractor and all of its Subcontractors shall comply with all applicable laws and regulations of any public body having jurisdiction for safety of persons or property to protect them from damage, injury or loss and erect and maintain all necessary safeguards for such safety and protection.

22

7.2     Notices.  Contractor shall provide notices as follows:

7.2.1   Notify owners of adjacent property including those that own or operate utility services and/or underground facilities, and utility owners, when prosecution of the Work may affect them or their facilities, and cooperate with them in the protection, removal, relocation and replacement, and access to their facilities and/or utilities.

7.2.2   Coordinate the exchange of material safety data sheets (MSDSs) or other hazard communication information required to be made available to or exchanged between or among employers at the site in connection with laws and regulations.  Maintain a complete file of MSDSs for all materials in use on site throughout the construction phase and make such file available to Owner and its agents as requested.

7.3     Emergencies.   In any emergency affecting the safety of persons or property, Contractor shall act to minimize, mitigate, and prevent threatened damage, injury or loss.

7.3.1   Have authorized agents of Contractor respond immediately upon call at any time of day or night when circumstances warrant the presence of Contractor to protect the Work or adjacent property from damage or to take such action pertaining to the Work as may be necessary to provide for the safety of the public.

7.3.2   Give ODR and A/E prompt notice of all such events.

7.3.3   If Contractor believes that any changes in the Work or variations from Contract Documents have been caused by its emergency response, promptly notify Owner within seventy-two (72) hours of the emergency response event.

7.3.4   Should Contractor fail to respond, **ODR** is authorized to direct other forces to take action as necessary and **ODR** may deduct any cost of remedial action from funds otherwise due Contractor.

7.4     Injuries. In the event of an incident or accident involving outside medical care for an individual on or near the Work, Contractor shall notify ODR and other parties as may be directed promptly, but no later than twenty-four (24) hours after Contractor learns that an event required medical care.

7.4.1   Record the location of the event and the circumstances surrounding it, by using photography or other means, and gather witness statements and other documentation which describes the event.

7.4.2   Supply ODR and A/E with an incident report no later than thirty-six (36) hours after the occurrence of the event.  In the event of a catastrophic incident (one (1) fatality or three (3) workers hospitalized), barricade and leave intact the scene of the incident until all investigations are complete.  A full set of incident investigation documents, including facts, finding of cause, and remedial plans shall be provided within one (1) week after occurrence, unless otherwise directed

23

by legal counsel.  Contractor shall provide ODR with written notification within one week of such catastrophic event if legal counsel delays submission of full report.

7.5     Environmental Safety.   Upon encountering any previously unknown potentially hazardous material, or other materials potentially contaminated by hazardous material, Contractor shall immediately stop work activities impacted by the discovery, secure the affected area, and notify ODR immediately.

    7.5.1   Bind all Subcontractors to the same duty.

    7.5.2   Upon receiving such notice, ODR will promptly engage qualified experts to make such investigations and conduct such tests as may be reasonably necessary to determine the existence or extent of any environmental hazard. Upon completion of this investigation, ODR will issue a written report to Contractor identifying the material(s) found and indicate any necessary steps to be taken to treat, handle, transport or dispose of the material.

    7.5.3   ODR may hire third-party Contractors to perform any or all such steps.

    7.5.4   Should compliance with ODR's instructions result in an increase in Contractor's cost of performance, or delay the Work, Owner will make an equitable adjustment to the Contract Sum and/or the time of completion, and modify the Contract in writing accordingly.

7.6     Trenching Plan.  When the project requires excavation which either exceeds a depth of four (4) feet, or results in any worker's upper body being positioned below grade level, Contractor is required to submit a trenching plan to ODR prior to commencing trenching operations unless an engineered plan is part of the Contract Documents. The plan is required to be prepared and sealed by a professional engineer registered in the State of Texas, and hired or employed by Contractor or Subcontractor to perform the work.  Said engineer cannot be anyone who is otherwise either directly or indirectly engaged on this project.

## Article 8.  Quality Control

8.1     Materials & Workmanship.   Contractor shall execute Work in a good and workmanlike matter in accordance with the Contract Documents.  Contractor shall develop and provide a quality control plan specific to this Project and acceptable to **ODR**.  Where Contract Documents do not specify quality standards, complete and construct all Work in compliance with generally accepted construction industry standards.  Unless otherwise specified, incorporate all new materials and equipment into the Work under the Contract.

8.2     Testing.

    8.2.1   Contractor is responsible for coordinating routine and special tests required to confirm compliance with quality and performance requirements, except as stated below or otherwise required by the Contract Documents. Contractor shall provide the following testing:

8.2.1.1   Any test of basic material or fabricated equipment included as part of a submittal for a required item in order to establish compliance with the Contract Documents.

8.2.1.2   Any test of basic material or fabricated equipment offered as a substitute for a specified item on which a test may be required in order to establish compliance with the Contract Documents.

8.2.1.3   Preliminary, start-up, pre-functional and operational testing of building equipment and systems as necessary to confirm operational compliance with requirements of the Contract Documents.

8.2.1.4   All subsequent tests on original or replaced materials conducted as a result of prior testing failure.

8.2.2   All testing shall be performed in accordance with standard test procedures by an accredited laboratory, or special consultant as appropriate, acceptable to Owner. Results of all tests shall be provided promptly to ODR, A/E, and Contractor.

8.2.3   Non-Compliance (Test Results).   Should any of the tests indicate that a material and/or system does not comply with the Contract requirements, the burden of proof remains with Contractor, subject to:

8.2.3.1   Contractor selection and submission of the laboratory for Owner acceptance.

8.2.3.2   Acceptance by Owner of the quality and nature of tests.

8.2.3.3   All tests taken in the presence of A/E and/or ODR, or their representatives.

8.2.3.4   If tests confirm that the material/systems comply with Contract Documents, Owner will pay the cost of the test.

8.2.3.5   If tests reveal noncompliance, Contractor will pay those laboratory fees and costs of that particular test and all future tests, of that failing Work, necessary to eventually confirm compliance with Contract Documents.

8.2.3.6   Proof of noncompliance with the Contract Documents will make Contractor liable for any corrective action which ODR determines appropriate, including complete removal and replacement of non-compliant work or material.

8.2.4   Notice of Testing.  Contractor shall give ODR and A/E timely notice of its readiness and the date arranged so ODR and A/E may observe such inspection, testing, or approval.

25

8.2.5 <u>Test Samples</u>. Contractor is responsible for providing Samples of sufficient size for test purposes and for coordinating such tests with their Work Progress Schedule to avoid delay.

8.2.6 <u>Covering Up Work</u>. If Contractor covers up any Work without providing Owner an opportunity to inspect, Contractor shall, if requested by ODR, uncover and recover the work at Contractor's expense.

8.3 <u>Submittals</u>.

8.3.1 <u>Contractor's Submittals</u>. Contractor shall submit with reasonable promptness consistent with the Project schedule and in orderly sequence all Shop Drawings, Samples, or other information required by the Contract Documents, or subsequently required by Change Order. Prior to submitting, Contractor shall review each submittal for general compliance with Contract Documents and approve submittals for review by A/E and **ODR** by an approval stamp affixed to each copy. Submittal data presented without Contractor's stamp will be returned without review or comment, and any delay resulting from failure is Contractor's responsibility.

8.3.1.1 Contractor shall within twenty-one (21) days of the effective date of the Notice To Proceed with construction, submit to ODR and A/E, a submittal schedule/register, organized by specification section, listing all items to be furnished for review and approval by A/E and **ODR**. The list shall include Shop Drawings, manufacturer's literature, certificates of compliance, materials Samples, materials colors, guarantees, and all other items identified throughout the Specifications.

8.3.1.2 Contractor shall indicate the type of item, Contract requirements reference, and Contractor's scheduled dates for submitting the item along with the requested dates for approval answers from A/E, ODR and Owner **(if applicable)**. The submittal register shall indicate the projected dates for procurement of all included items and shall be updated at least monthly with actual approval and procurement dates. Contractor's Submittal Register must be reasonable in terms of the review time for complex submittals. Contractor's submittal schedule must be consistent with the Work Progress Schedule and identify critical submittals. Show and allow a minimum of fifteen (15) days duration after receipt by A/E and ODR for review and approval. If re- submittal required, allow a minimum of an additional fifteen (15) days for review. Submit the updated Submittal Register with each request for progress payment. Owner may establish routine review procedures and schedules for submittals at the preconstruction conference and/or elsewhere in the Contract Documents. If Contractor fails to update and provide the Submittal Register as required, Owner may, after seven (7) days notice to Contractor withhold a reasonable sum of money that would otherwise be due Contractor. *Failure to update and provide the*

26

*submittal schedule/register as required shall constitute cause for Owner to withhold payment otherwise due.*

8.3.1.3    Contractor shall coordinate the Submittal Register with the Work Progress Schedule. Do not schedule Work requiring a submittal to begin prior to scheduling review and approval of the related submittal. Revise and/or update both schedules monthly to ensure consistency and current project data. Provide to ODR the updated Submittal Register and schedule with each application for progress payment. Refer to requirements for the Work Progress Schedule for inclusion of procurement activities therein. Regardless, the Submittal Register shall identify dates submitted and returned and shall be used to confirm status and disposition of particular items submitted, including approval or other action taken and other information not conveniently tracked through the Work Progress Schedule.

8.3.1.4    By submitting Shop Drawings, Samples or other required information, Contractor represents that it has determined and verified all applicable field measurements, field construction criteria, materials, catalog numbers and similar data; and has checked and coordinated each Shop Drawing and Sample with the requirements of the Work and the Contract Documents.

8.3.2    Review of Submittals.  A/E and ODR review is only for conformance with the design concept and the information provided in the Contract Documents. Responses to submittals will be in writing.  The approval of a separate item does not indicate approval of an assembly in which the item functions.  The approval of a submittal does not relieve Contractor of responsibility for any deviation from the requirements of the Contract unless Contractor informs A/E and ODR of such deviation in a clear, conspicuous, and written manner on the submittal transmittal and at the time of submission, and obtains Owner's written specific approval of the particular deviation.

8.3.3    Correction and Resubmission.  Contractor shall make any corrections required to a submittal and resubmit the required number of corrected copies promptly so as to avoid delay, until submittal approval.  Direct attention in writing to A/E and ODR, when applicable, to any new revisions other than the corrections requested on previous submissions.

8.3.4    Limits on Shop Drawing Review.  Contractor shall not commence any Work requiring a submittal until review of the submittal under Subsection 9.3.2. Construct all such work in accordance with reviewed submittals.  Comments incorporated as part of the review in Subsection 9.3.2 of Shop Drawings and Samples is not authorization to Contractor to perform extra work or changed work unless authorized through a Change Order.  A/E's and ODR's review, if any, does not relieve Contractor from responsibility for defects in the Work resulting from errors or omissions of any kind on the submittal, regardless of any approval action.

27

8.3.5   No Substitutions Without Approval.  ODR and A/E may receive and consider Contractor's request for substitution when Contractor agrees to reimburse Owner for review costs and satisfies the requirements of this section.   If Contractor does not satisfy these conditions, ODR and A/E will return the request        without action  except  to  record  noncompliance  with  these requirements.   Owner will not consider the request if Contractor cannot provide the product or method because of failure to pursue the Work promptly or coordinate activities properly. Contractor's request for a substitution may be considered by ODR and A/E when:

8.3.5.1   The Contract Documents do not require extensive revisions; and

8.3.5.2   Proposed changes are in keeping with the general intent of the Contract Documents and the design intent of A/E and do not result in an increase in cost to Owner; and

8.3.5.3   The request is timely, fully documented, properly submitted and one or more of the following apply:

8.3.5.3.1   Contractor  cannot  provide  the  specified  product, assembly or method of construction within the Contract Time;

8.3.5.3.2   The request directly relates to an "or-equal" clause or similar language in the Contract Documents;

8.3.5.3.3   The  request  directly  relates  to  a  "product  design standard"  or  "performance  standard"  clause  in  the Contract Documents;

8.3.5.3.4   The requested substitution offers Owner a substantial advantage in cost, time, energy conservation or other considerations,  after  deducting  additional  responsibilities Owner must assume;

8.3.5.3.5   The specified product or method of construction cannot receive  necessary  approval  by  an  authority  having jurisdiction,  and  ODR  can  approve  the  requested substitution;

8.3.5.3.6   Contractor  cannot  provide  the  specified  product, assembly or method of construction in a manner that is compatible  with  other  materials  and  where  Contractor certifies  that  the  substitution  will  overcome  the incompatibility;

8.3.5.3.7   Contractor  cannot  coordinate  the  specified  product, assembly or method of construction with other materials and

28

where Contractor certifies they can coordinate the proposed substitution; or

8.3.5.3.8    The specified product, assembly or method of construction cannot provide a warranty required by the Contract Documents and where Contractor certifies that the proposed substitution provides the required warranty.

8.3.6    Unauthorized Substitutions at Contractor's Risk.  Contractor is financially responsible for any additional costs or delays resulting from unauthorized substitution of materials, equipment or fixtures other than those specified. Contractor shall reimburse Owner for any increased design or contract administration costs resulting from such unauthorized substitutions.

8.4    Field Mock-up.

8.4.1    Mock-ups shall be constructed prior to commencement of a specified scope of work to confirm acceptable workmanship.

8.4.1.1    As a minimum, field mock-ups shall be constructed for roofing systems, exterior veneer / finish systems, glazing systems, and any other Work requiring a mock-up as identified throughout the Contract Documents.  Mock-ups for systems not part of the Project scope shall not be required.

8.4.1.2    Mock-ups may be incorporated into the Work if allowed by the Contract Documents and if acceptable to ODR.  If mock-ups are freestanding, they shall remain in place until otherwise directed by Owner.

8.4.1.3    Contractor shall include field mock-ups in their Work Progress Schedule and shall notify ODR and A/E of readiness for review sufficiently in advance to coordinate review without delay.

8.5    Inspection During Construction.

8.5.1    Contractor shall provide sufficient, safe, and proper facilities, including equipment as necessary for safe access, at all reasonable times for observation and/or inspection of the Work by Owner and its agents.

8.5.2    Contractor shall not cover up any Work with finishing materials or other building components prior to providing Owner and its agents an opportunity to perform an inspection of the Work.

8.5.2.1    Should corrections of the Work be required for approval, Contractor shall not over up corrected Work until Owner indicates approval.

29

8.5.2.2   Contractor shall provide notification of at least five (5) working days or otherwise as mutually agreed, to ODR of the anticipated need for a cover-up inspection.  Should ODR fail to make the necessary inspection within the agreed period, Contractor may proceed with cover-up Work, but is not relieved of responsibility for Work to comply with requirements of the Contract Documents.

## Article 9.  Construction Schedules

9.1     Contract Time.  TIME IS AN ESSENTIAL ELEMENT OF THE CONTRACT.
The Contract Time is the time between the dates indicated in the Notice to Proceed for commencement of the Work and for achieving Substantial Completion.  The Contract Time can be modified only by Change Order.  Failure to achieve Substantial Completion within the Contract Time as otherwise agreed to in writing will cause damage to Owner and may subject Contractor to liquidated damages as provided in the Contract Documents.   If Contractor fails to achieve Final Completion in a reasonable time after Substantial Completion, Contractor shall be responsible for Owner's additional inspection, project management, and maintenance cost to the extent caused by Contractor's failure to achieve Final Completion.

9.2     Notice to Proceed.  The **ODR** will issue a Notice to Proceed which shall state the dates for beginning Work and for achieving Substantial Completion of the Work.

9.3     Work Progress Schedule.   Contractor shall submit their initial Work Progress Schedule for the Work in relation to the entire Project not later than ten (10) days after the effective date of the Notice to Proceed to ODR and A/E.   Unless otherwise indicated in the Contract Documents, the Work Progress Schedule shall be computerized Critical Path Method (CPM) with fully editable logic. This initial schedule shall indicate the dates for starting and completing the various aspects required to complete the Work, including mobilization, procurement, installation, testing, inspection, delivery of Close-out Documents and acceptance of all the Work of the Contract.   When acceptable to Owner, the initially accepted schedule shall be the Baseline Schedule for comparison to actual conditions throughout the Contract duration.

9.3.1   Schedule Requirements.  Contractor shall submit electronic and paper copy of the initial Work Progress Schedule reflecting accurate and reliable representations of the planned progress of the Work, the Work to date if any, and of Contractor's actual plans for its completion.  Contractor shall organize and provide adequate detail so the schedule is capable of measuring and forecasting the effect of delaying events on completed and uncompleted activities.

9.3.1.1   Contractor shall re-submit initial schedule as required to address review comments from A/E and ODR until such schedule is accepted as the Baseline Schedule.

9.3.1.2   Submittal of a schedule, schedule revision or schedule update constitutes Contractor's representation to **ODR** of the accurate depiction

of all progress to date and that Contractor will follow the schedule as submitted in performing the Work.

9.3.2   Schedule Updates.   Contractor shall update the Work Progress Schedule and the Submittal Register monthly, as a minimum, to reflect progress to date and current plans for completing the Work, while maintaining original schedule as Baseline Schedule and submit electronic copies of the update to A/E and ODR as directed, but as a minimum with each request for payment. Owner has no duty to make progress payments unless accompanied by the updated Work Progress Schedule.   Show the anticipated date of completion reflecting all extensions of time granted through Change Order as of the date of the update.   Contractor may revise the Work Progress Schedule when in Contractor's judgment it becomes necessary for the management of the Work. Contractor shall identify all proposed changes to schedule logic to Owner/**ODR** and to A/E via an executive summary accompanying the updated schedule for review prior to final implementation of revisions into a revised Baseline Schedule.   Schedule changes that materially impact Owner's operations shall be communicated promptly to ODR and shall not be incorporated into the revised Baseline Schedule without ODR‟s consent.

9.3.3   The Work Progress Schedule is for Contractor's use in managing the Work and submittal of the schedule, and successive updates or revisions, is for the information of Owner and to demonstrate that Contractor has complied with requirements for planning the Work.   Owner's acceptance of a schedule, schedule update or revision constitutes Owner's agreement to coordinate its own activities with Contractor's activities as shown on the schedule.

　　　9.3.3.1   Acceptance of the Work  Progress Schedule, or update and/or revision thereto does not indicate any approval of Contractor's proposed sequences and duration.

　　　9.3.3.2   Acceptance of a Work Progress Schedule   update   or   revision indicating early or late completion does not constitute Owner's consent, alter the terms of the Contract, or waive either Contractor's responsibility for timely completion or Owner's right to damages for Contractor's failure to do so.

　　　9.3.3.3   Contractor's scheduled dates for completion of any activity or the entire Work do not constitute a change in terms of the Contract. Change Orders are the only method of modifying the Substantial Completion Date(s) and Contract Time.

9.4   Ownership of Float.   Unless indicated otherwise in   the   Contract   Documents, Contractor shall develop its schedule, pricing, and execution plan to provide a minimum of ten (10) percent total float at acceptance of the Baseline Schedule.   Float time contained in the Work Progress Schedule is not for the exclusive benefit of Contractor or Owner, but belongs to the Project and may be consumed by either party as needed on a first-used basis.

31

9.5     Completion of Work.  Contractor is accountable for completing the Work within the Contract Time stated in the Contract, or as otherwise amended by Change Order.

9.5.1   If, in the judgment of Owner/**ODR**, the work is behind schedule and the rate of placement of work is inadequate to regain scheduled progress to insure timely completion of the entire work or a separable portion thereof, Contractor, when so informed by Owner/**ODR**, shall immediately take action to increase the rate of work placement by:

9.5.1.1     An increase in working forces.

9.5.1.2     An increase in equipment or tools.

9.5.1.3     An increase in hours of work or number of shifts.

9.5.1.4     Expedite delivery of materials.

9.5.1.5     Other action proposed if acceptable to Owner.

9.5.2   Within five (5) days after such notice from ODR, Contractor shall notify ODR in writing of the specific measures taken and/or planned to increase the rate of progress.   Contactor shall include an estimate as to the date of scheduled progress recovery and an updated Work Progress Schedule illustrating Contractor's plan for achieving timely completion of the Project. Should ODR deem the plan of action inadequate, Contractor shall take additional steps or make adjustments as necessary to its plan of action until it meets with ODR's approval.

9.6     Modification of the Contract Time.

9.6.1   Delays and extension of time as hereinafter described are valid only if executed in accordance with provisions set forth in Article 11.

9.6.2   When a delay defined herein as excusable prevents Contractor from completing the Work within the Contract Time, Contractor is entitled to an extension of time. Owner will make an equitable adjustment and extend the number of days lost because of excusable delay or Weather Days, as measured by Contractor's progress schedule.  All extensions of time will be granted in calendar days.  In no event, however, will an extension of time be granted for delays that merely extend the duration of non-critical activities, or which only consume float without delaying the project Substantial Completion date(s).

9.6.2.1     A "Weather Day" is a day on which Contractor's current schedule indicates Work is to be done, and on which inclement weather and related site conditions prevent Contractor from performing seven (7) continuous hours of Work between the hours of 7:00 a.m. and 6:00 p.m. Weather days are excusable delays. When weather conditions at the site prevent work from proceeding, Contractor shall immediately notify ODR for confirmation of the conditions.  At the end of each calendar month, submit to ODR and A/E a list of Weather Days occurring in that

32

month along with documentation of the impact on critical activities. Based on   confirmation by ODR,   any time extension granted will be issued by Change Order *for those weather days during that month which exceed the number expected, as shown in the Rainfall Table below*. If Contractor and Owner cannot agree on the time extension, Owner  may  issue  a ULCO for fair and reasonable time extension.

9.6.2.1.1    *Rainfall Table*
*The number of weather days expected for each month during the term of this Contract is compiled by the State Climatologist, based on U.S. Weather Bureau records. The number of weather days shown in the Rainfall Table for the first and last months of the Contract will be prorated in determining the total number of weather days expected during the term of this Contract.*

*Texas A&M University (College Station/Bryan)*

| | | | | | |
|---|---|---|---|---|---|
| *January* | *5* | *May* | *5* | *September* | *6* |
| *February* | *5* | *June* | *4* | *October* | *4* |
| *March* | *5* | *July* | *4* | *November* | *4* |
| *April* | *5* | *August* | *4* | *December* | *5* |

9.6.2.2    Excusable Delay. Contractor is entitled to an equitable adjustment of the Contract Time, issued via change order, for delays caused by the following:

9.6.2.2.1    Errors, omissions and imperfections in design, which A/E corrects by means of changes in the Drawings and Specifications.

9.6.2.2.2    Unanticipated physical conditions at the Site, which A/E corrects by means of changes to the Drawings and Specifications or for which ODR directs changes in the Work identified in the Contract Documents.

9.6.2.2.3    Changes in the Work that effect activities identified in Contractor's schedule as "critical" to completion of the entire Work, if such changes are ordered by ODR or recommended by A/E and ordered by ODR.

9.6.2.2.4    Suspension of Work for unexpected natural events (sometimes called "*Force Majure*"), civil unrest, strikes or other events which are not within the reasonable control of Contractor.

9.6.2.2.5    Suspension of Work for convenience of ODR, which prevents Contractor from completing the Work within the Contract Time.

33

9.6.3    Contractor's relief in the event of such delays is the time impact to the critical path as determined by analysis of Contractor's schedule.   In the event that Contractor incurs additional direct costs because of the excusable delays other than described in Subparagraph 9.6.2.2.4 and within the reasonable control of Owner, the Contract price and Contract Time are to be equitably adjusted by Owner pursuant to the provisions of Article 11.

9.7    <u>No Damages for Delay</u>. Contractor has no claim for monetary damages for delay or hindrances to the work from any cause, including without limitation any act or omission of Owner.

9.8    <u>Concurrent Delay</u>.  When the completion of the Work is simultaneously delayed by an excusable delay and a delay arising from a cause not designated as excusable, Contractor may not be entitled to a time extension for the period of concurrent delay.

9.9    <u>Other Time Extension Requests</u>.  Time extensions requested in association with changes to the Work directed or requested by Owner shall be included with Contractor's proposed costs for such change. Time extensions requested for inclement weather are covered by Paragraph 9.6.2.1 above.  If Contractor believes that the completion of the Work is delayed by a circumstance other than for changes directed to the Work or weather, they shall give ODR written notice, stating the nature of the delay and the activities potentially affected, within five (5) days after the onset of the event or circumstance giving rise to the excusable delay. Contractor shall provide sufficient written evidence to document the delay.  In the case of a continuing cause of delay, only one claim is necessary.  State claims for extensions of time in numbers of whole or half days.

9.9.1    Within ten (10) days after the cessation of the delay, Contractor shall formalize its request for extension of time in writing to include a full analysis of the schedule impact of the delay and substantiation of the excusable nature of the delay. All changes to the Contract Time or made as a result of such claims is by Change Order, as set forth in Article 11.

9.9.2    No extension of time releases Contractor or the Surety furnishing a performance or payment bond from any obligations under the Contract or such a bond.  Those obligations remain in full force until the discharge of the Contract.

9.9.3    <u>Contents of Time Extension Requests</u>. Contractor shall provide with each Time Extension Request a quantitative demonstration of the impact of the delay on project completion time, based on the Work Progress Schedule. Contractor shall include with Time Extension Requests a reasonably detailed narrative setting forth:

9.9.3.1    The nature of the delay and its cause; the basis of Contractor's claim of entitlement to a time extension.

34

9.9.3.2   Documentation of the actual impacts of the claimed delay on the critical path indicated in Contractor's Work Progress Schedule, and any concurrent delays.

9.9.3.3   Description and documentation of steps taken by Contractor to mitigate the effect of the claimed delay, including, when appropriate, the modification of the Work Progress Schedule.

9.9.4   ODR's Response.   ODR will respond to the Time Extension Request by providing to Contractor written notice of the number of days granted, if any, and giving its reason if this number differs from the number of days requested by Contractor.

9.9.4.1   ODR will not grant time extensions for delays that do not affect the Contract Substantial Completion date.

9.9.4.2   ODR will respond to each properly submitted Time Extension Request within fifteen (15) days following receipt.  If ODR cannot reasonably make a determination about Contractor's entitlement to a time extension within that time, ODR will notify Contractor in writing.  Unless otherwise agreed by Contractor, ODR has no more than  fifteen (15) additional days to prepare  a final response.  If the ODR fails to respond within forty-five (45) calendar days from the date the Time Extension Request is received, the Contractor is entitled to a time extension in the amount requested.

9.10   Failure to Complete Work Within the Contract Time. TIME IS AN ESSENTIAL ELEMENT OF THE CONTRACT.  Contractor's failure to substantially complete the Work within the Contract Time or to achieve Substantial Completion as required will cause damage to Owner.   These damages shall be liquidated by agreement of Contractor and Owner, in the amount per day as set forth in the Contract Documents.

9.11   Liquidated Damages.  *For each consecutive calendar day after the date of Substantial Completion, plus any extensions of time granted by Change Order, that the Work is not substantially completed, Contractor shall pay to ODR, within ten (10) days following written demand, an amount determined by the following schedule:*

| **Project Work - Actual Cost of Construction (ACC)** | | |
|---|---|---|
| **From** | **To** | **Per Day** |
| $0 | $299,999.99 | $250.00 |
| $300,000 | $999,999.99 | $500.00 |
| $1,000,000 | $4,999,999.99 | $2,500.00 |
| $5,000,000 | $10,000,000 | $5,000.00 |

*Liquidated Damages shall be applied not as a penalty but as liquidated damages representing the parties' estimate at the time of contract execution of the damages that*

35

*Owner or ODR will sustain for late completion. ODR may also recover the liquidated damages from any money due or that becomes due Contractor. The amount of liquidated damages may be adjusted by Owner in Special Conditions.*

*The parties stipulate and agree that the actual damages sustained by Owner or ODR for late completion of the Project will be uncertain and difficult to ascertain, that calculating Owner's or ODR's actual damages would be impractical, unduly burdensome, and cause unnecessary delay, and that the amount of daily liquidated damages set forth above is a reasonable estimate.*

*Payment of the liquidated damages does not preclude recovery by Owner or ODR of other damages or losses under other provisions of the Contract, except for claims related to delays in Substantial Completion (as defined below) or Final Completion. Owner's right to receive liquidated damages shall not affect Owner's right to terminate the Contract as provided in these UGSC or elsewhere in the Contract Documents, nor shall termination of the Contract release Contractor from the obligation to pay the liquidated damages.*

## Article 10.  Payments

10.1.1 <u>Schedule of Values</u>.   Contractor shall submit to ODR and A/E for acceptance a Schedule of Values accurately itemizing material and labor for the various classifications of the Work based on the organization of the specification sections and of sufficient detail acceptable to ODR.  The accepted Schedule of Values will be the basis for the progress payments under the Contract.

    10.1.1 No progress payments will be made prior to receipt and acceptance of the Schedule of Values, provided in such detail as required by ODR, and submitted not less than twenty-one (21) days prior to the first request for payment.   The Schedule of Values shall follow the order of trade divisions of the Specifications and include itemized costs for general conditions, costs for preparing close out documents, fees, contingencies, and Owner cash allowances, if applicable, so that the sum of the items will equal the Contract price. As appropriate, assign each item labor and/or material values, the subtotal thereof equaling the value of the work in place when complete.

        10.1.1.1  ODR requires that the Work items be inclusive of the cost of the Work items only.  Any contract markups for overhead and profit, general conditions, etc., shall be contained within separate line items for those specific purposes.

    10.1.2 Contractor shall retain a copy of all worksheets used in preparation of its bid or proposal, supported by a notarized statement that the worksheets are true and complete copies of the documents used to prepare the bid or proposal. Make the worksheets available to ODR at the time of Contract execution. Thereafter Contractor shall grant **ODR** during normal business hours access to said copy of worksheets at any time during the period commencing upon execution of the Contract and ending one year after final payment.

10.2. Progress Payments. Contractor will receive periodic progress payments for Work performed, materials in place, suitably stored on Site, or as otherwise agreed to by **ODR** and Contractor. Payment is not due until receipt by ODR or his designee of a correct and complete Pay Application in electronic and/or hard copy format as set forth in **UGSC, Div 01 Specifications, Master Agreement Contract**, and certified by A/E. Progress payments are made provisionally and do not constitute acceptance of work not in accordance with the Contract Documents. **ODR** will not process progress payment applications for Change Order Work until all parties execute the Change Order.

10.2.1 Preliminary Pay Worksheet. Once each month that a progress payment is to be requested, the Contractor shall submit to A/E and ODR a complete, clean copy of a preliminary pay worksheet or preliminary pay application, to include the following:

10.2.1.1 Contractor's estimate of the amount of Work performed, labor furnished and materials incorporated into the Work, using the established Schedule of Values;

10.2.1.2 An updated Work Progress Schedule including the executive summary and all required schedule reports;

10.2.1.3 HUB subcontracting plan Progress Assessment Report as required in Paragraph 4.2.5.1;

10.2.1.4 Such additional documentation as **ODR** may require as set forth in the **UGSC** or elsewhere in the Contract Documents; and

10.2.1.5 Construction payment affidavit.

10.2.2 Contractor's Application for Payment. As soon as practicable, but in no event later than seven (7) days after receipt of the preliminary pay worksheet, A/E and ODR will meet with Contractor to review the preliminary pay worksheet and to observe the condition of the Work. Based on this review, ODR and A/E may require modifications to the preliminary pay worksheet prior to the submittal of an Application for Payment, and will promptly notify Contractor of revisions necessary for approval. As soon as practicable, Contractor shall submit its Application for Payment on the appropriate and completed form, reflecting the required modifications to the Schedule of Values required by A/E and/or ODR. Attach all additional documentation required by ODR and/or A/E, as well as an affidavit affirming that all payrolls, bills for labor, materials, equipment, subcontracted work and other indebtedness connected with Contractor's Application for Payment are paid or will be paid within the time specified in Tex. Gov't Code, Chapter 2251. No Application for Payment is complete unless it fully reflects all required modifications, and attaches all required documentation including Contractor's affidavit.

10.2.3 Certification by Architect/Engineer **(if applicable)**. Within five (5) days or earlier following A/E's receipt of Contractor's formal Application for

37

Payment, A/E will review the Application for Payment for completeness, and forward it to ODR. A/E will certify that the application is complete and payable, or that it is incomplete, stating in particular what is missing. If the Application for Payment is incomplete, Contractor shall make the required corrections and resubmit the Application for Payment for processing.

10.3     **ODR**'s Duty to Pay. **ODR** has no duty to pay the Contractor except on receipt by **ODR** of: 1) a complete, accurate, and correct Application for Payment certified by A/E; 2) Contractor's updated Work Progress Schedule; and 3) confirmation that Contractor's record documentation at the Site is kept current.

   10.3.1  Payment for stored materials and/or equipment confirmed by **ODR** and A/E to be on-site or otherwise properly stored is limited to eighty-five (85) percent of the invoice price or eighty-five (85) percent of the scheduled value for the materials or equipment, whichever is less.

   10.3.2  Retainage. **ODR** will withhold from each progress payment, as retainage, five (5) percent of the total earned amount, the amount authorized by law, or as otherwise set forth in the **UGSC** or Special Conditions. Retainage is managed in conformance with Tex. Gov't Code, Chapter 2252, Subchapter B.

      10.3.2.1  Contractor shall provide written consent of its surety for any request for reduction or release of retainage.

      10.3.2.2  At least sixty-five (65) percent of the Contract, or such other discrete Work phase as set forth in Subsection 12.1.6 or Work package delineated in the Contract Documents, must be completed before **ODR** can consider a retainage reduction or release.

      10.3.2.3  Contractor shall not withhold retainage from their Subcontractors and suppliers in amounts that are any percentage greater than that withheld in its Contract with **ODR** under this subsection, unless otherwise acceptable to **ODR**.

   10.3.3  Price Reduction to Cover Loss. **ODR** may reduce any Application for Payment, prior to payment to the extent necessary to protect **ODR** from loss on account of actions of Contractor including, but not limited to, the following:

      10.3.3.1  Defective or incomplete Work not remedied;

      10.3.3.2  Damage to Work of a separate Contractor;

      10.3.3.3  Failure to maintain scheduled progress or reasonable evidence that the Work will not be completed within the Contract Time;

      10.3.3.4  Persistent failure to carry out the Work in accordance with the Contract Documents;

      10.3.3.5  Reasonable evidence that the Work cannot be completed for the unpaid portion of the Contract Sum;

10.3.3.6 Assessment of fines for violations of prevailing wage rate law; or

10.3.3.7 Failure to include the appropriate amount of retainage for that periodic progress payment.

10.3.4 Title to all material and Work covered by progress payments transfers to Owner upon payment.

10.3.4.1 Transfer of title to Owner does not relieve Contractor and its Subcontractors of the sole responsibility for the care and protection of materials and Work upon which payments have been made until final acceptance, or the restoration of any damaged Work, or waive the right of **ODR** to require the fulfillment of all the terms of the Contract.

10.4    Progress Payments.  Progress payments to Contractor do not release Contractor or its surety from any obligations under the Contract.

10.4.1 Upon **ODR**'s request, Contractor shall furnish manifest proof of the status of Subcontractor's accounts in a form acceptable to **ODR**.

10.4.2 Pay estimate certificates must be signed by a corporate officer or a representative duly authorized by Contractor.

10.4.3 Provide copies of bills of lading, invoices, delivery receipts or other evidence of the location and value of such materials in requesting payment for materials.

10.4.4 For purposes of Tex. Gov't Code § 2251.021(a)(2), the date the performance of service is complete is the date when ODR approves the Application for Payment.

10.5    Off-Site Storage.  With prior approval by **ODR** and in the event Contractor elects to store materials at an off-site location, abide by the following conditions, unless otherwise agreed to in writing by **ODR**.

10.5.1 Store materials in a bonded commercial warehouse meeting the criteria stated below.

10.5.2 Provide insurance coverage adequate not only to cover materials while in storage, but also in transit from the off-site storage areas to the Project Site. Copies of duly authenticated certificates of insurance, made out to insure the **Owner and ODR**, must be filed with **ODR**.

10.5.3 Inspection by Owner's representative is allowed at any time.  Owner's inspectors must be satisfied with the security, control, maintenance, and preservation measures.

10.5.4 Materials for this Project are physically separated and marked for the Project in a sectioned-off area.  Only materials which have been approved through the submittal process are to be considered for payment.

10.5.5 **ODR** reserves the right to reject materials at any time prior to final acceptance of the complete **Project** if they do not meet Contract requirements regardless of any previous progress payment made.

10.5.6 With each monthly payment estimate, submit a report to **ODR, A/E and ODR's Inspector** listing the quantities of materials already paid for and still stored in the off-site location.

10.5.7 Make warehouse records, receipts and invoices available to **ODR**'s, upon request, to verify the quantities and their disposition.

10.5.8 In the event of Contract termination or default by Contractor, the items in storage off-site, upon which payment has been made, will be promptly turned over to **ODR** at a location near the jobsite as directed by ODR. The full provisions of performance and payment bonds on this Project cover the materials off-site in every respect as though they were stored on the Project Site.

10.6    Not Applicable.

## Article 11.  Changes

11.1    <u>Change Orders</u>. A Change Order issued after execution of the Contract is a written order to Contractor, signed by ODR, Contractor, and A/E **(if applicable)**, authorizing a change in the Work or an adjustment in the Contract Sum or the Contract Time. The Contract Sum and the Contract Time can only be changed by Change Order. A Change Order signed by Contractor indicates his agreement therewith, including the adjustment in the Contract Sum and/or the Contract Time. ODR may issue a written authorization for Contractor to proceed with Work of a Change Order in advance of final execution by all parties in accordance with Section 11.9.

11.1.1 Owner**/ODR**, without invalidating the Contract and without prior approval of the surety, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, and the Contract Sum and the Contract Time will be adjusted accordingly. All such changes in the Work shall be authorized by Change Order or ULCO, and shall be performed under the applicable conditions of the Contract Documents. If such changes cause an increase or decrease in Contractor's cost of, or time required for, performance of the Contract, an equitable adjustment shall be made and confirmed in writing in a Change Order or a ULCO.

11.1.2 It is recognized by the parties hereto and agreed by them that the Specifications and Drawings may not be complete or free from errors, omissions and imperfections or that they may require changes or additions in order for the Work to be completed to the satisfaction of Owner and **ODR** that, accordingly, it is the express intention of the parties, notwithstanding any other provisions in this Contract, that any errors, omissions or imperfections in such Specifications and Drawings, or any changes in or additions to same or to the

40

Work ordered by Owner and any resulting delays in the Work or increases in Contractor's costs and expenses arising out of such errors, shall not constitute or give rise to any claim, demand or cause of action of any nature whatsoever in favor of Contractor, whether for breach of Contract, or otherwise; provided, however, that Owner shall be liable to Contractor for the sum stated to be due Contractor in any Change Order approved and signed by both parties, it being agreed hereby that such sum, together with any extension of time contained in said Change Order, shall constitute full compensation to Contractor for all costs, expenses and damages to Contractor, as permitted under Tex. Gov't Code, Chapter 2260.

11.1.3 Procedures for administration of Change Orders shall be established by **ODR** and stated in Supplementary General Conditions, Special Conditions, or elsewhere in the Contract Documents.

11.1.4 No verbal order, verbal statement, or verbal direction of Owner or **ODR** shall be treated as a change under this article or entitle Contractor to an adjustment.

11.1.5 Contractor agrees that Owner or **ODR** shall have access and the right to examine any directly pertinent books, documents, papers, and records of Contractor. Further, Contractor agrees to include in all its subcontracts a provision to the effect that Subcontractor agrees that Owner or **ODR** shall have access to and the right to examine any directly pertinent books, documents, papers and records of such Subcontractor relating to any claim arising from the Contract, whether or not the Subcontractor is a party to the claim. The period of access and examination described herein which relates to appeals under the Disputes article of the Contract, litigation, or the settlement of claims arising out of the performance of the Contract shall continue until final disposition of such claims, appeals or litigation.

11.2   Unit Prices. If unit prices are stated in the Contract Documents, and if the quantities originally contemplated are so changed in a Proposed Change Order that application of the agreed unit prices to the quantities of work proposed will cause substantial inequity to Owner or Contractor, the applicable unit prices shall be equitably adjusted as agreed to by the parties and incorporated into a Change Order.

11.3   Claims for Additional Costs.

11.3.1 If Contractor wishes to make a claim for an increase in the Contract Sum not related to a requested change, they shall give ODR and A/E written notice thereof within twenty-one (21) days after the occurrence of the event giving rise to such claim, but, in any case before proceeding to execute the Work considered to be additional cost or time, except in an emergency endangering life or property in which case Contractor shall act in accordance with Subsection 8.2.1. No such claim shall be valid unless so made. If ODR and Contractor cannot agree on the amount of the adjustment in the Contract Sum, it shall be determined as set forth under Article 15. Any change in the Contract Sum resulting from such claim shall be authorized by a Change Order or a ULCO.

41

11.3.2 If Contractor claims that additional cost is involved because of, but not limited to, 1) any written interpretation of the Contract Documents, 2) any order by **ODR** to stop the Work pursuant to Article 14 where Contractor was not at fault, or 3) any written order for a minor change in the Work issued pursuant to Section 12.4, Contractor shall make such claim as provided in Subsection 12.3.1.

11.3.3 Should Contractor or his Subcontractors fail to call attention of A/E to discrepancies or omissions in the Contract Documents, but claim additional costs for corrective Work after Contract award, Owner may assume intent to circumvent competitive bidding for necessary corrective Work.  In such case, Owner may choose to let a separate Contract for the corrective Work, or issue a ULCO to require performance by Contractor.  Claims for time extensions or for extra cost resulting from delayed notice of patent Contract Document discrepancies or omissions will not be considered by Owner.

11.4    Minor Changes.  A/E, with concurrence of ODR, will have authority to order minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time.   Such changes shall be effected by written order which Contractor shall carry out promptly and record on as-built record documents.

11.5    Concealed Site Conditions.  Contractor is responsible for visiting the Site and being familiar with local conditions such as the location, accessibility, and general character of the Site and/or building.  If, in the performance of the Contract, subsurface, latent, or concealed conditions at the Site are found to be materially different from the information included in the Contract Documents, or if unknown conditions of an unusual nature are disclosed differing materially from the conditions usually inherent in Work of the character shown and specified, ODR and A/E shall be notified in writing of such conditions before they are disturbed.  Upon such notice, or upon its own observation of such conditions, A/E, with the approval of ODR, will promptly make such changes in the Drawings and Specifications as they deem necessary to conform to the different conditions, and any increase or decrease in the cost of the Work, or in the time within which the Work is to be completed, resulting from such changes will be adjusted by Change Order, subject to the prior approval of ODR.

11.6    Extension of Time.  All changes to the Contract Time shall be made as a consequence of requests as required under Section 10.6, and as documented by Change Order as provided under Section 12.1.

11.7    Administration of Change Order Requests.  All changes in the Contract shall be administered in accordance with procedures approved by **ODR**, and when required, make use of such electronic information management system(s) as **ODR** or Owner may employ.

11.7.1 Routine changes in the construction Contract shall be formally initiated by **ODR** or A/E by means of a PCO form detailing requirements of the proposed change for pricing by Contractor.  This action may be preceded by communications between Contractor, A/E and ODR concerning the need and nature of the change, but such communications shall not constitute a basis for

42

beginning the proposed Work by Contractor.  Except for emergency conditions described below, approval of Contractor's cost proposal by A/E and ODR will be required for authorization to proceed with the Work being changed.  **ODR** will not be responsible for the cost of Work changed without prior approval and Contractor may be required to remove Work so installed.

11.7.2  All proposed costs for change order Work must be supported by itemized accounting of material, equipment and associated itemized installation costs in sufficient detail, following the outline and organization of the established Schedule of Values, to permit analysis by A/E and ODR using current estimating guides and/or practices.  Photocopies of Subcontractor and vendor proposals shall be furnished unless specifically waived by ODR.  Contractor shall provide written response to a change request within twenty-one (21) days of receipt.

11.7.3  Any unexpected circumstance which necessitates an immediate change in order to avoid a delay in progress of the Work may be expedited by verbal communication and authorization between Contractor and **ODR**, with written confirmation following within twenty-four (24) hours.  A limited scope not-to-exceed estimate of cost and time will be requested prior to authorizing Work to proceed.  Should the estimate be impractical for any reason, ODR may authorize the use of detailed cost records of such work to establish and confirm the actual costs and time for documentation in a formal Change Order.

11.7.4  Emergency changes to save life or property may be initiated by Contractor alone (see Section 7.3) with the claimed cost and/or time of such work to be fully documented as to necessity and detail of the reported costs and/or time.

11.7.5  The method of incorporating approved Change Orders into the parameters of the accepted Schedule of Values must be coordinated and administered in a manner acceptable to ODR.

11.8    Pricing Change Order Work.  The amounts that Contractor and/or its Subcontractor adds to a Change Order for profit and overhead will also be considered by Owner before approval is given. The amounts established hereinafter are the maximums that are acceptable to Owner.

11.8.1  For Work performed by its forces, Contractor will be allowed their actual costs for materials, *equipment charges*, the total amount of wages paid for labor, plus the total cost of State and Federal payroll taxes and of worker's compensation and comprehensive general liability insurance, plus additional bond and builders risk insurance cost if the change results in an increase in the premium paid by Contractor.  To the total of the above costs, Contractor will be allowed to add a percentage as noted below to cover overhead and profit combined.

Allowable percentages for overhead and profit on any specific change shall not exceed fifteen (15) percent for the first $10,000 of value for self-performed work or portion thereof, ten (10) percent for the second $10,000 of

43

value for self-performed work or portion thereof and seven and a half (7.5) percent for any value of the self-performed work that exceeds $20,000.

11.8.2   For subcontracted Work each affected Subcontractor shall figure its costs, overhead and profit as described above for Contractor's Work, all Subcontractor costs shall be combined, and to that total Subcontractor cost

Contractor will be allowed to add a maximum mark-up of ten (10) percent for the first $10,000 of subcontracted Work value or portion thereof, seven and half (7.5) percent for the second $10,000 of subcontracted Work value or portion thereof, and five (5) percent for any value of the subcontracted Work exceeding $20,000.

11.8.3   On changes involving both additions and deletions, percentages for overhead and profit will be allowed only on the net addition.  Owner does not accept and will not pay for additional Contract cost identified as indirect or consequential damages.

11.8.4   For Contracts based on a Guaranteed Maximum Price (GMP), the Construction Manager-at-Risk or Design Builder shall NOT be entitled to a percentage mark-up on any Change Order Work unless the Change Order increases the Guaranteed Maximum Price.

11.9    Not Applicable.

11.10   Not Applicable.

# Article 12.  Project Completion and Acceptance

12.1    Closing Inspections.

12.1.1   Substantial Completion Inspection. When Contractor considers the entire Work or part thereof Substantially Complete, it shall notify ODR in writing that the Work will be ready for Substantial Completion inspection on a specific date.  Contractor shall include with this notice Contractor's Punch List to indicate that it has previously inspected all the Work associated with the request for inspection, noting items it has corrected and included all remaining work items with date scheduled for completion or correction prior to final inspection.  The failure to include any items on this list does not alter the responsibility of Contractor to complete all Work in accordance with the Contract Documents.  If any of the items on this list prevents the Project from being used as intended, Contractor shall not request a Substantial Completion Inspection.  Owner and **ODR** and its representatives will review the list of items and schedule the requested inspection, or inform Contractor in writing that such an inspection is premature because the Work is not sufficiently advanced or conditions are not as represented on Contractor's list.

12.1.1.1 Prior to the Substantial Completion inspection, Contractor shall furnish a copy of its marked-up Record Documents and a preliminary

44

copy of each instructional manual, maintenance and operating manual, parts catalog, wiring diagrams, spare parts, specified written warranties, and like publications or parts for all installed equipment, systems, and like items as described in the Contract Documents. Delivery of these items is a prerequisite for requesting the Substantial Completion inspection.

12.1.1.2 On the date requested by Contractor, or as mutually agreed upon pending the status of the Open Items List, A/E, ODR, Contractor, and other Owner representatives as determined by Owner will jointly attend the Substantial Completion inspection, which shall be conducted by ODR or their delegate. If ODR determines that the Work is Substantially Complete, ODR will issue a Certificate of Substantial Completion to be signed by A/E, Owner, and Contractor establishing the date of Substantial Completion and identifying responsibilities for security, maintenance, and insurance. A/E **(if applicable)** will provide with this certificate a list of Punch List items (the pre-final Punch List) for completion prior to final inspection. This list may include items in addition to those on Contractor's Punch List, which the inspection team deems necessary to correct or complete prior to final inspection. If Owner occupies the Project upon determination of Substantial Completion, Contractor shall complete all corrective Work at the convenience of Owner, without disruption to Owner's use of the Project for its intended purposes.

12.1.2  Final Inspection. Contractor shall complete the list of items identified on the pre-final Punch List prior to requesting a final inspection. Unless otherwise specified, or otherwise agreed in writing by the parties as documented on the Certificate of Substantial Completion, Contractor shall complete and/or correct all Work within thirty (30) days of the Substantial Completion date. Upon completion of the pre-final Punch List work, Contractor shall give written notice to ODR and A/E that the Work will be ready for final inspection on a specific date. Contractor shall accompany this notice with a copy of the updated pre-final Punch List indicating resolution of all items. On the date specified or as soon thereafter as is practicable, ODR, A/E and Contractor will inspect the Work. A/E will submit to Contractor a final Punch List of open items that the inspection team requires corrected or completed before final acceptance of the Work.

12.1.2.1 Correct or complete all items on the final Punch List before requesting Final Payment. Unless otherwise agreed to in writing by the parties, complete this work within seven (7) days of receiving the final Punch List. Upon completion of the final Punch List, notify A/E and ODR in writing stating the disposition of each final Punch List item. A/E, Owner, and Contractor shall promptly inspect the completed items. When the final Punch List is complete, and the Contract is fully satisfied according to the Contract Documents ODR will issue a

45

certificate establishing the date of Final Completion. Completion of all Work is a condition precedent to Contractor's right to receive Final Payment.

12.1.3  Annotation.  Any Certificate issued under this Article may be annotated to indicate that it is not applicable to specified portions of the Work, or that it is subject to any limitation as determined by Owner.

12.1.4  Purpose of Inspection.  Inspection is for determining the completion of the Work, and does not relieve Contractor of its overall responsibility for completing the Work in a good and competent fashion, in compliance with the Contract.  Work accepted with incomplete Punch List items or failure of Owner or other parties to identify Work that does not comply with the Contract Documents or is defective in operation or workmanship does not constitute a waiver of Owner's rights under the Contract or relieve Contractor of its responsibility for performance or warranties.

12.1.5  Additional Inspections.

12.1.5.1  If **ODR**'s inspection team determines that the Work is not substantially complete at the Substantial Completion inspection, ODR or A/E will give Contractor written notice listing cause(s) of the rejection.  Contractor will set a time for completion of incomplete or defective work acceptable to ODR.  Contractor shall complete or correct all work so designated prior to requesting a second Substantial Completion inspection.

12.1.5.2  If **ODR**'s inspection team determines that the Work is not complete at the final inspection, ODR or A/E will give Contractor written notice listing the cause(s) of the rejection.  Contractor will set a time for completion of incomplete or defective work acceptable to ODR. Contractor shall complete or correct all Work so designated prior to again requesting a final inspection.

12.1.5.3  The Contract contemplates three (3) comprehensive inspections: the Substantial Completion inspection, the Final Completion inspection, and the inspection of completed final Punch List items.  The cost to Owner of additional inspections resulting from the Work not being ready for one or more of these inspections is the responsibility of Contractor.  Owner may issue a ULCO deducting these costs from Final Payment.  Upon Contractor's written request, Owner will furnish documentation of any costs so deducted.  Work added to the Contract by Change Order after Substantial Completion inspection is not corrective Work for purposes of determining timely completion, or assessing the cost of additional inspections.

12.1.6  Phased Completion. The Contract may provide, or Project conditions may warrant, as determined by ODR, that designated elements or parts of the Work be

46

completed in phases. Where phased completion is required or specifically agreed to by the parties, the provisions of the Contract related to closing inspections, occupancy, and acceptance apply independently to each designated element or part of the Work. For all other purposes, unless otherwise agreed by the parties in writing, Substantial Completion of the Work as a whole is the date on which the last element or part of the Work completed receives a Substantial Completion certificate. Final Completion of the Work as a whole is the date on which the last element or part of the Work completed receives a Final Completion certificate.

12.2   Owner's Right of Occupancy. Owner may occupy or use all or any portion of the Work following Substantial Completion, or at any earlier stage of completion. Should Owner wish to use or occupy the Work, or part thereof, prior to Substantial Completion, ODR will notify Contractor in writing and identify responsibilities for security and maintenance Work performed on the premises by third parties on Owner's behalf does not constitute occupation or use of the Work by Owner for purposes of this Article. All Work performed by Contractor after occupancy, whether in part or in whole, shall be at the convenience of Owner so as to not disrupt Owner's use of, or access to occupied areas of the Project.

12.3   Acceptance and Payment

12.3.1   Request for Final Payment. Following the certified completion of all work, including all final Punch List items, cleanup, and the delivery of record documents, Contractor shall submit a certified Application for Final Payment and include all sums held as retainage and forward to A/E and ODR for review and approval.

12.3.2   Final Payment Documentation. Contractor shall submit, prior to or with the Application for Final Payment, final copies of all close out documents, maintenance and operating instructions, guarantees and warranties, certificates, Record Documents and all other items required by the Contract. Contractor shall submit evidence of return of access keys and cards, evidence of delivery to Owner of attic stock, spare parts, and other specified materials. Contractor shall submit consent of surety to Final Payment form and an affidavit that all payrolls, bills for materials and equipment, subcontracted work and other indebtedness connected with the Work, except as specifically noted, are paid, will be paid, after payment from Owner or otherwise satisfied within the period of time required by Tex. Gov't Code, Chapter 2251. Contractor shall furnish documentation establishing payment or satisfaction of all such obligations, such as receipts, releases and waivers of claims and liens arising out of the Contract. Contractor may not subsequently submit a claim on behalf of Subcontractor or vendor unless Contractor's affidavit notes that claim as an exception.

12.3.3   Architect/Engineer Approval. A/E will review a submitted Application for Final Payment promptly but in no event later than ten (10) days after its receipt. Prior to the expiration of this deadline, A/E will either: 1) return the Application for Final Payment to Contractor with corrections for action and

47

resubmission; or 2) accept it, note their approval, and send to Owner.

12.3.4 <u>Offsets and Deductions</u>.  **ODR** may deduct from the Final Payment all sums due from Contractor.  If the Certificate of Final Completion notes any Work remaining, incomplete, or defects not remedied, **ODR** may deduct the cost of remedying such deficiencies from the Final Payment.  On such deductions, **ODR** will identify each deduction, the amount, and the explanation of the deduction on or by the twenty-first (21st) day after **ODR**'s receipt of an approved Application for Final Payment.  Such offsets and deductions shall be incorporated via a final Change Order, including a ULCO as may be applicable.

12.3.5 <u>Final Payment Due</u>.  Final Payment is due and payable by **ODR**, subject to all allowable offsets and deductions, on the thirtieth (30th) day following **ODR**'s approval of the Application for Payment.  If Contractor disputes any amount deducted by **ODR**, Contractor shall give notice of the dispute on or before the thirtieth (30th) day following receipt of Final Payment.  Failure to do so will bar any subsequent claim for payment of amounts deducted.

12.3.6 <u>Effect of Final Payment</u>.  Final Payment constitutes a waiver of all claims by Owner and **ODR**, relating to the condition of the Work except those arising from:

12.3.6.1 Faulty or defective Work appearing after Substantial Completion (latent defects);

12.3.6.2 Failure of the Work to comply with the requirements of the Contract Documents;

12.3.6.3 Terms of any warranties required by the Contract, or implied by law; or

12.3.6.4 Claims arising from personal injury or property damage to third parties.

12.3.7 <u>Waiver of Claims</u>.  Final payment constitutes a waiver of all claims and liens by Contractor except those specifically identified in writing and submitted to ODR prior to the application for Final Payment.

12.3.8 <u>Effect on Warranty</u>.  Regardless of approval and issuance of Final Payment, the Contract is not deemed fully performed by Contractor and closed until the expiration of all warranty periods.

## Article 13.  Warranty and Guarantee

13.1 <u>Contractor's General Warranty and Guarantee</u>.  Contractor warrants to **ODR** that all Work is executed in accordance with the Contract, complete in all parts and in accordance

48

with approved practices and customs, and of the required finish and workmanship. Contractor further warrants that unless otherwise specified, all materials and equipment incorporated in the Work under the Contract are new. **ODR** may, at its option, agree in writing to waive any failure of the Work to conform to the Contract, and to accept a reduction in the Contract price for the cost of repair or diminution in value of the Work by reason of such defect. Absent such a written agreement, Contractor's obligation to perform and complete the Work in accordance with the Contract Documents is absolute and is not waived by any inspection or observation by ODR, A/E or others, by making any progress payment or final payment, by the use or occupancy of the Work or any portion thereof by Owner, at any time, or by any repair or correction of such defect made by Owner or **ODR**.

13.2    Warranty Period.  Except as may be otherwise specified or agreed, Contractor shall repair all defects in materials, equipment, or workmanship appearing within one year from the date of Substantial Completion of the Work.  If Substantial Completion occurs by phase, then the warranty period for that particular Work begins on the date of such occurrence, or as otherwise stipulated on the Certificate of Substantial Completion for the particular Work.

13.2.1 *Specific requirements for warranties and guarantees to include parts, labor, and other costs are noted in various sections of the technical specifications. Manufacture's warranties and guarantees are required for, but not limited to, the following: [Add or delete from list as required by Project]*

*Membrane Waterproofing ................................. 2 years*
*Urethane Roofing System ................................ 20 years*
*Joint Sealers .......................................... 2 years*
*Insulated Glass ....................................... 5 years*
*Aluminum Doors & Frames ............................... 3 years*
*Wood & Plastic Faced Doors .......... Life of installation*
*Upward Acting Doors ................................... 5 years*
*Mirror Glazing ....................................... 5 years*
*Window Wall System ................................... 2 years*
*Access Flooring ...................................... 5 years*
*Dampproofing ......................................... 2 years*
*Water Repellant Coating .............................. 5 years*
*Sheet Metal & Flashing ............................... 2 years*
*Roof Hatches ......................................... 2 years*
*Door Closers ......................................... 5 years*
*Metal Windows ........................................ 2 years*
*Curtain Wall/Skylights ............................... 2 years*
*Fixed Seating ........................................ 10 years*
*Carpet ............................................... 15 years*
*Chalkboard Surfaces .................................. 50 years*
*Dock Lift ............................................ 2 years*
*Prefabricated Environmental Box ...................... 10 years*
*Environmental Box Refrigeration*
   *Systems and Controls .............................. 2 years*

49

*Air Conditioning and*
   *Refrigeration Systems.....................................2 years*
*HVAC Controls...................................................2 years*
*Variable Speed Controllers...............................3 years*

*Until receipt of these guarantees, final inspection will not be conducted nor final payment released.*

13.3   <u>Limits on Warranty</u>.  Contractor's warranty and guarantee hereunder excludes defects or damage caused by:

   13.3.1  Modification or improper maintenance or operation by persons other than Contractor, Subcontractors, or any other individual or entity for whom Contractor is not responsible, unless Owner or **ODR** is compelled to undertake maintenance or operation due to the neglect of Contractor.

   13.3.2  Normal wear and tear under normal usage after acceptance of the Work by Owner.

13.4   <u>Events Not Affecting Warranty</u>.  Contractor's obligation to perform and complete the Work in a good and workmanlike manner in accordance with the Contract Documents is absolute.  None of the following will constitute an acceptance of defective Work that is not in accordance with the Contract Documents or a release of Contractor's obligation to perform the Work in accordance with the Contract Documents:

   13.4.1  Observations by **ODR** and/or A/E;

   13.4.2  Recommendation to pay any progress or final payment by A/E;

   13.4.3  The issuance of a certificate of Substantial Completion or any payment by **ODR** to Contractor under the Contract Documents;

   13.4.4  Use or occupancy of the Work or any part thereof by Owner**;**

   13.4.5  Any acceptance by **ODR** or any failure to do so;

   13.4.6  Any review of a Shop Drawing or sample submittal; or

   13.4.7  Any inspection, test or approval by others.

13.5   <u>Separate Warranties</u>.  If a particular piece of equipment or component of the Work for which the Contract requires a separate warranty is placed in continuous service before Substantial Completion, the warranty period for that equipment or component will not begin until Substantial Completion, regardless of any warranty agreements in place between suppliers and/or Subcontractors and Contractor.  ODR will certify the date of service commencement in the Substantial Completion certificate.

50

13.5.1  In addition to Contractor's warranty and duty to repair, Contractor expressly assumes all warranty obligations required under the Contract for specific building components, systems and equipment.

13.5.2 Contractor may satisfy any such obligation by obtaining and assigning to **ODR** a complying warranty from a manufacturer, supplier, or Subcontractor. Where an assigned warranty is tendered and accepted by **ODR** which does not fully comply with the requirements of the Contract, Contractor remains liable to **ODR** on all elements of the required warranty not provided by the assigned warranty.

13.6    Correction of Defects.  Upon receipt of written notice from Owner, or any agent of Owner designated as responsible for management of the warranty period, of the discovery of a defect, Contractor shall promptly remedy the defect(s), and provide written notice to Owner and designated agent indicating action taken.   In case of emergency where delay would cause serious risk of loss or damage to Owner, or if Contractor fails to remedy within thirty (30) days, or within another period agreed to in writing, Owner**/ODR** may correct the defect and be reimbursed the cost of remedying the defect from Contractor or its surety.

13.7    Certification of No Asbestos Containing Materials or Work.  Contractor shall ensure compliance with the Asbestos Hazard Emergency Response Act (AHERA– 40 C.F.R § 763-99(7)) from all Subcontractors and materials suppliers, and shall provide a notarized certification to Owner**/ODR** that all equipment and materials used in fulfillment of their Contract responsibilities are non Asbestos Containing Building Materials (ACBM).   This certification must be provided no later than Contractor's application for Final Payment.

## Article 14.  Suspension and Termination

14.1    Suspension of Work for Cause.  **ODR** may, at any time without prior notice, suspend all or any part of the Work, if after reasonable observation and/or investigation, **ODR** determines it is necessary to do so to prevent or correct any condition of the Work, which constitutes an immediate safety hazard, or which may reasonably be expected to impair the integrity, usefulness or longevity of the Work when completed.

14.1.1  **ODR** will give Contractor a written notice of suspension for cause, setting forth the reason for the suspension and identifying the Work suspended. Upon receipt of such notice, Contractor shall immediately stop the Work so identified.  As soon as practicable following the issuance of such a notice, **ODR** will initiate and complete a further investigation of the circumstances giving rise to the suspension, and issue a written determination of the findings.

14.1.2 If it is confirmed that the cause was within the control of Contractor, Contractor will not be entitled to an extension of time or any compensation for delay resulting from the suspension.  If the cause is determined not to have been within the control of Contractor, and the suspension has prevented Contractor from completing the Work within the Contract Time, the

51

suspension is an excusable delay and a time extension will be granted through a Change Order.

14.1.3  Suspension of Work under this provision will be no longer than is reasonably necessary to remedy the conditions giving rise to the suspension.

14.2    Suspension of Work for ODR's Convenience.  Upon seven (7) days written notice to Contractor, ODR may at any time without breach of the Contract suspend all or any portion of the Work for a period of up to thirty (30) days for its own convenience. Owner/**ODR** will give Contractor a written notice of suspension for convenience, which sets forth the number of suspension days for which the Work, or any portion of it, and the date on which the suspension of Work will cease.   When such a suspension prevents Contractor from completing the Work within the Contract Time, it is an excusable delay.  A notice of suspension for convenience may be modified by ODR at any time on seven (7) days written notice to Contractor.  If ODR suspends the Work for its convenience for more than sixty (60) consecutive days, Contractor may elect to terminate the Contract pursuant to the provisions of the Contract.

14.3    Termination by ODR for Cause.

14.3.1 Upon written notice to Contractor and its surety, **ODR** may, without prejudice to any right or remedy, terminate the Contract and take possession of the Site and of all materials, equipment, tools, construction equipment, and machinery thereon owned by Contractor under any of the following circumstances:

14.3.1.1 Persistent or repeated failure or refusal, except during complete or partial suspensions of work authorized under the Contract, to supply enough properly skilled workmen or proper materials;

14.3.1.2 Persistent disregard of laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, including ODR;

14.3.1.3 Persistent failure to prosecute the Work in accordance with the Contract, and to ensure its completion within the time, or any approved extension thereof, specified in the Contract;

14.3.1.4  Failure to remedy defective work condemned by ODR;

14.3.1.5 Failure to pay Subcontractors, laborers, and material suppliers pursuant to Tex. Gov't Code, Chapter 2251;

14.3.1.6  Persistent endangerment to the safety of labor or of the Work;

14.3.1.7  Failure to supply or maintain statutory bonds or to maintain required insurance, pursuant to the Contract;

14.3.1.8  Any material breach of the Contract; or

14.3.1.9  Contractor's insolvency, bankruptcy, or demonstrated financial inability to perform the Work.

14.3.2  Failure by Owner**/ODR** to exercise the right to terminate in any instance is not a waiver of the right to do so in any other instance.

14.3.3  Should Owner**/ODR** decide to terminate the Contract under the provisions of Section 14.3, it will provide to Contractor and its surety thirty (30) days prior written notice.

14.3.4  Should Contractor or its surety, after having received notice of termination, demonstrate to the satisfaction of Owner that Contractor or its surety are proceeding to correct such default with diligence and promptness, upon which the notice of termination was based, the notice of termination may be rescinded in writing by **ODR**.  If so rescinded, the Work may continue without an extension of time.

14.3.5  If Contractor or its surety fails, after written notice from **ODR** to commence and continue correction of such default with diligence and promptness to the satisfaction of **ODR** within thirty (30) days following receipt of notice, **ODR** may immediately terminate the contract and make arrangements for completion of the Work and deduct the cost of completion from the unpaid Contract Sum.

14.3.5.1  This amount includes the cost of additional **ODR** costs such as A/E services, other consultants, and contract administration.

14.3.5.2  **ODR** will make no further payment to Contractor or its surety unless the costs to complete the Work are less than the Contract balance, then the difference shall be paid to Contractor or its surety. If such costs exceed the unpaid balance, Contractor or its surety will pay the difference to **ODR**.

14.3.5.3  This obligation for payment survives the termination of the Contract.

14.3.5.4  **ODR** reserves the right in termination for cause to take assignment of all the Contracts between Contractor and its Subcontractors, vendors, and suppliers.  ODR will promptly notify Contractor of the contracts **ODR** elects to assume.  Upon receipt of such notice, Contractor shall promptly take all steps necessary to effect such assignment.

14.4    Conversion to Termination for Convenience.   In the event that any termination of Contractor for cause under Section 14.3 is later determined to have been improper, the termination shall automatically convert to a termination for convenience under Section 14.5 and Contractor's recovery for termination shall be strictly limited to the payments allowable under Section 14.5.

53

14.5    Termination for Convenience of **ODR**.  Owner reserves the right, without breach, to terminate the Contract prior to, or during the performance of the Work, for any reason.  Upon such an occurrence, the following shall apply:

14.5.1  **ODR** will immediately notify Contractor and A/E in writing, specifying the reason for and the effective date of the Contract termination.  Such notice may also contain instructions necessary for the protection, storage or decommissioning of incomplete work or systems, and for safety.

14.5.2  Upon receipt of the notice of termination, Contractor shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due at that point in the Contract:

14.5.2.1  Stop all work.

14.5.2.2  Place no further subcontracts or orders for materials or services.

14.5.2.3  Terminate all subcontracts for convenience.

14.5.2.4  Cancel all materials and equipment orders as applicable.

14.5.2.5  Take action that is necessary to protect and preserve all property related to the Contract which is in the possession of Contractor.

14.5.3  When the Contract is terminated for Owner/**ODR**'s convenience, Contractor may recover from **ODR** payment for all Work executed *before the notice of termination along with the actual and reasonable cost of any additional work required to secure the Project and property related to the Contract following the notice of termination. The Contractor will not be entitled to recover any other costs or damages arising from the termination for convenience of the ODR including, but not limited to, claims for lost business opportunities.*

14.6    Termination By Contractor.  If the Work is stopped for a period of ninety (90) days under an order of any court or other public authority having jurisdiction, or as a result of an act of government, such as a declaration of a national emergency making materials unavailable, through no act or fault of Contractor or Subcontractor or their agents  or employees or any other persons performing any of the Work under a contract with Contractor, then Contractor may, upon thirty (30) additional days written notice to ODR, terminate the Contract and recover from Owner payment for all Work executed, *before the work stoppage along with the actual and reasonable cost of securing the Project and property related to the Contract during the period of work stoppage. The Contractor will not be entitled to recover any other costs or damages arising from the work stoppage including, but not limited to, claims for lost business opportunities.*  If the cause of the Work stoppage is removed prior to the end of the thirty (30) day notice period, Contractor may not terminate the Contract, *but may be entitled to an equitable adjustment in the Contract Sum and Contract Time.*

54

14.7    Settlement on Termination.  When the Contract is terminated for any reason, at any time prior to one hundred eighty (180) days after the effective date of termination, Contractor shall submit a final termination settlement proposal to **ODR** based upon recoverable costs as provided under the Contract.  If Contractor fails to submit the proposal within the time allowed, **ODR** may determine the amount due to Contractor because of the termination and pay the determined amount to Contractor.

## Article 15.  Dispute Resolution

15.1    **Dispute resolution shall be set forth as per the attached Sample Contract or Master Agreement.**

15.2    Nothing herein shall hinder, prevent, or be construed as a waiver of Owner's right to seek redress on any disputed matter in a court of competent jurisdiction.

15.3    Nothing herein shall waive or be construed as a waiver of the State's sovereign immunity.

## Article 16.  Miscellaneous

16.1    Special Conditions.  When the Work contemplated by Owner is of such a character that the foregoing **SSC Uniform General and Supplementary Conditions** of the Contract cannot adequately cover necessary and additional contractual relationships, the Contract may include Special Conditions. Special Conditions shall relate to a particular Project and be unique to that Project but shall not weaken the character or intent of the **SSC Uniform General and Supplementary Conditions.**

16.2    Federally Funded Projects.  On Federally funded projects, Owner**/ODR** may waive, suspend or modify any Article in these **SSC Uniform General and Supplementary** Conditions which conflicts with any Federal statue, rule, regulation or procedure, where such waiver, suspension or modification is essential to receipt by Owner of such Federal funds for the Project.  In the case of any Project wholly financed by Federal funds, any standards required by the enabling Federal statute, or any Federal rules, regulations or procedures adopted pursuant thereto, shall be controlling.

16.3    Internet-based Project Management Systems.  At its option, **ODR** may administer its design and construction management through an Internet-based management system. In such cases, Contractor shall conduct communication through this media and perform all Project related functions utilizing this database system.   This includes correspondence, submittals, Requests for Information, vouchers or payment requests and processing, amendment, Change Orders and other administrative activities.
16.3.1  Accessibility and Administration.

16.3.1.1  When used, **ODR** will make the software accessible via the Internet to all Project team members.

16.3.1.2  ODR shall administer the software.

55

16.3.2  Training. When used, **ODR** shall provide training to the Project team members.

16.4  Not Applicable.

**This document is based on the 2010 Texas Facilities Commissions' Uniform General Conditions and apply to all Texas A&M University System and member institution construction projects managed by SSC Services for Education. All text shown in** *italics* **are changes incorporated into this UGSC from Texas A&M University System Facilities Planning & Construction.  All text shown in bold are SSC changes.**

# End of SSC Uniform General and Supplementary Conditions

## SSC SPECIAL CONDITIONS
### TEXAS A&M UNIVERSITY
### COLLEGE STATION
(FOR USE ON ALL PROJECTS)

**1.0** **GENERAL COORDINATION** The following supplements modify, change, delete from or add to the "SSC UNIFORM GENERAL AND SUPPLEMENTARY CONDITIONS." Where any Article of the SSC Uniform General and Supplementary Conditions is modified or any paragraph or clause thereof is modified or deleted by these supplements, the unaltered conditions of the article, paragraph, sub-paragraph or clause shall remain in effect.

**2.0** **LAWS GOVERNING CONSTRUCTION**

2.1  Prevailing Wage Schedules: The rates of pay for some classification which prevail in the locality of this Project can be found at http://www.tamus.edu/business/facilities-planning-construction/forms-guidelines-wage-rates/. Contribution by a worker toward retirement plans, health insurance, apprentice programs, etc., are part of the worker's pay; contributions by the employer are not. Contractors shall identify, briefly describe, and request a predetermination of rates for crafts (or apprentice programs) not included in the wage predetermination found in the link above.

2.2  Apprenticeship Program: Apprentices who are enrolled in a federally certified apprenticeship program may be used at the percentage rates of the journeyman scale stipulated in their apprenticeship agreement.

2.3  Applicable Codes:

- *National Fire Protection Association National Fire Codes, with emphasis on NFPA 1 and NFPA 101 - latest edition adopted by State Fire Marshall, Life Safety Code (LSC) and including all referenced standards.*
- *International Building Code - latest edition*
- *NFPA 45 Standard on Fire Protection for Laboratories Using Chemicals as applicable*
- *Texas Department of Licensing and Regulation (TDLR)*
- *Elimination of Architectural Barriers Act, Article 9102, Texas Civil Statutes and Texas Accessibility Standards (TAS)*
- *Elevators and Escalators, Health & Safety Code chapter 754 and 16TAC § 74*
- *ASME 17.1, 17.2, 17.3 and 18.1*
- *Boilers, Health & Safety Code chapter 755 and 16TAC § 65*
- *ASME Boiler and Pressure Vessel Code*
- *Americans with Disabilities Act, 28 CFR Part 35 Nondiscrimination on the Basis of Disability in State and Local Government Services, Final Rule, as published in the Federal Register Friday, July 26, 1991*
- *Fair Housing Act accessibility requirements for housing units.*
- *ACI – 318, building code requirements for reinforced concrete*

Page **1** of **15**

- *AISC, specification for the Design, Fabrication and Erection of Structural Steel*
- *Texas Department of Insurance requirements First Tier Coastal Counties wind load criteria*
- *FEMA 100 year flood plain designation*
- *TCEQ SWPPP Requirements*
- *International Mechanical Code latest edition*
- *International Plumbing Code latest edition*
- *International Fuel Gas Code latest edition*
- *ASHRAE 62.1 Indoor Air Quality Standard*
- *FM Global Standards for fire protection systems*
- *National Electric Code latest edition*
- *TIA/EIA Standards*
- *Energy Conservation Design Standard for New State Buildings (including major renovation projects), State Comptroller's Office, Government Code sec. 447.004 and 34 TAC § 19.32*
- *ASHRAE / IESNA 90.1 latest adopted Edition*
- *International Energy Conservation Code (IECC) latest adopted edition (Residential/Apartments)*
- *SECO Alternative Energy Evaluation Requirements*
- *SECO Water Efficiency Standards for State Buildings and Institutions of Higher Education Facilities - January 2011*
- *Design in accordance with good practice to achieve conventional ambient noise levels qualified in Noise Criteria (NC) defined in current ASHRAE Applications Volume, Chapter 42 and ANSI S1.8 Reference Quantities for Acoustical Levels – ASA 84.*

## 3.0  WORK HOURS

3.1  Work Hours: Normal work hours at TAMU are 8:00 a.m. to 5:00 p.m., Monday through Friday, exclusive of TAMU holidays. Project Work may be permitted on holidays at the option of TAMU at no additional cost to the ODR or TAMU, with prior written request and approval from the ODR at least 48 hours before the start of the holiday work.

   3.1.1  The Contractor may be allowed additional, or varied work hours, with prior written requested approval by the ODR.

   3.1.2  The Contractor shall limit use of the premises to the Project Work indicated and allow for TAMU occupancy and use during the construction.

3.2  TAMU Occupancy:  TAMU may occupy the adjacent spaces of facilities during the entire performance period of the contract. Cooperate fully with the TAMU representative and ODR during performance of work to minimize conflict and to facilitate TAMU usage. **SAFETY** is of a paramount concern. It is the sole responsibility of the Contractor to provide protective coverings, passage ways, barriers and any and all provisions as required to maintain required ADA/TAS approved means of egress and access and maintain all building exits as required by applicable Life Safety Codes. The Contractor is to coordinate with the ODR all work that may possibly affect building occupancy or continued **SAFE** use. Contractor is to provide

ODR advanced scheduling as required to successful notify TAMU facility administrative staff of his activities related to the Work. Contractor is to adequately staff and incorporate into his Proposal all additional labor, materials, and equipment required under this section.

**4.0  UTILITIES**

4.1  Utility Outage: When a utility outage affecting occupied facilities is necessary to perform the Project Work unless agreed upon prior to performing the work, the Contractor shall give written notice to ODR five (5) days in advance of a scheduled outage. TAMU or ODR personnel will perform disconnection and reconnection of utilities. Fourteen days advance notice is required for connection and disconnection of temporary utilities by TAMU including, but not limited to temporary water taps, electrical taps and other temporary site utilities

4.2  All information and documents regarding existing underground utilities, known to the ODR, will be made available to the Contractor. Contractor will be responsible for locating, marking, and protecting all underground utility lines during construction.

4.3  Should Contractor discover "Unknown Utilities", promptly notify the ODR's personnel for direction. Such piping systems and lines shall be treated as outlined above.

4.4  Procedures for notification if utility lines or piping systems are damaged during construction:

　　4.4.1  Facilities Services Communications Center @ 979-845-4311 and 9-911 if gas lines are damaged

　　4.4.2  ODR Project Manager

　　4.4.3  If unavailable, notify SSC/EDCS General Manager at 979-845-5317

**5.0  COMMUNICATIONS AND DATA** Work on telephone, fiber optic lines, data lines and other communication systems must be performed by TAMU IT personnel and/or their contractor(s). The Contractor shall coordinate his work with these agencies through the ODR.

**6.0 COORDINATION WITH OTHER WORK**

6.1  Coordination: Contractor shall coordinate work with the ODR, prior to beginning any Project Work. Additionally, prior to starting work each day, the Contractor's superintendent shall inform and coordinate with the ODR and others as may be required.

6.2  Contractor will be required to coordinate construction activities with other contractors and agencies under the direction of the ODR or TAMU personnel. This will include but is not limited to telephone, custodial, fire alarm, equipment maintenance, and grounds maintenance.

6.3  Contractor will be required to provide initial waxing of hard flooring per manufacturers requirements.

**7.0 <u>CRANES</u>** When a crane is necessary to perform the contract work, the crane delivery, placement and lift dates shall be coordinated with the ODR, TAMU Environmental Health and Safety, TAMU Transportation, and others as may be required such as Texas Department of Transportation and City of College Station. The Contractor shall give written notice to TAMU fourteen (14) days in advance of a required crane placement and lift. The Contractor shall submit a crane lift plan ("Crane Lift Plan") with the written notice of crane placement and lift. The Crane Lift Plan shall show the proposed crane location during the lift, the area of boom swing proposed for the lift, location and types of barricades, and affected streets, sidewalks, parking areas, and buildings. The area of boom swing shall be depicted as the arc of the boom for the proposed swing with a radius of the boom length if the boom were in the horizontal. Contractor shall comply with OSHA and ANSI safety standards for cranes.

**8.0  <u>PARKING, STORAGE, AND SITE RESTRICTIONS</u>**

8.1  Confine operations at the site to the areas permitted under the Contract Documents. Portions of the site beyond areas for which work is indicated are not to be disturbed. Comply with Owner's requirements concerning the Contractor's operations and use of the premises, parking, loading and unloading.

  8.1.1  Keep existing driveways and entrances serving the adjacent TAMU facilities and parking spaces clear and available to the visitors, staff and service vehicles at all times. Do not use these areas for parking or for storage of materials.

  8.1.2  Keep all storage areas free of debris, refuse, spills, leaks, stains, splashes and excess materials. All storage areas shall be maintained in a neat, clean, and safe condition. Do not unreasonably encumber the site with materials or equipment. Stockpiling of materials and the locations of storage sheds, trailers, or temporary field offices shall be confined to the area designated, area(s) shall be coordinated with TAMU.

  8.1.3  Contractor storage and parking are at the job site in an area to be designated by TAMU. Parking is not allowed on sidewalks, drives, or roadways. Do not block parking spaces. Contractor shall comply with the requirements of the coordination agreement plan presented at the preconstruction meeting. Contractors are required to purchase all TAMU required parking permits and incorporate this cost into their bids.

  8.1.4  Lock automobiles and other mechanized or motorized construction equipment, when parked and unattended, to prevent unauthorized use. Do not leave vehicles or equipment unattended with the motor running or the ignition key in place. Contractor shall not allow any construction equipment to park on adjacent streets at night.

  8.1.5  Designated roads shall be used for construction traffic. Contractor shall not close, block, or otherwise obstruct roads at any time without written permission of ODR and where required, the City of College Station. Contractor shall keep

all debris and mud off all sidewalks and streets. Immediately clean all debris and mud that is a result of contract operations.

8.1.6 TAMU is a smoke free and tobacco free campus. This includes cigarettes, cigars, e-cigarettes, vaping, smokeless tobacco and any other nicotine delivery products. There shall be no smoking on any TAMU property.

**9.0** **EXISTING FACILITIES AND CONDITIONS** Maintain the existing facilities in a safe and clean condition throughout the period work is being performed.

9.1 If available, areas designated around, or near the building will be made available for contractor staging and dumpsters. Coordinate with the ODR.

9.2 Prior to commencement of Project work, inspect areas in which work will be performed. Document and photograph existing conditions of structure, surfaces, equipment, and condition of surrounding properties, which could be misconstrued as damage resulting from demolition work or other contract operations. Inspection shall be verified, signed by, and filed with the Owner or ODR prior to starting work.

9.3 Any damage to the existing grounds or facilities caused by construction traffic or any construction operations shall be repaired or replaced by the Contractor to match or exceed existing undamaged conditions at no additional cost to the ODR or TAMU.

9.4 Contractor shall ensure that building plumbing systems within scope of work, are protected from freeze damage during periods of temperatures at or below freezing.

9.4.1 Contractor shall ensure that all new or replacement Hydronic Piping meets the latest TAMU Design Standards from UES. The Standards can be found at https://utilities.tamu.edu/wp-content/uploads/2016/08/TAMU-Design-Standards.pdf

9.5 Contractor shall ensure that any roof disturbed during construction must be repaired/replaced in a leak-free manner on the day of the disturbance. All disturbed roofs must be dried-in daily.

9.6 Curb Height(s): All new and/or re-roofing projects shall require curbs be constructed or modified to be a minimum of 8" above the finished roof. All new roof top equipment shall be installed a minimum of 8" AFR. All roof penetrations shall be repaired as per manufacturers recommendations for existing roof system. If roof warranty is in effect, roof shall be repaired as to not void current manufacturers warranty. If possible use roof contractor that installed the existing roof.

9.7 Structural Building Components: Unless indicated on the Contract Documents, do not cut or modify any structural building component (e.g. column, beam, floor slab) without prior approval of the ODR structural engineer. If an existing structural component is accidentally cut, the remedial design work shall be by a professional structural engineer licensed in the State of Texas. The Contractor is responsible for engaging the structural engineer and for payment of all design fees. The structural engineer shall be acceptable to the ODR and all structural designs shall be submitted to the ODR for review and approval.

  9.7.1 Core Drilling: Contractor must x-ray or use ground penetrating radar ("GPR") to locate rebar, post tensioned cables, conduits and other embedded items prior to core drilling slabs. Survey floor and pilot drill to locate all embedded items, rebar, conduits and post tensioned cables prior to core drilling slabs. Items damaged as a result of core drilling shall be repaired as specified in paragraph 9.5, structural building components at no additional cost to the ODR or TAMU.

9.8 Endangered Species: No activity is authorized that is likely to jeopardize the continued existence of a threatened or endangered species as listed or proposed for listing under the Federal Endangered Species Act (ESA), and/or the State of Texas Parks and Wildlife Code on Endangered Species, or to destroy or adversely modify the habitat of such species. Contractor shall notify ODR of any planned construction activities that might affect endangered species.

  9.8.1 If a threatened or endangered species is encountered during construction, the Contractor shall immediately cease work in the area of the encounter and notify the ODR, who will immediately implement actions in accordance with endangered species act and applicable State statutes. These actions shall include reporting the encounter to the Texas Parks and Wildlife Department, and obtaining any necessary approvals or permits to enable the work to continue. The Contractor shall not resume work in the area of the encounter until authorized to do so by the ODR.

9.9 Airport Restrictions: *[Include only when Project site is near an airport]* The Contractor shall verify that Construction activities and/or equipment do not constitute an obstruction of hazard to the flight paths of the nearby airport. The Federal Aviation Administration regulates airport airspace which may limit the height or working height of cranes, etc. This limitation is determined by FAA formula which, if exceeded, requires notification of and approval by FAA. A preliminary assessment will be provided, upon Contractor request, by the Airport Manager or other authority based on the construction equipment proposed to be used.

9.10 Archeological Discoveries: No activity which may affect a State Archeological Landmark is authorized until the Owner has complied with the provisions of the Texas Antiquities Code. The Owner has previously coordinated with the appropriate agencies and impacts to known cultural or archeological deposits have been avoided or mitigated. However, the Contractor may encounter unanticipated cultural or archeological deposits during Construction. Should an encounter occur the Contractor shall cease all work in the affected area and immediately notify the ODR. The ODR will take the appropriate notification steps and work will not resume until authorized by the ODR.

9.11 <u>Underground Utilities</u>

9.11.1    In accordance with State Law, all persons performing Work requiring digging or ground penetration are required to call 811 in advance and provide detailed information regarding planned Work. Notification shall occur not earlier than the 14th day prior to the date excavation is to begin or later than 48 hours before the excavation is to begin, excluding weekend and holidays. Additional information can be found at http://www.texas811.org

To increase the level of safety, TAMU has a policy that is more strict than State law* and requires an advance locate be performed for 1) any ground penetration on campus, to any depth, when mechanized equipment such as augers, trenchers, excavators, etc. will be used, and 2) for all other ground penetrations to a depth greater than 12 inches. Hand-digging or soft excavation is required whenever any excavation is performed to a depth less than 12 inches without a utility locate. An advance utility locate is always required if the excavation will be deeper than 12 inches. In the case of ground penetration resulting from agricultural tilling or other recurring instructional or research-based agricultural work on the TAMU campus, an exception to the requirement to perform an advance utility locate will be made after an initial utility locate is performed to determine the area to be tilled or worked is clear of underground utilities.

*State law requires that all persons performing work requiring digging or ground penetration to a depth of 16 inches or more are required to call 811 in advance and provide detailed information regarding planned work. By Texas Utilities Code, Title 5, Chapter 251 – Underground Facility Damage Prevention and Safety, a person who intends to excavate shall notify Texas 811 not earlier than the 14th day before the date the excavation is to begin or later than the 48th hour before the time the excavation is to begin, excluding Saturdays, Sundays, and legal holidays. Failure to comply with the Texas Utilities Code could result in a fine up to $1000 for the first offense, in addition to other potential liabilities.

TAMU is a member of the Texas 811 utility locate program. TAMU owns and is directly responsible for performing locates for the following utility systems: electrical, domestic water, chilled and heating hot water, sanitary and storm sewer, TAMU-owned natural gas, irrigation, and TAMU-owned telecommunications. **A locate request for all utility systems on campus is initiated by calling 811.**

*SSC Grounds Management is a contract service provider at TAMU responsible for all irrigation systems located on campus. Communications with SSC Grounds Management is through the TAMU Aggieworks Center at 979-458-5500, or the TAMU Communications Center at 979-845-4311. A locate request for irrigation systems on campus is initiated by calling 811. By calling*

*811, the TAMU Communications Center and SSC Grounds Management will be notified of the need for an irrigation system locate.*

Other utility systems NOT owned by TAMU, such as Atmos Energy's natural gas distribution and other third-party systems such as telecom, water, electrical, etc. must also be located prior to excavating or penetrating the ground. **A locate request for third-party owned utility systems on campus is initiated by calling 811.**

For additional information and assistance contact Utilities & Energy Services at 979-845-3234 or go to this website http://utilities.tamu.edu and look under **Digging on Campus?**

**FOR EMERGENCIES: An emergency excavation is sometimes necessary to respond to a situation that endangers life, health or property, or when service to the customer will be interrupted. When an emergency locate is needed on the TAMU campus, both Texas 811 and the TAMU Communications Center (at 979-845-4311) shall be contacted promptly with details of the emergency. The same information required on the Texas 811 Utility Locate Required Information form under normal conditions will also be required with an emergency.**

9.11.1.1  Routine Utility Locate Request Procedure:

9.11.1.1.1 The locate requestor is responsible to clearly mark the site perimeter to be excavated or penetrated, by using water-based white paint and/or white flags, prior to calling Texas 811.

9.11.1.1.2 Call 811 to request a utility locate. After clearly marking the site perimeter where locate will be performed, requestor must have the Texas 811 Utility Locate Required Information form completed and available.

9.11.1.1.3 The utility locator(s) will mark buried lines with paint and/or flags within the marked excavation perimeter. Utility flag colors are red for electric, orange for telecom, yellow for fuel gas, green for sanitary sewer, and blue for all other water systems.

9.11.1.1.4 The requestor shall not commence any digging, excavation, or ground penetration for at least two full working days (48 hours, excluding weekends and holidays) after the locate request is made.

9.11.1.1.5 If digging, excavation, or ground penetration must be performed more than 14 days after the initial locate is performed, then the requestor/excavator must request another locate at least 48 hours (excluding weekends and holidays) in advance of ground penetration so the locate markings can be refreshed.

**10.0 <u>FIRE REGULATIONS</u>**

10.1  Comply with National Fire Protection Association, NFPA 241 guidelines. The Contractor shall use no explosives or fire in performing the work. Contractor shall understand and comply with OSHA welding and cutting requirements. If hot work is required, a hot work permit shall be obtained by coordination with TAMU Environmental Health and Safety through the ODR.

10.2  Coordinate all work on existing fire alarm and fire suppression systems with the ODR and TAMU Environmental Health and Safety prior to the start of Project Work. Any work that could cause dust, smoke or fumes must be coordinated with the ODR prior to commencing so the fire alarm system can be modified and protected as necessary if system is active. Contractor is required to cover and uncover fire alarm devices daily.

10.3  Contractor is required to temporarily replace existing smoke detectors with heat detectors during all interior renovations in the following buildings:

- Memorial Student Center (MSC); Building No. 0454
- Rudder Tower; Building No. 0446
- Jack K. Williams Administration Building (JKW); Building No. 0473
- Student Recreation Center; Building No. 1560

The temporary replacement of these devices should include the entire area of construction that will be affected by dust and debris.  It is the sole responsibility of the Contractor, at the end of the project, to re-install the smoke detectors and remove temporary heat detectors.

**11.0 <u>CLEAN UP</u>**  The Contractor shall dispose of all trash, debris, refuse, garbage, etc., which is generated by the Contractor during the Project Work. Building sites shall be cleaned on a daily basis and disposal shall be outside the limits of TAMU property. Contractor shall routinely empty dumpsters to prevent windblown debris. Disposal shall be by sanitary landfill or other approved methods and shall conform to all local, state, and federal guidelines, criteria, and regulations. Any building material that the Contractor is required to dispose of shall not be shown or discussed on social media, either with or without intent to be sold or provided to anyone else.

**12.0 <u>ENERGY CONSERVATION</u>** The Contractor shall use good judgement in the conservation of utilities. Prevailing energy conservation practices shall be adhered to and enforced by the Contractor.

**13.0 <u>SPECIAL STORAGE</u>**

13.1  Petroleum Storage:

13.1.1  The Contractor shall store all fuel or petroleum products, whether new or used, in appropriate containers and within a bermed area with an impermeable liner (40 mil) or other approved containment measures.  All storage areas shall be marked with appropriate signage (i.e., Flammable Storage - No Smoking Within 50 ft).  All fuel tanks and petroleum storage

containers shall be structurally sound and in good condition, be kept sealed when not in use, and be grounded and bonded according to NFPA Requirements.

13.1.2 The containment area shall be sized to hold fluid volume equal to 110% of the largest storage container, with a minimum of one foot of freeboard for earthen berms. The Contractor shall immediately clean up and dispose of any evidence of a fuel or oil spill in conformance with all federal and state regulations at no additional cost to the ODR or Owner. Any areas that incur contamination by any hazardous substance shall be immediately remediated by the contractor at no additional expense to ODR. Any fuel or oil spill shall immediately be reported to the ODR and TAMU Environmental Health and Safety. Costs of all soil tests as a result of spills shall be a responsibility of the contractor.

13.1.3 The Contractor shall remove earthen berms at the completion of the job and restore the area to its original condition.

13.1.4 The Contractor shall keep all other storage areas free of debris, leaks, stains, or splashes. All storage areas shall be maintained in a neat, clean, and safe condition. Remediation may include subsequent soil analysis if directed by TAMU or the ODR. The Contractor shall store all paints, thinners, solvents and other hazardous materials in a contractor supplied trailer or storage unit, which shall be secured when not in use.

**14.0 <u>TESTING</u>** Testing indicated in these Contract Documents to be performed by TAMU, Contractor or the ODR will be performed at the option of TAMU. ODR will engage a special inspector and qualified testing and inspecting agency to perform field tests and inspections and prepare test reports.

**15.0 <u>SAFETY</u>**

15.1 Comply with all applicable Occupations Safety and Health Act (OSHA) Standards and Regulations.

15.2 For accident reporting, comply with SSC requirements to file written reports and immediately notify ODR and SSC Safety/Risk Manager at 979-575-3879.

15.3 Furnish and install all necessary safeguards to provide safety and protection of the public and TAMU property adjacent to the contract work area. Comply with all Applicable Laws related to the safety of the public and TAMU property while performing contract operations.

15.4 Speed Limit: Contractor shall notify all employees and subcontractors of the speed limit of the adjacent streets and ensure all personnel understand and comply with this requirement.

15.5 Temporary Roads and Paved Areas: Construct and maintain temporary roads and paved areas adequate to support loads and to withstand exposure to traffic during contract operations.

15.6 Temporary Traffic Controls: Furnish and install Temporary Traffic Controls ("TTC") in accordance with the Texas Manual on Uniform Traffic Control Devices ("TMUTCD"). Submit a TTC plan for vehicular and pedestrian traffic to the ODR and project engineer for approval prior to the start of construction operations. Pedestrian traffic control plans shall provide a safe, convenient and accessible travel path that replicates as nearly as possible the most desirable characteristics of the existing sidewalks or footpaths throughout all phases of construction. Provide for continuous operation of signs and barricades designating restricted or dangerous conditions including but not limited to: illuminated barricades, danger signals, warning signs and obstructions.

15.7 Accessible Routes: Accessible routes for the disabled shall be kept accessible and safe at all times or alternate routes shall be constructed and signed in accordance with the Texas Accessibility Standards. Revised alternate routes shall require approval by the ODR and Owner.

15.8 Site Safety: Do not leave the work areas in an unsecured or unsafe condition at any time during operations. Contractor personnel and equipment operators shall monitor their surroundings at all times and be alert for people moving in or adjacent to contract work areas. Contractor shall use spotters when moving vehicles through the construction sites and no construction vehicles (e.g. backhoes, bobcats, etc.) shall be left unsecured on site. Contractor shall furnish and install temporary fences, barricades, signs and other required items to:

    15.8.1 Warn/notify adjacent building occupants

    15.8.2 Protect construction materials

    15.8.3 Prevent unauthorized personnel from entering the construction site.

    15.8.4 Redirect vehicular and pedestrian traffic flow when required to perform Work; comply with paragraph 15.5 above, Temporary Traffic Controls TTC.

15.9 Prior to spraying paint, coatings or power washing exterior structures the following criteria shall be met:

    15.9.1 Contractor shall provide ODR and TAMU forty eight (48) hours' notice prior to spraying any material, including primer, paint or coatings.

    15.9.2 Consider use of dryfall paint when spray painting large areas of structure (e.g. metal building frames) or materials by conventional or airless spray.

    15.9.3 The Contractor shall provide all necessary barricades, signs, warning of spray area as determined in the preconstruction conference. The Contractor shall set these signs out the night before spraying begins.

    15.9.4 The Contractor shall be responsible for the removal of signs and barricades at the completion of the job.

15.9.5 The Contractor shall protect any automobile, bicycle, vehicle or other property which is located in a warning area where contact with the property owner has not been made before the commencement of work.

15.9.6 The Contractor shall employ approved wind screens, protective shrouds and other protection methods during all paint and coating applications. The Contractor is responsible for all overspray and shall have sole liability where damage occurs as a result of this work.

15.9.7 Spray equipment shall be as recommended by the materials manufacturer. Spray operations shall be performed only during adequate period calm weather with winds not exceeding 15 miles per hour. Protect all property from overspray or other damage.

15.9.8 To prevent sparking a flammable substance, smoking and other sources of flame near spray painting operations are prohibited and tools shall be properly rated and grounded for work in a spray painting area.

**16.0  LANDSCAPING** Take appropriate measures to prevent injury to landscaping in or near the worksite. Do not remove or prune any landscaping without the approval from the ODR. Plants which are damaged during work shall be replaced at no expense to TAMU or the ODR. Unless required by the contract documents, the ODR shall coordinate removal of all trees, tree branches, shrubs and plants that will interfere the Project Work. Actively nesting birds shall not be disturbed unless approved by the ODR. Disturbing actively nesting migratory birds will also require a permit to be obtained from the U.S. Fish and Wildlife Service.

**17.0  ENVIRONMENTAL REQUIREMENTS**

17.1 Compliance with Environmental Laws:  The Contractor and all subcontractors shall comply with any and all applicable federal, state, and local laws, regulations, ordinances, policies and standards ("Applicable Laws") related to environmental matters. Contractor and all subcontractors shall comply with all current TAMU/EHS and State of Texas Storm Water Pollution Prevention Plan (SWPPP) regulations. Please refer to the following links:
https://ehsd.tamu.edu
http://www.tceq.state.tx.us/assets/public/permitting/waterquality/attachments/stormwater/txr15largepri.pdf
https://www.tceq.texas.gov/assets/public/permitting/stormwater/txr15smallsite.pdf

17.2 PCB Ballast Disposal Requirements:  The transporting and disposal of lighting ballasts is subject to Environmental Protection Agency (EPA), D.O.T. and State of Texas laws, codes and guidelines. Any ballast that is not specifically marked "No PCB's" shall be considered to contain PCB's and shall be transported to an EPA approved incinerator and destroyed by incineration. Contractor shall furnish ODR with copies of tickets before and after transportation and a certificate of destruction from the firm that destroys the ballasts. The disposal company must be approved by the ODR. Contractors involved in projects that include the removal and/or disposal of fluorescent, mercury vapor, or HID Sodium Vapor lamps shall comply with the requirements of this section. Fluorescent lamps have been determined, by the TCEQ, to be hazardous waste and must be managed in accordance with

40 CFR 260-279, and 30 TAC 330-335. The Contractor shall immediately notify the ODR when activities involving the removal of the aforementioned lamps begin.

17.3 Nuisance and Polluting Activity Prohibited:  Polluting, dumping, or discharging of any harmful, nuisance, or regulated materials (such as concrete truck washout, vehicle maintenance fluids, residue from saw cutting operations, solid waste and hazardous substances) into building drains, site drains, streams, waterways, holding ponds or to the ground surface shall not be permitted. The Contractor shall be held responsible for any damages that may result. Further, the Contractor shall conduct activities in such a fashion to avoid creating any legal nuisance, including but not limited to, suppressing noise and dust, controlling erosion, and implementing other measures as necessary to minimize off-site impacts of work activities.

17.4 Asbestos Removal:  If, in the process of performing the Work, the Contractor suspects that asbestos has been found, the ODR shall be notified immediately. The ODR shall cause the suspicious material to be tested and, if found to be asbestos, will be responsible for its removal. It will be the Contractor's responsibility to protect its workers and other persons by regulating access to the affected area. Should the Contractor encounter previously unidentified and suspect asbestos-containing materials ("ACM"), mold, hazardous or potentially hazardous material or suspected lead containing paint which must be disturbed to comply with the Contract Documents, the Contractor shall cease all work that would disturb the suspect material and shall immediately notify the ODR.

17.5 Contractor is responsible for all materials brought on site, including hazardous materials. All hazardous waste or special waste generated by the Contractor as a result of its operations shall be identified, characterized, containerized and transported to a permitted disposal facility in strict accordance with the requirements of 40 CFR 260-279 (Hazardous waste and used oil regulations), 30 TAC 324, 330-335 (TCEQ Hazardous and Industrial Waste Regulations).

## 18.0  COLOR AND MATERIAL SELECTIONS

18.1 No color selections and no material selections will be made by the ODR until the Contractor submits all samples of all materials requiring color selections to the ODR or A/E (if applicable). In addition, prior to the ODR selection colors, the Contractor shall certify in writing that all colors and samples submitted are current, acceptable, and available to the Contractor for TAMU's selection.

18.2 Any samples that are not applicable to the work shall be carefully removed from the submittal by the Contractor. The Contractor shall submit the manufacturer's full range of applicable colors, patterns, and textures for the various materials that are required by the contract.

18.3 In the event that discontinued, non-current, or non-applicable colors, textures, or samples are submitted by the Contractor and their selection is made by the ODR, the Contractor shall immediately notify ODR of all associated delays required to resubmit and approve alternate materials.

**19.0 <u>PROJECT CLOSEOUT DOCUMENTS</u>** Before approval of final payment, Contractor must submit the following documents on all projects:

- Contractor's Affidavit of Release of Liens (AIA G706A), must be notarized
- The Contractor shall not incorporate hazardous materials into the work, and shall provide an affidavit attesting as such
- Warranties: Contractor must submit, on contractor's letterhead, a statement guaranteeing all work for a period of twelve months (show Substantial Completion date in warranty letter). Certify in writing and provide evidence that commercial general liability insurance coverage is effective through the contractor's warranty period
- Consent of Surety (AIA G707) if bonding is required
- Operation and Maintenance Manuals for equipment/products
- As Built / Marked Up Field Drawings. Send to A/E if applicable for update to CAD files.
- HVAC TAB Report
- Notice of Termination (NoT) of all temporary erosion controls having been removed, scheduled for removal, or transferred to a new operator within 30 days
- Sprinkler Systems: One (1) signed original & 1 (one) electronic copy of standard contractor's material and test certificate as required by Texas Dept. of Insurance for above and underground piping
- TCEQ Domestic Water Backflow Prevention and Customer Service Inspection Certification. Contractor's responsibility to have this done by a licensed individual required by Texas Dept. of Insurance for above and underground piping
- Other documents that may be required by the contract documents

**20.0 <u>RIGHT TO AUDIT</u>** The ODR shall have the right to verify and audit the details of Contractor's and subcontractor's billings, certificates, accountings, cost data, and statements, either before or after payment, by (1) inspecting the books and records of the Contractor and subcontractor's during normal business hours; (2) examining any reports with respect to the Project Work; (3) interviewing Contractor's and subcontractor's employees; and (4) any other reasonable action. Contractor's and subcontractor's records shall be kept on the basis of generally accepted accounting principles in accordance with cost accounting standards issued by the Federal Office of Management and Budget Cost Accounting Standards Board and organized by each Application for Payment period.

**21.0 <u>BUSINESS ETHICS EXPECTATION</u>**

21.1 *During the course of pursuing work with the ODR and while performing contract work in accordance with the Contract Documents, Contractor agrees to maintain business ethics standards aimed at avoiding any impropriety or conflict of interest which could be construed to have an adverse impact on the ODR or TAMUS's best interests.*

21.2 *Contractor shall take reasonable actions to prevent any actions or conditions which could result in a conflict with the ODR or TAMUS's best interests. These obligations shall apply to the activities of Contractor's employees, agents, subcontractors, subcontractors' employees and other persons under their control.*

21.3 *Contractor's employees, agents, subcontractors (and their representatives) shall not make or offer, or cause to be made or offered, any cash payments, commissions, employment, gifts valued at $50 dollars or more, entertainment, free travel, loans, free work, substantially discounted work, or any other considerations to the ODR's representatives,*

*employees or their relatives.*

21.4 *Contractor's employees, agents and subcontractors (and their relatives) shall not receive or accept any cash payments, commissions, employment, gifts valued at $50 dollars or more, entertainment, free travel, loans, free work, or substantially discounted work or any other considerations from representatives of Contractors, sub- contractors, or material suppliers or any other individuals, organizations, or businesses receiving funds in connection with the Project Work.*

21.5 *Contractor agrees to notify SSC's Resident Regional Manager within 48 hours of any instance where the Contractor becomes aware of a failure to comply with the provisions of this section.*

21.6 *Upon request by the ODR, Contractor agrees to provide a certified management representation letter executed by a Contractor representative selected by the ODR in a form agreeable to the ODR stating that the representative is not aware of any situations violating the business ethics expectations outlined in the Contract Documents or any similar potential conflict of interest as listed in the Compass Group "Code of Business Conduct" or "Code of Ethics" which can be found on the Compass Group website (http://compass-usa.com/pages/code-of- ethics.aspx).*

21.7 *Contractor agrees to include provisions similar to the aforementioned in all contracts with subcontractors receiving more than $25,000 in funds in connection with the Project Work.*

**END SECTION**



**THE TEXAS A&M UNIVERSITY SYSTEM**
**301 Tarrow Street, 2nd Floor**
**College Station, Texas 77840**

**Minimum Prevailing Wage Rate**
**County: Brazos**

| CLASSIFICATION | RATE | NOTES |
|---|---|---|
| Acoustic Ceiling Installer | 15.73 | |
| Asbestos Abatement Worker | 13.06 | |
| Carpenter | 15.95 | |
| Concrete – Pour and Finish | 15.39 | |
| Crane Operator | 26.40 | |
| Driver | 14.47 | |
| Drywall Installer | 16.20 | |
| Electrician – Journeyman | 25.70 | |
| Electrician – Apprentice | 20.35 | |
| Elevator Mechanic – Journeyman | 55.83 | |
| Elevator Mechanic – Apprentice | 48.10 | |
| Fire Protection – Controls | 17.72 | |
| Fire Protection – Pipefitter | 20.61 | |
| Formwork Builder | 14.58 | |
| Glazier | 17.69 | |
| HVAC – Journeyman | 25.09 | |
| HVAC – Apprentice | 15.81 | |
| HVAC – Controls | 21.80 | |
| Insulator | 16.01 | |
| Ironworker | 17.42 | |
| Laborer/Helper | 12.73 | |
| Mason | 19.13 | |
| Equipment Operator – Light | 14.97 | |
| Equipment Operator – Heavy | 16.76 | |
| Painter | 13.18 | |
| Pipefitter – Journeyman | 32.50 | |
| Pipefitter - Apprentice | 19.35 | |
| Plasterer | 15.51 | |
| Plumber – Journeyman | 30.74 | |
| Plumber – Apprentice | 20.32 | |
| Reinforcing Steel Worker | 15.78 | |
| Roofer | 19.94 | |
| Stone Mason | 18.12 | |
| Terrazzo Installer | 13.08 | |
| Tile Setter | 15.73 | |
| Waterproofer | 14.91 | |



# NOTICE OF PROJECT (NOP)

| EXHIBIT |
| :---: |
| **33** |

POSTED ON BEHALF OF SSC BY Texas A&M University (Part 02)

Attention: (02) Cindy Gillar - c-gillar@tamu.edu, CC Shawna Kennedy - shawna.kennedy@tamu.edu

Date of Request: 10/23/2023

## PROJECT INFORMATION
Project Number: 2023-06030
Project Name: Spence Hall Corps Dorm Bathroom Renovations
Project Location: Texas A&M University, College Station, TX
Project Start Date: 5/13/2024          Project Finish Date: 7/31/2024
Project Description: Renovation to the first floor women's room in Spence Hall including new flooring, ceiling, partitions, doors, plumbing, HVAC fixtures

## DOCUMENT ACQUSITION INFORMATION
RFP & Construction Documents (CSP) and information are available electronically at (web link): public
PublicFolderFiles.aspx - app-e-builder

## SUBMISSION INFORMATION
| | | |
|---|---|---|
| CSP RFP Submissions are due: | Date: 11/14/2023 | Time: 2:00 PM |
| HSP Submissions are due: | Date: 11/15/2023 | Time: 2:00 PM |
| Public Proposal Opening: SSC Facilities Services Building, Conference Room 204: | Date: 11/15/2023 | Time: 3:00 PM |

Public Proposal Virtual Meeting (web link): **Click here to join the meeting**

Mail or Hand-deliver to:          SSC Service Solutions
Facilities Services EDCS
1371 TAMU (Physical Address: 600 Agronomy Road, Suite 218)
College Station, TX 77843

## HISTORICALLY UNDERUTILIZED BUSINESS (HUB)
HUB Subcontracting Plan Required:          Yes ☒          No ☐
If yes, monthly HUB Progress Assessment Reports (PARs) are required with each pay application.
Contact (02) Cindy Gillar - c-gillar@tamu.edu, 979-845-9010. CC Shawna Kennedy - shawna.kennedy@tamu.edu, 979-845-3425 with all HUB-related questions.

## QUERY INFORMATION
Pre-proposal Meeting Location (if applicable): SSC Facilities Services Building, Conference Room 204
Date: 10/30/2023          Time: 2:30 PM

Inquiries regarding the submission process/requirements should be directed to
SSC Project Manager: Mike Garon
Email: Michael.Garon@sscserv.com
Phone: 979-446-2506

If applicable, inquiries regarding the technical aspects of the Construction Documents shall be directed to:
A/E Contact: Fred Patterson
A/E Firm: Patterson Architects
Email: fred@patarch.com
Phone:  979-775-6036

EXHIBIT
34



| Line Item | Description | A<br><br>Original Budget * | B<br><br>Approved Budget Changes * | C<br><br>A + B<br><br>Current Budget * | D<br><br>Pending Budget Changes * | E<br><br>Projected Budget Changes * |
|---|---|---|---|---|---|---|
| 01 | Pre-Design / Pre-Construction | 600 | 0 | 600 | 0 | 0 |
| 01.01 | Programmed Budget | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 01.02 | Surveys & Testing | 600.00 | 0.00 | 600.00 | 0.00 | 0.00 |
| 01.03 | Studies | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02 | Design | 31,250.00 | 0 | 31,250.00 | 0 | 0 |
| 02.01 | A/E Services | 31,250.00 | 0.00 | 31,250.00 | 0.00 | 0.00 |
| 02.02 | Consultant Services | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02.03 | Texas Accessibility Standards | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 03 | Procurement | 0 | 0 | 0 | 0 | 0 |
| 03.01 | Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 04 | Construction | 405,500.00 | 1,450.00 | 406,950.00 | 0 | 0 |
| 04.01 | Construction Contracts | 403,000.00 | 1,450.00 | 404,450.00 | 0.00 | 0.00 |
| 04.02 | Support Services | 2,500.00 | 0.00 | 2,500.00 | 0.00 | 0.00 |
| 04.03 | Construction Testing | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 99 | Project Management | 64,182.50 | 72.5 | 64,255.00 | 0 | 0 |
| 99.01 | Contingency | 40,300.00 | 0.00 | 40,300.00 | 0.00 | 0.00 |
| 99.02 | SSC Contract Admin Services | 23,882.50 | 72.50 | 23,955.00 | 0.00 | 0.00 |
| Totals | | 501,532.50 | 1,522.50 | 503,055.00 | 0.00 | 0.00 |

| F<br>C + D + E<br>Projected Budget * | G<br><br>Original Commitments | H<br><br>Approved Commit Changes * | I<br><br>Non Commitment Costs * | J<br>G + H + I<br>Current Commitments * | K<br>U - W<br>Current Retainage Held |
|---:|---:|---:|---:|---:|---:|
| 600 | 0 | 0 | 0 | 0 | 0 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 600.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 31,250.00 | 31,250.00 | 0 | 0 | 31,250.00 | 0 |
| 31,250.00 | 31,250.00 | 0.00 | 0.00 | 31,250.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 406,950.00 | 404,450.00 | 0 | 1,185.00 | 405,635.00 | 0 |
| 404,450.00 | 404,450.00 | 0.00 | 0.00 | 404,450.00 | 0.00 |
| 2,500.00 | 0.00 | 0.00 | 1,185.00 | 1,185.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 64,255.00 | 0 | 0 | 4,600.27 | 4,600.27 | 0 |
| 40,300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 23,955.00 | 0.00 | 0.00 | 4,600.27 | 4,600.27 | 0.00 |
| 503,055.00 | 435,700.00 | 0.00 | 5,785.27 | 441,485.27 | 0.00 |

| L | M | N | O | P | Q | R | S |
|---|---|---|---|---|---|---|---|
| | | | J + L + M + N | | | | ((R - V) + X) |
| Pending Commit Changes * | Projected Commit Changes * | Pending Commitments * | Projected Commitments | Actuals Received * | Actuals Approved * | Actuals Paid * | Net Actuals Paid |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0 | 0 | 0 | 31,250.00 | 27,495.00 | 27,495.00 | 27,495.00 | 27,495.00 |
| 0.00 | 0.00 | 0.00 | 31,250.00 | 27,495.00 | 27,495.00 | 27,495.00 | 27,495.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0 | 0 | 0 | 405,635.00 | 64,509.69 | 64,509.69 | 64,509.69 | 64,509.69 |
| 0.00 | 0.00 | 0.00 | 404,450.00 | 63,324.69 | 63,324.69 | 63,324.69 | 63,324.69 |
| 0.00 | 0.00 | 0.00 | 1,185.00 | 1,185.00 | 1,185.00 | 1,185.00 | 1,185.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0 | 0 | 0 | 4,600.27 | 4,600.27 | 4,600.27 | 4,600.27 | 4,600.27 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 4,600.27 | 4,600.27 | 4,600.27 | 4,600.27 | 4,600.27 |
| 0.00 | 0.00 | 0.00 | 441,485.27 | 96,604.96 | 96,604.96 | 96,604.96 | 96,604.96 |

| T | U | V | W | X | Y | Z | AA |
|---|---|---|---|---|---|---|---|
| ((Q - U) + W) | | | | | O - Q | Q / O | J - C |
| Net Actuals Approved | Amount Retained | Amount Retained Paid | Retainage Released | Retainage Release Paid | Actual Cost To Complete | Percent Cost Complete | Current Over/(Under) |
| 0 | 0 | 0 | 0 | 0 | 0 | 0.00% | -600 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -600.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 27,495.00 | 0 | 0 | 0 | 0 | 3,755.00 | 87.98% | 0 |
| 27,495.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,755.00 | 0.88 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0.00% | 0 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 64,509.69 | 0 | 0 | 0 | 0 | 341,125.31 | 15.90% | -1,315.00 |
| 63,324.69 | 0.00 | 0.00 | 0.00 | 0.00 | 341,125.31 | 0.16 | 0.00 |
| 1,185.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | -1,315.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 4,600.27 | 0 | 0 | 0 | 0 | 0 | 100.00% | -59,654.73 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -40,300.00 |
| 4,600.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | -19,354.73 |
| 96,604.96 | 0.00 | 0.00 | 0.00 | 0.00 | 344,880.31 | | -61,569.73 |

| AB O - F Projected Over/(Under) |
| --- |
| -600 |
| 0.00 |
| -600.00 |
| 0.00 |
| 0 |
| 0.00 |
| 0.00 |
| 0.00 |
| 0 |
| 0.00 |
| -1,315.00 |
| 0.00 |
| -1,315.00 |
| 0.00 |
| -59,654.73 |
| -40,300.00 |
| -19,354.73 |
| -61,569.73 |

EXHIBIT
35

# Revised Pu chase Order



| chase Order | | | |
|---|---|---|---|
| Purchase Order Date | PO/Reference No. | Revision No. | Revision Date |
| **Jun 26, 2023** | **AB0824034** | **1** | **Dec 4, 2023** |

## Sales Tax Exemption

Texas A&M University is exempt from state and municipal sales taxes under Chapter 20 Title 122A, revised Civil Statutes of Texas, for all purchases made for the exclusive use of Texas A&M.

The laws of the State of Texas shall govern this Purchase Order.

Member of the Texas A&M University System.

**Contact instructions for questions regarding this Purchase Order:**

If Buyer Contact information is listed below, please contact the Buyer.

If not, please contact the Customer.

**Buyer Contact:**

| Buye | B yer Email | Buyer Phone Number |
|---|---|---|
| cco - Oberg, Clyde | co@tamu.edu | 979.845.1042 |

**Customer Contact:**

| | |
|---|---|
| Name: | By Departmental Accounting Services RELH |
| Email: | tawhiten@tamu.edu |
| Phone: | +1 979-845-7621 |

**Order cceptance inst ctions:**

## For Order Acceptance Instructions and other Terms and Conditions applicable to t is PO, see the "Notes to Supplier" section below.

### S pplier Information

| | |
|---|---|
| Supplier Name | SSC Service Solutions |
| Address | |
| FOB / FREIGHT | Destination |
| Pre-Pay & Add | No |
| Payment Terms | 0, Net 30 |
| Contract Number - Header | TAMU CONTRACT # 25158 |
| Contract Number - Line | *no value* |
| Quote number | |

### Delivery Information

**Delivery Address**

| | |
|---|---|
| TAMUS Member: | 02-Texas A&M University (02) |
| Attn: | Rob Webber |

Residence Life

University Apts Maintenance Shop

225 Calvin Moore Ave

3365 TAMU

College Station, TX 77843-3365

United States

**Delivery Information**

Required Delivery Date

| Ship Via | Best Carrier-Best Way |
|---|---|

### Notes to Supplier

**Shipping Instr ctions**

Attachments for supplier

BA - 1 - 2023-060...

BM002.pdf

BM001.pdf

**PO Cl uses**

| Header | 001 | No Collect Freight Charges Accepted | Neither COD nor "Collect" freight or handling charges will be accepted. |
|---|---|---|---|
| | 100 | Order Acceptance Instructions - TAMU | Vendor guarantees that the products delivered, or the services performed, as a result of this Purchase Order will meet or exceed all specifications herein. Any exceptions to the pricing or the description contained herein must be approved by Texas A&M's Department of Procurement Services in writing prior to shipping or performance. This Purchase Order is governed by the laws of the State of Texas and Texas A&M's Terms & Conditions (the version that is effective as of the |

urchase Order Date  r the Revision Date specified above, whichever is later), which are incorporated into and made a material part of any Purchase Order issued by Texas A&M.

| 102 | Terms & Conditions - TAMU | Terms & Conditions - Texas A&M University -This purchase order is issued on behalf of Texas A&M University and is governed by the Terms & Conditions found online: http://purchasing.tamu.edu/_media/tamu-bid-terms1.pdf |
|---|---|---|

| Line No. | Product Description | Catalog No. | Size / Packaging | Unit Price | Quantity | Ext. Price |
|---|---|---|---|---|---|---|
| 1 of 1 | <<<<<<<<<<<<<<<<<<<<< **LINE MODIFIED** >>>>>>>>>>>>>>>>>>>>> | | | | | |
| | Contract with Patterson Architects for required design services for the renovations of the 1st floor women's restroom at Spence Hall. | NA | EA | 503,055.00 USD | 1 EA | 503,055.00 USD |
| | External Note | In performing the Scope of Work described herein, SSC shall be bound by the terms and conditions of the Facilities Support Services Agreement or Building Maintenance Services Agreement executed by SSC and Texas A and M University effective August 3, 2012 | | | | |

| | Total | **503,055.00 USD** |
|---|---|---|

| Billing Information | Billing Address |
|---|---|
| To assure  imely payment please e-mail invoices to the email provided in the bill to address. If the invoice is sent via email, please do not send a duplicate copy through the mail. Only if email is not an option then submit invoices to the billing address indicated in the "Billing Address" section. To inquire about electronic invoicing via cXML, CSV or PO flip through the supplier portal, e-mail vendorhelp@tamu.edu.<br><br>Invoice must include the PO/Reference number shown above. | Texas A&M University-Accounts Payable<br><br>***Do Not Mail Invoices***<br><br>Email invoices to invoices@tamu.edu<br><br>750 Agronomy Rd Suite 3101<br><br>6000 TAMU<br><br>College Station, TX 77843-6000<br><br>United States |

EXHIBIT
**36**



## Sales Tax Exemption

Texas A&M University is exempt from state and municipal sales taxes under Chapter 20 Title 122A, revised Civil Statutes of Texas, for all purchases made for the exclusive use of Texas A&M.

The laws of the State of Texas shall govern this Purchase Order.

Member of the Texas A&M University System.

### Purchase Order

| Purchase Order Date | PO/Reference No. | Revision No. | Revision Date |
|---|---|---|---|
| **Feb 21, 2024** | **AB0892173** | **1** | **Feb 22, 2024** |

**Contact instructions for questions regarding this Purchase Order:**

If Buyer Contact information is listed below, please contact the Buyer.

If not, please contact the Customer.

**Buyer Contact:**

| Buyer | Buyer Email | Buyer Phone Number |
|---|---|---|
| jan - Nelms, Jim | janelms@tamu.edu | 979.845.3819 |

**Customer Contact:**

| | |
|---|---|
| Name: | By Departmental Accounting Services RELH |
| Email: | tawhiten@tamu.edu |
| Phone: | +1 979-845-7621 |

**Order acceptance instructions:**

## For Order Acceptance Instructions and other Terms and Conditions applicable to this PO, see the "Notes to Supplier" section below.

| Supplier Information | | Delivery Information | |
|---|---|---|---|
| Supplier Name | SSC Service Solutions | **Delivery Address** | |
| Address | | TAMUS Member: | 02-Texas A&M University (02) |
| FOB / FREIGHT | Destination | Attn: | Ben Sasse |
| Pre-Pay & Add | No | Residence Life | |
| Payment Terms | 0, Net 30 | Spence/Briggs/Kiest Hall | |
| Contract Number - Header | TAMU CONTRACT# 25158 | Room | 1st floor women's restroom/ Kiest, Gainer, Lacy Hall's |
| Contract Number - Line | *no value* | | |
| Quote number | | 1253 TAMU | |
| | | College Station, TX 77843-1253 | |
| | | United States | |
| | | **Delivery Information** | |
| | | Required Delivery Date | |
| | | Ship Via | Best Carrier-Best Way |

### Notes to Supplier

**Shipping Instructions**

Attachments for supplier

    BA - 1 - 2024-063...

    AB0892173 BM-000...

**PO Clauses**

| Header | 001 | No Collect Freight Charges Accepted | Neither COD nor "Collect" freight or handling charges will be accepted. |
|---|---|---|---|
| | 100 | Order Acceptance Instructions - TAMU | Vendor guarantees that the products delivered, or the services performed, as a result of this Purchase Order will meet or exceed all specifications herein. Any exceptions to the pricing or the description contained herein must be approved by Texas A&M's Department of Procurement Services in writing prior to shipping or performance. This Purchase Order is governed by the laws of the State of Texas and Texas A&M's Terms & Conditions (the version that is effective as of the Purchase Order Date or the Revision Date specified above, whichever is later), which are incorporated into and made a material part of any Purchase Order issued by Texas A&M. |

| | | |
|---|---|---|
| 102 | Terms & Conditions - TAMU | Terms & Conditions - Texas A&M University -This purchase order is issued on behalf of Texas A&M University and is governed by the Terms & Conditions found online: http://purchasing.tamu.edu/_media/tamu-bid-terms1.pdf |

| Line No. | Product Description | Catalog No. | Size / Packaging | Unit Price | Quantity | Ext. Price |
|---|---|---|---|---|---|---|
| 1 of 2 | PROJECT#: 2024-06316 - Kiest Hall - Dorm 2 Feasibility Study for Restroom Renovation | NA | EA | 242,550.00 USD | 1 EA | 242,550.00 USD |
| | External Note | In performing the Scope of Work described herein, SSC shall be bound by the terms and conditions of the Facilities Support Services Agreement or Building Maintenance Services Agreement executed by SSC and Texas A&M University effective August 3, 2012 | | | | |
| 2 of 2 | <<<<<<<<<<<<<<<<<<< **LINE ADDED** >>>>>>>>>>>>>>>>>>>>> | | | | | |
| | BM-00001 Budget Modification | N/A | EA | 2,332,450.00 USD | 1 EA | 2,332,450.00 USD |
| | | | | Total | | **2,575,000.00 USD** |

| Billing Information | Billing Address |
|---|---|
| To assure timely payment please e-mail invoices to the email provided in the bill to address. If the invoice is sent via email, please do not send a duplicate copy through the mail. Only if email is not an option then submit invoices to the billing address indicated in the "Billing Address" section. To inquire about electronic invoicing via cXML, CSV or PO flip through the supplier portal, e-mail vendorhelp@tamu.edu.<br><br>Invoice must include the PO/Reference number shown above. | Texas A&M University-Accounts Payable<br><br>***Do Not Mail Invoices***<br>Email invoices to invoices@tamu.edu<br>750 Agronomy Rd Suite 3101<br>6000 TAMU<br>College Station, TX 77843-6000<br>United States |

EXHIBIT
37

# SSC UNIFORM GENERAL AND SUPPLEMENTARY CONDITIONS

## Table of Contents

Article 1.        Definitions ...................................................................................................2

Article 2.        Wage Rates and Other Laws Governing Construction ........................................6

Article 3.        General Responsibilities of Owner and Contractor.............................................10

Article 4.        Historically Underutilized Business (HUB) Subcontracting Plan.......................16

Article 5.        Bonds and Insurance ......................................................................................18

Article 6.        Construction Documents, Coordination Documents, and Record Documents.................20

Article 7.        Construction Safety ........................................................................................22

Article 8.        Quality Control ..............................................................................................24

Article 9.        Construction Schedules ..................................................................................30

Article 10.       Payments .......................................................................................................36

Article 11.       Changes .........................................................................................................40

Article 12.       Project Completion and Acceptance ...............................................................44

Article 13.       Warranty and Guarantee.................................................................................48

Article 14.       Suspension and Termination ..........................................................................51

Article 15.       Dispute Resolution ........................................................................................55

Article 16.       Miscellaneous................................................................................................55

1

## SSC UNIFORM GENERAL AND SUPPLEMENTARY CONDITIONS

**These General and Supplementary Conditions shall be used for contracts in support of the agreement between The Texas A&M University System ("TAMUS") ("Owner") and Southeast Service Corporations d/b/a SSC Services for Education ("SSC") ("ODR").**
**All users are advised to read and understand this entire document.**

## Article 1.  Definitions

Unless the context clearly requires another meaning, the following terms have the meaning assigned herein.

1.1     Application for Payment means Contractor's monthly partial invoice for payment that includes any portion of the Work that has been completed for which an invoice has not been submitted and performed in accordance with the requirements of the Contract Documents.  The Application for Payment accurately reflects the progress of the Work, is itemized based on the Schedule of Values, bears the notarized signature of Contractor, and shall not include subcontracted items for which Contractor does not intend to pay.

1.2     Application for Final Payment means Contractor's final invoice for payment that includes any portion of the Work that has been completed for which an invoice has not been submitted, amounts owing to adjustments to the final Contract Sum resulting from approved change orders, and release of remaining Contractor's retainage.

1.3     Architect/Engineer (A/E) means a person registered as an architect pursuant to Tex. Occ. Code Ann., Chapter 1051, as a landscape architect pursuant to Tex. Occ. Code Ann., Chapter 1052, a person licensed as a professional engineer pursuant Tex. Occ. Code Ann., Chapter 1001, and/or a firm employed by **ODR** or Design-Build Contractor  to provide professional architectural or engineering services  and  to exercise overall responsibility for the design of a Project or a significant portion thereof, and to perform the contract administration responsibilities set forth in the Contract.

1.4     Baseline Schedule means the initial time schedule prepared by Contractor for ODR's information and acceptance that conveys Contractor's and Subcontractors' activities (including coordination and review activities required in the Contract Documents to be performed by A/E and ODR), durations, and sequence of work related to the entire Project to the extent required by the Contract Documents.  The schedule clearly demonstrates the critical path of activities, durations and necessary predecessor conditions that drive the end date of the schedule.  The Baseline Schedule shall not exceed the time limit current under the Contract Documents.

1.5     Certificate of Final Completion means the certificate issued by A/E that documents, to the best of A/E's knowledge and understanding, Contractor's completion of all Contractor's Punch List items and pre-final Punch List items, final cleanup and

Contractor's provision of Record Documents, operations and maintenance manuals, and all other closeout documents required by the Contract Documents.

1.6     Change Order means a written modification of the Contract between **ODR** and Contractor, signed by **ODR**, Contractor and A/E.

1.7     Close-out Documents mean the product brochures, submittals, product/equipment maintenance and operations instructions, manuals, and other documents/warranties, record documents, affidavit of payment, release of lien and claim, and as may be further defined, identified, and required by the Contract Documents.

1.8     Competitive Sealed Proposals**,** in accordance with Tex. **Gov't Code, Chapter 2166**, a delivery procedure for construction projects by which a governmental entity (or its representative) requests proposals, ranks the offerors, negotiates as prescribed, and then contracts with a general contractor for the construction, rehabilitation, alteration, or repair of a facility.

1.9     Contract means the entire agreement between **ODR** and Contractor, including all of the Contract Documents.

1.10    Contract Date is the date when the agreement between **ODR** and Contractor becomes effective.

1.11    Contract Documents mean those documents identified as a component of the agreement (Contract) between **ODR** and Contractor.  These may include, but are not limited to, Drawings; **Project Manual/**Specifications; **SSC Uniform General and Supplementary Conditions**, and Special Conditions; and all pre-bid and/or pre-proposal addenda.

1.12    Contract Sum means the total compensation payable to Contractor for completion of the Work in accordance with the terms of the Contract.

1.13    Contract Time means the period between the start date identified in the Notice to Proceed with construction and the Substantial Completion date identified in the Notice to Proceed or as subsequently amended by a Change Order.

1.14    Contractor means the individual, corporation, limited liability company, partnership, firm, or other entity contracted to perform the Work, regardless of the type of construction contract used, so that the term as used herein includes a Construction Manager-at-Risk or a Design-Build firm as well as a general or prime Contractor. The Contract Documents refer to Contractor as if singular in number.

1.15    Construction Documents mean the Drawings, **Project Manual/**Specifications, and other documents issued to build the Project.  Construction Documents become part of the Contract Documents when listed in the Contract or any Change Order.

1.16    Construction Manager at Risk. In accordance with Tex. Gov't Code Chapter 2269, means a sole proprietor, partnership, corporation, or other legal entity that assumes the risk for

3

construction, rehabilitation, alteration, or repair of a facility at the contract price as a general contractor and provides consultation to ODR regarding construction during and after the design of the facility

1.17    Date of Commencement means the date designated in the Notice to Proceed for Contractor to commence the Work.

1.18    Day means a calendar day unless otherwise specifically stipulated.

1.19    Design-Build means a project delivery method in which the detailed design and subsequent construction is provided through a single contract with a Design-Build firm; a team, partnership, or legal entity that includes design professionals and a builder.  The Design-Build Project delivery shall be implemented in accordance with Tex. Gov't Code § 2269.301.

1.20    Drawings mean that product of A/E which graphically depicts the Work.

1.21    Final Completion means the date determined and certified by A/E and **ODR** on which the Work is fully and satisfactorily complete in accordance with the Contract.

1.22    Final Payment means the last and final monetary compensation made to Contractor for any portion of the Work that has been completed and accepted for which payment has not been made, amounts owing to adjustments to the final Contract Sum resulting from approved change orders, and release of Contractor's retainage.

1.23    Historically Underutilized Business (HUB) pursuant to Tex. Gov't Code, Chapter 2161, means a business that is at least 51% owned by an Asian Pacific American, a Black American, a Hispanic American, a Native American, a Disabled Veteran, and/or an American Woman; is an entity with its principal place of business in Texas; and has an owner residing in Texas with proportionate interest that actively participates in the control, operations, and management of the entity's affairs.

*1.24    Manufacturing Process means the application of a process to alter the form or function of materials or elements of a product in a manner that adds value and transforms the materials or elements into a new finished product that is functionally different from a finished product produced merely from assembling the materials or elements into a product.*

1.25    Notice to Proceed means written document informing Contractor of the dates beginning Work and the dates anticipated for Substantial Completion.

1.26    Open Item List means a list of work activities, Punch List items, changes or other issues that are not expected by **ODR** and Contractor to be complete prior to Substantial Completion.

1.27    Owner means the State of Texas, and any agency of the State of Texas, acting through the responsible entity of the State of Texas identified in the Contract as Owner.

4

1.27   Owner's Designated Representative (ODR) means the individual assigned by Owner to act on its behalf and to undertake certain activities as specifically outlined in the Contract. ODR is the only party authorized to direct changes to the scope, cost, or time of the Contract.

1.28   *Produced in the United States means, with respect to iron and steel products, a product for which all manufacturing processes, from initial melting through application of coatings, occur in the United States, other than metallurgical processes to refine steel additives.*

1.29   Project means all activities necessary for realization of the Work. This includes design, contract award(s), execution of the Work itself, and fulfillment of all Contract and warranty obligations.

1.30   **Project Manual means a bound document that contains the contract documents, with the exception of the drawings, specifically organized into bid requirements, contract information, addenda, general conditions for construction, and technical specifications.**

1.31   Progress Assessment Report (PAR) means the monthly compliance report to **ODR** verifying compliance with the HUB subcontracting plan (HSP).

1.32   Proposed Change Order (PCO) means a document that informs Contractor of a proposed change in the Work and appropriately describes or otherwise documents such change including Contractor's response of pricing for the proposed change.

1.33   Punch List means a list of items of Work to be completed or corrected by Contractor after Substantial Completion. Punch Lists indicate items to be finished, remaining Work to be performed, or Work that does not meet quality or quantity requirements as required in the Contract Documents.

1.34   Record Documents mean the drawing set, Specifications, and other materials maintained by Contractor that documents all addenda, Architect's Supplemental Instructions, Change Orders and postings and markings that record the as-constructed conditions of the Work and all changes made during construction.

1.35   Request for Information (RFI) means a written request by Contractor directed to A/E or ODR for a clarification of the information provided in the Contract Documents or for direction concerning information necessary to perform the Work that may be omitted from the Contract Documents.

1.36   Samples mean representative physical examples of materials, equipment, or workmanship used to confirm compliance with requirements and/or to establish standards for use in execution of the Work.

1.37   Schedule of Values means the detailed breakdown of the cost of the materials, labor, and equipment necessary to accomplish the Work as described in the Contract Documents, submitted by Contractor for approval by **ODR** and A/E.

5

1.38   Shop Drawings mean the drawings, diagrams, illustrations, schedules, performance charts, brochures, and other data prepared by Contractor or its agents which detail a portion of the Work.

1.39   Site means the geographical area of the location of the Work.

1.40   Special Conditions mean the documents containing terms and conditions which may be unique to the Project.  Special Conditions are a part of the Contract Documents and have precedence over the Uniform General Conditions and Supplementary General Conditions.

1.41   Specifications mean the written product of A/E that establishes the quality and/or performance of products utilized in the Work and processes to be used, including testing and verification for producing the Work.

1.42   Subcontractor means a business entity that enters into an agreement with Contractor to perform part of the Work or to provide services, materials, or equipment for use in the Work.

1.43   Submittal Register means a list provided by Contractor of all items to be furnished for review and approval by A/E and **ODR** and as identified in the Contract Documents including anticipated sequence and submittal dates.

1.44   Substantial Completion means the date determined and certified by Contractor, A/E, and **ODR** when the Work, or a designated portion thereof, is sufficiently complete, in accordance with the Contract, so as to be operational and fit for the use intended.

1.45   Unit Price Work means the Work, or a portion of the Work, paid for based on incremental units of measurement.

1.46   Unilateral Change Order (ULCO) means a Change Order issued by **ODR** without the complete agreement of Contractor, as to cost and/or time.

1.47   Work means the administration, procurement, materials, equipment, construction and all services necessary for Contractor, and/or its agents, to fulfill Contractor's obligations under the Contract.

1.48   Work Progress Schedule means the continually updated time schedule prepared and monitored by Contractor that accurately indicates all necessary appropriate revisions as required by the conditions of the Work and the Project while maintaining a concise comparison to the Baseline Schedule.

## Article 2.  Wage Rates and Other Laws Governing Construction

2.1   Environmental Regulations.  Contractor shall conduct activities in compliance with applicable laws and regulations and other requirements of the Contract relating to the environment and its protection at all times.  Unless otherwise specifically determined,

6

Contractor is responsible for obtaining and maintaining permits related to storm water run-off.  Contractor shall conduct operations consistent with storm water run-off permit conditions.  Contractor is responsible for all items it brings to the Site, including hazardous materials, and all such items brought to the Site by its Subcontractors and suppliers, or by other entities subject to direction of Contractor. Contractor shall not incorporate hazardous materials into the Work without prior approval of Owner, and shall provide an affidavit attesting to such in association with request for Substantial Completion inspection.

2.2   Wage Rates.  Contractor shall not pay less than the wage scale of the various classes of labor as indicated by county and "Building Type" at the following link: https://www.wdol.gov/wdol/scafiles/davisbacon/tx.html.  The specified wage rates are minimum rates only.  Owner is not bound to pay any claims for additional compensation made by any Contractor because the Contractor pays wages in excess of the applicable minimum rate contained in the Contract.  The prevailing wage schedule is not a representation that qualified labor adequate to perform the Work is available locally at the prevailing wage rates.

2.2.1   Notification to Workers.  Contractor shall post the prevailing wage schedule in a place conspicuous to all workers on the Project Site and shall notify each worker, in writing, of the following as they commence work on the Contract: the worker's job classification, the established minimum wage rate requirement for that classification, as well as the worker's actual wage.  The notice must be delivered to and signed in acknowledgement of receipt by the worker and must list both the wages and fringe benefits to be paid or furnished for each classification in which the worker is assigned duties.  When requested by Owner, Contractor shall furnish evidence of compliance with the Texas Prevailing Wage Law and the addresses of all workers.

2.2.1.1   Contractor shall submit a copy of each worker's wage-rate notification to ODR with the application for progress payment for the period during which the worker was engaged in activities on behalf of the Project *when requested by Owner*.

2.2.1.2   The prevailing wage schedule is determined by Owner in compliance with Tex. Gov't Code, Chapter 2258.  Should Contractor at any time become aware that a particular skill or trade not reflected on Owner's Prevailing Wage Schedule will be or is being employed in the Work, whether by Contractor or by Subcontractor, Contractor shall promptly inform ODR of the proposed wage to be paid for the skill along with a justification for same and ODR shall promptly concur  with or reject the proposed wage and classification. Contractor is responsible for determining the most appropriate wage for a particular skill in relation to similar skills or trades identified on the prevailing wage schedule.  In no case, shall any worker be paid less than the wage indicated for laborers.

2.2.2   Penalty for Violation.  Contractor, and any Subcontractor, will pay to the State a

7

penalty of sixty dollars ($60) for each worker employed for each day, or portion thereof, that the worker is paid less than the wage rates stipulated in the Prevailing Wage Schedule.

2.2.3   Complaints of Violations.

2.2.3.1   **ODR**'s Determination of Good Cause.  Upon receipt of information concerning a violation, **ODR** will conduct an investigation in accordance with Tex. Gov't Code, Chapter 2258 and make an initial determination as to whether good cause exists that a violation occurred. Upon making a good cause finding, ODR will retain the full amounts claimed by the claimant or claimants as the difference between wages paid and wages due under the Prevailing Wage Schedule and any supplements thereto, together with the applicable penalties, such amounts being subtracted from successive progress payments pending a final decision on the violation.

2.2.3.2   **If the Contractor and claimant worker reach an agreement concerning the claim, the Contractor shall promptly notify the ODR in a written document countersigned by the worker.**

2.2.3.3   **Arbitration Required. If the violation is not resolved within 14 days following initial determination by the ODR, the Contractor and the claimant worker must participate in binding arbitration in accordance with the Texas General Arbitration Act, Tex. Civ. Prac. & Rem. Code, Chapter 171. If the Contractor and the claimant worker do not agree on an arbitrator within 10 days, after the date arbitration is required, a district court may be petitioned by any of the parties to the arbitration to appoint an arbitrator whose decision will be binding on all parties. (See Tex. Gov't Code, § 2258.053)**

2.2.3.4   **Arbitration Award. If an arbitrator assesses an award against the Contractor, the Contractor shall promptly furnish a copy of said award to the ODR. The ODR may use any amounts retained under Article 2.2.3.1 to pay the worker the amount as designated in the arbitration award. If the retained funds are insufficient to pay the worker in accordance with the arbitration award, the worker has a right of action against the Contractor, and/or the surety to receive the amount owed, plus attorneys' fees and court costs. The ODR has no duty to release any funds to either the claimant or the Contractor until it has received the notices of agreement or the arbitration award.**

2.2.3.5   No Extension of Time.  If **ODR**'s determination proves valid that good cause existed to believe a violation had occurred, Contractor is not entitled to an extension of time for any delay arising directly or indirectly from the arbitration procedures.

2.3     Venue for Suits. The venue for any suit arising from the Contract will be in a court of competent jurisdiction **in the county of the site location**.

2.4     Licensing of Trades. Contractor shall comply with all applicable provisions of State law related to license requirements for skilled tradesmen, contractors, suppliers and or laborers, as necessary to accomplish the Work. In the event Contractor, or one of its Subcontractors, loses its license during the term of performance of the Contract, Contractor shall promptly hire or contract with a licensed provider of the service at no additional cost to Owner **or ODR**.

    2.4.1   **Partial list of licenses required. Listed by Texas Statue:**

    - **Boilers--Chapter 755, Health and Safety Code.**

    - **Electrical--Title 8, Occupations Code, Chapter 1305, Administered by the Texas Department of Licensing and Regulation.**

    - **Elevators, Escalators, and related Equipment--Chapter 754, Health and Safety Codes, Subchapter B. Inspection, Certification, and Registration.**

    - **Fire Detection and Alarms--Insurance Code, Article 5.43-2**.

    - **Fire Protection--Insurance Code, Article 5.43-1 and 5.43-3.**

    - **Plumbing--Plumbing License Law, Occupations Code, Title 8. Regulation of Environmental and Industrial Trades, Chapter 1301. Plumbers.**

    - **Mechanical--Air Conditioning and Refrigeration Contractor License Law, Occupations Code, Title 8. Regulation of Environmental and Industrial Trades, Chapter 1302, Administered by the Texas Department of Licensing and Regulation.**

2.5     Royalties, Patents, and Copyrights. Contractor shall pay all royalties and license fees, defend suits or claims for infringement of copyrights and patent rights, and shall hold Owner **and ODR** harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents, or where the copyright violations are contained in Drawings, Specifications or other documents prepared by **ODR** or A/E. However, if Contractor has reason to believe that the required design, process, or product is an infringement of a copyright or a patent, Contractor shall be responsible for such loss unless such information is promptly furnished to A/E.

2.6     State Sales and Use Taxes. Owner qualifies for exemption from certain State and Local Sales and use taxes pursuant to the provisions of Tex. Tax Code, Chapter 151. Upon request from Contractor, Owner/**ODR** shall furnish evidence of tax exempt status. Contractor may claim exemption from payment of certain applicable State taxes by complying with such procedures as prescribed by the State Comptroller of Public

Accounts.    Owner/**ODR** acknowledges not all items qualify for exemption. Owner/**ODR** is not obligated to reimburse Contractor for taxes paid on items that qualify for tax exemption.

2.7    *Iron and Steel Products. In accordance with Tex. Gov't. Code, Chapter 2252, Subchapter F all iron and steel products produced through a manufacturing process and used in the project shall be produced in the United States.*

*2.7.1  Exemption. Electrical components, equipment, systems, and appurtenances, including supports, covers, shielding, and other appurtenances related to an electrical system, necessary for operation or concealment are not considered to be iron or steel products and are exempt from this requirement.*

*2.7.2   Other exemptions, only if agreed to in writing by the Owner are:*

*2.7.2.1    Iron or steel products produced in the United States are not: (A) produced in sufficient quantities; (B) reasonably available; or (C) of a satisfactory quality; or if*

*2.7.2.2    Use of iron or steel products produced in the United States will increase the total cost of the project by more than 20 percent.*

2.8    *Prohibition on contracts with Companies boycotting Israel In accordance with Tex. Gov't Code, Chapter 2270 SSC will not enter into a contract with a company for goods or services unless the contract contains a written verification from the company that it*
*(1) does not boycott Israel; and*
*(2) will not boycott Israel during the term of the contract.*

## Article 3.  General Responsibilities of Owner and Contractor

3.1    **ODR**'s General Responsibilities.    **ODR** is the entity identified as such in the Contract and referred to throughout the Contract Documents as if singular in number.

3.1.1    Preconstruction Conference.    Prior to, or concurrent with, the issuance of Notice to Proceed with construction, a conference will be convened for attendance by Owner, Contractor, A/E and appropriate Subcontractors.  The purpose of the conference is to establish a working understanding among the parties as to the Work, the operational conditions at the Project Site, and general administration of the Project.    Topics include communications, schedules, procedures for handling Shop Drawings and other submittals, processing Applications for Payment, maintaining required records and all other matters of importance to the administration of the Project and effective communications between the project team members.

3.1.2    Owner's Designated Representative.  Prior to the start of construction, Owner will identify Owner's Designated Representative (ODR), who has the express authority to act and bind Owner to the extent and for the purposes described in the various Articles of the Contract, including responsibilities for general

10

administration of the Contract.

> 3.1.2.1 Unless otherwise specifically defined elsewhere in the Contract Documents, ODR is the single point of contact between Owner and Contractor. Notice to ODR, unless otherwise noted, constitutes notice to Owner under the Contract.
>
> 3.1.2.2 All directives on behalf of Owner will be conveyed to Contractor and A/E by ODR in writing.

3.1.3 <u>Owner Supplied Materials and Information</u>.

> 3.1.3.1 Owner **or ODR** will furnish to Contractor those surveys describing the physical characteristics, legal description, limitations of the Site, site utility locations, and other information used in the preparation of the Contract Documents.
>
> 3.1.3.2 Owner **or ODR** will provide information, equipment, or services under Owner's control to Contractor with reasonable promptness. *The Owner or ODR makes no representation as to the accuracy or completeness of the site information furnished to the Contractor by the Owner, and is not responsible for any interpretations or conclusions reached by the Contractor with respect to the information.*

3.1.4 <u>Availability of Lands</u>. Owner will furnish, as indicated in the Contract, all required rights to use the lands upon which the Work occurs. This includes rights-of-way and easements for access and such other lands that are designated for use by Contractor. Contractor shall comply with all Owner identified encumbrances or restrictions specifically related to use of lands so furnished. Owner will obtain and pay for easements for permanent structures or permanent changes in existing facilities, unless otherwise required in the Contract Documents.

3.1.5 <u>Limitation on **ODR**'s Duties</u>.

> 3.1.5.1 The **ODR** will not supervise, direct, control or have authority over or be responsible for Contractor's means, methods, technologies, sequences or procedures of construction or the safety precautions and programs incident thereto. T h e **ODR** is not responsible for any failure of Contractor to comply with laws and regulations applicable to the Work. The **ODR** is not responsible for the failure of Contractor to perform or furnish the Work in accordance with the Contract Documents. Except as provided in Section 2.5, the **ODR** is not responsible for the acts or omissions of Contractor, or any of its Subcontractors, suppliers or of any other person or organization performing or furnishing any of the Work on behalf of Contractor.
>
> 3.1.5.2 ODR will not take any action in contravention of a design decision made by A/E in preparation of the Contract Documents, when such

11

actions are in conflict with statutes under which A/E is licensed for the protection of the public health and safety.

3.2   Role of Architect/Engineer. **(if applicable)** Unless specified otherwise in the Contract between Owner and Contractor, A/E shall provide general administration services for Owner during the construction phase of the Project.  Written correspondence, Requests For Information, and Shop Drawings/submittals shall be directed to A/E for action. **The A/E has no authority to change material specifications, contract cost or contract time unless approved by the ODR.**

3.2.1   Site Visits.

3.2.1.1   A/E will make visits to the Site at intervals as provided in the A/E's Contract with Owner, to observe the progress and the quality of the various aspects of Contractor's executed Work and report findings to **ODR**.

3.2.1.2   A/E has the authority to interpret Contract Documents and inspect the Work for compliance and conformance with the Contract. Except as referenced in Paragraph 3.1.5.2, The **ODR** retains the sole authority to accept or reject Work and issue direction for correction, removal, or replacement of Work.

3.2.2   Clarifications and Interpretations.  It may be determined that clarifications or interpretations of the Contract Documents are necessary.  Upon direction by ODR, such clarifications or interpretations will be provided by A/E consistent with the intent of the Contract Documents.  A/E will issue these clarifications with reasonable promptness to Contractor as A/E's Supplemental Instruction ("ASI") or similar instrument.  If Contractor believes that such clarification or interpretation justifies an adjustment in the Contract Sum or the Contract Time, Contractor shall so notify **ODR** in accordance with the provisions of Article 11.

3.2.3   Limitations on Architect/Engineer Authority.  A/E is not responsible for:

3.2.3.1   Contractor's means, methods, techniques, sequences, procedures, safety, or programs incident to the Project, nor will A/E supervise, direct, control or have authority over the same;

3.2.3.2 The failure of Contractor to comply with laws and regulations applicable to the furnishing or performing the Work;

3.2.3.3   Contractor's failure to perform or furnish the Work in accordance with the Contract Documents; or

3.2.3.4   Acts or omissions of Contractor, or of any other person or organization performing or furnishing any of the Work.

12

3.3 <u>Contractor's General Responsibilities</u>. Contractor is solely responsible for implementing the Work in full compliance with all applicable laws, codes, regulations and the Contract Documents and shall supervise and direct the Work using the best skill and attention to assure that each element of the Work conforms to the Contract requirements. Contractor is solely responsible for all construction means, methods, techniques, safety, sequences, coordination and procedures. *The Contractor is responsible for having visited the Site and having ascertained all pertinent local conditions such as existing subsurface concealed conditions, location, accessibility and general character of the Site or building, the character and extent of existing work, the character and extent of existing work within adjacent sites, and any other work being performed thereon at the time Contractor's bid or proposal is submitted.*

3.3.1 <u>Project Administration</u>. Contractor shall provide project administration for all Subcontractors, vendors, suppliers, and others involved in implementing the Work and shall coordinate administration efforts with those of A/E **if applicable** and ODR in accordance with these **SSC Uniform General and Supplementary Conditions**, **Division 1 Specifications**, and other provisions of the Contract, and as outlined in the pre-construction conference.

3.3.2 <u>Contractor's Management Personnel</u>. Contractor shall employ a competent person or persons who will be present at the Project Site during the progress of the Work to supervise or oversee the work. The competent persons are subject to the approval of ODR. Contractor shall not change approved staff during the course of the project without the written approval of ODR unless the staff member leaves the employment of Contractor. Contractor shall provide additional quality control, safety and other staff as stated in the **SSC Uniform General and Supplementary Conditions.**

3.3.3 <u>Labor</u>. Contractor shall provide competent, suitably qualified personnel to survey, lay-out, and construct the Work as required by the Contract Documents and maintain good discipline and order at the Site at all times.

3.3.4 <u>Services, Materials, and Equipment</u>. Unless otherwise specified, Contractor shall provide and assume full responsibility for all services, materials, equipment, labor, transportation, construction equipment and machinery, tools, appliances, fuel, power, light, heat, telephone, water, sanitary facilities, temporary facilities, and all other facilities, incidentals, and services necessary for the construction, performance, testing, start-up, inspection and completion of the Work.

3.3.5 <u>Contractor General Responsibility</u>. For Owner furnished equipment or material that will be in the care, custody, and control of Contractor, Contractor is responsible for damage or loss.

3.3.6 <u>Non-Compliant Work</u>. Should A/E and/or ODR identify Work as non-compliant with the Contract Documents, A/E and/or ODR shall communicate the finding to Contractor, and Contractor shall correct such Work at no additional cost to the Owner. The approval of Work by either A/E or ODR does not relieve

13

Contractor from the obligation to comply with all requirements of the Contract Documents.

3.3.7 <u>Subcontractors</u>. Contractor shall not employ any Subcontractor, supplier or other person or organization, whether initially or as a substitute, against whom Owner **or ODR** shall have reasonable objection. **ODR** will communicate such objections in writing within ten (10) days of receipt of Contractor's intent to use such Subcontractor, supplier, or other person or organization. Contractor is not required to employ any Subcontractor, supplier or other person or organization to furnish any of the work to whom Contractor has reasonable objection. Contractor shall not substitute Subcontractors without the acceptance of Owner.

    3.3.7.1 All Subcontracts and supply contracts shall be consistent with and bind the Subcontractors and suppliers to the terms and conditions of the Contract Documents including provisions of the Contract between Contractor and **ODR**.

    3.3.7.2 Contractor shall be solely responsible for scheduling and coordinating the Work of Subcontractors, suppliers and other persons and organizations performing or furnishing any of the Work under a direct or indirect contract with Contractor. Require all Subcontractors, suppliers and such other persons and organizations performing or furnishing any of the Work to communicate with Owner **and ODR** only through Contractor. Contractor shall furnish to Owner and ODR a copy, at Owner's **or ODR's** request, of each first-tier subcontract promptly after its execution. Contractor agrees that Owner **and ODR** have no obligation to review or approve the content of such contracts and that providing Owner **and ODR** such copies in no way relieves Contractor of any of the terms and conditions of the Contract, including, without limitation, any provisions of the Contract which require the Subcontractor to be bound to Contractor in the same manner in which Contractor is bound to Owner.

3.3.8 <u>Continuing the Work</u>. Contractor shall carry on the Work and adhere to the progress schedule during all disputes, disagreements, or alternative resolution processes with **ODR**. Contractor shall not delay or postpone any Work because of pending unresolved disputes, disagreements or alternative resolution processes, except as **ODR** and Contractor may agree in writing.

3.3.9 <u>Cleaning</u>. Contractor shall at all times, keep the Site and the Work clean and free from accumulation of waste materials or rubbish caused by the construction activities under the Contract. Contractor shall ensure that the entire Project is thoroughly cleaned prior to requesting Substantial Completion inspection and, again, upon completion of the Project prior to the final inspection.

3.3.10 <u>Acts and Omissions of Contractor, its Subcontractors and Employees</u>. Contractor shall be responsible for acts and omissions of his employees and all

its Subcontractors, their agents and employees. Owner **or ODR** may, in writing, require Contractor to remove from the Project any of Contractor's or its Subcontractor's employees whom ODR finds to be careless, incompetent, unsafe, uncooperative, disruptive, or otherwise objectionable.

3.3.11   Indemnification of Owner.   **Contractor covenants and agrees to FULLY INDEMNIFY and HOLD HARMLESS, Owner and the elected and appointed officials, employees, officers, directors, volunteers, and representatives of Owner, individually or collectively, from and against any and all costs, claims, liens, damages, losses, expenses, fees, fines, penalties, proceedings, actions, demands, causes of action, liability and suits of any kind and nature, including but not limited to, personal or bodily injury, death or property damage, made upon Owner directly or indirectly arising out of, resulting from or related to Contractor's activities under this Contract, including any acts or omissions of Contractor, or any agent, officer, director, representative, employee, consultant or the Subcontractor of Contractor, and their respective officers, agents, employees, directors and representatives while in the exercise of performance of the rights or duties under this Contract. The indemnity provided for in this paragraph does not apply to any liability resulting from the negligence of the Owner, its officers or employees, separate contractors or assigned contractors, in instances where such negligence causes personal injury, death or property damage. IN THE EVENT CONTRACTOR AND OWNER ARE FOUND JOINTLY LIABLE BY A COURT OF COMPETENT JURISDICTION, LIABILITY WILL BE APPORTIONED COMPARATIVELY IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT WAIVING ANY GOVERNMENTAL IMMUNITY AVAILABLE TO THE STATE UNDER TEXAS LAW AND WITHOUT WAIVING ANY DEFENSES OF THE PARTIES UNDER TEXAS LAW.**

3.3.11.1   The provisions of this indemnification are solely for the benefit of the parties hereto and not intended to create or grant any rights, contractual or otherwise, to any other person or entity.

3.3.11.2   Contractor shall promptly advise Owner in writing of any claim or demand against Owner or against Contractor which involves Owner and known to Contractor and related to or arising out of Contractor's activities under this Contract.

3.3.12   Ancillary Areas. Operate and maintain operations and associated storage areas at the site of the Work in accordance with the following:

3.3.12.1   Confine all Contractor operations, including storage of materials and employee parking upon the Site of Work, to areas designated by Owner **or ODR**.

3.3.12.2   **With prior written approval of the Owner and ODR,** Contractor may erect, at its own expense, temporary buildings that will remain its

15

property.   Remove such buildings and associated utility service lines upon completion of the Work, unless Contractor requests and Owner provides written consent that it may abandon such buildings and utilities in place.

3.3.12.3  Use only established roadways or construct and use such temporary roadways as may be authorized by Owner.  Do not allow load limits of vehicles to exceed the limits prescribed by appropriate regulations or law.   Provide protection to road surfaces, curbs, sidewalks, trees, shrubbery, sprinkler systems, drainage structures and other like existing improvements to prevent damage and repair any damage thereto at the expense of Contractor.

3.3.12.4 ODR may restrict Contractor's entry to the Site to specifically assigned entrances and routes.

3.3.13  Separate Contracts. ODR reserves the right to award other contracts in connection with other portions of the Project under these same or substantially similar contract conditions, including those portions related to insurance and waiver of subrogation.  ODR reserves the right to perform operations related to the Project with ODR's own forces.

3.3.14  Under a system of separate contracts, the conditions described herein continue to apply except as may be amended by change order.

3.3.15  Contractor shall cooperate with other contractors or forces employed on the Project by Owner, including providing access to Site and Project information as requested.

3.3.16 ODR shall be reimbursed by Contractor for costs incurred by ODR which are payable to a separate contractor because of delays, improperly timed activities, or defective construction by Contractor.  ODR will equitably adjust the Contract by Change Order for costs incurred by Contractor because of delays, improperly timed activities, damage to the Work or defective construction by a separate contractor.

## Article 4.  Historically Underutilized Business (HUB) Subcontracting Plan

4.1  General Description. *The purpose of the HUB Program is to promote full and equal business opportunities for all businesses in State contracting.*

*In accordance with 34 TAC §20.14(d)(1)(D)(iii), a respondent (prime contractor) may demonstrate good faith effort to utilize Texas certified HUBs for its subcontracting opportunities if the total value of the respondent's subcontracts with Texas certified HUBs meets or exceeds the statewide HUB goal or the agency specific HUB goal, whichever is higher. When a respondent uses this method to demonstrate good faith effort, the respondent must identify the HUBs with which it will subcontract. If using*

16

*existing contracts with Texas certified HUBs to satisfy this requirement, only contracts that have been in place for five years or less shall qualify for meeting the HUB goal. The limitation is designed to encourage vendor rotation as recommended by the 2009 Texas Disparity Study.*

4.1.1    State agencies are required by statute to make a good faith effort to assist HUBs in participating in contract awards issued by the State.    34 T.A.C. §20.13(b) outlines the State's policy to encourage the utilization of HUBs in State contracting opportunities through race, ethnic and gender neutral means.

4.1.2    A Contractor who contracts with the State in an amount of $100,000 or greater is required to make a good faith effort to award subcontracts to HUBs in accordance with 34 T.A.C. § 20.14(a)(2)(A) by submitting a HUB subcontracting plan within twenty-four (24) hours after the bid or response is due and complying with the HUB subcontracting plan after it is accepted by Owner and during the term of the Contract.

4.2    <u>Compliance with Approved HUB Subcontracting Plan</u>.    Contractor having been awarded this Contract in part by complying with the HUB program statute and rules, hereby covenants to continue to comply with the HUB program as follows:

4.2.1    Prior to adding or substituting a Subcontractor, promptly notify Owner in the event a change is required for any reason to the accepted HUB subcontracting plan.

4.2.2    Conduct the good-faith effort activities required and provide Owner with necessary documentation to justify approval of a change to the approved HUB subcontracting plan.

4.2.3    Cooperate in the execution of a Change Order or such other approval of the change in the HUB subcontracting plans as Contractor and Owner may agree to.

4.2.4    Maintain and make available to Owner upon request business records documenting compliance with the accepted HUB subcontracting plan.

4.2.5    Upon receipt of payment for performance of Work, submit to Owner a compliance report, in the format required by Owner that demonstrates Contractor's performance of the HUB subcontracting plan.

4.2.5.1    Progress Assessment Report (PAR): monthly compliance reports to Owner (contracting agency), verifying their compliance with the HUB subcontracting plan, including the use/expenditures they have made to Subcontractors.    (The PAR is available at **http://www.window.state.tx.us/procurement/prog/hub/hub-forms/progressassessmentrpt.xls**).

4.2.6    Promptly and accurately explain and provide supplemental information to Owner to assist in Owner's investigation of Contractor's good-faith effort to fulfill

17

the HUB subcontracting plan and the requirements under 34 T.A.C. §20.14(a)(1).

4.3     Failure to Demonstrate Good-Faith Effort.     Upon a determination by Owner that Contractor has failed to demonstrate a good-faith effort to fulfill the HUB subcontracting plan or any Contract covenant detailed above, Owner may, in addition to all other remedies available to it, report the failure to perform to the Comptroller of Public Accounts, Texas Procurement and Support Services Division, Historically Underutilized Business Program and may bar Contractor from future contracting opportunities with Owner.

# Article 5.  Bonds and Insurance

5.1     Construction Bonds.  Contractor is required to tender to ODR, prior to commencing the Work, performance and payment bonds, as required by Tex. Gov't Code, Chapter2253.  On Construction Manager-at-Risk and Design-Build Projects the Owner shall require a security bond, as described in Subsection 5.1.2 below.

5.1.1     Bond Requirements. Each bond shall be executed by a corporate surety or sureties authorized to do business in the State of Texas and acceptable to the ODR, on the ODR's form, and in compliance with the relevant provisions of the Texas Insurance Code.  If a surety upon a bond loses its authority to do business in the State, Contractor shall, within thirty (30) days after such loss, furnish a replacement bond at no added cost to the ODR.

**Contractor agrees to promptly remove or discharge such lien or claim.  If the Contractor shall fail to so remove or discharge the same within ten (10) days after receipt of written notice from ODR, ODR shall have the right to remove or discharge the same by bonding, payment or otherwise.  The amount of any payment, costs and/or expenses made or incurred by ODR in connection with the removal or discharge of any such lien or claim may be deducted by ODR from any payment or amounts then due or thereafter to become due to the Contractor.  The premium of such bond is to be paid by the Contractor.  ODR, at its option, may terminate and cancel this contract without cost to ODR upon Contractor's failure to deliver such properly executed bonds to ODR and Contractor agrees to indemnify and hold harmless ODR from any and all damages suffered by ODR as a result of Contractor's failure to provide such a bond.**

5.1.1.1     Performance Bond.  A Performance Bond is required if the Contract Sum is in excess of $100,000.  The Performance Bond is solely for the protection of the Owner and ODR.  The Performance Bond is to be for the Contract Sum to guarantee the faithful performance of the Work in accordance with the Contract Documents.  The form of the bond shall be approved by the Office of the Attorney General of Texas.  The Performance Bond shall be effective through Contractor's warranty period.

18

5.1.1.2   Payment Bond.  A Payment bond is required if the Contract price is in excess of $25,000.  The payment bond is to be for the Contract Sum and is payable to the ODR solely for the protection and use of payment bond beneficiaries who have a direct contractual relationship with the Contractor or its subcontractor.  The form of the bond shall be approved by the Office of the Attorney General of Texas.

5.1.2   Security Bond.  The security bond provides protection to ODR if Contractor presents an acceptable guaranteed maximum price ("GMP") to ODR and 1) fails to execute the GMP; or 2) fails to deliver the required payment and performance bonds within the time period stated below.

5.1.3   When Bonds Are Due
5.1.3.1   Security bonds are due within ten (10) days of signing a Construction Manager-at-Risk or Design-Build Contract.

5.1.3.2   Payment and performance bonds are due within ten (10) days of Contractor's receipt of a fully executed GMP on a Construction Manager-at-Risk project or the Contract Sum for a Design-Build project, or within ten (10) days of Contractor's receipt of a fully executed Contract on competitively bid or competitive sealed proposal projects.

5.1.4   Power of Attorney.  Each bond shall be accompanied by a valid power- of-attorney issued by the surety company, attached to the bond, and signed and sealed with the corporate embossed seal, authorizing the attorney-in-fact who signs the bond to commit the surety to the terms of the bond, and stating any limit in the amount for which the attorney can issue a single bond.

5.1.5   Bond Indemnification.  The process of requiring and accepting bonds and making claims there under shall be conducted in compliance with Tex. Gov"t Code, Chapter 2253.  IF FOR ANY REASON A STATUTORY PAYMENT OR PERFORMANCE BOND IS NOT HONORED BY THE SURETY, CONTRACTOR SHALL FULLY INDEMNIFY AND HOLD THE ODR AND OWNER HARMLESS OF AND FROM ANY COSTS, LOSSES, OBLIGATIONS OR LIABILITIES IT INCURS AS A RESULT.

5.1.6   Furnishing Bond Information.  ODR shall furnish certified copies of the Payment Bond and the related Contract to any qualified person seeking copies who complies with Tex. Gov't Code § 2253.026.

5.1.7   Claims on Payment Bonds.  Claims on payment bonds must be sent directly to Contractor and his surety in accordance with Tex. Gov't Code § 2253.041.  All payment bond claimants are cautioned that no lien exists on the funds unpaid to Contractor on such Contract, and that reliance on notices sent to ODR may result in loss of their rights against Contractor and/or his surety. The ODR is not responsible in any manner to a claimant for collection of unpaid bills, and accepts no such responsibility because of any representation by any agent or employee.

19

5.1.8   Payment Claims when Payment Bond not Required.  The rights of Subcontractors regarding payment are governed by Tex. Prop. Code §§53.2 31 – 53.239  when the value of the Contract between ODR and Contractor is less than $25,000.00.  These provisions set out the requirements for filing a valid lien on funds unpaid to Contractor as of the time of filing the claim, actions necessary to release the lien and satisfaction of such claim.

5.1.9   Sureties.   Sureties shall be listed on the US Department of the Treasury's Listing of Approved Sureties maintained by the Bureau of Financial Management Service (FMS), www.fms.treas.gov/c570, stating companies holding Certificates of Authority as acceptable sureties on Federal Bonds and acceptable reinsuring companies (FMS Circular 570) **and have a rating of A- or better with A.M. Best Company.**

5.2   **Insurance Requirements.  See attached Sample Contract or Master Agreement. for insurance requirements.**

# Article 6.  Construction Documents, Coordination Documents, and Record Documents

6.1   Drawings and Specifications.

6.1.1   Copies Furnished.  *The Contractor will be furnished one (1) digital copy of Drawings and Specifications free of charge.*

6.1.2   Ownership of Drawings and Specifications. **If applicable**, all Drawings, Specifications and copies thereof furnished by A/E are to remain A/E's property.  These documents are not to be used on any other project, and with the exception of the Contract record set and electronic versions needed for warranty operations, are to be returned to the A/E, upon request, following completion of the Work.

6.1.3   Interrelation of Documents.  The Contract Documents as referenced in the Contract between Owner and Contractor are complimentary, and what is required by one shall be as binding as if required by all.

6.1.4   Resolution of Conflicts in Documents.  Where conflicts may exist within the Contract Documents, the documents shall govern in the following order:  (a) Change Orders, addenda, and written amendments to the Contract; (b) the Contract; (c) Specifications; (d) Drawings; and (e) other Contract Documents.  Among other categories of documents having the same order of precedence, the term or provision that includes the latest date shall control.  *Where conflicts may exist between and/or within the Contract Documents, the higher quality, greater quantity, more restrictive, and/or more expensive requirement shall be required and shall be the basis of Contractor pricing*. Contractor shall notify A/E and ODR for resolution of the issue prior to executing the Work in question.

20

6.1.5   Contractor's Duty to Review Contract Documents.   In order to facilitate its responsibilities for completion of the Work in accordance with and as reasonably inferable from the Contract Documents, prior to commencing the Work, Contractor shall examine and compare the Contract Documents, information furnished by Owner, relevant field measurements made by Contractor and any visible or reasonably anticipated conditions at the Site affecting the Work.  This duty extends throughout the construction phase prior to commencing each particular work activity and/or system installation.

6.1.6   Discrepancies and Omissions in Drawings and Specifications.

6.1.6.1   Promptly report to ODR and to A/E the discovery of any apparent error, omission or inconsistency in the Contract Documents prior to execution of the Work.

6.1.6.2   It is recognized that Contractor is not acting in the capacity of a licensed design professional, unless it is performing as a Design- Build firm.

6.1.6.3   It is further recognized that Contractor's examination of Contract Documents is to facilitate construction and does not create an affirmative responsibility to detect errors, omissions or inconsistencies or to ascertain compliance with applicable laws, building codes or regulations, unless it is performing as a Design- Build firm or a Construction Manager-at-Risk.

6.1.6.4   When performing as a Design-Build firm, Contractor has sole responsibility for discrepancies, errors, and omissions in the Drawings and Specifications.

6.1.6.5   When performing as a Construction Manager-at-Risk, Contractor has a shared responsibility with A/E for discovery and resolution of discrepancies, errors, and omissions in the Contract Documents.  In such case, Contractor's responsibility pertains to review, coordination, and recommendation of resolution strategies within budget constraints.

6.1.6.6   Contractor has no liability for errors, omissions, or inconsistencies unless Contractor knowingly failed to report a recognized problem to Owner or the Work is executed under a Design-Build or Construction Manager-at-Risk Contract as outlined above.   Should Contractor fail to perform the examination and reporting obligations of these provisions, Contractor is responsible for avoidable costs and direct and/or consequential damages.

*6.1.6.7   The* **ODR** *makes no representations, express or implied, about the adequacy or accuracy of the Drawings, Specifications or other*

21

*Construction Documents provided or their suitability for their intended use. Owner expressly disclaims any implied warranty that the Construction Documents are adequate, accurate or suitable for their intended use.*

6.2     Requirements for Record Documents.  Contractor shall:

6.2.1   Maintain at the Site one copy of all Drawings, Specifications, addenda, keep current and maintain Drawings and Specifications in good order with **as constructed** postings and markings to record actual conditions of Work and Show and reference all changes made during construction.   Provide Owner and A/E access to these documents.

6.2.2   Not Applicable.

6.2.3   Not Applicable.

6.2.4   **Prior to final payment application**, Contractor shall furnish a copy of its marked-up Record Documents and a preliminary copy of each instructional manual, maintenance and operating manual, parts catalog, wiring diagrams, spare parts, specified written warranties and like publications, or parts for all installed equipment, systems, and like items and as described in the Contract Documents.

6.2.5   Once determined acceptable by ODR with input from A/E, provide one (1) reproducible copy and one (1) electronic media copy of all Record Documents, unless otherwise required by the **SSC Uniform General & Supplementary Conditions or Special Conditions**.

6.2.6   Contractor shall be responsible for updating the Record Documents for all Contractor initiated documents and changes to the Contract Documents due to coordination and actual field conditions, including RFIs.

6.2.7    A/E shall be responsible for updating the Record Documents for any addenda, Change Orders, A/E supplemental instructions and any other alterations to the Contract Documents generated by A/E or Owner.

## Article 7.  Construction Safety

7.1     General.  It is the duty and responsibility of Contractor and all of its Subcontractors to be familiar with, enforce and comply with all requirements of Public Law No. 91-596, 29 U.S.C. § 651 et. seq., the Occupational Safety and Health Act of 1970, (OSHA) and all amendments thereto.  Contractor shall prepare a safety plan specific to the Project and submit it to ODR and A/E **(if applicable)** prior to commencing Work.  In addition, Contractor and all of its Subcontractors shall comply with all applicable laws and regulations of any public body having jurisdiction for safety of persons or property to protect them from damage, injury or loss and erect and maintain all necessary safeguards for such safety and protection.

7.2     Notices.  Contractor shall provide notices as follows:

    7.2.1     Notify owners of adjacent property including those that own or operate utility services and/or underground facilities, and utility owners, when prosecution of the Work may affect them or their facilities, and cooperate with them in the protection, removal, relocation and replacement, and access to their facilities and/or utilities.

    7.2.2     Coordinate the exchange of material safety data sheets (MSDSs) or other hazard communication information required to be made available to or exchanged between or among employers at the site in connection with laws and regulations.  Maintain a complete file of MSDSs for all materials in use on site throughout the construction phase and make such file available to Owner and its agents as requested.

7.3     Emergencies.     In any emergency affecting the safety of persons or property, Contractor shall act to minimize, mitigate, and prevent threatened damage, injury or loss.

    7.3.1     Have authorized agents of Contractor respond immediately upon call at any time of day or night when circumstances warrant the presence of Contractor to protect the Work or adjacent property from damage or to take such action pertaining to the Work as may be necessary to provide for the safety of the public.

    7.3.2     Give ODR and A/E prompt notice of all such events.

    7.3.3     If Contractor believes that any changes in the Work or variations from Contract Documents have been caused by its emergency response, promptly notify Owner within seventy-two (72) hours of the emergency response event.

    7.3.4     Should Contractor fail to respond, **ODR** is authorized to direct other forces to take action as necessary and **ODR** may deduct any cost of remedial action from funds otherwise due Contractor.

7.4     Injuries. In the event of an incident or accident involving outside medical care for an individual on or near the Work, Contractor shall notify ODR and other parties as may be directed promptly, but no later than twenty-four (24) hours after Contractor learns that an event required medical care.

    7.4.1     Record the location of the event and the circumstances surrounding it, by using photography or other means, and gather witness statements and other documentation which describes the event.

    7.4.2     Supply ODR and A/E with an incident report no later than thirty-six (36) hours after the occurrence of the event.  In the event of a catastrophic incident (one (1) fatality or three (3) workers hospitalized), barricade and leave intact the scene of the incident until all investigations are complete.  A full set of incident investigation documents, including facts, finding of cause, and remedial plans shall be provided within one (1) week after occurrence, unless otherwise directed

by legal counsel.  Contractor shall provide ODR with written notification within one week of such catastrophic event if legal counsel delays submission of full report.

7.5     Environmental Safety.   Upon encountering any previously unknown potentially hazardous material, or other materials potentially contaminated by hazardous material, Contractor shall immediately stop work activities impacted by the discovery, secure the affected area, and notify ODR immediately.

    7.5.1   Bind all Subcontractors to the same duty.

    7.5.2   Upon receiving such notice, ODR will promptly engage qualified experts to make such investigations and conduct such tests as may be reasonably necessary to determine the existence or extent of any environmental hazard. Upon completion of this investigation, ODR will issue a written report to Contractor identifying the material(s) found and indicate any necessary steps to be taken to treat, handle, transport or dispose of the material.

    7.5.3   ODR may hire third-party Contractors to perform any or all such steps.

    7.5.4   Should compliance with ODR's instructions result in an increase in Contractor's cost of performance, or delay the Work, Owner will make an equitable adjustment to the Contract Sum and/or the time of completion, and modify the Contract in writing accordingly.

7.6     Trenching Plan.  When the project requires excavation which either exceeds a depth of four (4) feet, or results in any worker's upper body being positioned below grade level, Contractor is required to submit a trenching plan to ODR prior to commencing trenching operations unless an engineered plan is part of the Contract Documents. The plan is required to be prepared and sealed by a professional engineer registered in the State of Texas, and hired or employed by Contractor or Subcontractor to perform the work.  Said engineer cannot be anyone who is otherwise either directly or indirectly engaged on this project.

# Article 8.  Quality Control

8.1     Materials & Workmanship.   Contractor shall execute Work in a good and workmanlike matter in accordance with the Contract Documents.  Contractor shall develop and provide a quality control plan specific to this Project and acceptable to **ODR**.  Where Contract Documents do not specify quality standards, complete and construct all Work in compliance with generally accepted construction industry standards.  Unless otherwise specified, incorporate all new materials and equipment into the Work under the Contract.

8.2     Testing.

    8.2.1   Contractor is responsible for coordinating routine and special tests required to confirm compliance with quality and performance requirements, except as stated below or otherwise required by the Contract Documents. Contractor shall provide the following testing:

8.2.1.1 Any test of basic material or fabricated equipment included as part of a submittal for a required item in order to establish compliance with the Contract Documents.

8.2.1.2 Any test of basic material or fabricated equipment offered as a substitute for a specified item on which a test may be required in order to establish compliance with the Contract Documents.

8.2.1.3 Preliminary, start-up, pre-functional and operational testing of building equipment and systems as necessary to confirm operational compliance with requirements of the Contract Documents.

8.2.1.4 All subsequent tests on original or replaced materials conducted as a result of prior testing failure.

8.2.2 All testing shall be performed in accordance with standard test procedures by an accredited laboratory, or special consultant as appropriate, acceptable to Owner. Results of all tests shall be provided promptly to ODR, A/E, and Contractor.

8.2.3 Non-Compliance (Test Results). Should any of the tests indicate that a material and/or system does not comply with the Contract requirements, the burden of proof remains with Contractor, subject to:

8.2.3.1 Contractor selection and submission of the laboratory for Owner acceptance.

8.2.3.2 Acceptance by Owner of the quality and nature of tests.

8.2.3.3 All tests taken in the presence of A/E and/or ODR, or their representatives.

8.2.3.4 If tests confirm that the material/systems comply with Contract Documents, Owner will pay the cost of the test.

8.2.3.5 If tests reveal noncompliance, Contractor will pay those laboratory fees and costs of that particular test and all future tests, of that failing Work, necessary to eventually confirm compliance with Contract Documents.

8.2.3.6 Proof of noncompliance with the Contract Documents will make Contractor liable for any corrective action which ODR determines appropriate, including complete removal and replacement of non-compliant work or material.

8.2.4 Notice of Testing. Contractor shall give ODR and A/E timely notice of its readiness and the date arranged so ODR and A/E may observe such inspection, testing, or approval.

25

8.2.5    Test Samples.  Contractor is responsible for providing Samples of sufficient size for test purposes and for coordinating such tests with their Work Progress Schedule to avoid delay.

8.2.6    Covering Up Work.  If Contractor covers up any Work without providing Owner an opportunity to inspect, Contractor shall, if requested by ODR, uncover and recover the work at Contractor's expense.

8.3    Submittals.

8.3.1    Contractor's Submittals.  Contractor shall submit with reasonable promptness consistent with the Project schedule and in orderly sequence all Shop Drawings, Samples, or other information required by the Contract Documents, or subsequently required by Change Order.  Prior to submitting, Contractor shall review each submittal for general compliance with Contract Documents and approve submittals for review by A/E and **ODR** by an approval stamp affixed to each copy.  Submittal data presented without Contractor's stamp will be returned without review or comment, and any delay resulting from failure is Contractor's responsibility.

8.3.1.1    Contractor shall within twenty-one (21) days of the effective date of the Notice To Proceed with construction, submit to ODR and A/E, a submittal schedule/register, organized by specification section, listing all items to be furnished for review and approval by A/E and **ODR**.  The list shall include Shop Drawings, manufacturer's literature, certificates of compliance, materials Samples, materials colors, guarantees, and all other items identified throughout the Specifications.

8.3.1.2    Contractor shall indicate the type of item, Contract requirements reference, and Contractor's scheduled dates for submitting the item along with the requested dates for approval answers from A/E, ODR and Owner **(if applicable)**.  The submittal register shall indicate the projected dates for procurement of all included items and shall be updated at least monthly with actual approval and procurement dates.  Contractor's Submittal Register must be reasonable in terms of the review time for complex submittals.  Contractor's submittal schedule must be consistent with the Work Progress Schedule and identify critical submittals.  Show and allow a minimum of fifteen (15) days duration after receipt by A/E and ODR for review and approval.  If re- submittal required, allow a minimum of an additional fifteen (15) days for review.  Submit the updated Submittal Register with each request for progress payment.  Owner may establish routine review procedures and schedules for submittals at the preconstruction conference and/or elsewhere in the Contract Documents.  If Contractor fails to update and provide the Submittal Register as required, Owner may, after seven (7) days notice to Contractor withhold a reasonable sum of money that would otherwise be due Contractor. *Failure to update and provide the*

26

*submittal schedule/register as required shall constitute cause for Owner to withhold payment otherwise due.*

8.3.1.3   Contractor shall coordinate the Submittal Register with the Work Progress Schedule. Do not schedule Work requiring a submittal to begin prior to scheduling review and approval of the related submittal. Revise and/or update both schedules monthly to ensure consistency and current project data. Provide to ODR the updated Submittal Register and schedule with each application for progress payment.   Refer to requirements for the Work Progress Schedule for inclusion   of procurement activities therein.   Regardless,  the Submittal Register shall identify dates submitted and returned and shall be used to confirm status and disposition of particular items submitted, including approval or other action taken and other information not conveniently tracked through the Work Progress Schedule.

8.3.1.4   By  submitting  Shop  Drawings,  Samples   or  other  required information, Contractor represents that it has determined and verified all applicable field measurements, field construction criteria, materials, catalog numbers and similar data; and has checked and coordinated each Shop Drawing and Sample with the requirements of the Work and the Contract Documents.

8.3.2   Review of Submittals.  A/E and ODR review is only for conformance with the design concept and the information provided in the Contract Documents. Responses to submittals will be in writing.  The approval of a separate item does not indicate approval of an assembly in which the item functions.  The approval of a submittal does not relieve Contractor of responsibility for any deviation from the requirements of the Contract unless Contractor  informs A/E and ODR of such deviation in a clear, conspicuous, and written manner on the submittal transmittal and at the time of submission, and obtains Owner's written specific approval of the particular deviation.

8.3.3   Correction and Resubmission.  Contractor shall make any corrections required to a submittal and resubmit the required number of corrected copies promptly so as to avoid delay, until submittal approval.  Direct attention in writing to A/E  and ODR,  when  applicable,  to  any  new  revisions  other  than  the corrections requested on previous submissions.

8.3.4   Limits on Shop Drawing Review.  Contractor shall not commence any Work requiring a submittal until review of the submittal under Subsection 9.3.2. Construct all such work in accordance with reviewed submittals.  Comments incorporated as part of the review in Subsection 9.3.2 of Shop Drawings and Samples is not authorization to Contractor to perform extra work or changed work unless authorized through a Change Order.  A/E's and ODR's review, if any, does not relieve Contractor from responsibility for defects in the Work resulting from errors or omissions of any kind on the submittal, regardless of any approval action.

8.3.5     No Substitutions Without Approval.  ODR and A/E may receive and consider Contractor's request for substitution when Contractor agrees to reimburse Owner for review costs and satisfies the requirements of this section.  If Contractor does not satisfy these conditions, ODR and A/E will return the request        without action except to record noncompliance with these requirements.  Owner will not consider the request if Contractor cannot provide the product or method because of failure to pursue the Work promptly or coordinate activities properly. Contractor's request for a substitution may be considered by ODR and A/E when:

8.3.5.1   The Contract Documents do not require extensive revisions; and

8.3.5.2   Proposed changes are in keeping with the general intent of the Contract Documents and the design intent of A/E and do not result in an increase in cost to Owner; and

8.3.5.3   The request is timely, fully documented, properly submitted and one or more of the following apply:

8.3.5.3.1   Contractor cannot provide the specified product, assembly or method of construction within the Contract Time;

8.3.5.3.2   The request directly relates to an "or-equal" clause or similar language in the Contract Documents;

8.3.5.3.3   The request directly relates to a "product design standard" or "performance standard" clause in the Contract Documents;

8.3.5.3.4   The requested substitution offers Owner a substantial advantage in cost, time, energy conservation or other considerations, after deducting additional responsibilities Owner must assume;

8.3.5.3.5   The specified product or method of construction cannot receive necessary approval by an authority having jurisdiction, and ODR can approve the requested substitution;

8.3.5.3.6   Contractor cannot provide the specified product, assembly or method of construction in a manner that is compatible with other materials and where Contractor certifies that the substitution will overcome the incompatibility;

8.3.5.3.7   Contractor cannot coordinate the specified product, assembly or method of construction with other materials and

28

where Contractor certifies they can coordinate the proposed substitution; or

8.3.5.3.8   The specified product, assembly or method of construction cannot provide a warranty required by the Contract Documents and where Contractor certifies that the proposed substitution provides the required warranty.

8.3.6   Unauthorized Substitutions at Contractor's Risk.   Contractor is financially responsible for any additional costs or delays resulting from unauthorized substitution of materials, equipment or fixtures other than those specified. Contractor shall reimburse Owner for any increased design or contract administration costs resulting from such unauthorized substitutions.

8.4   Field Mock-up.

8.4.1   Mock-ups shall be constructed prior to commencement of a specified scope of work to confirm acceptable workmanship.

8.4.1.1   As a minimum, field mock-ups shall be constructed for roofing systems, exterior veneer / finish systems, glazing systems, and any other Work requiring a mock-up as identified throughout the Contract Documents.  Mock-ups for systems not part of the Project scope shall not be required.

8.4.1.2   Mock-ups may be incorporated into the Work if allowed by the Contract Documents and if acceptable to ODR.   If mock-ups are freestanding, they shall remain in place until otherwise directed by Owner.

8.4.1.3   Contractor shall include field mock-ups in their Work Progress Schedule and shall notify ODR and A/E of readiness for review sufficiently in advance to coordinate review without delay.

8.5   Inspection During Construction.

8.5.1   Contractor shall provide sufficient, safe, and proper facilities, including equipment as necessary for safe access, at all reasonable times for observation and/or inspection of the Work by Owner and its agents.

8.5.2   Contractor shall not cover up any Work with finishing materials or other building components prior to providing Owner and its agents an opportunity to perform an inspection of the Work.

8.5.2.1   Should corrections of the Work be required for approval, Contractor shall not over up corrected Work until Owner indicates approval.

29

8.5.2.2   Contractor shall provide notification of at least five (5) working days or otherwise as mutually agreed, to ODR of the anticipated need for a cover-up inspection.  Should ODR fail to make the necessary inspection within the agreed period, Contractor may proceed with cover-up Work, but is not relieved of responsibility for Work to comply with requirements of the Contract Documents.

## Article 9.  Construction Schedules

9.1   Contract Time.  TIME IS AN ESSENTIAL ELEMENT OF THE CONTRACT.
The Contract Time is the time between the dates indicated in the Notice to Proceed for commencement of the Work and for achieving Substantial Completion.  The Contract Time can be modified only by Change Order.  Failure to achieve Substantial Completion within the Contract Time as otherwise agreed to in writing will cause damage to Owner and may subject Contractor to liquidated damages as provided in the Contract Documents.   If Contractor fails to achieve Final Completion in a reasonable time after Substantial Completion, Contractor shall be responsible for Owner's additional inspection, project management, and maintenance cost to the extent caused by Contractor's failure to achieve Final Completion.

9.2   Notice to Proceed.  The **ODR** will issue a Notice to Proceed which shall state the dates for beginning Work and for achieving Substantial Completion of the Work.

9.3   Work Progress Schedule.   Contractor shall submit their initial Work Progress Schedule for the Work in relation to the entire Project not later than ten (10) days after the effective date of the Notice to Proceed to ODR and A/E.   Unless otherwise indicated in the Contract Documents, the Work Progress Schedule shall be computerized Critical Path Method (CPM) with fully editable logic. This initial schedule shall indicate the dates for starting and completing the various aspects required to complete the Work, including mobilization, procurement, installation, testing, inspection, delivery of Close-out Documents and acceptance of all the Work of the Contract.   When acceptable to Owner, the initially accepted schedule shall be the Baseline Schedule for comparison to actual conditions throughout the Contract duration.

9.3.1   Schedule Requirements.  Contractor shall submit electronic and paper copy of the initial Work Progress Schedule reflecting accurate and reliable representations of the planned progress of the Work, the Work to date if any, and of Contractor's actual plans for its completion.  Contractor shall organize and provide adequate detail so the schedule is capable of measuring and forecasting the effect of delaying events on completed and uncompleted activities.

9.3.1.1   Contractor shall re-submit initial schedule as required to address review comments from A/E and ODR until such schedule is accepted as the Baseline Schedule.

9.3.1.2   Submittal of a schedule, schedule revision or schedule update constitutes Contractor's representation to **ODR** of the accurate depiction

30

of all progress to date and that Contractor will follow the schedule as submitted in performing the Work.

9.3.2   Schedule Updates.   Contractor shall update the Work Progress Schedule and the Submittal Register monthly, as a minimum, to reflect progress to date and current plans for completing the Work, while maintaining original schedule as Baseline Schedule and submit electronic copies of the update to A/E and ODR as directed, but as a minimum with each request for payment. Owner has no duty to make progress payments unless accompanied by the updated Work Progress Schedule.  Show the anticipated date of completion reflecting all extensions of time granted through Change Order as of the date of the update.  Contractor may revise the Work Progress Schedule when in Contractor's judgment it becomes necessary for the management of the Work. Contractor shall identify all proposed changes to schedule logic to Owner/**ODR** and to A/E via an executive summary accompanying the updated schedule for review prior to final implementation of revisions into a revised Baseline Schedule.  Schedule changes that materially impact Owner's operations shall be communicated promptly to ODR and shall not be incorporated into the revised Baseline Schedule without ODR"s consent.

9.3.3   The Work Progress Schedule is for Contractor's use in managing the Work and submittal of the schedule, and successive updates or revisions, is for the information of Owner and to demonstrate that Contractor has complied with requirements for planning the Work.  Owner's acceptance of a schedule, schedule update or revision constitutes Owner's agreement to coordinate its own activities with Contractor's activities as shown on the schedule.

9.3.3.1   Acceptance of the Work Progress Schedule, or update and/or revision thereto does not indicate any approval of Contractor's proposed sequences and duration.

9.3.3.2   Acceptance of a Work Progress Schedule update or revision indicating early or late completion does not constitute Owner's consent, alter the terms of the Contract, or waive either Contractor's responsibility for timely completion or Owner's right to damages for Contractor's failure to do so.

9.3.3.3   Contractor's scheduled dates for completion of any activity or the entire Work do not constitute a change in terms of the Contract. Change Orders are the only method of modifying the Substantial Completion Date(s) and Contract Time.

9.4   Ownership of Float.   Unless indicated otherwise in  the  Contract  Documents, Contractor shall develop its schedule, pricing, and execution plan to provide a minimum of ten (10) percent total float at acceptance of the Baseline Schedule.  Float time contained in the Work Progress Schedule is not for the exclusive benefit of Contractor or Owner, but belongs to the Project and may be consumed by either party as needed on a first-used basis.

31

9.5     Completion of Work.  Contractor is accountable for completing the Work within the Contract Time stated in the Contract, or as otherwise amended by Change Order.

9.5.1   If, in the judgment of Owner/**ODR**, the work is behind schedule and the rate of placement of work is inadequate to regain scheduled progress to insure timely completion of the entire work or a separable portion thereof, Contractor, when so informed by Owner/**ODR**, shall immediately take action to increase the rate of work placement by:

9.5.1.1   An increase in working forces.

9.5.1.2   An increase in equipment or tools.

9.5.1.3   An increase in hours of work or number of shifts.

9.5.1.4   Expedite delivery of materials.

9.5.1.5   Other action proposed if acceptable to Owner.

9.5.2   Within five (5) days after such notice from ODR, Contractor shall notify ODR in writing of the specific measures taken and/or planned to increase the rate of progress.   Contactor shall include an estimate as to the date of scheduled progress recovery and an updated Work Progress Schedule illustrating Contractor's plan for achieving timely completion of the Project. Should ODR deem the plan of action inadequate, Contractor shall take additional steps or make adjustments as necessary to its plan of action until it meets with ODR's approval.

9.6     Modification of the Contract Time.

9.6.1   Delays and extension of time as hereinafter described are valid only if executed in accordance with provisions set forth in Article 11.

9.6.2   When a delay defined herein as excusable prevents Contractor from completing the Work within the Contract Time, Contractor is entitled to an extension of time. Owner will make an equitable adjustment and extend the number of days lost because of excusable delay or Weather Days, as measured by Contractor's progress schedule.  All extensions of time will be granted in calendar days.  In no event, however, will an extension of time be granted for delays that merely extend the duration of non-critical activities, or which only consume float without delaying the project Substantial Completion date(s).

9.6.2.1   A "Weather Day" is a day on which Contractor's current schedule indicates Work is to be done, and on which inclement weather and related site conditions prevent Contractor from performing seven (7) continuous hours of Work between the hours of 7:00 a.m. and 6:00 p.m. Weather days are excusable delays. When weather conditions at the site prevent work from proceeding, Contractor shall immediately notify ODR for confirmation of the conditions.  At the end of each calendar month, submit to ODR and A/E a list of Weather Days occurring in that

32

month along with documentation of the impact on critical activities. Based on   confirmation by ODR,  any time extension granted will be issued by Change Order *for those weather days during that month which exceed the number expected, as shown in the Rainfall Table below*. If Contractor and Owner cannot agree on the time extension, Owner  may  issue  a ULCO for fair and reasonable time extension.

9.6.2.1.1 *Rainfall Table*
*The number of weather days expected for each month during the term of this Contract is compiled by the State Climatologist, based on U.S. Weather Bureau records. The number of weather days shown in the Rainfall Table for the first and last months of the Contract will be prorated in determining the total number of weather days expected during the term of this Contract.*

*Texas A&M University (College Station/Bryan)*

| | | | | | |
|---|---|---|---|---|---|
| *January* | *5* | *May* | *5* | *September* | *6* |
| *February* | *5* | *June* | *4* | *October* | *4* |
| *March* | *5* | *July* | *4* | *November* | *4* |
| *April* | *5* | *August* | *4* | *December* | *5* |

9.6.2.2   Excusable Delay. Contractor is entitled to an equitable adjustment of the Contract Time, issued via change order, for delays caused by the following:

9.6.2.2.1   Errors, omissions and imperfections in design, which A/E corrects by means of changes in the Drawings and Specifications.

9.6.2.2.2   Unanticipated physical conditions at the Site, which A/E corrects by means of changes to the Drawings and Specifications or for which ODR directs changes in the Work identified in the Contract Documents.

9.6.2.2.3   Changes in the Work that effect activities identified in Contractor's schedule as "critical" to completion of the entire Work, if such changes are ordered by ODR or recommended by A/E and ordered by ODR.

9.6.2.2.4   Suspension of Work for unexpected natural events (sometimes called "*Force Majure*"), civil unrest, strikes or other events which are not within the reasonable control of Contractor.

9.6.2.2.5   Suspension of Work for convenience of ODR, which prevents Contractor from completing the Work within the Contract Time.

33

9.6.3   Contractor's relief in the event of such delays is the time impact to the critical path as determined by analysis of Contractor's schedule.   In the event that Contractor incurs additional direct costs because of the excusable delays other than described in Subparagraph 9.6.2.2.4 and within the reasonable control of Owner, the Contract price and Contract Time are to be equitably adjusted by Owner pursuant to the provisions of Article 11.

9.7   No Damages for Delay. Contractor has no claim for monetary damages for delay or hindrances to the work from any cause, including without limitation any act or omission of Owner.

9.8   Concurrent Delay.  When the completion of the Work is simultaneously delayed by an excusable delay and a delay arising from a cause not designated as excusable, Contractor may not be entitled to a time extension for the period of concurrent delay.

9.9   Other Time Extension Requests.  Time extensions requested in association with changes to the Work directed or requested by Owner shall be included with Contractor's proposed costs for such change. Time extensions requested for inclement weather are covered by Paragraph 9.6.2.1 above.  If Contractor believes that the completion of the Work is delayed by a circumstance other than for changes directed to the Work or weather, they shall give ODR written notice, stating the nature of the delay and the activities potentially affected, within five (5) days after the onset of the event or circumstance giving rise to the excusable delay. Contractor shall provide sufficient written evidence to document the delay.  In the case of a continuing cause of delay, only one claim is necessary.   State claims for extensions of time in numbers of whole or half days.

9.9.1   Within ten (10) days after the cessation of the delay, Contractor shall formalize its request for extension of time in writing to include a full analysis of the schedule impact of the delay and substantiation of the excusable nature of the delay. All changes to the Contract Time or made as a result of such claims is by Change Order, as set forth in Article 11.

9.9.2   No extension of time releases Contractor or the Surety furnishing a performance or payment bond from any obligations under the Contract or such a bond.  Those obligations remain in full force until the discharge of the Contract.

9.9.3   Contents of Time Extension Requests. Contractor shall provide with each Time Extension Request a quantitative demonstration of the impact of the delay on project completion time, based on the Work Progress Schedule. Contractor shall include with Time Extension Requests a reasonably detailed narrative setting forth:

9.9.3.1   The nature of the delay and its cause; the basis of Contractor's claim of entitlement to a time extension.

34

9.9.3.2   Documentation of the actual impacts of the claimed delay on the critical path indicated in Contractor's Work Progress Schedule, and any concurrent delays.

9.9.3.3   Description and documentation of steps taken by Contractor to mitigate the effect of the claimed delay, including, when appropriate, the modification of the Work Progress Schedule.

9.9.4   ODR's Response.   ODR will respond to the Time Extension Request by providing to Contractor written notice of the number of days granted, if any, and giving its reason if this number differs from the number of days requested by Contractor.

9.9.4.1   ODR will not grant time extensions for delays that do not affect the Contract Substantial Completion date.

9.9.4.2   ODR will respond to each properly submitted Time Extension Request within fifteen (15) days following receipt.  If ODR cannot reasonably make a determination about Contractor's entitlement to a time extension within that time, ODR will notify Contractor in writing.  Unless otherwise agreed by Contractor, ODR has no more than  fifteen (15) additional days to prepare  a final response.  If the ODR fails to respond within forty-five (45) calendar days from the date the Time Extension Request is received, the Contractor is entitled to a time extension in the amount requested.

9.10   Failure to Complete Work Within the Contract Time. TIME IS AN ESSENTIAL ELEMENT OF THE CONTRACT.  Contractor's failure to substantially complete the Work within the Contract Time or to achieve Substantial Completion as required will cause damage to Owner.   These damages shall be liquidated by agreement of Contractor and Owner, in the amount per day as set forth in the Contract Documents.

9.11   Liquidated Damages.  *For each consecutive calendar day after the date of Substantial Completion, plus any extensions of time granted by Change Order, that the Work is not substantially completed, Contractor shall pay to ODR, within ten (10) days following written demand, an amount determined by the following schedule:*

| Project Work - Actual Cost of Construction (ACC) | | |
| --- | --- | --- |
| **From** | **To** | **Per Day** |
| $0 | $299,999.99 | $250.00 |
| $300,000 | $999,999.99 | $500.00 |
| $1,000,000 | $4,999,999.99 | $2,500.00 |
| $5,000,000 | $10,000,000 | $5,000.00 |

*Liquidated Damages shall be applied not as a penalty but as liquidated damages representing the parties' estimate at the time of contract execution of the damages that*

35

*Owner or ODR will sustain for late completion. ODR may also recover the liquidated damages from any money due or that becomes due Contractor. The amount of liquidated damages may be adjusted by Owner in Special Conditions.*

*The parties stipulate and agree that the actual damages sustained by Owner or ODR for late completion of the Project will be uncertain and difficult to ascertain, that calculating Owner's or ODR's actual damages would be impractical, unduly burdensome, and cause unnecessary delay, and that the amount of daily liquidated damages set forth above is a reasonable estimate.*

*Payment of the liquidated damages does not preclude recovery by Owner or ODR of other damages or losses under other provisions of the Contract, except for claims related to delays in Substantial Completion (as defined below) or Final Completion. Owner's right to receive liquidated damages shall not affect Owner's right to terminate the Contract as provided in these UGSC or elsewhere in the Contract Documents, nor shall termination of the Contract release Contractor from the obligation to pay the liquidated damages.*

## Article 10.  Payments

10.1.1 <u>Schedule of Values</u>.   Contractor shall submit to ODR and A/E for acceptance a Schedule of Values accurately itemizing material and labor for the various classifications of the Work based on the organization of the specification sections and of sufficient detail acceptable to ODR.  The accepted Schedule of Values will be the basis for the progress payments under the Contract.

10.1.1 No progress payments will be made prior to receipt and acceptance of the Schedule of Values, provided in such detail as required by ODR, and submitted not less than twenty-one (21) days prior to the first request for payment.   The Schedule of Values shall follow the order of trade divisions of the Specifications and include itemized costs for general conditions, costs for preparing close out documents, fees, contingencies, and Owner cash allowances, if applicable, so that the sum of the items will equal the Contract price. As  appropriate,  assign  each item  labor  and/or  material  values,  the subtotal thereof equaling the value of the work in place when complete.

10.1.1.1  ODR requires that the Work items be inclusive of the cost of the Work items only.   Any contract markups for overhead and profit, general conditions, etc., shall be contained within separate line items for those specific purposes.

10.1.2  Contractor shall retain a copy of all worksheets used in preparation of its bid or proposal, supported by a notarized statement that the worksheets are true and complete copies of the documents used to prepare the bid or proposal. Make the worksheets available to ODR at the time of Contract execution. Thereafter Contractor shall grant **ODR** during normal business hours access to said copy of worksheets at any time during the period commencing upon execution of the Contract and ending one year after final payment.

36

10.2.  Progress Payments.  Contractor will receive periodic progress payments for Work performed, materials in place, suitably stored on Site, or as otherwise agreed to by **ODR** and Contractor.  Payment is not due until receipt by ODR or his designee of a correct and complete Pay Application in electronic and/or hard copy format as set forth in **UGSC, Div 01 Specifications, Master Agreement Contract**, and certified by A/E. Progress payments are made provisionally and do not constitute acceptance of work not in accordance with the Contract Documents.  **ODR** will not process progress payment applications for Change Order Work until all parties execute the Change Order.

10.2.1  Preliminary Pay Worksheet.  Once each month that a progress payment is to be requested, the Contractor shall submit to A/E and ODR a complete, clean copy of a preliminary pay worksheet or preliminary pay application, to include the following:

10.2.1.1  Contractor's estimate of the amount of Work performed, labor furnished and materials incorporated into the Work, using the established Schedule of Values;

10.2.1.2  An updated Work Progress Schedule including  the executive summary and all required schedule reports;

10.2.1.3  HUB subcontracting plan Progress Assessment Report as required in Paragraph 4.2.5.1;

10.2.1.4  Such additional documentation as **ODR** may require as set forth in the **UGSC** or elsewhere in the Contract Documents; and

10.2.1.5  Construction payment affidavit.

10.2.2  Contractor's Application for Payment.  As soon as practicable, but in no event later than seven (7) days after receipt of the preliminary pay worksheet, A/E and ODR will meet with Contractor to review the preliminary pay worksheet and  to observe the condition of the Work.  Based on this review, ODR and A/E may require modifications to the preliminary pay worksheet prior to the submittal of an Application for Payment, and will promptly notify Contractor of revisions necessary for approval.  As soon as practicable, Contractor shall submit its Application for Payment on the appropriate and completed form, reflecting the required modifications to the Schedule of Values required by A/E and/or ODR.  Attach all additional documentation required by ODR and/or A/E, as well as an affidavit affirming that all payrolls, bills for labor, materials, equipment, subcontracted work and other indebtedness connected with Contractor's Application for Payment are paid or will be paid within the time specified in Tex. Gov't Code, Chapter 2251. No Application for Payment is complete unless it fully reflects all required modifications, and attaches all required documentation including Contractor's affidavit.

10.2.3  Certification by Architect/Engineer **(if applicable)**.  Within five (5) days or earlier following A/E's  receipt  of  Contractor's  formal  Application  for

37

Payment, A/E will review the Application for Payment for completeness, and forward it to ODR. A/E will certify that the application is complete and payable, or that it is incomplete, stating in particular what is missing. If the Application for Payment is incomplete, Contractor shall make the required corrections and resubmit the Application for Payment for processing.

10.3     **ODR**'s Duty to Pay.  **ODR** has no duty to pay the Contractor except on receipt by **ODR** of: 1) a complete, accurate, and correct Application for Payment certified by A/E; 2) Contractor's updated Work Progress Schedule; and 3) confirmation that Contractor's record documentation at the Site is kept current.

   10.3.1   Payment for stored materials and/or equipment confirmed by **ODR** and A/E to be on-site or otherwise properly stored is limited to eighty-five (85) percent of the invoice price or eighty-five (85) percent of the scheduled value for the materials or equipment, whichever is less.

   10.3.2   Retainage.  **ODR** will withhold from each progress payment, as retainage, five (5) percent of the total earned amount, the amount authorized by law, or as otherwise set forth in the **UGSC** or Special Conditions.  Retainage is managed in conformance with Tex. Gov't Code, Chapter 2252, Subchapter B.

      10.3.2.1  Contractor shall provide written consent of its surety for any request for reduction or release of retainage.

      10.3.2.2  At least sixty-five (65) percent of the Contract, or such other discrete Work phase as set forth in Subsection 12.1.6 or Work package delineated in the Contract Documents, must be completed before **ODR** can consider a retainage reduction or release.

      10.3.2.3  Contractor shall not withhold retainage from their Subcontractors and suppliers in amounts that are any percentage greater than that withheld in its Contract with **ODR** under this subsection, unless otherwise acceptable to **ODR**.

   10.3.3   Price Reduction to Cover Loss.  **ODR** may reduce any Application for Payment, prior to payment to the extent necessary to protect **ODR** from loss on account of actions of Contractor including, but not limited to, the following:

      10.3.3.1  Defective or incomplete Work not remedied;

      10.3.3.2  Damage to Work of a separate Contractor;

      10.3.3.3  Failure to maintain scheduled progress or reasonable evidence that the Work will not be completed within the Contract Time;

      10.3.3.4  Persistent failure to carry out the Work in accordance with the Contract Documents;

      10.3.3.5  Reasonable evidence that the Work cannot be completed for the unpaid portion of the Contract Sum;

38

10.3.3.6 Assessment of fines for violations of prevailing wage rate law; or

10.3.3.7 Failure to include the appropriate amount of retainage for that periodic progress payment.

10.3.4 Title to all material and Work covered by progress payments transfers to Owner upon payment.

10.3.4.1 Transfer of title to Owner does not relieve Contractor and its Subcontractors of the sole responsibility for the care and protection of materials and Work upon which payments have been made until final acceptance, or the restoration of any damaged Work, or waive the right of **ODR** to require the fulfillment of all the terms of the Contract.

10.4    Progress Payments.  Progress payments to Contractor do not release Contractor or its surety from any obligations under the Contract.

10.4.1 Upon **ODR**'s request, Contractor shall furnish manifest proof of the status of Subcontractor's accounts in a form acceptable to **ODR**.

10.4.2 Pay estimate certificates must be signed by a corporate officer or a representative duly authorized by Contractor.

10.4.3 Provide copies of bills of lading, invoices, delivery receipts or other evidence of the location and value of such materials in requesting payment for materials.

10.4.4 For purposes of Tex. Gov't Code § 2251.021(a)(2), the date the performance of service is complete is the date when ODR approves the Application for Payment.

10.5    Off-Site Storage.  With prior approval by **ODR** and in the event Contractor elects to store materials at an off-site location, abide by the following conditions, unless otherwise agreed to in writing by **ODR**.

10.5.1 Store materials in a bonded commercial warehouse meeting the criteria stated below.

10.5.2 Provide insurance coverage adequate not only to cover materials while in storage, but also in transit from the off-site storage areas to the Project Site. Copies of duly authenticated certificates of insurance, made out to insure the **Owner and ODR**, must be filed with **ODR**.

10.5.3 Inspection by Owner's representative is allowed at any time.  Owner's inspectors must be satisfied with the security, control, maintenance, and preservation measures.

10.5.4 Materials for this Project are physically separated and marked for the Project in a sectioned-off area.  Only materials which have been approved through the submittal process are to be considered for payment.

10.5.5 **ODR** reserves the right to reject materials at any time prior to final acceptance of the complete **Project** if they do not meet Contract requirements regardless of any previous progress payment made.

10.5.6 With each monthly payment estimate, submit a report to **ODR, A/E and ODR's Inspector** listing the quantities of materials already paid for and still stored in the off-site location.

10.5.7 Make warehouse records, receipts and invoices available to **ODR**'s, upon request, to verify the quantities and their disposition.

10.5.8 In the event of Contract termination or default by Contractor, the items in storage off-site, upon which payment has been made, will be promptly turned over to **ODR** at a location near the jobsite as directed by ODR. The full provisions of performance and payment bonds on this Project cover the materials off-site in every respect as though they were stored on the Project Site.

10.6    Not Applicable.

## Article 11.  Changes

11.1    <u>Change Orders</u>.  A Change Order issued after execution of the Contract is a written order to Contractor, signed by ODR, Contractor, and A/E **(if applicable)**, authorizing a change in the Work or an adjustment in the Contract Sum or the Contract Time. The Contract Sum and the Contract Time can only be changed by Change Order. A Change Order signed by Contractor indicates his agreement therewith, including the adjustment in the Contract Sum and/or the Contract Time. ODR may issue a written authorization for Contractor to proceed with Work of a Change Order in advance of final execution by all parties in accordance with Section 11.9.

11.1.1 Owner**/ODR**, without invalidating the Contract and without prior approval of the surety, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, and the Contract Sum and the Contract Time will be adjusted accordingly. All such changes in the Work shall be authorized by Change Order or ULCO, and shall be performed under the applicable conditions of the Contract Documents. If such changes cause an increase or decrease in Contractor's cost of, or time required for, performance of the Contract, an equitable adjustment shall be made and confirmed in writing in a Change Order or a ULCO.

11.1.2 It is recognized by the parties hereto and agreed by them that the Specifications and Drawings may not be complete or free from errors, omissions and imperfections or that they may require changes or additions in order for the Work to be completed to the satisfaction of Owner and **ODR** that, accordingly, it is the express intention of the parties, notwithstanding any other provisions in this Contract, that any errors, omissions or imperfections in such Specifications and Drawings, or any changes in or additions to same or to the

40

Work ordered by Owner and any resulting delays in the Work or increases in Contractor's costs and expenses arising out of such errors, shall not constitute or give rise to any claim, demand or cause of action of any nature whatsoever in favor of Contractor, whether for breach of Contract, or otherwise; provided, however, that Owner shall be liable to Contractor for the sum stated to be due Contractor in any Change Order approved and signed by both parties, it being agreed hereby that such sum, together with any extension of time contained in said Change Order, shall constitute full compensation to Contractor for all costs, expenses and damages to Contractor, as permitted under Tex. Gov't Code, Chapter 2260.

11.1.3 Procedures for administration of Change Orders shall be established by **ODR** and stated in Supplementary General Conditions, Special Conditions, or elsewhere in the Contract Documents.

11.1.4 No verbal order, verbal statement, or verbal direction of Owner or **ODR** shall be treated as a change under this article or entitle Contractor to an adjustment.

11.1.5 Contractor agrees that Owner or **ODR** shall have access and the right to examine any directly pertinent books, documents, papers, and records of Contractor. Further, Contractor agrees to include in all its subcontracts a provision to the effect that Subcontractor agrees that Owner or **ODR** shall have access to and the right to examine any directly pertinent books, documents, papers and records of such Subcontractor relating to any claim arising from the Contract, whether or not the Subcontractor is a party to the claim. The period of access and examination described herein which relates to appeals under the Disputes article of the Contract, litigation, or the settlement of claims arising out of the performance of the Contract shall continue until final disposition of such claims, appeals or litigation.

11.2 <u>Unit Prices</u>. If unit prices are stated in the Contract Documents, and if the quantities originally contemplated are so changed in a Proposed Change Order that application of the agreed unit prices to the quantities of work proposed will cause substantial inequity to Owner or Contractor, the applicable unit prices shall be equitably adjusted as agreed to by the parties and incorporated into a Change Order.

11.3 <u>Claims for Additional Costs</u>.

11.3.1 If Contractor wishes to make a claim for an increase in the Contract Sum not related to a requested change, they shall give ODR and A/E written notice thereof within twenty-one (21) days after the occurrence of the event giving rise to such claim, but, in any case before proceeding to execute the Work considered to be additional cost or time, except in an emergency endangering life or property in which case Contractor shall act in accordance with Subsection 8.2.1. No such claim shall be valid unless so made. If ODR and Contractor cannot agree on the amount of the adjustment in the Contract Sum, it shall be determined as set forth under Article 15. Any change in the Contract Sum resulting from such claim shall be authorized by a Change Order or a ULCO.

41

11.3.2  If Contractor claims that additional cost is involved because of, but not limited to, 1) any written interpretation of the Contract Documents, 2) any order by **ODR** to stop the Work pursuant to Article 14 where Contractor was not at fault, or 3) any written order for a minor change in the Work issued pursuant to Section 12.4, Contractor shall make such claim as provided in Subsection 12.3.1.

11.3.3  Should Contractor or his Subcontractors fail to call attention of A/E to discrepancies or omissions in the Contract Documents, but claim additional costs for corrective Work after Contract award, Owner may assume intent to circumvent competitive bidding for necessary corrective Work.  In such case, Owner may choose to let a separate Contract for the corrective Work, or issue a ULCO to require performance by Contractor.  Claims for time extensions or for extra cost resulting from delayed notice of patent Contract Document discrepancies or omissions will not be considered by Owner.

11.4    Minor Changes.  A/E, with concurrence of ODR, will have authority to order minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time.   Such changes shall be effected by written order which Contractor shall carry out promptly and record on as-built record documents.

11.5    Concealed Site Conditions.  Contractor is responsible for visiting the Site and being familiar with local conditions such as the location, accessibility, and general character of the Site and/or building.  If, in the performance of the Contract, subsurface, latent, or concealed conditions at the Site are found to be materially different from the information included in the Contract Documents, or if unknown conditions of an unusual nature are disclosed differing materially from the conditions usually inherent in Work of the character shown and specified, ODR and A/E shall be notified in writing of such conditions before they are disturbed.  Upon such notice, or upon its own observation of such conditions, A/E, with the approval of ODR, will promptly make such changes in the Drawings and Specifications as they deem necessary to conform to the different conditions, and any increase or decrease in the cost of the Work, or in the time within which the Work is to be completed, resulting from such changes will be adjusted by Change Order, subject to the prior approval of ODR.

11.6    Extension of Time.  All changes to the Contract Time shall be made as a consequence of requests as required under Section 10.6, and as documented by Change Order as provided under Section 12.1.

11.7    Administration of Change Order Requests.   All changes in the Contract shall be administered in accordance with procedures approved by **ODR**, and when required, make use of such electronic information management system(s) as **ODR** or Owner may employ.

11.7.1  Routine changes in the construction Contract shall be formally initiated by **ODR** or A/E by means of a PCO form detailing requirements of the proposed change for pricing by Contractor.   This action may be preceded by communications between Contractor, A/E and ODR concerning the need and nature of the change, but such communications shall not constitute a basis for

beginning the proposed Work by Contractor.  Except for emergency conditions described below, approval of Contractor's cost proposal by A/E and ODR will be required for authorization to proceed with the Work being changed.  **ODR** will not be responsible for the cost of Work changed without prior approval and Contractor may be required to remove Work so installed.

11.7.2  All proposed costs for change order Work must be supported by itemized accounting of material, equipment and associated itemized installation costs in sufficient detail, following the outline and organization of the established Schedule of Values, to permit analysis by A/E and ODR using current estimating guides and/or practices.  Photocopies of Subcontractor and vendor proposals shall be furnished unless specifically waived by ODR.  Contractor shall provide written response to a change request within twenty-one (21) days of receipt.

11.7.3  Any unexpected circumstance which necessitates an immediate change in order to avoid a delay in progress of the Work may be expedited by verbal communication and authorization between Contractor and **ODR**, with written confirmation following within twenty-four (24) hours.  A limited scope not-to-exceed estimate of cost and time will be requested prior to authorizing Work to proceed.  Should the estimate be impractical for any reason, ODR may authorize the use of detailed cost records of such work to establish and confirm the actual costs and time for documentation in a formal Change Order.

11.7.4  Emergency changes to save life or property may be initiated by Contractor alone (see Section 7.3) with the claimed cost and/or time of such work to be fully documented as to necessity and detail of the reported costs and/or time.

11.7.5  The method of incorporating approved Change Orders into the parameters of the accepted Schedule of Values must be coordinated and administered in a manner acceptable to ODR.

11.8    Pricing Change Order Work.  The amounts that Contractor and/or its Subcontractor adds to a Change Order for profit and overhead will also be considered by Owner before approval is given.  The amounts established hereinafter are the maximums that are acceptable to Owner.

11.8.1  For Work performed by its forces, Contractor will be allowed their actual costs for materials, *equipment charges*, the total amount of wages paid for labor, plus the total cost of State and Federal payroll taxes and of worker's compensation and comprehensive general liability insurance, plus additional bond and builders risk insurance cost if the change results in an increase in the premium paid by Contractor.  To the total of the above costs, Contractor will be allowed to add a percentage as noted below to cover overhead and profit combined.

Allowable percentages for overhead and profit on any specific change shall not exceed fifteen (15) percent for the first $10,000 of value for self-performed work or portion thereof, ten (10) percent for the second $10,000 of

value for self-performed work or portion thereof and seven and a half (7.5) percent for any value of the self-performed work that exceeds $20,000.

11.8.2  For subcontracted Work each affected Subcontractor shall figure its costs, overhead and profit as described above for Contractor's Work, all Subcontractor costs shall be combined, and to that total Subcontractor cost

Contractor will be allowed to add a maximum mark-up of ten (10) percent for the first $10,000 of subcontracted Work value or portion thereof, seven and half (7.5) percent for the second $10,000 of subcontracted Work value or portion thereof, and five (5) percent for any value of the subcontracted Work exceeding $20,000.

11.8.3  On changes involving both additions and deletions, percentages for overhead and profit will be allowed only on the net addition.  Owner does not accept and will not pay for additional Contract cost identified as indirect or consequential damages.

11.8.4  For Contracts based on a Guaranteed Maximum Price (GMP), the Construction Manager-at-Risk or Design Builder shall NOT be entitled to a percentage mark-up on any Change Order Work unless the Change Order increases the Guaranteed Maximum Price.

11.9  Not Applicable.

11.10  Not Applicable.

# Article 12.  Project Completion and Acceptance

12.1  Closing Inspections.

12.1.1  Substantial Completion Inspection. When Contractor considers the entire Work or part thereof Substantially Complete, it shall notify ODR in writing that the Work will be ready for Substantial Completion inspection on a specific date.  Contractor shall include with this notice Contractor's Punch List to indicate that it has previously inspected all the Work associated with the request for inspection, noting items it has corrected and included all remaining work items with date scheduled for completion or correction prior to final inspection.  The failure to include any items on this list does not alter the responsibility of Contractor to complete all Work in accordance with the Contract Documents.  If any of the items on this list prevents the Project from being used as intended, Contractor shall not request a Substantial Completion Inspection.  Owner and **ODR** and its representatives will review the list of items and schedule the requested inspection, or inform Contractor in writing that such an inspection is premature because the Work is not sufficiently advanced or conditions are not as represented on Contractor's list.

12.1.1.1 Prior to the Substantial Completion inspection, Contractor shall furnish a copy of its marked-up Record Documents and a preliminary

44

copy of each instructional manual, maintenance and operating manual, parts catalog, wiring diagrams, spare parts, specified written warranties, and like publications or parts for all installed equipment, systems, and like items as described in the Contract Documents.  Delivery of these items is a prerequisite for requesting the Substantial Completion inspection.

12.1.1.2 On the date requested by Contractor, or as mutually agreed upon pending the status of the Open Items List, A/E, ODR, Contractor, and other Owner representatives as determined by Owner will jointly attend the Substantial Completion inspection, which shall be conducted by ODR or their delegate.  If ODR determines that the Work is Substantially Complete, ODR will issue a Certificate of Substantial Completion to be signed by A/E, Owner, and Contractor establishing the date of Substantial Completion and identifying responsibilities for security, maintenance, and insurance.  A/E **(if applicable)** will provide with this certificate a list of Punch List items (the pre-final Punch List) for completion prior to final inspection.  This list may include items in addition to those on Contractor's Punch List, which the inspection team deems necessary to correct or complete prior to final inspection.   If Owner occupies the Project upon determination of Substantial Completion, Contractor shall complete all corrective Work at the convenience of Owner, without disruption to Owner's use of the Project for its intended purposes.

12.1.2  <u>Final Inspection</u>. Contractor shall complete the list of items identified on the pre-final Punch List prior to requesting a final inspection.   Unless otherwise specified, or otherwise agreed in writing by the parties as documented on the Certificate of Substantial Completion, Contractor shall complete and/or correct all Work within thirty (30) days of the Substantial Completion date. Upon completion of the pre-final Punch List work, Contractor shall give written notice to ODR and A/E that the Work will be ready for final inspection on a specific date.   Contractor shall accompany this notice with a copy of the updated pre-final Punch List indicating resolution of all items.   On the date specified or as soon thereafter as is practicable, ODR, A/E and Contractor will inspect the Work.  A/E will submit to Contractor a final Punch List of open items that the inspection team requires corrected or completed before final acceptance of the Work.

12.1.2.1 Correct or complete all items on the final Punch List before requesting Final Payment.  Unless otherwise agreed to in writing by the parties, complete this work within seven (7) days of receiving the final Punch List.  Upon completion of the final Punch List, notify A/E and ODR in writing stating the disposition of each final Punch List item. A/E, Owner, and Contractor shall promptly inspect the completed items.  When the final Punch List is complete, and the Contract is fully satisfied according to the Contract Documents ODR will issue a

certificate establishing the date of Final Completion.  Completion of all Work is a condition precedent to Contractor's right to receive Final Payment.

12.1.3   Annotation.   Any Certificate issued under this Article may be annotated to indicate that it is not applicable to specified portions of the Work, or that it is subject to any limitation as determined by Owner.

12.1.4   Purpose of Inspection.  Inspection is for determining the completion of the Work, and does not relieve Contractor of its overall responsibility for completing the Work in a good and competent fashion, in compliance with the Contract.  Work accepted with incomplete Punch List items or failure of Owner or other parties to identify Work that does not comply with the Contract Documents or is defective in operation or workmanship does not constitute a waiver of Owner's rights under the Contract or relieve Contractor of its responsibility for performance or warranties.

12.1.5   Additional Inspections.

12.1.5.1   If **ODR**'s inspection team determines that the Work is not substantially complete at the Substantial Completion inspection, ODR or A/E will give Contractor written notice listing cause(s) of the rejection.  Contractor will set a time for completion of incomplete or defective work acceptable to ODR.  Contractor shall complete or correct all work so designated prior to requesting a second Substantial Completion inspection.

12.1.5.2   If **ODR**'s inspection team determines that the Work is not complete at the final inspection, ODR or A/E will give Contractor written notice listing the cause(s) of the rejection.  Contractor will set a time for completion of incomplete or defective work acceptable to ODR. Contractor shall complete or correct all Work so designated prior to again requesting a final inspection.

12.1.5.3   The Contract contemplates three (3) comprehensive inspections: the Substantial Completion inspection, the Final Completion inspection, and the inspection of completed final Punch List items.  The cost to Owner of additional inspections resulting from the Work not being ready for one or more of these inspections is the responsibility of Contractor.  Owner may issue a ULCO deducting these costs from Final Payment.  Upon Contractor's written request, Owner will furnish documentation of any costs so deducted.  Work added to the Contract by Change Order after Substantial Completion inspection is not corrective Work for purposes of determining timely completion, or assessing the cost of additional inspections.

12.1.6   Phased Completion. The Contract may provide, or Project conditions may warrant, as determined by ODR, that designated elements or parts of the Work be

46

completed in phases.  Where phased completion is required or specifically agreed to by the parties, the provisions of the Contract related to closing inspections, occupancy, and acceptance apply independently to each designated element or part of the Work.   For all other purposes, unless otherwise agreed by the parties in writing, Substantial Completion of the Work as a whole is the date on which the last element or part of the Work completed receives a Substantial Completion certificate.  Final Completion of the Work as a whole is the date on which the last element or part of the Work completed receives a Final Completion certificate.

12.2   Owner's Right of Occupancy.  Owner may occupy or use all or any portion of the Work following Substantial Completion, or at any earlier stage of completion. Should Owner wish to use or occupy the Work, or part thereof, prior to Substantial Completion, ODR will notify Contractor in writing and identify responsibilities for security and maintenance Work performed on the premises by third parties on Owner's behalf does not constitute occupation or use of the Work by Owner for purposes of this Article.  All Work performed by Contractor after occupancy, whether in part or in whole, shall be at the convenience of Owner so as to not disrupt Owner's use of, or access to occupied areas of the Project.

12.3   Acceptance and Payment

12.3.1   Request for Final Payment.  Following the certified completion of all work, including all final Punch List items, cleanup, and the delivery of record documents, Contractor shall submit a certified Application for Final Payment and include all sums held as retainage and forward to A/E and ODR for review and approval.

12.3.2   Final Payment Documentation.  Contractor shall submit, prior to or with the Application for Final Payment, final copies of all close out documents, maintenance and operating instructions, guarantees and warranties, certificates, Record Documents and all other items required by the Contract. Contractor shall submit evidence of return of access keys and cards, evidence of delivery to Owner of attic stock, spare parts, and other specified materials. Contractor shall submit consent of surety to Final Payment form and an affidavit that all payrolls, bills for materials and equipment, subcontracted work and other indebtedness connected with the Work, except as specifically noted, are paid, will be paid, after payment from Owner or otherwise satisfied within the period of time required by Tex. Gov't Code, Chapter 2251. Contractor shall furnish documentation establishing payment or satisfaction of all such obligations, such as receipts, releases and waivers of claims and liens arising out of the Contract.  Contractor may not subsequently submit a claim on behalf of Subcontractor or vendor unless Contractor's affidavit notes that claim as an exception.

12.3.3   Architect/Engineer Approval.  A/E will review a submitted Application for Final Payment promptly but in no event later than ten (10) days after its receipt.  Prior to the expiration of this deadline, A/E will either: 1) return the Application for Final Payment to Contractor with corrections for action and

47

resubmission; or 2) accept it, note their approval, and send to Owner.

12.3.4  Offsets and Deductions.  **ODR** may deduct from the Final Payment all sums due from Contractor.  If the Certificate of Final Completion notes any Work remaining, incomplete, or defects not remedied, **ODR** may deduct the cost of remedying such deficiencies from the Final Payment.  On such deductions, **ODR** will identify each deduction, the amount, and the explanation of the deduction on or by the twenty-first (21st) day after **ODR**'s receipt of an approved Application for Final Payment.  Such offsets and deductions shall be incorporated via a final Change Order, including a ULCO as may be applicable.

12.3.5  Final Payment Due.  Final Payment is due and payable by **ODR**, subject to all allowable offsets and deductions, on the thirtieth (30th) day following **ODR**'s approval of the Application for Payment.  If Contractor disputes any amount deducted by **ODR**, Contractor shall give notice of the dispute on or before the thirtieth (30th) day following receipt of Final Payment.  Failure to do so will bar any subsequent claim for payment of amounts deducted.

12.3.6  Effect of Final Payment.  Final Payment constitutes a waiver of all claims by Owner and **ODR**, relating to the condition of the Work except those arising from:

12.3.6.1  Faulty or defective Work appearing after Substantial Completion (latent defects);

12.3.6.2  Failure of the Work to comply with the requirements of the Contract Documents;

12.3.6.3  Terms of any warranties required by the Contract, or implied by law; or

12.3.6.4  Claims arising from personal injury or property damage to third parties.

12.3.7  Waiver of Claims.  Final payment constitutes a waiver of all claims and liens by Contractor except those specifically identified in writing and submitted to ODR prior to the application for Final Payment.

12.3.8  Effect on Warranty.  Regardless of approval and issuance of Final Payment, the Contract is not deemed fully performed by Contractor and closed until the expiration of all warranty periods.

## Article 13.  Warranty and Guarantee

13.1  Contractor's General Warranty and Guarantee.  Contractor warrants to **ODR** that all Work is executed in accordance with the Contract, complete in all parts and in accordance

with approved practices and customs, and of the required finish and workmanship. Contractor further warrants that unless otherwise specified, all materials and equipment incorporated in the Work under the Contract are new. **ODR** may, at its option, agree in writing to waive any failure of the Work to conform to the Contract, and to accept a reduction in the Contract price for the cost of repair or diminution in value of the Work by reason of such defect. Absent such a written agreement, Contractor's obligation to perform and complete the Work in accordance with the Contract Documents is absolute and is not waived by any inspection or observation by ODR, A/E or others, by making any progress payment or final payment, by the use or occupancy of the Work or any portion thereof by Owner, at any time, or by any repair or correction of such defect made by Owner or **ODR**.

13.2    <u>Warranty Period</u>.  Except as may be otherwise specified or agreed, Contractor shall repair all defects in materials, equipment, or workmanship appearing within one year from the date of Substantial Completion of the Work.  If Substantial Completion occurs by phase, then the warranty period for that particular Work begins on the date of such occurrence, or as otherwise stipulated on the Certificate of Substantial Completion for the particular Work.

13.2.1  *Specific requirements for warranties and guarantees to include parts, labor, and other costs are noted in various sections of the technical specifications. Manufacture's warranties and guarantees are required for, but not limited to, the following: [Add or delete from list as required by Project]*

*Membrane Waterproofing* ................................... *2 years*
*Urethane Roofing System* ................................ *20 years*
*Joint Sealers* ....................................................... *2 years*
*Insulated Glass* .................................................. *5 years*
*Aluminum Doors & Frames* ............................... *3 years*
*Wood & Plastic Faced Doors* .......... *Life of installation*
*Upward Acting Doors* ........................................ *5 years*
*Mirror Glazing* .................................................. *5 years*
*Window Wall System* ......................................... *2 years*
*Access Flooring* ................................................. *5 years*
*Dampproofing* .................................................... *2 years*
*Water Repellant Coating* ................................... *5 years*
*Sheet Metal & Flashing* ..................................... *2 years*
*Roof Hatches* ..................................................... *2 years*
*Door Closers* ..................................................... *5 years*
*Metal Windows* ................................................... *2 years*
*Curtain Wall/Skylights* ..................................... *2 years*
*Fixed Seating* ................................................... *10 years*
*Carpet* .............................................................. *15 years*
*Chalkboard Surfaces* ....................................... *50 years*
*Dock Lift* ............................................................ *2 years*
*Prefabricated Environmental Box* .................... *10 years*
*Environmental Box Refrigeration*
    *Systems and Controls* ...................................... *2 years*

49

*Air Conditioning and*
   *Refrigeration Systems*......................................*2 years*
*HVAC Controls*..................................................*2 years*
*Variable Speed Controllers*..............................*3 years*

*Until receipt of these guarantees, final inspection will not be conducted nor final payment released.*

13.3    <u>Limits on Warranty</u>.  Contractor's warranty and guarantee hereunder excludes defects or damage caused by:

    13.3.1  Modification or improper maintenance or operation by persons other than Contractor, Subcontractors, or any other individual or entity for whom Contractor is not responsible, unless Owner or **ODR** is compelled to undertake maintenance or operation due to the neglect of Contractor.

    13.3.2  Normal wear and tear under normal usage after acceptance of the Work by Owner.

13.4    <u>Events Not Affecting Warranty</u>.  Contractor's obligation to perform and complete the Work in a good and workmanlike manner in accordance with the Contract Documents is absolute.  None of the following will constitute an acceptance of defective Work that is not in accordance with the Contract Documents or a release of Contractor's obligation to perform the Work in accordance with the Contract Documents:

    13.4.1  Observations by **ODR** and/or A/E;

    13.4.2  Recommendation to pay any progress or final payment by A/E;

    13.4.3  The issuance of a certificate of Substantial Completion or any payment by **ODR** to Contractor under the Contract Documents;

    13.4.4  Use or occupancy of the Work or any part thereof by Owner**;**

    13.4.5  Any acceptance by **ODR** or any failure to do so;

    13.4.6  Any review of a Shop Drawing or sample submittal; or

    13.4.7  Any inspection, test or approval by others.

13.5    <u>Separate Warranties</u>.  If a particular piece of equipment or component of the Work for which the Contract requires a separate warranty is placed in continuous service before Substantial Completion, the warranty period for that equipment or component will not begin until Substantial Completion, regardless of any warranty agreements in place between suppliers and/or Subcontractors and Contractor.  ODR will certify the date of service commencement in the Substantial Completion certificate.

13.5.1  In addition to Contractor's warranty and duty to repair, Contractor expressly assumes all warranty obligations required under the Contract for specific building components, systems and equipment.

13.5.2 Contractor may satisfy any such obligation by obtaining and assigning to **ODR** a complying warranty from a manufacturer, supplier, or Subcontractor. Where an assigned warranty is tendered and accepted by **ODR** which does not fully comply with the requirements of the Contract, Contractor remains liable to **ODR** on all elements of the required warranty not provided by the assigned warranty.

13.6    Correction of Defects.  Upon receipt of written notice from Owner, or any agent of Owner designated as responsible for management of the warranty period, of the discovery of a defect, Contractor shall promptly remedy the defect(s), and provide written notice to Owner and designated agent indicating action taken.   In case of emergency where delay would cause serious risk of loss or damage to Owner, or if Contractor fails to remedy within thirty (30) days, or within another period agreed to in writing, Owner**/ODR** may correct the defect and be reimbursed the cost of remedying the defect from Contractor or its surety.

13.7    Certification of No Asbestos Containing Materials or Work.  Contractor shall ensure compliance with the Asbestos Hazard Emergency Response Act (AHERA– 40 C.F.R § 763-99(7)) from all Subcontractors and materials suppliers, and shall provide a notarized certification to Owner**/ODR** that all equipment and materials used in fulfillment of their Contract responsibilities are non Asbestos Containing Building Materials (ACBM).   This certification must be provided no later than Contractor's application for Final Payment.

## Article 14.  Suspension and Termination

14.1    Suspension of Work for Cause.  **ODR** may, at any time without prior notice, suspend all or any part of the Work, if after reasonable observation and/or investigation, **ODR** determines it is necessary to do so to prevent or correct any condition of the Work, which constitutes an immediate safety hazard, or which may reasonably be expected to impair the integrity, usefulness or longevity of the Work when completed.

14.1.1  **ODR** will give Contractor a written notice of suspension for cause, setting forth the reason for the suspension and identifying the Work suspended. Upon receipt of such notice, Contractor shall immediately stop the Work so identified.  As soon as practicable following the issuance of such a notice, **ODR** will initiate and complete a further investigation of the circumstances giving rise to the suspension, and issue a written determination of the findings.

14.1.2 If it is confirmed that the cause was within the control of Contractor, Contractor will not be entitled to an extension of time or any compensation for delay resulting from the suspension.  If the cause is determined not to have been within the control of Contractor, and the suspension has prevented Contractor from completing the Work within the Contract Time, the

51

suspension is an excusable delay and a time extension will be granted through a Change Order.

14.1.3  Suspension of Work under this provision will be no longer than is reasonably necessary to remedy the conditions giving rise to the suspension.

14.2    Suspension of Work for ODR's Convenience.  Upon seven (7) days written notice to Contractor, ODR may at any time without breach of the Contract suspend all or any portion of the Work for a period of up to thirty (30) days for its own convenience. Owner/**ODR** will give Contractor a written notice of suspension for convenience, which sets forth the number of suspension days for which the Work, or any portion of it, and the date on which the suspension of Work will cease.  When such a suspension prevents Contractor from completing the Work within the Contract Time, it is an excusable delay.  A notice of suspension for convenience may be modified by ODR at any time on seven (7) days written notice to Contractor.  If ODR suspends the Work for its convenience for more than sixty (60) consecutive days, Contractor may elect to terminate the Contract pursuant to the provisions of the Contract.

14.3    Termination by ODR for Cause.

14.3.1  Upon written notice to Contractor and its surety, **ODR** may, without prejudice to any right or remedy, terminate the Contract and take possession of the Site and of all materials, equipment, tools, construction equipment, and machinery thereon owned by Contractor under any of the following circumstances:

14.3.1.1 Persistent or repeated failure or refusal, except during complete or partial suspensions of work authorized under the Contract, to supply enough properly skilled workmen or proper materials;

14.3.1.2 Persistent disregard of laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, including ODR;

14.3.1.3 Persistent failure to prosecute the Work in accordance with the Contract, and to ensure its completion within the time, or any approved extension thereof, specified in the Contract;

14.3.1.4 Failure to remedy defective work condemned by ODR;

14.3.1.5 Failure to pay Subcontractors, laborers, and material suppliers pursuant to Tex. Gov't Code, Chapter 2251;

14.3.1.6 Persistent endangerment to the safety of labor or of the Work;

14.3.1.7 Failure to supply or maintain statutory bonds or to maintain required insurance, pursuant to the Contract;

14.3.1.8  Any material breach of the Contract; or

14.3.1.9  Contractor's insolvency, bankruptcy, or demonstrated financial inability to perform the Work.

14.3.2  Failure by Owner**/ODR** to exercise the right to terminate in any instance is not a waiver of the right to do so in any other instance.

14.3.3  Should Owner**/ODR** decide to terminate the Contract under the provisions of Section 14.3, it will provide to Contractor and its surety thirty (30) days prior written notice.

14.3.4  Should Contractor or its surety, after having received notice of termination, demonstrate to the satisfaction of Owner that Contractor or its surety are proceeding to correct such default with diligence and promptness, upon which the notice of termination was based, the notice of termination may be rescinded in writing by **ODR**.  If so rescinded, the Work may continue without an extension of time.

14.3.5  If Contractor or its surety fails, after written notice from **ODR** to commence and continue correction of such default with diligence and promptness to the satisfaction of **ODR** within thirty (30) days following receipt of notice, **ODR** may immediately terminate the contract and make arrangements for completion of the Work and deduct the cost of completion from the unpaid Contract Sum.

14.3.5.1  This amount includes the cost of additional **ODR** costs such as A/E services, other consultants, and contract administration.

14.3.5.2  **ODR** will make no further payment to Contractor or its surety unless the costs to complete the Work are less than the Contract balance, then the difference shall be paid to Contractor or its surety. If such costs exceed the unpaid balance, Contractor or its surety will pay the difference to **ODR**.

14.3.5.3  This obligation for payment survives the termination of the Contract.

14.3.5.4  **ODR** reserves the right in termination for cause to take assignment of all the Contracts between Contractor and its Subcontractors, vendors, and suppliers.  ODR will promptly notify Contractor of the contracts **ODR** elects to assume.   Upon receipt of such notice, Contractor shall promptly take all steps necessary to effect such assignment.

14.4  Conversion to Termination for Convenience.   In the event that any termination of Contractor for cause under Section 14.3 is later determined to have been improper, the termination shall automatically convert to a termination for convenience under Section 14.5 and Contractor's recovery for termination shall be strictly limited to the payments allowable under Section 14.5.

14.5    Termination for Convenience of **ODR**.  Owner reserves the right, without breach, to terminate the Contract prior to, or during the performance of the Work, for any reason.  Upon such an occurrence, the following shall apply:

14.5.1  **ODR** will immediately notify Contractor and A/E in writing, specifying the reason for and the effective date of the Contract termination.  Such notice may also contain instructions necessary for the protection, storage or decommissioning of incomplete work or systems, and for safety.

14.5.2  Upon receipt of the notice of termination, Contractor shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due at that point in the Contract:

14.5.2.1  Stop all work.

14.5.2.2  Place no further subcontracts or orders for materials or services.

14.5.2.3  Terminate all subcontracts for convenience.

14.5.2.4  Cancel all materials and equipment orders as applicable.

14.5.2.5  Take action that is necessary to protect and preserve all property related to the Contract which is in the possession of Contractor.

14.5.3  When the Contract is terminated for Owner/**ODR**'s convenience, Contractor may recover from **ODR** payment for all Work executed *before the notice of termination along with the actual and reasonable cost of any additional work required to secure the Project and property related to the Contract following the notice of termination. The Contractor will not be entitled to recover any other costs or damages arising from the termination for convenience of the ODR including, but not limited to, claims for lost business opportunities.*

14.6    Termination By Contractor.  If the Work is stopped for a period of ninety (90) days under an order of any court or other public authority having jurisdiction, or as a result of an act of government, such as a declaration of a national emergency making materials unavailable, through no act or fault of Contractor or Subcontractor or their agents  or employees or any other persons performing any of the Work under a contract with Contractor, then Contractor may, upon thirty (30) additional days written notice to ODR, terminate the Contract and recover from Owner payment for all Work executed, *before the work stoppage along with the actual and reasonable cost of securing the Project and property related to the Contract during the period of work stoppage. The Contractor will not be entitled to recover any other costs or damages arising from the work stoppage including, but not limited to, claims for lost business opportunities.*  If the cause of the Work stoppage is removed prior to the end of the thirty (30) day notice period, Contractor may not terminate the Contract, *but may be entitled to an equitable adjustment in the Contract Sum and Contract Time.*

14.7    Settlement on Termination.  When the Contract is terminated for any reason, at any time prior to one hundred eighty (180) days after the effective date of termination, Contractor shall submit a final termination settlement proposal to **ODR** based upon recoverable costs as provided under the Contract.  If Contractor fails to submit the proposal within the time allowed, **ODR** may determine the amount due to Contractor because of the termination and pay the determined amount to Contractor.

## Article 15.  Dispute Resolution

15.1    **Dispute resolution shall be set forth as per the attached Sample Contract or Master Agreement.**

15.2    Nothing herein shall hinder, prevent, or be construed as a waiver of Owner's right to seek redress on any disputed matter in a court of competent jurisdiction.

15.3    Nothing herein shall waive or be construed as a waiver of the State's sovereign immunity.

## Article 16.  Miscellaneous

16.1    Special Conditions.   When the Work contemplated by Owner is of such a character that the foregoing **SSC Uniform General and Supplementary Conditions** of the Contract cannot adequately cover necessary and additional contractual relationships, the Contract may include Special Conditions. Special Conditions shall relate to a particular Project and be unique to that Project but shall not weaken the character or intent of the **SSC Uniform General and Supplementary Conditions.**

16.2    Federally Funded Projects.  On Federally funded projects, Owner**/ODR** may waive, suspend or modify any Article in these **SSC Uniform General and Supplementary** Conditions which conflicts with any Federal statue, rule, regulation or procedure, where such waiver, suspension or modification is essential to receipt by Owner of such Federal funds for the Project.  In the case of any Project wholly financed by Federal funds, any standards required by the enabling Federal statute, or any Federal rules, regulations or procedures adopted pursuant thereto, shall be controlling.

16.3    Internet-based Project Management Systems.  At its option, **ODR** may administer its design and construction management through an Internet-based management system. In such cases, Contractor shall conduct communication through this media and perform all Project related functions utilizing this database system.   This includes correspondence, submittals, Requests for Information, vouchers or payment requests and processing, amendment, Change Orders and other administrative activities.

16.3.1    Accessibility and Administration.

16.3.1.1  When used, **ODR** will make the software accessible via the Internet to all Project team members.

16.3.1.2  ODR shall administer the software.

55

16.3.2 <u>Training</u>. When used, **ODR** shall provide training to the Project team members.

16.4    <u>Not Applicable.</u>

**This document is based on the 2010 Texas Facilities Commissions' Uniform General Conditions and apply to all Texas A&M University System and member institution construction projects managed by SSC Services for Education. All text shown in** *italics* **are changes incorporated into this UGSC from Texas A&M University System Facilities Planning & Construction. All text shown in bold are SSC changes.**

# End of SSC Uniform General and Supplementary Conditions

# SSC SPECIAL CONDITIONS
**TEXAS A&M UNIVERSITY**
**COLLEGE STATION**
(FOR USE ON ALL PROJECTS)

**1.0 <u>GENERAL COORDINATION</u>** The following supplements modify, change, delete from or add to the "SSC UNIFORM GENERAL AND SUPPLEMENTARY CONDITIONS." Where any Article of the SSC Uniform General and Supplementary Conditions is modified or any paragraph or clause thereof is modified or deleted by these supplements, the unaltered conditions of the article, paragraph, sub-paragraph or clause shall remain in effect.

**2.0 <u>LAWS GOVERNING CONSTRUCTION</u>**

2.1 Prevailing Wage Schedules: The rates of pay for some classification which prevail in the locality of this Project can be found at http://www.tamus.edu/business/facilities-planning-construction/forms-guidelines-wage-rates/. Contribution by a worker toward retirement plans, health insurance, apprentice programs, etc., are part of the worker's pay; contributions by the employer are not. Contractors shall identify, briefly describe, and request a predetermination of rates for crafts (or apprentice programs) not included in the wage predetermination found in the link above.

2.2 Apprenticeship Program: Apprentices who are enrolled in a federally certified apprenticeship program may be used at the percentage rates of the journeyman scale stipulated in their apprenticeship agreement.

2.3 Applicable Codes:

- *National Fire Protection Association National Fire Codes, with emphasis on NFPA 1 and NFPA 101 - latest edition adopted by State Fire Marshall, Life Safety Code (LSC) and including all referenced standards.*
- *International Building Code - latest edition*
- *NFPA 45 Standard on Fire Protection for Laboratories Using Chemicals as applicable*
- *Texas Department of Licensing and Regulation (TDLR)*
- *Elimination of Architectural Barriers Act, Article 9102, Texas Civil Statutes and Texas Accessibility Standards (TAS)*
- *Elevators and Escalators, Health & Safety Code chapter 754 and 16TAC § 74*
- *ASME 17.1, 17.2, 17.3 and 18.1*
- *Boilers, Health & Safety Code chapter 755 and 16TAC § 65*
- *ASME Boiler and Pressure Vessel Code*
- *Americans with Disabilities Act, 28 CFR Part 35 Nondiscrimination on the Basis of Disability in State and Local Government Services, Final Rule, as published in the Federal Register Friday, July 26, 1991*
- *Fair Housing Act accessibility requirements for housing units.*
- *ACI – 318, building code requirements for reinforced concrete*

Page **1** of **15**

- *AISC, specification for the Design, Fabrication and Erection of Structural Steel*
- *Texas Department of Insurance requirements First Tier Coastal Counties wind load criteria*
- *FEMA 100 year flood plain designation*
- *TCEQ SWPPP Requirements*
- *International Mechanical Code latest edition*
- *International Plumbing Code latest edition*
- *International Fuel Gas Code latest edition*
- *ASHRAE 62.1 Indoor Air Quality Standard*
- *FM Global Standards for fire protection systems*
- *National Electric Code latest edition*
- *TIA/EIA Standards*
- *Energy Conservation Design Standard for New State Buildings (including major renovation projects), State Comptroller's Office, Government Code sec. 447.004 and 34 TAC § 19.32*
- *ASHRAE / IESNA 90.1 latest adopted Edition*
- *International Energy Conservation Code (IECC) latest adopted edition (Residential/Apartments)*
- *SECO Alternative Energy Evaluation Requirements*
- *SECO Water Efficiency Standards for State Buildings and Institutions of Higher Education Facilities - January 2011*
- *Design in accordance with good practice to achieve conventional ambient noise levels qualified in Noise Criteria (NC) defined in current ASHRAE Applications Volume, Chapter 42 and ANSI S1.8 Reference Quantities for Acoustical Levels – ASA 84.*

## 3.0 WORK HOURS

3.1 Work Hours: Normal work hours at TAMU are 8:00 a.m. to 5:00 p.m., Monday through Friday, exclusive of TAMU holidays. Project Work may be permitted on holidays at the option of TAMU at no additional cost to the ODR or TAMU, with prior written request and approval from the ODR at least 48 hours before the start of the holiday work.

   3.1.1 The Contractor may be allowed additional, or varied work hours, with prior written requested approval by the ODR.

   3.1.2 The Contractor shall limit use of the premises to the Project Work indicated and allow for TAMU occupancy and use during the construction.

3.2 TAMU Occupancy:  TAMU may occupy the adjacent spaces of facilities during the entire performance period of the contract. Cooperate fully with the TAMU representative and ODR during performance of work to minimize conflict and to facilitate TAMU usage. **SAFETY** is of a paramount concern. It is the sole responsibility of the Contractor to provide protective coverings, passage ways, barriers and any and all provisions as required to maintain required ADA/TAS approved means of egress and access and maintain all building exits as required by applicable Life Safety Codes. The Contractor is to coordinate with the ODR all work that may possibly affect building occupancy or continued **SAFE** use. Contractor is to provide

ODR advanced scheduling as required to successful notify TAMU facility administrative staff of his activities related to the Work. Contractor is to adequately staff and incorporate into his Proposal all additional labor, materials, and equipment required under this section.

**4.0  UTILITIES**

4.1  Utility Outage: When a utility outage affecting occupied facilities is necessary to perform the Project Work unless agreed upon prior to performing the work, the Contractor shall give written notice to ODR five (5) days in advance of a scheduled outage. TAMU or ODR personnel will perform disconnection and reconnection of utilities. Fourteen days advance notice is required for connection and disconnection of temporary utilities by TAMU including, but not limited to temporary water taps, electrical taps and other temporary site utilities

4.2  All information and documents regarding existing underground utilities, known to the ODR, will be made available to the Contractor. Contractor will be responsible for locating, marking, and protecting all underground utility lines during construction.

4.3  Should Contractor discover "Unknown Utilities", promptly notify the ODR's personnel for direction. Such piping systems and lines shall be treated as outlined above.

4.4  Procedures for notification if utility lines or piping systems are damaged during construction:

    4.4.1  Facilities Services Communications Center @ 979-845-4311 and 9-911 if gas lines are damaged

    4.4.2  ODR Project Manager

    4.4.3  If unavailable, notify SSC/EDCS General Manager at 979-845-5317

**5.0  COMMUNICATIONS AND DATA** Work on telephone, fiber optic lines, data lines and other communication systems must be performed by TAMU IT personnel and/or their contractor(s). The Contractor shall coordinate his work with these agencies through the ODR.

**6.0  COORDINATION WITH OTHER WORK**

6.1  Coordination: Contractor shall coordinate work with the ODR, prior to beginning any Project Work. Additionally, prior to starting work each day, the Contractor's superintendent shall inform and coordinate with the ODR and others as may be required.

6.2  Contractor will be required to coordinate construction activities with other contractors and agencies under the direction of the ODR or TAMU personnel. This will include but is not limited to telephone, custodial, fire alarm, equipment maintenance, and grounds maintenance.

6.3  Contractor will be required to provide initial waxing of hard flooring per manufacturers requirements.

**7.0 <u>CRANES</u>** When a crane is necessary to perform the contract work, the crane delivery, placement and lift dates shall be coordinated with the ODR, TAMU Environmental Health and Safety, TAMU Transportation, and others as may be required such as Texas Department of Transportation and City of College Station. The Contractor shall give written notice to TAMU fourteen (14) days in advance of a required crane placement and lift. The Contractor shall submit a crane lift plan ("Crane Lift Plan") with the written notice of crane placement and lift. The Crane Lift Plan shall show the proposed crane location during the lift, the area of boom swing proposed for the lift, location and types of barricades, and affected streets, sidewalks, parking areas, and buildings. The area of boom swing shall be depicted as the arc of the boom for the proposed swing with a radius of the boom length if the boom were in the horizontal. Contractor shall comply with OSHA and ANSI safety standards for cranes.

**8.0 <u>PARKING, STORAGE, AND SITE RESTRICTIONS</u>**

8.1 Confine operations at the site to the areas permitted under the Contract Documents. Portions of the site beyond areas for which work is indicated are not to be disturbed. Comply with Owner's requirements concerning the Contractor's operations and use of the premises, parking, loading and unloading.

  8.1.1 Keep existing driveways and entrances serving the adjacent TAMU facilities and parking spaces clear and available to the visitors, staff and service vehicles at all times. Do not use these areas for parking or for storage of materials.

  8.1.2 Keep all storage areas free of debris, refuse, spills, leaks, stains, splashes and excess materials. All storage areas shall be maintained in a neat, clean, and safe condition. Do not unreasonably encumber the site with materials or equipment. Stockpiling of materials and the locations of storage sheds, trailers, or temporary field offices shall be confined to the area designated, area(s) shall be coordinated with TAMU.

  8.1.3 Contractor storage and parking are at the job site in an area to be designated by TAMU. Parking is not allowed on sidewalks, drives, or roadways. Do not block parking spaces. Contractor shall comply with the requirements of the coordination agreement plan presented at the preconstruction meeting. Contractors are required to purchase all TAMU required parking permits and incorporate this cost into their bids.

  8.1.4 Lock automobiles and other mechanized or motorized construction equipment, when parked and unattended, to prevent unauthorized use. Do not leave vehicles or equipment unattended with the motor running or the ignition key in place. Contractor shall not allow any construction equipment to park on adjacent streets at night.

  8.1.5 Designated roads shall be used for construction traffic. Contractor shall not close, block, or otherwise obstruct roads at any time without written permission of ODR and where required, the City of College Station. Contractor shall keep

all debris and mud off all sidewalks and streets. Immediately clean all debris and mud that is a result of contract operations.

    8.1.6  TAMU is a smoke free and tobacco free campus.  This includes cigarettes, cigars, e-cigarettes, vaping, smokeless tobacco and any other nicotine delivery products. There shall be no smoking on any TAMU property.

**9.0**  <u>**EXISTING FACILITIES AND CONDITIONS**</u> Maintain the existing facilities in a safe and clean condition throughout the period work is being performed.

9.1  If available, areas designated around, or near the building will be made available for contractor staging and dumpsters. Coordinate with the ODR.

9.2  Prior to commencement of Project work, inspect areas in which work will be performed. Document and photograph existing conditions of structure, surfaces, equipment, and condition of surrounding properties, which could be misconstrued as damage resulting from demolition work or other contract operations. Inspection shall be verified, signed by, and filed with the Owner or ODR prior to starting work.

9.3  Any damage to the existing grounds or facilities caused by construction traffic or any construction operations shall be repaired or replaced by the Contractor to match or exceed existing undamaged conditions at no additional cost to the ODR or TAMU.

9.4  Contractor shall ensure that building plumbing systems within scope of work, are protected from freeze damage during periods of temperatures at or below freezing.

    9.4.1  Contractor shall ensure that all new or replacement Hydronic Piping meets the latest TAMU Design Standards from UES.  The Standards can be found at https://utilities.tamu.edu/wp-content/uploads/2016/08/TAMU-Design-Standards.pdf

9.5  Contractor shall ensure that any roof disturbed during construction must be repaired/replaced in a leak-free manner on the day of the disturbance.  All disturbed roofs must be dried-in daily.

9.6  Curb Height(s):  All new and/or re-roofing projects shall require curbs be constructed or modified to be a minimum of 8" above the finished roof.  All new roof top equipment shall be installed a minimum of 8" AFR.  All roof penetrations shall be repaired as per manufacturers recommendations for existing roof system.  If roof warranty is in effect, roof shall be repaired as to not void current manufacturers warranty.  If possible use roof contractor that installed the existing roof.

9.7   Structural Building Components:  Unless indicated on the Contract Documents, do not cut or modify any structural building component (e.g. column, beam, floor slab) without prior approval of the ODR structural engineer. If an existing structural component is accidentally cut, the remedial design work shall be by a professional structural engineer licensed in the State of Texas. The Contractor is responsible for engaging the structural engineer and for payment of all design fees. The structural engineer shall be acceptable to the ODR and all structural designs shall be submitted to the ODR for review and approval.

9.7.1   Core Drilling: Contractor must x-ray or use ground penetrating radar ("GPR") to locate rebar, post tensioned cables, conduits and other embedded items prior to core drilling slabs. Survey floor and pilot drill to locate all embedded items, rebar, conduits and post tensioned cables prior to core drilling slabs. Items damaged as a result of core drilling shall be repaired as specified in paragraph 9.5, structural building components at no additional cost to the ODR or TAMU.

9.8   Endangered Species: No activity is authorized that is likely to jeopardize the continued existence of a threatened or endangered species as listed or proposed for listing under the Federal Endangered Species Act (ESA), and/or the State of Texas Parks and Wildlife Code on Endangered Species, or to destroy or adversely modify the habitat of such species. Contractor shall notify ODR of any planned construction activities that might affect endangered species.

9.8.1   If a threatened or endangered species is encountered during construction, the Contractor shall immediately cease work in the area of the encounter and notify the ODR, who will immediately implement actions in accordance with endangered species act and applicable State statutes. These actions shall include reporting the encounter to the Texas Parks and Wildlife Department, and obtaining any necessary approvals or permits to enable the work to continue. The Contractor shall not resume work in the area of the encounter until authorized to do so by the ODR.

9.9   Airport Restrictions: *[Include only when Project site is near an airport]* The Contractor shall verify that Construction activities and/or equipment do not constitute an obstruction of hazard to the flight paths of the nearby airport. The Federal Aviation Administration regulates airport airspace which may limit the height or working height of cranes, etc. This limitation is determined by FAA formula which, if exceeded, requires notification of and approval by FAA. A preliminary assessment will be provided, upon Contractor request, by the Airport Manager or other authority based on the construction equipment proposed to be used.

9.10 Archeological Discoveries: No activity which may affect a State Archeological Landmark is authorized until the Owner has complied with the provisions of the Texas Antiquities Code. The Owner has previously coordinated with the appropriate agencies and impacts to known cultural or archeological deposits have been avoided or mitigated. However, the Contractor may encounter unanticipated cultural or archeological deposits during Construction. Should an encounter occur the Contractor shall cease all work in the affected area and immediately notify the ODR. The ODR will take the appropriate notification steps and work will not resume until authorized by the ODR.

9.11 Underground Utilities

9.11.1    In accordance with State Law, all persons performing Work requiring digging or ground penetration are required to call 811 in advance and provide detailed information regarding planned Work.  Notification shall occur not earlier than the 14th day prior to the date excavation is to begin or later than 48 hours before the excavation is to begin, excluding weekend and holidays.  Additional information can be found at http://www.texas811.org

To increase the level of safety, TAMU has a policy that is more strict than State law* and requires an advance locate be performed for 1) any ground penetration on campus, to any depth, when mechanized equipment such as augers, trenchers, excavators, etc. will be used, and 2) for all other ground penetrations to a depth greater than 12 inches.  Hand-digging or soft excavation is required whenever any excavation is performed to a depth less than 12 inches without a utility locate.  An advance utility locate is always required if the excavation will be deeper than 12 inches.  In the case of ground penetration resulting from agricultural tilling or other recurring instructional or research-based agricultural work on the TAMU campus, an exception to the requirement to perform an advance utility locate will be made after an initial utility locate is performed to determine the area to be tilled or worked is clear of underground utilities.

*State law requires that all persons performing work requiring digging or ground penetration to a depth of 16 inches or more are required to call 811 in advance and provide detailed information regarding planned work.  By Texas Utilities Code, Title 5, Chapter 251 – Underground Facility Damage Prevention and Safety, a person who intends to excavate shall notify Texas 811 not earlier than the 14th day before the date the excavation is to begin or later than the 48th hour before the time the excavation is to begin, excluding Saturdays, Sundays, and legal holidays.  Failure to comply with the Texas Utilities Code could result in a fine up to $1000 for the first offense, in addition to other potential liabilities.

TAMU is a member of the Texas 811 utility locate program.  TAMU owns and is directly responsible for performing locates for the following utility systems: electrical, domestic water, chilled and heating hot water, sanitary and storm sewer, TAMU-owned natural gas, irrigation, and TAMU-owned telecommunications. **A locate request for all utility systems on campus is initiated by calling 811.**

*SSC Grounds Management is a contract service provider at TAMU responsible for all irrigation systems located on campus.  Communications with SSC Grounds Management is through the TAMU Aggieworks Center at 979-458-5500, or the TAMU Communications Center at 979-845-4311.  A locate request for irrigation systems on campus is initiated by calling 811.  By calling*

*811, the TAMU Communications Center and SSC Grounds Management will be notified of the need for an irrigation system locate.*

Other utility systems NOT owned by TAMU, such as Atmos Energy's natural gas distribution and other third-party systems such as telecom, water, electrical, etc. must also be located prior to excavating or penetrating the ground. **A locate request for third-party owned utility systems on campus is initiated by calling 811.**

For additional information and assistance contact Utilities & Energy Services at 979-845-3234 or go to this website http://utilities.tamu.edu and look under **Digging on Campus?**

**FOR EMERGENCIES: An emergency excavation is sometimes necessary to respond to a situation that endangers life, health or property, or when service to the customer will be interrupted. When an emergency locate is needed on the TAMU campus, both Texas 811 and the TAMU Communications Center (at 979-845-4311) shall be contacted promptly with details of the emergency. The same information required on the <u>Texas 811 Utility Locate Required Information</u> form under normal conditions will also be required with an emergency.**

9.11.1.1    Routine Utility Locate Request Procedure:

9.11.1.1.1 The locate requestor is responsible to clearly mark the site perimeter to be excavated or penetrated, by using water-based white paint and/or white flags, prior to calling Texas 811.

9.11.1.1.2 Call 811 to request a utility locate. After clearly marking the site perimeter where locate will be performed, requestor must have the Texas 811 Utility Locate Required Information form completed and available.

9.11.1.1.3 The utility locator(s) will mark buried lines with paint and/or flags within the marked excavation perimeter. Utility flag colors are red for electric, orange for telecom, yellow for fuel gas, green for sanitary sewer, and blue for all other water systems.

9.11.1.1.4 The requestor shall not commence any digging, excavation, or ground penetration for at least two full working days (48 hours, excluding weekends and holidays) after the locate request is made.

9.11.1.1.5 If digging, excavation, or ground penetration must be performed more than 14 days after the initial locate is performed, then the requestor/excavator must request another locate at least 48 hours (excluding weekends and holidays) in advance of ground penetration so the locate markings can be refreshed.

## 10.0 <u>FIRE REGULATIONS</u>

10.1  Comply with National Fire Protection Association, NFPA 241 guidelines. The Contractor shall use no explosives or fire in performing the work. Contractor shall understand and comply with OSHA welding and cutting requirements. If hot work is required, a hot work permit shall be obtained by coordination with TAMU Environmental Health and Safety through the ODR.

10.2  Coordinate all work on existing fire alarm and fire suppression systems with the ODR and TAMU Environmental Health and Safety prior to the start of Project Work. Any work that could cause dust, smoke or fumes must be coordinated with the ODR prior to commencing so the fire alarm system can be modified and protected as necessary if system is active. Contractor is required to cover and uncover fire alarm devices daily.

10.3  Contractor is required to temporarily replace existing smoke detectors with heat detectors during all interior renovations in the following buildings:

- Memorial Student Center (MSC); Building No. 0454
- Rudder Tower; Building No. 0446
- Jack K. Williams Administration Building (JKW); Building No. 0473
- Student Recreation Center; Building No. 1560

The temporary replacement of these devices should include the entire area of construction that will be affected by dust and debris.  It is the sole responsibility of the Contractor, at the end of the project, to re-install the smoke detectors and remove temporary heat detectors.

## 11.0 <u>CLEAN UP</u>  
The Contractor shall dispose of all trash, debris, refuse, garbage, etc., which is generated by the Contractor during the Project Work. Building sites shall be cleaned on a daily basis and disposal shall be outside the limits of TAMU property. Contractor shall routinely empty dumpsters to prevent windblown debris. Disposal shall be by sanitary landfill or other approved methods and shall conform to all local, state, and federal guidelines, criteria, and regulations. Any building material that the Contractor is required to dispose of shall not be shown or discussed on social media, either with or without intent to be sold or provided to anyone else.

## 12.0 <u>ENERGY CONSERVATION</u>  
The Contractor shall use good judgement in the conservation of utilities. Prevailing energy conservation practices shall be adhered to and enforced by the Contractor.

## 13.0 <u>SPECIAL STORAGE</u>

13.1  Petroleum Storage:

13.1.1  The Contractor shall store all fuel or petroleum products, whether new or used, in appropriate containers and within a bermed area with an impermeable liner (40 mil) or other approved containment measures.  All storage areas shall be marked with appropriate signage (i.e., Flammable Storage - No Smoking Within 50 ft).  All fuel tanks and petroleum storage

containers shall be structurally sound and in good condition, be kept sealed when not in use, and be grounded and bonded according to NFPA Requirements.

13.1.2 The containment area shall be sized to hold fluid volume equal to 110% of the largest storage container, with a minimum of one foot of freeboard for earthen berms. The Contractor shall immediately clean up and dispose of any evidence of a fuel or oil spill in conformance with all federal and state regulations at no additional cost to the ODR or Owner. Any areas that incur contamination by any hazardous substance shall be immediately remediated by the contractor at no additional expense to ODR. Any fuel or oil spill shall immediately be reported to the ODR and TAMU Environmental Health and Safety. Costs of all soil tests as a result of spills shall be a responsibility of the contractor.

13.1.3 The Contractor shall remove earthen berms at the completion of the job and restore the area to its original condition.

13.1.4 The Contractor shall keep all other storage areas free of debris, leaks, stains, or splashes. All storage areas shall be maintained in a neat, clean, and safe condition. Remediation may include subsequent soil analysis if directed by TAMU or the ODR. The Contractor shall store all paints, thinners, solvents and other hazardous materials in a contractor supplied trailer or storage unit, which shall be secured when not in use.

**14.0 TESTING** Testing indicated in these Contract Documents to be performed by TAMU, Contractor or the ODR will be performed at the option of TAMU. ODR will engage a special inspector and qualified testing and inspecting agency to perform field tests and inspections and prepare test reports.

**15.0 SAFETY**

15.1 Comply with all applicable Occupations Safety and Health Act (OSHA) Standards and Regulations.

15.2 For accident reporting, comply with SSC requirements to file written reports and immediately notify ODR and SSC Safety/Risk Manager at 979-575-3879.

15.3 Furnish and install all necessary safeguards to provide safety and protection of the public and TAMU property adjacent to the contract work area. Comply with all Applicable Laws related to the safety of the public and TAMU property while performing contract operations.

15.4 Speed Limit: Contractor shall notify all employees and subcontractors of the speed limit of the adjacent streets and ensure all personnel understand and comply with this requirement.

15.5 Temporary Roads and Paved Areas: Construct and maintain temporary roads and paved areas adequate to support loads and to withstand exposure to traffic during contract operations.

15.6 Temporary Traffic Controls: Furnish and install Temporary Traffic Controls ("TTC") in accordance with the Texas Manual on Uniform Traffic Control Devices ("TMUTCD"). Submit a TTC plan for vehicular and pedestrian traffic to the ODR and project engineer for approval prior to the start of construction operations. Pedestrian traffic control plans shall provide a safe, convenient and accessible travel path that replicates as nearly as possible the most desirable characteristics of the existing sidewalks or footpaths throughout all phases of construction. Provide for continuous operation of signs and barricades designating restricted or dangerous conditions including but not limited to: illuminated barricades, danger signals, warning signs and obstructions.

15.7 Accessible Routes: Accessible routes for the disabled shall be kept accessible and safe at all times or alternate routes shall be constructed and signed in accordance with the Texas Accessibility Standards. Revised alternate routes shall require approval by the ODR and Owner.

15.8 Site Safety: Do not leave the work areas in an unsecured or unsafe condition at any time during operations. Contractor personnel and equipment operators shall monitor their surroundings at all times and be alert for people moving in or adjacent to contract work areas. Contractor shall use spotters when moving vehicles through the construction sites and no construction vehicles (e.g. backhoes, bobcats, etc.) shall be left unsecured on site. Contractor shall furnish and install temporary fences, barricades, signs and other required items to:

15.8.1 Warn/notify adjacent building occupants

15.8.2 Protect construction materials

15.8.3 Prevent unauthorized personnel from entering the construction site.

15.8.4 Redirect vehicular and pedestrian traffic flow when required to perform Work; comply with paragraph 15.5 above, Temporary Traffic Controls TTC.

15.9 Prior to spraying paint, coatings or power washing exterior structures the following criteria shall be met:

15.9.1 Contractor shall provide ODR and TAMU forty eight (48) hours' notice prior to spraying any material, including primer, paint or coatings.

15.9.2 Consider use of dryfall paint when spray painting large areas of structure (e.g. metal building frames) or materials by conventional or airless spray.

15.9.3 The Contractor shall provide all necessary barricades, signs, warning of spray area as determined in the preconstruction conference. The Contractor shall set these signs out the night before spraying begins.

15.9.4 The Contractor shall be responsible for the removal of signs and barricades at the completion of the job.

15.9.5   The Contractor shall protect any automobile, bicycle, vehicle or other property which is located in a warning area where contact with the property owner has not been made before the commencement of work.

15.9.6   The Contractor shall employ approved wind screens, protective shrouds and other protection methods during all paint and coating applications. The Contractor is responsible for all overspray and shall have sole liability where damage occurs as a result of this work.

15.9.7   Spray equipment shall be as recommended by the materials manufacturer. Spray operations shall be performed only during adequate period calm weather with winds not exceeding 15 miles per hour. Protect all property from overspray or other damage.

15.9.8   To prevent sparking a flammable substance, smoking and other sources of flame near spray painting operations are prohibited and tools shall be properly rated and grounded for work in a spray painting area.

**16.0   LANDSCAPING** Take appropriate measures to prevent injury to landscaping in or near the worksite. Do not remove or prune any landscaping without the approval from the ODR. Plants which are damaged during work shall be replaced at no expense to TAMU or the ODR. Unless required by the contract documents, the ODR shall coordinate removal of all trees, tree branches, shrubs and plants that will interfere the Project Work. Actively nesting birds shall not be disturbed unless approved by the ODR. Disturbing actively nesting migratory birds will also require a permit to be obtained from the U.S. Fish and Wildlife Service.

**17.0   ENVIRONMENTAL REQUIREMENTS**

17.1   Compliance with Environmental Laws:  The Contractor and all subcontractors shall comply with any and all applicable federal, state, and local laws, regulations, ordinances, policies and standards ("Applicable Laws") related to environmental matters. Contractor and all subcontractors shall comply with all current TAMU/EHS and State of Texas Storm Water Pollution Prevention Plan (SWPPP) regulations. Please refer to the following links:
https://ehsd.tamu.edu
http://www.tceq.state.tx.us/assets/public/permitting/waterquality/attachments/stormwater/txr15largepri.pdf
https://www.tceq.texas.gov/assets/public/permitting/stormwater/txr15smallsite.pdf

17.2   PCB Ballast Disposal Requirements:  The transporting and disposal of lighting ballasts is subject to Environmental Protection Agency (EPA), D.O.T. and State of Texas laws, codes and guidelines. Any ballast that is not specifically marked "No PCB's" shall be considered to contain PCB's and shall be transported to an EPA approved incinerator and destroyed by incineration. Contractor shall furnish ODR with copies of tickets before and after transportation and a certificate of destruction from the firm that destroys the ballasts. The disposal company must be approved by the ODR. Contractors involved in projects that include the removal and/or disposal of fluorescent, mercury vapor, or HID Sodium Vapor lamps shall comply with the requirements of this section. Fluorescent lamps have been determined, by the TCEQ, to be hazardous waste and must be managed in accordance with

40 CFR 260-279, and 30 TAC 330-335. The Contractor shall immediately notify the ODR when activities involving the removal of the aforementioned lamps begin.

17.3   Nuisance and Polluting Activity Prohibited:  Polluting, dumping, or discharging of any harmful, nuisance, or regulated materials (such as concrete truck washout, vehicle maintenance fluids, residue from saw cutting operations, solid waste and hazardous substances) into building drains, site drains, streams, waterways, holding ponds or to the ground surface shall not be permitted. The Contractor shall be held responsible for any damages that may result. Further, the Contractor shall conduct activities in such a fashion to avoid creating any legal nuisance, including but not limited to, suppressing noise and dust, controlling erosion, and implementing other measures as necessary to minimize off-site impacts of work activities.

17.4   Asbestos Removal:  If, in the process of performing the Work, the Contractor suspects that asbestos has been found, the ODR shall be notified immediately. The ODR shall cause the suspicious material to be tested and, if found to be asbestos, will be responsible for its removal. It will be the Contractor's responsibility to protect its workers and other persons by regulating access to the affected area. Should the Contractor encounter previously unidentified and suspect asbestos-containing materials ("ACM"), mold, hazardous or potentially hazardous material or suspected lead containing paint which must be disturbed to comply with the Contract Documents, the Contractor shall cease all work that would disturb the suspect material and shall immediately notify the ODR.

17.5   Contractor is responsible for all materials brought on site, including hazardous materials. All hazardous waste or special waste generated by the Contractor as a result of its operations shall be identified, characterized, containerized and transported to a permitted disposal facility in strict accordance with the requirements of 40 CFR 260-279 (Hazardous waste and used oil regulations), 30 TAC 324, 330-335 (TCEQ Hazardous and Industrial Waste Regulations).

## 18.0   COLOR AND MATERIAL SELECTIONS

18.1   No color selections and no material selections will be made by the ODR until the Contractor submits all samples of all materials requiring color selections to the ODR or A/E (if applicable). In addition, prior to the ODR selection colors, the Contractor shall certify in writing that all colors and samples submitted are current, acceptable, and available to the Contractor for TAMU's selection.

18.2   Any samples that are not applicable to the work shall be carefully removed from the submittal by the Contractor. The Contractor shall submit the manufacturer's full range of applicable colors, patterns, and textures for the various materials that are required by the contract.

18.3   In the event that discontinued, non-current, or non-applicable colors, textures, or samples are submitted by the Contractor and their selection is made by the ODR, the Contractor shall immediately notify ODR of all associated delays required to resubmit and approve alternate materials.

**19.0 <u>PROJECT CLOSEOUT DOCUMENTS</u>** Before approval of final payment, Contractor must submit the following documents on all projects:

- Contractor's Affidavit of Release of Liens (AIA G706A), must be notarized
- The Contractor shall not incorporate hazardous materials into the work, and shall provide an affidavit attesting as such
- Warranties: Contractor must submit, on contractor's letterhead, a statement guaranteeing all work for a period of twelve months (show Substantial Completion date in warranty letter). Certify in writing and provide evidence that commercial general liability insurance coverage is effective through the contractor's warranty period
- Consent of Surety (AIA G707) if bonding is required
- Operation and Maintenance Manuals for equipment/products
- As Built / Marked Up Field Drawings. Send to A/E if applicable for update to CAD files.
- HVAC TAB Report
- Notice of Termination (NoT) of all temporary erosion controls having been removed, scheduled for removal, or transferred to a new operator within 30 days
- Sprinkler Systems: One (1) signed original & 1 (one) electronic copy of standard contractor's material and test certificate as required by Texas Dept. of Insurance for above and underground piping
- TCEQ Domestic Water Backflow Prevention and Customer Service Inspection Certification. Contractor's responsibility to have this done by a licensed individual required by Texas Dept. of Insurance for above and underground piping
- Other documents that may be required by the contract documents

**20.0 <u>RIGHT TO AUDIT</u>** The ODR shall have the right to verify and audit the details of Contractor's and subcontractor's billings, certificates, accountings, cost data, and statements, either before or after payment, by (1) inspecting the books and records of the Contractor and subcontractor's during normal business hours; (2) examining any reports with respect to the Project Work; (3) interviewing Contractor's and subcontractor's employees; and (4) any other reasonable action. Contractor's and subcontractor's records shall be kept on the basis of generally accepted accounting principles in accordance with cost accounting standards issued by the Federal Office of Management and Budget Cost Accounting Standards Board and organized by each Application for Payment period.

**21.0 <u>BUSINESS ETHICS EXPECTATION</u>**

21.1 *During the course of pursuing work with the ODR and while performing contract work in accordance with the Contract Documents, Contractor agrees to maintain business ethics standards aimed at avoiding any impropriety or conflict of interest which could be construed to have an adverse impact on the ODR or TAMUS's best interests.*

21.2 *Contractor shall take reasonable actions to prevent any actions or conditions which could result in a conflict with the ODR or TAMUS's best interests. These obligations shall apply to the activities of Contractor's employees, agents, subcontractors, subcontractors' employees and other persons under their control.*

21.3 *Contractor's employees, agents, subcontractors (and their representatives) shall not make or offer, or cause to be made or offered, any cash payments, commissions, employment, gifts valued at $50 dollars or more, entertainment, free travel, loans, free work, substantially discounted work, or any other considerations to the ODR's representatives,*

*employees or their relatives.*

21.4 *Contractor's employees, agents and subcontractors (and their relatives) shall not receive or accept any cash payments, commissions, employment, gifts valued at $50 dollars or more, entertainment, free travel, loans, free work, or substantially discounted work or any other considerations from representatives of Contractors, sub- contractors, or material suppliers or any other individuals, organizations, or businesses receiving funds in connection with the Project Work.*

21.5 *Contractor agrees to notify SSC's Resident Regional Manager within 48 hours of any instance where the Contractor becomes aware of a failure to comply with the provisions of this section.*

21.6 *Upon request by the ODR, Contractor agrees to provide a certified management representation letter executed by a Contractor representative selected by the ODR in a form agreeable to the ODR stating that the representative is not aware of any situations violating the business ethics expectations outlined in the Contract Documents or any similar potential conflict of interest as listed in the Compass Group "Code of Business Conduct" or "Code of Ethics" which can be found on the Compass Group website (http://compass-usa.com/pages/code-of- ethics.aspx).*

21.7 *Contractor agrees to include provisions similar to the aforementioned in all contracts with subcontractors receiving more than $25,000 in funds in connection with the Project Work.*

**END SECTION**

EXHIBIT
38

CAUSE NO. 24-000902-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## THIRD BUSINESS RECORDS AFFIDAVIT

State of Texas          §
County of Brazos     §

Before me, the undersigned notary, on this day personally appeared Tricia Bledsoe, the affiant, whose identify is known to me. After I administered an oath, the affiant testified as follows:

1. My name is Tricia Bledsoe, and I am over the age of 18 years of age, of sound mind, capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am currently employed as the Director and designated Public Information Officer of Texas A&M University's (TAMU) Office of Open Records (ORO) and in this capacity am the primary custodian of the records identified herein by virtue of my duties and responsibilities.

3. The records identified in this affidavit and attached to Defendant's First Amended Plea to the Jurisdiction by exhibit number as business records are as follows:

**Exhibit 31**: Plaintiff's seventh TPIA request w/ history – J1723 (6 pgs)
**Exhibit 32**: J1723 production part 1 (123 pgs)
**Exhibit 33**: J1723 production part 2 (1 pg)
**Exhibit 34**: J1723 production part 3 (5 pgs chart)
**Exhibit 35**: J1723 production part 4 (2 pgs)
**Exhibit 36**: J1723 production part 5 (2 pgs)
**Exhibit 37**: J1723 production part 6 (71 pgs)

4.    These said 210 pages are kept by TAMU in the regular course of business. It was in the regular course of business for an employee or representative of TAMU or its predecessor agency, with knowledge of the act, event or condition recorded, to make the memorandum or record or to transmit information thereof to be included in such memorandum or record, and the memorandum or record was made at or near the time of the act, event or condition recorded or reasonably soon thereafter; or, in the case of documentation given to or received by TAMU, it was in the regular course of business for an employee or representative of TAMU to receive the record and place it in the appropriate files of TAMU. With the exception of the redaction of any personal, private, or confidential information, and any bates numbering or exhibit number identification of any documents by the parties of the records identified by exhibit number above, they are exact duplicates of the originals.

EXECUTED on August ___, 2024.

*Patricia Bledsoe*

Patricia Bledsoe, Director
Open Records
Office of Risk, Ethics, and Compliance
Texas A&M University

SUBSCRIBED AND SWORN BEFORE ME, on August ___, 2024 to certify which witness my hand and official seal.

*Cindy Patterson*

Notary Public, State of Texas

CINDY PATTERSON
Notary Public, State of Texas
Comm. Expires 07-07-2026
Notary ID 12158569

Page 2



# NOTICE OF PROJECT (NOP)

<div style="border:1px solid black">

**EXHIBIT**

**39**

</div>

POSTED ON BEHALF OF SSC BY Texas A&M University (Part 02)

Attention: (02) Cindy Gillar - c-gillar@tamu.edu, CC Shawna Kennedy - shawna.kennedy@tamu.edu

Date of Request: 10/23/2023

## PROJECT INFORMATION

Project Number: 2023-06030

Project Name: Spence Hall Corps Dorm Bathroom Renovations

Project Location: Texas A&M University, College Station, TX

Project Start Date: 5/13/2024          Project Finish Date: 7/31/2024

Project Description: Renovation to the first floor women's room in Spence Hall including new flooring, ceiling, partitions, doors, plumbing, HVAC fixtures

## DOCUMENT ACQUSITION INFORMATION

RFP & Construction Documents (CSP) and information are available electronically at (web link): public PublicFolderFiles.aspx - app-e-builder

## SUBMISSION INFORMATION

| | | |
|---|---|---|
| CSP RFP Submissions are due: | Date: 11/14/2023 | Time: 2:00 PM |
| HSP Submissions are due: | Date: 11/15/2023 | Time: 2:00 PM |
| Public Proposal Opening: SSC Facilities Services Building, Conference Room 204: | Date: 11/15/2023 | Time: 3:00 PM |

Public Proposal Virtual Meeting (web link): **Click here to join the meeting**

Mail or Hand-deliver to:          SSC Service Solutions
Facilities Services EDCS
1371 TAMU (Physical Address: 600 Agronomy Road, Suite 218)
College Station, TX 77843

## HISTORICALLY UNDERUTILIZED BUSINESS (HUB)

HUB Subcontracting Plan Required:          Yes ☒          No ☐

If yes, monthly HUB Progress Assessment Reports (PARs) are required with each pay application.

Contact (02) Cindy Gillar - c-gillar@tamu.edu, 979-845-9010. CC Shawna Kennedy - shawna.kennedy@tamu.edu, 979-845-3425 with all HUB-related questions.

## QUERY INFORMATION

Pre-proposal Meeting Location (if applicable): SSC Facilities Services Building, Conference Room 204

Date: 10/30/2023          Time: 2:30 PM

Inquiries regarding the submission process/requirements should be directed to

SSC Project Manager: Mike Garon

Email: Michael.Garon@sscserv.com

Phone: 979-446-2506

If applicable, inquiries regarding the technical aspects of the Construction Documents shall be directed to:

A/E Contact: Fred Patterson

A/E Firm: Patterson Architects

Email: fred@patarch.com

Phone:  979-775-6036

EXHIBIT
40



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

**Project: 4024003 - TAMU Corps Dorms Restrooms Renovations**
606 Military Mall
College Station, Texas 77840

# Daily Log: Tuesday 5/14/2024

 **Daily Log Completed**
The Daily Log was completed by Josh Farris on Thu, May 16, 2024 at 07:41 AM CDT.

## WEATHER REPORT

| Temperature | | | Precipitation Since | | | Humidity | | | | Windspeed | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Low | High | Avg | Midnight | 2 Days Ago | 3 Days Ago | Low | Avg | High | Dew | Avg | Max | Gust |
| 64°F | 84°F | 74°F | 0.00 in. | 0.29 in. | 0.39 in. | 36% | 73% | 100% | 63°F | 4.0 mph | 7 mph | 13 mph |

## DAILY SNAPSHOT

| 06:00 AM | 09:00 AM | 12:00 PM | 03:00 PM | 06:00 PM | 09:00 PM |
|---|---|---|---|---|---|
| Fog 65°F | Fog 67°F | Clear 76°F | Clear 83°F | Clear 84°F | Clear 81°F |

## OBSERVED WEATHER CONDITIONS

| No. | Time Observed | Weather Delay | Sky | Temp | Average | Precipitation | Wind | Ground/Sea |
|---|---|---|---|---|---|---|---|---|
| 1 | 07:15:00 AM | No | | | | | | |

## MANPOWER LOG

**9 Workers | 65.0 Man Hours**

| No. | Contact/Company | Workers | # Hours | Man Hours | Location | JSA Completed? | |
|---|---|---|---|---|---|---|---|
| 1 | Dailey Electric, Inc. | 5 | 8.0 | 40.0 | | Yes | 📎 |
| | Comments: Swap smokes and disconnect devices ;Making joints hanging lights; Created By: SG Integrations | | | | | | |
| 2 | SpawGlass Construction Corp | 3 | 8.0 | 24.0 | | Yes | 📎 |
| | Comments: Finish putting ram board on walls putting a plastic with zippers picking up trash; Created By: SG Integrations | | | | | | |
| 3 | American Fire Protection Group, Inc. | 1 | 1.0 | 1.0 | | | |
| | Comments: Drain down lines on 1st floor of each building Created By: Josh Farris | | | | | | |
| | | 9 | | 65.0 | | | |

**Manpower Log's Attachments:**

1. Dailey Electric, Inc.



[Dailey Electric, Inc.-JSA-2024.05.14.pdf](#)                    [Dailey Electric, Inc.-JSA-2024-05-14T00:00:00.0000000Z.pdf](#)

2. SpawGlass Construction Corp



[SpawGlass Construction Corp-JSA-2024-05-14T00:00:00.0000000Z.pdf](#)

## VISITOR LOG

| No. | Created By | Visitor | Start Time | End Time | Comments |
|---|---|---|---|---|---|
| 1 | Josh Farris | Baldemar Vazquez (Engineering Safety Consultants, Inc) | 08:30 AM | 09:30 AM | Safety inspection |

By _____  Date _____  Copies To _____



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

**Project: 4024003 TAMU Corps Dorms Restrooms
Renovations**
606 Military Mall
College Station, Texas 77840

# Inspection: [SpawGlass] JSA #6

| **40/40** | **1** | **0** | **36** | **3** |
|---|---|---|---|---|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| | | | |
|---|---|---|---|
| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/16/24 |
| | | **Location** | |
| | | **Created By** | SG Integrations |

**Linked Drawings**

**Description**    Competent Person Name: Charles Cripps|Crew Members: Charles cripps Pablo Urbana Boanense Metes Jorge Flores Juan Carlos William Mobeito Edwin Pablo Francisco Garcia Nicolas Diaz Jose Gerendo Diaz Dilmer Xavier Jose Mario Nicara Miguel Marquinhos Osman Torres Freddy Decaria Juan16 |Tier Company Name:

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?**    Demo restrooms

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**    N95 mask Ear plugs

## Inspection Details

| | | | |
|---|---|---|---|
| **Inspection Date** | May 15, 2024 | **Due Date** | |
| | | **Responsible Contractor** | Albo Construction LLC |
| **Assignee(s)** | Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1                    **3 Neutral    1 Conforming    0 Deficient    0 N/A**

| | |
|---|---|
| **1.1 Specific Work Tasks/Tareas de trabajo especificas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Remove ceilings Tile walls and tile flooring Removal metal studs |

**SG Integrations (GoFormz)** responded with Remove ceilings Tile walls and tile flooring Removal metal studs on May 16, 2024 at 06:37 AM CDT

| | |
|---|---|
| **1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | No |

**SG Integrations (GoFormz)** responded with No on May 16, 2024 at 06:37 AM CDT

| | |
|---|---|
| **1.3 Potential Hazards/Peligros potenciales**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Shock risk Slip and trip risk Dust |

**SG Integrations (GoFormz)** responded with Shock risk Slip and trip risk Dust  on May 16, 2024 at 06:37 AM CDT

| | |
|---|---|
| **1.4 Preventative Measures/Medidas preventivas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Make safe electrical Clean material and debri as demo Keep pathways clear Wear n95 mask |

**SG Integrations (GoFormz)** responded with Make safe electrical Clean material and debri as demo Keep pathways clear Wear n95 mask on May 16, 2024 at 06:37 AM CDT

## JSA Activity 2                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 3                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 4                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 5                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 6                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 7                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 8                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 9                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 10                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## Inspection Signatures



*SpawGlass Integrations signed on May 16, 2024 at 06:39 AM CDT*



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

# Inspection: [SpawGlass] JSA #5

| **40/40** | **1** | **0** | **36** | **3** |
|---|---|---|---|---|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/16/24 |
|---|---|---|---|
| | | **Location** | |
| | | **Created By** | SG Integrations |

**Linked Drawings**

**Description**  Competent Person Name: Mateo Delarosa Ortiz|Crew Members: Jose Hernandez |Tier Company Name:

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?**  Finshing puting up pink foam on doors , puting up fences screening , Turing on negative air machine

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**

## Inspection Details

| **Inspection Date** | May 15, 2024 | **Due Date** | |
|---|---|---|---|
| | | **Responsible Contractor** | SpawGlass Construction Corp |
| **Assignee(s)** | Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1                    **3 Neutral    1 Conforming    0 Deficient    0 N/A**

**1.1 Specific Work Tasks/Tareas de trabajo especificas**
*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations*

Finshing puting up pink foam on doors , puting up fences screening , Turing on negative air machine

**SG Integrations (GoFormz)** responded with Finshing puting up pink foam on doors , puting up fences screening , Turing on negative air machine on May 15, 2024 at 07:07 AM CDT

**1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?**
*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations*

No

**SG Integrations (GoFormz)** responded with No on May 15, 2024 at 07:07 AM CDT

**1.3 Potential Hazards/Peligros potenciales**
*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations*

Falling getting cut breathing dust particles

**SG Integrations (GoFormz)** responded with Falling getting cut breathing dust particles  on May 15, 2024 at 07:07 AM CDT

**1.4 Preventative Measures/Medidas preventivas**
*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations*

Wear ppe wear mask

**SG Integrations (GoFormz)** responded with Wear ppe wear mask  on May 15, 2024 at 07:07 AM CDT

## JSA Activity 2                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 3                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 4                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 5                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 6                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 7                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 8                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 9                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 10                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## Inspection Signatures



*Mateo Delarosa Ortiz signed on May 15, 2024 at 07:15 AM CDT*



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

**Project: 4024003 - TAMU Corps Dorms Restrooms Renovations**
606 Military Mall
College Station, Texas 77840

# Daily Log: Wednesday 5/15/2024

**Daily Log Completed**
The Daily Log was completed by Josh Farris on Thu, May 16, 2024 at 07:43 AM CDT.

## WEATHER REPORT

| Temperature | | | Precipitation Since | | | Humidity | | | | Windspeed | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Low | High | Avg | Midnight | 2 Days Ago | 3 Days Ago | Low | Avg | High | Dew | Avg | Max | Gust |
| 61°F | 90°F | 76°F | 0.00 in. | 0.00 in. | 0.29 in. | 33% | 61% | 94% | 60°F | 3.8 mph | 6 mph | 10 mph |

## DAILY SNAPSHOT

| 06:00 AM | 09:00 AM | 12:00 PM | 03:00 PM | 06:00 PM | 09:00 PM |
|---|---|---|---|---|---|
| Clear 64°F | Cloudy 67°F | Partly Cloudy 81°F | Cloudy 90°F | Cloudy 90°F | Cloudy 83°F |

## OBSERVED WEATHER CONDITIONS

| No. | Time Observed | Weather Delay | Sky | Temp | Average | Precipitation | Wind | Ground/Sea |
|---|---|---|---|---|---|---|---|---|
| 1 | 07:10:00 AM | No | | | | | | |

## MANPOWER LOG

**20 Workers | 190.0 Man Hours**

| No. | Contact/Company | Workers | # Hours | Man Hours | Location | JSA Completed? | |
|---|---|---|---|---|---|---|---|
| 1 | Dailey Electric, Inc. | 3 | 8.0 | 24.0 | | Yes | 📎 |
| | **Comments:** Remove existing electrical after Sheetrock comes down ; **Created By:** SG Integrations | | | | | | |
| 2 | SpawGlass Construction Corp | 2 | 8.0 | 16.0 | | Yes | 📎 |
| | **Comments:** Finshing puting up pink foam on doors , puting up fences screening , Turing on negative air machine ; **Created By:** SG Integrations | | | | | | |
| 3 | Albo Construction LLC | 15 | 10.0 | 150.0 | | | |
| | **Comments:** Start demo in all rooms. Taking everything down except studs for now **Created By:** Josh Farris | | | | | | |
| | | **20** | | **190.0** | | | |



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

# Inspection: [SpawGlass] JSA #2

| **40/40** | **1** | **0** | **36** | **3** |
|---|---|---|---|---|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| | | | |
|---|---|---|---|
| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/16/24 |
| | | **Location** | |
| | | **Created By** | SG Integrations |

**Linked Drawings**

**Description**    Competent Person Name: Mateo Delarosa Ortiz|Crew Members: Jose Hernandez |Tier Company Name:

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?**    Preparing hallways

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**

## Inspection Details

| | | | |
|---|---|---|---|
| **Inspection Date** | May 14, 2024 | **Due Date** | |
| | | **Responsible Contractor** | SpawGlass Construction Corp |
| **Assignee(s)** | Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1                    **3 Neutral**    **1 Conforming**    **0 Deficient**    **0 N/A**

| **1.1 Specific Work Tasks/Tareas de trabajo especificas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Finish putting ram board on walls putting a plastic with zippers picking up trash |
|---|---|

**SG Integrations (GoFormz)** responded with Finish putting ram board on walls putting a plastic with zippers picking up trash on May 14, 2024 at 08:21 AM CDT

| **1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | No |
|---|---|

**SG Integrations (GoFormz)** responded with No on May 14, 2024 at 08:21 AM CDT

| **1.3 Potential Hazards/Peligros potenciales**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Getting cut falling tripping |
|---|---|

**SG Integrations (GoFormz)** responded with Getting cut falling tripping on May 14, 2024 at 08:21 AM CDT

| **1.4 Preventative Measures/Medidas preventivas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Be cautious of surroundings watch your steps |
|---|---|

**SG Integrations (GoFormz)** responded with Be cautious of surroundings watch your steps on May 14, 2024 at 08:21 AM CDT

## JSA Activity 2                    **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## JSA Activity 3                    **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## JSA Activity 4                    **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## JSA Activity 5                    **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## JSA Activity 6                    **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## JSA Activity 7                    **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## JSA Activity 8                    **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## JSA Activity 9                    **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## JSA Activity 10                   **0 Neutral**    **0 Conforming**    **0 Deficient**    **4 N/A**

## Inspection Signatures



*Mateo Delarosa Ortiz signed on May 14, 2024 at 08:25 AM CDT*



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

**Project: 4024003 TAMU Corps Dorms Restrooms Renovations**
606 Military Mall
College Station, Texas 77840

# Inspection: [SpawGlass] JSA #3

| 40/40 | 1 | 0 | 36 | 3 |
|:---:|:---:|:---:|:---:|:---:|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| | | | | |
|---|---|---|---|---|
| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/16/24 | |
| | | **Location** | | |
| | | **Created By** | SG Integrations | |

**Linked Drawings**

**Description**  Competent Person Name: Greg|Crew Members: Greg|Tier Company Name:Siemens

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?**  Disconnect alarms and swap smoke detectors

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**  Ladder and basic ppe

## Inspection Details

| | | | |
|---|---|---|---|
| **Inspection Date** | May 14, 2024 | **Due Date** | |
| | | **Responsible Contractor** | Dailey Electric, Inc. |
| **Assignee(s)** | Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1

**3 Neutral    1 Conforming    0 Deficient    0 N/A**

| | |
|---|---|
| **1.1 Specific Work Tasks/Tareas de trabajo especificas** *Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Swap smokes and disconnect devices |

**SG Integrations (GoFormz)** responded with Swap smokes and disconnect devices  on May 14, 2024 at 09:47 AM CDT

| **1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | No |
|---|---|

**SG Integrations (GoFormz)** responded with No on May 14, 2024 at 09:47 AM CDT

| **1.3 Potential Hazards/Peligros potenciales**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Ladder falls |
|---|---|

**SG Integrations (GoFormz)** responded with Ladder falls on May 14, 2024 at 09:47 AM CDT

| **1.4 Preventative Measures/Medidas preventivas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Use ladder correctly |
|---|---|

**SG Integrations (GoFormz)** responded with Use ladder correctly on May 14, 2024 at 09:47 AM CDT

| | | | | |
|---|---|---|---|---|
| **JSA Activity 2** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 3** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 4** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 5** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 6** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 7** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 8** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 9** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 10** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |

## Inspection Signatures



*SpawGlass Integrations signed on May 14, 2024 at 09:57 AM CDT*

**Manpower Log's Attachments:**

1. Dailey Electric, Inc.



[Dailey Electric, Inc.-JSA-2024-05-15T00:00:00.0000000Z.pdf](Dailey Electric, Inc.-JSA-2024-05-15T00:00:00.0000000Z.pdf)

2. SpawGlass Construction Corp



[SpawGlass Construction Corp-JSA-2024-05-15T00:00:00.0000000Z.pdf](SpawGlass Construction Corp-JSA-2024-05-15T00:00:00.0000000Z.pdf)

## NOTES LOG

| No. | Created By | Issue? | Location | Comments |
|-----|------------|--------|----------|----------|
| 1 | Josh Farris | No | | RES Life picked up partitions |

By _____  Date _____  Copies To _____

**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

**Project: 4024003 - TAMU Corps Dorms Restrooms Renovations**
606 Military Mall
College Station, Texas 77840

# Daily Log: Thursday 5/16/2024

## WEATHER REPORT

| Temperature | | | Precipitation Since | | | Humidity | | | | Windspeed | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Low | High | Avg | Midnight | 2 Days Ago | 3 Days Ago | Low | Avg | High | Dew | Avg | Max | Gust |
| 69°F | 82°F | 75°F | 0.47 in. | 0.47 in. | 0.47 in. | 57% | 76% | 94% | 66°F | 4.5 mph | 6 mph | 13 mph |

## DAILY SNAPSHOT

| 06:00 AM | 09:00 AM | 12:00 PM | 03:00 PM | 06:00 PM | 09:00 PM |
|---|---|---|---|---|---|
| Clear 70°F | Partly Cloudy 77°F | Cloudy 83°F | Rain 77°F | Rain 70°F | Cloudy 69°F |

## OBSERVED WEATHER CONDITIONS

| No. | Time Observed | Weather Delay | Sky | Temp | Average | Precipitation | Wind | Ground/Sea |
|---|---|---|---|---|---|---|---|---|
| 1 | 05:50:00 AM | No | | | | | | |

## MANPOWER LOG

**20 Workers | 160.0 Man Hours**

| No. | Contact/Company | Workers | # Hours | Man Hours | Location | JSA Completed? | |
|---|---|---|---|---|---|---|---|
| 1 | Albo Construction LLC | 15 | 8.0 | 120.0 | | Yes | 📎 |
| | **Comments:** Demo walls and floor ;Remove ceilings Tile walls and tile flooring Removal metal studs; **Created By:** SG Integrations | | | | | | |
| 2 | SpawGlass Construction Corp | 2 | 8.0 | 16.0 | | Yes | 📎 |
| | **Comments:** Finish putting up fence screening bracing up fence with two by fours; **Created By:** SG Integrations | | | | | | |
| 3 | Gowan/Garrett, Inc. | 3 | 8.0 | 24.0 | | Yes | 📎 |
| | **Comments:** We will turn off all water to the restroom and start demoing, plumbing fixtures off the wall; **Created By:** SG Integrations | | | | | | |
| | | **20** | | **160.0** | | | |



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

**Project: 4024003 TAMU Corps Dorms Restrooms Renovations**
606 Military Mall
College Station, Texas 77840

# Inspection: [SpawGlass] JSA #9

| **40/40** | **1** | **0** | **36** | **3** |
|---|---|---|---|---|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| | | | | |
|---|---|---|---|---|
| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/16/24 | |
| | | **Location** | | |
| | | **Created By** | SG Integrations | |

**Linked Drawings**

**Description**    Competent Person Name: Adam Garrett|Crew Members: Two plumbers and one plumbing apprentice|Tier Company Name:

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?**    Saturn off water and Demo plumbing fixtures

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**    Gloves, hardhat, safety glasses

## Inspection Details

| | | | |
|---|---|---|---|
| **Inspection Date** | May 16, 2024 | **Due Date** | |
| | | **Responsible Contractor** | Gowan/Garrett, Inc. |
| **Assignee(s)** | Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1                    **3 Neutral    1 Conforming    0 Deficient    0 N/A**

| **1.1 Specific Work Tasks/Tareas de trabajo especificas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | We will turn off all water to the restroom and start demoing, plumbing fixtures off the wall |
|---|---|

**SG Integrations (GoFormz)** responded with We will turn off all water to the restroom and start demoing, plumbing fixtures off the wall on May 16, 2024 at 08:41 AM CDT

| **1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | No |
|---|---|

**SG Integrations (GoFormz)** responded with No on May 16, 2024 at 08:41 AM CDT

| **1.3 Potential Hazards/Peligros potenciales**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Cutting yourself by removing plumbing fixtures. Objects getting into your eyes |
|---|---|

**SG Integrations (GoFormz)** responded with Cutting yourself by removing plumbing fixtures. Objects getting into your eyes on May 16, 2024 at 08:41 AM CDT

| **1.4 Preventative Measures/Medidas preventivas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Always wear your gloves safety glasses, and all PPE |
|---|---|

**SG Integrations (GoFormz)** responded with Always wear your gloves safety glasses, and all PPE on May 16, 2024 at 08:41 AM CDT

## JSA Activity 2                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 3                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 4                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 5                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 6                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 7                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 8                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 9                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 10                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## Inspection Signatures



*Adam Garrett signed on May 16, 2024 at 08:46 AM CDT*



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

# Inspection: [SpawGlass] JSA #8

| **40/40** | **1** | **0** | **36** | **3** |
|---|---|---|---|---|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| | | | |
|---|---|---|---|
| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/16/24 |
| | | **Location** | |
| | | **Created By** | SG Integrations |

**Linked Drawings**

**Description**  Competent Person Name: Mateo Delarosa Ortiz|Crew Members: Jose Hernandez |Tier Company Name:

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?**  Finish putting up fence screening

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**

## Inspection Details

| | | | |
|---|---|---|---|
| **Inspection Date** | May 16, 2024 | **Due Date** | |
| | | **Responsible Contractor** | SpawGlass Construction Corp |
| **Assignee(s)** | Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1                    **3 Neutral    1 Conforming    0 Deficient    0 N/A**

| **1.1 Specific Work Tasks/Tareas de trabajo especificas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Finish putting up fence screening bracing up fence with two by fours |
|---|---|

**SG Integrations (GoFormz)** responded with Finish putting up fence screening bracing up fence with two by fours on May 16, 2024 at 07:16 AM CDT

| **1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | No |
|---|---|

**SG Integrations (GoFormz)** responded with No on May 16, 2024 at 07:16 AM CDT

| **1.3 Potential Hazards/Peligros potenciales**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Falling heat stroke getting cut |
|---|---|

**SG Integrations (GoFormz)** responded with Falling heat stroke getting cut  on May 16, 2024 at 07:16 AM CDT

| **1.4 Preventative Measures/Medidas preventivas**<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Be cautious Of surroundings drink plenty of water use PPe |
|---|---|

**SG Integrations (GoFormz)** responded with Be cautious Of surroundings drink plenty of water use PPe on May 16, 2024 at 07:16 AM CDT

## JSA Activity 2                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 3                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 4                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 5                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 6                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 7                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 8                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 9                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 10                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## Inspection Signatures



*Mateo Delarosa Ortiz signed on May 16, 2024 at 07:28 AM CDT*

**Manpower Log's Attachments:**

1. Albo Construction LLC —————————————————————————————————



[Albo Construction LLC-JSA-2024.05.16.pdf](#)

2. SpawGlass Construction Corp ————————————————————————————



[SpawGlass Construction Corp-JSA-2024-05-16T00:00:00.0000000Z.pdf](#)

3. Gowan/Garrett, Inc. ———————————————————————————————————



[Garrett, Inc.-JSA-2024-05-16T00:00:00.0000000Z.pdf](#)

| By | Date | Copies To |
|----|------|-----------|
| SpawGlass | Page 2 of 2 | Printed On: May 28, 2024 at 03:51 PM CDT |

- 844 -

**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

**Project: 4024003 - TAMU Corps Dorms Restrooms Renovations**
606 Military Mall
College Station, Texas 77840

# Daily Log: Friday 5/17/2024

## WEATHER REPORT

| Temperature | | | Precipitation Since | | | Humidity | | | | Windspeed | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Low | High | Avg | Midnight | 2 Days Ago | 3 Days Ago | Low | Avg | High | Dew | Avg | Max | Gust |
| 63°F | 79°F | 70°F | 0.00 in. | 0.47 in. | 0.47 in. | 64% | 85% | 96% | 65°F | 4.1 mph | 8 mph | 17 mph |

## DAILY SNAPSHOT

| 06:00 AM | 09:00 AM | 12:00 PM | 03:00 PM | 06:00 PM | 09:00 PM |
|---|---|---|---|---|---|
| Cloudy 64°F | Cloudy 67°F | Cloudy 71°F | Cloudy 78°F | Clear 79°F | Cloudy 74°F |

## OBSERVED WEATHER CONDITIONS

| No. | Time Observed | Weather Delay | Sky | Temp | Average | Precipitation | Wind | Ground/Sea |
|---|---|---|---|---|---|---|---|---|
| 1 | 07:05:00 AM | No | | | | | | |

## MANPOWER LOG

**29 Workers | 232.0 Man Hours**

| No. | Contact/Company | Workers | # Hours | Man Hours | Location | JSA Completed? | |
|---|---|---|---|---|---|---|---|
| 1 | Gowan/Garrett, Inc. | 3 | 8.0 | 24.0 | | Yes | 📎 |
| | **Comments:** We will be soldering on new copper cap to existing copper lines and laying out where the new floor drains go; **Created By:** SG Integrations | | | | | | |
| 2 | Albo Construction LLC | 15 | 8.0 | 120.0 | | Yes | 📎 |
| | **Comments:** Demo walls and tiles ; **Created By:** SG Integrations | | | | | | |
| 3 | SpawGlass Construction Corp | 2 | 8.0 | 16.0 | | Yes | 📎 |
| | **Comments:** Puting a windscreen straighten out fence, putting braces on fence; **Created By:** SG Integrations | | | | | | |
| 4 | Precision Site Services, LLC | 9 | 8.0 | 72.0 | | Yes | 📎 |
| | **Comments:** Saw cut and remove concrete ; **Created By:** SG Integrations | | | | | | |
| | | 29 | | 232.0 | | | |

**Manpower Log's Attachments:**

1. Gowan/Garrett, Inc.



[Garrett, Inc.-JSA-2024-05-17T00:00:00.0000000Z.pdf](#)

2. Albo Construction LLC



[Albo Construction LLC-JSA-2024-05-17T00:00:00.0000000Z.pdf](#)

3. SpawGlass Construction Corp



[SpawGlass Construction Corp-JSA-2024-05-17T00:00:00.0000000Z.pdf](#)

4.  Precision Site Services, LLC ────────────────────────────────

[Precision Site Services, LLC-JSA-2024-05-17T00:00:00.0000000Z.pdf](Precision Site Services, LLC-JSA-2024-05-17T00:00:00.0000000Z.pdf)



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

# Inspection: [SpawGlass] JSA #12

| 40/40 | 1 | 0 | 36 | 3 |
|---|---|---|---|---|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| | | | |
|---|---|---|---|
| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/17/24 |
| | | **Location** | |
| | | **Created By** | SG Integrations |

**Linked Drawings**

**Description** — Competent Person Name: Mateo Delarosa Ortiz|Crew Members: Jose Hernandez |Tier Company Name:

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?** — Site maintenance

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**

## Inspection Details

| | | | |
|---|---|---|---|
| **Inspection Date** | May 17, 2024 | **Due Date** | |
| | | **Responsible Contractor** | SpawGlass Construction Corp |
| **Assignee(s)** | Josh Farris, Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1

3 Neutral    1 Conforming    0 Deficient    0 N/A

| 1.1 Specific Work Tasks/Tareas de trabajo especificas
*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Puting a windscreen straighten out fence, putting braces on fence |
|---|---|
| **SG Integrations (GoFormz)** responded with Puting a windscreen straighten out fence, putting braces on fence on May 17, 2024 at 01:03 PM CDT | |

| **1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?** *Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | No |
|---|---|

**SG Integrations (GoFormz)** responded with No on May 17, 2024 at 01:03 PM CDT

| **1.3 Potential Hazards/Peligros potenciales** *Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Fence falling, getting cut getting pinched |
|---|---|

**SG Integrations (GoFormz)** responded with Fence falling, getting cut getting pinched on May 17, 2024 at 01:03 PM CDT

| **1.4 Preventative Measures/Medidas preventivas** *Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Be cautious be safe ask for help |
|---|---|

**SG Integrations (GoFormz)** responded with Be cautious be safe ask for help on May 17, 2024 at 01:03 PM CDT

| | Neutral | Conforming | Deficient | N/A |
|---|---|---|---|---|
| **JSA Activity 2** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 3** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 4** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 5** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 6** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 7** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 8** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 9** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |
| **JSA Activity 10** | 0 Neutral | 0 Conforming | 0 Deficient | 4 N/A |

## Inspection Signatures



*Mateo Delarosa Ortiz signed on May 17, 2024 at 01:04 PM CDT*



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

# Inspection: [SpawGlass] JSA #11

| **40/40** | **1** | **0** | **36** | **3** |
|---|---|---|---|---|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| | | | |
|---|---|---|---|
| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/17/24 |
| | | **Location** | |
| | | **Created By** | SG Integrations |

**Linked Drawings**

**Description**  Competent Person Name: |Crew Members: Osma Miguel Boanerge Wilian Dilmer Mario Jesse Nicolas Francisco Martin Edwin Gerardo Juan Carlos Juan Romero |Tier Company Name:

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?**  Demo

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**

## Inspection Details

| | | | |
|---|---|---|---|
| **Inspection Date** | May 17, 2024 | **Due Date** | |
| | | **Responsible Contractor** | Albo Construction LLC |
| **Assignee(s)** | Josh Farris, Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1                    **3 Neutral    1 Conforming    0 Deficient    0 N/A**

| | |
|---|---|
| **1.1 Specific Work Tasks/Tareas de trabajo especificas** <br> *Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Demo walls and tiles |

**SG Integrations (GoFormz)** responded with Demo walls and tiles  on May 17, 2024 at 07:47 AM CDT

| | |
|---|---|
| **1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?** <br> *Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | No |

**SG Integrations (GoFormz)** responded with No on May 17, 2024 at 07:47 AM CDT

| | |
|---|---|
| **1.3 Potential Hazards/Peligros potenciales** <br> *Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Trash debris |

**SG Integrations (GoFormz)** responded with Trash debris  on May 17, 2024 at 07:47 AM CDT

| | |
|---|---|
| **1.4 Preventative Measures/Medidas preventivas** <br> *Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Keep areas clean |

**SG Integrations (GoFormz)** responded with Keep areas clean  on May 17, 2024 at 07:47 AM CDT

## JSA Activity 2                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 3                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 4                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 5                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 6                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 7                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 8                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 9                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 10                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## Inspection Signatures



*SpawGlass Integrations signed on May 17, 2024 at 08:04 AM CDT*



**SpawGlass**
9331 Corporate Dr
Selma, Texas 78154
P: (210) 651-9000
F: (210) 651-4450

**Project: 4024003 TAMU Corps Dorms Restrooms
Renovations**
606 Military Mall
College Station, Texas 77840

# Inspection: [SpawGlass] JSA #10

| **40/40** | **1** | **0** | **36** | **3** |
|:---:|:---:|:---:|:---:|:---:|
| Items Inspected | Conforming | Deficient | N/A | Neutral |

| | | | |
|---|---|---|---|
| **Type** | Job Safety Analysis (JSA) | **Status** | Closed by Josh Farris on 05/17/24 |
| | | **Location** | |
| | | **Created By** | SG Integrations |

**Linked Drawings**

**Description**  Competent Person Name: Adam Garrett|Crew Members: Two plumbers and one plumbing apprentice|Tier Company Name:

**Attachments**

**Utility Locate Information (number & expiration date)/ #Ubicacion para la excavacion**

**Select Additional PPE required today/Seleccione el PPE adicional requerido hoy**

**Task/Job Scope/Cual es tu trabajo de hoy?**  Cut cap existing water, piping, and layout for saw cutting for new drains

**PPE needed to complete your work safely/PPE necesitado para completar tu trabajo seguro**  Hardhat, safety, glasses, and gloves

## Inspection Details

| | | | |
|---|---|---|---|
| **Inspection Date** | May 17, 2024 | **Due Date** | |
| | | **Responsible Contractor** | Gowan/Garrett, Inc. |
| **Assignee(s)** | Josh Farris, Layton Muehr, Orlando Marroquin, Billy Cloer | | |

## JSA Activity 1                    **3 Neutral    1 Conforming    0 Deficient    0 N/A**

| 1.1 Specific Work Tasks/Tareas de trabajo especificas<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | We will be soldering on new copper cap to existing copper lines and laying out where the new floor drains go |
|---|---|

SG Integrations (GoFormz) responded with We will be soldering on new copper cap to existing copper lines and laying out where the new floor drains go on May 17, 2024 at 06:58 AM CDT

| 1.2 SIF (Serious Injury or Fatality) Risk/Este trabajo tiene un peligro SIF?<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | No |
|---|---|

SG Integrations (GoFormz) responded with No on May 17, 2024 at 06:58 AM CDT

| 1.3 Potential Hazards/Peligros potenciales<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Potential Barnes and potential cuts |
|---|---|

SG Integrations (GoFormz) responded with Potential Barnes and potential cuts  on May 17, 2024 at 06:58 AM CDT

| 1.4 Preventative Measures/Medidas preventivas<br>*Activity: 1 Response Change, 0 Attachments, 0 Photos, 0 Comments, 0 Observations* | Always wear your PPE |
|---|---|

SG Integrations (GoFormz) responded with Always wear your PPE on May 17, 2024 at 06:58 AM CDT

## JSA Activity 2                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 3                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 4                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 5                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 6                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 7                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 8                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 9                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## JSA Activity 10                    **0 Neutral    0 Conforming    0 Deficient    4 N/A**

## Inspection Signatures



*Adam Garrett signed on May 17, 2024 at 07:06 AM CDT*

# Limited Building Inspection Report for Asbestos-Containing Building Materials

Location: Texas A&M University
401 – Keist Hall
1st Floor Restroom
College Station, Texas 77843

Reference: WO 2024-06316

Prepared by: Brandon Curtis    *BAC*
Asbestos Management Planner License #205771

To:        Michael Garon
           SSC Service Solutions
           1371 TAMU

Date:      March 7, 2024

Subject:   Asbestos Inspection and Testing – *401 Keist Hall, 1st Floor Restroom*


Please accept the asbestos inspection results for the ceiling, HVAC duct, walls and floor inspected in the 1st floor restroom at the Keist Hall, Bldg. #401. The limited asbestos inspection was performed by Brandon Curtis of TAMU – Environmental Health & Safety on February 27, 2024 and March 4, 2024.

Suspect ACBM was physically handled to determine friability and bulk samples were obtained for analysis. The inspection involved taking nine (9) samples of the suspect materials and had them analyzed under Polarized Light Microscopy with Dispersion Staining (PLM/DS), Method 40 CFR, Ch. 1, Part 763, Subpart F, Appendix A. The PLM report and chain of custody are attached to this report.

The asbestos inspection was conducted on a homogenous-area basis with the building materials sampled and tested that are suspect to contain asbestos and may be disturbed prior to or during renovation or demolition activities. Suspect asbestos-containing building materials (ACBM) that were sampled included drywall ceiling material, ceramic floor tiles with green mastic, floor grout/leveling compound and ceramic wall tiles with grout.


*SCOPE*

As described to the inspector per the asbestos survey request and subsequent communication, the referenced project will include renovation of the restroom.


*RESULTS*

Based on sampling and analysis, the materials were confirmed to be non-asbestos containing building material.

*PHOTOS*



Ceramic wall tile (no suspect ACBM);
Wall tile grout (negative); Ceramic floor
tile (no suspect ACBM); Floor tile grout
(negative); Leveling compound
(negative); Green mastic (negative);



Drywall (negative); White texture
(negative); Joint compound (negative);



Metal HVAC duct (no suspect
ACBM);

*NOTES*

*Non-asbestos containing* building material refers to material which contains less than one (1%) percent asbestos by weight. *Friable* asbestos-containing material refers to material which contains one (1%) percent or more asbestos by weight and when dry, *can* be crumbled, pulverized, or reduced to powder by hand pressure. *Non-friable* asbestos-containing material is any material containing one (1%) percent asbestos or more by weight and when dry, *cannot* be crumbled, pulverized or reduced to powder by hand pressure.

All materials detected/uncovered during present or future renovations or demolitions that are not listed as being sampled on the Chain of Custody Form and will be disturbed must be sampled and analyzed prior to disturbance. All additional samples and assessments are to be conducted by properly licensed individuals.

New building materials must not contain asbestos. Manufacturers' labels or material safety data sheets (MSDS) should be reviewed and documented to ensure that any asbestos containing building products are not used during future construction.

*LIMITATIONS*

This report only applies to the scope of work described herein. This report describes existing conditions at the time of services. Conditions of asbestos-containing materials may change as a result of damage, deterioration, or other disturbance and may increase the potential for elevated fiber levels.

This report applies only to accessible areas observed during our field services. Asbestos-containing materials may exist in concealed inaccessible enclosures, such as areas enclosed by permanent partitions, chases, shafts, equipment, etc. *Material locations and quantities may vary.*

Although a good-faith effort was made to locate asbestos-containing materials in the area within the scope of work, extensive destructive inspection and/or testing was not conducted due to the expense, potential exposure hazards and/or potential regulatory violations. All surfaces, paints, wire insulation, electrical panels, fire rated doors and panels, furnishings, Heating Ventilation and Air Conditioning (HVAC) Systems, fixtures and similar materials and equipment were not sampled and analyzed due to safety concerns and/or expense. Inspection and testing for mold contamination, PCB containing light ballast, and/or other hazardous and/or regulated materials were not included in this survey.

Per the Texas Department of State Health Services Texas Asbestos Health Protection Rules, this asbestos survey report may not be used as a design specification for asbestos abatement.

Sincerely,

Brandon Curtis
Individual Asbestos Management Planner License #205771
Asbestos Management Planner Agency License #200171



**Environmental Analytical Services, LLC**

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

401 Kiest Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24022804

**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 05:05 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-01 24022804.01 | A | Tan/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-01 24022804.01 | B | Gray/Tan Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-02 24022804.02 | A | Tan/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-02 24022804.02 | B | Gray/Tan Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-03 24022804.03 | A | Tan/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0

TDSHS License No. 300373

LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:**

Arthur Hernandez

**Approved Signatory:**

Arthur Hernandez



Environmental Analytical Services, LLC

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

# Test: EPA 600/R-93/116
# Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety
College Station, TX 77843-4472
,

**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

401 Kiest Hall
1st Floor Men's Restroom
2024-06316

**EAS Job:** 24022804
**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 05:05 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample #<br>Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-03<br>24022804.03 | B | Gray/Tan<br>Granular<br>Grout<br>Homogeneous | **NO** | **None Detected** | | Other Non-Fibrous 100% |
| 401-04<br>24022804.04 | A | White<br>Fibrous<br>Texture<br>Homogeneous | **NO** | **None Detected** | Cellulose 2% | Binders / CaCO 98% |
| 401-04<br>24022804.04 | B | Tan<br>Fibrous<br>Tape<br>Homogeneous | **NO** | **None Detected** | Cellulose 100% | |
| 401-04<br>24022804.04 | C | White<br>Fibrous<br>Joint Compound<br>Homogeneous | **NO** | **None Detected** | Cellulose 2% | Binders / CaCO 98% |
| 401-04<br>24022804.04 | D | Brown/White<br>Fibrous<br>Drywall<br>Non-Homogeneous | **NO** | **None Detected** | Cellulose 30% | Gypsum 70% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _Arthur Hernandez_

**Approved Signatory:** _Arthur Hernandez_



**Environmental Analytical Services, LLC**

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

# Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

401 Kiest Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24022804

**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 05:05 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample #<br>Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-05<br>24022804.05 | A | White<br>Fibrous<br>Texture<br>Homogeneous | **NO** | **None Detected** | Cellulose 2% | Binders / CaCO 98% |
| 401-05<br>24022804.05 | B | Tan<br>Fibrous<br>Tape<br>Homogeneous | **NO** | **None Detected** | Cellulose 100% | |
| 401-05<br>24022804.05 | C | White<br>Fibrous<br>Joint Compound<br>Homogeneous | **NO** | **None Detected** | Cellulose 2% | Binders / CaCO 98% |
| 401-05<br>24022804.05 | D | Brown/White<br>Fibrous<br>Drywall<br>Non-Homogeneous | **NO** | **None Detected** | Cellulose 30% | Gypsum 70% |
| 401-06<br>24022804.06 | A | White<br>Fibrous<br>Texture<br>Homogeneous | **NO** | **None Detected** | Cellulose 2% | Binders / CaCO 98% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:**

Arthur Hernandez

**Approved Signatory:**

Arthur Hernandez



**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

# Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

401 Kiest Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24022804

**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 05:05 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-06 24022804.06 | B | Tan Fibrous Tape Homogeneous | **NO** | **None Detected** | Cellulose 100% | |
| 401-06 24022804.06 | C | White Fibrous Joint Compound Homogeneous | **NO** | **None Detected** | Cellulose 2% | Binders / CaCO 98% |
| 401-06 24022804.06 | D | Brown/White Fibrous Drywall Non-Homogeneous | **NO** | **None Detected** | Cellulose 30% | Gypsum 70% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM.  TEM Chatfield analysis of bulk material is recommended in this case.  All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types.  Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested.  This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government.  This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted.  Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding.  Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _____
Arthur Hernandez

**Approved Signatory:** _____
Arthur Hernandez

**24022804**



Environmental
Analytical
Services, LLC

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
(713) 343-4017    Fax (713) 934-9942
www.easlabs.com, arthur@easlabs.com
facebook.com/easlabs

# CHAIN OF CUSTODY
### Bulk Sample Data

**\* Job ID:24022804**

Environmental Health & Safety

| Client Name / Address: | Project Name: |
|---|---|
| Environmental Health & Safety<br>TAMU 4472<br>College Station, TX 77843-4472 | **401 Kiest Hall<br>1st Floor Men's Restroom** |

| Quantity / Analysis Requested: PLM | Project Number:<br>2024-06316 | EAS PO Number: (if applicable) |
|---|---|---|

**Turnaround Time:** ☐ 2 Hour  ☐ 8 Hour  ☒ 24 Hour
☐ 2 Day  ☐ 3 Day  ☐ 5 Day (Routine)  ☐ Other: (Specify)

(Note: All turnaround times are based on the date / time the sample is received by the laboratory)

Contact: Brandon Curtis                     Phone: 9798452132

E-mail: ehsd-asbestos@tamu.edu

Special Instructions:

| Sample Number | Location | Sample Description<br>(or see attached description) |
|---|---|---|
| 401-1 | Under sink middle of wall | Ceramic tile; Grout; |
| 401-2 | Behind the door | Ceramic tile; Grout; |
| 401-3 | Under sink to the left | Ceramic tile; Grout; |
| 401-4 | Above first urinal on left | Drywall ceiling materials; |
| 401-5 | Shower side by the light to the left | Drywall ceiling materials; |
| 401-6 | In front of shower 8 next to vent | Drywall ceiling materials; |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Relinquished By: Brandon Curtis<br>Date/Time: 2/27/2023 1:42PM | Accepted By: _Ch_ 2/28/24 @9:40am<br>Date/Time: |
|---|---|

Rev 10/12                     Like us on **facebook**                     Page 1 of 1



**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

401 Kiest Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24030512

**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 01:35 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P,

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-01 24030512.01 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-01 24030512.01 | B | Green Tar Mastic Homogeneous | NO | None Detected | Cellulose 2% | Adhesive 98% |
| 401-01 24030512.01 | C | Gray/White Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-01 24030512.01 | D | Gray Granular Leveling Compound Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-02 24030512.02 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:

Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** Arthur Hernandez

**Approved Signatory:** Arthur Hernandez

Page 1 of 4



Environmental
Analytical
Services, LLC

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

401 Kiest Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24030512

**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 01:35 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P,

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-02 24030512.02 | B | Green Tar Mastic Homogeneous | **NO** | **None Detected** | Cellulose 2% | Adhesive 98% |
| 401-02 24030512.02 | C | Gray/White Granular Grout Homogeneous | **NO** | **None Detected** | | Other Non-Fibrous 100% |
| 401-02 24030512.02 | D | Gray Granular Leveling Compound Homogeneous | **NO** | **None Detected** | | Other Non-Fibrous 100% |
| 401-03 24030512.03 | A | Gray/White Granular Ceramic Tile Homogeneous | **NO** | **None Detected** | | Other Non-Fibrous 100% |
| 401-03 24030512.03 | B | Green Tar Mastic Homogeneous | **NO** | **None Detected** | Cellulose 2% | Adhesive 98% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** Arthur Hernandez

**Approved Signatory:** Arthur Hernandez



Environmental Analytical Services, LLC

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
phone 713-343-4017 | fax 713-934-9942
www.easlabs.com | facebook.com/easlabs | info@easlabs.com

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

401 Kiest Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24030512

**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 01:35 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P,

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-03 24030512.03 | C | Gray/White Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-03 24030512.03 | D | Gray Granular Leveling Compound Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0

TDSHS License No. 300373

LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:

Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:**

Arthur Hernandez

**Approved Signatory:**

Arthur Hernandez

24030512



Environmental
Analytical
Services, LLC

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
(713) 343-4017    Fax (713) 934-9942
www.easlabs.com, arthur@easlabs.com
facebook.com/easlabs

★ Job ID:24030512

# CHAIN OF CUSTODY
Bulk Sample Data

Environmental Health & Safety

| Client Name / Address:<br>Environmental Health & Safety<br>TAMU 4472<br>College Station, TX 77843-4472 | Project Name:<br>**401 Kiest Hall**<br>**1st Floor Men's Restroom** | Lab Use Only |
|---|---|---|
| Quantity / Analysis Requested: PLM | Project Number:<br>2024-06316 | EAS PO Number: (if applicable) |

**Turnaround Time:**  ☐ 2 Hour  ☐ 8 Hour  ☒ 24 Hour
☐ 2 Day  ☐ 3 Day  ☐ 5 Day (Routine)  ☐ Other: (Specify) [        ]

(Note: All turnaround times are based on the date / time the sample is received by the laboratory)

Contact: Brandon Curtis                     Phone: 9798452132

E-mail: ehsd-asbestos@tamu.edu

Special Instructions:

| Sample Number | Location | Sample Description<br>(or see attached description) |
|---|---|---|
| 401-1 | Under sink | Ceramic tile; Mastic; Grout; Leveling compound; |
| 401-2 | Back by stalls | Ceramic tile; Mastic; Grout; Leveling compound; |
| 401-3 | Back by stalls | Ceramic tile; Mastic; Grout; Leveling compound; |

| Relinquished By: Brandon Curtis<br>Date/Time: 3/4/2024  4:38PM | Accepted By: _Cn_ 3/5/24 0920am<br>Date/Time: |
|---|---|

Rev 10/12                     Like us on **facebook**                     Page 1 of 1

# Limited Building Inspection Report for Asbestos-Containing Building Materials

Location:        Texas A&M University
404 – Gainer Hall
1st Floor Restroom
College Station, Texas 77843

Reference:      WO 2024-06316

Prepared by:    Brandon Curtis   *BAC*
Asbestos Management Planner License #205771

To:        Michael Garon
               SSC Service Solutions
               1371 TAMU

Date:      March 7, 2024

Subject:   Asbestos Inspection and Testing – *404 Gainer Hall, 1st Floor Restroom*

Please accept the asbestos inspection results for the ceiling, HVAC duct, walls and floor inspected in the 1st floor restroom at the Gainer Hall, Bldg. #404. The limited asbestos inspection was performed by Brandon Curtis of TAMU – Environmental Health & Safety on February 27, 2024 and March 4, 2024.

Suspect ACBM was physically handled to determine friability and bulk samples were obtained for analysis. The inspection involved taking nine (9) samples of the suspect materials and had them analyzed under Polarized Light Microscopy with Dispersion Staining (PLM/DS), Method 40 CFR, Ch. 1, Part 763, Subpart F, Appendix A. The PLM report and chain of custody are attached to this report.

The asbestos inspection was conducted on a homogenous-area basis with the building materials sampled and tested that are suspect to contain asbestos and may be disturbed prior to or during renovation or demolition activities. Suspect asbestos-containing building materials (ACBM) that were sampled included drywall ceiling material, ceramic floor tiles with green mastic, floor grout/leveling compound and ceramic wall tiles with grout.

*SCOPE*

As described to the inspector per the asbestos survey request and subsequent communication, the referenced project will include renovation of the restroom.

*RESULTS*

Based on sampling and analysis, the materials were confirmed to be non-asbestos containing building material.



Drywall (negative); White texture (negative); Joint compound (negative);



Ceramic wall tile (no suspect ACBM); Wall tile grout (negative); Ceramic floor tile (no suspect ACBM); Floor tile grout (negative); Leveling compound (negative); Green mastic (negative);



Metal HVAC duct (no suspect ACBM);

*PHOTOS*

- 870 -

*NOTES*

*Non-asbestos containing* building material refers to material which contains less than one (1%) percent asbestos by weight. *Friable* asbestos-containing material refers to material which contains one (1%) percent or more asbestos by weight and when dry, *can* be crumbled, pulverized, or reduced to powder by hand pressure. *Non-friable* asbestos-containing material is any material containing one (1%) percent asbestos or more by weight and when dry, *cannot* be crumbled, pulverized or reduced to powder by hand pressure.

All materials detected/uncovered during present or future renovations or demolitions that are not listed as being sampled on the Chain of Custody Form and will be disturbed must be sampled and analyzed prior to disturbance. All additional samples and assessments are to be conducted by properly licensed individuals.

New building materials must not contain asbestos. Manufacturers' labels or material safety data sheets (MSDS) should be reviewed and documented to ensure that any asbestos containing building products are not used during future construction.

*LIMITATIONS*

This report only applies to the scope of work described herein. This report describes existing conditions at the time of services. Conditions of asbestos-containing materials may change as a result of damage, deterioration, or other disturbance and may increase the potential for elevated fiber levels.

This report applies only to accessible areas observed during our field services. Asbestos-containing materials may exist in concealed inaccessible enclosures, such as areas enclosed by permanent partitions, chases, shafts, equipment, etc. *Material locations and quantities may vary.*

Although a good-faith effort was made to locate asbestos-containing materials in the area within the scope of work, extensive destructive inspection and/or testing was not conducted due to the expense, potential exposure hazards and/or potential regulatory violations. All surfaces, paints, wire insulation, electrical panels, fire rated doors and panels, furnishings, Heating Ventilation and Air Conditioning (HVAC) Systems, fixtures and similar materials and equipment were not sampled and analyzed due to safety concerns

and/or expense. Inspection and testing for mold contamination, PCB containing light ballast, and/or other hazardous and/or regulated materials were not included in this survey.

Per the Texas Department of State Health Services Texas Asbestos Health Protection Rules, this asbestos survey report may not be used as a design specification for asbestos abatement.

Sincerely,

Brandon Curtis
Individual Asbestos Management Planner License #205771
Asbestos Management Planner Agency License #200171



**Environmental Analytical Services, LLC**

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
phone 713-343-4017 | fax 713-934-9942
www.easlabs.com | facebook.com/easlabs | info@easlabs.com

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety
College Station, TX 77843-4472
,
**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

404 Gainer Hall
1st Floor Men's Restroom
2024-06316
**EAS Job:** 24022806
**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 04:26 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-1 24022806.01 | A | White Fibrous Texture Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-1 24022806.01 | B | Tan Fibrous Tape Homogeneous | NO | None Detected | Cellulose 100% | |
| 401-1 24022806.01 | C | White Fibrous Joint Compound Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-1 24022806.01 | D | Brown/White Fibrous Drywall Non-Homogeneous | NO | None Detected | Cellulose 30% | Gypsum 70% |
| 401-2 24022806.02 | A | White Fibrous Texture Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _Arthur Hernandez_

**Approved Signatory:** _Arthur Hernandez_



Environmental
Analytical
Services, LLC

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety
College Station, TX 77843-4472
,
**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

404 Gainer Hall
1st Floor Men's Restroom
2024-06316
**EAS Job:** 24022806
**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 04:26 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-2 24022806.02 | B | Tan Fibrous Tape Homogeneous | NO | None Detected | Cellulose 100% | |
| 401-2 24022806.02 | C | White Fibrous Joint Compound Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-2 24022806.02 | D | Brown/White Fibrous Drywall Non-Homogeneous | NO | None Detected | Cellulose 30% | Gypsum 70% |
| 401-3 24022806.03 | A | White Fibrous Texture Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-3 24022806.03 | B | Tan Fibrous Tape Homogeneous | NO | None Detected | Cellulose 100% | |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _(signature)_
Arthur Hernandez

**Approved Signatory:** _(signature)_
Arthur Hernandez



**Environmental Analytical Services, LLC**

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
phone 713-343-4017 | fax 713-934-9942
www.easlabs.com | facebook.com/easlabs | info@easlabs.com

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**
Environmental Health & Safety
College Station, TX 77843-4472
,
**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**
404 Gainer Hall
1st Floor Men's Restroom
2024-06316
**EAS Job:** 24022806
**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 04:26 PM
**Date Received:** 02/28/2024 09:40 AM
**TAT Requested:** 1 Day
**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-3 24022806.03 | C | White Fibrous Joint Compound Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-3 24022806.03 | D | Brown/White Fibrous Drywall Non-Homogeneous | NO | None Detected | Cellulose 30% | Gypsum 70% |
| 401-4 24022806.04 | A | Tan/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-4 24022806.04 | B | Tan Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-5 24022806.05 | A | Tan/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _Arthur Hernandez_
Arthur Hernandez

**Approved Signatory:** _Arthur Hernandez_
Arthur Hernandez



**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

404 Gainer Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24022806

**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 04:26 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-5 24022806.05 | B | Tan Granular Grout Homogeneous | **NO** | **None Detected** | | Other Non-Fibrous 100% |
| 401-6 24022806.06 | A | Tan/White Granular Ceramic Tile Homogeneous | **NO** | **None Detected** | | Other Non-Fibrous 100% |
| 401-6 24022806.06 | B | Tan Granular Grout Homogeneous | **NO** | **None Detected** | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:

Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _Arthur Hernandez_

**Approved Signatory:** _Arthur Hernandez_

24022806



## Environmental Analytical Services, LLC

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
(713) 343-4017    Fax (713) 934-9942
www.easlabs.com, arthur@easlabs.com
facebook.com/easlabs



\* Job ID 24022806

Environmental Health & Safety

## CHAIN OF CUSTODY
### Bulk Sample Data

| Client Name / Address: | Project Name: | EAS Use Only |
|---|---|---|
| Environmental Health & Safety<br>TAMU 4472<br>College Station, TX 77843-4472 | **404 Gainer Hall**<br>**1st Floor Men's Restroom** | |

| Quantity / Analysis Requested: PLM | Project Number:<br>2024-06316 | EAS PO Number: (if applicable) |
|---|---|---|

**Turnaround Time:** ☐ 2 Hour  ☐ 8 Hour  ☒ 24 Hour
☐ 2 Day  ☐ 3 Day  ☐ 5 Day (Routine)  ☐ Other: (Specify) [        ]

(Note: All turnaround times are based on the date / time the sample is received by the laboratory)

Contact: Brandon Curtis                          Phone: 9798452132

E-mail: ehsd-asbestos@tamu.edu

Special Instructions:

| Sample Number | Location | Sample Description<br>(or see attached description) |
|---|---|---|
| 401-1 | Above first urinal on left | Drywall ceiling materials; |
| 401-2 | Shower side by the first light | Drywall ceiling materials; |
| 401-3 | In front of shower 7 next to vent | Drywall ceiling materials; |
| 401-4 | Right side under the sink | Ceramic tile; Grout; |
| 401-5 | Left side under sink | Ceramic tile; Grout; |
| 401-6 | Behind the door | Ceramic tile; Grout; |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Relinquished By: Brandon Curtis | Accepted By: Cn 2/28/24 @ 9:40am |
|---|---|
| Date/Time: 2/27/2023 1:42PM | Date/Time: |

Rev 10/12                    Like us on **facebook**                    Page 1 of 1



**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety
College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

404 Gainer Hall 1st Floor Men's Restroom

2024-06316
**EAS Job:** 24030511
**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 02:14 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 404-1 24030511.01 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 404-1 24030511.01 | B | Green Tar Mastic Homogeneous | NO | None Detected | Cellulose 2% | Adhesive 98% |
| 404-1 24030511.01 | C | Gray/White Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 404-1 24030511.01 | D | Tan/White Granular Leveling Compound Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 404-2 24030511.02 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _Arthur Hernandez_

**Approved Signatory:** _Arthur Hernandez_



**Environmental Analytical Services, LLC**

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
phone 713-343-4017 | fax 713-934-9942
www.easlabs.com | facebook.com/easlabs | info@easlabs.com

# Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**
Environmental Health & Safety
College Station, TX 77843-4472
,
**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**
404 Gainer Hall 1st Floor Men's Restroom

2024-06316
**EAS Job:** 24030511
**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 02:14 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 404-2 24030511.02 | B | Green Tar Mastic Homogeneous | NO | None Detected | Cellulose 2% | Adhesive 98% |
| 404-2 24030511.02 | C | Gray/White Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 404-2 24030511.02 | D | Tan/White Granular Leveling Compound Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 404-3 24030511.03 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 404-3 24030511.03 | B | Green Tar Mastic Homogeneous | NO | None Detected | Cellulose 2% | Adhesive 98% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _Arthur Hernandez_

**Approved Signatory:** _Arthur Hernandez_



Environmental Analytical Services, LLC

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

404 Gainer Hall 1st Floor Men's Restroom

2024-06316

**EAS Job:** 24030511

**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 02:14 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 404-3 24030511.03 | C | Gray/White Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 404-3 24030511.03 | D | Tan/White Granular Leveling Compound Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _Arthur Hernandez_

**Approved Signatory:** _Arthur Hernandez_

24030511



**Environmental Analytical Services, LLC**

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
(713) 343-4017    Fax (713) 934-9942
www.easlabs.com, arthur@easlabs.com
facebook.com/easlabs

**\* Job ID:24030511**

Environmental Health & Safety

# CHAIN OF CUSTODY
Bulk Sample Data

| Client Name / Address:<br>Environmental Health & Safety<br>TAMU 4472<br>College Station, TX 77843-4472 | Project Name:<br>**404 Gainer Hall**<br>**1st Floor Men's Restroom** | |
|---|---|---|
| Quantity / Analysis Requested: PLM | Project Number:<br>2024-06316 | EAS PO Number: (if applicable) |

**Turnaround Time:**  ☐ 2 Hour  ☐ 8 Hour  ☒ 24 Hour
☐ 2 Day  ☐ 3 Day  ☐ 5 Day (Routine)  ☐ Other: (Specify) [        ]

(Note: All turnaround times are based on the date / time the sample is received by the laboratory)

Contact: Brandon Curtis          Phone: 9798452132

E-mail: ehsd-asbestos@tamu.edu

Special Instructions:

| Sample Number | Location | Sample Description<br>(or see attached description) |
|---|---|---|
| 404-1 | Under sink | Ceramic tile; Mastic; Grout; Leveling compound; |
| 404-2 | Back by showers | Ceramic tile; Mastic; Grout; Leveling compound; |
| 404-3 | Back by showers | Ceramic tile; Mastic; Grout; Leveling compound; |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Relinquished By: Brandon Curtis<br>Date/Time: 3/4/2024 4:38PM | Accepted By: Cn 3/5/24 @92am<br>Date/Time: |
|---|---|

Rev 10/12          Like us on **facebook**          Page 1 of 1

# Limited Building Inspection Report for Asbestos-Containing Building Materials

Location:     Texas A&M University
              405 – Lacy Hall
              1st Floor Restroom
              College Station, Texas 77843

Reference:    WO 2024-06316

Prepared by:  Brandon Curtis     *BAC*
              Asbestos Management Planner License #205771

To:   Michael Garon
    SSC Service Solutions
    1371 TAMU

Date:  March 7, 2024

Subject: Asbestos Inspection and Testing – *405 Lacy Hall, 1st Floor Restroom*


Please accept the asbestos inspection results for the ceiling, HVAC duct, walls and floor inspected in the 1st floor restroom at the Lacy Hall, Bldg. #405. The limited asbestos inspection was performed by Brandon Curtis of TAMU – Environmental Health & Safety on February 27, 2024 and March 4, 2024.

Suspect ACBM was physically handled to determine friability and bulk samples were obtained for analysis. The inspection involved taking nine (9) samples of the suspect materials and had them analyzed under Polarized Light Microscopy with Dispersion Staining (PLM/DS), Method 40 CFR, Ch. 1, Part 763, Subpart F, Appendix A. The PLM report and chain of custody are attached to this report.

The asbestos inspection was conducted on a homogenous-area basis with the building materials sampled and tested that are suspect to contain asbestos and may be disturbed prior to or during renovation or demolition activities. Suspect asbestos-containing building materials (ACBM) that were sampled included drywall ceiling material, ceramic floor tiles with green mastic, floor grout/leveling compound and ceramic wall tiles with grout.

*SCOPE*

As described to the inspector per the asbestos survey request and subsequent communication, the referenced project will include renovation of the restroom.

*RESULTS*

Based on sampling and analysis, the materials were confirmed to be non-asbestos containing building material.

**NOTE**: any possible ACBM above the ceiling will need to be assumed positive due to lack of access or once found contact EHS for sampling. Specifically, the HVAC ducts were not able to be seen at time of inspection



Drywall (negative); White texture
(negative); Joint compound (negative);
Ceramic wall tile (non-suspect ACBM);
Grout (negative);



Ceramic floor tile (no suspect
ACBM); Floor tile grout (negative);
Leveling compound (negative);
Green mastic (negative);

*NOTES*

*Non-asbestos containing* building material refers to material which contains less than one (1%) percent asbestos by weight. *Friable* asbestos-containing material refers to material which contains one (1%) percent or more asbestos by weight and when dry, *can* be crumbled, pulverized, or reduced to powder by hand pressure. *Non-friable* asbestos-containing material is any material containing one (1%) percent asbestos or more by weight and when dry, *cannot* be crumbled, pulverized or reduced to powder by hand pressure.

All materials detected/uncovered during present or future renovations or demolitions that are not listed as being sampled on the Chain of Custody Form and will be disturbed must be sampled and analyzed prior to disturbance. All additional samples and assessments are to be conducted by properly licensed individuals.

New building materials must not contain asbestos. Manufacturers' labels or material safety data sheets (MSDS) should be reviewed and documented to ensure that any asbestos containing building products are not used during future construction.

*LIMITATIONS*

This report only applies to the scope of work described herein. This report describes existing conditions at the time of services. Conditions of asbestos-containing materials may change as a result of damage, deterioration, or other disturbance and may increase the potential for elevated fiber levels.

This report applies only to accessible areas observed during our field services. Asbestos-containing materials may exist in concealed inaccessible enclosures, such as areas enclosed by permanent partitions, chases, shafts, equipment, etc. *Material locations and quantities may vary.*

Although a good-faith effort was made to locate asbestos-containing materials in the area within the scope of work, extensive destructive inspection and/or testing was not conducted due to the expense, potential exposure hazards and/or potential regulatory violations. All surfaces, paints, wire insulation, electrical panels, fire rated doors and panels, furnishings, Heating Ventilation and Air Conditioning (HVAC) Systems, fixtures and similar materials and equipment were not sampled and analyzed due to safety concerns and/or expense. Inspection and testing for mold contamination, PCB containing light ballast, and/or other hazardous and/or regulated materials were not included in this survey.

Per the Texas Department of State Health Services Texas Asbestos Health Protection Rules, this asbestos survey report may not be used as a design specification for asbestos abatement.

Sincerely,

Brandon Curtis
Individual Asbestos Management Planner License #205771
Asbestos Management Planner Agency License #200171



Environmental Analytical Services, LLC

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety
College Station, TX 77843-4472
,

**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**
405 Lacy Hall
1st Floor Men's Restroom
2024-06316
**EAS Job:** 24022805
**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 04:55 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-1 24022805.01 | A | White Fibrous Texture Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-1 24022805.01 | B | Tan Fibrous Tape Homogeneous | NO | None Detected | Cellulose 100% | |
| 401-1 24022805.01 | C | White Fibrous Joint Compound Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-1 24022805.01 | D | Brown/White Fibrous Drywall Homogeneous | NO | None Detected | Cellulose 30% | Gypsum 70% |
| 401-2 24022805.02 | A | White Fibrous Texture Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** Arthur Hernandez

**Approved Signatory:** Arthur Hernandez



**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

405 Lacy Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24022805

**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 04:55 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-2 24022805.02 | B | Tan Fibrous Tape Homogeneous | NO | None Detected | Cellulose 100% | |
| 401-2 24022805.02 | C | White Fibrous Joint Compound Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-2 24022805.02 | D | Brown/White Fibrous Drywall Homogeneous | NO | None Detected | Cellulose 30% | Gypsum 70% |
| 401-3 24022805.03 | A | White Fibrous Texture Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-3 24022805.03 | B | Tan Fibrous Tape Homogeneous | NO | None Detected | Cellulose 100% | |

NVLAP Lab Code: 200784-0

TDSHS License No. 300373

LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:**            **Approved Signatory:**

Arthur Hernandez            Arthur Hernandez



Environmental Analytical Services, LLC

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
phone 713-343-4017 | fax 713-934-9942
www.easlabs.com | facebook.com/easlabs | info@easlabs.com

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety
College Station, TX 77843-4472
,
**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**
405 Lacy Hall
1st Floor Men's Restroom
2024-06316
**EAS Job:** 24022805
**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 04:55 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-3 24022805.03 | C | White Fibrous Joint Compound Homogeneous | NO | None Detected | Cellulose 2% | Binders / CaCO 98% |
| 401-3 24022805.03 | D | Brown/White Fibrous Drywall Homogeneous | NO | None Detected | Cellulose 30% | Gypsum 70% |
| 401-4 24022805.04 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-4 24022805.04 | B | Gray Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-5 24022805.05 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** *[signature]* Arthur Hernandez

**Approved Signatory:** *[signature]* Arthur Hernandez



Environmental
Analytical
Services, LLC

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety
College Station, TX 77843-4472
,
**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

405 Lacy Hall
1st Floor Men's Restroom
2024-06316
**EAS Job:** 24022805
**Attn:** Brandon Curtis

**Date Analyzed:** 02/29/2024 04:55 PM

**Date Received:** 02/28/2024 09:40 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 401-5 24022805.05 | B | Gray Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-6 24022805.06 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 401-6 24022805.06 | B | Gray Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _(signature)_

Arthur Hernandez

**Approved Signatory:** _(signature)_

Arthur Hernandez

**24022805**



Environmental
Analytical
Services, LLC

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
(713) 343-4017    Fax (713) 934-9942
www.easlabs.com, arthur@easlabs.com
facebook.com/easlabs

★ Job ID:24022805

## CHAIN OF CUSTODY
Bulk Sample Data

Environmental Health & Safety

| Client Name / Address: | Project Name: |
|---|---|
| Environmental Health & Safety<br>TAMU 4472<br>College Station, TX 77843-4472 | **405 Lacy Hall<br>1st Floor Men's Restroom** |

| Quantity / Analysis Requested: PLM | Project Number:<br>2024-06316 | EAS PO Number: (if applicable) |
|---|---|---|

**Turnaround Time:**  ☐ 2 Hour  ☐ 8 Hour  ☒ 24 Hour
☐ 2 Day  ☐ 3 Day  ☐ 5 Day (Routine)  ☐ Other: (Specify) [        ]

(Note: All turnaround times are based on the date / time the sample is received by the laboratory)

Contact: Brandon Curtis                    Phone: 9798452132

E-mail: ehsd-asbestos@tamu.edu

Special Instructions:

| Sample Number | Location | Sample Description<br>(or see attached description) |
|---|---|---|
| 401-1 | Above first urinal on left | Drywall ceiling materials; |
| 401-2 | Shower side by the first light | Drywall ceiling materials; |
| 401-3 | In front of shower 7 next to vent | Drywall ceiling materials; |
| 401-4 | Right side under the sink | Ceramic tile; Grout; |
| 401-5 | Left side under sink | Ceramic tile; Grout; |
| 401-6 | Behind the door | Ceramic tile; Grout; |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Relinquished By: Brandon Curtis | Accepted By: CM 2/28/24 09:40am |
|---|---|
| Date/Time: 2/27/2023 1:42PM | Date/Time: |

Rev 10/12                    Like us on **facebook**                    Page 1 of 1



Environmental Analytical Services, LLC

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**phone 713-343-4017 | fax 713-934-9942**
**www.easlabs.com | facebook.com/easlabs | info@easlabs.com**

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety
College Station, TX 77843-4472
,

**Phone:** 9798452132
**E-Mail:** edsd-asbestos@tamu.edu

**Project:**
405 Lacy Hall
1st Floor Men's Restroom
2024-06316
**EAS Job:** 24030514
**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 02:38 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample #<br>Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 405-1<br>24030514.01 | A | Gray/White<br>Granular<br>Ceramic Tile<br>Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 405-1<br>24030514.01 | B | Tan/Yellow<br>Tar<br>Mastic<br>Homogeneous | NO | None Detected | Cellulose 2% | Adhesive 98% |
| 405-1<br>24030514.01 | C | Tan<br>Granular<br>Grout<br>Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 405-1<br>24030514.01 | D | Gray<br>Granular<br>Leveling Compound<br>Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 405-2<br>24030514.02 | A | Gray/White<br>Granular<br>Ceramic Tile<br>Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _(signature)_
Arthur Hernandez

**Approved Signatory:** _(signature)_
Arthur Hernandez



Environmental
Analytical
Services, LLC

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
phone 713-343-4017 | fax 713-934-9942
www.easlabs.com | facebook.com/easlabs | info@easlabs.com

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

405 Lacy Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24030514

**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 02:38 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 405-2 24030514.02 | B | Tan/Yellow Tar Mastic Homogeneous | NO | None Detected | Cellulose 2% | Adhesive 98% |
| 405-2 24030514.02 | C | Tan Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 405-2 24030514.02 | D | Gray Granular Leveling Compound Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 405-3 24030514.03 | A | Gray/White Granular Ceramic Tile Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 405-3 24030514.03 | B | Tan/Yellow Tar Mastic Homogeneous | NO | None Detected | Cellulose 2% | Adhesive 98% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:

Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:** _____          **Approved Signatory:** _____

Arthur Hernandez                                                        Arthur Hernandez



Environmental Analytical Services, LLC

13201 Northwest Freeway, Suite 520
Houston, Texas 77040
phone 713-343-4017 | fax 713-934-9942
www.easlabs.com | facebook.com/easlabs | info@easlabs.com

## Test: EPA 600/R-93/116
## Polarized Light Microscopy

**Client Information:**

Environmental Health & Safety

College Station, TX 77843-4472

,

**Phone:** 9798452132

**E-Mail:** edsd-asbestos@tamu.edu

**Project:**

405 Lacy Hall

1st Floor Men's Restroom

2024-06316

**EAS Job:** 24030514

**Attn:** Brandon Curtis

**Date Analyzed:** 03/06/2024 02:38 PM

**Date Received:** 03/05/2024 09:20 AM

**TAT Requested:** 1 Day

**Microscope:** PLM Labomed LX 400P

| Sample # Lab ID # | Layer | Sample Description | Asbestos Detected (Yes/No) | Asbestos Mineral Percent | Non-Asbestos Fibers | Non-Fibrous Material |
|---|---|---|---|---|---|---|
| 405-3 24030514.03 | C | Tan Granular Grout Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |
| 405-3 24030514.03 | D | Gray Granular Leveling Compound Homogeneous | NO | None Detected | | Other Non-Fibrous 100% |

NVLAP Lab Code: 200784-0
TDSHS License No. 300373
LDEQ LELAP Certificate No: 04161, Agency Interest No. 149571

Notes:
Some samples (floor tiles, surfacing, etc.) may contain fibers too small to be detectable by PLM. TEM Chatfield analysis of bulk material is recommended in this case. All asbestos percentages are based on calibrated visual estimates traceable to NIST standards for regulated asbestos types. Analysts' percentages fall within a range of acceptable percentages, depending on the actual concentration of asbestos. This test report relates only to the items tested. This report must not be used to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the Federal Government. This report may not be reproduced except in full without permission from Environmental Analytical Services.

These results are submitted pursuant to EAS' current terms of sale, including the company's standard warranty and limitation of liability provisions and no responsibility or liability is assumed for the manner in which the results are used or interpreted. Unless notified in writing to return the samples covered by this report, EAS will store the samples for a period of ninety (90) days before discarding. Percent ranges reported are estimates and not absolute percent range values.

**Analyzed By:**  Arthur Hernandez

**Approved Signatory:**  Arthur Hernandez

||||||||||||||||||||
**24030514**



# Environmental Analytical Services, LLC

**13201 Northwest Freeway, Suite 520**
**Houston, Texas 77040**
**(713) 343-4017    Fax (713) 934-9942**
**www.easlabs.com, arthur@easlabs.com**
**facebook.com/easlabs**

## CHAIN OF CUSTODY
### Bulk Sample Data

**\* Job ID:24030514**

||||||||||||||||||||||
Environmental Health & Safety

| Client Name / Address: | Project Name: |
|---|---|
| Environmental Health & Safety<br>TAMU 4472<br>College Station, TX 77843-4472 | **405 Lacy Hall**<br>**1st Floor Men's Restroom** |

| Quantity / Analysis Requested: PLM | Project Number:<br>2024-06316 | EAS PO Number: (if applicable) |
|---|---|---|

**Turnaround Time:** ☐ 2 Hour  ☐ 8 Hour  ☒ 24 Hour
☐ 2 Day  ☐ 3 Day  ☐ 5 Day (Routine)  ☐ Other. (Specify)

(Note: All turnaround times are based on the date / time the sample is received by the laboratory)

**Contact:** Brandon Curtis          **Phone:** 9798452132

**E-mail:** ehsd-asbestos@tamu.edu

**Special Instructions:**

| Sample Number | Location | Sample Description<br>(or see attached description) |
|---|---|---|
| 405-1 | Under sink | Ceramic tile; Mastic; Grout; Leveling compound; |
| 405-2 | Back by stalls | Ceramic tile; Mastic; Grout; Leveling compound; |
| 405-3 | Back by stalls | Ceramic tile; Mastic; Grout; Leveling compound; |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Relinquished By: Brandon Curtis | Accepted By: |
|---|---|
| Date/Time: 3/4/2024  4:39PM | Date/Time: _Ch_ 3/5/24 @ 920am |

Rev 10/12                 Like us on **facebook**                 Page 1 of 1

# COM*check* Software Version COMcheckWeb
# Interior Lighting Compliance Certificate

## Project Information

Energy Code:        2021 IECC
Project Title:      TAMU - Corps Dorm RR Modernization
Project Type:       Alteration

| Construction Site: | Owner/Agent: | Designer/Contractor: |
|---|---|---|
| 606, 664 & 665 Military Mall | Kirksey Architecture | Cleary Zimmermann Engineers |
| College Station, Texas 77840 | 6909 Portwest Drive | 300 26th St |
| | Houston, Texas 77024 | Bryan, Texas 77803 |
| | 713-850-9600 | 979-341-8181 |

## Allowed Interior Lighting Power

| A Area Category | B Floor Area (ft2) | C Allowed Watts / ft2 | D Allowed Watts |
|---|---|---|---|
| 1-School/University | 426 | 0.72 | 307 |
| | | Total Allowed Watts = | 307 |

## Proposed Interior Lighting Power

| A Fixture ID : Description / Lamp / Wattage Per Lamp / Ballast | B Lamps/ Fixture | C # of Fixture | D Fixture Watt. | E (C X D) |
|---|---|---|---|---|
| School/University (426 sq.ft.) | | | | |
| LED: Type A: Other: | 1 | 6 | 14 | 82 |
| LED: Type A1: Other: | 1 | 9 | 8 | 68 |
| LED: Type B: Other: | 1 | 5 | 25 | 125 |
| LED: Type C: Other: | 1 | 1 | 19 | 19 |
| LED: Type D: Other: | 1 | 1 | 13 | 13 |
| | | Total Proposed Watts = | | 307 |

**Interior Lighting PASSES**

## Interior Lighting Compliance Statement

*Compliance Statement:*  The proposed interior lighting alteration project represented in this document is consistent with the building plans, specifications, and other calculations submitted with this permit application. The proposed interior lighting systems have been designed to meet the 2021 IECC requirements in COM*check* Version COMcheckWeb and to comply with any applicable mandatory requirements listed in the Inspection Checklist.

| Hal Johnston | Hal Johnston | 04-25-24 |
|---|---|---|
| Name - Title | Signature | Date |

| Project Title: | TAMU - Corps Dorm RR Modernization | Report date: 04/25/24 |
|---|---|---|
| Data filename: | | Page 1 of 5 |

- 895 -



# COMcheck Software Version COMcheckWeb

# Inspection Checklist

Energy Code: 2021 IECC

Requirements: 0.0% were addressed directly in the COMcheck software

Text in the "Comments/Assumptions" column is provided by the user in the COMcheck Requirements screen. For each requirement, the user certifies that a code requirement will be met and how that is documented, or that an exception is being claimed. Where compliance is itemized in a separate table, a reference to that table is provided.

| Section # & Req.ID | Plan Review | Complies? | Comments/Assumptions |
|---|---|---|---|
| C103.2 [PR4][1] | Plans, specifications, and/or calculations provide all information with which compliance can be determined for the interior lighting and electrical systems and equipment and document where exceptions to the standard are claimed. Information provided should include interior lighting power calculations, wattage of bulbs and ballasts, transformers and control devices. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |

**Additional Comments/Assumptions:**

| | | | | | |
|---|---|---|---|---|---|
| 1 | High Impact (Tier 1) | 2 | Medium Impact (Tier 2) | 3 | Low Impact (Tier 3) |

| Section # & Req.ID | Rough-In Electrical Inspection | Complies? | Comments/Assumptions |
|---|---|---|---|
| C405.2.3.1 [EL22][1] | Spaces required to have light-reduction controls have a manual control that allows the occupant to reduce the connected lighting load in a reasonably uniform illumination pattern >= 50 percent. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.2.1, C405.2.1.1 [EL18][1] | Occupancy sensors installed in classrooms/lecture/training rooms, conference/meeting/multipurpose rooms, copy/print rooms, lounges/breakrooms, enclosed offices, open plan office areas, restrooms, storage rooms, locker rooms, corridors, warehouse storage areas, and other spaces <= 300 sqft that are enclosed by floor-to-ceiling height partitions. Reference section language C405.2.1.2 for control function in warehouses and section C405.2.1.3 for open plan office spaces. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.2.1.2 [EL19][1] | Occupancy sensors control function in warehouses: In warehouses, the lighting in aisleways and open areas is controlled with occupant sensors that automatically reduce lighting power by 50% or more within 20 minutes of when the areas are unoccupied. The occupant sensors control lighting in each aisleway independently and do not control lighting beyond the aisleway being controlled by the sensor. Lights not turned off by occupant sensors is done so by time-switch. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.2.1.3 [EL20][1] | Occupant sensor control function in open plan office areas: Occupant sensor controls in open office spaces >= 300 sq.ft. have controls 1) configured so that general lighting can be controlled separately in control zones with floor areas <= 600 sq.ft. within the space, 2) general lighting in each zone permitted to turn on upon occupancy in control zone, 3) automatically turn off general lighting in all control zones within 20 minutes after all occupants have left the space, 4) are configured so that general lighting power in each control zone is reduced by >= 80% of the full zone general lighting power within 20 minutes of all occupants leaving that control zone. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.2.2, C405.2.2.1 [EL21][2] | Each area not served by occupancy sensors (per C405.2.1.1) have time-switch controls and functions detailed in sections C405.2.2.1. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |

| | | | | | |
|---|---|---|---|---|---|
| 1 | High Impact (Tier 1) | 2 | Medium Impact (Tier 2) | 3 | Low Impact (Tier 3) |

| Project Title: | TAMU - Corps Dorm RR Modernization | Report date: 04/25/24 |
|---|---|---|
| Data filename: | | Page 3 of 5 |

- 897 -

| Section # & Req.ID | Rough-In Electrical Inspection | Complies? | Comments/Assumptions |
|---|---|---|---|
| C405.2.4, C405.2.4.1, C405.2.4.2 [EL23][2] | Daylight zones provided with individual controls that control the lights independent of general area lighting. See code section C405.2.3 Daylight-responsive controls for applicable spaces, C405.2.3.1 Daylight responsive control function and section C405.2.3.2 Sidelit zone. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.2.5 [EL27][1] | Additional interior lighting power allowed for special functions per the approved lighting plans and is automatically controlled and separated from general lighting. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.7 [EL26][2] | Low-voltage dry-type distribution electric transformers meet the minimum efficiency requirements of Table C405.6. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.8 [EL27][2] | Electric motors meet the minimum efficiency requirements of Tables C405.7(1) through C405.7(4). Efficiency verified through certification under an approved certification program or the equipment efficiency ratings shall be provided by motor manufacturer (where certification programs do not exist). | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.9.1, C405.9.2 [EL28][2] | Escalators and moving walks comply with ASME A17.1/CSA B44 and have automatic controls configured to reduce speed to the minimum permitted speed in accordance with ASME A17.1/CSA B44 or applicable local code when not conveying passengers. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.10 [EL29][2] | Total voltage drop across the combination of feeders and branch circuits <= 5%. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.1.1 [EL30][2] | At least 90% of dwelling unit permanently installed lighting shall have lamp efficacy >= 65 lm/W or luminaires with efficacy >= 45 lm/W or comply with C405.2.4 or C405.3. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C405.11, C405.11.1 [EL31][2] | 50% of 15/20 amp receptacles installed in enclosed offices, conference rooms, copy rooms, break rooms, classrooms and workstations and > 25% of branch circuit feeders for modular furniture will have automatic receptacle control in accordance with C405.11.1. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |

**Additional Comments/Assumptions:**

| 1 | High Impact (Tier 1) | 2 | Medium Impact (Tier 2) | 3 | Low Impact (Tier 3) |
|---|---|---|---|---|---|

| Section # & Req.ID | Final Inspection | Complies? | Comments/Assumptions |
|---|---|---|---|
| C303.3, C408.2.5.2 [FI17][3] | Furnished O&M instructions for systems and equipment to the building owner or designated representative. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C408.1.1 [FI57][1] | Building operations and maintenance documents will be provided to the owner. Documents will cover manufacturers' information, specifications, programming procedures and means of illustrating to owner how building, equipment and systems are intended to be installed, maintained, and operated. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C408.2.5 [FI16][3] | Furnished as-built drawings for electric power systems within 90 days of system acceptance. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |
| C408.3 [FI33][1] | Lighting systems have been tested to ensure proper calibration, adjustment, programming, and operation. | ☐Complies ☐Does Not ☐Not Observable ☐Not Applicable | |

**Additional Comments/Assumptions:**

| 1 | High Impact (Tier 1) | 2 | Medium Impact (Tier 2) | 3 | Low Impact (Tier 3) |
|---|---|---|---|---|---|

# SSC Service Solutions

# TEXAS A&M UNIVERSITY

## COLLEGE STATION, TEXAS

PROJECT MANUAL FOR:

# TAMU CORPS DORMS RESTROOM RENOVATIONS
# SSC No. 2024-06316
# KA No. 2024020

VOLUME 1



**Date 04.26.2024**

**PREPARED BY:**
**SSC**
**Facilities Services**
**Engineering Design and Construction Services**
**979-845-5317/Fax  979-862-1661**

(A) – authored by Architect          (O) – authored by Owner
(MEP) – authored by MEP Engineer

## SECTION 00 01 10 - TABLE OF CONTENTS

| SECTIONS | ISSUE DATE | REVISED |
|---|---|---|

**COVER & TABLE OF CONTENTS**
00 00 00   COVER SHEET ............................................................ 26 APR 2024
00 01 02   TABLE OF CONTENTS ................................................ 26 APR 2024

**DIVISION 00 — PROCUREMENT AND CONTRACTING REQUIREMENTS**
00 01 07.1 ARCHITECT SEAL PAGE (A) ...................................... 26 APR 2024
00 01 07.5 MEP SEAL PAGE (MEP) ............................................ 26 APR 2024

**DIVISION 01 — GENERAL REQUIREMENTS**
01 10 00   SUMMARY OF WORK (O) ........................................... 26 APR 2024
01 25 00   SUBSTITUTION PROCEDURES (O) ........................... 26 APR 2024
01 25 00.13 SUBSTITUTION REQUEST FORM (A) ...................... 26 APR 2024
01 29 00   PAYMENT PROCEDURES (O) .................................... 26 APR 2024
01 31 00   PROJECT MANAGEMENT (O) .................................... 26 APR 2024
01 31 50   PROJECT MEETINGS (O) ........................................... 26 APR 2024
01 32 00   CONSTRUCTION PROGRESS DOCUMENTATION (O) ................................... 26 APR 2024
01 33 00   SUBMITTAL PROCEDURES (O) ................................ 26 APR 2024
01 34 00   SHOP DRAWINGS, PRODUCT DATA AND SAMPLES (O) ................................. 26 APR 2024
01 42 00   REFERENCES (O) ...................................................... 26 APR 2024
01 43 00   QUALITY ASSURANCE (O) ......................................... 26 APR 2024
01 45 00   QUALITY CONTROL (O) .............................................. 26 APR 2024
01 50 00   TAMU TEMPORARY FACILITIES AND CONTROLS (O) ................................... 26 APR 2024
01 60 00   PRODUCT REQUIREMENTS (O) ................................. 26 APR 2024
01 73 50   CUTTING AND PATCHING (O) ..................................... 26 APR 2024
01 74 00   CLEANING AND WASTE MANAGEMENT (O) ................ 26 APR 2024
01 77 00   CLOSEOUT PROCEDURES (O) ................................. 26 APR 2024
01 78 20   FACILITIES MANAGEMENT DATA SPECIFICATION-NEW (O) .......................... 26 APR 2024
01 78 23   OPERATION AND MAINTENANCE DATA (O) ................. 26 APR 2024

**DIVISION 02 — EXISTING CONDITIONS**
02 41 19   SELECTIVE DEMOLITION ......................................... 26 APR 2024

**DIVISION 03 — CONCRETE**
03 30 00   CAST-IN-PLACE CONCRETE (A) ............................... 26 APR 2024
03 54 16   HYDRAULIC CEMENT UNDERLAYMENT (A) ............... 26 APR 2024

**DIVISION 06 — WOOD, PLASTICS, AND COMPOSITES**
06 10 53   MISCELLANEOUS ROUGH CARPENTRY (A) ............. 26 APR 2024

**DIVISION 07 — THERMAL AND MOISTURE PROTECTION**
07 84 13   PENETRATION FIRESTOPPING (A) ........................... 26 APR 2024
07 84 46   FIRE-RESISTIVE JOINT SYSTEMS (A) ...................... 26 APR 2024
07 92 00   JOINT SEALANTS (A) ............................................... 26 APR 2024

**DIVISION 08 — OPENINGS**
08 16 13   FIBERGLASS REINFORCED DOORS AND FRAMES (A) ................................. 26 APR 2024
08 31 13   ACCESS DOORS AND FRAMES (A) ......................... 26 APR 2024
08 71 00   DOOR HARDWARE (A) .............................................. 26 APR 2024

**DIVISION 09 — FINISHES**
09 21 16.23 GYPSUM BOARD SHAFT WALL ASSEMBLIES (A) ..... 26 APR 2024
09 22 16   NON-STRUCTURAL METAL FRAMING (A) ................. 26 APR 2024
09 29 00   GYPSUM BOARD (A) ................................................ 26 APR 2024
09 30 00   TILING (A) ............................................................... 26 APR 2024
09 81 16   ACOUSTICAL BLANKET INSULATION (A) ................. 26 APR 2024
09 91 00   PAINTING (A) ........................................................... 26 APR 2024

**DIVISION 10 — SPECIALTIES**
10 28 00   TOILET, BATH, AND CUSTODIAL ACCESSORIES (A) ....................................... 26 APR 2024

**DIVISION 12 — FURNISHINGS**
12 36 62   SOLID SURFACING MATERIAL (A) .................................................................. 26 APR 2024

**DIVISION 21 — FIRE SUPPRESSION**
21 00 55   BASIC FIRE SUPPRESSION MATERIALS AND METHODS (MEP) ...................... 26 APR 2024
21 01 00   SPECIAL CONDITIONS FOR ALL FIRE SUPPRESSION WORK (MEP) ............... 26 APR 2024
21 05 13   COMMON WORK RESULTS FOR FIRE SUPPRESSION (MEP) ......................... 26 APR 2024
21 13 13   FIRE SUPPRESSION PIPING WET-PIPE SPRINKLER SYSTEM (MEP) .............. 26 APR 2024

**DIVISION 22 — PLUMBING**
22 00 06   PLUMBING DEMOLITION (MEP) .................................................................. 26 APR 2024
22 01 00   SPECIAL CONDITIONS FOR ALL PLUMBING WORK (MEP) ............................ 26 APR 2024
22 05 00   BASIC PLUMBING MATERIALS AND METHODS (MEP) .................................. 26 APR 2024
22 05 19   METERS AND GAUGES FOR PLUMBING (MEP) ......................................... 26 APR 2024
22 05 23   GENERAL-DUTY VALVES FOR PLUMBING PIPING (MEP) ............................. 26 APR 2024
22 05 29   HANGERS AND SUPPORTS FOR PLUMBING PIPING AND EQUIPMENT (MEP)  26 APR 2024
22 05 53   IDENTIFICATION FOR PLUMBING PIPING AND EQUIPMENT (MEP) ................ 26 APR 2024
22 07 16   PLUMBING INSULATION (MEP) ................................................................. 26 APR 2024
22 11 16   DOMESTIC WATER PIPING (MEP) ............................................................ 26 APR 2024
22 11 19   DOMESTIC WATER PIPING SPECIALTIES (MEP) ......................................... 26 APR 2024
22 13 16   SANITARY WASTE AND VENT PIPING (MEP) ............................................. 26 APR 2024
22 13 19   DRAIN PIPING SPECIALTIES (MEP) .......................................................... 26 APR 2024
22 41 00   PLUMBING FIXTURES (MEP) .................................................................... 26 APR 2024

**DIVISION 23 — HEATING VENTILATING AND AIR CONDITIONING**
23 00 05   MECHANICAL DEMOLITION (MEP) ............................................................ 26 APR 2024
23 01 00   SPECIAL CONDITIONS FOR ALL MECHANICAL WORK (MEP) ......................... 26 APR 2024
23 05 13   BASIC MECHANICAL MATERIALS AND METHODS (MEP) ............................... 26 APR 2024
23 05 53   MECHANICAL IDENTIFICATION (MEP) ....................................................... 26 APR 2024
23 05 93   TESTING, ADJUSTING AND BALANCING (MEP) .......................................... 26 APR 2024
23 07 19   MECHANICAL INSULATION (MEP) ............................................................ 26 APR 2024
23 31 13   METAL DUCTS (MEP) ............................................................................. 26 APR 2024
23 33 00   DUCT ACCESSORIES (MEP) .................................................................... 26 APR 2024
23 37 13   DIFFUSERS, REGISTERS AND GRILLES (MEP) ........................................... 26 APR 2024

**DIVISION 26 — ELECTRICAL**
26 00 05   ELECTRICAL DEMOLITION (MEP) ............................................................. 26 APR 2024
26 00 15   GENERAL CONDITIONS FOR ALL ELECTRICAL WORK (MEP) ........................ 26 APR 2024
26 00 50   BASIC ELECTRICAL MATERIALS AND METHODS (MEP) ............................... 26 APR 2024
26 05 19   CONDUCTORS AND CABLES (MEP) ......................................................... 26 APR 2024
26 05 26   GROUNDING AND BONDING (MEP) .......................................................... 26 APR 2024
26 05 33   RACEWAYS AND BOXES (MEP) ............................................................... 26 APR 2024
26 05 53   ELECTRICAL IDENTIFICATION (MEP) ........................................................ 26 APR 2024
26 09 23   LIGHTING CONTROL DEVICES (MEP) ....................................................... 26 APR 2024
26 13 10   PULL AND JUNCTION BOXES (MEP) ......................................................... 26 APR 2024
26 51 00   INTERIOR LIGHTING (MEP) ..................................................................... 26 APR 2024

**DIVISION 28 — ELECTRONIC SAFETY AND SECURITY**
28 32 00   FIRE ALARM EXPANSION (MEP) .............................................................. 26 APR 2024

**DOCUMENT 00 01 07.1 - ARCHITECT SEAL PAGE**

All sections identified on the Table of Contents with a suffix of (A) have been furnished by the Architect for this Project:



**KIRKSEY**

**DOCUMENT 00 01 07.5 - MEP SEAL PAGE**

All sections identified on the Table of Contents with a suffix of (MEP) have been furnished by **CLEARLY ZIMMERMANN ENGINEERS** (Mechanical, Electrical or Plumbing Engineer) for this Project:



04/26/2024

**MECHANICAL SEAL**



04/26/2024

**ELECTRICAL SEAL**



04/26/2024

**PLUMBING SEAL**

SECTION 01 10 00

SUMMARY OF WORK

PART 1 - GENERAL

1.01  RELATED DOCUMENTS

   A.  Drawings and general provisions of the Contract, including General and Supplementary Conditions and other Division 1 Specifications Sections, apply to this Section.

   B.  Owner:  The Board of Regents of The Texas A&M University System, an instrumentality of the State of Texas.  The term "Owner", "owner", "Owner's Designated Representative (ODR), or any other reference to the entity with whom the Contractor is bound in contract with, shall be synonymous for the extent of this contract and wherever found in the Contract Documents.

   C. OWNER'S DESIGNATED REPRESENTATIVE (ODR):  SOUTHEAST SERVICE CORPORATION d/b/a SSC Service Solutions, is herein referred to as "SSC," or "Owner's Designated Representative" (ODR).  The ODR is the only party authorized to direct changes to the scope, cost, or time of the Contract.

1.02  DESCRIPTION OF WORK

   A.  Work to be done:  The work to be performed under this contract and in accordance with these contract documents shall consist of furnishing all necessary plant, labor, materials, and constructing, installing, and performing all work shown and described in the contract documents, all of which are made a part thereof.

   B.  Character of Work and Mechanics:  The Work shall be executed in the best and most workmanlike manner by qualified, careful, and efficient mechanics skilled in the trade, and in strict accordance with the contract documents and standards of the industry.  Only certified journeymen in respective trades or apprentices under the direct supervision of certified journeymen will be permitted to install, supervise installation of, alter or replace electrical and mechanical systems including but not limited to:  pipe, plumbing, HVAC systems, electrical wiring, fire protection systems, welding equipment and devices.  A licensed plumber as defined by the Texas Plumbing License Law, section1301.002-#4, A-D., will accomplish installation, alteration and testing of gas systems.  A current plumbing, mechanical and electrical license, as indicated in the Supplemental General Conditions, will be recognized as certification upon approval of the Owners Designated Representative.  Licenses shall be available at the pre-construction conference and from plumbers, mechanics and electricians at the job site throughout the contract performance.   Work accomplished by unlicensed mechanics shall be removed and reinstalled by the contractor using licensed mechanics at no additional cost to the University.

A. Project Title and Location:

Project Title: TAMU Coprs Dorm Restroom Modernization
Project No.: 2024020
Project Location: 606, 664, and 665 Military Mall, College Station, TX 77840.

400 Bizzell Street
College Station, Texas  77843
Brazos County

B. Contract Documents:  Contract Documents, dated April 26, 2024 were prepared for the project by Southeast Service Corporation (SSC), Facilities Services, Engineering, Design & Construction Services and/or their consultants by Kirksey Architecture.

E. The Work will be constructed under a general construction contract.

## 1.03  PRINCIPAL FEATURES:

A. The contractor will do all work with the building occupied and the contract work area unoccupied.  The contractor shall coordinate all work with the Owner Designated Representative (ODR) and the building occupants.

B. Work of this contract can be summarized as follows:

1.  Full demolition and renovation of three dormitory restrooms.

## 1.04  STARTING WORK:

A. The Contractor shall not start work until the eBuilder commitment approval or Notice to Proceed has been issued and all insurance certificates have been submitted, reviewed and accepted by the Owners Designated Representative (ODR).

1. The Contractor shall provide and maintain the insurance coverage, with the minimum amounts required by the contract, until the end of the contract warranty period.  The Contractor shall present the ODR a current certificate of insurance prior to performing contract work and any required warranty work.

2. The Contractor shall update all expired policies prior to submission for monthly payment and during the contract warranty period.  Failure to update policies shall be reason for withholding of payment until renewal is provided to the ODR.

B. The Contractor shall notify the ODR prior to commencing any contract work.

## 1.05  WORK HOURS, UTILITY OUTAGE AND COORDINATION:

A. Work Hours:  Normal work hours at the University are 8:00 a.m. to 5:00 p.m., Monday through Friday.  Contract work hours shall be Monday through Friday exclusive of holidays.  Work may be permitted on Holidays at the option of SSC and at no additional cost to SSC, with written notice to SSC at least 48 hours before the start of the scheduled work.

1. The Contractor may be allowed additional, or varied work hours, with prior approval by SSC.

B. The Contractor shall limit use of the premises to the work indicated and allow for occupancy and use during the construction.

C. Utilities:

1. Utility Outage: When a utility outage affecting occupied facilities is necessary to perform the contract work, the outage shall be performed during non-work hours at no additional cost to SSC. The contractor shall give written notice to SSC fourteen (14) days in advance of a scheduled outage. University personnel will perform disconnection and reconnection of utilities. Fourteen days advance notice is also required for connection and disconnection of temporary utilities by University personnel including but not limited to temporary water taps, electrical taps and other temporary site utilities.

2. Utility Excavation: Before performing any excavation, grading, trenching or other operations whereby existing underground utilities may be disturbed or damaged, contact the Texas Excavation Safety System (Texas 811) at 811 to have utilities marked. Also, coordinate with Campus Utilities and Energy Services and Campus Telecommunications for marking of any utilities. In accordance with Texas Utilities Code, Title 5, Chapter 251 - Underground Facility Damage Prevention And Safety, a person who intends to excavate shall notify Texas 811 not earlier than the 14th day before the date the excavation is to begin or later than the 48th hour before the time the excavation is to begin, excluding Saturdays, Sundays, and legal holidays. The contractor shall allow sufficient time for Texas 811 and campus to accomplish marking of utilities at no additional cost to the ODR or campus. Once utilities are marked, the contractor shall be responsible for maintaining the flags/paint at their proper location(s). No excavation will be permitted until all utilities existing in the area have been marked. If no utilities are marked during the utility locate process, contractor shall confirm and notify the ODR's project manager that locates have in fact been accomplished before performing any excavation. The contractor shall be responsible for the repair of underground utilities damaged as a result of contract operations at no additional cost to ODR.

3. Damage occurring to these lines, during construction, shall be repaired and/or replaced by Contractor or ODR, at the expense of the Contractor. Subsequent expenses incurred by University Staff and Personnel, resulting from the interruption of service caused by the damaging of underground utilities, shall be borne by the Contractor.

4. ODR's personnel shall be notified for inspection of all buried utilities upon discovery. Damage and repairs shall be recorded by inspectors prior to approval of backfilling.

5. Should Contractor discover "Unknown Utilities", promptly notify the ODR's personnel for direction. Such piping systems and lines shall be treated as charted lines discussed above.

6. Procedures for Notification if utility lines or piping systems are damaged during construction:

   a. Facilities Services Communications Center:

      College Station – 979-845-4811
      Other Campuses: [PM to edit]
      Gas Company: 911 (if gas lines are damaged)
   b. ODR Project Manager

      c.  If unavailable, notify SSC/EDCS Resident Regional Manager: College Station at 979-446-2435.  Other Campuses: [PM to edit]

    7.  COMMUNICATIONS AND DATA: Work on telephone, fiber optic lines, data lines and other communication systems must be performed by Texas A&M personnel and/or the telephone contractor.  The Contractor shall coordinate his work with these agencies through the ODR.

D.  Coordination:  Contractor shall coordinate work with the Owner's Designated Representative, prior to beginning any work on the project.  Additionally, prior to starting work each day, the Contractor's superintendent shall inform and coordinate with the Owner's Designated Representative.

E.  Cranes:  When a crane is necessary to perform the contract work, the crane delivery, placement and lift dates shall be coordinated with the Owner's Designated Representative, Environmental Health and Safety and others as may be required such as Texas Department of Transportation and local government.  The Contractor shall give written notice to the University fourteen (14) days in advance of a required crane placement and lift.  The Contractor shall submit a Crane Lift Plan with the written notice of crane placement and lift.  The lift plan shall show the proposed crane location during the lift, the area of boom swing proposed for the lift, location and type of barricades, and affected streets, sidewalks, parking areas and buildings.  The area of boom swing shall be depicted as the arc of the boom for the proposed swing with a radius of the boom length if the boom were in the horizontal.  Contractor shall comply with OSHA and ANSI safety standards for cranes.

F.  Inspection of Work:  The Contractor shall not cover up any Work with finishing materials or other building components prior to an inspection of the Work by the ODR project inspector.  Should corrections of the Work be required for approval, cover-up shall be delayed until another inspection can be made and approval is granted.

    1.  The Contractor shall be responsible for providing notification of at least seven (7) WORKING days, to the ODR project inspector of the anticipated need for a cover-up inspection. Should the ODR project inspector fail to make the necessary inspection within the seven (7) working days, the Contractor may not proceed to cover up the Work until the inspection has been completed.

    2.  The Contractor will notify the ODR project inspector a minimum of 24-hours in advance of any concrete pour.  The ODR project inspector will inspect, approve or disapprove formwork, vapor retarder, fill, reinforcing/structural steel and utility line placements.  Contractor will not pour concrete until the ODR project inspector has approved the Work.

## 1.06  UNIVERSITY OCCUPANCY

A.  University Occupancy:  University may occupy the adjacent facilities during the entire period of the contract operations.  Cooperate fully with the University representative during contract operations to minimize conflicts and to facilitate University usage.

1.07  PARKING, STORAGE AND SITE RESTRICTIONS:  Confine operations at the site to the areas permitted under the Contract.  Portions of the site beyond areas for which work is indicated are not to be disturbed.  Comply with the Owner's requirements concerning the Contractor's operations and use of the premises, parking, loading and unloading.

A. Keep existing driveways and entrances serving the adjacent University facilities and parking spaces clear and available to the, visitors, staff and service vehicles at all times.  Do not use these areas for parking or storage of materials.

B. Keep all storage areas free of debris, refuse, spills, leaks, stains, splashes and excess materials.  All storage areas shall be maintained in a neat, clean, and safe condition. Do not unreasonably encumber the site with materials or equipment. Stockpiling of materials and the locations of storage sheds, trailers or temporary field offices shall be confined to the area designated by the University.  If additional storage is necessary obtain and pay for such storage off site.  Use of designated area(s) shall be coordinated with SSC/University.

C. Contractor storage and parking are at the job site in an area to be designated by SSC/University.  Parking is not allowed on sidewalks, drives, or roadway.  Do not block parking spaces.

D. Lock automobiles and other mechanized or motorized construction equipment, when parked and unattended, to prevent unauthorized use.  Do not leave vehicles or equipment unattended with the motor running or the ignition key in place.  Contractor shall not allow any construction equipment to be parked on adjacent streets at night.

E. Designated roads shall be used for construction traffic.  Contractor shall not close, block, or otherwise obstruct roads at any time without written permission of the University and where required the local government.  Contractor shall keep all debris and mud off all sidewalks and streets.  Immediately clean all debris and mud that is a result of contract operations.

1.08  EXISTING FACILITIES AND CONDITIONS:  Maintain the existing facilities in a safe condition throughout the demolition period.

A. Areas designated around, or near the building will be made available for contractor staging and dumpsters.  Coordinate with ODR and University.

B. Prior to commencement of contract work, inspect areas in which work will be performed.  Document and photograph existing conditions of structure, surfaces, equipment, and condition of surrounding properties, which could be misconstrued as damage resulting from demolition work or other contract operations.  Inspection shall be verified, signed by, and filed with the Owner or Owners Representative prior to starting work."

C. Structural Building Components:  Unless indicated on the Construction Documents, do not cut or modify any structural building component (e.g. column, beam, floor slab) without prior approval of Structural Engineer.  If an existing structural component is accidentally cut, the remedial design work shall be by a Professional Structural Engineer licensed in Texas.  The construction contractor is responsible for engaging the Structural Engineer and for payment of all design fees.

1.09  FIRE REGULATIONS:  Comply with National Fire Protection Association, NFPA 241 guidelines. The contractor shall use no explosives or fire in performing the work.  Contractor shall understand and comply with OSHA welding and cutting requirements.

A.  Coordinate all work on existing fire alarm and fire suppression systems with the ODR inspector prior to the start of contract work. Any work that could cause dust or fumes must be coordinated with the ODR prior to commencing so the fire alarm system can be modified and protected as necessary.

1.10  CLEANUP:  The contractor shall dispose of all trash, debris, refuse, garbage, etc., which is generated by the contractor during the contract.  Building sites shall be cleaned on a daily basis and disposal shall be outside the limits of University property.  Contractor shall routinely empty dumpsters to prevent wind-blown debris.  Disposal shall be by sanitary landfill or other approved methods and shall conform to all local, state, and federal guidelines, criteria, and regulations.

1.11  ENERGY CONSERVATION:  The contractor shall use good judgment in the conservation of utilities.  Prevailing energy conservation practices shall be adhered to and enforced by the contractor.

1.12  SPECIAL STORAGE:  The following shall apply when required to perform contract operations.

A.  Petroleum Storage:

1.  The contractor shall store all fuel or petroleum products, whether new or used, in appropriate containers and within a bermed area with an impermeable liner (40 mil) or other approved containment measures.  All storage areas shall be marked with appropriate signage (i.e., Flammable Storage - No Smoking Within 50 ft).  All fuel tanks and petroleum storage containers shall be structurally sound and in good condition, be kept sealed when not in use, and be grounded and bonded according to NFPA Requirements.

2.  The containment area shall be sized to hold fluid volume equal to 110% of the largest storage container, with a minimum of one foot of freeboard for earthen berms.  The contractor shall immediately clean up and dispose of any evidence of a fuel or oil spill in conformance with all federal and state regulations at no additional cost to the University.

3.  The contractor shall remove bermed areas at the completion of the job and restore the area to its original condition. The contractor shall immediately clean up and dispose of any evidence of a fuel or oil spill in conformance with all federal and state regulations. Costs of all soil tests as a result of spills shall be a responsibility of the contractor.

4.  The contractor shall keep all other storage areas free of debris, leaks, stains, or splashes.  All storage areas shall be maintained in a neat, clean, and safe condition.  Any areas that incur contamination by any hazardous substance shall be immediately remediated by the contractor at no additional expense to SSC/University.  Remediation may include subsequent soil analysis if directed by SSC/University.  The contractor shall store all paints, thinners, solvents and other hazardous materials in a contractor supplied trailer or storage unit, which shall be secured when not in use.

1.13  TESTING PARAGRAPHS:  Testing indicated in these contract documents to be performed by University or the Owner will be performed at the option of the University.

1.14  SAFETY:

A.  Comply with all applicable Occupational Safety and Health Act (OSHA) Standards and Regulations.

B.  Furnish and install all necessary safeguards to provide safety and protection of the public and University property adjacent to the contract work area.  Comply with all applicable federal, state, and local laws, regulations, ordinances, policies and standards related to the safety of the public and University property while performing contract operations.

C.  Speed Limit:  Contractor shall notify all employees and subcontractors of the speed limit of the adjacent streets and ensure all personnel understand and comply with this requirement.

D.  Temporary Roads and Paved Areas:  Construct and maintain temporary roads and paved areas adequate to support loads and to withstand exposure to traffic during contract operations.

E.  Temporary Traffic Controls:  Furnish and install Temporary Traffic Controls (TTC) in accordance with the Texas Manual on Uniform Traffic Control Devices (TMUTCD).  Submit a temporary traffic control plan for vehicular and pedestrian traffic to the project Engineer for approval prior to the start of construction operations.  Pedestrian traffic control plans shall provide a safe, convenient and accessible travel path that replicates as nearly as possible the most desirable characteristics of the existing sidewalks or footpaths throughout all phases of construction.  Provide for continuous operation of signs and barricades designating restricted or dangerous conditions including but not limited to: illuminated barricades, danger signals, warning signs and obstructions.

F.  Site Safety:  Do not leave the work areas in an unsecured or unsafe condition at any time during contract operations.  Contractor personnel and equipment operators shall monitor their surroundings at all times and be alert for people moving in or adjacent to contract work areas.  Contractor shall use spotters when moving vehicles through the construction sites and no construction vehicles (i.e. backhoes, bobcats, etc.) shall be left unsecured on site.  Contractor shall furnish and install temporary fences, barricades, signs and other required items to:

1.  Warn/notify adjacent building occupants
2.  Protect construction materials
3.  Prevent unauthorized personnel from entering the construction site.
4.  Redirect vehicular and pedestrian traffic flow when required to perform contract operations; comply with paragraph E above, Temporary Traffic Controls.

G.  Prior to spraying paint, coatings or power washing exterior structures the following criteria shall be met:

1.  Contractor shall provide ODR and University forty eight (48) hours' notice prior to spraying any material, including primer, paint or coatings.
2.  Consider use of dry-fall paint when spray painting large areas of structure (e.g. metal building frames) or materials by conventional or airless spray.

3.  The Contractor shall provide all necessary barricades, signs, warning of spray area as determined in the preconstruction conference.  The Contractor shall set these signs out the night before spraying begins.

4.  The Contractor shall be responsible for the removal of signs and barricades at the completion of the job.

5.  The Contractor shall protect any automobile, bicycle, vehicle or other property which is located in a warning area where contact with the Owner has not been made.

6.  The Contractor shall employ approved wind screens, protective shrouds and other protection methods during all paint and coating applications. The Contractor is responsible for all overspray and shall have sole liability where damage occurs as a result of this work.

7.  Spray equipment shall be as recommended by the materials manufacturer.  Spray operations shall be performed only during adequate period of calm weather with winds not exceeding 15 miles per hour.  Protect all property from overspray or other damage.

8.  To prevent sparking a flammable substance, smoking and other sources of flame near spray painting operations are prohibited and tools shall be properly rated and grounded for work in a spray painting area.

1.15  TREES, SHRUBS, AND HEDGES:  Coordinate all tree protection procedures through SSC Grounds Management.  Take appropriate measures to prevent injury to plants in or near the project site unless designated to be removed.  Do not remove or prune any plants without approval from SSC/University or designated representative. No tree, shrub or hedge, or portion of a tree, shrub or hedge shall be removed that contains actively nesting birds unless approved by SSC/University.  Actively nesting migratory birds will also require a permit be obtained from the U.S. Fish and Wildlife Service. Plants which are damaged during construction shall be replaced at no expense to SSC/University. Contractor shall remove all trees, tree branches, shrubs and plants that will interfere, encroach upon, or otherwise obstruct new construction and contract operations at no additional cost to SSC/University.

1.16  ENVIRONMENTAL REQUIREMENTS:

A.  Compliance with Environmental Laws:  The contractor shall comply, and assure that all subcontractors comply, with all applicable federal, state, and local laws, regulations, ordinances, policies and standards related to environmental matters.  The contractor shall also comply, and assure that all subcontractors comply, with all applicable specific instructions, policies, or references contained herein.

B.  Contractors involved in projects that include the removal and/or disposal of polychlorinated biphenyl (PCB) contaminated light ballasts shall comply with the requirements of 40 CFR 761. PCB containing ballasts are a special waste and must be managed as such.  The contractor shall immediately notify SSC/University when activities involving the removal of PCB light ballasts begin.

Contractors involved in projects that include the removal and/or disposal of fluorescent, mercury vapor, or HID Sodium Vapor lamps shall comply with the requirements of this section.  Fluorescent lamps have been determined, by the TCEQ to be hazardous waste and must be managed in accordance with 40 CFR 260-279, and 30 TAC 330-335.  The contractor shall immediately notify SSC/University when activities involving the removal of the aforementioned lamps begin.

C. Nuisance and Polluting Activity Prohibited: Polluting, dumping, or discharging of any harmful, nuisance, or regulated materials (such as concrete truck washout, vehicle maintenance fluids, residue from saw cutting operations, solid waste and hazardous substances) into building drains, site drains, streams, waterways, holding ponds or to the ground surface shall not be permitted. The contractor shall be held responsible for any damages that may result. Further, the contractor shall conduct activities in such a fashion to avoid creating any legal nuisance, including but not limited to, suppressing noise and dust, controlling erosion, and implementing other measures as necessary to minimize off-site impacts of work activities.

D. Should the contractor encounter previously unidentified and suspect asbestos-containing materials (ACM), mold, hazardous or potentially hazardous material or suspected lead containing paint which must be disturbed to comply with the contract documents, the contractor shall cease all work that would disturb the suspect material and shall immediately notify the Owner's Designated Representative. The Owner shall take steps, as appropriate, to ascertain the material's composition and determine any remedial action necessary. The Contractor will remove contract work crews from the area of the work site affected by the suspect materials and continue work on other parts of the project as feasible. Contractor shall return to abandoned work area after the owner has determined the composition of the suspect material and completed any required remedial action.

E. Contractor is responsible for all materials brought on site, including hazardous materials. All hazardous waste or special waste generated by the contractor as a result of contract operations shall be identified, characterized, containerized and transported to a permitted disposal facility in strict accordance with the requirements of 40 CFR 260-279 (Hazardous waste and used oil regulations), 30 TAC 324, 330-335 (TCEQ Hazardous and Industrial Waste Regulations).

1.17 WARRANTY PERIOD: Except as may be otherwise specified in the Contract Documents, the Contractor shall repair all defects in materials, equipment, or workmanship appearing within one year from the date of Substantial Completion of the Work. If Substantial Completion occurs by phase, then the warranty period for that particular Work begins on the date of such occurrence, or as otherwise stipulated on the Certificate of Substantial Completion for the particular Work.

1.18 COLOR AND MATERIAL SELECTIONS:

A. No color selections and no material selections will be made by SSC/University until the contractor submits all samples of all materials requiring color selections to SSC/University. In addition, prior to SSC/University selecting colors, the contractor shall certify in writing that all colors and samples submitted are current and are acceptable to the contractor for SSC/University's selection.

B. Any samples that are not applicable to the contract shall be carefully removed from the submittal by the contractor. The contractor shall submit the manufacturer's full range of applicable colors, patterns, and textures for the various materials that are required by the contract and within the guidelines hereinbefore stated.

C.  In the event that discontinued, non-current or non-applicable colors, textures, or samples are submitted by the contractor and their selection is made by SSC/University, the contractor shall bear all labor and material correction costs for fabrication, shipping, restocking, removal, repair of damaged materials, and installing of all materials required by SSC/University to correct the project.

PART 2 - PRODUCTS

Not Used

PART 3 - EXECUTION

Not Used

**END OF SECTION**

SECTION 01 25 00

SUBSTITUTION PROCEDURES

PART 1 - GENERAL

1.01    SECTION INCLUDES:

A.    General requirements for product options and substitution procedures.
B.    Material and product options.
C.    Substitutions.
D.    Coordination.

1.02    RELATED SECTIONS:

A.    Section 01 10 00 - Summary of Work.
B.    Section 01 31 00 - Project Management and Coordination
C.    Section 01 33 00 - Submittal Procedures
D.    Section 01 34 00 - Shop Drawings, Product Data and Samples.
E.    Section 01 60 00 - Product Requirements.
F.    Section 01 77 00 - Closeout Procedures.

1.03    GENERAL:

A.    In addition to Uniform General and Supplementary Conditions, comply with product option and substitution requirements specified in this Section.

1.04    MATERIAL AND PRODUCT OPTIONS:

A.    Materials and Products Specified by Reference Standards, by Performance, or by Description Only:  Any product meeting specified requirements.

B.    Materials and Products Specified by Naming Products of One or More Manufacturers with a Provision for an Equivalent Product:  Submit one of the products listed which complies with specified requirements or submit a request for substitution for a product of manufacturer not specifically named which complies with specified requirements.

C.    Materials and Products Specified by Naming Products of Several Manufacturers Meeting Specifications:  Submit one of the products listed which complies with specified requirements or submit a request for substitution for a product of manufacturer not specifically named which complies with specified requirements.

1.05    SUBSTITUTIONS

A.    Within sixty (60) days after date of Owner's Notice to Proceed, A/E will consider requests from Contractor for substitutions.  Subsequently, substitutions will be considered only when a material or product becomes unavailable due to no fault of Contractor or as follows:

1. Lockouts,
2. Strikes,
3. Bankruptcy,
4. Discontinuation of product,
5. Proven shortage,
6. Other similar occurrences.

B. Each proposed substitution of materials or products for that one specified is a representation by Contractor that it has personally investigated the substitution and determined that the proposed substitution is equivalent or superior to that specified in quality, durability and serviceability, design, appearance, function, finish, performance, and of size and weight which will permit installation in spaces provided and allow adequate service access. Additionally, Contractor agrees that it will provide and/or do the following:

1. Same warranty on substitution as for specified product or material,
2. Coordinate installation and make other changes that may be required for Work to be complete in all respects,
3. Waive claims for additional costs which may subsequently become apparent,
4. Verify that proposed materials and products comply with applicable building codes and governing regulations and, where applicable, has approval of governing authorities having jurisdiction.

C. The A/E will review requests from Contractor for substitutions with the ODR. Do not purchase or install substitute materials and products without written approval. The A/E will give written notice to Contractor and the ODR of acceptance or rejection within a reasonable time.

D. Document each request for substitution with complete data substantiating compliance of proposed substitution with Contract Documents. As appropriate include:

1. Reason for the proposed substitution,
2. Change in Contract Sum and Contract Time, if any,
3. Effect on WPS and completion date,
4. Changes in details and construction of related work required due to substitution,
5. Drawings and samples,
6. Product identification and description,
7. Performance and test data,
8. Itemized comparison of the qualities of the proposed substitution to the product specified including durability, serviceability, design, appearance, function, finish, performance, size and space limitations, vibration, noise, and weight,
9. Availability of maintenance service, source and interchangeability of parts or components,
10. Additional information as requested.

E. In the event of credit change in the cost, the Owner shall receive all benefit of the reduction in cost of the proposed substitution. Credit shall be established prior to final approval of the proposed substitution and will be adjusted by Change Order.

A.    Substitutions will not be considered when they are indicated or implied on shop drawing or product data submittals without separate written request, without having been reviewed and approved by Contractor, or when acceptance will require substantial revision of Contract Documents without additional compensation to A/E.

G.    In the event that the Contractor or Subcontractor has neglected to place an order for specified materials and products to meet the WPS, specified requirements, color schemes or other similar provisions, such failure or neglect shall not be considered as legitimate grounds for an extension of completion time nor shall arbitrary substitutions be considered to meet completion date.

H.    Only one request for substitutions will be considered for each product. When substitutions are not accepted, the Contractor shall provide specified product.

I.    Should substitution be accepted, and substitution subsequently is defective or otherwise unsatisfactory, replace defective material with specified material at no cost to Owner.

1.06    COORDINATION:

A.    When a specified, optional, specified by reference standard, or proposed substitution item of equipment or material is submitted which requires minor changes or additions to the designed structure, finishes or to mechanical and/or electrical services due to its requirements being different from those shown on the Contract Documents, itemize the changes required and attach to submittal. Do not proceed with changes without written approval from the A/E.

B.    Contractor shall make adjustments and changes required to coordinate Work for installation of optional materials and products, approved substitutions and materials and products specified by reference standards without additional costs to Owner or A/E.

PART 2 – PRODUCTS

    NOT USED

PART 3 – EXECUTION

    NOT USED

END OF SECTION

**SECTION 01 25 00.13 - SUBSTITUTION REQUEST FORM**
PROJECT: _____

TO: _____
NO. _____
DATE:_____

Contractor hereby requests acceptance of the following product or system as a substitution in accordance with provisions of Division 01 Section "Substitution Procedures:"

**1.    SPECIFIED PRODUCT OR SYSTEM**

Substitution request for: _____

Specification Section No.: _____ Article/ Paragraph: _____

**2.    REASON FOR SUBSTITUTION REQUEST**

SPECIFIED PRODUCT . . .

- ☐ Is no longer available.
- ☐ Is unable to meet project schedule.
- ☐ Is unsuitable for the designated application.
- ☐ Cannot interface with adjacent materials.
- ☐ Is not compatible with adjacent materials.
- ☐ Cannot provide the specified warranty.
- ☐ Cannot be constructed as indicated
- ☐ Cannot be obtained due to one or more of the following:
    - ☐ Strike        ☐ Bankruptcy of manufacturer or supplier
    - ☐ Lockout      ☐ Similar occurrence (explain below)

PROPOSED PRODUCT . . .

- ☐ Will reduce construction time
- ☐ Will result in cost savings of
    $ _____ to Project
- ☐ Is for supplier's convenience
- ☐ Is for subcontractor's convenience
- ☐ Other:_____
    _____

**3.    SUPPORTING DATA**

- ☐ Drawings, specifications, product data, performance data, test data, and any other necessary information to facilitate review of the Substitution Request is attached.

- ☐ Sample is attached.        ☐ Sample will be sent if requested.

**4.    QUALITY COMPARISON**

Provide all necessary side-by-side comparative data as required to facilitate review of Substitution Request:

|  | SPECIFIED PRODUCT | PROPOSED PRODUCT |
|---|---|---|
| Manufacturer: | _____ | _____ |
| Name / Brand: | _____ | _____ |
| Catalog No.: | _____ | _____ |
| Vendor: | _____ | _____ |
| Variations: | _____ | _____ |

(Add Additional Sheets If Necessary)

Local Distributor or Supplier:     _____

Maintenance Service Available:     ☐   Yes        ☐   No

Spare Parts Source: _____

Warranty: ☐   Yes      ☐   No      _____ Years

## 5. PREVIOUS INSTALLATIONS

Identification of at least three similar projects on which proposed substitution was used:

PROJECT #1:

Project:           _____

Address:   _____

                  _____

Architect:   _____

Owner:            _____

Contractor:      _____

Date Installed: _____

PROJECT #2:

Project:           _____

Address:   _____

                  _____

Architect:   _____

Owner:            _____

Contractor:      _____

Date Installed: _____

## 6. EFFECT OF SUBSTITUTION

Proposed substitution affects other work or trades:     ☐   No    ☐   Yes   (if yes, explain)

_____

_____

Proposed substitution requires dimensional revisions or redesign of architectural, structural, M-E-P, life safety, or other work:

     ☐    No         ☐    Yes   (if yes, attach data explaining revisions)

7. **STATEMENT OF CONFORMANCE OF REQUEST TO CONTRACT REQUIREMENTS**

Contractor and Subcontractor have investigated the proposed substitution and hereby represent that:

A. They have personally investigated the proposed substitution and believe that it is equal to or superior in all respects to specified product, except as stated above;

B. The proposed substitution is in compliance with applicable codes and ordinances;

C. The proposed substitution will provide same warranty as specified for specified product;

D. They will coordinate the incorporation of the proposed substitution into the Work, and will include modifications to the Work as required to fully integrate the substitution;

E. They have included complete cost data and implications of the substitution (attached);

F. They will pay any redesign fees incurred by the Architect or any of the Architect's consultants, and any special inspection costs incurred by the Owner, caused by the use of this product;

G. They waive all future claims for added cost or time to the Contract related to the substitution, or that become known after substitution is accepted.

H. The Architect's approval, if granted, will be based upon reliance upon data submitted and the opinion, knowledge, information, and belief of the Architect at the time decision is rendered and Addendum is issued; and that Architect's approval therefore is interim in nature and subject to reevaluation and reconsideration as additional data, materials, workmanship, and coordination with other work are observed and reviewed.

Contractor:_____
*(Name of Contractor)*

Date:_____     By: _____

Subcontractor:_____
*(Name of Subcontractor)*

Date:_____     By: _____

*Note:  Unresponsive or incomplete requests will be rejected and returned without review.*

8. **ARCHITECT'S REVIEW AND ACTION**

☐   Substitution is accepted.

☐   Substitution is accepted, with the following comments:_____

_____

_____

☐   Resubmit Substitution Request:

  ☐ Provide more information in the following areas: _____

  _____

  _____

  ☐   Provide proposal indicating amount of savings / credit to Owner

  ☐   Bidding Contractor shall sign Bidder's Statement of Conformance

  ☐   Bidding Subcontractor shall sign Bidder's Statement of Conformance

☐ Substitution is not accepted:

    ☐ Substitution Request received too late.

    ☐ Substitution Request received directly from subcontractor or supplier.

    ☐ Substitution Request not submitted in accordance with requirements.

    ☐ Substitution Request Form is not properly executed.

    ☐ Substitution Request does not indicate what item is being proposed.

    ☐ Insufficient information submitted to facilitate proper evaluation.

    ☐ Proposed product does not appear to comply with specified requirements.

    ☐ Proposed product will require substantial revisions to Contract Documents.

By: _____

Date:_____

Architect has relied upon the information provided by the Contractor, and makes no claim as to the accuracy, completeness, or validity of such information. If an accepted substitution is later found to be not in compliance with the Contract Documents, Contractor shall provide the specified product.

**9. OWNER'S REVIEW AND ACTION**

☐ Substitution is accepted; Architect to prepare Change Order.

☐ Substitution is not accepted.

☐ Owner will pay Architect directly for redesign fees.

☐ Include Architect's Additional Service fee for implementing the substitution in the Change Order.

By: _____

Date:_____
        *(Owner's Representative)*
**END OF FORM**

SECTION 01 29 00

PAYMENT PROCEDURES

PART 1 - GENERAL

1.01    SECTION INCLUDES:

    A.      Payment requests.

1.02    RELATED SECTIONS:

    A.      Section 01 11 00 - Summary of Work.
    B.      Section 01 77 00 - Closeout Procedures.
    C.      Section 01 34 00 - Shop Drawings, Product Data and Samples.

1.03    PAYMENT REQUESTS:

    A.      General:  Except as otherwise indicated, the progress payment cycle is to be regular.  Each application must be consistent with previous applications and payments.  Certain applications for payment, such as the initial application, the application for final payment involve additional requirements.  Refer to the Uniform General and Supplemental Conditions (UGSC) for additional requirements.

    B.      Progress Payments will be accomplished through eBuilder utilizing a payment application approval process.

    C.      At the earliest convenient time, but not later than 21 days after the Notice to Proceed, the Contractor shall develop a Schedule of Values (SOV) to reflect the value of the categories of work.  The categories will be as required by the OWNER to facilitate componetization of the work by the OWNER.  The ODR will provide the required categories at the pre-construction meeting.  If more than one building is involved, the breakdown shall be by building.  All exterior work involving utilities, landscaping, sidewalks, etc., should be identified as separate items.

        1.      The initial SOV may require some revisions by the Contractor after the ODR's review.  It is, therefore, recommended that this schedule be prepared and submitted as soon as possible to prevent delay of the initial payment to the Contractor.

        2.      The ODR's initial interest in the SOV is to assure that the breakdown is in sufficient detail to meet the above requirements.  After this requirement is satisfied, the A/E and ODR will review the schedule to assure that reasonable dollar values are assigned to the various items of work and to avoid front loading of payments.

        3.      Computer generated or photo copied schedules of values prepared by the Contractor using the approved breakdown are acceptable.

D. MONTHLY PAYMENT ESTIMATES:

The A/E will show approval of the monthly pay estimate by affixing their signature to the original pay estimate. The original pay estimate will be forwarded to the OWNER for further processing.

1. Limitations - Estimates will not be approved if the job site record drawings are not up to date and posted per the UGSC. Estimates will also not be approved if other periodic requirements are not provided, i.e., WPS, Cash Flow Schedule, Required Logs, etc.

2. Historically Underutilized Business Progress Assessment Report (PAR) will be prepared and submitted with the pay request each month in accordance with Uniform General and Supplementary Conditions. Pay requests will not be approved without this completed form. The HUB Progress Assessment Report will be submitted even when no Hub Subcontractor payment is made during the pay period.

3. Contract Change Statement - All approved Change Orders should be entered on the Contract Change Statement. This Statement will then be attached to the Contractor's monthly payment estimate. Percentages complete should be shown opposite each item listed and extended into the "Total Complete to Date" column. The total of the "Total Complete to Date" should be brought forward to the line item on the breakdown schedule titled, "Changes Complete to Date".

4. Payment for Stored Materials  - Invoices for stored materials will be submitted when required by the ODR. Stored material invoices will be accepted only after an approved shop drawing or sample has been received by the ODR.

Invoices for stored materials will only be considered when they exceed five hundred dollars ($500) for each individual item. There will be no invoices accepted that contain tools, or expendable materials.

Invoices will only be considered that are referenced to the materials in the SOV. Invoices that are not legible will not be considered for payment.

All stored materials will be checked by the Project Superintendent and verified by the ODR before being incorporated into the payment estimate.

5. Payment of Estimates – The ODR will process the Contractor's estimates as promptly as possible. In order to do this, it is requested that these instructions be followed and that the Contractor make every effort to ensure that the estimate is mathematically correct and that only approved items are included as material stored on the site.

D. Base applications for payment on value of work installed, and materials and equipment suitably stored at Site. Materials and equipment suitably stored off site in an insured or bonded warehouse may be included, if approved in writing by ODR. See UGSC for additional requirements when requesting payment for materials stored off site.

E.    Payment for Stored Materials:  The ODR shall be the sole authority for approval (proof of insurance or bond will be required).

1.    Where the Schedule of Values separates items into labor amounts and material amounts, payment will be made for materials delivered and suitably stored on Site provided said material is required for installation according to the Contractor's Work Progress Schedule (WPS).

2.    Materials stored at an off site location which are eligible for inclusion on progress payments are defined as finished goods made specifically for the Project, provided said material is required for installation according to the Contractor's WPS.  Raw materials, work in progress at fabrication plants, and commodity items readily available for purchase are not eligible for inclusion in Contractor's Application for Payment.

3.    Payment will be made under following provisions:
      a.    Items are listed separately on Application for Payment.
      b.    Include with Application for Payment:
            (1)    Paid receipts showing Contractor is unconditional owner.
            (2)    Fully executed Transfer of Title on photocopy of form provided herein.
            (3)    Location where materials are stored if off site, and method used to store.
            (4)    Identify items in off site storage as property of Owner and furnish description of identification method.
            (5)    Inventory of items and methods used to verify inventory, including Contractor's certification that quantities have been received in good order.
            (6)    Proof of insurance for materials stored off site, in Owner's name.
            (7)    Proof of transportation arranged for delivery of material stored off site.
            (8)    Material delivered and stored on site or off site needs to parallel WPS.
      c.    ODR reserves right to verify storage by physical inspection at any time.
      d.    Payment does not relieve Contractor's obligations to protect, transport and install materials.
      e.    Title of materials upon which partial payments are made shall transfer to Owner.  Partial payment does not constitute acceptance by ODR nor a waiver of any right or claim by ODR.  Any costs incurred by Owner shall be paid by Contractor.

F.    Final Payment Application (see UGSC):  Administrative actions and submittals must precede or coincide with submittal of Contractor's final payment application.

1.    Complete project closeout requirements specification in Section 01 77 00 and 01 78 00.

2.    Additions and deductions resulting from Change Orders.

      a.    Original Contract Sum.

3.      The Owner will prepare final Change Order, reflecting approval adjustments to Contract Sum not previously made by Change Orders.

4.      After final acceptance of the work, the Contractor shall submit their final payment application in the same manner as a progress payment, indicating this is the final payment application.  Include waivers of lien release with final pay application. When Federal Funds or other grant funds are included, approval of that agency may also be required.

G.      Cash Flow Schedule (When required by the Owner):  Cash Flow Schedule will be required within 21 days after approval of the SOV.  This schedule shall show monthly payment requirements for the duration of the Contract.  The schedule shall include a graphic analysis showing anticipated total completed to date accounts versus actual completed to date amounts. This Cash Flow Schedule is required to be updated monthly and submitted with each payment estimate.

PART 2 – PRODUCTS

    NOT USED

PART 3 – EXECUTION

    NOT USED

END OF SECTION

SECTION 01 31 00

PROJECT MANAGEMENT AND COORDINATION

PART 1 - GENERAL

1.01    SECTION INCLUDES:

    A.    Coordination of Contract Work.
    B.    Correspondence.
    C.    Meetings.
    D.    Coordination of Submittals.
    E.    Coordination of Contract Closeout.
    F.    Coordination with Local Personnel.

1.02    RELATED SECTIONS:

    A.    Uniform General and Supplementary Conditions Article 3
    B.    Section 01 11 00 - Summary of Work.
    C.    Section 01 25 00 - Substitutions Procedures.
    D.    Section 01 31 50 - Project Meetings.
    E.    Section 01 32 00 - Construction Progress Documentation
    F.    Section 01 33 00 - Submittal Procedures
    G.    Section 01 34 00 - Shop Drawings, Product Data and Samples
    H.    Section 01 60 00 - Product Requirements.
    I.    Section 01 73 50 - Cutting and Patching.
    J.    Section 01 77 00 - Closeout Procedures.
    K.    All Divisions of Facility Services Subgroup

1.03    COORDINATION, GENERAL:

    A.    Coordinate all portions of the Work under the Contract.  Require each Subcontractor to coordinate their portion of the Work and provide their requirements for coordination of their Work with other related Work. (see UGSC)

          Contractor shall require and be responsible for cooperation and coordination between various trades and Subcontractors whose work is dependent upon one another.  Schedule such work so as to prevent delays in dependent work and so that all related work will progress together.  Fully inform each trade or Subcontractor of the relation of its work to other work, and require each to make necessary provisions for the requirements of such other work.  No additional compensation for extra work incurred through the lack of cooperation and coordination between various trades and Subcontractors will be allowed.

    B.    Coordinate mechanical and electrical Work with that of other trades in order that various components of systems are installed at proper time, fit available space, and allow proper service access to those requiring maintenance, including equipment specified in other Divisions.

    C.    Coordinate Work of sections having interdependent responsibilities for installing, connecting to, and placing in service, such equipment.

D. Coordinate use of Project space and sequence of installation of mechanical, plumbing, and electrical Work which is indicated diagrammatically on Drawings. Follow routings shown for pipes, ducts, and conduits as closely as practicable, with proper allowance for available physical space; make runs parallel with lines of building. Utilize space efficiently to maximize accessibility for other installations, for maintenance, and for repairs.

E. In finished areas, except as otherwise shown, conceal pipes, ducts, conduit, and wiring in the construction. Coordinate locations of fixtures and outlets with finish elements. Provide escutcheon plates at penetrations through finished walls and ceilings with finish appropriate to adjacent finished surface.

F. Coordination Drawings: Before materials are fabricated or installation of the Work , prepare coordination drawings (Section 01 34 00). Prepare drawings including plans, elevations, sections, and details as required to clearly define relationships between all building trades including HVAC, Electrical, Plumbing, Fire Sprinkler Systems and the structural components of the building such as ceilings, beams, columns, walls and floors. The drawings shall clearly define locations of sleeves, floor penetrations, Plumbing and HVAC piping, ductwork, equipment, light fixtures, electrical and control wiring conduits, panels, and their relationship to building structural components.

1. In preparation of the coordination drawings the Contractor is required to hold coordination meetings with all trades providing the above Work for each building level and each mechanical and electrical room.

2. Resolve conflicts between trades and prepare composite coordination drawings and submit six (6) sets of drawings to the A/E and one set to ODR. Allow sufficient time for review, in accordance with submittal procedures, prior to proceeding with fabricated or installation of the Work.

a. Prepare CAD coordination drawings to 3/8" = 1'0" scale for each floor level and for each mechanical and electrical room. The drawings shall indicate all work items located on each level shown on the drawing with the work items indicated by the following colors:

| | |
|---|---|
| Building and structural components | black |
| HVAC ductwork and diffusers | dark green |
| HVAC piping | blue |
| Fire sprinkler piping and heads | red |
| Electrical conduits and equipment | orange |
| Domestic cold and hot water piping | brown |
| Plumbing storm and sanitary drain | purple |
| Plumbing gas piping | light green |

b. All piping and ductwork larger than 2½" in diameter shall be drawn two line; smaller piping and ductwork shall be drawn double thickness single line.

c. Show access space around equipment as directed by Specifications.

d. The superintendent for each trade and the Contractor shall sign the drawing indicating that he has reviewed the drawing for accuracy.

3.      When conflicts cannot be resolved, Contractor shall request clarification from the A/E prior to proceeding with that portion of the Work affected by such conflicts or discrepancies. Prepare interference Drawings to scale and include plans, elevations, sections, and other details as required to clearly define the conflict between the various systems and other components of the building such as beams, columns, and walls, and to indicate the Contractor's proposed solution.

G.      Remove and relocate items which are installed without regard to proper access, as directed by the A/E and ODR, at no additional cost to the Owner.

1.04    CORRESPONDENCE:

All correspondence relating to this Project should occur in eBuilder. Correspondence outside of eBuilder must show the Project name, Project number and Contract number and must be uploaded to eBuilder.

1.05    MEETINGS:

A.      In addition to project meetings specified in Section 01 31 50, hold coordination meetings and pre-installation conferences with appropriate personnel to assure coordination of Work.

1.06    COORDINATION OF SUBMITTALS:

A.      Schedule and coordinate submittals specified in Sections 01 32 00, 01 33 00, 01 34 00, 01 25 00 and 01 77 00 and other Sections of Divisions 2 through 35.

B.      Coordinate requests for substitutions to assure compatibility of space, of operating elements, and effect on Work of other sections.

1.07    COORDINATION OF CONTRACT CLOSEOUT:

A.      Coordinate completion and cleanup of Work of separate sections in preparation for Substantial Completion.

B.      After Owner occupancy of premises, coordinate access to site for correction of defective Work and Work not in accordance with Contract Documents, to minimize disruption of Owner's activities.

1.08    COORDINATION WITH LOCAL PERSONNEL:

A.      Problems concerning traffic, parking or blocking streets must be referred to the appropriate campus personnel. Confine truck route egress and exit to Site as indicated on Drawings. Coordination is to be through the ODR.

B.      Any exterior problems, including the moving of utilities is to be referred to the Facilities Services. Coordination is to be through the ODR.

C.      The scheduling of utility outages must be coordinated with the Physical Plant of the campus at least fourteen (14) days in advance. This coordination is to be arranged through the ODR.

1.09    PROTECTION:

A.    Contractor shall assume responsibility for initiation and maintenance of protective requirements specified in Section 01 50 00, Temporary Facilities and Controls.

1.10    REPAIR OF DAMAGE:

A.    Damage:  Restore accidental or careless damage to the Work to a condition as good as or better than existed before work was commenced and at no cost to the Owner.

1.11    SECURITY:

A.    Conform to requirements of public laws, ordinances and regulations and requirements of insurance carriers concerning security of Site while Work is in progress as well as when it has been suspended, if this occurs.

1.12    RECORD DOCUMENTS:

A.    Maintain project record documents at Site.  Refer to Section 01 77 00 for requirements.

1.13    CONSTRUCTION LOADING:

A.    General:  Concrete slabs on grade and suspended floors have not been designed for heavy loading.

B.    Slabs On Grade:  Do not subject slabs on grade to excessive loading by shoring, storage of materials or operation of construction equipment unless adequately protected by planking. Maintenance of slabs in good condition is the responsibility of the Contractor, who shall remove all damaged areas of such slabs and replace them with new work at no cost to Owner.

C.    Suspended Floors:  Do not subject suspended slabs to construction loads beyond 40 pounds per square foot unless adequately shored.  Such shoring shall be designed for the Contractor by a registered (Texas) Structural Engineer, who shall certify prior to imposing construction loads on slabs, that the shoring as installed conforms with the shoring as designed.  Submit three prints, for record only, of the shoring drawings to the A/E, signed by the Contractor's design engineer.

1.14    SPECIAL REQUIREMENTS:

A.    Existing Utilities:  Schedule shut downs if needed in order to minimize inconvenience to Owner.  Notify ODR in writing fourteen (14) days in advance of any anticipated shutdowns.  Utility shutdowns will only be scheduled at a time mutually agreeable to the Owner and Contractor.

B.    Existing Valves and Switchgear:  Owner will be responsible for opening and closing all valves and switches on all utility services.  This will be done by University's Facilities Services/Physical Plant personnel without cost, except when overtime work is required.

C.      Damaged Utilities and Services:  When existing utilities are damaged, SSC Facilities Services shall make repairs or permit Contractor to make repairs under supervision of SSC Facilities Services personnel.  If repairs are to utilities shown on Contract Documents, all costs or repairs incurred by Owner will be borne by Contractor.

D.      No additional compensation will be made to Contractor for reasons of premium time, after hours, overtime or for inefficiency of operation.

E.      Parking:  Restricted to areas indicated on Drawings for Contractor's use.  Contractor shall make arrangements and pay for any additional parking required off Project site.

F.      Deliveries and Removals:  All deliveries of construction material, equipment, supplies, and similar operations, and removals shall be performed only in areas designated and approved by ODR.

G.      Circulation:  Confine construction operations to designated areas avoiding any interruption of vehicular circulation to existing facilities.  Should these requirements become unavoidable, submit a request to ODR in writing at least two weeks prior to anticipated interruption, stating predicted time, location and duration of interruption.

H.      Construction Scheduling:  The Work shall be conducted in such a way as to cause a minimum of interference with the use of adjacent existing facilities during regular school and/or work hours.

I.      Noise Control:  The Contractor shall execute the Work in this Contract as quietly as practical to avoid unnecessary disturbances.

1.      Any complaints duly registered by Owner of unacceptable noise levels shall be cause for use of special precautions and methods of operation by Contractor to reduce noises to acceptable levels at no additional cost to the Owner.
2.      The ODR shall be sole judge of tolerability of noise levels.

J.      Dust Control:  Control all dust, to Owner's satisfaction, in working area and involved portions of the Project Site including access roads or drives.

PART 2 – PRODUCTS

        NOT USED

PART 3 – PRODUCTS

        NOT USED

                        END OF SECTION

SECTION 01 31 50

PROJECT MEETINGS

PART 1 - GENERAL

1.01    SECTION INCLUDES:

    A.    General Project Meeting Information.
    B.    Pre-Construction Meeting.
    C.    Progress Meetings.
    D.    Pre-Installation Meetings.
    E.    Lockset Hardware/Key Conference.

1.02    RELATED SECTIONS:

    A.    Section 01 10 00 - Summary of Work.
    B.    Section 01 25 00 - Substitutions Procedures
    C.    Section 01 32 00 - Construction Progress Documentation
    D.    Section 01 33 00 - Submittal Procedures
    E.    Section 01 34 00 - Shop Drawings, Product Data and Samples
    F.    Section 01 60 00 - Product Requirements..
    G.    Section 01 73 50 - Cutting and Patching.
    H.    Section 01 77 00 - Closeout Procedures.

1.03    GENERAL:

    A.    Contractors, Subcontractors and suppliers representatives attending the meetings/conferences of this section shall be qualified and authorized to act on behalf of the entity each represents.

    B.    Contractor shall comply with the following meeting requirements during performance of the Contract.

        1.    Arrangements: Arrange for a convenient, comfortable room in which to conduct the progress meetings, furnished as necessary to accommodate the people involved and to accomplish the purpose of the meeting.  Owner will provide the room for the pre-construction meeting.
        2.    Notices: Distribute notices to all concerned at least seven (7) days in advance of the meeting date.
        3.    Records: Minutes of all project meetings shall be kept in eBuilder and available to all concerned within four (4) days after the adjournment of the meeting.
        4.    Schedule Updating:  Immediately following each progress meeting, where revisions to the Work Progress Schedule (WPS) have been made or recognized, revise the progress schedule.  Reissue revised colored copies of the WPS concurrently with minutes of each meeting.

1.04    PRE-CONSTRUCTION CONFERENCE (see UGSC):

A.    Chairman:  The meeting will be presided over by the ODR.

B.    Attendance:  The following persons will be expected to attend:

1.    Owner's Representatives.
        Project Manager
        User Coordinator.
2.    A/E's Construction Administrator.
3.    A/E's Consultants for Mechanical, Electrical and Structural Engineering.
4.    A/E's special consultants as maybe required.
5.    Contractor's General Superintendent and Project Manager.
6.    Major Subcontractors including at least those for mechanical, plumbing and electrical work.

C.    Agenda:  Subjects shall include, but are not limited to the following:

1.    Distribution of submittals.  Refer to Sections 01 33 00 & 01 34 00.
2.    Sequence of critical work.
3.    Relation and coordination by the Contractor.
4.    Designation of responsible personnel.
5.    Processing of Change Orders.
6.    Distribution of Construction Documents.
7.    Access to Work to permit inspection.
8.    Maintaining project Record Documents.
9.    Use of the premises, access to the Site, office and storage areas, and Owner's requirements.
10.   Major equipment deliveries and priorities.
11.   Safety and first aid procedure.
12.   Security procedures.
13.   Housekeeping procedures.
14.   Additional subjects as requested by the Owner, the Architect/Engineer or the Contractor.
15.   List of major Subcontractors and suppliers.

1.05    PROGRESS MEETINGS:

A.    Chairman:  Contractor's Project Manager or Project Superintendent shall preside over the meeting, prepare agenda and record minutes in eBuilder.

B.      Attendance: The following persons will be expected to attend:

     1.      Owner's Representatives.
            Project Manager
            User Coordinator.
     2.      Architect/Engineer's Construction Administrator.
     3.      Architect/Engineer's Consultants for mechanical, electrical and structural engineering until excused from attendance.
     4.      A/E's special consultants as maybe required.
     5.      Contractor's General Superintendent, Project Superintendent and Project Manager.
     6.      Subcontractors who have work in progress.
     7.      Subcontractor who will start work within the next month.
     8.      Others as requested by ODR, A/E, or Contractor.

C.      Agenda: The Contractor will provide a written agenda including but not necessarily limited to the following items:

     1.      Present a brief written narrative of construction progress since the last monthly meeting containing:
         a.      General description of work performed.
         b.      Expectation of meeting scheduled dates.
         c.      Description of current or anticipated delaying factors or problems, if any.
     2.      Review the updated WPS and present a written schedule analysis.
     3.      Review the Submittal Schedule/Log.
     4.      Review the COR Log.
     5.      Review of Requests for Information.
     6.      Review of project Record Documents.
     7.      Review/approval of the Progress Payment.
     8.      General discussion: Other outstanding/current business.

D.      Review of Pre-Installation Meetings

E.      Number of Meetings: A minimum of one progress meeting shall be held each month. Other weekly or biweekly progress meetings shall be held as determined by the ODR and shall cover those subjects as required by the ODR.

1.06      PRE-INSTALLATION MEETINGS:

A.      Provide a list of all pre-installation meetings anticipated.

B.      Convene a pre-installation meeting at the Project field office prior to commencing any work.

C.      Require attendance of entities directly affecting, or affected by, work of Section.

D.      Notify A/E and ODR ten (10) days in advance of meeting date.

E.      Contractor shall prepare agenda, preside at meeting and record minutes in eBuilder.

F.      Review conditions of installation, preparation and installation procedures, and coordination with related work. Review submittals for all Work to be installed.

G.     The Contractor shall maintain an adequate inspection system and perform such inspection to insure that the work called for by this contract conforms to the contract specifications and requirements.

H.     The Contractor shall maintain complete inspection records and make them available to the ODR.

I.     Subcontractor foreman or project manager are required to attend this meeting.

1.07     LOCKSET HARDWARE/KEY CONFERENCE:

A key conference shall be conducted after approval of hardware submittal prior to the ordering of lock hardware. The Contractor shall, in conjunction with the ODR, A/E and User Coordinator, establish a date for the key conference to be held. A key conference is required to review the function of the locks and to insure that all security requirements of the Using Agency will be met.

PART 2 – PRODUCTS

    NOT USED

PART 3 – EXECUTION

    NOT USED

<div align="center">END OF SECTION</div>

SECTION 01 32 00

CONSTRUCTION PROGRESS DOCUMENTATION

PART 1 - GENERAL

1.01    SECTION INCLUDES:

A.    Work Progress Schedule (WPS).
B.    Daily reports.

1.02    RELATED SECTIONS:

A.    Section 01 10 00 - Summary of Work.
B.    Section 01 31 00 - Project Management and Coordination.
C.    Section 01 33 00 - Submittal Procedures.
D.    Section 01 33 50 - Shop Drawings, Product Data and Samples.
E.    Section 01 77 00 - Closeout Procedures.

1.03    WORK PROGRESS SCHEDULE:

Coordination:  Comply with Uniform General and Supplementary Conditions (UGSC).  Coordinate both the listing and timing of reports and other activities required by provisions of this Section and other Sections, so as to provide consistency and logical coordination between the reports.  Maintain coordination and correlation between separate reports by updating at monthly or shorter time intervals.  Make appropriate distribution of each report and updated report to all parties involved in the Work including the A/E and the Owner.  In particular, provide close coordination of the WPS, contract price breakdown, listing of subcontracts, schedule of submittals, progress reports, and payment requests.

A.    Initial Work Progress Schedule:  Submit a bar-chart type progress schedule within ten (10) calendar days after receipt of Notice to Proceed or Commitment Approval Work Order (CAWO).  On this schedule, indicate a time bar for each major category or unit of work to be performed at the Site, properly sequenced and coordinated with other elements of work.  Show completion of the activity sufficiently in advance of the date established for completion of the Work.  Under no circumstances will construction operations begin other than initial mobilization until the preliminary Work Progress Schedule is submitted.

B.    Work Progress Schedule:  Within ten (10) calendar days after the receipt of the Notice to Proceed or Commitment Approval Work Order (CAWO), submit a comprehensive Work Progress Schedule (WPS).  This schedule shall address and include all comments received from the ODR and the A/E that were in reference to the preliminary Work Progress Schedule.  Note:  The Owner prefers submission of the completed Construction Schedule at the preconstruction meeting if possible, otherwise the Construction Schedule shall be submitted to the ODR not later than ten (10) calendar days after the effective date of the Notice to Proceed or Commitment Approval Work Order (CAWO).

    1.    General:  The Work Progress Schedule shall be in accordance with requirements of the Uniform General and Supplementary Conditions (UGSC).

2. Work Progress Schedule: Based on development of the preliminary WPS and whatever updating and feedback may have occurred during project start-up, secure commitments for performing major elements of the Work. Submit a comprehensive WPS indicating, by stage-coded symbols, a time bar for each major category or unit of work to be performed at the Site; include minor elements of work which are involved in overall sequencing of the Work. Contractor shall identify all critical items, in red ink. Arrange schedule to graphically show the major sequences of Work necessary for the completion of related elements of Work. Prepare and maintain the schedule on either a sheet of sufficient size, not to exceed 11" x 17", or a series of sheets showing required data clearly for the entire Construction Time. Provide monthly updates in color (or clearly discernable gray tone shading), graphically and digitally to the ODR.

3. Area Separations: Arrange the WPS with separations between buildings and floors as approved by the ODR.

4. Network Diagram: Activities shown on the WPS shall be categorized and described as follows:

    a. Each individual construction activity.

    b. A concise description of the work.

    c. An activity duration shall not exceed 20 work days. Durations of greater than 20 work days are acceptable for non-construction activities or as required by the type of construction activity.

    d. Each activity shall be coded with an activity code or hammock that relates that activity to an item on the Schedule of Values.

    e. Each activity shall be coded with an activity code that relates that activity to a phase or building. This subdivision of the Project shall be mutually agreed upon between the ODR and the Contractor.

    f. Items requiring fabrication and delivery longer than 180 days.

    g. Times anticipated for shutdown and tying-in to existing services. Note: This does not serve as an official request to the ODR and each individual request for an outage shall be submitted in writing fourteen (14) calendar days prior to the anticipated outage, as described in Section 01 31 00 Project Management and Coordination. An integrated schedule containing all of the above categories, or individual schedules for each of the above categories, or both, shall be as required by the A/E and/or the ODR.

    h. After Substantial Completion the Contractor shall show the following activities as a minimum:
1. Completion of pre-final punchlist.
2. Final inspection.
3. The above activities are to be Finish to Start.

    i. The WPS shall show the following Major Milestone Target Finish Dates:
1. Completion of main structure foundation piers or footings.
2. First or ground floor slab complete.
3. Structure top out.
4. Building dry-in or enclosed. This is defined as the roof, exterior walls, exterior windows and openings closed in.

5. Start of conditioned air.  This is defined as the building is ready to hold environmental conditions.
6. Any Early Occupancy required by the Contract.
7. Project phases as outlined in the Construction Documents.
8. Permanent Power Required
9. Other milestones as appropriate to the Project.

j.      Application of Major Milestones Requirement:

1. The Major Milestone Target Finish Dates identified above are to allow for periodic assessment of critical points of delivery in the construction process.  If the Work progresses behind the WPS to the extent that a Major Milestone Target is missed, the ODR may retain sufficient funds, otherwise due to the Contractor, to provide for the assessment of Liquidated Damages in the event that the lost time is not regained.  There will be no such additional retainage of funds, provided the published Major Milestone Target Finish Dates are maintained throughout the life of the project.
2. In the event that a Major Milestone Target Finish Date has not been met according to the approved schedule, then an assessment equal to the number of days beyond the scheduled date, multiplied by the contractual liquidated damage amount will be withheld as additional retainage (see UGSC) from the current progress payment.  The Contractor shall consider this action by the ODR as Notice under UGSC and shall increase the rate of Work placement accordingly.
3. Contractor is expected to implement a recovery action plan that re-establishes the original project progress schedule within thirty (30) calendar days of the missed milestone target date.
4. Actions taken that restore the progress schedule within this 30 day work cycle will entitle the Contractor to recover the assessed additional retainage amount for that occurrence.
5. Beyond thirty (30) calendar days, no reimbursement will be made and a deductive Change Order will be issued.
6. All costs to recover lost time will be borne solely by the contractor.

k.      The WPS shall also show as a minimum the following activities:
1. Permanent power energized.
2. Required inspections such as: above ceiling inspections, wall inspections and pre-final inspections.
3. Sufficient time to correct the items listed in the above inspections.
4. Chilled and heating water required.

l.      Each activity shall be represented by a graphical horizontal line, as follows:

1. Each line clearly and briefly described.
2. Estimated duration.

3. Early start, late start, early finish, late finish, actual start and actual finish.

4. Each activity shall have its own number.

5. Each activity, except for start and finish activities shall have at least one preceding and succeeding activity and each may have more than one.

6. Line shall be drawn to the length as dictated by the item scale to indicate the activity's duration including both target duration and percent complete to date.

7. Each activity shall be placed at its proper calendar location as determined by the time scale.

8. Float shall be shown in its proper time scale for all activities. Float on specific activities shall be defined as the late finish date minus the early finish date. Total Float shall be the Contract Time less the duration of the critical path, or the amount of time non-critical activities can be delayed without causing the Contract Time to be exceeded.

9. The path of critical activities shall be illustrated or accented in red, thereby easily distinguished from non-critical activities. There should only be one defined critical path.

10. Milestones or intermediate completion dates shall be clearly shown.

11. Substantial Completion Date on the WPS shall coincide with time of completion indicated in the Contract Documents.

12. The duration of each activity shall be shown in work days and include anticipated days lost due to inclement weather based on the Rainfall Table in the Supplemental General Conditions.

13. Upon review and acceptance of the WPS by the A/E and the ODR, the target bars shall be locked showing comparison between anticipated schedule and actual schedule.

14. The original schedule shall be saved as the baseline schedule and each monthly update shall be saved as a different name or version.

5. Submittals: Submit two (2) copies each of the bar chart and two (2) copies each of the computer generated reports to the A/E and to the ODR. Also submit a digital copy of the WPS to the ODR. The ODR and A/E will request revisions, if necessary, and return to the Contractor.

6. Distribution: Following the initial submittal to and response by the A/E and ODR, print and distribute WPS to A/E, ODR, the principal subcontractors, suppliers or fabricators, and others with a need-to-know schedule-compliance requirement. Post copies in the project meeting room and temporary field office. When revisions are made, distribute updated issues to the same entities and post updated issues in the same locations. Delete entities from distribution when they have completed their assigned Work and are no longer involved in performance of scheduled Work.

a. As major revisions are made during construction, distribute current issues to the same entities listed above and make postings accordingly.

7. Reports: Computer generated printouts with data regarding each activity shown on the schedule shall include the following:

   a. Description of the activity.
   b. Activity number.
   c. Duration.
   d. Early start, late start, early finish, late finish, actual start and actual finish dates.
   e. Float.
   f. Show dates as calendar dates.
   g. Target start and target finish dates.

8. Report format shall be sorted in accordance with following format with "a" being the highest priority:

   a. List of activities in ascending order according to activity number.
   b. List of activities by amount of total float with activities having lowest float listed first, followed by activities with next lowest float.
   c. List activities by early start date.

9. Submit two (2) color copies each of the updated WPS to the ODR and the A/E and an electronic copy (current/active version) to the ODR at the Monthly Progress Meeting each month, illustrating the following:

   a. Show progress on all active items.
   b. Show actual completed Work as contrasted to estimated Work (i.e. target bar schedule).
   c. Show critical path activities marked to distinguish them from non-critical path activities.
   d. Show target bars from the baseline schedule.

10. Submit a detailed, written analysis describing deviations from the previous month's schedule as follows:

    a. Description of the critical path with changes from the previous month.
    b. Changes in the network diagram and logic from the previous month.
    c. Addition/deletion of activities.
    d. Activities not finishing on the late finish date, the reason for the delay, the impact on the project and corrections to the project timeline.
    e. Activities impacting meeting the Contract completion date and the reason and the corrective measures taken to correct the situation.
    f. Any other items deviating from or impacting the WPS in relation to the previous month's WPS which would have an adverse effect on the Project.
    g. Change Orders causing modifications in the Work which affect the duration, start or finish date of activities to the extent that the critical path is changed.

Note:  Each of the above items shall be addressed monthly in this report.

11.     Revisions to the schedule, including those created by Change Orders, shall be made at no cost to the Owner.

12.     Time Extensions: Contract time extensions will not be granted unless a Change Order causes either of the following:

>       a.      An increase in the duration of the Critical Path.
>       b.      The available float of a non-critical activity is consumed causing the activity to become critical and thereby altering the critical path.

13.     Time extensions shall be limited to the duration of the revised critical path less the Contract Time.

14.     Project Summary Schedule: A summary project bar chart schedule shall be submitted monthly.  The summary activities will match the construction items found on the Schedule Of Values.  The recommended method of producing this schedule is through the use of hammock activities.  All of the underlying construction activities should be linked to a hammock activity and the scheduled value for that item should be loaded onto the hammock activity.  The monthly submittal of this schedule should include the originally submitted schedule as a target schedule and the current status of that activity. In addition a cost weighted plan versus actual overall project progress curve should be submitted.  Immediately after the WPS has been accepted by the ODR a projected cash flow chart shall also be developed from this target schedule and transmitted to the ODR.  This cash flow chart shall show graphically projected total billings versus actual total billings.  This chart shall be updated monthly and submitted along with the Payment Application.  It is a requirement for approval of the Payment Application.

1.04    DAILY REPORTS:

A.      Prepare a daily report, recording the following information concerning events at the Site; and submit in eBuilder:

1.      List of Subcontractors at the Site with a brief description of the work being performed.
2.      Approximate count of personnel at the Site.
3.      High/low temperatures, general weather conditions.
4.      Accidents (refer to accident reports).
5.      Meetings and significant decisions.
6.      Unusual events (refer to special reports).
7.      Stoppages, delays, shortages, losses.
8.      Meter readings and similar recordings, as required.
9.      Emergency procedures, field orders.
10.     Orders/requests by governing authorities.
11.     Visitors.
12.     Services connected, disconnected.
13.     Equipment or system test and/or start-ups.
14.     Partial completions, occupancies.

15.     Status of long lead items that affect the critical path.


PART 2 - PRODUCTS

        NOT USED

PART 3 - EXECUTION

        NOT USED


END OF SECTION

SECTION 01 33 00

SUBMITTAL PROCEDURES

PART 1 - GENERAL

1.01    SECTION INCLUDES:

A.    General submittal information.
B.    List of proposed Subcontractors and suppliers.
C.    List of proposed materials.
D.    Schedule of Values (SOV).

1.02    RELATED SECTIONS:

A.    Section 01 10 00 - Summary of Work.
B.    Section 01 25 00 - Substitution Procedures.
C.    Section 01 32 00 - Construction Progress Documentation.
D.    Section 01 34 00 - Shop Drawings, Product Data, and Samples.
E.    Section 01 60 00 - Product Requirements.
F.    Section 01 77 00 - Closeout Procedures.
G.    All Divisions of Facility Services Subgroup - Additional submittal requirements

1.03    GENERAL REQUIREMENTS (see UGSC):

A.    General:  Prepare a complete schedule of work-related submittals.  Submit this submittal in eBuilder within twenty-one (21) days after the effective date of the Notice to Proceed with construction (per UGSC).  Correlate this submittal schedule with the listing of subcontractors and with the "list of materials" as specified in the Contract Documents.

B.    Form:  Prepare the submittal schedule in chronological order of submittals.  Show category of the submittal, name of Subcontractor, a generic description of work covered, related section numbers, activity or event number on WPS, the scheduled date for the first submission, resubmittal, and the final release or approval by A/E.  There should be sufficient time allowed for the approval process, including resubmittals, between the submission time and the required approval.  The Contractor should typically follow the critical timing of these submittals in accordance with the WPS.

C.    Delivery:  Submittals shall be logged into eBuilder.

D.    Approval:  When approval is required, if resubmittals are necessary they shall be made in the manner described for the original submission, unless specified otherwise.

1.04    LIST OF PROPOSED SUBCONTRACTORS AND SUPPLIERS:

A.    General:  Not later than thirty (30) days after award of Contract, submit the names of Subcontractors and material suppliers tabulated by each portion of the Work, in addition to the requirements set forth in the UGSC.  Performance or non-performance of any Subcontractor or material supplier will not relieve the Contractor of its responsibility for Work as called for in the Contract Documents.

1.05    LIST OF PROPOSED MATERIALS:

A.      Submit list of materials within forty-five (45) days after issuance of Notice to Proceed in accordance with the UGSC.

B.      Materials List:  Submit a list of the following types of materials proposed for installation:

        1.      Material(s) not specified. (Refer to Section 01 25 00, Substitution Procedures).
        2.      Material(s) selected from a Specification naming more than one manufacturer or supplier.
        3.      Material(s) selected to conform to a reference specification when no manufacturer has been named.

C.      It will be assumed that materials omitted from the list will be furnished as specified when only one manufacturer has been specified. When more than one manufacturer has been named or when reference specifications have been used the A/E's selection will govern.

D.      The list shall be complete and tabulated by, each Specification section and/or portion of the Work.  Include name of manufacturer of each material.  For materials specified by reference standards, also include the following with the listing of each such product:

        1.      Address of manufacturer.
        2.      Trade name.
        3.      Model or catalogue designation.
        4.      Manufacturer's data, including performance and test data and referenced standards.

1.06    SCHEDULE OF VALUES (see UGSC):

A.      General:

        1.      Submit a Schedule of Values (SOV) in sufficient time to allow review and approval by the ODR and A/E prior to submitting first Application for Payment.  (Refer to UGSC)
        2.      Upon request by A/E or ODR, furnish additional data to support SOV values given that will substantiate their correctness.
        3.      Approved SOV will be used as basis for reviewing Contractor's Applications for Payment.
        4.      No payment will be made to the Contractor until the ODR and the A/E have approved the SOV.

B.      Form and Content:

        1.      Use the Owners componetization categories (delivered at the preconstruction meeting) for preparing the SOV.
        2.      List installed value of component parts of Work in sufficient detail to serve as basis for computing values for progress payments.
        3.      Line item costs shall not include General Contractor fee/overhead and profit; but, shall reflect the direct cost for labor and materials to General Contractor.
        4.      Separate line item cost for each of the following General Contractor cost items:
                a.      Bonds.
                b.      Field supervision and layout.

                  c.        Temporary facilities and controls.

                  d.        General Contractor overhead and profit.

        5.      Separate items into labor amounts and material amounts for each item.

                  a.        Labor Costs: Estimated installation costs including labor, applicable taxes, insurance, fringe benefits, erection equipment and tools.

                  b.        Materials Costs: Include estimated material and manufactured equipment costs including delivery, taxes and insurance.

        6.      Combined total of all costs listed in SOV shall equal Contract Sum.

    C.      Review and Resubmittal:

        1.      After initial review by ODR and A/E, revise and resubmit as required.

PART 2 – PRODUCTS - NOT USED

PART 3 – EXECUTION - NOT USED

<div align="center">END OF SECTION</div>

SECTION 01 34 00

SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

PART 1 - GENERAL

1.01    SECTION INCLUDES:

    A.    General submittal information.
    B.    Architect's and Engineer's action.
    C.    Shop drawings, product data and samples.
    D.    Field mock-ups and field samples
    E.    Color schedules
    F.    Brick selection.
    G.    Precast architectural concrete and cut stone approvals.
    H.    Required submittals.

1.02    RELATED SECTIONS:

    A.    Section 01 10 00 - Summary of Work.
    B.    Section 01 25 00 - Substitution Procedures
    C.    Section 01 31 00 - Project Management and Coordination.
    D.    Section 01 32 00 - Construction Progress Documentation.
    E.    Section 01 33 00 - Submittal Procedures.
    F.    Section 01 60 00 - Product Requirements.
    G.    Section 01 77 00 - Closeout Procedures.
    H.    Other Technical Sections:  Additional submittal requirements.

1.03    SUBMITTALS, GENERAL:

    A.    In addition to the requirements outlined in the Uniform General and Supplementary Conditions, Contractor shall comply with the following duties and responsibilities.

    B.    The Contractor shall submit to the A/E for review all shop drawings, product data, samples and other submittals for all items required in the Technical Sections of the Specifications and for all items proposed for use in the Work.  Do not combine submittals for specified work with requests for substitutions.  Submit requests for substitutions in accordance with Section 01 25 00.  The Contractor will also submit one (1) complete set of review shop drawings, product data, samples and other submittals for all items proposed for use in the Work in eBuilder "For Review Only".

    C.    The Contractor shall review and stamp approval and submit, with reasonable promptness and in orderly sequence, all shop drawings, product data and samples required.
    D.    Submit shop drawings, product data and samples far enough in advance to allow ample time for A/E's review, resubmittal if required, and fabrication without creating any delay in the Work, or the work of any other contractor or subcontractor.

        1.    Make architectural submittals a minimum of thirty (30) days prior to needed return date.

2. Make structural, mechanical and electrical submittals a minimum of thirty (30) days prior to needed return date.
3. Allow more review time for requests of substitutions.
4. Shop drawings will be submitted via eBuilder.
5. The A/E, after review and approval of submittals, will place submittal in an Approved Submittal folder in eBuilder Docs/07 Construction/Submittals/Approved Submittals.
6. The use of eBuilder submittals will be discussed at the Pre-Construction Conference.

E. Submittal Content Requirements:

1. Shop drawings shall be completely detailed and dimensioned with types, sizes, and gauges of materials noted. Where shop coat of paint is required on materials, brand name, and chemical content shall be noted on the drawings.
2. Shop drawings shall be neatly, accurately, and legibly drawn, noted and referenced.
3. Each item contained in the submittal shall be clearly referenced and noted establishing the item's location in the finished work.
4. Member and item designations shall be the same as those used on the A/E's drawings, except that, where the A/E's has used the same designation for more than one member or item, the Contractor may add a suffix to the designation to differentiate between these members.
5. Where published standard exist (such as ACI Standard 315-99 Details and Detailing of Concrete Reinforcement), these shall be followed in the preparation of shop drawings. Where no such standards are published by the industry or trade concerned, the shop drawings shall be prepared in a suitable form acceptable to the A/E.

F. Submittal Format Requirements:

1. Submittal Preparation: Mark each submittal with a permanent label or title block, as appropriate, for identification with the following information on the label or title block for proper processing and recording of action taken.
   a. Title of submittal and date submitted.
   b. Sheet number and number of sheets included (as applicable). Number drawings consecutively.
   c. Project Name, Project Number, and location of Project.
   d. Name of Architect and Architect's Project Number.
   e. Name of Contractor, subcontractor, fabricator supplier, and manufacturer, as appropriate.
   f. Name of drawing and scale (as applicable).
   g. Name and date of each revision.
   h. Cross reference to A/E's Drawings and Specification Sections, as appropriate.
   i. Provide a space on the label or adjacent to title block for the Contractor's review and approval markings, and appropriate space for the Architect's or Engineer's "Action" stamp.
   j. Name of each item on each sheet submitted and indicate its location in the Project Work.

2. Submittal Numbering System: To expedite review of shop drawings, product data, samples and other submittals, all submittals shall be assigned a submittal number clearly visible on all transmittal forms and on each copy of each submittal adjacent to Contractor's review stamp. Numbering system shall track Specifications format. In the example 03 30 00-001.0, the number represents the following:
   a. First Six Numbers: Specification Section; Section 03 00 00 in example.
   b. Seventh Through Ninth Numbers: Numerical log of submittals within each Division; Submittal number 001 in example.
   c. Last Number: Initial or re-submittal of each submittal; .0 for initial submittal, .1 for first re-submittal, and so forth.

3. Transmittal Form: Provide a letter of transmittal with each submittal, in duplicate, accurately describing the complete contents of the submittal, including the following:
   a. Project name.
   b. Date.
   c. To:
   d. From:
   e. Names of subcontractor, manufacturer and supplier.
   f. References.
   g. Category and type of submittal.
   h. Submittal purpose and description of number of sheets, type of data, equipment and product types, finishes, submittal number, and similar data.
   i. Submittal and transmittal distribution record.
   j. Signature of transmitter.
   k. Record relevant information and requests for data on the transmittal form. On the transmittal form, or on a separate sheet attached to the form, record deviations from the requirements of the Contract Documents, if any, including minor variations and limitations.
4. Submit Plumbing, Mechanical and Electrical items specified in each individual Section at the same time. Partial submittals will not be considered.
5. Bind each of the Plumbing, Mechanical and Electrical submittals into a single file; individual submittals will not be accepted. Each complete brochure shall contain a Table of Contents showing the order in which the items are arranged in the file. Arrange items in the same order in each file. Where manufacturer's literature contains information on more than one product, clearly mark the item being submitted, using the symbol or designation used to identify the item on the Drawings or in the Specifications.
6. Group only like or related items together in a single submittal. Do not combine submittals for specified work with requests for substitutions. Submit requests for substitutions as specified in Section 01 25 00.

G. Contractor Duties and Responsibilities:

1. Coordinate requirements for submission of each shop drawing, product data and sample as required to properly execute the Work and as necessary to maintain satisfactory progress of the Work in accordance with the WPS and Submittal Schedule.

2.  Review shop drawings, product data, and samples prior to submission to A/E. By submitting shop drawings, product data, and samples, Contractor represents that it has verified field measurements, field construction criteria, catalog numbers and similar data, and has coordinated each submittal with requirements of the Work and of the Contract Documents. Contractor's responsibility for errors and omissions in submittals is not relieved by A/E's review of submittals. Submittals received from sources other than Contractor will be returned to sender without A/E's review "action".

3.  Contractor shall certify by stamped, signed, and dated notation on each submittal, that "Submittal is in compliance with requirements of Contract Documents without deviation." Submittals without Contractors stamp and submittals which, in A/E's or ODR's opinion, are incomplete, contain numerous errors, have not been checked, or have been checked only superficially, will be returned without disposition. Delays resulting there from shall be Contractor's responsibility.

4.  Contractor shall not be relieved of responsibility for any deviation from the requirements of the Contract Documents by A/E's review of shop drawings, product data, and samples unless Contractor has specifically informed the A/E in writing of such deviation at time of submission and A/E has given written acceptance to the specific deviation.

5.  Contractor shall direct specific attention, in writing or on resubmitted shop drawings, product data or samples, to revisions other than those requested by A/E on previous submittals.

6.  Contractor shall give prompt written notice to A/E of inability to comply with exceptions noted on the returned submittals or if unsatisfactory results are anticipated. Document specific reasons for inability to comply or specific unsatisfactory results that are anticipated. Propose substitution to comply with intent of the Contract Documents and produce satisfactory results in accordance with the substitution requirements of Section 01 25 00.

1.  No portion of the Work requiring submission of a shop drawing, product data or sample shall be commenced until submittal has been reviewed with "No Exceptions Taken" status by A/E, except as otherwise provided in this Section.

2.  All portions of the Work shall be in accordance with approved submittals.

H.  Submittal Quantity: The Contractor shall furnish Shop Drawings submittals in eBuilder. Submit minimum of three samples of materials requiring choice of color, texture or finish. Large job site samples shall be limited to one for each approval submittal.

I.  Reproduction and Distribution of Submittals After A/E's Review: A/E shall move Approved Submittals to a folder in eBuilder labeled Approved Submittals. Retain job site mock-ups and samples until removal is approved by A/E and ODR.

J.  There will be no payment made for submittal preparation.

1.04  ARCHITECT'S AND ENGINEER'S ACTION (UGSC):

A.  Upon receipt of submittals requiring review, the A/E will review submittals and return them to the Contractor with results of the review indicated as follows:

1. REVIEWED; NO EXCEPTIONS TAKEN: Submittal has been reviewed for the limited purpose of checking for conformance information given and design concept expressed in the Contract Documents and no exceptions are taken; Contractor may proceed with work represented in submittal, provided no deviation to Contract Documents.

2. REVIEWED; EXCEPTIONS NOTED: Submittal has been reviewed as stated above and certain exceptions are noted. Contractor may proceed with work represented in submittal, unless otherwise noted. Revise submittal, incorporating exceptions noted, and resubmit to A/E until "Reviewed; No Exceptions Taken" status is given.

3. REVIEWED; REVISE AND RESUBMIT: Submittal has been reviewed as stated in paragraph 1 above, Contractor may not proceed with work represented in submittal, and submittal is not acceptable for one of the following reasons:
   a. Not enough information is provided to make a determination.
   b. Submittal contains too many errors or omissions to make a determination.
   c. Information provided does not conform with the information given in the Contract Documents.

4. REJECTED; SUBMIT SPECIFIC ITEM: Submittal has been reviewed as stated in paragraph 1 above, work represented in submittal has not been accepted in accordance with procedures specified in Section 01 25 00; submit specified item.

1.05    SHOP DRAWINGS, PRODUCT DATA AND SAMPLES (UGSC):

A.    Shop Drawings: Comply with "Submittals, General" and the following:

1. Definition: The term Shop Drawings refers to original drawings prepared by the Contractor, Subcontractor, supplier, fabricator or distributor illustrating a portion of the Work including fabrication drawings, manufacturing drawings, erection drawings, setting drawings, patterns, coordination drawings, schedules, design mix formulas, Contractor's engineering calculations, and layout drawings including ceiling layouts if different from the Contract Documents. Do not submit Contract Documents for Shop Drawings.

2. Format: Prepare drawings on minimum 8-1/2" x 11" to maximum 30" x 42" sheets. Draw plan and section details at a scale of 1" = 1' - 0", details shall be drawn at a scale of 3" = 1' - 0" or larger scale. In addition to "Submittals, General" requirements, each drawing shall be cross-referenced to A/E's Drawings.

3. Content: Shop Drawings shall include, but not be limited to the following:
   a. The size thickness of members.
   b. The method of anchoring and securing parts.
   c. The quantity and location of each item.
   d. Other pertinent data necessary to show the work to be done, where, and how it is to be done.
   e. Materials and finishes.
   f. How item fits to abutting work and requirements for related construction.
   g. Required connections.
   h. Overall size and weight.
   i. Clearances and tolerances.
   j. Verification of field conditions prior to fabrication.
   k. Coordination of Shop Drawings and data with requirements for related construction.

l.      Refer to Section 01 31 00 - Project Management and Coordination for other requirements.

B.      Product Data:

1.      Definition: Manufacturer's standard product specifications, installation instructions, rough-in diagrams and templates, standard wiring diagrams, printed performance and operational range diagrams, mill reports, operating and maintenance manuals, color charts, data sheets, brochures, drawings and diagrams, and other standard illustrative and descriptive data to clearly identify pertinent data, models and materials, uses, limitations, actual dimensions and clearances required, and technical performance data including wiring diagrams and controls. **Specific item must be identified on catalog cut sheets.**

2.      Mark out information not applicable to this Project and supplement standard product data to show compliance with requirements.

C.      Samples:

1.      Definition:  Samples include:
        a.      Partial sections of manufactured or fabricated work.
        b.      Small cuts or containers of materials.
        c.      Complete units of repetitively-used materials.
        d.      Swatches showing full range of color, texture and pattern.
        e.      Color range sets.
        f.      Units of work to be used for independent inspection and testing.
        g.      Units of work to be used as a standard to judge materials and workmanship.
2.      Provide samples for items where specified and for items requiring a choice of color, texture or finish.  Samples shall illustrate the materials and workmanship and establish standards by which to judge the completed work.
3.      Typical office samples shall be approximately 12" square or 12" long unless otherwise noted and shall clearly illustrate the applicable function, corners, joints, related parts, attachment devices, specified finish and full range of colors.  Full size approved samples may be incorporated into the Work unless otherwise noted.

1.06    FIELD MOCK-UPS AND FIELD SAMPLES (UGSC):

A.      The Contractor shall erect and maintain mock-ups and field samples as required by the various sections of the specifications.  Mock-ups and field samples are required for, but not limited to the following:

1.      Concrete sidewalk finishes.
2.      Exterior face brick wall complete with required tooled mortar, sealants, related stonework, windows, glazing, roofing systems, flashings and other related exterior building materials. (see UGSC - Keep mock-ups clean and dry until approved).

B.      Field samples and job site mock-ups shall be erected at the Project Site at a mutually agreed location.  Contractor shall request approval for location on which to construct mock-up of field sample prior to proceeding.  Each field sample or mock-up shall be complete and illustrate the range of finish and workmanship required in the completed Work and will be used by A/E and ODR, upon approval, as a standard to judge subsequent work.

C.      Where several mock-ups of alternate construction techniques or finishes are required and prepared, each shall be labeled for clear identification indicating base construction finish material, special techniques used and where important for duplication of effect line pressures, grit classification, lengths of exposure, surface preparation, undercoats, strength of reagents, etc.

D.      Contractor shall request review of mock-up or field sample upon completion prior to proceeding with actual construction work.

E.      Contractor shall protect mock-up or field samples from damage, inclement weather, dirt and discoloration prior to and after A/E's and Owner's approval. Retain on the job as a standard reference for materials, workmanship and appearance until removal is authorized. Do not alter, move or destroy mock-up or field sample until so authorized. Remove and dispose of mock-up only after approval is given by the ODR.

1.07    COLOR SCHEDULES:

A.      After receipt of all samples, A/E will present to the ODR a proposed comprehensive color schedule for review and approval.

1.      Once approved, the colorboard will be sent to and kept at the job site for reference. A second set of approved colors, in a 3-ring binder, must be provided to the ODR.
2.      The Contractor must insure that required submittals for all items requiring color selection are accomplished in a timely manner. The A/E cannot prepare the colorboard for approval by the ODR until all items requiring color selection have been submitted.

B.      The approved color schedule will then be released to the Contractor for ordering materials.

C.      No color selection will be released until all colors are approved in the comprehensive color schedule. Any "early" selections requested, and acted upon by the Contractor, shall be at its own risk and understanding that material of color differing from the approved color schedule will be rejected.

D.      If the Contractor is unable to submit all exterior color selections/samples within sixty (60) days or all interior color selections/samples within ninety (90) days after "Notice to Proceed", the A/E may proceed with preparation of the color schedule using the color selections of a specified product. The Contractor shall be required to match the selected colors at no additional cost to the Owner of the specified product selected by the A/E.

1.08    BRICK SELECTION

Brick selection is a very important item from the Owner's perspective and timely submittals by the Contractor are important to prevent delay.

1.09    PRECAST ARCHITECTURAL CONCRETE AND CUT STONE APPROVALS (if applicable)

Contract may require a project sample of precast architectural concrete or cut stone to be constructed. After the project sample is erected, the ODR will arrange for appropriate personnel to inspect and approve the sample.

1.10    REQUIRED SUBMITTALS:

A.    General:

1.    In addition to the requirements outlined in the UGSC, Special Conditions, Division 1 and in the Technical Sections of the Specifications, the Contractor shall submit shop drawings, product data, samples, color samples, warranties, and other pertinent data as briefly scheduled herein.

2.    Refer to each individual Section of the Specifications for specific requirements of each submittal item.

3.    Where requirements are not specifically indicated, provide sufficient data as required to incorporate each item into the work.

4.    All subcontractors, suppliers, and manufacturers shall provide a warranty of materials and workmanship of not less than one year duration, and as otherwise specified (see UGSC).

B.    Submittal Legend: The following abbreviations are used in remarks column of the Submittals:

1.    SD:  Shop Drawings
2.    M:  Manufacturer's Data
3.    C:  Color Selection Required
4.    S:  Physical Samples
5.    R:  Additional Replacement Materials
6.    MO:  Maintenance and Operating Manuals
7.    IO:  Instruction of Owner's Personnel
8.    G1, G5, Etc:  Guarantee with number of years duration
9.    TR:  Test Reports
10.    CR:  Certifications

C.    Submittals:

**Division 1 - General Requirements**

| | |
|---|---|
| List of Subcontractors | within 30 days after notification of Contract Award (per UGSC) |
| List of Materials | within 45 days after issuance of Notice to Proceed (per UGSC) |
| Initial WPS | within 10 days after issuance of Notice to Proceed (per UGSC) |
| WPS | within 30 days after issuance of Notice to Proceed |
| General Contractor's Maintenance Warranty | G1 |
| Schedule of Values | not later than 45 days after issuance of Notice to Proceed and each month thereafter (per UGSC). |
| Contract Warranty and Guarantee | additions noted herein |
| Guarantees | additions noted herein |
| Project Sign | SD within 30 days |
| Maintenance | MO 4 sets prior to Final Acceptance and payment All items requiring Color Selection within 60 days |

|  |  |
|---|---|
| Coordination Drawings | Soil, Concrete Mix Designs M, S
within 90 days after issuance of Notice to Proceed and 10 days prior to work taking place |

### Division 2 - Existing Conditions (Not Used)

### Division 3 - Concrete

| | |
|---|---|
| Concrete Formwork | SD |
| Concrete Reinforcement & Assemblies | M, TR, CR, SD, G1 |
| Cast-in-Place Concrete | M, TR, SD, CR, G1 |
| Post Tension Concrete | M, SD, TR, CR, G1 |
| Architectural Precast Concrete | M, SD, S, TR, CR, G1 |

### Division 4 - Masonry

| | |
|---|---|
| Unit Masonry | M, S, C, CR, G1 |
| Granite Veneer & Marble Stone | M, SD, S, CR, C, G5 |
| Granite Stone Counter Tops | M, SD, S, CR, C, G1 |
| Limestone Veneer | M, SD, CR, C, G5 |

### Division 5 - Metals

| | |
|---|---|
| Structural Steel | M, SD, CR, TR, G1 |
| Metal Roof Decking | M, SD, CR, TR, G1 |
| Cold Formed Metal Framing | M, SD, CR, G1 |
| Miscellaneous Metals | M, CR, C, S, SD, G1 |
| Metal Stairs | M, SD, TR, CR, G1 |
| Handrails and Railings | M, SD, CR, G1 |
| Ornamental Handrails | M, SD, CR, S, G1 |
| Ornamental Pipe Handrails | M, SD, S, CR, G1 |

### Division 6 – Wood, Plastics and Composites

| | |
|---|---|
| Rough Carpentry | M, CR, G1 |
| Glue-Laminated Wood | M, SD, S, C, G1 |
| Finish Carpentry | S, SD, G1 |
| Wood Paneling | M, S, SD, C, G1 |

### Division 7 - Thermal and Moisture Protection

| | |
|---|---|
| Fluid Applied Waterproofing | M, S, CR, SD, G10 |
| Flexible Flashing | M, S, CR, G1 |
| Dampproofing | M, G1 |
| Vapor Retarder | M, G1 |
| Building Insulation | M, S, CR, G1 |
| Cementitious Fireproofing | M, TR, G1 |
| Firestopping | M, SD, G1, Schedule |
| Standing Seam Metal Roofing | M, SD, S, C, CR, G5/20 |
| Roofing | M, SD, S, CR, C, MO, IO, G10 |

Flashing and Sheet Metal            M, SD, S, CR, G2
Roof Accessories                    M, SD, G5
Skylights                           M, SD, CR, C, G5
Joint Sealers                       M, SD, S, CR, C, G5

**Division 8 - Openings**

Metal Doors and Frames              M, SD, CR, G1
Wood Doors                          M, SD, S, C, CR, G(Life)
Access Doors                        M, SD, G1
Overhead Rolling Grills             M, SD, S, G1
Aluminum Storefront                 M, SD, S, C, CR, TR, G5
Aluminum Windows                    M, SD, S, TR, CR, C, G5
Finish Hardware Schedule            M, SD, S, G1/5
Glass and Glazing                   M, SD, S, C, G1/5 (mirrors)

**Division 9 - Finishes**

Lath and Plaster                    M, S, CR, C, G1
Gypsum Board Systems                M, S, CR, TR, G1
Tile                                M, S, C, CR, R, G1
Acoustical Ceiling Systems          M, SD, S, R, CR, G1
Acoustical Wall Surfaces            M, S, SD, G1
Wood Flooring and Ceiling           M, S, C, G1
Stone Flooring                      M, SD, S, CR, C, R, G5
Terrazzo                            M, SD, S, CR, C, MO, G1
Resilient Flooring                  M, SD, S, CR, R, C, G1
Carpeting                           M, SD, S, C, TR, R, G15
Elastomeric Liquid Flooring         M, S, CR, C, G2
Painting                            M, SD, S, C, CR, R, G1
Wallcovering                        M, S, C, G1

**Division 10 - Specialties**

Markerboards                        M, SD, S, C, G1/50 (writing surface)
Toilet Partitions                   M, SD, S, C, CR, G1
Metal Wall Louvers                  M, SD, S, CR, C, G1
Identifying Devices                 M, SD, S, C, G1
Fire Extinguishers and Cabinets     M, SD, C, G1
Operable Partitions                 M, SD, S, C, G2
Toilet Accessories                  M, SD, C, CR, S, G1
Wardrobe Specialties                M, G1

**Division 11 - Equipment**

Projection Screens                  M, SD, S, G10
Loading Dock Equipment              M, SD, CR, G5
Appliances                          M, SD, C, S, G1 (manufacturer's warranties)
Darkroom Equipment                  M, SD, S, C, G1

**Division 12 - Furnishings**

| | |
|---|---|
| Manufactured Casework | M, SD, S, C, CR, G2 |
| Horizontal Blinds | M, SD, S, C, G1 |
| Foot Grilles | M, SD, C, S, G1 |
| Multiple Seating | M, SD, S, CR, C, G1 |
| Entrance Matts | M, SD, S, G1 |

**Division 13 - Special Construction (Not Used)**

**Division 14 - Conveying Equipment**

| | |
|---|---|
| Hydraulic Elevators | M, SD, S, C, MO, IO, G1 |
| Traction Elevators | M, SD, SC, MO, IO, G1 |

**Divisions 21 to 28 – Facility Services Subgroup**

| | |
|---|---|
| Refer to the various Division Sections specific submittal requirements | M, SD, S, C, MO, IO, G1 |

**Division 31 – Earthwork**

| | |
|---|---|
| Select Structural Fill Borrow Material | TR, S, G1 |
| Lime Stabilization | TR, G1 |
| Compaction and Testing | TR, Special Provisions |
| Soil Treatment | M, G5 |
| Drilled Pier Report | M, TR, G1 |

**Division 32 – Exterior Improvements**

| | |
|---|---|
| Concrete Pavers | M, S, TR, G1 |
| Sidewalk Finish Sample | S, G1 |
| Concrete and Reinforcing Steel | M, TR, SD, G1 |
| Granite Pavers | M, TR, S, C, SD, R, G5 |
| Pavement Marking | M, C, SD, G1 |
| Chain Link Fence | M, SD, S |
| Bicycle Racks | M, SD, G1 |
| Site Furniture | M, S, C, G1 |

**Division 33 – Utilities**

| | |
|---|---|
| Water Service System | M, SD, TR, G1 |
| Fire Hydrants | M, TR, G1 |
| Storm Sewer System | M, G1 |
| Sanitary Sewer System | M, SD, G1 |

**Division 34 – Transportation (Not Used)**

PART 2 – PRODUCTS

        NOT USED

PART 3 – EXECUTION

        NOT USED

           END OF SECTION

SECTION 01 42 00

REFERENCES

PART 1 - GENERAL

1.01    SECTION INCLUDES:

A.    Reference Requirements.
B.    Governing Regulations and Authorities.
C.    Definitions

1.02    REFERENCE REQUIREMENTS:

A.    Materials, equipment and operations specified by reference to published standards and specifications of a technical society, trade association, or other agency standard, shall comply with the requirements of the current edition of the listed document that is in effect on the issue date of the Specifications or Addendum page making reference thereto, unless otherwise specified.  Make copies of referenced documents available at site, as the ODR or A/E may request.

B.    No provision of a reference standard, specification, manual, or code shall change the duties and responsibilities of the Owner, the Contractor, the A/E and their consultants, their agents and employees from those duties and responsibilities set forth in the Contract Documents.

C.    Acronyms for names of technical societies, associations, and agencies referenced in the Contract Documents shall be interpreted as follows:

AA          Aluminum Association
            900 19th St., NW, Suite 300; Washington, DC 20006;
            202-862-5100
            www.aluminum.org

AABC        Associated Air Balance Council
            1518 K Street, NW, Suite 503; Washington, DC 20005
            202-737-0202
            www.aabchq.com

AAMA    American Architectural Manufacturers Association
            1827 Walden Office Square, Ste 550; Schaumburg, IL 60173-4268
            847-303-5664
            www.aamanet.org

ANLA        American Nursery & Landscape Association
            1000 Vermont Ave., NW, Ste 300; Washington, DC 20005-4914
            202-789-2900
            www.anla.org

ACI         American Concrete Institute
            38800 Country Club Drive; Farmington Hills, MI, 48331;
            248-848-3700
            www.concrete.org

ACIL        American Council of Independent Laboratories
            1629 K Street, NW, Suite 400; Washington, DC 20006-1633
            202-887-5872
            www.acil.org

ADC         Air Diffusion Council
            1000 E. Woodfield Road, Suite 102; Schaumburg, IL 60173-5921
            847-706-6750
            www.flexibleduct.org

AGC           Associated General Contractors of America
333 John Carlyle Street, Suite 200; Alexandria, VA 22314
703-548-3118
www.agc.org

AIA           America Institute of Architects
1735 New York Avenue, NW; Washington DC 20006
202-626-7300
www.aia.org

AIC           American Institute of Constructors
466 94th Avenue North; St. Petersburg, FL 33702
727-578-0317
www.aicnet.org

AISC          American Institute of Steel Construction, Inc.
One East Wacker Drive, Suite 3100; Chicago, IL 60601-2001
312-670-2400
www.aisc.org

AISI           American Iron and Steel Institute
1140 Connecticut Avenue, Suite 705; Washington, DC 20036
202-452-7100
www.steel.org

AMCA    Air Movement and Control Association
30 West University Drive; Arlington Heights, IL 60004-1893
847-394-0150
www.amca.org

ANSI          American National Standards Institute
1819 L. Street, NW, 6th Floor; Washington, DC 20036
202-293-8020
www.ansi.org

APA           American Plywood Association
P.O. Box 11700; Tacoma, WA 98411-0700
253-565-6600
www.apawood.org

ARI           Air Conditioning and Refrigeration Institute
4100 North Fairfax Drive, Suite 200; Arlington, VA 22203
703-524-8800
www.ari.org

ASHRAE American Society of Heating, Refrigerating &
Air Conditioning Engineers, Inc.
1791 Tullie Circle, NE; Atlanta, GA 30329
404-636-8400
www.ashrae.org

ASME         American Society of Mechanical Engineers
3 Park Avenue; New York, NY 10016
212-591-7000
www.asme.org

ASTM         American Society for Testing and Materials
100 Barr Harbor Drive; West Conshohocken, PA 19428-2959
610-832-9500
www.astm.org

| | |
|---|---|
| AWI | Architectural Woodwork Institute<br>1952 Isaac Newton Square West; Reston, VA 20190<br>703-733-0600<br>www.awinet.org |
| AWPA | American Wood Preservers' Association<br>P.O. Box 388; Selma, Alabama 36702-0388<br>www.awpa.com |
| AWS | American Welding Society, Inc.<br>550 Le Jeune Road, NW; Miami, FL 33126<br>305-443-9353<br>www.aws.org |
| AWWA | American Water Works Association<br>6666 West Quincy Avenue; Denver, CO 80235<br>303-794-7711<br>www.awwa.org |
| BHMA | Builders' Hardware Manufacturers Association<br>355 Lexington Ave., 17th Floor; New York, NY 10017<br>212-297-2122<br>www.buildershardware.com |
| BIA | Brick Institute of America<br>11490 Commerce Park Drive, Suite 300; Reston, VA 20191<br>703-620-0010<br>www.bia.org |
| BICSI | Building Industry Consulting Services International<br>8610 Hidden River Parkway; Tampa, FL 33637<br>800-242-7405<br>www.bicsi.org |
| CE | Corps of Engineers (U.S. Department of the Army) |
| CPA | Composite Panel Association<br>18922 Premiere Court; Gaithersburg, MD 20879<br>301-670-0604<br>www.pbmdf.com |
| CPSC | Consumer Product Safety Commission<br>National Injury Information Clearinghouse<br>4330 East-West Hwy.; Bethesda, MD 20814-4408<br>301-504-6816<br>www.cpsc.gov |
| CRSI | Concrete Reinforcing Steel Institute<br>933 Plum Grove Road; Schaumburg, IL 60173-4758<br>847-517-1200<br>www.crsi.org |
| DHI | Door and Hardware Institute<br>14150 Newbrook Drive, Suite 200; Chantilly, VA 20151-2223<br>703-222-2010<br>www.dhi.org |
| FM | Factory Mutual Engineering and Research Organization<br>1151 Boston-Providence Turnpike; Norwood, MA 02062-5001<br>781-762-4300 |

FS      Federal Specification (General Services
Administration) Specifications Unit (WFSIS)

GA      Gypsum Association
810 First Street, NE, Suite 510; Washington, DC 20002
202-289-5440
www.gypsum.org

IEEE      Institute of Electrical and Electronics Engineers
445 Hoes Lane; Piscataway, NJ 08854
732-981-0660
www.ieee.org

IESNA      Illuminating Engineering Society of North America
120 Wall Street, Floor 17; New York, NY 10005
212-248-5000
www.iesna.org

IGCC      Insulating Glass Certification Council
c/o ETL Testing Labs, P.O. Box 9, Henderson Harbor, NY 13651
315-646-2234
www.igcc.org

ILI      Indiana Limestone Institute of America
400 Stone City Bank Building, Bedford, IN 47421
812-275-4426
www.iliai.com

LPI      Lightning Protection Institute
3335 N. Arlington Hts. Road, Suite E; Arlington Hts., IL 60004
847-577-7200
www.lightning.org

MIL      Military Standardization Documents (U.S. Dept. of Defense)

MSS      Manufacturers Standardization Society of the Valve and Fittings Industry
127 Park Street, NE; Vienna, VA 22180-4602
703-281-6613
www.mss-hq.com

NAAMM National Association of Architectural Metal Manufacturers
8 South Michigan Avenue, Suite 1000; Chicago, IL 60603
312-332-0405
www.naamm.org

NCMA      National Concrete Masonry Association
13750 Sunrise Valley Drive; Herndon, VA 20171-4662
703-713-1900
www.ncma.org

NEC      National Electric Code (by NFPA)
National Elevator Industry, Inc.
1677 County Route 64, P.O. Box 838; Salem, NY 12865-0838
518-854-3100
www.neii.org

NEMA      National Electrical Manufacturers Association
1300 North 17th Street; Rosslyn, VA 22209
703-841-3200
www.nema.org

NFPA          National Fire Protection Association
              One Batterymarch Park; Quincy, MA 02269-9101
              617-770-3000
              www.nfpa.org

NIST          National Institute of Standards and Technology
              (formerly National Bureau of Standards; U.S. Dept. of Commerce)
              Gaithersburg, MD 20899-3460
              301-975-6478
              www.nist.gov

NPCA          National Paint and Coatings Association
              1500 Rhode Island Ave., NW; Washington, DC 20005
              202-462-6272
              www.paint.org

NRCA          National Roofing Contractors Association
              10255 W. Higgins Road, Suite 600; Rosemont, IL 60018-5607
              847-299-9070
              www.nrca.net

NSF           National Sanitation Foundation
              P.O. Box 130140, 789 N. Dixboro Rd; Ann Arbor, MI 48113-0140
              734-769-8010
              www.nsf.org

NTMA          The National Terrazzo and Mosaic Association, Inc.
              201 N. Maple Avenue, Suite 208; Purcelville, VA 20132
              800-323-9736
              www.ntma.com

NWWDA         National Wood Window and Door Association (formerly NWMA)
              1400 E. Touhy Avenue #G54; Des Plaines, IL 60018
              708-299-1286
              www.nwwda.org

OSHA          Occupational Safety & Health Administration (U.S. Department of Labor)
              Government Printing Office
              200 Constitution Avenue, NW; Washington, DC 20210
              www.osha.gov

PCA           Portland Cement Association
              5420 Old Orchard Road; Skokie, IL 60077
              847-966-6200
              www.portcement.org

PCI           Precast/Prestressed Concrete Institute
              209 W. Jackson Blvd, Suite 500.; Chicago, IL 60606-6938
              312-786-0300
              www.pci.org

PDI           Plumbing and Drainage Institute (c/o Saul Baker)
              45 Bristol Drive; South Easton, MA 02375
              800-589-8956
              www.pdionline.org

PS            Product Standard of NBS (U.S. Department of Commerce)

RFCI          Resilient Floor Covering Institute
              401 E. Jefferson Street, Suite 102; Rockville, MD 20850
              301-340-8580
              www.rfci.com

RIS        Redwood Inspection Service (Grading Rules)
405 Enfrente Drive, Suite 200; Novato, CA 94949
415-382-0662

SDI        Steel Deck Institute
P.O. Box 25; Fox River Grove, IL 60021
847-458-4647
www.sdi.org

SDI        Steel Door Institute
30200 Detroit Road; Cleveland, OH 44145-1967
440-899-0010
www.steeldoor.org

SIGMA    Sealed Insulating Glass Manufacturers Association
401 N. Michigan Avenue, Suite 2400; Chicago, IL 60611
312-644-6610

SMACNA    Sheet Metal & Air Conditioning Contractors National Association, Inc.
4201 Lafayette Center Drive; Chantilly, VA 20151-1209
703-803-2980
www.smacna.org

SPIB       Southern Pine Inspection Bureau (Grading Rules)
4709 Scenic Highway, Pensacola, FL 32504-9094
850-434-2611
www.spib.org

SSPC       The Society for Protective Coatings
40 24th Street, 6th Floor; Pittsburgh, PA 15222-4656
877-281-7772
www.sspc.org

TCA        Tile Council of America, Inc.
100 Clemson Research Blvd.; Anderson, SC 29625
864-646-8453
www.tileusa.com

TIA/EIA    Telecommunications Industry Association/Electronic Industries Alliance
2500 Wilson Blvd., Suite 300; Arlington, VA 22201
703-907-7700
www.tiaonline.org

UL         Underwriter's Laboratories
333 Pfingsten Road; Northbrook, IL 60062
847-272-8800
www.ul.com

WCLIB    West Coast Lumber Inspection Bureau (Grading Rules)
P.O. Box 23145; Portland, OR 97281
503-639-0651
www.wclib.com

WWPA    Western Wood Products Association
522 SW 5th Avenue, Suite 500; Portland, OR 97204-2122
503-224-3930
www.wwpa.org

1.03       GOVERNING REGULATIONS/AUTHORITIES:

A.       The A/E has contacted the appropriate authorities having jurisdiction for the listed regulations and codes to obtain information for preparation of the Contract Documents. The Contractor may contact authorities having jurisdiction directly for information and decisions having bearing on the Work.

          1.       Life Safety Code, NFPA 101, latest edition, and all codes referenced therein.
          2.       International Building Code, latest edition, International Code Council, Inc., (for all items not covered by Life Safety Code).
          3.       National Fire Codes, NFPA.
          4.       State Energy Conservation Design Standard (ASHRAE 90.1-2004 Energy Standard).
          5.       Other applicable ASHRAE Standards
          6.       International Plumbing Code, latest edition, International Code Council, Inc.
          7.       Building Service Piping, ASME/ANSI B 31.9.
          8.       Texas Accessibility Standards (TAS), Texas Department of Licensing and Regulations, Architectural Barriers Act, Chapter 469, Government Code.
          9.       American Disabilities Act, Part III, 28 CFR 36, July 26, 1991.
        10.       Safety Code for Elevators and Escalators, ASME A 17.1 & A 17.3.
        11.       TIA/EIA Standards.
        12.       Texas Commission on Environmental Quality – (SWPPP)

1.04       DEFINITIONS:

A.       Require and Similar Words: As needed to complete the Work and as directed by A/E, unless stated otherwise.

B.       Perform: Contractor, at its expense, shall perform operations necessary to complete the Work, including furnishing of necessary labor, tools and equipment, and further including furnishing and installing of materials indicated, specified or required to complete such performance.

C.       Provide: Contractor, at its expense, shall furnish and install the Work complete in place and ready for use, including furnishing of necessary labor, materials, tools, equipment and transportation. Definitions apply same to future, present and past tenses, except word "provide" may mean "contingent upon" where such is context.

D.       Other Acceptable Manufacture, Equal, Or Equal, Equivalent and Words of Similar Import: It shall be understood such words are followed by expression "in opinion of A/E" unless stated otherwise.

E.       Acceptable, Acceptance or Words of Similar Import: Acceptance or similar import of A/E is intended unless stated otherwise.

F.       At No Extra Cost to Owner, With No Extra Compensation to Contractor, at Contractor's Expense or Terms of Similar Import: Such terms shall be understood to mean that Contractor shall perform or provide specified products, materials or operations of the Work at no increase to Contract Sum stated in executed Contract.

G.       NIC: Work which is not being performed or provided as part of Contract; term shall mean "Not In This Contract" or "Not a Part of the Work to be Performed or Provided by Contractor." "NIC" work is indicated as an aid to Contractor in scheduling the amount of time and materials necessary for completion of Contract.

H.       Indicated: The term "indicated" is a cross-reference to graphics, notes or schedules on Drawings, to other paragraphs or schedules in the Specifications, and to similar means of recording requirements in Contract Documents. Where terms such as "shown," "noted," "scheduled," and "specified" are used in lieu of "indicated," it is for purpose of helping reader locate cross-reference, and no limitation of location is intended except as specifically noted.

I.       Directed, Requested or Similar Words: Where not otherwise explained, terms such as "directed," "requested," "authorized," "selected," "approved," "required," "accepted," and "permitted" mean "directed by the ODR, A/E," "requested by the ODR, A/E," and similar directions by the ODR and A/E. However, no such implied meaning will be interpreted to extend Owner's and A/E's responsibility into Contractor's area of construction supervision.

J.    Approve:  Where used in conjunction with Owner's and A/E's response to submittals, requests, applications, inquiries, reports and claims by Contractor, the meaning of the term "approved" will be held to limitations of Owner's and A/E's responsibilities and duties specified in General Conditions.  In no case will "approval" by Owner and/or A/E be interpreted as a release of Contractor from responsibilities to fulfill requirements of Contract Documents.

PART 2 - PRODUCTS

NOT USED

PART 3 - EXECUTION

NOT USED

END OF SECTION

SECTION 01 43 00

QUALITY ASSURANCE

PART I - GENERAL

1.01    SECTION INCLUDES:

A.    General Requirements and Qualifications for Owner's Quality Assurance Testing.
B.    Concrete Inspections.
C.    Wall Closure and Above Ceiling Inspections.
D.    Pre-final Inspection.
E.    Final Inspection
F.    Final Acceptance
G.    One Year Inspection.

1.02    RELATED SECTIONS:

A.    Section 01 34 00 - Shop Drawings, Product Data, and Samples

1.03    GENERAL REQUIREMENTS FOR OWNER'S QUALITY ASSURANCE TESTING (see UGSC):

A.    The Owner/Owner's Designated Representative (ODR) will employ a testing laboratory and/or geotechnical engineering service to perform quality assurance tests and to transmit copies of test reports to Contractor. Sampling and testing that the Owner/ODR may require is specified in this section and in the various technical sections requiring quality assurance testing.  Cooperate with Owner/ODR's testing laboratory personnel, provide access to the Work, to manufacturer's and fabricator's operations, furnish incidental labor and facilities, and samples for test and inspections, as specified.

1.    Employment of testing laboratory to perform quality assurance tests is for benefit of Owner/ODR in confirming that performance and quality of the Work is in conformance with the Contract Documents.
2.    Employment of a testing laboratory by Owner/ODR in no way relieves Contractor's obligation to perform the Work in accordance with Contract Documents.
3.    Owner/ODR's testing laboratory shall not be the same as Contractor's testing laboratory used for design and certification testing unless otherwise acceptable to the A/E and Owner/ODR.
4.    Where the terms "Inspector" and "Laboratory" are used, they mean and refer to an officially designated and accredited inspector of the testing laboratory engaged by the Owner/ODR.
5.    The testing firm shall make all inspections and perform all tests in accordance with the rules and regulations of the building code, local authorities, the Specifications of the ASTM and these Contract Documents.
6.    Commercial Testing Laboratories:  In general, all Contracts awarded by SSC will require that testing not performed by the Contractor (i.e., hydrostatic testing of piping) or by the A/E (i.e., spot checking of air flow by the Engineer) will be performed by a commercial testing laboratory selected by the Owner/ODR.  The cost of such commercial testing will be paid directly by SSC.  Retesting will also be paid by the Owner/ODR, but will be reinvoiced at cost to the Contractor.  The number of copies of test reports will be determined for each individual project but in general will include:

Two copies for the Contractor;
One copy for the A/E;
One copy for SSC; and
One copy for the Construction Project Inspector.

Employment of the testing laboratory is for the benefit of the Owner/ODR for confirming that performance and quality of the Work is in conformance with the Contract Documents.
7.    The engagement of a testing laboratory by the Owner/ODR in no way relieves the Contractor of its responsibility, for full compliance of the Contract. The Contractor remains liable for the quality of the materials, products/equipment installed, and satisfactory work performance.

B.  Owner/ODR's quality assurance testing and sampling may include the following testing and other services to ensure Contract performance.

1.  Compacted Fill and Backfill:  Perform field density tests on existing subgrade at each lift.
2.  Footing Subgrades: Perform tests and visual comparisons of footing subgrades to verify design bearing capacities.
3.  Asphalt Paving and Base Material.

C.  Limits of Testing Laboratory Authority:  Laboratory is not authorized to:

1.  Approve or reject any portion of the Work.
2.  Perform any duties of the Contractor and Subcontractors.
3.  Revoke, alter, relax, expand, or release any requirement of the Contract Documents or to approve or accept any portion of the Work, except where such approval is specifically called for in the Specifications.
4.  Laboratory technicians do not act as foremen, or perform other duties for Contractor.  Work will be checked as it progresses, but failure to detect any defective work or materials shall not, in any way, prevent later rejection when such defect(s) are discovered.

1.04    CONCRETE INSPECTIONS

A.  Before the placing of any cast-in-place concrete structure, an inspection will be conducted to see that all items meet the intent of the plans or specs.  Only after all the deficiencies have been corrected will the Contractor be allowed to proceed.

1.05    WALL CLOSURE/ABOVE-CEILING INSPECTIONS (see UGSC)

A.  Before the installation of any ceiling or the closing of walls and chases, an inspection will be conducted to see that all items fully meet the plans and specs before being covered.  Only after all the deficiencies have been corrected will the Contractor be allowed to install the ceiling or close-up the wall.

A.  As a minimum, the following should be in place before an above-ceiling inspection is scheduled:

1.  All light fixtures installed and working;
2.  All plumbing installed and insulation complete;
3.  All rigid and flexible ducts installed;
4.  All required valve identification tags installed;
5.  All air devices installed and connected;
6   All controlled air tubing installed; and
7.  The ceiling support structure installed.

C.  Walls and chases will be inspected to verify the presence of blocking and bridging, and to verify electrical conduit and boxes are installed and supported properly.

D.  Those in attendance at these inspections shall include the A/E (as required), selected personnel from SSC, the General Contractor, plumbing, electrical and mechanical subcontractors.

E.  A minimum of fourteen (14) days notice shall be given to the ODR prior to these inspections.

1.06    A/E AND PROJECT INSPECTOR'S SUBSTANTIAL COMPLETION INSPECTION (see UGSC)

    A.    When the Contractor feels that the Work is complete and ready for the Owner's use, it will notify the A/E and the ODR in writing fourteen (14) days prior to the date that the Work is anticipated to be complete and ready for a Substantial Completion Inspection. The A/E, along with representatives of SSC, User Coordinator, and the University will make a detailed inspection of all Work included in the Contract and the A/E will furnish to the Contractor a list of incomplete items. When all these items have been completed by the Contractor (within 30 days), the A/E and the ODR will be notified that all items of the Substantial Completion Inspection have been completed.

1.07    FINAL INSPECTION AND ACCEPTANCE (see UGSC)

    A.    Upon verification by the A/E and the ODR that the deficiencies found during the Substantial Completion Inspection have been corrected, and the Work is ready for Final Inspection and Acceptance, the ODR will, within ten (10) calendar days after receiving written verification by the A/E, make a Final Inspection. When the Work is found acceptable under the Contract Documents (within 7 days) without any exceptions and the Contract is fully performed, then final payment will be made to the Contractor. Those in attendance at the Final Inspection will include the A/E, representatives of SSC, User Coordinator and Texas A&M University.

1.08    FINAL ACCEPTANCE (see UGSC)

    A.    When the Work is fully complete, the A/E and construction project manager will notify SSC, recommending final acceptance of the Work. SSC will prepare a Report of Final Inspection and Acceptance.

1.09    ONE YEAR INSPECTION

    A.    All Contracts awarded by SSC contain a one (1) year workmanship and material guarantee as stated in Uniform General and Supplementary Conditions, Articles 13.2 and 13.5. Defects which might result in damage to the facility or other property should be called to the attention of the Project Manager, SSC, who will notify the A/E and the Contractor.

PART 2 – PRODUCTS

    NOT USED

PART 3 – EXECUTION

3.01    REINFORCING STEEL MECHANICAL SPLICES

    A.    Visually inspect and report on the completed condition of each mechanical splice of reinforcing steel.

    B.    Each mechanical splice shall be visually inspected to ensure compliance with building code and the manufacturer's published criteria for acceptable completed splices.

    C.    Special emphasis shall be placed on inspection of the end preparation of each bar to be spliced, as required by the building code.

    D.    Submit copies of manufacturer's published criteria for acceptable completed splices prior to observing mechanical splices.

    E.    Reports on each mechanical splice shall indicate location of the splice, size of bars spliced, and acceptability or rejection of splice. Reasons for rejection shall be shown on each report.

3.02    CONCRETE INSPECTION AND TESTING

    A.    Receive and evaluate all proposed concrete mix designs submitted by the Contractor. If the mix designs comply with the Drawings and Specifications, the laboratory shall submit a letter to the A/E certifying compliance. Mix designs not complying with the Drawings and Specifications shall be returned by the laboratory as unacceptable.

    B.    Secure composite samples of concrete at the jobsite in accordance with ASTM C 172.

C.  Mold and cure three specimens from each sample in accordance with ASTM C 31. Supervise the curing and protection provided (by others) for test specimens in the field, and the transportation from the field to the laboratory. The test cylinders shall be stored in the field 24 hours and then be carefully transported to the laboratory and cured in accordance with ASTM C 31.

D.  Test specimens in accordance with ASTM C 39. Two specimens shall be tested at 28 days for acceptance and one shall be tested at seven days for information.

E.  Make one strength test (three cylinders) for each 100 cubic yards or fraction thereof, of each mix design of concrete placed in any one day.

F.  Make one slump test for each set of cylinders following the procedural requirements of ASTM C 243 and ASTM C 172. Make additional slump tests whenever the consistency of concrete appears to vary. Do not permit placement of concrete having a measured slump outside the limits given on the Drawings, except when approved by the A/E. Slump tests corresponding to samples from which strength tests are made shall be reported with the strength test results. Other slump tests need not be reported.

G.  Determine total air content of air entrained normal-weight concrete sample for each strength test in accordance with ASTM C 231.

H.  Determine temperature of concrete sample for each strength test.

I.  The testing agency shall furnish and maintain a competent inspector at the mixing plant at the start of each day's mixing. The inspector shall examine concrete materials for compliance with Specifications and approved mix design, weighing and measuring devices, proportioning and mixing of materials, the water and cement content of each batch, the general operation of the plant and the transportation of concrete to the jobsite. The inspector shall verify that the amount of free surface moisture contained in the fine and coarse aggregate has been properly accounted for in the concrete mixing to achieve the required consistency and water cement ratio.

J.  The testing laboratory shall monitor the addition of water to the concrete at the jobsite and the length of time the concrete is allowed to remain in the truck before placement. The personnel shall compare the mixture with the criteria on the approved mix design and report any significant deviation to the A/E, ODR, Contractor and concrete supplier. Do not permit the addition of water which will exceed the maximum water/cement ratio for the mix as given on the approved mix design.

K.  Observe the placing of all concrete, except non-structural slabs-on-grade and sitework. Observe and report on placing method, consolidation, cold joints, length of drop, and displacement of reinforcement. Report deficiencies to the Contractor immediately for corrective action. Inspections may be reduced to a periodic basis when all procedures have been deemed satisfactory by the laboratory.

L.  The testing laboratory shall certify each delivery ticket indicating class of concrete delivered (or poured), amount of water added and the time at which the cement and aggregate was dispensed into the truck, and the time at which the concrete was discharged from the truck.

M.  Evaluation and Acceptance:

1.  If the measured slump, or air content of air entrained concrete, falls outside the specified limits, a check test shall be made immediately on another portion of the same sample. In the event of a second failure, the concrete shall be considered to have failed to meet the requirements of the specifications, and shall not be used in the structure.
2.  The strength level of the concrete will be considered satisfactory if the averages of all sets of three consecutive strength test results are equal to, or exceed specified strength and no individual test result (average of two cylinders) is below specified strength by more than 500 psi.
3.  Completed concrete work will be accepted when the requirements of "Specifications for Structural Concrete for Buildings," ACI 301, Chapter 18, have been met.

N.  Concrete Test Reports:

1.  Reports shall be made and distributed immediately after the respective tests or inspections are made.
2.  Where reports indicate deviations from the Contract Documents, they shall also include a determination of the probable cause of the deviation and, where applicable, a recommendation for corrective action.

3.      Whenever the testing laboratory recognizes a trend of decreasing quality in the concrete due to changing seasons, conditions of curing, or other cause; this shall be brought to the attention of the A/E and the ODR, along with a recommendation for corrective action to be taken before the materials fall below the requirements of these Specifications.

O.      Comply with ACI 311, "ACI Manual of Concrete Inspection".

P.      Inspect the application of curing compound and monitor all curing conditions to assure compliance with specification requirements. Report curing deficiencies to the Contractor immediately and submit a written report to the A/E and the ODR.

END OF SECTION

SECTION 01 45 00

QUALITY CONTROL

PART 1 - GENERAL

1.01    SECTION INCLUDES:

A.      General Requirements and Qualifications for Contractor's Testing Laboratory Services.
B.      Submittals.
C.      Reference Standards.

1.02    RELATED SECTIONS:

A.      Section 01 34 00 - Shop Drawings, Product Data, and Samples
        Section 01 33 00 – Submittal Procedures

1.03    GENERAL REQUIREMENTS FOR CONTRACTOR'S LABORATORY SERVICES (see UGSC):

A.      Contractor's Design and Certification Testing:  Provide services of an independent testing
        laboratory or facility acceptable to the A/E and the ODR to perform design and certification
        testing services.

        1.      Submit written description of testing laboratory giving qualifications of personnel,
                laboratory facilities and equipment, and other information as may be requested by
                A/E and ODR.
        2.      Contractor's testing laboratory shall not be the same as Owner's testing laboratory
                used for quality assurance testing unless otherwise acceptable to the A/E and ODR.

B.      Contractor's design testing and certification testing includes:

        1.      Earthwork:  Identify suitable soil material at borrow material location, sampling soil
                material, and testing of soil material samples.
        2.      Performing certified welding procedure qualification and requalification testing
                specified.
        3.      Testing of materials when mill certificates are unavailable.
        4.      Additional testing when source of material is changed after initial tests have been
                performed.
        5.      Other testing required by other Sections of the Specifications.

1.04    QUALIFICATIONS:

A.      Laboratory Qualifications and Procedures:

        1.      Meet "Recommended Requirements for Independent Laboratory Qualification,"
                latest edition published by American Council of Independent Laboratories.  Testing
                firms shall meet the requirements of ASTM E 329, "Recommended Practice for
                Inspection and Testing Agencies for Concrete, Steel and Bituminous Materials as
                Used in Construction" and ASTM E 543, "Determining the Qualification of
                Nondestructive Testing Agencies."

2. The inspection and testing services of the testing firm shall be under the direction of a Registered Engineer licensed in the State of Texas and having at least five years engineering experience in inspection and testing of construction materials.

3. Inspecting personnel monitoring concrete work shall be ACI certified inspectors.

4. Submit copy of report of inspection of facilities made by Materials Reference Laboratory of National Bureau of Standards during most recent tour of inspection. Include memorandum of remedies of deficiencies reported by this inspection.

5. Testing Equipment: Calibrated at reasonable intervals by devices of accuracy traceable to National Bureau of Standards.

6. Tests and inspections shall be conducted in accordance with specified requirements and if not specified, in accordance with applicable standards of the American Society for Testing and Materials and other recognized authorities, as approved.

7. Primary inspectors performing structural steel inspection shall be currently certified AWS Certified Welding Inspectors (CWI), in accordance with the provisions of AWS QCI, "Standard and Guide for Qualification and Certification of Welding Inspectors." The inspector may be supported by assistant inspectors who may perform specific inspection functions under the supervision of the inspector. Assistant inspectors shall be currently certified ASW Certified Associate Welding Inspectors (CAWI). The work of assistant inspectors shall be regularly monitored by the inspector.

B. Laboratory Duties: Cooperate with A/E, ODR and Contractor. Upon notice, provide qualified personnel to perform required tests and inspections. In performing tests and inspections, Laboratory shall:

1. Comply with specified standards. Comply with building code requirements for "Special Inspection" whether or not such inspections are specified herein.

2. Ascertain compliance of materials with requirements of Contract Documents. If the material furnished and/or work performed fails to meet requirements of Contract Documents, laboratory inspector shall promptly notify the Contractor, A/E and the ODR of such failure.

3. Promptly notify ODR, Contractor and A/E of observed irregularities or deficiencies in the Work.

4. A representative of the Owner's testing laboratory, who has reviewed and is familiar with the Project and Specifications, shall participate in all preconstruction conferences. The testing firm shall coordinate material testing and inspection requirements with the Contractor and its Subcontractors consistent with the planned construction schedule. The laboratory personnel shall attend, throughout the course of the Project, such conferences as may be required or requested to address quality control issues.

5. Laboratory personnel shall inspect and/or test materials, assemblies, specimens, and work performed, including design mixes, methods and techniques and furnish report(s) to the A/E and the ODR of the progress thereof.

C. Contractor's Responsibilities:

1. Cooperate with laboratory personnel, provide access to the Work, and to manufacturer's and fabricator's operations wherever the Work is in preparation or progress.

2. Secure and deliver to the laboratory, without cost to Owner, adequate quantities of representative samples of materials proposed to be used and which require testing.

3. Furnish Incidental Labor and Facilities:
   a. To provide access to work to be tested.
   b. To obtain and handle samples at the Project Site or at the source of the product to be tested.
   c. To facilitate inspections and tests. Furnish such labor as required to assist laboratory personnel in obtaining and handling samples at the Project Site.
   d. For safe storage and curing of concrete test cylinders at Project Site and other test samples as required for field curing by ASTM C31.
4. Costs of tests, samples, and mock-ups of substitute material, where the substitution is requested by the Contractor and the tests are necessary in the opinion of the A/E to establish equality with specified items, shall be borne by the Contractor.
5. Costs of tests, samples, and mock-ups performed solely for the benefit or convenience of the Contractor shall be borne by the Contractor.
6. Notify laboratory sufficiently in advance of construction operations to allow laboratory to make assignment of personnel and scheduling of tests to complete any required checks or tests.
7. Owner's testing laboratory will conduct additional tests at Contractor's expense when initial quality control testing indicates work is defective or does not conform to requirements. Materials and workmanship not meeting the required standards or performance obligations are to be removed and replaced. Replacement and subsequent testing shall be at the expense of the Contractor.
8. Furnish concrete mix designs, in accordance with ACI 301, made by an independent testing laboratory or qualified concrete supplier. When mix designs by an independent testing laboratory are required, the laboratory shall be selected by the Contractor, approved by the A/E and ODR, and paid by the Contractor.
9. Obtain required inspections or approvals of the building official when required. All inspection requests and notifications required by the building code, are the responsibility of the Contractor.
10. Provide current welder certifications for each welder to be employed.
11. Furnish fabrication/erection inspection and testing of all welds in accordance with AWS D1.1, Chapter 6.
12. Prequalification of all welding procedures to be used in executing the Work.

1.05    SUBMITTALS:

A.    General: Testing laboratory shall promptly submit written report of each and every test and inspection. Each report shall include:

1. Date issued.
2. Project title and number.
3. Testing laboratory name, address, and telephone number.
4. Name and signature of laboratory personnel.
5. Date and time of sampling or inspection.
6. Record of temperature and weather conditions.
7. Identification of product and Specification section.
8. Date of test.
9. Location of sample or test in the Project.
10. Type of inspection or test.
11. Results of tests and observation regarding compliance with Contract Documents.
12. Interpretation of test results, when requested by Architect.

B.  State in report all details of each inspection and test.  Indicate compliance or noncompliance with requirements of the Contract Documents.  Also state in report any and all unsatisfactory conditions.

C.  In addition to furnishing a written report, notify the A/E, the ODR and the Contractor verbally of any uncorrected conditions or failures to comply with the requirements of the Contract Documents.

D.  At completion of each trade or branch of the Work requiring inspecting and testing, submit a final certificate attesting to satisfactory completion of the Work and full compliance with requirements of Contract Documents.

E.  Upon completion of building, testing laboratory shall furnish, to ODR and A/E, statement that all required tests and inspections were made in accordance with requirements of Contract Documents.

1.06   REFERENCED STANDARDS

A.  The latest edition of all standards references in this section shall apply, unless noted otherwise.  In case of conflict between these Contract Documents and a referenced standard, the Contract Documents shall govern.  In case of conflict between these Contract Documents and the building code, the more stringent shall govern.

PART 2 – PRODUCTS

NOT USED

PART 3 - EXECUTION

NOT USED

END OF SECTION

SECTION 01 50 00

TEMPORARY FACILITIES AND CONTROLS

PART 1 - GENERAL

1.01    SECTION INCLUDES:

A.    General requirements.
B.    Temporary utilities and services
C.    Construction aids
D.    Barriers and enclosures.
E.    Security.
F.    Parking, access roads and traffic
G.    Temporary controls.
H.    Project identification and signs
I.    Field Offices

1.02    RELATED SECTIONS:

A.    Section 01 10 00 - Summary of Work.
B.    Section 01 74 00 - Cleaning.
C.    Section 01 77 00 - Closeout Procedures

1.03    GENERAL REQUIREMENTS:

A.    Contractor shall provide all construction facilities and temporary controls specified in this Section and as necessary for the proper and expeditious prosecution of the Work.

B.    The Contractor shall make or have made and pay all charges for all connections to and distribution from existing services and sources of supply.  **(Note:  Contractor will not be billed for utilities when the utilities are obtained from an existing building where the existing utilities are available.  Verify exact requirements with Campus Utilities (as specified herein) for construction of  new buildings and work on other facilities that do not have the required temporary and/or permanent utility services utilities or are not currently metered.)**

C.    Requirements of service and utility companies relating to the Work shall be ascertained by Contractor.  Comply with all requirements, including those relating to continued protection and maintenance until completion of Work.

D.    Materials and construction for construction facilities and temporary controls may be new or used, must be adequate in capacity for required usage, and must not create unsafe conditions.  Comply with requirements of federal, state and local authorities having jurisdiction.

E.    Construction facilities and temporary controls shall be maintained by Contractor in usable condition at all times until completion of Work or when their removal is authorized by A/E or ODR.

F.    Relocate temporary services and facilities as required by progress of construction, by storage or work requirements, to accommodate legitimate requirements of the Owner and other contractors employed at the Site, and when directed by the ODR.

G.    When any portions of permanent systems are in operating condition, that part of the system may be used for construction purposes provide that the Contractor:

1.    Obtains ODR's approval,
2.    Assumes full responsibility for the system used,
3.    Pays all costs for operation, maintenance, cleaning, and restoration of the system to as new condition,
4.    Operates the system under the supervision of the Subcontractor responsible for system installation and ultimate performance,
5.    Does not effect specified warranty.

H.    Completely remove temporary services and facilities when their use is no longer required and/or at completion of Project, when directed by ODR.

I.     Clean and repair damage caused by temporary services and facilities to new condition for new Work and to a condition as good as or better than existed prior to start of Work for existing construction, services, and facilities.

1.04     TEMPORARY UTILITIES AND SERVICES:

A.     General

     1.     New temporary utility connections and metering for construction purposes
     2.     Existing utility service connections and metering in renovation and construction
     3.     Permanent new utility service upgrades, connections, and metering, for construction or renovation
     4.     Utility connections, investigations and Contractor charges for construction or renovation

B.     College Station: Texas A&M University maintains and operates full service utility production and distribution assets which serve the College Station campus. Temporary and/or permanent utility services and metering required for a project may include primary and secondary type Electrical Distribution Systems, Chilled Water, Heating Hot Water, Domestic Cold Water, Domestic Hot Water, Sanitary Sewer, and Refuse Collection.

C.     College Station: Unless otherwise noted in the contract documents, Texas A&M University, Utility Energy Services (TAMU UES) will investigate, approve, extend and activate all temporary and permanent utility services and metering to construction sites, campus facilities, buildings and structures. The extent of service connection responsibilities may differ considerably between projects and will be clearly denoted on the contract drawings. The guidelines and procedures for utility services including forms can be found at https://utilities.tamu.edu/
Other Campuses [PM to edit]

1.05     TEMPORARY UTILITY CONNECTIONS AND METERING FOR CONSTRUCTION

A.     Temporary Telephone Service: Provide and maintain telephone service with a minimum of one direct line instrument in the Contractor's field office. The Contractor shall pay for costs of installation, maintenance and removal and service charges for local calls. Toll charges shall be paid by party who places the call, except toll calls made by Owner's and A/E's personnel related to project business shall be paid for by Contractor.

B.     Temporary Toilets and Sanitation: Provide service, clean, and maintain sanitary conveniences with proper enclosures, in conformance with requirements of local laws and ordinances governing such installations. Post notices, take such precautions as may be necessary, and do cleaning necessary to keep the building and the premises in a sanitary condition. From start of the Work, provide suitable temporary toilets and enclosures for the use of the workmen on the Project. Maintain these facilities in a sanitary condition. Use of Owner's existing toilet facilities will not be permitted.

C.     Temporary Fire Protection: Construction practices, including cutting and welding, and fire protection during construction shall be in accordance with applicable requirements of federal, state, and local authorities having jurisdiction. Provide prominently located multi-purpose portable fire extinguishers, with at least one in each wing on each floor.

     1.     Gasoline and other flammable liquids shall be stored in Underwriter's Laboratories listed safety containers. Storage shall not be permitted within the building.
     2.     Do not light fires of any kind in or about the premises. The use of salamanders is prohibited.
     3.     Schedule the Work so that the permanent fire protection system is installed and made operable at the earliest possible date. At such time, the Contractor shall furnish sufficient hose to provide adequate coverage of each floor.
     4.     All tarpaulins that may be used for any purpose during the construction of the Work shall be made of material which is resistant to fire, water, and weather.

D.     Elevators: Temporary use of elevators will be permitted only if acceptable to the ODR and elevator installer. Prior to such approved temporary use, provide the following:

     1.     Arrange and pay for necessary approvals, elevator manufacturer's acceptance, and temporary use permits.

2.    Install temporary protection over hoistway entrances and doors, car doors and frames, car front returns and enclosures so that elevator work will be without damage at completion of Project. Repair or replace damaged work prior to Final Inspection.

3.    Provide and pay for power, operators, necessary signaling and safety devices, lights and other equipment, temporary protection and enclosures required for safe elevator operation.

4.    After temporary elevator use is discontinued, remove temporary protections and enclosures.

5.    Refer to appropriate section in Division 14 of these Specifications for additional requirements.

1.06    TEMPORARY AND PERMANENT SERVICE FOR NATURAL GAS

A.    Natural gas services are the responsibility of the Local Distributing Company (LDC). When approved for a specific project, it shall be the responsibility of the Contractor to apply for temporary gas services directly with the LDC.

B.    A Contractor shall notify the Owner of its intent to establish temporary natural gas service with the LDC. Liquefied gas, such as propane, is prohibited unless otherwise authorized in the contract documents. Liquid fuels stored and used on a construction site must be coordinated with and approved by ODR, and conform to all applicable University safety guidelines.

C.    Permanent gas services to a new or existing structure, as may be required under a construction contract, including the meter installation and service extensions shall be coordinated directly with the ODR and the LDC. Utilities Energy Services will provide proper billing account information for establishing the permanent billing account upon attaining substantial completion.

For College Station: The guidelines and procedures including forms for temporary and permanent service for natural gas can be found at http://utilities.tamu.edu/guidelines-and-procedures-for-utility-service/

D.    All costs associated with temporary or permanent gas service, up to the date the Owner has determined a date of substantial completion of the building, which include connection fees, fixed and/or variable monthly charges, late fees, transactions costs, disputed charges, and any other administrative costs associated with the Contractor's natural gas service account with the LDC is the sole responsibility of the Contractor.

E.    A permanent natural gas account will be transferred from the Contractor to the permanent customer at substantial completion.

1.07    PERMANENT UTILITY SERVICES IN CONSTRUCTION CONTRACTS

A.    The guidelines and procedures for utility services including forms can be found at http://utilities.tamu.edu/guidelines-and-procedure-for-utility-service/

1.08    METERING FOR PERMANENT UTILITY SERVICES

A.    Most new campus facilities and major renovations of existing facilities will include work scope for establishing electronic utility metering. Metering devices will be certified "revenue-quality", be of the type TAMU UES has standardized on, and will be connected electronically by the Owner to the campus building automation system or power monitoring system via campus Ethernet.

B.    Other Campuses [PM to edit]

C.    Metering points in this project may include, but are not limited to, Electrical, Chilled Water flow and temperature difference, Heating Hot Water flow and temperature difference, Domestic Cold Water, Domestic Hot Water, and Steam. Together with the contract drawings, refer to Division 23 Mechanical, Division 26 Electrical, Division 27 Communications, and other relevant divisions for meter specification and installation on all required utility metering and for project coordination.

1.09    CONSTRUCTION AIDS:

A.    Material and Personnel Hoists: The Contractor shall provide material hoists as required for normal use by all trades, without charge. The Contractor shall also provide a personnel hoist for the transportation of all workmen as required for normal use, without charge.

1. Employ qualified, skilled operators for the material and personnel hoists.
2. Provide all necessary guards, signals, safety devices, required for safe operation, and suitable runways from hoists to each floor level and roof.
3. The construction and operation of the hoists shall conform to all applicable requirements for the American Standard Safety Code for Building, the "Manual of Accident Prevention in Construction" of the AGC, and shall be approved by the insurance underwriters.

B. Temporary Stairs, Ladders, Scaffolds, Runways, and Similar Facilities:

1. Provide and maintain all temporary equipment and construction such as temporary stairs, ladders, ramps, scaffolds, hoists, runways, derricks, chutes, and similar facilities as necessary for the proper execution of the Work. Derricks, cranes, and similar facilities shall comply with local airport restrictions.
2. Provide temporary protective treads, handrails, and wall coverings at stairways.
3. Scaffolding shall be furnished, installed, maintained, and removed as necessary for proper execution of the Work and shall be erected on the side of the wall on which facing work occurs. Scaffolding shall not be built into any finish facing material.

1.10 BARRIERS AND ENCLOSURES:

A. General: Construct temporary barricades, warning signs, hazard and warning lights, walks, passage-ways, and similar temporary barriers and enclosures that are necessary to protect persons and property from hazards or damage due to construction operations, and required by university, city, state or federal laws, ordinances or codes.

B. Construction Fences: Contractor shall furnish and install construction fences and gates within the "limits of construction", prior to beginning of work so as maintain area free of unauthorized personnel and which includes Project working area and storage locations allocated by the Owner to the Contractor. Keep adjacent property free from disturbance, dust, and noise as much as feasible.

C. Non-Movable Fences: Fencing and gates shall be minimum 6'-0" high, new material, chain link fabric tightly stretched between line posts (1-5/8" O.D. galvanized iron) at not more than 10 foot centers. Tree protection posts shall be on 8 foot centers. Posts in earthen areas shall be plumbed and aligned, and firmly anchored in the ground at least 24" deep. Corner and gate posts (2-3/4" O.D. galvanized iron) shall have line posts within 6' and braced using clamps at posts. Posts that are machine pounded must be cut off flush and level at top. Gates shall be substantially constructed of materials similar to fence, equipped with hinges of adequate size and strength for operation and to maintain the gate level. Provide security chain and padlock at each gate with 2 keys furnished to ODR. In sensitive and high visibility areas, and where noted on the Drawings, install redwood slats vertically in the fence fabric to reduce public view of unsightly areas. Fence posts in permanently paved and sidewalk areas shall be set in 4" thick concrete bases, 24" square or 30" round.

D. Movable Fences: Fences that need to be moved frequently for access to the Site or to be movable tree protection shall be 6' high posts, using 5" non-climb wire fabric, 12.5 gauge galvanized wire, 2" wide x 4" high openings, attached to posts set in concrete within an old tire to prevent post bases from marring pavements and sidewalks.

E. Tree and Plant Protection: Coordinate with SSC Grounds Maintenance – Work shall typically be performed by SSC Grounds Maintenance. If work is not performed by SSC Grounds Maintenance then Contractor shall provide barricades, fences, and guards as necessary to prevent damage to existing trees and shrubs indicated to remain including, but not limited to, the following construction operations:

1. Compaction of root area by equipment or material storage,
2. Trunk damage by moving equipment, material storage, nailing or bolting,
3. Strangling by tying ropes or guy wires to trunks or large branches,
4. Poisoning by pouring solvents, gas, paint and other toxic materials on or around trees and roots,
5. Cutting roots by excavating, ditching and similar operations,
6. Damaging branches by improper pruning; notify ODR for required pruning,
7. Drought damage from failure to water or by cutting or changing normal drainage pattern past roots,
8. Changes in soil pH factor by disposal of lime and other alkali based materials such as plaster, concrete, mortar and grout,
9. Machine excavating within the drip line of trees; conduct all excavating within drip line by hand. Do not cut roots 1-1/2" in diameter and over.

F.   Tree Damage:  When trees other than those indicated or approved for removal are destroyed, killed or badly damaged as a result of construction operations, the Contract Sum will be reduced by the amount determined from the following International Shade Tree Conference formula: D x D x 0.7854 x $28.00, where D is the diameter of the trunk measure 12" above grade.

G.   Fence Maintenance and Removal:  All fencing and gates shall be maintained deep, straight and level, having a neat and uniform appearance during the construction period and upon completion, before acceptance of the Work, shall be removed from the Site and post hole filled to original condition.

H.   Temporary Enclosures and Protection:

1.   Provide temporary weather-tight enclosure at exterior walls for successive areas of the building as work progresses, as necessary to provide
acceptable working conditions, provide weather protection for interior materials, allow for effective temporary heating, and to prevent entry of unauthorized persons.

2.   Temporary Partition and Ceiling Enclosures:  Framing and sheet materials which comply with structural and fire rating requirements of applicable codes and standards.
a.   Close joints between sheet materials, and seal edges and intersections with existing surfaces, to prevent penetration of dust or moisture.
b.   Provide temporary doors with self-closing hardware and padlocks as required for security.
c.   Provide removable portions of enclosures as necessary for work and for handling of materials.

3.   Protection of Installed Work: Provide protection for installed Work so that it will be without damage at time of acceptance by ODR.  Control traffic to minimize damage.  Provide protective coverings at walls, projections, jambs, sills and soffits of openings.  Protect finish floors and stairs from traffic, movement of heavy objects, storage and similar construction operations.  Prohibit traffic and storage on waterproofed and roofed surfaces, on lawn and landscaped areas.
a.   Concrete, cement, mortar, grout, sludge, plaster and similar materials shall not be placed in or washed down storm and sanitary sewers, plumbing lines or fixtures.

4.   Protect improvements on Owner's and adjoining properties.

I.   Site:  Unless otherwise specified or directed, carefully protect existing walks, lawns, other buildings, and other work on Site, whether specifically indicated on the Drawings or not.  Damaged areas of curbs, walks and paving will not be permitted to be patched; remove entire section between expansion joints in which the damage occurs and replace with construction to match existing adjacent work.

J.   The Contractor is responsible for damage to the Work and injury to persons due to failure of barriers and enclosure of work to adequately protect it; and wherever evidence is found of such damage, the Owner may order the Work so damaged to be immediately removed and replaced by the Contractor.  All costs and expenses for such occurrences shall be the responsibility of the Contractor at no additional expense to Owner.  The Contractor's responsibility for maintenance of barriers and enclosure work, shall not cease until the Project has been completed and is accepted by the Owner.

1.11   SECURITY:

A.   The Contractor shall provide a security program and facilities to protect the Work, existing facilities, and Owner's operations from unauthorized entry, vandalism, and theft.  Coordinate with Owner's security program.  Project security within "limits of construction" is Contractor's responsibility.

1.12   PARKING, ACCESS ROADS AND TRAFFIC:

A.   Parking:  Parking for workmen employed on the Site may be provided within construction limits or at a remote location, if needed, to the extent that space for that purpose may be available without interference with the activities related to performance of the Work.  On campus parking, other than within construction limits, shall only be as approved by ODR.  Contractor shall pay all associated parking fees.

B.   Provide temporary roads as required to bring vehicles onto the Site.  Restore new paving used for construction operations to new condition prior to acceptance of Work by Owner.

1.   Restrict vehicles from doing unnecessary damage to the Site and any existing paving.
2.   Restore all new or existing improvements damaged by this Work to original condition, as acceptable to Owner or other parties having jurisdiction.

C. Traffic Control:  Prior to start of Work, examine construction vehicle routing, and establish safeguards and procedures necessary to carry out the Work.  In addition, be responsible for and observe the following:

1. Be responsible for controlling construction traffic within and adjacent to the Site.
2. Provide all entrances, lifts and safeguards required or necessary to the progress of the Work, and effectively control such traffic to provide minimum hazard to the Work and all persons.
3. Route all construction equipment, trucks, and similar vehicles on existing public streets to and from the Site as approved by the ODR or as indicated on the Drawings.
4. Construct and maintain temporary walks for pedestrians.  Keep streets adjacent to the Site open to vehicular and pedestrian traffic.
5. Maintain constant access for police, fire and ambulance service.
6. Provide and maintain for proper control of traffic and safety:
   a. All necessary barricades, suitable and sufficient lights, reflectors, and danger signals,
   b. Warning and closure signs, directional, and detour signs,
   c. All traffic control devices furnished and installed in compliance with the Texas Manual on Uniform Traffic Control Devices as prepared by the State Department of Highways and Public Transportation.
7. The Contractor shall provide on a 24 hour basis for all restricted and dangerous conditions existing on or adjacent to the Site:
   a. For nighttime safety illuminate barricades, danger signals, warning signs and obstructions,
   b. Keep warning lights burning from sunset until sunrise.

1.13    TEMPORARY CONTROLS:

A. Cleaning During Construction:  Contractor at all times shall keep the premises free from accumulation of waste materials and rubbish caused by operations for the Work.  Provide a collection can at each area used for eating.  Pick up garbage daily.  Keep Project Site free of garbage, trash, vermin and rodent infestation.  Contractor, by agreement, shall require each Subcontractor to collect and deposit waste and rubbish caused by Subcontractor operations at pre-designated location.  Clean interior areas prior to start of finish Work.  Maintain areas free of dust and other contaminates during finishing operations.

B. Noise Control:  In and around occupied areas, minimize use of noise producing equipment.  Work with noise-producing is subject, at all times, to ODR's approval of entire procedure.  Use only on a scheduled basis as agreed with ODR prior to start of Construction operations.

C. Water Control:  Provide methods to control surface water to prevent damage to Project, site of adjoining properties.  Control fill, grade and ditch to direct surface drainage away from excavations, pits, tunnels and other construction areas.  Direct drainage to proper runoff.

1. Provide, operate and maintain hydraulic equipment of adequate capacity to control surface and water.
2. Dispose of drainage water in a manner to prevent flooding, erosion or other damage to any portion of site or to adjoining areas.
3. Refer to the appropriate section in Division 2 of these Specifications for TPDES requirements.

D. Pollution Control:

1. Provide methods, means and facilities required to prevent contamination of soil, water or atmosphere by discharge of noxious or hazardous substances from construction operations.
2. Provide equipment, personnel and perform emergency measures required to contain any spillages, and to remove contaminated soil or liquids.  Excavate and dispose of contaminated earth off site and replace with suitable compacted fill and topsoil.
3. Take special measures to prevent harmful substances from entering public waters.  Prevent disposal of wastes, effluents, chemicals or other such substances adjacent to streams or in sanitary or storm sewers.
4. Provide systems for control of atmospheric pollutants.  Prevent toxic concentrations of chemicals.  Prevent harmful dispersal of pollutants into atmosphere.

F. Dust Control:  Provide positive methods and apply dust control materials to minimize raising dust from construction operations and provide positive means to prevent air-borne dust from dispersing into atmosphere.

1.14    PROJECT IDENTIFICATION AND SIGNS:

Project signs will not be required nor allowed on main campus.  For projects on west campus or off campus facilities see the requirements listed below.

A.      Provide one construction sign shown on Contract Drawings and as specified below.  No other signs may be installed anywhere on the Site (except delivery route signs deemed necessary by ODR), including signs advertising the sale of salvage.

   1.      Face Size:  4'-0" wide x 8'-0" high x 3/4" thick, located approximately 3'-0" above grade.
   2.      Sign Faces:  New 3/4" exterior grade medium density overlay plywood.
   3.      Location of Sign, and Layout:  By the A/E.
   4.      Sign faces shall be painted a white background color.  All lettering shall be accomplished by a professional sign painter and shall be in Helvetica Medium style, upper and lower case, in black color and shall include, but not be limited to the following information:
        (1)      Project Name.
        (2)      Architect's Name.
        (3)      General Contractor's Name.

PART 2 – PRODUCTS

        NOT USED

PART 3 – EXECUTION

        NOT USED

                                    END OF SECTION

SECTION 01 60 00

PRODUCT REQUIREMENTS

PART 1 - GENERAL

1.01    SECTION INCLUDES:

A.    General Requirements.
B.    Manufacturer's Instructions
C.    Transportation and Handling.
D.    Storage and Protection.

1.02    RELATED SECTIONS:

A.    Section 01 10 00 - Summary of Work.
B.    Section 01 25 00 - Substitution Procedures.
C.    Section 01 31 00 - Project Management and Coordination.
D.    Section 01 33 00 - Submittal Procedures:  List of Materials.
E.    Section 01 34 00 - Shop Drawings, Product Data and Samples.
F.    Section 01 50 00 - Temporary Facilities and Controls:  Material Storage Facilities.
G.    Section 01 77 00 - Closeout Procedures.

1.03    GENERAL REQUIREMENTS:

A.    In addition to Uniform General and Supplementary Conditions (UGSC)  requirements, Contractor shall use materials and equipment that are:

1.    New, unless otherwise specified, and that are of good quality, free from faults and defects, and in conformance with the requirements of the Contract Documents.
2.    Suitable for use and function intended.
3.    Corresponding in quality to related materials in the absence of a complete specification.
4.    Of quality appearance where exposed to view.
5.    Of one manufacturer or source for the same specific purpose, with uniform appearance and physical properties.
6.    Interchangeable and be the same, when required to be supplied in quantity.
7.    Free of name, trade mark, or other insignia which is intended to identify the manufacturer, vendor, or other source(s) which is surface applied or affixed to any manufactured articles, materials, and items of equipment in any public area or similar locations within the Project.  Any manufactured articles, materials, and items of equipment which bears evidence that an insignia, name, or trade mark has been removed shall not be used.  Code required labels, such as Underwriters Laboratory labels, and other identification required by the Contract Documents are accepted.

B.    Product Color, Texture, or Pattern Selection:  No work requiring the A/E's review for color, texture and pattern selection shall be fabricated, delivered or installed prior to review and selection by the A/E.

1.    Contractor shall select products of a named manufacturer that complies with the specified requirements and submit the full range of available colors, textures, patterns, including custom colors, textures and patterns for the A/E's selection.  All subsequently approved products of other manufacturers are approved contingent upon availability of equivalent colors, textures, and patterns available to the A/E for selection.
2.    When "match existing color" is indicated or specified, Contractor shall, in addition to material and construction requirements specified elsewhere, match existing color, texture, and pattern in every respect, as approved by the A/E.
3.    When materials have a natural range of color, texture, and pattern such as natural stone, brick, tile, anodized aluminum finish and other exposed materials and finishes, the Contractor shall submit required number of sets of ranges of color, texture, and pattern, including representative naturally occurring defects as appropriate, for the A/E's review.  All work fabricated and installed shall be within range of samples approved by the A/E.  In addition, Contractor shall refer selection of raw materials containing defects within limits of the A/E's approved range of samples, to the A/E to provide distribution of such throughout required work so as to avoid patterns and concentrations of such defects.

C. Source Limitations: To the fullest extent possible, provide products of the same generic kind, from a single source, for each item of the Work.

1. When specified products are available from only sources that do not or cannot produce an adequate quantity to complete Project requirements in a timely manner, consult with the A/E for a determination of what product qualities are most important before proceeding. The A/E will designate those qualities, such as visual, structural, durability, or compatibility, that are most important. When Architect's determination has been made, select products from those sources that produce products that possess the most important qualities, to fullest extent possible.

D. Compatibility of Options: Where product options are permitted, select products that are compatible with other products to be incorporated into the Work, including products previously selected.

1.04 MANUFACTURER'S INSTRUCTIONS:

A. Install products in accordance with manufacturer's printed instructions. Obtain and distribute copies of such instructions to installer, including one copy to the A/E and one to the ODR. Maintain one set of complete instructions at the Site during installation and until completion.

B. Manufactured articles, materials, and items of equipment shall be handled, stored, applied, installed, connected, erected, used, cleaned, adjusted, conditioned, and protected in accordance with manufacturer's printed instructions and specifications for the Project conditions indicated, within manufacturer's published limitations, and requirements specified.

C. Should any manufactured articles, materials, and items of equipment be found to be damaged, deteriorated, or otherwise contrary to the requirements of the Contract Documents, remove and replace such damaged or deteriorated articles, materials, and items of equipment, no matter in what stage of completion and replace with new materials.

D. Should Project conditions or specified requirements be in conflict with manufacturer's instructions, request written clarification from the A/E before proceeding. Do not proceed with work without clear instructions. Do not omit any preparatory step or installation procedure unless specifically modified or exempted by Contract Documents.

E. Keep a copy of material safety data sheets for all products used in the Work, at Contractor's field office.

1.05 TRANSPORTATION AND HANDLING (see UGSC):

A. Arrange deliveries of materials and products in accordance with Construction Progress Schedule.

B. Transport products by methods to avoid product damage; deliver in undamaged condition in manufacturer's unopened containers or packaging, dry.

C. Provide equipment and personnel to handle products by methods to prevent soiling or damage.

D. Promptly inspect shipments to ensure that products comply with requirements of the Contract Documents and approved submittals, that quantities are correct, and products are undamaged.

1.06 STORAGE AND PROTECTION:

A. Store products in accordance with manufacturer's instructions, with seals and labels intact and legible. Store sensitive products, including factory-finished items and similar work, in weather-tight enclosures; maintain within temperature and humidity ranges required by manufacturer's instructions. Comply with applicable laws, ordinances and regulations for protective storage of potentially dangerous materials.

B. For exterior storage of fabricated products, place on sloped supports above ground. Cover products subject to deterioration with impervious sheet covering; provide ventilation to avoid condensation.

C. Store loose granular materials on solid surfaces in a well-drained area and prevent mixing with foreign matter.

D.          Arrange storage to provide access for inspection at all times. Periodically inspect to assure products are free from damage or deterioration, and are maintained under required conditions.

E.          At end of each day's work, cover new work likely to be damaged. Provide substantial coverings necessary to protect installed products from damage, traffic, and subsequent construction operations. Refer to Section 01 50 00 for additional requirements, including removal of temporary protections.

F.          Contractor shall provide inspection of Subcontractor's material for compliance with submittals on proper storage.

## PART 2 - PRODUCTS

NOT USED

## PART 3 - EXECUTION

NOT USED

END OF SECTION

SECTION 01 73 50

CUTTING AND PATCHING

PART 1 - GENERAL

1.01    SECTION INCLUDES:

        A.      Submittals required.
        B.      Materials required.
        C.      Procedures for cutting and patching.

1.02    RELATED SECTIONS:

        A.      Section 01 10 00 - Summary of Work.
        B.      Section 01 25 00 - Substitutions Procedures.
        C.      Section 01 31 00 - Project Management and Coordination.
        D.      Section 01 60 00 - Product Requirements.
        E.      Other Technical Sections:
                1.      Cutting and patching required being performed incidental to Work of the Section.
                2.      Advance notification to trades responsible for Work of other Sections
                3.      Coordination of trades responsible for Work of other Sections.

1.03    SUBMITTALS:

        A.      Submit written request sufficiently in advance to allow ODR and A/E time to adequately review and make a determination of approval of cutting, drilling, or alteration which affects:

                1.      Work of Owner or any separate Contractor.
                2.      Structural value or integrity of any element of Project.
                3.      Integrity or effectiveness of weather-exposed or moisture-resistant elements or systems.
                4.      Efficiency, operational life, maintenance, or safety of Project equipment elements.
                5.      Visual qualities of sight-exposed elements.
                6.      Damage to existing Work or utilities.

        B.      Include in request:

                1.      Identification of Project.
                2.      Location and description of affected Work.
                3.      Necessity for cutting, drilling, alteration, or excavation.
                4.      Effect on Work of Owner or any separate Contractor, or on structural or weatherproof integrity of Project.
                5.      Description of proposed Work:
                        a.      Scope of cutting, patching, alteration or excavation.
                        b.      Trades who will perform the Work.
                        c.      Products proposed to be used.
                        d.      Extent of refinishing to be done.
                6.      Alternative to cutting, drilling, patching, and excavation.
                7.      Written permission of separate contractors who's work is affected.
                8.      Date and time Work will be performed.

PART 2 - PRODUCTS

2.01    MATERIALS:

    A.    Provide materials and procedures required for original installation.

    B.    For any change in materials, submit request for substitution under provision of Section 01 25 00 - Substitution Procedures.

PART 3 - EXECUTION

3.01    GENERAL:

    A.    Field Conditions:  Check and verify Contract Documents and field conditions before proceeding with Work.  If there are any questions regarding these or other coordination questions, the Contractor is responsible for obtaining clarification from the A/E before proceeding with Work or related Work in question.

    B.    Execute cutting, drilling, and patching, including excavation and fill as required to complete the Work, and to:

        1.    Fit the several parts together, to integrate with other Work.
        2.    Uncover Work to install ill-timed Work.
        3.    Remove and replace defective and non-conforming Work.
        4.    Remove samples of installed Work for testing.
        5.    Provide openings in elements of Work for penetrations of mechanical and electrical work.
        6.    Uncover Work to allow for A/E's and ODR's observation of Work which has been covered prior to observation by A/E and ODR.

3.02    INSPECTION:

    A.    Inspection:  Carefully examine the premises to determine the extent of Work and the condition under which it must be done, including elements subject to movement or damage during cutting, patching, excavating and backfilling.  No extra payments will be allowed for claims for additional work that could have been determined or anticipated by such inspection.  After uncovering Work, inspect conditions affecting installation of new products.

    B.    Beginning of cutting, drilling, or patching means acceptance of existing conditions.

3.03    PREPARATION:

    A.    Preparation Prior to Cutting:  Provide adequate temporary support as necessary to assure structural value or integrity of affected portion of Work.  Provide protection from elements for that portion of the Project which may be exposed by cutting and patching work, and maintain excavations free from water.

B.    Protection:  Provide barricades, coverings, fences, supports, and similar temporary protections necessary to protect persons and property from injury or damage as a result of Work of this Section.  Confine operations to required limits and take reasonable precautions to protect remainder of property from damage.

C.    Dust Control: Control dust resulting from cutting and patching to prevent the spread of dust to adjacent occupied areas and to avoid creation of a nuisance in the adjacent surrounding area.  Use of water will be permitted as indicated.  Provide drop cloths or other suitable barriers to prevent dust from traveling to adjacent areas.  Seal off return air registers or other mechanical systems to prevent dust from entering such systems.

3.04    PERFORMANCE:

A.    Execute Work by methods to avoid damage to other Work, and which will provide proper surfaces to receive patching and finishing.

B.    Employ original installer to perform cutting and patching for weather-exposed, moisture-resistant elements, sight-exposed surfaces, and to preserve Owner's warranties and bonds for Work of this Contract and related work of other contracts.

C.    Cut rigid materials using masonry saw or core drill.  Pneumatic tools are not allowed without prior written approval by the ODR.

D.    Restore Work which has been cut or removed using new products in accordance with requirements of Contract Documents.

E.    Fit and seal interior Work airtight to pipes, sleeves, ducts, conduit, and other penetrations through surfaces.  Fit and seal for watertightness all penetrations through exterior envelope and through slabs.

F.    At penetrations of fire-rated wall, ceiling, or floor construction, completely seal all voids with fire stopping and sealant material, full thickness of the construction element to provide a smoke seal and penetration rating equivalent to adjacent rated construction.  Refer to appropriate sections of Division 7 in these Specifications for requirements.

G.    Refinish surfaces to match adjacent finishes.  For continuous surfaces, refinish to nearest intersection; for an assembly, refinish entire unit as follows:

1.    Walls:  From floor to ceiling and between the nearest corner.  New gypsum board construction meeting existing construction in same plane shall be flush with no visible joint showing,
2.    Ceiling:  The complete surface,
3.    Floor:  The complete surface unless otherwise shown or unless a matching patch in applied finishes can be made acceptable to A/E and ODR,
4.    Openings:  The entire unit including frame,
5.    Painted Cabinets:  The entire painted surface,
6.    Transparent Finish Cabinets:  Finish new surfaces to match existing,
7.    Base:  Between the nearest corners.

H.    Excavation:  Refer to appropriate sections of these Specifications.

I.      Damage: Restore accidental or careless damage to Work to a condition as good as or better than existed before Work was commenced and at no additional cost to the Owner.

END OF SECTION

SECTION 01 74 00

CLEANING AND WASTE MANAGEMENT

PART 1 - GENERAL

1.01    SECTION INCLUDES:

A.    General requirements for cleaning.
B.    Materials for cleaning.
C.    Procedures for cleaning.

1.02    RELATED SECTIONS:

A.    Section 01 10 00 - Summary of Work.
B.    Section 01 33 00 - Submittal Procedures.
C.    Section 01 50 00 - Temporary Facilities and Controls.
D.    Section 01 77 00 - Closeout Procedures.

1.03    GENERAL REQUIREMENTS:

A.    General:  In addition to Uniform General and Supplementary Conditions, Article 3 (see UGSC), provide progress and final cleaning as specified in this section.

B.    Progress Cleaning:  Keep premises and public properties free from accumulations of waste, debris and rubbish, caused by operations.  Maintain Project in accord with State and local safety, health, and insurance standards.

C.    Final Cleaning:  At completion of Work, remove waste materials, rubbish, tools, equipment, machinery and surplus materials, and clean all exposed surfaces of building and Project Site, including crawl spaces; leave Project clean and ready for occupancy.

D.    Final Inspection:  Prior to final inspection, clean all surfaces and remove all debris from project.

PART 2 - PRODUCTS

2.01    CLEANING MATERIALS:

A.    Use materials which will not create hazards to health or property, and which will not damage surfaces.

B.    Use only materials and methods recommended by manufacturer of material being cleaned.

PART 3 - EXECUTION

3.01    CLEANING:

A.    In addition to removal of debris and cleaning specified in other sections, clean interior and exterior exposed-to-view surfaces affected by Work of this Contract.

B.  Hazards Control:  Store volatile waste in covered metal containers and remove from premises daily.  Prevent accumulation of wastes which create hazardous conditions.  Provide adequate ventilation during use of volatile or noxious substances.

C.  Clean permanent filters of ventilating equipment and replace disposable filters when units have been operated during construction; in addition, clean ducts, blowers, and coils when units have been operated without filters during construction.

D.  Remove waste, debris, and surplus materials from site.  Clean paving areas, walks, drives and streets in the vicinity of the building; remove mud, rubbish, waste, stains, spills, and foreign substances from paved areas and sweep clean.  Immediately clean any mud tracked out of the construction area to adjacent drives and streets by vehicles and equipment.

E.  Keep the entire construction area clean and at least weekly conduct a general clean-up operation.

F.  Keep grass/weeds cut at all times within the limits of construction; maximum time interval in growing season is two weeks.

G.  Periodically inspect, tighten and realign construction/tree protection fencing.

H.  Do not burn or bury rubbish and waste materials on the Project site.

I.  Do not dispose of volatile wastes such as mineral spirits, oil, or paint thinner in storm, sanitary drains or into the soil.

J.  Do not dispose of rubbish and wastes into streams or waterways.

K.  Do not dispose of excess concrete on the Project Site or campus.

L.  Wet down rubbish and waste to subdue dust and prevent it from blowing.

M.  Provide on Site containers for collection of waste, debris and rubbish.  Handle materials in a controlled manner with as few handlings as possible; do not drop or throw materials from heights.  Do not fence, block, cover, otherwise make inaccessible, for Owner's use, any waste containers located inside or outside construction limits.

N.  Remove temporary protection and labels not required to remain.

O.  Just prior to painting and similar finishing operations, clean interior areas ready to receive finish, and continue cleaning as needed, until building is ready for Substantial Completion.

P.  Disposal: Remove waste materials, debris and rubbish from the Project Site and provide for legal disposal at a Texas Department of Health (TDH) permitted solid waste facility.  In hauling material from the Project Site, Contractor shall prevent debris from dropping from vehicles and littering the campus or area streets and roads.  Contractor shall promptly remove any debris which falls from vehicles.

3.02    FINAL CLEANING

A.    Employ experienced workmen or professional cleaners and perform cleaning in accordance with manufacturer's written recommendations, using products approved by the manufacturer for material being cleaned.

B.    Prior to final inspection and the Owner's acceptance of the Work, perform final cleaning of all areas of the building and Project Site, performing all operations specified in the various Sections of Project Specifications.  Final cleaning operations include, but are not limited to:

1.    Remove waste, debris, and surplus materials of any nature from Site.  Clean paving areas in the vicinity of the building; remove stains, spills, and foreign substances from paved areas and sweep paved areas clean and rake clean other surfaces of grounds,
2.    Broom cleaning of all exposed concrete floors,
3.    Cleaning all stonework,
4.    Cleaning all exposed painted and unpainted metals,
5.    Cleaning all architectural woodwork,
6.    Cleaning all doors and polish hardware; removing excess paint and stains,
7.    Cleaning all glass areas, exterior and interior,
8.    Cleaning all storefront framing and doors, and glazed wall system members, exterior and interior,
9.    Cleaning all walls and floors,
10.    Cleaning of resilient flooring, ready for waxing by Campus Personnel [*Project Manager verify with Campus*]
11.    Vacuum all carpeted floors,
12.    Cleaning all toilet partitions, fixtures, and accessories,
13.    Cleaning all exposed surfaces of light fixtures, including removal of construction dust, paint overspray, finger prints, and similar soiling from light fixture bodies, reflectors, and both sides of light fixture lenses,
14.    Removing and disposing of all temporary protections,
15.    Repair, patch and touch-up marred surfaces to match adjacent surfaces,
16.    Prior to Final Completion, inspect exposed interior and exterior surfaces and work areas to verify that entire work is clean.

C.    Clean finishes free of dust, stains, films, and other foreign substances.

D.    Clean transparent and glossy materials to a polished condition; remove foreign substances. Polish reflective surfaces to a clear shine.

END OF SECTION

SECTION 01 77 00

CLOSEOUT PROCEDURES

PART 1 - GENERAL

1.01    SECTION INCLUDES:

    A.      Instruction of using personnel.
    B.      Submittals.

1.02    RELATED SECTIONS:

    A.      Section 01 10 00 - Summary of Work.
    B.      Section 01 29 00 – Payment Procedures.
    C.      Section 01 32 00 – Construction Progress Documentation.
    D.      Section 01 33 00 – Submittal Procedures.
    E.      Section 01 50 00 – Temporary Facilities and Controls.
    F.      Section 01 74 00 – Cleaning and Waste Management.

1.03    INSTRUCTION OF USING PERSONNEL:

    A.      The Contractor will provide demonstrations; conduct training and familiarization sessions for physical plant/User personnel on the mechanical and electrical systems in the facility prior to Substantial Completion inspection.  Arrangements for these instruction periods shall be made by the ODR.  Operation and maintenance manuals must be available and used during this training period. Refer to Section 01 78 23 for requirements of Operating and Maintenance Manuals.

1.04    SUBMITTALS:

    A.      Refer to Section 01 29 00 - Payment Procedures for required administrative action and submittals which must precede or coincide with Contractor's final payment application. Contractor shall deliver these submittals to ODR, properly executed, prior to the request for final payment.

    B.      Final Completion (see UGSC):  Submit written request for Final Completion inspection and the following:

        1.      Certification that Work is complete and Owner has full access and use of completed work, Contract Documents have been reviewed, and systems and equipment have been tested, are operational and User personnel have received proper instruction and training on equipment and systems.

        2.      Copy of list of items to be completed or corrected from Substantial Completion Inspection, with each item initialed and showing date completed.

        3.      Evidence of compliance with requirements of governing authorities:
            a.      Certificates of occupancy.
            b.      Certificates of final inspection for elevator, plumbing, mechanical, fire protection, electrical, and other systems required by governing authorities.

        4.      List of all Subcontractors and material suppliers and product description.  Provide name, address, and complete phone number:

a. Product manufacturer.
b. Installer (Subcontractor).
c. Local representative.
d. Local source of supply for parts and replacement.

5. Submit test/adjust/balance records; start-up performance reports, and other information relevant to Owner's occupancy.

6. Clean-up: Project site and areas used by Contractor shall be cleaned in accordance with all requirements listed in the Project Manual and Drawings.

7. Deliver all special tools and keys in relation to project equipment and devices to ODR.

8. Instruction Logs for Instruction of Owner's Operating Personnel: Provide copies of sign in sheets and attendance records of all sessions held for instructing Owner's or ODR's personnel in the operation and maintenance of installed systems and equipment.

9. Warranties: Provide a letter of warranty on Contractor's letterhead in compliance with the Uniform General and Supplementary Conditions. Provide copies of all warranties supplied to Contractor for systems or equipment installed as part of the Work.

10. Keys, Keying Schedule, and Change over of Locks: For loaned keys and access cards for existing locks and security devices, return all loaned keys and access cards. For new locks and new security devices, refer to appropriate section in Division 8 of these Specifications for requirements.

11. Spare Parts and Maintenance Material: Refer to appropriate Sections in this Specification for requirements.

12. List of Contractor's incomplete work, recognized as exceptions to Owner's Certificate of Final Acceptance.

13. Affidavit from Contractor attesting that all materials and equipment installed by Contractor are free of hazardous substances with supporting certificates from subcontractors and suppliers.

14. Release of Liens: Submit the Release of Liens on the form provided by ODR.

15. Record Drawings: Submit drawings documenting the Work as installed, including makes and model numbers for all scheduled equipment.

16. Operations and Maintenance Manuals: Refer to Section 01 78 23, Operation and Maintenance Data for requirements.

17. Consent of Surety: Submit consent of surety to final payment.

18. Certificate of Insurance for Products and Completed Operations.

19. Final Application for Payment.

PART 2 – PRODUCTS

NOT USED

PART 3 – EXECUTION

NOT USED

END OF SECTION

SECTION 01 78 20

FACILITIES MANAGEMENT DATA

PART 1 - GENERAL

1.01 SUMMARY

A. Description:

1. This section specifies the standards that the Contractor shall follow for their scope of work related to Facilities Management Data (FM Data) Requirements.

2. This section does not negate any other section that requires Commissioning or Operations and Maintenance Data.

1.02 RELATED SECTIONS:

A. Section 01 77 00 - Closeout Procedures
B. Section 01 78 23 – Operations and Maintenance

1.03 FACILITY EQUIPMENT DATA

A. Facility Equipment Information Required

1. The Contractor shall provide facilities information in a digital format acceptable to the Owner for all assets identified in Table 01 Asset Groups that are included in the project. The minimum required information per asset are Floor, Location Asset Group, Description, Manufacturer, Model Number, Serial Number and Tag. Contractor shall also provide Owner a photo of the SSC asset sticker, photo of the asset's name plate data, and a photo of each asset in its final location in digital format, at least 8 megapixels and in jpg format. (See photo examples)

2. Floor shall designate the level (Basement, 01, 02, 03 Roof) or the exterior by Outside.

3. Location shall be the final room numbers assigned to each space or by use of Roof or Outside.

4. Asset Group shall be one of the asset groups as identified in Table 01.

5. Description shall be a simple description of the asset. (ex. Air Handler Unit)

6. Manufacturer shall be the actual manufacturer's name of the asset from the approved submittal and as installed.

7. Model Number shall be the complete model number of the asset from the approved submittal and as installed

8. Serial Number shall be the serial number for the asset as installed.

9. Tag shall be the tag designation for the asset as installed. (ex. AHU-1)

10. See Table 02 for acceptable format (.xlsx) of data collection.

11. All photographs shall be named in the following format xxxx-yyyyy-zz.jpg where "xxxx' represents the building number, "yyyyy" represents SSC barcode number and "zz" represents the picture number sequence. (ex. 1416-28044-01)

B. Barcodes

1. Barcodes shall be provided by the Owner for Contractor to place on equipment in field. The Contractor shall request these barcodes from the Owner, providing the total number of equipment assets to the Owner.

C. Final Deliverables

1. The Contractor shall provide, on a USB drive, the asset information to the owner within two (2) weeks of the substantial completion date.

1.04 MEETING

A. Contractor shall set up a meeting with the ODR and SSC to review asset groups on the project, quantity of assets on the projects, floor and location nomenclature for the project, placement of barcodes on assets and any other information necessary to complete the task prior to collecting the required information.

PART 2 - PRODUCTS

NOT USED

PART 3 - EXECUTION

Table 01 Asset Groups

| Asset Group | Asset Type | Description |
|---|---|---|
| ADA | SERIALIZED | ADA DOORS & OPENER |
| AHU | SERIALIZED | AIR HANDLING UNIT |
| AIR BLOWER | SERIALIZED | AIR BLOWER |
| AIR COMPRESSOR | SERIALIZED | AIR COMPRESSOR |
| AIR CURTAIN | SERIALIZED | AIR CURTAIN |
| AIR DEHUMIDIFIER | SERIALIZED | AIR DEHUMIDIFIER |
| AIR DRYER | SERIALIZED | AIR DRYER |
| AIR HUMIDIFIER | SERIALIZED | AIR HUMIDIFIER |
| AIR/DIRT SEPERATOR | SERIALIZED | AIR/DIRT SEPERATOR |
| AIRFLOW MEASURING STATION | SERIALIZED | AIRFLOW MEASURING STATION |
| AMMONIA REFRIG SYS | SERIALIZED | AMMONIA REFRIGERATION SYSTEM |
| ATS | SERIALIZED | AUTOMATIC TRANSFER SWITCH |
| AUTOCLAVE | SERIALIZED | AUTOCLAVE |
| AUTODOOR | SERIALIZED | AUTOMATIC DOORS |
| BACKFLOW PREVENTER | SERIALIZED | BACKFLOW PREVENTER |
| BATTERY | SERIALIZED | BATTERY SYSTEM |
| BOILER | SERIALIZED | BOILER |
| BOILER-STEAM | SERIALIZED | STEAM BOILER |
| BOILER-WATER | SERIALIZED | WATER BOILER |
| CAPACITOR BANK | SERIALIZED | CAPACITOR BANK |
| CEILING TRACK | SERIALIZED | CEILING TRACK |
| CENTRAL VACUUM EQUIPMENT | SERIALIZED | CENTRAL VACUUM EQUIPMENT |
| CHAIR LIFT | SERIALIZED | CHAIR LIFT |
| CHILLED_BEAM | SERIALIZED | CHILLED BEAM SYSTEM |
| CHILLER | SERIALIZED | CHILLER |
| CHILLER-GLYCOL | SERIALIZED | GLYCOL CHILLER |
| CHILLER-WATER | SERIALIZED | WATER CHILLER |
| CLEAN FUNNEL BOX | SERIALIZED | CLEAN FUNNEL BOX |
| CLOTHES DRYER | SERIALIZED | CLOTHES DRYER |
| COLD STORAGE ROOM | SERIALIZED | COLD STORAGE ROOM |
| COMMERCIAL DISHWASHER | SERIALIZED | COMMERCIAL DISHWASHER |
| COMPACTOR-TRASH | SERIALIZED | TRASH COMPACTOR |
| COMPRESS-BLDG | SERIALIZED | BUILDING COMPRESSOR |
| COMPRESS-LAB | SERIALIZED | MEDICAL/LAB COMPRESSOR |
| CONDENSATE TANK | SERIALIZED | CONDENSATE TANK |
| CONDENSING UNIT | SERIALIZED | CONDENSING UNIT |
| COND_BLEEDER | SERIALIZED | CONDENSATION BLEEDER |
| COND_UNIT | SERIALIZED | CONDENSING UNIT |

| COOLING TOWERS | SERIALIZED | COOLING TOWERS |
|---|---|---|
| COOL_TOWER | SERIALIZED | COOLING TOWER |
| DEHUMIDFIER | SERIALIZED | AIR DEHUMIDIFIER |
| DIGESTER | SERIALIZED | DIGESTER |
| DOCK LIFT | SERIALIZED | DOCK LIFT |
| DOOR-OVERHEAD | SERIALIZED | OVERHEAD DOORS |
| DRINKING FOUNTAIN | SERIALIZED | DRINKING FOUNTAIN |
| EFFLUENT DECON SYS | SERIALIZED | EFFLUENT DECONTAMINATION SYSTEM (EDS) |
| ELECTRIC GATE | SERIALIZED | ELECTRIC GATE |
| ELEC_GATE | SERIALIZED | ELECTRICAL GATE SYSTEM |
| ELEVATOR | SERIALIZED | ELEVATOR |
| EMERGENCY LIGHTING - BATT | SERIALIZED | EMERGENCY LIGHTING - BATTERY |
| ENERGY EXCHANGE CORE | SERIALIZED | ENERGY EXCHANGE CORE/ERU CUBE |
| ENTHALPY WHEEL | SERIALIZED | ENTHALPY WHEEL |
| ENVIRONMENTAL CHAMBER | SERIALIZED | ENVIRONMENTAL CHAMBER |
| ENVIRONMENTAL CONTROL | SERIALIZED | ENVIRONMENTAL CONTROL |
| ESCALATOR | SERIALIZED | ESCALATOR |
| EXHAUST FAN | SERIALIZED | EXHAUST FAN |
| EXIT LIGHTING - BATT | SERIALIZED | EMERGENCY EXIT LIGHTING - BATTERY |
| FAN COIL UNIT | SERIALIZED | FAN COIL UNIT |
| FAN-EXHAUST | SERIALIZED | EXHAUST FAN |
| FAN-RETURN | SERIALIZED | RETURN AIR FAN |
| FAN-STAIR | SERIALIZED | STAIRWELL PRESSURIZATION FAN |
| FAN-SUPPLY | SERIALIZED | SUPPLY FAN |
| FIRE BACKFLOW PREVENTER | SERIALIZED | FIRE BACKFLOW PREVENTER |
| FIRE PUMP | SERIALIZED | FIRE PUMP |
| FIRE READY HOOD | SERIALIZED | FIRE READY HOOD |
| FIRE-JOCKEY | SERIALIZED | JOCKEY PUMP |
| FIRE-PNL | SERIALIZED | FIRE PANEL |
| FIRE-PUMP | SERIALIZED | FIRE PUMP |
| GAS SENSOR | SERIALIZED | GAS SENSOR |
| GAS STORAGE TANK | SERIALIZED | GAS STORAGE TANK |
| GENERATOR | SERIALIZED | GENERATOR |
| GRAYWATER | SERIALIZED | GRAYWATER SYSTEM |
| HEAT EXCHANGER | SERIALIZED | HEAT EXCHANGER |
| HEAT TRACING CONTROLLER | SERIALIZED | HEAT TRACING CONTROLLER |
| HEAT_EXCH-STEAM | SERIALIZED | STEAM HEAT EXCHANGER |
| HEAT_EXCH-WATER | SERIALIZED | WATER HEAT EXCHANGER |
| HEPA FILTER | SERIALIZED | HEPA AIR FILTER |
| HOOD-VENT | SERIALIZED | VENT HOOD |
| HUMIDIFIER | SERIALIZED | AIR HUMIDIFIER |

| ICE MACHINE | SERIALIZED | ICE MACHINE |
|---|---|---|
| INCINERATOR | SERIALIZED | INCINERATOR |
| IRRIGATION CONTROLLER | SERIALIZED | IRRIGATION CONTROLLER |
| LAB EQUIP DRYING SYSTEM | SERIALIZED | LAB EQUIPMENT DRYING SYSTEM |
| LAB EQUIP WASHING SYSTEM | SERIALIZED | LAB EQUIP WASHING SYSTEM |
| LAB EXTRACTOR | SERIALIZED | LABORATORY EXTRACTOR |
| LAB FUME HOOD | SERIALIZED | LABORATORY FUME HOOD |
| LAB VACUUM/LAB AIR | SERIALIZED | LABORATORY VACUUM, LABORATORY AIR |
| LAB-VAC/AIR-SYSTEM | SERIALIZED | MEDICAL VACUUM SYSTEM |
| LIFT STATION DS | SERIALIZED | LIFT STATION DS |
| LIFT-CRANE_HOIST | SERIALIZED | CRANE & HOIST |
| LIFT-DOCK | SERIALIZED | DOCK LIFT |
| LIFT-DUMBWAITER | SERIALIZED | DUMBWAITER |
| LIFT-MISC | SERIALIZED | MISCELLANEOUS LIFT |
| LIFT-SPECIAL | SERIALIZED | LIFT (SPECIAL) |
| LIFT-WHEEL | SERIALIZED | WHEEL CHAIR LIFT |
| MIXING VALVE | SERIALIZED | MIXING VALVE |
| NAT-GAS-SYSTEM | SERIALIZED | NATURAL GAS SYSTEM |
| NITROGEN GENERATOR | SERIALIZED | NITROGEN GAS GENERATOR |
| OVERHEAD DOOR | SERIALIZED | OVERHEAD DOOR |
| OVERHEAD FAN | SERIALIZED | OVERHEAD FAN |
| PACKAGED AIR CONDITIONER | SERIALIZED | PACKAGED AIR CONDITIONER |
| PUMP | SERIALIZED | PUMP |
| PUMP-CIRC | SERIALIZED | CIRCULATION PUMP |
| PUMP-SUMP | SERIALIZED | SUMP PUMP |
| PUMP-WASTE | SERIALIZED | WASTE EJECTOR PUMP |
| RADIATOR | SERIALIZED | RADIATOR |
| REFRIG CONDENSING UNIT | SERIALIZED | REFRIGERATOR CONDENSING UNIT |
| REFRIGERATOR/FREEZER | SERIALIZED | REFRIGERATOR AND FREEZER |
| REFRIGERATOR_FREEZER | SERIALIZED | REFRIGERATOR/FREEZER |
| REFUGE SIGNAGE - BATT | SERIALIZED | AREA OF REFUGE SIGNAGE |
| RETURN AIR FAN | SERIALIZED | RETURN AIR FAN |
| SUPPLY AIR FAN | SERIALIZED | SUPPLY AIR FAN |
| SWGR | SERIALIZED | MAIN SWITCHGEAR |
| SYSTEM-FIRE-SUPPRESSION | SERIALIZED | FIRE SUPPRESSION SYSTEM |
| TANKLESS WATER HEATER | SERIALIZED | TANKLESS WATER HEATER |
| TNK-ACID | SERIALIZED | ACID TANK |
| TNK-DEAERATOR | SERIALIZED | Deaerator Tank |
| TNK-EXP | SERIALIZED | EXPANSION TANK |
| TNK-FLASH | SERIALIZED | FLASH TANK |
| TNK-FUEL | SERIALIZED | FUEL TANKS |

| | | |
|---|---|---|
| TNK-GREASE | SERIALIZED | GREASE TANK |
| TNK-SEPERATOR | SERIALIZED | OIL & SEPARATOR TANK |
| TRAP-PRIMER | SERIALIZED | TRAP PRIMER SYSTEM |
| UH-ELEC | SERIALIZED | ELECTRIC UNIT HEATER |
| UH-GAS | SERIALIZED | GAS UNIT HEATER |
| UH-STEAM | SERIALIZED | STEAM UNIT HEATER |
| UNIT HEATER | SERIALIZED | UNIT HEATER |
| UPS | SERIALIZED | UNINTERRUPTED POWER SUPPLY SYSTEM |
| VACUUM CONTAINER | SERIALIZED | VACUUM CONTAINER |
| VACUUM PRODUCER | SERIALIZED | VACUUM PRODUCER |
| VACUUM-BLDG | SERIALIZED | NON LAB/MED VACUUM |
| VACUUM-LAB | SERIALIZED | LAB/MEDICAL VACUUM |
| VAV-FP | SERIALIZED | VAV (FAN POWERED) |
| VAV-NP | SERIALIZED | VAV (NON FAN POWERED) |
| VFD | SERIALIZED | VARIABLE FREQUENCY DRIVE |
| WALL SYSTEM | SERIALIZED | WALL SYSTEM |
| WATER COOLER | SERIALIZED | ELECTRIC WATER COOLER |
| WATER FILTRATION SYSTEM | SERIALIZED | WATER FILTRATION SYSTEM |
| WATER HEATER | SERIALIZED | WATER HEATER |
| WATER SOFTENER | SERIALIZED | WATER SOFTENER |
| WATER-DI | SERIALIZED | DE-IONIZATION WATER SYSTEM |
| WATER-RO | SERIALIZED | REVERSE OSMOSIS WATER SYSTEM |
| WATER-SPECIAL | SERIALIZED | OTHER WATER FILTRATION SYSTEM |
| WELDING HOOD | SERIALIZED | WELDING HOOD |
| WINDOW A/C UNIT | SERIALIZED | WINDOW AIR CONDITIONER UNIT |

## Table 02 Data Collection

| Asset # | Floor | Location | Asset Group | Description | Manufacturer | Model | Serial # | Tag |
|---|---|---|---|---|---|---|---|---|
| 175166 | 01 | 148 | PANELBOARD | MDA1 - Main Distribution Panel | SQUARE D | HCP | 148 810 194 928 11000 | MDA1 Main 88 |
| 175167 | 01 | 119.A | FIRE PANEL | Fire Alarm Main Panel | Siemens | XLS | | NA |
| 175171 | 01 | 197 | VAV-FP | 197, 198 MdSC Rooms | Price | SDV5-001 | 1318991-050-001 | VAV 3-9 |
| 175172 | 01 | 141 | VAV-FP | 141 Game Room NW | Price | SDV5-003 | 1318991-029-001 | VAV 5-1 |
| 175173 | 01 | 141 | VAV-FP | 141 Game Room NNE | Price | SDV5-003 | 1318991-050-001 | VAV 3-51 |
| 175174 | 01 | 141 | VAV-FP | 141 Game Room NE | Price | SDV5-004 | 1318991-049-001 | VAV 3-52 |
| 175175 | 01 | 134 | VAV-FP | 134, 135, 156 Gaming Rooms | Price | SDV5-001 | 1318991-051-001 | VAV 5-4 |
| 175176 | 01 | 133 | VAV-FP | 132, 133 Office Key storage | Price | SDV5-001 | 1318991-039-001 | VAV 3-11 |
| 175177 | 01 | 151 | VAV-FP | 151 Gallery NW | Price | SDV5-005 | 1318991-040-001 | VAV 3-16 |
| 175178 | 01 | C160 | VAV-FP | C160 Corridor | Price | SDV5-001 | 1318991-088-001 | VAV 3-6 |
| 175179 | 01 | 150 | VAV-FP | 150, 151 Rec Storage Copy | Price | SDV5-001 | 1318991-056-001 | VAV 5-8 |
| 175180 | 01 | 129 | VAV-FP | 129 Conference | Price | SDV5-001 | 1318991-035-001 | VAV 3-8 |
| 175181 | 01 | 128 | VAV-FP | 128 Breakroom | Price | SDV5-001 | 1318991-034-001 | VAV 3-7 |
| 175182 | 01 | 141 | VAV-FP | 141 Game room NW | Price | SDV5-004 | 1318991-048-001 | VAV 3-50 |
| 175183 | 01 | 124 | VAV-FP | 124, 125 Staff Offices | Price | SDV5-002 | 1318991-032-001 | VAV 3-5 |
| 175184 | 01 | 122 | VAV-FP | 121, 123 Staff Offices | Price | SDV5-002 | 1318991-037-001 | VAV 5-10 |
| 175185 | 01 | C115 | VAV-FP | C115 121 Corridor, Storage | Price | SDV5-003 | 1318991-041-001 | VAV 3-17 |
| 175186 | 01 | 120 | VAV-FP | 120 Catering | Price | SDV5-004 | 1318991-058-001 | VAV 5-12 |
| 175187 | 01 | 116 | VAV-FP | 116 Electrical | Price | SDV5-004 | 1301603-006-001 | VAV 3-18 |
| 175188 | 01 | 118 | VAV-FP | 118 MDF | Price | SDV5-005 | 1341603-005-001 | VAV 5-11 |
| 175189 | 01 | 151 | VAV-FP | 151 Gallery SW | Price | SDV5-005 | 1318991-044-001 | VAV 3-24 |



Sample Photos



1416-28044-01
1416-28044-02

END OF SECTION

SECTION 01 78 23

OPERATION AND MAINTENANCE DATA

**PART 1 - GENERAL**

1.1     SUMMARY

   A.   This Section includes administrative and procedural requirements for preparing operation and maintenance manuals, including the following:
        1.     Operation manuals for systems, subsystems, and equipment.
        2.     Maintenance manuals for the care and maintenance of systems and equipment.

   B.   See Divisions 02 through 49 Sections for specific operation and maintenance manual requirements for the Work in those Sections.

1.2     SUBMITTALS

   A.   Manual:  Submit one copy of each manual in final form at least 30 days before final inspection.  Architect will return comments within 15 days after receipt.

        1.     Correct or modify each manual to comply with Architect's comments.  Submit each corrected manual within 15 days of receipt of Architect's comments.

**PART 2 - PRODUCTS**

2.1     MANUALS, GENERAL

   A.   Format:  Provide the manuals electronically in Adobe™ Portable Document Format (pdf).  Bookmark the first page of each division and section.  Also bookmark the first page of each item listed in the table of contents.

   B.   Organization:  Unless otherwise indicated, organize each manual into a separate section for each system and subsystem, and a separate section for each piece of equipment not part of a system.  Each manual shall contain a title page, table of contents, and manual contents.

   C.   Title Page:  Enclose title page.  Include the following information:

        1.     Subject matter included in manual.
        2.     Name and address of Project.
        3.     Name and address of Owner.
        4.     Date of submittal.
        5.     Name, address, and telephone number of Contractor.
        6.     Name and address of Architect.
        7.     Cross-reference to related systems in other operation and maintenance manuals.

   D.   Table of Contents:  List each product included in manual, identified by product name, indexed to the content of the volume, and cross-referenced to Specification Section number in Project Manual.

   E.   Manual Contents:  Organize into sets of manageable size.  Arrange contents alphabetically by system, subsystem, and equipment.   If possible, assemble instructions for subsystems, equipment, and components of one system into a single document.

        1.     Media:  Flash Drive/Load into eBuilder.

               a.     Identify flash drive with "OPERATION AND MAINTENANCE MANUAL," Building name, Building number, Project title or name, Project number, and subject matter of contents. Indicate volume number for multiple-volume sets.

2.2      OPERATION MANUALS

A.      Content:   In addition to requirements in this Section, include operation data required in individual Specification Sections and equipment descriptions, operating standards, operating procedures, operating logs, wiring and control diagrams, and license requirements.

B.      Descriptions:  Include the following:

1.      Product name and model number.
2.      Manufacturer's name.
3.      Equipment identification with serial number of each component.
4.      Equipment function.
5.      Operating characteristics.
6.      Limiting conditions.
7.      Performance curves.
8.      Engineering data and tests.
9.      Complete nomenclature and number of replacement parts.

C.      Operating Procedures:  Include start-up, break-in, and control procedures; stopping and normal shutdown instructions; routine, normal, seasonal, and weekend operating instructions; and required sequences for electric or electronic systems.

D.      Systems and Equipment Controls:  Describe the sequence of operation, and diagram controls as installed.

E.      Piped Systems:  Diagram piping as installed, and identify color-coding where required for identification.

2.3      PRODUCT MAINTENANCE MANUAL

A.      Content:  Organize manual into a separate section for each product, material, and finish.  Include source information, product information, maintenance procedures, repair materials and sources, and warranties and bonds, as described below.

B.      Source Information:  List each product included in manual, identified by product name and arranged to match manual's table of contents.  For each product, list name, address, and telephone number of Installer or supplier and maintenance service agent, and cross-reference Specification Section number and title in Project Manual.

C.      Product Information:  Include the following, as applicable:

1.      Product name and model number.
2.      Manufacturer's name.
3.      Color, pattern, and texture.
4.      Material and chemical composition.
5.      Reordering information for specially manufactured products.

D.      Maintenance Procedures:  Include manufacturer's written recommendations and inspection procedures, types of cleaning agents, methods of cleaning, schedule for cleaning and maintenance, and repair instructions.

E.      Repair Materials and Sources:   Include lists of materials and local sources of materials and related services.

F.      Warranties and Bonds:  Include copies of warranties and bonds and lists of circumstances and conditions that would affect validity of warranties or bonds.

2.4      SYSTEMS AND EQUIPMENT MAINTENANCE MANUAL

A.      Content:  For each system, subsystem, and piece of equipment not part of a system, include source information, manufacturers' maintenance documentation, maintenance procedures, maintenance and service schedules, spare parts list and source information, maintenance service contracts, and warranty and bond information, as described below.

B.      Source Information:  List each system, subsystem, and piece of equipment included in manual, identified by product name and arranged to match manual's table of contents.  For each product, list name, address, and telephone number of Installer or supplier and maintenance service agent, and cross-reference Specification Section number and title in Project Manual.

C.    Manufacturers' Maintenance Documentation:  Manufacturers' maintenance documentation including maintenance instructions, drawings and diagrams for maintenance, nomenclature of parts and components, and recommended spare parts for each component part or piece of equipment:

D.    Maintenance Procedures:  Include test and inspection instructions, troubleshooting guide, disassembly instructions, adjusting instructions, and demonstration and training videorecording if available, that detail essential maintenance procedures:

E.    Maintenance and Service Schedules:  Include service and lubrication requirements, list of required lubricants for equipment, and separate schedules for preventive and routine maintenance and service with standard time allotment.

F.    Spare Parts List and Source Information:  Include lists of replacement and repair parts, with parts identified and cross-referenced to manufacturers' maintenance documentation and local sources of maintenance materials and related services.

G.    Maintenance Service Contracts:  Include copies of maintenance agreements with name and telephone number of service agent.

H.    Warranties and Bonds:  Include copies of warranties and bonds and lists of circumstances and conditions that would affect validity of warranties or bonds.


**PART 3 - EXECUTION**

3.1      MANUAL PREPARATION

A.    Emergency Manual:  Assemble a complete set of emergency information indicating procedures for use by emergency personnel and by Owner's operating personnel for types of emergencies indicated.

B.    Product Maintenance Manual:  Assemble a complete set of maintenance data indicating care and maintenance of each product, material, and finish incorporated into the Work.

C.    Operation and Maintenance Manuals:  Assemble a complete set of operation and maintenance data indicating operation and maintenance of each system, subsystem, and piece of equipment not part of a system.

D.    Manufacturers' Data:  Where manuals contain manufacturers' standard printed data, include only sheets pertinent to product or component installed.  Mark each sheet to identify each product or component incorporated into the Work.  If data include more than one item in a tabular format, identify each item using appropriate references from the Contract Documents.  Identify data applicable to the Work and delete references to information not applicable.

E.    Drawings:  Prepare drawings supplementing manufacturers' printed data to illustrate the relationship of component parts of equipment and systems and to illustrate control sequence and flow diagrams. Coordinate these drawings with information contained in Record Drawings to ensure correct illustration of completed installation.

      1.    Do not use original Project Record Documents as part of operation and maintenance manuals.

F.    Comply with Division 01 Section "Project Closeout" for schedule for submitting operation and maintenance documentation.


**END OF SECTION**

**SECTION 02 41 19 - SELECTIVE DEMOLITION**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section Includes:
        1.      Demolition and removal of selected portions of building or structure.

1.3     DEFINITIONS

   A.   Remove:   Detach items from existing construction and legally dispose of them off-site unless indicated to be removed and salvaged or removed and reinstalled.

   B.   Remove and Salvage:   Carefully detach from existing construction, in a manner to prevent damage, and deliver to Owner ready for reuse.

   C.   Remove and Reinstall:   Detach items from existing construction, prepare for reuse, and reinstall where indicated.

   D.   Existing to Remain:   Existing items of construction that are not to be permanently removed and that are not otherwise indicated to be removed, removed and salvaged, or removed and reinstalled.

1.4     MATERIALS OWNERSHIP

   A.   Unless otherwise indicated, demolition waste becomes property of Contractor.

1.5     INFORMATIONAL SUBMITTALS

   A.   Inventory:   Submit a list of items to be removed and salvaged and deliver to Owner prior to start of demolition.

   B.   Predemolition Photographs or Video:   Submit before Work begins.

1.6     FIELD CONDITIONS

   A.   Conditions existing at time of inspection for bidding purpose will be maintained by Owner as far as practical.

   B.   Notify Architect of discrepancies between existing conditions and Drawings before proceeding with selective demolition.

   C.   Hazardous Materials:   It is not expected that hazardous materials will be encountered in the Work.
        1.      If suspected hazardous materials are encountered, do not disturb; immediately notify Architect and Owner.   Hazardous materials will be removed by Owner under a separate contract.

   D.   Storage or sale of removed items or materials on-site is not permitted.

   E.   Utility Service:   Maintain existing utilities indicated to remain in service and protect them against damage during selective demolition operations.
        1.      Maintain fire-protection facilities in service during selective demolition operations.

**PART 2 - PRODUCTS (Not Used)**

**PART 3 - EXECUTION**

3.1     EXAMINATION

    A.    Verify that utilities have been disconnected and capped before starting selective demolition operations.

    B.    Review record documents of existing construction provided by Owner.  Owner does not guarantee that existing conditions are same as those indicated in record documents.

    C.    Survey existing conditions and correlate with requirements indicated to determine extent of selective demolition required.

    D.    When unanticipated mechanical, electrical, or structural elements that conflict with intended function or design are encountered, investigate and measure the nature and extent of conflict.  Promptly submit a written report to Architect.

    E.    Perform an engineering survey of condition of building to determine whether removing any element might result in structural deficiency or unplanned collapse of any portion of structure or adjacent structures during selective building demolition operations.
        1.    Perform surveys as the Work progresses to detect hazards resulting from selective demolition activities.

    F.    Survey of Existing Conditions:   Record existing conditions by use of preconstruction photographs.
        1.    Comply with requirements specified in Section 01 32 33 "Photographic Documentation."
        2.    Inventory and record the condition of items to be removed and salvaged.  Provide photographs of conditions that might be misconstrued as damage caused by salvage operations.

3.2     UTILITY SERVICES AND MECHANICAL/ELECTRICAL SYSTEMS

    A.    Existing Services/Systems to Remain:  Maintain services/systems indicated to remain and protect them against damage.
        1.    Comply with requirements for existing services/systems interruptions specified in Section 01 10 00 "Summary."

    B.    Existing Services/Systems to Be Removed, Relocated, or Abandoned:  Locate, identify, disconnect, and seal or cap off indicated utility services and mechanical/electrical systems serving areas to be selectively demolished.
        1.    Arrange to shut off indicated utilities with utility companies.
        2.    If services/systems are required to be removed, relocated, or abandoned, provide temporary services/systems that bypass area of selective demolition and that maintain continuity of services/systems to other parts of building.
        3.    Disconnect, demolish, and remove fire-suppression systems, plumbing, and HVAC systems, equipment, and components indicated to be removed.
            a.    Piping to Be Removed:  Remove portion of piping indicated to be removed and cap or plug remaining piping with same or compatible piping material.
            b.    Equipment to Be Removed:  Disconnect and cap services and remove equipment.
            c.    Equipment to Be Removed and Reinstalled:  Disconnect and cap services and remove, clean, and store equipment; when appropriate, reinstall, reconnect, and make equipment operational.
            d.    Equipment to Be Removed and Salvaged:  Disconnect and cap services and remove equipment and deliver to Owner.
            e.    Ducts to Be Removed:  Remove portion of ducts indicated to be removed and plug remaining ducts with same or compatible ductwork material.

3.3     PREPARATION

    A.    Site Access and Temporary Controls:  Conduct selective demolition and debris-removal operations to ensure minimum interference with roads, streets, walks, walkways, and other adjacent occupied and used facilities.
        1.    Comply with requirements for access and protection specified in Section 01 50 00 "Temporary Facilities and Controls."

B. Temporary Facilities:  Provide temporary barricades and other protection required to prevent injury to people and damage to adjacent buildings and facilities to remain.
1. Provide protection to ensure safe passage of people around selective demolition area and to and from occupied portions of building.
2. Provide temporary weather protection, during interval between selective demolition of existing construction on exterior surfaces and new construction, to prevent water leakage and damage to structure and interior areas.
3. Protect walls, ceilings, floors, and other existing finish work that are to remain or that are exposed during selective demolition operations.
4. Cover and protect furniture, furnishings, and equipment that have not been removed.
5. Comply with requirements for temporary enclosures, dust control, heating, and cooling specified in Section 01 50 00 "Temporary Facilities and Controls."

3.4 SELECTIVE DEMOLITION, GENERAL

A. Removed and Salvaged Items:
1. Clean salvaged items.
2. Pack or crate items after cleaning.   Identify contents of containers.
3. Store items in a secure area until delivery to Owner.
4. Transport items to Owner's storage area designated by Owner. Protect items from damage during transport and storage.

B. Removed and Reinstalled Items:
1. Clean and repair items to functional condition adequate for intended reuse.
2. Pack or crate items after cleaning and repairing.   Identify contents of containers.
3. Protect items from damage during transport and storage.
4. Reinstall items in locations indicated.   Comply with installation requirements for new materials and equipment.   Provide connections, supports, and miscellaneous materials necessary to make item functional for use indicated.

C. Existing Items to Remain:  Protect construction indicated to remain against damage and soiling during selective demolition.   When permitted by Architect, items may be removed to a suitable, protected storage location during selective demolition[ and cleaned] and reinstalled in their original locations after selective demolition operations are complete.

3.5 SELECTIVE DEMOLITION PROCEDURES FOR SPECIFIC MATERIALS

A. Concrete Slabs-on-Grade:   Saw-cut perimeter of area to be demolished, then break up and remove.

3.6 DISPOSAL OF DEMOLISHED MATERIALS

A. General:  Except for items or materials indicated to be recycled, reused, salvaged, reinstalled, or otherwise indicated to remain Owner's property, remove demolished materials from Project site and legally dispose of them in an EPA-approved landfill.
1. Do not allow demolished materials to accumulate on-site.
2. Remove and transport debris in a manner that will prevent spillage on adjacent surfaces and areas.

B. Burning:   Do not burn demolished materials.

C. Disposal:   Transport demolished materials off Owner's property and legally dispose of them.

3.7 CLEANING

A. Clean adjacent structures and improvements of dust, dirt, and debris caused by selective demolition operations.   Return adjacent areas to condition existing before selective demolition operations began.

**END OF SECTION 02 41 19**

## SECTION 03 30 00 - CAST-IN-PLACE CONCRETE

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section includes cast-in-place concrete, including formwork, reinforcement, concrete materials, mixture design, placement procedures, and finishes, for the following:
        1.    Slabs-on-grade.

1.3     DEFINITIONS

   A.   Cementitious Materials: Portland cement alone or in combination with one or more of the following: blended hydraulic cement, fly ash and other pozzolans, ground granulated blast-furnace slag, and silica fume; subject to compliance with requirements.

1.4     ACTION SUBMITTALS

   A.   Product Data: For each type of product indicated.

   B.   Design Mixtures: For each concrete mixture, include the following:
        1.    Mixture identification.
        2.    Minimum 28-day compressive strength.
        3.    Durability exposure class.
        4.    Maximum w/cm.
        5.    Calculated equilibrium unit weight, for lightweight concrete.
        6.    Slump limit.
        7.    Air content.
        8.    Nominal maximum aggregate size.
        9.    Steel-fiber reinforcement content.
        10.   Synthetic micro-fiber content.
        11.   Indicate amounts of mixing water to be withheld for later addition at Project site if permitted.
        12.   Include manufacturer's certification that permeability-reducing admixture is compatible with mix design.
        13.   Include certification that dosage rate for permeability-reducing admixture matches dosage rate used in performance compliance test.
        14.   Intended placement method.
        15.   Submit alternate design mixtures when characteristics of materials, Project conditions, weather, test results, or other circumstances warrant adjustments.

1.5     QUALITY ASSURANCE

   A.   Installer Qualifications: A qualified installer who employs on Project personnel qualified as ACI-certified Flatwork Technician and Finisher and a supervisor who is an ACI-certified Concrete Flatwork Technician.

   B.   Testing Agency Qualifications: An independent agency, qualified according to ASTM C 1077 and ASTM E 329 for testing indicated.
        1.    Personnel conducting field tests shall be qualified as ACI Concrete Field Testing Technician, Grade 1, according to ACI CP-1 or an equivalent certification program.
        2.    Personnel performing laboratory tests shall be ACI-certified Concrete Strength Testing Technician and Concrete Laboratory Testing Technician - Grade I. Testing Agency laboratory supervisor shall be an ACI-certified Concrete Laboratory Testing Technician - Grade II.

   C.   Source Limitations: Obtain each type or class of cementitious material of the same brand from the same manufacturer's plant, obtain aggregate from single source, and obtain admixtures from single source from single manufacturer.

D. ACI Publications: Comply with the following unless modified by requirements in the Contract Documents:
   1. ACI 301, "Specifications for Structural Concrete," Sections 1 through 5.
   2. ACI 117, "Specifications for Tolerances for Concrete Construction and Materials."

E. Concrete Testing Service: Engage a qualified independent testing agency to perform material evaluation tests and to design concrete mixtures.

## 1.6 DELIVERY, STORAGE, AND HANDLING

A. Steel Reinforcement: Deliver, store, and handle steel reinforcement to prevent bending and damage. Avoid damaging coatings on steel reinforcement.

## PART 2 - PRODUCTS

## 2.1 CONCRETE, GENERAL

A. ACI Publications: Comply with ACI 301 unless modified by requirements in the Contract Documents.

## 2.2 FORM-FACING MATERIALS

A. Rough-Formed Finished Concrete: Plywood, lumber, metal, or another approved material. Provide lumber dressed on at least two edges and one side for tight fit.

B. Form-Release Agent: Commercially formulated form-release agent that will not bond with, stain, or adversely affect concrete surfaces and will not impair subsequent treatments of concrete surfaces.
   1. Formulate form-release agent with rust inhibitor for steel form-facing materials.

C. Form Ties: Factory-fabricated, removable or snap-off metal or glass-fiber-reinforced plastic form ties designed to resist lateral pressure of fresh concrete on forms and to prevent spalling of concrete on removal.
   1. Furnish units that will leave no corrodible metal closer than 1 inch to the plane of exposed concrete surface.
   2. Furnish ties that, when removed, will leave holes no larger than 1 inch in diameter in concrete surface.
   3. Furnish ties with integral water-barrier plates to walls indicated to receive dampproofing or waterproofing.

## 2.3 STEEL REINFORCEMENT

A. Reinforcing Bars: ASTM A 615/A 615M, Grade 60, deformed.

B. Galvanized Reinforcing Bars: ASTM A 615/A 615M, Grade 60, deformed bars, ASTM A 767/A 767M, Class I zinc coated after fabrication and bending.

C. Plain-Steel Wire: ASTM A 82/A 82M, as drawn.

D. Deformed-Steel Wire: ASTM A 496/A 496M.

E. Epoxy-Coated Wire: ASTM A 884/A 884M, Class A, Type 1 coated, as-drawn, plaindeformed-steel wire, with less than 2 percent damaged coating in each 12-inch wire length.

## 2.4 REINFORCEMENT ACCESSORIES

A. Joint Dowel Bars: ASTM A 615/A 615M, Grade 60, plain-steel bars, cut true to length with ends square and free of burrs.

B. Bar Supports: Bolsters, chairs, spacers, and other devices for spacing, supporting, and fastening reinforcing bars and welded wire reinforcement in place. Manufacture bar supports from steel wire, plastic, or precast concrete according to CRSI's "Manual of Standard Practice," of greater compressive strength than concrete and as follows:
   1. For concrete surfaces exposed to view where legs of wire bar supports contact forms, use CRSI Class 1 plastic-protected steel wire or CRSI Class 2 stainless-steel bar supports.

2.5    CONCRETE MATERIALS

A.    Cementitious Material: Use the following cementitious materials, of the same type, brand, and source, throughout Project:
1.    Portland Cement: ASTM C 150, Type I or Type I/II, gray.

B.    Normal-Weight Aggregates: ASTM C 33, Class 3M coarse aggregate or better, graded. Provide aggregates from a single source with documented service record data of at least 10 years' satisfactory service in similar applications and service conditions using similar aggregates and cementitious materials.
1.    Maximum Coarse-Aggregate Size: 1-1/2 inches nominal.
2.    Fine Aggregate: Free of materials with deleterious reactivity to alkali in cement.

C.    Water: ASTM C 94/C 94M and potable.

2.6    ADMIXTURES

A.    Air-Entraining Admixture: ASTM C 260.

B.    Chemical Admixtures: Provide admixtures certified by manufacturer to be compatible with other admixtures and that will not contribute water-soluble chloride ions exceeding those permitted in hardened concrete. Do not use calcium chloride or admixtures containing calcium chloride.
1.    Water-Reducing Admixture: ASTM C 494/C 494M, Type A.

2.7    CURING MATERIALS

A.    Water: Potable.

B.    Clear, Waterborne, Membrane-Forming Curing Compound: ASTM C 309, Type 1, Class B, dissipating.
1.    Products: Subject to compliance with requirements, provide one of the following:
       a.    Anti-Hydro International, Inc.; AH Curing Compound #2 DR WB.
       b.    BASF Construction Chemicals - Building Systems; Kure 200.
       c.    Dayton Superior Corporation; Day-Chem Rez Cure (J-11-W).
       d.    Euclid Chemical Company (The), an RPM company; Kurez W VOX; TAMMSCURE WB 30C.
       e.    L&M Construction Chemicals, Inc.; L&M Cure R.
       f.    Nox-Crete Products Group; Resin Cure E.

2.8    RELATED MATERIALS

A.    Semirigid Joint Filler: Two-component, semirigid, 100 percent solids, epoxy resin with a Type A shore durometer hardness of 80 per ASTM D 2240.

B.    Bonding Agent: ASTM C 1059/C 1059M, Type II, non-redispersible, acrylic emulsion or styrene butadiene.

C.    Epoxy Bonding Adhesive: ASTM C 881, two-component epoxy resin, capable of humid curing and bonding to damp surfaces, of class suitable for application temperature and of grade to suit requirements, and as follows:
1.    Types I and II, non-load bearing, for bonding hardened or freshly mixed concrete to hardened concrete.

D.    Reglets: Fabricate reglets of not less than 0.022-inch- thick, galvanized-steel sheet. Temporarily fill or cover face opening of reglet to prevent intrusion of concrete or debris.

2.9    REPAIR MATERIALS

A.    Repair Underlayment: Cement-based, polymer-modified, self-leveling product that can be applied in thicknesses from 1/8 inch and that can be feathered at edges to match adjacent floor elevations.
1.    Cement Binder: ASTM C 150, portland cement or hydraulic or blended hydraulic cement as defined in ASTM C 219.
2.    Primer: Product of underlayment manufacturer recommended for substrate, conditions, and application.
3.    Aggregate: Well-graded, washed gravel, 1/8 to 1/4 inch or coarse sand as recommended by underlayment manufacturer.
4.    Compressive Strength: Not less than 4100 psi at 28 days when tested according to ASTM C 109/C 109M.

B. Repair Overlayment: Cement-based, polymer-modified, self-leveling product that can be applied in thicknesses from 1/4 inch and that can be filled in over a scarified surface to match adjacent floor elevations.
1. Cement Binder: ASTM C 150, portland cement or hydraulic or blended hydraulic cement as defined in ASTM C 219.
2. Primer: Product of topping manufacturer recommended for substrate, conditions, and application.
3. Aggregate: Well-graded, washed gravel, 1/8 to 1/4 inch or coarse sand as recommended by topping manufacturer.
4. Compressive Strength: Not less than 5000 psi at 28 days when tested according to ASTM C 109/C 109M.

2.10 CONCRETE MIXTURES, GENERAL

A. Prepare design mixtures for each type and strength of concrete, proportioned on the basis of laboratory trial mixture or field test data, or both, according to ACI 301.
1. Use a qualified independent testing agency for preparing and reporting proposed mixture designs based on laboratory trial mixtures.

B. Cementitious Materials: Limit percentage, by weight, of cementitious materials other than portland cement in concrete as follows:
1. Fly Ash: 25 percent.

C. Limit water-soluble, chloride-ion content in hardened concrete to [**0.06**] [**0.15**] [**0.30**] [**1.00**] percent by weight of cement.

D. Admixtures: Use admixtures according to manufacturer's written instructions.
1. Use admixture in concrete, as required, for placement and workability.
2. Use water-reducing admixture in pumped concrete, concrete for heavy-use industrial slabs and parking structure slabs, concrete required to be watertight, and concrete with a water-cementitious materials ratio below 0.50.

2.11 FABRICATING REINFORCEMENT

A. Fabricate steel reinforcement according to CRSI's "Manual of Standard Practice."

2.12 CONCRETE MIXING

A. Ready-Mixed Concrete: Measure, batch, mix, and deliver concrete according to ASTM C 94/C 94M and ASTM C 1116/C 1116M, and furnish batch ticket information.
1. When air temperature is between 85 and 90 deg F, reduce mixing and delivery time from 1-1/2 hours to 75 minutes; when air temperature is above 90 deg F, reduce mixing and delivery time to 60 minutes.

**PART 3 - EXECUTION**

3.1 FORMWORK

A. Design, erect, shore, brace, and maintain formwork, according to ACI 301, to support vertical, lateral, static, and dynamic loads, and construction loads that might be applied, until structure can support such loads.

B. Construct formwork so concrete members and structures are of size, shape, alignment, elevation, and position indicated, within tolerance limits of ACI 117.

C. Limit concrete surface irregularities, designated by ACI 347 as abrupt or gradual, as follows:
1. Class B, 1/4 inch for rough-formed finished surfaces.

D. Construct forms tight enough to prevent loss of concrete mortar.

E. Fabricate forms for easy removal without hammering or prying against concrete surfaces. Provide crush or wrecking plates where stripping may damage cast concrete surfaces. Provide top forms for inclined surfaces steeper than 1.5 horizontal to 1 vertical.
1. Install keyways, reglets, recesses, and the like, for easy removal.
2. Do not use rust-stained steel form-facing material.

F. Set edge forms, bulkheads, and intermediate screed strips for slabs to achieve required elevations and slopes in finished concrete surfaces. Provide and secure units to support screed strips; use strike-off templates or compacting-type screeds.

G. Provide temporary openings for cleanouts and inspection ports where interior area of formwork is inaccessible. Close openings with panels tightly fitted to forms and securely braced to prevent loss of concrete mortar. Locate temporary openings in forms at inconspicuous locations.

H. Retain one of two options in first paragraph below. ACI 301 requires chamfers unless otherwise specified.

I. Chamfer exterior corners and edges of permanently exposed concrete.

J. Form openings, chases, offsets, sinkages, keyways, reglets, blocking, screeds, and bulkheads required in the Work. Determine sizes and locations from trades providing such items.

K. Clean forms and adjacent surfaces to receive concrete. Remove chips, wood, sawdust, dirt, and other debris just before placing concrete.

L. Retighten forms and bracing before placing concrete, as required, to prevent mortar leaks and maintain proper alignment.

M. Coat contact surfaces of forms with form-release agent, according to manufacturer's written instructions, before placing reinforcement.

3.2 EMBEDDED ITEMS

A. Place and secure anchorage devices and other embedded items required for adjoining work that is attached to or supported by cast-in-place concrete. Use setting drawings, templates, diagrams, instructions, and directions furnished with items to be embedded.
1. Install reglets to receive waterproofing and to receive through-wall flashings in outer face of concrete frame at exterior walls, where flashing is shown at lintels, shelf angles, and other conditions.

3.3 REMOVING AND REUSING FORMS

A. General: Formwork for sides of beams, walls, columns, and similar parts of the Work that does not support weight of concrete may be removed after cumulatively curing at not less than 50 deg F for 24 hours after placing concrete. Concrete has to be hard enough to not be damaged by form-removal operations and curing and protection operations need to be maintained.
1. Leave formwork for beam soffits, joists, slabs, and other structural elements that supports weight of concrete in place until concrete has achieved at least 70 percent of its 28-day design compressive strength.
2. Remove forms only if shores have been arranged to permit removal of forms without loosening or disturbing shores.

B. Clean and repair surfaces of forms to be reused in the Work. Split, frayed, delaminated, or otherwise damaged form-facing material will not be acceptable for exposed surfaces. Apply new form-release agent.

C. When forms are reused, clean surfaces, remove fins and laitance, and tighten to close joints. Align and secure joints to avoid offsets. Do not use patched forms for exposed concrete surfaces unless approved by Architect.

3.4 SHORES AND RESHORES

A. Comply with ACI 318 and ACI 301 for design, installation, and removal of shoring and reshoring.
1. Do not remove shoring or reshoring until measurement of slab tolerances is complete.

B. In multistory construction, extend shoring or reshoring over a sufficient number of stories to distribute loads in such a manner that no floor or member will be excessively loaded or will induce tensile stress in concrete members without sufficient steel reinforcement.

C. Plan sequence of removal of shores and reshore to avoid damage to concrete. Locate and provide adequate reshoring to support construction without excessive stress or deflection.

3.5     STEEL REINFORCEMENT

A.     General: Comply with CRSI's "Manual of Standard Practice" for placing reinforcement.
1.     Do not cut or puncture vapor retarder. Repair damage and reseal vapor retarder before placing concrete.

B.     Clean reinforcement of loose rust and mill scale, earth, ice, and other foreign materials that would reduce bond to concrete.

C.     Accurately position, support, and secure reinforcement against displacement. Locate and support reinforcement with bar supports to maintain minimum concrete cover. Do not tack weld crossing reinforcing bars.
1.     Weld reinforcing bars according to AWS D1.4/D 1.4M, where indicated.

D.     Set wire ties with ends directed into concrete, not toward exposed concrete surfaces.

3.6     JOINTS

A.     General: Construct joints true to line with faces perpendicular to surface plane of concrete.

B.     Revise criteria for locating construction joints in first paragraph below to suit Project.

C.     Construction Joints: Install so strength and appearance of concrete are not impaired, at locations indicated or as approved by Architect.
1.     Place joints perpendicular to main reinforcement. Continue reinforcement across construction joints unless otherwise indicated. Do not continue reinforcement through sides of strip placements of floors and slabs.
2.     Form keyed joints as indicated. Embed keys at least 1-1/2 inches into concrete.
3.     Locate joints for beams, slabs, joists, and girders in the middle third of spans. Offset joints in girders a minimum distance of twice the beam width from a beam-girder intersection.
4.     Locate horizontal joints in walls and columns at underside of floors, slabs, beams, and girders and at the top of footings or floor slabs.
5.     Insert spacing of construction joints in first subparagraph below if preferred.
6.     Space vertical joints in walls as indicated. Locate joints beside piers integral with walls, near corners, and in concealed locations where possible.
7.     Use a bonding agent at locations where fresh concrete is placed against hardened or partially hardened concrete surfaces.
8.     Use epoxy-bonding adhesive at locations where fresh concrete is placed against hardened or partially hardened concrete surfaces.

D.     Contraction Joints in Slabs-on-Grade: Form weakened-plane contraction joints, sectioning concrete into areas as indicated. Construct contraction joints for a depth equal to at least one-fourth  of concrete thickness as follows:
1.     Grooved Joints: Form contraction joints after initial floating by grooving and finishing each edge of joint to a radius of 1/8 inch. Repeat grooving of contraction joints after applying surface finishes. Eliminate groover tool marks on concrete surfaces.
2.     Sawed Joints: Form contraction joints with power saws equipped with shatterproof abrasive or diamond-rimmed blades. Cut 1/8-inch- wide joints into concrete when cutting action will not tear, abrade, or otherwise damage surface and before concrete develops random contraction cracks.

E.     Doweled Joints: Install dowel bars and support assemblies at joints where indicated. Lubricate or asphalt coat one-half of dowel length to prevent concrete bonding to one side of joint.

3.7     WATERSTOPS

A.     Self-Expanding Strip Waterstops: Install in construction joints and at other locations indicated, according to manufacturer's written instructions, adhesive bonding, mechanically fastening, and firmly pressing into place. Install in longest lengths practicable.

3.8     CONCRETE PLACEMENT

A.     Before placing concrete, verify that installation of formwork, reinforcement, and embedded items is complete and that required inspections have been performed.

B.     Do not add water to concrete during delivery, at Project site, or during placement unless approved by Architect.

C. Before test sampling and placing concrete, water may be added at Project site, subject to limitations of ACI 301.

D. Deposit concrete continuously in one layer or in horizontal layers of such thickness that no new concrete will be placed on concrete that has hardened enough to cause seams or planes of weakness. If a section cannot be placed continuously, provide construction joints as indicated. Deposit concrete to avoid segregation.
   1. Deposit concrete in horizontal layers of depth to not exceed formwork design pressures and in a manner to avoid inclined construction joints.
   2. Consolidate placed concrete with mechanical vibrating equipment according to ACI 301.
   3. Do not use vibrators to transport concrete inside forms. Insert and withdraw vibrators vertically at uniformly spaced locations to rapidly penetrate placed layer and at least 6 inches into preceding layer. Do not insert vibrators into lower layers of concrete that have begun to lose plasticity. At each insertion, limit duration of vibration to time necessary to consolidate concrete and complete embedment of reinforcement and other embedded items without causing mixture constituents to segregate.

E. Deposit and consolidate concrete for floors and slabs in a continuous operation, within limits of construction joints, until placement of a panel or section is complete.
   1. Consolidate concrete during placement operations so concrete is thoroughly worked around reinforcement and other embedded items and into corners.
   2. Maintain reinforcement in position on chairs during concrete placement.
   3. Screed slab surfaces with a straightedge and strike off to correct elevations.
   4. Slope surfaces uniformly to drains where required.
   5. Begin initial floating using bull floats or darbies to form a uniform and open-textured surface plane, before excess bleedwater appears on the surface. Do not further disturb slab surfaces before starting finishing operations.

F. Cold-Weather Placement: Comply with ACI 306.1 and as follows. Protect concrete work from physical damage or reduced strength that could be caused by frost, freezing actions, or low temperatures.
   1. When average high and low temperature is expected to fall below 40 deg F for three successive days, maintain delivered concrete mixture temperature within the temperature range required by ACI 301.
   2. Do not use frozen materials or materials containing ice or snow. Do not place concrete on frozen subgrade or on subgrade containing frozen materials.
   3. Do not use calcium chloride, salt, or other materials containing antifreeze agents or chemical accelerators unless otherwise specified and approved in mixture designs.

G. Hot-Weather Placement: Comply with ACI 301 and as follows:
   1. Maintain concrete temperature below 90 deg F at time of placement. Chilled mixing water or chopped ice may be used to control temperature, provided water equivalent of ice is calculated to total amount of mixing water. Using liquid nitrogen to cool concrete is Contractor's option.
   2. Fog-spray forms, steel reinforcement, and subgrade just before placing concrete. Keep subgrade uniformly moist without standing water, soft spots, or dry areas.

3.9 FINISHING FORMED SURFACES

A. Rough-Formed Finish: As-cast concrete texture imparted by form-facing material with tie holes and defects repaired and patched. Remove fins and other projections that exceed specified limits on formed-surface irregularities.
   1. Apply to concrete surfaces not exposed to public view.

B. Related Unformed Surfaces: At tops of walls, horizontal offsets, and similar unformed surfaces adjacent to formed surfaces, strike off smooth and finish with a texture matching adjacent formed surfaces. Continue final surface treatment of formed surfaces uniformly across adjacent unformed surfaces unless otherwise indicated.

3.10 FINISHING FLOORS AND SLABS

A. General: Comply with ACI 302.1R recommendations for screeding, restraightening, and finishing operations for concrete surfaces. Do not wet concrete surfaces.

B. Revise locations of scratch finish in subparagraph below to suit Project.

C. Float Finish: Consolidate surface with power-driven floats or by hand floating if area is small or inaccessible to power driven floats. Restraighten, cut down high spots, and fill low spots. Repeat float passes and restraightening until surface is left with a uniform, smooth, granular texture.
1. Apply float finish to surfaces to receive trowel finish.

D. Trowel Finish: After applying float finish, apply first troweling and consolidate concrete by hand or power-driven trowel. Continue troweling passes and restraighten until surface is free of trowel marks and uniform in texture and appearance. Grind smooth any surface defects that would telegraph through applied coatings or floor coverings.
1. Apply a trowel finish to surfaces exposed to view.
2. Finish surfaces to the following tolerances, according to ASTM E 1155, for a randomly trafficked floor surface:
   a. Specified overall values of flatness, F(F) 35; and of levelness, F(L) 25; with minimum local values of flatness, F(F) 24; and of levelness, F(L) 17; for slabs-on-grade.
3. Finish and measure surface so gap at any point between concrete surface and an unleveled, freestanding, 10-ft.- long straightedge resting on two high spots and placed anywhere on the surface does not exceed 1/8 inch.

3.11 MISCELLANEOUS CONCRETE ITEMS

A. Filling In: Fill in holes and openings left in concrete structures after work of other trades is in place unless otherwise indicated. Mix, place, and cure concrete, as specified, to blend with in-place construction. Provide other miscellaneous concrete filling indicated or required to complete the Work.

3.12 CONCRETE PROTECTING AND CURING

A. General: Protect freshly placed concrete from premature drying and excessive cold or hot temperatures. Comply with ACI 306.1 for cold-weather protection and ACI 301 for hot-weather protection during curing.

B. If evaporation rate in first paragraph below is exceeded, ACI 305R states that plastic shrinkage cracking is probable. See manufacturers' literature or ACI 305R for estimated moisture-loss chart relating relative humidity, air and concrete temperature, and wind velocity to rate of evaporation.

C. Formed Surfaces: Cure formed concrete surfaces, including underside of beams, supported slabs, and other similar surfaces. If forms remain during curing period, moist cure after loosening forms. If removing forms before end of curing period, continue curing for the remainder of the curing period.

D. Unformed Surfaces: Begin curing immediately after finishing concrete. Cure unformed surfaces, including floors and slabs, concrete floor toppings, and other surfaces.

E. Cure concrete according to ACI 308.1, by one or a combination of the following methods:
1. Curing Compound: Apply uniformly in continuous operation by power spray or roller according to manufacturer's written instructions. Recoat areas subjected to heavy rainfall within three hours after initial application. Maintain continuity of coating and repair damage during curing period.
   a. Removal: After curing period has elapsed, remove curing compound without damaging concrete surfaces by method recommended by curing compound manufacturer unless manufacturer certifies curing compound will not interfere with bonding of floor covering used on Project.

3.13 JOINT FILLING

A. Prepare, clean, and install joint filler according to manufacturer's written instructions.
1. Defer joint filling until concrete has aged at least one month(s). Do not fill joints until construction traffic has permanently ceased.

B. Remove dirt, debris, saw cuttings, curing compounds, and sealers from joints; leave contact faces of joint clean and dry.

C. Install semirigid joint filler full depth in saw-cut joints and at least 2 inches deep in formed joints. Overfill joint and trim joint filler flush with top of joint after hardening.

3.14 CONCRETE SURFACE REPAIRS

A. Defective Concrete: Repair and patch defective areas when approved by Architect. Remove and replace concrete that cannot be repaired and patched to Architect's approval.

B. Patching Mortar: Mix dry-pack patching mortar, consisting of one part portland cement to two and one-half parts fine aggregate passing a No. 16 sieve, using only enough water for handling and placing.

C. Insert provision for testing repair technique on a mockup or surface to be concealed later, before repairing surfaces.

D. Repairing Formed Surfaces: Surface defects include color and texture irregularities, cracks, spalls, air bubbles, honeycombs, rock pockets, fins and other projections on the surface, and stains and other discolorations that cannot be removed by cleaning.
   1. Immediately after form removal, cut out honeycombs, rock pockets, and voids more than 1/2 inch in any dimension to solid concrete. Limit cut depth to 3/4 inch. Make edges of cuts perpendicular to concrete surface. Clean, dampen with water, and brush-coat holes and voids with bonding agent. Fill and compact with patching mortar before bonding agent has dried. Fill form-tie voids with patching mortar or cone plugs secured in place with bonding agent.
   2. Repair defects on surfaces exposed to view by blending white portland cement and standard portland cement so that, when dry, patching mortar will match surrounding color. Patch a test area at inconspicuous locations to verify mixture and color match before proceeding with patching. Compact mortar in place and strike off slightly higher than surrounding surface.
   3. Repair defects on concealed formed surfaces that affect concrete's durability and structural performance as determined by Architect.

E. Repairing Unformed Surfaces: Test unformed surfaces, such as floors and slabs, for finish and verify surface tolerances specified for each surface. Correct low and high areas. Test surfaces sloped to drain for trueness of slope and smoothness; use a sloped template.
   1. Repair finished surfaces containing defects. Surface defects include spalls, popouts, honeycombs, rock pockets, crazing and cracks in excess of 0.01 inch wide or that penetrate to reinforcement or completely through unreinforced sections regardless of width, and other objectionable conditions.
   2. After concrete has cured at least 14 days, correct high areas by grinding.
   3. Correct localized low areas during or immediately after completing surface finishing operations by cutting out low areas and replacing with patching mortar. Finish repaired areas to blend into adjacent concrete.
   4. Correct other low areas scheduled to receive floor coverings with a repair underlayment. Prepare, mix, and apply repair underlayment and primer according to manufacturer's written instructions to produce a smooth, uniform, plane, and level surface. Feather edges to match adjacent floor elevations.
   5. Correct other low areas scheduled to remain exposed with a repair topping. Cut out low areas to ensure a minimum repair topping depth of 1/4 inch to match adjacent floor elevations. Prepare, mix, and apply repair topping and primer according to manufacturer's written instructions to produce a smooth, uniform, plane, and level surface.
   6. Repair defective areas, except random cracks and single holes 1 inch or less in diameter, by cutting out and replacing with fresh concrete. Remove defective areas with clean, square cuts and expose steel reinforcement with at least a 3/4-inch clearance all around. Dampen concrete surfaces in contact with patching concrete and apply bonding agent. Mix patching concrete of same materials and mixture as original concrete except without coarse aggregate. Place, compact, and finish to blend with adjacent finished concrete. Cure in same manner as adjacent concrete.
   7. Repair random cracks and single holes 1 inch or less in diameter with patching mortar. Groove top of cracks and cut out holes to sound concrete and clean off dust, dirt, and loose particles. Dampen cleaned concrete surfaces and apply bonding agent. Place patching mortar before bonding agent has dried. Compact patching mortar and finish to match adjacent concrete. Keep patched area continuously moist for at least 72 hours.

F. Perform structural repairs of concrete, subject to Architect's approval, using epoxy adhesive and patching mortar.

G. Repair materials and installation not specified above may be used, subject to Architect's approval.

3.15   FIELD QUALITY CONTROL

A. Testing and Inspecting: Owner will engage a to perform field tests and inspections and prepare test reports.

B. Testing and Inspecting: Engage a qualified testing and inspecting agency to perform tests and inspections and to submit reports.

C. Inspections:
1. Steel reinforcement placement.
2. Steel reinforcement welding.
3. Headed bolts and studs.
4. Verification of use of required design mixture.
5. Concrete placement, including conveying and depositing.
6. Curing procedures and maintenance of curing temperature.
7. Verification of concrete strength before removal of shores and forms from beams and slabs.

D. Concrete Tests: Testing of composite samples of fresh concrete obtained according to ASTM C 172 shall be performed according to the following requirements:
1. Testing Frequency: Obtain one composite sample for each day's pour of each concrete mixture exceeding 5 cu. yd., but less than 25 cu. yd., plus one set for each additional 50 cu. yd. or fraction thereof.
2. Testing Frequency: Obtain at least one composite sample for each 100 cu. yd. or fraction thereof of each concrete mixture placed each day.
   a. When frequency of testing will provide fewer than five compressive-strength tests for each concrete mixture, testing shall be conducted from at least five randomly selected batches or from each batch if fewer than five are used.
3. Slump: ASTM C 143/C 143M; one test at point of placement for each composite sample, but not less than one test for each day's pour of each concrete mixture. Perform additional tests when concrete consistency appears to change.
4. Air Content: ASTM C 231, pressure method, for normal-weight concrete; one test for each composite sample, but not less than one test for each day's pour of each concrete mixture.
5. Concrete Temperature: ASTM C 1064/C 1064M; one test hourly when air temperature is 40 deg F and below and when 80 deg F and above, and one test for each composite sample.
6. Unit Weight: ASTM C 567, fresh unit weight of structural lightweight concrete; one test for each composite sample, but not less than one test for each day's pour of each concrete mixture.
7. Compression Test Specimens: ASTM C 31/C 31M.
   a. Cast and laboratory cure two sets of two standard cylinder specimens for each composite sample.
   b. Field-cured specimens in first subparagraph below may be required to verify adequacy of curing and protection of concrete, to verify strength for tilt-up concrete and post-tensioning concrete, or to verify strength for removal of shoring and reshoring in multistory construction. Revise number of test specimens if required.
   c. Cast and field cure two sets of two standard cylinder specimens for each composite sample.
8. Compressive-Strength Tests: ASTM C 39/C 39M; test one set of two laboratory-cured specimens at 7 days and one set of two specimens at 28 days.
   a. Test one set of two field-cured specimens at 7 days and one set of two specimens at 28 days.
   b. A compressive-strength test shall be the average compressive strength from a set of two specimens obtained from same composite sample and tested at age indicated.
9. When strength of field-cured cylinders is less than 85 percent of companion laboratory-cured cylinders, Contractor shall evaluate operations and provide corrective procedures for protecting and curing in-place concrete.
10. Strength of each concrete mixture will be satisfactory if every average of any three consecutive compressive-strength tests equals or exceeds specified compressive strength and no compressive-strength test value falls below specified compressive strength by more than 500 psi.
11. Test results shall be reported in writing to Architect, concrete manufacturer, and Contractor within 48 hours of testing. Reports of compressive-strength tests shall contain Project identification name and number, date of concrete placement, name of concrete testing and inspecting agency, location of concrete batch in Work, design compressive strength at 28 days, concrete mixture proportions and materials, compressive breaking strength, and type of break for both 7- and 28-day tests.
12. Nondestructive Testing: Impact hammer, sonoscope, or other nondestructive device may be permitted by Architect but will not be used as sole basis for approval or rejection of concrete.
13. Additional Tests: Testing and inspecting agency shall make additional tests of concrete when test results indicate that slump, air entrainment, compressive strengths, or other requirements have not been met, as directed by Architect. Testing and inspecting agency may conduct tests to determine adequacy of concrete by cored cylinders complying with ASTM C 42/C 42M or by other methods as directed by Architect.
14. Additional testing and inspecting, at Contractor's expense, will be performed to determine compliance of replaced or additional work with specified requirements.

15. Correct deficiencies in the Work that test reports and inspections indicate do not comply with the Contract Documents.

E. Measure floor and slab flatness and levelness according to ASTM E 1155 within 48 hours of finishing.

**END OF SECTION 03 30 00**

**SECTION 03 54 16 - HYDRAULIC CEMENT UNDERLAYMENT**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section includes hydraulic-cement-based, polymer-modified, self-leveling underlayment for application below interior floor coverings.

1.3     ACTION SUBMITTALS

   A.   Product Data:  For each type of product indicated.

   B.   Qualification Data:  For qualified Installer.

1.4     INFORMATIONAL SUBMITTALS

   A.   Product Certificates:  Signed by manufacturers of underlayment and floor-covering systems certifying that products are compatible.

1.5     QUALITY ASSURANCE

   A.   Installer Qualifications:   Installer who is approved by manufacturer for application of underlayment products required for this Project.

   B.   Product Compatibility:  Manufacturers of underlayment and floor-covering systems certify in writing that products are compatible.

   C.   Fire-Resistance Ratings:  Where indicated, provide hydraulic-cement underlayment systems identical to those of assemblies tested for fire resistance per ASTM E 119 by a qualified testing agency.  Identify products with appropriate markings of applicable testing agency.
        1.     Indicate design designations from UL's "Fire Resistance Directory" or from the listings of another qualified testing agency.

1.6     DELIVERY, STORAGE, AND HANDLING

   A.   Store materials to comply with manufacturer's written instructions to prevent deterioration from moisture or other detrimental effects.

1.7     PROJECT CONDITIONS

   A.   Environmental Limitations:  Comply with manufacturer's written instructions for substrate temperature, ventilation, ambient temperature and humidity, and other conditions affecting underlayment performance.
        1.     Place hydraulic-cement-based underlayments only when ambient temperature and temperature of substrates are between 50 and 80 deg F.

1.8     COORDINATION

   A.   Coordinate application of underlayment with requirements of floor-covering products and adhesives, to ensure compatibility of products.

**PART 2 - PRODUCTS**

2.1    HYDRAULIC-CEMENT-BASED UNDERLAYMENTS

A.    Underlayment:  Hydraulic-cement-based, polymer-modified, self-leveling product that can be applied in minimum uniform thickness of 1/4 inch and that can be feathered at edges to match adjacent floor elevations.
   1.    Products:  Subject to compliance with requirements, provide one of the following :
      a.    Ardex; K-15 Self-Leveling Underlayment Concrete.
      b.    BASF Construction Chemicals, Inc.; MBT Mastertop 110 Plus Underlayment
      c.    Dayton Superior Corporation; LeveLayer.
      d.    MAPEI Corporation; Ultraplan Easy .
      e.    Maxxon Corporation; Level-Right.
      f.    Specialty Construction Brands, Inc., an H.B. Fuller company; TEC Smooth Start TEC EZ Level.
      g.    Teck Specialties; Teck 2800.
      h.    USG Corporation; Levelrock SLC 300.
   2.    Cement Binder:  ASTM C 150, portland cement, or hydraulic or blended hydraulic cement as defined by ASTM C 219.
   3.    Compressive Strength:  Not less than 4000 psi at 28 days when tested according to ASTM C 109/C 109M.
   4.    Underlayment Additive:  Resilient-emulsion product of underlayment manufacturer, formulated for use with underlayment when applied to substrate and conditions indicated.

B.    Aggregate:  Well-graded, washed gravel, 1/8 to 1/4 inch; or coarse sand as recommended by underlayment manufacturer.
   1.    Provide aggregate when recommended in writing by underlayment manufacturer for underlayment thickness required.

C.    Water:  Potable and at a temperature of not more than 70 deg F.

D.    Primer:  Product of underlayment manufacturer recommended in writing for substrate, conditions, and application indicated.
   1.    Primer shall have a VOC content of 200 g/L or less when calculated according to 40 CFR 59, Subpart D.

**PART 3 - EXECUTION**

3.1    EXAMINATION

A.    Examine substrates, with Installer present, for conditions affecting performance.
   1.    Proceed with application only after unsatisfactory conditions have been corrected.

3.2    PREPARATION

A.    General:  Prepare and clean substrate according to manufacturer's written instructions.
   1.    Treat nonmoving substrate cracks according to manufacturer's written instructions to prevent cracks from telegraphing (reflecting) through underlayment.
   2.    Fill substrate voids to prevent underlayment from leaking.

B.    Adhesion Tests:  After substrate preparation, test substrate for adhesion with underlayment according to manufacturer's written instructions.

3.3    APPLICATION

A.    General:  Mix and apply underlayment components according to manufacturer's written instructions.
   1.    Close areas to traffic during underlayment application and for time period after application recommended in writing by manufacturer.
   2.    Coordinate application of components to provide optimum underlayment-to-substrate and intercoat adhesion.

B.    Apply primer over prepared substrate at manufacturer's recommended spreading rate.

C.      Apply underlayment to produce uniform, level surface.
   1.     Apply a final layer without aggregate to product surface.
   2.     Feather edges to match adjacent floor elevations.

D.      Cure underlayment according to manufacturer's written instructions. Prevent contamination during application and curing processes.

E.      Do not install floor coverings over underlayment until after time period recommended in writing by underlayment manufacturer.

F.      Remove and replace underlayment areas that evidence lack of bond with substrate, including areas that emit a "hollow" sound when tapped.

3.4      PROTECTION

A.      Protect underlayment from concentrated and rolling loads for remainder of construction period.

**END OF SECTION 03 54 16**

**SECTION 06 10 53 - MISCELLANEOUS ROUGH CARPENTRY**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

    A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

    A.     Section Includes:
       1.     Wood blocking, cants, and nailers.

1.3     DEFINITIONS

    A.     Dimension Lumber: Lumber of 2 inches nominal or greater but less than 5 inches nominal in least dimension.

    B.     Lumber grading agencies, and the abbreviations used to reference them, include the following:
       1.     NeLMA: Northeastern Lumber Manufacturers' Association.
       2.     NHLA: National Hardwood Lumber Association.
       3.     NLGA: National Lumber Grades Authority.
       4.     SPIB: The Southern Pine Inspection Bureau.
       5.     WCLIB: West Coast Lumber Inspection Bureau.
       6.     WWPA: Western Wood Products Association.

1.4     ACTION SUBMITTALS

    A.     Product Data: For each type of process and factory-fabricated product. Indicate component materials and dimensions and include construction and application details.
       1.     Include data for wood-preservative treatment from chemical treatment manufacturer and certification by treating plant that treated materials comply with requirements. Indicate type of preservative used and net amount of preservative retained.
       2.     Include data for fire-retardant treatment from chemical treatment manufacturer and certification by treating plant that treated materials comply with requirements. Include physical properties of treated materials based on testing by a qualified independent testing agency.
       3.     For fire-retardant treatments, include physical properties of treated lumber both before and after exposure to elevated temperatures, based on testing by a qualified independent testing agency according to ASTM D 5664.
       4.     For products receiving a waterborne treatment, include statement that moisture content of treated materials was reduced to levels specified before shipment to Project site.
       5.     Include copies of warranties from chemical treatment manufacturers for each type of treatment.

1.5     INFORMATIONAL SUBMITTALS

    A.     Evaluation Reports: For the following, from ICC-ES:
       1.     Preservative-treated wood.
       2.     Fire-retardant-treated wood.
       3.     Power-driven fasteners.
       4.     Powder-actuated fasteners.
       5.     Expansion anchors.
       6.     Metal framing anchors.

1.6     QUALITY ASSURANCE

    A.     Source Limitations for Fire-Retardant-Treated Wood: Obtain each type of fire-retardant-treated wood product through one source from a single producer.

    B.     Testing Agency Qualifications: For testing agency providing classification marking for fire-retardant treated material, an inspection agency acceptable to authorities having jurisdiction that periodically performs

inspections to verify that the material bearing the classification marking is representative of the material tested.

1.7    DELIVERY, STORAGE, AND HANDLING

A.    Stack lumber flat with spacers beneath and between each bundle to provide air circulation.  Protect lumber from weather by covering with waterproof sheeting, securely anchored.  Provide for air circulation around stacks and under coverings.


**PART 2 - PRODUCTS**

2.1    WOOD PRODUCTS, GENERAL

A.    Do not use material that is warped or that does not comply with requirements for untreated material.

B.    Lumber:  DOC PS 20 and applicable rules of grading agencies indicated.  If no grading agency is indicated, provide lumber that complies with the applicable rules of any rules-writing agency certified by the ALSC Board of Review.  Provide lumber graded by an agency certified by the ALSC Board of Review to inspect and grade lumber under the rules indicated.
1.    Factory mark each piece of lumber with grade stamp of grading agency.
2.    For exposed lumber indicated to receive a stained or natural finish, mark grade stamp on end or back of each piece.
3.    Where nominal sizes are indicated, provide actual sizes required by DOC PS 20 for moisture content specified.  Where actual sizes are indicated, they are minimum dressed sizes for dry lumber.
4.    Provide dressed lumber, S4S, unless otherwise indicated.

C.    Maximum Moisture Content of Lumber:  15 percent unless otherwise indicated.

2.2    WOOD-PRESERVATIVE-TREATED MATERIALS

A.    Preservative Treatment by Pressure Process:  AWPA U1; Use Category UC2.
1.    Preservative Chemicals:  Acceptable to authorities having jurisdiction and containing no arsenic or chromium.
2.    For exposed items indicated to receive a stained or natural finish, use chemical formulations that do not require incising, contain colorants, bleed through, or otherwise adversely affect finishes.

B.    Kiln-dry lumber after treatment to a maximum moisture content of 19 percent.  Do not use material that is warped or does not comply with requirements for untreated material.

C.    Mark lumber with treatment quality mark of an inspection agency approved by the ALSC Board of Review.
1.    For exposed lumber indicated to receive a stained or natural finish, mark end or back of each piece.

D.    Application:  Treat items indicated on Drawings, and the following:
1.    Wood cants, nailers, curbs, equipment support bases, blocking, stripping, and similar members in connection with roofing, flashing, vapor barriers, and waterproofing.
2.    Wood sills, sleepers, blocking, and similar concealed members in contact with masonry or concrete.
3.    Wood framing and furring attached directly to the interior of below-grade exterior masonry or concrete walls.
4.    Wood framing members that are less than 18 inches above the ground in crawl spaces or unexcavated areas.
5.    Wood floor plates that are installed over concrete slabs-on-grade.

2.3    FIRE-RETARDANT-TREATED MATERIALS

A.    General:  Where fire-retardant-treated materials are indicated, use materials complying with requirements in this article, that are acceptable to authorities having jurisdiction, and with fire-test-response characteristics specified as determined by testing identical products per test method indicated by a qualified testing agency.

B. Fire-Retardant-Treated Lumber and Plywood by Pressure Process:  Products with a flame spread index of 25 or less when tested according to ASTM E 84, and with no evidence of significant progressive combustion when the test is extended an additional 20 minutes, and with the flame front not extending more than 10.5 feet beyond the centerline of the burners at any time during the test.
   1. Use treatment that does not promote corrosion of metal fasteners.
   2. Interior Type A:  Treated materials shall have a moisture content of 28 percent or less when tested according to ASTM D 3201 at 92 percent relative humidity.  Use where exterior type is not indicated.
   3. Design Value Adjustment Factors:  Treated lumber shall be tested according ASTM D 5664, and design value adjustment factors shall be calculated according to ASTM D 6841]

C. Kiln-dry lumber after treatment to a maximum moisture content of 19 percent.  Kiln-dry plywood after treatment to a maximum moisture content of 15 percent.

D. Identify fire-retardant-treated wood with appropriate classification marking of testing and inspecting agency acceptable to authorities having jurisdiction.

E. For exposed items indicated to receive a stained or natural finish, use chemical formulations that do not bleed through, contain colorants, or otherwise adversely affect finishes.

F. Application:  Treat all miscellaneous carpentry unless otherwise indicated.
   1. Concealed blocking.
   2. Roof framing and blocking.
   3. Wood cants, nailers, curbs, equipment support bases, blocking, and similar members in connection with roofing.
   4. Plywood backing panels.

2.4    MISCELLANEOUS LUMBER

A. General:  Provide miscellaneous lumber indicated and lumber for support or attachment of other construction, including the following:
   1. Blocking.
   2. Nailers.
   3. Rooftop equipment bases and support curbs.
   4. Cants.

B. For items of dimension lumber size, provide Construction or No. 2 grade lumber of any species.
   1. Mixed southern pine; SPIB.

C. For concealed boards, provide lumber with 15 percent maximum moisture content and any of the following species and grades:
   1. Spruce-pine-fir (south) or spruce-pine-fir, Construction or No. 2 Common grade; NeLMA, NLGA, WCLIB, or WWPA.

D. For blocking not used for attachment of other construction, Utility, Stud, or No. 3 grade lumber of any species may be used provided that it is cut and selected to eliminate defects that will interfere with its attachment and purpose.

E. For blocking and nailers used for attachment of other construction, select and cut lumber to eliminate knots and other defects that will interfere with attachment of other work.

2.5    FASTENERS

A. General:  Provide fasteners of size and type indicated that comply with requirements specified in this article for material and manufacture.
   1. Where carpentry is exposed to weather, in ground contact, pressure-preservative treated, or in area of high relative humidity, provide fasteners of Type 304 stainless steel.

B. Nails, Brads, and Staples:  ASTM F 1667.

C. Power-Driven Fasteners:  NES NER-272.

D. Wood Screws:  ASME B18.6.1.

E. Screws for Fastening to Metal Framing:  ASTM C 1002, length as recommended by screw manufacturer for material being fastened.

F. Lag Bolts:  ASME B18.2.1.

G.   Bolts:  Steel bolts complying with ASTM A 307, Grade A; with ASTM A 563 hex nuts and, where indicated, flat washers.

H.   Expansion Anchors:  Anchor bolt and sleeve assembly of material indicated below with capability to sustain, without failure, a load equal to 6 times the load imposed when installed in unit masonry assemblies and equal to 4 times the load imposed when installed in concrete as determined by testing per ASTM E 488 conducted by a qualified independent testing and inspecting agency.
1.   Material:  Carbon-steel components, zinc plated to comply with ASTM B 633, Class Fe/Zn 5.


**PART 3 - EXECUTION**

3.1   INSTALLATION, GENERAL

A.   Use fasteners of appropriate type and length. Predrill members when necessary to avoid splitting wood. Indicate that bolts and nuts are to be recessed flush with surface, unless otherwise indicated.

B.   Sheathing boards are to be installed flush and plumb with the joints between the boards not to exceed 1/8-inch. Wherever possible, the finished edge is to face the perimeter of rough openings (exposed gypsum is not a suitable substrate for the air barrier's self-adhered membrane).

C.   Set carpentry to required levels and lines, with members plumb, true to line, cut, and fitted.  Fit carpentry to other construction; scribe and cope as needed for accurate fit.  Locate nailers, blocking, and similar supports to comply with requirements for attaching other construction.

D.   Where wood-preservative-treated lumber is installed adjacent to metal decking, install continuous flexible flashing separator between wood and metal decking.

E.   Framing Standard:  Comply with AF&PA's WCD 1, "Details for Conventional Wood Frame Construction," unless otherwise indicated.

F.   Install plywood backing panels by fastening to studs; coordinate locations with utilities requiring backing panels.  Install fire-retardant treated plywood backing panels with classification marking of testing agency exposed to view.

G.   Do not splice structural members between supports unless otherwise indicated.

H.   Provide blocking and framing as indicated and as required to support facing materials, fixtures, specialty items, and trim.
1.   Provide metal clips for fastening gypsum board or lath at corners and intersections where framing or blocking does not provide a surface for fastening edges of panels.  Space clips not more than 16 inches o.c.

I.   Provide fire blocking in furred spaces, stud spaces, and other concealed cavities as indicated and as follows:
1.   Fire block furred spaces of walls, at each floor level, at ceiling, and at not more than 96 inches o.c. with solid wood blocking or noncombustible materials accurately fitted to close furred spaces.
2.   Fire block concealed spaces of wood-framed walls and partitions at each floor level, at ceiling line of top story, and at not more than 96 inches o.c.  Where fire blocking is not inherent in framing system used, provide closely fitted solid wood blocks of same width as framing members and 2-inch nominal thickness.
3.   Fire block concealed spaces between floor sleepers with same material as sleepers to limit concealed spaces to not more than 100 sq. ft. and to solidly fill space below partitions.
4.   Fire block concealed spaces behind combustible cornices and exterior trim at not more than 20 feet o.c.

J.   Sort and select lumber so that natural characteristics will not interfere with installation or with fastening other materials to lumber.  Do not use materials with defects that interfere with function of member or pieces that are too small to use with minimum number of joints or optimum joint arrangement.

K.   Comply with AWPA M4 for applying field treatment to cut surfaces of preservative-treated lumber.
1.   Use inorganic boron for items that are continuously protected from liquid water.
2.   Use copper naphthenate for items not continuously protected from liquid water.

L.  Securely attach carpentry work to substrate by anchoring and fastening as indicated, complying with the following:
1.  NES NER-272 for power-driven fasteners.
2.  Table 2304.9.1, "Fastening Schedule," in ICC's International Building Code.
3.  Table R602.3(1), "Fastener Schedule for Structural Members," and Table R602.3(2), "Alternate Attachments," in ICC's International Residential Code for One- and Two-Family Dwellings.

M.  Use steel common nails unless otherwise indicated.  Select fasteners of size that will not fully penetrate members where opposite side will be exposed to view or will receive finish materials.  Make tight connections between members.  Install fasteners without splitting wood.  Drive nails snug but do not countersink nail heads unless otherwise indicated.

3.2  WOOD BLOCKING, AND NAILER INSTALLATION

A.  Install where indicated and where required for attaching other work.  Form to shapes indicated and cut as required for true line and level of attached work.  Coordinate locations with other work involved.

B.  Attach items to substrates to support applied loading.  Recess bolts and nuts flush with surfaces unless otherwise indicated.

3.3  PROTECTION

A.  Protect wood that has been treated with inorganic boron (SBX) from weather.  If, despite protection, inorganic boron-treated wood becomes wet, apply EPA-registered borate treatment.  Apply borate solution by spraying to comply with EPA-registered label.

B.  Protect miscellaneous rough carpentry from weather.  If, despite protection, miscellaneous rough carpentry becomes wet, apply EPA-registered borate treatment.  Apply borate solution by spraying to comply with EPA-registered label.

**END OF SECTION 06 10 53**

**SECTION 07 84 13 - PENETRATION FIRESTOPPING**


**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section Includes:
        1.    Penetrations in fire-resistance-rated walls.
        2.    Penetrations in horizontal assemblies.

1.3     ACTION SUBMITTALS

   A.   Product Data:  For each type of product indicated.

   B.   Product Schedule:  For each penetration firestopping system.  Include location and design designation of qualified testing and inspecting agency.
        1.    Where Project conditions require modification to a qualified testing and inspecting agency's illustration for a particular penetration firestopping condition, submit illustration, with modifications marked, approved by penetration firestopping manufacturer's fire-protection engineer as an engineering judgment or equivalent fire-resistance-rated assembly.

1.4     INFORMATIONAL SUBMITTALS

   A.   Qualification Data:  For qualified Installer.

   B.   Installer Certificates:  From Installer indicating penetration firestopping has been installed in compliance with requirements and manufacturer's written recommendations.

   C.   Product Test Reports:  Based on evaluation of comprehensive tests performed by a qualified testing agency, for penetration firestopping.

1.5     QUALITY ASSURANCE

   A.   Installer Qualifications:  A firm that has been approved by FM Global according to FM Global 4991, "Approval of Firestop Contractors," or been evaluated by UL and found to comply with its "Qualified Firestop Contractor Program Requirements."

   B.   Fire-Test-Response Characteristics: Penetration firestopping shall comply with the following requirements:
        1.    Penetration firestopping tests are performed by a qualified testing agency acceptable to authorities having jurisdiction.
        2.    Penetration firestopping is identical to those tested per testing standard referenced in "Penetration Firestopping" Article.  Provide rated systems complying with the following requirements:
              a.    Penetration firestopping products bear classification marking of qualified testing and inspecting agency.
              b.    Classification markings on penetration firestopping correspond to designations listed by the following:
                    1)     UL in its "Fire Resistance Directory."

1.6     PROJECT CONDITIONS

   A.   Environmental Limitations:  Do not install penetration firestopping when ambient or substrate temperatures are outside limits permitted by penetration firestopping manufacturers or when substrates are wet because of rain, frost, condensation, or other causes.

   B.   Install and cure penetration firestopping per manufacturer's written instructions using natural means of ventilations or, where this is inadequate, forced-air circulation.

1.7     COORDINATION

A.     Coordinate construction of openings and penetrating items to ensure that penetration firestopping is installed according to specified requirements.

B.     Coordinate sizing of sleeves, openings, core-drilled holes, or cut openings to accommodate penetration firestopping.


**PART 2 - PRODUCTS**

2.1     MANUFACTURERS

A.     Manufacturers: Subject to compliance with requirements, provide products by one of the following:
1.     Hilti, Inc.
2.     RectorSeal Corporation.
3.     Specified Technologies Inc.
4.     3M Fire Protection Products.


2.2     PENETRATION FIRESTOPPING

A.     Provide penetration firestopping that is produced and installed to resist spread of fire according to requirements indicated, resist passage of smoke and other gases, and maintain original fire-resistance rating of construction penetrated.  Penetration firestopping systems shall be compatible with one another, with the substrates forming openings, and with penetrating items if any.

B.     Penetrations in Fire-Resistance-Rated Walls:  Provide penetration firestopping with ratings determined per ASTM E 814 or UL 1479, based on testing at a positive pressure differential of 0.01-inch wg.
1.     Fire-resistance-rated walls include fire walls fire-barrier walls smoke-barrier walls and fire partitions.
2.     F-Rating:  Not less than the fire-resistance rating of constructions penetrated.

C.     Penetrations in Horizontal Assemblies:  Provide penetration firestopping with ratings determined per ASTM E 814 or UL 1479, based on testing at a positive pressure differential of 0.01-inch wg.
1.     Horizontal assemblies include floors floor/ceiling assemblies and ceiling membranes of roof/ceiling assemblies.
2.     F-Rating:  At least 1 hour, but not less than the fire-resistance rating of constructions penetrated.
3.     T-Rating:  At least 1 hour, but not less than the fire-resistance rating of constructions penetrated except for floor penetrations within the cavity of a wall.

D.     Exposed Penetration Firestopping:  Provide products with flame-spread and smoke-developed indexes of less than 25 and 450, respectively, as determined per ASTM E 84.

E.     Accessories:  Provide components for each penetration firestopping system that are needed to install fill materials and to maintain ratings required.  Use only those components specified by penetration firestopping manufacturer and approved by qualified testing and inspecting agency for firestopping indicated.
1.     Permanent forming/damming/backing materials, including the following:
a.     Slag-wool-fiber or rock-wool-fiber insulation.
b.     Sealants used in combination with other forming/damming/backing materials to prevent leakage of fill materials in liquid state.
c.     Fire-rated form board.
d.     Fillers for sealants.
2.     Temporary forming materials.
3.     Substrate primers.
4.     Collars.
5.     Steel sleeves.


2.3     FILL MATERIALS

A.     Latex Sealants:  Single-component latex formulations that do not re-emulsify after cure during exposure to moisture.

B.     Firestop Devices:  Factory-assembled collars formed from galvanized steel and lined with intumescent material sized to fit specific diameter of penetrant.

C.  Intumescent Composite Sheets:  Rigid panels consisting of aluminum-foil-faced elastomeric sheet bonded to galvanized-steel sheet.

D.  Intumescent Putties:  Nonhardening dielectric, water-resistant putties containing no solvents, inorganic fibers, or silicone compounds.

E.  Intumescent Wrap Strips:  Single-component intumescent elastomeric sheets with aluminum foil on one side.

F.  Mortars:  Prepackaged dry mixes consisting of a blend of inorganic binders, hydraulic cement, fillers, and lightweight aggregate formulated for mixing with water at Project site to form a nonshrinking, homogeneous mortar.

G.  Pillows/Bags:  Reusable heat-expanding pillows/bags consisting of glass-fiber cloth cases filled with a combination of mineral-fiber, water-insoluble expansion agents, and fire-retardant additives.  Where exposed, cover openings with steel-reinforcing wire mesh to protect pillows/bags from being easily removed.

H.  Silicone Foams:  Multicomponent, silicone-based liquid elastomers that, when mixed, expand and cure in place to produce a flexible, nonshrinking foam.

I.  Silicone Sealants:  Single-component, silicone-based, neutral-curing elastomeric sealants of grade indicated below:
    1.  Grade:  Pourable (self-leveling) formulation for openings in floors and other horizontal surfaces, and nonsag formulation for openings in vertical and sloped surfaces, unless indicated firestopping limits use of nonsag grade for both opening conditions.

2.4     MIXING

A.  For those products requiring mixing before application, comply with penetration firestopping manufacturer's written instructions for accurate proportioning of materials, water (if required), type of mixing equipment, selection of mixer speeds, mixing containers, mixing time, and other items or procedures needed to produce products of uniform quality with optimum performance characteristics for application indicated.


**PART 3 - EXECUTION**

3.1     EXAMINATION

A.  Examine substrates and conditions, with Installer present, for compliance with requirements for opening configurations, penetrating items, substrates, and other conditions affecting performance of the Work.

B.  Proceed with installation only after unsatisfactory conditions have been corrected.

3.2     PREPARATION

A.  Surface Cleaning:  Clean out openings immediately before installing penetration firestopping to comply with manufacturer's written instructions and with the following requirements:
    1.  Remove from surfaces of opening substrates and from penetrating items foreign materials that could interfere with adhesion of penetration firestopping.
    2.  Clean opening substrates and penetrating items to produce clean, sound surfaces capable of developing optimum bond with penetration firestopping.  Remove loose particles remaining from cleaning operation.
    3.  Remove laitance and form-release agents from concrete.

B.  Priming:  Prime substrates where recommended in writing by manufacturer using that manufacturer's recommended products and methods.  Confine primers to areas of bond; do not allow spillage and migration onto exposed surfaces.

C.  Masking Tape:  Use masking tape to prevent penetration firestopping from contacting adjoining surfaces that will remain exposed on completion of the Work and that would otherwise be permanently stained or damaged by such contact or by cleaning methods used to remove stains.  Remove tape as soon as possible without disturbing firestopping's seal with substrates.

3.3    INSTALLATION

A.    General:  Install penetration firestopping to comply with manufacturer's written installation instructions and published drawings for products and applications indicated.

B.    Install forming materials and other accessories of types required to support fill materials during their application and in the position needed to produce cross-sectional shapes and depths required to achieve fire ratings indicated.
1.    After installing fill materials and allowing them to fully cure, remove combustible forming materials and other accessories not indicated as permanent components of firestopping.

C.    Install fill materials for firestopping by proven techniques to produce the following results:
1.    Fill voids and cavities formed by openings, forming materials, accessories, and penetrating items as required to achieve fire-resistance ratings indicated.
2.    Apply materials so they contact and adhere to substrates formed by openings and penetrating items.
3.    For fill materials that will remain exposed after completing the Work, finish to produce smooth, uniform surfaces that are flush with adjoining finishes.

3.4    IDENTIFICATION

A.    Identify penetration firestopping with preprinted metal or plastic labels.  Attach labels permanently to surfaces adjacent to and within 6 inches of firestopping edge so labels will be visible to anyone seeking to remove penetrating items or firestopping.  Use mechanical fasteners or self-adhering-type labels with adhesives capable of permanently bonding labels to surfaces on which labels are placed.  Include the following information on labels:
1.    The words "Warning - Penetration Firestopping - Do Not Disturb.  Notify Building Management of Any Damage."
2.    Contractor's name, address, and phone number.
3.    Designation of applicable testing and inspecting agency.
4.    Date of installation.
5.    Manufacturer's name.
6.    Installer's name.

3.5    FIELD QUALITY CONTROL

A.    Owner will engage a qualified testing agency to perform tests and inspections.

B.    Where deficiencies are found or penetration firestopping is damaged or removed because of testing, repair or replace penetration firestopping to comply with requirements.

C.    Proceed with enclosing penetration firestopping with other construction only after inspection reports are issued and installations comply with requirements.

3.6    CLEANING AND PROTECTION

A.    Clean off excess fill materials adjacent to openings as the Work progresses by methods and with cleaning materials that are approved in writing by penetration firestopping manufacturers and that do not damage materials in which openings occur.

B.    Provide final protection and maintain conditions during and after installation that ensure that penetration firestopping is without damage or deterioration at time of Substantial Completion.  If, despite such protection, damage or deterioration occurs, immediately cut out and remove damaged or deteriorated penetration firestopping and install new materials to produce systems complying with specified requirements.

3.7    PENETRATION FIRESTOPPING SCHEDULE

A.    Where UL-classified systems are indicated, they refer to system numbers in UL's "Fire Resistance Directory" under product Category XHEZ.

B.    Penetration firestopping to be installed to maintain wall and horizontal rating requirements as indicated on drawings.

**END OF SECTION 07 84 13**

**SECTION 07 84 46 - FIRE-RESISTIVE JOINT SYSTEMS**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section Includes:
        1.   Joints in or between fire-resistance-rated constructions.

1.3     ACTION SUBMITTALS

   A.   Product Data:  For each type of product indicated.

1.4     INFORMATIONAL SUBMITTALS

   A.   Qualification Data:  For qualified Installer.

   B.   Installer Certificates:   From Installer indicating fire-resistive joint systems have been installed in compliance with requirements and manufacturer's written recommendations.

   C.   Product Test Reports:  Based on evaluation of comprehensive tests performed by a qualified testing agency, for fire-resistive joint systems.

1.5     QUALITY ASSURANCE

   A.   Installer Qualifications:  A firm that has been approved by FM Global according to FM Global 4991, "Approval of Firestop Contractors," or been evaluated by UL and found to comply with UL's "Qualified Firestop Contractor Program Requirements."

   B.   Fire-Test-Response Characteristics:   Fire-resistive joint systems shall comply with the following requirements:
        1.   Fire-resistive joint system tests are performed by a qualified testing agency acceptable to authorities having jurisdiction.
        2.   Fire-resistive joint systems are identical to those tested per testing standard referenced in "Fire-Resistive Joint Systems" Article.  Provide rated systems complying with the following requirements:
             a.   Fire-resistive joint system products bear classification marking of qualified testing agency.
             b.   Fire-resistive joint systems correspond to those indicated by reference to designations listed by the following:
                  1)   UL in its "Fire Resistance Directory."

1.6     PROJECT CONDITIONS

   A.   Environmental Limitations:   Do not install fire-resistive joint systems when ambient or substrate temperatures are outside limits permitted by fire-resistive joint system manufacturers or when substrates are wet due to rain, frost, condensation, or other causes.

   B.   Install and cure fire-resistive joint systems per manufacturer's written instructions using natural means of ventilation or, where this is inadequate, forced-air circulation.

1.7     COORDINATION

   A.   Coordinate construction of joints to ensure that fire-resistive joint systems are installed according to specified requirements.

   B.   Coordinate sizing of joints to accommodate fire-resistive joint systems.

## PART 2 - PRODUCTS

2.1     FIRE-RESISTIVE JOINT SYSTEMS

A.     Where required, provide fire-resistive joint systems that are produced and installed to resist spread of fire according to requirements indicated, resist passage of smoke and other gases, and maintain original fire-resistance rating of assemblies in or between which fire-resistive joint systems are installed.  Fire-resistive joint systems shall accommodate building movements without impairing their ability to resist the passage of fire and hot gases.

B.     Joints in or between Fire-Resistance-Rated Construction:  Provide fire-resistive joint systems with ratings determined per ASTM E 1966 or UL 2079:
1.     Joints include those installed in or between fire-resistance-rated walls floor or floor/ceiling assemblies and roofs or roof/ceiling assemblies.
2.     Fire-Resistance Rating:  Equal to or exceeding the fire-resistance rating of construction they will join.
3.      Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
   a.     Hilti, Inc.
   b.     RectorSeal Corporation.
   c.     Specified Technologies Inc.
   d.     3M Fire Protection Products.

C.     Joints in Smoke Barriers:  Provide fire-resistive joint systems with ratings determined per UL 2079.
1.     L-Rating:  Not exceeding 5.0 cfm/ft of joint at 0.30 inch wg at both ambient and elevated temperatures.
2.     Manufacturers: Subject to compliance with requirements, provide products by one of the following:
   a.     Hilti, Inc.
   b.     RectorSeal Corporation.
   c.     Specified Technologies Inc.
   d.     3M Fire Protection Products.

D.     Accessories:  Provide components of fire-resistive joint systems, including primers and forming materials, that are needed to install fill materials and to maintain ratings required.  Use only components specified by fire-resistive joint system manufacturer and approved by the qualified testing agency for systems indicated.

## PART 3 - EXECUTION

3.1     EXAMINATION

A.     Examine substrates and conditions, with Installer present, for compliance with requirements for joint configurations, substrates, and other conditions affecting performance of the Work.

B.     Proceed with installation only after unsatisfactory conditions have been corrected.

3.2     PREPARATION

A.     Surface Cleaning:  Clean joints immediately before installing fire-resistive joint systems to comply with fire-resistive joint system manufacturer's written instructions and the following requirements:
1.     Remove from surfaces of joint substrates foreign materials that could interfere with adhesion of fill materials.
2.     Clean joint substrates to produce clean, sound surfaces capable of developing optimum bond with fill materials.  Remove loose particles remaining from cleaning operation.
3.     Remove laitance and form-release agents from concrete.

B.     Priming:  Prime substrates where recommended in writing by fire-resistive joint system manufacturer using that manufacturer's recommended products and methods.  Confine primers to areas of bond; do not allow spillage and migration onto exposed surfaces.

C.     Masking Tape:  Use masking tape to prevent fill materials of fire-resistive joint system from contacting adjoining surfaces that will remain exposed on completion of the Work and that would otherwise be permanently stained or damaged by such contact or by cleaning methods used to remove stains.  Remove tape as soon as possible without disturbing fire-resistive joint system's seal with substrates.

3.3     INSTALLATION

A.    General:  Install fire-resistive joint systems to comply with manufacturer's written installation instructions and published drawings for products and applications indicated.

B.    Install forming materials and other accessories of types required to support fill materials during their application and in position needed to produce cross-sectional shapes and depths required to achieve fire ratings indicated.
1.    After installing fill materials and allowing them to fully cure, remove combustible forming materials and other accessories not indicated as permanent components of fire-resistive joint system.

C.    Install fill materials for fire-resistive joint systems by proven techniques to produce the following results:
1.    Fill voids and cavities formed by joints and forming materials as required to achieve fire-resistance ratings indicated.
2.    Apply fill materials so they contact and adhere to substrates formed by joints.
3.    For fill materials that will remain exposed after completing the Work, finish to produce smooth, uniform surfaces that are flush with adjoining finishes.

3.4     IDENTIFICATION

A.    Identify fire-resistive joint systems with preprinted metal or plastic labels.  Attach labels permanently to surfaces adjacent to and within 6 inches of joint edge so labels will be visible to anyone seeking to remove or penetrate joint system.  Use mechanical fasteners or self-adhering-type labels with adhesives capable of permanently bonding labels to surfaces on which labels are placed.  Include the following information on labels:
1.    The words "Warning - Fire-Resistive Joint System - Do Not Disturb.  Notify Building Management of Any Damage."
2.    Contractor's name, address, and phone number.
3.    Designation of applicable testing agency.
4.    Date of installation.
5.    Manufacturer's name.
6.    Installer's name.

3.5     FIELD QUALITY CONTROL

A.    Inspecting Agency:  Owner will engage a qualified testing agency to perform tests and inspections.

B.    Where deficiencies are found or fire-resistive joint systems are damaged or removed due to testing, repair or replace fire-resistive joint systems so they comply with requirements.

C.    Proceed with enclosing fire-resistive joint systems with other construction only after inspection reports are issued and installations comply with requirements.

3.6     CLEANING AND PROTECTING

A.    Clean off excess fill materials adjacent to joints as the Work progresses by methods and with cleaning materials that are approved in writing by fire-resistive joint system manufacturers and that do not damage materials in which joints occur.

B.    Provide final protection and maintain conditions during and after installation that ensure fire-resistive joint systems are without damage or deterioration at time of Substantial Completion.  If damage or deterioration occurs despite such protection, cut out and remove damaged or deteriorated fire-resistive joint systems immediately and install new materials to produce fire-resistive joint systems complying with specified requirements.

3.7     FIRE-RESISTIVE JOINT SYSTEM SCHEDULE

A.    Where UL-classified systems are indicated, they refer to system numbers in UL's "Fire Resistance Directory" under product Category XHBN or Category XHDG.

B.    Refer to Drawings for specific scheduled applications.

**END OF SECTION 07 84 46**

## SECTION 07 92 00 - JOINT SEALANTS

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section Includes:
        1.     Nonstaining silicone joint sealants.
        2.     Mildew-resistant joint sealants.
        3.     Butyl joint sealants.
        4.     Latex joint sealants.

1.3     ACTION SUBMITTALS

   A.   Product Data: For each joint-sealant product.

   B.   Samples for Initial Selection: Manufacturer's color charts consisting of strips of cured sealants showing the full range of colors available for each product exposed to view.

   C.   Joint-Sealant Schedule: Include the following information:
        1.     Joint-sealant application, joint location, and designation.
        2.     Joint-sealant manufacturer and product name.
        3.     Joint-sealant formulation.
        4.     Joint-sealant color.

1.4     INFORMATIONAL SUBMITTALS

   A.   Product Test Reports: For each kind of joint sealant, for tests performed by manufacturer

   B.   Field-Adhesion-Test Reports: For each sealant application tested.

1.5     QUALITY ASSURANCE

   A.   Installer Qualifications: An authorized representative who is trained and approved by manufacturer.

   B.   Product Testing: Test joint sealants using a qualified testing agency.
        1.     Testing Agency Qualifications: Qualified according to ASTM C 1021 to conduct the testing indicated.

   C.   Sealant Log: Provide sealant logs.

1.6     FIELD CONDITIONS

   A.   Do not proceed with installation of joint sealants under the following conditions:
        1.     When ambient and substrate temperature conditions are outside limits permitted by joint-sealant manufacturer or are below 40 deg F.
        2.     When joint substrates are wet.
        3.     Where joint widths are less or greater than those allowed by joint-sealant manufacturer for applications indicated.
        4.     Where contaminants capable of interfering with adhesion have not yet been removed from joint substrates.

1.7     WARRANTY

   A.   Special Installer's Warranty: Installer agrees to repair or replace joint sealants that do not comply with performance and other requirements specified in this Section within specified warranty period.
        1.     Warranty Period: Two years from date of Substantial Completion.

B. Special Manufacturer's Warranty: Manufacturer agrees to furnish joint sealants to repair or replace those joint sealants that do not comply with performance and other requirements specified in this Section within specified warranty period.

1. Warranty Period: Silicone Sealants; Twenty years from date of Substantial Completion

C. Special warranties specified in this article exclude deterioration or failure of joint sealants from the following:

1. Movement of the structure caused by stresses on the sealant exceeding sealant manufacturer's written specifications for sealant elongation and compression.
2. Disintegration of joint substrates from causes exceeding design specifications.
3. Mechanical damage caused by individuals, tools, or other outside agents.
4. Changes in sealant appearance caused by accumulation of dirt or other atmospheric contaminants.

## PART 2 - PRODUCTS

2.1 JOINT SEALANTS, GENERAL

A. Compatibility: Provide joint sealants, backings, and other related materials that are compatible with one another and with joint substrates under conditions of service and application, as demonstrated by joint-sealant manufacturer, based on testing and field experience.

B. Colors of Exposed Joint Sealants: Match adjacent substrates unless indicated otherwise.

2.2 SILICONE JOINT SEALANTS

A. Silicone, ASTM C920, Type S, Grade NS, Class 50, Use NT, Nonstaining ASTM C 1248: single-component, nonsag, plus 50 percent and minus 50 percent movement capability, nontraffic-use, neutral-curing silicone joint sealant.

1. Products: Subject to compliance with requirements, provide one of the following:
   a. Dow Corning Corporation; 795.
   b. GE Construction Sealants; SilPruf NB.
   c. Pecora Corporation; 864NST .
   d. Tremco Incorporated; Spectrem 2 .
   e. Sika Corporation;  Silasil WS295.
1. Description: Neutral, one-part silicone sealant.
2. Usage: Structural glazing, steel, anodized aluminum, glass and painted metal.

B. Silicone, ASTM C920, Type S, Grade NS, Class 50, Use NT, Nonstaining ASTM C 124:, single-component, nonsag, plus 50 percent and minus 50 percent movement capability, nontraffic-use, neutral-curing silicone joint sealant.

1. Products: Subject to compliance with requirements, provide one of the following:
   a. Dow Corning Corporation; 791.
   b. GE Construction Sealants.
   c. Pecora Corporation.
   d. Tremco Incorporated.
   e. Sika Corporation.
2. Description: Neutral, one-part silicone sealant.
3. Usage: Steel, anodized aluminum, glass and painted metal, non-porous substrates, curtain walls, fluid-applied air barrier.

C. Silicone, ASTM C920, Type S, Grade NS, Class 25, Use NT, Nonstaining ASTM C 1248:single-component, nonsag, plus 25 percent and minus 25 percent movement capability, nontraffic-use, neutral-curing silicone joint sealant.

1. Products: Subject to compliance with requirements, provide one of the following:
   a. Dow Corning Corporation; 758.
   b. GE Construction Sealants.
   c. Pecora Corporation.
   d. Tremco Incorporated.
2. Description: Neutral one part silicone sealant, designed for adhering to low energy surfaces common in sheet or peel and stick weather resistant barriers.
3. Usage: Typical use at self-adhering sheet membrane or flexible flashing with polyethylene surfaces.

D. Silicone, ASTM C920, Type S, Grade NS, Class 100/50, Use NT, Nonstaining ASTM C 1248: single-component, nonsag, plus 100 percent and minus 50 percent movement capability, nontraffic-use, neutral-curing silicone joint sealant.
1. Products: Subject to compliance with requirements, provide one of the following:
   a. Dow Corning Corporation; 790.
   b. GE Construction Sealants.
   c. Pecora Corporation.
   d. Tremco Incorporated.
2. Description: Ultra-low-modulus sealant for new and remedial construction joint sealing applications.
3. Usage: Natural stone, concrete, cast stone, CMU, brick and metals where more significant joint movement is anticipated.

E. Silicone, ASTM C920, Type S, Grade NS, Class 50, Use NT, Nonstaining ASTM C 1248: single-component, nonsag, plus 50 percent and minus 50 percent movement capability, nontraffic-use, neutral-curing silicone joint sealant.
1. Products: Subject to compliance with requirements, provide one of the following:
   a. Dow Corning Corporation; 756.
   b. GE Construction Sealants.
   c. Pecora Corporation.
   d. Tremco Incorporated.
2. Description: Medium-modulus elastomeric sealant designed for weather-proofing sensitive porous stone and metal panel substrates. Reduced residue rundown or dirt pick up, substrate staining and adheres unprimed to porous and non-porous substrates.
3. Usage: Alternative for natural stone, cast stone, CMU, brick masonry and metal substrates where joint movement of up to +/- 50% is anticipated.

## 2.3    MILDEW-RESISTANT JOINT SEALANTS

A. Mildew-Resistant Joint Sealants: Formulated for prolonged exposure to humidity with fungicide to prevent mold and mildew growth.

B. Silicone, Mildew Resistant, Acid Curing, S, NS, 25, NT: Mildew-resistant, single-component, nonsag, plus 25 percent and minus 25 percent movement capability, nontraffic-use, acid-curing silicone joint sealant; ASTM C 920, Type S, Grade NS, Class 25, Use NT.
1. Products: Subject to compliance with requirements, provide one of the following:
   a. Dow Corning Corporation; 786-M White.
   b. GE Construction Sealants; SCS1700 Sanitary.
   c. Tremco Incorporated; Tremsil 200.
   d. Sika Corporation; Sikasil GP.
2. Usage: Seal nonporous surfaces around showers, tubs, sinks and plumbing fixtures where conditions of high humidity and temperature extremes exist. Typical applications include: • Sealing around shower-tub enclosures, tubs, sinks, urinals and whirlpools • Sealing around bathroom fixtures • Waterproofing rimless sinks • Ceramic tile grouting.

## 2.4    BUTYL JOINT SEALANTS

A. Butyl-Rubber-Based Joint Sealants: ASTM C 1311.
1. Products: Subject to compliance with requirements, provide one of the following:
   a. Pecora Corporation; BA-98.
   b. Sika; SikaLastomer 511
2. Usage: Concealed mastics, flashings, aluminum thresholds, sill plates.

## 2.5    LATEX JOINT SEALANTS

A. Acrylic Latex: Acrylic latex or siliconized acrylic latex, ASTM C 834, Type OP, Grade NF.
1. Products: Subject to compliance with requirements, provide one of the following:
   a. Pecora Corporation; AC-20.
   b. Sherwin-Williams Company (The); 850A .
   c. Tremco Incorporated; Tremflex 834.
2. Usage: General purpose interior and exterior caulking and as a back bedding glazing compound. Use on vinyl, aluminum and wood siding as well as on bathroom and kitchen fixtures.

2.6     JOINT-SEALANT BACKING

A.     Sealant Backing Material, General: Nonstaining; compatible with joint substrates, sealants, primers, and other joint fillers; and approved for applications indicated by sealant manufacturer based on field experience and laboratory testing.
1.     Manufacturers: Subject to compliance with requirements,   provide products by one of the following:
a.     BASF Construction Chemicals, LLC, Building Systems.
b.     Construction Foam Products, a division of Nomaco, Inc.

B.     Backer Rod: ASTM 1330. Type C (closed-cell material with a surface skin), Type O (open-cell material), Type B (bicellular material with a surface skin),   or any of the preceding types, as approved in writing by joint-sealant manufacturer for joint application indicated, and of size and density to control sealant depth and otherwise contribute to producing optimum sealant performance.
1.     Dual sealant joint conditions:
a.     At interior sealant joint: Use Type O (Open) at inner line of sealant in two-stage sealant
b.     At Exterior sealant joint: Use Type B (bicellular material with a surface skin) in outer line of sealant.

C.     Bond-Breaker Tape: Polyethylene tape or other plastic tape recommended by sealant manufacturer for preventing sealant from adhering to rigid, inflexible joint-filler materials or joint surfaces at back of joint. Provide self-adhesive tape where applicable.

2.7     MISCELLANEOUS MATERIALS

A.     Primer: Material recommended by joint-sealant manufacturer where required for adhesion of sealant to joint substrates indicated, as determined from preconstruction joint-sealant-substrate tests and field tests.

B.     Cleaners for Nonporous Surfaces: Chemical cleaners acceptable to manufacturers of sealants and sealant backing materials, free of oily residues or other substances capable of staining or harming joint substrates and adjacent nonporous surfaces in any way, and formulated to promote optimum adhesion of sealants to joint substrates.

C.     Masking Tape: Nonstaining, nonabsorbent material compatible with joint sealants and surfaces adjacent to joints.

D.     Weep Tubes to Weep Space Between Inner and Outer Seals on Concrete Panels: Weep and Vent Tubes: Clear plastic (PVC) UV-stable reticulated tubing, minimum ¼-inch (6.35mm) inside diameter, and of length as required to extend between exterior face of sealant and open cavity behind.


**PART 3 - EXECUTION**

3.1     EXAMINATION

A.     Examine joints indicated to receive joint sealants, with Installer present, for compliance with requirements for joint configuration, installation tolerances, and other conditions affecting performance of the Work.

B.     Proceed with installation only after unsatisfactory conditions have been corrected.

3.2     PREPARATION

A.     Surface Cleaning of Joints: Clean out joints immediately before installing joint sealants to comply with joint-sealant manufacturer's written instructions and the following requirements:
1.     Remove all foreign material from joint substrates that could interfere with adhesion of joint sealant, including dust, paints (except for permanent, protective coatings tested and approved for sealant adhesion and compatibility by sealant manufacturer), old joint sealants, oil, grease, waterproofing, water repellents, water, surface dirt, and frost.
2.     Clean porous joint substrate surfaces by brushing, grinding, mechanical abrading, or a combination of these methods to produce a clean, sound substrate capable of developing optimum bond with joint sealants. Remove loose particles remaining after cleaning operations above by vacuuming or blowing out joints with oil-free compressed air. Porous joint substrates include the following:
a.     Concrete.
b.     Masonry.
c.     Unglazed surfaces of ceramic tile.
d.     Exterior insulation and finish systems.
3.     Remove laitance and form-release agents from concrete.

4.   Clean nonporous joint substrate surfaces with chemical cleaners or other means that do not stain, harm substrates, or leave residues capable of interfering with adhesion of joint sealants. Nonporous joint substrates include the following:
   a.   Metal.
   b.   Glass.
   c.   Porcelain enamel.
   d.   Glazed surfaces of ceramic tile.

B.   Joint Priming: Prime joint substrates where recommended by joint-sealant manufacturer or as indicated by preconstruction joint-sealant-substrate tests or prior experience. Apply primer to comply with joint-sealant manufacturer's written instructions. Confine primers to areas of joint-sealant bond; do not allow spillage or migration onto adjoining surfaces.
   1.   Limit priming to areas that will be covered with sealant in the same day. Unless recommended otherwise by the sealant manufacturer, re-prime areas exposed for more than 24 hours.

C.   Masking Tape: Use masking tape where required to prevent contact of sealant or primer with adjoining surfaces that otherwise would be permanently stained or damaged by such contact or by cleaning methods required to remove sealant smears. Remove tape immediately after tooling without disturbing joint seal.

3.3   DUAL SEALANT JOINT

A.   All exterior joint sealants in building envelope around openings and within panel joints to have double line of sealant.

B.   At base of all panel joints, provide dual joint sealant with weep tubes for moisture drainage.

C.   General Contractor to sequence dual joint sealant installation to ensure that the interior line of sealant is allowed to adequately cure prior to exterior joint sealant installation.

D.   Temporary terminations are required to protect installed sealant and sealant backings from moisture contamination at the end of each work day.

3.4   INSTALLATION OF JOINT SEALANTS

A.   General: Comply with joint-sealant manufacturer's written installation instructions for products and applications indicated, unless more stringent requirements apply.

B.   Sealant Installation Standard: Comply with recommendations in ASTM C 1193 for use of joint sealants as applicable to materials, applications, and conditions indicated.

C.   Install sealant backings of kind indicated to support sealants during application and at position required to produce cross-sectional shapes and depths of installed sealants relative to joint widths that allow optimum sealant movement capability.
   1.   Do not leave gaps between ends of sealant backings.
   2.   Do not stretch, twist, puncture, or tear sealant backings.
   3.   Remove absorbent sealant backings that have become wet before sealant application, and replace them with dry materials.

D.   Install bond-breaker tape behind sealants where sealant backings are not used between sealants and backs of joints.

E.   Install sealants using proven techniques that comply with the following and at the same time backings are installed:
   1.   Place sealants so they directly contact and fully wet joint substrates.
   2.   Completely fill recesses in each joint configuration.
   3.   Produce uniform, cross-sectional shapes and depths relative to joint widths that allow optimum sealant movement capability.

F.   Tooling of Nonsag Sealants: Immediately after sealant application and before skinning or curing begins, tool sealants according to requirements specified in subparagraphs below to form smooth, uniform beads of configuration indicated; to eliminate air pockets; and to ensure contact and adhesion of sealant with sides of joint.
   1.   Remove excess sealant from surfaces adjacent to joints.
   2.   Use tooling agents that are approved in writing by sealant manufacturer and that do not discolor sealants or adjacent surfaces.
   3.   Provide concave joint profile per Figure 8A in ASTM C 1193 unless otherwise indicated.

3.5    CLEANING

A.    Clean off excess sealant or sealant smears adjacent to joints as the Work progresses by methods and with cleaning materials approved in writing by manufacturers of joint sealants and of products in which joints occur.

3.6    PROTECTION

A.    Protect joint sealants during and after curing period from contact with contaminating substances and from damage resulting from construction operations or other causes so sealants are without deterioration or damage at time of Substantial Completion. If, despite such protection, damage or deterioration occurs, cut out, remove, and repair damaged or deteriorated joint sealants immediately so installations with repaired areas are indistinguishable from original work.

**END OF SECTION 07 92 00**

**SECTION 08 16 13 - FIBERGLASS REINFORCED DOORS AND FRAMES**

**PART 1 -   GENERAL**

1.1     SUMMARY

   A.    Section Includes:
         1.    Fiberglass Reinforced Plastic (FRP) Doors.
         2.    Fiberglass Door Frames.
         3.    Fiberglass Louvers.

1.2     SUBMITTALS

   A.    Product Data:  Manufacturer's data sheets on each product to be used, including:
         1.    Preparation instructions and recommendations.
         2.    Storage and handling requirements and recommendations.
         3.    Installation methods.

   B.    Shop Drawings:
         1.    Elevations:  Dimensioned elevation of each type door opening assembly in project; indicate sizes and locations of door hardware, and lites and louvers, if specified.
         2.    Details:  Installation details of each type installation condition in project; indicate installation details of glazing, if specified.
         3.    Schedule:  Indicate each door opening assembly in project; cross-reference to plans, elevations, and details.

   C.    Verification Samples:  For each finish product specified, two samples, minimum size 6 inches (150 mm) square, representing actual product, color, and patterns.

   D.    Test Reports: Certified test reports showing compliance with specified performance characteristics and physical properties.

   E.    Closeout: Submit warranty documents specified herein.

1.3     QUALITY ASSURANCE

   A.    Manufacturer Qualifications: Company specializing in manufacturing fiberglass doors and frames with a minimum documented experience of ten years.

   B.    Installer Qualifications: Company specializing in installation of fiberglass doors and frames with minimum three years documented experience.

1.4     DELIVERY, STORAGE, AND HANDLING

   A.    Deliver materials in manufacturer's unopened, undamaged packaging, with manufacturer's labels intact.

   B.    Inspect and report damage to doors at time of delivery.

   C.    Store products in manufacturer's unopened packaging until ready for installation.

   D.    Store door assemblies in on end, to prevent damage to face corners and edges.

1.5     WARRANTY

   A.    Manufacturer's Warranty:  Manufacturer's 15-year warranty against failure due to corrosion from specified environment and against failure due to materials and workmanship, including warp, separation or de-lamination, and expansion of the core.

**PART 2 -   PRODUCTS**

2.1     PERFORMANCE REQUIREMENTS

A.     Door opening assemblies:
1.     Maximum flame spread 25 in accordance with ASTM E 84, self-extinguishing in accordance with ASTM D 635.

2.2     MANUFACTURERS

A.     Acceptable Manufacturer:
1.     Tiger Door

2.3     MATERIALS

A.     Fiberglass Mat: Glass fiber chopped strand, minimum 1.5 ounces per square foot.

B.     Resins:     Manufacturer's formulation for fabricating units to meet specified requirements. Adhesive bonded stiles and rails are prohibited.

C.     Anchors:  Manufacturer's standard stainless steel anchors required for opening condition and material of structures.

D.     Fasteners:  Stainless steel.

2.4     COMPONENTS

A.     Non-rated Fiberglass Reinforced Plastic (FRP) Doors:
1.     Thickness:  1-3/4 inches.
2.     Construction:
a.     Core:  Polypropylene Honeycomb (Interior Doors)
b.     Door Plates:  Molded in one continuous piece, resin reinforced with hand-laid glass fiber mat, nominal 1/8 inch thick, minimum 25 mil gel-coated surface.
c.     Door Edges:  Minimum 3 layers resin-reinforced glass fiber mat, nominal 3/8 inch thick, machine tooled to create a seamless monolithic panel.
3.     Sizes: Indicated on Drawings.
4.     Finish:  Smooth gloss surface, minimum value of 88 in accordance with ASTM D 523.
5.     Color:  Refer to Architect's Master Schedule.

B.     Non-rated Fiberglass Frames:
1.     Construction:  One-piece pultruded fiberglass reinforced plastic, minimum 1/4 inch wall thickness, jamb-to-head joints mitered and reinforced with FRP clips and stainless steel fasteners; conforming to SDI requirements for performance equivalent to 16 gage steel frames.
2.     Frame profile:    As indicated on frame type Drawings.
3.     Sizes:  As indicated on door schedule.
4.     Finish:  Refer to Architect's Master Schedule.

C.     Frame Anchors:  Stainless Steel anchors. Types recommended by manufacturer for project conditions.

D.     Louvers in Non-rated Doors:
1.     Construction:  Molded solid vanes; pultruded fiberglass reinforced plastic construction.
2.     Sizes: Indicated on Drawings.
3.     Finish:  Refer to Architect's Master Schedule.

E.     Door Hardware:  Specified Section 08 71 00.

2.5     FABRICATION

A.     Fiberglass Reinforced Plastic (FRP) Doors:
1.     Minimum glass fiber to resin ratio:  30 percent.
2.     Mortise for lockset, and recess for strike plate in lock stile.
3.     Embed steel reinforcement for hinges in fiberglass matrix; provide for hinge leaf recesses in hinge stile.

B.     Fiberglass Frames:
1.     Mortise for lock strike, and recess for strike plate in lock jamb.
2.     Reinforce for hinges and other indicated hardware.

## PART 3 -  EXECUTION

### 3.1    EXAMINATION

A.    Verify openings are ready to receive work and opening dimensions and clearances are as indicated on approved shop drawings. Do not begin installation until openings have been properly prepared.

B.    If opening preparation is the responsibility of another installer, notify Architect of unsatisfactory preparation before proceeding.

### 3.2    PREPARATION

A.    Acclimate doors and frames to site conditions for a minimum of 24 hours before installation.

B.    Do not remove labels from fire-rated doors and frames.

### 3.3    INSTALLATION

A.    Install door opening assemblies in accordance with approved shop drawings, SDI 100, and manufacturer's printed installation instructions, using installation methods and materials specified in installation instructions.

B.    Use anchorage devices to securely fasten sliding door assembly to wall construction without distortion or imposed stresses.

C.    Coordinate installation of thermal insulation at shim spaces at frame perimeter.

D.    Installation of door hardware is specified in Section 08 71 00.

E.    Install door hardware in accordance with manufacturer's printed instructions.

F.    Site Tolerances:  Maintain plumb and level tolerances specified in manufacturer's printed installation instructions.

### 3.4    ADJUSTING

A.    Adjust doors in accordance with door manufacturer's maintenance instructions to swing open and shut without binding, and to remain in place at any angle without being moved by gravitational influence.

B.    Adjust door hardware to operate correctly in accordance with hardware manufacturer's maintenance instructions.

### 3.5    CLEANING

A.    Clean surfaces of door opening assemblies and sight-exposed door hardware in accordance with manufacturer's maintenance instructions.

B.    Remove labels and visible markings.

### 3.6    PROTECTION

A.    Protect installed products until completion of project.

B.    Touch-up, repair or replace damaged products before Substantial Completion.

**END OF SECTION**

## SECTION 08 31 13 - ACCESS DOORS AND FRAMES

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section Includes:
        1.    Access doors and frames for walls and ceilings.

1.3     ACTION SUBMITTALS

   A.   Product Data: For each type of product.
        1.    Include construction details, fire ratings, materials, individual components and profiles, and finishes.

   B.   Shop Drawings:
        1.    Include plans, elevations, sections, details, and attachments to other work.
        2.    Detail fabrication and installation of access doors and frames for each type of substrate.

   C.   Product Schedule: Provide complete access door and frame schedule, including types, locations, sizes, latching or locking provisions, and other data pertinent to installation.

### PART 2 - PRODUCTS

2.1     ACCESS DOORS AND FRAMES FOR WALLS AND CEILINGS

   A.   Source Limitations: Obtain each type of access door and frame from single source from single manufacturer.

   B.   Manufacturers: Subject to compliance with requirements, provide products by one of the following:
        1.    Acudor Products, Inc.
        2.    Babcock-Davis.
        3.    J. L. Industries, Inc.; Div. of Activar Construction Products Group.
        4.    Karp Associates, Inc.
        5.    Larsen's Manufacturing Company.
        6.    Milcor Inc.
        7.    Nystrom, Inc.

   C.   Basis of Design: Refer to Architect's Master Schedule.

2.2     MATERIALS

   A.   Steel Plates, Shapes, and Bars: ASTM A 36/A 36M.

   B.   Steel Sheet: Uncoated or electrolytic zinc coated, ASTM A 879/A 879M, with cold-rolled steel sheet substrate complying with ASTM A 1008/A 1008M, Commercial Steel (CS), exposed.

   C.   Stainless-Steel Sheet, Strip, Plate, and Flat Bars: ASTM A 666, [Type 304] [Type 316]. Remove tool and die marks and stretch lines or blend into finish.

   D.   Frame Anchors: Same type as door face.

   E.   Inserts, Bolts, and Anchor Fasteners: Hot-dip galvanized steel according to ASTM A 153/A 153M or ASTM F 2329.

2.3     FABRICATION

   A.   General: Provide access door and frame assemblies manufactured as integral units ready for installation.

B. Metal Surfaces: For metal surfaces exposed to view in the completed Work, provide materials with smooth, flat surfaces without blemishes. Do not use materials with exposed pitting, seam marks, roller marks, rolled trade names, or roughness.

C. Doors and Frames: Grind exposed welds smooth and flush with adjacent surfaces. Furnish attachment devices and fasteners of type required to secure access doors to types of supports indicated.
   1. For concealed flanges with drywall bead, provide edge trim for gypsum board and gypsum base securely attached to perimeter of frames.
   2. Provide mounting holes in frames for attachment of units to metal or wood framing.
   3. Provide mounting holes in frame for attachment of masonry anchors.

D. Recessed Access Doors: Form face of panel to provide recess for application of applied finish. Reinforce panel as required to prevent buckling.

E. Latching Mechanisms: Furnish number required to hold doors in flush, smooth plane when closed.

2.4 FINISHES

A. Comply with NAAMM's "Metal Finishes Manual for Architectural and Metal Products" for recommendations for applying and designating finishes.

B. Protect mechanical finishes on exposed surfaces from damage by applying a strippable, temporary protective covering before shipping.

C. Appearance of Finished Work: Noticeable variations in same piece are not acceptable. Variations in appearance of adjoining components are acceptable if they are within the range of approved Samples and are assembled or installed to minimize contrast.

D. Steel and Metallic-Coated-Steel Finishes:
   1. Factory Finish: Immediately after cleaning and pretreating, apply manufacturer's standard two-coat, baked-on finish consisting of prime coat and thermosetting topcoat, with a minimum dry-film thickness of 1 mil for topcoat.

**PART 3 - EXECUTION**

3.1 EXAMINATION

A. Examine substrates for compliance with requirements for installation tolerances and other conditions affecting performance of the Work.

B. Proceed with installation only after unsatisfactory conditions have been corrected.

3.2 INSTALLATION

A. Comply with manufacturer's written instructions for installing access doors and frames.

B. Install doors flush with adjacent finish surfaces or recessed to receive finish material.

3.3 ADJUSTING

A. Adjust doors and hardware, after installation, for proper operation.

B. Remove and replace doors and frames that are warped, bowed, or otherwise damaged.

**END OF SECTION 08 31 13**

**SECTION 08 71 00 - DOOR HARDWARE**


**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   This Section includes the following:
        1.   Commercial door hardware for the following:
             a.   Swinging doors.
        2.   Cylinders for doors specified in other Sections.

   B.   Products furnished, but not installed, under this Section include the following.  Coordinating, purchasing, delivering, and scheduling remain requirements of this Section.

1.3     SUBMITTALS

   A.   Product Data:  Include installation details, material descriptions, dimensions of individual components and profiles, and finishes.

   B.   Shop Drawings:  Details of electrified and access control hardware, indicating the following:
        1.   System Block Wiring Diagrams:  Detail wiring for power, signal, and control systems and differentiate between manufacturer-installed and field-installed wiring.   Include the following for each unique electrified opening:
             a.   Point-to-point system wiring and riser diagrams.
             b.   Elevation diagram of each door.
             c.   Operational description.

   C.   Door Hardware Schedule:  Prepared by or under the supervision of supplier, detailing fabrication and assembly of door hardware, as well as procedures and diagrams.  Coordinate the final Door Hardware Schedule with doors, frames, and related work to ensure proper size, thickness, hand, function, and finish of door hardware.
        1.   Format:  Comply with scheduling sequence and vertical format in DHI's "Sequence and Format for the Hardware Schedule." Furnish submittal in accordance with 013300 Submittal Procedures.
        2.   Organization:  Organize the Door Hardware Schedule into door hardware sets indicating complete designations of every item required for each door or opening.
             a.   Organize door hardware sets in same order as in the Door Hardware Sets at the end of Part 3.  Submittals that do not follow the same format and order as the Door Hardware Sets will be rejected and subject to resubmission.
        3.   Content:  Include the following information:
             a.   Type, style, function, size, label, hand, and finish of each door hardware item.
             b.   Manufacturer of each item.
             c.   Fastenings and other pertinent information.
             d.   Location of door hardware set, cross-referenced to Drawings, both on floor plans and in door and frame schedule.
             e.   Explanation of abbreviations, symbols, and codes contained in schedule.
             f.   Mounting locations for door hardware.
             g.   Door and frame sizes and materials.
             h.   Description of each electrified door hardware function, including location, sequence of operation, and interface with other building control systems.
                  1)   Sequence of Operation:  Include description of component functions including, but not limited to, the following situations:  normal secured/unsecured state of door; authorized access; authorized egress; unauthorized access; unauthorized egress; fire alarm and loss of power conditions.
        4.   Submittal Sequence:   Submit the final Door Hardware Schedule at earliest possible date, particularly where approval of the Door Hardware Schedule must precede fabrication of other work that is critical in the Project construction schedule.   Include Product Data, Samples, Shop Drawings of other work

affected by door hardware, and other information essential to the coordinated review of the Door Hardware Schedule.

D. Keying Schedule: Prepared under the supervision of the Owner, separate schedule detailing final keying instructions for locksets and cylinders in writing. Include keying system explanation, door numbers, key set symbols, hardware set numbers and special instructions. Owner to approve submitted keying schedule prior to the ordering of permanent cylinders.

E. Maintenance Data: For each type of door hardware to include in maintenance manuals specified in Division 1. Upon completion of construction and building turnover, furnish two (2) complete maintenance manuals to the owner. Manuals to include the following items:
   1. Approved hardware schedule, catalog cuts and keying schedule.
   2. Furnish keying bitting list in paper and electronic format by registered mail directly to facility manager owner.
   3. Hardware installation and adjustment instructions.
   4. Manufacturer's written warranty information.
   5. Wiring diagrams, elevation drawings and operational descriptions for all electronic openings.

1.4    QUALITY ASSURANCE

A. Door Hardware Installer Qualifications: An experienced and factory trained Installer who has completed both standard and electrified builders hardware and integrated access control installations similar in material, design, and extent to that indicated for this Project and whose work has resulted in construction with a record of successful in-service performance.

B. Door Hardware Supplier Qualifications: Door hardware supplier with warehousing facilities in Project's vicinity which is not more then a half day of travel from the jobsite and who employs a qualified Architectural Hardware Consultant or equivalent experience available during the course of the Work to consult with Contractor, Architect, and Owner about door hardware and keying. Supplier recognized by manufacturers to be a direct factory-authorized distributor of the specified hardware products. Supplier is required to be available for onsite meetings with two days notice regarding issues that arise with opening functions, installation, keying, on-site warehousing, trouble shooting of products, and final punch out related issues.
   1. Scheduling Responsibility: Preparation of door hardware and keying schedules.

C. Architectural Hardware Consultant Qualifications: A person who is currently certified by the Door and Hardware Institute as an Architectural Hardware Consultant (AHC) and who is experienced in providing consulting services for door hardware installations that are comparable in material, design, and extent to that indicated for this Project.

D. Source Limitations: Obtain each type and variety of aluminum, steel and wood door hardware from the same single source manufacturer and supplier, unless otherwise indicated.
   1. Furnish electrified door hardware from the same manufacturer as mechanical door hardware, unless otherwise indicated. Electrified modifications or enhancements made to a source manufacturer's product line by a secondary or third party source will not be accepted.
   2. Furnish standard door hardware, electrified door hardware and access control door hardware as a single sourced package from the same qualified supplier.
   3. Furnish exterior door hardware from the same manufactures as the interior door hardware, no deviations will be allowed.

E. Regulatory Requirements: Comply with provisions of the following:
   1. Where indicated to comply with accessibility requirements, comply with "Americans with Disabilities Act" (ADA), "Accessibility Guidelines for Buildings and Facilities (ADAAG)," ANSI A117.1, and "Texas Accessibility Standards" (TAS) as follows:
      a. Handles, Pulls, Latches, Locks, and other Operating Devices: Shape that is easy to grasp with one hand and does not require tight grasping, tight pinching, or twisting of the wrist.
      b. Door Closers: Comply with the following maximum opening-force requirements indicated:
         1) Interior Hinged Doors: 5 lbfapplied perpendicular to door.
         2) Fire Doors: Minimum opening force allowable by authorities having jurisdiction.
      c. Thresholds: Not more than 1/2 inch high. Bevel raised thresholds with a slope of not more than 1:2.
   2. NFPA 101: Comply with the following for means of egress doors:
      a. Latches, Locks, and Exit Devices: Not more than 15 lbfto release the latch. Locks shall not require the use of a key, tool, or special knowledge for operation.
      b. Thresholds: Not more than 1/2 inchhigh.
   3. Applicable building code, as indicated on drawings.

1.5     DELIVERY, STORAGE, AND HANDLING

A.     Shipment of door hardware as detailed in approved Door Hardware Schedule Shop Drawings to be inventoried on site and upon receipt of material is secure in lock-up room furnished with shelving for door hardware.   Do not store electronic access control hardware, software or accessories at Project site without prior authorization and climate controlled facility, failure to do so will void electronic warranties.

B.     Tag each item or package separately with identification related to the final Door Hardware Schedule, and include basic installation instructions with each item or package.

C.     Deliver permanent keys, cylinders, cores, access control credentials, electronic key software with loaded bitting and key records per cylinder, and related accessories directly to Owner via registered mail or overnight package service.   Instructions for delivery to the Owner shall be established at the "Keying Conference".   Hardware Supplier must be a regional supplier to address owner questions and concerns relating to keying issues that arise as project close-out .

1.6     COORDINATION

A.     Templates:   Door Hardware Supplier to furnish and distribute to the parties involved for templating for doors, frames, and other work specified to be factory prepared for installing standard, electrified and access control door hardware.   Check Shop Drawings of other work to confirm that adequate provisions are made for locating and installing hardware to comply with indicated requirements.

B.     Access Control and Electrical Connections:   Door Hardware supplier with door and frame supplier and security consultant to coordinate the layout and installation of scheduled electrified door hardware with required connections to source power junction boxes, power supplies and security products.

C.     Keying Conference:   Door Hardware Supplier to conduct keying conference to comply with requirements in Division 1 Section "Project Meetings."   Keying conference to incorporate the following criteria into the final keying schedule document:
1.     Function of building, purpose of each area and degree of security required.
2.     Plans for existing and future key system expansion.
3.     Review all lock and exit device functions when reviewing keying requirements.
4.     Requirements for key control system.
5.     Installation of permanent keys and cylinder cores.
6.     Address the requirements for delivery of keys.
7.     Address keying and cylinder stamping (identification) as required by owner or owner representative.
8.     Establish method of submitting electronic format of keying systems and diagram and to be produced and furnished by Hardware Supplier.

D.     Pre-Installation Conference:   Hardware Supplier to conduct conference at Project site attended by representatives of Door Hardware Manufacturers, Hardware Installers, Owner Representative and General Contractor to review proper hardware installation methods and the procedures for receiving and handling hardware. On site training should address a minimum installation of each piece of hardware (electrical, closers, locksets, cylinders and exit devices) by qualified Hardware Supplier and Manufacturers. At completion of installation and final walk through, furnish written certification that hardware items were applied according to conference recommendations and to finish hardware specifications.

1.7     WARRANTY

A.     General Warranty:   Special warranties specified in this Article shall not deprive Owner of other rights Owner may have under other provisions of the Contract Documents and shall be in addition to, and run concurrent with, other warranties made by Contractor under requirements of the Contract Documents.

B.     Special Warranty:   Written warranty, executed by manufacturer agreeing to repair or replace components of standard, electrified hardware and access control hardware that fails in materials or workmanship within specified warranty period.   Failures include, but are not limited to, the following:
1.     Structural failures including excessive deflection, cracking, or breakage.
2.     Faulty operation of the hardware.
3.     Deterioration of metals, metal finishes, and other materials beyond normal weathering.

C.     Warranty Period:   Two year from date of Substantial Completion, unless otherwise indicated.

**KIRKSEY**

08 71 00 - 3
DOOR HARDWARE (A)

D.   Special Warranty Periods:
1.   Five years for mortise locksets.
2.   Five years for exit devices.
3.   Ten years for manual door closers.
4.   One year for electromechanical door hardware.
5.   Five years for Thresholds, Door Sweeps, Gasketing, Perimeter Weatherstripping.

E.   Extended Warranty:  As requested by the Owner, furnish a separate optional extended warranty and maintenance contract for power assist operated openings.   .

1.8   MAINTENANCE SERVICE

A.   Maintenance Tools and Instructions:   Furnish a complete set of specialized tools to Owner and maintenance instructions as needed for Owner's continued adjustment, maintenance, and removal and replacement of door hardware.

B.   Maintenance Service:   Beginning at Substantial Completion, furnish six months' full maintenance by skilled employees of door hardware suppliers and installers.   Include quarterly preventive maintenance, repair or replacement of worn or defective components, lubrication, cleaning, and adjusting as required for proper door opening operation.   Furnish parts and supplies as used in the manufacture and installation of original products.

**PART 2 - PRODUCTS**

2.1   SCHEDULED DOOR HARDWARE

A.   General:  Furnish door hardware for each door to comply with requirements in this Section and the Door Hardware Schedule at the end of Part 3.
1.   Door Hardware Sets:   Furnish quantity, item, size, finish or color indicated for named products listed in Hardware Sets.
2.   Sequence of Operation:   Furnish electrified and access control hardware function, sequence of operation, and interface with other building control systems indicated.

B.   Designations:   Requirements for design, grade, function, finish, size, and other distinctive qualities of each type of door hardware are indicated in the Door Hardware Schedule at the end of Part 3.   Products are identified by using door hardware designations, as follows:
1.   Named Manufacturer's Products:   Product designation and manufacturer are listed for each door hardware type required for the purpose of establishing requirements.   Manufacturers' names are abbreviated in the Door Hardware Schedule. (Source manufacturer listed in boldface).

2.2   HINGES AND PIVOTS

A.   Manufacturers:   Subject to compliance with requirements, furnish products by one of the following:
1.   Hinges:
a.   Hager Companies (HA).
b.   McKinney Products (MC).
c.   Stanley Hardware (ST).
d.   Ives (IV)
2.   Continuous Barrel Hinges (Stainless Steel):
a.   McKinney Products (MC).
b.   Markar Manufacturing (MA).
c.   Pemko Manufacturing (PE).
d.   Select Hinges (SH).
e.   Ives (IV)

B.   Standards: BHMA Certified products complying with the following:
1.   Butts and Hinges:   BHMA A156.1.
2.   Continuous Geared Hinges:   BHMA A156.26.
3.   Pivots:   BHMA A156.4.
4.   Template Hinge Dimensions:   BHMA A156.7.
5.   Self-Closing Hinges:   BHMA A156.17.
6.   Floor Hinges:   BHMA A156.4.

C.   Quantity:   Furnish the following, unless otherwise indicated:

1. Two Hinges:   For doors with heights up to 60 inches
2. Three Hinges:   For doors with heights 61 to 90 inches
3. Four Hinges:   For doors with heights 91 to 120 inches

D. For doors with heights more than 120 inchesfurnish 4 hinges, plus 1 hinge for every 30 inchesof door height greater than 120 inchesPivot Hinges:   Furnish 3/4" offset, single acting pivots with one intermediate pivot for doors less than 91 inches high and two intermediate pivots for doors between 91 inches and 121 inches in height.   Space intermediate pivots equally not less than 25 inches on center apart or not more than 35 inches on center for doors over 121 inches high.

E. Floor Pivots:   Furnish 3/4" offset, single acting floor closer complete with top and intermediate pivots according to manufacturer's recommendation. Options include availability for use on fire labeled; lead lined and extra heavy weight doors. Furnish independent and adjustable valves for closing speed, latch speed, and backcheck with built in dead stop and hold open features as specified.
   1. Flush Floor Plates and Thresholds:   Furnish finish cover plates or thresholds as indicated in door hardware sets for floor hinges.   Match door hardware finish, unless otherwise indicated.

F. Hinge Size:   Furnish the following, unless otherwise indicated, with hinge widths sized for door thickness and clearances required:

| Maximum Door Size (inches) | Hinge Height (inches) | Metal Thickness (inches) | |
| | | Standard Weight | Heavy Weight |
| --- | --- | --- | --- |
| 36-in by 86-in by 1-3/4 | 4-1/2 | 0.134 | 0.180 |
| < 36-in by 120-in by 1-3/4 | 5 | 0.146 | 0.190 |

2.3   Hinge Weight and Base Material:   Unless otherwise indicated, furnish the following:
   1. Exterior Doors:   Heavy weight, non-ferrous, ball bearing hinges.
   2. Interior Doors:   Heavy weight, ball bearing hinges unless Hardware Sets indicate standard weight.
      a. Standard weight hinges can be used at Mechanical, Electrical, IDF, Data, and Offices with out closers openings, regardless of specified hinge weight in hardware sets.

B. Hinge Height Clarifications: Where uneven door leafs occur, the widest door leaf in the pair   determines the height and weight of the hinges on the inactive and active door leafs; to ensure equal size hinges on opening.

C. Hinge Weight Clarification: If heavy weight hinges are specified in hardware sets for interior aluminum frames then standard weight hinges can be used. If aluminum frame opening has a door 42 inches or greater then provide an additional hinge in lieu of heavy weight or 5 inch hinges.

D. Hinge Options:   Comply with the following where indicated in the Door Hardware Schedule or on Drawings:
   1. Non-removable Pins:   Furnish set screw in hinge barrel that, when tightened into a groove in hinge pin, prevents removal of pin while door is closed; for the following applications:
      a. Out-swinging exterior doors.
      b. Out-swinging access controlled doors.
   2. Electric Hinges:   Furnish electric transfer hinges with standardized plug connectors to accommodate up to twelve (12) wires.   Connectors plug directly to through-door wiring harnesses for connection to electric locking devices and power supplies. Furnish sufficient number of concealed wires to accommodate electric function of specified hardware.

E. Continuous Barrel Hinges (Stainless Steel):   Hinges to be made of 14 GA. type 304 Stainless Steel with concealed Teflon-coated stainless steel pin, and twin self-lubricated nylon bearings at each 2 inch knuckle. Fabricate hinges non-handed and to template screw locations.

F. Accessible Electrical Transfer Continuous Hinges:   Furnish electric transfer continuous hinges with a 12" removable hinge modification accessible without de-mounting door from the frame and standardized plug connectors to accommodate up to twelve (12) wires.   Connectors plug directly to through-door wiring harnesses for connection to electric locking devices and power supplies.   Furnish sufficient number of concealed wires to accommodate electric function of specified hardware.

G. Furnish mortar guard enclosure on frames at each electrical hinge location specified.

2.4   DOOR BOLTS

A. Manufacturers:   Subject to compliance with requirements, furnish products by one of the following:
   1. Surface Bolts: Flush Bolts and Coordinators:
      a. McKinney Products (MC).

      b.     Rockwood Manufacturing (RO).
      c.     Trimco Manufacturing (TR).
      d.     Ives (IV).

B.    Standards:  Comply with the following:
1.    Surface Bolts:  BHMA A156.16.
2.    Automatic and Self-Latching Flush Bolts:  BHMA A156.3.
3.    Manual Flush Bolts:  BHMA A156.16.

C.    Surface Bolts and Flush Bolts:  BHMA Certified Grade 1.

D.    Furnish bolts with top rod of sufficient length to allow bolt location approximately six feet from the floor regardless if detailed as such in hardware sets.  Furnish dust proof strikes for bottom bolts.  Surface bolts to be 8" in length, unless otherwise noted and U.L. listed for labeled fire doors.

E.    Furnish Self-Latching flush bolts as follows:
1.    Access control inactive door leaf.
2.    Uneven inactive door leaf.

F.    Bolt Throw:  Comply with testing requirements for length of bolts to comply with labeled fire door requirements, and as follows:
1.    Mortise Flush Bolts:  Minimum 3/4-inch throw.

## 2.5 LOCKS AND LATCHES

A.    Manufacturers:  Subject to compliance with requirements, furnish products by one of the following:
1.    Mechanical Mortise Locks and Latches:
      a.     Best Access Systems (BE) – 45H Series.
      b.     Sargent Manufacturing (SA) - 8200 Series.
      c.     Schlage (SC) – L9000 Series
2.    Mechanical Bored Locks and Latches:
      a.     Best Access Systems (BE) – 93K Series
      b.     Sargent Manufacturing (SA) - 10-Line Series.
      c.     Schlage (SC) – ND Series
3.    Interconnected Locks and Latches:
      a.     Sargent Manufacturing (SA) - 7500 Series.
      b.     Schlage (SC) – H Series
4.    Auxiliary Cylindrical Deadbolts:
      a.     Best Access Systems (BE) – T Series
      b.     Sargent Manufacturing (SA) - 480 Series.
      c.     Schlage (SC) – B600 Series
5.    Auxiliary Mortise Deadbolts:
      a.     Best Access Systems (BE) –  48H Series
      b.     Sargent Manufacturing (SA) - 4870 Series.
      c.     Schlage (SC) –  L400 Series

B.    Standards:  Comply with the following:
1.    Mortise Locks and Latches:  BHMA A156.13.
2.    Bored Locks and Latches:  BHMA A156.2.
3.    Interconnected Locks and Latches:  BHMA A156.12.
4.    Auxiliary Locks:  BHMA A156.5.

C.    Mortise Locks:  BHMA Certified Grade 1, Series 1000.

D.    Bored Locks:  BHMA Certified Grade 1, Series 4000.

E.    Interconnected Locks:  BHMA Certified Grade 2, Series 5000.

F.    Auxiliary Locks:  BHMA Certified Grade 1.

G.    Lock Trim:  Match the following design style:
1.    Levers:
      a.     Best Access System (BE) – 15H/15D
      b.     Sargent Manufacturing (SA) – LNL/LL
      c.     Schlage (SC) – 06A/RHO

H. Lock Functions: Function numbers and descriptions indicated in the Door Hardware Schedule comply with the following:
1. Mortise Locks: BHMA A156.13.
2. Bored Locks: BHMA A156.2.
3. Interconnected Locks: BHMA A156.12.

I. Lock Throw: Comply with testing requirements for length of bolts to comply with labeled fire door requirements, and as follows:
1. Mortise Locks: Minimum 3/4-inchlatchbolt throw, with stainless steel bolt.
2. Bored Locks: Minimum 1/2-inchlatchbolt throw, 3/4" latchbolt throw at fire rated pairs.
3. Deadbolts: Minimum 1-inch bolt throw.

J. Backset: 2-3/4 inchesunless otherwise indicated.

2.6 CYLINDERS AND KEYING

A. Furnish Patented, High, Security cylinders utilizing a unique factory code pattern that is both geographically and time zoned protected. A letter of authorization under the letterhead of the End User must accompany purchases of any products which involve patented cylinders, keys and accessories. Manufacturers of patented security cylinders to allow the ability for both security and conventional cylinders to be used together under the same facility master or grandmaster key system. The End User is required to have the ability for on-site cylinder pinning and original key cutting.

B. Manufacturers: Subject to compliance with requirements, furnish products by one of the following:
1. Patented Cylinders:
   a. Best Access Systems (BE) - MX8 Patented Cylinders.
   b. Medeco Cylinders (ME) – X4 Patented Cylinders.
   c. Sargent Manufacturing (SA) – XC or Signature Patented Cylinders.
   d. Schlage (SC) – Everest Patented Cylinders.
2. Security Cylinders:
   a. Sargent Manufacturing (SA) - Signature Patented Cylinders.
   b. Schlage (SC) – Primus Security Cylinders.
3. High Security Cylinders:
   a. Sargent Manufacturing (SA) – UL437 Signature High Security Cylinders.
   b. Schlage (SC) – Everest Primus High Security Cylinders.

C. Standards: Comply with the following:
1. Cylinders: BHMA A156.5.
2. Key Control System: BHMA A156.5.

D. Cylinder Grade: BHMA Certified Grade 1.

E. Permanent Cores: Manufacturer's standard; finish face to match lockset; complying with the following:
1. Removable Cores: Core insert, removable by use of a special key, and for use with only the core manufacturer's cylinder and door hardware.

F. Construction Keying: Comply with the following:
1. Construction Master keying: Furnish temporary construction master keyed cores that are replaceable by permanent cores. Furnish construction master keys in quantity as required by project Contractor.

G. Keying System: Unless otherwise indicated, furnish for a keying system complying with the following requirements:
1. New Grand Master Key System: Cylinders are factory keyed operated by a change key, master key, and a grand master key. Conduct keying meeting with End User to define and document keying system instructions and requirements.

H. Keys: Furnish nickel-silver keys complying with the following:
1. Stamping: Permanently inscribe each key with a visual key control number and as directed by Owner.
2. Quantity: Furnish the following:
   a. Cylinder Change Keys (Per Key Set): Four.
   b. Master Keys (Per Level): Five.
   c. Grand Master Keys: Two.
   d. Construction Control Keys: Two.

    e.  Permanent Control Keys:   Two.
    f.  Extra Keyed Permanent Cores:   Ten.
    g.  Extra Blank Keys:   Fifty.

I. Key Registration List:   Furnish keying transcript list to Owner's representative for lock cylinders.

J. Key Control System:   Furnish one lockable cabinet for key control and storage for up to 150 percent capacity, type and model to be determined in the keying meeting with the owner.   Furnish End User with one copy of "Key Wizard" key management software program.

## 2.7 STRIKES

A. Manufacturers:   Subject to compliance with requirements, furnish products by one of the following:
  1. Electric Strikes: BHMA Certified Grade 1.
    a. Folger Adam EDC (FO) – 300, 700 Series.
    b. Hanchett Entry Systems (HES) – 1000, 5900, 9600 Series.
    c. Von Duprin (VO) 4200, 5100, 6200, 6300, 6400 Series.

B. Standards:   Comply with the following:
  1. Strikes for Bored Locks and Latches:   BHMA A156.2.
  2. Strikes for Mortise Locks and Latches:   BHMA A156.13.
  3. Strikes for Interconnected Locks and Latches:   BHMA A156.12.
  4. Strikes for Auxiliary Deadlocks:   BHMA A156.5.
  5. Dustproof Strikes:   BHMA A156.16.
  6. Electric Strikes:   BHMA A156.5.

C. Strikes:   Furnish manufacturer's standard strike with strike box for each latch or lock bolt, with curved lip extended to protect frame, finished to match door hardware set, unless otherwise indicated, and as follows:
  1. Flat-Lip Strikes:   For locks with three-piece antifriction latchbolts, as recommended by manufacturer.
  2. Extra-Long-Lip Strikes:   For locks used on frames with applied wood casing trim.
  3. Aluminum-Frame Strike Box:   Furnish manufacturer's special strike box fabricated for aluminum framing.

## 2.8 EXIT DEVICES

A. Manufacturers:   Subject to compliance with requirements, furnish products by one of the following:
  1. Exit Devices:
    a. Sargent Manufacturing (SA) - 80 Series.
    b. Stanley – Apex 2000 series
    c. Von Duprin (VO) – 35A/98 Series.
  2. Exit Device Trim, Pull/Lever:
    a. Sargent Manufacturing (SA) – FSW/ETL
    b. Stanley – Apex 2000 series
    c. Von Duprin (VO) – 990/994L-06
  3. Electrified Options:   As indicated in hardware sets, furnish electrified exit device options including: electric latch retraction, electric dogging, outside door trim control, exit alarm, delayed egress, latchbolt monitoring, lock/unlock status monitoring, touchbar monitoring and request-to-exit signaling. Unless otherwise indicated, furnish electrified exit devices standard as fail secure on lever or trim side, always free egress on push side or fail safe.
    a. If exit device requires over 1 amp of in-rush then furnish manufactures power supply to comply with warranty requirements, one power supply per two door leafs. Furnish power supply with applicable relay and control boards for complete operation and integration of associated hardware with opening which may require: auto operator, card access, fire alarm, delayed egress and alarmed control boards devices.
    b. If exit devices requires over 1 amp of in-rush then furnish Electric Power Transfer (EPT), coordinate preps of door, frame and continuous hinges; unless exit device manufacture has approved listed through wire products with standardized connectors.

B. Standard:   BHMA A156.3.

C. Exit Devices:   BHMA Certified Grade 1.

D. Panic Exit Devices:   Listed and labeled by a testing and inspecting agency acceptable to authorities having jurisdiction, for panic protection, based on testing according to UL 305.

E. Fire Exit Devices: Complying with NFPA 80 that are listed and labeled by a testing and inspecting agency acceptable to authorities having jurisdiction, for fire and panic protection, based on testing according to UL 305 and NFPA 252.

F. Ornamental Bar Exit Devices and Pulls: UL listed devices that have been panic load tested for use on all-glass entrance doors and fabricated principally from 1-1/4" diameter satin finished stainless steel tubing. Operation: The top latch bolt of the panic device shall be retracted by pushing the interior "L" shaped crash bar. In addition a built-in dogging device shall be provided which keeps the latch bolt in the retracted position and the crash bar becomes fixed. An exterior key cylinder for entry shall also be provided with each device.
   1. Product Reference: CR Laurence PA100 Panic Device x 3/4 Height Straight Handle on Exterior, or equivalent from Blumcraft. Custom outside pull is required to be full height of the door less 24 inches, locate pull in center of door height. One door leaf is required to have key override for emergency access. Provide mounting accessories for complete installation for door type in approved shop drawings.
   2. Electric Access: Coordinate with aluminum frame and glass door supplier applicable brackets and mounting accessories for electric strikes by CR Laurence ESK w/ 310 Series.

G. Surface Vertical Rod Exit Devices: Furnish and install interior surface and concealed vertical rod exit devices as Less Bottom Rod unless otherwise indicated.

H. Dummy Push Bar: Nonfunctioning push bar matching functional push bar.

I. Outside Trim: Match design for locksets and latchsets, unless otherwise indicated.

J. Through Bolt Installation: For exit devices and trim as required for fire rated wood doors. Where through bolts are used, coordinate the color of bolt on opposite of device with BHMA finish color similar to the color of door finish surface.

2.9 CLOSERS and POWER OPERATORS

A. Manufacturers: Subject to compliance with requirements, furnish products by one the following:
   1. Surface-Mounted Closers (Heavy Duty): BHMA Certified Grade 1.
      a. LCN Door Closers (LC) – 4040XP Series with heavy duty arms.
      b. Norton Door Controls (NO) - 9500 Series with heavy duty arms.
      c. Sargent Manufacturing (SA) - 281 Series with heavy duty arms.
   2. Surface-Mounted Closers (Standard Duty): BHMA Certified Grade 1.
      a. LCN Door Closers (LC) – 1450 Series.
      b. Norton Door Controls (NO) - 8500 Series.
      c. Sargent Manufacturing (SA) - 1431 Series.
   3. Closer Holder Release (Detector) Devices: BHMA Certified Grade 1.
      a. LCN Door Closers (LC) – 4040SE Series
      b. Norton Door Controls (NO) - 7700PT(D) Series.
      c. Sargent Manufacturing (SA) -351 EHT(D) Series
   4. Power Assist Operators: BHMA Certified Grade 1.
      a. Besam Manufacturing (BM) – SW-100 Series.
      b. LCN Door Closers (LC) – 4640 Series.
      c. Norton Door Controls (NO) – Norton 5900 X-in Series.
      d. Sargent Manufacturing (SA) - MPower 4000 Series.
      e. Stanley (ST) – Magic Force Series.

B. Standards: Comply with the following:
   1. Closers: BHMA A156.4.
   2. Power Operators: BHMA A156.19.

C. Size of Units: Unless otherwise indicated, comply with manufacturer's written recommendations for sizing of door closers depending on size of door, exposure to weather, and anticipated frequency of use. Furnish non-handed, factory-sized closers adjustable to meet field conditions and requirements for opening force.

D. Closer Options: As indicated in hardware sets, furnish door closer options including: delayed action, hold open arms, extra duty parallel arms, positive stop/hold open arms, compression stop/hold open arms, special mounting brackets, spacers and drop plates. Through bolt type mounting is required as indicated in the door hardware sets. Where through bolts are used, coordinate the color of bolt on opposite of device with BHMA finish color similar to the color of door finish surface.
   1. Furnish Delayed Action (DA) feature in closers at Laboratories, Shipping and Receiving doors and where cart traffic is active.
   2. Furnish shock absorbing arm such as Spring or Rubber Cushion at exterior outswing openings.

E. Power assist operators as surface mounted, electric low energy type conforming to ANSI A156.19 requirements and capable of meeting ANSI A117.1 guidelines. Outputs and relays required to be on board in the operator to allow for coordination of exit device latch retraction, electric strikes, magnetic locks, card readers, safety and motion sensors and specified auxiliary contacts.

    1. Outputs and relays on board the operator allow for coordination of exit device latch retraction, electric strikes, magnetic locks, card readers, safety and motion sensors and specified auxiliary contacts.

    2. Electronic Controls to be microprocessor controlled unit shall control the operation and switching of the swing power operator. The electronic control furnished with low voltage power supply for all means of actuation. Electronic encoder to determine absolute open and close position.

2.10 OPERATING and PROTECTIVE TRIM UNITS

A. Manufacturers: Subject to compliance with requirements, furnish products by one of the following:
    1. Metal Protective Trim Units:
        a. McKinney Products (MC).
        b. Ives (IV).
        c. Rockwood Manufacturing (RO).
        d. Trimco Manufacturing (TR).

B. Standard: Comply with BHMA A156.6.

C. Materials: Fabricate protection plates from the following:
    1. Brass/Bronze and Stainless Steel: .050 inchesthick, beveled four sides (B4E) with countersunk screw holes.

D. Push-Pull Design: 1" Round with 10" Centers. Furnish 90 degree offset pulls at exterior openings.

E. Fasteners: Furnish manufacturer's designated fastener type as indicated in door hardware sets.

F. Furnish protection plates sized 2 inchesless than door width (LDW) on push side and 1 inch less door width on pull side by height specified in door hardware sets.

G. Coordinate stainless steel hinges, door edges, kickplates and armor plates with less then .09375 inches between meeting edges, regardless of specified sizes in hardware sets.

2.11 STOPS AND HOLDERS

A. Manufacturers: Subject to compliance with requirements, furnish products by one of the following:
    1. Stops and Holders:
        a. McKinney Products (MC).
        b. Ives (IV).
        c. Rockwood Manufacturing (RO).
        d. Trimco Manufacturing (TR).

B. Standards: Comply with the following:
    1. Stops and Bumpers: BHMA A156.16.
    2. Electromagnetic Door Holders: BHMA A156.15.
    3. Combination Overhead Holders and Stops: BHMA A156.8.
    4. Door Silencers: BHMA A156.16.

C. Stops and Bumpers: BHMA Certified Grade 1.

D. Combination Overhead Stops and Holders: Certified BHMA Grade 1.
    1. Glynn-Johnson (GJ) – 100 Concealed and 90 Surface Series
    2. Rixson Hardware (RX) – 1 Concealed and 9 Surface Series.
    3. Sargent Hardware (SA) – 600 Concealed and 500 Surface Series.

E. Provide Overhead Concealed stops at public spaces such as conference, corridors, and office spaces where wall or floor stops are not applicable condition.

F. Provide Overhead Surface stops at non-public spaces such as mechanical, electrical, storage spaces.

G. Floor Stops: For doors, unless wall or other type stops are scheduled or indicated. Do not mount floor stops where they will impede traffic.
    1. Where floor or wall stops are not appropriate, furnish overhead stops.

H. Silencers for Metal Door Frames:  BHMA Grade 1; neoprene or rubber, minimum diameter 1/2 inchfabricated for drilled-in application to frame.  Furnish (3) per single door and (2) per paired door frame if applied gasketing is not specified in Hardware Sets.

2.12 DOOR THRESHOLDS, WEATHERSTRIPPING AND GASKETING

A. Manufacturers:  Subject to compliance with requirements, furnish products by one of the following:
1. Door Thresholds, Weatherstripping and Gasket Seals:
   a. McKinney Weatherstripping Products (MW).
   b. NGP Manufacturing (NG)
   c. Pemko Manufacturing (PE).
   d. Zero International (ZE)

B. Standard:  Comply with BHMA A156.22.

C. General:  Furnish continuous weatherstrip seal on exterior doors and smoke, light, or sound gasketing on interior doors where specified.  Furnish non-corrosive fasteners for exterior applications.
1. Perimeter Gasketing:  Apply to head and jamb, forming seal between door and frame.  Install header seal before mounting door closer arms.
2. Meeting Stile Astragals:  Fasten to meeting stiles, forming seal when doors are closed.
3. Door Sweep:  Apply to bottom of door, forming seal with threshold when door is closed.

D. Basic Sound Seal Requirement: Whether indicated on the drawings or not, furnish gasketing MCKS88BL at sound rated wall types and at the following areas for limiting of sound transmission: private offices, exams, conference, private toilets, corridor openings, rooms and similar sound sensitive area.

E. Provide Door Bottom Sweeps at Outswing Doors:
1. Exterior Outswing Openings without Overhead Protection:
   a. McKinney Weatherstripping Products (MW):MCK345ANB
   b. NGP Manufacturing (NG): C627A
   c. Pemko Manufacturing (PE): 345ANB
2. Exterior Outswing Openings with Overhead Protection:
   a. McKinney Weatherstripping Products (MW): MCK315CN
   b. NGP Manufacturing (NG): 202NA
   c. Pemko Manufacturing (PE): 315CN
3. Exterior Hollow Metal Inswing Openings with or with out Overhead Protection:
   a. McKinney Weatherstripping Products (MW): MCK420APKL
   b. NGP Manufacturing (NG): 320N
   c. Pemko Manufacturing (PE): 420APKL

2.13 FABRICATION

A. Fasteners:  Furnish door hardware manufactured to comply with published templates generally prepared for machine, wood, and sheet metal screws.  Furnish screws according to manufacturers recognized installation standards for application intended.
1. Furnish manufactures templated and approved stainless steel screws and fasteners for stainless steel hardware specified in the hardware sets.

B. Mounting Accessories: Furnish drop plates, filler brackets, extended length screws, through bolts, and accessories for complete mounting with door, frame, light kits, applied molding and special applications as part of the base bid with complete installation per manufactures recommendations.

2.14 FINISHES

A. Standard:  Comply with BHMA A156.18.

B. Furnish quality of finish, including thickness of plating or coating (if any), composition, hardness, and other qualities complying with manufacturer's standards, but in no case less than specified by referenced standards for the applicable units of hardware.

C. Protect mechanical finishes on exposed surfaces from damage by applying a strippable and temporary protective covering before shipping to jobsite.

D. Finishes on locksets, latchsets and exit devices to incorporate an FDA recognized antimicrobial coating (MicroShield ) listed for use on medical and food preparation equipment that will suppress the growth and spread of a broad range of bacteria, algae, fungus, mold and mildew.

E.    Furnish clear powder coat finish at exit devices located on exterior openings such as gates and at pool exit doors.

F.    BHMA Designations:   Comply with base material and finish requirements indicated by the following:
1.    BHMA 600:   Primed for painting, over steel base metal.
2.    BHMA 605:   Bright brass, clear coated, over brass base metal.
3.    BHMA 606:   Satin brass, clear coated, over brass base metal.
4.    BHMA 609:   Satin brass, blackened, satin relieved, clear coated, over brass base metal.
5.    BHMA 611:   Bright bronze, clear coated, over bronze base metal.
6.    BHMA 612:   Satin bronze, clear coated, over bronze base metal.
7.    BHMA 613:   Dark-oxidized satin bronze, oil rubbed, over bronze base metal.
8.    BHMA 618:   Bright nickel plated, clear coated, over brass or bronze base metal.
9.    BHMA 619:   Satin nickel plated, clear coated, over brass or bronze base metal.
10.   BHMA 622:   Flat black coated, over brass or bronze base metal.
11.   BHMA 623:   Light-oxidized statuary bronze, clear coated, over bronze base metal.
12.   BHMA 624:   Dark-oxidized statuary bronze, clear coated, over bronze base metal.
13.   BHMA 625:   Bright chromium plated over nickel, over brass or bronze base metal.
14.   BHMA 626:   Satin chromium plated over nickel, over brass or bronze base metal.
15.   BHMA 627:   Satin aluminum, clear coated, over aluminum base metal.
16.   BHMA 628:   Satin aluminum, clear anodized, over aluminum base metal.
17.   BHMA 629:   Bright stainless steel, over stainless-steel base metal.
18.   BHMA 630:   Satin stainless steel, over stainless-steel base metal.
19.   BHMA 651:   Bright chromium plated over nickel, over steel base metal.
20.   BHMA 652:   Satin chromium plated over nickel, over steel base metal.
21.   BHMA 689:   Aluminum painted, over any base metal.
22.   BHMA 690:   Dark bronze painted, over any base metal.
23.   BHMA 691:   Light bronze painted, over any base metal.
24.   BHMA 717:   Bright aluminum, uncoated; aluminum base metal.
25.   BHMA 718:   Satin aluminum, uncoated; aluminum base metal.
26.   BHMA 722:   Dark-oxidized bronze, oil rubbed, over architectural bronze base metal.

## PART 3 - EXECUTION

3.1      EXAMINATION

A.    Examine doors and frames, with Installer present, for compliance with requirements for installation tolerances, labeled fire door assembly construction, wall and floor construction, and other conditions affecting performance.

B.    Examine roughing-in for electrical source power to verify actual locations of wiring connections before electrified door hardware installation.

C.    Proceed with installation only after unsatisfactory conditions have been corrected.

D.    Notify architect of any discrepancies or conflicts between the door schedule, door types, drawings and scheduled hardware.   Proceed only after such discrepancies or conflicts have been resolved in writing.

3.2      INSTALLATION

A.    Mounting Heights:   Mount door hardware units at heights indicated in following applicable publications, unless specifically indicated or required to comply with governing regulations.

B.    Install each door hardware item to comply with manufacturer's written instructions.   Where cutting and fitting are required to install door hardware onto or into surfaces that are later to be painted or finished in another way, coordinate removal, storage, and reinstallation of surface protective trim units with finishing work specified in Division 9 Sections.   Do not install surface-mounted items until finishes have been completed on substrates involved.

C.    Furnish and coordinate concealed wood blocking for wall mount stops as detailed in Door Hardware Schedule.

D.    Thresholds:   Set thresholds for exterior and acoustical doors in full bed of sealant complying with requirements specified in Division 7 Section "Joint Sealants."

3.3     FIELD QUALITY CONTROL

A.     The Contractor shall comply with AIA A201 1997 section 3.3.1 which reads as follows: "The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the contract Documents give other specific instructions concerning these matters."

B.     Field Inspection:   Supplier and Door Hardware Manufacturer will perform a final inspection of installed door hardware and state in report whether work complies with or deviates from requirements, including whether door hardware is properly installed, operating and adjusted.
1.     Access Control System Consultant will inspect integrated electronic and access control hardware and state in report whether installed work complies with or deviates from requirements, including whether electronic and access control hardware is properly installed and performing according to system operational descriptions.
       a.     Inspection:   Verify that units and controls are properly installed, connected, and labeled and that interconnecting wires and terminals are identified.
       b.     Pre-testing:   Program and adjust the system and pretest all components, wiring, and functions to verify they conform to specified requirements.   Replace malfunctioning or damaged items with new items.
       c.     Acceptance Test Schedule:   Schedule tests after pre-testing has been successfully completed and system has been in normal functional operation for at least 2 weeks.
       d.     Retest:   Correct deficiencies identified by tests and observations and retest until specified requirements are met.

3.4     ADJUSTING

A.     Initial Adjustment:   Adjust and check each operating item of door hardware and each door to ensure proper operation or function of every unit.   Replace units that cannot be adjusted to operate as intended.   Adjust door control devices to compensate for final operation of heating and ventilating equipment and to comply with referenced accessibility requirements.
1.     Door Closers:   Adjust sweep period so that, from an open position of 70 degrees, the door will take at least 3 seconds to move to a point 3 inches from the latch, measured to the leading edge of the door.

B.     Six-Month Adjustment:   Approximately six months after date of Substantial Completion, Installer shall perform the following:
1.     Examine and readjust each item of door hardware as necessary to ensure function of doors, door hardware, and electrified door hardware.
2.     Consult with and instruct Owner's personnel on recommended maintenance procedures.
3.     Replace door hardware items that have deteriorated or failed due to faulty design, materials, or installation of door hardware units.

3.5     CLEANING AND PROTECTION

A.     Clean adjacent surfaces soiled by door hardware installation.

B.     Clean operating items as necessary to restore proper finish. Furnish final protection and maintain conditions that ensure door hardware is without damage or deterioration at time of owner occupancy.

3.6     DEMONSTRATION

A.     Engage a factory-authorized service representative to train Owner's maintenance personnel to adjust, operate, and maintain door hardware and door hardware finishes.

**END OF SECTION**

## SECTION 09 21 16.23 - GYPSUM BOARD SHAFT WALL ASSEMBLIES

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

   A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.     Section Includes: Gypsum board shaft wall assemblies for the following:
      1.     Chase enclosures.

1.3     ACTION SUBMITTALS

   A.     Product Data: For each component of gypsum board shaft wall assembly.

1.4     QUALITY ASSURANCE

   A.     Fire-Resistance Ratings:  Provide materials and construction identical to those of assemblies with fire-resistance ratings determined according to ASTM E 119 by a testing and inspecting agency.

   B.     STC-Rated Assemblies:  Provide materials and construction identical to those of assemblies tested according to ASTM E 90 and classified according to ASTM E 413 by a testing and inspecting agency.

1.5     DELIVERY, STORAGE, AND HANDLING

   A.     Store materials inside under cover and keep them dry and protected against weather, condensation, direct sunlight, construction traffic, and other potential causes of damage. Stack panels flat and supported on risers on a flat platform to prevent sagging.

1.6     FIELD CONDITIONS

   A.     Environmental Limitations: Comply with ASTM C 840 requirements or with gypsum board manufacturer's written recommendations, whichever are more stringent.

   B.     Do not install interior products until installation areas are enclosed and conditioned.

   C.     Do not install panels that are wet, moisture damaged, or mold damaged.
      1.     Indications that panels are wet or moisture damaged include, but are not limited to, discoloration, sagging, and irregular shape.
      2.     Indications that panels are mold damaged include, but are not limited to, fuzzy or splotchy surface contamination and discoloration.

### PART 2 - PRODUCTS

2.1     SUSTAINABILITY REQUIREMENTS

   A.     Low Emitting Requirements: Provide product that meets low emitting criteria listed in section 01 81 13.02 – Sustainable Design Requirements.

2.2     PERFORMANCE REQUIREMENTS

   A.     Fire-Resistance-Rated Assemblies: For fire-resistance-rated assemblies, provide materials and construction identical to those tested in assembly indicated according to ASTM E 119 by an independent testing agency.

2.3     GYPSUM BOARD SHAFT WALL ASSEMBLIES

   A.     Fire-Resistance Rating: As indicated.

B. Studs: Manufacturer's standard profile for repetitive members, corner and end members, and fire-resistance-rated assembly indicated.
   1. Depth: 2-1/2 inches unless otherwise indicated or required to comply with span and deflection design criteria.
   2. Minimum Base-Metal Thickness: 0.018 inch.

C. Runner Tracks: Manufacturer's standard J-profile track with manufacturer's standard long-leg length, but at least 2 inches long and matching studs in depth.
   1. Minimum Base-Metal Thickness: Matching steel studs.

D. Firestop Tracks: Provide firestop track at head of shaft wall on each floor level.

E. Room-Side Finish: As indicated.

F. Shaft-Side Finish: As indicated.

G. Insulation: Sound attenuation blankets.

2.4     PANEL PRODUCTS

A. Panel Size: Provide in maximum lengths and widths available that will minimize joints in each area and that correspond with support system indicated.

B. Gypsum Shaftliner Board, Type X: ASTM C 1396/C 1396M; manufacturer's proprietary fire-resistive liner panels with paper faces.
   1. Products: Subject to compliance with requirements, provide one of the following:
      a. American Gypsum; Shaft Liner.
      b. CertainTeed Corp.; ProRoc Shaftliner.
      c. Georgia-Pacific Gypsum LLC, Subsidiary of Georgia Pacific; ToughRock Fireguard Shaftliner.
      d. National Gypsum Company; Gold Bond Brand Fire-Shield Shaftliner.
      e. USG Corporation; Sheetrock Brand Gypsum Liner Panel.
   2. Thickness: 1 inch.
   3. Long Edges: Double bevel.

C. Gypsum Shaftliner Board, Moisture-and Mold-Resistant Type X: ASTM C 1396/C 1396M; manufacturer's proprietary fire-resistive liner panels with moisture- and mold-resistant core and surfaces.
   1. Products: Subject to compliance with requirements, provide one of the following:
      a. CertainTeed Corp.; ProRoc Moisture and Mold Resistant Shaftliner.
      b. Georgia-Pacific Gypsum LLC, Subsidiary of Georgia Pacific; Dens-Glass Ultra Shaftliner.
      c. National Gypsum Company; Gold Bond Brand Fire-Shield Shaftliner XP.
      d. USG Corporation; Sheetrock Brand Mold Tough Gypsum Liner Panel.
   2. Thickness: 1 inch.
   3. Long Edges: Double bevel.
   4. Mold Resistance: ASTM D 3273, score of 10 as rated according to ASTM D 3274.

D. Gypsum Board: As specified in Section 09 29 00 "Gypsum Board."

2.5     NON-LOAD-BEARING STEEL FRAMING

A. Steel Framing Members: Comply with AISI S 200 and ASTM C 645 requirements for metal unless otherwise indicated.
   1. Protective Coating: ASTM A 653/A 653M, G40, hot-dip galvanized unless otherwise indicated.

B. Firestop Tracks: Top runner manufactured to allow partition heads to expand and contract with movement of the structure while maintaining continuity of fire-resistance-rated assembly indicated; in thickness not less than indicated for studs and in width to accommodate depth of studs.
   1. Products: Subject to compliance with requirements, provide one of the following:
      a. ClarkDietrich Building Systems; Blazeframe.
      b. Fire Trak Corp.; Fire Trak System attached to studs with Fire Trak Posi Klip.
      c. Steel Network Inc. (The); VertiClip SLD or VertiTrack VTD Series.

2.6     AUXILIARY MATERIALS

A. General: Provide auxiliary materials that comply with manufacturer's written recommendations.

B. Trim Accessories: Cornerbead, edge trim, and control joints of material and shapes as specified in Section 09 29 00 "Gypsum Board" that comply with gypsum board shaft wall assembly manufacturer's written recommendations for application indicated.

C. Steel Drill Screws: ASTM C 1002 unless otherwise indicated.

D. Track Fasteners: Power-driven fasteners of size and material required to withstand loading conditions imposed on shaft wall assemblies without exceeding allowable design stress of track, fasteners, or structural substrates in which anchors are embedded.
1. Expansion Anchors: Fabricated from corrosion-resistant materials, with capability to sustain, without failure, a load equal to 5 times design load, as determined by testing according to ASTM E 488 conducted by a qualified testing agency.
2. Power-Actuated Anchors: Fastener system of type suitable for application indicated, fabricated from corrosion-resistant materials, with capability to sustain, without failure, a load equal to 10 times design load, as determined by testing according to ASTM E 1190 conducted by a qualified testing agency.

E. Sound Attenuation Blankets: As specified in 09 81 16 Acoustical Blanket Insulation

F. Acoustical Sealant: As specified in Section 07 92 00 "Joint Sealants."


**PART 3 - EXECUTION**

3.1 EXAMINATION

A. Examine substrates to which gypsum board shaft wall assemblies attach or abut, with Installer present, including hollow-metal frames, elevator hoistway door frames, cast-in anchors, and structural framing. Examine for compliance with requirements for installation tolerances and other conditions affecting performance.

B. Examine panels before installation. Reject panels that are wet, moisture damaged, or mold damaged.

C. Proceed with installation only after unsatisfactory conditions have been corrected.

3.2 INSTALLATION

A. General: Install gypsum board shaft wall assemblies to comply with requirements of fire-resistance-rated assemblies indicated, manufacturer's written installation instructions, and ASTM C 754 other than stud-spacing requirements.

B. Do not bridge building expansion joints with shaft wall assemblies; frame both sides of expansion joints with furring and other support.

C. Install supplementary framing in gypsum board shaft wall assemblies around openings and as required for blocking, bracing, and support of gravity and pullout loads of fixtures, equipment, services, heavy trim, furnishings, wall-mounted door stops, and similar items that cannot be supported directly by shaft wall assembly framing.
1. Reinforcing: Where handrails directly attach to gypsum board shaft wall assemblies, provide galvanized steel reinforcing strip with 0.033-inch minimum thickness of base metal (uncoated), accurately positioned and secured behind at least one layer of face panel.

D. Penetrations: At penetrations in shaft wall, maintain fire-resistance rating of shaft wall assembly by installing supplementary steel framing around perimeter of penetration and fire protection behind boxes containing wiring devices, elevator call buttons, elevator floor indicators, and similar items.

E. Isolate perimeter of gypsum panels from building structure to prevent cracking of panels, while maintaining continuity of fire-rated construction.

F. Firestop Tracks: Where indicated, install to maintain continuity of fire-resistance-rated assembly indicated.

G. Control Joints: Install control joints according to ASTM C 840 and in specific locations approved by Architect while maintaining fire-resistance rating of gypsum board shaft wall assemblies.

H. Sound-Rated Shaft Wall Assemblies: Seal gypsum board shaft walls with acoustical sealant at perimeter of each assembly where it abuts other work and at joints and penetrations within each assembly.

I.    Cant Panels: At projections into shaft exceeding 4 inches and where indicated, install 1/2- or 5/8-inch-thick gypsum board cants covering tops of projections.

    1.    Slope cant panels at least 75 degrees from horizontal. Set base edge of panels in adhesive and secure top edges to shaft walls at 24 inches o.c. with screws fastened to shaft wall framing.

    2.    Where steel framing is required to support gypsum board cants, install framing at 24 inches o.c. and extend studs from the projection to shaft wall framing.

J.    Installation Tolerance: Install each framing member so fastening surfaces vary not more than 1/8 inch from the plane formed by faces of adjacent framing.

## 3.3    PROTECTION

A.    Protect installed products from damage from weather, condensation, direct sunlight, construction, and other causes during remainder of the construction period.

B.    Remove and replace panels that are wet, moisture damaged, or mold damaged.

    1.    Indications that panels are wet or moisture damaged include, but are not limited to, discoloration, sagging, and irregular shape.

    2.    Indications that panels are mold damaged include, but are not limited to, fuzzy or splotchy surface contamination and discoloration.

**END OF SECTION 09 21 16.23**

## SECTION 09 22 16 - NON-STRUCTURAL METAL FRAMING

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section Includes:
        1.    Non-load-bearing steel framing systems for interior gypsum board assemblies.
        2.    Suspension systems for interior gypsum ceilings, soffits, and grid systems.

1.3     ACTION SUBMITTALS

   A.   Product Data:   For each type of product.

1.4     INFORMATIONAL SUBMITTALS

   A.   Evaluation Reports:   Submit evaluation reports certified under an independent third party inspection program administered by an agency accredited by IAS to ICC-ES AC98, IAS Accreditation Criteria for Inspection Agencies..

1.5     QUALITY ASSURANCE

   A.   Code-Compliance Certification of Studs and Tracks: Provide documentation that framing members are certified according to the product-certification program of the Steel Framing Industry Association (SFIA) or be a part of a similar organization that provides verifiable code compliance program.

1.6     DELIVERY, STORAGE, AND HANDLING

   A.   Protect cold-formed metal framing from corrosion, deformation, and other damage during delivery, storage, and handling as required by AISI's "Code of Standard Practice".

### PART 2 - PRODUCTS

2.1     SUSTAINABILITY REQUIREMENTS

   A.   Low Emitting Requirements: Provide product that meets low emitting criteria listed in section 01 81 13.02 – Sustainable Design Requirements.

2.2     PERFORMANCE REQUIREMENTS

   A.   Fire-Test-Response Characteristics:     For fire-resistance-rated assemblies that incorporate non-load-bearing steel framing, provide materials and construction identical to those tested in assembly indicated, according to ASTM E 119 by an independent testing agency.

   B.   Design framing systems in accordance with American Iron and Steel Institute Publication "S220 - North American Specification for the Design of Cold-Formed Steel Framing - Nonstructural Members", except as otherwise shown or specified.

2.3     MANUFACTURERS

   A.   Manufacturers:   Subject to compliance with requirements, provide products by one of the following:
        1.    CEMCO Steel Framing Systems
        2.    ClarkDietrich Building Systems.
        3.    MarinoWARE.
        4.    Mill Steel Framing

B. Framing Members, General: Comply with AISI S 200 and ASTM C 645 for conditions indicated.
1. Steel Sheet Components: Comply with ASTM C 645 requirements for metal unless otherwise indicated.
2. Protective Coating: ASTM A 653/A 653M, G40 (Z120), Coating with equivalent corrosion resistance of ASTM A 653/A 653M, G40 (Z120) or DiamondPlus coating; roll-formed from steel meeting mechanical and chemical requirements of ASTM A 1003 with a zinc-based coating. Galvannealed products are not acceptable.,
   a. Coatings shall demonstrate equivalent corrosion resistance with an evaluation report acceptable to the authorities having jurisdiction.

C. Studs and Runners: ASTM C 645.
1. Steel Studs and Runners:
   a. Minimum Base-Steel Thickness: 25 gage unless indicated otherwise on Drawings or below.
      1) Interior Metal Stud/Gypsum Board Assemblies, Typical Locations: Withstand lateral loading (air pressure) of 5 psf with deflection limit not more than L/240 of partition height.
      2) Interior Metal Stud/Gypsum Board Assemblies at Atriums, Lobbies, Service Corridors, Exit Corridors, Elevator Lobbies, Vertical Shafts, and walls receiving plaster veneer: Withstand lateral loading (air pressure) of 7.5 psf with deflection limit not more than L/360 of partition height
      3) Interior Metal Stud/Gypsum Board Assemblies at Locations with Ceramic Tile or Other Hard Surface Finishes: Withstand typical lateral loading (air pressure) with deflection limit not more than L/360 of partition height, minimum 20 gage studs at 16 inches on center.
      4) Where wall mounted equipment, woodwork, and casework items are indicated or elsewhere as shown on Drawings, provide minimum 16 gage studs
      5) At jambs of openings provide two minimum 20 gage studs.
      6) Ceilings: At ceilings using mold-mildew resistant gypsum framing to be 16 inches o.c. for 5/8 inches gypsum
      7) Refer to Division 5 for stud framing which is exposed to wind loads and for studs carrying heavy vertical loads (cement plaster, manufactured stone masonry, stone tile thicker than 3/4 inch, etc.)
   b. Where partition heights exceed stud manufacturer's recommended spans, provide one of the following:
      1) Heavier stud gage.
      2) Closer stud spacing.
      3) Deeper stud size (space permitting); As approved by Architect.
      4) Above ceiling bracing, anchored to structure above.
   c. Depth: As indicated on Drawings.
1. Equivalent Gauge Steel Studs and Runners:
   a. Product: ClarkDietrich Building Systems; ProSTUD 25 (25EQ) and ProTRAK 25 (25EQ), or comparable products.
   b. Minimum Base-Steel Thickness: 0.0150 inch.
2. "EQ" (Equivalent Gauge Thickness) Steel Studs and Runners: Members that can show certified third party testing with gypsum board in accordance with ICC ES AC86 (Approved August 2015) need not meet the minimum thickness limitation or minimum section properties set forth in ASTM C 645. The submission of an evaluation report is acceptable to show conformance to this requirement.

D. Slip-Type Head Joints: Where indicated, provide one of the following:
1. Deflection Track: Steel sheet top runner manufactured to prevent cracking of finishes applied to interior partition framing resulting from deflection of structure above; in thickness not less than indicated for studs and in width to accommodate depth of studs.
   a. Products: Subject to compliance with requirements, provide one of the following:
      1) ClarkDietrich Building Systems; BlazeFrame DSL Slotted Deflection Track.

E. Flat Strap and Backing Plate: Steel sheet for blocking and bracing in length and width indicated.
1. Minimum Base-Steel Thickness: 0.018 inch.

F. Backing Plate: Proprietary fire-retardant-treated wood blocking and bracing in width indicated.
1. ClarkDietrich Building Systems; Danback Fire-Retardant Treated Wood Backing Plate D16F or D24F, or a comparable product.

G. Cold-Rolled Channel Bridging: Steel, 0.053-inch minimum base-steel thickness, with minimum 1/2-inch-wide flanges.
   1. Product: ClarkDietrich Building Systems; Cold-Formed U-Channel and EasyClip U-Series Angle U543, U545, U547, or a comparable product.
   2. Depth: As indicated on Drawings.
   3. Clip Angle: Not less than 1-1/2 by 1-1/2 inches, 0.0538-inch- thick, galvanized steel.

H. Hat-Shaped, Rigid Furring Channels: ASTM C 645.
   1. Minimum Base-Steel Thickness: 0.018 inch.
   2. Depth: 7/8 inch.

I. Resilient Furring Channels: 1/2-inch- deep, steel sheet members designed to reduce sound transmission.
   1. Configuration: Asymmetrical.
   2. Basis of Design: Clark Dietrich, RC Deluxe single leg resilient channel.

J. Cold-Rolled Furring Channels: 0.053-inch uncoated-steel thickness, with minimum 1/2-inch- wide flanges.
   1. Depth: 3/4 inch.
   2. Furring Brackets: Adjustable, corrugated-edge type of steel sheet with minimum uncoated-steel thickness of 0.033 inch.
   3. Tie Wire: ASTM A 641/A 641M, Class 1 zinc coating, soft temper, 0.062-inch- diameter wire, or double strand of 0.048-inch- diameter wire.

K. Z-Shaped Furring: With slotted or nonslotted web, face flange of 1-1/4 inches, wall attachment flange of 7/8 inch, minimum uncoated-metal thickness of 0.018 inch, and depth required to fit insulation thickness indicated.

2.4    SUSPENSION SYSTEMS

A. Tie Wire: ASTM A 641/A 641M, Class 1 zinc coating, soft temper, 0.062-inch- diameter wire, or double strand of 0.048-inch- diameter wire.

B. Hanger Attachments to Concrete:
   1. Anchors: Fabricated from corrosion-resistant materials with holes or loops for attaching wire hangers and capable of sustaining, without failure, a load equal to 5 times that imposed by construction as determined by testing according to ASTM E 488 by an independent testing agency.
      a. Type: Postinstalled, expansion anchor.
   2. Powder-Actuated Fasteners: Suitable for application indicated, fabricated from corrosion-resistant materials with clips or other devices for attaching hangers of type indicated, and capable of sustaining, without failure, a load equal to 10 times that imposed by construction as determined by testing according to ASTM E 1190 by an independent testing agency.

C. Wire Hangers: ASTM A 641/A 641M, Class 1 zinc coating, soft temper, 0.16 inch in diameter.

D. Flat Hangers: Steel sheet, 1 by 3/16 inch by length indicated.

E. Carrying Channels: Cold-rolled, commercial-steel sheet with a base-steel thickness of 0.053 inch and minimum 1/2-inch- wide flanges.
   1. Depth: 2-1/2 inches.

F. Furring Channels (Furring Members):
   1. Cold-Rolled Channels: 0.053-inch uncoated-steel thickness, with minimum 1/2-inch- wide flanges, 3/4 inch deep.
   2. Steel Studs and Runners: ASTM C 645.
      a. Minimum Base-Steel Thickness: 0.018 inch.
      b. Depth: 1-5/8 inches.
   3. Equivalent Gauge Steel Studs and Runners:
      a. ClarkDietrich Building Systems; ProSTUD 25 (25EQ) and ProTRAK 25 (25 EQ), or comparable products.
      b. Minimum Base-Steel Thickness: 0.0150 inch.
   4. Hat-Shaped, Rigid Furring Channels: ASTM C 645, 7/8 inch deep.
      a. Minimum Base-Metal Thickness: 0.018 inch.
   5. Resilient Furring Channels: 1/2-inch- deep members designed to reduce sound transmission.
      a. ClarkDietrich Building Systems; RC Deluxe (RCSD) Resilient Channel
      b. Configuration: Asymmetrical.

G. Grid Suspension System for Gypsum Board Ceilings: ASTM C 645, direct-hung system composed of main beams and cross-furring members that interlock.
    1. Products: Subject to compliance with requirements, provide one of the following:
        a. Armstrong World Industries, Inc.; Drywall Grid Systems.
        b. Chicago Metallic Corporation; Drywall Grid System.
        c. USG Corporation; Drywall Suspension System.

## 2.5 AUXILIARY MATERIALS

A. General: Provide auxiliary materials that comply with referenced installation standards.

B. Fasteners for Metal Framing: Of type, material, size, corrosion resistance, holding power, and other properties required to fasten steel members to substrates.

C. Isolation Strip at Exterior Walls: Provide the following:
    1. Foam Gasket: Adhesive-backed, closed-cell vinyl foam strips that allow fastener penetration without foam displacement, 1/8 inch thick, in width to suit steel stud size.

## PART 3 - EXECUTION

## 3.1 EXAMINATION

A. Examine areas and substrates, with Installer present, and including welded hollow-metal frames, cast-in anchors, and structural framing, for compliance with requirements and other conditions affecting performance of the Work.

B. Proceed with installation only after unsatisfactory conditions have been corrected.

## 3.2 PREPARATION

A. Suspended Assemblies: Coordinate installation of suspension systems with installation of overhead structure to ensure that inserts and other provisions for anchorages to building structure have been installed to receive hangers at spacing required to support the Work and that hangers will develop their full strength.
    1. Furnish concrete inserts and other devices indicated to other trades for installation in advance of time needed for coordination and construction.

## 3.3 INSTALLATION, GENERAL

A. Installation Standard: ASTM C 754.
    1. Gypsum Plaster Assemblies: Also comply with requirements in ASTM C 841 that apply to framing installation.
    2. Portland Cement Plaster Assemblies: Also comply with requirements in ASTM C 1063 that apply to framing installation.
    3. Gypsum Veneer Plaster Assemblies: Also comply with requirements in ASTM C 844 that apply to framing installation.
    4. Gypsum Board Assemblies: Also comply with requirements in ASTM C 840 that apply to framing installation.

B. Install supplementary framing, and blocking to support fixtures, equipment services, heavy trim, grab bars, toilet accessories, furnishings, or similar construction.

C. Install bracing at terminations in assemblies.

D. Do not bridge building control and expansion joints with non-load-bearing steel framing members. Frame both sides of joints independently.

## 3.4 INSTALLING FRAMED ASSEMBLIES

A. Install framing system components according to spacings indicated, but not greater than spacings required by referenced installation standards for assembly types.
    1. Single-Layer Application: 16 inches o.c. unless otherwise indicated.
    2. Multilayer Application: 16 inches o.c. unless otherwise indicated.
    3. Partitions with Security Mesh: 8 inches (203 mm) o.c., unless otherwise indicated or required to comply with span and deflection design criteria.

B. Where studs are installed directly against exterior masonry walls or dissimilar metals at exterior walls, install isolation strip between studs and exterior wall.

C. Install studs so flanges within framing system point in same direction.

D. Install tracks (runners) at floors and overhead supports. Extend framing full height to structural supports or substrates above suspended ceilings except where partitions are indicated to terminate at suspended ceilings. Continue framing around ducts penetrating partitions above ceiling.
1. Slip-Type Head Joints: Where framing extends to overhead structural supports, install to produce joints at tops of framing systems that prevent axial loading of finished assemblies.
2. Door Openings: Screw vertical studs at jambs to jamb anchor clips on door frames; install runner track section (for cripple studs) at head and secure to jamb studs.
    a. Install two studs at each jamb unless otherwise indicated.
    b. Install cripple studs at head adjacent to each jamb stud, with a minimum 1/2-inch clearance from jamb stud to allow for installation of control joint in finished assembly.
    c. Extend jamb studs through suspended ceilings and attach to underside of overhead structure.
3. Other Framed Openings: Frame openings other than door openings the same as required for door openings unless otherwise indicated. Install framing below sills of openings to match framing required above door heads.
4. Fire-Resistance-Rated Partitions: Install framing to comply with fire-resistance-rated assembly indicated and support closures and to make partitions continuous from floor to underside of solid structure.
    a. Firestop Track: Where indicated, install to maintain continuity of fire-resistance-rated assembly indicated.
5. Sound-Rated Partitions: Install framing to comply with sound-rated assembly indicated.
6. Curved Partitions:
    a. Begin and end each arc with a stud, and space intermediate studs equally along arcs. On straight lengths of no fewer than two studs at ends of arcs, place studs 6 inches o.c.

E. Direct Furring:
1. Attach to concrete or masonry with stub nails, screws designed for masonry attachment, or powder-driven fasteners spaced 24 inches o.c.

F. Z-Furring Members:
1. Erect insulation, specified in Section 07 21 00 "Thermal Insulation," vertically and hold in place with Z-furring members spaced 24 inches o.c.
2. Except at exterior corners, securely attach narrow flanges of furring members to wall with concrete stub nails, screws designed for masonry attachment, or powder-driven fasteners spaced 24 inches o.c.
3. At exterior corners, attach wide flange of furring members to wall with short flange extending beyond corner; on adjacent wall surface, screw-attach short flange of furring channel to web of attached channel. At interior corners, space second member no more than 12 inches from corner and cut insulation to fit.

G. Installation Tolerance: Install each framing member so fastening surfaces vary not more than 1/8 inch from the plane formed by faces of adjacent framing.

3.5 INSTALLING SUSPENSION SYSTEMS

A. Install suspension system components according to spacings indicated, but not greater than spacings required by referenced installation standards for assembly types.
1. Hangers: 48 inches o.c.
2. Carrying Channels (Main Runners): 48 inches o.c.
3. Furring Channels (Furring Members): 16 inches o.c.

B. Isolate suspension systems from building structure where they abut or are penetrated by building structure to prevent transfer of loading imposed by structural movement.

C. Suspend hangers from building structure as follows:
1. Install hangers plumb and free from contact with insulation or other objects within ceiling plenum that are not part of supporting structural or suspension system.
    a. Splay hangers only where required to miss obstructions and offset resulting horizontal forces by bracing, countersplaying, or other equally effective means.

2.  Where width of ducts and other construction within ceiling plenum produces hanger spacings that interfere with locations of hangers required to support standard suspension system members, install supplemental suspension members and hangers in the form of trapezes or equivalent devices.

    a.  Size supplemental suspension members and hangers to support ceiling loads within performance limits established by referenced installation standards.

3.  Wire Hangers:  Secure by looping and wire tying, either directly to structures or to inserts, eye screws, or other devices and fasteners that are secure and appropriate for substrate, and in a manner that will not cause hangers to deteriorate or otherwise fail.

4.  Flat Hangers:  Secure to structure, including intermediate framing members, by attaching to inserts, eye screws, or other devices and fasteners that are secure and appropriate for structure and hanger, and in a manner that will not cause hangers to deteriorate or otherwise fail.

5.  Do not attach hangers to steel roof deck.

6.  Do not attach hangers to permanent metal forms.  Furnish cast-in-place hanger inserts that extend through forms.

7.  Do not connect or suspend steel framing from ducts, pipes, or conduit.

D.  Fire-Resistance-Rated Assemblies:  Wire tie furring channels to supports.

E.  Grid Suspension Systems:  Attach perimeter wall track or angle where grid suspension systems meet vertical surfaces.  Mechanically join main beam and cross-furring members to each other and butt-cut to fit into wall track.

F.  Installation Tolerances:  Install suspension systems that are level to within 1/8 inch in 12 feet measured lengthwise on each member that will receive finishes and transversely between parallel members that will receive finishes.

**END OF SECTION 09 22 16**

**SECTION 09 29 00 - GYPSUM BOARD**


**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.    Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.    Section Includes:
         1.    Interior gypsum board.
         2.    Specialty Gypsum Board
         3.    Tile backing panels.
         4.    Trim Accessories

1.3     ACTION SUBMITTALS

   A.    Product Data: For each type of product.

1.4     DELIVERY, STORAGE AND HANDLING

   A.    Store materials inside under cover and keep them dry and protected against weather, condensation, direct sunlight, construction traffic, and other potential causes of damage. Stack panels flat and supported on risers on a flat platform to prevent sagging.

1.5     FIELD CONDITIONS

   A.    Environmental Limitations: Comply with ASTM C 840 requirements or gypsum board manufacturer's written recommendations, whichever are more stringent.

   B.    Do not install paper-faced gypsum panels until installation areas are enclosed and conditioned.
         1.    At Contractor's request, Owner and Architect may consider the following strategies pending approval by the gypsum board manufacturer.
               a.    If building is not enclosed and rain or increased moisture is likely, Glass-Mat Interior Gypsum Board panel products may be used without additional cost to the Owner. Texture of fiberglass facer will require additional preparation including skim on entire panel to smooth out surface in preparation for painted finishes.
               b.    If building is enclosed but not conditioned and no rain or increased moisture is likely, then Moisture- and Mold-Resistant Gypsum Board panel products may be used without additional cost to the Owner.
         2.    Any panel products installed during construction that is damaged, has excessive moisture content exceeding manufacturer's recommendation or shows signs of mold or water damage must be replaced by the contractor.

   C.    Do not install panels that are wet, those that are moisture damaged, and those that are mold damaged.
         1.    Indications that panels are wet or moisture damaged include, but are not limited to, discoloration, sagging, or irregular shape.
         2.    Indications that panels are mold damaged include, but are not limited to, fuzzy or splotchy surface contamination and discoloration.

   D.    Install cavity wall insulation and interior gypsum board only after building is enclosed with exterior wall assembly as detailed in the drawings.

**PART 2 - PRODUCTS**

2.1      PERFORMANCE REQUIREMENTS

    A.    Fire-Resistance-Rated Assemblies: For fire-resistance-rated assemblies, provide materials and construction identical to those tested in assembly indicated according to ASTM E 119 by an independent testing agency.

2.2      GYPSUM BOARD, GENERAL

    A.    Size: Provide maximum lengths and widths available that will minimize joints in each area and that correspond with support system indicated.

2.3      INTERIOR GYPSUM BOARD

    A.    Manufacturers: Subject to compliance with requirements, provide products by one of the following:
        1.    American Gypsum.
        2.    CertainTeed Corp.
        3.    Georgia-Pacific Gypsum LLC.
        4.    National Gypsum Company.
        5.    PABCO Gypsum.
        6.    USG Corporation.

    B.    Gypsum Board, Type X: ASTM C 1396/C 1396M.
        1.    Thickness: 5/8 inch.
        2.    Long Edges: Tapered.

    C.    Gypsum Ceiling Board: ASTM C 1396/C 1396M.
        1.    Thickness: 1/2 inch.
        2.    Long Edges: Tapered.

    D.    Moisture- and Mold-Resistant Gypsum Board: ASTM C 1396/C 1396M. With moisture- and mold-resistant core and paper surfaces.
        1.    Core: As indicated.
        2.    Long Edges: Tapered.
        3.    Mold Resistance: ASTM D 3273, score of 10 as rated according to ASTM D 3274.

2.4      SPECIALTY GYPSUM BOARD

    A.    Gypsum Board, Type C: ASTM C 1396/C 1396M. Manufactured to have increased fire-resistive capability.
        1.    Products: Subject to compliance with requirements, provide one of the following:
            a.    American Gypsum; Firebloc Type C.
            b.    CertainTeed Corp.; ProRoc Type C.
            c.    Georgia-Pacific Gypsum LLC; Fireguard C.
            d.    National Gypsum Company; Gold Bond Fire-Shield C.
            e.    USG Corporation; Firecode C Core.
        2.    Thickness: As required by fire-resistance-rated assembly indicated on Drawings.
        3.    Long Edges: Tapered.

    B.    Glass-Mat Interior Gypsum Board: ASTM C 1658/C 1658M. With fiberglass mat laminated to both sides. Specifically designed for pre-rock interior use before building is completely enclosed.
        1.    Products: Subject to compliance with requirements, provide one of the following:
            a.    Georgia-Pacific Gypsum LLC; DensArmour Plus.
            b.    National Gypsum Company; Gold Bond eXP Interior Extreme
            c.    USG Corporation; Sheetrock Glass-Mat Panels Mold Tough.
        2.    Core: 5/8 inch, Type X .
        3.    Long Edges: Tapered.
        4.    Mold Resistance: ASTM D 3273, score of 10 as rated according to ASTM D 3274.
        5.    Texture of fiberglass facer will require additional preparation including skim on entire panel to smooth out surface in preparation for painted finishes.

2.5    TILE BACKING PANELS

A.    Glass-Mat, Water-Resistant Backing Board: ASTM C 1178/C 1178M, with manufacturer's standard edges.
      1.    Products: Subject to compliance with requirements, provide one of the following:
            a.    CertainTeed Corp.; GlasRoc Tile Backer.
            b.    Georgia-Pacific Gypsum LLC; DensShield Tile Backer.
            c.    National Gypsum; eXP Tile Backer.
            d.    USG Corporation; DUROCK Glass Mat Tile Backerboard.
      Core: 5/8 inch, Type X.
      2.    Mold Resistance: ASTM D 3273, score of 10 as rated according to ASTM D 3274.

B.    Cementitious Backer Units: ANSI A118.9 and ASTM C 1288 or 1325, with manufacturer's standard edges.
      1.    Products: Subject to compliance with requirements, provide one of the following:
            a.    CertainTeed Corp.; FiberCement .
            b.    James Hardie Building Products, Inc.; Hardiebacker.
            c.    National Gypsum Company, Permabase Cement Board.
            d.    USG Corporation; DUROCK Cement Board.
      2.    Thickness: 5/8 inch, or as indicated on drawings.
      3.    Mold Resistance: ASTM D 3273, score of 10 as rated according to ASTM D 3274.

A.    Schedule:
      1.    Showers – Cementitious Backer Unit
      2.    Large Format Tile (>15 inches) - Cementitious Backer Unit
      3.    Other Locations – Glass-Mat Backing Board

2.6    TRIM ACCESSORIES

A.    Interior Trim: ASTM C 1047.
      1.    Material: Galvanized or aluminum-coated steel sheet or rolled zinc.
      2.    Shapes:
            a.    Cornerbead.
            b.    Bullnose bead.
            c.    LC-Bead: J-shaped; exposed long flange receives joint compound.
            d.    L-Bead: L-shaped; exposed long flange receives joint compound.
            e.    U-Bead: J-shaped; exposed short flange does not receive joint compound.
            f.    Expansion (control) joint.
                  1)    For expansion (control) joints that are in rated partitions, provide Fire Rated 093V expansion bead with intumescent tape by Trim-Tex.

B.    Aluminum Trim: Extruded accessories of profiles and dimensions indicated.
      1.    Manufacturers: Subject to compliance with requirements, provide products by one of the following:
            a.    Fry Reglet Corp.
            b.    Gordon, Inc.
            c.    Pittcon Industries.
      2.    Basis of Design: Refer to Architect's Master Schedule
      3.    Aluminum: Alloy and temper with not less than the strength and durability properties of ASTM B 221, Alloy 6063-T5.

2.7    JOINT TREATMENT MATERIALS

A.    General: Comply with ASTM C 475/C 475M.

B.    Joint Tape:
      1.    Interior Gypsum Board: Paper.
      2.    Glass-Mat Gypsum Sheathing Board: 10-by-10 glass mesh.
      3.    Tile Backing Panels: As recommended by panel manufacturer.

C.    Joint Compound for Interior Gypsum Board: For each coat use formulation that is compatible with other compounds applied on previous or for successive coats.
      1.    Prefilling: At open joints, rounded or beveled panel edges, and damaged surface areas, use setting-type taping compound.
      2.    Embedding and First Coat: For embedding tape and first coat on joints, fasteners, and trim flanges, use drying-type, all-purpose compound.
            a.    Use setting-type compound for installing paper-faced metal trim accessories.
      3.    Fill Coat: For second coat, use drying-type, all-purpose compound.

4. Finish Coat: For third coat, use drying-type, all-purpose compound.
5. Skim Coat: For final coat of Level 5 finish, use drying-type, all-purpose compound.

D. Joint Compound for Tile Backing Panels:
1. Glass-Mat, Water-Resistant Backing Panel: As recommended by backing panel manufacturer.
2. Cementitious Backer Units: As recommended by backer unit manufacturer.

2.8 AUXILIARY MATERIALS

A. General: Provide auxiliary materials that comply with referenced installation standards and manufacturer's written recommendations.

B. Laminating Adhesive: Adhesive or joint compound recommended for directly adhering gypsum panels to continuous substrate.
1. Laminating adhesive shall have a VOC content of 50 g/L or less when calculated according to 40 CFR 59, Subpart D (EPA Method 24).

C. Steel Drill Screws: ASTM C 1002, unless otherwise indicated.
1. Use screws complying with ASTM C 954 for fastening panels to steel members from 0.033 to 0.112 inch thick.
2. For fastening cementitious backer units, use screws of type and size recommended by panel manufacturer.

D. Acoustical Joint Sealant: Manufacturer's standard nonsag, paintable, nonstaining latex sealant complying with ASTM C 834. Product effectively reduces airborne sound transmission through perimeter joints and openings in building construction as demonstrated by testing representative assemblies according to ASTM E 90.
1. Products: Subject to compliance with requirements, provide one of the following:
   a. Pecora Corporation; AC-20 FTR or AIS-919.
   b. Specified Technologies, Inc.; Smoke N Sound Acoustical Sealant.
   c. USG Corporation; SHEETROCK Acoustical Sealant.
2. Acoustical joint sealant shall have a VOC content of 250 g/L or less when calculated according to 40 CFR 59, Subpart D (EPA Method 24).


**PART 3 - EXECUTION**

3.1 EXAMINATION

A. Examine areas and substrates including welded hollow-metal frames and framing, with Installer present, for compliance with requirements and other conditions affecting performance.

B. Examine panels before installation. Reject panels that are wet, moisture damaged, and mold damaged.

C. Proceed with installation only after unsatisfactory conditions have been corrected.

3.2 APPLYING AND FINISHING PANELS, GENERAL

A. Comply with ASTM C 840.

B. Install ceiling panels across framing to minimize the number of abutting end joints and to avoid abutting end joints in central area of each ceiling. Stagger abutting end joints of adjacent panels not less than one framing member.

C. Install panels with face side out. Butt panels together for a light contact at edges and ends with not more than 1/16 inch of open space between panels. Do not force into place.

D. Locate edge and end joints over supports, except in ceiling applications where intermediate supports or gypsum board back-blocking is provided behind end joints. Do not place tapered edges against cut edges or ends. Stagger vertical joints on opposite sides of partitions. Do not make joints other than control joints at corners of framed openings.

E. Form control and expansion joints with space between edges of adjoining gypsum panels.

F.   Cover both faces of support framing with gypsum panels in concealed spaces (above ceilings, etc.), except in chases braced internally.
1.   Unless concealed application is indicated or required for sound, fire, air, or smoke ratings, coverage may be accomplished with scraps of not less than 8 sq. ft. in area.
2.   Fit gypsum panels around ducts, pipes, and conduits.
3.   Where partitions intersect structural members projecting below underside of floor/roof slabs and decks, cut gypsum panels to fit profile formed by structural members; allow 1/4- to 3/8-inch- wide joints to install sealant.

G.   Isolate perimeter of gypsum board applied to non-load-bearing partitions at structural abutments, except floors. Provide 1/4- to 1/2-inch- wide spaces at these locations and trim edges with edge trim where edges of panels are exposed. Seal joints between edges and abutting structural surfaces with acoustical sealant.

H.   Attachment to Steel Framing: Attach panels so leading edge or end of each panel is attached to open (unsupported) edges of stud flanges first.

I.   STC-Rated Assemblies: Seal construction at perimeters, behind control joints, and at openings and penetrations with a continuous bead of acoustical sealant. Install acoustical sealant at both faces of partitions at perimeters and through penetrations. Comply with ASTM C 919 and with manufacturer's written recommendations for locating edge trim and closing off sound-flanking paths around or through assemblies, including sealing partitions above acoustical ceilings.

J.   Install sound attenuation blankets before installing gypsum panels unless blankets are readily installed after panels have been installed on one side.

3.3   APPLYING INTERIOR GYPSUM BOARD

A.   Install interior gypsum board in the following locations:
1.   Type X: Vertical surfaces unless otherwise indicated.
2.   Flexible Type: Apply in double layer at curved assemblies.
3.   Ceiling Type: Ceiling surfaces.

B.   Single-Layer Application:
1.   On ceilings, apply gypsum panels before wall/partition board application to greatest extent possible and at right angles to framing unless otherwise indicated.
2.   On partitions/walls, apply gypsum panels vertically (parallel to framing unless otherwise indicated or required by fire-resistance-rated assembly, and minimize end joints.
a.   Stagger abutting end joints not less than one framing member in alternate courses of panels.
b.   At stairwells and other high walls, install panels horizontally unless otherwise indicated or required by fire-resistance-rated assembly.
3.   On Z-furring members, apply gypsum panels vertically (parallel to framing) with no end joints. Locate edge joints over furring members.
4.   Fastening Methods: Apply gypsum panels to supports with steel drill screws.

C.   Multilayer Application:
1.   On ceilings, apply gypsum board indicated for base layers before applying base layers on walls/partitions; apply face layers in same sequence. Apply base layers at right angles to framing members and offset face-layer joints one framing member, 16 inches minimum, from parallel base-layer joints, unless otherwise indicated or required by fire-resistance-rated assembly.
2.   On partitions/walls, apply gypsum board indicated for base layers and face layers vertically (parallel to framing) with joints of base layers located over stud or furring member and face-layer joints offset at least one stud or furring member with base-layer joints, unless otherwise indicated or required by fire-resistance-rated assembly. Stagger joints on opposite sides of partitions.
3.   On Z-furring members, apply base layer vertically (parallel to framing) and face layer either vertically (parallel to framing) or horizontally (perpendicular to framing) with vertical joints offset at least one furring member. Locate edge joints of base layer over furring members.
4.   Fastening Methods: Fasten base layers and face layers separately to supports with screws.

D.   Laminating to Substrate: Where gypsum panels are indicated as directly adhered to a substrate (other than studs, joists, furring members, or base layer of gypsum board), comply with gypsum board manufacturer's written recommendations and temporarily brace or fasten gypsum panels until fastening adhesive has set.

3.4      APPLYING TILE BACKING PANELS

A.    Cementitious Backer Units: ANSI A108.11.

B.    Where tile backing panels abut other types of panels in same plane, shim surfaces to produce a uniform plane across panel surfaces.

3.5      INSTALLING TRIM ACCESSORIES

A.    General: For trim with back flanges intended for fasteners, attach to framing with same fasteners used for panels. Otherwise, attach trim according to manufacturer's written instructions.

B.    Control Joints: Install control joints at locations indicated on Drawings or as required according to ASTM C 840 and in specific locations approved by Architect for visual effect.
1.    Wall: Control joints shall be installed where a wall or partition runs in an uninterrupted straight plane exceeding 30 linear feet, or 900 sq ft.
2.    Ceiling with Perimeter relief: Control joints in interior ceilings with perimeter relief shall be installed so that linear dimensions between control joints do not exceed 50 ft or 2500 sq. ft
3.    Ceiling, without perimeter relief: Control joints in interior ceilings without perimeter relief shall be installed so that linear dimensions between control joints do not exceed 30 ft
4.    Exterior: Control joints in exterior ceilings and soffits shall be installed so that linear dimensions between control joints do not exceed 30 ft. at acoustical or fire-rated walls: Where a control joint occurs in an acoustical or fire rated system, blocking shall be provided behind the control joint by using a backing material such as 5/8 in. type X gypsum panel products, mineral fiber, or other tested equivalent.

C.    Interior Trim: Install in the following locations:
1.    Cornerbead: Use at outside corners unless otherwise indicated.
2.    Bullnose Bead: Use where indicated.
3.    LC-Bead: Use at exposed panel edges.
4.    L-Bead: Use where indicated.
5.    U-Bead: Use where indicated.
6.    Expansion (control) joint

D.    Aluminum Trim: Install in locations indicated on Drawings.

3.6      FINISHING GYPSUM BOARD

A.    General: Treat gypsum board joints, interior angles, edge trim, control joints, penetrations, fastener heads, surface defects, and elsewhere as required to prepare gypsum board surfaces for decoration. Promptly remove residual joint compound from adjacent surfaces.

B.    Prefill open joints, rounded or beveled edges, and damaged surface areas.

C.    Apply joint tape over gypsum board joints, except for trim products specifically indicated as not intended to receive tape.

D.    Gypsum Board Finish Levels: Finish panels to levels indicated below and according to ASTM C 840:
1.    Level 1: Ceiling plenum areas, concealed areas, and where indicated.
2.    Level 2: Panels that are substrate for tile and where indicated on Drawings.
3.    Level 3: Beneath wall coverings.
4.    Level 4: At panel surfaces that will be exposed to view unless otherwise indicated.
      a.    Primer and its application to surfaces are specified in Section 09 91 00 "Painting."
5.    Level 5: Where indicated on Drawings.
      a.    Primer and its application to surfaces are specified in Section 09 91 00 "Painting."

E.    Glass-Mat Faced Panels: Finish according to manufacturer's written instructions.

F.    Cementitious Backer Units: Finish according to manufacturer's written instructions.

3.7      PROTECTION

A.    Protect adjacent surfaces from drywall compound and promptly remove from floors and other non-drywall surfaces. Repair surfaces stained, marred, or otherwise damaged during drywall application.

B.    Protect installed products from damage from weather, condensation, direct sunlight, construction, and other causes during remainder of the construction period.

C.  Remove and replace panels that are wet, moisture damaged, and mold damaged.
1.  Indications that panels are wet or moisture damaged include, but are not limited to, discoloration, sagging, or irregular shape.
2.  Indications that panels are mold damaged include, but are not limited to, fuzzy or splotchy surface contamination and discoloration.

**END OF SECTION 09 29 00**

**SECTION 09 30 00 - TILING**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section Includes:
        1.     Ceramic tile
        2.     Waterproof membrane.
        3.     Crack isolation membrane.
        4.     Metal edge strips.

1.3     DEFINITIONS

   A.   General: Definitions in the ANSI A108 series of tile installation standards and in ANSI A137.1 apply to Work of this Section unless otherwise specified.

   B.   ANSI A108 Series: ANSI A108.01, ANSI A108.02, ANSI A108.1A, ANSI A108.1B, ANSI A108.1C, ANSI A108.4, ANSI A108.5, ANSI A108.6, ANSI A108.8, ANSI A108.9, ANSI A108.10, ANSI A108.11, ANSI A108.12, ANSI A108.13, ANSI A108.14, ANSI A108.15, ANSI A108.16, and ANSI A108.17, which are contained in its "Specifications for Installation of Ceramic Tile."

   C.   Module Size: Actual tile size plus joint width indicated.

   D.   Face Size: Actual tile size, excluding spacer lugs.

1.4     PREINSTALLATION MEETINGS

   A.   Preinstallation Conference: Conduct conference at Project site.
        1.     Review requirements in ANSI A108.01 for substrates and for preparation by other trades.

1.5     ACTION SUBMITTALS

   A.   Product Data: For each type of product.

   B.   Samples for Verification:
        1.     Full-size units of each type and composition of tile and for each color and finish required.

1.6     INFORMATIONAL SUBMITTALS

   A.   Qualification Data: For Installer.

   B.   Master Grade Certificates: For each shipment, type, and composition of tile, signed by tile manufacturer and Installer.

   C.   Product Certificates: For each type of product.

   D.   Product Test Reports: For tile-setting and -grouting products.

   E.   Slip Resistance Testing Results: Submit test reports from qualified independent testing laboratory indicating and interpreting test results relative to compliance of flooring with requirements specified for slip resistance.

1.7     QUALITY ASSURANCE

   A.   Installer Qualifications:
        1.     Installer is a five-star member of the National Tile Contractors Association or a Trowel of Excellence member of the Tile Contractors' Association of America.
        2.     Installer's supervisor for Project holds the International Masonry Institute's Foreman Certification.

3. Installer employs Ceramic Tile Education Foundation Certified Installers or installers recognized by the U.S. Department of Labor as Journeyman Tile Layers.
4. Installer employ at least one individual for the project that has completed the Advanced Certification for Tile Installers (ACT) certification for installation of large format tile and substrate preparation, membranes, mud (mortar bed) floors, mud (mortar ) walls, shower receptors.

1.8 DELIVERY, STORAGE, AND HANDLING

A. Deliver and store packaged materials in original containers with seals unbroken and labels intact until time of use. Comply with requirements in ANSI A137.1 for labeling tile packages.

B. Store tile and cementitious materials on elevated platforms, under cover, and in a dry location.

C. Store aggregates where grading and other required characteristics can be maintained and contamination can be avoided.

D. Store liquid materials in unopened containers and protected from freezing.

1.9 FIELD CONDITIONS

A. Environmental Limitations: Do not install tile until construction in spaces is complete and ambient temperature and humidity conditions are maintained at the levels indicated in referenced standards and manufacturer's written instructions.

**PART 2 - PRODUCTS**

2.1 SUSTAINABILITY REQUIREMENTS

A. Low Emitting Requirements: Provide product that meets low emitting criteria listed in section 01 81 13.02 – Sustainable Design Requirements.

2.2 MANUFACTURERS

A. Source Limitations for Tile: Obtain tile of each type and color or finish from single source or producer.
1. Obtain tile of each type and color or finish from same production run and of consistent quality in appearance and physical properties for each contiguous area.

B. Source Limitations for Setting and Grouting Materials: Obtain ingredients of a uniform quality for each mortar, adhesive, and grout component from single manufacturer and each aggregate from single source or producer.
1. Obtain setting and grouting materials, except for unmodified Portland cement and aggregate, from single manufacturer.
2. Obtain waterproof membrane and crack suppressant membranes, except for sheet products, from manufacturer of setting and grouting materials.

2.3 PRODUCTS, GENERAL

A. ANSI Ceramic Tile Standard: Provide tile that complies with ANSI A137.1 for types, compositions, and other characteristics indicated.
1. Provide tile complying with Standard grade requirements unless otherwise indicated.

B. ANSI Standards for Tile Installation Materials: Provide materials complying with ANSI A108.02, ANSI standards referenced in other Part 2 articles, ANSI standards referenced by TCNA installation methods specified in tile installation schedules, and other requirements specified.

C. Factory Blending: For tile exhibiting color variations within ranges, blend tile in factory and package so tile units taken from one package show same range in colors as those taken from other packages and match approved Samples.

D. Mounting: For factory-mounted tile, provide back- or edge-mounted tile assemblies as standard with manufacturer unless otherwise indicated.
1. Where tile is indicated for installation on exteriors, do not use back- or edge-mounted tile assemblies unless tile manufacturer specifies in writing that this type of mounting is suitable for installation indicated and has a record of successful in-service performance.

2.4      CERAMIC TILE

    A.     Acceptable Manufacturers:
       1.      Daltile.

    B.     Basis of Design: As indicated in the Architect's Master Schedule.

    C.     Coefficient of Friction: Tiles suitable for level interior spaces expected to be walked upon shall have a wet DCOF of 0.42 or greater when tested per the DCOF AcuTest.

    D.     Trim Units: Coordinated with sizes and coursing of adjoining flat tile where applicable and matching characteristics of adjoining flat tile. Provide shapes as follows, selected from manufacturer's standard shapes:

2.5      WATERPROOF MEMBRANE

    A.     General: Manufacturer's standard product, selected from the following, that complies with ANSI A118.10 and is recommended by the manufacturer for the application indicated. Include reinforcement and accessories recommended by manufacturer.

    B.     Chlorinated Polyethylene Sheet: Nonplasticized, chlorinated polyethylene faced on both sides with nonwoven polyester fabric.
       1.      Products: Subject to compliance with requirements, provide one of the following:
          a.      Noble Company (The); Nobleseal TS.
          b.      Schluter Systems; Kerdi
          c.      MAPEI Corporation; Mapeguard WP 200
       2.      Nominal Thickness: 0.030 inch.

    C.     Fabric--Reinforced, Fluid-Applied Membrane: System consisting of liquid-latex rubber or elastomeric polymer and continuous fabric reinforcement.
       1.      Products: Subject to compliance with requirements, provide one of the following:
          a.      Custom Building Products; 9240 Waterproofing and Anti-Fracture Membrane.
          b.      Laticrete International, Inc.; Hydro Ban.
          c.      MAPEI Corporation; Mapelastic Aquadefense.
          d.      Texrite; Hydrorite with Texrite fibermesh.
          e.      Sika Corp.; SikaTile; Moisture Guard 100

2.6      CRACK ISOLATION MEMBRANE

    A.     General: Manufacturer's standard product that complies with ANSI A118.12 for   high performance and is recommended by the manufacturer for the application indicated. Include reinforcement and accessories recommended by manufacturer.

    B.     Chlorinated Polyethylene Sheet: Nonplasticized, chlorinated polyethylene faced on both sides with nonwoven polyester fabric; 0.030-inch nominal thickness.
       1.      Products: Subject to compliance with requirements, provide one of the following:
          a.      Noble Company (The); Nobleseal CIS.
          b.      Schluter Systems; Ditra
          c.      MAPEI Corporation; Mapeguard CI

    C.     Fabric-Reinforced, Fluid-Applied Membrane: System consisting of liquid-latex rubber or elastomeric polymer and fabric reinforcement.
       1.      Products: Subject to compliance with requirements, provide one of the following:
          a.      Custom Building Products; 9240 Waterproofing and Anti-Fracture Membrane.
          b.      Laticrete International, Inc.; Hydro Ban.
          c.      MAPEI Corporation; Mapelastic CI
          d.      Texrite; Hydro-rite with Texrite fibermesh.
          e.      Sika Corp.; SikaTile 200 Fracture Guard (dedicated crack isolation membrane)
          f.      Sika Corp.; SikaTile 100 Moisture Guard (crack isolation/waterproof membrane)

2.7    MORTAR BOND COAT / SETTING MATERIALS

A.    Large & Heavy Tile Mortar with Polymer (formerly Medium Bed):   for large, heavy, ceramic tile and stone. Used with stone or tile units (square, rectangular, plank sizes), an ANSI A118.11; product approved by manufacturer for application thickness of 5/8 inch (16 mm).
1.    Manufacturers:   Subject to compliance with requirements, provide products by one of the following:
a.    Bostik, Inc.
b.    Custom Building Products.
c.    Laticrete International, Inc.; 4XLT
d.    MAPEI Corporation; Keraflex Plus
e.    Texrite; Total Contact
f.    Sika Corp.; SikaTile 450 LHT Secure Set
2.    Basis of Design: Texrite; Total Contact
3.    Provide prepackaged, dry-mortar mix containing dry, redispersible, vinyl acetate or acrylic additive to which only water must be added at Project site.
4.    Back butter all tile prior to installing tile on mortar bed.

B.    Epoxy Thinset Mortar: ANSI A118.3, water cleanable; 100 percent solids epoxy thin-set mortar.
1.    Manufacturers: Subject to compliance with requirements, provide products by one of the following:
a.    Ardex Americas.
b.    Custom Building Products.
c.    Laticrete International, Inc.
d.    MAPEI Corporation; Kerapoxy 410
e.    Texrite
f.    Sika Corp.; SikaTile 825 Epoxy Mortar and Grout
2.    Basis of Design: Texrite; Epoxyplus TS
3.    Water cleanable epoxy thin-set with 2-hour cleaning time.100% solid epoxy resins and hardeners, with non-sag additive included in unit .
4.    Provide product capable of withstanding continuous and intermittent exposure to temperatures of up to 140 degrees F and 212 degrees F (60 degrees C and 100 degrees C), respectively, and certified by manufacturer for intended use.
5.    Color number and name:   Selected by Architect.

2.8    GROUT MATERIALS

A.    Water-Cleanable Epoxy Grout:   ANSI A118.3.
1.    Manufacturers:   Subject to compliance with requirements, provide products by one of the following:
a.    Bostik, Inc.
b.    Custom Building Products.
c.    Laticrete International, Inc
d.    MAPEI Corporation; Kerapoxy CQ
e.    Texrite
f.    Sika Corp.; SikaTile 825 Epoxy Mortar & Grout
2.    Basis of Design: Texrite; EpoxyPlus
3.    Water cleanable grout with 2-hour cleaning time.100% solid epoxy resins and hardeners, with non-sag additive included in unit.

2.9    MISCELLANEOUS MATERIALS

A.    Trowelable Underlayments and Patching Compounds: Latex-modified, Portland cement-based formulation provided or approved by manufacturer of tile-setting materials for installations indicated.
1.    Basis of Design: MAPEI Coproration; Mapecem Quickckpatch

B.    Metal Edge Strips: Angle or L-shaped, height to match tile and setting-bed thickness, metallic or combination of metal and PVC or neoprene base, designed specifically for flooring applications; stainless-steel, ASTM A 666, 300 Series exposed-edge material.
1.    Manufacturers: Subject to compliance with requirements, provide products by the following:
2.    Basis-of-Design Product: Schluter Systems L.P.

C.    Tile Cleaner: A neutral cleaner capable of removing soil and residue without harming tile and grout surfaces, specifically approved for materials and installations indicated by tile and grout manufacturers.

2.10    ELASTOMERIC SEALANTS

A.    General:  Provide sealants, primers, backer rods, and other sealant accessories that comply with the following requirements and with the applicable requirements in Division 07 Section "Joint Sealants" and that do not stain stone.
     1.    Use sealants that have a VOC content of 250 g/L or less when calculated according to 40 CFR 59, Subpart D.
     2.    Use primers, backer rods, and sealant accessories recommended by sealant manufacturer.

B.    Colors:  Provide colors of exposed sealants to match colors of grout in stone  adjoining sealed joints unless otherwise indicated.

C.    Multipart, Pourable Urethane Sealant for Use T:   ASTM C 920; Type M; Grade P; Class 25; Uses T, M, A, and, as applicable to joint substrates indicated, O.

**PART 3 - EXECUTION**

3.1    EXAMINATION

A.    Examine substrates, areas, and conditions where tile will be installed, with Installer present, for compliance with requirements for installation tolerances and other conditions affecting performance of the Work.
     1.    Verify that substrates for setting tile are firm; dry; clean; free of coatings that are incompatible with tile-setting materials, including curing compounds and other substances that contain soap, wax, oil, or silicone; and comply with flatness tolerances required by ANSI A108.01 for installations indicated.
     2.    Verify that concrete substrates for tile floors installed with thinset large and heavy tile mortar comply with surface finish requirements in ANSI A108.01 for installations indicated.
          a.    Verify that surfaces that received a steel trowel finish have been mechanically scarified.
          b.    Verify that protrusions, bumps, and ridges have been removed by sanding or grinding.
     3.    Verify that installation of grounds, anchors, recessed frames, electrical and mechanical units of work, and similar items located in or behind tile has been completed.
     4.    Verify that joints and cracks in tile substrates are coordinated with tile joint locations; if not coordinated, adjust joint locations in consultation with Architect.

B.    Proceed with installation only after unsatisfactory conditions have been corrected.

3.2    PREPARATION

A.    Fill cracks, holes, and depressions in concrete substrates for tile floors installed with   thinset or large  and heavy tile mortar with trowelable leveling and patching compound specifically recommended by tile-setting material manufacturer.

B.    Where indicated, prepare substrates to receive waterproofing by applying a reinforced mortar bed that complies with ANSI A108.1A and is sloped 1/4 inch per foot toward drains.

C.    Blending: For tile exhibiting color variations, verify that tile has been factory blended and packaged so tile units taken from one package show same range of colors as those taken from other packages and match approved Samples. If not factory blended, either return to manufacturer or blend tiles at Project site before installing.

3.3    CERAMIC TILE INSTALLATION

A.    Comply with TCNA's "Handbook for Ceramic, Glass, and Stone Tile Installation" for TCNA installation methods specified in tile installation schedules. Comply with parts of the ANSI A108 series "Specifications for Installation of Ceramic Tile" that are referenced in TCNA installation methods, specified in tile installation schedules, and apply to types of setting and grouting materials used.
     1.    For the following installations, follow procedures in the ANSI A108 series of tile installation standards for providing 95 percent mortar coverage:
          a.    Tile floors in wet areas.
          b.    Tile floors consisting of tiles 8 by 8 inches or larger.
          c.    Tile floors consisting of rib-backed tiles.

B.    Extend tile work into recesses and under or behind equipment and fixtures to form complete covering without interruptions unless otherwise indicated. Terminate work neatly at obstructions, edges, and corners without disrupting pattern or joint alignments.

C. Accurately form intersections and returns. Perform cutting and drilling of tile without marring visible surfaces. Carefully grind cut edges of tile abutting trim, finish, or built-in items for straight aligned joints. Fit tile closely to electrical outlets, piping, fixtures, and other penetrations so plates, collars, or covers overlap tile.

D. Provide manufacturer's standard trim shapes where necessary to eliminate exposed tile edges.

E. Where accent tile differs in thickness from field tile, vary setting-bed thickness so that tiles are flush.

F. Jointing Pattern: Lay tile in grid pattern unless otherwise indicated. Lay out tile work and center tile fields in both directions in each space or on each wall area. Lay out tile work to minimize the use of pieces that are less than half of a tile. Provide uniform joint widths unless otherwise indicated.
   1. For tile mounted in sheets, make joints between tile sheets same width as joints within tile sheets so joints between sheets are not apparent in finished work.
   2. Where adjoining tiles on floor, base, walls, or trim are specified or indicated to be same size, align joints.
   3. Where tiles are specified or indicated to be whole integer multiples of adjoining tiles on floor, base, walls, or trim, align joints unless otherwise indicated.

G. Lay out tile wainscots to dimensions indicated or to next full tile beyond dimensions indicated.

H. Expansion Joints: Provide expansion joints and other sealant-filled joints, including control, contraction, and isolation joints, as required. Form joints during installation of setting materials, mortar beds, and tile. Do not saw-cut joints after installing tiles.
   1. Where joints occur in concrete substrates, locate joints in tile surfaces directly above them.
   2. Joint Sealant: Color to match adjacent tile grout color.

I. Metal Edge Strips: Install where exposed edge of tile flooring meets carpet, wood, or other flooring that finishes flush with top of tile.

J. Grout Sealer: Apply grout sealer to cementitious grout joints in tile floors according to grout-sealer manufacturer's written instructions. As soon as grout sealer has penetrated grout joints, remove excess sealer and sealer from tile faces by wiping with soft cloth.

K. Install expansion and control joints in accordance with TCA method EJ171.

3.4 TILE BACKING PANEL INSTALLATION

A. Install panels and treat joints according to ANSI A108.11 and manufacturer's written instructions for type of application indicated. Use latex-Portland cement mortar for bonding material unless otherwise directed in manufacturer's written instructions.

3.5 WATERPROOFING INSTALLATION

A. Install waterproofing to comply with ANSI A108.13 and manufacturer's written instructions to produce waterproof membrane of uniform thickness that is bonded securely to substrate.

B. Allow waterproofing to cure and verify by testing that it is watertight before installing tile or setting materials over it.

3.6 CRACK ISOLATION MEMBRANE INSTALLATION

A. Install crack isolation membrane to comply with ANSI A108.17 and manufacturer's written instructions to produce membrane of uniform thickness that is bonded securely to substrate.

B. Allow crack isolation membrane to cure before installing tile or setting materials over it.

3.7 ADJUSTING AND CLEANING

A. Remove and replace tile that is damaged or that does not match adjoining tile. Provide new matching units, installed as specified and in a manner to eliminate evidence of replacement.

B. Cleaning: On completion of placement and grouting, clean all ceramic tile surfaces so they are free of foreign matter.

1. Remove grout residue from tile as soon as possible.
2. Clean grout smears and haze from tile according to tile and grout manufacturer's written instructions but no sooner than 10 days after installation. Use only cleaners recommended by tile and grout manufacturers and only after determining that cleaners are safe to use by testing on samples of tile and other surfaces to be cleaned. Protect metal surfaces and plumbing fixtures from effects of cleaning. Flush surfaces with clean water before and after cleaning.

3.8 PROTECTION

A. Protect installed tile work with kraft paper or other heavy covering during construction period to prevent staining, damage, and wear. If recommended by tile manufacturer, apply coat of neutral protective cleaner to completed tile walls and floors.

B. Prohibit foot and wheel traffic from tiled floors for at least seven days after grouting is completed.

C. Before final inspection, remove protective coverings and rinse neutral protective cleaner from tile surfaces.

3.9 TILE INSTALLATION SCHEDULE

A. Refer to Architect's Tile Installation drawings.

**END OF SECTION 09 30 00**

**SECTION 09 81 16 - ACOUSTICAL BLANKET INSULATION**

**PART 1 - GENERAL**

1.1     SUMMARY

   A.     Section Includes:
          1.     Concealed building acoustical insulation.

1.2     ACTION SUBMITTALS

   A.     Product Data:   For each type of product indicated.

1.3     QUALITY ASSURANCE

   A.     Source Limitations:   Obtain each type of building insulation through one source.

   B.     Fire-Test-Response Characteristics:   Provide insulation and related materials with the fire-test-response characteristics indicated, as determined by testing identical products per test method indicated below by UL or another testing and inspecting agency acceptable to authorities having jurisdiction.   Identify materials with appropriate markings of applicable testing and inspecting agency.
          1.     Surface-Burning Characteristics:   ASTM E 84.
          2.     Fire-Resistance Ratings:   ASTM E 119.
          3.     Combustion Characteristics:   ASTM E 136.

1.4     DELIVERY, STORAGE, AND HANDLING

   A.     Protect insulation materials from physical damage and from deterioration by moisture, soiling, and other sources.   Store inside and in a dry location.   Comply with manufacturer's written instructions for handling, storing, and protecting during installation.

**PART 2 - PRODUCTS**

2.1     MANUFACTURERS

   A.     Manufacturers:   Subject to compliance with requirements, provide products by one of the following:
          1.     Glass-Fiber Insulation:
                 a.     CertainTeed Corporation.
                 b.     Cameron Ashely Building Products. .
                 c.     Johns Manville.
                 d.     Knauf Insulation.
                 e.     Owens Corning.
          2.     Basis of Design: Knauf Insulation; EcoBatt with ECOSE

2.2     INSULATING MATERIALS

   A.     General:   Provide insulating materials that comply with requirements and with referenced standards.
          1.     Preformed Units:   Sizes to fit applications indicated; selected from manufacturer's standard thicknesses, widths, and lengths.

   B.     Unfaced, Flexible Glass-Fiber Board Insulation (in walls and above ceilings):   ASTM C 665, Type I; with maximum flame-spread and smoke-developed indices of 25 and 50, respectively; and of the following properties:
          1.     Combustion Characteristics:   Passes ASTM E 136.

   C.     Thickness: As indicated on the Architect's Partition Type sheet.

**PART 3 - EXECUTION**

3.1     EXAMINATION

A.      Examine substrates and conditions, with Installer present, for compliance with requirements for Sections in which substrates and related work are specified and other conditions affecting performance.

B.      Proceed with installation only after unsatisfactory conditions have been corrected.

3.2     PREPARATION

A.      Clean substrates of substances harmful to insulations or vapor retarders, including removing projections capable of puncturing vapor retarders or of interfering with insulation attachment.

3.3     INSTALLATION, GENERAL

A.      Comply with insulation manufacturer's written instructions applicable to products and application indicated.

B.      Install insulation that is undamaged, dry, and unsoiled and that has not been left exposed at any time to ice and snow.

C.      Extend insulation in thickness indicated to envelop entire area to be insulated.   Cut and fit tightly around obstructions and fill voids with insulation.   Remove projections that interfere with placement.

D.      Water-Piping Coordination:  If water piping is located on inside of insulated exterior walls, coordinate location of piping to ensure that it is placed on warm side of insulation and insulation encapsulates piping.

E.      Apply single layer of insulation to produce thickness indicated, unless multiple layers are otherwise shown or required to make up total thickness.

F.      Where glass-fiber blankets are indicated for sound attenuation above ceilings, install blanket insulation over entire ceiling area in thicknesses indicated.   Extend insulation 48 inches up either side of partitions.

3.4     INSTALLATION OF GENERAL BUILDING INSULATION

A.      Install blankets in cavities formed by framing members according to the following requirements:
1.      Use blanket widths and lengths that fill the cavities formed by framing members.   If more than one length is required to fill cavity, provide lengths that will produce a snug fit between ends.
2.      Place blankets in cavities formed by framing members to produce a friction fit between edges of insulation and adjoining framing members.
3.      For metal-framed wall cavities where cavity heights exceed 96 inches, support unfaced blankets mechanically and support faced blankets by taping stapling flanges to flanges of metal studs.

3.5     PROTECTION

A.      Protect installed insulation from damage due to harmful weather exposures, physical abuse, and other causes.  Provide temporary coverings or enclosures where insulation is subject to abuse and cannot be concealed and protected by permanent construction immediately after installation.

**END OF SECTION 09 81 16**

**SECTION 09 91 00 - PAINTING**

**PART 1 - GENERAL**

1.1     SUMMARY

   A.     Related Documents: General and Supplementary Conditions of the Contract, Division 01 General Requirements, and Drawings are applicable to this Section.

   B.     Section Includes:
      1.     Complete surface preparation and finishing for field application of coatings and requirements for field finishing mechanical and electrical equipment.
      2.     Examine specifications for various other trades and their provisions regarding their painting. Surfaces that are left unfinished by other sections of the specifications shall be painted or finished as a part of this Section.
      3.     Colors, including deep tones, will be selected by the Architect.   Number of colors to be used on job will be determined by Architect.

1.2     SURFACES NOT TO RECEIVE FIELD FINISHING

   A.     Do not paint copper, bronze, chrome plated items, nickel, stainless steel, Monel metal, lead, face brick, prefinished wall, ceiling, and floor coverings, items with factory applied final finish (except where exposed on roofs and in finished spaces), elevator shafts, crawl spaces, chases, and plenums above suspended ceilings unless otherwise specified or scheduled.

1.3     DEFINITIONS

   A.     Conform to ASTM D16 for interpretation of terms used in this Section.

1.4     QUALITY ASSURANCE

   A.     Product Manufacturer:  Company specializing in manufacturing quality paint and finish products with 3 years experience.

   B.     Applicator:   Company specializing in commercial painting and finishing with 2 years experience.

   C.     Product Labels:   Include manufacturer's name, type of paint, stock number, color and label analysis on label of containers.

1.5     REGULATORY REQUIREMENTS

   A.     Conform to applicable building code for flame spread/fuel contribution/smoke development rating requirements for finishes.

   B.     Comply with applicable city, county, state, and federal requirements and ordinances regarding maximum VOC (Volatile Organic Compound) content of all coatings.

1.6     TESTS

   A.     Provide periodic testing with Wet Film Thickness gage to verify that proper thickness of finish coatings are being applied.

1.7     SUBMITTALS

   A.     Provide product data describing physical performance criteria and composition on all finishing products.

   B.     Samples, 12 by 12 inches in size illustrating range of colors and textures selected for each surface finishing product scheduled.

1.8     DELIVERY, STORAGE, AND HANDLING

   A.     Deliver, store, and protect products under provisions of Division 1 section "Product Requirements"

   B.     Deliver products to site in sealed and labeled containers; inspect to verify acceptance.

**KIRKSEY**

09 91 00 - 1
PAINTING (A)

C. Container labeling to include manufacturer's name, type of paint, brand name, brand code, coverage, surface preparation, drying time, cleanup, color designation, and instructions for mixing and reducing.

D. Store paint materials at minimum ambient temperature of 45 degrees F and a maximum of 90 degrees F, in well ventilated area, unless required otherwise by manufacturer's instructions.

E. Take precautionary measures to prevent fire hazards and spontaneous combustion.

1.9 ENVIRONMENTAL REQUIREMENTS

A. Do not apply materials when surface and ambient temperatures are outside the ranges required by paint manufacturer.

B. Provide continuous ventilation and heating facilities to maintain surface and ambient temperatures above 45 degrees F for 24 hours before, during, and 48 hours after application of finishes, unless required otherwise by manufacturer's instructions.

C. Do not apply exterior coatings during rain or snow, or when relative humidity is above 75 percent, unless required otherwise by manufacturer's instructions.

D. Minimum Application Temperatures for Latex Paints: 45 degrees F for interiors; 50 degrees F for exterior; unless required otherwise by manufacturer's instructions.

E. Minimum Application Temperature for Varnish and Finishes: 65 degrees F for interior or exterior, unless required otherwise by manufacturer's instructions.

F. Provide lighting level of 80 ft candles measured mid- height at substrate surface.

1.10 EXTRA STOCK

A. Provide a 5 gallon container of each color to Owner.

B. Label each container with color, color number, texture, and room locations, in addition to the manufacturer's label.

1.11 SCAFFOLDS AND PROTECTION

A. Provide adequate safe ladders, scaffolds, and stages necessary to complete work.

B. Protect completed finish and paint work, and protect adjacent finish surfaces from paint splatter, spills and stains. Use adequate drop cloths and masking procedures during progress of work.

1.12 PRECAUTIONS

A. Do not store paints, oils, thinners and other flammable items inside the building and shall be stored in approved containers when not in actual use during the painting job. The fire hazard shall be kept at a minimum.

B. Precaution shall be taken to protect the public and construction workers during the progress of the work.

C. Furnish a temporary fire extinguisher of suitable chemicals and capacity, located near flammable materials.


**PART 2 - PRODUCTS**

2.1 SUSTAINABILITY REQUIREMENTS

A. Low Emitting Requirements: Provide product that meets low emitting criteria listed in section 018113.02 – Sustainable Design Requirements.

2.2 MANUFACTURERS

A. Acceptable Manufacturers: Subject to compliance with requirements indicated, provide products of one of the following:
1. Benjamin Moore.
2. PPG Paints
3. Sherwin-Williams.

B. Materials selected for coating systems for each type surface shall be product of a single manufacturer unless otherwise specified. Secondary products such as linseed oil, turpentine and shellacs shall be first quality products of a reputable manufacturer.

2.3 MATERIALS

A. Coatings: Ready mixed. Process pigments to a soft paste consistency, capable of being readily and uniformly dispersed to a homogeneous coating with good flow and brushing properties; capable of drying or curing free of streaks or sags.

B. Accessory Materials: Linseed oil, shellac, turpentine, paint thinners and other materials not specifically indicated but required to achieve the finishes specified, of commercial quality.

C. Patching Materials: Latex filler.

2.4 FINISHES

A. Color and Sheen: As indicated on Architect's Master Schedule.

**PART 3 - EXECUTION**

3.1 EXAMINATION

A. Verify that surfaces and substrate conditions are ready to receive work as instructed by the product manufacturer.

B. Examine surfaces scheduled to be finished prior to commencement of work. Report to Architect any condition that may potentially affect proper application.

C. Measure moisture content of surfaces using an electronic moisture meter. Do not apply finishes unless moisture content of surfaces are below the following maximums
   1. Plaster and Gypsum Wallboard: 12 percent.
   2. Masonry, Concrete, and Concrete Unit Masonry: 12 percent.
   3. Interior Located Wood: 15 percent, measured in accordance with ASTM D2016.
   4. Exterior Located Wood: 15 percent, measured in accordance with ASTM D2016.
   5. Concrete Floors: 8 percent.

D. Test shop applied primers for compatibility with subsequent cover materials.

E. Beginning of installation means acceptance of existing surfaces and substrate.

3.2 PREPARATION

A. Remove electrical plates, hardware, light fixture trim, and fittings prior to preparing surfaces or finishing.

B. Correct minor defects and clean surfaces which affect work of this Section. Remove existing coatings which exhibit loose surface defects.

C. Shellac and seal marks which may bleed through surface finishes.

D. Impervious Surfaces: Remove mildew by scrubbing with solution of tri-sodium phosphate and bleach. Rinse with clean water and allow surface to dry.

E. Gypsum Board Surfaces: Latex fill minor defects. Spot prime defects after repair.

3.3 SURFACE PREPARATION OF PREVIOUSLY COATED SURFACES

A. General:
   1. Remove cracked and deteriorated sealants and calking.
   2. Remove chalk deposits and loose, blistered, peeling, scaling, or crazed finish to bare base material or sound substrate by scraping and sanding.
   3. Wash surfaces with solution of TSP to remove wax, oil, grease, and other foreign material; rinse, and allow to dry. Exercise caution that TSP solution does not soften existing coating.
   4. Abrade glossy surfaces by sanding or wiping with liquid de-glosser.
   5. Remove mildew as specified above.

6.　　Test compatibility of existing coatings by applying new coating to small, inconspicuous area.　If new coatings lift or blister existing coatings, request recommendation from Architect.

7.　　Apply specified primer to surfaces scheduled to receive coatings.

B.　　Gypsum Wallboard:
1.　　Fill cracks and voids with spackling compound.
2.　　Apply primer over bare surfaces and newly applied texture coatings.

## 3.4　　PROTECTION

A.　　Protect elements surrounding the work of this Section from damage or disfiguration.

B.　　Repair damage to other surfaces caused by work of this Section.

C.　　Furnish drop cloths, shields, and protective methods to prevent spray or droppings from disfiguring other surfaces.

D.　　Remove empty paint containers from site.

## 3.5　　APPLICATION

A.　　The intent of these Specifications is to produce the highest quality appearance of paint and finish surfaces. Employ skilled mechanics only.　The proper preparation of all surfaces will be strictly enforced and wherever finished surfaces show any defects due to improper preparation, workmanship, etc., the defects shall be removed and the work refinished at the expense of the Contractor.

B.　　Apply products in accordance with manufacturer's instructions.　Final finish coats shall have visual evidence of solid hiding and uniform appearance, and shall be free and smooth of brush marks, streaks, sags, runs, laps, or skipped areas.

C.　　Do not apply finishes to surfaces that are not dry.

D.　　Apply each coat to uniform finish and thickness.

E.　　Apply each coat of paint slightly darker than preceding coat unless otherwise approved.

F.　　Sand lightly between coats on wood and metal items to achieve required finish.

G.　　Allow applied coat to dry before next coat is applied.

H.　　Where clear finishes are required, tint fillers to match wood.　Work fillers into the grain before set.　Wipe excess from surface.

I.　　Prime back surfaces of interior and exterior woodwork scheduled to be painted with primer paint.

J.　　Prime back surfaces of interior woodwork scheduled to receive stain or varnish finish with gloss varnish reduced 25 percent with mineral spirits.

K.　　Edges of paint adjoining other materials or colors shall be sharp and clean with no overlapping.

## 3.6　　FINISHING MECHANICAL AND ELECTRICAL EQUIPMENT

A.　　Paint all shop primed equipment.　Paint shop prefinished items where exposed to view in finished spaces. In mechanical rooms, repair shop pre-finished coatings which have been scratched or otherwise damaged with identical touch-up paint.　Sand prior to touching up as required.

B.　　Remove unfinished louvers, grilles, covers, and access panels on mechanical and electrical components and paint separately.

C.　　Paint all grilles, registers, diffusers, and speaker grilles to match adjacent wall and ceiling surfaces, except that factory pre-finished items need not be painted if installed in a suspended acoustical ceiling system where the acoustical panels match the mechanical or electrical item color.

D.　　In all finished spaces, prime and paint exposed pipes, conduit, boxes, ducts, hangers, brackets, collars and supports. Paint to match adjacent surfaces.

E.　　Repair or replace identification markings on mechanical or electrical equipment when painted accidentally.

F.　　Paint interior surfaces of air ducts and convectors that are visible through grilles and louvers with one coat of flat black paint, to limit of sight line.　Paint dampers exposed behind louvers, grilles, and convector to match face panels.

G. Paint all surfaces of plywood backboards for electrical and telephone equipment before installing equipment.

H. Replace electrical plates, hardware, light fixture trim, and fittings removed prior to finishing.

I. Paint exposed air handlers, roof ventilators, goose necks, exhaust fans and other items on the roof with 2 coats exterior enamel. Prepare surfaces in accordance with the base metal or primer as specified herein.

J. Paint concrete support bases with gray floor deck enamel.

K. Pipe hangers and other supports need not be painted except where installed in crawl spaces, where they shall be painted with a thick coat of asphaltic paint.

3.7    CLEANING/TOUCH-UP

A. As Work proceeds, promptly remove paint where spilled, splashed, or spattered.

B. During progress of Work maintain premises free of unnecessary accumulation of tools, equipment, surplus materials, and debris.

C. Collect cotton waste, cloths, and material which may constitute a fire hazard, place in closed metal containers and remove daily from site.

D. Spot painting will be allowed to correct soiled or damaged paint surfaces only when touch-up spot will blend into surrounding finish and is invisible to normal viewing (as determined by the Architect).   Otherwise, re-coat entire section to corners or to a visible stopping point.

3.8    V.O.C. (VOLATILE ORGANIC COMPOUND) COMPLIANCE

A. Products listed in following schedule and/or substitutes proposed for use by Contractor must be formulated to meet all applicable ordinances and regulations regarding maximum V.O.C. content. Utilize products which have been specially formulated to need such requirements.

3.9    INTERIOR PAINT SCHEDULE

A. Drywall (Gypsum):
   1. Latex:
      a. Benjamin Moore:
         1) Primer: UltraSpec 500 Zero VOC Latex Primer.
         2) Finish Coats: UltraSpec 500 Zero VOC Interior.
      b. PPG:
         1) Primer: One coat Speedhide latex sealer 6-2 primer
         2) Finish Coats: Two coats Speedhide zero VOC latex
      c. Sherwin-Williams:
         1) Primer: One coat ProMar 200 Zero VOC Interior Latex Primer, B28W2600
         2) Finish Coats:   Two coats ProMar 200 Zero VOC

B. Drywall (Gypsum - High Traffic Corridors, Stairwells)
      a. Benjamin Moore:
         1) Primer: One coat HB-2100 Inslx High Build Primer.
         2) Finish Coats: Two Coats Pre-Catalyzed WB Primer
      b. Sherwin-Williams:
         1) Primer: One coat High Build Latex Primer B28W8601
         2) Finish Coats: Two coats Pro Industrial Pre-Catalyzed Waterbased Epoxy.

C. Drywall (Gypsum – Wet Locations)
   1. Epoxy
      a. Sherwin-Williams:
         1) Primer: One coat ProMar 200 Zero VOC Latex Primer, B28W02600
         2) Finish Coats: Two coats Pro Industrial Water Based Catalyzed Epoxy B73 series.

**END OF SECTION**

## SECTION 10 28 00 - TOILET, BATH, AND CUSTODIAL ACCESSORIES

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.   Section Includes:
        1.    Restroom accessories.
        2.    Shower accessories.
        3.    Underlavatory guards.

1.3     ACTION SUBMITTALS

   A.   Product Data: For each type of product indicated. Include the following:
        1.    Construction details and dimensions.
        2.    Anchoring and mounting requirements, including requirements for cutouts in other work and substrate preparation.
        3.    Material and finish descriptions.
        4.    Features that will be included for Project.
        5.    Manufacturer's warranty.

   B.   Product Schedule: Indicating types, quantities, sizes, and installation locations by room of each accessory required.
        1.    Identify locations using room designations indicated.
        2.    Identify products using designations indicated.

1.4     INFORMATIONAL SUBMITTALS

   A.   Warranty: Sample of special warranty.

1.5     CLOSEOUT SUBMITTALS

   A.   Maintenance Data: For toilet and bath accessories to include in maintenance manuals.

1.6     QUALITY ASSURANCE

   A.   Single Source Limitations: For products listed together in the same Part 2 articles, obtain products from single source from single manufacturer.

   B.   Inserts and Anchorages:  Furnish accessory manufacturers' standard inserts and anchoring devices that must be set in concrete or built into masonry.   Coordinate delivery with other Work to avoid delay.

1.7     COORDINATION

   A.   Coordinate accessory locations with other work to prevent interference with clearances required for access by people with disabilities, and for proper installation, adjustment, operation, cleaning, and servicing of accessories.

   B.   Deliver inserts and anchoring devices set into concrete or masonry as required to prevent delaying the Work.

1.8     WARRANTY

   A.   Special Mirror Warranty: Manufacturer's standard form in which manufacturer agrees to replace mirrors that develop visible silver spoilage defects and that fail in materials or workmanship within specified warranty period.
        1.    Warranty Period: 15 years from date of Substantial Completion.

**PART 2 - PRODUCTS**

2.1     MATERIALS

A.  Stainless Steel: ASTM A 666, Type 304, 0.031-inch minimum nominal thickness unless otherwise indicated.

B.  Steel Sheet: ASTM A 1008/A 1008M, Designation CS (cold rolled, commercial steel), 0.036-inch minimum nominal thickness.

C.  Galvanized-Steel Sheet: ASTM A 653/A 653M, with G60 hot-dip zinc coating.

D.  Galvanized-Steel Mounting Devices: ASTM A 153/A 153M, hot-dip galvanized after fabrication.

E.  Fasteners: Screws, bolts, and other devices of same material as accessory unit and tamper-and-theft resistant where exposed, and of galvanized steel where concealed.

F.  Mirrors: ASTM C 1503, Mirror Glazing Quality, clear-glass mirrors, nominal 6.0 mm thick.

G.  ABS Plastic: Acrylonitrile-butadiene-styrene resin formulation.

2.2     RESTROOM ACCESSORIES

A.  Basis-of-Design Product: Subject to compliance with requirements, provide product indicated on Drawings or comparable product by one of the following:
    1.   American Specialties, Inc.
    2.   Bobrick Washroom Equipment, Inc.
    3.   Bradley Corporation.
    4.   GAMCO
    5.   Georgia-Pacific LLC.

B.  Basis of Design:  Bobrick Washroom Equipment, Inc, accessories indicated on As scheduled on Drawings and Architect's Master Schedule.

2.3     SHOWER ACCESSORIES

A.  Manufacturers: Subject to compliance with requirements, provide products by one of the following:
    1.   American Specialties, Inc.
    2.   Bobrick Washroom Equipment, Inc.
    3.   Bradley Corporation.
    4.   GAMCO
    5.   Georgia-Pacific LLC.

B.  Basis of Design:  Bobrick Washroom Equipment, Inc, accessories indicated on Architect's Master Schedule.

2.4     UNDERLAVATORY GUARDS

A.  Basis-of-Design Product: Subject to compliance with requirements, provide product indicated on Drawings or comparable product by one of the following:
    1.   Truebro by IPS Corporation.

B.  Underlavatory Guard:
    1.   Description: Insulating pipe covering for supply and drain piping assemblies that prevent direct contact with and burns from piping; allow service access without removing coverings.
    2.   Material and Finish: Antimicrobial, molded plastic, white.

2.5     FABRICATION

A.  Names or labels are not permitted on exposed faces of toilet and bath accessory units.  On either interior surface not exposed to view or on back surface, provide identification of each accessory item either by a printed, waterproof label or a stamped nameplate indicating manufacturer's name and product model number.

B.  General: Fabricate units with tight seams and joints, and exposed edges rolled. Hang doors and access panels with full-length, continuous hinges. Equip units for concealed anchorage and with corrosion-resistant backing plates.

C.　　Keys: Provide universal keys for internal access to accessories for servicing and resupplying. Provide minimum of six keys to Owner's representative.

## PART 3 - EXECUTION

3.1　　INSTALLATION

A.　　Installation shall meet or exceed all applicable federal, state and local requirements, referenced standards and conform to codes and ordinances of authorities having jurisdiction.

B.　　Install accessories according to manufacturers' written instructions, using fasteners appropriate to substrate indicated and recommended by unit manufacturer. Install units level, plumb, and firmly anchored in locations and at heights indicated.

C.　　Grab Bars: Install to withstand a downward load of at least 400 lbf, when tested according to ASTM F 446.

3.2　　ADJUSTING AND CLEANING

A.　　Adjust accessories for unencumbered, smooth operation. Replace damaged or defective items.

B.　　Remove temporary labels and protective coatings.

C.　　Clean and polish exposed surfaces according to manufacturer's written recommendations.

**END OF SECTION 10 28 00**

**SECTION 12 36 62 – SOLID SURFACING MATERIAL**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

    A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

    A.     This Section includes solid surfacing for the following:
        1.     Lavatory tops
        2.     Custom Shower Pans/Shower Receptors
        3.     Shower and Tub Wall Panels
        4.     Shower Accessories and Trim Moldings

1.3     ACTION SUBMITTALS

    A.     Product Data:   For each type of product indicated.

    B.     Shop Drawings:  Show thickness, finish, layout, and anchorage details.  Indicate attachment methods, seams, joint treatments, and supports.
        1.     Show locations and sizes of cutouts and holes for plumbing fixtures, faucets, soap dispensers, and other items installed in countertops for architectural woodwork
        2.     Show seam locations.
        3.     Full-size details, edge details, attachments, etc
        4.     Locations and sizes of furring, blocking, including concealed blocking and reinforcement specified in other Sections

    C.     Samples for Verification:   For the following:
        1.     Solid surfacing materials, 6 inches square.

1.4     CLOSEOUT SUBMITTALS

    A.     Maintenance Data:   Submit manufacturer's recommended cleaning and maintenance procedures.

1.5     QUALITY ASSURANCE

    A.     Fabricator Qualifications:  Company specializing in fabricating engineered stone surfacing material with minimum 5 years experience.

    B.     Fire-Test-Response Characteristics:   Provide surfacing material with the following surface-burning characteristics (if required by code) as determined by testing identical products per ASTM E 84 by UL or another testing and inspecting agency acceptable to authorities having jurisdiction:
        1.     Class I per ASTM E-84 including:
            a.     Flame Spread:   25 or less.

1.6     PROJECT CONDITIONS

    A.     Field Measurements:  Where surfacing is indicated to fit to other construction, verify dimensions of other construction by field measurements before fabrication and indicate measurements on Shop Drawings. Coordinate fabrication schedule with construction progress to avoid delaying the Work.

1.7     WARRANTY

    A.     Manufacturer's 10 year warranty against defects in materials.  Warranty shall provide material and labor to repair or replace defective materials.  Damage caused by physical or chemical abuse or damage from excessive heat will not be warranted.

**PART 2 - PRODUCTS**

2.1     SOLID SURFACING

A.     Acceptable Manufacturers and Products:  Subject to compliance with requirements, provide one of the following products:
1.     Inpro
2.     Wiltcher

B.     Basis of Design:  Refer to Master Schedule.

2.2     MATERIALS

A.     Solid Surfacing:  Nonporous surfacing material composed of a unique blend of natural minerals and high-performance acrylic meeting the following criteria:
1.     Wear and Cleanability: Passes per ASI Z124.3.
2.     Abrasion Resistance: No loss of pattern per NEMA LD3-3.01 and ANSI Z 124.3; weight loss, 1,000 cycles, 0.2 gm; wear, 10,000 cycles, 0.008 inches.
3.     Boiling Water Surface Resistance: No change per NEMA LD3-3.05.
4.     High Temperature Resistance: No change per NEMA LD3-3.06.
5.     Conductive Heat Resistance: No change per NEMA LD3-3.08.
6.     Impact Resistance, Notched Izod: 0.28 ft-lbs/in of notch per ASTM D 256, Method A.
7.     Impact Resistance, Ball Drop: 3/4 inch thick sheet, 36 inches with 1/2 pound ball, no failure per NEMA LD3-3.03.
8.     Stain Resistance: Passes, Rating-41, modified with additional stains used, per ANSI Z124.3.
9.     Weatherability: No change, 1000 hours, per ASTM D 1499.
10.    Fungi and Bacteria: No attack per ASTM G 21, G 22.
11.    Water Absorption: 3/4 inch sheet, 0.04 percent after 24 hours, 0.94 percent long term, per ASTM D 570.
12.    Flammability: Solid colors per ASTM E 84.
        a.     Flame Spread: Less than 5.
        b.     Smoke Developed: Less than 15.
        c.     Class Rating: 1.
13.    Thickness: 1/2 inch (12 mm) unless noted or scheduled otherwise.
14.    Colors and Sheen: Refer to Master Schedule.

2.3     MISCELLANEOUS MATERIALS

A.     Adhesives and Cements:   Non-staining, type as recommended by engineered stone manufacturer.
1.     Waterproof, permanent material which will not induce mildew and fungus growth.

B.     Joint Sealants:   Two part color matched polyester knife grade adhesive.

C.     Special Features:   Provide edge treatments as detailed in Drawings.

2.4     FABRICATION

A.     Assemble work at shop and deliver to job ready for installation.  Manufacture in largest practical lengths with seams in least conspicuous locations.

B.     Fabricate work square and to required lines.

C.     Recess and conceal fasteners, connections, and reinforcing.

D.     Design construction and installation details to allow for expansion and contraction of materials.  Properly frame material with tight, hairline joints held rigidly in place.

E.     Comply with adhesive manufacturer's recommendations for adhesive shelf life, pot life, working life, mixing, spreading, assembly time, time under pressure and ambient temperatures.

F.     Fabricate countertops with backsplash and side splashes to profiles indicated or detailed.

G.     Fabricate items to profiles shown with connections and supports as detailed or as required for proper installation per manufacturer's recommendations.

H.    Provide cut-outs for plumbing fixtures and trim, washroom accessories, appliances, and related items. Confirm layout with manufacturer's cut-outs templates before beginning work.   Round corners of cut-outs and sand edges smooth.

I.    Do not exceed manufacturer's recommended unsupported overhang distances.

J.    Finish exposed surfaces smooth and polish to a sheen indicated.

K.    Radius corners and edges.


**PART 3 - EXECUTION**

3.1    INSTALLATION

A.    Install in accordance with manufacturer's printed instructions and approved shop drawings.   Provide templates and rough-in measurements.

B.    Install surfacing true in line and plane, level, rigid and solidly adhered to substrate.

C.    Pre-fit items:   Adjust supports to make fit.   Align joints over support framing.
1.    Provide intermediate supports to that material will not span more than 3 feet in any direction.
2.    Cantilevers shall not exceed 12 inches without supplementary support.

D.    Apply dabs of mastic on supports; place items on supports and attach.

E.    Install with minimum number of joints practical, using full-length pieces from maximum lengths available. Cope at returns and square at corners to produce tight-fitting joints with full-surface contact throughout length of joint. Radius cutouts with minimum 3/8 inch corner radius.

F.    Install splashes using adhesive.   Apply adhesive to back surface only.   Place thin bead of seam adhesive along edge where splashes seat.

3.2    TOLERANCES

A.    Variation in Component Size:   Plus or minus 1/8 inch over 10'-0" length.

B.    Location of Openings:   Plus or minus 1/8 inch from indicated location.

C.    Install countertops level to within 1/8 inch in 10 feet.

D.    Allow minimum 1/16 inch clearance between edges of countertops and adjacent walls.

E.    Maximum Offset From True Position:   1/8 inch.

3.3    CLEANING

A.    Clean and polish fabrications in accordance with manufacturer's instructions.


**END OF SECTION**

**SECTION 210055 - BASIC FIRE SUPPRESSION MATERIALS AND METHODS**


**PART 1 - GENERAL**


1.1     SUMMARY

A.     This Section includes the following basic Fire Suppression materials and methods to complement other Fire Suppression Sections.
1.     Piping materials and installation
2.     Escutcheons.
3.     Sleeves.
4.     Mechanical sleeve seals.
5.     Installation requirements common to equipment specification sections.
6.     Fire Suppression Piping and Equipment Demolition.
7.     Painting and finishing.

B.     Pipe and pipe fitting materials are specified in Plumbing piping system Sections, if applicable.


1.2     DEFINITIONS

A.     Finished Spaces:  Spaces other than mechanical and electrical equipment rooms, furred spaces, pipe and duct shafts, unheated spaces immediately below roof, spaces above ceilings, unexcavated spaces, crawl spaces, and tunnels.

B.     Exposed, Interior Installations:  Exposed to view indoors.  Examples include finished occupied spaces and mechanical equipment rooms.

C.     Exposed, Exterior Installations:  Exposed to view outdoors, or subject to outdoor ambient temperatures and weather conditions.  Examples include rooftop locations.

D.     Concealed, Interior Installations:  Concealed from view and protected from physical contact by building occupants.  Examples include above ceilings and in duct shafts.

E.     Concealed, Exterior Installations:  Concealed from view and protected from weather conditions and physical contact by building occupants, but subject to outdoor ambient temperatures.  Examples include installations within unheated shelters.


1.3     SUBMITTALS

A.     Product Data:  For escutcheon, sleeves, and mechanical sleeve seals.


1.4     QUALITY ASSURANCE

A.     Comply with ASME A13.1 for lettering size, length of color field, colors, and viewing angles of identification devices.

B.     Equipment Selection:  Equipment of higher electrical characteristics, physical dimensions, capacities, and ratings may be furnished provided such proposed equipment is approved in writing and connecting mechanical and electrical services, circuit breakers, conduit, motors, bases, and equipment spaces are increased.  Additional costs shall be approved in advance by appropriate Contract Modification for these increases.  If minimum energy ratings or efficiencies of equipment are specified, equipment must meet design and commissioning requirements.


1.5     DELIVERY, STORAGE, AND HANDLING

A.     Deliver pipes and tubes with factory-applied end caps.  Maintain end caps through shipping, storage, and handling to prevent pipe end damage and prevent entrance of dirt, debris, and moisture.

B.    Protect stored pipes and tubes from moisture and dirt.  Elevate above grade.  Do not exceed structural capacity of floor, if stored inside.

C.    Protect flanges, fittings, and piping specialties from moisture and dirt.

1.6    SEQUENCING AND SCHEDULING

A.    Coordinate Fire Suppression equipment installation with other building components.

B.    Arrange for pipe spaces, chases, slots, and openings in building structure during progress of construction to allow for plumbing installations.

C.    Coordinate installation of required supporting devices and set sleeves in poured-in-place concrete and other structural components, as they are constructed.

D.    Sequence, coordinate, and integrate installations of plumbing materials and equipment for efficient flow of the Work.  Coordinate installation of large equipment requiring positioning before closing in building.

E.    Coordinate connection of Fire Suppression systems with exterior underground and overhead utilities and services.  Comply with requirements of governing regulations, franchised service companies, and controlling agencies.

F.    Coordinate installation of identifying devices after completing covering and painting, if devices are applied to surfaces.  Install identifying devices before installing acoustical ceilings and similar concealment.

**PART 2 - PRODUCTS**

2.1    MANUFACTURERS

A.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
1.    Mechanical Sleeve Seals:
a.    Calpico, Inc.
b.    Metraflex Co.
c.    Thunderline/Link-Seal.

2.2    MECHANICAL SLEEVE SEALS

A.    Description:  Modular sealing element unit, designed for field assembly, used to fill annular space between pipe and sleeve.

1.    Sealing Elements:  EPDM-rubber interlocking links shaped to fit surface of pipe.  Include type and number required for pipe materials and size of pipe.
2.    Pressure Plates:  Stainless steel.
3.    Connecting Bolts and Nuts:  Stainless steel of length required to secure pressure plates to sealing elements.

2.3    PIPING SPECIALTIES

A.    Sleeves:  The following materials are for wall, floor, slab, and roof penetrations:
1.    Steel Sheet Metal:  16 gage, galvanized, round tube closed with welded longitudinal joint.
2.    Steel Pipe:  ASTM A 53, Type E, Grade A, Schedule 40, galvanized, plain ends.
3.    Sleeve Fasteners: Manufactured, steel clips for securement during pour. Equal to B-line, BD40, BE-5-8 or BE-9-12.

B.    Escutcheons:  Manufactured wall, ceiling, and floor plates; deep-pattern type if required to conceal protruding fittings and sleeves.
1.    ID:  Closely fit around pipe, tube, and insulation of insulated piping.
2.    OD:  Completely cover opening.

3. Cast Brass: One piece, with set screw. (split face acceptable for existing piping)
   a. Finish: Polished chrome-plate.

## PART 3 - EXECUTION

### 3.1 PIPING SYSTEMS - COMMON REQUIREMENTS AND APPLICATIONS

A. General: Install piping as described below, unless piping Sections specify otherwise. Individual piping Sections specify unique piping installation requirements.

B. General Locations and Arrangements: Drawing plans, schematics, and diagrams indicate general location and arrangement of piping systems. Indicated locations and arrangements were used to size pipe and calculate friction loss, expansion, pump sizing, and other design considerations. Install piping as indicated, unless deviations to layout are approved on Coordination Drawings.

C. Install piping at indicated slope.

D. Install components with pressure rating equal to or greater than system operating pressure.

E. Install piping in concealed interior and exterior locations, except in equipment rooms and service areas.

F. Install piping free of sags and bends.

G. Install exposed interior and exterior piping at right angles or parallel to building walls. Diagonal runs are prohibited, unless otherwise indicated.

H. Install piping tight to slabs, beams, joists, columns, walls, and other building elements. Allow sufficient space above removable ceiling panels to allow for ceiling panel removal.

I. Install piping to allow application of insulation plus 1-inch clearance around insulation.

J. Locate groups of pipes parallel to each other, spaced to permit valve servicing.

K. Install fittings for changes in direction and branch connections.

L. Install couplings according to manufacturer's written instructions.

N. Fire-Barrier Penetrations: Maintain indicated fire rating of walls, partitions, ceilings, and floors at pipe penetrations. Seal pipe penetrations with firestop materials. Comply with requirements in Specification Section "Penetration Firestopping" for firestop materials and installations.
   1. Fire-stop all sleeves at floor penetrations of multistory buildings including underfloor penetrations.

### 3.2 ESCUTCHEON REQUIREMENTS

A. Install escutcheons at pipe penetrations of walls, ceilings, and floors in finished areas.
   1. Escutcheons for New Piping:
      a. Piping exposed through floors and walls in finished areas: One piece, cast brass with polished chrome-plated finish with set screw. Deep escutcheons to be provided where standard depth will not fit.
      b. Escutcheons shall cover entire hole penetration.
      c. Escutcheon to be appropriately sized for pipe.
   2. Escutcheons for Existing piping:
      a. Piping exposed through floors and walls in finished areas: Split plate, cast brass with polished chrome-plated finish with set screw. Deep escutcheons to be provided where standard depth will not fit.
      b. Escutcheons shall cover entire hole penetration.
      c. Escutcheon to be appropriately sized for pipe.
   3. Install escutcheons at wall, floor, and ceiling penetrations in exposed finished locations and within cabinets and millwork. Use deep-pattern escutcheons if required to conceal protruding pipe fittings.

3.3    PIPE SLEEVE INSTALLATION REQUIREMENTS

A.    Sleeves are required for all through floor and wall penetrations.  Sleeves to be set and poured in place (in slab applications), secure all sleeves with fasteners. Sleeves to extend 2 inches past face of floor or wall.  Pipe sleeve in finished areas to be flush with wall or floor for installation of escutcheon. Install sleeves in new partitions, slabs, and walls as they are built.

B.    Pipe sleeves are required at all through wall and floor penetrations.

C.    Install sleeve materials according to the following applications:
1.    Sleeves for Piping Passing through Concrete Floor Slabs:  galvanized steel pipe.
2.    Sleeves for Piping Passing through Concrete Floor Slabs of Mechanical Equipment Areas or Other Wet Areas:  Galvanized-steel pipe sleeves.
    a.    Extend sleeves 2 inches above finished floor level.
    b.    For pipes penetrating floors with membrane waterproofing, extend cast-iron sleeve fittings below floor slab as required to secure clamping ring if ring is specified.  Secure flashing between clamping flanges.  Install section of cast-iron soil pipe to extend sleeve to 2 inches above finished floor level.  Comply with requirements in Division 07 Section "Sheet Metal Flashing and Trim" for flashing.
    c.    Sleeves for Piping Passing through Gypsum-Board Partitions:
        1)    Galvanized-steel pipe sleeves, or galvanized-steel sheet metal sleeve.
        2)    Exception:  Sleeves are not required for water supply tubes and waste pipes for individual plumbing fixtures if escutcheons will cover openings.
    d.    Sleeves for Piping Passing through Concrete Roof Slabs:  Reference Structural/Architectural details.
    e.    Sleeves for Piping Passing through Concrete Walls:
        1)    Galvanized-steel pipe sleeves.
        2)    Install sleeves that are large enough to provide 1-inch annular clear space between sleeve and pipe or pipe insulation when sleeve seals are used.

D.    Ratproofing: The open space around all piping, ductwork, etc. passing through the ground floor and/or exterior walls shall be ratproofed in a manner acceptable to the Owner's Representative.

E.    Mechanical sleeve seals
1.    Install sleeve seals in sleeves in exterior concrete walls at water-service piping entries into building.  Sleeves must be poured in place.  Installation of sleeves after wall is constructed is not acceptable.
2.    Select type and number of sealing elements required for pipe material and size.  Position pipe in center of sleeve.  Assemble sleeve seal components and install in annular space between pipe and sleeve.  Tighten bolts against pressure plates that cause sealing elements to expand and make watertight seal.
3.    For exterior wall penetrations below grade, seal annular space between sleeve and pipe using sleeve seals specified in this Section.
    a.    Install sleeves that are large enough to provide 1/4-inch annular clear space between sleeve and pipe or pipe insulation unless otherwise indicated. Seal annular space with water tight sealant (equal to NP-1). All sleeves and penetrations to maintain rating of wall/floor. Seal pipe penetrations with fire-stopping materials.

F.    Piping Connections:  Make connections according to the following, unless otherwise indicated:
1.    Install unions, in piping 2-inch NPS and smaller, adjacent to each valve and at final connection to each piece of equipment with 2-inch NPS or smaller threaded pipe connection.
2.    Install flanges, in piping 2-1/2-inch NPS and larger, adjacent to flanged valves and at final connection to each piece of equipment with flanged pipe connection.

3.4    EQUIPMENT INSTALLATION – COMMON REQUIREMENTS

A.    Install equipment to provide maximum possible headroom, if mounting heights are not indicated.

B.    Install equipment according to approved submittal data.  Portions of the Work are shown only in diagrammatic form.  Refer conflicts to Architect.

C.   Install equipment level and plumb, parallel and perpendicular to other building systems and components in exposed interior spaces, unless otherwise indicated.

D.   Install mechanical equipment to facilitate service, maintenance, and repair or replacement of components.  Connect equipment for ease of disconnecting, with minimum interference to other installations.

E.   Install equipment giving right of way to piping installed at required slope.

3.5   PAINTING AND FINISHING

A.   Apply paint to exposed piping according to the following, unless otherwise indicated:
1.   Interior, Ferrous Piping:  Use semigloss, acrylic-enamel finish.  Include finish coat over enamel undercoat and primer.
2.   Interior, Galvanized-Steel Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over galvanized metal primer.
3.   Interior, Ferrous Supports:  Use semigloss, acrylic-enamel finish.  Include finish coat over enamel undercoat and primer.
4.   Exterior, Ferrous Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over rust-inhibitive metal primer.
5.   Exterior, Galvanized-Steel Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over galvanized metal primer.
6.   Exterior, Ferrous Supports:  Use semigloss, acrylic-enamel finish.  Include two finish coats over rust-inhibitive metal primer.

B.   Do not paint piping specialties with factory-applied finish.

C.   Extend paint up to, not including, sprinkler heads.

D.   Damage and Touchup:  Repair marred and damaged factory-painted finishes with materials and procedures to match original factory finish.

3.6   DEMOLITION

A.   Cut, channel, chase, and drill floors, walls, partitions, ceilings, and other surfaces necessary for Fire Suppression installations.  Perform cutting by skilled mechanics of trades involved.

B.   Repair cut surfaces to match adjacent surfaces.

3.7   CUTTING AND PATCHING

A.   Disconnect, demolish, and remove Work specified in Fire Suppression Sections.

B.   If pipe or equipment to remain is damaged or disturbed, remove damaged portions and install new products of equal capacity and quality.

C.   Accessible Work:  Remove indicated exposed pipe and ductwork in its entirety.

D.   Work Abandoned in Place:  Cut and remove underground pipe a minimum of 2 inches beyond face of adjacent construction.  Cap and patch surface to match existing finish.

E.   Removal:  Remove indicated equipment from Project site.

F.   Temporary Disconnection:  Remove, store, clean, reinstall, reconnect, and make operational equipment indicated for relocation.

**END OF SECTION**

**SECTION 210100 - SPECIAL CONDITIONS FOR ALL FIRE SUPPRESSION WORK**

**PART 1 - GENERAL**

1.1     DESCRIPTION OF WORK

A.     This section covers the general provisions of the fire suppression specifications applicable to the following systems:
1.     Fire Protection.

1.2     DRAWINGS

A.     These specifications are accompanied by drawings of the building and details of the installations showing the locations of equipment, piping, etc.  The drawings and these specifications are complementary to each other; requirements described in one or the other shall be considered binding as if described in both.

B.     If any departures from the drawings are deemed necessary by the Contractor, details of such departures and the reasons therefore shall be submitted to the Owner's Representative for approval.  No departures shall be made without prior written approval by the Owner's Representative.

C.     There are intricacies of construction which are impractical to specify or indicate in detail; means and methods for performing such work shall adhere to commonly accepted industry standards.

D.     It is the Contractor's responsibility to properly use all information found on the Architectural, Structural, Mechanical and Electrical drawings and applicable shop drawings where such information affects his work.

E.     For new buildings, all final dimensions shall be scaled from the drawings, unless otherwise noted. For work associated with existing buildings (renovations and additions), all final dimensions shall be field verified.

1.3     CONSTRUCTION REQUIREMENTS

A.     The architectural, civil, structural, electrical, plumbing, fire protection and Fire Suppression drawings, and specifications are all part of the Contract Documents.  In many instances there are details described another trade's drawings that are not necessarily included or referenced in the fire suppression drawings.  It is the Contractor's responsibility to review in detail all parts of the Contract Documents prior to submitting a bid.  Failure to comply with this requirement shall not relieve the Contractor of responsibility or be used as cause for additional compensation because architectural, structural, or electrical details were not included in the fire suppression drawings.

B.     It is the intent of the Contract Documents to provide complete and fully functional installation in every respect.  Material and/or construction details not specifically described in the Contract Documents, but commonly considered incidental to the industry, are required by the Contractor.

C.     The Contractor shall be responsible for fitting his material and apparatus into the building and shall carefully lay out his work at the site to conform to the structural conditions, to avoid all obstructions, to comply with Codes, to facilitate the work of other trades, to conform to the details of the installation supplied by the manufacturer of the equipment to be installed, and thereby to provide an integrated satisfactory operating installation.

D.     Final placement of serviceable equipment shall be carefully coordinated with all other trades to ensure sufficient clearance for maintenance according to manufacturer's recommendations.  Lubricating orifices and adjustable components shall be easily accessible.  Piping, conduit, valve stems, cabling and other building systems shall not interfere with service space.

E.     Location of Exposed Devices
1.     All exposed devices (sprinkler heads, fire risers, pumps, etcetera) shall be referenced to fixed data points that are coordinated with all trades; shall be located to present symmetrical arrangements with respect to the fixed data point; and shall facilitate the proper arrangements of acoustical ceiling tiles.

Fixed data points shall include such features as wall and ceiling lines, soffits, balanced border widths, masonry joints, etc. Devices located in acoustical ceiling tiles shall occur symmetrically in tile joints or in the centers of whole tiles. The final determination of the exact location of each outlet and the arrangements to be followed shall be acceptable to the Owner's Representative.

1.4     QUALIFICATIONS

A.     Contractor must have minimum of five years experience installing fire suppression systems similar to those described in these Contract Documents.

B.     Contractor must be licensed and hold a current contracting license that has been valid for a minimum of five years in the State of Texas.

C.     Plan preparation shall be performed at minimum by RME-G.

D.     Site Supervisor shall be RME-G.

E.     Contractor must be able to bond work for payment and performance of work being bid. Contractor's bonding agency shall have a Best's insurance rating of A or A+.

1.5     MATERIAL AND EQUIPMENT REQUIREMENTS

A.     Manufacturer's Instructions: The manufacturer's published instructions shall be followed for preparing, assembling, installing, erecting, and cleaning manufacturer materials or equipment, unless otherwise indicated. The Contractor shall promptly notify the Owner's Representative in writing of any conflict between the requirements of the Contract Documents and the manufacturer's direction and shall obtain the clarification of the Owner's Representative before proceeding with the work. Should the Contractor perform any such work that does not comply with the manufacturer's directions or such clarification by the Owner's Representative, he shall bear all costs arising in connection with the correction of the deficiencies.

B.     Storage at Site: The Contractor shall not receive material or equipment at the jobsite until there is suitable space provided to properly protect equipment from rust, drip, humidity, and dust damage and from surrounding work.

C.     Capacities shall be not less than those indicated and shall be such that no component or system becomes inoperative or is damaged because of startup or other overload conditions.

D.     Conformance to Agency Requirements: Where materials or equipment are specified to be approved, listed, tested, or labeled by the Underwriters Laboratories, Inc., or constructed and/or tested in accordance with the standards of the American Society of Mechanical Engineers, the Contractor shall submit proof that the items furnished under this section of the specifications conform to such requirements. The label of Underwriters Laboratories, Inc. applied to the item will be acceptable as sufficient evidence that the items conform to such requirements. The ASME stamp or the AMCA label will be acceptable as sufficient evidence that the items conform to the respective requirements.

E.     Nameplates: Each major component of equipment shall have the manufacturer's name, address, and model-identification number on a plate securely attached to the item of equipment. All data on nameplates shall be legible at the time of Final Inspection.

F.     Prevention of Rust: Standard factory finish will be acceptable on equipment specified by model number; otherwise surfaces of ferrous metal shall be given a rust-inhibiting coating. The treatment shall withstand 200 hours in salt-spray fog test, in accordance with Method 6061 of Federal Standard No. 141. Immediately after completion of the test, the specimen shall show no signs of wrinkling or cracking and no signs of rust creepage beyond 1/8 inch on either side of the scratch mark. Where rust inhibitor coating is specified hereinafter, any treatment that will pass the above test is acceptable unless a specific coating is specified, except that coal tar or asphalt-type coatings will not be acceptable unless so stated for a specific item. Where steel is specified to be hot-dip galvanized, mill-galvanized sheet steel may be used provided all raw edges are painted with a zinc-pigmented paint conforming to Military Specification MIL-P-26915.

G.   Protection from Moving Parts:  Belts, pulleys, chains, gears, couplings, projecting setscrews, keys, and other rotating parts located so that any person can come in close proximity thereto, shall be fully enclosed or properly guarded.

H.   Drive Guards:  For machinery and equipment, provide guards as shown in AMCA 410 for belts, chains, couplings, pulleys, sheaves, shafts, gears, and other moving parts regardless of height above the floor. Drive guards may be excluded where motors and drives are inside factory-fabricated air handling units casings.  Guards shall be constructed of sheet steel, cast iron, expanded metal, or wire mesh rigidly secured so as to be removable without disassembling pipe duct or electrical connection to equipment. Provide a 1-inch diameter hole in each drive guard at each shaft center to allow access for speed measurement.

I.   Verifications of Dimensions: The Contractor shall be responsible for the coordination and proper relation of his work to the building structure and to the work of all trades.  The Contractor shall visit the premises and thoroughly familiarize himself with all details of the work and working conditions, to verify all dimensions in the field, and to advise the Owner's Representative of any discrepancy before performing any work. Adjustments to the work required in order to facilitate a coordinated installation shall be made at no additional cost to the Owner, Architect, or Engineer.

J.   Standard Products:  Materials and equipment to be provided shall be the standard catalog products of manufacturers regularly engaged in the manufacture of products conforming to these specifications, and shall essentially duplicate materials and equipment that have been in satisfactory use at least two years.

1.6   INSPECTION OF THE SITE

A.   The Contractor shall visit the site, verifying all existing items indicated on drawings and/or specified, and familiarize himself with the existing work conditions, hazards, grades, actual formations, soil conditions, structures, utilities, equipment, systems, facilities, and local requirements.  The submission of bids shall be deemed evidence of such visits.  All proposals shall take these existing conditions into consideration, and the lack of specific information shall not relieve the Contractor of any responsibility.

1.7   UTILITY LOCATIONS AND ELEVATIONS

A.   Locations and elevations of the various utilities included within the scope of this work have been obtained from substantially reliable sources and are offered separately from the Contract Documents, as a general guide only, without guarantee as to accuracy.  Examine the site, the locations, and availability of all utilities and services required for their relation to the work.  Verify the location of all existing site utilities with each responsible utility company or applicable party.  The Contractor shall repair all damage to existing utilities, whether indicated on the drawings or not, at his sole expense.

1.8   PERMITS, UTILITY CONNECTIONS, AND INSPECTIONS

A.   Permitting Fees: Contractor shall pay for all fees associated with permits required by municipal authorities having jurisdiction.

B.   Tapping and Impact Fees: Contractor shall pay for all fees associated with tapping into municipal utility mains, including domestic water.  Impact fees will be paid for by the Owner.

C.   Compliance: The Contractor shall comply in every respect with all requirements of local authorities having jurisdiction, including building inspections, fire marshal, local ordinances and codes, and utility company requirements.  In no case does this relieve the Contractor of the responsibility of complying with these specifications and drawings where specified conditions are of a higher quality than the requirements of the above-specified authorities.  Where requirements of the specifications and drawings are below the requirements of the above offices having jurisdiction, the Contractor shall make installations in compliance with the requirements of the above authorities.

D.   Utilities: The Contractor shall coordinate with the various utility companies involved in this project and shall provide required utility relocations, extensions, modifications, and/or changes (complete in all respects) as described in the Contract Documents.  Contractor shall verify the location of all existing utilities with the applicable Utility Company.  The Contractor shall be responsible for all damages to existing utilities, whether

indicated on drawings or not, and repair all damage to existing utilities as acceptable to the affected Utility Company.

E.     Certification:  Prior to final acceptance, the Contractor shall furnish a certificate of acceptance from the inspection departments having jurisdiction over the work for any and all work installed under this Contract. Any additional labor costs incurred as a result of a substitution shall be the Contractor's responsibility.

1.9     SUBSTITUTION OF MATERIALS AND EQUIPMENT

A.     No substitution of materials or equipment herein specified or called for on the drawings will be permitted, except by written permission of the Owner's Representative.  Where several makes of equipment or material are mentioned, any item named may be bid upon provided it meets space, capacity specifications, and other requirements.

1.10     SUBMITTALS

A.     Submittals for Review:
       1.     As soon as practical or within 30 days after the date of contract award or notice to proceed, and before purchasing or starting installation of any materials or equipment, the Contractor shall submit for review sufficient material and equipment data to indicate that all requirements of the specifications have been met and samples shall be furnished when requested.  All manufacturer's data used as part of the submittal shall have all non-applicable features crossed out or deleted in a manner that will clearly indicate exactly what is to be furnished.
       2.     Four (4) copies of the submittal list and detailed submittals (for the Owner's and A/E's use) shall be submitted to the Owner's Representative.  The Contractor is requested to include a minimum of three (3) additional copies for insertion in the project's Owner's Manuals at the completion of the project, and the number of additional copies the Contractor requires for his and his subcontractor's use during the project's construction.  The detailed submittals shall be accompanied by the same number of sets of pictorial and descriptive data derived from the manufacturer's catalogs and sales literature or incorporated in the shop drawings.  The Contractor may provide a detailed submittal on any item even though not required by the Owner's Representative.

B.     Format
       1.     Submittals shall in pdf format.  The front sleeve shall have a cover sheet with the title "FIRE SUPPRESSION SUBMITTALS" centered in large print.  Below the title shall be the name of the project, the date, the project location, the name and address of the contractor, the name and address of the subcontractor and the name and address of the engineer(s) in smaller print.
       2.     Provide a Table of Contents that summarizes the information being submitted according to specification section.
       3.     Submittals shall be tab divided by specification section; **all sections** identified in the project specifications shall have a tab.  When no information is being provided concerning a particular specification section, insert a single dated sheet that explains the circumstances.

C.     Content:
       1.     The Contractor shall prepare or cause to be prepared shop drawings, product data, materials and equipment lists, diagrams, data, samples, and other submittals as required by the contract documents, hereinafter referred to as "Submittal Data."  The Contractor shall review and approve all submittal data for compliance with the contract documents, manufacturer's recommendations, adequacy, clearances, code compliance, safety, and coordination with associated work.
       2.     The Contractor shall submit approved submittal data to the Owner's Representative for review and comment as to general conformance with the design concept and general compliance with information given in the contract documents.  Owner's Representative's review shall not include review of quantities, dimensions, weights or gauges, fabrication processes, construction methods, coordination with other trades or work, or construction safety and precautions, all of which are the sole responsibility of the Contractor.
       3.     The Contractor shall clearly and specifically identify and call to the attention of the Owner's Representative any deviation from the contract documents for which Owner acceptance is desired. The responsibility for such a deviation accepted by the Owner shall remain with the Contractor.
       4.     Timeliness:  The burden of timeliness in the complete cycle of submittal data is on the Contractor. The Contractor shall allow a minimum of two (2) weeks' time frame for review of each submission by the Owner's Representative.  The Contractor is responsible for allowing sufficient time in the

construction schedule to cover the aforementioned cycles of data processing, including time for all re-submission cycles on nonconforming materials, equipment, etc. covered by the data submitted. Construction delays and/or lack of timeliness in the above regard are the responsibility of the Contractor and will not justify any request for scheduled construction time extensions or extra compensation.

5. Work performed in accordance with approved submittal data that is not in accordance with the Contract Documents and did not have the specific acceptance of the Owner's Representative shall be replaced at Contractor's cost.

D. Re-submittals
   1. Re-submit entire submittal in accordance with afore mentioned format and content requirements. **Loose-leaf or piecemeal re-submittals are not acceptable.** New and/or revised data for each section shall be prefaced with a colored (yellow, pink, orange, etc) cover sheet that identifies (in a word or two) the materials and/or equipment being re-submitted. Typeset the words "REVISED SUBMITTAL NO. 1 (or 2, 3 as applicable)" centered at the bottom of the cover sheet.
   2. Subsequent re-submittals (second and third, if necessary) shall have different colored cover sheets to distinguish between the various re-submittals.
   3. Include a cover letter at front of binder that specifically responds to each "REVISE AND RE-SUBMIT COMMENT" or "REJECTED" comment by number. Example responses would include the following:
      a. RESPONSE: "Please see attached re-submittal."
      b. RESPONSE: "Will be re-submitted at a later date."
      c. RESPONSE: "Requirement for (xxxxxx) was deleted in Addendum No. 2."
      d. RESPONSE: "Exception requested based on Section xx, Paragraph x.x.x.

E. These paragraphs related to Fire Suppression submittal data supersede any conflicting requirements contained in Division 01 sections.

1.11 ACCEPTANCE OF MATERIALS AND EQUIPMENT

A. All equipment installed on this project shall have **local (within 125 miles)** representation, local factory-authorized service, and a local stock of repair parts. This requirement is essential and will be strictly reviewed by the Owner's Representative prior to concurrence with the Contractor's approval for all submittals covered by Fire Suppression sections of this Specification.

B. NOTICE: The Contractor is responsible for providing materials and equipment that conform to the requirements of the project manual in every respect unless a deviation has been "accepted" in writing. Removal of any nonconforming materials and equipment and the replacement with conforming materials and equipment shall be at the Contractor's sole expense, regardless of when nonconformance was discovered.

C. Approval of materials and equipment shall be based on manufacturer's published data and shall be tentatively subject to the submission of complete shop drawings which comply with the contract documents. Approval is also dependent upon the existence of adequate and acceptable clearances for entry, servicing, and maintenance.

D. Approval of materials and equipment under this provision shall not be construed as authorizing any deviations from the specifications unless the attention of the Owner's Representative has been directed in writing to the specific deviations. Data submitted shall not contain unrelated information unless all pertinent information is properly identified.

E. Physical Size of Equipment: Space is critical; therefore, equipment of larger sizes than shown, even though of approved manufacturer, will not be acceptable unless it can be demonstrated that ample space exists for proper installation, operation, and maintenance.

1.12 SHOP DRAWINGS

A. As soon as practicable after the award of contract and approval of materials and equipment, but prior to installation, complete and detailed shop drawings of the Fire Suppression System shall be submitted for review and comment. The following systems are to be coordinated on the Shop Drawings:
   1. Equipment arrangements.
   2. Duct layouts.

3.    Piping layouts.
4.    Cable Tray.
5.    Sprinkler locations.
6.    Other details as directed by the Owner's Representative. Composite drawings of areas requiring coordination between trades shall be provided and expedited to eliminate conflicts and to ensure maximum cooperation and work progress.

B.    Work performed without benefit of reviewed and approved shop drawings **will not be recommended for payment by the Engineer** until such time as the shop drawings are submitted, reviewed, and approved. Any work performed without the benefit of reviewed and approved shop drawings may require removal, relocation, and/or replacement at the Contractor's sole expense in order to resolve conflicts between the various systems and provide the performance specified.

C.    All installation of equipment, fixtures, terminal devices, etc. shall be made in accordance with approved composite shop drawings. The Contractor shall modify installation and relocate installed work to provide code clearances, service access, and eliminate conflict with other systems.

D.    Submit approved shop drawings in pdf format.

E.    Shop drawing submittal shall be approved by the AHJ.

## 1.13    SITE OBSERVATION

A.    Site observation by the Architect, Engineer, and/or Owner's Representative is for the express purpose of verifying compliance by the Contractor with the contract documents, and shall not be construed as construction supervision nor indication of approval of the manner or location in which the work is being performed as being a safe practice or place.

## 1.14    SUPERVISION

A.    In addition to the Superintendent required under the conditions of the contract, each subcontractor shall keep a competent superintendent or foreman on the job at all times.

B.    It shall be the responsibility of each superintendent to study all plans and familiarize himself with the work to be done by other trades. He shall coordinate his work with other trades and, before material is fabricated or installed, make sure that his work will not cause an interference with another trade. Where interferences are encountered, they shall be resolved at the jobsite by the superintendents involved. Where interferences cannot be resolved without major changes to the plans, the matter shall be referred to the Owner's Representative for comments.

## 1.15    OPERATION PRIOR TO COMPLETION

A.    When any piece of mechanical equipment is operable and it is to the advantage of the Contractor to operate the equipment, he may do so, providing that he properly supervises the operation and has the written permission of the Owner's Representative to do so. The warranty period shall not commence, however, until such time as the equipment is operated for the beneficial use of the Owner or date of substantial completion, whichever occurs first.

B.    Regardless of whether or not the equipment has or has not been operated, the Contractor shall properly clean the equipment, properly adjust, and complete all deficiency list items before final acceptance by the Owner. The date of acceptance and the start of the warranty may not be the same date.

C.    Final inspection and testing shall be witnessed by AHJ or their authorized representative.

## 1.16    MANUFACTURER'S RECOMMENDATIONS

A.    The manufacturer's published directions shall be followed in the delivery, storage, protection, installation, piping, and wiring of all equipment and material. The Contractor shall promptly notify the Owner's Representative, in writing, of any conflict between the requirements of the contract documents and the manufacturer's directions, and shall obtain the Owner's Representative's comments before proceeding with

the work.  Should the Contractor perform any such work that does not comply with the manufacturer's directions or applicable comments from the Owner's Representative, he shall bear all costs arising in connection with the correction of such deficiencies.

## 1.17 CHECKING AND TESTING MATERIALS AND/OR EQUIPMENT

A. Before final acceptance of the work, an authorized representative of the manufacturer of the installed materials and/or equipment shall personally inspect the installation and operation of his materials and/or equipment to determine that it is properly installed and in proper operating order.  Testing and checking shall be accomplished during the course of the work where required by work being concealed, and at the completion of the work otherwise.  In addition, the Contractor shall submit to the Owner's Representative a signed statement from each representative certifying as follows:
   1. "I certify that the materials and/or equipment listed below have been personally inspected by the undersigned authorized manufacturer's representative and is properly installed and operating in accordance with the manufacturer's recommendations and are asbestos free."

## 1.18 OPERATING AND MAINTENANCE INSTRUCTION

A. The Contractor shall prepare for the owner's manual hereinafter specified complete sets of operating and maintenance instructions, system piping, valving, control and interlock diagrams, manuals, parts lists, etc. for each item of equipment.  These are to be assembled as hereinafter specified for owner's manual.

B. In addition, the Contractor shall provide the service of a competent engineer or a technician acceptable to the Owner's Representative to instruct a representative of the Owner in the complete and detailed operation of all equipment and systems.  These instructions shall be provided for a period of sufficient duration to fully accomplish the desired results.  Upon completion of these instructions, a letter of release will be required, acknowledged by the Owner, stating the dates of instruction and personnel to whom instructions were given.

C. Additional diagrams, operating instructions, etc. shall be provided as specified hereinafter in the other sections of these specifications.

## 1.19 MATERIAL AND EQUIPMENT SCHEDULES

A. Contractor shall refer to both drawings and specification for schedules.  Where reference is made to items "scheduled on drawings" or "scheduled in specifications," same shall include schedules contained in both the drawings and the specifications.  The Contractor's attention is directed to the various specification sections and drawings for schedules.

## 1.20 APPLICABLE CODES AND STANDARDS

A. The installation shall meet the minimum standards prescribed in the latest editions of the following listed codes and standards, which are made a part of these specifications, except as may be hereinafter specifically modified in these specifications and associated drawings.
   1. National Fire Protection Association Standards (NFPA):
      NFPA 10 - Portable Fire Extinguishers
      NFPA 13 – Standard for the installation of sprinkler systems.
      NFPA 54 - National Fuel and Gas Code
      NFPA 70 - National Electrical Code
      NFPA 90A - Air Conditioning Systems
      NFPA 101 - Life Safety Code
      NFPA 255 - Method of Test of Surface Burning Characteristics of Building Materials
   2. American National Standards Institute (ANSI):
      15-78 - Safety Code for Mechanical Refrigeration
      C.2 - 1984 National Electrical Safety Code
      A117.1 - Handicapped Code
   3. American Society of Mechanical Engineers (ASME): Section IV, V, CSD-1
   4. American Water Works Association (AWWA):  All applicable manuals and standards.
   5. American Society of Testing Materials (ASTM):  All applicable manuals and standards.

6. National Electrical Manufacturers' Association (NEMA):  All applicable manuals and standards.
7. Occupational Safety and Health ACT (OSHA):
   National Sanitation Foundation - Standard No. 2
8. American Society of Heating, Refrigeration, and Air conditioning Engineers (ASHRAE):
   90-80 Energy Conservation in New Building Design
   2001 ASHRAE Handbook of Fundamentals
9. Americans with Disabilities Act, 1990
10. American Gas Association (AGA)
11. Underwriters Laboratories, Inc. (UL)
12. Manufacturer's Standardization Society of the Valve and Fitting Industry (MSS)
13. Applicable State Building Codes (International Building Codes, as amended):
14. Applicable State Mechanical Code (International Mechanical Code, as amended).
15. Applicable State Plumbing Code (International Plumbing Code, as amended).
16. Applicable State Energy Code (International Energy Conservation Code, as amended).

B. All materials and workmanship shall comply with all applicable city, state, and national codes, specifications, and industry standards.  All materials shall be listed by the Underwriters Laboratories, Inc. as conforming to its standards and so labeled in every case where such a standard has been established for the particular type of material in question.

C. The contract documents are intended to comply with the aforementioned rules and regulations; however, some discrepancies may occur.  Where such discrepancies occur, the Contractor shall immediately notify the Owner's Representative in writing of said discrepancies and apply for an interpretation.   Should the discovery and notification occur after the execution of a contract, any additional work required for compliance with said regulations shall be paid for as covered by Division 1 of these contract documents, providing no work or fabrication of materials has been accomplished in a manner of noncompliance.  Should the Contractor fabricate and/or install materials and/or workmanship in such a manner that does not comply with the applicable codes, rules, and regulations, the Contractor who performed such work shall bear all costs arising in correcting these deficiencies to comply with said rules and regulations.

1.21    DEFINITIONS

A. Refer to the condition of the contract for Division 1 for additional requirements regarding definitions.

B. Where "as required" or "as necessary" is used in these specifications or on the drawings, it shall mean "that situations exist that are not necessarily described in detail or indicated that may cause the Contractor certain complications in performing the work described or indicated.  These complications entail the normal coordination activities expected of the Contractor where multiple trades are involved and new or existing construction causes deviations to otherwise simplistic approaches to the work to be performed.  The term shall not be interpreted to permit an option on the part of the Contractor to achieve the end result."

C. Where "and/or" is used in these specifications or on the drawings, it shall mean "that situations exist where either one or both conditions occur or are required and shall not be interpreted to permit an option on the part of the Contractor.

1.22    FINAL INSPECTION

A. Refer to Division 1 for additional requirements for final inspection.

B. It shall be the responsibility of the Contractor to personally conduct a careful inspection, assuring himself that the work on the project is ready for final acceptance and developing his own "punch lists," before calling upon the Owner's Representative to make a final inspection.  Failure of the Contractor to conduct such inspections and provide the Owner's Representative with a copy of his "punch lists" prior to the final inspection shall be adequate cause for the Owner's Representative to cancel any Contractor-requested final inspection.

C. In order not to delay final acceptance of the work, the Contractor shall conduct his own "final inspections" prior to requesting the Owner's Representative to "final" the project; will have all necessary bonds, guarantees, receipts, affidavits, etc. called for in the various articles of this specification prepared and signed in advance; and together with a letter of transmittal listing each paper included, shall deliver the same to the Owner's Representative at or before the time of said final inspection.  The Contractor is

cautioned to check over each bond, receipt, etc. before preparing same for submission to see that the terms check with the requirements of the specifications.

D.    The final inspection will be made jointly by the AHJ or their approved representative.

1.23    REQUIREMENTS FOR FINAL ACCEPTANCE

A.    Requirements for final acceptance shall include but not be limited to the Contractor accomplishing the following:
1.    Construction:  Complete all construction.
2.    Deficiency Lists:  Correct all deficiencies listed at time of Substantial Completion.
3.    Owner's Manual:  Submit at least 30 days prior to final acceptance on (1) copy of the owner's manual for the Owner's Representative's review and comments.  Following acceptance, prepare three (3) copies of bound and indexed owner's manual, to be delivered at the time of final acceptance, which shall include but not be limited to the following:
   a.    System operating instructions.
   b.    System control drawings.
   c.    System interlock drawings.
   d.    System maintenance instructions.
   e.    Manufacturers', suppliers', and subcontractors' names, addresses, and telephone numbers, both local representatives and manufacturers' service headquarters.
   f.    Equipment operating and maintenance instructions and parts lists.
   g.    Manufacturer's certifications (see Checking and Testing Materials and/or Equipment, this section).
   h.    Contractor's warranty.
   i.    Acceptance certificates of authorities having jurisdiction.
   j.    Log of all tests made during course of work.
   k.    Owner's acknowledgment of receipt of instruction, enumerating items in owner's manual.
   l.    List of manufacturers' guarantees executed by the Contractor.
   m.    Certified performance curves.
   n.    Owner's acknowledgment of items of equipment or accessories indicated or specified to be turned over to Owner.
4.    Instructions:
   a.    Verbal, as herein specified.
   b.    Posted, framed under glass or plastic laminated:
      1)    System operating instructions.
      2)    System control drawings.
      3)    System interlock drawings.
5.    Record Drawings: Deliver the specified record drawings to the Owner's Representative.

1.24    RECORD DRAWINGS

A.    The Contractor shall maintain a set of contract drawings (black-line prints) at the jobsite on which he shall indicate the installed (as-built) locations.

B.    Drawings shall be used for construction reference and shall not leave the field office of the jobsite.

C.    Drawings shall include all addenda, ASI's, Change Orders, and existing conditions and equipment that are not reflected in the original contract drawings.

D.    Upon completion of work, the Contractor shall obtain CAD files of the contract drawings from the Owner's Representative and transfer the above as-built information into these files.  The as-built files shall be permanently marked "RECORD DRAWINGS" and printed on full-size Mylar sheets. Upon completion, the CAD files shall be transferred to CD in AutoCAD 2010 format.  Both the CAD files CD and Mylar drawings shall be submitted to the Owner's Representative as part of the Close-out Submittals.

E.    Refer to Division 1 paragraph entitled "Record Documents" for additional requirements.

1.25    ALTERNATE PROPOSALS

A. Alternate proposals are summarized in Division 1 and on the bid proposal form. Refer to all sections of the specifications and the drawings to determine the exact extent and scope of the various alternate proposals as each pertains to the work of the various trades.

1.26    WARRANTY

A. General: All work performed (including equipment and materials furnished) under the various sections of these specifications shall be 100% warranted, for a period of one (1) year from the date of final acceptance thereof, against defective materials, design, and unauthorized substitution. Upon receipt of note of failure of any part of the guaranteed equipment and/or facilities during the guaranty period, the affected part(s) or facilities shall be replaced promptly with new parts, etc. by and at the expense of the Contractor. Further, the Contractor shall properly obtain, execute, and forward any and all manufacturer's warranties on equipment furnished under the Contract. Refer to Division 1 for additional requirements.

B. Extended Period: The Contractor shall provide all extended time warranties available from the manufacturer of the equipment provided as standard at no additional cost. This includes all extended warranties where specified with certain equipment as directed in other sections of this Specification.


**PART 2 - PRODUCTS**


2.1    MATERIALS AND WORKMANSHIP

A. All materials, unless otherwise specified, shall be current United States manufacture, new, free from all defects, and of the best quality. Foreign goods specifically approved for use by the Owner's Representative prior to bidding may be furnished.

B. Materials and equipment shall be installed in accordance with the manufacturer's recommendations and the best standard practice for the type of work involved. All work shall be executed by mechanics skilled in their respective trades, and the installations shall present a neat, precise appearance.

C. The responsibility for the furnishing and installation of the proper fire suppression equipment and/or material as intended rests entirely upon the Contractor. The Contractor shall request advice and supervisory assistance from the representative of specific manufacturers during the installation.


2.2    FLAME SPREAD AND SMOKE DEVELOPED PROPERTIES OF MATERIALS

A. All materials in concealed locations, including any above-ceiling area, shall have a flame spread rating not over 25 without evidence of continued progressive combustion and a smoke developed rating no higher than 50. Flame spread and smoke developed ratings shall be in accordance with NFPA Standard No. 255.


2.3    FIRE AND SMOKE PARTITION, WALL, AND/OR FLOOR PENETRATIONS

A. Pipe, conduit, etc. shall pass through fire- or smoke-rated floors, partitions, walls, or other barriers within a UL-listed assembly which shall maintain the rating of the applicable wall, floor, partition, or barrier.

B. The Contractor shall review the architectural and structural drawings and determine the location of the fire-rated building elements. Where these elements are penetrated, UL-listed fire-rated penetration assemblies approved by the local authority shall be provided in accordance with the manufacturer's instructions to obtain the required rating.


2.4    FOUNDATIONS / HOUSEKEEPING PADS

A. General: All special foundations and supports required for the proper installation of equipment and pipe shall be provided as hereinafter specified and under the section of the specifications covering the equipment, unless otherwise indicated on the drawings.

B. All equipment shall receive concrete housekeeping pads unless otherwise noted. Equipment to be receive pads are to include (but not limited to): air compressors, fire pumps, etc.

C.    Concrete foundations for the support of equipment such as floor-mounted pumps, equipment, etc. shall be not less than 5 1/2 inches high and not less than 4 inches larger (in both directions) than supported unit, unless otherwise noted and shall be poured in forms built of new dressed lumber. All corners of the foundations shall be neatly chaffered by means of sheet metal or triangular wood strips nailed to the form. Pads shall not be laid out directly against walls or structures. 2 inches shall be left available for pad form work. Foundation bolts shall be placed in the forms when the concrete is poured, the bolts being correctly located by means of templates. Allow 1 inch below the equipment bases for alignment and grouting (where applicable). Foundations for equipment located on the exterior of the building shall be provided as indicated. Foundations shall be constructed in accordance with approved shop drawings and shall be reinforced with #4 bars at 12 inches on center both ways (minimum).

2.5    FLOOR AND CEILING PLATES

A.    Except as otherwise noted, provide one-piece chrome-plated brass floor and ceiling plates (or escutcheons) around all pipes, conduits, etc. passing through walls, floors, or ceilings in any spaces, except underfloor and attic spaces. Plates shall be sized to fit snugly against the outside of the pipe or against the outside of insulation on lines which are insulated, and positively secured to such pipe or insulation. Plates will not be required for piping where pipe sleeves extend ¾ of an inch above finish floor and are concealed. Plates shall be one piece.

**PART 3 - EXECUTION**

3.1    SPACE AND EQUIPMENT ARRANGEMENT

A.    The size of equipment indicated on the drawings is based on the dimensions of a particular manufacturer. While other manufacturers will be acceptable, it is the responsibility of the Contractor to determine whether the equipment he proposes to furnish will fit in the space. Shop drawings shall be prepared when required by the Owner's Representative to indicate a suitable arrangement.

B.    All equipment shall be installed in a manner to permit access to all surfaces.

3.2    PROTECTION

A.    The Contractor shall take such precautions as may be necessary to properly protect all materials and equipment from damage from the time of delivery until the completion of work. This shall include the erection of all required temporary shelters and supports to adequately protect any items stored in the open on the site from the weather, the ground and surrounding work; the cribbing of any items above the floor of the construction; and the covering of items in the uncompleted building with tarpaulins or other protective covering. Failure on the part of the Contractor to comply with the above will be sufficient cause for the rejection of the items in question.

B.    The Contractor shall protect existing facilities, the work of others, and the premises from any and all damages that may be made possible by the execution of work.

C.    Equipment and materials shall be protected from rust both before and after installation. Any equipment or materials found in a rusty condition at the time of final inspection must be cleaned of rust and repainted as specified elsewhere in these specifications.

3.3    COOPERATION BETWEEN TRADES AND WITH OTHER CONTRACTORS

A.    Each trade, subcontractor, and/or Contractor must work in harmony with the various trades, subcontractors, and/or Contractors on the job as may be required to facilitate the progress to the best advantage of the job as a whole. Each trade, subcontractor, and/or Contractor must pursue its work promptly and carefully so as not to delay the general progress of the job. This Contractor shall work in harmony with Contractors working under other contracts on the premises.

B.    It shall be the responsibility of each trade to cooperate fully with the other trades on the job to help keep the jobsite in a clean and safe condition. At the end of each day's work, each trade shall properly store all of its

tools, equipment, and materials and shall clean its debris from the job. Upon the completion of the job, each trade shall immediately remove all of its tools, equipment, any surplus materials, and all debris caused by its portion of the work.

3.4     PRECEDENCE OF MATERIALS AND COORDINATION OF WORK

A.      These specifications and the accompanying drawings are intended to cover systems which will not interfere with the structural design of the building, which will fit into the several available spaces, and which will ensure complete and satisfactory systems. Each subcontractor and/or trade shall be responsible for the proper fitting of his material and apparatus into the building.

B.      The work of the various trades shall be performed in the most direct and workmanlike manner without hindering or handicapping the work of other trades. Piping interferences shall be handled by giving precedence to pipe lines which require a stated grade for proper operation. Where space requirements conflict, the following order or precedence shall, in general, be observed:
1.      Building lines.
2.      Structural members.
3.      Light fixtures.
4.      Soil and drain piping.
5.      Condensate drains.
6.      Vent piping.
7.      Supply, return, and outside air ductwork.
8.      Exhaust ductwork.
9.      HVAC water and steam piping.
10.     Steam condensate piping.
11.     Fire protection piping.
12.     Natural gas piping.
13.     Domestic water (cold and hot).
14.     Refrigerant piping.
15.     Electrical conduit.

C.      The light fixture grid layout as indicated on the drawings must be maintained. This Contractor shall refer to all light fixture plans and details indicated on the drawings and shall coordinate the location of dampers, supply grilles, return air grilles, sprinkler heads, etc. with the location of the light fixtures to assure proper access to all items in a manner acceptable to the Owner's Representative.

3.5     CONNECTIONS FOR OTHERS

A.      After the equipment is set in place, this Contractor shall make all final connections and shall provide all required pipe, fittings, valves, traps, connectors, etc.

B.      Provide all air gap fittings required, using materials hereinbefore specified. In each water line serving an item of equipment or piece of machinery, provide a shutoff valve.

C.      Provide all transition pieces, etc. required for a complete installation of equipment provided by others.

3.6     INSTALLATION METHODS

A.      Where to Conceal: All pipes and conduits shall be concealed in pipe chases, walls, furred spaces, below suspended floors, or above the ceilings of the building unless otherwise indicated.

B.      Where to Expose: In mechanical rooms, janitor's closets tight against pan soffits in exposed Tee structures, or storage spaces, but only where necessary, piping and conduit may be run exposed. All exposed piping and conduit shall be run in the neatest, most inconspicuous manner, and parallel or perpendicular to the building lines. All exposed piping to be coordinated with Architect.

C.      Support: All piping and conduit shall be adequately and properly supported from the building structure by means of hanger rods or clamps to walls as herein specified.

D. Maintaining Clearance: Where limited space is available above the ceilings and below concrete beams or other deep projections, pipe and conduit shall be sleeved through the projection where it crosses, rather than hung below them, in a manner to provide maximum above-floor clearance. Sleeves shall be as herein specified. Approval shall be obtained from the Owner's Representative for each penetration.

E. All pipe, conduits, etc. shall be cut accurately to measurements established at the building and shall be worked into place without springing or forcing. All pipes, and conduits run exposed in machinery and equipment rooms shall be installed parallel to the building lines, except that they shall be sloped to obtain the proper pitch. Piping run in furred ceilings, etc. shall be similarly installed, except as otherwise shown. Conduits in furred ceilings and in other concealed spaces may be run at angles to the construction but shall be neatly grouped and racked indicating good workmanship. All conduit and pipe openings shall be kept closed until the systems are closed with final connections.

F. Special Requirements:
1. There shall be no pipe joints nearer than 12 inches to a wall, ceiling, or floor penetration unless pipe joint is a welded or mechanically-coupled-type joint.
2. The Contractor shall study all construction documents and carefully lay out all work in advance of fabrication and erection in order to meet the requirements of the extremely limited spaces. Where conflicts occur, the Contractor shall meet with all involved trades and the Owner's Representative and resolve the conflict prior to erection of any work in the area involved.
3. Prior to the installation of any ceiling material, gypsum, plaster, or acoustical board, the Contractor shall notify the Owner's Representative so that arrangements can be made for an inspection of the above-ceiling area about to be "sealed off." The Contractor shall give as much advance notice as possible up to five (5) working days, but in no case less than three (3) working days.
4. The purpose of this inspection is to verify the completeness and quality of the installation of the air conditioning systems, the plumbing systems, and any other special above-ceiling systems such as pneumatic tube. The ceiling supports (tee bar or lath) should be in place so that access panel and light fixture locations are identifiable and so that clearances and access provisions may be evaluated.
5. No ceiling material shall be installed until the deficiencies listed from this inspection have been corrected to the satisfaction of the Owner's Representative.

3.7 TESTS AND INSPECTIONS

A. General: The Contractor shall make all tests deemed necessary by the inspection departments of the authority having jurisdiction (AHJ is defined as the Texas A&M University System Fire Protection Manager and the Texas A&M university San Antonio Department of Environmental Health and Safety), Board of Underwriters, etc. He shall provide all equipment, materials, and labor for making such tests. Fuel and electrical energy for system operational tests following beneficial occupancy by the Owner will be paid for by the Owner.

B. Other: Additional tests specified hereinafter under the various specification sections shall be made.

C. Notification: The Owner's Representative shall be notified at his office 36 hours prior to each test and other specifications requirements requiring action on the part of the Owner, Architect, Engineer, and/or Owner's Representative.

D. Test Logs: All tests which the Contractor conducts shall have pertinent data logged by the Contractor at the time of testing. Data shall include date, time, personnel, description and extent of system tested, test conditions, test results, specified results, and any other pertinent data. Data shall be delivered to the Owner's Representative as specified under "Requirements for Final Acceptance. Prior to final inspection and testing, contractor shall fill out checklist and sign as required by the Texas A&M University System.

E. Inspections: In general, an inspection by the Owner's Representative shall be required prior to closing up any work and prior to beneficial occupancy or final project completion. The closing up of work includes, but is not limited to, pipe and conduit installations prior to backfilling; mechanical, electrical, and fire protection work prior to placement of concrete; or closing up walls and overhead mechanical, electrical, and fire protection work prior to installation of the ceiling.

3.8 DISCHARGE OF WASTES FROM CONSTRUCTION SITE

A. The Contractor shall comply with all applicable provisions of local, state, and federal laws regarding the discharge of wastes into sewer and waterways. Special caution shall be exercised to prevent the discharge of wastes which contain oil, tar, asphalt, roofing compound, kerosene, gasoline, paint, mud, cement, lime, or other materials which would degrade the water quality of the receiving water course. The Contractor shall construct and maintain oil interceptors, settling basins, acid neutralization tanks, and/or other effective pollution countermeasures, as required by the Texas Water Quality Board.

**END OF SECTION**

**SECTION 210513 - COMMON WORK RESULTS FOR FIRE SUPPRESSION**


**PART 1 - GENERAL**


1.1     RELATED DOCUMENTS

    A.    Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.


1.2     SUMMARY

    A.    This Section includes the following:
        1.    Piping materials and installation instructions.
        2.    Mechanical sleeve seals.
        3.    Sleeves.
        4.    Escutcheons.
        5.    Grout.
        6.    Fire-suppression equipment and piping demolition.
        7.    Equipment installation requirements common to equipment sections.
        8.    Painting and finishing.
        9.    Concrete bases.
        10.   Supports and anchorages.


1.3     DEFINITIONS

    A.    Finished Spaces:  Spaces other than mechanical and electrical equipment rooms, furred spaces, pipe chases, unheated spaces immediately below roof, spaces above ceilings, unexcavated spaces, crawlspaces, and tunnels.

    B.    Exposed, Interior Installations:  Exposed to view indoors.  Examples include finished occupied spaces and mechanical equipment rooms.

    C.    Exposed, Exterior Installations:  Exposed to view outdoors or subject to outdoor ambient temperatures and weather conditions.  Examples include rooftop locations.

    D.    Concealed, Interior Installations:  Concealed from view and protected from physical contact by building occupants.  Examples include above ceilings and in chases.

    E.    Concealed, Exterior Installations:  Concealed from view and protected from weather conditions and physical contact by building occupants but subject to outdoor ambient temperatures.  Examples include installations within unheated shelters.

    F.    The following are industry abbreviations for plastic materials:
        1.    CPVC:  Chlorinated polyvinyl chloride plastic.

    G.    The following are industry abbreviations for rubber materials:
        1.    EPDM:  Ethylene-propylene-diene terpolymer rubber.
        2.    NBR:  Acrylonitrile-butadiene rubber.


1.4     SUBMITTALS

    A.    Product Data:  For the following:
        1.    Mechanical sleeve seals.
        2.    Escutcheons.

B.    Welding certificates.

1.5    QUALITY ASSURANCE

A.    Steel Support Welding:  Qualify processes and operators according to AWS D1.1, "Structural Welding Code--Steel."

B.    Steel Pipe Welding:  Qualify processes and operators according to ASME Boiler and Pressure Vessel Code:  Section IX, "Welding and Brazing Qualifications."
   1.    Comply with provisions in ASME B31 Series, "Code for Pressure Piping."
   2.    Certify that each welder has passed AWS qualification tests for welding processes involved and that certification is current.

C.    Electrical Characteristics for Fire-Suppression Equipment:  Equipment of higher electrical characteristics may be furnished provided such proposed equipment is approved in writing and connecting electrical services, circuit breakers, and conduit sizes are appropriately modified.  If minimum energy ratings or efficiencies are specified, equipment shall comply with requirements.

1.6    DELIVERY, STORAGE, AND HANDLING

A.    Deliver pipes and tubes with factory-applied end caps.  Maintain end caps through shipping, storage, and handling to prevent pipe end damage and to prevent entrance of dirt, debris, and moisture.

1.7    COORDINATION

A.    Arrange for pipe spaces, chases, slots, and openings in building structure during progress of construction, to allow for fire-suppression installations.

B.    Coordinate installation of required supporting devices and set sleeves in poured-in-place concrete and other structural components as they are constructed.

C.    Coordinate requirements for access panels and doors for fire-suppression items requiring access that are concealed behind finished surfaces.  Access panels and doors are specified in Division 08 Section "Access Doors and Frames."

**PART 2 - PRODUCTS**

2.1    MANUFACTURERS

A.    In other Part 2 articles where subparagraph titles below introduce lists, the following requirements apply for product selection:
   1.    Available Manufacturers:  Subject to compliance with requirements, manufacturers offering products that may be incorporated into the Work include, but are not limited to, the manufacturers specified.
   2.    Manufacturers:  Subject to compliance with requirements, provide products by the manufacturers specified.

2.2    PIPE, TUBE, AND FITTINGS

A.    Refer to individual Fire Suppression Sections for pipe, tube, and fitting materials and joining methods.

B.    Pipe Threads:  ASME B1.20.1 for factory-threaded pipe and pipe fittings.

2.3     JOINING MATERIALS

A.     Refer to individual Fire Suppression Sections for joining materials not listed below.

2.4     MECHANICAL SLEEVE SEALS

A.     Description:  Modular sealing element unit, designed for field assembly, to fill annular space between pipe and sleeve.
    1.     Manufacturers:
        a.     Advance Products & Systems, Inc.
        b.     Calpico, Inc.
        c.     Metraflex Co.
        d.     Pipeline Seal and Insulator, Inc.
    2.     Sealing Elements:  EPDM interlocking links shaped to fit surface of pipe.  Include type and number required for pipe material and size of pipe.
    3.     Pressure Plates:  Carbon steel.  Include two for each sealing element.
    4.     Connecting Bolts and Nuts:  Carbon steel with corrosion-resistant coating of length required to secure pressure plates to sealing elements.  Include one for each sealing element.

2.5     SLEEVES

A.     Galvanized-Steel Sheet:  0.0239-inch minimum thickness; round tube closed with welded longitudinal joint.

B.     Steel Pipe:  ASTM A 53, Type E, Grade B, Schedule 40, galvanized, plain ends.

C.     Cast Iron:  Cast or fabricated "wall pipe" equivalent to ductile-iron pressure pipe, with plain ends and integral waterstop, unless otherwise indicated.

D.     Stack Sleeve Fittings:  Manufactured, cast-iron sleeve with integral clamping flange.  Include clamping ring and bolts and nuts for membrane flashing.
    1.     Underdeck Clamp:  Clamping ring with set screws.

E.     Molded PVC:  Permanent, with nailing flange for attaching to wooden forms.

F.     PVC Pipe:  ASTM D 1785, Schedule 40.

G.     Molded PE:  Reusable, PE, tapered-cup shaped and smooth-outer surface with nailing flange for attaching to wooden forms.

2.6     ESCUTCHEONS

A.     Description:  Manufactured wall and ceiling escutcheons and floor plates, with an ID to closely fit around pipe, tube, and insulation of insulated piping and an OD that completely covers opening.

B.     One-Piece, Deep-Pattern Type:  Deep-drawn, box-shaped brass with polished chrome-plated finish.

C.     One-Piece, Cast-Brass Type:  With set screw.
    1.     Finish:  Polished chrome-plated.

D.     Split-Casting, Cast-Brass Type:  With concealed hinge and set screw.
    1.     Finish: Polished chrome-plated.

E.     One-Piece, Stamped-Steel Type:  With set screw and chrome-plated finish.

F.     Split-Plate, Stamped-Steel Type:  With concealed hinge, spring clips, and chrome-plated finish.

G.    One-Piece, Floor-Plate Type:  Cast-iron floor plate.

H.    Split-Casting, Floor-Plate Type:  Cast brass with concealed hinge and set screw.

## 2.7    GROUT

A.    Description:  ASTM C 1107, Grade B, nonshrink and nonmetallic, dry hydraulic-cement grout.
1.    Characteristics:  Post-hardening, volume-adjusting, nonstaining, noncorrosive, nongaseous, and recommended for interior and exterior applications.
2.    Design Mix:  5000-psi, 28-day compressive strength.
3.    Packaging:  Premixed and factory packaged.

## PART 3 - EXECUTION

## 3.1    PIPING SYSTEMS - COMMON REQUIREMENTS

A.    Install piping according to the following requirements and Division 21 Sections specifying piping systems.

B.    Drawing plans, schematics, and diagrams indicate general location and arrangement of piping systems. Indicated locations and arrangements were used to size pipe and calculate friction loss, expansion, pump sizing, and other design considerations.  Install piping as indicated unless deviations to layout are approved on Coordination Drawings.

C.    Install piping in concealed locations, unless otherwise indicated and except in equipment rooms and service areas.

D.    Install piping indicated to be exposed and piping in equipment rooms and service areas at right angles or parallel to building walls.  Diagonal runs are prohibited unless specifically indicated otherwise.

E.    Install piping above accessible ceilings to allow sufficient space for ceiling panel removal.

F.    Install piping to permit valve servicing.

G.    Install piping at indicated slopes.

H.    Install piping free of sags and bends.

I.    Install fittings for changes in direction and branch connections.

J.    Install piping to allow application of insulation.

K.    Select system components with pressure rating equal to or greater than system operating pressure.

L.    Install escutcheons for penetrations of walls, ceilings, and floors according to the following:
1.    New Piping:
a.    Piping with Fitting or Sleeve Protruding from Wall:  One-piece, deep-pattern type.
b.    Chrome-Plated Piping:  One-piece, cast-brass type with polished chrome-plated finish.
c.    Insulated Piping:  One-piece, stamped-steel type with spring clips.
d.    Bare Piping at Wall and Floor Penetrations in Finished Spaces:  One-piece, cast-brass type with polished chrome-plated finish.
e.    Bare Piping at Wall and Floor Penetrations in Finished Spaces:  One-piece, stamped-steel type.
f.    Bare Piping at Ceiling Penetrations in Finished Spaces:  One-piece, cast-brass type with polished chrome-plated finish.
g.    Bare Piping at Ceiling Penetrations in Finished Spaces:  One-piece, stamped-steel type and set screw.

      h.     Bare Piping in Unfinished Service Spaces:  One-piece, cast-brass type with polished chrome-plated finish.

      i.     Bare Piping in Unfinished Service Spaces:  One-piece, stamped-steel type with concealed.

      j.     Bare Piping in Equipment Rooms:  One-piece, cast-brass type.

      k.     Bare Piping in Equipment Rooms:  One-piece, stamped-steel type with set screw.

      l.     Bare Piping at Floor Penetrations in Equipment Rooms:  One-piece, floor-plate type.

M.     Sleeves are not required for core-drilled holes.

N.     Permanent sleeves are not required for holes formed by removable PE sleeves.

O.     Install sleeves for pipes passing through concrete and masonry walls and concrete floor and roof slabs.

P.     Install sleeves for pipes passing through concrete and masonry walls, gypsum-board partitions, and concrete floor and roof slabs.

    1.    Cut sleeves to length for mounting flush with both surfaces.

      a.     Exception:  Extend sleeves installed in floors of mechanical equipment areas or other wet areas 2 inches above finished floor level.  Extend cast-iron sleeve fittings below floor slab as required to secure clamping ring if ring is specified.

    2.    Install sleeves in new walls and slabs as new walls and slabs are constructed.

    3.    Install sleeves that are large enough to provide 1/4-inch annular clear space between sleeve and pipe or pipe insulation.  Use the following sleeve materials:

      a.     Steel Pipe Sleeves:  For pipes smaller than NPS 6.

      b.     Steel Sheet Sleeves:  For pipes NPS 6 and larger, penetrating gypsum-board partitions.

      c.     Stack Sleeve Fittings:  For pipes penetrating floors with membrane waterproofing.  Secure flashing between clamping flanges.  Install section of cast-iron soil pipe to extend sleeve to 2 inches above finished floor level.  Refer to Specification Section "Sheet Metal Flashing and Trim" for flashing.

         1)    Seal space outside of sleeve fittings with grout.

    4.    Except for underground wall penetrations, seal annular space between sleeve and pipe or pipe insulation, using joint sealants appropriate for size, depth, and location of joint.  Refer to Specification Section "Joint Sealants" for materials and installation.

Q.     Aboveground, Exterior-Wall Pipe Penetrations:  Seal penetrations using sleeves and mechanical sleeve seals.  Select sleeve size to allow for 1-inch annular clear space between pipe and sleeve for installing mechanical sleeve seals.

    1.    Install steel pipe for sleeves smaller than 6 inches in diameter.

    2.    Install cast-iron "wall pipes" for sleeves 6 inches and larger in diameter.

    3.    Mechanical Sleeve Seal Installation:  Select type and number of sealing elements required for pipe material and size. Position pipe in center of sleeve.  Assemble mechanical sleeve seals and install in annular space between pipe and sleeve.  Tighten bolts against pressure plates that cause sealing elements to expand and make watertight seal.

R.     Underground, Exterior-Wall Pipe Penetrations:  Install cast-iron "wall pipes" for sleeves.  Seal pipe penetrations using mechanical sleeve seals.  Select sleeve size to allow for 1-inch annular clear space between pipe and sleeve for installing mechanical sleeve seals.

    1.    Mechanical Sleeve Seal Installation:  Select type and number of sealing elements required for pipe material and size. Position pipe in center of sleeve.  Assemble mechanical sleeve seals and install in annular space between pipe and sleeve.  Tighten bolts against pressure plates that cause sealing elements to expand and make watertight seal.

S.     Fire-Barrier Penetrations:  Maintain indicated fire rating of walls, partitions, ceilings, and floors at pipe penetrations.  Seal pipe penetrations with firestop materials.  Refer to Specification Section "Penetration Firestopping" for materials.

T.     Verify final equipment locations for roughing-in.

U.     Refer to equipment specifications in other Sections of these Specifications for roughing-in requirements.

3.2     PAINTING

A.      Painting of fire-suppression systems, equipment, and components is specified in Specification Sections "Interior Painting" and "Exterior Painting."

B.      Damage and Touchup:  Repair marred and damaged factory-painted finishes with materials and procedures to match original factory finish.

C.      Sprinkler heads are **not** to be painted.

3.3     CONCRETE BASES

A.      Concrete Bases:  Anchor equipment to concrete base according to equipment manufacturer's written instructions and according to seismic codes at Project.

   1.   Construct concrete bases of dimensions indicated, but not less than 4 inches larger in both directions than supported unit.
   2.   Install dowel rods to connect concrete base to concrete floor.  Unless otherwise indicated, install dowel rods on 18-inch centers around the full perimeter of the base.
   3.   Install epoxy-coated anchor bolts for supported equipment that extend through concrete base, and anchor into structural concrete floor.
   4.   Place and secure anchorage devices.  Use supported equipment manufacturer's setting drawings, templates, diagrams, instructions, and directions furnished with items to be embedded.
   5.   Install anchor bolts to elevations required for proper attachment to supported equipment.
   6.   Install anchor bolts according to anchor-bolt manufacturer's written instructions.
   7.   Use 3000-psi, 28-day compressive-strength concrete and reinforcement as specified in Division 03.

3.4     ERECTION OF METAL SUPPORTS AND ANCHORAGES

A.      Refer to Specification Section "Metal Fabrications" for structural steel.

B.      Cut, fit, and place miscellaneous metal supports accurately in location, alignment, and elevation to support and anchor fire-suppression materials and equipment.

C.      Field Welding:  Comply with AWS D1.1.

3.5     GROUTING

A.      Mix and install grout for fire-suppression equipment base bearing surfaces, pump and other equipment base plates, and anchors.

B.      Clean surfaces that will come into contact with grout.

C.      Provide forms as required for placement of grout.

D.      Avoid air entrapment during placement of grout.

E.      Place grout, completely filling equipment bases.

F.      Place grout on concrete bases and provide smooth bearing surface for equipment.

G.      Place grout around anchors.

H.      Cure placed grout.

**END OF SECTION**

**SECTION 211313 - FIRE SUPPRESSION PIPING WET-PIPE SPRINKLER SYSTEM**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.     Drawings and general provision of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.     This Section includes the following fire-suppression piping system(s) inside the building. See other specification sections for additional systems requirements.
   1.     Wet-pipe sprinkler systems.

   B.     Related Sections include the following:
   1.     Specification Section "Fire Alarm" for alarm devices not specified in this Section.
   2.     Specification Section "Basic Fire Protection Materials and Methods."
   3.     Specification Section "Special Conditions for all Fire Suppression Work."

   C.     Scope of Work: Install a complete wet-pipe fire sprinkler system **Per NFPA**.

1.3     DEFINITIONS

   A.     High-Pressure Piping System: Fire-suppression piping system designed to operate at working pressure high than standard 175 psig.

   B.     Underground Service-Entrance Piping: Underground service piping below the building.

   C.     AHJ: Texas A&M University System Fire Protection System Fire Protection Manager and the Texas A&M University San Antonio Department of Environmental Health and Safety.

1.4     SYSTEM DESCRIPTION

   A.     Wet-Pipe Sprinkler System: Automatic sprinklers are attached to piping containing water and that is connected to water supply. Water discharges immediately from sprinklers when they are opened. Sprinklers open when heat melts fusible link or destroys frangible device. Hose connections are included if indicated.

1.5     PERFORMANCE REQUIREMENTS

   A.     Standard Piping System Component Working Pressure: Listed for at least 175 psig.

   B.     Fire-suppression sprinkler system design shall be approved for authorities having jurisdiction.
   1.     Margin of Safety for Available Water Flow and Pressure: 10 percent, including losses through water-service piping; valves, and backflow preventers.
   2.     Sprinkler Occupancy Hazard Classifications:
   a.     Building Service Areas: Ordinary Hazard, Group 1.
   b.     Electrical Equipment Rooms: Ordinary Hazard, Group 1.
   c.     General Storage Areas: Ordinary Hazard, Group 1.
   d.     Mechanical Equipment Rooms: Ordinary Hazard, Group 1.
   e.     Office and Public Areas: Light Hazard.
   3.     Minimum Density for Automatic-Sprinkler Piping Design:
   a.     Light-Hazard Occupancy: 0.10 gpm over 1500-sq.ft. (6.3 mL/s over 139-sq. m) area.

      b.     Ordinary-hazard, Group 1 Occupancy: 0.15 gpm over 1500-sq. ft. (9.5 mL/s over 139-sq. m) area.

4.     Total Combined Hose-Stream Demand Requirement: According to NFPA 13, unless otherwise indicated:

      a.     Light-Hazard Occupancies: 100 gpm (6.3 L/s) for 30 minutes.

      b.     Ordinary-Hazard Occupancies: 250 gpm (15.75 L/s) for 60 to 90 minutes.

5.     Standpipe System:

      a.     Class I, Automatic Wet.

## 1.6     SUBMITTALS

A.     Product Data: For the following: **All products must be UL and/or FMG**

1.     Piping materials, including dielectric fittings and sprinkler specialty fittings.

2.     Pipe hangers and supports.

3.     Valves, including listed fire-protection valves, unlisted general-duty valves, and specialty valves and trim.

4.     Sprinklers, escutcheons, and guards. Include sprinkler flow characteristics, mounting, finish, and other pertinent data.

5.     Hose connections, including size, type, and finish.

6.     Hose stations, including size, type, and finish of hose connections; type and length of fire hoses; finish of fire hose couplings; type, material, and finish of nozzles; and finish of rack.

7.     Alarm devices, including electrical data.

B.     Shop Drawings: Diagram power, signal, and control wiring.

C.     Fire-hydrant flow test report.

D.     Approved Sprinkler Piping Drawings: Working Plans, prepared according to NFPA 13, that have been approved by authorities having jurisdiction, including hydraulic calculations.

E.     Field Test Reports and Certificates: Indicate and interpret test results for compliance with performance requirements and as described in NFPA 13. Include "Contractor's Material and Test Certificate for Aboveground Piping" and "contractor's Material and Test Certificate for Underground Piping."

F.     Welding certificates.

G.     Field quality-control test reports.

H.     Operation and Maintenance Data: For sprinkler specialties to include in emergency, operation and maintenance manuals.

## 1.7     QUALITY ASSURANCE

A.     Installer Qualifications: Installer's responsibilities include designing, fabricating, and installing fire-suppression systems and providing design services needed to assume engineering responsibility. Base calculations on results of fire-hydrant flow test. All work is to be executed by an RME employed by the installing contractor.

B.     Welding: Qualify processes and operators according to ASME Boiler and Pressure Vessel Code: Section IX.

C.     Steel Pipe Welding: Quality processes and operators according to ASME Boiler and Pressure Vessel Code: Section IX, "Welding and Brazing Qualifications."

1.     Comply with provisions in ASME B31 Series, "Code for Pressure Piping."

2.     Certify that each welder has passed AWS qualification tests for welding processes involved and that certification is current.

D.     NFPA Standards: Fire-suppression-system equipment, specialties, accessories, installation, and testing shall comply with the following:

1. NFPA 13, "Installation of Sprinkler Systems."
2. NFPA 14, ""Standard for the Installation of Standpipe and Hose Systems"
3. NFPA 230, "Fire Protection of Storage."
4. NFPA 231, "Standard for General Storage."

1.8     COORDINATION

A.     Coordinate layout and installation of sprinklers with other construction that penetrates ceilings, including light fixtures, HVAC equipment, and partition assemblies.

1.9     EXTRA MATERIALS

A.     Furnish extra materials described below that match products installed and that are packaged with protective covering for storage and identified with labels describing contents.
    1.     Sprinkler Cabinets: Finished, wall-mounting, steel cabinet with hinged cover, with space for minimum of six spare sprinklers plus sprinkler wrench. Include number of sprinklers required by NFPA 13 and sprinkler wrench. Include separate cabinet with sprinklers and wrench for each type of sprinkler on Project.

1.10     STORAGE OF MATERIALS

A.     Store all piping on site in a clean, dry, clear area on the jobsite – covered and protected from the elements.  Pipe is not to be directly on the ground, support pipe off of ground by wood blocking or other material.  All pipe ends are to be capped and protected from the elements until piping is ready for installation.  Any piping not covered or protected will be required to be removed from the jobsite and replaced at no cost to the owner.

**PART 2 - PRODUCTS**

2.1     MANUFACTURERS

A.     Provide products from one of the following manufacturers:
    1.     Viking Corp.
    2.     Anvil International, Inc.
    3.     VGS by Viking
    4.     Flex head
    5.     ARGCO (Allied Rubber & Gasket Co.)
    6.     Tyco
    7.     Victaulic Co. of America
    8.     Ward Manufacturing
    9.     Milwaukee Valve Company
    10.    Sigma Valve Co.
    11.    Mueller Company
    12.    NIBCO
    13.    Reliable Automatic Sprinkler Co., Inc.
    14.    Watts Industries, Inc.; Water Products Div.
    15.    Guardian Fire Equipment Incorporated

2.2     DUCTILE-IRON PIPE AND FITTINGS

A.     Mechanical-Joint, Ductile-Iron Pipe: AWWA C151, with mechanical-joint bell end and plain end.
    1.     Mechanical-Joint, Ductile-Iron Fittings: AWWA C110, ductile- or gray-iron standard pattern.
    2.     Glands, Gaskets, and Bolts: AWWA C111, ductile- or gray-iron gland, rubber gasket, and steel bolts and nuts.

B.     Push-on-Joint, Ductile-Iron Fittings: AWWA C151, with push-on-joint bell end and plain end.

       1.      Push-on-Joint, Ductile-Iron Fittings: AWWA C110, ductile- or gray-iron standard pattern.
       2.      Gaskets: AWWA C111, rubber.

C.     Corrosion-Protective Encasement for Piping
       1.      Encasement for Underground Metal Piping: ASTM A674 or AWWA C105, PE film, 0.008-inch minimum thickness, tube or sheet.

## 2.3 STEEL PIPE AND FITTINGS

A.     All steel pipe to be threaded end, grooved end or weld-thread/grooved-end only. Hex/ reducing bushing, locking lug or saddle fittings are NOT acceptable.

B.     Threaded-End, Standard-Weight Schedule 40 Steel Pipe: ASTM 135 and with factory- or field-formed threaded ends.
       1.      Cast-Iron Threaded: ASME B16.1, Class 125.
       2.      Malleable-Iron Threaded Fittings: ASME B16.3, Class 150.
       3.      Steel Threaded Pipe Nipples: ASME A733, made of ASTM A 53/A 53M or ASTM A106, Schedule 40. Include ends matching joining method.

C.     Grooved-End, Standard-Weight Schedule 40 Steel Pipe: ASTM A 135 and with factory- or field-formed, square-cut- or roll-grooved ends.
       1.      Grooved-End Fittings: UL-listed, ASTM A 536, ductile-iron casting with OD matching steel-pipe OD.
       2.      Grooved-End-Pipe Couplings: UL 213 and AWWA C606, rigid pattern, unless otherwise indicated; gasketed fitting matching steel-pipe OD. Include ductile-iron housing with keys matching steel-pipe and fitting grooves, pre-lubricated rubber gasket listed for use with housing, and steel bolts and nuts.

D.     Welded-Threaded-End/Grooved-End, Schedule 40 Steel Fittings: ASTM A 53, Grade A (Weld-o-let).
       1.      UL/FM approved.
       2.      Size-on-Size not permitted.

## 2.4 SPRINKLER SPECIALTY FITTINGS

A.     Sprinkler specialty fittings shall be UL listed or FMG approved, with 175-psig minimum working-pressure rating and made of materials compatible with piping.

B.     Sprinkler Drain and Alarm Test Fittings: Cast- or ductile-iron body; with threaded inlet and outlet, test valve and orifice and sight glass.

C.     Sprinkler Branch-Line Test Fittings: Brass body with threaded inlet, capped drain outlet, and threaded outlet for sprinkler.

D.     Sprinkler Inspector's Test Fitting: Cast- or ductile-iron housing with threaded inlet and drain outlet and sight glass.

E.     Drop-Nipple Fittings: UL 1474, adjustable with threaded inlet and outlet and seals.

F.     Flexible Drops: Flexible drops are NOT allowed.

## 2.5 LISTED FIRE-PROTECTION VALVES

A.     Valves shall be UL listed or FMG approved, with 175-psig minimum pressure rating.

B.     Ball Valves: Comply with UL 1091, except with ball instead of disc.
       1.      NPS 1-1/2 and Smaller: Bronze body with threaded ends.
       2.      NPS 2 and NPS 2-1/2: Bronze body with threaded ends or ductile-iron body with grooved ends.
       3.      NPS 3: Ductile-iron body with grooved ends.

C. Butterfly Valves: UL 1091.
1. NPS 2 and Smaller: Bronze body with threaded ends.
2. NPS 2-1/2 and Larger: Bronze, cast-iron, or ductile-iron body; wafer type or with flanged or grooved ends.

D. Check Valves NPS 2 and Larger: UL 312, swing type, cast-iron body with flanged or grooved ends.

E. Gate Valves: UL 262, OS&Y type.
1. NPS 2 and Smaller: Bronze body with threaded ends.
2. NPS 2-1/2 and Larger: Cast-iron body with flanged ends.

## 2.6 UNLISTED GENERAL-DUTY VALVES

A. Ball Valves NPS 2 and Smaller: 2-piece copper-alloy body with stainless steel trim, 600-psig minimum CWP rating, blowout-proof stem, and threaded ends.

B. Check Valves NPS 2 and Smaller: Type 4, Class 125 minimum, swing type with bronze body, nonmetallic disc, and threaded ends.

C. Gate Valves NPS 2 and Smaller: Type 2, Class 125 minimum, with bronze body, solid wedge, and threaded ends.

D. Globe Valves NPS 2 and Smaller: Type 2, Class 125 minimum, with bronze body, nonmetallic disc, and threaded ends.

## 2.7 SPECIALTY VALVES

A. Sprinkler System Control Valves: UL listed or FMG approved, cast- or ductile-iron body with flanged or grooved ends, and 175-psig minimum pressure rating.
1. Alarm Check Valves: UL 193, designed for horizontal or vertical installation, with bronze grooved seat with O-ring seals, single-hinge pin, and latch design. Include trim sets for bypass, drain, electrical sprinkler alarm switch, pressure gages, retarding chamber and fill-line attachment with strainer.
a. Drip Cup Assembly: Pipe drain without valves and separate from main drain piping.
b. Drip Cup Assembly: Pipe drain with check valve to main drain piping.

B. Automatic Drain Valves: UL 1726, NPS 3/4, ball-check device with threaded ends.

## 2.8 SPRINKLERS

A. Sprinklers shall be UL listed or FMG approved, Viking or equal with 175-psig minimum pressure rating.

B. Automatic Sprinklers: With heat-responsive element complying with the following:
1. UL 199, for nonresidential applications.
2. UL 1767, for early-suppression, fast-response applications.

C. Sprinkler types, features and options as follows: Viking or equal
1. Concealed ceiling sprinklers, including cover plate.
2. Extended-coverage sprinklers.
3. Flow-control sprinklers, with automatic open and shutoff feature.
4. Flush ceiling sprinklers, including escutcheon.
5. High-pressure sprinklers.
6. Institution sprinklers, made with a small, breakaway projection.
7. Open sprinklers.
8. Pendent sprinklers.
9. Pendent, dry-type sprinklers.
10. Quick-response sprinklers.
11. Recessed sprinklers, including escutcheon.

12.    Sidewall sprinklers.
13.    Sidewall, dry-type sprinklers.
14.    Upright sprinklers.

D.    Sprinkler Finishes: Chrome plated, bronze, and painted.

E.    Special Coatings: Wax, lead, ENT and corrosion-resistant paint.

F.    Sprinkler Escutcheons: Materials, types and finishes for the following sprinkler mounting applications. Escutcheons for concealed, flush, and recessed-type sprinklers are specified with sprinklers.
1.    Ceiling Mounting: Chrome-plated steel, one piece, flat.
2.    Sidewall Mounting: Chrome-plated steel, one piece, flat.

G.    Sprinkler Guards: Viking or equal Wire-cage type, including fastening device for attaching to sprinkler.

2.9    HOSE CONNECTIONS

A.    Description: UL 668, brass or bronze, 300-psig minimum pressure rating, hose valve for connecting fire hose. Include angle or gate pattern design, as indicated; female NPS inlet and male hose outlet; and lugged cap, gasket, and chain. Include NPS 1-1/2 or NPS 2-1/2 as indicated, and hose valve threaded according to NFPA 1963 and matching local fire department threads.
1.    Valve Operation: Nonadjustable type.
2.    Finish: Rough metal or chrome-plated, as indicated.

2.10    FIRE DEPARTMENT CONNECTIONS

A.    Exposed, Freestanding-Type, Fire Department Connections: UL 405, 175-psig minimum pressure rating; with corrosion-resistant-metal body, brass inlets with threads according to NFPA 1963 and matching local fire department sizes and threads, and bottom outlet with pipe threads. Include brass lugged caps, gaskets, and brass chains; brass lugged swivel connection and drop clapper for each hose-connection inlet; 18-inch-high, brass sleeve; and round, floor, brass escutcheon plate with marking "AUTO SPKR & STANDPIPE."
1.    Finish Including Sleeve: Polished brass.

B.    Wall-Type, Fire Department Connection: UL 405, 175-psig minimum pressure rating, with corrosion-resistant-metal body with brass inlets, brass wall escutcheon plate, brass lugged caps with gaskets and brass chains, and brass lugged swivel connections. Include inlets with threads according to NFPA 1963 and matching local fire department sizes and threads, outlet with pipe threads, extension pipe nipples, check devices or clappers for inlets, and escutcheon plate with marking similar to "AUTO SPKR & STANDPIPE."
1.    Type: Flush, with multiple inlets and square or rectangular escutcheon plate.
2.    Type: Exposed, projecting, with two inlets and round escutcheon plate.
3.    Finish: Polished brass.

C.    Provide FDC signage in accordance with Texas State Fire Marshal's Office Notice.

2.11    ALARM DEVICES

A.    Alarm-device types shall match piping and equipment connections.

B.    Water-Motor-Operated Alarm: UL 753, mechanical-operation type with pelton-wheel operator with shaft length, bearings, and sleeve to suit wall construction and 10-inch diameter, cast-aluminum alarm gong with red-enamel factory finish. Include NPS 3/4 inlet and NPS 1 drain connections.

C.    Water-Flow Indicator: UL 346, electrical-supervision, paddle-operated-type, water-flow detector with 250-psig pressure rating and designed for horizontal or vertical installation. Include two single pole, double-throw circuit switches for isolated alarm and auxiliary contacts, 7A, 125-V ac and 0.25 A, 24-V

dc; complete with factory-set, field-adjustable retard element to prevent false signals and tamperproof cover that sends signal if removed.

D. Pressure Switch: UL 753, electrical-supervision-type, water-flow switch with retard feature. Include single-pole, double-throw, normally closed contacts and design that operates on rising pressure and signals water flow.

E. Valve Supervisory Switch: UL 753, electrical, single-pole, double-throw switch with normally closed contacts. Include design that signals controlled valve is in other than fully open position.

2.12    PRESSURE GAGES

A. Description: UL 393, 3-1/2 to 4-1/2-inch diameter, dial pressure gage with range of 0 to 250 psig minimum.
    1.    Water System Piping: Include caption "WATER" or "AIR/WATER" on dial face.
    2.    Air System Piping: Include retard feature and caption "AIR" or "AIR/WATER" on dial face.

**PART 3 - EXECUTION**

3.1    PREPARATION

A. Perform fire-hydrant flow test according to NFPA 13, FMG and NFPA 291. Use results for system design calculations required in Part 1 "Quality Assurance" Article.

B. Report test results promptly and in writing.

3.2    EXAMINATION

A. Examine roughing-in for hose connections and stations to verify actual locations of piping connections before installation.

B. Examine walls and partitions for suitable thicknesses, fire- and smoke-rated construction, framing for hose-station cabinets, and other conditions where hose connections and stations are to be installed.

C. Proceed with installation only after unsatisfactory conditions have been corrected.

3.3    PIPING APPLICATIONS, GENERAL

A. Shop weld pipe joints welded piping as indicated.

B. Flanges, flanged fittings, unions, nipples, and transition and special fittings with finish and pressure ratings same as or higher than system's pressure rating may be used in aboveground applications, unless otherwise indicated.

C. Piping between Fire Department Connections and Check Valves: Galvanized, standard-weight Schedule 40 steel pipe with threaded ends; cast- or malleable-iron threaded fittings; and threaded joints.

D. Underground Service-Entrance Piping: Ductile-iron, mechanical-joint pipe and fittings and restrained joints. Include corrosion-protective encasement.

3.4    SPRINKLER SYSTEM PIPING APPLICATIONS

A. Standard-pressure, Wet-Pipe Sprinkler System, 175-psig Maximum Working Pressure;

        1.     All piping NPS 2 and smaller shall be the following: Standard weight Schedule 40 threaded steel pipe, cast or malleable iron threaded fittings.

        2.     All piping NPS 2-1/2 and larger shall be the following: Schedule 40 steel pipe, grooved fittings and welded fittings.

B.     Water Service Pipe (up to Alarm Riser)
        1.     Mechanical-Joint, Ductile Iron and fittings (above ground).
        2.     Push-on-joint, Ductile Iron (underground).

## 3.5    VALVE APPLICATIONS

A.     Drawings indicate valve types to be used. Where specific valve types are not indicated, the following requirements apply:
        1.     Listed Fire-Protection Valves: UL listed and FMG approved for applications where required by NFPA 13.
            a.     Shutoff Duty: Use ball, butterfly, or gate valves.
        2.     Unlisted General-Duty Valves: For applications where UL-listed and FMG-approved valves are not required by NFPA 13.
            a.     Shutoff Duty: Use ball, butterfly, or gate valves.

## 3.6    JOINT CONSTRUCTION

A.     Refer to Specification Section "Basic Fire Suppression Materials and Methods" for basic piping joint construction.

B.     Threaded Joints: Comply with NFPA 13 for pipe thickness and threads. Do not thread nipples shorter than 8 inches with wall thickness less than Schedule 40 unless approved by authorities having jurisdiction and threads are checked by a ring gage and comply with ASME B1.20.1.

C.     Grooved Joints: Assemble joints with listed Viking or equal coupling and gasket, lubricant, and bolts.
        1.     Steel Pipe: Square-cut or roll-groove piping. Use grooved-end fittings and rigid, grooved-end-pipe couplings, unless otherwise indicated.

D.     Malleable Iron Joints:
        1.     Locking-lug fittings UL 213, malleable iron body with retainer lugs that require one quarter turn to secure pipe in fitting.

## 3.7    SERVICE-ENTRANCE PIPING

A.     Connect fire-suppression piping to water-service piping of size and in location indicated for service entrance to building. Refer to Specification Section "Water Distribution" for exterior piping.

B.     Install shutoff valve, check valve, pressure gage and drain at connection to water service.

## 3.8    PIPING INSTALLATION

A.     Refer to Specification Section "Basic Fire Suppression Materials and Methods" for basic piping installation.

B.     Locations and Arrangements: Drawing plans, schematics, and diagrams indicate general location and arrangement of piping. Install piping as indicated, as far as practical.
        1.     Deviations from approved working plans for piping require written approval from authorities having jurisdiction. File written approval with Architect before deviating from approved working plans.

C.     Install underground ductile-iron service-entrance piping according to NFPA 24 and with restrained joints. Encase piping in corrosion-protective encasement.

D. Use approved fittings to make changes in direction, branch takeoffs from mains, and reductions in pipe sizes. Saddle fittings or saddle couplings are NOT approved.

E. Install unions adjacent to each valve in pipes NPS 2 and smaller. Unions are not required on flanged devices or in piping installations using grooved joints.

F. Install flanges or flange adapters on valves, apparatus, and equipment having NPS 2-1/2 and larger connections.

G. Install "Inspector's Test Connections" in sprinkler system piping, complete with shutoff valve, sized and located according to NFPA 13.

H. Install sprinkler piping with drains for complete system drainage.

I. Install sprinkler zone control valves, test assemblies and drain risers adjacent to standpipes when sprinkler piping is connected to standpipes.

J. Bushings are not permitted.

K. Install drain valves on standpipes.

L. Install ball drip valves to drain piping between fire department connections and check valves. Drain to floor drain or outside building.

M. Install alarm devices in piping systems.

N. Hangers and Supports: Comply with NFPA 13 for hanger materials.
   1. Install sprinkler system piping according to NFPA 13.
   2. All hangers and supports to be galvanized.
   3. All supports to be secured to building structure.
   4. All supports to be listed as a support system (pipe not acceptable as supports).
   5. Pipe Support: All pipes throughout the building, both horizontal and vertical, shall be adequately supported from the construction to line of grade, with proper provision for expansion, contraction, vibration elimination, and anchorage. Vertical pipe shall be supported from floor lines with riser clamps sized to fit the lines and to adequately support their weight. At the bases of lines, where required for proper support, provide anchor base fittings or other approved supports.

O. Install pressure gages on riser or feed main, at each sprinkler test connection, and at top of each standpipe. Include pressure gages with connection not less than NPS 1/4 and with soft metal seated globe valve, arranged for draining pipe between gage and valve. Install gages to permit removal, and install where they will not be subject to freezing.

P. Fill wet-pipe sprinkler system piping with water.

3.9   VALVE INSTALLATION

A. Install listed fire-protection valves, unlisted general-duty valves, specialty valves and trim, controls, and specialties according to NFPA 13 and authorities having jurisdiction.

B. Install listed fire-protection shutoff valves supervised-open, located to control sources of water supply except from fire department connections. Install permanent identification signs indicating portion of system controlled by each valve.

C. Install check valve in each water-supply connection. Install backflow preventers instead of check valves in potable-water supply sources.

D. Specialty Valves:
   1. Alarm Check Valves: Install in vertical position for proper direction of flow, including bypass check valve and retarding chamber drain-line connection.

3.10    SPRINKLER APPLICATIONS

A.    Drawings indicate sprinkler types to be used. Where specific types are not indicated, use the following sprinkler types:
1.    Rooms without Ceilings: Upright sprinklers.
2.    Rooms with Suspended Ceilings: Recessed sprinklers.
3.    Platforms: Concealed sprinklers.
4.    Wall Mounting: Sidewall sprinklers.
5.    Spaces Subject to Freezing: Pendent, dry sprinklers; and sidewall, dry sprinklers as indicated.
6.    Special Applications: Quick-response sprinklers where indicated.
7.    Sprinkler Finishes:
a.    Upright, Pendent, and Sidewall Sprinklers: Chrome plated in finished spaces exposed to view; rough bronze in unfinished spaces not exposed to view; wax coated where exposed to acids, chemicals, or other corrosive fumes.
b.    Concealed Sprinklers: Rough brass, with factory-painted white cover plate.
c.    Recessed Sprinklers: Bright chrome, with bright chrome escutcheon.

3.11    SPRINKLER INSTALLATION

A.    Install sprinklers in suspended ceilings in center of narrow dimension and at 1/4, 1/2, or 3/4 points of long dimension of acoustical ceiling panels and tiles.

B.    Do not install pendent or sidewall, wet-type sprinklers in areas subject to freezing. Use dry-type sprinklers with water supply from heated space.

3.12    FIRE DEPARTMENT CONNECTION INSTALLATION

A.    Install freestanding-type, fire department connection in level surface.
1.    Install protective pipe bollards on three sides of each fire department connection. Refer to Specification Section "Metal Fabrications" for pipe bollards.

B.    Install wall-type, Fire Department connection in vertical wall (reference details).

C.    Install ball drip valve at each check valve for fire department connection.

3.13    CONNECTIONS

A.    Drawings indicate general arrangement of piping, fittings, and specialties.

B.    Install piping adjacent to equipment to allow service and maintenance.

C.    Connect water-supply piping to fire-suppression piping. Include backflow preventer between potable-water piping and fire-suppression piping. Refer to Specification Section "Plumbing Specialties" for backflow preventers.

D.    Install ball drip valves at each check valve for fire department connection. Drain to floor drain or outside building.

E.    Connect piping to specialty valves, hose valves, specialties, fire department connections, and accessories.

F.    Electrical Connections: Power wiring is specified in Electrical Specifications.

G.    Connect alarm devices to fire alarm.

H.    Ground equipment according to Specification Section "Grounding and Bonding."

I.    Connect wiring according to Specification Section "Conductors and Cables."

J.    Tighten electrical connectors and terminals according to manufacturer's published torque-tightening values. If manufacturer's torque valves are not indicated, use those specified in UL 486A and UL 486B.

3.14    LABELING AND IDENTIFICATION

A.    Install labeling and pipe markers on equipment and piping according to requirements in NFPA 13.

B.    All pipe shall be clearly identified in mechanical rooms and congested areas.

3.15    FIELD QUALITY CONTROL

A.    Perform the following field tests and inspections and prepare test reports:
1.    Leak Test: After installation, charge system and test for leaks. Repair leaks and retest until no leaks exist.
2.    Test and adjust controls and safeties. Replace damaged and malfunctioning controls and equipment.
3.    Energize circuits to electrical equipment and devices.
4.    Start and run excess-pressure pumps.
5.    Flush, test, and inspect sprinkler systems according to NFPA 13, "Systems Acceptance" Chapter.
6.    Coordinate with fire alarm tests. Operate as required.
7.    Verify that equipment hose threads are same as local fire department equipment.

B.    Report test results promptly and in writing to Architect and authorities having jurisdiction.

C.    Test to be witnessed by AHJ or their designated representative.  Prior to final inspection and testing, prepare and sigh Texas A&M University System checklist.

3.16    CLEANING AND PROTECTION

A.    Clean dirt and debris from sprinklers.

B.    Remove and replace sprinklers with paint or corrosion other than factory finish.

C.    Protect sprinklers from damage until Substantial Completion.

D.    All material to be protected from weather and shall not be installed rusted or weathered.

3.17    DEMONSTRATION

A.    Engage a factory-authorized service representative to train Owner's maintenance personnel to adjust, operate, and maintain specialty valves. Refer to Specification Section "Demonstration and Testing."

**END OF SECTION**

**SECTION 220006 - PLUMBING DEMOLITION**

**PART 1 - GENERAL**

1.1     SUMMARY

A.     This Section includes the following:
    1.     Demolition and removal of selected portions of building or structure.
    2.     Demolition and removal of selected site elements.
    3.     Salvage of existing items to be reused or recycled.

1.2     DEFINITIONS

A.     Remove or Demolish:  Detach items from existing construction and legally dispose of them off-site, unless indicated to be removed and salvaged or removed and reinstalled.

B.     Remove and Salvage:  Detach items from existing construction and deliver them to Owner cleaned, packaged, and ready for reuse.

C.     Remove and Reinstall:  Detach items from existing construction, prepare them for reuse, and reinstall them where indicated.

D.     Existing to Remain:  Existing items of construction that are not to be removed and that are not otherwise indicated to be removed, removed and salvaged, or removed and reinstalled.

1.3     MATERIALS OWNERSHIP

A.     Historic items, relics, and similar objects including, but not limited to, cornerstones and their contents, commemorative plaques and tablets, antiques, and other items of interest or value to Owner that may be encountered during selective demolition remain Owner's property.  Carefully remove and salvage each item or object in a manner to prevent damage and deliver promptly to Owner.
    1.     Coordinate with Owner's representative, who will establish special procedures for removal and salvage.

1.4     SUBMITTALS

A.     Schedule of Selective Demolition Activities:  Indicate the following:
    1.     Detailed sequence of selective demolition and removal work, with starting and ending dates for each activity.
    2.     Interruption of utility services.  Indicate how long utility services will be interrupted.
    3.     Coordination for shutoff, capping, and continuation of utility services (including but not limited to: Gas, Water, Fire Suppression, Chilled Water, Hot Water, Air Conditioning, etc).
    4.     Coordination of Owner's continuing occupancy of portions of existing building and of Owner's partial occupancy of completed Work.
    5.     Means of protection for items to remain and items in path of waste removal from building.

B.     Inventory:  After selective demolition is complete, submit a list of items that have been salvaged.

1.5     QUALITY ASSURANCE

A.     Regulatory Requirements:  Comply with governing EPA notification regulations before beginning selective demolition.  Comply with hauling and disposal regulations of authorities having jurisdiction.

B.     Standards:  Comply with ANSI A10.6 and NFPA 241.

C.   Pre-demolition Conference:  Conduct conference at Project site to comply with requirements in Section "Project Management and Coordination."   Review methods and procedures related to selective demolition including, but not limited to, the following:
1.   Inspect and discuss condition of construction to be selectively demolished.
2.   Review structural load limitations of existing structure.
3.   Review and finalize selective demolition schedule and verify availability of materials, demolition personnel, equipment, and facilities needed to make progress and avoid delays.
4.   Review requirements of work performed by other trades that rely on substrates exposed by selective demolition operations.
5.   Review areas where existing construction is to remain and requires protection.

1.6   PROJECT CONDITIONS

A.   Owner will occupy portions of building immediately adjacent to selective demolition area.  Conduct selective demolition so Owner's operations will not be disrupted.

B.   Conditions existing at time of inspection for bidding purpose will be maintained by Owner as far as practical.

C.   Notify Architect of discrepancies between existing conditions and Drawings before proceeding with selective demolition.

D.   Hazardous Materials:  It is unknown whether hazardous materials will be encountered in the Work.
1.   If materials suspected of containing hazardous materials are encountered, do not disturb; immediately notify Architect and Owner.  Owner will remove hazardous materials under a separate contract.

E.   Storage or sale of removed items or materials on-site is not permitted.

F.   Utility Service:  Maintain existing utilities indicated to remain in service and protect them against damage during selective demolition operations.
1.   Maintain fire-protection facilities in service during selective demolition operations.

1.7   WARRANTY

A.   Existing Warranties:  Remove, replace, patch, and repair materials and surfaces cut or damaged during selective demolition, by methods and with materials so as not to void existing warranties.

**PART 2  -  PRODUCTS (Not Used)**

**PART 3  -  EXECUTION**

3.1   EXAMINATION

A.   Verify that utilities have been disconnected and capped.

B.   Survey existing conditions and correlate with requirements indicated to determine extent of selective demolition required.

C.   Inventory and record the condition of items to be removed and reinstalled and items to be removed and salvaged.

D.   When unanticipated mechanical, electrical, or structural elements that conflict with intended function or design are encountered, investigate and measure the nature and extent of conflict.  Promptly submit a written report to Architect.

3.2   UTILITY SERVICES AND MECHANICAL/ELECTRICAL SYSTEMS

A. Existing Services/Systems: Maintain services/systems indicated to remain and protect them against damage during selective demolition operations.

B. Service/System Requirements: Locate, identify, disconnect, and seal or cap off indicated utility services and mechanical/electrical systems serving areas to be selectively demolished.
1. Arrange to shut off indicated utilities with utility companies.
2. If services/systems are required to be removed, relocated, or abandoned, before proceeding with selective demolition provide temporary services/systems that bypass area of selective demolition and that maintain continuity of services/systems to other parts of building.
3. Cut off pipe or conduit in walls or partitions to be removed. Cap, valve, or plug and seal remaining portion of pipe or conduit after bypassing.
   a. Where entire wall is to be removed, existing services/systems may be removed with removal of the wall.

3.3 PREPARATION

A. Site Access and Temporary Controls: Conduct selective demolition and debris-removal operations to ensure minimum interference with roads, streets, walks, walkways, and other adjacent occupied and used facilities.

3.4 SELECTIVE DEMOLITION, GENERAL

A. General: Demolish and remove existing construction only to the extent required by new construction and as indicated. Use methods required to complete the Work within limitations of governing regulations and as follows:
1. Proceed with selective demolition systematically, from higher to lower level. Complete selective demolition operations above each floor or tier before disturbing supporting members on the next lower level.
2. Do not use cutting torches until work area is cleared of flammable materials. At concealed spaces, such as duct and pipe interiors, verify condition and contents of hidden space before starting flame-cutting operations. Maintain portable fire-suppression devices during flame-cutting operations.
3. Maintain adequate ventilation when using cutting torches.
4. Dispose of demolished items and materials promptly.

B. Removed and Salvaged Items:
1. Clean salvaged items.
2. Pack or crate items after cleaning. Identify contents of containers.
3. Store items in a secure area until delivery to Owner.
4. Transport items to Owner's storage area designated by Owner.
5. Protect items from damage during transport and storage.

C. Removed and Reinstalled Items:
1. Clean and repair items to functional condition adequate for intended reuse. Paint equipment to match new equipment.
2. Pack or crate items after cleaning and repairing. Identify contents of containers.
3. Protect items from damage during transport and storage.
4. Reinstall items in locations indicated. Comply with installation requirements for new materials and equipment. Provide connections, supports, and miscellaneous materials necessary to make item functional for use indicated.

D. Existing Items to Remain: Protect construction indicated to remain against damage and soiling during selective demolition. When permitted by Architect, items may be removed to a suitable, protected storage location during selective demolition and cleaned and reinstalled in their original locations after selective demolition operations are complete.

E. Contractor shall terminate demolished pipe and/or ductwork. System shall be capped and insulated per new work specification.

F. Contractor shall remove any abandoned piping and/or ductwork in area of construction during the demolition process.

G. Unforeseen Conditions
   1. Any unforeseen utilities found during construction that directly affect any trade must be brought to the engineer's attention via RFI.
   2. All existing conditions must be clearly annotated on the As-Built drawings.

H. Repair any walls, floors or roofs that piping, ducts or equipment have been removed from (or through). Patch with similar materials to match finish and color (paint to match). If paint cannot be matched, repaint entire wall or surface.

3.5    DISPOSAL OF DEMOLISHED MATERIALS

A. General: Except for items or materials indicated to be reused, salvaged, reinstalled, or otherwise indicated to remain Owner's property, remove demolished materials from Project site and legally dispose of them in an EPA-approved landfill.
   1. Do not allow demolished materials to accumulate on-site.
   2. Remove and transport debris in a manner that will prevent spillage on adjacent surfaces and areas.

B. Burning: Do not burn demolished materials.

C. Disposal: Transport demolished materials off Owner's property and legally dispose of them.

**END OF SECTION**

**SECTION 220100 - SPECIAL CONDITIONS FOR ALL PLUMBING WORK**

**PART 1 - GENERAL**

1.1     DESCRIPTION OF WORK

　　A.　This section covers the general provisions of the plumbing specifications applicable to the following systems:
　　　　1.　Plumbing.

　　B.　The use of the word plumbing in the body of the various specifications sections shall be interpreted to include all the aspects of all of the systems referenced in the Plumbing Specifications.

1.2     DRAWINGS

　　A.　These specifications are accompanied by drawings of the building and details of the installations showing the locations of equipment, piping, etc.  The drawings and these specifications are complementary to each other; requirements described in one or the other shall be considered binding as if described in both.

　　B.　If any departures from the drawings are deemed necessary by the Contractor, details of such departures and the reasons therefore shall be submitted to the Owner's Representative for approval.  No departures shall be made without prior written approval by the Owner's Representative.

　　C.　There are intricacies of construction which are impractical to specify or indicate in detail; means and methods for performing such work shall adhere to commonly accepted industry standards.

　　D.　It is the Contractor's responsibility to properly use all information found on the Architectural, Structural, Mechanical, Plumbing and Electrical drawings and applicable shop drawings where such information affects his work.

　　E.　For new buildings, all final dimensions shall be scaled from the drawings, unless otherwise noted. For work associated with existing buildings (renovations and additions), all final dimensions shall be field verified.

1.3     CONSTRUCTION REQUIREMENTS

　　A.　The architectural, civil, structural, electrical, plumbing, fire protection and Plumbing drawings, and specifications are all part of the Contract Documents.  In many instances there are details described another trade's drawings that are not necessarily included or referenced in the plumbing drawings.  It is the Contractor's responsibility to review in detail all parts of the Contract Documents prior to submitting a bid. Failure to comply with this requirement shall not relieve the Contractor of responsibility or be used as cause for additional compensation because architectural, structural, or electrical details were not included in the plumbing drawings.

　　B.　It is the intent of the Contract Documents to provide complete and fully functional installation in every respect.  Material and/or construction details not specifically described in the Contract Documents, but commonly considered incidental to the industry, are required by the Contractor.

　　C.　The Contractor shall be responsible for fitting his material and apparatus into the building and shall carefully lay out his work at the site to conform to the structural conditions, to avoid all obstructions, to comply with Codes, to facilitate the work of other trades, to conform to the details of the installation supplied by the manufacturer of the equipment to be installed, and thereby to provide an integrated satisfactory operating installation.

　　D.　The plumbing, electrical and mechanical drawings are schematic in nature and do not show every connection in detail or every pipe or conduit in its exact location.  These details are subject to the requirements of ordinances and structural and architectural conditions.

E.  The Contractor shall carefully investigate structural and finish conditions and shall coordinate the separate trades in order to avoid interference between the various phases of work.  Work shall be laid out so that it will be concealed in furred chases and above suspended ceilings, etc. in finished portions of the building, unless specifically noted to be exposed.  Work shall be installed to avoid compromising structural members; therefore, inserts to accommodate hangers shall be set before concrete is poured, and proper openings through floor, walls, beams, etc. shall be provided as hereinafter specified or as otherwise indicated or required.  All work shall be installed parallel or perpendicular to building lines unless otherwise noted.

F.  When the plumbing drawings do not give exact details as to the elevation of pipe or equipment, physically arrange the systems to fit in the space available at the elevations intended with the proper grades for the functioning of the system involved.  Piping and exposed conduit, are generally intended to be installed true and square to the building construction, and located as high as possible against the structure in a neat and workmanlike manner.  The plans do not show all required offsets, control lines, pilot lines, and other location details. Work shall be concealed in all finished areas.  Piping specified to be insulated shall be supported in a manner that will allow the insulation to be installed without gaps.  Insulated piping in concealed areas shall be offset with fittings as necessary to permit installation of insulation.  Bending of pipes or installing pipes in a strain to insulate will not be permitted.

G.  Final placement of serviceable equipment shall be carefully coordinated with all other trades to ensure sufficient clearance for maintenance according to manufacturer's recommendations.  Lubricating orifices and adjustable components shall be easily accessible.  Piping, conduit, valve stems, cabling and other building systems shall not interfere with service space.

H.  Location of Exposed Devices
1.  All exposed devices (sprinkler heads, medical gas outlets, plumbing rough-ins, lights, outlets, communication devices, etcetera) shall be referenced to fixed data points that are coordinated with all trades; shall be located to present symmetrical arrangements with respect to the fixed data point; and shall facilitate the proper arrangements of acoustical ceiling tiles.  Fixed data points shall include such features as wall and ceiling lines, soffits, balanced border widths, masonry joints, etc. Devices located in acoustical ceiling tiles shall occur symmetrically in tile joints or in the centers of whole tiles.  The final determination of the exact location of each outlet and the arrangements to be followed shall be acceptable to the Owner's Representative.
2.  The drawings schematically indicate locations of the exposed devices.  Final locations shall be determined by carefully coordinating the drawings pertaining to each trade.  Where conflicts are identified, Owner's Representative shall determine final location.  The Owner reserves the right to make any reasonable change in location of any device before installation, without additional cost to the Owner or the Architect.

1.4  QUALIFICATIONS

A.  Contractor must have minimum of five years experience installing commercial, plumbing and piping systems similar to those described in these Contract Documents.

B.  Contractor must be licensed and hold a current contracting license that has been valid for a minimum of five years in the State of Texas.

C.  Contractor must be able to bond work for payment and performance of work being bid.  Contractor's bonding agency shall have a Best's insurance rating of A or A+.

1.5  MATERIAL AND EQUIPMENT REQUIREMENTS

A.  Manufacturer's Instructions:  The manufacturer's published instructions shall be followed for preparing, assembling, installing, erecting, and cleaning manufacturer materials or equipment, unless otherwise indicated.  The Contractor shall promptly notify the Owner's Representative in writing of any conflict between the requirements of the Contract Documents and the manufacturer's direction and shall obtain the clarification of the Owner's Representative before proceeding with the work. Should the Contractor perform any such work that does not comply with the manufacturer's directions or such clarification by the Owner's Representative, he shall bear all costs arising in connection with the correction of the deficiencies.

B.  Storage at Site:  The Contractor shall not receive material or equipment at the jobsite until there is suitable space provided to properly protect equipment from rust, drip, humidity, and dust damage and from surrounding work.

C.  Capacities shall be not less than those indicated and shall be such that no component or system becomes inoperative or is damaged because of startup or other overload conditions.

D.  Conformance to Agency Requirements:  Where materials or equipment are specified to be approved, listed, tested, or labeled by the Underwriters Laboratories, Inc., or constructed and/or tested in accordance with the standards of the American Society of Mechanical Engineers, the Contractor shall submit proof that the items furnished under this section of the specifications conform to such requirements.  The label of Underwriters Laboratories, Inc. applied to the item will be acceptable as sufficient evidence that the items conform to such requirements.  The ASME stamp or the AMCA label will be acceptable as sufficient evidence that the items conform to the respective requirements.

E.  Nameplates:  Each major component of equipment shall have the manufacturer's name, address, and model-identification number on a plate securely attached to the item of equipment.  All data on nameplates shall be legible at the time of Final Inspection.

F.  Prevention of Rust:  Standard factory finish will be acceptable on equipment specified by model number; otherwise surfaces of ferrous metal shall be given a rust-inhibiting coating.  The treatment shall withstand 200 hours in salt-spray fog test, in accordance with Method 6061 of Federal Standard No. 141.  Immediately after completion of the test, the specimen shall show no signs of wrinkling or cracking and no signs of rust creepage beyond 1/8 inch on either side of the scratch mark.  Where rust inhibitor coating is specified hereinafter, any treatment that will pass the above test is acceptable unless a specific coating is specified, except that coal tar or asphalt-type coatings will not be acceptable unless so stated for a specific item. Where steel is specified to be hot-dip galvanized, mill-galvanized sheet steel may be used provided all raw edges are painted with a zinc-pigmented paint conforming to Military Specification MIL-P-26915.

G.  Protection from Moving Parts:  Belts, pulleys, chains, gears, couplings, projecting setscrews, keys, and other rotating parts located so that any person can come in close proximity thereto, shall be fully enclosed or properly guarded.

H.  Drive Guards:  For machinery and equipment, provide guards as shown in AMCA 410 for belts, chains, couplings, pulleys, sheaves, shafts, gears, and other moving parts regardless of height above the floor. Drive guards may be excluded where motors and drives are inside factory-fabricated air handling units casings.  Guards shall be constructed of sheet steel, cast iron, expanded metal, or wire mesh rigidly secured so as to be removable without disassembling pipe duct or electrical connection to equipment. Provide a 1-inch diameter hole in each drive guard at each shaft center to allow access for speed measurement.

I.  Verifications of Dimensions: The Contractor shall be responsible for the coordination and proper relation of his work to the building structure and to the work of all trades.  The Contractor shall visit the premises and thoroughly familiarize himself with all details of the work and working conditions, to verify all dimensions in the field, and to advise the Owner's Representative of any discrepancy before performing any work. Adjustments to the work required in order to facilitate a coordinated installation shall be made at no additional cost to the Owner, Architect, or Engineer.

J.  Standard Products:  Materials and equipment to be provided shall be the standard catalog products of manufacturers regularly engaged in the manufacture of products conforming to these specifications, and shall essentially duplicate materials and equipment that have been in satisfactory use at least two years.

K.  Spare Parts Data:  As soon as practicable after approval of materials and equipment and, if possible, not later than four months prior to the date of beneficial occupancy, the Contractor shall furnish spare parts data for each different item of equipment listed.  The data shall include a complete list of parts and supplies with current unit prices and sources of supply, a list of parts and supplies that are either normally furnished at no extra cost with the purchase of the equipment or specified hereinafter to be furnished as part of the Contract, and a list of additional items recommended by the manufacturer to assure efficient operation for a period of 120 days at the particular installation.  The foregoing shall not relieve the Contractor of any responsibilities under the warranty specified.

1.6     INSPECTION OF THE SITE

A. The Contractor shall visit the site, verifying all existing items indicated on drawings and/or specified, and familiarize himself with the existing work conditions, hazards, grades, actual formations, soil conditions, structures, utilities, equipment, systems, facilities, and local requirements. The submission of bids shall be deemed evidence of such visits. All proposals shall take these existing conditions into consideration, and the lack of specific information shall not relieve the Contractor of any responsibility.

1.7 UTILITY LOCATIONS AND ELEVATIONS

A. Locations and elevations of the various utilities included within the scope of this work have been obtained from substantially reliable sources and are offered separately from the Contract Documents, as a general guide only, without guarantee as to accuracy. Examine the site, the locations, and availability of all utilities and services required for their relation to the work. Verify the location of all existing site utilities with each responsible utility company or applicable party. The Contractor shall repair all damage to existing utilities, whether indicated on the drawings or not, at his sole expense.

1.8 PERMITS, UTILITY CONNECTIONS, AND INSPECTIONS

A. Permitting Fees: Contractor shall pay for all fees associated with permits required by municipal authorities having jurisdiction.

B. Tapping and Impact Fees: Contractor shall pay for all fees associated with tapping into municipal utility mains, including sanitary sewer, natural gas and domestic water. Impact fees will be paid for by the Owner.

C. Compliance: The Contractor shall comply in every respect with all requirements of local authorities having jurisdiction, including building inspections, fire marshal, local ordinances and codes, and utility company requirements. In no case does this relieve the Contractor of the responsibility of complying with these specifications and drawings where specified conditions are of a higher quality than the requirements of the above-specified authorities. Where requirements of the specifications and drawings are below the requirements of the above offices having jurisdiction, the Contractor shall make installations in compliance with the requirements of the above authorities.

D. Utilities: The Contractor shall coordinate with the various utility companies involved in this project and shall provide required utility relocations, extensions, modifications, and/or changes (complete in all respects) as described in the Contract Documents. Contractor shall verify the location of all existing utilities with the applicable Utility Company. The Contractor shall be responsible for all damages to existing utilities, whether indicated on drawings or not, and repair all damage to existing utilities as acceptable to the affected Utility Company.

E. Certification: Prior to final acceptance, the Contractor shall furnish a certificate of acceptance from the inspection departments having jurisdiction over the work for any and all work installed under this Contract. Any additional labor costs incurred as a result of a substitution shall be the Contractor's responsibility.

1.9 EXISTING FACILITIES

A. The Contractor shall be responsible for loss or damage to the existing facilities caused by him and his workmen, and shall be responsible for repairing or replacing such loss or damage. The Contractor shall send proper notices, make necessary arrangements, and perform other services required for the care, protection, and in-service maintenance of all plumbing, heating, air conditioning, and ventilating services for the new and existing facilities. The Contractor shall erect temporary barricades, with necessary safety devices, as required to protect personnel from injury, removing all such temporary protection upon completion of the work.

B. The Contractor shall provide temporary or new services to all existing facilities as required to maintain their proper operation when normal services are disrupted as a result of the work being performed under this project.

C. Where existing construction is removed to provide working and extension access to existing utilities, Contractor shall remove doors, piping, conduit, outlet boxes, wiring, light fixtures, air conditioning ductwork and equipment, etc. to provide this access and shall reinstall same upon completion of work in the areas affected.

D.   Where partitions, walls, floors, or ceilings of existing construction are indicated to be removed, all Contractors shall remove and reinstall in locations approved by the Architect/Engineer all devices required for the operation of the various systems installed in the existing construction. This is to include but is not limited to temperature controls system devices, electrical switches, relays, fixtures, piping, conduit, etc.

E.   Outages of services as required by the new installation will be permitted but only at a time approved by the Owner. The Contractor shall allow the Owner two weeks in order to schedule required outages. The time allowed for outages will not be during normal working hours unless otherwise approved by the Owner. All costs of outages, including overtime charges, shall be included in the contract amount.

1.10   DEMOLITION AND RELOCATION

A.   The Contractor shall modify, remove, and/or relocate all materials and items so indicated on the drawings or required by the installation of new facilities. All removals and/or dismantling shall be conducted in a manner as to produce maximum salvage. Salvage materials shall remain the property of the Owner, and shall be delivered to such destination or otherwise disposed of as directed by the Owner. Materials and/or items scheduled for relocation and which are damaged during dismantling or reassembly operations shall be repaired and restored to good operative condition. The Contractor may, at his discretion, and upon the approval of the Owner, substitute new materials and/or items of like design and quality in lieu of materials and/or items to be relocated.

B.   All items which are to be relocated shall be carefully removed in reverse to original assembly or placement and protected until relocated. The Contractor shall clean and repair and provide all new materials, fittings, and appurtenances required to complete the relocations and to restore to good operative order. All relocations shall be performed by workmen skilled in the work and in accordance with standard practice of the trades involved.

C.   When items scheduled for relocation and/or reuse are found to be in damaged condition before work has been started on dismantling, the Contractor shall call the attention of the Owner to such items and receive further instructions before removal. Items damaged in repositioning operations are the Contractor's responsibility and shall be repaired or replaced by the Contractor as approved by the Owner, at no additional cost to the Owner.

D.   Service lines and wiring to items to be removed, salvaged, or relocated shall be removed to points indicated on the drawings, specified, or acceptable to the Owner. Service lines and wiring not scheduled for reuse shall be removed to the points at which reuse is to be continued or service is to remain. Such services shall be sealed, capped, or otherwise tied off or disconnected in a safe manner acceptable to the Owner. All disconnections or connections into the existing facilities shall be done in such a manner as to result in minimum interruption of services to adjacent occupied areas. Services to existing areas or facilities which must remain in operation during the construction period shall not be interrupted without prior specific approval of the Owner as hereinbefore specified.

1.11   SUBSTITUTION OF MATERIALS AND EQUIPMENT

A.   No substitution of materials or equipment herein specified or called for on the drawings will be permitted, except by written permission of the Owner's Representative. Where several makes of equipment or material are mentioned, any item named may be bid upon provided it meets space, capacity specifications, and other requirements.

1.12   SUBMITTALS

A.   Submittals for Review:
   1.   As soon as practical or within 30 days after the date of contract award or notice to proceed, and before purchasing or starting installation of any materials or equipment, the Contractor shall submit for review sufficient material and equipment data to indicate that all requirements of the specifications have been met and samples shall be furnished when requested. All manufacturer's data used as part of the submittal shall have all non-applicable features crossed out or deleted in a manner that will clearly indicate exactly what is to be furnished.
   2.   Four (4) copies of the submittal list and detailed submittals (for the Owner's and A/E's use) shall be submitted to the Owner's Representative. The Contractor is requested to include a minimum of

three (3) additional copies for insertion in the project's Owner's Manuals at the completion of the project, and the number of additional copies the Contractor requires for his and his subcontractor's use during the project's construction. The detailed submittals shall be accompanied by the same number of sets of pictorial and descriptive data derived from the manufacturer's catalogs and sales literature, or incorporated in the shop drawings. The Contractor may provide a detailed submittal on any item even though not required by the Owner's Representative.

B.   Format
1.   Submittals shall be bound in a BLACK hardback three-ring binder with clear-view sleeves on the spine and front. Binders larger than 3-inches shall be divided into two volumes. The front sleeve shall have a cover sheet inserted with the title "PLUMBING SUBMITTALS" centered in large print. Below the title shall be printed the name of the project, the date, the project location, the name and address of the contractor, the name and address of the subcontractor and the name and address of the engineer(s) in smaller print.
2.   Provide a Table of Contents at the beginning of the binder that summarizes the information being submitted according to specification section.
3.   Submittals shall be tab divided by specification section; **all sections** identified in the project specifications shall have a tab. When no information is being provided concerning a particular specification section, insert a single dated sheet that explains the circumstances.
4.   **Loose-leaf or piecemeal submittals are not acceptable and subject to rejection unless prior approval has been granted by the Engineer.**
5.   **Email/Digital Submittals are not acceptable and subject to rejection unless prior approval has been granted by the Engineer.**

C.   Content:
1.   The Contractor shall prepare or cause to be prepared shop drawings, product data, materials and equipment lists, diagrams, data, samples, and other submittals as required by the contract documents, hereinafter referred to as "Submittal Data." The Contractor shall review and approve all submittal data for compliance with the contract documents, manufacturer's recommendations, adequacy, clearances, code compliance, safety, and coordination with associated work.
2.   The Contractor shall submit approved submittal data to the Owner's Representative for review and comment as to general conformance with the design concept and general compliance with information given in the contract documents. Owner's Representative's review shall not include review of quantities, dimensions, weights or gauges, fabrication processes, construction methods, coordination with other trades or work, or construction safety and precautions, all of which are the sole responsibility of the Contractor.
3.   The Contractor shall clearly and specifically identify and call to the attention of the Owner's Representative any deviation from the contract documents for which Owner acceptance is desired. The responsibility for such a deviation accepted by the Owner shall remain with the Contractor.
4.   Timeliness: The burden of timeliness in the complete cycle of submittal data is on the Contractor. The Contractor shall allow a minimum of two (2) weeks' time frame for review of each submission by the Owner's Representative. The Contractor is responsible for allowing sufficient time in the construction schedule to cover the aforementioned cycles of data processing, including time for all re-submission cycles on nonconforming materials, equipment, etc. covered by the data submitted. Construction delays and/or lack of timeliness in the above regard are the responsibility of the Contractor and will not justify any request for scheduled construction time extensions or extra compensation.
5.   Work performed in accordance with approved submittal date that is not in accordance with the Contract Documents and did not have the specific acceptance of the Owner's Representative shall be replaced at Contractor's cost.

D.   Re-submittals
1.   Re-submit entire submittal in accordance with afore mentioned format and content requirements. **Loose-leaf or piecemeal re-submittals are not acceptable.** New and/or revised data for each section shall be prefaced with a colored (yellow, pink, orange, etc) cover sheet that identifies (in a word or two) the materials and/or equipment being re-submitted. Typeset the words "REVISED SUBMITTAL NO. 1 (or 2, 3 as applicable)" centered at the bottom of the cover sheet.
2.   Subsequent re-submittals (second and third, if necessary) shall have different colored cover sheets to distinguish between the various re-submittals.
3.   Include a cover letter at front of binder that specifically responds to each "REVISE AND RE-SUBMIT COMMENT" or "REJECTED" comment by number. Example responses would include the following:
   a.   RESPONSE: "Please see attached re-submittal."
   b.   RESPONSE: "Will be re-submitted at a latter date."

      c.     RESPONSE: "Requirement for (xxxxxx) was deleted in Addendum No. 2."

      d.     RESPONSE: "Exception requested based on Section xx, Paragraph x.x.x.

E.     These paragraphs related to Plumbing submittal data supersede any conflicting requirements contained in Division 01 sections.

## 1.13    CONTRACTOR CERTIFICATION OF SUBMITTAL DATA

A.     The Contractor shall provide the following certification with all submittal data furnished to the Owner's Representative for review and comment.

Project Title:

Description of Submittal Data:

This is to certify that the above-described submittal data has been reviewed and is approved for compliance with the Contract Documents, manufacturer's recommendation, adequacy, clearances, code compliance, safety, and coordination with other trades and/or work except as follows: (list "none" or itemize and explain). In addition, the Contractor shall submit to the Owner's Representative a signed statement from each representative certifying as follows:

"I certify that the materials and/or equipment listed below have been personally inspected by the undersigned authorized manufacturer's representative and is properly installed and operating in accordance with the manufacturer's recommendations and are asbestos free."

_____

Name and Company

## 1.14    ACCEPTANCE OF MATERIALS AND EQUIPMENT

A.     All equipment installed on this project shall have **local (within 125 miles)** representation, local factory-authorized service, and a local stock of repair parts. This requirement is essential and will be strictly reviewed by the Owner's Representative prior to concurrence with the Contractor's approval for all submittals covered by Plumbing Division of this Specification.

B.     NOTICE: The Contractor is responsible for providing materials and equipment that conform to the requirements of the project manual in every respect unless a deviation has been "accepted" in writing. Removal of any nonconforming materials and equipment and the replacement with conforming materials and equipment shall be at the Contractor's sole expense, regardless of when nonconformance was discovered.

C.     Approval of materials and equipment shall be based on manufacturer's published data and shall be tentatively subject to the submission of complete shop drawings which comply with the contract documents. Approval is also dependent upon the existence of adequate and acceptable clearances for entry, servicing, and maintenance.

D.     Approval of materials and equipment under this provision shall not be construed as authorizing any deviations from the specifications, unless the attention of the Owner's Representative has been directed in writing to the specific deviations. Data submitted shall not contain unrelated information unless all pertinent information is properly identified.

E.     Physical Size of Equipment: Space is critical; therefore, equipment of larger sizes than shown, even though of approved manufacturer, will not be acceptable unless it can be demonstrated that ample space exists for proper installation, operation, and maintenance.

## 1.15    SITE OBSERVATION

A.     Site observation by the Architect, Engineer, and/or Owner's Representative is for the express purpose of verifying compliance by the Contractor with the contract documents, and shall not be construed as

construction supervision nor indication of approval of the manner or location in which the work is being performed as being a safe practice or place.

1.16    SUPERVISION

A.    In addition to the Superintendent required under the conditions of the contract, each subcontractor shall keep a competent superintendent or foreman on the job at all times.

B.    It shall be the responsibility of each superintendent to study all plans and familiarize himself with the work to be done by other trades.  He shall coordinate his work with other trades and, before material is fabricated or installed, make sure that his work will not cause an interference with another trade.  Where interferences are encountered, they shall be resolved at the jobsite by the superintendents involved.  Where interferences cannot be resolved without major changes to the plans, the matter shall be referred to the Owner's Representative for comments.

1.17    OPERATION PRIOR TO COMPLETION

A.    When any piece of equipment is operable and it is to the advantage of the Contractor to operate the equipment, he may do so, providing that he properly supervises the operation and has the written permission of the Owner's Representative to do so.  The warranty period shall not commence, however, until such time as the equipment is operated for the beneficial use of the Owner or date of substantial completion, whichever occurs first.

B.    Regardless of whether or not the equipment has or has not been operated, the Contractor shall properly clean the equipment, install clean filter media, properly adjust, and complete all deficiency list items before final acceptance by the Owner.  The date of acceptance and the start of the warranty may not be the same date.

1.18    MANUFACTURER'S RECOMMENDATIONS

A.    The manufacturer's published directions shall be followed in the delivery, storage, protection, installation, piping, and wiring of all equipment and material.  The Contractor shall promptly notify the Owner's Representative, in writing, of any conflict between the requirements of the contract documents and the manufacturer's directions, and shall obtain the Owner's Representative's comments before proceeding with the work.  Should the Contractor perform any such work that does not comply with the manufacturer's directions or applicable comments from the Owner's Representative, he shall bear all costs arising in connection with the correction of such deficiencies.

1.19    CHECKING AND TESTING MATERIALS AND/OR EQUIPMENT

A.    Before final acceptance of the work, an authorized representative of the manufacturer of the installed materials and/or equipment shall personally inspect the installation and operation of his materials and/or equipment to determine that it is properly installed and in proper operating order.  Testing and checking shall be accomplished during the course of the work where required by work being concealed, and at the completion of the work otherwise.  In addition, the Contractor shall submit to the Owner's Representative a signed statement from each representative certifying as follows:

*"I certify that the materials and/or equipment listed below have been personally inspected by the undersigned authorized manufacturer's representative and is properly installed and operating in accordance with the manufacturer's recommendations and are asbestos free."*

B.    Check inspections shall include plumbing, heating, air conditioning, ventilating, mechanical control and electrical equipment, and such other items hereinafter specified or specifically designated by the Owner's Representative.

1.20    OPERATING AND MAINTENANCE INSTRUCTION

A. The Contractor shall prepare for the owner's manual hereinafter specified complete sets of operating and maintenance instructions, system piping, valving, control and interlock diagrams, manuals, parts lists, etc. for each item of equipment. These are to be assembled as hereinafter specified for owner's manual.

B. In addition, the Contractor shall provide the service of a competent engineer or a technician acceptable to the Owner's Representative to instruct a representative of the Owner in the complete and detailed operation of all equipment and systems. These instructions shall be provided for a period of sufficient duration to fully accomplish the desired results. Upon completion of these instructions, a letter of release will be required, acknowledged by the Owner, stating the dates of instruction and personnel to whom instructions were given.

C. Additional diagrams, operating instructions, etc. shall be provided as specified hereinafter in the other sections of these specifications.

1.21 MATERIAL AND EQUIPMENT SCHEDULES

A. Contractor shall refer to both drawings and specification for schedules. Where reference is made to items "scheduled on drawings" or "scheduled in specifications," same shall include schedules contained in both the drawings and the specifications. The Contractor's attention is directed to the various specification sections and drawings for schedules.

1.22 APPLICABLE CODES AND STANDARDS

A. The installation shall meet the minimum standards prescribed in the latest editions of the following listed codes and standards, which are made a part of these specifications, except as may be hereinafter specifically modified in these specifications and associated drawings.
   1. National Fire Protection Association Standards (NFPA):
      NFPA 10 - Portable Fire Extinguishers
      NFPA 54 - National Fuel and Gas Code
      NFPA 70 - National Electrical Code
      NFPA 90A - Air Conditioning Systems
      NFPA 101 - Life Safety Code
      NFPA 255 - Method of Test of Surface Burning Characteristics of Building Materials
      Local and State Health Code (TDSH)
   2. American National Standards Institute (ANSI):
      15-78 - Safety Code for Mechanical Refrigeration
      C.2 - 1984 National Electrical Safety Code
      A117.1 - Handicapped Code
   3. American Society of Mechanical Engineers (ASME): Section IV, V, CSD-1
   4. Air Conditioning and Refrigeration Institute Standards (ARI): All standards related to refrigeration and air conditioning equipment and piping furnished under these specifications.
   5. American Water Works Association (AWWA): All applicable manuals and standards.
   6. Sheet Metal and Air Conditioning Contractors National Associate, Inc, (SMACNA): All applicable manuals and standards.
   7. Air Moving and Conditioning Association (AMCA): All applicable manuals and standards.
   8. American Society of Testing Materials (ASTM): All applicable manuals and standards.
   9. National Electrical Manufacturers' Association (NEMA): All applicable manuals and standards.
   10. Occupational Safety and Health ACT (OSHA):
       National Sanitation Foundation - Standard No. 2
   11. American Society of Heating, Refrigeration, and Air conditioning Engineers (ASHRAE):
       90-80 Energy Conservation in New Building Design
       2001 ASHRAE Handbook of Fundamentals
   12. Americans with Disabilities Act, 1990
   13. American Gas Association (AGA)
   14. Underwriters Laboratories, Inc. (UL)
   15. Manufacturer's Standardization Society of the Valve and Fitting Industry (MSS)
   16. Applicable State Building Codes (International Building Codes, as amended):
   17. Applicable State Mechanical Code (International Mechanical Code, as amended).
   18. Applicable State Plumbing Code (International Plumbing Code, as amended).
   19. Applicable State Energy Code (International Energy Conservation Code, as amended).

B.     All materials and workmanship shall comply with all applicable city, state, and national codes, specifications, and industry standards.  All materials shall be listed by the Underwriters Laboratories, Inc. as conforming to its standards and so labeled in every case where such a standard has been established for the particular type of material in question.

C.     The contract documents are intended to comply with the aforementioned rules and regulations; however, some discrepancies may occur.  Where such discrepancies occur, the Contractor shall immediately notify the Owner's Representative in writing of said discrepancies and apply for an interpretation.   Should the discovery and notification occur after the execution of a contract, any additional work required for compliance with said regulations shall be paid for as covered by Division 1 of these contract documents, providing no work or fabrication of materials has been accomplished in a manner of noncompliance. Should the Contractor fabricate and/or install materials and/or workmanship in such a manner that does not comply with the applicable codes, rules, and regulations, the Contractor who performed such work shall bear all costs arising in correcting these deficiencies to comply with said rules and regulations.

1.23     DEFINITIONS

A.     Refer to the condition of the contract for Division 1 for additional requirements regarding definitions.

B.     Where "as required" or "as necessary" is used in these specifications or on the drawings, it shall mean "that situations exist that are not necessarily described in detail or indicated that may cause the Contractor certain complications in performing the work described or indicated.  These complications entail the normal coordination activities expected of the Contractor where multiple trades are involved and new or existing construction causes deviations to otherwise simplistic approaches to the work to be performed.  The term shall not be interpreted to permit an option on the part of the Contractor to achieve the end result."

C.     Where "and/or" is used in these specifications or on the drawings, it shall mean "that situations exist where either one or both conditions occur or are required and shall not be interpreted to permit an option on the part of the Contractor.

1.24     FINAL INSPECTION

A.     Refer to Division 1 for additional requirements for final inspection.

B.     It shall be the responsibility of the Contractor to personally conduct a careful inspection, assuring himself that the work on the project is ready for final acceptance and developing his own "punchlists," before calling upon the Owner's Representative to make a final inspection.  Failure of the Contractor to conduct such inspections and provide the Owner's Representative with a copy of his "punchlists" prior to the final inspection shall be adequate cause for the Owner's Representative to cancel any Contractor-requested final inspection.

C.     In order not to delay final acceptance of the work, the Contractor shall conduct his own "final inspections" prior to requesting the Owner's Representative to "final" the project; will have all necessary bonds, guarantees, receipts, affidavits, etc. called for in the various articles of this specification prepared and signed in advance; and together with a letter of transmittal listing each paper included, shall deliver the same to the Owner's Representative at or before the time of said final inspection.  The Contractor is cautioned to check over each bond, receipt, etc. before preparing same for submission to see that the terms check with the requirements of the specifications.

D.     The final inspection will be made jointly by the Owner's Representative and the Owner.

1.25     REQUIREMENTS FOR FINAL ACCEPTANCE

A.     Requirements for final acceptance shall include but not be limited to the Contractor accomplishing the following:
1.     Construction:  Complete all construction.
2.     Deficiency Lists:  Correct all deficiencies listed at time of Substantial Completion.
   a.     Owner's Manual:  Submit at least 30 days prior to final acceptance on (1) copy of the owner's manual for the Owner's Representative's review and comments.  Following acceptance,

prepare three (3) copies of bound and indexed owner's manual, to be delivered System operating instructions.
b.  System control drawings.
c.  System interlock drawings.
d.  System maintenance instructions.
e.  Manufacturers', suppliers', and subcontractors' names, addresses, and telephone numbers, both local representatives and manufacturers' service headquarters.
f.  Equipment operating and maintenance instructions and parts lists.
g.  Manufacturer's' certifications (see Checking and Testing Materials and/or Equipment, this section).
h.  Contractor's warranty.
i.  Acceptance certificates of authorities having jurisdiction.
j.  Log of all tests made during course of work.
k.  Owner's acknowledgment of receipt of instruction, enumerating items in owner's manual.
l.  List of manufacturers' guarantees executed by the Contractor.
m.  Certified performance curves.
n.  Balance and performance test reports.
o.  Owner's acknowledgment of items of equipment or accessories indicated or specified to be turned over to Owner.
p.  Verbal, as herein specified.
q.  Posted, framed under glass or plastic laminated:
3.  At the time of final acceptance, which shall include but not be limited to the following:
4.  Instructions:
a.  System operating instructions.
b.  System control drawings.
c.  System interlock drawings.
5.  Record Drawings:  Deliver the specified record drawings to the Owner's Representative.

1.26    RECORD DRAWINGS

A.  The Contractor shall maintain a set of contract drawings (black-line prints) at the jobsite on which he shall indicate the installed (as-built) locations of the following:
1.  Equipment
2.  Main lines of piping and ductwork.
3.  Dimensional locations (including depth) of all underground piping, valves and conduits.

B.  Drawings shall be used for construction reference and shall not leave the field office of the jobsite.

C.  Drawings shall include all addenda, ASI's, Change Orders, and existing conditions and equipment that are not reflected in the original contract drawings.

D.  Upon completion of work, the Contractor shall obtain CAD files of the contract drawings from the Owner's Representative and transfer the above as-built information into these files.  The as-built files shall be permanently marked "RECORD DRAWINGS" and printed on full-size Mylar sheets.  Upon completion, the CAD files shall be transferred to CD in AutoCAD 2007 format.  Both the CAD files CD and Mylar drawings shall be submitted to the Owner's Representative as part of the Close-out Submittals.

E.  Refer to Division 1 paragraph entitled "Record Documents" for additional requirements.

1.27    ALLOWANCES

A.  Refer to Division 1 for allowances.

1.28    ALTERNATE PROPOSALS

A.  Alternate proposals are summarized in Division 1 and on the bid proposal form.  Refer to all sections of the specifications and the drawings to determine the exact extent and scope of the various alternate proposals as each pertains to the work of the various trades.

1.29    WARRANTY

B.    General:  All work performed (including equipment and materials furnished) under the various sections of these specifications shall be 100% warranted, for a period of one (1) year from the date of final acceptance thereof, against defective materials, design, and unauthorized substitution.  Upon receipt of note of failure of any part of the guaranteed equipment and/or facilities during the guaranty period, the affected part(s) or facilities shall be replaced promptly with new parts, etc. by and at the expense of the Contractor.  Further, the Contractor shall properly obtain, execute, and forward any and all manufacturer's warranties on equipment furnished under the Contract.  Refer to Division 1 for additional requirements.

C.    Extended Period:  The Contractor shall provide all extended time warranties available from the manufacturer of the equipment provided as standard at no additional cost.  This includes all extended warranties where specified with certain equipment as directed in other sections of this Specification.

**PART 2 - PRODUCTS**

2.1    MATERIALS AND WORKMANSHIP

**A.    All materials, unless otherwise specified, shall be 51% manufactured in the United States, new, free from all defects, and of the best quality.  Foreign goods specifically approved for use by the Owner's Representative prior to bidding may be furnished.**

B.    Materials and equipment shall be installed in accordance with the manufacturer's recommendations and the best standard practice for the type of work involved.  All work shall be executed by mechanics skilled in their respective trades, and the installations shall present a neat, precise appearance.

C.    The responsibility for the furnishing and installation of the proper plumbing equipment and/or material as intended rests entirely upon the Contractor.  The Contractor shall request advice and supervisory assistance from the representative of specific manufacturers during the installation.

2.2    FLAME SPREAD AND SMOKE DEVELOPED PROPERTIES OF MATERIALS

A.    Duct coverings, duct linings, vapor barrier facings, tapes, adhesives, core materials, insulation, jackets, piping (of any sort), and other materials in concealed locations, including any above-ceiling area, shall have a flame spread rating not over 25 without evidence of continued progressive combustion and a smoke developed rating no higher than 50.  Flame spread and smoke developed ratings shall be in accordance with NFPA Standard No. 255.

2.3    BEARINGS

A.    All ball bearings shall be of radial and/or thrust type, and enclosed in a dust and moisture-proof housing.

2.4    MOTORS

A.    The Contractor shall provide all motors required for equipment supplied under each portion of the work.  Motors shall be built in accordance with the latest ANSI, IEE, and NEMA standards, shall be fully coordinated with the equipment served, shall be of sizes and electrical characteristics scheduled.

2.5    STARTING EQUIPMENT

A.    Each motor shall be provided with proper starting equipment.  This equipment, unless hereinafter specified or scheduled to the contrary, shall be provided by the trade furnishing the motor.  All motor starting equipment provided by any one trade shall be of the same manufacture unless such starting equipment is an integral part of the equipment on which the motor is mounted.

2.6    FIRE AND SMOKE PARTITION, WALL, AND/OR FLOOR PENETRATIONS

A.  Pipe, ductwork, conduit, etc. shall pass through fire- or smoke-rated floors, partitions, walls, or other barriers within a UL-listed assembly which shall maintain the rating of the applicable wall, floor, partition, or barrier.

B.  The Contractor shall review the architectural and structural drawings and determine the location of the fire-rated building elements.  Where these elements are penetrated, UL-listed fire-rated penetration assemblies approved by the local authority shall be provided in accordance with the manufacturer's instructions to obtain the required rating.

2.7  FOUNDATIONS / HOUSEKEEPING PADS

A.  General:  All special foundations and supports required for the proper installation of equipment and pipe shall be provided as hereinafter specified and under the section of the specifications covering the equipment, unless otherwise indicated on the drawings.

B.  All equipment shall receive concrete housekeeping pads unless otherwise noted.  Equipment to be receive pads are to include (but not limited to):  boilers, water heaters, water softeners, expansion / compression tanks, filter feeders, water treatment equipment, air compressors, pumps (in addition to inertia bases where required), surge tanks, deareators, etc.

C.  Concrete foundations for the support of equipment such as floor-mounted pumps, equipment, etc. shall be not less than 3 inches high and not less than 4 inches larger (in both directions) than supported unit, unless otherwise noted and shall be poured in forms built of new dressed lumber.  All corners of the foundations shall be neatly chaffered by means of sheet metal or triangular wood strips nailed to the form.  Pads shall not be laid out directly against walls or structures.  2 inches shall be left available for pad form work.  Foundation bolts shall be placed in the forms when the concrete is poured, the bolts being correctly located by means of templates.  Allow 1 inch below the equipment bases for alignment and grouting (where applicable).  Foundations for equipment located on the exterior of the building shall be provided as indicated.  Foundations shall be constructed in accordance with approved shop drawings and shall be reinforced with #4 bars at 12 inches on center both ways (minimum).

D.  Pipe and Conduit Support:  All pipes and conduits throughout the building, both horizontal and vertical, shall be adequately supported from the construction to line of grade, with proper provision for expansion, contraction, vibration elimination, and anchorage.  Vertical pipes and conduits shall be supported from floor lines with riser clamps sized to fit the lines and to adequately support their weight.  At the bases of lines, where required for proper support, provide anchor base fittings or other approved supports.

**PART 3 -  EXECUTION**

3.1  SPACE AND EQUIPMENT ARRANGEMENT

A.  The size of equipment indicated on the drawings is based on the dimensions of a particular manufacturer.  While other manufacturers will be acceptable, it is the responsibility of the Contractor to determine whether the equipment he proposes to furnish will fit in the space.  Shop drawings shall be prepared when required by the Owner's Representative to indicate a suitable arrangement.

B.  All equipment shall be installed in a manner to permit access to all surfaces.  All valves, motors, drives, filters, and other accessory items shall be installed in a position to allow removal for service without disassembly of another part.

3.2  LARGE APPARATUS

A.  Any large piece of apparatus which is to be installed in any space in the building, and which is too large to permit access through stairways, doorways, or shafts shall be brought to the job and placed in the space before the enclosing structure is completed.  Following placement in the space, such apparatus shall be thoroughly, completely protected from damage as hereinafter specified.

3.3  PROTECTION

A. The Contractor shall take such precautions as may be necessary to properly protect all materials and equipment from damage from the time of delivery until the completion of work. This shall include the erection of all required temporary shelters and supports to adequately protect any items stored in the open on the site from the weather, the ground and surrounding work; the cribbing of any items above the floor of the construction; and the covering of items in the uncompleted building with tarpaulins or other protective covering. Failure on the part of the Contractor to comply with the above will be sufficient cause for the rejection of the items in question.

B. The Contractor shall protect existing facilities, the work of others, and the premises from any and all damages that may be made possible by the execution of work.

C. Equipment and materials shall be protected from rust both before and after installation. Any equipment or materials found in a rusty condition at the time of final inspection must be cleaned of rust and repainted as specified elsewhere in these specifications.

3.4    COOPERATION BETWEEN TRADES AND WITH OTHER CONTRACTORS

A. Each trade, subcontractor, and/or Contractor must work in harmony with the various trades, subcontractors, and/or Contractors on the job as may be required to facilitate the progress to the best advantage of the job as a whole. Each trade, subcontractor, and/or Contractor must pursue its work promptly and carefully so as not to delay the general progress of the job. This Contractor shall work in harmony with Contractors working under other contracts on the premises.

B. It shall be the responsibility of each trade to cooperate fully with the other trades on the job to help keep the jobsite in a clean and safe condition. At the end of each day's work, each trade shall properly store all of its tools, equipment, and materials and shall clean its debris from the job. Upon the completion of the job, each trade shall immediately remove all of its tools, equipment, any surplus materials, and all debris caused by its portion of the work.

3.5    PRECEDENCE OF MATERIALS AND COORINATION OF WORK

A. These specifications and the accompanying drawings are intended to cover systems which will not interfere with the structural design of the building, which will fit into the several available spaces, and which will ensure complete and satisfactory systems. Each subcontractor and/or trade shall be responsible for the proper fitting of his material and apparatus into the building.

B. The work of the various trades shall be performed in the most direct and workmanlike manner without hindering or handicapping the work of other trades. Piping interferences shall be handled by giving precedence to pipe lines which require a stated grade for proper operation. Where space requirements conflict, the following order or precedence shall, in general, be observed:
    1.    Building lines.
    2.    Structural members.
    3.    Light fixtures.
    4.    Soil and drain piping.
    5.    Condensate drains.
    6.    Vent piping.
    7.    Supply, return, and outside air ductwork.
    8.    Exhaust ductwork.
    9.    HVAC water and steam piping.
    10.   Steam condensate piping.
    11.   Fire protection piping.
    12.   Natural gas piping.
    13.   Domestic water (cold and hot).
    14.   Refrigerant piping.
    15.   Electrical conduit.

C. Coordinate all major elements, components, and systems of plumbing equipment and materials in relationship with other systems, installations, and building components. Coordinate space requirements for installation and access. Verify the following:
    1.    Clearance for servicing and maintaining equipment, accessories, and specialties, including space for disassembly required for periodic maintenance.

2. Equipment and accessory service connections and support details.
3. Fire-rated wall and floor penetrations.
4. Scheduling, sequencing, movement and positioning of large equipment into building during construction.
5. Access panel and door locations.
6. Clearances between building openings and VTR's/Flues.

D. The light fixture grid layout as indicated on the drawings must be maintained. This Contractor shall refer to all light fixture plans and details indicated on the drawings and shall coordinate the location of dampers, supply grilles, return air grilles, sprinkler heads, etc. with the location of the light fixtures to assure proper access to all items in a manner acceptable to the Owner's Representative.

E. The electrical trades shall locate all junction boxes, pull boxes, conduits, etc. to avoid interference with the diffusers, dampers, grilles, etc. hereinbefore mentioned. The mechanical trades shall furnish to all other trades copies of approved ductwork shop drawings to assist in the coordination of the rough-in and installation of all items of work.

3.6 CONNECTIONS FOR OTHERS

A. This Contractor shall rough-in for and make all water, sewer, electrical, etc. connections to all fixtures, equipment, machinery, etc. provided by others in accordance with detailed roughing-in drawings provided by the equipment suppliers, by actual measurements of the equipment connections, or as detailed.

B. After the equipment is set in place, this Contractor shall make all final connections and shall provide all required pipe, fittings, valves, traps, connectors, etc.

C. Provide all air gap fittings required, using materials hereinbefore specified. In each water line serving an item of equipment or piece of machinery, provide a shutoff valve. On each drain without integral trap provide a suitable trap.

D. All pipe fittings, valves, traps, etc. exposed in finished areas and connected to chrome-plated lines provided by others shall be chrome-plated to match.

E. Provide all transition pieces, etc. required for a complete installation of equipment provided by others.

3.7 INSTALLATION METHODS

A. Where to Conceal: All pipes and conduits shall be concealed in pipe chases, walls, furred spaces, below suspended floors, or above the ceilings of the building unless otherwise indicated.

B. Where to Expose: In mechanical rooms, janitor's' closets tight against pan soffits in exposed Tee structures, or storage spaces, but only where necessary, piping and conduit may be run exposed. All exposed piping and conduit shall be run in the neatest, most inconspicuous manner, and parallel or perpendicular to the building lines.

C. Support: All piping and conduit shall be adequately and properly supported from the building structure by means of hanger rods or clamps to walls as herein specified.

D. Maintaining Clearance: Where limited space is available above the ceilings and below concrete beams or other deep projections, pipe and conduit shall be sleeved through the projection where it crosses, rather than hung below them, in a manner to provide maximum above-floor clearance. Sleeves shall be as herein specified. Approval shall be obtained from the Owner's Representative for each penetration.

E. All pipe, conduits, etc. shall be cut accurately to measurements established at the building and shall be worked into place without springing or forcing. All ducts, pipes, and conduits run exposed in machinery and equipment rooms shall be installed parallel to the building lines, except that they shall be sloped to obtain the proper pitch. Piping and ducts run in furred ceilings, etc. shall be similarly installed, except as otherwise shown. Conduits in furred ceilings and in other concealed spaces may be run at angles to the construction but shall be neatly grouped and racked indicating good workmanship. All conduit and pipe openings shall be kept closed until the systems are closed with final connections.

F.    Special Requirements:
1.    There shall be no pipe joints nearer than 12 inches to a wall, ceiling, or floor penetration unless pipe joint is a welded or mechanically-coupled-type joint.
2.    The Contractor shall study all construction documents and carefully lay out all work in advance of fabrication and erection in order to meet the requirements of the extremely limited spaces. Where conflicts occur the Contractor shall meet with all involved trades and the Owner's Representative and resolve the conflict prior to erection of any work in the area involved.
3.    Prior to the installation of any ceiling material, gypsum, plaster, or acoustical board, the Contractor shall notify the Owner's Representative so that arrangements can be made for an inspection of the above-ceiling area about to be "sealed off." The Contractor shall give as much advance notice as possible up to ten (10) working days, but in no case less than five (5) working days.
4.    The purpose of this inspection is to verify the completeness and quality of the installation of the air conditioning systems, the plumbing systems, and any other special above-ceiling systems such as pneumatic tube. The ceiling supports (tee bar or lath) should be in place so that access panel and light fixture locations are identifiable and so that clearances and access provisions may be evaluated.
5.    No ceiling material shall be installed until the deficiencies listed from this inspection have been corrected to the satisfaction of the Owner's Representative.

3.8    CUTTING AND PATCHING

A.    General: Cut and patch walls, floors, etc. resulting from work in existing construction or where made necessary by failure to provide proper openings or recesses in new construction.

B.    Methods of Cutting: Openings cut through concrete and masonry shall be made with masonry saws and/or core drills and at such locations acceptable to the Owner's Representative. Impact-type equipment will not be used except where specifically acceptable to the Owner's Representative. Openings in concrete for pipes, conduits, outlet boxes, etc. shall be core drilled to exact size. **Determine location of embedded conduit and reinforcing bars prior to cutting.**

C.    Restoration: All openings shall be restored to "as-new" condition under the appropriate specification section for the materials involved, and shall match remaining surrounding materials and/or finishes.

D.    Masonry: Where openings are cut through masonry walls, provide and install lintels or other structural supports to protect the remaining masonry. Adequate supports shall be provided during the cutting operation to prevent any damage to the masonry occasioned by the operation. All structural members, supports, etc. shall be of the proper size and shape, and shall be installed in a manner acceptable to the Owner's Representative.

E.    Plaster: All plumbing work in area containing plaster shall be completed prior to the application of the finish plaster coat. Cutting of finish plaster coat will not be permitted.

F.    Weakening: No cutting, boring, or excavating which will weaken the structure shall be undertaken.

3.9    ROOF PENETRATIONS AND FLASHING

A.    Pipe and conduit ducts, pitch pockets, curb bases, and flashing compatible with the roofing installation shall be provided for roof penetrations. Provide framing or other support around all openings through roof as required to preserve the structural integrity of the roof system and make the penetration weathertight.

3.10    EXCAVATING AND BACKFILLING

A.    Perform trenching, excavating, backfilling for plumbing work as set forth below.

B.    Depth of excavation varies with invert of pipe. Excavation to be carried to a depth of at least 6 inches below bottom of pipe elevation. Fill below pipe (6 inches), around pipe, and a minimum of 12 inches above pipe with sand of Class "B" crushed stone tamped firm and even. Separate topsoil during excavation. Final layer of dirt for exterior installations to be (6 inches minimum) to be topsoil. Backfilling shall be done to exclude use of rock or stone above sand or Class "B" crushed stone.

3.11    TESTS AND INSPECTIONS

A.    General:  The Contractor shall make all tests deemed necessary by the inspection departments of the engineer and the authority having jurisdiction, Board of Underwriters, etc.  He shall provide all equipment, materials, and labor for making such tests.  Fuel and electrical energy for system operational tests following beneficial occupancy by the Owner will be paid for by the Owner.

B.    Other:  Additional tests specified hereinafter under the various specifications sections shall be made.

C.    Notification: The Owner's Representative shall be notified at his office 36 hours prior to each test and other specifications requirements requiring action on the part of the Owner, Architect, Engineer, and/or Owner's Representative.

D.    Test Logs:  All tests which the Contractor conducts shall have pertinent data logged by the Contractor at the time of testing.  Data shall include date, time, personnel, description and extent of system tested, test conditions, test results, specified results, and any other pertinent data.  Data shall be delivered to the Owner's Representative as specified under "Requirements for Final Acceptance.

E.    Inspections:  In general, an inspection by the Owner's Representative shall be required prior to closing up any work and prior to beneficial occupancy or final project completion.  The closing up of work includes, but is not limited to, pipe and conduit installations prior to backfilling; mechanical, plumbing electrical, and fire protection work prior to placement of concrete; or closing up walls and overhead mechanical, plumbing, electrical and fire protection work prior to installation of the ceiling.

3.12    CLEANING AND PAINTING

A.    Thoroughly clean and touch up the finish on all parts of the materials and equipment.  Exposed parts in equipment rooms, and all other spaces except sealed chases and attics shall be thoroughly cleaned of cement, plaster, and other materials, and all oil and grease spots shall be removed.  Such surfaces shall be carefully wiped and all cracks and corners scraped out.

B.    All other painting shall be accomplished under the Painting Section of Division 9 of the specifications.

3.13    DISCHARGE OF WASTES FROM CONSTRUCTION SITE

A.    The Contractor shall comply with all applicable provisions of local, state, and federal laws regarding the discharge of wastes into sewer and waterways.  Special caution shall be exercised to prevent the discharge of wastes which contain oil, tar, asphalt, roofing compound, kerosene, gasoline, paint, mud, cement, lime, or other materials which would degrade the water quality of the receiving water course.  The Contractor shall construct and maintain oil interceptors, settling basins, acid neutralization tanks, and/or other effective pollution countermeasures, as required by the Texas Water Quality Board.

B.    On LEED and CHPS projects, contractor is responsible for tracking waste leaving the jobsite.  All waste on these projects to be sorted and processed during construction.

**END OF SECTION**

**SECTION 220500 - BASIC PLUMBING MATERIALS AND METHODS**

**PART 1 - GENERAL**

1.1     SUMMARY

A.     This Section includes the following basic plumbing materials and methods to complement other Plumbing Sections.
1.     Piping materials and installation instructions common to most piping systems.
2.     Concrete base construction requirements.
3.     Escutcheons.
4.     Dielectric fittings.
5.     Dielectric isolation tape
6.     Flexible connectors.
7.     Mechanical sleeve seals.
8.     Nonshrink grout for equipment installations.
9.     Field-fabricated metal and wood equipment supports.
10.     Installation requirements common to equipment specification sections.
11.     Mechanical demolition.
12.     Cutting and patching.
13.     Touchup painting and finishing.
14.     Access Doors

B.     Pipe and pipe fitting materials are specified in Plumbing piping system Sections, if applicable.

1.2     DEFINITIONS

A.     Finished Spaces:  Spaces other than mechanical and electrical equipment rooms, furred spaces, pipe and duct shafts, unheated spaces immediately below roof, spaces above ceilings, unexcavated spaces, crawl spaces, and tunnels.

B.     Exposed, Interior Installations:  Exposed to view indoors.  Examples include finished occupied spaces and mechanical equipment rooms.

C.     Exposed, Exterior Installations:  Exposed to view outdoors, or subject to outdoor ambient temperatures and weather conditions.  Examples include rooftop locations.

D.     Concealed, Interior Installations:  Concealed from view and protected from physical contact by building occupants.  Examples include above ceilings and in duct shafts.

E.     Concealed, Exterior Installations:  Concealed from view and protected from weather conditions and physical contact by building occupants, but subject to outdoor ambient temperatures.  Examples include installations within unheated shelters.

F.     The following are industry abbreviations for plastic materials:
1.     ABS:  Acrylonitrile-butadiene-styrene plastic.
2.     CPVC:  Chlorinated polyvinyl chloride plastic.
3.     NP:  Nylon plastic.
4.     PE:  Polyethylene plastic.
5.     PVC:  Polyvinyl chloride plastic.

G.     The following are industry abbreviations for rubber materials:
1.     CR:  Chlorosulfonated polyethylene synthetic rubber.
2.     EPDM:  Ethylene propylene diene terpolymer rubber.

1.3     SUBMITTALS

A. Product Data:  For dielectric fittings, flexible connectors, access doors, solder/brazing material and mechanical sleeve seals.

B. Shop Drawings:  Detail fabrication and installation for metal and wood supports and anchorage for mechanical materials and equipment.

C. Coordination Drawings:  Detail major elements, components, and systems of plumbing equipment and materials in relationship with other systems, installations, and building components.  Show space requirements for installation and access.  Indicate if sequence and coordination of installations are important to efficient flow of the Work.  Include the following:
1. Clearances for servicing and maintaining equipment, accessories, and specialties, including space for disassembly required for periodic maintenance.
2. Equipment and accessory service connections and support details.
3. Fire-rated wall and floor penetrations.
4. Scheduling, sequencing, movement, and positioning of large equipment into building during construction.
5. Access panel and door locations

1.4    QUALITY ASSURANCE

**A. All materials, unless otherwise specified, shall be 51% manufactured in the United States, new, free from all defects, and of the best quality.  Foreign goods specifically approved for use by the Owner's Representative prior to bidding may be furnished.**

B. Materials and equipment shall be installed in accordance with the manufacturer's recommendations and the best standard practice for the type of work involved.  All work shall be executed by mechanics skilled in their respective trades, and the installations shall present a neat, precise appearance.

C. Comply with ASME A13.1 for lettering size, length of color field, colors, and viewing angles of identification devices.

D. Equipment Selection:  Equipment of higher electrical characteristics, physical dimensions, capacities, and ratings may be furnished provided such proposed equipment is approved in writing and connecting mechanical and electrical services, circuit breakers, conduit, motors, bases, and equipment spaces are increased. Additional costs shall be approved in advance by  appropriate  Contract  Modification  for these increases.  If minimum energy ratings or efficiencies of equipment are specified, equipment must meet design and commissioning requirements.

1.5    DELIVERY, STORAGE, AND HANDLING

A. Deliver pipes and tubes with factory-applied end caps.  Maintain end caps through shipping, storage, and handling to prevent pipe end damage and prevent entrance of dirt, debris, and moisture.

B. Protect stored pipes and tubes from moisture and dirt.  Elevate above grade.  Do not exceed structural capacity of floor, if stored inside.

C. Protect flanges, fittings, and piping specialties from moisture and dirt.

D. Store plastic pipes protected from direct sunlight.  Support to prevent sagging and bending.

1.6    SEQUENCING AND SCHEDULING

A. Coordinate plumbing equipment installation with other building components.

B. Arrange for pipe spaces, chases, slots, and openings in building structure during progress of construction to allow for plumbing installations.

C. Coordinate installation of required supporting devices and set sleeves in poured-in-place concrete and other structural components, as they are constructed.

D.   Sequence, coordinate, and integrate installations of plumbing materials and equipment for efficient flow of the Work.  Coordinate installation of large equipment requiring positioning before closing in building.

E.   Coordinate connection of plumbing systems with exterior underground and overhead utilities and services.  Comply with requirements of governing regulations, franchised service companies, and controlling agencies.

F.   Coordinate requirements for access panels and doors if plumbing items requiring access are concealed behind finished surfaces.

G.   Coordinate installation of identifying devices after completing covering and painting, if devices are applied to surfaces.  Install identifying devices before installing acoustical ceilings and similar concealment.

## PART 2 - PRODUCTS

2.1   MANUFACTURERS

A.   Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
   1.   Dielectric Tape:
      a.   Holdrite (#272-4).
   2.   Metal, Flexible Connectors:
      a.   Flexicraft Industries.
      b.   Flex-Weld, Inc.
      c.   Grinnell Corp.; Grinnell Supply Sales Co.
      d.   Mercer Rubber Co.
      e.   Metraflex Co.
      f.   Uniflex, Inc.
   3.   Rubber, Flexible Connectors:
      a.   General Rubber Corp.
      b.   Mercer Rubber Co.
      c.   Metraflex Co.
      d.   Red Valve Co., Inc.
      e.   Uniflex, Inc.
   4.   Mechanical Sleeve Seals:
      a.   Calpico, Inc.
      b.   Metraflex Co.
      c.   Thunderline/Link-Seal.

2.2   PIPE AND PIPE FITTINGS

A.   Refer to individual Specification piping Sections for pipe and fitting materials and joining methods, if applicable.

B.   Pipe Threads:  ASME B1.20.1 for factory-threaded pipe and pipe fittings.

2.3   JOINING MATERIALS

A.   Refer to individual Specification piping Sections for special joining materials not listed below, if applicable.

B.   Pipe-Flange Gasket Materials:  Suitable for chemical and thermal conditions of piping system contents.
   1.   ASME B16.21, nonmetallic, flat, asbestos-free, 1/8-inch maximum thickness, unless thickness or specific material is indicated.
      a.   Full-Face Type:  For flat-face, Class 125, cast-iron and cast-bronze flanges.
      b.   Narrow-Face Type:  For raised-face, Class 250, cast-iron and steel flanges.
   2.   AWWA C110, rubber, flat face, 1/8 inch thick, unless otherwise indicated; and full-face or ring type, unless otherwise indicated.

C.      Flange Bolts and Nuts:  ASME B18.2.1, carbon steel, unless otherwise indicated.

D.      Plastic, Pipe-Flange Gasket, Bolts, and Nuts:  Type and material recommended by piping system manufacturer, unless otherwise indicated.

E.      Solder Filler Metals:  ASTM B 32.
        1.      ASTM B 32, 95/5 lead-free alloys.  Include water –flushable and soluble flux according to ASTM B 813.

F.      Brazing Filler Metals:  AWS A5.8.
        1.      BCuP Series:  Copper-phosphorus alloys.
        2.      BAg1:  Silver alloy.

G.      Welding Filler Metals:  Comply with AWS D10.12 for welding materials appropriate for wall thickness and chemical analysis of steel pipe being welded.

H.      Solvent Cements:  Manufacturer's standard solvent cements for the following:
        1.      CPVC Piping:  ASTM F 493.
        2.      PVC Piping:  ASTM D 2564, medium bodied (bond).  Include purple primer according to ASTM F 656.

I.      Plastic Pipe Seals:  ASTM F 477, elastomeric gasket.

J.      Flanged, Ductile-Iron Pipe Gasket, Bolts, and Nuts:  AWWA C110, rubber gasket, carbon-steel bolts and nuts.

K.      Couplings:  Iron-body sleeve assembly, fabricated to match OD of plain-end, pressure pipes.
        1.      Sleeve:  ASTM A 126, Class B, gray iron.
        2.      Followers:  ASTM A 47 malleable iron or ASTM A 536 ductile iron.
        3.      Gaskets:  Rubber.
        4.      Bolts and Nuts:  AWWA C111.
        5.      Finish:  Enamel paint.


2.4     DIELECTRIC FITTINGS

A.      General Requirements:  Assembly of copper alloy and ferrous materials or ferrous material body with separating nonconductive insulating material suitable for system fluid, pressure, and temperature, to prevent galvanic action and stop corrosion. Unions in first paragraph below are available in at least NPS 1/2 to NPS 2.

B.      Dielectric Unions:
        1.      Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
                a.      Capitol Manufacturing Company.
                b.      Central Plastics Company.
                c.      EPCO Sales, Inc.
                d.      Hart Industries International, Inc.
                e.      Watts Regulator Co.; a division of Watts Water Technologies, Inc.
                f.      Zurn Plumbing Products Group; Wilkins Water Control Products.
        2.      Description:
                a.      Pressure Rating:  250 psig at 180 deg F.
                b.      End Connections:  Solder-joint copper alloy and threaded ferrous.
                c.      Flanges in first paragraph below are available in at least NPS 1-1/2 to NPS 4.

C.      Dielectric Flanges:
        1.      Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
                a.      Capitol Manufacturing Company.
                b.      Central Plastics Company.
                c.      EPCO Sales, Inc.
                d.      Watts Regulator Co.; a division of Watts Water Technologies, Inc.
        2.      Description:

        a.     Factory-fabricated, bolted, companion-flange assembly.

        b.     Pressure Rating: 175 psig minimum.

        c.     End Connections: Solder-joint copper alloy and threaded ferrous; threaded solder-joint copper alloy and threaded ferrous.

D.    Dielectric-Flange Kits:

    1.    Manufacturers: Subject to compliance with requirements, provide products by one of the following:

        a.     Advance Products & Systems, Inc.

        b.     Calico, Inc.

        c.     Central Plastics Company.

        d.     Pipeline Seal and Insulator, Inc.

    2.    Description:

        a.     Nonconducting materials for field assembly of companion flanges.

        b.     Pressure Rating: 150 psig.

        c.     Gasket: Neoprene or phenolic.

        d.     Bolt Sleeves: Phenolic or polyethylene.

        e.     Washers: Phenolic with steel backing washers.

E.    Dielectric Couplings:

    1.    Manufacturers: Subject to compliance with requirements, provide products by one of the following:

        a.     Calpico, Inc.

        b.     Lochinvar Corporation.

    2.    Description:

        a.     Galvanized-steel coupling.

        b.     Pressure Rating: 300 psig at 225 deg F.

        c.     End Connections: Female threaded.

        d.     Lining: Inert and noncorrosive, thermoplastic.

F.    Dielectric Nipples:

    1.    Manufacturers: Subject to compliance with requirements, provide products by one of the following:

        a.     Perfection Corporation; a subsidiary of American Meter Company.

        b.     Precision Plumbing Products, Inc.

        c.     Victaulic Company.

    2.    Description:

        a.     Electroplated steel nipple complying with ASTM F 1545.

        b.     Pressure Rating: 300 psig at 225 deg F.

        c.     End Connections: Male threaded or grooved.

        d.     Lining: Inert and noncorrosive, propylene.

## 2.5 DIELECTRIC ISOLATION TAPE

A.    Tape to eliminate dissimilar metal contact: (equal to Holdrite #272-4)

    1.    White Polyester Felt. Pressure sensitive adhesive rubber base (one side only).

    2.    4" width.

## 2.6 FLEXIBLE CONNECTORS

A.    General: Fabricated from materials suitable for system fluid and that will provide flexible pipe connections. Include 125-psig minimum working-pressure rating, unless higher working pressure is indicated, and ends according to the following:

    1.    2-Inch NPS and Smaller: Threaded.

    2.    2-1/2-Inch NPS and Larger: Flanged.

    3.    Option for 2-1/2-Inch NPS and Larger: Grooved for use with keyed couplings.

B.    Bronze-Hose, Flexible Connectors: Corrugated, bronze, inner tubing covered with bronze wire braid. Include copper-tube ends or bronze flanged ends, braze welded to hose.

C.      Rubber, Flexible Connectors:  CR or EPDM elastomer rubber construction, with multiple plies of NP fabric, molded and cured in hydraulic presses.  Include 125-psig minimum working-pressure rating at 220 deg F.  Units may be straight or elbow type, unless otherwise indicated.

2.7      MECHANICAL SLEEVE SEALS

A.      Description:  Modular sealing element unit, designed for field assembly, used to fill annular space between pipe and sleeve.
1.      Sealing Elements:  EPDM-rubber interlocking links shaped to fit surface of pipe.  Include type and number required for pipe materials and size of pipe.
2.      Pressure Plates:  Stainless steel.
3.      Connecting Bolts and Nuts:  Stainless steel of length required to secure pressure plates to sealing elements.

2.8      PIPING SPECIALTIES

A.      Sleeves:  The following materials are for wall, floor, slab, and roof penetrations:
1.      Steel Sheet Metal:  0.0239-inch minimum thickness, galvanized, round tube closed with welded longitudinal joint.
2.      Steel Pipe:  ASTM A 53, Type E, Grade A, Schedule 40, galvanized, plain ends.
3.      Cast Iron:  Cast or fabricated "wall pipe" equivalent to ductile-iron pressure pipe, with plain ends and integral waterstop, unless otherwise indicated.
4.      Stack Sleeve Fittings:  Manufactured, cast-iron sleeve with integral clamping flange.  Include clamping ring and bolts and nuts for membrane flashing.
        a.      Underdeck Clamp:  Clamping ring with set screws.
5.      Sleeve Fasteners: Manufactured, steel clips for securement during pour. Equal to B-line, BD40, BE-5-8 or BE-9-12.

B.      Escutcheons:  Manufactured wall, ceiling, and floor plates; deep-pattern type if required to conceal protruding fittings and sleeves.
1.      ID:  Closely fit around pipe, tube, and insulation of insulated piping.
2.      OD:  Completely cover opening.
3.      Cast Brass:  One piece, with set screw.  (split face acceptable for existing piping)
        a.      Finish:  Polished chrome-plate.

2.9      GROUT

A.      Nonshrink, Nonmetallic Grout:  ASTM C 1107, Grade B.
1.      Characteristics:  Post-hardening, volume-adjusting, dry, hydraulic-cement grout, nonstaining, noncorrosive, nongaseous, and recommended for interior and exterior applications.
2.      Design Mix:  5000-psig, 28-day compressive strength.
3.      Packaging:  Premixed and factory packaged.

2.10      ACCESS DOORS

A.      General: Provide access doors for all serviceable mechanical appurtenances (valves, trap primers, shock arresters, actuators, sensors, etcetera) in inaccessible locations.  Such locations include gypsum, brick and CMU ceilings and walls.

B.      Location of panels shall be carefully coordinated with other Exposed Devices as described in earlier paragraphs.

C.      Manufacturers shall be Milcor, Mifab, or approved equal.  Unless indicated otherwise, use panels equal to Milcor Style M for masonry and drywall construction, equal to Milcor Style K for plastered masonry walls and ceilings.  Stainless steel panels shall be used in ceramic tile or glazed structural tile.

D.      Minimum construction features include 16-gage frame and door, continuous hinges, cam-style latch and 10x10" unobstructed opening size.

E.      UL labeled when in fire-rated construction, one and one-half hour rating.

F.   Access doors located outside, in restrooms or in a moisture-laden environment (dressing area, shower area, lockers, etcetera) shall be stainless steel construction.

G.   Equipment access doors shall be of sufficient size to remove/replace equipment and provide routine maintenance as necessary, unless otherwise noted.  Doors shall be set flush with adjacent finish surfaces.  All access doors shall be provided with cylinder locks. All access doors (MEP) shall have one (1) common key.

## PART 3 - EXECUTION

### 3.1   PIPING SYSTEMS - COMMON REQUIREMENTS AND APPLICATIONS

A.   General:  Install piping as described below, unless piping Sections specify otherwise.  Individual piping Sections specify unique piping installation requirements.

B.   General Locations and Arrangements:  Drawing plans, schematics, and diagrams indicate general location and arrangement of piping systems.  Indicated locations and arrangements were used to size pipe and calculate friction loss, expansion, pump sizing, and other design considerations.  Install piping as indicated, unless deviations to layout are approved on Coordination Drawings.

C.   All piping to be installed in compliance with current NEC required clearances.

D.   Install manufactured isolation clamps at all dissimilar metal pipe supports.  Install dielectric isolation tape (engineer approved) only when a manufactured isolation clamp is not available.

E.   Install piping at indicated slope.

F.   Install components with pressure rating equal to or greater than system operating pressure.

G.   Install piping in concealed interior and exterior locations, except in equipment rooms and service areas.

H.   Install piping free of sags and bends.

I.   Install exposed interior and exterior piping at right angles or parallel to building walls.  Diagonal runs are prohibited, unless otherwise indicated.

J.   Install piping tight to slabs, beams, joists, columns, walls, and other building elements.  Allow sufficient space above removable ceiling panels to allow for ceiling panel removal.

K.   Install piping to allow application of insulation plus 1-inch clearance around insulation.

L.   Locate groups of pipes parallel to each other, spaced to permit valve servicing.

M.   Install fittings for changes in direction and branch connections.

N.   Install couplings according to manufacturer's written instructions.

O.   Fire-Barrier Penetrations:  Maintain indicated fire rating of walls, partitions, ceilings, and floors at pipe penetrations.  Seal pipe penetrations with firestop materials.  Comply with requirements in Division 07 Section "Penetration Firestopping" for firestop materials and installations.
1.   Fire-stop all sleeves at floor penetrations of multistory buildings including underfloor penetrations.

P.   Verify final equipment locations for roughing-in.

Q.   Refer to equipment specifications in other Sections of these Specifications for roughing-in requirements.

R.   Piping Joint Construction:  Join pipe and fittings as follows and as specifically required in individual piping specification Sections:
1.   Ream ends of pipes and tubes and remove burrs.  Bevel plain ends of steel pipe.
2.   Remove scale, slag, dirt, and debris from inside and outside of pipe and fittings before assembly.

3. Soldered Joints: Construct joints according to AWS's "Soldering Manual," Chapter "The Soldering of Pipe and Tube"; or CDA's "Copper Tube Handbook."

4. Brazed Joints: Construct joints according to AWS's "Brazing Handbook," Chapter "Pipe and Tube."

5. Threaded Joints: Thread pipe with tapered pipe threads according to ASME B1.20.1. Cut threads full and clean using sharp dies. Ream threaded pipe ends to remove burrs and restore full ID. Join pipe fittings and valves as follows:
    a. Note internal length of threads in fittings or valve ends, and proximity of internal seat or wall, to determine how far pipe should be threaded into joint.
    b. Apply appropriate tape or thread compound to external pipe threads, unless dry seal threading is specified.
    c. Align threads at point of assembly.
    d. Tighten joint with wrench. Apply wrench to valve end into which pipe is being threaded.
    e. Damaged Threads: Do not use pipe or pipe fittings with threads that are corroded or damaged. Do not use pipe sections that have cracked or open welds.

6. Welded Joints: Construct joints according to AWS D10.12, "Recommended Practices and Procedures for Welding Low Carbon Steel Pipe," using qualified processes and welding operators according to "Quality Assurance" Article.

7. Flanged Joints: Align flange surfaces parallel. Select appropriate gasket material, size, type, and thickness for service application. Install gasket concentrically positioned. Assemble joints by sequencing bolt tightening to make initial contact of flanges and gaskets as flat and parallel as possible. Use suitable lubricants on bolt threads. Tighten bolts gradually and uniformly using torque wrench.

8. Plastic Piping Solvent-Cement Joints: Clean and dry joining surfaces by wiping with clean cloth or paper towels. Join pipe and fittings according to the following:
    a. Comply with ASTM F 402 for safe-handling practice of cleaners, primers, and solvent cements.
    b. CPVC Piping: ASTM D 2846 and ASTM F 493.
    c. PVC Pressure Piping: ASTM D 2672.
    d. PVC Nonpressure Piping: ASTM D 2855.

9. Plastic Piping Heat-Fusion Joints: Clean and dry joining surfaces by wiping with clean cloth or paper towels. Join according to ASTM D 2657 procedures and manufacturer's written instructions.
    a. Plain-End Pipe and Fittings: Use butt fusion.
    b. Plain-End Pipe and Socket Fittings: Use socket fusion.

3.2 ESCUTCHEON REQUIREMENTS

A. Install escutcheons at pipe penetrations of walls, ceilings, and floors in finished areas.
    1. Escutcheons for New Piping:
        a. Piping exposed through floors and walls in finished areas: One piece, cast brass with polished chrome-plated finish with set screw. Deep escutcheons to be provided where standard depth will not fit.
        b. Escutcheons shall cover entire hole penetration.
        c. Escutcheon to be appropriately sized for pipe.
    2. Escutcheons for Existing piping:
        a. Piping exposed through floors and walls in finished areas: Split plate, cast brass with polished chrome-plated finish with set screw. Deep escutcheons to be provided where standard depth will not fit.
        b. Escutcheons shall cover entire hole penetration.
        c. Escutcheon to be appropriately sized for pipe.
    3. Install escutcheons at wall, floor, and ceiling penetrations in exposed finished locations and within cabinets and millwork. Use deep-pattern escutcheons if required to conceal protruding pipe fittings.

3.3 PIPE SLEEVE INSTALLATION REQUIREMENTS

A. Pipe sleeves are required at all through wall and floor penetrations.
    1. Sleeves are to be of the following material:
        a. Galvanized-Steel-Pipe Sleeves: ASTM A 53/A 53M, Type E, Grade B, Schedule 40, zinc-coated, with plain ends.

2. Sleeves are required for all through floor and wall penetrations. Sleeves to be set and poured in place (in slab applications), secure all sleeves with fasteners.
3. Sleeves to extend 2 inches past face of floor or wall. Pipe sleeve in finished areas to be flush with wall or floor for installation of escutcheon.
4. Install sleeves in new partitions, slabs, and walls as they are built.
5. For interior wall penetrations, seal annular space between sleeve and pipe or pipe insulation using joint sealants appropriate for size, depth, and location of joint. Comply with requirements in Division 07 Section "Joint Sealants" for joint sealants.
6. For exterior wall penetrations above grade, seal annular space between sleeve and pipe using joint sealants appropriate for size, depth, and location of joint. Comply with requirements in Division 07 Section "Joint Sealants" for joint sealants.
7. For exterior wall penetrations below grade, seal annular space between sleeve and pipe using sleeve seals specified in this Section.
8. Install sleeves that are large enough to provide 1/4-inch (6.4-mm) annular clear space between sleeve and pipe or pipe insulation unless otherwise indicated. Seal annular space with water tight sealant. (equal to NP-1). All sleeves and penetrations to maintain rating of wall / floor. Seal pipe penetrations with fire-stopping materials.
9. Install sleeve materials according to the following applications:
   a. Sleeves for Piping Passing through Concrete Floor Slabs: galvanized steel pipe.
   b. Sleeves for Piping Passing through Concrete Floor Slabs of Mechanical Equipment Areas or Other Wet Areas: Galvanized-steel pipe sleeves.
      1) Extend sleeves 2 inches above finished floor level.
      2) For pipes penetrating floors with membrane waterproofing, extend cast-iron sleeve fittings below floor slab as required to secure clamping ring if ring is specified. Secure flashing between clamping flanges. Install section of cast-iron soil pipe to extend sleeve to 2 inches (50 mm) above finished floor level. Comply with requirements in Division 07 Section "Sheet Metal Flashing and Trim" for flashing.
10. Sleeves for Piping Passing through Gypsum-Board Partitions:
   a. Galvanized-steel pipe sleeves.
   b. Exception: Sleeves are not required for water supply tubes and waste pipes for individual plumbing fixtures if escutcheons will cover openings.
11. Sleeves for Piping Passing through Concrete Roof Slabs: Reference details.
12. Sleeves for Piping Passing through Exterior Concrete Walls:
   a. Galvanized-steel pipe sleeves.
   b. Install sleeves that are large enough to provide 1-inch annular clear space between sleeve and pipe or pipe insulation when sleeve seals are used.
13. Sleeves for Piping Passing through Interior Concrete Walls:
   a. Galvanized-steel pipe sleeves.
14. Mechanical sleeve seals
   a. Install sleeve seals in sleeves in exterior concrete walls at water-service piping entries into building. Sleeves must be poured in place. Installation of sleeves after wall is constructed is not acceptable.
   b. Select type and number of sealing elements required for pipe material and size. Position pipe in center of sleeve. Assemble sleeve seal components and install in annular space between pipe and sleeve. Tighten bolts against pressure plates that cause sealing elements to expand and make watertight seal.

B. Piping Connections: Make connections according to the following, unless otherwise indicated:
1. Install unions, in piping 2-inch NPS and smaller, adjacent to each valve and at final connection to each piece of equipment with 2-inch NPS or smaller threaded pipe connection.
2. Install flanges, in piping 2-1/2-inch NPS and larger, adjacent to flanged valves and at final connection to each piece of equipment with flanged pipe connection.
3. Dry Piping Systems: Install dielectric unions and flanges to connect piping materials of dissimilar metals.
4. Wet Piping Systems: Install dielectric coupling and nipple fittings to connect piping materials of dissimilar metals.

3.4 DIELECTRIC FITTING INSTALLATION

A. Install unions, in piping 2-inch NPS and smaller, adjacent to each valve and at final connection to each piece of equipment with 2-inch NPS or smaller threaded pipe connection.

B.  Install flanges, in piping 2-1/2-inch NPS and larger, adjacent to flanged valves and at final connection to each piece of equipment with flanged pipe connection.

3.5  EQUIPMENT INSTALLATION – COMMON REQUIREMENTS

A.  Install equipment to provide maximum possible headroom, if mounting heights are not indicated.

B.  Install equipment according to approved submittal data.  Portions of the Work are shown only in diagrammatic form.  Refer conflicts to Architect.

C.  Install equipment level and plumb, parallel and perpendicular to other building systems and components in exposed interior spaces, unless otherwise indicated.

D.  Install mechanical equipment to facilitate service, maintenance, and repair or replacement of components.  Connect equipment for ease of disconnecting, with minimum interference to other installations.  Extend grease fittings to accessible locations.

E.  Install equipment giving right of way to piping installed at required slope.

3.6  PAINTING AND FINISHING

A.  Apply paint to exposed piping according to the following, unless otherwise indicated:
    1.  Interior, Ferrous Piping:  Use semigloss, acrylic-enamel finish.  Include finish coat over enamel undercoat and primer.
    2.  Interior, Galvanized-Steel Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over galvanized metal primer.
    3.  Interior, Ferrous Supports:  Use semigloss, acrylic-enamel finish.  Include finish coat over enamel undercoat and primer.
    4.  Exterior, Ferrous Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over rust-inhibitive metal primer.
    5.  Exterior, Galvanized-Steel Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over galvanized metal primer.
    6.  Exterior, Ferrous Supports:  Use semigloss, acrylic-enamel finish.  Include two finish coats over rust-inhibitive metal primer.

B.  Do not paint piping specialties with factory-applied finish.

C.  Damage and Touchup:  Repair marred and damaged factory-painted finishes with materials and procedures to match original factory finish.

3.7  ERECTION OF METAL SUPPORTS AND ANCHORAGE

A.  Cut, fit, and place miscellaneous metal supports accurately in location, alignment, and elevation to support and anchor mechanical materials and equipment.

B.  Field Welding:  Comply with AWS D1.1, "Structural Welding Code--Steel."

3.8  ERECTION OF WOOD SUPPORTS AND ANCHORAGE

A.  Cut, fit, and place wood grounds, nailers, blocking, and anchorage to support and anchor mechanical materials and equipment (not to be used at pipe supports).

B.  Select fastener sizes that will not penetrate members if opposite side will be exposed to view or will receive finish materials.  Tighten connections between members.  Install fasteners without splitting wood members.

C.  Attach to substrates as required to support applied loads.

3.9  DEMOLITION

A.  Cut, channel, chase, and drill floors, walls, partitions, ceilings, and other surfaces necessary for mechanical installations.  Perform cutting by skilled mechanics of trades involved.

B.  Repair cut surfaces to match adjacent surfaces.

3.10    CUTTING AND PATCHING

A.  Disconnect, demolish, and remove Work specified in Plumbing Sections.

B.  If pipe, ductwork, insulation, or equipment to remain is damaged or disturbed, remove damaged portions and install new products of equal capacity and quality.

C.  Accessible Work:  Remove indicated exposed pipe and ductwork in its entirety.

D.  Work Abandoned in Place:  Cut and remove underground pipe a minimum of 2 inches beyond face of adjacent construction.  Cap and patch surface to match existing finish.

E.  Removal:  Remove indicated equipment from Project site.

F.  Temporary Disconnection:  Remove, store, clean, reinstall, reconnect, and make operational equipment indicated for relocation.

3.11    GROUTING

A.  Install nonmetallic, nonshrink, grout for plumbing equipment base bearing surfaces, pump and other equipment base plates, and anchors.  Mix grout according to manufacturer's written instructions.

B.  Clean surfaces that will come into contact with grout.

C.  Provide forms as required for placement of grout.

D.  Avoid air entrapment during placing of grout.

E.  Place grout, completely filling equipment bases.

F.  Place grout on concrete bases to provide smooth bearing surface for equipment.

G.  Place grout around anchors.

H.  Cure placed grout according to manufacturer's written instructions.

**END OF SECTION**

**SECTION 220519 - METERS AND GAUGES FOR PLUMBING**

**PART 1 - GENERAL**

1.1     SUMMARY

    A.     This Section includes the following meters and gauges for plumbing systems:
        1.     Thermometers.
        2.     Gauges.
        3.     Test plugs
        4.     Flow indicators.
        5.     Temperature and Pressure Test Kit

    B.     Related Sections include the following:
        1.     Specification Section "Domestic Water Piping" for domestic water appurtenances.

1.2     SUBMITTALS

    A.     Product Data:  For each type of product to be installed.

    B.     Operation and Maintenance Data:  For all products to be installed.

**PART 2 - PRODUCTS**

2.1     MANUFACTURERS

    A.     In other Part 2 articles where titles below introduce lists, the following requirements apply to product selection:
        1.     Manufacturers:  Subject to compliance with requirements, provide products by one of the manufacturers specified.

2.2     METAL-CASE, LIQUID-IN-GLASS THERMOMETERS

    A.     Manufacturers:
        1.     Palmer - Wahl Instruments Inc.
        2.     Trerice, H. O. Co.
        3.     Weiss Instruments, Inc.
        4.     Weksler Instruments Operating Unit; Dresser Industries; Instrument Div.

    B.     Case:  Black-finished Aluminum, 9 inches long.

    C.     Tube:  Red or blue reading, organic-liquid filled, with magnifying lens.

    D.     Tube Background:  Satin-faced, nonreflective aluminum with permanently baked on scale markings on lens (U.V. protected).

    E.     Window:  Glass.

    F.     Connector:  Adjustable type, 180 degrees in vertical plane, 360 degrees in horizontal plane, with locking device.

    G.     Stem:  Brass for thermowell installation and of length to suit installation.

    H.     Accuracy:  Plus or minus 1 percent of range or plus or minus 1 scale division to maximum of 1.5 percent of range.

2.3     THERMOWELLS

    A.     Manufacturers:
        1.     Palmer – Wahl Instruments Inc.
        2.     Trerice, H. O. Co.
        3.     Weiss Instruments, Inc.
        4.     Weksler Instruments Operating Unit; Dresser Industries; Instrument Div.

    B.     Manufacturers: Same as manufacturer of thermometer being used.

    C.     Description: Pressure-tight, socket-type metal fitting made for insertion into piping and of type, diameter, and length required to hold thermometer.  Provide extended neck to accommodate insulation thickness.

2.4     PRESSURE GAUGES

    A.     Manufacturers:
        1.     Palmer – Wahl Instruments, Inc.
        2.     Trerice, H. O. Co.
        3.     Weiss Instruments, Inc.
        4.     Weksler Instruments Operating Unit; Dresser Industries; Instrument Div.

    B.     Direct Mounting, Dial-type Dry or Liquid Filled Pressure Gauges: Indicating-dial type complying with ASME B40.100.
        1.     Case: Dry or Liquid-filled type, stainless steel, 4-inch diameter. Weatherproof.
        2.     Pressure-Element Assembly: Bourdon tube, unless otherwise indicated.
        3.     Pressure Connection: Brass, NPS 1/4, bottom-outlet type unless back-outlet type is indicated.
        4.     Movement: Mechanical, with link to pressure element and connection to pointer.
        5.     Dial: Satin-faced, nonreflective aluminum with baked on scale markings.
        6.     Pointer: Red or other dark-color metal.
        7.     Window: Glass
        8.     Ring: Stainless
        9.     Accuracy: Grade B, plus or minus 2 percent of middle half scale.
      10.     Vacuum-Pressure Range: 30-in. Hg of vacuum to 15 psig of pressure.
      11.     Range of Fluids under Pressure: Two times operating pressure.

    C.     Pressure-Gauge Fittings:
        1.     Valves: NPS ¼ brass or stainless-steel needle type.
        2.     Syphons: NPS ¼ coil of brass tubing with threaded ends.
        3.     Snubbers: ASME B40.5,NPS ¼ brass bushing with corrosion-resistant, porous-metal disc of material suitable for system fluid and working pressure.

2.5     TEST PLUGS (PT PORTS)

    A.     Manufacturers:
        1.     Palmer – Wahl Instruments, Inc.
        2.     Trerice, H. O. Co.
        3.     Weiss Instruments, Inc.
        4.     Weksler Instruments Operating Unit; Dresser Industries; Instrument Div.

    B.     Description:  Corrosion-resistant brass or stainless-steel body with core inserts and gasketed and threaded cap, with extended stem for units to be installed in insulated piping.

    C.     Minimum Pressure and Temperature Rating:  500 psig at 200 deg F

    D.     Core Inserts:  One or two self-sealing rubber valves.
        1.     Insert material for air, water, oil, or gas service at 20 to 200 deg F shall be CR.
        2.     Insert material for air or water service at minus 30 to plus 275 deg F shall be EPDM.

2.6     FLOW INDICATORS

    A.     Manufacturers:

1. Dwyer Instruments, Inc.
2. Ernst Gauge Co.

B. Description:  Instrument for installation in piping systems for visual verification of flow.

C. Construction:  Bronze or stainless-steel body; with sight glass and ABS plastic paddle-wheel indicator, and threaded or flanged ends.

D. Pressure Rating:  125 psig.

E. Temperature Rating:  200 deg F.

F. End Connections for NPS 2 and Smaller:  Threaded.

G. End Connections for NPS 2-1/2 and Larger:  Flanged.


2.7    TEMPERATURE AND PRESSURE TEST KIT

A. Test Kit:  Furnish (1) test kit containing one pressure gauge and adaptor, two (2) thermometers,     and carrying case. Pressure gauge, adapter probes, and thermometer     sensing     elements     shall     be     of diameter to fit test plugs and of length to project into piping.
1. Pressure Gauge:  Small bourdon-tube insertion type with 2- to 3-inch diameter dial and probe. Dial range shall be 0 to 200 psig.
2. Low-Range Thermometer:  Small bimetallic insertion type with 1- to 2-inch diameter dial and tapered-end sensing element.  Dial ranges shall be 25 to 125 deg F.
3. High-Range Thermometer:  Small bimetallic insertion type with 1- to 2-inch diameter dial and tapered-end sensing element.  Dial ranges shall be 0 to 220 deg F.
4. Carrying case shall have formed instrument padding.


**PART 3 - EXECUTION**


3.1    THERMOMETER APPLICATIONS

A. Install liquid-in-glass thermometers in the following locations:
1. Inlet and outlet of each storage tank.
2. Outlet of all domestic water heaters or boilers.
3. On hot water return line after circulation pump.
4. At the following locations for mixing valves:
   a. HW (inlet to valve).
   b. HWR (inlet to valve).
   c. Tempered (outlet of valve).

B. Provide the following temperature ranges for thermometers:
1. Domestic Hot Water:  30 to 180 deg F, with 2-degree scale divisions.
2. Domestic Cold Water:  0 to 100 deg F, with 2-degree scale divisions.


3.2    PRESSURE GAUGE APPLICATIONS

A. Install dry-case-type pressure gauges for discharge of each pressure-reducing valve and inlet and outlet of all backflow preventers (Domestic water).

B. Dry type pressure gauges to be used on domestic water systems (inlet and outlets of heaters mixing valves, booster pumps and water softeners).


3.3    FLOW INDICATOR APPLICATION

A. Install wheel type indicator on outlet side of each domestic pump (recirculation or booster).

3.4     INSTALLATIONS

    A.     Install direct-mounting thermometers and adjust vertical and tilted positions.

    B.     Install thermowells with socket extending to center of pipe and in vertical position in piping tees where thermometers are indicated.

    C.     Install direct-mounting pressure gauges in piping tees with pressure gauge located on pipe at most readable position.

    D.     Install ¼" NPT, ¼ turn ball-valve and snubber fitting in piping for each pressure gauge for fluids.

    E.     Install test plugs in tees in piping.

    F.     Install flow indicators, in accessible positions for easy viewing, in piping systems.

3.5     CONNECTIONS

    A.     Install meters and gauges adjacent to machines and equipment to allow service and maintenance for meters, gauges, machines, and equipment.

3.6     ADJUSTING

    A.     Calibrate meters according to manufacturer's written instructions, after installation.

    B.     Adjust faces of meters and gauges to proper angle for best visibility.

**END OF SECTION**

## SECTION 220523 - GENERAL-DUTY VALVES FOR PLUMBING PIPING


## PART 1 - GENERAL


1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.


1.2     SUMMARY

A.     Section Includes:
1.     Bronze ball valves.
2.     Ductile iron Butterfly valves.
3.     Bronze swing check valves.
4.     Iron swing check valves.
5.     Bronze globe valves.
6.     Ductile iron globe valves.


1.3     DEFINITIONS

A.     CWP:  Cold working pressure.

B.     EPDM:  Ethylene propylene copolymer rubber.

C.     NBR:  Acrylonitrile-butadiene, Buna-N, or nitrile rubber.

D.     NRS:  Nonrising stem.

E.     OS&Y:  Outside screw and yoke.

F.     RS:  Rising stem.

G.     SWP:  Steam working pressure.


1.4     SUBMITTALS

A.     Product Data:  For each type of valve indicated and required accessories (chains, extensions, etc.).


1.5     QUALITY ASSURANCE

A.     Source Limitations for Valves:  Obtain each type of valve from single source from single manufacturer.

B.     ASME Compliance:
1.     ASME B16.10 and ASME B16.34 for ferrous valve dimensions and design criteria.
2.     ASME B31.1 for power piping valves.
3.     ASME B31.9 for building services piping valves.

C.     NSF Compliance:  NSF 61 for valve materials for potable-water service.


1.6     DELIVERY, STORAGE, AND HANDLING

A.     Prepare valves for shipping as follows:
1.     Protect internal parts against rust and corrosion.
2.     Protect threads, flange faces, grooves, and weld ends.
3.     Set globe valves closed to prevent rattling.


**CLEARY ZIMMERMANN ENGINEERS**

        4.      Set ball and plug valves open to minimize exposure of functional surfaces.

        5.      Set butterfly valves closed or slightly open.

        6.      Block check valves in either closed or open position.

B.      Use the following precautions during storage:
1. Maintain valve end protection.
2. Store valves indoors and maintain at higher than ambient dew point temperature. If outdoor storage is necessary, store valves off the ground in watertight enclosures.

C.      Use sling to handle large valves; rig sling to avoid damage to exposed parts. Do not use handwheels or stems as lifting or rigging points.

## PART 2 - PRODUCTS

2.1      GENERAL REQUIREMENTS FOR VALVES

A.      Refer to valve schedule articles for applications of valves.

B.      Valve Pressure and Temperature Ratings: Not less than indicated and as required for system pressures and temperatures.

C.      Valve Sizes: Same as upstream piping unless otherwise indicated.

D.      Valve Actuator Types:
1. Gear Actuator: For quarter-turn valves NPS 8 and larger.
2. Handwheel: For valves other than quarter-turn types.
3. Handlever: For quarter-turn valves NPS 6 and smaller.
4. Chainwheel: Device for attachment to valve handwheel, stem, or other actuator; of size and with chain for mounting height, as indicated in the "Valve Installation" Article.

E.      Valve Action: Close rotation shall be clockwise.

F.      Valves in Insulated Piping: With 2-inch stem extensions and the following features:
1. Ball Valves: With extended operating handle of non-thermal-conductive material, and protective sleeve that allows operation of valve without breaking the vapor seal or disturbing insulation. Extension to be provided by valve manufacturer to match specific product.
2. Butterfly Valves: With extended neck.

G.      Valve-End Connections:
1. Flanged: With flanges according to ASME B16.1 for iron valves (with 316 stainless steel bolts).
2. Threaded: With threads according to ASME B1.20.1.

2.2      BRONZE BALL VALVES

A.      Two-Piece, Full-Port, Bronze Ball Valves with Stainless-Steel Trim:
1. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
    a. Conbraco Industries, Inc.; Apollo Valves.
    b. Milwaukee Valve Company.
    c. Mueller Steam Specialty; a division of SPX Corporation.
    d. NIBCO INC.
    e. Watts Regulator Co.; a division of Watts Water Technologies, Inc.
2. Description:
    a. Standard: MSS SP-110.
    b. SWP Rating: 150 psig.
    c. CWP Rating: 600 psig.
    d. Body Design: Two piece.
    e. Body Material: Bronze.
    f. Ends: Threaded.
    g. Seats: PTFE or TFE.

      h.     Stem:  Stainless steel, blowout-proof.
      i.     Ball:  Stainless steel, vented.
      j.     Port:  Full.

## 2.3  BUTTERFLY VALVES

A.  200 CWP, Ductile Iron, Lug Style-Flanged Butterfly Valves, potable rated:
1.  Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
    a.  Conbraco Industries, Inc.; Apollo Valves.
    b.  Milwaukee Valve Company.
    c.  Mueller Steam Specialty; a division of SPX Corporation.
    d.  NIBCO INC.
    e.  Watts Regulator Co.; a division of Watts Water Technologies, Inc.
2.  Description:
    a.  Standard:  MSS SP-67, Type I.
    b.  CWP Rating:  200 psig.
    c.  Body Design:  Lug type; suitable for bidirectional dead-end service at rated pressure without use of downstream flange.
    d.  Body Material:  ASTM A 536, ductile iron.
    e.  Seat:  EPDM.
    f.  Stem:  One- or two-piece stainless steel.
    g.  Disc:  Aluminum Bronze
    h.  Flange bolts to be 316 stainless steel.

## 2.4  BRONZE SWING CHECK VALVES

A.  Class 150, Bronze Swing Check Valves with Bronze Disc:
1.  Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
    a.  Conbraco Industries, Inc.; Apollo Valves.
    b.  Milwaukee Valve Company.
    c.  Mueller Steam Specialty; a division of SPX Corporation.
    d.  NIBCO INC.
    e.  Watts Regulator Co.; a division of Watts Water Technologies, Inc.
2.  Description:
    a.  Standard:  MSS SP-80, Type 3.
    b.  CWP Rating:  300 psig.
    c.  Body Design:  Horizontal flow.
    d.  Body Material:  ASTM B 62, bronze.
    e.  Ends:  Threaded.
    f.  Disc:  Bronze.

## 2.5  IRON SWING CHECK VALVES

A.  Class 250, Iron Swing Check Valves with Metal Seats, potable rated:
1.  Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
    a.  Conbraco Industries, Inc.; Apollo Valves.
    b.  Milwaukee Valve Company.
    c.  Mueller Steam Specialty; a division of SPX Corporation.
    d.  NIBCO INC.
    e.  Watts Regulator Co.; a division of Watts Water Technologies, Inc.
2.  Description:
    a.  Standard:  MSS SP-71, Type I.
    b.  CWP Rating: 500 psig.
    c.  Body Design:  Clear or full waterway.
    d.  Body Material:  ASTM A 126, gray iron with bolted bonnet.
    e.  Ends:  Flanged.
    f.  Trim:  Bronze.

g.    Gasket:  Asbestos free.
h.    Flange bolts to be 316 stainless steel.

## 2.6    BRONZE GLOBE VALVES

A.    Class 150, Bronze Globe Valves with Nonmetallic Disc:
1.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
a.    Conbraco Industries, Inc.; Apollo Valves.
b.    Milwaukee Valve Company.
c.    Mueller Steam Specialty; a division of SPX Corporation.
d.    NIBCO INC.
e.    Watts Regulator Co.; a division of Watts Water Technologies, Inc.
2.    Description:
a.    Standard:  MSS SP-80, Type 2.
b.    CWP Rating:  300 psig.
c.    Body Material:  ASTM B 62, bronze with integral seat and union-ring bonnet.
d.    Ends:  Threaded.
e.    Stem:  Bronze.
f.    Disc:  PTFE or TFE.
g.    Packing:  Asbestos free.
h.    Handwheel:  Malleable iron, bronze, or aluminum.

## 2.7    DUCTILE IRON GLOBE VALVES

A.    Class 150, Ductile Iron Globe Valves, potable rated:
1.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
a.    Conbraco Industries, Inc.; Apollo Valves.
b.    Milwaukee Valve Company.
c.    Mueller Steam Specialty; a division of SPX Corporation.
d.    NIBCO INC.
e.    Watts Regulator Co.; a division of Watts Water Technologies, Inc.
2.    Description:
a.    Standard:  MSS SP-85, Type I.
b.    CWP Rating:  200 psig.
c.    Body Material:  ASTM A395, ductile iron.
d.    Ends:  Flanged.
e.    Trim:  Bronze.
f.    Packing and Gasket:  PTFE.
g.    Flange bolts to be 316 stainless steel.

## 2.8    CHAINWHEELS

A.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
1.    Babbitt Steam Specialty Co.
2.    Roto Hammer Industries.
3.    Trumbull Industries.

B.    Description: Valve actuation assembly with sprocket rim, brackets, and chain.
1.    Brackets:  Type, number, size, and fasteners required to mount actuator on valve.
2.    Attachment:  For connection to butterfly valve stems.
3.    Sprocket Rim with Chain Guides:  Ductile iron, of type and size required for valve.
4.    Chain:  Hot-dip, galvanized steel, of size required to fit sprocket rim.

**PART 3 - EXECUTION**

3.1     EXAMINATION

A.      Examine valve interior for cleanliness, freedom from foreign matter, and corrosion.  Remove special packing materials, such as blocks, used to prevent disc movement during shipping and handling.

B.      Operate valves in positions from fully open to fully closed.  Examine guides and seats made accessible by such operations.

C.      Examine threads on valve and mating pipe for form and cleanliness.

D.      Examine mating flange faces for conditions that might cause leakage.  Check bolting for proper size, length, and material.  Verify that gasket is of proper size, that its material composition is suitable for service, and that it is free from defects and damage.

E.      Do not attempt to repair defective valves; replace with new valves.

3.2     VALVE INSTALLATION

A.      Install valves with unions or flanges at each piece of equipment arranged to allow service, maintenance, and equipment removal without system shutdown.

**B.      Install valves with brass short nipples and brass unions at downstream side (outlet) of ball and globe valves (NPS 2 and smaller).**

C.      Locate valves for easy access and provide separate support where necessary.

D.      Install valves in horizontal piping with stem at or above center of pipe.

E.      Install valves in position to allow full stem and handle movement.  Valve handle to have ample clearance to be fully exercised without interference (full open and full closed) with no modifications to handle.

F.      Install chainwheels on operators for butterfly valves NPS 4 and larger and more than 120 inches above finished floor.  Extend chains to 96 inches above finished floor.

G.      All valves NPS 3 and smaller shall be installed within 120 inches above finished floor.

H.      Install check valves for proper direction of flow and as follows:
        1.      Swing Check Valves:  In horizontal position with hinge pin level.

I.      For all valves on insulated piping, provide insulated stem extension.

J.      Install shutoff valves immediately upstream of each dielectric fitting.

K.      Provide and install shutoff valve close to water main on each branch and riser serving plumbing fixtures or equipment, on each water supply to equipment, and on each water supply to plumbing fixtures that do not have supply stops.

L.      Provide and install drain valves for equipment at base of each water riser, at low points in horizontal piping, and where required to drain water piping.
        1.      Drain Valves (At low points in water mains, risers, and branches):  Ball valves

3.3     ADJUSTING

A.      Adjust or replace valve packing after piping systems have been tested and put into service but before final adjusting and balancing.  Replace valves if persistent leaking occurs.

B.      Perform the following adjustments before operation:
        1.      Open shutoff valves to fully open position.

2.    Remove and clean strainer screens.  Close drain valves and replace drain plugs.


3.4    GENERAL REQUIREMENTS FOR VALVE APPLICATIONS

A.    Valve applications, use the following:
1.    Shutoff Service:  Ball, butterfly valves.
2.    Butterfly Valve Dead-End Service:  Flange (lug) type.
3.    Throttling Service:  Globe valves.
4.    Pump-Discharge Check Valves:
a.    NPS 2 and Smaller:  Bronze swing check valves with bronze disc.

B.    If valves with specified SWP classes or CWP ratings are not available, the same types of valves with higher SWP classes or CWP ratings may be substituted.

C.    Select valves, except wafer types, with the following end connections:
1.    For Copper Tubing, NPS 2 and Smaller:  Threaded ends.
2.    For Copper Tubing, NPS 2-1/2 and larger:  Flanged ends except where threaded valve-end option is indicated in valve schedules below.
3.    For Steel Piping, NPS 2 and Smaller:  Threaded ends.
4.    For Steel Piping, NPS 2-1/2 and larger:  Flanged ends.


3.5    VALVE SCHEDULE

A.    Pipe NPS 2 and Smaller:
1.    Ball Valves:  Two piece, full port, bronze with stainless-steel trim; **with brass short nipple and brass union connection at downstream side (outlet).**
2.    Bronze Swing Check Valves.
3.    Bronze Globe Valves: **With brass short nipple and brass union connection at downstream side (outlet).**

B.    Pipe NPS 2-1/2 and Larger:
1.    Ductile Iron, Butterfly Valves.
2.    Iron Swing Check Valves.
3.    Ductile Iron Globe Valves.


**END OF SECTION**

**SECTION 220529 - HANGERS AND SUPPORTS FOR PLUMBING PIPING AND EQUIPMENT**


**PART 1 - GENERAL**


1.1     RELATED DOCUMENTS

   A.     Drawings and general provisions of the contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.


1.2     SUMMARY

   A.     This Section includes the following hangers and supports for plumbing system piping and equipment.
      1.     Steel pipe hangers, supports and riser clamps.
      2.     Thermal-hanger shield inserts and saddles.
      3.     Fastener systems.
      4.     Pipe positioning systems.
      5.     Equipment supports.

   B.     Related Sections include the following:
      1.     All plumbing specification sections.


1.3     DEFINITIONS

   A.     MSS:  Manufacturers Standardization Society for The Valve and Fittings Industry Inc.

   B.     Terminology:  As defined in MSS SP-90, "Guidelines on Terminology for Pipe Hangers and Supports."


1.4     PERFORMANCE REQUIREMENTS

   A.     Design supports for multiple pipes capable of supporting combined weight of supported systems, system contents and test water.

   B.     Design equipment supports capable of supporting combined operating weight of supported equipment and connected systems and components.

   C.     Weight loading for supports and hangers shall not exceed manufacturers recommended tolerances and limits.


1.5     SUBMITTALS

   A.     Product Data:  For the following:
      1.     Steel pipe hangers and supports.
      2.     Thermal-hanger shield inserts and saddles.
      3.     Powder-actuated fastener systems.
      4.     Pipe positioning systems.

   B.     Shop Drawings:  Show fabrication and installation details and include calculations for the following:
      1.     Trapeze pipe hangers.  Include Product Data for components.
      2.     Metal framing systems.  Include Product Data for components.
      3.     Equipment supports.

   C.     Welding certificates.


1.6     QUALITY ASSURANCE

   A.     Welding:  Qualify procedures and personnel according to AWS D1.1, "Structural Welding Code-steel."

B.      Welding:  Qualify procedures and personnel according to the following:
        1.      AWS D1.1. "Structural Welding Code-Steel".

## PART 2 - PRODUCTS

2.1      MATERIALS AND WORKMANSHIP

**A.      All materials, unless otherwise specified, shall be 51% manufactured in the United States, new, free from all defects, and of the best quality.  Foreign goods specifically approved for use by the Owner's Representative prior to bidding may be furnished.**

B.      Materials and equipment shall be installed in accordance with the manufacturer's recommendations and the best standard practice for the type of work involved.  All work shall be executed by mechanics skilled in their respective trades, and the installations shall present a neat, precise appearance.

2.2      MANUFACTURERS

A.      In other Part 2 articles where titles below introduce lists, the following requirements apply to product selection:
        1.      Manufacturers:  Subject to compliance with requirements, provide products by one of the manufacturers specified.

2.3      METAL COATING REQUIREMENTS:

A.      All metal products shall have the following coatings:
        1.      Wet/damp areas: hot dipped galvanized.
        2.      Dry or conditioned areas: pre-galvanized.

2.4      STEEL PIPE HANGERS, SUPPORTS AND RISER CLAMPS

A.      Description:  MSS SP-58, Types 1 through 58, factory-fabricated components.  Refer to Part 3 "Hangers and Support Applications" Article for where to use specific hanger and support types.

B.      Manufacturers:
        1.      B-Line Systems, Inc.; a division of Cooper Industries.
        2.      ERICO/Michigan Hanger Co.
        3.      Grinnell Corp.

C.      Galvanized, Metallic Coatings:  Pre-galvanized (minimum thickness of 0.5 mils) or hot dipped (1.4 to 3.9 thickness).

D.      Nonmetallic Coatings:  Plastic coating, jacket or liner.

E.      Padded Hangers:  Hanger with fiberglass or other pipe insulation pad or cushion for support of bearing surface of piping.

F.      Channel, rod and securement hardware:
        1.      Channel:  12-ga.
        2.      Rod:  Sized as scheduled.
        3.      Hardware (clamps, bolts, washers, etc):  coating per area indication.

2.5      THERMAL-HANGER SHIELD INSERTS

A.      Description:  100-psig minimum, compressive-strength insulation insert encased in sheet metal shield.

B.      Manufactures:
        1.      B-line

      2.     ERICO / Michigan Hanger CO
      3.     Grinnell Corp

C.    Insulation –Insert Material for Cold Piping:  ASTM C 552, Type II cellular glass with vapor barrier.  Wood inserts are not acceptable.

D.    Insulation-Insert Material for Hot Piping:  Water-repellent treated, ASTM C 533, Type 1 calcium silicate or ASTM C 552, Type II cellular glass.

## 2.6    FASTENER SYSTEMS

A.    Mechanical-Expansion Anchors:  Insert-wedge-type stainless steel, for use in hardened Portland cement concrete with pull-out, tension and shear capacities appropriate for supported loads and building materials where used.
    1.     Manufacturers:
        a.    B-Line Systems, Inc.; a division of Cooper Industries.
        b.    Hilti, Inc.
        c.    Powers Fasteners.

B.    Concrete Insert:  electroplated steel finish, for embedding in concrete.  Steel insert nut for rod attachment.
    1.     Manufacturers:
        a.    B-Line Systems, Inc.; a division of Cooper Industries.
        b.    Hilti, Inc.
        c.    Powers Fasteners.

## 2.7    PIPE POSITIONING SYSTEMS

A.    Description:  IAPMO PS 42, system of metal brackets, clips and straps for positioning piping in pipe spaces for plumbing fixtures for commercial applications.

B.    Manufacturers:
    1.     C&S Mfg. Corp.
    2.     HOLDRITE Corp.; Hubbard Enterprises.
    3.     Samco Stamping Inc.

## 2.8    EQUIPMENT SUPPORTS

A.    Description:  Welded, shop or field-fabricated equipment support made from structural-steel shapes.

## 2.9    MISCELLANEOUS MATERIALS

A.    Structural Steel:  ASTM A 36/A 36M, steel plates, shapes and bars.  Galvanized only.  Painted steel not acceptable.

## PART 3 - EXECUTION

## 3.1    HANGERS AND SUPPORTS APPLICATIONS AND INSTALLATION

A.    Specific hanger and support requirements are specified in Hanger Application Schedule below.

B.    Steel Pipe Hanger Installation:  Comply with MSS SP-69 and MSS SP-89.  Install hangers, supports, clamps and attachments as required to properly support piping form building structure;  attaching to metal roof decks is not permissible.

C.    Use hangers and supports with galvanized, metallic coatings for piping. Field applied finish is not acceptable.

D. Use nonmetallic plastic coating, jacket or liner coatings on attachments for electrolytic protection where attachments are in direct contact with copper tubing.

E. Use padded hangers for piping that is subject to scratching.

F. Rod to be installed plumb. Bending rod is not acceptable. Provide and install required attachments.

G. Horizontal-Piping Hangers and Supports: Unless otherwise indicated and except as specified in piping system Sections, install the following types:
1. Adjustable, Heavy Duty Steel Clevis Hangers: For suspension of non-insulated or insulated stationary pipes, NPS 1/2 to NPS 30.
2. Strut System Clamps: For attachment of piping to channel. NPS ½ to NPS 2.
   a. Noninsulated copper piping to have dielectric insert. (dielectric tape not acceptable).
3. Trapeze Pipe Hanger Installation: Comply with MSS SP-69 and MSS SP-89. Arrange for grouping of parallel runs of horizontal piping and support together on field-fabricated trapeze pipe hangers.
   a. Pipes of Various Sizes: Support together and space trapezes for smallest pipe size or install intermediate supports for smaller diameter pipes as specified above for individual pipe hangers.
   b. Field fabricate from ASTM A 36/A 36M, steel shapes selected for lads being supported. Weld steel according to AWS D1.1.
4. Install hangers for piping with the following maximum horizontal spacing and minimum rod diameters (hangers shall be spaced to prevent sagging):
   a. NPS 2 and Smaller: 60 inches with 3/8-inch rod.
   b. NPS 2-1/2 to 5: 60 inches with 1/2-inch rod.
   c. NPS 6 to 8: 60 inches with 3/4-inch rod.

H. Vertical-Piping Riser Clamps: Unless otherwise indicated and except as specified in piping system Section, install the following types:
1. Required at all risers from under-floor or through floors from floor below. Risers clamps to be installed every 10 ft max. Coordinate installation with sleeves.

I. Building and Hanger-Rod Attachments: Unless otherwise indicated and except as specified in piping system Sections, install the following types:
1. Wide Jaw C-Clamps: For structural shapes, with retaining clip.
2. NPS 2 and smaller: mechanical-expansion anchors in concrete after concrete is placed and completely cured. Install fasteners according to manufacturer's written instructions.
3. NPS 2 ½ and larger: Concrete spot insert. Install building attachments within concrete slabs. Install additional attachments at concentrate loads, including valves, flanges and strainers, NPS 2-1/2 and larger and at changes in direction of piping. Install concrete inserts before concrete is placed; fasten inserts to forms and install reinforcing bars through openings at top of inserts.

J. Insulation Piping Installation:
1. Provide manufacture galvanized metal shield with locking tabs or securement band.
2. For Trapeze or Clamped Systems: Thermal insert and shield shall cover entire circumference of pipe.
3. For Clevis or Band Hangers: Thermal insert and shield shall cover lower 180 degrees of pipe.
4. Thermal Insert Length: Extend 4 inches beyond sheet metal shield for piping operating below ambient air temperature.

K. Use pipe positioning systems in pipe spaces behind plumbing fixtures to support supply and waste piping for plumbing fixtures; minimum three (3) for vertical pipe sections.

L. Pipe Positioning System Installation: Install support devices to make rigid supply and waste piping connections to each plumbing fixture. Refer Specification Section "Plumbing Fixtures" for plumbing fixtures.

M. Install hangers and supports complete with necessary inserts, bolts, rods, nuts washers and other accessories.

N. Load Distribution: Install hangers and supports so piping live and dead loads and stressed from movement will not be transmitted to connected equipment.

O.    Pipe Slopes:  Install hangers and supports to provide indicated pipe slopes and so maximum pipe deflections allowed by ASME B31.9 (for building services piping) are not exceeded.

3.2    EQUIPMENT SUPPORTS

A.    Manufacturer's structural-steel system to suspend equipment from structure overhead or to support equipment above floor.

3.3    ADJUSTING

A.    Hanger Adjustments:  Adjust hangers to distribute loads equally on attachments and to achieve indicated slope of pipe.

B.    Trim excess length of continuous-thread hanger and support rods to 1 inch.

3.4    PAINTING

A.    Repair Galvanized Surfaces:  Clean welds, bolted connections and abraded areas and apply galvanizing-repair paint to comply with ASTM A 780.

**END OF SECTION**

**SECTION 220553 - IDENTIFICATION FOR PLUMBING PIPING AND EQUIPMENT**


**PART 1 - GENERAL**


1.1     RELATED DOCUMENTS

    A.     Drawings and general provisions of the contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.


1.2     SUMMARY

    A.     Section Includes:
        1.     Equipment labels.
        2.     Warning signs and labels
        3.     Pipe labels.
        4.     Valve tags.
        5.     Warning tags.


1.3     SUBMITTALS

    A.     Product Data:  For each type of product indicated.

    B.     Samples:  For color, letter style and graphic representation required for each identification material and device.

    C.     Equipment Label Schedule:  Include a listing of all equipment to be labeled with the proposed content for each label.

    D.     Valve numbering scheme.

    E.     Valve Schedules:  For each piping system to include in maintenance manuals.


1.4     COORDINATION

    A.     Coordinate installation of identifying devices with completion of covering and painting of surfaces where devices are to be applied.

    B.     Coordinate installation of identifying devices with locations of access panels and doors.

    C.     Install identifying devices before installing acoustical ceilings and similar concealment.


**PART 2 - PRODUCTS**


2.1     EQUIPMENT LABELS

    A.     Plastic Labels for Equipment:
        1.     Material and Thickness:  Multilayer, multicolor, plastic labels for mechanical engraving, **1/8 inch** thick, and having predrilled holes for attachment hardware.
        2.     Letter Color:  **White.**
        3.     Background Color:  **Black.**
        4.     Maximum Temperature:  Able to withstand temperatures up to 160 deg F.
        5.     Minimum Label Size:  Length and width vary for required label content, but not less than 2-1/2 by 3/4 inch.

6.    Minimum Letter Size:  1/4 inch for name of units if viewing distance is less than 24 inches, 1/2 inch for viewing distances up to 72 inches, and proportionately larger lettering for greater viewing distances.  Include secondary lettering two-thirds to three-fourths the size of principal lettering.

7.    Fasteners:  Stainless-steel **rivets or self-tapping screws**.

B.    Label Content:  Include equipment's Drawing designation or unique equipment number, Drawing numbers where equipment is indicated (plans, details and schedules), plus the Specification Section number and title where equipment is specified.

C.    Equipment Label Schedule:  For each item of equipment to be labeled, on 8-1/2 by 11 inch (A4) bond paper.  Tabulate equipment identification number and identify Drawing numbers where equipment is indicated (plans, details, and schedules), plus the Specification Section number and title where equipment is specified.  Equipment schedule shall be included in operation and maintenance data.

## 2.2 WARNING SIGNS AND LABELS

A.    Material and Thickness:  Multilayer, multicolor, plastic labels for mechanical engraving, 1/8 inch thick, and having predrilled holes for attachment hardware.

B.    Letter Color:  White.

C.    Background Color:  Red.

D.    Maximum Temperature:  Able to withstand temperatures up to 160 deg F.

E.    Minimum Label Size:  Length and width vary for required label content, but not less than 2-1/2 by 3 inch.

F.    Minimum Letter Size:  1/4 inch for name of units if viewing distance is less than 24 inches, 1/2 inch for viewing distances up to 72 inches, and proportionately larger lettering for greater viewing distances.  Include secondary lettering two-thirds to three-fourths the size of principal lettering.

G.    Fasteners:  Stainless-Steel self-tapping screws.

H.    Adhesive:  Contact-type permanent adhesive, compatible with label and with substrate.

I.    Label Content:  Include caution and warning information, plus emergency notification instructions.

## 2.3 PIPE LABELS

A.    General Requirements for Manufactured Pipe Labels:  Preprinted, color-coded, with lettering indicating service, and showing flow direction.

B.    Pre-tensioned Pipe Labels:  Pre-coiled, semi-rigid plastic formed to cover full circumference of pipe and to attach to pipe without fasteners or adhesive.

C.    Self-Adhesive Pipe Labels:  Printed plastic with contact-type, permanent-adhesive backing.

D.    Pipe Label Contents:  Include identification of piping service using same designations or abbreviations as used on Drawings, pipe size and an arrow indicating flow direction.

1.    Flow-Direction Arrows:  Integral with piping system service lettering to accommodate both directions, or as separate unit on each label to indicate flow direction.

2.    Lettering Size:  At least 1-1/2 inches high.

## 2.5 VALVE TAGS

A.    Valve Tags:  Stamped or engrave with 1/4 inch letters piping system abbreviation and 1/2 inch numbers:

B.    Valve Schedules:  For each piping system, on 8-1/2 by 11-inch (A4) bond paper.  Tabulate valve number, piping system, system abbreviation (as shown on valve tag), location of a valve (room or

space), normal-operating position (open, closed, or modulating), and variations for identification. Mark valves for emergency shutoff and similar special uses.
1.      Valve-tag schedule shall be included in operation and maintenance data.

2.6     WARNING TAGS

A.      Warning Tags:  Preprinted or partially preprinted, accident-prevention tags, or plasticized card stock with matte finish suitable for writing.
1.      Size:  Approximately 4 by 7 inches.
2.      Fasteners:  Brass grommet and wire.
3.      Nomenclature:  Large-size primary caption such as "DANGER", "CAUTION", OR "DO NOT OPERATE".
4.      Color:  yellow background with black lettering.

PART 3 - EXECUTION

3.1     PREPARATION

A.      Clean piping and equipment surfaces or substances that could impair band of identification devices, including dirt, oil, grease, release agents and incompatible primers, paints and encapsulants.

3.2     EQUIPMENT LABEL INSTALLATION

A.      Install or permanently fasten labels on each major item of mechanical equipment.

B.      Locate equipment labels where accessible and visible.

3.3     PIPE LABEL INSTALLATION

A.      Piping Color-Coding:  Painting of piping is specified in Specification Section "Interior Painting".

B.      Locate pipe labels where piping is exposed or above accessible ceilings in finished spaces; machine rooms; accessible maintenance spaces such as shafts, tunnels and  plenums; and exterior exposed locations as follows:
1.      Near each valve and control device.
2.      Near each branch connection, excluding short takeoffs for fixtures and terminal units.  Where flow pattern is not obvious, mark each pipe at branch.
3.      Near penetrations through walls, floors, ceilings and inaccessible enclosures.
4.      At access doors, manholes and similar access points that permit view of concealed piping.
5.      Near major equipment items and other points of origination and termination.
6.      Spaced at maximum intervals of 50 feet along each run.  Reduce intervals to 25 feet in areas of congested piping and equipment.
7.      On piping above removable acoustical ceilings.  Omit intermediately spaced labels.

C.      Pipe Label Color Schedule:
1.      Domestic Water Piping:
        a.      Background Color:  Blue.
        b.      Letter Color:  White.
2.      Sanitary Waste and Storm Drainage Piping:
        a.      Background Color:  Green.
        b.      Letter Color:  White

3.4     VALVE-TAG INSTALLATION

A.      Install tags on valves and controls devices in piping systems, except check valves; valves within factory-fabricated equipment units; shutoff valves; faucets; convenience and lawn-watering hose connections;

and similar roughing-in connections of end-use fixtures and units.  List tagged valves in a valve schedule.

B.    Valve-Tag Application Schedule:  Tag valves according to size, shape, and color scheme and with captions similar to those indicated in the following subparagraphs:
1.    Valve-Tag Size and Shape:
    a.    Cold Water:  1-1/2 inches round.
    b.    Hot Water:  1-1/2 inches square.
2.    Valve-Tag Color:
    a.    Cold Water:  Blue.
    b.    Hot Water:  Orange.
3.    Letter Color:
    a.    Cold Water:  Black.
    b.    Hot Water:  Black

3.5    WARNING-TAG INSTALLATION

A.    Write required message on, and attach warning tags to, equipment and other items where required.

**END OF SECTION**

**SECTION 220716 - PLUMBING INSULATION**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SUMMARY

A.     This Section includes plumbing insulation for equipment and pipe, including the following:
        1.     Insulation Materials:
                a.     Cellular glass.
                b.     Flexible Elastomeric.
                c.     Mineral fiber.
                d.     Phenolic
        2.     Adhesives.
        3.     Mastics.
        4.     Sealants.
        5.     Factory-applied jackets.
        6.     Field-applied tape.
        7.     Field-applied jackets.
        8.     Securements.

B.     Related Sections include the following:
        1.     Specification Section "Hangers and Supports" for high-density inserts at hangers; **wood inserts at hangers are not acceptable.**
        2.     Specification Section "Special Conditions for All Plumbing Work".
        3.     Specification Section "Basic Plumbing Materials and Methods".

C.     Not all items listed within this specification are used. Use only items applicable per application schedule.

1.3     DEFINITIONS

A.     ASJ:  All-service jacket.

B.     CONCEALED: Covered or concealed by a ceiling (gypsum or lay-in acoustical tile) or wall.

C.     EXPOSED: Open to view; not concealed by a ceiling or wall of any sort.

D.     FSK:  Foil, scrim, kraft paper.

E.     UNDERFLOOR: Accessible craw space beneath lowest floor level (considered "outdoors").

1.4     SUBMITTALS

A.     Product Data:  For each type of product indicated, identify thermal conductivity, thickness, and jackets (both factory and field applied, if any). Provide submittal data on all products to be used.

1.5     QUALITY ASSURANCE

A.     Installer Qualifications:  Skilled mechanics who have successfully completed an apprenticeship program or another craft training program certified by the Department of Labor, Bureau of Apprenticeship and Training.

B.  Fire-Test-Response Characteristics:  Insulation and related materials shall have fire-test-response characteristics indicated, as determined by testing identical products per ASTM E 84, by a testing and inspecting agency acceptable to authorities having jurisdiction.  Factory label insulation and jacket materials and adhesive, mastic, and cement material containers, with appropriate markings of applicable testing and inspecting agency.
1.  Insulation Installed Indoors:  Flame-spread index of 25 or less, and smoke-developed index of 50 or less.

## 1.6  DELIVERY, STORAGE, AND HANDLING

A.  Packaging:  Insulation material containers shall be marked by manufacturer with appropriate ASTM standard designation, type and grade, and maximum use temperature.

B.  All products to be stored in a dry location, protected from the elements. All damaged insulation to be replaced.

## 1.7  COORDINATION

A.  Coordinate size and location of supports, hangers, and high-density insulation inserts and shields specified in Specification Section "Hangers and Supports."  Coordinate with drawing details where applicable; wood inserts at hangers are not acceptable.

B.  Coordinate clearance requirements with piping Installer for piping insulation application, and equipment Installer for equipment insulation application.  Before preparing piping Shop Drawings, establish and maintain clearance requirements for installation of insulation and field-applied jackets and finishes and for space required for maintenance.

## 1.8  SCHEDULING

A.  Schedule insulation application after pressure testing systems and, where required, after installing and testing heat tracing.  Insulation application may begin on segments that have satisfactory test results.

B.  Complete installation and concealment of plastic materials as rapidly as possible in each area of construction.

C.  Insulation not to be installed until building is dried in.

## PART 2 - PRODUCTS

## 2.1  MANUFACTURERS

A.  In other Part 2 articles where titles below introduce lists, the following requirements apply to product selection:
1.  Manufacturers:  Subject to compliance with requirements, provide products by one of the manufacturers specified.

## 2.2  INSULATION MATERIALS

A.  Refer to Part 3 schedule articles for requirements about where insulating materials shall be applied.

B.  Products shall not contain asbestos, lead, mercury, or mercury compounds.

C.  Products that come in contact with stainless steel shall have a leachable chloride content of less than 50 ppm when tested according to ASTM C 871.

D.  Insulation materials for use on austenitic stainless steel shall be qualified as acceptable according to ASTM C 795.

E.   Foam insulation materials shall not use CFC or HCFC blowing agents in the manufacturing process.

F.   Phenolic:
   1.   Products
      a.   Insul-phen
   2.   100% CFC-free, HCFC-free, and halogen-free, closed cell rigid phenolic foam insulation.
   3.   Minimal thermal conductivity @ 75˚ F.
      a.   Green, 2.5 lb/ft³. 0.15 (Btu.in/hr.ft².F)
      b.   Pink, 5.0 lb/ft³. 0.21 (Btu.in/hr.ft². F)

G.   Cellular Glass:
   1.   Products:
      a.   Pittsburgh Corning Corporation; Foamglas Super K.
   2.   Block Insulation:  ASTM C 552, Type I.
   3.   Special-Shaped Insulation:  ASTM C 552, Type III.
   4.   Board Insulation:  ASTM C 552, Type IV.
   5.   Preformed Pipe Insulation with Factory-Applied ASJ:  Comply with ASTM C 552, Type II, Class 2.
   6.   Factory fabricate shapes according to ASTM C 450 and ASTM C 585.
   7.   Inorganic, incombustible, foamed or cellulated glass with annealed, rigid, hermetically sealed cells. Minimal thermal conductivity at 75˚ F of 0.29 (Btu.in/hr.ft². F) (R-value of 10.34@ 3 inches thickness).  Factory-applied jacket requirements are specified in Part 2 "Factory-Applied Jackets" Article.

H.   Flexible Elastomeric:
   1.   Products:
      a.   Aeroflex USA Inc.; Aerocel.
      b.   Armacel LLC; AP Armaflex.
   2.   Closed-cell, sponge- or expanded-rubber materials.  Comply with ASTM C 534, Type I for tubular materials and Type II for sheet materials.
   3.   Minimal thermal conductivity at 75˚ F of 0.25 (Btu.in/hr.ft². F.)

I.   Mineral-Fiber Blanket Insulation:
   1.   Products:
      a.   Johns Manville; Microlite.
      b.   Knauf Insulation; Duct Wrap
      c.   Owens-Corning; All-Service Duct Wrap.
   2.   Mineral or glass fibers bonded with a thermosetting resin. Comply with ASTM C 553, Type II and ASTM C 1290, Type III with factory-applied FSP jacket. Factory-applied jacket requirements are specified in Part 2 "Factory-Applied jackets" Article.

J.   Mineral-Fiber, Preformed Pipe Insulation:
   1.   Products:
      a.   Johns Manville; Micro-Lok.
      b.   Knauf Insulation; 1000° Pipe Insulation.
      c.   Owens Corning; Fiberglas Pipe Insulation.
   2.   Type I, 850 deg F Materials:  Mineral or glass fibers bonded with a thermosetting resin.  Comply with ASTM C 547, Type I, Grade A, with factory-applied ASJ.  Factory-applied jacket requirements are specified in Part 2 "Factory-Applied Jackets" Article.

K.   Fire Rated Wrap
   1.   Manufacturers:
      a.   3M
      b.   Specialty Products and Insulation Co.
   2.   Insulation Materials: Fire rated fiber wrap insulation: 1-1/2 inch thick low bio-persistent Alka-line Earth Silicate fiber with melting point at 2200 degrees F. jacket shall be foil faced (one side) kraft fiber paper with a concealed reinforcing scrim. (FSK) One hour rating with 1-layer of wrap, 3 inches to combustibles. Two hour rating with 2 layers of wrap, 0 inch to combustibles.
   3.   Accessories and Attachments:
      a.   Glass Cloth and Tape: Comply with MIL-C-20079H, Type I for cloth and Type II for tape. Woven glass-fiber fabrics, plain weave, presized a minimum of 8 oz./sq.yd.
         1)   Tape Width: 4 inches.

  b. Bands: 3/4 inch wide, in one of the following materials compatible with jacket.
    1) Stainless Steel: ASTM A 666, Type 304; 0.020 inch thick.
  c. Insulation Anchor Pings and Speed Washers: Galvanized steel plate, pin and washer manufactured for attachment to duct by weld. Pin length sufficient for insulation thickness indicated.
  d. Vapor Retarders: Mastics: Materials recommended by insulation material manufacturers that are compatible with insulation materials, jackets, and substrates.
 4. Secured per manufacturer's requirements and AHJ.

## 2.2 ADHESIVES

A. Materials shall be compatible with insulation materials, jackets, and substrates and for bonding insulation to itself and to surfaces to be insulated, unless otherwise indicated. All products are to contain low V.O.C. as defined/governed by LEED IEQ 4.1 and 4.2 (Regardless of project type).

B. Cellular-Glass, Solvent-based resin adhesive, with a service temperature range of minus 75 to plus 300 deg F.
 1. Products:
  a. Foamglas: Pittseal 444N or equal

C. Flexible Elastomeric:  Comply with MIL-A-24179A, Type II, Class I.
 1. Products:
  a. K-Flex:  720 LVOC or equal

D. Phenolic: Water based adhesive with a service temp of minus 20°F to 700°F.
 1. Products:
  a. Foster 97-15

E. Metal Jacket Adhesive:  Comply with MIL-A-3316C, Class 2, Grade A.
 1. Products:
  a. Design Polymerics, DP2502 (or approved equal).

## 2.3 MASTICS

A. Materials shall be compatible with insulation materials, jackets, and substrates; comply with MIL-C-19565C, Type II. All products are to contain low V.O.C. as defined/governed by LEED IEQ 4.1 and 4.2 (Regardless of project type).

B. Vapor-Barrier Mastic:  Water based; suitable for outdoor use on below ambient services, or indoor vapor barrier use.
 1. Products:
  a. Childers Products, Division of ITW; CP-35.
 2. Water-Vapor Permeance:  ASTM F 1249, 0.09 perm at 55-mils film thickness.
 3. Service Temperature Range:  Minus 20 to plus 190 deg F.
 4. Solids Content:  ASTM D 1644, 60 percent by volume and 73 percent by weight.
 5. Color:  White.
 6. VOC: 36 g/l.

## 2.4 SEALANTS

A. Joint Sealants:
 1. Joint Sealants for Cellular-Glass Products:
  a. Pittsburgh Corning Corporation; Pittseal 444N.
 2. Joint Sealant for Phenolic Products
  a. Foster 95-50

B. Metal Jacket:
 1. Products:
  a. Foster 95-44 or equal.
  b. Childers Products, Division of ITW; CP-76.

C. Mineral Fiber:
1. Design Polymerics DP 2502.
2. Childers Products, Division of ITW; CP-35.

D. PVC Jacket:
1. Childers Products, Division of ITW; CP-35.

2.5 FACTORY-APPLIED JACKETS

A. Insulation system schedules indicate factory-applied jackets on various applications. When factory-applied jackets are indicated, comply with the following:
1. ASJ: White, kraft-paper, fiberglass-reinforced scrim with aluminum-foil backing; complying with ASTM C 1136, Type I.
2. ASJ-SSL: ASJ with self-sealing, pressure-sensitive, acrylic-based adhesive covered by a removable protective strip; complying with ASTM C 1136, Type I.
3. FSK Jacket: Aluminum-foil, fiberglass-reinforced scrim with kraft-paper backing; complying with ASTM C 1136, Type II.

2.6 FIELD-APPLIED JACKETS

A. Field-applied jackets shall comply with ASTM C 921, Type I, unless otherwise indicated.

B. PVC Jacket: High-impact-resistant, UV-resistant PVC complying with ASTM D 1784, 25/50 ASTM-F 84, Class 16354-C; thickness as scheduled; roll stock ready for shop or field cutting and forming. Thickness is indicated in field-applied jacket schedules.
1. Products:
a. Johns Manville; Zeston.
b. Proto PVC Corporation; LoSmoke.
2. Adhesive: As recommended by jacket material manufacturer.
3. Color: White:
4. Factory-fabricated fitting covers to match jacket if available; otherwise, field fabricate.
a. Shapes: 45- and 90-degree, short- and long-radius elbows, tees, valves, flanges, unions, reducers, end caps, soil-pipe hubs, traps, mechanical joints, and P-trap and supply covers for lavatories.
5. Factory-fabricated tank heads and tank side panels.

C. Metal Jacket:
1. Products:
a. Childers Products, Division of ITW; Metal Jacketing Systems.
b. PABCO Metals Corporation; Surefit.
c. RPR Products, Inc.; Insul-Mate.
2. Aluminum Jacket: Comply with ASTM B 209 (ASTM B 209M), Alloy 3003, 3005, 3105 or 5005, Temper H-14.
a. Factory cut and rolled to size.
b. Finish and thickness are indicated in field-applied jacket schedules.

2.7 TAPES

A. ASJ Tape: White vapor-retarder tape matching factory-applied jacket with acrylic adhesive, complying with ASTM C 1136 and UL listed.
1. Width: 3 inches.
2. Thickness: 14.0 mils.
3. Adhesion: 73 ounces force/inch in width.
4. Elongation: 2 percent.
5. Tensile Strength: 55 lbf/inch in width.
6. Color: White

B. FSK Tape: Foil-face, vapor-retarder tape matching factory-applied jacket with acrylic adhesive; complying with ASTM C 1136 and UL listed.
1. Width: 3 inches.

2.  Thickness:  13 mils.
3.  Adhesion:  73 ounces force/inch in width.
4.  Elongation:  2 percent.
5.  Tensile Strength:  40 lbf/inch in width.
6.  Color: Silver

## 2.8    SECUREMENTS

A.  Bands:
1.  Products:
    a.  Childers Products; Bands.
2.  Stainless Steel:  ASTM A 167 or ASTM A 240/A 240M, Type 316; 0.015 inch thick, 3/4 inch wide with wing or closed seal.
3.  Aluminum:  ASTM B 209 (ASTM B 209M), Alloy 3003, 3005, 3105, or 5005; Temper H-14, 0.020 inch thick, 1/2 inch with wing or closed seal.
4.  Springs:  Twin spring set constructed of stainless steel with ends flat and slotted to accept metal bands.  Spring size determined by manufacturer for application.

B.  Staples:  Outward-clinching insulation staples, nominal 3/4-inch- wide, stainless steel.

## PART 3 - EXECUTION

## 3.1    EXAMINATION

A.  Examine substrates and conditions for compliance with requirements for installation and other conditions affecting performance of insulation application.
1.  Verify that systems and equipment to be insulated have been tested and are free of defects.
2.  Verify that surfaces to be insulated are clean and dry.
3.  Proceed with installation only after unsatisfactory conditions have been corrected.

## 3.2    PREPARATION

A.  Surface Preparation:  Clean and dry surfaces to receive insulation.  Remove materials that will adversely affect insulation application. For Stainless Steel; apply a corrosion coating to insulated surfaces with an epoxy primer and an epoxy finish 5 mils thick.

B.  Verify and coordinate insulation installation with the systems and trades installing heat tracing.  Comply with requirements for heat tracing that applies to insulation.

## 3.3    COMMON INSTALLATION REQUIREMENTS

A.  Requirements in this Article generally apply to all insulation materials except where more specific requirements are specified in various pipe insulation material installation articles.

B.  Install insulation materials, accessories, and finishes with smooth, straight, and even surfaces; free of voids throughout the length of equipment, ducts and fittings, and piping including fittings, valves, and specialties

C.  Install insulation materials, forms, vapor barriers or retarders, jackets, and thicknesses required for each item of equipment, and pipe system as specified in insulation system schedules.

D.  Install accessories compatible with insulation materials and suitable for the service.  Install accessories that do not corrode, soften, or otherwise attack insulation or jacket in either wet or dry state.

E.  Install high-density inserts at hanger locations prior to insulating; wood or block inserts are not acceptable

F.  Do not weld brackets, clips, pins or other attachment devices to piping, fittings, tanks, coils, equipment, vessel, and specialties.

G.  Keep insulation materials clean and dry before, during application, and finishing.

H.  Install insulation with tight longitudinal seams and end joints, with least number of joints practical.

I.  Install insulation so that material is not over compressed.

J.  Seal all joints, and seams, including penetrations in insulation, at supports, and other projections with insulation of same material overlapped by 2". Secure strips with outward clinching staples along both edges of strip, (spaced 1 inch on center) and seal entire joint or seam with mastic.

K.  Do not insulate, conceal, or enclose pipe hangers, channel and steel supports, etc. not directly fasten to duct.

L.  Cover inserts with jacket material matching adjacent pipe insulation.  Install shields over jacket, arranged to protect jacket from tear or puncture by hanger, support, and shield.

M.  Apply adhesives, mastics, and sealants at manufacturer's recommended coverage rate and wet and dry film thicknesses. Do not water down products unless directed by manufacture. Use clean potable demineralized water when required.

N.  Finish installation with systems at operating conditions.  Repair joint separations and cracking due to thermal movement.

O.  Repair all damage insulation prior to concealment as noted above.

P.  Do not insulation or conceal vibration-control devices, labels, stamps, nameplates, data plates, manholes, cleanouts, etc. require for maintenances.

Q.  Install insulation over fittings, valves, strainers, flanges, unions, and other specialties with continuous thermal and vapor-retarded integrity, unless otherwise indicated.

R.  Insulate pipe elbows, tees, valves, strainers, flanges, etc., using preformed fitting insulation, mitered fittings or oversized preformed pipe insulation made from same material thickness and density as adjacent pipe insulation.  Each piece shall be butted tightly against adjoining piece and bonded with adhesive. Overlap adjoining pipe insulation by not less than two times the thickness of pipe insulation, or one pipe diameter, whichever is thicker. Fill joints, seams, voids, and irregular surfaces with insulating mastic finished to a smooth, hard, and uniform contour that is uniform with adjoining pipe insulation. Provide a removable reusable insulation cover; design that maintains vapor barrier. For valves, insulate up to and including the bonnets, valve stuffing-box studs, bolts, and nuts.

S.  Cover segmented insulated surfaces with a layer of finishing mastic prior to jacket installation.

T.  For services not specified to receive a field-applied jacket except for flexible elastomeric and polyolefin, install fitted PVC cover over elbows, tees, strainers, valves, flanges, and unions.  Terminate ends with PVC end caps.  Secure PVC covers to adjoining insulation facing using staples and ASJ tape. Seal PVC fitting covers with mastic.

U.  Insulate instrument connections for thermometers, pressure gages, pressure temperature taps, test connections, flow meters, sensors, switches, and transmitters on insulated pipes, vessels, and equipment.  Shape insulation at these connections by tapering it to and around the connection with insulating adhesive and finish with finishing mastic. All connections are to be accessible.

V.  Install removable insulation segment and covers at flanges, valves, controls, unions, equipment access doors, manholes, hand holes, and other elements that require frequent removal for service and inspection. Unless a PVC jacket is indicated in field-applied jacket schedules, finish exposed surfaces with a metal jacket.

3.4  PENETRATIONS

A.    Install insulation continuously through all walls, floors, and partitions penetrations and sleeves.

B.    Extend jacket of outdoor installation into wall and roof jacks by 2 inches. Seal jacket to roof flashing with approved flashing sealant.

C.    Insulation Installation at Below-Grade Exterior Wall Penetrations:  Terminate insulation flush with sleeve seal.  Seal terminations with approved flashing sealant.

3.5    GENERAL PIPE INSULATION INSTALLATION

A.    Preformed Pipe Insulation Installation on Pipe, Fittings, Valves, Flanges, Tanks, Elbows, and Appurtenances for Cellular- Glass, Mineral- Fiber, Flexible Elastomeric, and Phenolic insulations:
   1.    Install insulation in a manner that secures material to system being insulated with staples, tape and mastic.
   2.    When insulation with preformed pipe insulation, seal all longitudinal seams, end joints, and protrusions with manufacturers recommended tape matching jacket, vapor-barrier mastic, joint sealant, and adhesive to eliminate openings in insulation that allow passage of air to surface being insulated.
   3.    Secure fittings, jacket, cover, etc. with tape matching jacket and secure with outward clinched staples 1 inch on center.  Apply vapor-barrier mastic over staples.
   4.    Arrange insulation to permit access to valves packing, flanges, unions, etc. and valve operation for maintenance without disturbing insulation. Install insulation so that it can be removed without damage to surrounding insulation or access enclosure.
   5.    Pipe hangers are not to be concealed in insulation.
   6.    Seal all exposed insulation ends with mastic.
   7.    Seal all mitered joints prior to installing covers with vapor-barrier mastic.
   8.    Install preformed pipe insulation to outer diameter of pipe flange.
   9.    Make width of insulation section same as overall width of flange and bolts, plus twice the thickness of pipe insulation.
   10.   Fill voids between inner circumference of valves, flange, elbows, and bolts insulation and outer circumference of adjacent straight pipe segments with cut sections of sheet insulation of same thickness as pipe insulation.
   11.   Install preformed sections of same material insulation when available. When preformed insulation elbows and fittings are not available, install mitered sections of pipe insulation, to a thickness equal to adjoining pipe insulation. Install PVC cover over fitting or mitered section.
   12.   Arrange insulation to permit access to valves packing, flanges, unions, etc. and valve operation for maintenance without disturbing insulation. Install insulation so that it can be removed without damage to surrounding insulation or access enclosure.

3.6    GENERAL BLANKET INSULATION INSTALLATION (IN ADDITION TO COMMON REQUIREMENTS)

A.    Blanket Insulation Installation on Pipes, Drains, Tanks, Vessels, Elbows, and Appurtenances:
   1.    Apply adhesives according to manufacturer's recommended coverage rates per unit area, for a minimum of 50 percent coverage of insulated surface and 100 percent coverage of equipment, tanks, etc.; to secure insulation to surfaces. Apply adhesive to entire circumference of all surfaces; including fittings and transitions.
   2.    Install a continuous unbroken vapor barrier. Create a facing lap for longitudinal seams and end joints with insulation by removing 2 inches from 1 edge and 1 end of insulation segment.  Secure laps to adjacent insulation section with 3/4-inch outward-clinching staples, 1 inch on center.  Coat all seams/joints with mastic.
   3.    Repair punctures, tears, penetrations and protrusions with 6-inch-wide strips of same material used to insulate duct. Seal all seams with staples, cover with mastic and cover with embedded fiberglass reinforced mesh, cover mesh with finish coat of mastic.
   4.    Do not conceal hangers beneath/under insulation.
   5.    Insulation termination:  Butt insulation up to termination point.  Apply mastic no less than 3" overlap on insulation, and 3" on metal surface.

3.7    FIELD-APPLIED JACKET INSTALLATION

A. Install with 2-inch overlap at longitudinal seams and end joints. Overlap longitudinal seams arranged to shed water. Seal end joints with weatherproof sealant recommended by insulation manufacturer. Apply two continuous beads of sealant to seams and joints, one bead under lap and the finish bead along seam and joint edge. Secure metal jacket with stainless-steel bands 12 inches on center and at end joints.

3.8 FINISHES

A. Equipment, and Pipe Insulation with ASJ, Glass-Cloth, or Other Paintable Jacket Material: Paint jacket with paint system identified below and as specified in painting Sections (if applicable).
1. Flat Acrylic Finish: Two (2) finish coats over a primer that is compatible with jacket material and finish coat paint. Add fungicidal agent to render fabric mildew proof.
a. Finish Coat Material: Interior, flat, latex-emulsion size.

B. Color: Final color as selected by Architect. Vary first and second coats to allow visual inspection of the completed Work.

C. Do not field paint aluminum or stainless-steel jackets.

3.9 FIELD QUALITY CONTROL

A. Perform the following field tests and inspections and prepare test reports:
1. Inspect insulated pipe, and equipment, randomly selected by Engineer, by removing field-applied jacket and insulation in layers in reverse order of their installation. Extent of inspection shall be limited to two (3) location(s) for each system.
2. All insulation applications will be considered defective work if sample inspection reveals noncompliance with requirements.
3. Remove all defective work and install new insulation and jackets to replace insulation and jackets removed for inspection. Repeat inspection procedures as needed.

3.10 PIPING INSULATION SCHEDULE, GENERAL

A. Acceptable preformed pipe and tubular insulation materials and thicknesses are identified for each piping system and pipe size range. If more than one material is listed for a piping system, selection from materials listed is Contractor's option.

B. Items Not Insulated: Unless otherwise indicated, do not install insulation on the following:
1. Fire-suppression piping.
2. Drainage piping located in crawl spaces.
3. Chrome-plated pipes and fittings unless there is a potential for personnel injury.

3.11 INDOOR PIPING INSULATION SCHEDULE

A. Domestic Hot and Recirculated Hot Water:
1. Concealed Locations:
a. All Pipe Sizes: Insulation shall be any of the following:
1) Mineral Fiber Preformed: Type 1: 1-inch thick.
2) Phenolic (2.5 lb/ft³), 1-inch thick.
3) Cellular Glass: 1-1/2 inches thick.
2. Exposed Locations: (including inside mechanical rooms):
a. All Pipe Sizes: Insulation shall be any of the following:
1) Phenolic (3.5 lb/ft³), 1-inch thick.
2) Cellular Glass: 1-1/2 inches thick.
3) Mineral Fiber Preformed: Type 1: 1-inch thick.

B. Condensate, Equipment Drain, Floor Drains, Traps and Waste Water below 60 Deg F:
1. All PVC Piping exposed to and in a Return Air Plenum: Insulation shall be any of the following:
a. Fire rated wrap.
2. All Other Pipe: Insulation shall be any of the following:
a. Cellular Glass: 1-1/2 inches thick.

        b.      Phenolic (2.5 lb/ft³): 1-1/2 inches thick.

C.    Horizontal Storm Water Piping:
    1.     All PVC Piping exposed to and in a Return Air Plenum: Insulation shall be any of the following:
        a.      Fire rated wrap.
    2.     All Other Pipe: Insulation shall be any of the following:
        a.      Cellular Glass: 1-1/2 inches thick.
        b.      Phenolic (2.5 lb/ft³): 1-1/2 inches thick.
        c.      Mineral Fiber, Preformed, Type 1: 1-inch thick.

D.    Roof Drain Body:
    1.     PVC Roof Drain Body exposed to and in a Return Air Plenum: Insulation shall be any of the following:
        a.      Fire rated wrap.
    2.     All Other Roof Drain Bodies: Insulation shall be any of the following:
        a.      Mineral-Fiber Blanket Insulation: 1-1/2 inch thick.

E.    Sanitary Waste & Vent; Domestic Waterpiping:
    1.     All PVC Piping exposed to and in a Return Air Plenum: Insulation shall be any of the following:
        a.      Fire rated wrap.

3.12    OUTDOOR, ABOVEGROUND PIPING INSULATION SCHEDULE (ATTIC AND CRAWL SPACE INCLUDED)

A.    Domestic Cold, Hot and Recirculated Hot Water:
    1.     All Pipe Sizes: Insulation shall be any of the following:
        a.      Preinsulated Pipe: 1-1/2" thick (underfloor, outdoors and buried)
        b.      Cellular Glass: 2 inches thick (outdoors, not acceptable indoors)
        c.      Phenolic (5 lb/ft³): 2 inches thick (outdoors, not acceptable indoors)
        d.      Mineral Fiber Preformed, Type 1: 1-1/2 inch thick (uninsulated Attic space)

B.    Condensate, Equipment Drain, Floor Drains, Traps and Waste Water below 60 Deg. F:
    1.     All Pipe Sizes: Insulation shall be any of the following:
        a.      Cellular Glass: 1-1/2 inches thick
        b.      Phenolic (5 lb/ft³): 1-1/2 inches thick

C.    Fire Protection:
    1.     All Pipe Sizes: Insulation shall be any of the following:
        a.      Cellular Glass: 1-1/2 inches thick
        b.      Phenolic (5 lb/ft³): 1-1/2 inches thick

3.13    INSIDE EXTERIOR WALL PIPING INSULATION SCHEDULE

A.    Domestic Cold, Hot and Recirculated Hot Water:
    1.     All Pipe Sizes: Insulation shall be any of the following:
        a.      Cellular Glass: 1-1/2 inches thick
        b.      Phenolic (2.5 lb/ft³): 1 inch thick
        c.      Mineral Fiber Preformed, Type 1: 1 inch thick, coat entire ASJ jacket with vapor mastic

B.    Condensate, Equipment Drain, Floor Drains, Traps and Waste Water below 60 Deg. F:
    1.     All Pipe Sizes: Insulation shall be any of the following:
        a.      Cellular Glass: 1-1/2 inches thick
        b.      Phenolic (2.5 lb/ft³): 1-1/2 inches thick

C.    Fire Protection:
    1.     All Pipe Sizes: Insulation shall be any of the following:
        a.      Cellular Glass: 1-1/2 inches thick
        b.      Phenolic (2.5 lb/ft³): 1-1/2 inches thick

3.14    FIELD-APPLIED JACKET SCHEDULE

A.    Install jacket over insulation material.  For insulation with factory-applied jacket, install the field-applied jacket over the factory-applied jacket.

B.    Piping exposed in finish interior areas, outdoors, in underfloor, mechanical rooms:
1.    Aluminum, Stucco Embossed: 0.016 inch thick.

C.    Indoor piping fitting or elbows:
1.    PVC: (0.015 inch thick).

**END OF SECTION**

**SECTION 221116 - DOMESTIC WATER PIPING**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

    A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

    A.     Section Includes:
        1.     Under-building slab and aboveground domestic water pipes, tubes, fittings, and specialties inside the building.
        2.     Encasement for piping.

1.3     SUBMITTALS

    A.     Product Data:  For the following products:
        1.     Piping and fittings.

    B.     Field quality-control reports.

1.4     QUALITY ASSURANCE

    A.     Piping materials shall bear label, stamp, or other markings of specified testing agency.  Origin of product to be domestic.  No imported product will be acceptable.

    B.     Comply with NSF 14 for plastic, potable domestic water piping and components.  Include marking "NSF-pw" on piping.

    C.     Comply with NSF 61 for potable domestic water piping and components.

1.5     PROJECT CONDITIONS

    A.     Interruption of Existing Water Service:  Do not interrupt water service to facilities occupied by Owner or others unless permitted under the following conditions and then only after arranging to provide temporary water service according to requirements indicated:
        1.     Notify Owner no fewer than two days in advance of proposed interruption of water service.
        2.     Do not proceed with interruption of water service without Owner's written permission.

**PART 2 - PRODUCTS**

2.1     PIPING MATERIALS

    A.     Comply with requirements in "Piping Schedule" Article for applications of pipe, tube, fitting materials, and joining methods for specific services, service locations, and pipe sizes.

2.2     COPPER TUBE AND FITTINGS

    A.     Hard Copper Tube:  ASTM B 88, Type L or K water tube, drawn temper.
        1.     Copper Pressure Fittings:  ASME B16.18, cast copper-alloy or ASME B16.22, wrought-copper, solder fittings.

B. Soft Copper Tube:  ASTM B 88, Type L or K water tube, annealed temper.
   1. Copper Pressure Fittings:  ASME B16.18, cast copper-alloy or ASME B16.22, wrought-copper, solder fittings.

C. Copper Pipe, Pre-insulated:
   1. Available Manufacturers:  Subject to compliance with requirements, manufacturers offering products that may be incorporated into the Work include, but are not limited to, the following:
      a. Insul-Pipe Systems, Inc.
      b. Insul-tek
      c. Thermal Pipe Systems, Inc.
      d. Thermacor Process L.P.
   2. Description: Factory pre-insulated double-wall pipe system.
   3. Carrier Pipe:  Drawn-Temper Copper Tubing:  ASTM B 88, Type L (ASTM B 88M, Type B).
   4. Wrought-Copper Fittings:  ASME B16.22.
   5. Pipe Insulation: Foamed-in-place polyurethane, 90% closed cell, poured in place, "K" = 0.14 per inch @ 75 degrees F, with a density of not less than 2.5 lbs. per cubic foot.  Insulation shall be completely encased within a seamless jacket.
      a. Insulation at each end of each length of pipe shall be protected with an end seal bonded both to the carrier pipe and the outer jacket.  Piping cuts made in the field must be provided with end-seals equal to factory type.
      b. Insulation thickness, minimum: 1.12-inches for NPS 2 and smaller; 1.67-inches for NPS 2-1/2; 1.42-inches for NPS 3; 1.93-inches for NPS 4; and 1.93-inches for NPS 6.
   6. Jacket: PVC; ASTM D-1784, Class 12454-B, of not less than .060 inches thick and able to withstand H-20 highway loading.
   7. Fitting insulation: Coupling joints on straight runs shall be field wrapped with a mold/jacket of roll PVC, sealed with self seal tape and filled with field mixed pour poly-urethane foam.  Fittings shall be field insulated using a field mixed polyurethane poured between the fitting and a PVC fitting cover supplied by the manufacturer that is sealed with self seal tape.  Vapor barrier jacketing material for fittings and joints shall be of the same material as the pipe jacketing.  Installation shall be as per manufacturer's instructions.

2.3   NIPPLES

A. Brass Nipple: ASTM B687-88
   1. Threads:  NPT (Federal Services Handbook H-28)
   2. Potable use.

2.4   UNIONS

A. Factory-fabricated, brass or bronze union assembly, for 150-psig minimum working pressure at 180 deg F, ASTM B687-88

B. End Connections:  Solder-joint copper alloy and / or threaded ferrous.

C. Potable use.

2.5   FLANGES

A. Factory-fabricated, bronze union assembly, for 150-psig minimum working pressure at 180 deg F, ASME B16.24, Class 150.

B. End Connections:  Solder-joint copper alloy and / or threaded ferrous.

C. Potable use.

D. All bolts to be 316 stainless steel (Class 150).

2.6     PIPING JOINING MATERIALS

A.      Pipe-Flange Gasket Materials:   AWWA C110, rubber, flat face, 1/8 inch thick or ASME B16.21, nonmetallic and asbestos free, unless otherwise indicated; full-face or ring type unless otherwise indicated.

B.      Solder Filler Metals:   ASTM B 32, 95/5 lead-free alloys.   Include water-flushable and soluble flux according to ASTM B 813.

C.      Brazing Filler Metals:   AWS A5.8/A5.8M, BCuP Series, copper-phosphorus alloys for general-duty brazing unless otherwise indicated.

2.7     ENCASEMENT FOR PIPING

A.      Standard:  ASTM A 674 or AWWA C105.

B.      Form:  Tube.

C.      Material:  LLDPE film of 0.008-inch minimum thickness or high-density, cross-laminated PE film of 0.004-inch minimum thickness.

D.      Color:  Black or blue.

2.8     TRANSITION FITTINGS

A.      General Requirements:
        1.      Same size as pipes to be joined.
        2.      Pressure rating at least equal to pipes to be joined.
        3.      End connections compatible with pipes to be joined.

B.      Fitting-Type Transition Couplings:  Manufactured piping coupling or specified piping system fitting.

C.      Sleeve-Type Transition Coupling:  AWWA C219.
        1.      Manufacturers:   Subject to compliance with requirements, provide products by one of the following:
                a.      Cascade Waterworks Manufacturing.
                b.      Dresser, Inc.; Dresser Piping Specialties.
                c.      Ford Meter Box Company, Inc. (The).
                d.      JCM Industries.
                e.      Romac Industries, Inc.
                f.      Smith-Blair, Inc; a Sensus company.
                g.      Viking Johnson; c/o Mueller Co.

D.      Plastic-to-Metal Transition Fittings:
        1.      Manufacturers:   Subject to compliance with requirements, provide products by one of the following:
                a.      Charlotte Pipe and Foundry Company.
                b.      Harvel Plastics, Inc.
                c.      Spears Manufacturing Company.
        2.      Description:  CPVC one-piece fitting with manufacturer's Schedule 80 equivalent dimensions; one end with threaded brass insert and one solvent-cement-socket end.

E.      Plastic-to-Metal Transition Unions:
        1.      Manufacturers:   Subject to compliance with requirements, provide products by one of the following:
                a.      Colonial Engineering, Inc.
                b.      NIBCO INC.
                c.      Spears Manufacturing Company.
        2.      Description:  CPVC four-part union.  Include brass threaded end, solvent-cement-joint plastic end, rubber O-ring, and union nut.

**PART 3 - EXECUTION**

3.1     PIPING INSTALLATION

A.     Drawing plans, schematics, and diagrams indicate general location and arrangement of domestic water piping.  Indicated locations and arrangements are used to size pipe and calculate friction loss, expansion, and other design considerations.  Install piping as indicated unless deviations to layout are approved on Coordination Drawings.

B.     Install copper tubing under building slab according to CDA's "Copper Tube Handbook."

C.     Install underground copper tube in PE encasement according to ASTM A 674 or AWWA C105.

D.     Provide and install shutoff valve, strainer, pressure reducing valve, hose-end drain valve, pressure gage, and test tee with valve, inside the building at each domestic water service entrance.  Comply with requirements in Division 22 Section "Meters and Gages " for pressure gages and Division 22 Section "Domestic Water Piping Specialties" for drain valves and strainers.

E.     Install domestic water piping level and plumb.

F.     Install piping concealed from view and protected from physical contact by building occupants unless otherwise indicated and except in equipment rooms and service areas.

G.     Install piping indicated to be exposed and piping in equipment rooms and service areas at right angles or parallel to building walls.  Diagonal runs are prohibited unless specifically indicated otherwise.

H.     Install piping above accessible ceilings to allow sufficient space for ceiling panel removal, and coordinate with other services occupying that space.

I.     Install piping adjacent to equipment and specialties to allow service and maintenance.

J.     Install piping to permit valve servicing.

K.     Install nipples, unions, special fittings, and valves with pressure ratings the same as or higher than system pressure rating used in applications below unless otherwise indicated.

L.     Install piping free of sags and bends.

M.     Install fittings for changes in direction and branch connections.

N.     Install unions in copper tubing at final connection to each piece of equipment, machine, and specialty valves.

O.     All pipe nipples to be brass.

3.2     JOINT CONSTRUCTION

A.     Ream ends of pipes and tubes and remove burrs.  Bevel plain ends of steel pipe.

B.     Remove scale, slag, dirt, and debris from inside and outside of pipes, tubes, and fittings before assembly.

C.     Brazed Joints:  Join copper tube and fittings according to CDA's "Copper Tube Handbook," "Brazed Joints" Chapter.

D.     Soldered Joints:  Apply ASTM B 813, water-flushable flux to end of tube.  Join and prepare/clean copper tube and fittings according to ASTM B 828 or CDA's "Copper Tube Handbook."

E.     Flanged Joints:  Select appropriate asbestos-free, nonmetallic gasket material in size, type, and thickness suitable for domestic water service.  Join flanges with gasket and bolts according to ASME B31.9.

F.      Dissimilar-Material Piping Joints:  Make joints using adapters compatible with materials of both piping systems.

G.      All piping is to be cleaned prior to concealment.

3.3      TRANSITION FITTING INSTALLATION

A.      Install transition couplings at joints of dissimilar piping.

B.      Transition Fittings in Underground Domestic Water Piping:
1.      NPS 2 and Smaller:  Fitting-type coupling.
2.      NPS 2-1/2 and Larger:  mechanical joint-type coupling.

C.      Transition Fittings in Aboveground Domestic Water Piping NPS 2 and Smaller:  Plastic-to-metal transition unions.

3.4      CONNECTIONS

A.      Drawings indicate general arrangement of piping, fittings, and specialties.

B.      Install piping adjacent to equipment and machines to allow service and maintenance.

C.      Connect domestic water piping to exterior water-service piping.  Use transition fitting to join dissimilar piping materials.

D.      Connect domestic water piping to water-service piping with shutoff valve; extend and connect to all equipment.

3.5      FIELD QUALITY CONTROL

A.      Perform tests and inspections.

B.      Piping Inspections:
1.      Do not enclose, cover, or put piping into operation until it has been inspected and approved by engineer and authorities having jurisdiction
2.      During installation, notify engineer and authorities having jurisdiction at least one day before inspection must be made.  Perform tests specified below in presence of engineer and authority having jurisdiction:
        a.      Roughing-in Inspection:  Arrange for inspection of piping before concealing or closing-in after roughing-in and before setting fixtures.
        b.      Final Inspection:  Arrange final inspection for engineer and authority having jurisdiction to observe tests specified below and to ensure compliance with requirements.
3.      Reinspection:  If the engineer or authority having jurisdiction finds that piping will not pass tests or inspections, make required corrections and arrange for reinspection.
4.      Reports:  Prepare inspection reports and have them signed by engineer and authority having jurisdiction.

C.      Piping Tests:
1.      Fill domestic water piping.  Check components to determine that they are not air bound and that piping is full of water.
2.      Test for leaks and defects in new piping and parts of existing piping that have been altered, extended, or repaired.  If testing is performed in segments, submit a separate report for each test, complete with diagram of portion of piping tested.
3.      Leave new, altered, extended, or replaced domestic water piping uncovered and unconcealed until it has been tested and approved.  Expose work that was covered or concealed before it was tested.
4.      Cap and subject piping to static water pressure of 50 psig above operating pressure, without exceeding pressure rating of piping system materials.  Isolate test source and allow to stand for four hours.  Leaks and loss in test pressure constitute defects that must be repaired.
5.      Repair leaks and defects with new materials and retest piping or portion thereof until satisfactory results are obtained.

6. Prepare reports for tests and for corrective action required.

D. Domestic water piping will be considered defective if it does not pass tests and inspections.

E. Prepare test and inspection reports.

3.6 CLEANING

A. Clean and disinfect potable domestic water piping as follows:
1. Purge new piping and parts of existing piping that have been altered, extended, or repaired before using.
2. Use purging and disinfecting procedures prescribed by authorities having jurisdiction; if methods are not prescribed, use procedures described in either AWWA C651 or AWWA C652 or follow procedures described below:
   a. Flush piping system with clean, potable water until dirty water does not appear at outlets.
   b. Fill and isolate system according to either of the following:
      1) Fill system or part thereof with water/chlorine solution with at least 50 ppm (50 mg/L) of chlorine. Isolate with valves and allow to stand for 24 hours.
      2) Fill system or part thereof with water/chlorine solution with at least 200 ppm (200 mg/L) of chlorine. Isolate and allow to stand for three hours.
   c. Flush system with clean, potable water until no chlorine is in water coming from system after the standing time.

B. Clean non-potable domestic water piping as follows:
1. Purge new piping and parts of existing piping that have been altered, extended, or repaired before using.
2. Use purging procedures prescribed by authorities having jurisdiction or; if methods are not prescribed, follow procedures described below:
   a. Flush piping system with clean, potable water until dirty water does not appear at outlets.

C. Prepare and submit reports of purging and disinfecting activities.

D. Clean interior of domestic water piping system. Remove dirt and debris as work progresses.

3.7 PIPING SCHEDULE

A. Transition and special fittings with pressure ratings at least equal to piping rating may be used in applications below unless otherwise indicated.

B. Flanges and unions to be provided and installed at all equipment connections and appurtenances.

C. Under-building-slab, domestic water, building service and distribution piping, NPS 2 and smaller, shall be the following:
1. Soft copper tube, ASTM B 88, Type K; (continuous, no joints under slab.)

D. Under-building-slab, domestic water, building-service piping, NPS 2-1/2 and larger, shall be the following (see detail for additional requirements):
1. Hard copper tube, ASTM B 88, Type K; wrought- copper brazed-joint fittings and joints.
2. Mechanical-joint, ductile iron pipe; standard-pattern mechanical-joint fittings; and mechanical joints.

E. Aboveground domestic water piping, all sizes, shall be the following:
1. Hard copper tube, ASTM B 88, Type L; cast- or wrought- copper solder-joint fittings; and soldered joints.

F. Underfloor domestic water piping shall be the following:
1. Hard copper tube, ASTM B 88, Type L; cast- or wrought- copper solder-joint fittings; and soldered joints.
2. Pre-insulated copper pipe. (Hot and Recirculated water only)

**END OF SECTION**

**SECTION 221119 - DOMESTIC WATER PIPING SPECIALTIES**


**PART 1 - GENERAL**


1.1     RELATED DOCUMENTS

A.      Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.


1.2     SUMMARY

A.      This Section includes the following domestic water piping specialties:
1.      Vacuum breakers.
2.      Backflow preventers.
3.      Water pressure-reducing valves.
4.      Balancing valves.
5.      Temperature-actuated water mixing valves.
6.      Strainers.
7.      Hose bibbs.
8.      Wall hydrants.
9.      Water hammer arresters (shock arrestors).
10.     Trap-seal primer valves.
11.     Flexible connectors.
12.     Drain Valves.


1.3     PERFORMANCE REQUIREMENTS

A.      Minimum Working Pressure for Domestic Water Piping Specialties:   125 psig unless otherwise indicated.


1.4     SUBMITTALS

A.      Product Data:  For each type of product indicated.

B.      Shop Drawings:  Diagram power, signal, and control wiring.

C.      Field quality-control test reports.

D.      Operation and Maintenance Data:  For domestic water piping specialties to include in emergency, operation, and maintenance manuals.


1.5     QUALITY ASSURANCE

A.      Electrical Components, Devices, and Accessories:   Listed and labeled as defined in NFPA 70, Article 100, by a testing agency acceptable to authorities having jurisdiction, and marked for intended use.

B.      NSF Compliance:
1.      Comply with NSF 14, "Plastics Piping Components and Related Materials," for plastic domestic water piping components.
2.      Comply with NSF 61, "Drinking Water System Components - Health Effects; Sections 1 through 9."

**PART 2 - PRODUCTS**

2.1     VACUUM BREAKERS

    A.    Pipe-Applied, Atmospheric-Type Vacuum Breakers :
        1.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
            a.    Ames Co.
            b.    Conbraco Industries, Inc.
            c.    FEBCO; SPX Valves & Controls.
            d.    Watts Industries, Inc.; Water Products Div.
            e.    Woodford Manufacturing Company.
            f.    Zurn Plumbing Products Group; Wilkins Div.
        2.    Standard:  ASSE 1001.
        3.    Size:  NPS 1/4 to NPS 3, as required to match connected piping.
        4.    Body:  Bronze.
        5.    Inlet and Outlet Connections:  Threaded.
        6.    Finish: Mechanical areas: Rough bronze.  Finished areas:  Chrome

    B.    Hose-Connection Vacuum Breakers:
        1.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
            a.    Conbraco Industries, Inc.
            b.    MIFAB, Inc.
            c.    Watts Industries, Inc.; Water Products Div.
            d.    Woodford Manufacturing Company.
            e.    Zurn Plumbing Products Group.
        2.    Standard:  ASSE 1011.
        3.    Body:  Bronze, non-removable, with manual drain.
        4.    Outlet Connection:  Garden-hose threaded complying with ASME B1.20.7.
        5.    Finish:  Rough bronze.

2.2     BACKFLOW PREVENTERS

    A.    Reduced-Pressure-Principle Backflow Preventers:
        1.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
            a.    Ames Co.
            b.    Conbraco Industries, Inc.
            c.    FEBCO; SPX Valves & Controls.
            d.    Watts Industries, Inc.; Water Products Div.
            e.    Zurn Plumbing Products Group; Wilkins Div.
        2.    Standard:  ASSE 1013.
        3.    Operation:  Continuous-pressure applications.
        4.    Pressure Loss:  12 psig maximum, through middle 1/3 of flow range.
        5.    Body:  Bronze for NPS 2 and smaller; cast iron with interior lining complying with AWWA C550 or that is FDA approved for NPS 2-1/2and larger.
        6.    End Connections:  Threaded for NPS 2 and smaller; flanged for NPS 2-1/2 and larger.
        7.    Accessories:
            a.    Valves:  Ball type with threaded ends on inlet and outlet of NPS 2 and smaller; outside screw and yoke gate-type with flanged ends on inlet and outlet of NPS 2-1/2 and larger.
            b.    Strainer: Y-pattern with threaded ends on inlet of NPS 2 and smaller.
            c.    Air-Gap Fitting:  ASME A112.1.2, matching backflow-preventer connection.

    B.    Double-Check Backflow-Prevention Assemblies:
        1.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
            a.    Ames Co.
            b.    Conbraco Industries, Inc.
            c.    FEBCO; SPX Valves & Controls.
            d.    Watts Industries, Inc.; Water Products Div.

       e.      Zurn Plumbing Products Group; Wilkins Div.
2. Standard:  ASSE 1015.
3. Operation:  Continuous-pressure applications, unless otherwise indicated.
4. Pressure Loss:  5 psig maximum, through middle 1/3 of flow range.
5. Body:  Bronze for NPS 2 and smaller; cast iron with interior lining complying with AWWA C550 or that is FDA approved for NPS 2-1/2 and larger.
6. End Connections:  Threaded for NPS 2 and smaller; flanged for NPS 2-1/2 and larger.
7. Accessories:
       a.      Valves:  Ball type with threaded ends on inlet and outlet of NPS 2 and smaller; outside screw and yoke gate-type with flanged ends on inlet and outlet of NPS 2-1/2 and larger.

C. Pressure Type Backflow Preventers:
1. Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
       a.      Ames Co.
       b.      Conbraco Industries, Inc.
       c.      FEBCO; SPX Valves & Controls.
       d.      Watts Industries, Inc.; Water Products Div.
       e.      Zurn Plumbing Products Group; Wilkins Div.
2. Standard:  ASSE 1052.
3. Operation:  Up to 10-foot head of water back pressure.
4. Inlet Size:  NPS 1/2 or NPS 3/4.
5. Outlet Size:  Garden-hose thread complying with ASME B1.20.7.


2.3      WATER PRESSURE-REDUCING VALVES

A. Water Regulators:
1. Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
       a.      Ames Co.
       b.      Conbraco Industries, Inc.
       c.      FEBCO; SPX Valves & Controls.
       d.      Watts Industries, Inc.; Water Products Div.
       e.      Zurn Plumbing Products Group; Wilkins Div.
2. Standard:  ASSE 1003.
3. Pressure Rating:  Initial working pressure of 150 psig.
4. Size:  Service line size.
5. Design Outlet Pressure Setting:  70 psig.
6. Body:  Bronze for NPS 2 and smaller; cast iron with interior lining complying with AWWA C550 or that is FDA approved for NPS 2-1/2 and NPS 3.
7. End Connections:  Threaded for NPS 2 and smaller; flanged for NPS 2-1/2 and NPS 3.


2.4      BALANCING VALVES

A. Copper-Alloy Calibrated Balancing Valves:
1. Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
       a.      Armstrong International, Inc.
       b.      ITT Industries; Bell & Gossett Div.
       c.      NIBCO INC.
       d.      Taco, Inc.
       e.      Watts Industries, Inc.; Water Products Div.
2. Type: Y-pattern globe valve with two readout ports and memory setting indicator.
3. Body:  Bronze.
4. Size:  Same as connected piping, but not larger than NPS 2.
5. Accessories:  Meter hoses, fittings, valves, differential pressure meter, and carrying case.

B. Memory-Stop Balancing Valves:
1. Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
       a.      Conbraco Industries, Inc.

   b.  Milwaukee Valve Company.
   c.  NIBCO INC.
  2.  Standard:  MSS SP-110 for two-piece, copper-alloy ball valves.
  3.  Pressure Rating:  400-psig minimum CWP.
  4.  Size:  NPS 2 or smaller.
  5.  Body:  Copper alloy.
  6.  Port:  Standard or full port.
  7.  Ball:  Chrome-plated brass.
  8.  Seats and Seals:  Replaceable.
  9.  End Connections:  Solder joint or threaded.
  10.  Handle:  Vinyl-covered steel with memory-setting device.

## 2.5  TEMPERATURE-ACTUATED WATER MIXING VALVES

A. Primary, Thermostatic, Water Mixing Valves:
  1.  Basis-of-Design Product:  Subject to compliance with requirements, provide the product indicated on Drawings or a comparable product by one of the following:
   a.  Armstrong International, Inc.
   b.  Lawler Manufacturing Company, Inc.
   c.  Leonard Valve Company.
   d.  Powers; a Watts Industries Co.
   e.  Symmons Industries, Inc.
  2.  Standard:  ASSE 1017.
  3.  Pressure Rating:  125 psig.
  4.  Type: Thermostatically controlled water mixing valve.
  5.  Material:  Bronze body with corrosion-resistant interior components.
  6.  Connections:  Union inlets and outlet.
  7.  Accessories:  Manual temperature control, check stops on hot- and cold-water supplies, and adjustable, temperature-control handle.
  8.  Valve Pressure Rating:  125 psig minimum, unless otherwise indicated.

B. Manifold, Thermostatic, Water-Mixing-Valve Assemblies:
  1.  Basis-of-Design Product:  Subject to compliance with requirements, provide the product indicated on Drawings or a comparable product by one of the following:
   a.  Armstrong International, Inc.
   b.  Leonard Valve Company.
   c.  Powers; a Watts Industries Co.
   d.  Symmons Industries, Inc.
  2.  Description:  Factory-fabricated, thermostatically controlled, water-mixing-valve assembly in two or three-valve parallel arrangement.
  3.  Large-Flow Parallel:  Thermostatic water mixing valve and downstream pressure regulator with pressure gages on inlet and outlet.
  4.  Intermediate-Flow Parallel:  Thermostatic water mixing valve and downstream pressure regulator with pressure gages on inlet and outlet.
  5.  Small-Flow Parallel:  Thermostatic water mixing valve.
  6.  Thermostatic Mixing Valves:  Comply with ASSE 1017.  Include check stops on hot- and cold-water inlets and shutoff valve on outlet.
  7.  Water Regulator(s):  Comply with ASSE 1003.  Include pressure gage on inlet and outlet.
  8.  Component Pressure Ratings:  125 psig minimum, unless otherwise indicated.
  9.  Cabinet (where indicated):  Factory-fabricated, stainless steel, for recessed or surface mounting (per drawing indication) and with hinged, stainless-steel door.
  10.  Performance characteristics and other requirements: Refer to drawings.

C. Individual-Fixture, Water Tempering Valves:
  1.  Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
   a.  Armstrong International, Inc.
   b.  Lawler Manufacturing Company, Inc.
   c.  Leonard Valve Company.
   d.  Powers; a Watts Industries Co.
   e.  Watts Industries, Inc.; Water Products Div.
   f.  Zurn Plumbing Products Group; Wilkins Div.

2. Standard: ASSE 1016, thermostatically controlled water tempering valve.
3. Pressure Rating: 125 psig minimum, unless otherwise indicated.
4. Body: Bronze body with corrosion-resistant interior components.
5. Temperature Control: Adjustable.
6. Inlets and Outlet: Threaded.
7. Finish: Rough or chrome-plated bronze.

2.6 STRAINERS FOR DOMESTIC WATER PIPING

A. Y-Pattern Strainers:
1. Pressure Rating: 125 psig minimum, unless otherwise indicated.
2. Body: Bronze for NPS 2 and smaller; cast iron with interior lining complying with AWWA C550 or FDA-approved, epoxy coating and for NPS 2-1/2 and larger.
3. End Connections: Threaded for NPS 2 and smaller; flanged for NPS 2-1/2 and larger.
4. Screen: Stainless steel with round perforations, unless otherwise indicated.
5. Perforation Size:
   a. Strainers NPS 2 and Smaller: 0.033 inch.
   b. Strainers NPS 2-1/2 to NPS 4: 0.062 inch.
6. Drain: Factory-installed, hose-end drain valve.

2.7 HOSE BIBBS

A. Hose Bibbs:
1. Standard: ASME A112.18.1 for sediment faucets.
2. Body Material: Bronze.
3. Seat: Bronze, replaceable.
4. Supply Connections: NPS 3/4 threaded -joint inlet.
5. Outlet Connection: Garden-hose thread complying with ASME B1.20.7.
6. Pressure Rating: 125 psig.
7. Vacuum Breaker: Integral, nonremovable, drainable, hose-connection vacuum breaker complying with ASSE 1011.
8. Finish for Equipment Rooms: Rough bronze, or chrome plated.
9. Finish for Service Areas: Rough bronze.
10. Finish for Finished Rooms: Chrome plated.
11. Operation for Equipment Rooms: Metal wheel handle or operating key.
12. Operation for Service Areas: Metal wheel handle.
13. Operation for Finished Rooms: Operating key.
14. Include operating key with each operating-key hose bibb.
15. Include integral wall flange with each chrome plated hose bibb.
16. Other requirements: Refer drawing schedules and provide equivalency to model and manufacturer listed.

2.8 WALL HYDRANTS

A. Nonfreeze Wall Hydrants:
1. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
   a. Josam Company.
   b. MIFAB, Inc.
   c. Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
   d. Watts Drainage Products Inc.
   e. Woodford Manufacturing Company.
   f. Zurn Plumbing Products Group.
2. Standard: ASME A112.21.3M for self-draining wall hydrants.
3. Pressure Rating: 125 psig.
4. Casing and Operating Rod: Of length required to match wall thickness. Include wall clamp.
5. Inlet: NPS 3/4 or NPS 1.
6. Other requirements: Refer drawing schedules and provide equivalency to model and manufacturer listed.

B. Nonfreeze, Hot- and Cold-Water Wall Hydrants:
   1. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
      a. Josam Company.
      b. Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
      c. Watts Drainage Products Inc.
      d. Woodford Manufacturing Company.
      e. Zurn Plumbing Products Group; Specification Drainage Operation.
   2. Standard: ASME A112.21.3M for self-draining wall hydrants.
   3. Pressure Rating: 125 psig.
   4. Casings and Operating Rods: Of length required to match wall thickness. Include wall clamps.
   5. Inlets: NPS 3/4 or NPS 1.
   6. Vacuum Breaker: Nonremovable, manual-drain-type, hose-connection vacuum breaker complying with ASSE 1011 and with garden-hose thread complying with ASME B1.20.7 on outlet.
   7. Other requirements: Refer drawing schedules and provide equivalency to model and manufacturer listed.

2.9 DRAIN VALVES

A. Ball-Valve-Type, Hose-End Drain Valves:
   1. Standard: MSS SP-110 for standard-port, two-piece ball valves.
   2. Pressure Rating: 600-psig minimum CWP.
   3. Size: NPS 3/4.
   4. Body: Bronze.
   5. Ball: Stainless steel.
   6. Seats and Seals: Replaceable.
   7. Handle: Vinyl-covered steel.
   8. Inlet: Threaded.
   9. Outlet: Threaded, short nipple with garden-hose thread complying with ASME B1.20.7 and cap with brass chain.

2.10 WATER HAMMER ARRESTERS (SHOCK ARRESTORS)

A. Water Hammer Arresters:
   1. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
      a. Josam Company.
      b. MIFAB, Inc.
      c. PPP Inc.
      d. Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
      e. Watts Drainage Products Inc.
      f. Zurn Plumbing Products Group; Specification Drainage Operation.
   2. Standard: ASSE 1010 or PDI-WH 201.
   3. Type: Copper tube with piston.
   4. Size: ASSE 1010, Sizes AA and A through F or PDI-WH 201, Sizes A through F.

2.11 TRAP-SEAL PRIMER VALVES (TRAP PRIMERS)

A. Supply-Type, Trap-Seal Primer Valves:
   1. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
      a. MIFAB, Inc.
      b. PPP Inc.
      c. Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
      d. Watts Industries, Inc.; Water Products Div.
   2. Standard: ASSE 1018.
   3. Pressure Rating: 125 psig minimum.
   4. Body: Bronze.
   5. Inlet and Outlet Connections: NPS 1/2 threaded, union, or solder joint.

6. Gravity Drain Outlet Connection: NPS 1/2 threaded or solder joint.
7. Finish: Chrome plated, or rough bronze for units used with pipe or tube that is not chrome finished.

B. Drainage-Type, Flushometer, Trap-Seal Primer Valves:
1. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
 a. Sloan Valve Company.
 b. Zurn Plumbing Products Group; Commercial Brass Operation.
2. Standard: Vacuum breaker trap primer fitting that diverts a small amount of water with each flush; NPS 3/8 minimum, trap makeup connection.
3. Size: NPS 1-1/2 minimum.
4. Material: Chrome-plated, cast brass.
5. Accessories: Chrome-plated wall flange, fittings and elbow.

C. Drainage-Type, Lavatory, Trap-Seal Primer Valves:
1. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
 a. Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
2. Standard: ASSE 1044, lavatory P-trap with NPS 3/8 minimum, trap makeup connection.
3. Size: NPS 1-1/4 minimum.
4. Material: Chrome-plated, cast brass.

2.12 TRAP-SEAL PRIMER SYSTEMS

A. Trap-Seal Primer Systems:
1. Basis-of-Design Product: Subject to compliance with requirements, provide the product indicated on drawings "Plumbing Fixture Schedule" or a comparable product by one of the following:
 a. PPP Inc.
2. Standard: ASSE 1044,
3. Piping: NPS 3/4, ASTM B 88, Type L; copper, water tubing.
4. Cabinet: Recessed or Surface-mounting (per drawing indication) steel box with stainless-steel cover.
5. Electric Controls: 24-hour timer, solenoid valve, and manual switch for 120-V ac power.
6. Vacuum Breaker: ASSE 1001.
7. Number Outlets: Refer to drawings.
8. Size Outlets: NPS 1/2.

2.13 FLEXIBLE CONNECTORS

A. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
1. Flex-Hose Co., Inc.
2. Metraflex, Inc.

B. Stainless-Steel-Hose Flexible Connectors: Corrugated-stainless-steel tubing with stainless-steel wire-braid covering and ends welded to inner tubing.
1. Working-Pressure Rating: Minimum 200 psig.
2. End Connections: Flanged.

**PART 3 - EXECUTION**

3.1 INSTALLATION

A. Install backflow preventers in each water supply to mechanical equipment and systems and to other equipment and water systems that may be sources of contamination. Comply with authorities having jurisdiction.
1. Locate backflow preventers in same room as connected equipment or system.
2. Install drain for backflow preventers with atmospheric-vent drain connection with air-gap fitting, fixed air-gap fitting, or equivalent positive pipe separation of at least two pipe diameters in drain

piping and pipe to floor drain.  Locate air-gap device attached to or under backflow preventer.  Simple air breaks are not acceptable for this application.\

3. Install backflow preventers at 42-in above finished floor in an accessible location, preferably on a wall with galvanized steel channel and pipe strap support.

4. Do not install bypass piping around backflow preventers.

5. Provide and install threaded brass plugs for all test ports.

B. Install water regulators with inlet and outlet shutoff valves and bypass with memory-stop balancing valve.  Install pressure gages on inlet and outlet.

C. Install water-pressure-reducing valves downstream from shutoff valves.

D. Install balancing valves in locations where they can easily be adjusted.

E. Install temperature-actuated water mixing valves with check stops or shutoff valves on inlets and with shutoff valve on outlet.

1. Install water mixing valves at 42-in above finished floor in an accessible location, preferably on a wall with galvanized steel channel and pipe strap support.

2. Install thermometers and water regulators if specified.

3. Install cabinet-type units recessed in or surface mounted on wall as specified.

F. Install Y-pattern strainers for water on supply side of each water pressure-reducing valve, solenoid valve, and pump.

G. Install outlet boxes recessed in wall.  Install 2-by-4-inch fire-retardant-treated-wood blocking wall reinforcement between studs.  Fire-retardant-treated-wood blocking is specified in Division 06 Section "Rough Carpentry."

H. Install water hammer arresters in water piping according to PDI-WH 201 and applicable drawing details.

I. Install trap-seal primer valves without dedicated isolation valves; supply from nearest branch serving an occupant-use plumbing fixture.  System style trap primer to have isolation valve.

J. Install supply- and drainage-type, trap-seal primer valves with outlet piping pitched down toward drain trap a minimum of 1 percent, and connect to floor-drain body, trap, or inlet fitting.  Adjust valve for proper flow.

K. Install trap-seal primer systems with outlet piping pitched down toward drain trap a minimum of 1 percent, and connect to floor-drain body, trap, or inlet fitting.  Adjust system for proper flow.  Install unit at a minimum of 36" AFF.

L. Provide and install a calibrated balancing valve in each hot-water circulation return loop.  Verify that system flowrate is set and matches drawing requirements.

3.2 FLEXIBLE CONNECTOR INSTALLATION

A. Install flexible connectors in suction and discharge manifold connections to each domestic water booster pump.

3.3 FIELD QUALITY CONTROL

A. Perform the following tests and prepare test reports:

1. Test and certify each backflow assembly according to authorities having jurisdiction and the device's reference standard.

B. Remove and replace malfunctioning domestic water piping specialties and retest as specified above.

3.4 ADJUSTING

A. Set field-adjustable pressure set points of water pressure-reducing valves.

B.      Set field-adjustable flow set points of balancing valves.

C.      Set field-adjustable temperature set points of temperature-actuated water mixing valves.

D.      Open throttling valves to proper setting.

E.      Verify (by instrument flow testing) that auto-flow balancing valves in hot-water-circulation return piping are flowing specified gpm.

F.      Adjust balancing valves in hot-water-circulation return piping to provide adequate flow.

G.      Manually adjust ball-type balancing valves in hot-water-circulation return piping to provide flow of hot water in each branch.

H.      Check plumbing specialties and verify proper settings, adjustments, and operation.

**END OF SECTION**

## SECTION 221316 - SANITARY WASTE AND VENT PIPING

### PART 1 - GENERAL

1.1      RELATED DOCUMENTS

     A.      Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2      SUMMARY

     A.      This Section includes the following for soil, waste, and vent piping inside the building:
         1.      Pipe, tube, and fittings.
         2.      Special pipe fittings.

1.3      DEFINITION

     A.      Condensate Piping: Drainage piping that indirectly conveys clear-water condensate from air conditioning and refrigeration equipment to the sanitary drainage system.

     B.      Indirect Drainage Piping: Piping that conveys waste water from mechanical equipment, including cooling towers, evaporative coolers, evaporative condensers, chilled-water systems, etcetera, to the sanitary drainage system.

     C.      EPDM: Ethylene-propylene-diene terpolymer rubber.

     D.      NBR: Acrylonitrile-butadiene rubber.

1.4      PERFORMANCE REQUIREMENTS

     A.      Components and installation shall be capable of withstanding the following minimum working pressure, unless otherwise indicated:
         1.      Soil, Waste, and Vent Piping: 10-foot head of water.

1.5      SUBMITTALS

     A.      Product Data: For pipe, tube, fittings, and couplings.

     B.      Field quality-control inspection and test reports.

1.6      QUALITY ASSURANCE

     A.      Piping materials shall bear label, stamp, or other markings of specified testing agency. Origin of product to be domestic. No imported product will be acceptable.

### PART 2 - PRODUCTS

2.1      MANUFACTURERS

     A.      In other Part 2 articles where titles below introduce lists, the following requirements apply to product selection:
         1.      Manufacturers: Subject to compliance with requirements, provide products by one of the manufacturers specified.

2.2     PIPING MATERIALS

A.     Refer to Part 3 "Piping Applications" Article for applications of pipe, tube, fitting, and joining materials.

2.3     HUBLESS CAST-IRON SOIL PIPE AND FITTINGS

A.     Pipe and Fittings:  Service Class, ASTM A 888 and CISPI 301 and marked with the collective trademark of the CISPI and listed by NSF International.

B.     Shielded Couplings:  ASTM C 1277 assembly of metal shield or housing, corrosion-resistant fasteners, and rubber sleeve with integral, center pipe stop.
       1.     Standard, Shielded, Stainless-Steel Couplings:  CISPI 310, with stainless-steel corrugated shield; stainless-steel bands and tightening devices; and ASTM C 564, rubber sleeve.  Coupling shall be listed by NSF International.
              a.     Manufacturers:
                     1)     ANACO.
                     2)     Fernco, Inc.
                     3)     Ideal Div.; Stant Corp.
                     4)     Mission Rubber Co.
                     5)     Tyler Pipe; Soil Pipe Div.
       2.     Heavy-Duty, Shielded, Stainless-Steel Couplings:  ASTM C 1540, with stainless-steel shield, stainless-steel bands and tightening devices, and ASTM C 564, rubber sleeve.  Coupling shall be listed by NSF International.
              a.     Manufacturers:
                     1)     ANACO.
                     2)     Clamp-All Corp.
                     3)     Ideal Div.; Stant Corp.
                     4)     Mission Rubber Co.
                     5)     Tyler Pipe; Soil Pipe Div.

2.4     HUB-AND-SPIGOT, CAST-IRON SOIL PIPE AND FITTINGS

A.     Pipe and Fittings:  ASTM A 74, Extra-Heavy or Service class and marked with the collective trademark of the CISPI and listed by NSF International.

B.     Gaskets:  ASTM C 564 and ASTM C 1563, rubber.

C.     Caulking Materials:  ASTM B 29, pure lead and oakum or hemp fiber.

2.5     COPPER TUBE AND FITTINGS

A.     Copper DWV Tube:  ASTM B 306, drainage tube, drawn temper.
       1.     Copper Drainage Fittings:  ASME B16.23, cast copper or ASME B16.29, wrought copper, solder-joint fittings.

B.     Hard Copper Tube:  ASTM B 88, Types L, water tube, drawn temper.
       1.     Copper Pressure Fittings:  ASME B16.18, cast-copper-alloy or ASME B16.22, wrought-copper, solder-joint fittings.  Furnish wrought-copper fittings if indicated.

2.6     SPECIAL PIPE FITTINGS

A.     Flexible, Nonpressure Pipe Couplings:  Comply with ASTM C 1173, elastomeric, sleeve-type, reducing or transition pattern.  Include shear ring, ends of same sizes as piping to be joined, and corrosion-resistant-metal tension band and tightening mechanism on each end.
       1.     Manufacturers:
              a.     Dallas Specialty & Mfg. Co.
              b.     Fernco, Inc.
              c.     Logan Clay Products Company (The).
              d.     Mission Rubber Co.
              e.     NDS, Inc.

f.    Plastic Oddities, Inc.
2.    Sleeve Materials:
   a.    For Cast-Iron Soil Pipes:  ASTM C 564, rubber.
   b.    For Plastic Pipes:  ASTM F 477, elastomeric seal or ASTM D 5926, PVC.
   c.    For Dissimilar Pipes:  ASTM D 5926, PVC or other material compatible with pipe materials being joined.

B.    Shielded Nonpressure Pipe Couplings:  ASTM C 1460, elastomeric or rubber sleeve with full-length, corrosion-resistant outer shield and corrosion-resistant-metal tension band and tightening mechanism on each end.
1.    Manufacturers:
   a.    Cascade Waterworks Mfg. Co.
   b.    Mission Rubber Co.

C.    Flexible Ball Joints:  Ductile-iron fitting with combination of flanged and mechanical-joint ends complying with AWWA C110 or AWWA C153.  Include gasketed ball-joint section and ductile-iron gland, rubber gasket, and steel bolts.
1.    Manufacturers:
   a.    EBAA Iron Sales, Inc.

D.    Expansion Joints:  Two or three-piece, ductile-iron assembly consisting of telescoping sleeve(s) with gaskets and restrained-type, ductile-iron, bell-and-spigot end sections complying with AWWA C110 or AWWA C153.  Select and assemble components for expansion indicated.  Include AWWA C111, ductile-iron glands, rubber gaskets, and steel bolts.
1.    Manufacturers:
   a.    EBAA Iron Sales, Inc.
   b.    Romac Industries, Inc.
   c.    Star Pipe Products; Star Fittings Div.

E.    Wall-Penetration Fittings:  Compound, ductile-iron coupling fitting with sleeve and flexing sections for up to 20-degree deflection, gaskets, and restrained-joint ends complying with AWWA C110 or AWWA C153.  Include AWWA C111, ductile-iron glands, rubber gaskets, and steel bolts.
1.    Manufacturers:
   a.    SIGMA Corp.


**PART 3 - EXECUTION**


3.1     EXCAVATION

A.    Refer to Specification Section "Earthwork" for excavating, trenching, and backfilling.


3.2     PIPING APPLICATIONS

A.    Flanges and unions shall be provided and installed at equipment connections and appurtenances.

B.    Indirect drainage piping for equipment connections shall be:
1.    Copper DWV tube, copper drainage fittings, and soldered joints

C.    Below-floor (crawl space), condensate drain and vent piping shall be any of the following:
1.    Extra-heavy class, cast iron soil piping, hub and spigot; and gasketed joints.

D.    Above-floor, condensate drain and vent piping shall be any of the following:
1.    Extra-heavy class, cast iron soil piping, hub and spigot; and gasketed joints.

E.    Underground, condensate drain and vent piping shall be any of the following:
1.    Extra-Heavy class, cast-iron soil piping, hub and spigot; and gasketed joints.
2.    Dissimilar Pipe-Material Couplings:  Flexible, nonpressure pipe couplings for joining dissimilar pipe materials with small difference in OD.

F.    Below-floor (crawl space), soil, waste and vent piping shall be any of the following:

       1.     Hubless cast-iron soil pipe and fittings; heavy duty, shielded, stainless-steel couplings; and hubless-coupling joints.

G.     Above-floor, soil, waste and vent piping shall be any of the following:
       1.     Hubless cast-iron soil pipe and fittings; standard, shielded, stainless-steel couplings; and hubless-coupling joints.

H.     Underground, soil, waste, vent piping shall be any of the following:
       1.     Extra-Heavy class, cast-iron soil piping, hub and spigot; and gasketed joints.
       2.     Dissimilar Pipe-Material Couplings:  Flexible, nonpressure pipe couplings for joining dissimilar pipe materials with small difference in OD.

I.     Above and below floor (crawl space), trap primer drainage piping shall be:
       1.     Hard copper tube, ASTM B 88, Type L; cast- or wrought- copper solder-joint fittings; and soldered joints.

J.     Acid Waste and Vent Piping:  Reference Acid Waste and Vent Piping Specification.

K.     Above and below-floor (crawl space), pumped drain piping shall be any of the following:
       1.     Black steel pipe and fittings.
       2.     Type K copper tube and fittings.

## 3.3    PIPING INSTALLATION

A.     Condensate shall be indirectly discharged into the sanitary drainage system through a 2-inch air gap (into a floor or hub drain) and shall not be directly connected (hard piped).

B.     Indirect drainage piping shall be discharged into the sanitary drainage system through a 2-inch air gap (into a floor or hub drain) and shall not be directly connected (hard piped).

C.     Provide clean outs as indicated on drawings and per local codes.

D.     Lead fittings are not acceptable.

E.     Sanitary sewer piping outside the building is specified in Specification Section "Sanitary Sewerage."

F.     Basic piping installation requirements are specified in Plumbing Specification Section "Basic Plumbing Materials and Methods."

G.     Install cast-iron sleeve with water stop and mechanical sleeve seal at each service pipe penetration through foundation wall.  Select number of interlocking rubber links required to make installation watertight.  Sleeves and mechanical sleeve seals are specified in Plumbing Specification Section "Basic Plumbing Materials and Methods."

**H.**     Install sleeves for all pipes passing through walls and concrete floors.  **Refer to Plumbing Specification Section "Basic Plumbing Materials and Methods" for requirements.**

I.     Install cast-iron soil piping according to CISPI's "Cast Iron Soil Pipe and Fittings Handbook," Chapter IV, "Installation of Cast Iron Soil Pipe and Fittings."  Lead fittings are not acceptable.

J.     Make changes in direction for soil and waste drainage and vent piping using appropriate branches, bends, and long-sweep bends.  Sanitary tees and short-sweep 1/4 bends may be used on vertical stacks if change in direction of flow is from horizontal to vertical.  Use fixture fittings if 2 fixtures are installed back to back or side by side with common drain pipe.  Straight tees, elbows, and crosses may be used on vent lines.  Do not change direction of flow more than 135 degrees without the installation of a cleanout.  Use proper size of standard increasers and reducers if pipes of different sizes are connected.  Reducing size of drainage piping in direction of flow is prohibited.

K.     Lay buried building drainage piping beginning at low point of each system.  Install true to grades and alignment indicated, with unbroken continuity of invert.  Place hub ends of piping upstream.  Install required gaskets according to manufacturer's written instructions for use of lubricants, cements, and other installation requirements.  Maintain swab in piping and pull past each joint as completed.

L.  Install soil and waste drainage and vent piping at the following minimum slopes, unless otherwise indicated:
   1.  Building Sanitary Drain:  2 percent downward in direction of flow for all piping.
   2.  Horizontal Sanitary Drainage Piping:  2 percent downward in direction of flow.
   3.  Vent Piping:  1 percent down toward vertical fixture vent or toward vent stack.

M.  Install engineered soil and waste drainage and vent piping systems as follows:
   1.  Combination Waste and Vent:  Comply with standards of authorities having jurisdiction.

N.  Do not enclose, cover, or put piping into operation until it is inspected and approved by engineer and authorities having jurisdiction.

3.4    JOINT CONSTRUCTION

A.  Basic piping joint construction requirements are specified in Plumbing Specification Section "Basic Plumbing Materials and Methods."

B.  Join hubless cast-iron soil piping according to CISPI 310 and CISPI's "Cast Iron Soil Pipe and Fittings Handbook" for hubless-coupling joints.

C.  Join hub-and-spigot, cast-iron soil piping with gasket joints according to CISPI's "Cast Iron Soil Pipe and Fittings Handbook" for compression joints.

D.  Solder Joints:  Use ASTM B 813, water-flushable, lead-free flux; ASTM B 32, lead-free-alloy solder; and ASTM B 828 procedure, unless otherwise indicated.

3.5    VALVE INSTALLATION

A.  Provide and install backwater valves in sanitary main entering the building where the top of the manhole is at a higher elevation than the finished floor of the first floor.

B.  Backwater Valves:
   1.  Horizontal Piping:  Horizontal backwater valves. Use normally closed type, unless otherwise indicated.
   2.  Install backwater valves in accessible locations.

3.6    CONNECTIONS

A.  Drawings indicate general arrangement of piping, fittings, and specialties.  Contractor is responsible for coordination with all other trades.

B.  Connect soil and waste piping to exterior sanitary sewerage piping.  Use transition fitting to join dissimilar piping materials.

C.  Connect drainage and vent piping to the following:
   1.  Plumbing Fixtures:  Connect drainage piping in sizes indicated, but not smaller than required by plumbing code.
   2.  Plumbing Fixtures and Equipment:  Connect atmospheric vent piping in sizes indicated, but not smaller than required by authorities having jurisdiction.
   3.  Plumbing Specialties:  Connect drainage and vent piping in sizes indicated, but not smaller than required by plumbing code.
   4.  Equipment:  Connect drainage piping as indicated.  Provide shutoff valve, if indicated, and union for each connection.  Use flanges instead of unions for connections NPS 2-1/2 and larger.
   5.  Stainless steel flanges required at water fixture drain connection.

3.7    FIELD QUALITY CONTROL

A.  During installation, notify authorities having jurisdiction at least 24 hours before inspection must be made.  Perform tests specified below in presence of engineer and authorities having jurisdiction.

1. Roughing-in Inspection: Arrange for inspection of piping before concealing or closing-in after roughing-in and before setting fixtures.
2. Final Inspection: Arrange for final inspections by engineer and authorities having jurisdiction to observe tests specified below and to ensure compliance with requirements.

B. Re-inspection: If engineer or authorities having jurisdiction find that piping will not pass test or inspection, make required corrections and arrange for reinspection.

C. Reports: Prepare inspection reports and have them signed by engineer and authorities having jurisdiction.

D. Test sanitary drainage and vent piping as follows:
1. Test for leaks and defects in new piping and parts of existing piping that have been altered, extended, or repaired. If testing is performed in segments, submit separate report for each test, complete with diagram of portion of piping tested.
2. Leave uncovered and unconcealed new, altered, extended, or replaced drainage and vent piping until it has been tested and approved. Expose work that was covered or concealed before it was tested.
3. Roughing-in Plumbing Test Procedure: Test drainage and vent piping, except outside leaders, on completion of roughing-in. Close openings in piping system and fill with water to point of overflow, but not less than 10-foot head of water. From 15 minutes before inspection starts to completion of inspection, water level must not drop. Inspect joints for leaks.
4. **Final Plumbing Test Procedure: After plumbing fixtures have been set and traps filled with water, test connections and prove they are gastight and watertight. Contractor shall introduce smoke into piping system continuously until the entire system has been approved by the engineer and the owner's representative.**
5. Repair leaks and defects with new materials and retest piping, or portion thereof, until satisfactory results are obtained.
6. Prepare reports for tests and required corrective action.

3.8 CLEANING

A. Clean interior of piping. Remove dirt and debris as work progresses.

B. Protect drains during remainder of construction period to avoid clogging with dirt and debris and to prevent damage from traffic and construction work.

C. Place plugs in ends of uncompleted piping at end of day and when work stops.

**END OF SECTION**

**SECTION 221319 - DRAIN PIPING SPECIALTIES**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

A.      Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

A.      This Section includes the following sanitary drainage piping specialties:
1.      Cleanouts.
2.      Floor drains.
3.      Roof Drains and Emergency Overflow Drains.
4.      Miscellaneous sanitary drainage piping specialties.
5.      Miscellaneous storm drainage piping specialties.

1.3     DEFINITIONS

A.      PVC:  Polyvinyl chloride plastic.

1.4     SUBMITTALS

A.      Product Data:  For each type of product indicated.  Include rated capacities, operating characteristics, and accessories.

B.      Field quality-control test reports.

C.      Operation and Maintenance Data:  For drainage piping specialties to include in emergency, operation, and maintenance manuals.

1.5     QUALITY ASSURANCE

A.      Drainage piping specialties shall bear label, stamp, or other markings of specified testing agency.

B.      Comply with NSF 14, "Plastics Piping Components and Related Materials," for plastic sanitary piping specialty components.

1.6     COORDINATION

A.      Coordinate size and location of concrete bases for outdoor cleanouts.

B.      Coordinate size and location of roof penetrations and flashing requirements with architectural.

**PART 2 - PRODUCTS**

2.1     MATERIALS AND WORKMANSHIP

**A.      All materials, unless otherwise specified, shall be 51% manufactured in the United States, new, free from all defects, and of the best quality.  Foreign goods specifically approved for use by the Owner's Representative prior to bidding may be furnished.**

B. Materials and equipment shall be installed in accordance with the manufacturer's recommendations and the best standard practice for the type of work involved.  All work shall be executed by mechanics skilled in their respective trades, and the installations shall present a neat, precise appearance.

2.2 CLEANOUTS

A. Exposed Metal Cleanouts:
1. Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
   a. Josam Company; Josam Div.
   b. MIFAB, Inc.
   c. Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
   d. Tyler Pipe; Wade Div.
   e. Watts Drainage Products Inc.
   f. Zurn Plumbing Products Group; Specification Drainage Operation.
2. Standard:  ASME A112.36.2M for cast iron cleanout test tee.
3. Size:  Same as connected drainage piping
4. Body Material:  Hubless, cast-iron soil pipe test tee as required to match connected piping.
5. Closure:  Countersunk or raised-head, brass plug.
6. Closure Plug Size:  Same as or not more than one size smaller than cleanout size.

B. Metal Floor Cleanouts:
1. Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
   a. Josam Company; Josam Div.
   b. Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
   c. Tyler Pipe; Wade Div.
   d. Watts Drainage Products Inc.
   e. Zurn Plumbing Products Group; Light Commercial Operation.
   f. Zurn Plumbing Products Group; Specification Drainage Operation.
2. Standard:  ASME A112.36.2M for threaded, adjustable housing cleanout.
3. Size:  Same as connected branch.
4. Type:  Threaded, adjustable housing.
5. Body or Ferrule:  Cast iron.
6. Clamping Device:  Not required.
7. Outlet Connection:  Spigot.
8. Closure:  Brass plug with straight threads and gasket.
9. Adjustable Housing Material:  Cast iron with threads.
10. Frame and Cover Material and Finish:  Nickel-bronze, copper alloy.
11. Frame and Cover Shape:  Round.
12. Top Loading Classification:  Heavy Duty.
13. Riser:  ASTM A 74, Service class, cast-iron drainage pipe fitting and riser to cleanout.
14. Standard:  ASME A112.3.1.
15. Size:  Same as connected branch.

C. Cast-Iron Wall Cleanouts:
1. Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
   a. Josam Company; Josam Div.
   b. MIFAB, Inc.
   c. Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
   d. Tyler Pipe; Wade Div.
   e. Watts Drainage Products Inc.
   f. Zurn Plumbing Products Group; Specification Drainage Operation.
2. Standard:  ASME A112.36.2M.  Include wall access.
3. Size:  Same as connected drainage piping.
4. Body:  Hub-and-spigot, cast-iron soil pipe T-branch as required to match connected piping.
5. Closure:  Countersunk, brass plug.
6. Closure Plug Size:  Same as or not more than one size smaller than cleanout size.

2.3     FLOOR DRAINS

A.     Cast-Iron Floor Drains:
    1.     Basis-of-Design Product:  Subject to compliance with requirements, provide the product indicated on the drawing "Floor Drain Schedule" or a comparable product by one of the following:
        a.     Josam Company; Josam Div.
        b.     MIFAB, Inc.
        c.     Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
        d.     Tyler Pipe; Wade Div.
        e.     Watts Drainage Products Inc.
        f.     Zurn Plumbing Products Group; Light Commercial Operation.
        g.     Zurn Plumbing Products Group; Specification Drainage Operation.
    2.     Standard:  ASME A112.6.3.
    3.     Seepage Flange:  Required.
    4.     Anchor Flange:  Required.
    5.     Outlet:  Bottom.
    6.     Backwater Valve:  Not required.
    7.     Trap Pattern:  Standard P-trap, unless otherwise indicated.
    8.     Other Requirements: Refer to drawing schedule and provide full model equivalency.

2.4     ROOF DRAINS

A.     Metal Roof Drains:
    1.     Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
        a.     Josam Company; Josam Div.
        b.     MIFAB, Inc.
        c.     Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
        d.     Tyler Pipe; Wade Div.
        e.     Watts Drainage Products Inc.
        f.     Zurn Plumbing Products Group.
    2.     Standard:  ASME A112.21.2M.
    3.     Pattern:  Roof drain.
    4.     Body Material:  Cast iron.
    5.     Dimensions of Body:  Reference Roof Drain Schedule on Drawings.
    6.     Combination Flashing Ring and Gravel Stop:  Required.
    7.     Flow-Control Weirs:  Not required.
    8.     Outlet:  Bottom.
    9.     Dome Material:  Cast iron.
    10.    2" Extension Collars:  Required for overflow drains only.
    11.    Underdeck Clamp:  Required.
    12.    Sump Receiver:  Required.

B.     Metal Emergency Overflow Drains (EOD):
    1.     Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
        a.     Josam Company; Josam Div.
        b.     MIFAB, Inc.
        c.     Smith, Jay R. Mfg. Co.; Division of Smith Industries, Inc.
        d.     Tyler Pipe; Wade Div.
        e.     Watts Drainage Products Inc.
        f.     Zurn Plumbing Products Group.
    2.     Standard:  ASME A112.21.2M.
    3.     Pattern:  Roof drain.
    4.     Body Material:  Cast iron.
    5.     Dimensions of Body:  Reference Roof Drain Schedule on Drawings.
    6.     Combination Flashing Ring and Gravel Stop:  Required.
    7.     Flow-Control Weirs:  Not required.
    8.     Outlet:  Bottom.
    9.     Dome Material:  Cast iron.
    10.    2" Extension Collars:  Required for internal overflow drain.
    11.    Underdeck Clamp:  Required.

12. Sump Receiver: Required.

2.5 ROOF FLASHING ASSEMBLIES

A. Roof Flashing Assemblies: Refer to architectural drawings and specifications for requirements.

2.6 MISCELLANEOUS SANITARY DRAINAGE PIPING SPECIALTIES

A. Hub Drains:
1. Description: Shop or field fabricate from ASTM A 74, Service class, hub-and-spigot, cast-iron, soil-pipe fittings. Include P-trap, hub-and-spigot riser section; and where required, increaser fitting joined with ASTM C 564, rubber gaskets.
2. Size: Same as connected waste piping with increaser fitting of size indicated.

B. Floor-Drain, Trap-Seal Primer Fittings:
1. Description: Cast iron, with threaded inlet and threaded or spigot outlet, and trap-seal primer valve connection.
2. Size: Same as floor drain outlet with NPS 1/2 side inlet.

C. Air-Gap Fittings:
1. Standard: ASME A112.1.2, for fitting designed to ensure fixed, positive air gap between installed inlet and outlet piping.
2. Body: Bronze or cast iron.
3. Inlet: Opening in top of body.
4. Outlet: Larger than inlet.
5. Size: Same as connected waste piping and with inlet large enough for associated indirect waste piping.

2.7 MISCELLANEOUS STORM DRAIN PIPING SPECIALTIES

A. Downspout Boots:
1. Description: Manufactured, Dura-coated cast iron body, with strap or ears (with last bolt holes) for attaching to building.
2. Size: Inlet size to match downspout; outlet size NPS 4.

B. Downspout Nozzles:
1. Description:
   a. Plain, bronze body with threaded inlet and bronze wall flange with mounting holes. (Cast iron conductor)
   b. Cast nickel-bronze construction, push on PVC connection, nickel-bronze bolt- on escutcheon and security ring.
2. Size: Same as connected conductor.

**PART 3 - EXECUTION**

3.1 INSTALLATION

A. Refer to Plumbing Specification Section "Basic Plumbing Materials and Methods" for piping joining materials, joint construction, and basic installation requirements.

B. Provide and install cleanouts (in addition to those indicated on the drawings) in aboveground piping and building drain piping according to the following, unless otherwise indicated:
1. Size same as drainage piping up to NPS 4. Use NPS 4 for larger drainage piping unless larger cleanout is indicated.
2. Locate at each change in direction of piping greater than 135 degrees.
3. Locate at maximum intervals of 50 feet for piping.
4. Locate at base of each vertical soil and waste stack.
5. Locate one cleanout for each restroom.

C.	For floor cleanouts for piping below floors, install cleanout deck plates with top flush with finished floor.

D.	For cleanouts located in concealed piping, install cleanout wall access covers, of types indicated, with frame anchored to reinforcement or studs and cover flush with finished wall.

E.	Install floor drains at low points of surface areas to be drained.  Set grates of drains flush with finished floor, unless otherwise indicated.
	1.	Position floor drains for easy access and maintenance.
	2.	Set floor drains below elevation of surrounding finished floor to allow floor drainage.  Set with grates depressed according to architectural requirements.
	3.	Install floor-drain flashing collar or flange so no leakage occurs between drain and adjoining flooring.  Maintain integrity of waterproof membranes where penetrated.
	4.	Install individual traps for floor drains connected to sanitary building drain, unless otherwise indicated.

F.	Install roof flashing assemblies on roof drains, sanitary stack vents and vent stacks that extend through roof.

G.	Install flashing fittings on sanitary stack vents and vent stacks that extend through roof.

H.	Assemble open drain fittings and install with top of hub 2 inches above floor.

I.	Install floor-drain, trap-seal primer fittings on inlet to floor drains that require trap-seal primer connection.
	1.	Exception:  Fitting may be omitted if trap has trap-seal primer connection.
	2.	Size:  Same as floor drain inlet.
	3.	Connection to floor drain body is not acceptable.

J.	Install air-gap fittings on draining-type backflow preventers and on indirect-waste piping discharge into sanitary drainage system.

K.	Install solids interceptors with cleanout immediately downstream from interceptors that do not have integral cleanout on outlet.  Install trap on interceptors that do not have integral trap and are connected to sanitary drainage and vent systems.

L.	Install reinforcement for wall-mounting-type specialties.

M.	Install traps on plumbing specialty drain outlets.  Omit traps on indirect wastes unless trap is indicated.


3.2	CONNECTIONS

A.	Piping installation requirements are specified in other Plumbing Specification Sections.  Drawings indicate general arrangement of piping, fittings, and specialties.

B.	Install piping adjacent to equipment to allow service and maintenance.


3.3	FLASHING INSTALLATION

A.	Refer to architectural roofing drawings and specifications for requirements.

B.	Install flashing for piping passing through roofs with counter-flashing or commercially made flashing fittings, according to Specification Section "Sheet Metal Flashing and Trim."

C.	Extend flashing up vent pipe passing through roofs and turn down into pipe, or secure flashing into cast-iron sleeve having calking recess.

D.	Fabricate and install flashing and pans, sumps, and other drainage shapes.


3.4	FIELD QUALITY CONTROL

A.	Perform tests and inspections and prepare test reports.

B.    Tests and Inspections:
1.    Leak Test:  After installation, charge system and test for leaks.  Repair leaks and retest until no leaks exist.
2.    Test and adjust controls and safeties.  Replace damaged and malfunctioning controls and equipment.

3.5    PROTECTION

A.    Protect drains during remainder of construction period to avoid clogging with dirt or debris and to prevent damage from traffic or construction work.

B.    Place plugs in ends of uncompleted piping at end of each day or when work stops.

**END OF SECTION**

**SECTION 224100 - PLUMBING FIXTURES**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SUMMARY

A.     This Section includes the following conventional plumbing fixtures and related components:
1.     Faucets for lavatories.
2.     Flushometers.
3.     Toilet seats.
4.     Protective shielding guards.
5.     Fixture supports.
6.     Dishwasher air-gap fittings.
7.     Disposers.
8.     Water closets.
9.     Urinals.
10.    Lavatories.
11.    Commercial sinks.
12.    Kitchen sinks.
13.    Service basins.
14.    Utility Boxes

B.     Related Sections include the following:
1.     Specification Section "Water Distribution" for exterior plumbing fixtures and hydrants.
2.     Specification Section "Toilet and Bath Accessories."
3.     Specification Section "Emergency Plumbing Fixtures."
4.     Specification Section "Security Plumbing Fixtures."
5.     Specification Section "Drinking Fountains and Water Coolers."
6.     Specification Section "Plumbing Specialties" for backflow preventers, floor drains, and specialty fixtures not included in this Section.

1.3     DEFINITIONS

A.     Accessible Fixture:  Plumbing fixture that can be approached, entered, and used by people with disabilities; and is compliant with the Texas Accessibility Standards (TAS), Article 9102, Texas Civil Statutes.

B.     Fitting:  Device that controls the flow of water into or out of the plumbing fixture.  Fittings specified in this Section include supplies and stops, faucets and spouts, shower heads and tub spouts, drains and tailpieces, and traps and waste pipes.  Piping and general-duty valves are included where indicated.

1.4     SUBMITTALS

A.     Product Data:  For each type of plumbing fixture indicated.  Include selected fixture and trim, fittings, accessories, appliances, appurtenances, equipment, and supports.  Indicate materials and finishes, dimensions, construction details, and flow-control rates.

B.     Shop Drawings:  Diagram power, signal, and control wiring.

C.     Operation and Maintenance Data:  For plumbing fixtures to include in emergency, operation, and maintenance manuals.

1.5    QUALITY ASSURANCE

A.    Source Limitations:  Obtain plumbing fixtures, faucets, and other components of each category through one source from a single manufacturer.
1.    Exception:  If fixtures, faucets, or other components are not available from a single manufacturer, obtain similar products from other manufacturers specified for that category.

B.    Electrical Components, Devices, and Accessories:  Listed and labeled as defined in NFPA 70, Article 100, by a testing agency acceptable to authorities having jurisdiction, and marked for intended use.

C.    Regulatory Requirements:  Comply with requirements in ICC A117.1, "Accessible and Usable Buildings and Facilities" Public Law 90-480, "Architectural Barriers Act"; and Public Law 101-336, "Americans with Disabilities Act" for plumbing fixtures for people with disabilities.

D.    Regulatory Requirements: Comply with requirements in the Texas Accessibility Standards (TAS), Architectural Barriers Act, Article 9102, Texas Civil Statutes.

E.    Regulatory Requirements:  Comply with requirements in Public Law 102-486, "Energy Policy Act," about water flow and consumption rates for plumbing fixtures.

F.    NSF Standard:  Comply with NSF 61, "Drinking Water System Components--Health Effects," for fixture materials that will be in contact with potable water.

G.    Select combinations of fixtures and trim, faucets, fittings, and other components that are compatible.

H.    Comply with the following applicable standards and other requirements specified for plumbing fixtures:
1.    Enameled, Cast-Iron Fixtures:  ASME A112.19.1M.
2.    Water-Closet, Flushometer Tank Trim:  ASSE 1037.

I.    Comply with the following applicable standards and other requirements specified for lavatory and sink faucets:
1.    Backflow Protection Devices for Faucets with Hose-Thread Outlet:  ASME A112.18.3M.
2.    Faucets:  ASME A112.18.1.
3.    Hose-Connection Vacuum Breakers:  ASSE 1011.
4.    Hose-Coupling Threads:  ASME B1.20.7.
5.    Integral, Atmospheric Vacuum Breakers:  ASSE 1001.
6.    NSF Potable-Water Materials:  NSF 61.
7.    Pipe Threads:  ASME B1.20.1.
8.    Supply Fittings:  ASME A112.18.1.
9.    Brass Waste Fittings:  ASME A112.18.2.

J.    Comply with the following applicable standards and other requirements specified for miscellaneous fittings:
1.    Atmospheric Vacuum Breakers:  ASSE 1001.
2.    Brass and Copper Supplies:  ASME A112.18.1.
3.    Dishwasher Air-Gap Fittings:  ASSE 1021.
4.    Manual-Operation Flushometers:  ASSE 1037.
5.    Plastic Tubular Fittings:  ASTM F 409.
6.    Brass Waste Fittings:  ASME A112.18.2.

K.    Comply with the following applicable standards and other requirements specified for miscellaneous components:
1.    Disposers:  ASSE 1008 and UL 430.
2.    Dishwasher Air-Gap Fittings:  ASSE 1021.
3.    Flexible Water Connectors:  ASME A112.18.6.
4.    Hose-Coupling Threads:  ASME B1.20.7.
5.    Off-Floor Fixture Supports:  ASME A112.6.1M.
6.    Pipe Threads:  ASME B1.20.1.
7.    Plastic Toilet Seats:  ANSI Z124.5.
8.    Supply and Drain Protective Shielding Guards:  ICC A117.1.

1.6     WARRANTY

A.      Warranty Period: Two (2) years from dated of Substantial Completion.


1.7     EXTRA MATERIALS

A.      Furnish extra materials described below that match products installed and that are packaged with protective covering for storage and identified with labels describing contents.
        1.      Faucet Cartridge, Assembly and Associated O-Rings: Equal to 2 or 5 percent of amount of each type and size installed (whichever is greater).
        2.      Flushometer Valve, Repair Kits: Equal to 10 percent of amount of each type installed, but no fewer than 12 of each type.


**PART 2 - PRODUCTS**


2.1     GENERAL REQUIREMENTS

A.      Product descriptions hereinafter represent minimum requirements for each fixture; refer to Basis-of-Design manufacturer and model number listed on the drawing "Plumbing Fixture  Schedule"          for additional features, construction details, accessories and/or options.


2.2     MATERIALS AND WORKMANSHIP

**A.      All materials, unless otherwise specified, shall be 51% manufactured in the United States, new, free from all defects, and of the best quality.  Foreign goods specifically approved for use by the Owner's Representative prior to bidding may be furnished.**

B.      Materials and equipment shall be installed in accordance with the manufacturer's recommendations and the best standard practice for the type of work involved.  All work shall be executed by mechanics skilled in their respective trades, and the installations shall present a neat, precise appearance.


2.3     STOPS

A.      Angle Stops:
        1.      Manufacturers:  Subject to compliance with requirements, provide products by one of the following: (unless noted otherwise on drawings or on schedule).
                a.      Chicago Faucets.
                b.      McGuire Manufacturing Co., Inc.
                c.      T & S Brass and Bronze Works, Inc.
        2.      Description:  Heavy duty cast brass with compression cartridge.
                a.      Finish:  Chrome plated.
                b.      Stem: Brass, full turn.
                c.      Operation: Loose Key, unless otherwise indicated.
                d.      Outlet: NPS 3/8, compression
                e.      Inlet Size:  NPS 1/2, female thread.


2.4     LAVATORY FAUCETS

A.      Lavatory Faucets, Manual:
        1.      Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule)
                a.      Chicago Faucets.
                b.      T & S Brass and Bronze Works, Inc.

    2.    Description:  Two-handle mixing valve.  Include hot- and cold-water indicators; coordinate faucet inlets with supplies and fixture holes; coordinate outlet with spout and fixture receptor.
        a.    Body Material:  Commercial, solid brass.
        b.    Finish:  Polished chrome plate.
        c.    Maximum Flow Rate:  0.5 gpm. (unless noted otherwise on drawings or within Schedule)
        d.    Valve Handle(s):  Wrist blade, 4 inches.
        e.    Spout Outlet:  Aerator.
        f.    Operation/Cartridge:  Ceramic disk, manual.

B.    Lavatory Faucets, Automatic, Metering:
    1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule)
        a.    Chicago Faucets.
        b.    T & S Brass and Bronze Works, Inc.
    2.    Description:  Push button operated, metering; coordinate faucet inlets with supplies and fixture holes; coordinate outlet with spout and fixture receptor.
        a.    Body Material:  Commercial, solid brass.
        b.    Finish:  Polished chrome plate.
        c.    Maximum Flow Rate:  0.5 gpm, (unless noted otherwise on drawings or within Schedule)
        d.    Mixing Valve:  None, cold water only.
        e.    Spout Outlet:  Aerator, vandal resistant.
        f.    Operation:  Manual push button.

## 2.5    SINK FAUCETS

A.    Sink Faucets, Manual, Single Hole:
    1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule)
        a.    Chicago Faucets.
        b.    T & S Brass and Bronze Works, Inc.
    2.    Description:  One or two-handle valve.  Include cold and hot-water indicators; coordinate faucet inlets with supplies and fixture holes; coordinate outlet with spout and fixture receptor.
        a.    Body Material:  Commercial, solid brass.
        b.    Finish:  Polished chrome plate.
        c.    Maximum Flow Rate:  2.2 gpm, (unless noted otherwise on drawings or within Scheduled)
        d.    Mixing Valve:  None.
        e.    Handle: Wrist blade, 4 inches; coordinate single handle (CW only) units with floor plans such that lever is always located on front side of counter/sink.
        f.    Spout Outlet:  Aerator.
        g.    Operation:  Compression, manual.

B.    Sink Faucets, Manual:
    1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule).
        a.    Chicago Faucets.
        b.    T & S Brass and Bronze Works, Inc.
    2.    Description:  Two-handle mixing.  Include cold and hot-water indicators; coordinate faucet inlets with supplies and fixture holes; coordinate outlet with spout and fixture receptor.
        a.    Body Material:  Commercial, solid brass.
        b.    Finish:  Polished chrome plate.
        c.    Maximum Flow Rate:  2.2 gpm, (unless noted otherwise on drawings or within Schedule)
        d.    Mixing Valve:  None.
        e.    Handles: Wrist blade, 4 inches.
        f.    Spout Outlet:  Aerator.
        g.    Operation:  Compression, manual.

C.    Sink Faucets, Kitchen:

1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule)
      a.    Chicago Faucets.
      b.    T & S Brass and Bronze Works, Inc.
2.    Description:  Kitchen faucet without spray, single-handle mixing.  Coordinate faucet inlets with supplies and fixture holes; coordinate outlet with spout and fixture receptor.
      a.    Body Material:  Commercial, solid brass.
      b.    Finish:  Polished chrome plate.
      c.    Maximum Flow Rate:  2.2 gpm, (unless noted otherwise on drawings or within Schedule).
      d.    Mixing Valve:  Integral to cartridge.
      e.    Handle: Lever, minimum 4 inches;
      f.    Spout Outlet:  Aerator.
      g.    Operation/Cartridge:  Manual, ceramic disk mixing.

2.6    FLUSHOMETERS

A.    Flushometers, Automatic:
1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule)
      a.    Sloan Valve Company.
2.    Description:  Flushometer for water-closet or urinal-type fixture.  Include brass body with corrosion-resistant internal components, non-hold-open feature, control stop with check valve, vacuum breaker, copper or brass tubing, and polished chrome-plated finish on exposed parts.
      a.    Internal Design:  Diaphragm operation.
      b.    Style:  Exposed.
      c.    Trip Mechanism:  Sensor operated actuator.

2.7    TOILET SEATS

A.    Toilet Seats:
1.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
      a.    American Standard Companies, Inc.
      b.    Bemis Manufacturing Company.
      c.    Church Seats.
      d.    Kohler Co.
2.    Description:  Toilet seat for water-closet-type fixture.
      a.    Material:  Molded, solid plastic.
      b.    Configuration:  Open front without cover.
      c.    Size:  Elongated.
      d.    Hinge Type:  SC, self-sustaining, check.
      e.    Class:  Heavy-duty commercial.
      f.    Color:  White.

2.8    PROTECTIVE SHIELDING GUARDS

A.    Protective Shielding Pipe Covers:
1.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following: (unless noted otherwise on drawings or within Schedule)
      a.    McGuire Manufacturing Co., Inc.
      b.    TRUEBRO, Inc.
2.    Description:  Manufactured plastic wraps for covering plumbing fixture hot- and cold-water supplies and trap and drain piping.  Comply with Americans with Disabilities Act (ADA) requirements.

2.9     FIXTURE SUPPORTS

A.     Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
1.     Josam Company.
2.     MIFAB Manufacturing Inc.
3.     Smith, Jay R. Mfg. Co.
4.     Tyler Pipe; Wade Div.
5.     Zurn Plumbing Products Group; Specification Drainage Operation.

B.     Water-Closet Supports:
1.     Description:  Combination carrier designed for mounting height of wall-mounting, water-closet-type fixture.  Include single or double, vertical or horizontal, hub-and-spigot or hubless waste fitting as required for piping arrangement; faceplates; couplings with gaskets; feet; and fixture bolts and hardware matching fixture.  Include additional extension coupling, faceplate, and feet for installation in wide pipe space. Factory painted.

C.     Urinal Supports:
1.     Description:  Type I, manufactured urinal carrier with fixture support plates and coupling with seal and fixture bolts and hardware matching fixture for wall-mounting, urinal-type fixture.  Include steel uprights with feet. Factory painted.
2.     Accessible-Fixture Support:  Include rectangular steel uprights.

D.     Lavatory Supports:
1.     Description:  Type II, manufactured lavatory carrier with concealed arms and tie rod for wall-mounting, lavatory-type fixture.  Include steel uprights with feet. Factory painted.
2.     Accessible-Fixture Support:  Include rectangular steel uprights.

E.     Securements
1.     Stainless Steel drop in anchors with heavy-duty class stainless steel bolts. All-threaded is not acceptable.

2.10     DISHWASHER AIR-GAP FITTINGS

A.     Dishwasher Air-Gap Fittings:
1.     Manufacturers:  Subject to compliance with requirements, provide product (or provide Dishwasher loop where local jurisdiction allows):
a.     Watts Brass & Tubular; a division of Watts Regulator Co.
2.     Description:  Fitting suitable for use with domestic dishwashers and for deck mounting; with plastic body chrome-plated brass cover; and capacity of at least 5 gpm; and inlet pressure of at least 5 psig at a temperature of at least 140 deg F.  Include 5/8-inch ID inlet and 7/8-inch ID outlet hose connections.
3.     Hoses:  Rubber and suitable for temperature of at least 140 deg F.
a.     Inlet Hose:  5/8-inch ID and 48 inches long.
b.     Outlet Hose:  7/8-inch ID and 48 inches long.

2.11     DISPOSERS

A.     Disposers:
1.     Manufacturers:  Subject to compliance with requirements, provide products by one of the following: (unless noted otherwise on drawings or within Schedule).
a.     In-Sink-Erator; a div. of Emerson Electric Co.
b.     KitchenAid.
2.     Description:  Batch-feed household, food-waste disposer.  Include reset button; switch; corrosion-resistant chamber with jam-resistant, cutlery- or stainless-steel grinder or shredder; NPS 1-1/2 outlet; quick-mounting, stainless-steel sink flange; antisplash guard; and combination cover/stopper.
a.     Type:  Batch-feed household.
b.     Model:  Sound-insulated chamber.
c.     Motor:  115-V ac.
d.     Minimum 1/2 HP motor

2.12    WATER CLOSETS

A.    Water Closets, Floor Mounted, ADA-Compliant:
1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule)
a.    American Standard Companies, Inc.
b.    Kohler Co.
c.    Sloan (Water Closets/Flush Valve combo)
2.    Description:  Accessible, wall-mounting, back-outlet, vitreous-china fixture designed for flushometer valve operation.
a.    Style: One piece.
1)    Bowl Type:  Elongated with siphon-jet design; include bolt caps matching fixture.
2)    Design Consumption:  1.28 gal./flush (unless noted otherwise on drawings or within Schedule).
3)    Color:  White.
4)    Toilet Seat: Required; see other paragraph.
5)    Flushometer: Required; see other paragraph.
3.    Description:  Accessible, floor-mounting, floor-outlet, vitreous-china fixture designed for flushometer valve operation.
a.    Style:  Flushometer valve.
1)    Bowl Type:  Elongated with siphon-jet design; include bolt caps matching fixture.
2)    Height: Accessible, 16-3/4".
3)    Design Consumption:  1.28 gal./flush (unless noted otherwise or within Schedule).
4)    Color:  White.
5)    Toilet Seat: Required; see other paragraph.
6)    Flushometer: Required; see other paragraph.

2.13    URINALS

A.    Urinals:
1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule).
a.    American Standard Companies, Inc.
b.    Kohler Co.
c.    Sloan (Urinals/Flush Valve combo)
2.    Description:   Accessible, wall-mounting, back-outlet, vitreous-china fixture designed for flushometer valve operation.
a.    Type:  Siphon jet.
b.    Design Consumption:   0.5 gal./flush (unless noted otherwise on drawings or within Schedule).
c.    Color:  White.
d.    Supply Spud Size:  NPS 3/4.
e.    Outlet Size:  NPS 2.

2.14    LAVATORIES

A.    Lavatories:
1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule).
a.    American Standard Companies, Inc.
b.    Kohler Co.
2.    Description: Accessible, wall-mounting, vitreous-china fixture.
a.    Type:  With back Ledge back Shelf back Slab Pedestal.
b.    Faucet Hole Punching:  Coordinate with faucet.
c.    Color:  White.
d.    Supplies:  NPS 3/8 chrome-plated copper with stops.
e.    Drain:  Grid.

f.    Drain Piping:  NPS 1-1/4 chrome-plated, cast-brass 17-ga. P-trap; NPS 1-1/4 0.045-inch thick tubular brass waste to wall (trap arm); and wall escutcheon.

2.15    COMMERCIAL SINKS

A.    Commercial Sinks:
1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule).
   a.    Elkay Manufacturing Co.
   b.    Just Manufacturing Company.
2.    Description:  Counter-mounting, seamless commercial sink, self-rimming, fully undercoated for sound attenuation, with 1-3/4" radius coved corners.
   a.    Metal:  304 stainless steel, 18 gauge.
   b.    Finish: Satin.
   c.    Drain: 3" Grid, chrome-plated brass, with vandal resistant strainer and NPS 1-1/2 tailpiece; unless otherwise indicated.
   d.    Supplies:  NPS 1/2 chrome-plated copper with stops.
   e.    Drain Piping:  NPS 1-1/2 chrome-plated, cast-brass P-trap; 0.045-inch- thick tubular brass waste to wall (trap arm); and wall escutcheon(s).

2.16    KITCHEN SINKS

A.    Kitchen Sinks, Barrier Free:
1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule).
   a.    Kohler Co.
   b.    American Standard Companies, Inc.
2.    Description:  Two-compartment (high/low), accessible, built into counter, enameled, cast-iron kitchen sink.
   a.    Overall Dimensions:
   b.    Metal Thickness:  0.038 inch 0.050 inch.
   c.    Left Compartment:
      1)    Dimensions:  7 x 9-inches.
      2)    Drain:  3-1/2-inch outlet for disposer.
         a)    Location:  Near back of compartment.
   d.    Right Compartment:
      1)    Dimensions:  21 x 16-inches.
      2)    Drain:  3-1/2-inch crumb cup.
         a)    Location:  Near back of compartment on left side.
   e.    Supplies:  NPS 1/2 chrome-plated copper with stops.
   f.    Drain Piping:  Drain Piping:  NPS 1-1/2 chrome-plated, cast-brass P-trap; 0.045-inch thick tubular brass waste to wall (trap arm); and wall escutcheon(s).
   g.    Color: White.
   h.    Barrier-free Shroud: Required.
   i.    Disposer:  Required for left compartment.
   j.    Dishwasher Air-Gap Fitting:  Required.

2.17    SERVICE BASINS

A.    Service Basins:
1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule" or a comparable product by one of the following: (unless noted otherwise on drawings or within Schedule).
   a.    Crane Plumbing, L.L.C./Fiat Products.
   b.    Stern-Williams Co., Inc.
2.    Description: Flush-to-wall, floor-mounting, pre-cast terrazzo fixture with rim guard.
   a.    Rim Guard:  On front surfaces, stainless steel.
   b.    Faucet: As indicated on drawing "Plumbing Fixture Schedule."

      c.     Color:  Not applicable.
      d.     Drain:  Cast-brass with nickel-bronze grid and NPS 3 (DN 80) outlet; extra heavy-duty, cast iron, deep seal trap.

## 2.18   UTILITY BOXES

A.    Utility Boxes, Clothes Washer:
    1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule."
    2.    Description:  Flush mounted in wall cavity with shutoff valves.
      a.     Material:  Galvanized Steel.
      b.     Finish: Unpainted.
      c.     Valves: Bronze, brass stem, compression.
      d.     Outlets: 3/4" Hose Thread.
      e.     Inlet Size:  NPS 1/2, female thread.
      f.     Supplies: 60-inch Heavy-duty CW and HW clothes washer hoses, manufactured by Floodcheck (no exceptions).  Provide with shock arrestors equal to Precision Plumbing Products #WHA-500L.

B.    Utility Boxes, Ice Maker:
    1.    Basis-of-Design Product:  Subject to compliance with requirements, provide the product listed on the drawing "Plumbing Fixture Schedule."
    2.    Description:  Flush mounted in wall cavity with angle stop.
      a.     Material:  Galvanized Steel.
      b.     Finish: Unpainted.
      c.     Supply: Annealed copper tube, minimum 48-inch length (coiled) to permit pulling out appliance for rear service.

## PART 3 - EXECUTION

## 3.1   EXAMINATION

A.    Examine roughing-in of water supply and sanitary drainage and vent piping systems to verify actual locations of piping connections before plumbing fixture installation.

B.    Examine cabinets, counters, floors, and walls for suitable conditions where fixtures will be installed.

C.    Proceed with installation only after unsatisfactory conditions have been corrected.

## 3.2   INSTALLATION

A.    Assemble plumbing fixtures, trim, fittings, and other components according to manufacturers' written instructions.

B.    Install off-floor supports, affixed to building substrate, for wall-mounting fixtures.
    1.    Use carrier supports with waste fitting and seal for back-outlet fixtures.
    2.    Use carrier supports without waste fitting for fixtures with tubular waste piping.
    3.    Use chair-type carrier supports with rectangular steel uprights for accessible fixtures.

C.    All wall mounted fixtures and equipment shall be installed with floor mounted carriers (Manufacturer provided).

D.    Install wall-mounted fixtures AT ELEVATIONS INDICATED ON ARCHITECTURAL DRAWINGS.

E.    Install back-outlet, wall-mounting fixtures onto waste fitting seals and attach to supports.

F.    Install floor-mounting fixtures on closet flanges or other attachments to piping or building substrate.

G.    Install wall-mounting fixtures with tubular waste piping attached to supports.

H. Install floor-mounting, back-outlet water closets attached to building floor substrate and wall bracket and onto waste fitting seals.

I. Install counter-mounting fixtures in and attached to casework.

J. Install fixtures level and plumb according to roughing-in drawings.

K. Install water-supply piping with stop on each supply to each fixture to be connected to water distribution piping. Attach supplies to supports or substrate within pipe spaces behind fixtures. Install stops in locations where they can be easily reached for operation.
   1. Exception: Use ball, if supply stops are not specified with fixture. Valves are specified in Specification Section "Valves."

L. All appurtances supporting fixtures to be chrome plated in exposed areas (including but not limited to under cabinet areas).

M. Install trap and tubular waste piping on drain outlet of each fixture to be directly connected to sanitary drainage system.

N. Install tubular waste piping on drain outlet of each fixture to be indirectly connected to drainage system.

O. Install flushometer valves for accessible water closets and urinals with handle mounted on wide side of compartment. Install other actuators in locations that are easy for people with disabilities to reach.

P. Install toilet seats on water closets.

Q. Install faucet-spout fittings with specified flow rates and patterns in faucet spouts if faucets are not available with required rates and patterns. Include adapters if required.

R. Install water-supply flow-control fittings with specified flow rates in fixture supplies at stop valves.

S. Install faucet flow-control fittings with specified flow rates and patterns in faucet spouts if faucets are not available with required rates and patterns. Include adapters if required.

T. Install shower flow-control fittings with specified maximum flow rates in shower arms.

U. Install traps on fixture outlets.
   1. Exception: Omit trap on fixtures with integral traps.
   2. Exception: Omit trap on indirect wastes, unless otherwise indicated.

V. Install disposer in outlet of each sink indicated to have disposer. Install switch where indicated or in wall adjacent to sink if location is not indicated.

W. Install dishwasher air-gap fitting at each sink indicated to have air-gap fitting. Install on countertop at sink. Connect inlet hose to dishwasher and outlet hose to disposer.

X. Install escutcheons at piping wall ceiling penetrations in exposed, finished locations and within cabinets and millwork. Use deep-pattern escutcheons if required to conceal protruding fittings. Escutcheons are specified in Specification Section "Basic Mechanical Materials and Methods."

Y. Seal joints between fixtures and walls, floors, and countertops using sanitary-type, one-part, mildew-resistant silicone sealant. Match sealant color to fixture color. Sealants are specified in Specification Section "Joint Sealants."

3.3    CONNECTIONS

A. Piping installation requirements are specified in other Division 22 Sections. Drawings indicate general arrangement of piping, fittings, and specialties.

B. Connect fixtures and appliances with water supplies, stops, and risers, and with traps, soil, waste, and vent piping. Use size fittings required to match fixtures.

C.    Ground equipment according to Specification Section "Grounding and Bonding."

D.    Connect wiring according to Specification Section "Conductors and Cables."

E.    Arrange for electric-power connections to fixtures, transformers and devices that require power. Electric power is specified in Electrical Specification Sections.


3.4    FIELD QUALITY CONTROL

A.    Verify that installed plumbing fixtures are categories and types specified for locations where installed.

B.    Check that plumbing fixtures are complete with trim, faucets, fittings, and other specified components.

C.    Inspect installed plumbing fixtures for damage. Replace damaged fixtures and components.

D.    Test installed fixtures after water systems are pressurized for proper operation. Replace malfunctioning fixtures and components, then retest. Repeat procedure until units operate properly.


3.5    ADJUSTING

A.    Operate and adjust faucets and controls. Replace damaged and malfunctioning fixtures, fittings, and controls.

B.    Operate and adjust disposers and controls. Replace damaged and malfunctioning units and controls.

C.    Adjust water pressure at faucets and flushometer valves to produce proper flow and stream.

D.    Replace washers and seals of leaking and dripping faucets and stops.

E.    Install fresh batteries in sensor-operated mechanisms.

F.    Run hot water (full flow) at each faucet until temperature is stable (-2 degree deviation from water heater set point); balance manual (y-type, etcetera) mixing valve at each faucet to 110 F spout-discharge temperature.

G.    After compression cartridges are well-seated (50-60 cycles), adjust faucet wrist-blade handles to position parallel to back-splash (or wall that lavatory is mounted to) when fully closed (tight).


3.6    CLEANING

A.    Clean fixtures, faucets, and other fittings with manufacturers' recommended cleaning methods and materials. Do the following:
      1.    Remove faucet spouts and strainers, remove sediment and debris, and reinstall strainers and spouts.
      2.    Remove sediment and debris from drains.

B.    After completing installation of exposed, factory-finished fixtures, faucets, and fittings, inspect exposed finishes and repair damaged finishes.


3.7    PROTECTION

A.    Provide protective covering for installed fixtures and fittings.

B.    Do not allow use of plumbing fixtures for temporary facilities unless approved in writing by Owner.


**END OF SECTION**

**SECTION 230005 - MECHANICAL DEMOLITION**

**PART 1 - GENERAL**

1.1     SUMMARY

    A.     This Section includes the following:
        1.     Demolition and removal of selected portions of building or structure.
        2.     Demolition and removal of selected site elements.
        3.     Salvage of existing items to be reused or recycled.

1.2     DEFINITIONS

    A.     Remove or Demolish:  Detach items from existing construction and legally dispose of them off-site, unless indicated to be removed and salvaged or removed and reinstalled.

    B.     Remove and Salvage:  Detach items from existing construction and deliver them to Owner cleaned, packaged, and ready for reuse.

    C.     Remove and Reinstall:  Detach items from existing construction, prepare them for reuse, and reinstall them where indicated.

    D.     Existing to Remain:  Existing items of construction that are not to be removed and that are not otherwise indicated to be removed, removed and salvaged, or removed and reinstalled.

1.3     MATERIALS OWNERSHIP

    A.     Historic items, relics, and similar objects including, but not limited to, cornerstones and their contents, commemorative plaques and tablets, antiques, and other items of interest or value to Owner that may be encountered during selective demolition remain Owner's property.  Carefully remove and salvage each item or object in a manner to prevent damage and deliver promptly to Owner.
        1.     Coordinate with Owner's representative, who will establish special procedures for removal and salvage.

1.4     SUBMITTALS

    A.     Schedule of Selective Demolition Activities:  Indicate the following:
        1.     Detailed sequence of selective demolition and removal work, with starting and ending dates for each activity.
        2.     Interruption of utility services.  Indicate how long utility services will be interrupted.
        3.     Coordination for shutoff, capping, and continuation of utility services (including but not limited to: Gas, Water, Fire Suppression, Chilled Water, Hot Water, Air Conditioning, etc).
        4.     Coordination of Owner's continuing occupancy of portions of existing building and of Owner's partial occupancy of completed Work.
        5.     Means of protection for items to remain and items in path of waste removal from building.

    B.     Inventory:  After selective demolition is complete, submit a list of items that have been salvaged.

1.5     QUALITY ASSURANCE

    A.     Regulatory Requirements:  Comply with governing EPA notification regulations before beginning selective demolition.  Comply with hauling and disposal regulations of authorities having jurisdiction.

    B.     Standards:  Comply with ANSI A10.6 and NFPA 241.

C. Pre-demolition Conference: Conduct conference at Project site to comply with requirements in Section "Project Management and Coordination." Review methods and procedures related to selective demolition including, but not limited to, the following:
1. Inspect and discuss condition of construction to be selectively demolished.
2. Review structural load limitations of existing structure.
3. Review and finalize selective demolition schedule and verify availability of materials, demolition personnel, equipment, and facilities needed to make progress and avoid delays.
4. Review requirements of work performed by other trades that rely on substrates exposed by selective demolition operations.
5. Review areas where existing construction is to remain and requires protection.

1.6    PROJECT CONDITIONS

A. Owner will occupy portions of building immediately adjacent to selective demolition area. Conduct selective demolition so Owner's operations will not be disrupted.

B. Conditions existing at time of inspection for bidding purpose will be maintained by Owner as far as practical.

C. Notify Architect of discrepancies between existing conditions and Drawings before proceeding with selective demolition.

D. Hazardous Materials: It is unknown whether hazardous materials will be encountered in the Work.
1. If materials suspected of containing hazardous materials are encountered, do not disturb; immediately notify Architect and Owner. Owner will remove hazardous materials under a separate contract.

E. Storage or sale of removed items or materials on-site is not permitted.

F. Utility Service: Maintain existing utilities indicated to remain in service and protect them against damage during selective demolition operations.
1. Maintain fire-protection facilities in service during selective demolition operations.

1.7    WARRANTY

A. Existing Warranties: Remove, replace, patch, and repair materials and surfaces cut or damaged during selective demolition, by methods and with materials so as not to void existing warranties.

**PART 2 - PRODUCTS (Not Used)**

**PART 3 - EXECUTION**

3.1    EXAMINATION

A. Verify that utilities have been disconnected and capped.

B. Survey existing conditions and correlate with requirements indicated to determine extent of selective demolition required.

C. Inventory and record the condition of items to be removed and reinstalled and items to be removed and salvaged.

D. When unanticipated mechanical, electrical, or structural elements that conflict with intended function or design are encountered, investigate and measure the nature and extent of conflict. Promptly submit a written report to Architect.

3.2    UTILITY SERVICES AND MECHANICAL/ELECTRICAL SYSTEMS

A. Existing Services/Systems:  Maintain services/systems indicated to remain and protect them against damage during selective demolition operations.

B. Service/ Requirements: Locate, identify, disconnect, and seal or cap off indicated utility services and mechanical/electrical systems serving areas to be selectively demolished.
   1. Arrange to shut off indicated utilities with utility companies.
   2. If services/systems are required to be removed, relocated, or abandoned, before proceeding with selective demolition provide temporary services/systems that bypass area of selective demolition and that maintain continuity of services/systems to other parts of building.
   3. Cut off pipe or conduit in walls or partitions to be removed.  Cap, valve, or plug and seal remaining portion of pipe or conduit after bypassing.
      a. Where entire wall is to be removed, existing services/systems may be removed with removal of the wall.

3.3     PREPARATION

A. Site Access and Temporary Controls:  Conduct selective demolition and debris-removal operations to ensure minimum interference with roads, streets, walks, walkways, and other adjacent occupied and used facilities.

3.4     SELECTIVE DEMOLITION, GENERAL

A. General:  Demolish and remove existing construction only to the extent required by new construction and as indicated.  Use methods required to complete the Work within limitations of governing regulations and as follows:
   1. Proceed with selective demolition systematically, from higher to lower level.  Complete selective demolition operations above each floor or tier before disturbing supporting members on the next lower level.
   2. Do not use cutting torches until work area is cleared of flammable materials.  At concealed spaces, such as duct and pipe interiors, verify condition and contents of hidden space before starting flame-cutting operations.  Maintain portable fire-suppression devices during flame-cutting operations.
   3. Maintain adequate ventilation when using cutting torches.
   4. Dispose of demolished items and materials promptly.

B. Removed and Salvaged Items:
   1. Clean salvaged items.
   2. Pack or crate items after cleaning.  Identify contents of containers.
   3. Store items in a secure area until delivery to Owner.
   4. Transport items to Owner's storage area designated by Owner.
   5. Protect items from damage during transport and storage.

C. Removed and Reinstalled Items:
   1. Clean and repair items to functional condition adequate for intended reuse.  Paint equipment to match new equipment.
   2. Pack or crate items after cleaning and repairing.  Identify contents of containers.
   3. Protect items from damage during transport and storage.
   4. Reinstall items in locations indicated.  Comply with installation requirements for new materials and equipment.  Provide connections, supports, and miscellaneous materials necessary to make item functional for use indicated.

D. Existing Items to Remain:  Protect construction indicated to remain against damage and soiling during selective demolition.  When permitted by Architect, items may be removed to a suitable, protected storage location during selective demolition and cleaned and reinstalled in their original locations after selective demolition operations are complete.

E. Contractor shall terminate demolished pipe and/or ductwork.  System shall be capped and insulated per new work specification.

F. Contractor shall remove any abandoned piping and/or ductwork in area of construction during the demolition process.

G.  Unforeseen Conditions
1.  Any unforeseen utilities found during construction that directly affect any trade must be brought to the engineer's attention via RFI.
2.  All existing conditions must be clearly annotated on the As-Built drawings.

H.  Repair any walls, floors or roofs that piping, ducts or equipment have been removed from (or through). Patch with similar materials to match finish and color (paint to match). If paint cannot be matched, repaint entire wall or surface.

3.5  DISPOSAL OF DEMOLISHED MATERIALS

A.  General:  Except for items or materials indicated to be reused, salvaged, reinstalled, or otherwise indicated to remain Owner's property, remove demolished materials from Project site and legally dispose of them in an EPA-approved landfill.
1.  Do not allow demolished materials to accumulate on-site.
2.  Remove and transport debris in a manner that will prevent spillage on adjacent surfaces and areas.

B.  Burning:  Do not burn demolished materials.

C.  Disposal:  Transport demolished materials off Owner's property and legally dispose of them.

**END OF SECTION**

**SECTION 230100 - SPECIAL CONDITIONS FOR ALL MECHANICAL WORK**

**PART 1 - GENERAL**

1.1     DESCRIPTION OF WORK

   A.     This section covers the general provisions of the mechanical specifications applicable to the following systems:
   1.     Heating, air conditioning, and ventilation.

   B.     The use of the word mechanical in the body of the various specifications sections shall be interpreted to include all the aspects of all of the systems referenced in Mechanical Specifications.

1.2     DRAWINGS

   A.     These specifications are accompanied by drawings of the building and details of the installations showing the locations of equipment, piping, ductwork, etc.   The drawings and these specifications are complementary to each other; requirements described in one or the other shall be considered binding as if described in both.

   B.     If any departures from the drawings are deemed necessary by the Contractor, details of such departures and the reasons therefore shall be submitted to the Owner's Representative for approval.  No departures shall be made without prior written approval by the Owner's Representative.

   C.     There are intricacies of construction which are impractical to specify or indicate in detail; means and methods for performing such work shall adhere to commonly accepted industry standards.

   D.     It is the Contractor's responsibility to properly use all information found on the Architectural, Structural, Mechanical, and Electrical drawings and applicable shop drawings where such information affects his work.

   E.     For new buildings, all final dimensions shall be scaled from the drawings, unless otherwise noted. For work associated with existing buildings (renovations and additions), all final dimensions shall be field verified.

1.3     CONSTRUCTION REQUIREMENTS

   A.     The architectural, civil, structural, electrical, plumbing, fire protection and mechanical drawings, and specifications are all part of the Contract Documents.  In many instances there are details described another trade's drawings that are not necessarily included or referenced in the mechanical drawings.  It is the Contractor's responsibility to review in detail all parts of the Contract Documents prior to submitting a bid.  Failure to comply with this requirement shall not relieve the Contractor of responsibility or be used as cause for additional compensation because architectural, structural, or electrical details were not included in the mechanical drawings.

   B.     It is the intent of the Contract Documents to provide complete and fully functional installation in every respect.  Material and/or construction details not specifically described in the Contract Documents, but commonly considered incidental to the industry, are required by the Contractor.

   C.     The Contractor shall be responsible for fitting his material and apparatus into the building and shall carefully lay out his work at the site to conform to the structural conditions, to avoid all obstructions, to comply with Codes, to facilitate the work of other trades, to conform to the details of the installation supplied by the manufacturer of the equipment to be installed, and thereby to provide an integrated satisfactory operating installation.

   D.     The mechanical, electrical and plumbing drawings are schematic in nature and do not show every connection in detail or every pipe or conduit in its exact location.  These details are subject to the requirements of ordinances and structural and architectural conditions.

E.  The Contractor shall carefully investigate structural and finish conditions and shall coordinate the separate trades in order to avoid interference between the various phases of work. Work shall be laid out so that it will be concealed in furred chases and above suspended ceilings, etc. in finished portions of the building, unless specifically noted to be exposed. Work shall be installed to avoid compromising structural members; therefore, inserts to accommodate hangers shall be set before concrete is poured, and proper openings through floor, walls, beams, etc. shall be provided as hereinafter specified or as otherwise indicated or required. All work shall be installed parallel or perpendicular to building lines unless otherwise noted.

F.  When the mechanical drawings do not give exact details as to the elevation of pipe or ducts, physically arrange the systems to fit in the space available at the elevations intended with the proper grades for the functioning of the system involved. Piping, exposed conduit, and duct systems are generally intended to be installed true and square to the building construction, and located as high as possible against the structure in a neat and workmanlike manner. The plans do not show all required offsets, control lines, pilot lines, and other location details. Work shall be concealed in all finished areas. Piping specified to be insulated shall be supported in a manner that will allow the insulation to be installed without gaps. Insulated piping in concealed areas shall be offset with fittings as necessary to permit installation of insulation. Bending of pipes or installing pipes in a strain to insulate will not be permitted.

G.  Final placement of serviceable equipment shall be carefully coordinated with all other trades to ensure sufficient clearance for maintenance according to manufacturer's recommendations. Lubricating orifices and adjustable components shall be easily accessible. Piping, conduit, valve stems, cabling and other building systems shall not interfere with service space.

H.  Location of Exposed Devices
    1.  All exposed devices (grills, registers, diffusers, sprinkler heads, medical gas outlets, plumbing rough-ins, lights, outlets, communication devices, etcetera) shall be referenced to fixed data points that are coordinated with all trades; shall be located to present symmetrical arrangements with respect to the fixed data point; and shall facilitate the proper arrangements of acoustical ceiling tiles. Fixed data points shall include such features as wall and ceiling lines, soffits, balanced border widths, masonry joints, etc. Devices located in acoustical ceiling tiles shall occur symmetrically in tile joints or in the centers of whole tiles. The final determination of the exact location of each outlet and the arrangements to be followed shall be acceptable to the Owner's Representative.
    2.  The drawings schematically indicate locations of the exposed devices. Final locations shall be determined by carefully coordinating the drawings pertaining to each trade. Where conflicts are identified, Owner's Representative shall determine final location. The Owner reserves the right to make any reasonable change in location of any device before installation, without additional cost to the Owner or the Architect.

1.4  QUALIFICATIONS

A.  Contractor must have minimum of five years experience installing commercial heating, ventilation and air conditioning systems, plumbing and piping systems similar to those described in these Contract Documents.

B.  Contractor must be licensed and hold a current contracting license that has been valid for a minimum of five years in the State of Texas.

C.  Contractor must be able to bond work for payment and performance of work being bid. Contractor's bonding agency shall have a Best's insurance rating of A or A+.

1.5  MATERIAL AND EQUIPMENT REQUIREMENTS

A.  Manufacturer's Instructions: The manufacturer's published instructions shall be followed for preparing, assembling, installing, erecting, and cleaning manufacturer materials or equipment, unless otherwise indicated. The Contractor shall promptly notify the Owner's Representative in writing of any conflict between the requirements of the Contract Documents and the manufacturer's direction and shall obtain the clarification of the Owner's Representative before proceeding with the work. Should the Contractor perform any such work that does not comply with the manufacturer's directions or such clarification by the Owner's Representative, he shall bear all costs arising in connection with the correction of the deficiencies.

B.   Storage at Site:  The Contractor shall not receive material or equipment at the jobsite until there is suitable space provided to properly protect equipment from rust, drip, humidity, and dust damage and from surrounding work.

C.   Capacities shall be not less than those indicated and shall be such that no component or system becomes inoperative or is damaged because of startup or other overload conditions.

D.   Conformance to Agency Requirements:  Where materials or equipment are specified to be approved, listed, tested, or labeled by the Underwriters Laboratories, Inc., or constructed and/or tested in accordance with the standards of the American Society of Mechanical Engineers or the Air Moving and conditioning Association, the Contractor shall submit proof that the items furnished under this section of the specifications conform to such requirements.  The label of the Underwriters Laboratories, Inc. applied to the item will be acceptable as sufficient evidence that the items conform to such requirements.  The ASME stamp or the AMCA label will be acceptable as sufficient evidence that the items conform to the respective requirements.

E.   Nameplates:  Each major component of equipment shall have the manufacturer's name, address, and model-identification number on a plate securely attached to the item of equipment.  All data on nameplates shall be legible at the time of Final Inspection.

F.   Prevention of Rust:  Standard factory finish will be acceptable on equipment specified by model number otherwise surfaces of ferrous metal shall be given a rust-inhibiting coating.  The treatment shall withstand 200 hours in salt-spray fog test, in accordance with Method 6061 of Federal Standard No. 141.  Immediately after completion of the test, the specimen shall show no signs of wrinkling or cracking and no signs of rust creepage beyond 1/8 inch on either side of the scratch mark.  Where rust inhibitor coating is specified hereinafter, any treatment that will pass the above test is acceptable unless a specific coating is specified, except that coal tar or asphalt-type coatings will not be acceptable unless so stated for a specific item.  Where steel is specified to be hot-dip galvanized, mill-galvanized sheet steel may be used provided all raw edges are painted with a zinc-pigmented paint conforming to Military Specification MIL-P-26915.

G.   Protection from Moving Parts:  Belts, pulleys, chains, gears, couplings, projecting setscrews, keys, and other rotating parts located so that any person can come in close proximity thereto, shall be fully enclosed or properly guarded.

H.   Drive Guards:  For machinery and equipment, provide guards as shown in AMCA 410 for belts, chains, couplings, pulleys, sheaves, shafts, gears, and other moving parts regardless of height above the floor.  Drive guards may be excluded where motors and drives are inside factory-fabricated air handling units casings.  Guards shall be constructed of sheet steel, cast iron, expanded metal, or wire mesh rigidly secured so as to be removable without disassembling pipe duct or electrical connection to equipment.  Provide a 1-inch diameter hole in each drive guard at each shaft center to allow access for speed measurement.

I.   Verifications of Dimensions: The Contractor shall be responsible for the coordination and proper relation of his work to the building structure and to the work of all trades.  The Contractor shall visit the premises and thoroughly familiarize himself with all details of the work and working conditions, to verify all dimensions in the field, and to advise the Owner's Representative of any discrepancy before performing any work.  Adjustments to the work required in order to facilitate a coordinated installation shall be made at no additional cost to the Owner, Architect, or Engineer.

J.   Standard Products:  Materials and equipment to be provided shall be the standard catalog products of manufacturers regularly engaged in the manufacture of products conforming to these specifications, and shall essentially duplicate materials and equipment that have been in satisfactory use at least two years.

K.   Spare Parts Data:  As soon as practicable after approval of materials and equipment and, if possible, not later than four months prior to the date of beneficial occupancy, the Contractor shall furnish spare parts data for each different item of equipment listed.  The data shall include a complete list of parts and supplies with current unit prices and sources of supply, a list of parts and supplies that are either normally furnished at no extra cost with the purchase of the equipment or specified hereinafter to be furnished as part of the Contract, and a list of additional items recommended by the manufacturer to assure efficient operation for a period of 120 days at the particular installation.  The foregoing shall not relieve the Contractor of any responsibilities under the warranty specified.

1.6     INSPECTION OF THE SITE

A.     The Contractor shall visit the site, verifying all existing items indicated on drawings and/or specified, and familiarize himself with the existing work conditions, hazards, grades, actual formations, soil conditions, structures, utilities, equipment, systems, facilities, and local requirements.  The submission of bids shall be deemed evidence of such visits.  All proposals shall take these existing conditions into consideration, and the lack of specific information shall not relieve the Contractor of any responsibility.

1.7     UTILITY LOCATIONS AND ELEVATIONS

A.     Locations and elevations of the various utilities included within the scope of this work have been obtained from substantially reliable sources and are offered separately from the Contract Documents, as a general guide only, without guarantee as to accuracy.  Examine the site, the locations, and availability of all utilities and services required for their relation to the work.  Verify the location of all existing site utilities with each responsible utility company or applicable party.  The Contractor shall repair all damage to existing utilities, whether indicated on the drawings or not, at his sole expense.

1.8     PERMITS, UTILITY CONNECTIONS, AND INSPECTIONS

A.     Permitting Fees: Contractor shall pay for all fees associated with permits required by municipal authorities having jurisdiction.

B.     Tapping and Impact Fees: Contractor shall pay for all fees associated with tapping into municipal utility mains, including sanitary sewer, natural gas and domestic water.  Impact fees will be paid for by the Owner.

C.     Compliance:  The Contractor shall comply in every respect with all requirements of local authorities having jurisdiction, including building inspections, fire marshal, local ordinances and codes, and utility company requirements.  In no case does this relieve the Contractor of the responsibility of complying with these specifications and drawings where specified conditions are of a higher quality than the requirements of the above-specified authorities.  Where requirements of the specifications and drawings are below the requirements of the above offices having jurisdiction, the Contractor shall make installations in compliance with the requirements of the above authorities.

D.     Utilities: The Contractor shall coordinate with the various utility companies involved in this project and shall provide required utility relocations, extensions, modifications, and/or changes (complete in all respects) as described in the Contract Documents.  Contractor shall verify the location of all existing utilities with the applicable Utility Company.  The Contractor shall be responsible for all damages to existing utilities, whether indicated on drawings or not, and repair all damage to existing utilities as acceptable to the affected Utility Company.

E.     Certification:  Prior to final acceptance, the Contractor shall furnish a certificate of acceptance from the inspection departments having jurisdiction over the work for any and all work installed under this Contract.  Any additional labor costs incurred as a result of a substitution shall be the Contractor's responsibility.

1.9     EXISTING FACILITIES

A.     The Contractor shall be responsible for loss or damage to the existing facilities caused by him and his workmen, and shall be responsible for repairing or replacing such loss or damage.  The Contractor shall send proper notices, make necessary arrangements, and perform other services required for the care, protection, and in-service maintenance of all plumbing, heating, air conditioning, and ventilating services for the new and existing facilities.  The Contractor shall erect temporary barricades, with necessary safety devices, as required to protect personnel from injury, removing all such temporary protection upon completion of the work.

B.     The Contractor shall provide temporary or new services to all existing facilities as required to maintain their proper operation when normal services are disrupted as a result of the work being performed under this project.

C.     Where existing construction is removed to provide working and extension access to existing utilities, Contractor shall remove doors, piping, conduit, outlet boxes, wiring, light fixtures, air conditioning ductwork

and equipment, etc. to provide this access and shall reinstall same upon completion of work in the areas affected.

D. Where partitions, walls, floors, or ceilings of existing construction are indicated to be removed, all Contractors shall remove and reinstall in locations approved by the Architect/Engineer all devices required for the operation of the various systems installed in the existing construction.  This is to include but is not limited to temperature controls system devices, electrical switches, relays, fixtures, piping, conduit, etc.

E. Outages of services as required by the new installation will be permitted but only at a time approved by the Owner.  The Contractor shall allow the Owner two weeks in order to schedule required outages.  The time allowed for outages will not be during normal working hours unless otherwise approved by the Owner.  All costs of outages, including overtime charges, shall be included in the contract amount.

1.10   DEMOLITION AND RELOCATION

A. The Contractor shall modify, remove, and/or relocate all materials and items so indicated on the drawings or required by the installation of new facilities.  All removals and/or dismantling shall be conducted in a manner as to produce maximum salvage.  Salvage materials shall remain the property of the Owner, and shall be delivered to such destination or otherwise disposed of as directed by the Owner.  Materials and/or items scheduled for relocation and which are damaged during dismantling or reassembly operations shall be repaired and restored to good operative condition.  The Contractor may, at his discretion, and upon the approval of the Owner, substitute new materials and/or items of like design and quality in lieu of materials and/or items to be relocated.

B. All items which are to be relocated shall be carefully removed in reverse to original assembly or placement and protected until relocated.  The Contractor shall clean and repair and provide all new materials, fittings, and appurtenances required to complete the relocations and to restore to good operative order.  All relocations shall be performed by workmen skilled in the work and in accordance with standard practice of the trades involved.

C. When items scheduled for relocation and/or reuse are found to be in damaged condition before work has been started on dismantling, the Contractor shall call the attention of the Owner to such items and receive further instructions before removal.  Items damaged in repositioning operations are the Contractor's responsibility and shall be repaired or replaced by the Contractor as approved by the Owner, at no additional cost to the Owner.

D. Service lines and wiring to items to be removed, salvaged, or relocated shall be removed to points indicated on the drawings, specified, or acceptable to the Owner.  Service lines and wiring not scheduled for reuse shall be removed to the points at which reuse is to be continued or service is to remain.  Such services shall be sealed, capped, or otherwise tied off or disconnected in a safe manner acceptable to the Owner.  All disconnections or connections into the existing facilities shall be done in such a manner as to result in minimum interruption of services to adjacent occupied areas.  Services to existing areas or facilities which must remain in operation during the construction period shall not be interrupted without prior specific approval of the Owner as hereinbefore specified.

1.11   SUBSTITUTION OF MATERIALS AND EQUIPMENT

A. No substitution of materials or equipment herein specified or called for on the drawings will be permitted, except by written permission of the Owner's Representative.  Where several makes of equipment or material are mentioned, any item named may be bid upon provided it meets space, capacity specifications, and other requirements.

1.12   SUBMITTALS

A. Submittals for Review:
   1. As soon as practical or within 30 days after the date of contract award or notice to proceed, and before purchasing or starting installation of any materials or equipment, the Contractor shall submit for review sufficient material and equipment data to indicate that all requirements of the specifications have been met and samples shall be furnished when requested.  All manufacturer's

data used as part of the submittal shall have all non-applicable features crossed out or deleted in a manner that will clearly indicate exactly what is to be furnished.

2. Four (4) copies of the submittal list and detailed submittals (for the Owner's and A/E's use) shall be submitted to the Owner's Representative. The Contractor is requested to include a minimum of three (3) additional copies for insertion in the project's Owner's Manuals at the completion of the project, and the number of additional copies the Contractor requires for his and his subcontractor's use during the project's construction. The detailed submittals shall be accompanied by the same number of sets of pictorial and descriptive data derived from the manufacturer's catalogs and sales literature, or incorporated in the shop drawings. The Contractor may provide a detailed submittal on any item even though not required by the Owner's Representative.

B. Format
1. Submittals shall be bound in a BLACK hardback three-ring binder with clear-view sleeves on the spine and front. Binders larger than 3-inches shall be divided into two volumes. The front sleeve shall have a cover sheet inserted with the title "MECHANICAL SUBMITTALS" centered in large print. Below the title shall be printed the name of the project, the date, the project location, the name and address of the contractor, the name and address of the subcontractor and the name and address of the engineer(s) in smaller print.
2. Provide a Table of Contents at the beginning of the binder that summarizes the information being submitted according to specification section.
3. Submittals shall be tab divided by specification section; **all sections** identified in the project specifications shall have a tab. When no information is being provided concerning a particular specification section, insert a single dated sheet that explains the circumstances.
4. **Loose-leaf or piecemeal submittals are not acceptable and subject to rejection unless prior approval has been granted by the Engineer.**
5. **Email/Digital Submittals are not acceptable and subject to rejection unless prior approval has been granted by the Engineer.**

C. Content:
1. The Contractor shall prepare or cause to be prepared shop drawings, product data, materials and equipment lists, diagrams, data, samples, and other submittals as required by the contract documents, hereinafter referred to as "Submittal Data." The Contractor shall review and approve all submittal data for compliance with the contract documents, manufacturer's recommendations, adequacy, clearances, code compliance, safety, and coordination with associated work.
2. The Contractor shall submit approved submittal data to the Owner's Representative for review and comment as to general conformance with the design concept and general compliance with information given in the contract documents. Owner's Representative's review shall not include review of quantities, dimensions, weights or gauges, fabrication processes, construction methods, coordination with other trades or work, or construction safety and precautions, all of which are the sole responsibility of the Contractor.
3. The Contractor shall clearly and specifically identify and call to the attention of the Owner's Representative any deviation from the contract documents for which Owner acceptance is desired. The responsibility for such a deviation accepted by the Owner shall remain with the Contractor.
4. Timeliness: The burden of timeliness in the complete cycle of submittal data is on the Contractor. The Contractor shall allow a minimum of four (4) weeks' time frame for review of each submission by the Owner's Representative. The Contractor is responsible for allowing sufficient time in the construction schedule to cover the aforementioned cycles of data processing, including time for all re-submission cycles on nonconforming materials, equipment, etc. covered by the data submitted. Construction delays and/or lack of timeliness in the above regard are the responsibility of the Contractor and will not justify any request for scheduled construction time extensions or extra compensation.
5. Work performed in accordance with approved submittal date that is not in accordance with the Contract Documents and did not have the specific acceptance of the Owner's Representative shall be replaced at Contractor's cost.

D. Re-submittals
1. Re-submit entire submittal in accordance with afore mentioned format and content requirements. **Loose-leaf or piecemeal re-submittals are not acceptable.** New and/or revised data for each section shall be prefaced with a colored (yellow, pink, orange, etc) cover sheet that identifies (in a word or two) the materials and/or equipment being re-submitted. Typeset the words "REVISED SUBMITTAL NO. 1 (or 2, 3 as applicable)" centered at the bottom of the cover sheet.

2. Subsequent re-submittals (second and third, if necessary) shall have different colored cover sheets to distinguish between the various re-submittals.

3. Include a cover letter at front of binder that specifically responds to each "REVISE AND RE-SUBMIT COMMENT" or "REJECTED" comment by number. Example responses would include the following:

    a. RESPONSE: "Please see attached re-submittal."

    b. RESPONSE: "Will be re-submitted at a latter date."

    c. RESPONSE: "Requirement for (xxxxxx) was deleted in Addendum No. 2."

    d. RESPONSE: "Exception requested based on Section xx, Paragraph x.x.x.

E. These paragraphs related to Mechanical submittal data supersede any conflicting requirements contained in Division 01 sections.

## 1.13 CONTRACTOR CERTIFICATION OF SUBMITTAL DATA

A. The Contractor shall provide the following certification with all submittal data furnished to the Owner's Representative for review and comment.

Project Title:

Description of Submittal Data:

This is to certify that the above-described submittal data has been reviewed and is approved for compliance with the Contract Documents, manufacturer's recommendation, adequacy, clearances, code compliance, safety, and coordination with other trades and/or work except as follows: (list "none" or itemize and explain). In addition, the Contractor shall submit to the Owner's Representative a signed statement from each representative certifying as follows:

"I certify that the materials and/or equipment listed below have been personally inspected by the undersigned authorized manufacturer's representative and is properly installed and operating in accordance with the manufacturer's recommendations and are asbestos free."

_____

Name and Company

## 1.14 ACCEPTANCE OF MATERIALS AND EQUIPMENT

A. All equipment installed on this project shall have **local (within 125 miles)** representation, local factory-authorized service, and a local stock of repair parts. This requirement is essential and will be strictly reviewed by the Owner's Representative prior to concurrence with the Contractor's approval for all submittals covered by Mechanical sections of this Specification.

B. NOTICE: The Contractor is responsible for providing materials and equipment that conform to the requirements of the project manual in every respect unless a deviation has been "accepted" in writing. Removal of any nonconforming materials and equipment and the replacement with conforming materials and equipment shall be at the Contractor's sole expense, regardless of when nonconformance was discovered.

C. Approval of materials and equipment shall be based on manufacturer's published data and shall be tentatively subject to the submission of complete shop drawings which comply with the contract documents. Approval is also dependent upon the existence of adequate and acceptable clearances for entry, servicing, and maintenance.

D. Approval of materials and equipment under this provision shall not be construed as authorizing any deviations from the specifications, unless the attention of the Owner's Representative has been directed in writing to the specific deviations. Data submitted shall not contain unrelated information unless all pertinent information is properly identified.

E. Physical Size of Equipment: Space is critical; therefore, equipment of larger sizes than shown, even though of approved manufacturer, will not be acceptable unless it can be demonstrated that ample space exists for proper installation, operation, and maintenance.

1.15    SHOP DRAWINGS

A.    As soon as practicable after the award of contract and approval of materials and equipment, but prior to installation, complete and detailed shop drawings of the following shall be submitted for review and comment:
    1.    Equipment arrangements.
    2.    Duct layouts.
    3.    Piping layouts.
    4.    Layouts of equipment spaces indicating ductwork and piping larger than 2 inches.
    5.    Typical fittings and connections.
    6.    Equipment foundations.
    7.    Factory-fabricated equipment and materials.
    8.    Anchors.
    9.    Control.
    10.   Interlock.
    11.   Sprinkler locations.
    12.   Other details as directed by the Owner's Representative.  Composite drawings of areas requiring coordination between trades shall be provided and expedited to eliminate conflicts and to ensure maximum cooperation and work progress.

B.    Work performed without benefit of reviewed and approved shop drawings **will not be recommended for payment by the Engineer** until such time as the shop drawings are submitted, reviewed, and approved. Any work performed without the benefit of reviewed and approved shop drawings may require removal, relocation, and/or replacement at the Contractor's sole expense in order to resolve conflicts between the various systems and provide the performance specified.

C.    All installation of equipment, fixtures, terminal devices, etc. shall be made in accordance with approved composite shop drawings.  The Contractor shall modify installation and relocate installed work to provide code clearances, service access, and eliminate conflict with other systems.

D.    Submit one sepia and one blue-line print of approved shop drawings.  The sepia will be marked with the A/E's comments and returned to the Contractor for printing and distribution.  Distribution shall include the return of three blue-line prints of the approved shop drawings, with the A/E's comments included, to the A/E for the A/E's and Owner's use.

1.16    SITE OBSERVATION

A.    Site observation by the Architect, Engineer, and/or Owner's Representative is for the express purpose of verifying compliance by the Contractor with the contract documents, and shall not be construed as construction supervision nor indication of approval of the manner or location in which the work is being performed as being a safe practice or place.

1.17    SUPERVISION

A.    In addition to the Superintendent required under the conditions of the contract, each subcontractor shall keep a competent superintendent or foreman on the job at all times.

B.    It shall be the responsibility of each superintendent to study all plans and familiarize himself with the work to be done by other trades.  He shall coordinate his work with other trades and, before material is fabricated or installed, make sure that his work will not cause an interference with another trade.  Where interferences are encountered, they shall be resolved at the jobsite by the superintendents involved.  Where interferences cannot be resolved without major changes to the plans, the matter shall be referred to the Owner's Representative for comments.

1.18    OPERATION PRIOR TO COMPLETION

A.    When any piece of mechanical equipment is operable and it is to the advantage of the Contractor to operate the equipment, he may do so, providing that he properly supervises the operation and has the written permission of the Owner's Representative to do so.  The warranty period shall not commence, however,

until such time as the equipment is operated for the beneficial use of the Owner or date of substantial completion, whichever occurs first.

B.  Regardless of whether or not the equipment has or has not been operated, the Contractor shall properly clean the equipment, install clean filter media, properly adjust, and complete all deficiency list items before final acceptance by the Owner.  The date of acceptance and the start of the warranty may not be the same date.

## 1.19    MANUFACTURER'S RECOMMENDATIONS

A.  The manufacturer's published directions shall be followed in the delivery, storage, protection, installation, piping, and wiring of all equipment and material.  The Contractor shall promptly notify the Owner's Representative, in writing, of any conflict between the requirements of the contract documents and the manufacturer's directions, and shall obtain the Owner's Representative's comments before proceeding with the work.  Should the Contractor perform any such work that does not comply with the manufacturer's directions or applicable comments from the Owner's Representative, he shall bear all costs arising in connection with the correction of such deficiencies.

## 1.20    CHECKING AND TESTING MATERIALS AND/OR EQUIPMENT

A.  Before final acceptance of the work, an authorized representative of the manufacturer of the installed materials and/or equipment shall personally inspect the installation and operation of his materials and/or equipment to determine that it is properly installed and in proper operating order. Testing and checking shall be accomplished during the course of the work where required by work being concealed, and at the completion of the work otherwise.  In addition, the Contractor shall submit to the Owner's Representative a signed statement from each representative certifying as follows:

"I certify that the materials and/or equipment listed below have been personally inspected by the undersigned authorized manufacturer's representative and is properly installed and operating in accordance with the manufacturer's recommendations and are asbestos free."

B.  Check inspections shall include plumbing, heating, air conditioning, ventilating, mechanical control and electrical equipment, and such other items hereinafter specified or specifically designated by the Owner's Representative.

## 1.21    OPERATING AND MAINTENANCE INSTRUCTION

A.  The Contractor shall prepare for the owner's manual hereinafter specified complete sets of operating and maintenance instructions, system piping, valving, control and interlock diagrams, manuals, parts lists, etc. for each item of equipment.  These are to be assembled as hereinafter specified for owner's manual.

B.  In addition, the Contractor shall provide the service of a competent engineer or a technician acceptable to the Owner's Representative to instruct a representative of the Owner in the complete and detailed operation of all equipment and systems.  These instructions shall be provided for a period of sufficient duration to fully accomplish the desired results.  Upon completion of these instructions, a letter of release will be required, acknowledged by the Owner, stating the dates of instruction and personnel to whom instructions were given.

C.  Additional diagrams, operating instructions, etc. shall be provided as specified hereinafter in the other sections of these specifications.

## 1.22    MATERIAL AND EQUIPMENT SCHEDULES

A.  Contractor shall refer to both drawings and specification for schedules.  Where reference is made to items "scheduled on drawings" or "scheduled in specifications," same shall include schedules contained in both the drawings and the specifications.  The Contractor's attention is directed to the various specification sections and drawings for schedules.

## 1.23    APPLICABLE CODES AND STANDARDS

A. The installation shall meet the minimum standards prescribed in the latest editions of the following listed codes and standards, which are made a part of these specifications, except as may be hereinafter specifically modified in these specifications and associated drawings.

    1. National Fire Protection Association Standards (NFPA):
        NFPA 10 - Portable Fire Extinguishers
        NFPA 54 - National Fuel and Gas Code
        NFPA 70 - National Electrical Code
        NFPA 90A - Air Conditioning Systems
        NFPA 101 - Life Safety Code
        NFPA 255 - Method of Test of Surface Burning Characteristics of Building Materials
    2. American National Standards Institute (ANSI):
        15-78 - Safety Code for Mechanical Refrigeration
        C.2 - 1984 National Electrical Safety Code
        A117.1 - Handicapped Code
    3. American Society of Mechanical Engineers (ASME): Section IV, V, CSD-1
    4. Air Conditioning and Refrigeration Institute Standards (ARI): All standards related to refrigeration and air conditioning equipment and piping furnished under these specifications.
    5. American Water Works Association (AWWA): All applicable manuals and standards.
    6. Sheet Metal and Air Conditioning Contractors National Associate, Inc, (SMACNA): All applicable manuals and standards.
    7. Air Moving and Conditioning Association (AMCA): All applicable manuals and standards.
    8. American Society of Testing Materials (ASTM): All applicable manuals and standards.
    9. National Electrical Manufacturers' Association (NEMA): All applicable manuals and standards.
    10. Occupational Safety and Health ACT (OSHA):
        National Sanitation Foundation - Standard No. 2
    11. American Society of Heating, Refrigeration, and Air conditioning Engineers (ASHRAE):
        90-80 Energy Conservation in New Building Design
        2001 ASHRAE Handbook of Fundamentals
    12. Americans with Disabilities Act, 1990
    13. American Gas Association (AGA)
    14. Underwriters Laboratories, Inc. (UL)
    15. Manufacturer's Standardization Society of the Valve and Fitting Industry (MSS)
    16. Applicable State Building Codes (International Building Codes, as amended):
    17. Applicable State Mechanical Code (International Mechanical Code, as amended).
    18. Applicable State Plumbing Code (International Plumbing Code, as amended).
    19. Applicable State Energy Code (International Energy Conservation Code, as amended).

B. All materials and workmanship shall comply with all applicable city, state, and national codes, specifications, and industry standards. All materials shall be listed by the Underwriters Laboratories, Inc. as conforming to its standards and so labeled in every case where such a standard has been established for the particular type of material in question.

C. The contract documents are intended to comply with the aforementioned rules and regulations; however, some discrepancies may occur. Where such discrepancies occur, the Contractor shall immediately notify the Owner's Representative in writing of said discrepancies and apply for an interpretation. Should the discovery and notification occur after the execution of a contract, any additional work required for compliance with said regulations shall be paid for as covered by Division 1 of these contract documents, providing no work or fabrication of materials has been accomplished in a manner of noncompliance. Should the Contractor fabricate and/or install materials and/or workmanship in such a manner that does not comply with the applicable codes, rules, and regulations, the Contractor who performed such work shall bear all costs arising in correcting these deficiencies to comply with said rules and regulations.

1.24 DEFINITIONS

A. Refer to the condition of the contract for Division 1 for additional requirements regarding definitions.

B. Where "as required" or "as necessary" is used in these specifications or on the drawings, it shall mean "that situations exist that are not necessarily described in detail or indicated that may cause the Contractor certain complications in performing the work described or indicated. These complications entail the normal coordination activities expected of the Contractor where multiple trades are involved and new or existing construction causes deviations to otherwise simplistic approaches to the work to be performed. The term shall not be interpreted to permit an option on the part of the Contractor to achieve the end result."

C. Where "and/or" is used in these specifications or on the drawings, it shall mean "that situations exist where either one or both conditions occur or are required and shall not be interpreted to permit an option on the part of the Contractor.

1.25    FINAL INSPECTION

A. Refer to Division 1 for additional requirements for final inspection.

B. It shall be the responsibility of the Contractor to personally conduct a careful inspection, assuring himself that the work on the project is ready for final acceptance and developing his own "punchlists," before calling upon the Owner's Representative to make a final inspection. Failure of the Contractor to conduct such inspections and provide the Owner's Representative with a copy of his "punchlists" prior to the final inspection shall be adequate cause for the Owner's Representative to cancel any Contractor-requested final inspection.

C. In order not to delay final acceptance of the work, the Contractor shall conduct his own "final inspections" prior to requesting the Owner's Representative to "final" the project; will have all necessary bonds, guarantees, receipts, affidavits, etc. called for in the various articles of this specification prepared and signed in advance; and together with a letter of transmittal listing each paper included, shall deliver the same to the Owner's Representative at or before the time of said final inspection. The Contractor is cautioned to check over each bond, receipt, etc. before preparing same for submission to see that the terms check with the requirements of the specifications.

D. The final inspection will be made jointly by the Owner's Representative and the Owner.

1.26    REQUIREMENTS FOR FINAL ACCEPTANCE

A. Requirements for final acceptance shall include but not be limited to the Contractor accomplishing the following:
    1.  Construction:  Complete all construction.
    2.  Deficiency Lists:  Correct all deficiencies listed at time of Substantial Completion.
    3.  Owner's Manual:  Submit at least 30 days prior to final acceptance on (1) copy of the owner's manual for the Owner's Representative's review and comments. Following acceptance, prepare three (3) copies of bound and indexed owner's manual, to be delivered at the time of final acceptance, which shall include but not be limited to the following:
        a.  System operating instructions.
        b.  System control drawings.
        c.  System interlock drawings.
        d.  System maintenance instructions.
        e.  Manufacturers', suppliers', and subcontractors' names, addresses, and telephone numbers, both local representatives and manufacturers' service headquarters.
        f.  Equipment operating and maintenance instructions and parts lists.
        g.  Manufacturer's certifications (see Checking and Testing Materials and/or Equipment, this section).
        h.  Contractor's warranty.
        i.  Acceptance certificates of authorities having jurisdiction.
        j.  Log of all tests made during course of work.
        k.  Owner's acknowledgment of receipt of instruction, enumerating items in owner's manual.
        l.  List of manufacturers' guarantees executed by the Contractor.
        m.  Certified performance curves.
        n.  Balance and performance test reports.
        o.  Owner's acknowledgment of items of equipment or accessories indicated or specified to be turned over to Owner.
    4.  Instructions:
        a.  Verbal, as herein specified.
        b.  Posted, framed under glass or plastic laminated:
            1)  System operating instructions.
            2)  System control drawings.
            3)  System interlock drawings.
    5.  Record Drawings:  Deliver the specified record drawings to the Owner's Representative.

1.27    RECORD DRAWINGS

A.    The Contractor shall maintain a set of contract drawings (black-line prints) at the jobsite on which he shall indicate the installed (as-built) locations of the following:
1.    Equipment
2.    Main lines of piping and ductwork.
3.    Dimensional locations (including depth) of all underground piping, valves and conduits.

B.    Drawings shall be used for construction reference and shall not leave the field office of the jobsite.

C.    Drawings shall include all addenda, ASI's, Change Orders, and existing conditions and equipment that are not reflected in the original contract drawings.

D.    Upon completion of work, the Contractor shall obtain CAD files of the contract drawings from the Owner's Representative and transfer the above as-built information into these files.  The as-built files shall be permanently marked "RECORD DRAWINGS" and printed on full-size Mylar sheets.  Upon completion, the CAD files shall be transferred to CD in AutoCAD 2007 format.  Both the CAD files CD and Mylar drawings shall be submitted to the Owner's Representative as part of the Close-out Submittals.

E.    Refer to Division 1 paragraph entitled "Record Documents" for additional requirements.


1.28    ALLOWANCES

A.    Refer to Division 1 for allowances.


1.29    ALTERNATE PROPOSALS

A.    Alternate proposals are summarized in Division 1 and on the bid proposal form.  Refer to all sections of the specifications and the drawings to determine the exact extent and scope of the various alternate proposals as each pertains to the work of the various trades.


1.30    WARRANTY

A.    General:  All work performed (including equipment and materials furnished) under the various sections of these specifications shall be 100% warranted, for a period of one (1) year from the date of final acceptance thereof, against defective materials, design, and unauthorized substitution.  Upon receipt of note of failure of any part of the guaranteed equipment and/or facilities during the guaranty period, the affected part(s) or facilities shall be replaced promptly with new parts, etc. by and at the expense of the Contractor.  Further, the Contractor shall properly obtain, execute, and forward any and all manufacturer's warranties on equipment furnished under the Contract.  Refer to Division 1 for additional requirements.

B.    Extended Period:  The Contractor shall provide all extended time warranties available from the manufacturer of the equipment provided as standard at no additional cost.  This includes all extended warranties where specified with certain equipment as directed in other sections of this Specification.


PART 2 -  PRODUCTS


2.1    MATERIALS AND WORKMANSHIP

A.    All materials, unless otherwise specified, shall be current United States manufacture, new, free from all defects, and of the best quality.  Foreign goods specifically approved for use by the Owner's Representative prior to bidding may be furnished.

B.    Materials and equipment shall be installed in accordance with the manufacturer's recommendations and the best standard practice for the type of work involved.  All work shall be executed by mechanics skilled in their respective trades, and the installations shall present a neat, precise appearance.

C.    The responsibility for the furnishing and installation of the proper mechanical equipment and/or material as intended rests entirely upon the Contractor.  The Contractor shall request advice and supervisory assistance from the representative of specific manufacturers during the installation.

2.2    FLAME SPREAD AND SMOKE DEVELOPED PROPERTIES OF MATERIALS

A.    Duct coverings, duct linings, vapor barrier facings, tapes, adhesives, core materials, insulation, jackets, piping (of any sort), and other materials in concealed locations, including any above-ceiling area, shall have a flame spread rating not over 25 without evidence of continued progressive combustion and a smoke developed rating no higher than 50.  Flame spread and smoke developed ratings shall be in accordance with NFPA Standard No. 255.

2.3    BEARINGS

A.    All ball bearings shall be of radial and/or thrust type, and enclosed in a dust and moisture-proof housing.

2.4    MOTORS

A.    The Contractor shall provide all motors required for equipment supplied under each portion of the work. Motors shall be built in accordance with the latest ANSI, IEE, and NEMA standards, shall be fully coordinated with the equipment served, shall be of sizes and electrical characteristics scheduled.

2.5    STARTING EQUIPMENT

A.    Each motor shall be provided with proper starting equipment.  This equipment, unless hereinafter specified or scheduled to the contrary, shall be provided by the trade furnishing the motor.  All motor starting equipment provided by any one trade shall be of the same manufacture unless such starting equipment is an integral part of the equipment on which the motor is mounted.

2.6    LOW VOLTAGE (CONTROLS/THERMOSTAT) WIRING

A.    All low voltage wiring installed by the Mechanical Contractor, Electrical Contractor or Controls Vendor shall be run in a neat and workmen like manner, parallel and perpendicular to building lines on J-Hooks (above ceiling grid only).  Plenum rated cable is acceptable above ceilings only.  All other locations (exposed, Mechanical Rooms, outdoors or above hard lid ceiling) should be installed in conduit.

2.7    SLEEVES, INSERTS, AND FASTENINGS

A.    General:  Proper openings through floors, walls, roofs, etc. for the passage of piping, ductwork, conduits, etc. shall be provided.  All piping and conduit through floors and piping through walls must pass through sleeves except soil pipe installed under concrete slabs-on-fill, and pipe and conduit that is cast-in-place. Sleeves shall be set in new construction before concrete is poured, as cutting holes through any part of the concrete will not be permitted unless acceptable to the Owner's Representative.

B.    Aboveground, Exterior-Wall, Pipe Penetrations:  Seal penetrations using sleeves and mechanical sleeve seals. Size sleeve for 1-inch annular clear space between pipe and sleeve for installing mechanical sleeve seals.
       1.    Install steel pipe for sleeves smaller than 6 inches in diameter.
       2.    Install cast-iron "wall pipes" for sleeves 6 inches in diameter and larger.
       3.    Assemble and install mechanical sleeve seals according to manufacturer's written instructions. Tighten bolts that cause rubber sealing elements to expand and make watertight seal.

C.    Underground, Exterior-Wall, Pipe Penetrations:  Install cast-iron "wall pipes" for sleeves.  Seal pipe penetrations using mechanical sleeve seals.  Size sleeve for 1-inch annular clear space between pipe and sleeve for installing mechanical sleeve seals.
       1.    Assemble and install mechanical sleeve seals according to manufacturer's written instructions. Tighten bolts that cause rubber sealing elements to expand and make watertight seal.

D. Sleeves: The minimum clearance between horizontal pipe, including insulation where applicable, and sleeve shall be 1/4 inch, except that the minimum clearance shall be 2 inches where piping contacts the ground. Sleeves through floors shall extend 3/4 inch above the floor; sleeves through walls and partitions shall be installed flush with exposed surfaces. Sleeves are not required for piping indicated to the cast-in-concrete slabs-on-fill such as waste piping except for underground wall penetrations, seal annular space between sleeve and pipe or pipe insulation, using elastomeric joint sealants.

E. Materials: Install sleeves large enough to provide ¼" annular clear space between sleeve and pipe or pipe insulation. Use the following sleeve materials:
1. Steel Pipe Sleeves: For pipes smaller than 6-inch NPS.
2. Steel, Sheet-Metal Sleeves: For pipes 6-inch NPS and larger, penetrating gypsum-board partitions.
3. Stack Sleeve Fittings: For pipes penetrating floors with membrane waterproofing. Secure flashing between clamping flanges. Install section of cast-iron soil pipe to extend sleeve to 2 inches above finished floor level.
   a) Seal space outside of sleeve fittings with non-shrink, nonmetallic grout.

F. Inserts: Suitable concrete inserts for pipe, conduit, and equipment hangers shall be set and properly located for all piping, conduit, and equipment to be suspended from concrete construction.

G. Fasteners: Fastening of pipes, conduits, etc. in the building shall be as follows:
1. To wood members: by wood screws.
2. To masonry and concrete: by threaded metal inserts, metal expansion screws, or toggle bolts, whichever is appropriate for the particular type of masonry or concrete.
3. To steel: machine screws or welding (when specifically permitted or directed), or bolts.
   ***NOTE: Under no circumstances will the use of plastic anchors or plastic expansion shields be permitted for any purpose whatsoever.***

H. Ratproofing: The open space around all piping, ductwork, etc. passing through the ground floor and/or exterior walls shall be ratproofed in a manner acceptable to the Owner's Representative.

I. Weatherproofing: The annular space between a pipe and its sleeve in exterior walls or through floor to below grade shall be filled with polyurethane foam rods 50% greater in diameter than the space as backing and fill material and made watertight with a permanent elastic polysulfide compound. Seal both surfaces of wall or floor with a fire-resistant sealant.

J. Air Plenums: The space around piping, ductwork, etc. passing through an air plenum shall be made airtight in a manner acceptable to the Owner's Representative. The sealant used must be fire resistant.

2.8    FIRE AND SMOKE PARTITION, WALL, AND/OR FLOOR PENETRATIONS

A. Pipe, ductwork, conduit, etc. shall pass through fire- or smoke-rated floors, partitions, walls, or other barriers within a UL-listed assembly which shall maintain the rating of the applicable wall, floor, partition, or barrier.

B. The Contractor shall review the architectural and structural drawings and determine the location of the fire-rated building elements. Where these elements are penetrated, UL-listed fire-rated penetration assemblies approved by the local authority shall be provided in accordance with the manufacturer's instructions to obtain the required rating.

2.9    METAL BUILDING SYSTEMS/MECHANICAL-ELECTRICAL SUPPORTS

A. Metal building systems are required to be designed by the manufacturer to accommodate and support the mechanical systems indicated on the mechanical drawings and specified in Mechanical specifications.

B. The metal building systems manufacturer is required to provide the following:
1. Framed openings through the roofs with supports, roof curbs, and flashings for roof-mounted equipment, fans, vents, and air intakes.
2. Structural support for piping, conduits, and suspended equipment consisting of beam, joists, purlins, and/or blocking above and perpendicular to pipe routes and equipment hangers at intervals not to exceed 8 feet.
3. Structural support for suspended ceilings, diffusers, grilles, light fixtures including associated raceways and ductwork.

C.    The mechanical trade shall:
1.    Provide all routes, weights, installation heights, opening locations, etc. for all equipment, piping, vents, etc. to the metal building system manufacturer and coordinate requirements for structural supports, hangers, attachments, etc. with the metal building systems manufacturer.
2.    Provide all supporting devices (hangers, attachments, brackets, cross beams, etc.) to attach to the metal building structural system.

## 2.10    FOUNDATIONS / HOUSEKEEPING PADS

A.    General:  All special foundations and supports required for the proper installation of equipment and pipe shall be provided as hereinafter specified and under the section of the specifications covering the equipment, unless otherwise indicated on the drawings.

B.    All mechanical equipment shall receive concrete housekeeping pads unless otherwise noted.  Equipment to receive pads are to include (but not limited to):  air handlers, fan-coils, condensing units, boilers, water heaters, water softeners, expansion / compression tanks, filter feeders, water treatment equipment, air compressors, fans, pumps (in addition to inertia bases where required), chillers, surge tanks, deareators, etc.

C.    Concrete foundations for the support of equipment such as floor-mounted pumps, fans, etc. shall be not less than 5½ inches high and not less than 4 inches larger (in both directions) than supported unit, unless otherwise noted and shall be poured in forms built of new dressed lumber.  All corners of the foundations shall be neatly chaffered by means of sheet metal or triangular wood strips nailed to the form.  Pads shall not be laid out directly against walls or structures.  2 inches shall be left available for pad form work. Foundation bolts shall be placed in the forms when the concrete is poured, the bolts being correctly located by means of templates.  Allow 1 inch below the equipment bases for alignment and grouting (where applicable).  Foundations for equipment located on the exterior of the building shall be provided as indicated.  Foundations shall be constructed in accordance with approved shop drawings and shall be reinforced with #4 bars at 12 inches on center both ways (minimum).

D.    Pipe and Conduit Support:  All pipes and conduits throughout the building, both horizontal and vertical, shall be adequately supported from the construction to line of grade, with proper provision for expansion, contraction, vibration elimination, and anchorage.  Vertical pipes and conduits shall be supported from floor lines with riser clamps sized to fit the lines and to adequately support their weight.  At the bases of lines, where required for proper support, provide anchor base fittings or other approved supports.

## 2.11    ACCESS DOORS

A.    General: Provide access doors for all serviceable mechanical appurtenances (valves, trap primers, shock arresters, volume dampers, fire/smoke dampers, actuators, sensors, etcetera) in inaccessible locations. Such locations include gypsum, brick and CMU ceilings and walls.

B.    Location of panels shall be carefully coordinated with other Exposed Devices as described in earlier paragraphs.

C.    Manufacturers shall be Inland-Milcor, Bilco, Miami Carey, or approved equal.  Unless indicated otherwise, use panels equal to Milcor Style M for masonry and drywall construction, equal to Milcor Style K for plastered masonry walls and ceilings.  Stainless steel panels shall be used in ceramic tile or glazed structural tile.

D.    Minimum construction features include 14-gage frame and door, continuous hinges, cam-style latch and 10x10" unobstructed opening size.

E.    UL labeled when in fire-rated construction, one and one-half hour rating.

F.    Access doors located outside, in restrooms or in a moisture-laden environment (dressing area, shower area, lockers, etcetera) shall be stainless steel construction.

G.    Equipment access doors shall be of sufficient size to remove/replace equipment and provide routine maintenance as necessary, unless otherwise noted.  Doors shall be set flush with adjacent finish surfaces. Exterior doors shall be provided with cylinder locks.

H.     Access doors into ductwork shall be 14-gauge insulated galvanized steel with 16-gauge galvanized gasketed steel frame and cam-type locks. Ductwork access door shall be a minimum of 12" × 12" in size.

## 2.12    FLOOR AND CEILING PLATES

A.     Except as otherwise noted, provide one-piece chrome-plated brass floor and ceiling plates (or escutcheons) around all pipes, conduits, etc. passing through walls, floors, or ceilings in any spaces, except underfloor and attic spaces. Plates shall be sized to fit snugly against the outside of the pipe or against the outside of insulation on lines which are insulated, and positively secured to such pipe or insulation. Plates will not be required for piping where pipe sleeves extend ¾ of an inch above finish floor and are concealed. Plates shall be one piece.

## PART 3 -  EXECUTION

## 3.1    SPACE AND EQUIPMENT ARRANGEMENT

A.     The size of mechanical equipment indicated on the drawings is based on the dimensions of a particular manufacturer. While other manufacturers will be acceptable, it is the responsibility of the Contractor to determine whether the equipment he proposes to furnish will fit in the space. Shop drawings shall be prepared when required by the Owner's Representative to indicate a suitable arrangement.

B.     All equipment shall be installed in a manner to permit access to all surfaces. All valves, motors, drives, filters, and other accessory items shall be installed in a position to allow removal for service without disassembly of another part.

## 3.2    LARGE APPARATUS

A.     Any large piece of apparatus which is to be installed in any space in the building, and which is too large to permit access through stairways, doorways, or shafts shall be brought to the job and placed in the space before the enclosing structure is completed. Following placement in the space, such apparatus shall be thoroughly, completely protected from damage as hereinafter specified.

## 3.3    PROTECTION

A.     The Contractor shall take such precautions as may be necessary to properly protect all materials and equipment from damage from the time of delivery until the completion of work. This shall include the erection of all required temporary shelters and supports to adequately protect any items stored in the open on the site from the weather, the ground and surrounding work; the cribbing of any items above the floor of the construction; and the covering of items in the uncompleted building with tarpaulins or other protective covering. Failure on the part of the Contractor to comply with the above will be sufficient cause for the rejection of the items in question.

B.     The Contractor shall protect existing facilities, the work of others, and the premises from any and all damages that may be made possible by the execution of work.

C.     Equipment and materials shall be protected from rust both before and after installation. Any equipment or materials found in a rusty condition at the time of final inspection must be cleaned of rust and repainted as specified elsewhere in these specifications.

## 3.4    COOPERATION BETWEEN TRADES AND WITH OTHER CONTRACTORS

A.     Each trade, subcontractor, and/or Contractor must work in harmony with the various trades, subcontractors, and/or Contractors on the job as may be required to facilitate the progress to the best advantage of the job as a whole. Each trade, subcontractor, and/or Contractor must pursue its work promptly and carefully so as not to delay the general progress of the job. This Contractor shall work in harmony with Contractors working under other contracts on the premises.

B.  It shall be the responsibility of each trade to cooperate fully with the other trades on the job to help keep the jobsite in a clean and safe condition.  At the end of each day's work, each trade shall properly store all of its tools, equipment, and materials and shall clean its debris from the job.  Upon the completion of the job, each trade shall immediately remove all of its tools, equipment, any surplus materials, and all debris caused by its portion of the work.

3.5     PRECEDENCE OF MATERIALS AND COORINATION OF WORK

A.  These specifications and the accompanying drawings are intended to cover systems which will not interfere with the structural design of the building, which will fit into the several available spaces, and which will ensure complete and satisfactory systems.  Each subcontractor and/or trade shall be responsible for the proper fitting of his material and apparatus into the building.

B.  The work of the various trades shall be performed in the most direct and workmanlike manner without hindering or handicapping the work of other trades.  Piping interferences shall be handled by giving precedence to pipe lines which require a stated grade for proper operation.  Where space requirements conflict, the following order or precedence shall, in general, be observed:
1.  Building lines.
2.  Structural members.
3.  Light fixtures.
4.  Soil and drain piping.
5.  Condensate drains.
6.  Vent piping.
7.  Supply, return, and outside air ductwork.
8.  Exhaust ductwork.
9.  HVAC water and steam piping.
10. Steam condensate piping.
11. Fire protection piping.
12. Natural gas piping.
13. Domestic water (cold and hot).
14. Refrigerant piping.
15. Electrical conduit.

C.  The light fixture grid layout as indicated on the drawings must be maintained.  This Contractor shall refer to all light fixture plans and details indicated on the drawings and shall coordinate the location of dampers, supply grilles, return air grilles, sprinkler heads, etc. with the location of the light fixtures to assure proper access to all items in a manner acceptable to the Owner's Representative.

D.  The electrical trades shall locate all junction boxes, pull boxes, conduits, etc. to avoid interference with the diffusers, dampers, grilles, etc. hereinbefore mentioned.  The mechanical trades shall furnish to all other trades copies of approved ductwork shop drawings to assist in the coordination of the rough-in and installation of all items of work.

3.6     CONNECTIONS FOR OTHERS

A.  This Contractor shall rough-in for and make all water, sewer, electrical, etc. connections to all fixtures, equipment, machinery, etc. provided by others in accordance with detailed roughing-in drawings provided by the equipment suppliers, by actual measurements of the equipment connections, or as detailed.

B.  After the equipment is set in place, this Contractor shall make all final connections and shall provide all required pipe, fittings, valves, traps, connectors, etc.

C.  Provide all air gap fittings required, using materials hereinbefore specified.  In each water line serving an item of equipment or piece of machinery, provide a shutoff valve.  On each drain without integral trap provide a suitable trap.

D.  All pipe fittings, valves, traps, etc. exposed in finished areas and connected to chrome-plated lines provided by others shall be chrome-plated to match.

E.  Provide all sheet metal ducts, transition pieces, etc. required for a complete installation of equipment provided by others.

3.7    INSTALLATION METHODS

A.    Where to Conceal:  All pipes and conduits shall be concealed in pipe chases, walls, furred spaces, below suspended floors, or above the ceilings of the building unless otherwise indicated.

B.    Where to Expose:  In mechanical rooms, janitor's closets tight against pan soffits in exposed Tee structures, or storage spaces, but only where necessary, piping and conduit may be run exposed.  All exposed piping and conduit shall be run in the neatest, most inconspicuous manner, and parallel or perpendicular to the building lines.

C.    Support:  All piping and conduit shall be adequately and properly supported from the building structure by means of hanger rods or clamps to walls as herein specified.

D.    Maintaining Clearance:  Where limited space is available above the ceilings and below concrete beams or other deep projections, pipe and conduit shall be sleeved through the projection where it crosses, rather than hung below them, in a manner to provide maximum above-floor clearance.  Sleeves shall be as herein specified.  Approval shall be obtained from the Owner's Representative for each penetration.

E.    All pipe, conduits, etc. shall be cut accurately to measurements established at the building and shall be worked into place without springing or forcing.  All ducts, pipes, and conduits run exposed in machinery and equipment rooms shall be installed parallel to the building lines, except that they shall be sloped to obtain the proper pitch.  Piping and ducts run in furred ceilings, etc. shall be similarly installed, except as otherwise shown.  Conduits in furred ceilings and in other concealed spaces may be run at angles to the construction but shall be neatly grouped and racked indicating good workmanship.  All conduit and pipe openings shall be kept closed until the systems are closed with final connections.

F.    Special Requirements:
1.    There shall be no pipe joints nearer than 12 inches to a wall, ceiling, or floor penetration unless pipe joint is a welded or mechanically-coupled-type joint.
2.    The Contractor shall study all construction documents and carefully lay out all work in advance of fabrication and erection in order to meet the requirements of the extremely limited spaces.  Where conflicts occur the Contractor shall meet with all involved trades and the Owner's Representative and resolve the conflict prior to erection of any work in the area involved.
3.    All piping not directly buried in the ground shall be considered as "interior piping."
4.    Prior to the installation of any ceiling material, gypsum, plaster, or acoustical board, the Contractor shall notify the Owner's Representative so that arrangements can be made for an inspection of the above-ceiling area about to be "sealed off."  The Contractor shall give as much advance notice as possible up to ten (10) working days, but in no case less than five (5) working days.
5.    The purpose of this inspection is to verify the completeness and quality of the installation of the air conditioning systems, the plumbing systems, and any other special above-ceiling systems such as pneumatic tube.  The ceiling supports (tee bar or lath) should be in place so that access panel and light fixture locations are identifiable and so that clearances and access provisions may be evaluated.
6.    No ceiling material shall be installed until the deficiencies listed from this inspection have been corrected to the satisfaction of the Owner's Representative.

3.8    CUTTING AND PATCHING

A.    General:  Cut and patch walls, floors, etc. resulting from work in existing construction or where made necessary by failure to provide proper openings or recesses in new construction.

B.    Methods of Cutting:  Openings cut through concrete and masonry shall be made with masonry saws and/or core drills and at such locations acceptable to the Owner's Representative.  Impact-type equipment will not be used except where specifically acceptable to the Owner's Representative.  Openings in concrete for pipes, conduits, outlet boxes, etc. shall be core drilled to exact size.  **Determine location of embedded conduit and reinforcing bars prior to cutting.**

C.    Restoration:  All openings shall be restored to "as-new" condition under the appropriate specification section for the materials involved, and shall match remaining surrounding materials and/or finishes.

D.    Masonry:  Where openings are cut through masonry walls, provide and install lintels or other structural supports to protect the remaining masonry.  Adequate supports shall be provided during the cutting

operation to prevent any damage to the masonry occasioned by the operation. All structural members, supports, etc. shall be of the proper size and shape, and shall be installed in a manner acceptable to the Owner's Representative.

E.    Plaster:  All mechanical work in area containing plaster shall be completed prior to the application of the finish plaster coat.  Cutting of finish plaster coat will not be permitted.

F.    Weakening:  No cutting, boring, or excavating which will weaken the structure shall be undertaken.

3.9    ROOF PENETRATIONS AND FLASHING

A.    Pipe and conduit ducts, pitch pockets, curb bases, and flashing compatible with the roofing installation shall be provided for roof penetrations.  Provide framing or other support around all openings through roof as required to preserve the structural integrity of the roof system and make the penetration weathertight.

B.    Provide 30-inch round or square flashing acceptable to the roofing trades at all roof and deck drain and sleeve flashing locations.

C.    Roof curbs for all roofs except standing seam metal roofs shall be provided by the equipment supplier supplying the roof-mounted equipment, etc., and such curbs shall be installed by the roofing trades. Contractor shall coordinate all roof curb requirements with all trades and the roofing trades at the earliest possible stage of the project.

D.    Roof curbs for standing seam metal roofs shall be provided by the roofing trades.  Curb base size, height, and type shall be coordinated with the roofing trades at the earliest possible stage of the project.

E.    Flashing for pipe and conduit penetrations of standing seam metal roofs shall be provided and installed by the roofing trades.

3.10    EXCAVATING AND BACKFILLING

A.    Perform trenching, excavating, backfilling for mechanical work as set forth below.

B.    Depth of excavation to provide a minimum of 3 feet above top of pipe.  Excavation to be carried to a depth of at least 6 inches below bottom of pipe elevation. Fill below pipe (6 inches), around pipe, and a minimum of 12 inches above pipe with sand of Class "B" crushed stone tamped firm and even.  Separate topsoil during excavation.  Final layer of dirt (12 inches minimum) to be topsoil.  Trenches to be at least 18 inches wider than pipe with batter boards placed every 25 feet.  Backfilling shall be done to exclude use of rock or stone above sand or Class "B" crushed stone.

3.11    TESTS AND INSPECTIONS

A.    General:  The Contractor shall make all tests deemed necessary by the inspection departments of the authority having jurisdiction, Board of Underwriters, etc.  He shall provide all equipment, materials, and labor for making such tests.  Fuel and electrical energy for system operational tests following beneficial occupancy by the Owner will be paid for by the Owner.

B.    Other:  Additional tests specified hereinafter under the various specifications sections shall be made.

C.    Notification: The Owner's Representative shall be notified at his office 36 hours prior to each test and other specifications requirements requiring action on the part of the Owner, Architect, Engineer, and/or Owner's Representative.

D.    Test Logs:  All tests which the Contractor conducts shall have pertinent data logged by the Contractor at the time of testing.  Data shall include date, time, personnel, description and extent of system tested, test conditions, test results, specified results, and any other pertinent data.  Data shall be delivered to the Owner's Representative as specified under "Requirements for Final Acceptance.

E.    Inspections:  In general, an inspection by the Owner's Representative shall be required prior to closing up any work and prior to beneficial occupancy or final project completion.  The closing up of work includes, but is not limited to, pipe and conduit installations prior to backfilling; mechanical, electrical, and fire protection

work prior to placement of concrete; or closing up walls and overhead mechanical, electrical, and fire protection work prior to installation of the ceiling.

3.12    CLEANING AND PAINTING

A.    Thoroughly clean and touch up the finish on all parts of the materials and equipment.  Exposed parts in equipment rooms, and all other spaces except sealed chases and attics shall be thoroughly cleaned of cement, plaster, and other materials, and all oil and grease spots shall be removed.  Such surfaces shall be carefully wiped and all cracks and corners scraped out.

B.    Exposed metal work which is not galvanized shall be carefully brushed down with steel brushes to remove rust and other spots and left smooth and clean and then painted with a suitable rust resistant primer.  Exposed metal work includes work exterior to the building; exposed in mechanical or electrical equipment rooms and storage rooms; and other areas where occupants could see the work, whether normally occupied or not.

C.    All other painting shall be accomplished under the Painting Section of Division 9 of the specifications.

3.13    DISCHARGE OF WASTES FROM CONSTRUCTION SITE

A.    The Contractor shall comply with all applicable provisions of local, state, and federal laws regarding the discharge of wastes into sewer and waterways.  Special caution shall be exercised to prevent the discharge of wastes which contain oil, tar, asphalt, roofing compound, kerosene, gasoline, paint, mud, cement, lime, or other materials which would degrade the water quality of the receiving water course.  The Contractor shall construct and maintain oil interceptors, settling basins, acid neutralization tanks, and/or other effective pollution countermeasures, as required by the Texas Water Quality Board.

**END OF SECTION**

## SECTION 230513 - BASIC MECHANICAL MATERIALS AND METHODS

### PART 1 - GENERAL

1.1     SUMMARY

A.     This Section includes the following basic mechanical materials and methods to complement other Mechanical Sections.
1.     Piping materials and installation instructions common to most piping systems.
2.     Concrete base construction requirements.
3.     Escutcheons.
4.     Dielectric fittings.
5.     Dielectric isolation tape
6.     Flexible connectors.
7.     Mechanical sleeve seals.
8.     Nonshrink grout for equipment installations.
9.     Field-fabricated metal and wood equipment supports.
10.    Installation requirements common to equipment specification sections.
11.    Mechanical demolition.
12.    Cutting and patching.
13.    Touchup painting and finishing.
14.    Access Doors

B.     Pipe and pipe fitting materials are specified in mechanical piping system Sections, if applicable.

1.2     DEFINITIONS

A.     Finished Spaces:  Spaces other than mechanical and electrical equipment rooms, furred spaces, pipe and duct shafts, unheated spaces immediately below roof, spaces above ceilings, unexcavated spaces, crawl spaces, and tunnels.

B.     Exposed, Interior Installations:  Exposed to view indoors.  Examples include finished occupied spaces and mechanical equipment rooms.

C.     Exposed, Exterior Installations:  Exposed to view outdoors, or subject to outdoor ambient temperatures and weather conditions.  Examples include rooftop locations.

D.     Concealed, Interior Installations:  Concealed from view and protected from physical contact by building occupants.  Examples include above ceilings and in duct shafts.

E.     Concealed, Exterior Installations:  Concealed from view and protected from weather conditions and physical contact by building occupants, but subject to outdoor ambient temperatures.  Examples include installations within unheated shelters.

F.     The following are industry abbreviations for plastic materials:
1.     ABS:  Acrylonitrile-butadiene-styrene plastic.
2.     CPVC:  Chlorinated polyvinyl chloride plastic.
3.     NP:  Nylon plastic.
4.     PE:  Polyethylene plastic.
5.     PVC:  Polyvinyl chloride plastic.

G.     The following are industry abbreviations for rubber materials:
1.     CR:  Chlorosulfonated polyethylene synthetic rubber.
2.     EPDM:  Ethylene propylene diene terpolymer rubber.

1.3     SUBMITTALS

A. Product Data: For dielectric fittings, flexible connectors, access doors, solder/brazing material and mechanical sleeve seals.

B. Shop Drawings: Detail fabrication and installation for metal and wood supports and anchorage for mechanical materials and equipment.

C. Coordination Drawings: Detail major elements, components, and systems of mechanical equipment and materials in relationship with other systems, installations, and building components. Show space requirements for installation and access. Indicate if sequence and coordination of installations are important to efficient flow of the Work. Include the following:
1. Clearances for servicing and maintaining equipment, accessories, and specialties, including space for disassembly required for periodic maintenance.
2. Equipment and accessory service connections and support details.
3. Fire-rated wall and floor penetrations.
4. Scheduling, sequencing, movement, and positioning of large equipment into building during construction.
5. Access panel and door locations

1.4 QUALITY ASSURANCE

A. Comply with ASME A13.1 for lettering size, length of color field, colors, and viewing angles of identification devices.

B. Equipment Selection: Equipment of higher electrical characteristics, physical dimensions, capacities, and ratings may be furnished provided such proposed equipment is approved in writing and connecting mechanical and electrical services, circuit breakers, conduit, motors, bases, and equipment spaces are increased. Additional costs shall be approved in advance by appropriate Contract Modification for these increases. If minimum energy ratings or efficiencies of equipment are specified, equipment must meet design and commissioning requirements.

1.5 DELIVERY, STORAGE, AND HANDLING

A. Deliver pipes and tubes with factory-applied end caps. Maintain end caps through shipping, storage, and handling to prevent pipe end damage and prevent entrance of dirt, debris, and moisture.

B. Protect stored pipes and tubes from moisture and dirt. Elevate above grade. Do not exceed structural capacity of floor, if stored inside.

C. Protect flanges, fittings, and piping specialties from moisture and dirt.

D. Store plastic pipes protected from direct sunlight. Support to prevent sagging and bending.

1.6 SEQUENCING AND SCHEDULING

A. Coordinate Mechanical equipment installation with other building components.

B. Arrange for pipe spaces, chases, slots, and openings in building structure during progress of construction to allow for mechanical installations.

C. Coordinate installation of required supporting devices and set sleeves in poured-in-place concrete and other structural components, as they are constructed.

D. Sequence, coordinate, and integrate installations of mechanical materials and equipment for efficient flow of the Work. Coordinate installation of large equipment requiring positioning before closing in building.

E. Coordinate connection of mechanical systems with exterior underground and overhead utilities and services. Comply with requirements of governing regulations, franchised service companies, and controlling agencies.

F.    Coordinate requirements for access panels and doors if mechanical items requiring access are concealed behind finished surfaces.

G.    Coordinate installation of identifying devices after completing covering and painting, if devices are applied to surfaces.  Install identifying devices before installing acoustical ceilings and similar concealment.


## PART 2  - PRODUCTS


2.1    MANUFACTURERS

A.    Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
1.    Dielectric Tape:
a.    Holdrite (#272-4).
2.    Metal, Flexible Connectors:
a.    Flexicraft Industries.
b.    Flex-Weld, Inc.
c.    Grinnell Corp.; Grinnell Supply Sales Co.
d.    Mercer Rubber Co.
e.    Metraflex Co.
f.    Uniflex, Inc.
3.    Rubber, Flexible Connectors:
a.    General Rubber Corp.
b.    Mercer Rubber Co.
c.    Metraflex Co.
d.    Red Valve Co., Inc.
e.    Uniflex, Inc.
4.    Mechanical Sleeve Seals:
a.    Calpico, Inc.
b.    Metraflex Co.
c.    Thunderline/Link-Seal.


2.2    PIPE AND PIPE FITTINGS

A.    Refer to individual Specification piping Sections for pipe and fitting materials and joining methods, if applicable.

B.    Pipe Threads:  ASME B1.20.1 for factory-threaded pipe and pipe fittings.


2.3    JOINING MATERIALS

A.    Refer to individual Specification piping Sections for special joining materials not listed below, if applicable.

B.    Pipe-Flange Gasket Materials:  Suitable for chemical and thermal conditions of piping system contents.
1.    ASME B16.21, nonmetallic, flat, asbestos-free, 1/8-inch maximum thickness, unless thickness or specific material is indicated.
a.    Full-Face Type:  For flat-face, Class 125, cast-iron and cast-bronze flanges.
b.    Narrow-Face Type:  For raised-face, Class 250, cast-iron and steel flanges.
2.    AWWA C110, rubber, flat face, 1/8 inch thick, unless otherwise indicated; and full-face or ring type, unless otherwise indicated.

C.    Flange Bolts and Nuts:  ASME B18.2.1, carbon steel, unless otherwise indicated.

D.    Plastic, Pipe-Flange Gasket, Bolts, and Nuts:  Type and material recommended by piping system manufacturer, unless otherwise indicated.

E.    Solder Filler Metals:  ASTM B 32.

       1.     ASTM B 32, 95/5 lead-free alloys.  Include water –flushable and soluble flux according to ASTM B 813.

F.     Brazing Filler Metals:  AWS A5.8.
       1.     BCuP Series:  Copper-phosphorus alloys.
       2.     BAg1:  Silver alloy.

G.     Welding Filler Metals:  Comply with AWS D10.12 for welding materials appropriate for wall thickness and chemical analysis of steel pipe being welded.

H.     Solvent Cements:  Manufacturer's standard solvent cements for the following:
       1.     CPVC Piping:  ASTM F 493.
       2.     PVC Piping:  ASTM D 2564, medium bodied (bond).  Include purple primer according to ASTM F 656.

I.     Plastic Pipe Seals:  ASTM F 477, elastomeric gasket.

J.     Flanged, Ductile-Iron Pipe Gasket, Bolts, and Nuts:  AWWA C110, rubber gasket, carbon-steel bolts and nuts.

K.     Couplings:  Iron-body sleeve assembly, fabricated to match OD of plain-end, pressure pipes.
       1.     Sleeve:  ASTM A 126, Class B, gray iron.
       2.     Followers:  ASTM A 47 malleable iron or ASTM A 536 ductile iron.
       3.     Gaskets:  Rubber.
       4.     Bolts and Nuts:  AWWA C111.
       5.     Finish:  Enamel paint.

## 2.4     DIELECTRIC FITTINGS

A.     General Requirements:  Assembly of copper alloy and ferrous materials or ferrous material body with separating nonconductive insulating material suitable for system fluid, pressure, and temperature, to prevent galvanic action and stop corrosion. Unions in first paragraph below are available in at least NPS 1/2 to NPS 2.

B.     Dielectric Unions:
       1.     Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
           a.     Capitol Manufacturing Company.
           b.     Central Plastics Company.
           c.     EPCO Sales, Inc.
           d.     Hart Industries International, Inc.
           e.     Watts Regulator Co.; a division of Watts Water Technologies, Inc.
           f.     Zurn Mechanical Products Group; Wilkins Water Control Products.
       2.     Description:
           a.     Pressure Rating:  250 psig at 180 deg F.
           b.     End Connections:  Solder-joint copper alloy and threaded ferrous.
           c.     Flanges in first paragraph below are available in at least NPS 1-1/2 to NPS 4.

C.     Dielectric Flanges:
       1.     Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
           a.     Capitol Manufacturing Company.
           b.     Central Plastics Company.
           c.     EPCO Sales, Inc.
           d.     Watts Regulator Co.; a division of Watts Water Technologies, Inc.
       2.     Description:
           a.     Factory-fabricated, bolted, companion-flange assembly.
           b.     Pressure Rating:  175 psig minimum.
           c.     End Connections:  Solder-joint copper alloy and threaded ferrous; threaded solder-joint copper alloy and threaded ferrous.

D.     Dielectric-Flange Kits:

       1.     Manufacturers: Subject to compliance with requirements, provide products by one of the following:
- a. Advance Products & Systems, Inc.
- b. Calico, Inc.
- c. Central Plastics Company.
- d. Pipeline Seal and Insulator, Inc.

       2.     Description:
- a. Nonconducting materials for field assembly of companion flanges.
- b. Pressure Rating: 150 psig.
- c. Gasket: Neoprene or phenolic.
- d. Bolt Sleeves: Phenolic or polyethylene.
- e. Washers: Phenolic with steel backing washers.

E. Dielectric Couplings:
       1.     Manufacturers: Subject to compliance with requirements, provide products by one of the following:
- a. Calpico, Inc.
- b. Lochinvar Corporation.

       2.     Description:
- a. Galvanized-steel coupling.
- b. Pressure Rating: 300 psig at 225 deg F.
- c. End Connections: Female threaded.
- d. Lining: Inert and noncorrosive, thermoplastic.

F. Dielectric Nipples:
       1.     Manufacturers: Subject to compliance with requirements, provide products by one of the following:
- a. Perfection Corporation; a subsidiary of American Meter Company.
- b. Precision Mechanical Products, Inc.
- c. Victaulic Company.

       2.     Description:
- a. Electroplated steel nipple complying with ASTM F 1545.
- b. Pressure Rating: 300 psig at 225 deg F.
- c. End Connections: Male threaded or grooved.
- d. Lining: Inert and noncorrosive, propylene.

## 2.5 DIELECTRIC ISOLATION TAPE

A. Tape to eliminate dissimilar metal contact: (equal to Holdrite #272-4)
       1.     White Polyester Felt. Pressure sensitive adhesive rubber base (one side only).
       2.     4" width.

## 2.6 FLEXIBLE CONNECTORS

A. General: Fabricated from materials suitable for system fluid and that will provide flexible pipe connections. Include 125-psig minimum working-pressure rating, unless higher working pressure is indicated, and ends according to the following:
       1.     2-Inch NPS and Smaller: Threaded.
       2.     2-1/2-Inch NPS and Larger: Flanged.
       3.     Option for 2-1/2-Inch NPS and Larger: Grooved for use with keyed couplings.

B. Bronze-Hose, Flexible Connectors: Corrugated, bronze, inner tubing covered with bronze wire braid. Include copper-tube ends or bronze flanged ends, braze welded to hose.

C. Rubber, Flexible Connectors: CR or EPDM elastomer rubber construction, with multiple plies of NP fabric, molded and cured in hydraulic presses. Include 125-psig minimum working-pressure rating at 220 deg F. Units may be straight or elbow type, unless otherwise indicated.

## 2.7 MECHANICAL SLEEVE SEALS

A. Description:  Modular sealing element unit, designed for field assembly, used to fill annular space between pipe and sleeve.
1. Sealing Elements:  EPDM-rubber interlocking links shaped to fit surface of pipe.  Include type and number required for pipe materials and size of pipe.
2. Pressure Plates:  Stainless steel.
3. Connecting Bolts and Nuts:  Stainless steel of length required to secure pressure plates to sealing elements.

2.8    PIPING SPECIALTIES

A. Sleeves:  The following materials are for wall, floor, slab, and roof penetrations:
1. Steel Sheet Metal:  0.0239-inch minimum thickness, galvanized, round tube closed with welded longitudinal joint.
2. Steel Pipe:  ASTM A 53, Type E, Grade A, Schedule 40, galvanized, plain ends.
3. Cast Iron:  Cast or fabricated "wall pipe" equivalent to ductile-iron pressure pipe, with plain ends and integral waterstop, unless otherwise indicated.
4. Stack Sleeve Fittings:  Manufactured, cast-iron sleeve with integral clamping flange.  Include clamping ring and bolts and nuts for membrane flashing.
    a. Underdeck Clamp:  Clamping ring with set screws.
5. Sleeve Fasteners: Manufactured, steel clips for securement during pour. Equal to B-line, BD40, BE-5-8 or BE-9-12.

B. Escutcheons:  Manufactured wall, ceiling, and floor plates; deep-pattern type if required to conceal protruding fittings and sleeves.
1. ID:  Closely fit around pipe, tube, and insulation of insulated piping.
2. OD:  Completely cover opening.
3. Cast Brass:  One piece, with set screw.  (split face acceptable for existing piping)
    a. Finish:  Polished chrome-plate.

2.9    GROUT

A. Nonshrink, Nonmetallic Grout:  ASTM C 1107, Grade B.
1. Characteristics:  Post-hardening, volume-adjusting, dry, hydraulic-cement grout, nonstaining, noncorrosive, nongaseous, and recommended for interior and exterior applications.
2. Design Mix:  5000-psig, 28-day compressive strength.
3. Packaging:  Premixed and factory packaged.

2.10    ACCESS DOORS

A. General: Provide access doors for all serviceable mechanical appurtenances (valves, trap primers, shock arresters, actuators, sensors, etcetera) in inaccessible locations.  Such locations include gypsum, brick and CMU ceilings and walls.

B. Location of panels shall be carefully coordinated with other Exposed Devices as described in earlier paragraphs.

C. Manufacturers shall be Milcor, Mifab, or approved equal.  Unless indicated otherwise, use panels equal to Milcor Style M for masonry and drywall construction, equal to Milcor Style K for plastered masonry walls and ceilings.  Stainless steel panels shall be used in ceramic tile or glazed structural tile.

D. Minimum construction features include 16-gage frame and door, continuous hinges, cam-style latch and 10x10" unobstructed opening size.

E. UL labeled when in fire-rated construction, one and one-half hour rating.

F. Access doors located outside, in restrooms or in a moisture-laden environment (dressing area, shower area, lockers, etcetera) shall be stainless steel construction.

G. Equipment access doors shall be of sufficient size to remove/replace equipment and provide routine maintenance as necessary, unless otherwise noted.  Doors shall be set flush with adjacent finish

surfaces.  All access doors shall be provided with cylinder locks. All access doors (MEP) shall have one (1) common key.

**PART 3 - EXECUTION**

3.1     PIPING SYSTEMS - COMMON REQUIREMENTS AND APPLICATIONS

A.     General:  Install piping as described below, unless piping Sections specify otherwise.  Individual piping Sections specify unique piping installation requirements.

B.     General Locations and Arrangements:  Drawing plans, schematics, and diagrams indicate general location and arrangement of piping systems.  Indicated locations and arrangements were used to size pipe and calculate friction loss, expansion, pump sizing, and other design considerations.  Install piping as indicated, unless deviations to layout are approved on Coordination Drawings.

C.     All piping to be installed in compliance with current NEC required clearances.

D.     Install manufactured isolation clamps at all dissimilar metal pipe supports.  Install dielectric isolation tape (engineer approved) only when a manufactured isolation clamp is not available.

E.     Install piping at indicated slope.

F.     Install components with pressure rating equal to or greater than system operating pressure.

G.     Install piping in concealed interior and exterior locations, except in equipment rooms and service areas.

H.     Install piping free of sags and bends.

I.     Install exposed interior and exterior piping at right angles or parallel to building walls.  Diagonal runs are prohibited, unless otherwise indicated.

J.     Install piping tight to slabs, beams, joists, columns, walls, and other building elements.  Allow sufficient space above removable ceiling panels to allow for ceiling panel removal.

K.     Install piping to allow application of insulation plus 1-inch clearance around insulation.

L.     Locate groups of pipes parallel to each other, spaced to permit valve servicing.

M.     Install fittings for changes in direction and branch connections.

N.     Install couplings according to manufacturer's written instructions.

N.     Fire-Barrier Penetrations:  Maintain indicated fire rating of walls, partitions, ceilings, and floors at pipe penetrations.  Seal pipe penetrations with firestop materials.  Comply with requirements in Division 07 Section "Penetration Firestopping" for firestop materials and installations.
       1.     Fire-stop all sleeves at floor penetrations of multistory buildings including underfloor penetrations.

O.     Verify final equipment locations for roughing-in.

P.     Refer to equipment specifications in other Sections of these Specifications for roughing-in requirements.

Q.     Piping Joint Construction:  Join pipe and fittings as follows and as specifically required in individual piping specification Sections:
       1.     Ream ends of pipes and tubes and remove burrs.  Bevel plain ends of steel pipe.
       2.     Remove scale, slag, dirt, and debris from inside and outside of pipe and fittings before assembly.
       3.     Soldered Joints:  Construct joints according to AWS's "Soldering Manual," Chapter "The Soldering of Pipe and Tube"; or CDA's "Copper Tube Handbook."
       4.     Brazed Joints:  Construct joints according to AWS's "Brazing Handbook," Chapter "Pipe and Tube."

5. Threaded Joints: Thread pipe with tapered pipe threads according to ASME B1.20.1. Cut threads full and clean using sharp dies. Ream threaded pipe ends to remove burrs and restore full ID. Join pipe fittings and valves as follows:
   a. Note internal length of threads in fittings or valve ends, and proximity of internal seat or wall, to determine how far pipe should be threaded into joint.
   b. Apply appropriate tape or thread compound to external pipe threads, unless dry seal threading is specified.
   c. Align threads at point of assembly.
   d. Tighten joint with wrench. Apply wrench to valve end into which pipe is being threaded.
   e. Damaged Threads: Do not use pipe or pipe fittings with threads that are corroded or damaged. Do not use pipe sections that have cracked or open welds.
6. Welded Joints: Construct joints according to AWS D10.12, "Recommended Practices and Procedures for Welding Low Carbon Steel Pipe," using qualified processes and welding operators according to "Quality Assurance" Article.
7. Flanged Joints: Align flange surfaces parallel. Select appropriate gasket material, size, type, and thickness for service application. Install gasket concentrically positioned. Assemble joints by sequencing bolt tightening to make initial contact of flanges and gaskets as flat and parallel as possible. Use suitable lubricants on bolt threads. Tighten bolts gradually and uniformly using torque wrench.
8. Plastic Piping Solvent-Cement Joints: Clean and dry joining surfaces by wiping with clean cloth or paper towels. Join pipe and fittings according to the following:
   a. Comply with ASTM F 402 for safe-handling practice of cleaners, primers, and solvent cements.
   b. CPVC Piping: ASTM D 2846 and ASTM F 493.
   c. PVC Pressure Piping: ASTM D 2672.
   d. PVC Nonpressure Piping: ASTM D 2855.
9. Plastic Piping Heat-Fusion Joints: Clean and dry joining surfaces by wiping with clean cloth or paper towels. Join according to ASTM D 2657 procedures and manufacturer's written instructions.
   a. Plain-End Pipe and Fittings: Use butt fusion.
   b. Plain-End Pipe and Socket Fittings: Use socket fusion.

## 3.2 ESCUTCHEON REQUIREMENTS

A. Install escutcheons at pipe penetrations of walls, ceilings, and floors in finished areas.
   1. Escutcheons for New Piping:
      a. Piping exposed through floors and walls in finished areas: One piece, cast brass with polished chrome-plated finish with set screw. Deep escutcheons to be provided where standard depth will not fit.
      b. Escutcheons shall cover entire hole penetration.
      c. Escutcheon to be appropriately sized for pipe.
   2. Escutcheons for Existing piping:
      a. Piping exposed through floors and walls in finished areas: Split plate, cast brass with polished chrome-plated finish with set screw. Deep escutcheons to be provided where standard depth will not fit.
      b. Escutcheons shall cover entire hole penetration.
      c. Escutcheon to be appropriately sized for pipe.
   3. Install escutcheons at wall, floor, and ceiling penetrations in exposed finished locations and within cabinets and millwork. Use deep-pattern escutcheons if required to conceal protruding pipe fittings.

## 3.3 PIPE SLEEVE INSTALLATION REQUIREMENTS

A. Pipe sleeves are required at all through wall and floor penetrations.
   1. Sleeves are to be of the following material:
      a. Galvanized-Steel-Pipe Sleeves: ASTM A 53/A 53M, Type E, Grade B, Schedule 40, zinc-coated, with plain ends.
   2. Sleeves are required for all through floor and wall penetrations. Sleeves to be set and poured in place (in slab applications), secure all sleeves with fasteners.
   3. Sleeves to extend 2 inches past face of floor or wall. Pipe sleeve in finished areas to be flush with wall or floor for installation of escutcheon.

4. Install sleeves in new partitions, slabs, and walls as they are built.
5. For interior wall penetrations, seal annular space between sleeve and pipe or pipe insulation using joint sealants appropriate for size, depth, and location of joint. Comply with requirements in Division 07 Section "Joint Sealants" for joint sealants.
6. For exterior wall penetrations above grade, seal annular space between sleeve and pipe using joint sealants appropriate for size, depth, and location of joint. Comply with requirements in Division 07 Section "Joint Sealants" for joint sealants.
7. For exterior wall penetrations below grade, seal annular space between sleeve and pipe using sleeve seals specified in this Section.
8. Install sleeves that are large enough to provide 1/4-inch (6.4-mm) annular clear space between sleeve and pipe or pipe insulation unless otherwise indicated. Seal annular space with water tight sealant. (equal to NP-1). All sleeves and penetrations to maintain rating of wall / floor. Seal pipe penetrations with fire-stopping materials.
9. Install sleeve materials according to the following applications:
   a. Sleeves for Piping Passing through Concrete Floor Slabs: galvanized steel pipe.
   b. Sleeves for Piping Passing through Concrete Floor Slabs of Mechanical Equipment Areas or Other Wet Areas: Galvanized-steel pipe sleeves.
      1) Extend sleeves 2 inches above finished floor level.
      2) For pipes penetrating floors with membrane waterproofing, extend cast-iron sleeve fittings below floor slab as required to secure clamping ring if ring is specified. Secure flashing between clamping flanges. Install section of cast-iron soil pipe to extend sleeve to 2 inches (50 mm) above finished floor level. Comply with requirements in Division 07 Section "Sheet Metal Flashing and Trim" for flashing.
10. Sleeves for Piping Passing through Gypsum-Board Partitions:
    a. Galvanized-steel pipe sleeves.
    b. Exception: Sleeves are not required for water supply tubes and waste pipes for individual mechanical fixtures if escutcheons will cover openings.
11. Sleeves for Piping Passing through Concrete Roof Slabs: Reference details.
12. Sleeves for Piping Passing through Exterior Concrete Walls:
    a. Galvanized-steel pipe sleeves.
    b. Install sleeves that are large enough to provide 1-inch annular clear space between sleeve and pipe or pipe insulation when sleeve seals are used.
13. Sleeves for Piping Passing through Interior Concrete Walls:
    a. Galvanized-steel pipe sleeves.
14. Mechanical sleeve seals
    a. Install sleeve seals in sleeves in exterior concrete walls at water-service piping entries into building. Sleeves must be poured in place. Installation of sleeves after wall is constructed is not acceptable.
    b. Select type and number of sealing elements required for pipe material and size. Position pipe in center of sleeve. Assemble sleeve seal components and install in annular space between pipe and sleeve. Tighten bolts against pressure plates that cause sealing elements to expand and make watertight seal.

B. Piping Connections: Make connections according to the following, unless otherwise indicated:
1. Install unions, in piping 2-inch NPS and smaller, adjacent to each valve and at final connection to each piece of equipment with 2-inch NPS or smaller threaded pipe connection.
2. Install flanges, in piping 2-1/2-inch NPS and larger, adjacent to flanged valves and at final connection to each piece of equipment with flanged pipe connection.
3. Dry Piping Systems: Install dielectric unions and flanges to connect piping materials of dissimilar metals.
4. Wet Piping Systems: Install dielectric coupling and nipple fittings to connect piping materials of dissimilar metals.

3.4    DIELECTRIC FITTING INSTALLATION

A. Install unions, in piping 2-inch NPS and smaller, adjacent to each valve and at final connection to each piece of equipment with 2-inch NPS or smaller threaded pipe connection.

B. Install flanges, in piping 2-1/2-inch NPS and larger, adjacent to flanged valves and at final connection to each piece of equipment with flanged pipe connection.

3.5     EQUIPMENT INSTALLATION – COMMON REQUIREMENTS

A.     Install equipment to provide maximum possible headroom, if mounting heights are not indicated.

B.     Install equipment according to approved submittal data.  Portions of the Work are shown only in diagrammatic form.  Refer conflicts to Architect.

C.     Install equipment level and plumb, parallel and perpendicular to other building systems and components in exposed interior spaces, unless otherwise indicated.

D.     Install mechanical equipment to facilitate service, maintenance, and repair or replacement of components.  Connect equipment for ease of disconnecting, with minimum interference to other installations.  Extend grease fittings to accessible locations.

E.     Install equipment giving right of way to piping installed at required slope.

3.6     PAINTING AND FINISHING

A.     Apply paint to exposed piping according to the following, unless otherwise indicated:
1.     Interior, Ferrous Piping:  Use semigloss, acrylic-enamel finish.  Include finish coat over enamel undercoat and primer.
2.     Interior, Galvanized-Steel Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over galvanized metal primer.
3.     Interior, Ferrous Supports:  Use semigloss, acrylic-enamel finish.  Include finish coat over enamel undercoat and primer.
4.     Exterior, Ferrous Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over rust-inhibitive metal primer.
5.     Exterior, Galvanized-Steel Piping:  Use semigloss, acrylic-enamel finish.  Include two finish coats over galvanized metal primer.
6.     Exterior, Ferrous Supports:  Use semigloss, acrylic-enamel finish.  Include two finish coats over rust-inhibitive metal primer.

B.     Do not paint piping specialties with factory-applied finish.

C.     Damage and Touchup:  Repair marred and damaged factory-painted finishes with materials and procedures to match original factory finish.

3.7     ERECTION OF METAL SUPPORTS AND ANCHORAGE

A.     Cut, fit, and place miscellaneous metal supports accurately in location, alignment, and elevation to support and anchor mechanical materials and equipment.

B.     Field Welding:  Comply with AWS D1.1, "Structural Welding Code--Steel."

3.8     ERECTION OF WOOD SUPPORTS AND ANCHORAGE

A.     Cut, fit, and place wood grounds, nailers, blocking, and anchorage to support and anchor mechanical materials and equipment (not to be used at pipe supports).

B.     Select fastener sizes that will not penetrate members if opposite side will be exposed to view or will receive finish materials.  Tighten connections between members.  Install fasteners without splitting wood members.

C.     Attach to substrates as required to support applied loads.

3.9     DEMOLITION

A.     Cut, channel, chase, and drill floors, walls, partitions, ceilings, and other surfaces necessary for mechanical installations.  Perform cutting by skilled mechanics of trades involved.

B.	Repair cut surfaces to match adjacent surfaces.

3.10	CUTTING AND PATCHING

A.	Disconnect, demolish, and remove Work specified in Mechanical Sections.

B.	If pipe, ductwork, insulation, or equipment to remain is damaged or disturbed, remove damaged portions and install new products of equal capacity and quality.

C.	Accessible Work:  Remove indicated exposed pipe and ductwork in its entirety.

D.	Work Abandoned in Place:  Cut and remove underground pipe a minimum of 2 inches beyond face of adjacent construction.  Cap and patch surface to match existing finish.

E.	Removal:  Remove indicated equipment from Project site.

F.	Temporary Disconnection:  Remove, store, clean, reinstall, reconnect, and make operational equipment indicated for relocation.

3.11	GROUTING

A.	Install nonmetallic, nonshrink, grout for mechanical equipment base bearing surfaces, pump and other equipment base plates, and anchors.  Mix grout according to manufacturer's written instructions.

B.	Clean surfaces that will come into contact with grout.

C.	Provide forms as required for placement of grout.

D.	Avoid air entrapment during placing of grout.

E.	Place grout, completely filling equipment bases.

F.	Place grout on concrete bases to provide smooth bearing surface for equipment.

G.	Place grout around anchors.

H.	Cure placed grout according to manufacturer's written instructions.

**END OF SECTION**

## SECTION 230553 - MECHANICAL IDENTIFICATION


### PART 1 - GENERAL


1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.


1.2     SUMMARY

A.     This Section includes the following mechanical identification materials and their installation:
1.     Equipment nameplates.
2.     Equipment markers.
3.     Equipment signs.
4.     Access panel and door markers.
5.     Pipe markers.
6.     Duct markers.
7.     Stencils.
8.     Valve tags.
9.     Valve schedules.
10.    Warning tags.


1.3     SUBMITTALS

A.     Product Data:  For each type of product indicated.

B.     Valve Schedules:  For each piping system.  Furnish extra copies (in addition to mounted copies) to include in maintenance manuals.  Reproduce on 8½ □ 11 bond.  Tabulate valve number, piping system, system abbreviation as shown on tag, room or space location of valve, and variations for identification. Mark valves intended for emergency shutoff and similar special uses.  Indicate normal operating positions (open, closed, modulating, or balance).


1.4     QUALITY ASSURANCE

A.     ASME Compliance:  Comply with ASME A13.1, "Scheme for the Identification of Piping Systems," for letter size, length of color field, colors, and viewing angles of identification devices for piping.


1.5     COORDINATION

A.     Coordinate installation of identifying devices with completion of covering and painting of surfaces where devices are to be applied.

B.     Coordinate installation of identifying devices with location of access panels and doors.

C.     Install identifying devices before installing acoustical ceilings and similar concealment.


### PART 2 - PRODUCTS


2.1     GENERAL

A.     Products specified are for applications referenced in other Mechanical sections.  If more than a single type is specified for listed applications, selection is installer's choice; however, all equipment shall have an engraved nameplate.

2.2 EQUIPMENT IDENTIFICATION DEVICES

A. Equipment Nameplates: Metal, with data engraved or stamped, for permanent attachment on equipment. Equipment shall be tagged with construction document mark reference (i.e. AHU-1, VAV-1, UH-1, etc.).
1. Data:
    a. Manufacturer, product name, model number, and serial number.
    b. Capacity, operating and power characteristics, and essential data.
    c. Labels of tested compliances.
2. Location: Accessible and visible.
3. Fasteners: As required to mount on equipment.
4. Material: Brass.

B. Equipment Markers: Engraved, color-coded laminated plastic. Include contact-type, permanent adhesive.
1. Terminology: Match schedules as closely as possible.
2. Data:
    a. Name and plan number.
    b. Equipment service.
    c. Design capacity.
    d. Other design parameters such as pressure drop, entering and leaving conditions, and speed.
3. Size: 2-1/2 by 4 inches for control devices, dampers, and valves; 4-1/2 by 6 inches or equipment.

C. Equipment Signs: ASTM D 709, Type I, cellulose, paper-base, phenolic-resin-laminate engraving stock; Grade ES-2, black surface, black phenolic core, with white melamine subcore, unless otherwise indicated. Fabricate in sizes required for message. Provide holes for mechanical fastening.
1. Data: Instructions for operation of equipment and for safety procedures.
2. Engraving: Manufacturer's standard letter style, of sizes and with terms to match equipment identification.
3. Thickness: 1/8 inch, unless otherwise indicated.
4. Fasteners: Self-tapping, stainless-steel screws or contact-type, permanent adhesive.

D. Access Panel and Door Markers: 1/16-inch thick, engraved laminated plastic, with abbreviated terms and numbers corresponding to identification. Provide 1/8-inch center hole for attachment.
1. Fasteners: Self-tapping, stainless-steel screws or contact-type, permanent adhesive.


2.3 PIPING IDENTIFICATION DEVICES

A. Manufactured Pipe Markers, General: Manufacturers standard preprinted, semi-rigid, snap-on type.
1. Colors: Comply with ASME A13.1, unless otherwise indicated.
2. Pipes with OD, Including Insulation, Less Than 6 Inches: Full-band pipe markers extending 360 degrees around pipe at each location.
3. Pipes with OD, Including Insulation, 6 Inches and Larger: Either full-band or strip-type pipe markers at least three times letter height and of length required for label.
4. Arrows: Integral with piping system service lettering to accommodate both directions; or as separate unit on each pipe marker to indicate direction of flow.
5. Lettering: Manufacturers standard preprinted.


2.4 DUCT IDENTIFICATION DEVICES

A. Duct Markers: Engraved, color-coded laminated plastic. Include direction and quantity of airflow and duct service (such as supply, return, and exhaust). Include contact-type, permanent adhesive. See Execution section for color scheme.


2.5 VALVE TAGS

A. Valve Tags: Stamped or engraved with 1/4-inch letters for piping system abbreviation and 1/2-inch sequenced numbers. Provide 5/32-inch hole for fastener.

1.   Material:  0.032-inch thick aluminum.
2.   Valve-Tag Fasteners:  Brass S-hook.
3.   Size:  1½ inches in diameter, unless otherwise indicated.

## 2.6   VALVE SCHEDULES

A.   Valve-Schedule Frames:  Glazed display frame for removable mounting on masonry walls for each page of valve schedule.  Include mounting screws.

B.   Frame:  Extruded aluminum.

C.   Glazing:  ASTM C 1036, Type I, Class 1, Glazing Quality B, 2.5-mm, single-thickness glass.

## 2.7   WARNING TAGS

A.   Warning Tags:  Preprinted or partially preprinted, accident-prevention tags; of plasticized card stock with matte finish suitable for writing.
1.   Size:  3 by 5-1/4 inches **minimum**.
2.   Fasteners:  Brass grommet and wire.
3.   Nomenclature:  Large-size primary caption such as DANGER, CAUTION, or DO NOT OPERATE.
4.   Color:  Yellow background with black lettering.

## PART 3 -   EXECUTION

## 3.1   APPLICATIONS, GENERAL

A.   Products specified are for applications referenced in other Mechanical Sections.  If more than single-type material, device, or label is specified for listed applications, selection is Installer's option.

## 3.2   EQUIPMENT IDENTIFICATION

A.   Install and permanently fasten equipment nameplates on each major item of mechanical equipment that does not have nameplate or has nameplate that is damaged or located where not easily visible.  Locate nameplates where accessible and visible.  Include nameplates for the following general categories of equipment:
1.   Fuel-burning units, including boilers, furnaces, heaters, stills, and absorption units.
2.   Pumps, compressors, chillers, condensers, and similar motor-driven units.
3.   Heat exchangers, coils, evaporators, cooling towers, heat recovery units, and similar equipment.
4.   Fans, blowers, primary balancing dampers, and mixing boxes.
5.   Packaged HVAC central-station and zone-type units.

B.   Install equipment markers with permanent adhesive on or near each major item of mechanical equipment.  Data required for markers may be included on signs, and markers may be omitted if both are indicated.
1.   Letter Size:  Minimum 1/4 inch for name of units if viewing distance is less than 24 inches, ½ inch for viewing distances up to 72 inches, and proportionately larger lettering for greater viewing distances.  Include secondary lettering two-thirds to three-fourths the size of principal lettering.
2.   Data:  Distinguish among multiple units, indicate operational requirements, indicate safety and emergency precautions, warn of hazards and improper operations, and identify units.
3.   Locate markers where accessible and visible.  Include markers for the following general categories of equipment:
a.   Main control and operating valves, including safety devices and hazardous units such as gas outlets.
b.   Fire department hose valves and hose stations.
c.   Meters, gages, thermometers, and similar units.
d.   Fuel-burning units, including boilers, furnaces, heaters, stills, and absorption units.
e.   Pumps, compressors, chillers, condensers, and similar motor-driven units.

       f.      Heat exchangers, coils, evaporators, cooling towers, heat recovery units, and similar equipment.

       g.      Fans, blowers, primary balancing dampers, and mixing boxes.

       h.      Packaged HVAC central-station and zone-type units.

       i.      Tanks and pressure vessels.

       j.      Strainers, filters, humidifiers, water-treatment systems, and similar equipment.

C.      Install equipment signs with screws or permanent adhesive on or near each major item of mechanical equipment. Locate signs where accessible and visible.

     1.      Identify mechanical equipment with equipment markers in the following color codes:

       a.      Green: For cooling equipment and components.

       b.      Yellow: For heating equipment and components.

       c.      Green and Yellow, Orange: For combination cooling and heating equipment and components.

       d.      Brown: For energy-reclamation equipment and components.

     2.      Letter Size: Minimum 1/2 inch for name of units if viewing distance is less than 24 inches, 3/4 inch for viewing distances up to 72 inches, and proportionally larger lettering for greater viewing distances. Include secondary lettering two-thirds to three-fourths the size of principal lettering.

     3.      Data: Distinguish among multiple units, indicate operational requirements, indicate safety and emergency precautions, warn of hazards and improper operations, and identify units.

     4.      Include signs for the following general categories of equipment:

       a.      Main control and operating valves, including safety devices and hazardous units such as gas outlets.

       b.      Fuel-burning units, including boilers, furnaces, heaters, stills, and absorption units.

       c.      Pumps, compressors, chillers, condensers, and similar motor-driven units.

       d.      Heat exchangers, coils, evaporators, cooling towers, heat recovery units, and similar equipment.

       e.      Fans, blowers, primary balancing dampers, and mixing boxes.

       f.      Packaged HVAC central-station and zone-type units.

       g.      Tanks and pressure vessels.

       h.      Strainers, filters, humidifiers, water-treatment systems, and similar equipment.

D.      Install access panel markers with screws on equipment access panels.

## 3.3  PIPING IDENTIFICATION

A.      Install manufactured pipe markers indicating service on each piping system. Install with flow indication arrows showing direction of flow.

     1.      Pipes with OD, Including Insulation, Less Than 6 Inches: Snap-on application of pretensioned, semi-rigid plastic pipe marker.

     2.      Pipes with OD, Including Insulation, 6 Inches and Larger: Shaped pipe markers. Use size to match pipe and secure with manufacturer's stainless steel bands.

     3.      Fasten Option: Laminated or bonded application of pipe marker to pipe or insulation.

B.      Locate pipe markers and color bands where piping is exposed in finished spaces; in machine rooms; in accessible maintenance spaces such as shafts, tunnels and plenums; and in exterior nonconcealed locations such as rooftops and chiller yards, as follows:

     1.      Near each valve and control device.

     2.      Near each branch connection, excluding short takeoffs for fixtures and terminal units. Where flow pattern is not obvious, mark each pipe at branch.

     3.      Near penetrations through walls, floors, ceilings, and nonaccessible enclosures.

     4.      At access doors, manholes, and similar access points that permit view of concealed piping.

     5.      Near major equipment items and other points of origination and termination.

     6.      Spaced at maximum intervals of 50 feet along each run. Reduce intervals to 25 feet in areas of congested piping and equipment.

     7.      On piping above removable acoustical ceilings.

## 3.4  DUCT IDENTIFICATION

A.      Install duct markers with permanent adhesive on air ducts in the following color codes:

     1.      Green: For cold-air supply ducts.

2. Yellow:  For hot-air supply ducts.
3. Blue:  For exhaust-, outside-, relief-, return-, and mixed-air ducts.
4. ASME A13.1 Colors and Designs:  For hazardous material exhaust.
5. Letter Size:  Minimum 1/2 inch for name of units if viewing distance is less than 24 inches, 3/4 inch for viewing distances up to 72 inches, and proportionately larger lettering for greater viewing distances.  Include secondary lettering two-thirds to three-fourths the size of principal lettering.

B. Locate markers near points where ducts enter into concealed spaces and at maximum intervals of 50 feet in each space where ducts are exposed or concealed by removable ceiling system.  Reduce intervals to 25 feet in areas of high duct congestion.

3.5     VALVE-SCHEDULE INSTALLATION

A. Mount valve schedule on wall in accessible location in each major equipment room.

3.6     WARNING-TAG INSTALLATION

A. Write required message on, and attach warning tags to, equipment and other items where required.

3.7     VALVE TAGS

A. Install on valves and control devices in piping systems, except check valves, valves within factory-fabricated equipment units, plumbing fixture supply stops, shutoff valves, and HVAC terminal devices and similar roughing-in connections of end-use fixtures and units.  List tagged valves in valve schedule.

B. Valve Tag Application Schedule:  Tag valves according to size, shape, color scheme, and with captions similar to those indicated in the following:

C. Tag Material:  Aluminum.

D. Tag Size and Shape:  1-1/2 inches, round.

E. Tag Color:  According to the following:
1. Chilled Water:  Blue.
2. Cold Water:  Black.
3. Hot Water:  Red.
4. Fire Protection:  Red.
5. Sprinkler:  White.
6. Gas:  Yellow.
7. Steam:  Red.

F. Letter Color:  White.

G. Install mounted valve schedule in each major equipment room.

3.8     EQUIPMENT SIGNS AND MARKERS

A. Install engraved plastic-laminate signs or equipment markers on or near each major item of mechanical equipment.  Include signs for the following general categories of equipment:
1. Main control and operating valves, including safety devices and hazardous units such as gas outlets.
2. Meters, gages, thermometers, and similar units.
3. Fuel-burning units, including boilers, furnaces, heaters, stills, and absorption units.
4. Pumps, compressors, chillers, condensers, and similar motor-driven units.
5. Heat exchangers, coils, evaporators, cooling towers, heat recovery units, and similar equipment.
6. Fans, blowers, primary balancing dampers, and mixing boxes.
7. Packaged HVAC central-station and zone-type units.
8. Tanks and pressure vessels.
9. Strainers, filters, humidifiers, water-treatment systems, and similar equipment.

10. Any concealed appurtenances requiring access for maintenance shall be clearly identified by sign (to include but not be limited to unions, strainers, valves, etc.).

B. Duct Systems: Identify air supply, return, exhaust, intake, and relief ducts with duct markers; or provide stenciled signs and arrows showing service and direction of flow.

1. Location: Locate signs near points where ducts enter into concealed spaces and at maximum intervals of 50 feet in each space where ducts are exposed or concealed by removable ceiling system.

3.9 ADJUSTING AND CLEANING

A. Relocate mechanical identification materials and devices that have become visually blocked by work of this or other Divisions.

B. Clean faces of identification devices and glass frames of valve charts.

**END OF SECTION**

## SECTION 230593 - TESTING, ADJUSTING AND BALANCING

### PART 1 - GENERAL

1.1     SCOPE OF WORK

A.     The work included in this section consists of the furnishing of all labor, instruments, tools, and services required in connection with the testing, adjusting and balancing (TAB) of the heating, ventilating, and air conditioning systems as described in the mechanical specifications and/or shown on the mechanical plans, or reasonable implied therefrom.

B.     TAB of the HVAC systems will be performed by an impartial technical firm that is a member of NEBB and whose operations are limited to the field of professional testing and balancing.

C.     Mechanical Contractor to obtain TAB services from an independent TAB contractor.

D.     Qualified TAB firms shall submit cost, scope of work, qualifications, time line, and references.

E.     The TAB firm is responsible to and shall submit five (5) copies of all reports directly to the Architect/Engineer and one copy to the Owner.

F.     TAB services shall result in the optimum temperature, airflow, and noise levels in the conditioned space of the project.

G.     The following basic components of the HVAC systems shall be tested, adjusted, and balanced:
1.     Air distribution systems.
2.     Air moving equipment.
3.     HVAC pumps (chilled water, hot water, condenser water, etc.).
4.     Heating systems (HVAC).
5.     Control systems verification.

1.2     SUMMARY

A.     This Section includes testing, adjusting, and balancing HVAC systems to produce design objectives, including the following:
1.     Balancing airflow and water flow within distribution systems, including submains, branches, and terminals, to indicated quantities according to specified tolerances.
2.     Adjusting total HVAC systems to provide indicated quantities.
3.     Measuring electrical performance of HVAC equipment.
4.     Setting quantitative performance of HVAC equipment.
5.     Verifying that automatic control devices are functioning properly.
6.     Measuring sound and vibration.
7.     Reporting results of the activities and procedures specified in this Section.

B.     Related  sections include the following:
1.     Testing and adjusting requirements unique to particular systems and equipment are included in the Sections that specify those systems and equipment.  See all related HVAC mechanical sections.
2.     Field quality-control testing to verify that workmanship quality for system and equipment installation is specified in system and equipment Sections.

1.3     DEFINITIONS

A.     Adjust:  To regulate fluid flow rate and air patterns at the terminal equipment, such as to reduce fan speed or adjust a damper.

B.     Balance:  To proportion flows within the distribution system, including submains, branches, and terminals, according to design quantities.

C.    Draft:  A current of air, when referring to localized effect caused by one or more factors of high air velocity, low ambient temperature, or direction of airflow, whereby more heat is withdrawn from a person's skin than is normally dissipated.

D.    Procedure:  An approach to and execution of a sequence of work operations to yield repeatable results.

E.    Report Forms:  Test data sheets for recording test data in logical order.

F.    Static Head:  The pressure due to the weight of the fluid above the point of measurement.  In a closed system, static head is equal on both sides of the pump.

G.    Suction Head:  The height of fluid surface above the centerline of the pump on the suction side.

H.    System Effect:  A phenomenon that can create undesired or unpredicted conditions that cause reduced capacities in all or part of a system.

I.    System Effect Factors:  Allowances used to calculate a reduction of the performance ratings of a fan when installed under conditions different from those presented when the fan was performance tested.

J.    Terminal:  A point where the controlled medium, such as fluid or energy, enters or leaves the distribution system.

K.    Test:  A procedure to determine quantitative performance of a system or equipment.

L.    Testing, Adjusting, and Balancing Agent:  The entity responsible for performing and reporting the testing, adjusting, and balancing procedures.

M.    NEBB:  National Environmental Balancing Bureau.

N.    SMACNA:  Sheet Metal and Air Conditioning Contractors' National Association.

1.4    SUBMITTALS

A.    Quality-Assurance Submittals:  Within 30 days from the Contractor's Notice to Proceed, submit 2 copies of evidence that the testing, adjusting, and balancing Agent and this Project's testing, adjusting, and balancing team members meet the qualifications specified in the "Quality Assurance" Article below.

B.    Contract Documents Examination Report: Within 45 days from the Contractor's Notice to Proceed, submit 2 copies of the Contract Documents review report as specified in Part 3 of this Section.

C.    Strategies and Procedures Plan: Within 60 days from the Contractor's Notice to Proceed, submit 2 copies of the testing, adjusting and balancing strategies and step-by-step procedures as specified in Part 3 "Preparation" Article below. Include a complete set of report forms intended for use on this Project.

D.    Certified Testing, Adjusting and Balancing Reports: Submit 2 copies of reports prepared, as specified in this Section, on approved forms certified by the testing, adjusting and balancing Agent.

E.    Sample Report Forms: Submit 2 sets of sample testing, adjusting and balancing report forms.

F.    Warranty: Submit 2 copies of special warranty specified in the "Guarantee" Article below.

1.5    QUALITY ASSURANCE

A.    Agent Qualifications:  Engage a testing, adjusting, and balancing agent certified by NEBB.

B.    Testing, Adjusting, and Balancing Conference:  Meet with the Owner's and the Architect's representatives on approval of the testing, adjusting, and balancing strategies and procedures plan to develop a mutual understanding of the details.  Ensure the participation of testing, adjusting, and balancing team members, equipment manufacturers' authorized service representatives, HVAC controls Installer, and other support personnel.  Provide 7 days' advance notice of scheduled meeting time and location.
      1.    Agenda Items:  Include at least the following:
            a.    Submittal distribution requirements.

        b.      Contract Documents examination report.
        c.      Testing, adjusting, and balancing plan.
        d.      Work schedule and Project site access requirements.
        e.      Coordination and cooperation of trades and subcontractors.
        f.      Coordination of documentation and communication flow.

C.    Certification of Testing, Adjusting, and Balancing Reports:  Certify the testing, adjusting, and balancing field data reports.  This certification includes the following:
1.    Review field data reports to validate accuracy of data and to prepare certified testing, adjusting, and balancing reports.
2.    Certify that the testing, adjusting, and balancing team complied with the approved testing, adjusting, and balancing plan and the procedures specified and referenced in this Specification.

D.    Testing, Adjusting, and Balancing Reports:  Use standard forms from NEBB's "Procedural Standards for Testing, Adjusting, and Balancing of Environmental Systems."

E.    Instrumentation Type, Quantity, and Accuracy:  As described in NEBB's "Procedural Standards for Testing, Adjusting, and Balancing of Environmental Systems," Section II, "Required Instrumentation for NEBB Certification."

F.    Instrumentation Calibration:  Calibrate instruments at least every 12 months or more frequently if required by the instrument manufacturer.

## 1.6    PROJECT CONDITIONS

A.    Partial Owner Occupancy:  The Owner may occupy completed areas of the building before Substantial Completion.  Cooperate with the Owner during testing, adjusting, and balancing operations to minimize conflicts with the Owner's operations.

## 1.7    COORDINATION

A.    Coordinate the efforts of factory-authorized service representatives for systems and equipment, HVAC controls installers, and other mechanics to operate HVAC systems and equipment to support and assist testing, adjusting, and balancing activities.

B.    Notice:  Provide 7 days' advance notice for each test.  Include scheduled test dates and times.

C.    Perform testing, adjusting, and balancing after leakage and pressure tests on air and water distribution systems have been satisfactorily completed.

## 1.8    GUARANTEE

A.    General:  The national project performance guarantee specified in this Article shall not deprive the Owner of other rights the Owner may have under other provisions of the Contract Documents and shall be in addition to, and run concurrent with, other warranties made by the Contractor under requirements of the Contract Documents.

## PART 2 - PRODUCTS (Not Applicable)

## PART 3 - EXECUTION

### 3.1    EXAMINATION

A.    Examine Contract Documents to become familiar with project requirements and to discover conditions in systems' designs that may preclude proper testing, adjusting, and balancing of systems and equipment.
1.    Contract Documents are defined in the General and Supplementary Conditions of the Contract.

2. Verify that balancing devices, such as test ports, gage cocks, thermometer wells, flow-control devices, balancing valves and fittings, and manual volume dampers, are required by the Contract Documents. Verify that quantities and locations of these balancing devices are accessible and appropriate for effective balancing and for efficient system and equipment operation.

B. Examine approved submittal data of HVAC systems and equipment.

C. Examine Architect's and Engineer's design data, including HVAC system descriptions, statements of design assumptions for environmental conditions and systems' output, and statements of philosophies and assumptions about HVAC system and equipment controls.

D. Examine equipment performance data, including fan and pump curves. Relate performance data to project conditions and requirements, including system effects that can create undesired or unpredicted conditions that cause reduced capacities in all or part of a system. Calculate system effect factors to reduce the performance ratings of HVAC equipment when installed under conditions different from those presented when the equipment was performance tested at the factory. To calculate system effects for air systems, use tables and charts found in AMCA 201, "Fans and Systems," Sections 7 through 10; or in SMACNA's "HVAC Systems--Duct Design," Sections 5 and 6. Compare this data with the design data and installed conditions.

E. Examine system and equipment installations to verify that they are complete and that testing, cleaning, adjusting, and commissioning specified in individual Specification Sections have been performed.

F. Examine system and equipment test reports.

G. Examine HVAC system and equipment installations to verify that indicated balancing devices, such as test ports, gage cocks, thermometer wells, flow-control devices, balancing valves and fittings, and manual volume dampers, are properly installed, and their locations are accessible and appropriate for effective balancing and for efficient system and equipment operation.

H. Examine systems for functional deficiencies that cannot be corrected by adjusting and balancing.

I. Examine air-handling equipment to ensure clean filters have been installed, bearings are greased, belts are aligned and tight, and equipment with functioning controls is ready for operation.

J. Examine terminal units, such as variable-air-volume boxes and mixing boxes, to verify that they are accessible and their controls are connected and functioning.

K. Examine plenum ceilings, utilized for supply air, to verify that they are airtight. Verify that pipe penetrations and other holes are sealed.

L. Examine strainers for clean screens and proper perforations.

M. Examine 3-way valves for proper installation for their intended function of diverting or mixing fluid flows.

N. Examine heat-transfer coils for correct piping connections and for clean and straight fins.

O. Examine open-piping-system pumps to ensure absence of entrained air in the suction piping.

P. Examine equipment for installation and for properly operating safety interlocks and controls.

Q. Examine automatic temperature system components to verify the following:
1. Dampers, valves, and other controlled devices operate by the intended controller.
2. Dampers and valves are in the position indicated by the controller.
3. The Integrity of valves and dampers for free and full operation and for tightness of fully closed and fully open positions. This includes dampers in multizone units, mixing boxes, and variable-air-volume terminals.
4. Automatic modulating and shutoff valves, including 2-way valves and 3-way mixing and diverting valves, are properly connected.
5. Thermostats and humidistats are located to avoid adverse effects of sunlight, drafts, and cold walls.
6. Sensors are located to sense only the intended conditions.
7. Sequence of operation for control modes is according to the Contract Documents.

8.    Controller set points are set at design values.  Observe and record system reactions to changes in conditions.  Record default set points if different from design values.
9.    Interlocked systems are operating.
10.    Changeover from heating to cooling mode occurs according to design values.

R.    Report deficiencies discovered before and during performance of testing, adjusting, and balancing procedures.

## 3.2    PREPARATION

A.    Prepare a testing, adjusting, and balancing plan that includes strategies and step-by-step procedures.

B.    Complete system readiness checks and prepare system readiness reports.  Verify the following:
1.    Permanent electrical power wiring is complete.
2.    Hydronic systems are filled, clean, and free of air.
3.    Automatic temperature-control systems are operational.
4.    Equipment and duct access doors are securely closed.
5.    Balance, smoke, and fire dampers are open.
6.    Isolating and balancing valves are open and control valves are operational.
7.    Ceilings are installed in critical areas where air-pattern adjustments are required and access to balancing devices is provided.
8.    Windows and doors can be closed so design conditions for system operations can be met.
9.    Motors are wired properly with appropriate overloads and correct rotation.

## 3.3    GENERAL TESTING AND BALANCING PROCEDURES

A.    Perform testing and balancing procedures on each system according to the procedures contained in NEBB's "Procedural Standards for Testing, Adjusting, and Balancing of Environmental Systems" and this Section.

B.    Cut insulation, ducts, pipes, and equipment cabinets for installation of test probes to the minimum extent necessary to allow adequate performance of procedures.  After testing and balancing, close probe holes and patch insulation with new materials identical to those removed.  Restore vapor barrier and finish according to the insulation Specifications for this Project.

C.    Mark equipment settings with paint or other suitable, permanent identification material, including damper-control positions, valve indicators, fan-speed-control levers, and similar controls and devices, to show final settings.

## 3.4    FUNDAMENTAL AIR SYSTEMS' BALANCING PROCEDURES

A.    Prepare test reports for both fans and outlets.  Obtain manufacturer's outlet factors and recommended testing procedures.  Crosscheck the summation of required outlet volumes with required fan volumes.

B.    Prepare schematic diagrams of systems' "as-built" duct layouts.

C.    For variable-air-volume systems, develop a plan to simulate diversity.

D.    Determine the best locations in main and branch ducts for accurate duct airflow measurements.

E.    Check the airflow patterns from the outside-air louvers and dampers and the return- and exhaust-air dampers, through the supply-fan discharge and mixing dampers.

F.    Locate start-stop and disconnect switches, electrical interlocks, and motor starters.

G.    Verify that motor starters are equipped with properly sized thermal protection.

H.    Check dampers for proper position to achieve desired airflow path.

I.    Check for airflow blockages.

J.      Check condensate drains for proper connections and functioning.

K.      Check for proper sealing of air-handling unit components.


3.5     VARIABLE-AIR-VOLUME SYSTEMS' ADDITIONAL PROCEDURES

A.      Pressure-Dependent, Variable-Air-Volume Systems without Diversity:  After the fan systems have been adjusted, adjust the variable-air-volume systems as follows:
        1.      Balance systems similar to constant-volume air systems.
        2.      Set terminal units and supply fan at full-airflow condition.
        3.      Adjust inlet dampers of each terminal unit to design airflow and verify operation of the static-pressure controller.  When total airflow is correct, balance the air outlets downstream from terminal units as described for constant-volume air systems.
        4.      Readjust fan airflow for final maximum readings.
        5.      Measure operating static pressure at the sensor that controls the supply fan, if one is installed, and verify operation of the static-pressure controller.
        6.      Set supply fan at minimum airflow if minimum airflow is indicated.  Measure static pressure to verify that it is being maintained by the controller.
        7.      Set terminal units at minimum airflow and adjust controller or regulator to deliver the designed minimum airflow.  Check air outlets for a proportional reduction in airflow as described for constant-volume air systems.
                a.      If air outlets are out of balance at minimum airflow, report the condition but leave the outlets balanced for maximum airflow.
        8.      Measure the return airflow to the fan while operating at maximum return airflow and minimum outside airflow.  Adjust the fan and balance the return-air ducts and inlets as described for constant-volume air systems.


3.6     FUNDAMENTAL PROCEDURES FOR HYDRONIC SYSTEMS

A.      Prepare test reports with pertinent design data and number in sequence starting at pump to end of system.  Check the sum of branch-circuit flows against approved pump flow rate.  Correct variations that exceed plus or minus 5 percent.

B.      Prepare schematic diagrams of systems' "as-built" piping layouts.

C.      Prepare hydronic systems for testing and balancing according to the following, in addition to the general preparation procedures specified above:
        1.      Open all manual valves for maximum flow.
        2.      Check expansion tank liquid level.
        3.      Check makeup-water-station pressure gage for adequate pressure for highest vent.
        4.      Check flow-control valves for specified sequence of operation and set at design flow.
        5.      Set differential-pressure control valves at the specified differential pressure.  Do not set at fully closed position when pump is positive-displacement type, unless several terminal valves are kept open.
        6.      Set system controls so automatic valves are wide open to heat exchangers.
        7.      Check pump-motor load.  If motor is overloaded, throttle main flow-balancing device so motor nameplate rating is not exceeded.
        8.      Check air vents for a forceful liquid flow exiting from vents when manually operated.


3.7     HYDRONIC SYSTEMS' BALANCING PROCEDURES

A.      Determine water flow at pumps.  Use the following procedures, except for positive-displacement pumps:
        1.      Verify impeller size by operating the pump with the discharge valve closed.  Verify with the pump manufacturer that this will not damage pump.  Read pressure differential across the pump. Convert pressure to head and correct for differences in gage heights.  Note the point on the manufacturer's pump curve at zero flow and confirm that the pump has the intended impeller size.
        2.      Check system resistance.  With all valves open, read pressure differential across the pump and mark the pump manufacturer's head-capacity curve.  Adjust pump discharge valve until design water flow is achieved.

3.  Verify pump-motor brake horsepower.  Calculate the intended brake horsepower for the system based on the pump manufacturer's performance data.  Compare calculated brake horsepower with nameplate data on the pump motor.  Report conditions where actual amperage exceeds motor nameplate amperage.

4.  Report flow rates that are not within plus or minus 5 percent of design.

B.  Set calibrated balancing valves, if installed, at calculated presettings.

C.  Measure flow at all stations and adjust, where necessary, to obtain first balance.
1.  System components that have Cv rating or an accurately cataloged flow-pressure-drop relationship may be used as a flow-indicating device.

D.  Measure flow at main balancing station and set main balancing device to achieve flow that is 5 percent greater than design flow.

E.  Adjust balancing stations to within specified tolerances of design flow rate as follows:
1.  Determine the balancing station with the highest percentage over design flow.
2.  Adjust each station in turn, beginning with the station with the highest percentage over design flow and proceeding to the station with the lowest percentage over design flow.
3.  Record settings and mark balancing devices.

F.  Measure pump flow rate and make final measurements of pump amperage, voltage, rpm, pump heads, and systems' pressures and temperatures, including outdoor-air temperature.

G.  Measure the differential-pressure control valve settings existing at the conclusions of balancing.


3.8     VARIABLE-FLOW HYDRONIC SYSTEMS' ADDITIONAL PROCEDURES

A.  Balance systems with automatic 2- and 3-way control valves by setting systems at maximum flow through heat-exchange terminals and proceed as specified above for hydronic systems.


3.9     PRIMARY-SECONDARY-FLOW HYDRONIC SYSTEMS' ADDITIONAL PROCEDURES

A.  Balance the primary system crossover flow first, then balance the secondary system.


3.10    MOTORS

A.  Motors, 1/2 HP and Larger:  Test at final balanced conditions and record the following data:
1.  Manufacturer, model, and serial numbers.
2.  Motor horsepower rating.
3.  Motor rpm.
4.  Efficiency rating if high-efficiency motor.
5.  Nameplate and measured voltage, each phase.
6.  Nameplate and measured amperage, each phase.
7.  Starter thermal-protection-element rating.

B.  Motors Driven by Variable-Frequency Controllers:  Test for proper operation at speeds varying from minimum to maximum.  Test the manual bypass for the controller to prove proper operation.  Record observations, including controller manufacturer, model and serial numbers, and nameplate data.


3.11    BOILERS

A.  Measure entering- and leaving-water temperatures and water flow.


3.12    HEAT-TRANSFER COILS

A.  Water Coils:  Measure the following data for each coil:
1.  Entering- and leaving-water temperatures.
2.  Water flow rate.

3. Water pressure drop.
4. Dry-bulb temperatures of entering and leaving air.
5. Wet-bulb temperatures of entering and leaving air.
6. Airflow.
7. Air pressure drop.

B. Electric-Heating Coils:  Measure the following data for each coil:
1. Nameplate data.
2. Airflow.
3. Entering- and leaving-air temperatures at full load.
4. Voltage and amperage input of each phase at full load and at each incremental stage.
5. Calculated kW at full load.
6. Fuse or circuit-breaker rating for overload protection.

## 3.13    TEMPERATURE TESTING

A. During testing, adjusting, and balancing, report need for adjustment in temperature regulation within the automatic temperature-control system.

B. Measure indoor wet- and dry-bulb temperatures every other hour for a period of 2 successive 8-hour days, in each separately controlled zone, to prove correctness of final temperature settings.  Measure when the building or zone is occupied.

C. Measure outside-air, wet- and dry-bulb temperatures.

## 3.14    TEMPERATURE-CONTROL VERIFICATION

A. Verify that controllers are calibrated and commissioned.

B. Check transmitter and controller locations and note conditions that would adversely affect control functions.

C. Record controller settings and note variances between set points and actual measurements.

D. Verify operation of limiting controllers (i.e., high- and low-temperature controllers).

E. Verify free travel and proper operation of control devices such as damper and valve operators.

F. Verify sequence of operation of control devices.  Note air pressures and device positions and correlate with airflow and water-flow measurements.  Note the speed of response to input changes.

G. Confirm interaction of electrically operated switch transducers.

H. Confirm interaction of interlock and lockout systems.

I. Record voltages of power supply and controller output.  Determine if the system operates on a grounded or nongrounded power supply.

J. Note operation of electric actuators using spring return for proper fail-safe operations.

## 3.15    TOLERANCES

A. Set HVAC system airflow and water flow rates within the following tolerances:
1. Supply, Return, and Exhaust Fans:  -5 to plus 10 percent.
2. Air Outlets and Inlets:  $\pm$ 10 percent.
3. Heating-Water Flow Rate:  $\pm$ 10 percent.
4. Cooling-Water Flow Rate:  $\pm$ 5 percent.

## 3.16    REPORTING

A. Initial Construction-Phase Report:  Based on examination of the Contract Documents as specified in "Examination" Article above, prepare a report on the adequacy of design for systems' balancing devices. Recommend changes and additions to systems' balancing devices to facilitate proper performance measuring and balancing.  Recommend changes and additions to HVAC systems and general construction to allow access for performance measuring and balancing devices.

B. Status Reports:  As Work progresses, prepare reports to describe completed procedures, procedures in progress, and scheduled procedures.  Include a list of deficiencies and problems found in systems being tested and balanced.  Prepare a separate report for each system and each building floor for systems serving multiple floors.

C. Preliminary Report: Submit preliminary TAB reports to the design engineer for each floor, the central plant, and the chilled and hot water hydronic system.

3.17    FINAL REPORT

A. General:  Typewritten, or computer printout in letter-quality font, on standard bond paper, in 3-ring binder, tabulated and divided into sections by tested and balanced systems.

B. Include a certification sheet in front of binder signed and sealed by the certified testing and balancing engineer.
   1. Include a list of the instruments used for procedures, along with proof of calibration.

C. Final Report Final Report Contents:  In addition to the certified field report data, include the following:
   1. Pump Curves.
   2. Fan curves.
   3. Manufacturers' test data.
   4. Field test reports prepared by system and equipment installers.
   5. Other information relative to equipment performance, but not include approved Shop Drawings and Product Data.

D. General Report Data:  In addition to the form titles and entries, include the following data in the final report, as applicable:
   1. Title page.
   2. Name and address of testing, adjusting and balancing Agent.
   3. Project name.
   4. Project location.
   5. Architect's name and address.
   6. Engineer's name and address.
   7. Contractor's name and address.
   8. Report date.
   9. Signature of testing, adjusting and balancing Agent who certifies the report.
   10. Summary of contents, including the following:
       a. Design versus final performance.
       b. Notable characteristics of systems.
       c. Description of system operation sequence if it varies from the Contract Documents.
   11. Nomenclature sheets for each item of equipment.
   12. Data for terminal units, including manufacturer, type size and fittings.
   13. Notes to explain why certain final data in the body of reports vary from design values.
   14. Test conditions for fans and pump performance forms, including the following:
       a. Settings for outside-return-and exhaust-air dampers.
       b. Conditions of filters.
       c. Cooling coil, wet-and dry-bulb, conditions.
       d. Face and bypass damper settings at coils.
       e. Fan drive settings, including settings and percentage of maximum pitch diameter.
       f. Inlet vane settings for variable-air-volume, systems.
       g. Settings for supply-air, static-pressure, controller.
       h. Other system operating conditions that affect performance.

E. System Diagrams:  Include schematic layouts of air and hydronic distribution systems.  Present with single-line diagrams and include the following:
   1. Quantities of outside, supply, return and exhaust airflows.

2. Water and steam flow rates.
3. Duct, outlet and inlet sizes.
4. Pipe and valve sizes and locations.
5. Terminal units.
6. Balancing stations.
7. Locations of duct traverse(s) of duct layout.

F. Air-Handling Unit Test Reports:  For air-handling units with coils, include the following:
   1. Unit Data:  Include the following:
      a. Unit identification.
      b. Location.
      c. Make and type.
      d. Model number and unit size.
      e. Manufacturer's serial number.
      f. Unit arrangement and class.
      g. Discharge arrangement.
      h. Sheave make, size in inches and bore.
      i. Sheave dimension, center-to-center and amount of adjustments in inches (mm).
      j. Number of belts, make and size.
      k. Number of filters, type and size.
   2. Motor Data:  Include the following:
      a. Make and frame type and size.
      b. Horsepower and rpm.
      c. Volts, phase and hertz.
      d. Full-load amperage and service factor.
      e. Sheave make, size in inches and bore.
      f. Sheave dimensions, center-to-center and amount of adjustments in inches.
   3. Test Data:  Include design and actual values for the following:
      a. Unit identification.
      b. Location.
      c. Make and type.
      d. Model number and unit size.
      e. Manufacturer's serial number.

G. Apparatus-Coil Test Reports:  For apparatus coils, include the following:
   1. Coil Data:  Include the following:
      a. System Identification.
      b. Location.
      c. Coil type.
      d. Number of rows.
      e. Fin spacing in fins per inch.
      f. Make and model number.
      g. Face area in sq.ft.
      h. Tube size in NPS.
      i. Tube and fin materials.
      j. Circuiting arrangement.
   2. Test Data:  Include design and actual values for the following:
      a. Airflow rate in cfm.
      b. Average face velocity in fpm.
      c. Air pressure drop in inches wg.
      d. Outside-air, wet and dry-bulb temperatures in deg F.
      e. Return-air, wet and dry-bulb temperatures in deg F.
      f. Entering-air, wet and dry-bulb temperatures in deg F.
      g. Leaving-air, wet and dry bulb temperatures in deg F.
      h. Return-air, wet and dry-bulb temperatures in deg F.
      i. Entering water temperature in deg F.
      j. Leaving water temperature in deg F
      k. Water flow rate in gpm.
      l. Water pressure differential in feet of head or psig.

H. Water Chiller Test Reports:  For chillers (Air Cooled or Water Cooled)
   1. Unit Data:  Include the following:

        a.     Unit Identification.
        b.     Location.
        c.     Make and type.
        d.     Model number and unit size.
        e.     Manufacturer's serial number.
        f.     Unit arrangement and class.

2. Motor Data:
        a.     Make and frame type and size.
        b.     Volts, phase and hertz.
        c.     Full-load amperage and service factor.

3. Test Data:
        a.     Total chilled water flow rate in gpm.
        b.     Total condenser water flow rate in gpm.
        c.     WPD in ft across chilled water.
        d.     WPD in ft across condenser water.
        e.     Chilled water supply and return temperatures ˚F.
        f.     Condenser water supply and return temperatures in ˚F.

I.    Cooling Tower Test Reports:  For condenser water cooling tower:
1. Unit Data:  Include the following:
        a.     Unit identification.
        b.     Location.
        c.     Make and type.
        d.     Model number and unit size.
        e.     Manufacturer's serial number.
        f.     Unit arrangement and class.
        g.     Discharge arrangement.

2. Motor Data (Fan or Pump):  Include the following:
        a.     Make and frame type and size.
        b.     Horsepower and rpm.
        c.     Volts, phase, and hertz.
        d.     Full-load amperage and service factor.

3. Test Data:  Include design and actual values for the following:
        a.     Total condenser under flowrate in gpm.
        b.     Total wpd in ft across condenser water.
        c.     Condenser water supply and return temperatures in ˚F.
        d.     Fan rpm.

J.    Electric-Coil Test Reports:  For electric furnaces, duct coils, and electric coils installed in central-station air-handling units, include the following:
1. Unit Data:  Include the following:
        a.     System identification.
        b.     Location.
        c.     Coil identification.
        d.     Capacity in Btuh (kW).
        e.     Number of stages.
        f.     Connected volts, phase, and hertz.
        g.     Rated amperage.
        h.     Airflow rate in cfm.
        i.     Face area in sq. ft.
        j.     Minimum face velocity in fpm.

2. Test Data:  Include design and actual values for the following:
        a.     Heat output in Btuh.
        b.     Airflow rate in cfm.
        c.     Air velocity in fpm.
        d.     Entering-air temperature in deg F.
        e.     Leaving-air temperature in deg F.
        f.     Voltage at each connection.
        g.     Amperage for each phase.

K.    Fan Test Reports:  For supply, return, and exhaust fans, include the following:
1. Fan Data:  Include the following:

        a.      System identification.
        b.      Location.
        c.      Make and type.
        d.      Model number and size.
        e.      Manufacturer's serial number.
        f.      Arrangement and class.
        g.      Sheave make, size in inches, and bore.
        h.      Sheave dimensions, center-to-center and amount of adjustments in inches (mm).

2. Motor Data:  Include the following:
        a.      Make and frame type and size.
        b.      Horsepower and rpm.
        c.      Volts, phase, and hertz.
        d.      Full-load amperage and service factor.
        e.      Sheave make, size in inches, and bore.
        f.      Sheave dimensions, center-to-center and amount of adjustments in inches.
        g.      Number of belts, make, and size.

3. Test Data:  Include design and actual values for the following:
        a.      Total airflow rate in cfm.
        b.      Total system static pressure in inches wg.
        c.      Fan rpm.
        d.      Discharge static pressure in inches wg.
        e.      Suction static pressure in inches wg.

L. Round, Flat-Oval, and Rectangular Duct Traverse Reports:  Include a diagram with a grid representing the duct cross-section and record the following:
1. Report Data:  Include the following:
        a.      System and air-handling unit number.
        b.      Location and zone.
        c.      Locate traverse location on duct work layout.
        d.      Traverse air temperature in deg F.
        e.      Duct static pressure in inches wg.
        f.      Duct size in inches.
        g.      Duct area in sq. ft.
        h.      Design airflow rate in cfm.
        i.      Design velocity in fpm.
        j.      Actual airflow rate in cfm.
        k.      Actual average velocity in fpm.
        l.      Barometric pressure in psig.

M. Air-Terminal-Device Reports:  For terminal units, include the following:
1. Unit Data:  Include the following:
        a.      System and air-handling unit identification.
        b.      Location and zone.
        c.      Test apparatus used.
        d.      Area served.
        e.      Air-terminal-device make.
        f.      Air-terminal-device number from system diagram.
        g.      Air-terminal-device type and model number.
        h.      Air-terminal-device size.
        i.      Air-terminal-device effective area in sq. ft.
2. Test Data:  Include design and actual values for the following:
        a.      Airflow rate in cfm.
        b.      Air velocity in fpm.
        c.      Preliminary airflow rate as needed in cfm.
        d.      Preliminary velocity as needed in fpm.
        e.      Final airflow rate in cfm.
        f.      Final velocity in fpm.
        g.      Space temperature in deg F.

N. System-Coil Reports:  For reheat coils and water coils of terminal units, include the following:
1. Unit Data:  Include the following:
        a.      System and air-handling unit identification.

        b.      Location and zone.
        c.      Room or riser served.
        d.      Coil make and size.
        e.      Flowmeter type.

2. Test Data:  Include design and actual values for the following:
    a.      Airflow rate in cfm.
    b.      Entering-water temperature in deg F.
    c.      Leaving-water temperature in deg F.
    d.      Water pressure drop in feet of head or psig.
    e.      Entering-air temperature in deg F.
    f.      Leaving-air temperature in deg F.

O. Instrument Calibration Reports:  For instrument calibration, include the following:
1. Report Data:  Include the following:
    a.      Instrument type and make.
    b.      Serial number.
    c.      Application.
    d.      Dates of use.
    e.      Dates of calibration.

**END OF SECTION**

**SECTION 230719 - MECHANICAL INSULATION**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SUMMARY

A.     This Section includes mechanical insulation for duct, equipment, and pipe, including the following:
1.     Insulation Materials:
a.     Cellular glass.
b.     Flexible elastomeric.
c.     Mineral fiber.
d.     Phenolic
2.     Adhesives.
3.     Mastics.
4.     Sealants.
5.     Factory-applied jackets.
6.     Field-applied fabric-reinforcing mesh.
7.     Field-applied tape.
8.     Field-applied jackets.
9.     Securements.
10.    Corner angles.

B.     Related Sections include the following:
1.     Specification Section "Metal Ducts" for duct liners.
2.     Specification Section "Hangers and Supports" for high-density inserts at hangers; **wood inserts at hangers are not acceptable.**
3.     Specification Section "Special Conditions for All Mechanical Work".
4.     Specification Section "Basic Mechanical Materials and Methods".

C.     Not all items listed within this specification are used. Use only items applicable per application schedule.

1.3     DEFINITIONS

A.     ASJ:  All-service jacket.

B.     CONCEALED: Covered or concealed by a ceiling (gypsum or lay-in acoustical tile) or wall.

C.     EXPOSED: Open to view; not concealed by a ceiling or wall of any sort.

D.     FSK:  Foil, scrim, kraft paper.

E.     UNDERFLOOR: Accessible crawl space beneath lowest floor level. (considered "outdoors")

1.4     SUBMITTALS

A.     Product Data:  For each type of product indicated, identify thermal conductivity, thickness, and jackets (both factory and field applied, if any). Provide submittal data on all products to be used.

1.5     QUALITY ASSURANCE

A. Installer Qualifications:  Skilled mechanics who have successfully completed an apprenticeship program or another craft training program certified by the Department of Labor, Bureau of Apprenticeship and Training.

B. Fire-Test-Response Characteristics:  Insulation and related materials shall have fire-test-response characteristics indicated, as determined by testing identical products per ASTM E 84, by a testing and inspecting agency acceptable to authorities having jurisdiction.  Factory label insulation and jacket materials and adhesive, mastic, and cement material containers, with appropriate markings of applicable testing and inspecting agency.
1. Insulation Installed Indoors:  Flame-spread index of 25 or less, and smoke-developed index of 50 or less.

## 1.6 DELIVERY, STORAGE, AND HANDLING

A. Packaging:  Insulation material containers shall be marked by manufacturer with appropriate ASTM standard designation, type and grade, and maximum use temperature.

B. All products to be stored in a dry location, protected from the elements. All damaged insulation to be replaced.

## 1.7 COORDINATION

A. Coordinate size and location of supports, hangers, and high-density insulation inserts and shields specified in Specification Section "Hangers and Supports."  Coordinate with drawing details where applicable; wood inserts at hangers are not acceptable.

B. Coordinate clearance requirements with piping Installer for piping insulation application, duct Installer for duct insulation application, and equipment Installer for equipment insulation application.  Before preparing piping and ductwork Shop Drawings, establish and maintain clearance requirements for installation of insulation and field-applied jackets and finishes and for space required for maintenance.

## 1.8 SCHEDULING

A. Schedule insulation application after pressure testing systems and, where required, after installing and testing heat tracing.  Insulation application may begin on segments that have satisfactory test results.

B. Complete installation and concealment of plastic materials as rapidly as possible in each area of construction.

C. Insulation not to be installed until building is dried in.

## PART 2  - PRODUCTS

### 2.1 MANUFACTURERS

A. In other Part 2 articles where titles below introduce lists, the following requirements apply to product selection:
1. Manufacturers:  Subject to compliance with requirements, provide products by one of the manufacturers specified.

### 2.2 INSULATION MATERIALS

A. Refer to Part 3 schedule articles for requirements about where insulating materials shall be applied.

B. Products shall not contain asbestos, lead, mercury, or mercury compounds.

C. Products that come in contact with stainless steel shall have a leachable chloride content of less than 50 ppm when tested according to ASTM C 871.

D. Insulation materials for use on austenitic stainless steel shall be qualified as acceptable according to ASTM C 795.

E. Foam insulation materials shall not use CFC or HCFC blowing agents in the manufacturing process.

F. Phenolic:
　　1. Products
　　　　a. Insul-phen
　　2. 100% CFC-free, HCFC-free, and halogen-free, closed cell rigid phenolic foam insulation.
　　3. Minimal thermal conductivity @ 75° F
　　　　a. Green, 2.5 lb/ft³: 0.15 (Btu.in/hr.ft². F)
　　　　b. Pink, 5.0 lb/ft³: 0.21 (Btu.in/hr.ft². F)

G. Cellular Glass:
　　1. Products:
　　　　a. Pittsburgh Corning Corporation; Foamglas Super K.
　　2. Block Insulation:  ASTM C 552, Type I.
　　3. Special-Shaped Insulation:  ASTM C 552, Type III.
　　4. Board Insulation:  ASTM C 552, Type IV.
　　5. Preformed Pipe Insulation with Factory-Applied ASJ:  Comply with ASTM C 552, Type II, Class 2.
　　6. Factory fabricate shapes according to ASTM C 450 and ASTM C 585.
　　7. Inorganic, incombustible, foamed or cellulated glass with annealed, rigid, hermetically sealed cells. Minimal thermal conductivity at 75° F of 0.29 (Btu.in/hr.ft². F) (R-value of 10.34 @ 3 inches thickness).  Factory-applied jacket requirements are specified in Part 2 "Factory-Applied Jackets" Article.

H. Flexible Elastomeric:
　　1. Products:
　　　　a. Aeroflex USA Inc.; Aerocel.
　　　　b. Armacel LLC; AP Armaflex.
　　2. Closed-cell, sponge- or expanded-rubber materials. Comply with ASTM C 534, Type I for tubular materials and Type II for sheet materials.
　　3. Minimal thermal conductivity at 75° F of 0.25 (Btu.in/hr.ft². F).

I. Mineral-Fiber Blanket Insulation:
　　1. Products:
　　　　a. Johns Manville; Microlite.
　　　　b. Knauf Insulation; Duct Wrap
　　　　c. Owens-Corning; All-Service Duct Wrap.
　　2. Mineral or glass fibers bonded with a thermosetting resin. Comply with ASTM C 553, Type II and ASTM C 1290, Type III with factory-applied FSP jacket. Factory-applied jacket requirements are specified in Part 2 "Factory-Applied jackets" Article.
　　3. Minimal density of 0.75 lb/ft³, installed R-value of 5.6 (at 2" thick).

J. Mineral-Fiber Board Insulation:
　　1. Products:
　　　　a. Johns Manville; 800 Series Spin-Glas.
　　　　b. Knauf Insulation; Insulation Board.
　　　　c. Owens Corning; Fiberglas 700 Series.
　　2. Mineral or glass fibers bonded with a thermosetting resin.  Comply with ASTM C 612, Type IA or Type IB.  For duct and plenum applications, provide insulation with factory-applied FSK jacket.  For equipment applications, provide insulation with factory-applied FSK jacket.  Factory-applied jacket requirements are specified in Part 2 "Factory-Applied Jackets" Article.
　　3. Minimal density of 2.25 lb/ft³, with a R-value of 8.7 (at 2" thickness).

K. Mineral-Fiber, Preformed Pipe Insulation:
　　1. Products:
　　　　a. Johns Manville; Micro-Lok.
　　　　b. Knauf Insulation; 1000° Pipe Insulation.
　　　　c. Owens Corning; Fiberglas Pipe Insulation.

2.  Type I, 850 deg F Materials:  Mineral or glass fibers bonded with a thermosetting resin.  Minimum thermal conductivity at 75˚ F of 0.23 (Btu.in/hr.ft². F). Comply with ASTM C 547, Type I, Grade A, with factory-applied ASJ.  Factory-applied jacket requirements are specified in Part 2 "Factory-Applied Jackets" Article.

## 2.3    ADHESIVES

A.  Materials shall be compatible with insulation materials, jackets, and substrates and for bonding insulation to itself and to surfaces to be insulated, unless otherwise indicated. All products are to contain low V.O.C. as defined/governed by LEED IEQ 4.1 and 4.2 (Regardless of project type).

B.  Cellular-Glass, Solvent-based resin adhesive, with a service temperature range of minus 75 to plus 300 deg F.
    1.  Products:
        a.  Foamglas: Pittseal 444N or equal

C.  Flexible Elastomeric:  Comply with MIL-A-24179A, Type II, Class I.
    1.  Products:
        a.  K-Flex: 720 LVOC or equal

D.  Phenolic: Water based adhesive with a service temp of minus 20°F to 700°F.
    1.  Products:
        a.  Foster 97-15

E.  Mineral-Fiber Adhesive:  Comply with MIL-A-3316C, Class 2, Grade A.
    1.  Products:
        a.  Design Polymerics, DP2502 (or approved equal).

## 2.4    MASTICS

A.  Materials shall be compatible with insulation materials, jackets, and substrates; comply with MIL-C-19565C, Type II. All products are to contain low V.O.C. as defined/governed by LEED IEQ 4.1 and 4.2 (Regardless of project type).

B.  Vapor-Barrier Mastic:  Water based; suitable for outdoor use on below ambient services, or indoor vapor barrier use.
    1.  Products:
        a.  Childers Products, Division of ITW; CP-35.
    2.  Water-Vapor Permeance:  ASTM F 1249, 0.09 perm at 55-mils film thickness.
    3.  Service Temperature Range:  Minus 20 to plus 190 deg F.
    4.  Solids Content:  ASTM D 1644, 60 percent by volume and 73 percent by weight.
    5.  Color:  White.
    6.  VOC:  36 g/l

## 2.5    SEALANTS

A.  Joint Sealants:
    1.  Joint Sealants for Cellular-Glass Products:
        a.  Pittsburgh Corning Corporation; Pittseal 444N.
    2.  Joint Sealant for Phenolic Products
        a.  Foster 95-50

B.  Metal Jacket:
    1.  Products:
        a.  Foster 95-44 or equal.
        b.  Childers Products, Division of ITW; CP-76.

C.  Mineral Fiber:
    1.  Design Polymerics DP 2502.
    2.  Childers Products, Division of ITW; CP-35.

D.    PVC Jacket:
      1.    Childers Products, Division of ITW; CP-35.


2.6    FACTORY-APPLIED JACKETS

A.    Insulation system schedules indicate factory-applied jackets on various applications.  When factory-applied jackets are indicated, comply with the following:
      1.    ASJ:    White,  kraft-paper,  fiberglass-reinforced  scrim  with  aluminum-foil  backing; complying with ASTM C 1136, Type I.
      2.    ASJ-SSL:  ASJ with self-sealing, pressure-sensitive, acrylic-based adhesive covered by a removable protective strip; complying with ASTM C 1136, Type I.
      3.    FSK  Jacket:    Aluminum-foil,  fiberglass-reinforced  scrim  with  kraft-paper  backing; complying with ASTM C 1136, Type II.


2.7    FIELD-APPLIED FABRIC-REINFORCING MESH

A.    Woven Glass-Fiber Fabric:  Comply with MIL-C-20079H, Type I, plain weave, and presized a minimum of 2.2 oz./sq. yd. 10 x 10 strand count per square inch, minimum 4" wide band.
      1.    Available Products:
            a.    Chil-glas #10.
            b.    Charles Harmon and Co. white weaveset.


2.8    FIELD-APPLIED JACKETS

A.    Field-applied jackets shall comply with ASTM C 921, Type I, unless otherwise indicated.

B.    PVC Jacket:  High-impact-resistant, UV-resistant PVC complying with ASTM D 1784, 25/50 ASTM-F 84, Class 16354-C; thickness as scheduled; roll stock ready for shop or field cutting and forming. Thickness is indicated in field-applied jacket schedules.
      1.    Products:
            a.    Johns Manville; Zeston.
            b.    Proto PVC Corporation; LoSmoke.
      2.    Color:  White:
      3.    Factory-fabricated fitting covers to match jacket if available; otherwise, field fabricate.
            a.    Shapes:    45- and 90-degree, short- and long-radius elbows, tees, valves,        flanges, unions, reducers, end caps, soil-pipe hubs, traps, mechanical joints, and    P-trap and supply covers for lavatories.
      4.    Factory-fabricated tank heads and tank side panels.

C.    Metal Jacket:
      1.    Products:
            a.    Childers Products, Division of ITW; Metal Jacketing Systems.
      2.    Aluminum Jacket:  Comply with ASTM B 209 (ASTM B 209M), Alloy 3003, 3005, 3105 or 5005, Temper H-14.
            a.    Factory cut and rolled to size.
            b.    Finish and thickness are indicated in field-applied jacket schedules.


2.9    TAPES

A.    ASJ Tape:  White vapor-retarder tape matching factory-applied jacket with acrylic adhesive, complying with ASTM C 1136 and UL listed.
      1.    Width:  4 inches.
      2.    Thickness:  14.0 mils.
      3.    Adhesion:  73 ounces force/inch in width.
      4.    Elongation:  2 percent.
      5.    Tensile Strength:  55 lbf/inch in width.
      6.    Color: White

B.    FSK Tape:  Foil-face, vapor-retarder tape matching factory-applied jacket with acrylic adhesive; complying with ASTM C 1136 and UL listed.

1. Width: 4 inches.
2. Thickness: 13 mils.
3. Adhesion: 73 ounces force/inch in width.
4. Elongation: 2 percent.
5. Tensile Strength: 40 lbf/inch in width.
6. Color: Silver

## 2.10 SECUREMENTS

A. Bands:
   1. Products:
      a. Childers Products; Bands.
   2. Stainless Steel: ASTM A 167 or ASTM A 240/A 240M, Type 316; 0.015 inch thick, 3/4 inch wide with wing or closed seal.
   3. Aluminum: ASTM B 209 (ASTM B 209M), Alloy 3003, 3005, 3105, or 5005; Temper H- 14, 0.020 inch thick, 1/2 inch with wing or closed seal.
   4. Springs: Twin spring set constructed of stainless steel with ends flat and slotted to accept metal bands. Spring size determined by manufacturer for application.

B. Insulation Pins and Hangers:
   1. Cupped-Head, Capacitor-Discharge-Insulated Weld Pins: Zinc-coated steel pin, fully annealed for capacitor-discharge welding, 12 Gauge shank, length to suit depth of insulation indicated with integral 1-1/2-inch galvanized carbon-steel washer. **Contractor to field verify, integrity of pin weld on ductwork with sheet metal thickness less than 22-gauge. Integrity to be verified prior to concealment with insulation.**
      a. Products:
         1) GEMCO; Cupped Head Weld Pin or equal.
   2. Metal, "Peel and Press" Base Insulation Hangers: Baseplate welded to projecting spindle that is capable of holding insulation, of thickness indicated, securely in position indicated when self-locking washer is in place. Comply with the following requirements:
      a. Products:
         1) GEMCO; Peel and Press or equal.
      b. Baseplate: Galvanized carbon-steel sheet, 0.030 inch thick by 2 inches square.
      c. Spindle: Copper- or zinc-coated, low carbon steel, fully annealed, 12 Gauge diameter shank, length to suit depth of insulation indicated.
      d. Adhesive: Recommended by hanger manufacturer. Product with demonstrated capability to bond insulation hanger securely to substrates indicated without damaging insulation, hangers, and substrates.
   3. Insulation-Retaining Washers and Cap: Self-locking cap washers formed from 12 Gauge, galvanized-steel sheet, with beveled edge sized as required to hold insulation securely in place but not less than 1-1/2 inches in diameter.
      a. Products:
         1) AGM Industries, Inc.; RC-150.
         2) GEMCO; R-150.
      b. Protect ends with capped self-locking washers incorporating a spring steel insert to ensure permanent retention of cap in exposed locations.

C. Staples: Outward-clinching insulation staples, nominal 3/4-inch- wide, stainless steel or Monel.

## 2.11 CORNER ANGLES

A. PVC Corner Angles: 30 mils thick, minimum 1 by 1 inch, PVC according to ASTM D 1784, Class 16354-C. White or color-coded to match adjacent surface.

## PART 3 - EXECUTION

## 3.1 EXAMINATION

A. Examine substrates and conditions for compliance with requirements for installation and other conditions affecting performance of insulation application.
1. Verify that systems and equipment to be insulated have been tested and are free of defects.
2. Verify that surfaces to be insulated are clean and dry.
3. Proceed with installation only after unsatisfactory conditions have been corrected.

3.2 PREPARATION

A. Surface Preparation: Clean and dry surfaces to receive insulation. Remove materials that will adversely affect insulation application. For Stainless Steel; apply a corrosion coating to insulated surfaces with an epoxy primer and an epoxy finish 5 mils thick.

B. Verify and coordinate insulation installation with the systems and trades installing heat tracing. Comply with requirements for heat tracing that applies to insulation.

3.3 COMMON INSTALLATION REQUIREMENTS

A. Requirements in this Article generally apply to all insulation materials except where more specific requirements are specified in various pipe insulation material installation articles.

B. Install insulation materials, accessories, and finishes with smooth, straight, and even surfaces; free of voids throughout the length of equipment, ducts and fittings, and piping including fittings, valves, and specialties.

C. Install insulation materials, forms, vapor barriers or retarders, jackets, and thicknesses required for each item of equipment, duct system, and pipe system as specified in insulation system schedules.

D. Install accessories compatible with insulation materials and suitable for the service. Install accessories that do not corrode, soften, or otherwise attack insulation or jacket in either wet or dry state.

E. Install high-density inserts at hanger locations prior to insulating (duct and pipe); wood or block inserts are not acceptable.

F. Install insulation with longitudinal seams at top and bottom of horizontal runs.

G. Where multiple layers of insulation are required, longitudinal and end seams are to be staggered.

H. Do not weld brackets, clips, pins or other attachment devices to piping, fittings, tanks, coils, equipment, vessel, and specialties.

I. Keep insulation materials clean and dry before, during application, and finishing.

J. Install insulation with tight longitudinal seams and end joints.

K. Install insulation with least number of joints practical.

L. Install insulation so that material is not over compressed. Install corner angles prior to insulating; to protect all insulation from damage.

M. Seal all joints, and seams, including penetrations in insulation, at supports, and other projections with insulation of same material overlapped by 2". Secure strips with outward clinching staples along edge of overlap, (spaced 1 inch on center) and seal entire joint or seam with mastic and embedded fiberglass reinforcing mesh, minimum 4", cover mesh with finish coat of mastic.

N. Do not insulate, conceal, or enclose pipe hangers, channel and steel supports, etc. not directly fasten to duct.

O. Cover inserts with jacket material matching adjacent pipe insulation. Install shields over jacket, arranged to protect jacket from tear or puncture by hanger, support, and shield.

P.   Apply adhesives, mastics, and sealants at manufacturer's recommended coverage rate and wet and dry film thicknesses. Do not water down products unless directed by manufacture. Use clean potable demineralized water when required.

Q.   Finish installation with systems at operating conditions. Repair joint separations and cracking due to thermal movement.

R.   Repair all damage insulation prior to concealment as noted above.

S.   Do not insulate or conceal vibration-control devices, labels, stamps, nameplates, data plates, manholes, cleanouts, etc. require for maintenances.

T.   Install insulation over fittings, valves, strainers, flanges, unions, and other specialties with continuous thermal and vapor-retarded integrity, unless otherwise indicated.

U.   Insulate pipe elbows, tees, valves, strainers, flanges, etc., using preformed fitting insulation, mitered fittings or oversized preformed pipe insulation made from same material thickness and density as adjacent pipe insulation. Each piece shall be butted tightly against adjoining piece and bonded with adhesive. Overlap adjoining pipe insulation by not less than two times the thickness of pipe insulation, or one pipe diameter, whichever is thicker. Fill joints, seams, voids, and irregular surfaces with insulating mastic finished to a smooth, hard, and uniform contour that is uniform with adjoining pipe insulation. Provide a removable reusable insulation cover; design that maintains vapor barrier. For valves, insulate up to and including the bonnets, valve stuffing-box studs, bolts, and nuts.

V.   Cover segmented insulated surfaces with a layer of finishing adhesive and coat with a vapor-barrier mastic. Reinforce the mastic with fabric-reinforcing mesh. Trowel the mastic to a smooth and well-shaped contour.

W.   For services not specified to receive a field-applied jacket except for flexible elastomeric and polyolefin, install fitted PVC cover over elbows, tees, strainers, valves, flanges, and unions. Terminate ends with PVC end caps. Secure PVC covers to adjoining insulation facing using staples and ASJ tape. Seal PVC fitting covers with mastic.

X.   Insulate instrument connections for thermometers, pressure gages, pressure temperature taps, test connections, flow meters, sensors, switches, and transmitters on insulated pipes, vessels, and equipment. Shape insulation at these connections by tapering it to and around the connection with insulating adhesive and finish with mastic. All connections are to be accessible.

Y.   Install removable insulation segment and covers at flanges, valves, controls, unions, equipment access doors, manholes, hand holes, and other elements that require frequent removal for service and inspection. Unless a PVC jacket is indicated in field-applied jacket schedules, finish exposed surfaces with a metal jacket.

3.4   PENETRATIONS

A.   Install insulation continuously through all walls, floors, and partitions penetrations and sleeves.

B.   Extend jacket of outdoor installation into wall and roof jacks by 2 inches. Seal jacket to roof flashing with approved flashing sealant.

C.   Insulation Installation at Fire-Rated Walls, floors and Partitions Penetrations for duct work were fire/smoke dampers are required: Terminate insulation at fire damper sleeves as require by damper manufacturer. Externally insulate damper sleeves to match adjacent insulation and overlap duct insulation at least 2 inches.

3.5   GENERAL PIPE INSULATION INSTALLATION (IN ADDITION TO COMMON REQUIREMENTS)

A.   Preformed Pipe Insulation Installation on Pipe, Fittings, Valves, Flanges, Tanks, Elbows, and Appurtenances for Cellular- Glass, Mineral- Fiber, Flexible Elastomeric, and Phenolic insulations:
   1.   Install insulation in a manner that secures material to system being insulated with staples, tape and mastic.

2. When insulation with preformed pipe insulation, seal all longitudinal seams, end joints, and protrusions with manufacturers recommended tape matching jacket, vapor-barrier mastic, joint sealant, and adhesive to eliminate openings in insulation that allow passage of air to surface being insulated.

3. Secure fittings, jacket, cover, etc. with tape matching jacket and secure with outward clinched staples 1 inch on center. Apply vapor-barrier mastic over staples.

4. Arrange insulation to permit access to valves packing, flanges, unions, etc. and valve operation for maintenance without disturbing insulation. Install insulation so that it can be removed without damage to surrounding insulation or access enclosure.

5. Pipe hangers are not to be concealed in insulation.

6. Seal all exposed insulation ends with mastic.

7. Seal all mitered joints prior to installing covers with vapor-barrier sealant and mastic.

8. Install preformed pipe insulation to outer diameter of pipe flange.

9. Make width of insulation section same as overall width of flange and bolts, plus twice the thickness of pipe insulation.

10. Fill voids between inner circumference of valves, flange, elbows, and bolts insulation and outer circumference of adjacent straight pipe segments with cut sections of sheet insulation of same thickness as pipe insulation.

11. Install preformed sections of same material insulation when available. When preformed insulation elbows and fittings are not available, install mitered sections of pipe insulation, to a thickness equal to adjoining pipe insulation. Install PVC cover over fitting or mitered section.

12. Arrange insulation to permit access to valves packing, flanges, unions, etc. and valve operation for maintenance without disturbing insulation. Install insulation so that it can be removed without damage to surrounding insulation or access enclosure.

3.6 GENERAL BLANKET AND BOARD INSULATION INSTALLATION (IN ADDITION TO COMMON REQUIREMENTS)

A. Blanket and Board Insulation Installation on Duct, Tanks, Vessels, Elbows, and Appurtenances:

1. Apply adhesives according to manufacturer's recommended coverage rates per unit area, for a minimum of 50 percent coverage of duct and plenum and 100 percent coverage of equipment, tanks, etc.; to secure insulation to surfaces. Apply adhesive to entire circumference of all surfaces; including fittings and transitions.

2. Install cupped-head, capacitor-discharge-weld pins surfaces to secure insulation to ductwork. On sides and bottom of horizontal and vertical ducts on 16 inches center and 3 inches maximum from insulation joints. Install additional pins to hold insulation tightly against surface as required by manufacturer recommendation. Use approved adhesive stick anchor pins with washers for all equipment, tanks, etc. Cut excess portion of stick anchor pins and install washer's caps. Cover exposed pins and washers caps with tape and mastic matching insulation facing.

3. Install PVC corner angles prior to installing blanket insulation.

4. Do not over compress insulation during installation. Cover exposed pins and washers with tape matching insulation facing and mastic.

5. Install a continuous unbroken vapor barrier. Create a facing lap for longitudinal seams and end joints with insulation by removing 2 inches from 1 edge and 1 end of insulation segment. Secure laps to adjacent insulation section with 3/4-inch outward-clinching staples, 1 inch on center. Coat all seams/joints with mastic and embed with fiberglass reinforced mesh, minimum 4", cover mesh with finish coat of mastic.

6. Repair punctures, tears, penetrations and protrusions with 6-inch-wide strips of same material used to insulate duct. Seal all seams with staples, cover with mastic and cover with embedded fiberglass reinforced mesh, cover mesh with finish coat of mastic.

7. Install vapor stops for ductwork and plenums operating below 50 deg F at 18-foot intervals. Vapor stops shall consist of vapor-barrier mastic applied in a Z-shaped pattern over insulation face, along butt end of insulation, and over the surface. Cover insulation face and surface to be insulated a width equal to 2 times the insulation thickness but not less than 3 inches.

8. Install insulation on rectangular duct elbows and transitions with a full insulation section for each surface. Groove and score insulation to fit as closely as possible to outside and inside radius of elbows. Install insulation on round and flat-oval duct elbows with individually mitered gores cut to fit the elbow.

9. Insulate hangers attached to duct work. Do not insulate or enclose channel, supports, etc. not directly fasten to duct.

10. Insulation termination: Butt insulation up to termination point. Apply mastic no less than 3" overlap on insulation, and 3" on metal surface. Embed fiberglass reinforced mesh overlapping full 3" of termination point, 6" strip. Cover mesh with finish coat of mastic.

## 3.7 FIELD-APPLIED JACKET INSTALLATION

A. Install with 2-inch overlap at longitudinal seams and end joints. Overlap longitudinal seams arranged to shed water. Seal end joints with weatherproof sealant recommended by insulation manufacturer. Apply two continuous beads of adhesive to seams and joints, one bead under lap and the finish bead along seam and joint edge. Secure metal jacket with stainless-steel bands 12 inches on center and at end joints.

## 3.8 FINISHES

A. Duct, Equipment, and Pipe Insulation with ASJ, Glass-Cloth, or Other Paintable Jacket Material: Paint jacket with paint system identified below and as specified in Division 9 painting Sections.
1. Flat Acrylic Finish: Two (2) finish coats over a primer that is compatible with jacket material and finish coat paint. Add fungicidal agent to render fabric mildew proof.
a. Finish Coat Material: Interior, flat, latex-emulsion size.

B. Flexible Elastomeric Thermal Insulation: After adhesive has fully cured, apply two coats of insulation manufacturer's recommended protective coating.

C. Color: Final color as selected by Architect. Vary first and second coats to allow visual inspection of the completed Work.

D. Do not field paint aluminum or stainless-steel jackets.

## 3.9 FIELD QUALITY CONTROL

A. Perform the following field tests and inspections and prepare test reports:
1. Inspect insulated duct, pipe, and equipment, randomly selected by Engineer, by removing field-applied jacket and insulation in layers in reverse order of their installation. Extent of inspection shall be limited to two (3) location(s) for each system.
2. All insulation applications will be considered defective work if sample inspection reveals noncompliance with requirements.
3. Remove all defective work and install new insulation and jackets to replace insulation and jackets removed for inspection. Repeat inspection procedures as needed.

## 3.10 INSULATION SCHEDULE, GENERAL

A. Plenums and Ducts Requiring Insulation:
1. Indoor, concealed/exposed supply, return, relief and outdoor air.
2. Outdoor, concealed/exposed supply, return and relief air.

B. Piping Requiring Insulation:
1. Indoor and outdoor hydronics.
2. All pipe and appurtenances that are susceptible to sweating.
3. All pipe and appurtenances carrying water or refrigerant, for space conditioning.
4. Any piping not specifically scheduled for insulation below to be insulated with the code minimum required insulation.

C. Items Not Insulated:
1. Fibrous-glass ducts.
2. Double-wall metal ducts or lined metal ducts, both with sufficient insulation thickness to comply with 2009 IECC and ASHRAE/ IESNA 90.1.
3. Factory-insulated flexible ducts.
4. Factory-insulated plenums and casings.
5. Flexible connectors.
6. Vibration-control devices.

7. Factory-insulated access panels and doors.
8. General building exhaust duct.

## 3.11 DUCT AND PLENUM INSULATION SCHEDULE

A. Indoor, concealed, all duct insulation shall be of the following (Including dishwasher exhaust):
1. Mineral-Fiber Blanket: 2 inches thick and 0.75-lb/cu. ft. nominal density.

B. Indoor, exposed (including mechanical rooms and utility rooms), rectangular, all duct insulation shall be of the following:
1. Mineral-Fiber Board: 2 inches thick and 2.25-lb/cu. ft. nominal density.

C. Indoor, exposed round or flat oval ductwork shall be double-wall construction.

D. Outdoor (including underfloor), all duct insulation shall be any of the following:
1. Rectangular Duct: Cellular Glass, 3 inches thick and 7.5-lb/cu. ft. nominal density. (minimum R-value of 8)
2. Round/Flat Oval: Double wall construction (reference Metal Ducts Specification).

## 3.12 AIR DEVICE INSULATION SCHEDULE

A. Supply-air devices (all styles/sizes): Field insulate backside of all devices that are not factory lined:
1. Mineral-Fiber Blanket: 1-1/2 inches thick and 0.75-lb/cu. ft. nominal density. Secured to air device with FSK tape, all sides.

## 3.13 EQUIPMENT INSULATION SCHEDULE

A. Insulate indoor and outdoor equipment in paragraphs below that is not factory insulated.

B. Expansion/compression/buffer tanks, Air-separators, filter feeders, etc. insulation shall be any of the following:
1. Cellular Glass: 3 inches. (chilled water service)
2. Phenolic: 2 inches. (chilled water service)
3. Mineral Fiber Board: 3 inches. (hot water service)

C. Steam-to-hot water heat exchanger insulation:
1. Mineral-Fiber board: 3" thick, 3lb/cu. ft. density.
2. Cellular Glass: 3" thick, 7.5 lb/cu. ft density.

## 3.14 PIPING INSULATION SCHEDULE

A. Acceptable preformed pipe and tubular insulation materials and thicknesses are identified for each piping system and pipe size range.

B. Condensate and Equipment Drains:
1. All Pipe Sizes: Insulation shall be any of the following:
a. Flexible Elastomeric: 1 inch thick.

C. Chilled Water Supply and Return:
1. All Pipe Sizes: Insulation shall be any of the following:
a. Pre-insulated Pipe: Reference Hydronic Piping Specification (for use underfloor, buried, and outdoors).
b. Cellular Glass: (for use indoors and outdoors, not accepted in underfloor or buried). Reference schedule below for thickness.
c. Phenolic: (for use indoors and outdoors, not accepted in underfloor or buried). Reference schedule below for thickness.

D. Hot Water Supply and Return:
1. All pipe sizes:
a. Mineral-Fiber (for use indoors) Reference table below for thickness.

      b.    Pre-insulated Pipe:  Reference Hydronic Piping Specification (for use underfloor  and outdoors).  Reference table below for thickness.

      c.    Phenolic:   (for use indoors and outdoors, not accepted in underfloor or  buried) Reference Schedule below for thickness.

      d.    Cellular Glass:  (for use indoors and outdoors, not accepted in underfloor or  buried) Reference Schedule below for thickness.

E.    Phenolic Density Schedule:
1.    Indoors Concealed: 2.5 lb/ft.$^3$ (Green)
2.    Indoors Exposed: 5 lb/ft.$^3$ (Pink)
3.    Outdoors: 5 lb/ft.$^3$ (Pink)

F.    Steam and Steam Condensate, 350˚ F and below:
1.    All pipe sizes:
    a.    Mineral-Fiber, Preformed pipe, Type I: 3" thick.

**Insulation Thickness Schedule**

| Fluid | ≤1.5" Pipe Size | | | | | >1.5" Pipe Size | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Cellular Glass | Phenolic | Pre-Insulated | Mineral Fiber | Flex Elastomeric | Cellular Glass | Phenolic | Pre-Insulated | Mineral Fiber | Flex Elastomeric |
| | | | | | | | | | | |
| Chilled Water | 2" | 1.5" | 1.5" | N/A | N/A | 2" | 1.5" | 1.5" | N/A | N/A |
| Hot Water | 2" | 1.5" | 1.5" | 1.5" | N/A | 2.5" | 2" | 2" | 2" | N/A |
| Steam/ Condensate | N/A | N/A | N/A | 3" | N/A | N/A | N/A | N/A | 3" | N/A |
| Condensate | N/A | N/A | N/A | N/A | 1" | N/A | N/A | N/A | N/A | 1" |
| Refrigerant Suction/Hot Gas Piping | N/A | N/A | N/A | N/A | 1.5" | N/A | N/A | N/A | N/A | 1" |

G.    Refrigerant Suction and Hot Gas Piping:
1.    All pipe sizes:  Insulation shall be the following:
    a.    Flexible elastomeric:  1-½ inch thick.

3.15    FIELD-APPLIED JACKET SCHEDULE

A.    Install jacket over insulation material.  For insulation with factory-applied jacket, install the field-applied jacket over the factory-applied jacket.

B.    Ducts/Piping exposed in finished indoor areas, outdoors, underfloor and mechanical rooms.
1.    Aluminum, Stucco Embossed: 0.016 inch thick.

C.    Indoor hydronic piping fitting or elbows.
1.    PVC: 0.015 inch thick.

**END OF SECTION**

**SECTION 23 3113 - METAL DUCTS**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

   A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

   A.     Section Includes:
      1.     Single-wall rectangular ducts and fittings.
      2.     Double-wall rectangular ducts and fittings.
      3.     Single-wall round and flat-oval ducts and fittings.
      4.     Double-wall round and flat-oval ducts and fittings.
      5.     Sheet metal materials.
      6.     Duct liner.
      7.     Sealants and gaskets.
      8.     Hangers and supports.
      9.     Ductwork Handling and Plenum Protection.
      10.    Ductwork Cleaning

   B.     Related Sections:
      1.     Mechanical Specification Section "Testing, Adjusting, and Balancing for HVAC" for testing, adjusting, and balancing requirements for metal ducts.
      2.     Mechanical Specification Section "Air Duct Accessories" for dampers, sound-control devices, duct-mounting access doors and panels, turning vanes, and flexible ducts.
      3.     Mechanical Specification Section "Hangers & Supports".
      4.     Mechanical Specification Section "Mechanical Means and Methods".
      5.     Mechanical Specification Section "Special Conditions for Mechanical Work".

1.3     PERFORMANCE REQUIREMENTS

   A.     Delegated Duct Design:  Duct construction, including sheet metal thicknesses, seam and joint construction, reinforcements, and hangers and supports, shall comply with SMACNA's "HVAC Duct Construction Standards - Metal and Flexible" and performance requirements and design criteria indicated.
      1.     Static-Pressure Classes:  Variable Volume Systems
         a.     Supply Ducts:  (Upstream from Air Terminal Units):  3-inch wg.
         b.     Supply Ducts (Downstream from Air Terminal Units):  1-inch wg.
         c.     Return Ducts (Negative Pressure):  1-inch wg.
         d.     Outside Air Ducts (Negative Pressure):  1-inch wg.
      2.     Static-Pressure Classes:  Constant Volume Systems
         a.     Supply Ducts:  2-inch wg.
         b.     Return Ducts (Negative Pressure):  1-inch wg.
         c.     Outside Air Ducts (Negative Pressure):  1-inch wg.
      3.     Static-Pressure Classes:  Other Systems
         a.     Fume Hood Exhaust (negative Pressure):  3-inch wg.
         b.     General Exhaust (Negative Pressure):  1-inch wg.
         c.     Relief Air:  1-inch wg.
      4.     Leakage Class:
         a.     Round Supply-Air Duct:  3 cfm/100 sq. ft. at static pressure class.
         b.     Flat-Oval Supply-Air Duct:  3 cfm/100 sq. ft. at static pressure class.
         c.     Rectangular Supply-Air Duct:  6 cfm/100 sq. ft. at static pressure class.
         d.     Flexible Supply-Air Duct:  6 cfm/100 sq. ft. at static pressure class.

B.  Structural Performance:  Duct hangers and supports shall withstand the effects of gravity loads and stresses within limits and under conditions described in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

1.4  DEFINITIONS

A.  Exposed: Open to view; not concealed by a ceiling.
1.  Includes mechanical rooms.

B.  Concealed:  Covered or Concealed by a ceiling, solid inaccessible or lay-in acoustical tile.

1.5  SUBMITTALS

A.  Product Data:  For each type of the following products:
1.  Liners and adhesives.
2.  Sealants and gaskets.
3.  Insulation.
4.  Metal.
5.  Fasteners.
6.  Hangers.
7.  Double Wall Ductwork (Round or Flat Oval).
8.  Single Wall (Round or Flat Oval).

B.  Shop Drawings/Coordination Drawings:  CADD generated, ¼" scale.  Show fabrication and installation details for metal ducts.
1.  Fabrication, assembly, and installation, including plans, elevations, sections, components, and attachments to other work.
2.  Factory- and shop-fabricated ducts and fittings.
3.  Duct layout indicating sizes, configuration, liner material, and static-pressure classes.
4.  Elevation of top of ducts.
5.  Dimensions of main duct runs from building grid lines.
6.  Fittings.
7.  Reinforcement and spacing.
8.  Seam and joint construction.
9.  Penetrations through fire-rated and other partitions.
10. Equipment installation based on equipment being used on Project.
11. Locations for duct accessories, including dampers, turning vanes, and access doors and panels.
12. Hangers and supports, including methods for duct and building attachment, and vibration isolation (where applicable).
13. Ceiling suspension assembly members.
14. Other systems installed in same space as ducts, including fire sprinkler piping; electrical conduits; cable trays; hydronic, domestic, and sanitary piping; and structural members.
15. Ceiling-and-wall-mounting access doors and panels required to provide access to dampers and other operating devices.
16. Ceiling-mounting items, including lighting fixtures, diffusers, grilles, speakers, sprinklers, access panels, and special moldings.

C.  Welding certificates.

D.  Field quality-control reports.

E.  Field Pressure test Reports.

1.6  QUALITY ASSURANCE

A.  Welding Qualifications:  Qualify procedures and personnel according to the following:
1.  AWS D1.1/D1.1M, "Structural Welding Code - Steel," for hangers and supports.
2.  AWS D9.1M/D9.1, "Sheet Metal Welding Code," for duct joint and seam welding.

**PART 2 - PRODUCTS**

2.1     SINGLE-WALL RECTANGULAR DUCTS AND FITTINGS

A.     General Fabrication Requirements:  Comply with SMACNA's "HVAC Duct Construction Standards - Metal and Flexible" based on indicated static-pressure class unless otherwise indicated.

B.     Transverse Joints:  Select joint types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 1-4, "Transverse (Girth) Joints," for static-pressure class, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

C.     Longitudinal Seams:  Select seam types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 1-5, "Longitudinal Seams - Rectangular Ducts," for static-pressure class, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

D.     Elbows, Transitions, Offsets, Branch Connections, and Other Duct Construction:  Select types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Chapter 2, "Fittings and Other Construction," for static-pressure class, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

E.     Seal all duct transverse joints, longitudinal seams, flanges, and duct wall penetrations (SMACNA Seal Class-A regardless of static pressure construction class).

2.2     DOUBLE-WALL RECTANGULAR DUCTS AND FITTINGS

A.     Manufacturers:  Subject to compliance with requirements, available manufacturers offering products that may be incorporated into the Work include, but are not limited to, the following:
    1.     McGill Airflow LLC.

B.     Rectangular Ducts:  Fabricate ducts with indicated dimensions for the inner duct.

C.     Outer Duct:  Comply with SMACNA's "HVAC Duct Construction Standards - Metal and Flexible" based on indicated static-pressure class unless otherwise indicated.

D.     Transverse Joints:  Select joint types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 1-4, "Transverse (Girth) Joints," for static-pressure class, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

E.     Longitudinal Seams:  Select seam types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 1-5, "Longitudinal Seams - Rectangular Ducts," for static-pressure class, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

F.     Interstitial Insulation:  Fibrous-glass liner complying with ASTM C 1071, NFPA 90A, or NFPA 90B; and with NAIMA AH124, "Fibrous Glass Duct Liner Standard."
    1.     Maximum Thermal Conductivity:  0.27 Btu x in./h x sq. ft. x deg F at 75 deg F mean temperature.
    2.     Thickness:
        a.     1 inch, minimum for INDOOR, exposed ducts in conditioned spaces.
        b.     1-1/2 inches, minimum for INDOOR ducts in unconditioned spaces, including, but not limited to return-air plenums and mechanical rooms.
        c.     2-1/2 inches, minimum for OUTDOOR ducts.
    3.     Install spacers that position the inner duct at uniform distance from outer duct without compressing insulation.
    4.     Coat insulation with antimicrobial coating.

G.     Formed-on Transverse Joints (Flanges):  Select joint types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 1-4, "Traverse (Girth) Joints," for

static-pressure class, applicable sealing requirements, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

H.    Seal all duct transverse joints, longitudinal seams, flanges and duct wall penetrations (SMACNA Seal Class-A regardless of static pressure construction class).

2.3    SINGLE-WALL ROUND AND FLAT-OVAL DUCTS AND FITTINGS

A.    General Fabrication Requirements:  **Spiral seams** complying with SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Chapter 3, "Round, Oval, and Flexible Duct," based on indicated static-pressure class.  **Longitudinal-seams (snap-lock) are not acceptable for any application.**
1.    Manufacturers:  Subject to compliance with requirements, available manufacturers offering products that may be incorporated into the Work include, but are not limited to, the following:
a.    Lindab Inc.
b.    McGill AirFlow LLC.
c.    SEMCO Incorporated.
d.    Spiral Pipe of Texas

B.    Flat-Oval Ducts:  Indicated dimensions are the duct width (major dimension) and diameter (diameter of the round sides connecting the flat portions of the duct).

C.    Transverse Joints:  Select joint types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 3-2, "Transverse Joints - Round Duct," for static-pressure class, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."
1.    Transverse Joints in Ducts Larger Than 60 Inches in Diameter:  Flanged.

D.    Seams:  Fabricate according to the **spiral seam requirements** of SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 3-1, "Seams - Round Duct and Fittings," for static-pressure class, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."  **Longitudinal-seams (snap-lock) are not acceptable for any application, except where indicated below.**
1.    Fabricate round ducts larger than 90 inches in diameter with butt-welded longitudinal seams.
2.    Fabricate flat-oval ducts larger than 72 inches in width (major dimension) with butt-welded longitudinal seams.

E.    Tees and Laterals:  Select types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 3-4, "90 Degree Tees and Laterals," and Figure 3-5, "Conical Tees," for static-pressure class, applicable sealing requirements, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

F.    Seal all duct transverse joints, longitudinal seams, flanges and duct wall penetrations (SMACNA Seal Class-A regardless of static pressure construction class).

2.4    DOUBLE-WALL ROUND AND FLAT-OVAL DUCTS AND FITTINGS

A.    Manufacturers:  Subject to compliance with requirements, available manufacturers offering products that may be incorporated into the Work include, but are not limited to, the following:
1.    Lindab Inc.
2.    McGill AirFlow LLC.
3.    SEMCO Incorporated.
4.    Spiral Pipe of Texas

B.    Flat-Oval Ducts:  Indicated dimensions are the duct width (major dimension) and diameter (diameter of the round sides connecting the flat portions of the duct) of the inner duct.

C.    Outer Duct Fabrication Requirements:  **Spiral seams** complying with SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Chapter 3, "Round, Oval, and Flexible Duct," based on indicated static-pressure class.  **Longitudinal-seams (snap-lock) are not acceptable for any application.**

1. Transverse Joints: Select joint types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 3-2, "Transverse Joints - Round Duct," for static-pressure class, applicable sealing requirements, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."
    a. Transverse Joints in Ducts Larger Than 60 Inches in Diameter: Flanged.
2. Seams: Fabricate according to the **spiral seam requirements** of SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 3-1, "Seams - Round Duct and Fittings," for static-pressure class, applicable sealing requirements, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible." **Longitudinal-seams (snap-lock) are not acceptable for any application, except where indicated below.**
    a. Fabricate round ducts larger than 90 inches in diameter with butt-welded longitudinal seams.
    b. Fabricate flat-oval ducts larger than 72 inches in width (major dimension) with butt-welded longitudinal seams.
3. Tees and Laterals: Select types and fabricate according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 3-4, "90 Degree Tees and Laterals," and Figure 3-5, "Conical Tees," for static-pressure class, applicable sealing requirements, materials involved, duct-support intervals, and other provisions in SMACNA's "HVAC Duct Construction Standards - Metal and Flexible."

D. Inner Duct: Minimum 0.028-inch perforated galvanized sheet steel having 3/32-inch- diameter perforations, with overall open area of 23 percent.

E. Interstitial Insulation: Fibrous-glass liner complying with ASTM C 1071, NFPA 90A, or NFPA 90B; and with NAIMA AH124, "Fibrous Glass Duct Liner Standard."
1. Maximum Thermal Conductivity: 0.27 Btu x in./h x sq. ft. x deg F at 75 deg F mean temperature.
2. Thickness:
    a. 1 inch, minimum for INDOOR, exposed ducts in conditioned spaces.
    b. 1-1/2 inches, minimum for INDOOR ducts in unconditioned spaces, including, but not limited to return-air plenums and mechanical rooms.
    c. 2-1/2 inches, minimum for OUTDOOR ducts.
3. Install spacers that position the inner duct at uniform distance from outer duct without compressing insulation.
4. Coat insulation with antimicrobial coating.
5. Cover insulation with polyester film complying with UL 181, Class 1.

2.5    SHEET METAL MATERIALS

A. General Material Requirements: Comply with SMACNA's "HVAC Duct Construction Standards - Metal and Flexible" for acceptable materials, material thicknesses, and duct construction methods unless otherwise indicated. Sheet metal materials shall be free of pitting, seam marks, roller marks, rust, stains, discolorations, and other imperfections. All ductwork shall be a minimum of 24 gage, with a minimum thickness of 0.023 inches. Where in the SMACNA "HVAC Duct Construction Standards-Metal Flexible" it indicates that a lighter gage may be utilized, a minimum of 24 gage shall be used.

B. Galvanized Sheet Steel: Comply with ASTM A 653/A 653M.
1. Galvanized Coating Designation: G60 (Z180).
2. Finishes for Surfaces Exposed to View: Mill phosphatized.

C. PVC-Coated, Galvanized Sheet Steel: Comply with ASTM A 653/A 653M.
1. Galvanized Coating Designation: G60 (Z180).
2. Minimum Thickness for Factory-Applied PVC Coating: 4 mils thick on sheet metal surface of ducts and fittings exposed to corrosive conditions, and minimum 4 mils thick on opposite surface.
3. Coating Materials: Acceptable to authorities having jurisdiction for use on ducts listed and labeled by an NRTL for compliance with UL 181, Class 1.

D. Carbon-Steel Sheets: Comply with ASTM A 1008/A 1008M, with oiled, matte finish for exposed ducts.

E. Stainless-Steel Sheets: Comply with ASTM A 480/A 480M, Type 304 or 316, as indicated in the "Duct Schedule" Article; cold rolled, annealed, sheet. Exposed surface finish shall be No. 2B, No. 2D, No. 3, or No. 4 as indicated in the "Duct Schedule" Article.

F.   Aluminum Sheets:  Comply with ASTM B 209 (ASTM B 209M) Alloy 3003, H14 temper; with mill finish for concealed ducts, and standard, one-side bright finish for duct surfaces exposed to view.

G.   Reinforcement Shapes and Plates:  ASTM A 36/A 36M, steel plates, shapes, and bars; black and galvanized.
1.   Where black- and galvanized-steel shapes and plates are used to reinforce aluminum ducts, isolate the different metals with butyl rubber, neoprene, or EPDM gasket materials.

H.   Tie Rods:  Galvanized steel, 1/4-inch minimum diameter for lengths 36 inches or less; 3/8-inch minimum diameter for lengths longer than 36 inches.

I.   Plastic Connectors are not acceptable.

## 2.6   DUCT LINER

A.   Fibrous-Glass Duct Liner:  Comply with ASTM C 1071, NFPA 90A, or NFPA 90B; and with NAIMA AH124, "Fibrous Glass Duct Liner Standard."
1.   Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
a.   CertainTeed Corporation; Insulation Group.
b.   Johns Manville.
c.   Knauf Insulation.
d.   Owens Corning.
e.   Maximum Thermal Conductivity:
1)   Type I, Flexible:  0.27 Btu x in./h x sq. ft. x deg F at 75 deg F mean temperature.
2)   Type II, Rigid:  0.23 Btu x in./h x sq. ft. x deg F at 75 deg F mean temperature.
2.   Antimicrobial Erosion-Resistant Coating:  Apply to the surface of the liner that will form the interior surface of the duct to act as a moisture repellent and erosion-resistant coating. Antimicrobial compound shall be tested for efficacy by an NRTL and registered by the EPA for use in HVAC systems.
3.   Water-Based Liner Adhesive:  Comply with NFPA 90A or NFPA 90B and with ASTM C 916. Equal to DP 2502.

B.   Insulation Pins and Washers:
1.   Cupped-Head, Capacitor-Discharge-Weld Pins:  Copper- or zinc-coated steel pin, fully annealed for capacitor-discharge welding, 0.106-inch- diameter shank, length to suit depth of insulation indicated with integral 1-1/2-inch galvanized carbon-steel washer. Equal to CS-10.

C.   Shop Application of Duct Liner:  Comply with SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Figure 2-19, "Flexible Duct Liner Installation."
1.   Adhere a single layer of indicated thickness of duct liner with at least 90 percent adhesive coverage at liner contact surface area.  Attaining indicated thickness with multiple layers of duct liner is prohibited.
2.   Apply adhesive to transverse edges of liner facing upstream that do not receive metal nosing.
3.   Butt transverse joints without gaps, and coat joint with adhesive.
4.   Fold and compress liner in corners of rectangular ducts or cut and fit to ensure butted-edge overlapping.
5.   Do not apply liner in rectangular ducts with longitudinal joints, except at corners of ducts, unless duct size and dimensions of standard liner make longitudinal joints necessary.
6.   Secure liner with mechanical fasteners 4 inches from corners and at intervals not exceeding 12 inches transversely; at 3 inches from transverse joints and at intervals not exceeding 18 inches longitudinally.
7.   Secure transversely oriented liner edges facing the airstream with metal nosings that have either channel or "Z" profiles or are integrally formed from duct wall.  Fabricate edge facings at the following locations:
a.   Fan discharges.
b.   Intervals of lined duct preceding unlined duct.
c.   Upstream edges of transverse joints in ducts where air velocities are higher than 2500 fpm or where indicated.
8.   Terminate inner ducts with buildouts attached to fire-damper sleeves, dampers, turning vane assemblies, or other devices.  Fabricated buildouts (metal hat sections) or other buildout means are optional; when used, secure buildouts to duct walls with bolts, screws, rivets, or welds.

2.7    SEALANT AND GASKETS

A.    General Sealant and Gasket Requirements:  Surface-burning characteristics for sealants and gaskets shall be a maximum flame-spread index of 25 and a maximum smoke-developed index of 50 when tested according to UL 723; certified by an NRTL. All products are to contain low V.O.C. as defined/governed by LEED IEQ 4.1 and 4.2 (Regardless of project type).

B.    Water-Based Joint and Seam Sealant (for indoor installation):
    1.    Application Method:  Brush on.
    2.    Solids Content:  Minimum 68 percent.
    3.    Water resistant.
    4.    Mold and mildew resistant.
    5.    VOC:  less than 30 g/l (less water).
    6.    Maximum Static-Pressure Class:  15-inch wg, positive and negative.
    7.    Service:  Indoor.
    8.    Substrate:  Compatible with galvanized sheet steel (both PVC coated and bare), stainless steel, or aluminum sheets.
    9.    DP 1020 or approved equal.

C.    Water-Based Joint and Seam Sealant (for outdoor installation):
    1.    Application Method:  Tube application or dry tooling.
    2.    Service Temp Range (degrees F): -40 to 180.
    3.    Water resistant.
    4.    Mold and mildew resistant.
    5.    Service:  Indoor.
    6.    Substrate:  Compatible with galvanized sheet steel (both PVC coated and bare), stainless steel, or aluminum sheets.
    7.    Sonolastic NP-1 or approved equal.

D.    Flanged Joint Sealant:  Comply with ASTM E-84.
    1.    General: Butyl gasket tape.
    2.    Type: Butyl Rubber.
    3.    Service Temperature: Minus 40°F to 245°F
    4.    Pressure Class: All
    5.    DP 1040

2.8    HANGERS AND SUPPORTS

A.    Hanger Rods for Noncorrosive Environments:  Cadmium-plated steel rods and nuts.

B.    Hanger Rods for Corrosive Environments:  Electrogalvanized, all-thread rods or galvanized rods with threads painted with zinc-chromate primer after installation.

C.    Strap and Rod Sizes:  Comply with SMACNA's "HVAC Duct Construction Standards - Metal and Flexible," Table 4-1 (Table 4-1M), "Rectangular Duct Hangers Minimum Size," and Table 4-2, "Minimum Hanger Sizes for Round Duct."

D.    Steel Cables for Galvanized-Steel Ducts:  Galvanized steel complying with ASTM A 603.

E.    Steel Cables for Stainless-Steel Ducts:  Stainless steel complying with ASTM A 492.

F.    Steel Cable End Connections:  Cadmium-plated steel assemblies with brackets, swivel, and bolts designed for duct hanger service; with an automatic-locking and clamping device.

G.    Duct Attachments:  Sheet metal screws, blind rivets, or self-tapping metal screws; compatible with duct materials.

H.    Trapeze and Riser Supports:
    1.    Supports for Galvanized-Steel Ducts:  Galvanized-steel shapes and plates.
    2.    Supports for Stainless-Steel Ducts:  Stainless-steel shapes and plates.
    3.    Supports for Aluminum Ducts:  Aluminum or galvanized steel coated with zinc chromate.

**PART 3 - EXECUTION**

3.1     DUCT INSTALLATION

A.      Drawing plans, schematics, and diagrams indicate general location and arrangement of duct system. Indicated duct locations, configurations, and arrangements were used to size ducts and calculate friction loss for air-handling equipment sizing and for other design considerations.  Install duct systems as indicated unless deviations to layout are approved on Shop Drawings and Coordination Drawings.

B.      Install ducts according to SMACNA's "HVAC Duct Construction Standards - Metal and Flexible".

C.      Install round and flat-oval ducts in maximum practical lengths.

D.      Install ducts with fewest possible joints.

E.      Install factory- or shop-fabricated fittings for changes in direction, size, and shape and for branch connections.

F.      Unless otherwise indicated, install ducts vertically and horizontally, and parallel and perpendicular to building lines.

G.      Conceal ducts from view in finished spaces.  Do not encase horizontal runs in solid partitions unless specifically indicated.

H.      Coordinate layout with suspended ceiling, fire-and smoke-control dampers, lighting layouts, and similar finished work.

I.      Seal all joints and seams.  Apply sealant to male end connectors before insertion, and afterward to cover entire joint and sheet metal screws.  Sealant of seems/joints to include (but not limited to):  all joints (including gasketed joints) metal seams, taps, any connections, etc.

J.      Paint interiors of metal ducts that do not have duct liner, for 24 inches (600 mm) upstream of return air registers and grilles.  Apply one coat of flat, black, latex finish coat over a compatible galvanized-steel primer.  Paint materials and application requirements are specified in Division 9 painting Sections.

K.      Install ducts close to walls, overhead construction, columns, and other structural and permanent enclosure elements of building.

L.      Install ducts with a clearance of 1 inch, plus allowance for insulation thickness.  Compression of insulation by other trades (pipe, conduit, etc) is not acceptable.

M.      Route ducts to avoid passing through transformer vaults and electrical equipment rooms and enclosures.

N.      Where ducts pass through non-fire-rated interior partitions and exterior walls and are exposed to view, cover the opening between the partition and duct or duct insulation with sheet metal flanges of same metal thickness as the duct.  Overlap openings on four sides by at least 1-1/2 inches.

O.      Where ducts pass through fire-rated interior partitions and exterior walls, install fire dampers.  Comply with requirements in Mechanical Specification Section "Air Duct Accessories" for fire and smoke dampers.

P.      Protect duct interiors from moisture, construction debris and dust, and other foreign materials.  Comply with SMACNA's "Duct Cleanliness for New Construction Guidelines."

3.2     DUCTWORK HANDLING AND PLENUM PROTECTION

A.      All ductwork shall be delivered to site and stored with all openings protected from the elements. Protection to include 2.5 mil thick polyethylene plastic film secured with tape or integral elastic band.

B.      Each segment/section of ductwork installed is to be appropriately protected from elements.

C. Any ductwork damaged during delivery, installation, or at any time during construction will be removed from job and replaced.

D. Ductwork found onsite (installed or stored) without approved protection will be removed from job and replaced.

E. Ductwork installed exposed to the elements to be sealed (joints and seems) immediately after installation. Any ductwork not sealed is susceptible to rejection and removed from job.

F. Under no circumstances shall insulation be applied to ductwork prior to the building being fully dried in (i.e.: building sealed, windows and roof installed, etc). Any ductwork being insulated prior to building dry-in is susceptible to rejections and removed from job.

G. If ductwork is found onsite not protected or the newly installed ductwork is deemed as dirty, engineer can elect for the contractor to clean all duct at no cost to the owner per NADCA 1992.


3.3     SEAM AND JOINT SEALINGS

A. Seal all duct transverse joints, longitudinal seams, flanges and duct wall penetrations (SMACNA Seal Class-A regardless of static pressure construction class).


3.4     HANGERS AND SUPPORT INSTALLATION

A. Comply with SMACNA's "HVAC Duct Construction Standards – Metal and Flexible," Chapter 4 "Hangers and Supports," unless otherwise indicated.
    1.  Support ducts greater than 36 inches with width with trapeze threaded rod and angle or channel supports. Straps not acceptable.
    2.  Hangers Exposed to View: Threaded rod and channel supports (do not use steel angles).

B. Building Attachments: Concrete inserts or structural-steel fasteners appropriate for construction materials to which hangers are being attached.
    1.  Where practical, install concrete inserts before placing concrete.

C. Hanger Spacing: Comply with SMACNA's "HVAC Duct Construction Standards-Metal and Flexible," Table4-1 (Table 4-1M), "Rectangular Duct Hangers Minimum Size," and Table 4-2, "Minimum Hanger Sizes for Round Duct," for maximum hanger spacing; install hangers and supports within 24 inches of each elbow and within 48 inches of each branch intersection. Elbows 36" and larger to be individually supported.

D. Support vertical ducts with steel angles or channel secured to the sides of the duct with welds, bolts, sheet metal screws, or blind rivets; support at each floor and at a maximum intervals of 16' feet.

E. Install upper attachments to structures. Select and size upper attachments with pull-out, tension, and shear capacities appropriate for supported loads and building materials where used.
    1.  Do not attach hangers to metal deck roof assemblies with built-up insulation only (no concrete). Attach only to structural steel members.

F. Support vertical ducts at maximum intervals of 16 feet and at each floor.


3.5     CONNECTIONS

A. Make all connections to all fan-bearing equipment with flexible connectors complying with Specification Section "Air Duct Accessories".

B. Comply with SMACNA's "HVAC Duct Construction Standards – Metal and Flexible" for branch, outlet and inlet, and terminal unit connections. Reference detail for specific additional items required.


3.6     PAINTING

A. Paint interior of metal ducts that are visible through registers and grilles and that do not have duct liner. Apply one coat of flat, black, latex paint over a compatible galvanized-steel primer. Paint materials and application requirements are specified in Division 09 painting Sections.

3.7 FIELD QUALITY CONTROL

A. Perform tests and inspections.

B. Leakage Tests:
1. Comply with SMACNA's "HVAC Air Duct Leakage Test Manual." Leakage Class defined in previous sections of specification. Amount of ductwork to be tested to be determined by Engineer or Field Inspector).
2. Test the following systems:
    a. Supply air: Testing amount to be determined onsite by engineer or field inspector (VAV systems).
    b. Supply air: Testing amount to be determined onsite by engineer or field inspector. (constant volume systems).
3. Disassemble, reassemble, and seal segments of systems to accommodate leakage testing and for compliance with test requirements.
4. Test for leaks before insulation application.

C. Duct system will be considered defective if it does not pass tests and inspections.

D. Contractor to disassemble, reassemble and seal segments of systems to accommodate leakage testing and for compliance with test requirements / leakage rates.

E. All testing equipment to be calibrated (by manufacturer) within 3 years of onsite duct pressure testing. Documentation to be provided for verification of certification to Engineer through submittal process.

F. Test Coupons: Cut out three (3) 4x4" test coupons in random locations selected by the design engineer for verification of gage thickness. Coupons shall be taken at the time of pressure testing.

G. Prepare test and inspection reports.

3.8 DUCT SCHEDULE

A. Fabricate ducts with galvanized sheet steel except as follows:
1. Acid-Resistant (Fume-Handling) Ducts:
    a. Type 304, stainless-steel sheet – welded.
    b. Exposed to View: No. 4 finish.
    c. Concealed: No. 2D finish.
2. Moist Environment Ducts: Aluminum.
3. Spaces with pools, spas, hot tubs or water features: Aluminum.
4. Kitchen Exhaust – Reference applicable specification.

B. Intermediate Reinforcement:
1. Galvanized-Steel Ducts: Galvanized steel.
2. Stainless-Steel Ducts: Galvanized steel.
3. Aluminum Ducts: Aluminum or galvanized sheet steel coated with zinc chromate.

C. Liner:
1. Transfer Ducts: Fibrous glass, Type I 1 inch thick.

D. Double-Wall Duct Schedule:
1. All exposed Round/Flat Oval Ductwork.

E. Elbow Configuration:
1. Rectangular Duct: Comply with SMACNA's "HVAC Duct Construction Standards – Metal and Flexible," Figure 2-2, "Rectangular Elbows".
    a. Velocity 1000 fpm or Lower:
        1) Radius Type RE 1 with minimum 0.5 radius-to-diameter ratio.

        2)      Mitered Type RE 4 without vanes.
     b.    Velocity 1000 to 1500 fpm:
        1)      Radius Type RE 1 with minimum 1.0 radius-to-diameter ratio.
        2)      Radius Type RE 3 with minimum 0.5 radius-to-diameter ratio and two vanes.
        3)      Mitered Type RE 2 with vanes complying with SMACNA's "HVAC Duct Construction Standards – Metal and Flexible," Figure 2-3, "Vanes and Vane Runners," and Figure 2-4, "Vane Support Elbows."
     c.    Velocity 1500 fpm (7.6 m/s) or Higher:
        1)      Radius Type RE 1 with minimum 1.5 radius-to-diameter ratio.
        2)      Radius Type RE 3 with minimum 1.0 radius-to-diameter ratio and two vanes.
        3)      Mitered Type RE 2 with vanes complying with SMACNA's "HVAC Duct Construction Standards – Metal and Flexible," Figure 2-3, "Vanes and Vane Runners," and Figure 2-4, "Vane Support in Elbows.
  2.    Round Duct:  Comply with SMACNA's "HVAC Duct Construction Standards – Metal and Flexible," Figure 3-3, "Round Duct Elbows".
     a.    Minimum Radius-to-Diameter Ratio and Elbow Segments:  Comply with SMACNA's "HVAC Duct Construction Standards – Metal and Flexible," Table 3-1, "Mitered Elbows." Elbows with less than 90-degree change of direction have proportionately fewer segments.
        1)      Velocity 1000 fpm or Lower:  0.5 radius-to-diameter ratio and three segments for 90-degree elbow.
        2)      Velocity 1000 to 1500 fpm:  1.0 radius-to-diameter ratio and four segments for 90-degree elbow.
        3)      Velocity 1500 fpm or higher:  1.5 radius-to-diameter and five segments for 90-degree elbow.
     b.    Round Elbows, 12 inches and smaller diameter:  Stamped or pleated.
     c.    Round Elbows, 14 inches and larger in diameter:  Welded.

 F.    Branch Configuration
  1.    Rectangular Duct:  Comply with SMACNA's "HVAC Duct Construction Standards-Metal and Flexible," Figure 2-6, "Branch Connections."
     a.    Rectangular Main to Rectangular Branch:  45-degree entry.
     b.    Rectangular Main to Round Branch:  Side takeoff fitting.
  2.    Round and Flat Oval:  Comply with SMACNA's "HVAC Duct Construction Standards – Metal and Flexible," Figure 3-4, "90 Degree Tees and Laterals," and Figure 3-5, "Conical Tees."  Saddle taps are permitted in existing duct.
     a.    Velocity 1000 fpm or Lower:  90-degree tap.
     b.    Velocity 1000 to 1500 fpm:  Conical tap.
     c.    Velocity 1500 fpm or higher:  45-degree lateral.

## 3.9  CLEANING NEW SYSTEMS

A. If ductwork is found onsite not protected or the newly installed ductwork is deemed as dirty, engineer can elect for the contractor to clean all duct at no cost to the owner per NADCA 1992.

B.    System Cleaning: (If required)
  1.    Mark position of dampers and air-directional mechanical devices before cleaning, and perform cleaning before air balancing.
  2.    Provide service openings (approved duct access doors), as required, for physical and mechanical entry during cleaning and for inspection.  All duct access doors to be installed prior to any duct pressure tests.
     a.    Removed and reinstall ceiling sections to gain access during the cleaning process.
  3.    Vent vacuuming system to the outside.  Include filtration to conation debris removed from HVAC systems, and locate exhaust down wind and minimum of 20 feet away from air intakes and other points of entry into building.
  4.    Clean the following metal duct systems by removing surface contaminants and deposits:
     a.    Air outlets and inlets (registers, grilles and diffusers).
     b.    Supply, return and exhaust fans including fan housings, plenums (except ceiling supply and return plenums), scrolls, blades or vanes, shafts, baffles, dampers and drive assemblies.

  c. Air-handling unit internal surfaces and components including mixing box, coil section, condensate drain pans, humidifiers and dehumidifiers, filters and filter sections, and condensate collectors and drains.

  d. Coils and related components.

  e. Return-air ducts, dampers and actuators except in ceiling plenums and mechanical equipment rooms.

  f. Supply-air ducts, dampers, actuators and turning vanes.

5. Mechanical Cleaning Methodology:

  a. Clean metal duct systems using mechanical cleaning methods that extract contaminants from within duct systems and remove contaminants from building.

  b. Use vacuum-collection devices that are operated continuously during cleaning. Connect vacuum device to downstream end of duct sections so areas being cleaned are under negative pressure.

  c. Use mechanical agitation to dislodge debris adhered to interior duct surfaces without damaging integrity of metal ducts, duct liner or duct accessories.

  d. Clean fibrous-glass duct liner with HEPA vacuuming equipment; do no permit duct liner to get wet.

  e. Clean coils and coil drain pans according to NADCA 1992. Keep drain pan operational. Rinse coils with clean water to remove latent residues and cleaning materials; comb and straighten fins.

6. Cleanliness Verification:

  a. Visually inspect metal ducts for contaminants.

  b. Where contaminants are discovered, re-clean and re-inspect ducts.

**END OF SECTION**

**SECTION 233300 - DUCT ACCESSORIES**


**PART 1 – GENERAL**


1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.


1.2     SUMMARY

A.     This Section includes the following:
1.     Backdraft dampers.
2.     Manual-volume dampers.
3.     Fire dampers
4.     Fire and smoke dampers.
5.     Turning vanes.
6.     Duct-mounted access doors and panels.
7.     Flexible ducts.
8.     Flexible connectors.
9.     Side takeoff fittings.
10.    Duct accessory hardware.
11.    Motorized control dampers.

B.     Related Sections include the following:
1.     Specification Section "Access Doors" for wall- and ceiling-mounted access doors and panels.
2.     Specification Section "Louvers and Vents" for intake and relief louvers and vents connected to ducts and installed in exterior walls.
3.     Specification Section "Air Terminals" for constant-volume and variable-air-volume control boxes and reheat boxes.
4.     Specification Section "Air Inlets and Outlets."
5.     Specification Section "HVAC Controls" for electric damper actuators.


1.3     SUBMITTALS

A.     Product Data:  For the following:
1.     Backdraft dampers.
2.     Manual-volume dampers.
3.     Fire dampers.
4.     Fire and smoke dampers.
5.     Duct-mounted access doors and panels.
6.     Flexible ducts.
7.     Motorized control dampers.
8.     Side takeoff fittings


1.4     QUALITY ASSURANCE

A.     NFPA Compliance:  Comply with the following NFPA standards:
1.     NFPA 90A, "Installation of Air Conditioning and Ventilating Systems."
2.     NFPA 90B, "Installation of Warm Air Heating and Air Conditioning Systems."


1.5     EXTRA MATERIALS

A.     Furnish extra materials described below that match products installed, are packaged with protective covering for storage, and are identified with labels describing contents.
1.     Fusible Links:  Furnish quantity equal to 10 percent of amount installed.

**PART 2 - PRODUCTS**

2.1     SHEET METAL MATERIALS

A.     Galvanized, Sheet Steel:  Lock-forming quality; ASTM A 653/A 653M, G90 (Z275) coating designation; mill-phosphatized finish for surfaces of ducts exposed to view.

B.     Reinforcement Shapes and Plates:  Galvanized steel reinforcement where installed on galvanized, sheet metal ducts; compatible materials for aluminum and stainless-steel ducts.

C.     Tie Rods:  Galvanized steel, 1/4-inch minimum diameter for 36-inch length or less; 3/8-inch minimum diameter for lengths longer than 36 inches.

2.2     BACKDRAFT DAMPERS

A.     Description:  Suitable for horizontal or vertical installations.

B.     Frame:  0.063-inch thick extruded aluminum, with mounting flange.

C.     Blades:  0.050-inch thick aluminum sheet.

D.     Blade Seals:  Felt.

E.     Blade Axles:  Nonferrous.

F.     Tie Bars and Brackets:  Aluminum.

G.     Return Spring:  Adjustable tension.

2.3     MANUAL-VOLUME DAMPERS

A.     General:  Factory fabricated with required hardware and accessories.  Stiffen damper blades for stability.  Include locking device to hold single-blade dampers in a fixed position without vibration.  Close duct penetrations for damper components to seal duct consistent with pressure class.
    1.     Pressure Classifications of 3-Inch wg or Higher:  End bearings or other seals for ducts with axles full length of damper blades and bearings at both ends of operating shaft.

B.     Standard Volume Dampers:  Multiple- or single-blade, opposed-blade design, standard leakage rating, with linkage outside airstream, and suitable for horizontal or vertical applications.
    1.     Roll-Formed Steel Blades:  0.064-inch thick, galvanized, sheet steel.
    2.     Blade Axles:  Galvanized steel.
    3.     Tie Bars and Brackets:  Galvanized steel.
    4.     1-1/2-inch insulation buildout with locking quadrant.

C.     Low-Leakage Volume Dampers:  Multiple- or single-blade, opposed-blade design, low-leakage rating, with linkage outside airstream, and suitable for horizontal or vertical applications.
    1.     Steel Frames:  Hat-shaped, galvanized, sheet steel channels, minimum of 0.064 inch thick, with mitered and welded corners; frames with flanges where indicated for attaching to walls; and flangeless frames where indicated for installing in ducts.
    2.     Roll-Formed Steel Blades:  0.064-inch thick, galvanized, sheet steel.
    3.     Blade Seals:  Felt.
    4.     Blade Axles:  Galvanized steel.
    5.     Tie Bars and Brackets:  Galvanized steel.
    6.     1-1/2-inch insulation buildout with locking quadrant.

D.     Jackshaft:  1-inch diameter, galvanized steel pipe rotating within a pipe-bearing assembly mounted on supports at each mullion and at each end of multiple-damper assemblies.
    1.     Length and Number of Mountings:  Appropriate to connect linkage of each damper of a multiple-damper assembly.

E.  Damper Hardware:  Zinc-plated, die-cast core with dial and handle made of 3/32-inch thick zinc-plated steel, and a 3/4-inch hexagon locking nut.  Include center hole to suit damper operating-rod size.  Include elevated platform for insulated duct mounting.

F.  Remotely Operated Damper Accessories:
1.  Galvanized steel rotary cable with termination for adjustment either at the diffuser face or at a wall- or ceiling-recessed box/cup as shown on drawings.  Secure other cable end to damper worm gear assembly.  Cable must be one-piece with no linkages along the length.  Provide mounting clips to support cables at all changes in direction and at 3-foot intervals.

2.4     FIRE DAMPERS

A.  General:  Labeled to UL 555 (sixth edition). Ruskin Model D1BD2-B (or design engineer approved equivalent).  Dampers shall be marked with a UL-Classified fire protection rating and marked "For Use in Dynamic Systems".

B.  Fire Rating:  One and one-half and/or three hours as indicated.

C.  Frame:  SMACNA Type B with blades out of airstream; fabricated with roll-formed, 0.034-inch- thick galvanized steel; with mitered and interlocking corners.

D.  Mounting Sleeve:  Provide factory-mounted sleeve and retaining angles.
1.  Minimum Thickness (Sleeve shall not extend more than 6" past wall or floor without factory installed access door):  16 gauge and length to suit application.

E.  Mounting Orientation:  Vertical or horizontal as indicated.

F.  Blades:  Roll-formed, interlocking, 0.034-inch thick, galvanized, sheet steel.  In place of interlocking blades, use full-length, 0.034-inch thick, galvanized steel blade connectors.

G.  Horizontal Dampers:  Include a blade lock and stainless-steel negator closure spring.

H.  Fusible Link:  Replaceable, 165 deg F rated as indicated.

2.5     COMBINATION FIRE / SMOKE DAMPERS (SFD)

A.  General:  Labeled to UL 555/UL 555S (sixth and fourth edition respectively) Combination fire and smoke dampers shall be labeled for one-and-one-half-hour rating to UL 555S.  Provide Class II leakage rating.  Dampers shall be marked with a UL-classified fire rating.  Ruskin FSD-60 or approved equivalent.  The SFD shall be listed to operate from the fire alarm control panel (FACP).  Each SFD shall have an associated smoke detector that shall be addressable from the FACP.  The smoke detector shall be provided by the Fire Alarm Contractor and installed by the Electrical Contractor. Coordinate damper installation with these trades.

B.  Electric Fusible Link (EFL):  165 or 212 deg F rated as applicable.

C.  Frame and Blades: 16 gauge, galvanized, sheet steel.  Damper blades shall be airfoil-shaped, single-piece construction, with blade seals mechanically locked into blade edge (adhesive clip-on seals are not acceptable).  Ruskin FSD-60 or equivalent.  Damper blades shall be minimum 14 gauge.  SFD's installed off vertical chases shall have vertical airfoil blades (Ruskin FSD 60-V or equivalent).

D.  Mounting Sleeve:  Factory-installed, 16 gauge, galvanized, sheet steel; length to suit wall or floor application.  Sleeve shall not extend more than 6" past wall or floor without factory installed access door.  SFD shall be capable of mounting on either side of wall and working with airflow in either direction.  Provide manufacturer-recommended duct-to-sleeve joints.

E.  Electric controlled closure is not less than 7 seconds or more than 10 seconds to prevent HVAC and duct damage.  Damper shall have local reset button and shall have automatic reset after test, smoke detection or power failure conditions.  Damper shall close upon loss of power or AHU shut down.  Actuator shall be 120V.

F.  Provide with stainless steel jam seals and bearings. (Bronze bearings are not acceptable)

G. Furnish and install dampers according to manufacturer's instructions and in compliance with the latest edition of the SMACNA Duct Manual and NFPA Standards (90, 92A, and 92B).


2.6 TURNING VANES

A. Fabricate to comply with SMACNA's "HVAC Duct Construction Standards--Metal and Flexible."

B. Manufactured Turning Vanes: Fabricate of 1-1/2-inch wide, curved blades set 3/4 inch o.c.; support with bars perpendicular to blades set 2 inches o.c.; and set into side strips suitable for mounting in ducts.


2.7 DUCT-MOUNTED ACCESS DOORS AND PANELS

A. Manufactures:
1. Greenheck
2. Flexmaster
3. Elgens
4. No exceptions

B. Ratings
1. Differential Pressure
a. Access doors shall have a maximum differential pressure rating of 4.5 in.wg.

C. Construction
1. Frame
a. Access door shall be constructed of 27 ga. Galvanized steel on sizes up to 12 in. x 12 in. On sizes 14 in. x 14 in. and larger shall be constructed of 22 ga. Galvanized steel.
2. Door Panel: Door panel is constructed of 24 ga. Galvanized steel on both sides of the insulation.
3. Insulation: Insulation is 1 in. fiberglass.
4. Gasket: Gasket is ½ in. wide dual gasket (compressible synthetic type). Gasket is to be used door to frame and frame to duct.
5. Hinge: Continuous piano style.
6. Latches: Latches is plated steel with galvanized steel strikes.
7. Finish: Mill finish is standard.


2.8 FLEXIBLE CONNECTORS

A. General: Flame-retarded or noncombustible fabrics, coatings, and adhesives complying with UL 181, Class 1.

B. Standard Metal-Edged Connectors: Factory fabricated with a strip of fabric 3-1/2 inches wide attached to two strips of 2-3/4-inch wide, 0.028-inch thick, galvanized, sheet steel or 0.032-inch aluminum sheets. Select metal compatible with connected ducts.

C. Conventional, Indoor System Flexible Connector Fabric: Glass fabric double coated with polychloroprene.
1. Minimum Weight: 26 oz./sq. yd.
2. Tensile Strength: 480 lbf/inch in the warp, and 360 lbf/inch in the filling.

D. Conventional, Outdoor System Flexible Connector Fabric: Glass fabric double coated with a synthetic-rubber, weatherproof coating resistant to the sun's ultraviolet rays and ozone environment.
1. Minimum Weight: 26 oz./sq. yd.
2. Tensile Strength: 530 lbf/inch in the warp, and 440 lbf/inch in the filling.


2.9 INSULATED FLEXIBLE DUCT, LOW PRESSURE

A. Manufacturers:
1. Flexmaster type 1M UL181 Class I Air Duct.
2. Thermaflex MK-E
3. No exceptions

B. The duct shall be constructed of a CPE fabric supported by helical wound galvanized steel.

C. The internal working pressure rating shall be at least 6" w.g. positive and 4" w.g. negative, with a bursting pressure of at least 2-1/2 times the working pressure.

D. The duct shall be rated for a velocity of at least 4000 feet per minute.

E. The duct must be suitable for continuous operation at a temperature range of -20 deg F to +250 deg F.

F. Acoustical performance, when tested by an independent laboratory in accordance with the Air Diffusion Council's *Flexible Air Duct Test Code FD 72-R1*, Section 3.0, Sound Properties, shall be as follows:

1. The insertion loss (dB) of a 6-foot length of straight duct when tested in accordance with ASTM E 477, at a velocity of 500 feet per minute, shall be at least:

| Octave Band | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| Hz. | 125 | 250 | 500 | 1000 | 2000 | 4000 |
| 6" diameter | 11 | 33 | 36 | 37 | 19 | 14 |
| 8" diameter | 13 | 35 | 34 | 37 | 29 | 17 |
| 12" diameter | 10 | 26 | 26 | 32 | 24 | 11 |

G. Factory insulate the flexible duct with fiberglass insulation. The R-value shall be at least 6 at a mean temperature of 75 deg F.

H. Cover the insulation with a fire retardant metalized vapor barrier jacket reinforced with crosshatched scrim (FSK) having a permeance of not greater than 0.05 perms when tested in accordance with ASTM E 96, Procedure A.

2.10 SIDE TAKEOFF FITTINGS

A. Provide Flexmaster Model STOD or SBMD takeoff for sheet metal for all taps connecting to flex duct, except for air devices with OBD's and flow bar. For devices with OBD, use Flexmaster Model STO- or SBM no exceptions.

B. The side takeoff fittings shall maintain a ratio of 1:1 of inlet to outlet on all units over 7-inch diameter to allow proper sizing of the duct system.

C. Model STOD side takeoff shall have a 1-inch offset rear edge for enhanced pressure drop characteristics and 1-1/2-inch insulation buildout with locking hand quadrant.

D. Fittings shall have a 1-inch-wide prepunched mounting flange with corner clips and adhesive gasket for minimal leakage and ease of installation.

E. The fittings shall be constructed of a two-piece 26-gauge G-90 galvanized steel body and collar.

F. The overall length of the fitting shall be 13 inches with or without damper to reduce turbulence in the airstream.

G. The round outlet shall be provided with a rolled stiffener bead for strength and ease of installation and sealing of spiral and flexible ductwork joints.

2.11 ACCESSORY HARDWARE

A. Instrument Test Holes: Cast iron or cast aluminum to suit duct material, including screw cap and gasket. Size to allow insertion of pitot tube and other testing instruments, and length to suit duct insulation thickness.

B. Splitter Damper Accessories:  Zinc-plated damper blade bracket; 1/4-inch, zinc-plated operating rod; and a duct-mounted, ball-joint bracket with flat rubber gasket and square-head set screw.

C. Flexible Duct Clamps:  Stainless-steel band with cadmium-plated hex screw to tighten band with a worm-gear action, in sizes 3 to 18 inches to suit duct size.

D. Adhesives:  High strength, quick setting, neoprene based, waterproof, and resistant to gasoline and grease.

2.12    MOTORIZED CONTROL DAMPERS

A. Manufacturers:
   1. Greenheck.
   2. Nailor Industries Inc.
   3. Ruskin Company.
   4. Pottorff.

B. General Description:  AMCA-rated, opposed-blade design; minimum of 0.1084-inch thick, galvanized-steel frames with holes for duct mounting; minimum of 0.0635-inch thick, galvanized-steel damper blades with maximum blade width of 8 inches.
   1. Secure blades to ½-inch diameter, zinc-plated axles using zinc-plated hardware, with nylon blade bearings, blade-linkage hardware of zinc-plated steel and brass, ends sealed against spring-stainless-steel blade bearings, and thrust bearings at each end of every blade.
   2. Operating Temperature Range:  From minus 40 to plus 200 deg F.
   3. Provide parallel- or opposed-blade design with inflatable seal blade edging, or replaceable rubber seals, rated for leakage at less than 10 cfm per sq. ft. of damper area, at differential pressure of 4-inch wg when damper is being held by torque of 50 in.×lbf (5.6 N×m); when tested according to AMCA 500D.

**PART 3 - EXECUTION**

3.1     INSTALLATION

A. Install duct accessories according to applicable details shown in SMACNA's "HVAC Duct Construction Standards--Metal and Flexible" for metal ducts and NAIMA's "Fibrous Glass Duct Construction Standards" for fibrous-glass ducts.

B. When installing volume dampers in lined duct, avoid damage to and erosion of duct liner.

C. Install manual volume dampers at all main branch lines for ease of balancing.

D. Provide test holes at fan inlet and outlet and elsewhere as indicated.

E. Install fire and smoke dampers according to manufacturer's UL-approved written instructions.
   1. Install fusible links in fire dampers.

F. Install mounting angles, minimum of 1 ½ "x 1 ½ "x 20 gauge steel on both sides of SFD or FD.

G. Install duct access panels for access to both sides of duct coils. Install duct access panels downstream from volume dampers, fire dampers, smoke-fire dampers, turning vanes, and equipment.

H. Install duct access panels to allow access to interior of ducts for cleaning, inspecting, adjusting and maintaining accessories and terminal units.
   1. Install access panels on side of duct where adequate clearance is available.
   2. Label access doors according to Specification Section "Mechanical Identification."

3.2     ADJUSTING

A. Adjust duct accessories for proper settings.

B.  Adjust fire and smoke dampers for proper action.

C.  Final positioning of manual-volume dampers is specified in Specification Section "Testing, Adjusting, and Balancing."

**END OF SECTION**

## SECTION 233713 - DIFFUSERS, REGISTERS, AND GRILLES

### PART 1 - GENERAL

1.1 RELATED DOCUMENTS

A. Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2 SUMMARY

A. This Section includes ceiling- and wall-mounted diffusers, registers, and grilles.

B. Related Sections include the following:
1. Specification Section "Duct Accessories" for fire and smoke dampers and volume-control dampers not integral to diffusers, registers, and grilles.
2. Specification Section "Testing, Adjusting, and Balancing" for balancing diffusers, registers and grilles.

1.3 DEFINITIONS

A. Diffuser: Circular, square, or rectangular air distribution outlet, generally located in the ceiling and comprised of deflecting members discharging supply air in various directions and planes and arranged to promote mixing of primary air with secondary room air.

B. Grille: A louvered or perforated covering for an opening in an air passage, which can be located in a sidewall, ceiling, or floor.

C. Register: A combination grille and damper assembly over an air opening.

1.4 SUBMITTALS

A. Product Data: For each model indicated, include the following:
1. Data Sheet: For each type of air outlet and inlet, and accessory furnished; indicate construction, finish, and mounting details.
2. Performance Data: Include throw and drop, static-pressure drop, and noise ratings for each type of air outlet and inlet.
3. Schedule of diffusers, registers, and grilles indicating drawing designation, model number, size, and accessories furnished.
4. Assembly Drawing: For each type of air outlet and inlet; indicate materials and methods of assembly of components.

1.5 QUALITY ASSURANCE

A. NFPA Compliance: Install diffusers, registers, and grilles according to NFPA 90A, "Standard for the Installation of Air-Conditioning and Ventilating Systems."

### PART 2 - PRODUCTS

2.1 MANUFACTURED UNITS

A. Manufacturers: Subject to compliance with requirements, provide products by one of the following:
1. Krueger
2. Metalaire

3.      Price
4.      Titus

B.     Performance characteristics, specific models, material, features, dimensions and finishes of diffusers, registers, and grilles are scheduled on Drawings.

## 2.2    SOURCE QUALITY CONTROL

A.     Testing:  Test performance according to ASHRAE 70, "Method of Testing for Rating the Performance of Air Outlets and Inlets."

## PART 3 - EXECUTION

## 3.1    EXAMINATION

A.     Examine areas where diffusers, registers, and grilles are to be installed for compliance with requirements for installation tolerances and other conditions affecting performance of equipment.  Do not proceed with installation until unsatisfactory conditions have been corrected.

## 3.2    INSTALLATION

A.     Install diffusers, registers, and grilles level and plumb, according to manufacturer's written instructions, Coordination Drawings, original design, and referenced standards.

B.     Ceiling-Mounted Outlets and Inlets:  Drawings indicate general arrangement of ducts, fittings, and accessories.  Air outlet and inlet locations have been indicated to achieve design requirements for air volume, noise criteria, airflow pattern, throw, and pressure drop.  Coordinate with architectural Reflected Ceiling Plans.  Locate devices where indicated, as much as practical.  Where architectural features or other items conflict with installation, notify Architect for a determination of final location.

C.     Install diffusers, registers, and grilles with airtight connection to ducts and to allow service and maintenance of dampers, air extractors, and fire dampers.

## 3.3    ADJUSTING

A.     After installation, adjust diffusers, registers, and grilles to air patterns indicated, or as directed, before starting air balancing.

## 3.4    CLEANING

A.     After installation of diffusers, registers, and grilles, inspect exposed finish.  Clean exposed surfaces to remove burrs, dirt, and smudges.  Replace diffusers, registers, and grilles that have damaged finishes.

**END OF SECTION**

**SECTION 260005 - ELECTRICAL DEMOLITION**


**PART 1 - GENERAL**


1.1     RELATED DOCUMENTS


A.      Drawings and general provisions of the Contract, including General and Supplementary Conditions and other Division 1 Specification Sections, apply to this Section.


1.2     SUMMARY


A.      This Section includes the following:
1.      Demolition and removal of selected portions of building or structure.
2.      Salvage of existing items to be reused.


B.      Related Sections include the following:
1.      Division 1 Section "Summary" for use of premises, phasing, and Owner-occupancy requirements.
2.      Division 1 Section "Temporary Facilities and Controls" for temporary construction and environmental-protection measures for selective demolition operations.
3.      Division 1 Section "Construction Waste Management" for disposal of demolished materials.
4.      Division 1 Section "Cutting and Patching" for cutting and patching procedures.


1.3     DEFINITIONS


A.      Remove or Demolish:  Detach items from existing construction and legally dispose    of  them  off-site, unless indicated to be removed and salvaged or removed and reinstalled.


B.      Remove and Reinstall:  Detach items from existing construction, prepare them for reuse, and reinstall them where indicated.


C.      Existing to Remain:  Existing items of construction that are not to be removed and that are not otherwise indicated to be removed, removed and salvaged, or removed and reinstalled.


1.4     MATERIALS OWNERSHIP


1.5     SUBMITTALS


A.      Schedule of Selective Demolition Activities:  Indicate the following:
1.      Detailed sequence of selective demolition and removal work, with starting and ending dates for each activity.
2.      Interruption of utility services.  Indicate how long utility services will be interrupted.
3.      Coordination for shut-off, capping, and continuation of utility services.
4.      Coordination of Owner's continuing occupancy of portions of existing building and of Owner's partial occupancy of completed Work.
5.      Means of protection for items to remain and items in path of waste removal from building.


B.      Inventory:  After selective demolition is complete, submit a list of items that have been salvaged.


1.6     QUALITY ASSURANCE


A.      Regulatory Requirements:  Comply with governing EPA notification regulations before beginning selective demolition.  Comply with hauling and disposal regulations of authorities having jurisdiction.
B.      Standards:  Comply with ANSI A10.6 and NFPA 241.

1.7     PROJECT CONDITIONS

A.      Owner will occupy the building during the electrical replacements.  Shutdowns should be limited as much as possible and closely coordinated with the owner.

B.      Conditions existing at time of inspection for bidding purpose will be maintained by Owner as far as practical.

C.      Notify Engineer of discrepancies between existing conditions and Drawings before proceeding with demolition.

D.      Hazardous Materials:  It is unknown whether hazardous materials will be encountered in the Work.
1.      If materials suspected of containing hazardous materials are encountered, do not disturb; immediately notify Engineer and Owner.  Owner will remove hazardous materials under a separate contract.

E.      Storage or sale of removed items or materials on-site is not permitted.

F.      Utility Service:  Maintain existing service to the building until all loads have been transferred to the new service.  Once complete, shutdown existing service and remove the existing electrical gear.
1.      Maintain fire-alarm systems or provide other safety means during demolition that affects the fire alarm system.

**PART 2 - PRODUCTS (Not Used)**

**PART 3 - EXECUTION**

3.1     EXAMINATION

A.      Survey existing conditions and correlate with requirements indicated to determine extent of selective demolition required.

B.      Inventory and record the condition of items to be removed and reinstalled and items to be removed and salvaged.

C.      When unanticipated mechanical, electrical, or structural elements that conflict with intended function or design are encountered, investigate and measure the nature and extent of conflict.  Promptly submit a written report to Engineer.

3.2     SELECTIVE DEMOLITION, GENERAL

A.      General:  Demolish and remove existing construction only to the extent required by new construction and as indicated.  Use methods required to complete the Work within limitations of governing regulations and as follows:
1.      Proceed with selective demolition systematically.
2.      Do not use cutting torches until work area is cleared of flammable materials.  At concealed spaces, such as duct and pipe interiors, verify condition and contents of hidden space before starting flame-cutting operations.  Maintain portable fire-suppression devices during flame-cutting operations.
3.      Maintain adequate ventilation when using cutting torches.
4.      Dispose of demolished items and materials promptly.

B.      Removed and Reinstalled Items:
1.      Clean and repair items to functional condition adequate for intended reuse.  Paint equipment to match new equipment.
2.      Pack or crate items after cleaning and repairing.  Identify contents of containers.

3.  Protect items from damage during transport and storage.
4.  Reinstall items in locations indicated.  Comply with installation requirements for new materials and equipment.  Provide connections, supports, and miscellaneous materials necessary to make item functional for use indicated.

C.  Existing Items to Remain:  Protect construction indicated to remain against damage and soiling during selective demolition.  When permitted by Engineer, items may be removed to a suitable, protected storage location during selective demolition and reinstalled in their original locations after selective demolition operations are complete.

## 3.3 DISPOSAL OF DEMOLISHED MATERIALS

A.  General:  Except for items or materials indicated to be reused, salvaged, reinstalled, or otherwise indicated to remain Owner's property, remove demolished materials from Project site and legally dispose of them in an EPA- approved landfill.
1.  Do not allow demolished materials to accumulate on-site.
2.  Remove and transport debris in a manner that will prevent spillage on adjacent surfaces and areas.

B.  Burning:  Do not burn demolished materials.

C.  Disposal:  Transport demolished materials off Owner's property and legally dispose of them.

**END OF SECTION**

**SECTION 260015 - GENERAL CONDITIONS FOR ALL ELECTRICAL WORK**


**PART 1 - GENERAL**


1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of Contract, including Conditions of the Contract (General and Supplementary Conditions) and Division 1 specification sections, apply to work of this section.

B.     The requirements of this section apply to all sections that are installed by the electrical, signal and life safety, and all sections that are installed by the electrical contractor to include electrical work done under the mechanical contractor.


1.2     DESCRIPTION OF WORK

A.     This section covers the general provisions of the electrical specifications applicable to the following systems:
1.     Electrical lighting.
2.     All special systems (fire alarm).
3.     Control wiring associated with the electrical or mechanical equipment.

B.     The use of the word "pipe" shall refer to all electrical raceway.

C.     The use of the word "electrical" in any specification contained within the electrical, signal, or life safety division sections shall include all aspects of each systems complete install.  This shall be extended to mechanical or plumbing signal systems.

D.     The use of the word "mechanical" shall refer to both mechanical and plumbing.


1.3     DRAWINGS

A.     These specifications are accompanied by drawings of the building and details of the installations showing the locations of equipment, lighting, panels, etc.  The drawings and these specifications are complementary to each other, and what is called for by one shall be as binding as if called for by both.

B.     Drawings and specification conflicts shall be identified as early as possible to ensure conflict resolution prior to installation. The contractor shall not install any equipment with known conflicts or pending information requests. The contractor shall contact the Engineer of Record or their representative for information clarification prior to installing any item that is in question. The contractor shall not install any equipment that is not consistent with the manufacturers approved installation instructions unless directed by the engineer.

C.     In all cases all installations shall be at least in accordance with all the approved codes and their local amendments. The drawings and specifications may exceed local code allowances and the most stringent applies. The existence or allowance of a practice or product by code does not supersede requirements of the drawings and specifications. In other words, just because it is allowed by code does not mean that it is allowed on this project.

D.     If any departures from the drawings are deemed necessary by the Contractor, details of such departures and the reasons therefore shall be submitted to the Owner's Representative for approval. No departures shall be made without prior written approval by the Owner's Representative.

E.     There are intricacies of construction which are impractical to specify or indicate in detail; however, in such cases, the current rules of good practice and applicable specifications shall govern.  In all cases the requirements specified in the NEC and local jurisdiction shall be followed.

F.    It is the Contractor's responsibility to properly use all information found on the Architectural, Structural, Mechanical and Electrical drawings and applicable shop drawings where such information affects his work. The Contractor shall review the entire construction document set both prior to bid and construction.

G.    All dimensional information related to new structures shall be taken from the appropriate drawings. All dimensional information relative to existing facilities shall be taken from actual measurements made by the Contractor on the site.

H.    Any installation that is not in compliance with these requirements shall be corrected at the contractors cost and responsibility.

1.4    BIDDING

A.    The contractor is responsible for bidding complete and working systems. In the event that some part of the system is not included in the construction document or the specifications and it is a necessary part of the system to work properly, the contractor shall include that work as part of the bid amount.

B.    The contractor shall review the entire set of specifications and contract documents for all equipment and connections requiring electrical work.

C.    Equipment Substitutions or Proposed Equivalents:
1.    Comply with Division 1 of the specifications
2.    The contractor is responsible for providing full comparison information for the products to be substituted. Incomplete information is subject to immediate rejection.
3.    Bids taken for equipment that is not approved is under the contractor's own risk. Should the equipment be rejected under the post bid submittal process, the contractor is responsible for providing the specified equipment at no cost to the owner.
4.    Under no circumstances should the contractor accept bids for non-specified equipment from vendors who do not have prior approval or "speculate" that it will be approved. This is subject to immediate rejection and the specified equipment shall be required to be installed.
5.    No response from the Architect, Owner or Engineer shall not be considered an approval

1.5    CONSTRUCTION REQUIREMENTS

A.    The architectural, structural and electrical plans and specifications and other pertinent documents issued by the architect are a part of these specifications and the accompanying electrical drawings and shall be complied with in every respect. All the above is included in the Contract Documents and shall be examined by all bidders. Failure to comply shall not relieve the Contractor of responsibility or be used as a basis for additional compensation because architectural, structural, or mechanical details were not included in the electrical drawings.

B.    It is the intent of the Contract Documents to provide an installation complete in every respect. In the event that additional details or special construction may be required for work indicated or specified in this section or work specified in other sections, it shall be the responsibility of the Contractor to provide same as well as to provide material and equipment usually furnished with such systems or required to complete the installation, whether mentioned or not.

C.    The Contractor shall be responsible for fitting his material and apparatus into the building and shall carefully lay out his work at the site to conform to the structural conditions, to avoid all obstructions, to comply with Codes, to facilitate the work of other trades, to conform to the details of the installation supplied by the manufacturer of the equipment to be installed, and thereby to provide an integrated satisfactory operating installation.

D.    The mechanical, electrical, and associated drawings are necessarily diagrammatic in character and do not show every connection in detail or every pipe or conduit in its exact location. These details are subject to the requirements of ordinances and also structural and architectural conditions. It shall be the contractor's responsibility to coordinate with other disciplines to facilitate their equipment installation.

E.  The Contractor shall carefully investigate structural and finish conditions and shall coordinate the separate trades in order to avoid interference between the various phases of work.  Work shall be laid out so that it will be concealed in furred chases and above suspended ceilings, etc. in finished portions of the building, unless specifically noted to be exposed.  Work shall be installed to avoid crippling of structural members; therefore, inserts to accommodate hangers shall be set before concrete is poured, and proper openings through floor, walls, beams, etc. shall be provided as hereinafter specified or as otherwise indicated or required.  All work shall be installed parallel or perpendicular to the lines of the building unless otherwise noted.

F.  Conduit and equipment are generally intended to be installed true and square to the building construction and located as high as possible against the structure in a neat and workmanlike manner.  The plans do not show all required offsets, elbows, and other location details.  Work shall be concealed in all finished areas.  Conduit is intended to be installed with factory fittings or bent in a professional, workmanlike manner.

G.  All parts of equipment requiring adjustment shall be easily accessible.  Equipment shall be so located and installed as to permit convenient and safe maintenance and future replacement.  The trade furnishing the equipment shall be responsible for notifying the Contractor, who shall notify the Owner's Representative prior to ordering same in the event that equipment specified and/or proposed is incompatible with this requirement.

H.  Location of Lighting in Rooms:
    1.  All lighting, plumbing, acoustical tile, modular lighting outlets, diffusers, sprinkler heads, grilles, registers, and other devices shall be referenced to coordinated, established data points and shall be located to present symmetrical arrangements with these points and to facilitate the proper arrangements of acoustical tile panels and other similar panels with respect to the mechanical outlets and electrical lighting and devices.  Those mechanical and electrical outlets shall be referenced to such features as wall and ceiling furring's, balanced border widths, masonry joints, etc.  Outlets in acoustical tile shall occur symmetrically in tile joints or in the centers of whole tiles.  The final determination of the exact location of each outlet and the arrangements to be followed shall be acceptable to the Owner's Representative.
    2.  The drawings show diagrammatically the locations of the various outlets and apparatus.  Exact locations of these outlets and apparatus shall be determined by reference to the general plans and to all detail drawings, equipment drawings, roughing-in drawings, etc. by measurements at the building, and in cooperation with the other trades.  The Owner reserves the right to make any reasonable change in location of any outlet or apparatus before installation, without additional cost to the Owner or the Architect.  Contractor shall coordinate work with architectural reflective ceiling plan.

I.  The Contractor, by submitting a bid on this work, sets forth that he has the necessary technical training and ability, and that he will install his work in a satisfactory and workmanlike manner which is up to the best standards of the trade, complete and in good working order.  If any of the requirements of the plans and specifications are impossible of performance, or if the installation when made in accordance with such requirements will not perform satisfactorily, he shall report same to the Owner's Representative for correction promptly after discovery of the discrepancy.

J.  No extra compensation will be allowed for extra work or change caused by failure to comply with the above requirements.

1.6    JOB CONDITIONS

A.  Submittal of bid implies bidder has read paragraphs of the specifications and will be bound by their conditions.

B.  Contractor Qualifications:  A minimum of five years' experience installing commercial electrical power lighting and special systems, similar to those described in these specifications, and make available at the owner or engineer's request a list of five previous projects including name of project and contact person names and phone numbers as a separate document in addition to the bid or proposal submitted.

C.  Contractor must be licensed and hold a current contracting license that has been valid for a minimum of five years in the local State.

D.   Contractor must be able to bond work for performance of work being bid and provide a written statement from the bonding agency proposed to be used for this project as a separate document in addition to the bid or proposal submitted.  The bonding agency proposed to be used shall have a Best insurance rating of A or A+.

1.7      INSPECTION OF THE SITE

A.   The Contractor shall visit the site, verifying all existing items indicated on drawings and/or specified, and familiarize himself with the existing work conditions, hazards, grades, actual formations, soil conditions, structures, utilities, equipment, systems, facilities, and local requirements.  The submission of bids shall be deemed evidence of such visits.  All proposals shall take these existing conditions into consideration, and the lack of specific information shall not relieve the Contractor of any responsibility.

1.8      PERMITS, UTILITY CONNECTIONS, AND INSPECTIONS

A.   Fees and Costs:  The contractor shall obtain and pay for all permits and pay all costs for inspection fees, for all work included therein.

B.   Compliance:  The Contractor shall comply in every respect with all requirements of local inspection departments, Board of Fire Underwriters, local ordinances and codes, and utility company requirements.  In no case does this relieve the Contractor of the responsibility of complying with these specifications and drawings where specified conditions are of a higher quality than the requirements of the above-specified offices.  Where requirements of the specifications and drawings are below the requirements of the above offices having jurisdiction, the Contractor shall make installations in compliance with the requirements of the above offices.

C.   Certification:  Prior to final acceptance, the Contractor shall furnish a certificate of acceptance from the inspection departments having jurisdiction over the work for any and all work installed under this Contract.  Any additional labor costs incurred as a result of a substitution shall be the Contractor's responsibility.

1.9      EXISTING FACILITIES

A.   The Contractor shall be responsible for loss or damage to the existing facilities caused by him and his workmen and shall be responsible for repairing or replacing such loss or damage.  The Contractor shall send proper notices, make necessary arrangements, and perform other services required for the care, protection, and in-service maintenance of all electrical and special systems for the new and existing facilities.  The Contractor shall erect temporary barricades, with necessary safety devices, as required to protect personnel from injury, removing all such temporary protection upon completion of the work.  Barricades shall clearly indicate with signage that which they are protecting.  Contractor shall observe all OSHA rules.

B.   Where existing construction is removed to provide working and extension access to existing utilities, Contractor shall remove doors, piping, conduit, outlet boxes, wiring, light fixtures, and equipment, etc. to provide this access and shall reinstall same upon completion of work in the areas affected.

C.   Where partitions, walls, floors, or ceilings of existing construction are indicated to be removed, all Contractors shall remove and reinstall in locations approved by the Architect/Engineer all devices required for the operation of the various systems installed in the existing construction.  This is to include but is not limited to temperature controls system devices, electrical switches, relays, fixtures, piping, conduit, etc.

D.   Outages of services as required by the new installation will be permitted but only at a time approved by the Owner.  The Contractor shall allow the Owner two weeks in order to schedule required outages. The time allowed for outages will not be during normal working hours unless otherwise approved by the Owner.  All costs of outages, including overtime charges, shall be included in the contract amount. Unless otherwise scheduled by the Owner, planned shutdowns of the existing facilities shall occur between 6 p.m. Friday through 5 am Monday.  The existing building shall be ready for morning start-up by 5 am Monday.

1.10    SUBMITTAL DATA

A.    General: As soon as practical and within 30 days after the date of award of contract and before purchasing or starting installation of any materials or equipment, the Contractor prepare or cause to be prepared shop drawings, product data, materials and equipment lists, diagrams, data, samples, and other submittals as required by the contract documents, hereinafter referred to as "Submittal Data." The Contractor shall review and approve all submittal data for compliance with the contract documents, manufacturer's recommendations, adequacy, clearances, code compliance, safety, and coordination with associated work.

B.    The Contractor shall submit approved submittal data to the Owner's Representative for review and comment as to general conformance with the design concept and general compliance with information given in the contract documents.  Owner's Representative review shall not include review of quantities, dimensions, weights or gauges, fabrication processes, construction methods, coordination with other trades or work, or construction safety and precautions, all of which are the sole responsibility of the Contractor. The reviewers shall make every effort to "catch" discrepancies and identify these to the contractor prior to ordering equipment. However, it shall remain the contractor's responsibility to order and install the equipment as listed in the drawings and specifications. At the owner's representative discretion, a detailed submittal may be required.

C.    Substitutions shall be clearly identified as such in the submittal by a cover sheet indicating that items are different from what is specified or scheduled. It shall be the contractor responsibility to provide complete substitution information so an accurate comparison can be made.

D.    Detail Submittals:  Materials and equipment requiring detailed submittal data shall be submitted with sufficient data to indicate that all requirements of the specifications have been met and samples shall be furnished when requested.  All manufacturer's data used as part of the submittal shall have all non-applicable features crossed out or deleted in a manner that will clearly indicate exactly what is to be furnished. The detailed submittals shall be accompanied by the same number of sets of pictorial and descriptive data derived from the manufacturer's catalogs and sales literature or incorporated in the shop drawings.  The Contractor may provide a detailed submittal on any item even though not required by the Owner's Representative.

E.    The Engineer's review of Shop Drawings and Brochures shall not relieve the Contractor of the responsibility for dimensions, errors that may be contained therein, or deviations from Contract Document requirements.  It shall be clearly understood that the Engineer's noting some errors but overlooking others does not grant the Contractor permission to proceed in error.  Regardless of any information contained in the Shop Drawings, the requirements of the Contract Documents shall govern and are not waived or superseded in any way by the submittal data review.

F.    The Contractor shall clearly and specifically identify and call to the attention of the Owner's Representative any deviation from the contract documents for which Owner acceptance is desired.  The responsibility for such a deviation accepted by the Owner shall remain with the Contractor.

G.    Timeliness:  The burden of timeliness in the complete cycle of submittal data is on the Contractor.  The Contractor shall allow a minimum of Two (2) weeks' time frame for the submittal cycle of each submission by the Owner's Representative. The Contractor is responsible for allowing sufficient time in the construction schedule to cover the aforementioned cycles of data processing, including time for all re-submission cycles on non-conforming materials, equipment, etc. covered by the data submitted. Construction delays and/or lack of timeliness in the above regard are the responsibility of the Contractor and will not justify any request for scheduled construction time extensions or extra compensation.

H.    Work performed in accordance with approved submittal data that is not in accordance with the Contract Documents and did not have the specific acceptance of the Owner's Representative shall be replaced at Contractor's cost.

I.    Submittals shall be provided in the following format:
      1.    The submittal brochures shall be in pdf format.  The first page shall be titled "ELECTRICAL SUBMITTAL INFORMATION" and shall list the name and location of project, the Owner, the Engineer(s), the General Contractor, and the Subcontractors installing equipment represented in the brochure.

2. A table of contents will follow the first page and shall list all of the sections contained in the specification manual. Each section will be tabbed and will include its' respective brochures. All brochures will be three-hole punched and folded (if required). Each submittal section will correspond to the appropriate specification section number.

3. Provide submittal data for all materials to be used on this project as indicated in each specification manual section.

4. Brochures submitted shall contain only information which is relevant to the particular equipment or materials to be furnished. Do not submit catalogs that describe several different items other than those items to be used unless all irrelevant information is marked out or relevant information is clearly marked.

5. Brochures: Brochures submitted to the Engineer shall be published by the Manufacturers and shall contain complete and detailed engineering and dimensional information to show that the equipment will fit into the allotted space.

6. Any submittal that is disapproved must be resubmitted within two (2) weeks following notification of such disapproval. If no satisfactory material is submitted within the two-week period, the Engineer reserves the right to require the Contractor to furnish items exactly as described in the Contract Documents.

7. Unless a greater number is indicated within Division 1 of these specifications, submit six (6) copies of all submittal materials for review. Electronic copies are at the discretion of the owner.

8. No allowances will be made for submittals which are not made in a timely fashion or which are turned down because they do not meet the specifications. Should delivery problems arise due to the above, affecting the completion time of the project, the Contractor will furnish and install acceptable alternates until the proper materials arrive and then replace the alternate materials with the approved materials, all at no cost to the Owner, or Engineer. If the Contractor is not able to furnish an acceptable alternate until the proper materials arrive, he will assume all costs for furnishing and installing all alternates as directed by the Engineer.

9. Submittal shall have the certification information as listed hereafter.

10. Shop Drawings:
   a. All shop drawings shall have the certification as listed hereafter.
   b. Each Shop Drawing shall indicate in the lower right-hand corner and each Brochure shall indicate on the front cover the following: Title of the Sheet or Brochure; name and location of the building; names of the Engineer, Contractor, Manufacturer, Supplier, Vendor, etc., the date of submittal; and the date of each correction and revision. So far as is practical, each Shop Drawing and/or Brochure shall bear a cross-reference note to the sheet number or numbers of the Contract Drawings and Specifications showing the same work. Shop Drawings shall be prepared as follows:
      1) Shop Drawings: Drawings shall be newly prepared and not reproduced from the Contract Documents, drawn to a scale that can be easily read and shall contain sufficient plans, elevations, sections, and isometrics to describe clearly the items in question. Drawings shall be prepared by a draftsman skilled in this type of work. All equipment layouts and similar Shop Drawings shall be drawn to at least ¼ inch = 1'-0" scale.
      2) All Shop Drawings shall indicate the equipment actually purchased. The elevation, location, support points, load imposed on the structure at support and anchor points, shall be indicated. All beam penetrations and slab penetrations shall be indicated and sized and shall be coordinated. All Design Drawing space allocations shall be maintained, such as ceiling height, chase walls, equipment room size, etc., unless proper written authorization is required from the Engineer to change them. All associated equipment shall be coordinated and clearly shown on the Shop Drawings.

11. Submittal data for each section must be complete. Partial submittals, or submittals not in the specified format, will be rejected and returned to the Contractor without further review.

J. All equipment installed on this project shall have local (within 125 miles) representation, local factory-authorized service, and a local stock of repair parts. This requirement is essential and will be strictly reviewed by the Owner's Representative prior to concurrence with the Contractor's approval for all submittals covered by electrical division sections.

K. Physical Size of Equipment: Space is critical; therefore, equipment of larger sizes than shown, even though of approved manufacturer, will not be acceptable unless it can be demonstrated that ample space exists for proper installation, operation, and maintenance.

L.      These paragraphs related to electrical divisions submittal data rescind, amend, and supersede any provisions to the contrary contained in the Project Manual.

1.11    CERTIFICATION OF SUBMITTAL DATA

A.      The Contractor shall provide the following certification with all submittal data furnished to the Owner's Representative for review and comment.

Project Title:

Description of Submittal Data:

This is to certify that the above-described submittal data has been reviewed and is approved for compliance with the Contract Documents, manufacturer's recommendation, adequacy, clearances, code compliance, safety, and coordination with other trades and/or work except as follows: (list "none" or itemize and explain). In addition, the Contractor shall submit to the Owner's Representative a signed statement from each representative certifying as follows:

EXCEPTIONS:

"I certify that the materials and/or equipment listed below have been personally inspected by the undersigned authorized manufacturer's representative and   is   properly installed and operating in accordance with the manufacturer's   recommendations and are asbestos free."

_____
Name and Company

1.12    ACCEPTANCE OF MATERIALS AND EQUIPMENT

A.      Owner's Manual:  After the submittals have been accepted the Contractor is requested to include a minimum of three (3) additional copies for insertion in the projects Owner's Manuals at the completion of the project.

B.      NOTICE:  The Contractor is responsible for providing materials and equipment that conform to the requirements of the project manual in every respect unless a deviation has been "accepted" in writing. Removal of any nonconforming materials and equipment and the replacement with conforming materials and equipment shall be at the Contractor's sole expense, regardless of when nonconformance was discovered. If the owner or owner's representative elects to keep the equipment it shall be contractor's responsibility to provide any additional connections or services required to make the equipment function as specified or required by the manufacturer. The contractor shall coordinate with other subs for any different material requirements (wire size, breakers, cooling, mounting requirements, etc.).

C.      Approval of materials and equipment shall be based on manufacturer's published data and shall be tentatively subject to the submission of complete shop drawings which comply with the contract documents.  Approval is also dependent upon the existence of adequate and acceptable clearances for entry, servicing, and maintenance.

D.      Approval of materials and equipment under this provision shall not be construed as authorizing any deviations from the specifications, unless the attention of the Owner's Representative has been directed in writing to the specific deviations.  Data submitted shall not contain unrelated information unless all pertinent information is properly identified.

1.13    SHOP DRAWINGS

A.      As soon as practicable after the award of contract and approval of materials and equipment, but prior to installation, complete and detailed shop drawings of the following shall be submitted for review and comment:

1.      Fire Alarm Systems

B.      Work performed without benefit of reviewed and approved shop drawings will not be recommended for payment by the Engineer until such time as the shop drawings are submitted, reviewed, and approved. Any work performed without the benefit of reviewed and approved shop drawings may require removal, relocation, and/or replacement at the Contractor's sole expense in order to resolve conflicts between the various systems and provide the performance specified.

C.      All installation of equipment, fixtures, terminal devices, etc. shall be made in accordance with approved composite shop drawings. The Contractor shall modify installation and relocate installed work to provide code clearances, service access, and eliminate conflict with other systems.

D.      Submit one copy of shop drawings with each submittal. The shop drawing shall be marked with the O/E comments and returned to the Contractor for printing and distribution. Distribution shall include the return of three (3) prints of the approved shop drawings, with the O/E's comments included, to the O/E for the O/E's and Owner's use.

## 1.14    SITE OBSERVATION

A.      Site observation by the Engineer, and/or Owner's Representative is for the express purpose of verifying compliance by the Contractor with the contract documents, and shall not be construed as construction supervision nor indication of approval of the manner or location in which the work is being performed as being a safe practice or place.

## 1.15    SUPERVISION

A.      In addition to the Superintendent required under the conditions of the contract, each subcontractor shall keep a competent superintendent or foreman on the job at all times.

B.      It shall be the responsibility of each superintendent to study all plans and familiarize himself with the work to be done by other trades. He shall coordinate his work with other trades and, before material is fabricated or installed, make sure that his work will not cause an interference with another trade. Where interferences are encountered, they shall be resolved at the jobsite by the superintendents involved. Where interferences cannot be resolved without major changes to the plans, the matter shall be referred to the Owner's Representative for comments.

## 1.16    OPERATION PRIOR TO COMPLETION

A.      When any piece of electrical equipment is operable and it is to the advantage of the Contractor to operate the equipment, he may do so, providing that he properly supervises the operation and has the written permission of the Owner's Representative to do so. The contractor shall energize the power distribution in a timely manner to facilitate completion of other trades work. Electrical lighting shall be energized after ceiling has been completed. New permanent fixtures shall not be used as temporary under any circumstances. The warranty period shall not commence, however, until such time as the equipment is operated for the beneficial use of the Owner or date of substantial completion, whichever occurs first.

B.      Regardless of whether or not the equipment has or has not been operated, the Contractor shall properly clean the equipment, properly adjust, and complete all deficiency list items before final acceptance by the Owner. The date of acceptance and the start of the warranty may not be the same date.

## 1.17    MANUFACTURER'S RECOMMENDATIONS

A.      The manufacturer's published directions shall be followed in the delivery, storage, protection, installation, piping, and wiring of all equipment and material. The Contractor shall promptly notify the Owner's Representative, in writing, of any conflict between the requirements of the contract documents and the manufacturer's directions and shall obtain the Owner's Representative's comments before proceeding with the work. Should the Contractor perform any such work that does not comply with the

manufacturer's directions or applicable comments from the Owner's Representative, he shall bear all costs arising in connection with the correction of such deficiencies.

1.18    CHECKING AND TESTING MATERIALS AND/OR EQUIPMENT

A.    Before final acceptance of the work, an authorized representative of the manufacturer of the installed materials and/or equipment shall personally inspect the installation and operation of his materials and/or equipment to determine that it is properly installed and in proper operating order.  Testing and checking shall be accomplished during the course of the work where required by work being concealed, and at the completion of the work otherwise.  In addition, the Contractor shall submit to the Owner's Representative a signed statement from each representative certifying as follows:

"I certify that the materials and/or equipment listed below have been personally inspected by the undersigned authorized manufacturer's representative and is properly installed and operating in accordance with the manufacturer's recommendations and are asbestos free."

1.19    OPERATING AND MAINTENANCE INSTRUCTION

A.    The Contractor shall prepare for the owner's manual hereinafter specified complete sets of operating and maintenance instruction's, control and interlock diagrams, manuals, parts lists, etc. for each item of equipment.  These are to be assembled as hereinafter specified for owner's manual.

B.    In addition, the Contractor shall provide the service of a competent engineer or a technician acceptable to the Owner's Representative to instruct a representative of the Owner in the complete and detailed operation of all equipment and systems.  These instructions shall be provided for a period of sufficient duration to fully accomplish the desired results.  Upon completion of these instructions, a letter of release will be required, acknowledged by the Owner, stating the dates of instruction and personnel to whom instructions were given.

C.    Additional diagrams, operating instructions, etc. shall be provided as specified hereinafter in the other sections of these specifications.

1.20    MATERIAL AND EQUIPMENT SCHEDULES

A.    Contractor shall refer to both drawings and specification for schedules.  Where reference is made to items "scheduled on drawings" or "scheduled in specifications," same shall include schedules contained in both the drawings and the specifications.  The Contractor's attention is directed to the various specification sections and drawings for schedules.

1.21    APPLICABLE CODES AND STANDARDS

A.    The installation shall meet the minimum standards prescribed in the latest editions of the following listed codes and standards, which are made a part of these specifications, except as may be hereinafter specifically modified in these specifications and associated drawings.
    1.    National Fire Protection Association Standards (NFPA):
        a.    NFPA No. 10, Portable Fire Extinguishers
        b.    NFPA No. 54, National Fuel and Gas Code
        c.    NFPA No. 70, National Electrical Code
        d.    NFPA No. 101, Life Safety Code
        e.    NFPA No. 255, Method of Test of Surface Burning Characteristics of Building Materials
    2.    American National Standards Institute (ANSI):
        a.    C.2, 1984 National Electrical Safety Code
        b.    A117.1, Handicapped Code
    3.    American Society of Mechanical Engineers (ASME):  Section IV, V, CSD-1
    4.    American Society of Testing Materials (ASTM):  All applicable manuals and standards.
    5.    National Electrical Manufacturers' Association (NEMA):  All applicable manuals and standards.
    6.    State Occupational Safety Act:  All applicable safety standards.
    7.    Occupational Safety and Health ACT (OSHA):  National Sanitation Foundation, Standard No. 2
    8.    Americans with Disabilities Act, 1990

9. TAMU UES Standards
10. American Gas Association (AGA)
11. Underwriters Laboratories, Inc. (UL)
12. Applicable State Building Codes (Uniform Building Codes, as amended):
13. All County codes related to mechanical, electrical, plumbing, and system equipment; piping; conduit; wiring; etc. furnished and installed under these specifications.
14. All City ordinances related to mechanical, electrical, plumbing, and systems and equipment; piping; conduit; wiring; etc. furnished and installed under these specifications.
15. Refer to specification sections heretofore bound for additional codes and standards.

B. All materials and workmanship shall comply with all applicable city, state, and national codes, specifications, and industry standards. All materials shall be listed by the Underwriters Laboratories, Inc. as conforming to its standards and so labeled in every case where such a standard has been established for the particular type of material in question.

C. The contract documents are intended to comply with the aforementioned rules and regulations; however, some discrepancies may occur. Where such discrepancies occur, the Contractor shall immediately notify the Owner's Representative in writing of said discrepancies and apply for an interpretation. Should the discovery and notification occur after the execution of a contract, any additional work required for compliance with said regulations shall be paid for as covered by Division 1 of these contract documents, providing no work or fabrication of materials has been accomplished in a manner of noncompliance. Should the Contractor fabricate and/or install materials and/or workmanship in such a manner that does not comply with the applicable codes, rules, and regulations, the Contractor who performed such work shall bear all costs arising in correcting these deficiencies to comply with said rules and regulations.

1.22 DEFINITIONS

A. Refer to the condition of the contract for Division 1 for additional requirements regarding definitions.

B. Where "as required" is used in these specifications or on the drawings, it shall mean "that situations exist that are not necessarily described in detail or indicated that may cause the Contractor certain complications in performing the work described or indicated. These complications entail the normal coordination activities expected of the Contractor where multiple trades are involved and new or existing construction causes deviations to otherwise simplistic approaches to the work to be performed. The term shall not be interpreted to permit an option on the part of the Contractor to achieve the end result.

C. Where "and/or" is used in these specifications or on the drawings, it shall mean "that situations exist where either one or both conditions occur or are required and shall not be interpreted to permit an option on the part of the Contractor.

D. Unless specifically indicated otherwise elsewhere in these specifications or on the drawings the word "furnish" or any of its derivatives shall be understood to indicate the purchase, delivery, storage and protection of an item at the job site in a location and manner suitable for use by the recipient who will be responsible for installation of this item. The word "install" or any of its derivatives shall be understood to indicate taking receipt of an item, properly mounting it, and providing the related utilities (electrical, communication, etc.) for proper and complete operation of the item. Installation shall also include calibration, programming and operational testing of said item. The word "provide" or any of its derivatives shall be understood to indicate both furnishing and installing an item.

1.23 SUBSTANTIAL COMPLETION

A. Refer to Division 1 for additional requirements for substantial completion.

B. Substantial completion shall be defined as the level of project completion where the owner is ready to occupy the building. The contractor shall have ensured that all electrical and building systems are complete and in fully functional working order. This level of completion does not absolve the contractor from the requirements of final inspection or final acceptance. The contractor shall ensure there are no life safety issues unresolved with the project at the time of substantial completion.

C.    All "punch" list items shall have been resolved or shall be identified as pending resolution. Items listed as unresolved shall be either pending information or direction from the owner or owner's representative or shall be awaiting parts or supplies that are "on order". The contractor at the owner's discretion shall produce documentation of the part or supply on order status.

1.24    FINAL INSPECTION

A.    Refer to Division 1 for additional requirements for final inspection.

B.    It shall be the responsibility of the Contractor to personally conduct a careful inspection, assuring himself that the work on the project is ready for final acceptance and developing his own "punchlists," before calling upon the Owner's Representative to make a final inspection.  Failure of the Contractor to conduct such inspections and provide the Owner's Representative with a copy of his "punchlists" prior to the final inspection shall be adequate cause for the Owner's Representative to cancel any Contractor-requested final inspection.

C.    In order not to delay final acceptance of the work, the Contractor shall conduct his own "final inspections" prior to requesting the Owner's Representative to "final" the project; will have all necessary bonds, guarantees, receipts, affidavits, etc. called for in the various articles of this specification prepared and signed in advance; and together with a letter of transmittal listing each paper included, shall deliver the same to the Owner's Representative at or before the time of said final inspection.  The Contractor is cautioned to check over each bond, receipt, etc. before preparing same for submission to see that the terms check with the requirements of the specifications.

D.    The final inspection will be made jointly by the Owner's Representative and the Owner.

1.25    REQUIREMENTS FOR FINAL ACCEPTANCE

A.    Requirements for final acceptance shall include but not be limited to the Contractor accomplishing the following:
1.    Construction:  Complete all construction.
2.    Deficiency Lists:  Correct all deficiencies listed at time of Substantial Completion.
3.    Owner's Manual:  Submit at least 30 days prior to final acceptance one (1) copy of the owner's manual for the Owner's Representative's review and comments.  Following acceptance, prepare three (3) copies of bound and indexed owner's manual, to be delivered at the time of final acceptance, which shall include but not be limited to the following:
    a.    System operating instructions.
    b.    System control drawings.
    c.    System interlock drawings.
    d.    System maintenance instructions.
    e.    Manufacturers', suppliers, and subcontractor's names, addresses, and telephone numbers, both local representatives and manufacturers service headquarters.
    f.    Equipment operating and maintenance instructions and parts lists.
    g.    Manufacturers' certifications (see Checking and Testing Materials and/or Equipment, this section).
    h.    Contractor's warranty.
    i.    Acceptance certificates of authorities having jurisdiction.
    j.    Log of all tests made during course of work.
    k.    Owner's acknowledgment of receipt of instruction, enumerating items in owner's manual.
    l.    List of manufacturers guarantees executed by the Contractor.
    m.    Owner's acknowledgment of items of equipment or accessories indicated or specified to be turned over to Owner.
4.    Instructions:
    a.    Verbal, as herein specified.
    b.    Posted, framed under glass or plastic laminated:
        1)    System operating instructions.
        2)    System control drawings.
        3)    System interlock drawings.
5.    Record Drawings:  Deliver the specified record drawings to the Owner's Representative.

1.26    RECORD DRAWINGS

    A.    The Contractor shall maintain a set of contract drawings at the job site on which he shall indicate the installed locations of all equipment and electrical feeders.  These drawings shall be used for reference or construction and shall not leave the field office.  Upon completion of the work, the Contractor shall obtain and pay for Mylar's and/or disks (if available as CAD files) of the contract drawings from the Owner's Representative and transfer the above information to these Mylar's to provide "Record Drawings."  The above-mentioned prints and "Record Drawings" shall then be delivered to the Owner's Representative.    Refer to paragraph entitled "Record Drawings" of the Supplemental General Conditions.

1.27    WARRANTY

    A.    General:  All work performed (including equipment and materials furnished) under the various sections of these specifications shall be 100% warranted, for a period of one (1) year from the date of substantial completion thereof, against defective materials, design, and unauthorized substitution.  Upon receipt of note of failure of any part of the guaranteed equipment and/or facilities during the guaranty period, the affected part(s) or facilities shall be replaced promptly with new parts, etc. by and at the expense of the Contractor.    Further, the Contractor shall properly obtain, execute, and forward any and all manufacturer's warranties on equipment furnished under the Contract.  Refer to Division 1 for additional requirements.

**PART 2 - PRODUCTS**

2.1    MATERIALS AND WORKMANSHIP

    A.    All materials, unless otherwise specified, shall be current United States manufacture, new, free from all defects, and of the best quality.  Foreign goods specifically approved for use by the Owner's Representative prior to bidding may be furnished.

    B.    Materials and equipment shall be installed in accordance with the manufacturer's recommendations and the best standard practice for the type of work involved.  All work shall be executed by electricians skilled in their respective trades, and the installations shall present a neat, precise appearance.

    C.    The responsibility for the furnishing and intended installation of the proper electrical equipment and/or material as intended rests entirely upon the Contract.  The Contractor shall request advice and supervisory assistance from the representative of specific manufacturers during the installation.

2.2    MATERIAL AND EQUIPMENT REQUIREMENTS

    A.    Manufacturer's Instructions:  The manufacturer's published instructions shall be followed for preparing, assembling, installing, erecting, and cleaning manufacturer materials or equipment, unless otherwise indicated.  The Contractor shall promptly notify the Owner's Representative in writing of any conflict between the requirements of the Contract Documents and the manufacturer's direction and shall obtain the clarification of the Owner's Representative before proceeding with the work.  Should the Contractor perform any such work that does not comply with the manufacturer's directions or such clarification by the Owner's Representative, he shall bear all costs arising in connection with the correction of the deficiencies.

    B.    Storage at Site:  The Contractor shall not receive material or equipment at the jobsite until there is suitable space provided to properly protect equipment from rust, drip, humidity, and dust damage from surrounding work.  All new or relocated equipment shall be stored inside or protected from the environment. Equipment that is not properly stored shall be replaced by the contractor at no cost to the owner.

    C.    Capacities shall be not less than those indicated and shall be such that no component or system becomes inoperative or is damaged because of startup or other overload conditions.

D.    Conformance to Agency Requirements:  Where materials or equipment are specified to be approved, listed, tested, or labeled by the Underwriters Laboratories, Inc., or constructed and/or tested in accordance with the standards as listed in the NEC, the Contractor shall submit proof that the items furnished under this section of the specifications conform to such requirements.  The label of the Underwriters Laboratories, Inc. applied to the item will be acceptable as sufficient evidence that the items conform to such requirements.

E.    Nameplates:  Each major component of equipment shall have the manufacturer's name, address, and model-identification number embossed on a plate securely attached to the item of equipment.  All data on nameplates shall be legible at the time of Final Inspection.  All equipment starters and disconnects shall be tagged with the equipment designated mark and circuit.

F.    Prevention of Rust:  Standard factory finish will be acceptable on equipment specified by model number otherwise surfaces of ferrous metal shall be given a rust-inhibiting coating.  The treatment shall withstand 200 hours in salt-spray fog test, in accordance with Method 6061 of Federal Standard No. 141.  Immediately after completion of the test, the specimen shall show no signs of wrinkling or cracking and no signs of rust creepage beyond 1/8 inch on either side of the scratch mark.  Where rust inhibitor coating is specified hereinafter, any treatment that will pass the above test is acceptable unless a specific coating is specified, except that coal tar or asphalt-type coatings will not be acceptable unless so stated for a specific item.  Where steel is specified to be hot-dip galvanized, mill-galvanized sheet steel may be used provided all raw edges are painted with a zinc-pigmented paint conforming to Military Specification MIL-P-26915.

G.    Protection of Connections:  Switches, breaker handles, keys setscrews, handles and other parts not listed for normal occupied operation (light switches, etc.) shall be located accessible to but out of paths to prevent their accidental shutoff.

H.    Verifications of Dimensions:  The Contractor shall be responsible for the coordination and proper relation of his work to the building structure and to the work of all trades.  The Contractor shall visit the premises and thoroughly familiarize himself with all details of the work and working conditions, to verify all dimensions in the field, and to advise the Owner's Representative of any discrepancy before performing any work.  Adjustments to the work required in order to facilitate a coordinated installation shall be made at no additional cost to the Owner, Architect, or Engineer.

I.    Standard Products:  Materials and equipment to be provided shall be the standard catalog products of manufacturers regularly engaged in the manufacture of products conforming to these specifications and shall essentially duplicate materials and equipment that have been in satisfactory use at least two years.

2.3    SUBSTITUTION OF MATERIALS AND EQUIPMENT

A.    No substitution of materials or equipment herein specified or called for on the drawings will be permitted, except by written permission of the Owner's Representative.  Where several makes of equipment or material are mentioned, any item named may be bid upon provided it meets space, capacity specifications, finish, usage, and looks and functions as what was specified.

B.    Do not submit substitutions that do not match in whole what was specified or scheduled. Deviations from scheduled or specified items are installed at the contractor's risk and are subject to replacement if the owner/engineer deems the product different from the specified item.

C.    If the specified item is no longer available, it is the contractor's responsibility to contact the engineer and notify that the item is not available and suggest a suitable substitution that matches in whole the form, function, and appearance of the scheduled or specified item.

D.    Refer to Conditions of the Contract and Division 1 for additional requirements regarding substitutions.

2.4    FLAME SPREAD AND SMOKE DEVELOPED PROPERTIES OF MATERIALS

A.    Conduit, insulation, equipment supports and mounting hardware, tapes, adhesives, core materials, jackets, and other materials in concealed locations, including any above-ceiling area, shall have a flame spread rating not over 25 without evidence of continued progressive combustion and a smoke

developed rating no higher than 50. Flame spread and smoke developed ratings shall be in accordance with NFPA Standard No. 255.

2.5     SLEEVES, INSERTS, AND FASTENINGS

A.      General:  Proper openings through floors, masonry walls, roofs, etc. for the passage of conduits shall be provided.  All conduit through floors and walls must pass through sleeves, except conduit that is cast-in-place.  Sleeves shall be set in new construction before concrete is poured, as cutting holes through any part of the concrete will not be permitted unless acceptable to the Owner's Representative.

B.      Materials:  Sleeves shall be of standard weight galvanized iron pipe, except heavy-gauge galvanized iron sleeves may be utilized in concrete pours where acceptable to the Owner's Representative for size and metal gauge.  Sleeves in fittings, grade beams, and where pipes enter or leave the building or pass through concrete or masonry shall be Schedule 40 PVC along the pipe route from the underground installation to the insulating coupling installed above ground.

2.6     ACCESS DOORS

A.      General: Provide wall, ceiling, or duct access doors for unrestricted access to all concealed items of electrical equipment.

B.      Manufacturers shall be Inland-Milcor, Bilco, Miami Carey, or approved equal.

C.      UL labeled when in fire-rated construction, one and one-half hour rating.

D.      Equipment access doors shall be of sufficient size to remove/replace equipment and provide routine maintenance as necessary, unless otherwise noted.  All doors shall have wedge-type latches except where cylinder locks are otherwise indicated or specified.  Doors shall be set flush with adjacent finish surfaces.  Exterior doors shall be provided with cylinder locks.

E.      Access doors into ductwork shall be 14-gauge insulated galvanized steel with 16-gauge galvanized gasketed steel frame and cam-type locks.  Access door shall be a minimum of 12" $\times$ 12" in size.

2.7     CONDITION OF MATERIALS

A.      All materials required for the installation of the electrical systems shall be new and unused.  Any material or equipment damaged in transit from the factory, during delivery to premises, while in storage on premises, while being erected and installed, or while being tested, until time of final acceptance, shall be replaced by this Contractor without extra cost to Owner.

**PART 3 - EXECUTION**

3.1     SPACE AND EQUIPMENT ARRANGEMENTS

A.      The size of electrical equipment indicated on the drawings is based on the dimensions of a particular manufacturer.  While other manufacturers will be acceptable, it is the responsibility of the Contractor to determine whether the equipment he proposes to furnish will fit in the space.  Shop drawings shall be prepared when required by the Owner' Representative to indicate a suitable arrangement.

B.      All equipment shall be installed in a manner to permit access to all surfaces.

3.2     HOISTING, SCAFFOLDING, AND TRANSPORTATION

A.      Provide hoisting and scaffolding facilities as required to set materials and equipment in place

3.3     PROTECTION

A. The Contractor shall take such precautions as may be necessary to properly protect all materials and equipment from damage from the time of delivery until the completion of work. This shall include the erection of all required temporary shelters and supports to adequately protect any items stored in the open on the site from the weather, the ground and surrounding work; the cribbing of any items above the floor of the construction; and the covering of items in the uncompleted building with tarpaulins or other protective covering. Failure on the part of the Contractor to comply with the above will be sufficient cause for the rejection of the items in question.

B. The Contractor shall protect existing facilities, the work of others, and the premises from any and all damages that may be made possible by the execution of work.

C. Equipment and materials shall be protected from rust both before and after installation. Any equipment or materials found in a rusty condition at the time of final inspection must be cleaned of rust and repainted as specified elsewhere in these specifications.

3.4 COOPERATION BETWEEN TRADES AND WITH OTHER CONTRACTORS

A. Each trade, subcontractor, and/or Contractor must work in harmony with the various trades, subcontractors, and/or Contractors on the job as may be required to facilitate the progress to the best advantage of the job as a whole. Each trade, subcontractor, and/or Contractor must pursue its work promptly and carefully so as not to delay the general progress of the job. This Contractor shall work in harmony with Contractors working under other contracts on the premises.

B. It shall be the responsibility of each trade to cooperate fully with the other trades on the job to help keep the jobsite in a clean and safe condition. At the end of each days work, each trade shall properly store all of its tools, equipment, and materials and shall clean its debris from the job. Upon the completion of the job, each trade shall immediately remove all of its tools, equipment, any surplus materials, and all debris caused by its portion of the work.

3.5 PRECEDENCE OF MATERIALS

A. These specifications and the accompanying drawings are intended to cover systems which will not interfere with the structural design of the building, which will fit into the several available spaces, and which will ensure complete and satisfactory systems. Each subcontractor and/or trade shall be responsible for the proper fitting of his material and apparatus into the building.

B. The work of the various trades shall be performed in the most direct and workmanlike manner without hindering or handicapping the work of other trades. Piping interferences shall be handled by giving precedence to pipe lines which require a stated grade for proper operation. Where space requirements conflict, the following order or precedence shall, in general, be observed:
1. Building lines.
2. Structural members.
3. Soil and drain piping.
4. Condensate drains.
5. Vent piping.
6. Supply, return, and outside air ductwork.
7. Exhaust ductwork.
8. HVAC water and steam piping.
9. Steam condensate piping.
10. Fire protection piping.
11. Natural gas piping.
12. Domestic water (cold and hot).
13. Refrigerant piping.
14. Electrical conduit.

3.6 CONNECTIONS FOR OTHERS

A. This Contractor shall rough-in for and make all electrical connections to all fixtures, equipment, machinery, etc. provided by others in accordance with detailed roughing-in drawings provided by the equipment suppliers, by actual measurements of the equipment connections, or as detailed.

B.    After the equipment is set in place, this Contractor shall make all final connections and shall provide all required conduit, fittings, whips, connectors, etc.

C.    The Mechanical Contractors will set in place, ready for connection, all motors to be provided under their Contracts.  The Mechanical Contractors will furnish and deliver all starter and control equipment not shown in motor control centers for any motors which they furnish.  The Mechanical Contractor shall be responsible for the complete installation of all automatic temperature control systems, including wire, conduit, and interlocking connections.

D.    The Electrical Contractor shall connect all motors and shall set in place all control devices, furnishing supports if and as necessary, and shall furnish and install all interconnecting line voltage wiring and make all connections ready for operation between motors, starters, and disconnect switches, as required.  The Electrical Contractor shall furnish and install all motor control centers, including breakers, starters, etc.  The Contractor shall refer to the Mechanical drawings and specifications for his scope of the connections to equipment furnished under these Contracts.

3.7      INSTALLATION METHODS

A.    Where to Conceal:  All conduits shall be concealed in chases, walls, furred spaces, below suspended floors, or above the ceilings of the building unless otherwise indicated. All concealed conduit shall be run in a professional manner, and parallel or perpendicular to the building lines.

B.    Where to Expose:  In mechanical rooms, only where necessary, conduit may be run exposed.  All exposed conduit shall be run in the neatest, most inconspicuous manner, and parallel or perpendicular to the building lines. Conduit shall be bent in a manner as to run parallel to other conduits and not cross at angles.

C.    Support:  All conduit shall be adequately and properly supported from the building structure by means of hangers or clamps to walls as herein specified.

D.    Maintaining Clearance:  Where limited space is available above the ceilings and below concrete beams or other deep projections, conduit shall be sleeved through the projection where it crosses, rather than hung below them, in a manner to provide maximum above-floor clearance.  Sleeves shall be as herein specified.  Approval shall be obtained from the Owner's Representative for each penetration.

E.    All conduits, etc. shall be cut accurately to measurements established at the building and shall be worked into place without springing or forcing.  All conduits run exposed in machinery and equipment rooms shall be installed parallel to the building lines.  Conduits in furred ceilings and in other concealed spaces may be run at angles to the construction but shall be neatly grouped and racked indicating good workmanship.  All conduit openings shall be kept closed until the systems are closed with final connections.

F.    Special Requirements:
1.    The Contractor shall study all construction documents and carefully lay out all work in advance of fabrication and erection in order to meet the requirements of the extremely limited spaces. Where conflicts occur, the Contractor shall meet with all involved trades and the Owner's Representative and resolve the conflict prior to erection of any work in the area involved.
2.    All conduit not directly buried in the ground or installed outside shall be considered as "interior."
3.    Prior to the installation of any ceiling material, gypsum, plaster, or acoustical board, the Contractor shall notify the Owner's Representative so that arrangements can be made for an inspection of the above-ceiling area about to be "sealed off."  The Contractor shall give as much advance notice as possible up to ten (10) working days, but in no case less than five (5) working days.
4.    The purpose of this inspection is to verify the completeness and quality of the installation of the electrical systems and any other special above-ceiling systems, such as data, fire alarm, security.  The ceiling supports (tee bar or lath) should be in place so that access panel and light fixture locations are identifiable and so that clearances and access provisions may be evaluated.
5.    No ceiling material shall be installed until the deficiencies listed from this inspection have been corrected to the satisfaction of the Owner's Representative.

3.8     CUTTING AND PATCHING

A. General: Cut and patch walls, floors, etc. resulting from work in existing construction or where made necessary by failure to provide proper openings or recesses in new construction.

B. Methods of Cutting: Openings cut through concrete and masonry shall be made with masonry saws and/or core drills and at such locations acceptable to the Owner's Representative. Impact-type equipment will not be used except where specifically acceptable to the Owner's Representative. Openings in concrete for pipes, conduits, outlet boxes, etc. shall be core drilled to exact size. Determine location of embedded conduit and reinforcing bars prior to cutting.

C. Restoration: All openings shall be restored to "as-new" condition under the appropriate specification section for the materials involved, and shall match remaining surrounding materials and/or finishes.

D. Masonry: Where openings are cut through masonry walls, provide and install lintels or other structural supports to protect the remaining masonry. Adequate supports shall be provided during the cutting operation to prevent any damage to the masonry occasioned by the operation. All structural members, supports, etc. shall be of the proper size and shape, and shall be installed in a manner acceptable to the Owner's Representative.

E. Plaster: All mechanical work in area containing plaster shall be completed prior to the application of the finish plaster coat. Cutting of finish plaster coat will not be permitted.

F. Weakening: No cutting, boring, or excavating which will weaken the structure shall be undertaken.

3.9    SLEEVES, INSERTS, AND FASTENINGS

A. Sleeves: The minimum clearance between horizontal conduit and sleeve shall be ¼ inch, except that the minimum clearance shall be ½ inch where piping contacts the ground. Sleeves through floors shall extend ¾ inch above the floor; sleeves through walls and partitions shall be installed flush with exposed surfaces. Sleeves are not required for piping indicated to the cast-in-concrete slabs-on-fill.

B. Inserts: Suitable concrete inserts for conduit and equipment hangers shall be set and properly located for all conduit and equipment to be suspended from concrete construction.

C. Fasteners: Fastening of pipes, conduits, etc. in the building shall be as follows:
1.    To wood members: by wood screws.
2.    To masonry and concrete: by threaded metal inserts, metal expansion screws, or toggle bolts, whichever is appropriate for the particular type of masonry or concrete.
3.    To steel: machine screws or welding (when specifically permitted or directed), or bolts.

D. Weatherproofing: The annular space between a conduit and its sleeve in exterior walls or through floor to below grade shall be filled with polyurethane foam rods 50% greater in diameter than the space as backing and fill material and made watertight with a permanent elastic polysulfide compound. Seal both surfaces of wall or floor with a fire-resistant sealant.

3.10    FIRE AND SMOKE PARTITION, WALL, AND/OR FLOOR PENETRATIONS

A. Conduit passing through fire- or smoke-rated floors, partitions, walls, or other barriers within a UL-listed assembly which shall maintain the rating of the applicable wall, floor, partition, or barrier. Flexible conduit shall not be used in rated walls. Provide connections between "hard" pipe and flexible whips on either side of wall. Fireproof around conduits.

B. The Contractor shall review the architectural and structural drawings and determine the location of the fire-rated building elements. Where these elements are penetrated, UL-listed fire-rated penetration assemblies approved by the local authority shall be provided in accordance with the manufacturer's instructions to obtain the required rating.

3.11    CONDUIT SUPPORT

A. Conduit Support: All conduits throughout the building, both horizontal and vertical, shall be adequately supported from the construction to line of grade, with proper provision for expansion, contraction,

vibration elimination, and anchorage.  Vertical conduits shall be supported from floor lines with riser clamps sized to fit the lines and to adequately support their weight.  At the bases of lines, where required for proper support, provide anchor base fittings or other approved supports.

B.  Conduit shall not be supported from any other system.

## 3.12  HANGERS

A.  General:  Each hanger shall be properly sized to fit the supported pipe or to fit the outside of the insulation on lines where specified.

B.  Attachment:
1.  The load on each hanger and/or insert shall not exceed the safe allowable load for any component of the support system, including the concrete which holds the inserts.  Reinforcement at inserts shall be provided as required to develop the strength required.
2.  Where pipes are supported under steel beams, approved-type beam clamps shall be used.
3.  Where conduit is supported under wood joists, hanger rods shall be attached to joists with side beam brackets or angle clips.

C.  Spacing:  All hangers shall be so located as to properly support horizontal lines without appreciable sagging of these lines.

D.  Trapezes:  Where multiple lines are run horizontally at the same elevation and grade, they may be supported on trapezes of Kindorf, Elcen, or approved equal, channel-suspended on rods or pipes.  Trapeze members including suspension rods shall each be properly sized for the number, size, and loaded weight of the lines they are to support.

E.  Ceiling-Mounted Devices:  All lighting and devices or assemblies mounted in lay-in-type ceilings and which are supported by the ceiling grid, directly or indirectly, and which weigh in excess of 2 lbs., shall be provided with at least two 12-gauge minimum wire supports connected securely between the device or assembly and the structure, to serve as a safety support in the event of the collapse of or a disturbance in the support of the ceiling system that might cause the device or assembly to fall through the ceiling.  This includes, but is not limited to, light fixtures, J-boxes, and heavy speakers.  Provide additional support as required where the weight of the device or assembly will exceed the safe limits of the wire supports.

F.  Perforated strap iron or wire will not be acceptable as hanger material.

G.  Miscellaneous:  Provide any other special foundations, hangers, and supports indicated on the drawings, specified elsewhere herein, or required by conditions at the site.  Hangers and supporting structures for suspended equipment shall be provided as required to support the load from the building structure in a manner acceptable to the Owner's Representative.

H.  "Helicopter" box hangers are not acceptable.  The use of plate box hangers is allowed.

## 3.13  ACCESS DOORS

A.  Provide in walls, floors, and ceilings to permit access to all equipment and piping requiring service or adjustment.  Examples of such equipment needing access are disconnects, actuators, contacts, and equipment needing periodic or replacement maintenance.

B.  Use panels equal to Milcor Style M for masonry and drywall construction, equal to Milcor Style K for plastered masonry walls and ceilings.  Stainless steel panels shall be used in ceramic tile or glazed structural tile.

C.  Access doors located outside or in a moisture-laden environment (e.g., toilet room, dressing area, shower area, etc.) shall be stainless steel.

## 3.14  TESTS AND INSPECTIONS

A. Refer to conditions of the contract and Division 1 for additional requirements regarding tests and inspections.

B. General: The Contractor shall make all tests deemed necessary by the inspection departments of the authority having jurisdiction, Board of Underwriters, etc. He shall provide all equipment, materials, and labor for making such tests. Fuel and electrical energy for system operational tests following beneficial occupancy by the Owner will be paid for by the Owner.

C. Other: Additional tests specified hereinafter under the various specification sections shall be made.

D. Notification: The Owner's Representative shall be notified at his office 36 hours prior to each test and other specifications requirements requiring action on the part of the Owner, Engineer, and/or Owner's Representative.

E. Test Logs: All tests which the Contractor conducts shall have pertinent data logged by the Contractor at the time of testing. Data shall include date, time, personnel, description and extent of system tested, test conditions, test results, specified results, and any other pertinent data. Data shall be delivered to the Owner's Representative as specified under "Requirements for Final Acceptance."

F. Inspections: In general, an inspection by the Owner's Representative shall be required prior to closing up any work and prior to beneficial occupancy or final project completion. The closing up of work includes, but is not limited to, conduit installations prior to backfilling; electrical and fire protection work prior to placement of concrete; or closing up walls and overhead electrical and fire protection work prior to installation of the ceiling.

3.15 CLEANING AND PAINTING

A. The contractor shall at all times keep the premises free from accumulations of waste material or rubbish. Debris shall be removed from the site and from any street or alley adjacent to the site.

B. Thoroughly clean and touch up the finish on all parts of the materials and equipment. Exposed parts in equipment rooms, and all other spaces except sealed chases and attics shall be thoroughly cleaned of cement, plaster, and other materials, and all oil and grease spots shall be removed. Such surfaces shall be carefully wiped and all cracks and corners scraped out.

C. Exposed metal work which is not galvanized shall be carefully brushed down with steel brushes to remove rust and other spots and left smooth and clean and then painted with a suitable rust resistant primer. Exposed metal work includes work exterior to the building; exposed in mechanical or electrical equipment rooms and storage rooms; and other areas where occupants could see the work, whether normally occupied or not.

D. All other painting shall be accomplished under the Painting Section of Division 9 of the specifications.

E. At completion of the project, the Contractor shall remove all tools, scaffolding, and surplus materials. Contractor shall leave the area "broom clean". Before final acceptance, vacuum all panels, switchboards, starters, and other electrical devices. Wipe clean all fixture lenses and reflectors, all panelboard and switchboard interior and exterior surfaces, being careful to remove all stray paint, construction materials, dust, and particles. Touch-up all marred surfaces to restore existing conditions to those provided by the manufacturer.

3.16 IDENTIFICATION AND LABELING

A. General: The Contractor shall make it possible for the personnel operating and maintaining the equipment and systems in this project to readily identify the various pieces of equipment, disconnects, panels, etc. by marking them. All disconnects/starters/panels shall be labeled for the equipment they serve. Marks shall be the same as the drawings.

3.17 COORDINATION OF WORK

A. The light fixture grid layout as indicated on the drawings must be maintained. This Contractor shall refer to all light fixture plans and details indicated on the drawings.

B. The electrical trades shall locate all junction boxes, pull boxes, conduits, etc. to avoid interference with the diffusers, dampers, grilles, etc. The mechanical trades shall furnish to all other trades copies of approved ductwork shop drawings to assist in the coordination of the rough-in and installation of all items of work.

C. The order of space allocation priority in plan and in elevation shall be as follows.
1. 1st Light Fixtures, at Ceiling Soffit + 6"
2. 2nd Grade Plumbing Waste and Vent Systems
3. 3rd Ductwork
4. 4th Pressurized Piping Systems
5. 5th Electrical Conduit
6. 6th Ceiling Support System, where required

3.18 DISCHARGE OF WASTES FROM CONSTRUCTION SITE

A. The Contractor shall comply with all applicable provisions of local, state, and federal laws regarding the discharge of wastes into sewer and waterways. Special caution shall be exercised to prevent the discharge of wastes which contain oil, tar, asphalt, roofing compound, kerosene, gasoline, paint, mud, cement, lime, or other materials which would degrade the water quality of the receiving water course.

3.19 OPERATING AND MAINTENANCE MANUAL

A. The Contractor shall furnish indexed operating and maintenance manuals with complete technical data for each electrical system, piece of equipment, and material installed under this Contract.

B. The manuals shall be identified on the cover as "Operating and Maintenance Manual" and shall list the name and location of project, the Owner, the Engineers, the General Contractor, and the Subcontractors installing equipment represented in the brochure.

C. Two (2) copies of the manual, bound in three-ring hardback binders shall be provided. One copy shall be completed and delivered to the Engineer prior to the time that system and equipment tests are performed. The second copy shall be delivered prior to final acceptance. The manual shall have a Table of Contents and shall be grouped in tabbed sections according to the specification sections. Each section shall be organized as follows:
1. Approved engineering submittals with complete performance and technical data.
2. Manufacturer's local representative and/or distributor's name and address.
3. Manufacturer's installation instructions and brochures.
4. Manufacturer's operating and maintenance brochures.
5. Manufacturer's installation wiring diagram.
6. Contractor's field wiring diagram, if different.
7. Manufacturer's brochure listing recommended spare parts.
8. Manufacturer's brochure listing replacement part numbers and descriptions.

D. Provide a final section entitled, "Warranties and Guarantees", for all equipment as well as Contractor's warranty.

3.20 CONDITIONS OF EQUIPMENT AT FINAL ACCEPTANCE

A. At the time of acceptance, the Contractor shall have inspected all installed systems to assure the following has been completed:
1. Panelboards have all conductors neatly formed, bundled, and made-up tight. Cans shall be vacuum cleaned and surfaces cleaned of stray paint, dust, grease, and fingerprints. All circuit directories to be neatly typed and in place.
2. Safety and disconnect switches and motor starters to be vacuum cleaned of debris and dust, and all surfaces free of stray paint, grease, and fingerprints.
3. Switchgear, transformers, and system devices shall be cleaned internally and externally and have all surfaces restored to original surface conditions.

4. Touch-up all scratched surfaces using paint matching the existing equipment paint. Where paint cannot be matched, the entire surface shall be repainted in a color and manner approved by the Engineer.

**END OF SECTION**

## SECTION 260050 - BASIC ELECTRICAL MATERIALS AND METHODS

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

    A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SUMMARY

    A.     This Section includes the following:
        1.     Raceways.
        2.     Building wire and connectors.
        3.     Supporting devices for electrical components.
        4.     Cutting and patching for electrical construction.
        5.     Touchup painting.

1.3     DEFINITIONS

    A.     EMT:  Electrical metallic tubing.

    B.     FMC:  Flexible metal conduit.

    C.     LFMC:  Liquidtight flexible metal conduit.

    D.     RNC:  Rigid nonmetallic conduit.

1.4     SUBMITTALS

    A.     Submittals not required.

1.5     QUALITY ASSURANCE

    A.     Electrical Components, Devised, and Accessories:  Listed and labeled as defined in NFPA 70, Article 100, by a testing agency acceptable to authorities having jurisdiction, and marked for intended use.

    B.     Comply with NFPA 70.

1.6     COORDINATION

    A.     Sequence, coordinate, and integrate installing electrical materials and equipment for efficient flow of the Work.

### PART 2 - PRODUCTS

2.1     RACEWAYS

    A.     See Section "Raceways and Boxes."

2.2     CONDUCTORS

A. See Section "Conductors and Cables."

2.3 SUPPORTING DEVICES

A. Material: Cold-formed steel, with corrosion-resistant coating acceptable to authorities having jurisdiction.

B. Metal items for Use Outdoors or in Damp Locations: Hot-dip galvanized steel.

C. Slotted-Steel Channel Supports: Flange edges turned toward web, and 9/16-inch- diameter slotted holes at a maximum of 2 inches o.c., in webs.

D. Nonmetallic Channel and Angle Systems: Structural-grade, factory-formed, glass-fiber-resin channels and angles with 9/16-inch- diameter holes at a maximum of 8 inches o.c., in at least one surface.
1. Fittings and Accessories: Products of the same manufacturer as channels and angles.
2. Fittings and Accessory Materials: Same as channels and angles, except metal items may be stainless steel.

E. Raceways and Cable Supports: Manufactured clevis hangers, riser clamps, straps, threaded C-clamps with retainers, ceiling trapeze hangers or wall brackets.

F. Pipe Sleeves: ASTM A 53, Type E, Grade A, Schedule 40, galvanized steel, plain ends.

G. Expansion Anchors: Carbon-steel wedge or sleeve type.

H. Toggle Bolts: All-steel springhead type.

I. Powder-Driven Threaded Studs: Heat-treated steel.

2.4 TOUCHUP PAINT

A. For Equipment: Equipment manufacturer's paint selected to match installed equipment finish.

B. Galvanized Surfaces: Zinc-rich paint recommended by item manufacturer.

**PART 3 - EXECUTION**

3.1 ELECTRICAL EQUIPMENT INSTALLATION

A. Headroom Maintenance: If mounting heights or other location criteria are not indicated, arrange and install components and equipment to provide the maximum possible headroom.

B. Materials and Components: Install level, plumb, and parallel and perpendicular to other building systems and components, unless otherwise indicated.

C. Equipment: Install to facilitate service, maintenance, and repair or replacement of components. Connect for ease of disconnecting, with minimum interference with other installations.

3.2 ELECTRICAL SUPPORTING DEVICE APPLICATION

A. Damp Locations and Outdoors: Hot-dip galvanized materials or nonmetallic, U-channel system components.

B. Dry Locations: Steel materials.

C. Support Clamps for PVC Raceways: Click-type clamp system.

D. Selection of Supports: Comply with manufacturer's written instructions.

E.     Strength of Supports:  Adequate to carry present and future loads, times a safety factor of at least four; minimum of 200-lb design load.

3.3     SUPPORT INSTALLATION

A.     Install support devices to securely and permanently fasten and support electrical components.

B.     Install individual and multiple raceway hangers and riser clamps to support raceways.  Provide U-bolts, clamps, attachments, and other hardware necessary for hanger assemblies and for securing hanger rods and conduits.

C.     Support parallel runs of horizontal raceways together on trapeze- or bracket-type hangers.

D.     Support individual horizontal raceways with separate, malleable-iron pipe hangers or clamps.

E.     Install ¼-inch-diameter or larger threaded steel hanger rods, unless otherwise indicated.

F.     Spring-steel fasteners specifically designed for supporting single conduits or tubing may be used instead of malleable-iron hangers for 1½ inch and smaller raceways serving lighting and receptacle branch circuits above suspended ceilings and for fastening raceways to slotted channel and angle supports.

G.     Arrange supports in vertical runs so the weight of raceways and enclosed conductors is carried entirely by raceway supports, with no weight load on raceway terminals.

H.     Simultaneously install vertical conductor supports with conductors.

I.     Separately support cast boxes that are threaded to raceways and used for fixture support.  Support sheet-metal boxes directly from the building structure or by bar hangers.  If bar hangers are used, attach bar to raceways on opposite sides of the box and support the raceway with an approved fastener not more than 24 inches from the box.

J.     Install metal channel racks for mounting cabinets, panelboards, disconnect switches, control enclosures, pull and junction boxes, transformers, and other devices unless components are mounted directly to structural elements of adequate strength.

K.     Install sleeves for cable and raceway penetrations of concrete slabs and walls unless core-drilled holes are used.  Install sleeves for cable and raceway penetrations of masonry and fire-rated gypsum walls and of all other fire-rated floor and wall assemblies.  Install sleeves during erection of concrete and masonry walls.

L.     Securely fasten electrical items and their supports to the building structure, unless otherwise indicated.  Perform fastening according to the following unless other fastening methods are indicated:
1.     Wood:  Fasten with wood screws or screw-type nails.
2.     Masonry:  Toggle bolts on hollow masonry units and expansion bolts on solid masonry units.
3.     Existing Concrete:  Expansion bolts.
4.     Steel:  Welded threaded studs or spring-tension clamps on steel.
       a.     Field Welding:  Comply with AWS D1.1.
5.     Welding to steel structure may be used only for threaded studs, not for conduits, pipe straps, or other items.
6.     Light Steel:  Sheet-metal screws.
7.     Fasteners:  Select so the load applied to each fastener does not exceed 25 percent of its proof-test load.

3.4     FIRESTOPPING

A.     Apply firestopping to cable and raceway penetrations of fire-rated floor and wall assemblies to achieve fire-resistance rating of the assembly.  Firestopping materials and installation requirements are specified in Division 7 Section "Firestopping."

3.5     CUTTING AND PATCHING

A.     Cut, channel, chase, and drill floors, walls, partitions, ceilings, and other surfaces required to permit electrical installations.  Perform cutting by skilled mechanics of trades involved.

B.     Repair and refinish disturbed finish materials and other surfaces to match adjacent undisturbed surfaces.  Install new fireproofing where existing firestopping has been disturbed.  Repair and refinish materials and other surfaces by skilled mechanics of trades involved.

3.6     FIELD QUALITY CONTROL

A.     Inspect installed components for damage and faulty work, including the following:
1.     Raceways.
2.     Building wire and connectors.
3.     Supporting devices for electrical components.
4.     Electrical identification.
5.     Cutting and patching for electrical construction.
6.     Touchup painting.

3.7     REFINISHING AND TOUCHUP PAINTING

A.     Refinish and touch up paint.  Paint materials and application requirements are specified in Division 9 Section "Painting."
1.     Clean damaged and disturbed areas and apply primer, intermediate, and finish coats to suit the degree of damage at each location.
2.     Follow paint manufacturer's written instructions for surface preparation and for timing and application of successive coats.
3.     Repair damage to galvanized finishes with zinc-rich paint recommended by manufacturer.
4.     Repair damage to PVC or paint finishes with matching touchup coating recommended by manufacturer.

3.8     CLEANING AND PROTECTION

A.     On completion of installation, including outlets, fittings, and devices, inspect exposed finish.  Remove burrs, dirt, paint spots, and construction debris.

B.     Protect equipment and installations and maintain conditions to ensure that coatings, finishes, and cabinets are without damage or deterioration at time of Substantial Completion.

**END OF SECTION**

## SECTION 260519 - CONDUCTORS AND CABLES

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SUMMARY

A.     This Section includes building wires and cables and associated connectors, splices, and terminations for wiring systems rated 600 V and less.

1.3     SUBMITTALS

A.     Product Data:  For each type of product indicated.

B.     Qualification Data:  For testing agency.

C.     Field Quality-Control Test Reports:  From Contractor.

1.4     QUALITY ASSURANCE

A.     Electrical Components, Devices, and Accessories:  Listed and labeled as defined in NFPA 70, Article 100, by a testing agency acceptable to authorities having jurisdiction, and marked for intended use.

B. Comply with NFPA 70.

### PART 2 - PRODUCTS

2.1     MANUFACTURERS

A.     Available Manufacturers:  Subject to compliance with requirements, all conductors shall be listed for the application, temperature, and insulation rating to which they are intended.

2.2     CONDUCTORS AND CABLES

A.     Refer to Part 3 "Conductor and Insulation Applications" Article for insulation type, cable construction, and ratings.

B.     Conductor Material:
1.     Copper complying with NEMA WC-70.
2.     Solid conductors, sizes 10 and 12, uncoated copper per ASTM B3.
3.     Stranded conductor, all other sizes, uncoated copper per ASTM B3, ASTM B787, and ASTM B8.

C.     Conductor Insulation Types:  Type THHN-THWN and complying with NEMA WC-70. Type XHHW-2 and complying with UL 44.
1.     Rated for sunlight resistance all colors.
2.     Conductors shall be color coded for voltage and phase as per NEC and any TAMU design guideline requirements and local amendments.
3.     Larger conductors shall have taped color coding.
4.     Size, rating, temperature, and type shall be permanently marked on conductor jacket.

5.  Insulation shall be PVC, heat and moisture resistant, flame retardant compound as per UL-83 and UL-1063.
6.  Jacket shall be polyamide outer nylon covering per UL-83 and UL-1063.

D.  Rated for sunlight resistance all colors.

## 2.3    CONNECTORS

A.  Wire Connectors:
1.  Description:  Factory-fabricated UL listed connected and of size, ampacity rating, material, type, and class for application and service indicated.
2.  Provide self-locking square wire spring grab screw on wire connectors sized as per NEC and the number of conductors to be connected.
3.  Thermoplastic deep shell design, with wings on smaller connectors, rated for application temperature, Minimum 105 degrees C.
4.  Copper to copper connection, 600V.
5.  Provide high temp wire connectors for all high temperature equipment applications.

B.  Push-in wire connectors are Not Approved and shall not be used for any power or lighting circuits above 50V.

## PART 3 PART 3 - EXECUTION

## 3.1    CONDUCTOR AND INSULATION APPLICATIONS

A.  Branch Circuits Concealed in Ceilings, Walls, and Partitions:  Type THHN-THWN, single conductors in raceway.

## 3.2    INSTALLATION

A.  Conceal cables in finished walls, ceilings, and floors, unless otherwise indicated.

B.  Minimum line voltage conductor size is #12 AWG.

C.  Minimum control cabling is #14 AWG.

D.  Neutrals shall not be shared on any single pole circuit.

E.  Use manufacturer-approved pulling compound or lubricant where necessary; compound used must not deteriorate conductor or insulation.  Do not exceed manufacturer's recommended maximum pulling tensions and sidewall pressure values.

F.  Use pulling means; including fish tape, cable, rope, and basket-weave wire/cable grips that will not damage cables or raceway.

G.  Install exposed cables parallel and perpendicular to surfaces of exposed structural members and follow surface contours where possible.

H.  Support cables according to Section "Basic Electrical Materials and Methods."

I.  Seal around cables penetrating fire-rated elements according to Section "Through-Penetration Firestop Systems."

J.  Identify and color-code conductors and cables according to Section "Electrical Identification" and adhere to local color code requirements.

K.  "Plug & Play" or "Push-In" connections are not acceptable for this project.

L.  Wire connectors similar or equal to Wagos are not acceptable for this project.

3.3     CONNECTIONS

    A.     Tighten electrical connectors and terminals according to manufacturers published torque-tightening values.  If manufacturer's torque values are not indicated, use those specified in UL 486A and UL 486B.

    B.     Make splices and taps that are compatible with conductor material and that possess equivalent or better mechanical strength and insulation ratings than unspliced conductors.
        1.     Use oxide inhibitor in each splice and tap conductor for aluminum conductors.

    C.     Wiring at Outlets:  Install conductor at each outlet, with at least 12 inches of slack.


3.4     FIELD QUALITY CONTROL

    A.     Testing:  Engage a qualified testing agency to perform the following field quality-control testing:
        1.     After installing conductors and cables and before electrical circuitry has been energized, test for compliance with requirements.
        2.     Perform each electrical test and visual and mechanical inspection stated in NETA ATS, Section 7.3.1.  Certify compliance with test parameters.

    B.     Test Reports:  Prepare a written report to record the following:
        1.     Test procedures used.
        2.     Test results that comply with requirements.
        3.     Test results that do not comply with requirements and corrective action taken to achieve compliance with requirements.


**END OF SECTION**

**SECTION 260526 - GROUNDING AND BONDING**

**PART 1 - GENERAL**

1.1     RELATED DOCUMENTS

    A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SUMMARY

    A.     This Section includes grounding of electrical systems and equipment. Grounding requirements specified in this Section may be supplemented by special requirements of systems described in other Sections.

1.3     SUBMITTALS

    A.     Product Data:  For each type of product indicated.

    B.     Qualification Data:  For firms and persons specified in "Quality Assurance" Article.

1.4     QUALITY ASSURANCE

    A.     Electrical Components, Devices, and Accessories:  Listed and labeled as defined in NFPA 70, Article 100, by a testing agency acceptable to authorities having jurisdiction, and marked for intended use.
        1.     Comply with UL 467.

**PART 2 - PRODUCTS**

2.1     MANUFACTURERS

    A.     Manufacturers:  Subject to compliance with requirements, provide products by one of the following:
        1.     Grounding Conductors, Cables, Connectors, and Rods:
            a.     Apache Grounding/Erico Inc.
            b.     Boggs, Inc.
            c.     Chance/Hubbell.
            d.     Copperweld Corp.
            e.     Dossert Corp.
            f.     Erico Inc.; Electrical Products Group.
            g.     Framatome Connectors/Burndy Electrical.
            h.     Galvan Industries, Inc.
            i.     Harger Lightning Protection, Inc.
            j.     Hastings Fiber Glass Products, Inc.
            k.     Heary Brothers Lightning Protection, Co.
            l.     Ideal Industries, Inc.
            m.     ILSCO.
            n.     Kearney/Cooper Power Systems.
            o.     Korns:  C.C. Korns Co.; Division of Robroy Industries.
            p.     Lightning Master Corp.
            q.     Lyncole XIT Grounding.
            r.     O-Z/Gedney Co.; a business of the EGS Electrical Group.
            s.     Raco, Inc.; Division of Hubbell.
            t.     Robbins Lightning, Inc.
            u.     Salisbury:  W.H. Salisbury & Co.
            v.     Superior Grounding Systems, Inc.
            w.     Thomas & Betts, Electrical.

2.2     GROUNDING CONDUCTORS

    A.     For insulated conductors, comply with Section "Conductors and Cables."

    B.     Material:  Copper.

    C.     Equipment Grounding Conductors:  Insulated with green-colored insulation.

2.3     CONNECTOR PRODUCTS

    A.     Comply with IEEE 837 and UL 467; listed for use for specific types, sizes, and combinations of conductors and connected items.

    B.     Bolted Connectors:  Bolted-pressure-type connectors, or compression type.

**2.4     - EXECUTION**

3.1     APPLICATION

    A.     Use only copper conductors for both insulated and bare grounding conductors in direct contact with earth, concrete, masonry, crushed stone, and similar materials.

    B.     In raceways, use insulated equipment grounding conductors.

    C.     Equipment Grounding Conductor Terminations:  Use bolted pressure clamps.

3.2     EQUIPMENT GROUNDING CONDUCTORS

    A.     Comply with NFPA 70, Article 250, for types, sizes, and quantities of equipment grounding conductors, unless specific types, larger sizes, or more conductors than required by NFPA 70 are indicated.

    B.     Install equipment grounding conductors in all feeders and circuits.

3.3     INSTALLATION

    A.     Grounding Conductors:  Route along shortest and straightest paths possible, unless otherwise indicated.  Avoid obstructing access or placing conductors where they may be subjected to strain, impact, or damage.

3.4     CONNECTIONS

    A.     General:  Make connections so galvanic action or electrolysis possibility is minimized.  Select connectors, connection hardware, conductors, and connection methods so metals in direct contact will be galvanically compatible.
        1.     Use electroplated or hot-tin-coated materials to ensure high conductivity and to make contact points closer to order of galvanic series.
        2.     Make connections with clean, bare metal at points of contact.
        3.     Make aluminum-to-steel connections with stainless-steel separators and mechanical clamps.
        4.     Make aluminum-to-galvanized steel connections with tin-plated copper jumpers and mechanical clamps.
        5.     Coat and seal connections having dissimilar metals with inert material to prevent future penetration of moisture to contact surfaces.

    B.Equipment Grounding Conductor Terminations:  For No. 8 AWG and larger, use pressure-type grounding lugs.  No. 10 AWG and smaller grounding conductors may be terminated with winged pressure-type connectors.

C.    Tighten screws and bolts for grounding and bonding connectors and terminals according to manufacturers published torque-tightening values. If manufacturer's torque values are not indicated, use those specified in UL 486A and UL 486B.

D.    Compression-Type Connections: Use hydraulic compression tools to provide correct circumferential pressure for compression connectors. Use tools and dies recommended by connector manufacturer. Provide embossing die code or other standard method to make a visible indication that a connector has been adequately compressed on grounding conductor.

**END OF SECTION**

**SECTION 260533 - RACEWAYS AND BOXES**


**PART 1 - GENERAL**


1.1     RELATED DOCUMENTS

  A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.


1.2     SUMMARY

  A.     This Section includes raceways, fittings, boxes, enclosures, and cabinets for electrical wiring.

  B.     Related Sections include the following:
         1.     Division 7 Section "Firestopping" for firestopping materials and installation at penetrations through walls, ceilings, and other fire-rated elements.
         2.     Section "Basic Electrical Materials and Methods" for supports, anchors, and identification products.


1.3     DEFINITIONS

  A.     EMT:  Electrical metallic tubing.

  B.     ENT:  Electrical nonmetallic tubing.

  C.     FMC:  Flexible metal conduit.

  D.     LFMC:  Liquidtight flexible metal conduit.

  E.     LFNC:  Liquidtight flexible nonmetallic conduit.

  F.     RNC:  Rigid nonmetallic conduit.

  G.     PVC: Rigid Polyvinyl chloride conduit.


1.4     SUBMITTALS

  A.     Submittals not required.


1.5     QUALITY ASSURANCE

  A.     Electrical Components, Devices, and Accessories:  Listed and labeled as defined in NFPA 70, Article 100, by a testing agency acceptable to authorities having jurisdiction, and marked for intended use.

  B.     Comply with NFPA 70.


**PART 2 - PRODUCTS**


2.1     MANUFACTURERS

  A.     In other Part 2 articles where subparagraph titles below introduce lists, the following requirements apply for product selection:

1. Available Manufacturers: Subject to compliance with requirements, manufacturers offering products that may be incorporated into the Work include, but are not limited to, the manufacturers specified.
2. Refer to 3.1, RACEWAY APPLICATION, for materials to be used.

2.2 METAL CONDUIT AND TUBING

A. Available Manufacturers:
1. AFC Cable Systems, Inc.
2. Alflex, Inc.
3. Anamet Electrical, Inc.; Anaconda Metal Hose.
4. Electri-Flex Co.
5. Grinnell Co./Tyco International; Allied Tube and Conduit Div.
6. Republic Conduit.
7. Manhattan/CDT/Cole-Flex.
8. O-Z Gedney; Unit of General Signal.
9. Wheatland Tube Co.
10. Perma-Cote
11. Plasti Bond
12. KorKap

B. EMT: ANSI C80.3.

C. Fittings: NEMA FB 1; compatible with conduit and tubing materials. Provide fittings factory matched with conduit types.
1. Indoor Fittings: Steel Compression
2. Outdoor Fittings: Threaded fittings on IMC or Rigid Conduit
3. Outdoor Fittings: Compression fittings with gaskets on all transitions to flexible conduit.
4. Die cast fittings are not acceptable anywhere.
5. EMT crimp type or set screw fittings are not acceptable.
6. All conduits 1 ¼" and below shall be terminated with insulated throat fittings. All conduits 1 ½" and larger shall be terminated with bonding bushings.

2.3 BOXES, ENCLOSURES, AND CABINETS

A. Available Manufacturers:
1. Cooper Crouse-Hinds; Div. of Cooper Industries, Inc.
2. Emerson/General Signal; Appleton Electric Company.
3. Erickson Electrical Equipment Co.
4. Hoffman.
5. Hubbell, Inc.; Killark Electric Manufacturing Co.
6. O-Z/ Gedney; Unit of General Signal.
7. RACO; Division of Hubbell, Inc.
8. Stahlin
9. Scott Fetzer Co.; Adalet-PLM Division.
10. Spring City Electrical Manufacturing Co.
11. Thomas & Betts Corporation.
12. Walker Systems, Inc.; Wiremold Company (The).
13. Woodhead, Daniel Company; Woodhead Industries, Inc. Subsidiary.

B. Sheet Metal Outlet and Device Boxes: NEMA OS 1.

C. Cast-Metal Outlet and Device Boxes: NEMA FB 1, Type FD, with gasketed cover.

D. Nonmetallic Outlet and Device Boxes: NEMA OS 2.

E. Small Sheet Metal Pull and Junction Boxes: NEMA OS 1.

F. Cast-Metal Pull and Junction Boxes: NEMA FB 1, cast aluminum with gasketed cover.

2.4     FACTORY FINISHES

    A.     Finish:  For raceway, enclosure, or cabinet components, provide manufacturer's standard prime-coat finish ready for field painting.

    B.     Finish:  For raceway, enclosure, or cabinet components, provide manufacturer's standard paint applied to factory-assembled surface raceways, enclosures, and cabinets before shipping.


**PART 3 - EXECUTION**


3.1     RACEWAY APPLICATION

    A.     Indoors:
       1.     Exposed in Mechanical/Electrical/Unfinished Spaces:  EMT.
       2.     Exposed in Finished Spaces: Metal Surface Raceway painted/finished to match space finishes.
       3.     Concealed:  EMT.
       4.     Connection to Vibrating Equipment (Including Transformers and Hydraulic, Pneumatic, Electric Solenoid, or Motor-Driven Equipment):  FMC; except use LFNC in damp or wet locations or with water equipment. Minimum length shall be 18 inches, maximum length 72 inches.
       5.     Damp or Wet Locations: Sealed EMT with sealed fittings.
       6.     Underfloor:  Sealed EMT with sealed fittings or IMC.
       7.     Boxes and Enclosures:  NEMA 250, Type 1, except as follows:
          a.     Damp or Wet Locations:  NEMA 250, Type 4, nonmetallic.

    B.     Minimum Raceway Size:  3/4-inch trade size for power circuits, 1/2-inch for control wiring.

    C.     Aluminum conduit will not be accepted on this project.

    D.     Connections to Luminaires (Fixture Whips): 1/2-inch flexible metal conduit may be used in 6-foot maximum lengths for tap conductors to luminaires above accessible suspended ceilings. Provide flexible metal conduit around manufacturer's plastic whip when exposed in ceiling plenum to j-box.


3.2     INSTALLATION

    A.     Conduit Routing:
       1.     All branch circuit conduit shall be run overhead unless specifically directed by the engineer.
       2.     All conduit shall be run at right angles or parallel to the building lines to the limits that the structure will allow. Raceways shall not be run diagonal or curved.
       3.     Conduit should not be installed horizontal in walls except for power requirements for devices under windows.

    B.     Keep raceways at least 6 inches away from parallel runs of flues and steam or hot-water pipes.  Install horizontal raceway runs above water and steam piping.

    C.     Install raceways as high as possible and coordinate installation with other equipment.

    D.     Install raceways to equipment mounted on the floor away from walls from overhead down to the equipment or disconnects. Do not run across the floor creating a tripping hazard. Rack support conduit at the disconnect.

    E.     Provide clear access to all pull and j-boxes. Provide access doors over hard (non-lay-in ceilings) to all pull boxes.  Minimum access required 1.5 x box cover size or 18 inches.

    F.     Label all j-box and pull box covers with circuits contained within box.

    G.     Under no circumstances shall power and data be shared in the same raceway, tray, channel, or sleeve.

    H.     Do not provide more than 270 degrees of conduit bends before adding a junction box as a pull point.

I. Install raceways for power conductors (any conductor over 50V) 12 inches from any signal/communications conductor (data, fiber optics, telephone, fire alarm, PA, community antenna and radio distribution (CATV), low power or network powered broadband communications, systems controls, and any other system operating under 50V) not in conduit on J-hooks.

J. Install raceways for power conductors (any conductor over 50V) 12 inches from communications raceways. Communications raceways include; data, fiber optics, telephone, fire alarm, PA, community antenna and radio distribution (CATV), low power or network powered broadband communications, systems controls, and any other system operating under 50V.

K. Complete raceway installation before starting conductor installation.

L. Support raceways as specified in Section "Basic Electrical Materials and Methods."

M. Install temporary closures to prevent foreign matter from entering raceways during construction. Remove prior to completion of conduit.

N. Protect stub-ups from damage where conduits rise through floor slabs. Arrange so curved portions of bends are not visible above the finished slab.

O. Make bends and offsets so ID is not reduced. Keep legs of bends in the same plane and keep straight legs of offsets parallel, unless otherwise indicated.

P. Firestop: Firestop all raceway penetrations in rated walls. Provide intumescent fill in all sleeve openings. Contractor shall be responsible for all wall repair and damage. Excessive firestop for holes too large (½ inch beyond the edge of the raceway) is unacceptable. Holes shall be repaired with suitable wall materials to maintain the integrity of the wall construction.

Q. Cut openings in walls as per the outer edges of the raceway. Openings made with hammers or other wall damaging tools are not acceptable. Holes too large (½ inch beyond the edge of the raceway) are unacceptable and shall be repaired with suitable wall materials to maintain the integrity of the wall construction. Contractor shall be responsible for repair to match existing.

R. Conceal conduit and EMT within finished walls, ceilings, and floors, unless otherwise indicated.
1. Install concealed raceways with a minimum of bends in the shortest practical distance, considering type of building construction and obstructions, unless otherwise indicated.

S. Expansion Joints: Provide flexible connections suitable for use with conduit type for all conduit in structural expansion joints or independent slabs that are within another structural assembly.

T. Install ALL exposed raceways parallel or at right angles to nearby surfaces or structural members and follow surface contours as much as possible.
1. Run parallel or banked raceways together on common supports.
2. Make parallel bends in parallel or banked runs. Use factory elbows only where elbows can be installed parallel; otherwise, provide field bends for parallel raceways.
3. Install conduit as high as possible.
4. Flexible cable or raceway for general circuiting is allowed exposed in mechanical or electrical spaces only. Not allowed in finished spaces.
   a. Exception: As equipment connection only.

U. Join raceways with fittings designed and approved for that purpose and make joints tight.
1. Use insulating bushings to protect conductors.

V. Terminations:
1. Where raceways are terminated with locknuts and bushings, align raceways to enter squarely and install locknuts with dished part against box. Use two locknuts, one inside and one outside box.
2. Where raceways are terminated with threaded hubs, screw raceways or fittings tightly into hub so end bears against wire protection shoulder. Where chase nipples are used, align raceways so coupling is square to box; tighten chase nipple so no threads are exposed.
3. Provide grounding bushings with integral lug on all conduit terminations at switchboards, panelboards, transformers, and all electrical equipment.

W. Install raceway sealing fittings at suitable, approved, and accessible locations and fill them with UL-listed sealing compound. For concealed raceways, install each fitting in a flush steel box with a blank cover plate having a finish similar to that of adjacent plates or surfaces. Label boxes "seal-off". Install raceway sealing fittings at the following points:
1. Where conduits pass from warm to cold locations, such as boundaries of refrigerated spaces.
2. Where otherwise required by NFPA 70.

X. Prime and Paint exposed conduit in finished spaces, unless pre-painted surface raceways is provided, as per owner/architect. Provide with paintable surface.

Y. All conduits shall be marked by color code at minimum before each box and before and after any poke through. Mark shall be minimum 3/8-inch band that completely wraps conduit and shall comply with color code Table 1, located in Section 26 05 53 "Electrical Identification". Refer to most recent table from TAMU Facilities Design Guide Division 26.

Z. Helicopter hangers/Fixed bar hangers are not acceptable on this project. Provide box and conduit ceiling support plates for boxes/conduit. Orbit #BCHS-XX or approved equal.

AA. Conduit shall only run horizontally in half walls and walls underneath a window, otherwise conduit is not to be routed horizontally on or within walls unless specifically indicated on drawings by engineer.

BB. Junction boxes in adjacent rooms shall not be installed back-to-back within the wall. Provide at least 12 inches of separation between outlet boxes located on opposite sides on common wall.

CC. Metal-clad Cable or MC Cable may be used for light switches and receptacle whips of no more than 25 feet, and as follows:

1. Only in general occupancy rooms, such as offices, classrooms and conference rooms. Do not use in rooms such as Mechanical Rooms, Electrical Rooms, Laboratories, or any other high equipment rooms or laboratories. Do not use in spaces with exposed to ceiling structure.
2. MC Cable must be installed to a minimum of NECA standards, additionally must be installed in straight runs with definite bends only and must be well secured. Well secured shall be no more than 1" deflection for straight runs and 3" of deflection for bends at 3 lbs of force.

DD. All outlet boxes shall be supported with mounting brackets that are supported by two stud walls.

3.3 PROTECTION

A. Provide final protection and maintain conditions that ensure coatings, finishes, and cabinets are without damage or deterioration at time of Substantial Completion.
1. Repair damage to galvanized finishes with zinc-rich paint recommended by manufacturer.
2. Repair damage to PVC or paint finishes with matching touchup coating recommended by manufacturer.
3. Provide cover over conduits during storage to prevent dirt and debris from entering conduits during storage.

3.4 CLEANING

A. After completing installation of exposed, factory-finished raceways and boxes, inspect exposed finishes and repair damaged finishes.

B. Remove debris from conduits prior to capping any spare conduits.

C. Blow-out empty conduits that are future spares in any exterior or underground installation prior to capping.

**END OF SECTION**

## SECTION 260553 - ELECTRICAL IDENTIFICATION

### PART 1 - GENERAL

1.1      RELATED DOCUMENTS

     A.      Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2      SUMMARY

     A.      This Section includes electrical identification materials and devices required to comply with ANSI C2, NFPA 70, OSHA standards, and authorities having jurisdiction.

1.3      SUBMITTALS

     A.      Product Data:  For each electrical identification product indicated.

     B.      Schedule of Nomenclature:  An index of electrical equipment and system components used in identification signs and labels.

1.4      QUALITY ASSURANCE

     A.      Comply with ANSI C2.

     B.      Comply with NFPA 70.

     C.      Comply with ANSI A13.1 and NFPA 70 for color-coding.

### PART 2 - PRODUCTS

2.1      RACEWAYS AND CABLE LABELS

     A.      Comply with ANSI A13.1, Table 3, for minimum size of letters for legend and for minimum length of color field for each raceway and cable size.
         1.      Color:  Black letters on orange field.
         2.      Legend:  Indicates voltage and service.

     B.      Adhesive Labels:  Preprinted, flexible, self-adhesive vinyl with legend overlaminated with a clear, weather- and chemical-resistant coating.

     C.      Colored Adhesive Tape:  Self-adhesive vinyl tape not less than 3 mils thick by 1 to 2 inches wide.

     D.      Tape Markers:  Vinyl or vinyl-cloth, self-adhesive, wraparound type with preprinted numbers and letters.

2.2      NAMEPLATES AND SIGNS

     A.      Safety signs:  Comply with 29 CFR, Chapter XVII, Part 1910.145.

     B.      Engraved Plastic Nameplates and Signs:  Engraving stock, melamine plastic laminate, minimum 1/16 inch thick for signs up to 20 sq. in. and 1/8 inch thick for larger sizes.
         1.      Engraved legend with black letters on white face.
         2.      Punched or drilled for mechanical fasteners.

C.    Baked-Enamel Signs for Interior Use:  Preprinted aluminum signs, punched or drilled for fasteners, with colors, legend, and size required for the application.  ¼-inch grommets in corners for mounting.

D.    Exterior, Metal-Backed, Butyrate Signs:  Weather-resistant, nonfading, preprinted, cellulose-acetate butyrate signs with 0.0396-inch galvanized-steel backing; and with colors, legend, and size required for the application.  ¼-inch grommets in corners for mounting.

E.    Fasteners for Nameplates and Signs:  Self-tapping, stainless-steel screws or No. 10/32, stainless-steel machine screws with nuts and flat and lock washers.

2.3    MISCELLANEOUS IDENTIFICATION PRODUCTS

A.    Cable Ties:  fungus-inert, self-extinguishing, one-piece, self-locking, Type 6/6 nylon cable ties.
   1.    Minimum Width:  3/16 inch.
   2.    Tensile Strength:  50 lb minimum.
   3.    Temperature Range:  Minus 40 to plus 185 deg F.
   4.    Color:  According to color-coding.

B.    Paint:  Formulated for the type of surface and intended use.
   1.    Primer for Galvanized Metal:  Single-component acrylic vehicle formulated for galvanized surfaces.
   2.    Primer for Concrete Masonry Units:  Heavy-duty-resin block filler.
   3.    Primer for Concrete:  Clear, alkali-resistant, binder-type sealer.
   4.    Enamel:  Silicone-alkyd or alkyd urethane as recommended by primer manufacturer.

**PART 3 - EXECUTION**

3.1    INSTALLATION

A.    Identification Materials and Devices:  Install at locations for most convenient viewing without interference with operation and maintenance of equipment.

B.    Lettering, Colors, and Graphics:  Coordinate names, abbreviations, colors, and other designations with corresponding designations in the Contract Documents or with those required by codes and standards. Use consistent designations throughout Project.

C.    Sequence of Work:  If identification is applied to surfaces that require finish, install identification after completing finish work.

D.    Self-Adhesive Identification Products:  Clean surfaces before applying.

E.    Install painted identification according to manufacturer's written instructions and as follows:
   1.    Clean surfaces of dust, loose material, and oily films before painting.
   2.    Prime surfaces using type of primer specified for surface.
   3.    Apply one intermediate and one finish coat of enamel.

F.    Electric Box Color Coding:
   1.    All junction boxes and pull boxes shall be labeled as to the circuits contained within the box, including panel name and shall be painted as indicated below.
   2.    Each of the connected conduits shall also have approx. 1 to 2 inches of paint applies near the box.
   3.    Do not paint over the box cover identification tags.
   4.    Exclusions:
         a.    Exposed boxes in occupied spaces. Paint exposed boxes as directed by Architect.
         b.    Where direct mounted for aesthetic purposes.

| System | Conduit Band Color | Cover Identification | Color |
|---|---|---|---|
| Fire Alarm | Red | FA | Red |
| Emergency Power | White | EM/Panel ID/Ckt No | White |
| 208/120 Normal Pwr | Blue | Panel ID/Ckt No | Blue |
| 480/277 Normal Pwr | Yellow | Panel ID/Ckt No | Yellow |
| Data/Telecom/Fiber/A/V | Orange | Data/Tele/Fiber Optic/AV | Orange |
| HVAC Controls | Green | HVAC | Green |
| Security | Purple | SEC | Purple |

G. Color Banding Raceways and Exposed Cables: Band exposed and accessible raceways of the systems listed below:
1. Bands: Pretensioned, wraparound plastic sleeves; colored adhesive tape; or a combination of both. Make each color band 2 inches wide, completely encircling conduit, and place adjacent bands of two-color markings in contact, side by side.
2. Band Locations: At changes in direction, at penetrations of walls and floors, at 50-foot maximum intervals in straight runs, and at 25-foot maximum intervals in congested areas.
3. Apply the following colors to the systems listed below:
   a. Medium Voltage Conduits.

H. Caution Labels for Indoor Boxes and Enclosures for Power: Install pressure-sensitive, self-adhesive labels identifying system voltage with black letters on orange background. Install on exterior of door or cover.

I. Circuit Identification Labels on Boxes: Install labels externally.
1. Exposed Boxes: Pressure-sensitive, self-adhesive plastic label on cover.
2. Labeling Legend: Permanent, waterproof listing of panel and circuit number or equivalent.
3. Normal Power Circuits: Black lettering and numbers
4. Emergency Power Circuits: Red lettering and numbers

J. Color-Coding of Secondary Branch Circuit Conductors: Use the following colors for service, feeder, and branch-circuit branch circuit conductors:
1. 120/208V 3 Phase Conductors:
   a. Phase A: Black.
   b. Phase B: Red.
   c. Phase C: Blue.
   d. Neutral: White.
   e. Ground: Green.
   f. Switched Leg: Pink.
2. 277/480V 3 Phase Conductors:
   a. Phase A: Brown.
   b. Phase B: Purple.
   c. Phase C: Yellow.
   d. Neutral: Gray.
   e. Ground: Green.
   f. Switched Leg: Pink.
3. Factory apply color the entire length of conductors, except the following field-applied, color-coding methods may be used instead of factory-coded wire for sizes larger than No. 10 AWG:
   a. Colored, pressure-sensitive plastic tape in half-lapped turns for a distance of 6 inches from terminal points and in boxes where splices or taps are made. Apply last two turns of tape with no tension to prevent possible unwinding. Use 1-inch-wide tape in colors specified. Adjust tape bands to avoid obscuring cable identification markings.
   b. Colored cable ties applied in groups of three ties of specified color to each wire at each terminal or splice point starting 3 inches from the terminal and spaced 3 inches apart. Apply with a special tool or pliers, tighten to a snug fit, and cut off excess length.

K. In electrical room, permanently mark the floor with the NEC-required clear space in front of and behind switchgear, switchboards, transformers, panelboards, motor control centers, motor starters, and

disconnect switches. Install marking on the floor using color schemes conforming to ANSI Z535.1 for black and white striped border.

L.    In electrical room, all pull boxes and junction boxes shall have pressure sensitive, self adhesive plastic label on cover.

**END OF SECTION**

## SECTION 260923 - LIGHTING CONTROL DEVICES

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

A.      Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 01 Specification Sections, apply to this Section.

1.2     SUMMARY

A.      Section Includes:
        1.      Indoor occupancy sensors.

B.      Related Requirements:
        1.      Section "Wiring Devices" for wall-box dimmers, wall-switch occupancy sensors, and manual light switches.

1.3     ACTION SUBMITTALS

A.      Product Data: For each type of product.

1.4     INFORMATIONAL SUBMITTALS

A.      Field quality-control reports.

1.5     CLOSEOUT SUBMITTALS

A.      Operation and Maintenance Data: For each type of lighting control device to include in emergency, operation, and maintenance manuals.

### PART 2 - PRODUCTS

2.1     CEILING MOUNTED OCCUPANCY SENSORS

A.      Manufacturers:  Subject to compliance with requirements, available manufacturers offering products that may be incorporated into the Work include, but are not limited to, the following:
        1.      Cooper Industries, Inc.
        2.      Hubbell Building Automation, Inc.
        3.      Leviton Manufacturing Co., Inc.
        4.      Lithonia Lighting; Acuity Brands Lighting, Inc.
        5.      Lutron Electronics Co., Inc.
        6.      NSi Industries LLC; TORK Products.
        7.      Sensor Switch, Inc.
        8.      Square D.
        9.      Watt Stopper.

B.      General Requirements for Sensors: Ceiling-mounted, 360 degree, solid-state indoor occupancy sensors with a separate power pack.
        1.      Listed and labeled as defined in NFPA 70, by a qualified testing agency, and marked for intended location and application.

2. Operation: Turn lights on or enable wall manual switch when coverage area is occupied, and turn them off when unoccupied; with a time delay for turning lights off, adjustable over a minimum range of 1 to 30 minutes.
3. Sensor Output: Contacts rated to operate the connected relay, complying with UL 773A. Sensor is powered from the power pack.
4. Power Pack: Dry contacts rated for 20-A load at 120- and 277-V ac, and for 1 hp at 120-V ac. Sensor has 24-V dc, 150-mA, Class 2 power source, as defined by NFPA 70.
5. Mounting:
   a. Sensor: Suitable for mounting in any position on a standard outlet box.
   b. Relay: Internal dry contact closure for SPDT.
   c. Time-Delay and Sensitivity Adjustments: Recessed and concealed behind hinged door.
6. Indicator: Digital display, to show when motion is detected during testing and normal operation of sensor.
7. Bypass Switch: Override the "on" function in case of sensor failure.
8. Automatic Light-Level Sensor: Adjustable from 2 to 200 fc (21.5 to 2152 lux); turn lights off when selected lighting level is present.
9. Dimming output to control 0-10 VDC.
10. Provides second occupancy time out period enabling lighting to go dim prior to off.
11. Adjustable maximum minimum.
12. Can be series or parallel connected.
13. Photo Cell:
    a. Auto set point
    b. On/Off mode during occupancy
    c. Dimming control

C. Standard Dual-Technology Type: Ceiling mounted; detect occupants in coverage area using PIR and ultrasonic detection methods. The particular technology or combination of technologies that control on-off functions is selectable in the field by operating controls on unit.
   1. Sensitivity Adjustment: Separate for each sensing technology.
   2. Detector Sensitivity: Detect occurrences of 6-inch- (150-mm-) minimum movement of any portion of a human body that presents a target of not less than 36 sq. in. (232 sq. cm), and detect a person of average size and weight moving not less than 12 inches (305 mm) in either a horizontal or a vertical manner at an approximate speed of 12 inches/s (305 mm/s).
   3. Detection Coverage (Standard Room): Detect occupancy anywhere within a circular area of 15 ft. radius when mounted on a 108-inch high ceiling.

D. Extended Range Dual-Technology Type:  Ceiling Mounted
   1. Sensitivity Adjustment: Separate for each sensing technology.
   2. Detector Sensitivity: Detect occurrences of 6-inch- (150-mm-) minimum movement of any portion of a human body that presents a target of not less than 36 sq. in. (232 sq. cm), and detect a person of average size and weight moving not less than 12 inches (305 mm) in either a horizontal or a vertical manner at an approximate speed of 12 inches/s (305 mm/s).
   3. Detection Coverage (Standard Room): Detect occupancy anywhere within a circular area of 28 ft. radius when mounted on a 108-inch high ceiling.

## 2.2    SWITCHBOX-MOUNTED OCCUPANCY SENSORS

A. Manufacturers:  Subject to compliance with requirements, available manufacturers offering products that may be incorporated into the Work include, but are not limited to, the following:

B. Basis-of-Design Product:  Subject to compliance with requirements, provide product indicated on Drawings or comparable product by one of the following:
   1. Bryant Electric.
   2. Cooper Industries, Inc.
   3. Hubbell Building Automation, Inc.
   4. Leviton Manufacturing Co., Inc.
   5. Lightolier Controls.
   6. Lithonia Lighting; Acuity Brands Lighting, Inc.
   7. Lutron Electronics Co., Inc.
   8. NSi Industries LLC; TORK Products.
   9. RAB Lighting.

10. Sensor Switch, Inc.
11. Square D.
12. Watt Stopper.

C. General Requirements for Sensors: Automatic-wall-switch occupancy sensor, suitable for mounting in a single gang switchbox.
1. Listed and labeled as defined in NFPA 70, by a qualified testing agency, and marked for intended location and application.
2. Operating Ambient Conditions: Dry interior conditions, 32 to 120 deg F (0 to 49 deg C).
3. Switch Rating: Not less than 800-VA fluorescent at 120 V, 1200-VA fluorescent at 277 V, and 800-W incandescent.

D. Wall-Switch Sensor:
1. Standard Range: 180-degree field of view, field adjustable from 180 to 40 degrees; with a minimum coverage area of 2100 sq. ft (196 sq. m).
2. Sensing Technology: Dual technology - PIR and ultrasonic.
3. Switch Type: SP. SP, field selectable automatic "on," or manual "on" automatic "off."
4. Voltage: Dual voltage, 120 and 277 V.
5. Ambient-Light Override: Concealed, field-adjustable, light-level sensor from 10 to 150 fc (108 to 1600 lux). The switch prevents the lights from turning on when the light level is higher than the set point of the sensor.
6. Concealed, field-adjustable, "off" time-delay selector at up to 30 minutes.
7. Concealed "off" time-delay selector at 30 seconds, and 5, 10, and 20 minutes.
8. Adaptive Technology: Self-adjusting circuitry detects and memorizes usage patterns of the space and helps eliminate false "off" switching.
9. Programmable for occupancy or vacancy mode.

## 2.3 EMERGENCY SHUNT RELAY

A. Description: Normally closed, electrically held relay, arranged for wiring in parallel with manual or automatic switching contacts; complying with UL 924.
1. Coil Rating: See drawing detail.

## 2.4 CONDUCTORS AND CABLES

A. Power Wiring to Supply Side of Remote-Control Power Sources: Not smaller than No. 12 AWG. Comply with requirements in Section "Conductors and Cables."

B. Classes 2 and 3 Control Cable: Plenum rated, multiconductor cable with stranded-copper conductors.

C. Class 1 Control Cable: Plenum rated, multiconductor cable with stranded-copper conductors.

D. All exterior or underground cabling shall be rated for location.

## PART 3 - EXECUTION

## 3.1 SENSOR INSTALLATION

A. Coordinate layout and installation of ceiling-mounted devices with other construction that penetrates ceilings or is supported by them, including light fixtures, HVAC equipment, smoke detectors, fire-suppression systems, and partition assemblies.

B. Install and aim sensors in locations to achieve not less than 90 percent coverage of areas indicated. Do not exceed coverage limits specified in manufacturer's written instructions.

C. Provide factory representative to locate and calibrate daylight sensors (both stand-alone and integral to fixture) for daylight harvesting (dimming). Verify operation and document settings.

D.    Contractor to verify all sensors intended operation and calibrate sensor field of view and sensitivity.

E.    Coordinate with owner for occupancy/vacancy sensor delay times.

## 3.2    CONTACTOR INSTALLATION

A.    Mount electrically held lighting contactors with elastomeric isolator pads to eliminate structure-borne vibration, unless contactors are installed in an enclosure with factory-installed vibration isolators.

B.    Mount cabinet to wall or unistrut frame.

## 3.3    WIRING INSTALLATION

A.    Wiring Method: Comply with Section "Control/Signal Transmission Media." Minimum conduit size is 1/2 inch (13 mm).

B.    Wiring within Enclosures: Comply with NECA 1. Separate power-limited and nonpower-limited conductors according to conductor manufacturer's written instructions.

C.    Size conductors according to lighting control device manufacturer's written instructions unless otherwise indicated.

D.    Splices, Taps, and Terminations: Make connections only on numbered terminal strips in junction, pull, and outlet boxes; terminal cabinets; and equipment enclosures.

## 3.4    IDENTIFICATION

A.    Identify components and power and control wiring according to "Electrical Identification."
      1.    Identify controlled circuits in lighting contactors.
      2.    Identify circuits or luminaires controlled by photoelectric and occupancy sensors at each sensor.

B.    Label time switches and contactors with a unique designation.

## 3.5    FIELD QUALITY CONTROL

A.    Manufacturer's Field Service: Engage a factory-authorized service representative to test and inspect components, assemblies, and equipment installations, including connections.

B.    Perform the following tests and inspections with the assistance of a factory-authorized service representative:
      1.    Operational Test: After installing time switches and sensors, and after electrical circuitry has been energized, start units to confirm proper unit operation.
      2.    Test and adjust controls and safeties. Replace damaged and malfunctioning controls and equipment.
      3.    Verify emergency lighting automatic switchover to generator power at all UL 924 rated light fixture locations.
      4.    Verification of sensor operation
            a.    Sensor turns lighting on/off at programmed times
            b.    Sensor automatically dims lighting
            c.    Sensor enables additional switching
            d.    Sensor works during emergency lighting generator operation with automatic changeover

C.    Lighting control devices will be considered defective and replaced with new if they do not pass tests and inspections.

D.    Prepare a written report to be sent to the engineer for review indicating the following:
      1.    Room Number

2. Sensor Type (wall, ceiling, occupancy vacancy, daylighting)
3. Delay time
4. Operation Verification (Yes/No)

3.6 ADJUSTING

A. Occupancy Adjustments: When requested within 12 months from date of Substantial Completion, provide on-site assistance in adjusting sensors to suit actual occupied conditions. Provide up to two visits to Project during other-than-normal occupancy hours for this purpose.
   1. For occupancy and motion sensors, verify operation at outer limits of detector range. Set time delay to suit Owner's operations.
   2. For daylighting controls, adjust set points and deadband controls to suit Owner's operations.
   3. Align high-bay occupancy sensors using manufacturer's laser aiming tool.

3.7 DEMONSTRATION

A. Coordinate demonstration of products with Owner prior to substantial completion.

B. Engage a factory-authorized service representative to train Owner's maintenance personnel to adjust, operate, and maintain lighting control devices.

**END OF SECTION**

**SECTION 261310 - PULL AND JUNCTION BOXES**


**PART 1 - GENERAL**


1.1     DESCRIPTION

A.     Work covered by this Section includes furnishing of and paying for all materials, labor, services, equipment, licenses, taxes, other items, and appliances necessary for the execution, installation and completion of all work specified herein.

B.     Pull and junction boxes of appropriate size and depth as specified hereinafter.

C.     A pull or junction box is required in any conduit run with 270 degrees of bends.


1.2     SUBMITTALS

A.     Submittals for products furnished under this section are not required.


**PART 2  - PRODUCTS**


2.1     MATERIALS

A.     For interior work, provide galvanized sheet metal boxes of code thickness with lapped and welded joints, ¾-inch flanges, screw covers, etc.

B.Boxes with concentric knockouts are not acceptable.

C.     Provide ground terminal strip and ground pull box and circuits.


**PART 3 - EXECUTION**


3.1     INSTALLATION

A.     Provide junction boxes as required, sized according to number of conductors in box or type of service to be provided.  Minimum junction box size 4 inches square and 2⅛ inches deep.  Provide screw covers for junction boxes.

B.     Use minimum 16-gauge steel for pull boxes and provide with screw cover.

C.     Install boxes in conduit runs wherever necessary to avoid too long runs or too many bends.  Do not exceed 100-foot runs without pull boxes.

D.     Rigidly secure boxes to structure.  Conduit runs will not be considered adequate support.

E.     Install boxes with covers in accessible locations.

F.     Observe maximum conductor fill as required by the National Electrical Code.

G.     Helicopter hanger/Fixed bar hangers are not acceptable on this project.
H.     Junction boxes in adjacent rooms shall not be installed back-to-back within the wall. Provide at least 12 inches of separation between outlet boxes located on opposite sides on common wall.

I.     All outlet boxes shall be supported with mounting brackets that are supported by two stud walls.

**END OF SECTION**

## SECTION 265100 - INTERIOR LIGHTING

## PART 1 - GENERAL

1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SUMMARY

A.     This Section includes interior lighting fixtures, lighting fixtures mounted on exterior building surfaces, lamps, emergency lighting units, and accessories.

1.3     SUBMITTALS

A.     Product Data:  For each type of lighting fixture indicated, arranged in order of fixture designation. Include data on features, accessories, and the following:
1.     Dimensions of fixtures.
2.     Certified results of independent laboratory tests for fixtures and lamps for electrical ratings and photometric data.
3.     Certified results of laboratory tests for fixtures and lamps for photometric performance.
4.     Types of lamps.

B.     Field Test Reports:  Indicate and interpret test results for compliance with performance requirements.

C.     Maintenance Data:  For lighting fixtures to include in maintenance manuals specified in Division 1.

1.4     QUALITY ASSURANCE

A.     Fixtures, Emergency Lighting Units, and Accessories:  Listed and labeled as defined in NFPA 70, Article 100, by a testing agency acceptable to authorities having jurisdiction.

B.     Comply with NFPA 70.

C.     FM Compliance:  Fixtures for hazardous locations shall be listed and labeled for indicated class and division of hazard by FM.

D.     NFPA 101 Compliance:  Comply with visibility and luminance requirements for exit signs.

1.5     COORDINATION

A.     Fixtures, Mounting Hardware, and Trim:  Coordinate layout and installation of lighting fixtures with ceiling system and other construction.

1.6     WARRANTY

A.     General Warranty:  Special warranty specified in this Article shall not deprive Owner of other rights Owner may have under other provisions of the Contract Documents and shall be in addition to, and run concurrent with, other warranties made by Contractor under requirements of the Contract Documents.
1.     Warranties for LED Drivers; Written warranty, executed by manufacturer agreeing to replace LED drivers that fail in materials or workmanship within five years from date of manufacture, but not less than four years from date of Substantial Completion.

**PART 2 - PRODUCTS**

2.1     MANUFACTURERS

A.      Available Manufacturers and Models:  As indicated on the drawings and lighting fixture schedule. Additional manufacturers may be considered as equal after review from the design engineer. Submit two copies to the design engineer for review prior to bid. Include a cross reference for each fixture submitted.  Equipment submitted for "as-equal" without complete cutsheet cross reference, to include drawing fixture lettering, is subject to immediate rejection.
        1.      Additional manufacturers will be considered on a case by case basis prior to bid. Post-bid non-approved manufacturers/models are subject to rejection and any cost difference for approved fixtures will be the contractors' responsibility.

2.2     FIXTURES AND FIXTURE COMPONENTS, GENERAL

A.      Metal Parts:  Free from burrs, sharp corners, and edges.

B.      Sheet Metal Components:
        1.      Steel, unless otherwise indicated.
        2.      Form and support to prevent warping and sagging.
        3.      Housing painted after fabrication.
        4.      Smooth hemmed sides and smooth inward formed end flanges.

C.      Doors, Frames, and Other Internal Access:
        1.      Smooth operating, free from light leakage under operating conditions, and arranged to permit relamping without use of tools.  Arrange doors, frames, lenses, diffusers, and other pieces to prevent accidental falling during relamping and when secured in operating position.
        2.      Standard extruded aluminum door frame has superior structural integrity with premium appearance and mitered corners.  Door frame is painted after fabrication, standard.  Powder-painted rotary cam latches provide easy, secure door closure.  Integral T-bar clips are standard. Acrylic shielding materials is 100% UV stabilized.

D.      Reflecting Surfaces:  Minimum reflectance as follows, unless otherwise indicated:
        1.      White Surfaces:  85 percent.
        2.      Specular Surfaces:  83 percent.
        3.      Diffusing Specular Surfaces:  75 percent.
        4.      Laminated Silver Metallized Film:  90 percent.

E.      Lenses, Diffusers, Covers, and Globes:  100 percent virgin acrylic plastic or annealed crystal glass, unless otherwise indicated.
        1.      Plastic:  High resistance to yellowing and other changes due to aging, exposure to heat, and ultraviolet radiation.
        2.      Lens Thickness:  0.125-inch minimum, unless greater thickness is indicated.

F.      Electromagnetic Interference Filters:  Integral to fixture assembly.  Provide one filter for each ballast where indicated on drawings.  Suppress conducted electromagnetic interference filters as required by MIL-STD-461.

G.      Housings:  Manufacturers standard with integral heat sink.

2.3     LED LIGHTING

A.      General:  Comply with fixture component requirements.

B.      All LED products must be UL, ETL and/or CSA listed.

C.      All LED products must have LM-79 and LM-80 testing minimum and noted on specification sheet by an independent test lab and in accordance with the following:
        1.      Lay-in Troffers:  L90 at 60,000 hours at 25 degrees C.

2.  Surface Mounted:      L80 at 60,000 hours at 25 degrees C.
3.  Recessed Can: L70 at 50,000 hours at 25 degrees C.

D.  All LED products should be identified as L70 and/or L90 ratings based on independent test lab data.

E.  Long-life LEDs, coupled with high-efficiency drivers, provide superior level and quality of illumination for extended service life.

F.  All outdoor and wet location listed products must clearly state the IP rating carried on the fixture based on independent test lab data.

G.  All LED products must be serviceable for accessible for field repair needs. Drivers and internal components are accessible from floor. LED boards include plug-in connectors for easy replacement or servicing. Suitable for direct insulation contact. Suitable for damp location.

H.  Standard embedded controls continuously monitor system performance, allow for constant lumen management/compensation function, facilitate simple "plug-and-play' network and controls upgrading via Cat-5 cable.

I.  Minimum CRI 80.

J.  All indoor lighting color rendering should be within a 3 step McAdams ellipse. All indoor lighting should be 4000 Kelvin unless specifically noted.

K.  All LED drivers should be capable of 0-10 volt controls and DMX control and shall dim to 1% of total lumen output. Where specifically specified the dimming driver may be required to dim to .1% of lumen output, otherwise known as "dim to dark".

L.  Driver manufacturers must have a 5-year history producing dimmable electronic LED drivers for the North American market.

M.  Ambient driver temperatures must be within -20 degrees to 50 degrees C (-4 degrees to 122 degrees F).

N.  Driver must limit inrush current.
1.  Base specification: meet or exceed NEMA 410 driver inrush standard of 430 amp per 10 amps load with a maximum of 370 amps/2 seconds
2.  Preferred specification: Meet or exceed 30ma's at 277 VAC for up to 50 watts of load and 75A at 240us att 277 VAC for 100 watts of load
3.  Withstand up to a 1,000 volt surge without impairment of performance as defined by ANSI C62.41 Category A
4.  No visible change in light output with a variation of plus/minus 10percent line voltage input.
5.  Total harmonic distortion less than 20% and meet ANSI C82.11 maximum allowable THD requirements at full output. THD shall at no point in the dimming curve allow imbalance current to exceed full output THD

O.  Any exceptions are at the engineer's discretion based on project needs and applicability.

2.4  EXIT SIGNS

A.  General Requirements: Comply with UL 924 and the following:
1.  Sign Colors and Lettering Size: Comply with authorities having jurisdiction.
2.  Die cast brushed metal finish exit signage with manufacturer's multi-style mounting (wall, surface, and top). Plastic exit signage is not acceptable.

B.  Internally Lighted Signs: As follows:
1.  Lamps for AC Operation: Light-emitting diodes, 70,000 hours minimum rated lamp life.
2.  All exit signs shall have battery back-up.
3.  Provide with self-diagnostics as indicated on the drawings.

2.5     FIXTURE SUPPORT COMPONENTS

A.     Comply with Section "Basic Electrical Materials and Methods," for channel- and angle-iron supports and nonmetallic channel and angle supports.

B.     Single-Stem Hangers:  ½-inch steel tubing with swivel ball fitting and ceiling canopy.  Finish same as fixture.

C.     Twin-Stem Hangers:  Two, ½-inch steel tubes with single canopy arranged to mount a single fixture.  Finish same as fixture.

D.     Rod Hangers:  3/16-inch- minimum diameter, cadmium-plated, threaded steel rod.

E.     Hook Hangers:  Integrated assembly matched to fixture and line voltage and equipped with threaded attachment, cord, and locking-type plug.

F.     Aircraft Cable Support:  Use cable, anchorages, and intermediate supports recommended by fixture manufacturer.

2.6     FINISHES

A.     Fixtures:  See fixture schedule for colors and finishes. Otherwise manufacturer's standard.
       1.     Paint Finish:  Applied over corrosion-resistant treatment or primer, free of defects.
       2.     Metallic Finish:  Corrosion resistant.

**PART 3 - EXECUTION**

3.1     INSTALLATION

A.     Fixtures, General:  Set level, plumb, and square with ceiling and walls, and secure according to manufacturer's written instructions and approved submittal materials.  Install lamps in each fixture.
       1.     Coordinate location of fixtures with architectural ceiling plan.
       2.     Review architectural elevations prior to rough-in for any wall mounted fixtures.  Mount at 84 inches or above, unless otherwise indicated.  All wall mounted fixtures shall be ADA compatible if below 84 inches.
       3.     Center single fixtures in rooms as much as possible.
       4.     Center fixtures in exposed ceilings. Provide equal distance between fixtures and structural elements (walls, columns, furrdowns, etc.).
       5.     Provide switching mechanisms for all fixtures whether indicated on the drawings or not.
       6.     Provide supports without causing deflection of ceiling or wall.
       7.     Secure to outlet box.

B.Support for Fixtures in or on Grid-Type Suspended Ceilings:  Use grid for alignment.
       1.     Install a minimum of four (4) ceiling support system rods or wires attached to the fixture structure on **EACH** fixture secured to the building structure.  Locate not more than 6 inches from fixture corners.
       2.     Support Clips:  Fasten to fixtures and to ceiling grid members at or near each fixture corner.
       3.     Fixtures of Sizes Less Than Ceiling Grid:  Arrange as indicated on reflected ceiling plans or center in acoustical panel, and support fixtures independently with at least two (2) ¾-inch metal channels spanning and secured to ceiling tees.

C.     Suspended Fixture Support:  As follows:
       1.     Pendants and Rods:  Where longer than 48 inches, brace to limit swinging.  Provide blocking for heavy fixtures.
       2.     Stem- Mounted, Single-Unit Fixtures:  Suspend with twin-stem hangers.  Support with approved outlet box and accessories that hold stem and provide damping of luminaire oscillations.  Support outlet box vertically to building structure using approved devices.
       3.     Continuous Rows:  Use tubing or stem for wiring at one point and tubing or rod for suspension for each unit length of fixture chassis, including one at each end.

4.   Coordinate mounting heights with Architect/Engineer.  Consult prior to hanging.  Stems may need to be field cut.
5.   Chain hung fixtures are NOT acceptable unless indicated on the drawings.
6.   Provide secondary support for all fixtures without canopy support from structure.
     a.   All high and low bay fixtures shall have secondary support cables secured to structure.
7.   Sized and rated for fixture weight.
8.   Do not use ceiling grid as support for pendant luminaires.  Connect support wired or rods to building structure.

D.   Flush-Mounted Luminaire Support:
1.   Secured to outlet box.
2.   Attached to ceiling structural members at four points equally spaced around circumference of luminaire.
3.   Trim ring flush with finished surface.

E.   Wall-Mounted Luminaire Support:
1.   Attached to structural members in walls.
2.   Do not attach luminaires directly to gypsum board.
3.   Provide blocking to support.


3.2   CONNECTIONS

A.   Ground equipment:
1.   Tighten electrical connectors and terminals according to manufacturers' published torque-tightening values.  If manufacturer's torque values are not indicated, use those specified in UL 486A and UL 486B.

B.   Connect to switch mechanisms (wall switch, contactors, relays) room controllers.

C.   Provide dual switching for room mounted dual ballast fixtures. Wire each switch leg to each ballast. Do not connect together unless directed by engineer.
1.   Exception:  Step dimming fixtures in corridors may be connected together. Consult engineer prior to connections and installing switch legs.

D.   Fixture Connections:
1.   Indoors
     a.   With Lay-in ceilings: Provide EMT home runs to structure mounted J-boxes. Provide MC Cable from above ceiling j-boxes to fixtures. Do not daisy chain fixtures together unless specifically indicated on the drawings or allowed by engineer.
     b.   With gypboard ceilings: Provide EMT home runs to structure mounted J-boxes. Provide access to j-boxes or locate above fixtures. Provide MC Cable from above ceiling j-boxes to fixtures. Do not wire daisy chain fixtures together, unless indicated on the drawings.
     c.   Exposed (no ceiling) in finished spaces: Conceal EMT as much as possible in adjacent walls. Route EMT to fixtures in exposed spaces with steel compression fittings and install parallel along structural members to structural mounted j-boxes. Conceal conduit along structural members. DO NOT route conduit across open spaces suspended from structural members unless directed by architect or engineer. Mount fixtures from j-boxes. Center fixtures in spaces.
     d.   Exposed unfinished spaces: Provide EMT runs to structural mounted j-boxes. Route parallel to structural members as much as possible. Mount fixtures or fixture support to j-boxes.
2.   Provide flexible metal conduit around manufacturer's plastic whip when exposed in ceiling plenum to j-box.


3.3   FIELD QUALITY CONTROL

A.   Inspect each installed fixture for damage.  Replace damaged fixtures and components.

B.   Advance Notice:  Give dates and times for field tests.

C.      Provide instruments to make and record test results.

D.      Tests:  As follows:
1.      Verify normal operation of each fixture after installation.
2.      Emergency Lighting:  Interrupt electrical supply to demonstrate proper operation.
3.      Verify normal transfer to battery source and retransfer to normal.
4.      Report results in writing.

E.      Malfunctioning LED Fixtures:  Replace fixture then retest. LED fixtures shall not be repaired.

F.Corrosive Fixtures:  Replace during warranty period.


3.4     CLEANING AND ADJUSTING

A.      Clean fixtures internally and externally after installation.  Use methods and materials recommended by manufacturer.

B.      Adjust aimable fixtures to provide required light intensities.


**END OF SECTION**

## SECTION 283200 - FIRE ALARM EXPANSION

### PART 1 - GENERAL

1.1     RELATED DOCUMENTS

A.     Drawings and general provisions of the Contract, including General and Supplementary Conditions and Division 1 Specification Sections, apply to this Section.

1.2     SCOPE

A.     Provide new devices and connect to existing fire alarm control panel.  All new devices shall be by existing manufacturer and shall fully integrate into the existing system.  Recalculate battery power required and EOL resistors.  Provide expansion panel if FACP cannot accommodate additional devices. The contractor shall be responsible prior to bid for a price for a complete system to include; manual stations, detectors, signal equipment, controls, expansion panels, and devices. The drawings are schematic in nature and include approximate locations of devices. The fire alarm contractor shall coordinate the exact location of the visual signaling device in accordance with the candela of the installed devices.

B.     Daisy chain expansion panels to main FACP.

1.3     SUMMARY

A.     This Section includes fire alarm systems with manual stations, detectors, signal equipment, controls, and devices.

1.4     DEFINITIONS

A.     FACP:  Fire alarm control panel.

B.     LED:  Light-emitting diode.

C.     Definitions in NFPA 72 apply to fire alarm terms used in this Section.

1.5     SYSTEM DESCRIPTION

A.     General:  Noncoded, addressable-analog system with manual and automatic alarm initiation; automatic sensitivity control of certain smoke detectors; and multiplexed signal transmission dedicated to fire alarm service only.  "System shall individually identify each addressable initiating device and other addressable monitor functions.  System shall be capable of individually operating each alarm notification appliance and other addressable monitor functions."  Zoning is not acceptable.

B.     Provide a fully automatic fire alarm in all building.  Fire Alarm system shall be configured such that an alarm condition initiated in one building with activate annunciation devices in all other buildings on the campus.  Provide a complete intelligent analog addressable fire alarm system, compliant with the more stringent of local codes having jurisdiction.

C.     A full system test/inspection shall be provided by the fire alarm Contractor for a period of one (1) year as a part of the contract.

D.     The system as described shall be installed, programmed, tested and delivered to the Owner complete and in fully operational condition.  The system shall include all necessary hardware, software, raceways

and interconnecting wiring to accomplish the requirements of this specification and the Contract Drawings.

1.6     SUBMITTALS

A.      Product Data:  For each type of product indicated.

B.      Shop Drawings:  Show details of graphic annunciator.
        1.      Wiring Diagrams:  Detail wiring and differentiate between manufacturer-installed and field-installed wiring.  Include diagrams for equipment and for system with all terminals and interconnections identified.
        2.      Battery:  Sizing calculations.
        3.      Floor Plans:  Indicate final outlet locations and routings of raceway connections.
        4.      Device Address List:  Coordinate with final system programming.
        5.      System Operation Description:  Detailed description for this Project, including method of operation and supervision of each type of circuit and sequence of operations for manually and automatically initiated system inputs and outputs.  Manufacturer's standard descriptions for generic systems are not acceptable.

C.      Operating Instructions:  For mounting at the FACP.

D.      Product Certificates:  Signed by manufacturers of system components certifying that products furnished comply with requirements.

E.      Installer Certificates:  Signed by manufacturer certifying that installers comply with requirements.

F.      Field Test Reports:  Indicate and interpret test results for compliance with performance requirements.  Comply with NFPA 72.

G.      Maintenance Data:  For fire alarm systems to include in maintenance manuals specified in Division 1.  Comply with NFPA 72.

H.      Submissions to Authorities Having Jurisdiction:  In addition to distribution requirements for Submittals specified in Section "Submittals," make an identical submission to authorities having jurisdiction.  Include copies of annotated Contract Drawings as needed to depict component locations to facilitate review.  Resubmit if required to make clarifications or revisions to obtain approval.  On receipt of comments from authorities having jurisdiction, submit them to Architect for review.

I.      Certificate of Completion:  Comply with NFPA 72, AHJ, and local amendments.

1.7     QUALITY ASSURANCE

A.      Installer Qualifications:  An experienced installer who is an authorized representative of the FACP manufacturer for both installation and maintenance of units required for this Project.

B.      Manufacturer Qualifications:  A firm experienced in manufacturing systems similar to those indicated for this Project and with a record of successful in-service performance.

C.      Source Limitations:  Obtain fire alarm system components through one source from a single manufacturer.

D.      Compliance with Local Requirements:  Comply with applicable building code, local ordinances and regulations, and requirements of authorities having jurisdiction.

E.      Comply with NFPA 72.

**PART 2 - PRODUCTS**

2.1     MANUFACTURERS

A.     Provide products to match existing in both form and function.


2.2     FUNCTIONAL DESCRIPTION OF SYSTEM

A.     Control of System:  By the FACP.

B.     System Supervision:  Automatically detect and report open circuits, shorts, and grounds of wiring for initiating device, signaling line, and notification-appliance circuits.

C.     Priority of Signals:  Automatic alarm response functions resulting from an alarm signal from one zone or device are not altered by subsequent alarm, supervisory, or trouble signals.  An alarm signal is the highest priority.  Supervisory and trouble signals have second- and third-level priority.  Higher-priority signals take precedence over signals of lower priority, even when the lower-priority condition occurs first.  Annunciate and display all alarm, supervisory, and trouble signals regardless of priority or order received.

D.     System Reset:  All zones are manually resettable from the FACP after initiating devices are restored to normal.

E.     Transmission to Remote Alarm Receiving Station:  Automatically route alarm, supervisory, and trouble signals to a remote alarm station by means of a digital alarm communicator transmitter and telephone lines.

F.     System Alarm Capability during Circuit Fault Conditions:  System wiring and circuit arrangement prevent alarm capability reduction when an open circuit, ground or wire-to-wire short occurs, or an open circuit and a ground occur at the same time in an initiating device circuit, signal line circuit, or notification-appliance circuit.

G.     Loss of primary power at the FACP initiates a trouble signal at the FACP and the annunciator.  An emergency power light is illuminated at both locations when the system is operating on the secondary power supply.

H.     Basic Alarm Performance Requirements:  Unless otherwise indicated, operation of a manual station, automatic alarm operation of a smoke or flame or heat detector, or operation of a sprinkler flow device initiates the following:
        1.     Notification-appliance operation.
        2.     Identification at the FACP and the remote annunciator of the device originating the alarm.
        3.     Transmission of an alarm signal to the remote alarm receiving station.
        4.     Unlocking of electric door locks in designated egress paths.
        5.     Release of fire and smoke doors held open by magnetic door holders.
        6.     Recall of elevators.
        7.     Shutdown of fans and other air-handling equipment serving zone when alarm was initiated.
        8.     Closing of smoke dampers in air ducts of system serving zone where alarm was initiated.
        9.     Recording of the event in the system memory.

I.     Removal of an alarm-initiating device or a notification appliance initiates the following:
        1.     A "trouble" signal indication at the FACP and the annunciator for the device or zone involved.
        2.     Transmission of trouble signal to remote alarm receiving station.

J.     FACP Alphanumeric Display:  Plain-English-language descriptions of alarm, supervisory, and trouble events; and addresses and locations of alarm-initiating or supervisory devices originating the report.  Display monitoring actions, system and component status, system commands, programming information, and data from the system's historical memory.


2.5     NOTIFICATION APPLIANCES

A.     Description:  Equipped for mounting as indicated and have screw terminals for system connections.

      1.      Combination Devices:  Factory-integrated audible and visible devices in a single-mounting assembly.

      2.      Devices shall be red in color.

B.      Audio Alarm Devices (Horns – Interior Installation):

      1.      Electronic-vibrating-polarized type, 24V dc; with provision for housing the operating mechanism behind a grille.  Horns produce a minimum sound pressure level of 85 dB, measured 10 feet from the horn.

      2.      Device to be complete with outlet box, mounting plate, mounting hardware, and terminal strip for wiring connections.

C.      Visual Alarm Devices (Strobe Lights):  Xenon strobe lights listed under UL 1971 with clear or nominal white polycarbonate lens.  Mount lens on an aluminum faceplate.  The word "FIRE" is engraved shall be engraved on the device.

      1.      Rated Light Output:  75 candela (minimum), 110 candela in larger coverage spaces.

      2.      Strobe Leads:  Factory connected to screw terminals.

D.      Voice/Tone Speakers:

      1.      High-Range Units:  Rated 2 to 5 W.

      2.      Low-Range Units:  Rated 1 to 2 W.

      3.      Mounting:  Flush, semi-recessed, surface, or surface-mounted; bidirectional as indicated.

      4.      Matching Transformers:  Tap range matched to the acoustical environment of the speaker location.

E.      Audio Visual Devices (Voice/Tone Speakers and Strobe Lights):  Combination voice/tone speakers and visual alarm devices consisting of the same devices indicated above for "Voice/Tone Speakers" and "Visual Alarm Devices (Strobe Lights)" provided as a single combination alarm device.

## 2.6      EMERGENCY POWER SUPPLY

A.      General:  Components include sealed maintenance free battery, charger, and an automatic transfer switch.

      1.      Battery Nominal Life Expectancy:  20 years, minimum.

B.      Battery Capacity:  Comply with NFPA 72.

      1.      Magnetic door holders are not served by emergency power.  Magnetic door holders are released when normal power fails.

C.      Battery Charger:  Solid-state, fully automatic, variable-charging-rate type.  Provide capacity for 150 percent of the connected system load while maintaining batteries at full charge.  If batteries are fully discharged, the charger recharges them completely within four hours.  Charger output is supervised as part of system power supply supervision.

D.      Integral Automatic Transfer Switch:  Transfers the load to the battery without loss of signals or status indications when normal power fails.

## 2.7      WIRE

A.      Non-Power-Limited Circuits:  Red jacketed plenum rated solid-copper conductors with 600-V rated, 75 deg C, color-coded insulation.

      1.      Low-Voltage Circuits:  No. 16 AWG, minimum.

      2.      Line-Voltage Circuits:  No. 12 AWG, minimum.

B.      Power-Limited Circuits:  NFPA 70, Types FPL, FPLR, or FPLP, as recommended by manufacturer.

## PART 3 - EXECUTION

3.1     EQUIPMENT INSTALLATION

A.     Connect the FACP with a disconnect switch with lockable handle or cover. Install smoke detectors above the FACP, all expansion panels, and all power supplies.

B.     Audible Alarm-Indicating Devices:  Install so the top of the device is no less than 90 inches above finish floor and not less than 6 inches below the ceiling. Do not install higher than 120 inches unless directed. Install bells and horns on flush-mounted back boxes with the device-operating mechanism concealed behind a grille.  Combine audible and visible alarms at the same location into a single unit.

C.     Visible Alarm-Indicating Devices:  Install so the top of the device is no less than 90 inches above finish floor and not less than 6 inches below the ceiling.  Do not install higher than 120 inches unless directed.

3.2    WIRING INSTALLATION

A.     Wiring Method:  Install wiring in metal raceway according to specification section "Raceways and Boxes."  Conceal raceway except in unfinished spaces and as indicated.

B.     Wiring within Enclosures:  Separate power-limited and non-power-limited conductors as recommended by the manufacturer.  Install conductors parallel with or at right angles to sides and back of the enclosure.  Bundle, lace, and train conductors to terminal points with no excess.  Connect conductors that are terminated, spliced, or interrupted in any enclosure associated with the fire alarm system to terminal blocks.  Mark each terminal according to the system's wiring diagrams.  Make all connections with approved crimp-on terminal spade lugs, pressure-type terminal blocks, or plug connectors.

C.     Cable Taps:  Use numbered terminal strips in junction, pull and outlet boxes, cabinets, or equipment enclosures where circuit connections are made.

D.     Color-Coding:  Red fire alarm plenum rated conductors.  Paint fire alarm system junction boxes and covers red.

3.3     IDENTIFICATION

A.     Identify system components, wiring, cabling, and terminals according to specification section "Electrical Identification."

3.4     APPLICATION SCHEDULE

A.     General Application:  Provide fire alarm devices where indicated on drawings or as scheduled below. Locations on drawings are approximate.  Contractor shall coordinate exact locations with architectural drawings.  Contractor shall submit locations of fire alarm devices to engineer/architect as part of fire alarm shop drawings. Locations shall be based upon ability to mount the device to building construction and coverage afforded the device.

B.     Audio/Visuals and Visuals:  Device locations indicated on the drawings are approximate.  Coordinate with architectural for exact locations and install as per coverage criteria.  Install devices in areas that are unobtrusive to room or space intent (e.g. do not install device at the back of the stage, but install stage device off to one side; or do not try to install device on glass block wall).

3.5     FIELD QUALITY CONTROL

A.     Manufacturer's Field Service:  Engage a factory-authorized service representative to inspect field-assembled components and connections and to supervise pretesting, testing, and adjustment of the system.  Report results in writing.

B.     Pretesting:  After installation, align, adjust, and balance the system and perform complete pretesting. Determine, through pretesting, the compliance of the system with requirements of Drawings and

Specifications. Correct deficiencies observed in pretesting. Replace malfunctioning or damaged items with new ones, and retest until satisfactory performance and conditions are achieved. Prepare forms for systematic recording of acceptance test results.

C. Report of Pretesting: After pretesting is complete, provide a letter certifying the installation is complete and fully operable, including the names and titles of witnesses to preliminary tests.

D. Final Test Notice: Provide a minimum of 10 days' notice in writing when the system is ready for final acceptance testing.

E. Minimum System Tests: Test the system according to procedures outlined in NFPA 72. Minimum required tests are as follows:
1. Verify the absence of unwanted voltages between circuit conductors and ground.
2. Test all conductors for short circuits using an insulation-testing device.
3. With each circuit pair, short circuit at the far end of the circuit and measure the circuit resistance with an ohmmeter. Record the circuit resistance of each circuit on record drawings.
4. Verify that the control unit is in the normal condition as detailed in the manufacturer's operation and maintenance manual.
5. Test initiating and indicating circuits for proper signal transmission under open circuit conditions. One connection each should be opened at not less than 10 percent of initiating and indicating devices. Observe proper signal transmission according to class of wiring used.
6. Test each initiating and indicating device for alarm operation and proper response at the control unit. Test smoke detectors with actual products of combustion.
7. Test the system for all specified functions according to the approved operation and maintenance manual. Systematically initiate specified functional performance items at each station, including making all possible alarm and monitoring initiations and using all communications options. For each item, observe related performance at all devices required to be affected by the item under all system sequences. Observe indicating lights, displays, signal tones, and annunciator indications. Observe all voice audio for routing, clarity, quality, freedom from noise and distortion, and proper volume level.
8. Test Both Primary and Secondary Power: Verify by test that the secondary power system is capable of operating the system for the period and in the manner specified.

F. Retesting: Correct deficiencies indicated by tests and completely retest work affected by such deficiencies. Verify by the system test that the total system meets Specifications and complies with applicable standards.

G. Report of Tests and Inspections: Provide a written record of inspections, tests, and detailed test results in the form of a test log. Submit log on the satisfactory completion of tests.

H. Tag all equipment, stations, and other components at which tests have been satisfactorily completed.

3.6    CLEANING AND ADJUSTING

A. Cleaning: Remove paint splatters and other spots, dirt, and debris. Touch up scratches and marred finish to match original finish. Clean unit internally using methods and materials recommended by manufacturer.

**END OF SECTION**

# BUDGET WORKSHEET

**Project:**   Restroom Renovations (Kiest, Gainer and Lacy Halls) Construction Approval

**Project Number:**   2024-06316

**Programmed Amount:**   see below

ESTIMATE TYPE:   ☐ Program of Requirements   ☐ Preliminary Design   ☐ Detailed Design   ☑ Award

| | | |
|---|---|---:|
| 1. | Construction (Spaw Glass Job Order Contract) | $ 1,796,279.00 |
| 2. | Construction/Project Contingency | $ 228,658.00 |
| 3. | Project Management/Feasibility Study (Project Control) | $ 225,000.00 |
| 4. | Architect/Engineer (A/E) Fee (Kirksey Architecture incl. reimbursables) | $ 228,963.00 |
| 5. | Surveys & Testing Allowance | $ 16,000.00 |
| 6. | Furniture, Fixtures & Equipment Allowance | $ 2,100.00 |
| 7. | Facilities Services/UES Support   (Keying/fire alarms/utilities support/etc.) | $ 3,000.00 |
| | Subtotal | $ 2,500,000.00 |
| 8. | SSC Contract Administration @ 3.0% | $ 75,000.00 |
| | Total | $ 2,575,000.00 |

| | |
|---|---:|
| **Total Funding Required for Project:** | $ **2,575,000.00** |
| Less Previously Approved Expense Authorization: | $ (242,550.00) |
| **Additional Funding Required for Construction:** | $ **2,332,450.00** |



# Spence Hall Bathroom Renovations

Spence Hall Restroom Renovations || Weekly Progress Meeting

| | |
|---|---|
| Subject: | Spence Hall Restroom Renovations || Weekly Progress Meeting |
| Meeting Type: | Construction |
| Meeting Number: | 1 |
| Start Date: | 5/22/2024 3:00:00 PM |
| End Date: | 5/22/2024 4:00:00 PM |
| Location: | Spence Hall TBD |
| Date Created: | 5/14/2024 3:11:00 PM |
| Created By: | Garon, Mike |
| Description: | |

Published By:          Garon, Mike

**Attendees**

| First Name | Last Name | Email | Company | Role | Attended |
|---|---|---|---|---|---|
| | | bmeredith@corps.tamu.edu | | Optional Attendee | Yes |
| Tracy | Ash | tracy@quadtex.net | QuadTex | Required Attendee | No |
| Patrick | Blaha | PatrickB@QuadTex.net | Quad-Tex Construction, Inc. | Required Attendee | Yes |
| Doug | Chmelar | Doug@QuadTex.net | Quad-Tex Construction, Inc. | Required Attendee | Yes |

| | | | | | |
|---|---|---|---|---|---|
| Wade | Duke | wade.duke@sscserv.com | SSC College Station | Required Attendee | Yes |
| Mike | Garon | michael.garon@sscserv.com | SSC College Station | Organizer | Yes |
| John | Hare | john@patarch.com | Patterson Architects | Required Attendee | No |
| Fred | Patterson | fred@patarch.com | Patterson Architects | Required Attendee | Yes |
| Troy | Taylor | Troyt@quadtex.net | Quad-Tex Construction, Inc. | Optional Attendee | Yes |
| Blake | Tucker | Blake.Tucker@sscserv.com | SSC College Station | Optional Attendee | No |
| Rob | Webber | rob_webber@reslife.tamu.edu | TAMU | Required Attendee | Yes |
| Gary | Williams | Gary.williams@tamu.edu | TAMU Campus Planning, Design and Construction | Required Attendee | Yes |
| David | Zeiger | dwzeiger@tamu.edu | TAMU - EHS | Required Attendee | Yes |

**Meeting Items**

## 1.1
**Topic:** General Comments　　　　　　　**Status:** Open
**Discussion Date:** 5/22/2024 4:14:00 PM

**Discussion:** Safety:
 Secure jobsite daily.
 Keep work areas clear and free of potential hazards. Weekly MDX inspections
Schedule/ Progress:
 See attached schedule
 Dumpster and laydown area in place
 Floor and wall protection completed
 Walls and floor tile demo complete
 GPR and concrete saw cutting completed
Next Week:
 Demo concrete for drain tie-ins.
 Complete demo of plumbing
 Complete demo of exhaust ductwork
 Install new drain piping
RFI / ASI:
 RFI 01: Fire Damper Voltage (see attached)
 RFI 02: Plumbing (see attached)
Change Orders:
 None at this time
Testing & Inspections:
 None at this time
Outages:
 Hot and cold water outage in progress
Questions/Comments:
 Discuss fire rated wall behind water closets
 Open for discussion

| # | Subject | Author | Company | Held By | Date Due | Status |
|---|---------|--------|---------|---------|----------|--------|



# Spence Hall Bathroom Renovations

Spence Hall Restroom Renovations || Weekly Progress Meeting

Subject:            Spence Hall Restroom Renovations || Weekly Progress Meeting
Meeting Type:       Construction
Meeting Number:     2
Start Date:         5/29/2024 3:00:00 PM
End Date:           5/29/2024 4:00:00 PM
Location:           Spence Hall 2nd Floor Lounge
Date Created:       5/14/2024 3:11:00 PM
Created By:         Garon, Mike
Description:

Published By:        Garon, Mike

**Attendees**

| First Name | Last Name | Email | Company | Role | Attended |
|---|---|---|---|---|---|
| Tracy | Ash | tracy@quadtex.net | QuadTex | Required Attendee | No |
| Patrick | Blaha | PatrickB@QuadTex.net | Quad-Tex Construction, Inc. | Required Attendee | Yes |
| Doug | Chmelar | Doug@QuadTex.net | Quad-Tex Construction, Inc. | Required Attendee | No |
| Wade | Duke | wade.duke@sscserv.com | SSC College Station | Required Attendee | No |

| Mike | Garon | michael.garon@sscserv.com | SSC College Station | Organizer | Yes |
|------|-------|---------------------------|---------------------|-----------|-----|
| John | Hare | john@patarch.com | Patterson Architects | Required Attendee | Yes |
| Fred | Patterson | fred@patarch.com | Patterson Architects | Required Attendee | No |
| Troy | Taylor | Troyt@quadtex.net | Quad-Tex Construction, Inc. | Optional Attendee | Yes |
| Blake | Tucker | Blake.Tucker@sscserv.com | SSC College Station | Optional Attendee | Yes |
| Rob | Webber | rob_webber@reslife.tamu.edu | TAMU | Required Attendee | Yes |
| Gary | Williams | Gary.williams@tamu.edu | TAMU Campus Planning, Design and Construction | Required Attendee | Yes |
| David | Zeiger | dwzeiger@tamu.edu | TAMU - EHS | Required Attendee | No |

**Meeting Items**

## 2.1

**Topic:** General Comments        **Status:** Open
**Discussion Date:** 5/29/2024 4:24:00 PM
**Discussion:** Project Completion Date: 7/26/24
Safety:
 Secure jobsite daily.
 Keep work areas clear and free of potential hazards. Weekly MDX inspections
Schedule/ Progress:

See attached schedule
Concrete demo complete
Adjustments made for floor drains
Demo of exhaust duct complete
Concrete pour back complete
Wall layout completed
Installing new ductwork
Next Week:
Reset wall closet carrier
Install framing
Continue installing ductwork
Demo hot and cold water lines that are not needed
Install sheetrock
RFI / ASI:
RFI 02: Plumbing (see attached)
Change Orders:
None at this time
Testing & Inspections:
None at this time
Outages:
Hot and cold water outage in progress
Questions/Comments:
Discuss chase wall behind showers enclosures
Open for discussion

| # | Subject | Author | Company | Held By | Date Due | Status |
|---|---------|--------|---------|---------|----------|--------|

## 2.2

**Topic:** Schedule                     **Status:** Open
**Discussion Date:** 5/29/2024 4:24:00 PM
**Discussion:** On Schedule

| # | Subject | Author | Company | Held By | Date Due | Status |
|---|---------|--------|---------|---------|----------|--------|

*Confidential*

# Texas A&M University
# Corp Dorm Restroom Renovation Project

| DESCRIPTION | February 9, 2024<br><br>GMP Projection |
|---|---|
| **I.  HARD COSTS** | |
| Construction Services (SpawGlass Job Order Contract) | 1,740,426.00 |
| Change Orders | 0.00 |
| Total Costs of Work | 1,740,426.00 |
| | |
| Remaining Contingency | 91,601.00 |
| Expended Contingency | 0.00 |
| | 91,601.00 |
| | |
| Design/Pre-Construction Services | 179,729.00 |
| Pre-Construction Services Reimbursables | 13,640.00 |
| | 193,369.00 |
| | |
| **TOTAL HARD COSTS** | **2,025,396.00** |
| **II.  SOFT COSTS** | |
| Administration (Project Control + Support Services) | 228,000.00 |
| Design and Testing Costs | 31,000.00 |
| Furniture Fixtures and Equipment | 1,000.00 |
| Owner Contingency | 214,604.00 |
| **Current Soft Costs Total** | **474,604.00** |
| | |
| **TOTAL SOFT COSTS** | **474,604.00** |
| | |
| **SUBTOTAL** | **2,500,000.00** |
| | |
| SSC Management Fee (3%) | 75,000.00 |
| | |
| **ESTIMATED TOTAL PROJECT COST** | **2,575,000.00** |



Billing Department
**02 Environmental Health and Safety Department**
College Station, Texas 77843
Email: AR@tamu.edu

| Date | Invoice |
|---|---|
| 09/21/2023 04:48 PM | Q200706 |

| Bill To |
|---|
| Customer 6804222920000 |
| COMPASS GROUP SSC EDCS |
| 1225 E. WEISGARBER RD STE 200 |
| KNOXVILLE, TN 37909 |

| Total Amount Due |
|---|
| $1185.00 |

| Description of Goods/Services | Price | Quantity | Total |
|---|---|---|---|
| Asbestos Analysis | $1185.00 | 1 | $1185.00 |

| | |
|---|---|
| Sales Tax: | $0.00 |
| Total Due: | $1185.00 |

**Comments**

Asbestos analysis- Bldg 400- WO 2023-06030, Requested by: Michael Garon, EDCS (no PO# available)

**Additional Comments**

ALL PAYMENTS ARE DUE WITHIN 30 DAYS OF RECEIPT OF INVOICE.

Please make checks payable to **Texas A&M University** and reference the invoice number on the check.

REMIT CHECK PAYMENTS TO: FEIN:74-6000531 State Agency:3711711711 000 AggieBuy ID:X0101417012
Texas A&M University
FMO
Attn: Sales and Receivables Department
6000 TAMU
College Station, TX 77843

**To pay by credit card, please visit the below link:**
https://fmo.tamu.edu/invoice-payment-02
A 2.75% non-refundable fee is charged to all credit card payments.


OAC – 04/16/24 @ 2:00pm

Location MS Teams

Attendees:    Representatives from Project Control
Representatives from SpawGlass
Representatives from TAMU
Representatives from Kirksey

I.    Administration

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team.  All conversations in the meetings are to be considered confidential

    A.  Purpose – Provide project status update
    B.  Chair – SSC representative
    C.  Lead – SpawGlass filling in for Sam Lampe / TAMU Project Control
    D.  Comments and Corrections to previous meeting minutes are to be submitted to Seth Madison, cc: Sam Lampe, Gary Hall, Joy Lynn Winfrey, Austin Vader prior to the next scheduled meeting
    E.  Due Outs from last meeting – SpawGlass – Requested a submittal for flowable fill from Precision Site Services
    F.  Status of Proposals and Contracts

        1.  Kirksey Work Order – Executed
        2.  SpawGlass contract is waiting on Bond information

    G.  eBuilder/ Software

        1.  Pay Applications
        2.  Change Orders
        3.  Submittals / RFIs **- SpawGlass to upload final review copies to eBuilder**

    H.  Inspections
    I.  Meeting Schedule – The next project OAC will be on April 23rd 2024 at 2pm on MS Teams

II.    Design

    A.  Architectural / MEP

        1.  DD 100%             3/28/24 – Issued
        2.  DD Package Review    3/28/24 – 4/04/24 No Comments Received
        3.  Construction Documents  3/29/24 – 5/03/24 **-tracking for 4/26**
        4.  CD Package Review    5/06/24 – 5/10/24

    B.  All showers are required to have foot stool. Current design for the foot stool matches what is currently being proposed for the Spence renovation project


III.  Schedule

A.  Project Schedule

1.  Notice to Proceed          2/20/24
2.  Solicit for bid
3.  Buyout Subcontracts        3/08/24 – 3/28/24
4.  TAMU Spring Break          3/11/24 – 3/15/24
5.  Fiberglass Door/ Frame     3/15/24 – 6/19/24 – Ordered
6.  Solid Surface Proc         3/15/24 – 6/19/24 – Ordered
7.  Construction Start         5/13/24   **- Construction fence to be set up 5/12**
8.  Completed Demo             5/29/24
9.  MEP Rough- in              6/11/24
10. Floor and Wall Finishes    6/29/24
11. Trim and Finish Out        7/03/24
12. Project Completion         8/01/24

IV.  Budget

A.  AAOC = $1,796,279
B.  Preliminary SpawGlass Estimate $1,674,465

V.  Contractor Items

A.  Materials

1.  Fiberglass Doors and Frames  **-SG and Project Controls to visit facility**
2.  Solid Surface
3.  Tile   **- Being delivered and stored at Daltile San Antonio**

B.  Specification - SpawGlass is gathering flowable fill concrete submittal
**- SSC to get keys for mullions**

VI.  Owner Items – Construction fencing to be installed Sunday May 12th, 2024
**- Project Control to set up pre-con meeting**

VII.  New Business
**- All public questions and communication to go thru Gary Hall**

VIII.  Due Outs for future meetings



| Activity Name | Orig Dur | Remaining Duration | Start | Finish |
|---|---|---|---|---|
| **TAMU Corps Dorms RR Renovations** | 134 | 92 | 20-Feb-24 A | 02-Aug-24 |
| Pre-Construction | 110 | 65 | 20-Feb-24 A | 29-Jun-24 |
| Under Contract (Design NTP) | 0 | 0 | 20-Feb-24 A | |
| DD Package | 20 | 0 | 26-Feb-24 A | 28-Mar-24 A |
| Buyout Subcontracts | 15 | 0 | 14-Mar-24 A | 08-Apr-24 A |
| Fiberglass Doors and Frames Procurement | 72 | 60 | 01-Apr-24 A | 29-Jun-24 |
| Solid Surface Material Procurement | 72 | 60 | 02-Apr-24 A | 29-Jun-24 |
| Tile Procurement | 25 | 15 | 02-Apr-24 A | 01-May-24 |
| DD Package Review | 4 | 0 | 02-Apr-24 A | 05-Apr-24 A |
| CD Package | 20 | 13 | 08-Apr-24 A | 01-May-24 |
| CD Package Review | 5 | 5 | 02-May-24 | 08-May-24 |
| Milestones | 68 | 68 | 13-May-24 | 02-Aug-24 |
| Start Construction | 0 | 0 | 13-May-24 | |
| Complete Demo | 0 | 0 | | 30-May-24 |
| MEP Rough-In | 0 | 0 | | 12-Jun-24 |
| Floor and Wall Finishes | 0 | 0 | | 01-Jul-24 |
| Trim and Finish Out | 0 | 0 | | 08-Jul-24 |
| Project Completion | 0 | 0 | | 02-Aug-24 |
| Inspections | 17 | 17 | 24-May-24 | 14-Jun-24 |
| Mechanical Rough In Inspection | 0 | 0 | | 24-May-24 |
| Fire Suppression Testing | 0 | 0 | | 30-May-24 |
| Underground Plumbing Rough In Inspection | 0 | 0 | | 03-Jun-24 |
| Rebar Inspection | 0 | 0 | 04-Jun-24 | |
| Wall Framing Inspection | 0 | 0 | | 10-Jun-24 |
| Electrical Rough In Inspection | 0 | 0 | | 11-Jun-24 |
| Plumbing Rough In Inspection | 0 | 0 | | 12-Jun-24 |
| Ceiling Framing Inspection | 0 | 0 | | 14-Jun-24 |
| Construction | 82 | 82 | 15-Apr-24 | 22-Jul-24 |
| Dorm 2 (Kiest) | 58 | 58 | 13-May-24 | 22-Jul-24 |
| Demo | 15 | 15 | 13-May-24 | 30-May-24 |
| Mobilize Fence and Connexes | 2 | 2 | 13-May-24 | 14-May-24 |
| Make Safe of Electrical and Fire Safety | 1 | 1 | 13-May-24 | 13-May-24 |
| Demo/Salvage Fixtures | 2 | 2 | 14-May-24 | 15-May-24 |
| Demo/Salvage Partitions | 1 | 1 | 16-May-24 | 16-May-24 |
| Demo Floor and Wall Tile | 2 | 2 | 17-May-24 | 18-May-24 |
| Demo Ceiling | 2 | 2 | 20-May-24 | 21-May-24 |
| Demo Sheetrock and Framing | 2 | 2 | 22-May-24 | 23-May-24 |
| Demo Existing Electrical | 2 | 2 | 22-May-24 | 23-May-24 |
| Demo Existing In-Wall Plumbing | 2 | 2 | 22-May-24 | 23-May-24 |

Start Date: 20-Feb-24
Finish Date: 02-Aug-24
Data Date: 15-Apr-24
Run Date: 16-Apr-24

Actual Work
Remaining Work
Critical Remaining Work
◆ Milestone
▽ Summary
Level of Effort
Actual Level of Effort

**TAMU Corps Dorms RR Renovations**
Print Format
Page 1 of 2

SpawGlass



| Activity Name | Orig Dur | Remaining Duration | Start | Finish |
|---|---|---|---|---|
| Sawcut and Demo Concrete | 2 | 2 | 24-May-24 | 28-May-24 |
| Demo Existing In-Slab Plumbing | 2 | 2 | 29-May-24 | 30-May-24 |
| Renovations | 48 | 48 | 22-May-24 | 22-Jul-24 |
| Install new Ductwork | 3 | 3 | 22-May-24 | 24-May-24 |
| Install Fire Suppression | 6 | 6 | 22-May-24 | 30-May-24 |
| Install new Above-Ceiling Elecrical | 3 | 3 | 24-May-24 | 29-May-24 |
| In-Slab Plumbing | 3 | 3 | 31-May-24 | 03-Jun-24 |
| Pour Back Concrete at Sawcut Areas | 2 | 2 | 04-Jun-24 | 05-Jun-24 |
| Install Wall Framing | 4 | 4 | 06-Jun-24 | 10-Jun-24 |
| Install new In-Wall Electrical | 3 | 3 | 08-Jun-24 | 11-Jun-24 |
| Install new In-Wall Plumbing | 4 | 4 | 08-Jun-24 | 12-Jun-24 |
| Install Ceiling Framing | 4 | 4 | 11-Jun-24 | 14-Jun-24 |
| Floor Prep | 4 | 4 | 11-Jun-24 | 14-Jun-24 |
| Install Wall Sheetrock | 4 | 4 | 13-Jun-24 | 17-Jun-24 |
| Install Ceiling Sheetrock | 3 | 3 | 15-Jun-24 | 18-Jun-24 |
| Install Floor Tile | 8 | 8 | 15-Jun-24 | 24-Jun-24 |
| Tape, Float, and Finish | 2 | 2 | 19-Jun-24 | 20-Jun-24 |
| Install Electrical Ceiling Fixtures | 3 | 3 | 21-Jun-24 | 24-Jun-24 |
| Install Mechanical Fixtures | 2 | 2 | 21-Jun-24 | 22-Jun-24 |
| Install Wall Tile | 6 | 6 | 25-Jun-24 | 01-Jul-24 |
| Install Solid Surface Materials | 5 | 5 | 01-Jul-24 | 09-Jul-24 |
| Paint Ceiling | 3 | 3 | 02-Jul-24 | 08-Jul-24 |
| Install Electrical Wall Fixtures | 3 | 3 | 02-Jul-24 | 08-Jul-24 |
| Install new Specialties | 2 | 2 | 02-Jul-24 | 03-Jul-24 |
| Install Plumbing Fixtures | 2 | 2 | 03-Jul-24 | 08-Jul-24 |
| Install Doors and Hardware | 2 | 2 | 09-Jul-24 | 10-Jul-24 |
| Contractor Punchlist | 10 | 10 | 11-Jul-24 | 22-Jul-24 |
| Dorm 5 (Gainer) | 61 | 61 | 15-Apr-24 | 25-Jun-24 |
| Dorm 6 (Lacey) | 61 | 61 | 15-Apr-24 | 25-Jun-24 |
| Close-Out | 22 | 22 | 09-Jul-24 | 02-Aug-24 |
| Commisioning | 10 | 10 | 09-Jul-24 | 19-Jul-24 |
| Owner Punchlist | 10 | 10 | 23-Jul-24 | 02-Aug-24 |

Start Date: 20-Feb-24
Finish Date: 02-Aug-24
Data Date: 15-Apr-24
Run Date: 16-Apr-24

Actual Work
Remaining Work
Critical Remaining Work
Milestone
Summary
Level of Effort
Actual Level of Effort

TAMU Corps Dorms RR Renovations
Print Format
Page 2 of 2

SpawGlass



**SpawGlass Construction Corp.**

**PROJECT MANAGEMENT - SUBMITTAL LOG**

**4024003 - TAMU Corps Dorms**

Page: 1  of  1
Date:  Apr 16, 2024
Time:  10:17 AM EDT

| Submittal ID | Last Rev. | Title | Type | Status | Activity Start Date | Required | | Latest Dates | | | | | Responsibility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Start | Finish | Received | Sent | Days Out | Returned | Forwarded | |
| SPEC SECTION: | NONE | | | | | | | | | | | | |
| Spec Sub-Section | None | | | | | | | | | | | | |
| 211313-001 | 1 | Fire Suppression Piping Wet-Pipe Sprinkler System - Product Data | Product Data | Submitted for Approval | | | | 04/08/2024 | 04/10/2024 | 6 | | | Kirksey Architects, Inc. |
| 265100-001 | 1 | Interior Lighting - Product Data | Product Data | Submitted for Approval | | | | 04/09/2024 | 04/11/2024 | 5 | | | Kirksey Architects, Inc. |
| 260923-001 | 1 | Lighting Control Devices - Product Data | Product Data | Submitted for Approval | | | | 04/09/2024 | 04/11/2024 | 5 | | | Kirksey Architects, Inc. |

Electrical packages being revised and re-sent

**Report Parameters**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Break By: | Spec. Section (S) | Sent To Partner: | | Status Class: | | Run Date: | Apr 16, 2024 |
| Package: | | Sent To Partner Type: | | Status: | SFA | Run Time: | 10:17 AM EDT |
| From Specification Section: | | Returned By Partner: | | Submittal Type: | COMPLETE | Operator: | JOSH.FARRIS |
| To Specification Section: | | Returned By Partner Type: | | Sort By: | Submittal Sort Order | Report Code: | PM3041 |
| Responsibilty Partner: | | Forwarded To Partner: | | Project: | 4024003 | | |
| Responsibility Partner Type: | | Forwarded To Partner Type: | | Show Notes: | | | |

203



***40 - SpawGlass Construction Corp.***

***PROJECT MANAGEMENT - REQUEST FOR INFORMATION LOG***
***4024003 - TAMU Corps Dorms Restrooms Renovations***

Page: 1 of 1
Date: Apr 16, 2024
Time: 10:39 AM EDT



| RFI Number | Cost | Subject | From Company | To Company | Date Created | Date Required | Date Answered | Status | Answered By |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | Potentially | Testing and Inspections | SpawGlass Construction Corp. | Kirksey Architects, Inc. | 04/16/2024 | 04/17/2024 | | Open | |
| | | **Co-Author:** | | | | | | | |

Answered on 4/16

**Report Parameters**

| Company: | 40 | Restrict Value of: | Create Date | Status: | | Run Date: | Apr 16, 2024 |
|---|---|---|---|---|---|---|---|
| Project: | 4024003 | From Date: | | Status Class: | | Run Time: | 10:39 AM EDT |
| Sent To: | | To Date: | | | | Operator: | JOSH.FARRIS |
| | | | | | | Report Code: | PM3011 |

203



# TAMU Corp Dorm Restroom Renovation

## Estimate

| | | | |
|---|---|---|---|
| Estimate Date: | 02/09/2024 | Documents Date: | 10/20/2023 |
| Project Size (SF): | 1,500 | Project #: | 4022021 |
| Project Location: | College Station, TX | Lead Estimator: | Dustin Wilson |

| ITEM | COST | COST \| SF | % OF TOTAL |
|---|---|---|---|
| *Direct Costs* | *1,520,817* | *1,013.88* | *83.01 %* |
| Div. 01 - General Requirements | 174,686 | 116.46 | 9.54 % |
| Div. 02 - Existing Conditions | 81,192 | 54.13 | 4.43 % |
| Div. 03 - Concrete | 51,836 | 34.56 | 2.83 % |
| Div. 06 - Wood, Plastics, & Composites | 15,665 | 10.44 | 0.86 % |
| Div. 08 - Openings | 199,391 | 132.93 | 10.88 % |
| Div. 09 - Finishes | 413,347 | 275.56 | 22.56 % |
| Div. 10 - Specialties | 134,831 | 89.89 | 7.36 % |
| Div. 21 - Fire Suppression | 43,109 | 28.74 | 2.35 % |
| Div. 22 - Plumbing | 231,245 | 154.16 | 12.62 % |
| Div. 26 - Electrical | 175,515 | 117.01 | 9.58 % |

| ITEM | COST | COST \| SF | % OF TOTAL |
|---|---|---|---|
| *Indirect Costs* - | *311,209* | *207.47* | *16.99 %* |
| General Conditions | 150,648 | 100.43 | 8.22 % |
| A/E CA Fee's | 68,960 | 45.97 | 3.76 % |
| Contractor's Contingency | 91,601 | 61.07 | 5.00 % |
| *Total Cost* | *$ 1,832,027* | *$ 1,221.35* | *100.00 %* |



# Detail Report
## (Direct Costs Only)

# TAMU Corp Dorm Restroom Renovation
## Estimate

| | | | |
|---|---|---|---|
| Estimate Date: | 02/09/2024 | Documents Date: | 10/20/2023 |
| Project Size (SF): | 1,500 | Project #: | 4022021 |
| Project Location: | College Station, TX | Lead Estimator: | Dustin Wilson |

| ITEM | QUANTITY \| UM | UNIT COST | TOTAL COST |
|---|---|---|---|
| Div. 01 - General Requirements | | | 174,686 |
| Div. 01 - General Requirements | | | 174,686 |
| General Requirements - General Labor/Maintenance | 1.0 LS | 83,409.97 | 83,410 |
| General Requirements - Temp Fence & Facilities | 1.0 LS | 21,700.16 | 21,700 |
| General Requirements - Connex/Dumpster | 1.0 LS | 18,716.38 | 18,716 |
| General Requirements - Final Clean | 1,500.0 SF | 6.78 | 10,172 |
| General Requirements - General Site Protection | 1.0 LS | 20,343.90 | 20,344 |
| General Requirements - Project Touch-ups | 1.0 LS | 20,343.90 | 20,344 |
| Div. 02 - Existing Conditions | | | 81,192 |
| Div. 02 - Existing Conditions | | | 81,192 |
| Restroom Demolition | 1,500.0 SF | 54.13 | 81,192 |
| Div. 03 - Concrete | | | 51,836 |
| Div. 03 - Concrete | | | 51,836 |
| Underground Utilities - Pour Back | 1,500.0 SF | 34.56 | 51,836 |
| Div. 06 - Wood, Plastics, & Composites | | | 15,665 |
| Div. 06 - Wood, Plastics & Composites | | | 15,665 |
| Rough Carpentry | 1,500.0 SF | 3.39 | 5,086 |
| Architectural Woodwork - Restroom Countertop Base/Framing | 3.0 Each | 3,526.28 | 10,579 |
| Div. 08 - Openings | | | 199,391 |
| Div. 08 - Openings | | | 199,391 |
| Fiberglass Doors & Frames & Hardware w/Install | 33.0 Each | 6,042.14 | 199,391 |
| Div. 09 - Finishes | | | 413,347 |
| Div. 09 - Finishes | | | 413,347 |
| Drywall | 1,500.0 SF | 131.54 | 197,315 |

*TAMU Corp Dorm Restroom Renovation*
*Estimate*
*Page 1 of 2*
*Estimate Date: 02/09/2024*
*Documents Date: 10/20/2023*

**- 1396 -**

| ITEM | QUANTITY \| UM | UNIT COST | TOTAL COST |
|---|---|---|---|
| Ceramic Tile - Walls/Flooring/Base | 1,500.0 SF | 137.24 | 205,860 |
| Epoxy Painting | 1,500.0 SF | 6.78 | 10,172 |
| *Div. 10 - Specialties* | | | *134,831* |
| *Div. 10 - Specialties* | | | *134,831* |
| Solid Surface Shower Encloser & Countertops | 15.0 Each | 6,772.08 | 101,581 |
| Toilet/Shower Accessories | 3.0 Each | 11,083.35 | 33,250 |
| *Div. 21 - Fire Suppression* | | | *43,109* |
| *Div. 21 - Fire Suppression* | | | *43,109* |
| Fire Suppression | 1,500.0 SF | 28.74 | 43,109 |
| *Div. 22 - Plumbing* | | | *231,245* |
| *Div. 22 - Plumbing* | | | *231,245* |
| Plumbing & HVAC | 3.0 Each | 77,081.66 | 231,245 |
| *Div. 26 - Electrical* | | | *175,515* |
| *Div. 26 - Electrical* | | | *175,515* |
| Electrical | 3.0 Each | 58,504.97 | 175,515 |

*Total - Direct Costs*          *$ 1,520,817*



# TEXAS A&M UNIVERSITY CORP DORM RESTROOM RENOVATION PROJECT ESTIMATE

**TAMU Corp Dorms**
**College Station, TX**
**February 09, 2024**

## GENERAL QUALIFICATIONS

1. This Estimate proposal is based on IFC documents and Specs by Patterson Architects, dated 10.20.23.
2. This Estimate includes the proposed demolition and renovations to (3) three Corp Dorm restroom and bathroom facilities.  The (3) restroom and bathroom facilities being renovated are the north Kiest ground floor restroom and bathroom facility, the north Gainer ground floor restroom and bathroom facility and the north Lacy ground floor restroom and bathroom facility.
3. This Estimate assumes that the Owner will contract with a Testing Agency to conduct all special inspections that may be required by the local code authorities.
4. This estimate does not include any abatement or hazardous material removal activities.
5. Pricing assumes unlimited and un-hindered access to the work area in order to complete this project within the stipulated time frame.
6. The builder's risk policy for this project covers the cost and scope of work associated with this project and does not cover the entire building the project is located in.
7. The following project costs are EXCLUDED from SpawGlass' Conceptual Estimate Report:
    a. State of Texas Sales Tax and/or Remodeling Tax
    b. Material Testing, Surveys, Testing & Inspection and Soil Borings
    c. Fixtures, Furniture & Equipment; Moving & Storage
    d. Municipal/MUD/Utility Impact/Usage fees.
    e. Building Permit
8. Pricing assumes the use of Lot 26 for a storage/lay-down yard and for contractor parking.
    a. Pricing does not include any parking cost to park in Lot 26
9. Pricing assumes having sole access to the second-floor study/office room located in the north end-caps for use as a General Contractor office space.
10. Finish and material selection may have to change or be modified in order to complete the project within the stipulated time frame.
    a. These changes may impact overall costs.
11. Pricing assumes that an inspector is readily available to perform inspections in order to comply with the project schedule.

### Division 01 – General Requirements and General Conditions
1. Pricing includes a 5% contractor contingency.
2. Pricing assumes a 12-week schedule starting May 13, 2024, and going through August 2, 2024



**Division 02 – Demolition**

1. Pricing includes but is not limited to the demolition of the following:
   a. Framing/Walls/Ceilings and associated finishes
   b. Toilet and shower partitions
   c. Flooring/Floor tile and associated mud bed
   d. Doors, Frames and Hardware
   e. M.E.P. Equipment & Fixtures.
   f. Concrete Slab removal where new underground utilities are required.
2. Pricing includes presenting fixtures and equipment to the owner that are able to be salvaged.

**Division 03 – Concrete**

1. Pricing includes the pour-back of concrete in areas requiring to be trenched for new underground utilities. All other concrete work has been excluded from our pricing.

**Division 04 – Masonry**

1. Pricing **EXCLUDES** any interior or exterior masonry work.

**Division 05 – Metals**

1. Pricing **EXCLUDES** any structural steel or miscellaneous steel scope.

**Division 06 – Wood, Plastics, and Composites**

1. Pricing includes wood support and structure for the solid surface countertops.

**Division 08 – Openings**

1. Pricing includes fiberglass doors and frames not as specified in the specifications due to lead-time and procurement constraints. The current lead-time for the specified doors is approximately 16 weeks.
   a. This pricing includes fiberglass doors and frames from Tiger Doors which have an approximate lead-time of 8-10 weeks after submittals are approved.

**Division 09 – Finishes**

1. Pricing includes new framing and drywall for the walls and ceilings.
   a. This pricing includes the installation of new ceiling access doors.
   b. This pricing **EXCLUDES** corner guards.
2. Pricing includes new wall tile and floor tile where detailed in the drawings.
   a. Tile color has not been selected or determined. Specific owner required selections may impact lead time and material procurement.
3. Pricing includes epoxy paint on the ceilings only.
   a. The paint color has not been selected by the design team.



**Division 10 – Specialties**
1. Pricing includes the installation of toilet and bath accessories.
2. Pricing includes the installation of Solid Surface materials as shown:
    a. Shower Pans
    b. Shower Walls
    c. Counter Tops
    d. Shower Caddy
    e. Shower Footrest
3. Pricing includes the installation of wood blocking where necessary for specialty items.

**Division 11 - Equipment**
1. Pricing **EXCLUDES** any owner furniture, fixtures and equipment.

**Division 12 - Furnishings**
1. Pricing **EXCLUDES** any furnishings.

**Division 13 – Special Construction**
1. Pricing **EXCLUDES** any special construction.

**Division 21 – Fire Suppression**
1. Pricing includes the make-safe of existing fire sprinklers.
2. Pricing includes the installation of additional sprinkler heads and associated piping to each stall in the restrooms and showers areas.
3. Pricing **EXCLUDES** any drain-downs or re-charging of the existing fire sprinkler system each day.
    a. This assumes that level one and potentially the entire building will not have sprinkler coverage while the sprinkler rework is taking place.

**Division 22 – Plumbing**
1. Pricing includes the installation of new sanitary waste, vent, cold water, and hot water piping and associated components.
2. Pricing includes insulation for domestic water.

**Division 23 – HVAC**
1. Pricing includes the installation of new ductwork and associated fixtures.
2. Pricing includes the installation of new fire/smoke dampers.
3. Pricing includes the installation of previously removed fixtures.
4. Pricing **EXCLUDES** any new mechanical motorized systems.

**Division 26 – Electrical**
1. Pricing includes the installation of new light fixtures and associated raceways.
2. Pricing includes the installation of new occupancy light switches.
3. Pricing includes re-working the fire alarm system per the drawings.



**Division 27 – Communications**

1. Pricing **EXCLUDES** any communications devices or wiring.

**Division 28 – Electronic Safety & Security**

1. Pricing includes the installation of new visual and audible fire alarm devices.
2. Pricing does not include any security or surveillance systems.

**Division 33 – Utilities**

1. Pricing **EXLUDES** any site utilities work.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90476849
Filing Code Description: EXHIBIT LIST
Filing Description: Part1
Status as of 8/2/2024 12:33 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 8/2/2024 11:44:12 AM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/2/2024 11:44:12 AM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/2/2024 11:44:12 AM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/2/2024 11:44:12 AM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/2/2024 11:44:12 AM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/2/2024 11:44:12 AM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/2/2024 11:44:12 AM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| J DavidDodd III | | David@Jddoddlaw.com | 8/2/2024 11:44:12 AM | SENT |

**Received & Filed 8/2/2024 11:49 AM**
**Gabriel Garcia, District Clerk**
**Brazos County, Texas**
**Emily Velasquez**
**Envelope# - 90477261**

| | |
|---|---|
| **From:** | Eddie Hare <ehare@eddiehare.com> |
| **Sent:** | Tuesday, October 24, 2023 2:06 PM |
| **To:** | barbie@patarch.com; Fred Patterson; Garon, Michael |
| **Subject:** | [Ext] FW: TABS Payment Receipt-Corps Dorm-Spence |

CAUTION:This email contains a link or attachment. Please make sure it's from a trusted source before you open the attachment or click on the link.

Here is the registration

**Eddie Hare** R.A.S. 0008

(979) 820-0149

**From:** tabs-noreply@tdlr.texas.gov <tabs-noreply@tdlr.texas.gov>
**Sent:** Tuesday, October 24, 2023 12:24 PM
**To:** Eddie Hare <ehare@eddiehare.com>
**Subject:** TABS Payment Receipt

Architectural Barriers Project Registration Online Receipt

## Architectural Barriers Project Registration Online Receipt

Your project has been successfully registered! However, this is only the registration of the construction project. The building/facility owner is ultimately responsible for ensuring that the registration number, project details and construction documents (in the instance that a design professional is not associated with the project) are mailed, scanned, or hand delivered to the Registered Accessibility Specialist (RAS) for the required review and inspection of the project.

Your project registration number is **TABS2024003825**.

**Project Name**
Corps Dorm Bathroom Renovations
**Project Number**
TABS2024003825
**Receipt Number**
452AB2032935515
**Reference Number**
2032935515
**Receipt Date**
10/24/2023
**Fee Description**
Project Registration Fee
**Amount**
$175.00
**Billing Name**
Eddie Hare
**Billing Address**

1

**- 1403 -**

5855 FOSTER ROAD
BRYAN TX 77807
US
**Billing Phone**
9798200149
**Billing Email**
ehare@eddiehare.com

Architectural Barriers Program
Regulatory Program Management Division
Texas Department of Licensing and Regulation
512-539-5669 Voice • 877-278-0999 Toll Free • 512-539-5690 Fax
Visit our Website: www.tdlr.texas.gov
Email: Techinfo@tdlr.texas.gov

*NOTE: This email has been generated based on activity in the Texas Architectural Barriers online System (TABS) and does not address issues related to the Americans with Disabilities Act (ADA) or any other state, local, or federal requirement. For information regarding the ADA, please contact the U.S.Department of Justice ADA Technical Assistance Program at 1-800-514-0301(voice) or 1-800-514-0383(ADD).*

*Email was sent to: ehare@eddiehare.com*



**TAMU CORPS DORMS RESTROOM RENOVATIONS**

**PROJECT DESIGN MEETING MINUTES NO. 01**

**DATE:**       Thursday, February 22, 2024

**TIME:**       4:00pm

**LOCATION:**   MS TEAMS

**PRESENT:**
| | |
|---|---|
| Gary Hall | Project Control |
| Russ Wallace | Project Control |
| Sam Lampe | Project Control |
| Lane Rutledge | Project Control |
| Michael Garon | SSC |
| Ben Sasse | TAMU |
| Garett Wheaton | SpawGlass |
| Layton Muehr | SpawGlass |
| Paul Gregg | SpawGlass |
| Josh Farris | SpawGlass |
| Verr Soltes | Kirksey |
| Michael Lindermann | Kirksey |

## I.       ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.   Comments/Corrections to Previous Meeting Minutes

1.   Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey prior to the next scheduled meeting.

B.   Status of Proposals and Contracts

1.   Michael Garon will be issuing the construction contract through eBuilder to SpawGlass. A UPB will need to be created at some point. This is a requirement for a Job Order Contract (JOC).

C.   eBuilder/Software

1.   All processes to be submitted and recorded within eBuilder, including Pay Applications and Changer Orders.

2.   SpawGlass will utilize CMIC to process Submittals and RFIs. They will then upload the finalized documentation into eBuilder.

D.   Inspections

1.   Project Control will conduct all building inspections.

2.   TAMU EH&S will conduct all life safety inspections.

E.   Meeting Schedule

1. Project Control will coordinate with all parties to establish a reoccurring meeting schedule.

F. Project Directory

1. Project Control will generate a project directory for the entire team. All parties to send their teams contact information to Project Control.

II. DESIGN

A. Architectural/MEP

1. Design Schedule

   a. Design Development        02/23/24 – 03/21/24
   b. DD Package Review         03/22/24 – 03/28/24
   c. Construction Documents    03/29/24 – 05/03/24
   d. CD Package Review         05/06/24 – 05/10/24

III. SCHEDULE

A. Project Schedule

1. Notice to Proceed          02/20/24
2. Solicit for Bid
3. Buyout Subcontracts        03/08/24 – 03/28/24
4. TAMU Spring Break          03/11/24 – 03/15/24
5. Fiberglass Door/Frame      03/15/24 – 06/19/24
6. Solid Surface Proc         03/15/24 – 06/19/24
7. Construction Start         05/13/24
8. Completed Demo             05/29/24
9. MEP Rough-in               06/11/24
10. Floor and Wall Finishes   06/29/24
11. Trim and Finish Out       07/03/24
12. Project Completion        08/01/24

IV. BUDGET

A. Budget Status

1. AACC - $1,796,279
2. Preliminary SpawGlass Estimate - $1,674,465

V. CONTRACTOR ITEMS

A. Logistics Plan Development.

1. Parking Lot #26 – Laydown, Storage and Contractor Parking

   a. SpawGlass to send a preliminary site logistic plan to the project team for review and comment. SpawGlass to avoid having construction traffic through the Quad.

   b. SpawGlass will need a dumpster and temporary toilet facilities at each building. They will fence these areas off to prevent public access.

2. Construction Offices – 2nd Floor Study/Office Room

    a.   SpawGlass will be utilizing the 2nd Floor Study/Office Room in all three building for temporary construction offices and light storage space.

## VI.    OWNER ITEMS

A.   <u>Site Coordination</u>

1.   Accessing the Existing Corps Dorms

   a.   Kirksey has a couple of measurements to be acquired in the existing dorms restrooms. SpawGlass to identify and request a date to gain access to the restrooms. Access to the space can be conducted before Spring Break, but TAMU will need a couple of days' notice. Access to the space will need to be after 9am.

   b.   All existing card readers will be active throughout the duration of construction. SSC will issue access cards to the project team.

## VII.    NEW BUSINESS

The meeting was adjourned at 4:35 PM.

**SUBMITTED BY:** Sam Lampe

SL:sl (02/23/24)

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann



**TAMU CORPS DORMS RESTROOM RENOVATIONS**

**PROJECT DESIGN MEETING MINUTES NO. 02**

**DATE:**        Thursday, March 5, 2024

**TIME:**        2:00pm

**LOCATION:**    MS TEAMS

**PRESENT:**

| | |
|---|---|
| Gary Hall | Project Control |
| Sam Lampe | Project Control |
| Lane Rutledge | Project Control |
| Jo Lynn Winfrey | Project Control |
| Michael Garon | SSC |
| Ben Sasse | TAMU |
| Garett Wheaton | SpawGlass |
| Layton Muehr | SpawGlass |
| Paul Gregg | SpawGlass |
| Josh Farris | SpawGlass |
| Verr Soltes | Kirksey |
| Michael Lindermann | Kirksey |

## I.    ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.   Comments/Corrections to Previous Meeting Minutes

   1.   Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey prior to the next scheduled meeting.

B.   Status of Proposals and Contracts

   1.   Kirksey's contract has been completed.

   2.   SpawGlass's work order in currently in eBuilder pending submission of unit price breakdown. SpawGlass is working on the pricing and should have it completed by the end of the week.

C.   eBuilder/Software

   1.   Pay Applications

   2.   Changer Orders

   3.   Submittals/RFIs

D.   Inspections

   1.   Project Control

E.   Meeting Schedule

1. The next Project OAC Meeting will be on March 12, 2024, at 2:00pm on MS Teams.

## II.    DESIGN

A.    Architectural/MEP

1. Design Schedule

    a. Design Development          02/23/24 – 03/21/24
    b. DD Package Review           03/22/24 – 03/28/24
    c. Construction Documents      03/29/24 – 05/03/24
    d. CD Package Review           05/06/24 – 05/10/24

2. Drawing Review

    a. Kirksey to keep an emphasis on retaining 5 showers for each restroom. Due to space constraints Kiest and Gainer toilets will be reduced to 4, with an ADA and ambulatory stall. Kirksey to study Lacy restroom in more depth and revise the plans to accommodate 5 showers. Kirksey to reissue the drawing changes out to the team by the end of the week.

    b. SpawGlass is planning on using Tiger Doors, which have a stated lead time of 8-10 weeks. Project Control to forward product data to SSC for review. Samples have been ordered and should ship to Kirksey this week.

## III.   SCHEDULE

A.    Project Schedule

    1. Notice to Proceed          02/20/24
    2. Solicit for Bid
    3. Buyout Subcontracts        03/08/24 – 03/28/24
    4. TAMU Spring Break          03/11/24 – 03/15/24
    5. Fiberglass Door/Frame      03/15/24 – 06/19/24
    6. Solid Surface Proc         03/15/24 – 06/19/24
    7. Construction Start         05/13/24
    8. Completed Demo             05/29/24
    9. MEP Rough-in               06/11/24
    10. Floor and Wall Finishes   06/29/24
    11. Trim and Finish Out       07/03/24
    12. Project Completion        08/01/24

## IV.    BUDGET

A.    Budget Status

    1. AACC - $1,796,279
    2. Preliminary SpawGlass Estimate - $1,674,465

## V.     CONTRACTOR ITEMS

A.    Logistics Plan Development.

1. Parking Lot #26 – Laydown, Storage and Contractor Parking

    a. Project Control has forwarded the updated logistics plan to transportation for approval.

      b.    Project Control to forward next weeks OAC meeting invite to QuadTex and Aggieland Construction to discuss site logistics.

    2.    Construction Offices – 2nd Floor Study/Office Room

      a.    Project Control to coordinate with Ben Sasse in regard to removing signs, plaques and furniture out of the project area.

## VI.    OWNER ITEMS

    A.    <u>Site Coordination</u>

    1.    Accessing the Existing Corps Dorms

      a.    Project Control and SpawGlass need 4 access cards each.

## VII.    NEW BUSINESS

The meeting was adjourned at 4:55 PM.

**SUBMITTED BY**:  Sam Lampe

SL:sl (03/07/24)

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann

# TAMU Corps Dorms Restroom
## Renovations Overall Site Logistics Plan - Demo
## Phase May 10th - May 24th



**Legend**

- = QuadTex Parking
- = QuadTex Dumpster
- = SpawGlass Dumpster & Restrooms Enclosure
- = SpawGlass Work Area
- = Truck Routes
- = Trash Route
- = Lot 26 Parking and Laydown

# TAMU Corps Dorms Restroom Renovations Kiest Hall Site Logistics Plan - Demo Phase May 10th - May 24th



**Legend**

■ = QuadTex Parking

■ = SpawGlass Work Area

■ = SpawGlass Dumpster & Restrooms Enclosure

→ Truck Routes

Trucks to have flaggers when entering and

# TAMU Corps Dorms Restroom
## Renovations Gainer Hall Site Logistics Plan -
Demo Phase May 10th - May 24th



Protect

**Legend**

☐ = SpawGlass Restrooms Enclosure

☐ = SpawGlass Work Area

→ = Trash Route

# TAMU Corps Dorms Restroom Renovations Lacy Hall Site Logistics Plan -

## Demo Phase May 10th - May 24th



Trucks to have flaggers when entering and

Sidewalk

**Legend**

= SpawGlass Dumpster & Restrooms Enclosure

= SpawGlass Work Area

= Trash Route

= Truck Routes

# TAMU Corps Dorms Restroom Renovations
## Overall Site Logistics Plan - Renovation Phase May 24th - August 1st



QuadTex

QuadTex

Restrooms

Kiest

Restrooms

Lacy

Gainer

Lot

### Legend

- ■ = QuadTex Parking
- ■ = QuadTex Dumpster
- ■ = SpawGlass Dumpster & Restrooms Enclosure
- ■ = SpawGlass Work Area
- → = Truck Routes
- → = Trash Route
- ■ = Lot 26 Parking and Laydown

# TAMU Corps Dorms Restroom Renovations
## Kiest Hall Site Logistics Plan - Renovation Phase May 24th - August 1st



**Legend**

- 🟥 = QuadTex Parking
- 🟦 = SpawGlass Work Area
- 🟨 = SpawGlass Restrooms Enclosure
- ── = Truck Routes

Trucks to have flaggers when entering and

# TAMU Corps Dorms Restroom Renovations
## Gainer Hall Site Logistics Plan - Renovation Phase
### May 24th - August 1st



# TAMU Corps Dorms Restroom Renovations Lacy Hall Site Logistics Plan - Renovation Phase May 24th - August 1st



**Legend**

- 🟨 = SpawGlass Dumpster & Restrooms Enclosure
- 🟦 = SpawGlass Work Area
- ⟶ = Trash Route
- ⟶ = Truck Routes

Trucks to have flaggers when entering and

Sidewalk



**DATE:**        Thursday, March 12, 2024

**TIME:**        2:00pm

**LOCATION:**    MS TEAMS

**PRESENT:**     Gary Hall              Project Control
                 Sam Lampe             Project Control
                 David Zeiger          TAMU
                 Garett Wheaton        SpawGlass
                 Layton Muehr          SpawGlass
                 Paul Gregg            SpawGlass
                 Josh Farris           SpawGlass
                 Michael Lindermann    Kirksey


## I.        ADMINISTRATION

<u>Communication:</u> No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.   <u>Comments/Corrections to Previous Meeting Minutes</u>

  1.   Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey prior to the next scheduled meeting.

B.   <u>Status of Proposals and Contracts</u>

  1.   Kirksey Work Order – Executed

  2.   SpawGlass Work Order

     a.   SpawGlass in currently working on the unit price breakdown and HUB plan. SpawGlass is working on this to be completed by the end of the week.

C.   <u>eBuilder/Software</u>

  1.   Pay Applications

  2.   Changer Orders

  3.   Submittals/RFIs

D.   <u>Inspections</u>

  1.   Project Control

E.   <u>Meeting Schedule</u>

  1.   The next Project OAC Meeting will be on March 19, 2024, at 2:00pm on MS Teams.

## II. DESIGN

A. Architectural/MEP

1. Design Schedule

   a. Design Development      02/23/24 – 03/21/24
   b. DD Package Review      03/22/24 – 03/28/24
   c. Construction Documents      03/29/24 – 05/03/24
   d. CD Package Review      05/06/24 – 05/10/24

2. Drawing Review – Lacy Option #1

   a. Kirskey to move forward with Option #1. Option #2 is not feasible due to the existing chase between shower stall one and two. Relocation of the riser chase will not be conducive with the project schedule.

3. Fiber Glass Doors and Frames

   a. Kirskey has selected a color for the fiber glass doors and frames. SpawGlass to create a formal submittal for approval.

## III. SCHEDULE

A. Project Schedule

   1. Notice to Proceed      02/20/24
   2. Solicit for Bid
   3. Buyout Subcontracts      03/08/24 – 03/28/24
   4. TAMU Spring Break      03/11/24 – 03/15/24
   5. Fiberglass Door/Frame      03/15/24 – 06/19/24
   6. Solid Surface Proc      03/15/24 – 06/19/24
   7. Construction Start      05/13/24
   8. Completed Demo      05/29/24
   9. MEP Rough-in      06/11/24
   10. Floor and Wall Finishes      06/29/24
   11. Trim and Finish Out      07/03/24
   12. Project Completion      08/01/24

## IV. BUDGET

A. Budget Status

   1. AACC - $1,796,279
   2. Preliminary SpawGlass Estimate - $1,674,465

## V. CONTRACTOR ITEMS

A. Logistics Plan Development.

1. Parking Lot #26 – Laydown, Storage and Contractor Parking

   a. The project team reviewed the site logistics plan with QuadTex. Project Control to issue the site logistics plan with the meeting minutes for review.

2. Construction Offices – 2nd Floor Study/Office Room

VI.     OWNER ITEMS

    A.  Site Coordination

        1.  Project Control to reach out to SSC about getting into the existing restrooms to field verify the existing chases.

VII.    NEW BUSINESS

The meeting was adjourned at 2:30 PM.

**SUBMITTED BY**:  Sam Lampe

SL:sl (03/18/24)

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Les Williams
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann

# TAMU Corps Dorms Restroom Renovations Overall Site Logistics Plan - Demo Phase May 10th - May 24th



**Legend**

- = QuadTex Parking
- = QuadTex Dumpster
- = SpawGlass Dumpster & Restrooms Enclosure
- = SpawGlass Work Area
- = Truck Routes
- = Trash Route
- = Lot 26 Parking and Laydown

# TAMU Corps Dorms Restroom
## Renovations Kiest Hall Site Logistics Plan -
Demo Phase May 10th - May 24th



**Legend**

■ = QuadTex Parking

■ = SpawGlass Work Area

■ = SpawGlass Dumpster & Restrooms Enclosure

→ Truck Routes

Trucks to have flaggers when entering and

# TAMU Corps Dorms Restroom Renovations
## Gainer Hall Site Logistics Plan - Demo Phase May 10th - May 24th



**Legend**

- ▮ (yellow) = SpawGlass Restrooms Enclosure
- ▮ (cyan) = SpawGlass Work Area
- → = Trash Route

Protect

# TAMU Corps Dorms Restroom Renovations Lacy Hall Site Logistics Plan -
## Demo Phase May 10th - May 24th



Trucks to have flaggers when entering and

Sidewalk

### Legend

- ☐ (yellow) = SpawGlass Dumpster & Restrooms Enclosure
- ☐ (cyan) = SpawGlass Work Area
- ⟶ = Trash Route
- ⟶ = Truck Routes

# TAMU Corps Dorms Restroom Renovations Overall Site Logistics Plan -

## Renovation Phase May 24th - August 1st



**Legend**

- ▮ = QuadTex Parking
- ▮ = QuadTex Dumpster
- ▮ = SpawGlass Dumpster & Restrooms Enclosure
- ▮ = SpawGlass Work Area
- → = Truck Routes
- → = Trash Route
- ▮ = Lot 26 Parking and Laydown

QuadTex

QuadTex

Restrooms

Kiest

Restrooms

Lacy

Gainer

Lot

# TAMU Corps Dorms Restroom
## Renovations Kiest Hall Site Logistics Plan -
## Renovation Phase May 24th - August 1st



**Legend**

- = QuadTex Parking
- = SpawGlass Work Area
- = SpawGlass Restrooms Enclosure
- = Truck Routes

Trucks to have flaggers when entering and

# TAMU Corps Dorms Restroom Renovations
## Gainer Hall Site Logistics Plan - Renovation Phase May 24th - August 1st



## Legend

- 🟨 = SpawGlass Restrooms Enclosure
- 🟦 = SpawGlass Work Area
- → = Truck Route

Protect

# TAMU Corps Dorms Restroom Renovations
## Lacy Hall Site Logistics Plan - Renovation Phase May 24th - August 1st



**Legend**

- 🟨 = SpawGlass Dumpster & Restrooms Enclosure
- 🟦 = SpawGlass Work Area
- → = Trash Route
- → = Truck Routes

Trucks to have flaggers when entering and

Sidewalk



## TAMU CORPS DORMS RESTROOM RENOVATIONS

## PROJECT DESIGN MEETING MINUTES NO. 04

**DATE:**       Thursday, March 19, 2024

**TIME:**       2:00pm

**LOCATION:**   MS TEAMS

**PRESENT:**

| | |
|---|---|
| Gary Hall | Project Control |
| Sam Lampe | Project Control |
| Ben Sasse | TAMU |
| Rob Webber | TAMU |
| David Zeiger | TAMU |
| Mike Garon | SSC |
| Garett Wheaton | SpawGlass |
| Layton Muehr | SpawGlass |
| Paul Gregg | SpawGlass |
| Josh Farris | SpawGlass |
| Verr Soltes | Kirksey |

## I.       ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.   Comments/Corrections to Previous Meeting Minutes

   1.   Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey, Austin Vader prior to the next scheduled meeting.

B.   Status of Proposals and Contracts

   1.   Kirksey Work Order – Executed

   2.   Waiting on approval for SpawGlass Work Order

      a.   SpawGlass has submitted the unit pricing and HSP in eBuilder. SSC to execute contract.

C.   eBuilder/Software

   1.   Pay Applications

   2.   Changer Orders

   3.   Submittals/RFIs

D.   Inspections

   1.   Project Control

E.  Meeting Schedule

1.  The next Project OAC Meeting will be on March 26, 2024, at 2:00pm on MS Teams.

## II.  DESIGN

A.  Architectural/MEP

1.  Design Schedule

   a.  Design Development         02/23/24 – 03/21/24
   b.  DD Package Review          03/22/24 – 03/28/24
   c.  Construction Documents     03/29/24 – 05/03/24
   d.  CD Package Review          05/06/24 – 05/10/24

2.  Existing Corridor Doors and Frames

   a.  The Corps has requested the existing corridor doors and frames to remain. Kirksey confirm that keeping the doors can be accommodated within the redesign. Kirksey to clear with ADA &Cleary Zimmerman and reissue DD on 3/29/24

3.  Option #1

   a.  Revised option #1 for limiting sightline to be used in design

## III.  SCHEDULE

A.  Project Schedule

1.  Notice to Proceed        02/20/24
2.  Solicit for Bid
3.  Buyout Subcontracts      03/08/24 – 03/28/24
4.  TAMU Spring Break        03/11/24 – 03/15/24
5.  Fiberglass Door/Frame    03/15/24 – 06/19/24
6.  Solid Surface Proc       03/15/24 – 06/19/24
7.  Construction Start       05/13/24
8.  Completed Demo           05/29/24
9.  MEP Rough-in             06/11/24
10. Floor and Wall Finishes  06/29/24
11. Trim and Finish Out      07/03/24
12. Project Completion       08/01/24

## IV.  BUDGET

A.  Budget Status

1.  AACC - $1,796,279
2.  Preliminary SpawGlass Estimate - $1,674,465

   a.  SpawGlass currently receiving pricing and vetting. Current pricing received looks to be within budget.

V.      **CONTRACTOR ITEMS**

    A.  <u>Logistics Plan Development.</u>

        1.  Parking Lot #26 – Laydown, Storage and Contractor Parking

            a.  Approved

        2.  Construction Offices – 2nd Floor Study/Office Room

            a.  TAMU to reach back out to ResLife for approval to use the 2nd Floor Study/Office Room for construction office.

    B.  <u>Lead times</u>

        1.  SpawGlass to coordinate with Tiger Doors on confirmation for mounting and shop drawing lead times on lavatory doors.

    C.  <u>Submittals</u>

        1.  SpawGlass to produce submittals for tile, solid surface and doors by the end of the week.

VI.     **OWNER ITEMS**

    A.  <u>Site Coordination</u>

VII.    **NEW BUSINESS**

The meeting was adjourned at 2:30 PM.

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Les Williams
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann

**SUBMITTED BY**:  Sam Lampe
SL:av (03/18/24)



## TAMU CORPS DORMS RESTROOM RENOVATIONS

## PROJECT DESIGN MEETING MINUTES NO. 05

**DATE:**        Thursday, March 26, 2024

**TIME:**        2:00pm

**LOCATION:**    MS TEAMS

**PRESENT:**

| | |
|---|---|
| Gary Hall | Project Control |
| Sam Lampe | Project Control |
| Ben Sasse | TAMU |
| Rob Webber | TAMU ResLife |
| Chareny Rydl | TAMU ResLife |
| David Zeiger | TAMU EH&S |
| Billy Meredith | TAMU Corps |
| Mike Garon | SSC |
| Garett Wheaton | SpawGlass |
| Layton Muehr | SpawGlass |
| Paul Gregg | SpawGlass |
| Josh Farris | SpawGlass |
| Verr Soltes | Kirksey |
| Michael Lindermann | Kirksey |

## I.    ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.    Comments/Corrections to Previous Meeting Minutes

1.    Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey, Austin Vader prior to the next scheduled meeting.

B.    Status of Proposals and Contracts

1.    Kirksey Work Order – Executed

2.    SpawGlass Contract

a.    SSC to check on the status of SpawGlass contract, should be close to finalized.

C.    eBuilder/Software

1.    Pay Applications

2.    Changer Orders

3.    Submittals/RFIs

D.    Inspections

1.    Project Control

E.  Meeting Schedule

1.  The next Project OAC Meeting will be on April 2, 2024, at 2:00pm on MS Teams.


II.  **DESIGN**

A.  Architectural/MEP

1.  Design Schedule

a.  Design Development 100%    03/28/24
b.  DD Package Review          03/28/24 – 04/04/24
c.  Construction Documents     03/29/24 – 05/03/24
d.  CD Package Review          05/06/24 – 05/10/24

2.  Design Update

a.  Kirksey to reuse the existing doors, frames and card reader at the entry of the restrooms.

b.  Gainer Hall and Kiest Hall to have similar overall design with Lacy Hall to have one less restroom stall. All bathrooms will have five shower stalls.

3.  Submittals

a.  Solid surface and tile shop drawings / product under review by Kirksey.

b.  SpawGlass anticipates having fiberglass door and frame shop drawings to Kirkey be the end of the week.


III.  **SCHEDULE**

A.  Project Schedule

1.  Notice to Proceed          02/20/24
2.  Solicit for Bid
3.  Buyout Subcontracts        03/08/24 – 03/28/24
4.  TAMU Spring Break          03/11/24 – 03/15/24
5.  Fiberglass Door/Frame      03/15/24 – 06/19/24
6.  Solid Surface Proc         03/15/24 – 06/19/24
7.  Construction Start         05/13/24
8.  Completed Demo             05/29/24
9.  MEP Rough-in               06/11/24
10. Floor and Wall Finishes    06/29/24
11. Trim and Finish Out        07/03/24
12. Project Completion         08/01/24

IV.  **BUDGET**

A.  Budget Status

1.  AACC - $1,796,279

2.  Preliminary SpawGlass Estimate - $1,674,465


**- 1434 -**

a. SpawGlass currently receiving and vetting subcontractor pricing.

**V.  CONTRACTOR ITEMS**

A. Logistics Plan Development.

1. Parking Lot #26 – Laydown, Storage and Contractor Parking

a. Approved.

b. SpawGlass can start mobilizing onsite Sunday, May 12th, 2024.

2. Construction Offices – 2nd Floor Study/Office Room

a. Approved.

B. Lead times

1. SpawGlass to coordinate with TigerDoors for Shop Drawings.

**VI.  OWNER ITEMS**

A. Site Coordination

**VII.  NEW BUSINESS**

A. SpawGlass / Kirksey to coordinate with Reslife about storing existing restroom door stalls after demolition.

The meeting was adjourned at 2:30 PM.

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Les Williams
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann

**SUBMITTED BY:** Sam Lampe
SL:av (03/27/24)



**TAMU CORPS DORMS RESTROOM RENOVATIONS**

**PROJECT DESIGN MEETING MINUTES NO. 06**

**DATE:**       Tuesday, April 2, 2024

**TIME:**       2:00pm

**LOCATION:**   MS TEAMS

**PRESENT:**

| | |
|---|---|
| Gary Hall | Project Control |
| Sam Lampe | Project Control |
| Lane Rutledge | Project Control |
| Austin Vader | Project Control |
| Rob Webber | TAMU |
| Mike Garon | TAMU |
| Ben Sasse | TAMU |
| Rydl Chareny | TAMU |
| Garett Wheaton | SpawGlass |
| Layton Muehr | SpawGlass |
| Paul Gregg | SpawGlass |
| Josh Farris | SpawGlass |
| Verr Soltes | Kirksey |
| Michael Lindemann | Kirksey |

## I.    ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.  Comments/Corrections to Previous Meeting Minutes

1.  Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey, Austin Vader prior to the next scheduled meeting.

B.  Status of Proposals and Contracts

1.  Kirksey Work Order – Executed

2.  SpawGlass has signed the work order and waiting to receive the final executed contract back from SSC.

C.  eBuilder/Software

1.  Pay Applications

2.  Changer Orders

3.  Submittals/RFIs

D.  Inspections

1.  Project Control

E. Meeting Schedule

1. The next Project OAC Meeting will be on April 9, 2024, at 2:00pm on MS Teams.

II. DESIGN

A. Architectural/MEP

1. Design Schedule

   a. Design Development 100%     03/28/24 – Issued
   b. DD Package Review           03/28/24 – 04/04/24
   c. Construction Documents      03/29/24 – 05/03/24
   d. CD Package Review           05/06/24 – 05/10/24

2. Doors and Frames

   a. DD's revised for existing doors and card readers to remain.

3. Submittals

   a. Solid surface and Tile submittals have been approved. Kirksey and SpawGlass to make sure the foot stool is incorporated in the showers to match what is being installed on the Spence project.

   b. Door hardware is under review from Kirksey. Ben to check if specifications match what is being used on Spence project.

III. SCHEDULE

A. Project Schedule

1.  Notice to Proceed         02/20/24
2.  Solicit for Bid
3.  Buyout Subcontracts       03/08/24 – 03/28/24
4.  TAMU Spring Break         03/11/24 – 03/15/24
5.  Fiberglass Door/Frame     03/15/24 – 06/19/24
6.  Solid Surface Proc        03/15/24 – 06/19/24
7.  Construction Start        05/13/24
8.  Completed Demo            05/29/24
9.  MEP Rough-in              06/11/24
10. Floor and Wall Finishes   06/29/24
11. Trim and Finish Out       07/03/24
12. Project Completion        08/01/24

IV. BUDGET

A. Budget Status

1. AACC - $1,796,279

2. Preliminary SpawGlass Estimate - $1,674,465

   a. SpawGlass currently receiving and vetting pricing.

   b. Subcontractor buyout is approximately 50% complete.

V.      **CONTRACTOR ITEMS**

   A.   Logistics Plan Development.

      1.   Parking Lot #26 – Laydown, Storage and Contractor Parking

         a.   Approved

      2.   Construction Offices – 2nd Floor Study/Office Room

         a.   Approved

VI.     **OWNER ITEMS**

   A.   Site Coordination

VII.    **NEW BUSINESS**

The meeting was adjourned at 2:20 PM.

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Les Williams
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann

**SUBMITTED BY:**  Sam Lampe
SL:av (04/4/24)



TAMU CORPS DORMS RESTROOM RENOVATIONS

PROJECT DESIGN MEETING MINUTES NO. 07

**DATE:** Tuesday, April 9, 2024

**TIME:** 2:00pm

**LOCATION:** MS TEAMS

**PRESENT:**

| | |
|---|---|
| Gary Hall | Project Control |
| Sam Lampe | Project Control |
| Lane Rutledge | Project Control |
| Austin Vader | Project Control |
| Rob Webber | TAMU |
| Mike Garon | TAMU |
| Ben Sasse | TAMU |
| Billy Meredith Jr. | TAMU |
| Layton Muehr | SpawGlass |
| Paul Gregg | SpawGlass |
| Seth Madison | SpawGlass |
| Josh Farris | SpawGlass |
| Verr Soltes | Kirksey |
| Michael Lindemann | Kirksey |

## I. ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A. Comments/Corrections to Previous Meeting Minutes

1. Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey, Austin Vader prior to the next scheduled meeting.

B. Status of Proposals and Contracts

1. Kirksey Work Order – Executed

2. SpawGlass Contract is finalizing

C. eBuilder/Software

1. Pay Applications

2. Changer Orders

3. Submittals/RFIs

   a. Forthcoming electrical submittals to be submitted to Kirksey. SpawGlass in currently reviewing.

   b. Kirksey has no issues with proposed Submittal log.

D. Inspections

    1.   Project Control

E.   Meeting Schedule

    1.   The next Project OAC Meeting will be on April 16, 2024, at 2:00pm on MS Teams.

## II.    DESIGN

A.   Architectural/MEP

    1.   Design Schedule

        a.   Design Development 100%   03/28/24 – Issued
        b.   DD Package Review          03/28/24 – 04/04/24 – No Comments Received
        c.   Construction Documents    03/29/24 – 05/03/24
        d.   CD Package Review          05/06/24 – 05/10/24

    2.   Shower Foot Stool

        a.   All showers are required to have foot stool. Current design for the foot stool matches what is currently being proposed for the Spence renovation project.

## III.    SCHEDULE

A.   Project Schedule

| 1. | Notice to Proceed | 02/20/24 |
| 2. | Solicit for Bid | |
| 3. | Buyout Subcontracts | 03/08/24 – 03/28/24 |
| 4. | TAMU Spring Break | 03/11/24 – 03/15/24 |
| 5. | Fiberglass Door/Frame | 03/15/24 – 06/19/24 - Ordered |
| 6. | Solid Surface Proc | 03/15/24 – 06/19/24 - Ordered |
| 7. | Construction Start | 05/13/24 |
| 8. | Completed Demo | 05/29/24 |
| 9. | MEP Rough-in | 06/11/24 |
| 10. | Floor and Wall Finishes | 06/29/24 |
| 11. | Trim and Finish Out | 07/03/24 |
| 12. | Project Completion | 08/01/24 |

## IV.    BUDGET

A.   Budget Status

    1.   AACC - $1,796,279
    2.   Preliminary SpawGlass Estimate - $1,674,465

## V.    CONTRACTOR ITEMS

A.   Materials Ordered

    1.   Fiberglass Doors and Frames
    2.   Solid surface
    3.   Tile

B.   Specification

1. SpawGlass to provide specification for flowable fill concrete.

## VI.     OWNER ITEMS

A.     <u>Site Coordination</u>

1. Construction fencing to be installed Sunday, May 12, 2024.

## VII.    NEW BUSINESS

The meeting was adjourned at 2:20 PM.

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Les Williams
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann

**SUBMITTED BY:** Sam Lampe
SL:av (04/11/24)



**TAMU CORPS DORMS RESTROOM RENOVATIONS**

**PROJECT DESIGN MEETING MINUTES NO. 09**

**DATE:**        Tuesday, April 23, 2024

**TIME:**        2:00pm

**LOCATION:**    MS TEAMS

**PRESENT:**

| | |
|---|---|
| Gary Hall | Project Control |
| Sam Lampe | Project Control |
| Lane Rutledge | Project Control |
| Rob Webber | TAMU |
| Ben Sasse | TAMU |
| Billy Meredith Jr. | TAMU |
| Charney Rydl | TAMU |
| Mike Garon | SSC |
| Layton Muehr | SpawGlass |
| Paul Gregg | SpawGlass |
| Seth Madison | SpawGlass |
| Josh Farris | SpawGlass |
| Verr Soltes | Kirksey |
| Michael Lindemann | Kirksey |

## I.    ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.    Comments/Corrections to Previous Meeting Minutes

1.    Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey prior to the next scheduled meeting.

B.    Status of Proposals and Contracts

1.    SpawGlass

a.    Subcontractor buyout has been completed.

C.    eBuilder/Software

1.    Pay Applications

2.    Changer Orders

3.    Submittals/RFIs

a.    See attached logs.

b.    MEP submittals are the current priority.

c.    Lighting control submittal to be resubmitted by SpawGlass to include high moisture rated switches.

        d.    SpawGlass to submit a RFI in regards to a firestopping gasket detail at the top of walls.

D.  Inspections

    1.   Project Control

    2.   Moisture Testing

        a.    SpawGlass to include a moisture barrier admixture to help with moisture mitigation within the concrete.

E.  Meeting Schedule

    1.   The next Project OAC Meeting will be on April 30th, 2024, at 2:00pm on MS Teams.

## II. DESIGN

A.  Architectural/MEP

    1.   Design Schedule

| | | |
|---|---|---|
| a. | Design Development | Issued |
| b. | DD Package Review | Completed |
| c. | Construction Documents | 03/29/24 – 04/26/24 |
| d. | CD Package Review | 05/06/24 – 05/10/24 |

## III. SCHEDULE

A.  Project Schedule

| | | |
|---|---|---|
| 1. | Notice to Proceed | 02/20/24 |
| 2. | Solicit for Bid | |
| 3. | Buyout Subcontracts | 03/08/24 – 03/28/24 |
| 4. | TAMU Spring Break | 03/11/24 – 03/15/24 |
| 5. | Fiberglass Door/Frame | 03/15/24 – 06/19/24 |
| 6. | Solid Surface Proc | 03/15/24 – 06/19/24 |
| 7. | Construction Start | 05/13/24 |
| 8. | Completed Demo | 05/29/24 |
| 9. | MEP Rough-in | 06/11/24 |
| 10. | Floor and Wall Finishes | 06/29/24 |
| 11. | Trim and Finish Out | 07/03/24 |
| 12. | Project Completion | 08/01/24 |

## IV. BUDGET

A.  Budget Status

    1.   AACC - $1,796,279
    2.   Preliminary SpawGlass Estimate - $1,674,465

## V. CONTRACTOR ITEMS

A.  Long Lead Material Orders

    1.   Fiberglass Doors and Frames – May 17th to be shipped.
    2.   Solid Surface – June 14th to be shipped.

3. Tile - Available

## VI.   OWNER ITEMS

A.   Site Coordination

1.   Site construction fencing around lot 26 to be erected Sunday, May 12th, 2024.

## VII.   NEW BUSINESS

The meeting was adjourned at 2:15 PM.

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Les Williams
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann

**SUBMITTED BY:** Sam Lampe
SL:av (04/24/24)



| Activity Name | Orig Dur | Remaining Duration | Start | Finish |
|---|---|---|---|---|
| **TAMU Corps Dorms RR Renovations** | 133 | 85 | 20-Feb-24 A | 01-Aug-24 |
| Pre-Construction | 110 | 46 | 20-Feb-24 A | 14-Jun-24 |
| Under Contract (Design NTP) | 0 | 0 | 20-Feb-24 A | |
| DD Package | 20 | 0 | 26-Feb-24 A | 28-Mar-24 A |
| Buyout Subcontracts | 15 | 0 | 14-Mar-24 A | 08-Apr-24 A |
| Fiberglass Doors and Frames Procurement | 72 | 20 | 01-Apr-24 A | 17-May-24 |
| Solid Surface Material Procurement | 72 | 42 | 02-Apr-24 A | 14-Jun-24 |
| Tile Procurement | 25 | 10 | 02-Apr-24 A | 02-May-24 |
| DD Package Review | 4 | 0 | 02-Apr-24 A | 05-Apr-24 A |
| CD Package | 20 | 5 | 08-Apr-24 A | 26-Apr-24 |
| CD Package Review | 5 | 5 | 29-Apr-24 | 03-May-24 |
| Milestones | 67 | 67 | 13-May-24 | 01-Aug-24 |
| Start Construction | 0 | 0 | 13-May-24 | |
| Complete Demo | 0 | 0 | | 22-May-24 |
| MEP Rough-In | 0 | 0 | | 06-Jun-24 |
| Floor and Wall Finishes | 0 | 0 | | 25-Jun-24 |
| Trim and Finish Out | 0 | 0 | | 28-Jun-24 |
| Project Completion | 0 | 0 | | 01-Aug-24 |
| Inspections | 15 | 15 | 21-May-24 | 08-Jun-24 |
| Mechanical Rough In Inspection | 0 | 0 | | 21-May-24 |
| Fire Suppression Testing | 0 | 0 | | 24-May-24 |
| Underground Plumbing Rough In Inspection | 0 | 0 | | 28-May-24 |
| Rebar Inspection | 0 | 0 | 29-May-24 | |
| Wall Framing Inspection | 0 | 0 | | 04-Jun-24 |
| Electrical Rough In Inspection | 0 | 0 | | 05-Jun-24 |
| Plumbing Rough In Inspection | 0 | 0 | | 06-Jun-24 |
| Ceiling Framing Inspection | 0 | 0 | | 08-Jun-24 |
| Construction | 55 | 55 | 13-May-24 | 18-Jul-24 |
| Dorm 2 (Kiest) | 55 | 55 | 13-May-24 | 18-Jul-24 |
| Demo | 9 | 9 | 13-May-24 | 22-May-24 |
| Demo/Salvage Fixtures | 2 | 2 | 13-May-24 | 14-May-24 |
| Mobilize Fence and Connexes | 2 | 2 | 13-May-24 | 14-May-24 |
| Make Safe of Electrical and Fire Safety | 1 | 1 | 13-May-24 | 13-May-24 |
| Demo/Salvage Partitions | 1 | 1 | 15-May-24 | 15-May-24 |
| Demo Floor and Wall Tile | 2 | 2 | 16-May-24 | 17-May-24 |
| Demo Sheetrock and Framing | 2 | 2 | 16-May-24 | 17-May-24 |
| Demo Existing Electrical | 2 | 2 | 16-May-24 | 17-May-24 |
| Demo Existing In-Wall Plumbing | 2 | 2 | 16-May-24 | 17-May-24 |
| Demo Ceiling | 2 | 2 | 16-May-24 | 17-May-24 |

| Start Date: 20-Feb-24 | ▬▬ Actual Work | ◆ Milestone | ▬▬ Actual Level of Effort |
|---|---|---|---|
| Finish Date: 01-Aug-24 | ▬▬ Remaining Work | ▽—▽ Summary | |
| Data Date: 21-Apr-24 | ▬▬ Critical Remaining Work | ▬▬ Level of Effort | |
| Run Date: 22-Apr-24 | | | |

**TAMU Corps Dorms RR Renovations**

Print Format

Page 1 of 2

SpawGlass

| Activity Name | Orig Dur | Remaining Duration | Start | Finish |
|---|---|---|---|---|
| Demo Above Ceiling MEP | 2 | 2 | 16-May-24 | 17-May-24 |
| Sawcut and Demo Concrete | 2 | 2 | 18-May-24 | 20-May-24 |
| Demo Existing In-Slab Plumbing | 2 | 2 | 21-May-24 | 22-May-24 |
| Renovations | 48 | 48 | 18-May-24 | 18-Jul-24 |
| Install new Ductwork | 3 | 3 | 18-May-24 | 21-May-24 |
| Install new Above-Ceiling Elecrical | 3 | 3 | 18-May-24 | 21-May-24 |
| Install Fire Suppression | 6 | 6 | 18-May-24 | 24-May-24 |
| In-Slab Plumbing | 3 | 3 | 23-May-24 | 28-May-24 |
| Pour Back Concrete at Sawcut Areas | 2 | 2 | 29-May-24 | 30-May-24 |
| Install Wall Framing | 4 | 4 | 31-May-24 | 04-Jun-24 |
| Install new In-Wall Electrical | 3 | 3 | 03-Jun-24 | 05-Jun-24 |
| Install new In-Wall Plumbing | 4 | 4 | 03-Jun-24 | 06-Jun-24 |
| Install Ceiling Framing | 4 | 4 | 05-Jun-24 | 08-Jun-24 |
| Floor Prep | 4 | 4 | 05-Jun-24 | 08-Jun-24 |
| Install Wall Sheetrock | 4 | 4 | 07-Jun-24 | 11-Jun-24 |
| Install Ceiling Sheetrock | 3 | 3 | 10-Jun-24 | 12-Jun-24 |
| Install Floor Tile | 8 | 8 | 10-Jun-24 | 18-Jun-24 |
| Tape, Float, and Finish | 2 | 2 | 13-Jun-24 | 14-Jun-24 |
| Install Electrical Ceiling Fixtures | 3 | 3 | 15-Jun-24 | 18-Jun-24 |
| Install Mechanical Fixtures | 2 | 2 | 15-Jun-24 | 17-Jun-24 |
| Install Solid Surface Materials | 5 | 5 | 15-Jun-24 | 20-Jun-24 |
| Install Wall Tile | 6 | 6 | 19-Jun-24 | 25-Jun-24 |
| Install Plumbing Fixtures | 2 | 2 | 26-Jun-24 | 27-Jun-24 |
| Paint Ceiling | 3 | 3 | 26-Jun-24 | 28-Jun-24 |
| Install Electrical Wall Fixtures | 3 | 3 | 26-Jun-24 | 28-Jun-24 |
| Install new Specialties | 2 | 2 | 26-Jun-24 | 27-Jun-24 |
| Install Doors and Hardware | 2 | 2 | 29-Jun-24 | 01-Jul-24 |
| Contractor Punchlist | 12 | 12 | 02-Jul-24 | 18-Jul-24 |
| Dorm 5 (Gainer) | 53 | 53 | 13-May-24 | 16-Jul-24 |
| Dorm 6 (Lacey) | 53 | 53 | 13-May-24 | 16-Jul-24 |
| Close-Out | 26 | 26 | 29-Jun-24 | 01-Aug-24 |
| Commisioning | 10 | 10 | 29-Jun-24 | 13-Jul-24 |
| Owner Punchlist | 12 | 12 | 19-Jul-24 | 01-Aug-24 |



| | | | |
|---|---|---|---|
| Start Date: | 20-Feb-24 | ◆——◆ Milestone | Actual Work |
| Finish Date: | 01-Aug-24 | ▽——▽ Summary | Remaining Work |
| Data Date: | 21-Apr-24 | Level of Effort | Critical Remaining Work |
| Run Date: | 22-Apr-24 | Actual Level of Effort | |

**TAMU Corps Dorms RR Renovations**

Print Format

Page 2 of 2

SpawGlass



# *SpawGlass Construction Corp.*

## PROJECT MANAGEMENT - SUBMITTAL LOG

### 4024003 - TAMU Corps Dorms

| Submittal ID | Last Rev. | Title | Type | Status | Activity Start Date | Required Start | Required Finish | Received | Sent | Days Out | Returned | Forwarded | Responsibility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SPEC SECTION:** | **NONE** | | | | | | | | | | | | |
| **Spec Sub-Section** | **None** | | | | | | | | | | | | |
| 083113-001 | 1 | Access Doors and Frames - Product Data and Schedule | Product Data | Submitted for Approval | | | | 04/19/2024 | 04/19/2024 | 4 | | | Kirksey Architects, Inc. |
| 092216-001 | 1 | Non-Structural Metal Framing - Product Data | Product Data | Submitted for Approval | | | | 04/19/2024 | 04/22/2024 | 1 | | | Kirksey Architects, Inc. |
| 092900-001 | 1 | Gypsum Board - Product Data | Product Data | Submitted for Approval | | | | 04/19/2024 | 04/22/2024 | 1 | | | Kirksey Architects, Inc. |
| 102800-001 | 1 | Toilet and Bath Accessories - Product Data and Schedule | Product Data | Submitted for Approval | | | | 04/22/2024 | 04/22/2024 | 1 | | | Kirksey Architects, Inc. |
| 211313-001 | 1 | Fire Suppression Piping Wet-Pipe Sprinkler System - Product Data | Product Data | Submitted for Approval | | | | 04/08/2024 | 04/10/2024 | 13 | | | Kirksey Architects, Inc. |
| 265100-001 | 1 | Interior Lighting - Product Data | Product Data | Submitted for Approval | | | | 04/09/2024 | 04/11/2024 | 12 | | | Kirksey Architects, Inc. |
| 233300-001 | 1 | Duct Accessories - Product Data | Product Data | Submitted for Approval | | | | 04/16/2024 | 04/16/2024 | 7 | | | Kirksey Architects, Inc. |
| 260519-001 | 1 | Conductors and Cables - Product Data | Product Data | Submitted for Approval | | | | 04/22/2024 | 04/22/2024 | 1 | | | Kirksey Architects, Inc. |
| 260533-001 | 1 | Raceways and Boxes - Product Data | Product Data | Submitted for Approval | | | | 04/16/2024 | 04/30/2024 | -7 | | | Kirksey Architects, Inc. |
| 260553-001 | 1 | Electrical Identification - Product Data | Product Data | Submitted for Approval | | | | 04/16/2024 | 04/16/2024 | 7 | | | Kirksey Architects, Inc. |
| 260923-001 | 1 | Lighting Control Devices - Product Data | Product Data | Submitted for Approval | | | | 04/09/2024 | 04/11/2024 | 12 | | | Kirksey Architects, Inc. |
| 211313-003 | 1 | Fire Suppression Piping Wet-Pipe Sprinkler System - Flex Sprinkler Fittings | Product Data | Submitted for Approval | | | | 04/17/2024 | 04/17/2024 | 6 | | | Kirksey Architects, Inc. |

**Report Parameters**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Break By: | Spec. Section (S) | Sent To Partner: | | Status Class: | | Run Date: | Apr 23, 2024 |
| Package: | | Sent To Partner Type: | | Status: | SFA | Run Time: | 2:55 PM EDT |
| From Specification Section: | | Returned By Partner: | | Submittal Type: | COMPLETE | Operator: | JOSH.FARRIS |
| To Specification Section: | | Returned By Partner Type: | | Sort By: | Submittal Sort Order | Report Code: | PM3041 |
| Responsibilty Partner: | | Forwarded To Partner: | | Project: | 4024003 | | |
| Responsibility Partner Type: | | Forwarded To Partner Type: | | Show Notes: | | | |

203

- 1447 -



TAMU CORPS DORMS RESTROOM RENOVATIONS

**PROJECT DESIGN MEETING AGENDA NO. 10**

**DATE:**        Tuesday, April 30, 2024

**TIME:**        2:00pm

**LOCATION:**    MS TEAMS

**PRESENT:**     Gary Hall            Project Control
                 Sam Lampe           Project Control
                 Jo Lynn Winfrey     Project Control
                 Rob Webber          TAMU
                 Ben Sasse           TAMU
                 Gary Williams       TAMU
                 Billy Meredith Jr.  TAMU
                 Charney Rydl        TAMU
                 Mike Garon          SSC
                 Layton Muehr        SpawGlass
                 Paul Gregg          SpawGlass
                 Seth Madison        SpawGlass
                 Josh Farris         SpawGlass
                 Verr Soltes         Kirksey
                 Michael Lindemann   Kirksey

## I.    ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.  Comments/Corrections to Previous Meeting Minutes

1.  Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey prior to the next scheduled meeting.

B.  Status of Proposals and Contracts

1.  Subcontractor buyout has been completed.

C.  eBuilder/Software

1.  Pay Applications

2.  Submittals

    a.  See attached Submittal Log.

    b.  All submittals are critical to the schedule. Looking to have open submittals back by the end of the week.

    c.  Plumbing and mechanical submittals will be submitted to Kirksey soon.

3.  RFIs

a. No outstanding RFIs.

D. Inspections

1. Project Control

E. Meeting Schedule

1. The next Project OAC Meeting will be on May 7th, 2024, at 2:00pm on MS Teams.

## II. DESIGN

A. Architectural/MEP

1. Design Schedule

| | | |
|---|---|---|
| a. | Design Development | 02/23/24 – 03/28/24 |
| b. | DD Package Review | 03/28/24 – 04/04/24 |
| c. | Construction Documents | 03/29/24 – 04/30/24 |
| d. | CD Package Review | 05/01/24 – 05/10/24 |

## III. CONSTRUCTION

A. Project Schedule

| | | |
|---|---|---|
| 1. | Notice to Proceed | 02/20/24 |
| 2. | Solicit for Bid | |
| 3. | Buyout Subcontracts | 03/08/24 – 03/28/24 |
| 4. | TAMU Spring Break | 03/11/24 – 03/15/24 |
| 5. | Fiberglass Door/Frame | 03/15/24 – 06/19/24 |
| 6. | Solid Surface Proc | 03/15/24 – 06/19/24 |
| 7. | Construction Start | 05/13/24 |
| 8. | Completed Demo | 05/29/24 |
| 9. | MEP Rough-in | 06/11/24 |
| 10. | Floor and Wall Finishes | 06/29/24 |
| 11. | Trim and Finish Out | 07/03/24 |
| 12. | Project Completion | 08/01/24 |

B. 3-Week Look Ahead Schedule

1. SpawGlass to start providing a 3-Week Look Ahead Schedule for all OAC Meetings.

## IV. BUDGET

A. Budget Status

1. AACC - $1,796,279
2. Preliminary SpawGlass Estimate - $1,674,465

## V. CONTRACTOR ITEMS

A. Long Lead Material Orders

1. Fiberglass Doors and Frames – Shipping 5/17/24
2. Solid Surface – Shipping 6/14/24

      3.  Tile – Arrived at warehouse in San Antonio

## VI.   OWNER ITEMS

    A.  <u>Site Coordination</u>

        1.  Connex Delivery

           a.  SpawGlass and Project Control to coordinate a temporary location for storage of Connex before mobilization.

## VII.  NEW BUSINESS

    A.  Pre-construction meeting to be held at Project Control Bright Area Trailer on 5/4/24 at 2:00pm.

The meeting was adjourned at 2:15 PM.

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Les Williams
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris
Berr Soltes
Michael Lindermann

**SUBMITTED BY**: Sam Lampe
SL:av (05/01/24)



| Activity Name | Orig Dur | Remaining Duration | Start | Finish |
|---|---|---|---|---|
| **TAMU Corps Dorms RR Renovations** | 133 | 79 | 20-Feb-24 A | 01-Aug-24 |
| Pre-Construction | 110 | 40 | 20-Feb-24 A | 14-Jun-24 |
| Under Contract (Design NTP) | 0 | 0 | 20-Feb-24 A | |
| DD Package | 20 | 0 | 26-Feb-24 A | 28-Mar-24 A |
| Buyout Subcontracts | 15 | 0 | 14-Mar-24 A | 08-Apr-24 A |
| Fiberglass Doors and Frames Procurement | 72 | 15 | 01-Apr-24 A | 17-May-24 |
| Solid Surface Material Procurement | 72 | 37 | 02-Apr-24 A | 14-Jun-24 |
| Tile Procurement | 25 | 10 | 02-Apr-24 A | 09-May-24 |
| DD Package Review | 4 | 0 | 02-Apr-24 A | 05-Apr-24 A |
| CD Package | 20 | 0 | 08-Apr-24 A | 26-Apr-24 A |
| CD Package Review | 5 | 5 | 29-Apr-24 | 03-May-24 |
| Milestones | 67 | 67 | 13-May-24 | 01-Aug-24 |
| Start Construction | 0 | 0 | 13-May-24 | |
| Complete Demo | 0 | 0 | | 22-May-24 |
| MEP Rough-In | 0 | 0 | | 06-Jun-24 |
| Floor and Wall Finishes | 0 | 0 | | 25-Jun-24 |
| Trim and Finish Out | 0 | 0 | | 28-Jun-24 |
| Project Completion | 0 | 0 | | 01-Aug-24 |
| Inspections | 15 | 15 | 21-May-24 | 08-Jun-24 |
| Mechanical Rough In Inspection | 0 | 0 | | 21-May-24 |
| Fire Suppression Testing | 0 | 0 | | 24-May-24 |
| Underground Plumbing Rough In Inspection | 0 | 0 | | 28-May-24 |
| Rebar Inspection | 0 | 0 | 29-May-24 | |
| Wall Framing Inspection | 0 | 0 | | 04-Jun-24 |
| Electrical Rough In Inspection | 0 | 0 | | 05-Jun-24 |
| Plumbing Rough In Inspection | 0 | 0 | | 06-Jun-24 |
| Ceiling Framing Inspection | 0 | 0 | | 08-Jun-24 |
| Construction | 55 | 55 | 13-May-24 | 18-Jul-24 |
| Dorm 2 (Kiest) | 55 | 55 | 13-May-24 | 18-Jul-24 |
| Demo | 9 | 9 | 13-May-24 | 22-May-24 |
| Demo/Salvage Fixtures | 2 | 2 | 13-May-24 | 14-May-24 |
| Mobilize Fence and Connexes | 2 | 2 | 13-May-24 | 14-May-24 |
| Make Safe of Electrical and Fire Safety | 1 | 1 | 13-May-24 | 13-May-24 |
| Demo/Salvage Partitions | 1 | 1 | 15-May-24 | 15-May-24 |
| Demo Floor and Wall Tile | 2 | 2 | 16-May-24 | 17-May-24 |
| Demo Sheetrock and Framing | 2 | 2 | 16-May-24 | 17-May-24 |
| Demo Existing Electrical | 2 | 2 | 16-May-24 | 17-May-24 |
| Demo Existing In-Wall Plumbing | 2 | 2 | 16-May-24 | 17-May-24 |
| Demo Ceiling | 2 | 2 | 16-May-24 | 17-May-24 |

| | | |
|---|---|---|
| Start Date: 20-Feb-24 | ▬▬ Actual Work | ◆ Milestone | ▬▬ Actual Level of Effort |
| Finish Date: 01-Aug-24 | ▬▬ Remaining Work | ▽▽ Summary | |
| Data Date: 28-Apr-24 | ▬▬ Critical Remaining Work | ▬▬ Level of Effort | |
| Run Date: 29-Apr-24 | | | |

**TAMU Corps Dorms RR Renovations**
Print Format
Page 1 of 2

SpawGlass

| Activity Name | Orig Dur | Remaining Duration | Start | Finish |
|---|---|---|---|---|
| Demo Above Ceiling MEP | 2 | 2 | 16-May-24 | 17-May-24 |
| Sawcut and Demo Concrete | 2 | 2 | 18-May-24 | 20-May-24 |
| Demo Existing In-Slab Plumbing | 2 | 2 | 21-May-24 | 22-May-24 |
| Renovations | 48 | 48 | 18-May-24 | 18-Jul-24 |
| Install new Ductwork | 3 | 3 | 18-May-24 | 21-May-24 |
| Install new Above-Ceiling Elecrical | 3 | 3 | 18-May-24 | 21-May-24 |
| Install Fire Suppression | 6 | 6 | 18-May-24 | 24-May-24 |
| In-Slab Plumbing | 3 | 3 | 23-May-24 | 28-May-24 |
| Pour Back Concrete at Sawcut Areas | 2 | 2 | 29-May-24 | 30-May-24 |
| Install Wall Framing | 4 | 4 | 31-May-24 | 04-Jun-24 |
| Install new In-Wall Electrical | 3 | 3 | 03-Jun-24 | 05-Jun-24 |
| Install new In-Wall Plumbing | 4 | 4 | 03-Jun-24 | 06-Jun-24 |
| Install Ceiling Framing | 4 | 4 | 05-Jun-24 | 08-Jun-24 |
| Floor Prep | 4 | 4 | 05-Jun-24 | 08-Jun-24 |
| Install Wall Sheetrock | 4 | 4 | 07-Jun-24 | 11-Jun-24 |
| Install Ceiling Sheetrock | 3 | 3 | 10-Jun-24 | 12-Jun-24 |
| Install Floor Tile | 8 | 8 | 10-Jun-24 | 18-Jun-24 |
| Tape, Float, and Finish | 2 | 2 | 13-Jun-24 | 14-Jun-24 |
| Install Electrical Ceiling Fixtures | 3 | 3 | 15-Jun-24 | 18-Jun-24 |
| Install Mechanical Fixtures | 2 | 2 | 15-Jun-24 | 17-Jun-24 |
| Install Solid Surface Materials | 5 | 5 | 15-Jun-24 | 20-Jun-24 |
| Install Wall Tile | 6 | 6 | 19-Jun-24 | 25-Jun-24 |
| Install Plumbing Fixtures | 2 | 2 | 26-Jun-24 | 27-Jun-24 |
| Paint Ceiling | 3 | 3 | 26-Jun-24 | 28-Jun-24 |
| Install Electrical Wall Fixtures | 3 | 3 | 26-Jun-24 | 28-Jun-24 |
| Install new Specialties | 2 | 2 | 26-Jun-24 | 27-Jun-24 |
| Install Doors and Hardware | 2 | 2 | 29-Jun-24 | 01-Jul-24 |
| Contractor Punchlist | 12 | 12 | 02-Jul-24 | 18-Jul-24 |
| Dorm 5 (Gainer) | 55 | 55 | 13-May-24 | 18-Jul-24 |
| Dorm 6 (Lacey) | 55 | 55 | 13-May-24 | 18-Jul-24 |
| Close-Out | 26 | 26 | 29-Jun-24 | 01-Aug-24 |
| Commisioning | 10 | 10 | 29-Jun-24 | 13-Jul-24 |
| Owner Punchlist | 12 | 12 | 19-Jul-24 | 01-Aug-24 |



Start Date: 20-Feb-24
Finish Date: 01-Aug-24
Data Date: 28-Apr-24
Run Date: 29-Apr-24

Actual Work
Remaining Work
Critical Remaining Work
Milestone
Summary
Level of Effort
Actual Level of Effort

**TAMU Corps Dorms RR Renovations**
Print Format
Page 2 of 2

SpawGlass



# SpawGlass Construction Corp.

## PROJECT MANAGEMENT - SUBMITTAL LOG

### 4024003 - TAMU Corps Dorms

Page: 1 of 1
Date: Apr 30, 2024
Time: 12:10 PM EDT

| Submittal ID | Last Rev. | Title | Type | Status | Activity Start Date | Required Start | Required Finish | Received | Sent | Days Out | Returned | Forwarded | Responsibility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPEC SECTION: | NONE | | | | | | | | | | | | |
| Spec Sub-Section | None | | | | | | | | | | | | |
| 033000-001 | 1 | Cast-In-Place Concrete - Mix Design | Mix Design | Submitted for Approval | | | | 04/23/2024 | 04/24/2024 | 6 | | | Kirksey Architects, Inc. |
| 061053-001 | 1 | Misc. Rough Carpentry - Product Data | Product Data | Submitted for Approval | | | | 04/23/2024 | 04/23/2024 | 7 | | | Kirksey Architects, Inc. |
| 079200-001 | 1 | Joint Sealants - Schedule | Schedule | Submitted for Approval | | | | 04/23/2024 | 04/24/2024 | 6 | | | Kirksey Architects, Inc. |
| 083113-001 | 1 | Access Doors and Frames - Product Data and Schedule | Product Data | Submitted for Approval | | | | 04/19/2024 | 04/19/2024 | 11 | | | Kirksey Architects, Inc. |
| 092216-001 | 1 | Non-Structural Metal Framing - Product Data | Product Data | Submitted for Approval | | | | 04/19/2024 | 04/22/2024 | 8 | | | Kirksey Architects, Inc. |
| 092900-001 | 1 | Gypsum Board - Product Data | Product Data | Submitted for Approval | | | | 04/19/2024 | 04/22/2024 | 8 | | | Kirksey Architects, Inc. |
| 265100-001 | 1 | Interior Lighting - Product Data | Product Data | Submitted for Approval | | | | 04/09/2024 | 04/11/2024 | 19 | | | Kirksey Architects, Inc. |
| 099100-001 | 1 | Paint - Samples | Sample | Submitted for Approval | | | | 04/24/2024 | 04/30/2024 | 0 | | | Kirksey Architects, Inc. |
| 211313-001 | 1 | Fire Suppression Piping Wet-Pipe Sprinkler System - Product Data | Product Data | Submitted for Approval | | | | 04/08/2024 | 04/10/2024 | 20 | | | Kirksey Architects, Inc. |
| 211313-002 | 1 | Fire Suppression Piping Wet-Pipe Sprinkler System - Shop Drawings | Shop Drawing | Submitted for Approval | | | | 04/29/2024 | 04/29/2024 | 1 | | | Kirksey Architects, Inc. |
| 211313-003 | 1 | Fire Suppression Piping Wet-Pipe Sprinkler System - Flex Sprinkler Fittings | Product Data | Submitted for Approval | | | | 04/17/2024 | 04/17/2024 | 13 | | | Kirksey Architects, Inc. |
| 233300-001 | 1 | Duct Accessories - Product Data | Product Data | Submitted for Approval | | | | 04/16/2024 | 04/16/2024 | 14 | | | Kirksey Architects, Inc. |
| 260519-001 | 1 | Conductors and Cables - Product Data | Product Data | Submitted for Approval | | | | 04/22/2024 | 04/22/2024 | 8 | | | Kirksey Architects, Inc. |
| 092900-002 | 1 | Gypsum Board | Product Data | Submitted for Approval | | | | 04/25/2024 | 04/25/2024 | 5 | | | Kirksey Architects, Inc. |

## Report Parameters

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Break By: | Spec. Section (S) | Sent To Partner: | | Status Class: | | Run Date: | Apr 30, 2024 |
| Package: | | Sent To Partner Type: | | Status: | SFA | Run Time: | 12:10 PM EDT |
| From Specification Section: | | Returned By Partner: | | Submittal Type: | COMPLETE | Operator: | JOSH.FARRIS |
| To Specification Section: | | Returned By Partner Type: | | Sort By: | Submittal Sort Order | Report Code: | PM3041 |
| Responsibilty Partner: | | Forwarded To Partner: | | Project: | 4024003 | | |
| Responsibility Partner Type: | | Forwarded To Partner Type: | | Show Notes: | | | |

203



TAMU CORPS DORMS RESTROOM RENOVATIONS

PROJECT DESIGN MEETING AGENDA NO. 11

**DATE:**        Tuesday, May 14, 2024

**TIME:**        2:00pm

**LOCATION:**    MS TEAMS

**PRESENT:**
| | |
|---|---|
| Gary Hall | Project Control |
| Sam Lampe | Project Control |
| Jo Lynn Winfrey | Project Control |
| Austin Vader | Project Control |
| Rob Webber | TAMU |
| Gary Williams | TAMU |
| Charney Rydl | TAMU |
| Mike Garon | SSC |
| Layton Muehr | SpawGlass |
| Paul Gregg | SpawGlass |
| Seth Madison | SpawGlass |
| Josh Farris | SpawGlass |
| Verr Soltes | Kirksey |
| Michael Lindemann | Kirksey |

## Substantial Completion: August 1, 2024 : 78 Days

### I.    ADMINISTRATION

Communication: No outside communication, comments, pictures, or videos regarding the project are to be taken, spoken of, or shared outside the project team. All conversations in the meetings are to be considered confidential.

A.   Comments/Corrections to Previous Meeting Minutes

    1.   Comments to the meeting minutes are to be submitted via email to Sam Lampe, cc: Gary Hall, Jo Lynn Winfrey prior to the next scheduled meeting.

B.   Status of Proposals and Contracts

    1.   SpawGlass is currently working on finalizing pricing for new toilets in all restrooms in lieu of reusing existing.

C.   Inspections

    1.   No scheduled inspections.

D.   Meeting Schedule

    1.   The next Project OAC Meeting will be on May 21st, 2024, at 2:00pm on MS Teams.

### II.   CONSTRUCTION

A.   Schedule – 3 Week Look Ahead - Attached

    1. SpawGlass mobilized on site 5/12. Construction fencing has been installed and wind screens will be installed soon. Currently working on protecting existing areas and make safe. Demolition will kickoff tomorrow. SpawGlass is to salvage the partition doors and hardware only.

  B. RFIs

    1. No major update.

  C. Submittals

    1. Flowable fill and concrete submittal to be submitted to Kirskey soon.

  D. Long Lead Items

    1. Fiberglass Doors and Frames - Arrived in Bryan TX as of 05/14/2024.
    2. Solid surface - Shipping 06/14/2024.
    3. Tile – Held at warehouse in San Antonio, TX. Subcontractor to pick up.

  E. Site Coordination

    1. Summer camps to start 6/27 and run through 4/14.

## III. DESIGN

  A. No Items

## IV. OWNER ITEMS

  A. SpawGlass to save existing partition/shower doors and door hardware at the request of TAMU ResLife. SpawGlass to notify ResLife when items are ready to be picked up.

## V. NEW BUSINESS

  A. No Items.

The meeting was adjourned at 2:20 PM.

**ATTACHMENTS:**

**DISTRIBUTION**
Gary Hall
Russ Wallace
Sam Lampe
Lane Rutledge
Jo Lynn Winfrey
Austin Vader
Les Williams
Michael Garon
Ben Sasse
Garett Wheaton
Layton Muehr
Paul Gregg
Josh Farris

Berr Soltes
Michael Lindermann


**SUBMITTED BY:** Sam Lampe
SL:av (05/15/24)



| Activity Name | Orig Dur | Rem Dur | Start | Finish |
|---|---|---|---|---|
| TAMU Corps Dorms RR Renov | 89 | 28 | 15-Feb-24 A | 14-Jun-24 |
| Pre-Construction | 89 | 28 | 15-Feb-24 A | 14-Jun-24 |
| Fiberglass Doors and Frames Procuren | 72 | 5 | 15-Feb-24 A | 17-May-24 |
| Tile Procurement | 25 | 5 | 02-Apr-24 A | 17-May-24 |
| Solid Surface Material Procurement | 72 | 27 | 02-Apr-24 A | 14-Jun-24 |
| Milestones | 9 | 9 | 13-May-24 | 22-May-24 |
| Start Construction | 0 | 0 | 13-May-24 | |
| Complete Demo | 0 | 0 | | 22-May-24 |
| Inspections | 2 | 2 | 29-May-24 | 31-May-24 |
| Mechanical Rough In Inspection | 0 | 0 | | 29-May-24 |
| Underground Plumbing Rough In Inspec | 0 | 0 | | 29-May-24 |
| Rebar Inspection | 0 | 0 | 30-May-24 | |
| Electrical Above Ceiling Inspection | 0 | 0 | | 30-May-24 |
| Fire Suppression Testing | 0 | 0 | | 31-May-24 |
| Construction | 18 | 18 | 13-May-24 | 03-Jun-24 |
| Dorm 2 (Kiest) | 18 | 18 | 13-May-24 | 03-Jun-24 |
| Demo | 9 | 9 | 13-May-24 | 22-May-24 |
| Mobilize Fence and Connexes | 2 | 2 | 13-May-24 | 14-May-24 |
| Make Safe of Electrical and Fire Safety | 2 | 2 | 13-May-24 | 14-May-24 |
| Demo/Salvage Partitions | 1 | 1 | 15-May-24 | 15-May-24 |
| Demo/Salvage Fixtures | 2 | 2 | 15-May-24 | 16-May-24 |
| Demo Floor and Wall Tile | 2 | 2 | 17-May-24 | 18-May-24 |
| Demo Sheetrock and Framing | 2 | 2 | 17-May-24 | 18-May-24 |
| Demo Existing Electrical | 2 | 2 | 17-May-24 | 18-May-24 |
| Demo Existing In-Wall Plumbing | 2 | 2 | 17-May-24 | 18-May-24 |
| Demo Ceiling | 2 | 2 | 17-May-24 | 18-May-24 |
| Demo Above Ceiling MEP | 2 | 2 | 17-May-24 | 18-May-24 |
| Sawcut and Demo Concrete | 2 | 2 | 20-May-24 | 21-May-24 |
| Demo Existing In-Slab Plumbing | 1 | 1 | 22-May-24 | 22-May-24 |
| Renovations | 10 | 10 | 22-May-24 | 03-Jun-24 |
| Install new Ductwork | 5 | 5 | 22-May-24 | 29-May-24 |
| Fire Suppression Demo/Rough-In | 3 | 3 | 23-May-24 | 28-May-24 |
| In-Slab Plumbing | 4 | 4 | 23-May-24 | 29-May-24 |
| Install new Above-Ceiling Elecrical | 3 | 3 | 28-May-24 | 30-May-24 |
| Install Wall Framing | 6 | 6 | 28-May-24 | 03-Jun-24 |
| Install Sprinkler Heads | 3 | 3 | 29-May-24 | 31-May-24 |
| Pour Back Concrete at Sawcut Areas | 2 | 2 | 30-May-24 | 31-May-24 |
| Dorm 5 (Gainer) | 18 | 18 | 13-May-24 | 03-Jun-24 |
| Dorm 6 (Lacey) | 18 | 18 | 13-May-24 | 03-Jun-24 |

Start Date: 15-Feb-24
Finish Date: 01-Aug-24
Data Date: 12-May-24
Run Date: 13-May-24

Actual Work
Remaining Work
Critical Remaining Work
Milestone
Summary
Level of Effort
Actual Level of Effort

**TAMU Corps Dorms RR Renovations**
3 wk Look Ahead
Page 1 of 1

SpawGlass

### `EDDIE HARE-Accessibility Specialist-0008
**5855 Foster Road, Bryan, Texas 77807**
**ehare@eddiehare.com**
**979-775-6850 office * 979-820-0149 cell**

**October 28, 2023**

**TAMU SSC Service Solutions**
**TAMU MS 1371, 600 Agronomy Road**
**College Station, Texas 77843**

**Re: TAMU Corps Dorm, Bathroom Renovations       TABS2024003825**
**   Spence Hall # 0401, 605 Military Mall * College Station, Brazos County, Texas 77843**

**PLAN REVIEW-<mark>No Findings</mark>**

**To Michael Garon:**

The plan review is complete. A copy will be forwarded to the Texas Department of Licensing and Regulation. The referenced project may be eligible for inspection approval if constructed in accordance with the Texas Accessibility Standards. Items which are the responsibility of the owner should be referred to the appropriate person for action.

The building or facility owner must request an inspection no later than thirty (30) days after completion of construction. If the completion date provided on the Project Registration Form is no longer correct, notify this office (in writing) of the revised completion date as soon as possible.

This determination is applicable only to ensuring compliance with Texas Government Code, Chapter 469 and does not address the requirements of the Americans with Disabilities Act (ADA), (P.L. 101-336) or any other local, state, or federal requirement. For information on the ADA Hotline, (800) 949-4232, or the United States Department of Justice at (202) 514-0301.

Please reference the Department assigned project number (TABS#) in all future correspondence pertaining to this project.

Best Regards,

*Eddie Hare*

Accessibility Specialist **ICC# 1131801-21**
                                          **RAS# 0008**

**Cc: Patterson Architects**

*THE REVIEW OF DOCUMENTS AS CONTRACT DOCUMENTS AND FIELD INSPECTIONS, BY THIS REGISTERED ACCESSSIBLITY SPECIALIST, EDDIE HARE, FOR THE TEXAS DEPARTMENT OF LICENSING AND REGULATION (TDLR), AUSTIN, TEXAS, IS BASED ON BEST EFFORTS ENDEAVOR FOLLOWING INSTRUCTION AND CERTIFICATION BY BOTH TDLR AND ICBO. PLAN REVIEW AND INSPECTION IN NO WAY WARRANTS COMPLETE COMPLIANCE TO THE TEXAS ACCESSIBLITY STANDARDS. THIS BUSINESS, THE PROFESSIONAL, HIS EMPLOYEES, AND CLIENT FOR WHOM THE REVIEW OR INSPECTION IS MADE AGREES TO HOLD HARMLESS AND INDEMNIFY THE REGISTERED ACCESSIBILTY SPECIALIST, EDDIE HARE, AND THE TDLR FROM AND AGAINST ANY LIABILITY ARISING FROM THE PERFORMANCE OF THE WORK*



| Activity Name | Orig Dur | Start | Finish |
|---|---|---|---|
| TAMU Corps Dorms RR Renovations | 135 | 23-Feb-24 | 01-Aug-24 |
| Pre-Construction | 87 | 23-Feb-24 | 19-Jun-24 |
| Under Contract (Design NTP) | 0 | 23-Feb-24 | |
| DD Package | 20 | 23-Feb-24 | 21-Mar-24 |
| Buyout Subcontracts | 15 | 08-Mar-24 | 28-Mar-24 |
| Fiberglass Doors and Frames Procurement | 72 | 15-Mar-24 | 19-Jun-24 |
| Solid Surface Material Procurement | 72 | 15-Mar-24 | 19-Jun-24 |
| DD Package Review | 5 | 22-Mar-24 | 28-Mar-24 |
| CD Package | 26 | 29-Mar-24 | 03-May-24 |
| CD Package Review | 5 | 06-May-24 | 10-May-24 |
| Milestones | 67 | 13-May-24 | 01-Aug-24 |
| Start Construction | 0 | 13-May-24 | |
| Complete Demo | 0 | | 29-May-24 |
| MEP Rough-In | 0 | | 11-Jun-24 |
| Floor and Wall Finishes | 0 | | 29-Jun-24 |
| Trim and Finish Out | 0 | | 03-Jul-24 |
| Project Completion | 0 | | 01-Aug-24 |
| Construction | 56 | 13-May-24 | 22-Jul-24 |
| Dorm 2 (Kiest) | 55 | 13-May-24 | 20-Jul-24 |
| Demo | 13 | 13-May-24 | 29-May-24 |
| Demo/Salvage Fixtures | 2 | 13-May-24 | 14-May-24 |
| Demo Partitions | 1 | 15-May-24 | 15-May-24 |
| Demo Floor and Wall Tile | 2 | 16-May-24 | 17-May-24 |
| Demo Ceiling | 2 | 18-May-24 | 20-May-24 |
| Demo Sheetrock and Framing | 2 | 21-May-24 | 22-May-24 |
| Demo Existing Electrical | 2 | 21-May-24 | 22-May-24 |
| Demo Existing In-Wall Plumbing | 2 | 21-May-24 | 22-May-24 |
| Sawcut and Demo Concrete | 2 | 23-May-24 | 24-May-24 |
| Demo Existing In-Slab Plumbing | 2 | 28-May-24 | 29-May-24 |
| Renovations | 48 | 21-May-24 | 20-Jul-24 |
| Install new Ductwork | 3 | 21-May-24 | 23-May-24 |
| Install Fire Suppression | 6 | 21-May-24 | 29-May-24 |
| Install new Above-Ceiling Elecrical | 3 | 23-May-24 | 28-May-24 |
| In-Slab Plumbing | 3 | 30-May-24 | 01-Jun-24 |
| Pour Back Concrete at Sawcut Areas | 2 | 03-Jun-24 | 04-Jun-24 |
| Install Wall Framing | 4 | 05-Jun-24 | 08-Jun-24 |
| Install new In-Wall Electrical | 3 | 07-Jun-24 | 10-Jun-24 |
| Install new In-Wall Plumbing | 4 | 07-Jun-24 | 11-Jun-24 |
| Install Ceiling Framing | 4 | 10-Jun-24 | 13-Jun-24 |

Start Date: 23-Feb-24
Finish Date: 01-Aug-24
Data Date: 23-Feb-24
Run Date: 14-Feb-24

Actual Work
Remaining Work
Critical Remaining Work
Milestone
Summary
Level of Effort
Actual Level of Effort

**TAMU Corps Dorms RR Renovations**
Print Format
Page 1 of 2

SpawGlass

- 1459 -

| Activity Name | Orig Dur | Start | Finish |
|---|---|---|---|
| Floor Prep | 4 | 10-Jun-24 | 13-Jun-24 |
| Install Wall Sheetrock | 4 | 12-Jun-24 | 15-Jun-24 |
| Install Ceiling Sheetrock | 3 | 14-Jun-24 | 17-Jun-24 |
| Install Floor Tile | 8 | 14-Jun-24 | 22-Jun-24 |
| Tape, Float, and Finish | 2 | 18-Jun-24 | 19-Jun-24 |
| Install Mechanical Fixtures | 2 | 20-Jun-24 | 21-Jun-24 |
| Install Electrical Ceiling Fixtures | 3 | 20-Jun-24 | 22-Jun-24 |
| Install Solid Surface Materials | 5 | 20-Jun-24 | 25-Jun-24 |
| Install Wall Tile | 6 | 24-Jun-24 | 29-Jun-24 |
| Install Plumbing Fixtures | 2 | 01-Jul-24 | 02-Jul-24 |
| Install new Specialties | 2 | 01-Jul-24 | 02-Jul-24 |
| Paint Ceiling | 3 | 01-Jul-24 | 03-Jul-24 |
| Install Electrical Wall Fixtures | 3 | 01-Jul-24 | 03-Jul-24 |
| Install Doors and Hardware | 2 | 08-Jul-24 | 09-Jul-24 |
| Contractor Punchlist | 10 | 10-Jul-24 | 20-Jul-24 |
| Dorm 5 (Gainer) | 56 | 13-May-24 | 22-Jul-24 |
| Dorm 6 (Lacey) | 56 | 13-May-24 | 22-Jul-24 |
| Close-Out | 22 | 08-Jul-24 | 01-Aug-24 |
| Commisioning | 10 | 08-Jul-24 | 18-Jul-24 |
| Owner Punchlist | 10 | 22-Jul-24 | 01-Aug-24 |

Start Date: 23-Feb-24
Finish Date: 01-Aug-24
Data Date: 23-Feb-24
Run Date: 14-Feb-24

Actual Work
Remaining Work
Critical Remaining Work

Milestone
Summary
Level of Effort

Actual Level of Effort

TAMU Corps Dorms RR Renovations
Print Format
Page 2 of 2

SpawGlass

- 1460 -

**EXHIBIT**

**41**

| | |
|---|---|
| **From:** | Shive, Holly A |
| **Sent:** | Thursday, May 16, 2024 1:02 PM |
| **To:** | Welsh III, Mark A;Ballabina, Susan G |
| **Cc:** | Franke, Sarah E |
| **Subject:** | Emails |
| **Attachments:** | Corp of Cadet bathrooms.eml; quad renovations.eml |

President Welsh,

In follow up to our conversation, attached are the two emails we have received to date on the restroom renovation:

- '88. Her son was a cadet, graduated in 2022. (Note: I believe she serves as the the Corps of Cadets Association)
- . Her son is a current cadet. (Note: Her email was also sent to regents)

Thanks,
Holly

**From:**
**To:** BOR@tamus.edu
**Cc:** President
**Subject:** Corp of Cadet bathrooms
**Date:** Wednesday, May 15, 2024 10:26:29 PM

**This Message Is From an External Sender**
This message came from outside your organization.

It has come to my attention that there is a plan to renovate the bathrooms in the Corp to show for gender neutral bathrooms. 1) Didn't we just spend a boatload of money renovating the Quad? Why do you feel it is ok to ask the taxpayers to spend even more now?  2) why should the men and women in the Corp suffer with less bathrooms/showers to use because a confused individual decided to join the program and need their own accommodations?  3) I thought the Corp was about making leaders not conforming to woke?

I am so disappointed in the direction TAMU is heading. I looked the smaller, more conservative campus rich in tradition. I don't know, not like,  this version of TAMU.

I have a son considering the Corps in 2026. If this is the direction the Corp is heading, I will not support that direction.


C/O 1997

| From: | |
|---|---|
| **To:** | President |
| **Subject:** | quad renovations |
| **Date:** | Wednesday, May 15, 2024 7:46:12 PM |

**This Message Is From an External Sender**
This message came from outside your organization.

I am writing concerning the millions of dollars that are being spent to accommodate fewer cadets.  This is horrible! The university is spending millions on updating the bathrooms on the quad and they just redid this several years ago. Is this about a "few" cadets that are demanding certain accommodations because they are confused about their gender?  What about all those cadets that is affecting?  Why does the university continue to spend tax payers dollars to please less than 1% of the population.

The Rudder Association said it best.
        "It is worth noting that all decision makers at A&M are state employees. Thankfully, our elected leaders in Austin have courageously stood their ground in the face of the radical and unconstitutional directives emanating from the unelected bureaucrats of the Dept. of Education.  Just this month, both the AG of the State of Texas  and our Governor have stated unequivocally that public universities need not and should not comply with such directives pending the resolution of relevant court cases.

        Yet our campus administrators have apparently capitulated to a radical gender ideology and choses instead to burden the taxpayers and gender conforming students with this costly and ill-conceived scheme.  Nor were they even given a choice in this project, which they will ultimately help pay for."

I am Class of '88 and my husband is '89 and my son graduated in '22 and was a member of the Corps of Cadets.  Thank goodness he no longer is there under the current leadership both in the Corps and the University.  You can call it Ol' Army or whatever you want, but that is what made A&M what it is today.  Is saddens me the direction we are headed.

Sincerely,

**From:** Michaelis, Patrick Ralph
**To:** Williams, Les
**Cc:** Ramirez Jr, Joe E; Ballabina, Susan G; Lange, Peter; Crawford, John W; Sasse, Ben; Gonzales, Lilia Y; Reber, Thomas W; Rydl, Chareny L; Pettibon II, Joseph P; Simpson, Meredith M; Simpson, Meredith M
**Subject:** Re: Corps Facilities Brief Follow up
**Date:** Tuesday, February 20, 2024 8:30:16 AM
**Attachments:** ExAuth - Kiest Gainer Lacy RR Construction.pdf

Thanks Les.

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

On Feb 20, 2024, at 9:25 AM, Williams, Les <leswilliams@tamu.edu> wrote:

We received approval to proceed with the Corps Dorm Renovation project. The total project costs for (4) dorms is projected to cost $3.1 million. Res Life will be funding the first $2 million and John Crawford will fund the remaining $1.1 million. The Spence Hall project will be proceeding as originally planned and was awarded to Quad Tex through SSC. The other three projects (Kiest, Gainer and Lacy) will be managed delivered by Spaw Glass and Project Controls through SSC. Because of the tight time frame, Project Controls will be responsible meeting the objectives of 1) meeting the time frame and 2) establishing a cost-effective approach to construction for future projects.

Ben Sasse will be coordinating from the Facilities & Energy Services team, but Gary Hall and Russ Wallace with Project Controls will be driving this project. To meet the time frame, it is imperative that our teams are responsive to request from Project Controls. Ben will work with Project Controls and Res Life to identify team members for this project. I will expect that we could get started as early as this week with design.

les

Les Williams ¦ Associate Vice President

Division of Operations

Facilities & Energy Services

1185 TAMU ¦ College Station, TX 77843-1255

ph: 979.862.4470¦leswilliams@tamu.edu

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Monday, February 19, 2024 9:18 AM
**To:** Williams, Les <leswilliams@tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>; Reber, Thomas W <treber@tamu.edu>; Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

**Thanks Les.**

**We will need to discuss how we intend to pay for all of this. Res Life committed $2M for this construction project this Summer. Do we know who is going to pay the additional $575K if this is the plan we are going to execute this Summer?**

**I appreciate the update and look forward to the discussion.**

**Joe**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Friday, February 16, 2024 12:11 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>
**Subject:** Re: Corps Facilities Brief Follow up

I need to update the price. Ben pointed out that SSC did not include all the costs. See the updated correspondence below.

**From:** Williams, Les <leswilliams@tamu.edu>

**Sent:** Friday, February 16, 2024 12:02 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>
**Subject:** Corps Facilities Brief Follow up

Here is an update on the Corps Renovation Project.   The Spaw Glass and Project Controls team has established that the three additional bathrooms are possible in the limited time frame. The total estimated cost will be **$2,575,000** and will require an approval to proceed by next Friday (February 23rd).

There are number of conditions which make this possible and they are:

1. All design and construction decisions will be made by the Project Manager, Project Control.
2. Project Manager will review and approve all contracts and invoices prior to forwarding to SSC for payment.
3. No occupancy of these three dorms will be permitted during the construction period.
4. Hours of contractor operation are 7:00am till 7:00pm 7 days per week.
5. The areas to be renovated will all be on the ground floor north end of Kiest, Gainer and Lacy.
6. The contractor will be allowed the use of Parking Lot #26 for a storage/laydown yard and contractor parking.
7. The general contractor's offices will be located on the second-floor study/office in the north end of the building.
8. Finishes and materials may be changed or modified by Project Manager based on market availability.
9. Due to the late start and accelerated schedule, HUB Participation will be a best effort by the Contractor but may not reach the TAMU intend goal of 21.1%.
10. A Notice to Proceed must be issued no later than Friday, February 23, 2024, to meet the Substantial Completion date of August 1, 2024.

Les Williams

Les Williams ¦ Associate Vice President

Division of Operations

Facilities & Energy Services

1185 TAMU ¦ College Station, TX 77843-1255

ph: 979.862.4470¦leswilliams@tamu.edu

Texas A&M University

---

**From:** Garon, Michael <Michael.Garon@sscserv.com>
**Sent:** Friday, February 16, 2024 11:34 AM
**To:** Williams, Les <leswilliams@tamu.edu>
**Cc:** richard.gentry <richard.gentry@sscserv.com>; Heye, Jeff <Jeff.Heye@sscserv.com>;
Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** Community Access Restroom Renovations || 2024-06316

**This Message is From an External Sender**
This message came from outside your organization

Les,

Project Controls and Spaw Glass have provided the following milestone schedule.

Notice to proceeds issued no later than Feb 23rd.

Design to commence Feb 24th .

Construction at site to commence May 13th.

Substantial completion on August 2nd.

Corps move-in August 5th.

The total anticipated cost is $2,318,235.87 ($772,745.29 per restroom)

## Michael Garon

Senior Construction Project Manager

Engineering, Design and Construction Services

**SSC Service Solutions** | 979-446-2506

# TAMU CAMPUS CONSTRUCTION MANAGEMENT (CCM)

# FACILITIES EXPENSE AUTHORIZATION FORM

## February 14, 2024

| Project File Name | Restroom Renovations – Kiest, Gainer and Lacy (Construction Approval) | | |
|---|---|---|---|
| Requesting Unit | Facilities & Energy Services | Requestor's Name | Les Williams |
| Project Name | Restroom Renovations – Kiest, Gainer and Lacy | Project Number | TBD |
| Budget (attach estimate) | See below | Project Location | 0401 KIES<br>0404 GAIN<br>0405 LACY |
| Budget Modification (attach estimate)<br>Revised Budget (with modification(s)) | Total estimated project cost (see attached): $2,575,000<br>Less original approval for feasibility study: ($242,550)<br>**Additional Funding Required: $2,332,450** | Anticipated Funding Sources | % Dept.:<br>% Other: 100% |
| Funding Account Number(s) | Split 3-ways:<br>02-808818-06401 (Kiest)<br>02-808818-06404 (Gainer)<br>02-808818-06405 (Lacy) | Estimated Start & End Dates | February 2024 – August 2024 |

*Request will not be considered unless all fields are completed.*

| Project Description: | Design and construct three (3) each community access restroom renovations to be completed during summer 2024. One restroom on the ground floor in each of Kiest, Gainer and Lacy Halls will be modified. |
|---|---|
| Project Justification: | Title IX compliance. |

**Recommended for Approval by:**

_____     _____     _____     _____
Chareny Rydl, Executive Director        Date                  Ben Sasse, Director                        Date
Residence Life and Housing                                    Campus Construction Management
Division of Student Affairs                                    Facilities and Energy Services
                                                              Division of Operations

**Approved by:**

_____     _____
Les Williams, Associate Vice President of     Date
Facilities and Energy Services
Division of Operations

**From:** Simpson, Meredith M
**To:** Meredith Jr, Billy
**Subject:** RE: proposed note to ResLife and CPDC
**Date:** Wednesday, March 13, 2024 10:02:00 AM

Softer: the following was agreed upon ?

Yes, wait for SB to come back just in case

**Meredith Simpson**
Chief of Staff
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Wednesday, March 13, 2024 9:58 AM
**To:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** proposed note to ResLife and CPDC

Just need a sanity check.  More direct and "to-the-point."  Mainly wondering if I should wait to send until final "go" from higher?

-----------------------

Charney/Rob/Ben,

Meredith and I met with Les and Tom this morning.  There is now a shared understanding among all parties. In summary, the following was decided:

- All restrooms remodeled this summer will include exterior doors and swipe card access. These are gendered bathrooms placarded "men" or "women" depending on the makeup of the cadet population in the fall.
- Eliminate one toilet in the design and instead provide for a secured urinal instead.

-----------------------

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                              | bmeredith@corps.tamu.edu

**- 1469 -**

Susan. - I'm good to go here. Les, let's move out on the refined guidance below.

Prm

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

> On Mar 15, 2024, at 9:44 AM, Ballabina, Susan G <sg-ballabina@tamu.edu> wrote:

All,
I just spoke with President Welsh.
He agrees that the plan has shifted from gender neutral to gender designated.
He also agrees that there should be a door/swipe access into the restroom.
He did not concur with the need to retain a urinal in the restroom and indicated that if the restroom ended up designated as a men's restroom at some point, they could use the standard toilets.
Patrick, if that needs more discussion, we can further discuss with the President early next week.
Susan

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, March 15, 2024 8:55 AM
**To:** Ballabina, Susan G <sg-ballabina@tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>; Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Subject:** Corps Bathrooms

Good Morning Susan,

My team met with Les and Tom earlier this week regarding the restroom upgrades planned on the quad for summer.

Based on our conversations earlier this week, all understand the requirements for these upgrades to ultimately result in four new restrooms with enhanced safety and

**- 1470 -**

security measures.   All also understand that each of these new restrooms will be labeled gendered facilities based on the makeup of the outfits that reside in each dormitory from year to year.

Based on this shared understanding, I've asked the construction team to modify the proposed designs on each of the restrooms remodeled this summer to retain an exterior door and card swipe access for enhanced security.  I also asked them to remove one toilet from the design and instead retain one secured urinal in each restroom as a matter of flexibility and practicality should an all-male or predominantly male population reside in any of the dorms in the future.

Facilities and the construction team have asked for confirmation from the President's Office before proceeding with a re-design under these design requirements.

Patrick

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

**Meredith Jr, Billy**

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Wednesday, April 10, 2024 10:40 AM |
| **To:** | Sasse, Ben |
| **Cc:** | Meredith Jr, Billy; Sam Lampe; Simpson, Meredith M; Gary Hall; Garon, Michael |
| **Subject:** | RE: Summer lay down area. |

Thanks Ben.

On Apr 10, 2024 10:24 AM, "Sasse, Ben" <bsasse@tamu.edu> wrote:
Bill:

You would need to run this request through Sam Lampe with Project Control (copied).

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                      | **bsasse@tamu.edu**

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Wednesday, April 10, 2024 8:44 AM
**To:** Sasse, Ben <bsasse@tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** Summer lay down area.

Ben,

I was back briefing the Chief of Staff on the plan for the bathroom construction and we'd like to see if Spaw Glass can use 40A instead of 26 for lay down

40A is student parking and is usually nearly empty all summer.

26 is reserved parking and a good portion of the staff park there.

Let me know if this is feasible

Thanks
Bill

# Meredith Jr, Billy

**From:** Meredith Jr, Billy
**Sent:** Friday, March 22, 2024 1:57 PM
**To:** Webber, Rob W
**Cc:** Meredith Jr, Billy; Rydl, Chareny L
**Subject:** RE: Rooms in Kiest, Lacy, and Gainer

Good to go

On Mar 18, 2024 4:35 PM, "Webber, Rob W" <rob_webber@reslife.tamu.edu> wrote:

Bill,

I am circling back on my original request regarding the three rooms below. Can you please confirm that these spaces can be used for field offices and that they can be cleaned out by May 13th when the contractors would mobilize?

Thank you,

**Rob Webber** | Associate Director, Operations and Events
Department of Residence Life | Division of Student Affairs | Texas A&M University
1253 TAMU | College Station, TX 77843-1253

ph: 979.458.6773 | rob_webber@reslife.tamu.edu | reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DEPARTMENT OF RESIDENCE LIFE** | Aggies Live On

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 11:48 AM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Rooms in Kiest, Lacy, and Gainer

Had no idea a final plan had been approved.  Please give me a run-down.

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                    | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 11:46 AM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Rooms in Kiest, Lacy, and Gainer

Good morning,

As part of the Corps bathroom renovation, the contractors would like to access the following rooms as their field offices for summer:

Kiest—236
Lacy—238
Gainer—201

Based on our observations, these appear to be spaces occupied by the Corps. Bill can you please confirm that these spaces can be used for field offices and that they can be cleaned out by May 13th when the contractors would mobilize?

Thank you and please let me know if you have any questions.

**Rob Webber**  | Associate Director, Operations and Events
Department of Residence Life | Division of Student Affairs | Texas A&M University
1253 TAMU | College Station, TX 77843-1253

ph: 979.458.6773 | rob_webber@reslife.tamu.edu | reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DEPARTMENT OF RESIDENCE LIFE** | Aggies Live On

**Meredith Jr, Billy**

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Monday, March 18, 2024 11:00 AM |
| **To:** | Rydl, Chareny L |
| **Cc:** | Meredith Jr, Billy; Simpson, Meredith M; Williams, Les; Reber, Thomas W; Webber, Rob W; Sasse, Ben |
| **Subject:** | RE: Summer '24 Corps Restroom Updates |

Charney,

Yes.  All work this summer must include doors and swipe access

Thank you

Bill

On Mar 18, 2024 10:14 AM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
The Spence bathroom design, does not have a door on it, does the requirement for the door include the Spence Bathroom?

Chareny

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 15, 2024 10:08 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>; Sasse, Ben <bsasse@tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Williams, Les <leswilliams@tamu.edu>; Reber, Thomas W <treber@tamu.edu>
**Subject:** Summer '24 Corps Restroom Updates

Charney/Rob/Ben,

Meredith and I met with Les and Tom on Wednesday.  There is now a shared understanding among all parties. In summary, the following was agreed upon:

- All restrooms remodeled this summer will include exterior doors and swipe card access.  These are gendered bathrooms placarded "men" or "women" depending on the makeup of the cadet population in the fall.

We were given approval this morning to proceed as noted above.

Also discussed, but not approved, was the retention of an enclosed urinal.  The proposed design for toilets is approved.

-Bill

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets

# Meredith Jr, Billy

**From:** Meredith Jr, Billy
**Sent:** Wednesday, March 13, 2024 10:06 AM
**To:** Simpson, Meredith M
**Subject:** RE: proposed note to ResLife and CPDC

………………okay….. I guess…..  will wait to send.

--------------------------------

So in 24 hours we've determined:

1. I can't type
2. I don't do "soft" well

---------------------------------

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                          | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Wednesday, March 13, 2024 10:03 AM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Subject:** RE: proposed note to ResLife and CPDC

Softer: the following was agreed upon ?

Yes, wait for SB to come back just in case

**Meredith Simpson**
Chief of Staff
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Wednesday, March 13, 2024 9:58 AM
**To:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** proposed note to ResLife and CPDC

Just need a sanity check.  More direct and "to-the-point."  Mainly wondering if I should wait to send until final "go" from higher?

------------------------

Charney/Rob/Ben,

Meredith and I met with Les and Tom this morning.  There is now a shared understanding among all parties. In summary, the following was agreed upon:

- All restrooms remodeled this summer will include exterior doors and swipe card access.  These are gendered bathrooms placarded "men" or "women" depending on the makeup of the cadet population in the fall.
- Eliminate one toilet in the design and instead provide for a secured urinal.

------------------------

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                         | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

# Meredith Jr, Billy

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Tuesday, March 12, 2024 9:12 PM |
| **To:** | Simpson, Meredith M |
| **Subject:** | Fwd: RE: Corps Restroom Remodels |

---------- Forwarded message ----------
From: "McArthur, Alyssa" <amcarthur@tamu.edu>
Date: Mar 12, 2024 3:32 PM
Subject: RE: Corps Restroom Remodels
To: "Meredith Jr, Billy" <bmeredith@corps.tamu.edu>
Cc:

Good afternoon,

Apologies I missed your call! I was unsure if we were proceeding with scheduling this meeting, but I will take your voicemail as confirmation. I will send the calendar invite shortly for tomorrow, Wednesday March 13 at 8:00am. We are in Suite 104 at the Utilities Central Office (under the water tower off Asbury St).

Please do not hesitate to let me know if there are any questions.

Thank you,
Alyssa

**Alyssa McArthur** | Executive Assistant to the Associate Vice President
Facilities and Energy Services | Texas A&M University
1185 TAMU | College Station, TX 77843-1185

ph: 979.458.0387 | amcarthur@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

**From:** McArthur, Alyssa
**Sent:** Monday, March 11, 2024 10:49 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Reber, Thomas W <treber@tamu.edu>
**Subject:** RE: Corps Restroom Remodels

Good morning,

Does Wednesday 3/13 at 8:00-8:30am work for calendars?

Also, please let us know if there is a preference in meeting location. Les can travel to you, or we are happy to host here at the Utilities Central Office.

Thank you,
Alyssa

**Alyssa McArthur** | Executive Assistant to the Associate Vice President
Facilities and Energy Services | Texas A&M University
1185 TAMU | College Station, TX 77843-1185

ph: 979.458.0387 | amcarthur@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Monday, March 11, 2024 10:20 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>; McArthur, Alyssa <amcarthur@tamu.edu>; Reber, Thomas W <treber@tamu.edu>
**Subject:** RE: Corps Restroom Remodels

**Sounds good, Patrick. Tom Reber will be my rep for this if you guys decide to meet this week.**

**Thanks.  Joe**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

---

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Monday, March 11, 2024 10:16 AM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>; McArthur, Alyssa <amcarthur@tamu.edu>; Reber, Thomas W <treber@tamu.edu>
**Subject:** Re: Corps Restroom Remodels

Joe - I've got this.  Need to confirm some assumptions with the PResident's office, and I'll come back to you on what I find out.

Patrick

Sent from my iPad

> On Mar 11, 2024, at 10:00, Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu> wrote:
>
>
> **Les – I'm out for a funeral this week and won't be available. I've cc'd Tom Reber and will ask him to attend if/when it gets scheduled this week.**
>
> **Thanks. Joe**
>
> *BG Joe E. Ramirez, Jr*
> *United States Army (Retired)*
> *Vice President for Student Affairs*

*Texas A&M University*

---

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Monday, March 11, 2024 7:44 AM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; McArthur, Alyssa <amcarthur@tamu.edu>
**Subject:** Re: Corps Restroom Remodels

Patrick and Joe,

Would either of you care to join me in the meeting with Bill?  The two of you are more aware of the project intent than I am.

les

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 3:13 PM
**To:** Williams, Les <leswilliams@tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; McArthur, Alyssa <amcarthur@tamu.edu>
**Subject:** Corps Restroom Remodels

Good Afternoon Les ,

I'd like to get on your calendar early next week to discuss the proposed drawings for the Corps bathroom remodels scheduled this summer.  The bottom line is the design, as proposed to me today, does not meet the requirements set forth by the Commandant and agreed upon last fall.

I've communicated this to both ResLife and CPDC and they directed me to you for further discussion.

Thank you,

Bill Meredith

**Bill Meredith '96** | LTC, US Army (Ret.)
Director – Corps Facilities and Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                          | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

# Meredith Jr, Billy

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Friday, March 8, 2024 6:09 PM |
| **To:** | McArthur, Alyssa |
| **Subject:** | Corps Restroom Remodels |

Hi Alyssa,

Meredith forwarded your note over to me. She doesn't handle my schedule. She is the Chief of Staff and I was keeping her in the loop on my request to meet with Les.

Thanks for reaching out. I can meet on Wednesday. I prefer early if it works with Les's schedule.

Thank you,

Bill

---

**From:** McArthur, Alyssa <amcarthur@tamu.edu>
**Sent:** Friday, March 8, 2024 4:56 PM
**To:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: Corps Restroom Remodels

Good afternoon,

Does LTC Meredith have availability to meet with Mr. Williams on Wednesday, March 13? Please let me know what times may work best for him and we will work to accommodate schedules.

Thank you,

Alyssa

**Alyssa McArthur** | Executive Assistant to the Associate Vice President

Facilities and Energy Services | Texas A&M University

1185 TAMU | College Station, TX 77843-1185

ph: 979.458.0387 | amcarthur@tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 3:13 PM
**To:** Williams, Les <leswilliams@tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; McArthur, Alyssa <amcarthur@tamu.edu>
**Subject:** Corps Restroom Remodels

Good Afternoon Les ,

I'd like to get on your calendar early next week to discuss the proposed drawings for the Corps bathroom remodels scheduled this summer.  The bottom line is the design, as proposed to me today, does not meet the requirements set forth by the Commandant and agreed upon last fall.

I've communicated this to both ResLife and CPDC and they directed me to you for further discussion.

Thank you,

Bill Meredith

**Bill Meredith '96** | LTC, US Army (Ret.)

Director – Corps Facilities and Logisitics
Texas A&M Corps of Cadets

1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                    | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Friday, March 8, 2024 2:03 PM |
| **To:** | Rydl, Chareny L |
| **Cc:** | Meredith Jr, Billy; Webber, Rob W; Simpson, Meredith M |
| **Subject:** | RE: [EXTERNAL] Corps RRs |

We changed the design in October of last year.

I'm happy to re-send you the email traffic.

On Mar 8, 2024 1:49 PM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
If the Commandant wants to change the design he needs to talk directly to Les Willaims.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 1:36 PM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Cc:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Let me be perfectly clear.

This drawings are not approved.

They do not meet our requirements.

On Mar 8, 2024 1:18 PM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
I would recommend  you have a conversation with  Meredith and the Commandant.  This is on the fast track.  I have followed up with Ben Sasse who will follow up with Les Williams.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 12:21 PM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

I think it's immaterial whether its temporary or permanent.   The concept and requirement is the same.  I do not approve these drawings.

**Bill Meredith '96** | LtCol, US Army (Ret.)

Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                     | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:18 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Re: [EXTERNAL] Corps RRs

From memory the doors and urinals conversation was in regard to the temp spaces. The open entry was approved for the Spence renovation and these concepts were derived from that.

Rob
Sent from my iPhone

> On Mar 8, 2024, at 12:16 PM, Meredith Jr, Billy <bmeredith@corps.tamu.edu> wrote:

> The last I got from them was keep the urinals and the doors.  Who gave you different guidance?

> **Bill Meredith '96** | LtCol, US Army (Ret.)
> Director - Corps Logisitics
> Texas A&M Corps of Cadets
> 1115 TAMU | College Station, TX 77843-1227
>
> ofc: 979.845.0324 |                     | bmeredith@corps.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - - -
> **TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

> **From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
> **Sent:** Friday, March 8, 2024 12:14 PM
> **To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
> **Cc:** Webber, Rob W <rob_webber@reslife.tamu.edu>
> **Subject:** RE: [EXTERNAL] Corps RRs

> Billy you might want to talk to Meredith or the Commandant.  The direct given down on the bathrooms was removal of the urinals and no door if this has changed someone needs to speak up now.  This is on the fast track in order to meet several deadlines so if there are concerns, we need it ASAP.

> Chareny

> **From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
> **Sent:** Friday, March 8, 2024 12:11 PM
> **To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
> **Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
> **Subject:** RE: [EXTERNAL] Corps RRs

Rob,

The first thing that immediately jumps out at me is the proposals do not have any entry doors. That is a non-starter. The other is that all of the urinals were removed despite the our request to retain them.

I'll look at them in detail over next week and get back to you.

Thanks
Bill

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                    | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:05 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Bill,

Well that was fast. I didn't see this in my email while I was typing my first response to you. We just got these for review. Any thoughts?

Thank you,
Rob

---

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Friday, March 8, 2024 11:49 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Gary Hall <ghall@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Chareny/Rob:

Please see attached proposed plans for Kiest, Gainer and Lacy RRs.

Best,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 | | **bsasse@tamu.edu**

---

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Friday, March 8, 2024 11:36 AM
**To:** Garon, Michael <Michael.Garon@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Williams, Les <leswilliams@tamu.edu>
**Cc:** Lane Rutledge <lrutledge@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

---

**This Message is From an External Sender**
This message came from outside your organization

Great News!

**GARY W. HALL**
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
**P** 979.458.7085 • **C** 210.241.4154 • ghall@projectcontrol.com

Follow our latest news: **Project Control** • **PC Sports** • **Raba Kistner** • **LinkedIn** • **Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257.* *This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

---

**From:** Verr Soltes <verr.soltes@kirksey.com>
**Sent:** Friday, March 8, 2024 11:27 AM
**To:** Gary Hall <ghall@projectcontrol.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>; Garett Wheaton <Garett.Wheaton@Spawglass.com>; Josh Farris <Josh.Farris@SpawGlass.com>; Zac Stevenson, PE <zacs@clearyzimmermann.com>; Michael Lindemann <mlindemann@kirksey.com>; Paul Gregg <Paul.Gregg@SpawGlass.com>; Julius Marzo <julius.marzo@kirksey.com>
**Subject:** RE: [EXTERNAL] Corps RRs

Gary-
Good morning.

Please see attached for our proposed floor plans for Kiest, Gainer, and Lacy Halls.
We met and are very happy to be able to present to you an option that kept 4 toilets and 5 showers. Another big positive is that this plan supports the Corp culture and will provide a toilet and shower per class. The variations from what we discussed Tuesday are the decision not to include an ambulatory toilet compartment and we have removed a sink but understand this was an add to Spence that was not program driven.

Please let me know if you need anything else to review and approve.
Have a great weekend!


**Verr Soltes, AIA, RID, LEED Green Assoc.**

Senior Associate


**Kirksey Architecture**

6909 Portwest Drive | Houston Texas 77024 | kirksey.com

o 713 426 7513 | m 832 835 8140 | verr.soltes@kirksey.com


Houston + Austin + Dallas


**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Thursday, March 7, 2024 9:21 AM
**To:** Verr Soltes <verr.soltes@kirksey.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

Verr,

We can we expect revised plans based on our meeting.

Thank you,
Gary

GARY W. HALL
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
P 979.458.7085 • C 210.241.4154 • ghall@projectcontrol.com

Follow our latest news: **Project Control** • **PC Sports** • **Raba Kistner** • **LinkedIn** • **Facebook**

*Purpose:* To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.
*Quality:* Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.

*TBPE Firm F-3257.* This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                    | **bsasse@tamu.edu**

**WARNING:** This email originated from **outside** of Kirksey Architecture. Please validate the sender's email address before clicking on links or attachments as they may not be safe.

# Meredith Jr, Billy

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Friday, March 8, 2024 12:03 PM |
| **To:** | Simpson, Meredith M |
| **Subject:** | FW: Rooms in Kiest, Lacy, and Gainer |

fyi

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                          | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:01 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Rooms in Kiest, Lacy, and Gainer

Well there is no final plan that has been approved, and I really don't have any information to share with you at this time. I know the work will begin on 5/13 and continue until 8/3. I have not seen a design or anything like that. I have just been asked to secure this space. I should know more in the coming weeks as we are supposed to be included in the construction meetings moving forward. Obviously I will share information as I get it.

Please let me know about those spaces.

Thank you,
Rob

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 11:48 AM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Rooms in Kiest, Lacy, and Gainer

Had no idea a final plan had been approved. Please give me a run-down.

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                          bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 11:46 AM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Rooms in Kiest, Lacy, and Gainer

Good morning,

As part of the Corps bathroom renovation, the contractors would like to access the following rooms as their field offices for summer:

Kiest—236
Lacy—238
Gainer—201

Based on our observations, these appear to be spaces occupied by the Corps. Bill can you please confirm that these spaces can be used for field offices and that they can be cleaned out by May 13th when the contractors would mobilize?

Thank you and please let me know if you have any questions.

**Rob Webber**  | Associate Director, Operations and Events
Department of Residence Life | Division of Student Affairs | Texas A&M University
1253 TAMU | College Station, TX 77843-1253

ph: 979.458.6773 | rob_webber@reslife.tamu.edu | reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DEPARTMENT OF RESIDENCE LIFE** | Aggies Live On

# Meredith Jr, Billy

**From:** Rydl, Chareny L
**Sent:** Friday, March 8, 2024 2:07 PM
**To:** Meredith Jr, Billy
**Cc:** Webber, Rob W; Simpson, Meredith M
**Subject:** RE: [EXTERNAL] Corps RRs

Or feel free to talk to Les directly.

**From:** Rydl, Chareny L
**Sent:** Friday, March 8, 2024 2:06 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Webber, Rob W <rob_webber@reslife.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

There have been several conversations at the upper level since that meeting which Les and the Commandant were involved in. If the Commandant wants to change the current design he will have to talk to Les. Les was charged with this project. I was not involved in those high level conversations.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 2:03 PM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Cc:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

We changed the design in October of last year.

I'm happy to re-send you the email traffic.

On Mar 8, 2024 1:49 PM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
If the Commandant wants to change the design he needs to talk directly to Les Willaims.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 1:36 PM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Cc:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Let me be perfectly clear.

This drawings are not approved.

They do not meet our requirements.

On Mar 8, 2024 1:18 PM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
I would recommend  you have a conversation with  Meredith and the Commandant.  This is on the fast track.  I have followed up with Ben Sasse who will follow up with Les Williams.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 12:21 PM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

I think it's immaterial whether its temporary or permanent.    The concept and requirement is the same.  I do not approve these drawings.

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324                                    | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:18 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Re: [EXTERNAL] Corps RRs

From memory the doors and urinals conversation was in regard to the temp spaces. The open entry was approved for the Spence renovation and these concepts were derived from that.

Rob
Sent from my iPhone

On Mar 8, 2024, at 12:16 PM, Meredith Jr, Billy <bmeredith@corps.tamu.edu> wrote:

The last I got from them was keep the urinals and the doors.  Who gave you different guidance?

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                          | [bmeredith@corps.tamu.edu](mailto:bmeredith@corps.tamu.edu)
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Rydl, Chareny L <[chareny@reslife.tamu.edu](mailto:chareny@reslife.tamu.edu)>
**Sent:** Friday, March 8, 2024 12:14 PM
**To:** Meredith Jr, Billy <[bmeredith@corps.tamu.edu](mailto:bmeredith@corps.tamu.edu)>
**Cc:** Webber, Rob W <[rob_webber@reslife.tamu.edu](mailto:rob_webber@reslife.tamu.edu)>
**Subject:** RE: [EXTERNAL] Corps RRs

Billy you might want to talk to Meredith or the Commandant.  The direct given down on the bathrooms was removal of the urinals and no door if this has changed someone needs to speak up now.  This is on the fast track in order to meet several deadlines so if there are concerns, we need it ASAP.

Chareny

---

**From:** Meredith Jr, Billy <[bmeredith@corps.tamu.edu](mailto:bmeredith@corps.tamu.edu)>
**Sent:** Friday, March 8, 2024 12:11 PM
**To:** Webber, Rob W <[rob_webber@reslife.tamu.edu](mailto:rob_webber@reslife.tamu.edu)>
**Cc:** Rydl, Chareny L <[chareny@reslife.tamu.edu](mailto:chareny@reslife.tamu.edu)>
**Subject:** RE: [EXTERNAL] Corps RRs

Rob,

The first thing that immediately jumps out at me is the proposals do not have any entry doors.  That is a non-starter.  The other is that all of the urinals were removed despite the our request to retain them.

I'll look at them in detail over next week and get back to you.

Thanks
Bill

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                          | [bmeredith@corps.tamu.edu](mailto:bmeredith@corps.tamu.edu)
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Webber, Rob W <[rob_webber@reslife.tamu.edu](mailto:rob_webber@reslife.tamu.edu)>
**Sent:** Friday, March 8, 2024 12:05 PM
**To:** Meredith Jr, Billy <[bmeredith@corps.tamu.edu](mailto:bmeredith@corps.tamu.edu)>
**Cc:** Rydl, Chareny L <[chareny@reslife.tamu.edu](mailto:chareny@reslife.tamu.edu)>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Bill,

Well that was fast. I didn't see this in my email while I was typing my first response to you. We just got these for review. Any thoughts?

Thank you,
Rob

---

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Friday, March 8, 2024 11:49 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Gary Hall <ghall@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Chareny/Rob:

Please see attached proposed plans for Kiest, Gainer and Lacy RRs.

Best,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238                                    | **bsasse@tamu.edu**

---

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Friday, March 8, 2024 11:36 AM
**To:** Garon, Michael <Michael.Garon@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Williams, Les <leswilliams@tamu.edu>
**Cc:** Lane Rutledge <lrutledge@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

---

**This Message is From an External Sender**
This message came from outside your organization

Great News!

**GARY W. HALL**
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
P 979.458.7085 • C 210.241.4154 • ghall@projectcontrol.com

Follow our latest news: **Project Control** • **PC Sports** • **Raba Kistner** • **LinkedIn** • **Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257.* *This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

**From:** Verr Soltes <verr.soltes@kirksey.com>
**Sent:** Friday, March 8, 2024 11:27 AM
**To:** Gary Hall <ghall@projectcontrol.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>; Garett Wheaton <Garett.Wheaton@Spawglass.com>; Josh Farris <Josh.Farris@SpawGlass.com>; Zac Stevenson, PE <zacs@clearyzimmermann.com>; Michael Lindemann <mlindemann@kirksey.com>; Paul Gregg <Paul.Gregg@SpawGlass.com>; Julius Marzo <julius.marzo@kirksey.com>
**Subject:** RE: [EXTERNAL] Corps RRs

Gary-
Good morning.

Please see attached for our proposed floor plans for Kiest, Gainer, and Lacy Halls.
We met and are very happy to be able to present to you an option that kept 4 toilets and 5 showers. Another big positive is that this plan supports the Corp culture and will provide a toilet and shower per class. The variations from what we discussed Tuesday are the decision not to include an ambulatory toilet compartment and we have removed a sink but understand this was an add to Spence that was not program driven.

Please let me know if you need anything else to review and approve.
Have a great weekend!


**Verr Soltes, AIA, RID, LEED Green Assoc.**

Senior Associate


**Kirksey Architecture**

6909 Portwest Drive | Houston Texas 77024 | kirksey.com

o 713 426 7513 | m 832 835 8140 | verr.soltes@kirksey.com


Houston + Austin + Dallas


**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Thursday, March 7, 2024 9:21 AM
**To:** Verr Soltes <verr.soltes@kirksey.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

Verr,

We can we expect revised plans based on our meeting.

Thank you,
Gary

**GARY W. HALL**
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
**P** 979.458.7085 • **C** 210.241.4154 • ghall@projectcontrol.com

**Follow our latest news:** **Project Control** • **PC Sports** • **Raba Kistner** • **LinkedIn** • **Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257.* *This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

---

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 | | bsasse@tamu.edu

**WARNING:** This email originated from **outside** of Kirksey Architecture. Please validate the sender's email address before clicking on links or attachments as they may not be safe.

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Tuesday, April 16, 2024 1:44 PM |
| **To:** | Sasse, Ben; Williams, Gary W |
| **Subject:** | RE: Spence Bathroom Updates |

Thanks

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                          | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Tuesday, April 16, 2024 1:43 PM
**To:** Williams, Gary W <gary.williams@tamu.edu>
**Cc:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Subject:** RE: Spence Bathroom Updates

Gary:

Would you please send Bill an invite to the OAC meeting for Spence?

Thanks,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238                          | **bsasse@tamu.edu**

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Tuesday, April 16, 2024 1:37 PM
**To:** Sasse, Ben <bsasse@tamu.edu>
**Subject:** Spence Bathroom Updates

Ben,

I know the 1400 weekly update is for all "other," but when are the updates for the original renovation in Spence?

Thanks

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Wednesday, April 10, 2024 11:53 AM |
| **To:** | Gary Hall; Sasse, Ben |
| **Cc:** | Sam Lampe; Simpson, Meredith M; Garon, Michael |
| **Subject:** | Re: [EXTERNAL] RE: Summer lay down area. |

Gary,

How much space do you need?  The former basketball courts are a bit smaller,  but are closer to all of those dorms and have similar access.   it also puts the lay down area in a less visible area from Coke street where folks enter and leave campus.  Is that feasible?

-Bill

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                        | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Wednesday, April 10, 2024 10:54 AM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Sasse, Ben <bsasse@tamu.edu>
**Cc:** Sam Lampe <slampe@projectcontrol.com>; Simpson, Meredith M <msimpson@corps.tamu.edu>; Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** RE: [EXTERNAL] RE: Summer lay down area.

**This Message is From an External Sender**
This message came from outside your organization

Ben & Bill,

One of the reasons we chose Parking lot 26 is the larger sidewalks and accessways for our material movement to Kies, Lacy and Gainer. Due to our limited amount of time to complete the Project, we need that ease of access.

Thank you,
Gary

GARY W. HALL
SENIOR VICE PRESIDENT

Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
P 979.458.7085 • C 210.241.4154 • ghall@projectcontrol.com

Follow our latest news: **Project Control** • **PC Sports** • **Raba Kistner** • **LinkedIn** • **Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257. This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Wednesday, April 10, 2024 10:40 AM
**To:** Sasse, Ben <bsasse@tamu.edu>
**Cc:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Sam Lampe <slampe@projectcontrol.com>; Simpson, Meredith M <msimpson@corps.tamu.edu>; Gary Hall <ghall@projectcontrol.com>; Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] RE: Summer lay down area.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks Ben.

On Apr 10, 2024 10:24 AM, "Sasse, Ben" <bsasse@tamu.edu> wrote:
Bill:

You would need to run this request through Sam Lampe with Project Control (copied).

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 | | **bsasse@tamu.edu**

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Wednesday, April 10, 2024 8:44 AM
**To:** Sasse, Ben <bsasse@tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** Summer lay down area.

Ben,

I was back briefing the Chief of Staff on the plan for the bathroom construction and we'd like to see if Spaw Glass can use 40A instead of 26 for lay down

40A is student parking and is usually nearly empty all summer.

26 is reserved parking and a good portion of the staff park there.

Let me know if this is feasible

| | |
|---|---|
| **From:** | Rydl, Chareny L |
| **Sent:** | Friday, March 8, 2024 2:06 PM |
| **To:** | Meredith Jr, Billy |
| **Cc:** | Webber, Rob W; Simpson, Meredith M |
| **Subject:** | RE: [EXTERNAL] Corps RRs |

There have been several conversations at the upper level since that meeting which Les and the Commandant were involved in.  If the Commandant wants to change the current design he will have to talk to Les.  Les was charged with this project.  I was not involved in those high level conversations.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 2:03 PM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Cc:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

We changed the design in October of last year.

I'm happy to re-send you the email traffic.

On Mar 8, 2024 1:49 PM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
If the Commandant wants to change the design he needs to talk directly to Les Willaims.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 1:36 PM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Cc:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Let me be perfectly clear.

This drawings are not approved.

They do not meet our requirements.

On Mar 8, 2024 1:18 PM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
I would recommend  you have a conversation with  Meredith and the Commandant.  This is on the fast track.  I have followed up with Ben Sasse who will follow up with Les Williams.

Chareny

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 12:21 PM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

I think it's immaterial whether its temporary or permanent.   The concept and requirement is the same.  I do not approve these drawings.

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                              | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:18 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Re: [EXTERNAL] Corps RRs

From memory the doors and urinals conversation was in regard to the temp spaces. The open entry was approved for the Spence renovation and these concepts were derived from that.

Rob
Sent from my iPhone

> On Mar 8, 2024, at 12:16 PM, Meredith Jr, Billy <bmeredith@corps.tamu.edu> wrote:

The last I got from them was keep the urinals and the doors.  Who gave you different guidance?

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                              bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:14 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Billy you might want to talk to Meredith or the Commandant.  The direct given down on the bathrooms was removal of the urinals and no door if this has changed someone needs to speak up now.  This is on the fast track in order to meet several deadlines so if there are concerns, we need it ASAP.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 12:11 PM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Rob,

The first thing that immediately jumps out at me is the proposals do not have any entry doors.  That is a non-starter.  The other is that all of the urinals were removed despite the our request to retain them.

I'll look at them in detail over next week and get back to you.

Thanks
Bill

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                          | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:05 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Bill,

Well that was fast. I didn't see this in my email while I was typing my first response to you. We just got these for review. Any thoughts?

Thank you,
Rob

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Friday, March 8, 2024 11:49 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Gary Hall <ghall@projectcontrol.com>

**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Chareny/Rob:

Please see attached proposed plans for Kiest, Gainer and Lacy RRs.

Best,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                      | **bsasse@tamu.edu**

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Friday, March 8, 2024 11:36 AM
**To:** Garon, Michael <Michael.Garon@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Williams, Les <leswilliams@tamu.edu>
**Cc:** Lane Rutledge <lrutledge@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

**This Message is From an External Sender**
This message came from outside your organization

Great News!

GARY W. HALL
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
P 979.458.7085  •  C 210.241.4154  •  ghall@projectcontrol.com

Follow our latest news: **Project Control**  •  **PC Sports**  •  **Raba Kistner**  •  **LinkedIn**  •  **Facebook**

*Purpose:* To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.
*Quality:* Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.

*TBPE Firm F-3257.* This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.

**From:** Verr Soltes <verr.soltes@kirksey.com>
**Sent:** Friday, March 8, 2024 11:27 AM
**To:** Gary Hall <ghall@projectcontrol.com>

**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>; Garett Wheaton <Garett.Wheaton@Spawglass.com>; Josh Farris <Josh.Farris@SpawGlass.com>; Zac Stevenson, PE <zacs@clearyzimmermann.com>; Michael Lindemann <mlindemann@kirksey.com>; Paul Gregg <Paul.Gregg@SpawGlass.com>; Julius Marzo <julius.marzo@kirksey.com>
**Subject:** RE: [EXTERNAL] Corps RRs

Gary-
Good morning.

Please see attached for our proposed floor plans for Kiest, Gainer, and Lacy Halls.
We met and are very happy to be able to present to you an option that kept 4 toilets and 5 showers. Another big positive is that this plan supports the Corp culture and will provide a toilet and shower per class. The variations from what we discussed Tuesday are the decision not to include an ambulatory toilet compartment and we have removed a sink but understand this was an add to Spence that was not program driven.

Please let me know if you need anything else to review and approve.
Have a great weekend!


**Verr Soltes, AIA, RID, LEED Green Assoc.**

Senior Associate


**Kirksey Architecture**

6909 Portwest Drive | Houston Texas 77024 | kirksey.com

o 713 426 7513 | m 832 835 8140 | verr.soltes@kirksey.com


Houston + Austin + Dallas

---

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Thursday, March 7, 2024 9:21 AM
**To:** Verr Soltes <verr.soltes@kirksey.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

Verr,

We can we expect revised plans based on our meeting.

Thank you,
Gary

**GARY W. HALL**
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
**P** 979.458.7085 • **C** 210.241.4154 • ghall@projectcontrol.com

**Follow our latest news: Project Control • PC Sports • Raba Kistner • LinkedIn • Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257.* *This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238                              | **bsasse@tamu.edu**

**WARNING:** This email originated from **outside** of Kirksey Architecture. Please validate the sender's email address before clicking on links or attachments as they may not be safe.

| | |
|---|---|
| **From:** | Rydl, Chareny L |
| **Sent:** | Friday, March 8, 2024 1:50 PM |
| **To:** | Reber, Thomas W |
| **Subject:** | FW: [EXTERNAL] Corps RRs |

Ben talked to Les and Les said that Billy needs to talk to Patrick and Patrick can talk to him.

Chareny

**From:** Rydl, Chareny L
**Sent:** Friday, March 8, 2024 1:49 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Webber, Rob W <rob_webber@reslife.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

If the Commandant wants to change the design he needs to talk directly to Les Willaims.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 1:36 PM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Cc:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Let me be perfectly clear.

This drawings are not approved.

They do not meet our requirements.

On Mar 8, 2024 1:18 PM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
I would recommend  you have a conversation with  Meredith and the Commandant.  This is on the fast track.  I have followed up with Ben Sasse who will follow up with Les Williams.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 12:21 PM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

I think it's immaterial whether its temporary or permanent.    The concept and requirement is the same.  I do not approve these drawings.

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                    | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:18 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Re: [EXTERNAL] Corps RRs

From memory the doors and urinals conversation was in regard to the temp spaces. The open entry was approved for the Spence renovation and these concepts were derived from that.

Rob
Sent from my iPhone

> On Mar 8, 2024, at 12:16 PM, Meredith Jr, Billy <bmeredith@corps.tamu.edu> wrote:
>
> The last I got from them was keep the urinals and the doors.  Who gave you different guidance?
>
> **Bill Meredith '96** | LtCol, US Army (Ret.)
> Director - Corps Logisitics
> Texas A&M Corps of Cadets
> 1115 TAMU | College Station, TX 77843-1227
>
> ofc: 979.845.0324 |                    | bmeredith@corps.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - - -
> **TEXAS A&M UNIVERSITY** | FEARLESS on Every Front
>
> ---
>
> **From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
> **Sent:** Friday, March 8, 2024 12:14 PM
> **To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
> **Cc:** Webber, Rob W <rob_webber@reslife.tamu.edu>
> **Subject:** RE: [EXTERNAL] Corps RRs
>
> Billy you might want to talk to Meredith or the Commandant.  The direct given down on the bathrooms was removal of the urinals and no door if this has changed someone needs to speak up now.  This is on the fast track in order to meet several deadlines so if there are concerns, we need it ASAP.
>
> Chareny
>
> ---
>
> **From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
> **Sent:** Friday, March 8, 2024 12:11 PM

**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Rob,

The first thing that immediately jumps out at me is the proposals do not have any entry doors. That is a non-starter. The other is that all of the urinals were removed despite the our request to retain them.

I'll look at them in detail over next week and get back to you.

Thanks
Bill

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324                                | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:05 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Bill,

Well that was fast. I didn't see this in my email while I was typing my first response to you. We just got these for review. Any thoughts?

Thank you,
Rob

---

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Friday, March 8, 2024 11:49 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Gary Hall <ghall@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Chareny/Rob:

Please see attached proposed plans for Kiest, Gainer and Lacy RRs.

Best,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                    | **bsasse@tamu.edu**

---

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Friday, March 8, 2024 11:36 AM
**To:** Garon, Michael <Michael.Garon@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Williams, Les <leswilliams@tamu.edu>
**Cc:** Lane Rutledge <lrutledge@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

---

**This Message is From an External Sender**
This message came from outside your organization

Great News!

**GARY W. HALL**
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
P 979.458.7085  •  C 210.241.4154  •  ghall@projectcontrol.com

Follow our latest news: **Project Control**  •  **PC Sports**  •  **Raba Kistner**  •  **LinkedIn**  •  **Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257.* *This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

---

**From:** Verr Soltes <verr.soltes@kirksey.com>
**Sent:** Friday, March 8, 2024 11:27 AM
**To:** Gary Hall <ghall@projectcontrol.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>; Garett Wheaton <Garett.Wheaton@Spawglass.com>; Josh Farris <Josh.Farris@SpawGlass.com>; Zac Stevenson, PE <zacs@clearyzimmermann.com>; Michael Lindemann <mlindemann@kirksey.com>; Paul Gregg <Paul.Gregg@SpawGlass.com>; Julius Marzo <julius.marzo@kirksey.com>
**Subject:** RE: [EXTERNAL] Corps RRs

Gary-
Good morning.

Please see attached for our proposed floor plans for Kiest, Gainer, and Lacy Halls.

We met and are very happy to be able to present to you an option that kept 4 toilets and 5 showers. Another big positive is that this plan supports the Corp culture and will provide a toilet and shower per class. The variations from what we discussed Tuesday are the decision not to include an ambulatory toilet compartment and we have removed a sink but understand this was an add to Spence that was not program driven.

Please let me know if you need anything else to review and approve.
Have a great weekend!


**Verr Soltes, AIA, RID, LEED Green Assoc.**

Senior Associate


**Kirksey Architecture**

6909 Portwest Drive | Houston Texas 77024 | kirksey.com

o 713 426 7513 | m 832 835 8140 | verr.soltes@kirksey.com


Houston + Austin + Dallas

---

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Thursday, March 7, 2024 9:21 AM
**To:** Verr Soltes <verr.soltes@kirksey.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

Verr,

We can we expect revised plans based on our meeting.

Thank you,
Gary

GARY W. HALL
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
P 979.458.7085  •  C 210.241.4154  •  ghall@projectcontrol.com

Follow our latest news: **Project Control**  •  **PC Sports**  •  **Raba Kistner**  •  **LinkedIn**  •  **Facebook**

*Purpose:* To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.
*Quality:* Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.

*TBPE Firm F-3257.* This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process.  Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.

---

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>

**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 | C 979.213.3900 | **bsasse@tamu.edu**

**WARNING:** This email originated from **outside** of Kirksey Architecture. Please validate the sender's email address before clicking on links or attachments as they may not be safe.

| From: | Meredith Jr, Billy |
|---|---|
| **Sent:** | Friday, March 8, 2024 11:48 AM |
| **To:** | Webber, Rob W |
| **Cc:** | Rydl, Chareny L |
| **Subject:** | RE: Rooms in Kiest, Lacy, and Gainer |

Had no idea a final plan had been approved.  Please give me a run-down.

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                              | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 11:46 AM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Rooms in Kiest, Lacy, and Gainer

Good morning,

As part of the Corps bathroom renovation, the contractors would like to access the following rooms as their field offices for summer:

Kiest—236
Lacy—238
Gainer—201

Based on our observations, these appear to be spaces occupied by the Corps. Bill can you please confirm that these spaces can be used for field offices and that they can be cleaned out by May 13th when the contractors would mobilize?

Thank you and please let me know if you have any questions.

**Rob Webber**  | Associate Director, Operations and Events
Department of Residence Life | Division of Student Affairs | Texas A&M University
1253 TAMU | College Station, TX 77843-1253

ph: 979.458.6773 | rob_webber@reslife.tamu.edu | reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DEPARTMENT OF RESIDENCE LIFE** | Aggies Live On

| From: | Williams, Les |
|---|---|
| **Sent:** | Tuesday, February 20, 2024 3:28 PM |
| **To:** | Sasse, Ben; Rydl, Chareny L; Reber, Thomas W; Gary Hall; Garon, Michael |
| **Cc:** | jeff.heye; richard.gentry |
| **Subject:** | Re: Corps Facilities Brief Follow up |

Chareny and Tom,

If you have any concerns about the proposed schedule, let get those issues in front of Gary quickly.

les

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Tuesday, February 20, 2024 8:52 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Garon, Michael <Michael.Garon@sscserv.com>
**Cc:** Heye, Jeff <Jeff.Heye@sscserv.com>; richard.gentry <richard.gentry@sscserv.com>; Williams, Les <leswilliams@tamu.edu>
**Subject:** FW: Corps Facilities Brief Follow up

FYI. Consider this your notice to proceed. I am working on confirming account numbers and will provide SSC with a signed expense authorization form shortly.

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 | | **bsasse@tamu.edu**

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Tuesday, February 20, 2024 8:25 AM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>; Reber, Thomas W <treber@tamu.edu>; Rydl, Chareny L <chareny@reslife.tamu.edu>; Pettibon II, Joseph P <jpp2@tamu.edu>
**Subject:** Re: Corps Facilities Brief Follow up

We received approval to proceed with the Corps Dorm Renovation project. The total project costs for (4) dorms is projected to cost $3.1 million. Res Life will be funding the first $2 million and John Crawford will fund the remaining $1.1 million. The Spence Hall project will be proceeding as originally planned and was awarded to Quad Tex through SSC. The other three projects (Kiest, Gainer and Lacy) will be managed delivered by Spaw Glass and Project Controls through SSC. Because of the tight time frame, Project Controls will be responsible meeting the objectives of 1) meeting the time frame and 2) establishing a cost-effective approach to construction for future projects.

Ben Sasse will be coordinating from the Facilities & Energy Services team, but Gary Hall and Russ Wallace with Project Controls will be driving this project. To meet the time frame, it is imperative that our teams are responsive to request from Project Controls. Ben will work with Project Controls and Res Life to identify team members for this project. I will expect that we could get started as early as this week with design.

les

Les Williams │ Associate Vice President

Division of Operations

Facilities & Energy Services

1185 TAMU │ College Station, TX 77843-1255

ph: 979.862.4470│leswilliams@tamu.edu

Texas A&M University

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Monday, February 19, 2024 9:18 AM
**To:** Williams, Les <leswilliams@tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>; Reber, Thomas W <treber@tamu.edu>; Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

**Thanks Les.**

**We will need to discuss how we intend to pay for all of this. Res Life committed $2M for this construction project this Summer. Do we know who is going to pay the additional $575K if this is the plan we are going to execute this Summer?**

**I appreciate the update and look forward to the discussion.**

**Joe**

BG Joe E. Ramirez, Jr

United States Army (Retired)

Vice President for Student Affairs

Texas A&M University

I need to update the price.  Ben pointed out that SSC did not include all the costs.  See the updated correspondence below.

---

Here is an update on the Corps Renovation Project.   The Spaw Glass and Project Controls team has established that the three additional bathrooms are possible in the limited time frame. The total estimated cost will be **$2,575,000** and will require an approval to proceed by next Friday (February 23rd).

There are number of conditions which make this possible and they are:

1. All design and construction decisions will be made by the Project Manager, Project Control.
2. Project Manager will review and approve all contracts and invoices prior to forwarding to SSC for payment.
3. No occupancy of these three dorms will be permitted during the construction period.
4. Hours of contractor operation are 7:00am till 7:00pm 7 days per week.
5. The areas to be renovated will all be on the ground floor north end of Kiest, Gainer and Lacy.
6. The contractor will be allowed the use of Parking Lot #26 for a storage/laydown yard and contractor parking.
7. The general contractor's offices will be located on the second-floor study/office in the north end of the building.
8. Finishes and materials may be changed or modified by Project Manager based on market availability.
9. Due to the late start and accelerated schedule, HUB Participation will be a best effort by the Contractor but may not reach the TAMU intend goal of 21.1%.
10. A Notice to Proceed must be issued no later than Friday, February 23, 2024, to meet the Substantial Completion date of August 1, 2024.

Les Williams

Les Williams | Associate Vice President

Division of Operations

Facilities & Energy Services

1185 TAMU | College Station, TX 77843-1255

ph: 979.862.4470│leswilliams@tamu.edu

Texas A&M University

---

**From:** Garon, Michael <Michael.Garon@sscserv.com>
**Sent:** Friday, February 16, 2024 11:34 AM
**To:** Williams, Les <leswilliams@tamu.edu>
**Cc:** richard.gentry <richard.gentry@sscserv.com>; Heye, Jeff <Jeff.Heye@sscserv.com>; Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** Community Access Restroom Renovations || 2024-06316

---

**This Message is From an External Sender**
This message came from outside your organization

---

Les,
Project Controls and Spaw Glass have provided the following milestone schedule.
Notice to proceeds issued no later than Feb 23rd.
Design to commence Feb 24th.
Construction at site to commence May 13th.
Substantial completion on August 2nd.
Corps move-in August 5th.

The total anticipated cost is $2,318,235.87 ($772,745.29 per restroom)

# Michael Garon

Senior Construction Project Manager
Engineering, Design and Construction Services
**SSC Service Solutions |** 979-446-2506

1371 TAMU
College Station, TX  77843-1371
**Michael.Garon@sscserv.com**

A member of Compass Group PLC

**www.sscserv.com**

| **From:** | Rydl, Chareny L |
| --- | --- |
| **Sent:** | Monday, February 19, 2024 9:41 AM |
| **To:** | McCracken, Kyle R |
| **Subject:** | RE: Corps Facilities Brief Follow up |

No, all is good.

Chareny

**From:** McCracken, Kyle R <kyle_mccracken@reslife.tamu.edu>
**Sent:** Monday, February 19, 2024 9:38 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

Fair enough.   Thanks for looping us in.

Need anything of me on this at all?

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Monday, February 19, 2024 9:35 AM
**To:** McCracken, Kyle R <kyle_mccracken@reslife.tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

Timeline and rush.

**From:** McCracken, Kyle R <kyle_mccracken@reslife.tamu.edu>
**Sent:** Monday, February 19, 2024 9:31 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

Cost is going up… More expensive than originally projected.  Is that timeline and rush or is that just the particulars shaking out as they are finalized?

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Monday, February 19, 2024 9:27 AM
**To:** Johannes, Andrea K <andrea_johannes@reslife.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>; Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>; Krenz, Michael D <mikek@reslife.tamu.edu>; McCracken, Kyle R <kyle_mccracken@reslife.tamu.edu>
**Subject:** FW: Corps Facilities Brief Follow up

FYI

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Monday, February 19, 2024 9:19 AM
**To:** Williams, Les <leswilliams@tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>

Cc: Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>; Reber, Thomas W <treber@tamu.edu>; Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

**Thanks Les.**

**We will need to discuss how we intend to pay for all of this. Res Life committed $2M for this construction project this Summer. Do we know who is going to pay the additional $575K if this is the plan we are going to execute this Summer?**

**I appreciate the update and look forward to the discussion.**

**Joe**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

---

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Friday, February 16, 2024 12:11 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>
**Subject:** Re: Corps Facilities Brief Follow up

I need to update the price.  Ben pointed out that SSC did not include all the costs.  See the updated correspondence below.

---

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Friday, February 16, 2024 12:02 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>
**Subject:** Corps Facilities Brief Follow up

Here is an update on the Corps Renovation Project.   The Spaw Glass and Project Controls team has established that the three additional bathrooms are possible in the limited time frame. The total estimated cost will be **$2,575,000** and will require an approval to proceed by next Friday (February 23rd).

There are number of conditions which make this possible and they are:

1. All design and construction decisions will be made by the Project Manager, Project Control.
2. Project Manager will review and approve all contracts and invoices prior to forwarding to SSC for payment.

3. No occupancy of these three dorms will be permitted during the construction period.
4. Hours of contractor operation are 7:00am till 7:00pm 7 days per week.
5. The areas to be renovated will all be on the ground floor north end of Kiest, Gainer and Lacy.
6. The contractor will be allowed the use of Parking Lot #26 for a storage/laydown yard and contractor parking.
7. The general contractor's offices will be located on the second-floor study/office in the north end of the building.
8. Finishes and materials may be changed or modified by Project Manager based on market availability.
9. Due to the late start and accelerated schedule, HUB Participation will be a best effort by the Contractor but may not reach the TAMU intend goal of 21.1%.
10. A Notice to Proceed must be issued no later than Friday, February 23, 2024, to meet the Substantial Completion date of August 1, 2024.

Les Williams

Les Williams | Associate Vice President

Division of Operations

Facilities & Energy Services

1185 TAMU | College Station, TX 77843-1255

ph: 979.862.4470|leswilliams@tamu.edu

Texas A&M University

**From:** Garon, Michael <Michael.Garon@sscserv.com>
**Sent:** Friday, February 16, 2024 11:34 AM
**To:** Williams, Les <leswilliams@tamu.edu>
**Cc:** richard.gentry <richard.gentry@sscserv.com>; Heye, Jeff <Jeff.Heye@sscserv.com>; Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** Community Access Restroom Renovations || 2024-06316

**This Message is From an External Sender**
This message came from outside your organization

Les,

Project Controls and Spaw Glass have provided the following milestone schedule.

Notice to proceeds issued no later than Feb 23rd.

Design to commence Feb 24th.

Construction at site to commence May 13th.

Substantial completion on August 2nd.

Corps move-in August 5th.

The total anticipated cost is $2,318,235.87 ($772,745.29 per restroom)

## Michael Garon

Senior Construction Project Manager

Engineering, Design and Construction Services

**SSC Service Solutions** |979-446-2506

1371 TAMU

College Station, TX  77843-1371

**Michael.Garon@sscserv.com**

A member of Compass Group PLC

**www.sscserv.com**

| From: | Fred Patterson <fred@patarch.com> |
|---|---|
| Sent: | Wednesday, April 3, 2024 12:24 PM |
| To: | Garon, Michael; Doug Chmelar; Webber, Rob W |
| Cc: | John Hare |
| Subject: | Re: [Ext] 2023-06030 (2326) Spence Hall Bathroom Renovations - ASI 1 |

**This Message is From an External Sender**
This message came from outside your organization

We can do that!

Sorry, I don't remember having that conversation about keeping the shaft wall.
I can revised the ASI if that is the direction we need ot proceed.

**From:** Mike Garon <Michael.Garon@sscserv.com>
**Date:** Wednesday, April 3, 2024 at 12:21 PM
**To:** Fred Patterson <fred@patarch.com>, Doug Chmelar <doug@quadtex.net>, Rob Webber
<rob_webber@reslife.tamu.edu>
**Cc:** John Hare <john@patarch.com>
**Subject:** Re: [Ext] 2023-06030 (2326) Spence Hall Bathroom Renovations - ASI 1

Fre,
I thought our previous conversation was to keep the rated partitions. This would allow for removal of the hallway door in the future. This is how we are presenting the other 3 dorms.
If this has a negative impact, please let me know.

Get Outlook for iOS

**From:** Fred Patterson <fred@patarch.com>
**Sent:** Wednesday, April 3, 2024 10:34:58 AM
**To:** Doug Chmelar <doug@quadtex.net>; Garon, Michael <michael.garon@sscserv.com>; Rob Webber
<rob_webber@reslife.tamu.edu>
**Cc:** John Hare <john@patarch.com>
**Subject:** [Ext] 2023-06030 (2326) Spence Hall Bathroom Renovations - ASI 1

***WARNING***: This email originated from an external source and is potentially fraudulent. Do not click on links or attachments unless you are familiar with the sender.

All

See attached ASI with the proposed changes to the scope of work.

Let me know if you have any questions/comments.

Thanks, Fred

Fred A. Patterson, Jr., AIA
Patterson * Architects
701 South Texas Avenue
Bryan, Texas  77803

979-775-6036 – phone
979-229-7790 - mobile
fred@patarch.com - email
www.Pattersonarchitects.net – web

*Celebrating 39 years of design excellence in the Brazos Valley*

CONFIDENTIAL NOTICE:    The information contained in this transmission is considered by the sender to be confidential.  This material is intended only for use of the recipient named above.  If the reader or other recipient of this material is not the intended recipient named above, please notify me and delete this transmission.  Thank you.

ELECTRONIC MEDIA NOTICE:  It is understood and agreed, that Patterson Architects, upon release of these electronic files is no longer responsible for their use or modification.  The user of the attached electronic media accepts full responsibility and liability for any consequences arising out of the use of this electronic data.

| | |
|---|---|
| **From:** | Rydl, Chareny L |
| **Sent:** | Tuesday, March 26, 2024 2:25 PM |
| **To:** | Webber, Rob W |
| **Subject:** | FW: Corps Facilities Brief Follow up |

**From:** Johannes, Andrea K <andrea_johannes@reslife.tamu.edu>
**Sent:** Tuesday, February 20, 2024 9:02 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

Please use        -00000. We've transferred 2M, but would need Deborah to transfer the other 1.1M.

**Andrea Johannes** | Associate Director
Student Affairs Finance | Texas A&M University
3365 TAMU | College Station, TX 77843-3365

ph: 979.458.3201 | mobile: 734.777.0439 | andrea.johannes@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Tuesday, February 20, 2024 8:35 AM
**To:** Johannes, Andrea K <andrea_johannes@reslife.tamu.edu>
**Subject:** FW: Corps Facilities Brief Follow up

Please see Ben's question.

Chareny

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Tuesday, February 20, 2024 8:34 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>
**Subject:** Re: Corps Facilities Brief Follow up

Chareny,

Please see Ben's question below.

les

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Tuesday, February 20, 2024 8:29 AM

**To:** Williams, Les <leswilliams@tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

Are we using the same account numbers that were used for the feasibility study?  Need to know before I have Robbye route the expense authorization for signature in AdobeSign.

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                              | **bsasse@tamu.edu**

---

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Tuesday, February 20, 2024 8:25 AM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>; Reber, Thomas W <treber@tamu.edu>; Rydl, Chareny L <chareny@reslife.tamu.edu>; Pettibon II, Joseph P <jpp2@tamu.edu>
**Subject:** Re: Corps Facilities Brief Follow up

We received approval to proceed with the Corps Dorm Renovation project.   The total project costs for (4) dorms is projected to cost $3.1 million.   Res Life will be funding the first $2 million and John Crawford will fund the remaining $1.1 million.    The Spence Hall project will be proceeding as originally planned and was awarded to Quad Tex through SSC.    The other three projects (Kiest, Gainer and Lacy) will be managed delivered by Spaw Glass and Project Controls through SSC.  Because of the tight time frame, Project Controls will be responsible meeting the objectives of 1) meeting the time frame and 2) establishing a cost-effective approach to construction for future projects.

Ben Sasse will be coordinating from the Facilities & Energy Services team, but Gary Hall and Russ Wallace with Project Controls will be driving this project.   To meet the time frame, it is imperative that our teams are responsive to request from Project Controls.   Ben will work with Project Controls and Res Life to identify team members for this project.   I will expect that we could get started as early as this week with design.

les

Les Williams | Associate Vice President

Division of Operations

Facilities & Energy Services

1185 TAMU | College Station, TX 77843-1255

ph: 979.862.4470│leswilliams@tamu.edu

Texas A&M University

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Monday, February 19, 2024 9:18 AM
**To:** Williams, Les <leswilliams@tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>; Reber, Thomas W <treber@tamu.edu>; Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: Corps Facilities Brief Follow up

**Thanks Les.**

**We will need to discuss how we intend to pay for all of this. Res Life committed $2M for this construction project this Summer. Do we know who is going to pay the additional $575K if this is the plan we are going to execute this Summer?**

**I appreciate the update and look forward to the discussion.**

**Joe**

*BG Joe E. Ramirez, Jr*

*United States Army (Retired)*

*Vice President for Student Affairs*

*Texas A&M University*

---

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Friday, February 16, 2024 12:11 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter

<plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>
**Subject:** Re: Corps Facilities Brief Follow up

I need to update the price.  Ben pointed out that SSC did not include all the costs.  See the updated correspondence below.

---

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Friday, February 16, 2024 12:02 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Ballabina, Susan G <sg-ballabina@tamu.edu>; Lange, Peter <plange@tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Crawford, John W <crawford@tamu.edu>
**Cc:** Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>
**Subject:** Corps Facilities Brief Follow up

Here is an update on the Corps Renovation Project.   The Spaw Glass and Project Controls team has established that the three additional bathrooms are possible in the limited time frame. The total estimated cost will be **$2,575,000** and will require an approval to proceed by next Friday (February 23rd).

There are number of conditions which make this possible and they are:

1. All design and construction decisions will be made by the Project Manager, Project Control.
2. Project Manager will review and approve all contracts and invoices prior to forwarding to SSC for payment.
3. No occupancy of these three dorms will be permitted during the construction period.
4. Hours of contractor operation are 7:00am till 7:00pm 7 days per week.
5. The areas to be renovated will all be on the ground floor north end of Kiest, Gainer and Lacy.
6. The contractor will be allowed the use of Parking Lot #26 for a storage/laydown yard and contractor parking.
7. The general contractor's offices will be located on the second-floor study/office in the north end of the building.
8. Finishes and materials may be changed or modified by Project Manager based on market availability.
9. Due to the late start and accelerated schedule, HUB Participation will be a best effort by the Contractor but may not reach the TAMU intend goal of 21.1%.
10. A Notice to Proceed must be issued no later than Friday, February 23, 2024, to meet the Substantial Completion date of August 1, 2024.

Les Williams

Les Williams | Associate Vice President

Division of Operations

Facilities & Energy Services

1185 TAMU | College Station, TX 77843-1255

ph: 979.862.4470│leswilliams@tamu.edu

Texas A&M University

---

**From:** Garon, Michael <Michael.Garon@sscserv.com>
**Sent:** Friday, February 16, 2024 11:34 AM
**To:** Williams, Les <leswilliams@tamu.edu>
**Cc:** richard.gentry <richard.gentry@sscserv.com>; Heye, Jeff <Jeff.Heye@sscserv.com>; Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** Community Access Restroom Renovations || 2024-06316

**This Message is From an External Sender**
This message came from outside your organization

Les,

Project Controls and Spaw Glass have provided the following milestone schedule.

Notice to proceeds issued no later than Feb 23rd.

Design to commence Feb 24th.

Construction at site to commence May 13th.

Substantial completion on August 2nd.

Corps move-in August 5th.

The total anticipated cost is $2,318,235.87 ($772,745.29 per restroom)

## Michael Garon

Senior Construction Project Manager

Engineering, Design and Construction Services

**SSC Service Solutions |** 979-446-2506

1371 TAMU

College Station, TX  77843-1371

**Michael.Garon@sscserv.com**

A member of Compass Group PLC

**www.sscserv.com**

| | |
|---|---|
| **From:** | Rydl, Chareny L |
| **Sent:** | Tuesday, March 19, 2024 8:34 AM |
| **To:** | Webber, Rob W |
| **Subject:** | FW: Redesign of Corps RRs_Hallway Doors & Card Readers |

Just sharing all the conversations.

Chareny

**From:** Reber, Thomas W <treber@tamu.edu>
**Sent:** Tuesday, March 19, 2024 7:06 AM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Fwd: Redesign of Corps RRs_Hallway Doors & Card Readers

I wanted you to both know I received this e-mail this morning.  Tom
Sent from my iPhone

Begin forwarded message:

> **From:** "Williams, Les" <leswilliams@tamu.edu>
> **Date:** March 19, 2024 at 6:27:18 AM CDT
> **To:** Gary Hall <ghall@projectcontrol.com>, "Garon, Michael" <Michael.Garon@sscserv.com>, "richard.gentry" <richard.gentry@sscserv.com>, "Sasse, Ben" <bsasse@tamu.edu>, "Reber, Thomas W" <treber@tamu.edu>
> **Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>, Russ Wallace <russwallace80@gmail.com>, Sam Lampe <slampe@projectcontrol.com>
> **Subject: Re: Redesign of Corps RRs_Hallway Doors & Card Readers**
>
>
> This request was from the Corps.   I suggest you all sit down and discuss with them and Res Life and discuss.
> les

> **From:** Gary Hall <ghall@projectcontrol.com>
> **Sent:** Monday, March 18, 2024 4:57 PM
> **To:** Garon, Michael <Michael.Garon@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Williams, Les <leswilliams@tamu.edu>; richard.gentry <richard.gentry@sscserv.com>
> **Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Russ Wallace <russwallace80@gmail.com>; Sam Lampe <slampe@projectcontrol.com>
> **Subject:** RE: Redesign of Corps RRs_Hallway Doors & Card Readers

**This Message is From an External Sender**
This message came from outside your organization

Michael,

- 1529 -

Can you tell me who is requesting this, since this may shut this project down.  The Patterson construction documents for Spence Hall have been issued since October 20, 2023. Why is this coming up now?

This will mean a significant re-design effort for the team with additional costs if it can be done. The 1-hour fire wall will now remain at the corridor, instead of the interior of the room, which changes every interior measurement and with the entry door now opening into the space, the location of the hand sinks and dryers may not work.

As you know we are only 8 days from Design Development documents and the submittals for the Fiberglass Doors/Frames and Solid Surface showers are already in process. Based on the previous drawings the Subcontract Buyouts are to in process to be completed on the 28th.

If this is the case, then we will need to draft a different plan of action before we can commit to the summer schedule.

Please let me know if there are any questions.

Thank you,
Gary

**GARY W. HALL**
SENIOR VICE PRESIDENT



Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
**P** 979.458.7085  •  **C** 210.241.4154  •  ghall@projectcontrol.com

**Follow our latest news: <u>Project Control</u>  •  <u>PC Sports</u>  •  <u>Raba Kistner</u>  •  <u>LinkedIn</u>  •  <u>Facebook</u>**

*Purpose: To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality: Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257. This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process.  Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

---

**From:** Garon, Michael <Michael.Garon@sscserv.com>
**Sent:** Monday, March 18, 2024 3:17 PM
**To:** Sasse, Ben <bsasse@tamu.edu>; Sam Lampe <slampe@projectcontrol.com>; Gary Hall <ghall@projectcontrol.com>
**Cc:** Verr Soltes <verr.soltes@kirksey.com>; Garon, Michael <Michael.Garon@sscserv.com>; Garett Wheaton, LEED AP, AC <Garett.Wheaton@SpawGlass.com>
**Subject:** [EXTERNAL] RE: [Ext] Re: Corps RRs_Hallway Doors & Card Readers
**Importance:** High

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All,
I was informed today that TAMU is wanting us to keep the hallway entry doors and card readers.
This is a significant change but will alleviate the line of sight issue discussed below.

2

# Michael Garon

Senior Construction Project Manager
Engineering, Design and Construction Services
**SSC Service Solutions** | 979-446-2506

1371 TAMU
College Station, TX  77843-1371
**Michael.Garon@sscserv.com**

A member of Compass Group PLC

**www.sscserv.com**

**\*\*\*WARNING\*\*\*: This email originated from an external source and is potentially fraudulent. Do not click on links or attachments unless you are familiar with the sender.**

Understood, Sam.  Thanks for all your efforts.

Best,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                          | **bsasse@tamu.edu**

**This Message is From an External Sender**
This message came from outside your organization

Ben,

We were going to discuss this in the meeting today, but I remembered you were going to be out. Kirksey is going to proceed with Option #1 that you proposed. Option #2 was not going to be feasible to due the fast paced schedule. The main reason is Option #2 would require us to rework the riser chase between Shower 1 and Shower 2.

Thanks,
Sam Lampe

---

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                    | **bsasse@tamu.edu**

| From: | Williams, Gary W |
|---|---|
| **Sent:** | Monday, March 18, 2024 1:16 PM |
| **To:** | 'fred@patarch.com'; Garon, Michael; Doug Chmelar (Doug@QuadTex.net) |
| **Cc:** | Webber, Rob W |
| **Subject:** | Spence Hall Restroom Renovation |

All,

There has been a directive from the university to have an entry door into the restrooms with card access.  Looking at the plans, it appears that we should be able to leave the existing door in place and delete the "L" shaped wall.  I believe that Rob is in the process of verifying if that door currently has a card reader for access.

Please let me know if you have any questions or thoughts.

Thanks,
Gary

**Gary Williams |** Associate Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Suite 2701
1247 TAMU | College Station, TX 77843
P 979-845-7181 |                        | gary.williams@tamu.edu

| From: | Meredith Jr, Billy |
|---|---|
| **Sent:** | Friday, March 15, 2024 10:08 AM |
| **To:** | Rydl, Chareny L; Webber, Rob W; Sasse, Ben |
| **Cc:** | Simpson, Meredith M; Williams, Les; Reber, Thomas W |
| **Subject:** | Summer '24 Corps Restroom Updates |

Charney/Rob/Ben,

Meredith and I met with Les and Tom on Wednesday.  There is now a shared understanding among all parties. In summary, the following was agreed upon:

- All restrooms remodeled this summer will include exterior doors and swipe card access.  These are gendered bathrooms placarded "men" or "women" depending on the makeup of the cadet population in the fall.

We were given approval this morning to proceed as noted above.

Also discussed, but not approved, was the retention of an enclosed urinal.  The proposed design for toilets is approved.

-Bill


**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                        | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| From: | Sasse, Ben |
|---|---|
| Sent: | Tuesday, March 12, 2024 12:48 PM |
| To: | Rydl, Chareny L; Webber, Rob W |
| Cc: | Williams, Les |
| Subject: | FW: [EXTERNAL] Corps RRs |

Chareny/Rob:

FYI.

Ben

**From:** Sam Lampe <slampe@projectcontrol.com>
**Date:** Tuesday, March 12, 2024 at 11:38 AM
**To:** Sasse, Ben <bsasse@tamu.edu>, Gary Hall <ghall@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** RE: [EXTERNAL] Corps RRs

**This Message is From an External Sender**
This message came from outside your organization

Ben,

We were going to discuss this in the meeting today, but I remembered you were going to be out. Kirksey is going to proceed with Option #1 that you proposed. Option #2 was not going to be feasible to due the fast paced schedule. The main reason is Option #2 would require us to rework the riser chase between Shower 1 and Shower 2.

Thanks,
Sam Lampe

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                        | **bsasse@tamu.edu**

| | |
|---|---|
| **From:** | Sasse, Ben |
| **Sent:** | Friday, March 8, 2024 1:44 PM |
| **To:** | Rydl, Chareny L; Webber, Rob W |
| **Subject:** | RE: [EXTERNAL] Corps RRs |
| **Attachments:** | Lacy Restroom Options.pdf |

Here are two possible options to solve the line of sight issue.  Option 1 is easier but doesn't fix the problem entirely.  Option 2 would be better but not sure if this will fit and still maintain ADA clearance.  Kirksey would need to confirm in AutoCAD.

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                          | **bsasse@tamu.edu**

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:18 PM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>; Sasse, Ben <bsasse@tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Good catch.  I agree with your comment but not sure how it can be addressed.  Ben do you have any suggestions or thoughts?

Chareny

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:04 PM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; Sasse, Ben <bsasse@tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

The only one that I question is Lacy. Having shower stalls in plain view of the open hallway causes me to pause. Chareny did you have any concerns about that? The site lines of the other restrooms look okay.

Rob

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 11:57 AM
**To:** Sasse, Ben <bsasse@tamu.edu>
**Cc:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

They look good to me.

Chareny

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Friday, March 8, 2024 11:49 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Gary Hall <ghall@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Chareny/Rob:

Please see attached proposed plans for Kiest, Gainer and Lacy RRs.

Best,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                    | **bsasse@tamu.edu**

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Friday, March 8, 2024 11:36 AM
**To:** Garon, Michael <Michael.Garon@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Williams, Les <leswilliams@tamu.edu>
**Cc:** Lane Rutledge <lrutledge@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

**This Message is From an External Sender**
This message came from outside your organization

Great News!

**GARY W. HALL**
SENIOR VICE PRESIDENT



Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
P 979.458.7085  •  C 210.241.4154  •  ghall@projectcontrol.com

**Follow our latest news: Project Control  •  PC Sports  •  Raba Kistner  •  LinkedIn  •  Facebook**

*Purpose:* To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.
*Quality:* Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.

*TBPE Firm F-3257. This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

**From:** Verr Soltes <verr.soltes@kirksey.com>
**Sent:** Friday, March 8, 2024 11:27 AM
**To:** Gary Hall <ghall@projectcontrol.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>; Garett Wheaton <Garett.Wheaton@Spawglass.com>; Josh Farris <Josh.Farris@SpawGlass.com>; Zac Stevenson, PE <zacs@clearyzimmermann.com>; Michael Lindemann <mlindemann@kirksey.com>; Paul Gregg <Paul.Gregg@SpawGlass.com>; Julius Marzo <julius.marzo@kirksey.com>
**Subject:** RE: [EXTERNAL] Corps RRs

Gary-
Good morning.

Please see attached for our proposed floor plans for Kiest, Gainer, and Lacy Halls.
We met and are very happy to be able to present to you an option that kept 4 toilets and 5 showers. Another big positive is that this plan supports the Corp culture and will provide a toilet and shower per class. The variations from what we discussed Tuesday are the decision not to include an ambulatory toilet compartment and we have removed a sink but understand this was an add to Spence that was not program driven.

Please let me know if you need anything else to review and approve.
Have a great weekend!

**Verr Soltes, AIA, RID, LEED Green Assoc.**

Senior Associate

**Kirksey Architecture**

6909 Portwest Drive | Houston Texas 77024 | kirksey.com

o 713 426 7513 | m 832 835 8140 | verr.soltes@kirksey.com

Houston + Austin + Dallas

---

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Thursday, March 7, 2024 9:21 AM
**To:** Verr Soltes <verr.soltes@kirksey.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

Verr,

We can we expect revised plans based on our meeting.

Thank you,
Gary

**GARY W. HALL**
SENIOR VICE PRESIDENT



Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
P 979.458.7085 • C 210.241.4154 • ghall@projectcontrol.com

Follow our latest news: **Project Control** • **PC Sports** • **Raba Kistner** • **LinkedIn** • **Facebook**

*Purpose:* To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.
*Quality:* Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.

*TBPE Firm F-3257.* This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                    | **bsasse@tamu.edu**

**WARNING:** This email originated from **outside** of Kirksey Architecture. Please validate the sender's email address before clicking on links or attachments as they may not be safe.

3/8" = 1'-0"

6 LACY - PROPOSED PLAN | 1

2024020

NOT FOR REGULATORY APPROVAL, PERMITTING, OR CONSTRUCTION

DAVID L. MCLEMORE                    23 FEB 2024

0        1'-4"        2'-8"                    5'-4"

© 2024 Kirksey

**Kirksey**

| | |
|---|---|
| **From:** | Meredith Jr, Billy |
| **Sent:** | Friday, March 8, 2024 1:36 PM |
| **To:** | Rydl, Chareny L |
| **Cc:** | Meredith Jr, Billy; Webber, Rob W; Simpson, Meredith M |
| **Subject:** | RE: [EXTERNAL] Corps RRs |

Let me be perfectly clear.

This drawings are not approved.

They do not meet our requirements.


On Mar 8, 2024 1:18 PM, "Rydl, Chareny L" <chareny@reslife.tamu.edu> wrote:
I would recommend  you have a conversation with  Meredith and the Commandant.  This is on the fast track.  I have followed up with Ben Sasse who will follow up with Les Williams.

Chareny

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 12:21 PM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

I think it's immaterial whether its temporary or permanent.   The concept and requirement is the same.  I do not approve these drawings.

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                    | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:18 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Re: [EXTERNAL] Corps RRs

From memory the doors and urinals conversation was in regard to the temp spaces. The open entry was approved for the Spence renovation and these concepts were derived from that.

Rob

Sent from my iPhone

On Mar 8, 2024, at 12:16 PM, Meredith Jr, Billy <bmeredith@corps.tamu.edu> wrote:

The last I got from them was keep the urinals and the doors.  Who gave you different guidance?

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                              | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:14 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Billy you might want to talk to Meredith or the Commandant.  The direct given down on the bathrooms was removal of the urinals and no door if this has changed someone needs to speak up now.  This is on the fast track in order to meet several deadlines so if there are concerns, we need it ASAP.

Chareny

---

**From:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Sent:** Friday, March 8, 2024 12:11 PM
**To:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** RE: [EXTERNAL] Corps RRs

Rob,

The first thing that immediately jumps out at me is the proposals do not have any entry doors.  That is a non-starter.  The other is that all of the urinals were removed despite the our request to retain them.

I'll look at them in detail over next week and get back to you.

Thanks
Bill

**Bill Meredith '96** | LtCol, US Army (Ret.)
Director - Corps Logisitics
Texas A&M Corps of Cadets
1115 TAMU | College Station, TX 77843-1227

ofc: 979.845.0324 |                              | bmeredith@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

**From:** Webber, Rob W <rob_webber@reslife.tamu.edu>
**Sent:** Friday, March 8, 2024 12:05 PM
**To:** Meredith Jr, Billy <bmeredith@corps.tamu.edu>
**Cc:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Bill,

Well that was fast. I didn't see this in my email while I was typing my first response to you. We just got these for review. Any thoughts?

Thank you,
Rob

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Friday, March 8, 2024 11:49 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; Webber, Rob W <rob_webber@reslife.tamu.edu>
**Cc:** Williams, Les <leswilliams@tamu.edu>; Gary Hall <ghall@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs
**Importance:** High

Chareny/Rob:

Please see attached proposed plans for Kiest, Gainer and Lacy RRs.

Best,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                    | **bsasse@tamu.edu**

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Friday, March 8, 2024 11:36 AM
**To:** Garon, Michael <Michael.Garon@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Williams, Les <leswilliams@tamu.edu>
**Cc:** Lane Rutledge <lrutledge@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

**This Message is From an External Sender**
This message came from outside your organization

Great News!

**GARY W. HALL**
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
**P** 979.458.7085  •  **C** 210.241.4154  •  ghall@projectcontrol.com

Follow our latest news: **Project Control**  •  **PC Sports**  •  **Raba Kistner**  •  **LinkedIn**  •  **Facebook**

*Purpose:* To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.
*Quality:* Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.

*TBPE Firm F-3257.* This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.

**From:** Verr Soltes <verr.soltes@kirksey.com>
**Sent:** Friday, March 8, 2024 11:27 AM
**To:** Gary Hall <ghall@projectcontrol.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>; Garett Wheaton <Garett.Wheaton@Spawglass.com>; Josh Farris <Josh.Farris@SpawGlass.com>; Zac Stevenson, PE <zacs@clearyzimmermann.com>; Michael Lindemann <mlindemann@kirksey.com>; Paul Gregg <Paul.Gregg@SpawGlass.com>; Julius Marzo <julius.marzo@kirksey.com>
**Subject:** RE: [EXTERNAL] Corps RRs

Gary-
Good morning.

Please see attached for our proposed floor plans for Kiest, Gainer, and Lacy Halls.
We met and are very happy to be able to present to you an option that kept 4 toilets and 5 showers. Another big positive is that this plan supports the Corp culture and will provide a toilet and shower per class. The variations from what we discussed Tuesday are the decision not to include an ambulatory toilet compartment and we have removed a sink but understand this was an add to Spence that was not program driven.

Please let me know if you need anything else to review and approve.
Have a great weekend!

**Verr Soltes, AIA, RID, LEED Green Assoc.**

Senior Associate

**Kirksey Architecture**

6909 Portwest Drive | Houston Texas 77024 | kirksey.com

o 713 426 7513 | m 832 835 8140 | verr.soltes@kirksey.com

Houston + Austin + Dallas

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Thursday, March 7, 2024 9:21 AM

**To:** Verr Soltes <verr.soltes@kirksey.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

Verr,

We can we expect revised plans based on our meeting.

Thank you,
Gary

**GARY W. HALL**
SENIOR VICE PRESIDENT

<image001.jpg>

Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
**P** 979.458.7085 • **C** 210.241.4154 • ghall@projectcontrol.com

**Follow our latest news:** **Project Control** • **PC Sports** • **Raba Kistner** • **LinkedIn** • **Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257. This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

---

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                    | **bsasse@tamu.edu**

**WARNING:** This email originated from **outside** of Kirksey Architecture. Please validate the sender's email address before clicking on links or attachments as they may not be safe.

| | |
|---|---|
| **From:** | Sasse, Ben |
| **Sent:** | Friday, March 8, 2024 11:49 AM |
| **To:** | Rydl, Chareny L; Webber, Rob W |
| **Cc:** | Williams, Les; Gary Hall |
| **Subject:** | FW: [EXTERNAL] Corps RRs |
| **Attachments:** | 20240308_TAMU Corps Dorms - Restroom Plans.pdf |

**Importance:**        High

Chareny/Rob:

Please see attached proposed plans for Kiest, Gainer and Lacy RRs.

Best,

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 |                             | **bsasse@tamu.edu**

---

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Friday, March 8, 2024 11:36 AM
**To:** Garon, Michael <Michael.Garon@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Williams, Les <leswilliams@tamu.edu>
**Cc:** Lane Rutledge <lrutledge@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

**This Message is From an External Sender**
This message came from outside your organization

Great News!

**GARY W. HALL**
SENIOR VICE PRESIDENT



Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
P 979.458.7085  •  C 210.241.4154  •  ghall@projectcontrol.com

Follow our latest news: **Project Control**  •  **PC Sports**  •  **Raba Kistner**  •  **LinkedIn**  •  **Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257.* *This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

**From:** Verr Soltes <verr.soltes@kirksey.com>
**Sent:** Friday, March 8, 2024 11:27 AM
**To:** Gary Hall <ghall@projectcontrol.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>; Garett Wheaton <Garett.Wheaton@Spawglass.com>; Josh Farris <Josh.Farris@SpawGlass.com>; Zac Stevenson, PE <zacs@clearyzimmermann.com>; Michael Lindemann <mlindemann@kirksey.com>; Paul Gregg <Paul.Gregg@SpawGlass.com>; Julius Marzo <julius.marzo@kirksey.com>
**Subject:** RE: [EXTERNAL] Corps RRs

Gary-
Good morning.

Please see attached for our proposed floor plans for Kiest, Gainer, and Lacy Halls.
We met and are very happy to be able to present to you an option that kept 4 toilets and 5 showers. Another big positive is that this plan supports the Corp culture and will provide a toilet and shower per class. The variations from what we discussed Tuesday are the decision not to include an ambulatory toilet compartment and we have removed a sink but understand this was an add to Spence that was not program driven.

Please let me know if you need anything else to review and approve.
Have a great weekend!

**Verr Soltes, AIA, RID, LEED Green Assoc.**

Senior Associate

**Kirksey Architecture**

6909 Portwest Drive | Houston Texas 77024 | kirksey.com

o 713 426 7513 | m 832 835 8140 | verr.soltes@kirksey.com

Houston + Austin + Dallas

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Thursday, March 7, 2024 9:21 AM
**To:** Verr Soltes <verr.soltes@kirksey.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** FW: [EXTERNAL] Corps RRs

Verr,

We can we expect revised plans based on our meeting.

Thank you,
Gary

GARY W. HALL

SENIOR VICE PRESIDENT



Project Control • 301 Tarrow Street, 2nd Floor • College Station, Texas 77840
P 979.458.7085 • C 210.241.4154 • ghall@projectcontrol.com

**Follow our latest news: Project Control • PC Sports • Raba Kistner • LinkedIn • Facebook**

*Purpose:* To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.
*Quality:* Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.

*TBPE Firm F-3257.* This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.

**From:** Sasse, Ben <bsasse@tamu.edu>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** Gary Hall <ghall@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Cc:** Garon, Michael <Michael.Garon@sscserv.com>
**Subject:** [EXTERNAL] Corps RRs

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gary/Sam:

When do we expect to have updated plans from this past Tuesday's meeting to review with ResLife?

Please note I will be out of office next Tuesday 3/12 and will miss the OAC meeting.

Ben

**Ben Sasse** | Director
Campus Construction Management
Facilities & Energy Services
Division of Operations | Texas A&M University

General Services Complex, Bldg. 1800
750 Agronomy Road (corner of Agronomy and F&B Road), Suite 2701
1247 TAMU | College Station, TX 77843
P 979.458.5238 | | **bsasse@tamu.edu**

**WARNING:** This email originated from **outside** of Kirksey Architecture. Please validate the sender's email address before clicking on links or attachments as they may not be safe.

3/8" = 1'-0"    2 KIEST - RESTROOM DEMOLITION PLAN | 1

NOTE:
DASHED LINES INDICATE ITEMS TO BE DEMOLISHED

2024020
NOT FOR REGULATORY APPROVAL, PERMITTING, OR CONSTRUCTION
DAVID L. MCLEMORE                    23 FEB 2024

0    1'-4"    2'-8"    5'-4"



© 2024 Kirksey

3/8" = 1'-0"

2 KIEST - PROPOSED PLAN │ 1

2024020

NOT FOR REGULATORY APPROVAL, PERMITTING, OR CONSTRUCTION

DAVID L. MCLEMORE                    23 FEB 2024

0        1'-4"        2'-8"                    5'-4"

© 2024 Kirksey

Kirksey

3/8" = 1'-0"

5 GAINER - RESTROOM DEMOLITION PLAN | 1

NOTE:
DASHED LINES INDICATE ITEMS TO BE DEMOLISHED

2024020

0    1'-4"    2'-8"        5'-4"

NOT FOR REGULATORY APPROVAL, PERMITTING, OR CONSTRUCTION

DAVID L. MCLEMORE                    23 FEB 2024



© 2024 Kirksey

3/8" = 1'-0"

5 GAINER - PROPOSED PLAN | 1

2024020

NOT FOR REGULATORY APPROVAL, PERMITTING, OR CONSTRUCTION

DAVID L. MCLEMORE                    23 FEB 2024

0        1'-4"        2'-8"                5'-4"

**Kirksey**
ARCHITECTURE

© 2024 Kirksey

3/8" = 1'-0"        6 LACY - RESTROOM DEMOLITION PLAN │ D

NOTE:
DASHED LINES INDICATE ITEMS TO BE DEMOLISHED

2024020

NOT FOR REGULATORY APPROVAL, PERMITTING, OR CONSTRUCTION

DAVID L. MCLEMORE                    23 FEB 2024

0        1'-4"        2'-8"                5'-4"

**Kirksey**
ARCHITECTURE

© 2024 Kirksey

3/8" = 1'-0"

6 LACY - PROPOSED PLAN | 1

2024020

NOT FOR REGULATORY APPROVAL, PERMITTING, OR CONSTRUCTION

DAVID L. MCLEMORE                    23 FEB 2024

0    1'-4"    2'-8"        5'-4"

**Kirksey**
ARCHITECTURE

© 2024 Kirksey

| From: | Rydl, Chareny L |
| --- | --- |
| Sent: | Wednesday, February 21, 2024 11:46 AM |
| To: | Webber, Rob W; Krenz, Michael D; Johannes, Andrea K |
| Subject: | FW: Completed: "ExAuth - Kiest Gainer Lacy RR Construction" |
| Attachments: | ExAuth - Kiest Gainer Lacy RR Construction - signed.pdf |

FYI

Chareny

**From:** Adobe Acrobat Sign on behalf of Texas A&M University <adobesign@adobesign.com>
**Sent:** Wednesday, February 21, 2024 9:03 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Subject:** Completed: "ExAuth - Kiest Gainer Lacy RR Construction"

**This Message Is From an External Sender**

This message came from outside your organization.

All parties finished

**ExAuth - Kiest Gainer Lacy RR Construction**

**Open agreement**

Attached is the final agreement between:

- Texas A&M University
- Chareny Rydl
- Ben Sasse and 1 more

Read it with **Acrobat Reader**. You can also **open it online** to review its activity history.

Provided by Texas A&M Technology Services.
For more information contact adobe@tamu.edu.

Need your own documents signed? Adobe Acrobat Sign can help save you time. **Learn more**.

To ensure that you continue receiving our emails, please add adobesign@adobesign.com to your address book or safe list.

© 2024 Adobe. All rights reserved.

# TAMU CAMPUS CONSTRUCTION MANAGEMENT (CCM)

# FACILITIES EXPENSE AUTHORIZATION FORM

## February 20, 2024

| Project File Name | Restroom Renovations – Kiest, Gainer and Lacy (Construction Approval) | | |
|---|---|---|---|
| Requesting Unit | Facilities & Energy Services | Requestor's Name | Les Williams |
| Project Name | Restroom Renovations – Kiest, Gainer and Lacy | Project Number | TBD |
| Budget (attach estimate) | See below | Project Location | 0401 KIES<br>0404 GAIN<br>0405 LACY |
| Budget Modification (attach estimate) Revised Budget (with modification(s)) | Total estimated project cost (see attached): $2,575,000<br>Less original approval for feasibility study: ($242,550)<br>Additional Funding Required: $2,332,450 | Anticipated Funding Sources | % Dept.:<br>% Other: 100% |
| Funding Account Number(s) | 02-808815-00000 | Estimated Start & End Dates | February 2024 – August 2024 |

*Request will not be considered unless all fields are completed.*

| Project Description: | Design and construct three (3) each community access restroom renovations to be completed during summer 2024. One restroom on the ground floor in each of Kiest, Gainer and Lacy Halls will be modified. |
|---|---|
| Project Justification: | Title IX compliance. |

**Recommended for Approval by:**

*Chareny Rydl*                                    02/20/2024
Chareny Rydl (Feb 20, 2024 10:01 CST)
Chareny Rydl, Executive Director            Date
Residence Life and Housing
Division of Student Affairs

*Benjamin Sasse*
Ben Sasse, Director                              Date
Campus Construction Management
Facilities and Energy Services
Division of Operations

**Approved by:**

*L Williams*                                        02/21/2024
Les Williams, Associate Vice President of      Date
Facilities and Energy Services
Division of Operations



January 22, 2024

Mr. Richard Gentry
Regional Vice President
Facilities Services
The Texas A&M University System
600 Agronomy Road
College Station, Texas 77840

Re:     Project Control Program/Project Management
        Proposal for Texas A&M University Facilities Services – Renovation of Corp Cadet Dorm Restrooms
        Purchase Order No. – TBD

Dear Mr. Gentry:

Project Control is pleased to be working with Texas A&M University Facilities Services on the project at Texas A&M University for the Renovation of Corp Cadet Dorm Restrooms.

Our team has brought together the most experienced and talented design and construction professionals to assist you with this project. Mr. Gary W. Hall, Senior Vice President of Project Control will serve as Project Director, Gary has been with Project Control over 36 years and has worked on several major projects including the Kyle Field Stadium Redevelopment Project including the current West Player Development Center, Davis Diamond Softball Complex, E.B. Cushing Track and Field Project and numerous other large and complex projects. Supporting Gary will be Sam Lampe as Senior Program/Project Manager, Lane Rutledge as Senior Inspector/Project Manager and Mark Benton as Project Manager. Assisting us will be Russ Wallace, with Russ Wallace Consulting, L.P.  for our institutional consultant.

Our typical scope of services is attached for your review. Based on the project information and schedules provided, we propose to provide all the required program/project management for 9 months from January 22, 2024, through October 22, 2024, for design, construction, and close-out services for a not to exceed amount of Two Hundred Twenty-Five Thousand Dollars ($225,000) to be billed at a flat rate of Twenty-Five Thousand Dollars ($25,000) per month. All reimbursable expenses and inspection services are included within this cost.

We are honored to have this opportunity to work for the Texas A&M University Facilities Services. Please do not hesitate to call if you have any questions.

Very truly yours,

**Gary W. Hall**
Senior Vice President
Project Control

**Typical Scope of Services for Pre-Construction Services, Bidding, Construction Services and Project Close-out**

## I. Pre-Construction Services

- Assist Texas A&M University System and Design Team in negotiation the project.
- Assist Texas A&M University System in pre-bid conferences.
- Assist Texas A&M University System at bid openings.
- Recommend bid alternates to be accepted.
- Assist in reporting the outcome of bid openings.
- Evaluate bids for compliance with the project budget and schedule.
- Review the preparation of the Construction Manager Subcontractor's agreements.
- Review bond and insurance forms for compliance with the contract requirements.
- Assist the Texas A&M University System and the Design Team in pre-construction conferences.
- Review all invoices associated with the project for conformance to contract requirements and bond requirements.
- Recommend Texas A&M University System amounts to be paid on invoices.

## II. Design Development Phase

- Ensure proper communication between architects, staff, and administration.
- Chair design meetings with architects every two weeks or more often when appropriate.
- Produce and distribute minutes of all design meetings.
- Monitor activities of architects to make certain compliance with the desires of the Texas A&M University System.
- Monitor progress of the architects as it relates to project schedules.
- Cause the architects to make presentations to Texas A&M University System at appropriate intervals.
- Monitor designs to ensure they are within budget parameters.
- Review all invoices associated with the projects for conformance to contract requirements.
- Recommend to Texas A&M University System amounts to be paid on invoices.
- Maintain invoice approval logs showing amounts billed and amounts paid.
- Make recommendations regarding any special consultants that are needed.
- Assist Texas A&M University System and architects in identifying and retaining special consultants.
- Coordinate approvals by regulatory agencies.
- Assist Texas A&M University System in other matters as requested by Texas A&M University System.
- Serve as focal point for all project-related activities.
- Report to Texas A&M University System as required or needed.
- Recommend appropriate action should budget or schedule deviations arise.

## III. Construction Documents Phase

- Ensure proper interaction between architects, staff, and administration.
- Chair design meetings with architects every two weeks or more often when appropriate.
- Produce and distribute minutes of all design meetings.
- Monitor activities of architects to make certain compliance with the desires of the Texas A&M University System.
- Monitor progress of the architects as it relates to project schedules.
- Cause the architects to make presentations to Texas A&M University System at appropriate times.
- Monitor designs to ensure they are within budget parameters.
- Review documents with the Texas A&M University System's maintenance staff.
- Recommend design optimization options for the Texas A&M University System's consideration.
- Recommend bid alternates where appropriate.
- Review all invoices associated with the projects for conformance to contract requirements.

- Recommend Texas A&M University System amounts to be paid on invoices.
- Maintain invoice approval logs showing amounts billed and amounts paid.
- Coordinate approvals by regulatory agencies.
- Serve as focal point for all project related activities.
- Report to the Texas A&M University System as required or needed.
- Recommend appropriate action should budget or schedule deviations arise.
- Prepare draft agreements for general contractor services.

## IV. Bidding and Negotiation Phase
- Assist Texas A&M University System and architects in bidding projects.
- Assist Texas A&M University System in pre-bid conferences.
- Assist Texas A&M University System at bid openings.
- Recommend bid alternates to be accepted.
- Report outcome of bid openings.
- Evaluate bids for compliance with project budgets and schedules.
- Review bond and insurance forms for compliance with the contract requirements.
- Issue notices to proceed to construction manager.
- Assist Texas A&M University System and architects in preconstruction conferences.
- Review all invoices associated with the projects for conformance to contract requirements.
- Recommend Texas A&M University System amounts to be paid on invoices.

## V. Construction Phase
- Chair construction phase meetings with architects and contractors every two weeks.
- Produce minutes of all construction project meetings.
- Monitor activities of architects and contractors to ensure compliance.
- Monitor progress of the contractors as it relates to the project schedules.
- Make recommendations on proposed changes to construction.
- Monitor and update budgets.
- Recommend corrective action regarding budget or schedule deviations.
- Review all invoices associated with the projects for conformance to contract requirements.
- Recommend to Texas A&M University System amounts to be paid on invoices.
- Monitor the establishment of substantial completion dates.
- Monitor the progress of punch list completion.
- Monitor completion of as-built documents and operations and maintenance manuals.
- Monitor maintenance staff training sessions.
- Make recommendations regarding final payments to contractors and architects.
- Monitor LEED documentation status.

## VI. Post Construction Phase
- Follow up as requested by Texas A&M University System.
- Monitor turnover of all as-built documentation, warranties, manuals and training.
- Monitor timely correction of warranty work by contractors.
- Assist Texas A&M University System in moving to new facilities.
- Recommend Texas A&M University amounts to be paid on invoices.

| From: | Rydl, Chareny L |
|---|---|
| Sent: | Wednesday, February 7, 2024 4:44 PM |
| To: | Webber, Rob W; McCracken, Kyle R; Krenz, Michael D |
| Subject: | FW: Recommendation for Design/Build Contractor for Corps Dorm Restroom Renovation Project |
| Attachments: | Les Williams Memo 02.02.2024.pdf |

FYI

Chareny

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Wednesday, February 7, 2024 1:53 PM
**To:** Reber, Thomas W <treber@tamu.edu>; Rydl, Chareny L <chareny@reslife.tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Subject:** FW: Recommendation for Design/Build Contractor for Corps Dorm Restroom Renovation Project

**All – Just FYI.**

## *BG Joe E. Ramirez, Jr*
## *United States Army (Retired)*
## *Vice President for Student Affairs*
## *Texas A&M University*

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Monday, February 5, 2024 11:06 AM
**To:** Russ Wallace <russwallace80@gmail.com>; Gary Hall <ghall@projectcontrol.com>; Jeff W. Heye <jeff.heye@sscserv.com>; richard.gentry <richard.gentry@sscserv.com>; Sasse, Ben <bsasse@tamu.edu>; Gonzales, Lilia Y <lilia.gonzales@tamu.edu>; Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>; Hartman, Greg <ghartman@tamu.edu>; Lange, Peter <plange@tamu.edu>
**Cc:** Jo Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** Re: Recommendation for Design/Build Contractor for Corps Dorm Restroom Renovation Project

Russ and Gary,

Thank you for the update.  We are in support of Spaw Glass so please continue with them.  As we move forward, I want to ensure that we have established that your contract is with SSC and any subsequent contract to perform the work will also be through SSC.  I believe Ben is taking steps to ensure that is the case.   In the meantime, I am copying Jeff Heye, Richard Gentry, Ben Sasse and Lilia.  If anyone disagrees with the Spaw Glass recommendation, please indicate in a reply.

Our next step will be order of magnitude pricing so please include the SSC team, Ben and Lilia in these discussions.  Ben will be the point for TAMU (and will coordinate with other TAMU stakeholders) but Lilia will be engaged on design considerations.  Once we have the pricing, a go / no go decision can be made.

les

---

**From:** Russ Wallace <russwallace80@gmail.com>
**Sent:** Monday, February 5, 2024 9:10 AM
**To:** Williams, Les <leswilliams@tamu.edu>
**Cc:** Gary Hall <ghall@projectcontrol.com>; Jo Winfrey <jwinfrey@projectcontrol.com>; Sam Lampe <slampe@projectcontrol.com>
**Subject:** Re: Recommendation for Design/Build Contractor for Corps Dorm Restroom Renovation Project

| This Message Is From an External Sender |
|---|
| This message came from outside your organization. |

I agree with Gary on the recommendation to select SpawGlass, and would like to receive approval as soon as possible so we can engage them to assist with the Order of Magnitude pricing effort. Les, is there anything more you need in regards to the Project Control recommendation? If so, please let us know and we'll jump right on it. Thanks.
Russ Wallace
Sent from my iPhone

> On 2 Feb 2024, at 2:54 p.m., Gary Hall <ghall@projectcontrol.com> wrote:

Les,

We are working on the Project Budget and should have it to you by early next week. We will be using the existing information on Spence to develop our budget along with our best estimation of time/costs.

Both contractors said they could get to a magnitude estimate in about 5 days. Our hope was to get your agreement on our recommendation and then work with the selected contractor for their pricing. It is a little unfair to asked both to take time away from their other projects to provide an estimate. The other issue asking both for a free estimate, is the accuracy of their estimate. If they know they are estimating/bidding to get the job, there might be a tendency to under bid. The more it's their skin in the game the better the estimate.

Spaw Glass proposed to use the existing Patterson construction documents and take those to the subs for bidding, while developing the construction documentation for the other three. This could dramatically improve our time to get the submittals started and provide a much clearer picture of the construction costs. The construction documents for each location will need to be adjusted based on the specifics of each location, but given their experience with the buildings, they do not believe it would be significant cost.

Russ,

Please let us know your thoughts.

Thank you,
Gary

**GARY W. HALL**
SENIOR VICE PRESIDENT



Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
**P** 979.458.7085  •  **C** 210.241.4154  •  ghall@projectcontrol.com

**Follow our latest news:** **Project Control** • **PC Sports** • **Raba Kistner** • **LinkedIn** • **Facebook**

*Purpose:* *To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.*
*Quality:* *Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.*

*TBPE Firm F-3257.* *This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process. Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*

**From:** Williams, Les <leswilliams@tamu.edu>
**Sent:** Friday, February 2, 2024 1:50 PM
**To:** Gary Hall <ghall@projectcontrol.com>; Russ Wallace <russwallace80@gmail.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>
**Subject:** Re: Recommendation for Design/Build Contractor for Corps Dorm Restroom Renovation Project

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Thank you....any thoughts on costs?

les

---

**From:** Gary Hall <ghall@projectcontrol.com>
**Sent:** Friday, February 2, 2024 1:48 PM
**To:** Williams, Les <leswilliams@tamu.edu>; Russ Wallace <russwallace80@gmail.com>
**Cc:** Jo Lynn Winfrey <jwinfrey@projectcontrol.com>
**Subject:** Recommendation for Design/Build Contractor for Corps Dorm Restroom Renovation Project

**This Message Is From an External Sender**
This message came from outside your organization.

Les,

Please see our analysis of our interviews for the proposed Corp Dorm Restroom Renovation Project.

Please let me know if you have any questions.

Thank you,
Gary

**GARY W. HALL**
SENIOR VICE PRESIDENT



Project Control  •  301 Tarrow Street, 2nd Floor  •  College Station, Texas 77840
**P** 979.458.7085  •  **C** 210.241.4154  •  ghall@projectcontrol.com

**Follow our latest news: Project Control  •  PC Sports  •  Raba Kistner  •  LinkedIn  •  Facebook**

*Purpose:* To provide professional consulting services with passion and integrity, to help build a better world for our employees, their families, our clients, and the communities we serve.
*Quality:* Raba Kistner, Inc. is committed to delivering our services right, the first time, on time, every time.

*TBPE Firm F-3257. This electronic communication and its attachments contain confidential information. They are forwarded to you without passing through our standard review process.  Design data and recommendations included herein should not be used for final design. If you have received this information in error, please notify the sender immediately.*



# Memo

**To:**        Les Williams

**From:**      Gary W Hall

**cc:**        Richard Gentry, Russ Wallace

**Date:**      February 2, 2024

**Re:**        TAMU Corps Dorm Restroom Renovation Project

---

Les,

We have met with both J. T. Vaughn Construction and SpawGlass to discuss this project. Both companies are willing and able to complete the work. We have evaluated both companies based on the following criteria and provided our analysis of who we felt was the best in each.

1. **Job Interview/Preparedness**
   Both teams did an excellent job of describing how they would approach this job and what they felt were the challenges that needed to be met to successfully execute the project. SpawGlass, however, produced much more specific information about how the project would be executed, including specific examples of conditions that needed to be addressed. They prepared a schedule to indicate how the completion could be achieved and spoke more specifically about site and existing building conditions that would need to be addressed. They suggested which end on the three (3) dorms would be easiest to access and minimize the disruption to the rest of the dorm and the surrounding area.
   **Advantage – SpawGlass**

2. **Strength of the Proposed Design Team**
   Vaughn proposed to use an in-house architect that has considerable TAMU experience. It was unclear how much additional support this individual might have to perform for the architectural design for this project. Spaw proposes to bring on Kirksey as it's A/E consultant and proposed that the designer be the individual that was a key design team member on the previous Corps Dorm renovations performed by SpawGlass. Both teams proposed the use of the local office of Cleary Zimmerman, who prepared the MEP documents for the single Corp Dorm restroom renovation being performed by QuadTex. To us, the specific knowledge of the Corps Dorms by the Kirksey representative, as well as the deeper resources that Kirksey could apply to this project when needed is a differentiator for the SpawGlass team.
   **Advantage – SpawGlass**

3. **Strength of the Proposed Construction Team**
Both firms proposed excellent personnel for this project. The two (2) proposed superintendents for Vaughn both have worked with TAMU and Project Control on past projects with excellent results. Vaughn is supporting this team primarily from its Bryan office, so there will be local executive level support. SpawGlass also proposed that the project be managed by its local office, headed by Garrett Wheaton. Spaw proposed that Layton Muir be the full-time senior project superintendent. Layton has worked successfully on past TAMUS projects with excellent results. The superintendent for Spaw had considerably less experience than the superintendents proposed by Vaughn.
**Advantage – Vaughn**

4. **Past Experience with Project TAMU**
Both teams have worked extensively for TAMU and TAMUS over the years. The Vaughn team has considerably more recent special projects at TAMU than does the SpawGlass team.
**Advantage – Vaughn**

5. **Past Experience with Corps Dorms**
Both Vaughn and SpawGlass have performed earlier Corps Dorm renovation projects. Vaughn did a single corps dorm renovation, while SpawGlass performed a complete renovation of (9) Corps Dorms, as well as a complete redevelopment of the Quad over a 2-year period.
**Advantage – SpawGlass**

6. **Current Work Loads**
Vaughn is currently booked for numerous projects on campus for the summer months with SSC. Of most critical is the high-profile renovation for the Board of Regents in the MSC. There is some concern that due to the type of project and the short duration this work could negatively affect their other projects on campus. SpawGlass does not have any current projects with SSC slated for this summer.
**Advantage – SpawGlass**

**Conclusion and Recommendation**
As has been previously discussed, either of these teams is fully capable of performing this project. The interview process reinforced our belief that both teams would be able to fulfill the conditions we have set forth. Vaughn's distinct advantage strength of the project personnel they propose, and the familiarity of Project Control with those proposed individuals. SpawGlass' advantage is familiarity with the specific project conditions gained through the nine (9) dorm renovations. Given the political attention that is affiliated with this project, we believe choosing the team with the most extensive past experience with the Corps Dorms, and the team that demonstrated its desire for the work through the effort and level of detail it demonstrated in the interview is the best choice. Therefore, we recommend we award the project to SpawGlass.

# Asbestos Inspection Request



TAMU Environmental Health & Safety
4472 TAMU
1111 Research Parkway, Suite 220
College Station, TX 77845-4472

979.845.2132 (p)
979.845.1348 (f)
http://ehsd.tamu.edu
ehsd-asbestos@tamu.edu

**EXHIBIT**
**42**

Print Form

| | |
|---|---|
| **Date:** | Feb 22, 2024 |
| **SSC/Compass - Work Order #:** | 2024-06316 |
| **All Other Requestors - Account #:** | |

Must have 1 or 2 as first digit of main account number. For example: **02-100020-90004 or 270003**

| | |
|---|---|
| **Project Start Date:** | May 13, 2024 |

**Is survey report requested within five business days, thus pre-approving all RUSH charges?**   ◯ **Yes**   ⦿ **No**

**Requested By:**

| | |
|---|---|
| **Name:** | Michael Garon |
| **Email:** | michael.garon@sscserv.com |
| **Phone:** | 979.446.2506 |

**Location Information:**

| | |
|---|---|
| **Building Name:** | Kiest, Gainer & Lacey |
| **Building Number:** | 0401, 0404, 040⊞ |
| **Room No./Area:** | Ground Floor Restrooms (one per building) |
| **Specific Location:** | Entire room |
| **Materials to be Disturbed:** | Drywall, pipe insulation above ceiling, ceramic tile. |

For example: West wall, ceiling, floor, etc.

**Access to Area:**

| | |
|---|---|
| **Restricted Access?:** | |
| **Contact for Access: (Name & Phone #)** | |
| **Confined Space?:** | |
| **Any other hazards or restrictions:** | This is currently a womens restroom/shower area. |

**Send Report & Invoice To:**
⦿ Requestor
◯ Other

| | |
|---|---|
| **Name:** | |
| **E-mail:** | |
| **Contact for Billing Questions: (Name & Phone #)** | |

**Estimated Budget for Inspection:**  $3000

**Additional Notes :**

This room is currently in use as a womens restroom and shower area. We will be renovating the room during the summer of 2024, but need to have an asbestos survey accomplished in late February to early March 2024, in order to have information for design and bidding.
Please see attached demolition plans for additional information. The work will take place in the first floor restrooms at the north end of each of the 3 dorms.
A survey was completed for Spence hall restroom in late 2023, with all samples coming back negative. All dorms were renovated at the same time by the same contractor in 2019.

**Describe the scope of work. Please attach any supporting documents (plans, drawings, work order, etc.) :**

All wall, floor and ceiling finishes will be removed during construction. Mastic on ductwork above ceiling will be disturbed. There are access panels in the room for above ceiling inspection.

**Internal Use Only**

| Inspector | Survey Date | # of Samples | Report Date |
|---|---|---|---|
| | | | |

SSC Services for Education
Facilities Services
Revised 05/2023

EXHIBIT
43

Reset Form          COLLEGE STATION PROJECT SUMMARY/INITIAL MEETING FORM

Project Title: Kiest Hall - Dorm 2 Feasibility Study for Restroom Renovation

Project #:   2024-06316

Bldg Name: Kiest, Gainer & Lacey                    Bldg #: 0401, 0404, 0405

Date:        02/21/2024                             Time:   NA

IN ATTENDANCE (Sign-In Sheet)

| **Name** | **Office/Representing** | **Phone** | **Email** |
|---|---|---|---|
| Michael Garon | EDCS | | |
| Ben Sasse | CCM | | |
| | | | |
| | | | |
| | | | |
| | | | |

AGENDA ITEMS FOR DISCUSSION

1. Project Location (Room #s/Area of Bldg): 1st floor restrooms in the 3 dorms mentioned above

2. Client Representative (Direct POC for SSC PM, eB Details Pg): Ben Sasse

3. Budget Approver in eB (Client ROLE): Ben Sasse

4. Other Stakeholders (Cannot view costs in eB, but can see other things):

5. Other Financial Stakeholders (Can view costs in eB): Chareny Rydl & Rob Webber

6. Building Proctor:

7. Account Number (Must be provided before BA is submitted): 02-808815-00000    -OR- ☐ **TBD** (to be determined)

8. Client's Stipulated Budget (if known): 2,750,000

9. If #8 above is left blank, check one of the estimated budget ranges: ☐ $0 - $100,000  ☐ $100,001 - $1,000,000  ☐ $1,000,001 - $4,000,000  ☐ $4,000,001 - $10,000,000

10. Project Time Frame:

   a. Critical Start Date: 02/23/2024   -OR- ☐ **TBD** (to be determined)

   b. Critical Finish Date: 08/02/2024   -OR- ☐ **TBD** (to be determined)

## PROJECT SUMMARY/INITIAL MEETING FORM

Project Title: Kiest Hall - Dorm 2 Feasibility Study for Restroom Renovation

Project #: 2024-06316

Bldg Name: Kiest, Gainer & Lacey          Bldg #: 0401, 0404, 0405

Date: 02/21/2024          Time: NA

11. Scope of Work: Renovate (1) community restroom on the first floor of each of the (3) dorms. Finished restrooms will have fully enclosed toilet, shower and dressing compartments. All work is to take place during the 2024 summer semesters. Project Control will provide overall management of the project. Spaw Glass will provide construction services and Kirksey Architecture will provide design services.

12. Materials to be Disturbed (if applicable) for Asbestos Inspection Request: Drywall ceilings, pipe insulation

13. A/E Required? (see below/refer to Arch/PE Flow Charts for further details:  ☒ **YES** ☐ **NO** ☐ **TBD**
    a. Arch: New bldg. or Alteration estimated to be over $50k that includes modifications to walls, doors, etc. that alters the path of egress
    b. Eng: $8k+ in modifications to Mech (HVAC & Plumbing)/Elec, $20k+ other modifications (Civil, Structural, Other)

    If yes, Client's Preferred A/E: _____          ☐ **TBD**   ☐ **RFQ** (see below):

        - RFQ (Request for Qualifications) **required** to be posted on TX Smart Buy for a *minimum* of 10 business days if project amount is estimated to be greater than $4mil OR if Client would like to utilize A/E other than one of those selected via previous SSC A/E IDIQ RFQ (Note that this will add a minimum of 4-6 weeks to the project schedule)

14. If no A/E, does project still need to be registered with TDLR for TAS Compliance? (see below):  ☐ **YES**   ☐ **NO**   ☐ **TBD**
    a. Modification that affects the usability of the space, e.g. changes to walls/doors, exit path, replacing flooring, etc. and Construction costs exceed $50k
    b. if Yes/TBD, engage SSC Arch or RAS to determine required scope PRIOR to final proposal from Contractor

15. Contractor Procurement Method (see below for details):

    ☐ **Informal Proposals** (Min of 3 must be *requested*): Allowable if project budget estimated to be under $25k; lowest price required to be selected

    ☐ **CSP** (Competitive Sealed Proposal) Posted on Texas Smart Buy (*min* of 10 business days): Required on estimated project budgets over $1mil (or if Client requests regardless of dollar amount). *Note: posting CSP requires an A/E to complete construction documents, regardless of whether or not the scope requires an A/E, adding cost and time to project schedule

## PROJECT SUMMARY/INITIAL MEETING FORM

Project Title: Kiest Hall - Dorm 2 Feasibility Study for Restroom Renovation

Project #:   2024-06316

Bldg Name:  Kiest, Gainer & Lacey                    Bldg #:  0401, 0404, 0405

Date:        02/21/2024                     Time:   NA

☐ **MSA** (Master Service Agreement): Single Trade Sub, Allowable for contract amount up to $250k

☒ **JOC** (Job Order Contract): General Contractor, Allowable if <u>project</u> budget estimated to be under $1mil

☐ **DB** (Design Build) Posted on Texas Smart Buy: Project delivery system in which the design and construction team works under a single contract with project owner to provide design and construction service

☐ **CMAR** (Construction Manager at Risk) Post on Texas Smart Buy: Delivery method which entails commitment by the Construction Manager at Risk (CMAR) to deliver a project within a Guaranteed Maximum Price (GMP) based on construction document and specifications at the time of the GMP

☐ **State Cooperative** (Similar rules as MSA): Requested Vendor is contractor on an approved State Coop or other University/System MSA (Confirm with University Procurement Coordinator)

☐ **Sole Source Requested:**

 - Contractor:

 - Reasoning:

(Separate Sole Source Justification Form, if applicable, must be completed and verified by TAMU Procurement office prior to Budget Approval submission)

16. Other Meeting Minutes/Notes: Project Control will be utilized under the TAMUS agreement and set up in eBuilder as a new vendor. SSC will charge 3% admin fees and will have limited participation & coordination of the project. CCM will manage Project controls.

Michael Garon
Digitally signed by Michael Garon
Date: 2024.02.21 10:47:23 -06'00'

SSC Project Manager                                    Date

SSC Sr. Program Mgr./RDO-P (Review)                    Date

Client Representative                                  Date

EXHIBIT

44

CAUSE NO. 24-000902-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## FOURTH BUSINESS RECORDS AFFIDAVIT

State of Texas          §
County of Brazos      §

Before me, the undersigned notary, on this day personally appeared Tricia Bledsoe, the affiant, whose identify is known to me. After I administered an oath, the affiant testified as follows:

1.  My name is Tricia Bledsoe, and I am over the age of 18 years of age, of sound mind, capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.  I am currently employed as the Director and designated Public Information Officer of Texas A&M University's (TAMU) Office of Open Records (ORO) and in this capacity am the primary custodian of the records identified herein by virtue of my duties and responsibilities.

3.  The records identified in this affidavit and attached to Defendant's First Amended Plea to the Jurisdiction by exhibit number as business records are as follows:

    **Exhibit 39**: J1723 Notice of Project w weblink for meeting (1 pg)
    **Exhibit 40**: J1723 production part 1 (633 pgs)
    **Exhibit 41**:J1723 production part 2 (108 pgs)
    **Exhibit 42**: J1723 production part 3 (1 pg)
    **Exhibit 43**: J1723 production part 4 (3 pgs)

4.  These said 746 pages are kept by TAMU in the regular course of business. It was in the regular course of business for an employee or representative of TAMU or its

Page 1

- 1573 -

predecessor agency, with knowledge of the act, event or condition recorded, to make the memorandum or record or to transmit information thereof to be included in such memorandum or record, and the memorandum or record was made at or near the time of the act, event or condition recorded or reasonably soon thereafter; or, in the case of documentation given to or received by TAMU, it was in the regular course of business for an employee or representative of TAMU to receive the record and place it in the appropriate files of TAMU. With the exception of the redaction of any personal, private, or confidential information, and any bates numbering or exhibit number identification of any documents by the parties of the records identified by exhibit number above, they are exact duplicates of the originals.

EXECUTED on August 1, 2024.

Patricia Bledsoe, Director
Open Records
Office of Risk, Ethics, and Compliance
Texas A&M University

SUBSCRIBED AND SWORN BEFORE ME, on August 1, 2024 to certify which witness my hand and official seal.



CINDY PATTERSON
Notary Public, State of Texas
Comm. Expires 07-07-2026
Notary ID 12158668

Notary Public, State of Texas

EXHIBIT
45



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS



RECEIVED

JUL 22 2024

OFFICE OF
GENERAL COUNSEL

July 8, 2024

Mr. R. Brooks Moore
Deputy General Counsel
The Texas A&M University System
301 Tarrow Street, 6th Floor
College Station, Texas 77840-7896

OR2024-023625

Dear Mr. Moore:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 24-017643 (Ref. No. J001330-041124).

Texas A&M University (the "university") received a request for eight categories of information pertaining to certain renovations of specified buildings.[1] The university claims some of the submitted information is excepted from disclosure under section 552.107 of the Government Code.[2] Additionally, the university states release of some of the submitted information may implicate the proprietary interests of Kirksey Architecture; Patterson Architects; Project Control of Texas, Inc.; Quad-Tex Construction, Inc. ("Quad-Tex"); and SpawGlass Construction Corp. Accordingly, the university states, and provides documentation showing, it notified these third parties of the request for information and of the right to submit arguments to this office as to why the information at issue should not be

---

[1] The university states it sought and received clarification of the information requested. *See* Gov't Code § 552.222 (providing if request for information is unclear, governmental body may ask requestor to clarify request); *see also City of Dallas v. Abbott*, 304 S.W.3d 380, 387 (Tex. 2010) (holding that when a governmental entity, acting in good faith, requests clarification or narrowing of an unclear or overbroad request for information, the ten-day period to request an attorney general ruling is measured from the date the request is clarified or narrowed).

[2] Although the university also raises Texas Rule of Evidence 503, we note the proper exception to raise when asserting the attorney-client privilege for information not subject to section 552.022 of the Government Code is section 552.107 of the Government Code. *See* Open Records Decision No. 676 at 1-2 (2002).

released. *See* Gov't Code § 552.305(d); *see also* Open Records Decision No. 542 (1990) (statutory predecessor to section 552.305 permits governmental body to rely on interested third party to raise and explain applicability of exception in the Act in certain circumstances). We have received comments from Quad-Tex. We have considered the submitted arguments and reviewed the submitted information, a portion of which is a representative sample.[3]

Initially, we note an interested third party is allowed ten business days after the date of its receipt of the governmental body's notice under section 552.305(d) to submit its reasons, if any, as to why information relating to that party should be withheld from public disclosure. *See* Gov't Code § 552.305(d)(2)(B). As of the date of this letter, we have not received comments from any of the remaining third parties explaining why the information at issue should not be released. Therefore, we have no basis to conclude any of the remaining third parties have protected proprietary interests in the submitted information. *See, e.g., id.* § 552.110 (requiring the provision of specific factual evidence demonstrating the applicability of the exception). Accordingly, the university may not withhold the submitted information on the basis of any proprietary interest any of the remaining third parties may have in the information.

Section 552.107(1) of the Government Code protects information coming within the attorney-client privilege. *See id.* § 552.107(1). When asserting the attorney-client privilege, a governmental body has the burden of providing the necessary facts to demonstrate the elements of the privilege in order to withhold the information at issue. Open Records Decision No. 676 at 6-7 (2002). First, a governmental body must demonstrate that the information constitutes or documents a communication. *Id.* at 7. Second, the communication must have been made "to facilitate the rendition of professional legal services" to the client governmental body. TEX. R. EVID. 503(b)(1). The privilege does not apply when an attorney or representative is involved in some capacity other than that of providing or facilitating professional legal services to the client governmental body. *In re Tex. Farmers Ins. Exch.*, 990 S.W.2d 337, 340 (Tex. App.—Texarkana 1999, orig. proceeding) (attorney-client privilege does not apply if attorney acting in a capacity other than that of attorney). Governmental attorneys often act in capacities other than that of professional legal counsel, such as administrators, investigators, or managers. Thus, the mere fact that a communication involves an attorney for the government does not demonstrate this element. Third, the privilege applies only to communications between or among clients, client representatives, lawyers, and lawyer representatives. TEX. R. EVID. 503(b)(1). Thus, a governmental body must inform this office of the identities and capacities of the individuals to whom each communication at issue has been made. Lastly, the attorney-client privilege applies only to a *confidential* communication, *id.*, meaning it was "not intended to be disclosed to third persons other than those: (A) to whom disclosure is made to further the rendition of professional legal services to the client; or (B) reasonably

---

[3] We assume the "representative sample" of records submitted to this office is truly representative of the requested records as a whole. *See* Open Records Decision Nos. 499 (1988), 497 (1988). This open records letter does not reach, and therefore does not authorize the withholding of, any other requested records to the extent those records contain substantially different types of information than that submitted to this office.

necessary to transmit the communication." *Id.* 503(a)(5). Whether a communication meets this definition depends on the *intent* of the parties involved at the time the information was communicated. *Osborne v. Johnson*, 954 S.W.2d 180, 184 (Tex. App.—Waco 1997, orig. proceeding). Moreover, because the client may elect to waive the privilege at any time, a governmental body must explain that the confidentiality of a communication has been maintained. Section 552.107(1) generally excepts an entire communication that is demonstrated to be protected by the attorney-client privilege unless otherwise waived by the governmental body. *See Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996) (privilege extends to entire communication, including facts contained therein).

The university states Exhibit B-1 consists of communications involving attorneys for the university and university employees and officials in their capacities as clients. The university states these communications were made in furtherance of the rendition of professional legal services to the university. The university also states these communications were intended to be, and have remained, confidential. Based on these representations and our review, we find the university has demonstrated the applicability of the attorney-client privilege to the information at issue. Accordingly, the university may withhold Exhibit B-1 under section 552.107(1) of the Government Code.

Section 552.110(b) of the Government Code states, "[e]xcept as provided by [s]ection 552.0222, information is [excepted from required disclosure] if it is demonstrated based on specific factual evidence that the information is a trade secret." *See* Gov't Code § 552.110(b). Section 552.110(a) defines a trade secret as all forms and types of information if:

> (1) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

> (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

*Id.* § 552.110(a). Section 552.110(c) of the Government Code states:

> (c) Except as provided by Section 552.0222, commercial or financial information for which it is demonstrated based on specific factual evidence that disclosure would cause substantial competitive harm to the person from whom the information was obtained is [excepted from required disclosure].

*Id.* § 552.110(c). Quad-Tex argues some of its information consists of trade secrets subject to section 552.110(b) and commercial or financial information subject to section 552.110(c). Upon review, we find Quad-Tex has demonstrated portions of the information at issue constitute commercial or financial information, the release of which would cause substantial competitive harm. Accordingly, the university must withhold the information

we marked under section 552.110(c) of the Government Code; however, to the extent the customer information at issue is made available to the public by Quad-Tex, including but not limited to on its website or social media accounts, such information may not be withheld under section 552.110 of the Government Code.[4] However, we find Quad-Tex has failed to provide specific factual evidence demonstrating any portion of the remaining information at issue is a trade secret or constitutes commercial or financial information, the release of which would result in substantial competitive harm. Therefore, the university may not withhold any of the remaining information at issue under section 552.110 of the Government Code.

Section 552.1101 of the Government Code provides, in relevant part:

> (a) . . . [I]nformation submitted to a governmental body by a vendor, contractor, potential vendor, or potential contractor in response to a request for a bid, proposal, or qualification is excepted from the requirements of Section 552.021 if the vendor, contractor, potential vendor, or potential contractor that the information relates to demonstrates based on specific factual evidence that disclosure of the information would:
>
>> (1) reveal an individual approach to:
>>
>>> (A) work;
>>>
>>> (B) organizational structure;
>>>
>>> (C) staffing;
>>>
>>> (D) internal operations;
>>>
>>> (E) processes; or
>>>
>>> (F) discounts, pricing methodology, pricing per kilowatt hour, cost data, or other pricing information that will be used in future solicitation or bid documents; and
>>
>> (2) give advantage to a competitor.

*Id.* § 552.1101(a). Upon review, we find Quad-Tex has failed to provide the specific factual evidence necessary to withhold any of the remaining information at issue under section 552.1101(a) of the Government Code, and the university may not withhold any of the remaining information on that basis.

---

[4] As our ruling is dispositive, we need not address your remaining argument against disclosure of this information.

Section 552.101 of the Government Code excepts from disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." *Id.* § 552.101. Section 552.101 encompasses the doctrine of common-law privacy, which protects information that is (1) highly intimate or embarrassing, the publication of which would be highly objectionable to a reasonable person, and (2) not of legitimate concern to the public. *Indus. Found. v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 685 (Tex. 1976). To demonstrate the applicability of common-law privacy, both prongs of this test must be satisfied. *Id.* at 681-82. Types of information considered intimate and embarrassing by the Texas Supreme Court are delineated in *Industrial Foundation. Id.* at 683. We note the names, addresses, and telephone numbers of members of the public are not excepted from public disclosure under common-law privacy. *See* Open Records Decision Nos. 551 at 3 (1990) (disclosure of person's name, address, or telephone number not an invasion of privacy), 455 at 7 (1987) (home addresses and telephone numbers not protected under privacy). Upon review, we find Quad-Tex has failed to demonstrate any of the remaining information is highly intimate or embarrassing and not of legitimate public concern. Thus, the university may not withhold any of the remaining information under section 552.101 in conjunction with common-law privacy.

We note some of the remaining information may be protected by copyright. A custodian of public records must comply with the copyright law and is not required to furnish copies of records that are copyrighted. Open Records Decision No. 180 at 3 (1977). A governmental body must allow inspection of copyrighted materials unless an exception applies to the information. *Id.; see* Open Records Decision No. 109 (1975). If a member of the public wishes to make copies of copyrighted materials, the person must do so unassisted by the governmental body. In making copies, the member of the public assumes the duty of compliance with the copyright law and the risk of a copyright infringement suit.

In summary, the university may withhold Exhibit B-1 under section 552.107(1) of the Government Code. The university must withhold the information we marked under section 552.110(c) of the Government Code; however, to the extent the customer information at issue is made available to the public by Quad-Tex, including but not limited to on its website or social media accounts, such information may not be withheld under section 552.110 of the Government Code. The university must release the remaining information; however, any information that is subject to copyright may be released only in accordance with copyright law.

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at https://www.texasattorneygeneral.gov/open-government/members-public/what-expect-after-ruling-issued or call the OAG's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable

charges for providing public information under the Public Information Act may be directed to the Cost Rules Administrator of the OAG, toll free, at (888) 672-6787.

Sincerely,

Laura Zambrano
Assistant Attorney General
Open Records Division

LZ/jt

Ref:    ID# 24-017643

Enc.    Submitted documents

c:      Requestor
        (w/o enclosures)

        Five Third Parties
        (w/o enclosures)

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90477261
Filing Code Description: EXHIBIT LIST
Filing Description: part 2
Status as of 8/2/2024 12:26 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 8/2/2024 11:49:47 AM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/2/2024 11:49:47 AM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/2/2024 11:49:47 AM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/2/2024 11:49:47 AM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/2/2024 11:49:47 AM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/2/2024 11:49:47 AM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/2/2024 11:49:47 AM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| J DavidDodd III | | David@Jddoddlaw.com | 8/2/2024 11:49:47 AM | SENT |

**Received & Filed 8/5/2024 4:36 PM**
**Gabriel Garcia, District Clerk**
**Brazos County, Texas**
**Kristin Emert**
**Envelope# - 90554186**

CAUSE NO. 24-000902-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

### DEFENDANT'S FIRST SUPPLEMENT TO FIRST AMENDED PLEA TO THE JURISDICTION

Defendant Texas A&M University ("TAMU") files this First Supplement to Defendant's First Amended Plea to the Jurisdiction, and in support respectfully shows the following:

In filing its First Amended Plea to the Jurisdiction (First Amended Plea), Defendant attaches the following affidavits, documents, statements, materials, and other evidence to establish, as evidence in support thereto, and all such evidence is fully incorporated and adopted herein by reference for all purposes. **Exhibit 1** through **Exhibit 30**[1] were not filed when the First Amended Plea was initially filed on August 2, 2024 due to clerical error.

**Exhibit 1:** Plaintiff's first TPIA request w/ history – J000762
**Exhibit 2:** Plaintiff's second TPIA request w/ history –J000767
**Exhibit 3:** Plaintiff's third TPIA request w/ history – J001123
**Exhibit 4:** Plaintiff's fourth TPIA request w/ history – J001147
**Exhibit 5:** Plaintiff's fifth TPIA request w/ history – J0001320
**Exhibit 6:** TAMU request for AG decision, April 19, 2024
**Exhibit 7:** AG decision OR2024-004322
**Exhibit 8:** Plaintiff's lawsuit against TAMU
**Exhibit 9:** First batch produced B-1 (11 pgs)

---

[1] TAMU notes that **Exhibit 1** through **Exhibit 30** are the same exhibits previously filed in support of its initial Plea to the Jurisdiction.

**- 1582 -**

**Exhibit 10:** Second batch produced B-2 (111 pgs)
**Exhibit 11:** TAMU withdrawal letter re B-1 and B-2 docs
**Exhibit 12:** Plaintiff's sixth TPIA request w/ history – J0001365
**Exhibit 13:** Email w/ transmittal of documents re sixth TPIA request
**Exhibit 14:** Plaintiff's seventh TPIA request w/ history – J0001723
**Exhibit 15:** Email w/ transmittal of partial disclosure of seventh TPIA req
**Exhibit 16:** TAMU request for AG decision, May 6, 2024
**Exhibit 17:** TPIA request by JD Foster – J1330
**Exhibit 18:** Fish brigade concept docs (152 pgs)
**Exhibit 19:** Updated Plaintiff's fifth TPIA request w/ history – J-1320
**Exhibit 20:** Emails b/t Plaintiff and TAMU re TPIA req J001320
**Exhibit 21:** Rudder theatre email (2 pgs)
**Exhibit 22:** Facebook post (6 pgs)
**Exhibit 23:** Emails b/t Plaintiff and defense counsel
**Exhibit 24:** TAMU System policy 61.01, Public Information Act Compliance[2]
**Exhibit 25:** TAMU System regulation, 61.01.02, Public Information
**Exhibit 26:** J1147 production part one (292 pgs)
**Exhibit 27:** J1147 production part two (13 pgs)
**Exhibit 28:** Business records affidavit, Patricia Bledsoe
**Exhibit 29**: J1147 production June 13, 2024 (108 pgs)
**Exhibit 30**: Second business records affidavit, Patricia Bledsoe

### PRAYER

Wherefore, premises considered, TAMU respectfully requests its First Amended Plea to the Jurisdiction be granted thereby dismissing Plaintiff's claims with prejudice and denying all requested relief. TAMU further requests all other relief to which it may be justly entitled both at law and in equity.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

---

[2] TAMU system policies and regulations identified as **Exhibit 24** and **Exhibit 25** may be found online accessible to the public at https://orec.tamu.edu/open-records/.

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
Jason T. Contreras
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through the E-File Texas, File and Serve Texas in compliance with TRCP 21 on August 5, 2024 to:

J. David Dodd III
820 S. Macarthur Blvd., Ste. 105-341
Coppell, Texas 75019
214-923-3417
David@jddoddlaw.com
**Counsel for Plaintiff**

/s/ Jason T. Contreras
Jason T. Contreras
Assistant Attorney General

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90554186
Filing Code Description: PLEA TO THE JURISDICTION
Filing Description: DEFENDANT'S FIRST SUPPLEMENT TO FIRST AMENDED PLEA TO THE JURISDICTION
Status as of 8/6/2024 7:47 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 8/5/2024 4:36:38 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/5/2024 4:36:38 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/5/2024 4:36:38 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/5/2024 4:36:38 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/5/2024 4:36:38 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/5/2024 4:36:38 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/5/2024 4:36:38 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| J DavidDodd III | | David@Jddoddlaw.com | 8/5/2024 4:36:38 PM | SENT |

# Public Information Records (#J000762-022624)

Received & Filed 8/5/2024 4:36 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Kristin Emert
Envelope# - 90554186

EXHIBIT
1

⌄ **Public Information Records Details**

This request is for:                    Texas A&M University

Summary of Request:                ● All documents, communications, or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade

● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s

● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

● Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

● Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes

- 1586 -

| | |
|---|---|
| Describe in detail the Record(s) Requested: | From: Patti Artavia<br>Sent: Monday, February 26, 2024 7:03 AM<br>To: open-records@tamu.edu<br>Subject: Open Records Request<br><br>Please see attached letter. Thank you<br><br>Patti Artavia<br>Senior Paralegal/Case Manager<br>2016 AAJ Paralegal of the Year<br>VBAttorneys.com<br>Direct Dial (832) 791-3118<br><br><br>Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:<br><br>● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.<br><br>● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.<br><br>● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.<br><br>● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.<br><br>● Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.<br><br>● Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes |
| Date From: | |
| Date To: | |
| Preferred Method to Receive Records: | Electronic via Records Center |
| Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?: | YES |
| Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?: | YES |

> **Category**

| Clarification(s): | Rec'd Response to Clarification/Narrowing - 3/7 | STAFF: Please describe any clarifications requested and received. |
|---|---|---|
| | Sent Request for Clarification/Narrowing - 3/7 | |
| | Rec'd Response to Redaction ?'s - 2/26 | |
| | Sent 2 Redaction ?'s - 2/26 | |

⟩ **OAG decision requested**

⟩ **Exceptions**

⟩ **Charges**

⟩ **Notes**

∨ **Message History**

| Date |
|---|

On 4/5/2024 5:19:01 PM, Knesha Brashear wrote:
CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J000762-022624
**Body:**

04/05/2024


RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

The remaining information found responsive to your request is available and can be obtained by visiting the Public Records Online Portal and logging in from the " My Request Center" tab.

 Per your affirmative response to the "Redaction Statement" giving us permission to redact information subject to mandatory and discretionary exceptions, we have redacted and/or withheld information excepted under the following sections  of the Texas Government Code: 552.101 in conjunction with section 51.971(e)(2) of the Tex. Educ. Code, 552.111, 552.114 and 552.137.


Sincerely,

Knesha Brashear
Open Records Office

On 3/29/2024 2:42:02 PM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [open-records@tamu.edu], [patti@vbattorneys.com], [brendan@vbattorneys.com]

Ms. Brashear:
TAMU has repeatedly and intentionally violated Texas law. I will proceed accordingly.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 29, 2024 at 2:15 PM Texas A&M University Public Records Support wrote:


On 3/29/2024 2:15:12 PM, Knesha Brashear wrote:
CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/29/2024


RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Our apologies for the delay, but we are still in the process of locating and gathering records responsive to your request.

As required by Tex. Gov't Code sec. 552.221(d), we anticipate having any remaining records found responsive to your request to you no later than the close of business on Friday, April 5th.

Sincerely,

Knesha Brashear
Open Records Office


On 3/23/2024 4:51:02 PM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Patti"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

This email confirms that the Open Records Office at TAMU promised to respond by March 21, 2024, after being given multiple extensions, and then, on March 21, 2024, did not comply with the open records request, and instead produced almost nothing responsive.
Please explain to me why you promised to produce materials on March 21st after being given multiple extensions and then did not do so. Please include the legal justification for your failure to comply with Texas Open Records laws. Please also identify the individuals you have been working with on these requests as their depositions may be necessary.
Also, for some reason you refuse to reply to Brendan and Patti as well. Please do so going forward, including with any future document requests.
Thank you.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Mon, Mar 11, 2024 at 9:19 AM Texas A&M University Public Records Support wrote:

On 3/23/2024 4:03:02 PM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

By copy of this email, I hereby confirm that Texas A&M originally claimed the request was overbroad and that TAMU needed additional time to gather the documents, then, when the documents were partially produced, TAMU only produced three PowerPoint presentations that could have been produced in five minutes. Put another away, the original objections were frivolous, and the request for more time was also frivolous.
At this point, it is clear that TAMU is slow-playing the request for strategic and tactical reasons, which violates the Texas Open Records laws. I expect the next production to be responsive, full, and complete. If not, I will pursue formal legal action, which will include potentially depositions and forensic discovery.
I remind you (yet again) to let any involved parties know about their legal obligations to keep and maintain all records, including but not limited to emails, texts, and any other digital communications.

-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Fri, Mar 22, 2024 at 12:20 PM Texas A&M University Public Records Support wrote:


On 3/22/2024 12:20:14 PM, Knesha Brashear wrote:
CC: open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/22/2024


RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

As mentioned in our correspondence sent to you yesterday,   we are still processing the remaining items of your request and expect to have a response to you on or before Friday, March 29th.

Sincerely,

Knesha Brashear
Open Records Office

Date

On 3/22/2024 11:24:02 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Brendan Fradkin"[brendan@vbattorneys.com], "Patti"[patti@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

See below page advise today.
Thanks.

-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Thu, Mar 21, 2024 at 11:04 PM Brian Beckcom wrote:
I received part one of the responses. Where are the rest of the materials?
Please advise immediately as TAMU is now potentially in violation of the open records laws, which mandate timely and complete responses.
Also, please continue to ensure that all relevant materials of any nature preserved.
Thank you.
-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Thu, Mar 21, 2024 at 6:05 PM Texas A&M University Public Records Support wrote:


On 3/21/2024 11:06:02 PM, Brian Beckcom wrote:
TO: "Brendan Fradkin"[brendan@vbattorneys.com], "Patti"[patti@vbattorneys.com], "Texas A&M University Public Records Support" [texasam@mycusthelp.net]
CC: "open-records@tamu.edu"[Open-records@tamu.edu]

I received part one of the responses. Where are the rest of the materials?
Please advise immediately as TAMU is now potentially in violation of the open records laws, which mandate timely and complete responses.
Also, please continue to ensure that all relevant materials of any nature preserved.
Thank you.
-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Thu, Mar 21, 2024 at 6:05 PM Texas A&M University Public Records Support wrote:

On 3/21/2024 6:05:12 PM, Knesha Brashear wrote:

CC: open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/21/2024

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Texas A& M University received a public information request from you on February 26, 2024. Your request mentioned:

*"Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.*

*● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding " socialization, " " leadership education, " discussion of the " communal/fraternal aspects of the Corps, " any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed " re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the " Cadence, " and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.*

*● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.*

*● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.*

*● Any and all communications from anyone at Texas A& M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A& M, the Office of the Vice President of Student Affairs, and the Board of Regents.*

*● Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes"*

Information found to be responsive to items 2 and 3 of your request is available and can be obtained by visiting the Public Records Online Portal and logging in from the " My Request Center" tab.

Please note that we are still processing the remaining items of your request and expect to have a response to you on or before Friday, March 29th.

Sincerely,

Date

Knesha Brashear
Open Records Office

On 3/11/2024 9:19:01 AM, Tricia Bledsoe wrote:
CC: Open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/11/2024

RE: PUBLIC RECORDS REQUEST, Reference # J000762-022624

Dear Brian Beckcom,

We are in receipt of your narrowed request, received on March 7th and appreciate your willingness to work with us.  We are processing your narrowed request and expect to have a response to you on or before your tenth (10th) business day of March 21, 2024.

Sincerely,

Tricia Bledsoe

Open Records Office

Date

On 3/11/2024 6:03:03 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
I hope you had a relaxing weekend.
I have sent a few emails with no response and no acknowledgement. I would very much appreciate your responding to my requests. My hope is you will comply with the requests as limited and produce the overdue materials immediately. Please let me know the status. I am hoping we can avoid further legal measures and can work cooperatively.
I am happy to send my own IT team to assist if needed.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 2:13 PM Brian Beckcom wrote:
Ms. Kacer:
Please respond to my questions and to the unobjected to FOIA requests today. Otherwise, we will move forward with legal action as authorized by statute and Texas law.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 10:28 AM Brian Beckcom wrote:
Ms. Kacer:
1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory deadline;
2. Please confirm that the relevant personnel have been informed of their obligations to preserve all communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested documents and information.



-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:
Ms. Kacer:
Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.
For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.
With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved.
With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.
I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/
I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.
Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.
Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:

- 1595 -

On 3/8/2024 3:15:33 PM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
Please respond to my questions and to the unobjected to FOIA requests today. Otherwise, we will move forward with legal action as authorized by statute and Texas law.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 10:28 AM Brian Beckcom wrote:
Ms. Kacer:
1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory deadline;
2. Please confirm that the relevant personnel have been informed of their obligations to preserve all communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested documents and information.




-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:
Ms. Kacer:
Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.
For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.
With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved.
With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.
I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/
I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.
Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.
Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:

Date

On 3/8/2024 10:30:43 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory deadline;
2. Please confirm that the relevant personnel have been informed of their obligations to preserve all communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested documents and information.

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video

On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:
Ms. Kacer:
Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.
For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.
With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved.
With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.
I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/
I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.
Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.
Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video

On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:

On 3/7/2024 9:33:02 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.
For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.
With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved.
With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.
I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/
I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.
Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.
Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:

On 3/6/2024 6:56:02 PM, Leslie Kacer wrote:

Date
CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
March 6, 2024

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Texas A& M University received a public information request from you on February 26, 2024.   Your request mentioned:

*"From: Patti Artavia < patti@vbattorneys.com>*
*Sent: Monday, February 26, 2024 7:03 AM*
*To: open-records@tamu.edu*
*Subject: Open Records Request*

*Please see attached letter. Thank you*

*Patti Artavia*
*Senior Paralegal/Case Manager*
*2016 AAJ Paralegal of the Year*
*VBAttorneys.com*
*Direct Dial (832) 791-3118*


*Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.*

*● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding " socialization, " " leadership education, " discussion of the " communal/fraternal aspects of the Corps, " any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed " re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the " Cadence, " and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.*

*● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.*

*● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.*

*● Any and all communications from anyone at Texas A& M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A& M, the Office of the Vice President of Student Affairs, and the Board of Regents.*

● *Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes"< /patti@vbattorneys.com>*

Our office is unable to conduct a blind search for

*"● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.*

*● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding " socialization, " " leadership education, " discussion of the " communal/fraternal aspects of the Corps, " any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed " re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the " Cadence, " and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.*

*● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.*

*● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.*

*● Any and all communications from anyone at Texas A& M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A& M, the Office of the Vice President of Student Affairs, and the Board of Regents.*

*● Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes"* as there are numerous employees within the the Office of the Commandant and thousands of employees within the university. A request of this magnitude is too broad. Therefore, we are requesting that you narrow your request by providing us with the name(s) of employees who would be in possession of the requested records. Additionally, if you could please provide us with a date range so that we can better assist you with your request.

As provided by section 552.222(d) of the Texas Public Information Act, your request will be considered withdrawn if we do not receive a response from you by the 61st day after the date of this request for clarification/narrowing.

Sincerely,

Leslie Kacer
Open Records Office

On 2/26/2024 11:15:43 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu]

Yes to both questions.
Please make sure all the records requested are preserved.
Thank you.

On Feb 26, 2024, at 9:10 AM, Texas A&M University Public Records Support wrote:

On 2/26/2024 9:10:20 AM, Leslie Kacer wrote:
CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
February 26, 2024

BRIAN BECKCOM (J000762-022624): REQUEST FOR CLARIFICATION/NARROWING; REDACTION RESPONSES REQUESTED

There are now 2 statements regarding mandatory exceptions and discretionary exceptions you need to select for your open records request. These questions are derived from a form developed by the Office of the Attorney General, dated 10/01/19. Please select " yes" or " no" in regards to these 2 exception questions for your open records request. Selecting " yes" will allow the university to expedite your request by avoiding the necessity of seeking a decision from the Office of the Attorney General.

Statement #1:
Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Statement #2:
Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Note: This is a request for clarification/narrowing of your request. Section 552.222 provides that a request for information is considered withdrawn if the requestor does not respond in writing to a governmental body's written request for clarification or additional information within 61 days.

Sincerely,

Leslie Kacer
Open Records Office

On 2/26/2024 8:54:25 AM, System Generated Message:
**Subject:** Texas A&M University Public Information Request :: J000762-022624
**Body:**
Dear Brian Beckcom:

We received your public information request for **Texas A&M University**.  Your request was given the **reference number J000762-022624** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.

To monitor the progress or update this request please log into the Public Records Center.

Date

On 2/26/2024 8:54:25 AM, Leslie Kacer wrote:
Request was created by staff

## ⌄ Request Details

| | |
|---|---|
| Reference No: | J000762-022624 |
| Created By: | Leslie Kacer |
| Create Date: | 2/26/2024 8:00 AM |
| Update Date: | 4/11/2024 4:58 PM |
| Completed/Closed: | Yes |
| Close Date: | 4/11/2024 4:58 PM |
| | |
| Status: | Information Released |
| Priority: | Medium |
| Assigned Dept: | TAMU_Open Records |
| Assigned Staff: | Open Records University |
| | |
| Customer Name: | Brian Beckcom |
| Email Address: | Brian@vbattorneys.com |
| Phone: | 8327913118 |
| Group: | TAMU |
| | |
| Source: | Email |

EXHIBIT
2

# Public Information Records (#J000767-022624)

⌄ **Public Information Records Details**

| | |
|---|---|
| This request is for: | Texas A&M University |
| Summary of Request: | 1. Any contracts of employment for the Commandant of the Corps of Cadets, Patrick Michaelis, any drafts of the same, any communications in whatever form regarding the same, and any other agreements which relate to the same; |
| | 2. Any documents or materials related to the selection of Patrick Michaelis as Commandant, including but not limited to meeting notes, interview notes, memos, discussions, digital communications of any form, any discussion or notes regarding why Michaelis was selected over other candidates, and any other documents or materials concerning the same. |

Describe in detail the Record(s) Requested:

From: Patti Artavia
Sent: Monday, February 26, 2024 2:42 PM
To: open-records@tamu.edu
Subject: Public Records Request

Please see attached.

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:

1. Any contracts of employment for the Commandant of the Corps of Cadets, Patrick Michaelis, any drafts of the same, any communications in whatever form regarding the same, and any other agreements which relate to the same;

2. Any documents or materials related to the selection of Patrick Michaelis as Commandant, including but not limited to meeting notes, interview notes, memos, discussions, digital communications of any form, any discussion or notes regarding why Michaelis was selected over other candidates, and any other documents or materials concerning the same.

| | |
|---|---|
| Date From: | |
| Date To: | |
| Preferred Method to Receive Records: | Electronic via Records Center |
| Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?: | YES |
| Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?: | YES |

⟩ **Category**

⌄ **Clarification(s)**

| Clarification(s): | Rec'd Response to Redaction ?'s - 2/27 | STAFF: Please describe any clarifications requested and received. |
| | Sent 2 Redaction ?'s - 2/27 | |

## ❯ OAG decision requested

## ❯ Exceptions

## ❯ Charges

## ❯ Notes

## ⌄ Message History

Date

On 3/27/2024 10:03:02 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com], [chancellor@tamus.edu]

Good morning Ms. Kacer:
Texas A&M continues to violate Texas law on both of my FOIA requests, putting the institution at risk of adverse legal consequences.
With respect to the request pertaining to the hiring of the Commandant, the responses are obviously incomplete, and a laughably so.
Just to give you some specific examples:
1. There are no emails or texts or other information that I know for a fact exist but haven't been produced pertaining to the hiring;  2. There is missing information in the materials themselves, including missing information pertaining to the other candidates; 3.  The job posting and applicant resumes are not included;  4.  Emails, texts, and other communications between the office of Vice President of Student Affairs and the Office of the President (former President Banks), which I know exist, are not included;  5. Letters of recommendation (which I know exist) are not included;  6. Notes from deliberations are not included;  7. Emails to and from the candidates (which I know exist) are not included;  8. The process was a sham from the get-go. For instance, Colonel Stephen Ruth finished second in the initial round, and he was cut from the final process for reasons that are fairly obvious. There is no information pertaining to this issue, which I know exists. 9. The candidates themselves were specifically asked if they supported DE&I, which is now illegal in Texas, and there is no information pertaining to who, how, and why that question was asked.
At this point, it is clear that Texas A&M is intentionally violating Texas open records law. This has been clear for quite some time. As you know, this can result in substantial penalties, including costs and attorney fees, among other things.
Please respond to this email today and let me know whether TAMU is going to comply with Texas law or continue to intentionally violate Texas law. If the latter, I will take appropriate steps, which will likely start with taking depositions and doing forensic discovery.
I am willing to give TAMU one more chance to comply with the law. I am willing to work with you to get the information produced pursuant to the law. I am not willing to work with you if you continue to frivolously violate black letter Texas law.
I am extremely disappointed in your efforts and response. This is unworthy of our great institution. And given the fiascos that occurred last year--including former President Banks encouraging people to delete evidence--this is starting to look like a pattern.
Further, I am asking you again to remind everyone involved, including the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of the President, of their continuing obligations to preserve any potentially responsive evidence pursuant to Texas and federal law.
Finally, I would also ask that you capture and search the emails and texts of former President Banks as it relates to the hiring process, as I know for a fact that communications exist.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Mon, Mar 18, 2024 at 5:45 AM Brian Beckcom wrote:
Good morning Ms. Kacer
Just a friendly reminder that Texas A&M has information due per my FOIA request. I think you have confirmed that I will receive full and complete responses to my requests on March 19 and March 21 of this week. If I am mistaken, please let me know.
Please work with my assistant Patti (copied here) on any logistics.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Tue, Mar 12, 2024 at 6:03 PM Texas A&M University Public Records Support wrote:

Date

On 3/19/2024 4:59:01 PM, Knesha Brashear wrote:
CC: open-records@tamu.edu
**Subject:** Public Information Records :: J000767-022624
**Body:**
03/19/2024


RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000767-022624

Dear Brian Beckcom,

Texas A& M University received a public information request from you on February 26, 2024.   Your request mentioned:

*"1. Any contracts of employment for the Commandant of the Corps of Cadets, Patrick Michaelis, any drafts of the same, any communications in whatever form regarding the same, and any other agreements which relate to the same;*

*2. Any documents or materials related to the selection of Patrick Michaelis as Commandant, including but not limited to meeting notes, interview notes, memos, discussions, digital communications of any form, any discussion or notes regarding why Michaelis was selected over other candidates, and any other documents or materials concerning the same."*

The information found responsive to your request is available and can be obtained by visiting the <u>Public Records Online Portal</u> and logging in from the " My Request Center" tab.  Per your affirmative response to the "Redaction Statement" giving us permission to redact information subject to mandatory and discretionary exceptions, we have redacted information excepted under the following section of the Texas Government Code: 552.024 (Electing to Disclose Address and Telephone Number).


Sincerely,

Knesha Brashear
Open Records Office

Date

On 3/19/2024 2:30:33 PM, patti@vbattorneys.com wrote:
CC: "Texas A&M University Public Records Support"[texasam@mycusthelp.net], [Open-records@tamu.edu]

Ms. Kacer, I attempted to call you but there was no answer.
Do you have an idea of when we can expect a production of documents? Thank you

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

Follow us onFacebook, Twitter, LinkedIn, and Instagram
Why hire VB Attorneys
Tell me how I'm doing: ReviewVB.com
The best compliment you can give our team is the referral of someone who needs our help.


On Mon, Mar 18, 2024 at 5:45 AM Brian Beckcom wrote:
Good morning Ms. Kacer
Just a friendly reminder that Texas A&M has information due per my FOIA request. I think you have confirmed that I will receive full and complete responses to my requests on March 19 and March 21 of this week. If I am mistaken, please let me know.
Please work with my assistant Patti (copied here) on any logistics.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Tue, Mar 12, 2024 at 6:03 PM Texas A&M University Public Records Support wrote:


On 3/18/2024 5:48:05 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Good morning Ms. Kacer
Just a friendly reminder that Texas A&M has information due per my FOIA request. I think you have confirmed that I will receive full and complete responses to my requests on March 19 and March 21 of this week. If I am mistaken, please let me know.
Please work with my assistant Patti (copied here) on any logistics.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Tue, Mar 12, 2024 at 6:03 PM Texas A&M University Public Records Support wrote:

On 3/12/2024 6:03:02 PM, Leslie Kacer wrote:
CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J000767-022624
**Body:**
March 12, 2024

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000767-022624

Dear Brian Beckcom,

Texas A& M University received a public information request from you on February 26, 2024.   Your request mentioned:

*"From: Patti Artavia < patti@vbattorneys.com>*
*Sent: Monday, February 26, 2024 2:42 PM*
*To: open-records@tamu.edu*
*Subject: Public Records Request*

*Please see attached.*

*Patti Artavia*
*Senior Paralegal/Case Manager*
*2016 AAJ Paralegal of the Year*
*VBAttorneys.com*
*Direct Dial (832) 791-3118*

*Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*1. Any contracts of employment for the Commandant of the Corps of Cadets, Patrick Michaelis, any drafts of the same, any communications in whatever form regarding the same, and any other agreements which relate to the same;*

*2. Any documents or materials related to the selection of Patrick Michaelis as Commandant, including but not limited to meeting notes, interview notes, memos, discussions, digital communications of any form, any discussion or notes regarding why Michaelis was selected over other candidates, and any other documents or materials concerning the same."<*
*/patti@vbattorneys.com>*

We are still processing your request and expect to have a response to you on or before Tuesday, March 19, 2024.

Sincerely,

Leslie Kacer
Open Records Office

On 2/27/2024 10:12:06 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com]

Yes and Yes.
Please include Patti@vbattorneys.com on all further communications. Thank you!
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video

On Tue, Feb 27, 2024 at 9:51 AM Texas A&M University Public Records Support wrote:

On 2/27/2024 9:51:02 AM, Leslie Kacer wrote:
CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J000767-022624
**Body:**
February 27, 2024

BRIAN BECKCOM (J000767-022624): REQUEST FOR CLARIFICATION/NARROWING; REDACTION RESPONSES REQUESTED

There are now 2 statements regarding mandatory exceptions and discretionary exceptions you need to select for your open records request. These questions are derived from a form developed by the Office of the Attorney General, dated 10/01/19. Please select " yes" or " no" in regards to these 2 exception questions for your open records request. Selecting " yes" will allow the university to expedite your request by avoiding the necessity of seeking a decision from the Office of the Attorney General.

Statement #1:
Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Statement #2:
Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Note: This is a request for clarification/narrowing of your request. Section 552.222 provides that a request for information is considered withdrawn if the requestor does not respond in writing to a governmental body's written request for clarification or additional information within 61 days.

Sincerely,

Leslie Kacer
Open Records Office

On 2/26/2024 3:15:58 PM, System Generated Message:
**Subject:** Texas A&M University Public Information Request :: J000767-022624
**Body:**
Dear Brian Beckcom:

We received your public information request for **Texas A&M University**.  Your request was given the **reference number J000767-022624** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.

To monitor the progress or update this request please log into the Public Records Center.

Date

On 2/26/2024 3:15:57 PM, Leslie Kacer wrote:
Request was created by staff

## ⌄ Request Details

| | |
|---|---|
| Reference No: | J000767-022624 |
| Created By: | Leslie Kacer |
| Create Date: | 2/26/2024 8:00 AM |
| Update Date: | 3/27/2024 10:03 AM |
| Completed/Closed: | Yes |
| Close Date: | 3/19/2024 4:48 PM |
| | |
| Status: | Information Released |
| Priority: | Medium |
| Assigned Dept: | TAMU_Open Records |
| Assigned Staff: | Open Records University |
| | |
| Customer Name: | Brian Beckcom |
| Email Address: | Brian@vbattorneys.com |
| Phone: | 8327913118 |
| Group: | TAMU |
| | |
| Source: | Email |

EXHIBIT
3

# Public Information Records (#J001123-032724)

## ⌄ Public Information Records Details

| | |
|---|---|
| This request is for: | Texas A&M University |
| Summary of Request: | Information pertaining to the hiring of the Commandant. |
| Describe in detail the Record(s) Requested: | From: Brian Beckcom<br>Sent: Wednesday, March 27, 2024 10:02 AM<br>To: Texas A&M University Public Records Support<br>Cc: Open-records@tamu.edu; Patti Artavia ; Brendan Fradkin ; chancellor@tamus.edu<br><br>With respect to the request pertaining to the hiring of the Commandant.<br><br>* The job posting and applicant resumes.<br><br>* Emails, texts, and other communications between the office of Vice President of Student Affairs and the Office of the President (former President Banks).<br><br>* Letters of recommendation.<br><br>* Notes from deliberations.<br><br>* Emails to and from the candidates. |
| Date From: | |
| Date To: | |
| Preferred Method to Receive Records: | Electronic via Records Center |
| Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?: | YES |
| Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?: | YES |

## ⟩ Category

## ⌄ Clarification(s)

| | |
|---|---|
| Clarification(s): | Rec'd Response to Redaction ?'s - 3/28   STAFF: Please describe any clarifications requested and received.<br>Sent 2 Redaction ?'s - 3/28 |

## ⟩ OAG decision requested

## ⟩ Exceptions

## ⟩ Charges

## ⟩ Notes

## ⌄ Message History

On 4/11/2024 3:04:03 PM, Knesha Brashear wrote:
CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J001123-032724
**Body:**
04/11/2024


RE: PUBLIC RECORDS REQUEST of March 27, 2024, Reference # J001123-032724

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 27, 2024.   Your request mentioned:

*"With respect to the request pertaining to the hiring of the Commandant.*

*\* The job posting and applicant resumes.*

*\* Emails, texts, and other communications between the office of Vice President of Student Affairs and the Office of the President (former President Banks).*

*\* Letters of recommendation.*

*\* Notes from deliberations.*

*\* Emails to and from the candidates."*

The information found responsive to your request is available and can be obtained by visiting the Public Records Online Portal and logging in from the " My Request Center" tab.  Per your affirmative response to the "Redaction Statement" giving us permission to redact information subject to mandatory and discretionary exceptions, we have redacted information excepted under the following sections  of the Texas Government Code: 552.024, 552.117, 552.136 and 552.137.


Sincerely,

Knesha Brashear
Open Records Office


On 3/28/2024 10:06:02 AM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu]

Yes and Yes.
Where are the responsive  documents? They are overdue

-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Thu, Mar 28, 2024 at 9:52 AM Texas A&M University Public Records Support wrote:

On 3/28/2024 9:52:01 AM, Leslie Kacer wrote:
CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J001123-032724
**Body:**
March 28, 2024

BRIAN BECKCOM (J001123-032724): REQUEST FOR CLARIFICATION/NARROWING; REDACTION RESPONSES REQUESTED

There are now 2 statements regarding mandatory exceptions and discretionary exceptions you need to select for your open records request. These questions are derived from a form developed by the Office of the Attorney General, dated 10/01/19. Please select " yes" or " no" in regards to these 2 exception questions for your open records request. Selecting " yes" will allow the university to expedite your request by avoiding the necessity of seeking a decision from the Office of the Attorney General.

Statement #1:
Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Statement #2:
Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Note: This is a request for clarification/narrowing of your request. Section 552.222 provides that a request for information is considered withdrawn if the requestor does not respond in writing to a governmental body's written request for clarification or additional information within 61 days.

Sincerely,

Leslie Kacer
Open Records Office

On 3/27/2024 5:04:15 PM, System Generated Message:
**Subject:** Texas A&M University Public Information Request :: J001123-032724
**Body:**
Dear Brian Beckcom:

We received your public information request for **Texas A&M University**.  Your request was given the **reference number J001123-032724** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.


To monitor the progress or update this request please log into the Public Records Center.

On 3/27/2024 5:04:14 PM, Leslie Kacer wrote:
Request was created by staff

⌄ **Request Details**

| | |
|---|---|
| Reference No: | J001123-032724 |
| Created By: | Leslie Kacer |
| Create Date: | 3/27/2024 8:00 AM |
| Update Date: | 4/11/2024 2:53 PM |

Completed/Closed:   Yes

Close Date:         4/11/2024 2:53 PM


Status:             Information Released

Priority:           Medium

Assigned Dept:      TAMU_Open Records

Assigned Staff:     Open Records University


Customer Name:      Brian Beckcom

Email Address:      Brian@vbattorneys.com

Phone:              8327913118

Group:              TAMU


Source:             Email

# Public Information Records <span style="font-size:small">(#J001147-032824)</span>

EXHIBIT
4

⌄ **Public Information Records Details**

| | |
|---|---|
| This request is for: | Texas A&M University |
| Summary of Request: | Documents, communications, other materials regarding Investigation of Squadron 17. |

| | |
|---|---|
| Describe in detail the Record(s) Requested: | From: Brian Beckcom<br>Sent: Thursday, March 28, 2024 5:31 PM<br>To: Texas A&M University Public Records Support<br>Cc: Patti Artavia ; Brendan Fradkin ; open-records@tamu.edu<br>Subject: Freedom of Information Request related to Squadron 17<br><br>To whom it may concern:<br><br>Please see attached an open records request. Do not send me a form letter with frivolous objections like the last two times. Also, I agree with appropriate redactions and the answer to both of those questions is yes, so do not send me the form email that you utilize to delay the process.<br><br>Please remind Dr. Douglas Bell, Joe Ramirez, Patrick Michalis, and anyone else involved in this matter of their legal obligations to preserve any potentially responsive documents.<br><br>Texas law mandates the response be sent in 10 days. Do not ask for an extension unless you give me a rational, logical and appropriate reason for any extension. Given the failure to comply with my previous two requests, I expect this request to be answered fully and timely. If it is not, I will proceed appropriately<br><br>If you have any questions, please let me know.<br><br>-bb<br><br>● All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation<br><br>● All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A&M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in "DE&I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same<br><br>● Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.<br><br>● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same.<br>I agree to pay reasonable fees for the processing of this request.<br><br>As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.<br><br>Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.<br><br>Sincerely,<br>/s/ Brian Beckcom<br>Brian Beckcom<br>Brian@vbattorneys.com |

Date From:

Date To:

| | |
|---|---|
| Preferred Method to Receive Records: | Electronic via Records Center |
| Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?: | YES |
| Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?: | YES |

> **Category**

⌄ **Clarification(s)**

| | | |
|---|---|---|
| Clarification(s): | Rec'd Response to Narrowing Request - 4/2<br>Sent Request to Narrow - 4/2<br>Rec. payment for CE 4/18 | STAFF: Please describe any clarifications requested and received. |

> **OAG decision requested**

> **Exceptions**

> **Charges**

⌄ **Notes**

| Note | Created | Modified |
|---|---|---|
| Per the requestor direct any future correspondence to Patti@vbattoreys.com for this request. | 4/1/2024 12:55:00 PM by Leslie Kacer | 4/1/2024 12:55:00 PM by Leslie Kacer |

⌄ **Message History**

Date

On 5/8/2024 8:36:01 PM, Knesha Brashear wrote:

Date

CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com

**Subject:** Public Information Records :: J001147-032824

**Body:**

05/08/2024


RE: PUBLIC RECORDS REQUEST of March 29, 2024, Reference # J001147-032824

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 29, 2024.   Your request mentioned:

*"To whom it may concern:*

*Please see attached an open records request. Do not send me a form letter with frivolous objections like the last two times. Also, I agree with appropriate redactions and the answer to both of those questions is yes, so do not send me the form email that you utilize to delay the process.*

*Please remind Dr. Douglas Bell, Joe Ramirez, Patrick Michalis, and anyone else involved in this matter of their legal obligations to preserve any potentially responsive documents.*

*Texas law mandates the response be sent in 10 days. Do not ask for an extension unless you give me a rational, logical and appropriate reason for any extension. Given the failure to comply with my previous two requests, I expect this request to be answered fully and timely. If it is not, I will proceed appropriately*

*If you have any questions, please let me know.*

*-bb*

● *All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation*

● *All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A& M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in " DE& I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same*

● *Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or*

*elsewhere.*

*● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same. I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.*

*Sincerely,*
*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"*

The information found responsive to your request is available and can be obtained by visiting the Public Records Online Portal and logging in from the " My Request Center" tab. Per your affirmative response to the "Redaction Statement" giving us permission to redact information subject to mandatory and discretionary exceptions, we have redacted and/or withheld information excepted under the following sections of the Texas Government Code: 552.024, 552.107, 552.114 and 552.137.

Sincerely,

Knesha Brashear
Open Records Office

Date

On 5/2/2024 5:37:00 PM, Knesha Brashear wrote:

Date

CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com

**Subject:** Public Information Records :: J001147-032824

**Body:**

05/02/2024

RE: PUBLIC RECORDS REQUEST of March 29, 2024, Reference # J001147-032824

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 29, 2024.   Your request mentioned:

*"● All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation*

*● All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A& M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in " DE& I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same*

*● Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.*

*● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same. I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We*

**- 1622 -**

*look forward to hearing from you.*

*Sincerely,*
*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"*

Our apologies for the delay, but we are still processing your request. We expect to have a response to you no later than the close of business on Wednesday, May 8th.

Sincerely,

Knesha Brashear
Open Records Office

On 4/15/2024 5:35:41 PM, Knesha Brashear wrote:

Date
CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J001147-032824
**Body:**
04/15/2024


RE: PUBLIC RECORDS REQUEST of March 29, 2024, Reference # J001147-032824

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 29, 2024.   Your request mentioned:

*"● All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation*

*● All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A& M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in " DE& I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students, and any communications between or amongst same*

*● Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.*

*● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same. I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We*

*look forward to hearing from you.*

*Sincerely,*
*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"*

It has been determined that complying with your request will result in the imposition of a charge that exceeds $40. Therefore, a cost estimate is being provided to you as required by Section 552.2615 of the Texas Government Code. Additionally, the estimated charges exceed $100.00; therefore, as allowed by section 552.263(a) of the Government Code, TAMU requires payment of the bond before starting work on your request. As a less expensive way for you to obtain this information, the estimated cost can be reduced significantly by narrowing your request. It may be that viewing the information will be less costly. However, charges for the mandatory redactions may still apply. Your check or money order should be made payable to " Texas A& M University" and forwarded to:

*Texas A& M University*

1280 TAMU

*College Station, TX 77843-1280*

*Attn: Wendy Ramirez*

Your request will be considered automatically withdrawn if you do not either: a) provide the required bond payment within ten business days from the date of this letter; or b) notify us in writing within ten business days from the date of this letter that you:

1. wish to modify your request; OR

2. have sent to the Open Records Division of the Office of the Attorney General a complaint alleging that you are being overcharged for the information you have requested.

Please consider the options indicated above and advise this office of your decision as soon as possible.

Breakdown of responsive information:

- Estimated number of pages requiring mandatory redactions = 952
- 1 minute per page to make redactions = 952 minutes or 15.86 hours
- 15.86 X $15.00 per hour = $237.90 Labor charge
- $237.90 X 20% = $47.58 Overhead
- Total = $285.48

Please note, you can contact the Student Conduct' s Office directly to obtain your son' s student records through the University' s FERPA process.

*Douglas Bell*

douglasb@vpsa.tamu.edu

The university will redact or withhold personally identifiable information from student education records in accordance with Tex. Gov' t Code sec. 552.114 and the Family Educational Rights and Privacy Act, 20 U.S.C. sec. 1232g, and the Department of Education' s FERPA regulations (34 C.F.R. Pt. 99). Please note that the scope of what is " personally identifiable" under FERPA is more expansive and may cover entire records depending on how much a requesting party knows about a particular situation and the students involved, such as in the case of information " requested by a person who the education agency or institution reasonably believes knows the identity of the student to whom the education record relates." See 34 C.F.R. § 99.3, Definition of " Personally Identifiable Information, " (g). This will be particularly applicable to information you requested regarding Squadron 17, such as in items 1, 3, and 4.

Sincerely,

Knesha Brashear
Open Records Office

On 4/1/2024 5:33:01 PM, Brian Beckcom wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu]

This is another form response.
Date range is 2023 and 2024.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Mon, Apr 1, 2024 at 5:30 PM Texas A&M University Public Records Support wrote:

On 4/1/2024 5:30:29 PM, Leslie Kacer wrote:

CC: Open-records@tamu.edu;
**Subject:** Public Information Records :: J001147-032824
**Body:**
April 1, 2024

RE: PUBLIC RECORDS REQUEST of March 29, 2024, Reference # J001147-032824

Dear Brian Beckcom,

Texas A& M University received a public information request from you on March 29, 2024.   Your request mentioned:

*"From: Brian Beckcom< brian@vbattorneys.com>*
*Sent: Thursday, March 28, 2024 5:31 PM*
*To: Texas A& M University Public Records Support< texasam@mycusthelp.net>*
*Cc: Patti Artavia  < patti@vbattorneys.com> ; Brendan Fradkin  < brendan@vbattorneys.com> ; open-records@tamu.edu*
*Subject: Freedom of Information Request related to Squadron 17*

*To whom it may concern:*

*Please see attached an open records request. Do not send me a form letter with frivolous objections like the last two times. Also, I agree with appropriate redactions and the answer to both of those questions is yes, so do not send me the form email that you utilize to delay the process.*

*Please remind Dr. Douglas Bell, Joe Ramirez, Patrick Michalis, and anyone else involved in this matter of their legal obligations to preserve any potentially responsive documents.*

*Texas law mandates the response be sent in 10 days. Do not ask for an extension unless you give me a rational, logical and appropriate reason for any extension. Given the failure to comply with my previous two requests, I expect this request to be answered fully and timely. If it is not, I will proceed appropriately*

*If you have any questions, please let me know.*

*-bb*

*● All documents or other materials related to any so-called investigation of Squadron 17, including but not limited to texts, emails, interview notes, screen shots, and any other communications related to the investigation from the Office of the Commandant, the Office of the Vice President of Student Affairs, the Office of Student Conduct, any communications to or from Dr. Douglas Bell related to the investigation, including phone calls, emails, texts or any other form of communication, any notes of any kind related in any manner to any such investigation, along with any other information pertaining to any such investigation*

*● All documents or materials related to the qualifications or training of the individuals who have participated or will participate in any investigation into Squadron 17, including their resumes, background, application to be part of the Texas A& M University System, conviction records in other student conduct panels on which they have served, any training any such individuals have received in " DE& I" or any related type of training, along with any texts or emails or other forms of communication related to any investigation of Squadron 17, including but not limited to materials in the possession of Dr. Douglas Bell, Joe Ramirez, any of the investigators who participated in any questioning of current cadets or students,*

*and any communications between or amongst same*

*● Any and all materials which show how any investigation of Squadron 17 was referred to the Office of the Student Affairs or the Office of Student Conduct, including official referral papers and any emails, texts or other forms of communication related to same from anyone in the Office of Student Affairs or Student Conduct or the Office of the Commandant, or elsewhere.*

*● Any texts, emails or other forms of communication , digital or otherwise, between or among Joe Ramirez and Patrick Michaelis related to the subject of investigating the any Corps outfit or individual for hazing or any other infraction, including but not limited to the investigation of 17, and any such materials from anyone acting with or on behalf of these individuals, as well as any communications of any kind to or from Dr. Douglas Bell related to the same. I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*Please remind Dr. Bell, Joe Ramirez, and anyone else who possess potentially responsive information of their obligations under Texas law to preserve any such responsive information. Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.*

*Sincerely,*
*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"< /brendan@vbattorneys.com> < /patti@vbattorneys.com> < /texasam@mycusthelp.net> < /brian@vbattorneys.com>*

Our office is unable to conduct a search for  *"...All documents or other materials related to any so-called investigation of Squadron 17, ..., "* *"...All documents or materials related to the qualifications or training of the individuals..., "* *"...Any and all materials which show how any investigation of Squadron 17..., "*  and *"...Any texts, emails or other forms of communication , digital or otherwise, ...."*  Therefore, we are requesting that you narrow your request by providing us with a date range, so that we can better assist you with your request.

As provided by section 552.222(d) of the Texas Public Information Act, your request will be considered withdrawn if we do not receive a response from you by the 61st day after the date of this request for clarification/narrowing.

Sincerely,

Leslie Kacer
Open Records Office

Date

On 3/28/2024 5:44:14 PM, System Generated Message:
**Subject:** Texas A&M University Public Information Request :: J001147-032824
**Body:**
Dear Brian Beckcom:

We received your public information request for **Texas A&M University**.  Your request was given the **reference number J001147-032824** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.


To monitor the progress or update this request please log into the Public Records Center.

On 3/28/2024 5:44:13 PM, Leslie Kacer wrote:
Request was created by staff

## ⌄ Request Details

| | |
|---|---|
| Reference No: | J001147-032824 |
| Created By: | Leslie Kacer |
| Create Date: | 3/29/2024 8:00 AM |
| Update Date: | 5/8/2024 10:23 PM |
| Completed/Closed: | No |
| Required Completion Date: | 5/8/2024 |
| | |
| Status: | Activity Assigned |
| Priority: | Medium |
| Assigned Dept: | TAMU_Open Records |
| Assigned Staff: | Open Records University |
| | |
| Customer Name: | Brian Beckcom |
| Email Address: | Brian@vbattorneys.com |
| Phone: | 8327913118 |
| Group: | TAMU |
| | |
| Source: | Email |

EXHIBIT
5

# Public Information Records (#J001320-041024)

⌄ **Public Information Records Details**

---

| | |
|---|---|
| This request is for: | Texas A&M University |
| Summary of Request: | Re-file of J000762, without redaction authority per 4/10/24 Fradkin email. |
| Describe in detail the Record(s) Requested: | 4/11/24 email:<br>Also just confirming that you're still moving forward on seeking the OAG opinion for the new request on J762. |

Original Request J000762
From: Patti Artavia
Sent: Monday, February 26, 2024 7:03 AM
To: open-records@tamu.edu
Subject: Open Records Request

Please see attached letter. Thank you

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:

● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

● Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

● Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes

| | |
|---|---|
| Date From: | |
| Date To: | |
| Preferred Method to Receive Records: | Electronic via Records Center |

Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?:     NO

Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?:     NO

## ❯ Category

## ⌄ Clarification(s)

Clarification(s):                    STAFF: Please describe any clarifications requested and received.

## ❯ OAG decision requested

## ❯ Exceptions

## ❯ Charges

## ❯ Notes

## ⌄ Message History

| Date |
|---|
| On 4/10/2024 5:44:23 PM, System Generated Message:<br>**Subject:** Texas A&M University Public Information Request :: J001320-041024<br>**Body:**<br>Dear Brian Beckcom:<br><br>We received your public information request for **Texas A&M University**.  Your request was given the **reference number J001320-041024** for tracking purposes.  Please refer to this number when making inquiries about your request.<br><br>You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.<br><br>Thank you for your interest in **Texas A&M University**.<br><br><br>To monitor the progress or update this request please log into the Public Records Center.<br><br>On 4/10/2024 5:44:21 PM, Brooks Moore wrote:<br>Request was created by staff |

## ⌄ Request Details

Reference No:              J001320-041024

Created By:                Brooks Moore

Create Date:               4/10/2024 8:00 AM

Update Date:               4/16/2024 3:32 PM

Completed/Closed:          No

Required Completion Date:   4/24/2024

**- 1633 -**

| | |
|---|---|
| Status: | Activity Assigned |
| Priority: | Medium |
| Assigned Dept: | TAMU_Open Records |
| Assigned Staff: | Open Records University |
| | |
| Customer Name: | Brian Beckcom |
| Email Address: | Brian@vbattorneys.com |
| Phone: | 8327913118 |
| Group: | TAMU |
| | |
| Source: | Email |

| From: | Moore, Brooks |
|---|---|
| To: | "Brendan Fradkin" |
| Cc: | Brian Beckcom; Patti Artavia |
| Subject: | RE: Beckcom TPIA Request Recap |
| Date: | Wednesday, April 10, 2024 5:49:00 PM |

Brendan,

You are correct on J1123. The university is finalizing the responsive information for disclosure tomorrow, and it will provide written notice with a date certain to disclose any remaining information.

On J762, I was not sure if we had an agreement. Your email is confirmation, so we have logged this as a new request and seek an AG decision as discussed below. You, Brian, and Patti should have received an automated email of acknowledgement, or you will very soon. I logged in the request, and hopefully our online request system does not crash.

I left you a voicemail a little after 5:00 and we need to discuss the mandamus. In an abundance of caution, we will request representation from the Office of the Attorney General during the afternoon of Friday, April 12, 2024, if the suit is still pending at noon that day. If that occurs, my brief to the OAG on will lead with the fact that litigation is pending connected to the request. This complicates us moving forward on this request, but it is your choice. We appreciate your efforts to clear up this point. The withdrawing of the redaction authority and the initiation of the new request makes all claims on J762 moot, as did the university's production of information on J767 (and tomorrow's disclosure of J1123 information).

Regards,

Brooks

**R. Brooks Moore | Deputy General Counsel**
Office of General Counsel
THE TEXAS A&M UNIVERSITY SYSTEM

---

**From:** Brendan Fradkin <brendan@vbattorneys.com>
**Sent:** Wednesday, April 10, 2024 4:11 PM
**To:** Moore, Brooks <RBM@tamus.edu>
**Cc:** Brian Beckcom <brian@vbattorneys.com>; Patti Artavia <patti@vbattorneys.com>
**Subject:** Re: Beckcom TPIA Request Recap

Hey Brooks,

Just confirming that we should be receiving a portion of the documents tomorrow, and then a separate letter containing a later response date for additional documents if that additional time is needed. Is that correct?

Also just confirming that you're still moving forward on seeking the OAG opinion for the new request on J762.

Thanks!

On Mon, Apr 8, 2024 at 7:04 PM Moore, Brooks <RBM@tamus.edu> wrote:

Brendan,

1. Correct.
2. I read the second date mentioned as a response date and/or as providing a third response date, if needed. The Open Records folks will work expeditiously, but we are also required to respond in a timely manner to all other pending requests, and there are many.

   On the interview issue, I read the request for J1123 to be the following as shown below. Note that interview recordings are not requested. If you wish to modify the request, please let me know. Again, these are public, but they are voluminous and require review and possibly editing out confidential personal information. This could increase the response time. Request J767 has been fully responded to and is closed.

3. I have several letter rulings covering different groups of DEI documents covered by ongoing the compliance review. To my knowledge, one of our letter rulings covers this specific information, but we will have to verify. It is confidential either way and we are happy to seek an AG decision if needed.

4. For the sake of clarity, we will note that you are withdrawing authorization to make redactions for request J762. This will reopen J762 as a new request, and we will log it as such. However, I will give you our commitment to submit our OAG briefing as soon as we can, well before the 10-day deadline. This should not be problem because we have the information gathered that requires a decision, although I have not yet reviewed all of it. My goal would be this week, assuming we have an agreement on these issues. Asking us to seek a letter ruling is inconsistent with your pending mandamus action. The OAG will not consider requests already in litigation, so we need confirmation that the petition has been dismissed/withdrawn prior to submitting OAG briefing.

Please let me know if have additional questions.

Regards,
Brooks

**- 1636 -**

**Here is request J1123.**

From: Brian Beckcom
Sent: Wednesday, March 27, 2024 10:02 AM
To: Texas A&M University Public Records Support
Cc: Open-records@tamu.edu; Patti Artavia ; Brendan Fradkin ;
chancellor@tamus.edu

With respect to the request pertaining to the hiring of the Commandant.

* The job posting and applicant resumes.

* Emails, texts, and other communications between the office of Vice President of Student Affairs and the Office of the President (former President Banks).

* Letters of recommendation.

* Notes from deliberations.

* Emails to and from the candidates.


**R. Brooks Moore | Deputy General Counsel**
Office of General Counsel
THE TEXAS A&M UNIVERSITY SYSTEM

---

**From:** Brendan Fradkin <brendan@vbattorneys.com>
**Sent:** Monday, April 8, 2024 6:19 PM
**To:** Moore, Brooks <RBM@tamus.edu>
**Cc:** Brian Beckcom <brian@vbattorneys.com>; Patti Artavia <patti@vbattorneys.com>
**Subject:** Re: Beckcom TPIA Request Recap

Brooks,

To clarify:

(1) There is no email, the policymaking document is standalone. Therefore, you aren't producing anything further. Is that correct?

(2) Some portion of the documents will be released on 4/11, another portion will be released on 4/18. Will there be a third date/portion, or do those two dates account for all of the documents?

Can you explain what you mean about interviews not being responsive? Those are very much part of the requests. If that inclusion changes timelines, please let me know what dates you can provide.

(3) There is no OAG decision specific to the DEI documents requested here, but there is an OAG decision on other documents created based on compliance programs. Is that correct?

Lastly, per our discussion, we are rescinding our consent to TAMU's discretionary redaction of documents. Please submit the documents at issue to the OAG for analysis.

On Mon, Apr 8, 2024 at 5:12 PM Moore, Brooks <RBM@tamus.edu> wrote:

Brendan,
On item 1, I stand corrected.  We have a policy-making document that was NOT attached to an email.

On item 2, Open Records advises that "There are a voluminous amount of records responsive to this request that have to be reviewed and mandatory redactions made- there are 7 folders with records and folders within those folders.  We can release a portion of the information on April 11th and will give an expect date for the next portion of information on or before the following Thursday, April 18th."  The 10th business day is 4/11, based on Brian's narrowing on March 28, 2024.  This is the best I can tell you as I have not reviewed any of this information.  The interviews do not appear to be responsive to the request and that will save them some review time.

On item 3, see attached.  Please note that we have received multiple letter rulings on the SB 17 compliance review covering various groups of information.  This was one of the letter rulings that Open Records could locate the most quickly, but the reasoning is the same on all of them.  We have had a compliance review pending since last summer to ensure the university's compliance with the new law.

Again, we need to know by tomorrow morning where we stand.

Thank you.

Brooks

**R. Brooks Moore | Deputy General Counsel**
Office of General Counsel
THE TEXAS A&M UNIVERSITY SYSTEM

**From:** Brendan Fradkin <brendan@vbattorneys.com>
**Sent:** Monday, April 8, 2024 3:18 PM
**To:** Moore, Brooks <RBM@tamus.edu>
**Cc:** Brian Beckcom <brian@vbattorneys.com>; Patti Artavia <patti@vbattorneys.com>
**Subject:** Re: Beckcom TPIA Request Recap

Okay great. Three action items.

(1) Can you get us a date certain where you'll produce the email containing the policymaking document, or let us know you are not producing it?

(2) can you get us a date certain when you'll produce the Michaelis communications and other applicant information/communications?

(3) can you send us the AG opinion that you say may apply to the DEI docs?

Thanks!

On Mon, Apr 8, 2024 at 1:18 PM Moore, Brooks <RBM@tamus.edu> wrote:

> My responses are below. The below is correct with a couple of minor corrections (see highlighted text).
>
> Brooks
>
> **R. Brooks Moore | Deputy General Counsel**
> Office of General Counsel
> The Texas A&M University System
>
> **From:** Brendan Fradkin <brendan@vbattorneys.com>
> **Sent:** Monday, April 8, 2024 1:02 PM
> **To:** Moore, Brooks <RBM@tamus.edu>
> **Cc:** Brian Beckcom <brian@vbattorneys.com>; Patti Artavia <patti@vbattorneys.com>
> **Subject:** Beckcom TPIA Request Recap
>
> Brooks,
>
> Thanks again for talking with me today. This email is intended to confirm what documents are being withheld, what privileges are being applied to those documents, and additional documents you may be able to produce.

**DEI/Fish Program Documents**

Under this category of requests, you are withholding the following:

(1) An email with attached proposed policymaking document regarding the fish brigade.
*withheld based on policymaking privilege*—Brooks Moore Response-Correct
(2) The attached proposed fish brigade policymaking document.
*withheld based on policymaking privilege*—Brooks Moore Response-Correct
(3) A compilation of DEI documents prepared for systemwide compliance efforts.
*withheld based on 552.101 + 51.971(e)(2)* —Brooks Moore Response-Correct
(4) Documents that contain student identification information.
*withheld subject to FERPA request*—Brooks Moore Response-Correct

You stated that on (1), you would look into getting us the email if the email itself contained no policymaking information. —Brooks Moore Response-Correct

You stated that on (2), if we withdraw our consent to withholding, you could go back to the AG for an opinion. —Brooks Moore Response-Correct

You stated that on (3), there may already be an applicable holding from the AG's office, but you would send us that holding, and that you would go back to the AG's office with these documents as well. —Brooks Moore Response-Correct, except that if we have an applicable letter ruling on the same information, we are prohibited for asking for another ruling. If the information is different from that previously submitted to the OAG, we will request a letter ruling. We will provide the citation if it is binding here.

You stated that (4) would require an additional FERPA request, but if approved, you would produce. —Brooks Moore Response-Correct, assuming that the applicable student provides prior written consent for the release of the information in accordance with FERPA.

**Commandant Hiring Documents**

(1) Michaelis personnel information.
*this was all produced, subject to some personal information redactions*—Brooks Moore Response-Correct

(2) Communications about Michaelis hiring
*these will be produced*—Brooks Moore Response-Correct, under request J001123.

(3) Personnel information for other candidates

*these will be produced.* ==—Brooks Moore Response-Correct, under request J001123.==

If this sums up what we discussed today accurately, please confirm.

--
Brendan Fradkin
VB Attorneys
832-791-2337

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

--
Brendan Fradkin
VB Attorneys
832-791-2337

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

--
Brendan Fradkin
VB Attorneys
832-791-2337

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

--
Brendan Fradkin
VB Attorneys

832-791-2337

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

**EXHIBIT**

**6**



Office of General Counsel

# THE TEXAS A&M UNIVERSITY SYSTEM

April 19, 2024

Open Records Division                                                                *via OAG E-Filing*
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548

Re:     Request for a Decision regarding a Public Information Request from Brad Beckcom to
        Texas A&M University (J001320-041024)

Dear Open Records Division:

One April 10, 2024, Texas A&M University (the "university") received an open records request from Brian Beckcom, through an attorney in his law firm. The request, enclosed as Exhibit A-1, seeks certain documents, materials, and communications. The specific items of the request are found on pages 4-5 of the exhibit, as narrowed in the prior request (explained below).

## Prior Request

This request is a re-filing of another public information request for the same information. The prior request, enclosed as Exhibit A-2, was originally submitted on February 26, 2024. The requestor authorized the university in that request to redact excepted information without a decision from your office. *See* Exhibit A-2, at 17. The university requested clarification or narrowing on March 6, 2024, and the requestor provided narrowing on March 7, 2024. Exhibit A-2, at 12-13, 14-16. The university confirmed the narrowing on March 11, 2024. Exhibit A-2, at 9. The university provided responsive information on two dates, on March 21, 2024, and April 5, 2024. Exhibit A-2, at 3, 8. Prior to the second and final disclosure, the university informed the requestor in accordance with Tex. Gov't Code sec. 552.221(d) as to the university's expected response date. Exhibit A-2, at 4, 8 (expected response dates of March 29, 2024, and then April 5, 2024). The university's final disclosure, on April 5, 2024, explained the exceptions asserted by the university for redacting, and as required, withholding information in accordance with the requestor's authorization. The requestor did not object in writing to the university's final disclosure. *See* Exhibit A-2, at 3.

## Pending Mandamus Action

Prior to the university's final disclosure of information in the prior request, the requestor filed suit against Texas A&M University on March 28, 2024, and the citation and Petitioner's Original Petition for Writ of Mandamus are enclosed as Exhibit A-3. See Exhibit A-3, at 3. The suit challenges the university's response to the request discussed in Exhibit A-2, in addition to another request, which the university had fully responded to by this date. The university was

301 Tarrow Street, 6th Floor · College Station, Texas 77840-7896
(979) 454-5120 · Fax (979) 458-6130 · www.tamus.edu/legal

- 1643 -

served with this suit after the university's final disclosure of information, on April 8, 2024. *See id.*, at 1-2; Exhibit A-2, at 3. The Office of the Attorney General has assigned trial counsel to defend the university in this suit.

**Current Request**

The university, through the undersigned, communicated with the requestor and his law firm in an effort to resolve the requestor's dispute with the university regarding the request discussed in Exhibit A-2. The requestor, through his law firm, indicated his withdrawal of consent to withhold excepted information, with the intention that the university would request a decision from your office for excepted information on the request. *See* Exhibit A-1, at 8-9 (affirmatively stating this intention, after university business hours, on April 8, 2024), 10-11 (discussion of this concept). The undersigned explained the concept on April 8, 2024, after the close of business hours, that this would result in the request being refiled as a new request, and he confirmed on April 10, 2024, that the requestor agreed to this approach. *See* Exhibit A-1, at 6, 7. The requestor refused to withdraw the mandamus action despite agreeing to move forward with a new request for the same information. *See* Exhibit A-1, at 6-7. The request was re-filed by the university on April 10, 2024, indicating that the requestor did not agree to redactions without an OAG decision. Exhibit A-1, at 1-2.

**Prior Decision-Last Item of Request**

The final item of the request seeks:

> Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes would potentially impact Texas A&M or the Corps of Cadets from a DEI perspective.

Exhibit A-1, at 5. We note that the information responsive to this final item of the request was part of the information at issue in a separate prior university open records request, and this precise information is subject to a prior decision from your office. Under the prior decision, Tex. Att'y Gen. OR2024-004322, enclosed as Exhibit C, the university was required to "withhold the submitted information under section 552.101 of the Government Code in conjunction with section 51.971(e)(2) of the Education Code." The law, facts, and circumstances on which this letter ruling was based have not changed since the issuance of the ruling. Therefore, we are withholding this information in accordance with the letter ruling. *See* Exhibit C.

**Remaining Responsive Information**

As previously discussed, the university disclosed certain information under the prior request for the same information. We believe that the remaining information responsive to the request is excepted from disclosure under the Texas Public Information Act, Government Code, Chapter 552 ("Act"), as explained below. Therefore, we are requesting a decision regarding this information.

301 Tarrow Street, 6th Floor · College Station, Texas 77840-7896
(979) 458-6120 · Fax (979) 458-6150 · www.tamus.edu/legal

- 1644 -

### Tex. Gov't Code § 552.111

Section 552.111 of the Act, which excepts from disclosure "an interagency or intra-agency memorandum or letter that would not be available to a party in litigation with the agency," has been interpreted to encompass the deliberative process privilege as well as attorney work product privilege. According to your office, pre-decisional internal communications consisting of advice, recommendations, opinions, and other material reflecting deliberative or policymaking processes are subject to section 552.111. Also, policy-making drafts and related interagency communications are covered by this privilege.

For example, the Office of the Attorney General discussed the application of this exception as follows:

> Section 552.111 of the Government Code excepts from disclosure "an interagency or interagency memorandum or letter that would not be available by law to a party in litigation with the agency[.]" Gov't Code § 552.111. Section 552.111 encompasses the deliberative process privilege. *See* Open Records Decision No. 615 at 2 (1993). The purpose of this exception is to protect advice, opinion, and recommendation in the decisional process and to encourage open and frank discussion in the deliberative process. *See Austin v. City of San Antonio*, 630 S.W.2d 391, 394 (Tex. App.--San Antonio 1982, orig. proceeding); Open Records Decision No. 538 at 1-2 (1990).
>
> In Open Records Decision No. 615, this office re-examined the statutory predecessor to section 552.111 in light of the decision in *Texas Department of Public Safety v. Gilbreath*, 842 S.W.2d 408 (Tex. App.--Austin 1992, orig. proceeding). We determined section 552.111 excepts from disclosure only those internal communications that consist of advice, opinions, recommendations, and other material reflecting the policymaking processes of the governmental body. *See* ORD 615 at 5. A governmental body's policymaking functions do not encompass routine internal administrative or personnel matters, and disclosure of information about such matters will not inhibit free discussion of policy issues among agency personnel. *Id.*; *see also City of Garland v. Dallas Morning News*, 22 S.W.3d 351 (Tex. 2000) (section 552.111 not applicable to personnel-related communications that did not involve policymaking). A governmental body's policymaking functions do include administrative and personnel matters of broad scope that affect the governmental body's policy mission. *See* Open Records Decision No. 631 at 3 (1995). Further, section 552.111 does not protect facts and written observations of facts and events that are severable from advice, opinions, and recommendations. *Arlington Indep. Sch. Dist. v. Tex Attorney Gen.*, 37 S.W.3d 152 (Tex. App.--Austin 2001, no pet.); *see* ORD 615 at 5. But if factual information is so inextricably intertwined with material involving advice, opinion, or recommendation as to make severance of the factual data impractical, the factual

301 Tarrow Street, 6th Floor · College Station, Texas 77840-7896
(979) 458-6120 · Fax (979) 458-6150 · www.tamus.edu/legal

**- 1645 -**

information also may be withheld under section 552.111. *See* Open Records Decision No. 313 at 3 (1982).

This office has also concluded a preliminary draft of a document intended for public release in its final form necessarily represents the drafter's advice, opinion, and recommendation with regard to the form and content of the final document, so as to be excepted from disclosure under section 552.111. *See* Open Records Decision No. 559 at 2 (1990) (applying statutory predecessor). Section 552.111 protects factual information in the draft that also will be included in the final version of the document. *See id.* at 2-3. Thus, section 552.111 encompasses the entire contents, including comments, underlining, deletions, and proofreading marks, of a preliminary draft of a policymaking document that will be released to the public in its final form. *See id.* at 2.

*See. e.g.*, Tex. Att'y Gen. OR2016-02974 (2016).

We assert that the information enclosed as Exhibits B-1 and B-2 should be withheld under the deliberative process privilege component of section 552.111 of the Act. The enclosed information relates to policymaking, because it pertains to the university's adoption of formal university policies applicable to the Corps of Cadets, including student cadets in the Corps and university staff Corps administration. The information in Exhibit B-1 reflects advice, opinions, and recommendations of university administrators on such policies. The marked information in Exhibit B-2 reflects advice, opinions, and recommendations of current student cadets on such policies. Therefore, we believe that the information enclosed as Exhibits B-1 and B-2 (as marked) is excepted from disclosure under section 552.111 of the Act.

Thank you for your consideration of this matter. If you have any questions, please feel free to contact me.

Sincerely,

R. Brooks Moore
Deputy General Counsel

Enclosures:   Exhibits A-1, A-2, A-3, B-1, B-2, C

cc:   Requestor *(via email) (no attachments)*

Texas A&M University Open Records

301 Tarrow Street. 6th Floor - College Station, Texas 77840-7896
(979) 458-6120 - Fax (979) 458-6150 - www.tamus.edu/legal

**EXHIBIT**

**7**



KEN PAXTON
ATTORNEY GENERAL OF TEXAS



RECEIVED

FEB 0 0 2024

OFFICE OF
GENERAL COUNSEL

February 7, 2024

Ms. Claudene Marshall
Assistant General Counsel
Texas A&M University System
301 Tarrow Street, 6th Floor
College Station, Texas 77840-7896

OR2024-004022

Dear Ms. Marshall:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 23-098885 (Ref. No. H002573-091823).

Texas A&M University (the "university") received a request for information pertaining to specified information relating to diversity, equity, and inclusion initiatives. You claim the submitted information is excepted from disclosure under section 552.101 of the Government Code. We have considered the exception you claim and reviewed the submitted representative sample of information.[1]

Section 552.101 of the Government Code excepts from public disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." Gov't Code § 552.101. Section 552.101 encompasses information protected by other statutes, including section 51.971 of the Education Code. Section 51.971 of the Education Code provides, in relevant part, the following:

(a) In this section:

---

[1] We assume the "representative sample" of records submitted to this office is truly representative of the requested records as a whole. See Open Records Decision Nos. 499 (1988), 497 (1988). This open records letter does not reach, and therefore does not authorize the withholding of, any other requested records to the extent that those records contain substantially different types of information than that submitted to this office.

(1) "Compliance program" means a process to assess and ensure compliance by the officers, employees, agents, contractors, subcontractors, or other persons acting on behalf of an institution of higher education with applicable laws, rules, regulations, and policies, including matters of:

　　　(A) ethics and standards of conduct;

　　　(B) financial reporting;

　　　(C) internal accounting controls; or

　　　(D) auditing.

(2) "Institution of higher education" has the meaning assigned by Section 61.003.

. . . .

(e) Information is excepted from disclosure under [the Act] if it is collected or produced:

　　　. . . .

　　　(2) by a systemwide compliance office for the purpose of reviewing compliance processes at a component institution of higher education of a university system

Educ. Code § 51.971(a), (e)(2). We understand the university is an institution of higher education for purposes of section 61.003 of the Education Code. *See id* § 51.971(a)(2). You state the submitted information concerns a system-wide audit of member institutions' compliance with Senate Bill 17 conducted by the Texas A&M System Internal Audit Department. Based upon your representation and our review, we conclude the submitted information is confidential under section 51.971(e)(2) of the Education Code. Accordingly, the university must withhold the submitted information under section 552.101 of the Government Code in conjunction with section 51.971(e)(2) of the Education Code.

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

Ms. Claudene Marshall - Page 3

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at https://www.texasattorneygeneral.gov/open-government/members-public/what-expect-after-ruling-issued or call the OAG's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public information under the Public Information Act may be directed to the Cost Rules Administrator of the OAG, toll free, at (888) 672-6787.

Sincerely,

D. Michelle Case
Assistant Attorney General
Open Records Division

DMH/jxd

Ref:    ID# 23-098885

c:    Requestor

**EXHIBIT**

**8**

## THE STATE OF TEXAS
## CITATION

**CLERK OF THE COURT**
Gabriel Garcia
300 East 26th Street, Suite 1200
Bryan, TX 77803

**ATTORNEY FOR PLAINTIFF**
Brian Beckcom
6363 Woodway Dr., Suite 400
Houston, TX 77057

To: **Texas A&M University Through Office Of General Counsel Who May Be Served At Moore/Connally Building 6th Floor 301 Tarrow Street, College Station, Texas 77840.**
Defendant,

NOTICE TO THE DEFENDANT: "You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

Greeting:
You are hereby commanded to appear by filing a written answer to the **Petitioner's Original Petition for Writ Of Mandamus** at or before ten o'clock A.M. of the Monday next after the expiration of twenty days after the date of service of this citation before the Honorable **85th District Court** of Brazos County, Texas at the Courthouse of said County in Bryan, Texas. Said Petition was filed on **March 28, 2024** in the case, numbered **24-000902-CV-85** on the docket of said court, and styled,

**Brian Beckcom**
**vs.**
**Texas A&M University**

The nature of Plaintiff's demand is fully shown by a true and correct copy of the **Petitioner's Original Petition for Writ Of Mandamus** accompanying this citation and made a part thereof.

The officer executing the writ shall promptly serve the same according to requirements of the law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and sealed of said Court at office, on this the 3rd day of April, 2024.

**Gabriel Garcia**
**Brazos County District Clerk**
**300 East 26th Street, Suite 1200**
**Bryan, Texas 77803**

By: _Mia Portillo_ **Deputy**

**- 1650 -**

## OFFICER'S RETURN

Came to hand on the _____ day of _____, 20____, at _____ o'clock ____.M.

Executed at _____, within the County of _____ o'clock ____.M. on the __8__ day of __April_____, 20__24__, by delivering to the within named _____ each, in person, a true copy of this citation together with the accompanying copy of the petition, having first attached such copy of such petition to such copy of citation and endorsed on such copy of citation the date of delivery.

Total fee for serving this citation_____

Sheriff Account
To certify which witness my hand officially.
No._____

For Clerk's Use _____ _L_ _RN pn 1024_

Taxed_____  Sheriff of _____Brazos_____ County, Texas
Returned Record_____  By _____Lelu Ratt_____ Deputy

**- 1651 -**

Received & Filed 3/28/2024 4:08 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Kristin Emert
Envelope# - 86169545

24-000902-CV-85

Cause No. _____

| | | |
|---|---|---|
| Brian Beckcom | ) | In the District Court of |
| | ) | |
| vs. | ) | Brazos County, Texas |
| | ) | |
| Texas A&M University | ) | ____ Judicial District |

### Petitioner's Original Petition for Writ of Mandamus

In this Petition for Writ of Mandamus under the Texas Public Information Act, Brian Beckcom ("Petitioner") seeks an order from the Court compelling Respondent Texas A&M University ("TAMU") to release public records requested by Petitioner.

1. **Discovery Control Plan**

1.1 Petitioner requests expedited relief under Level 1 of the Texas Rules of Civil Procedure. At this time, Petitioner requests non-monetary relief only, except for attorney fees and court costs, the amount of which will not exceed $100,000.

2. **Claim for Relief**

2.1 Petitioner seeks only non monetary relief and attorney's fees and court costs necessary for the prosecution of this writ and subsequent discovery.

3. **Parties**

3.1 Petitioner Brian Beckcom is an attorney whose address is 6363 Woodway Drive, Suite 400, Houston, Texas 77057.

3.2. Respondent Texas A&M University is a public university that can be served through its Office of General Counsel at Moore / Connally Building, 6th Floor, 301 Tarrow Street, College Station, Texas 77840-7896

## 4. Jurisdiction, Venue, and Conditions Precedent

4.1 This Court has jurisdiction under Texas Government Code § 552.321. Venue is mandatory in Brazos County under Texas Government Code § 552.321(b).

4.2 All conditions precedent have been performed or have occurred.

## 5. Facts

5.1 On February 26, 2024, Petitioner submitted two requests for public information to TAMU pursuant to the Texas Public Information Act, Texas Government Code Chapter 552 (the "TPIA"). The requests sought documents related to issues involving the Corps of Cadets, including but not limited to so-called "DE&I" and irregularities related to the hiring of the new Commandant as well as irregularities related to the new Commandant's plan to radically restructure the Corps of Cadets in secret. The requests are attached to this motion as Exhibit 1.

5.2 The TPIA mandates timely responses, and specifically responses within 10 days.[1] To date, over thirty business days later, TAMU has failed to produce full and complete responsive documents and has refused to produce all of the requested public information. Instead, TAMU initially lodged frivolous form objections, refused to comply with the requests, refused to work with the undersigned, refused to respond to certain emails seeking clarification, and has repeatedly violated Texas open records laws. The email exchanges between Mr. Beckcom and the open records department are attached as Exhibit 2.

---

[1] Tex. Gov't Code § 552.301

5.3     Given recent occurrences wherein certain individuals at TAMU encourage others to delete text messages and other communications, there is a real and present danger that information and documents may be destroyed. It is imperative that TAMU preserve and produce all relevant information and materials immediately.

5.3     TAMU's failure to "promptly produce" the requested information violates the TPIA[2].

## 6.     Violation of the Texas Public Information Act

6.1     The TPIA requires that public information be produced "promptly."[3] The Texas Supreme Court has emphasized that the TPIA's prompt production requirement is a key part of its purpose to promote government transparency.[4] TAMU's failure to provide the requested information is a clear violation of the TPIA's unambiguous mandate.

## 7.     Request for Relief

Petitioner requests that the Court:

7.1     Order TAMU to immediately produce all public information responsive to Petitioner's February 26, 2024 TPIA requests immediately;

7.2     Order the video deposition of any personnel at TAMU who have participated in compiling the records requests or answering same;

7.3     Award Petitioner his reasonable attorney fees and costs under TPIA § 552.323, with that amount be decided pursuant to submission of evidence and hearing by this Court;

7.4     Order TAMU to comply fully with the TPIA for any future related requests or face further potential sanctions; and

---

[2] Tex. Gov't Code § 552.221(a)

[3] *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 243-44 (Tex. App.—Austin 2016, no pet.).

[4] *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011).

7.5    Grant all other relief to which Petitioner is entitled.

Respectfully submitted,

**VB Attorneys**

/s/ Brian Beckcom

**Brian Beckcom**
*Brian@vbattorneys.com*
SBN: 24012268
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713/224-7800 (Office)
713/224-7801 (Facsimile)



**Brian Beckcom**
Board Certified in Personal Injury Trial Law
Texas Board of Legal Specialization

6363 Woodway Drive
Suite 400
Houston, Texas 77057

Tel (713) 224-7800
Fax (713) 224-7801

www.VBAttorneys.com

February 26, 2024

Texas A&M University by email to: open-records@tamu.edu
Office of Open Records
750 Agronomy Road
Mail Stop 1280
College Station, Texas 77843

To Whom It May Concern:

Pursuant to Section 552.001, *et seq.*, of the Texas Open Records Act, Public Records Information, please produce the following documents:

- All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

- All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

- All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

- Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

VUJASINOVICH & BECKCOM PLLC

- Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

- Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes would potentially impact Texas A&M or the Corps of Cadets from a DEI perspective.

I agree to pay reasonable fees for the processing of this request.

As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

Please direct any future correspondence to the undersigned or Patti@vbattoreys.com We look forward to hearing from you.

Sincerely,

/s/ Brian Beckcom
Brian Beckom
Brian@vbattorneys.com


**Brian Beckcom**
Board Certified in Personal Injury Trial Law
Texas Board of Legal Specialization

63?? Woodway Drive
Suite 400
Houston, Texas 77057

Tel (713) 224-7800
Fax (713) 224-7801

www.VBAttorneys.com

February 26, 2024

Texas A&M University by email to: open-records@tamu.edu
Office of Open Records
750 Agronomy Road
Mail Stop 1280
College Station, Texas 77843

To Whom It May Concern:

Pursuant to Section 552.001, *et seq.*, of the Texas Open Records Act, Public Records Information, please produce the following documents:

1. Any contracts of employment for the Commandant of the Corps of Cadets, Patrick Michaelis, any drafts of the same, any communications in whatever form regarding the same, and any other agreements which relate to the same;

2. Any documents or materials related to the selection of Patrick Michaelis as Commandant, including but not limited to meeting notes, interview notes, memos, discussions, digital communications of any form, any discussion or notes regarding why Michaelis was selected over other candidates, and any other documents or materials concerning the same.

I agree to pay reasonable fees for the processing of this request.

As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

Please direct any future correspondence to the undersigned or Patti@vbattorneys.com We look forward to hearing from you.

VUJASINOVIC & BECKCOM PLLC

**Exhibit C**

- 1658 -

Sincerely,

/s/ Brian Beckcom
Brian Beckcom
Brian@vbattorneys.com

# J000762-022624 - Public Information Records

## Message History (18)

↩ On 3/29/2024 2:42:02 PM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [open-records@tamu.edu], [patti@vbattorneys.com], [brendan@vbattorneys.com]

Ms. Brashear:
TAMU has repeatedly and intentionally violated Texas law. I will proceed accordingly.
-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video

On Fri, Mar 29, 2024 at 2:15 PM Texas A&M University Public Records Support wrote:

---

✉ On 3/29/2024 2:15:12 PM, Texas A&M University Public Records Support wrote:

CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/29/2024

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Our apologies for the delay, but we are still in the process of locating and gathering records responsive to your request.

As required by Tex. Gov't Code sec. 552.221(d), we anticipate having any remaining records found responsive to your request to you no later than the close of business on Friday, April 5th.

Sincerely,

Knesha Brashear
Open Records Office

 Exhibit 2 Page 1

- 1660 -

On 3/23/2024 4:51:02 PM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Patti"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

This email confirms that the Open Records Office at TAMU promised to respond by March 21, 2024, after being given multiple extensions, and then, on March 21, 2024, did not comply with the open records request, and instead produced almost nothing responsive.

Please explain to me why you promised to produce materials on March 21st after being given multiple extensions and then did not do so. Please include the legal justification for your failure to comply with Texas Open Records laws. Please also identify the individuals you have been working with on these requests as their depositions may be necessary.

Also, for some reason you refuse to reply to Brendan and Patti as well. Please do so going forward, including with any future document requests.

Thank you.

-bb

VBAttorneysLessons from Leaders PodcastMy Bio Video


On Mon, Mar 11, 2024 at 9:19 AM Texas A&M University Public Records Support wrote:



Exhibit 2

Page 2

- 1661 -

On 3/23/2024 4:03:02 PM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

By copy of this email, I hereby confirm that Texas A&M originally claimed the request was overbroad and that TAMU needed additional time to gather the documents, then, when the documents were partially produced, TAMU only produced three PowerPoint presentations that could have been produced in five minutes. Put another away, the original objections were frivolous, and the request for more time was also frivolous.
At this point, it is clear that TAMU is slow-playing the request for strategic and tactical reasons, which violates the Texas Open Records laws.
I expect the next production to be responsive, full, and complete. If not, I will pursue formal legal action, which will include potentially depositions and forensic discovery.
I remind you (yet again) to let any involved parties know about their legal obligations to keep and maintain all records, including but not limited to emails, texts, and any other digital communications.

-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Fri, Mar 22, 2024 at 12:20 PM Texas A&M University Public Records Support wrote:

 Exhibit 2                                    Page 3

On 3/22/2024 12:20:14 PM, Texas A&M University Public Records Support wrote:

CC: open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/22/2024

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

As mentioned in our correspondence sent to you yesterday, we are still processing the remaining items of your request and expect to have a response to you on or before Friday, March 29th.

Sincerely,

Knesha Brashear
Open Records Office


Exhibit 2
Page 4

- 1663 -

↩ On 3/22/2024 11:24:02 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "Brendan Fradkin"[brendan@vbattorneys.com], "Patti"[patti@vbattorneys.com], "open-records@tamu.edu"[Open-records@tamu.edu]

See below page advise today.
Thanks.

-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Thu, Mar 21, 2024 at 11:04 PM Brian Beckcom wrote:
I received part one of the responses. Where are the rest of the materials?
Please advise immediately as TAMU is now potentially in violation of the open records laws, which mandate timely and complete responses.
Also, please continue to ensure that all relevant materials of any nature preserved.
Thank you.
-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org


On Thu, Mar 21, 2024 at 6:05 PM Texas A&M University Public Records Support wrote:


**- 1664 -**

On 3/21/2024 11:06:02 PM, Brian Beckcom wrote:

TO: "Brendan Fradkin"[brendan@vbattorneys.com], "Patti"[patti@vbattorneys.com], "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: "open-records@tamu.edu"[Open-records@tamu.edu]

I received part one of the responses. Where are the rest of the materials?
Please advise immediately as TAMU is now potentially in violation of the open records laws, which mandate timely and complete responses.
Also, please continue to ensure that all relevant materials of any nature preserved.
Thank you.
-bb
Brian Beckcom
www.VBAttorneys.com
www.BrianBeckcom.org

On Thu, Mar 21, 2024 at 6:05 PM Texas A&M University Public Records Support wrote:

On 3/21/2024 6:05:12 PM, Texas A&M University Public Records Support wrote:

CC: open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/21/2024

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Texas A&M University received a public information request from you on February 26, 2024. Your request mentioned:

*"Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.*

*● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any*



Exhibit 2

**- 1665 -**

discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

● Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

● Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes"

Information found to be responsive to items 2 and 3 of your request is available and can be obtained by visiting the Public Records Online Portal and logging in from the "My Request Center" tab.

Please note that we are still processing the remaining items of your request and expect to have a response to you on or before Friday, March 29th.


Sincerely,

Knesha Brashear
Open Records Office



Exhibit 2

Page 7

**- 1666 -**

✉ On 3/11/2024 9:19:01 AM, Texas A&M University Public Records Support wrote:

CC: Open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J000762-022624
**Body:**
03/11/2024

RE: PUBLIC RECORDS REQUEST, Reference # J000762-022624

Dear Brian Beckcom,

We are in receipt of your narrowed request, received on March 7th and appreciate your willingness to work with us. We are processing your narrowed request and expect to have a response to you on or before your tenth (10th) business day of March 21, 2024.

Sincerely,

Tricia Bledsoe

Open Records Office

↩ On 3/11/2024 6:03:03 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
I hope you had a relaxing weekend.
I have sent a few emails with no response and no acknowledgement. I would very much appreciate your responding to my requests. My hope is you will comply with the requests as limited and produce the overdue materials immediately. Please let me know the status. I am hoping we can avoid further legal measures and can work cooperatively.
I am happy to send my own IT team to assist if needed.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 2:13 PM Brian Beckcom wrote:
Ms. Kacer:
Please respond to my questions and to the unobjected to FOIA requests today. Otherwise, we will move forward with legal action as authorized by statute and Texas law.



Exhibit 2

Page 8

**- 1667 -**

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 10:28 AM Brian Beckcom wrote:
Ms. Kacer:
1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory deadline;
2. Please confirm that the relevant personnel have been informed of their obligations to preserve all communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested documents and information.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:
Ms. Kacer:
Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.
For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.
With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved. With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.
I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/
I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.
Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.
Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.



Exhibit 2

Page 9

- 1668 -

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:

On 3/8/2024 3:15:33 PM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan
Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
Please respond to my questions and to the unobjected to FOIA requests today. Otherwise, we will move
forward with legal action as authorized by statute and Texas law.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Fri, Mar 8, 2024 at 10:28 AM Brian Beckcom wrote:
Ms. Kacer:
1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory
deadline;
2. Please confirm that the relevant personnel have been informed of their obligations to preserve all
communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested
documents and information.


-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:
Ms. Kacer:
Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my
request is obviously limited in scope and time. I also note that you have not objected to some of the requests,
which makes the responses to those requests now one day overdue. Please produce any and all materials to
which you do not object immediately, or advise why you refuse to do so.
For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We
are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of

                                    Exhibit 2                                    Page 10

Student Affairs, and Office of the President.

With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved. With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.

I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/

I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.

Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.

Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video

On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:

↰ On 3/8/2024 10:30:43 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:
1. Please confirm that Texas A&M will produce the items for which there was no objection by today's statutory deadline;
2. Please confirm that the relevant personnel have been informed of their obligations to preserve all communications, documents, etc and not destroy, alter, or otherwise impede the ability to obtain the requested documents and information.

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video



Exhibit 2                                                                 Page 11

On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:

Ms. Kacer:

Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.

For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.

With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved. With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.

I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/

I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.

Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.

Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.

-bb

VBAttorneysLessons from Leaders PodcastMy Bio Video


On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:



Exhibit 2

Page 12

- 1671 -

On 3/7/2024 9:33:02 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu], "Patti Artavia"[patti@vbattorneys.com], "Brendan Fradkin"[brendan@vbattorneys.com]

Ms. Kacer:

Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.

For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.

With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved. With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.

I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/

I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.

Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.

Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.

-bb
VBAttorneysLessons from Leaders PodcastMy Bio Video


On Wed, Mar 6, 2024 at 6:56 PM Texas A&M University Public Records Support wrote:


On 3/6/2024 6:56:02 PM, Texas A&M University Public Records Support wrote:

CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
March 6, 2024

 Exhibit 2                                             Page 13

**- 1672 -**

RE: PUBLIC RECORDS REQUEST of February 26, 2024, Reference # J000762-022624

Dear Brian Beckcom,

Texas A&M University received a public information request from you on February 26, 2024. Your request mentioned:

*"From: Patti Artavia <patti@vbattorneys.com>*
*Sent: Monday, February 26, 2024 7:03 AM*
*To: open-records@tamu.edu*
*Subject: Open Records Request*

*Please see attached letter. Thank you*

*Patti Artavia*
*Senior Paralegal/Case Manager*
*2016 AAJ Paralegal of the Year*
*VBAttorneys.com*
*Direct Dial (832) 791-3118*

*Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.*

*● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.*

*● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.*

*● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.*

*● Any and all communications from anyone at Texas A&M concerning the plan to restructure*



Exhibit 2

the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

• Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes"</patti@vbattorneys.com>

Our office is unable to conduct a blind search for

"• All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

• All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

• All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

• Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

• Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

• Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadaets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes" as there are numerous employees within the the Office of the Commandant and thousands of employees within the university. A request of this magnitude is too broad. Therefore, we are requesting that you narrow your request by providing us with the name(s) of employees who would be in possession of the requested records. Additionally, if you could please provide us with a date range so that we can better assist you with your request.

As provided by section 552.222(d) of the Texas Public Information Act, your request will be considered



Exhibit 2

Page 15

- 1674 -

withdrawn if we do not receive a response from you by the 61st day after the date of this request for clarification/narrowing.

Sincerely,

Leslie Kacer
Open Records Office

On 2/26/2024 11:15:43 AM, Brian Beckcom wrote:

TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu]

Yes to both questions.
Please make sure all the records requested are preserved.
Thank you.

On Feb 26, 2024, at 9:10 AM, Texas A&M University Public Records Support wrote:



Exhibit 2

Page 16

On 2/26/2024 9:10:20 AM, Texas A&M University Public Records Support wrote:

CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J000762-022624
**Body:**
February 26, 2024

BRIAN BECKCOM (J000762-022624): REQUEST FOR CLARIFICATION/NARROWING; REDACTION RESPONSES REQUESTED

There are now 2 statements regarding mandatory exceptions and discretionary exceptions you need to select for your open records request. These questions are derived from a form developed by the Office of the Attorney General, dated 10/01/19. Please select "yes" or "no" in regards to these 2 exception questions for your open records request. Selecting "yes" will allow the university to expedite your request by avoiding the necessity of seeking a decision from the Office of the Attorney General.

Statement #1:
Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Statement #2:
Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Note: This is a request for clarification/narrowing of your request. Section 552.222 provides that a request for information is considered withdrawn if the requestor does not respond in writing to a governmental body's written request for clarification or additional information within 61 days.

Sincerely,

Leslie Kacer
Open Records Office



Exhibit 2

Page 17

✉ On 2/26/2024 8:54:25 AM, Texas A&M University Public Records Support wrote:

Dear Brian Beckcom:

We received your public information request for **Texas A&M University**. Your request was given the **reference number J000762-022624** for tracking purposes. Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.

To monitor the progress or update this request please log into the Public Records Center.

✉ On 2/26/2024 8:54:25 AM, Texas A&M University Public Records Support wrote:

Request was created by staff



Exhibit 2

Page 18

**- 1677 -**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Patti Artavia on behalf of Brian Beckcom
Bar No. 24012268
patti@vbattorneys.com
Envelope ID: 86169545
Filing Code Description: Case Information Sheet
Filing Description:
Status as of 4/2/2024 8:29 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brendan Fradkin | | brendan@vbattorneys.com | 4/1/2024 6:00:54 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 4/1/2024 6:00:54 PM | SENT |
| Patti Artavia | | patti@vbattorneys.com | 4/1/2024 6:00:54 PM | SENT |

EXHIBIT
9

Corps Orientation (Phase 1) Worksheet (Higgins, Sosa, Ornelaz, Washington, Fleming - LeVan)

Zero Week + 7 Weeks Academics

Purpose: To enable a transition from high school student "mindsets and skill sets" to college student skills and mindsets within the model of Texas A&M and the Corps of Cadets

**Phase I Endstate:** Freshman
- Are confident in their ability to take and do well in college classes
- Have a solid foundation of TAMU & Corps standards, values, and Traditions.
- Are comfortable managing their time
- Are self-disciplined
- Are fit
- Are having fun
- Understand and believe that they will have better student experience at A&M and will be more academically successful if they stay in the Corps than if they were to leave.  We must make a better value proposition than we are currently.

**Phase I POI outline:**
- Instruction and practical application in Standards/Values/Traditions
- SOMS
- Academic 1 on 1
- Resiliency 1 on 1
- Career Preparation introduction
- Drill
- Progressive physical fitness program
- Counseling/Feedback

**Housed by Major Unit**

**Manning:**
Cadet Cadre:   Certified through WG#2's Cert process.   Using Major & Minor Unit XOs for oversight, 1stSgt, (SR? PLt Cdr x 2), Juniors SL x4, ASL x 4, 40 fish.  That's 2 seniors, 9 juniors, 40+ fish = 51+ cadets/floor.  Using FOW 2023 numbers as a baseline, that's 5 BDE fish units (4 floors)~202, 5 Regt fish units (5 Floors) ~215, 8 Wing fish units (7 Floors)~309 , and 3 Floors of band fish units~130.  44 Senior and ~207 Juniors
- Minor Unit housed in Fish Dorms end of hallway
  - XO in charge of or Phase 1 operations
  - CO focus is on Corps Operations
  - Juniors FT/AFT leaders (Sophomores Phase 2)
  - Transfer Units in one dorm
- Training Cadre for Orientation Phase - SOMS, Hollingsworth, CMDT Leadership Briefs, Certification
  - Phase I not just for fish but also for outfits to get ready to be able to receive and train fish

- ○ **GAP:** What is the rest of the Units doing During Phase 1 as a unit. Need to know the training/certification of other classes/leadership. What is being taught so they can integrate cleanly in Phase 2.

Staff Oversight:
- Advisors - Corps Performance Coach, **how?** Academics, **how?** Military & Operational Advisors, **how?** ROTCs, **how?**
  - ○ Integration of support Advisors – LDA construct as part of this phase, dedicated time with FISH with academics, performance coaches, LDA teams during unit activities early during FO, as they approach Phase 2, preparation by cadre about unit

**Resources:** LLCs space needed by Major Units for Unit Activity Times - Meredith Question

**Policy and Procedure Needed:**
- Standard for how all Freshmen Operate by Year Group and Phase (Needs WG)
  - ○ Example: Introduces traditions through Campos in SOMS and unit activities/visit sites as part of unit activities when class starts

- There is a Brass culmination at the end of Phase 1. It would involve the FO Cadre presenting the brass to the freshmen , combined with a revealing of the freshmen's new outfit}. The FO Cadre will ceremoniously hand over the responsibility of training the Fish to the Outfit Cadre. Outfit Cadre take the oath and the freshmen greet them. It signifies the end or *Orientation* and the beginning of *Outfit Orientation*. A two-fold event: Awarding of Corps Brass by MU freshman unit cadre and outfit welcome by corps units for their assigned freshman.
- Subgroup Outfit Integration:
  - Standard/unified event from OOC/set standard (first time around)/outfits may not welcome with open arms/may want to put on their own culmination/welcome into Phase II
  - Easier transition into outfits
  - Actual accomplishment/something tangible to complete/be able to check a box
  - Feel transition as a Corps at all levels not just fish
  - Want it to mean something/sense of belonging
  - bring cadet challenge weekend to the fall?
  - Leadership based activities - LRCs
  - Cadre can see the results of their work/leadership training success
  - Not just about freshman/the entire Corps
  - Formal change of command from one cadre to new outfit cadre/leadership integration as an outfit
  - Hand off responsibility/take to next level past outfit integration mechanism
  - Recommend Data/Bio Cards for fish to meet/get to know upperclassmen and upperclassmen to know fish before Phase II – Transition Responsibility

**Explanation of the Weekly Sections:**
- SOMS 111 - The subject that is being taught to the freshmen
- Academics - Significant academic events for the University and freshman academic milestones

- Dedicated Cadet Life touchpoints - Career Preparedness, Resiliency Coaches, ATR, Cadet SLs
- Cadre Focus - Guidance for the FO Cadre. They need to know what Fish are being taught in SOMS so that they can reinforce it during unit activities and counseling time.
- Physical Fitness - Limits to physical activity so that freshmen encounter a progressive PT program
- Standards, Values, and Traditions (SVT) - Can be any number of events. Teaching/Reviewing Camposologies, inspecting uniforms, teaching CR skills, talking about TAMU traditions, Counseling Sessions. Cadre will use this time to achieve items identified on the Worksheet Schedule.
- Administrative - Various other necessary activities
- Fish Intramurals - allows fish to engage with other university students - extra curricluar

(Zero Week) 7 (band) /10 - 17 Aug

- FO Cadre Introductions by the Advisors to include a class on how the freshmen should expect to be treated. FO Cadre then will break them into their training platoon, explain structure and introduce themselves.
- Academics-
  - Campus Schedule Tour mandatory with all tools to navigate (Phone Apps etc)
  - EST Prep (Continue with EST assignments as in previous FOW, e.g. Ensure Maroon link profile is good, academic schedule printed, mandatory TAMU online classes)
    - Aggie Grade Book and Scheduler
  - Schedule Checks
    - SOMS, ROTC, Full Time Student (dependent on Scholarship)
- Dedicated Cadet Life touchpoints - Resiliency Coaches, ATR, Cadet SLs
  - Initial, then when next checks? Midpoint of phase and Prior to Culmination
- Cadre Focus- Conduct initial assessment- identify issues (administrative, medical, mental, academic, etc), Provide good example, Ensure FOW schedule is adhered to. Teach set up and wear of the uniform
- Physical Fitness - Intro to Stretching and conduct of PT
- SVT - Stationary Drill (Attention, Parade Rest, facing movements, saluting), CAMPOs: #1&2
- Administrative
  - Any other training requirements in Computer Based Training? Title IX
  - ROTC Inprocessing
  - Uniform Issue and re-fit
  - Scholarship Counseling? Different Scholarships/Requirements Video, Canvas, or in person?
  - Poll for all fish on what intramural teams are available for the Fall

(Week 1) 18 - 24 Aug - First Week of School

- SOMS 111 - Time Mgt (verify lesson plan/curriculum by weeks for entire semester with Katie)
- Academics - **Add/Drop end of Week** [correct classes, SOMS, ROTC, etc]
- Dedicated Cadet Life touchpoints- Resiliency Coaches, Cadet FLs, ATRs, (ROTC/CAP Chaplain?)
  - What is the Cadet Chaplains roles…they have taken on a lot of responsibility = redefine? As an individual to point students to the right or needed resource? or is it a Chain of Command responsibility – not a single student – does the chaplain elevate to

Battalion/Group lvl and are they a faith-based resource or not. If not, then they shouldn't be called chaplain.

- Cadre Focus - Introduction of Corps Brass Books. Morning Activities discuss add/drop
  - Activity 1 - Commandant Brief
- Academic Free Period – (one on ones with Cadet Life Academic Perf)
- Afternoon Activities (Meredith question for use of Adams hall – performance coaches)
- Physical Fitness-
  - Activity 2: Initial Strength/Agility assessment (modified Corps PFT with .5 mile run, max # of pushups, max plank time) Cadre record this data for ability group assignments
  - Activity 4: run 15 min @ 10 min/mile pace          Lower Body - 1 Set

- SVT -  CAMPOs: #3,4,11,&14
  - Activity 3: Marching Drill (Step off, halt, Open & Close Ranks),
  - Activity 5: Initial Counselings
- Administrative -  set up fish Intramural teams


(Week 2) 25 Aug – 31 Aug

- SOMS 111 - Goals
- Academics -
- Dedicated Cadet Life touchpoints
- Cadre Focus - get the freshmen to write down on a 3x5 card their goals for why they joined the Corps, post it above their rack.
- University Intramurals - during extra curricular times
- Physical Fitness
  - Activity 2: Run 20 Min ! 10min/mile pace;   Upper body (UN) Resistance Daily 16 - 1 set
  - Activity 5: Corps Run:  Lower Body - 1 set

- SVT - CAMPOs: #7,10,15,&27
  - Activity 1: Corps Discipline Brief
  - Activity 3: Marching Drill ("Eyes right" and "Ready front")
  - Activity 4: Initial Uniform Inspection


(Week 3) 1 Sep – 7 Sep

- SOMS 111 - Manifesto
- Academics -
- Dedicated Cadet Life touchpoints -
- Cadre Focus - Discuss Corps trip end of month, expectations, need to personally secure rooms.
- Physical Fitness
  - Activity 2: Run 22 min @ 10min/mile; Upper Body (UB) Resistance Daily 16 - 1 set
  - Activity 4: Corps Run; Lower Body - 1 set
- SVT - CAMPOs: #12,16,19&28
  - Activity 1:  Marching Drill(Column Movements)
  - Activity 3:
- Administrative -

(Week 4) 8 Sep – 14 Sep

- SOMS 111 - MBTI
- Academics - Scheduled appts with student groups - proactive assessment
- ==Dedicated Cadet Life touchpoints -==
- Cadre Focus - Discuss as an outfit cadre MBTI and what are same/different characteristics of the fish's MBTI. What opportunities do different personalities bring. Strengths and weaknesses.
- Physical Fitness
  - Activity 1: Run 22 miin @ 10 min/mile: lower body 1 set
  - Activity 3: Run 24 min @ 10 min/mile; Upper body Resistance Daily 16 - 1 Set
  - Activity 5: Run 16 min @ 10 min/mile: lower body 1 set
- SVT - CAMPOs: #13,20,21&29
  - Activity 2: Marching Drill (to the rear march & mark time)
  - ==Activity 4:==
- Administrative -

(Week 5) 15 Sep – 21 Sep

- SOMS 111 -  Character Artifact
- Academics - Scheduled appts with student groups - proactive assessment
- ==Dedicated Cadet Life touchpoints -==
- ==Cadre Focus -==
- Physical Fitness-
  - Activity 1: Run 24 Min @ 10 min/mile; Upper body Daily 16 - 2 Sets
  - Activity 3 Run 18 Min @ 10 min/mile; LB resistance - 2 Sets
  - Activity 5: Corps Run
- SVT - CAMPOs: #5,17,25,&26
  - Activity 2: Instruct fish on construction of fish spurs.
  - Activity 4: Marching Drill(Flanking).
- Administrative -

(Week 6) 22 Sep – 28 Sep

- ==SOMS 111 -==
- ==Academics -== Scheduled appts with student groups - proactive assessment
- ==Dedicated Cadet Life touchpoints -==
- ==Cadre Focus== -
- Physical Fitness
  - Activity 1: Run 24 Min @ 10 min/mile; Upper body Daily 16 - 2 Sets
  - Activity 3: Run 20 Min @ 10 min.mile;  LB resistance - 2 Sets
  - Activity 5: ==Corps Run before Arkansas??==
- SVT - CAMPOs: #9,18,22,&30
  - Activity 2:  Test fish on drill as per Corps Brass Book.
  - Activity 4: Corps Trip Prep and significance
- Administrative -

(Week 7) 29 Sep – 5 Oct

- ==SOMS 111 -==
- Academics - Heavy Testing WEEK =={may need to assess PFT period if early or late window)==
- ==Dedicated Cadet Life touchpoints -==
- Cadre Focus - Brass Culmination and signoffs complete;  ALL outfits provide a list of Cadre, hometown, and major for fish to start learning post outfit assignment notification
- Physical Fitness
  - Activity 1: Run 20 min 9 min/mile;  Upper body Daily 16 - 2 Sets
  - Activity 3: Corps PFT 1.5 miles, max pushups, max plank time(Outfit Ldrship Run with them to observe – CO/XO/1st Sgt/Plt Sgt)
  - Activity 5: Corps Run; Brass Culmination
- SVT - CAMPOs: #6,8,23,&24
  - Activity 2: Drill Time (continue testing per Corps Brass Book)
  - Activity 4: Final Counselings

- Administrative - Post outfit assignments


Fall Break (6-9 Oct)

**Transition** 4 days (10-13)

- Counseling: Cadet Cadre - FTL works directly with the outfits he has fish with.  Warm handoff on each Fish they were responsible for to the FTL at the unit.

- Handoff – Athletic Ability /Academic/Drill/SVT from SQLs to outfits

- Introduction to units during morning activity time (PT resumes next week based on ability groups).

- SVT - Tie unit into campos that have meaning to thems, bonfire, etc.

# Working Group #1 : Freshman Orientation Phases

## Defining the problem:

- Intentional and immersive leadership development experience that recognizes tradition but transcends and accelerates the leadership experience to remain competitive for tomorrow.
- Acknowledges 'student led' but within the construct of OOC standards, values, and policies.
- Holds the balance between outfit integrity and leadership development.

## Scope:

View OOC as 'TRADOC' – put in play policies and guidelines that

1) define success 2) define what 'right' looks like and 3) define the product

## Key tasks and progress markers:

Groups will design an implementation plan that begins with the end in mind.

1 Nov: Working Group Kick Off, IPRs begin

15 Nov: IPR #1

Refine/resource/reflect

28 Nov: IPR #2

Refine/resource/reflect

5 Dec: Staff Meeting Update/IPR #3

Refine/resource/reflect

19 Dec: Final Recommendation/Summary Report submitted

10 Jan: Implementation Meeting/Phase 2 Begins

## Outputs:

Each working group will present their findings to include

1) a summary of recommendations

2) a plan for enacting their recommendations

3) request for support with identified resources to support the work required for their plan

4) a timeline of implementation and assessment.

## Key Considerations

1. FOW is no longer a week; it extends to fall break or beyond
2. Becomes a white-belt event (those who have led before)
3. Focus on orientation NOT initiation
4. Socialization approach – 3 phases that need recommended timing
   a. Integration into the Corps: cadre focused, OOC facilitated
   b. Integration into the Outfit
   c. Training for the next position

## Strategic Considerations

1. Consolidation of fish to one area of the Quad that is restricted to Cadre and fish
2. Spring 2024 changes/needs/policies for fall 2024 implementation of your recommendations

**Working Group Collaborators**

Lead: Sherri LeVan                          Desiree Ornelaz

Katie Higgins                               John Regan

Russell Tipton                              Jerry Peralta

Josh Polk                                   Steven Allbert

Tommy Snyder                                Rob Washington

Brad Tippett                                Hannah Sosa

John Fleming

# Working Group #2: Sophomore Leadership Academy

## Defining the problem:

- Intentional and immersive leadership development experience that recognizes tradition but transcends and accelerates the leadership experience to remain competitive for tomorrow.
- Acknowledges 'student led' but within the construct of OOC standards, values, and policies.
- Holds the balance between outfit integrity and leadership development.

## Scope:

View OOC as 'TRADOC' – put in play policies and guidelines that

1) define success 2) define what 'right' looks like and 3) define the product

## Key tasks and progress markers:

Groups will design an implementation plan that begins with the end in mind.

1 Nov: Working Group Kick Off, IPRs begin

15 Nov: IPR #1

Refine/resource/reflect

28 Nov: IPR #2

Refine/resource/reflect

5 Dec: Staff Meeting Update/IPR #3

Refine/resource/reflect

19 Dec: Final Recommendation/Summary Report submitted

10 Jan: Implementation Meeting/Phase 2 Begins

## Outputs:

Each working group will present their findings to include

1) a summary of recommendations

2) a plan for enacting their recommendations

3) request for support with identified resources to support the work required for their plan

4) a timeline of implementation and assessment.


## Key Considerations

1. Result in certified/validated trainers
2. Concurrent to FOW; validated trainers develop the 'how' of outfit integration and Corps Brass
3. Socialization approach – phases that need recommended timing
   a. Task based: Proper training of physical fitness, drill and ceremonies, room inspections, uniforms, discipline process, honor code and honor process
   b. Theory based: demanding vs demeaning, transactional vs transformational, emotional intelligence, motivation, understanding subordinates
   c. Practical application and assessment: scenario based/role modeling case studies, personality assessment review, in-person (blind) interview process to certify, SGT rank awarded upon validation


## Strategic Considerations

1. Spring 2024 needs IOT implement this in Aug 2024
2. Role of the current Corps Leadership Development Model to support
3. Spring 2024 changes/needs/policies for fall 2024 implementation of your recommendations

### Working Group Collaborators

Lead: Byron Schlather      Frank Wood
Jason Mullenberg      Kristen LeForte
Ken Griffing      Bill Meredith
Jeff Gardner      Steven Cheatham
Kevin Parker      Cristina Vela
Will Zimmerman      Remi Bankole
Peter Siegel

Spring 2024

- WG#2 has not met as a complete group since late December.
- Dave Kelley developed the curriculum overlay for weekly Commandant instruction and SOMS 181/281 integration (see attachment; SOMS 181-281 KSA Curriculum overlay)
- Sub-group w/ Col Parker as lead has started developing case studies that incorporate the leadership topics for use in SOMS class discussions (see samples attached: Management v. Leadership; Values-based Leadership; Bases of Power)
- Contacted Shanna and Jason at Rudder Theater Complex to reserve the Auditorium/Theater for specified dates
  o No conflicts identified at this time
  o ~$1200 per week to use Rudder Mon/Fri mornings
  o Rudder has not confirmed availability; awaiting a response to email sent Friday, 12 Jan
  o Recommendation: Commandant kicks off first session on 5 Feb 24
    ▪ Audience: Freshmen and Sophomores
    ▪ Alternate Audience: Whole Corps?
- Certification:
  o Still wrestling with how to integrate SOMS, outfit preparation training, certification task force personnel
    ▪ Timeline for certification
      • Spring semester
      • Refresh during Zero Weeks (formerly cadre training/FOW)
      • Fall semester remediation
    ▪ Spring preparation training
      • Minor unit vice outfit training?
    ▪ Certification task force
      • OOC staff only or do we augment with cadet leadership who are "trusted agents?"

Withhold as marked per Tex. Gov't Code sec.

EXHIBIT
**10**

| | |
|---|---|
| **From:** | Simpson, Meredith M |
| **Sent:** | Wednesday, March 6, 2024 4:22 PM |
| **To:** | Thompson, Amy L |
| **Attachments:** | Feedback Form.27Feb1000.pdf |
| **Follow Up Flag:** | Follow Up |
| **Flag Status:** | Flagged |

**Meredith Simpson**
Chief of Staff
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

# How can we be more intentional and immersive in our leadership training and education program across the four-year journey?

The greatest leadership training is not done in the classroom but done in a position of authority. The fish are not learning leadership, except by example. The people gaining leadership are the upper class men who are given the privilege of responsibility.

Giving outfit leadership more autonomy while also enforcing high standards of outcomes is what will lead to the greatest leadership development.

https://texags.com/forums/16/topics/3445742

Have a standard for the corps as a whole (such as kicking out repeated PT failures) but allow individual company identities to remain. Allow companies to have a MAJOR say in their individual unit leadership

Let us lead. The corps is very hypocritical on being a "cadet run " organization then attempting to reinvent the entire program with zero cadet input

By bringing back an actual cadet led corps. The changes that you plan to implement will only bring resentment from the current cadets.

Do not go forward with all fish dorms next year. Outfit culture is vital to developing loyal leaders who respect authority.

Provide an opportunity for fish to take on a leadership role in their second semester, even if only a minor one. Once they have proven themselves as capable cadets, they should begin assuming that role.

Actually make the cadet lead the corps the Commandant promised in his initial address to the corps. There has been a constant stream of lies and false hope given this year. Commandant staff needs to have some accountability for their actions instead of blaming everything on the cadets. If they want more training for the freshmen class, then have the cadets be better prepared. Equip the cadets instead of taking away everything we have worked so hard to fix and prepare for next year.

Let ROTC units exist, cadets not going into the service can observe the "fraternal organization " and those joining the service can have their specific leadership models tweaked to their service

Make SOMS more than reading a book with discussion. Make SOMS 2 credits and have some sort of "hands on" training in regards to what is learned in class.

By letting upperclassman lead and train the fish that come to their unit and setting aside time during the week for outfit briefs.

Make soms classes more than busywork classes where commandants staff talks just to fill the space. Making it an intentional time for actual leadership development could be immensely valuable.

We need to redefine what it means to be a senior. The idea that seniors "inspire" is extremely vague and does not give them much to go off of. Furthermore, incentivize being present in the outfit and in the Corps. I firmly believe that upperclassman who don't show up shouldn't be allowed to train any class.

Creating a culture where every class has motivation and a genuine reason to invest in those below them. This means partially holding lazy whitebelts accountable but most importantly means giving outfits as many opportunities as possible to train freshmen and develop relationships through outfit activities and other mechanisms. Fish's training academy would make leadership development less immersive for everyone who isn't on the select Whitebelt cadre and that is a net loss.

Make sure everyone has a vital role in their outfit and feels needed. I think this would also inspire people to stay motivated and participate in corps activities to the full extent.

My answer to this is on my next answer.

Overall restructure the corps. Outfits become platoons. Battalions become companies and major units become battalions. It would make the description of these leadership billets make more sense as well as give the small leadership positions (SL, FTL) the ability to lead.

Secondly outfit COs now become PLs, Battalion Commanders are now company commanders and so on. I think this model can be seen amongst the RVs. We operate as a company but then we break off into our platoons to conduct drill, pt, etc. additionally we still have our own unique cultures across our platoons. The culture of the outfit wouldn't change. You would just rename Leadership positions as well as what it means to lead in this role. Which in turn will make leadership more Intentional as well as make leadership make more sense.

Look back at the years before COVID. What did they do then that had them at 2500+ cadets and see what has changed since then. The corps was growing at the rate it needed to survive and thrive before COVID.

It is hard to give thoughtful meaningful and purposeful answers for change if we do not know the reason for the change. As a student organization we deserve to know the full reason for the changes. Please.

By allowing leaders to do what is necessary to push the individuals below and around them. Encouraging the corps experience in its truest form, in the form we all came here because we love, not the form being pushed by those before us, Kathryn banks, General Ramirez, and I hope not yourself. Without a significant challenge and purpose we will never be immersed in this leadership environment. Without the ability to properly train our subordinates nothing but apathy will ensue. Without proper outfit and individual level culture individuals will have nothing to have pride for.

We must recognize that all leadership must be where the followers are and provide metrics and feedback for improvement and to keep units intact as much as possible.
This means that metrics must be provided to each unit for expectations of each position (from fish, to sophomore, to clerk, to junior, to Scholastics Junior, to XO, etc.) within the outfit, recognizing some units may divide effort within a chain among several individuals. Accountability for compliance must then be ensured. Most organizations include systems for feedback outside the direct chain of command - so the Corps should expect every Cadet to provide, perhaps monthly, a review of their own leadership and followership, of the leadership of their own outfit, and of the followership of their own members. With today's technology, it is easy to obtain an electronic survey from each Cadet.
Outfit advisors must read those monthly reports and take the appropriate action, which may be meetings and redirections to those in positions of command or in positions of followership. This affords an opportunity for Advisors to identify those on the bubble of retention and provide outlets, including potential transfer to another unit. This also affords the Outfit Advisors the opportunity to determine whether those in a position of leadership are suited to it, succeeding, or failing.
At the end of the day, training is Explaining, Demonstrating, Guiding and Enabling. Evaluation is a critical element in ensuring each of these elements is being met.
Regular evaluations should also be helpful in flagging the failures identified already.

Leadership (in my opinion) is a bottom up approach. So it takes time for ideas and culture to change. I think there have been quite a few good steps made this year with regard to holding people accountable, keeping Cadets involved, and giving Cadets the opportunity to take ownership and I think we need some more time to let these ideas truly take hold.

I would move forward with the proposed changes. All levels in the corps has been thoroughly corrupted by bad leadership and power hungry people who are not interested in developing people but rather being able to assert power over others and using freshmen as a means for entertainment and ego.

Continuing to allow fish to live with their outfit would result in a more immersive leadership training, as they are around their upperclassmen much more and can observe what they do and learn from their examples. We can also be more intentional by allowing cadets more control over the Corps to let cadets have larger scale leadership experiences to prepare them for the future.

I appreciate the weekly discussions with the commandant. However, it appears that SOMS teachings are antithetical to the mission of the Corps. I frequently left SOMS feeling disappointed in myself and feeling as though I was nothing more than a propagandized cog in a machine. I believe it would be beneficial to turn SOMS into a place where cadets can share leadership experience, discuss current issues, and learn about the issues of the Corps beyond the March to 3000. Additionally, I believe that the incentive for general Corps traditions has fallen as a result for apathy in our higher leadership. We must select individuals for staff who love the Corps and do not segregate themselves from the standard.

Make the Corps cool again. Make it difficult, but provide resources that make that manageable. Imagine if Cadets were treated like athletes here at Texas A&M. That is what I would love to see us move towards. Adults checking in on us, personal trainers, dietary and food coaches.

MORE OUTFIT MONITORING

Outfits culture and training needs to be monitored much more than it is, however it needs to be done consistently and effectively. I would propose both Unit Staff and Corps Staff doing routine check-ins with the blackbelts of every outfit to ask about outfit culture, trainings, and culture. This way, Corps staff can find out what goes on behind the scenes in outfits, not just what upperclassmen want you to see whenever someone is physically there. This will (if done properly) keep upperclassmen from being able to facilitate a toxic culture and unauthorized training. This will also offer a better support/protection for fish and sophomores (it is necessary for them too) against toxic training and culture that their outfit may try to facilitate.

There is lots of bad/toxic stuff that goes on in many outfits across the quad that never gets reported or found out because there is no way for someone on the outside to see it. Information must come from within the outfits.

I would love to discuss this topic more. My email: boomeraggie2@tamu.edu

The Corps experience is one of the most immersive leadership programs in the nation, currently. I'm not sure "more immersive" is possible. Intentional? The inherent structure of classes within an outfit is one of the most intentional arrangements that I've been a part of. The outfit provides every aspect of leadership opportunity that a cadet will likely encounter upon graduation. Now, for "training and education", more classes and seminars could be offered - outside speakers (alumni, pillars of the community, etc) could be engaged to interact and share insights to the cadets.

We allow outfits to develop leaders like 150 years of corps before us

Give more situational leadership education and training instead of theoretical. My time in the Corps helped, but not the classes. All of my leadership skills were developed within interactions with my fellow cadets and cadre through dialogue and trying different strategies. Give the fish the foundation their first semester or halfway through their first semester, but the rest of their time in the Corps should include how to deal with their peers and mentorship from fellow cadets, up and down their chains, and CTOs.

Continue with outfit culture as is, stop trying to implement the authority of big corps. Within the outfit, the four class system works extrodanarily well when done corrext (which it is most of the time.) As fish you learn, as heads you train, as butts you lead, and as Zips you mentor. fish are taught the skills they need

to uphold the standard and to be a cadet by their upperclassmen. Possheads use the skills they learn as a fish and are taught by their whitebelts to train the fish. Butts use the skills they learn as a blackbelt to be leaders and congrigate with the Zips for advice. And Zips mentor those under them to be better leaders, and prepare to use the skills they have learned in the real world post graduation.

A balance of student independence and Corps-wide accountability. More strictly enforced standards all around.

Don't separate Freshman from Upperclassman

We can be more intentional and immersive in our leadership training by giving cadets leaders to look up to and learn from. Yes there are already some, but maybe if cadets respected their CTOs or other leaders, it will be more immersive on how a leader should act. How one should not by hypocritical. How one should be flexible, not stiff as a board. How one should hope to become. This includes the DNC cadets, as they currently have no leaders in their major's fields to look up to beside what the university provides.

Honestly thought the way we were trained and learned during my 4 ( c/o '77) worked pretty well. The lessons I learned from being a fish were used in my 40+ career...

Allow more slack for outfits. Sophomores don't become scary and disciplinary when they can't be scary or disciplinary. No pushing at formo just makes them an outcast in the outfit where they can't goodbull and they can't be demanding either. Pushing was the one think that made fish respect them because they had the ability to actually execute their authority.

Promoting outfit unity by keeping outfit activities with all years, and creating more opportunities for outfits to grow with each other, such as team building events.

Challenge your cadets more by allowing for more training and not requiring meetings that have no direct purpose or intention. If meetings are necessary make them brief and as small groups as possible such as having wing meeting instead of a commandant address every week

1. Start leadership training the Fish the last 6 weeks of their fish year, so they are ready to assume their Sophomore Leadership roles when they come back on the quad.
2. Rotate ALL Sophomore Leadership positions at the end of the semester to give more cadets the opportunity to practice what they have learned. Currently only a limited number of cadets ever get to be a squad leader. This would double the number.
3. Consider also rotating All Jr positions at the end of the semester. If a Jr is stuck in a minor BS job, he feels left out and stuck in a rut.

Over the years, I have recruited a lot of cadets, many when I was a Scout Master. I remember one, that had been my best Senior Patrol leader. He quit after his fish final review, (Had a 3.5 GPA) because he did not want to spend the next three years stuck. He had been selected as the social corporal of his outfit. . The outfit tradition was, he would have been in the social position as a Soph, Jr and Sr. He wanted an opportunity to learn some leadership. Not a very good leadership training path.

It seems improbable that a leadership lab like the Corps can immerse its participants when all

I think this is the wrong question to ask. The leadership development that comes out of the Corps, contrary to the belief of a lot of people, doesn't come from the corps leadership positions. Nor does it come from general outfit positions. I think the leadership position that gives the most leadership development is to be a 1SG or a CO right now, as you have to manage and lead a large group of subordinates and peers. But the bulk of the leadership development within the Corps comes not from the direct training, but from the character development and growth experiences you get from being a part of the experience. It starts as a fish, with your own physical and mental limits being pushed as well as your

buddies. I can't understate the importance of a buddy class for a fish, the peer leadership opportunities a buddy class gives fish are some of the best the corps offers, and the character development you undergo as a fish comes not only from yourself but largely in part from watching and helping your buddies grow as they help you. Sophomore year you're on the opposite end of the board and now you have to lead your own fish, and the one-on-one leadership experience being a fireteam leader should be with proper execution is a great opportunity that sophomores miss out on. Junior and Senior year, the leadership development comes more from trying to help run larger outfit operations. I don't think the Corps needs more 'intentional' leadership training. Our current model actually has a lot of room for leadership development, but the problem is that cadets are disenfranchised with the corps, overloaded with coursework and don't have time to invest, or generally demotivated to take the opportunities they have. More 'mandatory training' will only make that problem worse.

Continue to raise the bar. An idea. Make FOW slightly longer, maybe even slightly into the school year. We are known for already making great leaders under the current model. This idea seems to have not failed us. I know so many leaders in the corps that were created with this model.

Listen to feedback on how upperclassman felt most effectively trained as underclassman

Give cadets ability to love the organization again. Allow it to be a challenge, make it worth earning. Make this place something to be proud of, earn, and difficult.

Focus on the "Be" and "Do" of leadership. We have classes, briefs, and the like to discuss and "Know," but of late have been lacking in the application.
The best way to learn, especially in a laboratory like this, is to be given more freedom; that means cadets need to be making the actual decisions, not Commandant's staff.
Army ROTC does this excellently with land navigation, and letting you get lost yourself instead of, in this case, guiding you to a point (which may not even be on your lane strip).

Additionally, the 2nd and 3rd semesters of SOMS should not be centered on MAs/CTOs ranting about what's wrong in the corps, but instead the military training (I.e. ORIs, customs & courtesies, professional translation of lessons learned, and allowing for an open forum of discussion centered on cadets themselves.)

What has always made the Corps unique is the intense stress and seemingly impossible challenges put on the fish, and the class bonding and unity that occurs as a result. My Corps buddies are still very close today 24 years later. We look back on the challenges we went through together with fondness, and now as an adult I know that no matter what I face, I dealt with X in the Corps, so I can deal with Y now. That's what robust and ready leaders are like, regardless of whether you are in the corporate world or military. That's why the Aggie Corps has always produced some of the highest quality leaders from any institution. If you take away the buddy system and the outfit identity, you'll get all the things that are the problem with the military and it's morale today. The goal is not to produce plug and play cadets that can be moved around - and create "sameness," but work on creating excellence and allowing that to look different across outfits. The goal is to create close bonds and hardened, humble leaders. The outfits are a laboratory of leadership, and naturally the best labs will produce the best results. Learn from the best and help the ones who are struggling - rather than lower the standard across the board and lose the heart of the organization. That's what the world needs. I was C-2 guidon, regiment sergeant major, regiment commander and RV platoon sergeant for the squats. Those experiences alongside my buddies is what made for "intentional and immersive leadership training." If you take that away, we might as well just be a service academy, where cadets will scrawl IHTFP all over campus and dream of the day they can get out of there.

Each class year has its own place in the development of a leader. Too much focus on one part or not enough focus on another causes a disconnect in what we should all value as a meaningful leadership training experience. If any changes are to occur, to keep the integrity of the leadership development model, precise and careful consideration needs to be given to the roles at every class level. This should come in the form of conceptual lessons and teaching points, but most importantly, physical examples on how the roles work within our organization and how they can be translated for our futures. If guidence

cannot be provided adequately to cadets amists changes, it may be good to reevaluate exactly how leadership at every level should be played out, lest we abandon the very purpose of the Corps of Cadets.

Continue to defend and uphold the standard while prioritizing the value of the corps leadership experiences available in outfit activities.

I believe that we can be more immersive in our leadership training by expanding the criteria for leadership roles as well as creating more. At the moment, the way we chose leaders is very simple and only focuses on grades first and foremost though most cadets would rather have a good CO with average grades rather than a bad CO with a 4.0.

I think that having a larger group for standardized drill and uniform would be good, however if we want the fish to stay close together, the outfits present a simple option. It is much harder for 200 cadets to become a cohesive unit than 20 or 30. Using outfits would also allow sophomores to learn their job and grow as a leader. I believe that FOW should be extended to two weeks and be corps wide to allow standardization, after this, these fish will be released to their outfits for sophomores to learn their job and fish to learn outfit culture.

We can do interviews for people each semester as part of the transition process from going to a fish to sophomore, sophomore to junior, junior to senior.

Intentional and immersive is by keeping the fish with the upperclassmen-having the upperclassmen teach them from the beginning, like it has been the past couple years. Although SOMS is required for only a year and 1/2, I think it should be required for all four years. And if you want to focus more on being intentional, in those classes there can be given situations that every under and upperclassmen experience and explain how every action that is taken not only has a reaction but has a purpose. We tell our fish all the time that everything we do has a reason and a leadership correspondence. That should be emphasized. If SOMS won't be for all four years then have meetings with the whitebelts as well. Fish year everyone cares because they want you to stay, and by that time you're already calling the Corps home and don't want to leave. Then during Pisshead year every MA and everyone on Corps Staff hates you because they think you're the problem-so you get a fraction of that care, maybe a fourth of initial care. Then once you hit being a whitebelt you're basically tossed to the way side. The whitebelt's leadership development matters too. Even if SOMS doesn't become required, whitebelts should still have meetings with the Commandant maybe once every two weeks to a month to understand our purpose, place, and course of action in accordance to your vision while fulfilling our own visions. I understand helping the blackbelts develop, but the whitebelts matter just as much as they do in this entire Corps process.

This is a student organization, let the students run it. They have the pulse on the generation, and those that thrive have the knowledge on how to do so. Just as fraternities have attrition, so too will the corps. Just as fraternities are not for everyone, so too is the corps. The corps is its own entity, NOT a USMA lite.

I was an Outfit Commander class of 2000:
1. As a sophmore, there was no official leadership training, just a "passed down" model of what some thought was cool, often yielding the next class to be even more obsurd. Any type of coaching/leadership training for sophmores should be welcomed.

2. When I became outfit commander, same thing, no real training. We met biweekly with a Cadet Training officer with no real guidance, it was story time.
We met weekly with the band directors, same thing, it was a pissing contest of which outfit was better.

Any training for commanders that would involve:
1. delegation techinques,
2. peer/underclassman accountability,
3. communication techniques
4. planning weekly, monthly and semester goals in PT, inspections, academics guidance
5. Conflict resolution strategies

If we are truly making an attempt to build leaders, these are the current strategies I stress with my current subodinates.

Mandatory leadership forums for the different classes where Old Ags and other leaders come and talk about leadership. In the interim between forums have classes broken down by major units have sessions with officers out of the Trigon.

Peer selected leadership. Would eliminate a lot of the perceived pointlessness of leadership positions that is prevalent amongst the Corps. Reinfecting pride into the corps will increase this ability too. The only way to reinfect pride is to make the corps something worth the time and effort it takes. The lessening of standards and ease/comfort of many outfits fish experience only subtracts from the pride one can have as a cadet as they know PT standards are not hard, you aren't going to be pushed, you're not going to be yelled at, the challenge changes to mundane inconveniences not a stressful situation from which to grow.

I think proper oversight of a cadet run corps and special units. I graduated in '21 and felt that part of the lack of leadership opportunities resided in the fact that not enough autonomy was given to cadets in how their corps, major units, special units, and outfits were run. Obviously oversight is needed or you'd end up with the inmates running the asylum. At the same time, your average cadet finds more opportunities for personal growth when they are presented to him as a means to make an impact. This impact is more readily seen when the decisions a cadet leader makes have tangible effects on the corps. This is opposed to the image that "the bulls" are the ultimate decisions makers and everything else is just cosmetic.

I appreciate what you're trying to do but I find that removing fish from an outfit ends up stranding all of the upperclassmen without a purpose.

By NOT separating the fish from their outfits for FOW

(AS800, '23 dead zip)

1. Immersion was not an issue in 2019. Every upper in my outfit was involved with training before COVID because people had responsibilities. Every year cadets have been able to take less and less action without oversight which kills drive to participate. Examples included training chow, training before formation, and daily room inspections before fallout in the morning. Every upper could be responsible for the performance and mentoring of fish in their CoC. These tasks are now gone, and engagement and immersion is following for both fish and uppers. Fallout holes and head sheds were great for getting cadets in the zone for training time, and assisted with "flipping the switch".

2. Corps events that give everyone a chance to lead such as a weekend at the O-course or LRC where each cadet must lead and pass a graded event before the end of the semester, similar to the PT test. The idea is to engage leadership in all cadets and provide opportunities for learning and discussion based on current performance. Events could also include things like taking turns planning a minor unit event with exclusively non-training cadets.

3. Cadets could assist with leading a SOMS class in a role similar to that of a TA, allowing cadets to

mentor each other with the guidance of instructors and have responsibilities to the class they serve.

4. Require non-corps or extracurricular Corps orgs leadership be mandatory for all those not in some position within the corps. Not everyone is in ROTC or corps leadership, so this could help thrust cadets into getting involved in something else they are interested in (aviation club, interamural teams, etc)

Expand SOMS for freshman and sophomore to twice a week. In SOMS classes, teach second semester fish about being sophomores and perhaps conduct "pisshead practices." Also, allow outfits to conduct "pisshead practices" by having second semester fish, ideally after spring break, practice training their buddies. Taking fish out of their outfits during designated training times takes away leadership opportunities for the upperclassmen, especially the sophomores in the outfit. First semester sophomore SOMS, the new pissheads should have opportunities to reflect on their leadership methods and see what is effective and what is not. Sophomore second semester SOMS should prepare the sophomores to be juniors. I know when I was in the Corps looking at scenarios and discussing how we would handle each scenario really helped me grow as a leader and see different viewpoints on how to solve problems and address issues. During weekly outfit meetings, allow juniors time to offer constructive criticism to the sophomores (without fish present). The criticism should be organized and offered with solutions and likely should be approved by the first sergeant. Increase white belt mentorship. Have chaplains make sure white belt mentors meet with their black belts formally at least once per month. Encourage COs to talk to all seniors in the outfit when setting outfit objectives.

The Corps has served as the best life lab for more than 100 years. Seeking ways to be intentional and immersive is like asking how to be a better helicopter parent. The Trigon staff should be present and offer guidance. The Trigon does not need to be selecting the leaders. Watch the activities for safety. Let the Cadets run the Corps and make mistakes. That is part of learning.

I will have complete buy in to this corps and making the best impact I can make on our freshmen

I think upholding everything that makes A&M and the corps special and preserving the four year corp development model is crucial, peak corps experience was last year.

Give cadets more power over the policies that are put in place for the corps.

Don't have a fish dorm

I believe that allowing cadets to have a larger say in the type of training that would be asked of them to perform and receive is important. I believe that kind of training would be more productive when those who are training as well as being trained really believe in what it is that they're conducting and learning.

Get rid of the Green tabs for all. Command tabs should be earned, not just because you are on that leadership tract. The Corps of Cadets is a Leadership Laboratory where you can work on your leadership style and learn by the success and failures within the safety net set forth and overseen by the Cadet Training Staff. The Corps of Cadets runs on the Class system. The Freshmen are the Main Cog in that wheel. Your first semester fish year (not FOW) is when you are expected to let go of all the accolades you got in HS and to relinquish your selfish instincts. Every fish starts off on the same level and you must rely on your buddies to be successful. Is it stressful? Yes, the goal is to make the fish class a unified entity which culminates with the earing of Corps Brass. I look back on my fish year with fondness and because it was tough, it showed me I could do anything I set my mind to and if I knew I had the help from my buddies. the second semester fish year is when the groundwork is laid out and the Leaders start to emerge. you know HOW to be a cadet (Uniform standards, inspection standards, and all the other things that your overall outfit has to do with the goal is the General Moore Award and the other

awards you can win. (again, promoting the all classes have to pull their weight to achieve that goal. The Sophomore class has the hardest Job in the Corps as they must instruct and discipline the fish to care about the smallest details about be able to present themselves off the quad in a manner that promotes the Corps as an organization that should be respected and to uphold the mantra of soldier, statesman, and knightly gentleman. at the same time the upperclassmen are pushing the sophomores to still work as a class in unity (the visual to the fish on how that should look) and to also lead them in their approach to leading that mission. The Jr Class is the day to day running of the outfit (making sure the study hours are kept, all the meal counts are there, etc.) but this is where the road takes a fork. while 40-45% of Cadets will eventually take a commission, the other 55-60% will take a D&C path. the Corps at this moment fails those D&C cadets at the expense of the contract cadets (I also understand that the commandant's office's mission is to assist those scholarship cadets. to be perfectly honest, the current system of cadets moving outfits is part of the problem. there were plenty of leadership positions available to those that wanted it in my time you had Corps Staff, Regiment staff, Battalion Staff, and Outfit staff. these positions are ROTC accolades. Nobody cares what staff position you held at your ROTC in the military or in the private sector. Now the culmination of 3 Hard years of Corps work, you are a Sr Cadet and you are now at your Leadership Lab to practice what you have learned from those leaders that came before you and in your ROTC classes and the Trigon officers and CTO's. this is the system I learned under and I feel it was successful.

Allow for Freshmen to put their newly learned leadership skills from their outfits (meaning that the Freshmen will be with their outfits since the beginning of their Corps career) by having them compete in Wing, Brigade, or Regiment level competitions solely led by the Freshmen, yet arranged by Upperclassmen (i.e. monthly marching competitions, "fish platoon" PT competitions, MPIs already test knowledge and The Standard which is good). The emphasis here is that the Freshmen will be forced to put their learned leadership skills to the test. Additionally, this would NOT ONLY increase outfit buy-in/better culture/class relations, but it would also be a good assessment of which Outfits are lacking the instructional, intentional, and immersive leadership because the Freshmen classes that would perform badly will reflect their Outfit leadership.

In order to create and intentional and immersive experience within a leadership organization, it is critical to consider the value of having a smaller ratio of trainee to the trainers. While understanding the purpose of the unified freshman dorm being to better prepare cadets for the Corps and student environment, it is also important to consider that there are other options to that of which is preposed that wouldn't inhibit the ability of Outfits to carry on with traditions and values that have been around for years. For example, if the issue is that the sophomores are placing too much stress on cadets in the first stages of the training. Why not, post-FOW, introduce all of the white belts to the fish but keep the same sophomore cadre who are already well trained present while the rest of the sophomores conduct an ethical leadership course. Thus, within the most critical part of a students education, the first month and a half, freshman will be able to slowly transition into what the rest of the semester will entail. Further instilling buddy unity, communication skills, and better utilizing the Senior and Junior cadets to create an environment of highly controlled stress where freshman "students first" can focus on their education in conjunction to the Corps of Cadets lifestyle.

When I was in the corps the formal leadership training took place in your junior year as addendum of the Naval Science curriculum and Naval History. It was in the form of a business management class. Good course but at 20 years old I struggled to apply the principles learned to the military context. While there were a few Corps positional opportunities (e.g., ASL)to demonstrate and experience leadership it was very "trial and error" and "on the job". My thought was and is that this resulted in a lot of mistakes and no doubt contributed to the abysmal attrition numbers in my outfit (S-2 87-91). We graduated 7 original folks from a 36 fISH. S-2 was disbanded for H-1 2 years after I graduated. I would propose an immersive leadership plan for every cadet every year. Every year could have objective based leadership principles that needed to be demonstrated with larger responsibilities each year (team, squad, platoon, company) Each fISH could be assigned a sophomore team leader/mentor who switched after one semester. Same principle up the line. Additionally, a robust peer evaluation system should be instituted providing anonymous feedback to the underclassmen and team leader mentor teams. I would suggest rotating key leadership positions each semester. West Point does this and I think it's a good learning. Finally, as a sophomore I was expected to be a disciplinarian to my fISH at exactly the time I had the least

experience. I propose that we shift the view of Pissheads from martinets to mentors. That will certainly require juniors and seniors to be more active.

By continuing to uphold the state of the corps as it was in school year 22-23

Provide a way for whitebelts to continue to buy in outside of special units. There are many ways we support fish and heads, but it drops off for upperclassman. I think having balls for each major unit would increase morale by a lot.

From what I am aware, freshmen are responsible for learning how to follow before they can lead in the Corps of Cadets. Learning how to be a follower can give insight on how to be a better leader in the future. If the structure of the Corps stays the same, I will use what I have learned from following instructions from my fire team and from various chains in my outfit to instruct and lead fish. Experiencing good and bad instruction helps the followers learn what kinds of communication and leadership styles work to develop well trained and confident individuals ready to be rewarded with leadership.
Secondly, Air Force Leadership Laboratories do an outstanding job at offering leadership opportunities to fish willing to step up and put out for them. For both LLAB and for Air Force PT, fish have many opportunities to take charge of their flight and learn. This is the whole point of a leadership laboratory, it is a time to experiment, learn, fail or succeed in leadership. From my personal understanding as a freshmen, it also offers a unique leadership experience for upperclassmen outside of their outfit as flight commander.

Properly train sophomores. The biggest single detriment to the corps leadership development is a lack of training at the sophomore level. Often times, the only leadership training that a sophomore gets is surviving freshman year. They then proceed to behave exactly as they were treated

From my perspective, and many other people I've talked to, the current MO of the Corps is to treat the fish as if they need to be walked through every step of life. Many of these young men and women come from the top echelons of their high schools, being key members of JROTC, STUCO, NHS, and others. When they arrive here, they are made out to be fragile and un-thinking, and their upperclassmen are made to effectively treat them like children. I am not advocating for making life unnecessarily hard for the freshmen, but I am advocating that making it too easy is denying these hard-working, motivated individuals their opportunity to molded by a more rigorous environment. These 4 years are fleeting compared to their careers in the military or civilian world, but learning how to cope with the stress of balancing schoolwork, cadet life, physical fitness, and their social lives here, in an environment you can relatively safely make mistakes, sets them up for great success down the road when many of these same stressors are re-encountered in a world that is much less understanding to failure. In short, the young adults that are attracted to this institution are allured by the idea that going through this program will make them tougher in all areas of life, and to deny them of that opportunity is to deny them experience that is necessary for the real world.

This may not be your question's answer but I didn't attend A&M to become a leader or to grow through education. I applied to A&M because I wanted to be in the Corps of Cadets like my dad('49). I knew I need what the Corps could teach me, whether or not it was pleasant.

The current 4-year development model that we have (following, coaching, mentoring, and inspiring) works well, and all 4 class years are needed to make this successful.
While I believe that the Commandant briefings are a stopgap until a more unified SOMS curriculum is put together, what makes us stand out from other leadership organizations is that we practice hands on leadership that can't be found in a classroom. Those briefings take us away from that.
The greatest teacher is experience. The corps provides us the ability to create controlled and artificial stressful situations that we can put our cadets through. This helps cadets get used to acting under pressure, and any mistakes made along the way are not permanent.

My recommendation is that the Commandant's staff and Corps Staff should shadow outfits to see how they operate. NOT interfere, but just observe, even if the situation MAY seem out of hand. Ask questions at the end of training times and bring back observations to consolidate and discuss.
Ensure that leaders are intentional: I'm sure there are many cadets in leadership positions who do not

have their priorities straight. EX: Personally, I don't believe that the current values surrounding the RVs are values they should be following (especially as an official honor guard). On the surface, things look great, but racist jokes at the ends of practices or a racist and dark who's-who powerpoint are not values we want in this organization.

Take action to put intentional leaders in place who have the right end goals in mind. Allow them to use their own methods within limits to achieve that end state.

Keep outfits and MUs together and close to foster a feeling of ownership of their outfits, MUs, and the Cadet Corps as a whole. Cadets are the keepers of tradition on campus and cadet leadership needs to carry more control to make the responsibility of their position have the weight their title suggests.

I personally think you are being too intentional into the aspect of developing leadership recently. For as long as the corps has been around we have been know for developing leaders. This was because you had 4 levels of development.

Fish year - the lowest of the low having to earn your keep and quite frankly having the worst year of your life. Learning about how to become a men of character but more importantly watching other be those men of character that you care to be like.

Pisshead year-

Being the reason that the fish hate their lives. There is no relationship between the fish and the pissheads besides smoke. I firmly believe this because there is nothing strong than bonding over a common enemy. Yes you are the bad guy for a year but you also learn a lot too. You get to see the inside of how the outfit is lead. You start going out for positions and developing academically. You learn how to lead in a different way. And learn how to get shit done because you are the workhouse of the outfit.

Butt year - you run the outfit. It is yours and you are in charge. You are the person that the fish strive to be like. You act like a father to them in a rough environment where they are broken down to be build back up stronger.

Zip year - watch back and see the three classes that you developed lead the outfit. Act like a butt here and there but essentially be the moral and building up of the fish and pissheads too. ( pissheading can be a lonely life)

Personally I don't see why we would try to get away from this. Personally I am a 4th generation corps of cadet member and my grandfather and father are some of the most successful people because of the corps and that is not a brag about them but a brag about the corps because they are successful because of it.

So stop. Stop changing what the corps is. There is no need. The punches are from soft people that is a recruiting fault. Don't recruit bad cadets or people who aren't mentally prepared to have a shit year. Like you said the punch rate was much lower this year during fow because it was softer. That makes sense it is your fault for giving those cadets a false sense of reality because that is not what the corps is. That is a leadership fault.

Being a relatively recent graduate from Texas A&M and the corps of cadets, I have had the opportunities to see many examples of good and bad leadership outside of the corps. In my job, I have seen our fairly robust training period create very dedicated members of our team as well as very poor workers. I have even had the opportunity to work alongside my manager to tweak and correct our training and many of the changes I pulled directly from my time in the corps. However, good leadership training, I believe, comes down to the people who are training and less about the training program. Also, breaking down the four years in the corps, I believe the most crucial years for learning how to be a good leader is sophomore and junior year. Similar to the training we have implemented at my job, the period of training is dedicated to learning the basic tasks while "in the trenches" of the job and grinding. The reason for this is to truly learn the job from the literal ground up, to earn the respect and trust of those above you,

show your peers and your leaders that you are willing to work hard, and to earn the rest of your training period. This method has been very successful for my company and I believe it's a pretty accurate representation of fish year in the corps. My argument away from the singular fish class until the spring is the same argument I would present my leadership if they said all of our new hires will spend the first few months together away from our work. They simply would not learn the job like it is to be done at each account while also not being given the opportunity to build bonds with their coworkers. I believe the same applies to fish year in the corps. fish year provides bonding and learning with your buddy class unlike any experience leading up to it. Good leaders in the years above can truly motivate a fish class to be extremely successful, setting them up for the crucial years to follow. As far as changes go in the corps, I would love to see the same dedication to leadership training given to the fish also given to the upperclassmen. Ultimately, my time in the corps and experiencing a "hard" fish year followed by built in leadership training the following years shaped who I am and what kind of leader in life I have become.

Perhaps we ought to look towards the experience of the Academies and our own University's similar programs. The Academies have a Summer time program to get their plebes ready for school in the Fall. We have ample models from Fish Camp and T-Camp and the like on how this can be managed and organized.
Perhaps, for the new upperclassmen, a similar program could be stood up in May between Final Review and the beginning of the Summer Session.

Hands-on leadership experience is better than in class, PowerPoint-centered "training" every single time. We need to focus on opportunities for cadets to lead from the front in physical activities rather than making them sit in a chair and learn about it but rarely have a chance to implement it.

Make things hard again. I understand the overall mission of your office and of the university is to get to the benchmark of 3,000 cadets, but so far that is coming at the expense of a harder training environment. Pressure makes diamonds, and the corps isn't designed to be for everyone. I know that the majority of cadets were allured in to the corps by the harsh environment to provided for one to test themselves and come out physically and mentally stronger individuals. The corps has been producing intelligent and ethical leaders in the military and civilian sector since its creation. What I've seen so far from the proposed changes is stripping the corps of the intensity it had which attracted many. Retention is going to plummet because people don't want to be in an organization that doesn't push them or make them feel like they earned their spot in their outfits or the corps as a whole. Additionally, outfit culture is what drives camaraderie and in some cases is the crutch of some people's experiences. Outfit culture is not the issue, and by targeting it you are making enemies of the people you hope to direct. Similarity, there are traditions that are being taken away that also adversely affects the way cadets view the office. Flight of the great pumpkin is a great example, it's something for the corps to rally behind and draws in thousands of people to view. It is what makes Texas A&M and the corps such a unique and special place to be. There is a way to implement leadership changes while preserving the culture of the corps and without creating animosity between the commandant office and the corps itself. We all believe in this corps, we all love this corps, but I've seen nothing but hatred and animosity grow from the policies implemented under your charge. It will destroy the corps from the inside out if it continues.

Focus on the leadership of the fish through formation of bonds through outfit culture and family. Though love, and a lot of being straight with the freshmen

Create more opportunities for learning. Too many times I see this interaction

"This is what I want done. This is why I need it done. This is how I want it done. This is when I need it by." That's a lazy leader. Too much information, too much management, not enough opportunity for learning. Leaders everywhere do this, and it breaks my heart because they are robbing their subordinates from the ability to learn, and robbing themselves of the ability to teach them. This, I fear, is what's happening to our Corps. They're lazy leaders. Everyone is micromanaging everyone, and the more they do it, the more slips through the cracks.

"This is the task, this is when I need it done by, what are your questions and thoughts" That's a leader. Let your subordinates work through it. Coach them if they have questions. Let them screw it up, to an

extent, then show them how to get back on track. Coach them, mentor them, understand them, and by doing so; you are molding them. In my opinion, that interaction right there is what the Corps is missing. The fact that you're accepting feedback at all tells me you're more than aware of this process. You use it yourself. Now apply it to the Corps. How do you get a Pisshead to use this process? A 1SG? A Commander?

You give them tasks, give them the opportunity for mess it up, then you bring them back on track. Use the process, teach the process, live the process. This process is not taught from the bottom, up. It taught from the top, down. If you want good pissheads, you need good 1SGs. And if you need good 1SGs, you need good Commanders. And if you want good commanders, then you need good Cadre. Start where you feel appropriate, but teaching this from the bottom is a waste of time, and energy, and is a lot of heat to bring onto yourself. Teach it from the top, let it trickle down. Let people make decisions, and live with them in some cases.

I am not going to pretend to know the answer to this.

Understand the traditional structure of leadership experience within the Corps and capitalize on why it was started that way. As a freshman, you learn to follow and work as a team.

As a Sophomore, you start with one leadership tool, that is direct command and control. You see what works and what does not work through trying different things at different times. Having a larger amount of Sophomores leading a smaller number of fish gives the best situation to practice that small scale, direct front-line experience in teaching and evaluating.

As a Junior, you oversee the Sophomores and guide them. And so forth into the strategic leadership of the Seniors.

At each level, fewer people actually hold the leadership roles as you identify the best leaders in the unit.

First and foremost, if quality over quantity is truly the goal there needs to be emphasis on raising the bar and standards that go with it rather than dropping to the lowest common denominator. Some people weren't cut out for it/didn't understand what they were signing up for. But instead because of how much has been removed to help make it more inclusive, it's created the effect of ostracizing those who've put in the effort who then start to question if it was worth it when they could've gotten by without having pushed themselves. Additionally, while it's possible things have changed in the 2 years since I've left the corps, there's constant complaints about upper class men not respecting the fish, but if you look at how the bulls treat the cadets I've seen a lot of similarities where cadets are not treated with respect and given the appearance of a double standard. When cadets intentionally go out of their way to avoid the people that are supposed to be their advisors, there is clearly something wrong. As for making a more immersive leadership training and development, for one there are so many alumni with such variety of backgrounds who'd me more than willing to even lend an hour of their time where they could even zoom and talk to small groups and provide mentorship and learning (C-2 does really well with this both with their annual conference and other activities).

give more leadership opportunities

Put cadets in challenging positions and allow them to face failure before you provide course correction. Leadership is about being a decisive and dynamic problem. It is not about being perfect. The DOD is a perfect example of failure at this.

Rewards outfits that people show up, many of the jocks outfits during time were part of the boys and got all staff positions. Look at outfits that show up everyday and don't look for glamour.

Provide us with healthy challenges to overcome, we need direction. If little-T traditions are "hurting" the corps from your perspective, maybe try to ride the train of tradition at Texas A&M, but do so in a healthy way. Give us experiences so challenging and/or thought out that outfits can't find time to do the stupid stuff that genuinely harms our corps.

This is just an idea of mine, I lack the creativity to give you ideas on what exactly these new traditions would be. Maybe something like the Cadet Challenge? I am merely giving feedback, not trying to make decisions for you.

Give leadership back to the cadets. COs and 1SGTs have no room to lead. Any mistake and it is immediate discipline to the highest degree. If development over all four years is the goal, then all ranks should be cadet-lead, not STANDARD ENFORCED. The standard is a rule book that is disregarded unless Comm Staff/Corps staff wants to punish a cadet or outfit to the highest possible level. Also, if "across four years" is the goal, the Learn, Coach, Lead, Inspire motto should be put into place. As of now, if a sophomore in my hallway is caught by a staff member even speaking to a fish during the academic day, they would receive discipline. This is not right. On the spot correction should be allowed, to include pushing, remaking racks, or requiring their uniform. These should be repeated until the fish demonstrates their ability to meet standards. Right now, I see freshmen who don't shave, greet, or simply honor the "elephant ear." What is the point of coaching these standards and traditions if there are no repercussions to follow unacceptable behavior. Additionally, is fish cannot demonstrate a simple, perfect uniform, why should they already be "transitioning" to sophomores. The system in place as of now is broken.

Focus on servant leadership and the guiding principles of that. Utilize extreme ownership (jocko's book) as another basis to teach from. Sophomores should understand the teach/show/hands on training path. Accountability to the standards firmly upheld and proper punitive punishment applied - and via buddy system.

Keep white belt engagement and D&C engagement. Especially those who are not cadre/green tabs. The corps has always been fish centric, and white belts get forgotten in the shuffle.

Consistency in core policies and a return to personal responsibility - appearance in uniform, always whipping out to upperclassmen, attention to military bearing, distinction between classes/not blurring the lines with upper and underclassmen

s opposed to outfits being able to directly find the best possible support options for each individual fish.

Please define leadership. What outcomes do you expect from such a program? How will you assess the programs effectiveness m?

How we've been doing it

The most immersive experience is as an OUTFIT. I didn't care about being a "generalized cadet in an amalgamated system", I cared about being a Husler. Make CROs Apply rather than being appointed, and move them between outfits if needed like other KL's, that way there will be more intention in career readiness and leadership training. Also make SOMS required all four years, not an option.

Communicate with cadets first. We shouldn't find out the purpose and execution of this plan from a Facebook post from the Commandant to old ags. Current cadets should be the first to hear about these changes. Even the little information we received from command team was far too limited. I think this news about restructuring would have gone over more smoothly had there been more information available and more unknowns figured out before this news reached the cadet level. You can be more intentional by keeping cadets in the loop on things, asking for their input and responding to it when provided.

There should be a differentiation between Cadets commissioning versus those going into the business world when it comes to leadership experiences and training; leading in the real military is not like what Cadet Fish are experiencing; some company's (especially in all male outfits) we are led by Sophomores or upperclassmen who see it as having power to mistreat Fish because they were mistreated; there is minimal leadership skills taught or shared; they think leading is aiming to instill fear; they think paining a Fish to punch out is what makes a guy tougher and if they punch them we don't need them - but they punch out because of how wrongly they are treated; and if they have it out for you - man - you better have thick skin to take it and not want to punch someone in the face or punch out; so leaders are not grown instead they are suppressed to not exist

Keep the commandant out of the decision process

Effective, intentional, and immersive leadership training comes from people who have real-world experience. While informational, Corps SOMS classes past sophomore year are not geared toward the average cadet. There is no call to action or cadet motivation from the instructors in these classes past 3rd semester. The most benefit and leadership perspective I've ever received from a SOMS class was when the CTOs/Gunnys were my SOMS instructors. When we walked into class it never seemed like there was a lesson plan, but the discussion always connected to a leadership principle. They would talk to us about problems in the Corps, and they were always more informed than we were. By the end of every single SOMS class with a CTO, I was inspired to go make a positive difference in the Corps. Experienced, informed, and "corps-involved" leaders that care are the way to keep cadets engaged into their white-belt years. Reading through leadership books can be beneficial, but it doesn't create buy-in from cadets. By keeping SOMS instructors informed, they can challenge our norms and be the link between the commandant and the non-staff cadet body.

Expand the military science classes to include the specific instruction you are seeking incorporate a grading system to judge units on successfully incorporating the instruction into unit operations. Reward high achievers with unit designations and citations. Penalize poor achievers with probationary periods and disbanding if corrections are not achieved.

Allow outfits to have fish in their hallways and don't split up outfits between hallways. This will in turn destroy outfit pride and will create a vast swath of once we're motivated cadets in said outfits into un-motivated apathetic cadets who have no reason to work hard apart from their contract due to them not having something that they can directly effect IE: "The Outfit".

Keeping the structure the same and not change it to this fish academy.

I

The corps development model encourages cadets to go out for key leadership and heralds first-sergeants and commanding officers as being peak examples of what the corps has to offer but wonders why cadets not in key leadership lack the motivation they had as fish or heads. By definition they have failed to achieve some of the greatest honors in the corps yet the corps turns around and asks why they no longer believe in their "leadership training". Intentionality means you are deliberate and careful with your actions, thinking about the result before you make decisions. Immersion is providing every cadet a depth of experience they will truly thrive in. When I think about the possibilities outlined in the leaked document, I immediately see how the fish will lack the deeper immersion that Outfits offer. For my three years in the corps, Major units have existed as a way to disseminate information and provide organization to the corps. fish who enter the corps at a major unit level without the cuture will lack the guidance that tight-knit outfits provide. I largely stayed in the corps because of my buddy class and upperclassmen. The size of my group of buddies encouraged us to get to know eachother well and we forged unbreakable relationships such that none of my buddies ever punched. Another part of being a member of an outfit is knowing the name of every single outfit member and this would be diminished if fish entered the corps at a major unit level. To make the corps more intentional, stop pouring commandant staff effort into only key leadership. Require advising each semester from members of commandant staff for every cadet in the corps. To make the corps more immersive create buy-in when you recruit a freshmen and rekindle that buy-in when they arrive at FOW. I have seen many times that cadets who can point to somone in their outfit that they know cares about them will have that same level of care for their outfit. When the follower fails it is the part of the leader. I believe many issues in the corps would be solved if we all had this mentality.

Assist in cutting costs. I have known several cadets who have seriously debated dropping out from the corps because they cannot afford it. Overpriced rooms, textbooks, weekly haircuts, special unit supplies, and dry cleaning really adds up.

I think that the leadership training is very immersive all the way down the chain as is. The Corps has made some of the best leaders there is to offer. Cadets have gone on to join the military or make very successful companies. Most of the CEO's of companies that I've met with that went to A&M were also in the Corps. I do think that upperclassmen accountability needs to be changed. Having the whole leadership chain present would insure the system that has worked well in the past stays working.

Start from the bottom with a comprehensive leadership development program that prioritizes education, physical fitness, CORPS values, and lastly individual unit values/culture

Semi annual Leadership seminars with current military and civilian leaders. Small group breakout sessions per semester.

It is apparent to me over the last few days that we all love Texas A&M university and love our Corps! That being said, I believe that there are issues across the Corps with lack of leadership, lack of accountability, lack of responsibility, and lack of communication. There also seems to be a lack of alignment between various stakeholders -- Corps, SOMS, Hollingsworth, Military Programs, D&C cadets/program, the University, etc. This drives a critical issue in keeping the Corps relevant within Texas A&M University AND the student body. I believe this survey, along with the Commandant's leadership, is the first step in getting the Corps back on track.

My suggestions is that the Commandant lay out a vision for the Corps for the next 150 years to these stakeholders seeking alignment around the "why". Any future idea or concept or plan should align to help achieve that vision. While the Corps is a student run/led organization, it requires leadership and ownership by a University official, the Commandant.

My suggestions for the "how":
Corps vs Outfit:
- Outfits have come and gone and changed over the years for various reasons.
- In the end, there is one Corps, including the Fightin' Texas Aggie Band
- Outfits have their place in Esprit de Corps, culture, focus, and organization
- Outfits should be held to the same standard regardless of focus / culture
- Create a recruitment incentive for meeting standards and retention rates (or other metrics). those that do well, continue to thrive, and those that struggle either adapt and recover or fade away --- this is Leadership Lab material right here! Of course, Commandant staff should come along side the struggling outfits and mentor, retrain. We really want everyone to succeed, but sometimes failures lead to future successes.
- When in doubt, look to the FTAB for long lived examples. Each cadet is in the Band first, then outfit, also further broken down into sectionals (by instrument). The FTAB has been doing this successfully for a long time!

Freshman Orientation:
- FO should be 4 weeks and in 3 phases:
+ Weeks 1-2 = Phase 1 -- focused week 1 led by Cadre; week 2 led by Cadre with focus on transition to classes and study habits/resources
+ Week 3 = Phase 2 --- fish are introduced to remainder of outfit Seniors and Juniors
+ Week 4 = Phase 3 --- fish are introduced to remainder of sophomores and establish FTL relationships and training cadence
-Outfits should lead the FO with a larger selected Cadre. 3-4 Seniors; 4-5 Juniors; 3 Sophomores (must have completed Sophomore Leadership Academy)
- Major units lead and ensure orientation tasks are being met; perhaps augmented staffs for the orientation period.
- A standard must be created -- process, checklists, master schedule, etc - so that each unit is orienting to the same standard---- each fish learns the same things, and shares similar experiences
- The Cadre should be trained specifically in the orientation standard, conduct, and be held accountable for training.

Train-the-Trainer Approach:
- Sophomore Leadership Academy -- this is a great idea. It should be structured and standardized across the units
- Rising Seniors and Juniors must also have a shorter but similar module. Juniors must learn how to be the backbone of the Corps during their year. Both executors and leaders!
- Structure and standard!

D&C Cadets
- These are some of the best leaders within the Corps. They should have leadership positions!
- There needs to be an overhaul of the program here. Texas A&M College of Agriculture has some excellent Leadership programs and courses. I recommend a collaboration between the Corps / Hollingsworth and College of Ag.
- The university needs to develop a Minor in Leadership for these cadets due to their experiences as well as the additional courses they have taken.

Other topics to help drive culture, leadership and education:
- Formations -- get back to holding formations and reporting! Its ok for cadets to miss for off quad activities, study groups, etc, but the Corps needs to be disciplined in creating a Corps environment

- Whip outs to other outfits -- This needs to be enforced! and there needs to be a simple standard of whipping out -- no specific outfit whipping out. And this needs to happen off quad as well. What a great way to bring the Corps together.

- Howdy --- Dammit!! I cannot tell you how disappointing it is to me to walk campus now and the Corps members do not say Howdy unless spoken too, and even then some dont! Need to get back to being Keepers of the Traditions!

- Off-quad organizations and uniforms ---- I hear many stories of cadets skipping other organization meetings / events because they would have to wear their uniform. Need a way to instill pride in wearing the uniform as well as incentivize participation outside the Corps.
+ MSC -- uniform
+ Library -- no uniform
+ Rudder -- uniform
+ other buildings after chow --- no uniform for studying and attending off quad organizations

- Each outfit establishes a mentorship program -- In the fall of 2023, the A Battery CO initiated a mentorship program connecting former members to current members. This is a start!! The program needs some structure and modules, but I believe it has been beneficial for both mentor and mentee. Focus should be on personal development, resume, leadership, etc.

Truthfully, letting the outfits have their cultures. Yes, they can be bad, but it's a matter of letting evolution take care of the bad parts and grow the good ones. Corps staff's crusade and pseudo us vs them between yourselves and those on the ground makes us more likely to be antagonistic against new ordinances and rules you put out. This takes away from our want and will to lead or learn how to lead.

Identify natural leaders early on. By the end of FOW, there is usually a clear 1-2 fish that are standouts and leaders of their class. For others, it will come down to motivation. There is no other way to say this. In every facet of life, there will be leaders and followers. Give them the means and the tools to become leaders. Ensure that legitimate leadership positions are available at the outfit level and hold each person accountable to the standard set. If people are not willing to pull their weight, get them out. It's as simple as that. Although harder to do via peer review. Counseling is one tool I wish I used more.

Give cadets leadership (not management) training, more training to the Fish than upperclassmen and hit it hard spring semester.

The first semester should emphasize:
- how not to flunk out in academics,
- learning corps operations,
- show there is more strength through unity, and
- basically how to live without parents.

Purpose: Show young cadets how to lead other students who are not in the corps. Having on the uniform gives cadets more initial respect than non regs.

Offer many oppurtunities for the cadets to lead and follow across the Corps and the community. Explore community activities in Bryan / College Station and include the ability for freshman and sophomore's to move around units.

Every upperclassmen does any pt with the freshmen and sophomores to show followers what leaders can do from back then and now. No underclassmen is more special than their upperclassmen.

Make this place a family

Create leadership classes at each level for the next phase in the leadership pipeline. Freshmen second semester learn about leading individual contributors versus being an individual contributor. Second semester sophomores then learn skills for next phase of leading front line leaders leading team leaders needed as a junior. Junior leaders at this point determine whether need skills as a functional leader (outfit) or enterprise (staff) based upon interests.

The leadership pipeline provides a model utilized by Fortune 500 organizations and prepares leaders for industry.

In alignment with the Commandant's vision to strengthen Corps culture and cultivate leaders, this proposition lays out guiding principles, ideals, and requirements for future Corps activity regarding unity amongst outfits, major units, and Corps values. Per Unitatem Vis.

Problem: Outfit activities and cultures become isolated from the standards and expectations of the Corps of Cadets. Well-meaning programs that take away outfit individuality have been met with opposition from many cadets.

The proposed solution-
-unify the corps on the individual level
-major unit activities
-mandatory co-outfit and battalion PT/CR events.

Corrective Implications to Outfit Requirements:

The unification of the corps on the individual level. Corps culture is often suppressed by outfit culture due to a lack of involvement from the Corps in daily outfit life. The solution cannot be found in forced Corps-wide classes/lectures. Outfits often attend briefings with a "mandatory" mindset. Implementing lasting and effective change must be done through facilitating comradery between outfits.

To facilitate the aforementioned unity, it should be the Corps' prerogative to begin regularly scheduled (preferably monthly) Major Unit activities that go beyond briefs. These activities should focus on team building and leadership development in a practical/active environment. These Major Unit activities will divide classes and outfits in the same way that ROTC organizes squadrons. This will allow Seniors, Juniors, and Sophomores to mentor fish and allow all classes to bond with members of other outfits.

Outfits must organize joint PT/CR events within Major-Units biweekly. Co-outfit activities will expose individual outfits to the broader Corps culture and allow for outfits to supplement/learn each other's leadership methods.

Increasing the amount of practice that cadets get for leading would be of great benefit, the SOMS classes that teach leading are mostly all lecture. While the classes give examples on what a good leader looks like and also what bad ones look like, it is generally accepted that people retain only 5% of what is heard in lecture environments. In order for cadets to retain any meaningful information on proper leadership, more practice with constructive feedback will be required.

Keep the Corps cadet led. As long as we do not do massive mistakes that harm others, then no cadet should be restricted in how to lead in accordance to the standard.

Give training to the whitebelts on how to do their specific jobs because they actually run the outfits and are responsible for our events and activities. The lack of knowledge in their specific job is noticeable across the quad and the sophomores and fish don't know how to do the job next year because the people above them don't know how to either.

Each major unit needs a mission (like the band has a mission). Training the fish to a standardized way of life in the fall semester is a huge mission in itself.

I like the plan of having the Wing, Brigade, Regiment, and the Band select 200 of their best cadre from within their major unit to train and standardize the fish (who are all kept together within the major unit and not assigned to an outfit until the spring semester).

A fish's first loyalty is to one another (their fish buddies across the entire major unit), their second loyalty is to the major unit and the unit's mission, lastly the outfit (and what ever revolving outfit "culture" may be popular at the time).

In the late 80s and early 90s the Band fish were trained by ALL outfit upperclassmen across the entire band and fish could never do anything without a buddy or big group of buddies.

B-Batt fish were trained by A-Company Pissheads, Butts, and Zips with no issues of cross-outfit conflicts. Everyone was exactly the same, on the same sheet of music, and standardized for the benefit of the band's overall mission (to perform). This was highly immersive leadership training for everyone all four years.

Fish learned active followership and how not to leave your buddy behind. We even had to speak as one, all together, and in unison. The fish collective was like a single giant force, and the individual was protected by the school (of many fish). I hated it at the time but is was invaluable training - and very immersive. It was so immersive, I hated it.

The Corps and ROTC programs are disconnected. One's success in the Corps does not directly contribute to success in ROTC programs, which subsequently results in a time and energy investment decision for the student. The ROTC programs and the Corps must find ways to work together integrate and account for cadet performance in both programs. A deliberate and Immersive cadet experience integrates the ROTC programs into the Corps of Cadets program and uses leadership education concepts found across all three ROTC programs to grow the cadet. For those not seeking a commission, the program offers a military leadership education program without the obligation of a commission.

To make sure we develop each class as a person first then focus on leading. We still need to have the class system but let us train how we see appropriate. For example, a piss head can be nice and still be an effective leader and coach.

Value making mistakes. Nobody gets it right the first time all the time. Let underclassmen view good examples and understand why they are good. (For me, this meant u estranging that each fish class emulates their senior class)

Maybe let cadets lead the fish in their own outfits instead of quarantining the fish to be indoctrinated by staff.

Maybe let cadets make decisions about the corps instead of overhauling the entire system with no input.

Maybe stop completely disintegrating any power cadets have, making their "leadership" irrelevant.

Be respectful of the past. Learn from it. Major changes to policy, SOPs, guidelines and processes aren't required.

Bring in corporate leaders to lecture. Start an internship program for current cadets with former cadet owned businesses. Military leadership skills are mostly learned from peers and upperclassmen. There is interaction with the Trigon staff, but not in teaching leadership. Start a leadership class for university credit

Create applicable leadership training sessions where training is done with real world examples and real life practice.

Provide more opportunities for leadership even at the fish level.

Extra SOMS lectures for Blackbelts on Monday/Friday mornings won't do much in terms for actual engagement. Revamping the curriculum to make it less lecture like and more practical/hands-on would actually help it to somewhat apply to what they're learning/practicing in their current roles within their outfits.

You already are. The Corps is the best student led leadership development program in the state. We create leaders. Don't fix what's not broken.

Leadership should be developed collaboratively among buddy classes. Strong relationships developed through the corps are what propel individuals through adversity and creates indivuals with quality characteristics for younger classes to emulate. This is the best way to create leaders, by giving indivuals an example to live up to, rather than an artificial idea of a leader which SOMS classes try to create.

Leadership starts from the first day of FOW. The fish need to be taught self discipline and reliance on their buddies. The Corps should be a student lead organization that is advised by university staff. Look to other programs on campus that teach leadership. Being self aware is the first step I'm leadership. If one doesn't understand how their actions impact themselves and others, they cannot effectively lead. Reward good character traits and disciple poor ones.

Back off the outfits, let them grow in culture, introduce more cross training if you want to make a "more unified" corps experience. People don't join for the corps, they join for outfits.

Make the program more of a challenge. You are making it too easy. If you make it easy, they won't want to wear a uniform bc it's not worth it.

To hit your 3000 number, Hire 5-6 kids who are cool recent graduate cadets to recruit for the Corps. Send them all over the state. Get more kids kids to sign up. That way, your 10% attrition isn't a problem. Because the 10% that quit are pussies anyway and we don't want them

Also, don't ever EVER let a trans person be in the Corps much less in a command position. You know how embarrassing that is???? To see a man dressed up as a woman in the Corps of Cadets uniform? That a major fucking cut. Do you know what the teasippers would do if they got a hold of a picture as such???

Remember the good 'ol days when dudes that were queer were in the closet? This woke BS is Crazy and doesn't belong in the Corps.

Staying hands off and allowing the outfits to govern themselves along with corps staff having less power would be the best intentional thing that can possibly be done.

Further develop the 4 year leadership model with a focus on the importance of what each year encompasses. Also allowing cadets more hands on experience to immerse them in key roles.

Why do you feel it is necessary? What exactly is the problem you're trying to solve?

I'm not going to answer your questions. I'll just say that your role is to not F this up. Just by the fact that you're asking for feedback, tells me that you understand the blowback you're receiving. Just stop give the cadets some autonomy to chart their destiny.

I strongly believe the corps culture is one of the most significant aspects of the Texas A&M development experience. It is unique in its approach even from the military careers for which many of the cadets will pursue in that the characteristics of the corps graduates excel in education, leadership, mission culture and camaraderie of team and loyalty development. It is an experience unavailable anywhere else.

I appreciate and applaud any effort to continue the process of evolving these programs and experiences to continue to produce the kind of cadets and individuals who continue to contribute so much leadership in our society in every aspect of their characters in the professional and/or military world. I believe it is the responsibility of the leaders of the corps program to focus on the continued improvements required to sustain these values through the knowledge and expertise they bring to the program. As recommendations are made, careful analysis and thorough reviews must be completed concerning suggested changes to include views of past and present benefactors of the corps experience. I believe only with this collective type process will the continued sustainability of the corps experience be maintained.

My particular comment will relate to the discussion around the suggestion that freshman be separated from upperclassmen for a more specific focus on initial stages of individual development. I can

understand that here may be some weaknesses and areas for improved methods for bringing young cadets into the corps leadership development process but do not believe separating them from their outfits or the interaction with older more experienced cadets will improve the program. Rather, I believe it will be detrimental and basically convert the sophomore cadets into more of a freshman cadet within the outfits where they reside. The age interaction of these young cadets is as important to their development as their relationship building with fellow cadets in their class. If weaknesses or areas for improved development are identified for the freshman class, it should be within the environment of the overall experience of the holistic outfit approach and within the leadership and development process of the upperclassmen within the outfit environment.

I would strongly oppose separating freshman from their outfits and the interaction with upperclassmen in the daily experience. Any concerns identified should be addressed within the existing environment that has already proved to be successful.

Most of my true leadership training came from the military science program, not from the corps. The corps was about attention to detail, being physically fit, and learning how to suck it up. And that was valuable. However, it provided minimal « real » leadership training, except for learning by example from the sophomores who weren't just assholes. (There were a lot of those.) It sounds like a lot more emphasis has been placed on actually learning about leadership since the early 2000s, so kudos.

Preserve outfit culture by giving value to the lowest level of leadership with the sophomores and juniors as team and squad leaders allowing them to grow with less restrictive boundaries and create genuine leaders through adversity, not by handholding them with an overtly restrictive and top down guidance approach.

Create outfit structures that require leadership roles to be filled and empower Major Unit staffs to enforce these structures with support staff functions

More training time. Academics are overprioritized

First, I applaud the openness to feedback on these issues. For perspective, I'm the father of a Senior Army ROTC cadet. I am not TAMU alumni, but USMA Class of 1994, so I do have some perspective on living in a Corps environment albeit a bit differently. Ensure each cadet has a leadership opportunity and

requirement commensurate with each stage of their development. Sophomore cadets should be in charge of, responsible for, and leading 1-2 freshmen in how to be a member of the corps, following standards, and how to be a good student. Junior cadets should be in charge of 4-6 sophomores and freshmen. They should have responsibilities in teaching/coaching the Sophomores HOW to lead the freshmen and also some responsibilities for looking after the welfare of the "squad" in terms of enforcing standards, inspections, holding sophomores accountable for deficiencies in their freshmen, and looking after health, morale welfare. This was GROSSLY under-delivered during COVID days and I fear this group may have missed out on learning how to take care of those below you. Anyone who had to endure the "quarantine barracks" will attest to this. Those Juniors that don't have squads should have some some type of "staff" function for the outfit with responsibilities for a "commodity" area that helps everyone. Establish some guides and left/right limits for what those staff duties are. Senior cadets should be in either leader roles (CO, XO, PL) or a staff OIC role. Set expectations for the leader roles. It's NOT the guys who march in front and have more dots/diamonds. What are their responsibilities? I recognize they are still students, so their responsibilities need to be commensurate with their own student requirements, but the point is teaching leadership through immersion. And leadership is not just wearing the rank and marching in front. Are the goals/rewards appropriate? Do they provide something sufficiently desirable that make the Cadets WANT to attain them? This may be an important consideration as they haven't all attained the level of maturity yet where they should be intrinsically motivated to achieve a successful outcome yet, but perhaps build toward that. I doubt that exists within all freshmen/sophomores. They are still kids after all. When the semester changes, you change everyone's duties so that a fresh batch get their shot in the critical leader roles, and others, who were the leaders, learn how to support the new leaders. Also, ensure that some time is spent in class-specific education about leadership at their level - and it doesn't even have to be all military, it can be civilian related as well. The point is to help guide them to be good leaders in general, and also good followers - of their leaders. This is separate from ROTC-specific training. -John Horning, COL, US Army

Rather than take certain classes away from the outfit once a week utilize CR training times once a week on either an outfit or maybe minor unit level. From there separate the classes so that each can do their own program without having to attempt a one-size-fits-all all approach. This would eliminate training times where an entire class is absent while still accomplishing the goals of education. This could be instructed by the new leadership advisers hired, cadets or Hollingsworth center and could rotate throughout minor units throughout the week.

Swap the CO and 1st Sergeant with another cadet after the fall semester

Giving the cadets an actual opportunity to lead. Respect them even though you think they are children. The point of the corps is to fail in a controlled environment, if you just tell them what to do and take away a very large part of learning how to lead then what even is the point of the corps other than to get 18 year Olds to spend new york apartment prices on a shared closet and inflating football audience numbers.

The Hollingsworth Leadership Center is what should be the focus. It has vastly improved over the past few years and need to start at the freshman level. Instead of having Military advisors teach those classes, actually hire real professors for it. These classes should take on the Socratic method of how the Corps is marketed out to be. A leadership discussion. This way each cadet can get a foundation and build upon it by the time they are seniors to decide which leadership method fits them the best and know how to cater it to their subordinates. The ILDP has greatly helped cadets in cultivating this process.

Empowerment of the students in the Corps is the key. Trust and verify. Give them guidance and set clear standards for what is to be achieved but allow a degree of freedom and creativity among different outfits and among larger unit leaders to achieve it. Make sure they are setting goals and tracking towards those goals and if they fail to do so intervene. The more students are making the decisions though the more they will be motivated and the more they will learn. The most important thing they need from the Commandant's office is clear and measurable objectives that they know they will be evaluated by (Academics, Retention, Recruiting, Discipline Reports, Inspections, Awards received, etc.)

Mistakes will be made but the key is learning and growing from the mistakes and not forgetting to focus

on the achievements as well as the shortfalls. The cadets should feel support from the Commandant's office and a larger accountability but not a heavy hand. The more that you expect of and trust the students the more they will deliver. The more the students own their mistakes and their successes the more they value them and the more they learn. Teach them how to make choices and learn from them for good and bad, don't simply tell them what you want them to do in too much detail.

I was class of 1998 and immersive was the best thing about it. You learned from the ground up. Learn how to follow, then learn how to instruct, then learn how to lead. All the while, you are learning from experience and what you like/dislike about the leadership qualities of your peers and upperclassmen.

How do you be more intentional about leadership training through the Zip year. That's easy.....Trust and Respect! You have to build trust and respect.

The hardest part about the process was the constant battle between the Trigon and the outfits. We always felt like the Trigon was imposing rules that were meant to be broken and making the Corps "soft". For instance, some time after my fish year we were told that freshmen were no longer allowed to do more than 40 pushups at a time and were not allowed to be in the front leaning rest. That's just one example of many. So, you have "leadership" trying to impose a rule that no one agreed with. Those decisions immediately make the Outfit culture at odds with the Corps culture. The Outfits believe the decision makers are making the Corps soft and feel like it is their duty to give the freshmen the experience they desire and will grow from. And usually, the staff cadets are caught in the middle. Some are "yes" men and women to the Trigon. They fear their commission spots and referrals. Others just turn a blind eye. Outfits are put in a position to fail and are distrustful of the Trigon and staff. No trust and no respect.

So leadership training is really difficult when there is no trust and no respect for what the "leadership" is doing.

If you can build trust, then you will have a much better chance of reaching the cadets for 4 years. Without trust, there is no way you will ever reach them. Without trust, there is not respect.

Have more intentionality in having productive events from outside speakers coming in and talking about leadership experience in the public and private sector as well as in the military. CR events on adult life skills and resume building. Case work studies on leadership challenges. A lot of white belts get left out of training. Most of the focus is on black belts. A lot of white belts are facing life after college and barely know how to perform basic life skills like filing taxes, negotiating for a car, house payments, etc.

the key to having more intentional and immersive leadership training is to create more opportunities for leadership. The more things that cadets are responsible for the more opportunities they will have to lead other cadets in support of that goal. Creating defined responsibilities for each white belt will give them the opportunity to grow and teach others within that chain of command to help execute those goals.these goals can be correlated, major unit, minor unit or outfit driven

There's a lot of discussion of changing. This is constructive but needs to be framed. As a '94 BQ and father of a '23 and '26 cadets, I can assure you that the passion and love for the Corps is strong and these current cadets want an experience no different than the one we lived. They're not asking for Kleenex and stress cards. They want to be tested, pressured, tempered, and come out smarter, harder,

and ready for a world they already know is unrelenting.

The pressures this generation feels to look to the future, to decide "what you're going to be", how much money and clout you'll gain, the level of influence you make, etc is so much stronger than the 90s and earlier. Just having the chance to be called an Aggie Cadet is radically harder. We didn't have social media, instant news, pandemics, hyper-political division and turmoil, and the speed of the world as it moves today. So I'd propose that we maintain some critical and fundamental basic truths about the Corps: the Seniors lead the Corps, the Juniors run the corps, the Sophomores discipline the Corps, and the freshmen are the Corps. Maintain this basic concept and use it as a building block methodology to move to the leadership positions awarded at each class - whether formal or informal. Leverage each class year as the developmental stage for the next year, and don't forget that our Zips need to be readied for their chosen life after graduation - they need development throughout their year as well. We can formalize a pisshead training program, create benchmarks and tasks that each cadet must complete to receive the privilege of performing at the next level, and use a more rigid system of accountability - document requirements and counselings, and apply these tools to inject more structure into the formal leadership selection process.

We need to level set expectations of what each year group is required to learn and what behaviors we expect them to exhibit. Cadets live a tradecraft type profession. Fish are apprentices. Pissheads are journeymen and should have well founded values, know their expectations instinctively, and be allowed to make honest mistakes that don't end or threaten their cadet life. Juniors are masters of the "corps trade" and must possess the skills to run and operate the organization. Zips are the corporate officials who create direction and establish the overall climate. The Trigon can intervene to provide steering corrections, but only in the most critical of situations should they step in and assume control. I can't stress enough that we need to underwrite honest mistakes and allow learning to occur from them.

We have opportunity to effect these changes that move us back toward Corps fundamentals by injecting procedures, processes, and standards that reflect the decades and decades of success we've all experienced. Wholesale change will trivialize and undermine these lessons.

As any good artillery man would tell you - shift from a known point. Let's not commit fratricide while trying to improve and grow the organization we all hold passionately dear.

Maintain outfit cohesion. Ultimately no one will care for freshmen or any other cadet at any level than their buddies and the other members of their outfit. Let outfits determine what their people need. It's much easier to determine needs from a small sample size, and much easier to effectively utilize time for a smaller group. Personally, I gained more from events my outfit planned than events planned by the Corps or the major unit. Additionally, re-emphasize involvement in student orgs off the quad. The Corps can only provide so much development, cadets should be incentivized to also look for community and growth elsewhere

By making more intentional interaction between the fish and sophomores. They should have the most influence and time together. The fish should always live with the outfit because the outfits are centered around the fish and that is the environment where they have and will develop.

The first question that has to be asked here is "WHY?" The Corps of Cadets by its very nature is a living, breathing Leadership Lab. You don't get much more immersive than that. As to how to make it more intentional, how about there is a written expectation of the duties and responsibilities of each of the classes and positions within the outfits, battalions, Major Units and Corps Staff. The individuals that are in those positions are counseled at the beginning of the year and either monthly or at the end of the semester. and make their performance in their duties part of their grade.

Learn more about each Cadet and what they want from their journey in the core. Give leadership positions to people who are qualified to deal with all kinds of difficulties. Meaning put people in positions to deal with emotional, physical, and mental health of all Cadets.

The first semester of college has always been a significant transition period for those who go directly from high school to college. Leadership training efforts should be deferred to the second semester. The primary lesson to be learned during the first semester of the fish year is "No Excuse, Sir", which teaches individual accountability for one's actions.

During the second semester of the fish year, a cadet's training should focus on one-on-one leadership of the next year's incoming freshman at the outfit level. The cadet cadre for this training should be comprised primarily of current 2nd and 3rd year cadets.

During the first semester of the second year, implementation of the prior year's training should occur. It should be evaluated by 3rd and 4th year cadets at the outfit level, with reporting upstream for accountability.

The first two years of a cadet's four-year journey are critical and become the foundation for all other leadership training. Some cadets will fill leadership roles in student organizations outside of the Corps. This should be encouraged, recognized and rewarded. Leadership roles within the Corps are not for all and should not be diluted by giving all cadets a title.

Couple of thoughts:

1. There are good outfits and bad ones. (My personal experience was fantastic! Very tough standards and accountability but fair and professional- if I got crapped out I deserved it and learned a lesson). I was blessed to be a G-2 Gladiator and then XO of a new M2 Spider outfit '89. There were also "Douche Bag" outfits that needed to be disbanded. My thought is to hold Cadet leaders accountable. If your outfit is not following and meeting the Corps Standard then you get disbanded and moved to other well performing outfits.

2. The Corps is not for everyone. You want more than 50% retention but you have a problem if you are at 100% retention. Not sure what the actual best balance of retention is on a yearly basis but it is not 90-100% or the program is not challenging enough to develop leaders of character.

3. Hold individual cadets accountable to the Honor code.

4. The Academics of the current Corps are fantastic but in concept I would rather hire a 3.0 leader with strong character than a 3.8-4.0 brainiac that can't lead a group of children across the street. The point is that too much emphasis on GPA is also detrimental and must always be balanced with Leadership Training and physical and mental challenges to build the Leaders of Character as Aggies.

My understanding (second hand info so not personal experience) is that the Corps has diminished the more demanding physical aspects of the corps in regards to PT and attending formation. They have also diminished accountability to respecting authority (upper class men) no whipping out, no pushups unless in very specific cases etc.. this must be re-examined. The Corps should be challenging and Cadets held accountable for their actions. Every consequence should have a specific accountability/ leadership training purpose. Following instructions, respecting authority, honor , respect etc. )Absolutely No Hazing allowed - Zero tolerance. ) Some one crosses the line then they are gone but we can not take out the physicality and accountability. We do the cadets a disservice if we do not help them grow and overcome

obstacles.

Again, not everyone is meant to be a Cadet. At the same time we do not want to lose good Cadets because of lack of leadership and accountability. The idea of squad level Leadership training for second semester fish and 1st semester Sophomores is a worthy endeavor. Separating the fish and only letting select cadre work with them is the lazy way out and destroys the fabric of the Corps. Train all cadets and hold them accountable to the standards is the only way to go. That I am interested in.

Sir, I think the best way to be more intentional and immersive in leadership training is to educate at the highest level first. The Corps is a student-led organization and one of the best parts of that is each cadet gets the opportunity to learn what kind of leadership style they have and also learn their strengths and weaknesses. I think if CDT BDE commanders could receive the education from you or the CTOs or the Hollingsworth center then they can utilize that new-found knowledge to pass it down to the BN commanders and so forth. One of the most helpful things about the Corps is that each outfit has its leaders and each leader teaches things differently and creates their environments, and with so much leadership diversity it creates a melting pot where each fish, pisshead, butt, or even zip can thrive in different learning environments. So, if the BDE commanders could receive the information and then pass that down to their subordinates it could become a ripple effect with their nuances at each level. If it seems like a specific outfit or BN is not handling something in the way you would like then you can simply nudge the BDE commander and they can course correct, and if that doesn't work then maybe a stronger intervention would be required but it would allow leadership to make mistakes and not be punished harshly for it because at the end of the day the Corps is a learning environment over everything.

I'm a member of the class of 2023, so a new dead zip. I was also in Gator 2. I understand you are going to have a lot of responses to this feedback form so just for the sake of saving your time and mine, my phone number is 2107179492. I live in College Station and would be happy to pop in and discuss this face to face, I think I could also offer a good perspective given that I am freshly out of the corps. Anyways, to your question, in a short answer, I think if you want to be more intentional with how you train and educate you need to be more intentional with who you are recruiting to train and educate. Because after being on my recruiting chain for 3 years, I know how the corps recruits. Yes, there is an aspect of wanting to boost the number of people who get to participate in the Corps experience. But the most efficient way to actually boost the number of people participating in this is by making it genuinely the premiere organization on campus, which it already should be. A handful of outfits have figured this out, that there is a solid way to take your responsibilities in the Corps seriously, while still having an amazing and authentic college experience. And I cannot for the life of me understand why we are not looking at these outfits, who have no problem getting plenty of people to preference them when that email drops in april, and as those cadets progress in those outfits they are chosen by members of other outfits as key leadership in corps wide special units more often than not, and instead of saying "this is bad" those of you calling the shots aren't going in to those hallways and saying "Show me what you are doing and how you are doing it so we can replicate it in the 40 other outfits across the Quad."

You need more interaction between cadets, not less. Taking freshman away from their outfit denies the upperclassmen the opportunity to lead. Non-ideal leadership is a reality of life; freshman need to learn to deal with that as well. Mistakes will be made, but that is to be expected in a leadership laboratory. That's how people learn.

let the RV's PT.

1. Break down the individual
2. Form the group and loyalty to one's buddies
3. Train the leader
4. Give the opportunity to lead

SOMS definitely plays a big role. I'd say make it mandatory for everyone and put a bigger emphasis on it. I don't know how to do that but it needs to be done. Also, work with the normal cadets and keep them informed. Not just the green tab leadership (like MUCs, BUCs, and COs). I'm saying the normal staff

sergeant juniors and two moon seniors. These kinds of cadets make up the majority of the Corps and technically run it. If there is going to be a change, make it a slow change in order to find out what works. It's been less than a year since General Michaelis became commandant. Plus, a lot of people are afraid of change. Back to the question, I kinda like how it is (no fish academy). It gives everyone a leadership role. I do have a couple of suggestions to change: make the fish "year" shorter and edit the 4th fish response. I think the fish should only go through the hard fish year for the first semester. This is something that was inspired by my former Naval Science Professor. After brass, fish should be treated much differently and that is changing (yay!). I think the big thing is to control the mindset and power struggle when they become sophomores. The second thing, the 4th fish answer ends with a demeaning sentence: "In short, sir/ma'am, I am a very dumb fish and do not know, sir/ma'am." Saying that one is "very dumb" is not right. That is demeaning and incorrect (to the most part but I don't know). All these cadets got accepted into Texas A&M University, they are not dumb. There should be a change that is not degrading.

To enhance the depth and efficacy of our leadership training and education program at the Texas A&M Corps of Cadets, incorporating a "Fish Dorms" initiative could offer a transformative approach.

**1. Structured Leadership Experiences:** The Fish Dorms would serve as a hub for structured leadership activities, enabling cadets to engage in daily leadership exercises. These activities are designed to be progressive, becoming more complex as cadets advance, ensuring a practical, hands-on approach to leadership training that complements classroom learning.

**2. Mentorship and Guidance:** Hand-picked upper-class cadets could play an integral role in the Fish Dorms, serving as mentors and role models. This direct interaction promotes a culture of mentorship, where learning from experienced peers becomes a daily practice, enhancing the cadets' leadership skills through observation, dialogue, and feedback.

**3. Cohesive Community Building:** Living together in the Fish Dorms encourages the development of a tight-knit community among first-year cadets. This environment fosters teamwork, camaraderie, and mutual support, which are essential components of effective leadership. The sense of belonging and unity cultivated in this setting is invaluable for personal growth and leadership development.

**4. Tailored Leadership Curriculum:** The Fish Dorms could also host workshops, guest speaker sessions, and leadership seminars tailored specifically to the needs and challenges of first-year cadets. This targeted approach ensures that the leadership curriculum is directly applicable to their current experiences, making the learning process more relevant and impactful.

**5. Continuous Evaluation and Feedback:** An integral part of the Fish Dorms initiative could be a structured feedback and evaluation system, where cadets receive regular assessments of their leadership progress. This system would not only highlight areas of strength but also identify opportunities for improvement, enabling a personalized development plan for each cadet.

By implementing the Fish Dorms concept, we can ensure that our leadership training and education program is not only intentional but also immersive, offering cadets a comprehensive, experiential learning environment from the very beginning of their journey. This initiative would lay a strong foundation for their development as leaders, preparing them to face the challenges of the future with confidence, competence, and a deep sense of commitment to their roles.

Meatballs do it on the RUN. They don't do it on the DON'T RUN. Stop ruining our traditions

Without an understanding of what is being done currently, it is a challenge to provide meaningful recommendations. Please answer first what is currently missing in Corps performance. Why is there a need to be more intentional and immersive?

What is the problem that needs solving by being more 'intentional and immersive'?

Stop lecturing the fish on Monday mornings. They are SO BORED with the lame messages you are delivering. Let them PT.

Earning something that requires discipline, growth, and adaptability is something that makes something more intentional and immersive. I believe the corps can do that by not just offering fish to earn the brass but come up with ways that other years can earn something every year. By doing this, it can give guidance on for every year to work towards a goal. Like corps brass is for the fish, come up with a corps brass like thing for the rest of the years in the corps. The corps brass is the foundation that should be built upon and I think that will make a great experience in the corps

and can lead Per Unitatem Vis, when there is no unity between freshmen and outfits.

I have not been on campus since the early 2000s, but there is an opportunity in the military sciences courses if they are still the same. Instead of focusing solely on recruiting for the branch, field training/o-courses, and marksmen shooting, there could be a heavier emphasis on how to lead. From there cadets need an opportunity to lead. I was a D&C cadet and those classes needed more for the real world. Having time spent on diamond qualities is outdated. Company leadership, teaching, career readiness, etc is a more productive use of those classes.

Keep all cadets residing with their units.

Start retention programs to remind cadets that their first year is SUPPOSED to be challenging. Start motivational retention programs that teach and implement mental strength. Many capable, but few are willing. Since that is the case, supportive and uplifting teachings will help cadets be more up-to-the-challenge that is fish year.

Leadership training isn't something you get from reading a book. Understanding the values of a leader requires that "leaders in training" are given opportunities to lead -- and fail. I personally think that learning from failure produces much better leaders. At all levels of the Corps, members can see with their own eyes and hear with their own ears who are good leaders and who are not. You emulate what you see, both good and bad.

Freshmen should be given opportunities to show responsibility. Important tasks that must be fulfilled should be regularly assigned. The Freshmen should not be told in a prescriptive manner how to do the task. The Fish class will work together to determine that. This creates further cohesiveness between

members and fosters a teamwork approach. Near the end of the Fish year, potentially after March to the Brazos, Freshmen should be immersed in some form of "Leadership 101". 360 degree evaluation of upperclassmen should be performed. What worked, what didn't work? Which Sophomore showed the best leadership qualities and why. The opposite question should be asked. Hard answers should be pursued. The whole chain of command should be evaluated. The dead elephants don't get off the hook!

All Sophomores should be included in a Leadership 201 course, not just Cadre. Taking lessons from Freshmen year and establishing plans and activities on how to lead their new Freshmen class. 201 should introduce concepts like the 4 phases of group dynamics (forming, storming, norming, performing), organizational leadership best practices, etc.

Junior and Senior year is when the leadership really comes out. The entire Junior and Senior classes should be in a 301/401 level training the same time the Sophomores are. Further emphasis on group dynamics, chain of command, unit cohesiveness (even with some members in corps/brigade/regiment/wing staff positions). They all started from the same outfit! Bring them back together.

Training is immersive when members are given opportunities to lead and fail. Learn from the experience, move forward. Training is intentional when it is developed and baked into everything that is done at all levels.

Prepare sophomores to be true leaders. Telling cadets daily that they are a waste of space is not motivating or any type of actual leadership development. Cadets choosing to attend this college do not need to be broken down and rebuilt, they already have the foundation to be great leaders. Don't break the foundation, keep it strong and build upon it. What's happening now is simply hazing wrapped in fancier words.

Return the Corps to becoming Corps-led. If our students are immature, it is because they've had too many "adults" intruding. Train them, then let them work and learn.

When students go to a big school, they need to find their people asap. The Corps and the outfits fulfill that goal right away. The 15-18 fish in their outfit are their people. The same isn't true when the group is 800 new fish. It's too big. The outfits fill that purpose.

Reducing the number of cadre last year was a big mistake. Go back to a bigger cadre.

FOW should not go away. How much more immersive can training be than FOW?

Try to place cadets in leadership roles throughout campus. Not just in the corps.

Transfer leadership of the fish to the Seniors. The Sophomores do not have the skills or training to be the their "leaders" yet.

This was my post to Quad Moms:

I am class of 2000 and my cadet is a Third Gen Ag and a legacy in the Corps - what is MOST important to me is to protect the institution of the Corps of Cadets at A&M which is currently in jeopardy.

Professionally, I have worked in organizational culture change and can share that there are situations which require drastic change to yield the needed culture shift. This is never the first option, but when other attempts do not result in the necessary change at the pace required, sometimes hard decisions must be made.

I would caution all of us to remember not all outfits have similar fish experiences and I would assume the rate of fish punching and the feedback received in their exit interviews may be what is driving the decision as well as the current litigation the Corps is facing.

Although many may feel this is not an ideal solution to whatever problems the Commandant is tasked to solve - we must remember there is MUCH we do not know about what may happen in other outfits.

Outfits are not disbanded for nominal reasons and Cadre are not removed from their positions lightly. Given all the activity in both subjects over the last year, there are presumably valid reasons for the actions that are being taken.

I agree we should discuss this with our cadets, but I suggest we trust the Corps Leadership to make the best decisions for the long term success of the Corps.

The leadership education should be at the corse that General Michaelis is currently taking the corps. The only concern I would have for the leadership training is whether the leadership program can transition transfer who are frogging up or snake-ing up a corp classification well.

More focus needs to be put back into the outfits.

The best way is to engage adults in oversight of the students in officer positions. Currently, there is little to no oversight therefore many things are happening (hazing, misuse of power, etc).

This question seems to want to know how the Corps can improve its leadership training. Well, I personally believe and have always been taught that leadership is based on trust. Therefore, I would counter this question by asking how the Corps plans to make leadership something that cadets can trust. This latest announcement, which has been met within widespread criticism, is the perfect example of what I mean. Corps Staff and Comm Staff have joined together without the input of the vast majority of cadets to make a plan that nobody favors except those at the very top of this organization. This announcement is failing and this plan WILL fail because cadets had no input, and because cadets were forced into this new system of Corps organization without their consent. So, how can leadership improve becomes a very simple answer. Corps leadership needs to take a backseat to what outfits care to do as outfits. I will explain what I mean more on my answer to the third question. Corp Staff, with its nepotism and corruption and isolation from the regular corps needs to go back to the drawing board. I would personally propose a voting process so that cadets are forced to argue their points and make promises of what they will do with their positions. Cadet Advisors, non-cadets, who wield far too much power in an organization that is supposedly led by cadets. The positions they occupy should be abolished or at the least stripped of their powers within the current Corps command structure. The office of the Commandant needs to come forward and bring out all of their plans and ambitions for what they believe that this organization should become, so that this Corps can have actual cadet input on what becomes of it in the future.

Stop listening to old ags who are sexist and racist.

The Corps of Cadets is already an intentional and immersive leadership development program, creating major structural change is not important. The Corps of Cadets has functioned without major hiccup from its current structure since 1876, and what hiccups did occur were due to extreme, severe, and tragic circumstances; not because of perceived "bad training."

Young leaders must have the opportunity to fail. To do that they have to make decisions that have consequences and will result in tangible results, either positive or negative.

Passing the uniform of the day down from Corps staff and making sure everyone is in formation at the right time isn't leadership. It's babysitting, and the cadets know it. We have slowly removed all decisions of significance that cadet leaders have. We have also removed all but a very small number of training opportunities with the expansion of the academic day. Academics have value, but if all you preach is academics over all else then we should not be surprised that everything else falls by the wayside.

Seniors need to make choices on when their outfits train, where they train, what training to put emphasis on and what just needs to meet standards. If they meet those standards or exceed them then recognize that loudly and broadly. If they fail, recognize that as well and institute correction plans.

I would also suggest starting early with a copy of The Three Meter Zone: Common Sense Leadership for NCOs by J.D. Pendry, CSM, USA. These lessons are easy to understand and will transfer well between all services and civilian leadership situations.

While the Corps taught me invaluable lessons upon leadership, my senior year at the Trigon in AFROTC Leadership was a defining moment during my time at A&M. I learned more that year than all the SOMS classes and previous years combined. The difference was that my AFROTC cadre truly embraced the concept of being cadet run, and most importantly they allowed me to fail. I had almost full reign with my cadet staff to execute how I saw fit to accomplish the mission. It allowed me to take risks and learn the consequences of poor decisions.

What I found lacking in the Corps was this spirit. Perhaps because I never served leadership on the quad, I am ill-informed. However, the vision of the Corps never seemed to originate from any cadets, and my buddies in outfit and MU leadership never seemed to have the same level of freedom as I did. I think returning more meaningful decisions to the cadet level, and truly allowing cadets to fail would prove incredible for leadership lessons. I learned so much more from when I failed as a cadet.

The foundation of this Corps are what makes this organization so impactful. We learn leadership through the Corps experience. The difficulties and hardships, the joy and the laughs, the tears and the sorrow, are what make this experience impactful. It gives SO many opportunities to learn about emotion intelligence, intellectual skills, self-awareness, and pushing men and women to their limits.

The Corps is special for the challenge it provides. To be quite truthful, knowing that my email is recorded on this form, I don't believe the SOMS classes and other forms of leadership instruction we receive are very helpful. We learn how to lead people at the outfit level. Corps staff learns how to lead at an organizational level. Neither groups truly learn how to lead in a classroom.

We will make mistakes. We will fail. We will disappoint. That is GOOD. You are facilitating an environment for us to do that, especially so it does not kill somebody when we enter the military. However, the opportunity for us to lead and learn from our leadership failures is crippling before our very eyes. That's why we care so much.

The Corps found 'leaders' for years without much input from the Trigon

I think the problem is we are assuming what we are currently doing is wrong. I believe the current leadership dynamic and setup is incredibly immersive as it is right now. Being someone who has had the most recent 4- year experience I have watched myself and others grow in ways we couldn't have ever imagined.

The Corps itself stands as the immersive element of leadership training. It is a massive and well decorated leadership laboratory, and having the opportunity for each class year to learn the role and invest into it, then train and be trained for the next year is what gives cadets such a unique experience that produces the best leaders. Time in these roles, during the Corps training times we have outside of academic responsibilities, is when this happens. Cadets will gain the most when they have time to invest and experiment and learn in active training times. Briefings are not training, they are only theory, and theory becomes useless without proper time to test and practice different leaderships and methods. Cadets learn more from failure than from success, and being allowed the room to fail in a relatively low stakes environment like the Corps will create even higher caliber leaders. Leaders and followers alike learn from more from failure than success, and cadets require the space to do so, and to then improve as people and as leaders. The current system has so much oversight that the Cadet leaders are leaders on paper. All the directives are wishes of commandant staff, not cadets leading and making decisions based on a vague, overall guidance. Cadets who fail are punished, and then the oversight becomes so heavy that there's no chance to learn and grow. The cadets need the time and responsibility to actually make decisions in regards to training, each level will take the vague guidance and apply their own vision to it and whittle it down to the operational level within outfits.

This is a great goal, but it can't be the only goal. It has to exist hand-in-hand with the question, "How can we provide a one-of-a-kind experience for our cadets that sets us apart from peer institutions by reinforcing our unique history and culture, and not just mirroring what some alumni will go on to

experience in the military?" The Corps and Texas A&M are much more than a preliminary training stop for military careers, and should be treated as such. The relationships we build as cadets -- particularly during FOW and the first semester of school -- make up the entire foundation of our time in the Corps. My buddies and the experiences we shared have had a vastly greater affect on my life than any specific leadership training I received.

Having said that, I think a more intentional four-year journey must include content aimed at each class, clearly outlining what is expected of them as a freshman, sophomore, junior and senior. How does your role change each year? How do you become an influential leader as a sophomore? How does that differ from your role as a junior or a senior? During my time in the Corps (1987-91), I was never given meaningful guidance on this ... We went from being wide-eyed fish to our sophomore year, where we essentially mirrored what we had experienced: lots of yelling, memorization, corrective PT, etc., without a deeper discussion of WHAT we were trying to accomplish and WHY we were doing that way. The upperclassman years were spent more on personal development vs. leading underclassmen in a meaningful way. There is tremendous room for change and evolution here ...

HOW this is accomplished can be something as simple as requiring all cadets to report for FOW, vs. only fish and cadre. Those not involved in working with the freshmen would spend their time in a weeklong leadership course with their class peers, filled with role-playing, group instruction, etc. I would have eaten this up as a cadet -- training aimed at me, which changed each year as I advanced through the program. I was not a loud, demonstrative leader, and I often felt left behind as positions and opportunities went to those who were more outspoken. Frankly, I think the lack of specific, role-based instruction played a big role in this. It's hard to stand out when you're not sure where you fit in, or what you should be focusing on.

I have spent a big chunk of my career working at the national level for the Boy Scouts of America, which employs a graduate-level leadership course called Wood Badge. Now more than 100 years old, the course has evolved into a weeklong leadership laboratory that guides participants through the process of becoming a more effective leader. It is transformative. The capstone of the program isn't the final day of class ... rather, it's the project phase that spans 18 months after the end of the course. Participants must come up with six "ticket" items or projects they will complete, aimed at furthering their growth as leaders and positively affecting their organizations. We could copy this approach and have cadets create three items they will complete over the course of the coming year, from taking further leadership courses through the university or online, developing team- and leadership-building activities for their unit, creating a more robust program of alumni outreach to span the generations, etc. As a former student and instructor of this course, it has changed who I am as a person and as a leader.

Good question. First, the HCEL needs a complete overhaul. It is not appropriately serving the Corps' needs. There needs to be real leadership and followership training conducted in the freshman and sophomore years that goes beyond the basic leadership traits and principles. The junior and senior cadets (contracted and D&C) need real "positional" leadership development to prepare and sustain them through their leadership journey. Additionally, the HCEL needs reorganizing to provide more tailored career readiness pipelines that truly provide D&C students with clear career readiness advantages. This means real faculty and optimally a real dean.
A key and critical deficiency is the lack of deliberate and comprehensive "transition" training to prepare cadets for their next leadership responsibilities and challenges. To do this properly, the OOC needs to overhaul its staff and hire a cadre of advisors with real experience leading organizations and developing leaders.

Stop treating D&C cadets as less than, instead of the reality that they keep the Corps lights through donations after they graduate. They are your most important cadets. They are the easiest students to recruit into the military after. They are the majority of the corps student body. They are the ones sending their sons and daughters to join the corps after.

Just because you can't threaten them by messing with their future livelihood like you do with every contract cadet in a leadership when they don't agree with you doesn't mean that they don't deserve the

same leadership opportunities and development. Yet that is consistently the attitude the leadership has displayed towards the largest percentage of the corps for at least the past 20 years.

let the RV's PT

Do not break what is not broken. I ask you back, how can the cadets in the Corps trust the adult leadership after this situation?

Invite guest leaders (prior Corps members) to come to an outfit dinner and talk about their journey, how they got where they are, and how the Corps influenced them as leaders.

I believe you can improve the leadership training by creating opportunities for most engaged and strong spirited pissheads, Butts and Zips to train the fish the last 4-6 weeks of the Spring semester so that those fish are ready to become effective pissheads when the new fish show up the following semester for FOW. I also think the Butts and Zips take the lead for the first 2-3 weeks of the Fall semester with the Pissheads taking a lesser role, yet still engaged in the process. Then you have a smooth handoff from the white belts to the Pissheads. Having the Pissheads engaged from day 1 their sophomore year is crucial to the process for their further development as leaders and to maintain tradition of the Corps. Pissheads will make mistakes in how they handle the fish from time to time but that is how they learn. They aren't going to learn that from a classroom or the Trigon. On the job training is the best way to learn and grow.

In this time of evolution, the term "leadership" is thrown around, and yet, as always, is absent of any context.

The question then becomes what is leadership? What is leadership in four years as a cadet in the Corps? What is leadership for life (as in life after the Corps of Cadets)? Are there different aspects to leadership? Is leadership the same once cadets depart the quad for life?

Let's examine the components of leadership specific to the Corps of Cadets. As I see it, there are three: trust, responsibility, and discipline.

As an observer of the Corps for the last decade or so, the question that comes to my mind is: how can the cadets exercise any leadership when they are under constant supervision from the Trigon?

I am constantly "astonished" when visiting campus, that, in any Corps activity, you cannot swing a dead cat without hitting a member of the supervisory staff from the Trigon; active duty or retired / hired.

These representatives of the Trigon have become a layer of supervision and responsibility for the Corps; the Pissheads of old.

We, as a society (sic), no longer trust the Corps of Cadets to police themselves, we no longer trust them to be accountable for bad behavior. Instead, we continue to enlarge our supervisory responsibility by growing our Trigon staff and having a greater presence on the Quad; and have evolved into the modern-day pisshead.

And allowing these supervisors (pissheads) to wear Cav Hats, with enlarged retired ranks puts the spotlight on them (for their ego) and most assuredly away from the Cadet Corps as they execute their pisshead duties. Hint: discretion suggests that the focus remain on the Corps and advisors show discretion when representing at activities.

The smothering of the Corps with all this "supervision" suppresses leadership development for the cadets.

We no longer trust the cadets to govern themselves, thus suppressing leadership development.

We continually expand Trigon supervisory staff to ensure things are accomplished properly and meet requirements.

An example: when the senior boot line forms up in the End Zone in the second half of a football game, there are a handful of bulls from the Trigon right there on field with them.

You'd think, at this point in their years as Cadets, Zips could exercise this independently. But the mere presence of the bulls reflects this lack of trust.

"Oh but SEC rules and requirements....." is your answer. My answer is: it will only take once.

That will reinforce the discipline necessary to allow the Zips to exercise the responsibility to form the boot line. It only takes the Trigon the ability to trust the Cadets to execute.

Now this lack of trust is also prevalent in certain aspects of our military. But that doesn't make it right.

In 1985, as an Army Attack Helicopter Company Commander in the grade of O3, I had the authority to downgrade a Red "X" condition and allow an aircraft or vehicle to continue operation to the nearest maintenance facility. I have subsequently learned that authority now rests with the O5 level battalion/squadron commanders. I will also add that in every case I did sign off that "Red X" to a "Circle Red X", I personally flew the aircraft back to the maintenance facility.

The real question then becomes, how can the Trigon influence actions on the Quad to ensure Cadets learn responsibility and discipline? and the answer is trust.

Failure is a component of leadership development, provided it does not become habitual.

Yet failure on the Quad is avoided at all cost. And that failure is thwarted by a suppressive supervisory Trigon staff.

The Corps was once allowed to discipline itself.

Maybe by teaching trust, responsibility and discipline, this privilege can be returned to them.

I think the best way to increase intentionality and immersive is to put the right leaders in place over the outfits.

I believe this can best be done by giving the outfits some say in how leadership is picked because those are the people that the potential leaders live with and know best. I do not think a board of people that do not really know the individual is equipped to make the best decision for an outfit's future.

# How do we expand the leadership opportunities for every leader in the Corps, ensuring each experience provides both learning and purpose?

Leadership opportunities are from positions of responsibility, and to be given feedback on your performance. The goal should be to foster the healthiest and most independent outfit leadership teams. Outfit leadership are incapable of learning from mistakes, improving and leading at all without some degree of autonomy and controlled failure.

In short giving outfits more autonomy, and allowing for an environment that is more accepting of failure will help cadets to lead better than they would as the "enforcers" of someone else's leadership. This way we will build leaders and not managers.

https://texags.com/forums/16/topics/3445742

How about allow the fish to report to their chosen unit, rather than the asinine 8 week fish program that was brought up.

We can expand leadership by giving opportunities to lead throughout the school year.

Stop commandant staff and corps staff from taking away all of the authority and responsibility from the cadet leaders already here and the ones being appointed next semester.

Dont. Not everyone needs a trophy. Everyone should have stiff competition at every level to be "in charge" of others

Everyone is not born to be a leader. While the Corps "builds leaders" the world does not and will not need everyone to lead - we need followers and supporters as well. This being said, not everyone needs a leadership position within their outfit or corps. More needs to be focused on the other supporting roles.

Push more CR and RUReady events.

Give each class opportunities to lead and make decisions that actually matter.

Truly I don't see where we can fit in more leaders. We already struggle with finding replacements when a CO/1SGT doesn't make grades, how are we going to find more full time people?

Shifting responsibility and workload off of CO's and 1SGT's towards other members of their respective classes. The biggest source of whitebelt apathy is feeling like one isn't necessary to the corps operating. In addition, invest more in special units and give them the opportunity to create difficult environments that will in turn keep whitebelts motivated. The RV's last semester and Recon this semester are examples of how physically difficult special units can intentionally help keep whitebelts motivated and further develop their leadership skills.

We could have more help getting leadership positions outside of the corps. Maybe create group chats/meetings for people interested in orgs, societies, sports teams, etc that can help new leaders

become more active in those organizations, while also developing the leadership skills of people already taking part in them.

We don't. Leadership is way to watered down. I believe the corps should be restructured to operate correctly. Our "outfits" operate as if they are companies in the military. But In reality we are actually the size of a platoon. If we restructure the corps so that outfits are platoons and operate as a platoon people who hold leadership billets like SL, PSG, and FTL will actually get to lead. Additionally it would make leadership more tangible. Our current "outfit" commanders (commonly referred to as company commanders) operate as if they are in charge of 100+ cadets. If we changed the verbiage and the structure of the corps then leadership wouldn't be watered down. A battalion commander in the corps today doesn't actually command a battalions worth of people, they command a companies worth of people. And so on up the chain of command. I believe restructuring the corps in this way provides more concrete steps to leadership as well as provides leadership billets that actually matter. Currently a squad leader has maybe 4-6 people under their command when that is really a fire team. If you restructure like I've laid out then that said squad leader can now lead in the way a squad is supposed to function because they have the correct amount of people in their command.

As we go through the 4 years, the leadership positions become a pyramid where they become less and less. Unless you implement new outfits, there really isn't a way to get everyone the experience that another would have.

By encouraging leadership opportunities inside and outside the quad, RVs, Cav, Rudders, FDT, Bonfire, outfit and corps leadership. Leadership opportunities in these organizations are every day being washed away by a larger agenda of control with the most common leadership phrase in the corps being "it's out of my hands it's coming from higher". Leaders are only built by making swift decisions in high risk environments. Leadership is not campos, it is not uniforms, it is the greatest challenge someone has ever been presented.

There are sufficient leadership opportunities for every leader in the Corps already. If anything, the Office of the Commandant could encourage cadets to get off the Quad and engage. We need current leaders to share their experience across the Corps.
As to sharing experiences, it should be expected that each head, butt and zip must provide, each semester, a 5 minute video answering "Where do you lead and what does that entail." These need to be provided Corps wide. In this way, cadets - particularly fish - will have an idea of where each cadet is and - if that is a position of interest - where they can be found. Yes, its about 1500 videos. But, this is how we control the narrative that "We Build Leaders."
With regard to leadership, we must recognize that come leadership may be found in a titled position in a regular unit or a speciality unit, may be untitled because the cadet provides leadership to those under them in another way, may be invisible as the cadet does not wish to be in a nominal leadership position, or may be found in any number of organizations off the Quad (where the Corps needs to be).
Metrics must be provided to each unit for expectations of each position (from fish, to sophomore, to clerk, to junior, to Scholastics Junior, to XO, etc.) within the outfit, recognizing some units may divide effort within a chain among several individuals. Accountability for compliance must then be ensured.
Most organizations include systems for feedback outside the direct chain of command - so the Corps should expect every Cadet to provide, perhaps monthly, a review of their own leadership and followership, of the leadership of their own outfit, and of the followership of their own members. With today's technology, it is easy to obtain an electronic survey from each Cadet.
As part of a regular monthly evaluation, cadets could identify what leadership positions they have on and off the Quad are any positions of interest to them. The Outfit Advisor, in reading the monthly surveys, could provide a link for that cadet to learn more about the leadership position of interest.
Outfit advisors must read those monthly reports and take the appropriate action, which may be meetings and redirections to those in positions of command or in positions of followership. This affords an opportunity for Advisors to identify those on the bubble of retention and provide outlets, including potential transfer to another unit. This also affords the Outfit Advisors the opportunity to determine whether those in a position of leadership are suited to it, succeeding, or failing.
At the end of the day, training is Explaining, Demonstrating, Guiding and Enabling. Evaluation is a

critical element in ensuring each of these elements is being met.
Regular evaluations should also be helpful in flagging the failures identified already.
We cannot make people take on leadership positions they do not want as they will not lead.
We cannot provide the leadership position each cadet wants - its their job.
All we can do is provide the path for each cadet to seek the leadership position they want.

It's the onus of the cadet to take charge of their post. In my opinion, the hardest and most important job in the entire Corps is the FTL - they have the responsibility as the first direct link in the chain of command. But why can't an AFTL take charge over certain responsibilities or make the time to get to know those under their care? I think the focus shouldn't necessarily be on expanding leadership opportunities, rather Cadets taking serious the opportunities already presented to them.

The corps is structured the way it is for a reason. A very specific reason. A reason that has been the same for over a century. Freshmen don't enter the Corps ready to lead. Nobody does. The entire point of freshmen year is not to lead. Rather, the point is to learn how to be led. How to follow. How to be the best subordinate you can possibly be. Everyone comes in expecting to magically become a "leader", when in reality, the only thing that can develop leadership is experience in a real world setting and learning from leaders around you. That's why the four different years of development are so critical. Sophomore year is the time to start leading, making mistakes, fostering a fire team of motivated fish and learning to influence and impact them in a way that is meaningful, challenging, and pushes them to be their very best. I think the idea that we can push leadership at all levels is valiant, but without a basis to practice it on, what good is the training? I believe that leadership is better learned through hands on experience and mistakes than in a classroom, which is what leads me to believe that we need to delegate more to the outfits. Monday and Friday morning SOMS classes and a fish Academy would only damage the ability of sophomores and white belts to experience that real world leadership applicability. Leadership opportunities have been the point of the outfit training for decades, and removing that is extremely detrimental.

How can we lead if there is nothing left to lead? If you take away the freshman and leave the units with only sophomores and whitebelts, there will be significantly less opportunities to lead. I know that the majority of cadets are motivated and care deeply for this corps. If you tell these motivated cadets that only 200 of the 1700 are "mature" enough to lead, then what do you expect? You have to find a balance where you empower positions that have been overlooked (Chain officers, SL's, etc.) instead of just saying we are not good enough and only giving leadership to a few hundred of the 1700.

Expand the amount of people involved in FOW, more manpower during this very busy period would be beneficial and those who are on cadre get to have a head start on influencing the freshmen and adapting to their roles.

You develop outfits with expanded chains of responsibilities. Giving people jobs for the sake of jobs is counterproductive. My outfit has expanded its chain work and is able to accomplish so much more. As a fish, I only know the outfit level, but I have a lot to look forward to. More responsibilities are created by the more freedom you give to outfits. Maybe it's because I'm just a fish and have no clue what the overhead looks like, but what I see from my good outfit is a system of chains where everyone has a say and fish are implemented into that system once they've learned the duties and responsibilities of it.

It appears as though standards and discipline fall on deaf ears as soon as you put a white belt on. I watched my most disciplined, former FTL, put on that white belt and fail to remember his campusologies, to shine his shoes, and wear the uniform properly. By dismissing white belt apathy as a symptom of prolonged time in the Corps, we are producing poor officers/civilians that will soon join the world as burnt out individuals. White belts that fail to fulfill their duties should be replaceable. Allow them to fail but be held accountable the way they were as a fish and pisshead. It is concerning that learning appears to end when handed more privileges and titles. They do not deserve a blind eye due to a title. You are not your title, rather a cadet doing a duty for your outfit and Corps.

Allow current leaders to properly delegate their responsibilities and work with cadets. I have personally seen how certain leaders bear the brunt of the responsibility and are unable to delegate and share this to other cadets so that they can gain leadership experience. What I have seen work well is where the butts lead the most, with heads directly under them and Zips providing insight and serving as a consultant to them. This is effective because it allows, at least on the outfit level, for leadership to have a coach who knows what they are going through and can provide advice. Furthermore, this, along with delegation, allows for cadets who might not have a formal title to serve in leadership roles. Many times here at A&M people get caught up with the title of their role instead of the actual work they needed to do. We don't need to create leadership roles out of thin air so everyone has a title for their resume, but we need to create the opportunity for cadets to step up and take on responsibility. That way they can take control of their own leadership journey and are motivated to lead not burdened with it.

By expanding the decisions currently leaders are allowed to make. We don't need more participation award leaders the corps is already saturated with those positions.

Performance reviews conducted for every upperclassmen conducted with unit or corps staff present. Unit staff must be inclined to look for/promote healthy leadership opportunities.

There is plenty of leadership opportunities for everyone, but not all of it gets promoted/capitalized on. Holding people accountable and promoting actual, productive leadership is the only way to really provide purpose to everyone and their leadership roles.

Committees for activities and creating delegation for outfit level leadership. By only allowing the CO and 1SGT to have access to certain responsibilities, we have trouble creating responsibilities to delegate. The only activity where we can delegate is going to be PT, that's why it's emphasized so much. That's why our culture is so dependent on it.

As mentioned on the previous question and the next one, how can we unite the corps? Creating an activity to unite behind. How can these activities be created? Committees. Led by comm staff, let people join different committees which are led by cadets who create decisions. This can be based on its own election process and have people in non-leadership positions apply. This way people can contribute to corps level decisions in the equivalent of 'think tanks', where people opinions can be heard. I'd be proud to have people in my outfit help contribute and plan events on a corps wide level. As well you can make it a requirement for 'x' amount of people per MU or MIU join, have them meet with outfit leadership or higher leadership. More responsibility, more opportunities to lead.

These events can include competitions, major/ minor unit FTX's, mass community service (Big Event but just the Corps), FOW prep and execution, dining outs.

As well don't be afraid to incentivize, give bag-ins and MESTS, that's how you'll get people in the door. Yes, the concept of buying in is frustrating, but it's necessary to get the momentum going for change.

The leadership opportunities that exist within an outfit in a dormitory 24/7 situation are almost unparalleled. Regardless of a "position" or "rank", cadets are constantly exposed to both following leaders and being leaders themselves. The concept of 'expanding' or 'creating new' leadership opportunities has a veiled implication that the current structure is inadequate. This mindset should be respectfully challenged by the simple question, "What is the metric?". A&M cadets routinely demonstrate on a national stage their superiority in comparison to other ROTC programs across the nation. We are competing against ourselves - can we tweak improvements? Always. Do we need a wholesale overhaul? Wholeheartedly, I would say, "No." - if there are 'trends' towards bucking the established system, then address them individually. The entire Corps does not need to change strategies to address an extrapolated issue.

You do not have to have a leadership position to be a damn leader. For this, we allow cadets to become leaders themselves like 150 years of corps before us.

You don't have to give everyone a position to make them feel like a leader. Positions help, but good leaders do not need people under them or a title to influence the actions of others. Leadership is influencing those around you to thrive and complete a common mission. Teach the cadets how to communicate their ideas and how to get people to listen to them and you. My short time in the military has taught me more about this than in the Corps because it means more. I wish the Corps taught me this fact sooner.

Stop trying to expand. Condense instead. There is enough positions within the Corps for everyone to be a leader already. Be that outfit leadership, Major/minor unit leadership, or chain leadership, there is plenty of positions as is for cadets to learn how to be a leader. To be a leader you don't have to be in charge and have a big title. To be a leader you have to use the skills you're taught to help and teach others. This can, and has been done, in the present state of the Corps. We can't all be chiefs. Stop the focus solely on people with diamonds. Everyone has a position to uphold in the state they're currently in. I'm a two-moon-goon in charge of two chains, and I'm knocking it out of the park with them. It's not hard to lead even if you're not in a "leadership position". Everyone has a job, and we're doing it to the best of our abilities and leading those under us as is.

Don't crush student leadership under the heel of staff influence, which isn't to say they should be left utterly independent, but that their leadership potential shouldn't be just amount to "mouthpiece for Commandant staff"

Distribute more authority to the Corps and create positions to fulfill those roles.

The amount of leadership opportunities already present in the Corps are sufficient given the current size of the Corps. As it stands, the amount of positions seems to distance the leaders from the actual outfits, as they remain on staff and are not bound to any individual within the outfit. This leads to decisions and regulations that are fundamentally not what outfits need, as the leaders are so far removed from the people. I suggest keeping the current amount of leaders and keeping the staff from outfits accountable within their own outfit to promote growth and ideas that benefit the cadets.

Adding battalions back in like was done does open up more leadership positions, which is good. Was on 3rd Batt Staff my jr and sr years. Remember, not all want to be General. Company level positions teach how to lead as part of a bigger organization, without having to be the CEO...

and growing the extracurricular landscape within the corps.

Make a board of cadets that directly communicate with the commandant of the Corps to keep him connecting to what the Cadets require and what they want to get out of the corps.

I believe my first answer covered this.
Rotate who is in a leadership position at the end of each semester for Sophomores, Juniors and Seniors. Maybe not the Sr Co position. But all other positions.

Expand the leadership roster, by elevating cadet responsibilities to those of the Commandant's office. Allow a level of cadet council that that meaningfully negotiate with the Commandant and be permitted to appeal a decision if it is found unsatisfactory.

Keeping all sophomores as fire team leaders to fish. It allows them to have one on one connection while also learning how lead on a more individualized level.

Refer to my previous answer. The leadership opportunities in the corps come from interactions with fish and being a fish primarily. An all fish dorm is an antithesis to that point and is probably the most 'opposite direction' solution you can go. We currently have a massive bucket of 'leadership and character development' cadets can fill, but they can only scoop so much water at a time and some of them don't want to scoop water anymore. Adding more buckets isn't going to help.

Leaders in the corps of Cadets are built already, whether that is in outfit, minor unit, major unit, or corps staff. So many leadership positions are available. Being more transparent with whitebelts even without leadership roles would also be beneficial.

A great word of wisdom shared to me about the corps, if you were to take off all of the ranks you would still have those leaders in the same roles.

Let the student do more instead of the commandant when possible

Make corps staff mean something again. Not just a joke that nobody respects.

Return to Ol Army, Traditions have the same weight as Leadership. You don't have to choose one or the other. Develop both at the same time, like it has always been.

Give special units and student organizations more leeway/room for growth and innovation.

Guard the traditions of past and present, allowing cadets to use their interests as an asset to lead their peers. Going out on a limb, even to your own detriment, is a step in the learning process.

Individuality and ideological diversity should not be axed/restricted due to nonconformity, as there will always be ebbs and flows (ups and downs).

Part of life is going tryouts hard times, or trials and tribulations. The corps should foster an environment of artificial stress to push everyone to their limit physically, but most importantly mentally and emotionally.

You create opportunity, and people take advantage of it. But we can't all be "top leaders" and we shouldn't try. Some will serve in leadership outside the Corps, that should be encouraged. Creating smaller, niche and special purpose organizations (think Rudders Rangers, Cyberwarfare team, sports, etc) so that everyone can find their spot. More small organizations for white belts, that's my view.

While the Corps of Cadets aims to develop those in it, it is increasingly become the case that those in this organization will only get out of it however much they choose. Those that choose to do the least they can, will receive very little leadership development even over the course of their Corps career. On the other hand, those that choose to do the most they can, become involved in leadership and special units, and successfully complete the transition from followers to leader across their time in the corps. As restrictions must be put in place for the safety and health of the regular Cadet, special units become the place for cadets to reach out into whatever field they choose and grow in those areas as well as with a variety of cadets across the quad. Placing further restrictions on the activity of special units only restricts those who volunteer to go beyond the outfit model of leadership development. While all of this is true, there is an understandable level at which restrictions should be placed, but in doing so, it should not limit the ability of that unit to function. Advocating for the autonomy of special units by consequence should encourage more people to be active and seek leadership experience where they would not get it otherwise, in organizations that compliment their interests.

The learning opportunities ultimately come down to individual attitude. It takes a growth mindset to learn from the opportunities in place.

We expand the leadership opportunities by not nuking 4 outfits that created those opportunities. All of those outfits went on to have people take over positions in other outfits that took away opportunities from people that had been in those outfits originally which has taken away positions instead of creating them.

I believe the use of special units would be a good idea. As a fish and now a sophomore, I don't really see the different units and would like to see if we can give special units more opportunity to show off their skills and recruit cadets.

Not everyone needs to lead. But everyone needs a shot.

Every cadet currently has this, and it's already highly reflective of the public and private sector. Those that wish to put forth the effort and gain everything they want to can do so, and those that wish to be

along for the ride but only halfway participate can also do so (with the understanding that they will not be in major leadership roles.)

Create a clear defined model for outfit leadership with roles and responsibilities. This will include the seniors through sophmores.

I understand you can run out of leadership opportunities in the outfit, therefore a strong push for special units with separate leadership levels can add depth, SEAL platoon, FDT, RECON platoon, Rudders Rangers, RV's etc. These leaders should not necessarily hold leadership positions in the outfit, expanding the opportunities.

Training and accountability at each level is key.

I do think what kills leadership at the student level: 1. when peers don't respect the rank or position of their classmates and fart off directives. 2. Cadet Leaders chose buddy loyalty over doing what is right .

Training and discussions in these areas is needed.

Not sure how much training is given to D&C cadets, but business leadership classes would be a good idea for noncontract cadets.

Everyone in the Corps has a job and someone they report to. Leadership works out of that even if the job isn't considered a leadership position such as CO or 1st Sgt. Make sure white belts don't sandbag on jobs like Clerk and other positions where the sophomores do everything.

Increase pride in the corps. Not through taking away outfit pride but increasing corps pride. Make this place and place where people who want to be challenged, grow, and set apart come. Not an advanced Boy Scout organization. One should come here to be pushed past their physical and mental breaking point, because only then can they go. Only someone else can taking you farther than you ever thought you could go.

I don't think everyone can exercise leadership opportunities. In 4 years you simply don't have the time to allot a leadership opportunity to all ~2000 cadets. That being said, there are ample preexisting leadership opportunities in the current corps structure. SOMS, ROTC classes, and the current fish experience provide the framework for leadership. There are opportunities that appear organically in the fish class and some that are necessary in SOMS or ROTC. After fish year, those basic opportunities persist and new ones appear from everywhere. One can join a special unit or pursue a position within a chain of command in their outfit's logistics. Some of these require initiative but most are a product of necessity. The truth is that some cadets never commit themselves to these opportunities.

Allowing upperclassmen to reach and train freshmen ALL year long

Create more frequent competitions for outfits, where non-training chain cadets are required to lead. This would encourage peer leadership for training chain, and the ability for others to have an opportunity to get hands on experience and responsibility in some setting, if not within the outfit operations/training. Some examples could be a weekend competition at the O-course, sports, drill inspections (similar to Citadel), or similar activities. In general, more opportunities for leadership. Restrictions to success would be time commitment, but can be mitigated by being held every 2 weeks on Friday afternoon, giving outfits 2 weeks to develop between each competition. This approach also fosters a Warrior Ethos and outfit pride.

I believe that I touched on this in the previous question, but shfiting from a management focus to a leadership focus. People are probably not feeling bought into the corps because they see it as their being micromanaged from many positions above themselves.

1st Sergeant, CO, BUC, BUXO, MUC, etc.

All telling them what needs to be done. They have their individuals chains to be creative but if they feel restricted in what they are able to do then they aren't going to feel motivated to go the extra mile. SOMS may be better suited to be a collaboration time on being creative with the time given. Sometimes I feel chains within outfits are seen as a burden rather than an opportunity for improvement and growth.

The proper opportunities for leadership in the corps exist. I've never believed that you need a billet to be a leader. Some of the best leaders I've have in the corps have been nothing more than an AFTL or a 2 moon senior. Some of them were better leaders than some of my COs or 1st Sergeants. The opportunities exist. What people need is the freedom and motivation to utilize their positions. I don't think that is something you can create, but it is something you can facilitiate and inspire to be done.

Ensure every white belt is on a chain or in a "green tab" position ie Squad Leader or Platoon Leader. XOs, COs, MUCs, and 1st Sergeants need to be responsible for making sure the white belts in their outfit are doing their jobs and leading effectively.

Also, outfit and major unit leaders specifically CO, 1st Sergeant, MUC, PLs, Sergeant Major, and Platoon Sgt. should change at semester.

Educate the Cadets about opportunities on and off of the Quad. Encourage Corps participation in events such as Big Event, Aggie Build, Muster, Traditions etc. The Corps also has leadership opportunities at all levels for all classes. Organizing and commanding PT, outfit service projects and outfit social events are all leadership opportunities. Organizing and maintaining communications with former members of the outfit is a great leadership opportunity.

Do not micromanage and demand that the Trigon chooses leaders. Micromanagement and arrogant control take away leadership opportunities. Let the cadets make mistakes and learn from them. The Trigon Cadet relationship should be like a mentor not a Tiger Mom.

The answer is certainly not by restricting the amount of people that can train the freshmen or by isolating them from the rest of the corps. This will afford them no leadership exposure or learning opportunities. It will create a cultural divide between freshmen and upperclassmen. Leadership opportunities for freshmen in their first semester would be to observe what works, what doesn't, and the second semester to be taught the concepts and start learning how to be a sophomore (while still being fish). Leadership opportunities for all other classes should be to allow each cadet to be present in a training environment, give them the opportunity to train and mentor freshman cadets and other cadets junior to them. As mentioned in my response to the first question, ensuring all of this has learning and purpose should be ensured by having actual shadowing by "advisors" in a PATIENT and GRACEFUL manner. Those who deconstruct/destroy training times as they happen and destroy the credibility of cadet leadership in front of their subordinates only make the learning experience a lot worse for the fish. I still remember my Fish Drill Team "Black Monday" being interrupted by a lecture from a CTO to our leadership and thinking how everything that I could overhear being said to my leaders could have been said before the training, in private, and in a manner that did not reflect poorly on them. In any case it may have taught me what not to do.

I personally find it strange this question was even thought to be asked and have no idea how the current plan for next year even addresses this question, given the large restriction on who will be able to interact with the fish. It seems the current solution to ensure learning and purpose is to destroy learning and purpose except for in very small and observable instances for very few cadets.

There are so many leadership shouldn't be a participation award. Simply put there already is leadership opportunities everywhere, getting a chain to be in charge of as a whitebelt, have a squad, learning to lead with influence instead of rank. As well as this, cadets have the highest involvement within off the quad leadership per capita of any organization on campus. We make leaders, we don't make people that get the most opportunities to get a position, that's not how the real world works. I think the leadership experience here speaks for itself with the high rate of jobs for cadets post graduation as well as the highest camp scores of any senior military college. I don't understand why we would borrow ideas from other senior military colleges to improve recruiting and retention when we are already larger than those schools and have better leadership scores where it matters.

Give cadet leaders more opportunities to have a real say in decisions that affect the corps.

Don't have a fish dorm

You Don't, this isn't everyone gets a trophy. The Cream rises to the top and Leadership opportunities are already there. (Corps Staff, Major Unit Staff, add Battalion Staff , Outfit staff.) There are jobs even in the outfit level that have to be fulfilled for the machine to run.

that being said, there needs to be a common list of positions that every outfit has if not, i have seen some outfits make up positions. but you also have to give those an option that may not want a leadership position as well.

the biggest issue i have heard is that you get a 1st sgt and CO & XO that are not promoted from inside the outfit. again, this was taken after the military model and you have to remember this is not the military. What the office of the commandant is failing to see here is that there is a fraternal bond that you have with your fish class that you earned corps brass with and was with you all throughout your fish and sophomore year. there is a real trust and respect that is built up and also the familiarity to call someone on their actions. (we did on several occasions)

My last point is also related to this. But, what helped me expand my leadership opportunities was becoming involved in organizations off-the-quad. Being involved in Freshmen Aggies Developing Excellence (FADE) and the SGA Student Senate showed me, and continues to show me, that there is a lack of leadership in organizations off-the-quad. This lack of leadership can be effectively filled by encouraging Cadets to get involved off-the-quad and use the skills that they learned on-the-quad to better these outside organizations (FLOs, Service Orgs, Professional Orgs, Intramurals, Women/Men Orgs, SGA, and many other orgs).

Refer to the last response which covers this as well.

In my previous answer I proposed an objective based plan, with cadet/ mentor teams being responsible to find opportunities. Since everyone is required to do this, the mentor role would work with their peers to rotate these opportunities. When I say objective based, you would literally be required to get a demonstration signed off for example: conducting a uniform inspection, conducting a hole inspection, teaching demonstrating how to set up a uniform, close order drill, etc. Mentors provide feedback but so do peer evals. With modern digital environment we could probably set up a single web app for this.

| Keeping it the same |
|---|
| more minor/major unit activities (not necessarily PT). Stop telling lower classes that the upper classes are terrible and failures and how you can't wait for them to leave. It's discouraging for us and makes us not want to try. |
| |
| For the freshmen class, leadership is already exercised in a buddy class. It is important for a buddy class of fish to work with and understand how to communicate to each other. I'm my outfit, although we do not have very many fish, we are always experimenting with ways to communicate information and being leaders in PT, in training times with leadership scenarios, and off the Quad as a group.<br>I think individual leadership could be expanded upon in Leadership Laboratory. The whole point of a lab in an academic class is to experiment and see if something works or not. This should be the same with leadership. This is the time we have to put to the test what we have learned about leadership and see if it is effective or not. Freshmen get to lead their flights in LLAB for things like briefings, scenarios, and during PT as well. There are often times to debrief and get feedback on a flight commander or fish flight commanders leadership and what can be improved upon. This is where the intent and purpose of LLAB come into play, because as you practice being a leader of a flight and get feedback, you are bettering yourself and your leadership style.<br>I would recommend if you wanted to expand upon leadership opportunities that are both a way to learn and that have a purpose, use Leadership Laboratory's more. This is something exclusive to the Corps of Cadets, and could be talked about more if what we really want to advertise is "We Make Leaders". |
| Continue leadership development across the class structure |
| Many other military-rooted institutions, such as the Academies and other SMC's (and to my knowledge, formerly the A&M Corps), utilize a rank structure that is not so tightly tied to class as ours currently is. In this structure, it is not uncommon to find sophomore cadets with sergeant rank, and senior cadets with none. Such a system, in my mind, could combat the current issue of whitebelt apathy. Awarding those that shine bright as leaders with rank and job that suits them brings quality people to positions of power. A cadet would have to prove worthy of a rank like C/2Lt, rather than handing the silver moon out to even the most apathetic senior. I believe that this system could work in the following way:<br>Freshmen start out as C/Pvt, but after the first semester, could be promotable to C/Pfc or even C/Cpl, and the jobs that come with them, such as a team leader of other freshmen.<br>Sophomores could be promotable up to an NCO-equivalent tier (with associated jobs within their outfits, staffs, chains, etc.), but could also stay as C/Pvt's if there is deemed to be no reason to promote them. The same sort of scale move on to juniors, who would be able to be on higher-level staff positions, with SNCO or even lower-grade cadet officer rank. But, of course, could still be anywhere from C/Pvt to C/Cpl if there is no reason for a promotion, and so on with seniors.<br>This system, in my eyes, opens up all years of cadets to leadership positions equal to their experience and qualifications as a leader, however, does not guarantee promotion to any sort of rank or position of power if they aren't deserving. When quality cadets are able to seek positions that fit them, the cream will rise to the top, and I believe this would bring some major motivation to cadets of all classes, all across the Quad. |
| Here again- not what you're asking… but assuming everyone wants to be a leader is a huge error. All I ever wanted to be was part of an organization and contribute. For 20 yrs in the AF I never once aspired to be the "boss"; just a contributing member of a great team. |
| I believe that this is a question of making outfit level leadership positions more meaningful. It is easy to allocate leadership to sophomores but whitebelts are a lot trickier. Adding incentives to squad leaders, or even ensuring that outfits treat these positions with value would help. Perhaps another whitebelt only special unit would help. A whitebelt FDT where candidacy is based on measurable goals and values would not only provide more leadership positions, but would entice the RVs to take their role seriously (especially with respect to drill and their values). |
| The Citadel's Summerall Guard is a precision drill unit made up of the TOP 61 Seniors. Instead of being similar to rushing a frat, the Summerall Guard has a clear candidacy process which juniors go through, |

and while their PT is intense, they still manage to complete their mission of conducting precision drill. Something similar here at Texas A&M could be a great motivator for whitebelts no matter their cadet rank.

Maintain an intersectional approach between contract seeking/contracted cadets and D&C cadets. Many contracted cadets do not plan to make a full military career out of their contract and leave A&M with less tools for the civilian world than their D&C counterparts. Emphasize and encourage cadets to keep and maintain their military bearing that makes them attractive leaders while also coaching cadets to hold managerial mindsets in managing people outside of a military environment.

I've said my peace there is no need to change. I believe that I have been given the best corps experience and the hardest. I have learned a crap done and have a huge purpose. I have opportunities that I wouldn't have if it wasn't for that either

Leadership is not completely learned from a lecture but must truly be experienced and practiced everyday in order to be effective. I would love to see cadets given the opportunities to lead fish across the quad in order to practice those leadership skills. Also, I believe those opportunities could help build working relationships between outfits. Those relationships could be used to share ideas in individual outfits on what leadership styles work the best. Another point is leadership positions within an outfit. I think better accountability or less positions would streamline outfits as well as given corps leadership a better understanding of how outfits are operating. I think positions in the outfit dedicated to training should be more effectively taught how to be a good leader and less how to do their job. They were in the corps freshman year so they know how to be a fish but what is important is to teach them how to teach someone to be a fish. And good training will come from good leaders.

We ma6y actually have too many leadership activities for upperclassmen, which dilutes the importance of competence in those skills, or the need to strive to become the best possible leader each Cadet can be, rather than just enough to span from the one below to the one above.

Not everyone in the corps needs a leadership position. I've heard from several people who were put in follower positions under people who did not want to lead and this heavily detracted from their experience. People should never be forced into a position they don't want

By diving up all the work between the classes

I would focus on making sure the leadership opportunities being offered right now provide both learning and purpose. You expand naturally when you're doing well. Forcing an expansion without the infrastructure and leaders to do so will put undue stress on the organization, and ultimately lead to failure.

As a former student, parent of a corps graduate '21 and parent of a prospective corps member I have tremendous love for my alma matter but am invested in the future path the corps takes. I believe strongly in traditions, but understand and accept that not all traditions are great. Some may need more oversight and adjustments, while others may have run their course. What was OK in the past doesn't always age well. I love just about everything about Texas A&M and the corps experience. That being said, I know that a cadet's outfit has a huge impact on a cadet's overall experience. As a parent, I worry almost equally about my future cadet's outfit fit, as his university fit. I can control which university he attends, but not which outfit he ends up in. The wrong outfit could result in an an punch while another may help him become a leader who is not intimidated by adversity. The line is sometimes very fine. Diversity in outfits can be great because it affords choices that fit a wide variety of personalities. However, there are some basic things they should ALL have in common. The basic culture is highly dependent on student personalities and backgrounds, but also on established and enforced parameters. The #1 reason we send out students to college is to get an education. As much as I love the corps, it comes 2nd to my child's education. I want him to have time to study. And I want him to get a minimum amount of sleep for his mental and physical wellbeing. The rest of the challenges the corps brings in order to turn him into a leader, I know he can handle. My only concern as a parent is "additional" corps activities (which vary

| |
|---|
| from outfit to outfit) that result in loss of study time and/or less than 5 hours of sleep time. I think THAT ALONE would have a positive impact on higher cadet retention and make a March to 3000 a reality. |
| The proposal you put out actually does the opposite of this. You start leading as a Sophomore with a small number of followers. You have many Sophomores in small-scale leader positions over their element of 2 to 3 Freshmen. |
| Make the system more accepting of spending time with special units/sports teams/clubs (on and off the quad)/ joining a staff position. Because so often cadets are looked down upon when they decide on other ways of leading outside of their outfit. Additionally, creating more "leadership" positions just adds to confusion and information getting lost, plus unfortunately there are people who are content with not being in one of those positions and if they are then placed there it leads to negative consequences. Plus the true leadership position need to better reflect the makeup of the corps and actually be given a voice rather than selecting a majority contract cadets, which at least gives the appearance of Comm staff selecting them because they can hold their contracts over them to keep them from actually speaking out. |
| allow cadets to decide what happens in their own corps. Allowing them to decide how the corps runs and the rules it runs by |
| |
| Sometimes being a leader is a team sport. Less focus on rank and grades. More focus on team building dynamics. |
| Sq. 21 class of 10-13 had a system which people would rotate morning drills, and everyone was given certain tasks. |
| See previous response. To ensure that it goes as planned, possibly send out information during the planning process and gauge the corps' response. |
| |
| Give leadership and decision-making back to cadets. LEARN, COACH, LEAD, INSPIRE is a great model if followed. The way the Corps is run now is DO NOT DO ANYTHING TO INCONVENIENCE A FRESHMAN OR GET YELLED AT BY A BULL AND RECEIVE A RESTRICTED WEEKEND. There is no opportunity for COs to lead their outfits. What is the point of being an "Officer" if all you do is get put at parade rest and yelled at every time you interact with an "Advisor." Expand leadership by letting cadets lead. |
| |
| The more you allow ranks outside of CO and 1st Sgt to own and be responsible the more all can develop leadership. Most tasks fall on CO or 1st butt. Make sure that a meeting regarding intramurals is attended by the athletic officer and proper chain of command under. Uniform changes or needs - supply officer. Define those roles and responsibilities (Cadets define with trigon suggestions).

True lessons for failure. Don't hold up the Corps standards, leadership can be fired. Next up.

Look to promote from within an outfit first. If proper leadership talent not available, then look outside the org. |
| |
| More roles for non key leaders that are just as impactful |
| Separation of classes in relation to military bearing, adherence to respect of rank and chain of command |
| |
| Through my experience, those who care to hold leadership positions have more than ample opportunity to reach those positions within their time at the Corps. Adding more leadership positions to the Corps cannot help the current structure of the corps, only harm it through increased bureaucracy and decreased group-leading possibilities. The best chance for more leadership opportunities is temporary |

leadership roles, like those for Corps sports, organizations, etc, that don't directly affect the organization of the Corps.

Please operationally define leadership. How will you assess whether or not the program achieved learning and purpose?

I think we've already expended these opportunities, especially with the change from major unit to adding the minor units in. I think, if you don't see the fact that everybody is a leader after this year, and everybody is leading in their own way, like the seniors are leading all of the classes, the juniors, the sophomores, and the seniors, the juniors are leading the sophomores and the fish and the sophomores are leading the fish you're not really looking at the corps. You're looking at something that does not exist. I think that he's opportunities are given if you use them. you know being a squad leader even just being a regular upperclassman you are always a leader you're always being watched, and being admired, or looked at.

Create more opportunities for non KLs, people get too hung up on that and when they don't get it they get apathetic.

Provide all levels of cadets with direct leadership opportunities and ways to mentor and develop subordinate cadets. A concern I have with the rumors and ideas about the restructuring is how those not on cadre will develop their own leadership, specifically sophomores, if there are not freshman cadets within the outfits from the very beginning, where is the leadership training going to be coming from. I think the best leadership training comes from having subordinates. In Air Force leadership lab, I am put in many situations to lead my peers, but I feel that the best of my leadership development has come from having fish under my command in directly interacting with them on a daily basis. Some clarification and guidance on this would be greatly appreciated.

Each year should contain experiences to grow in leadership and the experiences should align to the path the cadet is taking - going commissioned versus not upon graduation

Don't make major changes to an organization that is already really good. Really dumb thought process by the commandant

Leadership opportunities are everywhere in the corps. I believe that the opportunities are available for every cadet that is motivated enough to make a difference. However, not everyone gets the same learning experience, and cadets often lack a sense of purpose and give up in their later years. The problem with our current system is that every senior and junior key leadership position in the corps depends on one single interview during the cadet's sophomore year. We call this the "pipeline", because once you get one position, you're almost guaranteed to get the position directly above it next year. The cadets that get large leadership positions are sometimes the best fit, but the lessons learned by the cadets that don't hold large leadership positions their junior year go overlooked. I've seen strong leaders come out of their shell during their junior year, only to become immediately demotivated by the leadership selection process because it is historically impossible for anyone to challenge the cadet that has been in the "pipeline" position. The cadets in pipeline positions, while good leaders, have not experienced the same frustration and difficulty of being in a lower position as their peers. I think that a cadet democracy system could be beneficial, because the people that are in control will be further supported by their peers, and it gives more opportunities and sense of purpose to cadets who want to make a difference.

See answer to question 1. Reward/penalty at the unit level encourages unit cohesion by holding the unit accountable for the success or failure of the individuals in the unit to achieve desired leadership qualities.

Allow the cadet outfit leaders like the 1st SGT and the CO to have more freedom and flexibility with their outfits without the MA's continually stopping, berating and discouraging them from acting out in the position that they once were motivated and excited to work in and for other people.

Keeping fish with their outfits and implementing traits work for certain outfits and see how other outfits and implement those traits.

and by meeting them cadets deserve respect that commandant staff rarely gives. Stop playing favorites.

Expanding leadership opportunities means building confidence in one's words. Honestly the best way for fish to lead would be to take his knowledge and discipline to make use in the real world. As a fish I was humbled. I learned the real meaning of hard work. This work was put to use by organizing study groups and being a leader to my nonreg friends who were just trying to survive the year.

Implement the commandants plan. In fish training companies have CO's PL's and PSG's. In regular companies, enforce the standards and hold cadets to the standard, or hold them accountable. The largest breakdown in leadership learning and purpose (from the company level point of view) is that leaders cannot (or simply do not) enforce standards.

Is there not enough opportunities now? Encourage cadets to join student organizations outside the Corps.

Train the Trainer Approach:
- Sophomore Leadership Academy
- Rising Junior Academy
- Rising Senior Training
Each year group needs awareness of roles, responsibilities, and training.
Juniors are key -- they are the backbone of the Corps! Both leaders and executors!
Seniors need to understand their role change as well.

D&C cadets deserve leadership opportunities too!
- these are some of the best leaders in the Corps -- future entrepreneurs and business leaders
- These are our future financial backers!

Positions:
- Traditionally there are only a limited number of leadership positions
- Expand roles and responsibilities to those not in direct leadership positions -- assign special project leads -- the staffs and the leaders shouldn't always have to execute each plan or project
- Those not serving in a leadership position or staff should have opportunities to lead special events.
- create special jobs for each year group and conduct interviews

Again, letting the individual outfits handle it. Staff's job should ONLY be management and punishment for the most egregious violations of the standard and laws. Let the outfits choose the best people for the jobs, as time goes on more chances for leadership will crop up and it should be on those who want it to take advantage. Even in the instances where the leader isn't required but is helpful.

| |
|---|
| If younger cadets learn leadership techniques as Fish, require some type of group membership not affiliated with the corps Junior/Senior years. Cadets will basically have opportunities to lead in practical groups with other, lesser trained students. |
| Help the Cadets find mentors that are trained to develop and explore individual purpose and organizational progress. The Corps is a place to learn to fail, learn, and move beyond the reachable into the exceptional. Teach them to debrief properly and put into action plans to improve. |
| Produce more corps and major unit activities together. |
| Revive outfits and keep them small enough everyone has to stay engaged and put out. The large outfit model will not work this is not the military. |
| |
| Contract cadets get leadership roles in their respective ROTC advanced classes. These prepare contract cadets to compete in military evaluations at summer camps. Our need is how to handle D&C cadets to pursue leadership roles within the university. We should continue to prepare these cadets for roles in industry by learning skills presented by the business school similar to classes of MBA programs with case studies in leadership in business. |
| |
| |
| The corps already sends out lots of information for leadership opportunities within the corps of cadets. However, there can only be so many positions within the corps before they become meaningless. The corps should also advertise more leadership opportunities outside of the corps, leading those outside of the corps gives a more diversified leading experience. Having leaders from the corps in outside organizations will also help expose more people to the corps and possibly increase the number of people joining. |
| Empower the chains more. No one really takes the chain leadership seriously. Make a social/culture change to make chains more impactful. |
| Allow cadets to make mistakes and learn from them instead of instilling a culture of demerits or rams that are given out as if they're election pamphlets. People aren't willing to take risks or experiment with their own leadership style because almost everything we do is punished excessively. |
| |
| Expand leadership opportunities by creating missions and jobs. The Corps should be good at creating jobs - especially around Aggie tradition. I've always viewed the Aggie Corps as akin to the British Monarchy. The Corps takes on all the daily customs and traditions of the university in a very similar fashion. It's a type of service to the university. The Corps in itself is the collective mascot of Texas A&M. The Corps is A&M… and the cadets are expected to perform in the same capacity, doing the same things as they always have. The Corps is a visible representation of what A&M means and what A&M produces - what we've always produced. The cadets perform a selfless service to the university - and should be given perks (like athletes). This will increase recruiting and retention. Cadets should be rewarded for their selfless service to the school - like priority in course scheduling, priority in parking, etc. The Corps performing all these special services to the school need special rewarding. Cadets performing traditional services to the school in a standardized, customary fashion is purpose. Things like raising the flags at the Systems and Academic buildings every morning, escort service of girls across campus at night, performances by the FDT and Ross Volunteers, bugle calls, Silver Taps, Muster, etc. All the traditional services to the university is purpose. Create jobs associated with each and every tradition - and hold upperclassmen accountable for carrying out these services perfectly. |

Deliberate Cadet experience planning across the four years. Perhaps a 4 year plan for leadership opportunities could assist this gap.

We make sure they are involved outside of corps leadership. The corps has so much different opportunities in it. With those coming with more leadership opportunities and most people do not know about those special units. There must always be people to follow a leader. This does not mean that these followers are leaders. They are they might just not have green tabs that tell us they are. The best leaders I have followed while in the corps where not officially leaders but where leaders naturally because I know they care about me. I also think that if we had to pass a peer and subordinate evaluation before we get a leadership position. This will help stop bad leaders who are good at interviewing from taking it away from more qualified people who are worse are interviews.

Not everyone leads the same way, and not everyone leads the same purpose. My leadership style was to be quieter and more meaningful- to this day, this is still who I am. Others lead by being an academic example and there are those who are more vocal. All are appropriate at specific points in time.

Don't presume all want or are qualified to be leaders. Don't try to fix what isn't broken.

It's taught from day one. Not sure more officially recognized leadership roles are required.

The current system is sufficient, the individual outfit smaller roles need to be built up to have more meaning.

The MIC/MUC change is fine but putting more of an emphasis on confidence over policy can help with going through transition training. Additionally giving people roles during workouts or spreading the work among a buddy class can help increase involvement and a feeling like everyone matters. This can also help with improving buddy unity as well because stronger teams tend to be built under pressure.

we have 32 commanding officers (granted I'm out of date, class of '96), we have Major Unit commanders and XO's, we have 72 RV's elected every year, I'm not sure why we are lacking in command positions. If you have too many command positions, it dilutes the importance of the diamond.

The way this country is heading, everyone gets a fucking diamond. STOP. If you are great, you get one if you suck, you don't. We need to prepare our cadets for the real world and the REAL world doesn't give out diamonds.

To create leadership experiences each class must have the freedom to carry out their roles without interference. This means allowing sophomores to train and create relationships with their freshmen. Allowing juniors to oversee, moderate and carry this out, and finally giving seniors the ability to direct their outfits in a way which instills the corps and outfit values through every class. Each outfit is unique and strives for different things, so what works for one might not work for others, but where some outfits succeed others should have the ability to attempt to emulate this on their own rather than having the corps push these changes.

Mentorship is jey to developing leadership. Seniors should have executive leadership menors while underclassmen are mentored by those above them. Unit cohesion is critical to this. From FOW fish need to learn to grow and lead in the small group environment of the outfits. The unity that is built within the outfits is paramount to the success of the fish.

Let the outfits grow, foster better care of good ones. Let the COs meet monthly with no intervention or staff and discuss what they are doing. Quit trying to take away that purpose, which is personal connections to fish in an outfit, because you literally see them grow. You remove purpose when you take fish away. No fish wants that. None. At all. Dozens of my recruits are losing interest because of this stupid proposal.

make them do more PT. Why are the RV's not doing PT? Why are the fish not pushing at formation? If you don't make it difficult, the experience is meaningless.

Allowing cadets to make decisions for their own outfits will expand the leadership opportunities and provide greater learning and purpose.

Give cadets a more hands on experience to develop an understanding of what each position does, as well as encourage outside involvement to become leaders in other student organizations. Explain the meaning behind why things are done certain ways or why we do things in general to give cadets more understanding of the purpose behind a position or activity.

Give us people we can watch develop. Allow every upperclassmen to understand the purpose and effects of their words and actions, provide the experience of being a leader with people we will grow to know personally. Grant us front row seats to their development.

I am not sure what your intention is?? There are only so many leadership roles in the organization. If you will let it naturally happen, the leaders will rise to the top. It's just a fact of life that not everybody is going to have a majorly leadership role. Why do you feel it's necessary to expand leadership opportunities?

Transition training for fish needs to start post-brass. They need sufficient time to be confident in taking up their next role, and in this way the corps will not have to worry about sophomores not being competent enough to be cadre for incoming fish. Outfits need to do more activities as whole outfits so that everyone in the chain of command is involved. Even just the little outfit vs outfit competitions during FOW showed the role each person had, and it kept a motivated culture where everyone was dedicated to building up their outfit through unity. Whatever the leadership model, the idea of outfits cannot be thrown out the window. Grouping people into smaller groups where everyone knows everyone and has a chance to be closer individually creates a unity that cannot be described nor replicated any other way. Fish training is important, but the training doesn't stop when fish grow up. Sophomores still have a lot to learn from their juniors, and juniors from seniors, but from what I've seen, classes become less and less involved as they get older. Seniors have the "overseer" role, but this doesn't mean they cannot stay involved with their underclassmen. They may do more work behind the scenes, but the underclassmen really look up to them because they aspire to be seniors. To earn the Ring, the Boots, and to have made it 4 years in one of the most prestigious programs in the nation.

I believe it can only be achieved within a holistic review and improvement within the existing structure of the corps culture and organization. I have no knowledge of the type of leadership development programs currently within the corps process for development of cadets as they grow within their structure but believe that is where more focus should be conducted if there is a conclusion there is a weakness in freshman development.

There are tons of opportunities to be a leader in the corps, and it doesn't revolve around being a commander. Recruiting sergeant, scholastic sergeant, athletics etc all have leadership roles. Special units. Opportunities are abundant for those who actually want to learn leadership of teams. Honestly I was a major unit commander and an outfit commander, and the major unit commanders had far fewer / far lesser leadership opportunities. Because of the outfit culture, which has value, and the fact that we weren't doing « battalion » and « brigade » operations, the real leadership value was at lower levels.

Create a team leader/ squad leader academy and empower our lower and mid level leadership to determine the successes of the individual outfit.

Don't allow pro-forma leadership positions to form, require outfit chains to conduct proper checkups like academics, IG, operations, recruiting etc. these should be more than just titles, actually require work to be done and turned in through these various chains, even BBQ and athletics

| |
|---|
| More training time with more functional training |
| By ensuring people can actually lead, I think there are plenty of opportunities to lead as is, its a personal choice. We have upperclassmen who do a lot of behind the scenes work, in planning or paperwork, we have others who motivate us and lead us in workouts, others who support the outfit in their own unique ways, everyone plays a part. And if you worry about "White-belt apathy", I dont think adding more leadership will change that. Leadership is a choice and privilege and everyone does it their own way, give them the freedom to do so. The corp is supposed to be cadet run, thats why cadets make the training plans, and op orders, and lead major units, minor units, outfits, platoons, squads, and even fireteams. Such a system keeps people accountable while still allowing freedom and development. You only learn leadership by seeing it and doing it, and if you care to, you can lead in any regard. The most notable leaders ive seen this year I dont look up to because of their rank or title, I look up to them because they show that they want to lead and they care about their subordinates. Let the cadets lead as the corp was intended. |
| Standardize not only the leadership positions throughout the Corps, but also the SOP or Duties and Responsibilities for each of those positions. Ensure that each serves a purpose of development so that it is actually and visibly needed. Differentiate these from something that could be seen as an "additional duty." Rotate the upperclass in these positions after the fall semester - with possibly the exception of the "most senior" command positions - but do rotate the various staffs. Look at not only who might be good for a position, but who might also most benefit from the developmental experience of a particular position. Consider how this might vary for an ROTC Cadet versus D&C. You execute many of the same types of activities every year, so it shouldn't be too hard to orient the various duties of the positions towards the successful accomplishment of those events. While it's good to have the Cadets work through some planning/resourcing of these events, don't make them reinvent the wheel - give them problems that are solvable at their level of expertise and ensure the cadre already have the "approved solution" so they can advise or step in to assist when needed to prevent catastrophic failure. It's learning, not "sink or swim." -John Horning, COL, US Army |
| I believe this is looking at leadership the wrong way. Rather than try and create more opportunities focus on developing the idea of creating your own leadership and that you dont need a rank or command position to be a leader. Good leaders find a way to lead no matter what. One of the best leaders I had as a fish (and all my buddies would agree on this) was a no tab 2 moon good who was the outfit training officer. Despite not being in anyone's chain of command he was an engaged leader and we always felt connected to and inspired by him. Additionally, neither the real world or the military will create leadership opportunities at your convenience. Some people will get high-ranking positions, some won't and the people who don't need to learn to lead without holding a rank. |
| Provide more leadership workshops or conferences for the cadets. A lot of cadets will go through their 4 years and not be able to be a 1st Sergeant or CO. The pisshead role is a great way for them to see the direct results of their hands-on leadership from a small scale, but after sophomore year, a lot of cadets don't ever get that large-scale feel of leading a unit. Leadership conferences, even if it's a corps-lead conference could offer cadets more experiences under their belt. |
| Just let cadets make mistakes. Give them the room to learn. You are actively taking away learning opportunities. |
| |
| Eliminate the nepotism. There is a general understanding of the cadets that there is a biased towards certain cadets when interviewing for leadership positions. Now the problem has been expanding by creating more tiers of leadership as well. There is another stigmatism towards taking on a staff roll. We often see that the support positions don't even have a real roll. What exactly does a PR officer do on a minor unit or major unit level? Nothing unless they are motivated to. The same goes for Minor Unit and Major Unit Command Teams. They just pass down information that come from above them. There isn't any leadership until you go down to the outfit level at CO, XO, 1st SGT, etc. These positions are the only ones that get real leadership experience. FTL's learn how to communicate effectively with their fish and hold responsibility for them. PSG's learn how to delegate responsibilities and trouble shoot problems that may arise with conduct of their subordinates. Platoon |

Leaders finally are able to lead from the big picture point of view. They can be given or create a task to communicate towards their subordinates and see it out to completion. These could be a goal of Career Readiness points, academics, or physical fitness.

Growing the Corps to 3000 means that these positions on the outfit level now have a greater responsibility. They will now have more underclassmen below them. Putting an emphasis on the cadets a these levels will give them a greater sense of not only identity in the Corps but also their outfit. There are outfits in the Corps that hold platoon competitions where the freshmen to the seniors are all competing together against the other platoons in their outfit. A purpose will be instilled within these cadets. Therefore, leading to greater retention. Cadets are competitive with each other. Allow competition to make life in the Corps fun!

Put less emphasis on more prestigious leadership positions and instead emphasize the value and importance of every cadet, especially white belts. They should all feel an obligation to set an example, mentor, and lead regardless of position. The most influential leaders I had in my Corps days were rarely my CO or First Sergeant, much less anyone from Staff. The leaders I looked up to were the lower ranked white belts that spent time observing and interacting and caring about the outfit. They may not have had the highest grades or had the most ribbons but they damn sure had pride and they cared about the fish. There were bad leaders as well and I learned from them what not to do and what I didn't want to be. Earned respect is the greatest commodity, Stripes or Diamonds are great but it's important that every white belt feels a responsibility to lead by example and pass on knowledge. Servant leadership.

It's also crucial that leadership roles are determined by students as much as possible. There is no greater sense of pride than knowing your upperclassman chose you to lead and Officers should only step in when there is a real problem. The more that you are chosen by your peers or by the upperclassman that interact with you regularly the more meaning that has and the more respect it will garner. When the Commandant's office or Trigon makes those selections the natural reaction is to assume politics influenced them and there is less buy in and respect garnered, thus that should be limited as much as possible and primarily focused on the most senior positions, hopefully even then more for guidance than decree.

One of the best things about Texas A&M is the many student organizations that the school provides. I believe the Corps should encourage cadets to get involved outside the Corps. There are incredible student leaders outside of the Corps. I was blessed to serve on the Muster Committee when I was a senior. That was a great experience and showed me leadership in collaboration with others.

The Corps needs to encourage students to engage in student life outside of the Corps. There are obviously leadership opportunities there, but also leadership by setting the example. It also shows non regs what great students, leaders, and representative of the University cadets can be.

More intentionality on call to action at events. Give cadets additional materials to look in to if they want to. A lot of the leadership things we are taught seem "cookie cutter" or are things that we hear all the time anyway. I'd like to see more opportunities to interact with Cadet Advisors because I'm sure they have a lot to teach that I'd like to learn. It would also foster better relationships between cadets and command staff.

meet the students where they are. Find out the things that are important to them and create leadership structures around those events, functions or ideologies. Many of these things already exist, think about recrruiting, academics, retention efforts, physical training, drill, social and networking opportunities.

See my previous comment. Interconnected training times and opportunities for upper leadership from across the Quad to discuss leadership challenges and traditions will help us all understand each other and improve. From there, the experience given to fish and sophomores will also improve.

Please see previous reply

Allow outfits, special units, and major units to establish their own leadership positions. Like the military, existing leadership positions can't just spontaneously expand their scope of power and still maintain a healthy status quo and relationship with their people. Additionally, mandating certain positions to conform to an agenda can create more leaders, but not more passionate or involved leaders. From my

experience, the vast majority of people in CR positions found them more of a chore than an opportunity. Allow these smaller groups to create roles that fit their needs, and if you must create roles, create a democratic governing body that can at minimum vote on recommendations to be made to the Commander. The Corps is designed to prepare cadets for more than just the military, so this kind of involvement, while not realistic to the military, could be valuable in other fields

By giving the sophomores more opportunities to teach and lead the fish, this will naturally open up more opportunities for white belts as well.

The first thing that has to be done is to specifically define what a leader in the Corps is. once that is done, counsel the leader by putting it in writing as an initial counseling session where the expected duties and responsibilities are spelled out for each leadership position. Then have routine follow up counseling sessions throughout the semester and year to gauge performance. Make it part of their grade for their Military Science class or their Drill and Ceremonies (or whatever it is called now) class. This is basic duties and responsibilities any NCO should know.

Ask the Cadets prior(what they wish they had but did not get), present, and future what they want to accomplish in the Corps.

A unexplored way to expand leadership opportunities for leaders in the corps is allowing cadets the opportunity to practice training and learning skills in every single day of our lives . The best leaders are going to put themselves to be out into positions of leadership and power. however now all leaders are equal and some people will be in a place where they can lead others directly and more often. Expanding leadership opportunities I believe can be done through special units and organizations outside the few direct positions within the corps and outfits. it falls on the individual is the bottom line cadets who want development will find it and benefit through resources in the corps. Refining SOMS plans and leadership workshops throughout the year could benefit cadets in some ways however the current development process develops hundreds of sought out cadets who are very successful each year. Drastic change in leadership responsibilites in the face of how successful cadets often are outside the corps would detract from the corps vision.

Leadership opportunities within the Corps may not require expansion. Purpose should be clearly defined for each Corps leader, so that learning can be measured against goals, objectives and expectations. Those upperclassmen not involved in Corps leadership roles should be encouraged to pursue leadership roles in other student organizations or student government. This approach may broaden the influence of the Corps across the campus. Please keep in mind that members of the Corps represent less than 5% of the student body.

Please see answer#1. I very much like the idea of more intensive training for 2nd Semester Fish and 1st Semester Sophomores. Would volunteer to be a part of a workshop to bring both Military and Civilian business experience to the table if asked. I have been blessed my entire Military and Civilian career with the lessons learned in the Corps.

To put it shortly education. When I was in the Corps I would say the most limiting factor to cadets getting involved was the knowledge of what opportunities they had available. There was always MSC Open House but honestly, most people didn't attend that because it was in the MSC and required them to get into Bravos. If there was some sort of event for only cadets maybe held on the Quad that they could attend in nonregs and allowed them to ask questions or learn about everything then I think the number of cadets joining other organizations would exponentially increase. It is not as if there are limited leadership spots in the Corps, it all comes down to what people know about each organization which is usually via word of mouth from buddies or upperclassmen.

Like I said in the answer before, you replicate what the outfits who have figured out how to be voted on by their peers corps wide to lead them are doing across every outfit on the Quad. It's not complicated and you don't need all the fish in the same dorm for 7 weeks to do that, there really doesn't have to be a sacrifice here, there has to be an enhancement of outfits having a culture. Furthermore, If you actually want cadets to have leadership opportunities, how about you as commandant staff stop picking the leaders. Y'all aren't dumb, and you know perfectly well that no student organization operates where 40-50 year old men gather in a room and decide who they want to be their "yes men" at the top. That is so

insanely backwards. If you want to see an incentivization for cadets to lead, don't set up the leadership roles to be a catch and something to dread because you are picking them to do your dirty work. Let the corps vote on who should be their corps commander, and their deputy, and their chief of staff, and you'll be shocked at how many cadets are actually here for the reason you want them to be here: to learn how to lead and embrace opportunities to lead.

Don't abandon non-cadre cadets. If you only allow 'fully trained and certified', aka the chosen few, to interact with freshman, you are denying the vast majority of cadets the opportunity to practice leadership. It's also a good idea to keep outfits relatively small. The band recently went from 4 outfits to 6, which increased the number of leadership positions by 50%.

Is it true you threatened to disband the RV's if they didn't let you choose leadership roles? Have you lost your mind?

A&M has 1000 committees for non-regs. If they are not in a leadership position in the Corps, and want to be, they have many other campus positions available.

Learn to follow, practice to lead.
Reinstate official Corps support of Bonfire, thus providing additional leadership opportunities with practical application.

One thing I was thinking is that with the Corps expanding, make it so that a cadet cannot have more than one position if the numbers in the outfit/staff allow. So, if a cadet is a squad leader, they cannot be a training sergeant too. That will allow more cadets into leadership positions. Another thing that might expand opportunities is that the leadership changes every semester (like the NROTC leadership) but I'm not too sure about that. The MUCs, BUCs, and COs each have a vision and goals. Switching it up would make that more confusing. Another thing that would help regards sexual assault cases. I know of several cadets who were involved in sexual assault/harassment (the attackers) and basically got away with it. Some of them even went on to be commissioned into the military. That allows for more attitudes and actions not befitting a member of the Corps of Cadets to thrive. Cadets will see that they did not get that harsh of a punishment and do it too. The same goes for hazing. I know of several people who while on conduct probation still got into special units and one got into a university position (they did not participate during their probation but they did not have to apply again like others who were under the same punishment). If you want to make leaders of character, you first have to make sure the cadets have good character and not allow those with bad character to stick around and badly influence others. Talking to the cadets or allowing the cadets to speak (like this feedback form- thank you by the way) is a great way to answer these questions. You just need to be careful because there are sadly some cadets who are immature still and others have the wrong mindset for the Corps. I want the Corps to thrive and I agree it needs to change. I just don't think the Fish and Sophomore Academy is the way to do it. The briefs the fish and heads have been going to are great (I think). I just think they don't see how it would help them. I think they get tired of speeches. That problem is something I have still yet to find a good solution to.

To expand leadership opportunities within the Corps and ensure that each leadership experience is both meaningful and educative, a strategic approach could involve restructuring the current organization of outfits to form larger, full-sized company units. This restructuring aims to enhance the scale and scope of leadership experiences, providing a richer environment for development and application of leadership skills.

1. Broadening Leadership Roles: By transitioning to larger company units, we inherently increase the number of leadership roles available within each unit. This expansion allows for more cadets to take on various leadership positions, from squad leaders to company commanders, thus diversifying the leadership opportunities available to each member of the Corps.

2. Enhancing Team Dynamics: Larger units foster an environment where cadets can experience the complexities of managing more extensive teams. This setup mirrors real-world organizational structures more closely, providing cadets with a realistic understanding of leadership within larger groups. It offers a unique opportunity to navigate the challenges of communication, coordination, and motivation on a bigger scale.

3. Implementing Small Team Leadership: Despite the increase in overall unit size, the emphasis on

small team leadership remains paramount. Within these larger companies, cadets can lead smaller teams or squads, ensuring that the leadership experience is both intimate and impactful. This structure allows for more personalized mentorship and guidance, as leaders can focus on the development of their team members closely.

4. Structured Leadership Development Pathways: With the formation of larger units, the Corps can implement structured leadership development pathways, guiding cadets through progressively challenging roles within their tenure. This pathway ensures that each leadership experience builds on the previous one, providing a clear progression of responsibilities and learning outcomes.

5. Increased Engagement in Complex Projects: Larger units enable the Corps to undertake more ambitious projects and activities, from complex training exercises to extensive community service initiatives. These projects not only provide practical leadership challenges but also allow cadets to see the tangible impact of their efforts, adding a sense of purpose to their leadership experience.

6. Fostering a Culture of Excellence: The shift towards larger company units necessitates a culture that values excellence, accountability, and continuous improvement. This environment encourages cadets to strive for high standards in their leadership roles, promoting a Corps-wide ethos of excellence and dedication.

By reorganizing into larger, full-sized company units, the Corps can significantly expand the leadership opportunities available to every cadet, ensuring that each leadership role is both a learning experience and a purposeful endeavor. This approach not only prepares cadets for the complexities of leading in diverse and dynamic environments but also reinforces the Corps' commitment to developing capable, versatile leaders for the future.

I was D&C for the CHALLENGE of the Corps. Don't make it for the WEAK!!!

"ensuring each experience provides both learning and purpose?" - This is an interesting phrase - if the task/role is of importance to the organization vs. some meaningless position then by definition it will have a purpose, and to the degree that the task requires specialized training find an expert to teach, and empower leadership to implement. It is not that challenging to design...implementation requires discipline and organization.

I am class of '86. There were ample roles within the outfit for cadets to lead, we had academics officers, PT officers, inspections officers, etc. Have those roles been eliminated?
There were various staff positions, positions within Corps organizations (RV, etc).

Are we looking to solve the problem that not everyone is getting a 'participation ribbon'? I hope not, the civilian world is competitive, not everyone will be the CEO, I am certain it is the same in the military service. Our country is merit-based!

What am I missing? What is the specific problem that needs to be solved?

There is a transvestite in G-2. Daisy Mason. Don't let this woke BS infiltrate the Corps. If my daughter was in an outfit with this guy, I'd make her switch outfits.

I think maybe rotating leadership can give people the opportunity to grow. Put those that meet the standards for leadership and then once they get experience, they can mentor a new person in a similar position the following semester. Make it semester based. Or after fish year, offer a ranking system not based on seniority but based on merit.

We can expand the leadership opportunities for every leader in the Corps by defining roles for each leadership position with a brief SOP. If COs set expectations with their squad leaders, fire team leaders,

| |
|---|
| platoon leaders, etc., then each role can be imbued with purpose and executed with buy-in and accountability. |
| We can expand the leadership opportunities for every leader in the Corps by defining roles for each leadership position with a brief SOP. If COs set expectations with their squad leaders, fire team leaders, platoon leaders, etc., then each role can be imbued with purpose and executed with buy-in and accountability. |
| Supervise their leadership, but don't take it out of their hands. We learn from our mistakes, not by watching someone else do things. As a teacher, I can tell you this generation needs to be able to do and not just listen to people and watch. |
| Depends on how you define "leader". All upper class men should have a leadership position. |
| Make SOMS immersive. I've seen many cadets fall asleep because it's a boring, long 50 minute lecture, and then it's done. If teachers would do in class activities like Kahoot, or fun improvisation with cadets practicing and critiquing the leadership of each other, then the class would be more interesting and students will benefit from the active exercises. |
| As with previous answer - leadership starts with taking responsibility for your actions. Each level of leadership requires higher levels of responsibility due to the number of people below you relying on your leadership. Freshmen need to be given opportunities to be responsible - all the time. This is much more than making your bed, proper uniform, shined shoes and brass, learning and memorizing campusologies. That is the basics. Outfit leadership should find other opportunities for Fish to be responsible. When I was a cadet in the mid-90's (I'm class of '95) we had a Whistle Jock that rotated between us Fish. The Whistle Jock was the leader of his class for an entire week Sun-Sat. There was a set of assigned extra-duties that had to be performed by the class and the Whistle Jock's job was to ensure those things were accomplished. The upperclassmen would add/remove items weekly so that the Fish class had to reevaluate weekly how to get the job done.<br><br>Every class should have varying roles and responsibilities assigned. As classes progress, more responsibility is assigned/obtained. |
| |
| |
| Have leaders training others tested for competency and motive before placing them with cadets. Cadets at any level could "test in" and prove to be better role models regardless of class level. |
| Return the outfit leadership decisions back to the outfits. Outfits are currently led by COs chosen by the Commandant's staff, not the cadets who know them. This leads to COs who are good at "managing up" (playing politics, sucking up, "yes-men") and not necessarily good at leading people. The leadership positions in the outfits currently are meaningless because so much of the decision-making is directed from the top. A cadet-led corps doesn't have this problem.<br><br>The new Commandant has been a major disappointment in his leadership of the Corps. "Compliance over morale" is not a core value of the university or the Corps. He seems to be great with donors and ol' Ags (until now) and riding around with the PMC in parades, but his management of the actual Corps has been abysmal. If I had a high school student, I would not encourage him or her to join the Corps if this plan goes through. |
| |
| |
| |
| |
| Create committees and subcommittees that each cadet must serve on. These can be within many different organizations on campus or within the Corps itself. |

My son, and I believe other cadets would be willing to speak to the Commandant personally and confidentially, if it could be done in a way that no one would know who said what. The fish cannot risk sharing their transparent experiences, personal thoughts and ideas without the commandant somehow "randomly" selecting cadets for interviews. Truly the specific feedback would have to be kept confidential. Otherwise, the fish would end up having to punch.

My cadet is a leader among his peers, and always has been, but even he knows he cannot seek out leadership to share feedback, due to the potential repercussions.

We should expand on the chains that each outfit can attain in order to diversify the leadership opportunities of each cadet based on their general interests or opportunities to learn from.

Checks and balances. The suits arising before Christmas highlight a lack of checks and balances for who was in charge.

Leadership opportunities are provided by the expert and watchful eye of the adult leaders. The student leaders are more likely than not to choose their "kiss butt or yes sir" type. Those that are doing right and ensuring things are handled property are passed over many times because they are getting the job done and not kissing butt.

I believe that the Corps does not have a problem with leadership opportunities. There is a multitude of ROTC, special unit, and other university organizations that a cadet can gain leadership within if they do not receive a Corps leadership position. I do not believe that the solution to this problem, if it exists, is to create a "Fish Brigade" for more white belt positions. This will only result in a weaker cadre that does not live with their fish and has no personal connection with them.

Hazing does not equal leadership

Expanding leadership opportunities is truly not necessary. Good leaders will utilize their people well and place them in roles suited for them. Emphasis on the utilization of chain of command and not placing everything in the hands of the first sergeants, sergeants major, and commanders is what is needed. Expanding key leadership is not what is needed; emphasizing proper dissemination and chain of command is what is needed.

Nobody trusts you anymore. You are an E-1 Frog and you weren't an RV..and you want to get rid of the fish year and the RV's. Maybe because hey, you turned out great! But you know what? So did a lot of RV's from the past. We do it the Aggie way and it works. Don't fix what's not broke!!

The five bases of power are legitimate, expert, reward, coercive, and referent. In my experience in the corps, the leaders who have had the greatest impact on me have used referent power. I have had leaders who were not on the cadre or even wearing green tabs give me much greater nuggets of wisdom and teach me how to lead much better than any commander has done. This was only available to them because as a freshman and sophomore, I lived with them. I saw how they lived their lives and walked the walk along with the talk they talked. Many times as an upperclassman in the corps you are not utilized to fulfill the management side of leadership. In these times it is your responsibility to be a mentor or an inspiration to the classes below you. Taking away even a few weeks of this ability puts the relationships between underclassmen and upperclassmen at risk. These formative weeks are when they need the most upperclassmen around. They may need to see the "one moon goon" and watch how he focuses more on school than anything else. They may need to talk to someone who has chosen not to contract or someone in their major. The corps development model only works if all four classes are

present and active. In terms of actual training environments, the answer is clear, have a greater presence by the staff. I have seen very little of my staff and do not know where they go or what they do. If we assign the staff to PT and train with outfits that are not their home outfit they are much more likely to report when things that shouldn't happen do happen. This will also change the general corps view of staff from people who hide from outfits to people who want to better the corps. I also think that as cadets we have lacked a watchful eye on our own training plans and what actually happens.

Every level of leadership should have no more than 3 to 5 people they are managing, from the Corps Commander down to the fire team leader. This broadening of the pyramid will create more leadership positions. These positions must have significance and can't just be middlemen passing down information from on high. That translates to what we called Sgt's time in the Army. I'm sure the other branches have it as well. Build that into the training schedule and make it sacred.

Subject matter experts for specific training. The biggest one that stands out to me on this is PT. PT should be structured to accomplish Corps standards and specific goals of the outfit. I am sure there are a number of NCO's who would be able to teach cadets how to put together a PT training plan and help them execute it. This could be built into each outfit's leadership structure and added on as additional duties at higher levels.
These SME's could be expanded to include many areas and give cadets something to own and learn from their failures and success.

Every level of leadership should have a training class they have to complete to be put into that leadership position. This should be a nested objective of the leadership courses taught in the SOMS classes. As a freshman you are working to complete a course that will enable your leadership position at the sophomore level. OJT works and is heavily relied upon both in the military and the Corps of Cadets, but when it fails it fails dramatically and usually with significant fallout.

Return more meaningful decisions down to the cadet level. Embrace the subsidiarity philosophy: "matters ought to be handled by the smallest, lowest, or least centralized competent authority rather than by a higher and more distant one, whenever possible."

Please read this. This is the whole purpose of an outfit. Without outfits, I would've never gotten the chance to lead anyone. I was able to lead because I had juniors and seniors watching over me when I was a sophomore. I was able to lead as a junior because they taught me well, and I knew the limits of my people. I will be able to lead as a senior because I will be able to watch my peers, correct them as necessary, and make sure the class of '28 is safe, taken care of, cared for, well-rounded, and developing life-long skills before they learn them the hard way.

Limiting the size of individual units. Considering other corps wide extra units, like FDT, Parson's Mounted Cavalry etc)

In every organization there are going to be leaders and there are going to be followers. Seeking to make more leadership positions for the sake of "leadership experience" is how you flood the system with too many people thinking they are in charge. Not everyone is a leader. Period, hard fact of life. I think the perspective needs to be more in the mindset of "how do we create experiences where people are forced to make their own decisions for the betterment of an organization". Giving everyone a part to play but by no means making everyone "a leader".

The less management from commandant staff, the more responsibility falls onto cadets. When this happens, Staff on every level would have reason to have more people to spread the workload and keep it reasonable. This provides a multitude of positions for people to fulfill and practice leadership on a larger scale, managing more people and learning to handle admin and morale. This is for the leadership on paper. In practice, cadets simply require the time to practice with their people. Training times, whether its learning room and uniform standards, drill, or physical training, is when people are actively

practicing their operational leadership. The more space cadets have to actually make decisions based on the needs of their people and requirements of the organization, the more learning and leadership can take place. For purpose, the Corps can be a military organization without requiring military contract. The training can have the goal of producing the best officers in the nation, or to allow DNC the challenge of participating in a military environment and lending their strength, learning leadership, to then bring into the civilian sector. Challenge creates the purpose, and it allows people to feel the satisfaction of making it through something so challenging. There is an identity gained with the organization in a big challenge, and completing this challenge is a sense or pride that is difficult to replicate anywhere else. For many people, this is one of the big reasons to join the Corps.

My previous answer delves into this, so I won't repeat myself, other than to say, every cadet deserves a good leader, and every cadet deserves to learn how to BE a good leader – even if they don't hold a significant position. In the business world, you often see this called "leading without authority" and it's the idea that everyone can lead others through their own actions, regardless of whether they are in a management role.

This can and should be taught and demonstrated for each class year, and mixed into every teaching opportunity.

Class-specific opportunities for teaching and learning should be created, beginning at the first of the year before classes begin. FOW-like opportunities should exist for all cadets, at every level, before semesters begin. It seems we often look to the academies for inspiration and best practices -- this is one we can borrow from them. They start training much earlier in the summer than the Corps does and, as far as I'm aware, those opportunities aren't confined to cadre and new students only.

Every cadet does not need or desire a formal "leadership opportunity." You're trying to force a solution onto a problem that doesn't exist. Cadets are in the Corps for many reasons and many have significant academic responsibilities or leadership in other student organizations (like SCONA). So DON'T try to force a formal Corps leadership position on every cadet.

By removing the bulls from the equation. If the bulls are constantly micro managing everyone like the proposals you were trying to sneak through without outside input, then of course there will be less leadership opportunities. It's not rocket science. Encourage a decentralized structure and allow your outfits to select their own leaders. Stop trying to decide everything for everyone.

It used to be: "Meatballs do it on the run"
Now: "Meatballs don't do it on the run bc the commandant won't let them do PT"

Current setup allows the student leaders to lead. Micromanagement by adult leadership undermines this. I ask you a question in turn, how can the stakeholders and donors trust the adult leadership after this situation?

Not everyone is going to be a unit leader. There simply aren't enough spaces. One way to expand the opportunities is to institute project or initiative leadership opportunities. Project management/leadership is a great way explore how to build a team and lead and celebrate success. Recognize leadership.

From someone who was in the Corps and has managed countless employees over the last 20 years, not everyone has the drive to be a leader. Leaders are born, not made. So if you are trying to turn every cadet into a leader then you will always be disappointed. However, by earning Corps brass and Outfit brass, the toughest and most memorable part of the Corps experience, the true leaders will emerge out of each outfit's fish class. Those are the ones the upperclassmen must identify and mentor to be the leaders of their class when they are Pissheads and beyond. There could be some leadership positions created other than 1st sergeant, guidon bearer, etc. that allows other class leaders to lead by having specific responsibilities. Maybe someone in charge of PT workouts or improving marching standards, or making sure dorm rooms remain at a constant standers, etc. Cav, RVs and other special units provide these opportunities but if a cadet doesn't join one of those it is sometimes harder for them to find their way. The upperclassmen must identify the strengths of the leading fish and assign them those positions.

Again three words: trust, discipline and responsibility.

This question seemingly assumes that we should approach every member of the Corps of Cadets to

have potential to become a flag level officer in any of the military services.

If every member of the Corps were a leader, who then becomes the led?

It also begs what is "expansion of leadership opportunity"? Are we actively seeking more and more positions of authority? ("again where everyone's a winner"?)

If we continue to dilute authority, where lies its importance.

At one point in time only those in command leadership positions wore green tabs. Now in the "everyone's a winner" environment, we copy the Army and give them to anyone in a leadership position.

Or are we now looking at a new metric, in terms of the numbers of leadership positions?

I'd say that the responsibility of being an effective leader resides with every upperclassman wearing a Corps uniform regardless of position. Having said that, there are also varying degrees of interest to exercising authority or leadership. There are also limits to authority when serving in a position of leadership.

Perhaps the real question becomes: are we really developing leaders, (operative term "developing") or merely introducing cadets to resources so they might become more successful in life?

The question also might be re-worded to reflect: "…leadership opportunities for every member of the Corps".

Not everyone wants to be a General, Admiral, CEO. The desire to lead and accept responsibility, exhibit trust in the absence of supervision and the discipline to act and execute properly is a heavy demand. Cadets once did this with little interaction with the Trigon. Yes, abuse most certainly abounded, but those failures were also learning opportunities.

But not all are willing to accept, nor seek this demand.

Finally, the question almost suggests a "cookie cutter" type solution. Leadership application varies with the individual

By encouraging outfit leadership to delegate to the people under them at times in order to allow people to work on what they are passionate about.

Again, I would involve Cadets in the process of developing leadership curriculum for the underclassmen, as a SOMS credit or stipend position/option. I also think that lower echelon leaders (Platoon commanders, Training Sergeants, Squad leaders) need some curricular development to help define their role (I.e., spend a day with Captain Quandt learning about the critical role Squad leaders play in the Marine corps, look at historical examples and recognize the historic background and important link of the role).

In addition to that that though, the Corps needs missions! We can't continue on saying that we just march and "train fish". Train them to do what? Maybe we should incorporate military exercises somehow; even for non military seekers it's important to know how to logistically plan and coordinate efforts and accomplish ORM. We should do Corps FTXs and combined exercises on a semi regular basis.

To those who say military-style exercises aren't a viable mission because of our D&C populace, here is my response: If people are joining a military based culture for leadership development, it makes sense to do military-style operations or exercises to learn. It would be appropriate for me (a military contracted cadet) to join something like say, student senate, to learn to run a political campaign for the purpose of gaining skills that will make me a better military officer, even though that political campaign may bear little resemblance to my career aspirations. We shouldn't to cater our mission set and operations to the

civilian career field, if people wanted those types of cultural models and style of "mission" they would have joined a more appropriate leadership development organization.

# How do we reconcile the perceived disparity between the individual outfit experiences and overarching Corps standards and values, without diluting the identity that so defines the Corps experience?

Having a certain amount of objective performance measurements that will keep outfits accountable to what the corps must teach. It is important to actually enforce these standards, harshly if necessary.

If a cadet doesn't pass their pt test, they should be removed from the corps. If all of an outfits fish fail their classes, they should be disbanded.

The outfits should be given the expectation of performance, given the opportunities to coarse correct if necessary, and punished if these do not occur.

The different experiences of outfits, so long as they all result in the same corps objectives is a good thing. It makes the corps rich and deed in character. Allowing outfits to take different training approaches it what allows of leadership, personal responsibility and development.

https://texags.com/forums/16/topics/3445742

Allow companies to have a MAJOR say in their individual unit leadership and embrace those diverse outfit personalities. It is a good thing that units have different strengths, weaknesses, and cultures. Some focus on intramurals, some on heavy ROTC involvement, some are engineering outfits. THATS OK. Also establish more male only companies.

You let the outfits remain individual and keep their fish

Being in the Corps and being in a specific outfit gives us the opportunity to have some sort of drive. The buddies that you make during FOW are your lifelong friends.

More inter-outfit competitions and events

Ensure that the Standard is the defining document that unifies the entirety of the Corps. Too many times have I heard that "we don't do that in our outfit"
or "that's just how we do things in this outfit" even when the Standard explicitly says otherwise. Room standards are an excellent example of this, with different outfits imposing different standards. It makes it difficult to have a unified Corps when portions of the Standard are explicitly ignored.

Individual outfits promote hazing, end of story. But over bearing Corps staff makes "leaders" simply follow orders passed onto them, and scream it down on the people below them.

Where is this perceived disparity? The outfits create the competitiveness and family within the overarching corps. Everyone is a cadet and should live by the values of the corps and university, and follow the outlined standard. This has nothing to do with the outfits.

By pushing the standard not taking the fish away.

Stopping making the overarching Corps standards things that outfits feel like they have to fight. If the attitude of the Commandant is one that the outfits disagree with, of course they will fight back. Instead, let large scale workouts become an event that happens weekly or biweekly, that cadets look forward to.

Outfit experiences have gotten too large. I agree with the fish brigade idea as long as it is measured. I think FOW should be at least 2 weeks. We are not training soldiers here we are teaching adults how to march, shine their shoes, and communicating the overall Corps values. The fish Brigade idea needs to be toned back but I think it is part of the solution. The other half is patience and greater discipline for those who breaks those standards and values.

Have a baseline standard for the corps and make it higher than what it is now. Then, allow outfits to set even higher standards if they wish to do so. The major issue with overarching corps standards is that they are low and disappointing. It's incredibly easy to make it in the corps by doing the bare minimum, and that's why people feel more attached to their outfits as outfits can hold their cadets to a higher standard

I'm not sure I see this issue. Outfits should be unique in their development. Some outfits prepare people for the military, some are more focused on stem activities, and some are focused on preparing people for the private sector. Every commanders intent should be checked to make sure it aligns with the universities corps values, but at the end of the day, we're all in the same corps and we all have respect for one another no matter their outfit/culture.

It first starts with having a cohesive vision of that corps is across the board from our MAs and OAs. As a cadet I do often hear about one thing that is going on in the wings that is okay to MAs in the regiment. There is no cohesion across what they want from cadets. OAs and MAs need to be better trained to know what is expected of the ENTIRE corps.

Secondly what is the corps experience. That is a term that gets thrown around a ton but doesn't have a definition. This term needs to be defined so that cadets can execute. Until it is defined we will continue to give new cadets the cadet experience we had as fish.

Look back at the early 2010s and see what was working for the corps then. It was bigger than we are now and was producing quality cadets over just going for quantity. While the March to 3000 is great, it is only beneficial if we are producing quality cadets with outfit pride.

The corps experience is defined by outfit identities, it has always been this way. Any possibility of an overarching corps attitude, experience, etc was lost with Earl Rudder. All males and integrated outfits cannot be held to the same standards as one will be pushed too far or one will be dragged down to a lower level. This is pure science, not hypothesis. Without giving individual leaders the ability to tailor their leadership styles and methods, not a single leader will be built within this quadrangle.

We keep the outfits intact but ensure they are very aware that unacceptable performance will result in corrective action within the outfit.
By providing metrics for performance, providing opportunities for evaluation, encouraging cadets to engage off the Quad, providing guidance (not instruction) on these options, and imposing localized corrective actions to ensure compliance, Corps standards and values will be emphasized as the floor with the expectation that falling through the floor will have unwelcome repercussions.
This means providing monthly metrics on performance of the fish as a class - retention, grades, military performance, and -- big one -- campus involvement. Fish cannot just sit in their hole when not in class. The metrics should be adjusted monthly in light of expectations, such as a reduction in attrition throughout the fall semester from the end of FOW to the last day of the fall semester.
Metrics for performance will ensure compliance with Corps standards. Feedback from cadets will likewise

ensure compliance.

As part of a regular monthly evaluation, cadets could identify what leadership positions they have on and off the Quad are any positions of interest to them. The Outfit Advisor, in reading the monthly surveys, could provide a link for that cadet to learn more about the leadership position of interest.

Feedback from Outfit Advisors can raise retention by recognizing those on the bubble and determining if a transfer to another outfit is the solution.

Corps values are provided as an expectation. Failure of an outfit to uphold those values, whether based on Rams or on feedback or on observation, will make clear those values are more than words.

The Corps experience should be more than the outfit experience, so part of every Outfit Advisor's job must be to review the extent of out-of-the-outfit involvement by every cadet. Has the cadet joined a pre-professional society, a council, any on-campus organization, or any speciality units within the Corps. Well-rounded means get off the outfit hallway and get involved.

Nowadays, that involvement outside the outfit is going on the resume. We need to encourage (expect) involvement outside the outfit, whether in the larger Corps or on the campus. This is how cadets get jobs or positions.

Notably, the concept of intensive time-specific metrics, regular evaluations and sharing of expectations, including leadership off the Quad, does not require the logistical challenges contemplated in the announced concept and remains consistent with the representations made to current cadets and - most importantly - prospective cadets and their families - over the past two years.

As someone with a home outfit of a strong and mostly healthy outfit culture, people are worried change will mean the death of the place they call home. I think there is room for both an outfit experience, while still pushing a larger corps of cadets experience.

Happy medium -> Fish Academy WITH fish living with their respective outfits. I think we do a lot of good things during FOW and a lot of issues then arise when the rest of the Corps returns. If we were to expand the "FOW experience" and have these "training outfits" not immediately end after FOW but go on for a little longer (2-3 weeks?) that would both give the freshman an opportunity to learn how college works while instilling the values of the Corps as a whole before then being introduced to the Outfit Culture.

There should be more interactions between outfits, outside of their respective groups. Maybe more events that involve the entire Corps or at least a mix of different types of outfits that may not interact as much.

In short: there isn't a disparity between outfit experiences and overarching Corps standards and values. Outfit uniqueness is one of the most important attributes of the Corps. I am a freshman and already have more pride in this university and my outfit than most people will ever have in an organization they are ever involved in. Texas A&M thrives on the saying, "from the outside looking in you can't understand it. From the inside looking out you can't explain it." The Corps of Cadets is at the heart of this truth. We are not perfect, but that's to be expected. We say that the Corps is a "leadership laboratory", which would imply that it's an experiment. An unsure attempt to better yourself and those around you, particularly in the forms of physical fitness, leadership, and mental and moral development. This means the Corps will never be perfect, but that you make mistakes now so you can learn from them, and become better for our career post-Corps, whatever that path may be. Having a personal connection to those you lead has been the most important aspect of leadership that I have seen (and not seen) in my semester and a half spent in the Corps. Taking fish away from outfits will have results yet to be known, but one thing is sure to happen: Direct leadership (and the ability to follow) will not be developed. Life will be hard, and fish year prepares cadets for this reality. It shows that the things worth doing won't be easy, but that's the point. At the end of the day, I have two main points that I will stand firm in: direct leadership and follower-ship that outfits develop is a core element of the Corps of Cadets, and that a student lead Corps will never be perfect, but that failure is the best way to learn .

watch it become the best leadership development outfit there ever was!

You need to get cadet buy-in to the corps mission. That comes from choosing a staff that isn't just people who want to leave their outfit. I do not mean to be rude to staff, but the overarching similarity with them is that they did not enjoy their outfit so they left. Now these cadets who are not well respected are breathing down everyone's neck which causes animosity. Having a staff that actually has respect would carry more authority. Staff should not be a place for unpopular cadets to bag out and assert power. Staff has a role, change that.

Give outfits more opportunities to interact with each other. You could even implement some form of "sister outfit" system that pairs outfits with each other from across the quad to participate in combined training times. They could even compete with each other for cadet challenge to further encourage camaraderie. If outfits communicated and collaborated more they would have a better understanding of each other and their respective identities. Over time they could even influence each other and fix some of the tribalism in the corps.

I feel safe within my buddy class. What truly is the Corps experience, if not that?

Firstly, I believe the commandant talks are the first step in establishing a consensus. Second, as much as military advisors are seen as more of an annoyance than a helping hand, we must employ them to identify when command teams are straying from the Corps identity. I am not a fan of throwing people under the bus, but I recognize that I see this in my own outfit. To create a collectivized understanding of Corps identity, we must start meeting more frequently. Only seeing other outfits at discipline briefs and commandant speeches is concerning. I see the value in separating the fish. However, I believe that the fear is we will produce subpar cadets softened by unproductive cadet leadership and leadership chosen by nepotism. Fish struggled this semester to adhere to the bare minimum. The question is whether putting them into a larger basic training environment will better or worsen that.

Individual outfits are what makes the corps great, they allow for cadets to grow in comradery and have a shared identity. I don't see a problem with these strong outfit cultures because they show that people care strongly about their segment of the corps. In a way it is like a state and corps staff is the federal government. They work together but certain things are left the the states, or outfits, because it is more beneficial for them to focus on it. We are unified in our values and our love for aggie tradition but we go about that in our own way with certain outfits having key identifiers. In regards to the final statement, I think the corps experience would be nothing without the outfits because they help define the fish year

experience. There is a reason any time you ask an Old Ag what year they were in the corps, as if by instinct they include their outfit, it is a part of their identity.

I would just do more things as a major or minor unit. Last semester 7th battalion did a competition over a week, and it allowed me to talk to people who lived on the floors above or below me that I had never met. I would also use SOMS just to talk about the Corps standard. I understand the need to focus on the theory and study of leadership, but just discussing the Standard in a SOMS class and telling people why we have it would make more people understand the reasoning behind it.

Perceived by whom? This sounds like trying to solve a problem that either doesn't exist, or has been exaggerated to something it isn't. And define "disparity" - unlikeness or unequal? Throughout the history

of the Corps, different outfits approach things with different fervor. That's why there have always been two or three "Bloody Cross outfits" and three or four "Bonfire outfits" and some outfits where General Moore was their goal. This is what makes the Corps the Corps. If my outfit was successful in their internal motivations, that was a sense of pride that we carried around the Quad. That doesn't make my outfit inferior or your outfit inferior - we all add to the overall contribution that the Corps of Cadets gives to the University as a whole. Your outfit focuses on PT? Well, my outfit focuses on grades. Who's better? It doesn't matter! The outfits are a combination of the melting pot of cadets that decide to join the Corps of Cadets. All of these outfit 'focuses' can 100% still exist while adhering to the 'overarching Corps standards and values'. If they start to pull away from those, address them individually - this is not a "one size fits all" issue that needs to be addressed.

The corps experience is built on the outfit you join. You do not get a corps experience, without an outfit experience, like 150 years of corps before us.

Give more tangible missions and tailor it to the outfits. I was a MU recruiting officer when march to 3000 first came out. I did not know how to tell my outfits what they needed to do to accomplish it. There was no quota they had to reach or a number they needed to maintain. It was just a holistic number that needed to be reached by the Corps. Give a mission for people to rally around and they will give their best effort. Values are done from the ground up, not top down. Other than the ones that have been passed down from generation to generation of cadets, talk to the cadets and ask them what their values are. In Air Force terms, weather does not think the same as fighters who are not the same from bombers, finance, coms, etc., yet we still share the same mission of fly, fight and win. The Corps can be the same way. I know, from a wing level, that outfits think differently. Give them a shared mission with values to back it and they will show their best. In short, outfits think differently, give them something to apply it to.

We have an identity within the Corps by simply putting on the uniform and earning our Brass. And that is EARNING not being given, not being pinned, earning it. I was a cripple my freshman year and did everything I could to earn that piece of medal, and I continue to do so every day.
The focus needs to stop being put on the Corps as a whole and back onto the outfits, because those are our families. Those are the people that we interact with on the daily and who will marry us and bury us. Outside of the Corps, we're all seen as cadets no matter what, but within the Corps, we should be able to honor our outfits, because that's who we are. Yes, I might be a member of the Corps od Cadets at Texas A&M University. But more importantly to me, I'm a Hell Raising Rebel of the Lonestar Company class of 2024, and I'm damn proud of it.

Evolving the Corps experience is one thing; proposing a change which would fundamentally gut the Corps training model and wreck the formative weeks and months which create outfit identity without any prior dialogue with students is another.
Outfit culture is a precious part of what makes the Corps special. Yes, when too far separated from the Corps itself it can cause divides, but isn't that the same for societies around the world? In my eyes, the Corps' Outfit system serves as a laboratory for international/intercultural exchange and cooperation, as while we Cadets may be split into many outfits with different hump-its, traditions, training styles and code-phrases, we all come together to form a cohesive community despite our differences, just as nations and peoples cooperate despite their differences. Taking away the formative time that creates and fosters those distinct cultures would turn the Corps into an unrecognizable mush of centralization.
All in all, communication need to be much more open, and much less secretive and threatening. Reforms such as the one previously proposed should be discussed openly, not handed down with no chance for general student input. We shouldn't have CTO/Advisors giving mocking or threatening warnings to Cadets about sweeping future changes being handed down, traditions being removed or privileges being revoked! (See: RVs)
Also, I'd urge that we hire Advisors who wish to foster and improve Corps culture, not remove it out of disdain. Too many times have I had SOMS instructors who turned the classroom into a soapbox to talk about how much they hate the Corps model and how they wish it would fit THEIR vision instead. We've created an environment where the students and Staff are fundamentally disconnected, causing the students to feel like they've been treated unjustly and the Staff to, in our eyes, act like uncaring authority

figures who want to form this organization in their image instead of forming any sort of dialogue with students outside of Corps Staff.

No idea

The individual outfit is the identity of the Corps experience. It's not meant to be uniform. There are similarities between the Standard, landmarking events (such as Brass), and general activities. However, it is the "little T" Traditions that define how each member of the Corps experiences their time here. I don't know how many stories I've shared or heard talking about the Traditions that my outfit has compared to others. How our Brass was different. How our PT is different. The only perceived disparity is from those who aren't experiencing the day-to-day of cadets and only seeing the bad. If the Standard and corps values are something you truly care about, then make changes to the Corps that make cadets care about the values.

Outfits have got to know all rules apply to them. Was surprised to see this issue. While I was and am a form Old Army Cock Company CT, (C-2), I was always proud of being a CT...

Make the Corps worth fighting for. People have fallen back on the outfits for everything because no one likes or respects the Corps staff. They're all just pawns in this "cadet lead corps" and have no real say in things. Outfit leadership are the only people that have day to day interactions and the ability to bond with the underclassmen. If you made corps staff more available and more powerful then maybe people might respect them more and then in turn respect the Corps they represent. People dont wanna do the Corps humpit because to them its some stupid little faint attempt at unity when in reality they dont respect the people that try to push it

By letting outfits teach their own while keeping a light eye on activities, but do not interrupt with tradition that has kept outfits and the corps running. Do not split the corps up from each other keep us as separate but whole.

Keep the hallways and outfits the same and have meetings once a week where the whole corps of a certain class meets and discusses a topic then breaks into smaller groups comprised of cadets from all branches of the corps.

When my son was a fish in E2, the outfit tradition was that the Fish rooms had to be identical. So, they were not allowed to have books out, since they were taking different classes. Yes, read that again, fish were NOT allowed to use their bookshelves and had to keep their books locked up in their footlockers (except during CQ) (And during CQ they were encouraged to leave the dorm and go study in the library, due to an alcohol issue in the dorm.) DUMB tradition!!! Thank God General Van Alstine reorganized a few things his first year.

Maybe there needs to be a Standard on what a fish hole standard are, that is Corps wide. (What they can have on their desk, in their closet ..... when are they allow to have a dorm refrigerator etc. )

Is there currently a cadet court? If not, there should be. Another way to teach leadership, is by having a jury of your peers.

The identity that defines the Corps experience is reflected in the diversity of outfit interpretations of leadership, training, morale, traditions and social structure. Outfits should be granted the freedom to diverge from the status quo of procedures, to experiment and fail. Instead of eradicating decades of beloved 'small t' traditions, instead, pass guidelines and intermediate when specific outfits are out of line rather than punishing the entire organization.

Not be afraid to disband outfits that are causing the major issues. Or the problem cadets themselves. Overall the system works because outfit cultures are different with the same underlying values. It's the bad weeds that need to be cut out and sends a message to show that discipline and values matter.

isn't bad, the problem isn't our method, it's our execution of said method that needs to improve.

Making the Corps of Cadets as a whole develop more culture. Make major unit nights where people can get to know each other. Have more corps wide events where people actually congregate. To develop corps experience and standard, to where people are more loyal to the corps, help them get to know other cadets. Collaboration between outfits, creating new culture in the corps of Cadets where people value it more than their own outfit.

People will always be loyal to their outfit that will never change.

Outfit experience has defined the Corps for as long as I have heard from (back to the 80s). In my opinion no 2 experiences should be the same. There should not be one corps experience everyone gets. This isn't a theme park ride, it's a journey

Hold outfit cultures responsible. Hold outfits who preform below the standard accountable. Allow outfits who preform well to continue their culture and experience without in acting changed to harm those outfits. There are already metrics taken from retention, grades, recruitment etc.

Outfit Culture should be unique and obey to the standards mostly. However, going in and changing long established traditions for the sake of "Leadership" isn't going to fix the problem of low numbers for Corps attendance and recruitment.

Emphasize outfit cultures, don't coalesce them. Highlight Ol' army, and the traditional ways of doing things; find the methods that work.

If we're using other institutions as comparison, see what they allow that we don't, and start un-restricting the options of cadets.

Focus on quality and attitude of cadets, not the quantity. Make it harder and more prestigious to remain in the corps as opposed to keeping it harder to remove cadets who refuse to grow/participate. (I.e. brass should actually be earned again, not a certainty of being given)

Disparity is going to happen when you have different leaders, different cultures. My suggestion is identify outfits that are underperforming, take them to learn from outfits that are outperforming. What are the best practices that got them there and then challenge those outfits to implement them. That is what has always happened in every organization in history. The Japanese learned Six Sigma and manufacturing from us - and 30-40 years later we are back learning it from them. Don't destroy or try to make us all "same," let diversity of culture and style develop and build outfit best practices. You might be surprised what you find when you learn from the best outfits. C-2 was one of the better ones - and most of what made us great was not what the Trigon thought would make us great. Trigon leading an outfits culture is the dealt knell. This is not the military - it's more like a fraternity with a military framework. When graduates leave, they are ready for military or civilian life.

If a standardized fish training camp is to be put in place for the reasons meantioned in the facebook post to former Cadets, it must be very careful to not violate the Corps experience and the integrity of the leadership development model. Keeping that in mind, it would be wise to keep freshman grouped together with their future buddies within the larger group as to develop the values so central to the entire Corps together and seamlessly translate them into their outfits and outfit cultures. By holding the Corps traditions and values as the base to build from, freshman Cadets can bring that into their outfits while maintaining the buddie unity that is so essential and necessary to developing fish year.

Aside from the freshman, as the Corps changes in ways many do not understand, the natural response is

to turn inward to what you do know and can control, thus so many are more loyal now to their outfits than the organization as a whole. To restore pride in who we are as Cadets and to maintain leadership development, we must be confident that we truly are a Cadet led Corps. First we must establish the ability to communicate with those who make decisions, as to not see this as some sort of ploy against what we stand for. Second, the leadership that is placed over us should be the ones driving the Corps into a better future. Those who have put themselves forward to take on the heaviest burden this leadership development course has to offer, should have the understanding of every Cadet, and with it they have the task of leading us and being a GOOD leader. One who cares for those under them and acts on their behalf while listening to the voice of the people.

Outfit differences can be good. This is the value of diversity at work: different strengths complement each other. As long as they remain in line on the main principles, our corps values.

I don't believe there is a disparity created by outfits like the corps thinks there is. I think the disparity is created by the corps and how it only works with certain outfits while leaving others in the wind. It never gives outfits the spotlight on the Corps Instagram or recognizes outfits for their hard work, most outfits do things in the name of their buddies, upperclassmen, and underclassmen not necessarily the Corps as a whole. Most outfits also have so much history that if you take that away you go against cadets being the "Keepers of the Spirit" and simply college students in costumes advertising something that no longer exists or practices what it preaches.

I do think there is some disparity, however it might be a good thing. There are things we need to standardize such as drill, uniforms and rooms, however if we want cadets to feel connected to the corps, it has always started at the outfit level, NOT the whole corps level.

In regards to unfortunate outfit experiences, those that are not meeting the Corps standards and values seemed to be repeatedly disregarding that. The chopping block of getting rid of outfits does exist and is always a possibility. The Corps is supposed to prepare leaders of character for the global leadership challenges of the future. Each outfit has their own character, same with the Corps. However, the outfits fit into the Corps, outfit experiences should figure into the standards and values of the Corps, that's why there's a standard that any cadet can go and read anytime and there is a campusology of the Corps Values and we discuss endlessly what each mean in general, how they apply to us, and how they affect others around us. The standard is a guideline, the outfits should be allowed to be a little tougher on grading and/or training like the military, WITHOUT breaking the law. Crack down in academics or uniform/hole standards, etc. Again, if there are outfits that don't fall within those Corps standards (like way out of left field) a sit down should be had, warnings given, then a final date of expiration if needed. It wouldn't taint the Corps experience as much because numerous chances are given and we are a strict training environment-we are the best of both worlds involving military training and civilian life. We should be treating it as such instead of too lenient on one side of the spectrum with an outfit while being on the complete other side of the spectrum for a different outfit and insanely strict. Standard applies to all outfits and should be evenly executed to the outfits so both Corps experience is maintained while not destroying outfit culture.

The disparity is what makes us better and push harder. If it was one corps cadets wouldn't compete as hard.

Have more full corps functions that are casual and allow for outfit intermingling. You currently have an outfit that does a back porch event where everyone can come together to relax and have a good time. This should be corps sponsored.

You see the same issue between platoons and companies in the Army, and frats in Greek life. But they both put forth the effort to have communal events that bring everyone together.

There were absolutely zero fun, non ultra structured events that brought the corps together when I was in, and as such it was an us vs you mentality. You break this through relaxed communication and shared experiences.

The band accomplishes this very effectively because we do a lot as a major and minor unit. Yes we have individual outfit cultures to an extent, but none of us feels disconnected with people from other outfits. All classes are expected to show respect and stay true to their roles and leadership development model across the outfits within the units because we view ourselves more as pieces of a collective whole than complete separate entities that happen to wear the same uniform. Freshmen and sophomores are expected to whip out to all upperclassmen and stay as respectful with those upperclassmen as their own, including sophomore etiquette. The Corps implemented minor units recently, so I think this would be the perfect time to start instituting this kind of culture Corps-wide. It would create more unity across the board. While the band does have practices every morning that help us be more unified, we also do things like minor unit battalion weeks where each battalion does training times together for a whole week. We also have some events that are band-wide, like a band-wide tug of war about two weeks ago. It would probably be difficult to get this implemented at first with people always being resistant to change, but I think creating these policies and having minor unit staff and outfit leadership diligently observe and make sure they're being met could help the Corps have a more unified front.

This is a good question. You get this right, and you can build great leaders with alumni support.

1. Keep outfit time/training sacred in the afternoon. Make sure outfits are training and have a plan to improve in PT, academics, and inspections, especially for white belts.
2. Encourage participation and increase the number of Special units across the Corps giving choice to Cadets to participate and build relationships with others outside their outfit. If you keep the standard outfit time sacred, but encourage Spec Units you can get the best of both worlds.
(Not a 100% sure on this next option) Give the fish opportunities as well to join more Special Units that are only fish. Make these Special Units challenging and rigorous so if a fish decides to participate, he/she are not looked down upon by their buddies or outfit.

Lastly, have increased participation by the Commissioned officers with the Cadets, doing outfit stuff and good bull. Bridging this gap will win the hearts and minds of the cadets.

We need leadership in our country, and the Corps is a unique opportunity to get it right.

Gig'em and God Bless

Empower Major Units to uphold the Corps standards with the outfits under their command. Grant them the authority to discipline outfits and leaders for failing to uphold those basic and overarching standards without diluting the uniqueness of the individual outfits. Issue rams and have people walk it off on the weekend or even hold disciplinary hearings if the situation warrants it. Have members of the Trigon to advise so that no petty tyranny or paybacks take place.

Universal 2 week FOW. You can even have a fish dorm during that time to standardize training. But 5-6 weeks away from the outfit only makes fish year more complicated and you loose the essential experience that builds buddy unity and pride. Outfits are what make the corps special from other SMCs. Any old ag will say the same.

The truth about growing the Corps is that you rely upon the outfit experience to do so. The Corps as a whole feels a little bit lackluster. I agree that certain elements of unity such as the hump it and whipping out have fallen by the wayside and I wish that were not the case. That being said the diversity of cultures and experiences that come with each outfit help to shape the corps experience for each incoming cadet. I know several underclassmen that I helped guide into outfits based on their wants and strengths. If they were placed in a giant fish dorm I think several of them would have punched. There is nothing wrong with a diverse corps. The competitiveness that stems from it should be applauded.

Build from the ground up. It's easier to make people motivated about smaller organizations before bigger ones.

The overall Corps is seen as very cheesy and soft, plainly said. Cadets value muddy uniforms and loud whip outs on the Quad, and see Corps staff and the overall corps as a boring symbol of localized beurocracy. Each outfit is in a perpetual rebellious phase, and nobody wants to be the nerd that sucks up

to the helicopter mom that is Corps Staff and the adults perceived to be their puppet masters. The image of corps commanders has been bad lately, and nobody aspires to get the position because the position is now for nerds in most cadets' eyes. The corps can adapt to modern times without throwing the old army baby out with the bath water, especially when it comes to "little" T traditions, push ups, etc. People want those experiences more often than not. I think the air force and marine corps do a great job of promoting challenges and both intellectual and physical, by having a challenging attitude and backing it up with day to day life; they also suffer less in recruiting. Big Corps should value true grit, brains, and the ability to marry the two while protecting cadets from actual physical harm, as well as creating mental toughness through high pressure and not babying adults, as young and immature as they might be.

By giving Cadets a Corps they can be proud of.

The biggest issue is that individuals are proud to be apart of a special unit, outfit, or class. And not as in tune with being proud to be in the corps. I believe that stems back to the management portion of the issue I have highlighted in the first and second questions. We are given too many restrictions on what we can and cannot do.

People will enjoy the corps more if the Corps is more enjoyable to be apart of. Less micro management. Let us actually lead and I believe people will notice a difference.

I know there is an issue when it comes to Oufits not enforcing the standard or even Cadet Values. I think the way we combat this is by making the corps more of the experience that people wanted it to be when they signed up. People want a challenge. That is why they are here, They're not here for a free ride or an easy time. That is why the Corps is not for everyone. If the Corps goes back to the ideals that it can associate with, Honor, Integrity, Discipline, Courage, Respect, and Selfless Service, then the Corps can thrive.

I don't believe Resiliency can be taught in a classroom. It is learned with your buddies in the mud of combat conditioning, or a long run with the outfit.

If the Corps allows us to make mistakes and give the challenge that people want without raining on our parade all of the time then people will want to uphold the standard and be proud of the organization.

I do not believe that this is an outfit vs corps problem. People feel wronged by the Corps due to micromanagement and restrictions imposed and have retreated into their outfits and special units to find purpose.

I am proud of the Corps and what I have been able to accomplish in it. But I know a large amount of my peers do not feel the same way.
I do not believe the proper response to solving this problem is to further micromanage and remove fish, one of the few motivating factors for whitebelts to get out of their racks in the morning, for even a small period of time.
I believe this would further alienate individuals from wanting to uphold the Corps' core values and mission.

I appreciate y'all asking for feedback. I know despite all that is flying around, you all are trying to make the Corps better. Many people may not see that but I sure do, this survey proves it.

I hardly have any leadership or career experience compared to y'all at the top of the food chain. But what I have been able to learn in my short time in the Corps is that incredible individuals of character are forged out of times of hardship. Myself included. If I never came to the corps, I would have been deprived of a life of excellence and would have easily settled for Mediocrity. Please let us keep a challenge that has forged previous generations of Aggies into defenders of our way of life, and of our nation.

I pray for y'all everyday And I know y'all will make the right decision for us, for the Corps, and for future

generations of Aggies.
Thanks and Gig 'Em.

Have more all Corps activities and competitions. Have a water fight at FOW and air out with the whole fish class. I remember my dad talking about a "Corps Olympics" where every outfit put up 1-3 cadets for different running, swimming, and field events. Use SOMS classes to teach fish and sophomores overarching Corps standards and values.

At least in my time in the Corps, most "toxic" outfit culture (ie. not whipping out to females or BQs, ignoring leadership directives) came from all male outfits. While I don't think having females simply solves problems, I noticed that all-male outfits tended to attract people with a more toxic viewpoint causing many of the most toxic cadets to be together and perpetuate their culture within the outfit.

Create a list of non negotiable standards that every fish and cadet must meet. However, also allow room for outfits to set their own standards and rules (ie where covers are displayed in your room, where fish can look in the hallway, etc.)

Give the Cadets something from the Corps level to appreciate and respect. Provide opportunities for networking, summer internships and positive experiences for all cadets not just the ones the Commandant chooses. Stop all attempts by the Trigon to control all leadership opportunities. Show respect to earn respect. The Commandant has said nothing about what the good outfits do well. This entire process has the appearance of a bitter attack by the Commandant.
Stop micromanaging corps outfits. The Commandant slow trailing an outfit on a morning run then yelling at them about the way they conducted the activity is not an example of leading from the front. The actions and behavior of the Trigon staff and their families also reflects on the leadership ability of the Commandant and his staff.
Have successful outfits and less successful outfits communicate about operations, goals and objectives. Some Cadets prefer to be the strong Cadet in a weak outfit. Some Cadets prefer to be a strong cog in a strong outfit. The difference in outfits is a good lesson for Cadets. I was fortunate to be in a good outfit. We include former cadets from other outfits in our reunions.

I mean this completely seriously: look at the Band as a case study. Each with their own individual outfit culture but each exemplifying the Band's standards and values. All unified under being bandsmen and women. Because of inter-outfit involvement and collaboration during band events, we all share that identity. CTs have nothing to bind them together. Service events, special campus projects, mandatory things that outfits do with other outfits in their own minor, major, and entire corps units that give them the opportunity to SOCIALIZE AND BE FRIENDS, not just march or be administrative, will solve most cultural problems.

The cultural problems that arose during the COVID lockdown in many units and outfits were because of a lack of buy-in due to the many corps changes. Buy-in is created by an overall cadet support of the vision of the corps. This decision for the future plan of the corps has so much friction with the student body that it will destroy buy-in and arguably create more cultural problems, if not destroy culture altogether. Buy-in for the vision of the corps, support, is what creates culture.

The corps experience is an outfit experience. Being with your buddy class from day one until final review is what makes an experience. You can't pick your buddies, just like you can't pick your co-workers in real life, you learn to adapt and overcome challenges. I think all outfits should actually be held to (a last year version of) the standard with oversight. I think we also need to remove the rule that if you don't report for hazing then you get the same punishment. I reported someone for hazing and subsequently everyone that got called in for questioning said it wasn't hazing because otherwise they would receive the same punishment, this is preventing a lot of cases from being reported.

Make it more clear to cadets what the culture of the corps should be while not taking away from the outfit culture or experience. (Outfit culture is a large part of overall corps culture)

Don't have a fish dorm

I believe that the outfit culture is the largest unit of socialization a cadet will receive in the corps. I do not believe this is a bad thing. I would say that it is how a cadet chooses to express that outfit culture to other outfits on an individual level, as well as on an outfit wide level, is important to creating the relationships between outfits, that makes the corps culture what it is. I believe that a way to do this would be more interactions between the outfits on an outfit wide level, that wouldn't interfere with the normal training plan of each outfit, such as friendly sport competitions and multiple outfit wide briefs (possibly set goals on a battalion level?).

All I can speak to on this is my experience from 35 yrs ago. I am very Proud to have been in my outfit as we won the General Moore Award, the Jouine Award and placed third in the Hocmouth Award. I am a competitive person and each class in our outfit did what we had to do to accomplish our goals. that also had a wave effect in that our battalion won best minor unit, and the Regiment won major unit awards. we had guys in our outfit that were on Corps staff, Regiment Staff, Battalion Staff. I was proud to be in the Corps of Cadets and i took pride in my appearance and my actions off the quad to not put us in a bad light. i had friends in my Major from other outfits and we would study together.

Have you asked the Unit CO's to provide you with the Outfit semester and year end goals? and an outline of their process to accomplish that task? The Corps is an enigmatic group where you have to build upon the obvious inter-service rivalry (Brigade, Wing, Band and Regiment) and then within that are the battalion rivalry & finally the outfit rivalry.

I am not sure of the "fix" for this I just know that my buddies and I have fond memories of our time in the corps as well as our outfit.

I like everyone that will respond to this has a passion for the Corps or we wouldn't have tuned into hornets nest

thank you for your time in reading my ramblings, I want what is best for the Corps but I also want keep the traditional aspects

The possibility of making Commanders more strict in their training and also in their conduct with the outfit. At the end of the day, the success and detriment of their followers falls on their shoulders as far as expectations, standards, and values.

Again, this is answered in the first response. Thank you.

Great question. I've heard some of the feedback of fISH disrespecting other upperclassman from different outfits, etc. I do not understand that. I was never encouraged to disrespect other upperclassman. I still remember being afraid of Tony Buzbee and that's 35 years ago. He never even made me push, but my upperclassman would never have tolerated me disrespecting him or any other upperclassman. I think you go at it from a concept I learned in the business world called three questions (it can be up to five). In this case each cadet asks in order (1) is this the right decision to make for the United States? , (2) is this the right decision to make for the Corps of Cadets? (3) is this the right decision to make for my outfit? , and finally (4) is this the right decision for my squad, team, buddies p, etc. The trick is, if you answer no at any point, you don't do it. You only get to the lower questions if you've answered the first. These principles should be in the Standard, taught like the Code of Conduct, and recited like the Soldier's Creed.

You don't let the bad outfits fade into obscurity

Communicate about possible avenues the corps wants to take with the average cadet. Outfits typically communicate with their people, the corps needs to do the same. We feel like we have zero control and say in our overall experience unlike our outfits. Let cadets sit in on comm staff meetings. We feel like yall just talk poorly about us without us there, making the divide greater.

You get the Corps experience being in the corps regardless. You get an added bonus of outfit culture depending on which outfit you want to join. I see no problem with having differing outfit cultures because they all should have the same standard of the Corps overall. Some outfits like PT more, others like to do more community service, and have more of a structured and planned out CR event schedule. Others are

heavily involved in corps clubs or activities like PMC, FDT, bonfire, and RVs.

What I think needs to be done is advertise the outfit culture better than it is. On the Corps website where there is a list of all the outfits and a little blurb, most of them are extremely similar and slightly vague. Fish Academy has been explained to me in this way- by the end of their time there, fish will choose which outfit they want to "pledge" to based on how an outfit rates themselves on a variety of focuses like PT, academics, and so on. This should be provided right now instead of changing how the Corps is structured. Providing a better insight on what an outfit is about before fish join in my opinion will help a fish stay in a place that aligns more to their values. Let fish choose how they want to experience instead of watering down the experience for everybody.

Every year, move 5% of a units members to a new outfit

When outfits each have an individual identity, and engage in friendly competition with others, the esprit de corps of the entire organization rises. However, if all cadets were to conform to a single monoculture of the Corps, this individual interest is gone, and there will be much less buy-in. I believe that in order to form a healthy equilibrium between Corps-wide standardization and outfit prosperity, those in charge of this Corps need to lead with a less cookie-cutter-like approach. On some issues, leadership needs to be clear, concise, and impartial in enforcing standards. In others, there is no need to do much more than have a laissez-faire approach. Outfit PT can be seen as a key example of what I mean: leadership ought to let an outfit tailor its approach to physical training times in a way that alligns with the way it sells itself. At the same time, standards still need to be in place so there aren't outfits that do walking laps around the quad while others sprint to Madisonville and back. With adaptable leadership in mind, leaders could set a something in place like the following: outfits can do what they want for PT as long as it does not endanger physical wellbeing (can be anything from a focus on rec center workouts to an emphasis on long distance running across campus), and as long as they are posting good PFT results. If either of those are not the case, outfits could be dealt with on a case by case basis.

My point for that example is simple: that outfits can be allowed to do things "their way," as long as "their way" gets quality results and does not negatively impact the members of said outfit.

By admitting any disparity is " perceived" you answer the question. The whole is only as good as the individual smaller units in it, who each struggled to be the best. Without unit loyalty at a " lower" level, loyalty to the larger organization won't be possible.

Do the corps hump-it more than twice a semester, if it was practiced before or after formation you'd have significantly less cadets mumbling the words across the quad. Give cadet MU leadership the space and responsibility of keeping their MU unified culturally and aligned with Corps values.

Outfit pride doesn't dilute the corps experiences. It enhances it. It is sad that you look at an outfit that has strong pride a love for this school, involvement off the charts, grades off the charts, more leadership than

any outfit, with the best retention. You see something that doesn't Aline with the corps standards and values. Why not learn from those type of outfits and try to create more. The most successful outfits have alumni organizations and have a sense of pride that dates back 20-30-40 years. That is one of the reasons the corps is so special. Also you're wrong in how you perceive the outfits who have deep unity. You see it as a threat to the corps and disrespectful. Well the reason I love the corps is because of the outfit. And I would say there are a bunch more like that too.

I think the corps experience is derived from the individual outfit experiences. My grandfather who was in the corps loves to share his experiences and in 1961-1965 the experiences he shares were those within his unit. Whenever I am with my buddies and we are sharing things that impacted us most during our time in the corps, it is always the experiences within our outfit that are shared. I believe leaning into the outfit experience and making that truly the identity of the corps would be huge. Give outfits opportunities to grow together and strengthen that experience. Good leaders, good accountability, and a little difficulty will hold outfits and groups of people together through strong bonds formed. Give outfits the opportunity to share their experiences and give outfits chances to build experiences together. Activities within and outside of the corps. Involve the corps more into the campus life at A&M. Encourage members of the corps to gain more leadership experience outside of the quad within the student body.

Again, the answer may be that less is more. With over forty outfits there may be too many choices, and too many to police in a uniform sort of way. The rather large number of Major Units will further hinder having a "core" set of standards, values, experiences in the Corps.

This question barely makes sense. Two disparities are mentioned: the ones between outfit experiences, and the ones between the corps standards and the outfit "standards". Outfit experiences are supposed to vary. Otherwise they would lose identity and simultaneously, incentive to compete. We can see this issue in some units with no clear outfit identity. I once overheard two butts talking about how their outfit, sq. 3, was functionally the same as sq. 12. With the o Lt difference being the people, and they found that to be demoralizing. However other units, specifically the all-males do this very well. The difference between K-2 and C-2 is striking, but they both have shared corps experiences. The issue with standards can be fixed. Clearly outline the incentives to follow the standards and show why it's important to follow them, and punish those who don't. This goes for all standards. I have seen many corrected about slight issues with their hair or uniform but people who are extremely overweight and can't pass the pt test are allowed to stay. That doesn't make sense and every cadet sees it and feels less inclined to follow any standards if the staff is picking and choosing which standards they'll enforce

We don't have to fix this, Outfit culture is what defines the Corps, and gives us all a unique opportunity to learn and develop. If I didn't want to learn or be led the way I want, I would have joined a different outfit.

You uphold the Corps, and ensure all your subordinates are doing the same. If a individual is holding their unit above the Corps, then that individual needs to be retrained or coached if possible, or removed if it's not. It's up to their superiors to make that call, and live with the consequences. If you are fostering an environment where expectations and desires are clearly communicated and enforced, there's no easier way to say this, the trash will take itself out. You cannot sabotage the Corps, only your role in it. It's not an answer many want to hear, but the organization will always be more important than any individual, group, or unit.

The more important question is what do you do once the call is made to remove an individual or unit from the Corps due to their inability to achieve the standard? You communicate that. The ability to make the right decision is one thing, but making sure others know why that was the right decision and using it as an opportunity to coach and mentor others is far more valuable. Every organization has its failures. The ones that stick around are the ones who address those failures in a way that continues to uphold the organization and its values.

Thank you for the opportunity to share my experience and wisdom. I sincerely hope I have been of some help. Leadership is... difficult in practice, and easy to criticize. Whatever you decide to do, I hope it proves

fruitful. These cadets deserve every opportunity to become true leaders, something that is needed now more than ever.

Not an easy answer. I am not going to pretend to know the answer to this one!

You don't. While the Corps is a venue for ROTC, it is also a leadership training opportunity for mostly non-regs. Units hold up to The Standard or they don't. Continued failure to meet The Standard results in units being disbanded.

For nearly a century, Cadets identify more with their individual units than with the Corps in general. My best friends in the world are my Aggie buddies from the freshman year all the way through the Senior year. We learned together, we played together, we fought together. That cohesion formed life-long bonds in addition to the training.

No, I feel a sense of pride when I go back and I see the Challengers forming up on the Quad.

Can you genuinely say the identity of the corps experience hasn't been diluted as is over the past few years? Especially following Covid, it has felt like that was used as a catalyst for making far reaching changes. At least my experience people take more pride in their outfits because they feel there is still some opportunity to have influence on making a difference compared with the larger corps where more often changes are forced upon the cadets without any conversations.

Each outfit should be allowed to have its own culture. it allows for a unique experience for each individual. Outfit culutre and uniqueness is what makes our corps special

This is no different than barracks in the Army. The Bulls as leaders need to be present amd part of those teams, holding the outfits to a standard.

Stop jock outfits from being all about look at me, and individual pr shirts (outfit shirts and hoodies should be enough anything off uniform should be corps stuff).

Maybe it's a good thing. It's very possible that a majority of people join the corps because they think they've found an outfit that achieves everything they want to achieve in the corps. I think the corps offers a great experience that is only heightened by outfit diversity to better suit the individual. If an individual doesn't like the corps, most likely they simply don't like their outfit, but can't tell the difference. So, to prevent this, maybe fixing outfit recruiting to give a real (not biased) picture of their outfits' cultures to future leaders could solve this. Just food for thought, definitely not a refined idea.

The Corps experience is to have an extremely hard fish year. Not a semi-difficult first semester then immediately forced into SOMS "leadership briefs." That has never been a part of the "Corps experience" and nobody that I know joined the Corps to sit through briefings. I joined the Corps to be pushed to my limits which has made me into the leader I am today. It is sad to see the freshman class stripped of this opportunity in the name of "retention." QUALITY OVER QUANTITY. If someone can't handle getting yelled at because they can't wire a uniform properly, they should not receive their brass.

Start by uncovering what great outfits do right. Capture those processes and procedures. Build out unified Corps training based around the Standards. Bring cadre in early and train on those standards. Create the wanted guardrails and allow Corps to work within.

FOW should extend into first few weeks of school but with the outfits and trained cadre in charge. Allows fish to adjust to class cycle, studying and Corps expectations. It will take dedication from military advisors to be present during that time to ensure cadre only interaction.

Sophomore training during first few weeks to match timing of fish fully integrating in outfit. Define what is expected of them - hold high standards and push fish to chase excellence in all they do. Can be stern without the abuse. Be honest about what the abuse can do. These are adults, treat them as such.

The outfit traditions should be understood by Trigon. New military advisers should also get a training from the cadets. What's important to that outfit and why, how can MA help, etc. this will help their adjustment also.

The plan shared has merit. Just needs to be vetted with stakeholders and asked all to find common ground.

Use key leaders to reinforce corps standards and values and then integrate with outfit traditions to exceed corps expectations. Have meeting with outfit leadership to set up what outfit culture looks like that reinforces corps standards without killing outfit individuality.

Standardized core principles that every Corps outfit must adhere to and exhibit, with the outfit identity as a second place to core responsibilities.

I covered this in my answer to the first question, but my main concern is the fact that the freshmen will now have incentive to form cliques within the fish Academy, and will have an even harder transition to outfit-life later in the semester because of the friends they have made in the fish Academy.

What disparity exists? Could you provide examples? What is the "identity" that so defines the Corps experience? What is the problem?

See the thing is the individual outfits and their identity makes the corps the corps, because other than that you are basically doing the same thing and there is no difference in which outfit you choose. The court is fine the way it is and if you think it's wrong, you're wrong, yes something can change in a slower way if you automatically force people to change your not gonna make a productive environment you're going to kill the corps. The identity of each outfit is what makes people want to come to a certain place. I've talked to people about it, and there's almost no difference between the corps. If you do it on a fundamental level, the only difference is CT and BQ, and the ROTC and that is the only difference fundamentally. It is the culture of the outfits that makes people want to come and stay it is 17 culture and their legacy children that makes them come and stay it is sixes legacy that makes people want to come and stay. It is E2 Culture that makes it come and stay. What would make us different than a fraternity with these changes what would make us different from West Point, and those other military colleges nothing we are the core of cadets. We are a senior military college of Texas A&M. We have non-reg. We choose the core because of the heritage we were promised we were promised to go into and be apart of.

People pick outfits based on differences

I do not see a big enough disparity between outfit experience and corps experience to justify keeping the fish from their outfits for over a month. Everyone and every outfit is supposed to be held to the same standards outlined in the standard and guidance from staff, so if anybody or an outfit is not upholding these standards and values, the problem seems to come from a lack of accountability directed at those outfits not a faulty system and definitely does not require the need for a restructuring of the whole system. I think that the solution should involve more accountability being enforced from upper-level staff leadership rather than destroy generations of individual outfit traditions. There are two ways to build up the corps identity. One is to promote it and work towards a buy-in from cadets and the other is diminish outfit identity, which I believe is the direction these changes are directing the corps and is completely wrong. Outfit identity is a huge part of what makes us unique and what keeps people engaged in the corps and gives them a purpose and a "why". I understand the desire to want to build up a greater corps identity, but this can definitely be done without sacrificing the tradition and heritage that every outfit holds so dear.

The truth is that even if changes are made, current sophomores and upperclassmen (most not all) say they don't plan to change (all male outfit); fear will prevent others from speaking up with what happens after hours when no adults are around to check in or supervise (we've seen adults around once or twice

and it's when negative stuff went down - hazing); when students get to be fake leaders they will force those they lead to act in a way that goes against the plan when no one is looking. Again some not all. Maybe an anonymous survey should be given to fish to have them ask about how they feel about their current sophomores and juniors since they'll be the juniors and seniors leading next year. Maybe this would help fish be honest instead of fearful of who leads them

Don't think you have all the answers. You don't. Your viewpoint is skewed badly

Outfit identities have strayed into individualistic and xenophobic culture traps. This problem is difficult to approach, because many are so protective of their outfit cultures. I've found that when the corps does activities together, it boosts morale and I personally feel more connected to the rest of the corps. For example, whooping at formation is such a small tradition that we have, but it connects cadets across the quad because we all love good bull. Besides block T practice, Brass, and Commandant Briefs, United Corps activities are few and far in between. Maybe the answer to a toxic outfit culture is exposure to others, which could be achieved through joint training, social events, competitions, etc. with random other outfits across the quad. Whatever it is, the Corps needs to get a little closer with one another and build repertoire, whether we like it or not.

While perceptions are said to be reality, the colloquial is not true. The only way to effectively impact the perception is to communicate communicate communicate the facts that dispute the perception. But the communication cannot be varied, and it must be repetitive, common, and constant.

Start keeping outfits who are obviously lacking physically and grade wise accountable. Allow these outfits to actually pt together throughout the week and form a community that will push them to become the best outfit in the quad, not just in words and slogans. The main problem is discouraging the outfits who are producing good and high speed cadets by threatening the disbandment of their outfit and separating fish into their own dorms, this will effectively destroy the motivation factor that the Corps relies on through the outfits and will create a new norm of complacency and apathy in the corps as they can't be the primary teachers to the fish, rather a conglomerate of juniors who are not in their outfit.

Implementing more corps mpis and commandants inspection

I believe the idea that there should be a singular corps experience is wrong. When I was choosing my outfit, I liked the ability to select and outfit that I perceived to have values that aligned to my own. In my case, I joined a stem focused outfit, and I am really happy with that decision. Other people may chose to join an outfit that aligns closer to their values, and that's ok. As long as all outfits meet the basic requirements expected of cadets, that's ok.

I

Disparity is not the right word. I have no malice to any of my fellow corps members. I have pure love towards my unit, and pure respect to any of the members that went through the corps with me. I wish the corps would spotlight unit traditions so I could learn about every outfit. In 20 years I will find someone from a unit I was not in and I want to remember something about that unit. Getting rid of outfit identity would be stripling away the buy in of the corps. The world works in small groups. We can only handle so much. Jobs and military all have niche small groups that make up the whole.

There should be no issue with this. The perceived disparity is solely based around rumors lack of knowledge and lack of esprit de corps. Corps standards and values should be first and foremost in all cadets minds because it is the CORPS that is the spirit of Aggieland-NOT (close your eyes and pick your unit). If units are threatened by basic Corps standards I can only assume that they either do not meet the standard or they vary so far from it that it is completely subjective. that speaks volumes about their units culture and leadership: they are both weak. The corps experience is after all, what you make it. If the standard is raised and held high, the only units who can have a problem with it would fail to meet the standard anyway.

Just like the real military, some outfits will be better than others for myriad of unquantifiable reasons. The individual outfit experience is quintessential to being a cadet and should NEVER be diluted. It is therefore incumbent that the Trigon, Bulls, and cadet staffs at all levels ensure the outfits maintain standards and values. That is where the true leadership experiences will be gained. Individual oufits should be allowed to continue their own SOPs provided they fall within the Corps standards.

See my lengthy first answer!

When in doubt, look at the example of the Fightin Texas Aggie Band. Each member is in the Band first, then outfit, then section (by instrument). We can argue later if they are in the Band or Corps first!!

Again, don't stick your nose in unless there is an egregious violation of the standard or laws (I.e. hazing, SHARP/Title IX, or extreme MIP/DWI violations involving death or extreme injury). If a unit has a bad little t Tradition I believe you should advise the removal of them. I understand it's a tall order but I believe there is a way to do this.

Move to centralized control, decentralized execution.

When you look back at your Corps career, each individual will have a story. Some are outfit focused, but not all. The culture that exists in an outfit, while somewhat consistent is based more on the names on the doors vs a heritage. Some might disagree, but the reality is that culture is based on who is there now, not who was there 6 years ago or 20 years ago. Set standards for the Corps, get rid of the individuals that are bad apples and protect the Corps of Cadets.

Plan activities between each group to create synergy within and outside the outfits

Make it so that outfits shoot to exceed standards rather than meet them too many people in Comm Staff have told us to just shoot for the standard the problem with this is that people generally fall short of their goals that's why they say to aim high. Additionally the outfits are part of the corps pretending that that aren't will lead to people not feeling as though they belong and get lost in the sea. Outfit culture exists to create a family dynamic that motivates everyone to be better leaders.

The individual outfit experience is what makes A&M different from the academies. Having worked with academy grads, the bond built in the outfit experience builds lifelong bonds to a common outfit.

All leaders whether in the corps or in various schools on campus, the bond of a core group of individuals experiencing different experiences in contract cadet or D&C roles, allows for reflection and growth.

I have personally managed to stay close to my outfit buddies for 30 plus years in both military and business leadership role.

Any program to grow leadership roles without taking this as the key differentiating the A&M Corps experience from other uniformed student bodies in the US.

I like more attention being given to skills needed to learn at different paths along the 4 year experience. In my days, the only leadership training given was as part of the Army ROTC junior year. I personally learned more about leadership in that one year than I ever earned in dorms.

In my mind we need to provide this training. Allow cadets to return to their outfits for evaluation in these roles with feedback given by trained seniors as mentors. Think Army Advanced Camp but seniors are trained to evaluate junior and sophomores in their skills learned and applied. Rotate roles within the outfit for evaluation periods. Is there anything wrong with having three juniors having th first sergeant role in a given year?

We can do this and willing to help in any way.

Mike Munson
1995 Company E-1

I believe outfit experiences are just as vital as the corps experience. As all cadets say the people we meet in FOW and earn our brass with our outfit. Likewise, I believe the corps experience is there to provide structure to the outfits. My suggestion is to leave it the same I believe the corps is not broken. It has prevailed and flourished producing many successful people and it need not change now

The slight differences in each outfit are integral to the corps experience as it gives cadets a sense of belonging. Imagine a normal student coming into Texas A&M and not joining any organizations or clubs. The chance to develop a close community and sense of belonging greatly diminish. One of the largest draws to the corps is having an immediate close group of buddies which outfits provide. The identity of the corps still stands strong, look at everyone out in a uniform day by day across campus. As long as the corps values are upheld in an outfit (which almost all outfits already uphold them) and the 12 competencies are met, having an outfit identity does not subtract from the corps experience, rather it bolsters the experience.

Nothing needs to be changed in regards to the outfit to Corps relationship. Outfits buy in cadets to stay in the Corps. If cadets punch it is mostly because they simply do not belong in the Corps. Also, outfits with high retention rates are the ones with no outfit culture or they have bad leadership. C-2 has only lost 1 fish this year so far and it is not just because of our tradition but rather our deep-rooted brothership culture. There are a lot of outfits that do not have a strong family-like culture due to a lack of identity and poor leadership. Also, stop reinventing the wheel on issues that do not bother cadets like morning formo.

Make the corps more involved with campus activities and orgs. Build a culture of strength and unity that surpasses the individual outfit. Growth through struggle should be the norm across the quad. Most people that I know who punch after fish year cite that the real reason that they are leaving is not because they have an issue with their outfit but because the corps does not offer the challenge that we endured fish year and they feel stagnate and tied down with overbearing policies that restrict leadership, especially with D&C cadets. The corps experience is not unified across the quad. By making it easier, all you are doing is taking away the struggle that we want to experience to make us better. Nothing worth doing is ever easy. As president Kennedy said we chose to be here not because it is easy, but because it is hard. We want to push our limits and find out what we are capable of.

This is hard for a former BQ to answer… but I suppose the overall Corps priority is the selfless service to the university in guaranteeing all traditions, customs, and courtesies are carried out (no matter how bizarre or obsolete) because that is the duty of the Corps to the university. This duty is purpose, and

tradition, and can be an expanded mission set to include all classes of cadets and spur various jobs.

The band had horrible jobs within the major unit that were made prestigious (as only Aggies can do)… jobs like "Instrument Loading Crew." That was a terrible job, but an honor to be part of, and with a leadership chain of command. It was also tradition.

As a BQ, the band performance was my primary mission focus - a direct service to the university. My loyalty was to the band as a major unit first, then my outfit. Most of our cadet training occurred on the drill field every afternoon with the entire band. This would be very similar to major unit cadre training all their fish every morning and afternoon in the fall. This would be very immersive and provide mission, purpose, and jobs to the major units.

My individual outfit training occurred thirty minutes in the morning and thirty minutes in the evening. As a fish, we got snipits of "outfit culture" mostly enjoyed by Butts and Zips.

I see no problem with training fish for an entire semester with sharp cadre from the major units and then sending them to the outfits. They'll have seven semesters to learn "outfit culture."

The Corps may need a "reset" to condition cadets from the bottom up to perform a service to the university first. This is accomplished through the leadership of the major units who utilize manpower provided by the outfits. Standardization is important. Fish unity is important. A challenge is important (physically and mentally). The stressors of the Corps helped me in the Air Force… I could think clearly and make decisions in chaos. The Corps at A&M provided the scripted organized chaos and piled on stressors that strengthened my resolve and ability to prioritize. Even the incessant yelling was a stressor we learned to work through and even tune out.

Reset the Corps by pulling the fish out from the outfits for an entire semester. Train them correctly to proper standardization - blame the outfits for not training the fish and Pissheads properly. Tell the Old Ags to calm down - these are the same people who complain that the cadets are not standardized, look bad in uniform, are not engaged, are not militarily impressive, etc. Make the outfits unified under the umbrella of the major unit. All upperclassmen should be able to correct a fish - there's no reason why the Corps can't take a unified approach to training and standardization. COVID probably really caused some problems.

I'm not familiar with fixed unit culture. B-Battery's culture changed with normal attrition. Outfit culture in the band was driven by the various personalities within the unit… and we really didn't get a full grasp of the culture until we were Butts. Pissheads and fish were focused on grades and Corps training, not culture.

Matt Daniel '93
Head Drum Major
B-Battery
USAF Lt Col (Ret)
Matthew.daniel93@yahoo.com

Diluting the outfit experience is not the answer here. Those first months are critical to demonstrating to young cadets on the value of trust in the leadership of the people they will work with throughout the years of their Corps experience.Deliberate and intentional education and training targeted at outfit upperclassmen in how to train freshmen on the Corps's values is the answer. Think of corporate America organizations…it's the first line supervisors job to educate new employees on the organizations core values so that new employees may embrace them. THEN first line supervisors can have the foundational trust and environment to build their own organizational identity with their new employees.

All the outfits want to say the focus on academics, training, ROTC, ect more than any other outfit. But this is not true every outfit is different because of its history and traditions. We need to encourage and give incentives to the outfits that bring the standard back into a living document. As a fish we just do things

because we are told to with no reason or passion. As we become upperclassmen, we still think the same telling our fish creating an endless cycle. To fix anything we don't change the rules we change the culture. If we can get a corps culture of being redass and an outfit culture that is connected it. The corps experience will improve while keeping the unique outfit cultures.

I loved my outfit experience. My outfit was my family. The corps was my association. I'll admit we pushed boundaries, but overall that made us physically and mentally stronger and smarter in the long run. We thought independently, had pride for what we stood for, and would've given any and everything to help our buddies.

Outfit cultures are not at odds with "corps culture", whatever that even is. For example flight of the great pumpkin is a C-2 event, but loved and attended by the entire corps plus non regs. It is a c2 tradition sure, but it is something that adds to the corps overall.

Myself and all my buddies have said that we would have punched by now if not for our outfit's fantastic culture. No one cares about corps culture, because it has been so overhauled by ideas like this fish academy thing. The main representations of worthwhile tradition is found in the outfits, and most people have loyalty to their outfits over the corps anyway.

Outfits > corps. And outfit culture is NOT at odds with the corps anyway.

Each outfit should have its own identity. Why this focus on "equity"? Who perceives the suggested disparity? Members can change outfits if they like another's identity better.

This is a tough one. I'm old. So was my and my wife's father when we talked about changes over the decades. Having many friends that reached command rank in the military. We've visited about different units each had their own personalities. Some were outstanding in accomplishing combat objectives but caused grief at elevated levels due to their lack of sensitivities to the backlash of practices used. Creating an amalgamation of commonalities isn't how business or the military functions well. We need differences in approach, style, and skill levels. Disparity exists. Leaders learn to use that while minimizing harm or unfavorable outcomes to the disparate factions. I certainly do not see the specific issues being dealt with here. But solving disparities is most often not effective. Good luck. I always remember what a great friend told me as he was stepping down from his company. "They'll fix everything I messed up. Then they'll stay around long enough to mess up for the next guy." Best wishes going forward.

Through deduction if someone is in and outfit they are in the corps. There is a respect that is present but outfit culture takes personal precedence because they have the most facetime with cadets.

The outfits are key to the success of the Corps. They provide a family for the cadets and a leadership lab as well. Yet many times they are robbed of good leaders by job positions outside of the outfit. Though these positions are good for the individual they often prevent the fish from seeing these outstanding leaders and benefitting from contact with them. Corps staff is necessary as are the staffs of the different branches, yet they operate sperately and often opposed to the outfits. We often saw these staffs as the enemy and not our commrades, yet those cadets had once been a part of our ranks. If those staffs stayed more grounded to those they command then these differences would lessen.

There is no disparity between outfit culture and overall Corps culture. Each outfit may have more of a focus on one Corps value than another one but the difference in each outfit is what keeps the Corps experience diverse and unique for every cadet. Diluting the culture of every outfit leads to less motivation to be a better cadet overall because they don't have pride in their outfit to begin with. Additionally it would reduce the buy-in for freshmen because their experience would be less personal if they were to be shoved into a larger group that didn't have different focuses and would be a less intimate buddy class as well.

I'm D-2 '96. My son is a fish in D-2. We have several other legacy outfit members. The plan to homogenize the freshman class would ruin any legacy.

There are always going to be terrible outfits. Disband them if they get out of hand for too long. D-2 nearly got disbanded when I was a fish. We had 25 fish and 17 remained after first semester. 4 of us were

passing! We won the General Moore award the next year. We stick together like dogs.

Outfit experiences are what makes the Corps unique. My outfit has been around since 1971. We used to be the best. We won GM my pisshead year and got 2nd my zip. We were the BEST outfit on the quad. Times change. But we are still Dogs. My son hasn't earned FIDO yet. If you propose the homogenized Corps, FIDO will go away. So will the hard standards that Dog Company brings to the table for its fish.

How to make the Corps standards? We should tell the fish they are required to say "howdy" starting from fish camp. Into FOW, and lead by example. The Corps sets the standard. We say HOWDY. Simple solution. HOWDY!!!

What makes the corps experience significant is the ability to develop relationships with your buddies. As a non contract seeking cadet myself, the only reason I joined and have stayed in the corps is for my buddies. Doing anything to inhibit the creation of these relationships destroys what makes the corps unique.

First, the Corps commander needs to set the vision for the Corps and those under his or her lead need to implement the vision. Standards are critical. There is nothing wrong with individual outfit experiences but the outfits need to still have standards to meet and the outfit leadership needs to be heald accountable when these standards aren't met. This gives outfit leadership the ability to learn to motivate their outfit without demoralizing their outfits. Every organization is made up of teams of teams. The small teams have to learn to work together to fit into the larger picture. Just like a military unit, healthy competition is good but there has to be the understanding that in the end, both outfits are a part of something greater.

Remove CTAs, give better outfit autonomy, increase cross outfit training. You want more corps experience? Find ways to improve outfit involvement with other outfits. You kill outfits. You kill the corps. That is fundamentally what the corps is built on.

If you remove the outfit identity, you remove the oldest tradition at TAMU.

There are always going to be bad outfits. When grades slip and retention slips in a particular outfit, put the microscope on them. If they continue to suck, then threaten to disband them.

What you can't do is basically disband EVERY outfit and go to some west point basic training system. We are the Aggies. The Aggies are we. We don't do it like them and this is Texas A&M University, not a military academy. The Corps keeps the Spirit of Aggieland around here.

If you remove the outfit identity, you remove the oldest tradition at TAMU.

The Corps of Cadets overarching culture is to set the basic standards that each outfit adds to and creates the true experience that all cadets want, take a look at all males and why they are the best outfits.

Allow more interaction between Corps staff and outfits instead of it being autonomic entities.

You can't, but diversity is what makes the Corps so great. It's why it's known to produce such good leaders, there's variety within them.

You were once a member of this organization. Don't you feel connected to those who were in your outfit after so many years of being away? The outfit is the bedrock of the corps. Yes, getting an education, developing leadership skills and life lessons are very important. But the relationships you form during your time are just as important. that is being an aggie.

Every outfit has their issues. Like I said, many have a cadets vs staff mindset, and in exercising this mindset, they only receive more discipline, driving them to either retaliate or stop caring. Neither is good for outfit development, and neither sets a good example for fish, who don't know what a good leadership model is supposed to look like yet. But again, taking away what can be valuable training time (especially physical) to do, say, SOMS briefs, does not make much of an impact on the way the cadets lead. They don't like being told what to do. They like to learn hands-on, firsthand, and experiment. And that's not all bad. When problems arise, however, it is important that especially fish know they are able to make their own decisions if they are uncomfortable. They are allowed to speak up. In some cases, they will never be satisfied with the training because they simply cannot handle the rigor and didn't know what they were

getting into. There is nothing wrong with that, but standards should not be lowered, and outfit activities should not be banned, just to meet the lowest common denominator for retention. This is supposed to be a military program with a military training style. It will be hard. It will make you question yourself. It will not make you feel good. It is supposed to test your ability to act under pressure, to suffer with others, and most importantly, to develop as leaders. The corps has great examples of good leadership and of bad leadership. As much as bad leadership can be toxic to an outfit, it is important for cadets to recognize it and want to make that change. It shouldn't be higher's job to keep every outfit accountable for leadership, but outfits should work things out on their own. This isn't to say there are no consequences or people keeping accountability; I believe that should fall on the major unit leadership. Bringing outfits together under the major unit, especially if outfits look up to their MUCs, will have a more impactful result than guidance coming straight from higher itself (everyone is arguing that the current state is not a cadet-led corps).

I am not in a position to answer this as I am an alumni from many years past and am not sufficiently familiar with the current programs. I can only say I believe it is a holistic issue and not one that fragments the historical and existing structure of the corps.

If a large percentage of the corps is joining because, essentially, it is a fraternity or sorority like experience (I.e. they are neither joining the military nor seeking a four year long experiential leadership course), we will never transition away from outfit culture. They can claim they want to be leaders, but they really want to be fraternity president. However, if new cadet recruits ARE looking for a four year experiential leadership, then we should abandon the outfit culture.

It's simple, impart leaders with the values and regulations associated with the corps, and train them to utilize those as a frame of reference akin to commanders intent. Then provide them to tools and formats to standardize processes, then simply oversee. This allows the individual outfits to set and define their training priorities and create long term visions for their units year to year.

Perceived disparity? Who perceives it? This is a loaded question, what metric is there to actually determine this disparity? What specific Corps standards are being ignored? If this is indeed the case, isn't that the job of MU staffs and CTOs? What is the purpose of the chain of command if not to enforce corps policies?

Enforce a minimum standard. Individual outfit cultures should contribute to that standard bringing their unique elements. More supervision (but not direct interference) from the Bulls solves this.

Outfit experience is the Corps experience. The outfits are not a weakness but a strength. Not a single person in an outfit doubts that they are apart of the overall corp, they see themselves as apart of the outfit as their family and the corps as their organization. As I mentioned earlier, the outfit culture is why im still here. After every silver taps or memorial we pray and talk together, our upperclassmen have supported us and suffered with us through the worst of this year, inside and outside of the corps. The traditions and "culture" that they pass down we accept not because its a tradition, or its just something we do, but its because we emulate those we respect and look up to, and thats our family, our outfit. My identity is a cadet in the corp, but more specifically, my identity is found in my buddy class and upperclassmen, who understand what I go through because they've been there through all of it, and in the upperclassmen's case, put their heart and soul into planning and our development. Our outfit has made it abundantly clear that every single aspect of the corp is for the fish, is to lead and guide us. Anytime something has come across wrong or not gone as intended, it is fixed quickly and to the fullest extent, because they are here for us professionally and personally. Im proud of my outfit, my upperclassmen, and my buddies, these are the ones I suffer snd struggle with, the corp is about people, building strength and relationships, and being the spirit of aggieland. You learn those in the outfits, not a classroom. You learn how to develop

and be strong through people close to you who care for you and give you everything, like our upperclassmen. You learn how to love and help others by being in a buddy class that becomes an extension of yourself. Taking away the outfit experience in any one part damages all of the others as well.

I'm sure this may not be 100% popular, but perhaps more popular than removing Freshmen from the outfits. My experience at USMA was that following the Sophomore year, all the cadets moved to new companies/outfits. This enabled meeting new people and developing additional relationships, but also allowed for growth by being able to move beyond perhaps a challenging experience in the first two years, or to enable the new Juniors to more easily come in a NCO-leaders where no-one has any pre-conceived notions about them whether it be the Seniors or the Sophomores. It's kind of like a clean slate opportunity when they really need to perhaps outrun their knuckle-headedness of the first two years and when the Sophomores need someone to hold them the the standard, and not necessarily their drinking buddy. This would perhaps need to remain within the various "ROTC-types" to keep some semblance of the appropriate service culture, but this will also help provide more commonality across the Corps. Are there ever lectures, guest speakers, lessons that are brought in just for a particular class? Where topics are discussed that they all experience that are most relevant to them? And I don't mean bring all the Sophomores in and tell them how they aren't doing a good enough job keeping their rooms clean. But where they are all getting an experience together? Are their any other sort of "class-specific" activities that bind the class to each other and to Corps-wide traditions versus outfit traditions. We had class-level events at USMA (Yearling Winter Weekend, 500th Night, 100th Night) and the plebes had to be able to recount how many days to each of these upcoming events and how many days until we Beat the Hell Outta Navy... That Corps-wide telling by the plebes of an upcoming event that each class would participate in furthered that we were all part of the same thing. I full recognize TAMU and USMA are different and serve different purposes, and trust that you will discern the meaning behind what I'm offering and not as a suggestion that you mirror it be mirrored. I believe outfit traditions are important, to this day 30-yrs later I can remember the motto of one of the USMA companies I WAS NOT in because of how they shouted it. A small thing for sure, but heck, it bound them together - even if the rest of us had to endure it. If leadership positions are standardized, and roles/expectations are standardized, and certain events are made central to both the learning opportunity and the bonding opportunity, and then more people are getting their shot at some of those roles, then you will have a more common-across the quad experience that should meet Corps standards. In the mean time, outfit t-shirts, outfit PT, outfit songs, outfit mascots, etc are all good ways to allow some individual outfit experience as well. - John Horning, COL, US Army

This was an excellent point I found that the commandant made however I believe his reaction was far to extreme as I personally never felt this concern was made clear by him or his staff. The introduction of an idea as radical as Fish Academy feels to the corps like a punishment for not executing a vision we did not know we were expected to execute. To start, I believe that corps culture is synonymous with outfit culture. Outfit culture is to me the predominant factor that makes us different from every single academy and SMC. There is a healthy drive of competition and buy-in that is able to be generated on a small local scale that drives you to want your outfit to be the very best and this begins with the fish as they are the future generation. I believe that the issues in a lack of accountability for the freshman and standards of other outfits begin at disconnect at the minor and major unit levels. There is little to no sense of minor unit pride and while I by no means believe that outfits should have a part in training or imposing there own culture on other units fish, I do believe it would be beneficial for minor units to begin taking responsibility for one another. I by no means suggest that other outfits should pisshead another outfit's fish in a traditional sense however I absolutely suggest on-the-spot corrections and communication between outfits. One way to make this easier would be mass whip-outs at the beginning of the year similar to how outfits do, except to other outfits in the minor unit. Ideally, this will promote a more comfortable attitude towards a unified minor unit while maintaining outfit culture and "sovereignty". This would help a much broader standard and ultimately lead to a more unified corps.

The Corps Experience IS the differences and identities between outfits. Some outfits will excel at certain things based on their identity. Not every outfit can be a cookie cutter copy of the next. Yes, this doesn't result in everyone having that SQ-12 GPA or that K-2 Bloody Cross time, but that's why kids join the corps, so they can take pride in the identity of the outfit they've invested in. Just make sure everyone has the same opportunities, which I think has been the case ever since I was in.

This question implies outfit culture can't coexist with the overarching corps standards. Stop focusing on the March to 3000, we know it's just for the sake of money. Focus on QUALITY not quantity.

The Corps Experience starts with your buddies. Every class I have been able to talk to has said the same thing: "You marry and bury your buddies". Creating a fish dorm eliminates this. Part of the corps that is special is that not only you belong to one of the most unique organizations at the university and in the nation, but within it you belong to a family of cadets that you can trace back to the start of the outfit. An out of state cadet that is the first Aggie in their family can come to the Corps and have a family that is there no matter what. No other organization has that. The can grow from their an join a special unit like FDT, PMC, or RV's and now belong to another unique family. The Corps Experience is your outfit identity. Every outfit says that they are "the best damn outfit anywhere" for a reason. They can compete against other outfits in Corps challenges but gain their best friends with they join together in special units. Killing outfit identity hurts the Corps experience and eliminating the difficulty of special units hurts the pride of being accepted into them.

Embrace the differences. The Corps has a tremendous opportunity because of the unique nature of Texas A&M and the traditions of the Corps as both a Senior ROTC program and an elite University with such a large and diverse student body. Allow outfits to emphasize different things and celebrate them. That will also help with recruiting and retention. For instance, an outfit that emphasizes athletics. An outfit that emphasizes different traditions at Texas A&M that they can take pride in (E-2 obviously does this with Reveille but there are countless others). An outfit that emphasizes community service. An outfit that emphasizes different Corps organizations such as PMC or FDT. Outfits the emphasize physical fitness preparedness like Rudders Rangers. Outfits that emphasize different majors such as Engineering, Business, or Agriculture. The more prospective students feel they have options the more likely they are to join and to be happy with their choice and take pride in their outfit. It also shouldn't be discouraged for outfits that want to remain all male or even have an all female outfit if the students want one.

Yet the attitude from the staff I visited with seemed to be very negative about it. The obvious answer to me would be to look at what those outfits are doing and see how that can be replicated by other outfits instead of seemingly resenting a successful model.

Of course there should also be objective standards that all are expected to follow and Corps wide goals. Academics. Retention. Military bearing and inspections. Discipline. Those should be universal and expectations should be met. They should be the goals that every outfit strives for and is evaluated by. The more objective the better. Measure to those standards and make sure that the leaders of the outfits know what they need to do to be considered successful and what isn't satisfactory. Hold them accountable to those standards and if they aren't met attempt to support and assist them in doing so and when necessary make changes.

Survey Corps members about what they care most about the Corps and why they joined. Try to gather information from those who would be excellent candidates but didn't choose to join, for instance any students that spent the night but didn't convert. Know what students care about both for why they joined and why they stay or why they didn't. That's how you grow the Corps. That's how you build motivated cadets and help with retention.

has little to no interest now. I've donated to the CCA and my Dad donated incredible amounts of time and money to the Corps throughout his life.

I only say this as someone who has a lot of different perspectives and I care. I know that any decisions made will be criticized and make some unhappy. Change is part of the process. I'm happy to speak about it or to connect you with my 3 buddies who have all had varying experiences with their sons.

Gig'em,

I touched on this in the first question. I'm not sure what the current regulations are regarding the freshmen. But, I can assure you that the individual outfits think they are too soft. The Corps is meant to be hard. You should expect kids to punch. Not everyone can handle the rigors and that's ok. But that is what makes the experience valuable. I have a son that wants to enter the Corps next year. He wants it to be hard! He will be a great cadet. My biggest fear for him is 4 years of distrust with leadership outside his outfit.

My suggestion is the Trigon re-analyze their current regulations on freshmen. It should be a difficult year! PT is not bad. Freshmen can be yelled at and made to push. And they can do that and still make their grades. The outfits will respect a Trigon that has their back.

Educate parents and incoming freshmen about what they can expect. They are going to be yelled at, punished and broken down. Parents and cadets should know that when they look left and right during FOW, chances are that cadet won't be there.

How do you do this and get to your goal of 3,000? Recruit the right kids. The CCA's database of former cadets needs to include "children" and their ages. The CCA can then focus efforts on the children of former cadets when they are high school juniors/seniors.

What outfits are successful in recruiting? Why are they successful? Use those outfits as a guide.

This whole issue with cadets not saying the corps hump it is just the fact that I can't hear when it happens. Maybe have it start as soon as the canon goes off. Spirit of 02 fires and then everyone starts shouting the corps hump it sounds very motivational to me. I think the idea of having a group FOW isn't a bad idea. It would standardize training and make sure that all cadets are taught proper standards instead of just the units that deem the standards important. It would also be cool to have more opportunities to compete against other SMCs in ways that we can see. Healthy competition between outfits and pride for those outfits isn't a bad thing though. It pushes cadets to compete with one another and get better. I know for a fact that if I'm in a bad situation and I yell "old army fight" it doesn't matter what outfit I'm in, anyone in the corps around me will have my back.

the answer here is simple, accountability. If you hold individual outfits, and cadets to the same level of accountability you will create a shared experience that is not diluted by disparities between outfits

Once again, open discussion. Some outfits may cling tightly to traditions and ways of training that are either unproductive or counterproductive to leadership and personal development, but not everyone does!! Fish have upperclassmen to hold them accountable for mistakes (which are minor at this stage), but upperclassmen need to hold themselves accountable for far greater responsibilities. This will be accomplished by connecting whitebelts across the Quad and encouraging open discussion about training styles and outfit culture that others can then comment on and provide suggestions for improvement. When applied to our current training style, this will greatly improve freshman experience.

In combination with my first reply, I also believe we need to offer more development for our D&C folks. As a retired Army officer I fully embrace and have personally benefitted from the Corps' excellent ROTC programs and the immersive military environment of the Corps. But rather than allow our D&C folks to just "be along for the ride" maybe we should consider a non-military leadership and staff position on the Commandant's staff who shepherds the flock of D&C cadets, leads initiatives focused on their development, and advises the Commandant and key stakeholders on this significant population of

cadets. I view it as a General Officer / SES type relationship. I'd have a lot to flush out with this recommendation but this is a starting point for the discussion. Please let me know if you'd like to discuss further. -Jason Blevins

Accept that most cadets are not in the Corps for the Corps, their top priority will always be their buddies and their outfit. The Corps experience is defined at the outfit level, not the Corps level. The Corps provides a framework and guidance structure for the outfits, it's cannot exceed that role, or else resentment will follow. No former student looks back on their time and chooses an activity that involves the entire Corps as their favorite memory, those memories are always with buddies and with outfits, and those memories are what keep people in the Corps and keep children and grandchildren of cadets coming in

By having the corps staff be the people to monitor and oversee the behavior of the outfits. Not the CTOs. The more involved CTOs and the Comm staff are in desision making and monitoring, the less the corps is a cadet lead organization.

What perceived disparity? Nothing has been presented that shows an actual disparity. If there is any factual disparity, it would be a lack of discipline and leadership coming from the Trigon. Everything that I have seen or read has been a knee jerk over reaction. It is over the top, and fundamentally destroys the Corps.

The individual outfit experience, IS the basis for the Corps experience. It is the focus. It is the everyday. It is the three-meter area of control.

What was stated by Gen Patrick Michaelis on the two posts he made on the You know you were in the Corps at A&M when... Facebook page, will without a doubt do exactly what you are trying to prevent.

Let a Cadet that comes into a certain outfit change to another without question. Usually they have already done their homework on why they want to change. If this keeps their mental health in check and they do not punch it is a win. This idea of separating the Fish is ridiculous. My Fish is furious with this idea.

I believe there is no systemic and problematic disparity between individual outfit experiences and corps standards and values. As a cadet I am told by my outfit everyday to exceed the standard in my actions, represent the corps and the outfit well, and stay true to the values of the university and our organization. Outfits acting in such a way that disregards the standard and the corps is very rare in comparison to how much larger our organization is compared to others. There will always be those who divulge from the standard and act in a way contrary to our value this is of course unfortunate. However changing how an organization operates on a whole rather than disciplining individuals involved and identifying the steps that allowed those individuals to deviate sop thoroughly from our organization.

In the Fall of 1974, almost 50 years ago, I arrived as an incoming fish in the Corps. My outfit experience is the main reason I am still passionate about the Corps and want to see it continue to evolve and remain relevant as a training ground for future leaders. For many, the outfit is where lifelong friends are made, maturity develops and life-lessons are learned. Attempting to "reconcile the perceived disparity" should not be a goal in my opinion.

The Corps standards and values can be exhibited in a variety of ways. Different outfits have historically found ways to do so effectively or they have been disbanded, with members assimilated into other outfits. The perception of disparity has ebbed and flowed over the years and will continue to do so because the Corps is a dynamic organization. If that ever ceases, I suspect that the Corps will die a slow death.

Commandant - Thank you for your good intentions, your continued efforts and for taking time to listen to an old Ag that learned many things from upperclassmen with little formal leadership training, who often got it wrong, but didn't quit!

Please see answer #1. Accountability at unit/outfit level. If not performing get disbanded and dispersed to other more successful outfits. ( maybe bottom 5or10% of get automatically disbanded each year?).

Accountability at the Unit level as well as individual level. The Cadets know the standard going into each year and know the expectations and consequences.

Set clear left and right limits and allow BDE commanders to do the same. I was the L-1 CO Class of '22 and the 1st BDE Commander always set clear goals and left and right limits for us. Armed with that information I knew exactly what/when/where/how my outfit could plan and execute training. The best part of that was that the training we planned and executed had our personal outfit spin on it which made it feel genuine and truly ours, which helped to increase buy-in overall. If you and the CTOs and the Hollingsworth center can create very broad and clear left and right limits and then allow BDE commanders to interpret that and pass it down the line each outfit will know what they have to work with and cannot get mad when they step out of line for potentially going too far on one side or the other. It all comes down to clear communication and you as Commandant trusting your cadet leadership. The Corps is cadet-run and should always stay that way, but it would help leadership out if they had clear guidelines to follow. Also, something that could help would be more Corps-wide competitions, something similar to Bloody Cross but not necessarily always something physical because certain outfits excel in different areas. Maybe holding monthly or quarterly big Corps-wide competitions would help to make people buy-in and be proud to represent their outfit and the Corps overall.

A lot of big words there but don't worry I got an answer. People in outfits aren't more outfit centric than corps centric because that's just the way things are. They are like that because of you. The Corps stack represents to cadets a commandant staff that is looking to inhibit their experience and the rest of cadets experience while here at Texas A&M. And when you put out something like this I can understand why! They see a corps staff that seem to be puppets of CTO's. Same thing with MUC's. They see bulls that are itching to see you screw up so they can pounce. That's what the Corps Stack represents to most cadets. But it doesn't have to represent that. There can be a united Corps that doesn't just unite when bad decisions come down from comm staff. If you really want cadets to live up to Corps Standards and values, allow them to lead and actively participate in this experience without them having to look over their shoulders at a bull waiting for them to screw up. Discipline and Mentor when necessary, absolutely. But don't walk onto the Quad and act like your responsibility is to fix all these broken individuals or a broken system. Your job is to give these young men and women an environment to fix themselves. There was a time when one of the most popular shirts on campus was "Rent a Friend, Join a Frat" with a Corps stack on it. If you want people to have pride in that stack again and not just their outfit logo, allow that Corps Stack to be theirs, not yours.

You don't. The outfit experience IS the Corps experience. A-Co is not B-Co, nor should it be.
If you want to increase unity amongst the Corps, and particularly participation in the Corps hump-it, actually do the hump it more than once or twice a year. We all memorized it because it was a campo, but we never actually did it. When we would, no one knew the cadence or tempo for it. Figure that out, practice it during FOW, and then do it before each march in and before any Corps trip and March to the Brazos.

maybe it's time to consider retirement away from the Quad.



Hold cadets to standards, hold outfits to standards. Instill the Corps values and standards within the outfits. Embrace the mantra of lead, follow, or out of the way. Make standards actually count. ONE PT test for the Corps with ONE standard of measurement, age, sex, ableness should not matter. Either one can do the job or one can't, a buddy who can't get another back isn't a buddy, but a liability.

First, throw out the bad ones. Should all-male units still be around? We have seen units do better with females and males so why are there still all-male units (there aren't any all-female units...)? PT is not everything but it seems to be a big reason all-male units are still around. In my unit, PT is for the middle 80%. Those who want to go harder go to the gym or do STS or something more challenging for them. So, first, fix some outfit's culture. Second, do not allow different standards for different outfits. Some examples are burnt windshields, backward brass, unique spearheads on guidons, different ranks for guidon bearers, allowing females to wear earrings in PT and Charlies, female fish buns, allowing blackbelts to cross the elephant ears, and not allowing fish (or certain cadets) to say certain words). Outfit culture is a lot harder to change than simple changes to the Standard. Yet, I think a "crack-down" on

those small changes to the Standard would help. Another thing is that everyone learns differently and we all need different things. Some would like community service while others want perfect marching. That's the great thing about the Corps. You get a unique but relatable experience. One more thing, I have seen the older cadets are wiser and have great feedback. My Ol' Lady last year was 3 years older than me and she was amazing. Cadets from D-Co also have great advice. There should be more ways we can interact with them and learn from them.

Addressing the perceived disparity between individual outfit experiences and overarching Corps standards and values, while preserving the unique identity that defines the Corps experience, requires a nuanced approach. By introducing more layers between command staff and outfits, we can create a structure that facilitates better communication, oversight, and alignment with Corps-wide objectives, without compromising the distinctiveness of individual outfits. Here's how this can be achieved:

**1. Intermediate Leadership Bodies:** Establish intermediate leadership bodies or councils that serve as liaisons between the command staff and the individual outfits. These bodies would be composed of representatives from various outfits and command staff members, ensuring that there is a direct line of communication and feedback between the two. This structure allows for the concerns and suggestions of individual outfits to be heard and addressed, promoting a sense of inclusion and participation across the Corps.

**2. Standardization and Customization Balance:** Implement a framework that outlines core standards and values all outfits must adhere to, ensuring a unified Corps identity. However, within this framework, allow for customization where outfits can infuse their unique traditions and practices. This balance ensures that while the Corps operates cohesively under shared standards, the individuality of each outfit is not only preserved but celebrated.

**3. Leadership Development Programs:** Introduce specialized leadership development programs that focus on equipping leaders at all levels with the skills to navigate the challenges of maintaining Corps standards while fostering outfit identity. These programs can include workshops, mentorship opportunities, and scenario-based training that prepare leaders to effectively manage the dynamics of their specific outfits within the broader context of the Corps.

**4. Enhanced Oversight Mechanisms:** With additional layers between command staff and outfits, implement enhanced oversight mechanisms to ensure that all outfits are aligned with Corps standards and values. This could involve regular assessments, feedback sessions, and reporting systems that allow for continuous monitoring and support. However, these mechanisms should be designed to empower outfits rather than impose unnecessary control, encouraging self-regulation and accountability.

**5. Cross-Outfit Collaboration Initiatives:** Encourage initiatives that promote collaboration and interaction among different outfits. These could take the form of joint training exercises, community service projects, or leadership retreats. Such initiatives help to bridge the gap between individual outfit experiences and the overarching Corps identity, fostering a sense of unity and shared purpose.

**6. Transparent Communication Channels:** Ensure that communication channels between command staff, intermediate bodies, and outfits are open, transparent, and efficient. Regular updates, town hall meetings, and feedback sessions can help maintain a clear understanding of Corps objectives, standards, and the value of outfit identities within this larger framework.

By introducing more layers between command staff and outfits, we can create a more supportive and responsive structure that addresses the disparity between individual outfit experiences and Corps-wide standards. This approach not only reinforces the shared values and objectives of the Corps but also ensures that the unique identity and traditions of each outfit are preserved and respected, enriching the overall Corps experience.

You know when I was a fish, I had to high port the "fish guidon" back from the Brazos river. It was 7 miles and the "fish guidon" was a 6 inch wide, 8 foot tall tree trunk.

You know what? I made it back. This was the hardest thing I have ever done in my life and now I am 50 FIFTY. It changed my life forever.

There is no way this would be permitted these days for for God's sake, LEAVE THE CADETS TO DO PT. You are making a very WEAK CORPS.

My son (a current fish) says it's too easy. He was a high school wrestler. I put him in the Corps to make him even stronger, tougher and a better leader. If it's not going to be a PT challenge, and he's D&C, why would he do this AT ALL!!!!!??????? STOP with your RESTRICTIONS!!! My son needs to be crapped out!!!

I believe input shouldn't just come from the highest up people. There should be a system in such a way that the leaders such as CO's act as representatives for their whole outfit as opposed to just their opinions. It is the responsibility of the leaders on a smaller scale to bring the whole opinion, not just their own, to the leaders on a larger scale and the smaller scale leaders need to be made aware of how important they are. Without this, the majority of people that are lower on the chain of command are all of the sudden surprised when a decision was made that they don't like

"perceived disparity between the individual outfit experiences" - What is this? Perceived by who, what disparity, do people not like their outfit? If you do not like something be the catalyst of change within the outfit. There were things that our Zip class changed and I am certain that the Butts under us made changes when they were leaders.

Please define the Corps standards and values that are not being upheld. It goes back to accountability, if outfits are not meeting the standard, then address the problem at that level. If the Corps is not meeting the standards, then first examine the standard (is it relevant), then examine the leadership at the highest level.

Pretty much how it works in the corporate world - when an individual does not meet their goal - it goes on their evaluation and they are coached or eliminated. If the organization is not meeting the goals of the shareholders, then the CEO is coached and often eliminated.

Is there a problem here? More context is needed.

Let the outfits have their own identity and if they are hazing beyond PT, then punish them. YOU ARE RUINING THE CORPS. LET THE FISH PUSH AND LET THE RV'S RUN. FOR God's sake man, what are you DOING?????

The individual corps outfit experience is the what makes the corps so unique and honestly is one of my favorites. As a former CO, it was amazing to build an outfit culture that made us seemed different and not just like anyone else. I believe making members in the corps feel unique is a great thing. I understand the flip of the coin where if it goes too far, it can be a deterrent to the unity of the corps. I believe by analyzing the outfit cultures and identifying those cultures that can be dedicated to specific corps wide goals can help create a greater sense of achievement. So make the overall corps wide goals tailored to outfits around the quad that best suits their cultures. I think that would increase buy into not all the outfit culture but also into the corps identity. Another consideration, make FOW longer and more standardized. Select representatives from all around the corps and have them teach then they can go to specialized outfits. Kinda like a boot camp where everyone learns the same but do it in the summer and not during the regular year. I think by doing that, you can produce a more united corps but also help develop a sense of uniqueness

The purpose of each outfit at its very core is to follow the Corps mission statement: To develop well-educated leaders of character prepared for the global leadership challenges of the future. We can reconcile the perceived disparity between outfit experiences and overarching Corps standards and values by reinforcing good leadership. Current leadership involves staff and higher deciding who will be the next CO, 1SG, etc. without seeking input from cadets in their outfit. This results in leaders being chosen who can present themselves well at interview but be completely incompetent or lack the character and core

values to lead their unit to success. By seeking cadet input through a survey or form for every leadership position, we can align ourselves closer to a cadet-led Corps and achieve success.

The purpose of each outfit at its very core is to follow the Corps mission statement: To develop well-educated leaders of character prepared for the global leadership challenges of the future. We can reconcile the perceived disparity between outfit experiences and overarching Corps standards and values by reinforcing good leadership. Current leadership involves staff and higher deciding who will be the next CO, 1SG, etc. without seeking input from cadets in their outfit. This results in leaders being chosen who can present themselves well at interview but be completely incompetent or lack the character and core values to lead their unit to success. By seeking cadet input through a survey or form for every leadership position, we can align ourselves closer to a cadet-led Corps and achieve success. NOTE: Company A-2 has been blessed with good leadership. I am speaking of other outfits where this has not been the case.

Recruiting needs to be equitable. In the early 2000s my phone push list was not the same as the legacy outfits or all male outfits.

"Percieved" being the key word. Every outfit has their different experiences, that is what makes the Corps unique compared to other academies. Because you are trying to make it an equal experience for everybody, you are taking the fun out of the Corps of Cadets and the challenge I personally came here for. Those who seek a challenge seek outfits that will actually challenge them. Therefore, you should let outfits push their freshman during formation, allow them to do smokers more frequently, and allow them to teach their fish mental resiliency. By you limiting outfit activities and by having a commandant's brief on Monday mornings, you are doing the exact opposite. Instead, let cadets be challenged, let them learn and be taught that fish year is far from easy. If other outfits don't wish to smoke their fish? Fine! That's their decision, because the people in that outfit did not come to the Corps for a challenge.

You are trying to make everything the same for retention purposes. No! Like I said earlier, retention and motivational programs that remind cadets the Corps is supposed to be challenging would increase retention as a whole! Those who simply don't care? Let them punch, because they are the ones that aren't willing and aren't capable of upholding the standard. They are also the ones that do not seek a challenge, like many other cadets do. As a reminder, prospects are interested in the outfit, not the Corps as a whole. It's quite baffling to see that prospects come in for a challenge and instead are being softened up, being told they "are doing something hard" when in fact they are not. I know for a fact when I came in as a fish in an all-male, I was seeking the challenge. Now, every day I am more and more disappointed because I do not get what I came here for. And now, you're trying to make it even softer, for retention purposes. Please, I cannot say it enough, please allow outfits to make it harder on their fish. It's not "student-lead", as you call it, if some outfits are limited to what they can do. The Corps is getting softer and softer, and is not the challenge I thought I signed up for.

Outfit pride and culture is a big deal and should be celebrated. Healthy competition should be embraced to its fullest. Every outfit is not going to be a carbon copy of another (how boring). There is too much history and tradition (The Band vs C-2 and Flight of the Great Pumpkin come to mind as an example). This is why we have outfit level awards at the end of the year! You don't join the Corps for a participation trophy. Consistent 360 evaluations between classes in outfits should produce real data. Comparative analysis can be performed to determine disparities (if they are really there). Decisions should never be based on perception, that is a recipe for disaster. I've heard rumors that some are thinking that all Fish are somehow not fully affiliated with an outfit. I think that is also a disaster waiting to happen. Fish will have an affinity for an outfit based on many factors. My father was a Naval officer when I attended so I naturally found a welcoming place in the Regiment. It would be better served for incoming Freshmen to be polled/surveyed on affinities and help place them into an appropriate outfit.

Thank you for providing an opportunity to give feedback. I loved my Corps experience and use lessons learned all the time. I look forward to continuing to see a strong Corps of Cadets and the fostering of new leaders in our society.

Maintain true free time for cadets. Free time that is regularly interrupted by upperclassman barging in dorms is another form of intimidation. Reward outfits with higher retention rates. Post actual retention rate publicly for every outfit so that cadets are better informed of the outfit they are selecting. Outfit culture should not vary so significantly from Corps culture. Outfit culture forces cadets to urinate in their dorm sinks rather than leave the dorm and pass an upperclassman in the hall. Is that Corps leadership?

The cadet-led corps didn't have this problem. The outfits ARE different, thank goodness! Some are athletic-focused, academic-focused, service-focused,...thank goodness! What unifies them are things that have been taken away: greeting outside the outfit, formation, PT,...The routine of the Corps should be similar for all of them. But outfits need to be able to have their own identity. Healthy competition between them (as long as it's not nasty) is healthy and should be encouraged.

I would like to see the differences between the outfits better described on the Corps website and in recruiting. If an engineering major who wants to do well academically but isn't extraordinarily fit (and doesn't care to be), he should be able to eliminate the outfits where athletics is a focus without doing Spend the Night with all the outfits. The Corps can serve more students if the outfits are different, as long as the main parts are the same.

I really liked the reasoning in your FB proposal to the Old Ags. The current recruiting process is truly nothing other than a shot in the dark. My cadet really tried to get to know the different outfits based on their social media posts, but it is too heavily dependent on the skills of whomever is posting and they do not know the culture of the group they are selecting.

I think the idea of a fish Brigade and a Sophomore Leadership academy is excellent. I loved the idea of the fish getting to know the different outfits and their cultures in advance of their selection. In addition, I think it's also important for an adult to get to know the cadets and know the culture of the outfits and place cadets based on a multitude of factors. I believe many fish may push, simply because they are not a fit for the culture of their outfit and truly, they cannot switch outfits without the shame and ridicule from their former buddies.

I read your concern about moving the fish, mid year and I truly think you could have the outfit selection be during the 2nd semester and the fish remain in the fish brigade all year.

His outfit was disbanded twice, and I'm sure it was for good reason based on the stories I've heard. I am a member of Corps Mom's, Quad Mom's, Fish Mom's and Aggie Corps Parents and can share that many of our fish have had drastically different experiences based on the outfit they are in.

We need to be raising gentleman who are leaders with integrity and confidence and unfortunately, that is not the culture all cadets are experiencing.

There can be a new process to where all of the upperclassman are good bulling with the fish during their first semester. Once they are placed with their individual outfits, then we can initiate a time where we keep them to the standards that are required for our individual outfits while also maintaining their general corps standards and connections.

You don't. By putting the fish separate and not in outfits, you don't. It's diluted by 85%. Not to mention fdt, band, and rudders will ALL suffer immensely.

Fish do need protection from the ongoing hazing. But to separate them fully is going to cause more issues within the corps. Like it is currently., but with more oversight and accountability. Possibly increase an ethics and morals position within each outfit for members to confide in and provide feedback or action items. This would be better than the change that has gone out.

I do not believe that there is a "perceived disparity" between outfit experiences and the Corps standards and values. I believe that outfit experiences, or outfit culture, ARE the Corps and thus comprise its standards and values. I said before that I would outline how outfits should function with staff, and I shall explain more here. Corps Staff has come to believe through some misguided interpretation of their role that they are meant to personal lead the Corps into a unified vision of what they think it should be, that the Corps Commander's job is to standardize the experience and create a system similar to the military academies, where every freshmen receives the same experience. I believe that this is foolish, because a system that is entirely the same becomes stagnant. I believe in innovation and diversity, both things that create a system where by which information can be shared across outfits about what works best and what doesn't. I believe that outfits should communicate regularly, but this does not mean that they should be the same. I believe in a system of Darwinian evolution, by which outfits with poor retention and recruitment fail, and outfits that succeed thrive and continue in their success. I believe in a future that is ruled not by the whims of Corps and Comm staff that directs the Corps without cadet input or vote. I believe in a future that is designed and directed by regular cadets, where every member of the Corps can feel that their voice matters and that they are contributing to the direction in which this organization is headed. This is not this Corps that we have right now, but it needs to be if we are to survive as an organization that is run by and for cadets.

Disband the corps block at football games

A reason why cadets often have the attitude of "I love my outfit and hate the Corps" is because of bureaucracy and low standards often ignored for retention. This often starts right from FOW. Corps leadership control of FOW is something cadets do not like. FOW comes with many restrictions that cadets on cadre believe impedes on their training. Not allowing training outside after 1000, having PT that does not reflect what outfit PT consists of, having fish in corps-wide briefs for much of the training days, and limiting cadre members to 7 upperclassmen when there is no shortage of highly qualified cadets who are willing to sacrifice a week of their summer to train freshmen. As cadets, we don't have malicious intent or ill will toward freshmen, we do truly want to develop them into strong and high quality people who know how to manage adversity. Upperclassmen in most outfits have a very diverse portfolio of experiences since coming to A&M and life in general and we all want to impart that wisdom on our freshmen to help them succeed in their studies, social lives, their involvement in organizations, and their plans for after college be it graduate or professional school, the private sector, or the military. Cadets want to be able to train freshmen because they want to build genuine relationships with them and continue the fraternal aspect of the Corps. The bureaucracy in leadership selection and FOW strains this. Cadets often believe that their outfits train to a higher standard than the Corps at large which is something to take pride in, creating a disparity between Corps-wide training events and outfit training. Allowing more training opportunities along with decentralizing leadership to allow the outfit commanders to make the best decisions for their people and creating less bureaucracy in the Corps of Cadets will make the Corps of Cadets a more positive place and truly exemplify the Corps experience.

normally I'd just say FIDO, but not in this case. We will fight this one till the end and you won't get your way.

During my senior year of high school I had a zoom meeting with every single army outfit on the quad. I made it my goal to find the perfect outfit. What I found instead is that every outfit had its own benefits. I found A2 attracted totally different future leaders than D2 yet they both attract people to the corps. This sense of outfit community attracts people to the corps. One of the main reason second-generation cadets come back is because they have seen the power of the outfit. There is something so special about showing up to FOW and being assigned your family. From the buddies to the cadre everyone is there for that outfit. This culture does not degrade the corps culture however it adds to it. Being able to make a smaller, closer group your family helps people buy in. It helps them feel that they are home. Once fish are past FOW all echelons of their units should encourage them to participate in both special units and organizations off of the quad. This will help them meet other cadets and begin to help them buy into the corps culture AND the university culture at large.

In terms of pure standards corps wide the results of inspections and physical fitness tests should result in remedial training. However, these inspections (namely the Office of the Commandant inspections) should be more standardized. Currently, if you get some advisors you are liable to be degraded and treated as less than human while other advisors show you they care. I think this point also applies to almost all interactions with advisors which has put traditions such as whipping out at risk because you are liable to be lectured even if you are doing it outside and in a non-distracting manner.

In conclusion, outfit cultures are what make the corps culture. Each outfit is a puzzle piece that helps people buy in and contribute to the corps culture overall. With more participation in special units and general student organizations, we can strengthen corps culture. This encouragement on special units paired with remedial training based on inspection results will pull the corps up and help us come together.

How do we reconcile the perceived disparity between the individual outfit experiences and overarching Corps standards and values, without diluting the identity that so defines the Corps experience?

I believe the disparity is the result of second and third order effects of prior changes implemented primarily to preserve the academic day and reduce "Corps Games" impact of freshman. By removing these elements of the fish experience, we have insulated fish into their outfits and allowed them to exist with little input from surrounding upper classmen.

I don't necessarily think those changes were all bad but when done without consideration for other impacts they resulted in fish who don't have to run down the quad, thus not meeting upper classmen outside their outfit. Fish no longer speak to upperclassmen on all floors when going through their own dorms. Again, reducing their chance to meet other cadets outside of their outfit. Fish pranks, aka details from Mr. Claus, don't happen anymore. As a fish these allowed me and my buddies to meet and eventually drop handles with most of the upperclassmen in our dorm. We were invited to outfit parties because of pulling off particularly daring pranks. Through this we got to know the other outfits. I don't get the impression from talking to current cadets that this happens anymore.

To build Esprit de Corps everyone must feel they are held to the same standard. When people feel they are living up to the standards, or the perceived standards, and others are allowed to slack they become disillusioned.

Build opportunities for cadets to interact with other outfits through competitive events. Ideally these would be conceived of and executed by the cadets, but it might take some guidance to get that process started.

As a recent former student '22, the major issue you face is apathy.

Unfortunately, I believe this apathy has been self-inflicted by Comm Staff; the result of an inadequate amount of adversity that cadets and 1st semester fish experience. Has Comm Staff mistaken adversity as a reason for poor retention? If so, why does retention seemingly get worse each year, even with the myriad of changes made to the Corps?

I found my first semester incredibly challenging. It was physically and mentally draining. Yet, overcoming and earning my Brass with my buddy class made it meaningful. This was reflected on the daily level, when my buddies and I would overcome whatever smoke session, rack drills, or afternoon training our upperclassmen could throw at us. Those small wins kept me going, and most importantly they taught me valuable lessons that I thank God for learning now as an officer in the USAF.

Now I understand that continuing traditions merely because its always been how we do things is misguided. However, there can be great logic and reasoning behind those traditions. You killed Rack Drills, but they taught me how to work with peers, communicate, and survive intense situations. You killed Fallout Holes, but they where I formed incredible bonds with buddies and learned to mentally prepare for difficult situations. You don't believe PT should just be smoke sessions, but I truly learned who I am and that all things end when my class would be smoked. These are such incredible lessons I am so fortunate to have experienced, that I am much better off with.

When these traditions and aspects of the Corps were removed, we began to lose meaning in the Corps. At a point it becomes more of a professional development organization than a military leadership organization. Could I not get the same experience being in toast masters or another student club? Just do what the Corps does best!

Give cadets meaning again, and I believe that you will be truly impressed. You can already see this in how certain outfits that are known for being more difficult often wear the uniform better and follow the standard better (i.e. SQ-17).

Cadet leadership must be heard. The Corps, from a cadet perspective, appears to make a lot of dumb decisions, and once the decisions are made, we cannot change it no matter how much our voices raise.

It is very apparent to many of us that our upper-level cadet leadership is not brutally honest with those employed for the Corps. Our ideas are squashed, our training is hindered, and our voices drown in the silence of indifference.

By listening to cadets, allowing us to take charge, and trusting us with training that pushes the limits of our people, we will regain pride in the Corps. We care about outfits much more than the Corps because outfits are a family, and we feel like our family is under attack. I WANT to have pride in the Corps, but decisions like this make it hard to.

If I need to expand more upon these responses, I'd be more than happy to talk in person. I would love to, in fact. I truly hope this helps.

There has always been unit experience disparity. Ones experience in a Pre-Med outfit vs an Ag outfit is going to be different. Certainly make sure all in leadership, from Sophomores on up, understand the Corps standards and values, but accept different outfit cultures as the norm.

I believe this is created out of thin air and takes away the value of what is happening at the outfit level. I would seriously consider where I am hearing such discrimination against outfits from and be hesitant to assume such things. If this is from people within genuine outfits? Or if this is from people no longer in outfits or no longer/never were members of the Corps? My outfit has not only set the corps standard but as an outfit culture there is an expectation that we exceed and hold ourselves to a higher standard then that expected of us. It's what has made my outfit so successful as leaders and as men and women in life. Without outfit culture you cannot have Corps culture. Our individuality it is what allows us to unite as one Corps. We are all together different but the beauty of it is we serve the same purpose to better cadets for the future.

Different units and cultures exist for a reason. An organization this large will not be unanimous in its people's individual ambitions, goals, or personalities. The ability to invest into a unit that suits one's

personality and goals is what lends itself to be part of a large and successful organization. Competition between the units is also very healthy, just like siblings in a family. Requiring the same standards be met from every person in an organization is also a good and reasonable thing, but even higher standards within individual outfits doesn't work against the organization. It helps it, in fact. Having events and special units for people across the quad to meet and form relationships creates a more cohesive corps, though people can't be expected to know everyone due to sheer volume of people. If commanders have more responsibility over their people, then standards will also fall onto them to meet and exceed. Outfit experiences are the heartbeat of the Corps experience and values.

This is the biggest and most important question. Corps identity is important, as is that of the individual outfits. Rather than just jumping in with a massively disruptive solution (based on a "perceived disparity," no less), has there been a serious study of how and why this has occurred over the years? There was strong unit cohesion and identity during my years there, but I don't recall it being at the expense of Corps identity (though I could be wrong) … Perhaps the most painful and apt comparison can be the gradual, almost imperceptible changes over the years that led to the bonfire collapse -- small reductions in standards multiplied over time created catastrophe.

I took tremendous pride in belonging to the Corps, as I did with my individual outfit. But I would have chosen my outfit over the Corps every time, as would most cadets, I suspect. This is human nature, and can't be reorganized or trained away without diminishing the entire experience and unique nature of the Corps. As I said earlier, my outfit experience has been the most positive lasting influence the Corps has had over my lifetime. I also learned a lot about how to lead, follow and grow, but it's the personal relationship that matter most. I did not serve in the military following my time at A&M, but without exception, when I ask my buddies who did serve what they miss most now that they are retired from service, they ALL respond the same: the camaraderie. They never say "the comprehensive leadership training." That's not to say that training and development isn't important, because of course it is, but it needs to be a partner to the development of personal relationships.

In the business world, the most productive, satisfied employees are those who report they are part of a strong culture and those who have positive personal relationships with their coworkers.

I promise you that when I die, surrounded by friends, family and my group of brothers who have stuck together for decades through thick and thin, I won't wish that I had more leadership training and less opportunity for camaraderie during the most formative period of my life.

So, the answer is, BOTH must be stressed. Corps expectations and standards must be upheld or else consequences should ensue. The problems I've seen discussed – fish aren't whipping out to those not in their outfits or chains of command, cadets not participating in the Corps hump it, etc. – are all symptoms of a leadership structure that has forgotten how to instill pride and encourage participation. It's not a fault of the org chart, and it's not a problem that requires massive disruption. Fish will do what is taught, emphasized and demonstrated to them. In the '80s, before units were integrated, I had upperclassmen who would specifically tell us not to whip out to female cadets. Imagine if they had encouraged the opposite, and then stressed why it was important to conduct yourself professionally in every circumstance? If the things that are NOT being done are important, and I'm sure they are, then focus on rewarding those things and providing strong examples of the benefits of doing them. The problems we experience are never more than one college generation -- four short years -- from being completely eradicated.

This is a HUGE PROBLEM. The unit "t" traditions and cultures are absolutely diluting the overall Corps identity and creating unnecessary friction. Solution ...
1. Be more selective in unit leadership. The CO/SEA selection process must weed out prospective leaders who are more wedded to their unit's "traditions" and culture than the Corps'.
2. Accountability. Cadets DON'T hold each other accountable. Period.
3. Followership. With all the emphasis on Leadership the Corps does a terrible job at developing "Faithful Followers" who understand and support the organization's mission and culture. This starts with freshman AND sophomores, but the priority are the JUNIORS! (Yes, the forgotten class year). Get the JUNIORS on board with faithful followership and you'll make some real progress.

4. Refine ALL unit traditions. Here's the litmus test: Does this unit tradition or activity edify and unite the outfit or does it create unnecessary divisions and in/out groups? If the answer is the latter, get rid of it. For example ... EVERYTHING in Company E-2 that involved Reville is toxic, creates in/out groups and creates disunity in the outfit ... yet the OOC enables these activities to continue resulting in one of the most toxic outfit cultures on the Quad.

You are looking at this completely backwards. You want to recruit more, and your answer is to kill the outfits identities that recruit themselves? It's hare-brained. The outfits that have their own identity are recruiting with no issues. In fact, they usually have to turn away cadets. Figure out what part of their identity is causing demand from HS students to join, and encourage the outfits that have trouble recruiting to emulate their successes. The more you try to kill outfit identity, the harder time you will have recruiting.

I would also encourage you to start having some bulls on staff that were d&C cadets at A&M. Ones that have spent their lives in sales, marketing, etc. Ones that think outside the box, instead of just trying to force the same box on everyone.

Seriously...what justifies taking PT away from the best upperclassmen in the Corps? Check your ego at the door, sir.

What you are describing is communism and has never worked in all of history. Encourage the lower performing outfits to emulate the high performing outfits. I will follow up with a question for you, what lessons have you learned, specifically, and how will you implement change in your own decision making process, specifically

Best question ever. Do the opposite. Promote outfit individuality. Create separation and specialization opportunities between outfits. In my opinion, healthy and civil competition is the best way to create enthusiasm and growth. Outfits will adjust to suit and cater to their strengths, attract recruits, and improve on weaknesses. See my prior answer to creating project leadership opportunities. My son will join next year and we've been watching YouTube recruiting videos per outfit. Would be great to find a Civil Engineering outift or an Ag outfit, etc. Nothing says you can't have standards and values as a whole and still remain individual. There's nothing more American.

You don't. Outfit pride is what makes the Corps special. Forcing integration on outfits was a mistake during my time in the Corps and still is today. Some cadets don't mind being in an integrated outfit, especially those signing contract, but to some cadets it's a big deal. I was one of those as was most of my friends in the Corps. I was a D&C cadet and joined the Corps for the fraternal aspect and to be closely intertwined with the traditions of the school I love. There is a reason why there are fraternities and sororities; they aren't coed. As I'm sure you see, the outfits with the most pride are the ones that have that fraternal feel to them. I know my friends from the Corps are still my best friends today. I wouldn't have that without that environment I was fortunate to be a part of. I have a son that has already been accepted into the university and plans on joining the Corps. I will say that if the Corps is changed and he can't be a part of a non-integrated outfit, he is out, and as a father I will support his decision. I love the Corps but it's because I loved Spider D first. Lastly, outfits having their own identity is what helps cadets find those that they want to be around and become lifelong friends with. Doing away with outfit pride will water down the Corps and hurt recruiting a heck of a lot more than it will help it. Don't make the Corps softer because you are worried about retention. If it's not hard you don't grow from it. In the real world people quit their job all the time. Companies move on with the next man up. I've lost few employees over the years that were truly missed. The strong ones stick around. I have been with the same company for 23 years. Had good times and bad, but the hard times I had my fish year are what shaped me and made me the types of person who could withstand the tough times. Worry about making the fish strong so they are prepared to lead. Don't cater to the weak ones.

Please allow me to rephrase this question: How can we preserve the individual unit experience while balancing the Corps standards and values?

Not all units are/were the same. Not all military services are the same. Not all branches within each military service are the same.

You cannot from a "position on high" create an environment in which everyone succeeds to the exact

same metric. Look at the growth on the number of shoulder cords worn in the Quad. In my day there were three unit level cords, Moore, Hochmuth and Scholarship. Now we've added a few more.

I cannot confirm but I was told the blue and white cord is for scholarship. If the blue and white cord is for scholarship, what is the gold star for? And there was once a ribbon worn for achieving a 3.25 GPA. Wow, in one semester seemingly you can achieve a trifecta of uniform accoutrements.

However, you can pretty much expect the units having "pre-med" to win the scholarship cord. Certainly, not the "jock outfits". Perhaps a bit of expectation management is in order.

Likewise, if needed to better prepare fish for the rigors of u nit life, let's expand the Freshman orientation (Beast Barracks style?). Let's prepare our fish for the rigors of the Corps, but let's not modify its structure. This is still college, not basic training. The Corps is there to get an education, not prepare for war. And that is a difference.

And for heavens sake, allow members of the Corps to "run" and lead this fish preparation period. Keep the Trigon away. Allow leadership development by the upper classmen while preparing the fish.

You mentioned hiring four more Leadership advisors. (Just what the Corps needs, more representative of the Trigon.)

How about taking that money for salary and benefits and use it to bring in successful leaders as nominated by former members of the Corps of Cadets.

Have the former cadets nominate these leaders and the Trigon can vet them.

Especially, leaders who rose and succeeded as a result of their Corps experience, or despite it.

We have a large talent pool who have a lot to give and would be most willing to give back to their Corps in developing leadership for the Cadets. Put them up in the campus hotel for a few days and allow them to interact with the Corps. Allow the good with the bad….

I always am amused when I come upon a cadet or groups, and they hungerly want to know of my experiences as a Cadet. All the Trigon needs to do is tailor those "experiences" to those having an impact (good or bad) in their lives.

And it does not have to be limited to Aggies either.

I believe that having slightly different values between the outfits is part of what makes the Corps strong. Allowing fish to choose which culture suits them allows for a unique experience that you can't get at any other ROTC or academy.

Allow the outfits to excel and emphasize different things based on its culture while also having values that all the outfits can unite behind such as determination and leadership.

A big part of the difference is that the outfits do not trust Corps or Comm staff to train their freshmen because they don't have great experiences with either. CTO's are generally seen as fickle and inconsistent and Corps Staff is generally seen as resume builders that don't really care about people. While these aren't always true by any means, these perceptions exist for a reason.

This is a really tough one. I like the idea of a stronger FOW experience, one which really emphasizes the Corps and Cadet identity. The idea should be "by the end of FOW they should be able to return home and have their parents be astounded by how neat, courteous, and attentive they are." They should be transformed in this process. I think 4-6 weeks is the absolute minimum time for that transformation, but I also recognize that a lot of that transformation should occur in unit (i.e., the unit's culture and narrative should EMPHAISIZE and strengthen the influence of the Corps values in the fish).

Maybe every unit should provide a list of values (some sort of manifesto) which elaborates on and emphasizes the Corps values. This manifesto would help units to see how everything that makes someone a good cadet should make them a better Trident, Gladiator, Killer etc.

Maybe start a propaganda campaign that makes it looks cool to just be a CADET. (I would call this campaign "I am Cadet"). This is my silliest idea to date but I can totally see how it could give people solidarity as cadets. But it would involve a lot of old footage and heritage moments strung together to remind us of the awesome patriotic and red ass history of the corps. Basically bring the corps center to instagram in a way that makes everyone say "hell yeah the corps is awesome". One of my favorites is the story in the corps center about how the Head yell leader stopped a riot at the 1926 Baylor/TAMU football game by having the band play Taps. The riot ended immediately when the whole corps (previously rioting) stopped and came to attention. I read that and it made my heart ache to be part of that organization.

Lastly we need to focus more on the Cadet oath. Or make a cadet creed. But I'm afraid it would just become a joke.

**EXHIBIT**

**11**



Office of General Counsel

THE TEXAS A&M UNIVERSITY SYSTEM

April 23, 2024

Open Records Division                                    *via OAG E-Filing*
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548

Re:      Withdrawal of Request for a Decision Regarding Public Information Request from Brian
         Beckcom to Texas A&M University (J001320-041024)

Dear Open Records Division:

On April 19, 2024, we requested a decision on an open records request submitted by Brian
Beckcom ("requestor") to Texas A&M University (the "university") regarding the information we
submitted as Exhibits B-1 and B-2. The open records request, enclosed as Exhibit A, seeks certain
documents, materials, and communications.

After submitting the request for a decision to your office, the university has changed its
position with respect to the applicability of Tex. Gov't Code sec. 552.111 to Exhibits B-1 and B-2, and the university will release this information to the requestor. Therefore, a decision from your
office is not required with respect to Exhibits B-1 and B-2, and we are withdrawing our request to
your office.

Thank you for your consideration of this matter. If you have any questions, please feel free
to contact me.

Sincerely,

R. Brooks Moore
Deputy General Counsel

Enclosure:      Exhibit A

cc:             Requestor (without enclosures)

                TAMU Open Records

301 Tarrow Street, 6ᵗʰ Floor · College Station, Texas 77840-7896
(979) 458-6120 · Fax (979) 458-6150 · www.tamus.edu/legal

EXHIBIT

12

# Public Information Records (#J001365-041524)

∨ **Public Information Records Details**

| | |
|---|---|
| This request is for: | Texas A&M University |
| Summary of Request: | Any and all audio or video recordings of candidates as part of the Commandant selection process. |
| Describe in detail the Record(s) Requested: | From: Patti Artavia<br>Sent: Monday, April 15, 2024 11:33 AM<br>To: open-records@tamu.edu<br>Cc: Brendan Fradkin ; Brian Beckcom<br>Subject: Open Records Request |

Please see attached request.

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

To Whom It May Concern:
Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:

1. Any and all audio or video recordings of candidates as part of the Commandant selection process;

I agree to pay reasonable fees for the processing of this request.

As provided by the open records law, I will expect your response within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

You may make redactions for confidential personal information. I do not consent to redaction or withholding based on any other privilege.

Please direct any future correspondence to the undersigned and Brendan@vbattorneys.com and Patti@vbattorneys.com We look forward to hearing from you.

Sincerely,

/s/ Brian Beckcom
Brian Beckom
Brian@vbattorneys.com

| | |
|---|---|
| Date From: | |
| Date To: | |
| Preferred Method to Receive Records: | Electronic via Records Center |
| Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?: | YES |

Do you agree to the redaction of     NO
information that is subject to
discretionary exceptions,
provided such redactions are
clearly labeled on information you
receive?:

## ❯ Category

## ⌄ Clarification(s)

Clarification(s):          STAFF: Please describe any clarifications requested and received.

## ❯ OAG decision requested

## ❯ Exceptions

## ❯ Charges

## ⌄ Message History

Date

On 4/15/2024 1:15:18 PM, Leslie Kacer wrote:
CC: Open-records@tamu.edu; Brendan@vbattorneys.com; Patti@vbattorneys.com
**Subject:** Public Information Records :: J001365-041524
**Body:**
Dear Brian Beckcom:

We received your public information request for  Texas A& M University.  Your request was given the **reference number J001365-041524** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed. Thank you for your interest in  Texas A& M University.

To monitor the progress or update this request please log into the  Public Records Center.

On 4/15/2024 1:02:57 PM, Leslie Kacer wrote:
Request was created by staff

## ⌄ Request Details

Reference No:          J001365-041524

Created By:          Leslie Kacer

Create Date:          4/15/2024 8:00 AM

Update Date:          4/15/2024 1:05 PM

Completed/Closed:       No

Required Completion Date:  4/29/2024

Status:          Activity Assigned

Priority:          Medium

Assigned Dept:          TAMU_Open Records

Assigned Staff:         Open Records University

Customer Name:          Brian Beckcom

Email Address:          Brian@vbattorneys.com

Phone:                  8327913118

Group:                  TAMU


Source:                 Email

EXHIBIT
13

CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J001365-041524
**Body:**
04/29/2024


RE: PUBLIC RECORDS REQUEST of April 15, 2024, Reference # J001365-041524

Dear Brian Beckcom,

Texas A&M University received a public information request from you on April 15, 2024. Your request mentioned:

*"To Whom It May Concern:*
*Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records*
*Information, please produce the following documents:*

*1. Any and all audio or video recordings of candidates as part of the Commandant selection*
*process;*

*I agree to pay reasonable fees for the processing of this request.*

*As provided by the open records law, I will expect your response within 10 business days. If*
*you choose to deny this request, please provide a written explanation for the denial including a*
*reference to the specific statutory exemption(s) upon which you rely. Also, please provide all*
*segregable portions of otherwise exempt material.*

*You may make redactions for confidential personal information. I do not consent to*
*redaction or withholding based on any other privilege.*

*Please direct any future correspondence to the undersigned and Brendan@vbattorneys.com*
*and Patti@vbattorneys.com We look forward to hearing from you.*

*Sincerely,*

*/s/ Brian Beckcom*
*Brian Beckom*
*Brian@vbattorneys.com"*


The information found responsive to your request is available and can be obtained by visiting the Public Records Online Portal and logging in from the "My Request Center" tab.

Sincerely,

Knesha Brashear
Open Records Office

EXHIBIT

14

# Public Information Records (#J001723-051624)

⌄ **Public Information Records Details**

| | |
|---|---|
| This request is for: | Texas A&M University |

Summary of Request:

1. Any documents pertaining to renovation plans for the bathroom/restroom facilities in the dormitories housing the Corps of Cadets. This should include contracts or agreements related to the renovation projects, estimates, analyses, architectural designs/plans, engineering designs/plans, and anticipated costs.

2. Any communications between university employees or officials regarding the renovation plans or any of the documents pertaining to those plans.

3. Any communications between university employees or officials and third-parties regarding the renovation plans or any of the documents pertaining to those plans.
I agree to pay reasonable fees for the processing of this request.

Describe in detail the Record(s) Requested:

From: Patti Artavia
Sent: Thursday, May 16, 2024 3:37 PM
To: open-records@tamu.edu
Cc: Brendan Fradkin ; Brian Beckcom
Subject: TPIA Request

Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:

1. Any documents pertaining to renovation plans for the bathroom/restroom facilities in the dormitories housing the Corps of Cadets. This should include contracts or agreements related to the renovation projects, estimates, analyses, architectural designs/plans, engineering designs/plans, and anticipated costs.

2. Any communications between university employees or officials regarding the renovation plans or any of the documents pertaining to those plans.

3. Any communications between university employees or officials and third-parties regarding the renovation plans or any of the documents pertaining to those plans.
I agree to pay reasonable fees for the processing of this request.

Please respond within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.

You may make redactions for confidential personal information. I do not consent to redaction or withholding based on any other privilege.

Date From:

Date To:

Preferred Method to Receive Records: Electronic via Records Center

Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?: YES

Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?: NO

## ❯ Category

## ⌄ Clarification(s)

| Clarification(s): | Rec'd Response to Clarification Request - 5/17<br>Sent Clarification Request - 5/16 | STAFF: Please describe any clarifications requested and received. |

## ❯ OAG decision requested

## ❯ Exceptions

## ❯ Charges

## ⌄ Notes

| Note | Created | Modified |
|---|---|---|
| Hi Ladies -<br><br>Do you need a ruling for this request? If so, has the document needing a ruling been uploaded?<br><br>Thank you,<br><br>Melanie Burns<br><br>Tricia Bledsoe Knesha Brashear Wendy Ramirez Leslie Kacer Melanie Burns | 6/3/2024 9:07:00 AM by Melanie Burns | 6/3/2024 9:07:00 AM by Melanie Burns |

## ⌄ Message History

| Date |
|---|
| On 5/17/2024 2:21:02 PM, Brian Beckcom wrote:<br>TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]<br>CC: [Brendan@vbattorneys.com], [Open-records@tamu.edu], [Patti@vbattorneys.com]<br><br>We will limit it to the last 3 years.<br>Please respond timely instead of the constant delay and piecemeal production.<br>If you choose to assert any privileges, please produce a privilege log.<br><br>-bb<br>Brian Beckcom<br>www.VBAttorneys.com<br>www.BrianBeckcom.org<br><br><br>On Thu, May 16, 2024 at 4:49 PM Texas A&M University Public Records Support wrote: |

On 5/16/2024 4:48:22 PM, Leslie Kacer wrote:

Date
CC: Open-records@tamu.edu; Brendan@vbattorneys.com; Patti@vbattorneys.com
**Subject:** Public Information Records :: J001723-051624
**Body:**
May 16, 2024

RE: PUBLIC RECORDS REQUEST of May 16, 2024, Reference # J001723-051624

Dear Brian Beckcom,

Texas A& M University received a public information request from you on May 16, 2024. Your request mentioned:

*"From: Patti Artavia < patti@vbattorneys.com>*
*Sent: Thursday, May 16, 2024 3:37 PM*
*To: open-records@tamu.edu*
*Cc: Brendan Fradkin < brendan@vbattorneys.com> ; Brian Beckcom < brian@vbattorneys.com>*
*Subject: TPIA Request*

*Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*1. Any documents pertaining to renovation plans for the bathroom/restroom facilities in the dormitories housing the Corps of Cadets. This should include contracts or agreements related to the renovation projects, estimates, analyses, architectural designs/plans, engineering designs/plans, and anticipated costs.*

*2. Any communications between university employees or officials regarding the renovation plans or any of the documents pertaining to those plans.*

*3. Any communications between university employees or officials and third-parties regarding the renovation plans or any of the documents pertaining to those plans.*
*I agree to pay reasonable fees for the processing of this request.*

*Please respond within 10 business days. If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely. Also, please provide all segregable portions of otherwise exempt material.*

*You may make redactions for confidential personal information. I do not consent to redaction or withholding based on any other privilege."< /brian@vbattorneys.com> < /brendan@vbattorneys.com> < /patti@vbattorneys.com>*

We are in need of clarification/narrowing regarding the information requested. Could you please provide us with a date range so that we can better assist you with your request?

As provided by section 552.222(d) of the Texas Public Information Act, your request will be considered withdrawn if we do not receive a response from you by the 61st day after the date of this request for clarification/narrowing.

Sincerely,

Leslie Kacer
Open Records Office

Date

On 5/16/2024 4:16:02 PM, Leslie Kacer wrote:
CC: Open-records@tamu.edu; Brendan@vbattorneys.com; Patti@vbattorneys.com
**Subject:** Public Information Records :: J001723-051624
**Body:**
Dear Brian Beckcom:

We received your public information request for  Texas A& M University.  Your request was given the **reference number J001723-051624** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed. Thank you for your interest in  Texas A& M University.

To monitor the progress or update this request please log into the  Public Records Center.

On 5/16/2024 4:05:00 PM, Leslie Kacer wrote:
Request was created by staff

## ⌄ Request Details

| | |
|---|---|
| Reference No: | J001723-051624 |
| Created By: | Leslie Kacer |
| Create Date: | 5/16/2024 8:00 AM |
| Update Date: | 6/3/2024 4:00 PM |
| Completed/Closed: | No |
| Required Completion Date: | 6/3/2024 |
| | |
| Status: | Activity Assigned |
| Priority: | Medium |
| Assigned Dept: | TAMU_Open Records |
| Assigned Staff: | Open Records University |
| | |
| Customer Name: | Brian Beckcom |
| Email Address: | Brian@vbattorneys.com |
| Phone: | 8327913118 |
| Group: | TAMU |
| | |
| Source: | Email |

**EXHIBIT
15**

RE: PUBLIC RECORDS REQUEST, Reference # J001723-051624

Dear Mr. Brian Beckcom,

The information you seek was the subject of a previous request received by our office. We have requested a ruling from the Office of the Attorney General (OAG) regarding this information. Therefore, we will be relying on the pending ruling letter regarding your request.  You will be notified, once we are in receipt of the OAG's decision letter.  Please find uploaded information responsive to your request we are not seeking to withhold.  We are still reviewing the remaining responsive information and if there is any additional information that can be released pending the Attorney General's ruling, we will provide as soon as possible.

Please note, the PO for Spence showing a $503,055 charge for Patterson architects for design services is not accurate. The $503,055 is the total budget for the project. As shown in the uploaded a spreadsheet, the $503,055 total budget is broken down in the following categories:

Pre-design/pre-construction costs:          $600

Design costs:                                          $31,250

Construction:                                          $406,950

Project Management:                              $64,255 (including $40,400 contingency and $23,955 SSC contract administration services)

Total:                                                     $503,055

 This information is now available and can be obtained by visiting the <u>Public Records Online Portal </u>and logging in from the "My Request Center" tab.

Sincerely,

Tricia Bledsoe

Open Records Office

EXHIBIT
16

May 6, 2024

Open Records Division                                    *via UPS DELIVERY*
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548

Re:    Request for a Decision regarding a Public Information Request from JD Foster to Texas
       A&M University (J001330-041124)

Dear Open Records Division:

On April 29, 2024[1], we requested a decision on an open records request JD Foster
("requestor") submitted to Texas A&M University (the "university") on April 15, 2024. The
request, enclosed as Exhibit A, seeks certain correspondence and documents.

We believe that a portion of the information responsive to the request is excepted from
disclosure under the Texas Public Information Act, Government Code, Chapter 552 ("Act"), as
explained below. Therefore, we are requesting a decision regarding this information.[2]

**Exhibit B-1.  Tex. Gov't Code § 552.107, Tex. R. Evid. 503**

The representative sample of information enclosed as Exhibit B-1 constitutes or documents
a communication between a Texas A&M System attorney and university administrators and
system officials, and this communication should be excepted from disclosure under section
552.107(1) of the Act and/or Tex. R. Evid. 503 (to the extent that any information covered by
Exhibit B-1 is subject to section 552.022 of the Act). The attorney general has provided the
following analysis of this exception:

> Section 552.107(1) of the Government Code protects information coming within
> the attorney-client privilege. When asserting the attorney-client privilege, a
> governmental body has the burden of providing the necessary facts to demonstrate

---

[1] The request was originally received on April 11, 2024. *See* Exhibit A. The university requested clarification/
narrowing of the request on April 11, 2024, and the requestor provided clarification/narrowing on April 11, 2024. The
university requested further clarification/narrowing on April 12, 2024, and the requestor provided
clarification/narrowing on April 15, 2024, making it the official date of receipt. Thus, the 10th business day after
receipt of this request is April 29, 2024.

[2] Please note that the university will also redact or withhold certain other responsive information as authorized by
section 552.114 of the Act.

**- 1813 -**

the elements of the privilege in order to withhold the information at issue. Open Records Decision No. 676 at 6-7 (2002). First, a governmental body must demonstrate that the information constitutes or documents a communication. *Id*. at 7. Second, the communication must have been made "to facilitate the rendition of professional legal services" to the client governmental body. Tex. R. Evid. 503(b)(1). The privilege does not apply when an attorney or representative is involved in some capacity other than that of providing or facilitating professional legal services to the client governmental body. *In re Tex. Farmers Ins. Exch*., 990 S.W.2d 337, 340 (Tex. App.—Texarkana 1999, orig. proceeding) (attorney-client privilege does not apply if attorney acting in a capacity other than that of attorney). Governmental attorneys often act in capacities other than that of professional legal counsel, such as administrators, investigators, or managers. Thus, the mere fact that a communication involves an attorney for the government does not demonstrate this element. Third, the privilege applies only to communications between or among clients, client representatives, lawyers, and lawyer representatives. Tex. R. Evid. 503(b)(1). Thus, a governmental body must inform this office of the identities and capacities of the individuals to whom each communication at issue has been made. Lastly, the attorney-client privilege applies only to a confidential communication, *id*. 503(b)(1), meaning it was "not intended to be disclosed to third persons other than those: (A) to whom disclosure is made to further the rendition of professional legal services to the client; or (B) reasonably necessary to transmit the communication." *Id*. 503(a)(5). Whether a communication meets this definition depends on the intent of the parties involved at the time the information was communicated. *Osborne v. Johnson*, 954 S.W.2d 180, 184 (Tex. App.—Waco 1997, orig. proceeding). Moreover, because the client may elect to waive the privilege at any time, a governmental body must explain that the confidentiality of a communication has been maintained. Section 552.107(1) generally excepts an entire communication that is demonstrated to be protected by the attorney-client privilege unless otherwise waived by the governmental body. *See Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996) (privilege extends to entire communication, including facts contained therein).

*See, e.g.*, Tex. Att'y Gen. OR2016-02974 (2016). These same factors apply to the application of the attorney-client privilege under Tex. R. Evid. 503. *See* Tex. Att'y Gen. No. ORD-676 (2002).

We submit the information that meets the criteria set forth above to demonstrate the elements of the attorney-client privilege necessary to withhold this information in its entirety. First, the information constitutes or documents a communication, satisfying the first element of the privilege test. The communications or documented communications in Exhibit B-1 are between a Texas A&M System Office of General Counsel (OGC) attorney and university administrators and system officials. Specifically, the communications in Exhibit B-1 are between: Ray Bonilla, General Counsel, OGC; and Susan Ballabina, Chief of Staff, Office of the President, Texas A&M University. The following are copied on this communication: President Mark A.

Welsh III, Texas A&M University; Joe Ramirez, Vice President for Student Affairs, Texas A&M University; and Patrick Michaelis, Commandant, Corps of Cadets, Texas A&M University. The communications/documented communications were forwarded by Susan Ballabina to Regent Randy Brooks, Texas A&M System Board of Regents. The underlying communication was between: Ramirez and Welsh with a copy to Ballabina; Michaelis (full names and titles above); Thomas Reber, Executive Associate Vice President, Student Services, Texas A&M University; Chareny Rydl, Executive Director, Residence Life and Housing, Texas A&M University; and Kevin P. McGinnis, Vice President and Chief Compliance Officer, Texas A&M University. *See* Exhibit B-1.

Second, the communications or documented communications were sent and received expressly for the purpose of facilitating the rendition of legal advice or legal services from an OGC attorney to university administrators and system officials. Third, the communications or documented communications are between an OGC attorney and university administrators and system officials, and the attorney-client privilege expressly covers communications between a client or the client's representatives and the client's lawyer or the lawyer's representatives. *See* Tex. R. Evid. 503(b)(1)(A). Finally, at the time this information was communicated, it was the intent of the parties that the information not be disclosed to third persons. Subsequent to the initial communication of the information, the attorney and client representatives have maintained the confidentiality of the communication. Therefore, we believe that the representative sample of responsive information, enclosed in Exhibit B-1, is excepted from disclosure under section 552.107(1) of the Act and/or Tex. R. Evid. 503.

## Exhibit B-2. Tex. Gov't Code §§ 552.110, 552.1101

The information that is enclosed as Exhibit B-2 may include commercial or financial information excepted from disclosure as third-party proprietary information under sections 552.110 and/or 552.1101 of the Act. Regarding the application of this provision to the information at issue, we note that the Act provides:

(a) In a case in which information is requested under this chapter and a person's privacy or property interests may be involved, including a case under section 552.101, 552.110, 552.1101, 552.114, 552.131, or 552.143, a governmental body may decline to release the information for the purpose of requesting an attorney general decision.

(b) A person whose interests may be involved under Subsection (a), or any other person, may submit in writing to the attorney general that person's reasons why the information should be withheld or released.

(c) The governmental body may, but is not required to, submit its reasons why the information should be withheld or released.

(d)     If release of a person's proprietary information may be subject to exception under Section 552.101, 552.110, 552.1101, 552.113, 552.131, or 552.143, the governmental body that requests an attorney general decision under Section 552.301 shall make a good faith attempt to notify that person of the request for the attorney general decision. Notice under this subsection must:

    (1)     be in writing and sent within a reasonable time not later than the 10th business day after the date the governmental body receives the request for the information; and

    (2)     include:
    (A) a copy of the written request for the information, if any, received by the governmental body; and
    (B) a statement, in the form prescribed by the attorney general, that the person is entitled to submit in writing to the attorney general within a reasonable time not later than the 10th business day after the date the person receives the notice:
        (i) each reason the person has as to why the information should be withheld; and
        (ii) a letter, memorandum, or brief in support of that reason.

(e)     A person who submits a letter, memorandum, or brief to the attorney general under Subsection (d) shall send a copy of that letter, memorandum, or brief to the person who requested the information from the governmental body. If the letter, memorandum, or brief submitted to the attorney general contains the substance of the information requested, the copy of the letter, memorandum, or brief may be a redacted copy.

Tex. Gov't Code Ann. § 552.305 (West 2020).

The university is declining to release the information in Exhibit B-2 to the requestor pending a decision from your office, and we are sending the letter prescribed by the attorney general to the vendors as notice of their right to object to the release of materials containing proprietary information. A copy of this letter is enclosed as Exhibit C. The university takes no position regarding the application of sections 552.110 and/or 552.1101 to the information and declines to submit reasons why all or part of the marked information should or should not be considered proprietary to the vendors.

Please note that we are sending this brief via UPS because the size of the brief and the accompanying exhibits make it impractical and impossible to make this submission through the designated electronic filing system.

Thank you for your consideration of this matter. If you have any questions, please feel free to contact me.

Sincerely,

R. Brooks Moore
Deputy General Counsel

Enclosures: Exhibits A, B-1, B-2, C

cc: Requestor *(via email) (no attachments)*

Texas A&M University Open Records

**Quad-Tex Construction, Inc.**
Attention: Fred Patterson, Doug Chmelar
11069 N Dowling Rd
College Station, TX 77845
office@quadtex.net

**Patterson Architects**
701 South Texas Ave
Bryan, TX 77803
fred@patarch.com

**Kirksey Architecture**
Attention: Verr Soltes
6909 Portwest Drive
Houston, TX 77024
verr.soltes@kirksey.com

**Project Control of Texas, Inc.**
Attention: Gary Hall
17300 Henderson Pass, Suite 110
San Antonio, TX 78232
ghall@projectcontrol.com

**SpawGlass Construction Corp.**
Attention: Garett Wheaton
4030 SH-6 S., Ste. 300
College Station, TX 77845
garett.wheaton@spawglass.com

EXHIBIT
17

# Public Information Records (#J001330-041124)

⌄ **Public Information Records Details**

This request is for: Texas A&M University

Summary of Request: Corps of Cadets bathroom/restroom project/renovations.

Describe in detail the Record(s) Requested:

From: JD Foster
Sent: Thursday, April 11, 2024 1:09 PM
To: open-records@tamu.edu
Subject: Texas Open Records Act Request

To Whom it May Concern:

Please find attached my correspondence of even date.

Thank You,

JD Foster

JD Foster
Managing Attorney
Foster Massengill, PLLC


Please accept this letter as a formal request for documents or information pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:

1. All documents or other materials related to any 'bid plan' for any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).

2. Any and all contracts or agreements of any kind relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).

3. All documents relating to or evidencing any estimate for or actual costs relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).

4. All plans, mock-ups, proposals, floor-plans, depictions, or other similar documents relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).

5. Any and all documents exploring, discussing, or otherwise related to the effect such renovations may have on housing capacity or other effects on the existing use(s) of such dorms relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).

6. Any and all communications between any employee or University officials within the Office of the President, Office of the Vice President for Student Affairs, Office of the Commandant, and/or Office of the General Counsel relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12). (Such communications should include emails, text messages, other forms of electronic or digital communication, traditional correspondence and letters, interoffice and intraoffice memoranda, and other forms of written communication.)

7. Any and all communications between any employee or University officials within the Office of the President, Office of the Vice President for Student Affairs, Office of the Commandant, and/or Office of the

General Counsel and any third-party relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12). (Such communications should include emails, text messages, other forms of electronic or digital communication, traditional correspondence and letters, interoffice and intraoffice memoranda, and other forms of written communication.)

8. Any and all documents pertaining to Diversity, Equity, and Inclusion (commonly, "DEI") and/or Texas Senate Bill 17 (commonly, "SB17"), including but not limited to communications between any employee or University officials within the Office of the President, Office of the Vice President for Student Affairs, Office of the Commandant, and/or Office of the General Counsel and/or impact studies or equivalent documents, relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12). (Such communications should include emails, text messages, other forms of electronic or digital communication, traditional correspondence and letters, interoffice and intraoffice memoranda, and other forms of written communication.)

Date From:

Date To:

Preferred Method to Receive Records:     Electronic via Records Center

Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?:     NO

Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?:     NO

> **Category**

⌄ **Clarification(s)**

Clarification(s):     Clarification Requested - 04/11
Clarification Received - 04/11
2nd Clarification Requested 04/12
2nd Clarification Received 04/15     STAFF: Please describe any clarifications requested and received.

> **OAG decision requested**

> **Exceptions**

> **Charges**

⌄ **Notes**

| Note | Created | Modified |
|---|---|---|
| Quad- Tex filed 3rd Party Brief to OAG | 5/20/2024 4:36:00 PM by Melanie Burns | 5/20/2024 4:36:00 PM by Melanie Burns |

| | | |
|---|---|---|
| See the Student Affairs Response doc I uploaded in the OGC Feedback folder I created. The marked information should be withheld under 552.114 and/or 552.107. Also, pages 19-24 are potentially 552.110 information of SSC. NOTE: we did not submit SSC information with our brief and did NOT notice SSC. Please check with TAMU. Do we need to notice SSC and submit this information to allow SSC to present their objections (in addition to their objections on the current bids and contracts previously submitted). Are there other SSC contract docs or bids that need to be submitted as potentially 552.110 of SSC (any of the docs you have in the "response for release pending ruling" folder)?<br><br>The President Office Responsive Emails must be withheld per 552.107 and/or 552.114.<br><br>Any specific documents about construction prior to February 5, 2024 must be withheld per 552.114 as these relate to a project that is identifiable to 1 student. The screenshot on page has a reference to "Title IX Compliance". This reference is incorrect in that it references the prior project, and as such, should be redacted per 552.114.<br><br>A question for the TAMU team is whether the remaining information in the Student Affairs Response doc is specifically identifiable to the rationale for the prior project. I do not think so, but we need university input on this.<br><br>Please let me know if additional briefing is needed to cover any potential SSC 552.110.<br><br>Thanks,<br><br>Brooks<br><br>Open Records University Melanie Burns | 5/16/2024 2:43:00 PM by Brooks Moore | 5/16/2024 2:43:00 PM by Brooks Moore |
| The information for review as 552.111 or 552.111/FERPA should be withheld under 552.114 because it is identifiable to a specific student and a small group of students in the same outfit.<br><br>I will draft a brief asserting 552.107 and 552.110.<br><br>Brooks<br>Open Records University Melanie Burns | 5/5/2024 3:19:00 PM by Brooks Moore | 5/5/2024 3:19:00 PM by Brooks Moore |
| IT conducted a search of President Welsh's and Dr. Ballabina's emails. Two searches were done. Responsive emails in search #1 are attached. There were no responsive emails in search #2. Neither President Welsh nor Dr. Ballabina had any responsive text messages. | 4/20/2024 9:17:00 PM by Deena McConnell | 4/20/2024 9:17:00 PM by Deena McConnell |

⌄ **Message History**

On 6/3/2024 10:56:00 AM, Tricia Bledsoe wrote:
CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J001330-041124
**Body:**
06/03/2024


RE: PUBLIC RECORDS REQUEST, Reference # J001330-041124

Dear Mr. JD Foster,
Please find uploaded additional documents responsive to your request that we are not seeking to withhold.

This information  is now available and can be obtained by visiting the  Public Records Online Portal  and logging in from the " My Request Center" tab.

Please note, the PO for Spence showing a $503, 055 charge for Patterson architects for design services is not accurate.  The $503, 055 is the total budget for the project.  As shown in the uploaded a spreadsheet, the $503, 055 total budget is broken down in the following categories:

Pre-design/pre-construction costs:   $600

Design costs:                          $31, 250

Construction:                                        $406, 950

Project Management:                                   $64, 255 (including $40, 400 contingency and $23, 955 SSC contract administration services)

Total:                          $503, 055

Sincerely,

Tricia Bledsoe

Open Records Office


On 5/17/2024 5:16:02 PM, Tricia Bledsoe wrote:
CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J001330-041124
**Body:**
05/17/2024


RE: PUBLIC RECORDS REQUEST, Reference # J001330-041124

Dear Mr. JD Foster,

Please find uploaded documents responsive to your request that we are not seeking to withhold.
This information  is now available and can be obtained by visiting the  Public Records Online Portal  and logging in from the " My Request Center" tab.

Sincerely,

Tricia Bledsoe
Open Records Office

On 5/8/2024 11:27:01 AM, JD Foster wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [openrecords@tamus.edu], [Open-records@tamu.edu]


To Whom it May Concern:

Please release the documents you are not seeking to redact or exclude from the response to the request while we wait for the AG to make a determination regarding the information and documents
you are seeking to redact or exclude. Please let me know how we can best facilitate that effort.

Thank You,

JD Foster

JD Foster
Managing Attorney
Foster Massengill, PLLC



CONFIDENTIALITY STATEMENT
This message, as well as any attached document, contains information, which may be confidential
and/or privileged or may contain attorney work product. If you have received this message in error, please delete all electronic copies of this message and its attachments, if any, without disclosing the contents, and notify the sender immediately.

NO SIGNATURE OR AGREEMENT
Unless expressly stated otherwise, nothing contained in this message should be construed as a
digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

From: Texas A&M University Public Records Support

Sent: Monday, May 6, 2024 2:51 PM
To: JD Foster
Cc: openrecords@tamus.edu; Open-records@tamu.edu
Subject: Public Information Records :: J001330-041124



Attachments:
Foster_J1330_552.107__552.110__552.1101.pdf
VENDOR_NOTICE_-_Foster__J001330-041124_.pdf


On 5/6/2024 2:51:00 PM, Melanie Burns wrote:
CC: openrecords@tamus.edu; Open-records@tamu.edu
**Subject:** Public Information Records :: J001330-041124
**Body: 05/06/2024**

**For Requestor: JD Foster (J001330-041124): REQUEST FOR OAG DECISION**

The Texas A& M University System is requesting a decision from the Office of the Attorney General of Texas regarding your open records request to Texas A& M University.  Attached is a copy of our correspondence being submitted today.

Thank you,

System Open Records

On 4/29/2024 3:39:00 PM, Melanie Burns wrote:
CC: openrecords@tamus.edu
**Subject:** Public Information Records :: J001330-041124
**Body: 04/29/2024**

**For Requestor: JD Foster (J001330-041124): REQUEST FOR OAG DECISION**

The Texas A& M University System is requesting a decision from the Office of the Attorney General of Texas regarding your open records request to Texas A& M University.  Attached is a copy of our correspondence being submitted today.

Thank you,

System Open Records

On 4/15/2024 12:51:02 PM, JD Foster wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu]


Per your request, we are narrowing our requests to include the following date range: August 1, 2023 to present.

Please let us know if you have any questions or concerns.

Thank You,

JD Foster

JD Foster
Managing Attorney
Foster Massengill, PLLC



CONFIDENTIALITY STATEMENT
This message, as well as any attached document, contains information, which may be confidential
and/or privileged or may contain attorney work product. If you have received this message in error, please delete all electronic copies of this message and its attachments, if any, without disclosing the contents, and notify the sender immediately.

NO SIGNATURE OR AGREEMENT
Unless expressly stated otherwise, nothing contained in this message should be construed as a
digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

From: Texas A&M University Public Records Support

Sent: Friday, April 12, 2024 4:42 PM
To: JD Foster
Cc: Open-records@tamu.edu
Subject: Public Information Records :: J001330-041124

On 4/12/2024 4:41:38 PM, Leslie Kacer wrote:

CC: Open-records@tamu.edu;
**Subject:** Public Information Records :: J001330-041124
**Body:**
April 12, 2024

RE: PUBLIC RECORDS REQUEST of April 11, 2024, Reference # J001330-041124

Dear JD Foster,

Texas A& M University received a public information request from you on April 11, 2024.   Your request mentioned:

*"From: JD Foster < jd@fostermassengill.com>*
*Sent: Thursday, April 11, 2024 1:09 PM*
*To: open-records@tamu.edu*
*Subject: Texas Open Records Act Request*

*To Whom it May Concern:*

*Please find attached my correspondence of even date.*

*Thank You,*

*JD Foster*

*JD Foster*
*Managing Attorney*
*Foster Massengill, PLLC*


*Please accept this letter as a formal request for documents or information pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:*

*1. All documents or other materials related to any ' bid plan' for any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).*

*2. Any and all contracts or agreements of any kind relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).*

*3. All documents relating to or evidencing any estimate for or actual costs relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).*

*4. All plans, mock-ups, proposals, floor-plans, depictions, or other similar documents relating to any*

*intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).*

*5. Any and all documents exploring, discussing, or otherwise related to the effect such renovations may have on housing capacity or other effects on the existing use(s) of such dorms relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12).*

*6. Any and all communications between any employee or University officials within the Office of the President, Office of the Vice President for Student Affairs, Office of the Commandant, and/or Office of the General Counsel relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12). (Such communications should include emails, text messages, other forms of electronic or digital communication, traditional correspondence and letters, interoffice and intraoffice memoranda, and other forms of written communication.)*

*7. Any and all communications between any employee or University officials within the Office of the President, Office of the Vice President for Student Affairs, Office of the Commandant, and/or Office of the General Counsel and any third-party relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12). (Such communications should include emails, text messages, other forms of electronic or digital communication, traditional correspondence and letters, interoffice and intraoffice memoranda, and other forms of written communication.)*

*8. Any and all documents pertaining to Diversity, Equity, and Inclusion (commonly, " DEI" ) and/or Texas Senate Bill 17 (commonly, " SB17" ), including but not limited to communications between any employee or University officials within the Office of the President, Office of the Vice President for Student Affairs, Office of the Commandant, and/or Office of the General Counsel and/or impact studies or equivalent documents, relating to any intended, planned, or ongoing project for the renovation of any bathroom/restroom facility located in the dorms utilized for housing the Corps of Cadets, commonly referred to as Spence Hall (Dorm 1), Kiest Hall (Dorm 2), Briggs Hall (Dorm 3), Fountain Hall (Dorm 4), Gainer Hall (Dorm 5), Lacy Hall (Dorm 6), Leonard Hall (Dorm 7), Harrell Hall (Dorm 8), Whitely Hall (Dorm 9), White Hall (Dorm 10), Harrington Hall (Dorm 11), Utay Hall (Dorm 12). (Such communications should include emails, text messages, other forms of electronic or digital communication, traditional correspondence and letters, interoffice and intraoffice memoranda, and other forms of written communication.)"<*
*/jd@fostermassengill.com>*

Our office is unable to conduct a search for Items 1 through 8. Therefore, we are requesting that you narrow your request by providing us with a date range, so that we can better assist you with your request.

As provided by section 552.222(d) of the Texas Public Information Act, your request will be considered withdrawn if we do not receive a response from you by the 61st day after the date of this request for clarification/narrowing

Sincerely,

Leslie Kacer
Open Records Office

On 4/11/2024 1:54:01 PM, JD Foster wrote:
TO: "Texas A&M University Public Records Support"[texasam@mycusthelp.net]
CC: [Open-records@tamu.edu]

Ms. Kacer:

Please find my responses below:
 Statement #1. No.Statement #2. No.

Please let me know if you have any questions or concerns.

Thank You,

JD Foster

JD Foster
Managing Attorney
Foster Massengill, PLLC

CONFIDENTIALITY STATEMENT
This message, as well as any attached document, contains information, which may be confidential and/or privileged or may contain attorney work product. If you have received this message in error, please delete all electronic copies of this message and its attachments, if any, without disclosing the contents, and notify the sender immediately.

NO SIGNATURE OR AGREEMENT
Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

From: Texas A&M University Public Records Support

Sent: Thursday, April 11, 2024 1:44 PM
To: JD Foster
Cc: Open-records@tamu.edu
Subject: Public Information Records :: J001330-041124

Date

On 4/11/2024 1:44:03 PM, Leslie Kacer wrote:
CC: Open-records@tamu.edu
**Subject:** Public Information Records :: J001330-041124
**Body:**

April 11, 2024

JD FOSTER (J001330-041124): REQUEST FOR CLARIFICATION/NARROWING; REDACTION RESPONSES REQUESTED

There are now 2 statements regarding mandatory exceptions and discretionary exceptions you need to select for your open records request. These questions are derived from a form developed by the Office of the Attorney General, dated 10/01/19. Please select " yes" or " no" in regards to these 2 exception questions for your open records request. Selecting " yes" will allow the university to expedite your request by avoiding the necessity of seeking a decision from the Office of the Attorney General.

Statement #1:
Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Statement #2:
Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive? (Yes or No)

Note: This is a request for clarification/narrowing of your request. Section 552.222 provides that a request for information is considered withdrawn if the requestor does not respond in writing to a governmental body's written request for clarification or additional information within 61 days.

Sincerely,

Leslie Kacer
Open Records Office

On 4/11/2024 1:30:30 PM, System Generated Message:
**Subject:** Texas A&M University Public Information Request :: J001330-041124
**Body:**
Dear JD Foster:

We received your public information request for **Texas A&M University**.  Your request was given the **reference number J001330-041124** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.

To monitor the progress or update this request please log into the Public Records Center.

On 4/11/2024 1:30:29 PM, Leslie Kacer wrote:
Request was created by staff

## ⌄ Request Details

| | |
|---|---|
| Reference No: | J001330-041124 |
| Created By: | Leslie Kacer |
| Create Date: | 4/11/2024 8:00 AM |
| Update Date: | 6/3/2024 10:45 AM |

Completed/Closed:            No

Required Completion Date:    Paused

Status:                      OAG decision requested

Priority:                    Medium

Assigned Dept:               TAMU_Open Records

Assigned Staff:              Open Records University

Customer Name:               JD Foster

Email Address:               jd@fostermassengill.com

Phone:

Group:                       TAMU

Source:                      Email

EXHIBIT

**18**

Spring 2024

- WG#2 has not met as a complete group since late December.
- Dave Kelley developed the curriculum overlay for weekly Commandant instruction and SOMS 181/281 integration (see attachment; SOMS 181-281 KSA Curriculum overlay)
- Sub-group w/ Col Parker as lead has started developing case studies that incorporate the leadership topics for use in SOMS class discussions (see samples attached: Management v. Leadership; Values-based Leadership; Bases of Power)
- Contacted Shanna and Jason at Rudder Theater Complex to reserve the Auditorium/Theater for specified dates
    - No conflicts identified at this time
    - ~$1200 per week to use Rudder Mon/Fri mornings
    - Rudder has not confirmed availability; awaiting a response to email sent Friday, 12 Jan
    - Recommendation:  Commandant kicks off first session on 5 Feb 24
        - Audience:  Freshmen and Sophomores
        - Alternate Audience:  Whole Corps?
- Certification:
    - Still wrestling with how to integrate SOMS, outfit preparation training, certification task force personnel
        - Timeline for certification
            - Spring semester
            - Refresh during Zero Weeks (formerly cadre training/FOW)
            - Fall semester remediation
        - Spring preparation training
            - Minor unit vice outfit training?
        - Certification task force
            - OOC staff only or do we augment with cadet leadership who are "trusted agents?"

| | |
|---|---|
| **From:** | Schlather, Byron L |
| **To:** | Simpson, Meredith M |
| **Subject:** | RE: WG Updates |
| **Date:** | Monday, February 12, 2024 5:03:27 PM |

Meredith,
Here are the highlights from our latest WG meeting.

1. WG focus this semester has been on establishing timeline of Leadership Foundation classes and developing related instruction (case studies) for SOMS curriculum. WG members have been tasked with developing case studies for all Leadership Foundation material. Some are pending refinement of TLOs and ELOs.
2. Instructor certification process is ongoing.
   a. Will require augmentation with cadet evaluators (likely vetted seniors, maybe some juniors) to achieve appropriate throughput during zero week.
   b. Pool of available evaluators is dependent upon which cadets remain after sourcing cadre for Freshman Orientation.
3. We still need to nail down the available time for training in zero week (previously "FOW").
   a. Focus of zero week will be assessment of skills and practical application.
   b. We assume (need to confirm) we won't have sophomores check in until after the completion of Summer exams (8 Aug). Due to parents' work schedules, it may be best to have the bulk check in over the weekend (10-11 Aug) and begin training on 12 Aug; however, that only gives us one week prior to the start of classes. Also, we will need to deconflict with arrival/check-in of the freshmen.
   c. Remediation will continue into Phase I for cadets who can't/don't certify in zero week.

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Monday, February 12, 2024 11:57 AM
**To:** LeVan, Sherri Jean <slevan@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** WG Updates

Morning,

We plan to share WG updates tomorrow at the staff meeting. Sherri, you'll already be there and I think I have the most recent info from the PPT. If there is something else, please let me know.

Byron, can you plan to attend at 0930 tomorrow and share any decision points/requests today as a read ahead for the CMDT?

Thanks!

**Meredith Simpson**
Chief of Staff
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

**Class of 2027 (Freshman-to-Sophomore)**
**Spring 2024 Notional curriculum concept**

| CMDT Training Time | CMDT out | Intro/Kickoff "Why" behind these sessions (Combined session) | Historical Approaches "Great Man" Theory Trait Theory Behavioral Theories | Transactional Leadership | Situational Theories | Transform-ational Leadership | | Primal Leadership (Emotional Intelligence) | Ethical Leadership | CMDT out | Coaching skills & techniques | Disciplined habits Growth Mindset | Honorable Living | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **22 Jan** | **29 Jan** | **5 Feb** | **12 Feb** | **19 Feb** | **26 Feb** | **4 Mar** | **11 Mar** | **18 Mar** | **25 Mar** | **1 Apr** | **8 Apr** | **15 Apr** | **22 Apr** | **29 Apr** |
| **(MON)** | Leadership theories and major concepts | | | | | | Spr Brk | Theory & concepts (continued) | | | Coaching & Development | | | |

| SOMS 181 Course Overview | Leadership vs Management | Bases of Power | Case studies & application Historical approaches | Case studies & application Transactional Leadership | Case studies & application Situational Theories | Case studies & application Transform-ational Leadership | | Case studies & application Primal Leadership | Case studies & application Ethical Leadership | Personal application of Resiliency & Health concepts | Conduct a counseling session Instruct & evaluate drill Conduct inspections | Case studies & application Disciplined Habits Growth Mindset | Live in accordance with Core Values Respect & appreciate diverse perspectives | End of course Evaluations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** | **2** | **3** | **4** | **5** | **6** | **7** | **Spr Brk** | **8** | **9** | **10** | **11** | **12** | **13** | **14** |
| **SOMS 181** | Application of Leadership Theories | | | | | | | Application (continued) | | Resiliency/ Health | Coaching & Development | | | |

**Class of 2026 (Sophomore-to-Junior)**
**Spring 2024 Notional curriculum concept**

| CMDT Training Time | CMDT OUT | Intro/Kickoff "Why" behind these sessions (Combined session) | Servant leadership | Strengths Theory | Leverage Strengths for team effectiveness | Growing strengths in self & others | | Intro to Constraint Theory | Reading Day | Creating constraint growth goals & action plan | Developing others: Team leadership | Developing others: Motivation Theory | Cultivating Ethical Norms | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **26 Jan** | 2 Feb | 5 Feb | 16 Feb | 23 Feb | 1 Mar | 8 Mar | 15 Mar | 22 Mar | READING DAY | 5 Apr | 12 Apr | 19 Apr | 26 Apr | 3 May |
| **(FRI)** | Authentic Leadership | | | Strengths Theory & Development | | | Spr Brk | Constraint Theory & Mitigation | | | Team Leadership | | | |

| SOMS 281 Course Overview | Intro to Authentic leadership (True North) | Authentic leadership My leadership journey | Values clarification Connection between authenticity, values, & resiliency | *Personal application:* Servant leadership Leveraging authority for benefit of those under that authority | *Personal application:* Strengths Assessment Self Awareness | *Personal application:* Respect & appreciate strengths in others Leverage strengths for team effectiveness | | *Personal application:* Growing strengths in self & others Empower others | *Personal application:* Constraint Assessment | *Personal application:* Constraint mitigation | *Practical application:* Create constraint growth goals & action plan (growth mindset) | *Practical application:* Establishing team goals & account-ability Team leadership "I" to "We" | *Practical application:* Developing new leaders Enforcing standards Motivating others | End of course Evaluations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week 1** | 2 | 3 | 4 | 5 | 6 | 7 | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| **SOMS 281** | Authentic Leadership | | | | Strengths Theory & Development | | Spring Break | Strengths (cont) | Constraint Theory & Mitigation | | | Team Leadership | | |

**Abstract**

Cadets face a choice of what type of activity to schedule for unit training time. This is the last training time before Cadet Challenge, and winning the competition is an outfit goal. Interpersonal tensions about priorities have been on the rise at the competition approaches. The case provides two dissenting opinions which represent aspects of management and leadership.

**Learning Outcomes**

1. Demonstrate proficiency of selected competencies essential for leadership performance at the basic level
   a. Contrast aspects of management and leadership
   b. Describe positive aspects of both management and leadership
2. Develop and enhance supervisory, motivational and supporting skills
   a. Assess contributing factors to organizational climate
   b. Identify sources of motivation
3. Develop and enhance counseling techniques
   a. N/A
4. Develop and enhance effective instructional techniques for Performance Oriented Training
   a. N/A

**Discussion**

Questions for in-class discussion and related considerations to follow.

1. Which senior would you say is more of a manager than a leader? And, why? Try to describe the cadets' comments by what they did save rather than what they didn't do. First focus on management.

Cadet Arentz talked about the process to achieve the goal. Managers are focused on process.

He collected data along the way, showing progress and comparison to other outfits. Managers collect and use facts to make decisions.

He wanted to improve the chances of reaching the goal of winning the competition by continuing along the same pattern of progress with the same type of focused training time.  Managers use proven methods and seek to minimize risk.

2. Which senior would you say is more of a leader than a manager? And, why? Try to describe the cadets' comments by what they did save rather than what they didn't do. First focus on management.

Cadet Barbay wanted to take a different approach in the last training time to achieve the goal. Leaders are willing to try new methods.

He sensed the members of the outfit were stressed and tensions about the competition were building. Leaders take interest in attitudes, not just outcomes.

He wanted to re-focus the members of the outfit camaraderie and pride in the outfit. Leaders seek to motivate followers.

3.  Is either approach to the final training time completely wrong?

Neither approach is completely wrong. Each has its own merits and risks.

Breaking up into competition groups is likely to garner some incremental gain and additional points in the competition. It does not address the building tensions about priorities and could risk the conflict blowing up more publicly.

Playing ultimate frisbee could restore esprit de corps among the outfit. The session would need some introductory comments to explain the reasoning behind the departure from the norm. Frisbee has a higher risk of injury. It also forgoes an opportunity for incremental gain in preparedness toward a higher point total. With the right framing, this session could provide an additional measure of motivation to the competitors, which would produce more points.

4.  Will a team-focused event for training time provide the desired motivation for better performance in the competition?

A sense of belonging and teamwork is a common source of motivation. However, Individuals are motivated by different things. Competition itself can be a source of motivation, and some members would likely rather have an event-focused practice session.

5.  If you were making the decision, what would you schedule for the last training time?

There is no wrong answer here. Cadets may choose one of the two proposed options or develop their own.

**Case Progression [optional]**

The following progressions can be added to the case to extend learning opportunities based on available time.

1.  Now that you've decided, the activity for the training time, deliver opening comments for the outfit at the beginning of the training time.

Draw out comments that provide reasoning for the choice, motivation to members, and focus on the outfit goal.

2.  One of the unit's best athletes gets hurt playing frisbee and can't compete in Cadet Challenge. As the leader that made the decision, what do you say to the members of the unit.

Draw out comments that acknowledge risks, provide new motivation to members, and focuses on the outfit goal.

**Teaching Strategies [optional]**

Instructors may ask all students to choose which option they prefer without revealing it to the group at first. Then, using a show of hands, the students can be divided into two groups to debate the merits and risks of each option.

**References**

Zaleznik, Abraham. "Managers and Leaders: Are They Different." Harvard Business Review, January 2004. https://hbr.org/2004/01/managers-and-leaders-are-they-different#:~:text=The%20distinction%20is%20simply%20between,and%20decisions%20mean%20to%20participants..

**Scenario**

There is one scheduled training time left before this year's Cadet Challenge, the annual fitness competition between outfits. Because winning the competition is an outfit goal, most of the scheduled training times have been spent preparing for the event. Some of the other typical uses for training time have been set aside during this period, causing several upperclassmen to question if the outfit is too focused on Cadet Challenge at the expense of other interests. Discussions over priorities have been limited to a few people within each class and not public, but they were well known enough to have created some tension. Two seniors in the same outfit are planning how to use their last training time.

Senior Arentz says, "With one more training session focused on the specific events in the challenge, I think we just might win this thing. We've been working on it for over a month, and each time we've used a scheduled training time to focus our competitors on their specific events, we raise our total score by 5 points. In our practice last week, we scored the same as the winning overall score last year. I think it's important we stay focused on improving our score, because I know other outfits are working hard to win too. We should split up into groups so our competitors can maximize their time on their specific events."

Senior Barbay replies, "I don't think one more practice is going to make or break us. Everyone has been working so hard on this, especially on their own time. We know we're competitive to win the whole thing, but we should get everyone's mind off the competition for a bit. We should play ultimate frisbee to blow off some steam. Besides, that puts us all together, reminding us we're all in this together. We'll compete in Cadet Challenge as individuals and small teams, but we'll win as an outfit, so we should spend our last training time as an outfit. Surely, that extra team motivation will drive a few more points."

**Abstract**

An outfit has a fish who has not learned a single campusology over the first several weeks of the fall semester. He has fallen so far behind his pers, there may not be time left for him to earn his Corps Brass with his buddies unless something changes soon. The Platoon Sergeant responsible for this freshman's training pulls her sophomore Fire Team Leaders aside to brainstorm ideas on how to effectively change the fish's behavior. They provide diverse opinions, each based on a different basis of power.

**Learning Outcomes**

1. Demonstrate proficiency of selected competencies essential for leadership performance at the basic level
   a. Identify and describe each basis of power.
   b. Choose and justify a recommended basis of power to handle a challenging leadership scenario.
2. Develop and enhance supervisory, motivational and supporting skills
   a. Articulate the utility and limits of each basis of power.
3. Develop and enhance counseling techniques
   a. N/A
4. Develop and enhance effective instructional techniques for Performance Oriented Training
   a. N/A

**Discussion**

Questions for in-class discussion and related considerations to follow.

1. Pick one of the sophomore's inputs. It does not have to be one you agree with.
   a. Tell which basis of power this input represents. Why you think so?
   b. What are the strengths of this approach?
   c. What are the limitations of this approach?

Sophomore Cadet Oles: Reward Power

Let's try positive reinforcement by giving him something good when he learns a campo. You could give him junior privileges for the day when he says his first memorized campo correctly. Then, repeat that every time he says a new perfectly.

   a. Why? It offers a reward for the desired behavior.
   b. Strengths? It can provide motivation for changed behavior to receive the reward. A day with junior privileges is a very attractive reward for a fish. Effective for behaviors that will be observable, so the performance can be noticed and rewarded.
   c. Limits? It is not effective for behaviors that won't always be observable by the rewarder (e.g., staying awake in class). So, the subordinate may only act in desirable ways when being observed and may not create lasting, intrinsic change. Rewards are not effective if they are not achievable (for impossible tasks) or aren't valued by the subordinate. If a reward is promised and not delivered, the supervisor loses credibility, gains resentment, and the behavior change will cease. Offering a full day of junior privileges for each campusology would be unsustainable without

risking other tasks the fish likely needs to learn and practice. It also may create resentment from his peers who fulfilled their responsibilities without getting similar rewards.

Sophomore Cadet Taylor: Coercive Power

Let's make it painful for him to not know his campos by adding some negative consequence every time he can't recite them. We can have him doing pushups the whole time during every formation. And if that doesn't work after a week, then we can tell him we'll take his car keys away.

a. Why? It creates an expectation of punishment if the desire behavior isn't performed.
b. Strengths? It can produce desired behavior when subordinate is under observation and believes performing desired behavior will likely avoid a punishment they don't want to endure. The subordinate's perception of the severity of punishment and probability of receiving it both matter.
c. Limits? If the expected punishment is viewed as too light, it will not be coercive, because the subordinate may choose to endure it rather than perform the desired behavior. If the subordinate believes there is no way to avoid the punishment no matter what they do, they will not bother attempting the desired behavior. If the punishment is too severe (take car keys), it will build resentment in the subordinate. Repeated use of coercive power decreases attraction by the subordinate. In a voluntary organization, the use of coercive power on subordinates who lack commitment always risks the subordinate leaving the organization to avoid punishment or the threat of punishment.

Sophomore Cadet Zimpelman: Legitimate Power

Let's start by making the expectation very clear from someone in authority. Have the commanding officer order him directly to learn two campos by the end of every week. When I was a fish last year, that would have given me the motivation to do anything.

a. Why? It leverages the belief that someone has the authority, right or credibility to state what others ought to do and the subordinate feels an obligation to comply.
b. Strengths?  It can produce desired behavior when the subordinate is fully committed to the organization. Deliberate onboarding that emphasizes the structure, roles, and authorities to establish legitimate authority can set initial expectations of compliance.
c. Limits?  Onboarding expectations of compliance fade over time based on the subordinate's observations and experience, which become a greater influence on their belief in actual legitimacy and willingness to accept influence. The value of legitimate power relies on the subordinate's perception of its legitimacy, so their experience determines if the power grows or fades. Use of legitimate power must remain within the understood job description of the authority. Use beyond the limits of its intended bounds (abuse of authority) undercuts legitimate power. If the subordinate does not believe in the legitimacy of the organization's "system" (roles, authorities, obligations), then there is no legitimate power. A risk here is the subordinate's view that all cadets are just college students and basically the same with no actual power to dictate or influence behavior of another.

Sophomore Cadet Simmons: Referent Power

Let's try to leverage his desire to be a member of the Corps. You could talk to him one-on-one and make him realize some facts. First, he obviously wants to be in the Corps, because he signed up and he's still here. Second, learning campos is part of being in the Corps. We can't fulfill our role as Keepers of the Sprit if we don't' know A&M's traditions. He seems to have a lot of respect for you, so I think he'll respond to those facts coming from you.

    a. Why? It is based on using the subordinate's desire to be associated with the organization or another person.

    b. Strengths? It will induce a subordinate to believe, think, and act like a member of the organization. If the subordinate wants to be a member and believes that all members perform a certain behavior, then they will want to perform the same behavior. If the subordinate is attracted to another person (not romantically—more in the sense of respecting, wanting to be their friend, or wanting to be like them), they will want to perform behaviors like the other or act in ways that gain favor with the other.

    c. Limits? The degree of influence by referent power is solely based on the perception of the subordinate in how much they want to be associated with something or someone. Since this perception cannot be fully known, relying on referent power can come up hollow and not change behavior. The subordinate must be fully committed to wanting to remain a member of the organization. With referent power of an individual, the person the subordinate is attracted to may not even be aware of their influence, the lengths subordinates may go to win favor, and the acts subordinates believe are favored—so upperclassmen need to be careful and attentive.

Sophomore Cadet Campbell: Expert Power

I'd like to have a chance to coach him on a few techniques I used to learn my campos last year. The fish all know I have them memorized the best, because if their wording is a little off, I catch them when others don't.  And, you always use me as an example to recite them in training. I think I can show him the way of the "Campo Master."

    a. Why? It is based on the subordinates' perception of expertise compared their own knowledge.

    b. Strengths? It can encourage changed behavior by providing opportunity for influence as the subordinate respects the expertise and is willing to listen and mimic it.

    c. Limits? Expert power is limited in influence only over areas where expertise is recognized. Attempting to influence in areas beyond the expertise can undermine confidence. So, the sophomore should not try to expand the campusology coaching to also coach the freshman on math if they are getting Cs while the fish gets As.

2. What rewards might be appropriate in this scenario?

Verbal praise may be appropriate. Never underestimate the value of telling a subordinate, "Good job." Verbal praise can be more effective in done in front of others. Privileges for a more limited time without a promise for the same on each successive campusology might be effective. Consider fairness in distributing rewards across the other freshmen.

3. What punishments might be appropriate in this scenario?

A set of push-ups might be appropriate to get the fish's attention and make sure he knows you're serious about him meeting the standard, but it won't help him directly in learning campusologies. So, verbal feedback may be just as effective. Taking away a privilege might provide a new incentive, but it must be one the freshman cares about and given back once the freshman complies.

4. Are you limited in strictly using only one basis of power in this or any scenario?

No. Depending on the situation, consider and use approaches that leverage any of the bases of power, including any combination of them.

5. If the Platoon Sergeant asked you what she should do, what would you recommend?

Within reasonable limits, there is no wrong answer here. Cadets may choose variations of the proposed options or develop their own.

**Case Progression [optional]**

The following progressions can be added to the case to extend learning opportunities based on available time.

1. What happens if your chosen method doesn't work? Is the situation recoverable? What else could you try?

2. How might the other freshmen react to your chosen approach?

**Teaching Strategies [optional]**

Instructors may ask all students to choose which basis of power prefer without revealing it to the group at first. Then, using a show of hands, the students can be divided into groups to debate the merits and risks of each option.

**References**

French, Johan and Raven, Bertram, "The Bases of Social Power" in Cartwright, D (ed.), *Studies in Social Power*. Ann Arbor, MI: University of Michigan, 1959, 150-167.

**Scenario**

After the first several weeks of the fall semester, Fish Jones has not learned a single campusology. He has fallen so far behind his pers, there may not be time left for him to earn his Corps Brass with his buddies unless something changes soon. The Platoon Sergeant responsible for his training pulls her sophomore Fire Team Leaders aside to brainstorm ideas on how to effectively change the fish's behavior. They provide diverse opinions, each based on a different basis of power.

Sophomore Cadet Oles: Let's try positive reinforcement by giving him something good when he learns a campo. You could give him junior privileges for the day when he says his first memorized campo correctly. Then, repeat that every time he says a new perfectly.

Sophomore Cadet Taylor: Let's make it painful for him to not know his campos by adding some negative consequence every time he can't recite them. We can have him doing pushups the whole time during every formation. And if that doesn't work after a week, then we can tell him we'll take his car keys away.

Sophomore Cadet Zimpelman: Let's start by making the expectation very clear from someone in authority. Have the commanding officer order him directly to learn two campos by the end of every week. When I was a fish last year, that would have given me the motivation to do anything.

Sophomore Cadet Simmons: Let's try to leverage his desire to be a member of the Corps. You could talk to him one-on-one and make him realize some facts. First, he obviously wants to be in the Corps, because he signed up and he's still here. Second, learning campos is part of being in the Corps. We can't fulfill our role as Keepers of the Sprit if we don't' know A&M's traditions. He seems to have a lot of respect for you, so I think he'll respond to those facts coming from you.

Sophomore Cadet Campbell: I'd like to have a chance to coach him on a few techniques I used to learn my compos last year. The fish all know I have them memorized the best, because if their wording is a little off, I catch them when others don't.  And, you always use me as an example to recite them in training. I think I can show him the way of the "Campo Master."

**Abstract**

A cadet, with his drunk roommate on Northgate, is faced with the decision to abandon him and make it back by curfew or miss curfew to make sure the roommate gets home safely.

**Learning Outcomes**

1. Understand, recognize, and apply intentional leadership terms and functions to leadership case studies.
   a. Identify relevant values in a leadership case study.
2. Given a leadership case study (1) analyze the leadership issues present in the case, (2) critically evaluate potential courses of action, (3) generate values-based solutions, and (4) develop intentional plans to implement solutions.
   a. Analyze conflicting loyalties in a case study.
   b. Develop intentional plans to implement solutions that demonstrate behavior consistent with values.

**Discussion**

Questions for in-class discussion and related considerations to follow.

1. Considering values based leadership, what values should you consider in deciding what to do?

Loyalty. This should be one of the prime drivers of discussion in this case. Loyalty to who or what? Loyalty can be to the chain of command that ordered the curfew. Loyalty can be to the roommate to ensure he gets home safely, because it does not appear he can do that on his own. Loyalty can be to the Corps to obey orders but also to avoid the roommate getting in an incident that would reflect poorly on the Corps.

Courage. The ability to face fear, danger, or adversity; both physical and moral courage. Missing curfew will likely have consequences, but facing them to do what one thinks is right takes moral courage.

Selfless Service. The desire and ability to put others before self, making personal sacrifices to better the Corps of Cadets, the University, the State, and the Nation. Risking the personal consequences of missing curfew may be in the best interest of the Corps.

Discipline. Striving for excellence by holding yourself and others accountable to a higher standard. Making the ordered curfew takes discipline. Holding yourself to that standard requires personal sacrifice, because one might rather spend more time out on the town.

2. Some may be tempted to leave the roommate and go home now, thinking he created the situation on his own so now has to deal with on his own. If you leave him alone knowing it's a risk to his personal safety, what does that say about your sense of honor, defined as "An unwavering commitment to sound moral values and strong character"?

3. How are the multiple potential loyalties—to the chain of command, the roommate, and the Corps—in conflict with each other? Looking at each loyalty individually, what would each tell you to do?

Being loyal to the chain of command means going home now. Being loyal to the roommate means staying to make sure he gets home safely. Being loyal to the Corps could mean staying or going.

4. What is the riskiest outcome, and how does the risk affect your decision?

Missing curfew risks demerits or at worst a restricted weekend. Leaving the roommate alone risks he gets in a fight, arrested, or hurt trying to get home.

This will drive most cadets to choose to stay with the roommate and risk punishment. Calling or texting the outfit commanding officer may be an option to mitigate the consequences of missing curfew but it also risks the roommate getting in bigger trouble for being publicly intoxicated.

5. Either tonight or in the morning, do you plan notify the outfit commanding officer?

Notifying the outfit commanding officer may mean you get in trouble for missing curfew even if you did it for good reason. It also risks the roommate getting in bigger trouble for being publicly intoxicated. It's possible someone else saw you and will report the curfew violation. Bad news does not get better with time. It is also usually better to admit fault yourself rather than be seen as trying to omit or hide something.

6. Is reporting the incident being disloyal to your roommate?

It is not being disloyal to your roommate. It is honoring a higher-order loyalty to the Corps and the chain of command. The loyalty to your roommate took precedence due to the immediate nature of the situation but does not override the loyalty to the Corps or chain of command once the urgency has passed. Unless the action is purely self-serving, it should not be seen as disloyal. In the light of day, the roommate should see that he put you in a bad situation.

**Case Progression [optional]**

Thia case can be paired with another that emphasizes following orders even when it's unpleasant. This progression, with values-based decisions that point to different outcomes, will challenge cadets to think through the layers of loyalties and values.

**Teaching Strategies [optional]**

Role play. Students can be assigned to play roles in real time to act out the scenario and their reactions. Possible roles include: main actor, roommate, bystander, and commanding officer.

**References [optional]**

Corps of Cadets. The Standard. August 2023.

Chapter 50, paragraph 1.d:

> Cadets who are 21 years old or older and publicly intoxicated, on or off the university campus, will be charged with violating University Student Rules. This rule also applies to cadets, who

allow, provide, or do not attempt to stop a cadet under the age of 21 from drinking, on and off campus.

Chapter 1, paragraph 5:

CADET VALUES

Our values reflect what we hold to be important and guide our daily lives, especially our relationships with others. Our values shape the environment in which we live, study, and develop our leadership skills. Our Cadet Values are:

a. Honor.  An unwavering commitment to sound moral values and strong character.
b. Integrity.  The honesty and moral courage to always defend and do what is right.
c. Discipline.  Striving for excellence by holding yourself and others accountable to a higher standard.
d. Courage.  The ability to face fear, danger, or adversity; both physical and moral courage.
e. Respect.  Maintaining an environment that ensures all persons are treated with fairness and dignity.
f. Selfless Service.  The desire and ability to put others before self, making personal sacrifices to better the Corps of Cadets, the University, the State, and the Nation.

Texas A&M University website. https://www.tamu.edu/about/purpose-values.html (accessed 7 January 2024).

**Core Values.**  Our core values unify our current and former students, faculty and staff. They are guideposts we live by and show in our words and deeds. We are a community of problem-solvers, scholars and creators with a service mission.
**Excellence.**  Having an unwavering desire and commitment to do one's best academically and in all other aspects of life.
**Integrity.**  Doing the right things regardless of the circumstances or personal consequences.
**Leadership.**  Inspiring others to follow due to the strength, integrity and benevolence of one's character.
**Loyalty.**  Being dedicated to our nation, state, university, families and those institutions and values we hold dearest.
**Respect.**  Earning favor through the consistent dignity and merit of one's character.
**Selfless Service.**  Providing one's time, talents or resources for the greater good without regard for personal gain or recognition.

Coleman, Stephen. "Professional Ethics, Duties, and Obligations." In Military Ethics: An Introduction with Case Studies. Oxford: Oxford University Press, 2013. 45-46.

**Scenario**

Since Saturday's football game is early in the day, the commanding officer has set a curfew for everyone in the outfit to be back in the dorms by 0200. You lost track of time and are now out past the curfew. At 0230, you approach your dorm and see one of your buddies who is not 21 crawling out a first floor dorm window carrying a case of beer. He crawls back in another window to a room where you know neither occupant is 21. As he turns to shut the window behind him, you lock eyes.

**Class of 2027 (Freshman-to-Sophomore)**
**Spring 2024 Notional curriculum concept**

| CMDT Training Time | CMDT out | Intro/Kickoff "Why" behind these sessions (Combined session) | Historical Approaches "Great Man" Theory Trait Theory Behavioral Theories | Transactional Leadership | Situational Theories | Transform-ational Leadership | | Primal Leadership (Emotional Intelligence) | Ethical Leadership | CMDT out | Coaching skills & techniques | Disciplined habits Growth Mindset | Honorable Living | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22 Jan | 29 Jan | 5 Feb | 12 Feb | 19 Feb | 26 Feb | 4 Mar | 11 Mar | 18 Mar | 25 Mar | 1 Apr | 8 Apr | 15 Apr | 22 Apr | 29 Apr |
| (MON) | Leadership theories and major concepts | | | | | | Spr Brk | Theory & concepts (continued) | | | Coaching & Development | | | |

| SOMS 181 Course Overview | Leadership vs Management | Bases of Power | Case studies & application Historical approaches | Case studies & application Transactional Leadership | Case studies & application Situational Theories | Case studies & application Transform-ational Leadership | | Case studies & application Primal Leadership | Case studies & application Ethical Leadership | Personal application of Resiliency & Health concepts | Conduct a counseling session Instruct & evaluate drill Conduct inspections | Case studies & application Disciplined Habits Growth Mindset | Live in accordance with Core Values Respect & appreciate diverse perspectives | End of course Evaluations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | Spr Brk | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| SOMS 181 | Application of Leadership Theories | | | | | | | Application (continued) | | Resiliency/ Health | Coaching & Development | | | |

**Class of 2026 (Sophomore-to-Junior)**
**Spring 2024 Notional curriculum concept**

| CMDT Training Time | CMDT OUT | Intro/Kickoff "Why" behind these sessions (Combined session) | Servant leadership | Strengths Theory | Leverage Strengths for team effectiveness | Growing strengths in self & others | | Intro to Constraint Theory | Reading Day | Creating constraint growth goals & action plan | Developing others: Team leadership | Developing others: Motivation Theory | Cultivating Ethical Norms | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 Jan | 2 Feb | 5 Feb | 16 Feb | 23 Feb | 1 Mar | 8 Mar | 15 Mar | 22 Mar | READING DAY | 5 Apr | 12 Apr | 19 Apr | 26 Apr | 3 May |
| (FRI) | Authentic Leadership | | | Strengths Theory & Development | | | Spr Brk | Constraint Theory & Mitigation | | | Team Leadership | | | |

| SOMS 281 Course Overview | Intro to Authentic leadership (True North) | Authentic leadership My leadership journey | Values clarification Connection between authenticity, values, & resiliency | *Personal application:* Servant leadership Leveraging authority for benefit of those under that authority | *Personal application:* Strengths Assessment Self Awareness | *Personal application:* Respect & appreciate strengths in others Leverage strengths for team effectiveness | | *Personal application:* Growing strengths in self & others Empower others | *Personal application:* Constraint Assessment | *Personal application:* Constraint mitigation | *Practical application:* Create constraint growth goals & action plan (growth mindset) | *Practical application:* Establishing team goals & account-ability Team leadership "I" to "We" | *Practical application:* Developing new leaders Enforcing standards Motivating others | End of course Evaluations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week 1 | 2 | 3 | 4 | 5 | 6 | 7 | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| SOMS 281 | Authentic Leadership | | | | Strengths Theory & Development | | Spring Break | Strengths (cont) | Constraint Theory & Mitigation | | | Team Leadership | | |

**Class of 2027 (Freshman-to-Sophomore)**
**Spring 2024 Notional curriculum concept**

| CMDT Training Time | 29 Jan | 5 Feb | 12 Feb | 19 Feb | 26 Feb | 4 Mar | 11 Mar | 18 Mar | 25 Mar | 1 Apr | 8 Apr | 15 Apr | 22 Apr | 29 Apr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CMDT out | Intro/Kickoff "Why" behind these sessions (Combined session) | Historical Approaches; "Great Man" Theory; Trait Theory; Behavioral Theories | Transactional Leadership | Situational Theories | Transform-ational Leadership | | Primal Leadership (Emotional Intelligence) | Ethical Leadership | CMDT out | Coaching skills & techniques | Disciplined habits; Growth Mindset | Honorable Living | |
| 22 Jan (MON) | Leadership theories and major concepts | | | | | | Spr Brk | Theory & concepts (continued) | | | Coaching & Development | | | |

| SOMS 181 Course Overview | 2 | 3 | 4 | 5 | 6 | 7 | Spr Brk | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Leadership vs Management | Bases of Power | Case studies & application; Historical approaches | Case studies & application; Transactional Leadership | Case studies & application; Situational Theories | Case studies & application; Transform-ational Leadership | | Case studies & application; Primal Leadership | Case studies & application; Ethical Leadership | Personal application of Resiliency & Health concepts | Conduct a counseling session; Instruct & evaluate drill; Conduct inspections | Case studies & application; Disciplined Habits; Growth Mindset | Live in accordance with Core Values; Respect & appreciate diverse perspectives | End of course Evaluations |
| SOMS 181 (1) | Application of Leadership Theories | | | | | | Spr Brk | Application (continued) | | Resiliency/ Health | Coaching & Development | | | |

**Class of 2026 (Sophomore-to-Junior)**
**Spring 2024 Notional curriculum concept**

| CMDT Training Time | CMDT OUT | Intro/Kickoff "Why" behind these sessions (Combined session) | Servant leadership | Strengths Theory | Leverage Strengths for team effectiveness | Growing strengths in self & others | | Intro to Constraint Theory | Reading Day | Creating constraint growth goals & action plan | Developing others: Team leadership | Developing others: Motivation Theory | Cultivating Ethical Norms | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **26 Jan** | 2 Feb | 5 Feb | 16 Feb | 23 Feb | 1 Mar | 8 Mar | 15 Mar | 22 Mar | READING DAY | 5 Apr | 12 Apr | 19 Apr | 26 Apr | 3 May |
| **(FRI)** | Authentic Leadership | | | Strengths Theory & Development | | | Spr Brk | Constraint Theory & Mitigation | | | Team Leadership | | | |

| SOMS 281 Course Overview | Intro to Authentic leadership (True North) | Authentic leadership My leadership journey | Values clarification Connection between authenticity, values, & resiliency | *Personal application:* Servant leadership Leveraging authority for benefit of those under that authority | *Personal application:* Strengths Assessment Self Awareness | *Personal application:* Respect & appreciate strengths in others Leverage strengths for team effectiveness | | *Personal application:* Growing strengths in self & others Empower others | *Personal application:* Constraint Assessment | *Personal application:* Constraint mitigation | *Practical application:* Create constraint growth goals & action plan (growth mindset) | *Practical application:* Establishing team goals & account-ability Team leadership "I" to "We" | *Practical application:* Developing new leaders Enforcing standards Motivating others | End of course Evaluations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week 1** | 2 | 3 | 4 | 5 | 6 | 7 | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| **SOMS 281** | Authentic Leadership | | | | | Strengths Theory & Development | | Spring Break | Strengths (cont) | Constraint Theory & Mitigation | | | Team Leadership | | |



## Phase 1

**WG# 2**

Solid foundation in:
- Character
- Competency
- Actions

Through:
- Lecture
- Prac App / Role Play
- Assessment

Week 0:
- Immersive schedule

Weeks 1-7:
- Certification
- Remediation

Transition

Oct 9-12

| Week - 0 7/10–17 Aug | | Week 2 25-31 Aug | | Week 4 8-14 Sep | | Week 6 22-28 Sep | |
| Week 1 18-24 Aug | | Week 3 1-7 Sep | | Week 5 15-21 Sep | | Week 7 29 Sep-5 Oct | |

**WG# 1**

### Corps Orientation
- Confident in Academics
- Solid Foundation of TAMU & Corps Stds, values, & traditions
- Comfortable with Time Mgt
- Self-Disciplined
- Fit
- Have Fun/Better student exp in Corps than out

Corps Brass Fri AM/Fall Break

## Phase 2

- Employ KSAs learned in Phase 1 as a small unit leader
- Continue developing freshmen into contributing members of the outfit

Spring Term
Transition

MLK/ Week

| Week 2 20-26 Oct | | Week 4 3-9 Nov | | Week 6 17-23 Nov | |
| Week 1 13-19 Oct | | Week 3 27 Oct – 2 Nov | | Week 5 10-16 Nov | | Week 7 25-26 Nov | | Last week Jan |

### Outfit Orientation
- Demonstrate Phase 1 Skills/Mindset within Outfit Structure
  - Academics
  - Corps Stds, Values, Traditions
  - Self-Disciplined & Fit
- Learn Outfit Customs and Traditions
- Corps Leadership Development Book??
- Others?? Define??

Reading Day- Finals- Winter Break

## Phase 3 (SP24 Ph-0)

- Prepare and educate freshmen for the roles they will assume the following fall
- Prepare and educate sophomores to become juniors and Phase 1 cadre members

| Wk 1 Feb | | Wk 3 Feb | | Wk 5 Mar | | Wk 7 Mar | | Wk 9 Apr | | Wk 11 Apr | |
| Wk 2 Feb | | Wk 4 Feb | | Wk 6 Mar | | Wk 8 Mar | | Wk 10 Apr | | Wk 12 Apr |

1 FEB

Preparation for next level of Leadership through deliberate education and practical application of coaching and leader development KSAs

Final Review



WG# 2

Phase 3 (SP24 Ph-0)

Week 1
Feb

Week 2
Feb

Week 3
Feb

Week 4
Feb

Week 5
Mar

Week 6
Mar

Week 7
Mar

Week 8
Mar

Week 9
Apr

Week 10
Apr

Week 11
Apr

Week 12
Apr

1 FEB

Final
Review

WG# 1

Corps Orientation (Phase 1) Worksheet (Higgins, Sosa, Ornelaz, Washington, Fleming - LeVan)

Zero Week + 7 Weeks Academics

Purpose: To enable a transition from high school student "mindsets and skill sets" to college student skills and mindsets within the model of Texas A&M and the Corps of Cadets

**Phase I Endstate:** Freshman
- Are confident in their ability to take and do well in college classes
- Have a solid foundation of TAMU & Corps standards, values, and Traditions.
- Are comfortable managing their time
- Are self-disciplined
- Are fit
- Are having fun
- Understand and believe that they will have better student experience at A&M and will be more academically successful if they stay in the Corps than if they were to leave.  We must make a better value proposition than we are currently.

**Phase I POI outline:**
- Instruction and practical application in Standards/Values/Traditions
- SOMS
- Academic 1 on 1
- Resiliency 1 on 1
- Career Preparation introduction
- Drill
- Progressive physical fitness program
- Counseling/Feedback

**Housed by Major Unit**

**Manning:**
Cadet Cadre:  Certified through WG#2's Cert process.   Using Major & Minor Unit XOs for oversight, 1stSgt, (SR? PLt Cdr x 2), Juniors SL x4, ASL x 4, 40 fish.  That's 2 seniors, 9 juniors, 40+ fish = 51+ cadets/floor.  Using FOW 2023 numbers as a baseline, that's 5 BDE fish units (4 floors)~202, 5 Regt fish units (5 Floors) ~215, 8 Wing fish units (7 Floors)~309 , and 3 Floors of band fish units~130.  44 Senior and ~207 Juniors
- Minor Unit housed in Fish Dorms end of hallway
  - XO in charge of or Phase 1 operations
  - CO focus is on Corps Operations
  - Juniors FT/AFT leaders (Sophomores Phase 2)
  - Transfer Units in one dorm
- Training Cadre for Orientation Phase - SOMS, Hollingsworth, CMDT Leadership Briefs, Certification
  - Phase I not just for fish but also for outfits to get ready to be able to receive and train fish

- ○ **GAP:** What is the rest of the Units doing During Phase 1 as a unit. Need to know the training/certification of other classes/leadership. What is being taught so they can integrate cleanly in Phase 2.

Staff Oversight:
- ● Advisors - Corps Performance Coach, how? Academics, how? Military & Operational Advisors,how? ROTCs, how?
  - ○ Integration of support Advisors – LDA construct as part of this phase, dedicated time with FISH with academics, performance coaches, LDA teams during unit activities early during FO, as they approach Phase 2, preparation by cadre about unit

**Resources:** LLCs space needed by Major Units for Unit Activity Times - Meredith Question

**Policy and Procedure Needed:**
- ● Standard for how all Freshmen Operate by Year Group and Phase (Needs WG)
  - ○ Example: Introduces traditions through Campos in SOMS and unit activities/visit sites as part of unit activities when class starts

- ● There is a Brass culmination at the end of Phase 1. It would involve the FO Cadre presenting the brass to the freshmen , combined with a revealing of the freshmen's new outfit}. The FO Cadre will ceremoniously hand over the responsibility of training the Fish to the Outfit Cadre. Outfit Cadre take the oath and the freshmen greet them. It signifies the end or *Orientation* and the beginning of *Outfit Orientation*. A two-fold event: Awarding of Corps Brass by MU freshman unit cadre and outfit welcome by corps units for their assigned freshman.
- ● Subgroup Outfit Integration:
  - ● Standard/unified event from OOC/set standard (first time around)/outfits may not welcome with open arms/may want to put on their own culmination/welcome into Phase II
  - ● Easier transition into outfits
  - ● Actual accomplishment/something tangible to complete/be able to check a box
  - ● Feel transition as a Corps at all levels not just fish
  - ● Want it to mean something/sense of belonging
  - ● bring cadet challenge weekend to the fall?
  - ● Leadership based activities - LRCs
  - ● Cadre can see the results of their work/leadership training success
  - ● Not just about freshman/the entire Corps
  - ● Formal change of command from one cadre to new outfit cadre/leadership integration as an outfit
  - ● Hand off responsibility/take to next level past outfit integration mechanism
  - ● Recommend Data/Bio Cards for fish to meet/get to know upperclassmen and upperclassmen to know fish before Phase II – Transition Responsibility

**Explanation of the Weekly Sections:**
- ● SOMS 111 - The subject that is being taught to the freshmen
- ● Academics - Significant academic events for the University and freshman academic milestones

- Dedicated Cadet Life touchpoints - Career Preparedness, Resiliency Coaches, ATR, Cadet SLs
- Cadre Focus - Guidance for the FO Cadre. They need to know what Fish are being taught in SOMS so that they can reinforce it during unit activities and counseling time.
- Physical Fitness - Limits to physical activity so that freshmen encounter a progressive PT program
- Standards, Values, and Traditions  (SVT) - Can be any number of events. Teaching/Reviewing Camposologies, inspecting uniforms, teaching CR skills, talking about TAMU traditions, Counseling Sessions. Cadre will use this time to achieve items identified on the Worksheet Schedule.
- Administrative - Various other necessary activities
- Fish Intramurals - allows fish to engage with other university students - extra curricluar

(Zero Week) 7 (band) /10 - 17 Aug

- FO Cadre Introductions by the Advisors to include a class on how the freshmen should expect to be treated. FO Cadre then will break them into their training platoon, explain structure and introduce themselves.
- Academics-
    - Campus Schedule Tour mandatory with all tools to navigate (Phone Apps etc)
    - EST Prep (Continue with EST assignments as in previous FOW, e.g. Ensure Maroon link profile is good, academic schedule printed, mandatory TAMU online classes)
        - Aggie Grade Book and Scheduler
    - Schedule Checks
        - SOMS, ROTC, Full Time Student (dependent on Scholarship)
- Dedicated Cadet Life touchpoints - Resiliency Coaches, ATR, Cadet SLs
    - Initial, then when next checks? Midpoint of phase and Prior to Culmination
- Cadre Focus- Conduct initial assessment- identify issues (administrative, medical, mental, academic, etc), Provide good example, Ensure FOW schedule is adhered to. Teach set up and wear of the uniform
- Physical Fitness - Intro to Stretching and conduct of PT
- SVT - Stationary Drill (Attention, Parade Rest, facing movements, saluting), CAMPOs: #1&2
- Administrative
    - Any other training requirements in Computer Based Training?  Title IX
    - ROTC Inprocessing
    - Uniform Issue and re-fit
    - Scholarship Counseling? Different Scholarships/Requirements Video, Canvas, or in person?
    - Poll for all fish on what intramural teams are available for the Fall

(Week 1) 18 - 24 Aug - First Week of School

- SOMS 111 - Time Mgt (verify lesson plan/curriculum by weeks for entire semester with Katie)
- Academics - **Add/Drop end of Week** [correct classes, SOMS, ROTC, etc]
- Dedicated Cadet Life touchpoints- Resiliency Coaches, Cadet FLs, ATRs, (ROTC/CAP Chaplain?)
    - What is the Cadet Chaplains roles…they have taken on a lot of responsibility = redefine? As an individual to point students to the right or needed resource?  or is it a Chain of Command responsibility – not a single student – does the chaplain elevate to

> Battalion/Group lvl and are they a faith-based resource or not. If not, then they shouldn't be called chaplain.

- Cadre Focus - Introduction of Corps Brass Books. Morning Activities discuss add/drop
  - Activity 1 - Commandant Brief
- Academic Free Period – (one on ones with Cadet Life Academic Perf)
- Afternoon Activities (Meredith question for use of Adams hall – performance coaches)
- Physical Fitness-
  - Activity 2: Initial Strength/Agility assessment (modified Corps PFT with .5 mile run, max # of pushups, max plank time) Cadre record this data for ability group assignments
  - Activity 4: run 15 min @ 10 min/mile pace          Lower Body - 1 Set

- SVT -  CAMPOs: #3,4,11,&14
  - Activity 3: Marching Drill (Step off, halt, Open & Close Ranks),
  - Activity 5: Initial Counselings
- Administrative -  set up fish Intramural teams


(Week 2) 25 Aug – 31 Aug

- SOMS 111 - Goals
- Academics -
- Dedicated Cadet Life touchpoints
- Cadre Focus - get the freshmen to write down on a 3x5 card their goals for why they joined the Corps, post it above their rack.
- University Intramurals - during extra curricular times
- Physical Fitness
  - Activity 2: Run 20 Min ! 10min/mile pace;   Upper body (UN) Resistance Daily 16 - 1 set
  - Activity 5: Corps Run:  Lower Body - 1 set

- SVT - CAMPOs: #7,10,15,&27
  - Activity 1: Corps Discipline Brief
  - Activity 3: Marching Drill ("Eyes right" and "Ready front")
  - Activity 4: Initial Uniform Inspection


(Week 3) 1 Sep – 7 Sep

- SOMS 111 - Manifesto
- Academics -
- Dedicated Cadet Life touchpoints -
- Cadre Focus - Discuss Corps trip end of month, expectations, need to personally secure rooms.
- Physical Fitness
  - Activity 2: Run 22 min @ 10min/mile; Upper Body (UB) Resistance Daily 16 - 1 set
  - Activity 4: Corps Run; Lower Body - 1 set
- SVT - CAMPOs: #12,16,19&28
  - Activity 1:  Marching Drill(Column Movements)
  - Activity 3:
- Administrative -

(Week 4) 8 Sep – 14 Sep

- SOMS 111 - MBTI
- Academics - Scheduled appts with student groups - proactive assessment
- ==Dedicated Cadet Life touchpoints -==
- Cadre Focus - Discuss as an outfit cadre MBTI and what are same/different characteristics of the fish's MBTI. What opportunities do different personalities bring. Strengths and weaknesses.
- Physical Fitness
  - Activity 1: Run 22 miin @ 10 min/mile: lower body 1 set
  - Activity 3: Run 24 min @ 10 min/mile; Upper body Resistance Daily 16 - 1 Set
  - Activity 5: Run 16 min @ 10 min/mile: lower body 1 set
- SVT - CAMPOs: #13,20,21&29
  - Activity 2: Marching Drill (to the rear march & mark time)
  - ==Activity 4:==
- Administrative -

(Week 5) 15 Sep – 21 Sep

- SOMS 111 -  Character Artifact
- Academics - Scheduled appts with student groups - proactive assessment
- ==Dedicated Cadet Life touchpoints -==
- ==Cadre Focus -==
- Physical Fitness-
  - Activity 1: Run 24 Min @ 10 min/mile; Upper body Daily 16 - 2 Sets
  - Activity 3 Run 18 Min @ 10 min/mile; LB resistance - 2 Sets
  - Activity 5: Corps Run
- SVT - CAMPOs: #5,17,25,&26
  - Activity 2: Instruct fish on construction of fish spurs.
  - Activity 4: Marching Drill(Flanking).
- Administrative -

(Week 6) 22 Sep – 28 Sep

- ==SOMS 111 -==
- ==Academics -== Scheduled appts with student groups - proactive assessment
- ==Dedicated Cadet Life touchpoints -==
- ==Cadre Focus== -
- Physical Fitness
  - Activity 1: Run 24 Min @ 10 min/mile; Upper body Daily 16 - 2 Sets
  - Activity 3: Run 20 Min @ 10 min.mile;  LB resistance - 2 Sets
  - Activity 5: ==Corps Run before Arkansas??==
- SVT - CAMPOs: #9,18,22,&30
  - Activity 2:  Test fish on drill as per Corps Brass Book.
  - Activity 4: Corps Trip Prep and significance
- Administrative -

(Week 7) 29 Sep – 5 Oct

- ==SOMS 111 -==
- Academics - Heavy Testing WEEK =={may need to assess PFT period if early or late window)==
- ==Dedicated Cadet Life touchpoints -==
- Cadre Focus - Brass Culmination and signoffs complete;  ALL outfits provide a list of Cadre, hometown, and major for fish to start learning post outfit assignment notification
- Physical Fitness
    - Activity 1: Run 20 min 9 min/mile;  Upper body Daily 16 - 2 Sets
    - Activity 3: Corps PFT 1.5 miles, max pushups, max plank time(Outfit Ldrship Run with them to observe – CO/XO/1st Sgt/Plt Sgt)
    - Activity 5: Corps Run; Brass Culmination
- SVT - CAMPOs: #6,8,23,&24
    - Activity 2: Drill Time (continue testing per Corps Brass Book)
    - Activity 4: Final Counselings

- Administrative - Post outfit assignments


Fall Break (6-9 Oct)

**Transition** 4 days (10-13)

- Counseling: Cadet Cadre - FTL works directly with the outfits he has fish with.  Warm handoff on each Fish they were responsible for to the FTL at the unit.

- Handoff – Athletic Ability /Academic/Drill/SVT from SQLs to outfits

- Introduction to units during morning activity time (PT resumes next week based on ability groups).

- SVT - Tie unit into campos that have meaning to thems, bonfire, etc.

# Working Group #1 : Freshman Orientation Phases

## Defining the problem:

- Intentional and immersive leadership development experience that recognizes tradition but transcends and accelerates the leadership experience to remain competitive for tomorrow.
- Acknowledges 'student led' but within the construct of OOC standards, values, and policies.
- Holds the balance between outfit integrity and leadership development.

## Scope:

View OOC as 'TRADOC' – put in play policies and guidelines that

1) define success 2) define what 'right' looks like and 3) define the product

## Key tasks and progress markers:

Groups will design an implementation plan that begins with the end in mind.

   1 Nov: Working Group Kick Off, IPRs begin

   15 Nov: IPR #1

        Refine/resource/reflect

   28 Nov: IPR #2

        Refine/resource/reflect

   5 Dec: Staff Meeting Update/IPR #3

        Refine/resource/reflect

   19 Dec: Final Recommendation/Summary Report submitted

   10 Jan: Implementation Meeting/Phase 2 Begins

## Outputs:

Each working group will present their findings to include

1) a summary of recommendations

2) a plan for enacting their recommendations

3) request for support with identified resources to support the work required for their plan

4) a timeline of implementation and assessment.

## Key Considerations

1. FOW is no longer a week; it extends to fall break or beyond
2. Becomes a white-belt event (those who have led before)
3. Focus on orientation NOT initiation
4. Socialization approach – 3 phases that need recommended timing
   a. Integration into the Corps: cadre focused, OOC facilitated
   b. Integration into the Outfit
   c. Training for the next position

## Strategic Considerations

1. Consolidation of fish to one area of the Quad that is restricted to Cadre and fish
2. Spring 2024 changes/needs/policies for fall 2024 implementation of your recommendations

**Working Group Collaborators**

Lead: Sherri LeVan

Katie Higgins

Russell Tipton

Josh Polk

Tommy Snyder

Brad Tippett

John Fleming

Desiree Ornelaz

John Regan

Jerry Peralta

Steven Allbert

Rob Washington

Hannah Sosa

# Working Group #2: Sophomore Leadership Academy

## Defining the problem:

- Intentional and immersive leadership development experience that recognizes tradition but transcends and accelerates the leadership experience to remain competitive for tomorrow.
- Acknowledges 'student led' but within the construct of OOC standards, values, and policies.
- Holds the balance between outfit integrity and leadership development.

## Scope:

View OOC as 'TRADOC' – put in play policies and guidelines that

1) define success 2) define what 'right' looks like and 3) define the product

## Key tasks and progress markers:

Groups will design an implementation plan that begins with the end in mind.

1 Nov: Working Group Kick Off, IPRs begin

15 Nov: IPR #1

Refine/resource/reflect

28 Nov: IPR #2

Refine/resource/reflect

5 Dec: Staff Meeting Update/IPR #3

Refine/resource/reflect

19 Dec: Final Recommendation/Summary Report submitted

10 Jan: Implementation Meeting/Phase 2 Begins

## Outputs:

Each working group will present their findings to include

1) a summary of recommendations

2) a plan for enacting their recommendations

3) request for support with identified resources to support the work required for their plan

4) a timeline of implementation and assessment.

## Key Considerations

1. Result in certified/validated trainers
2. Concurrent to FOW; validated trainers develop the 'how' of outfit integration and Corps Brass
3. Socialization approach – phases that need recommended timing
   a. Task based: Proper training of physical fitness, drill and ceremonies, room inspections, uniforms, discipline process, honor code and honor process
   b. Theory based: demanding vs demeaning, transactional vs transformational, emotional intelligence, motivation, understanding subordinates
   c. Practical application and assessment: scenario based/role modeling case studies, personality assessment review, in-person (blind) interview process to certify, SGT rank awarded upon validation

## Strategic Considerations

1. Spring 2024 needs IOT implement this in Aug 2024
2. Role of the current Corps Leadership Development Model to support
3. Spring 2024 changes/needs/policies for fall 2024 implementation of your recommendations

**Working Group Collaborators**

| | |
|---|---|
| Lead: Byron Schlather | Frank Wood |
| Jason Mullenberg | Kristen LeForte |
| Ken Griffing | Bill Meredith |
| Jeff Gardner | Steven Cheatham |
| Kevin Parker | Cristina Vela |
| Will Zimmerman | Remi Bankole |
| Peter Siegel | |

Spring 2024

- WG#2 has not met as a complete group since late December.
- Dave Kelley developed the curriculum overlay for weekly Commandant instruction and SOMS 181/281 integration (see attachment; SOMS 181-281 KSA Curriculum overlay)
- Sub-group w/ Col Parker as lead has started developing case studies that incorporate the leadership topics for use in SOMS class discussions (see samples attached: Management v. Leadership; Values-based Leadership; Bases of Power)
- Contacted Shanna and Jason at Rudder Theater Complex to reserve the Auditorium/Theater for specified dates
  o No conflicts identified at this time
  o ~$1200 per week to use Rudder Mon/Fri mornings
  o Rudder has not confirmed availability; awaiting a response to email sent Friday, 12 Jan
  o Recommendation: Commandant kicks off first session on 5 Feb 24
    ▪ Audience: Freshmen and Sophomores
    ▪ Alternate Audience: Whole Corps?
- Certification:
  o Still wrestling with how to integrate SOMS, outfit preparation training, certification task force personnel
    ▪ Timeline for certification
      • Spring semester
      • Refresh during Zero Weeks (formerly cadre training/FOW)
      • Fall semester remediation
    ▪ Spring preparation training
      • Minor unit vice outfit training?
    ▪ Certification task force
      • OOC staff only or do we augment with cadet leadership who are "trusted agents?"

This was sent to me, looks like all our planning for the fall before the Commandant made any decisions was released. Unacceptable in my opinion, he still hadn't finalized all the COAs and direction.

This the Commandant's response to the facebook pages, I received this from Mike Reilly. Someone distilled it down for the cadets, but included his entire response. I have not seen what is being said only that it was posted on a former cadet facebook page.

Sherri

**Sherri J. LeVan, Colonel, USAF, (Ret)**
Corps Recruiting Director
Office of the Commandant | Corps of Cadets
1400 TAMU | College Station, TX 77843

979.862.6657 | slevan@tamu.edu | corps.tamu.edu
------------------------
**TEXAS A&M UNIVERSITY**

**From:** Sherri <dnslevan@att.net>
**Sent:** Tuesday, February 20, 2024 3:56 PM
**To:** LeVan, Sherri Jean <slevan@corps.tamu.edu>
**Subject:** Info

**This Message Is From an External Sender**
This message came from outside your organization.

Sent from my iPhone

For clarity's sake, the below was posted by The Commandant in a former Cadet Facebook group. I put it here to consolidate and make it easier for cadets to view.

For now, keep your ears open, and listen. Be quick to listen slow to speak, slow, become angry and slow to action. Let's see where this heads over the next couple of days. No rash decisions don't act out of emotion. I have to live the same way right now. My buddies are blowing up our group text.

A two part response (because it is long):  Part 1

All – well, looks like the rumor mill got well ahead of a final decision.

This below is a long post with a lot in it so strap in for a moment:  Last week, after a lot of discussion and working groups, I made a call to move out on planning to restructure Cadet 'socialization' and 'leadership education'.  Below lays out the logic – it is long, but it is because there is a lot to process in the 'why' here.

Since November I've had the staff working through options directly addressing the balance between the communal/fraternal aspects of the Corps experience and the leader training and education program that the Corps (and the Office of the Commandant) mission reflects.

Observations:

- Tradition above leader development.  There is a certain truth to a note sent to me by a Cadet earlier this year when we had a discussion about the culture of the Corps.  To quote: "Too often we put tradition above leadership development".

- Outfit culture is challenging Corps culture.  If you've witnessed the drop in basic Corps standards such as 'whipping out', uniform standards, simple things such as a lack of ability (or enthusiasm) to rally behind a 'Corps Hump it' – this is what I'm talking about.  Watch underclassmen address upperclassmen on/off the quad:  for the most part – it is only directed within the outfit – we are not meeting expectations this way.

- Corps standards and values don't apply to my unit.  I've detected an 'it does not apply to me or my unit' pattern.  This is deeply embedded in the previous two points.

- Peer accountability is hard.  I remain steadfastly committed to empower student leadership with authority and responsibility, but it also means they are accountable within a set of standards and values.  Holding each other accountable is the hardest act of leadership – there is growth here, and it continues to grow.  Young leaders are grasping (and not grasping) that being 'student led' also means it is within a framework of guidance, standards, values, and accountability.

- We need to expand leadership opportunities.  Our breadth of leadership positions within the Corps are lacking.  This become very apparent in the limited roles the majority of our White Belts have to expand their leadership experiences.  Can we provide 'purpose' here?

- Our leadership development program needs work.  We spend a lot of time discussing the 'Be' and 'Do' of leadership, but we are all over the map with 'Know'.  A lack of an integrated curriculum map with clear learning objectives the build off each other.  ROTC leader development classes and SOMS should be complimentary… but we have drifted in mapping an effective course design.  Because we don't have that, SOMS classes have become less effective than they could be.  In essence:  the lessons of SOMS are 'skipping' off the Corps experience.

- Our retention statistics are telling.  From a perspective of statistics I offer the following:  We spent an inordinate amount of time working with Cadet Leadership to 'be' the very best example (Know and Do) of a cadre for incoming freshmen for FOW last year.  It was the first time in a while that Cadets were in the lead.  And they did a OUTSTANDING job – leading, coaching, inspiring, teaching – being aspirational to every new freshmen.  The numbers told the story:  we lost just over 1% of freshmen that week.  An incredible tribute to leadership in action.  But then the rest of the Corps returned the first weekend, and within 3 weeks our attrition bumped to 10%.  An incredible statistic that can be interpreted in a myriad of ways.  I chose to interpret it this way:  our investment in (1) leadership development of 'ALL' cadets is not where it needs to be, and (2) our Freshmen were not given the time/space to be totally prepared for the rigors of cadet life in an academic setting.  This is also a realization that students coming to A&M are probably smarter than most of us where when we showed up, but at the same time, they are less mature.

Current Actions that have been in place:

- Connecting 'recruiting to retention' – an initiative brought forward by Cadet leadership under the assumption that if you have the right culture, you should be rewarded:  outfits can recruit 1.5 times the number of freshmen that remain at the end of the school year.  This allows outfits that 'have it right' to flourish, and those that don't, to either recover, or attrit themselves out of existence.  Yes, Darwin is at work here, and it should be an incentive that works both ways.  If you have a bad year retention-wise you can recover if you've got the right culture.

- Re-mapping 'core curriculum'.  We are in the process of looking at every aspect of how we bring the leadership models to each cadet.  What should every freshmen know?  How does it tie to their next leadership experience?  How do we validate 'knowledge' and 'certify' expertise before they lead freshmen?  What do rising sophomores, juniors, seniors need to know to be successful?  How do we create a curriculum map that builds on itself?  I am intimately involved in getting this right.  We are starting now with a top-down approach to arm every rising sophomore and rising junior with the 'tools' to be a better leader at echelon.  This is manifesting itself in a spring surge in leadership development led personally by the staff on Monday and Friday mornings.

- We are re-writing the 'Standard' and the 'Cadence'.  We are writing Commandant's Guidance to the Corps in the form of an 'order' that gives the framework for success… and models the behaviors we seek to impart.

- We are hiring 4 Leader Development Advisors – who will be someone cadets want to emulate' to focus on bringing leadership models and reflection to the practical application of every Cadet's leadership journey both on and off the quad.

- We are addressing the maturity of our Cadets by focusing on arming them with the five factors of resilience and how they intersect:  physical, mental, sleep, performance nutrition, and spiritual.  All in an effort to get left of harmful behaviors by helping each Cadet build resiliency in a way that helps them drive through adversity whether on the battlefield or in life.

Internal Discussions:

So the questions posed by me to the staff at the end of last semester:  Why do we do FOW the way we do?  Is it ground in history, tradition, or outcomes?  Do we continue to do FOW the same way we've always done it?  How do we re-imagine leadership development to better prepare rising sophomores and rising juniors for their next (if not first) leadership experience in the Corps, if not life?  How do we more rigorously, intentionally, and immersively bring leadership training and education to life?  How do we achieve balance between the twin aspects of the Corps experience:  leadership development and tradition.   How do we make them mutually supportive rather than mutually exclusive?  Reinforcing rather than the polarizing.

The working groups looked at multiple ways to addressing the above questions.   We looked at models where it is working.  We questioned the assumptions behind the way we've always done it.  We looked at time requirements.  We challenged ourselves to keep in balance the tension between the fraternal aspects of the Corps and the Leader of Character mission we are charged with.

….
PART 2:

A 'plan to plan' – this is what I said to move out on:

Go bold in honoring the past but pushing ourselves into the future – to remain relevant.  To transform the Corps experience to provide leaders of character to the state and nation at a time we need to most.

First, we are establishing a 'Sophomore Leadership Academy'.  This is focused on rising sophomores in the second semester of their fish year, and culminates during the first few weeks of the Sophomore year.  This will focus on educating, training, modeling, scenario/case study, demonstrating, and certifying that they (1) understand, and (2) can execute what it means to

lead in a demanding and aspirational way.  No longer can we tolerate the 'least qualified leading the most vulnerable'.

Second – we are extending the orientation period of incoming freshmen to focus on outcomes to be successful:   A common understanding of traditions, values, standards; to set conditions for success academically; to incorporate the five factors of resilience into the fabric of the Corps experience; and to drive an articulation of the value proposition of the Corps.
The combining of these two initiatives involves some pretty significant adaptations of the Corps experience up front to ensure we mature the Corps experience in a way that is valuable to all.

The extended Freshmen orientation will last about 5-6 weeks (around Fall Break), culminating in the pinning of Corps Brass.  It will be led under a cadre of about 200 Seniors and Juniors who will be exclusively responsible to the training and education of the outcomes listed above.  The Freshmen will be consolidated under Major unit 'pods'.  Simultaneous to this the Sophomores will be completing their 'certifications' under the Sophomore Leadership Academy.  As they graduate, they will be incorporated into the cadre.

After the Freshmen class has successfully been pinned, there is a transition from Cadre to outfit leadership – this transition more closely matches the mental model we all have of our experience.   The next 7-8 weeks is outfit integration that rides on (1) the commons set of standards, values, and traditions that all Cadets learn, and (2) under the leadership of outfits (Sophomores who have graduated from the Sophomore Leadership Academy), Juniors, and Senior into the unique aspects and culture of their outfit.  This will culminate in an outfit form of 'culmination' that each outfit will have to lay out.

As the Corps completes the first semester, the second semester becomes a selection and a preparation phase for the next leadership position in the Corps.

So what are the friction points?  What are the risks?

1. The one logistical challenge we are seeking to solve is the transition from 'orientation unit' consolidation, to outfit footprints.  This is a math and a physics problem.  Right now the challenge is whether it is feasible to reshuffle the entire quad during the semester (right around Fall break) or do we wait till the transition between fall and spring semesters.  This is a big driver of 'feasibility'. There are others:  march ins, PT, formations, etc… a lot to think through here.

2. It does not look like the way we've always done it.  Completely true.  Unless you go back to the 50's where all fish resided at RELLIS (FDT came out of this).  I would ask that we all take a step back from our own version of the Corps and allow this to improve our beloved institution.

3. What about outfit integrity?  I can see how this can be interpreted if we allow ourselves to be prisoners of our experience.  I'd challenge all of us to be 'informed' by our experience and see the future benefit of transforming the Corps experience in a way that results in leaders better prepared for the challenges of tomorrow while building a community that will last a lifetime.

4. What about outfits that have it right?  Now they get to get it 'righter'.  There are layers upon layers of how to address this.  We all have a sense of pride here, I am the same with E-1.  But we have to confront the brutal facts that we are losing the identity of the Corps at the expense of outfit identity.  That our leadership training and education program needs to be improved.  Our current leadership model is bouncing off the fraternal aspects of every outfit.  Spend a day with 'your unit' and watch how they interact with other units.  You'd be surprised.  We are actually addressing a larger concern of Corps identity in relation to the university, the state, and the nation.

5. Impact on recruiting?  Outfits still recruit for their outfit.  The 'Corps Orientation' Phase is about providing a corps wide calibration of standards, values, and tradition.  There is still a hugely important quality of outfit identity in the recruiting process.

6. General.. this is all about quantity!  I get this a lot.  Here's how I'd address it:  (1.) "Old" Army and 'Their' Army are vastly different, but equally as challenging.  I watch these young men and women wrestle hard everyday – and the stressors of yesterday pale in comparison to the stressors of today.  (2.)  Quantity or Quality:  I want both.  And I think we can do it.  There will always, always be some form of attrition.  And I'm calibrating what I think is acceptable.

If you've read this far it is because our version of the Corps experience so incredibly defined our identities, our friends, and our lives.  But we have to move forward in a way that balances the important and relevant aspects of the Corps experience we experienced to where it needs to go next.  We cannot remain relevant if we put tradition above leadership development.   We need balance here.

I look forward to your thoughts as I lay out this plan to keep planning to a group dedicated to 'you know you win the corps at A&M when…'

Thank you.  Commandant

| | |
|---|---|
| **From:** | Simpson, Meredith M |
| **Sent:** | Wednesday, March 6, 2024 4:22 PM |
| **To:** | Thompson, Amy L |
| **Attachments:** | Feedback Form.27Feb1000.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow Up |
| **Flag Status:** | Flagged |

**Meredith Simpson**
Chief of Staff
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

# How can we be more intentional and immersive in our leadership training and education program across the four-year journey?

The greatest leadership training is not done in the classroom but done in a position of authority. The fish are not learning leadership, except by example. The people gaining leadership are the upper class men who are given the privilege of responsibility.

Giving outfit leadership more autonomy while also enforcing high standards of outcomes is what will lead to the greatest leadership development.

https://texags.com/forums/16/topics/3445742

Have a standard for the corps as a whole (such as kicking out repeated PT failures) but allow individual company identities to remain. Allow companies to have a MAJOR say in their individual unit leadership

Let us lead. The corps is very hypocritical on being a "cadet run " organization then attempting to reinvent the entire program with zero cadet input

By bringing back an actual cadet led corps. The changes that you plan to implement will only bring resentment from the current cadets.

Do not go forward with all fish dorms next year. Outfit culture is vital to developing loyal leaders who respect authority.

Provide an opportunity for fish to take on a leadership role in their second semester, even if only a minor one. Once they have proven themselves as capable cadets, they should begin assuming that role.

Actually make the cadet lead the corps the Commandant promised in his initial address to the corps. There has been a constant stream of lies and false hope given this year. Commandant staff needs to have some accountability for their actions instead of blaming everything on the cadets. If they want more training for the freshmen class, then have the cadets be better prepared. Equip the cadets instead of taking away everything we have worked so hard to fix and prepare for next year.

Let ROTC units exist, cadets not going into the service can observe the "fraternal organization " and those joining the service can have their specific leadership models tweaked to their service

Make SOMS more than reading a book with discussion. Make SOMS 2 credits and have some sort of "hands on" training in regards to what is learned in class.

By letting upperclassman lead and train the fish that come to their unit and setting aside time during the week for outfit briefs.

Make soms classes more than busywork classes where commandants staff talks just to fill the space. Making it an intentional time for actual leadership development could be immensely valuable.

We need to redefine what it means to be a senior. The idea that seniors "inspire" is extremely vague and does not give them much to go off of. Furthermore, incentivize being present in the outfit and in the Corps. I firmly believe that upperclassman who don't show up shouldn't be allowed to train any class.

Creating a culture where every class has motivation and a genuine reason to invest in those below them. This means partially holding lazy whitebelts accountable but most importantly means giving outfits as many opportunities as possible to train freshmen and develop relationships through outfit activities and other mechanisms. Fish's training academy would make leadership development less immersive for everyone who isn't on the select Whitebelt cadre and that is a net loss.

Make sure everyone has a vital role in their outfit and feels needed. I think this would also inspire people to stay motivated and participate in corps activities to the full extent.

My answer to this is on my next answer.

Overall restructure the corps. Outfits become platoons. Battalions become companies and major units become battalions. It would make the description of these leadership billets make more sense as well as give the small leadership positions (SL, FTL) the ability to lead.

Secondly outfit COs now become PLs, Battalion Commanders are now company commanders and so on. I think this model can be seen amongst the RVs. We operate as a company but then we break off into our platoons to conduct drill, pt, etc. additionally we still have our own unique cultures across our platoons. The culture of the outfit wouldn't change. You would just rename Leadership positions as well as what it means to lead in this role. Which in turn will make leadership more Intentional as well as make leadership make more sense.

Look back at the years before COVID. What did they do then that had them at 2500+ cadets and see what has changed since then. The corps was growing at the rate it needed to survive and thrive before COVID.

It is hard to give thoughtful meaningful and purposeful answers for change if we do not know the reason for the change. As a student organization we deserve to know the full reason for the changes. Please.

By allowing leaders to do what is necessary to push the individuals below and around them. Encouraging the corps experience in its truest form, in the form we all came here because we love, not the form being pushed by those before us, Kathryn banks, General Ramirez, and I hope not yourself. Without a significant challenge and purpose we will never be immersed in this leadership environment. Without the ability to properly train our subordinates nothing but apathy will ensue. Without proper outfit and individual level culture individuals will have nothing to have pride for.

We must recognize that all leadership must be where the followers are and provide metrics and feedback for improvement and to keep units intact as much as possible.
This means that metrics must be provided to each unit for expectations of each position (from fish, to sophomore, to clerk, to junior, to Scholastics Junior, to XO, etc.) within the outfit, recognizing some units may divide effort within a chain among several individuals. Accountability for compliance must then be ensured. Most organizations include systems for feedback outside the direct chain of command - so the Corps should expect every Cadet to provide, perhaps monthly, a review of their own leadership and followership, of the leadership of their own outfit, and of the followership of their own members. With today's technology, it is easy to obtain an electronic survey from each Cadet.
Outfit advisors must read those monthly reports and take the appropriate action, which may be meetings and redirections to those in positions of command or in positions of followership. This affords an opportunity for Advisors to identify those on the bubble of retention and provide outlets, including potential transfer to another unit. This also affords the Outfit Advisors the opportunity to determine whether those in a position of leadership are suited to it, succeeding, or failing.
At the end of the day, training is Explaining, Demonstrating, Guiding and Enabling. Evaluation is a critical element in ensuring each of these elements is being met.
Regular evaluations should also be helpful in flagging the failures identified already.

As a rising senior, freshman cannot be the only priority when it comes to training. How do outfits push upperclassmen to grow? I think a big reason for whitebelt apathy is uppers do not feel like they have more to learn and if they don't get a position they want, they lose motivation to be there. I believe this is the reason everyone is as upset as they are because without fish, they won't know how to operate because they only focus on the fish.

Leadership (in my opinion) is a bottom up approach. So it takes time for ideas and culture to change. I think there have been quite a few good steps made this year with regard to holding people accountable, keeping Cadets involved, and giving Cadets the opportunity to take ownership and I think we need some more time to let these ideas truly take hold.

I would move forward with the proposed changes. All levels in the corps has been thoroughly corrupted by bad leadership and power hungry people who are not interested in developing people but rather being able to assert power over others and using freshmen as a means for entertainment and ego.

Continuing to allow fish to live with their outfit would result in a more immersive leadership training, as they are around their upperclassmen much more and can observe what they do and learn from their examples. We can also be more intentional by allowing cadets more control over the Corps to let cadets have larger scale leadership experiences to prepare them for the future.

Continue to provide the best possible training through intentional and corrective training, as well as providing resources to improve through both outfit upperclassmen and the Corps. As a fish this year, the entire reason why I joined was for the adversity. Knowing that I was going to become the best version of myself through a trial of fire was what lit me up and motivated me to be here. I believe the Aggie Corps is the best in every way for a reason, and that reason is because of the tried and true traditions that have been instated over the decades that hone the best leaders the nation could want. I love this Corps, and even as a freshman, it has already become my home. My outfit buddies are my best friends in the entire world and knowing that new changes for next year compromise this structure saddens me. I want what the Corps has given me to continue on for centuries to come. Sometimes, counterculture isn't bad.

As far as training and leadership goes, I say bring things back to the outfits at a radical level. Outfits are where everything important takes place. It's where you make your closest friends, face your greatest struggles, and learn who you really are under a volley of struggle. Keeping training and development under the outfits will not detract from the overall Corps spirit, I believe it will add to it by having a close family in a large unit.

There has to be a better way of choosing the future leaders of the corps and units. As a senior, I have suffered the command of unit commanders and major/minor unit commanders who are not prepared or committed to the prospect of leading. Many potentially great leaders are overlooked when it comes to even offering interviews, and the ones who are chose to lead are woefully inadequate. I have had one great CO and one good CO in my outfit in these four years. Each year me and my buddies have put out for leadership just to be overlooked and never give a chance. The imports we have gotten have cared little for the outfit and have been a detriment to the unit by imposing their will without feedback or consideration. You wonder why cadets are disheartened in the organization by the time they are seniors? It is obvious that cadets are not being seen or heard and are being subjugated to poor leadership by the corps. Let us choose our own leaders or actually spend more time choosing our leaders because this has been a major problem in many outfits and throughout all levels of staff.

I think it's important to let cadets continue to be involved. Taking sophomores away from their outfits to be trained by corps advisors detracts from the upperclassmen's ability to make an impact on their subordinates. I think it's okay to have a specific curriculum that sophomores should be learning, and advisors should definitely be present to enforce those ideas, but cadets should remain the main teachers.

I am only a fish. I know and have experienced less than a quarter of my journey. However, what I do know is I have learned a great amount from the current model. My buddies and I have fought through the first semester together, and I wouldn't want to change that for anything. What made the corps so great was having a close support network of my outfit from the beginning. I was aware of upperclassmen to go to for help in the transition from high school to college, and was able to gain good advice, strong bonds and deep mentorship from them. What I also know, is that a Commandant Brief every Monday morning to learn about leadership means little for a group of college students that attend multiple lectures daily. Those at the top are undermining the value of socialization in the leadership model. Much of that socialization comes from the outfit level. I was incredibly fortunate with a good one, one without a single punch, an outfit with a proud fish class who have improved in our leadership ability simply by having inspirational individuals directly in our lives everyday. It's not the corps that needs to change, it's those lacking outfit cultures that need to reevaluate. Intentionally and immersion stem from focusing on individual future leaders. People buy in to a system that they feel cherishes and knows them personally. The only way to do that is by improving outfits.

I appreciate the weekly discussions with the commandant. However, it appears that SOMS teachings are antithetical to the mission of the Corps. I frequently left SOMS feeling disappointed in myself and feeling as though I was nothing more than a propagandized cog in a machine. I believe it would be beneficial to turn SOMS into a place where cadets can share leadership experience, discuss current issues, and learn about the issues of the Corps beyond the March to 3000. Additionally, I believe that the incentive for general Corps traditions has fallen as a result for apathy in our higher leadership. We must select individuals for staff who love the Corps and do not segregate themselves from the standard.

Reevaluate the SOMS curriculum to focus more so on discussion of leadership theory and why we are coming to certain beliefs and actions in our leadership instead of surface level explanations of what we could do. A lot of the stuff has the potential to be interesting but it barely scratches the surface of why we as people do things and what benefits or consequences come from it. Currently it appears like it is just an excuse for leadership to tell their vision to us and just hope the younger classes grasp onto it. Make each soms class feel different because, aside from the transition from CTO to Leadership Professors, a lot of it has felt very similar and I personally didn't feel like the professors had the ability to use the hour a week to their full extent. Many cadets do the assignments and classify it as busy work and dont really think about what they are writing. If they do it is probably only what they imagine their professor wants to hear which will lead to no real change. Additionally there should be more of an emphasis on DNC careers. Previously I had mentioned in SOMS classes that I felt ill prepared by the Corps, especially for business careers, because we only started interview questions in the Fall of senior year. Nowadays it is common, if not essential, for students to have internships prior to senior year. Cadets should know about these opportunities and timelines so they can be prepared to be leaders in whatever world they go into.

Make the Corps cool again. Make it difficult, but provide resources that make that manageable. Imagine if Cadets were treated like athletes here at Texas A&M. That is what I would love to see us move towards. Adults checking in on us, personal trainers, dietary and food coaches.

We can allow leaders to actively make more choices and guide the future of the corps. It feels as if we are bowling with the bumpers up and anyone who's been bowling knows that is entirely different than the actual sport. Additionally cadet leadership is consistently undermined by CTOs or whatever you want to call them. We preach things in SOMS class like praise in public scold I private then proceed to rip leaders in the hallway for all to hear. Another key failure is communication all we have heard is that fish brigade is about March to 3000 and now it is about leadership values and a lack of whipping out. The fact that the way I and many others I know learned the justification for the Commandant's choices is through a leaked Facebook post is an absolute travesty. When the Commandant first arrived he said his one of his key goals was to "give the corps back to the cadets" since then there has been earth shattering decisions made behind close doors with little to no cadet input is a failure on all accounts. In sports it can be said a coach has lost a locker room when he is no longer respected by the team leaders. I think it can be effective said the Commandant has "lost the locker room" and similar to any coach who finds himself in that position needs to do something to regain our trust.

MORE OUTFIT MONITORING

Outfits culture and training needs to be monitored much more than it is, however it needs to be done consistently and effectively. I would propose both Unit Staff and Corps Staff doing routine check-ins with the blackbelts of every outfit to ask about outfit culture, trainings, and culture. This way, Corps staff can find out what goes on behind the scenes in outfits, not just what upperclassmen want you to see whenever someone is physically there. This will (if done properly) keep upperclassmen from being able to facilitate a toxic culture and unauthorized training. This will also offer a better support/protection for fish and sophomores (it is necessary for them too) against toxic training and culture that their outfit may try to facilitate.

There is lots of bad/toxic stuff that goes on in many outfits across the quad that never gets reported or found out because there is no way for someone on the outside to see it. Information must come from within the outfits.

I would love to discuss this topic more. My email:

I believe the briefs are a step in the correct direction. The give and take of formations have in my opinion enabled more leadership on outfit levels. Off the bat we were able to switch call times, adjust PT plans to be more focused on platoon level goals, and delegate responsibility throughout the ranks.

I believe in the importance of keeping a healthy mind and body. We're taught leadership is a muscle that needs to be worked. We need an 'exercise' to ACTUALLY practice leadership. Something we organized and execute on our own. This comes in to form of PT for several outfits including my own. Talking about leadership ideals and scenarios and good, but it doesn't mean anything if we can't practice it. It's just words. I think PT serves for this reason. I'm not someone who just says, 'smoke the freshman cause they're freshman', I believe in building them up. My point in this, is that we need something that we can organize on our own and execute. Something we can agree with on an outfit or major unit level. This can come in the form of major unit FTX's for contracts, something that was done in the past. As well corps wide major unit competitions. Competition breeds success, we could even encourage this through further academic incentives.

I understand little 't' traditions pose problems. I believe they only pose a problem if they push into an area of legality (obviously). Being able to connect with alumni about the same traditions is an incredible opportunity. Run traditions by CTOS and be OPEN-MINDED. CTOs need to stop cursing out cadets without learning a perspective. We could be doing everything correct and because it 'looks bad' I'll be at parade rest and have a bunch of curses slung at me for no reason. It breeds an environment of frustration and apathy. If I'm doing everything right, why am I being demeaned? If I work diligently to create an outfit within the boundaries of our rules why do the CTOS not know those rules? Why is their first response to do EXACTLY what you don't want us to do to the freshman? It's not fair, CTOs are the face of commandant staff, what happens when the only thing we see them do is yell at us? It makes us by proxy dislike you, as someone in a leadership position, it makes it increasingly difficult to support decisions or change.

Don't let outfit culture be quashed, and empower every class to be leaders. This year I have felt that as a sophomore (especially second semester) I have no role. I am constantly walking on eggshells as one wrong move will end up with me being dressed down by a military advisor. I came into my pisshead year thinking I was going to be yelling and screaming all of the time and love it. I didn't. I like being a sophomore who still upholds the Standard. I still am demanding when necessary but also I can build those relationships with my fish. These will be the people I rely on next year to execute whatever vision we as a corps have. I think if you want fish to stay and keep outfit culture and build a better corps culture you need to treat heads better and allow them a little bit more leniency to make mistakes. Empower your sophomores to keep fish accountable.

The Corps experience is one of the most immersive leadership programs in the nation, currently. I'm not sure "more immersive" is possible. Intentional? The inherent structure of classes within an outfit is one of the most intentional arrangements that I've been a part of. The outfit provides every aspect of leadership opportunity that a cadet will likely encounter upon graduation. Now, for "training and education", more classes and seminars could be offered - outside speakers (alumni, pillars of the community, etc) could be engaged to interact and share insights to the cadets.

We allow outfits to develop leaders like 150 years of corps before us

Give more situational leadership education and training instead of theoretical. My time in the Corps helped, but not the classes. All of my leadership skills were developed within interactions with my fellow cadets and cadre through dialogue and trying different strategies. Give the fish the foundation their first semester or halfway through their first semester, but the rest of their time in the Corps should include how to deal with their peers and mentorship from fellow cadets, up and down their chains, and CTOs.

Continue with outfit culture as is, stop trying to implement the authority of big corps. Within the outfit, the four class system works extrodanarily well when done corrext (which it is most of the time.) As fish you learn, as heads you train, as butts you lead, and as Zips you mentor. fish are taught the skills they need

to uphold the standard and to be a cadet by their upperclassmen. Possheads use the skills they learn as a fish and are taught by their whitebelts to train the fish. Butts use the skills they learn as a blackbelt to be leaders and congrigate with the Zips for advice. And Zips mentor those under them to be better leaders, and prepare to use the skills they have learned in the real world post graduation.

A balance of student independence and Corps-wide accountability. More strictly enforced standards all around.

Don't separate Freshman from Upperclassman

We can be more intentional and immersive in our leadership training by giving cadets leaders to look up to and learn from. Yes there are already some, but maybe if cadets respected their CTOs or other leaders, it will be more immersive on how a leader should act. How one should not by hypocritical. How one should be flexible, not stiff as a board. How one should hope to become. This includes the DNC cadets, as they currently have no leaders in their major's fields to look up to beside what the university provides.

Honestly thought the way we were trained and learned during my 4 ( c/o '77) worked pretty well. The lessons I learned from being a fish were used in my 40+ career...

Allow more slack for outfits. Sophomores don't become scary and disciplinary when they can't be scary or disciplinary. No pushing at formo just makes them an outcast in the outfit where they can't goodbull and they can't be demanding either. Pushing was the one think that made fish respect them because they had the ability to actually execute their authority.

Promoting outfit unity by keeping outfit activities with all years, and creating more opportunities for outfits to grow with each other, such as team building events.

Challenge your cadets more by allowing for more training and not requiring meetings that have no direct purpose or intention. If meetings are necessary make them brief and as small groups as possible such as having wing meeting instead of a commandant address every week

1. Start leadership training the Fish the last 6 weeks of their fish year, so they are ready to assume their Sophomore Leadership roles when they come back on the quad.
2. Rotate ALL Sophomore Leadership positions at the end of the semester to give more cadets the opportunity to practice what they have learned. Currently only a limited number of cadets ever get to be a squad leader. This would double the number.
3. Consider also rotating All Jr positions at the end of the semester. If a Jr is stuck in a minor BS job, he feels left out and stuck in a rut.

Over the years, I have recruited a lot of cadets, many when I was a Scout Master. I remember one, that had been my best Senior Patrol leader. He quit after his fish final review, (Had a 3.5 GPA) because he did not want to spend the next three years stuck. He had been selected as the social corporal of his outfit. . The outfit tradition was, he would have been in the social position as a Soph, Jr and Sr. He wanted an opportunity to learn some leadership. Not a very good leadership training path.

It seems improbable that a leadership lab like the Corps can immerse its participants when all meaningful decisions are made by the Commandant's Officer rather than a committee of cadets. Consult with cadets before proposing radical changes without our consent. Give the cadets the ability to govern ourselves and vote in changes with greater autonomy, i.e. allow us to perform in leadership roles.

I think this is the wrong question to ask. The leadership development that comes out of the Corps, contrary to the belief of a lot of people, doesn't come from the corps leadership positions. Nor does it come from general outfit positions. I think the leadership position that gives the most leadership development is to be a 1SG or a CO right now, as you have to manage and lead a large group of subordinates and peers. But the bulk of the leadership development within the Corps comes not from the direct training, but from the character development and growth experiences you get from being a part of the experience. It starts as a fish, with your own physical and mental limits being pushed as well as your

buddies. I can't understate the importance of a buddy class for a fish, the peer leadership opportunities a buddy class gives fish are some of the best the corps offers, and the character development you undergo as a fish comes not only from yourself but largely in part from watching and helping your buddies grow as they help you. Sophomore year you're on the opposite end of the board and now you have to lead your own fish, and the one-on-one leadership experience being a fireteam leader should be with proper execution is a great opportunity that sophomores miss out on. Junior and Senior year, the leadership development comes more from trying to help run larger outfit operations. I don't think the Corps needs more 'intentional' leadership training. Our current model actually has a lot of room for leadership development, but the problem is that cadets are disenfranchised with the corps, overloaded with coursework and don't have time to invest, or generally demotivated to take the opportunities they have. More 'mandatory training' will only make that problem worse.

Continue to raise the bar. An idea. Make FOW slightly longer, maybe even slightly into the school year. We are known for already making great leaders under the current model. This idea seems to have not failed us. I know so many leaders in the corps that were created with this model.

Listen to feedback on how upperclassman felt most effectively trained as underclassman

Give cadets ability to love the organization again. Allow it to be a challenge, make it worth earning. Make this place something to be proud of, earn, and difficult.

LET ME BE A SOPHOMORE PLEASE!!! I went through Brass and earned it, so let me be a sophomore and let the fish be fish.

Focus on the "Be" and "Do" of leadership. We have classes, briefs, and the like to discuss and "Know," but of late have been lacking in the application.
The best way to learn, especially in a laboratory like this, is to be given more freedom; that means cadets need to be making the actual decisions, not Commandant's staff.
Army ROTC does this excellently with land navigation, and letting you get lost yourself instead of, in this case, guiding you to a point (which may not even be on your lane strip).

Additionally, the 2nd and 3rd semesters of SOMS should not be centered on MAs/CTOs ranting about what's wrong in the corps, but instead the military training (I.e. ORIs, customs & courtesies, professional translation of lessons learned, and allowing for an open forum of discussion centered on cadets themselves.)

What has always made the Corps unique is the intense stress and seemingly impossible challenges put on the fish, and the class bonding and unity that occurs as a result. My Corps buddies are still very close today 24 years later. We look back on the challenges we went through together with fondness, and now as an adult I know that no matter what I face, I dealt with X in the Corps, so I can deal with Y now. That's what robust and ready leaders are like, regardless of whether you are in the corporate world or military. That's why the Aggie Corps has always produced some of the highest quality leaders from any institution. If you take away the buddy system and the outfit identity, you'll get all the things that are the problem with the military and it's morale today. The goal is not to produce plug and play cadets that can be moved around - and create "sameness," but work on creating excellence and allowing that to look different across outfits. The goal is to create close bonds and hardened, humble leaders. The outfits are a laboratory of leadership, and naturally the best labs will produce the best results. Learn from the best and help the ones who are struggling - rather than lower the standard across the board and lose the heart of the organization. That's what the world needs. I was C-2 guidon, regiment sergeant major, regiment commander and RV platoon sergeant for the squats. Those experiences alongside my buddies is what made for "intentional and immersive leadership training." If you take that away, we might as well just be a service academy, where cadets will scrawl IHTFP all over campus and dream of the day they can get out of there.

Each class year has its own place in the development of a leader. Too much focus on one part or not enough focus on another causes a disconnect in what we should all value as a meaningful leadership training experience. If any changes are to occur, to keep the integrity of the leadership development model, precise and careful consideration needs to be given to the roles at every class level. This should come in the form of conceptual lessons and teaching points, but most importantly, physical examples on how the roles work within our organization and how they can be translated for our futures. If guidence

cannot be provided adequately to cadets amists changes, it may be good to reevaluate exactly how leadership at every level should be played out, lest we abandon the very purpose of the Corps of Cadets.

Continue to defend and uphold the standard while prioritizing the value of the corps leadership experiences available in outfit activities.

I believe that we can be more immersive in our leadership training by expanding the criteria for leadership roles as well as creating more. At the moment, the way we chose leaders is very simple and only focuses on grades first and foremost though most cadets would rather have a good CO with average grades rather than a bad CO with a 4.0.

I think that having a larger group for standardized drill and uniform would be good, however if we want the fish to stay close together, the outfits present a simple option. It is much harder for 200 cadets to become a cohesive unit than 20 or 30. Using outfits would also allow sophomores to learn their job and grow as a leader. I believe that FOW should be extended to two weeks and be corps wide to allow standardization, after this, these fish will be released to their outfits for sophomores to learn their job and fish to learn outfit culture.

We can do interviews for people each semester as part of the transition process from going to a fish to sophomore, sophomore to junior, junior to senior.

Intentional and immersive is by keeping the fish with the upperclassmen-having the upperclassmen teach them from the beginning, like it has been the past couple years. Although SOMS is required for only a year and 1/2, I think it should be required for all four years. And if you want to focus more on being intentional, in those classes there can be given situations that every under and upperclassmen experience and explain how every action that is taken not only has a reaction but has a purpose. We tell our fish all the time that everything we do has a reason and a leadership correspondence. That should be emphasized. If SOMS won't be for all four years then have meetings with the whitebelts as well. Fish year everyone cares because they want you to stay, and by that time you're already calling the Corps home and don't want to leave. Then during Pisshead year every MA and everyone on Corps Staff hates you because they think you're the problem-so you get a fraction of that care, maybe a fourth of initial care. Then once you hit being a whitebelt you're basically tossed to the way side. The whitebelt's leadership development matters too. Even if SOMS doesn't become required, whitebelts should still have meetings with the Commandant maybe once every two weeks to a month to understand our purpose, place, and course of action in accordance to your vision while fulfilling our own visions. I understand helping the blackbelts develop, but the whitebelts matter just as much as they do in this entire Corps process.

As a zip, I look fondly at the time where it was tough as a buddy class and made me proud to be a killer. Enforcing height and weight along with pt scores will make everyone care more. Also let prospects know that this won't be easy but will be worth it.

This is a student organization, let the students run it. They have the pulse on the generation, and those that thrive have the knowledge on how to do so. Just as fraternities have attrition, so too will the corps. Just as fraternities are not for everyone, so too is the corps. The corps is its own entity, NOT a USMA lite.

Service towards others needs to be more heavily implemented. I was talking with Colonel Allison last semester, and he told me that when he was here no freshmen had to do pushups for their mistakes. Instead, the upperclassman directly in charge of them had to do the pushups because they didn't do enough to get their freshmen to the point where they were flawless. I think a system something like this would benefit the Corps. I don't think the upperclassmen necessarily always doing pushups in front of the freshmen or whoever it is that messed up would have any benefit, because then the initiator might do the opposite desired effect and try to mess up to make their upperclassmen have to do pushups. I think this kind of system, though, would make more humble and service-oriented cadets.

I was an Outfit Commander class of 2000:
1. As a sophmore, there was no official leadership training, just a "passed down" model of what some thought was cool, often yielding the next class to be even more obsurd. Any type of coaching/leadership training for sophmores should be welcomed.

2. When I became outfit commander, same thing, no real training. We met biweekly with a Cadet Training officer with no real guidance, it was story time.
We met weekly with the band directors, same thing, it was a pissing contest of which outfit was better.

Any training for commanders that would involve:
1. delegation techinques,
2. peer/underclassman accountability,
3. communication techniques
4. planning weekly, monthly and semester goals in PT, inspections, academics guidance
5. Conflict resolution strategies

If we are truly making an attempt to build leaders, these are the current strategies I stress with my current subodinates.

---

Mandatory leadership forums for the different classes where Old Ags and other leaders come and talk about leadership. In the interim between forums have classes broken down by major units have sessions with officers out of the Trigon.

---



---

Peer selected leadership. Would eliminate a lot of the perceived pointlessness of leadership positions that is prevalent amongst the Corps. Reinfecting pride into the corps will increase this ability too. The only way to reinfect pride is to make the corps something worth the time and effort it takes. The lessening of standards and ease/comfort of many outfits fish experience only subtracts from the pride one can have as a cadet as they know PT standards are not hard, you aren't going to be pushed, you're not going to be yelled at, the challenge changes to mundane inconveniences not a stressful situation from which to grow.

---

I think proper oversight of a cadet run corps and special units. I graduated in '21 and felt that part of the lack of leadership opportunities resided in the fact that not enough autonomy was given to cadets in how their corps, major units, special units, and outfits were run. Obviously oversight is needed or you'd end up with the inmates running the asylum. At the same time, your average cadet finds more opportunities for personal growth when they are presented to him as a means to make an impact. This impact is more readily seen when the decisions a cadet leader makes have tangible effects on the corps. This is opposed to the image that "the bulls" are the ultimate decisions makers and everything else is just cosmetic.

I appreciate what you're trying to do but I find that removing fish from an outfit ends up stranding all of the upperclassmen without a purpose.

---

By NOT separating the fish from their outfits for FOW

---

(AS800, '23 dead zip)

1. Immersion was not an issue in 2019. Every upper in my outfit was involved with training before COVID because people had responsibilities. Every year cadets have been able to take less and less action without oversight which kills drive to participate. Examples included training chow, training before formation, and daily room inspections before fallout in the morning. Every upper could be responsible for the performance and mentoring of fish in their CoC. These tasks are now gone, and engagement and immersion is following for both fish and uppers. Fallout holes and head sheds were great for getting cadets in the zone for training time, and assisted with "flipping the switch".

2. Corps events that give everyone a chance to lead such as a weekend at the O-course or LRC where each cadet must lead and pass a graded event before the end of the semester, similar to the PT test. The idea is to engage leadership in all cadets and provide opportunities for learning and discussion based on current performance. Events could also include things like taking turns planning a minor unit event with exclusively non-training cadets.

3. Cadets could assist with leading a SOMS class in a role similar to that of a TA, allowing cadets to

mentor each other with the guidance of instructors and have responsibilities to the class they serve.

4. Require non-corps or extracurricular Corps orgs leadership be mandatory for all those not in some position within the corps. Not everyone is in ROTC or corps leadership, so this could help thrust cadets into getting involved in something else they are interested in (aviation club, interamural teams, etc)

Actually giving Cadets an opportunity to Lead rather than Manage. Management is the forefront of what we do in the Corps of Cadets, rather than leadership. We are constantly told what we can and cannot do and have to work within the Small gray area and that sums up our leadership opportunities.

We are told to think outside of the box, but when we do we are told no or that it is not feasible or won't be approved. A key example of this would be when my outfit wanted to put on a 1 day long Field training exercise. Months of planning and logistics went into it as a way for my pissheads to practice for becoming whitebelts, leading teams and practicing execution of long term plans. Advisors constantly deffered their decisions saying maybe or it wasn't at all possible. One advisor finally agreed but told us day of that we couldn't go forward with it.

With all of the required guidance we have we cannot resonably set our own agenda for ourselves or our people with all these requirements that we have to hit otherwise we are hit with discipline. I understand the need for these requirements to better connect us to core values, but it does not allow us to be creative with our time or try new things, which I believe is essential to leadership.

I don't agree in a total laissez-faire approach to activities, there should be standards and an approval process for what is done. but as leaders we should be able to at least plan how we think activities or outfit led things should be done, rather than being shut down. It increases group cohesion and a shared sense of identity. Rather than a "do it because staff said so" mentality. This model doesn't make leaders, it makes managers and followers.

Expand SOMS for freshman and sophomore to twice a week. In SOMS classes, teach second semester fish about being sophomores and perhaps conduct "pisshead practices." Also, allow outfits to conduct "pisshead practices" by having second semester fish, ideally after spring break, practice training their buddies. Taking fish out of their outfits during designated training times takes away leadership opportunities for the upperclassmen, especially the sophomores in the outfit. First semester sophomore SOMS, the new pissheads should have opportunities to reflect on their leadership methods and see what is effective and what is not. Sophomore second semester SOMS should prepare the sophomores to be juniors. I know when I was in the Corps looking at scenarios and discussing how we would handle each scenario really helped me grow as a leader and see different viewpoints on how to solve problems and address issues. During weekly outfit meetings, allow juniors time to offer constructive criticism to the sophomores (without fish present). The criticism should be organized and offered with solutions and likely should be approved by the first sergeant. Increase white belt mentorship. Have chaplains make sure white belt mentors meet with their black belts formally at least once per month. Encourage COs to talk to all seniors in the outfit when setting outfit objectives.

The Corps has served as the best life lab for more than 100 years. Seeking ways to be intentional and immersive is like asking how to be a better helicopter parent. The Trigon staff should be present and offer guidance. The Trigon does not need to be selecting the leaders. Watch the activities for safety. Let the Cadets run the Corps and make mistakes. That is part of learning.

The answer is certainly not (in my opinion) fundamentally changing the system of the how the corps will be run for the future, instead of re-examining a proven, successful model that has been operational for a very long time in a university that values tradition. I think that if there's a broken part of a toy, you can fix that toy instead of buying a new one. You can fix it and reinforce it so the same thing doesn't happen again. Personally, I'd say one of the "repairs" to be more intentional and immersive in our leadership training and education program across the four-year journey is by involving comm staff in OBSERVING and offering GUIDANCE to outfits during their training times. The most effective way I've given feedback to my underclassmen is by affirming in public and correcting in private. Whenever anyone that has held rank in the military walks in the hallway, all we feel is fear, because there is a big chance that at the slightest mistake, the "Advisor" or "CTO" will destroy the training environment, embarrass the leadership

in front of the fish, damage their credibility, and all of that will occur for something like calling "preparation for new roles" the term that has been used for years, "transition training." Gen. Michaelis said it himself during his first Commandant's address, that this is a "leadership laboratory" that should afford cadets to make mistakes and learn experientially instead of sitting in a class learning concepts but not giving any experience of about how to enact them. If that is an issue, comm staff should take a more active role in providing accurate, constructive feedback, not taking destructive, seemingly intentionally intimidating and discouraging steps to put our cadets down instead of lifting them up. The measures being taken to keep cadets from making mistakes are also measures to stop them from learning, because mistakes are a huge part of learning. So for a short answer, I think a patient, graceful involvement of comm staff to advise outfits during training times, provide help and not give commands to outfits during operations, would be the most beneficial.

For our cadet leaders, at the upper-end of the four-year learning experience, a better feedback pipeline is necessary. This is the first time I've ever been given the opportunity to give feedback on a greater-than-outfit level in my three years in the corps, and I think that this should be a necessary expectation of our upper leaders. I know from being a fish to being in my own leadership position now that there is a constant pressure and need to fight against becoming disconnected from the bottom level of the hierarchy as you move up, and I believe our highest leaders are the most disconnected from the "real corps," the 90% of cadets that carry out their guidance on a day-to-day basis. Upper-leaders also rarely get to chance to see firsthand the effects of their guidance. There was a point last semester where I really wanted to offer some feedback to whoever decided afternoon training times were not allowed to take place on Thursday afternoons, and realized that the corps did not care what I thought (there was no way for me to give feedback), which is extremely backwards for an organization that is aiming to teach people to be leaders.

For the very bottom, "babying" cadets will lead us nowhere in either recruiting (most cadets are looking for a challenge) and the quality of our program and I believe this change to implement a fish dorm would be very similar to "babying" our cadets.

Please note that anything I've said has been meant and intended in the most respectful way possible. No matter the decision that is made, I will have complete buy in to this corps and making the best impact I can make on our freshmen

I think upholding everything that makes A&M and the corps special and preserving the four year corp development model is crucial, peak corps experience was last year.

Give cadets more power over the policies that are put in place for the corps.

Don't have a fish dorm

I believe that allowing cadets to have a larger say in the type of training that would be asked of them to perform and receive is important. I believe that kind of training would be more productive when those who are training as well as being trained really believe in what it is that they're conducting and learning.

Get rid of the Green tabs for all. Command tabs should be earned, not just because you are on that leadership tract. The Corps of Cadets is a Leadership Laboratory where you can work on your leadership style and learn by the success and failures within the safety net set forth and overseen by the Cadet Training Staff. The Corps of Cadets runs on the Class system. The Freshmen are the Main Cog in that wheel. Your first semester fish year (not FOW) is when you are expected to let go of all the accolades you got in HS and to relinquish your selfish instincts. Every fish starts off on the same level and you must rely on your buddies to be successful. Is it stressful? Yes, the goal is to make the fish class a unified entity which culminates with the earing of Corps Brass. I look back on my fish year with fondness and because it was tough, it showed me I could do anything I set my mind to and if I knew I had the help from my buddies. the second semester fish year is when the groundwork is laid out and the Leaders start to emerge. you know HOW to be a cadet (Uniform standards, inspection standards, and all the other things that your overall outfit has to do with the goal is the General Moore Award and the other

awards you can win. (again, promoting the all classes have to pull their weight to achieve that goal. The Sophomore class has the hardest Job in the Corps as they must instruct and discipline the fish to care about the smallest details about be able to present themselves off the quad in a manner that promotes the Corps as an organization that should be respected and to uphold the mantra of soldier, statesman, and knightly gentleman. at the same time the upperclassmen are pushing the sophomores to still work as a class in unity (the visual to the fish on how that should look) and to also lead them in their approach to leading that mission. The Jr Class is the day to day running of the outfit (making sure the study hours are kept, all the meal counts are there, etc.) but this is where the road takes a fork. while 40-45% of Cadets will eventually take a commission, the other 55-60% will take a D&C path. the Corps at this moment fails those D&C cadets at the expense of the contract cadets (I also understand that the commandant's office's mission is to assist those scholarship cadets. to be perfectly honest, the current system of cadets moving outfits is part of the problem. there were plenty of leadership positions available to those that wanted it in my time you had Corps Staff, Regiment staff, Battalion Staff, and Outfit staff. these positions are ROTC accolades. Nobody cares what staff position you held at your ROTC in the military or in the private sector. Now the culmination of 3 Hard years of Corps work, you are a Sr Cadet and you are now at your Leadership Lab to practice what you have learned from those leaders that came before you and in your ROTC classes and the Trigon officers and CTO's. this is the system I learned under and I feel it was successful.

Allow for Freshmen to put their newly learned leadership skills from their outfits (meaning that the Freshmen will be with their outfits since the beginning of their Corps career) by having them compete in Wing, Brigade, or Regiment level competitions solely led by the Freshmen, yet arranged by Upperclassmen (i.e. monthly marching competitions, "fish platoon" PT competitions, MPIs already test knowledge and The Standard which is good). The emphasis here is that the Freshmen will be forced to put their learned leadership skills to the test. Additionally, this would NOT ONLY increase outfit buy-in/better culture/class relations, but it would also be a good assessment of which Outfits are lacking the instructional, intentional, and immersive leadership because the Freshmen classes that would perform badly will reflect their Outfit leadership.

In order to create and intentional and immersive experience within a leadership organization, it is critical to consider the value of having a smaller ratio of trainee to the trainers. While understanding the purpose of the unified freshman dorm being to better prepare cadets for the Corps and student environment, it is also important to consider that there are other options to that of which is preposed that wouldn't inhibit the ability of Outfits to carry on with traditions and values that have been around for years. For example, if the issue is that the sophomores are placing too much stress on cadets in the first stages of the training. Why not, post-FOW, introduce all of the white belts to the fish but keep the same sophomore cadre who are already well trained present while the rest of the sophomores conduct an ethical leadership course. Thus, within the most critical part of a students education, the first month and a half, freshman will be able to slowly transition into what the rest of the semester will entail. Further instilling buddy unity, communication skills, and better utilizing the Senior and Junior cadets to create an environment of highly controlled stress where freshman "students first" can focus on their education in conjunction to the Corps of Cadets lifestyle.

When I was in the corps the formal leadership training took place in your junior year as addendum of the Naval Science curriculum and Naval History. It was in the form of a business management class. Good course but at 20 years old I struggled to apply the principles learned to the military context. While there were a few Corps positional opportunities (e.g., ASL)to demonstrate and experience leadership it was very "trial and error" and "on the job". My thought was and is that this resulted in a lot of mistakes and no doubt contributed to the abysmal attrition numbers in my outfit (S-2 87-91). We graduated 7 original folks from a 36 fISH. S-2 was disbanded for H-1 2 years after I graduated. I would propose an immersive leadership plan for every cadet every year. Every year could have objective based leadership principles that needed to be demonstrated with larger responsibilities each year (team, squad, platoon, company) Each fISH could be assigned a sophomore team leader/mentor who switched after one semester. Same principle up the line. Additionally, a robust peer evaluation system should be instituted providing anonymous feedback to the underclassmen and team leader mentor teams. I would suggest rotating key leadership positions each semester. West Point does this and I think it's a good learning. Finally, as a sophomore I was expected to be a disciplinarian to my fISH at exactly the time I had the least

experience. I propose that we shift the view of Pissheads from martinets to mentors. That will certainly require juniors and seniors to be more active.

By continuing to uphold the state of the corps as it was in school year 22-23

Provide a way for whitebelts to continue to buy in outside of special units. There are many ways we support fish and heads, but it drops off for upperclassman. I think having balls for each major unit would increase morale by a lot.



From what I am aware, freshmen are responsible for learning how to follow before they can lead in the Corps of Cadets. Learning how to be a follower can give insight on how to be a better leader in the future. If the structure of the Corps stays the same, I will use what I have learned from following instructions from my fire team and from various chains in my outfit to instruct and lead fish. Experiencing good and bad instruction helps the followers learn what kinds of communication and leadership styles work to develop well trained and confident individuals ready to be rewarded with leadership.
Secondly, Air Force Leadership Laboratories do an outstanding job at offering leadership opportunities to fish willing to step up and put out for them. For both LLAB and for Air Force PT, fish have many opportunities to take charge of their flight and learn. This is the whole point of a leadership laboratory, it is a time to experiment, learn, fail or succeed in leadership. From my personal understanding as a freshmen, it also offers a unique leadership experience for upperclassmen outside of their outfit as flight commander.

Properly train sophomores. The biggest single detriment to the corps leadership development is a lack of training at the sophomore level. Often times, the only leadership training that a sophomore gets is surviving freshman year. They then proceed to behave exactly as they were treated

From my perspective, and many other people I've talked to, the current MO of the Corps is to treat the fish as if they need to be walked through every step of life. Many of these young men and women come from the top echelons of their high schools, being key members of JROTC, STUCO, NHS, and others. When they arrive here, they are made out to be fragile and un-thinking, and their upperclassmen are made to effectively treat them like children. I am not advocating for making life unnecessarily hard for the freshmen, but I am advocating that making it too easy is denying these hard-working, motivated individuals their opportunity to molded by a more rigorous environment. These 4 years are fleeting compared to their careers in the military or civilian world, but learning how to cope with the stress of balancing schoolwork, cadet life, physical fitness, and their social lives here, in an environment you can relatively safely make mistakes, sets them up for great success down the road when many of these same stressors are re-encountered in a world that is much less understanding to failure. In short, the young adults that are attracted to this institution are allured by the idea that going through this program will make them tougher in all areas of life, and to deny them of that opportunity is to deny them experience that is necessary for the real world.

This may not be your question's answer but I didn't attend A&M to become a leader or to grow through education. I applied to A&M because I wanted to be in the Corps of Cadets like my dad('49). I knew I need what the Corps could teach me, whether or not it was pleasant.

The current 4-year development model that we have (following, coaching, mentoring, and inspiring) works well, and all 4 class years are needed to make this successful.
While I believe that the Commandant briefings are a stopgap until a more unified SOMS curriculum is put together, what makes us stand out from other leadership organizations is that we practice hands on leadership that can't be found in a classroom. Those briefings take us away from that.
The greatest teacher is experience. The corps provides us the ability to create controlled and artificial stressful situations that we can put our cadets through. This helps cadets get used to acting under pressure, and any mistakes made along the way are not permanent.

My recommendation is that the Commandant's staff and Corps Staff should shadow outfits to see how they operate. NOT interfere, but just observe, even if the situation MAY seem out of hand. Ask questions at the end of training times and bring back observations to consolidate and discuss.
Ensure that leaders are intentional: I'm sure there are many cadets in leadership positions who do not

have their priorities straight. EX: Personally, I don't believe that the current values surrounding the RVs are values they should be following (especially as an official honor guard). On the surface, things look great, but racist jokes at the ends of practices or a racist and dark who's-who powerpoint are not values we want in this organization.

Take action to put intentional leaders in place who have the right end goals in mind. Allow them to use their own methods within limits to achieve that end state.

Keep outfits and MUs together and close to foster a feeling of ownership of their outfits, MUs, and the Cadet Corps as a whole. Cadets are the keepers of tradition on campus and cadet leadership needs to carry more control to make the responsibility of their position have the weight their title suggests.

I personally think you are being too intentional into the aspect of developing leadership recently. For as long as the corps has been around we have been know for developing leaders. This was because you had 4 levels of development.

Fish year - the lowest of the low having to earn your keep and quite frankly having the worst year of your life. Learning about how to become a men of character but more importantly watching other be those men of character that you care to be like.

Pisshead year-

Being the reason that the fish hate their lives. There is no relationship between the fish and the pissheads besides smoke. I firmly believe this because there is nothing strong than bonding over a common enemy. Yes you are the bad guy for a year but you also learn a lot too. You get to see the inside of how the outfit is lead. You start going out for positions and developing academically. You learn how to lead in a different way. And learn how to get shit done because you are the workhouse of the outfit.

Butt year - you run the outfit. It is yours and you are in charge. You are the person that the fish strive to be like. You act like a father to them in a rough environment where they are broken down to be build back up stronger.

Zip year - watch back and see the three classes that you developed lead the outfit. Act like a butt here and there but essentially be the moral and building up of the fish and pissheads too. ( pissheading can be a lonely life)

Personally I don't see why we would try to get away from this. Personally I am a 4th generation corps of cadet member and my grandfather and father are some of the most successful people because of the corps and that is not a brag about them but a brag about the corps because they are successful because of it.

So stop. Stop changing what the corps is. There is no need. The punches are from soft people that is a recruiting fault. Don't recruit bad cadets or people who aren't mentally prepared to have a shit year. Like you said the punch rate was much lower this year during fow because it was softer. That makes sense it is your fault for giving those cadets a false sense of reality because that is not what the corps is. That is a leadership fault.

Being a relatively recent graduate from Texas A&M and the corps of cadets, I have had the opportunities to see many examples of good and bad leadership outside of the corps. In my job, I have seen our fairly robust training period create very dedicated members of our team as well as very poor workers. I have even had the opportunity to work alongside my manager to tweak and correct our training and many of the changes I pulled directly from my time in the corps. However, good leadership training, I believe, comes down to the people who are training and less about the training program. Also, breaking down the four years in the corps, I believe the most crucial years for learning how to be a good leader is sophomore and junior year. Similar to the training we have implemented at my job, the period of training is dedicated to learning the basic tasks while "in the trenches" of the job and grinding. The reason for this is to truly learn the job from the literal ground up, to earn the respect and trust of those above you,

show your peers and your leaders that you are willing to work hard, and to earn the rest of your training period. This method has been very successful for my company and I believe it's a pretty accurate representation of fish year in the corps. My argument away from the singular fish class until the spring is the same argument I would present my leadership if they said all of our new hires will spend the first few months together away from our work. They simply would not learn the job like it is to be done at each account while also not being given the opportunity to build bonds with their coworkers. I believe the same applies to fish year in the corps. fish year provides bonding and learning with your buddy class unlike any experience leading up to it. Good leaders in the years above can truly motivate a fish class to be extremely successful, setting them up for the crucial years to follow. As far as changes go in the corps, I would love to see the same dedication to leadership training given to the fish also given to the upperclassmen. Ultimately, my time in the corps and experiencing a "hard" fish year followed by built in leadership training the following years shaped who I am and what kind of leader in life I have become.

Perhaps we ought to look towards the experience of the Academies and our own University's similar programs. The Academies have a Summer time program to get their plebes ready for school in the Fall. We have ample models from Fish Camp and T-Camp and the like on how this can be managed and organized.
Perhaps, for the new upperclassmen, a similar program could be stood up in May between Final Review and the beginning of the Summer Session.

Hands-on leadership experience is better than in class, PowerPoint-centered "training" every single time. We need to focus on opportunities for cadets to lead from the front in physical activities rather than making them sit in a chair and learn about it but rarely have a chance to implement it.

Make things hard again. I understand the overall mission of your office and of the university is to get to the benchmark of 3,000 cadets, but so far that is coming at the expense of a harder training environment. Pressure makes diamonds, and the corps isn't designed to be for everyone. I know that the majority of cadets were allured in to the corps by the harsh environment to provided for one to test themselves and come out physically and mentally stronger individuals. The corps has been producing intelligent and ethical leaders in the military and civilian sector since its creation. What I've seen so far from the proposed changes is stripping the corps of the intensity it had which attracted many. Retention is going to plummet because people don't want to be in an organization that doesn't push them or make them feel like they earned their spot in their outfits or the corps as a whole. Additionally, outfit culture is what drives camaraderie and in some cases is the crutch of some people's experiences. Outfit culture is not the issue, and by targeting it you are making enemies of the people you hope to direct. Similarity, there are traditions that are being taken away that also adversely affects the way cadets view the office. Flight of the great pumpkin is a great example, it's something for the corps to rally behind and draws in thousands of people to view. It is what makes Texas A&M and the corps such a unique and special place to be. There is a way to implement leadership changes while preserving the culture of the corps and without creating animosity between the commandant office and the corps itself. We all believe in this corps, we all love this corps, but I've seen nothing but hatred and animosity grow from the policies implemented under your charge. It will destroy the corps from the inside out if it continues.

Focus on the leadership of the fish through formation of bonds through outfit culture and family. Though love, and a lot of being straight with the freshmen

Create more opportunities for learning. Too many times I see this interaction

"This is what I want done. This is why I need it done. This is how I want it done. This is when I need it by." That's a lazy leader. Too much information, too much management, not enough opportunity for learning. Leaders everywhere do this, and it breaks my heart because they are robbing their subordinates from the ability to learn, and robbing themselves of the ability to teach them. This, I fear, is what's happening to our Corps. They're lazy leaders. Everyone is micromanaging everyone, and the more they do it, the more slips through the cracks.

"This is the task, this is when I need it done by, what are your questions and thoughts" That's a leader. Let your subordinates work through it. Coach them if they have questions. Let them screw it up, to an

extent, then show them how to get back on track. Coach them, mentor them, understand them, and by doing so; you are molding them. In my opinion, that interaction right there is what the Corps is missing. The fact that you're accepting feedback at all tells me you're more than aware of this process. You use it yourself. Now apply it to the Corps. How do you get a Pisshead to use this process? A 1SG? A Commander?

You give them tasks, give them the opportunity for mess it up, then you bring them back on track. Use the process, teach the process, live the process. This process is not taught from the bottom, up. It taught from the top, down. If you want good pissheads, you need good 1SGs. And if you need good 1SGs, you need good Commanders. And if you want good commanders, then you need good Cadre. Start where you feel appropriate, but teaching this from the bottom is a waste of time, and energy, and is a lot of heat to bring onto yourself. Teach it from the top, let it trickle down. Let people make decisions, and live with them in some cases.

I am not going to pretend to know the answer to this.

Understand the traditional structure of leadership experience within the Corps and capitalize on why it was started that way. As a freshman, you learn to follow and work as a team.

As a Sophomore, you start with one leadership tool, that is direct command and control. You see what works and what does not work through trying different things at different times. Having a larger amount of Sophomores leading a smaller number of fish gives the best situation to practice that small scale, direct front-line experience in teaching and evaluating.

As a Junior, you oversee the Sophomores and guide them. And so forth into the strategic leadership of the Seniors.

At each level, fewer people actually hold the leadership roles as you identify the best leaders in the unit.

First and foremost, if quality over quantity is truly the goal there needs to be emphasis on raising the bar and standards that go with it rather than dropping to the lowest common denominator. Some people weren't cut out for it/didn't understand what they were signing up for. But instead because of how much has been removed to help make it more inclusive, it's created the effect of ostracizing those who've put in the effort who then start to question if it was worth it when they could've gotten by without having pushed themselves. Additionally, while it's possible things have changed in the 2 years since I've left the corps, there's constant complaints about upper class men not respecting the fish, but if you look at how the bulls treat the cadets I've seen a lot of similarities where cadets are not treated with respect and given the appearance of a double standard. When cadets intentionally go out of their way to avoid the people that are supposed to be their advisors, there is clearly something wrong. As for making a more immersive leadership training and development, for one there are so many alumni with such variety of backgrounds who'd me more than willing to even lend an hour of their time where they could even zoom and talk to small groups and provide mentorship and learning (C-2 does really well with this both with their annual conference and other activities).

give more leadership opportunities

Put cadets in challenging positions and allow them to face failure before you provide course correction. Leadership is about being a decisive and dynamic problem. It is not about being perfect. The DOD is a perfect example of failure at this.

Rewards outfits that people show up, many of the jocks outfits during time were part of the boys and got all staff positions. Look at outfits that show up everyday and don't look for glamour.

Provide us with healthy challenges to overcome, we need direction. If little-T traditions are "hurting" the corps from your perspective, maybe try to ride the train of tradition at Texas A&M, but do so in a healthy way. Give us experiences so challenging and/or thought out that outfits can't find time to do the stupid stuff that genuinely harms our corps.

This is just an idea of mine, I lack the creativity to give you ideas on what exactly these new traditions would be. Maybe something like the Cadet Challenge? I am merely giving feedback, not trying to make decisions for you.

Give leadership back to the cadets. COs and 1SGTs have no room to lead. Any mistake and it is immediate discipline to the highest degree. If development over all four years is the goal, then all ranks should be cadet-lead, not STANDARD ENFORCED. The standard is a rule book that is disregarded unless Comm Staff/Corps staff wants to punish a cadet or outfit to the highest possible level. Also, if "across four years" is the goal, the Learn, Coach, Lead, Inspire motto should be put into place. As of now, if a sophomore in my hallway is caught by a staff member even speaking to a fish during the academic day, they would receive discipline. This is not right. On the spot correction should be allowed, to include pushing, remaking racks, or requiring their uniform. These should be repeated until the fish demonstrates their ability to meet standards. Right now, I see freshmen who don't shave, greet, or simply honor the "elephant ear." What is the point of coaching these standards and traditions if there are no repercussions to follow unacceptable behavior. Additionally, is fish cannot demonstrate a simple, perfect uniform, why should they already be "transitioning" to sophomores. The system in place as of now is broken.

Please give the RV's Physical Training back…. It used to mean so much to me and challenged me to be better… it kept me healthy both physically and mentally. Now that it is gone the company has lost most of its uniqueness to me.. I'm not even excited to go to practice anymore. Please bring physical training back to the Rv's

Focus on servant leadership and the guiding principles of that. Utilize extreme ownership (jocko's book) as another basis to teach from. Sophomores should understand the teach/show/hands on training path. Accountability to the standards firmly upheld and proper punitive punishment applied - and via buddy system.

Keep white belt engagement and D&C engagement. Especially those who are not cadre/green tabs. The corps has always been fish centric, and white belts get forgotten in the shuffle.

Consistency in core policies and a return to personal responsibility - appearance in uniform, always whipping out to upperclassmen, attention to military bearing, distinction between classes/not blurring the lines with upper and underclassmen

I believe a worthwhile direction to take regarding being intentional and immersive would be corps-wide activities, but with individual outfits participating. General Michaelis detailed his worries about outfit culture and involvement being more focused than Corps relations, and I believe that this idea, or related opportunities, offers a good balance. These kinds of events would increase quad-wide outfit involvement in the culture of the Corps without sacrificing the body and spirit of individual outfits.

The most specific idea I hold is that to remain immersed in the corps experience, freshmen should be with their outfits all year. A fish academy would instill in too many freshmen the idea of being an individual, despite its intention of being more inclusive to the idea of "being in the Corps." The majority of my experience of being a part of the Corps has been solely through my involvement in my outfit, not in the Corps. I feel empowered as a member of the Corps of Cadets because of my uniform, my values, my knowledge, and everything I have struggled through as a Corps experience, but I am certain that if I didn't have the direct support of my own upperclassmen from my own outfit, I would not have felt as involved with the outfit and the spirit of A&M. In fact, I probably would have punched from the Corps during my fish year without the idea that I was part of something small and precious within the larger body of the Corps.

I agree that Corps involvement has declined over the years in favor of outfit culture, though I can also say that outfit culture has also declined. I believe that the most important support that can be offered to

freshmen in the Corps is almost solely through the outfit level. Offering support at such a large and broad level as a "fish Academy" requires that you "water down" that support to make it more accessible to all the fish, as opposed to outfits being able to directly find the best possible support options for each individual fish.

Please define leadership. What outcomes do you expect from such a program? How will you assess the programs effectiveness m?

How we've been doing it

The most immersive experience is as an OUTFIT. I didn't care about being a "generalized cadet in an amalgamated system", I cared about being a Husler. Make CROs Apply rather than being appointed, and move them between outfits if needed like other KL's, that way there will be more intention in career readiness and leadership training. Also make SOMS required all four years, not an option.

Communicate with cadets first. We shouldn't find out the purpose and execution of this plan from a Facebook post from the Commandant to old ags. Current cadets should be the first to hear about these changes. Even the little information we received from command team was far too limited. I think this news about restructuring would have gone over more smoothly had there been more information available and more unknowns figured out before this news reached the cadet level. You can be more intentional by keeping cadets in the loop on things, asking for their input and responding to it when provided.

There should be a differentiation between Cadets commissioning versus those going into the business world when it comes to leadership experiences and training; leading in the real military is not like what Cadet Fish are experiencing; some company's (especially in all male outfits) we are led by Sophomores or upperclassmen who see it as having power to mistreat Fish because they were mistreated; there is minimal leadership skills taught or shared; they think leading is aiming to instill fear; they think paining a Fish to punch out is what makes a guy tougher and if they punch them we don't need them - but they punch out because of how wrongly they are treated; and if they have it out for you - man - you better have thick skin to take it and not want to punch someone in the face or punch out; so leaders are not grown instead they are suppressed to not exist

Keep the commandant out of the decision process

Effective, intentional, and immersive leadership training comes from people who have real-world experience. While informational, Corps SOMS classes past sophomore year are not geared toward the average cadet. There is no call to action or cadet motivation from the instructors in these classes past 3rd semester. The most benefit and leadership perspective I've ever received from a SOMS class was when the CTOs/Gunnys were my SOMS instructors. When we walked into class it never seemed like there was a lesson plan, but the discussion always connected to a leadership principle. They would talk to us about problems in the Corps, and they were always more informed than we were. By the end of every single SOMS class with a CTO, I was inspired to go make a positive difference in the Corps. Experienced, informed, and "corps-involved" leaders that care are the way to keep cadets engaged into their white-belt years. Reading through leadership books can be beneficial, but it doesn't create buy-in from cadets. By keeping SOMS instructors informed, they can challenge our norms and be the link between the commandant and the non-staff cadet body.

Expand the military science classes to include the specific instruction you are seeking incorporate a grading system to judge units on successfully incorporating the instruction into unit operations. Reward high achievers with unit designations and citations. Penalize poor achievers with probationary periods and disbanding if corrections are not achieved.

Allow outfits to have fish in their hallways and don't split up outfits between hallways. This will in turn destroy outfit pride and will create a vast swath of once we're motivated cadets in said outfits into un-motivated apathetic cadets who have no reason to work hard apart from their contract due to them not having something that they can directly effect IE: "The Outfit".

Keeping the structure the same and not change it to this fish academy.

I am a fISH in the corps. While I have not had a lot of time leading, I have had the opportunity to observe examples of leadership and observe what kind of leader I want to be as a sophomore, white belt, and eventually as a commissioned officer. I have learned that a major aspect of leadership is seeing the individual in the person you lead. I've learned this through the personal connections I've made with my upperclassman, where they saw me as more than just a fISH they needed to discipline. If fISH are removed from the outfits initially, it hurts the formation of those personal connections. fISH will also probably not make that connection with the cadre, because they will only be together for a shorter period of time. To me, an important part of corps culture is how someone like my fire team leader cares about me beyond my ability to recite campos or have a sharp uniform, but also about my individual success. It makes the corps more enjoyable, and makes connections between people that will last a lifetime.

The corps development model encourages cadets to go out for key leadership and heralds first-sergeants and commanding officers as being peak examples of what the corps has to offer but wonders why cadets not in key leadership lack the motivation they had as fish or heads. By definition they have failed to achieve some of the greatest honors in the corps yet the corps turns around and asks why they no longer believe in their "leadership training". Intentionality means you are deliberate and careful with your actions, thinking about the result before you make decisions. Immersion is providing every cadet a depth of experience they will truly thrive in. When I think about the possibilities outlined in the leaked document, I immediately see how the fish will lack the deeper immersion that Outfits offer. For my three years in the corps, Major units have existed as a way to disseminate information and provide organization to the corps. fish who enter the corps at a major unit level without the cuture will lack the guidance that tight-knit outfits provide. I largely stayed in the corps because of my buddy class and upperclassmen. The size of my group of buddies encouraged us to get to know eachother well and we forged unbreakable relationships such that none of my buddies ever punched. Another part of being a member of an outfit is knowing the name of every single outfit member and this would be diminished if fish entered the corps at a major unit level. To make the corps more intentional, stop pouring commandant staff effort into only key leadership. Require advising each semester from members of commandant staff for every cadet in the corps. To make the corps more immersive create buy-in when you recruit a freshmen and rekindle that buy-in when they arrive at FOW. I have seen many times that cadets who can point to somone in their outfit that they know cares about them will have that same level of care for their outfit. When the follower fails it is the part of the leader. I believe many issues in the corps would be solved if we all had this mentality.

Assist in cutting costs. I have known several cadets who have seriously debated dropping out from the corps because they cannot afford it. Overpriced rooms, textbooks, weekly haircuts, special unit supplies, and dry cleaning really adds up.

I think that the leadership training is very immersive all the way down the chain as is. The Corps has made some of the best leaders there is to offer. Cadets have gone on to join the military or make very successful companies. Most of the CEO's of companies that I've met with that went to A&M were also in the Corps. I do think that upperclassmen accountability needs to be changed. Having the whole leadership chain present would insure the system that has worked well in the past stays working.

Start from the bottom with a comprehensive leadership development program that prioritizes education, physical fitness, CORPS values, and lastly individual unit values/culture

Semi annual Leadership seminars with current military and civilian leaders. Small group breakout sessions per semester.

It is apparent to me over the last few days that we all love Texas A&M university and love our Corps! That being said, I believe that there are issues across the Corps with lack of leadership, lack of accountability, lack of responsibility, and lack of communication. There also seems to be a lack of alignment between various stakeholders -- Corps, SOMS, Hollingsworth, Military Programs, D&C cadets/program, the University, etc. This drives a critical issue in keeping the Corps relevant within Texas A&M University AND the student body. I believe this survey, along with the Commandant's leadership, is the first step in getting the Corps back on track.

My suggestions is that the Commandant lay out a vision for the Corps for the next 150 years to these stakeholders seeking alignment around the "why". Any future idea or concept or plan should align to help achieve that vision. While the Corps is a student run/led organization, it requires leadership and ownership by a University official, the Commandant.

My suggestions for the "how":
Corps vs Outfit:
- Outfits have come and gone and changed over the years for various reasons.
- In the end, there is one Corps, including the Fightin' Texas Aggie Band
- Outfits have their place in Esprit de Corps, culture, focus, and organization
- Outfits should be held to the same standard regardless of focus / culture
- Create a recruitment incentive for meeting standards and retention rates (or other metrics). those that do well, continue to thrive, and those that struggle either adapt and recover or fade away --- this is Leadership Lab material right here! Of course, Commandant staff should come along side the struggling outfits and mentor, retrain. We really want everyone to succeed, but sometimes failures lead to future successes.
- When in doubt, look to the FTAB for long lived examples. Each cadet is in the Band first, then outfit, also further broken down into sectionals (by instrument). The FTAB has been doing this successfully for a long time!

Freshman Orientation:
- FO should be 4 weeks and in 3 phases:
+ Weeks 1-2 = Phase 1 -- focused week 1 led by Cadre; week 2 led by Cadre with focus on transition to classes and study habits/resources
+ Week 3 = Phase 2 --- fish are introduced to remainder of outfit Seniors and Juniors
+ Week 4 = Phase 3 --- fish are introduced to remainder of sophomores and establish FTL relationships and training cadence
-Outfits should lead the FO with a larger selected Cadre. 3-4 Seniors; 4-5 Juniors; 3 Sophomores (must have completed Sophomore Leadership Academy)
- Major units lead and ensure orientation tasks are being met; perhaps augmented staffs for the orientation period.
- A standard must be created -- process, checklists, master schedule, etc - so that each unit is orienting to the same standard---- each fish learns the same things, and shares similar experiences
- The Cadre should be trained specifically in the orientation standard, conduct, and be held accountable for training.

Train-the-Trainer Approach:
- Sophomore Leadership Academy -- this is a great idea. It should be structured and standardized across the units
- Rising Seniors and Juniors must also have a shorter but similar module. Juniors must learn how to be the backbone of the Corps during their year. Both executors and leaders!
- Structure and standard!

D&C Cadets
- These are some of the best leaders within the Corps. They should have leadership positions!
- There needs to be an overhaul of the program here. Texas A&M College of Agriculture has some excellent Leadership programs and courses. I recommend a collaboration between the Corps / Hollingsworth and College of Ag.
- The university needs to develop a Minor in Leadership for these cadets due to their experiences as well as the additional courses they have taken.

Other topics to help drive culture, leadership and education:
- Formations -- get back to holding formations and reporting! Its ok for cadets to miss for off quad activities, study groups, etc, but the Corps needs to be disciplined in creating a Corps environment

- Whip outs to other outfits -- This needs to be enforced! and there needs to be a simple standard of whipping out -- no specific outfit whipping out. And this needs to happen off quad as well. What a great way to bring the Corps together.

- Howdy --- Dammit!! I cannot tell you how disappointing it is to me to walk campus now and the Corps members do not say Howdy unless spoken too, and even then some dont! Need to get back to being Keepers of the Traditions!

- Off-quad organizations and uniforms ---- I hear many stories of cadets skipping other organization meetings / events because they would have to wear their uniform. Need a way to instill pride in wearing the uniform as well as incentivize participation outside the Corps.
+ MSC -- uniform
+ Library -- no uniform
+ Rudder -- uniform
+ other buildings after chow --- no uniform for studying and attending off quad organizations

- Each outfit establishes a mentorship program -- In the fall of 2023, the A Battery CO initiated a mentorship program connecting former members to current members. This is a start!! The program needs some structure and modules, but I believe it has been beneficial for both mentor and mentee. Focus should be on personal development, resume, leadership, etc.

Truthfully, letting the outfits have their cultures. Yes, they can be bad, but it's a matter of letting evolution take care of the bad parts and grow the good ones. Corps staff's crusade and pseudo us vs them between yourselves and those on the ground makes us more likely to be antagonistic against new ordinances and rules you put out. This takes away from our want and will to lead or learn how to lead.

Identify natural leaders early on. By the end of FOW, there is usually a clear 1-2 fish that are standouts and leaders of their class. For others, it will come down to motivation. There is no other way to say this. In every facet of life, there will be leaders and followers. Give them the means and the tools to become leaders. Ensure that legitimate leadership positions are available at the outfit level and hold each person accountable to the standard set. If people are not willing to pull their weight, get them out. It's as simple as that. Although harder to do via peer review. Counseling is one tool I wish I used more.

Give cadets leadership (not management) training, more training to the Fish than upperclassmen and hit it hard spring semester.

The first semester should emphasize:
- how not to flunk out in academics,
- learning corps operations,
- show there is more strength through unity, and
- basically how to live without parents.

Purpose: Show young cadets how to lead other students who are not in the corps. Having on the uniform gives cadets more initial respect than non regs.

Offer many oppurtunities for the cadets to lead and follow across the Corps and the community. Explore community activities in Bryan / College Station and include the ability for freshman and sophomore's to move around units.

Every upperclassmen does any pt with the freshmen and sophomores to show followers what leaders can do from back then and now. No underclassmen is more special than their upperclassmen.

Make this place a family

Create leadership classes at each level for the next phase in the leadership pipeline. Freshmen second semester learn about leading individual contributors versus being an individual contributor. Second semester sophomores then learn skills for next phase of leading front line leaders leading team leaders needed as a junior. Junior leaders at this point determine whether need skills as a functional leader (outfit) or enterprise (staff) based upon interests.

The leadership pipeline provides a model utilized by Fortune 500 organizations and prepares leaders for industry.

In alignment with the Commandant's vision to strengthen Corps culture and cultivate leaders, this proposition lays out guiding principles, ideals, and requirements for future Corps activity regarding unity amongst outfits, major units, and Corps values. Per Unitatem Vis.

Problem: Outfit activities and cultures become isolated from the standards and expectations of the Corps of Cadets. Well-meaning programs that take away outfit individuality have been met with opposition from many cadets.

The proposed solution-
-unify the corps on the individual level
-major unit activities
-mandatory co-outfit and battalion PT/CR events.

Corrective Implications to Outfit Requirements:

The unification of the corps on the individual level. Corps culture is often suppressed by outfit culture due to a lack of involvement from the Corps in daily outfit life. The solution cannot be found in forced Corps-wide classes/lectures. Outfits often attend briefings with a "mandatory" mindset. Implementing lasting and effective change must be done through facilitating comradery between outfits.

To facilitate the aforementioned unity, it should be the Corps' prerogative to begin regularly scheduled (preferably monthly) Major Unit activities that go beyond briefs. These activities should focus on team building and leadership development in a practical/active environment. These Major Unit activities will divide classes and outfits in the same way that ROTC organizes squadrons. This will allow Seniors, Juniors, and Sophomores to mentor fish and allow all classes to bond with members of other outfits.

Outfits must organize joint PT/CR events within Major-Units biweekly. Co-outfit activities will expose individual outfits to the broader Corps culture and allow for outfits to supplement/learn each other's leadership methods.

Increasing the amount of practice that cadets get for leading would be of great benefit, the SOMS classes that teach leading are mostly all lecture. While the classes give examples on what a good leader looks like and also what bad ones look like, it is generally accepted that people retain only 5% of what is heard in lecture environments. In order for cadets to retain any meaningful information on proper leadership, more practice with constructive feedback will be required.

Keep the Corps cadet led. As long as we do not do massive mistakes that harm others, then no cadet should be restricted in how to lead in accordance to the standard.

Give training to the whitebelts on how to do their specific jobs because they actually run the outfits and are responsible for our events and activities. The lack of knowledge in their specific job is noticeable across the quad and the sophomores and fish don't know how to do the job next year because the people above them don't know how to either.

Each major unit needs a mission (like the band has a mission). Training the fish to a standardized way of life in the fall semester is a huge mission in itself.

I like the plan of having the Wing, Brigade, Regiment, and the Band select 200 of their best cadre from within their major unit to train and standardize the fish (who are all kept together within the major unit and not assigned to an outfit until the spring semester).

A fish's first loyalty is to one another (their fish buddies across the entire major unit), their second loyalty is to the major unit and the unit's mission, lastly the outfit (and what ever revolving outfit "culture" may be popular at the time).

In the late 80s and early 90s the Band fish were trained by ALL outfit upperclassmen across the entire band and fish could never do anything without a buddy or big group of buddies.

B-Batt fish were trained by A-Company Pissheads, Butts, and Zips with no issues of cross-outfit conflicts. Everyone was exactly the same, on the same sheet of music, and standardized for the benefit of the band's overall mission (to perform). This was highly immersive leadership training for everyone all four years.

Fish learned active followership and how not to leave your buddy behind. We even had to speak as one, all together, and in unison. The fish collective was like a single giant force, and the individual was protected by the school (of many fish). I hated it at the time but is was invaluable training - and very immersive. It was so immersive, I hated it.

The Corps and ROTC programs are disconnected. One's success in the Corps does not directly contribute to success in ROTC programs, which subsequently results in a time and energy investment decision for the student. The ROTC programs and the Corps must find ways to work together integrate and account for cadet performance in both programs. A deliberate and Immersive cadet experience integrates the ROTC programs into the Corps of Cadets program and uses leadership education concepts found across all three ROTC programs to grow the cadet. For those not seeking a commission, the program offers a military leadership education program without the obligation of a commission.

To make sure we develop each class as a person first then focus on leading. We still need to have the class system but let us train how we see appropriate. For example, a piss head can be nice and still be an effective leader and coach.

Value making mistakes. Nobody gets it right the first time all the time. Let underclassmen view good examples and understand why they are good. (For me, this meant u estranging that each fish class emulates their senior class)

Maybe let cadets lead the fish in their own outfits instead of quarantining the fish to be indoctrinated by staff.

Maybe let cadets make decisions about the corps instead of overhauling the entire system with no input.

Maybe stop completely disintegrating any power cadets have, making their "leadership" irrelevant.

Be respectful of the past. Learn from it. Major changes to policy, SOPs, guidelines and processes aren't required.

Bring in corporate leaders to lecture. Start an internship program for current cadets with former cadet owned businesses. Military leadership skills are mostly learned from peers and upperclassmen. There is interaction with the Trigon staff, but not in teaching leadership. Start a leadership class for university credit

Create applicable leadership training sessions where training is done with real world examples and real life practice.

Provide more opportunities for leadership even at the fish level.

Extra SOMS lectures for Blackbelts on Monday/Friday mornings won't do much in terms for actual engagement. Revamping the curriculum to make it less lecture like and more practical/hands-on would actually help it to somewhat apply to what they're learning/practicing in their current roles within their outfits.

You already are. The Corps is the best student led leadership development program in the state. We create leaders. Don't fix what's not broken.

Leadership should be developed collaboratively among buddy classes. Strong relationships developed through the corps are what propel individuals through adversity and creates indivuals with quality characteristics for younger classes to emulate. This is the best way to create leaders, by giving indivuals an example to live up to, rather than an artificial idea of a leader which SOMS classes try to create.

Leadership starts from the first day of FOW. The fish need to be taught self discipline and reliance on their buddies. The Corps should be a student lead organization that is advised by university staff. Look to other programs on campus that teach leadership. Being self aware is the first step I'm leadership. If one doesn't understand how their actions impact themselves and others, they cannot effectively lead. Reward good character traits and disciple poor ones.

Back off the outfits, let them grow in culture, introduce more cross training if you want to make a "more unified" corps experience. People don't join for the corps, they join for outfits.

Make the program more of a challenge. You are making it too easy. If you make it easy, they won't want to wear a uniform bc it's not worth it.

To hit your 3000 number, Hire 5-6 kids who are cool recent graduate cadets to recruit for the Corps. Send them all over the state. Get more kids kids to sign up. That way, your 10% attrition isn't a problem. Because the 10% that quit are pussies anyway and we don't want them

Also, don't ever EVER let a trans person be in the Corps much less in a command position. You know how embarrassing that is???? To see a man dressed up as a woman in the Corps of Cadets uniform? That a major fucking cut. Do you know what the teasippers would do if they got a hold of a picture as such???

Remember the good 'ol days when dudes that were queer were in the closet? This woke BS is Crazy and doesn't belong in the Corps.

Staying hands off and allowing the outfits to govern themselves along with corps staff having less power would be the best intentional thing that can possibly be done.

Further develop the 4 year leadership model with a focus on the importance of what each year encompasses. Also allowing cadets more hands on experience to immerse them in key roles.

I have a relationship with my sophomores, my fire team leader is the only reason I haven't punched. Taking away these possible relationships from next year's fish is creating hinderance on their development. More immersive training = more focus on relationships. It's literally what A&M is about, why I chose to be here. The relationships I would form with others. If you take this away from fish, give them assignments from a constant rotation of people, the authoritativeness that comes from upperclassmen goes away.

Why do you feel it is necessary? What exactly is the problem you're trying to solve?

Pardon my very long, perhaps very disconnected following message; it is very late and I am trying to express all my thoughts at once:

Stick to the "learn, coach, mentor, inspire" mindset of each class's leadership role. As a fish, I have learned a lot from my sophomores just by their example in leading me, and I feel it has prepared me to be a leader myself. Every outfit and every person is different, but good leaders breed good leaders. Another thing that has influenced my passion to lead is buddy unity. I feel that if the incoming fish start

their year in one big gaggle, especially during the most important time of their development, buddy unity will be severely lacking, which is a big, big part of what gets them through their training. There is a lot of value in "trauma bonding" and there are valuable lessons fish learn in having to rely on their buddies. All fish come to the realization after completing hard training that suffering alongside their buddy class makes it worth it in the end. There is a feeling of accomplishment that every fish (and every cadet) gets and naturally wants to share with the class beneath them. I understand there are cadets who are not going into the military, but it is through the military-style leadership model that cadets most directly learn values of character that they will carry with them later on in life. It is not about making the Corps manageable for everyone, but rather being proud to be a rigorous program designed for those dedicated to excellence. I do recognize there are some cadets who are not as passionate about the leadership experience, but mandates only drive cadets to fight back against the "tyranny". That's the premise that needs to be erased: the "cadets vs. staff" mindset. As a cadet led corps, letting the cadets in on the information is first and foremost the best way to go about changes. This forum is a great start. Although their are cadets who push a culture controversial to that of the Corps vision, letting the students figure out leadership styles for themselves is in my opinion the best policy. It is good to have an honest, involved chain of command from the get-go. If fish know immediately who is leading them and what they stand for, they will be more confident not just in following said leadership, but also in questioning leadership if the truly believe something can be done better. In short, the only change I see necessary is the fact that fish are taught from the very beginning that they are always wrong, an it makes them afraid to speak up, even if they believe their opinion should be valued and there may be a better way of doing things. There is a time for training, and there is a time for developing people as people. Humans. Training value is not lost just because people may treAt their subordinates with dignity and respect. In fact, fish look up to leaders who see them as equals, and in turn are more likely to follow them. Cultivating a respectful leadership culture is the key to growing more passionate leaders in the corps as cadets advance to their next class year. As far as retention: FOW had an amazing retention rate, but as soon as the Academic year hit, it plummeted. Like I said, it is a result of fish being too afraid to speak up and ask for help. The academic year is difficult to balance with the corps standards, especially when fish are so preoccupied with satisfying said standards that it takes a toll on their time management. This falls on the leaders to make sure they are still training the fish, but simultaneously making sure the fish know they genuinely care about their success and that academics come first. In my experience, I had a few really good sophomores who showed their involvement during EST when they checked in on their fish. It surprised me to see the sophomores not in their normal "mean" sophomore mood, but it was relieving to know they had my back. The corps is a 4-year preparatory lab, where mistakes can be made but the game goes on. Academics are real. Fish need to know the difference and know that when it comes to real problems, their upperclassmen are their equals and they share the same problems.

I'm not going to answer your questions. I'll just say that your role is to not F this up. Just by the fact that you're asking for feedback, tells me that you understand the blowback you're receiving. Just stop give the cadets some autonomy to chart their destiny.

I strongly believe the corps culture is one of the most significant aspects of the Texas A&M development experience. It is unique in its approach even from the military careers for which many of the cadets will pursue in that the characteristics of the corps graduates excel in education, leadership, mission culture and camaraderie of team and loyalty development. It is an experience unavailable anywhere else.

I appreciate and applaud any effort to continue the process of evolving these programs and experiences to continue to produce the kind of cadets and individuals who continue to contribute so much leadership in our society in every aspect of their characters in the professional and/or military world. I believe it is the responsibility of the leaders of the corps program to focus on the continued improvements required to sustain these values through the knowledge and expertise they bring to the program. As recommendations are made, careful analysis and thorough reviews must be completed concerning suggested changes to include views of past and present benefactors of the corps experience. I believe only with this collective type process will the continued sustainability of the corps experience be maintained.

My particular comment will relate to the discussion around the suggestion that freshman be separated from upperclassmen for a more specific focus on initial stages of individual development. I can

understand that here may be some weaknesses and areas for improved methods for bringing young cadets into the corps leadership development process but do not believe separating them from their outfits or the interaction with older more experienced cadets will improve the program. Rather, I believe it will be detrimental and basically convert the sophomore cadets into more of a freshman cadet within the outfits where they reside. The age interaction of these young cadets is as important to their development as their relationship building with fellow cadets in their class. If weaknesses or areas for improved development are identified for the freshman class, it should be within the environment of the overall experience of the holistic outfit approach and within the leadership and development process of the upperclassmen within the outfit environment.

I would strongly oppose separating freshman from their outfits and the interaction with upperclassmen in the daily experience. Any concerns identified should be addressed within the existing environment that has already proved to be successful.

Most of my true leadership training came from the military science program, not from the corps. The corps was about attention to detail, being physically fit, and learning how to suck it up. And that was valuable. However, it provided minimal « real » leadership training, except for learning by example from the sophomores who weren't just assholes. (There were a lot of those.) It sounds like a lot more emphasis has been placed on actually learning about leadership since the early 2000s, so kudos.

Preserve outfit culture by giving value to the lowest level of leadership with the sophomores and juniors as team and squad leaders allowing them to grow with less restrictive boundaries and create genuine leaders through adversity, not by handholding them with an overtly restrictive and top down guidance approach.

Create outfit structures that require leadership roles to be filled and empower Major Unit staffs to enforce these structures with support staff functions

More training time. Academics are overprioritized

While there are legitimate concerns with the corp, bureaucracy is not the answer. You don't learn leadership and respect from a slideshow, you learn it by having role models who are doing the exact same thing you have and made it through, as well as by being honest. Spend the Night With the Corps last year tended to sugarcoat things for most prospects as a recruiting method, and that was disingenuous. Hard times create strong people, be honest about that, making the hard times easier does nobody any favors. Pretty much everyone who is here for the full 4 years does so for 1 reason, because it makes us better, and because its a challenge. So lean into that, be intentional by letting cadets run the corp, as it has been in the past and how it is marketed. You can protect against hazing and dangerous activities without stealing the corp experience from underclassmen specifically and the outfits in general. When I came here during FOW, the only thing that got me through was knowing that the upperclassmen over me were going to be my family one day and really did care. And then beyond that I learned to lean on my buddy class, as they became my new day to day family. My outfit became my home, without that Anchor of support from my own upperclassmen and my buddies by my side I would have given up. You dont get that kind of support and camaraderie from an organization. You get it from a small group who gives everything for you, and you can only get that from an outfit size. In sociology its been studied that as groups increase, and exposure decreases, personal relationships either develop slower or not at all. Outfits are small personal family units, and you can be intentional by letting the cadets lead them as planned.

First, I applaud the openness to feedback on these issues. For perspective, I'm the father of a Senior Army ROTC cadet. I am not TAMU alumni, but USMA Class of 1994, so I do have some perspective on living in a Corps environment albeit a bit differently. Ensure each cadet has a leadership opportunity and

requirement commensurate with each stage of their development. Sophomore cadets should be in charge of, responsible for, and leading 1-2 freshmen in how to be a member of the corps, following standards, and how to be a good student. Junior cadets should be in charge of 4-6 sophomores and freshmen. They should have responsibilities in teaching/coaching the Sophomores HOW to lead the freshmen and also some responsibilities for looking after the welfare of the "squad" in terms of enforcing standards, inspections, holding sophomores accountable for deficiencies in their freshmen, and looking after health, morale welfare. This was GROSSLY under-delivered during COVID days and I fear this group may have missed out on learning how to take care of those below you. Anyone who had to endure the "quarantine barracks" will attest to this. Those Juniors that don't have squads should have some some type of "staff" function for the outfit with responsibilities for a "commodity" area that helps everyone. Establish some guides and left/right limits for what those staff duties are. Senior cadets should be in either leader roles (CO, XO, PL) or a staff OIC role. Set expectations for the leader roles. It's NOT the guys who march in front and have more dots/diamonds. What are their responsibilities? I recognize they are still students, so their responsibilities need to be commensurate with their own student requirements, but the point is teaching leadership through immersion. And leadership is not just wearing the rank and marching in front. Are the goals/rewards appropriate? Do they provide something sufficiently desirable that make the Cadets WANT to attain them? This may be an important consideration as they haven't all attained the level of maturity yet where they should be intrinsically motivated to achieve a successful outcome yet, but perhaps build toward that. I doubt that exists within all freshmen/sophomores. They are still kids after all. When the semester changes, you change everyone's duties so that a fresh batch get their shot in the critical leader roles, and others, who were the leaders, learn how to support the new leaders. Also, ensure that some time is spent in class-specific education about leadership at their level - and it doesn't even have to be all military, it can be civilian related as well. The point is to help guide them to be good leaders in general, and also good followers - of their leaders. This is separate from ROTC-specific training. -John Horning, COL, US Army

Rather than take certain classes away from the outfit once a week utilize CR training times once a week on either an outfit or maybe minor unit level. From there separate the classes so that each can do their own program without having to attempt a one-size-fits-all all approach. This would eliminate training times where an entire class is absent while still accomplishing the goals of education. This could be instructed by the new leadership advisers hired, cadets or Hollingsworth center and could rotate throughout minor units throughout the week.

Swap the CO and 1st Sergeant with another cadet after the fall semester

Giving the cadets an actual opportunity to lead. Respect them even though you think they are children. The point of the corps is to fail in a controlled environment, if you just tell them what to do and take away a very large part of learning how to lead then what even is the point of the corps other than to get 18 year Olds to spend new york apartment prices on a shared closet and inflating football audience numbers.

The Hollingsworth Leadership Center is what should be the focus. It has vastly improved over the past few years and need to start at the freshman level. Instead of having Military advisors teach those classes, actually hire real professors for it. These classes should take on the Socratic method of how the Corps is marketed out to be. A leadership discussion. This way each cadet can get a foundation and build upon it by the time they are seniors to decide which leadership method fits them the best and know how to cater it to their subordinates. The ILDP has greatly helped cadets in cultivating this process.

Empowerment of the students in the Corps is the key. Trust and verify. Give them guidance and set clear standards for what is to be achieved but allow a degree of freedom and creativity among different outfits and among larger unit leaders to achieve it. Make sure they are setting goals and tracking towards those goals and if they fail to do so intervene. The more students are making the decisions though the more they will be motivated and the more they will learn. The most important thing they need from the Commandant's office is clear and measurable objectives that they know they will be evaluated by (Academics, Retention, Recruiting, Discipline Reports, Inspections, Awards received, etc.)

Mistakes will be made but the key is learning and growing from the mistakes and not forgetting to focus

on the achievements as well as the shortfalls. The cadets should feel support from the Commandant's office and a larger accountability but not a heavy hand. The more that you expect of and trust the students the more they will deliver. The more the students own their mistakes and their successes the more they value them and the more they learn. Teach them how to make choices and learn from them for good and bad, don't simply tell them what you want them to do in too much detail.

I was class of 1998 and immersive was the best thing about it. You learned from the ground up. Learn how to follow, then learn how to instruct, then learn how to lead. All the while, you are learning from experience and what you like/dislike about the leadership qualities of your peers and upperclassmen.

How do you be more intentional about leadership training through the Zip year. That's easy.....Trust and Respect! You have to build trust and respect.

The hardest part about the process was the constant battle between the Trigon and the outfits. We always felt like the Trigon was imposing rules that were meant to be broken and making the Corps "soft". For instance, some time after my fish year we were told that freshmen were no longer allowed to do more than 40 pushups at a time and were not allowed to be in the front leaning rest. That's just one example of many. So, you have "leadership" trying to impose a rule that no one agreed with. Those decisions immediately make the Outfit culture at odds with the Corps culture. The Outfits believe the decision makers are making the Corps soft and feel like it is their duty to give the freshmen the experience they desire and will grow from. And usually, the staff cadets are caught in the middle. Some are "yes" men and women to the Trigon. They fear their commission spots and referrals. Others just turn a blind eye. Outfits are put in a position to fail and are distrustful of the Trigon and staff. No trust and no respect.

So leadership training is really difficult when there is no trust and no respect for what the "leadership" is doing.

If you can build trust, then you will have a much better chance of reaching the cadets for 4 years. Without trust, there is no way you will ever reach them. Without trust, there is not respect.

Have more intentionality in having productive events from outside speakers coming in and talking about leadership experience in the public and private sector as well as in the military. CR events on adult life skills and resume building. Case work studies on leadership challenges. A lot of white belts get left out of training. Most of the focus is on black belts. A lot of white belts are facing life after college and barely know how to perform basic life skills like filing taxes, negotiating for a car, house payments, etc.

the key to having more intentional and immersive leadership training is to create more opportunities for leadership. The more things that cadets are responsible for the more opportunities they will have to lead other cadets in support of that goal. Creating defined responsibilities for each white belt will give them the opportunity to grow and teach others within that chain of command to help execute those goals.these goals can be correlated, major unit, minor unit or outfit driven

Focus on the whitebelts!! They are the ones who pass outfit culture down!! I agree that some outfits have lost the plot in terms of upholding what the Corps stands for, but as you've seen, forcing the entire Corps experience to change will simply burden the outfits that have been using the current experience responsibly and encourage the ones who haven't to set themselves even more firmly in their ways. Upperclassmen across the Quad need to get to know each other better- I hardly know how SQ-11 trains their fish as a C-Co junior, for example! They could be doing something far more productive than us that we could adopt, or vice versa. We won't know that unless we know each other. I like to think the band has been able to use the current format of training responsibly, but there is a huge rift between us and the CT outfits that I have yet to cross without a SOMS class or being in a special unit. If we want to see those outfits improve, we need to be more connected as a Corps- and this starts with those on TOP, not the fish who don't have any bearing on leadership or outfit culture yet!

There's a lot of discussion of changing. This is constructive but needs to be framed. As a '        and father of a '23 and '26 cadets, I can assure you that the passion and love for the Corps is strong and these current cadets want an experience no different than the one we lived. They're not asking for Kleenex and stress cards. They want to be tested, pressured, tempered, and come out smarter, harder,

and ready for a world they already know is unrelenting.

The pressures this generation feels to look to the future, to decide "what you're going to be", how much money and clout you'll gain, the level of influence you make, etc is so much stronger than the 90s and earlier. Just having the chance to be called an Aggie Cadet is radically harder. We didn't have social media, instant news, pandemics, hyper-political division and turmoil, and the speed of the world as it moves today. So I'd propose that we maintain some critical and fundamental basic truths about the Corps: the Seniors lead the Corps, the Juniors run the corps, the Sophomores discipline the Corps, and the freshmen are the Corps. Maintain this basic concept and use it as a building block methodology to move to the leadership positions awarded at each class - whether formal or informal. Leverage each class year as the developmental stage for the next year, and don't forget that our Zips need to be readied for their chosen life after graduation - they need development throughout their year as well. We can formalize a pisshead training program, create benchmarks and tasks that each cadet must complete to receive the privilege of performing at the next level, and use a more rigid system of accountability - document requirements and counselings, and apply these tools to inject more structure into the formal leadership selection process.

We need to level set expectations of what each year group is required to learn and what behaviors we expect them to exhibit. Cadets live a tradecraft type profession. Fish are apprentices. Pissheads are journeymen and should have well founded values, know their expectations instinctively, and be allowed to make honest mistakes that don't end or threaten their cadet life. Juniors are masters of the "corps trade" and must possess the skills to run and operate the organization. Zips are the corporate officials who create direction and establish the overall climate. The Trigon can intervene to provide steering corrections, but only in the most critical of situations should they step in and assume control. I can't stress enough that we need to underwrite honest mistakes and allow learning to occur from them.

We have opportunity to effect these changes that move us back toward Corps fundamentals by injecting procedures, processes, and standards that reflect the decades and decades of success we've all experienced. Wholesale change will trivialize and undermine these lessons.

As any good artillery man would tell you - shift from a known point. Let's not commit fratricide while trying to improve and grow the organization we all hold passionately dear.

Maintain outfit cohesion. Ultimately no one will care for freshmen or any other cadet at any level than their buddies and the other members of their outfit. Let outfits determine what their people need. It's much easier to determine needs from a small sample size, and much easier to effectively utilize time for a smaller group. Personally, I gained more from events my outfit planned than events planned by the Corps or the major unit. Additionally, re-emphasize involvement in student orgs off the quad. The Corps can only provide so much development, cadets should be incentivized to also look for community and growth elsewhere

By making more intentional interaction between the fish and sophomores. They should have the most influence and time together. The fish should always live with the outfit because the outfits are centered around the fish and that is the environment where they have and will develop.

The first question that has to be asked here is "WHY?" The Corps of Cadets by its very nature is a living, breathing Leadership Lab. You don't get much more immersive than that. As to how to make it more intentional, how about there is a written expectation of the duties and responsibilities of each of the classes and positions within the outfits, battalions, Major Units and Corps Staff. The individuals that are in those positions are counseled at the beginning of the year and either monthly or at the end of the semester. and make their performance in their duties part of their grade.

Learn more about each Cadet and what they want from their journey in the core. Give leadership positions to people who are qualified to deal with all kinds of difficulties. Meaning put people in positions to deal with emotional, physical, and mental health of all Cadets.

I feel that overall the current leadership training and education program is effective in it's implementations. I do not reject the fact that improvements can be made however. One major area that could easily make improvements to our structure is the dissemination of information. As a fish I often

have to get information about required activities or good opportunities for development from my buddies or unofficial sources. It would be nice if the chain of command was fully utilized to give information to better communication. Stressing communication across the corps could very well help develop leaders in. identifying critically information every level of the chain of command for disseminating only the information required. This would also lead to more control by the larger corps and commandant staff to make changes as it is communicated all the way up and down. This is one way to be more intentional and immerse all members in leadesrhip training by stressing communication skills.

The first semester of college has always been a significant transition period for those who go directly from high school to college. Leadership training efforts should be deferred to the second semester. The primary lesson to be learned during the first semester of the fish year is "No Excuse, Sir", which teaches individual accountability for one's actions.

During the second semester of the fish year, a cadet's training should focus on one-on-one leadership of the next year's incoming freshman at the outfit level. The cadet cadre for this training should be comprised primarily of current 2nd and 3rd year cadets.

During the first semester of the second year, implementation of the prior year's training should occur. It should be evaluated by 3rd and 4th year cadets at the outfit level, with reporting upstream for accountability.

The first two years of a cadet's four-year journey are critical and become the foundation for all other leadership training. Some cadets will fill leadership roles in student organizations outside of the Corps. This should be encouraged, recognized and rewarded. Leadership roles within the Corps are not for all and should not be diluted by giving all cadets a title.

Couple of thoughts:

1. There are good outfits and bad ones. (My personal experience was fantastic! Very tough standards and accountability but fair and professional- if I got crapped out I deserved it and learned a lesson). I was blessed to be a G-2 Gladiator and then XO of a new M2 Spider outfit '89. There were also "Douche Bag" outfits that needed to be disbanded. My thought is to hold Cadet leaders accountable. If your outfit is not following and meeting the Corps Standard then you get disbanded and moved to other well performing outfits.

2. The Corps is not for everyone. You want more than 50% retention but you have a problem if you are at 100% retention. Not sure what the actual best balance of retention is on a yearly basis but it is not 90-100% or the program is not challenging enough to develop leaders of character.

3. Hold individual cadets accountable to the Honor code.

4. The Academics of the current Corps are fantastic but in concept I would rather hire a 3.0 leader with strong character than a 3.8-4.0 brainiac that can't lead a group of children across the street. The point is that too much emphasis on GPA is also detrimental and must always be balanced with Leadership Training and physical and mental challenges to build the Leaders of Character as Aggies.

My understanding (second hand info so not personal experience) is that the Corps has diminished the more demanding physical aspects of the corps in regards to PT and attending formation. They have also diminished accountability to respecting authority (upper class men) no whipping out, no pushups unless in very specific cases etc.. this must be re-examined. The Corps should be challenging and Cadets held accountable for their actions. Every consequence should have a specific accountability/ leadership training purpose. Following instructions, respecting authority, honor , respect etc. )Absolutely No Hazing allowed - Zero tolerance. ) Some one crosses the line then they are gone but we can not take out the physicality and accountability. We do the cadets a disservice if we do not help them grow and overcome

obstacles.

Again, not everyone is meant to be a Cadet. At the same time we do not want to lose good Cadets because of lack of leadership and accountability. The idea of squad level Leadership training for second semester fish and 1st semester Sophomores is a worthy endeavor. Separating the fish and only letting select cadre work with them is the lazy way out and destroys the fabric of the Corps. Train all cadets and hold them accountable to the standards is the only way to go. That I am interested in.

Sir, I think the best way to be more intentional and immersive in leadership training is to educate at the highest level first. The Corps is a student-led organization and one of the best parts of that is each cadet gets the opportunity to learn what kind of leadership style they have and also learn their strengths and weaknesses. I think if CDT BDE commanders could receive the education from you or the CTOs or the Hollingsworth center then they can utilize that new-found knowledge to pass it down to the BN commanders and so forth. One of the most helpful things about the Corps is that each outfit has its leaders and each leader teaches things differently and creates their environments, and with so much leadership diversity it creates a melting pot where each fish, pisshead, butt, or even zip can thrive in different learning environments. So, if the BDE commanders could receive the information and then pass that down to their subordinates it could become a ripple effect with their nuances at each level. If it seems like a specific outfit or BN is not handling something in the way you would like then you can simply nudge the BDE commander and they can course correct, and if that doesn't work then maybe a stronger intervention would be required but it would allow leadership to make mistakes and not be punished harshly for it because at the end of the day the Corps is a learning environment over everything.

I'm a member of the class of 2023, so a new dead zip. I was also in            I understand you are going to have a lot of responses to this feedback form so just for the sake of saving your time and mine, my phone number is            I live in College Station and would be happy to pop in and discuss this face to face, I think I could also offer a good perspective given that I am freshly out of the corps. Anyways, to your question, in a short answer, I think if you want to be more intentional with how you train and educate you need to be more intentional with who you are recruiting to train and educate. Because after being on my recruiting chain for 3 years, I know how the corps recruits. Yes, there is an aspect of wanting to boost the number of people who get to participate in the Corps experience. But the most efficient way to actually boost the number of people participating in this is by making it genuinely the premiere organization on campus, which it already should be. A handful of outfits have figured this out, that there is a solid way to take your responsibilities in the Corps seriously, while still having an amazing and authentic college experience. And I cannot for the life of me understand why we are not looking at these outfits, who have no problem getting plenty of people to preference them when that email drops in april, and as those cadets progress in those outfits they are chosen by members of other outfits as key leadership in corps wide special units more often than not, and instead of saying "this is bad" those of you calling the shots aren't going in to those hallways and saying "Show me what you are doing and how you are doing it so we can replicate it in the 40 other outfits across the Quad."

You need more interaction between cadets, not less. Taking freshman away from their outfit denies the upperclassmen the opportunity to lead. Non-ideal leadership is a reality of life; freshman need to learn to deal with that as well. Mistakes will be made, but that is to be expected in a leadership laboratory. That's how people learn.

let the RV's PT.

1. Break down the individual
2. Form the group and loyalty to one's buddies
3. Train the leader
4. Give the opportunity to lead

SOMS definitely plays a big role. I'd say make it mandatory for everyone and put a bigger emphasis on it. I don't know how to do that but it needs to be done. Also, work with the normal cadets and keep them informed. Not just the green tab leadership (like MUCs, BUCs, and COs). I'm saying the normal staff

sergeant juniors and two moon seniors. These kinds of cadets make up the majority of the Corps and technically run it. If there is going to be a change, make it a slow change in order to find out what works. It's been less than a year since General Michaelis became commandant. Plus, a lot of people are afraid of change. Back to the question, I kinda like how it is (no fish academy). It gives everyone a leadership role. I do have a couple of suggestions to change: make the fish "year" shorter and edit the 4th fish response. I think the fish should only go through the hard fish year for the first semester. This is something that was inspired by my former Naval Science Professor. After brass, fish should be treated much differently and that is changing (yay!). I think the big thing is to control the mindset and power struggle when they become sophomores. The second thing, the 4th fish answer ends with a demeaning sentence: "In short, sir/ma'am, I am a very dumb fish and do not know, sir/ma'am." Saying that one is "very dumb" is not right. That is demeaning and incorrect (to the most part but I don't know). All these cadets got accepted into Texas A&M University, they are not dumb. There should be a change that is not degrading.

To enhance the depth and efficacy of our leadership training and education program at the Texas A&M Corps of Cadets, incorporating a "Fish Dorms" initiative could offer a transformative approach.

**1. Structured Leadership Experiences:** The Fish Dorms would serve as a hub for structured leadership activities, enabling cadets to engage in daily leadership exercises. These activities are designed to be progressive, becoming more complex as cadets advance, ensuring a practical, hands-on approach to leadership training that complements classroom learning.

**2. Mentorship and Guidance:** Hand-picked upper-class cadets could play an integral role in the Fish Dorms, serving as mentors and role models. This direct interaction promotes a culture of mentorship, where learning from experienced peers becomes a daily practice, enhancing the cadets' leadership skills through observation, dialogue, and feedback.

**3. Cohesive Community Building:** Living together in the Fish Dorms encourages the development of a tight-knit community among first-year cadets. This environment fosters teamwork, camaraderie, and mutual support, which are essential components of effective leadership. The sense of belonging and unity cultivated in this setting is invaluable for personal growth and leadership development.

**4. Tailored Leadership Curriculum:** The Fish Dorms could also host workshops, guest speaker sessions, and leadership seminars tailored specifically to the needs and challenges of first-year cadets. This targeted approach ensures that the leadership curriculum is directly applicable to their current experiences, making the learning process more relevant and impactful.

**5. Continuous Evaluation and Feedback:** An integral part of the Fish Dorms initiative could be a structured feedback and evaluation system, where cadets receive regular assessments of their leadership progress. This system would not only highlight areas of strength but also identify opportunities for improvement, enabling a personalized development plan for each cadet.

By implementing the Fish Dorms concept, we can ensure that our leadership training and education program is not only intentional but also immersive, offering cadets a comprehensive, experiential learning environment from the very beginning of their journey. This initiative would lay a strong foundation for their development as leaders, preparing them to face the challenges of the future with confidence, competence, and a deep sense of commitment to their roles.

Meatballs do it on the RUN. They don't do it on the DON'T RUN. Stop ruining our traditions

As a fish, I don't know the complete path and maybe that's part of the training but I always plan things so that I take my own personal best goal to the finish of whatever I'm working on. I don't know much about how the upperclassmen work or about how the Corps works as a whole

Without an understanding of what is being done currently, it is a challenge to provide meaningful recommendations. Please answer first what is currently missing in Corps performance. Why is there a need to be more intentional and immersive?

| |
|---|
| What is the problem that needs solving by being more 'intentional and immersive'? |
| |
| Stop lecturing the fish on Monday mornings. They are SO BORED with the lame messages you are delivering. Let them PT. |
| Earning something that requires discipline, growth, and adaptability is something that makes something more intentional and immersive. I believe the corps can do that by not just offering fish to earn the brass but come up with ways that other years can earn something every year. By doing this, it can give guidance on for every year to work towards a goal. Like corps brass is for the fish, come up with a corps brass like thing for the rest of the years in the corps. The corps brass is the foundation that should be built upon and I think that will make a great experience in the corps |
| By upholding the Corps Leadership Development Model, we can be intentional about our four-year journey. The Corps of Cadets is a leadership laboratory, training freshmen to learn, sophomores to coach, juniors to mentor, and seniors to inspire. Good leadership training is founded in the core values, and aligns with the Standard. In order for freshmen to learn effectively, external pressure is needed to guide them and help them reach their full potential. With sophomores, juniors, and seniors able to guide the freshman, he can receive the know-how to execute academic excellence, uniform readiness, drill and ceremony, and physical training well. Sophomores are there to help freshmen make goals and keep them accountable to it, as well as instruct freshmen to achieve the competencies necessary to become a well-educated leader of character prepared for the global leadership challenges of the future. Juniors are there to mentor freshmen, offering stories and helpful advice for how they overcame adversity and came to where they are now. Juniors also mentor sophomores, who for the first time are leading cadets, ensuring they guide their freshmen to the core values. Seniors inspire freshmen, sophomores, and juniors by their example and by setting the Standard and setting the tone for their outfit. Although seniors do not define the Standard, they set it—they model how executing the Standard looks like and steer the outfit to align with it should their outfit ever veer off the path. All leaders, regardless of class year, will build trust with those under them by modeling authenticity, integrity, and compassion while setting high standards of performance. They communicate their values and sense of mission and define the cause for their people and tell them where they fit in. For example, as XO, I tell the freshmen that they are an integral part of Company A-2, and we would not be the same without them.<br><br>With the freshmen being housed separately, I see that the Corps Leadership Development Model falls apart unless certain measures are taken. First by dividing the freshmen from upperclassmen, the CLDM is effectively (at least temporarily) not in effect. If an entire class is removed, all other classes are affected. If the freshmen are removed from their outfits, even for 3 months, then who will the sophomores coach? And if the sophomores are not coaching and there are no freshmen learning, how can the juniors mentor in these areas? And if the juniors are not mentoring, how can the seniors inspire? What will the seniors be inspiring them in?<br><br>In order to maintain the effectiveness of the CLDM, freshmen must be receiving coaching, mentoring, and inspiring. If the cadre cannot function as fire team leaders, chaplains, officers, and mentors and the other roles encompassed by the sophomores, juniors, and seniors, then the freshmen will necessarily be deprived for the 3 months in Phase I before Fall break. Even though they may be instructed on how to lead, without the proper nourishment, the freshmen will learn how to lead in a starved state. They will be unable to reach their full potential, no matter how many lectures in Rudder they attend.<br><br>Additionally, upperclassmen must also have a purpose during Phase I, and with the freshmen class removed, it may be difficult for them to believe that they are having a positive impact and can lead Per Unitatem Vis, when there is no unity between freshmen and outfits. |
| By upholding the Corps Leadership Development Model, we can be intentional about our four-year journey. The Corps of Cadets is a leadership laboratory, training freshmen to learn, sophomores to coach, juniors to mentor, and seniors to inspire. Good leadership training is founded in the core values, and aligns with the Standard. In order for freshmen to learn effectively, external pressure is needed to |

guide them and help them reach their full potential. With sophomores, juniors, and seniors able to guide the freshman, he can receive the know-how to execute academic excellence, uniform readiness, drill and ceremony, and physical training well. Sophomores are there to help freshmen make goals and keep them accountable to it, as well as instruct freshmen to achieve the competencies necessary to become a well-educated leader of character prepared for the global leadership challenges of the future. Juniors are there to mentor freshmen, offering stories and helpful advice for how they overcame adversity and came to where they are now. Juniors also mentor sophomores, who for the first time are leading cadets, ensuring they guide their freshmen to the core values. Seniors inspire freshmen, sophomores, and juniors by their example and by setting the Standard and setting the tone for their outfit. Although seniors do not define the Standard, they set it—they model how executing the Standard looks like and steer the outfit to align with it should their outfit ever veer off the path. All leaders, regardless of class year, will build trust with those under them by modeling authenticity, integrity, and compassion while setting high standards of performance. They communicate their values and sense of mission and define the cause for their people and tell them where they fit in. For example, as XO, I tell the freshmen that they are an integral part of Company A-2, and we would not be the same without them.

With the freshmen being housed separately, I see that the Corps Leadership Development Model falls apart unless certain measures are taken. First by dividing the freshmen from upperclassmen, the CLDM is effectively (at least temporarily) not in effect. If an entire class is removed, all other classes are affected. If the freshmen are removed from their outfits, even for 3 months, then who will the sophomores coach? And if the sophomores are not coaching and there are no freshmen learning, how can the juniors mentor in these areas? And if the juniors are not mentoring, how can the seniors inspire? What will the seniors be inspiring them in?

In order to maintain the effectiveness of the CLDM, freshmen must be receiving coaching, mentoring, and inspiring. If the cadre cannot function as fire team leaders, chaplains, officers, and mentors and the other roles encompassed by the sophomores, juniors, and seniors, then the freshmen will necessarily be deprived for the 3 months in Phase I before Fall break. Even though they may be instructed on how to lead, without the proper nourishment, the freshmen will learn how to lead in a starved state. They will be unable to reach their full potential, no matter how many lectures in Rudder they attend.

Additionally, upperclassmen must also have a purpose during Phase I, and with the freshmen class removed, it may be difficult for them to believe that they are having a positive impact and can lead Per Unitatem Vis, when there is no unity between freshmen and outfits.

I have not been on campus since the early 2000s, but there is an opportunity in the military sciences courses if they are still the same. Instead of focusing solely on recruiting for the branch, field training/o-courses, and marksmen shooting, there could be a heavier emphasis on how to lead. From there cadets need an opportunity to lead. I was a D&C cadet and those classes needed more for the real world. Having time spent on diamond qualities is outdated. Company leadership, teaching, career readiness, etc is a more productive use of those classes.

Keep all cadets residing with their units.

Start retention programs to remind cadets that their first year is SUPPOSED to be challenging. Start motivational retention programs that teach and implement mental strength. Many capable, but few are willing. Since that is the case, supportive and uplifting teachings will help cadets be more up-to-the-challenge that is fish year.

Leadership training isn't something you get from reading a book. Understanding the values of a leader requires that "leaders in training" are given opportunities to lead -- and fail. I personally think that learning from failure produces much better leaders. At all levels of the Corps, members can see with their own eyes and hear with their own ears who are good leaders and who are not. You emulate what you see, both good and bad.

Freshmen should be given opportunities to show responsibility. Important tasks that must be fulfilled should be regularly assigned. The Freshmen should not be told in a prescriptive manner how to do the task. The Fish class will work together to determine that. This creates further cohesiveness between

members and fosters a teamwork approach. Near the end of the Fish year, potentially after March to the Brazos, Freshmen should be immersed in some form of "Leadership 101". 360 degree evaluation of upperclassmen should be performed. What worked, what didn't work? Which Sophomore showed the best leadership qualities and why. The opposite question should be asked. Hard answers should be pursued. The whole chain of command should be evaluated. The dead elephants don't get off the hook!

All Sophomores should be included in a Leadership 201 course, not just Cadre. Taking lessons from Freshmen year and establishing plans and activities on how to lead their new Freshmen class. 201 should introduce concepts like the 4 phases of group dynamics (forming, storming, norming, performing), organizational leadership best practices, etc.

Junior and Senior year is when the leadership really comes out. The entire Junior and Senior classes should be in a 301/401 level training the same time the Sophomores are. Further emphasis on group dynamics, chain of command, unit cohesiveness (even with some members in corps/brigade/regiment/wing staff positions). They all started from the same outfit! Bring them back together.

Training is immersive when members are given opportunities to lead and fail. Learn from the experience, move forward. Training is intentional when it is developed and baked into everything that is done at all levels.

Prepare sophomores to be true leaders. Telling cadets daily that they are a waste of space is not motivating or any type of actual leadership development. Cadets choosing to attend this college do not need to be broken down and rebuilt, they already have the foundation to be great leaders. Don't break the foundation, keep it strong and build upon it. What's happening now is simply hazing wrapped in fancier words.

Return the Corps to becoming Corps-led. If our students are immature, it is because they've had too many "adults" intruding. Train them, then let them work and learn.

When students go to a big school, they need to find their people asap. The Corps and the outfits fulfill that goal right away. The 15-18 fish in their outfit are their people. The same isn't true when the group is 800 new fish. It's too big. The outfits fill that purpose.

Reducing the number of cadre last year was a big mistake. Go back to a bigger cadre.

FOW should not go away. How much more immersive can training be than FOW?

Try to place cadets in leadership roles throughout campus. Not just in the corps.

Transfer leadership of the fish to the Seniors. The Sophomores do not have the skills or training to be the their "leaders" yet.

This was my post to Quad Moms:

I am class of 2000 and my cadet is a Third Gen Ag and a legacy in the Corps - what is MOST important to me is to protect the institution of the Corps of Cadets at A&M which is currently in jeopardy.

Professionally, I have worked in organizational culture change and can share that there are situations which require drastic change to yield the needed culture shift. This is never the first option, but when other attempts do not result in the necessary change at the pace required, sometimes hard decisions must be made.

I would caution all of us to remember not all outfits have similar fish experiences and I would assume the rate of fish punching and the feedback received in their exit interviews may be what is driving the decision as well as the current litigation the Corps is facing.

Although many may feel this is not an ideal solution to whatever problems the Commandant is tasked to solve - we must remember there is MUCH we do not know about what may happen in other outfits.

Outfits are not disbanded for nominal reasons and Cadre are not removed from their positions lightly. Given all the activity in both subjects over the last year, there are presumably valid reasons for the actions that are being taken.

I agree we should discuss this with our cadets, but I suggest we trust the Corps Leadership to make the best decisions for the long term success of the Corps.

The leadership education should be at the corse that General Michaelis is currently taking the corps. The only concern I would have for the leadership training is whether the leadership program can transition transfer who are frogging up or snake-ing up a corp classification well.

More focus needs to be put back into the outfits.

The best way is to engage adults in oversight of the students in officer positions. Currently, there is little to no oversight therefore many things are happening (hazing, misuse of power, etc).

This question seems to want to know how the Corps can improve its leadership training. Well, I personally believe and have always been taught that leadership is based on trust. Therefore, I would counter this question by asking how the Corps plans to make leadership something that cadets can trust. This latest announcement, which has been met within widespread criticism, is the perfect example of what I mean. Corps Staff and Comm Staff have joined together without the input of the vast majority of cadets to make a plan that nobody favors except those at the very top of this organization. This announcement is failing and this plan WILL fail because cadets had no input, and because cadets were forced into this new system of Corps organization without their consent. So, how can leadership improve becomes a very simple answer. Corps leadership needs to take a backseat to what outfits care to do as outfits. I will explain what I mean more on my answer to the third question. Corp Staff, with its nepotism and corruption and isolation from the regular corps needs to go back to the drawing board. I would personally propose a voting process so that cadets are forced to argue their points and make promises of what they will do with their positions. Cadet Advisors, non-cadets, who wield far too much power in an organization that is supposedly led by cadets. The positions they occupy should be abolished or at the least stripped of their powers within the current Corps command structure. The office of the Commandant needs to come forward and bring out all of their plans and ambitions for what they believe that this organization should become, so that this Corps can have actual cadet input on what becomes of it in the future.

Stop listening to old ags who are sexist and racist.

The Corps of Cadets is already an intentional and immersive leadership development program, creating major structural change is not important. The Corps of Cadets has functioned without major hiccup from its current structure since 1876, and what hiccups did occur were due to extreme, severe, and tragic circumstances; not because of perceived "bad training."

OK looks like you wanted to implement this new plan in the fall and had met with the seniors last week to let them know. Very shady. This isn't YOUR CORPS. This is OUR CORPS.

The first thought that comes to my mind revolves around the fact that I have heard members of the commandant's staff refer to entire classes as needing to be "gotten rid of" each year I have been in the corps. If we truly are a world-class leadership organization why did I hear in October of this year from a member of the commandant's staff that we must "get rid of" the classes of 2025 and even 2026 to fix both the Ross Volunteer Company and Corps of Cadets? (never mind this was less than a month into being inducted into the RV's and almost a year away from '26 even heading to the company) How can we be training leaders if we have members of staff telling us they have given up on a class? (at this, the past four classes?) Where is the four-year training in that? The troubling part of the question is we see follow-through on this doctrine. Right now the classes of 2027 and 2026 are being "re-trained" If this is needed for their classes why is it not being done with the class of 2025? The class of 2025 will be the most crucial piece of any change made next year and the staff of the commandant has thrown us aside. Another major problem with our four-year leadership experience is the almost complete waste of multiple semesters of SOMS. In the second semester of my fish year and first semester of sophomore year, I learned next to nothing that my outfit did not teach me about the corps. I did however hear how a member of the Commandant's staff at one point in their career did not see a problem with making his Marine recruits get on their footlocker and faceplant onto the deck. Not only did they tell this story they related their clearly unethical behavior to using the term fish. This greatly worries me as they either believe using a term such as fish to be a much greater deal or they still see their actions as a very small thing. In my time I also heard war stories and many other less-than-relevant things while being quizzed from an outdated version of the standard which they believed to still be relevant. If we had used the second semester of my fish year to teach about tone, verbiage, and interactions with fish rather than what is described above I would have been far less vulnerable and had a far easier time being a sophomore. The first semester of the sophomore year could also be set up to be more discussion-based and be a helpful resource rather than being told how much of a problem we were and having to feel like we were the enemy.

In conclusion, in my time in the corps, I have observed my advisors consistently give up on classes as soon as they become whitebelts even to the point where they degrade these students in their conversations with their underclassmen. I have also observed the amazing opportunities of freshman and sophomore SOMS to be squandered and used to further separate sophomores from the Commandant's staff. Again I would like to re-emphasize I have heard multiple times from this leadership organization's hired staff that my class and every class I have been here for needs to be "gotten rid of"

Young leaders must have the opportunity to fail. To do that they have to make decisions that have consequences and will result in tangible results, either positive or negative.

Passing the uniform of the day down from Corps staff and making sure everyone is in formation at the right time isn't leadership. It's babysitting, and the cadets know it. We have slowly removed all decisions of significance that cadet leaders have. We have also removed all but a very small number of training opportunities with the expansion of the academic day. Academics have value, but if all you preach is academics over all else then we should not be surprised that everything else falls by the wayside.

Seniors need to make choices on when their outfits train, where they train, what training to put emphasis on and what just needs to meet standards. If they meet those standards or exceed them then recognize that loudly and broadly. If they fail, recognize that as well and institute correction plans.

I would also suggest starting early with a copy of The Three Meter Zone: Common Sense Leadership for NCOs by J.D. Pendry, CSM, USA. These lessons are easy to understand and will transfer well between all services and civilian leadership situations.

While the Corps taught me invaluable lessons upon leadership, my senior year at the Trigon in AFROTC Leadership was a defining moment during my time at A&M. I learned more that year than all the SOMS classes and previous years combined. The difference was that my AFROTC cadre truly embraced the concept of being cadet run, and most importantly they allowed me to fail. I had almost full reign with my cadet staff to execute how I saw fit to accomplish the mission. It allowed me to take risks and learn the consequences of poor decisions.

What I found lacking in the Corps was this spirit. Perhaps because I never served leadership on the quad, I am ill-informed. However, the vision of the Corps never seemed to originate from any cadets, and my buddies in outfit and MU leadership never seemed to have the same level of freedom as I did. I think returning more meaningful decisions to the cadet level, and truly allowing cadets to fail would prove incredible for leadership lessons. I learned so much more from when I failed as a cadet.

The foundation of this Corps are what makes this organization so impactful. We learn leadership through the Corps experience. The difficulties and hardships, the joy and the laughs, the tears and the sorrow, are what make this experience impactful. It gives SO many opportunities to learn about emotion intelligence, intellectual skills, self-awareness, and pushing men and women to their limits.

The Corps is special for the challenge it provides. To be quite truthful, knowing that my email is recorded on this form, I don't believe the SOMS classes and other forms of leadership instruction we receive are very helpful. We learn how to lead people at the outfit level. Corps staff learns how to lead at an organizational level. Neither groups truly learn how to lead in a classroom.

We will make mistakes. We will fail. We will disappoint. That is GOOD. You are facilitating an environment for us to do that, especially so it does not kill somebody when we enter the military. However, the opportunity for us to lead and learn from our leadership failures is crippling before our very eyes. That's why we care so much.

The Corps found 'leaders' for years without much input from the Trigon

I think the problem is we are assuming what we are currently doing is wrong. I believe the current leadership dynamic and setup is incredibly immersive as it is right now. Being someone who has had the most recent 4- year experience I have watched myself and others grow in ways we couldn't have ever imagined.

The Corps itself stands as the immersive element of leadership training. It is a massive and well decorated leadership laboratory, and having the opportunity for each class year to learn the role and invest into it, then train and be trained for the next year is what gives cadets such a unique experience that produces the best leaders. Time in these roles, during the Corps training times we have outside of academic responsibilities, is when this happens. Cadets will gain the most when they have time to invest and experiment and learn in active training times. Briefings are not training, they are only theory, and theory becomes useless without proper time to test and practice different leaderships and methods. Cadets learn more from failure than from success, and being allowed the room to fail in a relatively low stakes environment like the Corps will create even higher caliber leaders. Leaders and followers alike learn from more from failure than success, and cadets require the space to do so, and to then improve as people and as leaders. The current system has so much oversight that the Cadet leaders are leaders on paper. All the directives are wishes of commandant staff, not cadets leading and making decisions based on a vague, overall guidance. Cadets who fail are punished, and then the oversight becomes so heavy that there's no chance to learn and grow. The cadets need the time and responsibility to actually make decisions in regards to training, each level will take the vague guidance and apply their own vision to it and whittle it down to the operational level within outfits.

This is a great goal, but it can't be the only goal. It has to exist hand-in-hand with the question, "How can we provide a one-of-a-kind experience for our cadets that sets us apart from peer institutions by reinforcing our unique history and culture, and not just mirroring what some alumni will go on to

experience in the military?" The Corps and Texas A&M are much more than a preliminary training stop for military careers, and should be treated as such. The relationships we build as cadets -- particularly during FOW and the first semester of school -- make up the entire foundation of our time in the Corps. My buddies and the experiences we shared have had a vastly greater affect on my life than any specific leadership training I received.

Having said that, I think a more intentional four-year journey must include content aimed at each class, clearly outlining what is expected of them as a freshman, sophomore, junior and senior. How does your role change each year? How do you become an influential leader as a sophomore? How does that differ from your role as a junior or a senior? During my time in the Corps (1987-91), I was never given meaningful guidance on this ... We went from being wide-eyed fish to our sophomore year, where we essentially mirrored what we had experienced: lots of yelling, memorization, corrective PT, etc., without a deeper discussion of WHAT we were trying to accomplish and WHY we were doing that way. The upperclassman years were spent more on personal development vs. leading underclassmen in a meaningful way. There is tremendous room for change and evolution here ...

HOW this is accomplished can be something as simple as requiring all cadets to report for FOW, vs. only fish and cadre. Those not involved in working with the freshmen would spend their time in a weeklong leadership course with their class peers, filled with role-playing, group instruction, etc. I would have eaten this up as a cadet -- training aimed at me, which changed each year as I advanced through the program. I was not a loud, demonstrative leader, and I often felt left behind as positions and opportunities went to those who were more outspoken. Frankly, I think the lack of specific, role-based instruction played a big role in this. It's hard to stand out when you're not sure where you fit in, or what you should be focusing on.

I have spent a big chunk of my career working at the national level for the Boy Scouts of America, which employs a graduate-level leadership course called Wood Badge. Now more than 100 years old, the course has evolved into a weeklong leadership laboratory that guides participants through the process of becoming a more effective leader. It is transformative. The capstone of the program isn't the final day of class ... rather, it's the project phase that spans 18 months after the end of the course. Participants must come up with six "ticket" items or projects they will complete, aimed at furthering their growth as leaders and positively affecting their organizations. We could copy this approach and have cadets create three items they will complete over the course of the coming year, from taking further leadership courses through the university or online, developing team- and leadership-building activities for their unit, creating a more robust program of alumni outreach to span the generations, etc. As a former student and instructor of this course, it has changed who I am as a person and as a leader.

Good question. First, the HCEL needs a complete overhaul. It is not appropriately serving the Corps' needs. There needs to be real leadership and followership training conducted in the freshman and sophomore years that goes beyond the basic leadership traits and principles. The junior and senior cadets (contracted and D&C) need real "positional" leadership development to prepare and sustain them through their leadership journey. Additionally, the HCEL needs reorganizing to provide more tailored career readiness pipelines that truly provide D&C students with clear career readiness advantages. This means real faculty and optimally a real dean.
A key and critical deficiency is the lack of deliberate and comprehensive "transition" training to prepare cadets for their next leadership responsibilities and challenges. To do this properly, the OOC needs to overhaul its staff and hire a cadre of advisors with real experience leading organizations and developing leaders.

Stop treating D&C cadets as less than, instead of the reality that they keep the Corps lights through donations after they graduate. They are your most important cadets. They are the easiest students to recruit into the military after. They are the majority of the corps student body. They are the ones sending their sons and daughters to join the corps after.

Just because you can't threaten them by messing with their future livelihood like you do with every contract cadet in a leadership when they don't agree with you doesn't mean that they don't deserve the

same leadership opportunities and development. Yet that is consistently the attitude the leadership has displayed towards the largest percentage of the corps for at least the past 20 years.

let the RV's PT

Do not break what is not broken. I ask you back, how can the cadets in the Corps trust the adult leadership after this situation?

Invite guest leaders (prior Corps members) to come to an outfit dinner and talk about their journey, how they got where they are, and how the Corps influenced them as leaders.

I believe you can improve the leadership training by creating opportunities for most engaged and strong spirited pissheads, Butts and Zips to train the fish the last 4-6 weeks of the Spring semester so that those fish are ready to become effective pissheads when the new fish show up the following semester for FOW. I also think the Butts and Zips take the lead for the first 2-3 weeks of the Fall semester with the Pissheads taking a lesser role, yet still engaged in the process. Then you have a smooth handoff from the white belts to the Pissheads. Having the Pissheads engaged from day 1 their sophomore year is crucial to the process for their further development as leaders and to maintain tradition of the Corps. Pissheads will make mistakes in how they handle the fish from time to time but that is how they learn. They aren't going to learn that from a classroom or the Trigon. On the job training is the best way to learn and grow.

In this time of evolution, the term "leadership" is thrown around, and yet, as always, is absent of any context.

The question then becomes what is leadership? What is leadership in four years as a cadet in the Corps? What is leadership for life (as in life after the Corps of Cadets)? Are there different aspects to leadership? Is leadership the same once cadets depart the quad for life?

Let's examine the components of leadership specific to the Corps of Cadets. As I see it, there are three: trust, responsibility, and discipline.

As an observer of the Corps for the last decade or so, the question that comes to my mind is: how can the cadets exercise any leadership when they are under constant supervision from the Trigon?

I am constantly "astonished" when visiting campus, that, in any Corps activity, you cannot swing a dead cat without hitting a member of the supervisory staff from the Trigon; active duty or retired / hired.

These representatives of the Trigon have become a layer of supervision and responsibility for the Corps; the Pissheads of old.

We, as a society (sic), no longer trust the Corps of Cadets to police themselves, we no longer trust them to be accountable for bad behavior. Instead, we continue to enlarge our supervisory responsibility by growing our Trigon staff and having a greater presence on the Quad; and have evolved into the modern-day pisshead.

And allowing these supervisors (pissheads) to wear Cav Hats, with enlarged retired ranks puts the spotlight on them (for their ego) and most assuredly away from the Cadet Corps as they execute their pisshead duties. Hint: discretion suggests that the focus remain on the Corps and advisors show discretion when representing at activities.

The smothering of the Corps with all this "supervision" suppresses leadership development for the cadets.

We no longer trust the cadets to govern themselves, thus suppressing leadership development.

We continually expand Trigon supervisory staff to ensure things are accomplished properly and meet requirements.

An example: when the senior boot line forms up in the End Zone in the second half of a football game, there are a handful of bulls from the Trigon right there on field with them.
You'd think, at this point in their years as Cadets, Zips could exercise this independently. But the mere presence of the bulls reflects this lack of trust.

"Oh but SEC rules and requirements....." is your answer. My answer is: it will only take once.

That will reinforce the discipline necessary to allow the Zips to exercise the responsibility to form the boot line. It only takes the Trigon the ability to trust the Cadets to execute.
Now this lack of trust is also prevalent in certain aspects of our military. But that doesn't make it right.

In 1985, as an Army Attack Helicopter Company Commander in the grade of O3, I had the authority to downgrade a Red "X" condition and allow an aircraft or vehicle to continue operation to the nearest maintenance facility. I have subsequently learned that authority now rests with the O5 level battalion/squadron commanders. I will also add that in every case I did sign off that "Red X" to a "Circle Red X", I personally flew the aircraft back to the maintenance facility.

The real question then becomes, how can the Trigon influence actions on the Quad to ensure Cadets learn responsibility and discipline? and the answer is trust.

Failure is a component of leadership development, provided it does not become habitual.

Yet failure on the Quad is avoided at all cost. And that failure is thwarted by a suppressive supervisory Trigon staff.

The Corps was once allowed to discipline itself.

Maybe by teaching trust, responsibility and discipline, this privilege can be returned to them.

I think the best way to increase intentionality and immersive is to put the right leaders in place over the outfits.

I believe this can best be done by giving the outfits some say in how leadership is picked because those are the people that the potential leaders live with and know best. I do not think a board of people that do not really know the individual is equipped to make the best decision for an outfit's future.

I really like the idea of starting an "SLA" or curricular program for sophomore development. I think there should be a parallel course for juniors and seniors. Juniors should learn organizational planning (Col Washington's MTTB planning meetings would be EXCELLENT source material) and Seniors should have some extended sessions about organizational change and change management. Seniors could and should also be very involved in planning SLA and the fish introductory curriculum (see my last paragraph for more justification)

What I think is CRITICAL though is that it's not just CMDT staff lecturing a room full of cadets. Keep a low ratio of student/instructor and include Cadets on the teaching team (i.e. for SLA have a senior there getting a SOMs credit or a stipend to work with a CMDT staff member to learn and teach the material, sort of like the current SOMS peer mentor but more involved and more vocal).

Col Washington is really really good at this stuff in his MTTB planning. He entertains ANY suggestion and then gives us the tools we need to come to the conclusion that he could have just told us in the first place, but people listen best when it's their idea. If you can push cadets into coming up with the ideas that you want to execute, they will execute it with way more buy in because it's their idea.

# How do we expand the leadership opportunities for every leader in the Corps, ensuring each experience provides both learning and purpose?

Leadership opportunities are from positions of responsibility, and to be given feedback on your performance. The goal should be to foster the healthiest and most independent outfit leadership teams. Outfit leadership are incapable of learning from mistakes, improving and leading at all without some degree of autonomy and controlled failure.

In short giving outfits more autonomy, and allowing for an environment that is more accepting of failure will help cadets to lead better than they would as the "enforcers" of someone else's leadership. This way we will build leaders and not managers.

https://texags.com/forums/16/topics/3445742

How about allow the fish to report to their chosen unit, rather than the asinine 8 week fish program that was brought up.

Like I said, let us lead. Yalls entire role in command staff should be to provide guidance and that's it. We are a leadership lab and yet we don't lead. The corps is making these high level changes without input of any cadet

We can expand leadership by giving opportunities to lead throughout the school year.

Stop commandant staff and corps staff from taking away all of the authority and responsibility from the cadet leaders already here and the ones being appointed next semester.

Dont. Not everyone needs a trophy. Everyone should have stiff competition at every level to be "in charge" of others

Everyone is not born to be a leader. While the Corps "builds leaders" the world does not and will not need everyone to lead - we need followers and supporters as well. This being said, not everyone needs a leadership position within their outfit or corps. More needs to be focused on the other supporting roles.

Push more CR and RUReady events.

Give each class opportunities to lead and make decisions that actually matter.

Truly I don't see where we can fit in more leaders. We already struggle with finding replacements when a CO/1SGT doesn't make grades, how are we going to find more full time people?

Shifting responsibility and workload off of CO's and 1SGT's towards other members of their respective classes. The biggest source of whitebelt apathy is feeling like one isn't necessary to the corps operating. In addition, invest more in special units and give them the opportunity to create difficult environments that will in turn keep whitebelts motivated. The RV's last semester and Recon this semester are examples of how physically difficult special units can intentionally help keep whitebelts motivated and further develop their leadership skills.

We could have more help getting leadership positions outside of the corps. Maybe create group chats/meetings for people interested in orgs, societies, sports teams, etc that can help new leaders

become more active in those organizations, while also developing the leadership skills of people already taking part in them.

We don't. Leadership is way to watered down. I believe the corps should be restructured to operate correctly. Our "outfits" operate as if they are companies in the military. But In reality we are actually the size of a platoon. If we restructure the corps so that outfits are platoons and operate as a platoon people who hold leadership billets like SL, PSG, and FTL will actually get to lead. Additionally it would make leadership more tangible. Our current "outfit" commanders (commonly referred to as company commanders) operate as if they are in charge of 100+ cadets. If we changed the verbiage and the structure of the corps then leadership wouldn't be watered down. A battalion commander in the corps today doesn't actually command a battalions worth of people, they command a companies worth of people. And so on up the chain of command. I believe restructuring the corps in this way provides more concrete steps to leadership as well as provides leadership billets that actually matter. Currently a squad leader has maybe 4-6 people under their command when that is really a fire team. If you restructure like I've laid out then that said squad leader can now lead in the way a squad is supposed to function because they have the correct amount of people in their command.

As we go through the 4 years, the leadership positions become a pyramid where they become less and less. Unless you implement new outfits, there really isn't a way to get everyone the experience that another would have.

By encouraging leadership opportunities inside and outside the quad, RVs, Cav, Rudders, FDT, Bonfire, outfit and corps leadership. Leadership opportunities in these organizations are every day being washed away by a larger agenda of control with the most common leadership phrase in the corps being "it's out of my hands it's coming from higher". Leaders are only built by making swift decisions in high risk environments. Leadership is not campos, it is not uniforms, it is the greatest challenge someone has ever been presented.

There are sufficient leadership opportunities for every leader in the Corps already. If anything, the Office of the Commandant could encourage cadets to get off the Quad and engage. We need current leaders to share their experience across the Corps.

As to sharing experiences, it should be expected that each head, butt and zip must provide, each semester, a 5 minute video answering "Where do you lead and what does that entail." These need to be provided Corps wide. In this way, cadets - particularly fish - will have an idea of where each cadet is and - if that is a position of interest - where they can be found. Yes, its about 1500 videos. But, this is how we control the narrative that "We Build Leaders."

With regard to leadership, we must recognize that come leadership may be found in a titled position in a regular unit or a speciality unit, may be untitled because the cadet provides leadership to those under them in another way, may be invisible as the cadet does not wish to be in a nominal leadership position, or may be found in any number of organizations off the Quad (where the Corps needs to be).

Metrics must be provided to each unit for expectations of each position (from fish, to sophomore, to clerk, to junior, to Scholastics Junior, to XO, etc.) within the outfit, recognizing some units may divide effort within a chain among several individuals. Accountability for compliance must then be ensured.

Most organizations include systems for feedback outside the direct chain of command - so the Corps should expect every Cadet to provide, perhaps monthly, a review of their own leadership and followership, of the leadership of their own outfit, and of the followership of their own members. With today's technology, it is easy to obtain an electronic survey from each Cadet.

As part of a regular monthly evaluation, cadets could identify what leadership positions they have on and off the Quad are any positions of interest to them. The Outfit Advisor, in reading the monthly surveys, could provide a link for that cadet to learn more about the leadership position of interest.

Outfit advisors must read those monthly reports and take the appropriate action, which may be meetings and redirections to those in positions of command or in positions of followership. This affords an opportunity for Advisors to identify those on the bubble of retention and provide outlets, including potential transfer to another unit. This also affords the Outfit Advisors the opportunity to determine whether those in a position of leadership are suited to it, succeeding, or failing.

At the end of the day, training is Explaining, Demonstrating, Guiding and Enabling. Evaluation is a

critical element in ensuring each of these elements is being met.
Regular evaluations should also be helpful in flagging the failures identified already.
We cannot make people take on leadership positions they do not want as they will not lead.
We cannot provide the leadership position each cadet wants - its their job.
All we can do is provide the path for each cadet to seek the leadership position they want.

Let cadets be in the room for decisions. The current perception is that there aren't any and even if there were, there isn't enough respect for the big three as there should be. Many see our corps commander as someone who doesn't truly understand what it is to he a fish or a member of the corps, House is overbearing and Guest is overworked. I don't agree with those thoughts in the slightest, but as it is the rest of the corps thinks otherwise. There is a balance of course, but the perception of COs being able to voice their concerns might help. At the same time, battalions need to be used more. There is so much potential in them and I feel like we've only scratched the surface. It still feels like the MOs and OAs are influencing the corps and while there are good ones, many rub cadets all together in the wrong way. Blackbelt soms lead by them feels like they assume you want to haze freshman and there's no way around it. You wither play teachers pet, or you stay quiet. They all have so much knowledge, but it doesnt matter if cadets assume they arent cared about by them. Finally, standards are dropping and cadets need to have the ability to enforce them. Too many cadets wear non regs class, don't wip out, and organizations that once were heald in high esteem are now looked down upon. An example that comes to mind is the RVs. I had the honor of running into a corps commander in the 80s and he asked where my cord was. I told him I didn't have one and didn't want to join to his shock. Anyone who was anyone wanted to be an RV he said. All the high ranking individuals in the corps were RVs and served as examples of servant leaders for all to see. They were looked up to and admired. No that could be an old ag embellishing a story, but even still, the RVs aren't look at the same. They are seen as a special unit that parties and drinks and sees themselves as above the standard. They choose themselves so now it's like a frat that does piss poor drill, yet is the governor's honor guard. Don't get me wrong, there are good RVs, but they seem to be the exception, not the rule. Cadets have to take charge and ownership of changes and leadership, or they won't buy in and nothing will change.

It's the onus of the cadet to take charge of their post. In my opinion, the hardest and most important job in the entire Corps is the FTL - they have the responsibility as the first direct link in the chain of command. But why can't an AFTL take charge over certain responsibilities or make the time to get to know those under their care? I think the focus shouldn't necessarily be on expanding leadership opportunities, rather Cadets taking serious the opportunities already presented to them.

Allow the sophomores to be at more training times with the fish to let them interact and lead them more. If we have more fish next year, a strong sophomore glass is vital for creating good leaders in the class of 28.

The corps is structured the way it is for a reason. A very specific reason. A reason that has been the same for over a century. Freshmen don't enter the Corps ready to lead. Nobody does. The entire point of freshmen year is not to lead. Rather, the point is to learn how to be led. How to follow. How to be the best subordinate you can possibly be. Everyone comes in expecting to magically become a "leader", when in reality, the only thing that can develop leadership is experience in a real world setting and learning from leaders around you. That's why the four different years of development are so critical. Sophomore year is the time to start leading, making mistakes, fostering a fire team of motivated fish and learning to influence and impact them in a way that is meaningful, challenging, and pushes them to be their very best. I think the idea that we can push leadership at all levels is valiant, but without a basis to practice it on, what good is the training? I believe that leadership is better learned through hands on experience and mistakes than in a classroom, which is what leads me to believe that we need to delegate more to the outfits. Monday and Friday morning SOMS classes and a fish Academy would only damage the ability of sophomores and white belts to experience that real world leadership applicability. Leadership opportunities have been the point of the outfit training for decades, and removing that is extremely detrimental.

How can we lead if there is nothing left to lead? If you take away the freshman and leave the units with only sophomores and whitebelts, there will be significantly less opportunities to lead. I know that the majority of cadets are motivated and care deeply for this corps. If you tell these motivated cadets that only 200 of the 1700 are "mature" enough to lead, then what do you expect? You have to find a balance where you empower positions that have been overlooked (Chain officers, SL's, etc.) instead of just saying we are not good enough and only giving leadership to a few hundred of the 1700.

Expand the amount of people involved in FOW, more manpower during this very busy period would be beneficial and those who are on cadre get to have a head start on influencing the freshmen and adapting to their roles.

You develop outfits with expanded chains of responsibilities. Giving people jobs for the sake of jobs is counterproductive. My outfit has expanded its chain work and is able to accomplish so much more. As a fish, I only know the outfit level, but I have a lot to look forward to. More responsibilities are created by the more freedom you give to outfits. Maybe it's because I'm just a fish and have no clue what the overhead looks like, but what I see from my good outfit is a system of chains where everyone has a say and fish are implemented into that system once they've learned the duties and responsibilities of it.

It appears as though standards and discipline fall on deaf ears as soon as you put a white belt on. I watched my most disciplined, former FTL, put on that white belt and fail to remember his campusologies, to shine his shoes, and wear the uniform properly. By dismissing white belt apathy as a symptom of prolonged time in the Corps, we are producing poor officers/civilians that will soon join the world as burnt out individuals. White belts that fail to fulfill their duties should be replaceable. Allow them to fail but be held accountable the way they were as a fish and pisshead. It is concerning that learning appears to end when handed more privileges and titles. They do not deserve a blind eye due to a title. You are not your title, rather a cadet doing a duty for your outfit and Corps.

Allow current leaders to properly delegate their responsibilities and work with cadets. I have personally seen how certain leaders bear the brunt of the responsibility and are unable to delegate and share this to other cadets so that they can gain leadership experience. What I have seen work well is where the butts lead the most, with heads directly under them and Zips providing insight and serving as a consultant to them. This is effective because it allows, at least on the outfit level, for leadership to have a coach who knows what they are going through and can provide advice. Furthermore, this, along with delegation, allows for cadets who might not have a formal title to serve in leadership roles. Many times here at A&M people get caught up with the title of their role instead of the actual work they needed to do. We don't need to create leadership roles out of thin air so everyone has a title for their resume, but we need to create the opportunity for cadets to step up and take on responsibility. That way they can take control of their own leadership journey and are motivated to lead not burdened with it.

I feel like there's no leniency in the Corps. If you mess up, you're treated like trash. We're college kids, we're in the Corps. Let us mess up here. Let us learn from it. So that way, when we go out into the real world, we have experiences that we have learned from. I feel like the Corps is leaving that.

If cadets aren't given the opportunity to lead fish, then what are we learning? That only a select few can do that? That's my takeaway. I'm supposed to lead enlisted personel in 2-3 years but I'm not trusted to lead some fish in the Corps.

By expanding the decisions currently leaders are allowed to make. We don't need more participation award leaders the corps is already saturated with those positions.

Performance reviews conducted for every upperclassmen conducted with unit or corps staff present. Unit staff must be inclined to look for/promote healthy leadership opportunities.

There is plenty of leadership opportunities for everyone, but not all of it gets promoted/capitalized on. Holding people accountable and promoting actual, productive leadership is the only way to really provide purpose to everyone and their leadership roles.

Committees for activities and creating delegation for outfit level leadership. By only allowing the CO and 1SGT to have access to certain responsibilities, we have trouble creating responsibilities to delegate. The only activity where we can delegate is going to be PT, that's why it's emphasized so much. That's why our culture is so dependent on it.

As mentioned on the previous question and the next one, how can we unite the corps? Creating an activity to unite behind. How can these activities be created? Committees. Led by comm staff, let people join different committees which are led by cadets who create decisions. This can be based on its own election process and have people in non-leadership positions apply. This way people can contribute to corps level decisions in the equivalent of 'think tanks', where people opinions can be heard. I'd be proud to have people in my outfit help contribute and plan events on a corps wide level. As well you can make it a requirement for 'x' amount of people per MU or MIU join, have them meet with outfit leadership or higher leadership. More responsibility, more opportunities to lead.

These events can include competitions, major/ minor unit FTX's, mass community service (Big Event but just the Corps), FOW prep and execution, dining outs.

As well don't be afraid to incentivize, give bag-ins and MESTS, that's how you'll get people in the door. Yes, the concept of buying in is frustrating, but it's necessary to get the momentum going for change.

Make seniors show up to things. When you see a senior not doing anything and just blaming "white belt apathy" that breeds further apathy from every single class. In SOMS classes I would talk to rising juniors about timely feedback. As a head, there is sometimes an issue and we have no clue until a week later when said issue is brought up. Juniors and seniors should know how procedures are conducted and what is and isn't acceptable. Let them know that giving subordinate feedback is crucial.

The leadership opportunities that exist within an outfit in a dormitory 24/7 situation are almost unparalleled. Regardless of a "position" or "rank", cadets are constantly exposed to both following leaders and being leaders themselves. The concept of 'expanding' or 'creating new' leadership opportunities has a veiled implication that the current structure is inadequate. This mindset should be respectfully challenged by the simple question, "What is the metric?". A&M cadets routinely demonstrate on a national stage their superiority in comparison to other ROTC programs across the nation. We are competing against ourselves - can we tweak improvements? Always. Do we need a wholesale overhaul? Wholeheartedly, I would say, "No." - if there are 'trends' towards bucking the established system, then address them individually. The entire Corps does not need to change strategies to address an extrapolated issue.

You do not have to have a leadership position to be a damn leader. For this, we allow cadets to become leaders themselves like 150 years of corps before us.

You don't have to give everyone a position to make them feel like a leader. Positions help, but good leaders do not need people under them or a title to influence the actions of others. Leadership is influencing those around you to thrive and complete a common mission. Teach the cadets how to communicate their ideas and how to get people to listen to them and you. My short time in the military has taught me more about this than in the Corps because it means more. I wish the Corps taught me this fact sooner.

Stop trying to expand. Condense instead. There is enough positions within the Corps for everyone to be a leader already. Be that outfit leadership, Major/minor unit leadership, or chain leadership, there is plenty of positions as is for cadets to learn how to be a leader. To be a leader you don't have to be in charge and have a big title. To be a leader you have to use the skills you're taught to help and teach others. This can, and has been done, in the present state of the Corps. We can't all be chiefs. Stop the focus solely on people with diamonds. Everyone has a position to uphold in the state they're currently in. I'm a two-moon-goon in charge of two chains, and I'm knocking it out of the park with them. It's not hard to lead even if you're not in a "leadership position". Everyone has a job, and we're doing it to the best of our abilities and leading those under us as is.

Don't crush student leadership under the heel of staff influence, which isn't to say they should be left utterly independent, but that their leadership potential shouldn't be just amount to "mouthpiece for Commandant staff"

Distribute more authority to the Corps and create positions to fulfill those roles.

The amount of leadership opportunities already present in the Corps are sufficient given the current size of the Corps. As it stands, the amount of positions seems to distance the leaders from the actual outfits, as they remain on staff and are not bound to any individual within the outfit. This leads to decisions and regulations that are fundamentally not what outfits need, as the leaders are so far removed from the people. I suggest keeping the current amount of leaders and keeping the staff from outfits accountable within their own outfit to promote growth and ideas that benefit the cadets.

Adding battalions back in like was done does open up more leadership positions, which is good. Was on 3rd Batt Staff my jr and sr years. Remember, not all want to be General. Company level positions teach how to lead as part of a bigger organization, without having to be the CEO...

Don't put people who will throw people under the bus in positions if major leadership. The current regiment disciplinary officer literally raped a girl and was appointed. Y'all are putting the wrong people with no backbone into positions that require tough decision making.

Keeping units together and learning through the example of the upperclassmen, and growing the extracurricular landscape within the corps.

Make a board of cadets that directly communicate with the commandant of the Corps to keep him connecting to what the Cadets require and what they want to get out of the corps.

I believe my first answer covered this.
Rotate who is in a leadership position at the end of each semester for Sophomores, Juniors and Seniors. Maybe not the Sr Co position. But all other positions.

Expand the leadership roster, by elevating cadet responsibilities to those of the Commandant's office. Allow a level of cadet council that that meaningfully negotiate with the Commandant and be permitted to appeal a decision if it is found unsatisfactory.

Keeping all sophomores as fire team leaders to fish. It allows them to have one on one connection while also learning how lead on a more individualized level.

Refer to my previous answer. The leadership opportunities in the corps come from interactions with fish and being a fish primarily. An all fish dorm is an antithesis to that point and is probably the most 'opposite direction' solution you can go. We currently have a massive bucket of 'leadership and character development' cadets can fill, but they can only scoop so much water at a time and some of them don't want to scoop water anymore. Adding more buckets isn't going to help.

Leaders in the corps of Cadets are built already, whether that is in outfit, minor unit, major unit, or corps staff. So many leadership positions are available. Being more transparent with whitebelts even without leadership roles would also be beneficial.

A great word of wisdom shared to me about the corps, if you were to take off all of the ranks you would still have those leaders in the same roles.

Let the student do more instead of the commandant when possible

Make corps staff mean something again. Not just a joke that nobody respects.

Return to Ol Army, Traditions have the same weight as Leadership. You don't have to choose one or the other. Develop both at the same time, like it has always been.

Give special units and student organizations more leeway/room for growth and innovation.

Guard the traditions of past and present, allowing cadets to use their interests as an asset to lead their peers. Going out on a limb, even to your own detriment, is a step in the learning process.

Individuality and ideological diversity should not be axed/restricted due to nonconformity, as there will always be ebbs and flows (ups and downs).

Part of life is going tryouts hard times, or trials and tribulations. The corps should foster an environment of artificial stress to push everyone to their limit physically, but most importantly mentally and emotionally.

You create opportunity, and people take advantage of it. But we can't all be "top leaders" and we shouldn't try. Some will serve in leadership outside the Corps, that should be encouraged. Creating smaller, niche and special purpose organizations (think Rudders Rangers, Cyberwarfare team, sports, etc) so that everyone can find their spot. More small organizations for white belts, that's my view.

While the Corps of Cadets aims to develop those in it, it is increasingly become the case that those in this organization will only get out of it however much they choose. Those that choose to do the least they can, will receive very little leadership development even over the course of their Corps career. On the other hand, those that choose to do the most they can, become involved in leadership and special units, and successfully complete the transition from followers to leader across their time in the corps. As restrictions must be put in place for the safety and health of the regular Cadet, special units become the place for cadets to reach out into whatever field they choose and grow in those areas as well as with a variety of cadets across the quad. Placing further restrictions on the activity of special units only restricts those who volunteer to go beyond the outfit model of leadership development. While all of this is true, there is an understandable level at which restrictions should be placed, but in doing so, it should not limit the ability of that unit to function. Advocating for the autonomy of special units by consequence should encourage more people to be active and seek leadership experience where they would not get it otherwise, in organizations that compliment their interests.

The learning opportunities ultimately come down to individual attitude. It takes a growth mindset to learn from the opportunities in place.

We expand the leadership opportunities by not nuking 4 outfits that created those opportunities. All of those outfits went on to have people take over positions in other outfits that took away opportunities from people that had been in those outfits originally which has taken away positions instead of creating them.

I believe the use of special units would be a good idea. As a fish and now a sophomore, I don't really see the different units and would like to see if we can give special units more opportunity to show off their skills and recruit cadets.



I believe you should give everyone interviews when applying to leadership, regardless of previous experience with leadership as long as they meet the GPA and discipline requirements. I know, that's a lot of time tk give up. But, it gives everyone an opportunity to give their side and show how they've worked hard and why they want to go out for it. It doesn't seem fair as you ascend the ranks only the favorites or brown nosers are considered for interviews and few and far between are hard workers chosen. To also give EVERYONE a say in leadership, those who apply should be considered for their outfits first. The people in every outfit should also be included in the leadership process. MA's/Corps Staff has 1/3 of a say/vote, Current Leadership has 1/3 of a say/vote, and the people within each outfit get to voice their honest opinions and have a chance to choose their own leadership, contributing the last 1/3 of the voting process. There will be bias and possible nepotism, but by including everyone in the mix it should mostly zero out in the end. Everyone gets a chance no matter if you have had a previous leadership position, been offered a previous leadership position and accepted or denied it, applied to previous leadership position, or are unable to apply to a leadership position yet: everyone gets their voice heard. These experiences would teach us that our voices do matter and if we decided not to vote that's on us and we can't complain about leadership since we didn't give our input. It also shows the motivation and the importance of putting out and being the best leader you can be no matter what because there is always someone watching-reinforcing the Corps values 24/7.

Not everyone needs to lead. But everyone needs a shot.

Every cadet currently has this, and it's already highly reflective of the public and private sector. Those that wish to put forth the effort and gain everything they want to can do so, and those that wish to be

along for the ride but only halfway participate can also do so (with the understanding that they will not be in major leadership roles.)

Encouraging more creativity across the Quad could help. In talking with a first sergeant from another outfit, he said that one of his junior buddies that doesn't have any chain positions or anything will occasionally lead training times teaching subjects based off of his major. This makes him feel more involved and invested while also giving unique training times for the outfit. Additionally, one of the most demotivating times is the Spring because not much goes on like earning Brass or football games, and even preparation for new roles can become redundant after a while. One of the things my outfit decided to do this year is have the freshmen plan an event for outfit alumni. We gave them certain deadlines for when decisions on things like the date, location, attire, etc. needed to be decided. This makes them feel more involved in the outfit as well as gives them a more hands-on approach to the preparation of new roles, especially when it comes to chains. It's also a way for sophomores to begin to seriously bond with them on a level that isn't just making sure their uniform is perfect and they're keeping up with academics, because the freshmen go to their sophomores to ask for help with their respective chains. I think increasing the value of creativity across the quad would provide more leadership opportunities and purpose for classes that often feel like they lack purpose.

Create a clear defined model for outfit leadership with roles and responsibilities. This will include the seniors through sophmores.

I understand you can run out of leadership opportunities in the outfit, therefore a strong push for special units with separate leadership levels can add depth, SEAL platoon, FDT, RECON platoon, Rudders Rangers, RV's etc. These leaders should not necessarily hold leadership positions in the outfit, expanding the opportunities.

Training and accountability at each level is key.

I do think what kills leadership at the student level: 1. when peers don't respect the rank or position of their classmates and fart off directives. 2. Cadet Leaders chose buddy loyalty over doing what is right .

Training and discussions in these areas is needed.

Not sure how much training is given to D&C cadets, but business leadership classes would be a good idea for noncontract cadets.

Everyone in the Corps has a job and someone they report to. Leadership works out of that even if the job isn't considered a leadership position such as CO or 1st Sgt. Make sure white belts don't sandbag on jobs like Clerk and other positions where the sophomores do everything.

Increase pride in the corps. Not through taking away outfit pride but increasing corps pride. Make this place and place where people who want to be challenged, grow, and set apart come. Not an advanced Boy Scout organization. One should come here to be pushed past their physical and mental breaking point, because only then can they go. Only someone else can taking you farther than you ever thought you could go.

I don't think everyone can exercise leadership opportunities. In 4 years you simply don't have the time to allot a leadership opportunity to all ~2000 cadets. That being said, there are ample preexisting leadership opportunities in the current corps structure. SOMS, ROTC classes, and the current fish experience provide the framework for leadership. There are opportunities that appear organically in the fish class and some that are necessary in SOMS or ROTC. After fish year, those basic opportunities persist and new ones appear from everywhere. One can join a special unit or pursue a position within a chain of command in their outfit's logistics. Some of these require initiative but most are a product of necessity. The truth is that some cadets never commit themselves to these opportunities.

Allowing upperclassmen to reach and train freshmen ALL year long

Create more frequent competitions for outfits, where non-training chain cadets are required to lead. This would encourage peer leadership for training chain, and the ability for others to have an opportunity to get hands on experience and responsibility in some setting, if not within the outfit operations/training. Some examples could be a weekend competition at the O-course, sports, drill inspections (similar to Citadel), or similar activities. In general, more opportunities for leadership. Restrictions to success would be time commitment, but can be mitigated by being held every 2 weeks on Friday afternoon, giving outfits 2 weeks to develop between each competition. This approach also fosters a Warrior Ethos and outfit pride.

I believe that I touched on this in the previous question, but shfiting from a management focus to a leadership focus. People are probably not feeling bought into the corps because they see it as their being micromanaged from many positions above themselves.

1st Sergeant, CO, BUC, BUXO, MUC, etc.

All telling them what needs to be done. They have their individuals chains to be creative but if they feel restricted in what they are able to do then they aren't going to feel motivated to go the extra mile. SOMS may be better suited to be a collaboration time on being creative with the time given. Sometimes I feel chains within outfits are seen as a burden rather than an opportunity for improvement and growth.

The proper opportunities for leadership in the corps exist. I've never believed that you need a billet to be a leader. Some of the best leaders I've have in the corps have been nothing more than an AFTL or a 2 moon senior. Some of them were better leaders than some of my COs or 1st Sergeants. The opportunities exist. What people need is the freedom and motivation to utilize their positions. I don't think that is something you can create, but it is something you can facilitiate and inspire to be done.

Ensure every white belt is on a chain or in a "green tab" position ie Squad Leader or Platoon Leader. XOs, COs, MUCs, and 1st Sergeants need to be responsible for making sure the white belts in their outfit are doing their jobs and leading effectively.

Also, outfit and major unit leaders specifically CO, 1st Sergeant, MUC, PLs, Sergeant Major, and Platoon Sgt. should change at semester.

Educate the Cadets about opportunities on and off of the Quad. Encourage Corps participation in events such as Big Event, Aggie Build, Muster, Traditions etc. The Corps also has leadership opportunities at all levels for all classes. Organizing and commanding PT, outfit service projects and outfit social events are all leadership opportunities. Organizing and maintaining communications with former members of the outfit is a great leadership opportunity.

Do not micromanage and demand that the Trigon chooses leaders. Micromanagement and arrogant control take away leadership opportunities. Let the cadets make mistakes and learn from them. The Trigon Cadet relationship should be like a mentor not a Tiger Mom.

The answer is certainly not by restricting the amount of people that can train the freshmen or by isolating them from the rest of the corps. This will afford them no leadership exposure or learning opportunities. It will create a cultural divide between freshmen and upperclassmen. Leadership opportunities for freshmen in their first semester would be to observe what works, what doesn't, and the second semester to be taught the concepts and start learning how to be a sophomore (while still being fish). Leadership opportunities for all other classes should be to allow each cadet to be present in a training environment, give them the opportunity to train and mentor freshman cadets and other cadets junior to them. As mentioned in my response to the first question, ensuring all of this has learning and purpose should be ensured by having actual shadowing by "advisors" in a PATIENT and GRACEFUL manner. Those who deconstruct/destroy training times as they happen and destroy the credibility of cadet leadership in front of their subordinates only make the learning experience a lot worse for the fish. I still remember my Fish Drill Team "Black Monday" being interrupted by a lecture from a CTO to our leadership and thinking how everything that I could overhear being said to my leaders could have been said before the training, in private, and in a manner that did not reflect poorly on them. In any case it may have taught me what not to do.

I personally find it strange this question was even thought to be asked and have no idea how the current plan for next year even addresses this question, given the large restriction on who will be able to interact with the fish. It seems the current solution to ensure learning and purpose is to destroy learning and purpose except for in very small and observable instances for very few cadets.

There are so many leadership shouldn't be a participation award. Simply put there already is leadership opportunities everywhere, getting a chain to be in charge of as a whitebelt, have a squad, learning to lead with influence instead of rank. As well as this, cadets have the highest involvement within off the quad leadership per capita of any organization on campus. We make leaders, we don't make people that get the most opportunities to get a position, that's not how the real world works. I think the leadership experience here speaks for itself with the high rate of jobs for cadets post graduation as well as the highest camp scores of any senior military college. I don't understand why we would borrow ideas from other senior military colleges to improve recruiting and retention when we are already larger than those schools and have better leadership scores where it matters.

Give cadet leaders more opportunities to have a real say in decisions that affect the corps.

Don't have a fish dorm

As a fish, it is difficult for me to answer this question. I do believe that next year, it would be beneficial for me to get as much experience with my fish directly. I would have every training time throughout the week to learn about what leadership skills and styles I do and don't like, which would give me a longer time to hone in on those specific skills and styles. It would also put me through a larger variety of situations that I would have to adapt to, thus enhancing my flexibility as a leader.

You Don't, this isn't everyone gets a trophy. The Cream rises to the top and Leadership opportunities are already there. (Corps Staff, Major Unit Staff, add Battalion Staff , Outfit staff.) There are jobs even in the outfit level that have to be fulfilled for the machine to run.

that being said, there needs to be a common list of positions that every outfit has if not, i have seen some outfits make up positions. but you also have to give those an option that may not want a leadership position as well.

the biggest issue i have heard is that you get a 1st sgt and CO & XO that are not promoted from inside the outfit. again, this was taken after the military model and you have to remember this is not the military. What the office of the commandant is failing to see here is that there is a fraternal bond that you have with your fish class that you earned corps brass with and was with you all throughout your fish and sophomore year. there is a real trust and respect that is built up and also the familiarity to call someone on their actions. (we did on several occasions)

My last point is also related to this. But, what helped me expand my leadership opportunities was becoming involved in organizations off-the-quad. Being involved in Freshmen Aggies Developing Excellence (FADE) and the SGA Student Senate showed me, and continues to show me, that there is a lack of leadership in organizations off-the-quad. This lack of leadership can be effectively filled by encouraging Cadets to get involved off-the-quad and use the skills that they learned on-the-quad to better these outside organizations (FLOs, Service Orgs, Professional Orgs, Intramurals, Women/Men Orgs, SGA, and many other orgs).

Refer to the last response which covers this as well.

In my previous answer I proposed an objective based plan, with cadet/ mentor teams being responsible to find opportunities. Since everyone is required to do this, the mentor role would work with their peers to rotate these opportunities. When I say objective based, you would literally be required to get a demonstration signed off for example: conducting a uniform inspection, conducting a hole inspection, teaching demonstrating how to set up a uniform, close order drill, etc. Mentors provide feedback but so do peer evils. With modern digital environment we could probably set up a single web app for this.

| Keeping it the same |
| --- |
| more minor/major unit activities (not necessarily PT). Stop telling lower classes that the upper classes are terrible and failures and how you can't wait for them to leave. It's discouraging for us and makes us not want to try. |
| |
| For the freshmen class, leadership is already exercised in a buddy class. It is important for a buddy class of fish to work with and understand how to communicate to each other. I'm my outfit, although we do not have very many fish, we are always experimenting with ways to communicate information and being leaders in PT, in training times with leadership scenarios, and off the Quad as a group. I think individual leadership could be expanded upon in Leadership Laboratory. The whole point of a lab in an academic class is to experiment and see if something works or not. This should be the same with leadership. This is the time we have to put to the test what we have learned about leadership and see if it is effective or not. Freshmen get to lead their flights in LLAB for things like briefings, scenarios, and during PT as well. There are often times to debrief and get feedback on a flight commander or fish flight commanders leadership and what can be improved upon. This is where the intent and purpose of LLAB come into play, because as you practice being a leader of a flight and get feedback, you are bettering yourself and your leadership style. I would recommend if you wanted to expand upon leadership opportunities that are both a way to learn and that have a purpose, use Leadership Laboratory's more. This is something exclusive to the Corps of Cadets, and could be talked about more if what we really want to advertise is "We Make Leaders". |
| Continue leadership development across the class structure |
| Many other military-rooted institutions, such as the Academies and other SMC's (and to my knowledge, formerly the A&M Corps), utilize a rank structure that is not so tightly tied to class as ours currently is. In this structure, it is not uncommon to find sophomore cadets with sergeant rank, and senior cadets with none. Such a system, in my mind, could combat the current issue of whitebelt apathy. Awarding those that shine bright as leaders with rank and job that suits them brings quality people to positions of power. A cadet would have to prove worthy of a rank like C/2Lt, rather than handing the silver moon out to even the most apathetic senior. I believe that this system could work in the following way: Freshmen start out as C/Pvt, but after the first semester, could be promotable to C/Pfc or even C/Cpl, and the jobs that come with them, such as a team leader of other freshmen. Sophomores could be promotable up to an NCO-equivalent tier (with associated jobs within their outfits, staffs, chains, etc.), but could also stay as C/Pvt's if there is deemed to be no reason to promote them. The same sort of scale move on to juniors, who would be able to be on higher-level staff positions, with SNCO or even lower-grade cadet officer rank. But, of course, could still be anywhere from C/Pvt to C/Cpl if there is no reason for a promotion, and so on with seniors. This system, in my eyes, opens up all years of cadets to leadership positions equal to their experience and qualifications as a leader, however, does not guarantee promotion to any sort of rank or position of power if they aren't deserving. When quality cadets are able to seek positions that fit them, the cream will rise to the top, and I believe this would bring some major motivation to cadets of all classes, all across the Quad. |
| Here again- not what you're asking… but assuming everyone wants to be a leader is a huge error. All I ever wanted to be was part of an organization and contribute. For 20 yrs in the AF I never once aspired to be the "boss"; just a contributing member of a great team. |
| I believe that this is a question of making outfit level leadership positions more meaningful. It is easy to allocate leadership to sophomores but whitebelts are a lot trickier. Adding incentives to squad leaders, or even ensuring that outfits treat these positions with value would help. Perhaps another whitebelt only special unit would help. A whitebelt FDT where candidacy is based on measurable goals and values would not only provide more leadership positions, but would entice the RVs to take their role seriously (especially with respect to drill and their values). The Citadel's Summerall Guard is a precision drill unit made up of the TOP 61 Seniors. Instead of being similar to rushing a frat, the Summerall Guard has a clear candidacy process which juniors go through, |

and while their PT is intense, they still manage to complete their mission of conducting precision drill. Something similar here at Texas A&M could be a great motivator for whitebelts no matter their cadet rank.

Maintain an intersectional approach between contract seeking/contracted cadets and D&C cadets. Many contracted cadets do not plan to make a full military career out of their contract and leave A&M with less tools for the civilian world than their D&C counterparts. Emphasize and encourage cadets to keep and maintain their military bearing that makes them attractive leaders while also coaching cadets to hold managerial mindsets in managing people outside of a military environment.

I've said my peace there is no need to change. I believe that I have been given the best corps experience and the hardest. I have learned a crap done and have a huge purpose. I have opportunities that I wouldn't have if it wasn't for that either

Leadership is not completely learned from a lecture but must truly be experienced and practiced everyday in order to be effective. I would love to see cadets given the opportunities to lead fish across the quad in order to practice those leadership skills. Also, I believe those opportunities could help build working relationships between outfits. Those relationships could be used to share ideas in individual outfits on what leadership styles work the best. Another point is leadership positions within an outfit. I think better accountability or less positions would streamline outfits as well as given corps leadership a better understanding of how outfits are operating. I think positions in the outfit dedicated to training should be more effectively taught how to be a good leader and less how to do their job. They were in the corps freshman year so they know how to be a fish but what is important is to teach them how to teach someone to be a fish. And good training will come from good leaders.

We ma6y actually have too many leadership activities for upperclassmen, which dilutes the importance of competence in those skills, or the need to strive to become the best possible leader each Cadet can be, rather than just enough to span from the one below to the one above.

Not everyone in the corps needs a leadership position. I've heard from several people who were put in follower positions under people who did not want to lead and this heavily detracted from their experience. People should never be forced into a position they don't want

By diving up all the work between the classes

I would focus on making sure the leadership opportunities being offered right now provide both learning and purpose. You expand naturally when you're doing well. Forcing an expansion without the infrastructure and leaders to do so will put undue stress on the organization, and ultimately lead to failure.

As a former student, parent of a corps graduate '21 and parent of a prospective corps member I have tremendous love for my alma matter but am invested in the future path the corps takes. I believe strongly in traditions, but understand and accept that not all traditions are great. Some may need more oversight and adjustments, while others may have run their course. What was OK in the past doesn't always age well. I love just about everything about Texas A&M and the corps experience. That being said, I know that a cadet's outfit has a huge impact on a cadet's overall experience. As a parent, I worry almost equally about my future cadet's outfit fit, as his university fit. I can control which university he attends, but not which outfit he ends up in. The wrong outfit could result in an an punch while another may help him become a leader who is not intimidated by adversity. The line is sometimes very fine. Diversity in outfits can be great because it affords choices that fit a wide variety of personalities. However, there are some basic things they should ALL have in common. The basic culture is highly dependent on student personalities and backgrounds, but also on established and enforced parameters. The #1 reason we send out students to college is to get an education. As much as I love the corps, it comes 2nd to my child's education. I want him to have time to study. And I want him to get a minimum amount of sleep for his mental and physical wellbeing. The rest of the challenges the corps brings in order to turn him into a leader, I know he can handle. My only concern as a parent is "additional" corps activities (which vary

from outfit to outfit) that result in loss of study time and/or less than 5 hours of sleep time. I think THAT ALONE would have a positive impact on higher cadet retention and make a March to 3000 a reality.

The proposal you put out actually does the opposite of this. You start leading as a Sophomore with a small number of followers. You have many Sophomores in small-scale leader positions over their element of 2 to 3 Freshmen.

Make the system more accepting of spending time with special units/sports teams/clubs (on and off the quad)/ joining a staff position. Because so often cadets are looked down upon when they decide on other ways of leading outside of their outfit. Additionally, creating more "leadership" positions just adds to confusion and information getting lost, plus unfortunately there are people who are content with not being in one of those positions and if they are then placed there it leads to negative consequences. Plus the true leadership position need to better reflect the makeup of the corps and actually be given a voice rather than selecting a majority contract cadets, which at least gives the appearance of Comm staff selecting them because they can hold their contracts over them to keep them from actually speaking out.

allow cadets to decide what happens in their own corps. Allowing them to decide how the corps runs and the rules it runs by

Sometimes being a leader is a team sport. Less focus on rank and grades. More focus on team building dynamics.

Sq. 21 class of 10-13 had a system which people would rotate morning drills, and everyone was given certain tasks.

See previous response. To ensure that it goes as planned, possibly send out information during the planning process and gauge the corps' response.

Give leadership and decision-making back to cadets. LEARN, COACH, LEAD, INSPIRE is a great model if followed. The way the Corps is run now is DO NOT DO ANYTHING TO INCONVENIENCE A FRESHMAN OR GET YELLED AT BY A BULL AND RECEIVE A RESTRICTED WEEKEND. There is no opportunity for COs to lead their outfits. What is the point of being an "Officer" if all you do is get put at parade rest and yelled at every time you interact with an "Advisor." Expand leadership by letting cadets lead.

The more you allow ranks outside of CO and 1st Sgt to own and be responsible the more all can develop leadership. Most tasks fall on CO or 1st butt. Make sure that a meeting regarding intramurals is attended by the athletic officer and proper chain of command under. Uniform changes or needs - supply officer. Define those roles and responsibilities (Cadets define with trigon suggestions).

True lessons for failure. Don't hold up the Corps standards, leadership can be fired. Next up.

Look to promote from within an outfit first. If proper leadership talent not available, then look outside the org.

More roles for non key leaders that are just as impactful

Separation of classes in relation to military bearing, adherence to respect of rank and chain of command

Through my experience, those who care to hold leadership positions have more than ample opportunity to reach those positions within their time at the Corps. Adding more leadership positions to the Corps cannot help the current structure of the corps, only harm it through increased bureaucracy and decreased group-leading possibilities. The best chance for more leadership opportunities is temporary

leadership roles, like those for Corps sports, organizations, etc, that don't directly affect the organization of the Corps.

Please operationally define leadership. How will you assess whether or not the program achieved learning and purpose?

I think we've already expended these opportunities, especially with the change from major unit to adding the minor units in. I think, if you don't see the fact that everybody is a leader after this year, and everybody is leading in their own way, like the seniors are leading all of the classes, the juniors, the sophomores, and the seniors, the juniors are leading the sophomores and the fish and the sophomores are leading the fish you're not really looking at the corps. You're looking at something that does not exist. I think that he's opportunities are given if you use them. you know being a squad leader even just being a regular upperclassman you are always a leader you're always being watched, and being admired, or looked at.

Create more opportunities for non KLs, people get too hung up on that and when they don't get it they get apathetic.

Provide all levels of cadets with direct leadership opportunities and ways to mentor and develop subordinate cadets. A concern I have with the rumors and ideas about the restructuring is how those not on cadre will develop their own leadership, specifically sophomores, if there are not freshman cadets within the outfits from the very beginning, where is the leadership training going to be coming from. I think the best leadership training comes from having subordinates. In Air Force leadership lab, I am put in many situations to lead my peers, but I feel that the best of my leadership development has come from having fish under my command in directly interacting with them on a daily basis. Some clarification and guidance on this would be greatly appreciated.

Each year should contain experiences to grow in leadership and the experiences should align to the path the cadet is taking - going commissioned versus not upon graduation

Don't make major changes to an organization that is already really good. Really dumb thought process by the commandant

Leadership opportunities are everywhere in the corps. I believe that the opportunities are available for every cadet that is motivated enough to make a difference. However, not everyone gets the same learning experience, and cadets often lack a sense of purpose and give up in their later years. The problem with our current system is that every senior and junior key leadership position in the corps depends on one single interview during the cadet's sophomore year. We call this the "pipeline", because once you get one position, you're almost guaranteed to get the position directly above it next year. The cadets that get large leadership positions are sometimes the best fit, but the lessons learned by the cadets that don't hold large leadership positions their junior year go overlooked. I've seen strong leaders come out of their shell during their junior year, only to become immediately demotivated by the leadership selection process because it is historically impossible for anyone to challenge the cadet that has been in the "pipeline" position. The cadets in pipeline positions, while good leaders, have not experienced the same frustration and difficulty of being in a lower position as their peers. I think that a cadet democracy system could be beneficial, because the people that are in control will be further supported by their peers, and it gives more opportunities and sense of purpose to cadets who want to make a difference.

See answer to question 1. Reward/penalty at the unit level encourages unit cohesion by holding the unit accountable for the success or failure of the individuals in the unit to achieve desired leadership qualities.

Allow the cadet outfit leaders like the 1st SGT and the CO to have more freedom and flexibility with their outfits without the MA's continually stopping, berating and discouraging them from acting out in the position that they once were motivated and excited to work in and for other people.

Keeping fish with their outfits and implementing traits work for certain outfits and see how other outfits and implement those traits.

Stop playing favorites. Cadets who achieve great things in front of commandant staff are no greater than those who achieve great things in privacy. I have seen in the corps cadets who were poor leaders end up in higher positions than good leaders simply because of a five minute interview. I have seen good leaders lose hope of having an impact because of a neverending cycle of whitebelts with no leadership saying that positions don't determine your effect on the people around you while the adults on commandant staff stand by silently. When I think of successes in the corps I think of cadets and not commandant staff. Out of all my buddies it wasn't the guidon or the most outstanding pisshead who got first sergeant, it was my buddy who was an AFTL and not even on guidon chain at all. By himself he changed the course of his corps career even though some other heads stood out more in the beginning of the year. Its an accomplishment to be in the corps. There are basic requirements that you must meet to be a part of this organization and by meeting them cadets deserve respect that commandant staff rarely gives. Stop playing favorites.

Expanding leadership opportunities means building confidence in one's words. Honestly the best way for fish to lead would be to take his knowledge and discipline to make use in the real world. As a fish I was humbled. I learned the real meaning of hard work. This work was put to use by organizing study groups and being a leader to my nonreg friends who were just trying to survive the year.

Implement the commandants plan. In fish training companies have CO's PL's and PSG's. In regular companies, enforce the standards and hold cadets to the standard, or hold them accountable. The largest breakdown in leadership learning and purpose (from the company level point of view) is that leaders cannot (or simply do not) enforce standards.

Is there not enough opportunities now? Encourage cadets to join student organizations outside the Corps.

Train the Trainer Approach:
- Sophomore Leadership Academy
- Rising Junior Academy
- Rising Senior Training
Each year group needs awareness of roles, responsibilities, and training.
Juniors are key -- they are the backbone of the Corps! Both leaders and executors!
Seniors need to understand their role change as well.

D&C cadets deserve leadership opportunities too!
- these are some of the best leaders in the Corps -- future entrepreneurs and business leaders
- These are our future financial backers!

Positions:
- Traditionally there are only a limited number of leadership positions
- Expand roles and responsibilities to those not in direct leadership positions -- assign special project leads -- the staffs and the leaders shouldn't always have to execute each plan or project
- Those not serving in a leadership position or staff should have opportunities to lead special events.
- create special jobs for each year group and conduct interviews

Again, letting the individual outfits handle it. Staff's job should ONLY be management and punishment for the most egregious violations of the standard and laws. Let the outfits choose the best people for the jobs, as time goes on more chances for leadership will crop up and it should be on those who want it to take advantage. Even in the instances where the leader isn't required but is helpful.

| |
|---|
| If younger cadets learn leadership techniques as Fish, require some type of group membership not affiliated with the corps Junior/Senior years. Cadets will basically have opportunities to lead in practical groups with other, lesser trained students. |
| Help the Cadets find mentors that are trained to develop and explore individual purpose and organizational progress. The Corps is a place to learn to fail, learn, and move beyond the reachable into the exceptional. Teach them to debrief properly and put into action plans to improve. |
| Produce more corps and major unit activities together. |
| Revive outfits and keep them small enough everyone has to stay engaged and put out. The large outfit model will not work this is not the military. |
| |
| Contract cadets get leadership roles in their respective ROTC advanced classes. These prepare contract cadets to compete in military evaluations at summer camps.<br><br>Our need is how to handle D&C cadets to pursue leadership roles within the university. We should continue to prepare these cadets for roles in industry by learning skills presented by the business school similar to classes of MBA programs with case studies in leadership in business. |
| |
| |
| The corps already sends out lots of information for leadership opportunities within the corps of cadets. However, there can only be so many positions within the corps before they become meaningless. The corps should also advertise more leadership opportunities outside of the corps, leading those outside of the corps gives a more diversified leading experience. Having leaders from the corps in outside organizations will also help expose more people to the corps and possibly increase the number of people joining. |
| Empower the chains more. No one really takes the chain leadership seriously. Make a social/culture change to make chains more impactful. |
| Allow cadets to make mistakes and learn from them instead of instilling a culture of demerits or rams that are given out as if they're election pamphlets. People aren't willing to take risks or experiment with their own leadership style because almost everything we do is punished excessively. |
| |
| Expand leadership opportunities by creating missions and jobs. The Corps should be good at creating jobs - especially around Aggie tradition.<br><br>I've always viewed the Aggie Corps as akin to the British Monarchy. The Corps takes on all the daily customs and traditions of the university in a very similar fashion. It's a type of service to the university.<br><br>The Corps in itself is the collective mascot of Texas A&M. The Corps is A&M… and the cadets are expected to perform in the same capacity, doing the same things as they always have.<br><br>The Corps is a visible representation of what A&M means and what A&M produces - what we've always produced. The cadets perform a selfless service to the university - and should be given perks (like athletes). This will increase recruiting and retention. Cadets should be rewarded for their selfless service to the school - like priority in course scheduling, priority in parking, etc. The Corps performing all these special services to the school need special rewarding.<br><br>Cadets performing traditional services to the school in a standardized, customary fashion is purpose. Things like raising the flags at the Systems and Academic buildings every morning, escort service of girls across campus at night, performances by the FDT and Ross Volunteers, bugle calls, Silver Taps, Muster, etc. All the traditional services to the university is purpose. Create jobs associated with each and every tradition - and hold upperclassmen accountable for carrying out these services perfectly. |

Deliberate Cadet experience planning across the four years. Perhaps a 4 year plan for leadership opportunities could assist this gap.

We make sure they are involved outside of corps leadership. The corps has so much different opportunities in it. With those coming with more leadership opportunities and most people do not know about those special units. There must always be people to follow a leader. This does not mean that these followers are leaders. They are they might just not have green tabs that tell us they are. The best leaders I have followed while in the corps where not officially leaders but where leaders naturally because I know they care about me. I also think that if we had to pass a peer and subordinate evaluation before we get a leadership position. This will help stop bad leaders who are good at interviewing from taking it away from more qualified people who are worse are interviews.

Not everyone leads the same way, and not everyone leads the same purpose. My leadership style was to be quieter and more meaningful- to this day, this is still who I am. Others lead by being an academic example and there are those who are more vocal. All are appropriate at specific points in time.

Don't presume all want or are qualified to be leaders. Don't try to fix what isn't broken.

It's taught from day one. Not sure more officially recognized leadership roles are required.

The current system is sufficient, the individual outfit smaller roles need to be built up to have more meaning.

More small squad opportunities starting at the fish level and increasing in scope and sequnce by each year.

The MIC/MUC change is fine but putting more of an emphasis on confidence over policy can help with going through transition training. Additionally giving people roles during workouts or spreading the work among a buddy class can help increase involvement and a feeling like everyone matters. This can also help with improving buddy unity as well because stronger teams tend to be built under pressure.

we have 32 commanding officers (granted I'm out of date, class of '96), we have Major Unit commanders and XO's, we have 72 RV's elected every year, I'm not sure why we are lacking in command positions. If you have too many command positions, it dilutes the importance of the diamond.

The way this country is heading, everyone gets a fucking diamond. STOP. If you are great, you get one if you suck, you don't. We need to prepare our cadets for the real world and the REAL world doesn't give out diamonds.

To create leadership experiences each class must have the freedom to carry out their roles without interference. This means allowing sophomores to train and create relationships with their freshmen. Allowing juniors to oversee, moderate and carry this out, and finally giving seniors the ability to direct their outfits in a way which instills the corps and outfit values through every class. Each outfit is unique and strives for different things, so what works for one might not work for others, but where some outfits succeed others should have the ability to attempt to emulate this on their own rather than having the corps push these changes.

Mentorship is jey to developing leadership. Seniors should have executive leadership menors while underclassmen are mentored by those above them. Unit cohesion is critical to this. From FOW fish need to learn to grow and lead in the small group environment of the outfits. The unity that is built within the outfits is paramount to the success of the fish.

Let the outfits grow, foster better care of good ones. Let the COs meet monthly with no intervention or staff and discuss what they are doing. Quit trying to take away that purpose, which is personal connections to fish in an outfit, because you literally see them grow. You remove purpose when you take fish away. No fish wants that. None. At all. Dozens of my recruits are losing interest because of this stupid proposal.

make them do more PT. Why are the RV's not doing PT? Why are the fish not pushing at formation? If you don't make it difficult, the experience is meaningless.

Allowing cadets to make decisions for their own outfits will expand the leadership opportunities and provide greater learning and purpose.

Give cadets a more hands on experience to develop an understanding of what each position does, as well as encourage outside involvement to become leaders in other student organizations. Explain the meaning behind why things are done certain ways or why we do things in general to give cadets more understanding of the purpose behind a position or activity.

Give us people we can watch develop. Allow every upperclassmen to understand the purpose and effects of their words and actions, provide the experience of being a leader with people we will grow to know personally. Grant us front row seats to their development.

I am not sure what your intention is?? There are only so many leadership roles in the organization. If you will let it naturally happen, the leaders will rise to the top. It's just a fact of life that not everybody is going to have a majorly leadership role. Why do you feel it's necessary to expand leadership opportunities?

Transition training for fish needs to start post-brass. They need sufficient time to be confident in taking up their next role, and in this way the corps will not have to worry about sophomores not being competent enough to be cadre for incoming fish. Outfits need to do more activities as whole outfits so that everyone in the chain of command is involved. Even just the little outfit vs outfit competitions during FOW showed the role each person had, and it kept a motivated culture where everyone was dedicated to building up their outfit through unity. Whatever the leadership model, the idea of outfits cannot be thrown out the window. Grouping people into smaller groups where everyone knows everyone and has a chance to be closer individually creates a unity that cannot be described nor replicated any other way. Fish training is important, but the training doesn't stop when fish grow up. Sophomores still have a lot to learn from their juniors, and juniors from seniors, but from what I've seen, classes become less and less involved as they get older. Seniors have the "overseer" role, but this doesn't mean they cannot stay involved with their underclassmen. They may do more work behind the scenes, but the underclassmen really look up to them because they aspire to be seniors. To earn the Ring, the Boots, and to have made it 4 years in one of the most prestigious programs in the nation.

I believe it can only be achieved within a holistic review and improvement within the existing structure of the corps culture and organization. I have no knowledge of the type of leadership development programs currently within the corps process for development of cadets as they grow within their structure but believe that is where more focus should be conducted if there is a conclusion there is a weakness in freshman development.

There are tons of opportunities to be a leader in the corps, and it doesn't revolve around being a commander. Recruiting sergeant, scholastic sergeant, athletics etc all have leadership roles. Special units. Opportunities are abundant for those who actually want to learn leadership of teams. Honestly I was a major unit commander and an outfit commander, and the major unit commanders had far fewer / far lesser leadership opportunities. Because of the outfit culture, which has value, and the fact that we weren't doing « battalion » and « brigade » operations, the real leadership value was at lower levels.

Create a team leader/ squad leader academy and empower our lower and mid level leadership to determine the successes of the individual outfit.

Don't allow pro-forma leadership positions to form, require outfit chains to conduct proper checkups like academics, IG, operations, recruiting etc. these should be more than just titles, actually require work to be done and turned in through these various chains, even BBQ and athletics

| |
|---|
| More training time with more functional training |
| By ensuring people can actually lead, I think there are plenty of opportunities to lead as is, its a personal choice. We have upperclassmen who do a lot of behind the scenes work, in planning or paperwork, we have others who motivate us and lead us in workouts, others who support the outfit in their own unique ways, everyone plays a part. And if you worry about "White-belt apathy", I dont think adding more leadership will change that. Leadership is a choice and privilege and everyone does it their own way, give them the freedom to do so. The corp is supposed to be cadet run, thats why cadets make the training plans, and op orders, and lead major units, minor units, outfits, platoons, squads, and even fireteams. Such a system keeps people accountable while still allowing freedom and development. You only learn leadership by seeing it and doing it, and if you care to, you can lead in any regard. The most notable leaders ive seen this year I dont look up to because of their rank or title, I look up to them because they show that they want to lead and they care about their subordinates. Let the cadets lead as the corp was intended. |
| Standardize not only the leadership positions throughout the Corps, but also the SOP or Duties and Responsibilities for each of those positions. Ensure that each serves a purpose of development so that it is actually and visibly needed. Differentiate these from something that could be seen as an "additional duty." Rotate the upperclass in these positions after the fall semester - with possibly the exception of the "most senior" command positions - but do rotate the various staffs. Look at not only who might be good for a position, but who might also most benefit from the developmental experience of a particular position. Consider how this might vary for an ROTC Cadet versus D&C. You execute many of the same types of activities every year, so it shouldn't be too hard to orient the various duties of the positions towards the successful accomplishment of those events. While it's good to have the Cadets work through some planning/resourcing of these events, don't make them reinvent the wheel - give them problems that are solvable at their level of expertise and ensure the cadre already have the "approved solution" so they can advise or step in to assist when needed to prevent catastrophic failure. It's learning, not "sink or swim." -John Horning, COL, US Army |
| I believe this is looking at leadership the wrong way. Rather than try and create more opportunities focus on developing the idea of creating your own leadership and that you dont need a rank or command position to be a leader. Good leaders find a way to lead no matter what. One of the best leaders I had as a fish (and all my buddies would agree on this) was a no tab 2 moon good who was the outfit training officer. Despite not being in anyone's chain of command he was an engaged leader and we always felt connected to and inspired by him. Additionally, neither the real world or the military will create leadership opportunities at your convenience. Some people will get high-ranking positions, some won't and the people who don't need to learn to lead without holding a rank. |
| Provide more leadership workshops or conferences for the cadets. A lot of cadets will go through their 4 years and not be able to be a 1st Sergeant or CO. The pisshead role is a great way for them to see the direct results of their hands-on leadership from a small scale, but after sophomore year, a lot of cadets don't ever get that large-scale feel of leading a unit. Leadership conferences, even if it's a corps-lead conference could offer cadets more experiences under their belt. |
| Just let cadets make mistakes. Give them the room to learn. You are actively taking away learning opportunities. |
| |
| Eliminate the nepotism. There is a general understanding of the cadets that there is a biased towards certain cadets when interviewing for leadership positions. Now the problem has been expanding by creating more tiers of leadership as well. There is another stigmatism towards taking on a staff roll. We often see that the support positions don't even have a real roll. What exactly does a PR officer do on a minor unit or major unit level? Nothing unless they are motivated to.<br>The same goes for Minor Unit and Major Unit Command Teams. They just pass down information that come from above them. There isn't any leadership until you go down to the outfit level at CO, XO, 1st SGT, etc. These positions are the only ones that get real leadership experience. FTL's learn how to communicate effectively with their fish and hold responsibility for them. PSG's learn how to delegate responsibilities and trouble shoot problems that may arise with conduct of their subordinates. Platoon |

Leaders finally are able to lead from the big picture point of view. They can be given or create a task to communicate towards their subordinates and see it out to completion. These could be a goal of Career Readiness points, academics, or physical fitness.

Growing the Corps to 3000 means that these positions on the outfit level now have a greater responsibility. They will now have more underclassmen below them. Putting an emphasis on the cadets a these levels will give them a greater sense of not only identity in the Corps but also their outfit. There are outfits in the Corps that hold platoon competitions where the freshmen to the seniors are all competing together against the other platoons in their outfit. A purpose will be instilled within these cadets. Therefore, leading to greater retention. Cadets are competitive with each other. Allow competition to make life in the Corps fun!

Put less emphasis on more prestigious leadership positions and instead emphasize the value and importance of every cadet, especially white belts. They should all feel an obligation to set an example, mentor, and lead regardless of position. The most influential leaders I had in my Corps days were rarely my CO or First Sergeant, much less anyone from Staff. The leaders I looked up to were the lower ranked white belts that spent time observing and interacting and caring about the outfit. They may not have had the highest grades or had the most ribbons but they damn sure had pride and they cared about the fish. There were bad leaders as well and I learned from them what not to do and what I didn't want to be. Earned respect is the greatest commodity, Stripes or Diamonds are great but it's important that every white belt feels a responsibility to lead by example and pass on knowledge. Servant leadership.

It's also crucial that leadership roles are determined by students as much as possible. There is no greater sense of pride than knowing your upperclassman chose you to lead and Officers should only step in when there is a real problem. The more that you are chosen by your peers or by the upperclassman that interact with you regularly the more meaning that has and the more respect it will garner. When the Commandant's office or Trigon makes those selections the natural reaction is to assume politics influenced them and there is less buy in and respect garnered, thus that should be limited as much as possible and primarily focused on the most senior positions, hopefully even then more for guidance than decree.

One of the best things about Texas A&M is the many student organizations that the school provides. I believe the Corps should encourage cadets to get involved outside the Corps. There are incredible student leaders outside of the Corps. I was blessed to serve on the Muster Committee when I was a senior. That was a great experience and showed me leadership in collaboration with others.

The Corps needs to encourage students to engage in student life outside of the Corps. There are obviously leadership opportunities there, but also leadership by setting the example. It also shows non regs what great students, leaders, and representative of the University cadets can be.

More intentionality on call to action at events. Give cadets additional materials to look in to if they want to. A lot of the leadership things we are taught seem "cookie cutter" or are things that we hear all the time anyway. I'd like to see more opportunities to interact with Cadet Advisors because I'm sure they have a lot to teach that I'd like to learn. It would also foster better relationships between cadets and command staff.

meet the students where they are. Find out the things that are important to them and create leadership structures around those events, functions or ideologies. Many of these things already exist, think about recrruiting, academics, retention efforts, physical training, drill, social and networking opportunities.

See my previous comment. Interconnected training times and opportunities for upper leadership from across the Quad to discuss leadership challenges and traditions will help us all understand each other and improve. From there, the experience given to fish and sophomores will also improve.

Please see previous reply

Allow outfits, special units, and major units to establish their own leadership positions. Like the military, existing leadership positions can't just spontaneously expand their scope of power and still maintain a healthy status quo and relationship with their people. Additionally, mandating certain positions to conform to an agenda can create more leaders, but not more passionate or involved leaders. From my

experience, the vast majority of people in CR positions found them more of a chore than an opportunity. Allow these smaller groups to create roles that fit their needs, and if you must create roles, create a democratic governing body that can at minimum vote on recommendations to be made to the Commander. The Corps is designed to prepare cadets for more than just the military, so this kind of involvement, while not realistic to the military, could be valuable in other fields

By giving the sophomores more opportunities to teach and lead the fish, this will naturally open up more opportunities for white belts as well.

The first thing that has to be done is to specifically define what a leader in the Corps is. once that is done, counsel the leader by putting it in writing as an initial counseling session where the expected duties and responsibilities are spelled out for each leadership position. Then have routine follow up counseling sessions throughout the semester and year to gauge performance. Make it part of their grade for their Military Science class or their Drill and Ceremonies (or whatever it is called now) class. This is basic duties and responsibilities any NCO should know.

Ask the Cadets prior(what they wish they had but did not get), present, and future what they want to accomplish in the Corps.

A unexplored way to expand leadership opportunities for leaders in the corps is allowing cadets the opportunity to practice training and learning skills in every single day of our lives . The best leaders are going to put themselves to be out into positions of leadership and power. however now all leaders are equal and some people will be in a place where they can lead others directly and more often. Expanding leadership opportunities I believe can be done through special units and organizations outside the few direct positions within the corps and outfits. it falls on the individual is the bottom line cadets who want development will find it and benefit through resources in the corps. Refining SOMS plans and leadership workshops throughout the year could benefit cadets in some ways however the current development process develops hundreds of sought out cadets who are very successful each year. Drastic change in leadership responsibilites in the face of how successful cadets often are outside the corps would detract from the corps vision.

Leadership opportunities within the Corps may not require expansion. Purpose should be clearly defined for each Corps leader, so that learning can be measured against goals, objectives and expectations. Those upperclassmen not involved in Corps leadership roles should be encouraged to pursue leadership roles in other student organizations or student government. This approach may broaden the influence of the Corps across the campus. Please keep in mind that members of the Corps represent less than 5% of the student body.

Please see answer#1. I very much like the idea of more intensive training for 2nd Semester Fish and 1st Semester Sophomores. Would volunteer to be a part of a workshop to bring both Military and Civilian business experience to the table if asked. I have been blessed my entire Military and Civilian career with the lessons learned in the Corps.

To put it shortly education. When I was in the Corps I would say the most limiting factor to cadets getting involved was the knowledge of what opportunities they had available. There was always MSC Open House but honestly, most people didn't attend that because it was in the MSC and required them to get into Bravos. If there was some sort of event for only cadets maybe held on the Quad that they could attend in nonregs and allowed them to ask questions or learn about everything then I think the number of cadets joining other organizations would exponentially increase. It is not as if there are limited leadership spots in the Corps, it all comes down to what people know about each organization which is usually via word of mouth from buddies or upperclassmen.

Like I said in the answer before, you replicate what the outfits who have figured out how to be voted on by their peers corps wide to lead them are doing across every outfit on the Quad. It's not complicated and you don't need all the fish in the same dorm for 7 weeks to do that, there really doesn't have to be a sacrifice here, there has to be an enhancement of outfits having a culture. Furthermore, If you actually want cadets to have leadership opportunities, how about you as commandant staff stop picking the leaders. Y'all aren't dumb, and you know perfectly well that no student organization operates where 40-50 year old men gather in a room and decide who they want to be their "yes men" at the top. That is so

insanely backwards. If you want to see an incentivization for cadets to lead, don't set up the leadership roles to be a catch and something to dread because you are picking them to do your dirty work. Let the corps vote on who should be their corps commander, and their deputy, and their chief of staff, and you'll be shocked at how many cadets are actually here for the reason you want them to be here: to learn how to lead and embrace opportunities to lead.

Don't abandon non-cadre cadets. If you only allow 'fully trained and certified', aka the chosen few, to interact with freshman, you are denying the vast majority of cadets the opportunity to practice leadership. It's also a good idea to keep outfits relatively small. The band recently went from 4 outfits to 6, which increased the number of leadership positions by 50%.

Is it true you threatened to disband the RV's if they didn't let you choose leadership roles? Have you lost your mind?

A&M has 1000 committees for non-regs. If they are not in a leadership position in the Corps, and want to be, they have many other campus positions available.

Learn to follow, practice to lead.
Reinstate official Corps support of Bonfire, thus providing additional leadership opportunities with practical application.

One thing I was thinking is that with the Corps expanding, make it so that a cadet cannot have more than one position if the numbers in the outfit/staff allow. So, if a cadet is a squad leader, they cannot be a training sergeant too. That will allow more cadets into leadership positions. Another thing that might expand opportunities is that the leadership changes every semester (like the NROTC leadership) but I'm not too sure about that. The MUCs, BUCs, and COs each have a vision and goals. Switching it up would make that more confusing. Another thing that would help regards sexual assault cases. I know of several cadets who were involved in sexual assault/harassment (the attackers) and basically got away with it. Some of them even went on to be commissioned into the military. That allows for more attitudes and actions not befitting a member of the Corps of Cadets to thrive. Cadets will see that they did not get that harsh of a punishment and do it too. The same goes for hazing. I know of several people who while on conduct probation still got into special units and one got into a university position (they did not participate during their probation but they did not have to apply again like others who were under the same punishment). If you want to make leaders of character, you first have to make sure the cadets have good character and not allow those with bad character to stick around and badly influence others. Talking to the cadets or allowing the cadets to speak (like this feedback form- thank you by the way) is a great way to answer these questions. You just need to be careful because there are sadly some cadets who are immature still and others have the wrong mindset for the Corps. I want the Corps to thrive and I agree it needs to change. I just don't think the Fish and Sophomore Academy is the way to do it. The briefs the fish and heads have been going to are great (I think). I just think they don't see how it would help them. I think they get tired of speeches. That problem is something I have still yet to find a good solution to.

To expand leadership opportunities within the Corps and ensure that each leadership experience is both meaningful and educative, a strategic approach could involve restructuring the current organization of outfits to form larger, full-sized company units. This restructuring aims to enhance the scale and scope of leadership experiences, providing a richer environment for development and application of leadership skills.

1. Broadening Leadership Roles: By transitioning to larger company units, we inherently increase the number of leadership roles available within each unit. This expansion allows for more cadets to take on various leadership positions, from squad leaders to company commanders, thus diversifying the leadership opportunities available to each member of the Corps.

2. Enhancing Team Dynamics: Larger units foster an environment where cadets can experience the complexities of managing more extensive teams. This setup mirrors real-world organizational structures more closely, providing cadets with a realistic understanding of leadership within larger groups. It offers a unique opportunity to navigate the challenges of communication, coordination, and motivation on a bigger scale.

3. Implementing Small Team Leadership: Despite the increase in overall unit size, the emphasis on

small team leadership remains paramount. Within these larger companies, cadets can lead smaller teams or squads, ensuring that the leadership experience is both intimate and impactful. This structure allows for more personalized mentorship and guidance, as leaders can focus on the development of their team members closely.

4. Structured Leadership Development Pathways: With the formation of larger units, the Corps can implement structured leadership development pathways, guiding cadets through progressively challenging roles within their tenure. This pathway ensures that each leadership experience builds on the previous one, providing a clear progression of responsibilities and learning outcomes.

5. Increased Engagement in Complex Projects: Larger units enable the Corps to undertake more ambitious projects and activities, from complex training exercises to extensive community service initiatives. These projects not only provide practical leadership challenges but also allow cadets to see the tangible impact of their efforts, adding a sense of purpose to their leadership experience.

6. Fostering a Culture of Excellence: The shift towards larger company units necessitates a culture that values excellence, accountability, and continuous improvement. This environment encourages cadets to strive for high standards in their leadership roles, promoting a Corps-wide ethos of excellence and dedication.

By reorganizing into larger, full-sized company units, the Corps can significantly expand the leadership opportunities available to every cadet, ensuring that each leadership role is both a learning experience and a purposeful endeavor. This approach not only prepares cadets for the complexities of leading in diverse and dynamic environments but also reinforces the Corps' commitment to developing capable, versatile leaders for the future.

I was D&C for the CHALLENGE of the Corps. Don't make it for the WEAK!!!

"ensuring each experience provides both learning and purpose?" - This is an interesting phrase - if the task/role is of importance to the organization vs. some meaningless position then by definition it will have a purpose, and to the degree that the task requires specialized training find an expert to teach, and empower leadership to implement. It is not that challenging to design...implementation requires discipline and organization.

I am class of '86. There were ample roles within the outfit for cadets to lead, we had academics officers, PT officers, inspections officers, etc. Have those roles been eliminated?
There were various staff positions, positions within Corps organizations (RV, etc).

Are we looking to solve the problem that not everyone is getting a 'participation ribbon'? I hope not, the civilian world is competitive, not everyone will be the CEO, I am certain it is the same in the military service. Our country is merit-based!

What am I missing? What is the specific problem that needs to be solved?

There is a                                    . Don't let this woke BS infiltrate the Corps. If my daughter was in an outfit with this guy, I'd make her switch outfits.

I think maybe rotating leadership can give people the opportunity to grow. Put those that meet the standards for leadership and then once they get experience, they can mentor a new person in a similar position the following semester. Make it semester based. Or after fish year, offer a ranking system not based on seniority but based on merit.

We can expand the leadership opportunities for every leader in the Corps by defining roles for each leadership position with a brief SOP. If COs set expectations with their squad leaders, fire team leaders,

platoon leaders, etc., then each role can be imbued with purpose and executed with buy-in and accountability.

We can expand the leadership opportunities for every leader in the Corps by defining roles for each leadership position with a brief SOP. If COs set expectations with their squad leaders, fire team leaders, platoon leaders, etc., then each role can be imbued with purpose and executed with buy-in and accountability.

Supervise their leadership, but don't take it out of their hands. We learn from our mistakes, not by watching someone else do things. As a teacher, I can tell you this generation needs to be able to do and not just listen to people and watch.

Depends on how you define "leader". All upper class men should have a leadership position.

Make SOMS immersive. I've seen many cadets fall asleep because it's a boring, long 50 minute lecture, and then it's done. If teachers would do in class activities like Kahoot, or fun improvisation with cadets practicing and critiquing the leadership of each other, then the class would be more interesting and students will benefit from the active exercises.

As with previous answer - leadership starts with taking responsibility for your actions. Each level of leadership requires higher levels of responsibility due to the number of people below you relying on your leadership. Freshmen need to be given opportunities to be responsible - all the time. This is much more than making your bed, proper uniform, shined shoes and brass, learning and memorizing campusologies. That is the basics. Outfit leadership should find other opportunities for Fish to be responsible. When I was a cadet in the mid-90's (I'm class of '95) we had a Whistle Jock that rotated between us Fish. The Whistle Jock was the leader of his class for an entire week Sun-Sat. There was a set of assigned extra-duties that had to be performed by the class and the Whistle Jock's job was to ensure those things were accomplished. The upperclassmen would add/remove items weekly so that the Fish class had to reevaluate weekly how to get the job done.

Every class should have varying roles and responsibilities assigned. As classes progress, more responsibility is assigned/obtained.

Have leaders training others tested for competency and motive before placing them with cadets. Cadets at any level could "test in" and prove to be better role models regardless of class level.

Return the outfit leadership decisions back to the outfits. Outfits are currently led by COs chosen by the Commandant's staff, not the cadets who know them. This leads to COs who are good at "managing up" (playing politics, sucking up, "yes-men") and not necessarily good at leading people. The leadership positions in the outfits currently are meaningless because so much of the decision-making is directed from the top. A cadet-led corps doesn't have this problem.

The new Commandant has been a major disappointment in his leadership of the Corps. "Compliance over morale" is not a core value of the university or the Corps. He seems to be great with donors and ol' Ags (until now) and riding around with the PMC in parades, but his management of the actual Corps has been abysmal. If I had a high school student, I would not encourage him or her to join the Corps if this plan goes through.

Create committees and subcommittees that each cadet must serve on. These can be within many different organizations on campus or within the Corps itself.

My son, and I believe other cadets would be willing to speak to the Commandant personally and confidentially, if it could be done in a way that no one would know who said what. The fish cannot risk sharing their transparent experiences, personal thoughts and ideas without the commandant somehow "randomly" selecting cadets for interviews. Truly the specific feedback would have to be kept confidential. Otherwise, the fish would end up having to punch.

My cadet is a leader among his peers, and always has been, but even he knows he cannot seek out leadership to share feedback, due to the potential repercussions.

We should expand on the chains that each outfit can attain in order to diversify the leadership opportunities of each cadet based on their general interests or opportunities to learn from.

Checks and balances. The suits arising before Christmas highlight a lack of checks and balances for who was in charge.

Leadership opportunities are provided by the expert and watchful eye of the adult leaders. The student leaders are more likely than not to choose their "kiss butt or yes sir" type. Those that are doing right and ensuring things are handled property are passed over many times because they are getting the job done and not kissing butt.

I believe that the Corps does not have a problem with leadership opportunities. There is a multitude of ROTC, special unit, and other university organizations that a cadet can gain leadership within if they do not receive a Corps leadership position. I do not believe that the solution to this problem, if it exists, is to create a "Fish Brigade" for more white belt positions. This will only result in a weaker cadre that does not live with their fish and has no personal connection with them.

Hazing does not equal leadership

Expanding leadership opportunities is truly not necessary. Good leaders will utilize their people well and place them in roles suited for them. Emphasis on the utilization of chain of command and not placing everything in the hands of the first sergeants, sergeants major, and commanders is what is needed. Expanding key leadership is not what is needed; emphasizing proper dissemination and chain of command is what is needed.

Nobody trusts you anymore. You are an E-1 Frog and you weren't an RV..and you want to get rid of the fish year and the RV's. Maybe because hey, you turned out great! But you know what? So did a lot of RV's from the past. We do it the Aggie way and it works. Don't fix what's not broke!!

The five bases of power are legitimate, expert, reward, coercive, and referent. In my experience in the corps, the leaders who have had the greatest impact on me have used referent power. I have had leaders who were not on the cadre or even wearing green tabs give me much greater nuggets of wisdom and teach me how to lead much better than any commander has done. This was only available to them because as a freshman and sophomore, I lived with them. I saw how they lived their lives and walked the walk along with the talk they talked. Many times as an upperclassman in the corps you are not utilized to fulfill the management side of leadership. In these times it is your responsibility to be a mentor or an inspiration to the classes below you. Taking away even a few weeks of this ability puts the relationships between underclassmen and upperclassmen at risk. These formative weeks are when they need the most upperclassmen around. They may need to see the "one moon goon" and watch how he focuses more on school than anything else. They may need to talk to someone who has chosen not to contract or someone in their major. The corps development model only works if all four classes are

present and active. In terms of actual training environments, the answer is clear, have a greater presence by the staff. I have seen very little of my staff and do not know where they go or what they do. If we assign the staff to PT and train with outfits that are not their home outfit they are much more likely to report when things that shouldn't happen do happen. This will also change the general corps view of staff from people who hide from outfits to people who want to better the corps. I also think that as cadets we have lacked a watchful eye on our own training plans and what actually happens.

Every level of leadership should have no more than 3 to 5 people they are managing, from the Corps Commander down to the fire team leader. This broadening of the pyramid will create more leadership positions. These positions must have significance and can't just be middlemen passing down information from on high. That translates to what we called Sgt's time in the Army. I'm sure the other branches have it as well. Build that into the training schedule and make it sacred.

Subject matter experts for specific training. The biggest one that stands out to me on this is PT. PT should be structured to accomplish Corps standards and specific goals of the outfit. I am sure there are a number of NCO's who would be able to teach cadets how to put together a PT training plan and help them execute it. This could be built into each outfit's leadership structure and added on as additional duties at higher levels.
These SME's could be expanded to include many areas and give cadets something to own and learn from their failures and success.

Every level of leadership should have a training class they have to complete to be put into that leadership position. This should be a nested objective of the leadership courses taught in the SOMS classes. As a freshman you are working to complete a course that will enable your leadership position at the sophomore level. OJT works and is heavily relied upon both in the military and the Corps of Cadets, but when it fails it fails dramatically and usually with significant fallout.

Return more meaningful decisions down to the cadet level. Embrace the subsidiarity philosophy: "matters ought to be handled by the smallest, lowest, or least centralized competent authority rather than by a higher and more distant one, whenever possible."

Please read this. This is the whole purpose of an outfit. Without outfits, I would've never gotten the chance to lead anyone. I was able to lead because I had juniors and seniors watching over me when I was a sophomore. I was able to lead as a junior because they taught me well, and I knew the limits of my people. I will be able to lead as a senior because I will be able to watch my peers, correct them as necessary, and make sure the class of '28 is safe, taken care of, cared for, well-rounded, and developing life-long skills before they learn them the hard way.

Limiting the size of individual units. Considering other corps wide extra units, like FDT, Parson's Mounted Cavalry etc)

In every organization there are going to be leaders and there are going to be followers. Seeking to make more leadership positions for the sake of "leadership experience" is how you flood the system with too many people thinking they are in charge. Not everyone is a leader. Period, hard fact of life. I think the perspective needs to be more in the mindset of "how do we create experiences where people are forced to make their own decisions for the betterment of an organization". Giving everyone a part to play but by no means making everyone "a leader".

The less management from commandant staff, the more responsibility falls onto cadets. When this happens, Staff on every level would have reason to have more people to spread the workload and keep it reasonable. This provides a multitude of positions for people to fulfill and practice leadership on a larger scale, managing more people and learning to handle admin and morale. This is for the leadership on paper. In practice, cadets simply require the time to practice with their people. Training times, whether its learning room and uniform standards, drill, or physical training, is when people are actively

practicing their operational leadership. The more space cadets have to actually make decisions based on the needs of their people and requirements of the organization, the more learning and leadership can take place. For purpose, the Corps can be a military organization without requiring military contract. The training can have the goal of producing the best officers in the nation, or to allow DNC the challenge of participating in a military environment and lending their strength, learning leadership, to then bring into the civilian sector. Challenge creates the purpose, and it allows people to feel the satisfaction of making it through something so challenging. There is an identity gained with the organization in a big challenge, and completing this challenge is a sense or pride that is difficult to replicate anywhere else. For many people, this is one of the big reasons to join the Corps.

My previous answer delves into this, so I won't repeat myself, other than to say, every cadet deserves a good leader, and every cadet deserves to learn how to BE a good leader – even if they don't hold a significant position. In the business world, you often see this called "leading without authority" and it's the idea that everyone can lead others through their own actions, regardless of whether they are in a management role.

This can and should be taught and demonstrated for each class year, and mixed into every teaching opportunity.

Class-specific opportunities for teaching and learning should be created, beginning at the first of the year before classes begin. FOW-like opportunities should exist for all cadets, at every level, before semesters begin. It seems we often look to the academies for inspiration and best practices -- this is one we can borrow from them. They start training much earlier in the summer than the Corps does and, as far as I'm aware, those opportunities aren't confined to cadre and new students only.

Every cadet does not need or desire a formal "leadership opportunity." You're trying to force a solution onto a problem that doesn't exist. Cadets are in the Corps for many reasons and many have significant academic responsibilities or leadership in other student organizations (like SCONA). So DON'T try to force a formal Corps leadership position on every cadet.

By removing the bulls from the equation. If the bulls are constantly micro managing everyone like the proposals you were trying to sneak through without outside input, then of course there will be less leadership opportunities. It's not rocket science. Encourage a decentralized structure and allow your outfits to select their own leaders. Stop trying to decide everything for everyone.

It used to be: "Meatballs do it on the run"
Now: "Meatballs don't do it on the run bc the commandant won't let them do PT"

Current setup allows the student leaders to lead. Micromanagement by adult leadership undermines this. I ask you a question in turn, how can the stakeholders and donors trust the adult leadership after this situation?

Not everyone is going to be a unit leader. There simply aren't enough spaces. One way to expand the opportunities is to institute project or initiative leadership opportunities. Project management/leadership is a great way explore how to build a team and lead and celebrate success. Recognize leadership.

From someone who was in the Corps and has managed countless employees over the last 20 years, not everyone has the drive to be a leader. Leaders are born, not made. So if you are trying to turn every cadet into a leader then you will always be disappointed. However, by earning Corps brass and Outfit brass, the toughest and most memorable part of the Corps experience, the true leaders will emerge out of each outfit's fish class. Those are the ones the upperclassmen must identify and mentor to be the leaders of their class when they are Pissheads and beyond. There could be some leadership positions created other than 1st sergeant, guidon bearer, etc. that allows other class leaders to lead by having specific responsibilities. Maybe someone in charge of PT workouts or improving marching standards, or making sure dorm rooms remain at a constant standers, etc. Cav, RVs and other special units provide these opportunities but if a cadet doesn't join one of those it is sometimes harder for them to find their way. The upperclassmen must identify the strengths of the leading fish and assign them those positions.

Again three words: trust, discipline and responsibility.

This question seemingly assumes that we should approach every member of the Corps of Cadets to

have potential to become a flag level officer in any of the military services.

If every member of the Corps were a leader, who then becomes the led?

It also begs what is "expansion of leadership opportunity"? Are we actively seeking more and more positions of authority? ("again where everyone's a winner"?)

If we continue to dilute authority, where lies its importance.

At one point in time only those in command leadership positions wore green tabs. Now in the "everyone's a winner" environment, we copy the Army and give them to anyone in a leadership position.

Or are we now looking at a new metric, in terms of the numbers of leadership positions?

I'd say that the responsibility of being an effective leader resides with every upperclassman wearing a Corps uniform regardless of position. Having said that, there are also varying degrees of interest to exercising authority or leadership. There are also limits to authority when serving in a position of leadership.

Perhaps the real question becomes: are we really developing leaders, (operative term "developing") or merely introducing cadets to resources so they might become more successful in life?

The question also might be re-worded to reflect: "…leadership opportunities for every member of the Corps".

Not everyone wants to be a General, Admiral, CEO. The desire to lead and accept responsibility, exhibit trust in the absence of supervision and the discipline to act and execute properly is a heavy demand. Cadets once did this with little interaction with the Trigon. Yes, abuse most certainly abounded, but those failures were also learning opportunities.

But not all are willing to accept, nor seek this demand.

Finally, the question almost suggests a "cookie cutter" type solution. Leadership application varies with the individual

By encouraging outfit leadership to delegate to the people under them at times in order to allow people to work on what they are passionate about.

Again, I would involve Cadets in the process of developing leadership curriculum for the underclassmen, as a SOMS credit or stipend position/option. I also think that lower echelon leaders (Platoon commanders, Training Sergeants, Squad leaders) need some curricular development to help define their role (I.e., spend a day with Captain Quandt learning about the critical role Squad leaders play in the Marine corps, look at historical examples and recognize the historic background and important link of the role).

In addition to that that though, the Corps needs missions! We can't continue on saying that we just march and "train fish". Train them to do what? Maybe we should incorporate military exercises somehow; even for non military seekers it's important to know how to logistically plan and coordinate efforts and accomplish ORM. We should do Corps FTXs and combined exercises on a semi regular basis.

To those who say military-style exercises aren't a viable mission because of our D&C populace, here is my response: If people are joining a military based culture for leadership development, it makes sense to do military-style operations or exercises to learn. It would be appropriate for me (a military contracted cadet) to join something like say, student senate, to learn to run a political campaign for the purpose of gaining skills that will make me a better military officer, even though that political campaign may bear little resemblance to my career aspirations. We shouldn't to cater our mission set and operations to the

civilian career field, if people wanted those types of cultural models and style of "mission" they would have joined a more appropriate leadership development organization.

# How do we reconcile the perceived disparity between the individual outfit experiences and overarching Corps standards and values, without diluting the identity that so defines the Corps experience?

Having a certain amount of objective performance measurements that will keep outfits accountable to what the corps must teach. It is important to actually enforce these standards, harshly if necessary.

If a cadet doesn't pass their pt test, they should be removed from the corps. If all of an outfits fish fail their classes, they should be disbanded.

The outfits should be given the expectation of performance, given the opportunities to coarse correct if necessary, and punished if these do not occur.

The different experiences of outfits, so long as they all result in the same corps objectives is a good thing. It makes the corps rich and deed in character. Allowing outfits to take different training approaches it what allows of leadership, personal responsibility and development.

https://texags.com/forums/16/topics/3445742

Allow companies to have a MAJOR say in their individual unit leadership and embrace those diverse outfit personalities. It is a good thing that units have different strengths, weaknesses, and cultures. Some focus on intramurals, some on heavy ROTC involvement, some are engineering outfits. THATS OK. Also establish more male only companies.

You let the outfits remain individual and keep their fish

Being in the Corps and being in a specific outfit gives us the opportunity to have some sort of drive. The buddies that you make during FOW are your lifelong friends.

More inter-outfit competitions and events

Ensure that the Standard is the defining document that unifies the entirety of the Corps. Too many times have I heard that "we don't do that in our outfit"
or "that's just how we do things in this outfit" even when the Standard explicitly says otherwise. Room standards are an excellent example of this, with different outfits imposing different standards. It makes it difficult to have a unified Corps when portions of the Standard are explicitly ignored.

Stop lying to the cadets and actually make plans that equip and prepare us instead of removing any form of positive impact that we have. There is nothing that the commandant staff has done this year to increase moral and retention. The fish are leaving because there is no future in the corps with this projection. The only reason I haven't punched is because of my navy contract. I do not want to be in a corps that treats its cadets like this.

Individual outfits promote hazing, end of story. But over bearing Corps staff makes "leaders" simply follow orders passed onto them, and scream it down on the people below them.

Where is this perceived disparity? The outfits create the competitiveness and family within the overarching corps. Everyone is a cadet and should live by the values of the corps and university, and follow the outlined standard. This has nothing to do with the outfits.

By pushing the standard not taking the fish away.

Stopping making the overarching Corps standards things that outfits feel like they have to fight. If the attitude of the Commandant is one that the outfits disagree with, of course they will fight back. Instead, let large scale workouts become an event that happens weekly or biweekly, that cadets look forward to.

Outfit experiences have gotten too large. I agree with the fish brigade idea as long as it is measured. I think FOW should be at least 2 weeks. We are not training soldiers here we are teaching adults how to march, shine their shoes, and communicating the overall Corps values. The fish Brigade idea needs to be toned back but I think it is part of the solution. The other half is patience and greater discipline for those who breaks those standards and values.

Have a baseline standard for the corps and make it higher than what it is now. Then, allow outfits to set even higher standards if they wish to do so. The major issue with overarching corps standards is that they are low and disappointing. It's incredibly easy to make it in the corps by doing the bare minimum, and that's why people feel more attached to their outfits as outfits can hold their cadets to a higher standard

I'm not sure I see this issue. Outfits should be unique in their development. Some outfits prepare people for the military, some are more focused on stem activities, and some are focused on preparing people for the private sector. Every commanders intent should be checked to make sure it aligns with the universities corps values, but at the end of the day, we're all in the same corps and we all have respect for one another no matter their outfit/culture.

It first starts with having a cohesive vision of that corps is across the board from our MAs and OAs. As a cadet I do often hear about one thing that is going on in the wings that is okay to MAs in the regiment. There is no cohesion across what they want from cadets. OAs and MAs need to be better trained to know what is expected of the ENTIRE corps.

Secondly what is the corps experience. That is a term that gets thrown around a ton but doesn't have a definition. This term needs to be defined so that cadets can execute. Until it is defined we will continue to give new cadets the cadet experience we had as fish.

Look back at the early 2010s and see what was working for the corps then. It was bigger than we are now and was producing quality cadets over just going for quantity. While the March to 3000 is great, it is only beneficial if we are producing quality cadets with outfit pride.

The corps experience is defined by outfit identities, it has always been this way. Any possibility of an overarching corps attitude, experience, etc was lost with Earl Rudder. All males and integrated outfits cannot be held to the same standards as one will be pushed too far or one will be dragged down to a lower level. This is pure science, not hypothesis. Without giving individual leaders the ability to tailor their leadership styles and methods, not a single leader will be built within this quadrangle.

We keep the outfits intact but ensure they are very aware that unacceptable performance will result in corrective action within the outfit.
By providing metrics for performance, providing opportunities for evaluation, encouraging cadets to engage off the Quad, providing guidance (not instruction) on these options, and imposing localized corrective actions to ensure compliance, Corps standards and values will be emphasized as the floor with the expectation that falling through the floor will have unwelcome repercussions.
This means providing monthly metrics on performance of the fish as a class - retention, grades, military performance, and -- big one -- campus involvement. Fish cannot just sit in their hole when not in class. The metrics should be adjusted monthly in light of expectations, such as a reduction in attrition throughout the fall semester from the end of FOW to the last day of the fall semester.
Metrics for performance will ensure compliance with Corps standards. Feedback from cadets will likewise

ensure compliance.

As part of a regular monthly evaluation, cadets could identify what leadership positions they have on and off the Quad are any positions of interest to them. The Outfit Advisor, in reading the monthly surveys, could provide a link for that cadet to learn more about the leadership position of interest.

Feedback from Outfit Advisors can raise retention by recognizing those on the bubble and determining if a transfer to another outfit is the solution.

Corps values are provided as an expectation. Failure of an outfit to uphold those values, whether based on Rams or on feedback or on observation, will make clear those values are more than words.

The Corps experience should be more than the outfit experience, so part of every Outfit Advisor's job must be to review the extent of out-of-the-outfit involvement by every cadet. Has the cadet joined a pre-professional society, a council, any on-campus organization, or any speciality units within the Corps. Well-rounded means get off the outfit hallway and get involved.

Nowadays, that involvement outside the outfit is going on the resume. We need to encourage (expect) involvement outside the outfit, whether in the larger Corps or on the campus. This is how cadets get jobs or positions.

Notably, the concept of intensive time-specific metrics, regular evaluations and sharing of expectations, including leadership off the Quad, does not require the logistical challenges contemplated in the announced concept and remains consistent with the representations made to current cadets and - most importantly - prospective cadets and their families - over the past two years.

As someone with a home outfit of a strong and mostly healthy outfit culture, people are worried change will mean the death of the place they call home. I think there is room for both an outfit experience, while still pushing a larger corps of cadets experience.

Happy medium -> Fish Academy WITH fish living with their respective outfits. I think we do a lot of good things during FOW and a lot of issues then arise when the rest of the Corps returns. If we were to expand the "FOW experience" and have these "training outfits" not immediately end after FOW but go on for a little longer (2-3 weeks?) that would both give the freshman an opportunity to learn how college works while instilling the values of the Corps as a whole before then being introduced to the Outfit Culture.

There should be more interactions between outfits, outside of their respective groups. Maybe more events that involve the entire Corps or at least a mix of different types of outfits that may not interact as much.

In short: there isn't a disparity between outfit experiences and overarching Corps standards and values. Outfit uniqueness is one of the most important attributes of the Corps. I am a freshman and already have more pride in this university and my outfit than most people will ever have in an organization they are ever involved in. Texas A&M thrives on the saying, "from the outside looking in you can't understand it. From the inside looking out you can't explain it." The Corps of Cadets is at the heart of this truth. We are not perfect, but that's to be expected. We say that the Corps is a "leadership laboratory", which would imply that it's an experiment. An unsure attempt to better yourself and those around you, particularly in the forms of physical fitness, leadership, and mental and moral development. This means the Corps will never be perfect, but that you make mistakes now so you can learn from them, and become better for our career post-Corps, whatever that path may be. Having a personal connection to those you lead has been the most important aspect of leadership that I have seen (and not seen) in my semester and a half spent in the Corps. Taking fish away from outfits will have results yet to be known, but one thing is sure to happen: Direct leadership (and the ability to follow) will not be developed. Life will be hard, and fish year prepares cadets for this reality. It shows that the things worth doing won't be easy, but that's the point. At the end of the day, I have two main points that I will stand firm in: direct leadership and follower-ship that outfits develop is a core element of the Corps of Cadets, and that a student lead Corps will never be perfect, but that failure is the best way to learn .

Be honest when recruiting. I know from a fish perspective that this year, many of my buddies greatly misunderstood what the Corps was like because SNWC isn't even relatively accurate to the fish experience. Spending the night with a white belt, while valuable, is not nearly as insightful into what a future leader will experience as spending it with a current fish would be. I also think that letting outfits "do

their thing" is a huge benefit to the Corps, the only issue is that recruiting tries to hide this fact. It certainly wasn't made clear to me, an out of stater, that outfits had different cultures. This is one of the strengths of the Corps! Embrace it! I think this needs to be promoted. I LOVE my outfit! It's my home, my family, my brothers and sisters, my place in this big University. I think future leaders should be clued into this. Maybe outfits could have a set of "descriptive words" that define how the operate? How the live and how hard they train? It's no secret to anyone in the corps that outfits have varying levels of difficulty. The challenge is marketing that to Future Leaders so they're more aware of what they're getting into.

My takeaway from my fish experience so far has been this: we are changing too much, too fast. Trying to cater perfectly to everyone who signs up is a huge mistake. Yes, fish retention is good, but then again, do we really want everyone to stay? What if the Corps isn't for them? Take SEAL training in the Navy. So many people quit because of how difficult it is, and that's what makes them the most elite warriors! Lowering the standards of our great and powerful Corps to try and keep more people will only serve to weaken our structure over time. I believe that keeping the Corps "hard" is why the Aggie Corps is revered worldwide. I love my Corps, and want to help watch it become the best leadership development outfit there ever was!

You need to get cadet buy-in to the corps mission. That comes from choosing a staff that isn't just people who want to leave their outfit. I do not mean to be rude to staff, but the overarching similarity with them is that they did not enjoy their outfit so they left. Now these cadets who are not well respected are breathing down everyone's neck which causes animosity. Having a staff that actually has respect would carry more authority. Staff should not be a place for unpopular cadets to bag out and assert power. Staff has a role, change that.

Give outfits more opportunities to interact with each other. You could even implement some form of "sister outfit" system that pairs outfits with each other from across the quad to participate in combined training times. They could even compete with each other for cadet challenge to further encourage camaraderie. If outfits communicated and collaborated more they would have a better understanding of each other and their respective identities. Over time they could even influence each other and fix some of the tribalism in the corps.

You criticize the individual outfits, not the Corps. Outfit culture is made by the randomness of its selection. Future leaders have a short outfit description online, potentially spend a night with them and then select and become integrated. That's important for the well-roundedness of the outfits. Cadets are placed with personalities they get along with and ones they absolutely do not, but they stand by each other because that's what we're taught, but more importantly, because they're family. To improve the whole, you set a standard that defines the Corps, ensuring that the individual parts still have enough freedom to move within them. To me, my hallway feels like home. I look up to my Commander. I am proud of how I have been shaped. I feel safe within my buddy class. What truly is the Corps experience, if not that?

Firstly, I believe the commandant talks are the first step in establishing a consensus. Second, as much as military advisors are seen as more of an annoyance than a helping hand, we must employ them to identify when command teams are straying from the Corps identity. I am not a fan of throwing people under the bus, but I recognize that I see this in my own outfit. To create a collectivized understanding of Corps identity, we must start meeting more frequently. Only seeing other outfits at discipline briefs and commandant speeches is concerning. I see the value in separating the fish. However, I believe that the fear is we will produce subpar cadets softened by unproductive cadet leadership and leadership chosen by nepotism. Fish struggled this semester to adhere to the bare minimum. The question is whether putting them into a larger basic training environment will better or worsen that.

Individual outfits are what makes the corps great, they allow for cadets to grow in comradery and have a shared identity. I don't see a problem with these strong outfit cultures because they show that people care strongly about their segment of the corps. In a way it is like a state and corps staff is the federal government. They work together but certain things are left the the states, or outfits, because it is more beneficial for them to focus on it. We are unified in our values and our love for aggie tradition but we go about that in our own way with certain outfits having key identifiers. In regards to the final statement, I think the corps experience would be nothing without the outfits because they help define the fish year

experience. There is a reason any time you ask an Old Ag what year they were in the corps, as if by instinct they include their outfit, it is a part of their identity.

I trust my leaders in my individual outfit way more than the leadership in the Corps. Corps Staff and Commandant Staff. Build trust in Corps leadership and then that's a conversation to be had. After this though, I think it's going to take a year or two to build trust back within the Cadet Corps though.

Allow natural recruiting to run its course outfit pride is what makes the corps great. We are not a monolith and any attempt to make us into such will dilute the corps experience for everyone. Outfits with poor culture will not draw more people and will die. This disparity is not based on any facts but rather the Commandant's perception which appears to be massively flawed. I have seen him around my outfit once at which point he was confused why we hadn't dropped with our fish in mid January he is terribly out of touch and the reaction to decisions like this show it

The band is overall pretty unified, however, that is not the case for most other units. I believe a lot of the reason that outfits seem isolated from each other is because there is no real reason to interact with each other. Besides Corps Runs, pretty much all of our training is independent with just our outfits.

This can be fixed by supporting more unification between units. Having interconnected training times & competitions between major units will surely unify the Corps significantly more than it is. For example, the Corps track competition was a good way to unify major units behind something.

Fully unifying the Corps will be impossible, however, there are ways like this to significantly prevent total outfit isolation.

The outfit experience IS the corps experience. However, this should be solved on a minor unit level. Encourage multi-outfit level activities. Once again competition is always a breed for success, and I don't think people see it as a waste of time.

If you want to Corps to be united, we need something fun to be united behind besides values. Think about the times when the corps is fully assembled. For Block T practice (Necessary but universally hated), briefs (Necessary but universally hated), March-ins (Necessary but universally frustrating), and formations. Not to be on the nose, there is a trend. I am a junior, my favorite experiences are always seeing the entire corps marching to the brazos. Because it's FUN, and meaningful. Why can't we find more activities like that? Everything we do as a corps is a leadership exercise that feels like command team is getting the end of the stick and having to drag along the outfit. It makes us feel like it is us against them.

The point I'm getting at is the corps needs activities that are corps wide, fun, and make us proud to be part of the corps. Not that I participate in bonfire, but back in the day it was bonfire. We need something else, something universal. I mentioned some examples in the first question.

The OOC inspection as well in theory works, but when the corps standard is enforced so unevenly that it's a complete luck of the draw on whether or not you get yelled at because of your rank being a 1/10th of an inch off, or a CTO doesn't if you have your bed made it generates animosity.

I love the Corps, I love the standard, and I'm proud to be here. Even if this wasn't anonymous, I would have said the exact same things, it is my opinion. In the same way you want the best corps I want the best corps. Thank you for creating this and taking our opinions into account.

I would just do more things as a major or minor unit. Last semester 7th battalion did a competition over a week, and it allowed me to talk to people who lived on the floors above or below me that I had never met. I would also use SOMS just to talk about the Corps standard. I understand the need to focus on the theory and study of leadership, but just discussing the Standard in a SOMS class and telling people why we have it would make more people understand the reasoning behind it.

Perceived by whom? This sounds like trying to solve a problem that either doesn't exist, or has been exaggerated to something it isn't. And define "disparity" - unlikeness or unequal? Throughout the history

of the Corps, different outfits approach things with different fervor. That's why there have always been two or three "Bloody Cross outfits" and three or four "Bonfire outfits" and some outfits where General Moore was their goal. This is what makes the Corps the Corps. If my outfit was successful in their internal motivations, that was a sense of pride that we carried around the Quad. That doesn't make my outfit inferior or your outfit inferior - we all add to the overall contribution that the Corps of Cadets gives to the University as a whole. Your outfit focuses on PT? Well, my outfit focuses on grades. Who's better? It doesn't matter! The outfits are a combination of the melting pot of cadets that decide to join the Corps of Cadets. All of these outfit 'focuses' can 100% still exist while adhering to the 'overarching Corps standards and values'. If they start to pull away from those, address them individually - this is not a "one size fits all" issue that needs to be addressed.

The corps experience is built on the outfit you join. You do not get a corps experience, without an outfit experience, like 150 years of corps before us.

Give more tangible missions and tailor it to the outfits. I was a MU recruiting officer when march to 3000 first came out. I did not know how to tell my outfits what they needed to do to accomplish it. There was no quota they had to reach or a number they needed to maintain. It was just a holistic number that needed to be reached by the Corps. Give a mission for people to rally around and they will give their best effort. Values are done from the ground up, not top down. Other than the ones that have been passed down from generation to generation of cadets, talk to the cadets and ask them what their values are. In Air Force terms, weather does not think the same as fighters who are not the same from bombers, finance, coms, etc., yet we still share the same mission of fly, fight and win. The Corps can be the same way. I know, from a wing level, that outfits think differently. Give them a shared mission with values to back it and they will show their best. In short, outfits think differently, give them something to apply it to.

We have an identity within the Corps by simply putting on the uniform and earning our Brass. And that is EARNING not being given, not being pinned, earning it. I was a cripple my freshman year and did everything I could to earn that piece of medal, and I continue to do so every day.
The focus needs to stop being put on the Corps as a whole and back onto the outfits, because those are our families. Those are the people that we interact with on the daily and who will marry us and bury us. Outside of the Corps, we're all seen as cadets no matter what, but within the Corps, we should be able to honor our outfits, because that's who we are. Yes, I might be a member of the Corps od Cadets at Texas A&M University. But more importantly to me, I'm a Hell Raising Rebel of the Lonestar Company class of 2024, and I'm damn proud of it.

Evolving the Corps experience is one thing; proposing a change which would fundamentally gut the Corps training model and wreck the formative weeks and months which create outfit identity without any prior dialogue with students is another.
Outfit culture is a precious part of what makes the Corps special. Yes, when too far separated from the Corps itself it can cause divides, but isn't that the same for societies around the world? In my eyes, the Corps' Outfit system serves as a laboratory for international/intercultural exchange and cooperation, as while we Cadets may be split into many outfits with different hump-its, traditions, training styles and code-phrases, we all come together to form a cohesive community despite our differences, just as nations and peoples cooperate despite their differences. Taking away the formative time that creates and fosters those distinct cultures would turn the Corps into an unrecognizable mush of centralization.
All in all, communication need to be much more open, and much less secretive and threatening. Reforms such as the one previously proposed should be discussed openly, not handed down with no chance for general student input. We shouldn't have CTO/Advisors giving mocking or threatening warnings to Cadets about sweeping future changes being handed down, traditions being removed or privileges being revoked! (See: RVs)
Also, I'd urge that we hire Advisors who wish to foster and improve Corps culture, not remove it out of disdain. Too many times have I had SOMS instructors who turned the classroom into a soapbox to talk about how much they hate the Corps model and how they wish it would fit THEIR vision instead. We've created an environment where the students and Staff are fundamentally disconnected, causing the students to feel like they've been treated unjustly and the Staff to, in our eyes, act like uncaring authority

figures who want to form this organization in their image instead of forming any sort of dialogue with students outside of Corps Staff.

No idea

The individual outfit is the identity of the Corps experience. It's not meant to be uniform. There are similarities between the Standard, landmarking events (such as Brass), and general activities. However, it is the "little T" Traditions that define how each member of the Corps experiences their time here. I don't know how many stories I've shared or heard talking about the Traditions that my outfit has compared to others. How our Brass was different. How our PT is different. The only perceived disparity is from those who aren't experiencing the day-to-day of cadets and only seeing the bad. If the Standard and corps values are something you truly care about, then make changes to the Corps that make cadets care about the values.

Outfits have got to know all rules apply to them. Was surprised to see this issue. While I was and am a form Old Army Cock Company CT, (C-2), I was always proud of being a CT...

Make the Corps worth fighting for. People have fallen back on the outfits for everything because no one likes or respects the Corps staff. They're all just pawns in this "cadet lead corps" and have no real say in things. Outfit leadership are the only people that have day to day interactions and the ability to bond with the underclassmen. If you made corps staff more available and more powerful then maybe people might respect them more and then in turn respect the Corps they represent. People dont wanna do the Corps humpit because to them its some stupid little faint attempt at unity when in reality they dont respect the people that try to push it

By letting outfits teach their own while keeping a light eye on activities, but do not interrupt with tradition that has kept outfits and the corps running. Do not split the corps up from each other keep us as separate but whole.

Keep the hallways and outfits the same and have meetings once a week where the whole corps of a certain class meets and discusses a topic then breaks into smaller groups comprised of cadets from all branches of the corps.

When my son was a fish in E2, the outfit tradition was that the Fish rooms had to be identical. So, they were not allowed to have books out, since they were taking different classes. Yes, read that again, fish were NOT allowed to use their bookshelves and had to keep their books locked up in their footlockers (except during CQ) (And during CQ they were encouraged to leave the dorm and go study in the library, due to an alcohol issue in the dorm.) DUMB tradition!!! Thank God General Van Alstine reorganized a few things his first year.

Maybe there needs to be a Standard on what a fish hole standard are, that is Corps wide. (What they can have on their desk, in their closet ..... when are they allow to have a dorm refrigerator etc. )

Is there currently a cadet court? If not, there should be. Another way to teach leadership, is by having a jury of your peers.

The identity that defines the Corps experience is reflected in the diversity of outfit interpretations of leadership, training, morale, traditions and social structure. Outfits should be granted the freedom to diverge from the status quo of procedures, to experiment and fail. Instead of eradicating decades of beloved 'small t' traditions, instead, pass guidelines and intermediate when specific outfits are out of line rather than punishing the entire organization.

Not be afraid to disband outfits that are causing the major issues. Or the problem cadets themselves. Overall the system works because outfit cultures are different with the same underlying values. It's the bad weeds that need to be cut out and sends a message to show that discipline and values matter.

My answer to this will be long as I have the most thoughts on this. From my perspective of the corps, the disparity between outfit experiences and the overarching corps standards and values comes from several

sources. (TLDR below)

The first and foremost is commanders outright ignoring guidance. A great example of this is the 'resiliency training' guidance that got passed to my outfit earlier this year. It would have required us to sacrifice two morning activities a week for it, and my command team was trying to make it work. I talked with them about it, and not only were they obviously bullshiting the requirements so they could get other training in, because the guidance that was passed down was ridiculous and not very well thought out to them, but other COs within the regiment were simply going to ignore the guidance. Poorly thought out guidance being passed down from staff that doesn't properly answer cadets questions or give a plan of execution (the duncan policy is a great example of this, I asked the simple question of 'how are they going to track whos bagging in and not force them to go to duncan',and not even my battalion SGMAJ could answer that question). Multiple accounts of guidance being passed down from staff that force COs to implement decisions they know their outfits will dislike them for, and with no support or execution plan from staff sours relationships, screws over command teams, and doesn't actually help implementing the guidance. Which is another issue.

The second problem I see the most is one of enforcement. The Corps has a lot of rules right now about how outfits run themselves and what upperclassmen can do to train their fish. And if outfits stayed within those guidelines while varying depending on their commanders, we would still have outfit culture and a much more unified corps experience. The problem is outfits operate outside of those boundaries often. We don't need more (in my opinion we need less). We need them to be enforced. There's a joke in the regiments about 'brigade hazing' where the brigades are able to actually haze their fish outside corps guidelines easily, because they know how to bend/break the rules and get away with it, and it's got a semblance of truth. If you want outfits to effectively train fish without hazing them, implementing more rules and things to keep track of isn't the solution, effectively making sure commanders follow the intent of guidance in place is. I see outfits and white belts bragging about making their fish do things that my buddies have had their doors kicked down for with no repercussions. Not only this, but outfits that 'haze' or are hard on their fish generally get street cred and are seen as good or cool for it, and it's kind of part of corps culture right now. The corps culture is rewarding cadets for breaking rules because not only are the rules in place too restrictive, but they're easy to break and get away with. Until the wider Corps is able to actually implement and enforce a standard on outfits equally, guidance will continue to be ignored. You need to give outfits and COs a wide area to maneuver, but a strong barrier to keep them in the that area, because the moment some outfits go out of bounds without repercussion, everyone wants to.

The third mostly comes from the attitude between the average cadet and higher up leadership. It's not secret that a lot of cadets dislike Corps Staff, and have disliked staff for a long time. And unfortunately that's a product of the fact that staff has to be a limiting factor on what cadets can do. But a lot more can be done to help that relationship. Obviously, the first issue I pointed to about poor guidance being passed down and little support from upper staff about that guidance. But it's also a product of the attitude Commandant's staff has when it comes to cadets. In my sophomore SOMS class. My entire job was to listen to a CTO complain about white belts in class, that was every single lecture. It was always about some white belt who was negligent and how they're all lazy and poor leaders. And it made me realize that, because CTOs and staff usually interact with the bad actors of the corps primarily, they get a twisted view of the average cadet and are usually what I like to call 'hostile by default', or at least on a very short hair trigger. I see a CTO maybe once a week and interact with them maybe once a month, and usually I dread those interactions because I don't want to screw something minor up and get yelled at by someone with very little patience. But it speaks to what I believe is a wider problem with higher level Corps leadership that they see their role as cadets needing to be 'controlled' or 'disciplined'. Which is somewhat correct, but as a leader simply controlling, restricting, or disciplining personnel is not your only job. Higher level leadership needs to do a far better job of supporting the mission of outfits and supporting everyday cadets and lower level leadership instead of just being controlling. But because high level leadership sees cadets as something to control, and because cadets see high level leadership as a controlling element that almost never makes good decisions, it contributes to the rule breaking culture I talked about above.

And lastly, we can't take the staff's word seriously. I'm adding this because I just saw in the Corps teams the 'are staff going to read this?' question and the answer was 'write out a well thought out answer and they will'. After I'd written all this. Because staff isn't transparent all that often (and there's been a few cases of them going back on their word, the 'you guys can have pushing if you don't do pullout formo' that happened my fish year is a good example), we can't really trust them. So I've probably just written all this for it to be ignored, but here's hoping it isn't.

The TLDR of this is that our current system isn't bad, the problem isn't our method, it's our execution of said method that needs to improve.

Making the Corps of Cadets as a whole develop more culture. Make major unit nights where people can get to know each other. Have more corps wide events where people actually congregate. To develop corps experience and standard, to where people are more loyal to the corps, help them get to know other cadets. Collaboration between outfits, creating new culture in the corps of Cadets where people value it more than their own outfit.

People will always be loyal to their outfit that will never change.

Outfit experience has defined the Corps for as long as I have heard from (back to the 80s). In my opinion no 2 experiences should be the same. There should not be one corps experience everyone gets. This isn't a theme park ride, it's a journey

Hold outfit cultures responsible. Hold outfits who preform below the standard accountable. Allow outfits who preform well to continue their culture and experience without in acting changed to harm those outfits. There are already metrics taken from retention, grades, recruitment etc.

Outfit Culture should be unique and obey to the standards mostly. However, going in and changing long established traditions for the sake of "Leadership" isn't going to fix the problem of low numbers for Corps attendance and recruitment.

Emphasize outfit cultures, don't coalesce them. Highlight Ol' army, and the traditional ways of doing things; find the methods that work.

If we're using other institutions as comparison, see what they allow that we don't, and start un-restricting the options of cadets.

Focus on quality and attitude of cadets, not the quantity. Make it harder and more prestigious to remain in the corps as opposed to keeping it harder to remove cadets who refuse to grow/participate. (I.e. brass should actually be earned again, not a certainty of being given)

Disparity is going to happen when you have different leaders, different cultures. My suggestion is identify outfits that are underperforming, take them to learn from outfits that are outperforming. What are the best practices that got them there and then challenge those outfits to implement them. That is what has always happened in every organization in history. The Japanese learned Six Sigma and manufacturing from us - and 30-40 years later we are back learning it from them. Don't destroy or try to make us all "same," let diversity of culture and style develop and build outfit best practices. You might be surprised what you find when you learn from the best outfits. C-2 was one of the better ones - and most of what made us great was not what the Trigon thought would make us great. Trigon leading an outfits culture is the dealt knell. This is not the military - it's more like a fraternity with a military framework. When graduates leave, they are ready for military or civilian life.

If a standardized fish training camp is to be put in place for the reasons meantioned in the facebook post to former Cadets, it must be very careful to not violate the Corps experience and the integrity of the leadership development model. Keeping that in mind, it would be wise to keep freshman grouped together with their future buddies within the larger group as to develop the values so central to the entire Corps together and seamlessly translate them into their outfits and outfit cultures. By holding the Corps traditions and values as the base to build from, freshman Cadets can bring that into their outfits while maintaining the buddie unity that is so essential and necessary to developing fish year.

Aside from the freshman, as the Corps changes in ways many do not understand, the natural response is

to turn inward to what you do know and can control, thus so many are more loyal now to their outfits than the organization as a whole. To restore pride in who we are as Cadets and to maintain leadership development, we must be confident that we truly are a Cadet led Corps. First we must establish the ability to communicate with those who make decisions, as to not see this as some sort of ploy against what we stand for. Second, the leadership that is placed over us should be the ones driving the Corps into a better future. Those who have put themselves forward to take on the heaviest burden this leadership development course has to offer, should have the understanding of every Cadet, and with it they have the task of leading us and being a GOOD leader. One who cares for those under them and acts on their behalf while listening to the voice of the people.

Outfit differences can be good. This is the value of diversity at work: different strengths complement each other. As long as they remain in line on the main principles, our corps values.

I don't believe there is a disparity created by outfits like the corps thinks there is. I think the disparity is created by the corps and how it only works with certain outfits while leaving others in the wind. It never gives outfits the spotlight on the Corps Instagram or recognizes outfits for their hard work, most outfits do things in the name of their buddies, upperclassmen, and underclassmen not necessarily the Corps as a whole. Most outfits also have so much history that if you take that away you go against cadets being the "Keepers of the Spirit" and simply college students in costumes advertising something that no longer exists or practices what it preaches.

I do think there is some disparity, however it might be a good thing. There are things we need to standardize such as drill, uniforms and rooms, however if we want cadets to feel connected to the corps, it has always started at the outfit level, NOT the whole corps level.

In regards to unfortunate outfit experiences, those that are not meeting the Corps standards and values seemed to be repeatedly disregarding that. The chopping block of getting rid of outfits does exist and is always a possibility. The Corps is supposed to prepare leaders of character for the global leadership challenges of the future. Each outfit has their own character, same with the Corps. However, the outfits fit into the Corps, outfit experiences should figure into the standards and values of the Corps, that's why there's a standard that any cadet can go and read anytime and there is a campusology of the Corps Values and we discuss endlessly what each mean in general, how they apply to us, and how they affect others around us. The standard is a guideline, the outfits should be allowed to be a little tougher on grading and/or training like the military, WITHOUT breaking the law. Crack down in academics or uniform/hole standards, etc. Again, if there are outfits that don't fall within those Corps standards (like way out of left field) a sit down should be had, warnings given, then a final date of expiration if needed. It wouldn't taint the Corps experience as much because numerous chances are given and we are a strict training environment-we are the best of both worlds involving military training and civilian life. We should be treating it as such instead of too lenient on one side of the spectrum with an outfit while being on the complete other side of the spectrum for a different outfit and insanely strict. Standard applies to all outfits and should be evenly executed to the outfits so both Corps experience is maintained while not destroying outfit culture.

The disparity is what makes us better and push harder. If it was one corps cadets wouldn't compete as hard.

Have more full corps functions that are casual and allow for outfit intermingling. You currently have an outfit that does a back porch event where everyone can come together to relax and have a good time. This should be corps sponsored.

You see the same issue between platoons and companies in the Army, and frats in Greek life. But they both put forth the effort to have communal events that bring everyone together.

There were absolutely zero fun, non ultra structured events that brought the corps together when I was in, and as such it was an us vs you mentality. You break this through relaxed communication and shared experiences.

The band accomplishes this very effectively because we do a lot as a major and minor unit. Yes we have individual outfit cultures to an extent, but none of us feels disconnected with people from other outfits. All classes are expected to show respect and stay true to their roles and leadership development model across the outfits within the units because we view ourselves more as pieces of a collective whole than complete separate entities that happen to wear the same uniform. Freshmen and sophomores are expected to whip out to all upperclassmen and stay as respectful with those upperclassmen as their own, including sophomore etiquette. The Corps implemented minor units recently, so I think this would be the perfect time to start instituting this kind of culture Corps-wide. It would create more unity across the board. While the band does have practices every morning that help us be more unified, we also do things like minor unit battalion weeks where each battalion does training times together for a whole week. We also have some events that are band-wide, like a band-wide tug of war about two weeks ago. It would probably be difficult to get this implemented at first with people always being resistant to change, but I think creating these policies and having minor unit staff and outfit leadership diligently observe and make sure they're being met could help the Corps have a more unified front.

This is a good question. You get this right, and you can build great leaders with alumni support.

1. Keep outfit time/training sacred in the afternoon. Make sure outfits are training and have a plan to improve in PT, academics, and inspections, especially for white belts.
2. Encourage participation and increase the number of Special units across the Corps giving choice to Cadets to participate and build relationships with others outside their outfit. If you keep the standard outfit time sacred, but encourage Spec Units you can get the best of both worlds.
(Not a 100% sure on this next option) Give the fish opportunities as well to join more Special Units that are only fish. Make these Special Units challenging and rigorous so if a fish decides to participate, he/she are not looked down upon by their buddies or outfit.

Lastly, have increased participation by the Commissioned officers with the Cadets, doing outfit stuff and good bull. Bridging this gap will win the hearts and minds of the cadets.

We need leadership in our country, and the Corps is a unique opportunity to get it right.

Gig'em and God Bless

Empower Major Units to uphold the Corps standards with the outfits under their command. Grant them the authority to discipline outfits and leaders for failing to uphold those basic and overarching standards without diluting the uniqueness of the individual outfits. Issue rams and have people walk it off on the weekend or even hold disciplinary hearings if the situation warrants it. Have members of the Trigon to advise so that no petty tyranny or paybacks take place.

Universal 2 week FOW. You can even have a fish dorm during that time to standardize training. But 5-6 weeks away from the outfit only makes fish year more complicated and you loose the essential experience that builds buddy unity and pride. Outfits are what make the corps special from other SMCs. Any old ag will say the same.

The truth about growing the Corps is that you rely upon the outfit experience to do so. The Corps as a whole feels a little bit lackluster. I agree that certain elements of unity such as the hump it and whipping out have fallen by the wayside and I wish that were not the case. That being said the diversity of cultures and experiences that come with each outfit help to shape the corps experience for each incoming cadet. I know several underclassmen that I helped guide into outfits based on their wants and strengths. If they were placed in a giant fish dorm I think several of them would have punched. There is nothing wrong with a diverse corps. The competitiveness that stems from it should be applauded.

Build from the ground up. It's easier to make people motivated about smaller organizations before bigger ones.

The overall Corps is seen as very cheesy and soft, plainly said. Cadets value muddy uniforms and loud whip outs on the Quad, and see Corps staff and the overall corps as a boring symbol of localized beurocracy. Each outfit is in a perpetual rebellious phase, and nobody wants to be the nerd that sucks up

to the helicopter mom that is Corps Staff and the adults perceived to be their puppet masters. The image of corps commanders has been bad lately, and nobody aspires to get the position because the position is now for nerds in most cadets' eyes. The corps can adapt to modern times without throwing the old army baby out with the bath water, especially when it comes to "little" T traditions, push ups, etc. People want those experiences more often than not. I think the air force and marine corps do a great job of promoting challenges and both intellectual and physical, by having a challenging attitude and backing it up with day to day life; they also suffer less in recruiting. Big Corps should value true grit, brains, and the ability to marry the two while protecting cadets from actual physical harm, as well as creating mental toughness through high pressure and not babying adults, as young and immature as they might be.

By giving Cadets a Corps they can be proud of.

The biggest issue is that individuals are proud to be apart of a special unit, outfit, or class. And not as in tune with being proud to be in the corps. I believe that stems back to the management portion of the issue I have highlighted in the first and second questions. We are given too many restrictions on what we can and cannot do.

People will enjoy the corps more if the Corps is more enjoyable to be apart of. Less micro management. Let us actually lead and I believe people will notice a difference.

I know there is an issue when it comes to Oufits not enforcing the standard or even Cadet Values. I think the way we combat this is by making the corps more of the experience that people wanted it to be when they signed up. People want a challenge. That is why they are here, They're not here for a free ride or an easy time. That is why the Corps is not for everyone. If the Corps goes back to the ideals that it can associate with, Honor, Integrity, Discipline, Courage, Respect, and Selfless Service, then the Corps can thrive.

I don't believe Resiliency can be taught in a classroom. It is learned with your buddies in the mud of combat conditioning, or a long run with the outfit.

If the Corps allows us to make mistakes and give the challenge that people want without raining on our parade all of the time then people will want to uphold the standard and be proud of the organization.

I do not believe that this is an outfit vs corps problem. People feel wronged by the Corps due to micromanagement and restrictions imposed and have retreated into their outfits and special units to find purpose.

I am proud of the Corps and what I have been able to accomplish in it. But I know a large amount of my peers do not feel the same way.
I do not believe the proper response to solving this problem is to further micromanage and remove fish, one of the few motivating factors for whitebelts to get out of their racks in the morning, for even a small period of time.
I believe this would further alienate individuals from wanting to uphold the Corps' core values and mission.

I appreciate y'all asking for feedback. I know despite all that is flying around, you all are trying to make the Corps better. Many people may not see that but I sure do, this survey proves it.

I hardly have any leadership or career experience compared to y'all at the top of the food chain. But what I have been able to learn in my short time in the Corps is that incredible individuals of character are forged out of times of hardship. Myself included. If I never came to the corps, I would have been deprived of a life of excellence and would have easily settled for Mediocrity. Please let us keep a challenge that has forged previous generations of Aggies into defenders of our way of life, and of our nation.

I pray for y'all everyday And I know y'all will make the right decision for us, for the Corps, and for future

generations of Aggies.
Thanks and Gig 'Em.

Have more all Corps activities and competitions. Have a water fight at FOW and air out with the whole fish class. I remember my dad talking about a "Corps Olympics" where every outfit put up 1-3 cadets for different running, swimming, and field events. Use SOMS classes to teach fish and sophomores overarching Corps standards and values.

At least in my time in the Corps, most "toxic" outfit culture (ie. not whipping out to females or BQs, ignoring leadership directives) came from all male outfits. While I don't think having females simply solves problems, I noticed that all-male outfits tended to attract people with a more toxic viewpoint causing many of the most toxic cadets to be together and perpetuate their culture within the outfit.

Create a list of non negotiable standards that every fish and cadet must meet. However, also allow room for outfits to set their own standards and rules (ie where covers are displayed in your room, where fish can look in the hallway, etc.)

Give the Cadets something from the Corps level to appreciate and respect. Provide opportunities for networking, summer internships and positive experiences for all cadets not just the ones the Commandant chooses. Stop all attempts by the Trigon to control all leadership opportunities. Show respect to earn respect. The Commandant has said nothing about what the good outfits do well. This entire process has the appearance of a bitter attack by the Commandant.
Stop micromanaging corps outfits. The Commandant slow trailing an outfit on a morning run then yelling at them about the way they conducted the activity is not an example of leading from the front. The actions and behavior of the Trigon staff and their families also reflects on the leadership ability of the Commandant and his staff.
Have successful outfits and less successful outfits communicate about operations, goals and objectives. Some Cadets prefer to be the strong Cadet in a weak outfit. Some Cadets prefer to be a strong cog in a strong outfit. The difference in outfits is a good lesson for Cadets. I was fortunate to be in a good outfit. We include former cadets from other outfits in our reunions.

I mean this completely seriously: look at the Band as a case study. Each with their own individual outfit culture but each exemplifying the Band's standards and values. All unified under being bandsmen and women. Because of inter-outfit involvement and collaboration during band events, we all share that identity. CTs have nothing to bind them together. Service events, special campus projects, mandatory things that outfits do with other outfits in their own minor, major, and entire corps units that give them the opportunity to SOCIALIZE AND BE FRIENDS, not just march or be administrative, will solve most cultural problems.

The cultural problems that arose during the COVID lockdown in many units and outfits were because of a lack of buy-in due to the many corps changes. Buy-in is created by an overall cadet support of the vision of the corps. This decision for the future plan of the corps has so much friction with the student body that it will destroy buy-in and arguably create more cultural problems, if not destroy culture altogether. Buy-in for the vision of the corps, support, is what creates culture.

The corps experience is an outfit experience. Being with your buddy class from day one until final review is what makes an experience. You can't pick your buddies, just like you can't pick your co-workers in real life, you learn to adapt and overcome challenges. I think all outfits should actually be held to (a last year version of) the standard with oversight. I think we also need to remove the rule that if you don't report for hazing then you get the same punishment. I reported someone for hazing and subsequently everyone that got called in for questioning said it wasn't hazing because otherwise they would receive the same punishment, this is preventing a lot of cases from being reported.

Make it more clear to cadets what the culture of the corps should be while not taking away from the outfit culture or experience. (Outfit culture is a large part of overall corps culture)

Don't have a fish dorm

I believe that the outfit culture is the largest unit of socialization a cadet will receive in the corps. I do not believe this is a bad thing. I would say that it is how a cadet chooses to express that outfit culture to other outfits on an individual level, as well as on an outfit wide level, is important to creating the relationships between outfits, that makes the corps culture what it is. I believe that a way to do this would be more interactions between the outfits on an outfit wide level, that wouldn't interfere with the normal training plan of each outfit, such as friendly sport competitions and multiple outfit wide briefs (possibly set goals on a battalion level?).

All I can speak to on this is my experience from 35 yrs ago. I am very Proud to have been in my outfit as we won the General Moore Award, the Jouine Award and placed third in the Hocmouth Award. I am a competitive person and each class in our outfit did what we had to do to accomplish our goals. that also had a wave effect in that our battalion won best minor unit, and the Regiment won major unit awards. we had guys in our outfit that were on Corps staff, Regiment Staff, Battalion Staff. I was proud to be in the Corps of Cadets and i took pride in my appearance and my actions off the quad to not put us in a bad light. i had friends in my Major from other outfits and we would study together.

Have you asked the Unit CO's to provide you with the Outfit semester and year end goals? and an outline of their process to accomplish that task? The Corps is an enigmatic group where you have to build upon the obvious inter-service rivalry (Brigade, Wing, Band and Regiment) and then within that are the battalion rivalry & finally the outfit rivalry.

I am not sure of the "fix" for this I just know that my buddies and I have fond memories of our time in the corps as well as our outfit.

I like everyone that will respond to this has a passion for the Corps or we wouldn't have tuned into hornets nest

thank you for your time in reading my ramblings, I want what is best for the Corps but I also want keep the traditional aspects

The possibility of making Commanders more strict in their training and also in their conduct with the outfit. At the end of the day, the success and detriment of their followers falls on their shoulders as far as expectations, standards, and values.

Again, this is answered in the first response. Thank you.

Great question. I've heard some of the feedback of fISH disrespecting other upperclassman from different outfits, etc. I do not understand that. I was never encouraged to disrespect other upperclassman. I still remember being afraid of Tony Buzbee and that's 35 years ago. He never even made me push, but my upperclassman would never have tolerated me disrespecting him or any other upperclassman. I think you go at it from a concept I learned in the business world called three questions (it can be up to five). In this case each cadet asks in order (1) is this the right decision to make for the United States? , (2) is this the right decision to make for the Corps of Cadets? (3) is this the right decision to make for my outfit? , and finally (4) is this the right decision for my squad, team, buddies p, etc. The trick is, if you answer no at any point, you don't do it. You only get to the lower questions if you've answered the first. These principles should be in the Standard, taught like the Code of Conduct, and recited like the Soldier's Creed.

You don't let the bad outfits fade into obscurity

Communicate about possible avenues the corps wants to take with the average cadet. Outfits typically communicate with their people, the corps needs to do the same. We feel like we have zero control and say in our overall experience unlike our outfits. Let cadets sit in on comm staff meetings. We feel like yall just talk poorly about us without us there, making the divide greater.

You get the Corps experience being in the corps regardless. You get an added bonus of outfit culture depending on which outfit you want to join. I see no problem with having differing outfit cultures because they all should have the same standard of the Corps overall. Some outfits like PT more, others like to do more community service, and have more of a structured and planned out CR event schedule. Others are

heavily involved in corps clubs or activities like PMC, FDT, bonfire, and RVs.
What I think needs to be done is advertise the outfit culture better than it is. On the Corps website where there is a list of all the outfits and a little blurb, most of them are extremely similar and slightly vague. Fish Academy has been explained to me in this way- by the end of their time there, fish will choose which outfit they want to "pledge" to based on how an outfit rates themselves on a variety of focuses like PT, academics, and so on. This should be provided right now instead of changing how the Corps is structured. Providing a better insight on what an outfit is about before fish join in my opinion will help a fish stay in a place that aligns more to their values. Let fish choose how they want to experience instead of watering down the experience for everybody.

Every year, move 5% of a units members to a new outfit

When outfits each have an individual identity, and engage in friendly competition with others, the esprit de corps of the entire organization rises. However, if all cadets were to conform to a single monoculture of the Corps, this individual interest is gone, and there will be much less buy-in. I believe that in order to form a healthy equilibrium between Corps-wide standardization and outfit prosperity, those in charge of this Corps need to lead with a less cookie-cutter-like approach. On some issues, leadership needs to be clear, concise, and impartial in enforcing standards. In others, there is no need to do much more than have a laissez-faire approach. Outfit PT can be seen as a key example of what I mean: leadership ought to let an outfit tailor its approach to physical training times in a way that alligns with the way it sells itself. At the same time, standards still need to be in place so there aren't outfits that do walking laps around the quad while others sprint to Madisonville and back. With adaptable leadership in mind, leaders could set a something in place like the following: outfits can do what they want for PT as long as it does not endanger physical wellbeing (can be anything from a focus on rec center workouts to an emphasis on long distance running across campus), and as long as they are posting good PFT results. If either of those are not the case, outfits could be dealt with on a case by case basis.
My point for that example is simple: that outfits can be allowed to do things "their way," as long as "their way" gets quality results and does not negatively impact the members of said outfit.

By admitting any disparity is " perceived" you answer the question. The whole is only as good as the individual smaller units in it, who each struggled to be the best. Without unit loyalty at a " lower" level, loyalty to the larger organization won't be possible.

The Commandant has the power to set goals and objectives that the outfits should try to meet. Reward outfits that meet these goals with special privileges and benefits. Special trips, merchandise, monetary funds, larger amounts of incoming cadets, and highporting guidons are all potential ideas.

REWARD US FOR BEING MODEL CADETS.

The Aggie Band is in a unique situation. Because we spend 12+ hours a week learning, playing, and performing at Aggie football games we have a culture greater than our own outfits. Major unit, Minor unit, and Outfit culture ALL exist.

In the Aggie Band, people go to staffs in order to better serve the band. The rest of the corps has a sentiment that going to staff is a way to get away from your outfit. That is a mindset that needs to be changed. Staffs need to care about culture and foster ways to create it (such as the battalion weeks and combined band events that we conduct) in order to create that culture. It will not happen on its own.

In the Band, it is expected that all fish greet all upperclassmen in the Band whether they are in the same outfit or not. Shared standards create a shared experience. We also expect more from our cadets when it comes to room and uniform standards. There are corps standards, and then there are BQ standards. We pride ourselves in this and that is why so many of us refuse to put out for corps staff.

Do the corps hump-it more than twice a semester, if it was practiced before or after formation you'd have significantly less cadets mumbling the words across the quad. Give cadet MU leadership the space and responsibility of keeping their MU unified culturally and aligned with Corps values.

Outfit pride doesn't dilute the corps experiences. It enhances it. It is sad that you look at an outfit that has strong pride a love for this school, involvement off the charts, grades off the charts, more leadership than

any outfit, with the best retention. You see something that doesn't Aline with the corps standards and values. Why not learn from those type of outfits and try to create more. The most successful outfits have alumni organizations and have a sense of pride that dates back 20-30-40 years. That is one of the reasons the corps is so special. Also you're wrong in how you perceive the outfits who have deep unity. You see it as a threat to the corps and disrespectful. Well the reason I love the corps is because of the outfit. And I would say there are a bunch more like that too.

I think the corps experience is derived from the individual outfit experiences. My grandfather who was in the corps loves to share his experiences and in 1961-1965 the experiences he shares were those within his unit. Whenever I am with my buddies and we are sharing things that impacted us most during our time in the corps, it is always the experiences within our outfit that are shared. I believe leaning into the outfit experience and making that truly the identity of the corps would be huge. Give outfits opportunities to grow together and strengthen that experience. Good leaders, good accountability, and a little difficulty will hold outfits and groups of people together through strong bonds formed. Give outfits the opportunity to share their experiences and give outfits chances to build experiences together. Activities within and outside of the corps. Involve the corps more into the campus life at A&M. Encourage members of the corps to gain more leadership experience outside of the quad within the student body.

Again, the answer may be that less is more. With over forty outfits there may be too many choices, and too many to police in a uniform sort of way. The rather large number of Major Units will further hinder having a "core" set of standards, values, experiences in the Corps.

This question barely makes sense. Two disparities are mentioned: the ones between outfit experiences, and the ones between the corps standards and the outfit "standards". Outfit experiences are supposed to vary. Otherwise they would lose identity and simultaneously, incentive to compete. We can see this issue in some units with no clear outfit identity. I once overheard two butts talking about how their outfit, sq. 3, was functionally the same as sq. 12. With the o Lt difference being the people, and they found that to be demoralizing. However other units, specifically the all-males do this very well. The difference between K-2 and C-2 is striking, but they both have shared corps experiences. The issue with standards can be fixed. Clearly outline the incentives to follow the standards and show why it's important to follow them, and punish those who don't. This goes for all standards. I have seen many corrected about slight issues with their hair or uniform but people who are extremely overweight and can't pass the pt test are allowed to stay. That doesn't make sense and every cadet sees it and feels less inclined to follow any standards if the staff is picking and choosing which standards they'll enforce

We don't have to fix this, Outfit culture is what defines the Corps, and gives us all a unique opportunity to learn and develop. If I didn't want to learn or be led the way I want, I would have joined a different outfit.

You uphold the Corps, and ensure all your subordinates are doing the same. If a individual is holding their unit above the Corps, then that individual needs to be retrained or coached if possible, or removed if it's not. It's up to their superiors to make that call, and live with the consequences. If you are fostering an environment where expectations and desires are clearly communicated and enforced, there's no easier way to say this, the trash will take itself out. You cannot sabotage the Corps, only your role in it. It's not an answer many want to hear, but the organization will always be more important than any individual, group, or unit.

The more important question is what do you do once the call is made to remove an individual or unit from the Corps due to their inability to achieve the standard? You communicate that. The ability to make the right decision is one thing, but making sure others know why that was the right decision and using it as an opportunity to coach and mentor others is far more valuable. Every organization has its failures. The ones that stick around are the ones who address those failures in a way that continues to uphold the organization and its values.

Thank you for the opportunity to share my experience and wisdom. I sincerely hope I have been of some help. Leadership is... difficult in practice, and easy to criticize. Whatever you decide to do, I hope it proves

fruitful. These cadets deserve every opportunity to become true leaders, something that is needed now more than ever.

Not an easy answer. I am not going to pretend to know the answer to this one!

You don't. While the Corps is a venue for ROTC, it is also a leadership training opportunity for mostly non-regs. Units hold up to The Standard or they don't. Continued failure to meet The Standard results in units being disbanded.

For nearly a century, Cadets identify more with their individual units than with the Corps in general. My best friends in the world are my Aggie buddies from the freshman year all the way through the Senior year. We learned together, we played together, we fought together. That cohesion formed life-long bonds in addition to the training.

No, I feel a sense of pride when I go back and I see the Challengers forming up on the Quad.

Can you genuinely say the identity of the corps experience hasn't been diluted as is over the past few years? Especially following Covid, it has felt like that was used as a catalyst for making far reaching changes. At least my experience people take more pride in their outfits because they feel there is still some opportunity to have influence on making a difference compared with the larger corps where more often changes are forced upon the cadets without any conversations.

Each outfit should be allowed to have its own culture. it allows for a unique experience for each individual. Outfit culutre and uniqueness is what makes our corps special

This is no different than barracks in the Army. The Bulls as leaders need to be present amd part of those teams, holding the outfits to a standard.

Stop jock outfits from being all about look at me, and individual pr shirts (outfit shirts and hoodies should be enough anything off uniform should be corps stuff).

Maybe it's a good thing. It's very possible that a majority of people join the corps because they think they've found an outfit that achieves everything they want to achieve in the corps. I think the corps offers a great experience that is only heightened by outfit diversity to better suit the individual. If an individual doesn't like the corps, most likely they simply don't like their outfit, but can't tell the difference. So, to prevent this, maybe fixing outfit recruiting to give a real (not biased) picture of their outfits' cultures to future leaders could solve this. Just food for thought, definitely not a refined idea.

The Corps experience is to have an extremely hard fish year. Not a semi-difficult first semester then immediately forced into SOMS "leadership briefs." That has never been a part of the "Corps experience" and nobody that I know joined the Corps to sit through briefings. I joined the Corps to be pushed to my limits which has made me into the leader I am today. It is sad to see the freshman class stripped of this opportunity in the name of "retention." QUALITY OVER QUANTITY. If someone can't handle getting yelled at because they can't wire a uniform properly, they should not receive their brass.

Start by uncovering what great outfits do right. Capture those processes and procedures. Build out unified Corps training based around the Standards. Bring cadre in early and train on those standards. Create the wanted guardrails and allow Corps to work within.

FOW should extend into first few weeks of school but with the outfits and trained cadre in charge. Allows fish to adjust to class cycle, studying and Corps expectations. It will take dedication from military advisors to be present during that time to ensure cadre only interaction.

Sophomore training during first few weeks to match timing of fish fully integrating in outfit. Define what is expected of them - hold high standards and push fish to chase excellence in all they do. Can be stern without the abuse. Be honest about what the abuse can do. These are adults, treat them as such.

The outfit traditions should be understood by Trigon. New military advisers should also get a training from the cadets. What's important to that outfit and why, how can MA help, etc. this will help their adjustment also.

The plan shared has merit. Just needs to be vetted with stakeholders and asked all to find common ground.

Use key leaders to reinforce corps standards and values and then integrate with outfit traditions to exceed corps expectations. Have meeting with outfit leadership to set up what outfit culture looks like that reinforces corps standards without killing outfit individuality.

Standardized core principles that every Corps outfit must adhere to and exhibit, with the outfit identity as a second place to core responsibilities.

I covered this in my answer to the first question, but my main concern is the fact that the freshmen will now have incentive to form cliques within the fish Academy, and will have an even harder transition to outfit-life later in the semester because of the friends they have made in the fish Academy.

What disparity exists? Could you provide examples? What is the "identity" that so defines the Corps experience? What is the problem?

See the thing is the individual outfits and their identity makes the corps the corps, because other than that you are basically doing the same thing and there is no difference in which outfit you choose. The court is fine the way it is and if you think it's wrong, you're wrong, yes something can change in a slower way if you automatically force people to change your not gonna make a productive environment you're going to kill the corps. The identity of each outfit is what makes people want to come to a certain place. I've talked to people about it, and there's almost no difference between the corps. If you do it on a fundamental level, the only difference is CT and BQ, and the ROTC and that is the only difference fundamentally. It is the culture of the outfits that makes people want to come and stay it is 17 culture and their legacy children that makes them come and stay it is sixes legacy that makes people want to come and stay. It is E2 Culture that makes it come and stay. What would make us different than a fraternity with these changes what would make us different from West Point, and those other military colleges nothing we are the core of cadets. We are a senior military college of Texas A&M. We have non-reg. We choose the core because of the heritage we were promised we were promised to go into and be apart of.

People pick outfits based on differences

I do not see a big enough disparity between outfit experience and corps experience to justify keeping the fish from their outfits for over a month. Everyone and every outfit is supposed to be held to the same standards outlined in the standard and guidance from staff, so if anybody or an outfit is not upholding these standards and values, the problem seems to come from a lack of accountability directed at those outfits not a faulty system and definitely does not require the need for a restructuring of the whole system. I think that the solution should involve more accountability being enforced from upper-level staff leadership rather than destroy generations of individual outfit traditions. There are two ways to build up the corps identity. One is to promote it and work towards a buy-in from cadets and the other is diminish outfit identity, which I believe is the direction these changes are directing the corps and is completely wrong. Outfit identity is a huge part of what makes us unique and what keeps people engaged in the corps and gives them a purpose and a "why". I understand the desire to want to build up a greater corps identity, but this can definitely be done without sacrificing the tradition and heritage that every outfit holds so dear.

The truth is that even if changes are made, current sophomores and upperclassmen (most not all) say they don't plan to change (all male outfit); fear will prevent others from speaking up with what happens after hours when no adults are around to check in or supervise (we've seen adults around once or twice

and it's when negative stuff went down - hazing); when students get to be fake leaders they will force those they lead to act in a way that goes against the plan when no one is looking. Again some not all. Maybe an anonymous survey should be given to fish to have them ask about how they feel about their current sophomores and juniors since they'll be the juniors and seniors leading next year. Maybe this would help fish be honest instead of fearful of who leads them

Don't think you have all the answers. You don't. Your viewpoint is skewed badly

Outfit identities have strayed into individualistic and xenophobic culture traps. This problem is difficult to approach, because many are so protective of their outfit cultures. I've found that when the corps does activities together, it boosts morale and I personally feel more connected to the rest of the corps. For example, whooping at formation is such a small tradition that we have, but it connects cadets across the quad because we all love good bull. Besides block T practice, Brass, and Commandant Briefs, United Corps activities are few and far in between. Maybe the answer to a toxic outfit culture is exposure to others, which could be achieved through joint training, social events, competitions, etc. with random other outfits across the quad. Whatever it is, the Corps needs to get a little closer with one another and build repertoire, whether we like it or not.

While perceptions are said to be reality, the colloquial is not true. The only way to effectively impact the perception is to communicate communicate communicate the facts that dispute the perception. But the communication cannot be varied, and it must be repetitive, common, and constant.

Start keeping outfits who are obviously lacking physically and grade wise accountable. Allow these outfits to actually pt together throughout the week and form a community that will push them to become the best outfit in the quad, not just in words and slogans. The main problem is discouraging the outfits who are producing good and high speed cadets by threatening the disbandment of their outfit and separating fish into their own dorms, this will effectively destroy the motivation factor that the Corps relies on through the outfits and will create a new norm of complacency and apathy in the corps as they can't be the primary teachers to the fish, rather a conglomerate of juniors who are not in their outfit.

Implementing more corps mpis and commandants inspection

I believe the idea that there should be a singular corps experience is wrong. When I was choosing my outfit, I liked the ability to select and outfit that I perceived to have values that aligned to my own. In my case, I joined a stem focused outfit, and I am really happy with that decision. Other people may chose to join an outfit that aligns closer to their values, and that's ok. As long as all outfits meet the basic requirements expected of cadets, that's ok.

I am a member of the band. I don't see a disparity between my outfit experiences and corps standards and values. Every member of my outfit exceeds the standard in every way: knowledge, uniform, drill, etc. BQs look like real cadets when we walk down the Quad on our way to class and it hasn't been recognized by the commandant as being an accomplishment on the outfit level at all. The band outfits couldn't be more different from eachother in culture yet we all see the importance of the standard. The hallmarks of an Aggie Bandsmen are Dignity, Self-Discipline, and Enduring Pride. These are the reasons freshmen join the band and the reasons why we stay are because every member of the band exemplifies these hallmarks. Some part of the Fightin' Texas Aggie Band experience is making cadets who are far more outstanding than the rest of the corps while being largely tossed to the side by CTs or anyone in charge. For the three years I've been here band outfits have had the General Moore cord. For two out of three the band has had the Hochmuth cord. We are the example that MPI teams use to train new graders. We march perfect drills on Kyle field week after week. CTs make fun of us out of lighthearted jest and few are offended by that. I, however, am offended that the commandant wants to make such big changes to fix problems that the band does not have. Even with March to 3000 the band is exempt from a goal the rest of the corps has because next year we will reach capacity at 400 members and our portion of the mass recruiting will be over. The commandant is producing more disparity by ignoring the one success story in the corps. Instead of causing more problems, look at the band: true keepers of the spirit, guardians of tradition, and true examples of cadet excellence.

Disparity is not the right word. I have no malice to any of my fellow corps members. I have pure love towards my unit, and pure respect to any of the members that went through the corps with me. I wish the corps would spotlight unit traditions so I could learn about every outfit. In 20 years I will find someone from a unit I was not in and I want to remember something about that unit. Getting rid of outfit identity would be stripling away the buy in of the corps. The world works in small groups. We can only handle so much. Jobs and military all have niche small groups that make up the whole.

There should be no issue with this. The perceived disparity is solely based around rumors lack of knowledge and lack of esprit de corps. Corps standards and values should be first and foremost in all cadets minds because it is the CORPS that is the spirit of Aggieland-NOT (close your eyes and pick your unit). If units are threatened by basic Corps standards I can only assume that they either do not meet the standard or they vary so far from it that it is completely subjective. that speaks volumes about their units culture and leadership: they are both weak. The corps experience is after all, what you make it. If the standard is raised and held high, the only units who can have a problem with it would fail to meet the standard anyway.

Just like the real military, some outfits will be better than others for myriad of unquantifiable reasons. The individual outfit experience is quintessential to being a cadet and should NEVER be diluted. It is therefore incumbent that the Trigon, Bulls, and cadet staffs at all levels ensure the outfits maintain standards and values. That is where the true leadership experiences will be gained. Individual oufits should be allowed to continue their own SOPs provided they fall within the Corps standards.

See my lengthy first answer!

When in doubt, look at the example of the Fightin Texas Aggie Band. Each member is in the Band first, then outfit, then section (by instrument). We can argue later if they are in the Band or Corps first!!

Again, don't stick your nose in unless there is an egregious violation of the standard or laws (I.e. hazing, SHARP/Title IX, or extreme MIP/DWI violations involving death or extreme injury). If a unit has a bad little t Tradition I believe you should advise the removal of them. I understand it's a tall order but I believe there is a way to do this.

Move to centralized control, decentralized execution.

When you look back at your Corps career, each individual will have a story. Some are outfit focused, but not all. The culture that exists in an outfit, while somewhat consistent is based more on the names on the doors vs a heritage. Some might disagree, but the reality is that culture is based on who is there now, not who was there 6 years ago or 20 years ago. Set standards for the Corps, get rid of the individuals that are bad apples and protect the Corps of Cadets.

Plan activities between each group to create synergy within and outside the outfits

Make it so that outfits shoot to exceed standards rather than meet them too many people in Comm Staff have told us to just shoot for the standard the problem with this is that people generally fall short of their goals that's why they say to aim high. Additionally the outfits are part of the corps pretending that that aren't will lead to people not feeling as though they belong and get lost in the sea. Outfit culture exists to create a family dynamic that motivates everyone to be better leaders.

The individual outfit experience is what makes A&M different from the academies. Having worked with academy grads, the bond built in the outfit experience builds lifelong bonds to a common outfit.

All leaders whether in the corps or in various schools on campus, the bond of a core group of individuals experiencing different experiences in contract cadet or D&C roles, allows for reflection and growth.

I have personally managed to stay close to my outfit buddies for 30 plus years in both military and business leadership role.

Any program to grow leadership roles without taking this as the key differentiating the A&M Corps experience from other uniformed student bodies in the US.

I like more attention being given to skills needed to learn at different paths along the 4 year experience. In my days, the only leadership training given was as part of the Army ROTC junior year. I personally learned more about leadership in that one year than I ever earned in dorms.

In my mind we need to provide this training. Allow cadets to return to their outfits for evaluation in these roles with feedback given by trained seniors as mentors. Think Army Advanced Camp but seniors are trained to evaluate junior and sophomores in their skills learned and applied. Rotate roles within the outfit for evaluation periods. Is there anything wrong with having three juniors having th first sergeant role in a given year?

We can do this and willing to help in any way.

Mike Munson
1995 Company E-1

I believe outfit experiences are just as vital as the corps experience. As all cadets say the people we meet in FOW and earn our brass with our outfit. Likewise, I believe the corps experience is there to provide structure to the outfits. My suggestion is to leave it the same I believe the corps is not broken. It has prevailed and flourished producing many successful people and it need not change now

The slight differences in each outfit are integral to the corps experience as it gives cadets a sense of belonging. Imagine a normal student coming into Texas A&M and not joining any organizations or clubs. The chance to develop a close community and sense of belonging greatly diminish. One of the largest draws to the corps is having an immediate close group of buddies which outfits provide. The identity of the corps still stands strong, look at everyone out in a uniform day by day across campus. As long as the corps values are upheld in an outfit (which almost all outfits already uphold them) and the 12 competencies are met, having an outfit identity does not subtract from the corps experience, rather it bolsters the experience.

Nothing needs to be changed in regards to the outfit to Corps relationship. Outfits buy in cadets to stay in the Corps. If cadets punch it is mostly because they simply do not belong in the Corps. Also, outfits with high retention rates are the ones with no outfit culture or they have bad leadership. C-2 has only lost 1 fish this year so far and it is not just because of our tradition but rather our deep-rooted brothership culture. There are a lot of outfits that do not have a strong family-like culture due to a lack of identity and poor leadership. Also, stop reinventing the wheel on issues that do not bother cadets like morning formo.

Make the corps more involved with campus activities and orgs. Build a culture of strength and unity that surpasses the individual outfit. Growth through struggle should be the norm across the quad. Most people that I know who punch after fish year cite that the real reason that they are leaving is not because they have an issue with their outfit but because the corps does not offer the challenge that we endured fish year and they feel stagnate and tied down with overbearing policies that restrict leadership, especially with D&C cadets. The corps experience is not unified across the quad. By making it easier, all you are doing is taking away the struggle that we want to experience to make us better. Nothing worth doing is ever easy. As president Kennedy said we chose to be here not because it is easy, but because it is hard. We want to push our limits and find out what we are capable of.

This is hard for a former BQ to answer… but I suppose the overall Corps priority is the selfless service to the university in guaranteeing all traditions, customs, and courtesies are carried out (no matter how bizarre or obsolete) because that is the duty of the Corps to the university. This duty is purpose, and

tradition, and can be an expanded mission set to include all classes of cadets and spur various jobs.

The band had horrible jobs within the major unit that were made prestigious (as only Aggies can do)… jobs like "Instrument Loading Crew." That was a terrible job, but an honor to be part of, and with a leadership chain of command. It was also tradition.

As a BQ, the band performance was my primary mission focus - a direct service to the university. My loyalty was to the band as a major unit first, then my outfit. Most of our cadet training occurred on the drill field every afternoon with the entire band. This would be very similar to major unit cadre training all their fish every morning and afternoon in the fall. This would be very immersive and provide mission, purpose, and jobs to the major units.

My individual outfit training occurred thirty minutes in the morning and thirty minutes in the evening. As a fish, we got snipits of "outfit culture" mostly enjoyed by Butts and Zips.

I see no problem with training fish for an entire semester with sharp cadre from the major units and then sending them to the outfits. They'll have seven semesters to learn "outfit culture."

The Corps may need a "reset" to condition cadets from the bottom up to perform a service to the university first. This is accomplished through the leadership of the major units who utilize manpower provided by the outfits. Standardization is important. Fish unity is important. A challenge is important (physically and mentally). The stressors of the Corps helped me in the Air Force… I could think clearly and make decisions in chaos. The Corps at A&M provided the scripted organized chaos and piled on stressors that strengthened my resolve and ability to prioritize. Even the incessant yelling was a stressor we learned to work through and even tune out.

Reset the Corps by pulling the fish out from the outfits for an entire semester. Train them correctly to proper standardization - blame the outfits for not training the fish and Pissheads properly. Tell the Old Ags to calm down - these are the same people who complain that the cadets are not standardized, look bad in uniform, are not engaged, are not militarily impressive, etc. Make the outfits unified under the umbrella of the major unit. All upperclassmen should be able to correct a fish - there's no reason why the Corps can't take a unified approach to training and standardization. COVID probably really caused some problems.

I'm not familiar with fixed unit culture. B-Battery's culture changed with normal attrition. Outfit culture in the band was driven by the various personalities within the unit… and we really didn't get a full grasp of the culture until we were Butts. Pissheads and fish were focused on grades and Corps training, not culture.

Matt Daniel '93
Head Drum Major
B-Battery
USAF Lt Col (Ret)

Diluting the outfit experience is not the answer here. Those first months are critical to demonstrating to young cadets on the value of trust in the leadership of the people they will work with throughout the years of their Corps experience.Deliberate and intentional education and training targeted at outfit upperclassmen in how to train freshmen on the Corps's values is the answer. Think of corporate America organizations…it's the first line supervisors job to educate new employees on the organizations core values so that new employees may embrace them. THEN first line supervisors can have the foundational trust and environment to build their own organizational identity with their new employees.

All the outfits want to say the focus on academics, training, ROTC, ect more than any other outfit. But this is not true every outfit is different because of its history and traditions. We need to encourage and give incentives to the outfits that bring the standard back into a living document. As a fish we just do things

because we are told to with no reason or passion. As we become upperclassmen, we still think the same telling our fish creating an endless cycle. To fix anything we don't change the rules we change the culture. If we can get a corps culture of being redass and an outfit culture that is connected it. The corps experience will improve while keeping the unique outfit cultures.

I loved my outfit experience. My outfit was my family. The corps was my association. I'll admit we pushed boundaries, but overall that made us physically and mentally stronger and smarter in the long run. We thought independently, had pride for what we stood for, and would've given any and everything to help our buddies.

Outfit cultures are not at odds with "corps culture", whatever that even is. For example flight of the great pumpkin is a C-2 event, but loved and attended by the entire corps plus non regs. It is a c2 tradition sure, but it is something that adds to the corps overall.

Myself and all my buddies have said that we would have punched by now if not for our outfit's fantastic culture. No one cares about corps culture, because it has been so overhauled by ideas like this fish academy thing. The main representations of worthwhile tradition is found in the outfits, and most people have loyalty to their outfits over the corps anyway.

Outfits > corps. And outfit culture is NOT at odds with the corps anyway.

Each outfit should have its own identity. Why this focus on "equity"? Who perceives the suggested disparity? Members can change outfits if they like another's identity better.

This is a tough one. I'm old. So was my and my wife's father when we talked about changes over the decades. Having many friends that reached command rank in the military. We've visited about different units each had their own personalities. Some were outstanding in accomplishing combat objectives but caused grief at elevated levels due to their lack of sensitivities to the backlash of practices used. Creating an amalgamation of commonalities isn't how business or the military functions well. We need differences in approach, style, and skill levels. Disparity exists. Leaders learn to use that while minimizing harm or unfavorable outcomes to the disparate factions. I certainly do not see the specific issues being dealt with here. But solving disparities is most often not effective. Good luck. I always remember what a great friend told me as he was stepping down from his company. "They'll fix everything I messed up. Then they'll stay around long enough to mess up for the next guy." Best wishes going forward.

Through deduction if someone is in and outfit they are in the corps. There is a respect that is present but outfit culture takes personal precedence because they have the most facetime with cadets.

The outfits are key to the success of the Corps. They provide a family for the cadets and a leadership lab as well. Yet many times they are robbed of good leaders by job positions outside of the outfit. Though these positions are good for the individual they often prevent the fish from seeing these outstanding leaders and benefitting from contact with them. Corps staff is necessary as are the staffs of the different branches, yet they operate sperately and often opposed to the outfits. We often saw these staffs as the enemy and not our commrades, yet those cadets had once been a part of our ranks. If those staffs stayed more grounded to those they command then these differences would lessen.

There is no disparity between outfit culture and overall Corps culture. Each outfit may have more of a focus on one Corps value than another one but the difference in each outfit is what keeps the Corps experience diverse and unique for every cadet. Diluting the culture of every outfit leads to less motivation to be a better cadet overall because they don't have pride in their outfit to begin with. Additionally it would reduce the buy-in for freshmen because their experience would be less personal if they were to be shoved into a larger group that didn't have different focuses and would be a less intimate buddy class as well.

I'm          My son is a fish in       We have several other legacy outfit members. The plan to homogenize the freshman class would ruin any legacy.

There are always going to be terrible outfits. Disband them if they get out of hand for too long.       nearly got disbanded when I was a fish. We had 25 fish and 17 remained after first semester. 4 of us were

passing! We won the General Moore award the next year. We stick together like dogs.

Outfit experiences are what makes the Corps unique. My outfit has been around since ___ . We used to be the best. We won GM my pisshead year and got 2nd my zip. We were the BEST outfit on the quad. Times change. But we are still ___ . My son hasn't earned ___ yet. If you propose the homogenized Corps, ___ will go away. So will the hard standards that ___ Company brings to the table for its fish.

How to make the Corps standards? We should tell the fish they are required to say "howdy" starting from fish camp. Into FOW, and lead by example. The Corps sets the standard. We say HOWDY. Simple solution. HOWDY!!!

What makes the corps experience significant is the ability to develop relationships with your buddies. As a non contract seeking cadet myself, the only reason I joined and have stayed in the corps is for my buddies. Doing anything to inhibit the creation of these relationships destroys what makes the corps unique.

First, the Corps commander needs to set the vision for the Corps and those under his or her lead need to implement the vision. Standards are critical. There is nothing wrong with individual outfit experiences but the outfits need to still have standards to meet and the outfit leadership needs to be heald accountable when these standards aren't met. This gives outfit leadership the ability to learn to motivate their outfit without demoralizing their outfits. Every organization is made up of teams of teams. The small teams have to learn to work together to fit into the larger picture. Just like a military unit, healthy competition is good but there has to be the understanding that in the end, both outfits are a part of something greater.

Remove CTAs, give better outfit autonomy, increase cross outfit training. You want more corps experience? Find ways to improve outfit involvement with other outfits. You kill outfits. You kill the corps. That is fundamentally what the corps is built on.

If you remove the outfit identity, you remove the oldest tradition at TAMU.

There are always going to be bad outfits. When grades slip and retention slips in a particular outfit, put the microscope on them. If they continue to suck, then threaten to disband them.

What you can't do is basically disband EVERY outfit and go to some west point basic training system. We are the Aggies. The Aggies are we. We don't do it like them and this is Texas A&M University, not a military academy. The Corps keeps the Spirit of Aggieland around here.

If you remove the outfit identity, you remove the oldest tradition at TAMU.

The Corps of Cadets overarching culture is to set the basic standards that each outfit adds to and creates the true experience that all cadets want, take a look at all males and why they are the best outfits.

Allow more interaction between Corps staff and outfits instead of it being autonomic entities.

You can't, but diversity is what makes the Corps so great. It's why it's known to produce such good leaders, there's variety within them.

You were once a member of this organization. Don't you feel connected to those who were in your outfit after so many years of being away? The outfit is the bedrock of the corps. Yes, getting an education, developing leadership skills and life lessons are very important. But the relationships you form during your time are just as important. that is being an aggie.

Every outfit has their issues. Like I said, many have a cadets vs staff mindset, and in exercising this mindset, they only receive more discipline, driving them to either retaliate or stop caring. Neither is good for outfit development, and neither sets a good example for fish, who don't know what a good leadership model is supposed to look like yet. But again, taking away what can be valuable training time (especially physical) to do, say, SOMS briefs, does not make much of an impact on the way the cadets lead. They don't like being told what to do. They like to learn hands-on, firsthand, and experiment. And that's not all bad. When problems arise, however, it is important that especially fish know they are able to make their own decisions if they are uncomfortable. They are allowed to speak up. In some cases, they will never be satisfied with the training because they simply cannot handle the rigor and didn't know what they were

getting into. There is nothing wrong with that, but standards should not be lowered, and outfit activities should not be banned, just to meet the lowest common denominator for retention. This is supposed to be a military program with a military training style. It will be hard. It will make you question yourself. It will not make you feel good. It is supposed to test your ability to act under pressure, to suffer with others, and most importantly, to develop as leaders. The corps has great examples of good leadership and of bad leadership. As much as bad leadership can be toxic to an outfit, it is important for cadets to recognize it and want to make that change. It shouldn't be higher's job to keep every outfit accountable for leadership, but outfits should work things out on their own. This isn't to say there are no consequences or people keeping accountability; I believe that should fall on the major unit leadership. Bringing outfits together under the major unit, especially if outfits look up to their MUCs, will have a more impactful result than guidance coming straight from higher itself (everyone is arguing that the current state is not a cadet-led corps).

I am not in a position to answer this as I am an alumni from many years past and am not sufficiently familiar with the current programs. I can only say I believe it is a holistic issue and not one that fragments the historical and existing structure of the corps.

If a large percentage of the corps is joining because, essentially, it is a fraternity or sorority like experience (I.e. they are neither joining the military nor seeking a four year long experiential leadership course), we will never transition away from outfit culture. They can claim they want to be leaders, but they really want to be fraternity president. However, if new cadet recruits ARE looking for a four year experiential leadership, then we should abandon the outfit culture.

It's simple, impart leaders with the values and regulations associated with the corps, and train them to utilize those as a frame of reference akin to commanders intent. Then provide them to tools and formats to standardize processes, then simply oversee. This allows the individual outfits to set and define their training priorities and create long term visions for their units year to year.

Perceived disparity? Who perceives it? This is a loaded question, what metric is there to actually determine this disparity? What specific Corps standards are being ignored? If this is indeed the case, isn't that the job of MU staffs and CTOs? What is the purpose of the chain of command if not to enforce corps policies?

Enforce a minimum standard. Individual outfit cultures should contribute to that standard bringing their unique elements. More supervision (but not direct interference) from the Bulls solves this.

Outfit experience is the Corps experience. The outfits are not a weakness but a strength. Not a single person in an outfit doubts that they are apart of the overall corp, they see themselves as apart of the outfit as their family and the corps as their organization. As I mentioned earlier, the outfit culture is why im still here. After every silver taps or memorial we pray and talk together, our upperclassmen have supported us and suffered with us through the worst of this year, inside and outside of the corps. The traditions and "culture" that they pass down we accept not because its a tradition, or its just something we do, but its because we emulate those we respect and look up to, and thats our family, our outfit. My identity is a cadet in the corp, but more specifically, my identity is found in my buddy class and upperclassmen, who understand what I go through because they've been there through all of it, and in the upperclassmen's case, put their heart and soul into planning and our development. Our outfit has made it abundantly clear that every single aspect of the corp is for the fish, is to lead and guide us. Anytime something has come across wrong or not gone as intended, it is fixed quickly and to the fullest extent, because they are here for us professionally and personally. Im proud of my outfit, my upperclassmen, and my buddies, these are the ones I suffer snd struggle with, the corp is about people, building strength and relationships, and being the spirit of aggieland. You learn those in the outfits, not a classroom. You learn how to develop

and be strong through people close to you who care for you and give you everything, like our upperclassmen. You learn how to love and help others by being in a buddy class that becomes an extension of yourself. Taking away the outfit experience in any one part damages all of the others as well.

I'm sure this may not be 100% popular, but perhaps more popular than removing Freshmen from the outfits. My experience at USMA was that following the Sophomore year, all the cadets moved to new companies/outfits. This enabled meeting new people and developing additional relationships, but also allowed for growth by being able to move beyond perhaps a challenging experience in the first two years, or to enable the new Juniors to more easily come in a NCO-leaders where no-one has any pre-conceived notions about them whether it be the Seniors or the Sophomores. It's kind of like a clean slate opportunity when they really need to perhaps outrun their knuckle-headedness of the first two years and when the Sophomores need someone to hold them the the standard, and not necessarily their drinking buddy. This would perhaps need to remain within the various "ROTC-types" to keep some semblance of the appropriate service culture, but this will also help provide more commonality across the Corps. Are there ever lectures, guest speakers, lessons that are brought in just for a particular class? Where topics are discussed that they all experience that are most relevant to them? And I don't mean bring all the Sophomores in and tell them how they aren't doing a good enough job keeping their rooms clean. But where they are all getting an experience together? Are their any other sort of "class-specific" activities that bind the class to each other and to Corps-wide traditions versus outfit traditions. We had class-level events at USMA (Yearling Winter Weekend, 500th Night, 100th Night) and the plebes had to be able to recount how many days to each of these upcoming events and how many days until we Beat the Hell Outta Navy... That Corps-wide telling by the plebes of an upcoming event that each class would participate in furthered that we were all part of the same thing. I full recognize TAMU and USMA are different and serve different purposes, and trust that you will discern the meaning behind what I'm offering and not as a suggestion that you mirror it be mirrored. I believe outfit traditions are important, to this day 30-yrs later I can remember the motto of one of the USMA companies I WAS NOT in because of how they shouted it. A small thing for sure, but heck, it bound them together - even if the rest of us had to endure it. If leadership positions are standardized, and roles/expectations are standardized, and certain events are made central to both the learning opportunity and the bonding opportunity, and then more people are getting their shot at some of those roles, then you will have a more common-across the quad experience that should meet Corps standards. In the mean time, outfit t-shirts, outfit PT, outfit songs, outfit mascots, etc are all good ways to allow some individual outfit experience as well. - John Horning, COL, US Army

This was an excellent point I found that the commandant made however I believe his reaction was far to extreme as I personally never felt this concern was made clear by him or his staff. The introduction of an idea as radical as Fish Academy feels to the corps like a punishment for not executing a vision we did not know we were expected to execute. To start, I believe that corps culture is synonymous with outfit culture. Outfit culture is to me the predominant factor that makes us different from every single academy and SMC. There is a healthy drive of competition and buy-in that is able to be generated on a small local scale that drives you to want your outfit to be the very best and this begins with the fish as they are the future generation. I believe that the issues in a lack of accountability for the freshman and standards of other outfits begin at disconnect at the minor and major unit levels. There is little to no sense of minor unit pride and while I by no means believe that outfits should have a part in training or imposing there own culture on other units fish, I do believe it would be beneficial for minor units to begin taking responsibility for one another. I by no means suggest that other outfits should pisshead another outfit's fish in a traditional sense however I absolutely suggest on-the-spot corrections and communication between outfits. One way to make this easier would be mass whip-outs at the beginning of the year similar to how outfits do, except to other outfits in the minor unit. Ideally, this will promote a more comfortable attitude towards a unified minor unit while maintaining outfit culture and "sovereignty". This would help a much broader standard and ultimately lead to a more unified corps.

The Corps Experience IS the differences and identities between outfits. Some outfits will excel at certain things based on their identity. Not every outfit can be a cookie cutter copy of the next. Yes, this doesn't result in everyone having that SQ-12 GPA or that K-2 Bloody Cross time, but that's why kids join the corps, so they can take pride in the identity of the outfit they've invested in. Just make sure everyone has the same opportunities, which I think has been the case ever since I was in.

This question implies outfit culture can't coexist with the overarching corps standards. Stop focusing on the March to 3000, we know it's just for the sake of money. Focus on QUALITY not quantity.

The Corps Experience starts with your buddies. Every class I have been able to talk to has said the same thing: "You marry and bury your buddies". Creating a fish dorm eliminates this. Part of the corps that is special is that not only you belong to one of the most unique organizations at the university and in the nation, but within it you belong to a family of cadets that you can trace back to the start of the outfit. An out of state cadet that is the first Aggie in their family can come to the Corps and have a family that is there no matter what. No other organization has that. The can grow from their an join a special unit like FDT, PMC, or RV's and now belong to another unique family. The Corps Experience is your outfit identity. Every outfit says that they are "the best damn outfit anywhere" for a reason. They can compete against other outfits in Corps challenges but gain their best friends with they join together in special units. Killing outfit identity hurts the Corps experience and eliminating the difficulty of special units hurts the pride of being accepted into them.

Embrace the differences. The Corps has a tremendous opportunity because of the unique nature of Texas A&M and the traditions of the Corps as both a Senior ROTC program and an elite University with such a large and diverse student body. Allow outfits to emphasize different things and celebrate them. That will also help with recruiting and retention. For instance, an outfit that emphasizes athletics. An outfit that emphasizes different traditions at Texas A&M that they can take pride in (E-2 obviously does this with Reveille but there are countless others). An outfit that emphasizes community service. An outfit that emphasizes different Corps organizations such as PMC or FDT. Outfits the emphasize physical fitness preparedness like Rudders Rangers. Outfits that emphasize different majors such as Engineering, Business, or Agriculture. The more prospective students feel they have options the more likely they are to join and to be happy with their choice and take pride in their outfit. It also shouldn't be discouraged for outfits that want to remain all male or even have an all female outfit if the students want one.

One thing that surprised me when my son did Spend the Night is the overwhelming majority of kids were staying with a small number of outfits that they requested. The best outfits recruit well and have a reputation that prospective students want to be a part of. I took pride that my old outfit Squadron 17 was one of them and my son stayed with them. Yet the attitude from the staff I visited with seemed to be very negative about it. The obvious answer to me would be to look at what those outfits are doing and see how that can be replicated by other outfits instead of seemingly resenting a successful model.

Of course there should also be objective standards that all are expected to follow and Corps wide goals. Academics. Retention. Military bearing and inspections. Discipline. Those should be universal and expectations should be met. They should be the goals that every outfit strives for and is evaluated by. The more objective the better. Measure to those standards and make sure that the leaders of the outfits know what they need to do to be considered successful and what isn't satisfactory. Hold them accountable to those standards and if they aren't met attempt to support and assist them in doing so and when necessary make changes.

Survey Corps members about what they care most about the Corps and why they joined. Try to gather information from those who would be excellent candidates but didn't choose to join, for instance any students that spent the night but didn't convert. Know what students care about both for why they joined and why they stay or why they didn't. That's how you grow the Corps. That's how you build motivated cadets and help with retention.

I'm Class of '93 and was and was          (I considered a contract but ultimately didn't take one, as an aside I likely would have gone Reserves or National Guard had those options been more emphasized).
                                                          and served 28 years in the Air Force. I have 2 sons. One did Spend the Night but ended up going to
                              where he has a Leadership position. My other son is a Junior who is an exceptional student and is in excellent shape who plans to attend A&M and study Engineering but at this point based on what he has seen with some of my other Corps buddies kids (3 of which had sons in the Corps) he

has little to no interest now. I've donated to the CCA and my Dad donated incredible amounts of time and money to the Corps throughout his life.

I only say this as someone who has a lot of different perspectives and I care. I know that any decisions made will be criticized and make some unhappy. Change is part of the process. I'm happy to speak about it or to connect you with my 3 buddies who have all had varying experiences with their sons.

Gig'em,

---

I touched on this in the first question. I'm not sure what the current regulations are regarding the freshmen. But, I can assure you that the individual outfits think they are too soft. The Corps is meant to be hard. You should expect kids to punch. Not everyone can handle the rigors and that's ok. But that is what makes the experience valuable. I have a son that wants to enter the Corps next year. He wants it to be hard! He will be a great cadet. My biggest fear for him is 4 years of distrust with leadership outside his outfit.

My suggestion is the Trigon re-analyze their current regulations on freshmen. It should be a difficult year! PT is not bad. Freshmen can be yelled at and made to push. And they can do that and still make their grades. The outfits will respect a Trigon that has their back.

Educate parents and incoming freshmen about what they can expect. They are going to be yelled at, punished and broken down. Parents and cadets should know that when they look left and right during FOW, chances are that cadet won't be there.

How do you do this and get to your goal of 3,000? Recruit the right kids. The CCA's database of former cadets needs to include "children" and their ages. The CCA can then focus efforts on the children of former cadets when they are high school juniors/seniors.

What outfits are successful in recruiting? Why are they successful? Use those outfits as a guide.

This whole issue with cadets not saying the corps hump it is just the fact that I can't hear when it happens. Maybe have it start as soon as the canon goes off. Spirit of 02 fires and then everyone starts shouting the corps hump it sounds very motivational to me. I think the idea of having a group FOW isn't a bad idea. It would standardize training and make sure that all cadets are taught proper standards instead of just the units that deem the standards important. It would also be cool to have more opportunities to compete against other SMCs in ways that we can see. Healthy competition between outfits and pride for those outfits isn't a bad thing though. It pushes cadets to compete with one another and get better. I know for a fact that if I'm in a bad situation and I yell "old army fight" it doesn't matter what outfit I'm in, anyone in the corps around me will have my back.

the answer here is simple, accountability. If you hold individual outfits, and cadets to the same level of accountability you will create a shared experience that is not diluted by disparities between outfits

Once again, open discussion. Some outfits may cling tightly to traditions and ways of training that are either unproductive or counterproductive to leadership and personal development, but not everyone does!! Fish have upperclassmen to hold them accountable for mistakes (which are minor at this stage), but upperclassmen need to hold themselves accountable for far greater responsibilities. This will be accomplished by connecting whitebelts across the Quad and encouraging open discussion about training styles and outfit culture that others can then comment on and provide suggestions for improvement. When applied to our current training style, this will greatly improve freshman experience.

In combination with my first reply, I also believe we need to offer more development for our D&C folks. As a retired Army officer I fully embrace and have personally benefitted from the Corps' excellent ROTC programs and the immersive military environment of the Corps. But rather than allow our D&C folks to just "be along for the ride" maybe we should consider a non-military leadership and staff position on the Commandant's staff who shepherds the flock of D&C cadets, leads initiatives focused on their development, and advises the Commandant and key stakeholders on this significant population of

cadets. I view it as a General Officer / SES type relationship. I'd have a lot to flush out with this recommendation but this is a starting point for the discussion. Please let me know if you'd like to discuss further. -Jason Blevins

Accept that most cadets are not in the Corps for the Corps, their top priority will always be their buddies and their outfit. The Corps experience is defined at the outfit level, not the Corps level. The Corps provides a framework and guidance structure for the outfits, it's cannot exceed that role, or else resentment will follow. No former student looks back on their time and chooses an activity that involves the entire Corps as their favorite memory, those memories are always with buddies and with outfits, and those memories are what keep people in the Corps and keep children and grandchildren of cadets coming in

By having the corps staff be the people to monitor and oversee the behavior of the outfits. Not the CTOs. The more involved CTOs and the Comm staff are in desision making and monitoring, the less the corps is a cadet lead organization.

What perceived disparity? Nothing has been presented that shows an actual disparity. If there is any factual disparity, it would be a lack of discipline and leadership coming from the Trigon. Everything that I have seen or read has been a knee jerk over reaction. It is over the top, and fundamentally destroys the Corps.

The individual outfit experience, IS the basis for the Corps experience. It is the focus. It is the everyday. It is the three-meter area of control.

What was stated by Gen Patrick Michaelis on the two posts he made on the You know you were in the Corps at A&M when... Facebook page, will without a doubt do exactly what you are trying to prevent.

Let a Cadet that comes into a certain outfit change to another without question. Usually they have already done their homework on why they want to change. If this keeps their mental health in check and they do not punch it is a win. This idea of separating the Fish is ridiculous. My Fish is furious with this idea.

I believe there is no systemic and problematic disparity between individual outfit experiences and corps standards and values. As a cadet I am told by my outfit everyday to exceed the standard in my actions, represent the corps and the outfit well, and stay true to the values of the university and our organization. Outfits acting in such a way that disregards the standard and the corps is very rare in comparison to how much larger our organization is compared to others. There will always be those who divulge from the standard and act in a way contrary to our value this is of course unfortunate. However changing how an organization operates on a whole rather than disiciplining individuals involved and identifying the steps that allowed those individuals to deviate sop thoroughly from our organization.

In the Fall of 1974, almost 50 years ago, I arrived as an incoming fish in the Corps. My outfit experience is the main reason I am still passionate about the Corps and want to see it continue to evolve and remain relevant as a training ground for future leaders. For many, the outfit is where lifelong friends are made, maturity develops and life-lessons are learned. Attempting to "reconcile the perceived disparity" should not be a goal in my opinion.

The Corps standards and values can be exhibited in a variety of ways. Different outfits have historically found ways to do so effectively or they have been disbanded, with members assimilated into other outfits. The perception of disparity has ebbed and flowed over the years and will continue to do so because the Corps is a dynamic organization. If that ever ceases, I suspect that the Corps will die a slow death.

Commandant - Thank you for your good intentions, your continued efforts and for taking time to listen to an old Ag that learned many things from upperclassmen with little formal leadership training, who often got it wrong, but didn't quit!

Please see answer #1. Accountability at unit/outfit level. If not performing get disbanded and dispersed to other more successful outfits. ( maybe bottom 5or10% of get automatically disbanded each year?).

Accountability at the Unit level as well as individual level. The Cadets know the standard going into each year and know the expectations and consequences.

Set clear left and right limits and allow BDE commanders to do the same. I was the L-1 CO Class of '22 and the 1st BDE Commander always set clear goals and left and right limits for us. Armed with that information I knew exactly what/when/where/how my outfit could plan and execute training. The best part of that was that the training we planned and executed had our personal outfit spin on it which made it feel genuine and truly ours, which helped to increase buy-in overall. If you and the CTOs and the Hollingsworth center can create very broad and clear left and right limits and then allow BDE commanders to interpret that and pass it down the line each outfit will know what they have to work with and cannot get mad when they step out of line for potentially going too far on one side or the other. It all comes down to clear communication and you as Commandant trusting your cadet leadership. The Corps is cadet-run and should always stay that way, but it would help leadership out if they had clear guidelines to follow. Also, something that could help would be more Corps-wide competitions, something similar to Bloody Cross but not necessarily always something physical because certain outfits excel in different areas. Maybe holding monthly or quarterly big Corps-wide competitions would help to make people buy-in and be proud to represent their outfit and the Corps overall.

A lot of big words there but don't worry I got an answer. People in outfits aren't more outfit centric than corps centric because that's just the way things are. They are like that because of you. The Corps stack represents to cadets a commandant staff that is looking to inhibit their experience and the rest of cadets experience while here at Texas A&M. And when you put out something like this I can understand why! They see a corps staff that seem to be puppets of CTO's. Same thing with MUC's. They see bulls that are itching to see you screw up so they can pounce. That's what the Corps Stack represents to most cadets. But it doesn't have to represent that. There can be a united Corps that doesn't just unite when bad decisions come down from comm staff. If you really want cadets to live up to Corps Standards and values, allow them to lead and actively participate in this experience without them having to look over their shoulders at a bull waiting for them to screw up. Discipline and Mentor when necessary, absolutely. But don't walk onto the Quad and act like your responsibility is to fix all these broken individuals or a broken system. Your job is to give these young men and women an environment to fix themselves. There was a time when one of the most popular shirts on campus was "Rent a Friend, Join a Frat" with a Corps stack on it. If you want people to have pride in that stack again and not just their outfit logo, allow that Corps Stack to be theirs, not yours.

You don't. The outfit experience IS the Corps experience. A-Co is not B-Co, nor should it be.
If you want to increase unity amongst the Corps, and particularly participation in the Corps hump-it, actually do the hump it more than once or twice a year. We all memorized it because it was a campo, but we never actually did it. When we would, no one knew the cadence or tempo for it. Figure that out, practice it during FOW, and then do it before each march in and before any Corps trip and March to the Brazos.

 maybe it's time to consider retirement away from the Quad.

Hold cadets to standards, hold outfits to standards. Instill the Corps values and standards within the outfits. Embrace the mantra of lead, follow, or out of the way. Make standards actually count. ONE PT test for the Corps with ONE standard of measurement, age, sex, ableness should not matter. Either one can do the job or one can't, a buddy who can't get another back isn't a buddy, but a liability.

First, throw out the bad ones. Should all-male units still be around? We have seen units do better with females and males so why are there still all-male units (there aren't any all-female units...)? PT is not everything but it seems to be a big reason all-male units are still around. In my unit, PT is for the middle 80%. Those who want to go harder go to the gym or do STS or something more challenging for them. So, first, fix some outfit's culture. Second, do not allow different standards for different outfits. Some examples are burnt windshields, backward brass, unique spearheads on guidons, different ranks for guidon bearers, allowing females to wear earrings in PT and Charlies, female fish buns, allowing blackbelts to cross the elephant ears, and not allowing fish (or certain cadets) to say certain words). Outfit culture is a lot harder to change than simple changes to the Standard. Yet, I think a "crack-down" on

those small changes to the Standard would help. Another thing is that everyone learns differently and we all need different things. Some would like community service while others want perfect marching. That's the great thing about the Corps. You get a unique but relatable experience. One more thing, I have seen the older cadets are wiser and have great feedback. My Ol' Lady last year was 3 years older than me and she was amazing. Cadets from D-Co also have great advice. There should be more ways we can interact with them and learn from them.

Addressing the perceived disparity between individual outfit experiences and overarching Corps standards and values, while preserving the unique identity that defines the Corps experience, requires a nuanced approach. By introducing more layers between command staff and outfits, we can create a structure that facilitates better communication, oversight, and alignment with Corps-wide objectives, without compromising the distinctiveness of individual outfits. Here's how this can be achieved:

**1. Intermediate Leadership Bodies:** Establish intermediate leadership bodies or councils that serve as liaisons between the command staff and the individual outfits. These bodies would be composed of representatives from various outfits and command staff members, ensuring that there is a direct line of communication and feedback between the two. This structure allows for the concerns and suggestions of individual outfits to be heard and addressed, promoting a sense of inclusion and participation across the Corps.

**2. Standardization and Customization Balance:** Implement a framework that outlines core standards and values all outfits must adhere to, ensuring a unified Corps identity. However, within this framework, allow for customization where outfits can infuse their unique traditions and practices. This balance ensures that while the Corps operates cohesively under shared standards, the individuality of each outfit is not only preserved but celebrated.

**3. Leadership Development Programs:** Introduce specialized leadership development programs that focus on equipping leaders at all levels with the skills to navigate the challenges of maintaining Corps standards while fostering outfit identity. These programs can include workshops, mentorship opportunities, and scenario-based training that prepare leaders to effectively manage the dynamics of their specific outfits within the broader context of the Corps.

**4. Enhanced Oversight Mechanisms:** With additional layers between command staff and outfits, implement enhanced oversight mechanisms to ensure that all outfits are aligned with Corps standards and values. This could involve regular assessments, feedback sessions, and reporting systems that allow for continuous monitoring and support. However, these mechanisms should be designed to empower outfits rather than impose unnecessary control, encouraging self-regulation and accountability.

**5. Cross-Outfit Collaboration Initiatives:** Encourage initiatives that promote collaboration and interaction among different outfits. These could take the form of joint training exercises, community service projects, or leadership retreats. Such initiatives help to bridge the gap between individual outfit experiences and the overarching Corps identity, fostering a sense of unity and shared purpose.

**6. Transparent Communication Channels:** Ensure that communication channels between command staff, intermediate bodies, and outfits are open, transparent, and efficient. Regular updates, town hall meetings, and feedback sessions can help maintain a clear understanding of Corps objectives, standards, and the value of outfit identities within this larger framework.

By introducing more layers between command staff and outfits, we can create a more supportive and responsive structure that addresses the disparity between individual outfit experiences and Corps-wide standards. This approach not only reinforces the shared values and objectives of the Corps but also ensures that the unique identity and traditions of each outfit are preserved and respected, enriching the overall Corps experience.

You know when I was a fish, I had to high port the "fish guidon" back from the Brazos river. It was 7 miles and the "fish guidon" was a 6 inch wide, 8 foot tall tree trunk.

You know what? I made it back. This was the hardest thing I have ever done in my life and now I am 50 FIFTY. It changed my life forever.

There is no way this would be permitted these days for for God's sake, LEAVE THE CADETS TO DO PT. You are making a very WEAK CORPS.

My son (a current fish) says it's too easy. He was a high school wrestler. I put him in the Corps to make him even stronger, tougher and a better leader. If it's not going to be a PT challenge, and he's D&C, why would he do this AT ALL!!!!!??????? STOP with your RESTRICTIONS!!! My son needs to be crapped out!!!

I believe input shouldn't just come from the highest up people. There should be a system in such a way that the leaders such as CO's act as representatives for their whole outfit as opposed to just their opinions. It is the responsibility of the leaders on a smaller scale to bring the whole opinion, not just their own, to the leaders on a larger scale and the smaller scale leaders need to be made aware of how important they are. Without this, the majority of people that are lower on the chain of command are all of the sudden surprised when a decision was made that they don't like

"perceived disparity between the individual outfit experiences" - What is this? Perceived by who, what disparity, do people not like their outfit? If you do not like something be the catalyst of change within the outfit. There were things that our Zip class changed and I am certain that the Butts under us made changes when they were leaders.

Please define the Corps standards and values that are not being upheld. It goes back to accountability, if outfits are not meeting the standard, then address the problem at that level. If the Corps is not meeting the standards, then first examine the standard (is it relevant), then examine the leadership at the highest level.

Pretty much how it works in the corporate world - when an individual does not meet their goal - it goes on their evaluation and they are coached or eliminated. If the organization is not meeting the goals of the shareholders, then the CEO is coached and often eliminated.

Is there a problem here? More context is needed.

Let the outfits have their own identity and if they are hazing beyond PT, then punish them. YOU ARE RUINING THE CORPS. LET THE FISH PUSH AND LET THE RV'S RUN. FOR God's sake man, what are you DOING?????

The individual corps outfit experience is the what makes the corps so unique and honestly is one of my favorites. As a former CO, it was amazing to build an outfit culture that made us seemed different and not just like anyone else. I believe making members in the corps feel unique is a great thing. I understand the flip of the coin where if it goes too far, it can be a deterrent to the unity of the corps. I believe by analyzing the outfit cultures and identifying those cultures that can be dedicated to specific corps wide goals can help create a greater sense of achievement. So make the overall corps wide goals tailored to outfits around the quad that best suits their cultures. I think that would increase buy into not all the outfit culture but also into the corps identity. Another consideration, make FOW longer and more standardized. Select representatives from all around the corps and have them teach then they can go to specialized outfits. Kinda like a boot camp where everyone learns the same but do it in the summer and not during the regular year. I think by doing that, you can produce a more united corps but also help develop a sense of uniqueness

The purpose of each outfit at its very core is to follow the Corps mission statement: To develop well-educated leaders of character prepared for the global leadership challenges of the future. We can reconcile the perceived disparity between outfit experiences and overarching Corps standards and values by reinforcing good leadership. Current leadership involves staff and higher deciding who will be the next CO, 1SG, etc. without seeking input from cadets in their outfit. This results in leaders being chosen who can present themselves well at interview but be completely incompetent or lack the character and core

values to lead their unit to success. By seeking cadet input through a survey or form for every leadership position, we can align ourselves closer to a cadet-led Corps and achieve success.

The purpose of each outfit at its very core is to follow the Corps mission statement: To develop well-educated leaders of character prepared for the global leadership challenges of the future. We can reconcile the perceived disparity between outfit experiences and overarching Corps standards and values by reinforcing good leadership. Current leadership involves staff and higher deciding who will be the next CO, 1SG, etc. without seeking input from cadets in their outfit. This results in leaders being chosen who can present themselves well at interview but be completely incompetent or lack the character and core values to lead their unit to success. By seeking cadet input through a survey or form for every leadership position, we can align ourselves closer to a cadet-led Corps and achieve success. NOTE: Company A-2 has been blessed with good leadership. I am speaking of other outfits where this has not been the case.

Recruiting needs to be equitable. In the early 2000s my phone push list was not the same as the legacy outfits or all male outfits.



"Percieved" being the key word. Every outfit has their different experiences, that is what makes the Corps unique compared to other academies. Because you are trying to make it an equal experience for everybody, you are taking the fun out of the Corps of Cadets and the challenge I personally came here for. Those who seek a challenge seek outfits that will actually challenge them. Therefore, you should let outfits push their freshman during formation, allow them to do smokers more frequently, and allow them to teach their fish mental resiliency. By you limiting outfit activities and by having a commandant's brief on Monday mornings, you are doing the exact opposite. Instead, let cadets be challenged, let them learn and be taught that fish year is far from easy. If other outfits don't wish to smoke their fish? Fine! That's their decision, because the people in that outfit did not come to the Corps for a challenge.

You are trying to make everything the same for retention purposes. No! Like I said earlier, retention and motivational programs that remind cadets the Corps is supposed to be challenging would increase retention as a whole! Those who simply don't care? Let them punch, because they are the ones that aren't willing and aren't capable of upholding the standard. They are also the ones that do not seek a challenge, like many other cadets do. As a reminder, prospects are interested in the outfit, not the Corps as a whole. It's quite baffling to see that prospects come in for a challenge and instead are being softened up, being told they "are doing something hard" when in fact they are not. I know for a fact when I came in as a fish in an all-male, I was seeking the challenge. Now, every day I am more and more disappointed because I do not get what I came here for. And now, you're trying to make it even softer, for retention purposes. Please, I cannot say it enough, please allow outfits to make it harder on their fish. It's not "student-lead", as you call it, if some outfits are limited to what they can do. The Corps is getting softer and softer, and is not the challenge I thought I signed up for.

Outfit pride and culture is a big deal and should be celebrated. Healthy competition should be embraced to its fullest. Every outfit is not going to be a carbon copy of another (how boring). There is too much history and tradition (The Band vs C-2 and Flight of the Great Pumpkin come to mind as an example). This is why we have outfit level awards at the end of the year! You don't join the Corps for a participation trophy. Consistent 360 evaluations between classes in outfits should produce real data. Comparative analysis can be performed to determine disparities (if they are really there). Decisions should never be based on perception, that is a recipe for disaster. I've heard rumors that some are thinking that all Fish are somehow not fully affiliated with an outfit. I think that is also a disaster waiting to happen. Fish will have an affinity for an outfit based on many factors. My father was a Naval officer when I attended so I naturally found a welcoming place in the Regiment. It would be better served for incoming Freshmen to be polled/surveyed on affinities and help place them into an appropriate outfit.

Thank you for providing an opportunity to give feedback. I loved my Corps experience and use lessons learned all the time. I look forward to continuing to see a strong Corps of Cadets and the fostering of new leaders in our society.

Maintain true free time for cadets. Free time that is regularly interrupted by upperclassman barging in dorms is another form of intimidation. Reward outfits with higher retention rates. Post actual retention rate publicly for every outfit so that cadets are better informed of the outfit they are selecting. Outfit culture should not vary so significantly from Corps culture. Outfit culture forces cadets to urinate in their dorm sinks rather than leave the dorm and pass an upperclassman in the hall. Is that Corps leadership?

The cadet-led corps didn't have this problem. The outfits ARE different, thank goodness! Some are athletic-focused, academic-focused, service-focused,...thank goodness! What unifies them are things that have been taken away: greeting outside the outfit, formation, PT,...The routine of the Corps should be similar for all of them. But outfits need to be able to have their own identity. Healthy competition between them (as long as it's not nasty) is healthy and should be encouraged.

I would like to see the differences between the outfits better described on the Corps website and in recruiting. If an engineering major who wants to do well academically but isn't extraordinarily fit (and doesn't care to be), he should be able to eliminate the outfits where athletics is a focus without doing Spend the Night with all the outfits. The Corps can serve more students if the outfits are different, as long as the main parts are the same.

I really liked the reasoning in your FB proposal to the Old Ags. The current recruiting process is truly nothing other than a shot in the dark. My cadet really tried to get to know the different outfits based on their social media posts, but it is too heavily dependent on the skills of whomever is posting and they do not know the culture of the group they are selecting.

I think the idea of a fish Brigade and a Sophomore Leadership academy is excellent. I loved the idea of the fish getting to know the different outfits and their cultures in advance of their selection. In addition, I think it's also important for an adult to get to know the cadets and know the culture of the outfits and place cadets based on a multitude of factors. I believe many fish may push, simply because they are not a fit for the culture of their outfit and truly, they cannot switch outfits without the shame and ridicule from their former buddies.

I read your concern about moving the fish, mid year and I truly think you could have the outfit selection be during the 2nd semester and the fish remain in the fish brigade all year.

. His outfit was disbanded twice, and I'm sure it was for good reason based on the stories I've heard. I am a member of Corps Mom's, Quad Mom's, Fish Mom's and Aggie Corps Parents and can share that many of our fish have had drastically different experiences based on the outfit they are in.

We need to be raising gentleman who are leaders with integrity and confidence and unfortunately, that is not the culture all cadets are experiencing.

There can be a new process to where all of the upperclassman are good bulling with the fish during their first semester. Once they are placed with their individual outfits, then we can initiate a time where we keep them to the standards that are required for our individual outfits while also maintaining their general corps standards and connections.

You don't. By putting the fish separate and not in outfits, you don't. It's diluted by 85%. Not to mention fdt, band, and rudders will ALL suffer immensely.

Fish do need protection from the ongoing hazing. But to separate them fully is going to cause more issues within the corps. Like it is currently., but with more oversight and accountability. Possibly increase an ethics and morals position within each outfit for members to confide in and provide feedback or action items. This would be better than the change that has gone out.

I do not believe that there is a "perceived disparity" between outfit experiences and the Corps standards and values. I believe that outfit experiences, or outfit culture, ARE the Corps and thus comprise its standards and values. I said before that I would outline how outfits should function with staff, and I shall explain more here. Corps Staff has come to believe through some misguided interpretation of their role that they are meant to personal lead the Corps into a unified vision of what they think it should be, that the Corps Commander's job is to standardize the experience and create a system similar to the military academies, where every freshmen receives the same experience. I believe that this is foolish, because a system that is entirely the same becomes stagnant. I believe in innovation and diversity, both things that create a system where by which information can be shared across outfits about what works best and what doesn't. I believe that outfits should communicate regularly, but this does not mean that they should be the same. I believe in a system of Darwinian evolution, by which outfits with poor retention and recruitment fail, and outfits that succeed thrive and continue in their success. I believe in a future that is ruled not by the whims of Corps and Comm staff that directs the Corps without cadet input or vote. I believe in a future that is designed and directed by regular cadets, where every member of the Corps can feel that their voice matters and that they are contributing to the direction in which this organization is headed. This is not this Corps that we have right now, but it needs to be if we are to survive as an organization that is run by and for cadets.

Disband the corps block at football games

A reason why cadets often have the attitude of "I love my outfit and hate the Corps" is because of bureaucracy and low standards often ignored for retention. This often starts right from FOW. Corps leadership control of FOW is something cadets do not like. FOW comes with many restrictions that cadets on cadre believe impedes on their training. Not allowing training outside after 1000, having PT that does not reflect what outfit PT consists of, having fish in corps-wide briefs for much of the training days, and limiting cadre members to 7 upperclassmen when there is no shortage of highly qualified cadets who are willing to sacrifice a week of their summer to train freshmen. As cadets, we don't have malicious intent or ill will toward freshmen, we do truly want to develop them into strong and high quality people who know how to manage adversity. Upperclassmen in most outfits have a very diverse portfolio of experiences since coming to A&M and life in general and we all want to impart that wisdom on our freshmen to help them succeed in their studies, social lives, their involvement in organizations, and their plans for after college be it graduate or professional school, the private sector, or the military. Cadets want to be able to train freshmen because they want to build genuine relationships with them and continue the fraternal aspect of the Corps. The bureaucracy in leadership selection and FOW strains this. Cadets often believe that their outfits train to a higher standard than the Corps at large which is something to take pride in, creating a disparity between Corps-wide training events and outfit training. Allowing more training opportunities along with decentralizing leadership to allow the outfit commanders to make the best decisions for their people and creating less bureaucracy in the Corps of Cadets will make the Corps of Cadets a more positive place and truly exemplify the Corps experience.

normally I'd just say FIDO, but not in this case. We will fight this one till the end and you won't get your way.

During my senior year of high school I had a zoom meeting with every single army outfit on the quad. I made it my goal to find the perfect outfit. What I found instead is that every outfit had its own benefits. I found A2 attracted totally different future leaders than D2 yet they both attract people to the corps. This sense of outfit community attracts people to the corps. One of the main reason second-generation cadets come back is because they have seen the power of the outfit. There is something so special about showing up to FOW and being assigned your family. From the buddies to the cadre everyone is there for that outfit. This culture does not degrade the corps culture however it adds to it. Being able to make a smaller, closer group your family helps people buy in. It helps them feel that they are home. Once fish are past FOW all echelons of their units should encourage them to participate in both special units and organizations off of the quad. This will help them meet other cadets and begin to help them buy into the corps culture AND the university culture at large.

In terms of pure standards corps wide the results of inspections and physical fitness tests should result in remedial training. However, these inspections (namely the Office of the Commandant inspections) should be more standardized. Currently, if you get some advisors you are liable to be degraded and treated as less than human while other advisors show you they care. I think this point also applies to almost all interactions with advisors which has put traditions such as whipping out at risk because you are liable to be lectured even if you are doing it outside and in a non-distracting manner.

In conclusion, outfit cultures are what make the corps culture. Each outfit is a puzzle piece that helps people buy in and contribute to the corps culture overall. With more participation in special units and general student organizations, we can strengthen corps culture. This encouragement on special units paired with remedial training based on inspection results will pull the corps up and help us come together.

How do we reconcile the perceived disparity between the individual outfit experiences and overarching Corps standards and values, without diluting the identity that so defines the Corps experience?

I believe the disparity is the result of second and third order effects of prior changes implemented primarily to preserve the academic day and reduce "Corps Games" impact of freshman. By removing these elements of the fish experience, we have insulated fish into their outfits and allowed them to exist with little input from surrounding upper classmen.

I don't necessarily think those changes were all bad but when done without consideration for other impacts they resulted in fish who don't have to run down the quad, thus not meeting upper classmen outside their outfit. Fish no longer speak to upperclassmen on all floors when going through their own dorms. Again, reducing their chance to meet other cadets outside of their outfit. Fish pranks, aka details from Mr. Claus, don't happen anymore. As a fish these allowed me and my buddies to meet and eventually drop handles with most of the upperclassmen in our dorm. We were invited to outfit parties because of pulling off particularly daring pranks. Through this we got to know the other outfits. I don't get the impression from talking to current cadets that this happens anymore.

To build Esprit de Corps everyone must feel they are held to the same standard. When people feel they are living up to the standards, or the perceived standards, and others are allowed to slack they become disillusioned.

Build opportunities for cadets to interact with other outfits through competitive events. Ideally these would be conceived of and executed by the cadets, but it might take some guidance to get that process started.

As a recent former student '22, the major issue you face is apathy.

Unfortunately, I believe this apathy has been self-inflicted by Comm Staff; the result of an inadequate amount of adversity that cadets and 1st semester fish experience. Has Comm Staff mistaken adversity as a reason for poor retention? If so, why does retention seemingly get worse each year, even with the myriad of changes made to the Corps?

I found my first semester incredibly challenging. It was physically and mentally draining. Yet, overcoming and earning my Brass with my buddy class made it meaningful. This was reflected on the daily level, when my buddies and I would overcome whatever smoke session, rack drills, or afternoon training our upperclassmen could throw at us. Those small wins kept me going, and most importantly they taught me valuable lessons that I thank God for learning now as an officer in the USAF.

Now I understand that continuing traditions merely because its always been how we do things is misguided. However, there can be great logic and reasoning behind those traditions. You killed Rack Drills, but they taught me how to work with peers, communicate, and survive intense situations. You killed Fallout Holes, but they where I formed incredible bonds with buddies and learned to mentally prepare for difficult situations. You don't believe PT should just be smoke sessions, but I truly learned who I am and that all things end when my class would be smoked. These are such incredible lessons I am so fortunate to have experienced, that I am much better off with.

When these traditions and aspects of the Corps were removed, we began to lose meaning in the Corps. At a point it becomes more of a professional development organization than a military leadership organization. Could I not get the same experience being in toast masters or another student club? Just do what the Corps does best!

Give cadets meaning again, and I believe that you will be truly impressed. You can already see this in how certain outfits that are known for being more difficult often wear the uniform better and follow the standard better (i.e. SQ-17).

Cadet leadership must be heard. The Corps, from a cadet perspective, appears to make a lot of dumb decisions, and once the decisions are made, we cannot change it no matter how much our voices raise.

It is very apparent to many of us that our upper-level cadet leadership is not brutally honest with those employed for the Corps. Our ideas are squashed, our training is hindered, and our voices drown in the silence of indifference.

By listening to cadets, allowing us to take charge, and trusting us with training that pushes the limits of our people, we will regain pride in the Corps. We care about outfits much more than the Corps because outfits are a family, and we feel like our family is under attack. I WANT to have pride in the Corps, but decisions like this make it hard to.

If I need to expand more upon these responses, I'd be more than happy to talk in person. I would love to, in fact. I truly hope this helps.

There has always been unit experience disparity. Ones experience in a Pre-Med outfit vs an Ag outfit is going to be different. Certainly make sure all in leadership, from Sophomores on up, understand the Corps standards and values, but accept different outfit cultures as the norm.

I believe this is created out of thin air and takes away the value of what is happening at the outfit level. I would seriously consider where I am hearing such discrimination against outfits from and be hesitant to assume such things. If this is from people within genuine outfits? Or if this is from people no longer in outfits or no longer/never were members of the Corps? My outfit has not only set the corps standard but as an outfit culture there is an expectation that we exceed and hold ourselves to a higher standard then that expected of us. It's what has made my outfit so successful as leaders and as men and women in life. Without outfit culture you cannot have Corps culture. Our individuality it is what allows us to unite as one Corps. We are all together different but the beauty of it is we serve the same purpose to better cadets for the future.

Different units and cultures exist for a reason. An organization this large will not be unanimous in its people's individual ambitions, goals, or personalities. The ability to invest into a unit that suits one's

personality and goals is what lends itself to be part of a large and successful organization. Competition between the units is also very healthy, just like siblings in a family. Requiring the same standards be met from every person in an organization is also a good and reasonable thing, but even higher standards within individual outfits doesn't work against the organization. It helps it, in fact. Having events and special units for people across the quad to meet and form relationships creates a more cohesive corps, though people can't be expected to know everyone due to sheer volume of people. If commanders have more responsibility over their people, then standards will also fall onto them to meet and exceed. Outfit experiences are the heartbeat of the Corps experience and values.

This is the biggest and most important question. Corps identity is important, as is that of the individual outfits. Rather than just jumping in with a massively disruptive solution (based on a "perceived disparity," no less), has there been a serious study of how and why this has occurred over the years? There was strong unit cohesion and identity during my years there, but I don't recall it being at the expense of Corps identity (though I could be wrong) … Perhaps the most painful and apt comparison can be the gradual, almost imperceptible changes over the years that led to the bonfire collapse -- small reductions in standards multiplied over time created catastrophe.

I took tremendous pride in belonging to the Corps, as I did with my individual outfit. But I would have chosen my outfit over the Corps every time, as would most cadets, I suspect. This is human nature, and can't be reorganized or trained away without diminishing the entire experience and unique nature of the Corps. As I said earlier, my outfit experience has been the most positive lasting influence the Corps has had over my lifetime. I also learned a lot about how to lead, follow and grow, but it's the personal relationship that matter most. I did not serve in the military following my time at A&M, but without exception, when I ask my buddies who did serve what they miss most now that they are retired from service, they ALL respond the same: the camaraderie. They never say "the comprehensive leadership training." That's not to say that training and development isn't important, because of course it is, but it needs to be a partner to the development of personal relationships.

In the business world, the most productive, satisfied employees are those who report they are part of a strong culture and those who have positive personal relationships with their coworkers.

I promise you that when I die, surrounded by friends, family and my group of brothers who have stuck together for decades through thick and thin, I won't wish that I had more leadership training and less opportunity for camaraderie during the most formative period of my life.

So, the answer is, BOTH must be stressed. Corps expectations and standards must be upheld or else consequences should ensue. The problems I've seen discussed – fish aren't whipping out to those not in their outfits or chains of command, cadets not participating in the Corps hump it, etc. – are all symptoms of a leadership structure that has forgotten how to instill pride and encourage participation. It's not a fault of the org chart, and it's not a problem that requires massive disruption. Fish will do what is taught, emphasized and demonstrated to them. In the '80s, before units were integrated, I had upperclassmen who would specifically tell us not to whip out to female cadets. Imagine if they had encouraged the opposite, and then stressed why it was important to conduct yourself professionally in every circumstance? If the things that are NOT being done are important, and I'm sure they are, then focus on rewarding those things and providing strong examples of the benefits of doing them. The problems we experience are never more than one college generation -- four short years -- from being completely eradicated.

This is a HUGE PROBLEM. The unit "t" traditions and cultures are absolutely diluting the overall Corps identity and creating unnecessary friction. Solution ...
1. Be more selective in unit leadership. The CO/SEA selection process must weed out prospective leaders who are more wedded to their unit's "traditions" and culture than the Corps'.
2. Accountability. Cadets DON'T hold each other accountable. Period.
3. Followership. With all the emphasis on Leadership the Corps does a terrible job at developing "Faithful Followers" who understand and support the organization's mission and culture. This starts with freshman AND sophomores, but the priority are the JUNIORS! (Yes, the forgotten class year). Get the JUNIORS on board with faithful followership and you'll make some real progress.

4. Refine ALL unit traditions. Here's the litmus test: Does this unit tradition or activity edify and unite the outfit or does it create unnecessary divisions and in/out groups? If the answer is the latter, get rid of it. For example ... EVERYTHING in Company E-2 that involved Reville is toxic, creates in/out groups and creates disunity in the outfit ... yet the OOC enables these activities to continue resulting in one of the most toxic outfit cultures on the Quad.

You are looking at this completely backwards. You want to recruit more, and your answer is to kill the outfits identities that recruit themselves? It's hare-brained. The outfits that have their own identity are recruiting with no issues. In fact, they usually have to turn away cadets. Figure out what part of their identity is causing demand from HS students to join, and encourage the outfits that have trouble recruiting to emulate their successes. The more you try to kill outfit identity, the harder time you will have recruiting.

I would also encourage you to start having some bulls on staff that were d&C cadets at A&M. Ones that have spent their lives in sales, marketing, etc. Ones that think outside the box, instead of just trying to force the same box on everyone.

Seriously...what justifies taking PT away from the best upperclassmen in the Corps? Check your ego at the door, sir.

What you are describing is communism and has never worked in all of history. Encourage the lower performing outfits to emulate the high performing outfits. I will follow up with a question for you, what lessons have you learned, specifically, and how will you implement change in your own decision making process, specifically

Best question ever. Do the opposite. Promote outfit individuality. Create separation and specialization opportunities between outfits. In my opinion, healthy and civil competition is the best way to create enthusiasm and growth. Outfits will adjust to suit and cater to their strengths, attract recruits, and improve on weaknesses. See my prior answer to creating project leadership opportunities. My son will join next year and we've been watching YouTube recruiting videos per outfit. Would be great to find a Civil Engineering outfit or an Ag outfit, etc. Nothing says you can't have standards and values as a whole and still remain individual. There's nothing more American.

You don't. Outfit pride is what makes the Corps special. Forcing integration on outfits was a mistake during my time in the Corps and still is today. Some cadets don't mind being in an integrated outfit, especially those signing contract, but to some cadets it's a big deal. I was one of those as was most of my friends in the Corps. I was a D&C cadet and joined the Corps for the fraternal aspect and to be closely intertwined with the traditions of the school I love. There is a reason why there are fraternities and sororities; they aren't coed. As I'm sure you see, the outfits with the most pride are the ones that have that fraternal feel to them. I know my friends from the Corps are still my best friends today. I wouldn't have that without that environment I was fortunate to be a part of. I have a son that has already been accepted into the university and plans on joining the Corps. I will say that if the Corps is changed and he can't be a part of a non-integrated outfit, he is out, and as a father I will support his decision. I love the Corps but it's because I loved Spider D first. Lastly, outfits having their own identity is what helps cadets find those that they want to be around and become lifelong friends with. Doing away with outfit pride will water down the Corps and hurt recruiting a heck of a lot more than it will help it. Don't make the Corps softer because you are worried about retention. If it's not hard you don't grow from it. In the real world people quit their job all the time. Companies move on with the next man up. I've lost few employees over the years that were truly missed. The strong ones stick around. I have been with the same company for 23 years. Had good times and bad, but the hard times I had my fish year are what shaped me and made me the types of person who could withstand the tough times. Worry about making the fish strong so they are prepared to lead. Don't cater to the weak ones.

Please allow me to rephrase this question: How can we preserve the individual unit experience while balancing the Corps standards and values?

Not all units are/were the same. Not all military services are the same. Not all branches within each military service are the same.

You cannot from a "position on high" create an environment in which everyone succeeds to the exact

same metric. Look at the growth on the number of shoulder cords worn in the Quad. In my day there were three unit level cords, Moore, Hochmuth and Scholarship. Now we've added a few more.

I cannot confirm but I was told the blue and white cord is for scholarship. If the blue and white cord is for scholarship, what is the gold star for? And there was once a ribbon worn for achieving a 3.25 GPA. Wow, in one semester seemingly you can achieve a trifecta of uniform accoutrements.

However, you can pretty much expect the units having "pre-med" to win the scholarship cord. Certainly, not the "jock outfits". Perhaps a bit of expectation management is in order.

Likewise, if needed to better prepare fish for the rigors of u nit life, let's expand the Freshman orientation (Beast Barracks style?). Let's prepare our fish for the rigors of the Corps, but let's not modify its structure. This is still college, not basic training. The Corps is there to get an education, not prepare for war. And that is a difference.

And for heavens sake, allow members of the Corps to "run" and lead this fish preparation period. Keep the Trigon away. Allow leadership development by the upper classmen while preparing the fish.

You mentioned hiring four more Leadership advisors. (Just what the Corps needs, more representative of the Trigon.)

How about taking that money for salary and benefits and use it to bring in successful leaders as nominated by former members of the Corps of Cadets.

Have the former cadets nominate these leaders and the Trigon can vet them.

Especially, leaders who rose and succeeded as a result of their Corps experience, or despite it.

We have a large talent pool who have a lot to give and would be most willing to give back to their Corps in developing leadership for the Cadets. Put them up in the campus hotel for a few days and allow them to interact with the Corps. Allow the good with the bad….

I always am amused when I come upon a cadet or groups, and they hungerly want to know of my experiences as a Cadet. All the Trigon needs to do is tailor those "experiences" to those having an impact (good or bad) in their lives.

And it does not have to be limited to Aggies either.

I believe that having slightly different values between the outfits is part of what makes the Corps strong. Allowing fish to choose which culture suits them allows for a unique experience that you can't get at any other ROTC or academy.

Allow the outfits to excel and emphasize different things based on its culture while also having values that all the outfits can unite behind such as determination and leadership.

A big part of the difference is that the outfits do not trust Corps or Comm staff to train their freshmen because they don't have great experiences with either. CTO's are generally seen as fickle and inconsistent and Corps Staff is generally seen as resume builders that don't really care about people. While these aren't always true by any means, these perceptions exist for a reason.

This is a really tough one. I like the idea of a stronger FOW experience, one which really emphasizes the Corps and Cadet identity. The idea should be "by the end of FOW they should be able to return home and have their parents be astounded by how neat, courteous, and attentive they are." They should be transformed in this process. I think 4-6 weeks is the absolute minimum time for that transformation, but I also recognize that a lot of that transformation should occur in unit (i.e., the unit's culture and narrative should EMPHAISIZE and strengthen the influence of the Corps values in the fish).

Maybe every unit should provide a list of values (some sort of manifesto) which elaborates on and emphasizes the Corps values. This manifesto would help units to see how everything that makes someone a good cadet should make them a better Trident, Gladiator, Killer etc.

Maybe start a propaganda campaign that makes it looks cool to just be a CADET. (I would call this campaign "I am Cadet"). This is my silliest idea to date but I can totally see how it could give people solidarity as cadets. But it would involve a lot of old footage and heritage moments strung together to remind us of the awesome patriotic and red ass history of the corps. Basically bring the corps center to instagram in a way that makes everyone say "hell yeah the corps is awesome". One of my favorites is the story in the corps center about how the Head yell leader stopped a riot at the 1926 Baylor/TAMU football game by having the band play Taps. The riot ended immediately when the whole corps (previously rioting) stopped and came to attention. I read that and it made my heart ache to be part of that organization.

Lastly we need to focus more on the Cadet oath. Or make a cadet creed. But I'm afraid it would just become a joke.

EXHIBIT
**19**

# Public Information Records (#J001320-041024)

⌄ **Public Information Records Details**

| | |
|---|---|
| This request is for: | Texas A&M University |
| Summary of Request: | Re-file of J000762, without redaction authority per 4/10/24 Fradkin email. |
| Describe in detail the Record(s) Requested: | 4/11/24 email:<br>Also just confirming that you're still moving forward on seeking the OAG opinion for the new request on J762. |

Original Request J000762
From: Patti Artavia
Sent: Monday, February 26, 2024 7:03 AM
To: open-records@tamu.edu
Subject: Open Records Request

Please see attached letter. Thank you

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118


Pursuant to Section 552.001, et seq., of the Texas Open Records Act, Public Records Information, please produce the following documents:

● All documents or other materials related to the Office of the Commandant's plans regarding the so-called fish Brigade, including but not limited to any documents from any working groups and any communications regarding the same.

● All materials, studies, communications, etc. referred to in the Commandant's February 2024 Facebook post regarding "socialization," "leadership education," discussion of the "communal/fraternal aspects of the Corps," any studies or materials concerning same, any discussions or studies of outfit v. Corps culture, the Rellis experiment in late 1940s and 1950s wherein fish were moved to Rellis Air Force Base and any studies or documents concerning same, any study of retention or attrition statistics, any proposed "re-mapping" of the core curriculum, any documents or other materials related to re-writing the Standard and the "Cadence," and any documents or materials related to Commandant's Guidance to the Corps or any drafts of same.

● All documents or materials related to the 4 Leadership Development Advisors and any documents related to the Commandant's plans moving forward regarding the Corps of Cadets.

● Any and all email or other digital communications from anyone in the Commandant's Office to anyone else related to the subject of the Corps of Cadets or any restructuring of the same.

● Any and all communications from anyone at Texas A&M concerning the plan to restructure the fish and Corps experience, including from the Office of the President of Texas A&M, the Office of the Vice President of Student Affairs, and the Board of Regents.

● Any discussions, communications or materials related to Diversity, Equity and Inclusion as they related to any proposed changes to the Corps of Cadets and any analysis or reference to the recent laws in Texas as they relate to same, and any analysis regarding whether any proposed changes

| | |
|---|---|
| Date From: | |
| Date To: | |
| Preferred Method to Receive Records: | Electronic via Records Center |

Do you agree to the redaction of information that is subject to mandatory exceptions, provided such redactions are clearly labeled on information you receive?:     NO

Do you agree to the redaction of information that is subject to discretionary exceptions, provided such redactions are clearly labeled on information you receive?:     NO

> **Category**

⌄ **Clarification(s)**

Clarification(s):                    STAFF: Please describe any clarifications requested and received.

> **OAG decision requested**

> **Exceptions**

> **Charges**

⌄ **Notes**

| Note | Created | Modified |
|------|---------|----------|

| | | |
|---|---|---|
| Narrowed:<br><br>On Thu, Mar 7, 2024 at 9:30 AM Brian Beckcom wrote:<br>Ms. Kacer:<br>Thank you for your form letter. I obviously am not requesting a blind search, or an unlimited search, and my request is obviously limited in scope and time. I also note that you have not objected to some of the requests, which makes the responses to those requests now one day overdue. Please produce any and all materials to which you do not object immediately, or advise why you refuse to do so.<br>For the sake of compromise, we are willing to limit the request at this juncture to the years 2023 and 2024. We are willing to limit the scope to personnel in the Office of the Commandant, Office of the Vice President of Student Affairs, and Office of the President.<br>With respect to identifying the name(s) of individuals with documents, that objection is quite obviously improper as well as illogical. If I knew all the name(s) of the people involved, I wouldn't be sending a request, obviously. In fact, one of the purposes of information requests is to learn the personnel involved.<br>With that said, there is a limited number of personnel employed at the Office of the Commandant and the ROTCs, in fact the website lists less than 25 employees, so your form objection that A&M has "thousands" of employees is frivolous.<br>I would suggest you start with these folks: https://corps.tamu.edu/staff-directory/<br>I would likewise request that you inform the personnel in the Trigon, the ROTCs, the Office of the Vice President, and the Office of the President of their continuing obligations under law to preserve all documents, communications, and other matters. Destruction of documents -- even those subject to document retention procedures -- is improper and impermissible under Texas law, and may result in a variety of consequences both individually and institutionally, so please ensure that the relevant personnel understand their obligations in this regard.<br>Thank you. Please do not hesitate to call me with any questions. In the meantime, I look forward to receiving the materials to which there are no objections today.<br>Going forward, I request that you copy my colleagues Patti Artavia and Brendan Fradkin, cc'd above, on all future communications.<br>-bb<br>VBAttorneysLessons from Leaders PodcastMy Bio Video | 4/16/2024 3:23:00 PM by Tricia Bledsoe | 4/16/2024 3:23:00 PM by Tricia Bledsoe |
| Please cc these email addresses when we send to Requestor:<br>brendan@vbattorneys.com; patti@vbattorneys.com | 4/10/2024 6:24:00 PM by Tricia Bledsoe | 4/10/2024 6:24:00 PM by Tricia Bledsoe |

⌄ **Message History**

On 4/24/2024 9:36:10 AM, Knesha Brashear wrote:
CC: open-records@tamu.edu; patti@vbattorneys.com; brendan@vbattorneys.com
**Subject:** Public Information Records :: J001320-041024
**Body:**
04/24/2024


RE: PUBLIC RECORDS REQUEST of April 10, 2024, Reference # J001320-041024

Dear Brian Beckcom,

The information we are no longer seeking to withhold in response to your request #J000762 is available and can be obtained by visiting the Public Records Online Portal and logging in from the " My Request Center" tab.

Please note we have redacted information confidential under FERPA and 552.114 of the Tex. Gov't Code. Information confidential under FERPA can be redacted/withheld without seeking a decision from the attorney general.
Finally, in accordance with Open Records Decision No. 684, we have redacted information confidential under section 552.137 of the Texas Government Code.


Sincerely,

Knesha Brashear
Open Records Office


On 4/23/2024 5:11:01 PM, Melanie Burns wrote:
CC: openrecords@tamus.edu; open-records@tamu.edu
**Subject:** Public Information Records :: J001320-041024
**Body:** 04/23/2024

For Requestor: Brian Beckcom (J001320-041024): WITHDRAWAL OF OAG DECISION REQUEST

The Texas A& M University System is withdrawing its request for a decision from the Office of the Attorney General of Texas regarding your open records request to Texas A& M University.  Attached is a copy of our correspondence being submitted today.

Thank you,

System Open Records

On 4/19/2024 4:09:02 PM, Melanie Burns wrote:
CC: openrecords@tamus.edu; open-records@tamu.edu
**Subject:** Public Information Records :: J001320-041024
**Body: 04/19/2024**

**For Requestor: Brian Beckcom (J001320-041024): REQUEST FOR OAG DECISION**

The Texas A& M University System is requesting a decision from the Office of the Attorney General of Texas regarding your open records request to Texas A& M University.  Attached is a copy of our correspondence being submitted today.

Thank you,

System Open Records

Date

On 4/10/2024 5:44:23 PM, System Generated Message:
**Subject:** Texas A&M University Public Information Request :: J001320-041024
**Body:**
Dear Brian Beckcom:

We received your public information request for **Texas A&M University**.  Your request was given the **reference number J001320-041024** for tracking purposes.  Please refer to this number when making inquiries about your request.

You can monitor the progress of your request at the link below and you'll receive an email when your request has been completed.

Thank you for your interest in **Texas A&M University**.

To monitor the progress or update this request please log into the Public Records Center.

On 4/10/2024 5:44:21 PM, Brooks Moore wrote:
Request was created by staff

## ⌄ Request Details

| | |
|---|---|
| Reference No: | J001320-041024 |
| Created By: | Brooks Moore |
| Create Date: | 4/10/2024 8:00 AM |
| Update Date: | 5/7/2024 11:40 AM |
| Completed/Closed: | Yes |
| Close Date: | 4/24/2024 9:36 AM |
| | |
| Status: | Information Released |
| Priority: | Medium |
| Assigned Dept: | TAMU_Open Records |
| Assigned Staff: | Open Records University |
| | |
| Customer Name: | Brian Beckcom |
| Email Address: | Brian@vbattorneys.com |
| Phone: | 8327913118 |
| Group: | TAMU |
| | |
| Source: | Email |

**EXHIBIT 20**

**Jason Contreras**

| | |
|---|---|
| **From:** | Moore, Brooks |
| **Sent:** | Friday, April 26, 2024 9:37 AM |
| **To:** | 'Brendan Fradkin' |
| **Subject:** | RE: Public Information Records :: J001320-041024 |
| **Attachments:** | EMAIL RE_ Class Request - Rudder Theatre.pdf; CMDT Note to All .pdf |
| **Categories:** | Orange Category |

Brendan,
The email reserving Rudder Theatre is attached. We do not believe this was responsive to the request but are happy to provide it.

The second is the original FB post, which I believe was previously provided. We do not have access to the FB group because it is a closed group not under the university's control.

The powerpoint you referenced was previously provided, on pages 23-24 (timeline).

The university did not have any proposed lesson plans/curricula.

Brooks

**R. Brooks Moore | Deputy General Counsel**
Office of General Counsel
THE TEXAS A&M UNIVERSITY SYSTEM

---

**From:** Moore, Brooks
**Sent:** Thursday, April 25, 2024 5:02 PM
**To:** 'Brendan Fradkin' <brendan@vbattorneys.com>
**Subject:** RE: Public Information Records :: J001320-041024

Brendan,
See below. I will let you know when we have something to report on the items for which TAMU is searching to see if they have information as noted below.

Please know that the university's Open Records Office is short-staffed from yesterday until May 1, so this is affecting their response time a bit. They are doing their best but still have approximately 87 open requests.

Brooks

**R. Brooks Moore | Deputy General Counsel**
Office of General Counsel
THE TEXAS A&M UNIVERSITY SYSTEM

---

**From:** Brendan Fradkin <brendan@vbattorneys.com>
**Sent:** Thursday, April 25, 2024 11:02 AM
**To:** Moore, Brooks <RBM@tamus.edu>
**Subject:** Re: Public Information Records :: J001320-041024

Brooks,

I've reviewed the fish brigade documents and there are a few references to other documents that should have been searched for and included if found.

Emails reserving Rudder Theater Complex (referenced on p.1) ==Moore Response-Outside scope of request==

Powerpoint Sharing Updates (referenced on p.2-3) ==Moore Response-TAMU is looking to see if they have this information==

Proposed lesson plans/curricula (referenced on p.27) ==Moore Response-TAMU is looking to see if they have this information==

Mike Reilly Communication to Sherri LeVan (referenced on p.36). Also, this raises the question of other third-party communications to the Commandant and his office discussing these plans. Has an email search been conducted for the Commandant, Sherri LeVan, Meredith Simpson, or anyone else who was working on the fish brigade plans? If not, could you have your TPIA folks search for additional documents? ==Moore Response-Yes to first question.  TAMU searched email accounts for all staff in the Office of the Commandant.==

The original facebook communications from the Commandant (referenced on p.37). Similar to the prior post, this raises concerns of facebook or other social media communications related to the fish brigade planning. At a minimum, there is without a doubt an original facebook post with that information. Can you see if your TPIA folks requested this information from the Commandant and his office? And if not, can they please do so? ==Moore Response-TAMU is looking to see if they have this information==

If you believe that some of these aren't covered under the requests, please let me know. If they aren't covered we'll get new requests out. If they are covered, please have the TPIA folks do a search and get those produced as soon as possible. Thanks,

On Wed, Apr 24, 2024 at 10:31 AM Moore, Brooks <RBM@tamus.edu> wrote:

> Pages 25-end (152) are what we originally took to the OAG, including the long survey response document previously provided in redacted form.  It is my understanding that pages 1-24 were flagged by Corps staff yesterday as additional planning information that should have been taken to the OAG but were not.  To our knowledge, this is everything on the fish brigade concept.
>
> Brooks
>
> **R. Brooks Moore | Deputy General Counsel**
> Office of General Counsel
> THE TEXAS A&M UNIVERSITY SYSTEM
>
> ---
>
> **From:** Brendan Fradkin <brendan@vbattorneys.com>
> **Sent:** Wednesday, April 24, 2024 10:07 AM

**To:** Moore, Brooks <RBM@tamus.edu>
**Subject:** Re: Public Information Records :: J001320-041024

Thanks, Brooks. It looks a little different than what we talked about so I just want to make sure it's the right thing. J0762-J1320 are the policymaking documents related to the fish brigade? My initial understanding was that it was one big document only containing the fish brigade plans. The released documents have communications, survey results, meeting notes, charts, etc.

Can you clarify if this is indeed all of the fish brigade stuff?

On Wed, Apr 24, 2024 at 9:53 AM Moore, Brooks <RBM@tamus.edu> wrote:

The information has been released.

Brooks

Sent from my IPhone

> On Apr 24, 2024, at 7:12 AM, Brendan Fradkin <brendan@vbattorneys.com> wrote:

Thanks, Brooks,

When can we expect the documents?

On Tue, Apr 23, 2024 at 5:13 PM Moore, Brooks <RBM@tamus.edu> wrote:

FYI.

Brooks

**R. Brooks Moore | Deputy General Counsel**
Office of General Counsel
THE TEXAS A&M UNIVERSITY SYSTEM

---

**From:** Texas A&M University Public Records Support <texasam@mycusthelp.net>
**Sent:** Tuesday, April 23, 2024 5:11 PM
**To:** Brian@vbattorneys.com
**Cc:** SO-Open Records <OpenRecords@tamus.edu>; open-records@tamu.edu
**Subject:** Public Information Records :: J001320-041024

**Attachments:**
WITHDRAWAL_NOTICE_-_Beckcom__J001320-041024_.pdf

--- Please respond above this line ---

04/23/2024

For Requestor: Brian Beckcom (J001320-041024): WITHDRAWAL OF OAG DECISION REQUEST

The Texas A&M University System is withdrawing its request for a decision from the Office of the Attorney General of Texas regarding your open records request to Texas A&M University.  Attached is a copy of our correspondence being submitted today.

Thank you,

System Open Records

---

To monitor the progress or update this request please log into the Public Records Center.

--

Brendan Fradkin

VB Attorneys

832-791-2337


Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.


--

Brendan Fradkin

VB Attorneys

832-791-2337


Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.


--
Brendan Fradkin
VB Attorneys
832-791-2337

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

**EXHIBIT**

**21**

| From: | Schlather, Byron L |
|---|---|
| To: | Muchow, Jason A |
| Cc: | Wright, Shanna A |
| Subject: | RE: Class Request - Rudder Theatre |
| Date: | Tuesday, January 16, 2024 4:32:00 PM |

Howdy, Jason!

After speaking with Meredith Simpson last week, we'd still like to use Rudder Theater as our first option (except for our first session, which we'd like to conduct in the Auditorium). We are aware of the cost associated with this request.

This series of lectures is not tied to an academic curriculum or class. It is a speaker series that includes the Commandant and other members of his staff. We did some additional planning yesterday, and our first event is likely to be on 5 February (vice 26 January) with all freshmen and sophomores attending (roughly 1250), so we'd like to hold that session in the Auditorium. We plan to conduct subsequent sessions on Mondays with the freshmen (about 700) and Fridays with the sophomores (about 550) in the Theater.

The MAC is not regularly set up for lectures/presentations, and the Office of the Commandant does not own the space—it belongs to Music Activities.

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Muchow, Jason A <j-muchow@tamu.edu>
**Sent:** Thursday, January 11, 2024 3:11 PM
**To:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Cc:** Wright, Shanna A <shanna.wright@tamu.edu>
**Subject:** Class Request - Rudder Theatre

Howdy Byron, following up on our call earlier.

As discussed, I understand the need to make this happen, but I do feel that the Theatre should be a last resort option. There are several reasons for that, one of the biggest being the fact that we charge for space usage & this would work out to around $1,200 per week to support.

Please let me know if you need assistance locating another space for this to take place.
-jason

P.S. How many does the large band rehearsal hall hold at the MAC?

**- 1993 -**

**Jason Muchow**| Associate Director
University Center & Special Events | Operations
1232 TAMU | College Station, TX 77843-1232

ph: 979.845.8903 | j-muchow@tamu.edu | http://rtc.ucenter.tamu.edu
--------------------------------------------------------------------------------
**TEXAS A&M UNIVERSITY**

**EXHIBIT 22**

All – well, looks like the rumor mill got well ahead of a final decision.

This below is a long post with a lot in it to strap in for a moment:  Last week, after a lot of discussion and working groups, I made a call to move out on planning to restructure Cadet 'socialization' and 'leadership education'.  Below lays out the logic – it is long, but it is because there is a lot to process in the 'why' here.

Since November I've had the staff working through options directly addressing the balance between the communal/fraternal aspects of the Corps experience and the leader training and education program that the Corps (and the Office of the Commandant) mission reflects.

Observations:

- Tradition above leader development.  There is a certain truth to a note sent to me by a Cadet earlier this year when we had a discussion about the culture of the Corps.  To quote: "Too often we put tradition above leadership development".

- Outfit culture is challenging Corps culture.  If you've witnessed the drop in basic Corps standards such as 'whipping out', uniform standards, simple things such as a lack of ability (or enthusiasm) to rally behind a 'Corps Hump it' – this is what I'm talking about.  Watch underclassmen address upperclassmen on/off the quad:  for the most part – it is only directed within the outfit – we are not meeting expectations this way.

- Corps standards and values don't apply to my unit.  I've detected an 'it does not apply to me or my unit' pattern.  This is deeply embedded in the previous two points.

- Peer accountability is hard.  I remain steadfastly committed to empower student leadership with authority and responsibility, but it also means they are accountable within a set of standards and values.  Holding each other accountable is the hardest act of leadership – there is growth here, and it continues to grow.  Young leaders are grasping (and not grasping) that being 'student led' also means it is within a framework of guidance, standards, values, and accountability.

- We need to expand leadership opportunities.  Our breadth of leadership positions within the Corps are lacking.  This become very apparent in the limited roles the

majority of our White Belts have to expand their leadership experiences.  Can we provide 'purpose' here?

- Our leadership development program needs work.  We spend a lot of time discussing the 'Be' and 'Do' of leadership, but we are all over the map with 'Know'.  A lack of an integrated curriculum map with clear learning objectives the build off each other.  ROTC leader development classes and SOMS should be complimentary… but we have drifted in mapping an effective course design.  Because we don't have that, SOMS classes have become less effective than they could be.  In essence:  the lessons of SOMS are 'skipping' off the Corps experience.

- Our retention statistics are telling.  From a perspective of statistics I offer the following:  We spent an inordinate amount of time working with Cadet Leadership to 'be' the very best example (Know and Do) of a cadre for incoming freshmen for FOW last year.  It was the first time in a while that Cadets were in the lead.  And they did a OUTSTANDING job – leading, coaching, inspiring, teaching – being aspirational to every new freshmen.  The numbers told the story:  we lost just over 1% of freshmen that week.  An incredible tribute to leadership in action.  But then the rest of the Corps returned the first weekend, and within 3 weeks our attrition bumped to 10%.  An incredible statistic that can be interpreted in a myriad of ways.  I chose to interpret it this way:  our investment in (1) leadership development of 'ALL' cadets is not where it needs to be, and (2) our Freshmen were not given the time/space to be totally prepared for the rigors of cadet life in an academic setting.  This is also a realization that students coming to A&M are probably smarter than most of us where when we showed up, but at the same time, they are less mature.

Current Actions that have been in place:

- Connecting 'recruiting to retention' – an initiative brought forward by Cadet leadership under the assumption that if you have the right culture, you should be rewarded:  outfits can recruit 1.5 times the number of freshmen that remain at the end of the school year.  This allows outfits that 'have it right' to flourish, and those that don't, to either recover, or attrit themselves out of existence.  Yes, Darwin is at work here, and it should be an incentive that works both ways.  If you have a bad year retention-wise you can recover if you've got the right culture.
- Re-mapping 'core curriculum'.  We are in the process of looking at every aspect of how we bring the leadership models to each cadet.  What should every freshmen know?  How does it tie to their next leadership experience?  How do

we validate 'knowledge' and 'certify' expertise before they lead freshmen?  What do rising sophomores, juniors, seniors need to know to be successful?  How do we create a curriculum map that builds on itself?  I am intimately involved in getting this right.  We are starting now with a top-down approach to arm every rising sophomore and rising junior with the 'tools' to be a better leader at echelon.  This is manifesting itself in a spring surge in leadership development led personally by the staff on Monday and Friday mornings.

- We are re-writing the 'Standard' and the 'Cadence'.  We are writing Commandant's Guidance to the Corps in the form of an 'order' that gives the framework for success… and models the behaviors we seek to impart.
- We are hiring 4 Leader Development Advisors – who will be someone cadets want to emulate' to focus on bringing leadership models and reflection to the practical application of every Cadet's leadership journey both on and off the quad.
- We are addressing the maturity of our Cadets by focusing on arming them with the five factors of resilience and how they intersect:  physical, mental, sleep, performance nutrition, and spiritual.  All in an effort to get left of harmful behaviors by helping each Cadet build resiliency in a way that helps them drive through adversity whether on the battlefield or in life.

Internal Discussions:

So the questions posed by me to the staff at the end of last semester:  Why do we do FOW the way we do?  Is it ground in history, tradition, or outcomes?  Do we continue to do FOW the same way we've always done it?  How do we re-imagine leadership development to better prepare rising sophomores and rising juniors for their next (if not first) leadership experience in the Corps, if not life?  How do we more rigorously, intentionally, and immersively bring leadership training and education to life?  How do we achieve balance between the twin aspects of the Corps experience:  leadership development and tradition.   How do we make them mutually supportive rather than mutually exclusive?  Reinforcing rather than the polarizing.

The working groups looked at multiple ways to addressing the above questions.   We looked at models where it is working.  We questioned the assumptions behind the way we've always done it.  We looked at time requirements.  We challenged ourselves to keep in balance the tension between the fraternal aspects of the Corps and the Leader of Character mission we are charged with.

A 'plan to plan' – this is what I said to move out on:

Go bold in honoring the past but pushing ourselves into the future – to remain relevant. To transform the Corps experience to provide leaders of character to the state and nation at a time we need to most.

First, we are establishing a 'Sophomore Leadership Academy'. This is focused on rising sophomores in the second semester of their fish year, and culminates during the first few weeks of the Sophomore year. This will focus on educating, training, modeling, scenario/case study, demonstrating, and certifying that they (1) understand, and (2) can execute what it means to lead in a demanding and aspirational way. No longer can we tolerate the 'least qualified leading the most vulnerable'.

Second – we are extending the orientation period of incoming freshmen to focus on outcomes to be successful: A common understanding of traditions, values, standards; to set conditions for success academically; to incorporate the five factors of resilience into the fabric of the Corps experience; and to drive an articulation of the value proposition of the Corps.

The combining of these two initiatives involves some pretty significant adaptations of the Corps experience up front to ensure we mature the Corps experience in a way that is valuable to all.

The extended Freshmen orientation will last about 5-6 weeks (around Fall Break), culminating in the pinning of Corps Brass. It will be led under a cadre of about 200 Seniors and Juniors who will be exclusively responsible to the training and education of the outcomes listed above. The Freshmen will be consolidated under Major unit 'pods'. Simultaneous to this the Sophomores will be completing their 'certifications' under the Sophomore Leadership Academy. As they graduate, they will be incorporated into the cadre.

After the Freshmen class has successfully been pinned, there is a transition from Cadre to outfit leadership – this transition more closely matches the mental model we all have of our experience. The next 7-8 weeks is outfit integration that rides on (1) the commons set of standards, values, and traditions that all Cadets learn, and (2) under the leadership of outfits (Sophomores who have graduated from the Sophomore Leadership Academy), Juniors, and Senior into the unique aspects and culture of their outfit. This will culminate in an outfit form of 'culmination' that each outfit will have to lay out.

As the Corps completes the first semester, the second semester becomes a selection and a preparation phase for the next leadership position in the Corps.

So what are the friction points? What are the risks?

1. The one logistical challenge we are seeking to solve is the transition from 'orientation unit' consolidation, to outfit footprints.  This is a math and a physics problem.  Right now the challenge is whether it is feasible to reshuffle the entire quad during the semester (right around Fall break) or do we wait till the transition between fall and spring semesters.  This is a big driver of 'feasibility'. There are others:  march ins, PT, formations, etc… a lot to think through here.

2. It does not look like the way we've always done it.  Completely true.  Unless you go back to the 50's where all fish resided at RELLIS (FDT came out of this).  I would ask that we all take a step back from our own version of the Corps and allow this to improve our beloved institution.


3. What about outfit integrity?  I can see how this can be interpreted if we allow ourselves to be prisoners of our experience.  I'd challenge all of us to be 'informed' by our experience and see the future benefit of transforming the Corps experience in a way that results in leaders better prepared for the challenges of tomorrow while building a community that will last a lifetime.

4. What about outfits that have it right?  Now they get to get it 'righter'.  There are layers upon layers of how to address this.  We all have a sense of pride here, I am the same with E-1.  But we have to confront the brutal facts that we are losing the identity of the Corps at the expense of outfit identity.  That our leadership training and education program needs to be improved.  Our current leadership model is bouncing off the fraternal aspects of every outfit.  Spend a day with 'your unit' and watch how they interact with other units.  You'd be surprised.  We are actually addressing a larger concern of Corps identity in relation to the university, the state, and the nation.


5. Impact on recruiting?  Outfits still recruit for their outfit.  The 'Corps Orientation' Phase is about providing a corps wide calibration of standards, values, and tradition.  There is still a hugely important quality of outfit identity in the recruiting process.

6. General.. this is all about quantity!  I get this a lot.  Here's how I'd address it:  (1.) "Old" Army and 'Their' Army are vastly different, but equally as challenging.  I watch these young men and women wrestle hard everyday – and the stressors of yesterday pale in comparison to the stressors of today.  (2.) Quantity or Quality:

I want both.  And I think we can do it.  There will always, always be some form of attrition.  And I'm calibrating what I think is acceptable.

If you've read this far it is because our version of the Corps experience so incredibly defined our identities, our friends, and our lives.  But we have to move forward in a way that balances the important and relevant aspects of the Corps experience we experienced to where it needs to go next.  We cannot remain relevant if we put tradition above leadership development.   We need balance here.

I look forward to your thoughts as I lay out this plan to keep planning to a group dedicated to 'you know you win the corps at A&M when…'

Thank you.  Commandant.


+++

EXHIBIT

**23**

| | |
|---|---|
| **From:** | Brian Beckcom <brian@vbattorneys.com> |
| **Sent:** | Wednesday, May 22, 2024 2:11 PM |
| **To:** | Brendan Fradkin |
| **Cc:** | Jason Contreras; Nicole Myette; Patti Artavia |
| **Subject:** | Re: Beckcom v. Texas A&M - Mandamus |

Jason:

See Brendan's email.

I wanted to work this out, but since you are too busy to talk on the phone for 10 minutes, I'll just summarize briefly what I wanted to discuss with you:

Does your boss know that you are taking a pro-DEI, anti-SB 17 position in this litigation?? Have you sought and received approval from the higher-ups in the AGs office to take this position?

I think the powers-that-be may be interested to know that you are taking a pro-DEI, anti-SB 17 position in this case.

-bb

VBAttorneys
Lessons from Leaders Podcast
My Bio Video

On Wed, May 22, 2024 at 1:36 PM Brendan Fradkin <brendan@vbattorneys.com> wrote:
> Jason,
>
> To clarify, we followed the Court procedure by submitting a request for hearing date. We didn't select that specific date.
>
> Are there some hearing dates that do work for you and we can jointly inform the Court?
>
> On Wed, May 22, 2024 at 1:19 PM Jason Contreras <Jason.Contreras@oag.texas.gov> wrote:

Brian: I'm not available any earlier than 5/30. Also, in the future you need to confer w/ me on hearing dates versus unilaterally setting them.

Jason T. Contreras

Assistant Attorney General

---

**From:** Patti Artavia <patti@vbattorneys.com>
**Sent:** Wednesday, May 22, 2024 11:56 AM
**To:** Jason Contreras <Jason.Contreras@oag.texas.gov>
**Cc:** Brian Beckcom <brian@vbattorneys.com>; Brendan Fradkin <brendan@vbattorneys.com>; Nicole Myette <Nicole.Myette@oag.texas.gov>
**Subject:** Re: Beckcom v. Texas A&M - Mandamus

Mr. Contreras, is there an earlier date you can have the call with Mr. Beckcom. Right now we are set for next Thursday at 330. He would like to try to get it done sooner. Thank you

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
Tell me how I'm doing: ReviewVB.com
The best compliment you can give our team is the referral of someone who needs our help.

On Mon, May 20, 2024 at 12:40 PM Jason Contreras <Jason.Contreras@oag.texas.gov> wrote:

Had to push to 3:30pm b/c of a conflict

Jason T. Contreras

Assistant Attorney General

**From:** Patti Artavia <patti@vbattorneys.com>
**Sent:** Monday, May 20, 2024 12:30 PM
**To:** Jason Contreras <Jason.Contreras@oag.texas.gov>
**Cc:** Brian Beckcom <brian@vbattorneys.com>; Brendan Fradkin <brendan@vbattorneys.com>; Nicole Myette <Nicole.Myette@oag.texas.gov>
**Subject:** Re: Beckcom v. Texas A&M - Mandamus

Thank you. What is the best number for him to call?

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
Tell me how I'm doing: ReviewVB.com
The best compliment you can give our team is the referral of someone who needs our help.

On Mon, May 20, 2024 at 12:28 PM Jason Contreras <Jason.Contreras@oag.texas.gov> wrote:

Brian: I'm not available this week. Next Thursday at 2:30pm works.

Jason T. Contreras

Assistant Attorney General

---

**From:** Patti Artavia <patti@vbattorneys.com>
**Sent:** Friday, May 17, 2024 1:44 PM
**To:** Jason Contreras <Jason.Contreras@oag.texas.gov>
**Cc:** Brendan Fradkin <brendan@vbattorneys.com>; Brian Beckcom <brian@vbattorneys.com>
**Subject:** Beckcom v. Texas A&M - Mandamus

Mr. Contreras, Mr. Beckcom would like to schedule a call with you as soon as possible regarding this matter. Please let me know if you have any availability early next week. Thank you.

Patti Artavia
Senior Paralegal/Case Manager
2016 AAJ Paralegal of the Year
VBAttorneys.com
Direct Dial (832) 791-3118

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
Tell me how I'm doing: ReviewVB.com
The best compliment you can give our team is the referral of someone who needs our help.

--
Brendan Fradkin
VB Attorneys
832-791-2337

Follow us on **Facebook**, **Twitter**, **LinkedIn**, and **Instagram**
Why hire VB Attorneys
The best compliment you can give our team is the referral of someone who needs our help.

**EXHIBIT 24**

# 61.01    Public Information Act Compliance

Revised November 10, 2022 (MO   -2022)
Next Scheduled Review:  November 10, 2027
Click to view Revision History.



## Policy Summary

The Texas A&M University System (system) and its members are committed to full compliance with the Texas Public Information Act.

## Policy

1.  The system Board of Regents (board) is committed to full and complete compliance with the letter and the spirit of the Texas Public Information Act and to public policy of the state of Texas that "all persons are, unless otherwise expressly provided by law, at all times entitled to full and complete information regarding the affairs of government and the official acts of those who represent them."  It is the board's policy that the system and all members fully comply with the provisions of the Texas Public Information Act.  In the absence of any applicable exception to disclosure under the Act, requested information will be provided as soon as possible.

2.  Each chief executive officer (CEO) is designated as that member's Officer for Public Information.  To assist in achieving full compliance with the Act, the chancellor must promulgate a regulation that includes procedures to be used in the receipt and referral of public information requests.  Such procedures must provide for the appointment of a specific agent of the Officer for Public Information at each member to compile and coordinate responses to all public information requests.  The System Office of General Counsel assists members in determining whether requested information is public and in seeking Attorney General decisions in accordance with the Act.  The agent of the Officer for Public Information must notify the CEO and/or other appropriate member or system contacts of requests that may have public relations significance.

3.  The chancellor and each member CEO must make every effort to keep the board informed on issues which could appear in the media and about which board members may be questioned.

## Related Statutes, Policies, or Requirements

Tex. Gov't Code, Ch. 552

Regulation *61.01.02, Public Information*

## Member Rule Requirements

A rule is not required to supplement this policy.

## Contact Office

General Counsel
(979) 458-6120

EXHIBIT
25

# 61.01.02   Public Information

Revised September 10, 2019
Next Scheduled Review:  September 10, 2024
Click to view Revision History.



## Regulation Summary

This regulation establishes baseline procedures to help members of The Texas A&M University System (system) comply with the Texas Public Information Act.

## Regulation

1.   PUBLIC INFORMATION

   1.1   The Texas Public Information Act, Chapter 552, Texas Government Code (the Act), specifies that, with certain exceptions, all information collected, assembled or maintained pursuant to law or ordinance or in connection with the transaction of official business by a governmental body or for a governmental body, if the governmental body owns or has access to the information, is public information and must be available to the public during normal business hours of the governmental body.

   1.2   As used in the Act, the term "governmental body" includes boards, committees, institutions, agencies or offices that are within or created by the executive branch of the state government, including the system Board of Regents (board), system members and System Offices, and are under the direction of one or more elected or appointed members (i.e., system board).

   1.3   The Act "will be liberally construed in favor of granting a request for information."

2.   THE OFFICER FOR PUBLIC INFORMATION AND DESIGNATED AGENT

   2.1   The Act provides that each member chief executive officer (CEO) is the officer for public information, who is responsible for the preservation and care of the member's public records.

   2.2   Each CEO must designate an agent to act as public information officer/coordinator (PIO) for that member.  The PIO will compile and coordinate responses to all public information requests the member receives. ***However, the CEO retains ultimate responsibility for that member's full compliance with the Act.***  Also, each CEO must appoint a backup or alternate PIO to act in the PIO's absence.  Each CEO will also ensure that the identity of the PIO, the PIO's office and mailing address, the member's open records email address, and a link to the member's electronic open records portal are prominently displayed and easily accessible on the member's website.  The System Office of General Counsel (OGC)

and the PIOs for the other members must be promptly notified upon the appointment of a new PIO.

2.3     Each member PIO and backup/alternate must complete open records training as required by the Act.

2.4     The PIO will not make any inquiry of a requestor except to establish proper identification, seek clarification to determine what public information is being requested, or seek to narrow the scope of a request for a large amount of information. All requests will be treated uniformly without regard to the position or occupation of the requestor or whether the requestor is a member of the media.

2.5     The PIO must keep an accurate record of all public information requests the member receives for a given year, including the name and contact information of each requestor, the date on which a request is received, the date on which the records are made available or copies provided, the type of information requested, which departments or units were requested to provide information by the PIO, which departments or units provided the requested information, how much is charged to and paid by the requestor for copies and other costs, if any, and any other information necessary to demonstrate the member's compliance with the Act for each request. The PIO must also keep a record of when an Attorney General decision is sought and the decision of the Attorney General for a given request, if any.

2.6     Not later than the end of each month, the PIO must electronically submit to the Office of the Attorney General all necessary information on the number and nature of public information requests the member responded to during the prior month. For example, reports for September of a given year must be submitted to the Attorney General's Office by the end of October of that year.

2.7     Each member PIO must ensure that the member timely makes all other reports to the Office of the Attorney General which are required by the Act.

2.8     Each member PIO must prominently display the sign in the form approved by the Attorney General "that contains basic information about the rights of a requestor, the responsibilities of a governmental body, and the procedures for inspecting or obtaining a copy of public information under" the Act.

2.9     Each member must develop guidelines for public information requests to ensure that the PIO can promptly seek and receive responsive information from the widest reasonable group of departments/units. Members are encouraged to use email and electronic records when possible to expedite responses to public information requests.

3.   PUBLIC INFORMATION REQUEST PROCEDURES

3.1     Any public information request to a member must be in writing and directed to that member's PIO. A public information request to a member may only be submitted by one of the following methods to the person designated as that member's PIO: hand delivery, US mail, email, or the member's electronic open records portal.

3.2     After receiving a public information request, the PIO must promptly:

(a) Process the request through the member's electronic open records portal.

(b) Send an acknowledgment of receipt to the requestor, including its assigned portal number.

(c) Forward a copy of the request to the member department/unit or widest group of departments/units that may reasonably possess the requested information. The member department/unit or group of departments/units will search for the requested information and notify the PIO by the next business day, if possible, what responsive information each department/unit possesses. A copy of the records containing the responsive information will be forwarded to the PIO as soon as possible.

(d) Notify the CEO and/or other appropriate member or system contacts of requests that may have public relations significance.

(e) Forward a copy of the request and responsive documents to OGC if the PIO has a question regarding the applicability of an exception to disclosure under the Act. See Section 5 for seeking a decision from the Attorney General.

3.3 If the PIO determines, through consultation with OGC, the requested information is public, the PIO must promptly produce to the requestor a copy of the information or produce the information for inspection.

3.4 If the information is unavailable within 10 business days after receiving a written request for information, the PIO must certify this fact in writing to the requestor and set a date and hour within a reasonable time when the information will be available.

4. COST OF COPIES

4.1 If assessed, copy charges will not be excessive. Maximum charges for the reproduction of public information, reflecting rates approved by the Office of the Attorney General, can be found in Texas Administrative Code.

4.2 Public information will be furnished without charge or at a reduced rate if the member determines that a waiver or reduction of the fee is in the public interest because furnishing the information can be considered as primarily benefiting the general public. Requests for reduced charges must be in writing and addressed to the PIO.

5. PUBLIC INFORMATION DECISIONS

5.1 If a member receives a public information request that it (1) considers to be within one of the Act's exceptions to disclosure; and (2) wishes to withhold responsive information from public disclosure, a request for decision must be submitted to the Attorney General within _**10 business days**_ after receiving the public information request. In some limited circumstances, the Act may permit the withholding of information without seeking an Attorney General decision, e.g., FERPA.

5.2 The PIO will segregate responsive public information from the information submitted to the Attorney General and will promptly produce the public information to the requestor.

5.3 The member PIO will immediately submit information to OGC for review and for preparation of the Attorney General decision request, including the following:

    (a) a copy of the written public information request and information showing when the request was first received by the member;

    (b) information showing who at the member first received the request;

    (c) a copy of the specific information requested or representative samples of the information if a voluminous amount of information was requested; and

    (d) a list of all departments/units that were requested by the PIO to provide responsive information and which departments/units actually provided the information.

OGC will then forward the decision request and the information to the Attorney General.

6. EMPLOYEE PUBLIC INFORMATION REQUESTS

6.1 System employees are not authorized to submit public information requests to members while acting in their official capacity. Any public information request made by a member employee must be submitted in that employee's individual capacity as a private citizen.

6.2 The willful misuse of information received through the Act may subject the employee to the loss of individual indemnification by the state. This regulation does not affect employees' access to information in their official personnel files.

7. ANNUAL SYSTEM MEMBER COMPLIANCE CERTIFICATION

Not later than the last business day of September, members must annually submit a *Public Information Act Compliance Certification* to OGC for the prior fiscal year. The certification will be consistent with the form linked in this regulation.

## Related Statutes, Policies, or Requirements

1 Tex. Admin. Code Ch. 70, *Cost of Copies of Public Information*

Tex. Gov't Code Ch. 552

Attorney General's Open Government website

Attorney General's Public Information Act Handbook 2018

Attorney General's Public Information Act Sign

System Policy *33.04, Use of System Resources*

System Policy *61.01, Public Information Act Compliance*

System Regulation *61.99.01, Retention of State Records*

## Appendix

[Annual System Member Public Information Act Compliance Certification Form](#)

## Member Rule Requirements

A rule is not required to supplement this regulation.

## Contact Office

General Counsel
(979) 458-6120

**EXHIBIT**
**26**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Cc:** | Gardner, Jeffery D; Smith, Asia |
| **Subject:** | FW: |
| **Date:** | Tuesday, March 5, 2024 12:08:25 PM |

Howdy Audrey,

Have we spoken wit

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, March 5, 2024 11:38 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**

Sir,

has not been questioned yet you may want to reach out to him.  He is willing to make a statement if asked.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Corps Standards and Accountability Director
Military Advisor Parsons Mounted Cavalry
979-458-9317

| From: | Alvarado, Blair |
|---|---|
| To: | Alva |
| Subject: | FW |
| Date: | Frid |

---

**From:** Eddy, Georgia G <spur-saddle59@exchange.tamu.edu>
**Sent:** Wednesday, January 31, 2024 1:01 PM
**To:** Alvarado, Blair <abalvarado@tamu.edu>
**Subject:** Fw

Howdy,

A student has requested witnesses to be present for their upcoming Conference. I will discuss the case with you during our 1:1 today.

Respectfully,

Georgia Eddy '22
Texas A&M University
Academic Integrity Administrator
Aggie Honor System Office
(979) 458-3378

---

**From**
**Sent:** Tuesday, November 28, 2023 12:15 AM
**To:** Eddy, Georgia G <spur-saddle59@exchange.tamu.edu>; Eddy, Georgia G <spur-saddle59@exchange.tamu.edu>
**Subject**

Dear Georgia Eddy,

This email is for additional information for the

*Amend to the case's file:
- The case's file claimed that ▮▮▮▮ went to the afternoon activity's training time. However, instead, ▮▮ texted and called ▮▮▮▮▮▮ through his (▮▮▮▮▮▮ phone number and told ▮▮ to go back to the dormitory.

*Witnesses:
▮▮▮▮▮▮▮▮▮ Justify whether has told others that he ( ▮▮ was a                    .

- ▮▮▮▮▮▮▮ is a                    in company        in the Corps of Cadets. He is a lower ranking

Cadet than ██████████ and a ██████ with ████████, █ is taking ████████ for ██████ During a conversation with ████████, ████████ told ████████ that Mr. █ told that he (Mr. ██) was a ████████████, and he (Mr. ███) would help ████████ if ████████ struggled in that class (as █ did with ████████.

████████ Justify whether █ has told others that he (Mr. ██) was a ████████

- ████████ is a ████████ in company ████ in the Corps of Cadets. He is a lower ranking Cadet than ████████, a ████████ with ████████, and a former roommate with ████████ (before ████████ moved to a different room). ████████ used to take ████████ (he dropped it to take ████. At the time he was taking ████████, He, as he told ████████, was told by Mr. ██ that Mr. ██ is a ████████████ and would offer help if ███ struggled in that class (as █ did with ████████.

████████; Justify whether ██ has told others that he (Mr. ██) was a ████████

- ████████ is a ████████ in company ████ in the Corps of Cadets. ████ is a lower ranking Cadet than ████████ and a ████████ with ████████. Unlike other witnesses, ███ is not taking ████████ for ████. Despite that, ████ was told by Mr. ██ that he (Mr. ██) is a ████████ after he (Mr. ███) found out that ████████ was gathering witnesses for the case. After ████████ asked ███ whether Mr. ██ told ████ that he (Mr. ███) was a ██████ Mr. ██ found out the situation and came to ████████'s room; he (Mr. ███) started to convince ████ that he (Mr. ███) was a ████████

████████████ Justify whether ████ has told others that he ( ████████ was a ████████ .

- ████████ is a ████████ in company ████ in the Corps of Cadets. He is a lower ranking cadet than ████ and a ████ with ████ . ████ is taking ████ for ████ ████████ knows, as he told ████, that ████ is a ████████ through a story by ████████ (As ████

████████████ Justify the story on ████████████ leaving outfit's afternoon training time to meet Mr. ██).

████████████ is a ████████ in company ████ in the Corps of Cadet. ████ is a lower ranking cadet than ████████ and a ████ buddy with ████████. On ████ as ████████ was leaving the outfit's afternoon activity from the ████████ | ████ He (████████) met ████████ on the steep in front of the Kyle Field. They (████████ and ████████) had a talk about how sore ████████ leg was from having to train in the morning. Then, they (████████ and ████████ saw Mr. ██, and ████████ started to leave with Mr. ██.

*Edvidences:



Picture of ▮▮▮▮▮▮ mail to ▮ : This is a picture of the ▮▮▮▮ that ▮▮▮▮▮▮ sent to Mr. ▮ .

Help desk with ▮▮▮▮▮▮ , Help Desk 2: This is a picture of the email correspondence when ▮ ▮▮▮▮ tried to retrieve the email after Mr. ▮ deleted it.

Mr. ▮ phone number, ▮ text on ▮▮ this to justify the story on Friday (noted that those evidences in email form will be forwarded to Georgia Eddy)

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Latham, Skylar |
| **Cc:** | Smith, Asia |
| **Subject:** | Investigation Assigned |
| **Date:** | Monday, December 18, 2023 3:24:13 PM |
| **Attachments:** | |

Howdy,

Please see the attached      harassment investigation assigned to you.  Please let me know if you have any questions or concerns.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| **From:** | Smith, Asia |
| **To:** | Bell Jr, Douglas |
| **Subject:** | RE: 3 items shared with you |
| **Date:** | Monday, February 26, 2024 9:50:00 AM |
| **Attachments:** | image001.png |

I would assign myself as the SCA and ask Skylar to co adjudicate with me.

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Smith, Asia
**Sent:** Monday, February 26, 2024 9:45 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: 3 items shared with you

Dr. Bell,

I have reviewed this case and believe that            should be charged with Abuse of Process for *attempting to discourage an individuals'*            *participation in, or use of, a student conduct, disciplinary or legal process.* Additionally, I would charge hazing for the coercive behavior and theft for stealing the intellectual property of another student. Dishonesty may also apply or making false statements in the meeting with the faculty member and submission of work that was not his.

The theft maybe addressed by the AHSO but if I were charging the student I would want to encompass all behaviors. I would not charge            ould also like to determine if other            members sent their work

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, February 23, 2024 2:23 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:** FW: 3 items shared with you

I'm looking through my email, and I forgot to send this your way for your review.  Please review and let me know your thoughts before you assign.

**Douglas Bell, Ph.D.** | Director of Student Community Standards

**- 2017 -**

Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas
**Sent:** Tuesday, February 6, 2024 11:43 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: 3 items shared with you

See attached.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, February 6, 2024 11:39 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: 3 items shared with you

Hey Dr. Bell,

I tried but I'm unable to open those attachments, it says I need access.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, February 6, 2024 11:06 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: 3 items shared with you


**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Blair Alvarado (via Google Drive) <drive-shares-noreply@google.com>
**Sent:** Friday, February 2, 2024 1:08 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** 3 items shared with you

**This Message Is From an External Sender**

This message came from outside your organization.

# Blair Alvarado shared 3 items



Blair Alvarado (abalvarado@tamu.edu) has shared the following items:



Howdy Dr. Bell,

We have been navigating a potential case of academic misconduct with the following information. As information continues to be provided, some indicators have begun to present themselves that may need to be reviewed by your office. ▮▮▮▮▮▮ sites exceeding pressures to provide assignments along with demands to delete emails, etc. to and from their ▮▮▮▮▮▮▮▮ in the documents I have provided. There are also some witnesses that may provide some clarity. There are other documents as well; if you would like to review more or have questions, please let me know. A conference is scheduled to address potential academic misconduct within the next week. Thank you for your time.

ABA

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because abalvarado@tamu.edu shared files or folders
located in Google Drive with you.



**From:** Smith, Asia
**To:** Gardner, Jeffery D
**Cc:** Latham, Skylar
**Subject:** RE: Corps Conduct Cases
**Date:** Wednesday, March 20, 2024 2:27:00 PM

Thanks for the statement from ▮▮▮▮. The Honor Council Probation is different from the Student Conduct Probation. He was charged for student rule violations in Student Rule 20. For our office Student Rule 24 is used and he will have different behaviors addressed that include Hazing, Abuse of process, dishonesty.

I tried calling you this morning to see where you were at with getting this statement (great minds think alike). Are you available                                              I can schedule him for that time.

**Asia Smith M.S.Ed.**  |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, March 20, 2024 11:02 AM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** RE: Corps Conduct Cases

Morning Ladies,

        I'm trying to catch up on delinquent emails.  I apologize for the delay in responding.    For the ▮▮▮▮▮▮▮ situation, Aggie Honor has already ruled that       is responsible.  I received a statement from ▮▮▮▮ (attached).  I do have a question.  If ▮▮ is already on Conduct Probation as a result of academic dishonesty, would it be double jeopardy to charge him again?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Corps Standards and Accountability Director
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Smith, Asia <asias@sco.tamu.edu>
**Sent:** Thursday, February 29, 2024 4:05 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** Corps Conduct Cases

Howdy,

We have three cadets that will be seen by the Conduct office. I wanted to get your schedule for March 7th and 8th.

I've asked Skylar to co-SCA with me so I have copied her on this email. In my conversations with Skylar she said that you may already be aware of the incidents but I wanted to loop you in officially prior to sending charge letters.

I assume all will get conduct unbecoming a cadet.

**Summary**

█████-Fighting a non student

██████- interfering with the officers who were addressing the fight with

███- appeared before AHSO regarding turning in another        The other        stated that asked several other students for them to submit their work to him. Would it be possible to gather statements for the other students named?

████████ –

24.4.3. Physical abuse. Any attempt to cause injury or inflict pain; or causing injury or inflicting pain. Also causing physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. It is not a defense that the person, group, or organization against whom the physical abuse was directed consented to, or acquiesced to, the physical abuse.

24.4.6.1. Evading. Intentionally fleeing from a University official or law enforcement officer when the person knows or reasonably should have known the University official or law enforcement officer is attempting to confront, arrest, or detain.

████████

24.4.17. Disorderly conduct. Public behavior that is disruptive, lewd, or indecent; breach of peace; or aiding, or procuring another person to breach the peace on University premises or at functions sponsored by the University or participated in by members of the University community.

24.4.6. Failure to comply. Failure to comply with proper and lawful direction of any University official or law enforcement officer.

████████████

24.4.23. Abuse of process. Abuse of the student conduct, disciplinary and/or legal processes including, but not limited to, investigations, conferences, and appeals.

24.4.5. Hazing. Any act that endangers the mental or physical health or safety of a student, or that destroys or removes public or private property; and/or assisting, directing, or in any way causing others to participate in degrading behavior and/or behavior that causes ridicule, humiliation, or embarrassment for the purpose of initiation, admission into, affiliation with, or as a condition for continued membership in a group or organization; or as part of any activity of a recognized student organization, student group, Corps of Cadets, Corps outfit, Corps unit, or Corps Special Activities. Previously relied upon "traditions" (including Corps, fraternity/sorority, or any other group or organization activity, practice or tradition), intent of such acts, or coercion by current or former

**- 2022 -**

members or student leaders of such groups, will not suffice as a justifiable reason for participation in such acts. It is not a defense that the person (or group) against whom the hazing was directed consented to, or acquiesced to, the behavior in question.

Examples of such behavior include but are not limited to:
- Misuse of authority by virtue of one's class rank or leadership position.

24.4.1. Dishonesty. Acts of dishonesty, including but not limited to the following:

24.4.4.1. Theft. Unauthorized removal or stealing and/or attempted removal or stealing of property of a member of the University community or other personal or public property, on or off campus. This includes knowingly possessing such stolen property. This also includes theft of services and/or misuse of another's property including, but not limited to, unauthorized use of another's property, unauthorized selling of subsidized tickets, and use of a forged parking permit.

I was hoping to get with you earlier today however time moves so quickly. I must have letters out on Monday to have meetings at the end of the week so your prompt response is appreciated.

Let me know your thoughts!

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | [asiasmith@tamu.edu](mailto:asiasmith@tamu.edu) | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Smith, Asia
**To:** Bell Jr, Douglas
**Subject:** RE:            Investigation Report
**Date:** Tuesday, January 9, 2024 4:44:00 PM

Skylar will be the SCA for this case.

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
DIVISION OF STUDENT AFFAIRS | One Division. One Mission.

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Monday, January 8, 2024 2:32 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**            Investigation Report

Howdy,
Please review the attached investigation report and let me know who you would like for me to forward this report to.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
DIVISION OF STUDENT AFFAIRS | One Division. One Mission.

**From:** Bell Jr, Douglas
**To:** Winking, Audrey J
**Subject:** FW: Corps Hazing/Harassment Complaint
**Date:** Thursday, September 14, 2023 12:15:29 PM
**Attachments:** FW Video and photos from corps student.msg

I am forwarding this information to initiate an investigation into this matter. Please let me know if you have any questions or concerns.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Smith, Jennifer M <jennifer.smith@exchange.tamu.edu>
**Sent:** Thursday, September 7, 2023 1:16 PM
**To:** Bell Jr, Douglas <douglasb@ypsa.tamu.edu>
**Cc:** Desai, Jennifer L <jdesai@tamu.edu>
**Subject:** FW: Corps Hazing/Harassment Complaint

See synopsis below.

*Jennifer Smith* | Assistant Vice President & Title IX Coordinator
University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations
Texas A&M University | YMCA, Suite 108
1268 TAMU | College Station, TX 77843-1268
ph: 979.458.8167 |Jennifer.smith@tamu.edu

**From:** Desai, Jennifer L <jdesai@tamu.edu>
**Sent:** Wednesday, September 6, 2023 1:31 PM
**To:** Smith, Jennifer M <jennifer.smith@exchange.tamu.edu>
**Subject:** Corps Hazing/Harassment Complaint

Hi Jennifer-

I had an intake this morning with ▮▮▮▮▮ a corps member in ▮▮▮ He is being harassed/hazed by ▮▮▮▮▮ another student in his unit. I recognize this is not an 08.01.01 violation, but a Rule ▮▮▮▮▮ is concerned about retaliation and ostracism from the corps if he reports up the chain and also worried that Student Conduct will identify him to the respondent and ▮▮ is already in fear for his safety and under emotional distress. When I asked him what he wanted to get from reporting to our office, he stated "I just want ▮▮▮ moved away from me. I do not want to interfere with his ▮▮▮▮▮ and future."

Synopsis of events
This past weekend, ▮▮ was 5 minutes late to ▮▮▮▮▮ and ▮▮ forced him to stand in front of the unit whi▮ yelled things at him, such as "you're a p▮ of shit", "I fucking hate



you", "I want you out". After the game several people told ████ to watch his back and keep his door locked to his dorm room. ████ reported that he is afr██ of ████ causing him bodily harm. ████ understands he needs to take responsibility for his infraction and is willing to follow corps a██oved sanctions, but ████ takes things beyond discipline to the level of harassment.

████ has repeatedly targeted ████ since his ██████ year. ████ reported the following hazing incidents, all of which are not approved by the corps:
-Last year before the ████ game, ████ entered ████ dorm room at 4am

-████ forced him to do squats while holding his footlocker.

-When ████ was sick with ████ forced him to stand at attention in front of his window ████ would come up behind him █d yell at him. This was reported to the CO but nothing was done about it.
-████ called ████ a "faggott"

████ has photos and videos of these incidents

████ also reports ████ had issues with his ████ when she was a student at TAMU. ████ was a ████ and was drinking in the dorm and lied about it. ████ was the ████ and reported it up. ████ tried to accuse her of ████ days ████ graduation, but was proven innocent. ████ instantly targeted ████ because of the issues with ████ refers to her as a '████' and talks about hi██ tred for her.

Jennifer Desai | Case Manager
Department of Civil Rights and Equity Investigations
Texas A&M University | YMCA Building, Suite 108
1268 TAMU | College Station, TX 77843
ph: 979.458.8192 | jdesai@tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
TEXAS A&M UNIVERSITY

MENTAL HEALTH RESOURCES: 24/7 Professional Counseling | After-hours Mental Health Support | Local Emergency Services

- 2026 -

| From: | Winking, Audrey J |
|---|---|
| To: | Washington, Robert Sykes |
| Subject: | RE: Investigation |
| Date: | Friday, September 22, 2023 9:27:00 AM |

Thank you!  See you in a bit.

**From:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Sent:** Friday, September 22, 2023 9:00 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation

I can do that

LtCol Robert Washington, USMC (ret)
Cadet Training Officer, Corps of Cadets
Texas A&M University
rwashington@corps.tamu.edu

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 8:28:27 AM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE: Investigation

Would 11 work? If so, I can meet with you in                                     in one of our
panel rooms.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Sent:** Thursday, September 21, 2023 5:02 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: Investigation

Audrey,
   Yes, I am available at 10am. I am assuming you are in the SSB? What is your office number?

 Rob

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

Office ph: 979.458.1202 Mobile ph:
[rwashington@corps.tamu.edu](mailto:rwashington@corps.tamu.edu) | [corps.tamu.edu](http://corps.tamu.edu)
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders



---

**From:** Winking, Audrey J <[audrey_winking@sco.tamu.edu](mailto:audrey_winking@sco.tamu.edu)>
**Sent:** Thursday, September 21, 2023 4:15 PM
**To:** Washington, Robert Sykes <[rwashington@corps.tamu.edu](mailto:rwashington@corps.tamu.edu)>
**Subject:** Investigation

Howdy,

Dr. Bell informed me that you have been assigned to work on the       investigation with me.  Do you have some time tomorrow (Friday) where we could chat briefly about the plan for the investigation moving forward?  The only times I am unavailable                           . We could meet via Zoom or Teams if that is more convenient for you since it should be a quick meeting!

I am hoping to do interviews next Wednesday afternoon      if that works for you!

Thanks,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 [|audrey_winking@sco.tamu.edu|](mailto:audrey_winking@sco.tamu.edu) sco.tamu.edu

Okay great, thank you!  I do plan on condensing some of our questions as well so I will make sure he's done on time.  I can always have him come back the next day to review notes if needed.

**From:** Washington, Robert Sykes
**Sent:** Friday, September 29, 2023 10:29 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: ▮

That is the event that I have to leave for since I am the ▮ advisor. He is not expected to be out there until 4:25 so I think if we are done by 3:45 then he should have time to get to his room and change. It is important for him to take part in it but I think he will have time.

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders



**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 29, 2023 10:22 AM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** ▮

Hi Lt. Col. Washington,

▮ emailed me saying he has the ▮ at ▮ , so he was asking if we can reschedule his interview.  I typically only work around students' class schedules, but is this something we should work around? I wasn't sure if this was extracurricular or something that is critical he participates in so I wanted to get your perspective!

He is the one we have scheduled ▮ with his class ending ▮ So we in theory should be done by ▮ but I do recognize that would be really rushed for him.

Thanks,
Audrey

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: - |
| **Date:** | Thursday, October 12, 2023 10:55:54 AM |

FYI for Co-Investigator

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, October 12, 2023 8:48 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE:

Sir,

       John Regan will be our investigator. He can be reached at jregan@corps.tamu.edu

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**- 2031 -**

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: ▊▊ - |
| Date: | Wednesday, October 11, 2023 2:27:04 PM |
| Attachments: | FW Filex - You have access to the folder 23-1003-0003.msg |
| | Re Filex - You have access to the folder 23-1003-0003.msg |
| | FW ▊▊ update.msg |

Please see the information below. I am recommending this information for an investigation.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Sent:** Wednesday, October 11, 2023 1:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: ▊ ▊ -

Howdy Dr. Bell.

Attached below is another email SCO email received from

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station,TX 77843-1172

ph: 979.847.7272 | neldat@sco.tamu.edu | sco.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▊▊▊▊▊
**Sent:** Wednesday, October 11, 2023 1:11 PMHowdy
**To:** Mathes, Kathryn <kathryn_mathes@studentlife.tamu.edu>; Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Cc:** ▊▊▊▊▊
**Subject:** ▊ ▊ -

▊

### This Message Is From an External Sender
This message came from outside your organization.

To whom this may concern,



███████ has become too distraught over the idea of reporting the ongoing and progressing issues of retaliation and harassment to anyone, but especially ██████ due to his recent actions and the new threats that have steamed from them. ██████ expressed a resistance to speaking to ██████ over the weekend. And this morning she stated that she did not want to speak to ██████ because he's not going to do anything, and things just keep getting worse. Which, I firmly believe was ██████ intent to begin with, which was clearly demonstrated in his actions of reporting to other students and informing them of the police report, and her hiding place between classes, and other things she reported to him in confidence.

I feel it's pertinent to review the facts that have occurred over this long weekend because so much has happened over such a short period of time. ██████ and immediately upon receiving the report ██████ informed the students in ██████ Chain of Command that ██████ met with ██████, who immediately turned around and informed these students ██████ what ██████ reported to him including the fact that ██████ has been essentially ██████ was then informed by ██████ that she would be expected to sit in a meeting with these same ██████ who have been bullying, threatening, and intimidating her for weeks.

Less than 24 hours later, after standing for a uniform inspection, with at least ██████ inspecting her not a single one said anything about her hair. ██████ waited until after the formation was over, and for ██████ to enter her room before ordering her to wear a hair net, again. She didn't even have the common curtesy to stop and speak to her about it, she gave the order and walked away. Let's take this opportunity to point out that other students in ██████ class have **not** been required to wear hair nets from day one. Including ██████ and ██████ who did not have hair nets on during that same inspection. And ██████ has been allowed to wear her hair in a braid, every day, since day one, when all the ██████ were ordered that braids were forbidden for ██████ to wear (not a privilege). But nothing has been said to these other students. They went as far as deducting demerits from ██████ due to her hair style, and in turn refused her the right to due process in accordance with the Standard to appeal those demerits. As a matter of fact, everything these girls have ordered ██████ to do regarding her hair or attempted to enforce is in clear violation of the Standard and made up lies, but they only want to enforce these made-up policies when it comes to ██████ no one else is required to follow them. No other students are singled out. No other students are required to wear hair nets or forbidden to wear braids. No other ██████ in this unit are being constantly harassed over their hair. Clearly this is retaliation that has progressed into unrelenting harassment.

On Saturday, during the football game, several ██████ publicly accosted ██████ demanding that she put a hair net on immediately or else they were going to get "smoked" (physical training). Apparently, Cadet ██████ told these ██████ they needed to hold ██████ accountable and if ██████ refused to immediately put on a hair net the entire ██████ class was going to pay and be smoked. First, I would like to point out that they are not only ordering ██████ to wear a hairnet but are taking away the rights afforded to her under the standard, which clearly states all females are authorized to wear their hair in the approved styles, hair nets are optional, and that these standards apply to all cadets regardless of class year. Second, the ██████ already gave permission for ██████ to wear her hair in this specific style and did not require her to wear a hair net. Third, ██████ also told ██████ she was authorized to wear her hair in accordance with the Standard and I think he also even went as far as telling her not to buy a hair net because it is not required.

Cadets ▮ decision to threaten several ▮ that ▮ better put on the hair net right this minute or else, is a blatant threat of punitive physical training. According to the Standard, "Punitive PT" (used solely to punish) is not authorized. It goes on to state how Corrective Physical Training should not be the default answer and that counseling has to take place first. The one time they attempted to conduct a counseling was when they made it a formal written counseling, which ▮ refused to sign, and in turn the girls' deducted demerits without informing her. And the counseling was in direct violation to the Standards policy on female hair and grooming standards. These girls were attempting to conduct a formal counseling and deduct demerits because ▮ was FOLLOWING THE STANDARDS POLICY. These girls are simply making things up with the sole intent to get another student in trouble, which is what they verbally told ▮ was their intent weeks ago when they threatened to re-write the unit manual to ensure she gets in trouble and threatened to have her kicked out of the program. To return to the topic of Corrective Physical Training, threatening students with Physical Corrective Training for following the Standard, is outrageous to say the least. But according to the standard "Group ▮ will never be conducted because of a single cadet's actions." Which is exactly what they threatened or have planned to do, ▮ the entire ▮ class solely because of ▮ Let's go on to state that the Standard also says "Violations of these guidelines will be investigated as potential hazing incidents."

Last night, ▮ returned to her dorm at approximately ▮ She was not even in her room for an hour before the problems started. Last night, the same group of girls told ▮ she was not allowed to go to ▮ practice in the morning. Claiming they were never given a document excusing her from morning formation. At the beginning of the ▮ was told by her ▮ Cadet ▮, that she simply had to fill out the accountability sheet to be excused. This was the same form the other ▮ in her unit on the team filled out. And what has been used up to this point to excuse these ▮ from formation. But it wasn't until last night that ▮ and only ▮ was told she wasn't allowed to go to practice unless she produced the document from the Corps Commander excusing her from practice. ▮ checked with the other ▮ in her unit, and confirmed she was the only one told she wasn't allowed to go. The other ▮ was never spoken to about any issues regarding ▮ practice.

On top of all of that, ▮ was told by another ▮ this morning ▮ that she overheard a conversation that sounded suspicious and concerned this student enough to tell ▮ what she heard, but also requested to remain anonymous because she feared retaliation and being treated the way ▮ has been. The ▮ reported to ▮ that she overheard Cadets ▮ talking about ▮ and that they said: "... good, I hope she doesn't make it back." Why wouldn't ▮ make it back from her car? What plans have they made that would prevent this from happening? They already stole her daily class schedule; a school faculty member told these bullies where she was hiding between classes, and now threats are being made about ▮ not making it back from her car. How many more red flags do we need to see before someone intervenes and brings a stop to this?

Let's be very clear, at this point it is specific unrelenting pinpointed attacks designed to target, harass, and intimidate ▮ These girls are doing everything in and out of their power to ensure ▮ gets in trouble, makes her life miserable, fails her classes, and ruins her reputation. These attacks are being planned and implemented by Cadets ▮ ▮ who have refused to stop after multiple School faculty members have insured ▮ repeatedly, that their behavior would stop, and this situation would not continue. However, that could not be the furthest from the truth. After all, these

problems have continued to progress for over three weeks now.

Are these girls so out of control that the faculty members have no form or recourse to bring them to a stop? Are these girls blatantly refusing to follow the orders and directions given to them by faculty members? Are they so out of control that they are refusing to conform to the rules of the school and the program? How many faculty members over how many weeks, with how many repeated occurrences, does it take to get someone to intervene and to bring an end to this insanity? How little control and oversight of its students does the Corps have that this type of behavior is being condoned and allowed to continue? Or, is this the intent of the faculty members and the cadet program, to allow it to continue and bread so out of control that ▮ is forced to flee the program and the school because ▮ violated the perceived "code of silence" bread into the Corps students as "tradition." And students who follow the rules, and refuse to be bullied and intimidated, are labeled as troublemakers.

These have just been the problems that have steamed since ▮ To add to the never-ending list of problems these girls are instigating. I am completely flabbergasted that these students have been allowed to continue on this destructive path with unchecked authority at clearly retaliating, harassing, and intimidating another student. I completely understand why ▮ feels like nothing will ever get done and these girls are clearly not just being allowed to continue to behave like this but are being encouraged to create more problems for ▮ has been ostracized from her fellow classmates and ▮ because of these ongoing problems. Instead of focusing on her studies she is being required to take time out of her personal study time to address these unrelenting problems which is becoming increasingly time demanding, stressful, and degrading.

It is not just ▮ that is concerned for her health and safety, but ▮ and I as well. I fear it will just be a matter of time before there's another incident.

Regards,

▮

Dr. Bell,

Please see email below.

Best,
Lori

**Lori White** | Administrative Coordinator I
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | loriw@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ███████████████████████
**Sent:** Monday, October 9, 2023 4:18 PM
**To:** Mathes, Kathryn <kathryn_mathes@studentlife.tamu.edu>
**Cc:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Subject:** ███████ update

·

**This Message Is From an External Sender**

This message came from outside your organization.

Mrs. Mathes,

I wanted to keep you updated on the situation with ███ and bring to light some concerning issues I have. And new information was brought to light regarding what I believe are red flags in the decision-making processes of a faculty member.

Are you aware ██████████ considers it part of his standard policy to notify a student's chain of command when police reports are made? This means a faculty member believes it's his obligation to inform other students when police reports are being made. Without the prior knowledge or consent of the student who actually made the report. Even when the report is made about those exact same students in the chain of command.

**I honestly can not think of a greater threat and deterrent to reporting crimes and problems of any nature.**

Students, including those in the Corps of Cadets, are known to spread vicious rumors and gossip especially when faculty members themselves are the ones maliciously feeding this information to students. Faculty members that tell Cadet

- 2036 -

students when another cadet has made a report to law enforcement or another faculty member. This breeds into the culture at A&M Corps of Cadets demanding that "what happens in the Corps, stays in the Corps." This is reminiscent of the military "code of silence" regarding violence within the military setting, especially geared toward females, in which some victims fail to report their victimization experiences because they believe no action will be taken, or because they fear they will experience negative career consequences, or other forms of retaliation, including being labeled a "troublemaker."

How many crimes occur between a subordinate and a higher-ranked student in the same chain of command in the Corps of Cadets? I am willing to bet this category is the highest when it comes to hazing and other serious crimes involving the Corps. However, how likely is a student in the Corps to report a crime if they fear retaliation, especially when it's a 100% guaranteed fact that the other students will be notified by faculty members if they even attempt to report anything to anyone? I fear this is the case, and a lot is going underreported in the Corps because of this fear tactic practice that demands victims stay silent.



To further perpetuate this conflict,                    was informed on                    by ▮▮ ▮▮ (student) that she will be expected to sit in on a meeting with ;        of the girls who have been involved in the incidents                    has reported.
against my one                    With                    , the faculty member, who has demonstrated he has no concern for ▮▮ health and safety, and in turn, has been gossiping with the students and spreading information ▮▮ gave to him in confidence that could prove to endanger her safety if this situation continues to spiral.

We also already know that                    found it pertinent to divulge information about what reported to him during their meeting to students. To include, reporting to ▮▮ ▮▮ (a student) that                    has been practically out of fear of being in her own room due to these girls' actions and behaviors.                    has flagrantly advertised to these girls where                    has been hiding when she is not in classes. And I will remind you, they already stole her daily schedule that was required of her to publically post on her door (door card) and now they know where she hides between classes.                    actions have taken away her only safe space and boldly advertised her location to not only her bullies but strangers who have already clearly demonstrated a blatant refusal to follow school rules and the Standard. Strangers that have already blatantly told her they have every intention of getting her into trouble and ensuring she is kicked out of the Corps, and not only have they said these things but have already acted upon these threats.

                    can claim they are part of her chain of command and live together, regardless of his petty excuse for his poor decisions. I will remind you these students are not friends and have never been friends. They do not socialize to any degree outside of the quad, and in                    case, the absolute only time they speak to her is to threaten her and/or give orders that often conflict with the Standard or orders provided to ▮▮ by higher ranked Cadets, intentionally creating more problems. These same girls have created such fear in the dorm that the other students don't even speak to my daughter anymore because they fear they will be treated like                    f they even socialize with her. There is total and complete segregation in the dorm and this unit because of the absolutely poor leadership and behavior displayed by a handful of power-hungry girls who have been given too much authority, not enough training, and zero accountability. Any so-called leader who controls and demands

compliance and respect through fear-based leadership has absolutely no business influencing the lives of other students or continuing this horrible cycle that gets labeled in the Corps as a "tradition."

It is absolutely no student's business where ⬛⬛⬛⬛⬛ location is at any point in time, especially not some random unhinged strangers who have clearly and deliberately been targeting ⬛⬛⬛⬛⬛ Double fold for a student who is already being accused of threatening, intimidating, harassing, and bullying her. No police officer in the world would condone advertising the schedule and location of any person, especially to their bullies and people they already feared. This screams "red flag" with pure deliberate and malicious intent behind it.

There is zero empathy or even a basic level of understanding by ⬛⬛⬛⬛⬛ in how it feels to be in ⬛⬛⬛⬛⬛ shoes or any kid who is stuck living in this horrible situation while attempting to get an education and achieve her goals while being at this school and in this so-called "leadership program." I believe if the Corps was truly interested in problem resolution they would have handled this situation more effectively weeks ago, instead of not only allowing the problems to continue to spiral out of control but having staff members feed into the problems. Even after ⬛⬛⬛⬛⬛ repetitive complaints of continued problems the corps chose to ignore her. The school should have better oversight and ensure there are adequate policies and procedures put in place to instill more trust, professionalism, and confidence in the system and in the actions of the Crops faculty members and the students involved in this program. The school and the Corps should follow their own rules and the Standard it claims to uphold and properly educate the students on these rules. Instead, it would appear the Corps operates totally separately from the school with zero oversight.

The girls ⬛⬛⬛⬛⬛ has reported have no respect for the Standard. No respect for school policies or the law of the land. And clearly, they see themselves as above these rules and laws. As they have repetitively demonstrate their refusal to follow them. As exemplified on Saturday when they yet again gave ⬛⬛⬛⬛⬛ an order that restricts and takes away the rights afforded to her in the Standard. As the Standard clearly states: "...all cadets are permitted to wear their hair in the following fashion regardless of class year." At this point, there is no misunderstanding of their intent to continue to harass and intimidate ⬛⬛ Clearly, these girls feel they have unlimited power to give students any order they see fit and feel these orders should be followed regardless of what the law, the school, or the Standard states. There were also reports made to ⬛⬛⬛⬛⬛ by other students that could indicate a plan made by these same girls to issue punitive physical training to the entire ⬛⬛⬛ class as a form of punishment if ⬛⬛⬛⬛⬛ doesn't do what they say.

I appreciate the help you are trying to prove ⬛⬛ However, I fear the Corps is practicing unhealthy and potentially harmful practices for students who are trying to report problems or seeking assistance. In the future, we will not utilize the school police department as there's a clear conflict of interest and no respect for victims much less students trying to protect themselves, rather it's a dangerous path for any student, especially those in the Corps to utilize.

Thank you for your time on this matter.

⬛⬛⬛⬛⬛

**From:** TAMU Civil Rights
**To:** Gardner, Jeffery D; Bell Jr, Douglas
**Cc:** Simpson, Meredith M
**Subject:** FW: Filex - You have access to the folder 23-1003-0003
**Date:** Thursday, October 5, 2023 9:03:30 AM
**Attachments:**

Good morning,

The CREI office received the attached UPD report yesterday afternoon. Since this does not rise to the CREI or TIX level to address, we are referring to the Corps and SCO to address as you see fit.

Please let me know if you have any questions or discover any sex-based misconduct or discrimination/harassment against a protected class.

Best,

Samantha Brunner  (she/her)
Assistant Deputy Title IX Coordinator
University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations
Texas A&M University | YMCA, Suite 108
1268 TAMU | College Station, TX 77843-1268
ph: 979.458.7598 |SBrunner@tamu.edu


-----Original Message-----
From: tbrooks@tamu.edu <tbrooks@tamu.edu>
Sent: Wednesday, October 4, 2023 2:56 PM
To: TAMU Civil Rights <civilrights@tamu.edu>
Subject: Filex - You have access to the folder

The folder,                  , is now available for you to use:



You can download files in this folder.

This folder currently has the following files:

               .PDF
Commander Johnson (                  )

| From: | Bell Jr, Douglas |
| --- | --- |
| To: | Winking, Audrey J |
| Subject: | FW: ▮ Car statement |
| Date: | Monday, October 16, 2023 9:07:34 AM |

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Sent:** Monday, October 16, 2023 9:05 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: ▮ Car statement

This is the first email received this morning from ▮ ▮

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | neldat@sco.tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮ ▮
**Sent:** Monday, October 16, 2023 5:27 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Leible, Jason Aaron
<jleible@corps.tamu.edu>; Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Subject:** ▮ Car statement

On ▮ , at approximately 2120, I was informed by ▮ that she had
been approached by other cadets outside of the unit with questions regarding if she is
in the unit that has the ▮ I believe that this supports my claim
that ▮ jeopardize my safety by informing other cadets of information I gave
him in confidence. It also supports my claim that the unit leadership/ students(s) this
information was given to is maliciously gossiping about me and providing information
to others that do not have a need to know about any of this.
- ▮ ▮

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: ▉ Dorm Statement |
| **Date:** | Monday, October 16, 2023 9:13:37 AM |

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Sent:** Monday, October 16, 2023 9:10 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: ▉ Dorm Statement

More information from ▉ ▉

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station,TX 77843-1172

ph: 979.847.7272 | neldat@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▉ ▉ ▉
**Sent:** Monday, October 16, 2023 5:27 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Leible, Jason Aaron <jleible@corps.tamu.edu>; Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Subject:** ▉ Dorm Statement

On ▉, during my meeting with the Commandant I had informed him I suspected someone was entering my room with the malicious intent of messing with things, including leaving debris behind on my desk. Ensuring I failed my room inspections. This was documented in my room inspection appeal (sent on ▉), which was sent to ▉. As well as, the other statement I will be sending up in regards to all of the incidents that have occurred since.

On Sunday, ▉, I returned to campus, at approximately 1830, I walked through the door to my room to discover a singular french fry centered on the star on my bed sheet, perfectly parallel to the lines in the star. Obviously, this fry was intentionally placed there.

At approximately 2000, I asked ▮▮▮▮ if she did it and she stated ▮▮▮▮ did it. It turns out she let him into our room and allowed him to place the fry on my bed yesterday morning (Saturday). And let it stay there for over 24 hours which obviously could have gotten me into trouble. Not to mention the insects or rodents this could have attracted.

▮▮▮▮, is one of the cadets in this unit that does not speak to me. We don't socialize and we are not on friendly terms, I do not consider this "good bull."

-▮▮ ▮▮▮

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: ▮▮▮ Statement |
| Date: | Monday, October 16, 2023 9:32:26 AM |
| Attachments: | Teams-Text Messages.zip |
| | Social Media Incident.zip |
| | Emails.zip |
| | Dement pictures – Documents.zip |
| | ▮▮▮ ▮▮ Statement.docx |

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
**Sent:** Monday, October 16, 2023 9:30 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: ▮▮ Statement

Another email with information.

Nelda Trevino | Administrative Coordinator II
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station,TX 77843-1172

ph: 979.847.7272 | neldat@sco.tamu.edu | sco.tamu.edu

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮ ▮▮▮▮▮
**Sent:** Monday, October 16, 2023 9:22 AM
**To:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>; Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** ▮▮ Statement

Good morning,
Attached is my statement along with supporting documents/ pictures. My apologies, the first email did not include the attachments.

Respectfully,



FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
----------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** specialsituationsteam@tamu.edu <specialsituationsteam@tamu.edu>
**Sent:** Wednesday, October 18, 2023 9:27 PM
**To:** DSA - DL - DSA TAMU Special Situations Team <SpecialSituationsTeam@tamu.edu>
**Subject:** Tell Somebody Report

**Name of Submitter:** █████████
**Title:** parent
**UIN:**
**Email:** ████████
**Phone:** ██████
**Address:** ████████████████████

**Name of person exhibiting behavior:** ████████
**UIN of person exhibiting behavior:**

**Event Description:** ████████████ is my daughter's roommate, she has been allowing people to go into the room and rummage through my daughter's drawers and wardrobe closet. Things have been stolen and damaged.█
█████ admitted to my daughter, ████████, on Sunday        that she allowed████ to leave a french fry behind on my daughter's bed for over 24 hours, while she was out of town (trying to get her in trouble and harass her).
█████ admitted to another student that████ and████ have been participating in this same behavior by damaging my daughter's stuff, going through her personal stuff including undergarments, and leaving dirt and debris behind on furniture. And participating in other activities to ensure my daughter fails room inspections and gets in trouble.

Today        - She went through all her drawers and damaged a dress with ink. A book and some sheet music were stolen. She suspects other clothing is missing but it's hard to identify each

individual piece of clothing.

My daughter has reason to believe this activity has been going on for at least the past 3 weeks and has been taking pictures and videos of her room before leaving every day. This situation is increasing in frequency and seriousness with more being disturbed and damaged on a daily basis.

Residence in this hall have also started cyberstalking my daughter and our family, they have been printing off pictures from my social media accounts, altering the images, and posting them in the hallways (there are pictures to document this). The Corps of Cadets faculty is aware of this and has done nothing to stop it.

**Supporting Documentation 1:**
**Supporting Documentation 2:**
**Supporting Documentation 3:**
**Supporting Documentation 4:**

FYI

Douglas Bell

Please excuse any typo, message sent from I-Phone

Begin forwarded message:

> **From:** Mailbox - DSL - Student Conduct Office <sco@tamu.edu>
> **Date:** October 19, 2023 at 8:23:49 AM CDT
> **To:** "Bell Jr, Douglas" <douglasb@vpsa.tamu.edu>
> **Subject: FW:** ▮▮ ▮▮ **Room Incident #2**
>
> Good morning Dr. Bell.
>
> Another incident.
>
> Nelda Trevino | Administrative Coordinator II
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station,TX 77843-1172
>
> ph: 979.847.7272 | neldat@sco.tamu.edu<mailto:neldat@sco.tamu.edu> |
> sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - - -
> DIVISION OF STUDENT AFFAIRS | One Division. One Mission.
>
> **From:** ▮▮ ▮▮ ▮▮▮▮ >
> **Sent:** Wednesday, October 18, 2023 10:43 PM
> **To:** Leible, Jason Aaron <jleible@corps.tamu.edu>; Mailbox - DSL - Student
> Conduct Office <sco@tamu.edu>
> **Subject:** ▮▮ ▮▮ Room Incident #2

at approximately 1700, I returned to my dorm room and immediately knew an unknown party had rummaged through it. First, I took pictures of my room at approximately 0700 before leaving for the day. The room was perfectly squared away and inspection-ready. Upon returning at 1700, I immediately noticed my books on the shelf above the desk were tipped over. Upon further inspection clothes had been pulled off the hangers in the wardrobe closet and left laying on the bottom ground area, drawers had been opened and clothing and personal items had been rummaged through. A dress was damaged with what

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90554186
Filing Code Description: PLEA TO THE JURISDICTION
Filing Description: DEFENDANT'S FIRST SUPPLEMENT TO FIRST
AMENDED PLEA TO THE JURISDICTION
Status as of 8/6/2024 7:47 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 8/5/2024 4:36:38 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/5/2024 4:36:38 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/5/2024 4:36:38 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/5/2024 4:36:38 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/5/2024 4:36:38 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/5/2024 4:36:38 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/5/2024 4:36:38 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| J DavidDodd III | | David@Jddoddlaw.com | 8/5/2024 4:36:38 PM | SENT |

appears to be ink. I suspect articles of clothing are missing, but I am positive a book and some sheet music have been stolen. My ⬛ with as they ⬛ The bins over my bed, very top shelf, had also been rummaged through.

⬛ had heard about the incident on Monday regarding my roommate, ⬛, accusing ⬛ of messing around with my side of the room and leaving a french fry on my bed. ⬛ told ⬛ that he had nothing to do with it and that it was actually ⬛ and ⬛.

My expectation of reasonable privacy has been violated by people opening drawers and digging through my personal items and undergarments, not to mention the theft, and damage to private property. My roommate, ⬛, already admitted to bringing her friends into our room and allowing other people and herself to violate my personal property is a clear and blatant violation of guests' privileges, regardless of whether those guests are family, strangers, or other students/residents. Regardless of other people/students' involvement ⬛ already admitted to being an equal participant in violating my privacy, and my property.

I do not consider targeting me and vandalizing my personal space, property, and gear in my room funny. It is not a joke. Nor is it considered "good bull".

The continued harassment of my roommate, ⬛, and other unknown residents of this hall is a clear demonstration of repeated harassment in ⬛ I have been facing for the last several weeks and have repeatedly sought out faculty assistance with and it has resulted in zero resolution. I spent over four hours trying to locate my roommate ⬛ to confront her about the new incident and missing/damaged items in my room. However, I was unable to locate her, even after lights out.

I am unsure if the incidents that have occurred/continue to occur fall under the current investigation or if I am required to file another report elsewhere.

[cid:18b45fee9727790a4ed1]
[cid:image001.jpg@01DA0265.907DFFE0]
[cid:image002.jpg@01DA0265.907DFFE0]
[cid:image003.jpg@01DA0265.907DFFE0]

[cid:image004.jpg@01DA0265.907DFFE0]
[cid:image005.jpg@01DA0265.907DFFE0]



| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Michaelis, Patrick Ralph; Simpson, Meredith M |
| **Subject:** | Re: Filex - You have access to the folder |
| **Date:** | Monday, October 9, 2023 5:03:26 PM |

Sir,

After speaking with this student and her outfit we have actions in place that will resolve the situation.  As the police report stated there is no indication of hazing and we found the same thing.  I will be happy to discuss your findings and mine.

V/R

> On Oct 9, 2023, at 4:51 PM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> Howdy,
> I wanted to follow up on this issue.  I received some additional information regarding this concern, and I feel that an investigation from SCO maybe warranted.  Please let me know if you have any additional information.
>
> Douglas Bell, Ph.D.  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> DIVISION OF STUDENT AFFAIRS | One Division. One Mission.
> -----Original Message-----
> From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> Sent: Thursday, October 5, 2023 10:08 AM
> To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
> Cc: Simpson, Meredith M <msimpson@corps.tamu.edu>
> Subject: FW: Filex - You have access to the folder
>
> Dr. Bell,
>
>   I reviewed the report and the other complaints Ms. ▓▓▓▓ has filed against her outfit.  I will be speaking with her either today or tomorrow to determine what is going on.
>
> V/R
>
> Lt. Col Jeff Gardner '82, USAF (Ret)
> Assistant Commandant for Accountability and Standards Military Advisor Parsons Mounted Cavalry
> 979-458-9317
>
> -----Original Message-----
> From: TAMU Civil Rights <civilrights@tamu.edu>
> Sent: Thursday, October 5, 2023 9:03 AM
> To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> Cc: Simpson, Meredith M <msimpson@corps.tamu.edu>
> Subject: FW: Filex - You have access to the folder
>
> Good morning,
>
> The CREI office received the attached UPD report yesterday afternoon. Since this does not rise to the CREI or TIX level to address, we are referring to the Corps and SCO to address as you see fit.

&gt;

&gt; Please let me know if you have any questions or discover any sex-based misconduct or discrimination/harassment against a protected class.

&gt;

&gt; Best,

&gt;

&gt; Samantha Brunner  (she/her)

&gt; Assistant Deputy Title IX Coordinator

&gt; University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations Texas A&M University | YMCA, Suite 108

&gt; 1268 TAMU | College Station, TX 77843-1268

&gt; ph: 979.458.7598 |SBrunner@tamu.edu

&gt;

&gt;

&gt; -----Original Message-----

&gt; From: tbrooks@tamu.edu <tbrooks@tamu.edu>

&gt; Sent: Wednesday, October 4, 2023 2:56 PM

&gt; To: TAMU Civil Rights <civilrights@tamu.edu>

&gt; Subject: Filex - You have access to the folder 23-1003-0003

&gt;

&gt; The folder, 2⬛⬛⬛⬛⬛, is now available for you to use:

&gt;

&gt;

&gt;

&gt; You can download files in this folder.

&gt;

&gt; This folder currently has the following files:

&gt;

&gt;

⬛⬛⬛⬛⬛⬛: ⬛ ⬛

&gt;

| From: | Regan III, John M |
|---|---|
| To: | Winking, Audrey J |
| Subject: | RE: investigation |
| Date: | Friday, October 13, 2023 10:50:38 AM |

Good Morning Audrey,

The only time I will not be available next week is Wednesday 1200 – 4:30.

**GySgt John M. Regan III USMC (Ret)** | 1st Regiment Military Advisor/CCMU Advisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-4279 I jregan@corps.tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 13, 2023 8:50 AM
**To:** Regan III, John M <jregan@corps.tamu.edu>
**Subject:** investigation

Good morning,

I was told that you will be working on the ▮▮▮▮▮▮▮▮ investigation with me. Can you please send me your availability for next week so that we can get her interview scheduled? I would like to meet with her on Tuesday or Wednesday next week if possible and then once we have more information from her we can schedule the other students' interviews for the following week.

Thanks!

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Bell Jr, Douglas**

**From:**              Winking, Audrey J
**Sent:**              Wednesday, May 24, 2023 11:56 AM
**To:**                Upshaw-Brown, Jaclyn B; Bell Jr, Douglas
**Subject:**           Investigation


The             investigation report is complete and can be found here:    Investigations\Active Investigations\Completed Investigations\Completed_

Thanks,

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Wednesday, April 19, 2023 8:34 AM
**To:** Harrell, Kristen
**Subject:** FW: [Maxient]      College Station - On-Campus Grounds
**Attachments:**

We can chat about this at our 1 on 1

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Monday, April 17, 2023 10:42 AM
To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]      College Station - On-Campus Grounds

For discussion. . .

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]      College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**

Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

Involved Parties
() Alleged Offender
() Alleged Offender
() Alleged Offender
() Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**
No additional documents were attached to this report.

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**

Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Thursday, April 20, 2023 11:08 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** RE: [Maxient]     College Station - On-Campus Grounds

Hey Jaclyn,
I would like to chat about this today for first thing tomorrow morning.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Monday, April 17, 2023 10:42 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: [Maxient]     College Station - On-Campus Grounds

For discussion. . .

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |Jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Maxient System <notifications@maxient.com>
**Sent:** Sunday, April 16, 2023 6:39 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** [Maxient]     College Station - On-Campus Grounds

## This Message Is From an External Sender
This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
### Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Student**

Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**

() Alleged Offender
() Alleged Offender
() Alleged Offender
() Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**
**No additional documents were attached to this report.**

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Friday, April 28, 2023 11:48 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Upshaw-Brown, Jaclyn B; Winking, Audrey J; Anderson, Chauncy Jovan |
| **Subject:** | Re: [Maxient]       College Station - On-Campus Grounds |

Msg t Anderson is your man. He is copied on this email.

V/R

> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]       College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences

We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]                College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B
<jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

Thank you for your assessment of the information provided.  We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the
      ? Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]          College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)

3

Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]                College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
          ? We'll also be checking to see if security footage from Duncan is available (although we
suspect it may not have been retained this long, since the alleged incident in Duncan occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]                College Station - On-Campus Grounds

**This Message Is From an External Sender**
This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
                    () Alleged Offender
          [] Alleged Offender
             () Alleged Offender
          () Alleged Offender

4

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation

No additional documents were attached to this report.

## Submitted By

Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
  • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Thursday, May 11, 2023 1:17 PM |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: [Maxient]        College Station - On-Campus Grounds |

FYI

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, May 11, 2023 1:16 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Just spoke to him.  He has received the correspondence and is tracking for next week.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, May 11, 2023 1:13 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Howdy Lt. Col. Gardner,
We have had some issues getting in touch with MSG. Anderson and we would like to move forward with our investigation. Can you please give him a gentle reminder to check his email and respond to Audrey Winking.  Thanks in advance.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>; Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Re: [Maxient]        College Station - On-Campus Grounds

Msg t Anderson is your man. He is copied on this email.

V/R

> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]        College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences

We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]        College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Thank you for your assessment of the information provided. We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the
     Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

. . . . . . . . . . . . . . . . . . . . . . . .

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]                College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry

979-458-9317

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]          College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
          We'll also be checking to see if security footage from Duncan is available (although we
suspect it may not have been retained this long, since the alleged incident in Duncan occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]          College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

**Campus Community Incident Report**

**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**

          lleged Offender
          () Alleged Offender
          () Alleged Offender
          () Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective
language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific

5

people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**
**No additional documents were attached to this report.**

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
- scrs@studentlife.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

## Bell Jr, Douglas

**From:** Winking, Audrey J
**Sent:** Wednesday, May 10, 2023 11:39 AM
**To:** Anderson, Chauncy Jovan
**Cc:** Bell Jr, Douglas
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Hi Chauncy,

I would like to schedule interviews for the following dates/times (      interviews total). Please let me know as soon as possible if these work for you so that I can send the interview notices to the students!

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Thursday, May 4, 2023 10:40 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Are there any days/times that I need to avoid scheduling interviews for next week?

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Thursday, May 4, 2023 10:39 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Ok next week will be good. Looking forward to it.

R/

**MSgt Chauncy J. Anderson USMC (Ret)**  | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 |                                    | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, May 3, 2023 10:40 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]              College Station - On-Campus Grounds

Hi Chauncy,

Just wanted to follow up on your availability. We will probably need to look at next week and depending on whether the cadets are still in town after finals or not we may need to do some via Zoom.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Friday, April 28, 2023 11:52 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]              College Station - On-Campus Grounds

Hi there,

Looks like you will be working with me on this investigation!  What does your availability look like next week?  Once I know when you're available for interviews, I will work on getting the students scheduled. I am hoping we can get them in before finals or them leaving for the semester. If you happen to know when the cadets leave campus for summer too, that may be helpful for me to know in case we can't fit them all in before finals.

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>; Anderson,

2

Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Re: [Maxient]              College Station - On-Campus Grounds

Msg t Anderson is your man. He is copied on this email.

V/R

On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:

Thank you for this information.

Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]             College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences

We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>

Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>
Subject: FW: [Maxient]            College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Wednesday, April 26, 2023 8:47 AM
To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]            College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

From: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Sent: Thursday, April 20, 2023 3:12 PM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B
<jaclynu@sco.tamu.edu>
Subject: RE: [Maxient]            College Station - On-Campus Grounds

Thank you for your assessment of the information provided. We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the
    Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

4

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]                College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]           College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in
          We'll also be checking to see if security footage from Duncan is available (although we
suspect it may not have been retained this long, since the alleged incident in Duncan occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]           College Station - On-Campus Grounds

**This Message Is From an External Sender**
This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
          () Alleged Offender
        Alleged Offender
          Alleged Offender
Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective
language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific
people, words, phrases, and interactions.

6

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
· scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:

7

**- 2079 -**

Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

**Bell Jr, Douglas**

**From:** Bell Jr, Douglas
**Sent:** Wednesday, September 27, 2023 11:59 AM
**To:** Winking, Audrey J
**Subject:** Corp Incident
**Attachments:** FW: Corps Searching Rooms

Howdy Audrey,
I wanted to give you the opportunity to weigh in to see if an additional investigation is needed or if this is enough information to move forward with the conduct process.  One email contain statements from the Corps Members and the next email contains information from the IRs received.  Let me know your thoughts.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

**From:** Latham, Skylar
**Sent:** Friday, March 22, 2024 8:49 AM
**To:** Bell Jr, Douglas
**Cc:** Smith, Asia
**Subject:** RE:      Hazing Concerns

I will forward him the link to the report and inform him that if he wishes to, he may file a report.

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, March 22, 2024 8:45 AM
**To:** Latham, Skylar <skylarl@sco.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:** RE:      Hazing Concerns

I think this may be worth investigating if student ▮▮▮▮▮ would like to make a formal statement via a CCIR.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Latham, Skylar <skylarl@sco.tamu.edu>
**Sent:** Friday, March 22, 2024 8:42 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**      Hazing Concerns

Hey ya'll,

Yesterday I met with student ▮▮▮▮ ▮▮▮▮▮ who is a ▮▮▮▮▮ and was ▮▮▮▮▮ in the Corps of Cadets. At one point in our meeting, he mentioned having been in the Corps, and to make conversation, I asked why he punched. He then proceeded to tell me he and ▮▮▮▮▮ punched three days into ▮▮▮ and discussed how it was intense for them both. Two specific comments he made raised concerns for me:

1. He was woken up at 2:00 AM to an ▮▮▮▮▮▮▮▮▮▮▮▮▮ and telling them to be ready for fallout at the usual start time.
2. When punching, he was advised to not share much about his experience with the outfit to Corps staff, specifically by an upperclassman (or multiple), because ▮▮▮ could get disbanded.

I'm not sure what much may be done in this circumstance, but I do want it to be brought to your attention.

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -

**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Monday, September 25, 2023 3:31 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | FW: |
| **Attachments:** | ▊▊▊.pdf; ▊ Account.pdf; ▊▊▊ Account.pdf; ▊▊▊ Account.pdf; ▊ Account.pdf; ▊▊▊ Account.pdf; ▊ Account.pdf; Account.pdf; ▊ Account.pdf; ▊▊ Account.pdf |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Sir,

Statement from ▊ cadets.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** ▊▊▊▊▊▊▊▊▊ >
**Sent:** Friday, September 22, 2023 10:29 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject**:

Howdy!

Sir, attached are the written accounts of ▊ Cadets involved in the incident with nonregs in our dorm. I am sorry for the late email, but I was just now able to gather all of the accounts. Thank you again, and let me know if there is anything I can do to help.

With Respect,

▊▊▊▊

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Monday, September 25, 2023 11:20 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Michaelis, Patrick Ralph; Simpson, Meredith M |
| **Subject:** | RE: Corps Searching Rooms |

Sir,

I spoke to the      1st Sgt.  He is providing me with information today.  I'll send it to you as soon as I receive it.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Monday, September 25, 2023 10:37 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: Corps Searching Rooms

I have discovered the names of    cadets that were searching rooms:

█████████████████████████████ .  Please let me know if you have any additional information.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, September 21, 2023 12:31 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: Corps Searching Rooms

Sir,

I will reach out to the

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, September 21, 2023 12:15 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Subject:** Corps Searching Rooms

Howdy Lt. Gardner,
I received several incident reports from Residence Life regarding Corps Members entering non-regs student rooms in search of a               laundry bag last week.  I wanted to see if you have any additional information related to this situation.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

**From:** Winking, Audrey J
**Sent:** Friday, September 29, 2023 2:39 PM
**To:** Bell Jr, Douglas
**Subject:** RE: Incident report
**Attachments:** Incident report.docx

I made a few highlights on here where we did get        names.  There is also mention about UPD assisting with one of the incidents – can you reach out to see if we can get notes from that?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, September 29, 2023 2:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: Incident report

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 10:55 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** Incident report

Good Morning Dr. Bell,

Attached you will find four individual incident reports from Corps            .  In each of these incidents, non-corps students attempted to take items from the cadets.  We would appreciate the Student Conduct Office looking into these events and taking appropriate action.  Please let me know if you have questions or if we can be of assistance.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry
979-458-9317

2

## Bell Jr, Douglas

**From:** Gardner, Jeffery D
**Sent:** Tuesday, September 5, 2023 2:15 PM
**To:** Bell Jr, Douglas; Michaelis, Patrick Ralph; Simpson, Meredith M
**Subject:** RE: [Maxient]        College Station - On-Campus Residence Hall
**Attachments:** Incident.pdf


Dr. Bell,

     Attached are the Commandant's thoughts on the      issue.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, September 5, 2023 11:42 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>;
Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Residence Hall

I wanted to follow up to see if there was any additional information.   SCO intends to move forward with an investigation
in the coming week.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas
**Sent:** Wednesday, August 30, 2023 3:41 PM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>;
Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]        College Station - On-Campus Residence Hall

I wanted to pass this along for your consideration and review.  Please let me know your thoughts.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Thursday, October 19, 2023 10:53 AM
**To:** Caldwell III, Danny Wilson
**Subject:** Investigation Report
**Attachments:** Investigation Report - Final.pdf; Audio Clip 1 - S.mp3; Audio Clip 2 - W.mp3; FW_ Audio Files for Hazing Investigation.pdf

Howdy Danny,

I am assigning the      investigation to you.  Lets chat after you have reviewed this information.  I will also forward you the initial report in Maxient.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

---

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Wednesday, October 11, 2023 3:21 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | RE:    report |

I just added two audio files as well as a PDF of the email from the student from when he sent the audio files to Tia.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Wednesday, October 11, 2023 11:24 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:**    report

The    investigation report is complete and in the share drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Upshaw-Brown, Jaclyn B
**To:** Winking, Audrey J; Barrett, Jamyia C; Doughty, Jeanae
**Cc:** Bell Jr, Douglas
**Subject:** Investigations
**Date:** Friday, January 6, 2023 1:43:21 PM

Hi, all!

After looking at the two bigger investigations that have recently come in, here is what I'm thinking in terms of assignments:

- Jeanae and Jaclyn to team up as SCAs.
- : Jamyia and Audrey to team up as SCAs
    - Note: We are still uncertain whether more information relevant to this org/investigation is forthcoming from the individual who contacted OFSL shortly before the break. I've checked in with CREI to see if they've heard from her; OFSL has provided contact information so I can follow up with her if not. But I figured y'all could at least start reading, making your list of who might be charged and what type of process, drafting charges, etc. while we figure that out.

Each investigation came with some video/audio files; I've put those into the main Scans→Investigations folder for now.

Please let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

| | |
|---|---|
| **From:** | Doughty, Jeanae |
| **To:** | Gardner, Jeffery D |
| **Subject:** | Administrative Conferences |
| **Date:** | Thursday, February 23, 2023 10:13:00 AM |

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the ⬛⬛⬛ cadets. Would you be available on Monday, ⬛⬛⬛⬛⬛⬛⬛⬛⬛ and Tuesday, ⬛⬛⬛⬛⬛⬛⬛⬛⬛ Since there are ⬛⬛⬛ cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Gardner, Jeffery D |
|---|---|
| To: | Doughty, Jeanae |
| Subject: | RE:     Administrative Conferences |
| Date: | Thursday, February 23, 2023 10:37:01 AM |

Morning Ma'am,

I can be available at those times.  Quick question, I thought they were all going before a panel starting on            Has there been a change?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**     Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the      cadets. Would you be available on Monday,                             and Tuesday,                             ? Since there are      cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Very well.  I knew I had not seen charge letters for this.  Makes sense now.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:43 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:  Administrative Conferences

Okay perfect! I'll get those letters sent out now. To clarify, the      cadets are still going before a
panel starting                The administrative conferences are for the                              that had
lesser alleged unrelated hazing/alcohol violations. Also, the cadet on              has
charges.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:37 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:  Administrative Conferences

Morning Ma'am,

        I can be available at those times.  Quick question, I thought they were all going before a
panel starting on            .  Has there been a change?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the        cadets. Would you be available on Monday,                                and Tuesday,                                Since there are        cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | Doughty, Jeanae |
| **To:** | Gardner, Jeffery D |
| **Subject:** | RE:     Administrative Conferences |
| **Date:** | Thursday, February 23, 2023 1:42:00 PM |

Looks like it was just a system glitch. I have retracted the second letter.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - -

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 12:59 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Administrative Conferences

I received letters on      cadets but received two letter for ███████████

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**     Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the      cadets. Would you be available on Monday,                              and Tuesday,                        Since there are      cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - -

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| **From:** | Doughty, Jeanae |
|---|---|
| **To:** | Gardner, Jeffery D |
| **Subject:** | Re:  Administrative Conferences |
| **Date:** | Thursday, February 23, 2023 1:47:40 PM |

Yes, and just a heads up,  of the cadets just called to request a separate administrative conference on Monday. Are you available at 8:30 am or 11:00 am?

All the Best,
**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Thursday, February 23, 2023 1:43 PM

**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Subject:** RE:  Administrative Conferences

Very well. So there are only  ?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Sent:** Thursday, February 23, 2023 1:43 PM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:** RE:  Administrative Conferences

Looks like it was just a system glitch. I have retracted the second letter.

All the Best,
**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Thursday, February 23, 2023 12:59 PM

**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Subject:** RE:  Administrative Conferences

I received letters on  cadets but received two letter for ▮▮▮▮▮▮▮▮

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**     Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the      cadets. Would you be

available on Monday,                                    and Tuesday,                                ? Since there

are      cadets, I've scheduled two separate conferences. If you are unavailable during those

days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:**        Gardner, Jeffery D
**To:**           Doughty, Jeanae
**Subject:**     RE:     Administrative Conferences
**Date:**        Thursday, February 23, 2023 1:48:50 PM

I am available at both times.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:48 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re:     Administrative Conferences

Yes, and just a heads up,     of the cadets just called to request a separate administrative conference on Monday. Are you available at 8:30 am or 11:00 am?

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Administrative Conferences

Very well.  So there are only     ?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Administrative Conferences

Looks like it was just a system glitch. I have retracted the second letter.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 12:59 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Administrative Conferences

I received letters on      cadets but received two letter for ▮▮▮▮▮▮▮▮▮▮.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the      cadets. Would you be available on Monday,                              and Tuesday,                              ? Since there are      cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator

Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| **From:** | Doughty, Jeanae |
|---|---|
| **To:** | Gardner, Jeffery D |
| **Subject:** | Options Letter |
| **Date:** | Monday, February 27, 2023 12:02:00 PM |

Howdy Col. Gardner,

I am creating the options letter for ▮▮▮▮▮▮ for his abuse of process charge/unbecoming a cadet (for abusing the process) and wanted to run the sanctions by you before sending. I was thinking about assigning him Conduct Review/Corps Conduct Review for the remainder of the                as well as an          that will be due at the end of April. Thoughts?

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Gardner, Jeffery D |
| --- | --- |
| **To:** | Doughty, Jeanae |
| **Subject:** | RE:    Options Letter |
| **Date:** | Monday, February 27, 2023 12:04:13 PM |

Thank you very much.  That works for me.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Monday, February 27, 2023 12:02 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Options Letter

Howdy Col. Gardner,

I am creating the options letter for ▮▮▮▮▮▮ for his abuse of process charge/unbecoming a cadet (for abusing the process) and wanted to run the sanctions by you before sending. I was thinking about assigning him Conduct Review/Corps Conduct Review for the remainder of the ▮▮▮▮ as well as an ▮▮▮ that will be due at the end of April. Thoughts?

All the Best,

Jeanae Doughty |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
DIVISION OF STUDENT AFFAIRS | One Division. One Mission.

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **To:** | Freeman Jr, Cedric L; Alvarado, Blair; Gardner, Jeffery D |
| **Cc:** | Spangler, Rebecca; Doughty, Jeanae |
| **Subject:** | Panel information for March 6-10 |
| **Date:** | Tuesday, February 21, 2023 9:13:10 AM |

Howdy, panel members,

Thank you SO MUCH for volunteering for the large panel scheduled for March 6-10! I'll be your Panel Chair. Rebecca, I'm sharing this information with you so that you'll have it in the event we need to bring you in. If that's the case, we will let you know as soon as we find out!

I do want to note that we are planning to feed you throughout the week; if you have any special dietary needs (or just ideas of what you'd like to eat!), please let me know.

Given the length of the investigation report, I am giving you access to the file documents via Filex a little earlier than we usually would. You will need to enter the access codes below to decrypt the files.

**Some reminders about reviewing the file electronically:** Please take steps to maintain confidentiality while reviewing the files and do not save them to your devices. We also ask that you delete the files from your downloads once you are finished. Finally, please refrain from seeking out information about the individuals or incidents involved other than what is provided in the file documents.

**Filex access codes**
Combined charge letters:
Investigation report:
Recording 1:
Recording 2:

If you have any questions or concerns, please let us know.

Thank you,
Jaclyn


**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

| From: | jbupshaw@tamu.edu |
| --- | --- |
| To: | Doughty, Jeanae |
| Subject: | Filex - You have access to the folder March 6-10 panel documents |
| Date: | Tuesday, February 21, 2023 9:13:10 AM |

The folder, March 6-10 panel documents, is now available for you to use:


You can upload and download files in this folder.

This folder currently has the following files:

Recording 2
Recording 2.m4a

Recording 1
Recording 1.mp3

Investigation report
    Investigation Report - FINAL_Redacted.pdf

Combined charge letters
Compiled charge letters.pdf

**From:** jbupshaw@tamu.edu
**To:** Doughty, Jeanae
**Subject:** Filex - A new file is available for you to download
**Date:** Thursday, March 2, 2023 10:14:07 AM

The encrypted file, Screenshots submitted by ▮▮▮▮▮▮ is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:


File Details:
Screenshots submitted by ▮▮▮▮
Screenshots submitted by ▮▮▮▮ .pdf 1.85MB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

| | |
|---|---|
| **From:** | jbupshaw@tamu.edu |
| **To:** | Doughty, Jeanae |
| **Subject:** | Filex - A new file is available for you to download |
| **Date:** | Thursday, March 2, 2023 10:17:26 AM |

The encrypted file,     log submitted by ▮▮▮▮▮▮ is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:


File Details:
EST log submitted by ▮▮▮▮▮▮
2nd Reg EST Log -            , 9_47PM.xlsx 123.52KB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

**From:** Upshaw-Brown, Jaclyn B
**To:** Alvarado, Blair; Freeman Jr, Cedric L; Gardner, Jeffery D
**Cc:** Spangler, Rebecca; Doughty, Jeanae
**Subject:** Documents added to file
**Date:** Thursday, March 2, 2023 10:21:36 AM

Morning, all,

I have received some additional documents from one of the students for next week's panel. Their submission deadline is today at 5 pm, so if anything else comes in I will get it added to the Filex tomorrow and send you the codes.

**Access codes:**
- Screenshots submitted by ██████████ :
- ████ log submitted by ██████████ :

It looks like the Filex links have expired for the other files; let me know if you didn't have a chance to view them before that happened, and I'll re-add them.

Just as an FYI, we are planning to order breakfast for y'all on Monday and Tuesday, since we're asking you to join us so bright and early.  We'll provide lunch as well. Reminder to let me know if there are any dietary needs!

Thank you!

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**- 2109 -**

**From:** jbupshaw@tamu.edu
**To:** Doughty, Jeanae
**Subject:** Filex - A new file is available for you to download
**Date:** Friday, March 3, 2023 10:16:02 AM

The encrypted file, Compiled    documents submitted 3.2 is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:


File Details:
Compiled    documents submitted 3.2
Compiled    documents submitted 3.2.pdf 19.60MB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

| From: | Upshaw-Brown, Jaclyn B |
|---|---|
| **To:** | Alvarado, Blair; Freeman Jr, Cedric L; Gardner, Jeffery D |
| **Cc:** | Spangler, Rebecca; Doughty, Jeanae |
| **Subject:** | RE: Documents added to file |
| **Date:** | Friday, March 3, 2023 10:20:10 AM |

Hi again, everyone,

I'm writing with one more access code for documents for fact-finding that were submitted by the deadline. You should have just received a Filex link, but let me know if not.

Access code:

This document includes several written statements from the charged students, a few witness statements pertaining to the alleged hazing of the ⬛⬛⬛⬛⬛⬛⬛ and a larger set of text messages discussing the planning of the ⬛⬛⬛ incident. If you have time to take a look at it before Monday, that's great. If not, don't stress about it; you should have a bit of time at the beginning of the day to review while we get the students settled, help them complete paperwork, etc.

Thank you!!!
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Thursday, March 2, 2023 10:22 AM
**To:** Alvarado, Blair <abalvarado@tamu.edu>; Freeman Jr, Cedric L <cedric_freeman@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Spangler, Rebecca <rebeccas@studentlife.tamu.edu>; Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Documents added to file

Morning, all,

I have received some additional documents from one of the students for next week's panel. Their submission deadline is today at 5 pm, so if anything else comes in I will get it added to the Filex tomorrow and send you the codes.

**Access codes:**
- Screenshots submitted by ⬛⬛⬛⬛⬛⬛⬛:
- ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

It looks like the Filex links have expired for the other files; let me know if you didn't have a chance to view them before that happened, and I'll re-add them.

Just as an FYI, we are planning to order breakfast for y'all on Monday and Tuesday, since we're asking you to join us so bright and early.  We'll provide lunch as well. Reminder to let me know if there are any dietary needs!

Thank you!

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

From: Bell Jr, Douglas
To: Doughty, Jeanae
Subject: Res.Life/Corps Incident
Date: Tuesday, October 3, 2023 10:07:07 AM
Attachments: Statements.pdf
23-0918-0005 SA.pdf
2023.09.20 - Email 2.pdf
2023.09.20 - Email.pdf
2023.09.22 - Email 2.pdf
2023.09.22 - Email.pdf
2023.09.25 - Email.pdf
text from █ 1.png
text from █ 2.png
text from █ 3.png

Howdy Jeanae,

I have gathered all the emails and statements I received and there are several incident reports as well. Below are the actors who allegedly entered the rooms:

██████████████ (Instructed to check rooms)
██████████████ (checked rooms)
██████████████ (checked rooms)
██████████████ (checked rooms)

██████████████ – went upstairs
██████████████ – went upstairs
██████████████ – went upstairs
██████████████ – went upstairs

There are three other names mentioned, but based on the information, they were just present

 (appears to have calmed things down)

Take a look at all the information, and we can discuss it tomorrow or Thursday. I will forward the res.life IRs to you as well.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

- 2113 -

| From: | Doughty, Jeanae |
|---|---|
| **To:** | Gardner, Jeffery D |
| **Subject:** | Case |
| **Date:** | Tuesday, October 10, 2023 9:47:00 AM |

Howdy Col. Gardner,

I've been assigned the      case and wanted to reach out and touch base with you regarding your availability. There are      students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D
**To:** Doughty, Jeanae
**Subject:** RE:     Case
**Date:** Tuesday, October 10, 2023 9:54:43 AM

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**     Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

- 2115 -

| From: | Doughty, Jeanae |
|---|---|
| **To:** | Gardner, Jeffery D |
| **Subject:** | RE:      Case |
| **Date:** | Tuesday, October 10, 2023 10:03:00 AM |

This is for the administrative conferences involving    cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Case

Howdy Col. Gardner,

I've been assigned the       case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | [jeanaed@sco.tamu.edu](mailto:jeanaed@sco.tamu.edu) | [sco.tamu.edu](http://sco.tamu.edu)
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D
**To:** Doughty, Jeanae
**Subject:** RE: Case
**Date:** Tuesday, October 10, 2023 2:29:32 PM

Howdy Ma'am,

I have read through everything. Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Case

This is for the administrative conferences involving cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**       Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Doughty, Jeanae
**To:** Gardner, Jeffery D
**Subject:** RE:      Case
**Date:** Tuesday, October 10, 2023 2:33:00 PM

Howdy,

Ok, thank you! Also, the only rule I could charge the upper for giving the direction is "hazing", which doesn't apply in this case, so I am leaving his charges as is. In looking at our calendars, I wanted to confirm that you are available during the following days/times:

- Monday, October 16th 9:30 am-11:00 am
- Monday, October 16th 2:00 pm-3:30 pm
- Wednesday, October 18th 9:30 am-11:00 am

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:30 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Ma'am,

I have read through everything.  Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Case

This is for the administrative conferences involving    cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

**- 2120 -**

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>
<span style="color:maroon">Assistant Commandant for Accountability and Standards</span>
<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>
<span style="color:maroon">979-458-9317</span>

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Those times should work.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:39 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

My apologies. Wednesday, the time is 9:00 am-10:30 am.

**From:** Doughty, Jeanae
**Sent:** Tuesday, October 10, 2023 2:33 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

Howdy,

Ok, thank you! Also, the only rule I could charge the upper for giving the direction is "hazing", which doesn't apply in this case, so I am leaving his charges as is. In looking at our calendars, I wanted to confirm that you are available during the following days/times:

- Monday, October 16th 9:30 am-11:00 am
- Monday, October 16th 2:00 pm-3:30 pm
- Wednesday, October 18th 9:30 am-11:00 am

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:30 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Case

Howdy Ma'am,

I have read through everything.  Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

This is for the administrative conferences involving     cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Case

Howdy Jeanae,

        Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Doughty, Jeanae |
| **Subject:** | Investigation Assigned |
| **Date:** | Friday, October 20, 2023 10:23:40 AM |
| **Attachments:** | Investigation Report.pdf |

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| **From:** | Bell Jr, Douglas |
|---|---|
| **To:** | Doughty, Jeanae |
| **Subject:** | Investigation Assigned |
| **Date:** | Friday, October 20, 2023 10:23:40 AM |
| **Attachments:** | Investigation Report.pdf |

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|---|---|
| **To:** | Gardner, Jeffery D |
| **Subject:** | Corps Admin |
| **Date:** | Wednesday, October 25, 2023 2:31:00 PM |
| **Attachments:** | Investigation Report.pdf |

Howdy Col. Gardner,

I've been assigned the _____ investigation. I am attaching the investigation report for your reference. Please let me know if/when you are available to chat.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| **From:** | Doughty, Jeanae |
|---|---|
| **To:** | Gardner, Jeffery D |
| **Subject:** | RE: Corps Admin |
| **Date:** | Thursday, October 26, 2023 8:37:00 AM |

Sounds good! I can walk over at 10:15 am.

All the Best,
**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, October 26, 2023 7:17 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Corps Admin

Morning Ma'am,

I have some time tomorrow after 1000.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Wednesday, October 25, 2023 2:32 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Corps Admin

Howdy Col. Gardner,

I've been assigned the                investigation. I am attaching the investigation report for your reference. Please let me know if/when you are available to chat.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator

- 2128 -

Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Hey, can you redact this for us please?

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 10:24 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Investigation Assigned

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
DIVISION OF STUDENT AFFAIRS | One Division. One Mission.

| | |
|---|---|
| **From:** | - Student Conduct Office - Student Employee |
| **To:** | Doughty, Jeanae |
| **Subject:** | RE: Investigation Assigned |
| **Date:** | Friday, October 27, 2023 10:10:56 AM |
| **Attachments:** | Investigation Report_Redacted.pdf |

All done.

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Friday, October 27, 2023 9:46 AM
**To:** - Student Conduct Office - Student Employee
**Subject:** FW: Investigation Assigned

Hey, can you redact this for us please?

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 10:24 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Investigation Assigned

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
DIVISION OF STUDENT AFFAIRS | One Division. One Mission.

**- 2131 -**

# Jeanae Doughty

EMAIL: █████████████

## EDUCATION

| | |
|---|---|
| 2021 | **Master of Organizational Leadership** *(awarded May 7, 2021)*<br>Trevecca Nazarene University – Nashville, TN |
| 2013 | **Bachelor of Liberal Studies** *(awarded May 12, 2013)*<br>The University of Memphis – Memphis, TN<br>Major: Interdisciplinary Studies |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2021 – Present | **Associate Coordinator, Student Conduct Office**<br>**Texas A&M University – College Station, TX** |

- Assist in the resolution of student conduct cases and other office initiatives, services, and projects.
- Supervise the Graduate Assistant.
- Administer the student conduct code.
- Serve as an investigator.
- Assist with office assessment.
- Assisting with and coordinating office presentations and trainings.
- Review reports for potential violations of the Student Conduct Code.
- Meet with students, witnesses, advisors, and other supporters to resolve cases.
- Engage in individual developmental and/or educational conversations with students.
- Appropriately refer to university and community resources and services.
- Assign appropriate educational sanctions.
- Serve as panel chair or student conduct administrator as needed.
- Design, implement, and evaluate presentations and workshops to students, faculty, and staff in alignment with office mission.
- Stay current on trends in student conduct and new legislation, state laws, federal requirements, and national standards relating to student conduct.
- Work with supervisor to create and maintain professional development plan, this may include utilizing campus trainings and/or attending professional conferences directly affiliated with job responsibilities.
- Assist in maintaining positive working relationships with office stakeholders, providing information when appropriate, responding promptly to appropriate requests for assistance, and maintaining a professional demeanor.

- Serve as representative on Department, Division and University committees and task forces, at events, and to department stakeholders as assigned.
- Attend and actively engage in Department and Division meetings, trainings, and functions. Other duties as assigned.

2019 – 2021    **Administrative Assistant to the Dean of Student Services & Enrollment Management**
**Mississippi Gulf Coast Community College, Harrison County Campus – Gulfport, MS**
- Assist Dean in daily planning and implementation of Student Services functions.
- Take minutes at all meetings assigned by the Dean.
- Produce letters, reports, and minutes from rough drafts utilizing word processing skills.
- Compose routine correspondence.
- Handle telephone calls in an effective manner.
- Maintain an accurate and complete filing system.
- Compile and maintain data for reports.
- Arrange for college vehicles, transportation, reservations, and lodging requirements.
- Order all departmental printing from District Printing.
- Handle the purchasing of supplies, etc. for the department.
- Complete hiring packages for personnel hired.
- Maintain employee personnel files for all Student Services personnel.
- Maintain timecards for all Student Services personnel and input leave in Banner during specific payroll dates.
- Prepare special contracts and/or contract addendums when required.
- Monitor, process, and reconcile expenditures and revenues.
- Prepare specifications for quotes and bid tabulations.
- Prepare monthly procurement card statements.
- Process check requests, purchase orders, and travel vouchers.
- Verify and maintain departmental budgets for accuracy.
- Maintain inventory for major and minor equipment for the department and stay up to date on inventory procedures.
- Schedule, coordinate, and assist Dean of Student Services with all aspects of conduct hearings.
- Supervise and/or participate in student activities as assigned by administrative staff.
- Supervise student workers and, when assigned, office personnel in lower levels.
- Schedule meetings and coordinate arrangements for refreshments, meals, audiovisual, and other requirements.
- Handle the reservations for rooms under Student Services responsibility.
- Coordinate the Awards Day Program held at the end of the spring semester.

- Coordinate nominations and selection of the Citizenship Award, Campus Hall of Fame, and Who's Who Among Mississippi Gulf Coast Community College programs.
- Participate in the planning and execution of all Student Services functions (orientation, registration, graduation, Bulldog Day, etc.).
- Maintain an effective relationship with college personnel, students and the community.
- Upgrade skill level and performance through employee development.
- Demonstrate exceptional adherence to work schedules and policies as exemplary performance for co-workers and subordinates.
- Perform other duties as assigned by the Dean of Student Services and Campus Vice President.
- Nominated and selected as 1st Quarter "In the Blue" Employee for the Harrison County Campus in March 2021.

2017– 2019 **Teller**
**BancorpSouth – Biloxi, MS**
- Provided basic cash receipt and payment services in accordance with policies and procedures.
- Offered prompt and efficient customer transactions.
- Cashed checks and processing withdrawals.
- Balanced cash drawer daily.
- Completed balanced, weekly reports.
- Maintained confidentiality of bank records and customer information.
- Processed orders for tellers from the vault.
- Prepared incoming and outgoing monetary shipments.

## PROFESSIONAL AFFILIATIONS & AWARDS
Association for Student Conduct Administrators (ASCA), 2021-Present
MGCCC "In the Blue" Staff Award, 3rd Quarter - 2021
Delta Sigma Theta Sorority, Incorporated, 2011-Present



View Submitted Application: TAMU Career
Site: Assistant Coordinator-Student Conduct
Office

10:22 AM
04/08/2024
Page 1 of 3

## Contact Information

Recruiters can reach out to you about this application using the public contact information from your worker profile below.

| | |
|---|---|
| **Email** | jeanaed@sco.tamu.edu (Work) |
| | jeanaed@tamu.edu (Work) |
| **Phone Number** | |

## Experience

| | |
|---|---|
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | Mississippi Gulf Coast Community College, Harrison County Campus |
| **Title** | Administrative Assistant to the Dean of Student Services & Enrollment Management |
| **Location** | Gulfport, MS |
| **Start Date** | |
| **Currently Work Here** | Yes |
| **Responsibilities and Achievements** | ·Assist Dean in daily planning and implementation of Student Services functions. |

· Take minutes at all meetings assigned by the Dean.
· Produce letters, reports, and minutes from rough drafts utilizing word processing skills.
· Compose routine correspondence.
· Handle telephone calls in an effective manner.
· Maintain an accurate and complete filing system.
· Compile and maintain data for reports.
· Arrange for college vehicles, transportation, reservations, and lodging requirements.
· Order all departmental printing from District Printing.
· Handle the purchasing of supplies, etc. for the department.
· Complete hiring packages for personnel hired.
· Maintain employee personnel files for all Student Services personnel.
· Maintain time cards for all Student Services personnel and input leave in Banner during specific payroll dates.
· Prepare special contracts and/or contract addendums when required.
· Monitor, process, and reconcile expenditures and revenues.
· Prepare specifications for quotes and bid tabulations.
· Prepare monthly procurement card statements.
· Process check requests, purchase orders, and travel vouchers.
· Verify and maintain departmental budgets for accuracy.
· Maintain inventory for major and minor equipment for the department and stay up to date on inventory procedures.
· Schedule, coordinate, and assist Dean of Student Services with all aspects of conduct hearings.
· Supervise and/or participate in student activities as assigned by administrative staff.
· Supervise student workers and, when assigned, office personnel in lower levels.
· Schedule meetings and coordinate arrangements for refreshments, meals, audiovisual, and other requirements.
· Handle the reservations for rooms under Student Services responsibility.
· Coordinate the Awards Day Program held at the end of the spring semester.
· Coordinate nominations and selection of the Citizenship Award, Campus Hall of Fame, and Who's Who Among Mississippi Gulf Coast Community College programs.
· Participate in the planning and execution of all Student Services functions (orientation, registration, graduation, Bulldog Day, etc.).
· Maintain an effective relationship with college personnel, students and the community.
· Upgrade skill level and performance through employee development.
· Demonstrate exceptional adherence to work schedules and policies as exemplary performance for co-workers and subordinates.
· Perform other duties as assigned by the Dean of Student Services and Campus Vice President.
· Nominated and selected as 1st Quarter "In the Blue" Employee for the Harrison County Campus in March 2021.

| | |
|---|---|
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | Morton's the Steakhouse |
| **Title** | Hostess/Food Runner |

| | |
|---|---|
| Location | Biloxi, MS |
| Start Date | |
| End Date | |
| Responsibilities and Achievements | · Greeted and seated all guests.<br>· Enhanced customer experiences by providing personalized service.<br>· Maintained a positive rapport with colleagues and other patrons.<br>· Retrieved and delivered guest entrees and sides.<br>· Assisted bar staff with daily operations. |

| | |
|---|---|
| If you can't find the Company Name, check this box and enter it manually | Yes |
| Company Name | BancorpSouth |
| Title | Teller |
| Location | Biloxi, MS |
| Start Date | |
| End Date | |
| Responsibilities and Achievements | · Provided basic cash receipt and payment services in accordance with policies and procedures.<br>· Offered prompt and efficient customer transactions.<br>· Cashed checks and processing withdrawals.<br>· Balanced cash drawer daily.<br>· Completed balanced, weekly reports.<br>· Maintained confidentiality of bank records and customer information.<br>· Processed orders for tellers from the vault.<br>· Prepared incoming and outgoing monetary shipments. |

| | |
|---|---|
| If you can't find the Company Name, check this box and enter it manually | Yes |
| Company Name | Red Lobster, Inc. |
| Title | Service Professional |
| Location | D'Iberville, MS |
| Start Date | |
| End Date | |
| Responsibilities and Achievements | ·Greeted and seated all VIP Guests.<br>· Enhanced customer experiences by providing personalized service<br>· Maintained a positive rapport with colleagues and other patrons.<br>· Delivered food and drinks.<br>· Managed financial transactions. |

| | |
|---|---|
| If you can't find the Company Name, check this box and enter it manually | Yes |
| Company Name | Harrison County Courthouse |
| Title | Chancery Clerk Assistant |
| Location | Gulfport, MS |
| Start Date | |
| End Date | |
| Responsibilities and Achievements | ·Input data including deed records, liens records, and IRS revenue.<br>· Filed and archived records.<br>· Organized and designed informational displays for individuals considering foreclosures. |

| | |
|---|---|
| Replace the Experience information in my profile with this information | No |

Education

| | |
|---|---|
| Country | United States of America |
| School | Trevecca Nazarene University |
| Degree | Masters |
| Degree Received | |
| Field of Study | |
| First Year Attended | 2019 |
| Last Year Attended | 2021 |
| GPA | |

| | |
|---|---|
| Country | |
| School | |
| Degree | Bachelors |
| Degree Received | |
| Field of Study | Interdisciplinary Studies |
| First Year Attended | 2007 |
| Last Year Attended | 2013 |
| GPA | |

| | |
|---|---|
| Replace the Education information in my profile with this information | No |

**Certifications**

none entered

**Language**

none entered

**Skills**

My experience related to Assistant Coordinator – Student Conduct Office includes: •10 plus years of administrative duties; •Efficient organizational skills, ensuring that all data is complete and accurate upon insertion; •Ability to work effectively with diverse populations; •Experience in purchasing and budget management; •Strong planning, execution, and project management skills; •Experience in coordinating student conduct hearings; •Ability to effectively resolve conflict; •Experience in advising and supervising undergraduate peers and student workers in various organizations; •Ability to develop and maintain effective working relationships with stakeholders and vendors.

| | |
|---|---|
| Replace the Skills information in my profile with this information | No |

**Resume - JADoughty.doc**

| | |
|---|---|
| File Name | Resume - JADoughty.doc |
| Content Type | application/msword |
| Updated By | |
| Upload Date | 07/29/2021 09:07:55 AM |
| Comment | |

**Cover Letter - TA&M - JDoughty.docx**

| | |
|---|---|
| File Name | Cover Letter - TA&M - JDoughty.docx |
| Content Type | application/vnd.openxmlformats-officedocument.wordprocessingml.document |
| Updated By | |
| Upload Date | 07/29/2021 09:27:46 AM |
| Comment | |



**MEMORANDUM**

DATE:           January 30, 2024

TO:             BG Joe E. Ramirez, Jr., USA (Ret.)
                Vice President for Student Affairs

THROUGH:        Dr. Kristen Harrell
                Assistant Vice President for Student Affairs

FROM:           Dr. Douglas Bell
                Director, Student Community Standards

SUBJECT:        Case
_____

                       submitted a statement to the Corps of Cadets when she requested to transfer out of
   and into a different squadron. The statement that          submitted included information concerning multiple
incidents that have taken place within        that led to          request to transfer outfits. Some of the incidents
that occurred include:

- Requiring      to stand on the wall for an extended amount of time (three hours with only one "shake it out" where they got to relax).  Multiple      submitted statements mentioning standing at 5 points of attention for "very long periods of time."
    - Five points meant their heels, butt, both shoulder blades, and head had to be on the wall.
    - It was stated during the investigation that "only the        had to stand like this."
- Requiring      to make and break their racks repeatedly for over 40 minutes. Upperclassmen repeatedly gave the     3-5 minutes to make their racks.  Some statements mentioned that they had to remake their Rack for 2 hours during FOW.
- During FOW,     was required to perform Uniform Drills where they were required to change from PT gear to bravos, then charlies, then bravos fully wired, back to PT gear in an unreasonable amount of time.
- Making     perform PT when sick or injured.
- Calling the     pathetic/weak/ and other names such as "wags."
- The     were told there would be "hell to pay" if they did not win and capture the flag. Calling     "fucking retards" after they lost a game of
- Performing "    Jokes" during outfit meetings where a     gets to tell a joke to an upperclassman to attempt to make an upperclassman laugh.  Anyone who laughs has to "wipe it off," which means sticking their hand out and counting to three and then smacking themselves in the forehead and wiping their smile off their face.

All the cadets within the outfit were charged with alleged violations of Student Rule 24 related to Hazing. Also, all the     were charged with having knowledge and failing to report due to the bolded portions of our Hazing rule:

Student Conduct Office
Student Services Building, 3rd Floor, Suite 309
1172 TAMU
College Station, TX 77843

Tel. 979.847.7272
Fax 979.845.6136
sco@tamu.edu
http://studentconduct.tamu.edu/

**- 2138 -**



1. [24.4.5.] Hazing. Any act that endangers the mental or physical health or safety of a student, or that destroys or removes public or private property; and/or assisting, directing, or in any way causing others to participate in

degrading behavior and/or behavior that causes ridicule, humiliation, or embarrassment for the purpose of initiation, admission into, affiliation with, or as a condition for continued membership in a group or organization; or as part of any activity of a recognized student organization, student group, Corps of Cadets, Corps outfit, Corps unit, or Corps Special Activities. Previously relied upon "traditions" (including Corps, fraternity/sorority, or any other group or organization activity, practice or tradition), intent of such acts, or coercion by current or former members or student leaders of such groups, will not suffice as a justifiable reason for participation in such acts**. It is not a defense that the person (or group) against whom the hazing was directed consented to, or acquiesced to, the behavior in question.**

Examples of such behavior include but are not limited to:
- Misuse of authority by virtue of one's class rank or leadership position.
- Striking another student by hand or with any instrument.
- Any form of physical bondage of a student.
- Taking of one or more students to an outlying area and dropping them off.
- Causing a student to violate the law or a University rule such as indecent exposure, trespassing, violation of visitation, etc.
- Any form of "quadding."
- **Having firsthand knowledge of the planning of such activities or firsthand knowledge that an incident of this type has occurred and failing to report it to appropriate University officials (The Vice President for Student Affairs or designee responsible for oversight of the student conduct processes and/or the University Police Department) is also a violation under this section.**

During the investigation, it was mentioned by the Corps Staff that the information that was provided was not a part of the legitimate military training program as defined and approved by the University. Due to the information provided during the investigation, it was requested that all the          provide statements. The          were not charged with Conduct Unbecoming of a Cadet. Cadet          was transferred to          Since she initially reported this information, she was not charged with violating the student rule.  All the          were offered the low-level options process, which did not include any Corps sanctions.   If requested, we will hold administrative conferences and talk with the          to gain additional perspective regarding the case and determine if the cadets were in violation of our hazing rule.


Douglas Bell, Ph.D.
Director of Student Community Standards

Student Conduct Office
Student Services Building, 3rd Floor, Suite 309
1172 TAMU
College Station, TX 77843

Tel. 979.847.7272
Fax 979.845.6136
sco@tamu.edu
http://studentconduct.tamu.edu/

**- 2139 -**

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Tuesday, October 24, 2023 4:26 PM
**To:** Winking, Audrey J
**Subject:** FW:    incidents ██████████

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Subject:** RE:    incidents ██████████

Sir,

That would be Jason Leible, jleible@corps.tamu.edu

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:26 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:    incidents ██████████

Howdy,
I think there may be enough here to at least investigate. We can initiate our investigation into this situation. Lt. Col. Gardner, can you please provide a support staff name to serve as a Co-Invesitgator.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:       incidents ███████████████

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the        in this outfit.  The first document is the one that really stands out (request to transfer).  Before I act here, I'd like your perspectives if there is any form of violation of university hazing standards here.

patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**       incidents ███████████████

Good Morning Sir,

I finally received the additional info last night regarding Cadet ███████████  Below is the original email from last month but I've also attached the additional document that I received last night as well.  She stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.

**R/**
**MSgt Chauncy J. Anderson USMC (Ret)**  | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 |                          | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** ███████████████████████
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ███████████████ . I'm a cadet in        and a recent transfer from        I was in the same outfit as ████ ████ when she was in the Corps of Cadets. My time in       , though brief, has been incredibly different than my time

2

spent in ▮▮▮. If you're available this Thursday, ▮▮▮ and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to ▮▮▮ was the best choice for me, and I'm truly grateful to ▮▮▮ and ▮▮▮ for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including ▮▮▮ would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in ▮▮▮.

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,

▮▮▮

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Friday, December 22, 2023 12:06 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | investigation reports complete |

Both the         and         Event reports have been completed and saved in the shared drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Bell Jr, Douglas**
_____

**From:** Bell Jr, Douglas
**Sent:** Tuesday, January 30, 2024 2:35 PM
**To:** Harrell, Kristen
**Subject:** Memo for Gen. Ramirez
**Attachments:** Case Memo -            docx


Please see the attached memo and let me know if you have any questions or feedback.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Harrell, Kristen |
| **Sent:** | Monday, January 29, 2024 11:00 AM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | Need to follow up |

We'll need to chat about

**Kristen Harrell, PhD** | She, her, hers | Assistant Vice President
Office of the Vice President | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.845.4728 | kristenh@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Monday, November 6, 2023 9:43 AM
**To:** Rydl, Chareny L
**Cc:** Reber, Thomas W; Harrell, Kristen
**Subject:** RE: Cadet Suspension

To my knowledge, this individual was      suspended from the Corps (only) by CMDT, pending the outcome of an investigation and adjudication process. We are still investigating

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Monday, November 6, 2023 9:31 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Reber, Thomas W <treber@tamu.edu>; Harrell, Kristen <kristenh@vpsa.tamu.edu>
**Subject:** FW: Cadet Suspension

Well this is a first. Not sure how if he is      suspended from the Corps how they can allow him to move back. Not my area so if there is any follow up I will leave it up to you.

Chareny

**From:** Wilson, Jeff C <jeff_wilson@tamu.edu>
**Sent:** Monday, November 6, 2023 9:23 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; McCracken, Kyle R <kyle_mccracken@reslife.tamu.edu>; Krenz, Michael D <mikek@reslife.tamu.edu>
**Subject:** FW: Cadet Suspension

Interesting…that the OOC is allowing a cadet who has been      suspended to remain (move back) to the Quad (in a Corps space) while this issue is being worked thru Student Conduct
Thank you

**Jeff Wilson '84** | Associate Director
Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-1258

ph: 979.845.4744 | toll free 888.451.3896 | email: jeff_wilson@reslife.tamu.edu
------------------------
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front



1

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Friday, November 3, 2023 2:36 PM
**To:** Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Parker, Chad L <cparker@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Subject:** RE: Cadet Suspension

All,

The CMDT learned this afternoon via parent concern that ▮▮▮ is living in a study carrell in ▮▮▮ . That was not his intended result of the suspension and subsequent move, and he assured the family that the OOC would take action to remedy the situation.

Rick identified a space in ▮▮▮ that is vacant.▮▮▮ will connect with Corps Housing on Monday morning to initiate the next iteration of the move. Rick is standing by with access/keys/ ▮▮▮ and the student was notified of the availability of the space/next steps.

Chad, can you please let the CO know to expect to see the student in the hallway on Monday mid-day?
Rick, once the move is complete can you cancel access to his current facility in ▮▮▮ ?

Thanks,
mms

**Meredith Simpson**
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Sent:** Friday, October 20, 2023 1:07 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>; Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Cadet Suspension

All –
We have a temporary space held for this student in ▮▮▮ . We have notified ▮▮▮ that this student could move today (after 5 pm).

Sylvia & Rick –
Alexis sent you a note on this via Teams as well
Thank you

**Jeff Wilson '84 |** Associate Director
Housing Assignments Office | Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-0000

ph: 979.845.4744 | toll free 888.451.3896 |email:  jeff_wilson@reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 1:04 PM
**To:** Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Cadet Suspension

Howdy Sylvia,

I will cc you on an email to a cadet shortly but wanted to first explain what is going on.

SCO has initiated and investigation into potential violations of student rules in          Based on statements gathered so far a particular cadet has been identified as possibly be the main focus of the investigation.  BG Michaelis has decided to suspend that cadet from the Corps pending the results of the investigations.  This cadet will be instructed to move out of his Corps dorm living space Monday and into another           space, preferably off the quad.  This is similar to the situation involving a number of      cadets            .

I already called Jeff Wilson and talked through this with him.  Let me know if you have any questions.

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Michaelis, Patrick Ralph |
| **Sent:** | Friday, October 20, 2023 12:25 PM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Gardner, Jeffery D; Simpson, Meredith M |
| **Subject:** | RE:      incidents ████████████ |

Doug. I've temporarily suspended ████████ from the Corps pending the results of the investigation.  Thanks for your help here and looking forward to a quick turnaround.


patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**


**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:42 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      incidents████████████████

I am available to chat until noon.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.


**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:39 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re:      incidents ████████████

Doug - before you move forward, need a quick chat. Are you available for a call this morning?

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

On Oct 20, 2023, at 9:35 AM, Gardner, Jeffery D <jeff_gardner@corps.tamu.edu> wrote:

Sir,

That would be Jason Leible, jleible@corps.tamu.edu

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:26 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:          incidents ███████████████████

Howdy,
I think there may be enough here to at least investigate.  We can initiate our investigation into this situation.   Lt. Col. Gardner, can you please provide a support staff name to serve as a Co-Invesitgator.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:          incidents ███████████████████

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the ██████ in this outfit.  The first document is the one that really stands out (request to transfer).  Before I act here, I'd like your perspectives if there is any form of violation of university hazing standards here.

patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM

2

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**          incidents ██████████████████████

Good Morning Sir,

I finally received the additional info last night regarding Cadet ████████ Below is the original email from last month but I've also attached the additional document that I received last night as well. She stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.


**R/**
**MSgt Chauncy J. Anderson USMC (Ret)** | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 | mobile:                          | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders



**From:** ██████████████████████████████████
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ████████████████. I'm a cadet in          and a recent          from          . I was in the same outfit as ██████████ when she was in the Corps of Cadets. My time in          ,          , has been incredibly different than my time spent in          . If you're available this Thursday, ████ and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to          was the best choice for me, and I'm truly grateful to ████████ and ████████ for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including          would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in          .

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,

██████████

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Friday, January 19, 2024 9:34 AM
**To:** Latham, Skylar; Smith, Asia
**Subject:** RE:


That is my thought.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Latham, Skylar <skylarl@sco.tamu.edu>
**Sent:** Friday, January 19, 2024 9:33 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Smith, Asia <asias@sco.tamu.edu>
**Subject:** RE:

Should these be the students brought in for administrative conferences?

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:28 AM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** FW:

Below are the names of the                    who assisted during        .

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, January 19, 2024 9:26 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE:

Sir,

As requested.

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**

Howdy Lt. Col. Gardner,
We are reviewing the investigation report for              , and I wanted to know if you had the list of the
Members for              who participated/assisted in        .  Thanks in advance.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**<span style="color:maroon">DIVISION OF STUDENT AFFAIRS</span>** | <span style="color:maroon">One Division. One Mission.</span>

Request to Transfer Document Concerning ███████

Objective: Transfer to

Reasons for Transfer: Compatibility with outfit culture, moral alignment, leadership methods, differing priorities.

To be more specific, _____ promotes selfless leadership and actively engages in community service. The outfit is very academic-oriented. ███████ is currently in _____. The outfit promotes honor and hard work and heavily promotes discipline through physical training.

I was personally asked by my superiors to provide constructive criticism for the outfit. The leadership in the outfit is striving to change for the better. The following list details my personal experience and recommendations. These are my personal opinions, but I can honestly say that many are shared by my fellow cadets.

Unfortunately, we have lost _____ so far, leaving _____ in our buddy class; however, several would have been excellent cadets. I'm writing this because I don't want to lose any more cadets who might punch if things don't change.

My overall observation is that ███████████████ care very much about this outfit. There are a few issues I would like to address:

Chain of command is ineffective:
_____ are not willing or able to answer questions or address concerns. Fire teams are inefficient and squad leaders are nonexistent. _____ are the ones primarily disciplining us throughout _____ and even now. For example, they are the ones who dictated training in _____. They are intimidating figures who lead with negative reinforcement and degradation. This treatment has led some _____ to punch * Although ███████ is in a position to lead by example, she has allowed _____ to dictate training and often harsh discipline. For example, during _____, _____ participated in rack drills for most days of _____ often lasting more than two hours. We also had timed uniform drills, in which the _____ had to change back and forth between various uniforms for inspection. It was often very intense and the pressure was excessive. The _____ stood at attention on the wall for increasingly long periods of time past the point where the _____ collapsed from leg cramps, or were shaking and in tears. You're considered weak if you're pushing yourself and your body doesn't comply. Examples include cadets passing out during PT, cadets participating in PT even when excused with doctor's notes, and having a "spew line" for the amount of _____ throwing up, and cadets being called "pathetic" and "weak" before collapsing.

*I can provide specifics for why many _____ quit and which factors were responsible, but it is not my place to type it out on this report.

Communication is lacking:

who were sick or injured were still expected to participate in PT even when excused by medical professionals. In my case, I was unable to attend classes for 3 days. I messaged my team leaders immediately, and received no specific instructions. I was told to still line up with my buddies for the first call even though I was unable to stand properly. My CO found me in the restroom and told me that in the future, I should go to my        doors rather than just text them so that I would be accounted for. The next day, I was still unable to participate in PT or training activities, but was told to still line up with my buddies. I attended formation and all attempts made to make a statement and explain that I was dizzy and ill were met with harsh instructions and demands to shut up. We went back to our dorms and had our room inspection drills until breakfast. I stumbled through helping my buddies clean their holes while fighting nausea. We lined up on the wall, and I was yelled at for looking like I was falling asleep. I made a statement that I was dizzy and concerned about passing out before running to the restroom. When I finally did return to PT, I informed my        that I was able to do calisthenics, but would likely throw up if I ran. I was still expected to run sprints until I was violently puking on the ground and hyperventilating.

Unfortunately, a fellow buddy of mine who was sick had a similar story. She was excused for several days by a doctor, but was told by the upperclassmen that she was still expected to attend PT. She is recovering from a                injury, and still attempts to do strenuous physical activity to avoid getting yelled at.


Culture:

The culture of this outfit is competitive and intense. There is no positive feedback and expectations are never clear. There is no transparency, and the        are not treated respectfully. Our outfit has had        punch out. The        are overwhelmed and often scared. The        often confuse fear for respect and lead by intimidation instead of example. The        are often told that if we get it together for once, we'll get good bull. When we do get good bull, we aren't allowed to smile or laugh, and we aren't allowed to initiate anything considered fun. They tell us that they push us to make us better and that we're lucky to have them. Our buddy class all encouraged each other to hold on until after        because things would get better. Our        then told us that they had weeded out all the weak ones, and it was only going to get harder. There is no motivation or encouragement. We are belittled and called pathetic if we struggle to keep up. This outfit defines your worth in your PFT scores, and cadets are treated accordingly. You will not be respected if you aren't athletic. In fact, you will likely be the target of belittlement and degradation during PT times if you fall behind. There's no accountability with leadership, and the        do not know who to ask questions to. We were assigned our fire team leaders after three weeks and didn't meet our                until after two weeks of classes. Personally, I felt that my        were not willing to answer my questions and often took a very long time to reply to messages if they replied at all.

Personal Experience:

In my experience, I've had little to no issues with most of the        . Many of them have been very supportive and inspiring figures to me. I have had little to no contact with most of the
.

was primarily run by _____. Those who were there were often intimidating and harsh disciplinarians. My personal opinion of _____ is that he is degrading and unapproachable. He would often say harsh things about us to other _____ in the hallway. He's angry most of the time and gives off the impression that he would be much happier of a person if he had never met any of us. When he does feel like joking around, he gets angry if we react positively. We often say that he loves good bull and hates other people's joy. In the case of some cadets, his degradation often seemed personal. It is my understanding that _____ are supposed to be inspiring and supportive figures. I felt neither of those things after being called "a bunch of f****ng retards" after losing a game of _____ In fact, during field day we were told that _____ don't lose, and if we lost a game, we would go back to standing at attention on the wall for two hours.

We are often told that the _____ are rooting for us and want to see us improve. I mentioned to _____ that I felt that some _____ were rooting for me to quit, and would celebrate if I left because they wouldn't have to deal with me during PT anymore. He assured me that that wasn't the case and that some people just take PT a lot more seriously than others and that I would get better. In the case of _____, the degradation has often felt personal to me. My buddies often say that outside of training times, he's nice; however, he's never spoken to me outside of harshly pointing out my mistakes or calling me pathetic. In fact, there was a time during _____ in which there were several of us in the hallway rushing back to our holes hoping we wouldn't have to greet. We were noisier than necessary, and _____ saw us. I was the only one who got in trouble. He came to my door and told me that it was astounding how I couldn't get the simplest things right, and how shockingly incompetent and pathetic I am. There were six of us in the hallway, and I was the only one who got in trouble. I went to a paired dinner with my _____ mentor, a buddy of mine, and her mentor. I made a joke about how I was sure that _____ hated me because I struggled during PT, and both _____ confirmed that I was probably right.

I had no issues with _____ until going to dinner with him, my mentor, and my buddy. That evening, I had previously told _____ that I was considering transferring outfits. He asked me if he could tell _____ so she could talk to me about it. I told him I would be happy to talk to her about it and that he definitely should tell her. I hadn't yet told anyone other than ▮ _____ and I was planning on speaking to my _____ about it the following day, but for reasons regarding consolidation of rooms, I spoke up sooner than planned. That night, during the _____ mentor dinner, _____ began to ask me questions. He asked me if it was true that I was planning to transfer outfits. I told him yes, and my buddy with me was very upset. _____ began to ask me why. I told him that I would be happy to have that conversation with him in another time and place, but I wasn't comfortable talking about it at the moment. He continued pushing me multiple times, and I continued saying that I was uncomfortable. I felt like my privacy had been breached.

I am seriously concerned about the _____ of one of my buddies. She's had many breakdowns and reached out to the _____. She dreads PT for fear of degradation, and she is

understanding but upset that I am leaving because we had previously hoped to be ▮▮▮▮.
Her concerns are valid, and I worry about how she will cope if things continue how they are.

It is only fair to mention the positives in this outfit.
There are several people who have made my experience in the outfit a positive one. ▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were both very kind and supportive to my buddies and I who
were struggling. ▮▮▮▮▮▮▮▮▮▮▮ have both inspired me to work hard even when I've
been upset, frustrated, or tired. ▮▮▮▮▮▮ especially has given me invaluable advice and
motivation. During PT, the only person who was kind to me when I struggled was ▮▮▮▮▮
He fell out on runs with me, and instead of belittling me, he encouraged me to try my best and to
keep pushing myself. He never made me feel bad, and I was always thankful to have him there
with me. Similarly, ▮▮▮▮▮ helped me calm down when I hyperventilated, and didn't make
me feel bad about myself.

In conclusion, I strongly believe that there needs to be a culture change within this outfit. There
needs to be accountability because the ▮▮▮ are struggling, and I would not be surprised if there
were more punches. In an outfit where worth is defined by ▮▮▮ scores, "weak ▮▮" are
degraded and belittled. We are never fully unlocked and the ▮▮▮ are always walking on
eggshells and afraid of upsetting the ▮▮▮▮. Ultimately, I am requesting immediate transfer to
▮▮▮ because I anticipate retaliation for my transfer request.

Update as of 09/26/27

I have spent one full week in         and I truly believe that I have made the right decision. There is an effective chain of command, and I was immediately placed in a fire team with strict, but helpful                 . My      team leader is often hard on me, but in the best possible way. I can tell he cares and wants me to improve, and I only feel motivated to work harder and make him proud. Our          leader is very approachable, though I haven't yet needed to ask a question that far up the chain of command. Our             are fantastic. They inspire and motivate us to improve.

I've experienced severe           in the past during outfit physical training time. This morning, we had our                 session, and those feelings came flooding back. No one was upset with me. In fact,             pulled me aside to collect myself. He told me it was good that I understood that what I was going through was          and that I could work through it because if I couldn't, I wouldn't already be here. One of the           told me that while they wanted me to push myself, overexertion was not the goal. Even the                 motivated me. No one called me weak or pathetic, they all just told me that they knew I had more to give, and I did. I completed an incredibly intense workout, and instead of feeling          or dread for the day to come, I felt a sense of accomplishment. I did something difficult and scary, and I got through it. I was never put down or left behind, I was only supported and encouraged to get back up. The training environment is so different from what I was used to, I didn't know how to react at first. Now, I'm just so thankful that I'm here.

The culture here is different too. Everyone cares about each other and lifts each other up. You never give up on yourself, and you never give up on your buddies. I'm still finding my place within this outfit, but everyone has been so kind and welcoming, I have no doubt that this is where I'm meant to be. I know that there will always be hard days, but I also know that in          I have people to lean on. My buddies are supporting me, my                 are pushing me, my          are rooting for me, and my           are inspiring me. Every day will be another step towards improvement, and someday, I'll be able to inspire that growth in someone else.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Wednesday, January 24, 2024 1:23 PM |
| **To:** | Smith, Asia |
| **Cc:** | Latham, Skylar |
| **Subject:** | RE:      Tentative Charges |

Move forward.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Smith, Asia <asias@sco.tamu.edu>
**Sent:** Wednesday, January 24, 2024 1:16 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** RE:      Tentative Charges

Dr. Bell,

After consultation with Col. Garner and heavy reflection, I believe Skylar is ready to move forward with          charge letters.

Please let us know if you have any thoughts or concerns.

Asia

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:18 AM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** RE:      Tentative Charges

After an additional review, this makes sense.  I would do an options process for the          and unnamed upperclassmen.  I am attempting to get the          list from Gardner, so we know exactly who was present at          .

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Smith, Asia <asias@sco.tamu.edu>
**Sent:** Friday, January 19, 2024 9:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:**        Tentative Charges

Howdy Dr. Bell,

I wanted to streamline the tentative charges for you for review.


Failure to report
Conduct Unbecoming


Failure to report
Complicity
Conduct Unbecoming a Cadet


Hazing
Failure to report
Complicity
Conduct Unbecoming

As mentioned some of the named upperclassmen were dishonest in their interview with the investigators and, as a result, will also receive "Abuse of the Conduct Process".

**Asia Smith M.S.Ed.**   |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Latham, Skylar |
| **Sent:** | Thursday, January 25, 2024 5:48 PM |
| **To:** | White, Lori J; Trevino, Nelda L.; Gonzalez Guerra, Bernardo; Crumrine, Calleigh; Koch, Aubrey - Student Conduct Office - Student Employee; Doughty, Jeanae; Caldwell III, Danny Wilson; Masroor, Wajiha - Graduate Assistant - Student Conduct Office; Taylor, Japheth J. |
| **Cc:** | Smith, Asia; Bell Jr, Douglas |
| **Subject:** | |

Howdy,

Just finished finalizing        Letters will auto send at 8:30 AM tomorrow morning. There is about     students involved so we may want to make a tablet or two.

Sincerely,

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Smith, Asia |
| **Sent:** | Tuesday, January 9, 2024 4:44 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | RE: Investigation Report |

Skylar will be the SCA for this case.

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Monday, January 8, 2024 2:32 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:** Investigation Report

Howdy,
Please review the attached investigation report and let me know who you would like for me to forward this report to.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

**From:** Bell Jr, Douglas
**Sent:** Thursday, January 5, 2023 11:41 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** FW: Report

I have put this report within your scans folder.

**Douglas Bell, Ph.D.** | Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, December 23, 2022 11:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** Report

The Investigation Report is complete. The final report and the two audio recordings can be found here:
   \Investigations\Active Investigations\In Progress _


Have a great break!

**Audrey Winking**| Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Subject:** | FW:      Initial Report: ██████████████ |
| **Date:** | Friday, September 29, 2023 2:15:02 PM |

---

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 11:26 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** FW:      Initial Report:

Dr. Bell,

        I just received another incident report.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:**
**Sent:** Friday, September 29, 2023 11:23 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>;

**Cc:** ████████████████████████████████████████████████
████████████████████████████
**Subject:**       Initial Report:

Good afternoon, Lt Col Gardner and Cadet ██████,

**Who:** ███████████████████████████████
**What:** Stolen Property
**Where:** In between
**When:** 1300, Thurs
**Why:**   Cadet ██████ was returning from a mathematics lab class with a non-reg friend, during which

- 2164 -

one of his ▮▮▮▮▮ was taken. ▮ fraternity students (male) came up from behind him and took his spur by stepping on his heels and shoving him. Cadet ▮▮▮ tried to grab one of the frat students, but he got away with the ▮▮▮▮ .
The ▮ fraternity students were ▮▮▮▮▮▮▮▮▮▮▮▮ Both wore black tennis shoes, no glasses, one with a turquoise shirt other with a black shirt.

The reasoning for submitting this ▮▮▮ is to help create a trail of similar cases to hold the fraternities accountable.


--
Very Respectfully,


▮▮▮▮▮▮▮
Texas A&M University
Corps of Cadets |
P: ▮▮▮▮▮▮
E: ▮▮▮▮▮▮▮▮▮▮▮

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: |
| Date: | Friday, September 29, 2023 9:52:11 AM |

Gardner is suppose to provide some statements.  I am not sure who should be a co-investigator.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Harrell, Kristen <kristenh@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 8:14 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW:

**Kristen Harrell, PhD** | She, her, hers | Assistant Vice President
Office of the Vice President | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.845.4728 | kristenh@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:02 PM
**To:** Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ████████████████████████████████████
████████████████████████████████
**Subject:** RE:

**Good on all, Shante. Thanks.**

**I'd like a report on where we are on this incident next week. This is the kind of behavior that leads to physical altercations between our students – something that is never good for anyone.**

**Thanks again for the information.**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

**From:** Hearst, Shante <shearst@stuact.tamu.edu>
**Sent:** Thursday, September 28, 2023 12:07 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Cc** ███████████████████████████████████████
███████████████████████████████████
**Subject:** RE:

General Ramirez,

    are recognized as a registered student organization but are not a member of any council. They operate and are viewed more like a         because they are not affiliated with    (where they would be housed if they were affiliated with a council).

I'm happy to provide additional clarification if this wasn't helpful.

**Shanté Hearst**
Fraternity & Sorority Life, Director
Department of Student Activities, Assistant Director
Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.5636 | shearst@stuact.tamu.edu | studentactivities.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 12:01 PM
**To:** Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ███████████████████████████████████████
███████████████████████████████████
**Subject:** Re:

So the frat involved is NOT recognized by the university?? Is that what you're telling me??

BG(R) Joe E. Ramirez, Jr
Vice President for Student Affairs
Texas A&M University
Sent from my iPhone

    On Sep 28, 2023, at 11:42 AM, Hearst, Shante <shearst@stuact.tamu.edu> wrote:

    Hello General Ramirez,

██████ has been in contact with ████████, and shared that ████████████ (outside of our office) is an identified group. It was addressed on Tuesday at the meeting and all chapters were warned to refrain from participating in this behavior. I will continue to keep everyone posted.

**Shanté Hearst**
Fraternity & Sorority Life, Director
Department of Student Activities, Assistant Director
Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.5636 | shearst@stuact.tamu.edu | studentactivities.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 11:30 AM
**To:** Dobiyanski, Victoria E <vdobiyanski@tamu.edu>; Brown, Josh <jhbrown@stuact.tamu.edu>; Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ████████████████████████████████████████████████████ >
**Subject:** Fwd:

I've asked ████████████ to send me everything he has on this incident, including any names he may have of those who did this, as well any specific fraternities who have been doing it. Once I get that information I want this investigated and dealt with immediately.

More to follow. Will forward the information once I get it.

BG(R) Joe E. Ramirez, Jr
Vice President for Student Affairs
Texas A&M University
Sent from my iPhone

Begin forwarded message:

> **From:** ████████████████████████████████████████
> **Date:** September 28, 2023 at 11:22:09 AM CDT
> **To:** "Ramirez Jr, Joe E" <jramirez@vpsa.tamu.edu>
> **Cc:** "Simpson, Meredith M" <msimpson@corps.tamu.edu>
> **Subject: Fwd:**
>
> ████ - I don't know of a single instance where the Corps actively targets Greek life. This is embarrassing.
>
> ████████

**- 2168 -**

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

Begin forwarded message:

> **From:** "Simpson, Meredith M"
> <msimpson@corps.tamu.edu>
> **Date:** September 28, 2023 at 10:51:50 AM CDT
> **To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>,
> "Michaelis, Patrick Ralph" <pmichaelis@corps.tamu.edu>
> **Subject: RE:**
>
>
> Sir,
>
> Jeff and I talked this morning and I reached out to
>      /Fraternity and Sorority Life to engage their
> leadership as well. The pledges are being 'tasked' with
> stealing spurs.
>
> V/R,
> mms
>
> **Meredith Simpson**
> Office of the Commandant | Corps of Cadets
> 1227 TAMU | College Station, TX 77843-1227
> ph: 979.458.2829 | msimpson@tamu.edu
>
> Corps Virtual Office: tx.ag/corpsacademics
> - - - - - - - - - - - - - - - - - - - - - - - -
> **TEXAS A&M UNIVERSITY**
>
> ---
>
> **From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Sent:** Thursday, September 28, 2023 10:27 AM
> **To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
> **Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>
> **Subject:**
>
> Morning Sir,
>
>         Wanted to update you on the           situation.
> So far this week there have been three known instances
> where frat pledges have either attempted to steal or have

stolen        .  I am obtaining statements from the
and        .  I'm still trying to find the female        in the wing
who was surrounded by frat pledges and had her spurs
stomped.  We have the names of two of the frat pledges.
Once I have all the information consolidated, we will move
forward to Student Conduct.  I am available for questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: Incident report |
| **Date:** | Friday, September 29, 2023 2:14:53 PM |
| **Attachments:** | Incident report.docx |

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 10:55 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M
<msimpson@corps.tamu.edu>
**Subject:** Incident report

Good Morning Dr. Bell,

　　　　Attached you will find　　　individual incident reports from Corps　　　　　. In each of
these incidents, non-corps students attempted to take items from the cadets. We would appreciate
the Student Conduct Office looking into these events and taking appropriate action. Please let me
know if you have questions or if we can be of assistance.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

Who:

What: Stolen Property

Where: Outside Southside Commons by Bike Racks

When: 1230

Why:                          was walking with a non-reg friend of his and they were in the middle of a conversation on their way into the commons near the bike rack area.                         got flat tired by two kids and one grabbed onto his backpack.                          spun around and was carrying a metal water bottle in his hand so he used it and whacked one of the kids in the ribs but the other with the spurs got away and started running towards the parking lot near the greenhouses in front of the commons. A few other cadets saw what happened and ran to the parking lot. The kid who took the spurs went inside their getaway car and they surrounded the car so they couldn't move. A few minutes later he quickly ran out the side of the car and the cadets chased him around commons by          dorm hall. While this was happening a few cadets stayed behind to keep the car from leaving and the University Police Department arrived and surrounded their car. Then, the kid with the spurs ran inside          . The kid then returned back to the car and a few minutes later he was forced to return the             with the help of UPD. UPD asked if                          wanted to press charges but he declined.


Walking back from class by          , frat guy on a bike drove by and grabbed bider off of Cadets head. No retaliation from          . Was reacquired by                          after the same guy tried to take his. in this occurrence                 lowered his shoulder, causing the frat to drop both biders and run off.

                    Incident report


In the early afternoon of                 my roommate and I,                 were eating in the commons at the tables side by side Infront of the 4 vending machines across from the mail room. I then suddenly heard face paced footsteps behind me when a person took my                 off the table and proceeded to sprint away. Without hesitation I sprinted after him running through the doors in the back of commons. In full uniform                 I was chasing this pledge through the commons and down the concrete steps in the back of commons. I then proceeded to subdue him from behind in the street in the back of commons. He then was getting up still refusing to give up my property. I then secured his leg with my upper body. I also felt his leg rear back to kick me. I knew          was not far behind.          then proceeded to subdue him causing him to be on the ground again. He still would not give up my property. After a few seconds of me and my roommate securing him on the ground he finally gave my property back. His get away truck then left without him. He then walked into the commons. This was an organized event enacted by the pledges who were involved. Me and          never used force that could have caused serious or fatal harm to this pledge even though we had the full ability to do so. We were simply reacting to someone who blatantly stole a valuable item from me with the intention of getting that item back and not hurting the pledge.

Incident Report

In the early afternoon of _____ my roommate and I were eating a quick snack at the Commons at the tables in front of the vending machines across from the MailRoom when suddenly an individual while sprinting by our table reaches down and grabs something off of our table. Unsure exactly what was happening, I began to sprint after this individual alongside my roommate and after realizing exactly what was taken I turned back to grab the remainder of our property off of the table such as my phone and the rest of our _____ . When sprinting back out of the door I heard the other people standing outside causing ruckus and after getting to a position where I could see I witnessed this individual standing over my roommate with a deminer of aggression while my roommate was hugging tightly onto one of his legs and holding his head against his thigh which made me realize he was continuing to escalate the situation. My immediate reaction was to subdue the individual in order to deescalate the situation to insure the safety of everyone involved. Referring back to the numerous de escalation training I have participated in at the _____ as a _____ " I did exactly what I was taught. After a quick scan of the surrounding terrain and analyzing the environment I realized that a takedown would be safe therefore I quickly got the individual onto the ground and stood with one leg in between his two legs bisecting the center of his body with my body turned at a 45 degree angle towards the center of the individual in the ready position for anything that this individual might try to do. I stayed in this position and did not allow him to get up until I felt the situation was completely deescalated and was comfortable with the attitude this individual had due to the fact that I knew he was much bigger than myself and I was unsure of his mission and skillset.  The individuals name is

On Monday, _____ I was studying at the West Campus Dining facility on the 2nd floor. At approximately 1545, I had my _____ on the table next to my laptop while I was working on a math assignment. All of a sudden, some kid snatched my spurs and took off running. I was taken by surprise but quickly got up and started chasing him. I ran down the stairs and chased him outside of the building. I sprinted, slowly gaining on him until he ran through the door of the Heep Building. He then proceeded to run into a pole in the middle of a doorway where I was able to catch him. I quickly grabbed him with both arms and held him from getting away. Then, a fellow cadet came to my aid and helped me pry the spurs from his hands. Even being captured by me, he did not want to give up the spurs as we had to forcefully take them from his hands. After I got my spurs back, I let him go without much confrontation. I then ran back to get my stuff from where I was studying before going to class. After class I learned that the kid that attempted to steal my spurs was in my same class but left once he saw me enter. He also did not show up to class on Wednesday. I do not have much information on him except that his name is

# Bell Jr, Douglas

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Tuesday, September 19, 2023 9:10 AM |
| **To:** | Michaelis, Patrick Ralph |
| **Cc:** | Gardner, Jeffery D; Simpson, Meredith M |
| **Subject:** | FW: [Maxient]      College Station - On-Campus Residence Hall |
| **Attachments:** | .pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Please see the incident report I received last week. I sent this information to CREI, and they returned it to SCO. Please conduct your 72-hour review of this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** ▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Monday, September 11, 2023 4:33 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** [Maxient]     College Station - On-Campus Residence Hall

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
### Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Residence Hall**

### Involved Parties
**Corp of cadets,** ▮▮▮▮▮ Alleged Offender
▮▮▮▮▮▮▮▮▮ Witness

### Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

During my time in the ▮▮▮ unit, I witnessed some very hurtful and unproductive "leadership" among the upperclassmen. To give some specifics:

A student who came from ▮▮▮ was talked about behind his back as if he was an outsider. One upperclassman specifically said, "When I get in trouble for hazing that ▮▮▮, I will say I was protecting my country." A group of upperclassmen then laughed as if that was something funny to say. This same student continued to be given a hard time based on ▮▮▮ in the way they wanted him to.

▮▮▮ He would be forced to stand in the hall constantly repeating the same phrase and if he did not get it right he would be sent back into his room, only to then come out 5 minutes later and deal with the same actions. Even being laughed at and shouted at while attempting to do things correctly.

The other ▮▮▮ do not have things any easier, the upperclassmen are constantly changing times around on them or calling the ▮▮▮ dumb and stupid. In one specific instance, the ▮▮▮ were told to have three jokes for their Sunday meeting and when the meeting came they were told every ▮▮▮ should have had three individual jokes, that the jokes they did have were horrible, that they were stupid for not coming up with anything in 8 hours. The ▮▮▮ are also struggling to get enough sleep because when a meeting is scheduled for just 1 hour it will end up taking 2. They do not feel they have enough time to accomplish their academic homework.

The final inconsistency comes with the ▮▮▮ being told to join groups outside of the corps, but then being told they are not allowed to miss too much formation. They then have to quit the groups they joined or pick between the few.

Overall the ▮▮▮ outfit is negatively impeeding the mental health and overall stability of this group of ▮▮▮ .

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

▮▮▮▮▮

Position/title/student status

▮▮▮▮▮

Your email address

▮▮▮▮▮

Your phone number

▮▮▮▮▮

UIN

▮▮▮▮▮

*[UNAUTHENTICATED]*

## Routing Information
Primary recipient:
**Dr. Douglas Bell (Interim Executive Director, Student Community Standards)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Dr. Douglas Bell, Interim Executive Director, Student Community Standards.

**Upshaw-Brown, Jaclyn B**

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, January 31, 2023 1:40 PM
**To:** Gardner, Jeffery D
**Subject:**

Hi, Jeff,

I've shared        with you through Filex. Passcode is

I'll be the assigned SCA for this one. On first read, I'm seeing some concerns about unauthorized PT. . . there may not be a lot more than that, since the reporting party was contradicted by those whom he says were hazed on most of the incidents. I'll finish reading more thoroughly this afternoon and keep you posted.

Thanks,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**Upshaw-Brown, Jaclyn B**

**From:** Bell Jr, Douglas
**Sent:** Thursday, January 5, 2023 11:41 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** FW: Report

I have put this report within your scans folder.

**Douglas Bell, Ph.D.** | Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, December 23, 2022 11:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:**

The       Investigation Report is complete. The final report and the two audio recordings can be found here:
   \Investigations\Active Investigations\In Progress _


Have a great break!

**Audrey Winking**| Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Tuesday, February 7, 2023 9:13 AM |
| **To:** | Pearce, Jeffrey Scott |
| **Subject:** | FW: |
| **Attachments:** | statements.docx; Night Incident - ███ (1).pdf; ███ Statement.docx; ███ |
| | ███ written report.docx; Incident Report.pdf; ███ - Google Docs.pdf; Statment .pdf; |
| | Statement - Google Docs.pdf; ███ Paper.docx; CDT ███ Personal Statement.docx; |
| | ███ Incident 01_15_23.pdf; FDT Written Statement.docx |

As discussed. Let me know if you run into questions!

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 Jjaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 2, 2023 9:08 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:**

Good morning,

Attached are the statements from the members of the ███. Let me know if you have questions. Enjoy your day.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

## Upshaw-Brown, Jaclyn B

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, January 17, 2023 2:13 PM
**To:** Bell Jr, Douglas
**Cc:** Winking, Audrey J; Gardner, Jeffery D
**Subject:** FW: FW: [Maxient]        College Station - Off Campus      B:00 PM

Good afternoon, Dr. Bell,

Please see below for an incident report and some initial follow-up regarding alleged hazing of ████████ leaders.

I believe these allegations warrant further investigation.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** ████████ ████████
**Sent:** Tuesday, January 17, 2023 11:56 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: FW: [Maxient]      College Station - Off Campus     8:00 PM

Howdy!

I became aware of this information when I asked ████████ why he had the wok in his room, and he explained the details I provided about the situation.

I know it occurred on Sunday night, ████ at around 6:30pm.

I do not know any names of those who were subjected, all he explained was that they did this to all ████████ members.

Sincerely,
████████

On Tue, Jan 17, 2023 at 11:17 AM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

> Howdy ████
>
>
> Thank you for bringing this matter to the University's attention.

So that we can determine an appropriate path forward in looking into this issue, I wondered if you could answer a few preliminary questions:

- How did you become aware of this information?
- Do you know approximately when this occurred?
- Can you provide names of any of the individuals who were subjected to this behavior?

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

From: ▮▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
Sent: Sunday, January 15, 2023 8:36 PM
To: Sellers, Tyler B <tsellers@stuact.tamu.edu>
Subject: [Maxient]         College Station - Off Campus         8:00 PM

**This Message Is From an External Sender**
This message came from outside your organization.

Secondary recipient (you were copied)

**Campus Community Incident Report**

## Background Information

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

## Involved Parties

() Organization

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

██████████████████ and other ████ leadership blind folded ████ members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.

## Supporting Documentation

**No additional documents were attached to this report.**

## Submitted By

Your full name

Position/title/student status
**Student**
Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:

- Tyler Sellers
- jhbrown@stuact.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

**Message sent by Maxient**
**Replies will be sent to the submitter**

# Upshaw-Brown, Jaclyn B

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, January 24, 2023 5:31 PM
**To:** Bell Jr, Douglas; Winking, Audrey J
**Subject:** FW: Investigations

Thoughts on this???

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:27 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations

Thank you. Is there any chance I could go ahead and get statements from the                          to help speed up the process?

V/R

> On Jan 24, 2023, at 4:01 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:
>
> Sure! I'll Filex them to you. Please use the access codes below.
>
> After reviewing        , I would agree with Jamyia that there's not enough here to support issuing charges. I do have some lingering questions about the references to conversations that the CTO had with the outfit early in the fall semester where            was left with the impression that the CTO felt hazing was happening; do you know anything more about that?
>
> Additionally, I wanted to give you an update regarding the timeline for the        investigation. Audrey will be working on it with a representative from the Corps. We would expect interviews to start no earlier than late next week, as she is currently attending the ASCA conference and will be wrapping up a different report early next week.
>
> **Access codes:**
>
>
> Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations

Good morning Ma'am,

Just a quick question. Will I be able to review the investigation reports before they are charged out? I believe I can provide some insight and context.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

# Upshaw-Brown, Jaclyn B

**From:** Sellers, Tyler B
**Sent:** Tuesday, January 17, 2023 9:39 AM
**To:** Upshaw-Brown, Jaclyn B
**Cc:** Bell Jr, Douglas; Dobiyanski, Victoria E; Brown, Josh; Moore, Erica
**Subject:** FW: [Maxient]        College Station - Off Campus - 01/15/2023 8:00 PM
**Attachments:**

Howdy Jaclyn,

Please see below and attached for an IR we received related to activities within                    which may constitute violations of student rules. As this is a Corps unit, I'll have Erica forward you the IR in Maxient so you can determine next steps with Corps staff partners. Let us know regarding any questions or support you may need on our end. Thanks.

-Tyler

**Tyler Sellers** | Assistant Director
SOLAD & Community Expectations and Conduct
Department of Student Activities | Texas A&M University
125 John J. Koldus Building, 1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2953 | tsellers@stuact.tamu.edu | studentactivities.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Sunday, January 15, 2023 8:36 PM
**To:** Sellers, Tyler B <tsellers@stuact.tamu.edu>
**Subject:** [Maxient]        College Station - Off Campus        8:00 PM

## This Message Is From an External Sender
This message came from outside your organization.

Secondary recipient (you were copied)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

**Involved Parties**

() Organization

## Incident Description
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

██████████████████████ and other ████████ blind folded members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

████████████

Position/title/student status
**Student**
Your email address

████████████████████

Your phone number

██████████

UIN

████████████████

## Routing Information
Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
• Tyler Sellers
• jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Wednesday, March 1, 2023 10:32 AM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Subject:** | Fwd: OCJ |
| **Attachments:** | OCJ-　　.pdf |

Sorry for the delay

Douglas Bell

Please excuse any typo, message sent from I-Phone

Begin forwarded message:

> **From:** "Berry, Carrie M" <cberry@vpsa.tamu.edu>
> **Date:** February 22, 2023 at 4:27:37 PM CST
> **To:** "Bell Jr, Douglas" <douglasb@vpsa.tamu.edu>
> **Subject: RE: OCJ**
>
> Thanks,
> Carrie
>
> **From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> **Sent:** Wednesday, February 22, 2023 4:04 PM
> **To:** Berry, Carrie M <cberry@vpsa.tamu.edu>
> **Subject:** RE: OCJ
> Good Afternoon. Nothing is attached. You can just scan the memo.
> **Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
> **From:** Berry, Carrie M <cberry@vpsa.tamu.edu>
> **Sent:** Wednesday, February 22, 2023 3:57 PM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> **Subject:** OCJ
> Doug-
> Off campus incident for　　　　　　memo attached.
> Do you want me to just scan the memo in the future or do you need the
> attachments as well?
> Carri
> **Carrie Berry |** Sr. Administrative Coordinator
> Office of the Vice President for Student Affairs | Texas A&M University

1

1256 TAMU | College Station, TX 77843-1256
ph: 979.845.4728 | c-berry@tamu.edu

- - - - - - - - - - - - - - - - - - - - - - - -

**TEXAS A&M UNIVERSITY**

**Upshaw-Brown, Jaclyn B**

---

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Friday, January 6, 2023 1:43 PM
**To:** Winking, Audrey J; Barrett, Jamyia C; Doughty, Jeanae
**Cc:** Bell Jr, Douglas
**Subject:** Investigations

Hi, all!

After looking at the two bigger investigations that have recently come in, here is what I'm thinking in terms of assignments:

- : Jeanae and Jaclyn to team up as SCAs.
- Jamyia and Audrey to team up as SCAs
  - o Note: We are still uncertain whether more information relevant to this org/investigation is forthcoming from the individual who contacted OFSL shortly before the break. I've checked in with CREI to see if they've heard from      OFSL has provided contact information so I can follow up with     if not. But I figured y'all could at least start reading, making your list of who might be charged and what type of process, drafting charges, etc. while we figure that out.

Each investigation came with some video/audio files; I've put those into the main Scans→Investigations folder for now.

Please let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

| | |
|---|---|
| Nature | **College Station** |
| Urgency | **Recognized Student Organization** |
| Incident Date and Time | **8:00 PM** |
| Incident Location | |

Reported by
Name:
Title:
Email: ███████████████████████
Phone: ██████████
Address: ██████████
**[UNAUTHENTICATED]**

Involved Parties

███████████████    ███████████

Organization

Incident Description
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

████████████████████████ **and other** ██████████████ **blind folded team members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.**

*Pending*
*Submitted from* ████████████ *and routed to Erica Moore (Administrative Coordinator, Department of Student Activities). Processed by routing rule #189.*
*Copies to: tsellers@stuact.tamu.edu,jhbrown@stuact.tamu.edu*



**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Tuesday, February 21, 2023 11:32 AM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | OCJ request |
| **Attachments:** | OCJ request.pdf |

Hi, Doug,

Please see the attached request for OCJ and let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

DIVISION OF STUDENT AFFAIRS
OFFICES OF THE DEAN OF STUDENT LIFE



## MEMORANDUM

DATE:        February 17, 2023

TO:          BG Joe E. Ramirez, Jr., USA (Ret.)
             Interim Vice President for Student Affairs

THROUGH:     Dr. Douglas Bell
             Executive Director, Student Community Standards

FROM:        Jaclyn Upshaw-Brown *Jaclyn Upshaw-Brown*
             Interim Director, Student Conduct Office

SUBJECT:     Disciplinary Action for an Off-Campus Incident

On                    the Assistant Commandant for Discipline submitted to the Student Conduct Office a series of statements from current and former                              regarding an incident on               According to the statements,                  and              were instructed to report to Hensel Park and bring their Corps beanies. Once at the park, they were met by         who told them to pull their beanies down over their eyes and then drove them to a location that was undisclosed to the              at the time (the home of a               and           TAMU student). At the home, the               were informed they would each be expected to eat a 12-egg omelet, competing for the fastest time. Some              reported hearing comments that suggested failing to finish would result in negative consequences, though it does not seem they were explicitly told what those ramifications would be. Several statements reflect that two or three of the             felt ill and/or vomited as a result of eating the omelets. Finally, one report indicates that one of the upperclassmen consumed alcohol while                during the event.

Given this conduct occurred off campus and in order to address the totality of the situation, I recommend that the University be granted permission to further investigate and, if necessary, issue disciplinary charges. In accordance with University Student Rules 24.3, disciplinary action for an off-campus offense will be taken only when, in the judgment of the Vice President for Student Affairs, action is warranted.

Attached to this request memo is the packet of statements.

Approved/Disapproved

_____          2/22/2023
BG Joe E. Ramirez, Jr., USA (Ret.)                     Date
Vice President for Student Affairs

ENCL:   FDT statements

Student Conduct Office                          Tel. 979.847.7272   Fax 979.845.6136
Student Services Building, Suite 309            scrs@tamu.edu
1257 TAMU                                       http://studentlife.tamu.edu/sco
College Station, TX 77843-1257

**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | ████████████████████████████ |
| **Sent:** | Wednesday, January 18, 2023 12:46 PM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Subject:** | Re: FW: [Maxient]            College Station - Off Campus            8:00 PM |

Thank you. I appreciate your concerns, and for letting me know quickly.

On Tue, Jan 17, 2023 at 2:52 PM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

Thank you, ████ You may be hearing from our investigations team in the coming weeks; please be on the lookout for communication from them via email.

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** ████████████████████████████████
**Sent:** Tuesday, January 17, 2023 11:56 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: FW: [Maxient]            College Station - Off Campus            8:00 PM

Howdy!

I became aware of this information when I asked ████████████ why he had the wok in his room, and he explained the details I provided about the situation.

I know it occurred on Sunday night,          at around 6:30pm.

I do not know any names of those who were subjected, all he explained was that they did this to all
          members.

Sincerely,

████████████

On Tue, Jan 17, 2023 at 11:17 AM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

Howdy, ████

Thank you for bringing this matter to the University's attention.

So that we can determine an appropriate path forward in looking into this issue, I wondered if you could answer a few preliminary questions:

- How did you become aware of this information?

- Do you know approximately when this occurred?
- Can you provide names of any of the individuals who were subjected to this behavior?

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jaclynu@sco.tamu.edu | sco.tamu.edu

**From:** ▮▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Sunday, January 15, 2023 8:36 PM
**To:** Sellers, Tyler B <tsellers@stuact.tamu.edu>
**Subject:** [Maxient]                    College Station - Off Campus                    8:00 PM

**This Message Is From an External Sender**
This message came from outside your organization.

Secondary recipient (you were copied)

## Campus Community Incident Report

### Background Information

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

### Involved Parties

▮ () Organization

### Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words,

phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."
██████████████████ and other ████████ blind folded
▓▓▓ ▓▓▓ ▓▓▓ members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.

## Supporting Documentation

**No additional documents were attached to this report.**

## Submitted By

Your full name
██████████

Position/title/student status
**Student**
Your email address
██████████████

Your phone number
██████

UIN
██████

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
• Tyler Sellers
• jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

**Upshaw-Brown, Jaclyn B**

**From:** Doughty, Jeanae
**Sent:** Tuesday, January 17, 2023 8:20 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** RE: Investigation Report

Oops! Sorry about that. Will do! Thanks!

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, January 17, 2023 8:18 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Investigation Report

Hi, Jeanae,

There's no attachment here. Also, Dr. Bell should be the one to receive completed investigation reports!

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Friday, January 13, 2023 5:40 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigation Report

Hey Jaclyn,

I am attaching the Investigation Report for                    Please let me know if you have any questions. Have a great
weekend 😊

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Wednesday, January 25, 2023 12:48 PM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Subject:** | Re: Investigations |

Very well. Thank you.

> On Jan 25, 2023, at 12:34 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:
>
> If it were me, I would probably try something like:
> "There has been a report regarding an alleged hazing event that occurred around            involving upperclassmen requiring                          to eat a large quantity of eggs. The Student Conduct Office will be investigating this allegation. In order to expedite and streamline that process, and in accordance with the expectation to report hazing within the Student Conduct Code, anyone who has information about this incident is asked to submit a written statement detailing their knowledge of what occurred."
> Of course, you are welcome to wordsmith so that it makes sense to you/them.
> Jaclyn
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, January 25, 2023 12:26 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** RE: Investigations
Very well. How would you recommend I ask?
Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Wednesday, January 25, 2023 12:23 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigations
If you want to request written statements from the students who may have additional information, that may help guide the investigation process. The framing of that request will be important, in that it truly needs to be a request and not a situation where we are seen as coercing or threatening students.
**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172
ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:27 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations
Thank you. Is there any chance I could go ahead and get statements from the                                    to
help speed up the process?
V/R

> On Jan 24, 2023, at 4:01 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:


> Sure! I'll Filex them to you. Please use the access codes below.
> After reviewing        I would agree with Jamyia that there's not enough here to support
> issuing charges. I do have some lingering questions about the references to
> conversations that the CTO had with the outfit early in the        semester where
> ▮▮▮▮        was left with the impression that the CTO felt hazing was happening; do you
> know anything more about that?
> Additionally, I wanted to give you an update regarding the timeline for the
> investigation. Audrey will be working on it with a representative from the Corps. We
> would expect interviews to start no earlier than late next week, as she is currently
> attending the ASCA conference and will be wrapping up a different report early next
> week.
> **Access codes:**


> Jaclyn
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations
Good morning Ma'am,
Just a quick question. Will I be able to review the investigation reports before they are
charged out? I believe I can provide some insight and context.
V/R
Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Wednesday, January 25, 2023 4:50 PM |
| **To:** | Gardner, Jeffery D |
| **Cc:** | Bell Jr, Douglas |
| **Subject:** | Re: Investigations |

Okay. Bases on what we have, there's not enough information to support issuing Student Conduct charges to a specific individual at this time; the specific actions discussed in the interviews that might have been chargeable could not be attributed to a particular person. Please let me know if you learn anything else that might change that decision.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 |jaclynu@studentlife.tamu.edu| studentlife.tamu.edu/sco
– – – – – – – – – – – – – – – – – – – – – – –
**OFFICES OF THE DEAN OF STUDENT LIFE** | Supporting [YOU]

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, January 25, 2023 4:44 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations
I do not. However,      leadership, CTO, the cadets in question and I are going to have a nice discussion.

V/R

> On Jan 25, 2023, at 4:17 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

Thank you! Did you have any additional context regarding the      conversations referenced below?
**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172
ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, January 25, 2023 2:58 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** RE: Investigations
Howdy Ma'am,

I spent an enjoyable and educational afternoon reading the two reports you provided. I'm available to discuss should my input be needed.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>
<span style="color:maroon">Assistant Commandant for Discipline</span>
<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>
<span style="color:maroon">979-458-9317</span>

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:02 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigations

Sure! I'll Filex them to you. Please use the access codes below.

After reviewing         I would agree with Jamyia that there's not enough here to support issuing charges. I do have some lingering questions about the references to conversations that the CTO had with the outfit early in the        semester where              was left with the impression that the CTO felt hazing was happening; do you know anything more about that?

Additionally, I wanted to give you an update regarding the timeline for the        investigation. Audrey will be working on it with a representative from the Corps. We would expect interviews to start no earlier than late next week, as she is currently attending the ASCA conference and will be wrapping up a different report early next week.

**Access codes:**


Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172
ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations

Good morning Ma'am,

Just a quick question. Will I be able to review the investigation reports before they are charged out? I believe I can provide some insight and context.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>
<span style="color:maroon">Assistant Commandant for Discipline</span>
<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>
<span style="color:maroon">979-458-9317</span>

**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Friday, April 28, 2023 11:48 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Upshaw-Brown, Jaclyn B; Winking, Audrey J; Anderson, Chauncy Jovan |
| **Subject:** | Re: [Maxient]       College Station - On-Campus Grounds |

Msg t Anderson is your man. He is copied on this email.

V/R

> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
> **Sent:** Friday, April 28, 2023 9:35 AM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
> **Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Subject:** FW: [Maxient]      College Station - On-Campus Grounds
>
> Good morning, Dr. Bell and Audrey,
>
> Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences running for
>
> We have confirmed that surveillance footage from        is not likely to be available due to the amount of time that has passed.
>
> Please let me know if you have any questions.
>
> Thank you,
> **Jaclyn Upshaw-Brown**  | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]                College Station - On-Campus Grounds                2

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B
<jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

Thank you for your assessment of the information provided.  We would still like to do our due diligence
to ensure everything is above board and not assume any details within this incident report. So again, do
you know how we would go about figuring out who would have been in the pool of candidates for
        Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - -

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]                    College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]           College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the current and prospective
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
for          ' We'll also be checking to see if security footage from          is available (although we
suspect it may not have been retained this long, since the alleged incident in          occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]           College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
                  () Alleged Offender
            () Alleged Offender
                  () Alleged Offender
      () Alleged Offender

4

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

| | |
|---|---|
| **From:** | Crawford, Dr. Tia |
| **To:** | Winking, Audrey J |
| **Subject:** | Investigation - Final Report |
| **Date:** | Wednesday, October 11, 2023 10:43:52 AM |

Audrey,

I have completed the       Investigation final report. It is labeled     *Investigation – Final* and located V:\Working Groups\DSA Investigators\      Investigation\REPORT PREP\Final Report.

Please let me know if you need anything else.

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| | |
|---|---|
| **From:** | Crawford, Dr. Tia |
| **To:** | Winking, Audrey J; Brummett, Kevin L |
| **Subject:** | RE: Investigation |
| **Date:** | Friday, September 22, 2023 12:49:25 PM |

Thank you, Audrey!

Howdy Kevin! I look forward to working with you.

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 12:27 PM
**To:** Brummett, Kevin L <kbrummett@corps.tamu.edu>; Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** Investigation

Good afternoon,

I wanted to introduce you two, as you will be working together on the        investigation.  Tia has graciously agreed to help me out during this busy time by taking the lead on this investigation.  I will do my best to assist you all throughout the process if anything comes up that you need help with!

Thanks so much for your help with this investigation!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

No worries at all, just wanted to check back in!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, October 6, 2023 2:28 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: investigation

Audrey,

My deepest apologies as I was tasked with a last-minute project and got swamped. I will get this completed and sent to you ASAP!!!

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 6, 2023 1:15 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: investigation

Hey Tia,

Just wanted to check in to see how things were going with the report? Is there anything I can do to help you?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:31 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: investigation

Hi Audrey,

No worries. I've been in and out of meetings all day as well. Thanks again for helping us troubleshoot the technology. I will know moving forward how to do it. But the last two interviews went well. We do not believe we need to have additional interviews. The two that we interviewed have until tomorrow to send additional information. Both indicated that they might actually send something. So, we will see.

I have blocked a couple of hours on tomorrow to knock out the report for it. The only thing I may need is to have you look at the report to make sure I have done it correctly.

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:18 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** investigation

Hey Tia,

Sorry for not checking in sooner, it's been a crazy week!  But I wanted to see how interviews went for the      investigation and if you need anything from me moving forward?

Best,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

Good deal! Thank you!

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities | Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514 | dr.tia@tamu.edu | stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 3:29 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

I think just you two is fine!

**Audrey Winking** | Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | audrey_winking@sco.tamu.edu | sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 1:32 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: Shared Folder Access

One more question, should I copy you on the communication? Or just Kevin & me?

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities | Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514 | dr.tia@tamu.edu | stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 1:26 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

Yes! I reserved            (the other panel room, not the one we were in this morning) for all of those times!

For the students' interview notices, you'll just put "X date at X time in the Student Services Building,            " (not the exact room) so they just check in and then our student worker will let you know when they check in.

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 1:14 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: Shared Folder Access

Audrey,

Are there rooms available for the following:

Monday, Sept. 25th, 9am – 10am – Investigator Touch Base
Tuesday, Sept. 26th, 9am-10am – Conduct Meeting
Wednesday, Sept. 27th, 9:30am-10:30am – Conduct Meeting
Wednesday, Sept. 27th, 10:30am-11:30am – Conduct meeting

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 12:46 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

I created a document called "Notes Formatting Directions" in the DSA Investigators Drive. Hopefully it makes sense, but I tried to make a step by step for how to format the notes pages after the

interview so that the student can review and sign them.

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Friday, September 22, 2023 12:28 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

Wonderful! I am working on adding documents to the folder in that drive now.

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 10:54 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Shared Folder Access

Audrey,

I found the DSA Investigators Folder and I do have access.

Thank you,
Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Monday, December 11, 2023 12:24 PM |
| **To:** | Harrell, Kristen |
| **Subject:** | Memo |
| **Attachments:** | Case Memo -              .docx |

Please let me know if you need any additional information.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.



**MEMORANDUM**

DATE:          April 12, 2024

TO:            BG Joe E. Ramirez, Jr., USA (Ret.)
               Vice President for Student Affairs

THROUGH:       Dr. Kristen Harrell
               Assistant Vice President for Student Affairs

FROM:          Dr. Douglas Bell
               Director, Student Community Standards

SUBJECT:       Case

---

Several reports were submitted by cadets who had their            taken by alleged fraternity members. Only three of the alleged fraternity members were identified, so they were interviewed. Each of them are members of different fraternities. There was also an incident where the Student Conduct Office was unable to identify the alleged violators.

During the Student Conduct Office investigation, it was discovered that members of the Corps chased an individual in an effort to retrieve the            . One of the alleged students who took the            has a class with one of the members from the Corps.  Through our investigation, it is alleged that the alleged thief had to skip class because there were "like 20 people waiting" for him at his class, which is why there was an additional complicity charge.

During the Student Conduct Office Investigation, it was discovered that when one of the alleged thieves ran with the            , members of the Corps gave chase and "subdued him from behind."  Another member from the Corps "secured the individual's leg with his upper body."  When the alleged thief complied and gave the spurs back, a Corp member "straddled him," and when he tried to get up after no longer being in possession of the Spur, the Corp member "pushed him back down and said, 'get up pussy'.  As the alleged thief walked away, the members of the Corps kept taunting him.  The alleged thief had his phone shattered when he was tackled to the ground and had multiple bruises and scrapes.

The decision to charge both the alleged thieves and the members of the Corp of Cadets stemmed from the information that was collected during the interview process.  The Assistant Commandant for Discipline was involved with the Corps administrative hearing and did not provide any resistance regarding the charges or sanctions.


Charge
- Theft
    - Accepted Responsibility
Sanction
- Conduct Review through
- Ethics and Decision-Making Workshop



Charge
- Theft
    - Accepted Responsibility

Sanction
- Conduct Review through
- Ethics and Decision-Making Workshop

Charge
- Theft
    - Accepted Responsibility

Sanction
- Conduct Review Through
- Ethics and Decision-Making Workshop

(Co Adjudicated with Lt. Col. Gardner)

Charges
- Physical Abuse
    - Accepted Responsibility
- Harassment
    - Not Responsible
- Complicity
    - Accepted Responsibility
- Corps – Conduct Unbecoming a Cadet
    - Accepted Responsibility

Sanctions
- Conduct Review through          (Case Heard November 28th)
- Corps Review
- Ethics and Decision-Making Workshop

(Co Adjudicated with Lt. Col. Gardner)

Charges
- Physical Abuse
    - Found Responsible
- Damages
    - Not Responsible
- Corps-Conduct Unbecoming a Cadet
    - Found Responsible

Sanctions
- Conduct Review through
- Corps Conduct Review
- Ethics and Decision-Making Workshop

(Co Adjudicated with Lt. Col. Gardner)

Charges



- Physical Abuse
    - o Found Responsible
- Damages
    - o Not Responsible
- Corps-Conduct Unbecoming a Cadet
    - o Found Responsible

Sanctions
- Conduct Review through
- Corps Conduct Review
- Ethics and Decision-Making Workshop


Charges
- Physical Abuse
    - o Not Responsible
- Corps-Conduct Unbecoming a Cadet
    - o Not Responsible


In closing, all of the respondents who were alleged to have stolen the        expressed remorse and thought that this was a standing tradition.  All of the alleged thieves demonstrated some level of reflection prior to their administrative conference.



Douglas Bell, Ph.D.
Director of Student Community Standards

| **From:** | Bell Jr, Douglas |
|---|---|
| **Sent:** | Tuesday, February 21, 2023 11:59 AM |
| **To:** | Ramirez Jr, Joe E |
| **Cc:** | Smith, Cindy M; Barrett, Sandra; Harrell, Kristen |
| **Subject:** | FW: OCJ request |
| **Attachments:** | OCJ request.pdf |

Howdy BG Ramirez,
Please see attached OCJ. Please let me know if you have any additional questions.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, February 21, 2023 11:32 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** OCJ request

Hi, Doug,

Please see the attached request for OCJ and let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu



**MEMORANDUM**

DATE:          February 17, 2023

TO:            BG Joe E. Ramirez, Jr., USA (Ret.)
               Interim Vice President for Student Affairs

THROUGH:       Dr. Douglas Bell
               Executive Director, Student Community Standards

FROM:          Jaclyn Upshaw-Brown
               Interim Director, Student Conduct Office

SUBJECT:       Disciplinary Action for an Off-Campus Incident

_____

On February 2, 2023, the Assistant Commandant for Discipline submitted to the Student Conduct Office a series of statements from current and former                                    regarding an incident on                . According to the statements,                    and             were instructed to report to Hensel Park and bring their Corps beanies. Once at the park, they were met by         , who told them to pull their beanies down over their eyes and then drove them to a location that was undisclosed to the                 at the time (the home of a                 advisor and         TAMU student). At the home, the                 were informed they would each be expected to eat a 12-egg omelet, competing for the fastest time. Some                 reported hearing comments that suggested failing to finish would result in negative consequences, though it does not seem they were explicitly told what those ramifications would be. Several statements reflect that two or three of the                 felt ill and/or vomited as a result of eating the omelets. Finally, one report indicates that one of the upperclassmen consumed alcohol while                 during the event.

Given this conduct occurred off campus and in order to address the totality of the situation, I recommend that the University be granted permission to further investigate and, if necessary, issue disciplinary charges. In accordance with University Student Rules 24.3, disciplinary action for an off-campus offense will be taken only when, in the judgment of the Vice President for Student Affairs, action is warranted.

Attached to this request memo is the packet of statements.

Approved/Disapproved


_____          _____
BG Joe E. Ramirez, Jr., USA (Ret.)                                                      Date
Vice President for Student Affairs

ENCL:    FDT statements

Student Conduct Office
Student Services Building, Suite 309
1257 TAMU
College Station, TX 77843-1257

- 2221 -

Tel. 979.847.7272   Fax 979.845.6136
scrs@tamu.edu
http://studentlife.tamu.edu/sco

Personal Statement

On Sunday                    at 6:00PM, the                              and                arrived at a park off campus where we were instructed to park and bring beanies. A few minutes later,                     and                arrived, where we got into their cars and blindfolded ourselves with our beanies.                drove with                                             and myself, and we drove a few minutes to                                      residence, where we waited for everyone to arrive. Once everyone was there, we were told that we would be cooked a plate of a dozen eggs to eat with whatever toppings we liked as fast as possible with the intent of us needing to finish to remain with the team or potentially face some unknown consequences as well as competing for the record time. We all hung out as                    with help from the other                                        and                cooked each plate of eggs.                    ate the first plate of eggs within a few minutes while everyone else watched, socialized, and played board games. I do not remember exactly who went after her, but I believe I was around the      person to begin eating, going after                and before                        . I ate for about 1 hour and 40 minutes and completed my                              during this time. At some point                ate her eggs within a couple of minutes, and she called                    to be able to see how fast she could eat. I was quite spaced out and was otherwise focused on eating for the rest of the time, so I am not aware of too much of what else was going on, although I believe it was mostly just people catching up and socializing. The                and                took an egg shot at some point during this time frame, and people were eating ice cream and pizza while they continued to socialize. Before I finished eating, the                        made                stop eating the eggs because she was having an adverse reaction to the eggs and was throwing up, and they did not wish for her to continue eating since it was making her sick. They noted expressly that they did not care that she did not finish and wanted to prioritize health and wellbeing first. I finished eating shortly after                    stopped eating and I myself was not feeling well physically and was overstimulated from the social setting, so I went outside to lay down on the front porch with                    and            , and                              stayed outside with us for a while as well. We stayed outside for the remainder of the time at the house, maybe an hour, as we waited for everyone else to finish eating. Other people came outside to check on us and bring us water or ice cream if we wanted, including                                                                . Once                    , the last person to eat, was finished eating, we went inside to regroup before leaving. We split back up into cars and drove back to the park, picked up our vehicles and drove back to campus, where we all met in the            . We were given our                              and then left, and I returned back to bed.

I would like to write a statement concerning the alleged incident concerning the                    which occurred on                    . I dropped in for approximately 5-10 minutes in order to say hello to everyone after they had finished hell week before the rest of the corps returned from Christmas. From what I saw, everyone that was there was watching the NFL playoff games that were occurring that night, playing board games and talking. After saying hello to everyone there, I left the location as I had a prior commitment later that night.

Very Respectfully,

The                    were instructed to meet at a park and stay in their cars until they were told otherwise. There were a total of three cars of                    sense we all car pulled. About 7-10 min after we were told to be there the          pulled into the parking lot and walked up to our cars. They told us to get out of the cars and put on our corps beanies over our eyes. We then were separated into groups to fit into different cars. We held onto each other's shoulders and were guided by a          . I was in the backseat of a truck making jokes with my buddies.                    was sitting next to me and we started to play a game of sticks , a finger counting game that many elementary schoolers play. When the short car ride was over we piled out of the car and were led inside. We were then sat down on a couch and waited till everyone had made it. After everyone had gotten there we were told to take off our beanies to see a combination of current and past          . Soon after music was turned on and people started playing board games, such as Secret Hittler, and picking out what they wanted in their omelets. It was explained to us that it was a competition to see who could eat it the fastest.          was the first to go and she finished fast. After her I don't really remember the order. The others such as                    took a really long time to finish. In fact          started to not feel good from the eggs and was told to stop. She didn't finish. After you finished eating the eggs you just went back to the party. They had ice cream for after you had finished as well. Some time after I had finished I ended up sitting on the front porch with                    . The music was really loud inside so it was nice to just get a breath of fresh air and talk about all the stories we had from          and the Corps in general. Periodically someone, whether it was one of our buddies or an upperclassman, would come outside and check on us. After everyone was done and the night had come to an end, we were driven back to the park where the cars were or back to campus depending on if you were the person who drove or not. All the current          and          then met in the          room and we were given out                    . Then everyone dispersed and went back to their rooms for the night.

On                 , we parked in Hensel Park at 1800, turned the cars off and waited there until the             told us to get out of the car, put on the Corps issued beanie and put it over our eyes. They guided us to their cars and drove us for about five minutes. When we arrived, they carefully led us inside and sat us down before telling us to take the beanie off. All of the                    team was there along with the        from last year and some of the team from the            They told us that we were all going to eat dozen egg omelets, and why that was a tradition. I told them that I had a slight sensitivity to eggs which makes my stomach a bit upset, but I refused the option of vegan eggs that they wanted me to eat and instead insisted on eating normal eggs.        was in the kitchen making the eggs however we wanted them to be made. While she was making them, more and more of the past      came in. Half of the             had no problem eating the eggs, but            who were before me were struggling. The three of us took about an hour and a half to finish the eggs. After I had thrown up a second time, they made me quit even though I wanted to finish.

Since it was so loud inside from everyone cheering, playing games, and having a good time, I went outside to breathe with          and       went out with us to make sure we were doing alright and talked with us while       would poke his head out and make sure we didn't need anything and gave us ice cream to help settle our stomachs. We visited outside until the remaining         finished and we were called back inside to ask who we thought got 15 eggs. We easily reached the conclusion that        and        were the ones who ate 15 eggs. We were then told to go to the       So we got back into the       cars to go back to the Park and get our cars. We then drove back to campus and went to the       where they gave us the          .

On                    me and my                        buddies were told me go to a location that is close to campus and arrive hungry. After we arrived at the park our                        pretended to kidnap us and drove us to a house where we were surprised with the company of                    and from

It was explained to us that it was an old tradition for the                        back in the day to eat for time a large omelet that was served at a restaurant that is now closed. The offered us to partake in this friendly competition to eat omelets that they made for us with whatever toppings we wanted in the omelet. All of my buddies partook in this friendly competition and me and my buddies cheered each other on as each of us ate an omelet. After we finished we were drove back to get our cars and arrived back on campus.

Overall, the night was very memorable and brought me and my buddies together in a positive way while being around past                    that we love being around.

This concludes my statement,

Very respectfully,

This account is told from the perspective of

On Sunday,                        , the                        were informed that they would be meeting at Hensel Park and to bring a Corps issued beanie with us. Once arrived at around 1610 current          on the team instructed us to put the beanies on and pull them down over our face. I was guided to the          car and drove to a location that I did not know about. Once we arrived I was guided out of the car and into a room where I sat down. After everyone arrived we were told to remove our beanies so that we could see, and we realized that we were in a living room sitting down on a couch. Around us were our former          who we said hi to. The                   were all gathered onto the couch and the          explained the situation about having to eat a dozen egg omelets. They explained the rules of the competition and how we would want to eat as fast as possible.

We then got up and greeted and joked around with our                    and          and were plenty happy to see all of them. We made an order of who was going to eat the eggs, and we were all allowed to customize the omelets we were given. As the night progressed we would make jokes around those eating, play board games with each other. The night continued on with those eating the eggs able to take breaks, eat at their own pace, watch tv or Youtube, or anything they wanted. The rest of us just talked and joked around, discussed          within the team and continually checked on those eating. No events within that time really stood out.

After the last person had finished eating they gathered us onto the couch and explained to us the tradition of the egg eating and that there used to be a diner where the          would all order a 12 egg omelet. They explained that when the diner closed they started making their own and that punishment for not finishing would mean a giant smoke session with the          . Finally they let us know that before          was disbanded, the                    used to add extra eggs into their meals. They let us know that                    were the ones to receive this tradition and that it was based on someone's personality. We were free to leave after that and we all went back to the          and received our                    and we all joked around for a bit and then went back to the dorms.

This is                    , one of the                              . This email is my written statement of the event.

On                  we were told to drive to 502 College Ave (Hensel Park) at 1800 and to bring our Corps issued beanie. Once there, we waited in our cars for about 5 minutes before the arrived. When they arrived they told us to get out of our cars and to put our beanies over our eyes. We were then guided into the cars of upperclassmen.   was with two other                        . We were driven to                house, a           student and previous          Once there we were brought in and moved to a couch in the room then were told to take our beanies off. We saw all of the current                              and some of our from when we were      . They then told us about the dozen egg omelet and the story behind it. After Hell Week, the           would go to a diner and the                would order the 12 egg omelet on the menu. When the diner took the omelet off the menu, the             didn't want the tradition to die so they decided to start making the omelets themselves. We were told to pick an order to eat in. I was the       one to go. When it was my turn,                asked me what all I wanted in my omelet. I chose cheese, ham, and bacon and she made the omelet. It took me over an hour to eat and while I was eating a few more former                                              ) walked in. Once I finished I started talking to everyone again. I encouraged my buddies when it was their turn to eat.                          , started to get sick and was told to stop eating. After everyone was done eating, we stayed at the house talking for about another hour before getting rides back to the park for the cars or back to the quad.

That is my statement of the event.

Very Respectfully,

On                    after the first        mock drill meet of the semester,                                        and buddies were told to keep the following evening open around 1830 and to be hungry. The next day around 1400 we were notified through the Microsoft teams chat to arrive at Hensel Park at 1800, bringing our corps issued beanies. After we arrived at the park we saw the                          and             drive up and approach our cars. We were instructed to get out and pull our beanies down over our eyes. They led us in groups of 2-3 to their cars and helped us in. I ended up in a car with             and we sat in the back of the car trying not to laugh as                          put music on the radio and drove us away from the park. None of the three of us spoke during the car ride. When the car stopped        led us out of the car and into a house where we were led to a couch and told to sit down. I could hear my other            buddies sitting around me on the couch as well as some familiar voices of past upperclassmen on the team. We were all laughing and talking and someone told us to "take the beanies off already". When I opened my eyes I saw several of my old advisors including            and                       . We were briefly told about the competition of eating 12 egg omelets and when asked who wanted to go first I raised my hand excitedly because I am a competitive person. We were told of the previous record of three minutes and fifty-three seconds, as well as given the opportunity to choose toppings for our omelets. While everyone else, all                            as well as most of the             from last year, played board games and conversed,             was cooking the omelets for             to consume. The omelets took awhile to cook, but when each one was completed the next             in line would have someone begin their timer and start eating. When my omelet was done being cooked I fully intended to break the previous record and I finished eating in                        . Everyone else took varying lengths of time to finish their omelets, with            beating                       and             taking over ninety minutes. Several people threw up during or after eating their omelets including                          ,             While each             either waited their turn to eat or hung around after they were finished, we had fun talking and catching up with people we hadn't seen in nearly a year due to being in                       or due to their            . We intermittently cheered on our buddies who were still eating and sat around reminiscing about       last year. Once everyone was done eating, the                          cleaned up the dishes from cooking and eating the omelets then made sure all the             had rides back to campus or to their cars at the park. We met up in the            and received our             to commemorate the end of our                       , then we were congratulated on our hard work over the past week and released.

Very Respectfully,

I'm _____ and I am one of the _____ on the team in question. The team _____ let us know to share our side of the story and any knowledge of the event we might have to share. It is my intention to speak plainly about what happened at the event.

After our _____ meet we had our _____ and at the very end we were told to keep our schedule clear for the Evening of Sunday _____. They told us it would be fun to come with an appetite and our black corps issued beanies. On that evening we drove to a park 5 minutes away from campus and we waited for the upperclassmen to arrive. The upperclassman met us and pretended to kidnap us by pulling our beanies over our heads and we drove in their cars to, which we didn't know at the time, one of the old _____ house. It was about a 5 minute drive away from campus. Once we arrived at the location though, it was revealed that all the _____ as well as our _____ were there. The reason we went to the house was to have more space and a proper kitchen.

Once there, they shared that once hell week was over, the time where the team comes back early from winter break and prepares for Tulane, traditionally the team and past _____ would go celebrate the hard work of the _____ and recount old stories. In years past, the team would go to a restaurant that offered an omelet made from a dozen eggs and the _____ would typically order one and there would be a friendly competition to see who could eat it the fastest. The restaurant has since stopped offering a dozen egg omelets so the _____ made homemade ones for us. They asked us for toppings and made it to our desire and once it had cooled enough for eating we started chowing down while recording each other's times. We cheered each other on while we waited for ours to be made, board games were played, and we enjoyed each other's company before the school year started.

At the end of the evening, we thanked our host, said our goodbyes, and we were driven back to our cars. My _____ buddies and myself enjoyed the evening and laughed about our experience on the way back to the quad.

I hope my side of the story is able to add another piece to this puzzle and I am more than willing to answer any questions anyone has on the subject. Thank you for taking the time to hear my side.

Very Respectfully,

My name is                    and I was present at the events of                    with       This is an account of events from my perspective.

On the evening of                          , myself and the other                          of the Team arrived at Hensel Park, and were instructed to bring our black beanies. We waited for approximately 5 minutes then various                    arrived. We exited our vehicles and were instructed to put the beanies on and pull them down to cover our eyes. We were guided to our upperclassman's vehicles and guided to the door handle, where we were told to get in. We were driven to another location which took about 5-10 minutes of which I was not sure where, however it was a residential location. We were then guided inside the building, still unable to see, and sat down on a couch as we waited for the rest of our buddies to arrive.

Once all of my buddies had arrived, we were instructed to remove our beanies and were greeted by the other                    . There were a decent number of people at the house, approximately 20-25. It was at this point that the purpose of us being there was presented. We were told that each member of       would attempt to eat a 12 egg omelets against the clock. We were allowed to customize the omelets with cheese, peppers, ham, turkey, and other toppings if we desired. While it was a race against the clock, we could also take as long as we needed, however it was stressed the expectation was to finish the omelet by the end of the night. There was no penalty for a slow time vs a fast time, however, again, the expectation was that we finished the omelet. We weren't told what would happen if we did not finish the omelet, only told that we should finish them. Once             started to

volunteer for order, since each omelets took a while to cook, we began to socialize and play board games until it was our turn to eat. Some took a very short time,                          eating very quickly at a sub 5 minute time. Times were written down on a white board as we completed. We were allowed to eat as slow or as fast as we wanted using whatever strategy we wanted,        approximately an hour and a half to eat            and                          . As we finished, ice cream and other snacks were available and we continued to socialize.

Once we finished, we were driven back to our vehicles in Hensel park and arrived at our vehicles at approximately 2300.

I hope this is satisfactory and if any more information is required please let me know.

Best Regards,

To whom it concerns,

This is a personal recount of the sequence of events that occurred regarding the report to the Student

Conduct Office. On                    at 1800 I was in the car waiting with                                        at

Hensel Park. We waited until                    and                        arrived. All current year          pulled

up in vehicles behind us around five minutes later.                        , and I got out of our respective

vehicle as instructed by                                        then we were instructed to place a beanie over

our eyes and led to different vehicles. I got into a car with                    and we were driven by

           to an undisclosed location. Upon arriving, I was led into a house and instructed to sit down on a

couch. All the                                        as well as                        were in attendance and we were

collectively instructed to take off our blindfolds. I was informed by                    that it was his house.

Previous year          arrived throughout the night such as

                                        . I talked with

before sitting down to play Settler's of Catan with

                        was cooking bacon in the kitchen. All the                        were called to gather in the living

room and informed by                    and                    that each                    would be receiving a

twelve-egg omelet to eat. We were to be timed in doing so and the slowest eater would face a punishment

at a later date. We were told by various                                                                that

we could take however long we wanted as long as we finished. After the instructions for what we were

going to do,                    volunteered to go first.                    cooked the omelets for each

one at a time. While I waited for my turn, I sat at the counter talking to

           asked me what I wanted on my eggs and she cooked it.                    kept my time while I ate at

my own pace. I sat next to                    while I ate. She could not finish her plate of eggs and started to

feel sick and was told that she would not have to eat anymore and there would be no punishment. After

every                    was done eating eggs, every individual (myself included) made conversation for about

an hour before departing in the separate vehicles that we had arrived in. I rode back in                    car where I was dropped off at campus, not blindfolded and knowing exactly where we were going. Afterward the entire                    team met in the campus                                    and we (all                    ) were rewarded, by the                                            to commemorate our achievement of finishing Hellweek. Afterwards I left and returned to my dorm.

Respectfully,

26 January 2023

<div align="center">Incident Report</div>

On the night of _____ many current and former members of the _____ and myself took part in what had been an annual tradition for what I assume to be many years. I arrived at the house of one of the _____ from last year, _____, at around 1800. The individuals who showed up to the event were all of the _____ of the team, as well as almost all of my _____ buddies from last year, the _____ from last year, and a few other members of the _____

The events that transpired are the following: the _____ members of the team showed up in two groups to the house, their eyes covered by the beanies they had on their head, and they were seated on the couch in the living room until the rest of their buddies arrived. When the _____ deemed they were ready, they were told to uncover their eyes, and were told that they would be eating 12 eggs in an omelet as it had been tradition on the team from years past. Then, over the course of the night, the _____ cooked all of the eggs for the _____ feeding them their omelets one by one, while other current/former _____, (myself included), had a stopwatch going to time how fast the _____ finished. The _____ were also told in a joking manner that they didn't want to know what happened if they did not finish. Some _____ took as fast as 2 minutes and some took as long as an hour. Their were a few who struggled to eat them, and one, _____, who's body reacted poorly and she threw up. She was then told she didn't have to finish. During this time, I was leading a group in playing the board game "Secret Hitler" while the _____ ate their eggs and the rest of us ate

pizza. We all exchanged memories, inside jokes, and stories from our time with the team. Once the                had finished, the             gathered them in the living room and revealed that two of them had been given an omelet of 15 eggs instead of 12. After they were able to figure out who it was, they then reminded the                that they have to get back to work on Monday after the fun they had that night, and they gave additional words of encouragement, criticism, etc. about how their fish are doing in getting prepared for Tulane. This was the conclusion of the night and people incrementally left the house.

Written Statement of        Incident on                    :

        On Saturday,                    , at the conclusion of the team's                meet. I told
the                            and                to keep their Sunday evening free and to come hungry.
        On the night of the        we (the

                                                                        to drive to Hinsel
Park (I believe) and to bring their corps-issued beanies with them. From there the
                            picked up the                and told them to put their beanies on so that it
covered their eyes.                then drove them to                        ,                        was
already there (both former members of the Corps and the previous year's
respectively). While this was happening,                                and I were preparing all
of the eggs and omelet toppings. At this point            arrived.
        When the                arrived at the house we sat them down on the couch and other
chairs in the living room while we waited for the rest of the                to arrive. When all of the
                        were at the house we had them remove their blindfolds. At this point I
explained how at the end of hell week each year the                    would go to a restaurant in
town that served dozen egg omelets and how all the                would order and eat one.
Since then that restaurant stopped serving these omelets. The tradition changed to where the
                    would make the omelets for the                .
        During this time, former                        to the team,
                                                        arrived at the house.
        Then      started taking orders for the omelets.                and            started making
the omelets for the                . When the omelet was finished, a                would get the
omelet and we would set a timer before they started eating so as to see who would finish their
omelet the fastest. There was no prize for being the fastest, and no punishment for being the
slowest or being unable to finish. When                was eating her omelet, another former
                    to the team,                        was facetiming                was on a
                        .        continued cooking and serving the omelets. While
cooking the omelets,
            and                        , took 1-2 egg shots (a small amount of liquor is poured
into an egg that had the top cracked off, and the egg and liquor was drunk). This was the only
alcohol consumed during the night. None of the                drank anything. At some point in
the night, another former                        to the team                arrived to say hello
to everyone, was there for less than half an hour then left. While people were not eating they
were all playing board games or watching football. All of the                ate and finished their
omelet                    , who was not able to finish and no repercussions followed. I just
took the plate and told her she didn't have to worry about not being able to finish. When another
                        ,                finished her omelet, she was not feeling well so she, along
with                            , went and sat out on the front porch. After the
finished their omelet they were served ice cream if they wanted it. I went out to go check on the

three            that were outside and brought them some water and ice cream. I sat with them, while the remaining            finished their omelets.

When everyone was finished with their omelets      returned indoors. I spoke to them about how proud I was of all of them for the hard work they put in that past week and how we still had a lot of work ahead of us.

The         then left with them to take them back to their cars.       and   finished cleaning everything up and said goodbye to                   then we drove back to campus. When everyone had returned to campus, all of us went down to our         to give the                              . We meant to give the            to them at         house but they were forgotten in the         . Once everyone had their              . Everyone returned to their dorms.

Here is my statement for the student conduct officer concerning the        event that happened on


I arrived at                    house at around 8pm with                    . In the house were the current                    and a couple former            from the team. Everyone in the house were either currently or formerly an            on the team excluding the other residents of the house. The house atmosphere was laid back with music playing consistently, board games being played and food being consumed. As the night went on the                                                        were cooking a dozen eggs for each                    to eat. The                were allowed to pick what was in the eggs (meat, veggies, cheese, etc.) and then would proceed to eat the eggs on their own accord either as fast as they could or whatever pace they wanted. I do not remember all the                who ate the eggs but the ones I remember were                                        , the other                            and the other                    whose names I can't remember. They each ate their eggs in whatever time they could and then would presume enjoying the evening talking and later eating ice cream that was also provided. 2-3 of the                threw up after eating the egg but continued to enjoy the night. The gathering went until about 2215 where                        and I talked with with two of our old                                until about 2230.                and I left at about 2235 and went back to the dorms where we went to        room and talked for about an a hour before going back to our own dorms.

This concludes my statement of what happened on                            . Thank you for your time.

Very Respectfully,

My name is                          and I was present at the        incident. My knowledge about the incident is as follows. The site was off campus and I arrived at the house at approximately 1830 with the remainder of the team. I believe the house was owned by                    and                        (prior          ). From there, I talked to present                    and the past since this was an event to bring back                    . When the event started, the                          was asked to consume a 12-egg omelet made to their liking.                              were

in charge of making the omelets as well as preparing the fixings. We held it in a competition style where the fastest one to eat it won. The                ate it at their own pace with no penalty for finishing last. I played a board game for the remainder of the time and talked to my peers. When the event finished, we all went our separate ways. If there needs to be any clarification do not hesitate to reach out.

Sincerely,

The following is my statement on the incident on            .

The event consisted of the current               , myself, a few current cadets, and one graduate, who were all             at some point. The event occurred at a house off campus. My experience was mostly hanging out with the other older/prior cadets and also talking with some of the cadets who were eating the eggs, encouraging them to finish what they were eating. Alcohol was present, but only some people were drinking to my knowledge, all of whom are at                        including myself. This started around 2000-2100 and then we left around 2200. Others who had not been drinking drove us back to campus. Upon returning to campus, I went to sleep.

If I can be of any further assistance, please contact me using the information listed below.

Very Respectfully,

**Written Statement**

After hearing that everyone would meet around 1800, I left campus around 1915 to arrive at            s apartment on the night of                     around 1930 hours. I went inside and immediately caught up with the group of        guys and girls who were there, including                                     right inside the front door. By the counter area, the             had already begun the egg-eating tradition so I swung by to see how they were doing. Around this time, I was catching up with

, and others. I ate a        pizza there as well while catching up with some of the             and said hello to                     who was cooking the eggs and                     who was helping to keep things clean. After, I walked around and talked with the group and checked on                                     to see how their omelets and stomachs were doing. Later, roughly around 2000,   had a shot of pink-lemonade vodka with                     , followed by an egg-shot with the same vodka with                     around 2030. At some point,                     came by for a short time and I said hello to him. Afterwards, I went over to the couch area and caught up with more friends and listened to music. I could tell                     and                     were struggling with their eggs a bit, so I went over to check on them before        ended up vomiting in a garbage can. After she vomited and finished her eggs,                     ended up going outside for some fresh air;             went out to check on them soon after. I saw                     quickly finish her eggs in about 2 minutes or so while FaceTiming                     , who I also said hello to over the phone. After, I talked to             and others about music and how their breaks were near the couch area, talked to                                     a bit, and then checked on            as he was eating his eggs while watching a video. After        finished his omelet, I said my goodbyes around the room to as many people as I could before heading outside to see                                     sitting together on the front porch helping to calm down their stomachs;        was curled up in a ball near the corner of the porch. I said goodbye to them,                     before walking back to my car and driving away at 2205. I arrived back at campus and the                                     .

I arrived at College Station on that same evening and was there between the hours of 1930 to 2230. This was an event where          got together to boost morale after a long "hell week". It was a very comfortable environment where everyone was hanging out and getting ready to return to school. From what I know concerning the eggs, nobody was required to participate in eating them. Anyone that did not feel well after eating was well taken care of. After the event, I left and went back to the dorms.

Best,

This email is to respond as a report to what happened around                    . Each          currently on the team (who could attend) was made a 12-egg omelet and timed to see how long it would take for them to eat it. People would cheer them on and encourage them to eat it fast and some people threw up and felt quite ill due to it.                                        A speech was given at the end to build morale.

Very Respectfully,

Before my time on the team, the                    used to go to a local restaurant and order a 12 egg omelet for each of the                              on the team at the conclusion of Hell Week. That restaurant has since stopped serving the 12 egg omelet, so now the team buys its own eggs and toppings, and the omelets are made by the                    on the team to the liking of each of the                       This event now happens at an off campus house. More specifically, a house that belongs to someone who once held a                                       , and this year                              . The                    were introduced to this night by being told that there was a surprise, and that they should plan on not eating heavily during the day. They were told to meet at a certain location where the                     were waiting to carpool them to the house.

With the event not being fully known to the                    they were blindfolded for the surprise, and then brought into the house. After everyone's arrival, the blind folds were taken off and they were able to see all of the             they had looked up to the year before when they were freshmen. It was like a big family reunion, with board games, the NFL football game on the TV, and omelets being served one by one to each of the                  . In true fashion of the very competitive team, the times it takes for each person to finish the omelet was recorded on the whiteboard, and everyone wants to beat the best time from the year before, to "stick it" to their previous upperclassmen. Many times during the night the                were reminded that nothing would happen in the event that they couldn't finish the omelet. There was a story that was told about one time (a few years before I                  ) that someone didn't finish the omelet, and as a punishment, they had to do physical training until they vomited, but it was assured numerous times that in no event would there be any backlash in the case that someone didn't finish. Everyone ended up finishing their omelet, and the previous year's record was broken twice. After everyone had finished, some were feeling a little queasy as expected, but everyone seemed to be in good spirits, and most people would even wash down the eggs with a bowl of ice cream. The whole event had no ounce of mal-intent, and it was only for the reunion purpose as well as your previous upperclassmen cooking for you after you ordered what you wanted in your omelet. Everyone cleaned up where they had sat, and made sure looked as good as it did when they showed up. I was even able to get a hug and a smile, and tell everyone how proud I was about their accomplishments both on the team and in the Corps. I remember multiple times during the night where myself and the previous                        would look around at all the people we had hopefully had a positive impact on during our times in the Corps. Looking at all of the and multiple             that were once             when they were        gave me so much pride and happiness. The overall mood of the night seemed so good and heartwarming, and it saddens me very much to understand that other people may not have had the same sense of reunion and happiness.

On            around 1800,

came to Hensel Park in separate cars.

Shortly afterward,                                                    I arrived at Hensel Park and instructed the                to pull the beanies over their eyes and get into our cars. We arrived as a group at                apartment, where                    ,

, and several of            roommates were socializing. Blindfolds came off and someone explained that      for some time had a yearly event where                were encouraged to eat 12-egg omelets. There was no punishment for not finishing, and in fact,                did not finish her omelet and did not receive any negative repercussions from any upperclassmen.

I heard a rumor that back in the day they used to do terrible things to                that did not finish their omelet, but I had never witnessed anything like that, nor had any evidence presented to me to suggest that my fellow          and                intended on doing anything of the sort. The intention of the event was to socialize and celebrate a finished week of practice, not to initiate members.

At some point during the night of the incident,                arrived and stayed.                and his girlfriend dropped by for around 10 minutes at most

had upset stomachs after eating, and                and I checked in with both of them throughout the night, to offer them water and anything else they might need. Around 2230-2300 we all left back to the dorms in separate cars.

I don't recall there being any underage drinking at the event. There could have been more people at this event, but to the best of my memory, these were all the names I could gather.

and I are all the current                on . Together, we organized and coordinated the event, and in no way are any of the participating                to blame for the incident.

Please contact me via email or at                you have any questions or concerns.

Very respectfully,

On Sunday,                    at approximately 1730, I drove to the store to buy supplies for the omelet dinners for the                    on the                    and the                    who would be participating. I then drove to                    house as he was a                    who had offered to let us use his house for the evening.                    , the                    , then spent the next hour prepping the kitchen for the                    to arrive At some point around 1830,           and    other           from the Corps who were all former                    arrived.

The                    arrived between 1830 and 1900 and were led blindfolded into the house by the           on the team who had picked them up. I was in the kitchen from 1900 to 2200, where, over the course of the evening,                                                                          .           was allowed to choose what ingredients they wanted included and allowed to take their time in eating the food.

  then cleaned the dishes and around the kitchen/dining area from 2200 to sometime after 2300 when the party ended and everyone left.

The egg eating event is a tradition in which                    eat a cooked 12 egg omelet upon the completion of Hell Week. They choose what, if any, condiments they would like in their omelet and are timed how fast they eat it. Some choose to eat their omelets slowly, while others try to eat it quickly. The event is in no way "bad bull" and was an opportunity for past and present            to reconnect. On the evening of              , I witnessed the omelet eating event that occurred with the                    ,                     , as well as various other       personnel/former personnel. Everyone present was either a current or former                    The event occurred off campus at around 1830. I rode with                    to the event about an hour after the planned start time, as we were both at an       practice. When we arrived, the             were already eating the eggs, had already eaten, or waiting for the omelets to be cooked. After about 2-3 hours, the omelets had been eaten and people began to depart the house. I rode back to the Quad again with                   , and     h also rode in the car.

V/R

On the evening of              , I witnessed the omelet eating event that occurred with the                                     , as well as various other       personnel/former personnel. Everyone present was either a current or former                       . The event occurred off campus at around 1830. I rode with                       to the event about an hour after the planned start time, as we were both at an              . When we arrived, the              were already eating the eggs, had already eaten, or waiting for the omelets to be cooked. After about 2-3 hours, the omelets had been eaten and people began to depart the house. I rode back to the Quad again with                             also rode in the car.

Please let me know if there is anything else I can provide to assist in this matter.

Very Respectfully,

Written Statement:


On                              participated in an event that took place off campus involving
        members of the                          eating eggs.   coordinated with the other
                                                        .  messaged the
                                          and to meet us at Hensel Park at 1800.
                                communicated the same with the                              . Once
at the park, we met with all the                    and had them put on their corps issued beanies as
a blindfold and led them to our cars.   was responsible for driving
                        and drove them to                    house. Once there, we led them inside with the
beanies covering their eyes and had them sit on the couch. Once everyone was present, we
had them take off the beanies. Following that,                    explained the situation, which
was that they were being cooked 12 egg omelets to eat as fast as they were able to. This has
been a tradition in past years, starting when the              went to Hullabaloo Diner and ordered
a 12 egg omelet each.                    was in charge of cooking the eggs, and the
were allowed to choose what toppings they wanted inside. They went in random order and each
ate the omelet while being timed.                    did not finish the omelet, which was
        . The times were written on a white board and after they finished the omelet,     gave
them ice cream to calm their stomachs. The rest of the night was just waiting for everyone to
finish and hanging out around the house. After everyone was done,      told them that two of
them received 15 eggs instead of 12, which were                                    , who
were randomly selected based on their size. After talking for a little bit,      all drove the
                        back to the park where their cars were. Afterwards,      all met at the          to
distribute                    and then went our separate ways.

I'm writing to detail my account of the reported          incident.

In advance, the                    were told to keep their evening open on Sunday          and to not eat much that day. All of the team's active                                      ) met at a park off campus where they were picked up by the team's          . They were told to put their Corps-issue beanie on to cover their eyes. They were driven by the          to          apartment since a place was needed to cook the eggs. They were led inside and told to remove the beanies once all were inside.
explained to the              that they would each be eating dozen egg omelets.              cooked all the omelets with help from                    .

ate in the order they volunteered. The omelets were made to-order. They were allowed to pick whatever toppings they wanted. When it came time to eat, they were timed and encouraged to attempt to be the fastest, but were ultimately allowed to eat at whatever pace they desired without threat. Times varied from 2:20 to 1:41:02. If requested, ice cream was served once a
finished to help them feel better since that soothes the stomach. I believe 2 or 3          threw up.
2          had omelets that contained 15 eggs but they were not the ones who threw up as those were given to the 2 perceived biggest eaters.

Beyond the egg eating, it was a standard social gathering. There was no PT involved the entire night. No alcohol was consumed by minors. If anyone started to feel unwell while or after eating, they were assisted as needed/requested. If a          felt unwell while eating, they were allowed to take a pause as needed. People played board games and talked. Former members arrived to cheer on the          in their old positions and ask about Hell Week. These former members include

was not present as she was                              . She was on                              to eat her omelet.

Once every          was done and ready to leave, everyone said their goodbyes and the were either taken back to their cars or directly back to campus. Nothing was required of them the following day.

Please let me know if you or the Student Conduct Office need anything clarified or have any questions.

Very respectfully,

Statement

I arrived at        house at around 1800 along with the other        While we waited for everyone else to arrive we prepped the supplies to make the omelets.      cooked the bacon and chopped up vegetables to add if the       wanted that in their meal. At around 1830 the       on the team arrived with the     driving them. The       were blind folded when they walked into the house but the blind folds were removed as soon as they had sat down in the house. The       were told how as a celebration of the end of hell week the whole team got together to compete in a food challenge. Each       would receive a 12 egg omelet to eat. There was no maximum amount of time allowed but the goal is to compete against their buddies and finish the omelet. Vegan egg substitute was also provided if the wanted to participate but was unable to eat egg. I don't remember the exact order that they went but I do know      went first. While      cooked the Omelets everyone else cheered on their buddies, hung out and talked.       started feeling sick while eating hers so she did not finish it. She went outside with        to get some water and cool off. Those    who were of age also took a shot of raw egg but that was the only alcohol at the event that I am aware of. The rest of the      finished their Omelets. After everyone was done,      gathered everyone together to congratulate us on the end of hell week and to get ready to be in the mindset to compete at Tulane. We left around 11:00.

The following is my account of what happened the night of                    .

It started with the other                                        and myself arriving at a park to meet the
                    After all the           and                    had arrived, we told the                    to cover their
eyes with beanies they'd been told to bring. They were then escorted into the                    vehicles. The
              then drove the                                        house where           and past       members where
waiting. After being escorted inside they were told to remove their blindfolds. The upperclassmen then
explained what the                    would be doing. They would be eating an omelet made up of twelve
eggs and other ingredients at the                    request. The                    then began to eat. They
decided on an order and each took a turn eating. While each                    was eating, the upperclassmen
and the                    who weren't eating socialized, played music and board games, cheered on the
                    eating, and those over 21 drank. During the night a few of the                    felt sick from
the omelet and threw up. After confirming that the                    were okay, the upperclassmen would
encourage them to finish the omelet. Old team members came and went throughout the night. After
everyone had finished, the time to eat the omelet was written on a whiteboard for each
The socializing went on for a little longer, and eventually the                    were driven back to their
parked vehicles by the           . Everyone then separated.

This has been my knowledge of the night of the event, told to the best of my ability. If there are any
questions, please email me.

Very respectfully,

**exas A&M Corps of Cadets**



Date 21 September 2023

**MEMORANDUM**

TO:      Dr. Douglas Bell

FROM:    BG Patrick Michaelis

SUBJECT:

Our initial investigation was conducted yesterday with the _____ in Company _____ During the discussion, the _____ were asked general questions about the treatment they have received from their upperclassmen and how things were going overall. As the discussion progressed more direct questions were asked dealing with the specific allegations outlined in the complaint. When asked about the _____ from _____ being given a hard time based on _____ and required to repeat answers, the _____ indicated all _____ were required to repeat answers until they answered in the way the upperclassmen desired. The specific example given was a campusology question that had to be memorized and repeated exactly as written. All _____ that could not repeat the answer correctly were sent back to their room for five minutes to practice. Knowing campusology answers are part of the _____ class earning their Corps _____ which is consistent with Corps policy. The question dealing with having joke ready for the outfit meeting was met with the answer that it was a misunderstanding between the upperclassmen and the _____ The upperclassmen said one thing and the _____ understood something different. The _____ were asked about being able to get enough sleep, and responded with they stay up late to do homework, and the length of the meeting had nothing to do with their lack of sleep. The _____ in _____ are encouraged to be involved in activities outside the Corps, but the outfit does require them to attend evening formation, a required activity, unless they are in class or have signed a military letter to miss the event. This is consistent with Corps policy.

Based on the answers provided by the _____, we believe the allegations to be unsubstantiated.

Patrick R. Michaelis

Brigadier General (Ret.), U.S. Army

Commandant, TAMU Corps of Cadets

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Tuesday, November 7, 2023 2:26 PM
**To:** Winking, Audrey J
**Subject:** FW: [Maxient]       College Station - On-Campus Residence Hall

Additional information from

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, November 7, 2023 1:42 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** Fwd: [Maxient]       College Station - On-Campus Residence Hall


Please excuse short messages and typos, as I am responding on my phone

Begin forwarded message:

> **From:** "Moore, Erica" <erica_moore@stuact.tamu.edu>
> **Date:** November 7, 2023 at 1:25:31 PM CST
> **To:** "Murray, Dylan C" <dmurray@stuact.tamu.edu>
> **Subject: FW: [Maxient]       College Station - On-Campus Residence Hall**
>
>
> Howdy Dylan,
>
> I am sending this over to you. I've already submitted a report for this and told the student an additional report from him would be helpful as well.
>
> **Erica Moore** | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000
>
> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

> **From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> **Sent:** Tuesday, November 7, 2023 1:12 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** Re: [Maxient]       College Station - On-Campus Residence Hall
>
> Good afternoon, I experienced hazing this morning at formation. The entire class of        cadets were yelling at me, cursing at me and making fun of me in front of the rest of my unit. One particular student

named ▊▊▊▊▊▊ who is a ▊▊▊ was leading the charge as they surrounded me and were mocking me for being hurt and unable to run. They are making me very uncomfortable being part of ▊▊▊ as they continue to say hurtful things to me in front of the rest of the unit. They made me continuously do push ups until I was no longer able to, and they kept screaming at me to do it

On Tue, Nov 7, 2023 at 12:01 PM Moore, Erica <erica_moore@stuact.tamu.edu> wrote:

Howdy,

Thank you for reaching out to us regarding the incident below. Your report has been received by the Department of Student Activities and will be reviewed to determine any needed further action. If you have any additional information or documentation related to the incident you would like to submit, feel free to reply to this email, or if you would prefer to speak to a staff member directly you may contact me at the number below. Thank you again for your submission, and for your support of our Texas A&M student organization community.

Sincerely,

-Erica

**Erica Moore** | Administrative Coordinator II
Koldus 224G|Student Organization Leadership And Development I Department of Student Activities

1236 TAMU | College Station, TX 77843-0000

ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ notifications@maxient.com>
**Sent:** Sunday, November 5, 2023 9:11 PM
**To:** Moore, Erica <erica_moore@stuact.tamu.edu>
**Subject:** [Maxient] ▊▊▊▊▊▊ College Station - On-Campus Residence Hall

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report

**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident

Location of incident
**On-Campus Residence Hall**

**Involved Parties**

**Company** ) Alleged Offender

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation

[doctorsnote1.pdf](doctorsnote1.pdf)
[doctorsnote2.pdf](doctorsnote2.pdf)
[doctorsnote3.pdf](doctorsnote3.pdf)
*For added security, these links will expire in 10 days. The attachments will remain accessible when viewing the report within Maxient.*

## Submitted By

Your full name



*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
   • Dylan Murray
   • [jhbrown@stuact.tamu.edu](mailto:jhbrown@stuact.tamu.edu)
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1

Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of Student Activities.

**Message sent by Maxient**
**Replies will be sent to the submitter**

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Friday, November 3, 2023 11:35 AM |
| **To:** | Winking, Audrey J |
| **Subject:** | ███████ |
| **Attachments:** | Re: ██████ DOC 231030 10_53_55.pdf; DOC 231030 15_33_52.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

FYI for the        Investigation

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ██████

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the        acquisitions with supporting documentation.

V/R


Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**Bell Jr, Douglas**

---

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Monday, December 18, 2023 3:24 PM |
| **To:** | Latham, Skylar |
| **Cc:** | Smith, Asia |
| **Subject:** | Investigation Assigned |
| **Attachments:** | Investigation Report.pdf |

Howdy,
Please see the attached      harassment investigation assigned to you.  Please let me know if you have any questions or concerns.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

**From:** Winking, Audrey J
**Sent:** Tuesday, December 12, 2023 4:09 PM
**To:** Bell Jr, Douglas
**Subject:** investigation complete

The     investigation report is completed and has been saved in the shared drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Bell Jr, Douglas**

---

**From:** Bell Jr, Douglas
**Sent:** Monday, November 6, 2023 10:17 AM
**To:** Winking, Audrey J
**Subject:** FW: █████████

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Monday, November 6, 2023 9:29 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re: █████████

Doug,

Desiree Ornelaz is the next coinvestigator.

I'll talk with █████ and see if a new room will alleviate some of his immediate concerns.

Thanks!

> On Nov 6, 2023, at 8:37 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Howdy,
> Thanks for the update.  If you move him to another, it will not impact the investigation. I would like to know who the co-investigator is so we can begin scheduling with the student and members of the outfit.
>
> **Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
> **Sent:** Sunday, November 5, 2023 5:28 PM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Subject:** RE: █████████

Doug,

Jeff is out of the office and will return this week. If you need an investigator sooner, I can see who is next up for assignment.

Additionally, there are some extenuating circumstances with this student that also impact his health. If we offer to move him to another room on the ⬛⬛⬛⬛ is that a violation of any protocols now that SCO investigation is ongoing?

Thanks,

**Meredith Simpson**
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, November 3, 2023 3:59 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: ⬛⬛⬛⬛

Howdy,
Can you please provide a co-investigator from the Corps regarding this case?  We will be initiating an investigation. Thank you in advance.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ⬛⬛⬛⬛

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the ⬛⬛⬛ acquisitions with supporting documentation.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317



Date 21 September 2023

## MEMORANDUM

**TO:**       Dr. Douglas Bell

**FROM:**   BG Patrick Michaelis

**SUBJECT:**

An initial inquiry was conducted into the allegations contained in the      reports submitted to Student Conduct.  Our findings for each complaint are:

**Retaliation from                      after missing a mandatory football game.**

For missing the football game without authorization ▮▮▮ was given a restricted weekend.  In the explanation, the discipline was given as much for ▮▮▮ lying about attending the event and providing a photoshopped phot as "proof" of attending much as missing the game. (See attached Discipline report)

**The                       members have continuously kept adding more overexaggerating and falsified discipline items on to my profile to serve in the form of demerits, marching tours, and restricted weekends.**

See attached incidental counseling forms and Discipline report.

**People have taken my several of my personal belongings and school supplies and I have been unable to find out where they went.**

When questioned about what was taken Cadet ▮▮▮ was unable to provide specific examples.

**                    has given me restricted weekends for missing               class which we both have, even though I have excusal letters for them.**

Cadet ▮▮▮ was not able to produce the excusal letters for missing class.

**Destruction of my personal property as I had to make unnecessary repairs to my**

Cadet ▮▮▮ was not able to explain what damage was done to his

Military Sciences Building
1227 TAMU
College Station, TX 77843-1227

Tel. 979.845.2811  Fax 979.845.8066
corps.tamu.edu

- 2265 -

I was also set up by members of my unit when my room mate ▮▮▮▮ and passed me in the hall not telling me anything and did not take my calls or texts right after seeing me walk by, even though he did not have class. ▮▮▮▮ locked me out of my room for several hours and I missed class because I could not get into my uniform and ▮▮▮▮ stood in the hall watching me with a smirk on his face as I could not get into my room, and then ▮▮▮▮ gave me discipline for not attending class intentionally, even though I went to the Corps Housing Office and they were not able to help me get into my room so I could go to class.

Cadet ▮▮▮ does not sleep in the dorm. When Cadet ▮▮▮ left for work, he locked his door. Cadet ▮▮▮ was not carrying his room key.

Most recently as of thi▮▮▮ s to my knowledge. I was kicked off of the Corps of Cadets ▮▮▮ team which I have been on since ▮▮▮ year, and my unit's leadership has continued to pressure the captain about having me on the team.

Cadet ▮▮▮ was removed from the team for not attending practice. (See email from team captain)

continuously bullied by ▮▮▮ and ▮▮▮ - who routinely drunkenly bullies ▮▮▮

Cadet ▮▮▮ does not sleep in the Corps Dorm and is not there in the evenings.

Cadet ▮▮▮ is described by his military advisor as being nonparticipative for most outfit activities. In addition to being absent, he has also been caught being untruthful on several occasions. His military letter for missing morning activity Monday-Thursday indicated he was training with the ▮▮▮ when in fact the team only trains Monday-Wednesday. Lt Col Gardner conducted a meeting with ▮▮▮ his Commanding Officer and Executive Officer. During the discussion, Cadet ▮▮▮ indicated he did not feel comfortable being in the same room as his roommate, ▮▮▮ because of his roommate's personal lifestyle choices and had been staying off campus with one of his friends. When questioned about what personal items or school supplies had been taken, ▮▮▮ was unable to provide specific examples. His roommate denies taking anything from ▮▮▮ or messing with any of his belongings. Cadet ▮▮▮ was told by his Commander he was authorized to change rooms, but ▮▮▮ has not talked to the Corps Housing Officer to initiate this process. Cadet ▮▮▮ came to this outfit from ▮▮▮ in the ▮▮▮ and was on a ▮▮▮ for the ▮▮▮ semester, making this only the ▮▮▮ full semester he has been in this outfit. With the small amount of time ▮▮▮ spends with the outfit, it is difficult to determine when, or by whom he is being harassed. Although the situation is not ideal, we do not see violations of Student Rule 24.

Patrick R. Michaelis
Brigadier General (Ret.), U.S. Army
Commandant, TAMU Corps of Cadets

Building and room/suite number
#### TAMU
College Station, TX 77843-####

Tel. 979.123.4567  Cell. 979.123.4567  Fax 979.123.4567
myname@tamu.edu
www.mywebsite.tamu.edu

- 2266 -

| | |
|---|---|
| **From:** | Ramirez Jr, Joe E |
| **To:** | Michaelis, Patrick Ralph; Bell Jr, Douglas |
| **Cc:** | Gardner, Jeffery D; Simpson, Meredith M |
| **Subject:** | RE: [Maxient]        College Station - On-Campus Residence Hall -      On |
| **Date:** | Tuesday, October 24, 2023 6:26:17 PM |

**Doug – we agreed to let the Commandant and his staff have 72 hours to conduct their own internal inquiry to determine if there was validity to the report before they sent to SCO. This definitely falls into that category.**

**Please hold on any further actions until the Commandant and his staff have had the chance to look into this and come back to SCO with what they have discovered.**

**Patrick – you and your staff have 72 hours to report back to Doug and SCO what you find out about this allegation.**

**Thanks.**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

---

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Tuesday, October 24, 2023 5:45 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Simpson, Meredith M
<msimpson@corps.tamu.edu>; Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Subject:** Re: [Maxient]        College Station - On-Campus Residence Hall        On

Okay Doug. This is not within the MOA agreement. You have every right to do what you want (which you've tipped your hand already) after the 72 hour period.

I will discuss with Joe on Thursday.

Michaelis

Sent from my iPad

> On Oct 24, 2023, at 17:39, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> The first report was received today from a Tell Somebody report from a faculty. Within this report it appears that the Corps is aware of this student issue and complaints. The second report is from the student and outlines the same information. I intend to reach out to this student, who is a       in the Corps about his concerns about continued harassment. We can discuss tomorrow if needed.
>
> Douglas Bell

Please excuse any typo, message sent from I-Phone

On Oct 24, 2023, at 4:46 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:

 Okay… so lay them out.  Did we do the 72 hour process on the first one?  Are they both from different or the same student?  Did we see the first on?

This is why we do this.  Thanks.

Sent from my iPad

> On Oct 24, 2023, at 14:42, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> Yes, but being we have received two reports regarding this situation, I feel that an investigation is warranted.
>
> Douglas Bell
>
> Please excuse any typo, message sent from I-Phone
>
>> On Oct 24, 2023, at 4:38 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:
>>
>> Okay… but isn't that how almost all reports start?
>>
>> Sent from my iPad
>>
>>> On Oct 24, 2023, at 14:34, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>>>
>>> Being this report is coming from the student I feel an investigation is warranted.
>>>
>>> Douglas Bell
>>>
>>> Please excuse any typo, message sent from I-Phone

On Oct 24, 2023, at 4:29 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:

Doug - is this a secondary report? If not, let us come back to you within the 72 hour agreement first. As I recall this is one we've been working for a while. Jeff can elaborate.

Sent from my iPad

On Oct 24, 2023, at 14:24, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:

Howdy, I have received the attached IR and Tell Somebody Report about the

outfit. SCO will be investigating this matter.  Can you provide a CTO to co-investigate.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | [dbelljr3@tamu.edu](mailto:dbelljr3@tamu.edu) | sco.tamu.edu
- - - - - - - - - - - - - -

# Bell Jr, Douglas

**From:** Simpson, Meredith M
**Sent:** Monday, November 6, 2023 9:29 AM
**To:** Bell Jr, Douglas
**Cc:** Gardner, Jeffery D
**Subject:** Re: ███████

Doug,

Desiree Ornelaz is the next coinvestigator.

I'll talk with ████ and see if a new room will alleviate some of his immediate concerns.

Thanks!


> On Nov 6, 2023, at 8:37 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:


Howdy,
Thanks for the update.  If you move him to another, it will not impact the investigation. I would like to know who the co-investigator is so we can begin scheduling with the student and members of the outfit.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Sunday, November 5, 2023 5:28 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: ███████

Doug,

Jeff is out of the office and will return this week. If you need an investigator sooner, I can see who is next up for assignment.

Additionally, there are some extenuating circumstances with this student that also impact his health. If we offer to move him to another room on the Quad, is that a violation of any protocols now that SCO investigation is ongoing?

Thanks,

**Meredith Simpson**
Office of the Commandant | Corps of Cadets

1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, November 3, 2023 3:59 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M
<msimpson@corps.tamu.edu>
**Subject:** RE: █████████

Howdy,
Can you please provide a co-investigator from the Corps regarding this case?  We will be initiating an
investigation. Thank you in advance.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M
<msimpson@corps.tamu.edu>
**Subject:** █████████

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the        acquisitions with
supporting documentation.

V/R


Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Tuesday, October 31, 2023 8:50 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Michaelis, Patrick Ralph; Simpson, Meredith M |
| **Subject:** | RE: ██████ |

Yes Sir.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:49 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE:██████

Thank you for this information.  The Student Conduct Office will follow up with                        regarding his submission
of an Incident report.  Depending on the information received from our routine follow-up, an investigation may still be
warranted.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
<span style="color:maroon">**DIVISION OF STUDENT AFFAIRS**</span> | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ██████

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the        acquisitions with supporting
documentation.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Bell Jr, Douglas |
| To: | Winking, Audrey J |
| Subject: | FW: [Maxient] IR        College Station - On-Campus Residence Hall     On |
| Date: | Tuesday, October 24, 2023 4:25:11 PM |
| Attachments: | Tell Somebody Report |

I have received the information and will be recommending this situation for an investigation.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, October 24, 2023 4:11 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Brown, Josh <jhbrown@stuact.tamu.edu>
**Subject:** FW: [Maxien        College Station - On-Campus Residence Hall     On

Howdy Doug,

Please see the below Incident Report received this morning to review from a SCO perspective or to pass along to Corps Staff to address through their processes.

Thank you,
Dylan

**Dylan Murray** | Assistant Director
Campus Engagement & Traditions | Organization Conduct
Department of Student Activities | Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.1973 | dmurray@stuact.tamu.edu | http://studentactivities.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Tuesday, October 24, 2023 10:03 AM
**To:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Subject:** [Maxient]        College Station - On-Campus Residence Hall     On

---

**This Message Is From an External Sender**

This message came from outside your organization.

Secondary recipient (you were copied)

## Campus Community Incident Report

**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**On**
Location of incident
**On-Campus Residence Hall**

**Involved Parties**
**Company** in the Corps of Cadets () **Organization**

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me." I am currently being harassed by multiple people in my unit in the Corps of Cadets. I have been receiving continuous retaliation from other cadets. It started during the week after I missed a mandatory event the football game against the game and went to my instead. The cadets in my unit gave me enough discipline to get me removed from the Corps, and go before the Cadet Performance Review Board, however after the incident had to meet with the head of the Corps Discipline office to ensure I was still able to stay in the organization without being forced out. The problem is that even after being put in a bad position, the cadet members have continuously kept adding more overexaggerating and falsified discipline items on to my profile to serve in the form of demerits, marching tours, and restricted weekends; and I have been given heavy discipline for barely missing deadlines of online forms to submit and messing up letters. However I was delivered the amount of discipline from the unit's leadership to kick me out of the Corps in less with only having been counseled a single day about missing the game beforehand. I have experienced ongoing harassment from members in my unit including destruction of my personal property as I had to make unnecessary repairs to my As well, people have taken my several of my personal belongings and school supplies and I have been unable to find out where they went, and my room mate ▮▮▮▮▮▮▮ did not even tell me who did it even when someone stole for several days. The other cadets in my unit continue to try give me large discipline as ▮▮▮▮▮▮ has given me restricted weekends for missing class which have, even though I have excusal letters for them.

- 2276 -

**Supporting Documentation**
**No additional documents were attached to this report.**

**Submitted By**
Your full name

[REDACTED]

Position/title/student status
**Student**
Your email address

[REDACTED]

Your phone number

[REDACTED]

UIN

[REDACTED]

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
- Dylan Murray
- jhbrown@stuact.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of Student Activities.

**Message sent by Maxient**
**Replies will be sent to the submitter** [REDACTED]

| From: | Bell Jr, Douglas |
|---|---|
| **To:** | Winking, Audrey J |
| **Subject:** | FW: [Maxient]      College Station - On-Campus Residence Hall |
| **Date:** | Tuesday, November 7, 2023 2:26:05 PM |

Additional information from

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, November 7, 2023 1:42 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** Fwd: [Maxient]      College Station - On-Campus Residence Hall


Please excuse short messages and typos, as I am responding on my phone

Begin forwarded message:

> **From:** "Moore, Erica" <erica_moore@stuact.tamu.edu>
> **Date:** November 7, 2023 at 1:25:31 PM CST
> **To:** "Murray, Dylan C" <dmurray@stuact.tamu.edu>
> **Subject: FW: [Maxient]      College Station - On-Campus Residence Hall**


> Howdy Dylan,
>
> I am sending this over to you. I've already submitted a report for this and told the student an additional report from him would be helpful as well.
>
> **Erica Moore** | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000
>
> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

> **From:** ███████████████████████████
> **Sent:** Tuesday, November 7, 2023 1:12 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** Re: [Maxient]      College Station - On-Campus Residence Hall -

Good afternoon, I experienced hazing this morning at formation. The entire class of ▮▮▮ cadets were yelling at me, cursing at me and making fun of me in front of the rest of my unit. One particular student named ▮▮▮▮▮▮ who is a ▮▮▮ was leading the charge as they surrounded me and were mocking me for being hurt and unable to run. They are making me very uncomfortable being part of Company ▮▮▮ as they continue to say hurtful things to me in front of the rest of the unit.

On Tue, Nov 7, 2023 at 12:01 PM Moore, Erica <erica_moore@stuact.tamu.edu> wrote:

> Howdy,
>
> Thank you for reaching out to us regarding the incident below. Your report has been received by the Department of Student Activities and will be reviewed to determine any needed further action. If you have any additional information or documentation related to the incident you would like to submit, feel free to reply to this email, or if you would prefer to speak to a staff member directly you may contact me at the number below. Thank you again for your submission, and for your support of our Texas A&M student organization community.
>
> Sincerely,
>
>
> -Erica
>
> **Erica Moore** | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000
>
> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** ▮▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
> **Sent:** Sunday, November 5, 2023 9:11 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** [Maxient] ▮▮▮ College Station - On-Campus Residence Hall

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident

Location of incident
**On-Campus Residence Hall**

**Involved Parties**

**Company**        () Alleged Offender

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**

doctorsnote1.pdf
doctorsnote2.pdf
doctorsnote3.pdf

*For added security, these links will expire in 10 days. The attachments will remain accessible when viewing the report within Maxient.*

**Submitted By**

Your full name

█████████████████

Position/title/student status
**Student**

Your email address

████████████████████

Your phone number

█████████

UIN

█████████

*[UNAUTHENTICATED]*

**Routing Information**

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:

- Dylan Murray
- jhbrown@stuact.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of Student Activities.

**Message sent by Maxient**
**Replies will be sent to the submitter**

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: |
| Date: | Friday, November 3, 2023 11:35:18 AM |
| Attachments: | |
| | DOC____10_53_55.pdf |
| | DOC____15_33_52.pdf |

---

FYI for the        Investigation

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:**

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the        acquisitions with supporting documentation.

V/R

    Lt. Col Jeff Gardner '82, USAF (Ret)
    Assistant Commandant for Accountability and Standards
    Military Advisor Parsons Mounted Cavalry
    979-458-9317

**- 2283 -**

| **From:** | Winking, Audrey J |
|-----------|----------------------|
| **To:** | Ornelaz, Desiree A |
| **Subject:** | RE:      Investigation |
| **Date:** | Monday, November 20, 2023 3:37:00 PM |

No problem, I went ahead and let my new full-time investigator serve as the co-investigator since he was here already anyways to observe for his training, so we have wrapped up the interviews for today.

Best,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 20, 2023 2:31 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re:      Investigation

I'm so sorry about missing my appointments with you. I will certainly be all day tomorrow and I will cancel my leave if no problem.

Sent from my iPhone

> On Nov 20, 2023, at 12:37 PM, Ornelaz, Desiree A <dmercado@corps.tamu.edu> wrote:
>
> I appolligize, I am trying to find your office.
>
> Sent from my iPhone

>> On Nov 20, 2023, at 11:08 AM, Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:
>>
>> Good morning,
>>
>> Just checking to see if you were still able to do the interviews we have at 11, 2, and 3 today?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student
Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Tuesday, November 14, 2023 3:10 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:      Investigation

Yes, that works. Thank you! I will clear my calendar for Monday so we can finish hopefully before the holiday.

**GySgt Desiree A. Ornelaz USMC (Ret)**  | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 14, 2023 2:20 PM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:      Investigation

I just looked at their class schedules and it's going to be really tough to get them in this week in the order I wanted to interview them (complainant first).  It looks like              would work well for them though – would this work for you?


Complainan
Alleged
Alleged

Let me know if that would work for you and if so, I will send you a calendar appointment and will send them their interview notices!

**- 2285 -**

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student
Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 13, 2023 8:31 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:      Investigation

Sounds great, thank you!

**GySgt Desiree A. Ornelaz USMC (Ret)**  | 1St Regiment Operations Advisor/AMC
Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 13, 2023 8:17 AM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:

Thank you! My goal is to try to fit the interviews in by the end of this
week, but if needed we could finish up next Monday/Tuesday while the
students still technically have class. So we should be done by the time you
leave, but we can definitely Zoom if something major changes and we
absolutely have to do any after Thanksgiving.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student
Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 13, 2023 8:03 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Subject:** RE:        Investigation

Thank you so much, It is awesome that you are a                    . I
completely understand           always comes first.              is moving
from here to            for work so starting the 22nd I will be on leave to
help her move. Hopefully we will be done by then, but if not I can
definitely get on zoom or whatever.

**GySgt Desiree A. Ornelaz USMC (Ret)**  | 1st Regiment Operations Advisor/AMC
Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 13, 2023 7:57 AM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:        Investigation

Sure, I have attached the reports that have been submitted as well as
documentation that I received from the Corps regarding some of the
allegations.

Also – I am a                  and ended up receiving a new
              Friday afternoon, so I won't be in the office today but will try
to be doing some work from home as I am able.  I am hoping that I can get
              set up to start tomorrow.  As soon as I know when she can
start          , I will schedule the interviews!  Sorry for the delay, I had
fully intended to do that on Friday. I apologize for any inconvenience this
delay is causing but will get these scheduled ASAP once I know when she
can go to

Sincerely,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student
Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>

**Sent:** Monday, November 13, 2023 7:53 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:**          Investigation

Good morning,

I was wondering if there are any notes or anything I should read concerning this case. Thank you.

**GySgt Desiree A. Ornelaz USMC (Ret)** | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, November 8, 2023 12:37 PM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:**      Investigation

Hi Desiree,

I was told that you will be helping me with the       investigation.  I am planning on setting up interviews to take place next week.  Would you mind sending me your availability for next week when you have a chance? I am hoping to send the students their notices by the end of this week.

Thanks, and looking forward to working with you!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: SQ 21 incidents ICO ▮▮▮▮▮▮▮▮ (SQ 6) |
| **Date:** | Friday, October 20, 2023 9:27:01 AM |
| **Attachments:** | Request to Transfer Document Concerning ▮▮▮ .pdf ▮▮▮ Incident.pdf |

Howdy,

I have received this information and I an recommending an investigation.  I have requested a military advisor (CTO) to co-investigate.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:        incidents        ▮▮▮▮▮▮▮

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the ▮▮▮ in this outfit.  The first document is the one that really stands out (request to transfer).
Before I act here, I'd like your perspectives if there is any form of violation of university hazing standards here.

patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets | Texas A&M University**

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**        incidents        ▮▮▮▮▮▮

Good Morning Sir,

I finally received the additional info last night regarding Cadet ▮▮▮▮ . Below is the original email from last month but I've also attached the additional document that I received last night as well.  She

stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.


R/
**MSgt Chauncy J. Anderson USMC (Ret)** | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs | Texas A&M University
Lacy |      TAMU | College Station, TX 77843

ph: 979.458.9372 | mobile:          | [canderson@corps.tamu.edu](mailto:canderson@corps.tamu.edu)
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** ███████████████████████████ >
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <[canderson@corps.tamu.edu](mailto:canderson@corps.tamu.edu)>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ███████████████ . I'm a cadet in    and a        from     I was in the same outfit as ███████ when      in the Corps of Cadets. My time in     ,       , has been incredibly different than my time spent in     . If you're available this        and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to     was the best choice for me, and I'm truly grateful to Mr. Garza and Ms. Peters for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including ███ would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in     .

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,

███████

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **To:** | Leible, Jason Aaron |
| **Subject:** | RE: interviews postponed |
| **Date:** | Tuesday, November 7, 2023 3:32:00 PM |

Thank you!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 3:32 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Yes, I can do Monday.

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 3:30 PM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

███████ just emailed me saying he will be out of town on Friday…can you do 2:00pm on Monday 11/13? If so, then I will try to move one of our Friday students so that we don't have an hour in between the two.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 10:01 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Yes, I changed the date to 10 Nov for Friday.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                     | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 9:57 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

Here's what I am thinking, let me know if this works for you and then I can send their notices and will send you calendar appointments:

Wednesday, 11/8:
2:00pm –
3:00pm –

Friday, 11/10:
9:00am –
10:00am –
11:00am –

Will that work?

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 9:37 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Thursday, I have a Veterans day speech to do for a high school. 0750-1000hrs
1430hrs I have a meeting to attend.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 8:27 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

Good morning,

I'm back in the office sooner than expected.  Can you please send me your availability for tomorrow through the end of the week? I will work on rescheduling our interviews from yesterday.  I did also get the names of those who punched from the       so I will add a couple interviews for them as well.

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Monday, November 6, 2023 8:05 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Ok, thanks for letting me know.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)**  | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

| mobile:                    | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 6, 2023 6:35 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** interviews postponed

Good morning,

I am going to have to be out of the office today (and likely for a couple of days), so the interviews are going to have to be postponed. I will reach out about rescheduling once I know when I will be returning to work.  I apologize for any inconvenience!

Best,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

We've got ███████ at 1:00 Friday. I'll look at those other names tomorrow morning! Thanks!

Sent from my iPhone

On Nov 2, 2023, at 4:27 PM, Leible, Jason Aaron <jleible@corps.tamu.edu> wrote:

Checking on interview times for Friday. Want to make sure I am tracking all.

Also, 2x people we may want to talk with



I spoke with ███████████, if he knew anyone we might want to talk to.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:52 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews today

Yep I can get that pulled up for you to review before we start!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs |
Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:52 AM

**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews today

Was getting ready to head over, saw the change. On my way at 0900. If I could review the complaint and any information about the case?
v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                    | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:50 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** interviews today

Good morning,

Just wanted to make sure you saw that I had to slightly adjust the interview times for this morning! So we start at 9:30 instead of 9.

See you in a bit!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs |
Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| | |
|---|---|
| **From:** | Leible, Jason Aaron |
| **To:** | Winking, Audrey J |
| **Subject:** | RE: rescheduling today |
| **Date:** | Tuesday, November 14, 2023 9:03:15 AM |

I think we can work with it.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 14, 2023 9:02 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: rescheduling today

Okay maybe we do this…

Please describe in detail any situations/instances that you've experienced that:
- you believe may have been hazing
- were concerning to you
- caused you to question what was happening

These may include, but are not limited to: making/remaking your rack over and over, rapidly changing uniforms, standing on the wall with 5 points at attention for extended periods of time, participating in "training" or "gentleman's" chow, having to use EST for Corps-related tasks, being asked to do Corps-related tasks during the academic day, etc.

Thoughts on that? If there's anything I missed that you think should be included in that list, let me know or feel free to add it!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 14, 2023 8:56 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: rescheduling today

Howdy Audrey,

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90554586
Filing Code Description: Other
Filing Description: Defendant's First Supplement to First Amended Plea to the Jurisdiction-Exhs Pt. 2
Status as of 8/6/2024 7:51 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 8/5/2024 4:41:38 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/5/2024 4:41:38 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/5/2024 4:41:38 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/5/2024 4:41:38 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/5/2024 4:41:38 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/5/2024 4:41:38 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/5/2024 4:41:38 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| J DavidDodd III | | David@Jddoddlaw.com | 8/5/2024 4:41:38 PM | SENT |

**Received & Filed 8/5/2024 4:47 PM**
**Gabriel Garcia, District Clerk**
**Brazos County, Texas**
**Kristin Emert**
**Envelope# - 90555078**

I can do this, I spoke with ███████ and his concern is if we provided no context then we would get nothing back.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 14, 2023 7:52 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: rescheduling today

I will be back in the office tomorrow, so I am going to reschedule ███████ to Wednesday at 3pm! Let me know if that doesn't work for you.

When we've had cadets write statements in the past, it's been more broad (not a set of questions like we would do in an interview). So maybe something like this:

Please describe in detail any situations/instances that you've experienced that:
- you believe may have been hazing
- were concerning to you
- caused you to question what was happening

**Audrey Winking** | Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Monday, November 13, 2023 2:33 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: rescheduling today

Howdy,

No issues. I have not been in my office all this morning. I would like to have the questions to get them started and work it.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**- 2299 -**

**Sent:** Monday, November 13, 2023 7:38 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** rescheduling today

Good morning,

Since I got my new                    late on                    hasn't gotten set up yet, so I will be out today with her.  I will check in with the caseworker later today to try and make sure it gets submitted/approved today!  I will reschedule ▮▮▮▮▮▮ interview from today once I know when I will be back in the office.  Can you send me your availability for the rest of the week?

Also, I spoke with Dr. Bell and he said that it would be great if you can ask MSgt. ▮▮▮▮▮ to have the      in      submit written statements to him about anything that's taken place that they have found concerning.

Thanks so much!  And sorry I am out again and having to reschedule another one!

Best,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| From: | Leible, Jason Aaron |
|---|---|
| To: | Winking, Audrey J |
| Subject: | RE:        Investigation |
| Date: | Friday, October 27, 2023 11:19:49 AM |

Howdy Audrey,

I'll put them on my calendar.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                    | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders


**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 27, 2023 8:41 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE:        Investigation

I just sent calendar appointments for what I am planning on scheduling.  I plan on sending their interview notices out later today.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu


**From:** Winking, Audrey J
**Sent:** Wednesday, October 25, 2023 3:48 PM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE:        Investigation

Thank you!  My Monday afternoon is already full so I will plan on scheduling interviews for Tuesday and Wednesday (I will make sure to work around the times you listed below for those days).  I will probably have us hold Friday in case we determine we need to interview additional people after the Tuesday and Wednesday interviews.

I will try to get schedules confirmed tomorrow, but if not I will for sure get calendar appointments to

you Friday!

Thanks again,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 3:39 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:          Investigation

Audrey,

Howdy, I listed when I currently have hard times that I must meet for next week.

Monday – Meeting 0845-0945; Class 1020-1130
Tuesday- OPS&TRNG MTG 1430-1530
Wednesday – Class 1240-1330
Thursday
Friday

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)**  | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: | mobile:                | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, October 25, 2023 10:47 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:**          Investigation

Good morning,

I was told that you will be my co-investigator for the ____ investigation.  Would you mind sending me your availability for next week so that I can begin scheduling interviews? I will send you calendar appointments as I get them scheduled.

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Bell Jr, Douglas**

---

| | |
|---|---|
| **From:** | Smith, Asia |
| **Sent:** | Tuesday, March 19, 2024 4:24 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | RE: |

Thank you. I will officially assign it to Skylar tomorrow.

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, March 19, 2024 4:12 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**

Howdy,
I have placed the        investigation report in your intake folder.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

**From:** Doughty, Jeanae
**Sent:** Tuesday, January 17, 2023 8:27 AM
**To:** Bell Jr, Douglas
**Cc:** Upshaw-Brown, Jaclyn B
**Subject:** Investigation Report Submission
**Attachments:** FINAL Sample Investigation Report -


Howdy,

Please find the completed investigation report related to the incidents involving             attached.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

 
## Contact Information

Recruiters can reach out to you about this application using the public contact information from your worker profile below.

**Email** audrey_winking@sco.tamu.edu (Work)

**Phone Number**

## Experience

| | |
|---|---|
| **Company** | Texas A&M University |
| **Title** | Student Affairs Coordinator |
| **Location** | Student Conduct Office |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | Supervision and training of full time administrative support staff.<br>Student conduct case administration.<br>Facilitate training and outreach opportunities. |

| | |
|---|---|
| **Company** | Texas A&M University |
| **Title** | Associate Coordinator |
| **Location** | Student Conduct Office |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | Supervision of graduate assistant, including hiring and training.<br>Student conduct administration.<br>Facilitate hazing prevention trainings, hazing education workshops, and ethics and decision making workshops. |

| | |
|---|---|
| **Company** | Texas A&M University |
| **Title** | Community Director |
| **Location** | Residence Life |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | Supervise resident advisors.<br>Manage residence halls, keys, budgets, and more.<br>Advise community council.<br>Serve in on-call duty rotation.<br>Plan events and programs for the on campus residents. |

| | |
|---|---|
| **Company** | Texas A&M University |
| **Title** | Graduate Hall Director/Graduate Resident Manager |
| **Location** | Residence Life |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | |

| | |
|---|---|
| **Replace the Experience information in my profile with this information** | No |

## Education

| | |
|---|---|
| **Country** | United States of America |
| **School** | Texas A&M University |
| **Degree** | Doctorate |
| **Degree Received** | |


| | |
|---|---|
| **Field of Study** | Higher Education Administration |
| **First Year Attended** | 2018 |
| **Last Year Attended** | |
| **GPA** | |

| | |
|---|---|
| **Country** | United States of America |
| **School** | Texas A&M University |
| **Degree** | Masters |
| **Degree Received** | |
| **Field of Study** | Education Administration |
| **First Year Attended** | 2014 |
| **Last Year Attended** | 2016 |
| **GPA** | |

| | |
|---|---|
| **Country** | United States of America |
| **School** | Maryville University of Saint Louis |
| **Degree** | Bachelors |
| **Degree Received** | |
| **Field of Study** | |
| **First Year Attended** | 2010 |
| **Last Year Attended** | 2013 |
| **GPA** | |

| | |
|---|---|
| **Replace the Education information in my profile with this information** | No |

**Certifications**

none entered

**Language**

none entered

**Skills**

none entered

**Resume / Cover Letter**

**Questionnaire**

1. Default Primary Questionnaire - Internal Career Site 09/22

| Question | Answer(s) |
|---|---|
| If this position is located in the United States and you are selected, would you now or in the future require sponsorship for immigration-related employment authorization (e.g. H1-B, O-1, E-3, TN)? | No |



| Question | Answer(s) |
|---|---|
| Texas Government Code, Section 657, as amended, requires that a state agency or institution of higher education must provide employment preference to individuals who qualify for a veteran's employment preference. An individual who qualifies for a veteran's employment preference is entitled to a preference in employment with or appointment to a state agency or institution of higher education over other applicants for the same position who do not have a greater qualification.<br><br>You are not obligated to respond to State Veteran's Preference demographics; however, your response is important to meet federal and state reporting requirements. Information you provide will remain confidential in accordance with applicable federal and state regulations. Your employment will not be adversely affected by information you furnish.<br><br>Do you qualify for State of Texas veteran employment preference based on the four definitions below? | None of the above |
| I am 25 years of age or younger and was under the permanent managing conservatorship of the Texas Department of Family and Protective Services on the day preceding my 18th birthday. If hired and claiming foster child status, you will be required to provide verification of such status. | No |
| To comply with The Texas A&M University System policy on nepotism, answer the following question. Are you related to any current Texas A&M University System employee, official or regent? | No |
| If yes, state his/her name, relationship and the A&M System institution or agency. | |
| Have you ever worked for the State of Texas? | Yes |
| If yes, please indicate the agency and start/end dates of employment. | Texas A&M, August 2014-current |


| Question | Answer(s) |
|---|---|
| Application Terms and Conditions<br><br>I certify the statements made by me in this application and materials supplied by me as part of my employment application are true, complete and correct to the best of my knowledge and belief and made in good faith. I understand that any falsification, misrepresentation, or omission of fact made herein or at any point in the hiring process may (a) void my application, (b) be cause for denial of employment or immediate termination of employment, regardless of when or how it was discovered. I agree to revise this application should any of the information change.<br><br>I authorize Texas A&M System members to conduct checks relating to my employment, education and any licenses. I also authorize all current and prior employers to provide full details concerning my past employment and I release them from all liability that may result from providing such truthful information. I understand that this history check may be required as specified by the appropriate System Member.<br><br>The Texas A&M System members are at-will employers and may dismiss employees with or without cause. I understand that if employed by a member of The Texas A&M System I will be an at-will employee and may be dismissed from employment with or without cause unless I have a legally different status.<br><br>I understand that if I am male, I am required to sign a Certification of Registration Status for the Selective Service as a requirement for employment. I further understand if I am a male age 18 through 25, I must show proof of registration with Selective Service at the time of hire.<br><br>I understand that any offer of employment is contingent upon my completing the U.S. Citizenship and Immigration Services Form I-9 and providing documents to verify my identity and employment eligibility as required by law. When completing the Form I-9, I will be required to attest that I am a citizen or national of the U.S., a lawful Permanent Resident or an alien authorized to work. I understand that as conditions of employment, I will be required to comply with U.S. export control regulations, clear a background check, and provide the TAMUS member all required employment documentation.<br><br>I acknowledge that by checking the certification statement below, I am ELECTRONICALLY SIGNING the Employment Application and affirming that information contained within this application is accurate and true. | Yes, I have read and consent to the terms and conditions |
| You have responded to the Term and Conditions that you do not consent, which will cause your application to be removed from consideration. | |


| Question | Answer(s) |
|---|---|
| Application Terms and Conditions<br><br>I certify the statements made by me in this application and materials supplied by me as part of my employment application are true, complete and correct to the best of my knowledge and belief and made in good faith. I understand that any falsification, misrepresentation, or omission of fact made herein or at any point in the hiring process may (a) void my application, (b) be cause for denial of employment or immediate termination of employment, regardless of when or how it was discovered. I agree to revise this application should any of the information change.<br><br>I authorize Texas A&M System members to conduct checks relating to my employment, education and any licenses. I also authorize all current and prior employers to provide full details concerning my past employment and I release them from all liability that may result from providing such truthful information. I understand that this history check may be required as specified by the appropriate System Member.<br><br>The Texas A&M System members are at-will employers and may dismiss employees with or without cause. I understand that if employed by a member of The Texas A&M System I will be an at-will employee and may be dismissed from employment with or without cause unless I have a legally different status.<br><br>I understand that if I am male, I am required to sign a Certification of Registration Status for the Selective Service as a requirement for employment. I further understand if I am a male age 18 through 25, I must show proof of registration with Selective Service at the time of hire.<br><br>I understand that any offer of employment is contingent upon my completing the U.S. Citizenship and Immigration Services Form I-9 and providing documents to verify my identity and employment eligibility as required by law. When completing the Form I-9, I will be required to attest that I am a citizen or national of the U.S., a lawful Permanent Resident or an alien authorized to work.  I understand that as conditions of employment, I will be required to comply with U.S. export control regulations, clear a background check, and provide the TAMUS member all required employment documentation.<br><br>I acknowledge that by checking the certification statement below, I am ELECTRONICALLY SIGNING the Employment Application and affirming that information contained within this application is accurate and true. | |

Questionnaire

TAMU_U9798_Student Affairs Coordinator

| Question | Answer(s) |
|---|---|
| Select the response that best represents your years of education. | Completed a Master's degree |
| Select the response that best represents your years of experience student affairs work or related specialty area. | 8 |

# Audrey Winking

## EDUCATION:

**Texas A&M University**                                                            College Station, TX
Ph.D. in Educational Administration                                          Anticipated: May 2023

**Texas A&M University**                                                            College Station, TX
Master of Education in Educational Administration                              May 2016
Student Affairs Administration in Higher Education

**Maryville University**                                                                   St. Louis, MO
Bachelor of Arts in Organizational Leadership – Cum Laude          December 2013
Concentration:  Rehabilitation Services

**Regent's College**                                                                London, England
Study Abroad                                                                                June 2011

## EXPERIENCE:

**Texas A&M University – Student Conduct Office**                    College Station, TX
**Associate Coordinator**                                                    February 2020 – present
- Review reports for potential violations of the Student Code of Conduct
- Meet with students, witnesses, advisors, and other stakeholders to resolve cases and assign appropriate educational sanctions
- Hire, train, and supervise the Graduate Assistant
- Update and facilitate Hazing Education Workshops and Hazing Prevention Trainings
- Facilitate Ethics and Decision-Making Workshops
- Serve on various working groups and committees, including a multi-office group focused on establishing accommodations in the conduct process for Aggie ACHIEVE students, the Department Unity committee, the Professional Development and Staff Training committee, and a full-time staff search committee
- Additional responsibilities during Summer 2021, including but not limited to:
    o Supervise full-time staff members
    o Supervise, evaluate, and hire student employees
    o Review all incoming reports, determine potential rule violations, assign cases to staff
    o Process incoming investigation reports
    o Prepare paperless process for resuming in-person conduct conferences and panels
    o Draft and send all letters to students
    o Run analytics and sanction reports
    o Collaborate with campus partners for various presentations and trainings

1

**Texas A&M University – Residence Life**                              College Station, TX
**Community Director**                                        January 2016 – February 2020

- Supervise 1-2 Graduate Hall Directors
- Supervise 11-16 undergraduate Resident Advisors
  o Includes oversight of multiple buildings, including Corps dorms, for a total of 480-740 residents
- Work through the student conduct process and hold student conduct conferences in hall
- Collaborate with the Student Conduct Office on co-adjudications and serve on conduct panels
- Participate in an on-call duty rotation for all on-campus residence halls (approximately 10,000 residents)
- Refer students to various campus and community resources
- Facilitate training presentations for the RAs and GHDs
- Advise a Community Council and manage the budget (about $1000-$1300 per semester)
- Assist in the recruitment and selection of resident advisors
- Follow through with the department's accountability model for staff members
- Manage the facilities for summer conferences, including meeting with camp and conference sponsors
- Serve on two Residence Education committees (RA Training and Summer Operations)

**Texas A&M University – Residence Life**                              College Station, TX
**Graduate Resident Manager**                                    May 2015 – December 2015

- Prepared the facility for opening Fall 2015 to house over 1200 primarily freshmen
- Hired and supervised undergraduate student workers (office assistants and resident advisors)
- Developed the RAs' programming model based on the department's academic initiatives
- Planned a program (with a $1000 budget) to take place the first week of classes to build community
- Established a community council for the White Creek Apartments, including recruiting members and officers, creating a constitution, and completing the steps for student organization recognition
- Advised the White Creek Community Council and managed the budget (about $2500 per semester)
- Supervised the 21 RAs' programming efforts (including budget) for the entire White Creek Apartments
- Worked through the student conduct process and held student conduct conferences
- Participated in an on-call duty rotation for on-campus apartments (approximately 2100 residents)
- Served on a Residence Education committee (RA Training and Development)

**Texas A&M University – Athletics**                                  College Station, TX
**Center for Student Athlete Services Intern**                    August 2015 – December 2015

- Worked one on one with 13 student athletes that were high-risk for losing NCAA eligibility
- Created Week at a Glance (WAG) charts for each athlete to help them keep up with coursework
- Completed administrative tasks around the office as needed when not meeting with an athlete

**Association for Student Conduct Administration (ASCA)**              College Station, TX
**Practicum Intern**                                              May 2015 – July 2015

- Assisted in planning the 2015 Gehring Academy, Title IX workshops, and webinars
- Began a historical project by doing research and setting up the methodology for collecting the data, as well as conducting interviews with the organization's original members

2

- Attended the Gehring Academy (July 2015) to assist throughout the conference, including helping with registration and set up/clean up
- Attended the ASCA Annual Conference (February 2016 and 2017) and assisted throughout the conference, including helping with registration and collecting items for and setting up the silent auction

**Texas A&M University – Residence Life**                                    College Station, TX
**Graduate Hall Director**                                                  August 2014 – May 2015

- Co-supervised staff of 15 resident advisors in two separate residence halls (about 450 residents)
- Advised two student organizations (hall councils)
- Served on a Residence Education committee (First Year Experience)
- Developed and used conflict resolution, mediation, and student conduct adjudication skills
- Understood and worked within the student conduct process
- Managed Hall Council and staff programming budgets
- Performed facility management duties, including managing keys for both residence halls
- Participated in duty rotation for half of the university's residence halls

## INVOLVEMENT:

- Conflict Mediation Certificate
- Green Dot Training (Bystander Intervention)
- QPR Training (Question, Persuade, Refer – Suicide Prevention Training)
- Gehring Academy Attendee – 2015, 2019 (Foundations), 2020 (Conflict Resolution), 2021 (Equitable & Inclusive Practices)
- ASCA Annual Conference Attendee – 2016, 2017, 2021
- ASCA Member – Association for Student Conduct Administration
- SWACUHO Conference Attendee (Southwest Association of College and University Housing Officers)
- ACUHO-I Annual Conference Attendee – 2016
- Summer Operations Committee Member
- First Year Experience Committee Member
- Community Director Selection Committee Member
- Resident Manager Search Committee Member
- Graduate Hall Director Selection Committee Member
- Resident Advisor Training and Development Committee Member
- Graduate Hall Director Training and Development Committee Member
- SWACURH 2015 Advisor – Dining and Hospitality Committees (Southwest Affiliate of College and University Residence Halls)
- National Night Out (Texas A&M University Campus Safety Week) Committee Member and Volunteer
- AFSAP Member – Association of Future Student Affairs Professionals

3

# MARK TAPLETTE, ED. D.

Phone:

## PROFESSIONAL PROFILE

- Accomplished career demonstrating consistent success as an Administrator and Educator at the secondary and higher education levels. Outstanding record of accomplishment in assuring student success.

- Seasoned in conceiving and building programs from the ground up through proven competencies in grant writing and administration, project and program management, and staff development and empowerment.

- Extensive background of developing and implementing special programs for at-risk and special needs students

- Effective communicator with excellent planning, organizational, and negotiation strengths as well as the ability to lead, reach consensus, establish goals, and attain results.

## EDUCATION

**EdD**   Azusa Pacific University, Azusa, CA, Educational Leadership/Administration, December 2005 Dissertation: *"Factors Affecting Retention and Graduation of Black American Football and Basketball Players at Division I-A, Revenue-Producing Institutions"*

**MS**   The Criswell College, Dallas, TX Theology, May 1999

**BS**   Texas A&M University-Commerce, Public Administration Minored in Sociology, December 1983

## PROFESSIONAL EXPERIENCE

**Laura Burrell GO Center/Bryan, Texas**                          2022 to 2023
**Program Director**

- Provide on-going leadership and effective direction to all aspects of area network.
- Program development and grant writing.
- Working with College Bound students on college admission requirement, testing, and financial aid.
- Working with Board of Director to accomplish local mission.
- Supervision and training of volunteers.
- Make recommendations to management on policy and procedures changes.
- Annual development and implementation of the budgetary plan.

M. Taplette - 1

**Sam Houston State University/Huntsville, Texas**                     2020-2022
**Assistant Director of Greek Life**

- Provide comprehensive advising leadership to 30+ social Greek-letter organizations, Interfraternity Council, Multicultural Greek Council, National Pan-Hellenic Council, Panhellenic Association, and the Greek honor society Order of Omega.
- Develop and maintain educational workshop series for Greek students focusing on leadership, chapter development, wellness programs, risk management and risk-reduction education, community service initiatives, and membership recruitment.
- Serve as a liaison to inter/national offices, chapter advisors, faculty advisors, housing corporations, alumni, and members of the University community.
- Advise the coordination of formal and informal fraternity and sorority recruitment efforts.
- Oversee data collection and database management for fraternities and sororities. Maintain active and current records on membership, conduct matters, retention, and scholastic achievement of all Greek-letter organizations.
- Assist the Associate Dean with the coordination and oversight of Greek traditional events, including Greek Week, the Greek Awards program, and Bearkat Bolt 5K.
- Serve as a member of the Dean of Students Office department leadership team providing support to other areas within Dean of Students Office, assisting in the planning and coordination of University traditions such as Bearkat Family Weekend and Homecoming.
- Help manage University's Greek standards.
- Be able to create PR and marketing content related to the Greek life office, i.e. booklets, pamphlets, videos, etc.
- Be one of the sole account users of all office related social media accounts.
- Act as a student advocate, providing personal advice and appropriate referrals to students seeking assistance.
- Be willing and able to travel with students or alone to various conferences.

## PUBLICATIONS

### *Journal Papers in Review*

- Taplette, M.T., "Review of *Colormute* by Mica Pollock," Submitted to Childhood Education, vol. 83, no. 3, 2007, pp. 181-186.

## PRESENTATIONS

### Paper Presentation

- "Minority Males and College Athletics," Graduate Symposium Azusa Pacific University, December 2020.
- *"Minority Athletes at Division I-A Institutions: Should they be paid?"* Texas A&M University, May 2016.

**Keynote Address**
- "Making it Work: Keys to Success for Minority Students on Predominately White Universities," Black College Professionals Conference, May 2018.

**Workshop**
- "Student Success in the 21st Century," Moorpark College Student Success Day, May 2022.
- Taplette, M. (2019), "Staff Development for Mid-Career Faculty." Presented at the Bryan ISD staff development conference, Bryan, TX.
- Taplette, M. (2017), "Youth Suicide Prevention." Presented to Brazos County Public School Special Education Teachers in In-service Day, Bryan, TX.
- Taplette, M. (2016), "Creating Effective Schools," seminar at the Association of Professional Educator of Texas, Austin, TX
- Special Education Facilities In-service Conference, Bryan, TX.

## PROFESSIONAL TRAINING

National Workforce Institute
NASPA/SACSA Mid-Managers Institute, Participant, Duke University
NASPA Doctoral Students Workshop, St. Louis, Missouri
Student Activities Diversity Committee, Chair, Criswell College
Upward Bound Program, Mentor, East Texas State University
Intercultural Leadership Seminar, facilitator, Howard Payne University
University Retention Initiative, Co-Chair, Howard Payne University
Department of Residence Life Diversity Committee, Texas A&M University
Department of Residence Life Resident Advisor Training Class, Facilitator, Texas A&M University

## PROFESSIONAL AFFILIATIONS

Southern Association for College Student Affairs
National Association of Student Personnel Administrators

## COMMUNITY SERVICE

**Save our Streets Ministry**
Board of Directors, Bryan, TX, February 2003 to Present

**Pop Warner Little Scholars**
Regional President, Brazos Valley, May 2007, to May 2014

**Boy Scouts of America**

<div align="right">M. Taplette - 3</div>

Assistant Scout Leader Troop 976, Bryan, TX, 2005 to 2013

## LANGUAGES

**English**: Native Language

**Spanish**: Intermediate Listener, Novice Speaker

## COMPUTER SKILLS

- Microsoft Office
- Spreadsheets
- PowerPoint
- Microsoft Access
- QuickBooks
- Email
- Web and Social Skills
- Graphic and Writing Skills

M. Taplette - 4

## REFERENCES

**John Yarabeck,** Dean of Students
Campus Life & Student Relations
McMurry University
1400 Sayles Blvd.
Abilene, TX  79605
936-577-1444


**Dr. Rachael Valle,** Director
Student Activities
Sam Houston State University
1905 University Avenue
Huntsville, TX 77340
936-294-3588
**Rachael.Valle@shsu.edu**

**Dr. Jerrell Sherman,** Associate Dean
Dean of Students Office
University of Houston
4455 University Dr.
Student Center South RM 256
Houston, TX 77204-3035
713-992-0038
jsherman6@uh.edu

**Dr. Michael Thornton**, Clinical Assistant Professor
Health & Kinesiology
 Texas A&M University
332 Blocker
College Station, TX 77843
(979) 845-3109
mthornton@tamu.edu

**Dr. John Singer**, Tenured Professor
Health and Kinesiology
Texas A&M University
355-B Blocker
804 E Harrington Office Building
College Station, TX 77843
(979) 845-5497
singerjn@tamu.edu

M. Taplette - 5

**EXHIBIT
28**

CAUSE NO. 24-000902-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## BUSINESS RECORDS AFFIDAVIT

| | |
|---|---|
| State of Texas | § |
| County of Brazos | § |

Before me, the undersigned notary, on this day personally appeared Tricia Bledsoe, the affiant, whose identify is known to me. After I administered an oath, the affiant testified as follows:

1. My name is Tricia Bledsoe, and I am over the age of 18 years of age, of sound mind, capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am currently employed as the Director and designated Public Information Officer of Texas A&M University's (TAMU) Office of Open Records (ORO) and in this capacity am the primary custodian of the records identified herein by virtue of my duties and responsibilities.

3. The records identified in this affidavit and attached to Defendant's Plea to the Jurisdiction by exhibit number as business records are as follows:

**Exhibit 1:** Plaintiff's first TPIA request w/ history – J000762
**Exhibit 2:** Plaintiff's second TPIA request w/ history –J000767
**Exhibit 3:** Plaintiff's third TPIA request w/ history – J001123
**Exhibit 4:** Plaintiff's fourth TPIA request w/ history – J001147
**Exhibit 5:** Plaintiff's fifth TPIA request w/ history – J0001320
**Exhibit 6:** TAMU request for AG decision, April 19, 2024
**Exhibit 7:** AG decision OR2024-004322
**Exhibit 9:** First batch produced B-1 (11 total pgs)

Page 1

**Exhibit 10:** Second batch produced B-2 (111 total pgs)
**Exhibit 11:** TAMU withdrawal letter re B-1 and B-2 docs
**Exhibit 12:** Plaintiff's sixth TPIA request w/ history – J0001365
**Exhibit 13:** Email w/ transmittal of documents re sixth TPIA request
**Exhibit 14:** Plaintiff's seventh TPIA request w/ history – J0001723
**Exhibit 15:** Email w/ transmittal of partial disclosure of seventh TPIA req
**Exhibit 16:** TAMU request for AG decision, May 6, 2024
**Exhibit 17:** TPIA request by JD Foster – J1330
**Exhibit 18:** Fish brigade concept docs (152 total pgs)
**Exhibit 19:** Updated Plaintiff's fifth TPIA request w/ history – J-1320
**Exhibit 20:** Emails b/t Plaintiff and TAMU re TPIA req J001320
**Exhibit 21:** Rudder theatre email (2 total pgs)
**Exhibit 22:** Facebook post (6 total pgs)
**Exhibit 26:** J1147 production part one (292 total pgs)
**Exhibit 27:** J1147 production part two (13 total pgs)

4.  These said 690 pages are kept by TAMU in the regular course of business. It was in the regular course of business for an employee or representative of TAMU or its predecessor agency, with knowledge of the act, event or condition recorded, to make the memorandum or record or to transmit information thereof to be included in such memorandum or record, and the memorandum or record was made at or near the time of the act, event or condition recorded or reasonably soon thereafter; or, in the case of documentation given to or received by TAMU, it was in the regular course of business for an employee or representative of TAMU to receive the record and place it in the appropriate files of TAMU. With the exception of the redaction of any personal, private, or confidential information, and any bates numbering or exhibit number identification of any documents by the parties of the records identified by exhibit number above, they are exact duplicates of the originals.

5.  TAMU's Office of Open Records is dedicated to the principles of open government and strives to ensure compliance as set forth by the Texas Public Information Act (TPIA). TAMU's ORO oversees the collection process of information requested under the TPIA. The actual collection is done by the department maintaining the information or, in the case of emails, IT for that group. TAMU's ORO reviews, processes and releases information gathered by the respective department and/or IT. TAMU's ORO confirms the applicability of exceptions to disclosure on information requested under the TPIA with the Office of General Counsel of The Texas A&M University System (TAMUS OGC). For information determined to be excepted, TAMU's ORO works with TAMUS OGC to: request a decision from the Office of the Attorney General; confirm the applicability of a prior open records decision from the Office of the Attorney General; confirm TAMU's authority to redact or withhold excepted information without seeking a decision from the Office of the Attorney General per the TPIA; and/or confirm the applicability of the requestor's

Page 2

- 2320 -

authorization to redact or withhold excepted information without seeking a decision from the Office of the Attorney General. TAMU's ORO redacts and/or withholds information requested under TPIA only when: authorized by the Office of the Attorney General in a decision/letter ruling; the information is subject to a prior decision of the Office of the Attorney General; the TPIA authorizes the action; and/or authorized by the requestor.

EXECUTED on June _11_, 2024.

*Patricia Bledsoe*

Patricia Bledsoe, Director
Open Records
Office of Risk, Ethics, and Compliance
Texas A&M University

SUBSCRIBED AND SWORN BEFORE ME, on June _11_, 2024 to certify which witness my hand and official seal.

*Cindy Patterson*

Notary Public, State of Texas

CINDY PATTERSON
Notary Public, State of Texas
Comm. Expires 07-07-2026
Notary ID 12158568

**EXHIBIT**

**29**

**FRANK WOOD**

PRI Email: fcwood@corps.tamu.edu
ALT Email:

## Objective

To earn a Doctorate in Education (Curriculum & Instruction) to collaborate with the Hollingsworth Center improve the SOMs curriculum and overall delivery of the leadership pedagogy at TAMU.

## Summary

- One year as a Corps OPS Coordinator II/Military Advisor and SOMs instructor with Office of the Commandant TAMU
- Three years as a Cadet Training Officer III and SOMs instructor with Office of the Commandant TAMU
- Seven years as a US Army JROTC Army Instructor
- 30 years of experience in Leadership and Training in the US Army.
- Developed and implemented training and special programs for Combined Arms Operations.
- Evaluated and managed Personnel Specialists to ensure performance objectives were met consistently.
- Experienced in Information Technology and proficient in working with Digital Projectors and Video Camera systems, Microsoft Suite, the Army C4ISR and battle command automated systems including FBCB2, MCS, MBTR, ASIP, BFT.
- Recognized numerous times for outstanding job performance.

## Education

- Currently enrolled in Ed D Cohort XIV EDCI TAMU (4.0 gpa)
- Graduate of Basic and Advanced JROTC School of Cadet Command Instructor Certification Course, Fort Knox, KY
- Graduate, M. Ed, C&I, TAMU, College Station, TX (3.8 gpa)
- Graduate, BS degree, Liberal Arts, Excelsior College, NY (3.5 gpa)
- Graduate, AA degree, General Study, Central Texas College, TX (3.0 gpa)
- Command Sergeant Major Training, Fort Leavenworth, KS
- US Air Force Sergeants Major Course, Maxwell-Gunter Annex, AL
- First Sergeant School, Fort Bliss, TX **(Commandants' List)**
- Fast ROPE Master training, Fort Campbell, KY
- Sabaluaski Air Assault School, Fort Campbell, KY **(Distinguished Graduate)**
- Small Group Leader Instructor Trainers Course, Fort Bragg, NC
- Maneuver Senior Leaders Course, Fort Benning, GA **(Commandants' List)**
- Pathfinder School, Fort Benning, GA
- Advanced Airborne Course (Jumpmaster), Fort Bragg, NC
- Air movement Operations Course, Fort Bragg, NC
- Ranger School, Fort Benning, GA
- TRADOC Small Group Instructor Trainer school, Fort Jackson, SC
- Drill Sergeant School, Fort Jackson, SC **(Commandants' List)**

- Infantry Advanced Leaders Course, Fort Benning, GA **(Commandants' List)**

## Work Experience

Corps OPS Coordinator II/1st BDE Military Advisor, Office of the Commandant TAMU, College Station TX JUL 2020-Currently Supervisor: John Fleming Asst CMDT OPS & TRNG (979) 862-4311; jfleming@corps.tamu.edu Contact: Yes

Assists the Commandant, Deputy Commandant, and Assistant Commandants with the oversight of daily operations, facilities, services, and activities which contribute to missions of the Office of the Commandant and the Corps of Cadets, the learning environment and overall quality of cadet life. Ensures appropriate dining hall practices, customs, etiquette, and decorum are observed and maintained. Serves as an advisor to the Duncan Dining Council. Approves and supervises unit physical training programs. Conducts periodic dorm room, uniform, and individual inspections of cadets to ensure compliance with Corps Policies and The Standard. Assists cadets at the Unit, Major Unit, and Corps Level in the planning and conduct of events to include, but not limited to Corps Trips, parades, reviews, ceremonies, and march-ins. Advise, recognize and sponsored Student Organizations. Responds and coordinates action during contingencies and emergencies. Keeps the Commandant, Deputy Commandant, and Assistant Commandant for Operations and Training informed of serious incidents and problems. Represents the Assistant Commandant for Operations and Training in his/her absence and makes decisions as delegated.

- Capably schedules and advises the cadet supervision the Freshman Orientation Week event that efficiently and effectively assists over 700 incoming cadets assimilate and inculcate into the cadet and academic experience of TAMU.

- Expertly instructs two sections of SOMs and manages the curriculum, content, delivery, and scheduling of SOMs 181 sections.

- Diligently performs 24-hour duty and oversight of the Quad as the Commandants Duty Officer.

- Routinely performs march in support and sideline oversight to support the boot line and other student activities during all home and select football games.

JROTC Army Instructor, "Eagle Battalion" CE Ellison HS, Killeen TX AUG 2012-JUN 2020 Supervisor: Elise Jacko AP – (254) 336-0600; Elise.Jacko@killeenisd.org Contact: Yes

Annually educates over 200 high school students in the areas of leadership, academics, athletics, while motivating them to be better citizens. Coached and sponsored special performance and exhibition teams in synchronized drill and ceremonies and academic challenges for Military Skills Meets and competitions across the great state of Texas. Worked diligently to earn the Honor Unit award for one Annual Formal Inspection and the most recent JROTC Program Accreditation.

- Developed strategies to ensure the JROTC program surpassed accreditation standards and earned distinguished ratings.

- Implemented an interactive journal for all cadets in all grades to develop reflective thinking skills and improve academic rigor.

- Coached and mentored three cocurricular competition teams that routinely competed and won titles across the state of Texas.

Command Sergeant Major, 1-8th Calvary Regt, Fort Hood, TX Aug 2010 – Jul 2012
Supervisor: COL Sicoli, Peter – (516) 376-7386; peter.a.sicoli.mil@mail.mil;  Contact: Yes

Mentored and influenced for over 1100 men and women in Combined Armed Battalion Combat team during Garrison and combat operations.  As a top senior enlisted executive manager, provided sound advice to the Commander on all matters pertaining to enlisted personnel including assignment, training, education, professional development, morale, welfare, and performance evaluation.

- Directly responsible for this organization earning the Meritorious Unit Citation for successful transition of U.S. Forces in support of Operation New Dawn, Iraq.

- Developed and implemented the battalion Abrams Tank and Bradley IFV resulting in 100% crew qualification and 97% 1st time qualification rates.

- Commended by the 1st Cavalry Division Deputy Commanding General-Maneuver for his expert training and evaluation of six infantry platoons during combined arms live fire exercises.

- Prepared and led five leader professional development sessions on topics about the history of Iraq, ethnic diversity in the Diyala and sectarian fault lines of the Iraqi Northern provinces, and so was recognized as the most technically and tactically proficient battalion command sergeant major in the brigade.

- Managed the battalion volunteer recognition ceremonies and organization celebrations that honored the soldiers and their families for providing dedicated service to our community, greatly increasing esprit de corps, morale, and camaraderie.

G3 Operation SGM, 7th US Army JMTC, Grafenwoehr, Germany, Nov 2009 - Aug 2010
Supervisor: CSM (ret) ZaGara, Darieus – (304) 535-5394;  darieus.a.zagara.mil@mail.mil;
Contact: Yes

Responsible for all garrison operations and functions related to soldier and family fitness, soldier and family readiness, continued soldier education programs while serving in a community of over 38,000 soldiers, family members, and civilians. Advises and mentors the commanders, panel chairs, and community representatives overseeing all community and garrison functions for the commanding general. Provided oversight, synchronization, and coordination for all the command's special projects, and community relations.

- Directly responsible for the lead the effort to establish historical displays spanning the 100 years of Grafenwoehr Training Area in support of the centennial celebration.

- provided much needed experience regarding Soldiers and their struggles during Community Health Promotion Council and Risk Reduction Program meetings thereby enhancing the programs.

- established a much-needed bridge between many of the community panels/advisory committees and Soldiers and Family's resulting in

- presented invaluable input in support of Warrior University that was an absolute success in supporting post deployment soldiers training in achieving college credit.

Command Sergeant Major, 2/2 Stryker Cavalry Regt, Vilseck, Germany, APR 2006– Nov 2009
Supervisor:  MG Jones IV, Omar--(571) 358-4420; omar.jones.mil@mail.mil; Contact: Yes
Supervisor:  COL (ret) Reineke, Myron -- (913) 705-0311; myron.reineke.civ@mail.mil; Contact: Yes

Mentored and influenced for over 900 men and women in a Stryker Infantry Squadron during Garrison and combat operations. As a top senior enlisted executive manager, provided sound advice to the Commander on all matters pertaining to enlisted personnel including assignment, training, education, professional development, morale, welfare, and performance evaluation.

- Directly responsible for this organization earning the Valorous Unit Award for combat operation during the U.S. Forces surge in support of Operation Iraqi Freedom, Iraq.

- Implemented systems for administrative management that resulted a near perfect176 of 177 or 99.4% of annual enlisted evaluation reports being processed on time.

- Executed a program that efficiently deduced NCO education back log sending 473 soldiers to all levels of leader professional development school and motivated 159 of them to graduate with honors.

- Actively involved in effort to make Composite Risk Management along with the Risk Reduction Program habitual across the formation; resulting in early identification and intervention with high risk Soldiers

- Expertly evaluated 6 rifle platoons during live-fire exercises in Bulgaria in support of a USAREUR Theater Security Cooperation deployment exercise

- Consistently recognized and commended as one of the best of six senior enlisted advisors in the Regiment.

- Time and again sought innovative techniques and procedures to solve training and operational dilemmas and then codified those lessons into standard operation procedures that would be adopted as the regimental standard.

# Lt Col Jeffery D. Gardner

## Curriculum Vitae

_____

## Education

BS in Mechanized Agriculture Texas A&M University 1982

MPA in Public Administration Troy State University 1990

Squadron Officers School 1987

Air Command and Staff College 1996

Armed Forces Staff College 1996

Air War College 1999

Air Force Academic Instructor School 2003

Texas A&M Student Conduct investigator/panel member training 2007

Texas A&M SASH panel member training 2012

Gehring Academy 2023

## Teaching Experience

Squadron Officers School 1993-1995

Air Force ROTC Texas A&M University 2003-2007

School of Military Science Texas A&M University 2007-Present

## Professional Experience

Corps Accountability and Standards Director 1 October 2023-Present

Director, Sanders Corps of Cadets Center, Office of the Commandant, Texas A&M 2008-2023

First Wing Cadet Training Officer, Office of the Commandant, Texas A&M 2007-2008

Professor of Aerospace Studies, Air Force ROTC, Texas A&M 2006-2007

Assistant Professor of Aerospace Studies, Air Force ROTC, Texas A&M, 2003-2006

Command Center Operations Chief, National Airborne Operations Center, Offutt AFB 1999-2003

Chief, SIOP Training, Cheyenne Mountain Air Station, 1996-1999

Operations Officer, Squadron Officers School, Maxwell AFB, 1993-1995

Chief, Command and Control Inspections, USAF Europe, Ramstein AB, 1990-1993

Chief, Command Post, RAF Bentwaters UK, 1987-1990

Instructor ICBM Combat Crew Commander, Malmstrom AFB, 1986-1987

ACP/SCP ICBM Combat Crew Commander, Malmstrom AFB, 1985-1986

Instructor ICBM Deputy Combat Crew Commander, Malmstrom AFB, 1984-1985

| From: | Gardner, Jeffery D |
| :--- | :--- |
| To: | Fleming, John D; Schlather, Byron L |
| Subject: | Fwd: Outcome Letters |
| Date: | Wednesday, February 8, 2023 6:19:35 AM |
| Attachments: | ██████ SCO Final Outcome Letter.pdf |
| | ██████ 08_01_01 Final Outcome Letter Respondent Copy.pdf |
| | ██████ SCO Final Outcome Letter.pdf |
| | ██████ 08_01_01 Final Outcome Letter Respondent Copy.pdf |

FYI. We need to discuss if these cadets will return to their outfit.

V/R

Begin forwarded message:

> **From:** "Reilly, Michael" <mreilly@navy.tamu.edu>
> **Date:** February 7, 2023 at 5:48:00 PM CST
> **To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>, "BEATY, GARY"
> <gbeaty@corps.tamu.edu>
> **Cc:** "Fleming, John D" <jfleming@corps.tamu.edu>, "Marsh, Scott"
> <smarsh@navy.tamu.edu>, "Mullenberg, Jason" <jmullenberg@navy.tamu.edu>
> **Subject: Fwd: Outcome Letters**
>
> Gary and Jeff,
>
> Please see the attached SCO and Title IX results for ██████ and ██████.
>
> Both of these cadets have displayed appropriate repentance and I'd like for them
> to resume their life in the Corps as soon as possible.
>
> I don't have any of the results for other cadets.
>
> Thanks,
> Mike
>
> Semper Fi,
> Col Michael D. Reilly
>
> Begin forwarded message:
>
> > **From:** "Quandt, Kathryn" <kquandt@navy.tamu.edu>
> > **Date:** February 7, 2023 at 17:08:23 CST
> > **To:** "Reilly, Michael" <mreilly@navy.tamu.edu>
> > **Subject: Outcome Letters**

**- 2328 -**

Good Afternoon, Sir,

As requested.

Respectfully,

**Kathryn Quandt**
Captain | USMC
Marine Officer Instructor | NROTC | Texas A&M University
(979) 845-1775
(979) 458-6066

- - - - - - - - - - - - - - - - - - - - - - -

TEXAS A&M UNIVERSITY | FEARLESS on Every Front

**From:** Fleming, John D
**To:** Anderson, Chauncy Jovan
**Cc:** Schlather, Byron L
**Subject:** FW: Cadet ████
**Date:** Wednesday, February 8, 2023 10:50:06 AM

MSgt,

      FYI below on ████.

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, February 8, 2023 10:39 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Cadet ████

Sir,

      We conducted a conduct hearing for the failed urinalysis test for Cadet ████████, a ████ in ████ He provided a list of prescribed medications he takes for back pain.  I consulted a pharmacist and determined the combination of prescribed medications can result in a false positive THC test.  The cadet has agreed to participate in future random or directed drug tests.  I believe this is a false positive and the matter is closed.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**- 2330 -**

| | |
|---|---|
| **From:** | Fleming, John D |
| **To:** | Gardner, Jeffery D |
| **Cc:** | Michaelis, Patrick Ralph; BEATY, GARY; Schlather, Byron L; Anderson, Chauncy Jovan |
| **Subject:** | Urinalysis results |
| **Date:** | Monday, January 30, 2023 4:32:18 PM |
| **Attachments:** | |

Jeff,

One positive result from our 23 Jan urinalysis, see attached.  Cadet ███████ is a          in
Pop is for THC.

There is also one cadet who was on the roster and notified Sunday night 22 Jan, but then he had to leave campus in the middle of the night for a family emergency.  He is still at home in         He will provide his sample upon return.

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Michaelis, Patrick Ralph |
| **Cc:** | BEATY, GARY; Fleming, John D; Schlather, Byron L |
| **Subject:** | |
| **Date:** | Tuesday, February 21, 2023 2:27:59 PM |
| **Attachments:** | |

Good afternoon Sir,

The attachment contains the members of        that are being charged.  Student Conduct office has determined this to be low level hazing and as such, has given those charged three options:

     (1) Accept responsibility for all charges and accept the sanctions listed below

     (2) Choose not to contest the charges and accept the sanctions listed below.

     (3) Request a Student Conduct Conference to contest the charges.

The sanctions identified by Student Conduct include:

1. Conduct Review through Friday, May 12, 2023.
2. Corps Conduct Review through Friday, May 12, 2023
3. Hazing Education Workshop (HEW), due Friday, April 28, 2023.

I am standing by for your questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Gardner, Jeffery D
**To:** Michaelis, Patrick Ralph
**Cc:** BEATY, GARY; Fleming, John D; Schlather, Byron L; Regan III, John M
**Subject:** Additional    charges
**Date:** Thursday, February 23, 2023 1:35:00 PM

Good afternoon Sir,

An additional    cadets from    were charged today for hazing resulting from the investigation.  These cadets are not facing dismissal from the University. The cadets are:

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Michaelis, Patrick Ralph |
| **Cc:** | BEATY, GARY; Fleming, John D; Schlather, Byron L |
| **Subject:** | Cadet ▓ |
| **Date:** | Wednesday, March 1, 2023 9:23:54 AM |

Sir,

Yesterday we held a conduct conference for Cadet ▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓ He was found responsible for hazing with ▓▓▓▓▓▓ and has been placed on Conduct Review until 12 May 2023.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

Sorry.  Probation until Dec 2023.

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:33 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** RE:

Thank you Sir.

?

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:29 AM
**To:** Fleming, John D <jfleming@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** RE:

Here you go.  We need to discuss the future of the ▮▮▮ on probation.

▮▮▮ - one year suspension-withdrew from the university
▮▮▮ - one year suspension
▮▮▮ - one year suspension
▮▮▮ - one semester suspension
▮▮▮ - one semester suspension
▮▮▮ - Probation
▮▮▮▮▮▮

 - Probation

███ - Probation

███ - Probation

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:25 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** RE:

Jeff,

I have lost count on these.  Can you please give us a full paybook on the ███████ and their status.

Chief,

For all cadets whose suspension from the University has been upheld, are we cleared hot to inform them of their Corps dismissal and have them start checkout?

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
Corps of Cadets | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:08 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Reilly, Michael <mreilly@navy.tamu.edu>
**Subject:**

Sir,

I received the following results of the ████ appeals.

 - Suspension from the University until 29 Dec 2023

- Suspension from the University until 31 May 2023

- Conduct probation- there was no end date in the letter, so I am checking with Title IX.

- Suspension form the University until 31 Dec 2024

- Suspension from the University until 29 Dec 2023

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| From: | Gardner, Jeffery D |
| --- | --- |
| **To:** | Fleming, John D; Schlather, Byron L |
| **Subject:** | Fwd:                    College Station - On-Campus Residence Hall - 04/07/2023 1:15 AM |
| **Date:** | Friday, April 7, 2023 11:29:30 AM |
| **Attachments:** | |

FYI.

Begin forwarded message:

**From:** "Upshaw-Brown, Jaclyn B" <jaclynu@sco.tamu.edu>
**Date:** April 7, 2023 at 8:56:16 AM CDT
**To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>
**Subject: FW:                        College Station - On-Campus Residence Hall - 04/07/2023 1:15 AM**

Sharing this with you; there are no names as of now. Res Life may also be following up to see if they can provide further information.

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Kaitlin Kopf (via Maxient) <notifications@maxient.com>
**Sent:** Friday, April 7, 2023 2:37 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:**                     College Station - On-Campus Residence Hall - 04/07/2023 1:15 AM

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

**Campus Community Incident Report**
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

**2023-04-07**
Time of incident
**1:15 AM**
Location of incident
**On-Campus Residence Hall -**

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**was just arriving to the dorm around 1:15 am when she got to the stairwell, about 4 or 5 corps boys were giggling and running very quickly and loudly down the stairs. They all went into the 1st floor hallway with the rest if the boys. They moved quickly, but            got a glimpse of about 3 of them, the one who dropped the table had dark hair and a white shirt, looked to be Caucasian, the other two had shaven heads, also Caucasian, one with dark hair and one with lighter, blonder hair. None of them were wearing shoes. The residents of                          then heard a loud pop sound from the hallway.            had just gotten to the top of the stairs when the residents came out of their rooms to see what was happening.**

**noticed an exploded water bottle with a small bag inside and a foamy substance and water around it. She spoke with Resident                          about the first explosion, how the water bottle was smoking and smelled of chemicals.            looked around and found a second bottle, still building the pressure to pop.            called the RA on duty,                  .            turned to walk back to her room and heard the loudest sound she's ever heard.            ear drum almost burst, it hurt for at least 10 minutes after, she couldn't hear out of her right ear for about 7 minutes and had just had a lot of ear pain. Floor partner,                          came out to see.            arrived and called noticed a light fixture had been tampered with, noting the same people who threw the water bottles probably broke the light as well. The light's plastic clover was on the floor.            believes it was an attack from the below Corps floors, specifically the first floor as she saw them running down the stairs to the first floor.**

**has noted a few times in the past where corps members have had animosity towards the**

**Supporting Documentation**
70254150642e3d19dd7609b4135a8f8b1dd4155300c.heic
img5592.heic
img5593.heic
img5594.heic
img5595.heic
img5596.heic
img5597.png
*For added security, these links will expire in 10 days. The attachments will remain accessible when viewing the report within Maxient.*

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**Replies will be sent to the submitter (katie.kopf@tamu.edu).**

| From: | Regan III, John M |
| To: | ▮▮▮▮▮▮▮ |
| Subject: | RE: Hazing |
| Date: | Tuesday, August 22, 2023 4:17:10 PM |

Good Afternoon Sir,

As stated in my previous email, I ask that you provide me with any statements you may have that lists specific potential violations. If you have names, please include them. I understand that you have doubts and concerns about retaliation. I can assure you that if the unlikely act of retaliation does occur, it will be dealt with swiftly and appropriately.

Until I am provided with statements of potential specific violations, I have nothing to move forward with.

Respectfully,

**GySgt John M. Regan III USMC (Ret)** | 1st Regiment Military Advisor/CCMU Advisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-4279 | jregan@corps.tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, August 22, 2023 2:37 PM
**To:** Regan III, John M <jregan@corps.tamu.edu>
**Subject:** Re: Hazing

**This Message Is From an External Sender**
This message came from outside your organization.

GySgt Regan:

I assumed that was the response I would receive, and, with all do respect, based on what has occurred I have zero trust that this would be handled in a manner that would allow a cadet to continue in the Corps after making such a report.

**- 2341 -**

It's very disappointing that the Corps doesn't have a way for a cadet to report such issues anonymously without fear of retaliation.

We were sold on the Corps for the leadership development and tradition, but I'm not sure how forcing immorality and criticizing spirituality and religious beliefs can possibly develop better leaders.

On Tue, Aug 22, 2023 at 2:01 PM Regan III, John M <jregan@corps.tamu.edu> wrote:

> Good Afternoon Sir,
>
> My name is GySgt John Regan and I currently serve as the 1st Regiment Military Advisor, and member of the Commandants Staff. As per your email, you have serious concerns about things that may be occurring in       .  If you have statements that lists specific violations, I encourage you to send them to me so that I may begin an initial inquiry.  Holding on to them will not help us in identifying and correcting potential issues/violations.
>
> I also ask that you send any further correspondence directly to me.
>
> Respectfully,
>
> **GySgt John M. Regan III USMC (Ret)**  | 1st Regiment Military Advisor/CCMU Advisor
> Office of the Commandant | Division of Student Affairs | Texas A&M University
> 1227 TAMU | College Station, TX 77843-1227
>
> ph: 979-458-4279 I jregan@corps.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - - -
> **Corps of Cadets** | We Make Leaders
>
> _____
>
> **From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
> **Sent:** Tuesday, August 22, 2023 11:35 AM
> **To:** Regan III, John M <jregan@corps.tamu.edu>
> **Subject:** Fwd: Hazing
>
> I think this one is for you
>
> Sent from my iPhone

Begin forwarded message:

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Date:** August 22, 2023 at 11:15:36 AM CDT
**To:** "Ornelaz, Desiree A" <dmercado@corps.tamu.edu>
**Subject: Fwd: Hazing**

**This Message Is From an External Sender**

This message came from outside your organization.

---------- Forwarded message ----------
From: ▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮
Date: Tue, Aug 22, 2023 at 11:12 AM
Subject: Hazing
To: ▮▮▮▮▮@tamu.edu ▮▮▮▮▮@tamu.edu>
Cc: <dmercado@corps.tamu>

Mr. ▮▮▮▮ :

You need to get your house in order. The Corps' sales pitch was great, but the execution is horrible. For a leadership organization to work, your upperclassmen should set an example of the high moral character you say you desire. You have a lot of work to do to really develop a culture rooted in excellence, character and pride.

Please speak to your Pissheads and upperclassmen as there have already been violations that could be the end of some student careers, and your legacy as the commanding officer of your unit will be tarnished.

I have statements that I will send to the leadership, if necessary, specifically outlining incidents that would result in disciplinary action. As you can imagine, I won't give specifics now, because I'm afraid of how you and your buddies may use it against people in your unit.

Remember, our students should believe that they can trust and look up to the leadership, and I really had the feeling that they could - but I am left extremely disappointed on the second day of class. Set a better example.

Sincerely,

A concerned and very motivated parent

Thanks Kevin.

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, August 29, 2023 8:54 AM
**To:** Brummett, Kevin L <kbrummett@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>
**Cc:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: Cadet ▮▮ ,

I talked to the outfit and ▮▮ yesterday afternoon during training time. We received a "tell someone' Report regarding her. I'll be interested to hear what the command team has to say.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Brummett, Kevin L <kbrummett@corps.tamu.edu>
**Sent:** Tuesday, August 29, 2023 8:42 AM
**To:** Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Cadet ▮▮

Sir,

I just finished talking to the ▮▮ about the concerning hazing statement in this survey. Cadet ▮▮ is going to present a plan of action to our team and Lt Col Gardner today. In it, it should detail what happened, what steps they have taken to fix the solution, a way forward for retraining to

**- 2344 -**

make sure it doesn't happen again and repercussions for the Cadets who                    about the situation and posted it to the outfit.  I believe it can be dealt with at the Wing/Minor Unit Level and teach a good lesson to all, but I wanted to make sure that Lt Col Gardner was in the loop, and you had a heads-up if the Commandant or Meredith asked any questions.

Because I will be out of the office the next couple of days, I wanted to let you know it was being covered and that           should be reporting this via email to our CAT team and Lt Col Gardner before the end of today.

Lt Col Gardner, please let me know if you have any questions or guidance moving forward to assist these Cadets in taking care of this issue.

**v/r,**

**CPT Kevin L. Brummett USA (ret.)** | 3rd Group Operations Advisor
Office of the Commandant | Operations and Training | Texas A&M University
Harrell Hall,                    | 1227 TAMU College Station | TX 77843-1227

ph: 979.458.4406 |                          | kbrummett@corps.tamu.edu
**TEXAS A&M UNIVERSITY** | We Make Leaders

Good Afternoon Sir,

This is what John and I received from LtCol Gardner.

**GySgt Desiree A. Ornelaz USMC (Ret)** | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, September 19, 2023 2:18 PM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:      allegations

I don't think so.  We can discuss tomorrow if you like.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Tuesday, September 19, 2023 11:22 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      allegations

Good Morning Sir,

I was unaware of allegations against       Do you need anything from my end as the operations advisor?

**GySgt Desiree A. Ornelaz USMC (Ret)** | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |

**- 2346 -**

------------------------

**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, September 19, 2023 10:56 AM
**To:** ██████ @email.tamu.edu; ██████ @email.tamu.edu; ██████ < ██████ @email.tamu.edu>
**Cc:** Regan III, John M <jregan@corps.tamu.edu>; Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:**       allegations

All,

We have received an allegation of hazing in       . I need to meet with all your             that are not in class tomorrow at 1600 in room 203 of Ash 1. ██████ and ████ I would like for you to attend and run the meeting.  Let me know if you have questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| From: | Schlather, Byron L |
|---|---|
| To: | Gardner, Jeffery D |
| Cc: | Fleming, John D; Washington, Robert Sykes; Simpson, Meredith M |
| Subject: | FW: ▮▮▮▮▮ , UIN ▮▮▮▮▮ |
| Date: | Wednesday, October 25, 2023 10:37:00 AM |
| Attachments: | ▮▮▮▮▮ |

Jeff,

FYSA. Jeff Wilson from ResLife indicated that former cadet ▮▮▮▮▮ 's mother has "made comments about the 'horrible things' that happened to her son over the past several months while he was in the Corps..." and may be making an official complaint in the future. He didn't mention any of this in his resignation survey or resignation form (both attached). I just wanted you to be aware in case you get a call from SCO (or someone else).

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

From: Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
Sent: Wednesday, October 25, 2023 10:16 AM
To: Schlather, Byron L <bschlather@corps.tamu.edu>
Subject: RE: ▮▮▮▮▮ , UIN ▮▮▮▮▮

Thank you. Just a heads up, but we have now had several conversations with the Mom (called several offices here and I spoke to her yesterday as well)...who made comments about the "horrible things" that happened to her son over the past several months while he was in the Corps (to include the ▮▮▮▮▮ that he received). Sounded like they were getting ready make an official complaint on this.

This student has been assigned to temporary space in the ▮▮▮▮▮ If you look in StarRez, you should see this "tentative" booking (which means he has not completed the move-in yet)

Thanks

**Jeff Wilson '84** | Associate Director
Housing Assignments Office | Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-0000

ph: 979.845.4744 | toll free 888.451.3896 |email: jeff_wilson@reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

From: Schlather, Byron L <bschlather@corps.tamu.edu>

**- 2348 -**

**Sent:** Tuesday, October 24, 2023 10:37 AM
**To:** Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Subject:** RE: ███████ , UIN ███████

Jeff,

███████ voluntarily resigned from the Corps on ███████ to focus on his academics; he completed his check-out on ███████ . His resignation form is attached.

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

---

**From:** Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Sent:** Tuesday, October 24, 2023 10:34 AM
**To:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** ███████ , UIN ███████

Working on an appeal on the above student. Anything you can share on why he left the Corps?
Thanks

**Jeff Wilson '84** | Associate Director
Housing Assignments Office | Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-0000

ph: 979.845.4744 | toll free 888.451.3896 |email: jeff_wilson@reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

*Q1.* Last Name:

▮

*Q2.* First Name:

▮

*Q3.* UIN:

▮

*Q4.* Major:

[                                    ⌄]

*Q5.* Outfit:

[        ⌄]

*Q6.* Sex:

⦿ Male

○ Female

*Q7.* Age:

[19        ⌄]

*Q8.* Please answer the following questions:

|  | Yes | No |
|---|---|---|
| Did you attend Fish Camp? | ○ | ⦿ |
| Did you participate in the "Spend the Night with the Corps" program? | ○ | ⦿ |
| Do you intend to continue to attend Texas A&M University? | ⦿ | ○ |
| Did you receive a Corps of Cadets Scholarship (e.g., Sul Ross Scholarship, Corps 21 Scholarship, General Rudder Scholarship, Easterwood Scholarship, etc.) | ⦿ | ○ |
| Did you receive an ROTC Scholarship? | ○ | ⦿ |

**- 2350 -**

Do you have any family members who graduated
from Texas A&M University?

Q9. Did your family influence your decision to join the Corps of Cadets?

⦿ Yes
○ No

Q9A. On a scale of 1 to 5, how much influence did your family have on your decision to join the Corps of Cadets?

1 = Verbal encouragement ... 5 = Family member(s) made the decision for me

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Family Influence | | | | | | 2 |

Q10. Did your family support your decision to join the Corps of Cadets?

⦿ Yes
○ Neutral
○ No

Q11. Does your family support your decision to leave the Corps of Cadets?

⦿ Yes, my family is fully supportive of my decision to leave the Corps.
○ My family somewhat supports my decision to leave the Corps.
○ My family is neutral regarding my decision to leave the Corps.
○ My family is somewhat unsupportive of my decision to leave the Corps.
○ No, my family is not supportive of my decision to leave the Corps.

Q12. Did you want to seek a commission in one of the military services?

⦿ Yes
○ No
○ Undecided

Q13. Why did you join the Corps of Cadets?

I joined the Corps of Cadets to prepare myself to become an officer in the US Navy.

Q14. How were you recruited for the Corps of Cadets? (check all that apply)

- [ ] Was not recruited
- [ ] Was contacted by a cadet
- [ ] During College Night at my high school
- [ ] Interaction with Recruiting Office staff
- [x] JROTC instructor recommended the Corps
- [ ] High School Counselor recommended the Corps
- [ ] Teacher or Coach recommended the Corps
- [ ] Heard a presentation about the Corps
- [ ] Spend the Night with the Corps program
- [ ] Spend the Day with the Corps program
- [ ] Junior Cadet Accession Program (JCAP)
- [ ] Aggie Eagle Program (AEP/Scouting)
- [ ] Aggieland Saturday
- [x] New Student Conference at Texas A&M

**Q15.** What is your MAIN reason for leaving the Corps? (check only one)

- (●) Academic reasons
- ( ) Family Influence
- ( ) Financial reasons
- ( ) Other Medical reasons
- ( ) Religious reasons
- ( ) Lifestyle is too negative
- ( ) Lifestyle is too stressful
- ( ) Lifestyle is too physical
- ( ) Lifestyle is too structured
- ( ) Other

**Q15A.** Please elaborate on your reason for leaving the Corps (including explaining any selection of "Other").

I am leaving the Corps of Cadets to focus on academics. I have had trouble placing academics first while in the Corps and it is my desire to earn a GPA of 3.75 so that I can enter into                    I have also struggled to focus in classes because of worrying too much about what I needed to get done for the Corps.

**Q16.** What other reasons contribute to your departure? (Check all that apply)

- [ ] No additional reasons
- [ ] Academic reasons
- [ ] Family influence
- [ ] Financial reasons
- [ ] Other Medical reasons
- [ ] Religious reasons
- [ ] Lifestyle is too negative
- [ ] Lifestyle is too stressful
- [ ] Lifestyle is too physical

☐ Lifestyle is too structured

☐ Other

*Q16A.* You selected "Other."  Please elaborate.

*This question was not displayed to the respondent.*

*Q17.* Indicate your opinions on the following statements regarding the Corps of Cadets:

| | Strongly Agree | Agree | Neutral | Disagree | Strongly Disagree |
|---|---|---|---|---|---|
| My outfit really cared about me. | ○ | ◉ | ○ | ○ | ○ |
| The upperclassmen were professional. | ○ | ◉ | ○ | ○ | ○ |
| Members of my outfit demonstrated good leadership. | ○ | ◉ | ○ | ○ | ○ |
| Members of my outfit respected my dignity as a person. | ○ | ◉ | ○ | ○ | ○ |
| Academic performance was really my outfit's first priority. | ○ | ○ | ◉ | ○ | ○ |
| Discipline and training were correctly balanced in the Corps. | ○ | ◉ | ○ | ○ | ○ |
| I had adequate time to study. | ○ | ○ | ○ | ◉ | ○ |
| I had enough to eat during mealtimes. | ○ | ◉ | ○ | ○ | ○ |
| I had sufficient time to sleep. | ○ | ○ | ◉ | ○ | ○ |
| My dorm room was an adequate living environment. | ○ | ○ | ◉ | ○ | ○ |
| I had sufficient free time scheduled into an average week. | ○ | ○ | ○ | ○ | ◉ |
| I was physically prepared for the Corps. | ○ | ○ | ◉ | ○ | ○ |
| I was mentally prepared for the Corps. | ○ | ◉ | ○ | ○ | ○ |
| There was more PT than I expected. | ○ | ○ | ○ | ◉ | ○ |
| There was more yelling than I expected. | ○ | ○ | ◉ | ○ | ○ |
| There was a lot of profanity used around me. | ○ | ◉ | ○ | ○ | ○ |
| There was a lot of alcohol use. | ○ | ○ | ○ | ◉ | ○ |
| I witnessed a hazing incident while in the Corps. | ○ | ○ | ○ | ◉ | ○ |
| I was a victim of hazing while in the Corps. | ○ | ○ | ○ | ○ | ◉ |

*Q17A.* Describe the hazing event(s) in detail.  Include who was present, what actions took place, when did it occur, where did it occur, and what purpose was given, if any, for the activity that took place.

*This question was not displayed to the respondent.*

*Q18.* List the three MOST POSITIVE upperclassmen in your outfit:

███████  Mr. ███  and Mr. ███████ .

*Q19.* If applicable, list any ABUSIVE upperclassmen in your outfit.  Provide a short explanation why you consider their actions or behavior negative or abusive.

# RESIGNATION FROM THE CORPS OF CADETS

*\*\*FORM TO BE PRINTED AS A TWO-SIDED DOCUMENT & ISSUED BY OPERATIONS ADVISOR\*\**

## I. PERSONAL INFORMATION *(PLEASE PRINT LEGIBLY IN BLACK OR BLUE INK)*

NAME (LAST, FIRST, MIDDLE) [redacted]  UIN [redacted]

CORPS CLASS YR | CORPS UNIT | DORM NUMBER [redacted] | ROOM NUMBER [redacted] | ACADEMIC MAJOR | SEX ☒ M ☐ F

ROTC BRANCH AFFILIATION *(IF APPLICABLE)*
☐ Army   ☐ Air Force   ☐ Navy/Marine

CONTRACT STATUS
☐ Basic ROTC   ☐ ROTC Contract   ☐ Marine PLC   ☒ D&C

HOME ADDRESS [redacted]  CITY [redacted]  STATE [redacted]  ZIP [redacted]

CELL PHONE NUMBER [redacted]  EMAIL ADDRESS [redacted]

Are you a **Corps Scholarship** recipient?  ☒ YES  ☐ NO

Are you a **ROTC Scholarship** recipient?  ☐ YES  ☒ NO  Term  ☐ 3Yr  ☐ 4Yr

## II. REASON(S) FOR RESIGNATION

I decided to resign from the Corps of Cadets in order to focus more on my academics and pursue an _____ degree.

## III. PLANS AFTER LEAVING CORPS *(CHECK ALL THAT APPLY)*

☒ remain at TAMU as a civilian student   ☐ resign from TAMU   ☐ return to Corps at later date

## IV. STATEMENT ON HAZING

*(CHECK ONE)*
I  ☐ was  ☒ was not  a victim of hazing in the Corps of Cadets

*(CHECK ONE)*
I  ☐ am  ☐ am not  willing to provide a statement about hazing incident(s) in Corps  ☒ N/A

## V. TERMS AND CONDITIONS OF RESIGNATION *(PLEASE READ BEFORE SIGNING)*

I resign my membership in the Corps of Cadets. I understand and accept the following terms and conditions:

- I am required to complete the clearance process indicated on the reverse side of this form within 5 business days from the date of resignation
- I am required to turn in all Corps uniforms to the UDC within 5 business days from my date of resignation
- I remain bound by the terms of my housing contract
- I will forfeit any Corps scholarships that have been awarded for current and future semesters
- I must present a copy of this form to the Sbisa Dining Center to cancel my meal plan or change to a non-Corps plan
- I must contact my ROTC department to determine the status of my ROTC scholarship (if applicable)
- I must complete all steps in the clearance process prior to Corps Operations, the last stop of the checkout process.

I certify by my below signature that all information I have provided is accurate to the best of my knowledge.

CADET SIGN[redacted]  DATE OF RESIGNATION  9/26/2022

## VI. CLEARANCE FROM THE CORPS OF CADETS

### 1. COMMANDERS' INITIALS

| OUTFIT ██████ | MINOR UNIT *Not Avail for Signature* | MAJOR UNIT *Not Available for signature* |
|---|---|---|
| COMMENTS: Stay HARD | COMM ██████ | COMMENT ██████ |

### 2. OPERATIONS ADVISOR

SIGNAT ██████ DATE 9/26/23

COMMENTS: *Would like to focus on Academics.*

### 3. BAND DIRECTOR (Band Hall), 845-3529
For Cadets in the Aggie Band Only

SIGNATURE *N/A*  DATE 10/17/23

COMMENTS:

### 4. CORPS HOUSING (Plank LLC), 845-3443
Pick up room inventory card and transfer papers (if transferring to civilian housing)

SIGNATURE ██████ DATE 10/17/23

COMMENTS:

### 5. SCHOLARSHIP OFFICE (ASH 1 LLC), 458-0469
Mr. Siegel, Director of Corps Scholarship Programs

██████ DATE 10/17/23

COMMENTS:

## VII. ADDITIONAL REQUIREMENTS (STUDENT MAY INCUR ADDITIONAL CHARGES IF THESE STEPS ARE NOT COMPLETED)

### 1. ROTC REPRESENTATIVE (Trigon)
Army - 3rd Floor, 845-2814;  Air Force - 2nd Floor, 845-7611;
Navy/Marine - 1st Floor & Basement, 845-1775

SIGNATURE ██████ DATE 10/18/23

COMMENTS: *ROTC is Aware of resignation.*

### 2. UNIFORM DISTRIBUTION CENTER, 845-2528
Uniforms must be turned in no later than **5 business days** from the Date of Resignation (on front side of this form)

SIGN ██████ DATE 10/3/23

The UDC has my permission to assess dry cleaning charges to my fee statement  [ ] YES  [ ] NO

COMMENTS:

### 3. MEAL PLAN OFFICE (Sbisa Underground)
Cancel Corps meal plan or change to non-Corps plan

SI ██████ DATE 10/18/23

COMMENTS:

### 4. CORPS HOUSING OFFICER (In appropriate dorm)
[ ] Room Inspected & Inventory Card Signed

SIGNATU ██████ DATE 10/18/23

COMMENTS:

### 5. CORPS HOUSING (Plank LLC), 845-3443
Must complete all previous steps prior to outprocessing Corps Housing

SIGNATU ██████ DATE 10/18/23

COMMENTS:

[✓] Signed and completed inventory card & room key returned  [✓] Card access canceled  [✓] Photocopy of this form given to student

### 6. CORPS OPERATIONS (ASH II LLC), 862-4311, LAST
LtCol Fleming, Operations Director
LtCol Schlather, Operations Deputy

SIG ██████ DATE 18 OCT 23

COMMENTS:

[ ] Deactivated in CMS  [ ] Updated Exit Roster  [ ] Updated Fish Attrition Report, if freshman

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Schlather, Byron L; Anderson, Chauncy Jovan |
| **Cc:** | Fleming, John D; Griffing, Kenneth; Scheffler, Ricky L; Washington, Robert Sykes |
| **Subject:** | RE:                Floor Damage and Guidance |
| **Date:** | Monday, January 29, 2024 9:40:48 AM |

If specific individuals are responsible for the damage, why are they going to pay out of outfit funds? Seems like the individuals responsible should pay.  I can charge them with destruction of property under student rules if you would like.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Corps Standards and Accountability Director
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Sent:** Monday, January 29, 2024 9:36 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Griffing, Kenneth <kgriffing@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE:                Floor Damage and Guidance

Chauncy,
Thanks for the info.  Other than the shower door and room          , all of the other rooms belong to
              , yet those identified as being responsible for the damage are               and          .  That's a curious trend.

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Monday, January 29, 2024 8:16 AM
**To:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Griffing, Kenneth <kgriffing@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE:                Floor Damage and Guidance

Good Morning Sir,

I Spoke with ██████████ on this issue. He provided me with the following info.

Room ██████ - Missing Door number. ██████████ and ██████████ responsible.
Room ██████ - Broken Peephole. ██████████ Responsible
Room ██████ - Broken Peephole. ██████████ Responsible.
Room ██████ – Broken Peephole. ██████████ Responsible
Room ██████ Peephole - ██████ Responsible.
Shower Door- ██████████ responsible.

He also stated that they we willing to pay for it with outfit funds if possible. I told him we would let him know if that was an option. I know you said we cant ENFORCE group billing but does that mean they cant voluntarily pay for it with outfit funds? I will stop by the office to get further guidance here in a bit.

R/

**MSgt Chauncy J. Anderson USMC (Ret)** | 1st Wing Military Advisor
Office of the Commandant | Division of Student Affairs| Texas A&M University
Plank| ██████ TAMU | College Station, TX 77843

ph: 979.458.9372 | ██████████ | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Sent:** Friday, January 26, 2024 8:54 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Griffing, Kenneth <kgriffing@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** FW: ██████████ Floor Damage and Guidance

Chauncy,
Try to find out who broke the shower door. We can no longer enforce group billing, so if we don't identify a cadet (or multiple cadets), we can't split the cost among all outfit members.

Please look into the peephole issue (pun intended). If cadets are reversing the peepholes or removing them, that's a chargeable offense.

Also, tell the cadets that removing room numbers is vandalism, at least, and could easily be considered theft (an honor code violation).

v/r,
Byron

**LtCol Byron L. Schlather '93, USMC (Ret)** | Deputy, Corps Operations
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979.458.8458 | bschlather@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

---

**From:** Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>
**Sent:** Friday, January 26, 2024 8:16 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>; Schlather, Byron L
<bschlather@corps.tamu.edu>; Griffing, Kenneth <kgriffing@corps.tamu.edu>; Meredith Jr, Billy
<bmeredith@corps.tamu.edu>; DSA - DL - Corps Advisors <cto@corps.tamu.edu>
**Subject:** RE: ▮▮▮▮▮▮▮▮ Floor Damage and Guidance


Thanks ▮▮▮ for the follow-up and inspection report in ▮▮▮▮▮▮▮▮▮ . -
Just to confirm you put ▮▮▮▮ in the header but
I assume this information is all about ▮▮▮▮ and not ▮ correct ?  I am
including Corps Staff on this as we have a couple of different issues to
resolve here.  Also ▮▮▮ send me your ▮▮▮ report form with all of the
relevant information on these issues including the work order number for
that shower door.

- First as far as the broken shower door if you are able to identify the
  cadet or cadets who broke this door let me know as there will most
  likely be billing involved here as this does not look like normal wear &
  tear.

- As far as the missing number cards if those are the ones with a cadet's
  name & class information those are obtained through the Corps and not
  Housing

- Also on your report let me know where all of the missing peepholes are
  as that is a risk management issue and needs to be addressed asap .

Thanks ,

Rick


---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, January 25, 2024 4:13 PM

**To:** Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>
**Subject:**                    Floor Damage and Guidance

**This Message Is From an External Sender**

This message came from outside your organization.

Howdy Rick,

This week for inspection, there some missing room number cards and a lot of missing or broken peepholes on the _____ floor, as well as a broken shower door which I'll include a picture of. I've already submit a work order for the door and for the number cards and peepholes, I'm going to talk with _____ leadership this evening and determine what all can still be recovered before marking it all as lost.

For the number cards and peepholes that are considered lost or no longer usable, should I submit a work order or are those kept in the housing office?

Thank you,

██████



| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Michaelis, Patrick Ralph |
| **Cc:** | Fleming, John D |
| **Subject:** | FW: FW:  College Station - Off Campus - 01/15/2023 8:00 PM |
| **Date:** | Tuesday, January 17, 2023 2:58:59 PM |

Sir,

I received the following from Student Conduct. I do not believe we should act until the University determines if they will start a hazing investigation.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

---

**From:** ▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Sunday, January 15, 2023 8:36 PM
**To:** Sellers, Tyler B <tsellers@stuact.tamu.edu>
**Subject:**   College Station - Off Campus - 01/15/2023 8:00 PM

**This Message Is From an External Sender**

This message came from outside your organization.

Secondary recipient (you were copied)
**Campus Community Incident Report**
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident
**2023-01-15**
Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

**Involved Parties**
　　　　　() Organization

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes,

**- 2361 -**

even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

██████████ **and other** ██████████ **blind folded** ██████████ **and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that** ██ **keeps in his dorm.**

## Supporting Documentation
**No additional documents were attached to this report.**

## Submitted By
Your full name
██████████

Position/title/student status
**Student**
Your email address
██████████████████

Your phone number
██████████

UIN
██████████

*[UNAUTHENTICATED]*

## Routing Information
Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
• Tyler Sellers
• jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

**Message sent by Maxient** ████████████
**Replies will be sent to the submitter (** ██████████████ **)**

| From: | Gardner, Jeffery D |
|---|---|
| To: | Brummett, Kevin L; Nester, Aoife |
| Cc: | Simpson, Meredith M; Fleming, John D; Schlather, Byron L; BEATY, GARY; Regan III, John M |
| Subject: | RE: ██████████ Incident |
| Date: | Thursday, January 26, 2023 12:29:28 PM |
| Attachments: | image001.png |

Officer Nestor,

You will need to contact Student Conduct to obtain any violations of Student Rules and resulting sanctions. As for the Corps side, he was in violation of the Corps Alcohol policy ████████ and received sanctions. If you need more specific information, please contact me directly.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Brummett, Kevin L <kbrummett@corps.tamu.edu>
**Sent:** Thursday, January 26, 2023 11:28 AM
**To:** Nester, Aoife <aoifenester@tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>; Regan III, John M <jregan@corps.tamu.edu>
**Subject:** RE: ██████████ Incident

Officer Nestor,

Below are several contacts that may be able to provide information about ████████ All are copied on this email. My best guess is to talk to LtCol Gardner and COL Beaty first so they can talk to the University Discipline and Legal offices about releasing any information.

Gunnery Sergeant Regan was ████████ Cadet Training Officer – jregan@tamu.edu

LtCol Gardner is our Asst. Commandant of Discipline – jeff.gardner@tamu.edu

Ms. Simpson is our Asst. Commandant for Academics – msimpson@corps.tamu.edu

COL Beaty is our Chief of Staff for the Corps - gbeaty@tamu.edu

Hope this helps.

**v/r,**

**CPT Kevin L. Brummett USA (ret.)** | 3rd Wing Cadet Training Officer
Office of the Commandant | Operations and Training | Texas A&M University
Harrell Hall, ████████ | 1227 TAMU College Station | TX 77843-1227

ph: 979.458.4406 | ████████ | kbrummett@corps.tamu.edu
**TEXAS A&M UNIVERSITY** | We Make Leaders
RLTW

**From:** Nester, Aoife <aoifenester@tamu.edu>
**Sent:** Wednesday, January 25, 2023 8:55 PM
**To:** Brummett, Kevin L <kbrummett@corps.tamu.edu>
**Subject:** ████████ - Dec. 11 Incident

Capt. Brummett,

**- 2363 -**

I'm Officer Nester, one of the two TAMUPD Officers you spoke with in regards to the incident involving ██████ and ██████████ after the ██████████ .

I've been asked by the District Attorney to obtain any complaints, sanctions, disciplinary actions or commendations for ██████ for his time during the Corps. You were my one point of contact during that ████ so I figured I would start with you as to figuring out the best way to go about obtaining this information.

As with when we spoke last time, I am still working nights, 1800 to 0600, but I am able to access my email from my phone.

*Aoife Nester '18*
*Police Officer*
*Texas A&M University Police Department*
*979-845-2345*
*aoifenester@tamu.edu*

**From:** Gardner, Jeffery D
**To:** Michaelis, Patrick Ralph
**Cc:** BEATY, GARY; Fleming, John D
**Subject:**
**Date:** Wednesday, February 1, 2023 10:27:11 AM

Good morning Sir,

I participated in a conduct panel yesterday for ▮▮▮▮▮▮▮▮ The panel's decision was to suspend him from the university and dismiss him from the Corps. He can return to the university in the fall. He will appeal the decision.

V/R

**From:** Gardner, Jeffery D
**To:** Michaelis, Patrick Ralph
**Cc:** BEATY, GARY; Fleming, John D
**Subject:** outcome
**Date:** Wednesday, February 8, 2023 7:42:55 AM

Sir,

I have requested the official outcome from the Title IX office. I received the following from the outfit:

███ withdrew from the university

█████ one year suspension

█████ one year suspension

██████ one semester suspension

█████ one semester suspension

████ Probation

██████ Probation

████ Probation

█████ Probation

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Gardner, Jeffery D
**To:** Michaelis, Patrick Ralph
**Cc:** BEATY, GARY; Fleming, John D
**Subject:** FW: RE:      Outcome Letters
**Date:** Wednesday, February 8, 2023 2:06:23 PM
**Attachments:**



Sir,

Attached is the email request sent to Title IX. It answers your question as to why we were not notified. I reiterated the importance of letting us know the outcome of investigations before or when the student is notified with the understanding the appeals process could change the outcome.

I also contacted Jennifer Smith, who informed me the deadline to appeal is                    If any of the cases are appealed, it goes through another process and will likely not be resolved until sometime mid-March. As summary of the findings is attached in the excel document.

Sir, I believe we need to have a discussion regarding the cadets not suspended future in the Corps.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Allison, Terri L <terriallison@tamu.edu>
**Sent:** Wednesday, February 8, 2023 9:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Smith, Jennifer M <jennifer.smith@exchange.tamu.edu>
**Subject:** RE:      Outcome Letters

Good morning, Lt. Col. Gardner

Our usual practice is not to send out the final decision letters to campus entities until the appeals process has run it's course, in case any decisions are modified. However, I have attached the outcome letters for you here as a courtesy. The deadline for appeal in this case is                    .

Best,

*Terri Allison* | She |Her|Hers|Hearing Coordinator/Civil Rights Investigator
University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations
Texas A&M University | YMCA, Suite 200D

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Michaelis, Patrick Ralph |
| **Cc:** | BEATY, GARY; Thompson, Amy L; Fleming, John D |
| **Subject:** | |
| **Date:** | Wednesday, February 8, 2023 2:47:02 PM |

Afternoon Sir,

Just got off the phone with Student Conduct. Charge letters for ▮▮▮ should be out by next Wednesday. The ▮▮▮▮▮▮▮ will be included in the letters. I presume ▮▮▮ discussed the plan for ensuring ▮▮▮ calendar is not impacted.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Gardner, Jeffery D |
| --- | --- |
| To: | Fleming, John D; Schlather, Byron L |
| Subject: | Fwd: Outcome Letters |
| Date: | Wednesday, February 8, 2023 6:19:34 AM |
| Attachments: | ██████████████████████ |

FYI. We need to discuss if these cadets will return to their outfit.

V/R

Begin forwarded message:

> **From:** "Reilly, Michael" <mreilly@navy.tamu.edu>
> **Date:** February 7, 2023 at 5:48:00 PM CST
> **To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>, "BEATY, GARY"
> <gbeaty@corps.tamu.edu>
> **Cc:** "Fleming, John D" <jfleming@corps.tamu.edu>, "Marsh, Scott"
> <smarsh@navy.tamu.edu>, "Mullenberg, Jason" <jmullenberg@navy.tamu.edu>
> **Subject: Fwd: Outcome Letters**
>
>
> Gary and Jeff,
>
> Please see the attached SCO and Title IX results for ████████ and ████████
>
> Both of these cadets have displayed appropriate repentance and I'd like for them
> to resume their life in the Corps as soon as possible.
>
> I don't have any of the results for other cadets.
>
>
> Thanks,
> Mike
>
> Semper Fi,
> Col Michael D. Reilly
>
>
> Begin forwarded message:
>
> > **From:** "Quandt, Kathryn" <kquandt@navy.tamu.edu>
> > **Date:** February 7, 2023 at 17:08:23 CST
> > **To:** "Reilly, Michael" <mreilly@navy.tamu.edu>
> > **Subject: Outcome Letters**

Good Afternoon, Sir,

As requested.

Respectfully,

**Kathryn Quandt**

Captain | USMC

Marine Officer Instructor | NROTC | Texas A&M University

(979) 845-1775

(979) 458-6066

- - - - - - - - - - - - - - - - - - - - - - -

**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Norris, Dale W; Fleming, John D |
| **Subject:** | FW: CC: Texas A&M University Correspondence for Conduct Case |
| **Date:** | Thursday, February 9, 2023 10:47:40 AM |
| **Attachments:** | |

FYI

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Student Conduct Office (via Maxient) <notifications@maxient.com>
**Sent:** Thursday, February 9, 2023 10:40 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** CC: Texas A&M University Correspondence for Conduct Case

**This Message Is From an External Sender**

This message came from outside your organization.

You have been copied on a letter for case ▮▮▮▮▮▮▮▮▮ Please review the PDF attachment and retain a copy for your files. If you encounter difficulty opening this attachment, please contact our office.

Student Conduct Office
Offices of the Dean of Student Life
Texas A&M University
Phone: 979.847.7272
scrs@tamu.edu
https://studentlife.tamu.edu/sco/

**- 2371 -**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Norris, Dale W; Fleming, John D |
| **Subject:** | FW: CC: Texas A&M University Correspondence for Conduct Case |
| **Date:** | Thursday, February 9, 2023 10:47:56 AM |
| **Attachments:** | |

FYI

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Student Conduct Office (via Maxient) <notifications@maxient.com>
**Sent:** Thursday, February 9, 2023 10:44 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** CC: Texas A&M University Correspondence for Conduct Case

**This Message Is From an External Sender**

This message came from outside your organization.

You have been copied on a letter for case ▮▮▮▮▮▮▮▮▮▮ Please review the PDF attachment and retain a copy for your files. If you encounter difficulty opening this attachment, please contact our office.

Student Conduct Office
Offices of the Dean of Student Life
Texas A&M University
Phone: 979.847.7272
scrs@tamu.edu
https://studentlife.tamu.edu/sco/

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Norris, Dale W; Fleming, John D |
| **Subject:** | FW: CC: Texas A&M University Correspondence for Conduct Case            ▮ |
| **Date:** | Thursday, February 9, 2023 10:51:23 AM |
| **Attachments:** | |

FYI

<span style="color:#8B1A2B">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

<span style="color:#8B1A2B">Assistant Commandant for Discipline</span>

<span style="color:#8B1A2B">Military Advisor Parsons Mounted Cavalry</span>

<span style="color:#8B1A2B">979-458-9317</span>

**From:** Student Conduct Office (via Maxient) <notifications@maxient.com>
**Sent:** Thursday, February 9, 2023 10:46 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** CC: Texas A&M University Correspondence for Conduct Case ▮

**This Message Is From an External Sender**

This message came from outside your organization.

You have been copied on a letter for case ▮ Please review the PDF attachment and retain a copy for your files. If you encounter difficulty opening this attachment, please contact our office.

Student Conduct Office
Offices of the Dean of Student Life
Texas A&M University
Phone: 979.847.7272
scrs@tamu.edu
https://studentlife.tamu.edu/sco/

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Fleming, John D |
| **Subject:** | RE: CC: Texas A&M University Correspondence for Conduct Case ██████ |
| **Date:** | Thursday, February 9, 2023 11:27:32 AM |

They kicked ██████ back to me.

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

<span style="color:maroon">Assistant Commandant for Discipline</span>

<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>

<span style="color:maroon">979-458-9317</span>

**From:** Fleming, John D <jfleming@corps.tamu.edu>

**Sent:** Thursday, February 9, 2023 11:26 AM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:** RE: CC: Texas A&M University Correspondence for Conduct Case ██████ ██████

Copy all. ████?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - - -

<span style="color:maroon">**Corps of Cadets**</span> | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Thursday, February 9, 2023 10:51 AM

**To:** Norris, Dale W <dnorris@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>

**Subject:** FW: CC: Texas A&M University Correspondence for Conduct Case ██████ ██████

FYI

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

<span style="color:maroon">Assistant Commandant for Discipline</span>

<span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>

<span style="color:maroon">979-458-9317</span>

**From:** Student Conduct Office (via Maxient) <notifications@maxient.com>

**Sent:** Thursday, February 9, 2023 10:46 AM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:** CC: Texas A&M University Correspondence for Conduct Case ██████

**This Message Is From an External Sender**

This message came from outside your organization.

You have been copied on a letter for case ██████████ Please review
the PDF attachment and retain a copy for your files. If you encounter difficulty opening this
attachment, please contact our office.

| | |
|---|---|
| **From:** | Michaelis, Patrick Ralph |
| **To:** | Gardner, Jeffery D |
| **Cc:** | BEATY, GARY; Fleming, John D; Schlather, Byron L; Washington, Robert Sykes |
| **Subject:** | RE: |
| **Date:** | Tuesday, February 14, 2023 3:52:10 PM |

Got it. Thanks Jeff.

Also… got a not from Joe Ramirez,      will be charged out on Thursday.

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets | Texas A&M University**

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Tuesday, February 14, 2023 3:35 PM

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>

**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Washington, Robert Sykes <rwashington@corps.tamu.edu>

**Subject:**

Sir,

Results of the         Conduct hearing today are:

█████████ not responsible for hazing. Responsible for Conduct unbecoming a cadet- University and Corps Conduct review until 12 May 2023

█████████ not responsible for hazing. Responsible for Conduct unbecoming a cadet- University and Corps Conduct review until 12 May 2023

█████████ not responsible for hazing. Responsible for Conduct unbecoming a cadet- University and Corps Conduct review until 12 May 2023

Additionally, the outfit is required to meet with me to determine how we are going to change the outfit culture.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Gardner, Jeffery D |
|---|---|
| To: | Fleming, John D |
| Subject: | RE: |
| Date: | Monday, February 20, 2023 4:02:09 PM |

These did not file an appeal. The others did file so we will not be able to move forward until mid-March.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>

**Sent:** Monday, February 20, 2023 4:01 PM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>

**Subject:** RE:

So much for the middle of March…?

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training

Office of the Commandant | Division of Student Affairs | Texas A&M University

Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - - -

Corps of Cadets | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Monday, February 20, 2023 3:45 PM

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>

**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>;

Schlather, Byron L <bschlather@corps.tamu.edu>

**Subject:**

Good afternoon Sir,

Just received notice that the appeals window for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is closed and their sanctions and their cases are now finalized. We will need to decide on their Corps status in the next couple of days.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Michaelis, Patrick Ralph |
| **Cc:** | BEATY, GARY; Fleming, John D; Schlather, Byron L |
| **Subject:** | |
| **Date:** | Tuesday, February 21, 2023 2:27:59 PM |
| **Attachments:** | |

Good afternoon Sir,

The attachment contains the members of        that are being charged. Student Conduct office has determined this to be low level hazing and as such, has given those charged three options:

(1) Accept responsibility for all charges and accept the sanctions listed below

(2) Choose not to contest the charges and accept the sanctions listed below.

(3) Request a Student Conduct Conference to contest the charges.

The sanctions identified by Student Conduct include:

1. Conduct Review through Friday, May 12, 2023.
2. Corps Conduct Review through Friday, May 12, 2023
3. Hazing Education Workshop (HEW), due Friday, April 28, 2023.

I am standing by for your questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Gardner, Jeffery D |
|---|---|
| To: | Fleming, John D |
| Subject: | RE: Additional        charges |
| Date: | Thursday, February 23, 2023 2:21:52 PM |

The "deal" was for        This is still part of the bigger        problem not separable.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>

**Sent:** Thursday, February 23, 2023 2:20 PM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Subject:** RE: Additional        charges

Any idea if they will be offered the same deal as the others?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Thursday, February 23, 2023 1:35 PM

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>

**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>;
Schlather, Byron L <bschlather@corps.tamu.edu>; Regan III, John M <jregan@corps.tamu.edu>

**Subject:** Additional        charges

Good afternoon Sir,

An additional        cadets from        were charged today for hazing resulting from the investigation.                     The cadets are:

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Michaelis, Patrick Ralph |
|---|---|
| To: | Gardner, Jeffery D |
| Cc: | BEATY, GARY; Fleming, John D; Regan III, John M; Parker, Chad L; Thompson, Amy L |
| Subject: | Re:     Student Conduct |
| Date: | Monday, February 27, 2023 11:32:37 AM |

Got it. Thank you.

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

> On Feb 27, 2023, at 12:31 PM, Gardner, Jeffery D
> <jeff_gardner@corps.tamu.edu> wrote:

Sir,
They are the         class.
V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Monday, February 27, 2023 11:30 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D
<jfleming@corps.tamu.edu>; Regan III, John M <jregan@corps.tamu.edu>; Parker,
Chad L <cparker@corps.tamu.edu>; Thompson, Amy L <amy.thompson@tamu.edu>
**Subject:** Re:
Thanks Jeff. Remind me what class they belong to?

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets
Sent from my iPhone

>> On Feb 27, 2023, at 12:21 PM, Gardner, Jeffery D
>> <jeff_gardner@corps.tamu.edu> wrote:

Good Morning Sir,

We help the Conduct Conference for _____ cadets from ____ this morning. ██████████████████████████████████ were all found NOT RESPONSIBLE for the allegations of hazing regarding last _____ . I am available for questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **To:** | Fleming, John D |
| **Cc:** | Schlather, Byron L |
| **Subject:** | RE: |
| **Date:** | Thursday, March 2, 2023 9:34:10 AM |

Sorry. Probation until Dec 2023.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>

**Sent:** Thursday, March 2, 2023 9:33 AM

**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>

**Subject:**

Thank you Sir.

██████ ?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -

**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>

**Sent:** Thursday, March 2, 2023 9:29 AM

**To:** Fleming, John D <jfleming@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>

**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>

**Subject:** RE:

Here you go. We need to discuss the future of the ████ on probation.

 one year suspension-withdrew from the university

██████ one year suspension

███████ one year suspension

██████ one semester suspension

██████ one semester suspension

██████ Probation

████████ Probation

██████ Probation

██████ Probation

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:25 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; BEATY, GARY <gbeaty@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>
**Subject:** RE:

Jeff,

I have lost count on these. Can you please give us a full paybook on the ▮▮▮ cadets and their status.

Chief,

For all cadets whose suspension from the University has been upheld, are we cleared hot to inform them of their Corps dismissal and have them start checkout?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
Corps of Cadets | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, March 2, 2023 9:08 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Reilly, Michael <mreilly@navy.tamu.edu>
**Subject:**

Sir,

I received the following results of the ▮▮▮ appeals.

▮▮▮▮▮▮▮ Suspension from the University until 29 Dec 2023

▮▮▮▮▮▮ Suspension from the University until 31 May 2023

▮▮▮▮▮▮▮ Conduct probation- there was no end date in the letter, so I am checking with Title IX.

▮▮▮▮▮ Suspension form the University until 31 Dec 2024

▮▮▮▮▮▮▮ Suspension from the University until 29 Dec 2023

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

Begin forwarded message:

> **From:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>
> **Date:** March 9, 2023 at 11:24:46 AM CST
> **To:** "Michaelis, Patrick Ralph" <pmichaelis@corps.tamu.edu>
> **Cc:** "BEATY, GARY" <gbeaty@corps.tamu.edu>
> **Subject:**

Sir,

The Student Conduct panel for       concluded today. The students will be notified of their sanctions either this afternoon or tomorrow. I do not have the sanction letters but will send them to you as soon as I receive them. The sanctions are as follows:

████████████ -University and Corps Conduct Probation until Dec 23

████████████ - University and Corps Conduct Probation until Dec 23

█████████ - University and Corps Conduct Probation until Dec 23

████████████ - University and Corps Conduct Probation until Dec 23 ( recently selected as a            )

████████████ - University and Corps Conduct Probation until Dec 23

████████████ ' - University and Corps Conduct Probation until Dec 23

████████████ ' - University and Corps Conduct Probation until Dec 23

████████████ - University and Corps Conduct Probation until Dec 23

█████████ - University and Corps Conduct Probation until May 23

Each of these students is considered not in good standing with the University or Corps and as such, cannot hold leadership positions in student organizations nor represent the Corps or University.

In addition to the Probation there are educational requirements for each cadet that include Ethical decision-making workshop, Hazing Education workshop, reflective papers and monthly meetings with me.

I am available for questions or to discuss.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| From: | Gardner, Jeffery D |
|---|---|
| To: | Fleming, John D |
| Subject: | RE: Who"s next |
| Date: | Thursday, September 14, 2023 8:25:43 AM |

Rob is being assigned to investigate

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Wednesday, September 13, 2023 1:55 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Who's next

Washington, then Leible.  Provided they do not conflict with the subject of the investigation.

Let me know if they are going to be assigned so I can give them a heads up.

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, September 13, 2023 1:48 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Who's next

John,

Who are the next two on the joint investigation list?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

| | |
|---|---|
| **From:** | Leible, Jason Aaron |
| **To:** | Fleming, John D |
| **Subject:** | RE: Investigation |
| **Date:** | Friday, October 20, 2023 9:55:16 AM |

Roger Sir.

v/r

Jason

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:54 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigation

Jason,

You were next on the list when the ▮▮▮▮ investigation came up, but because you were close to that I assigned John. So you get the ▮▮▮▮ investigation.

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:36 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Investigation

Jason,

Heads up. You will be contacted to assist in the investigation into ▮▮▮▮.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**- 2387 -**

**From:** Gardner, Jeffery D
**To:** Fleming, John D
**Subject:** RE: Investigator
**Date:** Wednesday, October 25, 2023 9:40:22 AM

I'll come talk to you later today.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 7:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigator

What is this one for?

S/F

**LtCol John D. Fleming '94. USMC (Ret)** | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 7:42 AM
**To:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** RE: Investigator

Thanks

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 6:44 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigator

Desiree is next on the list.  What is this one for?

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 24, 2023 4:27 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Investigator

John,

I need another investigator.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Fleming, John D |
|---|---|
| **To:** | Gardner, Jeffery D |
| **Subject:** | RE: Investigation |
| **Date:** | Thursday, February 22, 2024 2:32:00 PM |

Sorry, was in class.  Rob already did the      .  Chad is up next, please take him.

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Operations Director
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 22, 2024 2:27 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>
**Subject:** Investigation

John,

I'm going to take Rob.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Corps Standards and Accountability Director
Military Advisor Parsons Mounted Cavalry
979-458-9317

# ROBERT WASHINGTON

linkedin.com/in/robert-washington-63269438

## EXECUTIVE OVERVIEW

**Seasoned professional** with 25 years' experience building and leading high functioning teams and organizations. Has 7+ years training and instruction to U.S. and foreign military to include advising in austere environments. Proven performer in challenging situations. Effectively managed an under resourced staff while directing twice as many subordinate units than the normal structure and preparing 450 person unit for combat deployment. Led organizations and planning efforts in support of crisis operations. With Master's Degree in Strategic Foresight, learned how to determine and understand changes in business environments and assist companies in modifying their model for continued success. Lean Sigma Six Green Belt trained and currently pursuing Project Management Professional certification. Able to step back to see the big picture and direct appropriate action but does not hesitate to get involved in the work. Proficient in the use of Microsoft Word, Excel, SharePoint and PowerPoint. A dedicated volunteer to the community and non-profits. Foreign experience in Asia, Europe, and Middle East. Active Top Secret Clearance.

## KEY TRAITS

- Executive Leadership
- Organizational Management
- Operational Planning
- Attention to Detail

- Quality Assurance & Quality Improvement
- Resource & Requirements Planning
- Crisis Management
- Program Management

## WORK EXPERIENCE

**Cadet Training Officer (Leadership Teacher)**                    **July 2020- Present**

- Mentor, lecture, and develop cadet leaders within the Texas A&M University Corps of Cadets on the Cadet Values, the Aggie Honor Code as well as leadership traits and principles in order to prepare them to handle the global challenges of the future.

**Senior Marine Instructor (Leadership Teacher)**                    **July 2018- July 2020**

- Lectured, and mentored 80+ Junior Reserve Officer Training Corps high school cadets on techniques of leadership, citizenship, general military subjects and staff planning processes, thereby developing more responsible citizens
- Organized, and scheduled numerous public engagements for the cadets which resulted in improved community relations and opportunities for cadets to develop their leadership skills
- Developed and managed program budget and fundraising activities to enable logistical support to cadet activities and events through equipment acquisition and transportation ordering

**Active Duty Officer, United States Marine Corps**                    Dec 1995- July 2018

**Operations Officer, (Chief Operations Officer)**                    July 2016- July 2018
**2d Marine Expeditionary Brigade, Camp Lejeune, NC**

- Supervised a section of over 40 Marines in the planning and execution of a major exercise for a 4000 person force that successfully conducted training and maneuvers with 9 foreign countries and resulted in no mishaps
- Directed the readiness, equipping and training of a 100 person staff in preparation for crisis response operations for national defense and humanitarian assistance which resulted in a response force ready to execute within 24 hours while managing a $1 million annual budget for exercise, travel and training costs

**Executive Officer, (Senior Vice President)**                    July 2013- June 2016
**10th Marine Regiment, Camp Lejeune, NC**

- Organized the information management and decision making cycle for the chief executive officer that was in charge of three subordinate elements totaling over 2300, enabling on a daily basis multiple critical decisions to maintain, organize and train the force while also meeting all higher headquarters reporting and tasking requirements
- Managed a staff of 12+ intermediate managers who were responsible for a collective of 200+ personnel, organized and prepared this group for successful passing of higher headquarters readiness inspection

# ROBERT WASHINGTON

**Training Requirements Officer, (Training and Development Manager)**    July 2010- June 2013
**Joint Staff, J7 Directorate, Suffolk, VA**
- Assessed strategic initiatives as related to the joint training environment and recommended and developed changes to respond to evolving needs of the joint warfighter, while directing a 25 person staff in the absence of the branch chief and managing a $4 million budget
- Developed Department of Defense technology roadmaps from policy analysis and future technology assessments thereby anticipating future challenges for our forces and preparing their global crisis response readiness

**Executive Officer, (Staff Director)**    Jan 2009- June 2010
**1st Battalion, 10th Marines, Camp Lejeune, NC**
- Evaluated and assigned over 70+ new personnel to positions within the unit to ensure resource allocation was in line with commander's guidance and thereby maximizing efficiencies in human resource structure to meet unit mission
- Analyzed and improved staff processes in order to manage the increased number of assigned sub-units to the headquarters without an equal increase in management personnel to handle the additional requirements and material
- Organized, coordinated and prepared a unit for crisis response deployment on a humanitarian mission to Haiti following an earthquake thereby fully resourcing response options for national command authority relief operations

**Military Transition Team Advisor**, (Senior Operations Consultant)    July 2007- Dec 2008
**1st Iraqi Army Division Advisor Team, Camp Lejeune, NC and Iraq**
- Led an ad hoc team of 12 Marines, on short notice, in partnering with an Iraqi Army unit to provide intelligence and operational support during remote location security missions away from Coalition bases and within a 4 month period traveled 800+ miles, cleared 12+ municipalities/neighborhoods, and brought all personnel home safely
- Advised, trained and mentored my Iraqi counterpart on the headquarters staff in the execution of large scale clearing and checkpoint operations which resulted in the transfer of security responsibilities for multiple towns and sectors in the Euphrates River Valley from U.S. forces to host nation forces, thereby facilitating drawdown of U.S. presence

**Small Group Leader & Doctrine Rep, (Staff Trainer & Policy Writer)**    July 2004- June 2007
**U.S. Army Field Artillery School, Fort Sill, Ok**
- Lectured, evaluated and mentored 60+ Army, Marine and International officers in small group settings on techniques of command management and staff planning processes, thereby successfully graduating 4 separate classes
- Organized, scheduled and taught curriculum instruction as the subject matter expert for specialized coursework
- Led project execution with numerous stakeholders on the development and refinement of a publication that provided procedures for the implementation of new system across both the U.S. Army and the Marine Corps services

## EDUCATION

Regent University, Virginia Beach, Virginia
Masters, Strategic Foresight, GPA: 3.83 / 4.0

Texas A&M University, College Station, Texas
Bachelor of Science, Political Science, GPA: 3.24 / 4.0

## TRAINING

- Lean Sigma Six, Green Belt Course, 2018- Department of the Navy recognized continuous performance improvement process for developing efficiencies in administrative procedures and production efforts
- Joint Maritime Prepositioning Forces Planners Course, 2017- Training focused on the tasks necessary to plan, deploy and employ prepositioned equipment by Marine and Navy forces

2

# ROBERT WASHINGTON

- <u>Military Justice Senior Officers Course</u>, 2013- Familiarize one with the uniform code of military justice, administrative fact-finding bodies and policy matters relating to command legal responsibilities
- <u>Toastmaster Curriculum</u>, 2010 to 2013- Competent Communicator and Leader levels achieved
- <u>Collateral Damage Assessment Course</u>, 2011- Determine hazards for target engagement
- <u>Joint Targeting, Staff Course</u>, 2011- Honor Graduate, planning target engagements at operational level
- <u>Joint, Interagency and Multinational Planners Course</u>, 2011- Plan and coordinate operations with Federal, State and local agency for national defense and humanitarian response to natural disasters
- <u>Joint Information Ops Orientation Course</u>, 2011- Plan operations to influence adversary information
- <u>Basic Effective Facilitation Course</u>, 2011- Techniques to enable instructor led discussions and debates
- <u>Joint & Combined Warfighting School</u>, 2011- Operational level of joint & interagency conflict planning
- <u>Security Manager's Course</u>, 2009- Information safeguarding and applying personnel security measures
- <u>Operator Advanced Casualty Response Course</u>, 2007- Hands on first responder treatment of injuries
- <u>Joint Operational Fires and Effects Course</u>, 2006- Plan use of artillery and air delivered munitions
- <u>Combat Lifesaver Course</u>, 2004- Basic lifesaving techniques of CPR, and treating injuries
- <u>Small Group Instructor Training Course</u>, 2004- Techniques of small group teaching and discussion
- <u>Total Army Instructor Training Course</u>, 2004- Techniques of large group lecture and demonstration
- <u>Field Artillery Captain's Career Course</u>, 2001- Distinguished Honor Graduate, number 1 out of 47
- <u>Basic Instructor Course</u>, 2000- Taught the techniques of lecture and discussion methods of instruction
- <u>Field Artillery Officer's Basic Course</u>, 1996- Honor Graduate, number 6 out of 167 students

## VOLUNTEER AND CIVIC CONTRIBUTIONS

- Boy Scouts of America leader for 10 years, mentoring young boys to become better citizens
- Semper Fi Fund volunteer for 5 years, assisted in community events to raise money so that the non-profit could provide assistance to critically wounded service members on their road to recovery
- Local church volunteer for 4 years supporting the children's ministry and guest services
- Volunteered with multiple Parent-Teacher Associations over a 15 year period
- Youth soccer league coach for two years teaching boys and girls between ages 4-7

## AWARDS

Bronze Star Medal, Defense Meritorious Service Medal, Meritorious Service Medal (2x), Navy/Marine Corps Commendation Medal (3x), Army Commendation Medal, Combat Action Ribbon, Presidential Unit Citation, Joint Meritorious Unit Award (x2), Meritorious Unit Commendation, NATO Medal, Iraqi Campaign Medal, Inherent Resolve Campaign Medal, Letter of Appreciation (3x), Certificate of Appreciation (3x), Letter of Commendation, Certificate of Achievement, Staff Achievement Award, Distinguished Student Certificate, Distinguished Naval Student Certificate (3x), Commandant's Honor Roll Certificate (2x), Superior Physical Fitness Certificate

3

| | |
|---|---|
| **From:** | Washington, Robert Sykes |
| **Sent:** | Thursday, April 4, 2024 10:30 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: Investigation Interview Notice |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, October 4, 2023 8:14 AM
**To:** XXXXXXXXXXXXXXXX
**Cc:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE: Investigation Interview Notice

Okay, thank you for getting back to me!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Monday, October 2, 2023 8:05 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy Audrey,
I apologize for not responding over the weekend. The picture                                                        before it
was deleted and for some reason I had saved it, I came by it when looking through old photos for supporting
documentation like you requested. I do not know who took the picture or who was present but I believe he sent the
picture of himself to the account to be posted.

Thank you,
XXXXXXXXXXXXXX

On Mon, Oct 2, 2023 at 3:53 PM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Hi XXXXXXXXXXXX

I just wanted to follow up to see if you could share with us where you got this picture? Also, if you have any additional context (who took the picture, who was present, etc.), any additional information you have would be greatly appreciated.

Please let me know by the end of the day tomorrow (Tuesday).

Thanks,

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Winking, Audrey J
**Sent:** Friday, September 29, 2023 9:13 AM
**To:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXX>
**Subject:** RE: Investigation Interview Notice

Thank you for sending this, XXXXXXXXXXX  Can you clarify where you were able to obtain this picture from?

Thanks again,

Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257


ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** XXXXXXXXXXXXXXXXXXXX>
**Sent:** Thursday, September 28, 2023 6:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice


Howdy Audrey,

This is the only supporting documentation I have for The investigation. I
                                                     I was asked about at the beginning of my interview in regards to
        dorms. I do not know who took the picture but I hope it will be sufficient evidence that XXXXXXXXXXX was
the one who                                                              I was not aware of        when it
happened so all I have is the picture.

Thank you for your time,

XXXXXXXXXXXXX


On Tue, Sep 26, 2023, 7:59 AM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

  Good morning, XXXXXXXXXXXX,



  Thank you for confirming your plan to attend tomorrow's meeting.  I do not need anything from you at this time.  At
  the start of your interview tomorrow I will walk through the acknowledgment form with you, and during the interview
  you will gain more context for what the report entails.  Once you have more context for the situation we will be
  discussing during the interview, should you wish to submit any supporting documentation (statements, pictures, texts,
  etc.) you will have the opportunity to do so!



  We do not share the report with students unless a student is charged with a student rule violation, which is not the
  case at this time.  If this investigation does lead to any charges, the charged student(s) would be able to review the
  report at that time.

Again, I will go over all of this more in detail with you tomorrow at the start of your interview, but hopefully this provides a little clarity on our process in the meantime.

Best,

Audrey

**FromXXXXXXXXXXXXXXXXXXXXXXXX**>
**Sent:** Monday, September 25, 2023 11:57 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy,

Thank you for the communication I will be present for the interview in my designated time slot. Is there any additional information you need from me? Is there any additional information you can provide to me about the nature of the complaint or investigation? I do not know anything.

Thank you for your time,

XXXXXXXXXXXXXX

On Mon, Sep 25, 2023, 1:33 PM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Dear XXXXX

The Student Conduct Office received a report regarding alleged hazing within        You have been identified as someone who may have been involved in the incident or have witnessed/has additional knowledge related to the incident. In order to gain additional information you are being asked to participate in the investigation process and an interview date has been scheduled for **Wednesday, September 27ᵗʰ at 2:30pm in the Student Services Bldg., Suite 309.** Your options for participation in this investigation will be reviewed with you prior to being asked to respond to any questions posed by the investigators. The attached Investigation Acknowledgement Form will be reviewed with you during your interview and you will be able to choose your level of participation in the interview process. A copy of the investigation flowchart, which outlines the process is also attached for your review. Information related to the student conduct code and any alleged violations specific to this investigation can be found here: http://student-rules.tamu.edu/rule24/. Click here to review additional information or FAQs regarding the investigation process.

Per student rule (*24.4.23. Abuse of Process*), you are required to meet with investigators. Should this meeting conflict with a scheduled class online or other obligation, please let us know. **Please confirm your receipt of this notice and your intended attendance on the date and time above by replying to this email.**

Please note that pursuant to **section 30.06 of the penal code and University Rule 34.06.02. MI:** while formal administrative hearings/investigations are taking place the carrying of concealed handguns is prohibited in **the Student Services Bldg., Suite 309.** Written communication will be posted outside of the room. Section 30.06 of the penal code states:

(3) Written communication means:

(A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."

If you need an accommodation for a disability, please contact our office. Requests for accommodations may be evaluated in consultation with Disability Resources.

Sincerely,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| **From:** | Washington, Robert Sykes |
|---|---|
| **Sent:** | Thursday, April 4, 2024 10:22 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 29, 2023 10:22 AM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:**

Hi Lt. Col. Washington,

XXXXXX emailed me saying he has the                                    at 4:00 on Monday, so he was asking if we can reschedule his interview.  I typically only work around students' class schedules, but is this something we should work around? I wasn't sure if this was extracurricular or something that is critical he participates in so I wanted to get your perspective!

He is the one we have scheduled at 2:45, with his class ending at 2:40.  So we in theory should be done by 3:45 but I do recognize that would be really rushed for him.

Thanks,
Audrey

| **From:** | Washington, Robert Sykes |
|---|---|
| **Sent:** | Thursday, April 4, 2024 10:24 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: Investigation Interview Notice |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, October 2, 2023 3:52 PM
**To:** XXXXXXXXXXXXXXXXXXXXXXXX
**Cc:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE: Investigation Interview Notice

Hi XXXXX,

Lt. Col. Washington and I would like to ask you a few follow up questions, so I have scheduled another interview for you on **Wednesday, October 4th at 1:30pm**.  This interview should be pretty brief since we only have a few things to follow up on!

We will meet in the same location and all of the same processes will apply.  Please just reply back to this email to confirm that this new date/time will work for you.

Best,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** XXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Tuesday, September 26, 2023 10:28 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

I'll be there at 1pm tomorrow.
Very Respectfully,

XXXXXXXXXXX

XXXXXXXXXXXXX

████████

On Mon, Sep 25, 2023 at 13:33 Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Dear XXXXXXX,

The Student Conduct Office received a report regarding alleged hazing within        You have been identified as someone who may have been involved in the incident or have witnessed/has additional knowledge related to the incident. In order to gain additional information you are being asked to participate in the investigation process and an interview date has been scheduled for **Wednesday, September 27th at 1:00pm in the Student Services Bldg., Suite 309.** Your options for participation in this investigation will be reviewed with you prior to being asked to respond to any questions posed by the investigators.  The attached Investigation Acknowledgement Form will be reviewed with you during your interview and you will be able to choose your level of participation in the interview process. A copy of the investigation flowchart, which outlines the process is also attached for your review.  Information related to the student conduct code and any alleged violations specific to this investigation can be found here:  http://student-rules.tamu.edu/rule24/. Click here to review additional information or FAQs regarding the investigation process.

Per student rule (*24.4.23. Abuse of Process*), you are required to meet with investigators. Should this meeting conflict with a scheduled class online or other obligation, please let us know. **Please confirm your receipt of this notice and your intended attendance on the date and time above by replying to this email.**

**Please note that pursuant to section 30.06 of the penal code and University Rule 34.06.02. MI:** while formal administrative hearings/investigations are taking place the carrying of concealed handguns is prohibited in **the Student Services Bldg., Suite 309.** Written communication will be posted outside of the room. Section 30.06 of the penal code states:

(3) Written communication means:

(A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."

If you need an accommodation for a disability, please contact our office. Requests for accommodations may be evaluated in consultation with Disability Resources.

Sincerely,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| From: | Washington, Robert Sykes |
|---|---|
| **Sent:** | Thursday, April 4, 2024 10:27 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: Investigation Interview Notice |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, October 2, 2023 3:54 PM
**To:** XXXXXXXXXXXXXXXXXXXXXXXX
**Cc:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** RE: Investigation Interview Notice

Hi XXXXXXXXXXXXXXX,

I just wanted to follow up to see if you could share with us where you got this picture? Also, if you have any additional context (who took the picture, who was present, etc.), any additional information you have would be greatly appreciated.

Please let me know by the end of the day tomorrow (Tuesday).

Thanks,

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Winking, Audrey J
**Sent:** Friday, September 29, 2023 9:13 AM

**To:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Subject:** RE: Investigation Interview Notice

Thank you for sending this, XXXXXXX!  Can you clarify where you were able to obtain this picture from?

Thanks again,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Thursday, September 28, 2023 6:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy Audrey,
This is the only supporting documentation I have for The investigation. I
                                          I was asked about at the beginning of my interview in regards to
     dorms. I do not know who took the picture but I hope it will be sufficient evidence that XXXXXXXX was the one
who                                                                     I was not aware of          when it
happened so all I have is the picture.
Thank you for your time,
XXXXXXXXXXXXXXX

On Tue, Sep 26, 2023, 7:59 AM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

  Good morning, XXXXXXXXXX,


  Thank you for confirming your plan to attend tomorrow's meeting.  I do not need anything from you at this time.  At
  the start of your interview tomorrow I will walk through the acknowledgment form with you, and during the interview
  you will gain more context for what the report entails.  Once you have more context for the situation we will be
  discussing during the interview, should you wish to submit any supporting documentation (statements, pictures, texts,
  etc.) you will have the opportunity to do so!


  We do not share the report with students unless a student is charged with a student rule violation, which is not the
  case at this time.  If this investigation does lead to any charges, the charged student(s) would be able to review the
  report at that time.


  Again, I will go over all of this more in detail with you tomorrow at the start of your interview, but hopefully this
  provides a little clarity on our process in the meantime.

Best,

Audrey

**From:** XXXXXXXXXXXXXXX>
**Sent:** Monday, September 25, 2023 11:57 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy,

Thank you for the communication I will be present for the interview in my designated time slot. Is there any additional information you need from me? Is there any additional information you can provide to me about the nature of the complaint or investigation? I do not know anything.

Thank you for your time,

XXXXXXXXXXXX

On Mon, Sep 25, 2023, 1:33 PM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Dear XXXXXXXXXX,

The Student Conduct Office received a report regarding alleged hazing within         You have been identified as someone who may have been involved in the incident or have witnessed/has additional knowledge related to the incident. In order to gain additional information you are being asked to participate in the investigation process and an interview date has been scheduled for **Wednesday, September 27th at 2:30pm in the Student Services Bldg., Suite 309.** Your options for participation in this investigation will be reviewed with you prior to being asked to respond to any questions posed by the investigators. The attached Investigation Acknowledgement Form will be reviewed with you during your interview and you will be able to choose your level of participation in the interview process. A copy of the investigation flowchart, which outlines the process is also attached for your review. Information related to the student conduct code and any alleged violations specific to this investigation can be found here: http://student-rules.tamu.edu/rule24/. Click here to review additional information or FAQs regarding the investigation process.

Per student rule (*24.4.23. Abuse of Process*), you are required to meet with investigators. Should this meeting conflict with a scheduled class online or other obligation, please let us know. **Please confirm your receipt of this notice and your intended attendance on the date and time above by replying to this email.**

**Please note that pursuant to section 30.06 of the penal code and University Rule 34.06.02. MI:** while formal administrative hearings/investigations are taking place the carrying of concealed handguns is prohibited in **the Student Services Bldg., Suite 309.** Written communication will be posted outside of the room. Section 30.06 of the penal code states:

> (3) Written communication means:
>
>> (A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."

If you need an accommodation for a disability, please contact our office. Requests for accommodations may be evaluated in consultation with Disability Resources.

Sincerely,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| **From:** | Washington, Robert Sykes |
|---|---|
| **Sent:** | Thursday, April 4, 2024 10:20 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | FW: Investigation Interview Notice |

**LtCol Robert S. Washington '95, USMC (Ret)** | Operations Planner & RV Company Advisor
Corps of Cadets | Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227
Office ph: 979.458.1202 Mobile ph:
rwashington@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS** | We Make Leaders

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 29, 2023 9:34 AM
**To:** Washington, Robert Sykes <rwashington@corps.tamu.edu>
**Subject:** FW: Investigation Interview Notice

Received the below email and the attached picture from XXXX last night. I emailed him back this morning and asked for clarification in where/how he got the photo. But depending on what he says, we may need to have XXXX come back in so we can ask him about this and some of the other discrepancies in his version of that incident
.).

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Thursday, September 28, 2023 6:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy Audrey,
This is the only supporting documentation I have for The investigation. I believe this was
I was asked about at the beginning of my interview in regards to

1

dorms. I do not know who took the picture but I hope it will be sufficient evidence that XXXXX XXXXX was the one who _____. I was not aware of _____ when it happened so all I have is the picture.

Thank you for your time,

XXXX XXXX

On Tue, Sep 26, 2023, 7:59 AM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Good morning, XXXX,

Thank you for confirming your plan to attend tomorrow's meeting.  I do not need anything from you at this time.  At the start of your interview tomorrow I will walk through the acknowledgment form with you, and during the interview you will gain more context for what the report entails.  Once you have more context for the situation we will be discussing during the interview, should you wish to submit any supporting documentation (statements, pictures, texts, etc.) you will have the opportunity to do so!

We do not share the report with students unless a student is charged with a student rule violation, which is not the case at this time.  If this investigation does lead to any charges, the charged student(s) would be able to review the report at that time.

Again, I will go over all of this more in detail with you tomorrow at the start of your interview, but hopefully this provides a little clarity on our process in the meantime.

Best,

Audrey

**From:** XXXXXXXXXXXXXXXXXXXXXXXXXXXX
**Sent:** Monday, September 25, 2023 11:57 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re: Investigation Interview Notice

Howdy,

Thank you for the communication I will be present for the interview in my designated time slot. Is there any additional information you need from me? Is there any additional information you can provide to me about the nature of the complaint or investigation? I do not know anything.

Thank you for your time,

XXXX XXXX


On Mon, Sep 25, 2023, 1:33 PM Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:

Dear XXXXX,


The Student Conduct Office received a report regarding alleged hazing within      .  You have been identified as someone who may have been involved in the incident or have witnessed/has additional knowledge related to the incident. In order to gain additional information you are being asked to participate in the investigation process and an interview date has been scheduled for **Wednesday, September 27th at 2:30pm in the Student Services Bldg., Suite 309.** Your options for participation in this investigation will be reviewed with you prior to being asked to respond to any questions posed by the investigators.  The attached Investigation Acknowledgement Form will be reviewed with you during your interview and you will be able to choose your level of participation in the interview process. A copy of the investigation flowchart, which outlines the process is also attached for your review.  Information related to the student conduct code and any alleged violations specific to this investigation can be found here:  http://student-rules.tamu.edu/rule24/. Click here to review additional information or FAQs regarding the investigation process.


Per student rule (*24.4.23. Abuse of Process*), you are required to meet with investigators. Should this meeting conflict with a scheduled class online or other obligation, please let us know. **Please confirm your receipt of this notice and your intended attendance on the date and time above by replying to this email.**


**Please note that pursuant to section 30.06 of the penal code and University Rule 34.06.02. MI:** while formal administrative hearings/investigations are taking place the carrying of concealed handguns is prohibited in **the Student Services Bldg., Suite 309.** Written communication will be posted outside of the room. Section 30.06 of the penal code states:

> (3) Written communication means:
>
> > (A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."


If you need an accommodation for a disability, please contact our office. Requests for accommodations may be evaluated in consultation with Disability Resources.


Sincerely,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257


ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Thursday, September 21, 2023 4:15 PM |
| **To:** | Washington, Robert Sykes |
| **Subject:** | Investigation |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Howdy,

Dr. Bell informed me that you have been assigned to work on the      investigation with me.  Do you have some time tomorrow (Friday) where we could chat briefly about the plan for the investigation moving forward?  The only times I am unavailable tomorrow are 10-11am and 1:30-3:15pm.  We could meet via Zoom or Teams if that is more convenient for you since it should be a quick meeting!

I am hoping to do interviews next Wednesday afternoon (9/27) if that works for you!

Thanks,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:**
**Sent:** Thursday, September 7, 2023 11:35 AM
**To:** WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>
**Cc:** Leible, Jason Aaron <jleible@corps.tamu.edu>; ████████████████████████████
**Subject:** Re:     Hazing Investigation Statements (████████)

Good morning CSM Wood,

The ████████, has collected the statements from the ████████ involved, so I'll help make sure that gets to ████. ████████ for the cadet in question. Him and I are both free this afternoon from 1415-1500 to link up if that works for you.

Very Respectfully,

████████████

On Thu, Sep 7, 2023 at 09:27 WOOD, FRANK Chriswell <fcwood@corps.tamu.edu> wrote:

> Howdy Mr. ████
>
>
> I've read your attachment. You also need individual statements from each of the ████ involved and any that later may have additional information relayed to them after the ████ returned from PT. Those are the most important ones. I would also like to link up with you ████████████████ sometime today  regarding ████████' statement.

**V/R…RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University

Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**



**From:** ███████████████████████████
**Sent:** Thursday, September 7, 2023 8:59 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>; WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>
**Subject:** I1 Hazing Investigation Statements (CDT Kimes)


Good morning SGM Wood and MAJ Leible,


Attached below are the statements in regards to the hazing investigation involving ███████ and ███████


███████████

███████████

Of my own volition, I decided to do a morning workout. I wanted to get fit and build up my physical resilience. ▮▮▮▮ happened to have a morning workout plan and I volunteered to join. ▮▮▮▮ is good at jogging and pacing so I asked to join his morning workout. We slow paced jogged until we reached bush school, then we proceeded to walk around until we were ready to leave. There were no expectations of me and I had a great time with ▮▮▮▮.

I volunteered to participate in the voluntary physical training lead by ██████████ several times he mentioned that it was voluntary and anyone could join if they want to. I volunteered because I enjoy doing extra physical training. During the physical training we jogged for a short distance and completed short easy excersises.

The workout we did with ██████████ was as follows: we started with a jog to a parking area, where we did 100 burpees, or up to however many we could do and double the remainder on squats. After that, we started jogging again until we reached the Bush School of Government and Public Service. We then walked to where President Bush's tombstone, along with his wife Barbara Bush and daughter Pauline Robinson Bush, are located, to which after standing and resting for a few moments began to walk back to

Throughout the workout, the tone was very nonchalant, where we could ask ██████████ any questions freely, along with ██████████ giving explanations and stories behind buildings and landmarks. All participants came on their own free will, and there was no shaming for those who did not.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90555078
Filing Code Description: Other
Filing Description: DEFENDANT'S FIRST SUPP FIRST AMND PTJ-Exhs_Part3
Status as of 8/6/2024 7:57 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 8/5/2024 4:47:11 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/5/2024 4:47:11 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/5/2024 4:47:11 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/5/2024 4:47:11 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/5/2024 4:47:11 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/5/2024 4:47:11 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/5/2024 4:47:11 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| J DavidDodd III | | David@Jddoddlaw.com | 8/5/2024 4:47:11 PM | SENT |

Received & Filed 8/5/2024 4:51 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Kristin Emert
Envelope# 90555467

_____ pointfully informed people of an entirely voluntary work out that he would hold the morning of _____ The group who showed up did of their own volition without any reminder from _____ that morning. The workout started with stretching then a light jog to the Bush school. At the Bush school _____ stared is the Berlin wall memorial and the Bush family cemetery with no expectation to memorize information of not a certain way. We walked back to the quad finishing our voluntary workout.

If _____ punished I will seriously consider quiting the Corps of Cadets. _____ is a wealth of knowledge, who has opened my eyes to new possibilities in work out of the corps. _____ is a model _____ and cadet.

- 2418 -

On Monday _____, a small group of _____ , led by [redacted], went out on a run to George Bush's grave. We went at a term inirute mile pace and stopped several times to allow everyone to catch up. On these steps he did a series of burpees and squats, with rests in between. Once we reached our destination, and on the walk back [redacted] talked to us about history, rudders, & gave us tips and tricks to be more successful in the corps. This event was not, in any shape of form, a type of hazing in any way.

████████████

'writes:                         had
████████████████     has^3 ~~pieces of~~
inudents of which a lack of Integrity was displayed,
and behavior was unbecoming of the Corps values.
Foremost is the most recent event, in which
█████ took        (see appendix) on a morning
run and calisthenics workout on the date of
                              the       were
                                        which
told It was the
█████ did start last year. However,     █████ was
the only person there other than        :    There
was not sanctioned practice to be held by the
university or Corps at this time. The workout
was optional for the        which is why only
attended. Next,     █████ wore a '
        shirt to a        event, around the
quad, and in the dorms, representing a
poor message to        and    military
career.

what: voluntary workout with

who: myself, male no

when: Mon

where: white tables outside dorms; mvmnt
to Reed; logged 9:30 pace, burpees,
squats, walked back

why: noPT monday » told                     about it
                        wanted to join

team

Statement:

Bad judgement on          ████████ part,
not getting approval from    training chain.
Not asking          to      higher   before
conducting.          ███████  did not think be
had to get approved because it was not
corps event.

▮▮▮▮▮

What: ▮▮▮▮▮, PT'd them unbeknowing to anyone else

when: ▮▮▮▮▮ to his knowledge

Where: run to Bush + back; burpees

how: on the run made stops to do calisthenics

why: he ▮▮ said ▮▮ practice

Recommended Discipline: 4hr, 2 RW's, silenced

How found out: word of mouth, asked ▮▮ during run throughs if it happened or not

---

statement

▮▮▮▮▮ task confirmed ▮▮ (suspected) ▮▮ ▮▮ on an unauthorized run. ▮▮ moving. He ran to the bush school and back with "calisthenics spread out. He has also been seen disciplining ▮▮ despite not being an ▮▮ scholastic. His actions were not made public and were told after the fact.

what:

▮ pleads the 5th, does not want a part it in it. Believes discipline evaluation should be left up to command team.

███████████████ +                 sept 5 23

what: unauthorized PT for the purpose of affiliation with as a condition for continued membership (24.4.5 hazing) by ███████ + ___ on '

when:

where: Reed Arena

why: optional PT; "wbm" (in eyes of           )

how: unformal meetup+ unauthorized times, logged on app [evidence]

statement: To put it simply, ███████████ lacks an understanding of integrity. His actions did not display a commitment to the corps values or commitment to selfless service ___ ought to represent in memorium of _____ and what he stood for. He does not have a clear understanding of following the standard operating procedures for leadership development of training. He failed to represent the Corps values through these actions.

Appendix



| From: | WOOD, FRANK Chriswell |
|---|---|
| **Sent:** | Friday, April 5, 2024 4:55 AM |
| **To:** | Simpson, Meredith M |
| **Subject:** | FW:    Hazing Investigation Statements (           ) |
| **Attachments:** | Scanned Documents.pdf |

**Categories:** ORR Clear

More to follow

**V/R…RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st  Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**



**From:** WOOD, FRANK Chriswell
**Sent:** Thursday, September 7, 2023 9:31 AM
**To:**
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**          Hazing Investigation Statements (          )

███████ didn't oversee this (he's been advised to do so) and the ██████ didn't even interview the      . MTF…

**V/R…RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st  Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**



**From:** ██████████████████████████
**Sent:** Thursday, September 7, 2023 8:59 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>; WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>
**Subject:**    Hazing Investigation Statements (███████

Good morning SGM Wood and MAJ Leible,

Attached below are the statements in regards to the hazing investigation involving        and █████████

Very Respectfully,

██████████████

**From:** WOOD, FRANK Chriswell
**Sent:** Friday, April 5, 2024 4:55 AM
**To:** Simpson, Meredith M
**Subject:** FW: Hazing Investigation Statements

**Importance:** High

**Categories:** ORR Clear

More to follow

**V/R…RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**

---

**From:** WOOD, FRANK Chriswell
**Sent:** Thursday, September 7, 2023 9:27 AM
**To:** ███████████████████████████
**Cc:** Leible, Jason Aaron <jleible@corps.tamu.edu>; ███████████████████████████
**Subject:** RE: Hazing Investigation Statements
**Importance:** High

Howdy ███████

I've read your attachment. You also need individual statements from each of the ██████ involved and any that later may have additional information relayed to them after the ██████ returned from PT. Those are the most important ones. I would also like to link up with you ███████████████████ sometime today regarding ██████████' statement.

**V/R…RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**

**Sent:** Thursday, September 7, 2023 8:59 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>; WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>
**Subject:**    Hazing Investigation Statements (██████)

Good morning SGM Wood and MAJ Leible,

Attached below are the statements in regards to the hazing investigation involving        and ██████

Very Respectfully,
██████████

| | |
|---|---|
| **From:** | WOOD, FRANK Chriswell |
| **Sent:** | Friday, April 5, 2024 4:56 AM |
| **To:** | Simpson, Meredith M |
| **Subject:** | FW:      Discipline CCIR |
| | |
| **Categories:** | ORR Clear |

More to follow

**V/R...RLTW**

**CSM Frank C. Wood '16, USA (Ret)** | Military Advisor, 1st Brigade
Office of the Commandant | Division of Student Affairs | Texas A&M University
Room 334 Leonard Hall | College Station, TX 77843-0000
ph: 979.458.1628 | fcwood@corps.tamu.edu | corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**CORPS OF CADETS | We Make Leaders**

---

**From:** ███████████████████████████
**Sent:** Tuesday, September 5, 2023 9:18 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** WOOD, FRANK Chriswell <fcwood@corps.tamu.edu>; Leible, Jason Aaron <jleible@corps.tamu.edu>; ████████
████████████████████████
**Subject:**      Discipline CCIR

Good evening Col. Gardner,

There was a report this morning that ████████ (            ) took a group      out for a workout on
    . I am treating this allegation as a hazing report and have asked the         of Company    to collect statements,
silence the             in question, and ensure the      are mentally and physically well.

I will have the packet ready for your review by Thursday COB.

Very Respectfully,

████████████ ████████████████ Corps of Cadets Intramural & Logistics Office Division of Student Affairs
TAMU | College Station, TX 77843-1227

EXHIBIT
30

CAUSE NO. 24-000902-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## SECOND BUSINESS RECORDS AFFIDAVIT

| | |
|---|---|
| State of Texas | § |
| County of Brazos | § |

Before me, the undersigned notary, on this day personally appeared Tricia Bledsoe, the affiant, whose identify is known to me. After I administered an oath, the affiant testified as follows:

1. My name is Tricia Bledsoe, and I am over the age of 18 years of age, of sound mind, capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am currently employed as the Director and designated Public Information Officer of Texas A&M University's (TAMU) Office of Open Records (ORO) and in this capacity am the primary custodian of the records identified herein by virtue of my duties and responsibilities.

3. The records identified in this affidavit and attached to First Supplemental to Defendant's Plea to the Jurisdiction by exhibit number as business records are as follows:

**Exhibit 29:** TPIA request J1147 document production, June 13, 2024

4. These said 108 pages are kept by TAMU in the regular course of business. It was in the regular course of business for an employee or representative of TAMU or its predecessor agency, with knowledge of the act, event or condition recorded, to make the memorandum or record or to transmit information thereof to be included in such memorandum or record, and the memorandum or record was made at or near the

Page 1

- 2431 -

time of the act, event or condition recorded or reasonably soon thereafter; or, in the case of documentation given to or received by TAMU, it was in the regular course of business for an employee or representative of TAMU to receive the record and place it in the appropriate files of TAMU. With the exception of the redaction of any personal, private, or confidential information, and any bates numbering or exhibit number identification of any documents by the parties of the records identified by exhibit number above, they are exact duplicates of the originals.

EXECUTED on June 13, 2024.



Patricia Bledsoe, Director
Open Records
Office of Risk, Ethics, and Compliance
Texas A&M University

SUBSCRIBED AND SWORN BEFORE ME, on June 13, 2024 to certify which witness my hand and official seal.

CINDY PATTERSON
Notary Public, State of Texas
Comm. Expires 07-07-2026
Notary ID 12158568

Notary Public, State of Texas

Page 2

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90555467
Filing Code Description: Other
Filing Description: Defendant's First Supplement to First Amended Plea to the Jurisdiction-Exhs Pt. 4
Status as of 8/6/2024 7:58 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 8/5/2024 4:51:58 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/5/2024 4:51:58 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/5/2024 4:51:58 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/5/2024 4:51:58 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/5/2024 4:51:58 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/5/2024 4:51:58 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/5/2024 4:51:58 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| J DavidDodd III | | David@Jddoddlaw.com | 8/5/2024 4:51:58 PM | SENT |

CAUSE NO. 24-000902-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## DEFENDANT'S SECOND SUPPLEMENT TO FIRST AMENDED PLEA TO THE JURISDICTION

Defendant Texas A&M University ("TAMU") files this Second Supplement to Defendant's First Amended Plea to the Jurisdiction, and in support respectfully shows the following:

### Plaintiff's *Seventh request – J0001723 – the bathroom renovation documents – Additional Documents Produced Pursuant to AG Ruling*

TAMU requested a ruling from the AG's Office on information sought by Plaintiff that was also the subject of a prior request for public information, namely a TPIA request from JD Foster (J001330-041124). **Exhibit 15**; **Exhibit 16**; **Exhibit 17**. On July 8, 2024, the AG ruling was issued regarding the information in issue. **Exhibit 45**. On August 2, 2024, in accordance with that ruling, TAMU produced additional information to Plaintiff per his seventh TPIA request, which is attached hereto as **Exhibit 46** (731 pages, TAMU 1811 to TAMU 2571).

### PRAYER

Wherefore, premises considered, TAMU respectfully requests its First Amended Plea to the Jurisdiction be granted thereby dismissing Plaintiff's claims with prejudice and

- 2434 -

that all requested relief be denied. TAMU further requests all other relief to which it may

be justly entitled both at law and in equity.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 210-270-1109
Fax: 512-320-0667
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through the E-File Texas, File and Serve Texas in compliance with TRCP 21 on August 7, 2024 to:

J. David Dodd III
820 S. Macarthur Blvd., Ste. 105-341
Coppell, Texas 75019
214-923-3417
David@jddoddlaw.com
**Counsel for Plaintiff**

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90642812
Filing Code Description: PLEA TO THE JURISDICTION
Filing Description: DEFENDANT'S SECOND SUPPLEMENT TO FIRST AMENDED PLEA TO THE JURISDICTION
Status as of 8/7/2024 3:37 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 8/7/2024 2:58:50 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/7/2024 2:58:50 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/7/2024 2:58:50 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/7/2024 2:58:50 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/7/2024 2:58:50 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/7/2024 2:58:50 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/7/2024 2:58:50 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| J DavidDodd III | | David@Jddoddlaw.com | 8/7/2024 2:58:50 PM | SENT |

**Received & Filed 8/5/2024 4:47 PM**
**Gabriel Garcia, District Clerk**
**Brazos County, Texas**
**Kristin Emert**
**Envelope# - 90555078**

I can do this, I spoke with ▮▮▮▮▮ and his concern is if we provided no context then we would get nothing back.

v/r

Jason

From: Winking, Audrey J <audrey_winking@sco.tamu.edu>
Sent: Tuesday, November 14, 2023 7:52 AM
To: Leible, Jason Aaron <jleible@corps.tamu.edu>
Subject: RE: rescheduling today

I will be back in the office tomorrow, so I am going to reschedule ▮▮▮▮▮ to Wednesday at 3pm! Let me know if that doesn't work for you.

When we've had cadets write statements in the past, it's been more broad (not a set of questions like we would do in an interview). So maybe something like this:

Please describe in detail any situations/instances that you've experienced that:
- you believe may have been hazing
- were concerning to you
- caused you to question what was happening

**Audrey Winking** | Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | audrey_winking@sco.tamu.edu | sco.tamu.edu

From: Leible, Jason Aaron <jleible@corps.tamu.edu>
Sent: Monday, November 13, 2023 2:33 PM
To: Winking, Audrey J <audrey_winking@sco.tamu.edu>
Subject: RE: rescheduling today

Howdy,

No issues. I have not been in my office all this morning. I would like to have the questions to get them started and work it.

v/r

Jason

From: Winking, Audrey J <audrey_winking@sco.tamu.edu>

**- 2438 -**

**Sent:** Monday, November 13, 2023 7:38 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** rescheduling today

Good morning,

Since I got my new ▮▮▮▮▮▮▮ late on ▮▮▮▮▮▮▮ hasn't gotten set up yet, so I will be out today with her.  I will check in with the caseworker later today to try and make sure it gets submitted/approved today!  I will reschedule ▮▮▮▮▮▮ interview from today once I know when I will be back in the office.  Can you send me your availability for the rest of the week?

Also, I spoke with Dr. Bell and he said that it would be great if you can ask MSgt. ▮▮▮▮▮ to have the ▮▮ in ▮ submit written statements to him about anything that's taken place that they have found concerning.

Thanks so much!  And sorry I am out again and having to reschedule another one!

Best,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron
**To:** Winking, Audrey J
**Subject:** RE:        Investigation
**Date:** Friday, October 27, 2023 11:19:49 AM

Howdy Audrey,

I'll put them on my calendar.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                    | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 27, 2023 8:41 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE:        Investigation

I just sent calendar appointments for what I am planning on scheduling.  I plan on sending their interview notices out later today.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Wednesday, October 25, 2023 3:48 PM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE:        Investigation

Thank you!  My Monday afternoon is already full so I will plan on scheduling interviews for Tuesday and Wednesday (I will make sure to work around the times you listed below for those days).  I will probably have us hold Friday in case we determine we need to interview additional people after the Tuesday and Wednesday interviews.

I will try to get schedules confirmed tomorrow, but if not I will for sure get calendar appointments to

you Friday!

Thanks again,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Wednesday, October 25, 2023 3:39 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:            Investigation

Audrey,

Howdy, I listed when I currently have hard times that I must meet for next week.

Monday – Meeting 0845-0945; Class 1020-1130
Tuesday- OPS&TRNG MTG 1430-1530
Wednesday – Class 1240-1330
Thursday
Friday

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)**  | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: | mobile:                    | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, October 25, 2023 10:47 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:**            Investigation

Good morning,

I was told that you will be my co-investigator for the _____ investigation.  Would you mind sending me your availability for next week so that I can begin scheduling interviews? I will send you calendar appointments as I get them scheduled.

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Bell Jr, Douglas**

---

**From:** Smith, Asia
**Sent:** Tuesday, March 19, 2024 4:24 PM
**To:** Bell Jr, Douglas
**Subject:** RE:

Thank you. I will officially assign it to Skylar tomorrow.

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, March 19, 2024 4:12 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**

Howdy,
I have placed the       investigation report in your intake folder.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

---

**From:**            Doughty, Jeanae
**Sent:**            Tuesday, January 17, 2023 8:27 AM
**To:**              Bell Jr, Douglas
**Cc:**              Upshaw-Brown, Jaclyn B
**Subject:**                    Investigation Report Submission
**Attachments:**     FINAL Sample Investigtion Report -


Howdy,

Please find the completed investigation report related to the incidents involving                    attached.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

appears to be ink. I suspect articles of clothing are missing, but I am positive a book and some sheet music have been stolen. My ▮▮▮ with as they ▮▮▮ The bins over my bed, very top shelf, had also been rummaged through.

▮▮▮ had heard about the incident on Monday regarding my roommate, ▮▮▮, accusing ▮▮▮ of messing around with my side of the room and leaving a french fry on my bed. ▮▮▮ told ▮▮▮ that he had nothing to do with it and that it was actually ▮▮▮ and ▮▮▮.

My expectation of reasonable privacy has been violated by people opening drawers and digging through my personal items and undergarments, not to mention the theft, and damage to private property. My roommate, ▮▮▮, already admitted to bringing her friends into our room and allowing other people and herself to violate my personal property is a clear and blatant violation of guests' privileges, regardless of whether those guests are family, strangers, or other students/residents. Regardless of other people/students' involvement ▮▮▮ already admitted to being an equal participant in violating my privacy, and my property.

I do not consider targeting me and vandalizing my personal space, property, and gear in my room funny. It is not a joke. Nor is it considered "good bull".

The continued harassment of my roommate, ▮▮▮, and other unknown residents of this hall is a clear demonstration of repeated harassment in ▮▮▮ I have been facing for the last several weeks and have repeatedly sought out faculty assistance with and it has resulted in zero resolution. I spent over four hours trying to locate my roommate ▮▮▮ to confront her about the new incident and missing/damaged items in my room. However, I was unable to locate her, even after lights out.

I am unsure if the incidents that have occurred/continue to occur fall under the current investigation or if I am required to file another report elsewhere.

[cid:18b45fee9727790a4ed1]
[cid:image001.jpg@01DA0265.907DFFE0]
[cid:image002.jpg@01DA0265.907DFFE0]
[cid:image003.jpg@01DA0265.907DFFE0]

[cid:image004.jpg@01DA0265.907DFFE0]
[cid:image005.jpg@01DA0265.907DFFE0]



**From:** Gardner, Jeffery D
**To:** Bell Jr, Douglas
**Cc:** Michaelis, Patrick Ralph; Simpson, Meredith M
**Subject:** Re: Filex - You have access to the folder
**Date:** Monday, October 9, 2023 5:03:26 PM

Sir,

After speaking with this student and her outfit we have actions in place that will resolve the situation.  As the police report stated there is no indication of hazing and we found the same thing.  I will be happy to discuss your findings and mine.

V/R

> On Oct 9, 2023, at 4:51 PM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> Howdy,
> I wanted to follow up on this issue.  I received some additional information regarding this concern, and I feel that an investigation from SCO maybe warranted.  Please let me know if you have any additional information.
>
> Douglas Bell, Ph.D.  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> DIVISION OF STUDENT AFFAIRS | One Division. One Mission.
> -----Original Message-----
> From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> Sent: Thursday, October 5, 2023 10:08 AM
> To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
> Cc: Simpson, Meredith M <msimpson@corps.tamu.edu>
> Subject: FW: Filex - You have access to the folder
>
> Dr. Bell,
>
>    I reviewed the report and the other complaints Ms. ▮▮▮▮ has filed against her outfit.  I will be speaking with her either today or tomorrow to determine what is going on.
>
> V/R
>
> Lt. Col Jeff Gardner '82, USAF (Ret)
> Assistant Commandant for Accountability and Standards Military Advisor Parsons Mounted Cavalry
> 979-458-9317
>
> -----Original Message-----
> From: TAMU Civil Rights <civilrights@tamu.edu>
> Sent: Thursday, October 5, 2023 9:03 AM
> To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> Cc: Simpson, Meredith M <msimpson@corps.tamu.edu>
> Subject: FW: Filex - You have access to the folder
>
> Good morning,
>
> The CREI office received the attached UPD report yesterday afternoon. Since this does not rise to the CREI or TIX level to address, we are referring to the Corps and SCO to address as you see fit.

&gt;

&gt; Please let me know if you have any questions or discover any sex-based misconduct or discrimination/harassment against a protected class.

&gt;

&gt; Best,

&gt;

&gt; Samantha Brunner  (she/her)

&gt; Assistant Deputy Title IX Coordinator

&gt; University Risk, Ethics, and Compliance | Civil Rights and Equity Investigations Texas A&M University | YMCA, Suite 108

&gt; 1268 TAMU | College Station, TX 77843-1268

&gt; ph: 979.458.7598 |SBrunner@tamu.edu

&gt;

&gt;

&gt; -----Original Message-----

&gt; From: tbrooks@tamu.edu <tbrooks@tamu.edu>

&gt; Sent: Wednesday, October 4, 2023 2:56 PM

&gt; To: TAMU Civil Rights <civilrights@tamu.edu>

&gt; Subject: Filex - You have access to the folder 23-1003-0003

&gt;

&gt; The folder, 2⬛⬛⬛⬛, is now available for you to use:

&gt;

&gt;

&gt;

&gt; You can download files in this folder.

&gt;

&gt; This folder currently has the following files:

&gt;

&gt;

⬛⬛⬛⬛: ⬛⬛ ⬛⬛

&gt;

| **From:** | Regan III, John M |
| **To:** | Winking, Audrey J |
| **Subject:** | RE: investigation |
| **Date:** | Friday, October 13, 2023 10:50:38 AM |

Good Morning Audrey,

The only time I will not be available next week is Wednesday 1200 – 4:30.

**GySgt John M. Regan III USMC (Ret)**  | 1st Regiment Military Advisor/CCMU Advisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-4279 I jregan@corps.tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 13, 2023 8:50 AM
**To:** Regan III, John M <jregan@corps.tamu.edu>
**Subject:** investigation

Good morning,

I was told that you will be working on the ▮▮▮▮▮▮▮ investigation with me.  Can you please send me your availability for next week so that we can get her interview scheduled? I would like to meet with her on Tuesday or Wednesday next week if possible                and then once we have more information from her we can schedule the other students' interviews for the following week.

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Bell Jr, Douglas**

**From:** Winking, Audrey J
**Sent:** Wednesday, May 24, 2023 11:56 AM
**To:** Upshaw-Brown, Jaclyn B; Bell Jr, Douglas
**Subject:** Investigation

The             investigation report is complete and can be found here:       Investigations\Active Investigations\Completed Investigations\Completed_

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Wednesday, April 19, 2023 8:34 AM
**To:** Harrell, Kristen
**Subject:** FW: [Maxient]      College Station - On-Campus Grounds
**Attachments:**

We can chat about this at our 1 on 1

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
---------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Monday, April 17, 2023 10:42 AM
To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]      College Station - On-Campus Grounds

For discussion. . .

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]     College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

# Campus Community Incident Report
## Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Student**

Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

Involved Parties
() Alleged Offender
() Alleged Offender
() Alleged Offender
() Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**
No additional documents were attached to this report.

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Thursday, April 20, 2023 11:08 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Hey Jaclyn,
I would like to chat about this today for first thing tomorrow morning.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Monday, April 17, 2023 10:42 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW: [Maxient]        College Station - On-Campus Grounds

For discussion. . .

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Maxient System <notifications@maxient.com>
**Sent:** Sunday, April 16, 2023 6:39 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** [Maxient]        College Station - On-Campus Grounds

**This Message Is From an External Sender**
This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
### Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Student**

Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**

() Alleged Offender
() Alleged Offender
() Alleged Offender
() Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**
**No additional documents were attached to this report.**

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**

Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
  • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

# Bell Jr, Douglas

**From:** Gardner, Jeffery D
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas
**Cc:** Upshaw-Brown, Jaclyn B; Winking, Audrey J; Anderson, Chauncy Jovan
**Subject:** Re: [Maxient]        College Station - On-Campus Grounds


Msg t Anderson is your man. He is copied on this email.

V/R


> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]        College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences


We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]           College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]           College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]           College Station - On-Campus Grounds

Thank you for your assessment of the information provided. We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the
    ? Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
. . . . . . . . . . . . . . . . . . . . . . . . .
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]                College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]          College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
          ? We'll also be checking to see if security footage from Duncan is available (although we
suspect it may not have been retained this long, since the alleged incident in Duncan occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]          College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
() Alleged Offender
() Alleged Offender
() Alleged Offender
() Alleged Offender

4

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Thursday, May 11, 2023 1:17 PM
**To:** Winking, Audrey J
**Subject:** FW: [Maxient]        College Station - On-Campus Grounds


FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, May 11, 2023 1:16 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Just spoke to him.  He has received the correspondence and is tracking for next week.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, May 11, 2023 1:13 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** BEATY, GARY <gbeaty@corps.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Grounds

Howdy Lt. Col. Gardner,
We have had some issues getting in touch with MSG. Anderson and we would like to move forward with our investigation. Can you please give him a gentle reminder to check his email and respond to Audrey Winking.  Thanks in advance.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>; Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Re: [Maxient]                College Station - On-Campus Grounds

Msg t Anderson is your man. He is copied on this email.

V/R

> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]                College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences

We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

2

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]                College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]                College Station - On-Campus Grounds

Thank you for your assessment of the information provided.  We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the
        Thank you for this information.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]                    College Station - On-Campus Grounds

So I've ask a few questions about this process. Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry

4

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]                College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
                We'll also be checking to see if security footage from Duncan is available (although we
suspect it may not have been retained this long, since the alleged incident in Duncan occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]                College Station - On-Campus Grounds

## This Message Is From an External Sender

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report

**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**

⬛                        lleged Offender
⬛ () Alleged Offender
⬛                        () Alleged Offender
⬛ () Alleged Offender

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective
language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific

5

people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
- scrs@studentlife.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

## Bell Jr, Douglas

**From:** Winking, Audrey J
**Sent:** Wednesday, May 10, 2023 11:39 AM
**To:** Anderson, Chauncy Jovan
**Cc:** Bell Jr, Douglas
**Subject:** RE: [Maxient]         College Station - On-Campus Grounds

Hi Chauncy,

I would like to schedule interviews for the following dates/times (      interviews total). Please let me know as soon as possible if these work for you so that I can send the interview notices to the students!

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Thursday, May 4, 2023 10:40 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]       College Station - On-Campus Grounds

Are there any days/times that I need to avoid scheduling interviews for next week?

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Thursday, May 4, 2023 10:39 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: [Maxient]       College Station - On-Campus Grounds

Ok next week will be good. Looking forward to it.

R/

**MSgt Chauncy J. Anderson USMC (Ret)** | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 |                           | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Wednesday, May 3, 2023 10:40 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]              College Station - On-Campus Grounds

Hi Chauncy,

Just wanted to follow up on your availability. We will probably need to look at next week and depending on whether the cadets are still in town after finals or not we may need to do some via Zoom.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Friday, April 28, 2023 11:52 AM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** RE: [Maxient]              College Station - On-Campus Grounds

Hi there,

Looks like you will be working with me on this investigation!  What does your availability look like next week?  Once I know when you're available for interviews, I will work on getting the students scheduled. I am hoping we can get them in before finals or them leaving for the semester. If you happen to know when the cadets leave campus for summer too, that may be helpful for me to know in case we can't fit them all in before finals.

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>; Anderson,

Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Re: [Maxient]              College Station - On-Campus Grounds

Msg t Anderson is your man. He is copied on this email.

V/R

> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:

Thank you for this information.

Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]             College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences

We have confirmed that surveillance footage from Duncan is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>

Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>
Subject: FW: [Maxient]                    College Station - On-Campus Grounds

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Wednesday, April 26, 2023 8:47 AM
To: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]                    College Station - On-Campus Grounds

These are the names I was given:

**Lt. Col Jeff Gardner '82, USAF (Ret)**
**Assistant Commandant for Discipline**
**Military Advisor Parsons Mounted Cavalry**
**979-458-9317**

From: Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Sent: Thursday, April 20, 2023 3:12 PM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B
<jaclynu@sco.tamu.edu>
Subject: RE: [Maxient]                    College Station - On-Campus Grounds

Thank you for your assessment of the information provided. We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the
    Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
--------------------------
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

4

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]            College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

5

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]                College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in
        We'll also be checking to see if security footage from Duncan is available (although we
suspect it may not have been retained this long, since the alleged incident in Duncan occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]                College Station - On-Campus Grounds

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
            () Alleged Offender
      Alleged Offender
            Alleged Offender
Alleged Offender

**Incident Description**
Please describe the incident with as much detail as possible and use specific, concise, objective
language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific
people, words, phrases, and interactions.

6
- 2475 -

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**
No additional documents were attached to this report.

**Submitted By**
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:

7

Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Wednesday, September 27, 2023 11:59 AM |
| **To:** | Winking, Audrey J |
| **Subject:** | Corp Incident |
| **Attachments:** | FW: Corps Searching Rooms |

Howdy Audrey,

I wanted to give you the opportunity to weigh in to see if an additional investigation is needed or if this is enough information to move forward with the conduct process. One email contain statements from the Corps Members and the next email contains information from the IRs received. Let me know your thoughts.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

# Bell Jr, Douglas

| | |
|---|---|
| **From:** | Latham, Skylar |
| **Sent:** | Friday, March 22, 2024 8:49 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Smith, Asia |
| **Subject:** | RE:      Hazing Concerns |

I will forward him the link to the report and inform him that if he wishes to, he may file a report.

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, March 22, 2024 8:45 AM
**To:** Latham, Skylar <skylarl@sco.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:** RE:      Hazing Concerns

I think this may be worth investigating if student ▮▮▮▮▮ would like to make a formal statement via a CCIR.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Latham, Skylar <skylarl@sco.tamu.edu>
**Sent:** Friday, March 22, 2024 8:42 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject**:      Hazing Concerns

Hey ya'll,

Yesterday I met with student ▮▮▮▮ ▮▮▮▮▮ who is a ▮▮▮▮▮ and was ▮▮▮▮▮ in the Corps of Cadets. At one point in our meeting, he mentioned having been in the Corps, and to make conversation, I asked why he punched. He then proceeded to tell me he and ▮▮▮▮▮ punched three days into ▮▮▮ and discussed how it was intense for them both. Two specific comments he made raised concerns for me:

1. He was woken up at 2:00 AM to an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and telling them to be ready for fallout at the usual start time.
2. When punching, he was advised to not share much about his experience with the outfit to Corps staff, specifically by an upperclassman (or multiple), because ▮▮▮ could get disbanded.

I'm not sure what much may be done in this circumstance, but I do want it to be brought to your attention.

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Monday, September 25, 2023 3:31 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | FW: |
| **Attachments:** | ██████.pdf; ██ Account.pdf; ██████ Account.pdf; ██████ Account.pdf; ██ Account.pdf; ██ Account.pdf; ██ Account.pdf; ██ Account.pdf; ██ Account.pdf; ██ Account.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Sir,

Statement from ████ cadets.

V/R

<span style="color:#8B1A2B">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** ████████████████████████████ >
**Sent:** Friday, September 22, 2023 10:29 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject**:

Howdy!

Sir, attached are the written accounts of ████ Cadets involved in the incident with nonregs in our dorm. I am sorry for the late email, but I was just now able to gather all of the accounts. Thank you again, and let me know if there is anything I can do to help.

With Respect,

████████

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Monday, September 25, 2023 11:20 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Michaelis, Patrick Ralph; Simpson, Meredith M |
| **Subject:** | RE: Corps Searching Rooms |

Sir,

I spoke to the      1st Sgt.  He is providing me with information today.  I'll send it to you as soon as I receive it.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Monday, September 25, 2023 10:37 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: Corps Searching Rooms

I have discovered the names of    cadets that were searching rooms:

 .  Please let me know if you have any additional information.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, September 21, 2023 12:31 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: Corps Searching Rooms

Sir,

I will reach out to the

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, September 21, 2023 12:15 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Subject:** Corps Searching Rooms

Howdy Lt. Gardner,
I received several incident reports from Residence Life regarding Corps Members entering non-regs student rooms in search of a                    laundry bag last week.  I wanted to see if you have any additional information related to this situation.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Friday, September 29, 2023 2:39 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | RE: Incident report |
| **Attachments:** | Incident report.docx |

I made a few highlights on here where we did get         names.  There is also mention about UPD assisting with one of the incidents – can you reach out to see if we can get notes from that?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, September 29, 2023 2:15 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: Incident report

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 10:55 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** Incident report

Good Morning Dr. Bell,

        Attached you will find four individual incident reports from Corps          .  In each of these incidents, non-corps students attempted to take items from the cadets.  We would appreciate the Student Conduct Office looking into these events and taking appropriate action.  Please let me know if you have questions or if we can be of assistance.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry
979-458-9317

2

## Bell Jr, Douglas

**From:** Gardner, Jeffery D
**Sent:** Tuesday, September 5, 2023 2:15 PM
**To:** Bell Jr, Douglas; Michaelis, Patrick Ralph; Simpson, Meredith M
**Subject:** RE: [Maxient]         College Station - On-Campus Residence Hall
**Attachments:** Incident.pdf

Dr. Bell,

       Attached are the Commandant's thoughts on the      issue.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, September 5, 2023 11:42 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: [Maxient]        College Station - On-Campus Residence Hall

I wanted to follow up to see if there was any additional information.   SCO intends to move forward with an investigation in the coming week.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas
**Sent:** Wednesday, August 30, 2023 3:41 PM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]        College Station - On-Campus Residence Hall

I wanted to pass this along for your consideration and review.  Please let me know your thoughts.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

---

**From:**              Bell Jr, Douglas
**Sent:**              Thursday, October 19, 2023 10:53 AM
**To:**                Caldwell III, Danny Wilson
**Subject:**              Investigation Report
**Attachments:**            Investigation Report - Final.pdf; Audio Clip 1 - S.mp3; Audio Clip 2 - W.mp3; FW_ Audio Files for
                       Hazing Investigation.pdf


Howdy Danny,

I am assigning the        investigation to you.  Lets chat after you have reviewed this information.  I will also forward you
the initial report in Maxient.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Wednesday, October 11, 2023 3:21 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | RE:  report |

I just added two audio files as well as a PDF of the email from the student from when he sent the audio files to Tia.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Wednesday, October 11, 2023 11:24 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:**  report

The  investigation report is complete and in the share drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Upshaw-Brown, Jaclyn B
**To:** Winking, Audrey J; Barrett, Jamyia C; Doughty, Jeanae
**Cc:** Bell Jr, Douglas
**Subject:** Investigations
**Date:** Friday, January 6, 2023 1:43:21 PM

Hi, all!

After looking at the two bigger investigations that have recently come in, here is what I'm thinking in terms of assignments:

- Jeanae and Jaclyn to team up as SCAs.
- : Jamyia and Audrey to team up as SCAs
  - Note: We are still uncertain whether more information relevant to this org/investigation is forthcoming from the individual who contacted OFSL shortly before the break. I've checked in with CREI to see if they've heard from her; OFSL has provided contact information so I can follow up with her if not. But I figured y'all could at least start reading, making your list of who might be charged and what type of process, drafting charges, etc. while we figure that out.

Each investigation came with some video/audio files; I've put those into the main Scans➔Investigations folder for now.

Please let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**- 2489 -**

| | |
|---|---|
| **From:** | Doughty, Jeanae |
| **To:** | Gardner, Jeffery D |
| **Subject:** | Administrative Conferences |
| **Date:** | Thursday, February 23, 2023 10:13:00 AM |

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the        cadets. Would you be

available on Monday,                                        and Tuesday,                                Since there

are        cadets, I've scheduled two separate conferences. If you are unavailable during those

days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator

Student Conduct Office | Division of Student Affairs | Texas A&M University

1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu

- - - - - - - - - - - - - - - - - - - - - - -

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Gardner, Jeffery D |
|---|---|
| To: | Doughty, Jeanae |
| Subject: | RE:      Administrative Conferences |
| Date: | Thursday, February 23, 2023 10:37:01 AM |

Morning Ma'am,

I can be available at those times.  Quick question, I thought they were all going before a panel starting on            Has there been a change?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the        cadets. Would you be available on Monday,                                    and Tuesday,                              ? Since there are      cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Gardner, Jeffery D |
|---|---|
| To: | Doughty, Jeanae |
| Subject: | RE:      Administrative Conferences |
| Date: | Thursday, February 23, 2023 10:48:22 AM |

Very well.  I knew I had not seen charge letters for this.  Makes sense now.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:43 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Administrative Conferences

Okay perfect! I'll get those letters sent out now. To clarify, the      cadets are still going before a panel starting                The administrative conferences are for the                              that had lesser alleged unrelated hazing/alcohol violations. Also, the cadet on             has            charges.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:37 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Administrative Conferences

Morning Ma'am,

        I can be available at those times.  Quick question, I thought they were all going before a panel starting on            .  Has there been a change?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the        cadets. Would you be available on Monday,                                    and Tuesday,                                Since there are        cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|-------|------------------|
| To: | Gardner, Jeffery D |
| Subject: | RE: Administrative Conferences |
| Date: | Thursday, February 23, 2023 1:42:00 PM |

Looks like it was just a system glitch. I have retracted the second letter.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 12:59 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Administrative Conferences

I received letters on ▮▮ cadets but received two letter for ██████████

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the ▮▮ cadets. Would you be available on Monday, ▮▮▮▮▮▮▮▮▮▮▮▮ and Tuesday, ▮▮▮▮▮▮▮▮ Since there are ▮▮ cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Yes, and just a heads up,    of the cadets just called to request a separate administrative conference on Monday. Are you available at 8:30 am or 11:00 am?

All the Best,
**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:    Administrative Conferences
Very well. So there are only    ?
V/R
Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:    Administrative Conferences
Looks like it was just a system glitch. I have retracted the second letter.
All the Best,
**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 12:59 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:    Administrative Conferences
I received letters on    cadets but received two letter for ▮▮▮▮▮▮▮

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the      cadets. Would you be available on Monday,                                    and Tuesday,                              ? Since there are      cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| **From:** | Gardner, Jeffery D |
| **To:** | Doughty, Jeanae |
| **Subject:** | RE:      Administrative Conferences |
| **Date:** | Thursday, February 23, 2023 1:48:50 PM |

I am available at both times.

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:48 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re:      Administrative Conferences

Yes, and just a heads up,        of the cadets just called to request a separate administrative conference on Monday. Are you available at 8:30 am or 11:00 am?

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Administrative Conferences

Very well.  So there are only        ?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Discipline

Military Advisor Parsons Mounted Cavalry

979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Sent:** Thursday, February 23, 2023 1:43 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Administrative Conferences

Looks like it was just a system glitch. I have retracted the second letter.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, February 23, 2023 12:59 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Administrative Conferences

I received letters on        cadets but received two letter for ███████████.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Thursday, February 23, 2023 10:14 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Administrative Conferences

Howdy Col. Gardner,

I am in the process of scheduling the administrative conferences for the        cadets. Would you be available on Monday,                              and Tuesday,                            ? Since there are        cadets, I've scheduled two separate conferences. If you are unavailable during those days/times, please provide me your availability for next Monday through Wednesday.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator

Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Doughty, Jeanae
**To:** Gardner, Jeffery D
**Subject:** Options Letter
**Date:** Monday, February 27, 2023 12:02:00 PM

Howdy Col. Gardner,

I am creating the options letter for ██████████ for his abuse of process charge/unbecoming a cadet (for abusing the process) and wanted to run the sanctions by you before sending. I was thinking about assigning him Conduct Review/Corps Conduct Review for the remainder of the                    as well as an            that will be due at the end of April. Thoughts?

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Gardner, Jeffery D |
|---|---|
| To: | Doughty, Jeanae |
| Subject: | RE:    Options Letter |
| Date: | Monday, February 27, 2023 12:04:13 PM |

Thank you very much.  That works for me.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Monday, February 27, 2023 12:02 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Options Letter

Howdy Col. Gardner,

I am creating the options letter for ▓▓▓▓▓▓ for his abuse of process charge/unbecoming a cadet (for abusing the process) and wanted to run the sanctions by you before sending. I was thinking about assigning him Conduct Review/Corps Conduct Review for the remainder of the ▓▓▓▓ as well as an ▓▓▓ that will be due at the end of April. Thoughts?

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B
**To:** Freeman Jr, Cedric L; Alvarado, Blair; Gardner, Jeffery D
**Cc:** Spangler, Rebecca; Doughty, Jeanae
**Subject:** Panel information for March 6-10
**Date:** Tuesday, February 21, 2023 9:13:10 AM

Howdy, panel members,

Thank you SO MUCH for volunteering for the large panel scheduled for March 6-10! I'll be your Panel Chair. Rebecca, I'm sharing this information with you so that you'll have it in the event we need to bring you in. If that's the case, we will let you know as soon as we find out!

I do want to note that we are planning to feed you throughout the week; if you have any special dietary needs (or just ideas of what you'd like to eat!), please let me know.

Given the length of the investigation report, I am giving you access to the file documents via Filex a little earlier than we usually would. You will need to enter the access codes below to decrypt the files.

**Some reminders about reviewing the file electronically:** Please take steps to maintain confidentiality while reviewing the files and do not save them to your devices. We also ask that you delete the files from your downloads once you are finished. Finally, please refrain from seeking out information about the individuals or incidents involved other than what is provided in the file documents.

**Filex access codes**
Combined charge letters:
Investigation report:
Recording 1:
Recording 2:

If you have any questions or concerns, please let us know.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** jbupshaw@tamu.edu
**To:** Doughty, Jeanae
**Subject:** Filex - You have access to the folder March 6-10 panel documents
**Date:** Tuesday, February 21, 2023 9:13:10 AM

The folder, March 6-10 panel documents, is now available for you to use:

You can upload and download files in this folder.

This folder currently has the following files:

Recording 2
Recording 2.m4a

Recording 1
Recording 1.mp3

Investigation report
    Investigation Report - FINAL_Redacted.pdf

Combined charge letters
Compiled charge letters.pdf

| | |
|---|---|
| **From:** | jbupshaw@tamu.edu |
| **To:** | Doughty, Jeanae |
| **Subject:** | Filex - A new file is available for you to download |
| **Date:** | Thursday, March 2, 2023 10:14:07 AM |

The encrypted file, Screenshots submitted by ▮▮▮▮▮▮▮ is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:


File Details:
Screenshots submitted by ▮▮▮▮▮
Screenshots submitted by ▮▮▮▮▮ .pdf 1.85MB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

**From:** jbupshaw@tamu.edu
**To:** Doughty, Jeanae
**Subject:** Filex - A new file is available for you to download
**Date:** Thursday, March 2, 2023 10:17:26 AM

The encrypted file,       log submitted by ▮▮▮▮▮▮▮ is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:

File Details:
EST log submitted by ▮▮▮▮▮▮▮
2nd Reg EST Log -                    , 9_47PM.xlsx 123.52KB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

**From:** Upshaw-Brown, Jaclyn B
**To:** Alvarado, Blair; Freeman Jr, Cedric L; Gardner, Jeffery D
**Cc:** Spangler, Rebecca; Doughty, Jeanae
**Subject:** Documents added to file
**Date:** Thursday, March 2, 2023 10:21:36 AM

Morning, all,

I have received some additional documents from one of the students for next week's panel. Their submission deadline is today at 5 pm, so if anything else comes in I will get it added to the Filex tomorrow and send you the codes.

**Access codes:**

- Screenshots submitted by ▮▮▮▮▮▮▮ :
-      log submitted by ▮▮▮▮▮ :

It looks like the Filex links have expired for the other files; let me know if you didn't have a chance to view them before that happened, and I'll re-add them.

Just as an FYI, we are planning to order breakfast for y'all on Monday and Tuesday, since we're asking you to join us so bright and early.  We'll provide lunch as well. Reminder to let me know if there are any dietary needs!

Thank you!

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

| From: | jbupshaw@tamu.edu |
|---|---|
| **To:** | Doughty, Jeanae |
| **Subject:** | Filex - A new file is available for you to download |
| **Date:** | Friday, March 3, 2023 10:16:02 AM |

The encrypted file, Compiled     documents submitted 3.2 is now available for you to download.
To read this file you will need the passcode. Contact the person who sent the
file to request the passcode. To download the file, visit the address below:


File Details:
Compiled     documents submitted 3.2
Compiled     documents submitted 3.2.pdf 19.60MB

This file is in the folder, March 6-10 panel documents. You can upload and download files in this folder.

Hi again, everyone,

I'm writing with one more access code for documents for fact-finding that were submitted by the deadline. You should have just received a Filex link, but let me know if not.

Access code:

This document includes several written statements from the charged students, a few witness statements pertaining to the alleged hazing of the _____ and a larger set of text messages discussing the planning of the _____ incident. If you have time to take a look at it before Monday, that's great. If not, don't stress about it; you should have a bit of time at the beginning of the day to review while we get the students settled, help them complete paperwork, etc.

Thank you!!!
Jaclyn

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Thursday, March 2, 2023 10:22 AM
**To:** Alvarado, Blair <abalvarado@tamu.edu>; Freeman Jr, Cedric L <cedric_freeman@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Spangler, Rebecca <rebeccas@studentlife.tamu.edu>; Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Documents added to file

Morning, all,

I have received some additional documents from one of the students for next week's panel. Their submission deadline is today at 5 pm, so if anything else comes in I will get it added to the Filex tomorrow and send you the codes.

**Access codes:**
- Screenshots submitted by ▮▮▮▮▮▮▮ :
- ▮▮▮▮▮▮▮▮▮▮▮▮

It looks like the Filex links have expired for the other files; let me know if you didn't have a chance to view them before that happened, and I'll re-add them.

Just as an FYI, we are planning to order breakfast for y'all on Monday and Tuesday, since we're asking you to join us so bright and early.  We'll provide lunch as well. Reminder to let me know if there are any dietary needs!

Thank you!

**Jaclyn Upshaw-Brown**  |  Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

From: Bell Jr, Douglas
To: Doughty, Jeanae
Subject: Res.Life/Corps Incident
Date: Tuesday, October 3, 2023 10:07:07 AM
Attachments: Statements.pdf
23-0918-0005 SA.pdf
2023.09.20 - Email 2.pdf
2023.09.20 - Email.pdf
2023.09.22 - Email 2.pdf
2023.09.22 - Email.pdf
2023.09.25 - Email.pdf
text from █████ 1.png
text from █████ 2.png
text from █████ 3.png

Howdy Jeanae,

I have gathered all the emails and statements I received and there are several incident reports as well. Below are the actors who allegedly entered the rooms:

████████████ (Instructed ▓▓▓▓ to check rooms)
████████████ (checked rooms)
████████████ (checked rooms)
████████████ (checked rooms)

████████████ – went upstairs
████████████ – went upstairs
████████████ – went upstairs
████████████ – went upstairs

There are three other names mentioned, but based on the information, they were just present

 (appears to have calmed things down)

Take a look at all the information, and we can discuss it tomorrow or Thursday. I will forward the res.life IRs to you as well.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

- 2510 -

| From: | Doughty, Jeanae |
|---|---|
| **To:** | Gardner, Jeffery D |
| **Subject:** | Case |
| **Date:** | Tuesday, October 10, 2023 9:47:00 AM |

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|---|---|
| To: | Gardner, Jeffery D |
| Subject: | RE: Case |
| Date: | Tuesday, October 10, 2023 10:03:00 AM |

This is for the administrative conferences involving    cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.


**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:    Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**    Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | [jeanaed@sco.tamu.edu](mailto:jeanaed@sco.tamu.edu) | [sco.tamu.edu](http://sco.tamu.edu)
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Howdy Ma'am,

I have read through everything.  Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:      Case

This is for the administrative conferences involving    cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Howdy,

Ok, thank you! Also, the only rule I could charge the upper for giving the direction is "hazing", which doesn't apply in this case, so I am leaving his charges as is. In looking at our calendars, I wanted to confirm that you are available during the following days/times:

- Monday, October 16th 9:30 am-11:00 am
- Monday, October 16th 2:00 pm-3:30 pm
- Wednesday, October 18th 9:30 am-11:00 am

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:30 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:    Case

Howdy Ma'am,

    I have read through everything.  Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:    Case

This is for the administrative conferences involving    cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:      Case

Howdy Jeanae,

        Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      Case

Howdy Col. Gardner,

I've been assigned the        case and wanted to reach out and touch base with you regarding your availability. There are        students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Those times should work.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:39 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

My apologies. Wednesday, the time is 9:00 am-10:30 am.

**From:** Doughty, Jeanae
**Sent:** Tuesday, October 10, 2023 2:33 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

Howdy,

Ok, thank you! Also, the only rule I could charge the upper for giving the direction is "hazing", which doesn't apply in this case, so I am leaving his charges as is. In looking at our calendars, I wanted to confirm that you are available during the following days/times:

- Monday, October 16th 9:30 am-11:00 am
- Monday, October 16th 2:00 pm-3:30 pm
- Wednesday, October 18th 9:30 am-11:00 am

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 2:30 PM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Case

Howdy Ma'am,

I have read through everything.  Conduct unbecoming a cadet is the only thing I would really be able to charge them with.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Tuesday, October 10, 2023 10:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     Case

This is for the administrative conferences involving    cadets.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, October 10, 2023 9:55 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE:     Case

Howdy Jeanae,

Is this for the investigation or the administrative hearings?

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>

**Sent:** Tuesday, October 10, 2023 9:48 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**     Case

Howdy Col. Gardner,

I've been assigned the       case and wanted to reach out and touch base with you regarding your availability. There are       students, which will require multiple meetings. Also, please let me know if you have any questions.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Doughty, Jeanae |
| **Subject:** | Investigation Assigned |
| **Date:** | Friday, October 20, 2023 10:23:40 AM |
| **Attachments:** | Investigation Report.pdf |

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Doughty, Jeanae |
| **Subject:** | Investigation Assigned |
| **Date:** | Friday, October 20, 2023 10:23:40 AM |
| **Attachments:** | Investigation Report.pdf |

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|---|---|
| To: | Gardner, Jeffery D |
| Subject: | Corps Admin |
| Date: | Wednesday, October 25, 2023 2:31:00 PM |
| Attachments: | Investigation Report.pdf |

Howdy Col. Gardner,

I've been assigned the _____ investigation. I am attaching the investigation report for your reference. Please let me know if/when you are available to chat.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| From: | Doughty, Jeanae |
|---|---|
| To: | Gardner, Jeffery D |
| Subject: | RE: Corps Admin |
| Date: | Thursday, October 26, 2023 8:37:00 AM |

Sounds good! I can walk over at 10:15 am.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.


**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Thursday, October 26, 2023 7:17 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Corps Admin

Morning Ma'am,

I have some time tomorrow after 1000.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Wednesday, October 25, 2023 2:32 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Corps Admin

Howdy Col. Gardner,

I've been assigned the                investigation. I am attaching the investigation report for your reference. Please let me know if/when you are available to chat.

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator

Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | Doughty, Jeanae |
| **To:** | - Student Conduct Office - Student Employee |
| **Subject:** | FW: Investigation Assigned |
| **Date:** | Friday, October 27, 2023 9:45:00 AM |
| **Attachments:** | Investigation Report.pdf |

Hey, can you redact this for us please?

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 10:24 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Investigation Assigned

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

| | |
|---|---|
| **From:** | - Student Conduct Office - Student Employee |
| **To:** | Doughty, Jeanae |
| **Subject:** | RE: Investigation Assigned |
| **Date:** | Friday, October 27, 2023 10:10:56 AM |
| **Attachments:** | Investigation Report_Redacted.pdf |

All done.

---

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Friday, October 27, 2023 9:46 AM
**To:** - Student Conduct Office - Student Employee
**Subject:** FW: Investigation Assigned

Hey, can you redact this for us please?

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 10:24 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** Investigation Assigned

Please see attached investigation report assigned to you.  Please let me know if you have any questions.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
DIVISION OF STUDENT AFFAIRS | One Division. One Mission.

# Jeanae Doughty

EMAIL: ███████████

## EDUCATION

2021    **Master of Organizational Leadership** *(awarded May 7, 2021)*
Trevecca Nazarene University – Nashville, TN

2013    **Bachelor of Liberal Studies** *(awarded May 12, 2013)*
The University of Memphis – Memphis, TN
Major:  Interdisciplinary Studies

## PROFESSIONAL EXPERIENCE

2021 – Present    **Associate Coordinator, Student Conduct Office**
**Texas A&M University – College Station, TX**
- Assist in the resolution of student conduct cases and other office initiatives, services, and projects.
- Supervise the Graduate Assistant.
- Administer the student conduct code.
- Serve as an investigator.
- Assist with office assessment.
- Assisting with and coordinating office presentations and trainings.
- Review reports for potential violations of the Student Conduct Code.
- Meet with students, witnesses, advisors, and other supporters to resolve cases.
- Engage in individual developmental and/or educational conversations with students.
- Appropriately refer to university and community resources and services.
- Assign appropriate educational sanctions.
- Serve as panel chair or student conduct administrator as needed.
- Design, implement, and evaluate presentations and workshops to students, faculty, and staff in alignment with office mission.
- Stay current on trends in student conduct and new legislation, state laws, federal requirements, and national standards relating to student conduct.
- Work with supervisor to create and maintain professional development plan, this may include utilizing campus trainings and/or attending professional conferences directly affiliated with job responsibilities.
- Assist in maintaining positive working relationships with office stakeholders, providing information when appropriate, responding promptly to appropriate requests for assistance, and maintaining a professional demeanor.

- Serve as representative on Department, Division and University committees and task forces, at events, and to department stakeholders as assigned.
- Attend and actively engage in Department and Division meetings, trainings, and functions. Other duties as assigned.

2019 – 2021    **Administrative Assistant to the Dean of Student Services & Enrollment Management**
**Mississippi Gulf Coast Community College, Harrison County Campus – Gulfport, MS**
- Assist Dean in daily planning and implementation of Student Services functions.
- Take minutes at all meetings assigned by the Dean.
- Produce letters, reports, and minutes from rough drafts utilizing word processing skills.
- Compose routine correspondence.
- Handle telephone calls in an effective manner.
- Maintain an accurate and complete filing system.
- Compile and maintain data for reports.
- Arrange for college vehicles, transportation, reservations, and lodging requirements.
- Order all departmental printing from District Printing.
- Handle the purchasing of supplies, etc. for the department.
- Complete hiring packages for personnel hired.
- Maintain employee personnel files for all Student Services personnel.
- Maintain timecards for all Student Services personnel and input leave in Banner during specific payroll dates.
- Prepare special contracts and/or contract addendums when required.
- Monitor, process, and reconcile expenditures and revenues.
- Prepare specifications for quotes and bid tabulations.
- Prepare monthly procurement card statements.
- Process check requests, purchase orders, and travel vouchers.
- Verify and maintain departmental budgets for accuracy.
- Maintain inventory for major and minor equipment for the department and stay up to date on inventory procedures.
- Schedule, coordinate, and assist Dean of Student Services with all aspects of conduct hearings.
- Supervise and/or participate in student activities as assigned by administrative staff.
- Supervise student workers and, when assigned, office personnel in lower levels.
- Schedule meetings and coordinate arrangements for refreshments, meals, audiovisual, and other requirements.
- Handle the reservations for rooms under Student Services responsibility.
- Coordinate the Awards Day Program held at the end of the spring semester.

- Coordinate nominations and selection of the Citizenship Award, Campus Hall of Fame, and Who's Who Among Mississippi Gulf Coast Community College programs.
- Participate in the planning and execution of all Student Services functions (orientation, registration, graduation, Bulldog Day, etc.).
- Maintain an effective relationship with college personnel, students and the community.
- Upgrade skill level and performance through employee development.
- Demonstrate exceptional adherence to work schedules and policies as exemplary performance for co-workers and subordinates.
- Perform other duties as assigned by the Dean of Student Services and Campus Vice President.
- Nominated and selected as 1st Quarter "In the Blue" Employee for the Harrison County Campus in March 2021.

2017– 2019    **Teller**
**BancorpSouth – Biloxi, MS**
- Provided basic cash receipt and payment services in accordance with policies and procedures.
- Offered prompt and efficient customer transactions.
- Cashed checks and processing withdrawals.
- Balanced cash drawer daily.
- Completed balanced, weekly reports.
- Maintained confidentiality of bank records and customer information.
- Processed orders for tellers from the vault.
- Prepared incoming and outgoing monetary shipments.

## PROFESSIONAL AFFILIATIONS & AWARDS

Association for Student Conduct Administrators (ASCA), 2021-Present
MGCCC "In the Blue" Staff Award, 3rd Quarter - 2021
Delta Sigma Theta Sorority, Incorporated, 2011-Present

View Submitted Application: TAMU Career
Site: Assistant Coordinator-Student Conduct
Office

10:22 AM
04/08/2024
Page 1 of 3



THE TEXAS A&M
UNIVERSITY SYSTEM

## Contact Information

Recruiters can reach out to you about this application using the public contact information from your worker profile below.

**Email**    jeanaed@sco.tamu.edu (Work)
jeanaed@tamu.edu (Work)

**Phone Number**

## Experience

| | |
|---|---|
| If you can't find the Company Name, check this box and enter it manually | Yes |
| Company Name | Mississippi Gulf Coast Community College, Harrison County Campus |
| Title | Administrative Assistant to the Dean of Student Services & Enrollment Management |
| Location | Gulfport, MS |
| Start Date | |
| Currently Work Here | Yes |
| Responsibilities and Achievements | See below |

·Assist Dean in daily planning and implementation of Student Services functions.
· Take minutes at all meetings assigned by the Dean.
· Produce letters, reports, and minutes from rough drafts utilizing word processing skills.
· Compose routine correspondence.
· Handle telephone calls in an effective manner.
· Maintain an accurate and complete filing system.
· Compile and maintain data for reports.
· Arrange for college vehicles, transportation, reservations, and lodging requirements.
· Order all departmental printing from District Printing.
· Handle the purchasing of supplies, etc. for the department.
· Complete hiring packages for personnel hired.
· Maintain employee personnel files for all Student Services personnel.
· Maintain time cards for all Student Services personnel and input leave in Banner during specific payroll dates.
· Prepare special contracts and/or contract addendums when required.
· Monitor, process, and reconcile expenditures and revenues.
· Prepare specifications for quotes and bid tabulations.
· Prepare monthly procurement card statements.
· Process check requests, purchase orders, and travel vouchers.
· Verify and maintain departmental budgets for accuracy.
· Maintain inventory for major and minor equipment for the department and stay up to date on inventory procedures.
· Schedule, coordinate, and assist Dean of Student Services with all aspects of conduct hearings.
· Supervise and/or participate in student activities as assigned by administrative staff.
· Supervise student workers and, when assigned, office personnel in lower levels.
· Schedule meetings and coordinate arrangements for refreshments, meals, audiovisual, and other requirements.
· Handle the reservations for rooms under Student Services responsibility.
· Coordinate the Awards Day Program held at the end of the spring semester.
· Coordinate nominations and selection of the Citizenship Award, Campus Hall of Fame, and Who's Who Among Mississippi Gulf Coast Community College programs.
· Participate in the planning and execution of all Student Services functions (orientation, registration, graduation, Bulldog Day, etc.).
· Maintain an effective relationship with college personnel, students and the community.
· Upgrade skill level and performance through employee development.
· Demonstrate exceptional adherence to work schedules and policies as exemplary performance for co-workers and subordinates.
· Perform other duties as assigned by the Dean of Student Services and Campus Vice President.
· Nominated and selected as 1st Quarter "In the Blue" Employee for the Harrison County Campus in March 2021.

| | |
|---|---|
| If you can't find the Company Name, check this box and enter it manually | Yes |
| Company Name | Morton's the Steakhouse |
| Title | Hostess/Food Runner |

| | |
|---|---|
| **Location** | Biloxi, MS |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | · Greeted and seated all guests.<br>· Enhanced customer experiences by providing personalized service.<br>· Maintained a positive rapport with colleagues and other patrons.<br>· Retrieved and delivered guest entrees and sides.<br>· Assisted bar staff with daily operations. |

| | |
|---|---|
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | BancorpSouth |
| **Title** | Teller |
| **Location** | Biloxi, MS |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | · Provided basic cash receipt and payment services in accordance with policies and procedures.<br>· Offered prompt and efficient customer transactions.<br>· Cashed checks and processing withdrawals.<br>· Balanced cash drawer daily.<br>· Completed balanced, weekly reports.<br>· Maintained confidentiality of bank records and customer information.<br>· Processed orders for tellers from the vault.<br>· Prepared incoming and outgoing monetary shipments. |

| | |
|---|---|
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | Red Lobster, Inc. |
| **Title** | Service Professional |
| **Location** | D'Iberville, MS |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | ·Greeted and seated all VIP Guests.<br>· Enhanced customer experiences by providing personalized service<br>· Maintained a positive rapport with colleagues and other patrons.<br>· Delivered food and drinks.<br>· Managed financial transactions. |

| | |
|---|---|
| **If you can't find the Company Name, check this box and enter it manually** | Yes |
| **Company Name** | Harrison County Courthouse |
| **Title** | Chancery Clerk Assistant |
| **Location** | Gulfport, MS |
| **Start Date** | |
| **End Date** | |
| **Responsibilities and Achievements** | ·Input data including deed records, liens records, and IRS revenue.<br>· Filed and archived records.<br>· Organized and designed informational displays for individuals considering foreclosures. |

| | |
|---|---|
| **Replace the Experience information in my profile with this information** | No |

Education

| | |
|---|---|
| Country | United States of America |
| School | Trevecca Nazarene University |
| Degree | Masters |
| Degree Received | |
| Field of Study | |
| First Year Attended | 2019 |
| Last Year Attended | 2021 |
| GPA | |

| | |
|---|---|
| Country | |
| School | |
| Degree | Bachelors |
| Degree Received | |
| Field of Study | Interdisciplinary Studies |
| First Year Attended | 2007 |
| Last Year Attended | 2013 |
| GPA | |

| | |
|---|---|
| Replace the Education information in my profile with this information | No |

**Certifications**

none entered

**Language**

none entered

**Skills**

My experience related to Assistant Coordinator – Student Conduct Office includes: •10 plus years of administrative duties; •Efficient organizational skills, ensuring that all data is complete and accurate upon insertion; •Ability to work effectively with diverse populations; •Experience in purchasing and budget management; •Strong planning, execution, and project management skills; •Experience in coordinating student conduct hearings; •Ability to effectively resolve conflict; •Experience in advising and supervising undergraduate peers and student workers in various organizations; •Ability to develop and maintain effective working relationships with stakeholders and vendors.

| | |
|---|---|
| Replace the Skills information in my profile with this information | No |

Resume - JADoughty.doc

| | |
|---|---|
| File Name | Resume - JADoughty.doc |
| Content Type | application/msword |
| Updated By | |
| Upload Date | 07/29/2021 09:07:55 AM |
| Comment | |

Cover Letter - TA&M - JDoughty.docx

| | |
|---|---|
| File Name | Cover Letter - TA&M - JDoughty.docx |
| Content Type | application/vnd.openxmlformats-officedocument.wordprocessingml.document |
| Updated By | |
| Upload Date | 07/29/2021 09:27:46 AM |
| Comment | |



**MEMORANDUM**

DATE:          January 30, 2024

TO:            BG Joe E. Ramirez, Jr., USA (Ret.)
               Vice President for Student Affairs

THROUGH:       Dr. Kristen Harrell
               Assistant Vice President for Student Affairs

FROM:          Dr. Douglas Bell
               Director, Student Community Standards

SUBJECT:       Case

_____

              submitted a statement to the Corps of Cadets when she requested to transfer out of
   and into a different squadron. The statement that          submitted included information concerning multiple
incidents that have taken place within        that led to           request to transfer outfits. Some of the incidents
that occurred include:

- Requiring       to stand on the wall for an extended amount of time (three hours with only one "shake it out"
  where they got to relax).  Multiple       submitted statements mentioning standing at 5 points of attention
  for "very long periods of time."
    - Five points meant their heels, butt, both shoulder blades, and head had to be on the wall.
    - It was stated during the investigation that "only the         had to stand like this."
- Requiring       to make and break their racks repeatedly for over 40 minutes. Upperclassmen repeatedly gave
  the      3-5 minutes to make their racks.  Some statements mentioned that they had to remake their Rack
  for 2 hours during FOW.
- During FOW,      was required to perform Uniform Drills where they were required to change from PT gear
  to bravos, then charlies, then bravos fully wired, back to PT gear in an unreasonable amount of time.
- Making      perform PT when sick or injured.
- Calling the      pathetic/weak/ and other names such as "wags."
- The      were told there would be "hell to pay" if they did not win and capture the flag. Calling      "fucking
  retards" after they lost a game of
- Performing "     Jokes" during outfit meetings where a      gets to tell a joke to an upperclassman to
  attempt to make an upperclassman laugh.  Anyone who laughs has to "wipe it off," which means sticking
  their hand out and counting to three and then smacking themselves in the forehead and wiping their smile
  off their face.

All the cadets within the outfit were charged with alleged violations of Student Rule 24 related to Hazing.
Also, all the      were charged with having knowledge and failing to report due to the bolded portions of
our Hazing rule:

Student Conduct Office
Student Services Building, 3rd Floor, Suite 309
1172 TAMU
College Station, TX 77843

**- 2535 -**

Tel. 979.847.7272
Fax 979.845.6136
sco@tamu.edu
http://studentconduct.tamu.edu/



1. [24.4.5.] Hazing. Any act that endangers the mental or physical health or safety of a student, or that destroys or removes public or private property; and/or assisting, directing, or in any way causing others to participate in

degrading behavior and/or behavior that causes ridicule, humiliation, or embarrassment for the purpose of initiation, admission into, affiliation with, or as a condition for continued membership in a group or organization; or as part of any activity of a recognized student organization, student group, Corps of Cadets, Corps outfit, Corps unit, or Corps Special Activities. Previously relied upon "traditions" (including Corps, fraternity/sorority, or any other group or organization activity, practice or tradition), intent of such acts, or coercion by current or former members or student leaders of such groups, will not suffice as a justifiable reason for participation in such acts**. It is not a defense that the person (or group) against whom the hazing was directed consented to, or acquiesced to, the behavior in question.**

Examples of such behavior include but are not limited to:
- Misuse of authority by virtue of one's class rank or leadership position.
- Striking another student by hand or with any instrument.
- Any form of physical bondage of a student.
- Taking of one or more students to an outlying area and dropping them off.
- Causing a student to violate the law or a University rule such as indecent exposure, trespassing, violation of visitation, etc.
- Any form of "quadding."
- **Having firsthand knowledge of the planning of such activities or firsthand knowledge that an incident of this type has occurred and failing to report it to appropriate University officials (The Vice President for Student Affairs or designee responsible for oversight of the student conduct processes and/or the University Police Department) is also a violation under this section.**

During the investigation, it was mentioned by the Corps Staff that the information that was provided was not a part of the legitimate military training program as defined and approved by the University. Due to the information provided during the investigation, it was requested that all the          provide statements. The          were not charged with Conduct Unbecoming of a Cadet. Cadet          was transferred to          Since she initially reported this information, she was not charged with violating the student rule.  All the          were offered the low-level options process, which did not include any Corps sanctions.   If requested, we will hold administrative conferences and talk with the          to gain additional perspective regarding the case and determine if the cadets were in violation of our hazing rule.

Douglas Bell, Ph.D.
Director of Student Community Standards

Student Conduct Office
Student Services Building, 3rd Floor, Suite 309
1172 TAMU
College Station, TX 77843

Tel. 979.847.7272
Fax 979.845.6136
sco@tamu.edu
http://studentconduct.tamu.edu/

- 2536 -

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Tuesday, October 24, 2023 4:26 PM
**To:** Winking, Audrey J
**Subject:** FW:     incidents ███████████████

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Subject:** RE:     incidents ███████████████

Sir,

      That would be Jason Leible, jleible@corps.tamu.edu

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:26 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:     incidents ███████████████

Howdy,
I think there may be enough here to at least investigate. We can initiate our investigation into this situation. Lt. Col. Gardner, can you please provide a support staff name to serve as a Co-Invesitgator.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

1

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:      incidents ███████████████

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the ████ in this outfit.  The first document is the one that really stands out (request to transfer).  Before I act here, I'd like your perspectives if there is any form of violation of university hazing standards here.

patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**

---

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**      incidents ███████████████

Good Morning Sir,

I finally received the additional info last night regarding Cadet ███████ Below is the original email from last month but I've also attached the additional document that I received last night as well.  She stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.

**R/**
**MSgt Chauncy J. Anderson USMC (Ret)** | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 |                    | canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** ████████████████████████
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ████████████████. I'm a cadet in ████ and a recent transfer from ████. I was in the same outfit as ████ ████ when she was in the Corps of Cadets. My time in ████, though brief, has been incredibly different than my time

2

spent in ▮▮▮. If you're available this Thursday, ▮▮▮ and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to ▮▮▮ was the best choice for me, and I'm truly grateful to ▮▮▮ and ▮▮▮ for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including ▮▮ would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in ▮▮▮.

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,

▮▮▮

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Friday, December 22, 2023 12:06 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | investigation reports complete |

Both the        and        Event reports have been completed and saved in the shared drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Tuesday, January 30, 2024 2:35 PM
**To:** Harrell, Kristen
**Subject:** Memo for Gen. Ramirez
**Attachments:** Case Memo -        docx

Please see the attached memo and let me know if you have any questions or feedback.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

TAMU-0558

## Bell Jr, Douglas

| | |
|---|---|
| **From:** | Harrell, Kristen |
| **Sent:** | Monday, January 29, 2024 11:00 AM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | Need to follow up |

We'll need to chat about

**Kristen Harrell, PhD** | She, her, hers | Assistant Vice President
Office of the Vice President | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.845.4728 | kristenh@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Monday, November 6, 2023 9:43 AM |
| **To:** | Rydl, Chareny L |
| **Cc:** | Reber, Thomas W; Harrell, Kristen |
| **Subject:** | RE: Cadet Suspension |

To my knowledge, this individual was          suspended from the Corps (only) by CMDT, pending the outcome of an investigation and adjudication process.  We are still investigating

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu

---

**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Rydl, Chareny L <chareny@reslife.tamu.edu>
**Sent:** Monday, November 6, 2023 9:31 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Reber, Thomas W <treber@tamu.edu>; Harrell, Kristen <kristenh@vpsa.tamu.edu>
**Subject:** FW: Cadet Suspension

Well this is a first.  Not sure how if he is          suspended from the Corps how they can allow him to move back.  Not my area so if there is any follow up I will leave it up to you.

Chareny

**From:** Wilson, Jeff C <jeff_wilson@tamu.edu>
**Sent:** Monday, November 6, 2023 9:23 AM
**To:** Rydl, Chareny L <chareny@reslife.tamu.edu>; McCracken, Kyle R <kyle_mccracken@reslife.tamu.edu>; Krenz, Michael D <mikek@reslife.tamu.edu>
**Subject:** FW: Cadet Suspension

Interesting…that the OOC is allowing a cadet who has been          suspended to remain (move back) to the Quad (in a Corps space) while this issue is being worked thru Student Conduct
Thank you

**Jeff Wilson '84** | Associate Director
Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-1258

ph: 979.845.4744 | toll free 888.451.3896 |email: jeff_wilson@reslife.tamu.edu

---

**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

1

- 2543 -

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Friday, November 3, 2023 2:36 PM
**To:** Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Fleming, John D <jfleming@corps.tamu.edu>; Meredith Jr, Billy <bmeredith@corps.tamu.edu>; Parker, Chad L <cparker@corps.tamu.edu>
**Cc:** Schlather, Byron L <bschlather@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Subject:** RE: Cadet Suspension

All,

The CMDT learned this afternoon via parent concern that ▮▮▮ is living in a study carrell in ▮▮▮. That was not his intended result of the suspension and subsequent move, and he assured the family that the OOC would take action to remedy the situation.

Rick identified a space in ▮▮▮ that is vacant. ▮▮▮ will connect with Corps Housing on Monday morning to initiate the next iteration of the move. Rick is standing by with access/keys/ ▮▮▮ and the student was notified of the availability of the space/next steps.

Chad, can you please let the CO know to expect to see the student in the hallway on Monday mid-day?
Rick, once the move is complete can you cancel access to his current facility in ▮▮▮ ?

Thanks,
mms

**Meredith Simpson**
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

**From:** Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>
**Sent:** Friday, October 20, 2023 1:07 PM
**To:** Fleming, John D <jfleming@corps.tamu.edu>; Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Cadet Suspension

All –
We have a temporary space held for this student in ▮▮▮ . We have notified ▮▮▮ that this student could move today (after 5 pm).

Sylvia & Rick –
Alexis sent you a note on this via Teams as well
Thank you

**Jeff Wilson '84 |** Associate Director
Housing Assignments Office | Department of Residence Life | Division of Student Affairs
1258 TAMU | College Station, TX 77843-0000

ph: 979.845.4744 | toll free 888.451.3896 |email:  jeff_wilson@reslife.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Fleming, John D <jfleming@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 1:04 PM
**To:** Barrera, Sylvia <sylvia_barrera@reslife.tamu.edu>
**Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>; Wilson, Jeff C <jeff_wilson@reslife.tamu.edu>; Schlather, Byron L <bschlather@corps.tamu.edu>; Scheffler, Ricky L <rick_scheffler@reslife.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Cadet Suspension

Howdy Sylvia,

I will cc you on an email to a cadet shortly but wanted to first explain what is going on.

SCO has initiated and investigation into potential violations of student rules in         Based on statements gathered so far a particular cadet has been identified as possibly be the main focus of the investigation.  BG Michaelis has decided to suspend that cadet from the Corps pending the results of the investigations.  This cadet will be instructed to move out of his Corps dorm living space Monday and into another         space, preferably off the quad.  This is similar to the situation involving a number of       cadets         .

I already called Jeff Wilson and talked through this with him.  Let me know if you have any questions.

S/F

**LtCol John D. Fleming '94. USMC (Ret)**  | Assistant Commandant, Operations and Training
Office of the Commandant | Division of Student Affairs | Texas A&M University
Ash II LLC |1227 TAMU | College Station, TX 77843-1227

ph: 979.862.4311 | fax: 979.458.1436 | jfleming@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Michaelis, Patrick Ralph |
| **Sent:** | Friday, October 20, 2023 12:25 PM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Gardner, Jeffery D; Simpson, Meredith M |
| **Subject:** | RE:        incidents ███████████████ |

Doug. I've temporarily suspended ██████ from the Corps pending the results of the investigation.  Thanks for your help here and looking forward to a quick turnaround.


patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**


**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:42 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:        incidents ███████████████

I am available to chat until noon.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.


**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 9:39 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re:        incidents ███████████████

Doug - before you move forward, need a quick chat. Are you available for a call this morning?

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

On Oct 20, 2023, at 9:35 AM, Gardner, Jeffery D <jeff_gardner@corps.tamu.edu> wrote:

Sir,

That would be Jason Leible, jleible@corps.tamu.edu

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, October 20, 2023 9:26 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE:       incidents ███████████████

Howdy,
I think there may be enough here to at least investigate.  We can initiate our investigation into this situation.   Lt. Col. Gardner, can you please provide a support staff name to serve as a Co-Invesitgator.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:       incidents ███████████████

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the        in this outfit.  The first document is the one that really stands out (request to transfer).  Before I act here, I'd like your perspectives if there is any form of violation of university hazing standards here.

patrick

**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM

**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:**        incidents ██████████████████

Good Morning Sir,

I finally received the additional info last night regarding Cadet ████████ Below is the original email from last month but I've also attached the additional document that I received last night as well.  She stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.


**R/**
**MSgt Chauncy J. Anderson USMC (Ret)**  | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy| Dorm 6  TAMU | College Station, TX 77843

ph: 979.458.9372 | mobile:                        |  canderson@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders



**From:** ████████████████████████████████
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ████████████████. I'm a cadet in         and a recent          from        . I was in the same outfit as ██████████ when she was in the Corps of Cadets. My time in        ,             , has been incredibly different than my time spent in        . If you're available this Thursday, ████ and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to        was the best choice for me, and I'm truly grateful to ████████ and ████████ for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including        would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in        .

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,

████████

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Friday, January 19, 2024 9:34 AM
**To:** Latham, Skylar; Smith, Asia
**Subject:** RE:

That is my thought.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Latham, Skylar <skylarl@sco.tamu.edu>
**Sent:** Friday, January 19, 2024 9:33 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Smith, Asia <asias@sco.tamu.edu>
**Subject:** RE:

Should these be the students brought in for administrative conferences?

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:28 AM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** FW:

Below are the names of the                    who assisted during        .

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, January 19, 2024 9:26 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE:

Sir,

As requested.

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:04 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**

Howdy Lt. Col. Gardner,
We are reviewing the investigation report for                    , and I wanted to know if you had the list of the Members for                who participated/assisted in       .  Thanks in advance.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

Request to Transfer Document Concerning ▓▓▓▓

Objective: Transfer to

Reasons for Transfer: Compatibility with outfit culture, moral alignment, leadership methods, differing priorities.

To be more specific, ▓▓▓ promotes selfless leadership and actively engages in community service. The outfit is very academic-oriented. ▓▓▓▓▓ is currently in ▓▓▓. The outfit promotes honor and hard work and heavily promotes discipline through physical training.

I was personally asked by my superiors to provide constructive criticism for the outfit. The leadership in the outfit is striving to change for the better. The following list details my personal experience and recommendations. These are my personal opinions, but I can honestly say that many are shared by my fellow cadets.

Unfortunately, we have lost ▓▓▓▓ so far, leaving ▓▓ in our buddy class; however, several would have been excellent cadets. I'm writing this because I don't want to lose any more cadets who might punch if things don't change.

My overall observation is that ▓▓▓▓▓▓▓▓▓▓▓ care very much about this outfit. There are a few issues I would like to address:

Chain of command is ineffective:
▓▓▓▓ are not willing or able to answer questions or address concerns. Fire teams are inefficient and squad leaders are nonexistent. ▓▓▓ are the ones primarily disciplining us throughout ▓▓ and even now. For example, they are the ones who dictated training in ▓▓. They are intimidating figures who lead with negative reinforcement and degradation. This treatment has led some ▓▓ to punch * Although ▓▓▓▓ is in a position to lead by example, she has allowed ▓▓▓ to dictate training and often harsh discipline. For example, during ▓▓, ▓▓▓▓ participated in rack drills for most days of ▓▓ often lasting more than two hours. We also had timed uniform drills, in which the ▓▓ had to change back and forth between various uniforms for inspection. It was often very intense and the pressure was excessive. The ▓▓ stood at attention on the wall for increasingly long periods of time past the point where the ▓▓ collapsed from leg cramps, or were shaking and in tears. You're considered weak if you're pushing yourself and your body doesn't comply. Examples include cadets passing out during PT, cadets participating in PT even when excused with doctor's notes, and having a "spew line" for the amount of ▓▓ throwing up, and cadets being called "pathetic" and "weak" before collapsing.

*I can provide specifics for why many ▓▓ quit and which factors were responsible, but it is not my place to type it out on this report.

Communication is lacking:

who were sick or injured were still expected to participate in PT even when excused by medical professionals. In my case, I was unable to attend classes for 3 days. I messaged my team leaders immediately, and received no specific instructions. I was told to still line up with my buddies for the first call even though I was unable to stand properly. My CO found me in the restroom and told me that in the future, I should go to my          doors rather than just text them so that I would be accounted for. The next day, I was still unable to participate in PT or training activities, but was told to still line up with my buddies. I attended formation and all attempts made to make a statement and explain that I was dizzy and ill were met with harsh instructions and demands to shut up. We went back to our dorms and had our room inspection drills until breakfast. I stumbled through helping my buddies clean their holes while fighting nausea. We lined up on the wall, and I was yelled at for looking like I was falling asleep. I made a statement that I was dizzy and concerned about passing out before running to the restroom. When I finally did return to PT, I informed my          that I was able to do calisthenics, but would likely throw up if I ran. I was still expected to run sprints until I was violently puking on the ground and hyperventilating.

Unfortunately, a fellow buddy of mine who was sick had a similar story. She was excused for several days by a doctor, but was told by the upperclassmen that she was still expected to attend PT. She is recovering from a                     injury, and still attempts to do strenuous physical activity to avoid getting yelled at.


Culture:

The culture of this outfit is competitive and intense. There is no positive feedback and expectations are never clear. There is no transparency, and the       are not treated respectfully. Our outfit has had        punch out. The       are overwhelmed and often scared. The often confuse fear for respect and lead by intimidation instead of example. The       are often told that if we get it together for once, we'll get good bull. When we do get good bull, we aren't allowed to smile or laugh, and we aren't allowed to initiate anything considered fun. They tell us that they push us to make us better and that we're lucky to have them. Our buddy class all encouraged each other to hold on until after        because things would get better. Our then told us that they had weeded out all the weak ones, and it was only going to get harder. There is no motivation or encouragement. We are belittled and called pathetic if we struggle to keep up. This outfit defines your worth in your PFT scores, and cadets are treated accordingly. You will not be respected if you aren't athletic. In fact, you will likely be the target of belittlement and degradation during PT times if you fall behind. There's no accountability with leadership, and the       do not know who to ask questions to. We were assigned our fire team leaders after three weeks and didn't meet our                     until after two weeks of classes. Personally, I felt that my        were not willing to answer my questions and often took a very long time to reply to messages if they replied at all.

Personal Experience:

In my experience, I've had little to no issues with most of the          . Many of them have been very supportive and inspiring figures to me. I have had little to no contact with most of the

.

- 2552 -

was primarily run by ⬛⬛⬛⬛. Those who were there were often intimidating and harsh disciplinarians. My personal opinion of ⬛⬛⬛⬛⬛ is that he is degrading and unapproachable. He would often say harsh things about us to other ⬛⬛⬛⬛ in the hallway. He's angry most of the time and gives off the impression that he would be much happier of a person if he had never met any of us. When he does feel like joking around, he gets angry if we react positively. We often say that he loves good bull and hates other people's joy. In the case of some cadets, his degradation often seemed personal. It is my understanding that ⬛⬛⬛⬛ are supposed to be inspiring and supportive figures. I felt neither of those things after being called "a bunch of f****ng retards" after losing a game of ⬛⬛⬛⬛ In fact, during field day we were told that ⬛⬛⬛⬛ don't lose, and if we lost a game, we would go back to standing at attention on the wall for two hours.

We are often told that the ⬛⬛⬛⬛ are rooting for us and want to see us improve. I mentioned to ⬛⬛⬛⬛⬛⬛ that I felt that some ⬛⬛⬛⬛ were rooting for me to quit, and would celebrate if I left because they wouldn't have to deal with me during PT anymore. He assured me that that wasn't the case and that some people just take PT a lot more seriously than others and that I would get better. In the case of ⬛⬛⬛⬛⬛, the degradation has often felt personal to me. My buddies often say that outside of training times, he's nice; however, he's never spoken to me outside of harshly pointing out my mistakes or calling me pathetic. In fact, there was a time during ⬛⬛⬛ in which there were several of us in the hallway rushing back to our holes hoping we wouldn't have to greet. We were noisier than necessary, and ⬛⬛⬛⬛⬛⬛ saw us. I was the only one who got in trouble. He came to my door and told me that it was astounding how I couldn't get the simplest things right, and how shockingly incompetent and pathetic I am. There were six of us in the hallway, and I was the only one who got in trouble. I went to a paired dinner with my ⬛⬛⬛⬛ mentor, a buddy of mine, and her mentor. I made a joke about how I was sure that ⬛⬛⬛⬛⬛ hated me because I struggled during PT, and both ⬛⬛⬛⬛⬛⬛⬛⬛⬛ confirmed that I was probably right.

I had no issues with ⬛⬛⬛⬛⬛ until going to dinner with him, my mentor, and my buddy. That evening, I had previously told ⬛⬛⬛⬛ that I was considering transferring outfits. He asked me if he could tell ⬛⬛⬛⬛ so she could talk to me about it. I told him I would be happy to talk to her about it and that he definitely should tell her. I hadn't yet told anyone other than ⬛ ⬛⬛⬛⬛⬛ and I was planning on speaking to my ⬛⬛⬛⬛⬛⬛⬛ about it the following day, but for reasons regarding consolidation of rooms, I spoke up sooner than planned. That night, during the ⬛⬛⬛⬛ mentor dinner, ⬛⬛⬛⬛ began to ask me questions. He asked me if it was true that I was planning to transfer outfits. I told him yes, and my buddy with me was very upset. ⬛⬛⬛⬛ began to ask me why. I told him that I would be happy to have that conversation with him in another time and place, but I wasn't comfortable talking about it at the moment. He continued pushing me multiple times, and I continued saying that I was uncomfortable. I felt like my privacy had been breached.

I am seriously concerned about the ⬛⬛⬛⬛⬛⬛⬛ of one of my buddies. She's had many breakdowns and reached out to the ⬛⬛⬛⬛. She dreads PT for fear of degradation, and she is

understanding but upset that I am leaving because we had previously hoped to be ▮▮▮▮▮▮.
Her concerns are valid, and I worry about how she will cope if things continue how they are.

It is only fair to mention the positives in this outfit.
There are several people who have made my experience in the outfit a positive one. ▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were both very kind and supportive to my buddies and I who
were struggling. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ have both inspired me to work hard even when I've
been upset, frustrated, or tired. ▮▮▮▮▮▮▮ especially has given me invaluable advice and
motivation. During PT, the only person who was kind to me when I struggled was ▮▮▮▮▮▮▮
He fell out on runs with me, and instead of belittling me, he encouraged me to try my best and to
keep pushing myself. He never made me feel bad, and I was always thankful to have him there
with me. Similarly, ▮▮▮▮▮▮ helped me calm down when I hyperventilated, and didn't make
me feel bad about myself.

In conclusion, I strongly believe that there needs to be a culture change within this outfit. There
needs to be accountability because the ▮▮▮ are struggling, and I would not be surprised if there
were more punches. In an outfit where worth is defined by ▮▮▮ scores, "weak ▮▮" are
degraded and belittled. We are never fully unlocked and the ▮▮▮ are always walking on
eggshells and afraid of upsetting the ▮▮▮▮. Ultimately, I am requesting immediate transfer to
▮▮▮ because I anticipate retaliation for my transfer request.

Update as of 09/26/27

I have spent one full week in _____ and I truly believe that I have made the right decision. There is an effective chain of command, and I was immediately placed in a fire team with strict, but helpful _____. My ____ team leader is often hard on me, but in the best possible way. I can tell he cares and wants me to improve, and I only feel motivated to work harder and make him proud. Our _____ leader is very approachable, though I haven't yet needed to ask a question that far up the chain of command. Our _____ are fantastic. They inspire and motivate us to improve.

I've experienced severe _____ in the past during outfit physical training time. This morning, we had our _____ session, and those feelings came flooding back. No one was upset with me. In fact, ████████ pulled me aside to collect myself. He told me it was good that I understood that what I was going through was _____ and that I could work through it because if I couldn't, I wouldn't already be here. One of the _____ told me that while they wanted me to push myself, overexertion was not the goal. Even the _____ motivated me. No one called me weak or pathetic, they all just told me that they knew I had more to give, and I did. I completed an incredibly intense workout, and instead of feeling _____ or dread for the day to come, I felt a sense of accomplishment. I did something difficult and scary, and I got through it. I was never put down or left behind, I was only supported and encouraged to get back up. The training environment is so different from what I was used to, I didn't know how to react at first. Now, I'm just so thankful that I'm here.

The culture here is different too. Everyone cares about each other and lifts each other up. You never give up on yourself, and you never give up on your buddies. I'm still finding my place within this outfit, but everyone has been so kind and welcoming, I have no doubt that this is where I'm meant to be. I know that there will always be hard days, but I also know that in ____ I have people to lean on. My buddies are supporting me, my _____ are pushing me, my _____ are rooting for me, and my _____ are inspiring me. Every day will be another step towards improvement, and someday, I'll be able to inspire that growth in someone else.

**Bell Jr, Douglas**

---

**From:** Bell Jr, Douglas
**Sent:** Wednesday, January 24, 2024 1:23 PM
**To:** Smith, Asia
**Cc:** Latham, Skylar
**Subject:** RE: Tentative Charges

Move forward.

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Smith, Asia <asias@sco.tamu.edu>
**Sent:** Wednesday, January 24, 2024 1:16 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** RE: Tentative Charges

Dr. Bell,

After consultation with Col. Garner and heavy reflection, I believe Skylar is ready to move forward with          charge letters.

Please let us know if you have any thoughts or concerns.

Asia

**Asia Smith M.S.Ed.** |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, January 19, 2024 9:18 AM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:** RE: Tentative Charges

After an additional review, this makes sense. I would do an options process for the          and unnamed upperclassmen. I am attempting to get the          list from Gardner, so we know exactly who was present at     .

**Douglas Bell, Ph.D.** | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Smith, Asia <asias@sco.tamu.edu>
**Sent:** Friday, January 19, 2024 9:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Latham, Skylar <skylarl@sco.tamu.edu>
**Subject:**        Tentative Charges

Howdy Dr. Bell,

I wanted to streamline the tentative charges for you for review.


Failure to report
Conduct Unbecoming


Failure to report
Complicity
Conduct Unbecoming a Cadet


Hazing
Failure to report
Complicity
Conduct Unbecoming

As mentioned some of the named upperclassmen were dishonest in their interview with the investigators and, as a result, will also receive "Abuse of the Conduct Process".

**Asia Smith M.S.Ed.**  |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Latham, Skylar |
| **Sent:** | Thursday, January 25, 2024 5:48 PM |
| **To:** | White, Lori J; Trevino, Nelda L.; Gonzalez Guerra, Bernardo; Crumrine, Calleigh; Koch, Aubrey - Student Conduct Office - Student Employee; Doughty, Jeanae; Caldwell III, Danny Wilson; Masroor, Wajiha - Graduate Assistant - Student Conduct Office; Taylor, Japheth J. |
| **Cc:** | Smith, Asia; Bell Jr, Douglas |
| **Subject:** | |

Howdy,

Just finished finalizing        Letters will auto send at 8:30 AM tomorrow morning. There is about     students involved so we may want to make a tablet or two.

Sincerely,

**Skylar Latham '23** | Assistant Coordinator
Student Conduct Office | Division of Student Affairs
Texas A&M University 1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | skylarl@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**STUDENT CONDUCT OFFICE** | Live By The Aggie Core Values

# Bell Jr, Douglas

**From:**                    Smith, Asia
**Sent:**                      Tuesday, January 9, 2024 4:44 PM
**To:**                          Bell Jr, Douglas
**Subject:**              RE:                Investigation Report

Skylar will be the SCA for this case.

**Asia Smith M.S.Ed.**  |Assistant Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | asiasmith@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Monday, January 8, 2024 2:32 PM
**To:** Smith, Asia <asias@sco.tamu.edu>
**Subject:**             Investigation Report

Howdy,
Please review the attached investigation report and let me know who you would like for me to forward this report to.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Thursday, January 5, 2023 11:41 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** FW:    Report

I have put this report within your scans folder.

**Douglas Bell, Ph.D.**  | Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, December 23, 2022 11:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:**    Report

The      Investigation Report is complete. The final report and the two audio recordings can be found here:
  \Investigations\Active Investigations\In Progress _


Have a great break!

**Audrey Winking**|  Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 11:26 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** FW:      Initial Report:

Dr. Bell,

I just received another incident report.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:**
**Sent:** Friday, September 29, 2023 11:23 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>;

**Cc:** ████████████████████████████████████████
██████████████████████████
**Subject:**      Initial Report:

Good afternoon, Lt Col Gardner and Cadet ████,

**Who:** ████████████████████████████
**What:** Stolen Property
**Where:** In between
**When:** 1300, Thurs
**Why:**  Cadet ██████ was returning from a mathematics lab class with a non-reg friend, during which

- 2561 -

one of his               was taken.    fraternity students (male) came up from
behind him and took his spur by stepping on his heels and shoving him. Cadet ██████ tried to grab
one of the frat students, but he got away with the              .
The   fraternity students were
                        Both wore black tennis shoes, no glasses, one with a turquoise shirt other with a
black shirt.

The reasoning for submitting this        is to help create a trail of similar cases to hold the fraternities
accountable.


--
Very Respectfully,


██████████████
Texas A&M University
Corps of Cadets |
P: ████████████
E: ██████████████████████

| From: | Bell Jr, Douglas |
|---|---|
| To: | Winking, Audrey J |
| Subject: | FW: |
| Date: | Friday, September 29, 2023 9:52:11 AM |

Gardner is suppose to provide some statements.  I am not sure who should be a co-investigator.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Harrell, Kristen <kristenh@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 8:14 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** FW:

**Kristen Harrell, PhD** | She, her, hers | Assistant Vice President
Office of the Vice President | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.845.4728 | kristenh@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:02 PM
**To:** Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ███████████████████████████████████████
███████████████████████████████████
**Subject:** RE:

**Good on all, Shante. Thanks.**

**I'd like a report on where we are on this incident next week. This is the kind of behavior that leads to physical altercations between our students – something that is never good for anyone.**

**Thanks again for the information.**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

**From:** Hearst, Shante <shearst@stuact.tamu.edu>
**Sent:** Thursday, September 28, 2023 12:07 PM
**To:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Cc** ███████████████████████████████████████████████
████████████████████████████████████████████
**Subject:** RE:

General Ramirez,

　　are recognized as a registered student organization but are not a member of any council. They operate and are viewed more like a 　　　　　because they are not affiliated with 　　(where they would be housed if they were affiliated with a council).

I'm happy to provide additional clarification if this wasn't helpful.

**Shanté Hearst**
Fraternity & Sorority Life, Director
Department of Student Activities, Assistant Director
Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.5636 | shearst@stuact.tamu.edu | studentactivities.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 12:01 PM
**To:** Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ███████████████████████████████████████████████
████████████████████████████████████████████
**Subject:** Re:

So the frat involved is NOT recognized by the university?? Is that what you're telling me??

BG(R) Joe E. Ramirez, Jr
Vice President for Student Affairs
Texas A&M University
Sent from my iPhone

　　　　On Sep 28, 2023, at 11:42 AM, Hearst, Shante <shearst@stuact.tamu.edu> wrote:

　　　　Hello General Ramirez,

██████ has been in contact with ██████, and shared that ████████████ (outside of our office) is an identified group. It was addressed on Tuesday at the meeting and all chapters were warned to refrain from participating in this behavior. I will continue to keep everyone posted.

**Shanté Hearst**
Fraternity & Sorority Life, Director
Department of Student Activities, Assistant Director
Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.5636 | shearst@stuact.tamu.edu | studentactivities.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Sent:** Thursday, September 28, 2023 11:30 AM
**To:** Dobiyanski, Victoria E <vdobiyanski@tamu.edu>; Brown, Josh <jhbrown@stuact.tamu.edu>; Hearst, Shante <shearst@stuact.tamu.edu>
**Cc:** ████████████████████████████████████████████ >
**Subject:** Fwd:

I've asked ████████ to send me everything he has on this incident, including any names he may have of those who did this, as well any specific fraternities who have been doing it. Once I get that information I want this investigated and dealt with immediately.

More to follow. Will forward the information once I get it.

BG(R) Joe E. Ramirez, Jr
Vice President for Student Affairs
Texas A&M University
Sent from my iPhone

Begin forwarded message:

> **From:** ████████████████████████████████████
> **Date:** September 28, 2023 at 11:22:09 AM CDT
> **To:** "Ramirez Jr, Joe E" <jramirez@vpsa.tamu.edu>
> **Cc:** "Simpson, Meredith M" <msimpson@corps.tamu.edu>
> **Subject: Fwd:**
>
> ████ - I don't know of a single instance where the Corps actively targets Greek life. This is embarrassing.
>
> ████

- 2565 -

Patrick R. Michaelis
Brigadier General, USA (ret)
Commandant
Texas A&M Corps of Cadets

Sent from my iPhone

Begin forwarded message:

> **From:** "Simpson, Meredith M"
> <msimpson@corps.tamu.edu>
> **Date:** September 28, 2023 at 10:51:50 AM CDT
> **To:** "Gardner, Jeffery D" <jeff_gardner@corps.tamu.edu>,
> "Michaelis, Patrick Ralph" <pmichaelis@corps.tamu.edu>
> **Subject: RE:**
>
>
> Sir,
>
> Jeff and I talked this morning and I reached out to
> /Fraternity and Sorority Life to engage their
> leadership as well. The pledges are being 'tasked' with
> stealing spurs.
>
> V/R,
> mms
>
> **Meredith Simpson**
> Office of the Commandant | Corps of Cadets
> 1227 TAMU | College Station, TX 77843-1227
> ph: 979.458.2829 | msimpson@tamu.edu
>
> Corps Virtual Office: tx.ag/corpsacademics
> - - - - - - - - - - - - - - - - - - - - - - - -
> **TEXAS A&M UNIVERSITY**
>
> ---
>
> **From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Sent:** Thursday, September 28, 2023 10:27 AM
> **To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
> **Cc:** Simpson, Meredith M <msimpson@corps.tamu.edu>
> **Subject:**
>
> Morning Sir,
>
> Wanted to update you on the           situation.
> So far this week there have been three known instances
> where frat pledges have either attempted to steal or have

- 2566 -

stolen              .  I am obtaining statements from the
and          .  I'm still trying to find the female       in the wing
who was surrounded by frat pledges and had her spurs
stomped.  We have the names of two of the frat pledges.
Once I have all the information consolidated, we will move
forward to Student Conduct.  I am available for questions.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| From: | Bell Jr, Douglas |
|---|---|
| **To:** | Winking, Audrey J |
| **Subject:** | FW: Incident report |
| **Date:** | Friday, September 29, 2023 2:14:53 PM |
| **Attachments:** | Incident report.docx |

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Friday, September 29, 2023 10:55 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** Incident report

Good Morning Dr. Bell,

Attached you will find        individual incident reports from Corps            .  In each of these incidents, non-corps students attempted to take items from the cadets.  We would appreciate the Student Conduct Office looking into these events and taking appropriate action.  Please let me know if you have questions or if we can be of assistance.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317

Who:

What: Stolen Property

Where: Outside Southside Commons by Bike Racks

When: 1230

Why:                    was walking with a non-reg friend of his and they were in the middle of a conversation on their way into the commons near the bike rack area.                got flat tired by two kids and one grabbed onto his backpack.                spun around and was carrying a metal water bottle in his hand so he used it and whacked one of the kids in the ribs but the other with the spurs got away and started running towards the parking lot near the greenhouses in front of the commons. A few other cadets saw what happened and ran to the parking lot. The kid who took the spurs went inside their getaway car and they surrounded the car so they couldn't move. A few minutes later he quickly ran out the side of the car and the cadets chased him around commons by        dorm hall. While this was happening a few cadets stayed behind to keep the car from leaving and the University Police Department arrived and surrounded their car. Then, the kid with the spurs ran inside        . The kid then returned back to the car and a few minutes later he was forced to return the             with the help of UPD. UPD asked if                    wanted to press charges but he declined.


Walking back from class by         , frat guy on a bike drove by and grabbed bider off of Cadets head. No retaliation from        . Was reacquired by                       after the same guy tried to take his. in this occurrence             lowered his shoulder, causing the frat to drop both biders and run off.

                Incident report


In the early afternoon of                my roommate and I,                were eating in the commons at the tables side by side Infront of the 4 vending machines across from the mail room. I then suddenly heard face paced footsteps behind me when a person took my             off the table and proceeded to sprint away. Without hesitation I sprinted after him running through the doors in the back of commons. In full uniform             I was chasing this pledge through the commons and down the concrete steps in the back of commons. I then proceeded to subdue him from behind in the street in the back of commons. He then was getting up still refusing to give up my property. I then secured his leg with my upper body. I also felt his leg rear back to kick me. I knew        was not far behind.        then proceeded to subdue him causing him to be on the ground again. He still would not give up my property. After a few seconds of me and my roommate securing him on the ground he finally gave my property back. His get away truck then left without him. He then walked into the commons. This was an organized event enacted by the pledges who were involved. Me and        never used force that could have caused serious or fatal harm to this pledge even though we had the full ability to do so. We were simply reacting to someone who blatantly stole a valuable item from me with the intention of getting that item back and not hurting the pledge.

Incident Report

In the early afternoon of _____ my roommate and I were eating a quick snack at the Commons at the tables in front of the vending machines across from the MailRoom when suddenly an individual while sprinting by our table reaches down and grabs something off of our table. Unsure exactly what was happening, I began to sprint after this individual alongside my roommate and after realizing exactly what was taken I turned back to grab the remainder of our property off of the table such as my phone and the rest of our _____ . When sprinting back out of the door I heard the other people standing outside causing ruckus and after getting to a position where I could see I witnessed this individual standing over my roommate with a deminer of aggression while my roommate was hugging tightly onto one of his legs and holding his head against his thigh which made me realize he was continuing to escalate the situation. My immediate reaction was to subdue the individual in order to deescalate the situation to insure the safety of everyone involved. Referring back to the numerous de escalation training I have participated in at the _____ as a _____ " I did exactly what I was taught. After a quick scan of the surrounding terrain and analyzing the environment I realized that a takedown would be safe therefore I quickly got the individual onto the ground and stood with one leg in between his two legs bisecting the center of his body with my body turned at a 45 degree angle towards the center of the individual in the ready position for anything that this individual might try to do. I stayed in this position and did not allow him to get up until I felt the situation was completely deescalated and was comfortable with the attitude this individual had due to the fact that I knew he was much bigger than myself and I was unsure of his mission and skillset.  The individuals name is

On Monday, _____ I was studying at the West Campus Dining facility on the 2nd floor. At approximately 1545, I had my _____ on the table next to my laptop while I was working on a math assignment. All of a sudden, some kid snatched my spurs and took off running. I was taken by surprise but quickly got up and started chasing him. I ran down the stairs and chased him outside of the building. I sprinted, slowly gaining on him until he ran through the door of the Heep Building. He then proceeded to run into a pole in the middle of a doorway where I was able to catch him. I quickly grabbed him with both arms and held him from getting away. Then, a fellow cadet came to my aid and helped me pry the spurs from his hands. Even being captured by me, he did not want to give up the spurs as we had to forcefully take them from his hands. After I got my spurs back, I let him go without much confrontation. I then ran back to get my stuff from where I was studying before going to class. After class I learned that the kid that attempted to steal my spurs was in my same class but left once he saw me enter. He also did not show up to class on Wednesday. I do not have much information on him except that his name is

## Bell Jr, Douglas

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Tuesday, September 19, 2023 9:10 AM |
| **To:** | Michaelis, Patrick Ralph |
| **Cc:** | Gardner, Jeffery D; Simpson, Meredith M |
| **Subject:** | FW: [Maxient]      College Station - On-Campus Residence Hall |
| **Attachments:** | .pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Please see the incident report I received last week. I sent this information to CREI, and they returned it to SCO. Please conduct your 72-hour review of this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Monday, September 11, 2023 4:33 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** [Maxient]      College Station - On-Campus Residence Hall

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
### Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Residence Hall**

### Involved Parties
**Corp of cadets,**     ▮ Alleged Offender
▮▮▮▮▮▮▮ Witness

### Incident Description

1

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**During my time in the ▮▮▮▮▮ unit, I witnessed some very hurtful and unproductive "leadership" among the upperclassmen. To give some specifics:**

**A student who came from ▮▮▮▮▮ was talked about behind his back as if he was an outsider. One upperclassman specifically said, "When I get in trouble for hazing that ▮▮▮, I will say I was protecting my country." A group of upperclassmen then laughed as if that was something funny to say. This same student continued to be given a hard time based on ▮▮▮▮▮▮▮▮▮▮▮ in the way they wanted him to.**

**▮▮▮▮▮▮ He would be forced to stand in the hall constantly repeating the same phrase and if he did not get it right he would be sent back into his room, only to then come out 5 minutes later and deal with the same actions. Even being laughed at and shouted at while attempting to do things correctly.**

**The other ▮▮▮▮▮ do not have things any easier, the upperclassmen are constantly changing times around on them or calling the ▮▮▮▮▮ dumb and stupid. In one specific instance, the ▮▮▮▮▮ were told to have three jokes for their Sunday meeting and when the meeting came they were told every ▮▮▮▮▮ should have had three individual jokes, that the jokes they did have were horrible, that they were stupid for not coming up with anything in 8 hours. The ▮▮▮▮▮ are also struggling to get enough sleep because when a meeting is scheduled for just 1 hour it will end up taking 2. They do not feel they have enough time to accomplish their academic homework.**

**The final inconsistency comes with the ▮▮▮▮▮ being told to join groups outside of the corps, but then being told they are not allowed to miss too much formation. They then have to quit the groups they joined or pick between the few.**

**Overall the ▮▮▮ outfit is negatively impeeding the mental health and overall stability of this group of ▮▮▮▮▮.**

**Supporting Documentation**
**No additional documents were attached to this report.**


**Submitted By**
Your full name
▮▮▮▮▮▮▮▮

Position/title/student status
▮▮▮▮▮▮▮▮▮

Your email address
▮▮▮▮▮▮▮▮

Your phone number
▮▮▮▮▮

UIN
▮▮▮▮▮▮

*[UNAUTHENTICATED]*


**Routing Information**
Primary recipient:
**Dr. Douglas Bell (Interim Executive Director, Student Community Standards)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Dr. Douglas Bell, Interim Executive Director, Student Community Standards.


**Message sent by Maxient**
**Replies will be sent to the submitter** ▮▮▮▮▮▮▮▮▮▮.

# Upshaw-Brown, Jaclyn B

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, January 31, 2023 1:40 PM
**To:** Gardner, Jeffery D
**Subject:**

Hi, Jeff,

I've shared         with you through Filex. Passcode is

I'll be the assigned SCA for this one. On first read, I'm seeing some concerns about unauthorized PT. . . there may not be a lot more than that, since the reporting party was contradicted by those whom he says were hazed on most of the incidents. I'll finish reading more thoroughly this afternoon and keep you posted.

Thanks,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Thursday, January 5, 2023 11:41 AM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Subject:** | FW:    Report |

I have put this report within your scans folder.

**Douglas Bell, Ph.D.** | Director of Student Conduct
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, December 23, 2022 11:15 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:**

The    Investigation Report is complete. The final report and the two audio recordings can be found here:
   \Investigations\Active Investigations\In Progress _


Have a great break!

**Audrey Winking**| Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

# Upshaw-Brown, Jaclyn B

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Tuesday, February 7, 2023 9:13 AM |
| **To:** | Pearce, Jeffrey Scott |
| **Subject:** | FW: |
| **Attachments:** | statements.docx; Night Incident - ██████ (1).pdf; ██████ Statement.docx; ██████ ██████ written report.docx; Incident Report.pdf; ██████ - Google Docs.pdf; Statment .pdf; Statement - Google Docs.pdf; ██████ Paper.docx; CDT ██████ Personal Statement.docx; ██████ Incident 01_15_23.pdf; FDT Written Statement.docx |

As discussed. Let me know if you run into questions!

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 Jjaclynu@sco.tamu.edu |sco.tamu.edu

---

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, February 2, 2023 9:08 AM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject:

Good morning,

Attached are the statements from the members of the ██████. Let me know if you have questions. Enjoy your day.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

# Upshaw-Brown, Jaclyn B

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, January 17, 2023 2:13 PM
**To:** Bell Jr, Douglas
**Cc:** Winking, Audrey J; Gardner, Jeffery D
**Subject:** FW: FW: [Maxient]      College Station - Off Campus      8:00 PM

Good afternoon, Dr. Bell,

Please see below for an incident report and some initial follow-up regarding alleged hazing of            leaders.

I believe these allegations warrant further investigation.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, January 17, 2023 11:56 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: FW: [Maxient]      College Station - Off Campus      8:00 PM

Howdy!

I became aware of this information when I asked ▮▮▮▮▮▮▮▮ why he had the wok in his room, and he explained the details I provided about the situation.

I know it occurred on Sunday night,       at around 6:30pm.

I do not know any names of those who were subjected, all he explained was that they did this to all       members.

Sincerely,
▮▮▮▮▮▮▮▮

On Tue, Jan 17, 2023 at 11:17 AM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

Howdy ▮▮▮▮▮

Thank you for bringing this matter to the University's attention.

So that we can determine an appropriate path forward in looking into this issue, I wondered if you could answer a few preliminary questions:

- How did you become aware of this information?
- Do you know approximately when this occurred?
- Can you provide names of any of the individuals who were subjected to this behavior?

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** ▮▮▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Sunday, January 15, 2023 8:36 PM
**To:** Sellers, Tyler B <tsellers@stuact.tamu.edu>
**Subject:** [Maxient]      College Station - Off Campus      8:00 PM

**This Message Is From an External Sender**
This message came from outside your organization.

Secondary recipient (you were copied)

**Campus Community Incident Report**

## Background Information

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

## Involved Parties

() Organization

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and other ▮▮▮▮ leadership blind folded ▮▮▮ members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.

## Supporting Documentation

**No additional documents were attached to this report.**

## Submitted By

Your full name

Position/title/student status
**Student**
Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:

- Tyler Sellers
- jhbrown@stuact.tamu.edu

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

Message sent by Maxient
Replies will be sent to the submitter

# Upshaw-Brown, Jaclyn B

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Tuesday, January 24, 2023 5:31 PM
**To:** Bell Jr, Douglas; Winking, Audrey J
**Subject:** FW: Investigations

Thoughts on this???

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:27 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations

Thank you. Is there any chance I could go ahead and get statements from the                              to help speed up the process?

V/R

> On Jan 24, 2023, at 4:01 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:
>
> Sure! I'll Filex them to you. Please use the access codes below.
>
> After reviewing        , I would agree with Jamyia that there's not enough here to support issuing charges. I do have some lingering questions about the references to conversations that the CTO had with the outfit early in the fall semester where           was left with the impression that the CTO felt hazing was happening; do you know anything more about that?
>
> Additionally, I wanted to give you an update regarding the timeline for the        investigation. Audrey will be working on it with a representative from the Corps. We would expect interviews to start no earlier than late next week, as she is currently attending the ASCA conference and will be wrapping up a different report early next week.
>
> **Access codes:**
>
>
> Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations

Good morning Ma'am,

Just a quick question. Will I be able to review the investigation reports before they are charged out? I believe I can provide some insight and context.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

# Upshaw-Brown, Jaclyn B

| | |
|---|---|
| **From:** | Sellers, Tyler B |
| **Sent:** | Tuesday, January 17, 2023 9:39 AM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Cc:** | Bell Jr, Douglas; Dobiyanski, Victoria E; Brown, Josh; Moore, Erica |
| **Subject:** | FW: [Maxient]       College Station - Off Campus - 01/15/2023 8:00 PM |
| **Attachments:** | |

Howdy Jaclyn,

Please see below and attached for an IR we received related to activities within        which may constitute violations of student rules. As this is a Corps unit, I'll have Erica forward you the IR in Maxient so you can determine next steps with Corps staff partners. Let us know regarding any questions or support you may need on our end. Thanks.

-Tyler

**Tyler Sellers** | Assistant Director
SOLAD & Community Expectations and Conduct
Department of Student Activities | Texas A&M University
125 John J. Koldus Building, 1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2953 | tsellers@stuact.tamu.edu | studentactivities.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** [redacted] (via Maxient) <notifications@maxient.com>
**Sent:** Sunday, January 15, 2023 8:36 PM
**To:** Sellers, Tyler B <tsellers@stuact.tamu.edu>
**Subject:** [Maxient]      College Station - Off Campus      8:00 PM

**This Message Is From an External Sender**
This message came from outside your organization.

Secondary recipient (you were copied)

## Campus Community Incident Report
### Background Information
Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

### Involved Parties

() Organization

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

█████████████████████ and other ██████████ blind folded members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.

## Supporting Documentation

No additional documents were attached to this report.

## Submitted By

Your full name

██████████

Position/title/student status

**Student**

Your email address

████████████████

Your phone number

██████████

UIN

████████████

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
• Tyler Sellers
• jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

## Upshaw-Brown, Jaclyn B

**From:** Bell Jr, Douglas
**Sent:** Wednesday, March 1, 2023 10:32 AM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** Fwd: OCJ
**Attachments:** OCJ-    .pdf

Sorry for the delay

Douglas Bell

Please excuse any typo, message sent from I-Phone

Begin forwarded message:

> **From:** "Berry, Carrie M" <cberry@vpsa.tamu.edu>
> **Date:** February 22, 2023 at 4:27:37 PM CST
> **To:** "Bell Jr, Douglas" <douglasb@vpsa.tamu.edu>
> **Subject: RE: OCJ**
>
> Thanks,
> Carrie
>
> **From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> **Sent:** Wednesday, February 22, 2023 4:04 PM
> **To:** Berry, Carrie M <cberry@vpsa.tamu.edu>
> **Subject:** RE: OCJ
> Good Afternoon. Nothing is attached. You can just scan the memo.
> **Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** Berry, Carrie M <cberry@vpsa.tamu.edu>
> **Sent:** Wednesday, February 22, 2023 3:57 PM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
> **Subject:** OCJ
> Doug-
> Off campus incident for                    memo attached.
> Do you want me to just scan the memo in the future or do you need the
> attachments as well?
> Carri
> **Carrie Berry |** Sr. Administrative Coordinator
> Office of the Vice President for Student Affairs | Texas A&M University

1256 TAMU | College Station, TX 77843-1256
ph: 979.845.4728 | [c-berry@tamu.edu](mailto:c-berry@tamu.edu)

- - - - - - - - - - - - - - - - - - - - - - -

**TEXAS A&M UNIVERSITY**

# Upshaw-Brown, Jaclyn B

**From:** Upshaw-Brown, Jaclyn B
**Sent:** Friday, January 6, 2023 1:43 PM
**To:** Winking, Audrey J; Barrett, Jamyia C; Doughty, Jeanae
**Cc:** Bell Jr, Douglas
**Subject:** Investigations

Hi, all!

After looking at the two bigger investigations that have recently come in, here is what I'm thinking in terms of assignments:

- : Jeanae and Jaclyn to team up as SCAs.
- Jamyia and Audrey to team up as SCAs
  - o Note: We are still uncertain whether more information relevant to this org/investigation is forthcoming from the individual who contacted OFSL shortly before the break. I've checked in with CREI to see if they've heard from        OFSL has provided contact information so I can follow up with        if not. But I figured y'all could at least start reading, making your list of who might be charged and what type of process, drafting charges, etc. while we figure that out.

Each investigation came with some video/audio files; I've put those into the main Scans→Investigations folder for now.

Please let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

Nature                          **College Station**
Urgency                         **Recognized Student Organization**
Incident Date and Time                    **8:00 PM**
Incident Location

Reported by
Name:
Title:
Email:               ████████████████████████
Phone                ████████████
Address:             ██████████
                     **[UNAUTHENTICATED]**

Involved Parties
                                              ████████████████        ████████████
Organization

Incident Description
Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

████████████████████████████ **and other** ████████████ **blind folded team members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.**

*Pending*
*Submitted from* ████████████ *and routed to Erica Moore (Administrative Coordinator, Department of Student Activities). Processed by routing rule #189.*
*Copies to: tsellers@stuact.tamu.edu,jhbrown@stuact.tamu.edu*



**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Tuesday, February 21, 2023 11:32 AM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | OCJ request |
| **Attachments:** | OCJ request.pdf |

Hi, Doug,

Please see the attached request for OCJ and let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jjaclynu@sco.tamu.edu | sco.tamu.edu

DIVISION OF STUDENT AFFAIRS
OFFICES OF THE DEAN OF STUDENT LIFE



## MEMORANDUM

DATE:       February 17, 2023

TO:         BG Joe E. Ramirez, Jr., USA (Ret.)
            Interim Vice President for Student Affairs

THROUGH:    Dr. Douglas Bell
            Executive Director, Student Community Standards

FROM:       Jaclyn Upshaw-Brown  *Jaclyn Upshaw-Brown*
            Interim Director, Student Conduct Office

SUBJECT:    Disciplinary Action for an Off-Campus Incident

On                the Assistant Commandant for Discipline submitted to the Student Conduct Office a series of statements from current and former                          regarding an incident on                     According to the statements,                 and              were instructed to report to Hensel Park and bring their Corps beanies. Once at the park, they were met by            who told them to pull their beanies down over their eyes and then drove them to a location that was undisclosed to the              at the time (the home of a                 and       TAMU student). At the home, the                 were informed they would each be expected to eat a 12-egg omelet, competing for the fastest time. Some               reported hearing comments that suggested failing to finish would result in negative consequences, though it does not seem they were explicitly told what those ramifications would be. Several statements reflect that two or three of the                felt ill and/or vomited as a result of eating the omelets. Finally, one report indicates that one of the upperclassmen consumed alcohol while                during the event.

Given this conduct occurred off campus and in order to address the totality of the situation, I recommend that the University be granted permission to further investigate and, if necessary, issue disciplinary charges. In accordance with University Student Rules 24.3, disciplinary action for an off-campus offense will be taken only when, in the judgment of the Vice President for Student Affairs, action is warranted.

Attached to this request memo is the packet of statements.

(Approved)/Disapproved

_____          2/22/2023
BG Joe E. Ramirez, Jr., USA (Ret.)                    Date
Vice President for Student Affairs

ENCL:   FDT statements

Student Conduct Office
Student Services Building, Suite 309
1257 TAMU
College Station, TX 77843-1257

Tel. 979.847.7272   Fax 979.845.6136
scrs@tamu.edu
http://studentlife.tamu.edu/sco

- 2590 -

**Upshaw-Brown, Jaclyn B**

---

**From:** ████████████████████████████████████
**Sent:** Wednesday, January 18, 2023 12:46 PM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** Re: FW: [Maxient]      College Station - Off Campus      8:00 PM

Thank you. I appreciate your concerns, and for letting me know quickly.

On Tue, Jan 17, 2023 at 2:52 PM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

> Thank you, ████ You may be hearing from our investigations team in the coming weeks; please be on the lookout for communication from them via email.
>
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
>
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** ████████████████████████████████████
**Sent:** Tuesday, January 17, 2023 11:56 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: FW: [Maxient]      College Station - Off Campus      8:00 PM

Howdy!

I became aware of this information when I asked ████████████ why he had the wok in his room, and he explained the details I provided about the situation.

I know it occurred on Sunday night,      at around 6:30pm.

I do not know any names of those who were subjected, all he explained was that they did this to all       members.

Sincerely,

████████████

On Tue, Jan 17, 2023 at 11:17 AM Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

> Howdy, ████
>
> Thank you for bringing this matter to the University's attention.
>
> So that we can determine an appropriate path forward in looking into this issue, I wondered if you could answer a few preliminary questions:
>
> - How did you become aware of this information?

- Do you know approximately when this occurred?
- Can you provide names of any of the individuals who were subjected to this behavior?

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jaclynu@sco.tamu.edu | sco.tamu.edu

**From:** ▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
**Sent:** Sunday, January 15, 2023 8:36 PM
**To:** Sellers, Tyler B <tsellers@stuact.tamu.edu>
**Subject:** [Maxient]                    College Station - Off Campus                    8:00 PM

**This Message Is From an External Sender**

This message came from outside your organization.

Secondary recipient (you were copied)

**Campus Community Incident Report**

**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**8:00 PM**
Location of incident
**Off Campus - Unknown House**

**Involved Parties**

▮ () Organization

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words,

2

phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

██████████████████████ and other ██████████ blind folded ▪▪▪▪▪ ▪▪▪▪ ▪▪▪▪ members and made them get into cars and drove them to a house at an unknown location. They then forced them to consume 12 dozen eggs made from a wok that he keeps in his dorm.

## Supporting Documentation

No additional documents were attached to this report.

## Submitted By

Your full name
████████████

Position/title/student status
**Student**
Your email address
██████████████████

Your phone number
████████

UIN
████████

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
• Tyler Sellers
• jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189

Message sent by Maxient
Replies will be sent to the submitter

**Upshaw-Brown, Jaclyn B**

| | |
|---|---|
| **From:** | Doughty, Jeanae |
| **Sent:** | Tuesday, January 17, 2023 8:20 AM |
| **To:** | Upshaw-Brown, Jaclyn B |
| **Subject:** | RE: Investigation Report |

Oops! Sorry about that. Will do! Thanks!

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, January 17, 2023 8:18 AM
**To:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Subject:** RE: Investigation Report

Hi, Jeanae,

There's no attachment here. Also, Dr. Bell should be the one to receive completed investigation reports!

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Doughty, Jeanae <jeanaed@sco.tamu.edu>
**Sent:** Friday, January 13, 2023 5:40 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigation Report

Hey Jaclyn,

I am attaching the Investigation Report for                    Please let me know if you have any questions. Have a great weekend 😊

All the Best,

**Jeanae Doughty** |*she/her/hers*| Assistant Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 | jeanaed@sco.tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Upshaw-Brown, Jaclyn B**

**From:** Gardner, Jeffery D
**Sent:** Wednesday, January 25, 2023 12:48 PM
**To:** Upshaw-Brown, Jaclyn B
**Subject:** Re: Investigations

Very well. Thank you.

> On Jan 25, 2023, at 12:34 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:

> If it were me, I would probably try something like:
> "There has been a report regarding an alleged hazing event that occurred around                    involving upperclassmen requiring                              to eat a large quantity of eggs. The Student Conduct Office will be investigating this allegation. In order to expedite and streamline that process, and in accordance with the expectation to report hazing within the Student Conduct Code, anyone who has information about this incident is asked to submit a written statement detailing their knowledge of what occurred."
> Of course, you are welcome to wordsmith so that it makes sense to you/them.
> Jaclyn
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

> **From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Sent:** Wednesday, January 25, 2023 12:26 PM
> **To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
> **Subject:** RE: Investigations
> Very well. How would you recommend I ask?
> <span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>
> <span style="color:maroon">Assistant Commandant for Discipline</span>
> <span style="color:maroon">Military Advisor Parsons Mounted Cavalry</span>
> <span style="color:maroon">979-458-9317</span>

> **From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
> **Sent:** Wednesday, January 25, 2023 12:23 PM
> **To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Subject:** RE: Investigations
> If you want to request written statements from the students who may have additional information, that may help guide the investigation process. The framing of that request will be important, in that it truly needs to be a request and not a situation where we are seen as coercing or threatening students.
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:27 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations

Thank you. Is there any chance I could go ahead and get statements from the ⬛⬛⬛⬛⬛⬛⬛⬛ to help speed up the process?

V/R

> On Jan 24, 2023, at 4:01 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:
>
>
> Sure! I'll Filex them to you. Please use the access codes below.
> After reviewing ⬛⬛⬛ I would agree with Jamyia that there's not enough here to support issuing charges. I do have some lingering questions about the references to conversations that the CTO had with the outfit early in the ⬛⬛⬛ semester where ⬛⬛⬛⬛⬛ was left with the impression that the CTO felt hazing was happening; do you know anything more about that?
> Additionally, I wanted to give you an update regarding the timeline for the investigation. Audrey will be working on it with a representative from the Corps. We would expect interviews to start no earlier than late next week, as she is currently attending the ASCA conference and will be wrapping up a different report early next week.
> **Access codes:**
>
>
> Jaclyn
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations

Good morning Ma'am,

Just a quick question. Will I be able to review the investigation reports before they are charged out? I believe I can provide some insight and context.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

| | |
|---|---|
| **From:** | Upshaw-Brown, Jaclyn B |
| **Sent:** | Wednesday, January 25, 2023 4:50 PM |
| **To:** | Gardner, Jeffery D |
| **Cc:** | Bell Jr, Douglas |
| **Subject:** | Re: Investigations |

Okay. Bases on what we have, there's not enough information to support issuing Student Conduct charges to a specific individual at this time; the specific actions discussed in the interviews that might have been chargeable could not be attributed to a particular person. Please let me know if you learn anything else that might change that decision.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Student Affairs Coordinator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 |jaclynu@studentlife.tamu.edu| studentlife.tamu.edu/sco
– – – – – – – – – – – – – – – – – – – – – – –
**OFFICES OF THE DEAN OF STUDENT LIFE** | Supporting [YOU]

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, January 25, 2023 4:44 PM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Re: Investigations
I do not. However,       leadership, CTO, the cadets in question and I are going to have a nice discussion.

V/R

> On Jan 25, 2023, at 4:17 PM, Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu> wrote:
>
> Thank you! Did you have any additional context regarding the       conversations referenced below?
> **Jaclyn Upshaw-Brown** | Assistant Director
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1172 TAMU | College Station, TX 77843-1172
> ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu
>
> ---
>
> **From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Sent:** Wednesday, January 25, 2023 2:58 PM
> **To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
> **Subject:** RE: Investigations
> Howdy Ma'am,

I spent an enjoyable and educational afternoon reading the two reports you provided. I'm available to discuss should my input be needed.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, January 24, 2023 4:02 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** RE: Investigations

Sure! I'll Filex them to you. Please use the access codes below.

After reviewing         I would agree with Jamyia that there's not enough here to support issuing charges. I do have some lingering questions about the references to conversations that the CTO had with the outfit early in the       semester where              was left with the impression that the CTO felt hazing was happening; do you know anything more about that?

Additionally, I wanted to give you an update regarding the timeline for the        investigation. Audrey will be working on it with a representative from the Corps. We would expect interviews to start no earlier than late next week, as she is currently attending the ASCA conference and will be wrapping up a different report early next week.

**Access codes:**


Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172
ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Tuesday, January 24, 2023 11:33 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Subject:** Investigations

Good morning Ma'am,

Just a quick question. Will I be able to review the investigation reports before they are charged out? I believe I can provide some insight and context.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

**Upshaw-Brown, Jaclyn B**
_____

**From:** Gardner, Jeffery D
**Sent:** Friday, April 28, 2023 11:48 AM
**To:** Bell Jr, Douglas
**Cc:** Upshaw-Brown, Jaclyn B; Winking, Audrey J; Anderson, Chauncy Jovan
**Subject:** Re: [Maxient]        College Station - On-Campus Grounds


Msg t Anderson is your man. He is copied on this email.

V/R


> On Apr 28, 2023, at 9:36 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Thank you for this information.
>
> Lt.Col Gardner, can you assist in identifying a CTO to assist with this investigation.  Thank you in  advance.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
>
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Friday, April 28, 2023 9:35 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW: [Maxient]        College Station - On-Campus Grounds

Good morning, Dr. Bell and Audrey,

Based on the information in the initial report, I would recommend that we initiate an investigation to speak with the individuals LtCol Gardner has identified below about their experiences running for


We have confirmed that surveillance footage from        is not likely to be available due to the amount of time that has passed.

Please let me know if you have any questions.

Thank you,
**Jaclyn Upshaw-Brown**  | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Wednesday, April 26, 2023 10:29 AM
**To:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** FW: [Maxient]          College Station - On-Campus Grounds          2

FYI

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Wednesday, April 26, 2023 8:47 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** RE: [Maxient]          College Station - On-Campus Grounds

These are the names I was given:

Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Thursday, April 20, 2023 3:12 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Winking, Audrey J <audrey_winking@sco.tamu.edu>; Upshaw-Brown, Jaclyn B
<jaclynu@sco.tamu.edu>
**Subject:** RE: [Maxient]          College Station - On-Campus Grounds

Thank you for your assessment of the information provided.  We would still like to do our due diligence to ensure everything is above board and not assume any details within this incident report. So again, do you know how we would go about figuring out who would have been in the pool of candidates for
        Thank you for this information.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University

1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

From: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Sent: Thursday, April 20, 2023 2:55 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: RE: [Maxient]                    College Station - On-Campus Grounds

So I've ask a few questions about this process.  Here are my thoughts:

Lt. Col Jeff Gardner '82, USAF (Ret)

3
**- 2601 -**

Assistant Commandant for Discipline
Military Advisor Parsons Mounted Cavalry
979-458-9317

From: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Sent: Thursday, April 20, 2023 11:47 AM
To: Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
Cc: Winking, Audrey J <audrey_winking@sco.tamu.edu>; Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
Subject: FW: [Maxient]                    College Station - On-Campus Grounds

Hi, Jeff,

We received the IR below involving allegations of hazing among the current and prospective
After discussing it, we feel we need to do our due diligence in looking into it.

Do you know how we would best go about figuring out who would have been in this
for            ' We'll also be checking to see if security footage from          is available (although we
suspect it may not have been retained this long, since the alleged incident in          occurred several
months ago).

Thank you,
Jaclyn

From: Maxient System <notifications@maxient.com>
Sent: Sunday, April 16, 2023 6:39 PM
To: Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
Subject: [Maxient]                    College Station - On-Campus Grounds

**This Message Is From an External Sender**
This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

## Campus Community Incident Report
**Background Information**
Campus Location
**College Station**
Status of the Alleged Offender
**Student**
Date of incident

Time of incident

Location of incident
**On-Campus Grounds**

**Involved Parties**
                    () Alleged Offender
          () Alleged Offender
              () Alleged Offender
          () Alleged Offender

4

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation
No additional documents were attached to this report.

## Submitted By
Your full name

Position/title/student status

Your email address

Your phone number

UIN

*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Jaclyn Upshaw-Brown (Interim Director, Student Conduct Office)**
Copied recipients:
   • scrs@studentlife.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #167. Routed to Jaclyn Upshaw-Brown, Interim Director, Student Conduct Office.

**Message sent by Maxient**
**The reporter did not provide an email address. REPLIES WILL NOT REACH ANYONE.**

| From: | Crawford, Dr. Tia |
|---|---|
| **To:** | Winking, Audrey J |
| **Subject:** | Investigation - Final Report |
| **Date:** | Wednesday, October 11, 2023 10:43:52 AM |

Audrey,

I have completed the       Investigation final report. It is labeled     *Investigation – Final* and located
V:\Working Groups\DSA Investigators\        Investigation\REPORT PREP\Final Report.

Please let me know if you need anything else.

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| From: | Crawford, Dr. Tia |
|---|---|
| To: | Winking, Audrey J; Brummett, Kevin L |
| Subject: | RE: Investigation |
| Date: | Friday, September 22, 2023 12:49:25 PM |

Thank you, Audrey!

Howdy Kevin! I look forward to working with you.

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 12:27 PM
**To:** Brummett, Kevin L <kbrummett@corps.tamu.edu>; Crawford, Dr. Tia
<tcrawford@stuact.tamu.edu>
**Subject:** Investigation

Good afternoon,

I wanted to introduce you two, as you will be working together on the        investigation.  Tia has graciously agreed to help me out during this busy time by taking the lead on this investigation.  I will do my best to assist you all throughout the process if anything comes up that you need help with!

Thanks so much for your help with this investigation!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **To:** | Crawford, Dr. Tia |
| **Subject:** | RE: investigation |
| **Date:** | Friday, October 6, 2023 4:03:00 PM |

No worries at all, just wanted to check back in!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, October 6, 2023 2:28 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: investigation

Audrey,

My deepest apologies as I was tasked with a last-minute project and got swamped. I will get this completed and sent to you ASAP!!!

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, October 6, 2023 1:15 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: investigation

Hey Tia,

Just wanted to check in to see how things were going with the report? Is there anything I can do to help you?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:31 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: investigation

Hi Audrey,

No worries. I've been in and out of meetings all day as well. Thanks again for helping us troubleshoot the technology. I will know moving forward how to do it. But the last two interviews went well. We do not believe we need to have additional interviews. The two that we interviewed have until tomorrow to send additional information. Both indicated that they might actually send something. So, we will see.

I have blocked a couple of hours on tomorrow to knock out the report for it. The only thing I may need is to have you look at the report to make sure I have done it correctly.

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Thursday, September 28, 2023 4:18 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** investigation

Hey Tia,

Sorry for not checking in sooner, it's been a crazy week!  But I wanted to see how interviews went for the      investigation and if you need anything from me moving forward?

Best,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

Good deal! Thank you!

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 3:29 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

I think just you two is fine!

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 1:32 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: Shared Folder Access

One more question, should I copy you on the communication? Or just Kevin & me?

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu | stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 1:26 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

Yes! I reserved        (the other panel room, not the one we were in this morning) for all of those times!

For the students' interview notices, you'll just put "X date at X time in the Student Services Building,     " (not the exact room) so they just check in and then our student worker will let you know when they check in.

**Audrey Winking**| Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 1:14 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: Shared Folder Access

Audrey,

Are there rooms available for the following:

Monday, Sept. 25th, 9am – 10am – Investigator Touch Base
Tuesday, Sept. 26th, 9am-10am – Conduct Meeting
Wednesday, Sept. 27th, 9:30am-10:30am – Conduct Meeting
Wednesday, Sept. 27th, 10:30am-11:30am – Conduct meeting

Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Friday, September 22, 2023 12:46 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

I created a document called "Notes Formatting Directions" in the DSA Investigators Drive. Hopefully it makes sense, but I tried to make a step by step for how to format the notes pages after the

interview so that the student can review and sign them.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Winking, Audrey J
**Sent:** Friday, September 22, 2023 12:28 PM
**To:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Subject:** RE: Shared Folder Access

Wonderful!  I am working on adding documents to the folder in that drive now.

**Audrey Winking**|  Senior Student Conduct Investigator
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Crawford, Dr. Tia <tcrawford@stuact.tamu.edu>
**Sent:** Friday, September 22, 2023 10:54 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Shared Folder Access

Audrey,

I found the DSA Investigators Folder and I do have access.

Thank you,
Tia

**Tia Crawford, Ph.D.** | Assistant Director
Department of Student Activities| Division of Student Affairs
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.2514| dr.tia@tamu.edu| stuact.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY** | FEARLESS on Every Front

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Monday, December 11, 2023 12:24 PM |
| **To:** | Harrell, Kristen |
| **Subject:** | Memo |
| **Attachments:** | Case Memo -            .docx |

Please let me know if you need any additional information.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.



**MEMORANDUM**

DATE:            April 12, 2024

TO:              BG Joe E. Ramirez, Jr., USA (Ret.)
                 Vice President for Student Affairs

THROUGH:         Dr. Kristen Harrell
                 Assistant Vice President for Student Affairs

FROM:            Dr. Douglas Bell
                 Director, Student Community Standards

SUBJECT:         Case

---

Several reports were submitted by cadets who had their                taken by alleged fraternity members. Only three of the alleged fraternity members were identified, so they were interviewed. Each of them are members of different fraternities. There was also an incident where the Student Conduct Office was unable to identify the alleged violators.

During the Student Conduct Office investigation, it was discovered that members of the Corps chased an individual in an effort to retrieve the             .  One of the alleged students who took the             has a class with one of the members from the Corps.  Through our investigation, it is alleged that the alleged thief had to skip class because there were "like 20 people waiting" for him at his class, which is why there was an additional complicity charge.

During the Student Conduct Office Investigation, it was discovered that when one of the alleged thieves ran with the             , members of the Corps gave chase and "subdued him from behind."  Another member from the Corps "secured the individual's leg with his upper body."  When the alleged thief complied and gave the spurs back, a Corp member "straddled him," and when he tried to get up after no longer being in possession of the Spur, the Corp member "pushed him back down and said, 'get up pussy'.  As the alleged thief walked away, the members of the Corps kept taunting him.  The alleged thief had his phone shattered when he was tackled to the ground and had multiple bruises and scrapes.

The decision to charge both the alleged thieves and the members of the Corp of Cadets stemmed from the information that was collected during the interview process.  The Assistant Commandant for Discipline was involved with the Corps administrative hearing and did not provide any resistance regarding the charges or sanctions.

Charge
- Theft
    - Accepted Responsibility

Sanction
- Conduct Review through
- Ethics and Decision-Making Workshop



Charge
- Theft
    - Accepted Responsibility

Sanction
- Conduct Review through
- Ethics and Decision-Making Workshop


Charge
- Theft
    - Accepted Responsibility

Sanction
- Conduct Review Through
- Ethics and Decision-Making Workshop


(Co Adjudicated with Lt. Col. Gardner)

Charges
- Physical Abuse
    - Accepted Responsibility
- Harassment
    - Not Responsible
- Complicity
    - Accepted Responsibility
- Corps – Conduct Unbecoming a Cadet
    - Accepted Responsibility

Sanctions
- Conduct Review through          (Case Heard November 28th)
- Corps Review
- Ethics and Decision-Making Workshop


(Co Adjudicated with Lt. Col. Gardner)

Charges
- Physical Abuse
    - Found Responsible
- Damages
    - Not Responsible
- Corps-Conduct Unbecoming a Cadet
    - Found Responsible

Sanctions
- Conduct Review through
- Corps Conduct Review
- Ethics and Decision-Making Workshop


(Co Adjudicated with Lt. Col. Gardner)

Charges



- Physical Abuse
  - Found Responsible
- Damages
  - Not Responsible
- Corps-Conduct Unbecoming a Cadet
  - Found Responsible

Sanctions
- Conduct Review through
- Corps Conduct Review
- Ethics and Decision-Making Workshop


Charges
- Physical Abuse
  - Not Responsible
- Corps-Conduct Unbecoming a Cadet
  - Not Responsible


In closing, all of the respondents who were alleged to have stolen the            expressed remorse and thought that this was a standing tradition.  All of the alleged thieves demonstrated some level of reflection prior to their administrative conference.


Douglas Bell, Ph.D.
Director of Student Community Standards

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Tuesday, February 21, 2023 11:59 AM |
| **To:** | Ramirez Jr, Joe E |
| **Cc:** | Smith, Cindy M; Barrett, Sandra; Harrell, Kristen |
| **Subject:** | FW: OCJ request |
| **Attachments:** | OCJ request.pdf |

Howdy BG Ramirez,
Please see attached OCJ. Please let me know if you have any additional questions.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Upshaw-Brown, Jaclyn B <jaclynu@sco.tamu.edu>
**Sent:** Tuesday, February 21, 2023 11:32 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** OCJ request

Hi, Doug,

Please see the attached request for OCJ and let me know if you have any questions.

Thank you,
Jaclyn

**Jaclyn Upshaw-Brown** | Assistant Director
Student Conduct Office | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1172

ph: 979.847.7272 |jaclynu@sco.tamu.edu |sco.tamu.edu



**MEMORANDUM**

DATE:            February 17, 2023

TO:              BG Joe E. Ramirez, Jr., USA (Ret.)
                 Interim Vice President for Student Affairs

THROUGH:         Dr. Douglas Bell
                 Executive Director, Student Community Standards

FROM:            Jaclyn Upshaw-Brown
                 Interim Director, Student Conduct Office

SUBJECT:         Disciplinary Action for an Off-Campus Incident
─────────────────────────────────────────────────────────────────────────────

On February 2, 2023, the Assistant Commandant for Discipline submitted to the Student Conduct Office a series of statements from current and former                                    regarding an incident on            . According to the statements,                    and             were instructed to report to Hensel Park and bring their Corps beanies. Once at the park, they were met by         , who told them to pull their beanies down over their eyes and then drove them to a location that was undisclosed to the                at the time (the home of a               advisor and         TAMU student). At the home, the                were informed they would each be expected to eat a 12-egg omelet, competing for the fastest time. Some                 reported hearing comments that suggested failing to finish would result in negative consequences, though it does not seem they were explicitly told what those ramifications would be. Several statements reflect that two or three of the                felt ill and/or vomited as a result of eating the omelets. Finally, one report indicates that one of the upperclassmen consumed alcohol while                 during the event.

Given this conduct occurred off campus and in order to address the totality of the situation, I recommend that the University be granted permission to further investigate and, if necessary, issue disciplinary charges. In accordance with University Student Rules 24.3, disciplinary action for an off-campus offense will be taken only when, in the judgment of the Vice President for Student Affairs, action is warranted.

Attached to this request memo is the packet of statements.

Approved/Disapproved


─────────────────────────────────────────────────────────────    ──────────────────────────────
BG Joe E. Ramirez, Jr., USA (Ret.)                                                          Date
Vice President for Student Affairs

ENCL:    FDT statements

Student Conduct Office
Student Services Building, Suite 309
1257 TAMU
College Station, TX 77843-1257

**- 2618 -**

Tel. 979.847.7272   Fax 979.845.6136
scrs@tamu.edu
http://studentlife.tamu.edu/sco

Personal Statement

On Sunday                    at 6:00PM, the                              and              arrived at a park
off campus where we were instructed to park and bring beanies. A few minutes later,
              and              arrived, where we got into their cars and blindfolded ourselves with our
beanies.            drove with                                        and myself, and we
drove a few minutes to                              residence, where we waited for everyone
to arrive. Once everyone was there, we were told that we would be cooked a plate of a dozen
eggs to eat with whatever toppings we liked as fast as possible with the intent of us needing to
finish to remain with the team or potentially face some unknown consequences as well as
competing for the record time. We all hung out as                  with help from the other
                    and              cooked each plate of eggs.              ate the first plate of eggs
within a few minutes while everyone else watched, socialized, and played board games. I do
not remember exactly who went after her, but I believe I was around the     person to begin
eating, going after            and before                    . I ate for about 1 hour and 40 minutes
and completed my                          during this time. At some point              ate her
eggs within a couple of minutes, and she called                to be able to see how fast she
could eat. I was quite spaced out and was otherwise focused on eating for the rest of the time,
so I am not aware of too much of what else was going on, although I believe it was mostly just
people catching up and socializing. The              and              took an egg shot at some point
during this time frame, and people were eating ice cream and pizza while they continued to
socialize. Before I finished eating, the                  made              stop eating the eggs
because she was having an adverse reaction to the eggs and was throwing up, and they did not
wish for her to continue eating since it was making her sick. They noted expressly that they did
not care that she did not finish and wanted to prioritize health and wellbeing first. I finished
eating shortly after              stopped eating and I myself was not feeling well physically
and was overstimulated from the social setting, so I went outside to lay down on the front
porch with              and         , and                      stayed outside with us for a
while as well. We stayed outside for the remainder of the time at the house, maybe an hour, as
we waited for everyone else to finish eating. Other people came outside to check on us and
bring us water or ice cream if we wanted, including
                              . Once              , the last person to eat, was finished eating,
we went inside to regroup before leaving. We split back up into cars and drove back to the
park, picked up our vehicles and drove back to campus, where we all met in the        . We
were given our                      and then left, and I returned back to bed.

I would like to write a statement concerning the alleged incident concerning the                     which occurred on                     . I dropped in for approximately 5-10 minutes in order to say hello to everyone after they had finished hell week before the rest of the corps returned from Christmas. From what I saw, everyone that was there was watching the NFL playoff games that were occurring that night, playing board games and talking. After saying hello to everyone there, I left the location as I had a prior commitment later that night.

Very Respectfully,

The                     were instructed to meet at a park and stay in their cars until they were told otherwise. There were a total of three cars of                     sense we all car pulled. About 7-10 min after we were told to be there the             pulled into the parking lot and walked up to our cars. They told us to get out of the cars and put on our corps beanies over our eyes. We then were separated into groups to fit into different cars. We held onto each other's shoulders and were guided by a          . I was in the backseat of a truck making jokes with my buddies.                     was sitting next to me and we started to play a game of sticks , a finger counting game that many elementary schoolers play. When the short car ride was over we piled out of the car and were led inside. We were then sat down on a couch and waited till everyone had made it. After everyone had gotten there we were told to take off our beanies to see a combination of current and past             . Soon after music was turned on and people started playing board games, such as Secret Hittler, and picking out what they wanted in their omelets. It was explained to us that it was a competition to see who could eat it the fastest.             was the first to go and she finished fast. After her I don't really remember the order. The others such as                     took a really long time to finish. In fact          started to not feel good from the eggs and was told to stop. She didn't finish. After you finished eating the eggs you just went back to the party. They had ice cream for after you had finished as well. Some time after I had finished I ended up sitting on the front porch with                     . The music was really loud inside so it was nice to just get a breath of fresh air and talk about all the stories we had from        and the Corps in general. Periodically someone, whether it was one of our buddies or an upperclassman, would come outside and check on us. After everyone was done and the night had come to an end, we were driven back to the park where the cars were or back to campus depending on if you were the person who drove or not. All the current             and             then met in the        room and we were given out                     . Then everyone dispersed and went back to their rooms for the night.

On                , we parked in Hensel Park at 1800, turned the cars off and waited there until the             told us to get out of the car, put on the Corps issued beanie and put it over our eyes. They guided us to their cars and drove us for about five minutes. When we arrived, they carefully led us inside and sat us down before telling us to take the beanie off. All of the                             team was there along with the         from last year and some of the team from the                They told us that we were all going to eat dozen egg omelets, and why that was a tradition. I told them that I had a slight sensitivity to eggs which makes my stomach a bit upset, but I refused the option of vegan eggs that they wanted me to eat and instead insisted on eating normal eggs.        was in the kitchen making the eggs however we wanted them to be made. While she was making them, more and more of the past      came in. Half of the                   had no problem eating the eggs, but                    who were before me were struggling. The three of us took about an hour and a half to finish the eggs. After I had thrown up a second time, they made me quit even though I wanted to finish.

Since it was so loud inside from everyone cheering, playing games, and having a good time, I went outside to breathe with                and          went out with us to make sure we were doing alright and talked with us while        would poke his head out and make sure we didn't need anything and gave us ice cream to help settle our stomachs. We visited outside until the remaining             finished and we were called back inside to ask who we thought got 15 eggs. We easily reached the conclusion that              and             were the ones who ate 15 eggs. We were then told to go to the        So we got back into the           cars to go back to the Park and get our cars. We then drove back to campus and went to the where they gave us the             .

On                    me and my                       buddies were told me go to a location that is close to campus and arrive hungry. After we arrived at the park our                       pretended to kidnap us and drove us to a house where we were surprised with the company of                and from

It was explained to us that it was an old tradition for the                       back in the day to eat for time a large omelet that was served at a restaurant that is now closed. The offered us to partake in this friendly competition to eat omelets that they made for us with whatever toppings we wanted in the omelet. All of my buddies partook in this friendly competition and me and my buddies cheered each other on as each of us ate an omelet. After we finished we were drove back to get our cars and arrived back on campus.

Overall, the night was very memorable and brought me and my buddies together in a positive way while being around past                that we love being around.

This concludes my statement,

Very respectfully,

This account is told from the perspective of

On Sunday,                        , the                        were informed that they would be meeting at Hensel Park and to bring a Corps issued beanie with us. Once arrived at around 1610 current           on the team instructed us to put the beanies on and pull them down over our face. I was guided to the            car and drove to a location that I did not know about. Once we arrived I was guided out of the car and into a room where I sat down. After everyone arrived we were told to remove our beanies so that we could see, and we realized that we were in a living room sitting down on a couch. Around us were our former            who we said hi to. The                        were all gathered onto the couch and the             explained the situation about having to eat a dozen egg omelets. They explained the rules of the competition and how we would want to eat as fast as possible.

We then got up and greeted and joked around with our                        and             and were plenty happy to see all of them. We made an order of who was going to eat the eggs, and we were all allowed to customize the omelets we were given. As the night progressed we would make jokes around those eating, play board games with each other. The night continued on with those eating the eggs able to take breaks, eat at their own pace, watch tv or Youtube, or anything they wanted. The rest of us just talked and joked around, discussed            within the team and continually checked on those eating. No events within that time really stood out.

After the last person had finished eating they gathered us onto the couch and explained to us the tradition of the egg eating and that there used to be a diner where the            would all order a 12 egg omelet. They explained that when the diner closed they started making their own and that punishment for not finishing would mean a giant smoke session with the             . Finally they let us know that before       was disbanded, the                        used to add extra eggs into their meals. They let us know that                        were the ones to receive this tradition and that it was based on someone's personality. We were free to leave after that and we all went back to the            and received our                        and we all joked around for a bit and then went back to the dorms.

This is                          , one of the                                        . This email is my written statement of the event.

On                        we were told to drive to 502 College Ave (Hensel Park) at 1800 and to bring our Corps issued beanie. Once there, we waited in our cars for about 5 minutes before the                    arrived. When they arrived they told us to get out of our cars and to put our beanies over our eyes. We were then guided into the cars of upperclassmen.   was with two other                                        . We were driven to                    house, a            student and previous            Once there we were brought in and moved to a couch in the room then were told to take our beanies off. We saw all of the current                                        and some of our                    from when we were      . They then told us about the dozen egg omelet and the story behind it. After Hell Week, the             would go to a diner and the                     would order the 12 egg omelet on the menu. When the diner took the omelet off the menu, the             didn't want the tradition to die so they decided to start making the omelets themselves. We were told to pick an order to eat in. I was the             one to go. When it was my turn,                     asked me what all I wanted in my omelet. I chose cheese, ham, and bacon and she made the omelet. It took me over an hour to eat and while I was eating a few more former                                                    ) walked in. Once I finished I started talking to everyone again. I encouraged my buddies when it was their turn to eat.                                    , started to get sick and was told to stop eating. After everyone was done eating, we stayed at the house talking for about another hour before getting rides back to the park for the cars or back to the quad.

That is my statement of the event.

Very Respectfully,

On                     after the first        mock drill meet of the semester,                                           and buddies were told to keep the following evening open around 1830 and to be hungry. The next day around 1400 we were notified through the Microsoft teams chat to arrive at Hensel Park at 1800, bringing our corps issued beanies. After we arrived at the park we saw the                              and                drive up and approach our cars. We were instructed to get out and pull our beanies down over our eyes. They led us in groups of 2-3 to their cars and helped us in. I ended up in a car with                and we sat in the back of the car trying not to laugh as                              put music on the radio and drove us away from the park. None of the three of us spoke during the car ride. When the car stopped         led us out of the car and into a house where we were led to a couch and told to sit down. I could hear my other                  buddies sitting around me on the couch as well as some familiar voices of past upperclassmen on the team. We were all laughing and talking and someone told us to "take the beanies off already". When I opened my eyes I saw several of my old advisors including                 and                        . We were briefly told about the competition of eating 12 egg omelets and when asked who wanted to go first I raised my hand excitedly because I am a competitive person. We were told of the previous record of three minutes and fifty-three seconds, as well as given the opportunity to choose toppings for our omelets. While everyone else, all                                        as well as most of the                    from last year, played board games and conversed,                   was cooking the omelets for                     to consume. The omelets took awhile to cook, but when each one was completed the next                     in line would have someone begin their timer and start eating. When my omelet was done being cooked I fully intended to break the previous record and I finished eating in                              . Everyone else took varying lengths of time to finish their omelets, with                 beating                                      and                    taking over ninety minutes. Several people threw up during or after eating their omelets including                                     ,                     While each                       either waited their turn to eat or hung around after they were finished, we had fun talking and catching up with people we hadn't seen in nearly a year due to being in                              or due to their                    . We intermittently cheered on our buddies who were still eating and sat around reminiscing about       last year. Once everyone was done eating, the                                    cleaned up the dishes from cooking and eating the omelets then made sure all the                    had rides back to campus or to their cars at the park. We met up in the               and received our                    to commemorate the end of our                          , then we were congratulated on our hard work over the past week and released.

Very Respectfully,

I'm _____ and I am one of the _____ on the team in question. The team _____ let us know to share our side of the story and any knowledge of the event we might have to share. It is my intention to speak plainly about what happened at the event.

After our _____ meet we had our _____ and at the very end we were told to keep our schedule clear for the Evening of Sunday _____. They told us it would be fun to come with an appetite and our black corps issued beanies. On that evening we drove to a park 5 minutes away from campus and we waited for the upperclassmen to arrive. The upperclassman met us and pretended to kidnap us by pulling our beanies over our heads and we drove in their cars to, which we didn't know at the time, one of the old _____ house. It was about a 5 minute drive away from campus. Once we arrived at the location though, it was revealed that all the _____ as well as our _____ were there. The reason we went to the house was to have more space and a proper kitchen.

Once there, they shared that once hell week was over, the time where the team comes back early from winter break and prepares for Tulane, traditionally the team and past _____ would go celebrate the hard work of the _____ and recount old stories. In years past, the team would go to a restaurant that offered an omelet made from a dozen eggs and the _____ would typically order one and there would be a friendly competition to see who could eat it the fastest. The restaurant has since stopped offering a dozen egg omelets so the _____ made homemade ones for us. They asked us for toppings and made it to our desire and once it had cooled enough for eating we started chowing down while recording each other's times. We cheered each other on while we waited for ours to be made, board games were played, and we enjoyed each other's company before the school year started.

At the end of the evening, we thanked our host, said our goodbyes, and we were driven back to our cars. My _____ buddies and myself enjoyed the evening and laughed about our experience on the way back to the quad.

I hope my side of the story is able to add another piece to this puzzle and I am more than willing to answer any questions anyone has on the subject. Thank you for taking the time to hear my side.

Very Respectfully,

My name is                    and I was present at the events of                        with       This is an account of events from my perspective.

On the evening of                          , myself and the other                          of the Team arrived at Hensel Park, and were instructed to bring our black beanies. We waited for approximately 5 minutes then various                      arrived. We exited our vehicles and were instructed to put the beanies on and pull them down to cover our eyes. We were guided to our upperclassman's vehicles and guided to the door handle, where we were told to get in. We were driven to another location which took about 5-10 minutes of which I was not sure where, however it was a residential location. We were then guided inside the building, still unable to see, and sat down on a couch as we waited for the rest of our buddies to arrive.

Once all of my buddies had arrived, we were instructed to remove our beanies and were greeted by the other                      . There were a decent number of people at the house, approximately 20-25. It was at this point that the purpose of us being there was presented. We were told that each member of       would attempt to eat a 12 egg omelets against the clock. We were allowed to customize the omelets with cheese, peppers, ham, turkey, and other toppings if we desired. While it was a race against the clock, we could also take as long as we needed, however it was stressed the expectation was to finish the omelet by the end of the night. There was no penalty for a slow time vs a fast time, however, again, the expectation was that we finished the omelet. We weren't told what would happen if we did not finish the omelet, only told that we should finish them. Once             started to

volunteer for order, since each omelets took a while to cook, we began to socialize and play board games until it was our turn to eat. Some took a very short time,                       eating very quickly at a sub 5 minute time. Times were written down on a white board as we completed. We were allowed to eat as slow or as fast as we wanted using whatever strategy we wanted,         approximately an hour and a half to eat            and                          . As we finished, ice cream and other snacks were available and we continued to socialize.

Once we finished, we were driven back to our vehicles in Hensel park and arrived at our vehicles at approximately 2300.

I hope this is satisfactory and if any more information is required please let me know.

Best Regards,

To whom it concerns,

This is a personal recount of the sequence of events that occurred regarding the report to the Student Conduct Office. On                    at 1800 I was in the car waiting with                                        at Hensel Park. We waited until                    and                            arrived. All current year          pulled up in vehicles behind us around five minutes later.                              , and I got out of our respective vehicle as instructed by                                          then we were instructed to place a beanie over our eyes and led to different vehicles. I got into a car with                    and we were driven by            to an undisclosed location. Upon arriving, I was led into a house and instructed to sit down on a couch. All the                                    as well as                    were in attendance and we were collectively instructed to take off our blindfolds. I was informed by                that it was his house. Previous year          arrived throughout the night such as                                                . I talked with before sitting down to play Settler's of Catan with

                    was cooking bacon in the kitchen. All the                    were called to gather in the living room and informed by                and                    that each              would be receiving a twelve-egg omelet to eat. We were to be timed in doing so and the slowest eater would face a punishment at a later date. We were told by various                                                            that we could take however long we wanted as long as we finished. After the instructions for what we were going to do,              volunteered to go first.                    cooked the omelets for each one at a time. While I waited for my turn, I sat at the counter talking to

            asked me what I wanted on my eggs and she cooked it.                    kept my time while I ate at my own pace. I sat next to                    while I ate. She could not finish her plate of eggs and started to feel sick and was told that she would not have to eat anymore and there would be no punishment. After every            was done eating eggs, every individual (myself included) made conversation for about

an hour before departing in the separate vehicles that we had arrived in. I rode back in            car

where I was dropped off at campus, not blindfolded and knowing exactly where we were

going. Afterward the entire            team met in the campus                        and we (all

            ) were rewarded, by the                                to commemorate our

achievement of finishing Hellweek. Afterwards I left and returned to my dorm.


Respectfully,

26 January 2023

Incident Report

On the night of              many current and former members of the                     and myself took part in what had been an annual tradition for what I assume to be many years. I arrived at the house of one of the                     from last year,              , at around 1800. The individuals who showed up to the event were all of the                          of the team, as well as almost all of my            buddies from last year, the                     from last year, and a few other members of the

The events that transpired are the following: the                     members of the team showed up in two groups to the house, their eyes covered by the beanies they had on their head, and they were seated on the couch in the living room until the rest of their buddies arrived. When the                deemed they were ready, they were told to uncover their eyes, and were told that they would be eating 12 eggs in an omelet as it had been tradition on the team from years past. Then, over the course of the night, the            cooked all of the eggs for the                     feeding them their omelets one by one, while other current/former                          , (myself included), had a stopwatch going to time how fast the                finished. The                     were also told in a joking manner that they didn't want to know what happened if they did not finish. Some                took as fast as 2 minutes and some took as long as an hour. Their were a few who struggled to eat them, and one,                    , who's body reacted poorly and she threw up. She was then told she didn't have to finish. During this time, I was leading a group in playing the board game "Secret Hitler" while the                     ate their eggs and the rest of us ate

pizza. We all exchanged memories, inside jokes, and stories from our time with the team. Once the                had finished, the             gathered them in the living room and revealed that two of them had been given an omelet of 15 eggs instead of 12. After they were able to figure out who it was, they then reminded the                that they have to get back to work on Monday after the fun they had that night, and they gave additional words of encouragement, criticism, etc. about how their fish are doing in getting prepared for Tulane. This was the conclusion of the night and people incrementally left the house.

Written Statement of     Incident on                    :

     On Saturday,                    , at the conclusion of the team's                    meet. I told
the                         and                    to keep their Sunday evening free and to come hungry.
     On the night of the        we (the

                                                            to drive to Hinsel
Park (I believe) and to bring their corps-issued beanies with them. From there the
                              picked up the                    and told them to put their beanies on so that it
covered their eyes.                    then drove them to                         ,                              was
already there (both former members of the Corps and the previous year's
respectively). While this was happening,                                    and I were preparing all
of the eggs and omelet toppings. At this point            arrived.
     When the                    arrived at the house we sat them down on the couch and other
chairs in the living room while we waited for the rest of the                    to arrive. When all of the
                         were at the house we had them remove their blindfolds. At this point I
explained how at the end of hell week each year the                         would go to a restaurant in
town that served dozen egg omelets and how all the                    would order and eat one.
Since then that restaurant stopped serving these omelets. The tradition changed to where the
                    would make the omelets for the                    .
     During this time, former                         to the team,
                                                            arrived at the house.
     Then     started taking orders for the omelets.                    and            started making
the omelets for the                    . When the omelet was finished, a                    would get the
omelet and we would set a timer before they started eating so as to see who would finish their
omelet the fastest. There was no prize for being the fastest, and no punishment for being the
slowest or being unable to finish. When                    was eating her omelet, another former
                    to the team,                         was facetiming                    was on a
                         .        continued cooking and serving the omelets. While
cooking the omelets,
          and                         , took 1-2 egg shots (a small amount of liquor is poured
into an egg that had the top cracked off, and the egg and liquor was drunk). This was the only
alcohol consumed during the night. None of the                    drank anything. At some point in
the night, another former                         to the team                    arrived to say hello
to everyone, was there for less than half an hour then left. While people were not eating they
were all playing board games or watching football. All of the                    ate and finished their
omelet                    , who was not able to finish and no repercussions followed. I just
took the plate and told her she didn't have to worry about not being able to finish. When another
                    ,                    finished her omelet, she was not feeling well so she, along
with                         , went and sat out on the front porch. After the
finished their omelet they were served ice cream if they wanted it. I went out to go check on the

three                that were outside and brought them some water and ice cream. I sat with them, while the remaining              finished their omelets.

When everyone was finished with their omelets       returned indoors. I spoke to them about how proud I was of all of them for the hard work they put in that past week and how we still had a lot of work ahead of us.

The           then left with them to take them back to their cars.        and   finished cleaning everything up and said goodbye to                   then we drove back to campus. When everyone had returned to campus, all of us went down to our          to give the                                     . We meant to give the             to them at          house but they were forgotten in the          . Once everyone had their               . Everyone returned to their dorms.

Here is my statement for the student conduct officer concerning the        event that happened on

I arrived at                house at around 8pm with              . In the house were the current
          and a couple former        from the team. Everyone in the house were either currently or
formerly an        on the team excluding the other residents of the house. The house atmosphere was
laid back with music playing consistently, board games being played and food being consumed. As the
night went on the                                                    were cooking a dozen eggs for
each                    to eat. The              were allowed to pick what was in the eggs (meat,
veggies, cheese, etc.) and then would proceed to eat the eggs on their own accord either as fast as they
could or whatever pace they wanted. I do not remember all the              who ate the eggs but the
ones I remember were                                          , the other                    and
the other                whose names I can't remember. They each ate their eggs in whatever time
they could and then would presume enjoying the evening talking and later eating ice cream that was
also provided. 2-3 of the            threw up after eating the egg but continued to enjoy the night.
The gathering went until about 2215 where                    and I talked with with two of our old
                            until about 2230.            and I left at about 2235 and went
back to the dorms where we went to        room and talked for about an a hour before going back to
our own dorms.

This concludes my statement of what happened on                    . Thank you for your time.

Very Respectfully,

My name is                     and I was present at the       incident. My knowledge about the incident is as follows. The site was off campus and I arrived at the house at approximately 1830 with the remainder of the team. I believe the house was owned by                and                       (prior          ). From there, I talked to present                     and the past since this was an event to bring back                       . When the event started, the                        was asked to consume a 12-egg omelet made to their liking.                            were

in charge of making the omelets as well as preparing the fixings. We held it in a competition style where the fastest one to eat it won. The                ate it at their own pace with no penalty for finishing last. I played a board game for the remainder of the time and talked to my peers. When the event finished, we all went our separate ways. If there needs to be any clarification do not hesitate to reach out.

Sincerely,

The following is my statement on the incident on              .

The event consisted of the current              , myself, a few current cadets, and one graduate, who were all              at some point. The event occurred at a house off campus. My experience was mostly hanging out with the other older/prior cadets and also talking with some of the cadets who were eating the eggs, encouraging them to finish what they were eating. Alcohol was present, but only some people were drinking to my knowledge, all of whom are at              including myself. This started around 2000-2100 and then we left around 2200. Others who had not been drinking drove us back to campus. Upon returning to campus, I went to sleep.

If I can be of any further assistance, please contact me using the information listed below.

Very Respectfully,

**Written Statement**

After hearing that everyone would meet around 1800, I left campus around 1915 to arrive at            s apartment on the night of                   around 1930 hours. I went inside and immediately caught up with the group of        guys and girls who were there, including                                          right inside the front door. By the counter area, the              had already begun the egg-eating tradition so I swung by to see how they were doing. Around this time, I was catching up with

, and others. I ate a         pizza there as well while catching up with some of the                and said hello to                    who was cooking the eggs and                    who was helping to keep things clean. After, I walked around and talked with the group and checked on                                          to see how their omelets and stomachs were doing. Later, roughly around 2000,   had a shot of pink-lemonade vodka with                          , followed by an egg-shot with the same vodka with                    around 2030. At some point,                    came by for a short time and I said hello to him. Afterwards, I went over to the couch area and caught up with more friends and listened to music. I could tell                    and                    were struggling with their eggs a bit, so I went over to check on them before        ended up vomiting in a garbage can. After she vomited and finished her eggs,                    ended up going outside for some fresh air;            went out to check on them soon after. I saw            quickly finish her eggs in about 2 minutes or so while FaceTiming                    , who I also said hello to over the phone. After, I talked to            and others about music and how their breaks were near the couch area, talked to                                          a bit, and then checked on            as he was eating his eggs while watching a video. After        finished his omelet, I said my goodbyes around the room to as many people as I could before heading outside to see                          sitting together on the front porch helping to calm down their stomachs;        was curled up in a ball near the corner of the porch. I said goodbye to them,                          before walking back to my car and driving away at 2205. I arrived back at campus and the                                          .

I arrived at College Station on that same evening and was there between the hours of 1930 to 2230. This was an event where          got together to boost morale after a long "hell week". It was a very comfortable environment where everyone was hanging out and getting ready to return to school. From what I know concerning the eggs, nobody was required to participate in eating them. Anyone that did not feel well after eating was well taken care of. After the event, I left and went back to the dorms.

Best,



This email is to respond as a report to what happened around                    . Each        currently on the team (who could attend) was made a 12-egg omelet and timed to see how long it would take for them to eat it. People would cheer them on and encourage them to eat it fast and some people threw up and felt quite ill due to it.                                    A speech was given at the end to build morale.

Very Respectfully,

Before my time on the team, the ⬚⬚⬚⬚⬚⬚ used to go to a local restaurant and order a 12 egg omelet for each of the ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ on the team at the conclusion of Hell Week. That restaurant has since stopped serving the 12 egg omelet, so now the team buys its own eggs and toppings, and the omelets are made by the ⬚⬚⬚⬚⬚⬚ on the team to the liking of each of the ⬚⬚⬚⬚⬚⬚⬚ This event now happens at an off campus house. More specifically, a house that belongs to someone who once held a ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚, and this year ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚. The ⬚⬚⬚⬚⬚⬚⬚ were introduced to this night by being told that there was a surprise, and that they should plan on not eating heavily during the day. They were told to meet at a certain location where the ⬚⬚⬚⬚⬚⬚⬚ were waiting to carpool them to the house.

With the event not being fully known to the                    they were blindfolded for the surprise, and then brought into the house. After everyone's arrival, the blind folds were taken off and they were able to see all of the            they had looked up to the year before when they were freshmen. It was like a big family reunion, with board games, the NFL football game on the TV, and omelets being served one by one to each of the                    . In true fashion of the very competitive team, the times it takes for each person to finish the omelet was recorded on the whiteboard, and everyone wants to beat the best time from the year before, to "stick it" to their previous upperclassmen. Many times during the night the                    were reminded that nothing would happen in the event that they couldn't finish the omelet. There was a story that was told about one time (a few years before I                    ) that someone didn't finish the omelet, and as a punishment, they had to do physical training until they vomited, but it was assured numerous times that in no event would there be any backlash in the case that someone didn't finish. Everyone ended up finishing their omelet, and the previous year's record was broken twice. After everyone had finished, some were feeling a little queasy as expected, but everyone seemed to be in good spirits, and most people would even wash down the eggs with a bowl of ice cream. The whole event had no ounce of mal-intent, and it was only for the reunion purpose as well as your previous upperclassmen cooking for you after you ordered what you wanted in your omelet. Everyone cleaned up where they had sat, and made sure looked as good as it did when they showed up. I was even able to get a hug and a smile, and tell everyone how proud I was about their accomplishments both on the team and in the Corps. I remember multiple times during the night where myself and the previous                    would look around at all the people we had hopefully had a positive impact on during our times in the Corps. Looking at all of the and multiple                    that were once                    when they were            gave me so much pride and happiness. The overall mood of the night seemed so good and heartwarming, and it saddens me very much to understand that other people may not have had the same sense of reunion and happiness.

On            around 1800,

came to Hensel Park in separate cars.

Shortly afterward,                                                    I arrived at Hensel
Park and instructed the            to pull the beanies over their eyes and get into our cars. We arrived
as a group at            apartment, where            ,

            , and several of        roommates were socializing. Blindfolds came off and someone
explained that      for some time had a yearly event where            were encouraged to eat 12-egg

omelets. There was no punishment for not finishing, and in fact,            did not finish her omelet
and did not receive any negative repercussions from any upperclassmen.

I heard a rumor that back in the day they used to do terrible things to            that did not finish
their omelet, but I had never witnessed anything like that, nor had any evidence presented to me to
suggest that my fellow      and            intended on doing anything of the sort. The intention
of the event was to socialize and celebrate a finished week of practice, not to initiate members.

At some point during the night of the incident,            arrived and stayed.            and his
girlfriend dropped by for around 10 minutes at most

                                                            had
upset stomachs after eating, and            and I checked in with both of them throughout the
night, to offer them water and anything else they might need. Around 2230-2300 we all left back to the
dorms in separate cars.

I don't recall there being any underage drinking at the event. There could have been more people at this
event, but to the best of my memory, these were all the names I could gather.

                                    and I are all the current            on
   . Together, we organized and coordinated the event, and in no way are any of the participating
            to blame for the incident.

Please contact me via email or at            you have any questions or concerns.

Very respectfully,

On Sunday,                    at approximately 1730, I drove to the store to buy supplies for the omelet dinners for the                   on the                   and the                   who would be participating. I then drove to                   house as he was a                   who had offered to let us use his house for the evening.                   , the                   , then spent the next hour prepping the kitchen for the                   to arrive At some point around 1830,                   and     other                   from the Corps who were all former                   arrived.

The                   arrived between 1830 and 1900 and were led blindfolded into the house by the                   on the team who had picked them up. I was in the kitchen from 1900 to 2200, where, over the course of the evening,                   .                   was allowed to choose what ingredients they wanted included and allowed to take their time in eating the food.

  then cleaned the dishes and around the kitchen/dining area from 2200 to sometime after 2300 when the party ended and everyone left.

The egg eating event is a tradition in which                     eat a cooked 12 egg omelet upon the completion of Hell Week. They choose what, if any, condiments they would like in their omelet and are timed how fast they eat it. Some choose to eat their omelets slowly, while others try to eat it quickly. The event is in no way "bad bull" and was an opportunity for past and present            to reconnect. On the evening of              , I witnessed the omelet eating event that occurred with the                     ,                     , as well as various other      personnel/former personnel. Everyone present was either a current or former                     The event occurred off campus at around 1830. I rode with                     to the event about an hour after the planned start time, as we were both at an      practice. When we arrived, the            were already eating the eggs, had already eaten, or waiting for the omelets to be cooked. After about 2-3 hours, the omelets had been eaten and people began to depart the house. I rode back to the Quad again with              , and     h also rode in the car.

V/R

On the evening of              , I witnessed the omelet eating event that occurred with the                     , as well as various other      personnel/former personnel. Everyone present was either a current or former                     . The event occurred off campus at around 1830. I rode with                     to the event about an hour after the planned start time, as we were both at an              . When we arrived, the            were already eating the eggs, had already eaten, or waiting for the omelets to be cooked. After about 2-3 hours, the omelets had been eaten and people began to depart the house. I rode back to the Quad again with                     also rode in the car.

Please let me know if there is anything else I can provide to assist in this matter.

Very Respectfully,

Written Statement:


On                          participated in an event that took place off campus involving
          members of the                    eating eggs.   coordinated with the other
                                              .   messaged the
                                          and to meet us at Hensel Park at 1800.
                          communicated the same with the                            . Once
at the park, we met with all the                and had them put on their corps issued beanies as
a blindfold and led them to our cars.   was responsible for driving
                    and drove them to                  house. Once there, we led them inside with the
beanies covering their eyes and had them sit on the couch. Once everyone was present, we
had them take off the beanies. Following that,                    explained the situation, which
was that they were being cooked 12 egg omelets to eat as fast as they were able to. This has
been a tradition in past years, starting when the            went to Hullabaloo Diner and ordered
a 12 egg omelet each.                    was in charge of cooking the eggs, and the
were allowed to choose what toppings they wanted inside. They went in random order and each
ate the omelet while being timed.                    did not finish the omelet, which was
          . The times were written on a white board and after they finished the omelet,      gave
them ice cream to calm their stomachs. The rest of the night was just waiting for everyone to
finish and hanging out around the house. After everyone was done,      told them that two of
them received 15 eggs instead of 12, which were                                        , who
were randomly selected based on their size. After talking for a little bit,      all drove the
                    back to the park where their cars were. Afterwards,      all met at the        to
distribute                and then went our separate ways.

I'm writing to detail my account of the reported          incident.

In advance, the                     were told to keep their evening open on Sunday          and to not eat much that day. All of the team's active                              ) met at a park off campus where they were picked up by the team's        . They were told to put their Corps-issue beanie on to cover their eyes. They were driven by the          to           apartment since a place was needed to cook the eggs. They were led inside and told to remove the beanies once all were inside.
          explained to the              that they would each be eating dozen egg omelets.          cooked all the omelets with help from                  .

                    ate in the order they volunteered. The omelets were made to-order. They were allowed to pick whatever toppings they wanted. When it came time to eat, they were timed and encouraged to attempt to be the fastest, but were ultimately allowed to eat at whatever pace they desired without threat. Times varied from 2:20 to 1:41:02. If requested, ice cream was served once a
finished to help them feel better since that soothes the stomach. I believe 2 or 3          threw up. 2          had omelets that contained 15 eggs but they were not the ones who threw up as those were given to the 2 perceived biggest eaters.

Beyond the egg eating, it was a standard social gathering. There was no PT involved the entire night. No alcohol was consumed by minors. If anyone started to feel unwell while or after eating, they were assisted as needed/requested. If a          felt unwell while eating, they were allowed to take a pause as needed. People played board games and talked. Former members arrived to cheer on the          in their old positions and ask about Hell Week. These former members include

                    was not present as she was                              . She was on                              to eat her omelet.

Once every          was done and ready to leave, everyone said their goodbyes and the
were either taken back to their cars or directly back to campus. Nothing was required of them the following day.

Please let me know if you or the Student Conduct Office need anything clarified or have any questions.

Very respectfully,

Statement

I arrived at            house at around 1800 along with the other
                    While we waited for everyone else to arrive we prepped the supplies to make the
omelets.       cooked the bacon and chopped up vegetables to add if the               wanted that in
their meal. At around 1830 the               on the team arrived with the        driving them. The
             were blind folded when they walked into the house but the blind folds were removed as
soon as they had sat down in the house. The                were told how as a celebration of the end of
hell week the whole team got together to compete in a food challenge. Each             would receive
a 12 egg omelet to eat. There was no maximum amount of time allowed but the goal is to compete
against their buddies and finish the omelet. Vegan egg substitute was also provided if the
wanted to participate but was unable to eat egg. I don't remember the exact order that they went but I
do know          went first. While        cooked the Omelets everyone else cheered on their
buddies, hung out and talked.             started feeling sick while eating hers so she did not finish it.
She went outside with                          to get some water and cool off. Those       who
were of age also took a shot of raw egg but that was the only alcohol at the event that I am aware of.
The rest of the             finished their Omelets. After everyone was done,             gathered
everyone together to congratulate us on the end of hell week and to get ready to be in the mindset to
compete at Tulane. We left around 11:00.

The following is my account of what happened the night of              .

It started with the other                                    and myself arriving at a park to meet the
              . After all the         and                had arrived, we told the             to cover their
eyes with beanies they'd been told to bring. They were then escorted into the         vehicles. The
           then drove the                                house where         and past       members where
waiting. After being escorted inside they were told to remove their blindfolds. The upperclassmen then
explained what the             would be doing. They would be eating an omelet made up of twelve
eggs and other ingredients at the             request. The             then began to eat. They
decided on an order and each took a turn eating. While each             was eating, the upperclassmen
and the             who weren't eating socialized, played music and board games, cheered on the
             eating, and those over 21 drank. During the night a few of the             felt sick from
the omelet and threw up. After confirming that the             were okay, the upperclassmen would
encourage them to finish the omelet. Old team members came and went throughout the night. After
everyone had finished, the time to eat the omelet was written on a whiteboard for each
The socializing went on for a little longer, and eventually the             were driven back to their
parked vehicles by the         . Everyone then separated.

This has been my knowledge of the night of the event, told to the best of my ability. If there are any
questions, please email me.

Very respectfully,

<div align="center">exas A&M Corps of Cadets</div>



Date 21 September 2023

**MEMORANDUM**

TO:      Dr. Douglas Bell

FROM:    BG Patrick Michaelis

SUBJECT:

Our initial investigation was conducted yesterday with the           in Company      During the discussion, the           were asked general questions about the treatment they have received from their upperclassmen and how things were going overall. As the discussion progressed more direct questions were asked dealing with the specific allegations outlined in the complaint. When asked about the      from      being given a hard time based on and required to repeat answers, the           indicated all      were required to repeat answers until they answered in the way the upperclassmen desired. The specific example given was a campusology question that had to be memorized and repeated exactly as written. All      that could not repeat the answer correctly were sent back to their room for five minutes to practice. Knowing campusology answers are part of the           class earning their Corps      which is consistent with Corps policy. The question dealing with having joke ready for the outfit meeting was met with the answer that it was a misunderstanding between the upperclassmen and the The upperclassmen said one thing and the      understood something different. The were asked about being able to get enough sleep, and responded with they stay up late to do homework, and the length of the meeting had nothing to do with their lack of sleep. The in      are encouraged to be involved in activities outside the Corps, but the outfit does require them to attend evening formation, a required activity, unless they are in class or have signed a military letter to miss the event. This is consistent with Corps policy.

Based on the answers provided by the           , we believe the allegations to be unsubstantiated.

Patrick R. Michaelis

Brigadier General (Ret.), U.S. Army

Commandant, TAMU Corps of Cadets

# Bell Jr, Douglas

**From:**                      Bell Jr, Douglas
**Sent:**                       Tuesday, November 7, 2023 2:26 PM
**To:**                           Winking, Audrey J
**Subject:**                  FW: [Maxient]         College Station - On-Campus Residence Hall

Additional information from

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, November 7, 2023 1:42 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** Fwd: [Maxient]           College Station - On-Campus Residence Hall

Please excuse short messages and typos, as I am responding on my phone

Begin forwarded message:

> **From:** "Moore, Erica" <erica_moore@stuact.tamu.edu>
> **Date:** November 7, 2023 at 1:25:31 PM CST
> **To:** "Murray, Dylan C" <dmurray@stuact.tamu.edu>
> **Subject: FW: [Maxient]**         **College Station - On-Campus Residence Hall**
>
>
> Howdy Dylan,
>
> I am sending this over to you. I've already submitted a report for this and told the student an additional report from him would be helpful as well.
>
> **Erica Moore**  | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000
>
> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

> **From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> **Sent:** Tuesday, November 7, 2023 1:12 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** Re: [Maxient]           College Station - On-Campus Residence Hall
>
> Good afternoon, I experienced hazing this morning at formation. The entire class of        cadets were yelling at me, cursing at me and making fun of me in front of the rest of my unit. One particular student

named ▮▮▮▮▮▮ who is a ▮▮▮▮ was leading the charge as they surrounded me and were mocking me for being hurt and unable to run. They are making me very uncomfortable being part of ▮▮▮ as they continue to say hurtful things to me in front of the rest of the unit. They made me continuously do push ups until I was no longer able to, and they kept screaming at me to do it

On Tue, Nov 7, 2023 at 12:01 PM Moore, Erica <erica_moore@stuact.tamu.edu> wrote:

Howdy,

Thank you for reaching out to us regarding the incident below. Your report has been received by the Department of Student Activities and will be reviewed to determine any needed further action. If you have any additional information or documentation related to the incident you would like to submit, feel free to reply to this email, or if you would prefer to speak to a staff member directly you may contact me at the number below. Thank you again for your submission, and for your support of our Texas A&M student organization community.

Sincerely,

-Erica

**Erica Moore**  | Administrative Coordinator II
Koldus 224G|Student Organization Leadership And Development I Department of Student Activities

1236 TAMU | College Station, TX 77843-0000

ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ notifications@maxient.com>
**Sent:** Sunday, November 5, 2023 9:11 PM
**To:** Moore, Erica <erica_moore@stuact.tamu.edu>
**Subject:** [Maxient] ▮▮▮▮▮▮ College Station - On-Campus Residence Hall

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

**Campus Community Incident Report**

## Background Information

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident

Location of incident
**On-Campus Residence Hall**

## Involved Parties

**Company** ) Alleged Offender

## Incident Description

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

## Supporting Documentation

[doctorsnote1.pdf](#)
[doctorsnote2.pdf](#)
[doctorsnote3.pdf](#)
*For added security, these links will expire in 10 days. The attachments will remain accessible when viewing the report within Maxient.*

## Submitted By

Your full name



*[UNAUTHENTICATED]*

## Routing Information

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
   • Dylan Murray
   • [jhbrown@stuact.tamu.edu](mailto:jhbrown@stuact.tamu.edu)
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1

Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of Student Activities.

**Message sent by Maxient**
**Replies will be sent to the submitter**

# Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Friday, November 3, 2023 11:35 AM
**To:** Winking, Audrey J
**Subject:** ▮▮▮▮▮
**Attachments:** Re: ▮▮▮▮▮ DOC 231030 10_53_55.pdf; DOC 231030 15_33_52.pdf

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

FYI for the ▮▮▮▮ Investigation

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ▮▮▮▮▮

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the ▮▮▮▮ acquisitions with supporting documentation.

V/R


Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**Bell Jr, Douglas**

---

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **Sent:** | Monday, December 18, 2023 3:24 PM |
| **To:** | Latham, Skylar |
| **Cc:** | Smith, Asia |
| **Subject:** | Investigation Assigned |
| **Attachments:** | Investigation Report.pdf |

Howdy,

Please see the attached    harassment investigation assigned to you.  Please let me know if you have any questions or concerns.

**Douglas Bell, Ph.D.**  | Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **Sent:** | Tuesday, December 12, 2023 4:09 PM |
| **To:** | Bell Jr, Douglas |
| **Subject:** | investigation complete |

The     investigation report is completed and has been saved in the shared drive.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

## Bell Jr, Douglas

**From:** Bell Jr, Douglas
**Sent:** Monday, November 6, 2023 10:17 AM
**To:** Winking, Audrey J
**Subject:** FW: ██████

FYI

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
**Sent:** Monday, November 6, 2023 9:29 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** Re: ██████

Doug,

Desiree Ornelaz is the next coinvestigator.

I'll talk with ██████ and see if a new room will alleviate some of his immediate concerns.

Thanks!

> On Nov 6, 2023, at 8:37 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
>
> Howdy,
> Thanks for the update.  If you move him to another, it will not impact the investigation. I would like to know who the co-investigator is so we can begin scheduling with the student and members of the outfit.
>
> **Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
> **Sent:** Sunday, November 5, 2023 5:28 PM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Subject:** RE: ██████

Doug,

Jeff is out of the office and will return this week. If you need an investigator sooner, I can see who is next up for assignment.

Additionally, there are some extenuating circumstances with this student that also impact his health. If we offer to move him to another room on the _____ is that a violation of any protocols now that SCO investigation is ongoing?

Thanks,

**Meredith Simpson**
Office of the Commandant | Corps of Cadets
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, November 3, 2023 3:59 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE:

Howdy,
Can you please provide a co-investigator from the Corps regarding this case? We will be initiating an investigation. Thank you in advance.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ▮▮▮▮

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the _____ acquisitions with supporting documentation.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317



Date 21 September 2023

## MEMORANDUM

**TO:**       Dr. Douglas Bell

**FROM:**    BG Patrick Michaelis

**SUBJECT:**

An initial inquiry was conducted into the allegations contained in the        reports submitted to Student Conduct.  Our findings for each complaint are:

**Retaliation from                        after missing a mandatory football game.**

For missing the football game without authorization ▮▮▮▮▮ was given a restricted weekend.  In the explanation, the discipline was given as much for▮▮▮▮▮ lying about attending the event and providing a photoshopped phot as "proof" of attending much as missing the game. (See attached Discipline report)

**The                        members have continuously kept adding more overexaggerating and falsified discipline items on to my profile to serve in the form of demerits, marching tours, and restricted weekends.**

See attached incidental counseling forms and Discipline report.

**People have taken my several of my personal belongings and school supplies and I have been unable to find out where they went.**

When questioned about what was taken Cadet ▮▮▮▮▮ was unable to provide specific examples.

**has given me restricted weekends for missing                        class which we both have, even though I have excusal letters for them.**

Cadet ▮▮▮▮▮ was not able to produce the excusal letters for missing class.

**Destruction of my personal property as I had to make unnecessary repairs to my**

Cadet ▮▮▮▮▮ was not able to explain what damage was done to his

Military Sciences Building
1227 TAMU
College Station, TX 77843-1227

Tel. 979.845.2811  Fax 979.845.8066
corps.tamu.edu

- 2662 -

I was also set up by members of my unit when my room mate ▮▮▮▮▮ and passed me in the hall not telling me anything and did not take my calls or texts right after seeing me walk by, even though he did not have class. ▮▮▮▮▮ locked me out of my room for several hours and I missed class because I could not get into my uniform and ▮▮▮▮▮ stood in the hall watching me with a smirk on his face as I could not get into my room, and then ▮▮▮▮▮ gave me discipline for not attending class intentionally, even though I went to the Corps Housing Office and they were not able to help me get into my room so I could go to class.

Cadet ▮▮▮ does not sleep in the dorm. When Cadet ▮▮▮ left for work, he locked his door. Cadet ▮▮▮ was not carrying his room key.

Most recently as of thi▮▮▮▮ s to my knowledge. I was kicked off of the Corps of Cadets ▮▮▮ team which I have been on since ▮▮▮▮ year, and my unit's leadership has continued to pressure the captain about having me on the team.

Cadet ▮▮▮ was removed from the team for not attending practice. (See email from team captain)

continuously bullied by ▮▮▮▮▮ and ▮▮▮▮▮ - who routinely drunkenly bullies ▮▮▮

Cadet ▮▮▮ does not sleep in the Corps Dorm and is not there in the evenings.

Cadet ▮▮▮ is described by his military advisor as being nonparticipative for most outfit activities. In addition to being absent, he has also been caught being untruthful on several occasions. His military letter for missing morning activity Monday-Thursday indicated he was training with the ▮▮▮ when in fact the team only trains Monday-Wednesday. Lt Col Gardner conducted a meeting with ▮▮▮ his Commanding Officer and Executive Officer. During the discussion, Cadet ▮▮▮ indicated he did not feel comfortable being in the same room as his roommate, ▮▮▮ because of his roommate's personal lifestyle choices and had been staying off campus with one of his friends. When questioned about what personal items or school supplies had been taken, ▮▮▮ was unable to provide specific examples. His roommate denies taking anything from ▮▮▮ or messing with any of his belongings. Cadet ▮▮▮ was told by his Commander he was authorized to change rooms, but ▮▮▮ has not talked to the Corps Housing Officer to initiate this process. Cadet ▮▮▮ came to this outfit from ▮▮▮ in the ▮▮▮ and was on a ▮▮▮ for the ▮▮▮ semester, making this only the ▮▮▮ full semester he has been in this outfit. With the small amount of time ▮▮▮ spends with the outfit, it is difficult to determine when, or by whom he is being harassed. Although the situation is not ideal, we do not see violations of Student Rule 24.

Patrick R. Michaelis
Brigadier General (Ret.), U.S. Army
Commandant, TAMU Corps of Cadets

Building and room/suite number
#### TAMU
College Station, TX 77843-####

Tel. 979.123.4567  Cell. 979.123.4567  Fax 979.123.4567
myname@tamu.edu
www.mywebsite.tamu.edu

- 2663 -

| From: | Ramirez Jr, Joe E |
|---|---|
| To: | Michaelis, Patrick Ralph; Bell Jr, Douglas |
| Cc: | Gardner, Jeffery D; Simpson, Meredith M |
| Subject: | RE: [Maxient]      College Station - On-Campus Residence Hall -      On |
| Date: | Tuesday, October 24, 2023 6:26:17 PM |

**Doug – we agreed to let the Commandant and his staff have 72 hours to conduct their own internal inquiry to determine if there was validity to the report before they sent to SCO. This definitely falls into that category.**

**Please hold on any further actions until the Commandant and his staff have had the chance to look into this and come back to SCO with what they have discovered.**

**Patrick – you and your staff have 72 hours to report back to Doug and SCO what you find out about this allegation.**

**Thanks.**

*BG Joe E. Ramirez, Jr*
*United States Army (Retired)*
*Vice President for Student Affairs*
*Texas A&M University*

---

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Tuesday, October 24, 2023 5:45 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>; Ramirez Jr, Joe E <jramirez@vpsa.tamu.edu>
**Subject:** Re: [Maxient]      College Station - On-Campus Residence Hall      On

Okay Doug. This is not within the MOA agreement. You have every right to do what you want (which you've tipped your hand already) after the 72 hour period.

I will discuss with Joe on Thursday.

Michaelis

Sent from my iPad

> On Oct 24, 2023, at 17:39, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> The first report was received today from a Tell Somebody report from a faculty. Within this report it appears that the Corps is aware of this student issue and complaints. The second report is from the student and outlines the same information. I intend to reach out to this student, who is a       in the Corps about his concerns about continued harassment. We can discuss tomorrow if needed.
>
> Douglas Bell

**- 2664 -**

Please excuse any typo, message sent from I-Phone

On Oct 24, 2023, at 4:46 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:

Okay… so lay them out.  Did we do the 72 hour process on the first one?  Are they both from different or the same student?  Did we see the first on?

This is why we do this.  Thanks.

Sent from my iPad

> On Oct 24, 2023, at 14:42, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> Yes, but being we have received two reports regarding this situation, I feel that an investigation is warranted.
>
> Douglas Bell
>
> Please excuse any typo, message sent from I-Phone
>
>> On Oct 24, 2023, at 4:38 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:
>>
>> Okay… but isn't that how almost all reports start?
>>
>> Sent from my iPad
>>
>>> On Oct 24, 2023, at 14:34, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>>>
>>> Being this report is coming from the student I feel an investigation is warranted.
>>>
>>> Douglas Bell
>>>
>>> Please excuse any typo, message sent from I-Phone

On Oct 24, 2023, at 4:29 PM, Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu> wrote:

Doug - is this a secondary report?  If not, let us come back to you within the 72 hour agreement first.  As I recall this is one we've been working for a while.  Jeff can elaborate.

Sent from my iPad

> On Oct 24, 2023, at 14:24, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:

Howdy, I have received the attached IR and Tell Somebody Report about the

outfit. SCO will be investigating this matter. Can you provide a CTO to co-investigate.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards Student Conduct Office | Division of Student Affairs | Texas A&M University 1257 TAMU | College Station, TX 77843-1257 ph: 979.847.7272 | [dbelljr3@tamu.edu](mailto:dbelljr3@tamu.edu) | sco.tamu.edu
- - - - - - - - - - - - - -

**- 2667 -**

# Bell Jr, Douglas

**From:** Simpson, Meredith M
**Sent:** Monday, November 6, 2023 9:29 AM
**To:** Bell Jr, Douglas
**Cc:** Gardner, Jeffery D
**Subject:** Re: ▮▮▮▮▮

Doug,

Desiree Ornelaz is the next coinvestigator.

I'll talk with ▮▮▮▮ and see if a new room will alleviate some of his immediate concerns.

Thanks!

> On Nov 6, 2023, at 8:37 AM, Bell Jr, Douglas <douglasb@vpsa.tamu.edu> wrote:
>
> Howdy,
> Thanks for the update. If you move him to another, it will not impact the investigation. I would like to know who the co-investigator is so we can begin scheduling with the student and members of the outfit.
>
> **Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
> Student Conduct Office | Division of Student Affairs | Texas A&M University
> 1257 TAMU | College Station, TX 77843-1257
> ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
> - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> **From:** Simpson, Meredith M <msimpson@corps.tamu.edu>
> **Sent:** Sunday, November 5, 2023 5:28 PM
> **To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>; Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
> **Subject:** RE: ▮▮▮▮▮
>
> Doug,
>
> Jeff is out of the office and will return this week. If you need an investigator sooner, I can see who is next up for assignment.
>
> Additionally, there are some extenuating circumstances with this student that also impact his health. If we offer to move him to another room on the Quad, is that a violation of any protocols now that SCO investigation is ongoing?
>
> Thanks,
>
> **Meredith Simpson**
> Office of the Commandant | Corps of Cadets

1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811 | msimpson@tamu.edu

Academic Questions: academics@corps.tamu.edu
Corps Virtual Office: tx.ag/corpsacademics
- - - - - - - - - - - - - - - - - - - - - - - - -
**TEXAS A&M UNIVERSITY**

---

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Friday, November 3, 2023 3:59 PM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE: ▮▮▮▮

Howdy,
Can you please provide a co-investigator from the Corps regarding this case? We will be initiating an investigation. Thank you in advance.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ▮▮▮▮

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the ▮▮▮ acquisitions with supporting documentation.

V/R

Lt. Col Jeff Gardner '82, USAF (Ret)

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

**Bell Jr, Douglas**

| | |
|---|---|
| **From:** | Gardner, Jeffery D |
| **Sent:** | Tuesday, October 31, 2023 8:50 AM |
| **To:** | Bell Jr, Douglas |
| **Cc:** | Michaelis, Patrick Ralph; Simpson, Meredith M |
| **Subject:** | RE: ▮▮▮▮ |

Yes Sir.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)
Assistant Commandant for Accountability and Standards
Military Advisor Parsons Mounted Cavalry
979-458-9317</span>

**From:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:49 AM
**To:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** RE:▮▮▮▮

Thank you for this information.  The Student Conduct Office will follow up with ▮▮▮▮ regarding his submission of an Incident report.  Depending on the information received from our routine follow-up, an investigation may still be warranted.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
<span style="color:maroon">**DIVISION OF STUDENT AFFAIRS**</span> | One Division. One Mission.

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:** ▮▮▮▮

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the ▮▮▮▮ acquisitions with supporting documentation.

V/R

<span style="color:maroon">Lt. Col Jeff Gardner '82, USAF (Ret)</span>

Assistant Commandant for Accountability and Standards

Military Advisor Parsons Mounted Cavalry

979-458-9317

| From: | Bell Jr, Douglas |
| --- | --- |
| To: | Winking, Audrey J |
| Subject: | FW: [Maxient] IR       College Station - On-Campus Residence Hall     On |
| Date: | Tuesday, October 24, 2023 4:25:11 PM |
| Attachments: | Tell Somebody Report |

I have received the information and will be recommending this situation for an investigation.

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, October 24, 2023 4:11 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Brown, Josh <jhbrown@stuact.tamu.edu>
**Subject:** FW: [Maxien       College Station - On-Campus Residence Hall    On

Howdy Doug,

Please see the below Incident Report received this morning to review from a SCO perspective or to pass along to Corps Staff to address through their processes.

Thank you,
Dylan

**Dylan Murray** | Assistant Director
Campus Engagement & Traditions | Organization Conduct
Department of Student Activities | Texas A&M University
1236 TAMU | College Station, TX 77843-1236

ph: 979.862.1973 | dmurray@stuact.tamu.edu | http://studentactivities.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** ████████ (via Maxient) <notifications@maxient.com>
**Sent:** Tuesday, October 24, 2023 10:03 AM
**To:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Subject:** [Maxient]       College Station - On-Campus Residence Hall    On

**This Message Is From an External Sender**

This message came from outside your organization.

Secondary recipient (you were copied)

## Campus Community Incident Report

**Background Information**

Campus Location
**College Station**
Status of the Alleged Offender
**Recognized Student Organization**
Date of incident

Time of incident
**On**
Location of incident
**On-Campus Residence Hall**

**Involved Parties**

Company        in the Corps of Cadets () Organization

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me." I am currently being harassed by multiple people in my unit      in the Corps of Cadets. I have been receiving continuous retaliation from other        cadets. It started during the week after I missed a mandatory event the football game against the                        game and went to my                              instead. The              cadets in my unit gave me enough discipline to get me removed from the Corps, and go before the Cadet Performance Review Board, however after the incident                             had to meet with the head of the Corps Discipline office to ensure I was still able to stay in the organization without being forced out. The problem is that even after being put in a bad position, the            cadet members have continuously kept adding more overexaggerating and falsified discipline items on to my profile to serve in the form of demerits, marching tours, and restricted weekends; and I have been given heavy discipline for barely missing deadlines of online forms to submit and messing up letters. However I was delivered the amount of discipline from the unit's leadership to kick me out of the Corps in less              with only having been counseled a single day about missing the game beforehand. I have experienced ongoing harassment from members in my unit including destruction of my personal property as I had to make unnecessary repairs to my              As well, people have taken my several of my personal belongings and school supplies and I have been unable to find out where they went, and my room mate ▮▮▮▮▮▮▮▮ did not even tell me who did it even when someone stole              or several days. The other          cadets in my unit continue to try give me large discipline as ▮▮▮▮▮▮▮▮ has given me restricted weekends for missing        class which          have, even though I have excusal letters for them.

**Supporting Documentation**
**No additional documents were attached to this report.**

**Submitted By**
Your full name

▮▮▮▮▮▮▮▮▮▮

Position/title/student status
**Student**
Your email address

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Your phone number

▮▮▮▮▮▮▮▮

UIN

▮▮▮▮▮

*[UNAUTHENTICATED]*

**Routing Information**
Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:
   • Dylan Murray
   • jhbrown@stuact.tamu.edu
Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of
Student Activities.

**Message sent by Maxient**
**Replies will be sent to the submitter** ▮▮▮▮▮▮▮▮▮▮▮▮

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: [Maxient]       College Station - On-Campus Residence Hall |
| **Date:** | Tuesday, November 7, 2023 2:26:05 PM |

Additional information from

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Murray, Dylan C <dmurray@stuact.tamu.edu>
**Sent:** Tuesday, November 7, 2023 1:42 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Subject:** Fwd: [Maxient]       College Station - On-Campus Residence Hall


Please excuse short messages and typos, as I am responding on my phone

Begin forwarded message:

> **From:** "Moore, Erica" <erica_moore@stuact.tamu.edu>
> **Date:** November 7, 2023 at 1:25:31 PM CST
> **To:** "Murray, Dylan C" <dmurray@stuact.tamu.edu>
> **Subject: FW: [Maxient]**       **College Station - On-Campus Residence Hall**


> Howdy Dylan,

> I am sending this over to you. I've already submitted a report for this and told the student an additional report from him would be helpful as well.

> **Erica Moore**  | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000

> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

> ---

> **From:** ██████████████████████████████
> **Sent:** Tuesday, November 7, 2023 1:12 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** Re: [Maxient]       College Station - On-Campus Residence Hall -

Received & Filed 3/21/2025 4:09 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Erika Garcia
Envelope# - 98756498

Good afternoon, I experienced hazing this morning at formation. The entire class of ▮▮▮ cadets were yelling at me, cursing at me and making fun of me in front of the rest of my unit. One particular student named ▮▮▮▮▮ who is a ▮▮▮ was leading the charge as they surrounded me and were mocking me for being hurt and unable to run. They are making me very uncomfortable being part of Company ▮▮ as they continue to say hurtful things to me in front of the rest of the unit.

On Tue, Nov 7, 2023 at 12:01 PM Moore, Erica <erica_moore@stuact.tamu.edu> wrote:

> Howdy,
>
> Thank you for reaching out to us regarding the incident below. Your report has been received by the Department of Student Activities and will be reviewed to determine any needed further action. If you have any additional information or documentation related to the incident you would like to submit, feel free to reply to this email, or if you would prefer to speak to a staff member directly you may contact me at the number below. Thank you again for your submission, and for your support of our Texas A&M student organization community.
>
> Sincerely,
>
> -Erica
>
> **Erica Moore**  | Administrative Coordinator II
> Koldus 224G|Student Organization Leadership And Development I Department of Student Activities
> 1236 TAMU | College Station, TX 77843-0000
>
> ph: 979.458.4371 | erica_moore@stuact.tamu.edu |
> - - - - - - - - - - - - - - - - - - - - - - - -
> **DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.
>
> ---
> **From:** ▮▮▮▮▮▮ (via Maxient) <notifications@maxient.com>
> **Sent:** Sunday, November 5, 2023 9:11 PM
> **To:** Moore, Erica <erica_moore@stuact.tamu.edu>
> **Subject:** [Maxient] ▮▮▮▮ College Station - On-Campus Residence Hall

**This Message Is From an External Sender**

This message came from outside your organization.

Primary recipient (awaiting your action in Maxient)

**Campus Community Incident Report**

**Background Information**

Campus Location

**College Station**

Status of the Alleged Offender

**Recognized Student Organization**

Date of incident

Time of incident

Location of incident

**On-Campus Residence Hall**

**Involved Parties**

**Company**        () Alleged Offender

**Incident Description**

Please describe the incident with as much detail as possible and use specific, concise, objective language. Focus on the Who, What, When, Where, How, and Why of the incident. Indicate specific people, words, phrases, and interactions.

Please try use specific names instead of pronouns (he, she, they, etc.) when referring to people in the body of the report. When possible, we encourage the use of direct quotes, even in incidents when the language may be profane or abusive. For example, "Joe Aggie shook his fist at me and said 'you are a stupid loser'" is more helpful than "Joe Aggie was threatening and used aggressive language with me."

**Supporting Documentation**

doctorsnote1.pdf
doctorsnote2.pdf
doctorsnote3.pdf
*For added security, these links will expire in 10 days. The attachments will remain accessible when viewing the report within Maxient.*

**Submitted By**

Your full name

█████████████

Position/title/student status
**Student**
Your email address

█████████████████

Your phone number

████████

UIN

████████

*[UNAUTHENTICATED]*

**Routing Information**

Primary recipient:
**Erica Moore (Administrative Coordinator, Department of Student Activities)**
Copied recipients:

- Dylan Murray
- [jhbrown@stuact.tamu.edu](mailto:jhbrown@stuact.tamu.edu)

Text msg recipients: None
Originating IP address:
Submitted through IR layout #1
Processed by routing rule #189. Routed to Erica Moore, Administrative Coordinator, Department of Student Activities.

**Message sent by Maxient**
**Replies will be sent to the submitter**

**From:** Bell Jr, Douglas
**To:** Winking, Audrey J
**Subject:** FW:
**Date:** Friday, November 3, 2023 11:35:18 AM
**Attachments:**
         DOC     10_53_55.pdf
         DOC     15_33_52.pdf

FYI for the      Investigation

**Douglas Bell, Ph.D.** | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

---

**From:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Sent:** Monday, October 30, 2023 3:57 PM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>; Simpson, Meredith M <msimpson@corps.tamu.edu>
**Subject:**

Sir,

Attached is the memo from BG Michaelis regarding the initial inquiry into the     acquisitions with supporting documentation.

V/R

      Lt. Col Jeff Gardner '82, USAF (Ret)
      Assistant Commandant for Accountability and Standards
      Military Advisor Parsons Mounted Cavalry
      979-458-9317

**From:** Winking, Audrey J
**To:** Ornelaz, Desiree A
**Subject:** RE:     Investigation
**Date:** Monday, November 20, 2023 3:37:00 PM

No problem, I went ahead and let my new full-time investigator serve as the co-investigator since he was here already anyways to observe for his training, so we have wrapped up the interviews for today.

Best,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 20, 2023 2:31 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** Re:     Investigation

I'm so sorry about missing my appointments with you. I will certainly be all day tomorrow and I will cancel my leave if no problem.

Sent from my iPhone

> On Nov 20, 2023, at 12:37 PM, Ornelaz, Desiree A <dmercado@corps.tamu.edu> wrote:
>
> I appolligize, I am trying to find your office.
>
> Sent from my iPhone
>
>> On Nov 20, 2023, at 11:08 AM, Winking, Audrey J <audrey_winking@sco.tamu.edu> wrote:
>>
>> Good morning,
>>
>> Just checking to see if you were still able to do the interviews we have at 11, 2, and 3 today?

Thanks!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student
Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Tuesday, November 14, 2023 3:10 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:      Investigation

Yes, that works. Thank you! I will clear my calendar for Monday so we can finish hopefully before the holiday.

**GySgt Desiree A. Ornelaz USMC (Ret)**  | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 14, 2023 2:20 PM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:      Investigation

I just looked at their class schedules and it's going to be really tough to get them in this week in the order I wanted to interview them (complainant first).  It looks like              would work well for them though – would this work for you?


Complainan
Alleged
Alleged

Let me know if that would work for you and if so, I will send you a calendar appointment and will send them their interview notices!

**- 2682 -**

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student
Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 13, 2023 8:31 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE:      Investigation

Sounds great, thank you!

**GySgt Desiree A. Ornelaz USMC (Ret)**  | 1st Regiment Operations Advisor/AMC
Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 13, 2023 8:17 AM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:

Thank you! My goal is to try to fit the interviews in by the end of this
week, but if needed we could finish up next Monday/Tuesday while the
students still technically have class. So we should be done by the time you
leave, but we can definitely Zoom if something major changes and we
absolutely have to do any after Thanksgiving.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student
Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Sent:** Monday, November 13, 2023 8:03 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Subject:** RE:    Investigation

Thank you so much, It is awesome that you are a               . I completely understand           always comes first.           is moving from here to           for work so starting the 22nd I will be on leave to help her move. Hopefully we will be done by then, but if not I can definitely get on zoom or whatever.

**GySgt Desiree A. Ornelaz USMC (Ret)** | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 13, 2023 7:57 AM
**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>
**Subject:** RE:    Investigation

Sure, I have attached the reports that have been submitted as well as documentation that I received from the Corps regarding some of the allegations.

Also – I am a               and ended up receiving a new               Friday afternoon, so I won't be in the office today but will try to be doing some work from home as I am able.  I am hoping that I can get               set up to start tomorrow.  As soon as I know when she can start           , I will schedule the interviews!  Sorry for the delay, I had fully intended to do that on Friday. I apologize for any inconvenience this delay is causing but will get these scheduled ASAP once I know when she can go to

Sincerely,
Audrey

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>

**Sent:** Monday, November 13, 2023 7:53 AM

**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Subject:**  Investigation

Good morning,

I was wondering if there are any notes or anything I should read concerning this case. Thank you.

**GySgt Desiree A. Ornelaz USMC (Ret)** | 1st Regiment Operations Advisor/AMC Advisor/FDTAdvisor
Office of the Commandant | Division of Student Affairs | Texas A&M University
1227 TAMU | College Station, TX 77843-1227

ph: 979-458-1034 I dornelaz@tamu.edu |
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Sent:** Wednesday, November 8, 2023 12:37 PM

**To:** Ornelaz, Desiree A <dmercado@corps.tamu.edu>

**Subject:**  Investigation

Hi Desiree,

I was told that you will be helping me with the        investigation.  I am planning on setting up interviews to take place next week.  Would you mind sending me your availability for next week when you have a chance?  I am hoping to send the students their notices by the end of this week.

Thanks, and looking forward to working with you!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

| | |
|---|---|
| **From:** | Bell Jr, Douglas |
| **To:** | Winking, Audrey J |
| **Subject:** | FW: SQ 21 incidents ICO ████████ (SQ 6) |
| **Date:** | Friday, October 20, 2023 9:27:01 AM |
| **Attachments:** | Request to Transfer Document Concerning ████████.pdf |
| | Incident.pdf |

Howdy,

I have received this information and I an recommending an investigation.  I have requested a military advisor (CTO) to co-investigate.

**Douglas Bell, Ph.D.**  | Interim Executive Director of Student Community Standards
Student Conduct Office | Division of Student Affairs | Texas A&M University
1257 TAMU | College Station, TX 77843-1257
ph: 979.847.7272 | dbelljr3@tamu.edu | sco.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**DIVISION OF STUDENT AFFAIRS** | One Division. One Mission.

**From:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Sent:** Friday, October 20, 2023 8:06 AM
**To:** Bell Jr, Douglas <douglasb@vpsa.tamu.edu>
**Cc:** Gardner, Jeffery D <jeff_gardner@corps.tamu.edu>
**Subject:** FW:        incidents            ████████████

Doug – I read through these documents in detail this morning.  I am bothered by the conduct of the
████ in this outfit.  The first document is the one that really stands out (request to transfer).
Before I act here, I'd like your perspectives if there is any form of violation of university hazing
standards here.


patrick


**BG Patrick R. Michaelis '93, US Army (Ret.)**
Commandant
1227 TAMU | College Station, TX 77843-1227
ph: 979.845.2811|
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | **Texas A&M University**

**From:** Anderson, Chauncy Jovan <canderson@corps.tamu.edu>
**Sent:** Wednesday, October 18, 2023 6:47 AM
**To:** Michaelis, Patrick Ralph <pmichaelis@corps.tamu.edu>
**Cc:** Fleming, John D <jfleming@corps.tamu.edu>; Gardner, Jeffery D
<jeff_gardner@corps.tamu.edu>
**Subject:**        incidents          ████████████


Good Morning Sir,

I finally received the additional info last night regarding Cadet ████████. Below is the original email
from last month but I've also attached the additional document that I received last night as well.  She

- 2686 -

stated also having an audio file that she sent her mother the night that it happened. She's working on getting that to me. If you have any questions please let me know.

R/
**MSgt Chauncy J. Anderson USMC (Ret)** | Cadet Training Officer II
Office of the Commandant | Division of Student Affairs| Texas A&M University
Lacy|          TAMU | College Station, TX 77843

ph: 979.458.9372 | mobile:                    | [canderson@corps.tamu.edu](mailto:canderson@corps.tamu.edu)
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** ████████████████████████████ >
**Sent:** Tuesday, September 26, 2023 7:45 PM
**To:** Anderson, Chauncy Jovan <[canderson@corps.tamu.edu](mailto:canderson@corps.tamu.edu)>
**Subject:** Meeting 09/28

Good evening Master Sergeant Anderson,

My name is ████████████████ . I'm a cadet in         and a                    from        I was in the same outfit as ████████ when            in the Corps of Cadets. My time in        ,               , has been incredibly different than my time spent in         . If you're available this                and I would love to meet with you and discuss our experiences and perhaps receive some advice to navigate our new circumstances.

I truly believe that transferring to        was the best choice for me, and I'm truly grateful to Mr. Garza and Ms. Peters for allowing me to find somewhere I am a better fit, however, I also believe that many of my buddies, including ████ would have remained in the Corps of Cadets had they begun their time in a different outfit or made the transfer as I did. I do not say this lightly, and I truly think that discussing our experience would benefit our buddies who remain in         .

I initially typed up a request to transfer outfits that I have attached to this email. As of today, I have also modified it to detail my experience within

Thank you for your time, and please get back to me at your earliest convenience.

Best wishes,

████████

- 2687 -

| | |
|---|---|
| **From:** | Winking, Audrey J |
| **To:** | Leible, Jason Aaron |
| **Subject:** | RE: interviews postponed |
| **Date:** | Tuesday, November 7, 2023 3:32:00 PM |

Thank you!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 3:32 PM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Yes, I can do Monday.

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 3:30 PM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

████████  just emailed me saying he will be out of town on Friday…can you do 2:00pm on Monday 11/13? If so, then I will try to move one of our Friday students so that we don't have an hour in between the two.

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 10:01 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Yes, I changed the date to 10 Nov for Friday.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                          | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 9:57 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

Here's what I am thinking, let me know if this works for you and then I can send their notices and will send you calendar appointments:

Wednesday, 11/8:
2:00pm –
3:00pm –

Friday, 11/10:
9:00am –
10:00am –
11:00am –

Will that work?

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 7, 2023 9:37 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Thursday, I have a Veterans day speech to do for a high school. 0750-1000hrs
1430hrs I have a meeting to attend.

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 7, 2023 8:27 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews postponed

Good morning,

I'm back in the office sooner than expected. Can you please send me your availability for tomorrow through the end of the week? I will work on rescheduling our interviews from yesterday. I did also get the names of those who punched from the        so I will add a couple interviews for them as well.

Thanks,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

---

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Monday, November 6, 2023 8:05 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: interviews postponed

Ok, thanks for letting me know.

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)**  | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

| mobile:                   | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Monday, November 6, 2023 6:35 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** interviews postponed

Good morning,

I am going to have to be out of the office today (and likely for a couple of days), so the interviews are going to have to be postponed. I will reach out about rescheduling once I know when I will be returning to work.  I apologize for any inconvenience!

Best,

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

We've got ██████████ at 1:00 Friday. I'll look at those other names tomorrow morning! Thanks!

Sent from my iPhone

On Nov 2, 2023, at 4:27 PM, Leible, Jason Aaron <jleible@corps.tamu.edu> wrote:

Checking on interview times for Friday. Want to make sure I am tracking all.

Also, 2x people we may want to talk with

██████████████

████████████████

████████████████

I spoke with ████████████, if he knew anyone we might want to talk to.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:52 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: interviews today

Yep I can get that pulled up for you to review before we start!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs |
Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:52 AM

**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>

**Subject:** RE: interviews today

Was getting ready to head over, saw the change. On my way at 0900. If I could review the complaint and any information about the case?

v/r

Jason

**MAJ Jason A. Leible, USA (Ret)** | Operations Advisor, 1st Brigade
Office of the Commandant| Division of Student Affairs | Texas A&M University
Dorm 5, Room 301 | College Station, TX 77843-0000

ph: 979.458.1116 | mobile:                        | jleible@corps.tamu.edu
- - - - - - - - - - - - - - - - - - - - - - - -
**Corps of Cadets** | We Make Leaders

---

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, October 31, 2023 8:50 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** interviews today

Good morning,

Just wanted to make sure you saw that I had to slightly adjust the interview times for this morning! So we start at 9:30 instead of 9.

See you in a bit!

**Audrey Winking**|  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs |
Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

I think we can work with it.

v/r

Jason

**From:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Sent:** Tuesday, November 14, 2023 9:02 AM
**To:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Subject:** RE: rescheduling today

Okay maybe we do this…

Please describe in detail any situations/instances that you've experienced that:
- you believe may have been hazing
- were concerning to you
- caused you to question what was happening

These may include, but are not limited to: making/remaking your rack over and over, rapidly changing uniforms, standing on the wall with 5 points at attention for extended periods of time, participating in "training" or "gentleman's" chow, having to use EST for Corps-related tasks, being asked to do Corps-related tasks during the academic day, etc.

Thoughts on that? If there's anything I missed that you think should be included in that list, let me know or feel free to add it!

**Audrey Winking** |  Senior Student Conduct Investigator
Department of Student Community Standards | Division of Student Affairs | Texas A&M University
1172 TAMU | College Station, TX 77843-1257

ph: 979.847.7272 |audrey_winking@sco.tamu.edu| sco.tamu.edu

**From:** Leible, Jason Aaron <jleible@corps.tamu.edu>
**Sent:** Tuesday, November 14, 2023 8:56 AM
**To:** Winking, Audrey J <audrey_winking@sco.tamu.edu>
**Subject:** RE: rescheduling today

Howdy Audrey,

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90554586
Filing Code Description: Other
Filing Description: Defendant's First Supplement to First Amended Plea to the Jurisdiction-Exhs Pt. 2
Status as of 8/6/2024 7:51 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 8/5/2024 4:41:38 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/5/2024 4:41:38 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/5/2024 4:41:38 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/5/2024 4:41:38 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/5/2024 4:41:38 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/5/2024 4:41:38 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/5/2024 4:41:38 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| J DavidDodd III | | David@Jddoddlaw.com | 8/5/2024 4:41:38 PM | SENT |

SSC Services for Education
Facilities Services
Revised 1/2023

**Received & Filed 8/7/2024 3:10 PM**
**Gabriel Garcia, District Clerk**
**Brazos County, Texas**
**MIA PORTILLO**
**Envelope# - 90643903**

The undersigned Respondent has carefully examined and considered the Project Site and relevant conditions and circumstances for the Work, information and requirements set out in the Request for Proposals, the Drawings and Project Manual/Specifications, and the requirements of the proposed Contract Documents, including the ODR's Agreement, the Uniform General and Supplemental Conditions, Special Conditions, and Tex. Gov. Code pertaining to Prevailing Wages Rates, in making this Proposal. Capitalized terms used but not otherwise defined in this Proposal Form shall have the same meanings as designated in the Request for Proposals.

The undersigned Proposer further agrees to the following conditions:

1. An incomplete Proposal or one having additional information or other modifications or qualifications inscribed thereon, may be cause for rejection of the entire Proposal.
2. That, if accepted by the Owner ODR, this Proposal becomes a part to the Contract Documents upon the signing of the Contract Agreement, and failing to comply with any part of this Bid will be taken as failure of the Proposer to comply with the Contract Documents, and will be just cause for rejection of the Work.

RESPONDENT:

Quad-Tex Construction, Inc.
_____
Company

17426625970
_____
Employer Federal Identification Number (EIN)

By: _____
Signature

President
_____
Title

979-774-9341
_____
Company Phone Number

November 14, 2023
_____
Date

Office@quadtex.net
_____
Company Email or Fax Number

Tracy Ash
_____
Company Contact and Address for Invoice

11069 N Dowling Rd
_____

College Station, TX 77845
_____

END OF SECTION

**SSC SERVICES FOR EDUCATION**
**COMPETITIVE SEALED PROPOSAL**
**PART 2**
**TECHNICAL PROPOSAL**
SECTION 00 45 16

SSC Services for Education
***Texas A&M University – College Station, TX***
*Project No.:* ***2023-06030***
*Project Title:* ***Spence Hall Corps Dorms Bathroom Renovations***

**NOTE: Contractor must complete each item pertaining to this form or bid may be disqualified for being incomplete.**
**FALSIFICATION OF ANY INFORMATION ON THIS PROPOSAL MAY RESULT IN DISQUALIFICATION.**

General Contractor's Name:     Quad-Tex Construction, Inc.

Address:     11069 N. Dowling Rd.

City, State, Zip:     College Station, TX 77845

Telephone No.:     979-774-9341          E-Mail:     Office@quadtex.net

State Comptroller Vendor Identification Number:     17426625970

**1.0     GENERAL**
    1.1 Qualification information submitted shall be applicable only to the Contractor's office that will perform this Work.

**2.0     COMPANY INFORMATION & HISTORY**
    2.1     ☒ Corporation  ☐ Partnership  ☐ Sole Proprietorship  ☐ Joint Venture  ☐ Limited Liability Company
            State of Organization:     Texas

    2.2     How many years has organization been in business as a contractor?     38 years

    2.3     How many years has your organization been in business under its present business name?
            26 years

    2.4     Under what other or former names has your organization operated?
            G&S Construction, Inc.

    2.5     List other fully staffed offices or fully staffed branch offices of your organization:

| Name/Location | Branch Manager | Telephone Number |
|---|---|---|
| College Station | Tracy Ash | 979-774-9341 |
| | | |
| | | |
| | | |

    2.6     Corporate Officers, Partners or Owners of Organization:

| Name | Title | Construction Experience |
|---|---|---|
| Susan Chmelar | President | 38 years |
| George Chmelar | | 38 years |
| | | |
| | | |

**- 2697 -**

2.7   If your organization is a corporation, answer the following:
- Date of incorporation:  1985
- State of incorporation:  Texas
- President's name:  Susan Chmelar
- Vice-president's name(s):  George Chmelar
- Secretary's name:  N/A
- Treasurer's name:  N/A

2.8   If your organization is a partnership, answer the following:
- Date of organization:  N/A
- Type of partnership, if applicable:  N/A
- Name(s) of general partner(s):  N/A

2.9   If your organization is individually owned, answer the following:
- Date of organization:  N/A
- Name of owner:  N/A

2.10  If the form of your organization is other than those listed above, describe it and name principals:  N/A

2.11  List jurisdictions and trade categories in which your organization is legally qualified to do business, and indicate registration or license numbers, if applicable.  N/A

2.12  List jurisdictions in which your organization's partnership or trade name is filed.  N/A

## 3.0   LITIGATION/CLAIMS

3.1   Has your organization ever failed to complete any work awarded to it as contracted, that resulted in termination of the contract?   YES ☐ NO ☒

3.2   Are there any judgements, claims, arbitration proceedings or suits pending or outstanding against your organization or its officers made by your customers?   YES ☐ NO ☒

3.3   Has your organization filed any lawsuits or requested arbitration with regard to construction contracts within the last five years?   YES ☐ NO ☒

3.4   Within the last five years, has any officer or principal of your organization ever been an officer or principal of another organization when it failed to complete a construction contract?   YES ☐ NO ☒

**4.0    EXPERIENCE & QUALIFICATONS**

4.1    List categories of work that your organization normally performs with its own forces.

Construction management, supervision

4.2    Propose to perform ___10___% of the work for this project with own forces.
(List Trades) ___Construction management___

4.3    List major construction projects of similar scope and size where General Contractor acted as prime of publically funded projects. Using a similar format to that shown below list projects your organization has in-progress and/or has completed (Limit 10 projects) within the past 5 years:
(Include as attachment at end of this document titled as "Current & Past Projects")

**FOR EXAMPLE ONLY**

## PROJECT PHOTO HERE

Name and Location of Project: _____
_____
_____
Contract Amount:_____
Percent Complete: _____
Contract Start Date: _____
Contractual Completion Date: _____
Actual Completion Date:_____

Owner Reference Contact:

_____              _____
Name                                                         Telephone

_____
Physical Address
Email:_____

A/E Reference Contact:

_____              _____
Name                                                         Telephone

_____
Physical Address
Email:_____

**- 2699 -**

4.4     Total number and dollar amount of contracts currently in progress:
Number _____21_____          $ _____13,052,166.92_____

4.5     Largest single contract amount currently in-progress: $ ____3,099,056____
Project Name: _____KAMU Technical Operations Building_____
Projected Completion Date: _____2/29/24_____

4.6     Volume of work completed over last 5 years: (Through 12/31)
2022    $19,427,768
2021    $19,400,959
2020    $11,152,209
2019    $10,537,835
2018    $12,439,847

**5.0     REFERENCES**

5.1     Client References: _____
David DeLeon - AgriLife - (979) 229-8895
David Ritter - SSC Services - (979)219-0774
Ralph Davila - Facilities, Planning, and Construction - (979) 458-6003

5.2     Trade References:
Robert Webster - CAIRS Mechanical - (281)323-8783
Mike Reams - Lone Star Laboratory Group - (832)721-2717
Billy Hardesty - Dailey Electric - (979)599-6804

5.3     Bank References: _____
Prosperity Bank
Jamie Lander
(979)764-9443

5.4     Surety
• Name of bonding company: International Fidelity Insurance Company
    One Newark Center, 20th Floor, Newark, NJ 07102-5207
• Name and address of agent: The Nitsche Group. Jeff Norwood
    143 E Austin St. Giddings, TX 78942

**6.0     ABILITY & QUALIFICATIONS OF PROFESSIONAL PERSONNEL**

6.1     Project Organization Chart (Please attach at the end of this document)

6.2     Detailed resumes of individuals assigned to this project including project manager, superintendent, project scheduler/expediter, and quality control supervisors as applicable. (Please attach at end of this document)

6.2.1   Resumes of your key personnel shall include professional affiliations such as membership in the American Institute of Constructors and if the individual is a Level I or Level II Certified Professional Constructor.

6.2.2   In addition, a listing of other construction personnel within your organization that are members of the American Institute of Constructors shall be included and their respective level of certification.

**- 2700 -**

6.3     Approximate amount of time each project team member is expected to spend on the project: <u>We will provide a superintendent on site during the project duration.</u>
        <u>The project</u>

**7.0     PROJECT APPROACH & METHODOLOGY**

7.1     Provide methodology on meeting the parameters/expectations of the specific project. (If additional space is needed please insert additional sheets at the end of this document): <u>We have walked the site multiple times and understand the requirements of the project. Our subcontractors have reviewed the site with us and are highly proven and experienced. We have completed projects of this scope recently for TAMU, and understand the logistical requirements to complete them, while coordinating with users.</u>

**8.0     LIST OF SUBCONTRACTORS**

8.1     Please list all subcontractors proposing to use on this project. (If additional space is needed please insert additional sheets at the end of this document): <u>Ashley Flooring, BB Construction, CAIRS, Dailey Electric, Floyds Glass, Lonestar Lab Group, MCS Door & Hardware Solutions, Summit Fire & Security, Tucker Construction, Wiltcher Industries</u>

**9.0     PROPOSED PROJECT SCHEDULE**

9.1     List procedures outlining how the contractor will update the Architect & ODR on progress of the project work schedule in order to meet the established contractual completion date: <u>Please see attached outline project schedule. We will provide schedule updates monthly.</u>

9.2     Please attach proposed project schedule in Gantt format at the end of this document, including material/equipment lead times prior to construction.

END OF SECTION

**- 2701 -**

| ID | Task Name | Duration | Start | Finish | Dec | 1st Quarter Jan | Feb | Mar | 2nd Quarter Apr | May | Jun | 3rd Quarter Jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Contract** | | | | | | | | | | | |
| 2 | Contract Awarded | 1 day | Fri 12/1/23 | Fri 12/1/23 | | | | | | | | |
| 3 | Submittals & Order Materials | 116 days | Sat 12/2/23 | Fri 5/10/24 | | | | | | | | |
| 4 | Mobilize | 1 day | Mon 5/13/24 | Mon 5/13/24 | | | | | | | | |
| 5 | Demolition | 6 days | Mon 5/13/24 | Sun 5/19/24 | | | | | | | | |
| 6 | Plumbing Rough In | 4 days | Mon 5/20/24 | Thu 5/23/24 | | | | | | | | |
| 7 | Concrete | 2 days | Fri 5/24/24 | Sun 5/26/24 | | | | | | | | |
| 8 | Framing | 6 days | Mon 5/27/24 | Sun 6/2/24 | | | | | | | | |
| 9 | MEP Rough In | 6 days | Mon 6/3/24 | Sun 6/9/24 | | | | | | | | |
| 10 | Drywall/Cement Board | 6 days | Mon 6/10/24 | Sun 6/16/24 | | | | | | | | |
| 11 | Ceiling | 3 days | Mon 6/17/24 | Wed 6/19/24 | | | | | | | | |
| 12 | MEP Ceiling Rough In | 4 days | Thu 6/20/24 | Tue 6/25/24 | | | | | | | | |
| 13 | Drywall Ceiling | 4 days | Wed 6/26/24 | Sun 6/30/24 | | | | | | | | |
| 14 | Ceramic Tile | 11 days | Mon 7/1/24 | Sun 7/14/24 | | | | | | | | |
| 15 | Set Fixtures | 9 days | Mon 7/15/24 | Thu 7/25/24 | | | | | | | | |
| 16 | Set Panels | 6 days | Mon 7/15/24 | Sun 7/21/24 | | | | | | | | |
| 17 | Paint Touch Up | 2 days | Fri 7/26/24 | Sat 7/27/24 | | | | | | | | |
| 18 | Final Clean Up | 1 day | Sun 7/28/24 | Sun 7/28/24 | | | | | | | | |
| 19 | Substantial Inspection | 1 day | Mon 7/29/24 | Mon 7/29/24 | | | | | | | | |

Project: Heldenfels Hall
Exterior Window Replacement
Date: Tue 11/14/23



| | | | | |
|---|---|---|---|---|
| Task | | Duration-only | | Progress |
| Split | | Start-only | | Manual Progress |
| Project Summary | | Finish-only | | |
| Manual Task | | Deadline | | |

# Quad-Tex Construction, Inc.

11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

---

## Pertinent Corporate Information

Quad-Tex Construction, Inc., a Texas Corporation, Chartered January 11, 1985 (name changed on February 6, 1996 from G&S Construction, Inc.)

Officers:
President/Secretary: Susan Chmelar
Vice-President/Treasurer: George Chmelar

Tax ID: 74-2662597

Bank Information:
Prosperity Bank
1862 Rock Prairie Rd
College Station TX 77845
Jamie Lander 979-764-9443

Insurance:
The Nitsche Group
Jeff Norwood
143 E Austin St
Giddings TX 78942
254-493-4600

Bonding:
International Fidelity Insurance Company
One Newark Center, 20th Floor
Newark, New Jersey 07102-5207

Required Statement:
"Under Section, 231.006, Family Code, the vendor or applicant certifies that the individual or business entity named in this contract Proposal or application, is not ineligible to receive the specified grant, loan or payment and acknowledges that this contract may be terminated and payment may be withheld if this certification is inaccurate." Respondent agrees with this certification statement upon submittal of a properly executed Proposal.





## Franchise Tax Account Status

As of : 08/10/2023 08:51:27

This page is valid for most business transactions but is not sufficient for filings with the Secretary of State

### QUAD-TEX CONSTRUCTION, INC.

| | |
|---|---|
| **Texas Taxpayer Number** | 17426625970 |
| **Mailing Address** | 11069 N DOWLING RD COLLEGE STA, TX 77845-8539 |
| ⓘ **Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 01/11/1985 |
| **Texas SOS File Number** | 0073520200 |
| **Registered Agent Name** | GEORGE CHMELAR |
| **Registered Office Street Address** | 3600 PARK MEADOW LN. BRYAN, TX 77802 |

Quad-Tex Construction, Inc.

11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

**Organization Chart and Resumes**



11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

**Susan Chmelar**
**President**
 **(979) 774-9341 Office     (979) 229-4016 Mobile**



**Education:**

Blinn Jr. College (Brenham Campus)
Associates of Arts (Business Management)

**Experience:**

From 1981 to Present   Co-Owner Quad-Tex Construction, Inc.

**Responsibilities:**

Susan Chmelar has over thirty years of experience in office management.

Duties include overseeing each project by tracking job cost and preparing documents.   Her duties also include making onsite visits to each project location during construction to stay abreast of the progress and to maintain good client-contractor relations.

In addition I prepare the quarterly reports and maintain the corporate records.

# Quad-Tex Construction, Inc.

11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

**George Chmelar**
**Vice President**
**(979) 774-9341 Office    (979) 412-2717 Mobile**



**Education:**

Texas State Technical Institute
Waco, Texas
Degree - Associate of Science
Civil Engineering Technology

**Experience:**

From 1981 to Present   Co-Owner Quad-Tex Construction, Inc.

**Responsibilities:**

George Chmelar has over thirty years of experience in the building industry.  He is responsible for client contact, cost estimating, sub-contractor contact, project supervision/coordination and public relations.

Mr. Chmelar coordinates the various staff requirements for the projects under contract.  He also provides the necessary quality control supervision over the job superintendents to assure that Quad-Tex Construction, Inc. meets the expectations of our clients.

11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

**Doug Chmelar**
**Project Manager / Quality Control Supervisor**
**(979) 774-9341 Office    (979) 412-4015 Mobile**



**Experience:**
From 1997 to Present        Quad-Tex Construction, Inc.

**Certificates:**
OSHA 30 Hour Certified

**Responsibilities:**
Pre-construction Services
      Estimating
      Pre-bid Services
      Bidding Process
      Scheduling
Construction Services
      Pre-construction
      Operations
      Project Coordination
      Subcontractor Coordination
      Quality Control
      Scheduling

# Quad-Tex Construction, Inc.

11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

**Tracy Ash**
**Office Manager / Safety Manager**
**(979) 774-9341 Office     (979) 412-5051 Mobile**

**Experience:**

| | |
|---|---|
| 2005 to Current | Quad-Tex Construction, Inc. |
| | Office Manager |
| 2000 to 2005 | Boyd Ready Mix, Inc |
| | Job Duties: A/R Collections, Department of Transportation regulations on drivers and trucks, OSHA regulations, answer phone, new accounts |
| 1996 to 2000 | City of College Station |
| | Job Duties: Customer Service Representative |
| 1993 to 1996 | USDA/ARS |
| | Job Duties: Lab Assistant |

**Certificates:**
OSHA 30 Hour Certified

**Responsibilities:**
Accounts Receivable
Accounts Payable
HUB program
Insurance & Bonding
OSHA Program
Drug and Alcohol Program
Pre-construction Services:
      Pre-bid Services
      Bidding Process
      HUB Plan

**Jason Garcia**
**Superintendent**
**(979) 774-9341 Office   (979) 412-3822 Mobile**



**Education:**
Graduated from Bryan High School in 1999
Graduated from TSTC in 2001 Associate in Science

**Experience:**
2006 to Present         Quad-Tex Construction, Inc. - Superintendent
2005 to 2006           JB Plumbing - Plumber
2001 to 2005           Rick Welch Plumbing - Plumber

**Certificates:**
OSHA 30 Hour Certified

**Responsibilities:**
Project Superintendent
        Pre-construction
        Scheduling
        Project Coordination
        Subcontractor Coordination
        Quality Control
        Safety Meeting and OSHA Regulations

**Projects:**
Texas A&M Univ., HCRF Aerospace Annex
Texas A&M Univ., Lynntech Buildout of Bay D
Texas A&M Univ., Reed McDonald Window Replacement
Texas A&M Univ., NMR Cryo EM Room Construction
Texas A&M Univ., EIC Move Lab
Texas A&M Univ., Doherty Rm 101, 102 & 102A
Texas A&M Univ., Medical Science Library Renovation
Texas A&M Univ., ILSB Building Renovate Labs 1203-1212

# Quad-Tex Construction, Inc.

11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

**Patrick Blaha**
**Superintendent**
**(979) 774-9341 Office   (979) 255-6022 Mobile**



**Education:**
Graduated from Bryan High School in 1991

**Experience:**

| | |
|---|---|
| 9/2013 to Present | Quad-Tex Construction, Inc.—Job Superintendent |
| 9/2012 to 8/2013 | Collier Construction |
| 9/2011 to 9/2012 | SSC Services |
| 9/2009 to 9/2011 | TAMU Facilities Services |
| 1/1991 to 9/2009 | BISD |

**Certificates:**
OSHA 10 Hour Certified

**Responsibilities:**
Project Superintendent
  Pre-construction
  Scheduling
  Project Coordination
  Subcontractor Coordination
  Quality Control
  Safety Meeting & OSHA Regulations

**Project Superintendent:**

Texas A&M Univ., Reed McDonald Design & Renovation 201
Texas A&M Univ., Campus Wayfinding Signage
Texas A&M Univ., Academic Building 4th Floor Renovation
Texas A&M Univ., Vet Teaching Hospital Restroom Upgrades
Texas A&M Univ., Small Animal Hospital Restroom Renovation
Texas A&M Univ., Enology Teaching Lab
Texas A&M Univ., Leach Teaching Gardens

**Brian Estlund**
**Job Superintendent**
**(979) 774-9341 Office   (979) 213-0790 Mobile**



**Experience:**

| | |
|---|---|
| 05/2015 to Present | Quad-Tex Construction, Inc.—Job Superintendent |
| 11/2014 to 05/2015 | Brazos Valley Floor & Design – Operations Manager |
| 11/2007 to 11/2014 | Stylecraft Builders – Construction Manager |

**Certificates:**

OSHA 10-hr  Certified 2016

**Responsibilities:**

Brian has been given the responsibility of job superintendent.  He will be responsible for several projects.  He oversees each phase of construction from site work and coordinating sub-contractors to the completion of the project.

**Project Superintendent:**

Texas A&M Univ., O&M Classrooms Renovations
Texas A&M Univ., NMR Construction Phase I
Texas A&M Univ., HCRB Lighted Sidewalk
Texas A&M Univ., Koldus Remodel Reception Area
Texas A&M Univ., Halbouty Basement Remodel
Texas A&M Univ., Rudder Theater Janitor's Closet/Breakroom Renovations

# Quad-Tex Construction, Inc.

11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

---

**Ritchie Biggs**
**Superintendent**
**(979) 774-9341 Office    (979) 255-9483 Mobile**



**Certificates:**
OSHA 10
TWIC, Transportation Worker Identification Credential
Well Control Training
Water Survival Training
Equipment Operator Training
        Forklift
        Manlift

**Experience:**
2020-Present    Quad-Tex Construction, Inc. - Superintendent
2010-2020        Bronco Oilfield Services – Business Development, Service Supervisor

**Responsibilities:**
Project Superintendent
        Scheduling
        Project Coordination
        Subcontractor Coordination
        Quality Control
        Safety Meetings
        OSHA Regulations

**Projects:**
Texas A&M Univ. Sheep Feeding Facility Expansion
Texas A&M Univ. Blocker 2nd Floor West Wing Renovation
Texas A&M Univ. RELLIS Storage Buildings
Texas A&M Univ. Bio Bio Suite 226 Renovation
Texas A&M Univ. RELLIS Asphalt Repairs
Texas A&M Univ. Gateway Greenhouse Renovation
Texas A&M Univ. Poultry Tunnel Ventilation BSL2
Texas A&M Univ. Building 1041 Electrical Replacement

**Troy Taylor**
**Estimator**
**(979) 774-9341 Office    (979) 571-4765 Mobile**



**Education:**
Bachelor of Science, Construction Science, 2003, Texas A&M University

**Certificates:**
OSHA 30 Hour Certified
AIC Level One Certified

**Experience:**
2022-Present   Quad-Tex Construction, Inc. - Estimator
2020-2021      SSC Services for Education - Project Manager II
2009-2019      Alpha Building Corporation - Estimator
2005-2008      AECOM – Graduate Engineer III

**Responsibilities:**
Pre-construction Services:
        Estimating
        Pre-construction Services
        Bidding Process
        Cost Budgeting
        Value Engineering
        Unit Price Book Estimating

Operations Services:
        Project Planning
        Scheduling
        Project Coordination
        Quality Control

**Projects:**
Texas A&M Univ. J.Cain Classroom Renovation
Texas A&M Univ. Horticulture Classroom Renovation
Texas A&M Univ. School of Rural/Public Health Classroom Renovation
Texas A&M Univ. Bio/Bio New Growth Chambers

Quad-Tex Construction, Inc.

11069 N. Dowling Rd.
College Station, TX 77845
Office: 979-774-9341
office@quadtex.net

**Lauren Lang**
**Office Assistant**
**(979) 774-9341 Office**



**Experience:**
April 2019 to Current   Quad-Tex Construction, Inc
                        Office Administrator
2014 to 2019            RV Station
                        Job Duties: Accounting, Title Work

**Responsibilities:**
HUB Program
Subcontractor Insurance
OSHA Program & Safety Meetings
Drug and Alcohol Program
Submittal Management
Project Documentation
Project Closeout

**SSC SERVICES FOR EDUCATION**
**COMPETITIVE SEALED PROPOSAL**
**Part 3**
**SAFETY, RISK ASSESSMENT & QUALITY CONTROL**
SECTION 00 45 17

SSC Services for Education
***Texas A&M University – College Station, TX***
*Project No.:* ***2023-06030***
*Project Title:* ***Spence Hall Corps Dorms Bathroom Renovations***

**NOTE: Contractor must complete each item pertaining to this form or bid may be disqualified for being incomplete.**
**FALSIFICATION OF ANY INFORMATION ON THIS PROPOSAL MAY RESULT IN DISQUALIFICATION.**

General Contractor's Name:   Quad-Tex Construction, Inc.

Address:   11069 N Dowling Rd

City, State, Zip:   College Station, TX 77845

Telephone No.:   979-774-9341          E-Mail:   Office@quadtex.net

State Comptroller Vendor Identification Number:   17426625970

## 1.0   SAFETY PROGRAM

1.1   List your organization's Workers Compensation Experience Modification Rate (EMR) for the last three years, as obtained from your insurance agent. Provide proof in the form of a letter from your Insurance Agent.  If you do not have an EMR rating provide name and contact information for your Insurance Agent.

|      |      |
|------|------|
| 2022 | .97  |
| 2021 | .96  |
| 2020 | .95  |

Average (3 years)
.96

Insurance Company Name:   The Nitsche Group
Agent Name:   Jeff Norwood
Agent Phone #:  (254)493-4600
Agent Email:  jeffn@thenitschegroup.com

1.2   **OSHA Recordable Incident Rate**.  Attach your OSHA 300A log or similar documentation of company's injuries if the OSHA 300A log is not required due to the size of your company:

The OSHA Recordable Incident Rate (or Incident Rate) is calculated by multiplying the number of recordable cases by 200,000, and then dividing that number by the number of labor hours at the company.

$$IR = \frac{\text{Number of OSHA Recordable Cases X 200,000}}{\text{Number of Employee labor hours worked}}$$

IR = _____ 0 _____

CSP Part 3 - Safety, Risk Assessment & Accident Prevention, & Quality Control
Projects over $100,000
Page - 1 of 2

1.3     Are regular project safety meetings held?   ☒ Yes     ☐ No

If yes, frequency:     ☒ Weekly    ☐ Bi-monthly    ☐ Monthly    ☐ As Needed

1.4     Are project safety inspections conducted?   ☒ Yes     ☐ No

If yes, who performs inspection?   <u>MDX Safety Consultants</u>

How often? <u>Weekly</u>

Who is required to attend? <u>Workers on site, supervisors</u>

1.5     Does organization have a written safety program?   ☒ Yes     ☐ No

If yes, provide a copy. It will become a compliance document upon contract award.

**2.0    SITE SPECIFIC RISK ASSESSMENT**

2.1     Submit a complete Risk Assessment Program for this specific project at the end of this section.

**3.0    QUALITY CONTROL PROGRAM**

3.1     Submit a complete quality control program for this project which will become a compliance document upon contract award.

3.2     This plan should address all aspects of quality control including responsibility for surveillance work, acceptance, rejection, documentation and resolution of deficiencies, trend analysis and corrective action and interface with Owner's inspectors.

3.3     Contractor to maintain documentation log of project progress including photos from beginning to end of project.

END OF SECTION

**Safety History**

**Firm's Experience Modification Rate (EMR) for five years**

- 2022 – .97
- 2021 – .96
- 2020 – .95
- 2019 – .95
- 2018 – .93

**Firm's annual OSHA Recordable Incident Rate (RIR) for five years**

- 2022 – 0
- 2021 – 0
- 2020 – 0
- 2019 – 0
- 2018 – 0

**Firm's annual OSHA Days Away From Work (DAFW) for five years**

- 2022 – 0
- 2021 – 0
- 2020 – 0
- 2019 – 0
- 2018 – 0

**Firm's OSHA reports/citations for five years**

- 2022 – 0
- 2021 – 0
- 2020 – 0
- 2019 – 0
- 2018 – 0

## OSHA's Form 300A (Rev. 01/2004)
# Summary of Work-Related Injuries and Illnesses



Year 2022

U.S. Department of Labor
Occupational Safety and Health Administration

Form approved OMB no. 0218-0176

All establishments covered by Part 1904 must complete this Summary page, even if no work-related injuries or illnesses occurred during the year. Remember to review the Log to verify that the entries are complete and accurate before completing this summary.

Using the Log, count the individual entries you made for each category. Then write the totals below, making sure you've added the entries from every page of the Log. If you had no cases, write "0."

Employees, former employees, and their representatives have the right to review this OSHA Form 300 in its entirety. They also have limited access to the OSHA Form 301 or its equivalent. See 29 CFR Part 1904.35, in OSHA's recordkeeping rule, for further details on the access provisions for these forms.

### Number of Cases

| Total number of deaths | Total number of cases with days away from work | Total number of cases with job transfer or restriction | Total number of other recordable cases |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| (G) | (H) | (I) | (J) |

### Number of Days

| Total number of days away from work | Total number of days of job transfer or restriction |
|---|---|
| 0 | 0 |
| (K) | (L) |

### Injury and Illness Types

Total number of...
(M)

| | | | |
|---|---|---|---|
| (1) Injuries | 0 | (4) Poisonings | 0 |
| (2) Skin disorders | 0 | (5) Hearing loss | 0 |
| (3) Respiratory conditions | 0 | (6) All other illnesses | 0 |

**Establishment information**

Your establishment name  Quad-Tex Construction, Inc

Street  11069 N Dowling

City  College Sta  State  TX  ZIP  77845

Industry description (e.g. Manufacture of motor truck trailers)
General Contractor

Standard Industrial Classification (SIC), if known (e.g. 3715)
_ _ _ _ — _ _ _ _

OR

North American Industrial Classification (NAICS), if known (e.g. 336212)
2 3 6 2 1 0

**Employment information** (If you don't have these figures, see the Worksheet on the back of this page to estimate.)

Annual average number of employees  10

Total hours worked by all employees last year  20,592

**Sign here**

Knowingly falsifying this document may result in a fine.

I certify that I have examined this document and that to the best of my knowledge the entries are true, accurate, and complete.

Company executive  Office Mgr

979-774-9341  Phone  1/6/23  Date

Post this Summary page from February 1 to April 30 of the year following the year covered by the form.

Public reporting burden for this collection of information is estimated to average 50 minutes per response, including time to review the instructions, search and gather the data needed, and complete and review the collection of information. Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number. If you have any comments about these estimates or any other aspects of this data collection, contact: US Department of Labor, OSHA Office of Statistical Analysis, Room N-3644, 200 Constitution Avenue, NW, Washington, DC 20210. Do not send the completed forms to this office.

OSHA's Form 300A (Rev. 01/2004)

# Summary of Work-Related Injuries and Illnesses

Year 20_21_

U.S. Department of Labor
Occupational Safety and Health Administration

Form approved OMB no. 1218-0176

All establishments covered by Part 1904 must complete this Summary page, even if no work-related injuries or illnesses occurred during the year. Remember to review the Log to verify that the entries are complete and accurate before completing this summary.

Using the Log, count the individual entries you made for each category. Then write the totals below, making sure you've added the entries from every page of the Log. If you had no cases, write "0."

Employees, former employees, and their representatives have the right to review the OSHA Form 300 in its entirety. They also have limited access to the OSHA Form 301 or its equivalent. See 29 CFR Part 1904.35, in OSHA's recordkeeping rule, for further details on the access provisions for those forms.

## Number of Cases

| Total number of deaths | Total number of cases with days away from work | Total number of cases with job transfer or restriction | Total number of other recordable cases |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| (G) | (H) | (I) | (J) |

## Number of Days

| Total number of days away from work | Total number of days of job transfer or restriction |
|---|---|
| 0 | 0 |
| (K) | (L) |

## Injury and Illness Types

Total number of . . .
(M)

| | | | |
|---|---|---|---|
| (1) Injuries | 0 | (4) Poisonings | 0 |
| (2) Skin disorders | 0 | (5) Hearing loss | 0 |
| (3) Respiratory conditions | 0 | (6) All other illnesses | 0 |

## Establishment information

Your establishment name  Quad-Tex Construction, Inc.

Street  11069 N Dowling

City  College Station  State TX  Zip 77845

Industry description (e.g., Manufacture of motor truck trailers)
General Contractor

Standard Industrial Classification (SIC), if known (e.g., 3715)

OR

North American Industrial Classification (NAICS), if known (e.g., 336212)
236210

## Employment information (If you don't have these figures, see the Worksheet on the back of this page to estimate.)

Annual average number of employees  10

Total hours worked by all employees last year  20,800

## Sign here

Knowingly falsifying this document may result in a fine.

I certify that I have examined this document and that to the best of my knowledge the entries are true, accurate, and complete.

Company executive  Office Manager

979-774-9341  01/24/2022
Phone  Date

Post this Summary page from February 1 to April 30 of the year following the year covered by the form.

Public reporting burden for this collection of information is estimated to average 58 minutes per response, including time to review the instructions, search and gather the data needed, and complete and review the collection of information. Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number. If you have any comments about these estimates or any other aspects of this data collection, contact: US Department of Labor, OSHA Office of Statistical Analysis, Room N-3644, 200 Constitution Avenue, NW, Washington, DC 20210. Do not send the completed forms to this office.

OSHA's Form 300A (Rev. 01/2004)

# Summary of Work-Related Injuries and Illnesses

Year 2020



U.S. Department of Labor
Occupational Safety and Health Administration

Form approved O.M.B. no. 1218-0176

All establishments covered by Part 1904 must complete this Summary page, even if no work-related injuries or illnesses occurred during the year. Remember to review the Log to verify that the entries are complete and accurate before completing this summary.

Using the Log, count the individual entries you made for each category. Then write the totals below, making sure you've added the entries from every page of the Log. If you had no cases, write "0."

Employees, former employees, and their representatives have the right to review the OSHA Form 300 in its entirety. They also have limited access to the OSHA Form 301 or its equivalent. See 29 CFR Part 1904.35, in OSHA's recordkeeping rule, for further details on the access provisions for these forms.

## Number of Cases

| Total number of deaths | Total number of cases with days away from work | Total number of cases with job transfer or restriction | Total number of other recordable cases |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| (G) | (H) | (I) | (J) |

## Number of Days

| Total number of days away from work | Total number of days of job transfer or restriction |
|---|---|
| 0 | 0 |
| (K) | (L) |

## Injury and Illness Types

Total number of...
(M)

| | | |
|---|---|---|
| (1) Injuries | 0 | (4) Poisonings | 0 |
| (2) Skin disorders | 0 | (5) Hearing loss | 0 |
| (3) Respiratory conditions | 0 | (6) All other illnesses | 0 |

Post this Summary page from February 1 to April 30 of the year following the year covered by the form.

Public reporting burden for this collection of information is estimated to average 58 minutes per response, including time to review the instructions, search and gather the data needed, and complete and review the collection of information. Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number. If you have any comments about these estimates or any other aspects of this data collection, contact: US Department of Labor, OSHA Office of Statistical Analysis, Room N-3644, 200 Constitution Avenue, NW, Washington, DC 20210. Do not send the completed forms to this office.

### Establishment information

Your establishment name  Quad-Tex Construction Inc

Street  11069 N Doloting Rd

City  CS  State  TX  ZIP  77845

Industry description (e.g., Manufacture of motor truck trailer)
General Contractor

Standard Industrial Classification (SIC), if known (e.g., 3715)
_ _ _ _

OR

North American Industrial Classification (NAICS), if known (e.g., 336212)
2 3 6 2 1 0

### Employment information (If you don't have these figures, see the Worksheet on the back of this page to estimate.)

Annual average number of employees  10

Total hours worked by all employees last year  20,760

### Sign here

Knowingly falsifying this document may result in a fine.

I certify that I have examined this document and that to the best of my knowledge the entries are true, accurate, and complete.

Company executive  Office Manager

Phone  979 774 - 9841  Date  1/27/21

# OSHA's Form 300A (Rev. 01/2004)
# Summary of Work-Related Injuries and Illnesses



**U.S. Department of Labor**
Occupational Safety and Health Administration

Form approved OMB no. 1218-0176

All establishments covered by Part 1904 must complete this Summary page, even if no work-related injuries or illnesses occurred during the year. Remember to review the Log to verify that the entries are complete and accurate before completing this summary.

Using the Log, count the individual entries you made for each category. Then write the totals below, making sure you've added the entries from every page of the Log. If you had no cases, write "0."

Employees, former employees, and their representatives have the right to review the OSHA Form 300 in its entirety. They also have limited access to the OSHA Form 301 or its equivalent. See 29 CFR Part 1904.35, in OSHA's recordkeeping rule, for further details on the access provisions for these forms.

## Number of Cases

| Total number of deaths | Total number of cases with days away from work | Total number of cases with job transfer or restriction | Total number of other recordable cases |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| (G) | (H) | (I) | (J) |

## Number of Days

| Total number of days away from work | Total number of days of job transfer or restriction |
|---|---|
| 0 | 0 |
| (K) | (L) |

## Injury and Illness Types

Total number of... (M)

| | | | | |
|---|---|---|---|---|
| (1) Injuries | 0 | (4) Poisonings | 0 | |
| | | (5) Hearing loss | 0 | |
| (2) Skin disorders | 0 | (6) All other illnesses | 0 | |
| (3) Respiratory conditions | 0 | | | |

### Establishment information

Your establishment name **Quad-Tex Construction Inc**

Street **11069 N Dowling**

City **College Station** State **TX** ZIP **77845**

Industry description (e.g., Manufacture of motor truck trailer)
**General Contractor**

Standard Industrial Classification (SIC), if known (e.g., 3715)

_____ _____

OR

North American Industrial Classification (NAICS), if known (e.g., 336212)
**236210**

**Employment information** (If you don't have these figures, see the Worksheet on the back of this page to estimate.)

Annual average number of employees **10**

Total hours worked by all employees last year **20,240**

### Sign here

Knowingly falsifying this document may result in a fine.

I certify that I have examined this document and that to the best of my knowledge the entries are true, accurate, and complete.

Company executive _____ **Office Mgr** Title

Phone **979 774-9841** Date **1/22/20**

Post this Summary page from February 1 to April 30 of the year following the year covered by the form.

Public reporting burden for this collection of information is estimated to average 50 minutes per response, including time to review the instructions, search and gather the data needed, and complete and review the collection of information. Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number. If you have any comments about these estimates or any other aspects of this data collection, contact: US Department of Labor, OSHA Office of Statistical Analysis, Room N-3644, 200 Constitution Avenue, NW, Washington, DC 20210. Do not send the completed forms to this office.

**Safety Plan**

Our number one goal is to ensure the safety of our employees, subcontractors, and suppliers. We pride ourselves in our impeccable safety rating. Quad-Tex Construction utilizes many safety tools such as site-specific safety plans, task hazard analysis, new employee orientation, weekly toolbox talks, monthly supervisor meetings, quarterly regulation updates, random site investigations, and training seminars. Though safety is everyone's responsibility, our project managers and superintendents are the front lines of safety on the job. They have authority to act to prevent issues and remove safety risks.

We utilize MDX Safety Consultants for weekly safety site visits, pre-project site specific safety plans, analyzing job hazards, and monthly supervision safety meetings. Tracy Ash is our safety coordinator.  She conducts new employee orientations, random site investigations, and stays up to date on OSHA regulations. She is the communication hub for safety compliance and implementation of new safety initiatives.

New Employee Orientation

Each new employee will attend and OSHA seminar that will allow them to learn the rules and regulations that they will be required to follow.  They will also receive first aide training and safety management training.

Project Manager and Superintendent Responsibilities

It is the responsibility of the project manger and or the project superintendent to ensure that everyone on the project site is following all safety rule and regulations on a daily basis.  If they find that an employee or subcontractor is not following the safety rules and regulation, they are required to correct the incident at once and report the incident to the corporate office.

Safety Meetings

Each superintendent conducts weekly safety meetings on every project. Safety meetings include project superintendents, trade supervisors, and any subcontractors that will be on the project site for that week. A sign-in sheet is required to be signed by everyone that attends the meeting.

Safety meetings include a schedule for that week to pre-plan activities and mitigate risk areas. They also include safety literature and training that are expected to be followed. Any incidents that have occurred the previous week will be discussed so that they do not occur again. There is also an open discussion time to allow anyone that may have concerns to voice their concerns.

Random Site Inspections

MDX Safety Consultants inspectors and our safety coordinator will conduct weekly site inspections. The unannounced site inspections are to ensure that all rules and regulations are being followed at all times. If at any time an employee or subcontractor is not in compliance, the zero-tolerance policy will be enforced.

Zero Tolerance Policy

Quad-Tex Construction, Inc. requires all employees to follow OSHA regulation at all times. We have a zero-tolerance policy set in place to ensure that all regulations and rules are followed at all times. If an employee has violated any regulation, he/she will follow the following procedures:

Employee:

- 1st offense: discussion concerning the violation that was committed and what the consequences could have been, written reprimand and 7 days off without pay.
- 2nd offense: discussion concerning the violation that was committed and what the consequences could have been, written reprimand and release of their duties.

Subcontractor/Supplier:

- 1st offense: discussion concerning the violation that was committed, written reprimand
- 2nd offense: discussion concerning the violation that was committed, written reprimand, they will no longer be allowed on the project site.

Accident and Illness Reporting

All accidents, illnesses, and incidents are to be reported immediately. Our priority is to make sure the involved parties receive treatment and care that is required at the time of injury. We require that a written report of injury and treatment is completed and that everyone including insurance carrier is notified in a timely manner.

A written account from the project manager or project superintendent is required within 24 hrs.

All injuries are recorded on OSHA Log 300 and all the appropriate forms are to be completed in a timely manner.

At Quad-Tex Construction, Inc. our goal is to continue to have a zero injury/illness score. We pride ourselves in keeping our employees and our subcontractor's safe at all times. Human life is something that cannot be replaced.



# General Contractor and Subcontractor Agreement

As part of a commitment to ensure a safe workplace environment, General Contractor will implement a subcontractor mutual agreement to all subcontractors working on General Contractor's construction site(s). In accordance with OSHA requirements, each Subcontractor shall protect the employment and places of employment of each of his employees engaged in construction at the General Contractor's Construction site(s). Such Subcontractor shall comply with appropriate standards. In case a Subcontractor use any 3rd party agents or vendors within his command, Subcontractor shall be responsible and will hold accountable each person working under his command. Subcontractors shall obey and follow General Contractor's instructions and requirements at any project site.

If a Subcontractor is violating a safety requirement at any given time, the Subcontractor won't be allowed on General Contractor's site(s), until the situation has been assessed, verified, and corrected. In case of any damages to General Contractor's personnel or equipment, an investigation will be open to assess the damages.

All General Contractor's locations will have the minimum PPE requirements posted.

Description of work and safety responsibility:

- Follow General Contractor's Project Superintendent's commands at all times..
- Review safety Personal Protective Equipment requirements.
- Check your SDS. Make sure you have a complete set.
- Make an evaluation or site risk assessment.
- Report any accident or near miss.
- Supervise your employees and their work.
- Check for site training requirements

## OSHA COMPLIANCE PROGRAMS:
### A. GHS (Hazard Communication)
1. All Contractor and Subcontractor's employees have a right to know what chemicals they work with, what the hazards are, and how to handle them safely.
2. Safety Data Sheets (SDS) are documents provided by the supplier of a chemical. SDS detail the chemical contents, associated hazards, and general safe handling guidelines. The SDS collection of each Subcontractor must be present on each job, maintained by the site supervisor. A copy may also be requested at the jobsite office of the General Contractor. All workers are free to utilize the SDS as needed.
3. General rules for handling chemicals are:
☐ Read all label warnings and instructions.
☐ Follow instructions for quantity. More is not better.
☐ Minimize contact with chemicals. Use double layer cloths or gloves to protect your skin and keep your face clear of the area to reduce inhalation.
☐ Always wash your hands after handling chemicals.



☐ If a chemical enters your eye(s) immediately hold open the injured eye(s) and rinse it/them with clean, cool water for 15 minutes. Then be sure to report the injury immediately. The General Contractor will provide a 15-minute eyewash station at the jobsite office: however, all Subcontractors are encouraged to keep an eyewash station closer to where its employees are working.

☐ Any questions or concerns regarding chemicals should be reported to your Job Site Supervisor.

4. All chemical containers must be labeled to identify contents and hazards. Most labels use numbers to rank the hazard level in three important areas:

❖ FIRE (red background color) - will the material burn?
❖ HEALTH (blue background) - is the material dangerous to my body?
❖ REACTIVITY (yellow background) - is the material dangerously unstable?

If using the NFPA diamond or the HMIS system, a number from 0-4 will be assigned. The number reflects the degree (or amount) of hazard:

0 - Minimal
1 - Slight
2 - Moderate
3 – Serious
4 - Extreme

Under the new GHS system, after each hazard (Fire, Health, and Reactivity), a number from 1-5 will be assigned. The number reflects the degree (or amount) of hazard:

5 - Minimal
4 - Slight
3 - Moderate
2 – Serious
1 - Extreme

## B.    Bloodborne Pathogens

1. Blood and other bodily fluids can carry pathogens, which are capable of causing diseases in others. This includes HIV, which leads to AIDS, and hepatitis.

2. Because we cannot tell by looking at a person if they are infected with a pathogenic disease, we must take precautions following an illness or injury when bodily fluids are released.

3. In the event of a person losing bodily fluids, stay away from the area and warn others to also do so. You can still stay close to the ill/injured person to support him/her, just be sure to stay out of contact any bodily fluids.

4. If you find spilled bodily fluids, a syringe, or other medically contaminated materials, do not attempt clean up by yourself. Call General Contractor immediately for instructions.



## C. Personal Protective equipment (PPE)

All Subcontractors are required to do a PPE assessment before starting work and issue the appropriate PPE to its employees. Make each employee inspect PPE prior to each use. Do not use damaged PPE. You are required to maintain and keep PPE clean.

1. **Safety Glasses** – must be worn at all times in designated areas in this facility.
2. **Hard Hats** – must be worn at all times in designated areas.
3. **Gloves** – work gloves must be worn at all times when handling sharp or rough stock, welding, or performing other jobs, which could cause hand injuries. Synthetic gloves must be worn when handling chemicals.
4. **Welding** – appropriate filter lens, welding helmet, gloves, and sleeves are required for welders at all times.
5. **Respirators** – only employees trained and authorized to use respirators are allowed to do so.
6. **Hearing Protection** – is required in areas where noise exposure is more than 90dBA (85dBA if you already have experienced a hearing loss.
7. Reflective Vest – TX NON DOT unless indicated otherwise

## D.    Lockout/Tagout

Subcontractors are to comply with any Lockout/Tagout requirements. Prior to working on any machinery when guards are removed, every energy source (electrical, hydraulic, chemical, mechanical, etc.) must be deactivated, stored energy dissipated, and the control locked in the off (safe) position.

Subcontractor's employees must never remove or tamper with a lockout performed by another employee or contractor. A lockout could consist of a lock applied to a control such as a switch, breaker, or valve. A tag containing words such as "**DANGER - DO NOT OPERATE!**" may also be used for lockout. If you see the lock, the tag, or both applied to an energy control device it means, **Keep your hands off!**

1. Do not perform any maintenance, inspection, cleaning, adjusting or servicing of any equipment without following the company's lockout/tagout program.

2. If required to work on powered equipment (hydraulic, electrical, air, etc.), you must have your personal padlock with your name on it and personal key on your person at all times.

3. Disconnect and padlock all machine power disconnects in the off position before removing guards for the purpose of working **"ON"** or **"IN"** the machinery or approaching its unguarded parts. (NOTE: When more than one employee is working on a single piece of equipment, each employee must use his own padlock along with lock-out tongs to lock out the equipment. When the work is completed, he must remove only his lock.

4. Do not commence equipment repair or maintenance work until you have verified that the tagged/locked out switch or control cannot be overridden or bypassed.

5. Replace all guards before removing personal padlocks from the control.



6.  Do not use or remove another employee's protective lock.  Do not remove a lock from equipment unless you placed it there.

7.  Before machinery is put back into use after LOCKOUT/TAGOUT, give a verbal announcement or sound a warning to fellow employees.

## E.    Confined Space

Only the trained and authorized Subcontractor employees are permitted to enter confined spaces.  If you believe that your job requires confined space entry, contact you're the Jobsite Safety Officer prior to undertaking the work to obtain a permit.  Confined spaces are areas not meant for human occupancy, have limited means of entry/exit, and have electrical, chemical, thermal, atmospheric, or entrapment hazards.

## F.    Respiratory Protection

Subcontractors must submit a written respiratory program if performing work that requires the use of a respirator.  The written respirator plan must comply with the following rules:

1.  Do not perform operations requiring respirators, unless you have been approved for use of respirators, fitted and trained the company's respiratory protection program.

2.  Inspect respirators for cracked or worn parts before and after each use and after cleaning.

3.  Do not work in an area that requires the use of respiratory equipment, if you fail to obtain a tight seal between the respirator and your face.

4.  Do not wear a respirator if facial hair prevents a tight seal between the respirator and your face.

5.  Clean and sanitize respiratory equipment according to manufactures recommendations after each use.

6.  Store respiratory equipment in a clean and sanitary location.

## G.    Silica Dust

Subcontractors must submit a written Silica Dust Plan if Subcontractor's employees will be involved in any of the following activities that might expose them to greater levels of silica dust:

*   Cutting or sawing masonry
*   Cutting of cement products with a hand saw, a walk behind saw, a demolition saw, or stationary cut-off saw,
*   Drilling or coring of concrete products
*   Cutting or sawing sheet rock
*   Jackhammering or demolition of mortar or concrete
*   Grinding concrete by hand, a walk behind machine, or a drivable piece of equipment
*   Operating heavy equipment to crush, abrade or fracture concrete products or materials



All Subcontractors will use engineering controls such as ventilation to try to eliminate the Silica exposure to its employees and other workers who may be affected. If unable to eliminate the silica dust hazard, Subcontractors will utilize work practices such as wet methods for controlling dust or worker rotation to limit the tie a worker may be exposed. And to protect each worker from the effects of silica dust exposure, all Subcontractors will comply with the requirements listed in OSHA's Table 1 and provide its workers with PPE necessary to assure their protection.

All Subcontractor's employees working in the job/tasks identified in OSHA Table One are required to complete a training course prior to working in the exposure area. Workers will be trained when first assigned to the job/task.

Training for the Occupational Silica Dust Exposure shall include the following topics:
1. Health hazards of silica dust exposure (including signs and symptoms of silicosis).
2. Operations and materials that can produce silica dust exposure.
3. Engineering and work practice controls used to protect them from exposures.
4. The importance of proper equipment and control maintenance.
5. Housekeeping procedures.
6. Proper use of respirators and the respirator standard.
7. Personal Hygiene procedures to reduce exposures.
8. How smoking increases the risk of developing silicosis and other lung damage.
9. The details of the Occupational Silica Dust Exposure Control Program.

**NOT ALLOWED AT GENERAL CONTRACTOR'S JOB SITE(S)**

- No fire arms
- No drugs & alcohol
- No Theft
- No fighting
- No inappropriate language
- No negligence

**MISCELLANEOUS REQUIREMENTS:**

- Each Subcontractor is to supply his/her own drinking water for his/her crew.
- Each Subcontractor is to keep his work area clean. If a Subcontractor fails to keep his area clean, the Subcontractor will be fined. The assessed fine will be subtracted from the Subcontractor's check.



**QUAD-TEX CONSTRUCTION, INC**
**BRYAN, TEXAS**

# SAFETY POLICY MANUAL

# 29 CFR 1910, 1926
## Safety Policy
## Table of Contents

I.      Objective

II.     Policy

III.    Applicability

IV.     Implementation

V.      Administration

VI.     Reporting Injuries

VII.    Notifications

VIII.   Basic Safety Rules

IX.     Enforcement of Safety Policy

X.      Attachments

    A.  Independent

# QUAD-TEX CONSTRUCTION INC.

## Safety Policy

### I.  OBJECTIVE

The Safety Policy of *Quad-Tex Construction Inc. known as ''Quad-Tex''* is designed to comply with the Standards of the Occupational Safety and Health Administration known as OSHA, and to endeavor to maintain a safe and injury/illness free workplace. A copy of the OSHA Safety and Health Standards 1926 and 1910 are available for all employees to use and for reference. These Standards shall be available in the home office at all times and will be sent to the jobsite on request.

Compliance with the following Safety Policy and all items contained therein is mandatory for all employees of the company. The authorization and responsibility for enforcement has been given primarily to *Quad-Tex Superintendents and 3rd Party, MDX* share in this responsibility as well.

### II.  POLICY

It is company policy that accident prevention be a prime concern of all employees. This includes the safety and well-being of our employees, subcontractors, and customers, as well as the prevention of wasteful, inefficient operations, and damage to property and equipment.

### III.  APPLICABILITY

This Safety Policy applies to all employees of *Quad-Tex*, regardless of position within the company. The Safety Rules contained herein apply to all subcontractors and anyone who is on a company project site.

Every employee is expected to comply with the Safety Policy, as well as OSHA Health and Safety Standards and *Quad-Tex* Safety Policies.

## IV. IMPLEMENTATION

This Safety Policy supports six fundamental means of maximum employee involvement:

- A. Management commitment to safety.
- B. Job Hazard Analysis Site Risk Assessment (one per site).
- C. Effective job safety training for all categories of employees.
- D. Audio and/or visual safety Quarterly presentations given.
- E. Safety Weekly Dropbox Meetings
- F. (Observation Cards) Filled Out by All Superintendents.

*Quad-Tex and 3rd Party, MDX* will inspect at least three times a week to evaluate all areas of safety and make recommendations to the company president.

## V. ADMINISTRATION

The Safety Policy will be carried out according to guidelines established and published in this and other related procedures. Specific instructions and assistance will be provided by *3rd Party MDX* as requested. Each supervisor/crew leader will be responsible for meeting all of the requirements of the Safety Policy, and for maintaining an effective accident prevention effort within his or her area of responsibility. Each supervisor/superintendent must also ensure that all accidents are thoroughly investigated and reported to *Quad-Tex Office and to 3rd Party, MDX* on the same day of the occurrence.

## VI. REPORTING OF INJURIES

All employees will be held accountable for filling out a Notice of Injury Form" immediately after an injury occurs, even if medical treatment is not required. (Notice must be made at or near the time of the injury and on the same day of the injury.) Employees must report the injury to their supervisor/leadman/foreman/superintendent/project manager, etc. **A casual mentioning of the injury will not be sufficient**. Employees must let their supervisor know:

- A. How they think they hurt themselves.
- B. What they were doing at the time.
- C. Who they were working with at the time.
- D. When and where it happened.
- E. Other pertinent information that will aid in the investigation of the incident.

**Failure to report an injury immediately (meaning at or near the time of the injury and on the same day of the injury) is a violation of the Safety Policy, and they may result in immediate termination, in accordance with company policy. Superintendents and Subcontractors**

## VII.  NOTIFICATIONS

A.    In Case of Serious Injury or Death

After the injured has been taken to the hospital, the leadman/foreman/supervisor shall notify the main office and *Quad-Tex and 3rd Party, MDX* as soon as possible. Statements from witnesses shall be taken. Statements are to be signed by witnesses and should include the time and date. Photographs of the area where the incident occurred and any other relevant items are to be taken *Quad-Tex and 3rd Party, MDX* will assist in the investigation. The completed accident report form will sent to the main office after contacting the Superintendent On-site.

B.    In Case of Inspection by OSHA Inspector

The leadman/foreman/supervisor must notify *Quad-Tex and 3rd Party, MDX* that an OSHA Inspector is on the jobsite. It is the responsibility of all employees to make the inspector(s) visit on the jobsite as pleasant and timely as possible.

## VIII.  BASIC SAFETY RULES

A.    Compliance with applicable federal, state, county, city, client, and company safety rules and regulations is a condition of employment.

B.    All injuries, regardless of how minor, must be reported to your supervisor and the Safety Office immediately. An employee who fails to fill out a "Notice Of Injury Form" and send it to the Safety Office can be issued a safety violation notice and may be subject to termination, in accordance with company policy. In the event of an accident involving personal injury or damage to property, all persons involved in any way will be required to submit to drug testing.

C.    Hard hats will be worn by all employees on the project site at all times. The bill of the hard hat will be worn in front at all times. Alterations or modifications of the hat or liner is prohibited. Crane operators, when in an enclosed cab, have the option of not wearing a hard hat due to the possible obstruction of view.

D.    Safety glasses, safety vest, gloves FRC (Fire Resistant Clothing) and boots will be worn as the minimum-required eye protection at all times.  Additional eye and face protection such as mono-goggles and face shields are required for such operations as grinding, jack hammering, utilizing compressed air or handling chemicals, acids and caustics. Burning goggles for cutting, burning or brazing and welding hoods for welding, etc., are required.

E.    Fall Protection Requirements

1. Full body harnesses and lanyards shall be worn and secured any time there is a fall hazard of more than six (6) feet.
2. Lifelines shall be erected to provide fall protection where work is required in areas where permanent protection is not in place. Horizontal lifelines shall be a minimum of 2-inch diameter wire rope. Vertical lifelines shall be 3/4 inch manila rope or equivalent and shall be used in conjunction with an approved rope grab.
3. Structural steel erectors are required to "hook up" with full body harness and lanyard.
4. Employees using lanyards to access the work or position themselves on a wall or column, etc., must use an additional safety lanyard for fall protection.
5. Manlifts must be used properly. As soon as an employee enters an articulating boom lift and before the lift is started, the employee must put on the harness and attach the lanyard to the lift. Employees are not required to wear harnesses on scissor lifts.

F. Clothing must provide adequate protection to the body. Shirts must have at least a tee sleeve. Shirts with sleeves and long pants will be worn at all times. No shorts are to be worn on projects. All employees, except welders and burners, must tuck shirt tails inside trousers. Burners and welders will not be permitted to wear polyester or nylon clothing. Sturdy work boots with rigid, slip resistant soles are required. No clogs, tennis shoes or loafers are permitted

G. All personnel will be required to attend safety meetings as stipulated by project requirements in order to meet OSHA Safety Standards.

H. Firearms, alcoholic beverages or illegal drugs are not allowed on company property or in company vehicles at any time. When drugs are prescribed by a physician, *Quad-Tex Superintendent and/oro 3rd Party, MDX* must be informed. The use or possession of illegal drugs or alcoholic beverages on the jobsite will result in immediate termination.

I. Housekeeping shall be an integral part of every job. Supervisors\foremen\crew leader and employees are responsible for keeping their work areas clean and hazard-free. Clean up is required when a job is finished at the end of the day. This applies to ALL Subcontractors.

K. Drinking water containers are to be used for drinking water and ice only. Tampering with or placing items such as drinks in the water cooler will result immediate termination. The "common drinking cup" is not allowed. Only disposable cups will be used. G.C. *Quad-Tex* is not supplying any water, but subcontractor are responsible of bringing their own water supplies for hydration.

L. All tools whether company or personal, must be in good working condition. Defective tools will not be used. Examples of defective tools include chisels with

mushroomed heads, hammers with loose or split handles, guards missing on saws or grinders, etc.

M.   All extension cords, drop cords, and electrical tools shall be checked, properly grounded with ground fault interrupters (GFI's), and color-coded by a designated competent person each month. This shall be part of the assured grounding program. Cords and equipment that do not meet requirements shall be immediately tagged and removed from service until repairs have been made.

N.   "Horseplay" on the jobsite is strictly prohibited. Running on the jobsite is allowed only in extreme emergencies.

O.   Glass containers or bottles of any kind are not permitted on jobsites or in company vehicles.

P.   The jobsite speed limit is 10 MPH. No employee is permitted to ride in the bed of a truck standing up or sit on the outside edges of a truck. Employees must be sitting down inside the truck or truck bed when the vehicle is in motion. Riding as a passenger on equipment is prohibited unless the equipment has the safe capacity for transporting personnel.

Q.   Adequate precautions must be taken to protect employees and equipment from hot work such as welding or burning. Fire extinguishing equipment shall be no further than 20 feet away from all hot work. Used fire extinguishers must be returned to the shop and be delivered in the designated area to be recharged immediately.  Use of welding blinds is required in high traffic areas.

R.   All scaffolding and work platforms must be built and maintained in accordance with OSHA specifications.  All ladders must be in safe condition without broken rungs or split side rails.  Damaged ladders shall be removed from service.  Ladders shall be secured at the top and bottom and extend three (3) feet past the working surface. Metal ladders around electrical work are prohibited.  A step ladder shall never be used as an extension ladder.  A step ladder must only be used when fully opened with braces locked.

S.   Crowfoot connections on air hoses shall be wired to prevent accidental disconnection. Compressed air shall not be used to dust off hands, face or clothing.

T.   Report all unsafe conditions and near accidents to *Quad-Tex and to 3rd Party, MDX* so corrective action can be taken.

U.   All floor openings or excavations shall be barricaded on all sides to ensure employees are aware of the hazards. Floor holes shall be covered, with the covers secured and clearly marked.

V.    Warning signs, barricades, and tags will be used to fullest extent and shall be obeyed.

## IX.  ENFORCEMENT OF SAFETY POLICY

Safety violation notice(s) shall be issued to any employee, subcontractor, or anyone on the jobsite violating the safety rules or regulations by *Quad-Tex and to 3rd Party, MDX*.

A.    Any violation of safety rules can result in suspension or immediate termination.
B.    Any employee receiving three (3) written general violations within a six (6) month period shall be terminated.
C.    Issuance of a safety violation notice for failure to use fall protection or for failure to report a job injury (at the time of the injury) may result in immediate termination, in accordance with company policy.

It is understood that *Quad-Tex* is not restricting itself to the above rules and regulations. Additional rules and regulations as dictated by the job will be issued and posted as needed.

Revised: 04/07/2020
01/15/2021



**QUAD-TEX CONSTRUCTION, INC**

# Corona Virus (Covid-19) Policy

# Quad-Tex Construction, Inc
## Covid-19 (Corona Virus) Policy

## Table of Contents

I.      Purpose

II.     Applicability

III.    Source of Exposure

IV.    Symptoms

V.      Risk Factors

VI.    Prevention Measures

VII.   Reporting

2

# QUAD-TEX CONSTRUCTION, INC
## Covid-19 (Corona Virus) Policy

### I.   PURPOSE
In response to the rapid spread of Corona Virus (Covid-19), the company is implementing the following policy in order to take all the necessary precaution to protect its workers and all others near our work area(s). This policy will explain the general guidelines on what to do during this pandemic.

### II.   APPLICABILITY
This policy applies to all employees of Quad-Tex, regardless of position within the company. The safety guidelines contained herein apply to all subcontractors and anyone who is on a company project site.

### III.   SOURCES OF EXPOSURE
Corona Virus is thought to spread mainly from person to person, including:
* Between people who are in close contact with one another (usually within 6 feet)
* Through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths and noses of people who are nearby or possibly be inhaled into the lungs.
* By touching a surface or object that has Covid-19 on it and then touching their own mouth, nose, or possibly their eyes.

People can be contagious when they are symptomatic as well as when they are asymptomatic, meaning, whenever no symptoms have been detected.

### IV.   SYMPTOMS
Corona Virus infections can cause illness ranging from mild to severe and, in some cases, can be fatal. Symptoms typically include fever, cough, and shortness of breath. Some people infected with the virus have reported experiencing other non-respiratory symptoms. Other people, referred to as asymptomatic cases, have experienced no symptoms at all. These symptoms may appear **2-14 days after exposure** (based on the incubation period of MERS-CoV viruses).

### V.   RISK FACTORS
COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, **older adults and people of any age who have serious underlying medical conditions** might be at higher risk for severe illness from COVID-19.

Based on CDC information, those at high-risk for severe illness from COVID-19 are people aged 65 years and older and people who live in a nursing home or long-term care facility

3

People of all ages with underlying medical conditions, particularly if not well controlled, including:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
  - Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

## VI.  PREVENTION MEASURES

Quad-Tex will implement best hygiene and infection prevention measures practices when feasible:

- All employees will wash hands with soap and water frequently for a minimum of 20 seconds. If no water and soap is available, 60% alcohol-based hand sanitizer should be second option.
- All employees will use respiratory etiquette (cover coughs and sneezes)
- All employees will practice social distance practice. Usually 6 feet distance.
- ~~Masks will always be worn and will be disposed of properly~~
- Maintain regular housekeeping practices, including routine cleaning and disinfecting of surfaces, equipment and other elements of the work environment.
- Discourage employees from using other employee's phones, desks, offices, tools, and equipment when possible.
- Discontinue nonessential travel to locations with ongoing COVID-19 outbreaks. Check all local, state, and federal laws for areas where travel is discouraged or prohibited.
- Implementing flexible work hours (e.g., staggered shifts)
- Increasing physical space between employees at the worksite
- Implementing flexible meeting and travel options (e.g., postpone non-essential meetings or events)
- Downsizing operations
- CDC recommends wearing cloth face covering in public settings where other social distancing measures are difficult to maintain

Quad-Tex will encourage all employees to follow all applicable best hygiene practices at home. Due to the current pandemic situation, some items may be low due to availability.

4

## VII. REPORTING

All employees are to immediately report any confirmed positive or presumptive positive cases of Covid-19. If an employee has been exposed to Covid-19, he/she is to immediately report by phone call and should stay at home. Employee should contact a healthcare provider for medical assistance.

Workers who have had close contact with a person diagnosed with Covid-19 or presumptive diagnosis should self-quarantine for 14 days.



5

**Quality Control Plan**

Quad-Tex Construction has a stellar reputation of providing quality projects to our clients. We will work with the customer to ensure that we meet their needs of quality, time and cost. Our quality control supervisor and project superintendents will ensure that the work is done correctly the first time and that the workmanship is of top quality. Our QA efforts are evident in all of our projects, as punch lists are minimal, and closeout is rapid.

Planning Phase

The quality control supervisor will coordinate with the project manager, superintendent, and subcontractors to review the design documents for problematic materials, discrepancies, and general quality issues. We will submit and identify concerns in an RFI with a proactive solution. Objectives during this phase are:

➢ Review all contract documents
➢ Pre-coordinate submittals and mockup requirements
➢ Discuss quality expectations with all management, subcontractors, and suppliers
➢ Schedule subcontractors and suppliers to ensure the best materials are available
➢ Meet with owner and designers to discuss the working conditions, operational limitations, and logistical concerns
➢ Plan pre-construction meetings and site visits to understand the project early and stay in communication with the team

Construction Phase

During the construction phase of the project the quality control supervisor will monitor all workmanship to verify that it meets and exceeds the expectation of the project manager, architect, engineers, inspector, and owner. Daily inspections will be conducted by the superintendent to assure continuing compliance with the contract requirements. If a discrepancy is found it will be resolved immediately so that no loss of time or days will occur. Objectives during this phase are:

➢ Utilize the baseline construction schedule for material deliveries and trade progress
➢ Monthly updates of the project schedule
➢ Scheduling inspections, shutdowns and testing in a timely manner
➢ Inspect all products and material that are delivered to jobsite
➢ Submit prompt RFIs concerning any changes that may occur while project is underway
➢ Ensure that all materials are being installed according to the contract documents
➢ Look ahead schedules with stakeholders
➢ Weekly progress reviews
➢ Ensure that the project site is kept in order and remove debris before the end of every day
➢ Track known issues and follow through to prompt resolution

Submittals, Mock-Up's, Color Selection

All submittals, samples, and mockups as required by the contract documents will be submitted to the architect/engineer for approval. The quality control supervisor will review all submittals to ensure that materials being submitted are compliant with the project plans and specifications. We will allow adequate time for approval to ensure materials can be ordered in a timely manner. A submittal logbook will remain on the project site for the duration of the project.

Coordination with A/E and Owner

The superintendent will coordinate with the designers, inspector, and owner representative. The project manager will keep everyone informed of the progress of the project and discrepancies that might occur. The superintendent will coordinate any shutdowns, inspection, and testing that is required. We will notify the inspector prior to all shutdowns and inspections.

Closeout

The superintendent will provide notice to the project manager, designers, inspector, and owner that the project is ready for a substantial completion inspection. We will ensure punch list items are completed in a timely manner. After all items have been completed, we will request a final inspection to complete the project. We will promptly deliver as-built drawings, close-out documents, final payment application, warranties, and O&M's.  Objectives during this phase are:

➢ Substantial completion
➢ Punch list
➢ Subcontractor as-built drawings, O&M's
➢ Final inspection

**Site Specific Risk Assessment Plan**

Quad-Tex Construction teams up with MDX Safety Consultants to produce a site-specific risk assessment plan for each project.  Our goal is to identify hazards before work starts, and implement a plan to mitigate, reduce, control, or eliminate such hazards. The risk assessment plan is built with active input from the Safety Manager and Superintendent. Each subcontractor is required to meet with the site Superintendent to discuss and acknowledge the plan.

Please see the following attachment for a site-specific risk assessment plan.



## Purpose

**QUAD-TEX CONSTRUCTION** must ensure that all **risks are under control** and the necessary **prevention measures** have been taken. For this reason this Risk Assessment Sheet will help Superintendents/Supervisors recognize, understand, and mitigate the risk(s) associated with this particular location.

## Description of the works (By Superintendent)

................................................................................................................................................................................................

................................................................................................................................................................................................

................................................................................................................................................................................................

................................................................................................................................................................................................

## Associated documents (Write down additional documentation)

| Name | Document | Version | Title |
|---|---|---|---|
| _____(TBD) | Binder | 1.1 | Superintendent |
| | | | |
| | | | |

- ITEMS NEEDED:
    - Fire Extinguishers
    - First Aid Kits
    - SDS
    - OSHA Posters (if applicable)
    - Eye Wash Station (if applicable)
    - List of Emergency Medical Facilities
    - Safety Meetings
    - Posted Address
    - Posted PPE Requirements

1



# Spence Hall Bathroom CSP

**Address: Building 0400 605 Military Mall, College Station, TX 77840**

**Project Location ------**

Provided by:

MDX

2

| QUAD-TEX CONSTRUCTION SITE RISK ASSESSMENT | | |
|---|---|---|
| **LOCATION:** **Spence Hall Bathroom CSP** | **Assessment by:** **MDX- Cassidy Howard** | **Date:** **11-09-2023** |
| **Review Date:** | **Approved by:** (Please Sign Name and Signature) | **Date:** |

**WORK ACTIVITY (brief description):  Protection of existing, Demolition, Framing, Insulation, Patching, Painting, Concrete, Plumbing Demo & Install, Doors/Hardware, Flooring, Mechanical demo & install, Electrical.**

| Type of PPE | Required: |
|---|---|
| Hard Hats | • When objects or debris might fall from above and strike workers on the head<br>• When employees may strike their heads against fixed objects, like supports, beams, or other equipment<br>• When there is the possibility that workers' heads will make contact with electrical hazards |
| Safety Glasses | • When exposed to eye or face hazards from flying particles, molten metal, liquid chemicals, acids or caustic liquids, chemical gases or vapors, or potentially injurious light radiation. |
| Hearing Protection | • When noise exposure is at/above 85 decibels averaged over 8 working hours, or an 8-hour time-weighted average |
| Face Protection: Welding Helmet, Faceshields | • When workers are exposed to flying objects, molten metal, liquid chemicals, acids or caustic liquids, chemical gasses or vapors, potentially hazardous light radiation, or other splashes. |
| Gloves | • When employees' hands are exposed to hazards such as those from skin absorption of harmful substances; severe cuts or lacerations; severe abrasions; punctures; chemical burns; thermal burns; and harmful temperature extremes. |
| High-Visibility | • When employees work as flaggers<br>• When workers are exposed to public vehicular traffic<br>• When workers are near heavy equipment |
| Steel-Toe Boots/ Protective Boots | • When working in areas where there is a danger of foot injuries due to falling or rolling objects, or objects piercing the sole<br>• When working in areas where workers feet are exposed to electrical hazards |
| Respirators | • When exposed to air contaminated with harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors. |

3

| | | | Potential Consequences | | | | |
|---|---|---|---|---|---|---|---|
| | | | L6 | L5 | L4 | L3 | L2 |
| | | | Minor injuries or discomfort. No medical treatment or measureable physical effects | Injuries or illness requiring medical treatment. Temporary impairment. | Injuries or illness requiring hospital admission. | Injury or illness resulting in permanent impairment. | Fatality |
| | | | Not Significant | Minor | Moderate | Major | Severe |
| Likelihood | Expected to occur regularly under normal circumstances | Almost Certain | Medium | High | Very High | Very High | Very High |
| | Expected to occur at some time | Likely | Medium | High | High | Very High | Very High |
| | May occur at some time | Possible | Low | Medium | High | High | Very High |
| | Not likely to occur in normal circumstances | Unlikely | Low | Low | Medium | Medium | High |
| | Could happen, but probably never will | Rare | Low | Low | Low | Low | Medium |

4

| Hazard / Risk | Who is at Risk? | Normal Control Measures<br>*(Brief description and/or reference to source of information).* | Risk Rating |
|---|---|---|---|
| **ELEVATED HEIGHTS / FALL HAZARD** | Staff<br>Visitors<br>Sub-contra<br>Pedestrians | • Ensure that all areas and phases of construction requiring the use of fall protection are identified.<br>• When working/walking at elevated heights of 6' or more, all employees SHALL be protected from falling by a guardrail system (toprails, midrails, and toeboards), safety net system or Personal Fall Arrest System (PFAS). Other forms of protective devices may include but are not limited to, flagged wire cables, fences, flagging, & barricades.<br>• If necessary, each employee shall wear a personal fall arrest system that is secured with proper anchorage points.<br>• All floor holes shall be covered to protect employees from tripping in or stepping into or through holes.<br>• Encourage the use of aerial platforms and elevated platforms for greater worker safety.<br>• All personnel working under fall hazards needs to have fall protection training based on their scope of work. | Almost Certain – L2 |
| **INAPPROPRIATE USE OF OR ACCESS TO EQUIPMENT** | Staff<br>Visitors<br>Sub-contra<br>Pedestrians | • Do not leave equipment unattended to avoid unauthorized use.<br>• All equipment operators shall use only machinery in good condition.<br>• Operators must obtain authorization from appropriate person of authority (supervisor) before operating. | Rare – L4 |
| **CHEMICALS** | Staff<br>Visitors<br>Sub-contra<br>Pedestrians | • All chemicals should be stored in a safe place when not in use and marked with the appropriate HAZCOM and GHS labels.<br>• Safety Data Sheet (SDS) for each chemical will be kept on the job site.<br>• This information will be made accessible to all affected personnel.<br>• Workers shall clean up spills, protect themselves and properly dispose of used materials.<br>• The use of proper personal protective equipment will be enforced.<br>• Chemicals will be stored safely and securely.<br>• Ensure Sub-Contractors provide copy of their SDS binder. | Possible – L6 |
| **GLASS/BREAKING GLASS HAZARD** | Staff<br>Visitors<br>Sub-contra<br>Pedestrians | • Determine what precautions must be taken to protect all personnel from breaking glass.<br>• Determine the best method for breaking glass that will have the least effect on creating a hazard from the glass.<br>• Ensure to use techniques for the safe handling of glass, glass fragments, and the disposal of broken glass. | Unlikely – L4 |

5

| | | | |
|---|---|---|---|
| **SLIPS, TRIPS AND FALLS HAZARDS** Falls, falling objects, materials handling | Staff Visitors Sub-contra Pedestrians | • When handling materials, employees will do so in such a way as not to create trip or fall hazards.<br>• Materials will be stored neatly and orderly so as to prevent or reduce the amount of trip hazards.<br>• Keep electrical cords and air hoses out of the middle of hallways and safe walking areas.<br>• If an electrical cord or air hoses has to cross a high traffic area, then the cords or hoses should be taped to the floor or be properly hung to prevent being a trip hazard.<br>• Report, contain, and clean up spills immediately.<br>• Ensure the use of non-slip footwear.<br>• Take extra precautions when workin in wet, ice, or other adverse weather conditions. | Almost Certain – L4 |
| **PNEUMATIC POWER TOOLS** | Staff Visitors Sub-contra Pedestrians | • Pneumatic power tools shall be secured to the hose or whip by some positive means to prevent the tool from becoming accidentally disconnected.<br>• The manufacturer's safe operating pressure for hoses, pipes, valves, filters, and other fittings shall not be exceeded.<br>• Hoses shall not be used for hoisting or lowering of tools.<br>• Airless spray guns of the type which atomize paints and fluids at high pressures (1,000 pounds or more per square inch) shall be equipped with automatic or visible manual safety devices which will prevent pulling of the trigger to prevent release of the paint or fluid until the safety device is manually released.<br>• Painting, pressure washers, and all other pressure equipment need to be used properly and in the manner in which they were designed by the manufacturer.<br>• ALL PERSONNEL using pressure or washer or painting compressors need to wear proper methods of personal protection: Safety glasses, face shields, and respirators may be needed if paint sprayers are used. | Possible – L5 |
| **HAND / POWER TOOL USE** | Staff Visitors Sub-contra Pedestrians | • Make sure your Tools (hand tools) are adequate for the type of job to be performed.<br>• All electrical tools and equipment are maintained in safe condition and checked regularly for defects and taken out of service if a defect is found.<br>• All electrical tools must be properly grounded unless they are of the double insulated type.<br>• Use extension cord sets used with portable electric tools and appliances that are the three-wire type and designed for hard or extra-hard service. (Look for some of the following letters imprinted on the casing: S, ST, SO, STO.)<br>• GRINDERS need to have covers and handles. NO EXCEPTIONS!<br>• Safety glasses or face shields are worn anytime work operations can cause foreign objects getting into the eye such as during welding, cutting, grinding, nailing (or when working with concrete and/or harmful chemicals or when exposed to flying particles).<br>• Avoid drop starting power tools.<br>• Follow manufacturer's specific safety procedures. | Almost Certain – L5 |

6

| Hazard | Affected | Controls | Rating |
|---|---|---|---|
| **OVERHEAD HAZARDS** | Staff Visitors Sub-contra Pedestrians | • All personnel at this location should have the adequate PPE indicated by the sign-in sheet, Superintendent, and/or posted signs.<br>• When working in an area where overhead cranes or equipment will be used, employees shall wear bright fluorescent safety apparel to enhance being seen by the crane operator.<br>• Under no circumstances will an employee work directly under a SUSPENDED load.<br>• Survey area prior for overhead hazards prior to any type of erection.<br>• Make sure that overhead electrical power lines are located and identified.<br>• Ensure that ladders, scaffolds, equipment or materials never come within 10 feet of electrical power lines.<br>• Workers shall wear hard hats where there is a potential for objects falling from above, bumps to their heads from fixed objects, or of accidental head contact with electrical hazards. | Likely – L5 |
| **ELECTRICAL HAZARDS** | Staff Visitors Sub-contra Pedestrians | • Make sure that all energized sources are properly de-energized.<br>• Ensure that all LOCK OUT/TAG OUT devices are in place.<br>• Verify that the energy source has been de-energized and there is no stored energy.<br>• Make sure that all temporary 110 V. power sources have GFCI protection.<br>• Make sure that overhead electrical power lines are located and identified.<br>• Ensure that ladders, scaffolds, equipment or materials never come within 10 feet of electrical power lines.<br>• Ensure the guarding of live part against accidental contact.<br>• No metal ladders to be used when working around any type of electrical source.<br>• If a receptacle or receptacles are installed as part of the permanent wiring of the building or structure and they are used for temporary electric power, GFCI protection is required. | Almost Certain – L3 |
| **LADDERS** | Staff Visitors Sub-contra Pedestrians | • No metal ladders in use when electrical work it's been performed.<br>• Only ladders in good condition and the appropriate size for the job being undertaken will be used. If damage is found, tag out and remove from jobsite.<br>• No work will be performed either standing or sitting on the top of the ladder and no standing on the first rung from the top.<br>• All ladders shall be used in the manner that they were designed for.<br>• Ensure extension ladders are set 3ft above support point.<br>• Inspect all ladders thoroughly before each use.<br>• Set damaged ladder(s) out of service. | Almost Certain – L2 |
| **SIMULTANEOUS OPERATIONS HAZARD** | Staff Visitors Sub-contra Pedestrians | • Establish communications with other subcontractors to coordinate simultaneous operations with construction to ensure that there is no new hazards created by multiple operations or no construction delays due to operations that are ongoing simultaneously. | Almost Certain – L5 |

7

| PERIMETER SECURITY | Staff Visitors Sub-contra Pedestrians | • Ensure that the worksite is secure each day during/after working hours so as to keep intruders (especially small children) from entering the job site.<br>• Student activities will take place while construction is ongoing.<br>• School will be in session | Likely – L6 |
|---|---|---|---|
| CONSTRUCTION PARKING | Staff Visitors Sub-contra Pedestrians | • Limited parking exists for the workers to park. This will be complicated by school parking and parental parking on days of parental participation.<br>• Ensure employees are instructed of proper parking procedures. | Possible – L6 |
| MATERIALS DELIVERY/HANDLING | Staff Visitors Sub-contra Pedestrians | • Provisions must be made to ensure that trucks delivering materials to the jobsite have unobstructed access to the construction site.<br>• Make sure that overhead electrical power lines are located and identified.<br>• Ensure that materials are placed in such a place that they are not directly under overhead powerlines.<br>• Ensure proper procedures are being utilized by all handling materials or tools when they are being lifted into a multilevel overhead structure. | Possible – L6 |
| SILICA DUST | Staff Visitors Sub-contra Pedestrians | • When any task identified on Table 1 is being performed that may cause workers to be exposed to silica dust, workers will adhere to the engineering and work practice controls methods as well as PPE requirements as outlined in OSHA Silica Dust Control Table One and the Silica Dust Site Plan.<br>• Subcontractors will be required to submit a Silica Dust Control Plan (Written expusre control plan) if any activities they perform create a Silica Dust hazard.<br>• The employer shall ensure that no employee is exposed to an airborne concentration of respirable crystalline silica in excess of $50 \ \mu g/m^3$, calculated as an 8-hour TWA.<br>• Workers will practice good hygiene when performing tasks which create Silica Dust.<br>• When respirators are required to protect workers from Silica Dust exposure, subcontractors are required to follow their respective Respirator Program.<br>• Dry sweeping or dry brushin are not allowed to clean surfaces.<br>• | Possible – L3 |
| NOISE | Staff Visitors Pedestrians Sub-contra | • When noise exposure is at/above 85 decibels averaged over 8 working hours, or an 8-hour time-weighted average, a hearing conservation method must be implemented.<br>• Make sure workers are equipped with hearing protection devices such as ear plugs, ear muffs, or both.<br>• Enclose or isolate the noise at the source<br>• Choose low-noise tools and machinery<br>• Set a barrier between the noise and other workers. | Possible – L5 |

8

## Person(s) or Sub-contractors involved in your operations

The undersigned managers and operators have taken due note of the HAZARDOUS CONDITIONS FOR THIS LOCATON and for safely undertaking the works involving third parties and shall comply with these conditions.
**By signing this Risk Assessment, I acknowledge that I understand the risks for this location and understand there are Guidelines for PPE, Procedures, as well as Superintendent Commands that I agree to follow at all times. In addition, by signing this my company will follow these guidelines and all OSHA safety regulations.**

| Managers / Supervisors / Subcontractors | | | | |
|---|---|---|---|---|
| Last name | First name | Company | Signature | Date |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EMERGENCY CONTACT INFORMATION BRYAN FACILITY: NAME:  MDX SAFETY (NOTIFY THEM IF INJURED OR MINOR INJURY) 979.985.5388 info@mdxsafetyinc.com
ACCIDENT EMERGENCY CONTACT
**Emergency contact:**

9



# Final Estimate

**William Wight**
**SpawGlass**
**JOC - JOC - Basic Contract - 8/01/2017 to 8/31/2020**
**TAMU Corp Dorm Restroom Renovation - 4022021**
**William Wight**

## Estimator: William Wight

**TAMU Corp Dorm Restroom Renovation**

Estimate Scope:  A fast-paced renovation of three restrooms in the existing Corps of Cadets dormitories. Project scope includes the removal of all existing finishes and walls back to structure with a
rebuild back to a similar configuration with fully-enclosed, individual toilet compartments and fully-enclosed, individual shower compartment.

### Division Summary (MF04)

| Division | Amount | | Division | Amount |
|---|---|---|---|---|
| 01 - General Requirements | $824,238.40 | | 26 - Electrical | $96,506.05 |
| 02 - Existing Conditions | $86,433.00 | | 27 - Communications | |
| 03 - Concrete | $30,284.50 | | 28 - Electronic Safety and Security | $11,145.00 |
| 04 - Masonry | | | 31 - Earthwork | |
| 05 - Metals | $7,665.75 | | 32 - Exterior Improvements | |
| 06 - Wood, Plastics, and Composites | $6,073.00 | | 33 - Utilities | |
| 07 - Thermal and Moisture Protection | $65,170.00 | | 34 - Transportation | |
| 08 - Openings | $24,953.10 | | 35 - Waterway and Marine Transportation | |
| 09 - Finishes | $189,633.00 | | 41 - Material Processing and Handling Equipment | |
| 10 - Specialties | $14,334.00 | | 44 - Pollution Control Equipment | |
| 11 - Equipment | | | 46 - Water and Wastewater Equipment | |
| 12 - Furnishings | | | 48 - Electric Power Generation | |
| 13 - Special Construction | | | Project Specific Items | $378,281.20 |
| 14 - Conveying Equipment | | | Trades | |
| 21 - Fire Suppression | $22,185.00 | | Assemblies | |
| 22 - Plumbing | $228,962.50 | | FMR | |
| 23 - Heating, Ventilating, and Air-Conditioning (HVAC) | $82,077.70 | | **MF04 Total (Without totalling components)** | **$2,067,942.20** |
| 25 - Integrated Automation | | | | |

### Totalling Components

| | |
|---|---|
| Priced Line Items | $2,067,942.20 |
| RSMeans BRYAN, TX CCI 2022Q4, 85.80% | $(293,647.79) |
| Contractors Coefficient (1.0400%) | $18,452.66 |

### Material, Labor, and Equipment Totals (No Totalling Components)

| | |
|---|---|
| Material: | $692,882.48 |
| Labor: | $1,277,097.44 |
| Equipment: | $41,481.53 |
| Other: | $56,480.75 |
| Laborhours: | 6,807.10 |
| Green Line Items:16 | $113,166.75 |

### Nonpriced/Non-Priced

| | |
|---|---|
| Nonpriced Line Items | |
| Nonpriced Contractors Coefficient () | |

### Priced/Non-Priced

| | | | |
|---|---|---|---|
| Total Priced Items: | 211 | $2,067,942.20 | |
| Total Non-Priced Items: | 0 | $0.00 | 0.00% |
| | 211 | $2,067,942.20 | |

### Grand Total

**$1,792,747.07**

**Estimator: William Wight**  **TAMU Corp Dorm Restroom Renovation**

## 01 - General Requirements

| | Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|---|
| 1 | 01-21-57-50-0020-L | Overtime, for early completion of projects or where labor shortages exist, add to usual labor, up to | Costs | 300,000.0000 | 100.0000% | $300,000.00 | RSM23FAC L, O&P | P |
| 2 | 01-31-13-20-0160 | Field personnel, general purpose laborer, average | Week | 12.0000 | $3,000.00 | $36,000.00 | RSM23FAC L, O&P | P |
| 3 | 01-31-13-20-0160 | Field personnel, general purpose laborer, average | Week | 12.0000 | $3,000.00 | $36,000.00 | RSM23FAC L, O&P | P |
| 4 | 01-31-13-20-0220 | Field personnel, project manager, maximum | Week | 20.0000 | $4,274.00 | $85,480.00 | RSM23FAC L, O&P | P |
| 5 | 01-31-13-20-0280 | Field personnel, superintendent, maximum | Week | 20.0000 | $4,225.00 | $84,500.00 | RSM23FAC L, O&P | P |
| 6 | 01-31-13-20-0280 | Field personnel, superintendent, maximum | Week | 20.0000 | $4,225.00 | $84,500.00 | RSM23FAC L, O&P | P |
| 7 | 01-31-13-30-0020 | Insurance, standard builders risk, minimum | Job | 1,796,279.0000 | 0.2400% | $4,311.07 | RSM23FAC O&P | P |
| 8 | 01-31-13-30-0850-L | Workers' compensation & employer's liability insurance, carpentry, general | Payroll | 201,378.9200 | 8.9200% | $17,963.00 | RSM23FAC L, O&P | P |
| 9 | 01-31-13-90-0100 | Performance Bond, for buildings, maximum | Job | 1,796,279.0000 | 2.5000% | $44,906.98 | RSM23FAC O&P | P |
| 10 | 01-31-14-20-0060 | Large 3 pole circuit breaker lock out device (over 225 Amp) | Ea. | 3.0000 | $44.50 | $133.50 | RSM23FAC M, L, O&P | P |
| 11 | 01-31-14-20-0180 | Lock out sign | Ea. | 3.0000 | $23.00 | $69.00 | RSM23FAC M, L, O&P | P |
| 12 | 01-31-14-20-0190 | Lock out tag | Ea. | 3.0000 | $8.00 | $24.00 | RSM23FAC M, L, O&P | P |
| 13 | 01-52-13-20-1250 | Storage boxes, rent per month, 20' x 8' | Ea. | 3.0000 | $138.00 | $414.00 | RSM23FAC M, O&P | P |
| 14 | 01-52-13-20-1250 | Storage boxes, rent per month, 20' x 8' | Ea. | 3.0000 | $138.00 | $414.00 | RSM23FAC M, O&P | P |
| 15 | 01-52-13-20-1250 | Storage boxes, rent per month, 20' x 8' | Ea. | 3.0000 | $138.00 | $414.00 | RSM23FAC M, O&P | P |
| 16 | 01-52-13-40-0120 | Field office expense, office supplies, average | Month | 3.0000 | $104.00 | $312.00 | RSM23FAC M, O&P | P |
| 17 | 01-54-33-10-0700-2 | Rent per day for rent cart concrete operator riding 18 CF | Ea. | 6.0000 | $159.50 | $957.00 | RSM23FAC E, O&P | P |
| 18 | 01-54-33-40-0919-4 | Rent per month for rent air scrubber, 200 - 1200 CFM, 110V | Ea. | 9.0000 | $1,019.21 | $9,172.89 | RSM23FAC E, O&P | P |
| 19 | 01-54-33-40-0990-2 | Rent per day for rent air tool, 12 lb chipping hammer | Ea. | 10.0000 | $42.90 | $429.00 | RSM23FAC E, O&P | P |
| 20 | 01-54-33-40-1670-4 | Rent per month for rent barricade, portable with flasher 1 to 6 units | Ea. | 24.0000 | $42.90 | $1,029.60 | RSM23FAC E, O&P | P |
| 21 | 01-54-33-40-2045-4 | Rent per month for rent forklift,pnm tire,all terr,tele boom, 5000 lb, 10' reach, 19' lift | Ea. | 3.0000 | $3,228.62 | $9,685.86 | RSM23FAC E, O&P | P |

**- 2756 -**

**Estimator: William Wight** — **TAMU Corp Dorm Restroom Renovation**

## 01 - General Requirements

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| 22 | 01-54-33-40-3440-4 | Rent per month for gen equip. rental; level, laser type, rotating beam for interior control | Ea. | 3.0000 | $685.08 | $2,055.24 | RSM23FAC E, O&P | P |
| 23 | 01-54-33-40-6000-3 | Rent per week for rent masonry saw 14" diameter 5 HP | Ea. | 6.0000 | $327.42 | $1,964.52 | RSM23FAC E, O&P | P |
| 24 | 01-54-33-40-6100-3 | Rent per week for rent saw circular electric 7-1/4" diameter | Ea. | 12.0000 | $55.00 | $660.00 | RSM23FAC E, O&P | P |
| 25 | 01-54-33-40-6410-4 | Rent per month for rent toilet portable chemical | Ea. | 27.0000 | $246.02 | $6,642.54 | RSM23FAC E, O&P | P |
| 26 | 01-54-36-50-1400 | Mobilization or demobilization, delivery charge for equipment, hauled on 20-ton capacity towed trailer | Ea. | 4.0000 | $995.00 | $3,980.00 | RSM23FAC L, E, O&P | P |
| 27 | 01-54-36-50-1400 | Mobilization or demobilization, delivery charge for equipment, hauled on 20-ton capacity towed trailer | Ea. | 4.0000 | $995.00 | $3,980.00 | RSM23FAC L, E, O&P | P |
| 28 | 01-55-23-50-1000 | Temporary, ramps, plywood, 3/4" plywood on 2" x 6" joists, 16" OC | S.F. | 500.0000 | $8.90 | $4,450.00 | RSM23FAC M, L, O&P | P |
| 29 | 01-56-16-10-0020 | Dust barrier, temporary, spring loaded telescoping pole & head, 12', erect and dismantle | Ea. | 50.0000 | $2.50 | $125.00 | RSM23FAC L, O&P | P |
| 30 | 01-56-16-10-0025 | Dust barrier, temporary, spring loaded telescoping pole & head, 12', cost per day | Day | 4,050.0000 | $0.67 | $2,713.50 | RSM23FAC M, O&P | P |
| 31 | 01-56-16-10-0070 | Dust barrier, temporary, accessories, caution tape | C.L.F. | 20.0000 | $3.75 | $75.00 | RSM23FAC M, L, O&P | P |
| 32 | 01-56-16-10-0080 | Dust barrier, temporary, accessories, zipper, standard duty | Ea. | 15.0000 | $28.00 | $420.00 | RSM23FAC M, L, O&P | P |
| 33 | 01-56-16-10-0110 | Dust barrier, temporary, polyethylene sheet, 6 mil | Sq. | 1,500.0000 | $24.00 | $36,000.00 | RSM23FAC M, L, O&P | P |
| 34 | 01-56-16-10-1085 | Negative air machine, 1800 CFM | Ea. | 3.0000 | $1,100.00 | $3,300.00 | RSM23FAC M, O&P | P |
| 35 | 01-56-26-50-0250 | Temporary fencing, chain link, rented up to 12 months, 6' high, 11 ga, over 1000' | L.F. | 2,000.0000 | $8.10 | $16,200.00 | RSM23FAC M, L, O&P | P |
| 36 | 01-56-29-50-2300 | Temporary, sidewalks, exterior plywood, 2 uses, 1/2" thick | S.F. | 2,000.0000 | $1.63 | $3,260.00 | RSM23FAC M, L, O&P | P |
| 37 | 01-74-13-20-0052 | Cleaning up, cleanup of floor area, continuous, per day, during construction | M.S.F. | 160.0000 | $96.50 | $15,440.00 | RSM23FAC M, L, E, O&P | P |
| 38 | 01-74-13-20-0100 | Cleaning up, cleanup of floor area, final by GC at end of job | M.S.F. | 2.0000 | $133.00 | $266.00 | RSM23FAC M, L, E, O&P | P |
| 39 | 01-76-13-20-0020 | Temporary protection, flooring, taped seams, 1/8" tempered hardboard | S.F. | 1,000.0000 | $1.50 | $1,500.00 | RSM23FAC M, L, O&P | P |
| 40 | 01-91-13-50-0100 | Building commissioning, systems operation and verification during turnover | % | 1,796,279.0000 | 0.2500% | $4,490.70 | RSM23FAC O&P | P |

**01 - General Requirements Total**    **$824,238.40**

## 02 - Existing Conditions

- 2757 -

## Estimator: William Wight — TAMU Corp Dorm Restroom Renovation

### 02 - Existing Conditions

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| 41 | 02-41-13-38-2300 | Selective demolition, water & sewer piping & fittings, copper pipe, 3/4"-2", diameter, excludes excavation | L.F. | 400.0000 | $3.20 | $1,280.00 | RSM23FAC L, O&P | P |
| 42 | 02-41-13-38-2400 | Selective demolition, water & sewer piping & fittings, copper pipe, 2-1/2"-3", diameter, excludes excavation | L.F. | 400.0000 | $5.35 | $2,140.00 | RSM23FAC L, O&P | P |
| 43 | 02-41-13-38-2600 | Selective demolition, water & sewer piping & fittings, copper pipe fittings, 3/4"-2", diameter, excludes excavation | Ea. | 200.0000 | $107.00 | $21,400.00 | RSM23FAC L, O&P | P |
| 44 | 02-41-13-38-2700 | Selective demolition, water & sewer piping & fittings, cast Iron Pipe, 4", diameter, excludes excavation | L.F. | 200.0000 | $8.00 | $1,600.00 | RSM23FAC L, O&P | P |
| 45 | 02-41-13-38-3000 | Selective demolition, water & sewer piping & fittings, cast iron fittings, 4", diameter, excludes excavation | Ea. | 20.0000 | $53.50 | $1,070.00 | RSM23FAC L, O&P | P |
| 46 | 02-41-16-17-0440 | Building footings and foundations demolition, floors, concrete slab on grade, concrete, rod reinforced, 6" thick, excludes disposal costs and dump fees | S.F. | 350.0000 | $1.34 | $469.00 | RSM23FAC L, E, O&P | P |
| 47 | 02-41-19-19-0725 | Selective demolition, rubbish handling, dumpster, 20 C.Y., 5 ton capacity, weekly rental, includes one dump per week, cost to be added to demolition cost | Week | 12.0000 | $625.00 | $7,500.00 | RSM23FAC M, O&P | P |
| 48 | 02-41-19-19-0725 | Selective demolition, rubbish handling, dumpster, 20 C.Y., 5 ton capacity, weekly rental, includes one dump per week, cost to be added to demolition cost | Week | 12.0000 | $625.00 | $7,500.00 | RSM23FAC M, O&P | P |
| 49 | 02-41-19-19-0725 | Selective demolition, rubbish handling, dumpster, 20 C.Y., 5 ton capacity, weekly rental, includes one dump per week, cost to be added to demolition cost | Week | 12.0000 | $625.00 | $7,500.00 | RSM23FAC M, O&P | P |
| 50 | 02-41-19-19-2045 | Selective demolition, rubbish handling, 0'-100' haul, load, haul, dump and return, wheeled, cost to be added to demolition cost | C.Y. | 150.0000 | $48.00 | $7,200.00 | RSM23FAC L, O&P | P |
| 51 | 02-41-19-20-0100 | Selective demolition, dump charges, typical urban city, building construction materials, includes tipping fees only | Ton | 20.0000 | $81.00 | $1,620.00 | RSM23FAC M, O&P | P |
| 52 | 02-41-19-21-1020 | Selective demolition, gutting, building interior, commercial building, includes disposal, excludes dumpster fees, maximum | SF Flr. | 1,500.0000 | $13.65 | $20,475.00 | RSM23FAC L, E, O&P | P |
| 53 | 02-42-10-20-0100 | Deconstruction of building plumbing fixtures, wall hung or countertop lavatory, up to 2 stories, excludes handling, packaging or disposal costs | Ea. | 6.0000 | $75.00 | $450.00 | RSM23FAC Gm, L, O&P | P |
| 54 | 02-42-10-20-0120 | Deconstruction of building plumbing fixtures, wall hung urinal, up to 2 stories, excludes handling, packaging or disposal costs | Ea. | 6.0000 | $86.00 | $516.00 | RSM23FAC Gm, L, O&P | P |
| 55 | 02-42-10-20-0150 | Deconstruction of building plumbing fixtures, wall hung water closet, up to 2 stories, excludes handling, packaging or disposal costs | Ea. | 15.0000 | $86.00 | $1,290.00 | RSM23FAC Gm, L, O&P | P |
| 56 | 02-42-10-20-0200 | Deconstruction of building plumbing fixtures, shower, single, up to 2 stories, excludes handling, packaging or disposal costs | Ea. | 15.0000 | $200.00 | $3,000.00 | RSM23FAC Gm, L, O&P | P |
| 57 | 02-42-10-20-0350 | Deconstruction of building electrical fixtures, surface mounted strip fluorescent, 2 lamp, up to 2 stories, excludes handling, packaging or disposal costs | Ea. | 30.0000 | $37.50 | $1,125.00 | RSM23FAC Gm, L, O&P | P |
| 58 | 02-42-10-20-0620 | Deconstruction of millwork and trim, countertops, up to 2 stories, excludes handling, packaging or disposal costs | L.F. | 20.0000 | $14.90 | $298.00 | RSM23FAC Gm, L, O&P | P |

**Estimator: William Wight**

**TAMU Corp Dorm Restroom Renovation**

## 02 - Existing Conditions

| Item | Description | UM | Quantity | Unit Cost | Total | Book |
|------|-------------|-----|----------|-----------|-------|------|
| | **02 - Existing Conditions Total** | | | | | **$86,433.00** |
| | **03 - Concrete** | | | | | |
| 59 | 03-01-30-72-7040 | Leveling & reprofiling of vertical & overhead surfaces (ACI RAP-10), mix pre-bagged repair material with mixing paddle | C.F. | 255.0000 | $88.50 | $22,567.50 | RSM23FAC M, L, O&P | P |
| 60 | 03-01-30-72-7050 | Leveling & reprofiling of vertical & overhead surfaces (ACI RAP-10), place repair material by hand with steel trowel to fill pores & honeycombs | S.F. | 1,500.0000 | $1.56 | $2,340.00 | RSM23FAC L, O&P | P |
| 61 | 03-21-11-60-0602 | Reinforcing steel, in place, slab on grade, #3 to #7, A615, grade 60, incl labor for accessories, excl material for accessories | Lb. | 500.0000 | $1.55 | $775.00 | RSM23FAC Grn, M, L, O&P | P |
| 62 | 03-30-53-40-4700 | Structural concrete, in place, slab on grade (3500 psi), 6" thick, includes forms(4 uses), Grade 60 rebar, concrete (Portland cement Type I), and placing, excludes finishing | C.Y. | 12.0000 | $297.00 | $3,564.00 | RSM23FAC M, L, E, O&P | P |
| 63 | 03-31-13-70-4300 | Structural concrete, placing, slab on grade, direct chute, up to 6" thick, includes leveling (strike off) & consolidation, excludes material | C.Y. | 12.0000 | $34.50 | $414.00 | RSM23FAC L, E, O&P | P |
| 64 | 03-35-13-30-0200 | Concrete finishing, fresh concrete flatwork, floors, basic finishing for unspecified flatwork, bull float, manual float & manual steel trowel, excl placing, striking off & consolidating | S.F. | 400.0000 | $1.56 | $624.00 | RSM23FAC L, O&P | P |
| | **03 - Concrete Total** | | | | | **$30,284.50** |
| | **05 - Metals** | | | | | |
| 65 | 05-05-13-50-5900 | Paints and protective coatings, galvanizing structural steel in shop, under 1 ton, hot dip | Ton | 0.2000 | $925.00 | $185.00 | RSM23FAC M, O&P | P |
| 66 | 05-05-23-10-0600 | Bolt, hex head, plain steel, 3/8" dia x 1" L, A307, incl nut & washer | Ea. | 75.0000 | $6.65 | $498.75 | RSM23FAC Grn, M, L, O&P | P |
| 67 | 05-05-23-35-0020 | Machine screw, steel, round head, #8 x 1" L | C | 2.0000 | $161.00 | $322.00 | RSM23FAC Grn, M, L, O&P | P |
| 68 | 05-05-23-50-0100 | Powder actuated stud driver, semi automatic, strip, .27 cal | Ea. | 6.0000 | $635.00 | $3,810.00 | RSM23FAC M, O&P | P |
| 69 | 05-12-23-40-0468 | Angle framing, structural steel, 1-1/2"x1-1/2"x3/16", field fabricated, incl cutting & welding | L.F. | 100.0000 | $28.50 | $2,850.00 | RSM23FAC Grn, M, L, E, O&P | P |
| | **05 - Metals Total** | | | | | **$7,665.75** |
| | **06 - Wood, Plastics, and Composites** | | | | | |
| 70 | 06-11-10-02-2780 | 2" x 8" miscellaneous wood blocking, to steel construction, per M.B.F. | M.B.F. | 1.0000 | $5,750.00 | $5,750.00 | RSM23FAC M, L, O&P | P |
| 71 | 06-11-10-24-5000 | Wood framing, miscellaneous, nailers, treated, wood construction, 2" x 4" | L.F. | 100.0000 | $3.23 | $323.00 | RSM23FAC M, L, O&P | P |

- 2759 -

**Estimator: William Wight**  |  **TAMU Corp Dorm Restroom Renovation**

06 - Wood, Plastics, and Composites

| Item | Description | UM | Quantity | Unit Cost | Total | Book |
|---|---|---|---|---|---|---|
| | **06 - Wood, Plastics, and Composites Total** | | | | **$6,073.00** | |

## 07 - Thermal and Moisture Protection

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| 72 | 07-26-13-10-0700 | Vapor retarders, building paper, polyethylene vapor barrier, standard, 4 mil (.004" thick), 9' x 400' roll | Sq. | 400.0000 | $26.00 | $10,400.00 RSM23FAC Grn, M, L, O&P | P |
| 73 | 07-84-13-10-0150 | Firestopping, metallic piping, non insulated, through floors, 2" dia | Ea. | 15.0000 | $30.00 | $450.00 RSM23FAC M, L, O&P | P |
| 74 | 07-84-13-10-0160 | Firestopping, metallic piping, non insulated, through floors, 4" dia | Ea. | 15.0000 | $38.00 | $570.00 RSM23FAC M, L, O&P | P |
| 75 | 07-84-13-10-0780 | Firestopping, construction joints, floor slab to drywall partition, fluted joint | L.F. | 850.0000 | $34.00 | $28,900.00 RSM23FAC M, L, O&P | P |
| 76 | 07-91-23-10-0052 | Pre-formed joint seals, backer rod, polyethylene, 1/2" dia | L.F. | 5,000.0000 | $1.78 | $8,900.00 RSM23FAC M, L, O&P | P |
| 77 | 07-92-13-20-2700 | Joint sealants, caulking and sealants, polysulfide compounds, in place, 1 or 2 component, 154 LF per gal, 1/2" x 1/4" | L.F. | 2,500.0000 | $3.33 | $8,325.00 RSM23FAC M, L, O&P | P |
| 78 | 07-92-19-10-0030 | Joint sealants, caulking and sealants, acoustical sealants, elastomeric, cartridges, 1/4" x 1/2", in place | L.F. | 2,500.0000 | $3.05 | $7,625.00 RSM23FAC M, L, O&P | P |
| | | **07 - Thermal and Moisture Protection Total** | | | | **$65,170.00** | |

## 08 - Openings

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| 79 | 08-05-05-10-0500 | Door demolition, interior door, single, 3' x 7' high, 1-3/8" thick, remove | Ea. | 3.0000 | $30.00 | $90.00 RSM23FAC L, O&P | P |
| 80 | 08-05-05-10-2205 | Door demolition, door hardware, remove | Ea. | 3.0000 | $16.30 | $48.90 RSM23FAC L, O&P | P |
| 81 | 08-05-05-10-5500 | Door demolition, door closer, remove | Ea. | 3.0000 | $60.00 | $180.00 RSM23FAC L, O&P | P |
| 82 | 08-31-13-10-4200 | Doors, specialty, access, recessed door for drywall, metal, 24" x 36" | Ea. | 12.0000 | $292.00 | $3,504.00 RSM23FAC M, L, O&P | P |
| 83 | 08-71-20-30-0040 | Door hardware, door closer, rack and pinion, adjustable backcheck, 3 way mount, Ea. hold open arm | Ea. | 27.0000 | $535.00 | $14,445.00 RSM23FAC M, L, O&P | P |
| 84 | 08-71-20-40-0100 | Door hardware, lockset, standard duty, cylindrical, with sectional trim, non-keyed, Ea. privacy | Ea. | 27.0000 | $228.00 | $6,156.00 RSM23FAC M, L, O&P | P |
| 85 | 08-71-20-90-0040 | Door hardware, hinges, full mortise, average frequency, steel base, US26D, 4-1/2" x 4-1/2" | Pair | 27.0000 | $19.60 | $529.20 RSM23FAC M, O&P | P |
| | | **08 - Openings Total** | | | | **$24,953.10** | |

## 09 - Finishes

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| 86 | 09-01-90-92-0530 | Paint preparation, surface protection, placement & removal, volume cover up (using plastic sheathing or building paper) | S.F. | 4,500.0000 | $0.04 | $180.00 RSM23FAC L, O&P | P |

**- 2760 -**

# Final Estimate

## TAMU Corp Dorm Restroom Renovation

**Estimator: William Wight**

### 09 - Finishes

| Item | | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|---|
| 87 | 09-05-05-30-3760 | Walls and partitions demolition, tile, ceramic, on walls, thin set | S.F. | 3,000.0000 | $2.00 | $6,000.00 | RSM23FAC L, O&P | P |
| 88 | 09-22-13-13-0900 | Furring, ceilings, on steel, galvanized, 1-5/8" channels, 24" OC | S.F. | 2,000.0000 | $2.31 | $4,620.00 | RSM23FAC M, L, O&P | P |
| 89 | 09-22-16-13-1710 | Metal stud partition, non-load bearing, galvanized, 8' high, 1-5/8" wide, 20 gauge, S.F. 24" OC, includes top & bottom track | S.F. | 3,500.0000 | $1.86 | $6,510.00 | RSM23FAC M, L, O&P | P |
| 90 | 09-22-16-13-1730 | Metal stud partition, non-load bearing, galvanized, 8' high, 2-1/2" wide, 20 gauge, S.F. 24" OC, includes top & bottom track | S.F. | 1,000.0000 | $1.53 | $1,530.00 | RSM23FAC M, L, O&P | P |
| 91 | 09-22-26-13-8420 | Suspended ceiling system, 1-1/2" carriers, 24" OC with 1-5/8" channels, 24" OC, S.F. incl. carriers | S.F. | 1,500.0000 | $3.89 | $5,835.00 | RSM23FAC M, L, O&P | P |
| 92 | 09-28-13-10-0170 | Cementitious backerboard, on wall, 3' x 6' x 1/2" sheet | S.F. | 5,200.0000 | $5.90 | $30,680.00 | RSM23FAC M, L, O&P | P |
| 93 | 09-29-10-30-2150 | Gypsum wallboard, on walls, fire resistant, taped & finished (level 4 finish), 5/8" thick | S.F. | 1,000.0000 | $2.05 | $2,050.00 | RSM23FAC M, L, O&P | P |
| 94 | 09-29-10-30-2520 | Gypsum wallboard, on walls, mold resistant, taped & finished (level 4 finish), 5/8" thick | S.F. | 5,200.0000 | $2.09 | $10,868.00 | RSM23FAC M, L, O&P | P |
| 95 | 09-29-10-30-3310 | Gypsum wallboard, on ceilings, mold resistant, taped & finished (level 4 finish), 5/8" thick | S.F. | 1,500.0000 | $2.50 | $3,750.00 | RSM23FAC M, L, O&P | P |
| 96 | 09-29-15-10-0300 | Accessories, gypsum board, corner bead, galvanized steel, 1" x 1" | C.L.F. | 15.0000 | $240.00 | $3,600.00 | RSM23FAC M, L, O&P | P |
| 97 | 09-29-15-10-1100 | Accessories, gypsum board, furring channel, galvanized steel, resilient, 1/2" wide C.L.F. | C.L.F. | 15.0000 | $320.00 | $4,800.00 | RSM23FAC M, L, O&P | P |
| 98 | 09-29-15-10-1160 | Accessories, gypsum board, screws, #6 x 1" A | M | 3.0000 | $25.00 | $75.00 | RSM23FAC M, O&P | P |
| 99 | 09-31-13-10-0700 | Ceramic tile, cove base, thin set, 4-1/4" x 4-1/4" | L.F. | 800.0000 | $16.60 | $13,280.00 | RSM23FAC M, L, O&P | P |
| 100 | 09-31-13-10-3310 | Ceramic tile, floors, glazed, porcelain type, thin set, 1 color, color group 2, 2" x 2" S.F. or 2" x 1" | S.F. | 2,200.0000 | $11.80 | $25,960.00 | RSM23FAC M, L, O&P | P |
| 101 | 09-31-13-10-5400 | Ceramic tile, walls, interior, thin set, 4-1/4" x 4-1/4" | S.F. | 5,200.0000 | $9.40 | $48,880.00 | RSM23FAC M, L, O&P | P |
| 102 | 09-34-13-10-0030 | Waterproofing membrane ceramic tiling, fleece laminated polyethylene grid, 1/8" S.F. thick, on floors, including thinset | S.F. | 1,500.0000 | $7.70 | $11,550.00 | RSM23FAC M, L, O&P | P |
| 103 | 09-81-16-10-1500 | Sound attenuation blanket, 3" thick | S.F. | 2,500.0000 | $1.65 | $4,125.00 | RSM23FAC M, L, O&P | P |
| 104 | 09-81-16-10-3200 | Sound attenuation blanket, thermal or acoustical batt above ceiling, 4" thick | S.F. | 1,500.0000 | $1.99 | $2,985.00 | RSM23FAC M, L, O&P | P |
| 105 | 09-91-23-72-1240 | Paints & coatings, walls & ceilings, interior, concrete, drywall or plaster, latex paint, 3 coats, smooth finish, roller | S.F. | 1,500.0000 | $1.57 | $2,355.00 | RSM23FAC M, L, O&P | P |

**09 - Finishes Total**     **$189,633.00**

**- 2761 -**

**Estimator: William Wight**  |  **TAMU Corp Dorm Restroom Renovation**  |  **Final Estimate**

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| **10 - Specialties** | | | | | | | |
| 106 10-05-05-10-1105 | Specialties demolition, demolition, mirror, wall mounted | Ea. | 3.0000 | $20.00 | $60.00 | RSM23FAC L, O&P | P |
| 107 10-05-05-10-1850 | Specialties demolition, shower partitions, cabinet or stall, includes base and door | Ea. | 15.0000 | $150.00 | $2,250.00 | RSM23FAC L, O&P | P |
| 108 10-05-05-10-1930 | Urinal screen, remove | Ea. | 3.0000 | $50.00 | $150.00 | RSM23FAC L, O&P | P |
| 109 10-28-13-13-0200 | Toilet accessories, curtain rod, stainless steel, 1" diameter x 5' long | Ea. | 15.0000 | $113.00 | $1,695.00 | RSM23FAC M, L, O&P | P |
| 110 10-28-13-13-0610 | Toilet accessories, dispenser units, towel dispenser & waste receptacle, 18 gallon capacity | Ea. | 3.0000 | $515.00 | $1,545.00 | RSM23FAC M, L, O&P | P |
| 111 10-28-13-13-0900 | Toilet accessories, grab bars, straight, stainless steel, 24" long | Ea. | 15.0000 | $59.00 | $885.00 | RSM23FAC M, L, O&P | P |
| 112 10-28-13-13-1105 | Toilet accessories, grab bars, straight, stainless steel, 42" long | Ea. | 3.0000 | $93.00 | $279.00 | RSM23FAC M, L, O&P | P |
| 113 10-28-13-13-1120 | Toilet accessories, grab bars, corner, stainless steel, 36" long | Ea. | 3.0000 | $158.00 | $474.00 | RSM23FAC M, L, O&P | P |
| 114 10-28-13-13-1900 | Toilet accessories, grab bars, end tub bar, 90 degree angle, 1" diameter, 16" x 32" | Ea. | 3.0000 | $171.00 | $513.00 | RSM23FAC M, L, O&P | P |
| 115 10-28-13-13-3100 | Toilet accessories, mirror, 36" x 24", with stainless steel 3/4" square frame | Ea. | 7.0000 | $138.00 | $966.00 | RSM23FAC M, L, O&P | P |
| 116 10-28-13-13-4300 | Toilet accessories, robe hook, regular, single | Ea. | 15.0000 | $36.50 | $547.50 | RSM23FAC M, L, O&P | P |
| 117 10-28-13-13-4600 | Toilet accessories, soap dispenser, chrome, surface mounted, liquid | Ea. | 3.0000 | $94.50 | $283.50 | RSM23FAC M, L, O&P | P |
| 118 10-28-13-13-5600 | Toilet accessories, shelf, stainless steel, 5" wide x 24" long, 18 gauge | Ea. | 15.0000 | $114.00 | $1,710.00 | RSM23FAC M, L, O&P | P |
| 119 10-28-13-13-5800 | Toilet accessories, shelf, stainless steel, 8" wide x 24" long, 18 gauge | Ea. | 12.0000 | $104.00 | $1,248.00 | RSM23FAC M, L, O&P | P |
| 120 10-28-13-13-6200 | Toilet accessories, toilet tissue dispenser, stainless steel, surface mounted, double roll | Ea. | 12.0000 | $144.00 | $1,728.00 | RSM23FAC M, L, O&P | P |
| **10 - Specialties Total** | | | | | **$14,334.00** | | |
| **21 - Fire Suppression** | | | | | | | |
| 121 21-11-11-16-0110 | Pipe fittings, for fire-suppression, ductile iron, elbow, 90 Deg., 2", grooved joint, add coupling material cost, excludes coupling material cost | Ea. | 100.0000 | $59.50 | $5,950.00 | RSM23FAC M, L, O&P | P |
| 122 21-11-11-16-0530 | Pipe fittings, for fire-suppression, ductile iron, coupling,rigid, 2", grooved joint, add coupling material cost, excludes coupling material cost | Ea. | 100.0000 | $62.50 | $6,250.00 | RSM23FAC M, L, O&P | P |
| 123 21-11-11-16-0738 | Pipe fittings, for fire-suppression, ductile iron, end of run fitting, 2" x 3/4", grooved joint, add coupling material cost, excludes coupling material cost | Ea. | 50.0000 | $88.50 | $4,425.00 | RSM23FAC M, L, O&P | P |

# Final Estimate

## TAMU Corp Dorm Restroom Renovation

**Estimator: William Wight**

### 21 - Fire Suppression

| Item | | Description | UM | Quantity | Unit Cost | Total | Book |
|---|---|---|---|---|---|---|---|
| 124 | 21-13-13-50-2440 | Sprinkler system components, sprinkler head escutcheons, recessed type, chrome or white enamel | Ea. | 40.0000 | $26.00 | $1,040.00 | RSM23FAC M, L, O&P | P |
| 125 | 21-13-13-50-4860 | Sprinkler system components, sprinkler heads, recessed pendent, brass, 135 to 286 degrees F, 1/2" NPT, 17/32" orifice, standard spray | Ea. | 40.0000 | $113.00 | $4,520.00 | RSM23FAC M, L, O&P | P |
| | | **21 - Fire Suppression Total** | | | | **$22,185.00** | |

### 22 - Plumbing

| Item | | Description | UM | Quantity | Unit Cost | Total | Book |
|---|---|---|---|---|---|---|---|
| 126 | 22-05-05-10-1200 | Fixture, lavatory, wall hung, selective demolition, includes 10' piping | Ea. | 9.0000 | $89.00 | $801.00 | RSM23FAC L, O&P | P |
| 127 | 22-05-05-10-1420 | Fixture, water closet, wall mounted, selective demolition | Ea. | 12.0000 | $127.00 | $1,524.00 | RSM23FAC L, O&P | P |
| 128 | 22-05-05-10-1520 | Fixture, urinal, wall mounted, selective demolition, includes 10' piping | Ea. | 6.0000 | $127.00 | $762.00 | RSM23FAC L, O&P | P |
| 129 | 22-05-05-10-1980 | Pipe hanger / support, selective demolition | Ea. | 100.0000 | $11.10 | $1,110.00 | RSM23FAC L, O&P | P |
| 130 | 22-05-29-10-2866 | Pipe hanger / support, assembly, size includes an insulation allowance, 3/4" pipe size, includes adjustable clevis, saddle, rod and clamp | Ea. | 35.0000 | $124.00 | $4,340.00 | RSM23FAC M, L, O&P | P |
| 131 | 22-05-29-10-2870 | Pipe hanger / support, assembly, size includes an insulation allowance, 1-1/2" pipe size, includes adjustable clevis, saddle, rod and clamp | Ea. | 30.0000 | $124.00 | $3,720.00 | RSM23FAC M, L, O&P | P |
| 132 | 22-05-29-10-2874 | Pipe hanger / support, assembly, size includes an insulation allowance, 2-1/2" pipe size, includes adjustable clevis, saddle, rod and clamp | Ea. | 25.0000 | $155.00 | $3,875.00 | RSM23FAC M, L, O&P | P |
| 133 | 22-05-29-10-2876 | Pipe hanger / support, assembly, size includes an insulation allowance, 3" pipe size, includes adjustable clevis, saddle, rod and clamp | Ea. | 25.0000 | $163.00 | $4,075.00 | RSM23FAC M, L, O&P | P |
| 134 | 22-05-48-40-1120 | Vibration absorber, mounts, spring flex, 165 lb. capacity | Ea. | 75.0000 | $86.00 | $6,450.00 | RSM23FAC M, O&P | P |
| 135 | 22-05-53-10-1114 | Piping system identification labels, pipe markers, indicate contents and flow direction, self adhesive, 1" pipe | Ea. | 30.0000 | $14.40 | $432.00 | RSM23FAC M, L, O&P | P |
| 136 | 22-05-53-10-1116 | Piping system identification labels, pipe markers, indicate contents and flow direction, self adhesive, 2" pipe | Ea. | 30.0000 | $15.15 | $454.50 | RSM23FAC M, L, O&P | P |
| 137 | 22-05-53-10-1118 | Piping system identification labels, pipe markers, indicate contents and flow direction, self adhesive, 3" pipe | Ea. | 30.0000 | $17.30 | $519.00 | RSM23FAC M, L, O&P | P |
| 138 | 22-05-76-10-4060 | Cleanout, wall type, square smooth cover, over wall frame, 2" pipe size | Ea. | 10.0000 | $410.00 | $4,100.00 | RSM23FAC M, L, O&P | P |
| 139 | 22-05-76-20-0200 | Cleanout tee, cast iron, B. & S., 2" pipe size, includes countersunk plug | Ea. | 6.0000 | $280.00 | $1,680.00 | RSM23FAC M, L, O&P | P |
| 140 | 22-07-19-10-4301 | Insulation, pipe (price copper tube one size less than I.P.S.), cellular glass, closed cell foam, all service jacket, sealant, 0 water vapor transmission, working temperature (-450 Deg.F to +900 Deg.F), 1-1/2" wall, 1" iron pipe size, includes sealant | L.F. | 800.0000 | $32.50 | $26,000.00 | RSM23FAC Grn, M, L, O&P | P |

**- 2763 -**

# Estimator: William Wight

**TAMU Corp Dorm Restroom Renovation**

## 22 - Plumbing

| Item | | Description | UM | Quantity | Unit Cost | Total | Book |
|---|---|---|---|---|---|---|---|
| 141 | 22-07-19-10-4304 | Insulation, pipe (price copper tube one size less than I.P.S.), cellular glass, closed cell foam, all service jacket, sealant, 0 water vapor transmission, working temperature (-450 Deg.F to +900 Deg.F), 1-1/2" wall, 2-1/2" iron pipe size, includes sealant | L.F. | 600.0000 | $48.00 | $28,800.00 | RSM23FAC Grn, M, L, O&P |
| 142 | 22-11-13-23-1200 | Pipe, copper, tubing, solder, 1" diameter, type K, includes coupling & clevis hanger assembly 10' OC | L.F. | 300.0000 | $22.00 | $6,600.00 | RSM23FAC M, L, O&P |
| 143 | 22-11-13-23-1220 | Pipe, copper, tubing, solder, 1-1/4" diameter, type K, includes coupling & clevis hanger assembly 10' OC | L.F. | 300.0000 | $27.00 | $8,100.00 | RSM23FAC M, L, O&P |
| 144 | 22-11-13-23-1240 | Pipe, copper, tubing, solder, 1-1/2" diameter, type K, includes coupling & clevis hanger assembly 10' OC | L.F. | 300.0000 | $32.00 | $9,600.00 | RSM23FAC M, L, O&P |
| 145 | 22-11-13-23-1280 | Pipe, copper, tubing, solder, 2-1/2" diameter, type K, includes coupling & clevis hanger assembly 10' OC | L.F. | 150.0000 | $90.00 | $13,500.00 | RSM23FAC M, L, O&P |
| 146 | 22-11-13-25-0130 | Elbow, 90 Deg., copper, wrought, copper x copper, 1" | Ea. | 35.0000 | $73.00 | $2,555.00 | RSM23FAC M, L, O&P |
| 147 | 22-11-13-25-0140 | Elbow, 90 Deg., copper, wrought, copper x copper, 1-1/4" | Ea. | 35.0000 | $85.00 | $2,975.00 | RSM23FAC M, L, O&P |
| 148 | 22-11-13-25-0150 | Elbow, 90 Deg., copper, wrought, copper x copper, 1-1/2" | Ea. | 30.0000 | $109.00 | $3,270.00 | RSM23FAC M, L, O&P |
| 149 | 22-11-13-25-0170 | Elbow, 90 Deg., copper, wrought, copper x copper, 2-1/2" | Ea. | 25.0000 | $256.00 | $6,400.00 | RSM23FAC M, L, O&P |
| 150 | 22-11-13-25-0710 | Coupling, copper, wrought, copper x copper, 1" | Ea. | 35.0000 | $65.00 | $2,275.00 | RSM23FAC M, L, O&P |
| 151 | 22-11-13-25-0715 | Coupling, copper, wrought, copper x copper, 1-1/4" | Ea. | 35.0000 | $80.00 | $2,800.00 | RSM23FAC M, L, O&P |
| 152 | 22-11-13-25-0716 | Coupling, copper, wrought, copper x copper, 1-1/2" | Ea. | 35.0000 | $95.00 | $3,325.00 | RSM23FAC M, L, O&P |
| 153 | 22-11-13-25-0721 | Coupling, copper, wrought, copper x copper, 2-1/2" | Ea. | 35.0000 | $231.00 | $8,085.00 | RSM23FAC M, L, O&P |
| 154 | 22-11-19-54-0500 | Water hammer arrester/shock absorber, copper, for 1 to 11 fixtures, 3/4" male IPS | Ea. | 5.0000 | $123.00 | $615.00 | RSM23FAC M, L, O&P |
| 155 | 22-11-19-54-0700 | Water hammer arrester/shock absorber, copper, for 33 to 60 fixtures, 1-1/4" male IPS | Ea. | 5.0000 | $191.00 | $955.00 | RSM23FAC M, L, O&P |
| 156 | 22-13-16-20-4120 | Pipe, cast iron soil, no hub, 2" diameter, includes couplings 10' OC, clevis hanger assemblies 5' OC | L.F. | 200.0000 | $38.00 | $7,600.00 | RSM23FAC M, L, O&P |
| 157 | 22-13-16-50-2820 | Drain, shower, with strainer, uniform diameter trap, bronze top, 4" pipe size | Ea. | 15.0000 | $895.00 | $13,425.00 | RSM23FAC M, L, O&P |
| 158 | 22-13-19-13-2040 | Drain, floor, medium duty, cast iron, deep flange, 7" diameter top, 2" and 3" pipe size | Ea. | 3.0000 | $695.00 | $2,085.00 | RSM23FAC M, L, O&P |
| 159 | 22-41-16-13-2900 | Lavatory, vanity top, vitreous china, white, single bowl, 20" x 16", includes trim | Ea. | 7.0000 | $585.00 | $4,095.00 | RSM23FAC M, L, O&P |

**- 2764 -**

**Estimator: William Wight**  **TAMU Corp Dorm Restroom Renovation**

## 22 - Plumbing

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| 160 | 22-41-39-10-2220 | Faucets/fittings, lavatory faucet, center set with porcelain cross handles, polished chrome, with pop-up drain | Ea. | 7.0000 | $390.00 | $2,730.00 | RSM23FAC M, L, O&P | P |
| 161 | 22-41-39-10-4250 | Faucets/fittings, shower pressure balancing mixing valve, satin nickel, with shower head, arm, flange and diverter tub spout | Ea. | 15.0000 | $795.00 | $11,925.00 | RSM23FAC M, L, O&P | P |
| 162 | 22-42-39-10-0890 | Faucets/fittings, flush valve, tankless water closet, concealed top spud | Ea. | 12.0000 | $365.00 | $4,380.00 | RSM23FAC M, L, O&P | P |
| 163 | 22-42-39-30-7040 | Carriers/supports, water closet, siphon jet, horizontal, adjustable, caulk, single, 4" pipe size | Ea. | 9.0000 | $1,750.00 | $15,750.00 | RSM23FAC M, L, O&P | P |
| 164 | 22-42-39-30-7050 | Carriers/supports, water closet, siphon jet, horizontal, adjustable, ADA compliant, caulk, single, 4" pipe size | Ea. | 3.0000 | $2,425.00 | $7,275.00 | RSM23FAC M, L, O&P | P |

**22 - Plumbing Total**  **$228,962.50**

## 23 - Heating, Ventilating, and Air-Conditioning (HVAC)

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| 165 | 23-05-05-10-1570 | Ductwork, metal; steel and stainless steel, fabricated, selective demolition | Lb. | 1,500.0000 | $1.57 | $2,355.00 | RSM23FAC L, O&P | P |
| 166 | 23-05-05-10-1630 | Diffusers, registers or grills, up thru 20" max dimension, selective demolition | Ea. | 6.0000 | $17.45 | $104.70 | RSM23FAC L, O&P | P |
| 167 | 23-05-93-10-3000 | Balancing, air conditioning equipment, supply, return, exhaust, registers and diffusers, average ceiling height, (Subcontractor's quote including material & labor) | Ea. | 33.0000 | $84.00 | $2,772.00 | RSM23FAC O&P | P |
| 168 | 23-07-13-10-3170 | Duct thermal insulation, blanket type, fiberglass, flexible, FSK vapor barrier wrap, .75 lb. density, 1-1/2" thick | S.F. | 4,000.0000 | $5.30 | $21,200.00 | RSM23FAC Grn, M, L, O&P | P |
| 169 | 23-31-13-13-1040 | Metal ductwork, fabricated rectangular, 1000 to 2000 lb., stainless steel, type 304, incl fittings, joints, supports & allow for a flexible connections field sketches, excludes as-built drawings and insulation | Lb. | 2,000.0000 | $15.40 | $30,800.00 | RSM23FAC M, L, O&P | P |
| 170 | 23-31-13-16-6620 | Metal ductwork, spiral preformed, steel, galvanized, elbow, max. 10" S.P.W.G., 90 Deg., 6" diameter | Ea. | 15.0000 | $42.00 | $630.00 | RSM23FAC M, L, O&P | P |
| 171 | 23-31-13-16-9840 | Metal ductwork, spiral preformed, stainless steel, straight lengths, 6" diameter, 26 ga. | L.F. | 200.0000 | $45.00 | $9,000.00 | RSM23FAC M, L, O&P | P |
| 172 | 23-33-13-13-7504 | Duct accessories, variable volume modulating motorized damper, 8" x 6", includes electric motor | Ea. | 45.0000 | $325.00 | $14,625.00 | RSM23FAC M, L, O&P | P |
| 173 | 23-33-13-16-3120 | Duct accessories, fire damper, curtain type, vertical, 12" x 10", UL label, 1-1/2 hour rated | Ea. | 6.0000 | $98.50 | $591.00 | RSM23FAC M, L, O&P | P |

**23 - Heating, Ventilating, and Air-Conditioning (HVAC) Total**  **$82,077.70**

## 26 - Electrical

| Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|
| 174 | 26-05-05-10-0100 | Conduit, rigid galvanized steel, 1/2" to 1" diameter, electrical demolition, remove conduit to 10' high, including fittings & hangers | L.F. | 800.0000 | $3.42 | $2,736.00 | RSM23FAC L, O&P | P |

**- 2765 -**

## Estimator: William Wight — TAMU Corp Dorm Restroom Renovation

### 26 - Electrical

| # | Item | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|------|-------------|-----|----------|-----------|-------|------|---|
| 175 | 26-05-05-10-0200 | Conduit, electric metallic tubing (EMT), 1/2" to 1" diameter, electrical demolition, remove conduit to 10' high, including fittings & hangers | L.F. | 500.0000 | $2.10 | $1,050.00 | RSM23FAC L, O&P | P |
| 176 | 26-05-05-10-1640 | Pull boxes & cabinets, sheet metal, 6" x 6" x 4", electrical demolition, remove, including removal of supports and terminations | Ea. | 30.0000 | $26.50 | $795.00 | RSM23FAC L, O&P | P |
| 177 | 26-05-05-10-1720 | Junction boxes, 4" square & octagon, electrical demolition, remove, including removal of supports and terminations | Ea. | 50.0000 | $10.35 | $517.50 | RSM23FAC L, O&P | P |
| 178 | 26-05-05-10-1790 | Receptacle & switches, 15 to 30 amp, electrical demolition, remove | Ea. | 6.0000 | $6.15 | $36.90 | RSM23FAC L, O&P | P |
| 179 | 26-05-05-10-1840 | Wire, THW-THWN-THHN, #12, electrical demolition, removed from in place conduit, to 10' high | C.L.F. | 8.0000 | $15.05 | $120.40 | RSM23FAC L, O&P | P |
| 180 | 26-05-05-10-2210 | Fluorescent fixtures, interior, acrylic lens & hinged frame, 2 lamp, 6" x 4', electrical demolition, remove, surface mount, to 10' high, including supports & whips | Ea. | 18.0000 | $37.50 | $675.00 | RSM23FAC L, O&P | P |
| 181 | 26-05-05-10-2340 | Fluorescent fixtures, interior, strip fixture, 2 lamp, 4' long, electrical demolition, remove, surface mount, to 10' high, including supports & whips | Ea. | 60.0000 | $33.00 | $1,980.00 | RSM23FAC L, O&P | P |
| 182 | 26-05-05-20-5040 | Conduit nipples, 3/4" diameter, electrical demolition, remove, incl locknuts and bushings | Ea. | 60.0000 | $8.60 | $516.00 | RSM23FAC L, O&P | P |
| 183 | 26-05-19-90-0030 | Wire, copper solid, 600 volt, #12, type THW, normal installation conditions in wireway, conduit, cable tray | C.L.F. | 140.0000 | $94.00 | $13,160.00 | RSM23FAC M, L, O&P | P |
| 184 | 26-05-29-20-0150 | Strap, steel, 2 holes, rigid steel conduit, 3/4" diameter | Ea. | 125.0000 | $2.17 | $271.25 | RSM23FAC M, L, O&P | P |
| 185 | 26-05-29-20-0800 | Strap, steel, 2 holes, EMT, 3/4" diameter | Ea. | 125.0000 | $2.16 | $270.00 | RSM23FAC M, L, O&P | P |
| 186 | 26-05-29-20-2600 | Threaded rod, steel, painted, 3/8" diameter | L.F. | 200.0000 | $16.50 | $3,300.00 | RSM23FAC M, L, O&P | P |
| 187 | 26-05-29-20-3050 | Nuts, galvanized steel, 3/8" diameter | C | 5.0000 | $35.00 | $175.00 | RSM23FAC M, O&P | P |
| 188 | 26-05-29-20-3300 | Washers, galvanized steel, 3/8" diameter | C | 10.0000 | $35.50 | $355.00 | RSM23FAC M, O&P | P |
| 189 | 26-05-29-20-3900 | Channels, steel, 1-1/2" x 1-1/2", 12 Ga | L.F. | 500.0000 | $21.00 | $10,500.00 | RSM23FAC M, L, O&P | P |
| 190 | 26-05-33-13-1770 | Rigid galvanized steel conduit, 3/4" diameter, to 10' H, incl 2 terminations, 2 elbows, 11 beam clamps, and 11 couplings per 100 LF | L.F. | 800.0000 | $15.65 | $12,520.00 | RSM23FAC M, L, O&P | P |
| 191 | 26-05-33-13-2030 | Rigid galvanized steel conduit elbows, 3/4" diameter, to 10' high | Ea. | 100.0000 | $38.50 | $3,850.00 | RSM23FAC M, L, O&P | P |
| 192 | 26-05-33-13-2270 | Rigid galvanized steel conduit couplings, 3/4" diameter, to 10' high | Ea. | 100.0000 | $8.10 | $810.00 | RSM23FAC M, L, O&P | P |
| 193 | 26-05-33-13-5020 | Electric metallic tubing (EMT), 3/4" diameter, to 10' high, incl 2 terminations, 2 field bend elbows, 11 beam clamps, and 11 couplings per 100 LF | L.F. | 500.0000 | $8.50 | $4,250.00 | RSM23FAC M, L, O&P | P |

**- 2766 -**

**Estimator: William Wight**  ·  **TAMU Corp Dorm Restroom Renovation**

## 26 - Electrical

| Item | | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|---|
| 194 | 26-05-33-13-5220 | Electric metallic tubing (EMT), field bends, 45 Deg. to 90 Deg., 3/4" diameter | Ea. | 45.0000 | $10.35 | $465.75 | RSM23FAC L, O&P | P |
| 195 | 26-05-33-13-6220 | EMT couplings, set screw, steel, 3/4" diameter, to 15' H | Ea. | 75.0000 | $7.25 | $543.75 | RSM23FAC M, L, O&P | P |
| 196 | 26-05-33-16-0150 | Outlet boxes, pressed steel, 4" square | Ea. | 60.0000 | $45.00 | $2,700.00 | RSM23FAC M, L, O&P | P |
| 197 | 26-05-33-35-0200 | Flexible metallic conduit, steel, 3/4" diameter | L.F. | 500.0000 | $6.10 | $3,050.00 | RSM23FAC M, L, O&P | P |
| 198 | 26-05-33-35-0970 | Flexible metallic conduit, couplings, to flexible conduit, 3/4" diameter | Ea. | 200.0000 | $22.50 | $4,500.00 | RSM23FAC M, L, O&P | P |
| 199 | 26-09-23-10-0150 | Lighting devices, automatic wall switches | Ea. | 54.0000 | $123.00 | $6,642.00 | RSM23FAC Gm, M, L, O&P | P |
| 200 | 26-27-26-20-2600 | Wall plates, stainless steel, 1 gang | Ea. | 54.0000 | $12.25 | $661.50 | RSM23FAC M, L, O&P | P |
| 201 | 26-51-13-55-0180 | Interior LED fixtures, downlight, cylinder, 20 watts, incl lamps, mounting hardware and connections | Ea. | 55.0000 | $201.00 | $11,055.00 | RSM23FAC M, L, O&P | P |
| 202 | 26-51-13-55-2020 | Interior LED fixtures, strip, surface mounted, 5,000 K, two light bar 4' long, incl lamps, mounting hardware and connections | Ea. | 15.0000 | $600.00 | $9,000.00 | RSM23FAC Gm, M, L, O&P | P |

**26 - Electrical Total** — **$96,506.05**

## 28 - Electronic Safety and Security

| Item | | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|---|
| 203 | 28-05-05-10-1210 | Fire alarm horn and strobe light, electrical demolition, remove | Ea. | 6.0000 | $51.50 | $309.00 | RSM23FAC L, O&P | P |
| 204 | 28-46-20-50-5610 | Detection system, strobe & horn, ADA type, excluding wires & conduits | Ea. | 6.0000 | $300.00 | $1,800.00 | RSM23FAC M, L, O&P | P |
| 205 | 28-46-20-50-5620 | Detection system, visual alarm, ADA type, excluding wires & conduits | Ea. | 36.0000 | $251.00 | $9,036.00 | RSM23FAC M, L, O&P | P |

**28 - Electronic Safety and Security Total** — **$11,145.00**

## Project Specific Items

| Item | | Description | UM | Quantity | Unit Cost | Total | Book | |
|---|---|---|---|---|---|---|---|---|
| 206 | 01-21-16-50-0149 | Contractor's Contingency | Costs | 89,813.9500 | $1.00 | $89,813.95 | CUSTOM L, O&P | P |
| 207 | 01-31-13-70-0059 | Subcontractors' O&P | Costs | 53,845.2500 | $1.00 | $53,845.25 | CUSTOM S, M, O&P | P |
| 208 | 08-16-13-10-0041 | Fiberglass Doors and Frames | Costs | 146,466.0000 | $1.00 | $146,466.00 | CUSTOM M, O&P | P |
| 209 | 09-34-13-10-0029 | Solid Surfaces | Costs | 78,156.0000 | $1.00 | $78,156.00 | CUSTOM S, M, O&P | P |
| 210 | 21-05-23-01-0001 | Fire Suppression System Make-Safe | Costs | 5,000.0000 | $1.00 | $5,000.00 | CUSTOM S, L, O&P | P |
| 211 | 21-05-23-01-0002 | Fire Suppression System Testing | Costs | 5,000.0000 | $1.00 | $5,000.00 | CUSTOM S, L, O&P | P |

- 2767 -

**Estimator: William Wight**        **TAMU Corp Dorm Restroom Renovation**

**Project Specific Items**

| Item | Description | UM | Quantity | Unit Cost | Total | Book |
|---|---|---|---|---|---|---|
| | | | | | | $378,281.20 |
| **Project Specific Items Total** | | | | | | |
| **Estimate Grand Total** | | | | | | **1,792,747.07** |

**- 2768 -**

DocuSign Envelope ID: 50C44D8E-8AD5-4FF8-8272-2C7D08FB3136

WORK ORDER NO. BCS-2024-2

PROJECT NAME: Kiest Hall - Dorm 2 Feasibility Study for Restroom Renovation | 2024-06316

The Contractor agrees to furnish all necessary management, supervision, labor, materials, supplies, equipment, plant, services, sundries, appurtenances, engineering (if required by the contract), diligently and fully perform all those portions of the Project Work described as follows and all in accordance with the MASTER CONTRACT FOR JOB ORDER WORK dated November 1, 2021, between Southeast Service Corporation d/b/a SSC Service Solutions ("ODR") and SpawGlass Construction Corp. ("Contractor"). The Services will commence upon the issuance of a Notice to Proceed and will continue until the contracted work is completed, which must be completed within one hundred twenty (120) calendar days as time is of the essence.

## LOCATION:

Kiest, Gainer, Lacy Halls
Building #0401, #404, #405 Location: 1st floor women's restrooms/shower rooms
Texas A&M University – College Station
College Station, TX 77845

## SERVICE:

The Contractor shall provide the necessary labor, materials, and equipment to renovate restrooms in Kiest, Gainer & Lacey Halls, which must be completed no later than August 2, 2024, according to the following:

## UPB:

- SpawGlass; TAMU Corp Dorm Restroom Renovation - 4022021; Final Estimate; dated March 19, 2024, pages 1-14, attached hereto as Exhibit A.

## Drawings:

- Kirksey Architecture; Texas A&M University; TAMU CORPS DORM RR MODERNIZATION; Owner Review; dated March 1, 2024, pages 1-16, attached hereto as Exhibit B.

## UGSC:

- SSC Services for Education, SSC Uniform General and Supplementary Conditions, dated September 2018, attached hereto as Exhibit C.

## Special Conditions:

- SSC Special Conditions, Texas A&M University, College Station, dated April 2023, attached hereto as Exhibit D.

## PRICING:

The pricing for this work order shall be a not to exceed amount of $1,792,747.07. Actual cost to be calculated based on RS Means line item pricing.

[SIGNATURE PAGE TO FOLLOW]

**- 2769 -**

DocuSign Envelope ID: 50C44D8E-8AD5-4FF8-8272-2C7D08FB3136

IN WITNESS WHEREOF, the parties hereto have executed this Work Order by their officers thereunto duly authorized, as of the last date of signature below.

Accepted and Agreed,

*Shannon Thornton on behalf of Seth Ferriell*

Signature

Shannon Thornton on behalf of Seth Ferriell

Print or Type Name

**Southeast Service Corporation**
**d/b/a SSC Service Solutions**

Title: VP of Human Resources

Date: 4/4/2024

Signature

GARETT W HEATON

Print or Type Name

**SpawGlass Construction Corp.**

Title: VICE PRESIDENT

Date: 03/27/24

**- 2770 -**

DocuSign Envelope ID: 50C44D8E-8AD5-4FF8-8272-2C7D08FB3136

**Exhibit A**

SpawGlass; TAMU Corp Dorm Restroom Renovation - 4022021; Final Estimate; dated March 19, 2024, pages 1-14.

DocuSign Envelope ID: 50C44D8E-8AD5-4FF8-8272-2C7D08FB3136

Exhibit B

Kirksey Architecture; Texas A&M University; TAMU CORPS DORM RR MODERNIZATION; Owner Review; dated March 1, 2024, pages 1-16.

DocuSign Envelope ID: 50C44D8E-8AD5-4FF8-8272-2C7D08FB3136

Exhibit C

SSC Services for Education, SSC Uniform General and Supplementary Conditions, dated September 2018.

DocuSign Envelope ID: 50C44D8E-8AD5-4FF8-8272-2C7D08FB3136

**Exhibit D**

SSC Special Conditions, Texas A&M University, College Station, dated April 2023.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24092093
nicole.myette@oag.texas.gov
Envelope ID: 90643903
Filing Code Description: Other
Filing Description: Defendant's Second Supplement to First Amended Plea to the Jurisdiction-Exh 46 Pt. 3 of 3
Status as of 8/7/2024 3:41 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 8/7/2024 3:10:28 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 8/7/2024 3:10:28 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 8/7/2024 3:10:28 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 8/7/2024 3:10:28 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/7/2024 3:10:28 PM | SENT |
| Thomas Silver | | tsilver@tamus.edu | 8/7/2024 3:10:28 PM | SENT |
| Jerri Low | | jlow@tamus.edu | 8/7/2024 3:10:28 PM | SENT |

Associated Case Party: Brian Beckcom

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| J DavidDodd III | | David@Jddoddlaw.com | 8/7/2024 3:10:28 PM | SENT |

CAUSE NO. 24-003177-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## DEFENDANT'S THIRD SUPPLEMENT TO PLEA TO THE JURISDICTION

Defendant Texas A&M University ("TAMU") files this Third Supplement to Plea to the Jurisdiction, and respectfully shows as follows:

## TAMU ATTACHES AND INCORPORATES ADDITIONAL EVIDENCE IN SUPPORT OF PLEA

TAMU incorporates fully by reference herein for all purposes the Affidavit of Patricia Bledsoe attached hereto as **Exhibit 24**.

Defendant also incorporates fully by reference herein for all purposes the attached email from Plaintiff Beckcom to TAMU Chancellor John Sharp dated March 28, 2024, which is the same day Plaintiff submitted the open records request to TAMU for the Squadron 17 hazing investigation documents. **Exhibit 25**.

## TAMU PROPERLY WITHHELD CERTAIN INVESTIGATION DOCUMENTS IN ACCORDANCE WITH THE TEXAS SUPREME COURT DECISION IN *GATEHOUSE*

In its initial plea, TAMU cited to the opinion in *Gatehouse* in support of its position that certain documents were properly withheld in response to Plaintiff's TPIA request for the Squadron 17 hazing investigation documents. See Plea at pgs. 15-16. TAMU now submits this additional briefing regarding Gatehouse to demonstrate its applicability to the instant case.

The Supreme Court of Texas issued that opinion on December 31, 2024, addressing how the federal Family Educational Rights and Privacy Act of 1974 ("FERPA") and Texas Public Information Act ("TPIA") intersect under circumstances substantially similar to this case. *Univ. of Texas at Austin v. Gatehouse Media Texas Holdings II, Inc.*, No. 23-0023, 2024 WL 5249449 (Tex. Dec. 31, 2024).

Specifically, the Supreme Court of Texas held that the PIA did not require the University to obtain a decision of the Office of the Attorney General ("OAG") before refusing the newspaper's request for student educational records. *Id*. at *1, 8. In finding that the trial court and appellate court erred by construing the TPIA to require mandatory disclosure of the information, the Court held that Section 552.026 grants an educational institution such as TAMU discretion whether to disclose information in an education record if the disclosure is authorized by FERPA. *Id*. at *7. The Court concluded that the

TPIA authorized the University's refusal to produce information without an OAG opinion and, therefore, that the trial court should have granted the University's motion for summary judgment. *Id.*

The Court in *Gatehouse* further held that the TPIA allowed the University to withhold the requested information in its entirety. It reasoned that "[i]f Section 552.114(b) authorizes the University to withhold the requested information, as it argues and the court of appeals' dissent concluded, then the redaction provision in Section 552.114(d) may negate the obligation to seek an OAG decision before withholding documents under Section 552.114(b)." *Id.* Producing documents consisting of pages of black bars without any text without seeking an OAG decision "is the same as producing nothing without seeking an OAG decision." *Id.*

The Court further cited the 2006 letter from the U.S. Department of Education to the OAG, in which the Department communicated that "FERPA does not permit an educational agency or institution in Texas to disclose, without parental consent, education records to the OAG for the purpose of determining whether it has complied with the TPIA or whether it has redacted more than is necessary under FERPA." *Id.* Because of this, the Court agreed that Section 552.114(d) negates its obligation to seek an OAG decision before withholding information under Section 552.114(b). *Id.*

For the substantially same reasons, TAMU has established in its Plea and all supplements filed in support thereto, that it properly withheld certain documents in their entirety because the information requested was personally identifiable to specific students and could not be sufficiently de-identified solely by redaction. See **Exhibit 24** at ¶¶ 4-5.

Plaintiff mischaracterizes TAMU's position that it withheld documents merely because he is "a parent of one of the students in the outfit." See Plaintiff's Amended Petition for Writ of Mandamus at ¶ 5.1.2. The evidence shows that Plaintiff was not only a parent of a Squadron 17 member but also the legal representative of at least one student involved in the Squadron 17 hazing investigation and thus had knowledge of the identities of other students that were also members of the same squadron. **Exhibit 24** at ¶ 4. As their legal representative in the student conduct process, Plaintiff had knowledge of the underlying facts and the associated conduct allegations. *Id*. Plaintiff's own email to TAMU Chancellor John Sharp further substantiates the fact he was much more involved in the Squadron 17 investigation than simply as a parent, demanding that TAMU stop the investigation and even threatening TAMU with legal action. **Exhibit 25**.

Under *Gatehouse*, TAMU is not required to redact or produce any student record because the disclosure—*even with redactions*—would reveal students' personally identifiable information. *Id.* at *3, 7. The investigation documents withheld by TAMU could not be produced with redactions because it reasonably believed the disclosure would reveal the identity of the Squadron 17 students because Plaintiff knows the identity of the students to whom the education records relate through his involvement as the legal representative. In this regard, the *Gatehouse* Court affirmed that the respondent state agency has the discretion to determine whether the requested documents fall within the purview of FERPA prohibitions. *Id.* at *7.

Thus, TAMU reasonably believed in good faith that Plaintiff knows the identities of the students to whom the Squadron 17 investigation documents relate and therefore properly withheld certain investigation documents. *Id.* at ¶ 4. The University did so after it determined in its discretion that the information sought was education records "confidential and excepted from the requirements of Section 552.021" and 552.114(b) and prohibited from disclosure by FERPA. In accordance with *Gatehouse*, it was not necessary to seek an OAG decision prior to doing so. The Supreme Court of Texas's recent decision in *Gatehouse* affirms that TAMU's actions were appropriate in response to the TPIA request in issue.

## PRAYER

Wherefore, premises considered, TAMU respectfully requests that its Plea to the Jurisdiction be granted thereby dismissing Plaintiff's claims with prejudice, and that all requested relief be denied. TAMU further requests all other relief to which it may be justly entitled both at law and in equity.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through E-File Texas, File and Serve Texas in compliance with TRCP 21 on April 14, 2025 to:

Brendan Fradkin
Brian Beckcom
VB Attorneys
1220 Augusta, Suite 240
Houston, TX 77057
713/224-7800 (Office)
713/224-7801 (fax)
brendan@vbattorneys.com
Brian@vbattorneys.com

Hunter Shurtleff
Texas Bar No. 00794629
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
Office: 409 E. 26th Street
Bryan, Texas 77803
Telephone (979) 446-4012
Fax (979) 431-0065
hunter@shurtlefflaw.com

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General

EXHIBIT
24

CAUSE NO. 24-003177-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## AFFIDAVIT

| | |
|---|---|
| State of Texas | § |
| County of Brazos | § |

Before me, the undersigned notary, on this day personally appeared Patricia Bledsoe, the affiant, whose identify is known to me. After I administered an oath, the affiant testified as follows:

1. My name is Paricia Bledsoe, and I am over the age of 18 years of age, of sound mind, capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. I am currently employed as the Director and designated Public Information Officer of Texas A&M University's (TAMU) Office of Open Records (ORO) and in this capacity am the primary custodian of the records identified herein by virtue of my duties and responsibilities.

3. In connection with my job duties and responsibilities, I was involved in TAMU's response to Plaintiff's Texas Public Information Act Request # J001147-032824), which was received by TAMU on or about March 28, 2024. Among the information requested was the TAMU Corps of Cadets Squadron 17 investigation documents.

4. In working with the Student Conduct Office at Texas A&M University regarding the information responsive to the TPIA request, it was determined that Plaintiff Brian Beckcom served as a legal representative

Page 1

of at least one student involved in the Squadron 17 hazing investigation and had a child who was a current members of the outfit. Such representation by Plaintiff indicated that he knew the identity of not only his son, but also the identities of the other students that were also members of Squadron 17. As a representative in the student conduct process, Plaintiff had knowledge of the underlying facts and the associated conduct allegations.

5. Based on the foregoing, TAMU reasonably believed in good faith that Plaintiff knows the identities of the students to whom the Squadron 17 investigation documents relate. Thus, TAMU determined within its discretion that under the terms of the Family Educational Rights and Privacy Act of 1974 (FERPA), the information requested regarding the Squadron 17 investigation was personally identifiable to specific students and could not be sufficiently de-identified by redaction to allow for production of investigation-related documents. As a result, documents were withheld pursuant to an applicable exception from disclosure under the TPIA, namely TEX. GOV'T CODE § 552.114, Confidentiality of Student Records. In this regard, documents were withheld in TAMU's initial production on or about May 8, 2024 and in a subsequent production on or about June 13, 2024.

EXECUTED on April __11__, 2025.

_Patricia Bledsoe_
Patricia Bledsoe, Director
Open Records
Office of Risk, Ethics, and Compliance
Texas A&M University

SUBSCRIBED AND SWORN BEFORE ME, on April __11__, 2025 to certify which witness my hand and official seal.



CINDY PATTERSON
Notary Public, State of Texas
Comm. Expires 07-07-2026
Notary ID 12158568

_Cindy Patterson_
Notary Public, State of Texas

**EXHIBIT**

**25**

**From:** Brian Beckcom <brian@vbattorneys.com>
**Date:** March 28, 2024 at 4:40:58 PM CDT
**To:** "Sharp, John" <chancellor@tamus.edu>

Chancellor Sharp:

I write to you as a concerned parent, former student, lawyer, and lifelong Aggie. There are major irregularities going on with an investigation into Squadron 17. My son, ██████████████████████ and 30+ of his fellow cadets, including the entire fish class minus two, have been accused of frivolous charges after an "investigation" that is not worthy of our great school.

I think my background may be pertinent, so you can understand my connection to our University and the Corps of Cadets and my deep and abiding love for our school and our Corps.

The Beckcom family has supported Texas A&M and the Corps of Cadets for the past 90 years, when my grandfather, Lt. Col / Dr. Edwin Augustus Beckcom Jr. ('38), first stepped foot on campus as a fish in Company E in 1934. "Jarrin" John Kimbraugh was a fish in my granddad's outfit. My grandad served 20 years in the Air Force, has a degree in veterinary medicine from Texas A&M, and earned a Ph.D from John Hopkins. He is a World War II veteran.

My father, Lt. Col. Edwin Augustus Beckcom III ('65), played football for Texas A&M, was in the Corps and a Ross Volunteer and on the firing squad, is a member of the Corps Hall of Honor in recognition of his lifetime commitment to the Corps of Cadets, and is one of the five-founding members of the Corps of Cadet Association. He flew 200 combat missions over Vietnam and received the Distinguished Flying Cross, the second highest honor an airman can receive, among many other honors, and he raised my brother and I as a single father after my mother died when I was 10 years old of breast cancer.

Like my dad, I am a varsity letterman from Texas A&M (basketball), and I was in the Corps of Cadets. In the Corps, I was a Ross Volunteer for two years and served on the firing squad (the biggest honor I received by far), O.R. Simpson Honor Society, was the outstanding senior Air Force Cadet, Who's Who in American Colleges and Universities, and was a columnist for the Battalion for two years. I served as Wing Commander under Tyson Voekel. After Texas A&M, I went to UT Law school, where I graduated with honors, served on the board of the Texas Law Review, and clerked for Professor Charles Alan Wright, the nation's foremost scholar in federal practice and procedure. I started my legal career at Fulbright & Jaworski under Otway Denny and other amazing Aggies before starting my own law firm 20 years ago. My wife, Cara ('98), has a finance degree from Texas A&M and a law degree from UT.

My brother, Brett Beckcom, was the guidon bearer for Squadron 17 in 1997 and was a Ross Volunteer. He works at an oil company in Houston.

My family has given 7 scholarships to Texas A&M, including a President's Endowed Scholarship, a scholarship to the School of Veterinary Medicine, and five Sul Ross Scholarships.

My oldest son,  a member of Squadron 17, and a member of the Aggie Men's Club ("AMC"). My younger son ███ ███████████████████████████████ in Houston, has been accepted to TAMU, and intends to follow in the footsteps of his brother, dad, uncle, grandad, and great grandad by joining the Corps of Cadets and Squadron 17 this coming year. Also, all three of my kids have attended the best summer camp in the country :). My daughter, ████████ ██████████████████████████ ██████████████████ and intends to follow in her brothers' and mom's footsteps by attending Texas A&M.

-----

This process is a fiasco. It is a kangaroo court. For example, my son ███ is being investigated for hazing and he was not even present at most of the events described (which are not hazing in any event). It grossly violates both procedural and substantive due process. It smacks of retaliation at best and abuse at worst. It is unworthy of our school and our state.

I also have information about other related matters that would make your stomach turn.

This investigation is being perpetrated in the dark, by people who have agendas. I have issued FOIA requests and I have proof.

I have been asked to pursue legal action if this ridiculous process is not stopped immediately. I have been a practicing trial lawyer for 25 years, I am board certified in trial law (less than 2% of lawyers in Texas hold that distinction), and I will gladly engage in this battle if it is necessary. And I will win. But this is not my preferred course of action.

I am also extremely disappointed that the adult leadership of the Corps of Cadets and the VP of Student Affairs has done nothing whatsoever to help these students. Where is the Trigon? Where is student affairs? Who is advocating for these young men? I know that the Commanding Officer, ██████████ repeatedly sought help to deal with one problematic fish, and he received no help whatsoever from the adult leadership, and in fact, the adult leadership has made his life more difficult and impeded him rather than helped him.

**I am asking you to stop this frivolous investigation**. You have the power to do that. **Please exercise that power and show these young men and their parents that this kind of witch hunt will not be tolerated at our school anymore.**

I love our school and I love the Corps. I believe in the school and our mission. I know you all feel the same. Please help these young men and their parents. No one else is doing so right now.

-bb

VBAttorneys
Lessons from Leaders Podcast
My Bio Video

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| Brian Beckcom | § | |
| | § | 85th District Court |
| v. | § | |
| | § | Brazos County, Texas |
| Texas A&M University | § | |

---

**Plaintiff's Response to Defendant's Plea to the Jurisdiction**

---

> It appears to me that you want to skip the [mandamus] process, go directly to trial, skip that, and get a dismissal. Well, I'm not about to revamp the entire judicial process just because you find yourself in the ***unique*** position of defending clients who say they didn't do it.[1]

## I. Introduction

In this proceeding, Brian Beckcom asks this Court to consider whether Texas A&M University has properly complied with his requests under the Texas Public Information Act. A Texas statute specifies that a petition for a writ of mandamus is the appropriate vehicle to do so. The University's assertion that this Court lacks "jurisdiction" to consider a remedy that the Legislature authorized is spurious.

This Court should also summarily reject the University's contention that this Court lacks "jurisdiction" simply because the University believes it has complied with the TPIA's requirements. (Indeed, if a party could challenge a court's "jurisdiction" whenever it believed itself to be wrongly accused, no court would *ever* have jurisdiction to consider the merits of *any* dispute.) Instead, this Court should deny the University's plea and proceed to consider the merits of the parties' respective arguments.

---

[1] Judge Chamberlain Haller, *My Cousin Vinny*, 20th Century Fox (1992) (emphasis orginal).

## II. Restatement of the Case

Beckcom narrowed the issues that remain before this Court in the *amended* petition that he filed on March 3, 2025.[2] Specifically, Beckcom's live pleading contends that the University violated the Texas Public Information Act by failing to provide sufficient responses to two requests, which relate to:

— The Corps of Cadets freshman-experience program (also known as the "fish brigade"), which the University has coded as Request J000762; and

— The University's investigation of Squadron 17 of the Corps of Cadets, which the University has coded as Request J001147.

Beckcom is *not* asking this Court to consider the merits of any other requests that he identified in his *original* petition at this time.

The "argument and authority" section of the University's plea to the jurisdiction addresses the second of these two requests (J001147)—but not the first (J000762). And because the University did not amend its plea to the jurisdiction after Beckcom filed his amended petition, the plea contains sections of "argument and authority" devoted to disputes that are no longer before this Court, specifically, sections I, V-D, V-E, V-F, V-G, and V-I. Accordingly, none of these sections have any relevance to the pending dispute, and this Court only needs to consider the following arguments:

— Section V-H (whether Beckcom has standing to pursue mandamus);

— Section V-A (the requirements of the TPIA, which are undisputed); and

— Sections V-B and V-C (whether the University satisfied its obligations with respect to Request J001147).

---

[2] Although Beckcom filed his amended petition in Cause No. 24-*3177*-CV-85, this Court consolidated that proceeding into this Cause on March 6, 2025.

## III. Argument for Denying the University's Plea

**A.  The Legislature specifically authorized this Court to grant mandamus relief when a government agency fails to comply with the Public Information Act.**

Although the University's arguments challenging Beckcom's standing to seek relief in this Court appear at the *end* of its plea, this Court must consider those arguments *first*.[3] At the outset of this discussion, therefore, this Court should note that 552.321 of the Texas Government Code authorizes a "requestor" of information under the Texas Public Information Act to "file suit for a writ of mandamus compelling a governmental body to make information available for public inspection if the governmental body refuses to request an attorney general's decision." The University does not—because it cannot—argue that Beckcom does not meet the Government Code's definition of a "requestor."[4] Nor does any authority cited in section IV or section V-H of University's plea make any reference to the TPIA or the remedies that it provides for parties who are dissatisfied with a governmental agency's response to a public-information request. In sum, the University is asking this Court to conclude that it has no jurisdiction, despite the undisputed existence of a statute that specifically provides it with jurisdiction. Because the University's plea seeks an absurd result, this Court should summarily reject it.

---

[3] *See Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 917 (Tex. 2020) ("Because lack of standing deprives the court of subject-matter jurisdiction," we would normally "address the issue first" before resolving the merits of the plaintiffs' claims.").

[4] Tex. Gov't Code § 552.003(6) ("'Requestor' means a person who submits a request to a governmental body for inspection or copies of public information.").

**B.** **The University's argument that this Court "lacks jurisdiction" is an impermissible effort to obtain a dismissal on the merits—without a sufficient evidentiary showing.**

Instead, the University maintains that Beckcom lacks standing in this proceeding because it believes that it has satisfied all of its obligations under the TPIA and, therefore, Beckcom either has no cognizable injury or, alternatively, his complaints are moot.[5] But, of course, denying an opposing party's allegations is not a unique strategy for a defendant in civil litigation. Indeed, if a general denial could deprive a trial court of jurisdiction to hear the merits of a dispute, *every* case would be dismissed for lack of jurisdiction.

Accordingly, the Texas Supreme Court held a quarter century ago in *Bland Independent School District v. Blue* that pleas to the jurisdiction should *not* be used to require plaintiffs "to put on their case simply to establish jurisdiction."[6] The state's high court expanded on that rule four years later in *Texas Department of Parks and Wildlife v. Miranda* when it held, "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court *cannot* grant the plea to the jurisdiction."[7] This Court should conclude that the prohibitions announced in *Blue* and *Miranda* should apply here.

As discussed above, there are two factual disputes for this Court to resolve, both of which relate to whether the evidence attached to the University's plea conclusively establishes that it satisfied its obligations under the TPIA.

— With respect to Request J000762, the evidence that the University filed reveals that its last communication with Beckcom regarding this request

---

[5] 1st Am. Plea, p. 22–23.

[6] *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

[7] *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004).

occurred on March 29, 2024, in which it stated "we are still in the process of locating and gathering records responsive to your request."[8] Beckcom's attached declaration confirms that the University has since produced *some* documents, but has withheld others.[9] Because the "argument and authority" section of the University's plea does not address this request *at all*, it has not conclusively established its compliance with the TPIA.

— With respect to Request J001147, section C of the "argument and authority" section of the University's plea claims that Beckcom "served as his son's representative in the process."[10] Not only does the University fail to explain the "process" it references, it offers no evidence in support of this argument. But even if it had, Beckcom's attached declaration denies that he has *ever* served as his son's representative in any "process" related to his request.[11]

Because both of the University's "jurisdictional" arguments are "inextricably linked to the merits" of its defenses, this Court should conclude that the University cannot obtain a dismissal in this proceeding without satisfying "a burden very similar to that of a movant for summary judgment."[12] And because the University has not "conclusively established" that it has complied with the TPIA (as required by Rule of Civil Procedure 166a(c)) nor identified "no-evidence" points that would shift the burden to Beckcom to come forward with evidence (as required by Rule 166a(i)), this Court should reject the University's argument that this Court "lacks jurisdiction" to consider the merits of the parties' respective arguments.

---

[8] 2d Supp. to Plea, p. 38; *see also* Ex. _ to Beckcom Decl., (attached).

[9] Beckcom Decl., ¶ 3 (attached).

[10] 1st Am. Plea, p. 15.

[11] Beckcom Decl., ¶ 6 (attached).

[12] *See, e.g.*, *City of San Antonio by & through City Pub. Serv. Bd. of San Antonio v. Smith*, 562 S.W.3d 75, 86 (Tex. App.—San Antonio 2018, pet. denied); *Univ. of Texas v. Poindexter*, 306 S.W.3d 798, 806 (Tex. App.—Austin 2009, no pet.).

## IV. Conclusion

Having established that genuine issues of material fact remain in dispute with respect to whether the University's responses to Beckcom's requests J001147 and J000762 satisfied the requirements of the Texas Public Information Act, this Court should deny the University's plea to the jurisdiction and provide the parties with guidance for submitting arguments and evidence to this Court for a ruling on the merits.

Respectfully submitted,

*/s/ Hunter Shurtleff*
Hunter Shurtleff
Texas Bar No. 00794629
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
(979) 446-4012
hunter@shurtlefflaw.com

Brian A. Beckcom
Texas Bar No. 24097706
1220 Augusta, Suite 240
Houston, Texas 77057
(713) 224-7800
brian@vbattorneys.com

## Certificate of Service

I certify that on April 15, 2025, I served a copy of this response brief on all counsel of record via e-filing in accordance with Texas Rule of Civil Procedure 21a and this Court's local rules.

*/s/ Brian Beckcom*
Brian Beckcom

## DECLARATION OF BRIAN BECKCOM

My name is Brian Beckcom. My date of birth is November 30, 1972. My address is 1220 Augusta Drive, Suite 240, Houston, Texas 77057. I am over 18 years of age, of sound mind, and capable of making this declaration.

1. I am the Plaintiff in the above-captioned case. I submitted the two requests that remain at issue in this case: Request J000762 and Request J001147.

2. Request J000762 relates to a proposed radical restructuring of the Corps of Cadets freshman-experience program (also known as the "fish brigade"). I submitted this request to the University on March 28, 2024.

3. As of the date of this declaration, TAMU has refused to produce *all* responsive documents to this request alleging that they are a "compilation" of DEI documents within the meaning of Education Code section 51.971. However, based on information and belief, the documents existed independently prior to SB17 and therefore do not only exist as part of the alleged compliance program.

4. Additionally, SB17 made DEI illegal in the State of Texas and established a mechanism to report violations. If public institutions can withhold DEI documents as a "compliance effort," the public could not discover or report violations.

5. Request J001147 relates to the University's investigation of Squadron 17 of the Corps of Cadets in the Spring of 2024. I submitted this request to the University on March 28, 2024.

6. TAMU claims in an affidavit that I served as a "legal" representative during these hearings. TAMU's affidavit is false. While many parents and their students wanted me to serve as their lawyer, and I requested the same from TAMU, TAMU rules prohibit students from having lawyers during administrative hearings and TAMU did not allow me to represent any students as their lawyer during the hearings. I was allowed to sit in on my son's hearings as an advisor but was prohibited from speaking or serving as his lawyer. Per TAMU rules, I was only allowed to be in the room because I was his father.

7. TAMU has produced to me almost all of the materials related to an investigation of Squadron 17 in the Fall of 2024, but has withheld almost all documents from an investigation of Squadron 17 in the Spring of 2024, now alleging FERPA protections via affidavit.

**- 2794 -**

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on this 15th day of April, 2025.


/s/ Brian Beckcom

_____

Brian Beckcom



# Kyle Hawthorne
**DISTRICT JUDGE**
**85th Judicial District**

Brazos County Courthouse
300 East 26th Street, Suite 440
Bryan, Texas 77803

(979) 361-4270
FAX: (979) 361-4276

April 24, 2025

**VIA E-MAIL:**
hunter@shurtlefflaw.com
Mr. Hunter Shurtleff

**VIA E-MAIL:**
Jason.Contreras@oag.texas.gov
Mr. Jason Contreras

Re:  **LETTER RULING – Brian Beckom v. Texas A&M University Cause # 24-003177-CV-85; 85th District Court, Brazos County, Texas**

Dear Mr. Shurtleff and Mr. Contreras:

On April 17, 2025, the court heard and considered Plaintiff's Amended Petition for Writ of Mandamus and Defendant's First Amended Plea to the Jurisdiction (along with a First, Second and Third Supplements thereto).

After consideration of the live pleadings, including Plaintiff's Response to Defendant's Plea to the Jurisdiction, the court rules as follows.

Defendant's First Amended Plea to the Jurisdiction is denied. Plaintiff's Amended Petition for Writ of Mandamus is denied.

Mr. Contreras is ordered to prepare an order for the court in compliance with the court's ruling as noted above. The order shall be submitted to the court per the local rules for signature of the court. Any conflict between this letter ruling and the judgment signed shall be controlled by the order signed. This letter ruling will be maintained in the court's file.

Sincerely,

KYLE HAWTHORNE

Received & Filed 4/28/2025 2:03 PM
Gabriel Garcia, District Clerk
Brazos County, Texas
Jeri Alexander
Envelope# - 190167410

CAUSE NO. 24-003177-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## ORDER

Came to be considered Plaintiff's First Amended Petition for Writ of Mandamus and Defendant's First Amended Plea to the Jurisdiction, along with all three supplements thereto and Plaintiff's Response to Defendant's plea.

After consideration of the afore-mentioned pleadings, the controlling law and the argument of counsel, Plaintiff's First Amended Petition for Writ of Mandamus is **DENIED** and Defendant's First Amended Plea to the Jurisdiction is **DENIED**.

Accordingly, all claims and causes of action are **DISMISSED WITH PREJUDICE** and Plaintiff is **DENIED** all requested relief.

This order is a final, appealable judgment in this cause. All other relief not expressly granted herein is denied.

SIGNED this 12 day of MAY 2025.

JUDGE KYLE HAWTHORNE

- 2797 -

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| BRIAN BECKCOM | § | |
| | § | 85th DISTRICT COURT |
| v. | § | |
| | § | BRAZOS COUNTY, TEXAS |
| TEXAS A&M UNIVERSITY | § | |

## PLAINTIFF'S REQUEST FOR
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court. Plaintiff respectfully requests this Court to issue findings of fact and conclusions of law in support of its Final Judgment dated May 12, 2025. The Texas Supreme Court has held that such requests are appropriate and necessary in statutorily authorized mandamus proceedings in trial courts. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 792 n.1 (Tex.1991). This request is timely, as it is filed within 20 days of this Court's final judgment. Tex. R. Civ. P. 4, 296. **The Court's findings and conclusions are due June 23, 2025.** Tex. R. Civ. P. 4, 297.

Respectfully submitted,

*/s/ Hunter Shurtleff*

Hunter Shurtleff
Texas Bar No. 00794629
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
(979) 446-4012
hunter@shurtlefflaw.com

Brian A. Beckcom
Texas Bar No. 24097706
1220 Augusta, Suite 240
Houston, Texas 77057
(713) 224-7800
brian@vbattorneys.com

- 1 -

## CERTIFICATE OF SERVICE

I certify that on June 2, 2025, I served a copy of this response brief on all counsel of record via e-filing in accordance with Texas Rule of Civil Procedure 21a and this Court's local rules.

*/s/ Hunter Shurtleff*
Hunter Shurtleff

CAUSE NO. 24-003177-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## DEFENDANT'S OBJECTIONS TO PLAINTIFF'S REQUEST FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Texas A&M University ("TAMU") files its Objections to Plaintiff's Request for Findings of Fact and Conclusions of Law because Plaintiff is not entitled to findings and conclusions in this case. In support, TAMU respectfully offers the following for consideration by the Court:

On April 17, 2025, a hearing was held before this Court on Plaintiff's Amended Petition for Writ of Mandamus ("Petition"), Defendant's Plea to the Jurisdiction along with all three supplements thereto and Plaintiff's Response to the Plea. On May 12, 2025, an order was issued denying Plaintiff's Petition and also denying TAMU's Plea. On June 2, 2025, Plaintiff filed a Request for Findings of Fact and Conclusions of Law.

For the reasons set forth herein, Plaintiff is not entitled to findings of fact and conclusions of law therefore this request should be denied and disregarded.

## LEGAL ARGUMENT AND AUTHORITY

This is a suit for writ of mandamus pursuant to the Texas Public Information Act (TPIA). TEX. GOV'T CODE § 552.321.

According to Rules 296 and 297 of the Texas Rules of Civil Procedure, a trial judge must prepare findings of fact in cases *tried* in the district court without a jury. See TEX. R. CIV. P. 296, 297 (emphasis added). When a trial court grants summary judgment relief, however, findings of fact are not appropriate because the summary judgment proceeding has not been "tried" within the scope of rule 296. *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 441 (Tex. 1997) (holding that findings of fact and legal conclusions are neither necessary nor proper in summary judgment proceeding); *Willms v. Americas Tire Co., Inc.*, 190 S.W.3d 796, 810 (Tex. App. - Dallas 2006, pet. denied); *Linwood v. NCNB Tex.*, 885 S.W.2d 102, 103 (Tex.1994) (holding that appellate deadlines are not extended by request for findings of fact and conclusions of law following summary judgment because they "have no place in a summary judgment proceeding").

As these cases suggest, the trial court's precise legal conclusions are neither essential nor particularly germane to the disposition of an appeal from a summary judgment because the grounds for granting summary judgment are limited to those specified in the motion, and courts of appeal review those judgments de novo. *See, e.g., Valence Operating Co. v. Dorsett*, 164 S.W.3d 656,

661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211,215 (Tex. 2003).

Here, the Court expressly denied Plaintiff's Petition by way of an Order dismissing with prejudice all claims and causes of action asserted by Plaintiff. See Order dated May 12, 2025. Accordingly, all relief requested by Plaintiff was denied. *Id.* This is tantamount to the granting of a summary judgment since the Court effectively dismissed the case because Plaintiff's TPIA claims were unmeritorious and lacked any genuine issue of material fact. See TEX. R. CIV. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 n.5 (Tex. 1979). As a result, TAMU was entitled to and, in fact, obtained a final judgment in its favor.

Moreover, nowhere in the TPIA does it authorize a bench trial much less a jury trial. In this regard, the April 17th hearing was exactly that, simply a hearing based on the pleading and the evidence. There were no opening statements, no witness examination or cross examination, no closing arguments and no verdict by the Honorable Judge. Stated another way, there was no indicia to indicate or suggest that the April 17th hearing was "tried" within the meaning of Rule 296.

Plaintiff also misrepresents the case cited in support of his request for findings and conclusions, namely *Anderson v. City of Seven Points*, 806 S.W.2d 791 (Tex. 1991). First and most obviously, *Anderson* was not a TPIA case.

Rather, it involved a suit to require a mayor to hold an election on a question abolishing the city's corporate existence. *Id.* Additionally, the *Anderson* case involved a bench trial in which witnesses testified and there was even conflicting witness testimony. *Id.* at 793. In this case, as explained above, what occurred in this case on April 17th was merely a hearing more akin to a dispositive summary judgment motion versus a "trial" within the meaning of Rule 296.

Moreover, nowhere in *Anderson*, including footnote 1 cited to by Plaintiff, can be found the broad and sweeping generalization that "The Texas Supreme Court has held that such requests (i.e., a request for findings of facts and conclusions of law) are appropriate and necessary in statutorily authorized mandamus proceedings in trial courts." See Plaintiff's Request. Plaintiff blatantly misrepresents the *Anderson* case to this Court.

## CONCLUSION

Accordingly, because findings of fact and conclusions of law are not appropriate, TAMU's objections should be sustained. Therefore, the Court should deny and disregard Plaintiff's Request for Findings of Fact and Conclusions of Law.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through E-File Texas, File and Serve Texas in compliance with TRCP 21 on June 4, 2025 to:

Hunter Shurtleff
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
Office: 409 E. 26th Street
Bryan, Texas 77803
Telephone (979) 446-4012
Fax (979) 431-0065
hunter@shurtlefflaw.com

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General

| | | |
|---|---|---|
| BRIAN BECKCOM | § | |
| | § | 85th DISTRICT COURT |
| v. | § | |
| | § | BRAZOS COUNTY, TEXAS |
| TEXAS A&M UNIVERSITY | § | |

## PLAINTIFF'S AMENDED RESPONSE TO DEFENDANT'S OBJECTION TO REQUEST FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Texas A&M University's objections to Plaintiff's request for findings of fact and conclusions of law are premised on its mistaken belief that (a) this court's denial of Plaintiff's petition for writ of mandamus was "tantamount to the granting of summary judgment;" and (b) Plaintiff's cited authorities do not support his request. Because TAMU is wrong on both counts, this Court should overrule its objection.

First, the hearing that this Court held on April 17, 2025 has no similarities to a summary-judgment proceeding, either procedurally or substantively. Here, Plaintiff filed suit for a writ of mandamus as section 552.321 of the Texas Government Code requires when "a governmental body…refuses to supply public information." In response, TAMU filed a "plea to the jurisdiction" that did not cite Texas Rule of Civil Procedure 166a, nor did it cite the summary-judgment standard of review, nor did it argue that it had "conclusively established" *anything*, nor did it argue that "there is no genuine issue as to any material fact," nor did it suggest that it was entitled to relief on "no evidence" grounds following "an adequate time for discovery." Instead, TAMU argued that this Court lacked subject-matter jurisdiction because it believed that it complied with the

Pubic Information Act and, therefore, Plaintiff lacked standing to pursue mandamus relief in this Court.

Correctly recognizing that Legislature granted Plaintiff's standing to seek this relief when it enacted section 552.321 of the Texas Government Code, this Court summarily denied TAMU's "plea to the jurisdiction." But this Court also reached its decision to deny Plaintiff's request for writ of mandamus *with prejudice* after considering the parties' arguments and evidence and the applicable law. Although Plaintiff acknowledges that this appears to be an issue of first impression, he respectfully submits that this Court's April 17, 2025 hearing was much more akin to a bench trial than to a summary-judgment proceeding.

Accordingly, Plaintiff requested findings of fact and conclusions of law to facilitate the court of appeals' review of this proceeding. For example, given that TAMU denied Plaintiff's requests for records on *multiple* bases, which one did this Court find persuasive? Were the requests too broad? Was the information protected by state or federal law? Did TAMU demonstrate that responsive documents do not exist? Moreover, what authority allows this Court to deny a suit for a writ of mandamus "with prejudice"? And what does "with prejudice" mean? If the Court's conclusion was based on the absence of existing documents, and Plaintiff learns later that responsive documents have been created, could Plaintiff seek production of them in the future? If Plaintiff files a new records request using different criteria, does the court's existing order now collaterally estop any requests for any documents that could have been the subject of the requests in *this* proceeding?

TAMU's argument that findings of fact and conclusions of law will not be helpful to the court of appeals is unpersuasive. According to TAMU:

> The trial court's precise legal conclusions are neither essential nor particularly germane to the disposition of an appeal *from a summary judgment* because the grounds for granting summary judgment are limited to those specified in the motion."

But the fact is, *none* of these questions can be answered by looking to the bases on which TAMU sought relief, because its only basis for denying Plaintiff's substantive requests for relief was based on his alleged "lack of standing," a nonsensical argument that this Court summarily dismissed. And TAMU's reliance on the Texas Supreme Court's 1979 decision in City of Houston v. Clear Creek Basin Authority, 589 S.W.2d 671, 678 n.5 (Tex. 1979)—a case where the governmental entity *moved* for summary judgment, obviously has no relevance to this issue either.

Finally, with respect to Plaintiff's reliance on *Anderson v. City of Seven Points*, 806 S.W.2d 791 (Tex. 1991) in support of his request for findings of fact and conclusions of law, Plaintiff acknowledges that it does not arise out of a Public Information Act dispute. (Of course, neither do any of the authorities on which TAMU relies.). But in *Anderson*, the Texas Supreme Court recognized that the trial court's findings of fact and conclusions of law allowed the appellate court to conduct its legal and factual sufficiency review. *Id.* at 794. And because there—as here—this Court's factual findings will be inherently tied to the determination of whether a government agency or official had discretion to act in a certain way, *Id.* at 794 n.2, this Court should reject TAMU's suggestion that Plaintiff's reliance on *Anderson* was a "blatant misrepresentation."

For these reasons, this Court should overrule TAMU's objection and issue the findings and conclusions that Plaintiff requested.

Respectfully submitted,

*/s/ Hunter Shurtleff*
Hunter Shurtleff
Texas Bar No. 00794629
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
(979) 446-4012
hunter@shurtlefflaw.com

Brian A. Beckcom
Texas Bar No. 24097706
1220 Augusta, Suite 240
Houston, Texas 77057
(713) 224-7800
brian@vbattorneys.com

## Certificate of Service

I certify that on June 6, 2025, I served a copy of this response brief on all counsel of record via e-filing in accordance with Texas Rule of Civil Procedure 21a and this Court's local rules.

*/s/ Brian Beckcom*
Brian Beckcom

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| BRIAN BECKCOM | § | |
| | § | 85th DISTRICT COURT |
| v. | § | |
| | § | BRAZOS COUNTY, TEXAS |
| TEXAS A&M UNIVERSITY | § | |

## PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Petitioner Brian Beckcom submits the following proposed findings of fact and conclusions of law in support of an order that DENIES Defendant Texas A&M University's plea to the jurisdiction.

### Findings of Fact

1. On February 26, 2024, Plaintiff Brian Beckcom sent a letter to Defendant Texas A&M University requesting documents related to plans regarding the restructuring of the Corps of Cadets.

2. In a separate correspondence also sent on February 26, 2024, but as part of the same request, Beckcom requested documents regarding TAMU's DEI initiatives, as they related to the restructuring of the Corps of Cadets.

3. In its response to Beckcom, TAMU stated that it intended to withhold and/or redact documents that were responsive to Beckcom's February 26, 2024 requests and cited section 552.101 of the Texas Government Code and section 51.971 of the Texas Education Code as authority for its withholding and/or redactions.

4.	Although TAMU produced some documents in response to Beckcom's February 26, 2024 requests, it also redacted and/or withheld documents that were responsive to Beckcom's February 26, 2024 requests.

5.	On March 28, 2024, Beckcom sent another request to TAMU for documents related to several investigations into the Corps of Cadets.

6.	In its response to Beckcom, TAMU stated that it intended to withhold and/or redact documents that were responsive to Beckcom's March 28, 2024 requests and cited the federal Family Education Rights and Privacy Act, 28 U.S.C. § 1232g and section 552.026 of the Texas Education Code as authority for its withholding and/or redactions.

7.	Although TAMU produced some documents in response to Beckcom's March 28, 2024 requestes, it also withheld and/or redacted documents that were responsive to Beckcom's March 28, 2024 requests.

8.	This is the second of three suits that Beckcom filed in this Court seeking writs of mandamus ordering TAMU to comply with his requests:

—	Beckcom nonsuited his first suit, Cause No. 23-902-CV-85

—	This Court consolidated Beckcom's third suit, Cause No. 23-3358-CV-85, into this Cause.

9.	In response to Beckcom's suits, TAMU filed a plea to the jurisdiction in which it contended that it complied with its obligations under the Texas Public Information Act and, therefore, Plaintiff lacked standing to seek relief in this Court.

10. TAMU's plea to the jurisdiction did not cite Texas Rule of Civil Procedure 166a, nor did it include the words "summary judgment" or any phrases from Rule 166a that would suggest to this Court that it was requesting a summary judgment, nor did its plea attach evidence that would be admissible in a summary-judgment proceeding.

11. Beckcom filed a response to TAMU's plea to the jurisdiction on April 15, 2025, which included a declaration from Beckcom.

12. The Court considered the parties' arguments and evidence at a hearing on April 17, 2025.

13. At the hearing, TAMU did not object to Beckcom's response as being untimely under Rule 166a.

### Conclusions of Law

1. The first section of the Texas Public Information Act provides:

Under the fundamental philosophy of the American constitutional form of representative government that adheres to the principle that government is the servant and not the master of the people, it is the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created. The provisions of this chapter shall be liberally construed to implement this policy.

Tex. Gov't Code Ann. § 552.001(a).

2. The Public Information Act requires "*an officer for public information* of a governmental body shall promptly produce public information for inspection, duplication, or both *on application by any person* to the officer." *Id.* at § 552.221(a) (emphasis added).

3. Beckcom's requests to TAMU on February 26, 2024 and March 28, 2024 are "applications" within the meaning of section 552.221(a).

4. Beckcom's applications were received by TAMU's "officer for public information" within the meaning of section 552.221(a).

5. The Public Information Act authorizes a "requestor" of information to "file suit for a writ of mandamus compelling a governmental body to make information available for public inspection if the governmental body refuses to…supply public information…." *Id.* at § 552.321.

6. Beckcom is a "requestor" of information within the meaning of section 552.321(a).

7. TAMU is a "governmental body" within the meaning of section 552.321(a).

8. TAMU refused to supply public information to Beckcom.

9. Beckcom had standing to file this suit against TAMU.

10. TAMU has failed to explain how the federal Family Education Rights and Privacy Act, 28 U.S.C. § 1232g, sections 552.101 and 552.026 of the Texas Government Code, or sections 51.971 of the Texas Education Code, support its decisions to withhold and/or redact documents in its possession, custody, or control that are responsive to Beckcom's requests.

Respectfully submitted,

/s/ *Hunter Shurtleff*
Hunter Shurtleff
Texas Bar No. 00794629
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
(979) 446-4012
hunter@shurtlefflaw.com

Brian A. Beckcom
Texas Bar No. 24097706
1220 Augusta, Suite 240
Houston, Texas 77057
(713) 224-7800
brian@vbattorneys.com

## Certificate of Service

I certify that on April 15, 2025, I served a copy of this response brief on all counsel of record via e-filing in accordance with Texas Rule of Civil Procedure 21a and this Court's local rules.

/s/ *Brian Beckcom*
Brian Beckcom

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| Brian Beckcom | § | |
| | § | 85th District Court |
| v. | § | |
| | § | Brazos County, Texas |
| Texas A&M University | § | |

## Order

Upon consideration of Defendant Texas A&M University's objections to Plaintiff Brian Beckcom's request for findings of fact and conclusions of law, as well as Plaintiff's response, this Court OVERRULES the objection.

_____

JUDGE KYLE HAWTHORNE

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| Brian Beckcom | § | |
| | § | 85th District Court |
| v. | § | |
| | § | Brazos County, Texas |
| Texas A&M University | § | |

## Order

This Court's Order dated May 12, 2025 is VACATED.

Defendant Texas A&M University's plea to the jurisdiction is DENIED.

The Clerk of this Court is ORDERED to set this proceeding for a bench trial at its next available setting.

_____
JUDGE KYLE HAWTHORNE

CAUSE NO. 24-003177-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## <u>DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBJECT TO OBJECTIONS</u>

Defendant Texas A&M University ("TAMU") respectfully submits the following Findings of Fact and Conclusions of Law as requested by the Court, subject to its Objections:

## I. FINDINGS OF FACT

1. On or about February 26, 2024, Plaintiff made a TPIA request to TAMU, including a request for DEI-related documents.

2. TAMU withheld and excepted from disclosure certain DEI-related documents in response to the February 26, 2024 request pursuant to TEX. GOV'T CODE § 552.101 and TEX. EDUC. CODE § 51.971.

3. On or about March 28, 2024, Plaintiff made another TPIA request to TAMU, including a request for documents related to a hazing investigation occurring within the TAMU Corps of Cadets.

4. TAMU withheld and excepted from disclosure certain hazing-related documents in response to the March 28, 2024 request pursuant to TEX. GOV'T CODE § 552.114.

5. At a hearing before the Court on April 17, 2025, the court considered the argument of the parties and the evidence presented in support, including TAMU's Plea to the Jurisdiction, all three supplements attached thereto, and all exhibits attached to the Plea and the three supplements.

6. Plaintiff failed to present any evidence to support his claim that TAMU has additional responsive documents to his TPIA requests, not subject to an applicable exception to disclosure that it failed to provide.

7. Plaintiff failed to present any evidence that TAMU did not conduct an adequate search of documents responsive to the TPIA requests in issue.

## II.    CONCLUSIONS OF LAW

1. Plaintiff's Original Petition for Writ of Mandamus filed on October 24, 2024 was superseded by Plaintiff's Amended Petition for Writ of Mandamus filed on March 3, 2025. TEX. R. CIV. P. 64 and 65; *Town Park Ctr., LLC v. City of Sealy*, 639 S.W.3d 170, 195 (Tex. App.— Houston [1st Dist.] 2021, no pet.) ("When an amended pleading is

filed, the amended pleading supersedes and supplants the prior pleading, which may no longer be considered.").

2. TAMU was not required to request an opinion from the Attorney General to withhold documents protected by Family Educational Rights and Privacy Act (FERPA).

3. TAMU has discretion whether to disclose information in an educational record even if disclosure is authorized by FERPA.

4. TAMU met its burden that the exceptions from disclosure applied in response to the TPIA requests in issue pursuant to TEX. GOV'T CODE § 552.101 and § 552.114, and TEX. EDUC. CODE § 51.971.

5. TAMU met its obligations under the TPIA in response to Plaintiff's requests and was in no way in violation of the TPIA.

6. Plaintiff's Amended Petition for Writ of Mandamus was denied by the trial court because it lacked merit and due to the lack of a genuine issue of any material fact.

## CONCLUSION

Accordingly, TAMU respectfully requests that the above findings of fact and conclusions of law be entered in support of the final judgment in this case.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through E-File Texas, File and Serve Texas in compliance with TRCP 21 on June 6, 2025 to:

Hunter Shurtleff
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
Office: 409 E. 26th Street
Bryan, Texas 77803
Telephone (979) 446-4012
Fax (979) 431-0065
hunter@shurtlefflaw.com

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General

CAUSE NO. 24-003177-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## <u>DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED ORDER TO VACATE FINAL JUDGMENT ORDER</u>

Defendant Texas A&M University ("TAMU") files its Objections to Plaintiff's Proposed Order to Vacate the May 12, 2025 Final Judgment Order and to set this case for a bench trial. In support of its Objections, TAMU respectfully offers the following for consideration by the Court:

TAMU objects to Plaintiff's proposed order because he filed it as a "stand-alone" order without any motion or brief in support. The reason Plaintiff submitted the proposed order in this manner is because no legal basis exists that would entitle him to any of the relief requested therein.

Moreover, in his Amended Response to Defendant's Objection to Request for Findings of Fact and Conclusions of Law (Amended Response), Plaintiff argued that "this Court's April 17, 2025 hearing was much more akin to a bench trial …." Assuming what occurred on April 17th was a bench trial as he argues, which TAMU disputes, he is now in non-sensical fashion requesting

*another* bench trial. *See* Amended Response at p. 2. He then proceeds to posit a host of irrelevant, immaterial questions in an obvious attempt to distort the issues. *Id.* By all accounts, requesting a second bench trial after taking the position that the April 17th hearing was a bench trial, is not only procedurally improper but also entirely absurd.

Plaintiff had his day in court on April 17th and he does not get a "re-do" simply because he is unhappy that TAMU prevailed.

Plaintiff's proposed order is entirely vacuous and without legal basis. Accordingly, filing this frivolous proposed order without any grounds in law whatsoever subjects Plaintiff and his counsel to sanctions pursuant to Rule 13 of the Texas Rules of Civil Procedure and Section 10.001 of the Civil Practice and Remedies Code.

## CONCLUSION

Accordingly, TAMU's objections to Plaintiff's proposed order seeking to vacate the May 12, 2025 Final Judgment Order should be SUSTAINED. Therefore, the Court should deny and disregard Plaintiff's proposed order.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General
Texas Bar No. 24032093
Jason.Contreras@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically through E-File Texas, File and Serve Texas in compliance with TRCP 21 on June 9, 2025 to:

Hunter Shurtleff
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
Office: 409 E. 26th Street
Bryan, Texas 77803
Telephone (979) 446-4012
Fax (979) 431-0065
hunter@shurtlefflaw.com

/s/ Jason T. Contreras
JASON T. CONTRERAS
Assistant Attorney General

Cause No. 24-3177-CV-85

| Brian Beckcom | § | |
| | § | 85th District Court |
| v. | § | |
| | § | Brazos County, Texas |
| Texas A&M University | § | |

## Plaintiff's Motion for New Trial

Plaintiff Brian Beckcom respectfully requests this Court to order a new trial because the Court's conclusions of law that (a) Plaintiff was not entitled to a writ of mandamus, and (b) Defendant Texas A&M University is entitled to a dismissal *with prejudice*, were contrary to law and/or against the overwhelming weight of the evidence. Tex. R. Civ. P. 320; 324.

Respectfully submitted,

*/s/ Hunter Shurtleff*
Hunter Shurtleff
Texas Bar No. 00794629
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
(979) 446-4012
hunter@shurtlefflaw.com

Brian A. Beckcom
Texas Bar No. 24097706
1220 Augusta, Suite 240
Houston, Texas 77057
(713) 224-7800
brian@vbattorneys.com

**Certificate of Service**

I certify that on June 10, 2025, I served a copy of this response brief on all counsel of record via e-filing in accordance with Texas Rule of Civil Procedure 21a and this Court's local rules.

*/s/ Brian Beckcom*
Brian Beckcom

**Received & Filed 6/5/2025 1:14 PM**
**Gabriel Garcia, District Clerk**
**Brazos County, Texas**
**Cereena Grimes**
**Envelope# - 101668037**

CAUSE NO. 24-003177-CV-85

| | | |
|---|---|---|
| BRIAN BECKOM, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | BRAZOS COUNTY, TEXAS |
| | § | |
| TEXAS A&M UNIVERSITY, | § | |
| | § | |
| *Defendant.* | § | 85TH JUDICIAL DISTRICT |

## <u>ORDER</u>

Came to be considered Defendant's Objections to Plaintiff's Request for Findings of Fact and Conclusions of Law. After consideration of the objections and the controlling law, it is **SUSTAINED**.

Accordingly, Plaintiff's Request for Findings of Fact and Conclusions of Law is **DENIED** and disregarded.

6/16/2025
SIGNED this _____ day of June 2025.

_____
JUDGE PRESIDNG

- 2828 -

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Jason Contreras
Bar No. 24032093
nicole.myette@oag.texas.gov
Envelope ID: 101668037
Filing Code Description: Proposed Order
Filing Description: Denying Plaintiff's Request for Findings of Fact and Conclusions of Law
Status as of 6/5/2025 2:45 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 6/5/2025 1:14:32 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 6/5/2025 1:14:32 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 6/5/2025 1:14:32 PM | SENT |
| Michael  Granado | | michael@vbattorneys.com | 6/5/2025 1:14:32 PM | SENT |
| Hunter Shurtleff | | hunter@shurtlefflaw.com | 6/5/2025 1:14:32 PM | SENT |

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 6/5/2025 1:14:32 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 6/5/2025 1:14:32 PM | SENT |

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| Brian Beckcom | § | |
| | § | 85th District Court |
| v. | § | |
| | § | Brazos County, Texas |
| Texas A&M University | § | |

**Plaintiff's Notice of Past-Due
Findings of Fact and Conclusions of Law**

This Court signed an order in this Cause on May 12, 2025 that serves as a final judgment because it disposed of all claims against all parties. Because all of Plaintiff's claims against all Defendant were adjudicated by the Court (as opposed to a jury trial) a request for findings of fact and conclusions of law is now timely. In a document filed June 2, 2025, Plaintiff respectfully requested this Court to issue findings of fact and conclusions of law. **The Court's findings and conclusions were due June 22, 2025.** Tex. R. Civ. P. 297. Accordingly, Plaintiff serves this notice to inform the Court that its findings and conclusions are past due. **This Court's plenary power expires on August 25, 2025.**

Respectfully submitted,

*/s/ Hunter Shurtleff*
Hunter Shurtleff
Texas Bar No. 00794629
Shurtleff Law Firm, PC
P.O. Box 9618
College Station, Texas 77842-9618
(979) 446-4012
hunter@shurtlefflaw.com

Brian A. Beckcom
Texas Bar No. 24097706
1220 Augusta, Suite 240
Houston, Texas 77057
(713) 224-7800
brian@vbattorneys.com

## Certificate of Service

I certify that on June 23, 2025, I served a copy of this response brief on all counsel of record via e-filing in accordance with Texas Rule of Civil Procedure 21a and this Court's local rules.

*/s/ Hunter Shurtleff*
Hunter Shurtleff

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| Brian Beckcom | § | |
| | § | 85th District Court |
| v. | § | |
| | § | Brazos County, Texas |
| Texas A&M University | § | |

## Designation of Reporter's Record

Plaintiff Brian Beckcom respectfully requests this Court's reporter to prepare a transcript of the proceedings in this Cause before this Court on April 17, 2025, and to send the transcript and all exhibits to the Court of Appeals of Texas, Tenth District.

Respectfully submitted,

*/s/ Matthew J. Kita*
Matthew J. Kita
Texas Bar No. 24050883
3110 Webb Avenue, Suite 150
Dallas, Texas 75205
(214) 699-1863
matt@mattkita.com

Appellate Counsel for Plaintiff

## Certificate of Service

I certify that on June 30, 2025, I served a copy of this notice on all counsel of record via e-filing in accordance with Texas Rule of Civil Procedure 21a.

/s/ Matthew J. Kita
Matthew J. Kita

**Received & Filed 6/30/2025 12:47 PM**
**Gabriel Garcia, District Clerk**
**Brazos County, Texas**
**Mikayla Ryann Watson**
**Envelope# - 102585598**

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| Brian Beckcom | § | |
| | § | 85th District Court |
| v. | § | |
| | § | Brazos County, Texas |
| Texas A&M University | § | |

## Plaintiff's Notice of Appeal

Plaintiff Brian Beckcom appeals this Court's May 12, 2025 order of dismissal to the Court of Appeals of Texas, Tenth District

Respectfully submitted,

*/s/ Matthew J. Kita*
Matthew J. Kita
Texas Bar No. 24050883
3110 Webb Avenue, Suite 150
Dallas, Texas 75205
(214) 699-1863
matt@mattkita.com

Appellate Counsel for Plaintiff

## Certificate of Service

I certify that on June 30, 2025, I served a copy of this notice on all counsel of record and this Court's reporter via e-filing in accordance with Texas Rule of Civil Procedure 21a, Texas Rule of Appellate Procedure 42.3, and section 51.017(a) of the Texas Civil Practice and Remedies Code.

*/s/ Matthew J. Kita*
Matthew J. Kita

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Matthew Kita on behalf of Matthew Kita
Bar No. 24050883
matt@mattkita.com
Envelope ID: 102585598
Filing Code Description: Notice
Filing Description: of Appeal
Status as of 6/30/2025 3:09 PM CST

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Contreras | | Jason.contreras@oag.texas.gov | 6/30/2025 12:47:37 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 6/30/2025 12:47:37 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patti Artavia | | patti@vbattorneys.com | 6/30/2025 12:47:37 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 6/30/2025 12:47:37 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 6/30/2025 12:47:37 PM | SENT |
| Matthew Kita | 24050883 | matt@mattkita.com | 6/30/2025 12:47:37 PM | SENT |
| Michael  Granado | | michael@vbattorneys.com | 6/30/2025 12:47:37 PM | SENT |
| Hunter Shurtleff | | hunter@shurtlefflaw.com | 6/30/2025 12:47:37 PM | SENT |
| Paula Frederick | | pfrederick@co.brazos.tx.us | 6/30/2025 12:47:37 PM | SENT |

**Received & Filed 6/30/2025 12:47 PM**
**Gabriel Garcia, District Clerk**
**Brazos County, Texas**
**Mikayla Ryann Watson**
**Envelope# - 102585598**

Cause No. 24-3177-CV-85

| | | |
|---|---|---|
| Brian Beckcom | § | |
| | § | 85th District Court |
| v. | § | |
| | § | Brazos County, Texas |
| Texas A&M University | § | |

## Notice of Appendix in Lieu of Clerk's Record

Plaintiff Brian Beckcom provides the Clerk of this Court with notice that he will prepare an appendix in lieu of a clerk's record for the appeal of this cause. This notice is filed within 10 days of the filing of his notice of appeal, as permitted and required by section 51.018 of the Civil Practice and Remedies Code and Texas Rule of Appellate Procedure 34.5a. Under this statute and rule, the Clerk *may not* prepare a Clerk's Record or assess a fee if an appendix is filed.

Respectfully submitted,

*/s/ Matthew J. Kita*
Matthew J. Kita
Texas Bar No. 24050883
3110 Webb Avenue, Suite 150
Dallas, Texas 75205
(214) 699-1863
matt@mattkita.com

Appellate Counsel for Plaintiff

## Certificate of Service

I certify that on June 30, 2025, I served a copy of this notice on all counsel of record via e-filing in accordance with Texas Rule of Civil Procedure 21a.

/s/ Matthew J. Kita
Matthew J. Kita

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Matthew Kita on behalf of Matthew Kita
Bar No. 24050883
matt@mattkita.com
Envelope ID: 102585598
Filing Code Description: Notice
Filing Description: of Appeal
Status as of 6/30/2025 3:09 PM CST

Associated Case Party: Texas A&M University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 6/30/2025 12:47:37 PM | SENT |
| Jason Contreras | | Jason.contreras@oag.texas.gov | 6/30/2025 12:47:37 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Patti Artavia | | patti@vbattorneys.com | 6/30/2025 12:47:37 PM | SENT |
| Brian ABeckcom | | brian@vbattorneys.com | 6/30/2025 12:47:37 PM | SENT |
| Brendan Fradkin | | brendan@vbattorneys.com | 6/30/2025 12:47:37 PM | SENT |
| Matthew Kita | 24050883 | matt@mattkita.com | 6/30/2025 12:47:37 PM | SENT |
| Michael  Granado | | michael@vbattorneys.com | 6/30/2025 12:47:37 PM | SENT |
| Hunter Shurtleff | | hunter@shurtlefflaw.com | 6/30/2025 12:47:37 PM | SENT |
| Paula Frederick | | pfrederick@co.brazos.tx.us | 6/30/2025 12:47:37 PM | SENT |

## Case Information

24-003177-CV-85 | Brian Beckcom vs. Texas A&M University

| Case Number | Court | Judicial Officer |
|---|---|---|
| 24-003177-CV-85 | 85th District Court | Hawthorne, Kyle |
| File Date | Case Type | Case Status |
| 10/24/2024 | Civil Case - Other | Dismissed |

## Party

**Plaintiff**
Beckcom, Brian

Address
1200 Augusta, Suite 240
Suite 400
Houston TX 77057

Active Attorneys ▼
Attorney
Fradkin, Brendan
Retained

Attorney
BECKCOM, BRIAN
Retained

Lead Attorney
Kita, Matthew Joseph
Retained

**Defendant**
Texas A&M University

Address
400
Bizzel St.
College Station TX 77840

Active Attorneys ▼
Lead Attorney
Contreras, Jason T.
Retained

**- 2839 -**

**- 2840 -**

## Disposition Events

05/12/2025 Judgment ▾

Judicial Officer
Hawthorne, Kyle

Judgment Type
Dismissed

## Events and Hearings

10/24/2024 Original Petition (OCA)

10/24/2024 ORIGINAL PETITION

10/28/2024 Issue Process Instructions

11/12/2024 Writ of Mandamus

11/12/2024 Issue Process Instructions

11/15/2024 CITATION ISSUED

11/19/2024 Citation ▾

Served
12/19/20248:10 AM

11/19/2024 CITATION ISSUED

12/04/2024 Citation Served

12/11/2024 SETTING REQUESTS

12/20/2024 Citation Served

12/27/2024 Original Answer

12/27/2024 OBJECTIONS

01/13/2025 Defendant's Original Answer

01/15/2025 MOTION TO CONSOLIDATE

01/15/2025 Order

01/16/2025 REQUEST

01/16/2025 CERTIFICATE OF

01/17/2025 MOTION TO COMPEL

01/17/2025 PLEA TO THE JURISDICTION

01/17/2025 EXHIBIT

01/17/2025 Proposed Order

01/17/2025 REQUEST

01/27/2025 RESPONSE TO MOTION (MISC. MOTIONS)

01/27/2025 ORDER ON MOTION TO COMPEL

02/06/2025 PLEA TO THE JURISDICTION

02/06/2025 EXHIBIT

02/06/2025 EXHIBIT

02/06/2025 Proposed Order

02/06/2025 REQUEST

02/19/2025 No Fee Documents

02/19/2025 PLEA TO THE JURISDICTION

**- 2841 -**

02/19/2025 Order

02/27/2025 NOTICE OF APPEARANCE

02/27/2025 NOTICE OF APPEARANCE

03/03/2025 AMENDED NOTICE

03/03/2025 Order

03/05/2025 Motion to Compel ▼

Judicial Officer
Hawthorne, Kyle

Hearing Time
01:30 PM

Cancel Reason
Both Parties Agree to Reset

03/05/2025 Plea to the Jurisdiction ▼

Judicial Officer
Hawthorne, Kyle

Hearing Time
01:30 PM

Cancel Reason
Both Parties Agree to Reset

03/05/2025 Petition ▼

Judicial Officer
Hawthorne, Kyle

Hearing Time
01:30 PM

Cancel Reason
Both Parties Agree to Reset

03/05/2025 RULE 11 AGREEMENT

03/06/2025 Proposed Order

03/06/2025 Proposed Order

03/06/2025 Proposed Order

03/20/2025 Docket Entry

03/21/2025 PLEA TO THE JURISDICTION

**- 2842 -**

03/21/2025 PLEA TO THE JURISDICTION

03/21/2025 PLEA TO THE JURISDICTION

03/21/2025 PLEA TO THE JURISDICTION

03/21/2025 PLEA TO THE JURISDICTION

03/21/2025 PLEA TO THE JURISDICTION

03/21/2025 PLEA TO THE JURISDICTION

03/21/2025 REQUEST

03/21/2025 PLEA TO THE JURISDICTION

04/14/2025 PLEA TO THE JURISDICTION

04/14/2025 REQUEST

04/15/2025 Plaintiff's Response

04/17/2025 Plea to the Jurisdiction ▼

Judicial Officer
Hawthorne, Kyle

Hearing Time
10:30 AM

04/17/2025 Petition ▼

Judicial Officer
Hawthorne, Kyle

Hearing Time
10:30 AM

04/24/2025 BRIEF

04/28/2025 Order

04/28/2025 Order

05/13/2025 NOTICE OF JUDGMENT AS TO RULE 306A

05/13/2025 RETENTION (DESTROY DATE)

06/02/2025 FINDINGS OF FACT AND CONCLUSION OF LAW

06/04/2025 OBJECTIONS

**- 2843 -**

06/05/2025 Proposed Order

06/06/2025 Plaintiff's Response

06/06/2025 FINDINGS OF FACT AND CONCLUSION OF LAW

06/06/2025 AMENDED ANSWER

06/06/2025 Proposed Order

06/06/2025 Proposed Order

06/06/2025 FINDINGS OF FACT AND CONCLUSION OF LAW

06/09/2025 OBJECTIONS

06/10/2025 MOTION FOR NEW TRIAL

06/17/2025 Docket Entry

06/24/2025 NOTICE

06/25/2025 OBJECTIONS

06/25/2025 Proposed Order

06/27/2025 NOTICE

06/30/2025 NOTICE OF APPEAL

06/30/2025 NOTICE

06/30/2025 DESIGNATION

06/30/2025 NOTICE OF APPEARANCE

07/02/2025 Docket Entry

07/08/2025 LETTER FROM CCA

07/25/2025 TRANSFER IN AND OUT LETTER

**- 2844 -**

# Financial

Beckcom, Brian

|  | Total Financial Assessment |  |  | $438.00 |
| Total Payments and Credits |  |  | $438.00 |

| 10/28/2024 | Transaction Assessment |  |  | $350.00 |
| 10/28/2024 | eFile Payment | Receipt # 2024-166055 | Beckcom, Brian | ($213.00) |
| 10/28/2024 | State Credit |  |  | ($137.00) |
| 10/28/2024 | Transaction Assessment |  |  | $8.00 |
| 10/28/2024 | eFile Payment | Receipt # 2024-166074 | Beckcom, Brian | ($8.00) |
| 6/10/2025 | Transaction Assessment |  |  | $80.00 |
| 6/10/2025 | eFile Payment | Receipt # 2025-169208 | Beckcom, Brian | ($35.00) |
| 6/10/2025 | State Credit |  |  | ($45.00) |

**- 2845 -**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Matthew Kita on behalf of Matthew Kita
Bar No. 24050883
matt@mattkita.com
Envelope ID: 108187276
Filing Code Description: Appendix
Filing Description: Appellant's Appendix
Status as of 11/18/2025 2:51 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Matthew J.Kita | | matt@mattkita.com | 11/18/2025 2:35:47 PM | SENT |
| Jason T.Contreras | | jason.contreras@oag.texas.gov | 11/18/2025 2:35:47 PM | SENT |